# **<u>EXHIBIT B</u>**

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 2 of 1598 PageID 13049
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 2 of 14

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket Nos. 2535, 2621, 2648** |
| | ) | |

**DEBTOR'S AMENDED REPLY IN SUPPORT OF ITS MOTION FOR ENTRY OF
AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN PROPERTY AND (II)
GRANTING RELATED RELIEF**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 3 of 1598 PageID 13050
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 3 of 14

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this amended reply (the "Reply")[2] (a) in response to the *Objection to the Debtor's Motion for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2621] (the "Objection") filed by NexPoint Advisors, L.P. ("NexPoint") and (b) in support of the *Motion of the Debtor for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2535] (the "Motion").[23] In further support of the Motion, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     Through the Motion, the Debtor seeks authority to exercise its Management Rights to cause Maple Holdings, its wholly owned subsidiary, to sell the Property to the Purchaser pursuant to the terms of the Purchase Agreement. After a thorough marketing process, the Debtor determined that the Purchaser's offer for the Property was the highest and otherwise best offer and that conducting a private sale was in the best interests of its estate. The Committee supports the Debtor's exercise of the Management Rights to cause a sale of the Property to the Purchaser – notwithstanding the competing "offer" presented by NexPoint – and no true creditor or party-in-interest has objected.

2.     Not surprisingly, the only objecting party is NexPoint, an entity owned and controlled by James Dondero. During the marketing process, the Debtor received an unsolicited offer to purchase the Property from NPRE, another entity owned and controlled by Mr. Dondero.

---

[2] The Debtor is filing this amended Reply to clarify an issue initially raised in the *Debtor's Reply in Support of Its Motion for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2648] (the "Initial Reply"). For the convenience of the Court, a redline showing the changes to the Initial Reply is attached hereto as Exhibit B.

[23] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

DOCS_NY:43784.6 36027/00243784.7 36027/002

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 4 of 1598 PageID 13051
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 4 of 14

For the reasons discussed in the Motion, the Debtor determined not to engage with NPRE with respect to the offer. The Debtor has also reviewed NexPoint's unsolicited contingent offer and has determined, for the same reasons, that it is not in the Debtor's best interests to engage with NexPoint regarding a sale of the Property.

3.    NexPoint challenges the Debtor's business judgment, claiming that the Debtor's decision not to engage with it (1) lacks a "sound business justification," (2) "blatantly shows an unjustified prejudice toward NPA supported by conclusory statements and incomplete facts," and (3) is an "abuse of discretion" and "arbitrary." Objection ¶¶ 1, 4, 6, 7. According to NexPoint, because its offer is nominally higher than the Purchaser's offer, the Debtor must agree to sell the Property to it. NexPoint is wrong.

4.    Preliminarily, and as discussed below, NexPoint – as a potential purchaser – lacks standing to object to the Motion. To the extent NexPoint asserts standing based upon its post-confirmation acquisition of certain disputed employee claims, such standing is tenuous at best and should be viewed through that lens.

5.    Even assuming NexPoint has standing, its objection to the Motion is frivolous. First, NexPoint's "offer" is contingent and subject to a ten-day "Inspection Period" at the conclusion of which NexPoint would, in its sole discretion, have the option to terminate its agreement to purchase the Property and receive $990,000 of its $1 million earnest money deposit back in full. NPA PSA, pg. 2; § 5. That is not an offer; it is a free option. Second, NexPoint's overarching argument that the Debtor may not take its prior interactions with Mr. Dondero and his related entities into account in determining whether to transact business with them is nonsensical and not supported by the case law. Actions have consequences. Mr. Dondero's repeated failure to abide by Court orders and contractual obligations to the estate, unabashed

DOCS_NY:43784.6 36027/00243784.7 36027/002

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 5 of 1598 PageID 13052
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 5 of 14

willingness to assert frivolous positions and initiate baseless lawsuits,[34] and his documented history of litigiousness[45] provide ample support for the Debtor's decision not to engage with Mr. Dondero or any of his related entities in the sale of the Property.

6.     As set forth in the Motion and as will be demonstrated in connection with the hearing on the Motion, the risks associated with selling the Property to Mr. Dondero or his related entities are not present in the transaction with the Purchaser. NexPoint's argument that both transactions are "apples to apples" ignores (a) the fact that NexPoint's offer is contingent on NexPoint's inspection of the Property and (b)(i) the closing risk, (ii) the risk of potential post-sale litigation if the Debtor transacts with Mr. Dondero, and (iii) the risk that if – for whatever reason – NexPoint does not close, the Purchaser will no longer be willing to complete the transaction, let alone on the terms negotiated. One need look no further than the years of litigation that caused the Debtor's chapter 11 filing and Mr. Dondero's conduct during the case to conclude that *any* commercial transaction with Mr. Dondero presents material risk. The Court should overrule the Objection and grant the Motion.

---

[34] In fact, in just the few weeks since the Debtor was last before this Court, Mr. Dondero has commenced two new actions against the Debtor that lack factual or legal support and that otherwise make no rational sense to pursue given Mr. Dondero's highly speculative and remote economic interest in the Debtor's estate.

*First*, on July 22, 2021, Mr. Dondero, again through his attorneys at Sbaiti & Co. ("Sbaiti"), filed an action in the Northern District of Texas using the Charitable Donor Advised Fund, L.P. (the "DAF Complaint"). *Original Complaint, The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Cause No. 3:21-cv-01710-N (N.D. Tex. July 22, 2021). The DAF Complaint alleges that the DAF is a limited partner in the Highland Multi-Strategy Credit Fund ("Multi-Strat") and asserts claims against the Debtor for mismanagement of Multi-Strat during the pendency of this Bankruptcy Case. The DAF Complaint is essentially verbatim the complaint filed in the Northern District of Texas by the Sbaiti firm on behalf of Mr. Dondero's family trust, the Dugaboy Investment Trust. As this Court will remember, that complaint was duplicative of the proof of claim (Claim No. 177) filed by Dugaboy in this Court and was withdrawn within an hour after it was brought to this Court's attention.

*Second*, also on July 22, 2021, Sbaiti, again on behalf of the DAF, initiated an action in Texas state court for pre-suit discovery against the Redeemer Committee alleging, among other things, that the Redeemer Committee's transfer of its claim was in furtherance of a scheme concocted by James P. Seery, Jr., the Debtor's Court-approved chief executive officer and chief restructuring officer, to drain the estate of resources. *Verified Petition to Take Deposition Before Suit and Seek Documents, In re James Dondero*, Cause No. DC-21-09534 (Tex. July 22, 2021).

[45] A chart showing the litigation caused, directly and indirectly, by Mr. Dondero since October 2020 is attached hereto as Exhibit A.

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 6 of 1598 PageID 13053
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 6 of 14

**THE COURT SHOULD AUTHORIZE THE DEBTOR TO EXERCISE ITS
MANAGEMENT RIGHTS TO CAUSE MAPLES TO SELL THE PROPERTY TO THE
PURCHASER**

**A.     NexPoint Lacks Standing to Object to the Motion**

7.      NexPoint filed two proofs claim in this case (Claim Nos. 104 and 108) which
were later expunged [Docket No. 1233]. NexPoint, however, holds prepetition claims against
the estate after acquiring them from five former Debtor employees (acquisitions done solely to
manufacture standing to object to the Plan).[56] The Debtor has objected to each of these claims
and believes that they are frivolous [Docket No. 2059]. A hearing on those objections is
scheduled for November 15, 2021.

8.      Consequently, NexPoint's standing to object to the Purchase Agreement as a
prepetition creditor is extremely attenuated as its chances of recovery in this case are, at best,
theoretical and speculative. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding
that a party had standing only when it had a "pecuniary interest . . . directly affected by the
bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del.
2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in
interest standing).

9.      Further, any claim made by NexPoint that it has standing to object to the sale of
the Property as a potential bidder also fails. *In re VCR I, LLC*, 2017 Bankr. LEXIS 3341, at *12
(Bankr. S.D. Miss. Sept. 29, 2017) ("This Court has previously held that a prospective purchaser
does not have standing to object to a sale motion."); *see also Squire v. Scher (In re Squire)*, 282

---

[56] One of NexPoint's "claims," acquired from Michael Beispiel, is not a claim at all. Mr. Beispiel did not file a
proof of claim nor was Mr. Beispiel's claim scheduled. Any alleged prepetition claim that Mr. Beispiel might have
had is therefore barred. *See Order Establishing Bar Dates for Filing Claims and (ii) Approving the Form and
Manner of Notice Thereof* [Docket No. 488] ("Any entity that is required to file a Proof of Claim Form but fails to
[do] so properly by the applicable Bar Date, shall not be treated as a creditor with respect to such claim for purposes
of voting upon, or receiving distributions under, any chapter 11 plan in this case.").

DOCS_NY:43784.6 36027/00243784.7 36027/002

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 7 of 1598   PageID 13054
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 7 of 14

Fed. Appx. 413, 416 (6th Cir. 2008) ("Frustrated Bidders do not have standing to object to the sale of a property"); 3 COLLIER ON BANKRUPTCY ¶363.02[c] (same).

10.    Finally, Mr. Dondero initially offered to acquire the Property through NPRE, another of his related entities.  NexPoint only submitted its "offer" after the Motion was filed. The Debtor believes that Mr. Dondero is causing NexPoint, rather than NPRE, to object because Mr. Dondero recognizes that NPRE has no standing as a prepetition creditor[67] and that NexPoint's standing arguments (although flimsy) are better.  These shell games highlight Mr. Dondero's coordination of the efforts amongst his related entities.

**B.    The Debtor's Good Faith Decision Not to Engage Mr. Dondero or His Related Entities in Connection with the Sale of the Property Was Justified and a Proper Exercise of the Debtor's Business Judgment**

11.    As discussed in the Motion, section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  As set forth in Rule 6004(f)(1), sales under 11 U.S.C. § 363(b) can be conducted by "private sale or by public auction."  Although the Bankruptcy Code does not include a statutory standard for determining when the use or sale of property should be authorized, it is well-established that a debtor may use or sell property of the estate outside the ordinary course of business if there is a good business reason for doing so and the proposed course of action is advantageous to the estate.  *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Pisces Energy*, *LLC*, 2009 Bankr. LEXIS 4709, at *18 (Bankr. S.D. Tex. Dec. 21, 2009).

12.    To challenge the Debtor's business judgment, NexPoint cites to case law for the

---

[67] NPRE filed one proof of claim (Claim No. 146), which seeks to novate a limited liability corporation agreement because NPRE believes that there was a mutual mistake in the drafting of such agreement.  The Debtor believes NPRE's claim is frivolous and has objected [Docket No. 1673].

DOCS_NY:43784.6 36027/00243784.7 36027/002

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 8 of 1598 PageID 13055
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 8 of 14

unremarkable proposition that the goal of any sale is to maximize the proceeds to the estate.[78]

Objection ¶¶ 9-10 (citing *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764 (Bankr. D. Del.

Aug. 15, 2007); *In re Walker County Hosp. Corp.*, 2021 U.S. App. LEXIS 20610 (5th Cir. July

12, 2021)).[89]  The Debtor agrees and believes that the process overseen by the Debtor for the sale

of the Property did just that:  a sale of the Property to Purchaser has maximized value.  NexPoint

cites no cases – and the Debtor believes none exist – for the proposition that the Debtor must

agree to include any party in a sale process and choose the nominally highest bid regardless of

other circumstances that exist.

13.      Under 11 U.S.C. § 363(b), a Debtor is tasked with finding the highest ***and best***

offer, not just accepting the offer that is nominally a higher dollar amount on paper.  *See, e.g.,*

*Cadle Co. v. Mims (In re Moore),* 608 F.3d 253, 263 (5th Cir. 2010)) (a trustee "must

demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court

may accept a lower bid in the presence of sound business reasons, such as substantial doubt that

the higher bidder can raise the cash necessary to complete the deal"); *In re Tresha-Mob, LLC*,

2019 Bankr. LEXIS 13333, at *4-6 (Bankr. W.D. Tex. 2019) ("Voltaire adopts a one-track

value-maximization argument that ignores the mountains of precedent in which trustees,

debtors-in-possession, and courts have rejected the highest bid when it was not the 'best

bid'");[910] COLLIER ¶ 363.02[4] ("Although a trustee normally would be expected to sell to the

---

[78] NexPoint also alleges, without factual support, that NexPoint's "participation in the sale process has resulted in incremental estate recoveries."  Objection ¶ 5.  This is not true.  Neither NPRE's nor NexPoint's "bids" were shown to any other bidder.  They were received after a deal had been reached with Purchaser and simply did not factor in to the agreed upon purchase price.

[89] Although *Walker County* has general language in *dicta* concerning 11 U.S.C. § 363(b), that case does not address the requirements of section 363(b) at all.  Instead, *Walker County* deals with whether an appeal is statutorily moot by reason of 11 U.S.C. § 363(m).

[910] In *Treshe-Mob* the bankruptcy court rejected NexPoint's premise that the highest bid is always the best bid:
    Here, the objection that Voltaire seeks to pursue is not "colorable."  In its *Limited Objection*, Voltaire adopts a one-track value-maximization argument that ignores mountains of precedent in which trustees,

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 9 of 1598   PageID 13056
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 9 of 14

highest bidder in an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale.").

14.  *In re 160 Royal Palm*, a case from the District Court for the Southern District of Florida which was affirmed by the 11th Circuit, presented a strikingly similar fact pattern to this case.  600 B.R. 119 (S.D. Fla. 2019), *aff'd* 785 Fed. App'x 829 (11th Cir. 2019).  In *160 Royal Palm*, the Debtor attempted to sell an asset at public auction.  That auction failed in substantial part because of the constant barrage of litigation brought by the property's former owner.  *Id.* at 124.  Ultimately, the Debtor entered into a private sale and sought bankruptcy court approval. The former owner objected arguing it was "an abuse of discretion to eliminate other potential bidders from the sale," which included, of course, the former owner.  *Id.* at 127.  The bankruptcy court rejected that argument, and the district court affirmed, stating "private sales are not unheard of in bankruptcy proceedings" and, in part because the offer was conditioned on a private sale, the Debtor was entitled to pursue a "bird in hand" approach and sell the asset

---

debtors-in-possession, and courts have rejected the highest bid when it was not the "best bid."  *See In re Family Christian, LLC, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015)* ("a debtor must demonstrate that the proposed purchase price is not only the highest offer, ***but the highest and best offer***") (emphasis added).  While the bid that brings in the most cash often wins, it is "common knowledge" that the "highest bid is not always the best bid," especially if there are "conditions sufficient to overbalance the difference between the two."  *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925).  The Bankruptcy Code thus affords courts "broad flexibility in determining which of several bidders should be deemed the successful bidder at a *§ 363(b)* sale."  *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993).  As such, courts routinely reject the proposition that reviewing courts or fiduciaries are "duty-bound to mechanically accept a bid with the highest dollar amount."  *Lawsky v. Condor Capital Corp.,* 2015 U.S Dist. LEXIS 96347, 2015 WL 4470332, at \*9 (S.D.N.Y. July 21, 2015) (internal quotation marks and citations omitted); *see also After Six, 154 B.R.* at 882 ("The Bankruptcy Code, like any law, must be read in its context as a tool of mankind, not a body of edicts to which mankind is a slave irrespective of its interests to the contrary.").

In determining whether the highest bid is the "best bid," the fiduciary and reviewing court must consider factors such as "the risks associated with each bid and the probabilities that the proposed terms will come to fruition" as well as "contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing." *Lawsky,* 2015 U.S. Dist. LEXIS 96347, 2015 WL 4470332, at \*9 (quoting and citing *Family Christian,* 533 B.R. at 622).

*Treshe-Mob*, 2019 Bankr. LEXIS 1333, at \*4-6 (emphasis in original).

DOCS_NY:~~43784.6 36027/002~~43784.7 36027/002

Case 19-34054-sgj11   Doc 3445-39   Filed 08/15/22   Entered 08/15/22 16:45:41   Page 36 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 10 of 1598   PageID 13057
Case 19-34054-sgj11   Doc 2656-2   Filed 08/03/21   Entered 08/03/21 12:20:51   Page 10 of
14

without competing bids.  *Id.* at 128.

15.    In so ruling, the District Court also rejected the unsolicited bid made by the former owner on the property despite that bid being higher.  The District Court found persuasive, among other things, the fact that the former owner had defaulted on a prior deal with the Debtor and his documented history of litigiousness:

> While the KKPB offer ostensibly *could* provide the estate with an additional million dollars . . . the Court credits the Debtor's concerns about the uncertainty of that offer.  Indeed, the Debtor sought a settlement and sale with KKPB once in the past, which fell through, because KKPB defaulted.
>
> Appellant vigorously argued at oral argument on April 5 that the Debtor should have accepted its higher bid.  However, the Court notes that while a debtor has a duty to "maximize the return to a bankruptcy estate," which "often does require [the] recommendation of the highest monetary bid, *overemphasis of this usual outcome overlooks a fundamental truism, i.e., a 'highest' bid is not always the 'highest and best' bid.*  The inclusion of 'best' in that conjunction is not mere surplusage." . . . .
>
> Appellant also alleges that Debtor only rejected KKPB's higher offer out of personal animus towards KKPB's owner, Mr. Straub.  The Debtor provides a number of explanations for its rejection of the KKPB offer, including, among other things, Mr. Straub's litigiousness. . . .
>
>> Among other things, Mr. Glickstein testified that the potential for about a $1 million increase in the overall sale price was not worth the risk that KK-PB, and its principal, Mr. Glenn Straub, would take action that would greatly increase the costs to the estate.  Mr. Glickstein pointed to specific experience with Mr. Straub in this very case to support [his] view that the potential increase in recovery was fair outweighed by the risk of additional litigation.  Mr. Glickstein stressed the strength of the purchaser identified in the sale motion. . . .
>
> ***
>
> On the record before this Court, the Debtor had real concerns about the viability of the KKPB offer for a variety of reasons — including the fear of additional litigation.  Though Appellant may characterize this as "animus," the avoidance of litigation is a legitimate business objective.  And, Appellant could not provide the Court with a single case where a court disallowed a sale because the debtor had concerns about future litigation.
>
> The Debtor's duty is to maximize value to the creditors, and that maximization

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 37 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 11 of 1598   PageID 13058
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 11 of
14

includes considerations such as finality, stability, and expeditious resolution of the bankruptcy proceeding.  The LR offer, although 2.5% lower than the KKPB offer, provided that finality and stability.  When asked by the Court at oral argument, Appellant could provide no other reasons why the KKPB offer constituted the highest and best offer *other than* the purported one-million-dollar additional benefit to the estate.  Thus, to force the Debtor to forego the LR offer and subject itself to a public auction would require this Court to inappropriately use its own business judgment in place of the Debtor's, which this Court will not do.

*Id.*, at 129-30 (emphasis in original).

16.     *160 Royal Palm* supports the Debtor's position in this case.  On the one hand, the Debtor has the Purchaser who represents finality and stability.  The Purchaser has conducted its diligence and, as its inspection period has expired, has no due diligence out, negotiated a purchase agreement that contemplated a private sale not subject to auction, and is ready, willing, and able to close.  NexPoint would have the Debtor renege on the commitment to the Purchaser and agree to sell the Property to NexPoint (subject to NexPoint's diligence) enter into a contingent agreement with NexPoint that could be terminated (without material consequence) in NexPoint's sole discretion.  No reasonable person would terminate an agreement with the Purchaser and enter into an "agreement" with NexPoint under these conditions.

17.     Moreover, even if the agreements were "apples to apples," NexPoint also effectively insists that the Debtor ignore its prior dealings with Mr. Dondero and his related entities and disregard their failure to live up to their prior contractual obligations and documented history of litigation, including more than twenty pending litigation matters in this case alone.  And for what purpose?  So that the Debtor's estate can theoretically receive $350,000 more in sale proceeds?  The Debtor and the Committee have decided that any theoretical upside in agreeing to sell the Property to Mr. Dondero or any of his related entities is not worth the risk.  The evidence the Debtor will submit in connection with the hearing on the

DOCS_NY:43784.6 36027/00243784.7 36027/002

APPX. 013091

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 38 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 12 of 1598    PageID 13059
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 12 of
14

Motion will unequivocally demonstrate that the Debtor's position is justified.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:~~43784.6 36027/002~~43784.7 36027/002

**APPX. 08012**

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 39 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 13 of 1598    PageID 13060
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 13 of
14

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated:  August ~~2~~3, 2021.          **PACHULSKI STANG ZIEHL & JONES LLP**
                                      Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
                                      Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
                                      John A. Morris (NY Bar No. 266326) (*pro hac vice*)
                                      Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
                                      Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
                                      10100 Santa Monica Blvd., 13th Floor
                                      Los Angeles, CA 90067
                                      Telephone: (310) 277-6910
                                      Facsimile: (310) 201-0760
                                      E-mail:    jpomerantz@pszjlaw.com
                                                 ikharasch@pszjlaw.com
                                                 jmorris@pszjlaw.com
                                                 gdemo@pszjlaw.com
                                                 hwinograd@pszjlaw.com

                                      -and-

                                      **HAYWARD PLLC**

                                      _____
                                      Melissa S. Hayward
                                      Texas Bar No. 24044908
                                      MHayward@HaywardFirm.com
                                      Zachery Z. Annable
                                      Texas Bar No. 24053075
                                      ZAnnable@HaywardFirm.com
                                      10501 N. Central Expy, Ste. 106
                                      Dallas, Texas 75231
                                      Tel: (972) 755-7100
                                      Fax: (972) 755-7110

                                      *Counsel for the Debtor and Debtor-in-Possession*

Document comparison by Workshare Compare on Tuesday, August 03, 2021
1:02:29 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/43784/6 |
| Description | DOCS_NY-#43784-v6-Highland_-_Maple_Ave_Reply |
| Document 2 ID | PowerDocs://DOCS_NY/43784/7 |
| Description | DOCS_NY-#43784-v7-Highland_-_Maple_Ave_Reply |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 32 |
| Deletions | 21 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 53 |

# EXHIBIT 40

Case 19-34054-sgj11 Doc 3445-40 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 16 of 1598   PageID 13063
Case 19-34054-sgj11 Doc 2640 Filed 07/30/21   Entered 07/30/21 21:54:57   Page 1 of 8

Docket #2640  Date Filed: 07/30/2021

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

In re:

HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]

            Debtor.

) Chapter 11
)
) Case No. 19-34054 (SGJ)
)
)
)

## CERTIFICATE OF SERVICE

I, Elliser Silla, depose and say that I am employed by Kurtzman Carson Consultants LLC ("KCC"), the claims and noticing agent for the Debtor in the above-captioned case.

On July 27, 2021, at my direction and under my supervision, employees of KCC caused the following documents to be served via Electronic Mail upon the service list attached hereto as **Exhibit A**; and via First Class Mail upon the service list attached hereto as **Exhibit B**:

- **Fifth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from January 1, 2021 Through January 31, 2021** [Docket No. 2609]

- **Sixth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from February 1, 2021 Through February 28, 2021** [Docket No. 2610]

- **Sixth Interim Fee Application of FTI Consulting, Inc. as Financial Advisor for the Official Committee of Unsecured Creditors, for Compensation and Reimbursement of Expenses for the Period from March 1, 2021 Through and Including May 31, 2021** [Docket No. 2611]

Furthermore, on July 27, 2021, at my direction and under my supervision, employees of KCC caused the following documents to be served via First Class Mail upon the service list attached hereto as **Exhibit C**:

- **Fifth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from January 1, 2021 Through January 31, 2021** [Docket No. 2609]

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210730000000000020

APPX. 08916

Case 19-34054-sgj11 Doc 3445-40 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 17 of 1598   PageID 13064
Case 19-34054-sgj11 Doc 2640 Filed 07/30/21   Entered 07/30/21 21:54:57   Page 2 of 8

- **Sixth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from February 1, 2021 Through February 28, 2021** [Docket No. 2610]

Dated: July 29, 2021

<u>/s/ Elliser Silla</u>
Elliser Silla
KCC
222 N Pacific Coast Highway, Suite 300
El Segundo, CA 90245

Case 19-34054-sgj11 Doc 2640 Filed 07/30/21   Entered 07/30/21 21:54:57   Page 3 of 8

# EXHIBIT A

Case 19-34054-sgj11 Doc 3445-40 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 19 of 1598   PageID 13066
Case 19-34054-sgj11 Doc 2640 Filed 07/30/21   Entered 07/30/21 21:54:57   Page 4 of 8

**Exhibit A**
Fee App Parties List
Served via Electronic Mail

| Description | CreditorName | CreditorNoticeName | Email |
|---|---|---|---|
| Debtor | Highland Capital Management | Attn: Thomas Surgent | TSurgent@highlandcapital.com |
| US Trustee for Northern District of TX | Office of the United States Trustee | Lisa L. Lambert, Esq | lisa.l.lambert@usdoj.gov |
| US Trustee for District of DE | Office of the United States Trustee Delaware | Jane M. Leamy | jane.m.leamy@usdoj.gov |
| Counsel for the Debtor | Pachulski Stang Ziehl & Jones LLP | Richard M. Pachulski, Jeffrey N. Pomerantz, Ira D. Kharasch, James E. O'Neill | rpachulski@pszjlaw.com; jpomerantz@pszjlaw.com; ikharasch@pszjlaw.com; joneill@pszjlaw.com |
| Counsel to Official Committee of Unsecured Creditors | Sidley Austin LLP | Matthew Clemente, Alyssa Russell, Elliot A. Bromagen | mclemente@sidley.com; alyssa.russell@sidley.com; ebromagen@sidley.com |

**APP. 10809**



Case 19-34054-sgj11 Doc 2640 Filed 07/30/21   Entered 07/30/21 21:54:57   Page 5 of 8

# EXHIBIT B

**Exhibit B**

Fee App Parties List

Served via First Class Mail

| Description | CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip |
|---|---|---|---|---|---|---|---|---|
| US Trustee for Northern District of TX | Office of the United States Trustee | Lisa L. Lambert, Esq | 1100 Commerce Street, Room 976 | Earle Cabell Federal Building | | Dallas | TX | 75242 |
| US Trustee for District of DE | Office of the United States Trustee Delaware | Jane M. Leamy | J. Caleb Boggs Federal Building | 844 King St Ste 2207 | Lockbox 35 | Wilmington | DE | 19801 |
| United States Bankruptcy Court | United States Bankruptcy Court | Honorable Stacey G. Jernigan | Northern District of Texas - Dallas Division | Earle Cabell Federal Building | 1100 Commerce St., Rm. 1254 | Dallas | TX | 75242-1496 |

Highland Capital Management, L.P.
Case No. 19-34054

Page 1 of 1

# EXHIBIT C

Case 19-34054-sgj11 Doc 3445-40 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of 9
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 23 of 1598    PageID 13070
Case 19-34054-sgj11 Doc 2640 Filed 07/30/21    Entered 07/30/21 21:54:57    Page 8 of 8

**Exhibit C**

Fee App Party List

Served via First Class Mail

| Description | CreditorName | CreditorNoticeName | Address1 | City | State | Zip |
|---|---|---|---|---|---|---|
| Counsel to Official Committee of Unsecured Creditors | Sidley Austin LLP | Matthew Clemente, Alyssa Russell, Elliot A. Bromagen | One South Dearborn Street | Chicago | IL | 60603 |

Highland Capital Management, L.P.
Case No. 19-34054

APP.10323

# EXHIBIT 41

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 25 of 1598 PageID 13072
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 1 of 10 PageID 22874

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Reorganized Debtor. | Chapter 11<br><br>Bankr. Ct. No. 19-34054-sgj-11 |
| NEXPOINT ADVISORS, L.P.,<br><br>     Appellant,<br><br>v.<br><br>PACHULSKI STANG ZIEHL & JONES LLP, WILMER CUTLER PICKERING HALE AND DORR LLP, SIDLEY AUSTIN LLP, FTI CONSULTING, INC., and TENEO CAPITAL, LLC,<br><br>     Appellees. | Civil Action No. 3:21-CV-03086-K<br><br>*consolidated with:*<br><br>Civil Action No. 3:21-CV-03088-K<br>Civil Action No. 3:21-CV-03094-K<br>Civil Action No. 3:21-CV-03096-K<br>Civil Action No. 3:21-CV-03104-K |

## APPEAL FROM THE
## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

## **MEMORANDUM OPINION AND ORDER**

Before the Court are Appellees' Joint Motion to Dismiss Appeals as Constitutionally Moot (the "Motion") (Doc. No. 14), Appellant NexPoint Advisors, L.P.'s Opposition to Appellees' Joint Motion to Dismiss Appeals as Constitutionally Moot (the "Response") (Doc. No. 24), and Appellees' Joint Reply to Appellant's

1

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 26 of 1598 PageID 13073
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 2 of 10 PageID 22875

Opposition to Motion to Dismiss Appeals as Constitutionally Moot (the "Reply") (Doc. No. 26). Having carefully considered the Motion, the Response, the Reply, the applicable briefs and appendices, and the applicable law, the Court finds Appellant lacks standing to appeal under this circuit's "person aggrieved" test, and therefore **GRANTS** Appellees' Motion.

## I.     Background

NexPoint Advisors, L.P. ("NexPoint" or "Appellant") appeals five bankruptcy court orders approving final applications for compensation of fees and reimbursement expenses of various estate professionals (collectively, the "Fee Application Orders"). On January 11, 2022, the Court consolidated these appeals into this action. Doc. No. 8. Appellees now motion this Court to dismiss these consolidated appeals as constitutionally moot. Doc. No. 14.

## II.     Legal Standard

Appellees characterize the issue as one of constitutional standing and mootness, though they cite case law and present arguments primarily about the prudential standing requirement of the "person aggrieved" test. *E.g.*, Doc. No. 14 at 9-15; Doc. No. 26 at 5-9. A court-maintained prudential requirement for standing to appeal a bankruptcy court's order, the "'person aggrieved' test is an even more exacting standard than traditional constitutional standing." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) ("To prevent unreasonable delay, courts have created an *additional* prudential standing requirement in bankruptcy cases: The appellant must be a 'person

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 27 of 1598 PageID 13074
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 3 of 10 PageID 22876

aggrieved' by the bankruptcy court's order." (quoting *In re P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))). In *Matter of Technicool Sys., Inc.*, the Fifth Circuit recently repeated the rationale for the additional standing requirement:

> . . . [D]isgruntled litigants may [not] appeal every bankruptcy court order willy-nilly. Quite the contrary. Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, quite limited.

896 F.3d 382, 385 (5th Cir. 2018). A cursory glance at the bankruptcy court's docket for this case offers an apt example of the doctrine's continued necessity. To be a "person aggrieved," appellant "must show that he was '*directly* and *adversely* affected pecuniarily by the order of the bankruptcy court . . .'" *In re Coho Energy Inc.*, 395 F.3d at 203 (emphasis added) (quoting *In re Fondiller*, 707 F.2d 441, 443 (9th Cir. 1983)).

While Appellant engages with Appellees' person aggrieved test arguments (*e.g.*, Doc. No. 24 at 6, 10-15), Appellant also urges this Court not to apply the test based on the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, which held in part that courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates." 572 U.S. 118, 128 (2014); *but see In re Alpha Nat. Res., Inc.*, 763 Fed. App'x 412 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1601 (2019) (denying *certiorari* for question of whether Article III courts may apply person aggrieved test to determine standing to appeal bankruptcy court order). But regardless of whatever impact *Lexmark* was intended to have on standing in bankruptcy appeals—

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 28 of 1598 PageID 13075
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 4 of 10 PageID 22877

if any—virtually every circuit still applies some form of the person aggrieved test. *E.g.*, John A. Peterson III & Joshua A. Esses, *The Future of Bankruptcy Appeals: Appellate Standing After Lexmark* Considered, 37 Emory Bankr. Dev. J. 285, 305-16 (2021). And, although some circuits have modified their approaches to the doctrine in the wake of *Lexmark*, that does not appear to be the case in this circuit. *Id.* at 309.

The Fifth Circuit has consistently stated, "Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing." *In re Coho Energy Inc.*, 395 F.3d at 202; *see also Matter of Technicool Sys., Inc.*, 896 F.3d at 385 ("Bankruptcy courts are not Article III creatures bound by traditional standing requirements."). Just five months ago in *Matter of Dean*, the Fifth Circuit reaffirmed its use of the person aggrieved test in determining whether a party has standing to appeal a bankruptcy court order. 18 F.4th 842, 844 (5th Cir. 2021). Thus, the Court is bound by the doctrine; Appellant has standing to appeal the Fee Application Orders only if it can demonstrate that it is "directly, adversely, and financially impacted" by them. *Matter of Technicool Sys., Inc.*, 896 F.3d at 384.

## III.   Analysis

### A. *Is Appellant a "person aggrieved?"*

#### 1. *Administrative Claim*

Appellant has a number of prepetition claims—all of which have been either expunged or withdrawn—and an administrative claim with a pending objection. *E.g.*,

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 29 of 1598 PageID 13076
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 5 of 10 PageID 22878

Doc. No. 14 at 8-9. Appellant does not offer any substantive standing arguments related to its prepetition claims, and instead focuses on its supposed appellate standing based on its administrative expense claim. *See* Doc. No. 24 at 7, 15-18. The Court will address these arguments first.

Appellant maintains that its administrative claim independently confers it standing as a creditor to appeal the Fee Application Orders. *Id.* Appellees counterargue that the Bankruptcy Code affords high priority for administrative expense claims (*e.g.*, 11 U.S.C. §§ 507(a)(2)-(3), 1129(a)(9)) that the Confirmed Plan (Bankr. Doc. No. 1943 at 113) echoes that same priority scheme, and therefore "both the Bankruptcy Code and the Debtor's plan of reorganization . . . mandate the full payment of allowed administrative claims." Doc. No. 14 at 12-14; Doc. No. 26 at 9-26. In rebuttal, Appellant argues that neither the Bankruptcy Code nor the Confirmed Plan *guarantee* payment of its administrative expense claim. Doc. No. 24 at 15-18.

In their Motion, Appellees argue:

Appellees anticipate that Appellant will argue that it is potentially financially impacted by these appeals to the extent there are insufficient funds to satisfy its asserted $14 million administrative claim. This is false. In addition to the fact that Highland has already paid 100% of the amounts owed to the professionals under the Fee Application Orders, Highland's projections filed in connection with the confirmation of the Plan projected payment of approximately 71% of the estimated $273 million of general unsecured claims, which would result in an aggregate distribution of approximately $194 million to general unsecured creditors. *See* Bankruptcy Docket No. 1875-1. Because holders of administrative claims must be fully paid prior to any distributions to unsecured creditors and all professional fee claims have already been paid, there can be no credible argument that Highland would not be able to

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 30 of 1598 PageID 13077
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 6 of 10 PageID 22879

> pay NexPoint's $14 million administrative claim (to the extent it is even allowed) given the substantial projected distribution to the junior unsecured claims.

Doc. No. 14 at 14 n.29; *see also* Doc. No. 26 at 10-11. Regardless of whether the Bankruptcy Code and/or Confirmed Plan absolutely guarantee payment of the administrative claim, Appellant fails to meaningfully rebut Appellees' argument that the chances of Appellant's administrative claim not being paid (assuming it is allowed) are extremely remote. For that reason, Appellant fails to persuasively argue that it has been directly and adversely impacted by the Fee Application Orders. As the Fifth Circuit stated in *In re Coho Energy Inc.*, "A remote possibility does not constitute injury under *Rohm's* 'person aggrieved' test." 395 F.3d at 202 (citing *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205 (5th Cir. 1994)). Accordingly, Appellant's administrative expense claim does not afford it standing to appeal the Fee Application Orders.

## 2. *Adversary Proceeding*

Appellant's main argument involves an Adversary Proceeding in which Marc. S. Kirschner—the Litigation Trustee of the Litigation Sub-Trust formed under the Confirmed Plan—allegedly "seeks to hold NexPoint liable for hundreds of millions of dollars of Highland debt, including 'in excess of $40 million in professional fees in connection with the bankruptcy.'" Bankr. Doc. No. 2934 at 39, 77, 86-88; Doc. No. 24 at 9. According to Appellant, it has standing here to appeal the Fee Application

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 31 of 1598 PageID 13078
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 7 of 10 PageID 22880

Orders because, "As a defendant in the Adversary Proceeding, NexPoint is potentially

on the hook for professional fees awarded to the Appellees." Doc. No. 24 at 12.

Appellees cite a number of cases that generally hold that "potential litigation in

another proceeding does not make an appellant a 'person aggrieved' for standing

purposes." Doc. No. 26 at 7 n.7. In this case, of course, there is no "specter of possible

litigation" as Appellant is currently a defendant in the Adversary Proceeding. But the

underlying principle—that Appellant must be "directly, adversely, and financially

impacted" by the bankruptcy court orders for standing to appeal them—remains

unchanged. *Matter of Technicool Sys., Inc.*, 896 F.3d at 384. Here, the Fee Application

Orders do not directly impact Appellant. At most, Appellant *could* be *indirectly* impacted

by the Fee Application Orders, but only if Appellant was to be found liable in the

Adversary Proceeding. Any future liability from the Adversary Proceeding is speculative

and, in this Court's opinion, not sufficient to confer standing on Appellant to appeal

the Fee Application Orders under the person aggrieved standard.

   B. *Bankruptcy Code Argument*

      Last, Appellant argues, regardless of the "person aggrieved" test, the Bankruptcy

Code specifically affords it standing to appeal the Fee Application Orders here as a

party with interests protected by the Bankruptcy Code. Doc. No. 24 at 8, 14-15, 18-

19. Cited by Appellant, §§ 330(a)(1)-(2) states:

> (a)(1) After notice to the *parties in interest* and the United States Trustee
> and a hearing, and subject to sections 326, 328, and 329, the court may
> award to a trustee, a consumer privacy ombudsman appointed under

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 32 of 1598 PageID 13079
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 8 of 10 PageID 22881

> section 332, an examiner, an ombudsman appointed under section 333,
> or a professional person employed under section 327 or 1103—
>
>> (A) reasonable compensation for actual, necessary services
>> rendered by the trustee, examiner, ombudsman, professional
>> person, or attorney and by any paraprofessional person employed
>> by any such person; and
>>
>> (B) reimbursement for actual, necessary expenses.
>
> (2) The court may, on its own motion or on the motion of the United
> States Trustee, the United States Trustee for the District or Region, the
> trustee for the estate, or any other *party in interest*, award compensation
> that is less than the amount of compensation that is requested.

11 U.S.C. §§ 330(a)(1)-(2) (emphasis added). The Bankruptcy Code does not define

"party in interest," though § 1109(b) offers a non-exhaustive list of who may be

considered a party in interest:

> A party in interest, including the debtor, the trustee, a creditors'
> committee, an equity security holders' committee, a creditor, an equity
> security holder, or an indenture trustee, *may raise and may appear and be
> heard* on any issue in a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added). Appellant maintains that it is a party in interest

as a creditor via its administrative expense claim. Doc. No. 24 at 18. Also, recognizing

that "litigant in an adversary proceeding" is not a category specifically enumerated in

§ 1109(b), Appellant argues that it separately qualifies as a party in interest because §

330 broadly refers to "parties in interest" in discussing who is entitled to notice of a

court's order granting professional fees, as well as who may motion a court to "award

compensation that is less than the amount of compensation that is requested." Doc.

No. 24 at 19. In other words, Appellant reasons that based on its potential liability for

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 33 of 1598 PageID 13080
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 9 of 10 PageID 22882

the professional fees in the Adversary Proceeding, it is a party in interest that may object to the Bankruptcy Court's Fee Application Orders per § 330, and therefore has appellate standing here to appeal those Fee Application Orders. Doc. No. 24 at 18 (". . . NexPoint qualifies as a creditor and party in interest by virtue of its request for payment of expenses of administration under 11 U.S.C. § 503(b)(1), as well as a party in interest under 11 U.S.C. § 1109(b) by virtue of its status as a defendant in the Adversary Proceeding in which the damages claim is based, in part, on the professional fees at issue in these appeals.").

The Court disagrees. Broadly conferring appellate standing to any potential party in interest to a bankruptcy court order would likely result in exactly the type of "sclerotic litigation" this circuit seeks to avoid with its additional prudential standing requirement; a party in interest cannot also necessarily be a person aggrieved. According to Collier on Bankruptcy:

> Although section 1109 speaks broadly of the right of a party in interest to raise and to appear and be heard on any issue in a chapter 11 case, the section is silent on the subject of a party's standing to take an appeal from an adverse decision, other than to expressly prohibit the Securities and Exchange Commission from taking an appeal. In general, in order for a person to be a proper party to take an appeal, one must be a "person aggrieved" by the outcome of a particular proceeding. Consistent with the basic purpose of section 1109(b), a party qualifies as a "person aggrieved" if the decision in question adversely affects the party's pecuniary interest.

7 Collier on Bankruptcy, ¶ 1109.08 (16th ed. 2022). Appellant fails to cite to any Fifth Circuit precedent suggesting that § 1109(b) confers appellate standing for parties in interest. Similarly, even if Appellant is a "party in interest" that can "appear and be

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 34 of 1598 PageID 13081
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 10 of 10 PageID 22883

heard" on its objections to the professional fees per § 330, that still does not mean that

it has appellate standing as a person aggrieved. As discussed in Section III(A)(1) above,

even a creditor with an administrative expense claim—a "party in interest" category

included in § 1109(b)—can lack appellate standing to appeal a bankruptcy court order

where it cannot demonstrate that the order directly and adversely impacts it

pecuniarily.

## IV.   Conclusion

For the reasons discussed above, Appellant lacks standing to appeal the Fee

Application Orders under the person aggrieved standard. Appellant's appeal is therefore

**DISMISSED**.

**SO ORDERED.**

Signed May 9th, 2022.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE

# EXHIBIT 42

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 7
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 36 of 1598 PageID 13083
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 1 of 6 PageID 6930

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAMES DONDERO, | § | |
| | § | |
| *Appellant,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:20-CV-03390-X |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT LP; ACIS CAPITAL | § | |
| MANAGEMENT LP; and ACIS | § | |
| CAPITAL MANAGEMENT GP LLC, | § | |
| | § | |
| *Appellees.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is appellee Highland Capital Management's (Highland) motion to dismiss this bankruptcy appeal as constitutionally moot. [Doc. No. 18.] Because the appealed bankruptcy order no longer directly, adversely, and pecuniarily affects appellant James Dondero, the Court **GRANTS** the motion to dismiss. The Court **DISMISSES** this appeal for lack of jurisdiction.

### I. Factual Background

Among the vast ashes of Highland Capital Management, we find this appeal. Highland filed for Chapter 11 bankruptcy in October 2019. Soon thereafter, appellee Acis Capital Management GP LLC (Acis) filed a proof of claim, and Highland and Acis later executed a settlement agreement. In October 2020, the bankruptcy court entered a written order approving the settlement pursuant to Bankruptcy Rule 9019 (the 9019 order). The 9019 order is the subject of this appeal.

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 7
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 37 of 1598 PageID 13084
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 2 of 6 PageID 6931

In January 2021, Highland filed the *Fifth Amended Plan of Organization of Highland Capital Management, L.P.*, and the bankruptcy court entered an order confirming the Plan in February 2021.[1] Under the terms of the Plan, a Claimant Trust and a Litigation Sub-Trust were established to receive and administer Highland's assets for the benefit of creditors. All "Estate Claims"—including, of note, all potential claims held by Highland against appellant Dondero—were transferred to the Trust.

In April 2021, Dondero filed his opening brief in this appeal of the 9019 order approving the settlement agreement between Highland and Acis. At that time, Dondero had three live proofs of claim arguably affected by the 9019 order.

Marc Kirschner is the Trustee of the Trust. In October 2021, Kirschner commenced an adversary proceeding in the bankruptcy court against Dondero (the Kirschner lawsuit). Among other things, the Kirschner lawsuit seeks a declaratory judgment that Dondero is liable for Highland's debts in his alleged capacity as Highland's alter ego. The Kirschner lawsuit specifically alleges that Dondero is liable for Highland's debts to Acis, as approved by the 9019 order.

On February 1, 2022, after the parties had completed their briefing of this appeal of the 9019 order, Dondero withdrew, and the bankruptcy court entered an

---

[1] Both parties asked the Court to take judicial notice of the existence of certain documents appearing on the dockets of related proceedings that the parties describe in their briefing on this motion. The Court grants that request, as the existence of those documents and their contents "cannot reasonably be questioned" and because doing so is necessary to determine whether this appeal is moot. *In re Halo Wireless, Inc.*, 684 F.3d 581, 597 (5th Cir. 2012); *see also In re Manges*, 29 F.3d 1034, 1041 (5th Cir. 1994) ("Thus, this court may review evidence as to subsequent events . . . which bears upon the issue of mootness.").

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 7
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 38 of 1598 PageID 13085
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 3 of 6 PageID 6932

order approving of the withdrawal, of his remaining three proofs of claim affected by the 9019 order. Two days later, appellee Highland filed the instant motion to dismiss this bankruptcy appeal, alleging that this appeal is moot because appellant Dondero now lacks standing by virtue of his withdrawal of his remaining proofs of claim.

## II. Legal Standards

It is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution. While "[t]he 'case or controversy' limitation of Article III dictates that the alleged harm is fairly traceable to the act complained of," the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.[2] To have standing to appeal a bankruptcy order, the appellant must be a "person aggrieved."[3] A person aggrieved is someone who is "directly, adversely, and financially impacted" by the "exact order being appealed."[4] Being directly, adversely, and financially impacted by "the proceedings more generally" won't cut it.[5] "Appellants cannot demonstrate bankruptcy standing when the court order to which they are objecting does not directly affect their wallets."[6]

Standing must exist not only at the inception of the litigation but must also continue throughout litigation.[7] When at least one of the adverse parties to a suit

---

[2] *In re Coho Energy Inc.*, 395 F.3d 198, 202–03 (5th Cir. 2004) (cleaned up).

[3] *Id.* at 202 (cleaned up).

[4] *Matter of Dean*, 18 F.4th 842, 844 (5th Cir. 2021).

[5] *Id.*

[6] *Id.*

[7] *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (cleaned up).

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 7
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 39 of 1598    PageID 13086
Case 3:20-cv-03390-X    Document 25    Filed 03/18/22    Page 4 of 6    PageID 6933

loses standing, the case becomes moot.[8]  And when a case becomes moot, a court loses its "constitutional jurisdiction to resolve the issues [the case] presents."[9]

### III.    Analysis

This appeal's procedural history is labyrinthine, but the parties' arguments are not.  Highland contends that Dondero has lost standing to maintain this appeal of the 9019 order.  Although no one disputes that Dondero had standing when he filed his opening brief, Highland argues that he lost it on February 1, 2021, when he withdrew his remaining proofs of claim.

In response, Dondero concedes that he no longer has any proofs of claim but argues that his being a defendant in the Kirschner lawsuit provides him standing to continue pursuing this appeal.  As Dondero explains, the Kirschner lawsuit "seeks to hold [him] directly liable for the amounts awarded under the 9019 Order," including the debts to Acis.  Because he could ultimately lose in the Kirschner lawsuit, Dondero argues that "his risk in the litigation and potential liability to [Highland] will be materially reduced to the tune of millions of dollars" if the 9019 order is overturned. Dondero also notes that he has already "been required to retain counsel to defend himself against the Kirschner Lawsuit and will be required to defend against the allegations regarding the millions awarded to Acis . . . under the 9019 Order."

---

[8] *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999).

[9] *Id.*

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 7
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 40 of 1598 PageID 13087
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 5 of 6 PageID 6934

Dondero stresses that the "key question" for the Court is to consider Dondero's "interest" in the outcome of this appeal.[10]

Under Fifth Circuit precedent, the bankruptcy order at issue in this appeal no longer "directly, adversely, and financially impact[s]" Dondero.[11] Simply put, by withdrawing all of his remaining claims against Highland, Dondero is no longer a "person aggrieved" by the order. The order no longer directly affects Dondero because even a reversal of the order would put no money back in Dondero's pocket—because, again, he withdrew all of his claims.[12]

And Dondero does not dispute that reality. Instead, his argument, boiled down, is that he has standing because of the indirect, speculative connection between the Kirschner lawsuit and the debts determined by the order. But the Fifth Circuit has repeatedly stressed that speculative, indirect harm is not enough: "Th[e] speculative prospect of harm is far from a direct, adverse, pecuniary hit."[13] From another Fifth Circuit opinion: "A remote possibility does not constitute injury under [the] 'person aggrieved' test."[14] In another Fifth Circuit opinion, the "Court denied

---

[10] Doc. No. 22 at 11 ("The key question for this Court to consider is whether Mr. Dondero is pecuniarily interested in the outcome of this appeal."); *see also id.* at 5 ("Mr. Dondero [is] financially interested in every single claim and every single dollar that is incurred or spent by [Highland's] estate."); *id.* at 6 ("Mr. Dondero [is] financially interested in the reasonableness and propriety of the settlement approved under 9019 Order.").

[11] *Matter of Technicool Sys., Inc.*, 896 F.3d 382, 384 (5th Cir. 2018) (cleaned up).

[12] *See id.* at 386 ("The order must burden [the appellant's] pocket before he burdens a docket.").

[13] *Id.*

[14] *In re Coho Energy, Inc.*, 395 F.3d at 203.

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 7
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 41 of 1598 PageID 13088
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 6 of 6 PageID 6935

standing because the debtor was not a claimant to the fund and, as such, was only indirectly affected by the order establishing priority."[15]

The Court does not deny that Dondero has an interest in the outcome of this appeal, or even a direct interest and effect caused by the "proceedings more generally."[16]  For example, Dondero notes that he has already taken a direct financial hit by having to defend against the Kirschner lawsuit.  But, again, the Fifth Circuit's bankruptcy-standing test requires a direct, adverse, and pecuniary effect (not interest) tied to the specific order being appealed (not to the proceedings generally).[17]

Dondero is no longer a person aggrieved by the bankruptcy order at issue in this appeal.  Accordingly, the appeal is moot.

### IV.    Conclusion

The Court finds this appeal moot and **DISMISSES** it for lack of jurisdiction.

**IT IS SO ORDERED** this 18th day of March, 2022.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[15] *Id.* (describing the holding in *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 212 (5th Cir. 1994)).

[16] *Matter of Dean*, 18 F.4th at 844.

[17] *Id.*; *see also Technicool*, 896 F.3d at 385.

# EXHIBIT 43

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 43 of 1598   PageID 13090

Case 3:21-cv-01895-D   Document 44   Filed 01/28/22   Page 1 of 8   PageID 4635

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., et al., | § § § § § | |
| Appellants, | § § | Civil Action No. 3:21-CV-1895-D (Bank. Ct. No. 19-34054-sgj-11) |
| VS. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § | |
| Appellee. | § | |

APPEAL FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

FITZWATER, Senior Judge:

Three creditors of a reorganized chapter 11 debtor appeal a bankruptcy court order approving the debtor's motion for entry of an order authorizing the creation of an indemnity subtrust and entry into an indemnity trust agreement and granting related relief (the "Order"). The appellee-debtor moves to dismiss the appeal as equitably and constitutionally moot and challenges appellants' standing. Concluding that two of the three appellants lack standing and that the Order is not a plan modification—meaning that the bankruptcy court was not required to comply with 11 U.S.C. § 1127(b) in approving the Order—the court DISMISSES

the appeal in part and AFFIRMS the bankruptcy court's Order.[1]

<div align="center">I</div>

The court turns first to the question whether appellants have standing. Appellants are NexPoint Advisors, L.P. ("NexPoint"), Highland Capital Management Fund Advisors. L.P. ("HCMFA"), and The Dugaboy Investment Trust ("Dugaboy"). Although the parties frame this issue as one of constitutional standing and mootness, they cite case law and present arguments about the prudential standing requirement embodied in the "person aggrieved" test. *See In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) ("To prevent unreasonable delay, courts have created an *additional* prudential standing requirement in bankruptcy cases: The appellant must be a 'person aggrieved' by the bankruptcy court's order." (emphasis in original) (quoting *In re P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))); *In re Acis Capital Mgmt., L.P.*, 604 B.R. 484, 508 (N.D. Tex. 2019) (Fitzwater, J.) ("[T]he person aggrieved doctrine is itself a creature of prudential standing."), *dism'd in part*, 850 Fed. Appx. 300 (5th Cir. 2021), and *aff'd in part and dism'd in part*, 850 Fed. Appx. 302 (5th Cir. 2021).[2]

---

[1] Under § 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this appeal, and not for publication in an official reporter, and should be understood accordingly.

[2] The court has an independent obligation to consider constitutional standing before reaching its prudential aspects. *See Harold H. Huggins Realty, Inc. v. FNC, Inc*., 634 F.3d 787, 795 n.2 (5th Cir. 2011). "[T]he plaintiffs must allege an injury in fact that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable ruling." *Id.*

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 9
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 45 of 1598    PageID 13092
Case 3:21-cv-01895-D    Document 44    Filed 01/28/22    Page 3 of 8    PageID 4637

Applying the prudential "person aggrieved" test, the court holds that HCMFA lacks standing.    HCMFA only has administrative claims.    Appellants concede that these administrative claims will be paid under any circumstances.  *See* Appellant Obj. to Mot. to Dis. Appeal 5 ("[U]nder the Plan, administrative claims are paid in full.").[3]    Accordingly, HCMFA lacks standing.  *See In re Coho Energy Inc*., 395 F.3d at 203; *In re Technicool Sys., Inc*., 896 F.3d 382, 386 (5th Cir. 2018).

NexPoint has standing because of the "Covitz claim."[4]    Although this claim was disallowed by a recent bankruptcy order, *see* Appellee Reply App. in Support of Mot. to Dis. Appeal 3 ("The [Covitz] Claim is DISALLOWED with prejudice and expunged in its entirety." (bold font omitted)), the order is not final, *see In re Linn Energy*, *L.L.C.*, 927 F.3d 862, 866 (5th Cir. 2019) (describing final bankruptcy orders as "orders that are affirmed upon direct review, or, as in this case, not appealed or contested.").    Accordingly, NexPoint's

_____

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Dugaboy and HCMFA lack constitutional standing because they have not identified any injury fairly traceable to the Order: the injuries identified are speculative at best and nonexistent at worst.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (holding that despite "reasonable likelihood" of injury, "respondents' theory of future injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'").  Alternatively, for the reasons discussed above, they lack prudential standing.  NexPoint has constitutional standing, however, based on the Covitz claim.

[3]The estimated amount for distributions is $181,879,000.  *See* R. 1244.  And the administrative expenses total only $1,078,000.  *Id.*  Accordingly, even if $25 million is removed from the Claimant Trust, there will still be sufficient funds to pay NexPoint's and HCMFA's administrative claims.

[4]The parties dispute whether NexPoint owns this claim.  Appellants have proved that NexPoint owned this claim beginning on March 24, 2021.  Appellant Obj. App. in Support of Obj. to Mot. to Dis. Appeal 13-17.

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 9
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 46 of 1598 PageID 13093
Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 4 of 8 PageID 4638

Covitz claim has not been extinguished by final order, *see United States v. Stone*, 435 Fed.

Appx. 320, 321-22 (5th Cir. 2011) (per curiam) (holding that interest in property became

extinguished when order became final), and the claim remains as a basis to confer standing

on NexPoint to press this appeal, *see In re JFK Capital Holdings, L.L.C.*, 880 F.3d 747, 751

(5th Cir. 2018).[5]

Dugaboy lacks standing. It has a contingent interest that will only be paid if all other

creditors are paid in full. R. 434, 520, 1244 (providing that limited partnership interests,

which are included in Class 10 and 11 of classified claims and equity interests, expect "no

distribution."). Dugaboy's expected return is therefore $0 both before and after entry of the

Order.[6] Accordingly, it lacks standing. *See In re Coho Energy Inc.*, 395 F.3d at 203; *In re*

---

[5]Assuming *arguendo* that NexPoint lacks prudential standing, the outcome of this appeal is effectively the same: the bankruptcy court's Order remains undisturbed either because no appellant has standing or because, despite NexPoint's standing, the Order is affirmed on the merits.

[6]Appellants cannot rely on the possibility that the Litigation Sub-Trust *might* secure sufficient funds to pay contingent interests. This is speculative at best; Dugaboy will suffer an injury if and only if the Litigation Sub-Trust obtains a future windfall. *See* R. 2279-80 ("Theoretically, there's a circumstance, and that is if every other creditor in the case were to be paid in full . . . theoretically the junior interest holders could receive distributions. However, based upon our projections, that would be wholly dependent on a significant recovery in the Litigation -- by the Litigation Trustee."); *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc*., 32 F.3d 205, 211 (5th Cir. 1994) (addressing constitutional standing and holding that "Ortiz has failed utterly to demonstrate that any action by the IRS against company officers is a real or immediate likelihood or how such an action would adversely affect the company in the least"); *In re Acis Capital Mgmt.*, 604 B.R. at 510 (addressing prudential standing and holding that "although the orders for relief created the possibility that Neutra might suffer harm in the future, Neutra was not aggrieved by them for standing purposes because '[the] speculative prospect of harm is far from a direct, adverse, pecuniary hit'" (quoting *In re Technicool Sys.*, 896 F.3d at 386)).

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 9
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 47 of 1598 PageID 13094
Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 5 of 8 PageID 4639

*Technicool Sys.*, 896 F.3d at 386.[7]

Because HCMFA and Dugaboy lack standing, their appeals are dismissed.

## II

Turning to the merits, the parties agree that this appeal turns on whether the Order is a plan modification. If it is, the bankruptcy court erred by failing to comply with 11 U.S.C. § 1127(b). But if it is not, the bankruptcy court did not err because it complied with 11 U.S.C. § 363(b). This court applies a *de novo* standard of review when deciding whether the bankruptcy court's order is a plan modification. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).

A plan modification occurs when a proposed action "alter[s] the parties' rights, obligations, and expectations under the plan." *In re U.S. Brass Corp.*, 301 F.3d 296, 309 (5th Cir. 2002). In *U.S. Brass Corp.* the bankruptcy court denied a motion that would have replaced a term of the plan (requiring litigation) with another term (requiring arbitration), because it constituted a plan modification. *Id.* at 302. The Fifth Circuit affirmed, holding that "[t]o substitute arbitration for litigation at this point would alter the bargain the Insurers secured in exchange for their approval of the plan—in violation of § 1127(b)." *Id.* at 308.

The instant Order, however, does not alter the parties' "rights, obligations, and expectations under the plan." The first change appellants point to is that the plan created and

---

[7]Appellants' alternate theories of standing—including creating a counter-factual causal chain linking the Order to the confirmation plan—are too speculative to support standing.

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 9
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 48 of 1598 PageID 13095

Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 6 of 8 PageID 4640

contemplated two trusts, while the Order authorizes the creation of a third. But this is a complaint of form over substance. The plan authorizes the creation of reserves from which to satisfy indemnity claims. As such, the Indemnify Sub-Trust, which as an economic mechanism functions as a reserve for payment of indemnity claims, is likely at least "specifically contemplated" by the plan. *See id*. at 308.

Next, appellants complain that, because the plan contemplates D&O insurance (as a waivable condition) for payment of indemnification claims, the Order (creating an Indemnity Sub-Trust to pay indemnification claims) violates the spirit of the plan. But the insurance condition is waivable, and the payment of indemnification via a reserve is "specifically contemplated" by the plan. *See id.*

Appellants also challenge the movement of funds from the Claimant Trust to the Indemnity Sub-Trust. The plan provides, however, that the Claimant Trust may take money otherwise earmarked for creditors and set up a reserve. This movement of funds under the Order therefore does not violate the creditors' expectations of what will occur under the plan—indeed, it is specifically contemplated by the Plan. *See id.*

Finally, appellants contend that the Order alters the terms of the confirmed plan because it obligates the Claimant Trust to indemnify more parties; under the Order, the Claimant Trust transfers its assets to the Indemnity Sub-Trust, which are then used to pay indemnity claims for the Litigation Sub-Trust and reorganized debtor's indemnified parties.[8]

---

[8]Appellants' argument is not that more parties are being indemnified—they appear to concede this point in their reply brief. Appellants Reply Br. 7 ("It is true, however, that the

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of 9
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 49 of 1598 PageID 13096
Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 7 of 8 PageID 4641

It should be noted at the outset that the Indemnity Sub-Trust is only a fallback source of funding if the Claimant Trust, Litigation Sub-Trust, and reorganized debtor cannot meet their indemnification obligations. Further, if funding is needed from the Indemnity Sub-Trust, the deposits in the Sub-Trust are intended "to satisfy the obligations of the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor, each of which will be jointly and severally liable under" the note for the deposits. Appellee App. in Support of Mot. to Dis. Appeal 254. Indeed, the terms state that "such deposits are intended to ensure proper allocation of the respective assets of the Claimant Trust, the Litigation Sub-Trust and the Reorganized Debtor." *Id.* In other words, although the Claimant Trust is depositing the money, the Litigation Sub-Trust and the reorganized debtor remain legally obligated for their portions of indemnified parties: nothing has changed.[9]

*     *     *

Because two of the three appellants lack standing, the appeal is DISMISSED in part. Because the Order is not a plan modification and the bankruptcy court complied with 11 U.S.C. § 363(b), the bankruptcy court's July 21, 2021 order approving the debtor's motion for entry of an order (I) authorizing the (A) creation of an indemnity subtrust and (B) entry

---

foregoing persons were entitled to indemnification under the Plan Implementation Documents . . . ."). Their argument is that the Claimant Trust is obligating itself to indemnify more parties.

[9]Because the court concludes that the Order did not modify the confirmed plan, it does not reach appellee's argument that this appeal is equitably moot. *See In re Blast Energy Servs., Inc.*, 593 F.3d 418, 424 (5th Cir. 2010) ("Unlike Article III mootness, equitable mootness is prudential, not jurisdictional.").

into an indemnity trust agreement and (II) granting related relief is AFFIRMED.

AFFIRMED in part; DISMISSED in part.

# EXHIBIT 44

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., et al., | § § § | Civil Action No. 3:21-CV-1895-D |
| Appellants, | § § | (Bank. Ct. No. 19-34054-sgj-11) |
| VS. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Appellee. | § § | |

APPEAL FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

**JUDGMENT**

This appeal came on for consideration on the briefs, with oral argument. For the reasons

stated in the court's opinion filed today, this appeal is DISMISSED in part, and the bankruptcy

court's July 21, 2021 Order Approving Debtor's Motion for Entry of an Order (I) Authorizing the

(A) Creation of an Indemnity Subtrust and (B) Entry into an Indemnity Trust Agreement and (II)

Granting Related Relief is AFFIRMED.

All pending motions filed in this appeal are terminated.

Case 19-34054-sgj11 Doc 3445-44 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 3
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 53 of 1598   PageID 13100
Case 3:21-cv-01895-D   Document 45   Filed 01/28/22   Page 2 of 2   PageID 4644

Costs of this appeal are taxed against appellants pursuant to Fed. R. Bankr. P. 8021(a)(1) or

(a)(2).

Entered:  January 28, 2022.


KAREN MITCHELL
Clerk of Court


By: P. Esquivel

APPX. 08343

# EXHIBIT 45

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 55 of 1598    PageID 13102
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20    Entered 11/19/20 18:48:06    Page 1 of 13

Docket #1439  Date Filed: 11/19/2020

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054** |
| **L.P.,** | § | |
| | § | |
| Debtor. | § | **Chapter 11** |

### JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS <u>OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS</u>

James Dondero ("<u>Movant</u>"), a creditor, indirect equity security holder, and party in interest

in the above-captioned bankruptcy case, pursuant to sections 1108, 363, and 105(a) of title 11 of

the United States Code (the "<u>Bankruptcy Code</u>"), hereby files this *Motion for Entry of an Order*

*Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary*

*Course of Business* (the "<u>Motion</u>"). In support thereof, Movant respectfully represents as follows:

### I.    <u>SUMMARY OF ARGUMENT</u>

1.    Since the Court's approval of the Debtor's settlement with the Committee in

January 2020, the Debtor has been operating under certain protocols governing its operations.

Under these protocols (the "<u>Protocols</u>") the Debtor has sold a number of significant assets

1934054201119000000000012

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 56 of 1598    PageID 13103
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20    Entered 11/19/20 18:48:06    Page 2 of 13

providing notice only to the Committee. The Debtor, under these Protocols, has been selling significant assets of value to the estate outside the ordinary course of business without giving creditors, equity holders, parties in interest, and the U.S. trustee notice and opportunity to be heard. Doing so is inconsistent with the spirit, if not the letter, of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2.      Until confirmation of a plan that provides otherwise, the sale of assets of the Debtor or its wholly-owned or controlled subsidiaries should occur only after notice and an opportunity for a hearing. While the Protocols may arguably have excused the Debtor from the Bankruptcy Code's requirement that transactions outside the ordinary course be subject to notice and a hearing, there is ample justification for the Court to require them for future transactions. Transparency is a key concept in chapter 11 under the Bankruptcy Code and Bankruptcy Rules, and notice and an opportunity for a hearing before a trustee or debtor in possession acts outside the ordinary course of business is essential to that transparency.

3.      Clearly, the sale of a substantial asset owned by a subsidiary of the Debtor is outside the ordinary course of a debtor's business and Bankruptcy Code § 363(b) requires notice and an opportunity for hearing before such an act. Indeed, requiring notice and an opportunity for a hearing increases transparency and provides disclosure to creditors and other parties in interest. Moreover, requiring notice and a hearing often results in competitive bidding, increasing the value received for the asset by the Debtor's estate.

4.      For these reasons, the Court should require that, at least until confirmation of a plan, transactions outside the ordinary course, including the disposition of assets held by Debtor's wholly-owned or controlled subsidiaries, only occur after notice and hearing.

---

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                                    PAGE 2

APPX. 108346

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 57 of 1598    PageID 13104
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20    Entered 11/19/20 18:48:06    Page 3 of 13

## II.    **BACKGROUND**

5.        On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S.

Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

6.        On October 29, 2019, the Official Committee of Unsecured Creditors (the

"Committee") was appointed by the U.S. trustee in Delaware.

7.        On December 4, 2019, the Delaware Court entered an order transferring venue of

the Debtor's Bankruptcy Case to this Court [Docket No. 186].

8.        On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for

Approval of Settlement with the Official Committee of Unsecured Creditors Regarding

Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No.

281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020

[Docket No. 339] (the "Settlement Order").

9.        In connection with the Settlement Order, an independent board of directors was

appointed on January 9, 2020, for the Debtor's general partner, Strand Advisors, Inc. (the

"Independent Board").  The members of the Independent Board are James P. Seery, Jr., John S.

Dubel, and Russell F. Nelms. Mr. Seery was later retained as the Debtor's Chief Executive Officer.

10.        The Settlement Order also approved the Protocols governing the "Debtor's

operation in the ordinary course of business."[1]

11.        Among other things, the Protocols provide that, for transactions involving the assets

held directly on the Debtor's balance sheet or the balance sheet of a wholly-owned subsidiary, the

---

[1] Term Sheet, Docket No. 354-1, p. 5.

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                                PAGE 3

APPX. 10355

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 5 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 58 of 1598  PageID 13105
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20  Entered 11/19/20 18:48:06  Page 4 of 13

Debtor may (i) undertake Ordinary Course Transactions[2] without Court approval; and (ii) with respect to third party transactions in excess of $2,000,000, proceed so long as it receives no objection from the Committee after having provided three business days advance notice.[3]

12.    While the Settlement Motion and the underlying Term Sheet appear to state that the Protocols govern the Debtor's operations in the ordinary course of business, the terms of the Protocols seemingly provide the Debtor with authority to conduct transactions outside the ordinary course of business without notice and hearing so long as the Committee (but only the Committee) does not object and the transactions are not with any Related Entity.

13.    Pursuant to the authority arguably granted under the Protocols, the Debtor has conducted a number of substantial asset sales outside the ordinary course of business without notice other than to the Committee. Among these are the sale of certain assets held by Highland Multi Strategy Credit Fund, L.P. and Highland Restoration Capital Partners. Most recently, the Debtor, through its wholly-owned subsidiary Trussway, conducted a transaction in which it, on information and belief, sold a Trussway division, d/b/a SSP Holdings, for $50,000,000, netting proceeds to the Debtor's estate of $10,000,000. On information and belief, this transaction has already closed.

14.    It is Movant's belief that there was no arm's length competitive process undertaken with respect to this sale. As a result, though certain metrics of SSP had improved materially since it was acquired in 2014, the price to be paid was markedly less than might have been produced through competitive bidding.

15.    It is unclear whether the Court or other parties contemplated that the Debtor would

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet and incorporated Protocols.
[3] See Amended Operating Protocols, Docket No. 466-1, p. 4.

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                                    PAGE 4

APPX. 013458

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 59 of 1598 PageID 13106
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 5 of 13

dispose of such significant assets without an opportunity for this Court to review the transactions to ensure that they satisfy the requirements of section 363(b) and for creditors and parties in interest to be heard.

16.     This is significant in part because, in early October, Movant submitted a proposal to the Debtor and the Committee for a consensual "Pot Plan," which would include a substantial infusion of cash and notes by the Movant for the benefit of creditors and would continue the Debtor's business in its current form, rather than the liquidating of the company under the pending Third Amended Plan (Movant had previously made proposals that were rejected). Movant and the Debtor have engaged in discussions and exchanged term sheets regarding the terms of a Pot Plan, but no agreement has yet been reached. The Movant has also reached out to Committee counsel and members of the Committee, but has not received any definitive response to his proposal. If the Debtor continues to sell significant assets (at what Movant believes to be less than fair value), the amount to be contributed by Movant under such a plan—and even the recoveries to be received under Debtor's Third Amended Plan—may be significantly reduced, which will ultimately lower the recovery to creditors.

17.     The Term Sheet governing the Protocols provides the Protocols may be modified either with consent of the Committee or by order of this Court.[4]

### III.     RELIEF REQUESTED AND BASIS FOR RELIEF

18.     By this Motion, pursuant to sections 1108, 363, and 105(a) of the Bankruptcy Code, Movant respectfully requests that the Court enter an order modifying the Protocols and requiring that, at least until confirmation of a plan, all transactions outside the ordinary course of business, including the disposition of substantial assets held by Debtor's wholly-owned or controlled

---

[4] *See* Term Sheet, Docket No. 354-1, p. 5.

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                    PAGE 5

APPX. 13349

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 60 of 1598   PageID 13107
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20    Entered 11/19/20 18:48:06    Page 6 of 13

subsidiaries, only occur after notice and an opportunity for hearing.

19.    Section 1108 of the Bankruptcy Code provides authorization for the debtor in possession to operate the debtor's business unless the court, on a request of a party in interest and after notice and a hearing, limits that authority. 11 U.S.C. § 1108.

20.    Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. To sell property under section 363(b), the Trustee must demonstrate a legitimate business justification for the proposed transaction. *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel*), 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). "In determining whether a good business reason exists to grant a motion to approve a sale pursuant to section 363(b), a court should consider all of the salient factors pertaining to the proceeding and act to further the diverse interests of the debtor, creditors, and equity holders." *In re GSC, Inc.*, 453 B.R. 132, 155 (Bankr. S.D.N.Y. 2011) (internal quotations omitted).

21.    Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) "authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code." *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116 (5th Cir. 1995).

**A. The Court should require notice and hearing for all transactions occurring outside the ordinary course of business as required under section 363(b)**

22.    The Court should require that the sale of assets of the Debtor directly or through its wholly-owned subsidiaries be subject to notice and a hearing. While the Protocols may arguably have given the Debtor authority to sidestep the Bankruptcy Code's requirement that transactions

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                                PAGE 6

APPX. 00050

Case 19-34054-sgj11  Doc 3445-45  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 61 of 1598  PageID 13108
Case 19-34054-sgj11  Doc 1439  Filed 11/19/20    Entered 11/19/20 18:48:06    Page 7 of 13

outside the ordinary course be subject to notice and a hearing, there is ample justification here for the Court to require them for future transactions. Further, it is unclear whether (i) the Protocols actually provide the Debtor with the authority to dispose of significant direct or indirect estate assets without an opportunity for this Court to review the transactions and for creditors and parties in interest to be heard; and (ii) in the event the Protocols do provide that authority, the Court and other parties contemplated such a result. Accordingly, and in the interest of transparency, the Court should require that all future transactions occurring outside the ordinary course of business be subject to notice and hearing.

i.    **Requiring notice and hearing ensures compliance with section 363(b) of the Bankruptcy Code, ensures due process, and increases transparency.**

23.    First, the Court should approve this request because it ensures compliance with the requirements of section 363(b)(1), ensures due process, and increases transparency.

24.    Under section 363(b), a debtor in possession is required not only to provide notice and hearing for a transaction outside the ordinary course, but also to articulate a sound business purpose for the transaction. *See In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).

25.    The Protocols, as the Debtor and Committee have interpreted them, conflict with section 363(b) and deprive various parties of due process. Unlike the requirements of section 363(b), where all creditors, equity holders, parties in interest, and the Office of the United States trustee are entitled to notice, under the Protocols, as they have been construed, the Debtor is only required to provide notice to the Committee of the proposed transaction and it is only if the Committee objects that the matter is brought before the Court. Such notice is of doubtful value to others, especially given intra-Committee disputes.

26.    Without proper notice and hearing, there is the potential that the Debtor will dispose of significant assets without all constituents having an opportunity to be heard. Under the

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                                    PAGE 7

APPX. 08059

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 62 of 1598 PageID 13109
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 8 of 13

Bankruptcy Code and Bankruptcy Rules, creditors, equity holders, and parties in interest are entitled to notice and an opportunity to be heard before their rights are impacted. *In re Bombay Co.*, 2007 Bankr. LEXIS 3218, at *7 (Bankr. N.D. Tex. Sep. 26, 2007) ("[A] party in interest . . . is entitled to notice and an opportunity to be heard before its rights are affected."); *see also* 2 Collier on Bankruptcy P 102.02 (16th Ed. 2020) ("Notwithstanding section 102(1) and the desire for flexibility, an adversely affected party is entitled, consistent with the due process requirements of the Constitution, and with the wording of section 102(1), to notice reasonably calculated to apprise it of the proposed action and an opportunity to be heard.").

27.     This Court has stated many times on the record that this case is all about transparency. The Court has provided the Committee and other parties various forms of relief to ensure transparency is achieved. Movant believes the relief requested herein will only increase transparency and is asking for the same treatment here on behalf of himself and other creditors and equity holders.

28.     Finally, neither the Debtor nor any other party will be prejudiced by this request. The transactions undertaken by the Debtor and contemplated by this Motion generally take time to consummate. Allowing time for proper notice and a hearing is unlikely to significantly delay any transaction or prejudice any other party to a sale, and in the exceptional case, section 102(1) of the Bankruptcy Code gives the Court great flexibility in fixing notice periods.

   **ii.     Consistent with section 363(b), requiring notice and hearing may produce competitive bidding and increase the value received by the Debtor's estate.**

29.     Second, requiring notice and hearing may elicit competitive bidding and therefore increase the value received by the Debtor's estate, consistent with one of the purposes of the Bankruptcy Code.

30.     The courts have long recognized the need for competitive bidding at hearings on

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                    PAGE 8

APPX. 08762

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 63 of 1598 PageID 13110
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 9 of 13

private sales. *In re Muscongus Bay Company,* 597 F.2d 11 (1st Cir. 1979); *In re Alves,* 52 B.R. 353 (Bankr. D. R.I. 1985); *In re Dartmouth Audio Inc.,* 42 B.R. 871, 874 (Bankr. D. N.H. 1984).

31.    "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Prods.*, Inc., 99 B.R. 124, 130 (N.D. Ga. 1988). Competitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is "to maximize the bidding, not to restrict it." *In re The Ohio Corrugating Company,* 59 B.R. 11, 13 (Bankr. N.D. Ohio 1985) (quoting *In re Beck Industries Inc.,* 605 F.2d 624, 637 (2d Cir. 1979)).

32.    In this case, the Debtor's actions under the Protocols have not always been consistent with this fundamental bankruptcy purpose. The Debtor has conducted several significant asset sales with advance notice only to the Committee. There has been no opportunity for the other creditors, equity holders, the U.S. trustee, or the Court to scrutinize the transactions or for a competitive bidding process to occur. Case law makes clear that the entirety of the *estate*, not just a few creditors, has an interest in these sales and in ensuring value is maximized. *See In re Fin. News Networks, Inc.*, 126 B.R. 152, 157 (S.D.N.Y. 1991) (a trustee maximizes value for creditors by selecting the "highest and best bid, and thereby protecting the interests of [the debtor], its creditors, and its equity holders); *In re Lionel*, 722 F.2d at 1071 ("In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."); *ASARCO, Inc. v. Elliott Mgmt. (In re Asarco, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (same).

33.    The U.S. Court of Appeals for the Second Circuit, in the case of *In re Lionel Corp.*,

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                    PAGE 9

APPX. 03363

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 64 of 1598    PageID 13111
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20    Entered 11/19/20 18:48:06    Page 10 of 13

722 F.2d. 1063 (2d Cir. 1983), affirmed the notion that, under section 363(b), the debtor in

possession must articulate a good business reason to enter into a substantial sale outside the

ordinary course and that a creditors' committee's insistence on such a transaction is, standing

alone, not a sound business reason because it ignores the equity interests that are required to be

considered. *See also In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("for the

debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity

holders, there must be some articulated business justification for using, selling, or leasing the

property outside the ordinary course of business").

34.    In *Lionel*, the Court stated that a bankruptcy judge should consider a number of

factors in deciding whether a sale under section 363(b) furthers the "diverse interests of the debtor,

creditors and equity holders, alike." *Lionel,* 722 F.2d. at 1071. Those factors may include "the

proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing,

the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the

effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained

from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale

or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or

decreasing in value." *Id.*

35.    Here, in conflict with section 363(b), the Protocols arguably allow the Debtor to

dispose of assets outside the ordinary course without notice, without any opportunity for a hearing,

and without providing a sound business justification as mandated by section 363(b). That the

Debtor may dispose of significant assets the value of which runs to the estate without notice,

without the opportunity for court review as contemplated by section 363(b), and outside of a plan

of reorganization may well disserve the estate. In addition, many of the factors articulated by the

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                    PAGE 10

APPX. 10064

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 65 of 1598    PageID 13112
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20    Entered 11/19/20 18:48:06    Page 11 of 13

Second Circuit in *Lionel* might well, in, e.g., the SSP transaction, have weighed against undertaking the sale.

36.    These concerns are particularly relevant in this case for at least two reasons.

37.    First, because the Debtor's Third Amended Plan is essentially a liquidation plan that will provide for the "monetization" of the assets held by the Debtor and its subsidiaries, these preconfirmation transactions have the taint of being part of a "creeping" or *sub rosa* plan of reorganization that may fundamentally alter the rights of creditors and equity holders in this case. *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1227 (5th Cir. 1986) ("In *Braniff* we recognized that a debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization. Likewise, if a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditors' rights under, for example, 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan.").

38.    Similarly, the disposition of significant assets outside of a plan and without notice raises a number of questions, including why the sale must proceed so quickly that adequate notice cannot be given, whether the asset is increasing or decreasing in value, what the proportionate value of the asset is to the estate as a whole, and other "salient factors pertaining to the proceeding." The constituents in this case (with the exception of the Committee and its few members) and this Court have largely been deprived of the chance to ask these questions.

39.    Second, because equity may receive a recovery in this case, equity holders should receive notice and an opportunity to be heard on all significant transactions outside the ordinary

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                                PAGE 11

APPX. 10363

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 66 of 1598 PageID 13113
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 12 of 13

course of business. The Debtor, through the Independent Board, has represented on the record that it believes the Debtor is solvent and that there is a reasonable chance that equity may receive a recovery in this case. The possibility that equity may receive a recovery is all the more reason for the Court to scrutinize closely these transactions to ensure that they satisfy the requirements of section 363(b) and they "further the diverse interests of the debtor, creditors and equity holders."

<div align="center"><u>CONCLUSION</u></div>

For the foregoing reasons, Movant respectfully requests that the Court enter an order (i) granting this Motion, (ii) requiring that, at least until confirmation of a plan, transactions outside the ordinary course, including the disposition of assets held by Debtor's wholly-owned or controlled subsidiaries, only be authorized after notice and an opportunity for hearing, and (iii) granting Movant such other and further relief to which he may be justly entitled.

Dated: November 19, 2020      Respectfully submitted,

/s/ D. Michael Lynn
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: bryan.assink@bondsellis.com

**ATTORNEYS FOR JAMES DONDERO**

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 67 of 1598    PageID 13114
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20    Entered 11/19/20 18:48:06    Page 13 of 13

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that, on November 19, 2020, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

*/s/ Bryan C. Assink*
Bryan C. Assink

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                    PAGE 13

APPX. 08367

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 68 of 1598   PageID 13115
Case 19-34054-sgj11 Doc 1439-1 Filed 11/19/20    Entered 11/19/20 18:48:06    Page 1 of 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054** |
| **L.P.,** | § | |
| | § | |
| Debtor. | § | **Chapter 11** |

**ORDER GRANTING JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER**
**REQUIRING NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS**
**OCCURING OUTSIDE THE ORDINARY COURSE OF BUSINESS**

Having considered the *Motion for Entry of an Order Requiring Notice and Hearing for*

*Future Estate Transactions Occurring Outside the Ordinary Course of Business* (the "Motion")[1]

filed by James Dondero ("Movant"); and this Court having jurisdiction over this matter pursuant

to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

ORDER GRANTING JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER                    PAGE 1
REQUIRING NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURING OUTSIDE THE ORDINARY COURSE OF BUSINESS

APPX. 03768

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 69 of 1598 PageID 13116
Case 19-34054-sgj11 Doc 1439-1 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 2 of 2

in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that

the notice of the Motion and opportunity for a hearing on the Motion were appropriate under the

circumstances and that no other notice need be provided; and this Court having reviewed the

Motion, any and all other documents filed in support of the Motion and any responses thereto; and

this Court having determined that the legal and factual bases set forth in the Motion establish good

cause for the relief granted herein; and upon all of the proceedings had before this Court; and after

due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. The Debtor is hereby required to provide notice and an opportunity for hearing to

    all creditors, equity security holders, and parties in interest, including Movant, in

    accordance with Bankruptcy Code § 363(b) and Bankruptcy Rule 2002 on any

    transactions outside the ordinary course of business, including the disposition of

    assets held by Debtor's wholly-owned or controlled subsidiaries.

3. The Court shall retain jurisdiction with respect to all matters arising from or relating

    to the implementation, interpretation, and enforcement of this Order.

### ### END OF ORDER ###

Respectfully submitted by:

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

ORDER GRANTING JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER
REQUIRING NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURING OUTSIDE THE ORDINARY COURSE OF BUSINESS

PAGE 2

APPX. 108767

# EXHIBIT 46

Case 19-34054-sgj11 Doc 3445-46 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 3
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 71 of 1598 PageID 13118
Case 19-34054-sgj11 Doc 1622 Filed 12/23/20 Entered 12/23/20 15:41:01 Page 1 of 2

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | Chapter 11 |
| | § | |
| Debtor. | § | |

## NOTICE OF WITHDRAWAL

**PLEASE TAKE NOTICE THAT** James Dondero hereby **WITHDRAWS** the following

documents:

1. *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Outside the Ordinary Course of Business* [Docket No. 1439];

2. Notice of Subpoena of Jean Paul Sevilla [Docket No. 1559];

3. Notice of Subpoena of Russell Nelms [Docket No. 1560]; and

4. Notice of Subpoena of Fred Caruso [Docket No. 1561].

**NOTICE OF WITHDRAWAL**

Case 19-34054-sgj11 Doc 3445-46 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 3
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 72 of 1598   PageID 13119
Case 19-34054-sgj11 Doc 1622 Filed 12/23/20   Entered 12/23/20 15:41:01   Page 2 of 2

Dated: December 23, 2020                 Respectfully submitted,

/s/ Bryan C. Assink
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: john.wilson@bondsellis.com
Email: bryan.assink@bondsellis.com

**ATTORNEYS FOR JAMES DONDERO**

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on December 23, 2020, a true and correct copy of the foregoing document was served via the Court's CM/ECF system upon all parties requesting or consenting to such service.

/s/ Bryan C. Assink
Bryan C. Assink

# EXHIBIT 47

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 74 of 1598 PageID 13121
Case 19-34054-sgj11 Doc 354 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 1 of 3

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § | Related to Docket No. 281 |

## NOTICE OF FINAL TERM SHEET

TO:   (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) counsel to the Committee; (d) the Debtor's principal secured parties; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 75 of 1598   PageID 13122
Case 19-34054-sgj11 Doc 354 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 2 of 3

**PLEASE TAKE NOTICE** that on January 9, 2020, the Court held a hearing (the "Hearing") on that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Dkt. No. 281] (the "Motion") filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (collectively, the "Debtor") in the above-captioned chapter 11 bankruptcy case (the "Case").

**PLEASE TAKE FURTHER NOTICE** that at the Hearing, the Debtor presented to the Court an amended and modified version of the Term Sheet (as defined in the Motion) and the exhibits thereto (collectively, the "Amended Term Sheet").

**PLEASE TAKE FURTHER NOTICE** that the Amended Term Sheet is attached hereto as **Exhibit A.**

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 76 of 1598   PageID 13123
Case 19-34054-sgj11 Doc 354 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 3 of 3

Dated:  January 14, 2020.             PACHULSKI STANG ZIEHL & JONES LLP

                                      Jeffrey N. Pomerantz (CA Bar No. 143717)
                                      (*admitted pro hac vice*)
                                      Ira D. Kharasch (CA Bar No. 109084)
                                      (*admitted pro hac vice*)
                                      Maxim B. Litvak (Texas Bar No. 24002482)
                                      Gregory V. Demo (NY Bar No. 5371992)
                                      (*admitted pro hac vice*)
                                      10100 Santa Monica Blvd., 13th Floor
                                      Los Angeles, CA 90067
                                      Telephone: (310) 277-6910
                                      Facsimile: (310) 201-0760
                                      E-mail:    jpomerantz@pszjlaw.com
                                                 ikharasch@pcszjlaw.com
                                                 mlitvak@pszjlaw.com
                                                 gdemo@pszjlaw.com

                                      -and-

                                      HAYWARD & ASSOCIATES PLLC

                                      */s/ Zachery Z. Annable*
                                      Melissa S. Hayward
                                      Texas Bar No. 24044908
                                      MHayward@HaywardFirm.com
                                      Zachery Z. Annable
                                      Texas Bar No. 24053075
                                      ZAnnable@HaywardFirm.com
                                      10501 N. Central Expy, Ste. 106
                                      Dallas, Texas 75231
                                      Tel: (972) 755-7100
                                      Fax: (972) 755-7110

                                      *Counsel and Proposed Counsel for the Debtor and
                                      Debtor-in-Possession*



Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 1 of 62

# EXHIBIT "A"

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 78 of 1598    PageID 13125
66

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 2 of 62

## Highland Capital Management, L.P.

### Preliminary Term Sheet

*This term sheet ("Term Sheet") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P, Case No. 19-34054 (SGJ) (the "Chapter 11 Case"), pending in the Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125]. This Term Sheet shall be subject to approval by the Bankruptcy Court.*

| Topic | Proposed Terms |
|---|---|
| Parties | Highland Capital Management, L.P. (the "Debtor").<br><br>The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "Committee"). |
| Independent Directors | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "Independent Directors"): James Seery, John Dubel, and Judge Russell Nelms. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).<br><br>The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 79 of 1598 PageID 13126

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 3 of 62

| | |
|---|---|
| | source of funding, whether directly or via reimbursement, will be the Debtor.<br><br>As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "CEO") should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.<br><br>The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as President and CEO of the Debtor, and (4) will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities. Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination. Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("CRO") to the |

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 80 of 1598 PageID 13127

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 4 of 62

|  | Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**.<br><br>DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
|---|---|
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor other than Mr. Dondero. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by |

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 5 of 62

| | |
|---|---|
| | the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **Exhibit D**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **Exhibit D** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |
| **Reservation of Rights** | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date. Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 6 of 62

**Exhibit A**

**Debtor's Corporate Governance Documents**

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 83 of 1598 PageID 13130
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 7 of 62

# WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR

## OF

## STRAND ADVISORS, INC.

### January 9, 2020

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

I.    **AMENDMENT OF BYLAWS**

**WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

**WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors, and to add certain provisions respecting director qualifications and the removal of directors; and

**NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved, and the Board is increased from one (1) to three (3) directors;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

II.    **ELECTION OF DIRECTORS**

**WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and Russell Nelms to the Board and desires that such individuals constitute the whole Board;

**NOW, THEREFORE, BE IT RESOLVED**, that James Seery, John Dubel, and Russell Nelms, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

**RESOLVED FURTHER**, that any officer of the Company is authorized to take any such actions as

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 84 of 1598 PageID 13131
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 8 of 62

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

RESOLVED FURTHER, that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

RESOLVED FURTHER, that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

RESOLVED FURTHER, that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

### III. STIPULATION WITH THE BANKRUPTCY COURT

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

WHEREAS, the Company is the general partner for HCMLP;

WHEREAS, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

WHEREAS, the Company and the Stockholder wish to enter into a stipulation (the "Stipulation") with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such Stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by these resolutions to be re-elected upon the expiration of his or her term; (c) upon the death, disability, or resignation of a member of the Board, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and (i) acceptable to the Stockholder and the Committee or (ii) selected by the remaining members of the Board; and (d) not take any action or exercise the voting power of such shares in any way that is inconsistent with the term sheet agreed to by HCMLP and the Committee and any order of the Texas Court approving such agreement and compromise between HCMLP and the Committee;

WHEREAS, for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

WHEREAS, it is in the intent of the parties that the Stipulation will no longer be effective or bind the Company or the Stockholder following the termination of the Bankruptcy Case.

NOW, THEREFORE, BE IT RESOLVED, that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 85 of 1598    PageID 13132
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 9 of 62

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 86 of 1598    PageID 13133
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 10 of 62

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

**STOCKHOLDER:**


_____

James Dondero


*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

APPX. 08376

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 87 of 1598 PageID 13134
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 11 of 62

## First Amendment to Bylaws of
## Strand Advisors, Inc.

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.** Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.** Article III, Section 5, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 5. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the official committee of unsecured creditors (the "Committee") appointed in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Debtor") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11 and reasonably acceptable to the stockholders; (y) nominated by the stockholders and acceptable to the Committee; or (z) selected by the duly appointed independent directors.

**3.** The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Removal of Directors. Once appointed, the independent directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the independent directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 88 of 1598    PageID 13135
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 12 of 62

IN WITNESS WHEREOF, the Company has caused this amendment to be signed this 9th day of January, 2020.

**STRAND ADVISORS, INC.**

_____

By: Scott Ellington
Its: Secretary

APPX. 08378

Case 19-34054-sgj11  Doc 3445-47  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 89 of 1598  PageID 13136
Case 19-34054-sgj11  Doc 354-1  Filed 01/14/20    Entered 01/14/20 09:59:10    Page 13 of 62

# INSERT STRAND ADVISORS, INC. LETTERHEAD

[ _____ ]


[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

**Re:**     **Strand Advisors, Inc. – Director Agreement**

Dear [_____]:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

## 1.     APPOINTMENT TO THE BOARD OF DIRECTORS.

a.     Title, Term and Responsibilities.

i.     Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

ii.     You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding (the "Bankruptcy") pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

b.     Mandatory Board Meeting Attendance. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

c.     Independent Contractor. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

d.     Information Provided by the Company. The Company shall: (i) provide you with reasonable access to management and other representatives of the Company and HCMLP; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company and HCMLP that you request in connection with the services to be provided to the Company. You will rely, without further independent verification,

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 18 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 90 of 1598   PageID 13137
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 14 of 62

on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns.

2.    **COMPENSATION AND BENEFITS.**

a.    <u>Retainer</u>. The Company will pay you a retainer for each month you serve on the Board (the "<u>Retainer</u>") to be paid in monthly installments of (a) $60,000 for each of the first three months, (b) $50,000 for each of the next three months, and (c) $30,000 for each of the following six months.  The parties will re-visit the Retainer after the sixth month.  The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b.    <u>Expense Reimbursement</u>. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c.    <u>Invoices; Payment</u>.

i.    In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment of the Retainer will be due on the first business day of each month regardless of whether an invoice has been provided.  Reimbursement of expenses will also occur on the first business day of each month, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii.    You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d.    <u>Indemnification; D&O Insurance</u>. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated **[_____]**, a copy of which is attached hereto as **Appendix A** (the "<u>Indemnification Agreement</u>"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e.    <u>Tax Indemnification</u>. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3.    **PROPRIETARY INFORMATION OBLIGATIONS.**

a.    <u>Proprietary Information</u>. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

APP. 08380

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 91 of 1598 PageID 13138
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 15 of 62

        b.    <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose it to anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

        c.    <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

### 4. OUTSIDE ACTIVITIES.

        a.    <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

        b.    <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

        c.    <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

### 5. TERMINATION OF DIRECTORSHIP.

        a.    <u>Voluntary Resignation, Removal Pursuant to Bylaws</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law.

        b.    <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

        c.    <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

### 6. GENERAL PROVISIONS.

        a.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

APPX. 10089

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 20 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 92 of 1598   PageID 13139
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 16 of 62

       b.      <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

       c.      <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder.

       d.      <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 93 of 1598 PageID 13140
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 17 of 62

**ACCEPTED AND AGREED:**

_____
[NAME]
Date: _____

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 94 of 1598 PageID 13141

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 18 of 62

## INDEMNIFICATION AND GUARANTY AGREEMENT

This Indemnification and Guaranty Agreement ("**Agreement**"), dated as of [ _____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), HIGHLAND CAPITAL MANAGEMENT, LP, a Delaware partnership (the "**Debtor**") (solely as to Section 29 hereunder), and [_____] (the "**Indemnitee**").

WHEREAS, the Company is the general partner of the Debtor and, in such capacity, manages the business affairs of the Debtor;

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company, on its own behalf and for the benefit of the Debtor, to retain and attract as directors the most capable Persons is in the best interests of the Company and the Debtor and that the Company and the Debtor therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**")), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in Section 1(g) below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties (including the Debtor solely as to Section 29 hereunder) agree as follows:

1.    Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 95 of 1598 PageID 13142
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 19 of 62

owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

(b) "**Claim**" means:

(i) any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

(ii) any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

(c) "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

(d) "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a

APPX. 103393

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 96 of 1598 PageID 13143
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 20 of 62

Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e) "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f) "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g) "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i) "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j) "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k) "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the

APP.103396

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 97 of 1598 PageID 13144
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 21 of 62

Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)     "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m)     "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n)     "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o)     References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2.     <u>Indemnification</u>.

(a)     Subject to <u>Section 9</u> and <u>Section 10</u> of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims

4

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 98 of 1598  PageID 13145
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 22 of 62

brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)    For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

3.    <u>Contribution</u>.

(a)    Whether or not the indemnification provided in <u>Section 2</u> is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)    The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)    To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes,

5

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 99 of 1598 PageID 13146
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 23 of 62

amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.    <u>Advancement of Expenses</u>. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this <u>Section 4</u>, the final sentence of <u>Section 9(b)</u>, or <u>Section 11(b)</u> in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to <u>Section 9</u>, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.    <u>Indemnification for Expenses in Enforcing Rights</u>. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with <u>Section 4</u>, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.    <u>Partial Indemnity</u>. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 28 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 100 of 1598   PageID 13147
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 24 of 62

related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.    Notification and Defense of Claims.

(a)    Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)    Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 101 of 1598 PageID 13148
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 25 of 62

is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with <u>Section 9</u> below.

9.    <u>Determination of Right to Indemnification</u>.

(a)    <u>Mandatory Indemnification; Indemnification as a Witness</u>.

(i)    To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with <u>Section 2</u>, and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

(ii)    To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

(b)    <u>Standard of Conduct</u>. To the extent that the provisions of <u>Section 9(a)</u> are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

(i)    if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

(ii)    if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 102 of 1598 PageID 13149
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 26 of 62

incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c)     Making the Standard of Conduct Determination. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under Section 9(b) to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under Section 9(b) shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to Section 8 (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

(d)     Payment of Indemnification. If, in regard to any Losses:

(i)     Indemnitee shall be entitled to indemnification pursuant to Section 9(a);

(ii)     no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii)     Indemnitee has been determined or deemed pursuant to Section 9(b) or Section 9(c) to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e)     Selection of Independent Counsel for Standard of Conduct Determination. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(i), the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(ii), the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in Section 1(k), and the objection shall

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 103 of 1598 PageID 13150
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 27 of 62

set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this Section 9(e) to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this Section 9(e) or Indemnitee gives its initial notice pursuant to the second sentence of this Section 9(e), as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to Section 9(b).

(f)     Presumptions and Defenses.

(i)     Indemnitee's Entitlement to Indemnification. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii)     Reliance as a Safe Harbor. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports

APP. 108493

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 104 of 1598 PageID 13151
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 28 of 62

or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii) <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.   <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a)   indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)   proceedings referenced in <u>Section 4</u> above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)   where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)   indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)   indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.   <u>Remedies of Indemnitee</u>.

(a)   In the event that (i) a determination is made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to <u>Section 4</u>, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 9</u> within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant <u>Section 9(d)</u>, Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such

11

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 33 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 105 of 1598   PageID 13152
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 29 of 62

indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this <u>Section 11(a)</u>. The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)      In the event that Indemnitee, pursuant to this <u>Section 11</u>, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)      In the event that a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this <u>Section 11</u> shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under <u>Section 9</u>.

(d)      If a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this <u>Section 11</u>, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.      <u>Settlement of Claims</u>. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this <u>Section 12</u>, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.      <u>Duration</u>. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 106 of 1598   PageID 13153
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 30 of 62

agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.    <u>Other Indemnitors</u>. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this <u>Section 14</u>.

15.    <u>Non-Exclusivity</u>. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.    <u>Liability Insurance</u>. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights

13

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 107 of 1598 PageID 13154
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 31 of 62

and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.    <u>No Duplication of Payments</u>. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.    <u>Subrogation</u>. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.    <u>Indemnitee Consent.</u> The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.    <u>Amendments</u>. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.    <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume

APPX. 103403

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 108 of 1598   PageID 13155
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 32 of 62

and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.     <u>Severability</u>. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.     <u>Notices</u>. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

    (a)     if to Indemnitee, to the address set forth on the signature page hereto.

    (b)     if to the Company, to:

            Strand Advisors, Inc.
            Attention:     Isaac Leventon
            Address:       300 Crescent Court, Suite 700
                           Dallas, Texas 75201
            Email:         ileventon@highlandcapital.com

        Notice of change of address shall be effective only when given in accordance with this <u>Section 23</u>. All notices complying with this <u>Section 23</u> shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.     <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.     <u>Jurisdiction</u>. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 109 of 1598 PageID 13156
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 33 of 62

consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.     Enforcement.

       (a)     Without limiting Section 15, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

       (b)     The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.     Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.     Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

29.     Guaranty By Debtor. The Debtor guarantees to Indemnitee the performance of the obligations of the Company hereunder (the "**Guaranteed Obligations**"). If the Company does not satisfy any of the Guaranteed Obligations when due, Indemnitee may demand that the Debtor satisfy such obligations and the Debtor shall be required to do so by making payment to, or for the benefit of, Indemnitee. Indemnitee can make any number of demands upon the Debtor and such demands can be made for all or part of the Guaranteed Obligations. This guaranty by the Debtor is for the full amount of the Guaranteed Obligations. The Debtor's obligations under this Agreement are continuing. Even though Indemnitee receives payments from or makes arrangements with the Company or anyone else, the Debtor shall remain liable for the Guaranteed Obligations until satisfied in full. The guaranty hereunder is a guaranty of payment, and not merely of collectability, and may be enforced against the Debtor. The Debtor's liability under this Section 29 is unconditional. It is not affected by anything that might release the Debtor from or limit all or part of its obligations.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 38 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 110 of 1598    PageID 13157
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 34 of 62

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.


By: _____
Name:
Title:


HIGHLAND CAPITAL MANAGEMENT, LP (solely as to <u>Section 29</u> hereunder)


By: _____
Name:
Title:

[SIGNATURE PAGE – INDEMNIFICATION AND GUARANTY AGREEMENT]

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 39 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 111 of 1598   PageID 13158
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 35 of 62

INDEMNITEE:

_____

Name:      [_____]
Address: _____
            _____
            _____

Email:

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 36 of 62

**<u>Exhibit B</u>**

**Amended DSI Retention Letter**

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 41 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 113 of 1598   PageID 13160
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 37 of 62

January ___, 2020

Attn:  Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX  75201

> Re:    Development Specialists, Inc. ("DSI")
>         Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide
restructuring support services to Highland Capital Management, L.P. (the "Company").  This
Agreement replaces and supersedes in all respects the letter agreement between DSI and the
Company, dated October 7, 2019, as amended and revised by the letter agreement dated October
29, 2019.  However, all fees and expenses incurred by DSI prior to the date hereof in accordance
with such prior letter agreements will be paid by the Company, subject to allowance of such fees
and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy
Court").  The Agreement will become effective upon execution by duly authorized
representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1. Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with
   other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2. Subject to the terms of this Agreement, Mr. Sharp will report to the Independent
   Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and
   will comply with the Company's corporate governance requirements.
3. Mr. Sharp will fulfill such duties as directed by the Independent Directors and/or CEO, if
   any, of the Company with respect to the Company's restructuring and bankruptcy filed on
   October 16, 2019 (the "Chapter 11 Case"), including implementation and prosecution of
   the Chapter 11 Case**.**
4. Provide other personnel of DSI ("Additional Personnel") to provide restructuring support
   services as requested or required to the Company, which may include but are not limited
   to:
   a. assisting the Company in the preparation of financial disclosures required by the
      Bankruptcy Code, including the Schedules of Assets and Liabilities, the
      Statements of Financial Affairs and Monthly Operating Reports;

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 114 of 1598 PageID 13161
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 38 of 62

Highland Capital Management, LP
December ___, 2019
Page 2

    b.  advising and assisting the Company, the Company's legal counsel, and other professionals in responding to third party requests;

    c.  attending meetings and assisting in communications with parties in interest and their professionals, including the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case;

    d.  providing litigation advisory services with respect to accounting matters, along with expert witness testimony on case related issues; and

    e.  rendering such other general business consulting services or other assistance as the Company may deem necessary and which are consistent with the role of a financial advisor and not duplicative of services provided by other professionals in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information. The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements. The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports. Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may also be involved, we have listed below certain of the DSI personnel (along with their corresponding billing rates) who would likely constitute the Additional Personnel. The individuals are:

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 115 of 1598 PageID 13162
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 39 of 62

Highland Capital Management, LP
December ___, 2019
Page 3

| | |
|---|---|
| R. Brian Calvert | $640.00/hr. |
| Thomas P. Jeremiassen | $575.00/hr. |
| Eric J. Held | $495.00/hr. |
| Nicholas R. Troszak | $485.00/hr. |
| Spencer G. Ferrero | $350.00/hr. |
| Tom Frey | $325.00/hr. |

The above rates are adjusted as of January 1 of each year to reflect advancing experience, capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company. The purpose of the retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor should such be required for DSI to continue to provide the Services. As such, should a need arise to increase this retainer due to the level of Services DSI is providing or projected to provide, we will send the Company a supplement to this Agreement requesting the necessary increases and discuss with the Company the amount and timing of providing such increase to the retainer.

This retainer will be applied to our final invoice. If the retainer exceeds the amount of our final invoice, we will refund the difference to the Company at that time. In the event that periodic invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices and, if applicable, any related late charges, and we will stop work until the retainer is replenished to the full amount required. If the retainer is not replenished within ten (10) days after the application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and expenses may include, among others, charges for messenger services, photocopying, travel expenses, long distance telephone charges, postage and other charges customarily invoiced by consulting firms. Airfare for international flights will be charged at the business class fare; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation, pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be contingent upon such approval.

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business days' written notice. Notwithstanding anything to the contrary contained herein, the Company

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 116 of 1598   PageID 13163
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 40 of 62

Highland Capital Management, LP
December ___, 2019
Page 4

shall be obligated, in accordance with any orders of or procedures established by the Court, to pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to specific roles for the benefit of the Company. These members will remain as DSI employees during the pendency of this case. Specifically, the parties intend that an independent contractor relationship will be created by this Agreement. Employees of DSI are not to be considered employees of the Company and are not entitled to any of the benefits that the Company provides for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in connection with DSI's engagement is intended solely for the benefit and use of the Company in considering the transaction to which it relates, and that no third party is entitled to rely on any such advice or communication. DSI will in no way be deemed to be providing services for any person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company in connection with this Agreement or that is developed pursuant to this Agreement, will be treated as confidential and will not be disclosed by DSI, except as required by Court order, or other legal process, or as may be authorized by the Company. DSI shall not be required to defend any action to obtain an order requiring disclosure of such information, but shall instead give prompt notice of any such action to the Company so that it may seek appropriate remedies, including a protective order. The Company shall reimburse DSI for all costs and fees (including reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall indemnify him on the same terms as provided to the Company's other officers and directors under the Company partnership agreement or other governing document and applicable state law. Mr. Sharp shall be included as an insured under any insurance policies or coverage available to officers and directors of the Company.

The Company shall additionally indemnify those persons, and only those persons, serving as executive officers on the same terms as provided to the Company's other officers and directors under the Company's partnership agreement or other governing document and applicable state law, along with insurance coverage under the Company's D&O policies. Any such indemnity shall survive the expiration or termination by either party of this Agreement. Except as provided

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 45 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 117 of 1598    PageID 13164
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 41 of 62

Highland Capital Management, LP
December ___, 2019
Page 5

in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the
Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as
well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the
Company, or any party asserting claims on behalf of the Company, except for direct damages
found in a final determination (not subject to further appeal) by a court of competent jurisdiction
to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence
of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any
connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case.
Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's
professional staff, neither DSI nor its professionals have any known conflicts with the parties in
this case.  DSI will separately provide its connections to parties in this case and/or their
professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business
planning and operations.  DSI's engagement shall not constitute an audit, review or compilation,
or any other type of financial statement reporting engagement that is subject to the rules of
AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of
one year subsequent to the completion and/or termination of this Agreement; provided that the
Company shall not be prohibited from (x) making general advertisements for employment not
specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited
requests for employment.

Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of
DSI employees, and all other provisions necessary to the enforcement of the intent of this
Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 118 of 1598 PageID 13165
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 42 of 62

Highland Capital Management, LP
December ___, 2019
Page 6

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of this Agreement and supersedes and is intended to nullify any other agreements, understandings or representations relating to the subject of this Agreement. This Agreement may not be amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance by signing an original copy of this Agreement on the signature lines below, then returning one fully-executed Agreement to DSI's office. The Agreement will become effective upon execution by duly authorized representatives of the respective parties.

Very truly yours,

Bradley Sharp
Development Specialists, Inc.


AGREED AND ACKNOWLEDGED:

Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner


_____
By: _____, Independent Director
Date: _____

**Exhibit C**

**Document Production Protocol**

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 48 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 120 of 1598   PageID 13167
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 44 of 62

**A. Definitions**

  a. Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

**B. Preservation of ESI - Generally**

  a. Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

**C. Preservation of ESI – Specific Forms**

  a. For email, Debtor uses Outlook Email on an Exchange server.  Veritas Enterprise Vault is used to archive emails.  Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email communications have been preserved and are not at risk of deletion due to normal document retention practices.  Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.

  b. The file server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created and stored on a portable hard drive at a secured location.

  c. The Sharepoint server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.

  d. The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago.  A copy of this backup shall be created in a format and stored at a secured location.

  e. The Advent Geneva accounting system used by Debtor was backed up approximately one week ago.  Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva.  Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein.

  f. The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format and stored at a secured location.

  g. For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data.  Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.

  h. Bloomberg data is archived for five years.  Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 49 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 121 of 1598   PageID 13168
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 45 of 62

      i.   Files may be saved locally on laptops/work computers used by employees of Debtor.  This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere.  Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees.  Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

### D.  Not Reasonably Accessible Documents

a.  Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost. The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

      i.   Deleted, slack, fragmented, or other data only accessible by forensics;

     ii.   Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and

   iii.   On-line access data such as temporary internet files, history, cache, cookies, and the like.

b.  To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

### E.  Collection and Search Methodology

a.  Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than seven (7) days after the Committee requests ESI from the Debtor.  DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates.  Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs).  Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

b.  The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 122 of 1598 PageID 13169
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 46 of 62

c. A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above. Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

d. The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

e. Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

f. Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

g. Debtor shall propose a format for producing Sharepoint data. The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

## F. Format of Documents Produced

a. Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

b. The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

c. The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

d. The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

e. In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 123 of 1598 PageID 13170
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 47 of 62

f. For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

g. For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

h. For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

i. The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

      i. Production Bates begin
      ii. Production Bates end
      iii. Production Bates begin attachment
      iv. Production Bates end attachment

Notwithstanding the aforementioned, all parties acknowledge that Debtor's Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

j. Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 124 of 1598 PageID 13171
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 48 of 62

thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k.   Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

l.   To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

**G.  Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status**

a.   No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b.   Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c.   Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d.   Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e.   Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

**Metadata List**

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the | 2 |

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 125 of 1598 PageID 13172
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 49 of 62

|  |  |  |
|---|---|---|
|  | document |  |
| Global Custodian | Custodian name produced in format: Lastname, Firstname. | Smith, Jane; Taylor, Michael |
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted: "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID |  |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available |  |
| Extension | The file extension | .doc |

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 54 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 126 of 1598 PageID 13173
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 50 of 62

| | | |
|---|---|---|
| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

ACTIVE 252191584

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 51 of 62

**Exhibit D**

**Reporting Requirements**

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 56 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 128 of 1598   PageID 13175
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 52 of 62

I. **Definitions**

 A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

 B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

 C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

 D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

 E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

 F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

 G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

 H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 57 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 129 of 1598 PageID 13176
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 53 of 62

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.    "<u>Ordinary Course Transaction</u>" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.    "<u>Notice</u>" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

**II.    Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy <u>Credit Fund, L.P., and Highland Restoration Capital Partners</u>**

A.    **Covered Entities**: N/A (See entities above).

B.    **Operating Requirements**

    1.    Ordinary Course Transactions do not require Court approval (All Stages).

        a)    <u>Stage 1 and Stage 2</u>:  ordinary course determined by the CRO.

        b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

    2.    Related Entity Transactions

        a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)    <u>Stage 3</u>:

            (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3.    Third Party Transactions (All Stages)

        a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 130 of 1598    PageID 13177
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 54 of 62

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)   The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

### III.   Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)

A.   **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.   **Operating Requirements**

1.   Ordinary Course Transactions do not require Court approval (All Stages).

a)   <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

b)   <u>Stage 3</u>: ordinary course determined by the Debtor.

2.   Related Entity Transactions

a)   <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   <u>Stage 3</u>:

(1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

APP.106420

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 59 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 131 of 1598   PageID 13178
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 55 of 62

the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.     Third Party Transactions (All Stages)

a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.   The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.     **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV.     Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

A.     **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.     **Operating Requirements**

1.     Ordinary Course Transactions do not require Court approval (All Stages).

a)     Stage 1 and Stage 2: ordinary course determined by the CRO.

b)     Stage 3: ordinary course determined by the Debtor.

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 132 of 1598 PageID 13179
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 56 of 62

    2.    Related Entity Transactions

        a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)    <u>Stage 3</u>:

            (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3.    Third Party Transactions (All Stages):

        a)    Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        c)    The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 133 of 1598 PageID 13180
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 57 of 62

**V.** **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.** **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.** **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 62 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 134 of 1598    PageID 13181
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 58 of 62

**VIII.**   **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.**   **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.**   **Representations and Warranties**

    A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 63 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 135 of 1598   PageID 13182
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 59 of 62

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD:  Schedule A is work in process and may be supplemented or amended.

8

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 64 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 136 of 1598  PageID 13183
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20  Entered 01/14/20 09:59:10  Page 60 of 62

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 65 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 137 of 1598    PageID 13184
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 61 of 62

**<u>Schedule B</u>**

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 66 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 138 of 1598   PageID 13185
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 62 of 62

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

APPX. 106428

# EXHIBIT 48

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 140 of 1598 PageID 13187
Case 19-34054-sgj11 Doc 466 Filed 02/21/20 Entered 02/21/20 11:08:22 Page 1 of 3

Docket #0466 Date Filed: 02/21/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | Related to Docket No. 281 |

## <u>NOTICE OF DEBTOR'S AMENDED OPERATING PROTOCOLS</u>

TO:  (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) counsel to the Committee; (d) the Debtor's principal secured parties; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

NOTICE OF DEBTOR'S AMENDED OPERATING PROTOCOLS


APPX. 06436

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 141 of 1598    PageID 13188
Case 19-34054-sgj11 Doc 466 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 2 of 3

**PLEASE TAKE NOTICE** that on February 19, 2020, the Court held a hearing (the "<u>Hearing</u>") on (i) that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Dkt. No. 281] (the "<u>Motion</u>") filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (collectively, the "<u>Debtor</u>") in the above-captioned chapter 11 bankruptcy case (the "<u>Case</u>"), and (ii) that certain *Limited Objection of the Issuers to Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Dkt. No. 324] (the "<u>Limited Objection</u>") filed by the Issuers[2] in response to the Debtor's Motion.

**PLEASE TAKE FURTHER NOTICE** that at the Hearing, the Debtor announced to the Court that the Issuers' Limited Objection had been resolved and that, as part of the resolution of the Limited Objection, the Debtor would present to the Court an amended and modified version of the protocols governing the Debtor's continued operations in the ordinary course of its business (the "<u>Amended Operating Protocols</u>").

**PLEASE TAKE FURTHER NOTICE** that the Amended Operating Protocols are attached hereto as **Exhibit A**.  A redline copy identifying the specific amendments and modifications appearing in the Amended Operating Protocols is attached hereto as **Exhibit B**.

*[Remainder of Page Intentionally Left Blank]*

---

[2] The "Issuers" are a group of 25 separate Cayman issuers of collateralized loan and debt obligations are specifically identified in the Limited Objection.

---

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 142 of 1598    PageID 13189
Case 19-34054-sgj11 Doc 466 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 3 of 3

Dated:  February 21, 2020.          PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:   jpomerantz@pszjlaw.com
         ikharasch@pcszjlaw.com
         mlitvak@pszjlaw.com
         gdemo@pszjlaw.com

-and-

HAYWARD & ASSOCIATES PLLC

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

**Counsel for the Debtor and
Debtor-in-Possession**

Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 143 of 1598   PageID 13190

Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 1 of 13

# EXHIBIT "A"

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 144 of 1598 PageID 13191
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 2 of 13

I. **Definitions**

A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 145 of 1598   PageID 13192
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 3 of 13

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.  "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.  "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.  "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

## II.  Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners

A.  **Covered Entities**: N/A (See entities above).

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

a)  Stage 1 and Stage 2:  ordinary course determined by the CRO.

b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  Stage 3:

(1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

APPX. 05436

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 146 of 1598   PageID 13193
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 4 of 13

(2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.    Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 147 of 1598   PageID 13194
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20   Entered 02/21/20 11:08:23   Page 5 of 13

<table>
<tr><td>a)</td><td><u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.</td></tr>
</table>

     a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

     b)    <u>Stage 3</u>:

         (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

         (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

  3.    Third Party Transactions (All Stages)

     a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

     b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

     c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 148 of 1598    PageID 13195
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 6 of 13

IV.    **Transactions involving entities that the Debtor manages but in which the Debtor
does not hold a direct or indirect interest**

A.    **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    Stage 3:

(1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages):

a)    Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 149 of 1598 PageID 13196
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 7 of 13

> Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V. **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 150 of 1598 PageID 13197
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 8 of 13

**VI.** **Transactions involving entities that the Debtor does not manage and in which the**
**Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.** **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.** **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.** **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

APP.103440

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 151 of 1598    PageID 13198
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 9 of 13

X.    **Representations and Warranties**

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 14 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 152 of 1598   PageID 13199
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20   Entered 02/21/20 11:08:23   Page 10 of 13

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
    a) Rockwall II CDO Ltd.
    b) Grayson CLO Ltd.
    c) Eastland CLO Ltd.
    d) Westchester CLO, Ltd.
    e) Brentwood CLO Ltd.
    f) Greenbriar CLO Ltd.
    g) Highland Park CDO Ltd.
    h) Liberty CLO Ltd.
    i) Gleneagles CLO Ltd.
    j) Stratford CLO Ltd.
    k) Jasper CLO Ltd.
    l) Rockwall DCO Ltd.
    m) Red River CLO Ltd.
    n) Hi V CLO Ltd.
    o) Valhalla CLO Ltd.
    p) Aberdeen CLO Ltd.
    q) South Fork CLO Ltd.
    r) Legacy CLO Ltd.
    s) Pam Capital
    t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD:  Schedule A is work in process and may be supplemented or amended.

9

APPX. 081452

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 153 of 1598    PageID 13200
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 11 of 13

   8.  Highland Socially Responsible Equity Fund
   9.  Highland Income Fund
  10.  Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

  11.  SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1. NexBank SSB Account
2. Charitable DAF Fund LP

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 154 of 1598    PageID 13201
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 12 of 13

**<u>Schedule B</u>**

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 155 of 1598    PageID 13202
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 13 of 13

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 1 of 14

# EXHIBIT "B"

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 157 of 1598   PageID 13204
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 2 of 14

I.    **Definitions**

    A.    "Court" means the United States Bankruptcy Court for the Northern District of Texas.

    B.    "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

    C.    "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

    D.    "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

    E.    "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

    F.    "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

    G.    "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

    H.    "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 158 of 1598 PageID 13205
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 3 of 14

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I. "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J. "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K. "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II. **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy** Credit Fund, L.P., and Highland Restoration Capital Partners

A. **Covered Entities**: N/A (See entities above).

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

   a) Stage 1 and Stage 2: ordinary course determined by the CRO.

   b) Stage 3: ordinary course determined by the Debtor.

2. Related Entity Transactions

   a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b) Stage 3:

   (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 159 of 1598   PageID 13206
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 4 of 14

<ol start="2" type="1">
<li>Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.</li>
</ol>

<ol start="3" type="1">
<li>Third Party Transactions (All Stages)</li>
</ol>

<ol type="a">
<li>Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.</li>

<li>The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.</li>

<li>The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.</li>
</ol>

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.    Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

<ol type="1">
<li>Ordinary Course Transactions do not require Court approval (All Stages).

<ol type="a">
<li><u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.</li>
<li><u>Stage 3</u>: ordinary course determined by the Debtor.</li>
</ol>
</li>
<li>Related Entity Transactions</li>
</ol>

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 22 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 160 of 1598   PageID 13207
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20   Entered 02/21/20 11:08:23   Page 5 of 14

    a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    <u>Stage 3</u>:

        (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

    a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV.    Transactions involving entities that the Debtor manages but in which the Debtor <u>does not hold a direct or indirect interest</u>**

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 161 of 1598    PageID 13208
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 6 of 14

A.  **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

   a)  <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

   b)  <u>Stage 3</u>: ordinary course determined by the Debtor.

2.  Related Entity Transactions

   a)  <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b)  <u>Stage 3</u>:

   (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   (2)  Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.  Third Party Transactions (All Stages):

   a)  Except <u>(x)</u> as set forth in (b) and (c) below <u>and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party</u>, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 162 of 1598    PageID 13209
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 7 of 14

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)   The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties.  The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.  Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

**V.   Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.   Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.   Ordinary Course Transactions (All Stages): N/A

C.   Operating Requirements: N/A

D.   Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.   Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 25 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 163 of 1598   PageID 13210
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20   Entered 02/21/20 11:08:23   Page 8 of 14

    A.      Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.      Ordinary Course Transactions (All Stages): N/A

    C.      Operating Requirements: N/A

    D.      Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.    Transactions involving Non-Discretionary Accounts**

    A.      Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.      Ordinary Course Transactions (All Stages): N/A

    C.      Operating Requirements: N/A

    D.      Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.    Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.      DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.      The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.    Shared Services**

    A.      The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.      The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

APP. 108453

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 164 of 1598    PageID 13211
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 9 of 14

X.    **Representations and Warranties**

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 165 of 1598   PageID 13212
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 10 of 14

**Schedule A[6]**

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 166 of 1598 PageID 13213
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 11 of 14

    8.   Highland Socially Responsible Equity Fund
    9.   Highland Income Fund
    10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

    11. SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

    1.   The Dugaboy Investment Trust
    2.   NexPoint Capital LLC
    3.   NexPoint Capital, Inc.
    4.   Highland IBoxx Senior Loan ETF
    5.   Highland Long/Short Equity Fund
    6.   Highland Energy MLP Fund
    7.   Highland Fixed Income Fund
    8.   Highland Total Return Fund
    9.   NexPoint Advisors, L.P.
    10. Highland Capital Management Services, Inc.
    11. Highland Capital Management Fund Advisors L.P.
    12. ACIS CLO Management LLC
    13. Governance RE Ltd
    14. PCMG Trading Partners XXIII LP
    15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
    16. NexPoint Real Estate Advisors II LP
    17. NexPoint Healthcare Opportunities Fund
    18. NexPoint Securities
    19. Highland Diversified Credit Fund
    20. BB Votorantim Highland Infrastructure LLC
    21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

    1.   NexBank SSB Account
    2.   Charitable DAF Fund LP

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 167 of 1598    PageID 13214
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 12 of 14

### Schedule B

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 168 of 1598    PageID 13215
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 13 of 14

## Schedule C

1.  James Dondero
2.  Mark Okada
3.  Grant Scott
4.  John Honis
5.  Nancy Dondero
6.  Pamela Okada
7.  Thomas Surgent
8.  Scott Ellington
9.  Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

APPX. 001468

Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 14 of 14

| Summary report: Litéra® Change-Pro TDC 10.1.0.300 Document comparison done on 2/3/2020 1:05:23 PM | |
|---|---|
| **Style name:** Sidley Default | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** DOCS_NY-#39943-v15-Highland_-_Discussion_Outline_for_Protocols.docx | |
| **Modified filename:** DOCS_NY-#39943-v15-Highland_-_Discussion_Outline_for_Protocols_2.docx | |
| **Changes:** | |
| Add | 5 |
| Delete | 0 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 5 |

# EXHIBIT 49

Case 19-34054-sgj11 Doc 3445-49 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 4
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 171 of 1598 PageID 13218
Case 20-03190-sgj Doc 10 Filed 12/10/20 Entered 12/10/20 13:31:53 Page 1 of 3



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 10, 2020**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding |
| | § | |
| vs. | § | |
| | § | No. 20-03190-sgj |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

## ORDER GRANTING DEBTOR'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER AGAINST JAMES DONDERO

Having considered the *Debtor's Motion for a Temporary Restraining Order and*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-49 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 4
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 172 of 1598 PageID 13219
Case 20-03190-sgj Doc 10 Filed 12/10/20 Entered 12/10/20 13:31:53 Page 2 of 3

*Preliminary Injunction against James Dondero* [Docket No. 6] (the "Motion"), the *Memorandum of Law* (the "Memorandum of Law")[2] in support of the Motion, and the *Declaration of James P. Seery, Jr. in Support of the Debtor's Motion for a Temporary Restraining Order against James Dondero* [Docket No. 4] (the "Seery Declaration"), including the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion and the Memorandum of Law establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      James Dondero is temporarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Memorandum of Law.

Case 19-34054-sgj11 Doc 3445-49 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 4
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 173 of 1598    PageID 13220
Case 20-03190-sgj Doc 10 Filed 12/10/20    Entered 12/10/20 13:31:53    Page 3 of 3

employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[3]

3.      James Dondero is further temporarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct.

4.      All objections to the Motion are overruled in their entirety.

5.      The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

---

[3] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from seeking judicial relief upon proper notice or from objecting to any motion filed in the above-referenced bankruptcy case.

APPX. 10473

# EXHIBIT 50

Case 19-34054-sgj11 Doc 3445-50 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 6
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 175 of 1598    PageID 13222
Case 20-03190-sgj Doc 59 Filed 01/12/21    Entered 01/12/21 07:46:55    Page 1 of 5



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 11, 2021**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | No. 20-03190-sgj |
| | § | |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

### ORDER GRANTING DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
### AGAINST JAMES DONDERO

This matter having come before the Court on *Plaintiff Highland Capital Management,*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-50 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 6
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 176 of 1598 PageID 13223
Case 20-03190-sgj Doc 59 Filed 01/12/21 Entered 01/12/21 07:46:55 Page 2 of 5

*L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 2] (the "Motion"), filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"); and this Court having considered (a) the Motion, (b) *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Injunctive Relief* [Adv. Pro. Docket No. 1] (the "Complaint"), (c) the arguments and law cited in the *Debtor's Amended Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 3] (the "Memorandum of Law," and together with the Motion and Complaint, the "Debtor's Papers"), (d) *James Dondero's Response in Opposition to Debtor's Motion for a Preliminary Injunction* [Adv. Pro. Docket No. 52] (the "Opposition") filed by James Dondero, (e) the testimonial and documentary evidence admitted into evidence during the hearing held on January 8, 2021 (the "Hearing"), including assessing the credibility of Mr. James Dondero, (f) the arguments made during the Hearing, and (g) all prior proceedings relating to the Motion, including the December 10, 2020 hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against James Dondero* [Adv. Pro. Docket No. 6] (the "TRO Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest;

Case 19-34054-sgj11 Doc 3445-50 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 6
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 177 of 1598 PageID 13224
Case 20-03190-sgj Doc 59 Filed 01/12/21 Entered 01/12/21 07:46:55 Page 3 of 5

and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted in support thereof, establish good cause for the relief granted herein, and that (1) such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate and reorganization process; (2) the Debtor is likely to succeed on the merits of its underlying claim for injunctive relief; (3) the balance of the equities tip in the Debtor's favor; and (4) such relief serves the public interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      James Dondero is preliminarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents, in whatever capacity they are acting; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned, controlled or managed by the Debtor, and the pursuit of the Plan or any

Case 19-34054-sgj11 Doc 3445-50 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 6
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 178 of 1598 PageID 13225
Case 20-03190-sgj Doc 59 Filed 01/12/21 Entered 01/12/21 07:46:55 Page 4 of 5

alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[2]

3.      James Dondero is further preliminarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

4.      James Dondero is further preliminarily enjoined and restrained from communicating (in person, telephonically, by e-mail, text message or otherwise) with Scott Ellington and/or Isaac Leventon, unless otherwise ordered by the Court.

5.      James Dondero is further preliminarily enjoined and restrained from physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas, Texas, or any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel.  If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

6.      James Dondero is ordered to attend all future hearings in this Bankruptcy Case by Webex (or whatever other video platform is utilized by the Court), unless otherwise ordered by the Court.

7.      This Order shall remain in effect until the date that any plan of reorganization or liquidation resolving the Debtor's case becomes effective, unless otherwise ordered by the Court.

---

[2] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from (1) seeking judicial relief upon proper notice or from objecting to any motion filed in this Bankruptcy Case, or (2) communicating with the committee of unsecured creditors (the "UCC") and its professionals regarding a pot plan.

DOCS_NY:41944.3 36027/002

APPX. 10478

Case 19-34054-sgj11 Doc 3445-50 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 6
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 179 of 1598    PageID 13226
Case 20-03190-sgj Doc 59 Filed 01/12/21    Entered 01/12/21 07:46:55    Page 5 of 5

8.      All objections to the Motion are overruled in their entirety.

9.      The Court shall retain exclusive jurisdiction with respect to all matters arising

from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

DOCS_NY:41944.3 36027/002

APPX. 10347

# EXHIBIT 51

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 181 of 1598   PageID 13228
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 1 of 31

Docket #2660  Date Filed: 8/4/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed August 3, 2021

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § § | |

### MEMORANDUM OPINION AND ORDER HOLDING CERTAIN PARTIES AND THEIR ATTORNEYS IN CIVIL CONTEMPT OF COURT FOR VIOLATION OF BANKRUPTCY COURT ORDERS[2]

#### I.    Introduction.

This Memorandum Opinion and Order addresses the ***second*** civil contempt matter that this bankruptcy court has been asked to address since confirmation of a Chapter 11 plan for Highland Capital Management, L.P. (the "Debtor" or "Highland") on February 22, 2021.  In this instance,

_____

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This ruling constitutes the court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. Pro. 7052, in connection with the Motion, Memorandum of Law, Declaration, and Show Cause Order found at DE ## 2235, 2236, 2237, 2247, and 2255 in the above-referenced Bankruptcy Case.



1934054210804000000000001

APPX. 06479

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 182 of 1598    PageID 13229
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 2 of 31

Highland seeks to have at least two entities held in civil contempt of two bankruptcy court orders and imposed with sanctions: Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLO Holdco") (collectively, the "Alleged Contemnors"). Highland also seeks to have a law firm that has recently begun representing the Alleged Contemnors (Sbaiti & Company PLLC) held in civil contempt of the bankruptcy court, as well as any control-persons who authorized the Alleged Contemnors ("Authorizing Persons") to take the allegedly contemptuous actions.

First, who are these Alleged Contemnors? DAF[3] is alleged to be a charitable fund and a limited company that was formed in the Cayman Islands. DAF is the 100% owner of CLO Holdco, which is also a Cayman Islands entity. Thus, DAF controls CLO Holdco.[4] DAF was founded by Highland's former Chief Executive Officer ("CEO") and indirect beneficial equity owner—Mr. James Dondero ("Mr. Dondero"). DAF controls $200 million of assets, which asset base was derived from Highland, Mr. Dondero, Mr. Dondero's family trusts, or other donor trusts.[5] Mr. Dondero has historically been DAF's informal investment advisor (without an agreement), and he was DAF's managing member until 2012.[6] In 2012, an individual named Grant Scott (a patent lawyer with no experience in finance or running charitable organizations, who was Mr. Dondero's long-time friend, college housemate, and best man at his wedding) became DAF's managing member.[7] Then, Grant Scott resigned from that role, on or around January 31, 2021, after apparent

---

[3] The acronym "DAF" stands for donor advised fund.

[4] Debtor's Exh. 25 [DE # 2410]. CLO Holdco has sometimes been referred to as the "investment arm" of the DAF organizational structure. Transcript of 6/8/21 Hearing at 122:17-20.

[5] Transcript 6/8/21 Hearing at 98:3-99:15 (testimony that the donors "gave up complete dominion and control over the respective assets and at that time claimed a federal income tax donation for that").

[6] Id. at 149:16-150:2.

[7] Id. at 150:3-5; 154:11-24; 156:7-10. See also Debtor's Exh. 23 (Grant Scott Deposition 1/21/21) at 24-25; 28:21 ("I think he is my closest friend") [DE # 2410].

APPX. 103482

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 183 of 1598   PageID 13230
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21   Entered 08/04/21 08:56:33   Page 3 of 31

disagreements with Mr. Dondero.  After having no manager for a couple of months, an individual

named Mark Patrick ("Mr. Patrick") became DAF's general manager on March 24, 2021 (just 19

days before the events occurred that are the subject of this contempt matter). It appears that Mr.

Scott assigned his interests that undergirded his managing member role to Mr. Patrick at Mr.

Patrick's direction.[8]  Mr. Patrick was an employee of Highland (having had some sort of a "tax

counsel" role—but not in Highland's legal department) from 2008 until early 2021, and he now is

an employee of Highgate Consultants, d/b/a Skyview Group, which is an entity recently created by

certain former Highland employees.[9]  Mr. Patrick had no prior experience running a charitable

organization prior to becoming DAF's manager on March 24, 2021 (just like Grant Scott).[10]  He

testified that he "hold[s] [him]self out as a tax professional versant on setting up offshore master

fund structures."[11]

    <u>What were the allegedly contemptuous actions?</u>  DAF and CLO Holdco filed: (a) on April

12, 2021, a Complaint[12] ("Complaint") in the United States District Court for the Northern District

of Texas (the "District Court Action"), against the Debtor and two Debtor-controlled entities (*i.e.,*

Highland HCF Advisor, Ltd. ("Highland HCFA") and Highland CLO Funding, Ltd.

""HCLOF"));[13] and then (b) one week later, on April 19, 2021, filed a motion for leave to amend

---

[8] Debtor's Exh. 24 at 90-93 [DE # 2410].

[9] Transcript from 6/8/21 Hearing, at 95:18-97:2 [DE # 2440].

[10] *Id.* at 100:2-103:9. For further clarity, above the Cayman Islands structure for DAF and CLO Holdco, there are various foundations that hold "participation shares." *Id.* Mr. Dondero is president and director of those foundations. Debtor's Exh. 23 at 57.

[11] *Id.* at 144:7-8.

[12] Debtor's Exh. 12 [DE # 2410].

[13] Highland HCFA is a Cayman Islands limited company 100% owned by the Debtor.  HCLOF is a limited company incorporated under the laws of Guernsey. It is 49.02% owned by CLO Holdco and the remaining 50%+ is owned by the Debtor or Debtor's designee, as a result of the HarbourVest Settlement, as further explained herein.

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 184 of 1598 PageID 13231
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 4 of 31

the Complaint to add the Debtor's current CEO, James P. Seery, Jr. ("Mr. Seery") as a defendant

in the action (the "Seery Motion").[14] ***It is the Seery Motion that is primarily in controversy here***.

Note that in the original Complaint, Mr. Seery is named as a "potential party"[15] and, while not

nominally a party, he was mentioned approximately 50 times, by this court's count. Mr. Seery's

conduct is plastered throughout the Complaint, accusing him of deceitful, improper conduct. ***The***

***original Complaint does not mention that Highland is still in bankruptcy, nor that the claims***

***asserted in the Complaint are related to a bankruptcy case pursuant to 28 U.S.C. § 1334, but,***

***rather, asserts that federal subject matter jurisdiction exists in the District Court pursuant to 28***

***U.S.C. §§ 1331 & 1367***.

As will be explained further below, the District Court Action—which in some ways reads

like a minority shareholder suit[16]—is all about the alleged impropriety of a settlement (*i.e.,* the

"HarbourVest Settlement") that was proposed by the Debtor to the bankruptcy court in December

2020[17] and approved by the bankruptcy court (with notice to all creditors and after an evidentiary

hearing) on January 14, 2021.[18] "HarbourVest" was a collective of investors that had invested

approximately $80 million in the year 2017 into the defendant-entity herein known as HCLOF

(acquiring a 49.98% interest in it), and filed six proofs of claim against the Debtor in the bankruptcy

case, totaling $300 million, alleging that the Debtor had committed fraud back in 2017, in

---

[14] Debtor's Exh. 19 [DE # 2410].

[15] Debtor's Exh. 12 [DE # 2410], ¶ 6.

[16] Indeed, as alluded to in footnote 13 above, CLO Holdco is a minority shareholder (49.02%) of one of the Defendants, HCLOF, and HCLOF is now more than 50% owned by the Debtor or its designee as a result of the HarbourVest Settlement—a fact that CLO Holdco and DAF apparently do not like.

[17] Declaration of John Morris (Exhs. 1 & 2 attached thereto) [DE # 2237].

[18] "HarbourVest" refers to the collective of HarbourVest Dover Street IX Investment, L.P., HarbourVest 2017 Global AIF, L.P., HarbourVest 2017 Global Fund, L.P., HV International VIII Secondary, L.P., and HarbourVest Skew Base AIF, L.P.

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 185 of 1598 PageID 13232
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 5 of 31

connection with its encouraging HarbourVest to invest in and acquire the 49.98% interest in HCLOF. The Debtor and HarbourVest eventually negotiated a settlement of HarbourVest's proofs of claim which, in pertinent part, allowed HarbourVest a $45 million general unsecured claim in the bankruptcy case and involved HarbourVest transferring its 49.98% interest in defendant HCLOF to the Debtor or Debtor's designee.[19] The bankruptcy court approved this settlement as fair and equitable and in the best interests of the bankruptcy estate.[20]

Despite the full vetting in the bankruptcy court of the HarbourVest Settlement and an order approving the HarbourVest Settlement, which was not appealed by DAF or CLO Holdco,[21] various torts and other causes of action are now being alleged by DAF and CLO Holdco against the Debtor **relating entirely to the HarbourVest Settlement**, including: breach of fiduciary duties owed to DAF and CLO Holdco; breach of the HCLOF membership agreement, and an alleged right of first refusal provision therein; negligence; violations of RICO;[22] and tortious interference. In a nutshell, the gravamen of DAF's and CLO Holdco's Complaint is that the economics of the HarbourVest Settlement resulted in the Debtor obtaining HarbourVest's 49.98% in HCLOF for a value of $22.5 million, and DAF and CLO Holdco believe that the 49.98% interest was worth far more than this. DAF and CLO Holdco assert that they and HarbourVest were deceived. Somewhat shockingly to

---

[19] Declaration of John Morris (Exhs. 1 & 2 attached thereto) [DE # 2237]. HarbourVest basically wanted to rescind its earlier acquisition of the 49.98% to extract itself from Highland.

[20] Declaration of John Morris (Exh. 11 attached thereto) [DE # 2237].

[21] *Id.* The court notes that certain family trusts of Mr. Dondero (known as the Dugaboy and Get Good Trusts) did appeal the bankruptcy court order approving the HarbourVest Settlement. However, there was no stay pending appeal and the settlement was implemented.

[22] Shockingly, DAF and CLO Holdco state that Highland's "actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D)." Debtor's Exh. 12, [DE # 2410], at ¶ 117.

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 186 of 1598    PageID 13233
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 6 of 31

this court, the Complaint implies that information was withheld from DAF and CLO Holdco.[23]

DAF and CLO Holdco further argue that they should have been given the opportunity to purchase HarbourVest's 49.98% interest in HCLOF. Mr. Seery is alleged to be the chief perpetrator of wrongdoing. Subsequently, in the Seery Motion, in which DAF and CLO Holdco seek leave to amend the Complaint to add Mr. Seery to the District Court Action, DAF and CLO Holdco were clear for the first time that there is a "pending Chapter 11 proceeding" and disclosed to the District Court that they did not name Mr. Seery in the Complaint since the bankruptcy court "issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at [Highland], subject to certain prerequisites. In that order, the bankruptcy court also asserted 'sole jurisdiction' over all such causes of action."[24] DAF and CLO Holdco went on to state that the bankruptcy court's order "exceeds the bankruptcy court's powers and is unenforceable," but even if enforceable, in an abundance of caution, DAF and CLO Holdco are satisfying the bankruptcy court's mandates by asking the ***District Court*** for leave to sue Mr. Seery, since the bankruptcy court's powers are derivative from the District Court.[25]

Disturbingly, one of the Alleged Contemnors (CLO Holdco) objected to the HarbourVest Settlement during the bankruptcy case[26] and later withdrew its objection during the bankruptcy

---

[23] Mr. Dondero and CLO Holdco appeared at and examined the HarbourVest witness, Michael Pugatch, at a deposition before the hearing on the HarbourVest Settlement. Declaration of John Morris, Exhs. 7 & 8 thereto [DE # 2237]. Moreover, it is rather astounding to this court for anyone to suggest that any human being (Mr. Seery or anyone else) knew more, or withheld, any information that wasn't ***well known*** to Mr. Dondero and all principals/agents of DAF and CLO Holdco. Mr. Dondero and any personnel associated with DAF and CLO Holdco were as (or more) familiar with HCLOF's assets and their potential value than any human beings on the planet—having managed these assets for years. As one example, it has been represented to the court that HCLOF owns shares in MGM Holdings, Inc. ("MGM"). It is undisputed that Mr. Dondero sits on the MGM Board of Directors. *See* DE # 2236, n.14.

[24] Debtor's Exh. 17 [DE # 2410] at paragraph 2, p. 1.

[25] *Id.* at paragraph 3, pp. 1-2; & pp.5-8.

[26] Declaration of John Morris (Exh. 6 attached thereto) [DE # 2237].

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 187 of 1598   PageID 13234
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 7 of 31

court hearing regarding the settlement,[27] and did not appeal the order approving the HarbourVest Settlement.  CLO Holdco, in its later-withdrawn objection, made the very same argument that it now makes in Count 2 of the Complaint (in its breach of HCLOF membership agreement claim)—*i.e.,* that the Debtor committed a breach of a "right of first refusal" in the HCLOF membership agreement (in fact, this was the sole argument CLO Holdco made in its objection).[28] The Debtor and CLO Holdco submitted briefing on the alleged "right of first refusal" prior to the hearing on the HarbourVest Settlement, and the bankruptcy court spent a fair amount of time reviewing the briefing—only to learn on the morning of the hearing that CLO Holdco was withdrawing its objection.

    In any event, the Debtor now alleges that the District Court Action is not only an improper collateral attack on the bankruptcy court's order approving the HarbourVest Settlement, but—more germane to this civil contempt matter—the motion to amend the District Court Action to add Mr. Seery is a violation of *two* earlier bankruptcy court orders[29] that contained "***gatekeeper provisions***"—*i.e.,* specific provisions ***requiring parties to seek bankruptcy court approval before filing lawsuits against the persons controlling the Debtor***. These gatekeeper provisions—which the bankruptcy court considered to be both (a) a way to maintain control of potentially vexatious, distracting litigation (which might interfere with the reorganization effort), and (b) consistent with the United States Supreme Court case of *Barton v. Barbour*,[30] and some of its progeny (as well as

---

[27] Declaration of John Morris (Exh. 10 attached thereto), Transcript of 1/14/21 Hearing, at 7:20-8:6 [DE # 2237]. Note that two family trusts of Mr. Dondero had objected to the HarbourVest Settlement (in addition to Mr. Dondero personally), but they made clear at the January 14, 2021 Hearing on the HarbourVest Settlement that they were not asserting that the HCLOF membership agreement (or an alleged right of first refusal therein) was being violated by the HarbourVest Settlement. *Id.* at 22:5-20.

[28] Declaration of John Morris (Exh. 6 attached thereto) [DE # 2237].

[29] Debtor's Exh. 15 & 16 [DE # 2410].

[30] 104 U.S. 126 (1881).

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 188 of 1598 PageID 13235
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 8 of 31

the second sentence of 28 U.S.C. § 959(a))—were heavily negotiated in the case and significant, since they were put in place against a backdrop of contentious litigation. ***No one appealed the two bankruptcy court orders with the gatekeeper provisions***. There were still more gatekeeping provisions in the Debtor's Chapter 11 plan that the bankruptcy court confirmed on February 22, 2021 (that plan is on appeal at the Fifth Circuit, although the Fifth Circuit has denied a stay pending appeal; at the time of the hearing on this civil contempt matter, the plan had not yet gone effective).

Objections to the Debtor's request to have the Alleged Contemnors, the Alleged Contemnors' lawyers, and Authorizing Persons held in civil contempt of court were filed by DAF, CLO Holdco, Sbaiti & Company, PLLC,[31] by Mr. Patrick,[32] and by Mr. Dondero.[33] They argue that the Alleged Contemnors have not violated the bankruptcy court's prior orders containing gatekeeper provisions because the Alleged Contemnors have ***not actually sued*** Mr. Seery but, rather, have sought permission from the District Court to sue him. They argue that, even though the January 2020 Corporate Governance Order and July 2020 Seery CEO Order required parties to seek bankruptcy court permission to sue Mr. Seery, that seeking ***District Court*** permission is appropriate, since district courts actually have bankruptcy subject matter jurisdiction and bankruptcy courts are mere units of the district courts. Moreover, the Alleged Contemnors suggest that the bankruptcy court's gatekeeper provisions in the two orders ***exceeded the reach of its powers***, and, again, their Seery Motion was simply about asking the court with original bankruptcy subject matter jurisdiction (*i.e.*, the District Court) for authority to sue Mr. Seery.

---

[31] DE # 2313.

[32] DE # 2309.

[33] DE # 2312.

8

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 189 of 1598    PageID 13236
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 9 of 31

The bankruptcy court held an evidentiary hearing on the civil contempt matter on June 8, 2021. For the reasons set forth below, the court finds and concludes that DAF, CLO Holdco, Sbaiti & Company, PLLC (and its lawyers Jonathan Bridges and Mazin Sbaiti), Mr. Patrick, and Mr. Dondero are all in civil contempt of at least two bankruptcy court orders of which they had knowledge and were well aware. They shall each be jointly and severally liable for the sum of **$239,655** as a compensatory sanction for their civil contempt, and they will be purged from their contempt if they pay this amount within 15 days of entry of this Order. Moreover, the court will add on a sanction of **$100,000** for each level of rehearing, appeal, or petition for *certiorari* that the Alleged Contemnors may choose to take with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for *certiorari* are not successful.

## II.    Background.

A brief summary of the above-referenced bankruptcy case can be found in this court's Memorandum and Opinion issued June 7, 2021, regarding an earlier contempt motion that involved Mr. Dondero and different allegedly contemptuous actions.[34] This court will not repeat that summary herein but will hit some of the most pertinent highlights.

Bankruptcy Filing. On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that manages billions of dollars of assets. Highland's assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO, Mr. Seery, was selected by the creditors and approved by the bankruptcy court during the Chapter 11 case.

---

[34] Adversary Proceeding No. 20-03190, [DE # 190].

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 190 of 1598   PageID 13237
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 10 of 31

Corporate Governance Shake-Up.  Specifically, early in the case, the Official Unsecured

Creditors Committee (the "UCC")—whose members asserted well over $1 billion worth of claims

and whose members had been in litigation with Highland for many years in many courts—and the

U.S. Trustee ("UST") both desired to have a Chapter 11 Trustee appointed in Highland's

bankruptcy case—absent some major change in corporate governance—due to conflicts of interest

and the alleged self-serving, improper acts of Mr. Dondero and possibly other former officers.

Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC, which was

executed by Mr. Dondero and approved by a bankruptcy court order on January 9, 2020 (the

"January 2020 Corporate Governance Order").[35] The settlement and term sheet contemplated a

***complete overhaul of the corporate governance structure of the Debtor***.  Mr. Dondero resigned

from his role as an officer and director of the Debtor and of the Debtor's general partner. Three new

independent directors (the "Independent Board") were appointed to govern the Debtor's general

partner—Strand Advisors, Inc. ("Strand")—which, in turn, manages the Debtor. All of the new

Independent Board members were selected by the UCC and are very experienced within either the

industry in which the Debtor operates, restructuring, or both.  The three Independent Board

members are:  Retired Bankruptcy Judge Russell Nelms; John Dubel; and Mr. Seery.  As noted

above, one of the Independent Board members, Mr. Seery, was ultimately appointed as the Debtor's

new CEO and CRO on July 16, 2020 (the "July 2020 Seery CEO Order").[36]  To be clear,

Highland—during the bankruptcy case and still now—is governed by these wholly new,

---

[35] *See* Debtor's Exh. 15 [DE # 2410]. The exact title and location on the Bankruptcy Docket for this Order is: Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [DE # 339].

[36] *See* Debtor's Exh. 16 [DE # 2410]. The exact title and location on the Bankruptcy Docket for this Order is: Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [DE # 854].

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 191 of 1598 PageID 13238
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 11 of 31

Independent Board members who had no prior connection to Highland. They were brought in to build trust with creditors and to hopefully put an end to a litigation culture that permeated Highland.

As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as a portfolio manager for certain separate **non-Debtor** investment vehicles/entities whose funds are managed by the Debtor. The court approved this arrangement when the UCC ultimately did not oppose it. Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board,[37] and Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities.

Eventually, the Debtor's new Independent Board concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity because of conflicts and friction on many issues. Mr. Dondero's employment arrangement with the Debtor ceased in October 2020, but the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero. In fact, a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain of his related entities, on the one hand, and the Debtor on the other.

---

[37] "Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors . . . [and] will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination." *See* Debtor's Exh. 15 (paragraph 8 therein). [DE # 2410].

APPX. 06489

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 192 of 1598 PageID 13239
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 12 of 31

<u>Plan Confirmation</u>. The bankruptcy court confirmed a Chapter 11 plan on February 22, 2021. The plan was supported by the UCC and an overwhelming dollar amount of creditors. Mr. Dondero and certain entities related to him objected to the plan and have appealed the Confirmation Order. Mr. Seery remains as the executive of the Debtor, and will continue to serve in that role, under a specific structure established in the plan and accompanying documents (with oversight by the court and creditor representatives).

III.    **The Impetus for this Second Civil Contempt Matter**.

A. <u>The Orders</u>.

The subject of this second civil contempt matter is, primarily, two orders ***that were never appealed***: (a) the January 2020 Corporate Governance Order; and (b) the July 2020 Seery CEO Order—both referenced above.[38]

B. <u>The Gatekeeper Provisions in the Two Orders</u>.

As mentioned above, these orders contained certain provisions that are sometimes referred to as "gatekeeper" provisions. These "gatekeeper" protections require litigants to obtain the bankruptcy court's approval before suing certain protected parties in control of the Debtor for actions arising in the course of their duties, including Mr. Seery.

Paragraph 10 of the January 2020 Corporate Governance Order provided:

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

---

[38] Debtor's Exhs. 15 & 16. The HarbourVest Settlement Order described above is likewise significant to this analysis (also not appealed by the Alleged Contemnors).

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 193 of 1598 PageID 13240
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 13 of 31

Similarly, paragraph 5 of the July 2020 Seery CEO Order provided:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Despite these gatekeeper provisions, on April 12, 2021, the Alleged Contemnors, through new counsel (*i.e.,* different from the lawyers who represented them during the Bankruptcy Case previously) filed the District Court Action and promptly thereafter filed the Seery Motion asking the District Court for permission to add him as a defendant.

C.  A Few Words About Gatekeeper Provisions.

Gatekeeper provisions are not uncommon in the world of bankruptcy. There are multiple decisions from the Northern District of Texas[39] (as well as other districts)[40] approving gatekeeper

---

[39] *See, e.g., In re Pilgrim's Pride Corp.,* 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. Jan. 14, 2010) (bankruptcy court channeled to itself exclusive jurisdiction to hear claims against debtors' management (including their boards of directors and chief restructuring officer) and the professionals based upon their conduct in pursuit of their responsibilities during the chapter 11 cases.); *see also In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization [DE # 1671-1, attached to Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization], Section 10.8(b) at 57 (court retained ***exclusive*** jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added); *see also Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir. 1988) (bankruptcy court must determine that claim is colorable before authorizing a committee to sue in the stead of the debtor).

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (bankruptcy court acts as gatekeeper to determine whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust)); *In re Motors Liquidation Co.,* 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing bankruptcy court's gatekeeper function over GM ignition switch cases); *In re Motors Liquidation Co.,* 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same). The use of the gatekeeper structure in the General Motors cases is particularly noteworthy. The causes of action arising from defective ignition switches are based on state tort law – both product liability and personal injury – and are causes of action unquestionably outside the jurisdiction of a bankruptcy court to hear on the merits. Nevertheless, the General Motors bankruptcy court acted as the gatekeeper post-confirmation to determine whether such litigation should proceed against the estate of the old debtor or the asset purchaser under the confirmed plan.

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 194 of 1598 PageID 13241
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 14 of 31

provisions that either: (a) granted exclusive jurisdiction in the bankruptcy court to hear matters

challenging the actions of debtors' officers and directors arising from their conduct in the

bankruptcy cases; or (b) at least granted power to a bankruptcy court to determine whether such

matters could go forward. [41]

Bankruptcy courts frequently determine that the "Barton Doctrine" supports gatekeeper

provisions and may, by analogy, sometimes be applied to executives and independent directors of

debtors in possession. The "Barton Doctrine" originated from an old Supreme Court case[42] dealing

with receivers. The "Barton Doctrine" was eventually expanded in bankruptcy jurisprudence to

apply to bankruptcy trustees. As this court once noted regarding the "Barton Doctrine":

> [It] provides that, as a general rule, before a suit may be brought against a
> trustee, leave of the appointing court (*i.e.,* the bankruptcy court) must be obtained.
> The Barton doctrine is not an immunity doctrine but—strange as this may sound—
> has been held to be a jurisdictional provision (in other words, a court will not have
> subject matter jurisdiction to adjudicate a suit against a trustee unless and until the
> bankruptcy court has granted leave for the lawsuit to be filed).[43]

Courts have articulated numerous rationales for having this jurisdictional gatekeeping

doctrine. One is that, because a "trustee in bankruptcy is an officer of the court that appoints him,"[44]

the appointing court "has a strong interest in protecting him from unjustified personal liability for

acts taken within the scope of his official duties."[45] Another rationale is that the leave requirement

---

[41] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (under "Barton Doctrine," litigant must still seek authority from the bankruptcy court that appointed the trustee before filing litigation even if the bankruptcy court may not have jurisdiction to adjudicate the underlying claim).

[42] *Barton v. Barbour*, 104 U.S. 126 (1881).

[43] *Baron v. Sherman (In re Ondova Ltd. Co.)*, 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, *Baron v. Sherman (In re Ondova Co.)*, 2018 U.S. Dist. LEXIS 13439 (N.D. Tex. Jan. 26, 2018), *aff'd, In re Ondova Ltd.*, 2019 U.S. App. LEXIS 3493 (5th Cir. 2019).

[44] *In re Lehal Realty Assocs.*, 101 F.3d 272, 276 (2d Cir. 1996).

[45] *Id.*

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 195 of 1598 PageID 13242
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 15 of 31

"enables the bankruptcy court to maintain control over the estate and furthers the goal of
centralizing all creditors' claims so they can be efficiently administered."[46]  Yet other courts have
expressed an underlying reason for the doctrine is to maintain a panel of competent and qualified
trustees and to ensure efficient administration of bankruptcy estates:  Without the leave
requirement, "trusteeship w[ould] become a more irksome duty" and it would become "harder for
courts to find competent people to appoint as trustees.  Trustees w[ould] have to pay higher
malpractice premiums" and "this w[ould] make the administration of bankruptcy estates more
expensive."[47] Finally, another policy concern underlying the doctrine is a concern for the overall
integrity of the bankruptcy process and the threat of trustees being distracted from or intimidated
from doing their jobs.  For example, losers in the bankruptcy process might turn to other courts to
try to become winners there—by alleging the trustee did a negligent job.[48]  The Fifth Circuit has
recently recognized the continuing vitality of the "Barton Doctrine"—even after *Stern v. Marshall*[49]
(that is, even in a scenario in which the appointing bankruptcy court might not itself have
Constitutional authority to **adjudicate** the claims asserted against the trustee pursuant to the *Stern*
decision).[50]

> To be clear, the "Barton Doctrine" originated as a protection for federal receivers, but courts
expanded the concept to bankruptcy trustees, and eventually it has been applied to various court-
appointed and court-approved fiduciaries and their agents in bankruptcy cases, including debtors in

---

[46] *In re Ridley Owens, Inc.*, 391 B.R. 867, 871 (Bankr. N.D. Fla. 2008).

[47] *McDaniel v. Blust*, 668 F.3d 153, 157 (4th Cir. 2012) (citing *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998)). *See also generally* 1 COLLIER ON BANKRUPTCY 10-4 & 10-5 (Alan R. Resnick and Henry J. Sommer, eds., 16th Ed. 2016).

[48] *Linton*, 136 F.3d at 545-546.

[49] *Stern v. Marshall*, 564 U.S. 462 (2011).

[50] *See Villegas v. Schmidt,* 788 F.3d 156, 58-59 (5th Cir. 2015).

APPX. 004493

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 196 of 1598   PageID 13243
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 16 of 31

possession,[51] officers and directors of a debtor,[52] and the general partner of a debtor.[53] In the

Highland case, since Mr. Seery and the Independent Directors were proposed by the UCC to avoid

the appointment of a trustee, it seemed rather obvious to the bankruptcy court that they should have

similar protections from suit—particularly against the backdrop of a litigation culture at Highland

that had theretofore existed.

DAF and CLO Holdco argue that the gatekeeper provisions that are involved here run afoul

of 28 USC § 959(a) and are an inappropriate extension of the "Barton Doctrine" and, more

generally, they argue that the January 2020 Corporate Governance Order and July 2020 Seery CEO

Order simply went too far by precluding claims being asserted against Mr. Seery that are lesser than

gross negligence and willful misconduct—suggesting that precluding claims lesser than gross

negligence and willful misconduct (such as a mere negligence claim) would violate federal law (the

Investment Advisors Act) because Mr. Seery cannot contract away his fiduciary duties in this

regard.

Putting aside for the moment the fact that the January 202 Corporate Governance Order and

the July 2020 Seery CEO Order are final and nonappealable orders that have *res judicata* effect,

DAF and CLO Holdco are simply wrong about 28 U.S.C. § 959(a) and the unavailability of the

"Barton Doctrine" in a situation such as this.  28 U.S.C. § 959(a) states:

---

[51] *Helmer v. Pogue*, 2012 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also* 11 U.S.C §§ 1107(a) (providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity).

[52] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 & n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[53] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

16

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 197 of 1598 PageID 13244
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 17 of 31

> Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. ***Such actions shall be subject to the general equity of such court*** so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury. (Emphasis added.)

To be sure, this statute has long been recognized as a limited exception to the "Barton Doctrine," so that trustees and debtors in possession can be sued for postpetition torts or other causes of action that happen to occur in the ***ordinary course of operating a business*** (as opposed to actions of the trustee while engaged in the general administration of the case)—the classic example being a "slip and fall" personal injury suit that might occur on the premises of a business that a trustee or debtor in possession is operating.[54] However, DAF and CLO Holdco ignore the last sentence of the statute that gives the appointing court the equitable powers to control the litigation "as the same may be necessary to the ends of justice." This is precisely what a gatekeeper provision is all about.[55]

But as earlier noted, DAF and CLO Holdco are too late to argue about the legality or enforceability of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order. The Fifth Circuit has made clear that, if a party fails to object to or appeal a final order—even one that grants relief that may be outside of a bankruptcy court's jurisdiction—the order is *res judicata* as to parties who had the opportunity to object to it. It becomes the law of the case and is

---

[54] *E.g., Muratore v. Darr*, 375 F.3d 140, 144 (1st Cir. 2004) (section 959(a) "is intended to 'permit actions redressing torts committed in furtherance of the debtor's business, such as the common situation of a negligence claim in a slip and fall case where a bankruptcy trustee, for example, conducted a retail store'") (quoting *Carter v. Rodgers*, 220 F.3d 1249, 1254 (11th Cir. 2000)). *See also Lebovits v. Scheffel (In re Lehal Realty Assocs.)*, 101 F.3d 272, 276 (2d Cir. 1996); *In re Am. Associated Sys., Inc.*, 373 F. Supp. 977, 979 (E.D. Ky. 1974).

[55] The court further notes anecdotally that DAF and CLO Holdco demanded a jury trial in their Complaint, and they have alluded to this as a reason why it was appropriate to bring their suit in the District Court. But it appears they contractually waived their jury trial rights in a prepetition agreement with Highland. *See* DE # 2495, Ex. A thereto, ¶14(f).

APPX. 013437

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 198 of 1598 PageID 13245
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 18 of 31

not subject to collateral attack.[56] The Supreme Court has more recently stated this principle in the bankruptcy context in *United Student Aid Funds, Inc. v. Espinosa.*[57]

In summary, there can be no doubt that there are two binding, nonappealable final orders[58] that govern in the situation at bar. Not only were they wholly proper but parties are now bound by them regardless.

IV. **The Evidence at the June 8, 2021 Hearing.**

The bankruptcy court held an evidentiary hearing on the civil contempt matter on June 8, 2021. The court considered the Declaration of John Morris (with Exhibits 1-18 thereto), at DE # 2237; Debtor's Exhibits 12-55, at DE ## 2410 & 2421; Exhibits 1, 3-12, 15-28, 30-46 of DAF, CLO Holdco, and Mr. Patrick at DE ## 2411 & 2420; and the live witness testimony of Mr. Patrick and Mr. Dondero.

There really is very little, if anything, in dispute. No one disputes the existence of the January 2020 Corporate Governance Order or the July 2020 Seery CEO Order or the Harbourvest Settlement. No one disputes the existence of the District Court Action or the Seery Motion. Thus, all that the court heard at the June 8, 2021 hearing that was "new," beyond what was in the pleadings and documents, was the explanations/rationales given by those involved with filing the District Court Action and the Seery Motion.

---

[56] *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987).

[57] 130 S. Ct. 1367 (2010) (order confirming Chapter 13 plan, that improperly proposed to discharge a student loan without a hardship adversary proceeding, was not void where there had been no objection or appeal).

[58] DAF and CLO Holding presented a case at the June 8, 2021 hearing suggesting the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order might not have been final orders. The case dealt with an employment order under Section 327 of the Bankruptcy Code, and this court does not believe it was applicable here.

APPX. 013498

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 199 of 1598    PageID 13246
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 19 of 31

Mr. Patrick testified that he became the manager/director of DAF and CLO Holdco on March 24, 2021,[59] and he earns no compensation for that role, although the prior manager/director, Mr. Grant Scott, earned $5,000 per month.[60]  Mr. Patrick testified that he authorized the filing of the Complaint and the Seery Motion.[61] He testified that he retained the Sbaiti law firm 12 days before the District Court Action was filed, and the idea for filing the Complaint came from that firm,[62] although  Mr. Dondero "brought certain information" to Mr. Patrick. Mr. Patrick then "engaged the Sbaiti firm to launch an investigation," and  "also wanted Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts."[63] Mr. Patrick elaborated that he had no specific knowledge about the HarbourVest Settlement before taking charge of DAF and CLO Holdco,[64] but Mr. Dondero came to him with information about it.[65] Mr. Patrick did not talk to DAF's and CLO Holdco's prior managing member (Grant Scott) about the District Court Action, even though Grant Scott had been the managing member at the time of the HarbourVest Settlement that is the subject of the District Court Action.[66] Mr. Patrick hired the Sbaiti law firm at the unsolicited recommendation of D.C. Sauter,[67]  the  in-house  general  counsel  of  NexPoint

---

[59] Transcript 6/8/21 Hearing, at 97:3-21. [DE# 2440].

[60] Id. at 132:6-17. See also Debtor's Exh. 24 at 96:2-18 [DE # 2410].

[61] Transcript 6/8/21 Hearing, at 103:10-14; 104:3-13. [DE # 2440].

[62] Id. at 104:9-22.

[63] Id. at 105:1-5.

[64] Id. at 104:17-22.

[65] Id. at 105:13-106:16.

[66] Debtor's Exh. 24 at 101:10-102:20 [DE # 2410]; see also Transcript 6/8/21 Hearing, at 108:20-109:22. [DE # 2440].

[67] Transcript 6/8/21 Hearing, at 106:22-107:11. [DE # 2440].

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 200 of 1598 PageID 13247
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 20 of 31

Advisors (a company of which Mr. Dondero is president and controls).[68] Mr. Patrick further testified that Mr. Dondero communicated directly with the Sbaiti firm in relation to the investigation that was being undertaken and he "did not participate in those conversations";[69] Mr. Patrick "considered Mr. Dondero as the investment advisor to the portfolio . . . I wanted him to participate in the investigation."[70] Mr. Patrick confirmed that there is no formal investment advisory agreement with Mr. Dondero, and DAF and CLO Holdco had previously been in an investment advisory agreement with Highland.[71] While Mr. Patrick's testimony was replete with comments that he deferred to the Sbaiti law firm quite a bit, he did confirm that he authorized the filing of the Seery Motion and he was aware of the July 2020 Seery CEO Order.[72]

As for Mr. Dondero, much of the testimony elicited from Mr. Dondero centered around whether he essentially controls DAF and CLO Holdco and the sequence of events that led to Mr. Grant Scott resigning as their managing member. Recall that Mr. Scott had been their managing member at the time of the HarbourVest Settlement—to which CLO Holdco objected and then

---

[68] NexPoint Advisors is 99% owned by Mr. Dondero's family trust, Dugaboy Investment Trust, and is 1% owned by NexPoint Advisors GP, LLC, which is 100% owned by Mr. Dondero. [DE # 2543].

[69] *Id.* at Transcript 6/8/21 Hearing, at 107:24-108:18. [DE # 2440].

[70] *Id.* at 107:18-23.

[71] The lawyers at Sbaiti & Company commented during opening statements that Mr. Dondero was the source of certain of the information in the Complaint and that they were asserting "work product privilege" and "attorney-client privilege" as to their communications with Mr. Dondero "because he's an agent of our client." *Id.* at 41:6-10. The court ultimately overruled this claim of privilege since, among other things, Mr. Patrick's own testimony confirmed that Mr. Dondero had no contractual arrangement of any sort with DAF and CLO Holdco, and he was not a board member and had no decision-making authority for them. *Id.* at 137:2-12; *See also id.* at 180:23-188:7. For purposes of privilege assertion, there was no evidence whatsoever that Mr. Dondero was an agent or representative of DAF and CLO Holdco.

[72] *Id.* at 111:5-112:9.

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 201 of 1598 PageID 13248
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 21 of 31

withdrew its objection.[73]  Mr. Dondero testified that he believed Mr. Scott's decision to withdraw

the objection to the HarbourVest Settlement was inappropriate.[74]

Mr. Dondero further confirmed that he was the founder and primary donor to DAF.[75] He

expressed disapproval for Mr. Scott's various decisions on behalf of DAF and CLO Holdco during

the bankruptcy case (such as withdrawing a proof of claim and settling a lawsuit with the Debtor).[76]

He testified about general knowledge of the January 2020 Corporate Governance Order and the

July 2020 Seery CEO Order.[77]  He confirmed that he participated in discussions with Mr. Sbaiti

regarding the filing of the Complaint—indicating he spoke with the firm a "[h]alf dozen times,

maybe."[78] He testified that he was not involved with the Seery Motion itself.[79]

The totality of the evidence was clear that Mr. Dondero sparked this fire (*i.e.,* the idea of

bringing the District Court Action to essentially re-visit the HarbourVest Settlement and to find a

way to challenge Mr. Seery's and the Debtor's conduct), and Mr. Patrick and Sbaiti & Company,

PLLC, were happy to take the idea and run with it. The court believes the evidence was clear and

convincing that Mr. Dondero encouraged Mr. Patrick to do something wrong, and Mr. Patrick

basically abdicated responsibility to Mr. Dondero with regard to dealing with Sbaiti and executing

the litigation strategy.

**Conclusions of Law**

---

[73] *Id.* at 163:10-165:18.

[74] *Id.*

[75] *Id.* at 165:19-24.

[76] *Id.* at 161:24-168:1; 169:1-170:9.

[77] *Id.* at 178:16-180:11.

[78] *Id.* at 180:12-22; 207:10-12.

[79] *Id.* at 210:7-14.

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 202 of 1598    PageID 13249
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 22 of 31

A. <u>Jurisdiction and Authority</u>.

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This bankruptcy court has authority to exercise such subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b) in which this court may issue a final order.

The contempt motion currently before the court seeks for this court to hold DAF, CLO Holdco, Sbaiti & Company, PLLC, and any persons who authorized their actions in civil contempt of court for violating two orders of this court.  Mr. Patrick and Mr. Dondero have both responded herein—neither, of course, admitting to any wrongdoing.

It is well established that bankruptcy courts have civil (as opposed to criminal) contempt powers.  "The power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts."[80] A bankruptcy court's power to sanction those who "flout [its] authority is both necessary and integral" to the court's performance of its duties.[81]  Indeed, without such power, the court would be a "mere board[ ] of arbitration, whose judgments and decrees would be only advisory."[82]

---

[80] *In re SkyPort Global Comm's, Inc.,* No. 08-36737-H4-11, 2013 WL 4046397, at *1 (Bankr. S.D.Tex. Aug. 7, 2013), *aff'd.,* 661 Fed. Appx. 835 (5th Cir. 2016); *see also In re Bradley,* 588 F.3d 254, 255 (5th Cir. 2009) (noting that "civil contempt remains a creature of inherent power[,]" to "prevent insults, oppression, and experimentation with disobedience of the law[,]" and it is "widely recognized" that contempt power extends to bankruptcy) (quoting 11 U.S.C. § 105(a), which states, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),* 108 F.3d 609, 613 (5th Cir. 1997) ("[W]e assent with the majority of the circuits … and find that a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105."); *Citizens Bank & Trust o. v. Case (In re Case),* 937 F.2d 1014, 1023 (5th Cir. 1991) (held that bankruptcy courts, as Article I as opposed to Article III courts, have the inherent power to sanction and police their dockets with respect to misconduct).

[81] *SkyPort Global,* 2013 WL 4046397, at *1.

[82] *Id.* (internal quotations omitted); *see also Bradley,* 588 F.3d at 266 (noting that contempt orders are both necessary and appropriate where a party violates an order for injunctive relief, noting such orders "are important to the

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 203 of 1598   PageID 13250
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 23 of 31

Contempt is characterized as either civil or criminal depending upon its "primary purpose."[83] If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.[84] It is clear that Highland's intent is to both seek compensation for the expenses incurred by Highland, due to the Alleged Contemnors' purported violations of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order (*i.e.,* the gatekeeper provisions therein), and to coerce compliance going forward.

B.    Type of Civil Contempt:  Alleged Violation of a Court Order.

There are different types of civil contempt, but the most common type is violation of a court order (such as is alleged here). "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order."[85] Thus, the party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence:[86] "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[87]

---

management of bankruptcy cases, but have little effect if parties can irremediably defy them before they formally go into effect.").

[83] *Bradley*, 588 F.3d at 263.

[84] *Id.* (internal citations omitted).

[85] *Travelhost*, 68 F.3d at 961.

[86] *United States v. Puente*, 558 F. App'x 338, 341 (5th Cir. 2013) (per curiam) (internal citation omitted) ("[C]ivil contempt orders must satisfy the clear and convincing evidence standard, while criminal contempt orders must be established beyond a reasonable doubt.").

[87] *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.,* 959 F.2d 45, 47 (5th Cir. 1992) (same); *Travelhost*, 68 F.3d at 961 (same).

APPX. 13593

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 204 of 1598   PageID 13251
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 24 of 31

C.  <u>Specificity of the Order</u>.

To support a contempt finding in the context of an order alleged to have been violated, the order must delineate 'definite and specific' mandates that the defendants violated."[88] The court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated."[89]

D.  <u>Possible Sanctions</u>.

To be clear, if the court ultimately determines that the Alleged Contemnors are in contempt of court, for not having complied with the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order, the court can order what is necessary to: (1) compel or coerce obedience of the order; and (2) to compensate the Debtor/estate for losses resulting from the Alleged Contemnors' non-compliance with the court orders.[90] The court must determine that the Debtor/movant showed by clear and convincing evidence that: (1) the orders were in effect; (2) the orders required or prohibited certain conduct; and (3) that the Alleged Contemnors failed to comply with the orders.[91]  "[T]he factors to be considered in imposing civil contempt sanctions are: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order."[92] "Compensatory civil contempt reimburses the injured party for

---

[88] *Am. Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[89] *Id.*

[90] *In re Gervin*, 337 B.R. 854, 858 (W.D. Tex. 2005) (citing *United States v. United Mine Workers*, 330 U.S. 258 (1947)).

[91] *In re LATCL&F, Inc.,* 2001 WL 984912, at *3 (N.D. Tex. 2001) (citing to *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 400 (5th Cir. 1987)).

[92] *Lamar Financial Corp. v. Adams,* 918 F.2d 564, 567 (5th Cir. 1990) (citing *United States v. United Mine Workers,* 330 U.S. 258 (1947)).

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 205 of 1598 PageID 13252
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 25 of 31

the losses and expenses incurred because of [their] adversary's noncompliance."[93] Ultimately, courts have "broad discretion in the assessment of damages in a civil contempt proceeding."[94]

### E. Knowledge of the Order.

"An alleged contemnor must have had knowledge of the order on which civil contempt is to be based. The level of knowledge required, however, is not high. And intent or good faith is irrelevant."[95] To be clear, "intent is not an element in civil contempt matters. Instead, the basic rule is that all orders and judgments of courts must be complied with promptly."[96]

### F. Willfulness of Actions.

For civil contempt of a court order to be found, "[t]he contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order."[97] For a stay violation, the complaining party need not show that the contemnor intended to violate the stay. Rather, the complaining party must show that the contemnor intentionally committed the acts which violate the stay. Nevertheless, in determining whether damages should be awarded under the court's contempt powers, the court considers whether the contemnor's conduct constitutes a willful violation of the stay.[98]

---

[93] *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976); *see also Travelhost*, 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.*, 43 F.3d at 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees).

[94] *Am. Airlines*, 228 F.3d at 585; *see also F.D.I.C.*, 43 F.3d at 168 (reviewing lower court's contempt order for "abuse of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 ("The bankruptcy court's decision to impose sanctions is discretionary[]").

[95] *Kellogg v. Chester,* 71 B.R. at 38.

[96] *In re Unclaimed Freight of Monroe, Inc.,* 244 B.R. 358, 366 (Bankr. W.D. La. 1999); *see also In re Norris*, 192 B.R. 863, 873 (Bankr. W.D. La. 1995) ("Intent is not an element of civil contempt.")

[97] *Am. Airlines*, 228 F.3d at 581 (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984)).

[98] *In re All Trac Transport, Inc.,* 306 B.R. 859, 875 (Bankr. N.D. Tex. 2004) (internal citations omitted).

APPX. 06593

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 27 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 206 of 1598   PageID 13253
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21   Entered 08/04/21 08:56:33   Page 26 of 31

G.  Applying the Evidence to the Literal Terms of the January 2020 Corporate Governance
Order and the July 2020 Seery CEO Order.

The court concludes that there is clear and convincing evidence that DAF, CLO Holdco,
Sbaiti & Company, PLLC (through attorneys Mazin Sbaiti and Jonathan Bridges), Mr. Patrick, and
Mr. Dondero—each and every one of them, with their collaborative actions—violated the specific
wording of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order,
and all are in contempt of the bankruptcy court.  The evidence was clear and convincing:  (1) that
two court orders were in effect (the January 2020 Corporate Governance Order and the July 2020
Seery CEO Order); (2) that the orders prohibited certain conduct (*i.e.,* "[n]o entity may commence
or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as
the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy
Court (i) first determining after notice that such claim or cause of action represents a colorable
claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing
such entity to bring such claim.");[99] and (3) that the all of the Alleged Contemnors (DAF, CLO
Holdco, Sbaiti & Company, PLLC, Mr. Mazin Sbaiti, Mr. Jonathan Bridges, Mr. Patrick, and Mr.
Dondero) knew about the orders and failed to comply with the court's orders.

As earlier noted, the District Court Action is all about Mr. Seery's allegedly deceitful
conduct in connection with a bankruptcy court-approved settlement (*i.e.,* the HarbourVest
Settlement), to which CLO Holdco objected, but then withdrew its objection the day of the hearing.
***The lawsuit is, from this court's estimation, wholly frivolous***.  This court is in a better position to
realize its frivolousness than any other—having spent hours reflecting on the merits of the
HarbourVest Settlement.  This court believes that it is clear and convincing that each of the Alleged

---

[99] This is quoting from the July 2020 Seery CEO Order.  The January 2020 Corporate Governance Order, of course,
had the same prohibitory language as to all three of the Independent Directors.

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 207 of 1598 PageID 13254
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 27 of 31

Contemnors knew that it would be a "hard sell" to convince this bankruptcy court that the District

Court Action and the claims against Mr. Seery should be allowed to go forward. That's why they

tried their luck with the District Court—concocting a rationale that their methods were proper since

the bankruptcy court's power to exercise bankruptcy subject matter is derivative, by statute, from

the District Court. This rationale is nothing more than thinly veiled forum shopping. But worse, it

is, in this instance, contempt of court. The Alleged Contemnors argue that they should not be held

in contempt because, in filing the Complaint (which mentions Mr. Seery 50 times—but merely

names him as a "potential party"), they did not "commence or pursue" a claim against Mr. Seery.

Likewise, they argue that, in filing the Seery Motion, they did not actually "commence or pursue"

a claim against Mr. Seery. They argue that a request for leave from the District Court, to add him

to the District Court Action, cannot possibly meet the definition of "pursue"—and that one can only

"pursue" litigation against a party *after* "commencing" an action against the party. This is linguistic

gymnastics that does not fly. The Alleged Contemnors were pursuing litigation when they filed the

Seery Motion in the District Court (and maybe even as early as when they filed the Complaint

mentioning Mr. Seery 50 times and describing him as a "potential party"). These were all sharp

litigation tactics, to be sure, but more problematic, were contemptuous of this court's orders.

### V. Damages.

The Contempt Motion requests that the court: (a) find and hold each of the Alleged

Contemnors (directed at DAF, CLO Holdco, Sbaiti & Company, PLLC, and any persons who

actually authorized their acts—*i.e.,* "Authorizing Persons") in contempt of court; (b) direct the

Alleged Contemnors, jointly and severally, to pay the Debtor's estate an amount of money equal to

two times the Debtor's actual expenses incurred in bringing this contempt matter, payable within

three calendar days of presentment of an itemized list of expenses; (c) impose a penalty of three

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 208 of 1598    PageID 13255
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 28 of 31

times the Debtor's actual expenses incurred in connection with any future violation of any order of this court; and (d) grant the Debtor such other and further relief as the court deems just and proper under the circumstances.[100]

As indicated earlier, the court can order what is necessary to: (1) compel or coerce obedience of an order; and (2) to compensate the Debtor/estate for losses resulting from non-compliance with a court order. Here, the court believes compensatory damages are more appropriate than a remedy to compel or coerce future compliance. Compensatory damages are supposed to reimburse the injured party for the losses and expenses incurred because of their adversary's noncompliance. Courts have broad discretion but may consider such factors as: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order.

As far as the harm from noncompliance, the Debtor presented invoices of the fees incurred by its counsel relating to this matter. The invoices were Exhibits 54 & 55 [DE # 2421]. The invoices reflect fees of the Debtor's primary bankruptcy counsel, Pachulski Stang, relating to this contempt matter, during the time period of April 18–April 30, 2021, of $38,796.50,[101] and another $148,998.50,[102] during the time period of May 1–June 7, 2021. These total **$187,795**, and the court determines these to have been reasonable and necessary fees incurred in having to respond and react to the contemptuous conduct set forth herein.    Moreover, the court considers it to likely be a

---

[100] Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders.  [DE # 2247].

[101] The total fees and expenses for this time period were $1,295,070.58, but the court has calculated the fees related to this contempt matter.

[102] The total fees and expenses for this time period were $1,465,010 but the court has calculated the fees related to this contempt matter.

APPX. 10596

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 209 of 1598 PageID 13256
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 29 of 31

conservative number because: (a) it does not reflect the fees and expenses incurred at the June 8, 2021 Hearing (which went 4+ hours); (b) it does not include any expenses the firm incurred (the court notes from the time entries that there were depositions taken—thus, there must have been expenses); (c) it does not include any fees and expenses that the UCC may have incurred monitoring this contested matter; and (d) it does not include any fees for Pachulski's local counsel (Hayward & Associates). As for the June 8, 2021 Hearing, the court is aware that at least three professionals from Pachulski Stang participated (Jeff Pomeranz at $1,295/hour; John Morris at $1,245/hour; and paralegal Asia Canty at $425/hour, for a total of $2,965/hour; multiplied by 4 hours equals $11,860)—thus, the court will add on another $11,860 of fees that should be reimbursed. The expenses the Pachulski firm incurred during this time period were $22,271.14, but they are not itemized. Thus, the court will assume $10,000 of this related to the contempt matter. The court will conservatively assume the UCC incurred $20,000 in fees monitoring this matter—as this matter could impact their constituency's recovery (the court is aware that the UCC's lawyer Matthew Clemente attended the June 8, 2021 Hearing). The court will conservatively assume that Hayward and Associates incurred $10,000 in fees assisting Pachulski. Thus, all totaled, this amounts to **$239,655** of fees and expenses that this court is imposing upon the Alleged Contemnors, jointly and severally, to reimburse the bankruptcy estate for the fees and expenses it has incurred relating to their contemptuous acts.

The Debtor has asked for the court to impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this bankruptcy court. The court declines to do this. However, the court will add on a sanction of $100,000 for each level of rehearing, appeal, or petition for *certiorari* that the Alleged Contemnors may choose to take

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 210 of 1598 PageID 13257
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 30 of 31

with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for certiorari are not successful.

Accordingly, it is hereby ORDERED that:

(i) DAF, CLO Holdco, Sbaiti & Company, PLLC (including Mazin Sbaiti and Jonathan Bridges), Mark Patrick, and James Dondero (collectively, now the "Contemnors") are each in civil contempt of court in having violated the court's January 2020 Corporate Governance Order and July 2020 Seery CEO Order—the court having found by clear and convincing evidence that: (1) these orders were in effect and each of the Contemnors knew about them; (2) the orders prohibited certain conduct; and (3) the Contemnors failed to comply with the orders;

(ii) In order to compensate the Debtor's estate for loss and expense resulting from the Contemnors' non-compliance with the orders, the Contemnors are jointly and severally liable for the compensatory sum of **$239,655** and are directed to pay the Debtor (on the 15th day after entry of this order) an amount of money equal to **$239,655;**

(iii) The court will add on a monetary sanction of **$100,000** for each level of rehearing, appeal, or petition for *certioriari* that the Contemnors may choose to take with regard to this Order, to the extent that any such motions for rehearing, appeals, or petitions for *certiorari* are pursued by any of them and are not successful;

(iv) Other sanctions (such as further deterrence sanctions) are denied at this time but, ***should any of these Contemnors be subject to another contempt motion in this court in the future and be found to have committed contempt***, the court anticipates imposing significant deterrence sanctions (the court duly notes that this is the second

APPX. 013508

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 32 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 211 of 1598   PageID 13258
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21   Entered 08/04/21 08:56:33   Page 31 of 31

time in the last several weeks that the court has found Mr. Dondero to be in contempt

of court); and

(v)      The court reserves jurisdiction to interpret and enforce this Order.

### End of Memorandum Opinion and Order ###

APPX. 08509

# EXHIBIT 52

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
 3                                  )    Case No. 19-34054-sgj-11
        In Re:                      )    Chapter 11
                                    )
 4      HIGHLAND CAPITAL            )    Dallas, Texas
        MANAGEMENT, L.P.,           )    Tuesday, June 8, 2021
 5                                  )    9:30 a.m. Docket
                                    )
 6           Debtor.                )
                                    )    - SHOW CAUSE HEARING (2255)
 7                                  )    - MOTION TO MODIFY ORDER
                                    )      AUTHORIZING RETENTION OF
                                    )      JAMES SEERY (2248)
 8                                  )    - MOTION FOR ORDER FURTHER
                                    )      EXTENDING THE PERIOD WITHIN
 9                                  )      WHICH DEBTOR MAY REMOVE
                                    )      ACTIONS (2304)
10      _____)

11                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                 UNITED STATES BANKRUPTCY JUDGE.

13      APPEARANCES:

14      For the Debtor:         Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
15                              10100 Santa Monica Blvd.,
                                  13th Floor
16                              Los Angeles, CA  90067-4003
                                (310) 277-6910
17
        For the Debtor:         John A. Morris
18                              Gregory V. Demo
                                PACHULSKI STANG ZIEHL & JONES, LLP
19                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
20                              (212) 561-7700

21      For the Debtor:         Zachery Z. Annable
                                HAYWARD & ASSOCIATES, PLLC
22                              10501 N. Central Expressway,
                                  Suite 106
23                              Dallas, TX  75231
                                (972) 755-7104
24

25
```

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:            Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:            Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:           Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee   Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee   Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                 Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
            Proceedings recorded by electronic sound recording;
24             transcript produced by transcription service.

25

4

<u>DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M.</u>

 1       THE COURT: All right. We have settings in Highland

 2  this morning. We have three settings. We have the show cause

 3  hearing with regard to a lawsuit filed in the District Court.

 4  We have a couple of more, I would say, ministerial matters,

 5  although I think we do have objections. I know we have

 6  objections. We have a motion to extend the removal period in

 7  this case as well as a motion to modify the order authorizing

 8  Mr. Seery's retention.

 9      So let's go ahead and start out by getting appearances

10  from the lawyers who are participating today. I'll get those

11  now.

12       MR. MORRIS: Good morning, Your Honor.

13       THE COURT: Good morning.

14       MR. MORRIS: John Morris from Pachulski, Stang, Ziehl

15  & Jones for the Debtor. I'm joined with me this morning by my

16  colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable.

17       THE COURT: Okay.

18       MR. MORRIS: We do have a proposal on how to proceed

19  today, a substantial portion of which is in agreement with the

20  Respondents.

21       THE COURT: Okay.

22       MR. MORRIS: So, at the appropriate time, I'd be

23  happy to present that to the Court.

24       THE COURT: All right. Well, let's get all the

5

```
 1   appearances and then I'll hear from you on that.
 2              MR. SBAITI:  Your Honor, my name is -- would you like
 3   me to approach, Your Honor?
 4              THE COURT:  Yes, please.
 5              MR. SBAITI:  It's my first time appearing in
 6   Bankruptcy Court, Your Honor.  My name is Mazin Sbaiti.  I'm
 7   here on behalf of the charitable DAF Fund, CLO Holdco, and the
 8   Respondents to the show cause hearing.  We are also
 9   representing them as the Movants on the motion to modify the
10   Court's order appointing Mr. Seery.
11              THE COURT:  All right.  Thank you.
12              MR. BRIDGES:  Jonathan Bridges, Your Honor, with Mr.
13   Sbaiti, also representing the Charitable DAF and CLO Holdco,
14   as well as our firm that is named in the show cause order.
15              THE COURT:  Okay.
16              MR. BRIDGES:  Thank you, Your Honor.
17              THE COURT:  Thank you.
18              MR. PHILLIPS:  Good morning, Your Honor.  Louis M.
19   Phillips from Kelly Hart Hallman here on behalf of Mark
20   Patrick in the show cause matter.  I'm joined with my
21   colleague Michael Anderson from the Kelly Hart firm here in
22   Fort Worth.  And that's the matter that we're involved in, the
23   show cause auction.
24              THE COURT:  All right.  Thank you, Mr. Phillips.
25              MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor
```

6

```
 1  of Bonds Ellis Eppich Schafer Jones here on behalf of Jim
 2  Dondero.  I have Mr. Will Howell here with me from my firm.
 3           THE COURT:  All right.  Thank you.
 4           MR. CLEMENTE:  Good morning, Your Honor.  Matthew
 5  Clemente from Sidley Austin on behalf of the Committee.  I'm
 6  here with my partner, Paige Montgomery.
 7           THE COURT:  Okay.  Thank you.
 8           MR. CLEMENTE:  Good morning.
 9           THE COURT:  All right.  Just to remind people, we do
10  have participants on the WebEx, but in setting the hearing I
11  made clear that participants today needed to be here live in
12  the courtroom.  So the WebEx participants are going to be only
13  observers.
14      We have a camera on the screen here that is poised to
15  capture both the lawyer podium as well as the witness box, and
16  then another camera on the bench.
17      So, please be mindful.  We want the lawyers to speak from
18  the podium so that they are captured and heard by the WebEx.
19  And so hopefully we don't have any cords you will trip over.
20  We've worked hard to make it easy to maneuver around the
21  courtroom.
22      All right.  So, Mr. Morris, you had a proposal on how we
23  would approach this today?
24           MR. MORRIS:  I do, Your Honor.  And it's rather
25  brief, but I think it makes a lot of sense.
```

7

1          There are three motions on the calendar for today, --

2               THE COURT:  Uh-huh.

3               MR. MORRIS:  -- only one of which required the

4    personal appearance of certain parties.

5               THE COURT:  Uh-huh.

6               MR. MORRIS:  And for that reason, and because,

7    frankly, it was the first of the three motions filed, we

8    believe that that ought to go first.

9               THE COURT:  Okay.

10              MR. MORRIS:  And then it can be followed by the

11   motion for reconsideration of the July order, assuming time

12   permits, and then the motion to extend the removal deadline.

13        And with respect to the contempt motion, Your Honor, the

14   parties have agreed that each side shall have a maximum of

15   three hours to make opening statements, closing arguments,

16   direct and cross-examination of witnesses.

17        You know, I did point out to them that from time to time

18   Your Honor has used the Court's discretion to adjust the time

19   --

20              THE COURT:  Uh-huh.

21              MR. MORRIS:  -- if the Court is making inquiries, and

22   I guess we'll deal with that matter as it comes.  But as a

23   general matter, that is what we've agreed to.  And I would

24   propose that, unless anybody has any objections, that we just

25   proceed on that basis.

8

```
 1            THE COURT:  Okay.
 2            MR. MORRIS:  And I could -- I could go right forward.
 3            THE COURT:  So, three hours in the aggregate?
 4            MR. MORRIS:  Uh-huh.
 5            THE COURT:  It doesn't matter how people spend it --
 6    with argument, examination, cross -- three hours in the
 7    aggregate?
 8            MR. MORRIS:  Correct.
 9            THE COURT:  Okay.  So, Nate, you'll be the timer on
10    that.
11            MR. MORRIS:  Yeah.  We thought it was very important
12    to get this done today, with people coming in from out of
13    town.
14            THE COURT:  Okay.  Sounds fine.
15            MR. MORRIS:  So does the Court want to inquire if
16    anybody has any questions or comments?
17            THE COURT:  I do.  Well, I see Mr. Bridges getting
18    up.  You confirm that that's agreeable?
19            MR. BRIDGES:  Thank you, Your Honor.  Yes, that's
20    agreeable.  We have one slight difference in our proposal.  We
21    would suggest to Your Honor that the motion for modification,
22    if Your Honor decides our way, would moot the entire motion
23    for contempt.  And we'd suggest, if that possibility is
24    realistic, that we would go first with that motion, perhaps
25    obviate having to have the evidence presented and the lengthy
```

9

1  hearing.

2      The motion for modification, Your Honor, asks the Court to

3  reconsider -- to modify that order because of jurisdictional

4  and other shortcomings in it that make the order

5  unenforceable.  And because that's the order that is the

6  subject of the contempt motion, we'd ask Your Honor to

7  consider putting that motion first.

8          THE COURT:  Okay.  Or second?  Ahead of the contempt

9  matter?

10          MR. BRIDGES:  Ahead of the contempt matter, --

11          THE COURT:  Uh-huh.

12          MR. BRIDGES:  -- because it has a possibility --

13          THE COURT:  We have the removal matter, which I think

14  is the shortest.  All right.

15          MR. BRIDGES:  No objection to that, Your Honor.

16  That's correct.

17          THE COURT:  Okay.  So, Mr. Morris, that's fine by

18  you?

19          MR. MORRIS:  Your Honor, that doesn't make a lot of

20  sense to us.  We don't believe there's any basis for the Court

21  to reconsider, modify, or amend in any way the July order.

22  But even if we were wrong about that, that would not

23  retroactively validate conduct which was otherwise wrongful at

24  the time it was committed.

25      The contempt motion needs to go first.  The other motion

10

1  will have no impact on whether or not there is a finding of

2  contempt of court.

3          THE COURT:  All right.  And update me on this.  There

4  was something filed yesterday, a notice of a proposed form of

5  order that the Debtor had proposed, that I think was not

6  agreed to, where there would be a change about any action that

7  goes forward, the cause of action would be in the sole

8  jurisdiction of the Court, and you all agreed to change that

9  part of the order, correct?

10         MR. MORRIS:  So, just as a division of labor for Your

11 Honor, I'm doing the contempt motion.

12         THE COURT:  Okay.  That's Mr. Pomerantz's?

13         MR. MORRIS:  Mr. Pomerantz is going to take care of

14 that.

15         MR. POMERANTZ:  Yes, Your Honor.  Good morning.  Good

16 to see you again.

17         THE COURT:  Good to see you.

18         MR. POMERANTZ:  Yes, Your Honor, that's correct.  If

19 Your Honor recalls, there's really three aspects of the

20 January 9th and the July 16th order.  First, requiring people

21 to come to Bankruptcy Court before commencing or pursuing an

22 action.  Second, for the Bankruptcy Court to have the sole and

23 exclusive authority to determine whether the claim is a

24 colorable claim of willful negligence or gross misconduct.

25 And then third, if Your Honor passed the claim through the

1   gate, whether you would have jurisdiction.

2       In Your Honor's January 9th and July 16th orders, you said

3   you would have exclusive jurisdiction.  In the motion for

4   reconsideration, and particularly the reply, Movants said, if

5   you just change that and say that if passes through the gate

6   that you'd have jurisdiction only to the extent you would

7   otherwise have it, that would resolve the motion, in the same

8   way that the plan of reorganization was amended.

9       We proposed that.  They rejected it.  We put it before

10  Your Honor.  So we believe that it moots out a good portion --

11  actually, we think it should moot out the entire motion.  They

12  obviously disagree.  But we definitely agree it moots out the

13  most significant portion of their motion, which is that Your

14  Honor would take jurisdiction to adjudicate a matter on an

15  exclusive basis when you might not otherwise have jurisdiction

16  on an exclusive basis.

17            THE COURT:  Okay.  Well, --

18            MR. BRIDGES:  Your Honor, may I respond to that?

19            THE COURT:  You may.  And --

20            MR. BRIDGES:  Thank you, Your Honor.

21            THE COURT:  -- why -- could you clarify why you think

22  it would moot out the entire show cause matter?  I wouldn't be

23  retroactively changing my order.  Is that what you're

24  proposing?

25            MR. BRIDGES:  Your Honor, with all respect, we

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 224 of 1598 PageID 13271

12

1  believe the order is defective and unenforceable and has to be

2  modified in order to fix it.  And because of the defects,

3  we're -- we're actually arguing, Your Honor, that it is

4  unenforceable in a contempt proceeding.  That is exactly what

5  our argument is.

6          THE COURT:  Okay.  I think I'm getting way farther

7  down this road than maybe I want to right now.  But I guess

8  here's the elephant in the room, I feel like:  *Republic Supply*

9  *versus Shoaf*.

10          MR. BRIDGES:  Uh-huh.

11          THE COURT:  The U.S. Supreme Court *Espinosa* case, for

12  that matter.  If I accept your argument that maybe there was a

13  flaw in those orders, that maybe they went too far, don't you

14  have a problem with those two cases?

15          MR. BRIDGES:  Your --

16          THE COURT:  The orders weren't appealed.

17          MR. BRIDGES:  I understand completely, Your Honor.

18          THE COURT:  Uh-huh.

19          MR. BRIDGES:  And I think the answer is no because of

20  the *Applewood* case from the Fifth Circuit.  The *Applewood* case

21  cited in our reply brief explains that in order for an order,

22  a final order of the Bankruptcy Court to have exculpatory

23  effect, in order for it to release claims, for example, that

24  the claims at issue must be enumerated in the order.  It's not

25  enough to have a blanket statement like the order, the July

13

 1  order has, like the January order has, saying that Mr. Seery's

 2  claims -- claims cannot be brought against him for ordinary

 3  negligence at all.  The -- Your Honor, we're delving into my

 4  argument.

 5          THE COURT:  Okay.

 6          MR. BRIDGES:  And I was hoping to do this on a

 7  preliminary basis.

 8          THE COURT:  Right.

 9          MR. BRIDGES:  I don't mean to bog you down with that.

10  But Your Honor, no, mandatory authority from the Fifth Circuit

11  after *Shoaf* limits *Shoaf's* application and says that it does

12  not extinguish the claims that are not specifically enumerated

13  in the order.  And the reason for that is because it doesn't

14  give the kind of notice to the parties that they would need to

15  make an appearance and object to those orders at the time.  It

16  actually helps to stem the amount of litigation at the time

17  rather than to encourage it.

18          THE COURT:  All right.  Well, you'll get your

19  opportunity to make your full argument on this.  But I'm not

20  convinced, preliminarily, at least, to affect my decision on

21  the sequence, okay?  So even if it potentially wastes time

22  under your view of the law, I am going to do the removal

23  matter first -- the extension of time request, I should say --

24  and then the show cause and then the motion to modify.  And I

25  realize, those last two matters, everything is kind of

14

```
 1   interrelated.  All right?

 2            MR. BRIDGES:  Yes, Your Honor.

 3            THE COURT:  All right.  So, with that decided, is

 4   there a desire on the part of the lawyers to make opening

 5   statements, or shall we just go to the motions?  And, of

 6   course, people can use their three hours for oral argument,

 7   however much they want to use for oral argument.

 8            MR. MORRIS:  Your Honor, the -- to be clear, the six-

 9   hour time limit only applies to the contempt proceeding.

10            THE COURT:  Oh, yes.  Yes.  Uh-huh.

11            MR. MORRIS:  And I do want to make an opening

12   statement.

13            THE COURT:  Okay.

14            MR. MORRIS:  So, as the Movant, I'd like to go first.

15            THE COURT:  You want to make opening statements?

16            MR. BRIDGES:  Yes.  Yes, Your Honor.

17            THE COURT:  Okay.  Okay.

18            MR. BRIDGES:  I believe we've got a PowerPoint

19   prepared that I think can lay out our side of it.

20            THE COURT:  Okay.

21            MR. BRIDGES:  I don't think we're participating in

22   the motion to extend the removal time.

23            THE COURT:  Okay.

24            MR. BRIDGES:  That's going first.

25            THE COURT:  All right.
```

15

```
 1            MR. BRIDGES:  So we'll wait until that is --

 2            THE COURT:  Well, so we don't get confused on the

 3    timing, let's just do the motion to extend right now.  And I

 4    think we only had one objection.  As Mr. Sbaiti just pointed

 5    out, they're not objecting on that one.  We have a Dondero

 6    objection.  So let's, without starting the timer, hear that

 7    one.  Okay?

 8            MR. DEMO:  Good morning, Your Honor.  Greg Demo;

 9    Pachulski, Stang, Ziehl & Jones.

10            THE COURT:  Good morning.

11            MR. DEMO:  I'll be arguing the removal motion and

12    then turn it over.

13        It's fairly basic and straightforward, Your Honor.  We're

14    asking for a further extension of the statutory deadline to

15    remove cases until December 14th, 2021.  The deadline is

16    procedural only.  As Your Honor is well aware, there's a lot

17    of moving parts in this case.  You know, we don't know to this

18    date, really, the full universe of what could actually be out

19    there.  So we're just asking for a short extension of the

20    removal period to cover through December.

21        I know that there was an objection from Mr. Dondero.  I

22    know that he argues that 9006 does not allow us to extend that

23    deadline past the effective date of the plan, and he cites one

24    case for that purpose, which is *Health Support*.  I think it's

25    out of Florida.  That case dealt with the extension of the
```

16

```
 1    two-year extension of the statute of limitations and was very

 2    clear that you can't use 9 --

 3            THE COURT:  You mean the 546 deadline?

 4            MR. BRIDGES:  Yes.  Yes.

 5            THE COURT:  Okay.

 6            MR. BRIDGES:  That you can't use 9006 to extend non-

 7    bankruptcy deadlines.  That's not what we're doing here, Your

 8    Honor.  We're using 9006 to extend the bankruptcy deadline to

 9    remove the cases.

10            THE COURT:  Uh-huh.

11            MR. DEMO:  And we'd just ask Your Honor for the

12    extension through December.

13            THE COURT:  Okay.  I'll hear Mr. Dondero's counsel.

14            MR. HOWELL:  Good morning, Judge.  Will Howell for

15    Mr. Dondero.

16        So, the argument here is not that the Court can't do this.

17    I was just pointing that there is an outside limit to what

18    we're doing.  And so if you look at the cases that the Debtor

19    cites in support of this motion, the one that is most apt was

20    when Judge Nelms did a fourth extension of time.  But those

21    were all 90-day extensions.  Here, we're in a situation where

22    the Debtor is asking for a fourth 180-day extension of time,

23    and this is really where the, you know, objection came -- or,

24    the response in opposition came from.  They specifically asked

25    that it be without prejudice to further extensions.
```

17

1    And so, at some point, you know, does 9006 have an outside

2    limit?  You know, do we need to see some sort of a light at

3    the end of the tunnel here?

4        So we would ask that the motion, at a minimum, be denied

5    in part with respect to this open-ended request for extension

6    beyond two years for a 90-day period.  The other cases that

7    they cite, they have one extension here, one extension there,

8    120 days here, but not 180 days after 180 days after 180 days,

9    and then asking specifically for without prejudice to further

10   extensions beyond two years.  So that's -- that's where this

11   comes from.

12           THE COURT:  All right.  Do you think it matters that

13   this is a very complex case?

14           MR. BRIDGES:  I --

15           THE COURT:  There's litigation here, there, and

16   everywhere.

17           MR. HOWELL:  I also think, you know, *Mirant* was

18   complex.  I think *Pilgrim's Pride* was complex.  I think, you

19   know, it is not out of bounds for the Court to grant a fourth

20   extension.

21           THE COURT:  Uh-huh.

22           MR. BRIDGES:  But to -- you know, at some point --

23   you know, maybe the Court could grant a 90-day extension and

24   make them come back a little more frequently to kind of corral

25   this thing, rather than just saying "This grant of 180 days,

18

 1 | the fourth time, is going to be without prejudice to further

 2 | extensions."  It just gets kind of large.

 3 |         THE COURT:  Okay.  Mr. Demo, your motion.  You get

 4 | the last word.

 5 |         MR. DEMO:  Your Honor, I mean, it is without

 6 | prejudice for further extensions, but that doesn't mean that

 7 | Your Honor is granting the further extensions now.  It means

 8 | we'll have to come back.  We'll have to make our case for why

 9 | an extension is necessary.  And, you know, if Your Honor

10 | doesn't want to give us another extension past December 2021,

11 | Your Honor doesn't have to.  This is not an order saying that

12 | it's a limitless grant.

13 |     You know, I'd also ask, you know, quite honestly, why Mr.

14 | Dondero has such an issue with this.  He hasn't said that any

15 | of these cases involve him.  He hasn't given any reasons why

16 | this affects him.  He hasn't given any reason why this damages

17 | him at all.  So I do, I guess, wonder as an initial matter

18 | kind of why we're here, you know, why we're responding to Mr.

19 | Dondero's request, when that request really has no impact on

20 | him.

21 |     And then, Your Honor, to the extent that you are inclined

22 | to limit this, I would say, you know, we would ask for a

23 | reasonable extension of time.  We do think an extension of

24 | time, because of the complexity of this case, through December

25 | is warranted.  But if Your Honor for some reason does agree

19

1   that a shorter extension is necessary under 9006 -- I don't

2   think it is -- we'd just ask that Your Honor grant us leave to

3   come back for further extensions of time.

4              THE COURT:  Okay.  All right.  I will -- I'll grant a

5   90-day extension, without prejudice for further extensions.

6              MR. DEMO:  Thank you, Your Honor.

7              THE COURT:  Maybe in 90 days we'll be farther down

8   the road and we won't need any more extensions, but you'll

9   have the ability to argue for more if you think it's really

10  necessary.  All right.  So that will bring us to around

11  September 14th, I guess.

12     All right.  Well, let's go ahead and hear opening

13  statements with regard to the show cause matter.  And again,

14  if you want to roll in arguments about the -- well, no, you

15  said the six hours only applies to show cause, so we'll not

16  hear opening statements with regard to the Seery retention

17  modification, just show cause.

18             MR. MORRIS:  All right.  Before I begin, Your Honor,

19  I have a small deck to guide --

20             THE COURT:  Okay.

21             MR. MORRIS:  -- to guide my opening statement.

22             THE COURT:  All right.

23             MR. MORRIS:  Can I approach the bench?

24             THE COURT:  You may.  And is your legal assistant

25  going to share her content --

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 21 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 232 of 1598   PageID 13279
299

20

```
 1          MR. MORRIS:  Yes.
 2          THE COURT:  -- so people on the WebEx will see?
 3  Okay.
 4          MR. MORRIS:  That's the intention, Your Honor.
 5          THE COURT:  Okay.
 6          MR. MORRIS:  All right.  Are you ready for me to
 7  proceed?
 8          THE COURT:  I am.  And obviously, everyone has a
 9  copy?
10          MR. MORRIS:  Yes.
11          THE COURT:  Your opponents have a copy of this?
12          MR. MORRIS:  Yep.
13          THE COURT:  Okay.  Although we hope to see it on the
14  screen.
15            OPENING STATEMENT ON BEHALF OF THE DEBTOR
16          MR. MORRIS:  Good morning, Your Honor.  John Morris;
17  Pachulski, Stang, Ziehl & Jones; for the Debtor.
18      We're here today on the Debtor's motion to hold certain
19  entities and individuals in contempt of court for violating a
20  very clear and specific court order.  I hope to be relatively
21  brief in my opening here, Your Honor, and I'd like to begin
22  where I think we must, and that is, how do we -- how do we
23  prove this and what do we have to prove?
24      The elements of a claim for contempt of court are really
25  rather straightforward.  The Movant must establish by clear
```

21

 1   and convincing evidence three things.

 2            THE COURT:  Let me stop you and stop the clock.

 3   We're not seeing the shared content.

 4            MR. MORRIS:  Uh-huh.

 5            THE COURT:  Did you want her to go ahead and share

 6   her content?

 7            MR. MORRIS:  I did.

 8            THE COURT:  Okay.

 9            MR. MORRIS:  I was hoping that she'd do that.

10            THE COURT:  All right.  It says it's receiving

11   content.

12            MR. MORRIS:  There we go.  It's on my screen, anyway.

13            THE COURT:  Oh, here it is.  I don't know why it's

14   not on my Polycom.  Can you all see it out there?

15        (Chorus of affirmative replies.)

16            THE COURT:  Okay.  Very good.

17            MR. MORRIS:  Okay.

18            THE COURT:  You may proceed.

19            MR. MORRIS:  Thank you, Your Honor.

20        So, there's three elements to the cause of action for

21   contempt, for civil contempt.  We have to prove by clear and

22   convincing evidence that a court order was in effect; that the

23   order required certain conduct by the Respondents; and that

24   the Respondent failed to comply with the Court's order.

25        We've cited in the footnote the applicable case law from

22

 1   the Fifth Circuit, and I don't believe that there's any

 2   dispute that is indeed the legal standard.

 3        The intent of the Respondents as to liability is

 4   completely irrelevant.  It doesn't matter if they thought they

 5   were doing the right thing.  It doesn't matter if they

 6   believed in their heart of hearts that the court order was

 7   invalid.  These are the three elements, and we will be able to

 8   establish these elements not by clear and convincing evidence,

 9   but if we ever had to, beyond reasonable doubt.

10        If we can go to the next slide, please.

11        We begin with the Court's order, the Court's July 9 order.

12   And that order states very clearly what conduct was required.

13   And the conduct that was required was that no entity could

14   commence or pursue -- those are really the magic words --

15   commence or pursue a claim against Mr. Seery without the

16   Bankruptcy Court doing certain things.  And we've referred to

17   this as the gatekeeper.  And the only question I believe the

18   Court has to ask today is whether the Respondents commenced or

19   pursued a claim against Mr. Seery without seeking Bankruptcy

20   Court approval, as set forth in this order.

21        I'll dispute that there's anything ambiguous about this.

22   I'll dispute that it could not be clearer what conduct was

23   prohibited.  It could not be clearer.  The only question is

24   whether the conduct constitutes the pursuit of a claim.

25        Let's see what they did.  If we could go to the next

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 235 of 1598 PageID 13282

23

1    slide.  There will be no dispute about what they did.  And

2    what they did is, a week after filing a lawsuit against the

3    Debtor and two others arising out of the HarbourVest

4    settlement, a settlement that this Court approved, after

5    notice and a hearing and participation by the Respondents,

6    after they had the opportunity to take discovery, after they

7    had the opportunity to examine Mr. Seery about the value of

8    HarbourVest's interest in HCLOF, after all of that, they

9    brought a lawsuit after Mr. Patrick took control of the DAF

10   and CLO Holdco.  And that lawsuit related to nothing but the

11   HarbourVest suit, and it named in Paragraph 2, right up above,

12   Mr. Seery as a potential party.  And a week later, Your Honor,

13   they filed what we call the Seery Motion, and it was a motion

14   for leave to amend their complaint to add Mr. Seery as a

15   defendant.

16       We believe that that clearly violates the Court's July 7

17   order.  And indeed, again, these are facts.  They're not --

18   they're not in dispute.  Just look at the first sentence of

19   their motion.  The purpose of the motion was to name James

20   Seery as a defendant.  That was the purpose of the motion.

21   And the way that they made the motion, Your Honor -- and these

22   are undisputed facts -- the way they made the motion, Your

23   Honor, shows contemptuous intent.  We don't have to prove

24   intent, but I think it might be relevant when you get to

25   remedies.  Okay?

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 236 of 1598   PageID 13283

24

 1      And so how do I -- why do I say that?  Because they made

 2   this motion, Your Honor, and they didn't have to.  Everybody

 3   knows that under Rule 15 they could have amended the complaint

 4   if they wanted to.  If they wanted to, they didn't need the

 5   Court's permission.  What they wanted to do was try to get the

 6   District Court to do what they knew they couldn't.  And that's

 7   contemptuous.

 8      And they did it, Your Honor, without notice to the Debtor.

 9   Even after the Debtor had accepted service of the complaint,

10   even after we told them, if you go down this path, we're going

11   to file a motion for contempt, they did it anyway.  They

12   didn't serve the Debtor.  They didn't give the Debtor a

13   courtesy copy.  They didn't notify the Debtor.  The only thing

14   that happened was the next day, when the District Court

15   dismissed it without prejudice, they sent us a copy of that

16   notice.  And within three days, we were here.

17      A court order was in effect.  Mr. Patrick is going to

18   admit to that.  There's not going to be any dispute about

19   that.  The order required that the Respondents come to this

20   Court before they pursue a claim against Mr. Seery, and they

21   failed to comply with that order.  The facts, again -- if we

22   can go to the next slide.  We can look at some of the detail,

23   because the timeline is mindboggling.

24      Mr. Patrick became the Plaintiffs' authorized

25   representative on March 24th.  And folks, when I took their

25

```
 1  depositions, weren't specific about dates, and that's why some
 2  of the entries here refer to sometime after, but there's no
 3  question that the order of events is as presented here and as
 4  the evidence will show today.
 5      The evidence will show that sometime after Patrick became
 6  the Plaintiffs' authorized representative, Mr. Dondero
 7  informed Mr. Patrick that Highland had usurped an investment
 8  opportunity from the Plaintiffs.  Mr. Patrick is going to
 9  testify to that.  Mr. Patrick is also going to testify that,
10  without prompting, without making a request, D.C. Sauter, the
11  general counsel of NexPoint Advisors, recommended the Sbaiti
12  firm to Mr. Patrick.  Mr. Patrick considered nobody else.
13      Mr. Patrick retained the Sbaiti firm in April.  In other
14  words, within 12 days of the filing of the complaint.  They're
15  retained and they conduct an investigation.  You're going to
16  hear the assertion of the attorney-client and the common
17  interest privilege every time I ask Mr. Dondero what he and
18  Mr. Sbaiti talked about and whether they talked about naming
19  Jim Seery as a defendant.  But with Patrick's authorization,
20  the Sbaiti firm filed the complaint on April 12th, just days
21  after they were retained.
22      It's like a -- it's an enormous complaint.  I don't know
23  how they did that so quickly.  But in any event, the important
24  point is that they all worked together.  None of this happened
25  until Mr. Patrick became the authorized representative.
```

26

1        Mr. Patrick is going to tell you, Your Honor, he's going

2    to tell you that he had no knowledge of any wrongdoing by Mr.

3    Seery prior to the time he assumed the rein of the DAF and the

4    CLO Holdco.  He had no knowledge, Your Honor, of any claims

5    that the DAF and CLO Holdco had against the Debtor until he

6    became the Plaintiffs' authorized representative and Mr.

7    Dondero spoke to him.

8        If we can flip to the next page.  Mr. Dondero has

9    effective control of the DAF.  He has effective control of CLO

10   Holdco. You're going to be bombarded with corporate documents

11   today, because they're going to show you -- and they want you

12   to respect the corporate form, they really want you to follow

13   the rules and respect the corporate form, because only Mr.

14   Scott was responsible for the DAF and CLO Holdco until he

15   handed the reins on March 24th to Mr. Patrick.  Mr. Dondero

16   has nothing to do with this.  He's going to tell you.  He's

17   going to tell you he had nothing to do with the selection of

18   Mr. Patrick as Mr. Scott's replacement.

19       The facts are going to show otherwise, Your Honor.  The

20   DAF is a $200 million charitable organization that is funded

21   almost exclusively with assets derived from Highland or Mr.

22   Dondero or the Get Good Trust or the Dugaboy Trust.  The

23   evidence is going to show that at all times these entities had

24   shared services agreements and investment advisory agreements

25   with HCMLP.  The evidence will show that HCMLP at all times

27

 1   was controlled by Mr. Dondero.

 2       And it made sense.  The guy put in an awful lot of money

 3   for charitable usage.  Is he really just going to say, I don't

 4   really care who runs it?  The evidence is going to show that

 5   between October 2020 and January 2021, Grant Scott actually

 6   exercised independence.  Grant Scott was Mr. Dondero's

 7   childhood friend.  They went to UVA together.  They were

 8   roommates.  Mr. Scott was the best man at Mr. Dondero's

 9   wedding.  But we were now in bankruptcy court.  We're now in

10   the fishbowl.  And I will -- this may be a little argument,

11   but there's no disputing the facts that Mr. Scott acted

12   independently, and he paid the price for it.  Mr. Scott did it

13   three times.

14       He did it when he amended CLO Holdco's proof of claim to

15   take it down to zero.  He did it again after he withdrew the

16   objection to the HarbourVest settlement motion.  And he did it

17   again when he settled the lawsuit that the Debtors had brought

18   against CLO Holdco.  And that -- and on each of those three

19   occasions, the evidence will show that Mr. Scott did not

20   communicate with Mr. Dondero in advance, that Mr. Dondero

21   found out about these acts of independence after the fact, and

22   that each time he found out about it he had a little

23   conversation with Mr. Scott.

24       Mr. Dondero is going to tell you about it, and he's going

25   to tell you that he told Mr. Scott each act was inappropriate.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 29 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 240 of 1598   PageID 13287

28

1    You may have heard that word before.  Each act was not in the

2    best interests of the DAF.

3        The last of those conversations happened either on or just

4    after January 26th.  And by January 31st, Mr. Scott gave

5    notice of his resignation.  And you're going to see that

6    notice of resignation.  And he asks for releases.

7        Mr. Patrick becomes, almost two months later, the

8    successor to Mr. Scott.  Mr. Dondero is going to say he has no

9    idea how that happened.  He was just told after the fact that

10   Mr. Patrick and Mr. Scott had an agreement.  He's going to

11   tell you they had an agreement and he just heard about it

12   afterwards.  He didn't really -- for two months, I guess, he

13   sat there after Mr. Scott told him that he wanted out and did

14   nothing to try to find out who's going to take control of my

15   charitable foundation with $200 million.  He wasn't

16   interested.

17       But here's the thing, Your Honor.  If we go to the next

18   slide.  Let's see what Mr. Scott said at his deposition last

19   week.  Question, "Do you know who selected Mark?"  Answer, "I

20   do not."  Question, "Do you know how Mark was selected?"  Mark

21   is a reference to Mark Patrick.  "I do not."  "Did you ever

22   ask Mark how he was selected?"  "I did not."  "Did you ever

23   ask Mark who selected him?"  "I did not."  "Did you ever ask

24   anybody at any time how Mr. Patrick was selected to succeed

25   you?"  "No, I did not."  "Did you ever ask anybody at any time

29

1   as to who made the decision to select Mr. Patrick to succeed

2   you?"  "No, I did not."

3       So I don't know what happened between Mr. Patrick and Mr.

4   Dondero when Mr. Patrick supposedly told Mr. Dondero that

5   there was an agreement with Mr. Scott, but that is news to Mr.

6   Scott.  He had no idea.

7       Your Honor, we are going to prove by clear and convincing

8   evidence that each of the Respondents violated a very clear

9   and specific court order.  And unless the Court has any other

10  questions, I'll stop for now.

11              THE COURT:  No questions.

12              MR. MORRIS:  Thank you, Your Honor.

13              THE COURT:  All right.  Who is making the argument

14  for the Respondents?

15              MR. SBAITI:  Your Honor, I am.  I'm just trying to

16  put the PowerPoint up on the WebEx.

17              THE COURT:  Okay.

18              MR. SBAITI:  Sorry about that.

19              MR. MORRIS:  Your Honor, I'll try not to make this a

20  practice, but can I inquire as to how much time I used?

21              THE COURT:  Oh.  Nate?

22              THE CLERK:  About thirteen minutes.

23              THE COURT:  Thirteen minutes?

24              MR. MORRIS:  Thank you very much.

25              THE COURT:  Okay.  All right.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 242 of 1598 PageID 13289

30

1          MR. SBAITI:  Your Honor, our PowerPoint is a little

2     bit longer than that one.  May I approach with a copy?

3          THE COURT:  You may.  Uh-huh.

4        (Pause.)

5          MR. SBAITI:  Your Honor, it does feel good to be back

6     in the courtroom.

7          THE COURT:  Okay.

8          MR. SBAITI:  It's been a long time.

9          THE COURT:  Yes.  For us, too.

10          MR. SBAITI:  Jut wish it wasn't under a circumstance

11     where someone is trying to sanction me.

12       But we're going to be dividing up this oral argument a

13     little bit.  Also, to just kind of break up a little bit of

14     the monotony, because I think we have a lot to cover at the

15     opening stage of this.  And I'll try to be as expeditious as I

16     can be.

17     OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

18          MR. SBAITI:  Your Honor, the thing we -- the thing we

19     open with is the due process issue that we raised in our

20     brief.  And where this really arises from is the Court's show

21     cause order calls us violators before we've had a chance to

22     respond to the allegations and before we've obviously been

23     able to approach this hearing.  And the word violators means

24     something to us, Your Honor, because I've been a lawyer for a

25     long time, my partner has been a lawyer for a long time, our

31

1   clients have never been sanctioned, we've never been

2   sanctioned, and for us to be labeled violators first by

3   counsel and then in a court order makes us wonder whether or

4   not this process is already prejudged or predetermined.

5           THE COURT:  I actually want to address that.  Turn

6   off the clock.

7       Just so you know, I looked this up a while back, because

8   we gave a bankruptcy judges panel at some CLE.  The average

9   bankruptcy judge in our district, back when I looked, signs

10  over 200 orders a week.

11          MR. SBAITI:  Sure.

12          THE COURT:  Many of those -- in fact, most of them --

13  are submitted by lawyers.  So, you know, a big chunk of my

14  week is signing orders.  And I obviously give more scrutiny to

15  those that are substantive in nature.  Okay?  If someone

16  submits to me a 50-page debtor-in-possession financing order,

17  I will look at that much more carefully than what I consider a

18  mere procedural order setting a hearing.

19      So I regret that that word was used, but I can assure you

20  I fairly quickly set that -- signed that, I should say --

21  regarding it as a merely procedural order setting a hearing.

22  Okay?  So it's as simple as that.  There was no hmm, I like

23  that word, violator.  I had a stack, if you will, an

24  electronic stack of probably 200 orders in front of me the day

25  I signed that.  Okay?

32

1      So, if that makes anyone feel any better, I don't know,

2    but that's the reality.

3      Okay.  You can start the clock again.

4          MR. SBAITI:  And I appreciate Your Honor saying that.

5    It does make us feel better, both about where the -- the

6    genesis of the order and the impact and its reflection on what

7    Your Honor thinks in terms of going into this.

8      The other thing that obviously raised concerns, and I

9    assume this comes from the same place, was four days ahead of

10   that order counsel told us the Court was going to order

11   everyone to be in person, and they had advance notice of that,

12   and we weren't sure how they had advance notice of that.  I

13   guess they assumed --

14         THE COURT:  I can assure you right here on the record

15   I never had ex parte communications with any lawyer in this

16   case, on this matter or any other matter.  Okay?  Again, those

17   are pretty strong words to venture out there with, which your

18   pleading did venture out there with those words.

19     My courtroom deputy, Traci, I think answers her phone 24

20   hours a day.  So I'm quite sure she had communications with

21   the lawyers about this, just like she probably had

22   communications with you and your firm and every other firm in

23   this case.  Okay?

24         MR. SBAITI:  Like I said, Your Honor, we appreciated

25   what Your Honor -- appreciate what Your Honor said, but that

33

1   issue obviously stuck out -- stuck out to us, in combination.

2   So I'll move on from that issue.

3       This has to do with the lawsuit that was filed, and the

4   lawsuit, the genesis of the lawsuit, I think it's important to

5   say, because the argument has been raised in the briefing and

6   we wanted to address it upfront, why the lawsuit comes about.

7   And it comes about because of the Advisers Act and the

8   responsibilities that the Debtor has to the assets of the

9   funds that it manages.  And the Advisers Act imposes a duty

10  not only on Highland but obviously on its control people and

11  its supervised people.  And the lawsuit has to do with HCLOF,

12  which is what HarbourVest owned a piece of.  And Highland, as

13  the advisor to HCLOF and the advisor to the DAF, owed

14  fiduciary duties to CLO Holdco, which is the DAF's holding

15  entity of its assets in HCLOF, but Highland Capital was also

16  an advisor, a registered investment advisor to the DAF

17  directly at the time.  And so those federally-imposed

18  fiduciary duties lie at the crux of that lawsuit.

19      Moving on, Mr. Seery testified at the hearing that was in

20  this Court to be -- to get him appointed, and this was Exhibit

21  2 that was presented by the Debtor, and on Page 16 at the

22  bottom he says -- of the transcript, he says, I think, from a

23  high level, the best way to think about the Debtor is that

24  it's a registered investment advisor.  As a registered

25  investment advisor, which is really any advisor of third-party

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 246 of 1598 PageID 13293

34

1    money over $25 million, it has to register with the SEC, and

2    it manages funds in many different ways.

3        In the middle of the next page he says, In addition, the

4    Debtor manages about $2 billion, $2 billion in total managed

5    assets, around $2 billion in CLO assets, and then other

6    securities, which are hedge funds -- other entities, rather,

7    which are hedge funds or PE style.  Private equity style.

8        On Page 23 towards the bottom he says, As I said, the

9    Investment Advisers Act puts a fiduciary duty on Highland

10   Capital to discharge its duty to the investors.  So while we

11   have duties to the estate, we also have duties, as I mentioned

12   in my last testimony, to each of the investors in the funds.

13   CLO Holdco would be an investor in one of those funds, HCLOF.

14       He goes on to say, Some of them are related parties, and

15   those are a little bit easier.  Some of them are owned by

16   Highland.  HCLOF was not owned by Highland.  But there are

17   third-party investors in these funds who have no relation

18   whatsoever to Highland, and we owe them a fiduciary duty both

19   to manage their assets prudently but also to seek to maximize

20   value.

21       Now, the lawsuit alleges that Seery testified that the

22   HarbourVest portion of Highland CLO Funding was worth $22-1/2

23   million.  Now, Mr. Morris wants the Court to hinge on the fact

24   that, well, no one asked him whether he was lying.  But that's

25   not really the standard, and it certainly isn't the standard

35

1   when someone's an investment advisor and owes fiduciary

2   duties, which include fiduciary duties to be transparent with

3   your investors.

4        It also includes fiduciary duties not to self-deal.

5        The lawsuit also alleges that, in reality, those assets

6   were worth double that -- double that amount at the time.  We

7   found out just, you know, in late March/early April that a

8   third -- from a third party who had access to the underlying

9   valuations at the time that those values were actually double

10  and that there was a misrepresentation, giving rise to the

11  lawsuit.  That change in circumstance is the key issue behind

12  the lawsuit.

13       We allege that Mr. Seery and the Debtor, as RIAs, had a

14  duty to not self-deal and be fully transparent with that

15  information, and we think both of those things were violated

16  under the Advisers Act.

17       We don't allege that the HarbourVest settlement should be

18  undone or unwound.  We can't unscramble that egg.  We do seek

19  damages, as I believe is our right, arising out of the

20  wrongdoing and the process of pushing forth the settlement.

21       I think one of the allegations in the actual motion for

22  the show cause order was that this was going to undo all of

23  the hard work that Court had done and basically unwind and try

24  to re-piece Humpty Dumpty back together again.  But that's

25  simply not the case.  Nowhere in our allegations or in the

36

1    relief that we request are we trying to undo the HarbourVest

2    settlement as such.

3         Now, whether the lawsuit should be dismissed under the

4    affirmative defenses that they bring up -- res judicata,

5    waiver, release -- all of those are questionable under the

6    Advisers Act, given the change of circumstance, and therefore

7    are also questions on the merits.  They don't go to the

8    colorability of the underlying claims in and of themselves,

9    which I think is important.

10        So we asked for leave to amend from the Court.  And what

11   they want us to do, Your Honor, is they want to sanction us

12   for asking.  They're saying asking for leave to amend is the

13   same thing as pursuing a claim.  And I'll get to the specifics

14   on that in a little bit.  But that's the frame.  Can we be

15   sanctioned for asking a court, any court, even if it's the

16   wrong court, for permission to bring the lawsuit?  They don't

17   cite a single case that says that that, in and of itself, is

18   sanctionable conduct, us asking.

19        So I'd like to introduce some of the Respondents.

20        Your Honor, may I have one of these waters?

21             THE COURT:  Certainly.

22             MR. SBAITI:  Thank you.

23             THE COURT:  That's why they're there, by the way.

24             MR. SBAITI:  I didn't know if they belonged to

25   somebody else.

37

1          THE COURT:  We've scattered water bottles around for

2    people.

3          MR. SBAITI:  I appreciate it.  Thank you, Your Honor.

4          THE COURT:  So if you see these little ones, that's

5    for anyone.

6          MR. SBAITI:  So, this is an org chart, and you'll see

7    it as -- the exhibits that the Debtor's going to bring up.

8    And when we talk about the DAF, Your Honor -- I don't know if

9    that's visible to you.  We're on Slide 19, if you're looking

10   at it on paper.  There's a little number at the lower right-

11   hand corner.  The charitable DAF GP, LLP and then the

12   Charitable DAF Holdco, Ltd. together are the principles of the

13   Charitable DAF Fund, LP.  And so when we refer to the DAF or

14   the Charitable DAF, that's really the entity structure that

15   we're referring to.  And then the GP and Holdco Ltd. have a

16   managing member.  It used to be Grant Scott at the time this

17   was done.  Today, it's Mr. Mark Patrick, who's in the room,

18   sitting next to Mr. Bridges.

19       The DAF is a charitable fund.  It's funded over $32

20   million, as the evidence will show, including Dallas-Fort

21   Worth organizations, The Family Place, Dallas Children's

22   Advocacy, Center for Brain Health, the Crystal Ray Initiative,

23   Friends of the Dallas Police, Snowball Express, various

24   community and education initiatives, Dallas Arts, museums, the

25   Perot Museum, Dallas Zoo.  That evidence is undisputed, Your

38

1    Honor.  The DAF is a real fund.  It is a real charitable fund.

2    It does real good in the community.

3        Now, Respondents -- Holdco, which you will see at the

4    bottom of that chart, is essentially the investment arm.

5    There are assets that the DAF owns in various pots, and Holdco

6    is the actual business engine that generates the money from

7    those assets that then -- that then gets passed up to the

8    charitable -- the four charitable foundations at the top.

9        I'll go back to Slide 21.  And if you look at the top,

10   Your Honor, the Dallas Foundation, Greater Kansas City

11   Community, Santa Barbara Foundation, The Community Foundation

12   of North Texas:  Those are the charities that then themselves

13   bestow the funds onto the actual recipients.  So the money

14   flows up as dividends or distributions, and then gets

15   contributed.

16       CLO Holdco invests those assets, and it's an important

17   part of the business model, so that you're not sending out

18   principal.  It's the money that CLO makes, the profits, if you

19   will, that it is able to generate that gets donated and makes

20   its way into the community.

21       So there's an important feature to the structure in that

22   it has to be able to generate money.  It's not just money that

23   sits there and waits to be distributed.  There's active

24   investing going on.

25       Mr. Mark Patrick owns the control shares of the entities

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 40 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 251 of 1598   PageID 13298

39

1   comprising the DAF and CLO Holdco, as I showed you, and the

2   beneficiary charitable foundations hold what we call

3   beneficial interests, where they just get money.  They don't

4   have a vote.

5       Mr. Patrick cares about the public service the DAF engages

6   in.  He's been an advisor to the DAF, CLO Holdco, and its

7   predecessor, Mr. Scott, since its inception.  He receives no

8   compensation for the job he's doing today.  And you'll hear

9   how he became -- how he inured to the control position of the

10  DAF and CLO Holdco from him, but it doesn't involve Mr.

11  Dondero, and the absence of someone saying that it did, I

12  think, is going to be striking by the end of the presentation

13  of evidence.

14      Their only argument against you, Your Honor, is going to

15  be you just can't believe them.  But not believing witnesses

16  is not a substitute for the lack of affirmative evidence.

17      Mr. Patrick has said all along he authorized the filing of

18  the motion for leave to add Mr. Seery to the lawsuit in

19  District Court.  He doesn't believe the motion to amend

20  violated this Court's orders, for the reasons stated in our

21  responsive filings to the motions for contempt and show cause

22  order.  That's why he authorized it.

23      My firm, Sbaiti & Company, we're a small Dallas litigation

24  boutique retained by the DAF and CLO Holdco to file the

25  lawsuit.  We did an investigation.  I'm tickled to death that

40

1   Mr. Morris loved our complaint so much and gave us the

2   compliment that we got it done in a short amount of time, but

3   we did get it done in a short amount of time, because, in the

4   end, it's a rather simple issue, as I was able to lay it out

5   in about three or four bullet points in a previous slide.

6       The written aspect of that doesn't take that long, as Your

7   Honor knows, but the idea that there's a suspicion that we

8   didn't write it or someone else wrote it and ghost-wrote it

9   and gave it to us, which I think is the insinuation he was

10  making, is completely unfounded.  There's no evidence of that.

11      We carefully read Your Honor's orders.  We developed a

12  good-faith basis, as required by Rule 11, that the lawsuit and

13  the motion to add Mr. Seery were not filed in bad faith or for

14  an improper purpose.  We don't think they're frivolous.  We

15  don't think they're in violation of Your Honor's orders, given

16  the current state of the law.

17      Mr. Dondero is one of the settlors of the CRT, of the

18  Charitable Remainder Trust that ultimately provided assets to

19  CLO Holdco and the DAF.  He does care about the DAF's mission.

20  I think Mr. Morris hit the nail on the head.  Of course Mr.

21  Dondero cares about what happens to it.  He's one of the

22  settlors, and it was his funds that initially were put into

23  it, so he's allowed to care.  And I don't think him caring is

24  insidious, and him caring doesn't mean he has control and

25  doesn't mean he's the driving force behind some insidious

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 253 of 1598 PageID 13300

41

1    conspiracy that they're trying to insinuate exists.

2        He is an advisor to the DAF and CLO Holdco.  It is a lot

3    of money and it needs advice, and he's an advisor to Mr.

4    Patrick.  We don't run away from any of those facts, Your

5    Honor.

6        We also don't run away from the fact that he was the

7    source of some of the information that came in to that

8    complaint and that he relayed some of that information.  The

9    content, we do claim work product privilege and attorney-

10   client privilege, because he's an agent of our client, and as

11   lawyers doing an investigation, the content of our

12   communications is protected under the attorney-client and work

13   product privileges, as well as the joint interest privilege.

14   But the fact that we admit that those communications happened,

15   we're not running away from that fact.

16       So, what does he have to do with this?  It's interesting

17   that that opening argument you just heard spent about three

18   minutes on contempt and the other fourteen or fifteen minutes

19   or so on Mr. Dondero.  And only on Mr. Dondero.  There's a

20   negative halo effect, I believe, that they're trying to get

21   this Court to abide by.  They want to inflame Your Honor and

22   hopefully capture -- cultivate and then capitalize on whatever

23   antipathy you might have for Mr. Dondero, and then sweep us

24   all in under that umbrella and sanction everybody just because

25   he had some involvement.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 254 of 1598    PageID 13301

42

1        But whatever involvement he has, which we admit he had

2   some involvement in helping us marshal the facts, that's not a

3   basis for us to be sanctioned if there isn't an actual

4   sanctionable conduct that -- as we say there isn't.

5        We think there's an ulterior motive.  That's why Mr.

6   Morris just announced to Your Honor, Mr. Dondero controls it

7   all.  The ulterior motive, I believe, is, down the line, when

8   they want to argue some kind of alter ego theory, they want to

9   lay that foundation here.  I don't think this is the

10  appropriate time for that foundation, and I don't think any of

11  the information and the evidence they're trying to marshal in

12  front of you is really going to be relevant to the very

13  specific question that's before Your Honor:  Does our motion

14  asking the District Court to add Mr. Seery violate your order,

15  or violate it in a way that can be -- that we can be

16  sanctioned for?  We don't believe it violates it.

17       So, the three core standards that have to be met.  First

18  of all, civil contempt requires a valid, enforceable order.

19  It's not debatable and it's not -- I don't think that's a

20  shocking statement.  Then they have to have clear and

21  convincing evidence of a violation of a specific unambiguous

22  term therein.  Mr. Morris wants his version of the word pursue

23  to be unambiguous, and I think the word pursue is unambiguous.

24  But the way he wants you to construe it makes it completely

25  ambiguous, and we'll -- I'll get to that in a moment.

43

1        Now, for sanctioning counsel, the Fifth Circuit has held

2    you have to find bad faith.  We're adjudged under a slightly

3    separate standard under the Fifth Circuit law.  So the

4    contempt motion, though, to the extent it seeks to impose

5    double and treble attorney's fees, those are in punitive

6    fines.  They are not compensatory.  So criminal contempt

7    standards are raised, and so they have to show a violation in

8    bad faith.  In other words, our arguments that we're making

9    have to be bad faith, not simply that we're wrong, and they

10   have to show beyond a reasonable doubt, usually in front of a

11   jury.  The U.S. Supreme Court explained the difference and the

12   different procedural protections that have to be involved if

13   they're really going to seek double and treble compensatory

14   damages.

15       Now, he's right.  Saying we intended -- saying that we

16   didn't mean to violate it isn't necessarily a defense.  But

17   what you're actually going to hear from him is the opposite

18   argument, that even though we didn't violate it, we wanted to.

19   That's what he says.  That's why he quoted you the opening

20   section of our motion asking for permission to sue Mr. Seery,

21   because that's a statement of purpose.  And he says you should

22   sanction them right there.  That's literally what he said.

23   It's right there, their purpose.  If intent is irrelevant to

24   them, it's irrelevant as to us.  The fact that we wanted to

25   sue Seery is fully admitted.  We don't deny the fact that we

44

```
 1   believe Mr. Seery should be a defendant in this lawsuit.  But
 2   the fact that we didn't sue him is why we didn't violate the
 3   order.  And they can't say that the fact that we eventually
 4   wanted to sue him means we did violate the order.  That door
 5   swings both ways, Your Honor.
 6       We don't think any element is met.  The order, while writ
 7   large, prohibits suing Mr. Seery without permission, and we
 8   did not sue James Seery, pure and simple.  The July 12 --
 9   14th, 2020 order purports to reserve exclusively to this Court
10   that which, according to the statutes and the case law, we
11   believe the Court can't exclusively reserve to itself.  And
12   Your Honor, the order prohibits commencing and pursuing a
13   claim against Jim Seery without coming here first to decide
14   the colorability of such a claim.
15       They, I believe, admit that we didn't commence a claim
16   against Jim Seery.  I think they've admitted that now.  So now
17   we're talking about what does pursue mean?  We didn't pursue a
18   claim against Jim Seery.  Is asking for leave to bring suit
19   the same thing as pursuing a claim?  That's the question
20   that's really before Your Honor.  Lawyers never talk of
21   pursuing a claim that hasn't been filed.  We don't say, I'm
22   pursuing a claim and I'm going to file it next week or next
23   year.  Usually, that type of language is in an order, because
24   when the order happens, there may already be claims against
25   Mr. Seery.  And so the pursuit of claim is supposed to attack
```

45

 1    those cases, to come here and show colorability, presumably,

 2    before they continue on with those lawsuits.  It doesn't mean

 3    asking for permission.

 4        If it did mean asking for permission, then complying with

 5    Your Honor's order would be a violation.  If the motion for

 6    leave is a violation because it is pursuing a claim, if I had

 7    filed that motion in this Court, it would still be pursuing a

 8    claim without Your Honor's permission.  I'd have to get

 9    permission just to ask for permission.  It puts us in this

10    endless loop of, well, if asking for permission is pursuing a

11    claim, and pursuing a claim is without permission violates the

12    Court's order, we'd always be in violation of the Court's

13    order just for asking, just for following Your Honor's edict.

14            THE COURT:  I'm just, I'm going to interject.  You

15    were supposed to, under the order, file a motion in this

16    Court.

17            MR. SBAITI:  I understand that, Your Honor, and I

18    think that we can get to the specifics on why we disagree with

19    how the motion went, Your Honor.  We hadn't sued Mr. Seery.

20    So as long as we dealt with the order, which is what our

21    position is, then we don't believe we violated the order.

22            THE COURT:  You think the order was ambiguous,

23    requiring a motion to be filed in the Bankruptcy Court?

24            MR. SBAITI:  Your Honor, what we believe is that the

25    order was ambiguous in terms of whether us asking for

46

1   permission in the District Court was in and of itself a

2   violation of the order.  We don't think it was.  Actually, we

3   don't think the order's ambiguous to that extent.  The second

4   we file a suit against Mr. Seery and we don't have some

5   resolution of the issue, then I think the question of

6   sanctionability comes in.  But we never filed suit, Your

7   Honor.

8       The Court doesn't say I can't seek permission in the

9   District Court or that we can't go to the District Court with

10  -- which has general jurisdiction over this case, and has

11  jurisdiction, we believe, over the actual case and controversy

12  that's being raised.  But the idea of pursuit being a

13  violation of the order, of the letter of that order, is

14  nonsensical under that, it leads to an absurd result, and it's

15  plainly vague and ambiguous, Your Honor.

16      Asking Judge Boyle or asking a District Court for

17  permission is not a violation of this Court's order, not the

18  way it was written and not -- and I don't even believe it was

19  a violation necessarily of the Court's -- of the language that

20  the Court has.  We -- it doesn't unambiguously prevent us from

21  asking the District Court for leave.

22      The Court's order yesterday, Your Honor, applied this very

23  rule.  The TRO -- you said the TRO did not specifically state,

24  Turn your cell phone over.  And you denied motion for

25  sanctions on that.  That's basically the argument we're making

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 259 of 1598 PageID 13306
299

47

1    here, Your Honor.  We think that was the correct ruling, and

2    we think the same type of ruling applies here.

3         Your order yesterday also determined that the Court

4    ultimately believes that hiring lawyers to file motions should

5    not be viewed as having crossed the line into contemptuous

6    behavior.  That's essentially the argument they want you to

7    buy, that there's somehow a vindictiveness behind this and an

8    insidious plan to violate court orders, Your Honor.  We don't

9    have any evidence of that.

10             THE COURT:  Okay.  Take the words vindictiveness and

11   insidious out of the equation.  That's making things personal,

12   and I don't like that.  The key is the literal wording of the

13   order, is it not?

14             MR. SBAITI:  Your Honor, the key, I believe, is the

15   --

16             THE COURT:  No entity may commence or pursue a cause

17   of action of any kind against Mr. Seery relating in any way to

18   his role as the chief executive officer and chief

19   restructuring officer of the Debtor without the Bankruptcy

20   Court first determining, after notice, that such claim or

21   cause of action represents a colorable claim of willful

22   misconduct or gross negligence against Mr. Seery and

23   specifically authorizing such entity to bring such a claim.

24   So I'm trying to understand why you argue that filing a motion

25   asking the District Court for permission is not inconsistent

48

 1   with this order.

 2          MR. SBAITI:  Because it's not commencing a claim,

 3   Your Honor.  It's not commencing a claim against him.

 4          THE COURT:  Okay.  So is your argument that if Judge

 5   Boyle authorizes amendment of the pleading to add Mr. Seery

 6   and then you do it, at that point they may have grounds for a

 7   motion for contempt, but not yet, because she has not actually

 8   granted your motion?

 9          MR. SBAITI:  Correct, Your Honor.  I mean, in a

10   nutshell.  In fact, that's one of -- I think that's probably

11   our next argument.  We think, in a sense, this argument is

12   incredibly premature.  There is three ways that this -- well,

13   I'd like to address this, so I've got -- I've got a diagram

14   that I think will actually help elucidate what our thought

15   process was.

16      There's three things she could have done.  She could have

17   referred -- referred it to Your Honor, which is what we

18   expected was likely to happen.

19          THE COURT:  But you didn't file a motion for referral

20   of the motion before her.

21          MR. SBAITI:  Well, no, I don't mean in respect of

22   enforcing the reference.  The referral we thought was most

23   likely going to happen because it's an associated case, and we

24   actually put those orders in front of her, so we expected that

25   those orders would end up -- that the question would

49

1  ultimately end up in front of Your Honor on that basis.

2      She could have denied our motion outright, in which case

3  we haven't filed a claim, we haven't violated it, or she could

4  have granted our motion and done one of two things.  She could

5  have granted it to the extent that she thought leave would be

6  proper but then referred it down, or she could have decided --

7  taken the decision as the court with general jurisdiction and

8  simply decided it all on her own.  She had all of those

9  options, Your Honor, and none of them results in a claim being

10 commenced or pursued without the leave of this Court, if leave

11 is absolutely necessary, Your Honor.  And that's the point

12 that we were trying to make.

13     Your Honor, the -- there's -- you know, there's no

14 evidence that, absent an order from a court with jurisdiction,

15 that we were going to file a claim against Mr. Seery, that we

16 were going to commence or pursue a claim against Mr. Seery.

17 We were cognizant of Your Honor's order.  We considered that.

18 And the reason we filed them the way we did is because,

19 according to the statutes and the case law, this is the type

20 of case that would be subject to a mandatory withdrawal of the

21 reference.

22     And so there's this paradox that arises, Your Honor.  And

23 the paradox that arises is that we show up and immediately go,

24 well, we need to be back in the District Court.  So we filed

25 our motion there, and I don't think that was contemptuous, it

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 262 of 1598 PageID 13309

50

```
 1   wasn't intended to be contemptuous of the Court, but we showed
 2   the orders to the Court, made the same arguments that we have
 3   been making here, that we believe that there's problems with
 4   the order, we believe the order oversteps its jurisdiction and
 5   maybe is unenforceable, and it's up to that District Court, as
 6   it has been in almost all of these other gatekeeper order
 7   cases that get filed.  None of them result in sanctions, Your
 8   Honor.  What they result in is a District Court deciding,
 9   well, either they refer it or they decide I don't need to
10   refer it.  But I don't think that that is the same thing as
11   commencing or pursuing a claim in the end, Your Honor, because
12   all we did was ask for permission, and permission could have
13   been denied or granted or granted in part.
14       Your Honor, they haven't cited an injury.  You've heard
15   the testimony, Your Honor, that they -- the first time they
16   knew we had filed a motion -- which I don't understand why
17   that's the first time they knew we had filed a motion; we told
18   them we were going to file the motion -- was when I forwarded
19   an email saying that it's been denied without prejudice, Your
20   Honor.  Well, that means they didn't have to do any work to
21   respond to the motion.  They didn't have to do any work to do
22   any of the other things.
23       And one hundred percent of the damages that they're going
24   to say they incurred is the litigation of this contempt
25   hearing or this sanction motion, as opposed to some other
```

51

1   simpler remedy, like going in to Judge Boyle and saying, Your

2   Honor, all that needs to go, which is what they eventually

3   did.  But they would have had to incur those costs anyway

4   because they're now moving to enforce the reference.  They

5   filed a 12(b)(6).  That briefing would have existed regardless

6   of whether or not we had filed our motion, regardless of

7   whether the sanctions hearing had commenced.

8       Your Honor, I'm going to let my partner, Mr. Bridges,

9   address this part of it, if I could.  I think that gets into

10  more of the questions that you asked, and I think he can

11  answer them a lot better than I can.

12          THE COURT:  Okay.

13          MR. SBAITI:  Thank you.

14          THE COURT:  That's fine.

15          MR. BRIDGES:  Thank you, Your Honor.  And I do want

16  to address pointedly the questions that you're asking.  First,

17  though, I was hoping to back up to some preliminary remarks

18  that you made and say that I find the 200 orders a week just

19  mindboggling.  It amazes me, and puts the entire hearing in a

20  different perspective for me.  I'm grateful that you shared

21  that with us.

22      Your expression of regret about naming us violators was

23  very meaningful to me.  It causes me -- well, the strong words

24  in our brief were mine.  I wrote them.  And your expression of

25  regret causes me to regret some of those words.  I'm hopeful

52

1   that you can understand, at least in part, our reaction out of

2   concern.

3       And Your Honor, it's awkward for me to talk about problems

4   with your order, and that's the task that's come to me, to

5   list and talk through four of them and why we think they put

6   us in a really awkward position in deciding what to do in this

7   case, in the filing of it, in where we filed it, and in how we

8   sought leave to go forward against Mr. Seery.  That was

9   awkward and difficult for us, and I'm hopeful that I can

10  explain that and that you'll understand, if I'm blunt about

11  problems with the order, that I mean it very respectfully.

12  Two hundred orders a week is still very difficult for me to

13  get my mind around.

14      The four issues in the order start with the gatekeeping.

15  Then, secondly, in the preliminary remarks, I made mention of

16  the *Applewood* case and the notice that the order releases some

17  claims.  Its effect of --

18          THE COURT:  And by the way, I mean, you might

19  elaborate on the facts and holding of *Applewood*, because I

20  came into this thinking *Republic Supply v. Shoaf*, and for that

21  matter, as I said, *Espinosa*, were much more germane.  And so,

22  you know, you'll have to elaborate on *Applewood*.  I remember

23  that case, but it's just not one people cite as frequently as

24  those two.

25          MR. BRIDGES:  Yes, Your Honor.  And our reply brief

53

```
 1    devotes a page to the case, and I'm hopeful that I can

 2    remember it well enough to give you what you're looking for

 3    about it, but I would point you to our reply brief on that

 4    topic as well.

 5        The Shoaf case that Applewood quotes from and

 6    distinguishes and expressly limits, the Shoaf case actually

 7    has been cautioned and limited and distinguished numerous

 8    times, if you Shepardize it, and the Applewood case is the

 9    leading case, and it also is from the Fifth Circuit, that

10    describes and cabins the effects of Shoaf.  And in Applewood,

11    what happened is a bankruptcy confirmation order became final

12    with releases in it, and the court held that exculpatory

13    orders in a final order from the Bankruptcy Court do not have

14    res judicata effect and do not release claims unless those

15    claims are enumerated in the exculpatory order.  And --

16            THE COURT:  Okay.  So it was about specificity more

17    than anything else, right?

18            MR. BRIDGES:  Yes, Your Honor. It was a --

19            THE COURT:  Okay.

20            MR. BRIDGES:  -- a blanket release, a blanket --

21            THE COURT:  Okay.

22            MR. BRIDGES:  -- exculpatory order that didn't

23    specify what claims were released by what parties, and

24    therefore the parties didn't have the requisite notice.

25        In my mind, Your Honor, it's comparable to the Texas
```

54

1   Supreme Court's holdings on what's required in a settlement

2   release in terms of a disclaimer of reliance, --

3           THE COURT:  Okay.  But, again, --

4           MR. BRIDGES:  -- that if you aren't --

5           THE COURT:  -- it's about specificity --

6           MR. BRIDGES:  Yes, Your Honor.

7           THE COURT:  -- more than anything else?  And then

8   we've got the U.S. Supreme Court *Espinosa* case subsequent.

9           MR. BRIDGES:  Okay.  Your Honor, I'm not sure what

10  *Espinosa* you're referring to.  Can you tell me why that

11  applies?

12          THE COURT:  Well, it was a confirmation order.  It

13  was in a Chapter 13 context.  And there were provisions that

14  operated to discharge student loan debt, --

15          MR. BRIDGES:  Uh-huh.

16          THE COURT:  -- which, of course, cannot be discharged

17  without a 523 action, a separate adversary proceeding.

18  Nevertheless, the confirmation order operated to do what 523

19  suggests you cannot do, discharge student loan debt through a

20  plan confirmation order.

21      The U.S. Supreme Court says, well, that's unfortunate that

22  the confirmation order did something which it doesn't look

23  like you can do, but no one ever objected or appealed.  That's

24  my recollection of *Espinosa*.  So it seems to be the same

25  holding as *Republic Supply v. Shoaf*.  And what I -- why I

55

1    asked you to elaborate on *Applewood* is because it does seem to

2    deal with the specificity of the order versus the

3    enforceability, no?

4               MR. BRIDGES:  Your Honor, if it's not obvious

5    already, I'm not prepared to argue *Espinosa*.  And your

6    explanation of it is very helpful to me.  I think you're right

7    that the specificity issue from *Applewood* is what we're

8    relying on.  And it sounds like --

9               THE COURT:  Okay.  So, that being the case, how was

10   this order not specific?  Okay?

11              MR. BRIDGES:  That's easy, Your Honor, because it

12   doesn't say which parties are releasing which claims.  And

13   what we're talking specifically about there -- as we go

14   through the order, I can show you the language -- but what

15   we're talking about specifically are the ordinary negligence

16   and breach of fiduciary duty claims that your order doesn't

17   provide for at all.  Rather, it says colorability of gross

18   negligence or willful wrongdoing, if I remember the words

19   precisely, that's what must be shown to pursue a case -- a

20   cause of action against Mr. Seery, thereby -- thereby

21   indicating that claims for mere negligence, not gross

22   negligence, or breach of fiduciary duty, which is an even

23   lesser standard, that those claims are prohibited entirely.

24        And by having that kind of general all-encompassing

25   release or exculpation for potential liability involving

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 57 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 268 of 1598    PageID 13315

56

1    negligence, and most importantly, fiduciary duty breach under

2    the Advisers Act, that that kind of exculpation under

3    *Applewood* is not enforceable and has no res judicata effect

4    because it wasn't -- those claims weren't enumerated in the

5    order.

6        That for it to have the intended exculpatory effect, if

7    that was what was intended, that the fiduciary duty claims and

8    the parties who those claims may belong to would have to have

9    been enumerated.

10       And indeed, that kind of specificity, what was required in

11   *Applewood*, isn't even possible for a claim that hasn't yet

12   occurred for future conduct.  It's not possible to enumerate

13   the details, any details, of a future claim, because the

14   underlying act -- if the underlying basis, facts for that

15   claim, haven't yet happened.  It's something to happen in the

16   future.

17       And here, that's what we're dealing with.  We're dealing

18   with conduct that took place well after the January and July

19   2020 orders that had that exculpatory effect.  Is -- is that

20   clear?

21              THE COURT:  Understood.

22              MR. BRIDGES:  Thank you, Your Honor.  So, the four

23   areas of the order, the four functions that the order does

24   that are problematic to us that led us to do what we have done

25   are the gatekeeping function; the release; the fact that by

57

1    stating sole jurisdiction, that it had a jurisdiction-

2    stripping effect; and then, finally, jurisdiction asserting,

3    where, respectfully, Your Honor, we think to some extent the

4    order goes beyond what this Court's jurisdiction is.  And so

5    that not only claiming exclusive jurisdiction, but claiming

6    jurisdiction over all actions against Mr. Seery, as described

7    in the order, is going too far.

8        And those are the four issues I want to talk about one at

9    a time, and here -- I went two screens instead of one.  There

10   we go.  And here's the order.  I have numbered the highlights

11   here out of sequence because this is the sequence that I wish

12   to talk about them and that I think their significance to our

13   decision applies.

14       Before we get into the words of this July 16, 2020 order,

15   I want to mention the January order as well.  Although the

16   motion for contempt recites both orders, we don't actually

17   think the January order applies to us, because our lawsuit

18   against Mr. Seery is not about his role as a director at

19   Strand in any way.  We didn't make an issue of that, other

20   than in a footnote in our brief, because we don't think that

21   distinction matters much since the orders essentially say the

22   same things.

23       I'm not sure that it matters whether we have potentially

24   violated one order or two.  If Your Honor finds we've violated

25   one, I think we're on the hook regardless.  If Your Honor

58

1  finds that we didn't violate the July order, I don't think you

2  will find that we violated the January order, either.  So my

3  focus is on the July order.

4      The gatekeeping function comes from the preliminary

5  language about commencing or pursuing a claim or cause of

6  action against Mr. Seery.  And it says what you want us to do

7  first before bringing such a claim.

8      The second issue of the release comes a little bit later.

9  It's the colorable claim of willful misconduct or gross

10 negligence language.  In other words, because only claims of

11 willful misconduct or gross negligence can pass the bar, can

12 pass muster under this order, that lesser claims -- ordinary

13 negligence and breach of fiduciary duty -- that those claims

14 are released by this order.  That's the second argument.

15     Third is your reference to sole jurisdiction and the

16 effect that that has of attempting to say that other courts,

17 courts of original jurisdiction, do not have jurisdiction

18 because it solely resides here.  That's the third thing I want

19 to address.

20     And then the fourth is the notion that we have to come to

21 this Court first for any action that fits the description of

22 an action against Mr. Seery, when some actions are, through

23 acts of Congress, removed from what this Court has the power

24 to address.  Under 157(d) of Title 28, Your Honor, there are

25 some kinds of actions which withdrawal of the reference is

59

1    mandatory, and therefore this court lacks jurisdiction to

2    address those.

3        And so those are the four issues I want to tackle,

4    starting with the first, the gatekeeping.  Your Honor, Section

5    28 -- Section 959 of Title 28 appears to be precisely on

6    point.  It calls -- it is called by some courts an exception

7    to the Barton Doctrine, which we believe is the only basis,

8    the Barton Doctrine, for this Court to claim that it has

9    jurisdiction or sole jurisdiction and can require us to come

10   here first.  We think the Barton Doctrine is the only basis

11   for that.  We haven't seen anything in the briefing from

12   opposing counsel indicating there was another basis for it.

13   We think we're talking about the Barton Doctrine here as the

14   basis for that.

15       959 is exception to the Barton Doctrine, and we think it

16   explicitly authorizes what we have done.

17       Secondly, Your Honor, the order, the gatekeeping functions

18   of the order are too broad because of its incorporation of the

19   jurisdictional problems and the release problem that we'll

20   talk about later.  But for problem number one, the key issue

21   that we're talking about is 959 as an exception to the Barton

22   Doctrine.  And I went the wrong way.

23           THE COURT:  So, we could go down a lot of rabbit

24   trails today, and I'm going to try not to do that, but are you

25   saying the very common practice of having gatekeeping

60

1   provisions in Chapter 11 cases is just defective law under 28

2   U.S.C. § 959(a)?

3           MR. BRIDGES:  Can I say yes and no?

4           THE COURT:  Okay.

5           MR. BRIDGES:  Yes, to some extent, for some claims.

6   No as to other claims to another extent.  We are not saying

7   gatekeeping orders are altogether wrong, --

8           THE COURT:  Okay.

9           MR. BRIDGES:  -- no.

10          THE COURT:  Okay.

11          MR. BRIDGES:  There are problems with gatekeeping

12  orders that do more than what the law, Section 959 in

13  particular, allows them to do.

14          THE COURT:  Okay.  Be more explicit.  I'm not -- I

15  think you're saying, no, except when certain situations exist,

16  but I don't know what the certain situations are.

17          MR. BRIDGES:  And Your Honor, you're exactly right.

18  It's complicated, and it takes a long explanation.  Let me

19  start --

20          THE COURT:  Okay.  I really want to know, --

21          MR. BRIDGES:  Yeah, me, too.

22          THE COURT:  -- since I do these all the time, and

23  most of my colleagues do.

24          MR. BRIDGES:  Thank you, Your Honor.  And 959 is on

25  the screen.  Managers of any property --

61

```
 1              THE COURT:  Uh-huh.
 2              MR. BRIDGES:  -- is what we're talking about,
 3    including debtors in possession.  Now, it starts off by saying
 4    trustees, receivers.  I mean, this is exactly what the Barton
 5    Doctrine is about, right?  We're talking about trustees and
 6    receivers, but not just them.  We're also talking about
 7    managers of any property, including debtors in possession, --
 8              THE COURT:  Uh-huh.
 9              MR. BRIDGES:  -- may be sued without leave of the
10    court appointing that.  That's contrary to the Barton Doctrine
11    so far.
12       With respect to what I've numbered five here -- these
13    numbers are mine -- the quote is directly verbatim out of the
14    U.S. Code, but the numbering one through five is mine.  With
15    respect to what acts or transactions in carrying on business
16    connected with such property.
17       And so, Your Honor, what we're talking about isn't Barton
18    Doctrine is inapplicable, or you can't have a gatekeeping
19    order for any claims, but it's about managers of property.
20    And one of the hornbook examples of this is the grocery store
21    that files for bankruptcy and then, when --
22              THE COURT:  Slip-and-fall.
23              MR. BRIDGES:  You've got it, Your Honor.
24              THE COURT:  Uh-huh.
25              MR. BRIDGES:  And because they're managing property,
```

62

1  --

2          THE COURT:  So your cause of action, if it went

3  forward, is the equivalent of a slip-and-fall --

4          MR. BRIDGES:  Yes, Your Honor.

5          THE COURT:  -- in a grocery store?

6          MR. BRIDGES:  Yes, Your Honor.

7          THE COURT:  Okay.  Let me skip ahead.  What about the

8  last sentence of 959(a)?

9          MR. BRIDGES:  959(b)?  Or 959(a)?

10         THE COURT:  No, of 959(a).

11         MR. BRIDGES:  What we're looking at here?

12         THE COURT:  That's the sentence that I have always

13  thought was one justification for a gatekeeper provision.  And

14  I know, you know, a lot of others feel the same.

15         MR. BRIDGES:  Are we talking about what I have listed

16  in number five here?

17         THE COURT:  No.  I'm talking about the last sentence

18  of 959(a).  Such actions, okay, shall be subject to the

19  general equity power of such court, you know, meaning the

20  Bankruptcy Court, so far as the same may be necessary to the

21  ends of justice, but this shall not deprive a litigant of his

22  right to a trial by jury.

23      Isn't that one of the provisions that lawyers sometimes

24  rely on in arguing a gatekeeper provision is appropriate?

25         MR. BRIDGES:  Certain --

63

1        THE COURT:  You, Bankruptcy Judge, have the power,

2   the general equity power, so far as the same may be necessary

3   to the ends of justice?

4        MR. BRIDGES:  Your Honor, you bet.  Absolutely, there

5   is equitable power to do more.  There's no doubt that there

6   are reliance -- there is reliance on that in many instances.

7   So I'm not sure -- I'm not sure I'm responding to your point.

8        THE COURT:  Well, again, I think this is the third or

9   fourth argument down the line that really you start with in

10  the analytical framework here, but I guess I'm just saying I

11  always thought a gatekeeping provision was consistent,

12  entirely consistent with 28 U.S.C. § 959(a), the last

13  sentence.

14        MR. BRIDGES:  When you're dealing --

15        THE COURT:  You disagree with that?

16        MR. BRIDGES:  I do, Your Honor.

17        THE COURT:  Okay.

18        MR. BRIDGES:  And it's not that the Court lacks

19  equitable powers to do more.  It's that those equitable powers

20  are affected by when management of other parties, third

21  parties' property is at issue.

22     What we're talking about is similar to yesterday's

23  contempt order.  When you set the basis of describing what it

24  is that Highland's business is, that they're a registered

25  investment advisor in the business of buying, selling, and

64

 1   managing assets -- assets, of course, are property, and that

 2   property is not just Highland's, but it's third-party

 3   property, as if a railroad loses luggage belonging to its

 4   customers.  Rather than the railroad with a trustee appointed

 5   having mismanaged railroad property, we're talking about

 6   third-party property here, third-party property that belongs

 7   to the CLOs, about a billion dollars of assets in these CLO

 8   SPEs that Highland manages.

 9       And again, the slide that Mr. Sbaiti showed you showing

10   Highland, yes, they manage their own assets, the assets of the

11   Debtor, but also of the third parties, including the

12   Charitable DAF and CLO Holdco, and that the Advisers Act

13   imposes fiduciary duties on them that are unwaivable when

14   they're doing that.

15       In *Anderson*, the Fifth Circuit called 959 an exception to

16   the rule requiring court's permission for leave to sue.  In

17   *Hoffman v. City of San Diego* much more recently, relying on

18   this statute again, the court rejected a *Barton* challenge and

19   called it a statutory exception.  And in *Barton* itself, from a

20   century ago, the U.S. Supreme Court even acknowledged there

21   that where a receiver misappropriated the property of another

22   -- not the debtor's property, the property of another -- that

23   the receiver could still be sued personally, without leave of

24   court.

25       Absent *Barton*, absent applicability of the Barton

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 66 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 277 of 1598   PageID 13324
299

65

1    Doctrine, Your Honor, the gatekeeper order is problematic.

2        *Barton* applies where a court has appointed a trustee, and

3    I don't think, Your Honor, under the circumstances in this

4    case, that it is fair to say Mr. Seery was appointed, as

5    opposed to approved by this Court.  And it involves a

6    trustee's actions under the powers conferred on him.  The

7    Barton Doctrine is not about a broader exculpation of the

8    trustee.

9        Here, what the Debtor asked for in its motion for

10   approval, approval of hiring Mr. Seery, what it asked for

11   specifically in the motion was that the Court not interfere

12   with corporate decisions absent a showing of bad faith, self-

13   interest, or gross negligence, and asking the Court to uphold

14   the board's decision to appoint Mr. Seery as the CEO as long

15   as they are attributable to any rationale business purpose.

16       At the hearing, Your Honor, at the hearing, we've quoted

17   your comments saying that the evidence amply shows a sound

18   business justification and reasonable business judgment on the

19   part of the Debtor in proposing that Mr. Seery be CEO and CRO.

20   Your Honor, respectfully, those words don't sound like the

21   judge using its discretion to choose -- appoint a trustee.

22   They sound like the Court exercising deference to the business

23   judgment of a business.  And appropriately so.  We don't have

24   trouble with application of the business judgment rule.  Our

25   problem is with application of it and the Barton Doctrine.

66

 1    Those two do not go together.  A trustee has protection

 2    because it's acting under color of the court that appointed

 3    it.  A court that merely deferred to someone else's

 4    appointment, that's not what the Barton Doctrine is about.

 5    The Barton Doctrine is about the court's function that the

 6    trustee takes on, not deference to the business judgment of

 7    the debtor in possession or the other fiduciary appointed by

 8    the court.

 9        Problem one was the gatekeeping.  Problem two is about the

10    release and the *Applewood* case.  Your Honor, again, ordinary

11    negligence and ordinary fiduciary duty breaches do not rise to

12    the level of gross negligence and willful misconduct.  And

13    because of that, the language of this order appears to be

14    barring them entirely.  No entity may bring a lawsuit against

15    Mr. Seery in certain circumstances without the Bankruptcy

16    Court doing what?  Determining that the cause of action

17    represents a colorable claim of willful misconduct or gross

18    negligence against Mr. Seery.

19        A breach of fiduciary duty under the Advisers Act can be

20    unintentional, it can fall short of gross negligence by miles,

21    and to exculpate Mr. Seery from those kinds of claims entirely

22    is to make him no longer a fiduciary.  A fiduciary duty that

23    is unenforceable makes someone not a fiduciary.  That's

24    plainly not what Mr. Seery thinks his role is.  It's

25    inconsistent with the Advisers Act.  And Your Honor, the

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 279 of 1598 PageID 13326
299

67

1   notion that he would not owe his clients fiduciary duties as

2   he manages their assets would require disclosures under the

3   SEC regulations.  It creates all kinds of problems to state

4   that a fiduciary under the Advisers Act does not have

5   enforceable fiduciary duties.  The order appears to be

6   releasing all of those.  But for *Applewood's* specificity

7   requirement, it would be doing that.

8        As an asset manager under the Advisers Act, Mr. Seery is

9   managing assets belonging to CLO Holdco and The Charitable

10  DAF.  That's precisely what the District Court action is

11  about, those fiduciary duties.  And Mr. Seery, in describing

12  these recently in testimony here -- forgive me for reading

13  through this, Your Honor, but it is pretty short -- Mr. Seery

14  testifies, I think, from a high level, the best way to think

15  about the Debtor is that it's a registered investment advisor.

16  As a registered investment advisor, which is really any

17  advisor of third-party money over $25 million, it has to

18  register with the SEC and it manages funds in many different

19  ways.  The Debtor manages approximately $200 million current

20  values -- it was more than that of the start of the case -- of

21  its own assets.

22       I'm pausing there, Your Honor.  $200 million of its own

23  assets, but we're about to talk about third-party assets.

24       It doesn't have to be a registered investment advisor for

25  those assets, but it does manage its own assets, which include

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 69 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 280 of 1598   PageID 13327

68

1    directly-owned securities, loans, from mostly related entities

2    but not all, and investments in certain funds, which it also

3    manages.

4         And then here it comes:  In addition, the manager -- the

5    Debtor manages about roughly $2 billion, $2 billion in total

6    managed assets, around $2 billion in CLO assets, and then

7    other entities, which are hedge funds or PE style.

8         We also had to get a very good understanding of each of

9    the funds that we manage.  And as I said, the Investment

10   Advisers Act puts a fiduciary duty on Highland Capital to

11   discharge its duty to the investors.  So while we have duties

12   to the estate, we also have duties, as I mentioned in my last

13   testimony, to each of the investors in the funds.

14        Now, some of them are related parties, and those are a

15   little bit easier.  Some of them are owned by Highland.  But

16   there are third-party investors in these funds who have no

17   relation whatsoever to Highland, and we owe them a fiduciary

18   duty both to manage their assets prudently but also to seek to

19   manage -- maximize value.

20        Those duties do not require -- requires the opposite of

21   what I mean.  They don't merely require avoiding gross

22   negligence or willful wrongdoing.  When you're managing assets

23   of others, the fiduciary duties that you owe are far stricter

24   than that.  The highest duty known to law is a fiduciary duty.

25        The order is inconsistent with that testimony,

1   acknowledging the fiduciary duties owed to The Charitable DAF

2   and to CLO Holdco.  It appears to release the Debtor -- maybe

3   not the Debtor.  My slide may be wrong about that.  It appears

4   to release Seery from having to uphold these duties.

5        In addition to problems with the gatekeeping under the

6   Barton Doctrine, in addition to the release problem and

7   *Applewood* and the unwaivable fiduciary duties under the

8   Advisers Act, there's also a problem with telling other courts

9   that they lack jurisdiction.  Your Honor knows bankruptcy

10  court law -- bankruptcy -- and the Bankruptcy Code far better

11  than I do, I'm certain.  But a first principle, I believe, of

12  bankruptcy law is that this Court's jurisdiction is derivative

13  of the District Court's.  And the only doctrine I've heard of

14  that can allow this Court to exercise exclusive jurisdiction

15  of the District Court that it sits in is the Barton Doctrine,

16  which, again, is very problematic to apply in this case, for

17  the reasons we've discussed already.

18       By claiming to have -- by stating in the order that this

19  Court has sole jurisdiction, it appears to either be inclusive

20  of the District Court, which I understand Your Honor doesn't

21  think her order can be read that way, but if it's not read

22  that way, then it results in telling the District Court that

23  it doesn't have the original jurisdiction that Congress has

24  given it.  And that's problematic in the order as well.

25            THE COURT:  Let me ask you.  If you think the word

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 71 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 282 of 1598 PageID 13329

70

1    "power" had been used, or "authority," versus "jurisdiction,"

2    that would have cured it?

3            MR. BRIDGES:  I think there would still have been

4    other problems.  Would it have cured this?  I don't think so,

5    Your Honor, because, again, I think the only basis for that

6    power is the Barton Doctrine.

7            THE COURT:  Okay.

8            MR. BRIDGES:  To listen to opposing counsel, you'd

9    think that our jurisdictional argument was entirely about the

10   jurisdiction stripping.  It's not.  Frankly, Your Honor,

11   that's maybe even a lesser point.  A key problem here to is

12   the assertion of jurisdiction, not over any of the claims, but

13   over all of the claims, because of 157(d), Your Honor, because

14   some claims, some causes of action, have been put outside the

15   reach of bankruptcy, the Bankruptcy Court, and those actions

16   may in some instances fit within your description of the cases

17   that are precluded here.

18       That's a problem jurisdictionally with this Court's

19   ability to say it retains jurisdiction or that it has, that it

20   asserts jurisdiction.  Over what?  Any kind of claim or cause

21   of action against Mr. Seery relating in any way to his role as

22   the chief executive officer and chief restructuring officer of

23   the Debtor.

24       Some claims that fit into that bucket also fit into the

25   description in 157(d) of cases that require both consideration

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 72 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 283 of 1598   PageID 13330

71

1   of bankruptcy law and federal laws affecting interstate

2   commerce or regulating it.  Right?  Some cases must fall into

3   -- under 157(d), despite having something to do with Mr.

4   Seery's role as a chief executive officer.  And Your Honor,

5   the Advisers Act fiduciary duty claims asserted by Respondents

6   in the District Court are such claims.  They cannot be decided

7   without considering the Advisers Act.

8       There are also RICO claims that, of course, require

9   consideration of the RICO statute.  But the Advisers Act

10  claims absolutely require consideration of both bankruptcy law

11  and this Court's order exonerating -- exculpating Mr. Seery

12  from some liability, in addition to the unwaivable fiduciary

13  duties imposed by the Advisers Act.

14      The assertion of jurisdiction here blanketed, in a blanket

15  manner, over all claims against Mr. Seery in any way related

16  to his CEO role is a 157(d) problem that the order has no --

17  has no solution for and we see no way around.  157(d) requires

18  withdrawal of the reference, makes it mandatory, when a case

19  requires considerations of federal law implicating interstate

20  commerce.

21      Your Honor, we think we had to do it the way we did,

22  filing in the District Court instead of filing here, in order

23  to preserve our jurisdictional arguments.  To come to this

24  Court with a motion and then what?  Immediately file a motion

25  to withdraw the reference on our own motion here?  To come

1   here and ask for a decision on colorability, when first

2   colorability would exclude the claims that we're trying to

3   bring, at least some of them, the mere negligence, mere

4   fiduciary duty breaches, because they don't rise to the level

5   necessarily of gross negligence or willful wrongdoing.

6       Your Honor, coming here and asking this Court to rule on

7   that may well have waived our jurisdictional objections.

8   Coming here to this Court and doing that and immediately

9   filing a motion --

10          THE COURT:  I don't get it.

11          MR. BRIDGES:  The ordinary --

12          THE COURT:  Subject matter jurisdiction, if it's a

13  problem, it's not waivable.

14          MR. BRIDGES:  The ordinary issue -- the ordinary

15  waiver rule, Your Honor, is that when you come and ask for a

16  court to rule on something, that you waive your right to -- to

17  later -- you're estopped judicially from taking the contrary

18  position.

19          THE COURT:  Okay.  Well, again, I don't get it.  If

20  you filed your motion and I ruled in a way you didn't like,

21  you would appeal to the District Court.

22          MR. BRIDGES:  Yes, Your Honor.  An appeal to the

23  District Court, we would be entitled to do.  I understand, no

24  matter what happens here, we can appeal to the District Court.

25  That's different from whether or not, by coming here first,

73

1  have we waived or have we created an estoppel situation, in

2  terms of arguing jurisdiction.

3        THE COURT:  Okay.

4        MR. BRIDGES:  Because of the problems with the order,

5  we thought we were in a situation where coming here would

6  waive rights that we could avoid waiving by asking in the

7  District Court.

8      In other words, there was a jurisdictional paradox:  How

9  does a party ask a court to do something it believes the court

10 lacks the power to do?  That's the spot we found ourselves in.

11 What were we supposed to do?

12     Your Honor, it is definitely a complex case.  And coming

13 into this matter with over 2,000 filings on the docket before

14 I had ever heard of Highland was a very daunting thing, coming

15 into this case.  And whether or not there's something that we

16 missed is certainly possible, but these orders that are the

17 subject of the contempt motion, these orders are not things

18 that we overlooked.  These are things that we studied

19 carefully, that we did not ignore or have disdain for, but

20 that affected and changed our actions.

21     And in the Slide #3 from Mr. Morris's -- from Mr. Morris's

22 presentation, in his third slide, he quotes from the first

23 page of our motion for leave, the motion that he says exhibits

24 our contemptuous behavior.

25     The second paragraph is kind of tiny print there, Your

 1    Honor, and it's not highlighted, but I'd like to read it.

 2    Seery is not named in the original complaint, but this is only

 3    out of an abundance of caution due to the Bankruptcy Court in

 4    HCM's pending Chapter 11 proceeding having issued an order

 5    prohibiting the filing of any causes of action against Seery

 6    in any way related to his role at HCM, subject to certain

 7    prerequisites.  In that order, the Bankruptcy Court also

 8    asserts sole jurisdiction over all such causes of action.

 9        Your Honor, our intent was not to violate the order.  Our

10    intent was to be cautious about how we proceeded, to fully

11    disclose what we were doing, and to do it in a District Court

12    that absolutely could refer the matter here to this Court for

13    a decision, but to do it in a way that didn't waive our

14    jurisdictional arguments, that didn't waive our arguments

15    regarding the release of the very claims we were trying to

16    bring, by first having to prove that they were colorful claims

17    of willful misconduct or gross negligence, when we were trying

18    to assert claims that weren't willful negligence or gross --

19    gross negligence or willful misconduct.  That was what I was

20    trying to say.

21        Your Honor, this was not disregard of your order.  If

22    we're wrong on the law, we're wrong on the law, but it's not

23    that we disregarded your order or lacked respect for it.  We

24    disclosed it.

25        Mr. Morris has argued in the briefs that we attempted to

1   do this on an ex parte basis.  Your Honor, we did not attempt

2   to do this on an ex parte basis.  And if there are errors,

3   they probably are mine.  I know one error is mine.  On the

4   civil cover sheet in the filing in the District Court, I noted

5   and passed on that we should check the box for related case

6   and list this case on there.  I did not follow up to make sure

7   that it happened, and administratively, it didn't happen.  We

8   did not check the box on the civil cover sheet.  Mr. Morris is

9   correct that we failed to do that.  He's incorrect that that

10  was sneaky or intentional.  It was my error, having noticed it

11  but not followed up.

12      Your Honor, similarly, the argument that we didn't serve

13  them with the motion I think is disingenuous.  What happened,

14  Your Honor, is that counsel for the Debtor had agreed to

15  accept service of the complaint itself against the Debtor

16  before the motion for leave, and after accepting service, I

17  was under the impression that they'd be monitoring the docket,

18  especially when I emailed them, informed them that we were

19  filing the motion for leave to amend, because I was required

20  to submit a certificate of conference on that motion.  I

21  informed them in a polite email.  The polite email is not

22  quoted in their brief.  It is included in the record, and it's

23  quoted in full in our brief.

24      The email exchange indicates to them, Thank you for

25  pointing out the Court's orders.  We've carefully studied them

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 77 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 288 of 1598    PageID 13335
209

76

 1   and we don't think what we're doing is a violation of those

 2   orders.

 3       That we didn't serve them is because we thought they

 4   already knew that the motion was coming and would be

 5   monitoring the docket, and we didn't know which lawyers they

 6   were going to have make an appearance in that case, so we

 7   wouldn't have known who to serve.  But if not serving them --

 8   first, the Rules do not require that service.  But if not

 9   serving them out of politeness --

10            THE COURT:  Mr. Morris is standing up.  Did --

11            MR. MORRIS:  I move to strike all of this, Your

12   Honor.  If Counsel wants to take the stand and raise his hand,

13   he should testify under oath.  I'm just going to leave it at

14   that.  He's not on their witness list.

15            THE COURT:  All right.  I overrule.  You can

16   continue.

17            MR. BRIDGES:  Thank you, Your Honor.

18       If failure to serve them was an error, it was mine.  I

19   know of no rule that requires it.

20            THE COURT:  Can I ask you, you were talking about the

21   cover sheet mistake in not checking the box.  What about your

22   jurisdictional statement in the actual complaint not

23   mentioning 28 U.S.C. § 1334 as a possible basis for subject

24   matter jurisdiction?  Do you think that was a mistake as well,

25   or was that purposeful, not necessary?

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 78 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 289 of 1598 PageID 13336

77

1           MR. BRIDGES:  Candidly, Your Honor, standing here

2    right now, I have no recollection whatsoever of it.

3           THE COURT:  You mention 28 U.S.C. § 1331, and then

4    1367 supplemental jurisdiction, but you don't mention 1334.

5           MR. BRIDGES:  I suspect it's true, but Mr. Sbaiti

6    would have written that.

7           THE COURT:   Okay.

8           MR. BRIDGES:  I have no recollection of --

9           THE COURT:  Okay.

10          MR. BRIDGES:  -- making any decision at all --

11          THE COURT:  All right.

12          MR. BRIDGES:  -- with regards to that.

13          THE COURT:  Okay.

14          MR. BRIDGES:  Your Honor, you've been very patient

15   with a very long opening argument, and I'm very grateful for

16   that.  Please know that we take this Court's order seriously.

17   We voluntarily appeared here before the Court ordered us to do

18   so by filing our motion asking for a modification of the order

19   we're accused now of having been in violation of.

20      And the last thing I'd like to say, Your Honor, Mr.

21   Morris's brief claims that the first he knew of the motion,

22   the motion seeking leave to add Mr. Seery to the District

23   Court claim, the first he knew of that was when Mr. Sbaiti

24   forwarded him the District Court's order dismissing that

25   motion, denying that motion without prejudice.

78

 1    Your Honor, in a civil contempt proceeding, where the

 2   issue is compensating, not punishing, if the aggrieved party

 3   didn't even know about the action until it had been denied by

 4   the District Court, we submit that there can be no harm from

 5   that having taken place.

 6    That's all I have for opening.  Thank you, Your Honor.

 7          THE COURT:  All right.  Thank you.

 8    Before we give you a time check, do we have other opening

 9   statements?

10          MR. ANDERSON:  Yes.  Yes, Your Honor.  Michael

11   Anderson on behalf of Mr. Patrick.  If we need to take a

12   break, that's fine, too.

13          THE COURT:  Well, how long do you plan to use?

14          MR. ANDERSON:  No more than ten minutes, for sure.

15          THE COURT:  Let's go ahead and do that, and then

16   we'll take a break.

17          MR. POMERANTZ:  Your Honor, after, I would ask the

18   opportunity to respond to Mr. Bridges' argument.  Probably

19   another ten minutes.

20          THE COURT:  All right.  Let's go ahead and take a

21   ten-minute break.  And Mr. Taylor, you're going to have

22   something, because you --

23          MR. TAYLOR:  Five.

24          THE COURT:   Okay.  We'll take a ten-minute break.

25   And Nate, can you give them a time?

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 80 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 291 of 1598 PageID 13338

79

```
1            THE CLERK:  I'm showing it was about 59-1/2 minutes.

2            THE COURT:  Fifty-nine and a half?  And is that

3   subtracting some for my questioning?

4            THE CLERK:  I stopped whenever you talked, maybe a

5   little over --

6            THE COURT:   Okay.  So he stopped it whenever I asked

7   questions and you answered, so 59 minutes has been used by the

8   Respondents.

9      All right.  We'll take a ten-minute break.  We'll come

10  back at 11:35.

11           THE CLERK:  All rise.

12     (A recess ensued from 11:25 a.m. to 11:37 a.m.)

13           THE COURT:  All right.  We're going back on the

14  record in the Highland matter.  We have further opening

15  statements.  Counsel, you may proceed.

16     OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

17           MR. ANDERSON:  Thank you.  May it please the Court,

18  Counsel.  Michael Anderson on behalf of Respondent, Mark

19  Patrick.

20     Your Honor, after listening to this and looking at the

21  filings in this case, this issue of whether there's contempt

22  -- and I would argue there's not -- is ripe for decision.  We

23  have no real undisputed facts for purposes of the contempt

24  issue.  We have your Court's July order, the subject of Mr.

25  Bridge's arguments.  We have the Plaintiffs in the underlying
```

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 292 of 1598 PageID 13339
291

80

1   lawsuit at issue.  They commenced the lawsuit in April of this

2   year.  There's absolutely nothing improper about that filing.

3   It's not subject to the contempt.  A week later, there is a

4   motion for leave to add Mr. Seery.  That's the issue.  There's

5   no dispute over that.  There's no dispute that Mr. Patrick

6   authorized the filing of the motion for leave.

7       And so then the question becomes we look at the Court's

8   July order, did a motion for leave, did that violate the terms

9   of the order?  The motion for leave is not commencing a

10  lawsuit.  It's also not pursuing a claim, because whether or

11  not the Court grants the motion, denies the motion, or

12  whatever the Court does, nothing happened, because the day

13  after the motion for leave was filed it was dismissed *sua*

14  *sponte* without prejudice because not all parties had been

15  served in the case.

16      It was permission asked one day.  The matter was mooted

17  the following day by the District Court.  And so that is

18  completely undisputed.

19      And so the question is, is asking permission, is that

20  commence?  I think everybody says there's no way that's

21  commencing a lawsuit because you have asked permission.  The

22  question, then, is it pursuing a claim?  And the argument,

23  well, no, that's not pursuing a claim; it's asking permission.

24      And I think it's also important to note that when the

25  motion for leave was filed, there were no secrets there.  I

81

1    mean, I'm coming in this after the fact, representing Mr.

2    Patrick.  You look at a motion for leave, and right there on

3    Page 1 it talks about Your Honor's order.  Page 2, it quotes

4    the order and it gives the reasons, there's arguments being

5    made as to why that order doesn't bar adding Mr. Seery as a

6    defendant in the lawsuit, many of the arguments that Mr.

7    Bridges made.

8        So that's where we are.  And so when I hear, hey, we've

9    got six hours, three hours and three hours, and we're going to

10   split this up, you know, maybe too simplistic from Fort Worth,

11   but I'm like, wait a second, this is all undisputed.  It's

12   totally undisputed.  The -- whether or not the prior order is

13   enforceable or not enforceable, those are all legal arguments.

14   You know, no witnesses are necessary for that.  And as I

15   understood, right before we broke, counsel stood up and he's

16   going to do what generally doesn't happen in opening

17   statements, which is respond to opening statements, which

18   shows that that's a legal issue.

19       And so it really does come down to undisputed facts.

20   There's no testimony.  No -- nothing is necessary.  And a lot

21   of what this comes down to is the old statement, you know, is

22   it better to ask forgiveness or permission?  And usually that

23   statement comes up when somebody has already done something:

24   Hey, I'm going to go do it anyway and I'll ask for forgiveness

25   later.  Well, what the Plaintiffs in the underlying case did

 1   was ask permission.  Motion for leave.  That is not

 2   contemptuous.  And there's literally no damages.  As was

 3   pointed out, by the time counsel found out, it had already

 4   been dismissed.

 5       The last thing I want to point out, Your Honor, is that

 6   the argument from opposing counsel was, well, under Rule 15 of

 7   the Federal Rules of Civil Procedure, since parties hadn't

 8   answered yet, the Plaintiffs in the underlying case could have

 9   just simply added Mr. Seery as a defendant and moved on that

10   way, but then that would be another ball of wax and then we

11   would be addressing issues as far as whether or not there is a

12   violation of the Court's order, notwithstanding Mr. Bridge's

13   arguments.  But then we would have those issues.  But that's

14   not what happened.  Everybody knows that's not what happened.

15   It was a motion for leave that was resolved the following day.

16       And so, Your Honor, for those reasons, and those

17   undisputed reasons, we would request that the Court at the end

18   of this hearing deny the request for sanctions and a contempt

19   finding against our client, Mr. Patrick.

20       Mr. Phillips is going to address one brief issue

21   bankruptcy-wise I believe that was raised earlier.

22           THE COURT:  Okay.  Mr. Phillips?

23           MR. PHILLIPS:  Your Honor, thank you very much.

24   Louis M. Phillips on behalf of Mark Patrick.

25       The only thing that I would point out, Your Honor, and I'm

 1    going to do -- try to simplistically, because that's about the

 2    level at which I operate, boil down the questions about the

 3    order.

 4          This order was an employment order.  The problem that Mr.

 5    Bridges has elucidated to Your Honor is that the precise

 6    effect, one of the precise effects of that order is to bar the

 7    claims of third parties that arise into the future on the

 8    basis of the employment of Mr. Seery, because the order

 9    required that all claims asserting gross negligence or willful

10    misconduct need to be brought before you to determine that

11    they're colorable.

12          One question I have is, does it apply to the lawsuit that

13    was filed?  Doesn't apply unless the effect of the order was

14    to release those claims and preclude any party from bringing

15    those claims at all.  And while you can say correctly that

16    this Court issues gatekeeper orders all of the time, one thing

17    I cannot imagine that you would say is that in employment

18    orders you release claims of third parties existing and as may

19    arise in the future that could be brought against the party

20    employed to be a CRO of a debtor, who, by his own testimony,

21    says we do all kinds of stuff in the billions of dollars for

22    third parties that we owe fiduciary duties to.

23          There's no way, Your Honor, that you were considering your

24    July order to bar third-party claims arising from breach of

25    fiduciary duties by Mr. Seery to third parties who held third-

84

1  party claims that did not involve some assertion that, in his

2  capacity as CRO, he was in some way acting within the scope of

3  his authority as CRO for the Debtor and yet committed

4  negligence against the Debtor.

5      Now, if the order was asserting that you know what a lot

6  of people in this courtroom know, that the standard of

7  liability for a CRO doing work for a debtor, just like the

8  standard of liability for the president of a corporation or an

9  officer of the corporation, is as long as you're within the

10 course and scope of your employment, your actions for the

11 corporation have -- can -- the corporation takes care of you

12 because there's no personal claim unless you're outside the

13 scope, and you're outside the scope if you commit gross

14 negligence or willful misconduct.

15     That, if you're restating the standard of care and

16 standard of liability for a CRO, we have no problem with that,

17 because Mr. Patrick did not authorize a cause of action

18 arising against Mr. Seery against the Debtors for damage to

19 the Debtors.  He authorized the filing of a complaint in the

20 District Court with jurisdiction for a third-party claim for

21 breach of a fiduciary duty to a third party that Mr. Seery

22 admits he owes, and then sought leave because they didn't

23 understand the order that Your Honor issued.  It couldn't have

24 been to release the breach of fiduciary duty claims that

25 wouldn't rise to gross negligence or willful misconduct, it

85

1   couldn't be that, but it might be.  But if it did, under an

2   employment order?  That's very different from *Espinosa*, that's

3   very different from *Shoaf*, when you're at the end of a case in

4   a confirmation of a plan and you're talking about matters

5   arising in the past.

6       This order, if it has the effect it could be read to have,

7   precludes any third party from asserting a breach of fiduciary

8   duty against Seery for actions that violate the duty to that

9   third party, when Seery's biggest job, it looks to us like, is

10  running third-party money.  That could not have been what Your

11  Honor was thinking.

12      And so all I'm pointing out is I'm trying to distill down.

13  The lawsuit doesn't involve gross negligence or willful

14  misconduct allegations.  It involves breach of fiduciary duty,

15  breach of the Advisers Act, et cetera, et cetera.  Mr. Patrick

16  authorized that lawsuit.

17      Now, what we're here for today is to determine whether the

18  complaint, which was not against the Debtor -- which was not

19  against Seery, the motion for leave, which did not -- all they

20  did was ask for permission, not forgiveness.  And we can't

21  understand how the Debtor should be saying, all they had to do

22  was amend.  Well, if they amended, would we be in hotter water

23  than we are today for asking for permission to sue?  I think

24  we would have been, that should have been the prescribed

25  course, when we are more concerned and we are more risk-averse

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 298 of 1598 PageID 13345
299

86

1    by asking for leave rather than just amending by right.

2    Absolutely, that makes no sense.  We can't be held to be more

3    contemptuous because we asked for permission, when we could

4    have just sued him, because they're saying asking for

5    permission was wrong.  Certainly, suing him would have been

6    wrong.  That would have been easier.

7              THE COURT:  But Mr. Phillips, the issue is you all

8    didn't come to the Bankruptcy Court and ask permission.

9              MR. PHILLIPS:  Look at your order, Your Honor.

10             THE COURT:  It's right in front of me.

11             MR. PHILLIPS:  Right.  That order either doesn't

12   apply to the claims that were brought or it released the

13   claims that were brought.  That's our point.  It couldn't have

14   released them.  Does it apply to them?  Thank you.

15             THE COURT:  Okay.  Mr. Taylor?

16             MR. TAYLOR:  Good morning.

17             THE COURT:  Good morning.

18             OPENING STATEMENT ON BEHALF OF JAMES DONDERO

19             MR. TAYLOR:  Your Honor, Clay Taylor on behalf of Jim

20   Dondero.  I'll be very brief because I know we've already

21   spent a lot of time on opening argument.  But I do think it is

22   appropriate to, one, first look at who brought the lawsuit,

23   CLO Holdco & DAF.  That was authorized -- it's undisputed it

24   was authorized by Mr. Patrick.  There is no dispute about

25   that.  There's no dispute who the Plaintiffs are.  But yet my

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 88 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 299 of 1598   PageID 13346
299

87

1    client is up here as an alleged violator.

2        I think it's very clear, as all the parties have said,

3    there's no dispute as to there's an order, there was a

4    complaint, and there was a motion for leave.

5        It seems to me that the rest of the evidentiary hearing

6    that you may be about to go through is going to be about pin

7    the blame on Mr. Dondero.  It is undisputed that he is not a

8    control person for the DAF or CLO Holdco.  The only type of

9    evidence you will hear is going to be insinuation that he

10   somehow controls Mr. Patrick and used to control Mr. Scott.

11   There will be no direct evidence that he authorized this or

12   that he's the control person and the proper corporate

13   authorized representative that signed off on the --

14       It seems to me, Your Honor, first of all, that's a

15   discrete issue that should be able to be decided separately

16   from this, and the first gating issue is, was there indeed a

17   violation of this Court's order?  It would seem to me that

18   there is no disputes about those facts and that we should

19   bifurcate that, and if you then find that there is a violation

20   and find that there is any even need to move into who the

21   alleged violators are, that then we could have that

22   evidentiary portion.  But there is no reason to do that now

23   before there's even been found to be a violation.

24           THE COURT:  All right.  Thank you.

25       All right.  Well, someone made the point rebuttals in

88

```
 1 │ opening statements are not very common, --

 2 │          MR. POMERANTZ:  Your -- Your --

 3 │          THE COURT:  -- but you can use your three hours

 4 │ however you want.

 5 │            OPENING STATEMENT ON BEHALF OF THE DEBTOR

 6 │          MR. POMERANTZ:  Your Honor, I didn't intend to stand

 7 │ up.

 8 │          THE COURT:  Okay.

 9 │          MR. POMERANTZ:  I also didn't intend to have the

10 │ motion to modify the sealing order presented to Your Honor,

11 │ which it was in the course of that opening argument.  And

12 │ despite your comments at the beginning of the hearing, the

13 │ Movants have taken Your Honor down a series of rabbit holes

14 │ that have really no relevance to the contempt motion.  And

15 │ notwithstanding, as I said, your ruling that basically the

16 │ contempt would go first and the modification would go second,

17 │ there they were, persistent in making all the arguments why

18 │ this Court should modify the order.

19 │    They're just really trying to obfuscate the simple issue

20 │ that Mr. Morris presented and raised at the beginning of the

21 │ hearing:  Did they violate the order by pursuing a claim?  We

22 │ think the answer is undoubtedly yes.

23 │    I'm not going to try to address each of the issues they

24 │ raised in connection with the modification motion in detail.

25 │ I have a lengthy presentation.  I'll do it at the appropriate
```

89

 1   time.  But there are a few issues I want to address.  I want
 2   to address one of the last points Mr. Bridges raised first.
 3   If they thought that the order was a problem, they could have
 4   filed their motion to modify that order before Your Honor.
 5   They could have had that heard first.  There was no statute of
 6   limitations issue in connection with the HarbourVest matter.
 7   They could have come to Your Honor to do that.  But no, they
 8   didn't.  They went to the District Court first, and it was
 9   only after we filed our contempt motion that they came back
10   and said, well, Your Honor, you should modify the order.
11   Their argument that if they did that there would have been
12   waiver and estoppel is just an after-the-fact justification
13   for what they did and what they tried to do, which was
14   unsuccessful.  They tried to have the District Court make the
15   decision.
16       And why?  Your Honor, they've filed motions to recuse
17   before Your Honor.  They -- they -- it's no secret the disdain
18   they have for Your Honor's rulings as it relates to them.
19   They wanted to be out of this courtroom and in another
20   courtroom.
21       And their belated argument, Mr. Bridges falling on the
22   sword, that they failed to check the box, inadvertent, it's on
23   me, it's very curious.  Because if they had done so and had
24   referred to the correct 1334 jurisdictional predicate, as Your
25   Honor had mentioned, the complaint would have been referred to

1   this Court and the entire trajectory of the proceedings would

2   have been different.  They would have had the opportunity to

3   take their shot to go to District Court and argue that your

4   order didn't apply.

5       Your Honor, they say the January 9th order is not

6   relevant.  It is entirely relevant.  It covered the

7   independent directors and their agents.  Yes, Mr. Seery is an

8   independent director, but he was also an agent of the

9   independent directors and carried out the duties.  You heard

10  argument at the July 16th hearing that Mr. Seery had been

11  acting as the chief executive officer for several months.  And

12  why is it important?  Mr. Bridges said, well, if we violated

13  one order, we violated the other.  It's important because,

14  Your Honor, number one, Mr. Dondero supported that order.  We

15  would never have had an independent board in this case if Mr.

16  Dondero, the decision-making -- of the Debtor at that time,

17  supported that order and supported the exculpations that are

18  now claimed to have been invalid.

19      And also Your Honor heard testimony at the confirmation

20  hearing that the independent directors would never have taken

21  this job, would never have taken this job because of the

22  potential for litigation, litigation that we've now had to

23  endure for several months.  So to come back 16 months later

24  and say, well, you know, you couldn't really exculpate them,

25  it's really an employment order:  It was an employment order.

1   They know it.  We know it.  Your Honor knows it.  It was a

2   resolution of corporate governance issues that changed the

3   whole trajectory of the case, and luckily it -- luckily, Your

4   Honor approved it.

5       The question just is whether they violated the order,

6   period.  And I'll have a lot to say about res judicata, but I

7   won't go in too much in detail, but I will just briefly

8   address their arguments.  They're correct and the Court is

9   correct that there's a difference between *Applewood* and *Shoaf*.

10  And Your Honor got the exact difference.  In one case, a

11  release was not specific, *Applewood*.  In one case it was.

12  *Shoaf* hasn't been discredited by *Applewood*.  It was different

13  facts.  In fact, *Shoaf* relied on two Supreme Court cases, the

14  *Stoll* case and the *Chicot* case, both for the propositions that

15  a court that enters an order, a clear order, even if it didn't

16  have jurisdiction, that cannot be attacked in res judicata.

17  So here what we have is clear, unambiguous, you come to this

18  Court before commencing or pursuing a claim.  That's the

19  clarity.  The focus on the releases, that's not what we're

20  here for today, that's not what we're here for on a contempt

21  motion, on whether the release covered them or it didn't cover

22  them.  We're here on the clear issue of did they violate the

23  language, and we submit that they did.

24      And similarly, *Espinosa* applies.  Your Honor, just to

25  quote some language, "Appellees could have moved to remand the

1    action to state court after it improperly -- after its

2    improper removal to the federal court or challenge the

3    district court's exercise in jurisdiction on direct appeal.

4    Because they did neither, they are now barred by principles of

5    res judicata."

6        Res judicata actually does apply, and I will speak about

7    it in much more detail in the modification motion.

8        With respect to *Barton*, Your Honor, we disagree with their

9    argument that Mr. Seery is not a court-appointed agent.  We've

10   briefed it extensively in our motion to modify.  *Barton*

11   applies to debtors in possession.  *Barton* applies to general

12   partners of the debtor.  *Barton* applies to chief restructuring

13   orders -- officers who are approved by the debtor.  And it

14   applies to general counsel who are appointed by the chief

15   restructuring order.  Officer.

16       So the argument that *Barton* is somehow inapplicable is

17   just wrong.  Your Honor knows that.  Your Honor has written

18   extensively on *Barton* in connection with your *Ondova* opinion.

19       Some of the argument about 959 is all wrong, as well.

20   Your Honor got it right that 959 applies to slip-and-fall

21   cases or torts, injuries to parties that are strangers to this

22   process.  There is a legion of cases that I will cite to Your

23   Honor in connection with argument.  959 does not apply here.

24   There's nothing more core to this case than the transactions

25   surrounding the resolution of the HarbourVest claims.

93

1    We also disagree, Your Honor, that the complaint is

2    subject to mandatory withdrawal of the reference.  We've --

3    one of our exhibits in the motion to modify is our motion to

4    enforce the reference.  We think Movants have it completely

5    wrong.  This is not the type of case that will be subject to

6    withdrawal -- mandatory withdrawal of the reference, and in

7    any event, for this contempt motion, it's irrelevant.

8        And they argue -- one of the other points Mr. Bridges

9    raises is that, because this Court would not have had

10   jurisdiction under 157 because of the mandatory withdrawal,

11   then Your Honor could not legally act as a gatekeeper.  But

12   they haven't addressed *Villegas v. Schmidt*.  We've raised it

13   throughout this case.  And again, in these series of

14   pleadings, they don't even address it.  And *Villegas v.*

15   *Schmidt* was a *Barton* case.  It was a *Barton* case where the --

16   where the argument was that *Barton* does not apply because it's

17   a *Stern* claim and the Bankruptcy Court would not have

18   jurisdiction.  And *Villegas* said no, it does apply.  And Your

19   Honor even cited that in your *Ondova* case.  And why does it

20   apply?  Because there's nothing inconsistent with a Bankruptcy

21   Court having exclusive decision to make a *Barton*

22   determination.

23       In fact, in that case *Villegas* said, you can't go to the

24   District Court for that decision, it is the Bankruptcy Court's

25   decision.

94

1      So, again, it's a red herring, Your Honor.  Your Honor had

2    the ability to act as an exclusive gatekeeper for these types

3    of actions.

4      With that, Your Honor, I'll leave the rest of my argument

5    for the next motion.

6          THE COURT:  All right.  Thanks.

7      All right.  Nate, let's give everyone their time.

8          THE CLERK:  That was just about eight and a half

9    additional from the Debtor, and then altogether the other ones

10   were just shy of fourteen minutes.  Thirteen minutes and fifty

11   seconds for the other three combined.  Do you want me to --

12         THE COURT:  Yes, I meant for Debtor combined versus

13   --

14         THE CLERK:  Oh.  Oh.

15         THE COURT:  Respondents combined.

16         THE CLERK:  So that would be twenty one and a half

17   the Debtor.  Let me do the math on the other one.  Be an hour

18   twelve minutes and fifty seconds for --

19         THE COURT:  Okay.  All right.  Got that?  Debtors

20   used a total of twenty one and a half minutes; Responders have

21   used an hour twelve minutes and fifty seconds.

22     All right.  Mr. Morris, you may call your first witness.

23         MR. MORRIS:  Thank you very much, Your Honor.  The

24   Debtor calls Mark Patrick.

25         THE COURT:  All right.  Mr. Patrick?  Please approach

Patrick - Direct                              95

 1   our witness stand and I'll swear you in.  Please raise your

 2   right hand.

 3        (The witness is sworn.)

 4            THE COURT:  All right.  Please take a seat.

 5            MARK PATRICK, DEBTOR'S WITNESS, SWORN

 6                   DIRECT EXAMINATION

 7   BY MR. MORRIS:

 8   Q    Good afternoon, Mr. Patrick.

 9   A    Good afternoon.

10   Q    Can you hear me okay?

11   A    Yes, I can.

12   Q    Okay.  You have before you several sets of binders.

13   They're rather large.  But when I deposed you on Friday, we

14   did that virtually.  Now, I may direct you specifically to one

15   of the binders or one of the documents from time to time, so I

16   just wanted you to know that those were in front of you and

17   that I may be doing that.

18        Mr. Patrick, since March 1st, 2001 [sic], you've been

19   employed by Highland Consultants, right?

20   A    I believe the name is Highgate Consultants doing business

21   as Skyview Group.

22   Q    Okay.  And that's an entity that was created by certain

23   former Highland employees, correct?

24   A    That is my understanding, correct.

25   Q    And your understanding is that Mr. Dondero doesn't have an

Patrick - Direct                              96

1  ownership interest in that entity, correct?

2  A    That he does not.  That is correct.

3  Q    And your understanding is that he's not an employee of

4  that -- of Skyview, correct?

5  A    That is correct.

6  Q    Prior to joining Skyview on March 1st, you had worked at

7  Highland Capital Management, LP for about 13 years, correct?

8  A    Correct.

9  Q    Joining in, I believe, early 2008?

10 A    Correct.

11 Q    Okay.  I'm going to refer to Highland Capital Management,

12 LP from time to time as HCMLP.  Is that okay?

13 A    Yes.

14 Q    While at HCMLP, you served as a tax counselor, correct?

15 A    No, I would like to distinguish that.  I did have the

16 title tax counsel.  However, essentially all my activities

17 were in a non-lawyer capacity, being the client

18 representative.  I would engage other outside law firms to

19 provide legal advice.

20 Q    Okay.  So you are an attorney, correct?

21 A    Yes, I am.

22 Q    But essentially everything you did at Highland during your

23 13 years was in a non-lawyer capacity, correct?

24 A    Correct.

25 Q    In fact, you didn't even work in the legal department; is

Patrick - Direct                                97

1  that right?

2  A    That is correct.  I worked for the tax department.

3  Q    Okay.  Let's talk about how you became the authorized

4  representative of the Plaintiffs.  You are, in fact,

5  authorized representative today of CLO Holdco, Ltd. and

6  Charitable DAF, LP, correct?

7  A    Charitable DAF Fund, LP.  Correct.

8  Q    And those are the two entities that filed the complaint in

9  the United States District Court against the Debtor and two

10 other entities, correct?

11 A    Correct.

12 Q    And may I refer to those two entities going forward as the

13 Plaintiffs?

14 A    Yes.

15 Q    You became the authorized representative of the Plaintiffs

16 on March 24th, 2021, the day you and Mr. Scott executed

17 certain transfer documents, correct?

18 A    Correct.

19 Q    And you had no authority to act on behalf of either of the

20 Plaintiffs before March 24th, correct?

21 A    Correct.

22 Q    The DAF controls about $200 million in assets, correct?

23 A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24 Fund, LP.

25 Q    Yes.

Patrick - Direct                                    98

1   A    Around there.

2   Q    Okay.  Let me try and just ask that again, and thank you

3   for correcting me.  To the best of your knowledge, the

4   Plaintiffs control about $200 million in assets, correct?

5   A    Net assets, correct.

6   Q    Okay.  And that asset base is derived largely from HCMLP,

7   Mr. Dondero, or Mr. Dondero's trusts, correct?

8   A    Can you restate that question again, Mr. Morris?

9   Q    Sure.  The asset base that you just referred to is derived

10  largely from HCMLP, Mr. Dondero, or donor trusts?

11  A    The way I would characterize it -- you're using the word

12  derived.  I would characterize it with respect to certain

13  charitable donations --

14  Q    Uh-huh.

15  A    -- that were -- that were made at certain time periods,

16  where the donors gave up complete dominion and control over

17  the respective assets and at that time claimed a federal

18  income tax deduction for that.

19      I do -- I do believe that, as far as the donor group, as

20  you specified, Highland Capital Management, I recall, provided

21  a donation to a Charitable Remainder Trust that eventually had

22  expired and that eventually such assets went into the

23  supporting organizations.  And then I do believe Mr. Dondero

24  also contributed to the Charitable Remainder Trust No. 2,

25  which seeded substantial amounts of the original assets that

Patrick - Direct                               99

1    were eventually composed of the $200 million.  And then from

2    time to time I do believe that Mr. Dondero's trusts made

3    charitable donations to their respective supporting

4    organizations.

5    Q    Okay.  Thank you.

6    A    Is that responsive?

7    Q    It is.  It's very responsive.  Thank you very much.  So,

8    to the best of your knowledge, the charitable donations that

9    were made that form the bases of the assets came from those

10   three -- primarily from those three sources, correct?

11   A    Well, you know, there's two different trusts.  There's the

12   Dugaboy Trust and the Get Good Trust.

13   Q    Okay.

14   A    Then you have Mr. Dondero and Highland Capital Management.

15   So I would say four sources.

16   Q    Okay.  All right.  Thank you.  Prior to assuming your role

17   as the authorized representative of the Plaintiff, you had

18   never had meaningful responsibility for making investment

19   decisions, correct?

20   A    I'm sorry.  You kind of talk a little bit fast.  Please

21   slow it down --

22   Q    That's okay.

23   A    -- and restate it.  Thank you.

24   Q    And I appreciate that.  And any time you don't understand

25   what I'm saying or I speak too fast, please do exactly what

Patrick - Direct                    100

 1  you're doing.  You're doing fine.

 2       Prior to assuming your role as the authorized

 3  representative of the Plaintiffs, you never had any meaningful

 4  responsibility making investment decisions.  Is that correct?

 5  A    To whom?

 6  Q    For anybody.

 7  A    Well, during my deposition, I believe I testified that I

 8  make investment decisions with respect to my family.  Family

 9  and friends come to me and they ask me for investment

10  decisions.  I was -- in my deposition, I indicated to you that

11  I was a board member of a nonprofit called the 500, Inc.  They

12  had received a donation of stock in Yahoo!, and the members

13  there looked to me for financial guidance.  As an undergrad at

14  the University of Miami, I was a -- I was a finance major, and

15  so I do have a variety of background with respect to

16  investments.

17  Q    Okay.  So you told me that from time to time friends and

18  family members come to you for investing advice.  Is that

19  right?

20  A    That is correct.

21  Q    And when you were a young lawyer you were on the board of

22  a nonprofit that received a donation of Yahoo! stock and the

23  board looked to you for guidance.  Is that correct?

24          THE COURT:  Just a moment.  I think there's an

25  objection.

Patrick - Direct                                    101

 1            MR. MORRIS:  Uh-huh.

 2            THE COURT:  Go ahead.

 3            MR. ANDERSON:  So far -- relevance, Your Honor.  This

 4    is way out of the bounds of the contempt proceeding.  You

 5    know, what he did as a young person with Yahoo! stock.  We're

 6    here to -- he authorized the lawsuit.  They filed the lawsuit.

 7    That's it.  Getting into all this peripheral stuff is

 8    completely irrelevant.

 9            THE COURT:  Your response?

10            MR. MORRIS:  My response, Your Honor, is very simple.

11    Mr. Patrick assumed responsibility, and you're going to be

12    told that he exercised full and complete authority over a $200

13    million fund that was created by Mr. Dondero, --

14            THE COURT:  Okay.

15            MR. MORRIS:  -- that funds -- that is funded

16    virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17    lovely man, and I don't mean to disparage him at all -- but he

18    has no meaningful experience in investing at all.

19            THE COURT:  All right.  Counsel, I overrule.  I think

20    there's potential relevance.

21        And may I remind people that when you're back at counsel

22    table, please make sure you speak your objections into the

23    microphone.  Thank you.

24    BY MR. MORRIS:

25    Q    When you were a young lawyer, sir, you were on the board

Patrick - Direct                        102

 1  of a nonprofit that received a donation of Yahoo! stock and

 2  the board looked to you for guidance, correct?

 3  A    Yes, correct.

 4  Q    And -- but during your 13 years at Highland, you never had

 5  formal responsibility for making investment decisions,

 6  correct?

 7  A    That is correct.

 8  Q    Yeah.  In fact, other than investment opportunities that

 9  you personally presented where you served as a co-decider, you

10  never had any responsibility or authority to make investment

11  decisions on behalf of HCMLP or any of its affiliated

12  entities, correct?

13  A    That is correct.

14  Q    And at least during your deposition, you couldn't identify

15  a single opportunity where you actually had the authority and

16  did authorize the execution of a transaction on behalf of

17  HCMLP or any of its affiliates, correct?

18  A    Correct.

19  Q    And yet today you are now solely responsible for making

20  all investment decisions with respect to a $200 million

21  charitable fund, correct?

22  A    Yes, but I get some help.  I've engaged an outside third

23  party called ValueScope, and they have been as -- effectively

24  working as a "gatekeeper" for me, and I look to them for

25  investment guidance and advice, and I informally look to Mr.

Patrick - Direct                    103

1   Dondero since the time period of when I took control on March

2   24th for any questions I may have with respect to the

3   portfolio.  So I don't feel like I'm all by myself in making

4   decisions.

5   Q    Okay.  I didn't mean to suggest that you were, sir, and I

6   apologize if you took it that way.  I was just asking the

7   question, you are the person now solely responsible for making

8   the investment decisions, correct?

9   A    Yes.

10  Q    Okay.  Let's talk about the circumstances that led to the

11  filing of the complaint for a bit.  On April 12, 2021, you

12  caused the Plaintiffs to commence an action against HCMLP and

13  two other entities, correct?

14  A    Correct.

15  Q    Okay.  One of the binders -- you've got a couple of

16  binders in front of you.  If you look at the bottom, one of

17  them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18  could grab that one and turn to Exhibit 12.  Do you have that,

19  sir?

20  A    It says -- it says the original complaint.  Is that the

21  right one?

22  Q    That is the right one.  And just as I said when we were

23  doing this virtually last Friday, if I ask you a question

24  about a particular document, you should always feel free to

25  review as much of the document as you think you need to

Patrick - Direct                                        104

1   competently and fully answer the question.  Okay?

2   A    Okay.  Thank you.

3   Q    All right.  You instructed the Sbaiti firm to file that

4   complaint on behalf of the Plaintiffs, correct?

5   A    Correct.

6   Q    And to the best of your recollection, the Plaintiffs

7   returned -- retained the Sbaiti firm in April, correct?

8   A    Correct.

9   Q    So the Sbaiti firm was retained no more than twelve days

10  before the complaint was filed, correct?

11  A    Correct.

12  Q    You personally retained the Sbaiti firm, correct?

13  A    Correct.

14  Q    And the idea of filing this complaint originated with the

15  Sbaiti firm, correct?

16  A    Correct.

17  Q    Before filing -- withdrawn.  Before becoming the

18  Plaintiffs' authorized representative, you hadn't had any

19  communications with anyone about potential claims that might

20  be brought against the Debtor arising out of the HarbourVest

21  settlement, correct?

22  A    That is correct.

23  Q    Now, after you became the Plaintiffs' authorized

24  representative, Mr. Dondero communicated with the Sbaiti firm

25  about the complaint that's marked as Exhibit 12, correct?

Patrick - Direct                              105

1  A    Yes.  After he brought certain information to myself and

2  then that I engaged the Sbaiti firm to launch an

3  investigation, I also wanted Mr. Dondero to work with the

4  Sbaiti firm with respect to their investigation of the

5  underlying facts.

6  Q    Okay.  Mr. Dondero did not discuss the complaint with you,

7  but he did communicate with the Sbaiti firm about the

8  complaint, correct?

9  A    I believe -- yeah.  I heard you slip in at the end "the

10 complaint."  I know he communicated with the Sbaiti firm.  I

11 can't -- I can't say what he said or didn't say with respect

12 to the -- the actual complaint.

13 Q    Okay.  But Mr. Dondero got involved in the process

14 initially when he brought some information to your attention

15 concerning the HarbourVest transaction, correct?

16 A    Correct.

17 Q    And he came to you with the HarbourVest information after

18 you assumed your role as the authorized representative of the

19 Plaintiffs on March 24th, correct?

20 A    That is correct.

21 Q    At the time he came to you, you did not have any specific

22 knowledge about the HarbourVest transaction, correct?

23 A    I did not have specific knowledge with respect to the

24 allegations that were laid out and the facts with respect to

25 the original complaint.  I think I had just had a general

Patrick - Direct                    106

 1   awareness that there was a HarbourVest something or other, but

 2   the specific aspects of it, I was unaware.

 3   Q    Okay.  And you had no reason to believe that Mr. Seery had

 4   done anything wrong with respect to the HarbourVest

 5   transaction at the time you became the Plaintiffs' authorized

 6   representative, correct?

 7   A    That is correct.

 8   Q    But you recall very specifically that some time after

 9   March 24th Mr. Dondero told you that an investment opportunity

10   was essentially usurped or taken away, to the Plaintiffs' harm

11   and for the benefit of HCMLP, correct?

12   A    That is correct.

13   Q    And after Mr. Dondero brought this information to your

14   attention, you hired the Sbaiti firm to launch an

15   investigation into the facts, correct?

16   A    Correct.

17   Q    You had never worked with the Sbaiti firm before, correct?

18   A    That is correct.

19   Q    And you had hired many firms as a tax counselor at HCMLP,

20   but not the Sbaiti firm until now.  Correct?

21   A    That is correct.

22   Q    You got to the Sbaiti firm through a recommendation from

23   D.C. Sauter, correct?

24   A    Correct.

25   Q    Mr. Sauter is the in-house counsel, the in-house general

Patrick - Direct                                    107

1  counsel at NexPoint Advisors, correct?

2  A    Correct.

3  Q    You didn't ask Mr. Sauter for a recommendation for a

4  lawyer; he just volunteered that you should use the Sbaiti

5  firm.  Correct?

6  A    That is correct.

7  Q    And you never used -- considered using another firm, did

8  you?

9  A    When they were presented to me, they appeared to have all

10 the sufficient skills necessary to undertake this action, and

11 so I don't recall interviewing any other firms.

12 Q    Okay.  Now, after bringing the matter to your action, Mr.

13 Dondero communicated directly with the Sbaiti firm in relation

14 to the investigation that was being undertaken.  Correct?

15 A    That is correct.

16 Q    But you weren't privy to the communications between Mr.

17 Dondero and the Sbaiti firm, correct?

18 A    I did not participate in those conversations as the --

19 what I, again, considered Mr. Dondero as the investment

20 advisor to the portfolio, and he was very versant in the

21 assets.  I wanted him to participate in the investigation that

22 the Sbaiti firm was undertaking prior to the filing of this

23 complaint.

24 Q    Let's talk for a minute about the notion of Mr. Dondero

25 being the investment advisor.  Until recently, the entity

Patrick - Direct                                         108

1   known as the DAF had an investment advisory committee with HC

2   -- an investment advisory agreement with HCMLP.  Correct?

3   A    It's my understanding that the investment advisory

4   agreement existed with the Plaintiffs, CLO Holdco, as well as

5   Charitable DAF Fund, LP, up and to the end of February,

6   throughout the HarbourVest transaction.

7   Q    Okay.  And since February, the Plaintiffs do not have an

8   investment advisory agreement with anybody, correct?

9   A    That is correct.

10  Q    Okay.  So Mr. Dondero, if he serves as an investment

11  advisor, it's on an informal basis.  Is that fair?

12  A    After I took control, he serves as an informal investment

13  advisor.

14  Q    Okay.  So there's no contract that you're aware of between

15  either of the Plaintiffs and Mr. Dondero pursuant to which he

16  is authorized to act as the investment advisor for the

17  Plaintiffs, correct?

18  A    That is correct.

19  Q    Okay.  When you communicated with Grant Scott --

20  withdrawn.  You know who Grant Scott is, right?

21  A    Yes, I do.

22  Q    He's the gentleman who preceded you as the authorized

23  representative of the Plaintiffs, correct?

24  A    Yes.

25  Q    Okay.  You communicated with Mr. Scott from time to time

Patrick - Direct                                109

1   during February and March 2021, correct?

2   A    February and March are the dates?  Yes.

3   Q    Yeah.  And from February 1st until March 21st -- well,

4   withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5   Plaintiffs' authorized representative, correct?

6   A    Correct.

7   Q    And you have no recollection of discussing with Mr. Scott

8   at any time prior to March 24th any aspect of the HarbourVest

9   settlement with Mr. Scott.  Correct?

10  A    Correct.

11  Q    And you have no recollection of discussing whether the

12  Plaintiffs had potential claims that might be brought against

13  the Debtor.  Correct?  Withdrawn.  Let me ask a better

14  question.

15       You have no recollection of discussing with Mr. Scott at

16  any time prior to March 24th whether the Plaintiffs had

17  potential claims against the Debtor.  Correct?

18  A    That is correct.

19  Q    You and Mr. Scott never discussed whether either of --

20  either of the Plaintiffs had potential claims against Mr.

21  Seery.  Correct?

22  A    Correct.

23  Q    Okay.  At the time that you became their authorized

24  representative, you had no knowledge that the Plaintiffs would

25  be filing a complaint against the Debtors relating to the

Patrick - Direct                          110

1    HarbourVest settlement less than three weeks later, correct?

2    A    That is correct.

3    Q    Okay.  Now, if you look at Page 2 of the complaint, you'll

4    see at the top it refers to Mr. Seery as a potential party.

5    Do you see that?

6    A    Yes, I do.

7    Q    Okay.  You don't know why Mr. Seery was named --

8    withdrawn.  You don't know why Mr. Seery was not named as a

9    defendant in the complaint, correct?

10   A    No, I -- that's correct.  I do not know why he was not

11   named.  That's in the purview of the Sbaiti firm.

12   Q    Okay.  And the Sbaiti firm also made the decision to name

13   Mr. Seery on Page 2 there as a potential party when drafting

14   the complaint, correct?

15   A    That's what the document says.

16   Q    And you weren't involved in the decision to identify Mr.

17   Seery as a potential party, correct?

18   A    That is correct.  Again, I rely on the law firm to decide

19   what parties to bring a suit to -- against.

20   Q    Okay.  Okay.  Do you recall the other day we talked about

21   a document called the July order?

22   A    Yes.

23   Q    Okay.  That's in -- that's in Tab 16 in your binder, if

24   you can turn to that.  And take a moment to look at it, if

25   you'd like.  And my first question is simply whether this is

Patrick - Direct                                    111

1    the July order, as you understand it.

2         (Pause.)

3    A    Yes, it is.  I was just looking for the gatekeeper

4    provision.  It looks like it's Paragraph 5.  So, --

5    Q    Okay.  Thank you for that.  About a week after the

6    complaint was filed, you authorized the Plaintiffs to file a

7    motion in the District Court for leave to amend the

8    Plaintiffs' complaint to add Mr. Seery as a defendant.

9    Correct?

10   A    I authorized the filing of a motion in Federal District

11   Court that would ask the Federal District Court whether or not

12   Jim Seery could be named in the original complaint with

13   respect to the gatekeeper provision cited in that motion and

14   with respect to the arguments that were made in that motion.

15   Q    Okay.  Just to be clear, if you turn to Exhibit 17, the

16   next tab, --

17   A    I'm here.

18   Q    -- do you see that document is called Plaintiffs' Motion

19   for Leave to File First Amended Complaint?

20   A    Yes.

21   Q    And that's the document that you authorized the Plaintiffs

22   to file on or about April 19th, correct?

23   A    Correct.

24   Q    Okay.  And can we refer to that document as the motion to

25   amend?

Patrick - Direct                                112

1   A    Yes.

2   Q    Okay.  You were aware of the July order at Tab 16 before

3   you authorized the filing of the motion to amend.  Correct?

4   A    Yes, because it's cited in the motion itself.

5   Q    Okay.  And at the time that you authorized the filing of

6   the motion to amend, you understood that the July order was

7   still in effect.  Correct?

8   A    Yes, because it was referenced in the motion, so my

9   assumption would be it would still be in effect.

10  Q    Okay.  Before the motion to amend was filed, you're -- you

11  are aware that my firm and the Sbaiti firm communicated by

12  email about the propriety of filing the motion to amend?

13  A    Before it was filed?  Communications between your firm and

14  the Sbaiti firm?  I would have to have my recollection

15  refreshed.

16  Q    I'll just ask the question a different way.  Did you know

17  before you authorized the filing of the motion to amend that

18  my firm and the Sbaiti firm had engaged in an email exchange

19  about the propriety of filing the motion to amend in the

20  District Court?

21  A    It's my recollection -- and again, I could be wrong here

22  -- but I thought the email exchange occurred after the fact,

23  not before.  But again, I -- I just --

24  Q    Okay.  In any event, on April 19th, the motion to amend

25  was filed.  Correct?

Patrick - Direct                                113

 1  A    Correct.

 2  Q    That's the document that is Exhibit 17.  And you

 3  personally authorized the Sbaiti firm to file the motion to

 4  amend on behalf of the Plaintiffs, correct?

 5  A    Correct.

 6  Q    And you authorized the filing of the motion to amend with

 7  knowledge -- withdrawn.

 8      Can you read the first sentence of the motion to amend out

 9  loud, please?

10  A    Yeah.  (reading)  Plaintiffs submit this motion under Rule

11  15 of the Federal Rules of Civil Procedure for one purpose:

12  to name as defendant one James P. Seery, Jr., the CEO of

13  defendant Highland Capital Management, LP (HCM) and the chief

14  perpetrator of the wrongdoing that forms the basis of the

15  Plaintiffs' causes of action.

16  Q    And does that fairly state the purpose of the motion?

17           MR. SBAITI:  Objection, Your Honor.  Asks him to make

18  a legal conclusion about the purpose of the legal motion filed

19  in court that he didn't draft.

20           THE COURT:  Okay.  I overrule.  You can answer if you

21  have an answer.

22           THE WITNESS:  It's always been my general

23  understanding that the purpose of filing this motion was to go

24  to the Federal District Court and ask that Court of reference

25  to this Court whether or not Mr. Seery could be named with

Patrick - Direct                    114

1    respect to the original complaint, citing again the gatekeeper

2    provisions and citing the various arguments that we've heard

3    much earlier.

4    BY MR. MORRIS:

5    Q    Okay.  You personally didn't learn anything between April

6    9th, when the complaint was filed, and April 19th, when the

7    motion to amend was filed, that caused you to authorize the

8    filing of the motion to amend, correct?

9    A    That is correct.

10   Q    In fact, you relied on the Sbaiti firm with respect to

11   decisions concerning the timing of the motion to amend.

12   Correct?

13   A    Correct.

14   Q    And you had no knowledge of whether anyone acting on

15   behalf of the Plaintiffs ever served the Debtor with a copy of

16   the motion to amend.  Correct?

17   A    Yes.  I have no knowledge.

18   Q    Okay.  And you have no knowledge that the Sbaiti firm ever

19   provided my firm with a copy of the motion to amend.  Correct?

20   A    I cannot recall one way or another.

21   Q    Okay.  You never instructed anyone on behalf -- acting on

22   behalf of the Plaintiffs to inform the Debtor that the motion

23   to amend had been filed, correct?

24   A    That is correct.

25   Q    And that's because you relied on the Sbaiti firm on

Patrick - Direct                                115

1   procedural issues, correct?

2   A    That is correct.

3   Q    You didn't consider waiting until the Debtor --

4        (Interruption.)

5   Q    -- had appeared in the action before authorizing the

6   filing of the motion --

7   A    Yeah, --

8            THE COURT:  Yes.  Y'all are being a little bit loud.

9   Okay.

10           A VOICE:  Sorry.

11           MR. MORRIS:  No problem.

12           MR. PHILLIPS:  I've heard that before, Your Honor,

13   and I apologize.

14           THE COURT:  I bet you have.  Thank you.

15           MR. MORRIS:  Admonish Mr. Phillips, please.

16           THE COURT:  Okay.

17           MR. MORRIS:  He's always the wild card.

18           MR. PHILLIPS:  I admonish --

19           MR. MORRIS:  He's always the wild card.

20           MR. PHILLIPS:  I admonish myself.

21           THE COURT:  All right.  I think he got the message.

22   Continue.

23   BY MR. MORRIS:

24   Q    You didn't consider waiting until the Debtor had appeared

25   in the action before filing the motion to amend, correct?

Patrick - Direct                                     116

1   A    Again, I am the client and I rely upon the law firm that's

2   engaged with respect to making legal decisions as to the

3   timing and notice and appearance and what have you.  I'm a tax

4   lawyer.

5   Q    Okay.  You wanted the District Court to grant the relief

6   that the Plaintiffs were seeking.  Correct?

7   A    I wanted the District Court to consider, under the

8   gatekeeper provisions of this Court, whether or not Mr. Seery

9   could be named in the original complaint.  That's -- that,

10  from my perspective, is what was desired.

11  Q    All right.  You wanted the District Court to grant the

12  relief that the Plaintiffs were seeking, correct?

13          MR. SBAITI:  Objection, Your Honor.  Asked and

14  answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  Again, I would characterize this motion

17  as not necessarily asking for specific relief, but asking the

18  Federal District Court whether or not, under the gatekeeper

19  provision, that Mr. Seery could be named on there.  What

20  happens after that would be a second step.  So I kind of -- I

21  dispute that characterization.

22  BY MR. MORRIS:

23  Q    All right.  I'm going to cross my fingers and hope that

24  Ms. Canty is on the line, and I would ask her to put up Page

25  57 from Mr. Patrick's deposition transcript.

Patrick - Direct                                117

1          THE COURT:  There it is.

2          MR. MORRIS:  There it is.  It's like magic.  Can we

3    go down to Lines 18 through 20?

4    BY MR. MORRIS:

5    Q   Mr. Patrick, during the deposition on Friday, did I ask

6    you this question and did you give me this answer?  Question,

7    "Did you want the Court to grant the relief you were seeking?"

8    Answer, "Yes."

9    A   I -- and it was qualified with respect to Lines 12 through

10   17.  In my view, when I answered yes, I was simply restating

11   what I stated in Line 12.  I wanted the District Court to

12   consider this motion as to whether or not Mr. Seery could be

13   named in the original complaint or the amended complaint

14   pursuant to the existing gatekeeper rules and the arguments

15   that were made in that motion.  That's -- that's what I

16   wanted.  And so then when I was asked, did you want the Court

17   to grant the relief that you were seeking, when I answered

18   yes, it was from that perspective.

19   Q   Okay.  Thank you very much.  If the District Court had

20   granted the relief that you were seeking, you would have

21   authorized the Sbaiti firm to file the amended complaint

22   naming Mr. Seery as a defendant if the Sbaiti firm recommended

23   that you do so.  Correct?

24   A   If the Sbaiti firm recommended that I do so.  That is

25   correct.

Patrick - Direct                          118

1   Q    Okay.  Let's talk for a little bit about the line of

2   succession for the DAF and CLO Holdco.  Can we please go to

3   Exhibit 25, which is in the other binder?  It's in the other

4   binder, sir.

5        (Pause.)

6   Q    I guess you could look on the screen or you can look in

7   the binder, whatever's easier for you.

8   A    Yeah.  I prefer the screen.  I prefer the screen.

9   Q    Okay.

10  A    It's much easier.

11  Q    All right.  We've got it in both spots.  But do you have

12  Exhibit 25 in front of you, sir?

13  A    Yes, I do.

14  Q    All right.  Do you know what it is?

15  A    This is the organizational chart depicting a variety of

16  charitable entities as well as entities that are commonly

17  referred to the DAF.  However, when I look at this chart, I do

18  not look at and see just boxes, what I see is the humanitarian

19  effort that these boxes represent.

20           MR. MORRIS:  Your Honor, may I interrupt?

21           THE COURT:  You may.

22           MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q    I appreciate that, and when your lawyers get up to ask you

25  questions, I bet they'll want to know just what you were about

Patrick - Direct                                          119

1   to tell me.  But I just want to understand what this chart is.

2   This chart is the DAF, CLO Holdco, structure chart.  Correct?

3   A   Correct.

4   Q   Okay.  And you were personally involved in creating this

5   organizational structure, correct?

6   A   I -- yes.

7   Q   Okay.  And from time to time, the Charitable DAF Holdco

8   Limited distributes cash to the foundations that are above it.

9   Correct?

10  A   Correct.

11  Q   All right.  I want to talk a little bit more specifically

12  about how this happens.  The source of the cash distributed by

13  Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14  entity, the Cayman Islands entity near the bottom.  Correct?

15          MR. ANDERSON:  Your Honor, I have an objection.

16  Completely irrelevant.  I'm objecting on relevance grounds.

17  This has nothing to do with the contempt proceeding.  We've

18  already gone over that he authorized the filing of the

19  complaint, that he authorized the filing of the motion to

20  amend.  It's all in the record.  This is completely irrelevant

21  at this point.

22          THE COURT:  Okay.  Relevance objection.  Your

23  response?

24          MR. MORRIS:  I believe that it's relevant to the

25  Debtor's motion to hold Mr. Dondero in contempt for pursuing

Patrick - Direct                    120

1   claims against Mr. Seery, in violation of the July 7 order.  I

2   think an understanding of what the Plaintiffs are, how they're

3   funded, and Mr. Dondero's interest in pursuing claims on

4   behalf of those entities is relevant to the -- to the -- just

5   -- it's just against him.  It's not against their clients,

6   frankly.  It's just against Mr. Dondero.

7            THE COURT:  I overrule.

8            MR. MORRIS:  I'll try and -- I'll try and make this

9   quick, though.

10  BY MR. MORRIS:

11  Q    CLO Holdco had two primary sources of capital.  Is that

12  right?

13  A    Two primary sources of capital?

14  Q    Let me ask it differently.  There was a Charitable

15  Remainder Trust that was going to expire in 2011, correct?

16  A    That is correct.

17  Q    And that Charitable Remainder Trust had certain CLO equity

18  assets, correct?

19  A    Correct.

20  Q    And the donor to that Charitable Remainder Trust was

21  Highland Capital Management, LP.  Correct?

22  A    Not correct.  After my deposition, I refreshed my memory.

23  There were two Charitable Remainder Trusts that existed, which

24  I think in my mind caused a little bit of confusion.  The

25  Charitable Remainder Trust No. 2, which is the one that

Patrick - Direct                                      121

1  expired in 2011, was originally funded by Mr. Dondero.

2  Q    Okay.  So, so the Charitable Remainder Trust that we were

3  talking about on Friday wasn't seeded with capital from

4  Highland Capital Management, it came from Mr. Dondero

5  personally?

6  A    That is correct.

7  Q    Okay.  Thank you.  And the other primary source of capital

8  was the Dallas Foundation, the entity that's in the upper

9  left-hand corner of the chart.  Is that correct?

10 A    No.

11 Q    The -- you didn't tell me that the other day?

12 A    You said -- you're pointing to the Dallas Foundation.

13 That's a 501(c)(3) organization.

14 Q    I apologize.  Did you tell me the other day that the

15 Dallas Foundation was the second source of capital for HCLO

16 Hold Company?

17 A    No, I did not.  You --

18       (Pause.)

19 Q    Maybe I know the source of the confusion.  Is the Highland

20 Dallas Foundation something different?

21 A    Yes.  On this organizational chart, you'll see that it has

22 an indication, it's a supporting organization.

23 Q    Ah, okay.  So, so let me restate the question, then.  The

24 second primary source of capital for CLO Holdco, Ltd. is the

25 Highland Dallas Foundation.  Do I have that right?

Patrick - Direct                                    122

1   A    Yes.

2   Q    Okay.  And the sources of that entity's capital were

3   grantor trusts and possibly Mr. Dondero personally.  Correct?

4   A    In addition -- per my refreshing my recollection from our

5   deposition, the other Charitable Remainder Trust, I believe

6   Charitable Remainder Trust No. 1, which expired later, also

7   sent a donation, if you will, or assets to -- and I cannot

8   recall specifically whether it was just the Highland Dallas

9   Foundation or the other supporting organizations that you see

10  on this chart.

11  Q    But the source of that -- the source of the assets that

12  became the second Charitable Remainder Trust was Highland

13  Capital Management, LP.  Is that right?

14  A    I think that is accurate from my recollection.  And again,

15  I'm talking about Charitable Remainder Trust No. 1.

16  Q    Okay.  So is it fair to say -- I'm just going to try and

17  summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18  is the investment arm of the organizational structure on this

19  page?

20  A    Yes.

21  Q    And is it fair to say that nearly all of the assets that

22  are in there derived from either Mr. Dondero, one of his

23  trusts, or Highland Capital Management, LP?

24  A    Yes.  It's like the Bill Gates Foundation or the

25  Rockefeller Foundation.  These come from the folks that make

Patrick - Direct                                    123

1    their donations and put their name on it.

2    Q    Okay.

3            MR. MORRIS:  Now, now, Your Honor, I'm going to go

4    back just for a few minutes to how Mr. Scott got appointed,

5    because I think that lays kind of the groundwork for his

6    replacement.  It won't take long.

7            THE COURT:  Okay.  I have a question either --

8            MR. MORRIS:  Sure.

9            THE COURT:  -- for you or the witness.  I'm sorry,

10   but --

11           MR. MORRIS:  Sure.  Yeah.

12           THE COURT:  -- the organizational chart, it's not

13   meant to show everything that might be connected to this

14   substructure, right?  Because doesn't CLO Holdco, Ltd. own

15   49.02 percent of HCLOF, --

16           MR. MORRIS:  That --

17           THE COURT:  -- which gets us into the whole

18   HarbourVest transaction issue?

19           MR. MORRIS:  You're exactly right, Your Honor.

20           THE COURT:  Okay.

21           MR. MORRIS:  But that's just an investment that HCLO

22   Holdco made.

23           THE COURT:  Right.

24           MR. MORRIS:  Right?  And so I -- let me ask the

25   witness, actually.

Patrick - Direct                                    124

1            THE COURT:  Okay.  Thank you.  Thank you.

2            MR. MORRIS:  Let me ask the witness.  Yeah.

3            THE COURT:  I just want my brain --

4            MR. MORRIS:  Right.

5            THE COURT:  -- to be complete on this chart.

6   BY MR. MORRIS:

7   Q   Mr. Patrick, there are three entities under CLO Holdco,

8   Ltd.  Do you see that?

9   A   Yes.

10  Q   And does CLO Holdco, Ltd. own one hundred percent of the

11  interests in each of those three entities?

12  A   Yes.

13  Q   Do you know why those three entities are depicted on this

14  particular chart?  Is it because they're wholly-owned

15  subsidiaries?

16  A   Correct.

17  Q   Okay.  And CLO Holdco, Ltd. has interests in other

18  companies.  Isn't that right?

19  A   It has other investments.  That is correct.

20  Q   And the reason that they're not depicted on here is

21  because they're not wholly-owned subsidiaries, they're just

22  investments; is that fair?

23  A   That is fair.

24           MR. MORRIS:  Does that--?

25           THE COURT:  Yes.

Patrick - Direct                                  125

 1           MR. MORRIS:  Okay.

 2           THE COURT:  Uh-huh.

 3    BY MR. MORRIS:

 4    Q    So, so let's go back to Mr. Grant for a moment.  Mr.

 5    Scott, rather.  Mr. Dondero was actually the original general

 6    partner.  If you look at this chart, while it's still up here,

 7    you see on the left there's Charitable DAF GP, LLC?

 8    A    Yes.

 9    Q    And the Charitable DAF GP, LLC is the general partner of

10    the Charitable DAF Fund, LP.  Correct?

11    A    Correct.

12    Q    And on this chart, Grant Scott was the managing member of

13    Charitable DAF GP, LLC.  Right?

14    A    Correct.

15    Q    Okay.  But Mr. Dondero was the original general partner of

16    that entity, correct?

17    A    That is correct.  But I do want to point out, I just note

18    that the GP interest is indicating a one percent interest and

19    the 99 interest to Charitable DAF Holdco.  I believe that's

20    incorrect.  It's a hundred percent by Charitable DAF Holdco,

21    Ltd., and the Charitable DAF GP interest is a noneconomic

22    interest.  So that should actually reflect a zero percent to

23    the extent it may indicate some sort of profits or otherwise.

24    Q    Okay.  Thank you for the clarification.  Can you turn to

25    Exhibit 26, please, in your binder?  And is it your

Patrick - Direct                                                126

1    understanding that that is the amended and restated LLC

2    agreement for the DAF GP, LLC?

3    A    Yes.

4    Q    Okay.  And this was amended and restated effective as of

5    January 1st, 2012, correct?

6    A    Yes.

7    Q    And if you go to the last page, you'll see there are

8    signatures for Mr. Scott and Mr. Dondero, correct?

9    A    Yes.

10   Q    And Mr. Dondero is identified as the forming -- former

11   managing member and Mr. Scott is identified as the new

12   managing member.   Correct?

13   A    Correct.  That's what the document says.

14   Q    And it's your understanding that Mr. Dondero had the

15   authority to select his successor.  Correct?

16   A    Correct.

17   Q    In fact, it's based on your understanding of documents and

18   your recollection that Mr. Dondero personally selected Mr.

19   Scott as the person he was going to transfer control to,

20   correct?

21   A    Upon advice of Highland Capital Management's tax

22   compliance officer, Mr. Tom Surgent.

23   Q    What advice did Mr. Surgent give?

24   A    He gave advice that, because Mr. Dondero -- and this is

25   what I came to an understanding after the fact of this

Patrick - Direct                                      127

1   transaction, because I was not a part of it -- that by Mr.

2   Dondero holding that GP interest, that it would be -- the

3   Plaintiffs, if you will, would be an affiliate entity for

4   regulatory purposes, and so he advised that if he -- if Mr.

5   Dondero transferred his GP interest to Mr. Scott, it would no

6   longer be an affiliate, is my recollection.

7   Q    Okay.  You didn't appoint Mr. Scott, did you?

8   A    No.

9   Q    That was Mr. Dondero.  Is that right?

10  A    Yes.

11  Q    Okay.  Let's go to 2021.  Let's come back to the current

12  time.  Sometime in February, Mr. Scott called you to ask about

13  the mechanics of how he could resign.  Correct?

14  A    That is correct.

15  Q    But the decision to have you replace Mr. Scott was not

16  made until March 24th, the day you sent an email to Mr. Scott

17  with the transfer documents.  Correct?

18  A    That is correct.

19  Q    And it's your understanding that he could have transferred

20  the management shares and control of the DAF to anyone in the

21  world.  Correct?

22  A    Correct.

23  Q    That's what the docu... that he had the authority under

24  the documentation, as you understood it, to freely trade or

25  transfer the management shares.  Correct?

Patrick - Direct                           128

1   A    Wait.  Now, let's be precise here.

2   Q    Okay.

3   A    Are you talking about the GP interests or the management

4   shares held by Charitable DAF Holdco, Ltd.?

5   Q    Let's start with the management shares.  Can you explain

6   to the Court what the management shares are?

7            MR. ANDERSON:  Your Honor?  Hang on one second.  Your

8   Honor, I want to object again on relevance.  We're going way

9   beyond the scope of the contempt issue, whether or not --

10            MR. MORRIS:  This is about control.

11            MR. ANDERSON:  -- the motion to amend somehow

12   violated the prior order of this Court.  Getting into the

13   management structure, transfer of shares, that's way outside

14   the bounds.  I object on relevance.

15            THE COURT:  Okay.  Relevance objection?

16            MR. MORRIS:  Your Honor, they have probably 30

17   documents, maybe 20 documents, on their exhibit list that

18   relate to management and control.  I'm asking questions about

19   management and control.  Okay?  This is important, again, to

20   (a) establish his authority, but (b) the circumstances under

21   which he came to be the purported control person.

22            THE COURT:  Okay.  Overruled.  Go ahead.

23            THE WITNESS:  It might be helpful to look at the

24   organizational chart, but if not -- but I'll describe it to

25   you again.  With respect to the entity called --

Patrick - Direct                                    129

1          MR. MORRIS:  Hold on one second.  Can we put up the

2    organizational chart again, Ms. Canty, if you can?  There you

3    go.

4          THE WITNESS:  Okay.  So with respect to the

5    Charitable DAF Holdco, Ltd., it is my understanding that Mr.

6    Scott, he organized that entity when he was the independent

7    director of the Charitable Remainder Trust, and he caused the

8    issuance of the management shares to be issued to himself.

9    And then those are, again, noneconomic shares, but they are

10   control shares over that entity.

11        And I think, to answer your question, is -- it -- he alone

12   decides who he can transfer those shares to.

13   BY MR. MORRIS:

14   Q   Do I have this right, that whoever holds the noneconomic

15   management shares has the sole authority to appoint the

16   representatives for each of the Charitable DAF entities and

17   CLO Holdco?  It's kind of a magic ticket, if you will?

18   A   It -- I think there's a -- the answer really is no from a

19   legal standpoint, because Charitable DAF Holdco is a limited

20   partner in Charitable DAF Fund, LP, so it does not have

21   authority -- authority under all -- the respective entities

22   underneath that.  It could cause a redemption, if you will, of

23   Charitable DAF Fund.  And so, really, the authority -- the

24   trickle-down authority that you're referencing is with respect

25   to his holding of the Charitable DAF GP, LLC interest.  It's a

Patrick - Direct                    130

1  member-managed Delaware limited liability company.  And from

2  that, he -- that authority kind of trickles down to where he

3  can appoint directorships.

4  Q   All right.  I think I want to just follow up on that a

5  bit.  Which entity is the issuer of the manager shares, the

6  management shares?

7  A   Yeah, the -- per the organizational chart, it is accurate,

8  it's the Charitable DAF Holdco, Ltd. which issued the

9  management shares to Mr. Scott.

10 Q   Okay.  And that's why you have the arrow from Mr. Scott

11 into that entity?

12 A   Correct.

13 Q   And do those -- does the holder of the management shares

14 have the authority to control the Charitable DAF Holdco, Ltd.?

15 A   Yes.

16 Q   Okay.  And as the control person for the Charitable DAF

17 Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18 Holdco Limited owns a hundred percent of the limited

19 partnership interests of the Charitable DAF Fund, LP.

20 Correct?

21 A   Correct.

22 Q   And so does the holder of that hundred percent limited

23 partnership interest have the authority to decide who acts on

24 behalf of the Charitable DAF Fund, LP?

25 A   I would say no.  I mean, you know, just -- I would love to

Patrick - Direct                           131

1   read the partnership agreement again.  But I, conceptually,

2   what I know with partnerships, I would say the limited partner

3   would not.  It would be through the Charitable DAF GP, LLC

4   interest.

5   Q    The one on the left, the general partner?

6   A    The general partner.

7   Q    I see.  So when Mr. Scott transferred to you the one

8   hundred percent of the management shares as well as the title

9   of the managing member of the Charitable DAF GP, LLC, did

10  those two events give you the authority to control the

11  entities below it?

12  A    Yes.

13  Q    Thank you.  And so prior to the time that he transferred

14  those interests to you, is it your understanding that Mr.

15  Scott had the unilateral right to transfer those interests to

16  anybody in the world?

17  A    Yes.

18  Q    Okay.  And you have that right today, don't you?

19  A    Yes, I do.

20  Q    If you wanted, you could transfer it to me, right?

21  A    Yes, I could.

22  Q    Okay.  But of all the people in the world, Mr. Scott

23  decided to transfer the management shares and the managing

24  member title of the DAF GP to you, correct?

25  A    Restate that question again?

Patrick - Direct                               132

1    Q    Of all the people in the world, Mr. Scott decided to

2    transfer it to you, correct?

3    A    Yeah.  Mr. Scott transferred those interests to me.

4    Q    Okay.  And you accepted them, right?

5    A    Yes.

6    Q    You're not getting paid anything for taking on this

7    responsibility, correct?

8    A    I am not paid by any of the entities depicted on this

9    chart.

10   Q    And Mr. Scott used to get $5,000 a month, didn't he?

11   A    I believe that's what he testified to.

12   Q    Yeah.  But you don't get anything, right?

13   A    Correct.

14   Q    In fact, you get the exact same salary and compensation

15   from Skyview that you had before you became the authorized

16   representative of the DAF entities and CLO Holdco.  Correct?

17   A    Correct.

18          MR. MORRIS:  Okay.  Your Honor, if I may just take a

19   moment, I may be done.

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  Your Honor, I have no further questions.

23          THE COURT:  All right.  Pass the witness.  Any

24   examination of the witness?

25                        CROSS-EXAMINATION

Patrick - Cross                                    133

 1   BY MR. ANDERSON:

 2   Q    Mr. Patrick, I just had a few follow-up questions.  When

 3   you authorized the filing of the lawsuit against Highland

 4   Capital Management, LP, Highland HCF Advisor Limited, and

 5   Highland CLO Funding, Limited, when that lawsuit was filed in

 6   April of this year, was Mr. Seery included as a defendant?

 7   A    No.

 8   Q    Have the two Plaintiffs in that lawsuit, have they

 9   commenced any lawsuit against Mr. Seery?

10   A    No.

11   Q    Have they pursued any lawsuit against Mr. Seery?

12   A    No.

13   Q    Have they pursued a claim or cause of action against Mr.

14   Seery?

15   A    No.

16   Q    At most, did the Plaintiffs file a motion for leave to add

17   Mr. Seery as a defendant?

18            MR. MORRIS:  Objection, Your Honor.  To the extent

19   that any of these questions are legal conclusions, I object.

20   He's using the word pursue.  If he's trying -- if he's then

21   going to argue that, But the witness testified that he didn't

22   pursue and that's somehow a finding of fact, I object.

23            THE COURT:  Okay.  I understand.

24            MR. MORRIS:  Yeah.

25            THE COURT:  But I overrule.  He can answer.

                        Patrick - Cross                    134

1          MR. MORRIS:  That's fine.

2          THE WITNESS:  Can you restate the question again?

3    BY MR. ANDERSON:

4    Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

5    Did the Plaintiffs pursue a claim or cause of action against

6    Mr. Seery?

7    A    No.

8    Q    At most, did the Plaintiffs file a motion for leave to

9    file an amended complaint regarding Mr. Seery?

10   A    Yes.  But, again, I viewed the motion as simply asking the

11   Federal District Court whether Mr. Seery could or could not be

12   named in a complaint, and then the next step might be how the

13   Federal District Court might rule with respect to that.

14   Q    And we have -- it's Tab 17 in the binders in front of you.

15   That is Plaintiffs' motion for leave.  If you could turn to

16   that, please.

17   A    Yes.  I've got it open.

18   Q    Is the Court's July order, the Bankruptcy Court's July

19   order, is it mentioned on the first page and then throughout

20   the motion for leave to amend?

21   A    Yes, it is.  I see it quoted verbatim on Page 2 under

22   Background.

23   Q    Was the Court's order hidden at all from the District

24   Court?

25   A    The document speaks for itself.  It's very transparent.

Patrick - Cross                                   135

1   Q   Was there any effort whatsoever to hide the prior order of

2   the Bankruptcy Court?

3   A   No.

4               MR. ANDERSON:  Pass the witness.

5               THE COURT:  Okay.  Other examination?

6               MR. SBAITI:  Yes, Your Honor.  Just a couple of

7   questions.

8                        CROSS-EXAMINATION

9   BY MR. SBAITI:

10  Q   Do you mind flipping to Exhibit 25, which I believe is the

11  org chart, the one that you were looking at before?

12  A   Okay.

13  Q   It'll still be in --

14  A   Okay.  Yeah.

15  Q   -- the defense binder.  No reason to swap out right now.

16  A   I've got the right binders.  Some of them are repeatable

17  exhibits, so --

18  Q   Yeah.

19  A   -- I have to grab the right binder.  Yes.

20  Q   As this org chart would sit today, is the only difference

21  that Grant Scott's name would instead be Mark Patrick?

22  A   Yes.

23  Q   Was there ever a period of time where Jim Dondero's name

24  would sit instead of Grant Scott's name prior?

25  A   Yes, originally, when this -- yes.

Patrick - Cross                         136

1   Q    So did Mr. Dondero both have the control shares of the GP,

2   LLC and DAF Holdco Limited?

3   A    No, I believe not.  I believe he only held the Charitable

4   DAF GP interest and that Mr. Scott at all times held the

5   Charitable DAF Holdco, LTD interest, until he decided to

6   transfer it to me.

7   Q    Can you just tell us how Mr. Scott came to hold the

8   control shares of the Charitable DAF Holdco, LTD?

9   A    When he was the independent trustee of the Charitable

10  Remainder Trust, he caused that -- the creation of that

11  entity, and that's how he became in receipt of those

12  management shares.

13  Q    And does the Charitable DAF GP, LLC have any control over

14  Charitable DAF Fund, LP's actions or activities?

15  A    Yes, it does.

16  Q    What kind of control is that?

17  A    I would describe complete control.  It's the managing

18  member of that entity and can -- and effectively owns, you

19  know, the hundred percent interest in the respective

20  subsidiaries, and so the control follows down.

21  Q    And when did Mr. Scott replace Mr. Dondero as the GP --

22  managing member of the GP?

23  A    Well, I think as the -- and Mr. Morris had shown me with

24  respect to that transfer occurring on March 2012.

25  Q    So nine years ago?

Patrick - Cross                    137

1   A    Yes.

2   Q    Does Mr. Dondero today exercise any control over the

3   activities of the DAF Charitable -- the Charitable DAF, GP or

4   the Charitable DAF Holdco, LTD?

5   A    No.

6   Q    Is he a board member of sorts for either of those

7   entities?

8   A    No.

9   Q    Is he a board members of CLO Holdco?

10  A    No.

11  Q    Does he have any decision-making authority at CLO Holdco?

12  A    None.

13  Q    The decision to authorize the lawsuit and the decision to

14  authorize the motion that you've been asked about, who made

15  that authorization?

16  A    I did.

17  Q    Did you have to ask for anyone's permission?

18  A    No.

19         MR. SBAITI:  No more questions, Your Honor.

20         THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21      All right.  Any redirect?

22                    REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q    Since becoming the authorized representative of the

25  Plaintiffs, have you ever made a decision on behalf of those

Patrick - Cross                                    138

1  entities that Mr. Dondero disagreed with?

2  A    I have made decisions that were adverse to Mr. Dondero's

3  financial -- financial decision.  I mean, financial interests.

4  Whether he disagreed with them or not, I don't -- he has not

5  communicated them to me.  But they have been adverse, at least

6  two very strong instances.

7  Q    Have you ever -- have you ever talked to him about making

8  a decision that would be adverse to his interests?  Did he

9  tell -- did --

10 A    I didn't -- I don't -- I did not discuss with him prior to

11 making the decisions that I made that were adverse to his

12 economic interests.

13          MR. MORRIS:  Okay.  No further questions, Your Honor.

14          THE COURT:  Any further examination?  Recross on that

15 redirect?

16          MR. ANDERSON:  No further questions.

17          MR. SBAITI:  No further questions, Your Honor.

18          MR. ANDERSON:  Sorry.

19          THE COURT:  Nothing?

20          MR. ANDERSON:  I think we're good.

21          THE COURT:  Okay.  I have one question, Mr. Patrick.

22 My brain sometimes goes in weird directions.

23                    EXAMINATION BY THE COURT

24          THE COURT:  I'm just curious.  What are these Cayman

25 Island entities, charitable organizations formed in the Cayman

Patrick - Examination by the Court                139

1   Islands?

2           THE WITNESS:  Yeah.  I'll keep it as simple as I can,

3   even though I'm a tax lawyer, so I won't get into the tax

4   rules, but the Cayman structure is modeled after what you

5   typically see in the investment management industry, and so I

6   -- and I won't reference specific entities here with respect

7   to the Highland case, but I think you'll note some

8   similarities, if you think about it.  They're -- it's

9   described as an offshore master fund structure where you have

10  a -- and that would be the Charitable DAF Fund that's

11  organized offshore, usually in the Cayman or Bermuda Islands,

12  where the general partner, typically, in the industry, holds

13  the management --

14          THE COURT:  Yeah.  Let --

15          THE WITNESS:  Okay.

16          THE COURT:  -- me just stop you.  I've seen this

17  enough --

18          THE WITNESS:  Yeah, it's

19          THE COURT:  -- to know that it happens in the

20  investment world.  But in --

21          THE WITNESS:  Yeah.

22          THE COURT:  You know, usually, I see 501(c)(3), you

23  know, domestically-created entities for charitable purposes,

24  so I'm just curious.

25          THE WITNESS:  Yes.

Patrick - Examination by the Court                 140

1            THE COURT:  Uh-huh.

2            THE WITNESS:  The offshore master fund structure

3       typically will have two different types of -- they call it

4       foreign feeder funds.  One foreign feeder fund is meant to

5       accommodate foreign investors; the other foreign feeder fund

6       is meant to accommodate U.S. tax-exempt investors.

7            Why, why is it structured that way?  In order to avoid

8       something called -- I was trying not to be wonkish -- UBTI.

9       That's, let's see, Un -- Unrelated Trader Business Income.  I

10      probably have that slightly wrong.  But it's essentially,

11      it's a means to avoid active business income, which includes

12      debt finance income, which is what these CLOs tend to be, that

13      would throw off income that would be taxable normally if the

14      exempts did not go through this foreign blocker, and it

15      converts that UBTI income -- it's called (inaudible) income --

16      into passive income that flows -- that flows up to the

17      charities.

18           And so it's very typical that you'll have a U.S. tax-

19      exempt investor, when they make an investment in a fund,

20      prefer to go through an offshore feeder fund, which is

21      actually Charitable DAF Holdco, LTD.  That's essentially what,

22      from a tax perspective, represents as a UBTI blocker entity.

23      And then you have the offshore investments being held offshore

24      because there's a variety of safe harbors where the receipt of

25      interest, the portfolio interest exception, is not taxable.

Patrick - Examination by the Court        141

1    The creation of capital gains or losses under the -- they call

2    it the trading, 864(b) trading safe harbor, is not taxable.

3    So that's why you'll find these structures operating offshore

4    to rely on those safe harbor provisions as well as -- as well

5    as what I indicated with respect to the two type blocker

6    entities.  It's very typical and industry practice to organize

7    these way.  And so when this was set --

8              THE COURT:  It's very typical in the charitable world

9    to --

10             THE WITNESS:  In the investment management --

11             THE COURT:  -- form this way?

12             THE WITNESS:  In the investment management world,

13   when you have charitable entities that are taking some

14   exposure to assets that are levered, to set this structure up

15   in this way.  It was modeled after -- they just call them

16   offshore master fund structures.  They're known as Mickey

17   Mouse structures, where you'll have U.S. investors --

18             THE COURT:  Yes.  I -- yes, I --

19             THE WITNESS:  -- enter through a U.S. partnership,

20   and the foreign investors enter through a blocker.

21             THE COURT:  It was really just the charitable aspect

22   of this that I was --

23             THE WITNESS:  Yeah.  Yeah.

24             THE COURT:  -- getting at.

25             THE WITNESS:  Yeah.  No, but I'm just trying to

Patrick - Recross                    142

1  emphasize if --

2          THE COURT:  All right.  It's --

3          THE WITNESS:  Yeah.

4          THE COURT:  -- neither here nor there.  All right.

5          MR. SBAITI:  Your Honor, may I ask a slightly

6  clarifying leading question on that, because I think I

7  understand what he was trying to say, just for the record?

8          THE COURT:  Well, --

9          MR. MORRIS:  I object.

10          THE COURT:  -- I tell you what.  Anyone who wants to

11  ask one follow-up question on the judge's question can do so.

12  Okay?  You can go first.

13          MR. SBAITI:  I'll approach, Your Honor.

14          THE COURT:  Okay.

15                  RECROSS-EXAMINATION

16  BY MR. SBAITI:

17  Q   Would it be a fair summary of what you were saying a

18  minute ago that the reason the bottom end of that structure is

19  offshore is so that it doesn't get taxed before the money

20  reaches the charities on the U.S. side?

21  A   Tax -- it converts the nature of the income that is being

22  thrown off by the investments so that it becomes a tax

23  friendly income to the tax-exempt entity.  Passive income.

24  That's --

25  Q   So, essentially, --

Patrick - Recross                              143

1              THE COURT:  Okay.  Okay.

2              MR. SBAITI:  -- so it doesn't get taxed before it

3    hits the --

4              THE COURT:  I said one question.

5              MR. SBAITI:  Sorry, Your Honor.

6              THE COURT:  Okay.  He answered it.

7              MR. PHILLIPS:  And I have one question, Your Honor

8              THE COURT:  Okay.

9              MR. PHILLIPS:  I don't know if I need to ask this

10   question, but I'd rather not ask you if I need to ask it.

11             THE COURT:  Go ahead.

12             MR. PHILLIPS:  But if I do, you know, I could --

13             THE COURT:  Go ahead.

14             MR. PHILLIPS:  Well, okay.

15                        RECROSS-EXAMINATION

16   BY MR. PHILLIPS:

17   Q   We've talked about the offshore structure.  Are the

18   foundations in the top two tiers of the organizational chart

19   offshore entities?

20   A   No.

21   Q   They're --

22   A   They're onshore entities.  They're tax-exempt entities.

23   Q   Thank you.

24   A   The investments are offshore.

25   Q   Thank you.

Patrick - Further Redirect                    144

1           THE COURT:  Mr. Morris?  One question.

2                    FURTHER REDIRECT EXAMINATION

3    BY MR. MORRIS:

4    Q    Do you hold yourself out as an expert on the

5    organizational structures in the Caribbean for charitable

6    organizations?

7    A    I hold myself out as a tax professional versant on setting

8    up offshore master fund structures.  It's sort of a bread-and-

9    butter thing.  But there are plenty of people that can testify

10   that this is very typical.

11   Q    Uh-huh.  Okay.

12           THE COURT:  Okay.  Thank you.

13       All right.  You are excused, Mr. Patrick.  I suppose

14   you'll want to stay around.  I don't know if you'll

15   potentially be recalled today.

16       (The witness steps down.)

17           THE COURT:  All right.  We should take a lunch break.

18   I'm going to put this out for a democratic vote.  Forty-five

19   minutes?  Is that good with everyone?

20           MR. SBAITI:  Do we have to leave the building to eat,

21   Your Honor, or is there food in the building?

22           THE COURT:  I think --

23           MR. SBAITI:  I'm sorry to ask that question, but --

24           THE COURT:  Yes.  You know what, there used to be a

25   very bad cafeteria, but I think it closed.  Right, Mike?  So,

145

1   you know, --

2           MR. SBAITI:  Sorry I asked that.

3           A VOICE:  Hate to miss that one.

4           THE COURT:  Is 45 minutes not enough since you have

5   to go off campus?  I'll give you an hour.  It just means we

6   stay later tonight.

7           A VOICE:  Can we just say 2:00 o'clock?

8           MR. SBAITI:  That's fine with us, Your Honor.

9           THE COURT:  2:00 o'clock.  That's 50 minutes.  See

10  you then.

11          MR. SBAITI:  Thank you.

12          A VOICE:  Your Honor, can we just get a time check?

13          THE COURT:  Okay.

14          THE CLERK:  Yeah.  The Debtors are at an hour and

15  eleven minutes.  Respondents at an hour nineteen.

16          THE COURT:  And hour and eleven and an hour and

17  nineteen.

18          A VOICE:  Wait, that's not right.

19          A VOICE:  That can't be right.

20          A VOICE:  Two hours?  We started at --

21          THE COURT:  Okay.  So, again, their side, the

22  collective Respondents?

23          THE CLERK:  An hour and eleven, responding to your

24  questions, --

25          A VOICE:  Yeah, he's not recording --

146

1      THE CLERK:  So an hour and eleven and an hour and
2  nineteen.

3      THE COURT:  But they were already over an hour --

4      A VOICE:  Yeah.  It's been over three hours.

5      THE COURT:  -- with opening statements.

6      THE CLERK:  An hour and twelve.  Yes.  They were very
7  short with the questioning.  It was only like --

8      THE COURT:  Okay.  We'll double-check that over the
9  break with the court reporter.

10     A VOICE:  All right.  Thank you, Your Honor.

11     THE COURT:  We'll double-check and let you know.

12     THE COURT:  All rise.

13   (A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)

14     THE COURT:  All right.  Please be seated.  We're
15  going back on the record in Highland after our lunch break.
16  I'm going to confirm time.  We've had the Debtor an aggregate
17  of an hour and eleven minutes.  The Respondents, an aggregate
18  of an hour and twenty minutes.  Okay?  So we've gone two hours
19  and thirty-one minutes.

20     If it seems like we've been going longer, it's because we
21  did not do the clock on the opening matters regarding removal,
22  extension of time.  And then when I interjected with
23  questions, we stopped the clock.  All right?  So let's go.

24     You may call your next witness, Mr. Morris.

25     MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

 1   James Dondero.

 2          THE COURT:  All right.

 3          A VOICE:  He had to step down the hall.  We had a

 4   little trouble getting through security.  Let me --

 5          THE COURT:  All right.  Mr. Dondero, you've been

 6   called as the next witness.  So if you'll approach our witness

 7   stand, please.  All right.  Please raise your right hand.

 8      (The witness is sworn.)

 9          THE COURT:  All right.  Please be seated.

10          JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12   BY MR. MORRIS:

13   Q   Good afternoon, Mr. Dondero.

14   A   Good afternoon.

15   Q   Can you hear me?

16   A   Yes.

17   Q   Okay.  So, you were here this morning, correct?

18   A   Yes.

19   Q   All right.  So, we're going to put up -- we'll put it up

20   on the screen, but if you'd prefer to look at a hard copy in

21   the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to

22   turn to Exhibit 25.  Or you could just follow on the screen.

23   And this is a one-page document, so maybe that's easier.

24   A   Sure.

25   Q   Do you have it?  All right.

Dondero - Direct                           148

1   A    Yes.

2   Q    This is the organizational chart for what's known as the

3   DAF, correct?

4   A    Yes.

5   Q    And Mark Patrick set up this structure, correct?

6   A    I believe he coordinated.  I believe it was set up by

7   third-party law firms.  I believe it was Hutton or a firm like

8   that.

9   Q    Mr. Patrick participated in the creation of this structure

10  because you gave him the task of setting up a charitable

11  entity for Highland at that time, correct?

12  A    Yes.

13  Q    And you approved of this organizational structure,

14  correct?

15  A    Yes.

16  Q    And Grant Scott was the Trustee of the DAF for a number of

17  years, correct?

18  A    I often use that word, trustee, but technically I think

19  it's managing member.

20  Q    That's right.  I appreciate that.  I was using your word

21  from the deposition.  But is it fair to say that, to the best

22  of your knowledge, Grant Scott was the sole authorized

23  representative of the entity known as the DAF from 2011 until

24  just recently?

25  A    Sole -- I would describe it more he was in a trustee

Dondero - Direct                      149

1    function.

2    Q    Uh-huh.

3    A    Advice was being provided by Highland on the investment

4    side.  He wasn't expected to be a financial or an investment

5    expert.  And then accounting, tax, portfolio, tracking, you

6    know, compliance with all the offshore formation documents,

7    that was all done by Highland as part of a shared services

8    agreement.

9    Q    Okay.  I appreciate that, but listen carefully to my

10   question.  All I asked you was whether he was the authorized

11   representative, the sole authorized representative for the

12   ten-year period from 2011 until recently.

13   A    Yes.

14   Q    Okay.

15   A    I believe so.

16   Q    Thank you.  You served as the managing member of the DAF

17   GP, LLC before Mr. Scott, correct?

18   A    Yes.

19   Q    Okay.  And if you turn to Exhibit 26 in your binder,

20   that's the amended and restated limited liability company

21   agreement for the DAF GP, LLC, correct?

22   A    Yes.

23   Q    And on the last page, that's your signature line, right?

24   A    Yes.

25   Q    And you stepped down as the managing member on March 12,

Dondero - Direct                    150

1   2012, and were replaced by Mr. Scott, correct?

2   A    Yes.

3   Q    And as you recall it, Mr. Scott came to be appointed the

4   trustee of the DAF based on your recommendation, right?

5   A    Based on my recommendation?  Yes, I would say that's fair.

6   Q    And you made that recommendation to Mr. Patrick, right?

7   A    I -- I don't remember who I made the recommendation to.

8   But I would echo the testimony of Mark Patrick earlier that

9   the purpose of stepping down was to make the DAF unaffiliated

10  or independent versus being in any way affiliated.

11        MR. MORRIS:  I move to strike.

12  BY MR. MORRIS:

13  Q    And I'd ask you to listen carefully to my question.

14        THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q    You made the recommendation to Mr. Patrick, correct?

17  A    I would give the same answer again.

18  Q    Okay.

19        MR. MORRIS:  Can we please put up Mr. Dondero's

20  deposition transcript from last Friday at Page 297?

21      I believe, Your Honor, that the court reporter thought

22  that this was a continuation of a prior deposition, and that's

23  why the pages begin in the, you know, high in the 200s and not

24  at Page 1.  Just to avoid any confusion.

25  BY MR. MORRIS:

Dondero - Direct                                  151

1  Q    Mr. Dondero, do you see the transcript in front of you?

2  A    Yes.

3  Q    Okay.  Were you asked this question and did you give this

4  answer?  "Who did you make the" -- question, "Who did you make

5  the recommendation to?"  Answer, "It would have been Mark

6  Patrick."

7  A    I don't recall right now as I sit here, and it seems like

8  I was speculating when I answered, but it -- it probably would

9  have been Mark Patrick.  I just don't have a specific

10 recollection.

11 Q    You made the recommendation to Mr. Patrick because he was

12 responsible for setting up the overall structure, correct?

13 A    I -- I can't testify to why I did something I don't

14 remember.  I think that would be --

15 Q    Can we --

16 A    -- speculative.

17 Q    Are you finished, sir?

18 A    Yeah.

19 Q    Okay.

20       MR. MORRIS:  Can we go to Page 299, please?

21 BY MR. MORRIS:

22 Q    Lines 6 through 10.  Did I ask this question and did you

23 give me this answer?  Question, "But why did you select Mr.

24 Patrick as the person to whom to make your recommendation?"

25 Answer, "Because he was responsible for setting up the overall

Dondero - Direct                          152

1  structure."
2      Were you asked that question and did you give that answer
3  last Friday?
4  A    Yes.
5  Q    Thank you.  But it's your testimony that you don't really
6  know what process led to Mr. Scott's appointment, correct?
7  A    No, I -- I said I was refreshed by Mark Patrick's
8  testimony earlier.
9  Q    Yeah.  Were you refreshed that, in fact, you specifically
10 had the authority to and did appoint Grant Scott as the
11 managing member of the DAF GP, LLC?
12 A    I -- I don't know.
13 Q    Well, you're referring to Mr. Patrick's testimony and I'm
14 asking you a very specific question.  Did you agree -- is your
15 memory refreshed now that you're the person who put Grant
16 Scott in the position in the DAF?
17 A    I -- I don't know if I owned those secret shares that --
18 well, they're not secret, but shares that could appoint
19 anybody on the planet.  I guess if I was in that box at that
20 time before Grant, then I would have had that ability.  I'm
21 not denying at all that I recommended Grant.  I'm just saying
22 I don't -- I don't remember if I went specifically to him or
23 if it was Thomas Surgent that was orchestrating it at the
24 time.  I don't remember.
25 Q    Do you deny that you had the authority to and that you did

                        Dondero - Direct                      153

 1  appoint Grant Scott as your successor?

 2            MR. TAYLOR:  Your Honor, objection to the extent it

 3  calls for a legal conclusion.  I can't get close to a mic, so

 4  --

 5            THE COURT:  I overrule the objection.

 6            THE WITNESS:  Can you repeat the question for me?

 7  BY MR. MORRIS:

 8  Q   Do you deny that you had the authority to and that you

 9  did, in fact, appoint Grant Scott as your successor?

10  A   It'd be better to say I don't -- I don't -- no, I don't

11  remember or I didn't know the details at the time.  But,

12  again, I -- I assume I owned those shares.  And, again, I do

13  remember recommending Grant and -- but exactly how it

14  happened, I don't remember.

15  Q   Did you hear Mark Patrick say just an hour ago that you

16  appointed Grant Scott as your successor?

17            MR. SBAITI:  Objection, Your Honor.  Misstates

18  testimony.  The witness testified he transferred shares.

19  That's different than an appointment power.

20            THE COURT:  Response?  I can't remember the exact way

21  you worded it, to be honest.

22            MR. MORRIS:  Neither can I, but I'll even take it

23  that way.

24            THE COURT:  Okay.

25            MR. MORRIS:  I think he's wrong, but I'll even take

Dondero - Direct                    154

1   it that way.

2           THE COURT:  Okay.

3   BY MR. MORRIS:

4   Q   Mr. Dondero, did you listen to Mark Patrick say that you

5   are the person who made the decision to transfer the shares to

6   Mr. Scott in 2012?

7   A   Yes, I heard him say that.

8   Q   Okay.  So, do you -- do you dispute that testimony?

9   A   I -- I don't have any better knowledge to dispute or

10  confirm.

11  Q   You and Mr. Scott have known each other since high school,

12  correct?

13  A   Yes.

14  Q   You spent a couple of years at UVA together, correct?

15  A   Yes.

16  Q   You were housemates together, correct?

17  A   Yes.

18  Q   He was the best man at your wedding, correct?

19  A   Yes.

20  Q   He's a patent lawyer, correct?

21  A   Yes.

22  Q   He had no expertise in finance when -- when he was

23  appointed as your successor to the DAF, correct?

24  A   Correct.

25  Q   To the best of your knowledge, at the time Mr. Scott

Dondero - Direct                         155

1  assumed his position, he had never made any decisions

2  concerning collateralized loan obligations, correct?

3  A    Correct, but he wasn't hired for that.  That wasn't his

4  position.

5  Q    Was he the person who was going to make the decisions with

6  respect to the DAF's investments?

7  A    My understanding on how it was structured was the DAF was

8  paying a significant investment advisory fee to Highland.

9  Highland was doing portfolio construction and the investment

10  selection of -- or the investment recommendations for the

11  portfolio.  There is an independent trustee protocol that I

12  believe was adhered to, but it was never my direct

13  involvement.  It was always the portfolio managers or the

14  traders.

15      You have to provide three similar or at least two other

16  alternatives, and then with a rationale for each of them, but

17  a rationale for why you think one in particular is better.

18  And the trustee looks at the three, evaluates them.  And the

19  way I understand it always worked, that it works at pretty

20  much every charitable trust or trust that I'm aware of, they

21  generally, if not always, pick alongside the -- or, pick the

22  recommendation of their highly-paid investment advisory firm.

23  Q    And are you the highly-paid investment advisory firm?

24  A    Highland was at the time, yes.

25  Q    And you controlled Highland, right?

Dondero - Direct                          156

1   A     Yes.

2   Q     Okay.  But at the end of the day, is it your understanding

3   that Mr. Scott had the exclusive responsibility for making

4   actual decisions on behalf of the charitable trust that you

5   had created?

6   A     Yeah, I mean, subject to the protocol I just described.

7   Q     Yeah, okay, so let's keep going.  Mr. Scott had no

8   experience or expertise running charitable organizations at

9   the time you decided to transfer the shares to him, correct?

10  A     Yes, I believe that's correct.

11  Q     Okay.  You didn't recommend Mr. Scott to serve as the

12  DAF's investment advisor, did you?

13  A     No.

14  Q     And until early 2021, as you testified, I believe,

15  already, HCMLP served as the DAF's investment advisor,

16  correct?

17  A     Yes.

18  Q     And until early 2021, all of the DAF's day-to-day

19  operations were conducted by HCMLP pursuant to a shared

20  services agreement, correct?

21  A     Yes.

22  Q     And from the time the DAF was formed until January 9,

23  2020, you controlled HCMLP, correct?

24  A     Yes.

25  Q     You can't think of one investment decision that HCMLP

Dondero - Direct                                157

1    recommended that Mr. Scott ever rejected in the ten-year

2    period, correct?

3            MR. SBAITI:  Objection, Your Honor.  Lacks

4    foundation.

5            THE COURT:  Response?

6            MR. MORRIS:  I'm not quite sure what to say, Your

7    Honor.  The witness has already testified that HCMLP was the

8    investment advisor, made recommendations to Mr. Scott, and

9    that Mr. Scott was the one who had to make the investment

10   decisions at the end of the day.

11           MR. SBAITI:  He's not here as a witness for HCMLP.

12   He's here in his personal capacity.  There's no foundation

13   he'd have personal knowledge of which specific investments

14   were proposed, which ones were rejected or accepted.  He said

15   it was done by the portfolio manager.

16           THE COURT:  Okay.  I overrule.  He can answer if he

17   has an answer.

18   BY MR. MORRIS:

19   Q   Sir, you can't think of one investment decision that HCMLP

20   ever recommended to Mr. Scott that he rejected, correct?

21   A   I can't think of one, but I would caveat with I wouldn't

22   have expected there to be any.

23   Q   So you expected him to just do exactly what HCMLP

24   recommended, correct?

25   A   No.  I would expect him to sort through the various

Dondero - Direct                           158

1    investments when he was given three or four to choose from and

2    be able to discern that, just as we had with our expertise,

3    which was much greater than his, discern which one was the

4    best and most suitable investment, the best risk-adjusted

5    investment, that he would come to the same conclusion.

6    Q    Okay.  You can't think of an investment that Mr. Scott

7    ever made on behalf of the DAF that didn't originate with

8    HCMLP, correct?

9    A    Again, no, but I wouldn't expect there to be.

10   Q    Okay.  And that's because you expected all of the

11   investments to originate with the company that you were

12   controlling, correct?

13   A    We were the hired investment advisor with fiduciary

14   responsibility --

15   Q    Uh-huh.

16   A    -- and with a vested interest in making sure the DAF

17   performance was the best it could be.

18   Q    Okay.  Let --

19   A    He was, as you said, a patent attorney.  It would have

20   been unusual for him to second-guess.  I'm sure, in any

21   private investment or any investment that was one off or

22   didn't have comps, you know, he probably sought third-party

23   valuations.  But you would have to talk to him about that, or

24   the people at Highland that did that.

25            MR. MORRIS:  I move to strike.  It's a very simple

Dondero - Direct                        159

1   question.

2           THE COURT:  Sustained.

3   BY MR. MORRIS:

4   Q   Sir, you can't think of one investment that Mr. Scott made

5   on behalf of the DAF that did not originate with HCMLP,

6   correct?

7   A   I'm going to give the same answer.

8   Q   Okay.  Let's go to Page 371 of the transcript, please.

9   Lines 7 through 11.

10      Oh, I apologize.  I think I might -- I think I meant 317.

11  I think I got that inverted.  Yeah.

12      Did I ask this question and did you give this answer:

13  "Can you think of any investment that Mr. Scott made on behalf

14  of the DAF that didn't original with HCMLP?"  Answer, "He

15  wasn't the investment advisor, but no, I don't -- I don't

16  recall."

17      Is that the answer you gave on Friday?

18  A   Yes.

19  Q   Thank you.  Let's --

20          MR. SBAITI:  Just for clarification, Your Honor, --

21          THE COURT:   Pardon?

22          MR. SBAITI:  -- the deposition was last Tuesday, not

23  on Friday.

24          MR. MORRIS:  I stand corrected, Your Honor.

25          THE COURT:  Okay.

Dondero - Direct                          160

1          MR. MORRIS:  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  I apologize if the Court thinks I misled

4    it.

5    BY MR. MORRIS:

6    Q   Let's talk about Mr. Scott's decision during the

7    bankruptcy case that preceded his resignation.  After HCMLP

8    filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim,

9    correct?

10         MR. ANDERSON:  Your Honor, I haven't objected yet,

11   but we literally haven't covered anything that deals with

12   commencing or pursuing a claim or cause of action.  I'm going

13   to object.  This is way outside, again, the bounds of the

14   contempt hearing.  It's -- otherwise, it's other discovery for

15   something else.  It literally has nothing to do with pursue a

16   claim or cause of action.

17         THE COURT:  We have another relevance objection.

18   Your response?

19         MR. MORRIS:  Your Honor, the evidence is going to

20   show that Mr. Dondero told Mr. Scott on three separate

21   occasions that his conduct, which were acts of independence,

22   were inappropriate and were not in the best interests of the

23   DAF.  Within days of the third strike, he resigned.  Okay?

24      I think it's relevant to Mr. Dondero's control of the DAF.

25   I think that the moment that Mr. -- this is the argument I'm

Dondero - Direct                161

 1   going to make.  I'll make it right now.  You want me to make

 2   it now, I'll make it now.  The moment that Mr. Scott exercised

 3   independence, Mr. Dondero was all over him, and Mr. Scott

 4   left.  That's what happened.  The evidence is going to be

 5   crystal clear.

 6       And I think that that control of the DAF is exactly what

 7   led to this lawsuit.  And what led -- and I'm allowed to make

 8   my argument.  So that's why it's relevant, Your Honor, because

 9   I think it shows that Mr. Scott -- Mr. Scott, after exercising

10   independence, was forced out.

11             MR. ANDERSON:  That doesn't move the needle one bit

12   as to whether a lawsuit was commenced or a claim or cause of

13   action was pursued, which is the subject of the contempt

14   motion.  It doesn't move the needle one bit as to those two

15   issues, as to whether that has any bearing on was it commenced

16   or was it pursued.

17             MR. MORRIS:  Your Honor, I appreciate the very narrow

18   focus that counsel for a different party is trying to put on

19   this, but it is absolutely relevant to the question of whether

20   Mr. Dondero was involved in the pursuit of these claims.  All

21   right?  That's what the order says.  Pursue.

22             THE COURT:  All right.  Overruled.

23   BY MR. MORRIS:

24   Q   After HCMLP filed for bankruptcy, CLO Holdco filed a proof

25   of claim, correct?

Dondero - Direct                                   162

1   A    I believe so.

2   Q    And in the fall of 2020, Mr. Scott amended the proof of

3   claim to effectively reduce it to zero, correct?

4   A    I -- I guess.

5   Q    And Mr. Scott made that decision without discussing it

6   with you in advance, correct?

7   A    Yes.

8   Q    But you did discuss it with him after you learned of that

9   decision, correct?

10  A    I don't -- I don't recall.  I'm willing to be refreshed,

11  but I don't remember.

12  Q    Well, you told him specifically that he had given up bona

13  fide claims against the Debtor, correct?

14  A    Let me state or clarify my testimony this way.  Um, --

15       MR. MORRIS:  Your Honor, it's really just a yes or no

16  question.  His counsel can ask him if he wants to clarify, but

17  it's really just a yes or no question.

18  BY MR. MORRIS:

19  Q    You told Mr. Scott that he gave up bona fide claims

20  against the Debtor, correct?

21       THE COURT:  Okay.

22       THE WITNESS:  I don't know if I told him then with

23  regard to those claims.

24  BY MR. MORRIS:

25  Q    Okay.  Can we go to Page 321 of the transcript?  At the

Dondero - Direct                    163

1   bottom, Line 21?  22, I apologize.

2        Did I ask this question and did you give this answer?

3   "And what do you" -- Question, "And what do you recall about

4   your discussion with Mr. Scott afterwards?"  Answer, "That he

5   had given up bona fide claims against the Debtor and I didn't

6   understand why."

7        Did I ask that question and did you give that answer last

8   Tuesday?

9   A    Yes.

10  Q    Okay.  A short time later, in December, the Debtor filed

11  notice of their intention to enter into a settlement with

12  HarbourVest, correct?

13  A    Yes.

14  Q    And CLO Holdco, under Mr. Scott's direction, filed an

15  objection to that settlement, correct?

16  A    Yes.

17  Q    And that settlement, the substance of that settlement was

18  that the Debtor did not have the right to receive

19  HarbourVest's interests in HCLOF at the time, correct?

20  A    I don't remember the exact substance of it.

21  Q    Okay.  But you do remember that you learned that Mr. Scott

22  caused CLO Holdco to withdraw the objection, correct?

23  A    Yes, ultimately.

24  Q    Okay.  And again, Mr. Scott did not give you advance

25  notice that he was going to withdraw the HarbourVest

Dondero - Direct                    164

 1  objection, correct?

 2  A    No, he -- he did it an hour before the hearing.  He didn't

 3  give anybody notice.

 4  Q    You learned that Mr. Scott caused CLO Holdco to withdraw

 5  its objection to the HarbourVest settlement at the hearing,

 6  correct?

 7  A    Yes.

 8  Q    And you were surprised by that, weren't you?

 9  A    I believe everybody was.

10  Q    You were sur... you were surprised by that, weren't you,

11  sir?

12  A    Yes.

13  Q    And you were surprised by that because you believed Mr.

14  Scott's decision was inappropriate, right?

15  A    Partly inappropriate, and partly because 8:00 o'clock the

16  night before he confirmed that he was going forward with the

17  objection.  And I think the DAF's objection was scheduled to

18  be first, I think.

19  Q    After you learned that Mr. Scott instructed his attorneys

20  to withdraw the CLO Holdco objection to the HarbourVest

21  settlement, you again spoke with Mr. Scott, correct?

22  A    Yes.

23  Q    And that conversation took place the day of the hearing or

24  shortly thereafter, correct?

25  A    Yes.

Dondero - Direct                                    165

1    Q    And during that conversation, you told Mr. Scott that it

2    was inappropriate to withdraw the objection, correct?

3    A    Yes.

4    Q    And in response, Mr. Scott told you that he followed the

5    advice of his lawyers, correct?

6    A    Yes.

7    Q    But that didn't -- that explanation didn't make sense to

8    you, right?

9    A    Yes.

10   Q    In fact, you believed that Mr. Scott failed to act in the

11   best interests of the DAF and CLO Holdco by withdrawing its

12   objection to the HarbourVest settlement, correct?

13   A    Yes.

14   Q    And while you didn't specifically use the words fiduciary

15   duty, you reminded Mr. Scott in your communications with him

16   that he needed to do what was in the best interests of the

17   DAF, correct?

18   A    Yes.

19   Q    You're the founder of the DAF, correct?

20   A    I put it -- I put it in motion. Yeah. I tasked Mark

21   Patrick and third-party law firms to do it, but if that boils

22   down to founder, I guess yes.

23   Q    Uh-huh. And you're the primary donor to the DAF, correct?

24   A    Yes.

25   Q    You're the investment advisor to the DAF, or at least you

Dondero - Direct                     166

1  were at that time?

2  A    Yes.

3  Q    And because you served in these roles, you expected Mr.

4  Scott to discuss his decision to withdraw the HarbourVest

5  objection in advance, correct?

6  A    Yes, I -- I think it was even broader than that.  I mean,

7  he was having health and anxiety issues, and to the extent he

8  felt overwhelmed, I -- you know, yeah, you should do what's in

9  the best interests at all times, but -- but yes, I thought it

10 would be helpful if he conferred with me or Mark Patrick or

11 whoever he was comfortable with.

12 Q    Mr. Dondero, you specifically believed that Mr. Scott's

13 failure to tell you that he was going to withdraw the

14 HarbourVest objection in advance was inappropriate, right?

15 A    Yes.

16 Q    Even though he was the sole authorized representative, you

17 believed that, because you were the founder of the DAF, the

18 primary donor of the DAF, and the investment advisor to the

19 DAF, he should have discussed that before he actually made the

20 decision, correct?

21 A    No.  What I'm saying is at 8:00 o'clock at night, when he

22 confirms to numerous people he's ready to go first thing with

23 his objection, and then he or counsel or some combination of

24 them change their mind and don't tell anybody before the

25 hearing, that's odd and inappropriate behavior.

Dondero - Direct                    167

 1           MR. MORRIS:  Can we go to Page 330 of the transcript,

 2   please?

 3       And Your Honor, before I read the testimony, there is an

 4   objection there.  So I'd like you to rule --

 5           THE COURT:  Okay.

 6           MR. MORRIS:  -- before I do that.  It can be found at

 7   -- on Page 330 at Line 21.

 8       (Pause.)

 9           MR. MORRIS:  Here we go.  Page 30, beginning at Line

10   19.  330, rather.

11           THE COURT:  Okay.

12       (Pause.)

13           THE COURT:  Okay.  I overrule that objection.

14   BY MR. MORRIS:

15   Q   Mr. Dondero, were you asked this question and did you give

16   this answer last Tuesday?  Question, "Do you believe that he

17   had an obligation to inform you in advance?"  Answer, "I don't

18   know if I would use the word obligation, but, again, as the

19   founder or the primary donor and continued donor to the DAF,

20   and as the investment advisor fighting for above-average

21   returns on a daily basis for the fund, significant decisions

22   that affect the finances of the fund would be something I

23   would expect typically a trustee to discuss with the primary

24   donor."

25       Did you give that answer the other day, sir?

Dondero - Direct                168

1  A    Yes.

2  Q    If Mr. Patrick decides tomorrow to withdraw the lawsuit

3  that's in District Court, does he have an the obligation to

4  tell you in advance?

5  A    Again, I wouldn't use the word obligation.  But something

6  that I think ultimately is going to be a $20 or $30 million,

7  if not more, benefit to the DAF, to the detriment of Highland,

8  if you were to give that up, I would expect him to have a

9  rationale and I would expect him to get other people's

10 thoughts and opinions before he did that.

11 Q    Okay.  But does he have to get your opinion before he

12 acts?

13 A    No, he does not.

14 Q    Okay.  So he -- Mr. Patrick could do that tomorrow, he

15 could settle the case, and if he doesn't come to you to

16 discuss it in advance, you won't be critical of him, right?

17 A    He doesn't have the obligation, but there's -- there's a

18 reasonableness in alignment of interests.  I -- a growing

19 entrepreneur sets up a trust, a lot of times they'll put their

20 wife in charge of it, and she hires investment advisers and

21 whatever, but they've got the best interests at mind for the

22 charity or the children or whatever.

23      You know, people who go rogue and move in their own self-

24 interest or panic, that stuff can happen all the time.  It

25 doesn't make it appropriate, though.

Dondero - Direct                                    169

1    Q    A couple of weeks after Mr. Scott withdraw the objection

2    to the HarbourVest settlement, he entered into a settlement

3    agreement with the Debtor pursuant to which he settled the

4    dispute between the Debtor and CLO Holdco, correct?

5    A    Yes.

6    Q    Okay.  You didn't get advance notice of that third

7    decision, correct?

8    A    No.

9    Q    Can we go to Page -- Exhibit 32 in your binder?  And this

10   is the settlement agreement between CLO Holdco and the Debtor,

11   correct?  Attached as the exhibit.  I apologize.

12   A    Yes.

13   Q    And do you understand that that's Mr. Scott's signature on

14   the last page?

15   A    Yep.

16   Q    And you learned about this settlement only after it had

17   been reached, correct?

18   A    Yep.

19   Q    And you believed Mr. Scott's decision not to pursue

20   certain claims against the Debtor or to remove HCMLP as the

21   manager of the CLOs was not in the best interests of the DAF,

22   correct?

23   A    Correct.

24   Q    And you let Mr. Scott know that, correct?

25   A    Yes.

Dondero - Direct                          170

1   Q    After learning about the settlement agreement on January

2   26th, you had one or two conversations with Mr. Scott on this

3   topic, correct?

4   A    Yes.

5   Q    And your message to Mr. Scott was that the compromise or

6   settlement wasn't in the DAF's best interest, correct?

7   A    It was horrible for the DAF.

8   Q    Uh-huh.  And you told him that, right?

9   A    Yes.

10  Q    Okay.  From your perspective, any time a trustee doesn't

11  do what you believe is in the trust's best interest, you leave

12  yourself open to getting sued, correct?

13  A    Who is "you" in that question?

14  Q    You.  Mr. Dondero.

15  A    Can you repeat the question, then, please?

16  Q    Sure.  From your perspective, any time you're a trustee

17  and you don't believe that the trustee is doing what's in the

18  best interests of the fund, the trustee leaves himself open to

19  getting sued, correct?

20  A    I don't know who the trustee leaves himself open to, but

21  as soon as you go down a path of self-interest or panic, you

22  -- you potentially create a bad situation.  But I don't know

23  who holds who liable.

24  Q    Did you believe that Mr. Scott was acting out of self-

25  interest or panic when he decided to settle the dispute with

Dondero - Direct                     171

1   the Debtor on behalf of CLO Holdco?

2   A    Yes.

3   Q    Did you tell him that?

4   A    He told me that.

5   Q    He told you that he was acting out of panic or

6   desperation?  With self-int... withdrawn.  Withdrawn.  Did he

7   tell you that he was acting out of self-interest?

8   A    He was having health problems, anxiety problems, and he

9   didn't want to deal with the conflict.  He didn't want to

10  testify.  He didn't want to come to court.  He didn't want to

11  do those things.  And I told him I didn't think the settlement

12  was going to get him out of that stuff.  I think, you know, it

13  got him out of some issues, but I think you guys are going to

14  go after him for other stuff.  But he -- he panicked.

15          MR. MORRIS:  I move to strike the latter remark.

16          THE COURT:   Sustained.

17  BY MR. MORRIS:

18  Q    Shortly after you had the conversation with Mr. Scott, he

19  sent you notice of his intent to resign from his positions at

20  the DAF and CLO Holdco, correct?

21  A    Yes.

22  Q    Okay.  Let's take a look at that, please.  Exhibit 29.

23  This is Mr. Scott's notice of resignation, correct?

24  A    Yes.

25  Q    He sent it only to you, correct?

Dondero - Direct                            172

1  A    Yes.

2  Q    A couple of days before he sent this, he told you he was

3  considering resigning; isn't that right?

4  A    Yes.

5  Q    Okay.  And he told you he was considering resigning

6  because he was suffering from health and anxiety issues

7  regarding the confrontation and the challenges of

8  administering the DAF given the bankruptcy, correct?

9  A    Yes.

10  Q    He didn't tell you that he made the decision -- withdrawn.

11  Did you tell him in this same conversation -- withdrawn.  Is

12  this the same conversation where you conveyed the message that

13  the compromise or settlement wasn't in the best interests of

14  the DAF?

15  A    You mean the conversation -- or the resignation? Is that

16  -- can you rephrase the question, please?

17  Q    Yeah, I apologize.  It's my fault, sir.  You testified

18  that after the January 26th hearing you had a conversation

19  with Mr. Scott where you told him that the compromise or

20  settlement was not in the best interests of the DAF, correct?

21  A    Yes.

22  Q    Okay.  Did Mr. Scott share with you his concerns about

23  anxiety and health issues in that same conversation, or was it

24  in a subsequent conversation?

25  A    It was at or around that time.  I -- I don't remember

Dondero - Direct                         173

1    which conversation.

2    Q    Okay.

3    A    But it was right at or around that time.

4    Q    All right.  You never asked Mr. Scott to reconsider, did

5    you?

6    A    No.

7    Q    You don't recall sending this notice of resignation to

8    anyone, do you?

9    A    No.

10   Q    You don't remember notifying anyone that you'd received

11   notice of Mr. Scott's intent to resign from the DAF, do you?

12   A    It was -- yeah, no, I -- I don't remember.  It was a busy

13   time around that time and this was a secondary issue.

14   Q    Okay.  So the fact that the person who has been running

15   the DAF for a decade gives you and only you notice of his

16   intent to resign was a secondary issue in your mind?

17   A    Yes, because when I talked to him at about that time, I

18   said, okay, well, it's going to take a while.  I don't even

19   know how the mechanism works.  But don't do anything adverse

20   to the DAF, don't do anything else until, you know, you've

21   figured out transition.

22   Q    Uh-huh.

23   A    And so once he had confirmed he wouldn't do anything

24   outside normal course until he transitioned, I didn't worry

25   about this.  I had bigger issues to worry about at the time.

Dondero - Direct                           174

1  Q    In the third paragraph of his email to you, he wrote that

2  his resignation will not be effective until he approves of the

3  indemnification provisions and obtains any and all necessary

4  releases.  Do you see that?

5  A    Yes.

6  Q    And that was the condition that on January 31st Mr. Scott

7  placed on the effectiveness of his resignation, correct?

8  A    Condition?  Yeah, I -- I think he's trying to state the

9  timing will happen after that.

10 Q    After he gets the release, right?

11 A    Yes.

12 Q    And he wanted the release because you'd told him three

13 different times that he wasn't acting in the best of the DAF,

14 correct?

15         MR. TAYLOR:  Objection, Your Honor.

16         MR. SBAITI:  Objection.  Calls for --

17         MR. TAYLOR:  Objection.  Calls for speculation.

18         THE WITNESS:  Yeah, I --

19         THE COURT:  Sustained.

20         THE WITNESS:  I can't take that jump.  Yeah.

21 BY MR. MORRIS:

22  Q    In response to this email from your lifelong friend, you

23 responded, if we could scroll up, about whether divest was a

24 synonym -- if we can look at the first one -- whether divest

25 is a synonym for resigned.  Do I have that right?

Dondero - Direct                    175

1   A    (no immediate response)

2   Q    If you will look at your response on Monday morning at

3   9:50.

4   A    Yes.

5   Q    Okay.  And then after Mr. Scott responds, you respond

6   further, if we can scroll up, and you specifically told him,

7   "You need to tell me ASAP that you have no intent to divest

8   assets."  Correct?

9   A    Yes.

10  Q    And you wrote that because you believed some of his

11  behavior was unpredictable, right?

12  A    I think I wrote that because the term divest in investment

13  terms means sale or liquidate, but I guess it had a different

14  legal term in the way he was looking at it.  I wasn't aware at

15  that time of the shares that could be bequeathed to anybody,

16  and I think the divest refers to that, but I wasn't aware that

17  that's how the structure worked at that time, and I was

18  worried that divest could be the investment term and I -- it

19  wouldn't have been appropriate for him to liquidate the

20  portfolio.

21  Q    So, and you wanted to make sure he wasn't liquidating or

22  intending to liquidate any of the CLOs, correct?

23  A    Correct.

24  Q    Okay.  So he's still the authorized, the sole authorized

25  representative, but you wanted to make sure that he didn't do

Dondero - Direct                          176

```
 1   anything that you thought was inappropriate.  Fair?
 2   A    It's because I had talked to him before this and he said
 3   he wasn't going to do anything outside normal course, and then
 4   the word divest scared me, but I didn't realize it was a legal
 5   term in this parlance here.
 6   Q    And so after he explained, you still wanted to make sure
 7   that he wasn't divesting any assets, correct?
 8   A    Yes.
 9   Q    Okay.  Since February 1st, you've exchanged exactly one
10   text messages with Mr. Scott; is that right?
11   A    I think there've been several, several text messages.  But
12   one on his birthday.
13   Q    Yeah.  And you haven't spoken to him in months, correct?
14   A    In a couple months, yes.
15   Q    All right.  Let's talk about the replacement of Mr. Scott.
16   With -- with Mr. Scott's notice, someone needed to find a
17   replacement, correct?
18   A    Yes.
19   Q    And the replacement was going to be responsible for
20   managing a charitable organization with approximately $200
21   million of assets, most of which was seeded directly or
22   indirectly through you, correct?
23   A    Yes.
24   Q    And the replacement was going to get his and her -- his or
25   her investment advice from you and NexPoint Advisors; do I
```

Dondero - Direct                          177

1    have that right?

2    A    That was the plan.

3    Q    Okay.  Ultimately, Mr. Patrick replaced Mr. Scott,

4    correct?

5    A    Yes.

6    Q    But it's your testimony that you had no knowledge that Mr.

7    Patrick was going to replace Mr. Scott until after it happened

8    on March 24, 2021.  Correct?

9    A    That's correct.  I believe it happened suddenly.

10   Q    So, for nearly two months after you had received notice of

11   Mr. Scott's intent to resign, you were uninvolved in the

12   process of selecting his replacement, correct?

13   A    I was uninvolved.  I'd say the process was dormant for an

14   extended period of time until Mark Patrick came on board, and

15   then Mark Patrick ran the process of interviewing multiple

16   potential candidates.

17   Q    Mark Patrick didn't have any authority prior to March

18   24th, correct?

19   A    Is March 24th the date that he transitioned the shares to

20   himself from Grant Scott?

21   Q    Yep.

22   A    That's when he then became the trustee of the DAF, yes.

23   Q    Do you know -- do you know who was instructing Mr. Patrick

24   on who to interview or how to carry the process out?

25   A    He was doing that on his own with, I think,

Dondero - Direct                    178

1  recommendations from third-party tax firms.

2  Q   So Mr. Patrick was trying to find a successor to Mr.

3  Scott, even though he had no authority to do that, and you

4  were completely uninvolved in the whole process?  Do I have

5  that right?

6  A   I was uninvolved, yes.  He was trying to facilitate it for

7  the benefit of his friendship with Grant Scott and knowing

8  that it -- it -- with his resignation, it had to transition to

9  somebody.  And he enjoys working on the DAF, he enjoys the

10  charitable stuff in the community, and he was the most

11  appropriate person to work on helping Grant transition.

12         MR. MORRIS:  All right.  I move to strike, Your

13  Honor.  It's hearsay.

14         THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q   You're aware that Mr. Seery was appointed the Debtor's CEO

17  and CRO last summer, correct?

18  A   Yes.

19  Q   And you're aware that Mr. Seery's appointment was approved

20  by the Bankruptcy Court, correct?

21  A   Yes.

22  Q   And you were aware of that at the time it happened,

23  correct?

24  A   Yes.

25  Q   And even before that, in January of 2020, you consented to

Dondero - Direct                    179

1   a settlement where you gave up control of the Debtor.

2   Correct?

3   A    To the independent board for a consensual Chapter 11

4   restructuring that would leave Highland intact.

5   Q    And do you understand that the gatekeeper provision in the

6   July order is exactly like the one that you agreed to in

7   January except that it applies to Mr. Seery instead of the

8   independent directors?

9   A    I -- I learned a lot about that today, but I don't think

10  it's appropriate to move what applied to the board to the CEO

11  of a registered investment advisor.

12  Q    Okay.  I'm just asking you, sir.  Listen carefully to my

13  question.  Were you aware in January 2020 that you agreed to a

14  gatekeeper provision on behalf of the independent board?

15  A    Generally, but not specifically.

16  Q    Okay.

17  A    Not -- not like what we've been going over today.

18  Q    Okay.  And you knew that Mr. Seery had applied to be

19  appointed CEO subject to the Court's approval, correct?

20  A    Wasn't it backdated to March?  I -- I think the hearing

21  was in June, but it was backdated for -- for money and other

22  purposes, right?  I -- that's my recollection.  I don't

23  remember otherwise.

24  Q    You do remember that Mr. Seery got -- he got -- his

25  appointment got approved by the Court, right?

Dondero - Direct                               180

1   A    Yes.  But, as far as the dates are concerned, I thought it
2   was either in March or retroactive to March.  Maybe it was
3   June or July.
4   Q    And you --
5   A    But I don't remember.
6   Q    Did you have your lawyers review the motion that was filed
7   on behalf of the Debtor?
8   A    I'm -- I assume they do their job.  I -- if they didn't, I
9   don't know.
10  Q    Okay.  That's what you hired them to do; is that fair?
11  A    Yes.
12  Q    Okay.  Can we go to Exhibit 12, please?  I think it's in
13  Binder 1.  You've seen this document before, correct?
14  A    Yes.
15  Q    In fact, you saw versions of this complaint before it was
16  filed, correct?
17  A    Yes, I saw one or two versions towards the end.  I don't
18  know if I saw the final version, but --
19  Q    Sir, you participated in discussions with Mr. Sbaiti
20  concerning the substance of this complaint before it was
21  filed, correct?
22  A    Some.  I would just use the word some.
23  Q    Okay.  Can you describe for me all of your conversations
24  with Mr. Sbaiti concerning the substance of this complaint?
25          MR. SBAITI:  Your Honor, I would object on the basis

Dondero - Direct                    181

1  of work product privilege and attorney-client communications.

2  He was an agent for my client, the DAF, at the time he was

3  having these discussions with us, and our discussions with him

4  were work product.  So to the extent he can reveal the

5  conversations without discussing the actual content, we would

6  raise privilege objection, Your Honor.

7          THE COURT:  Mr. Morris?

8          MR. MORRIS:  Your Honor, there is no privilege here.

9  That's exactly why I asked Mr. Patrick the questions earlier

10  today.  Mr. Dondero is not party to any agreement with the DAF

11  today.  It's an informal agreement, perhaps, but there is no

12  contractual relationship, there is no privity any longer

13  between Mr. Dondero or any entity that owns and controls in

14  the DAF, as far as I know.  If they have evidence of it, I'm

15  happy to listen, but that -- that's exactly why I asked those

16  questions of Mr. Patrick earlier today.

17          THE COURT:  All right.

18          MR. SBAITI:  Your --

19          THE COURT:  That was the testimony.  There's an

20  informal arrangement, at best.

21          MR. SBAITI:  Well, Your Honor, I would suggest that

22  that doesn't necessarily mean that he isn't an agent of the

23  DAF.  It doesn't have to be a formal agreement for him to be

24  an agent of the DAF.

25      Everyone's agreed he was an advisor.  Everyone's agreed he

Dondero - Direct                          182

1    was helping out.  That is an agency relationship.  It doesn't

2    have to be written down.  It doesn't have to be a formal

3    investment advisory relationship.  He's still an agent of the

4    DAF.  He was requested to do something and agreed to do it

5    under the expectation that all of us had that those would be

6    privileged, Your Honor.  That is -- that is sufficient -- that

7    is sufficient, I would argue, to get us where we need to be.

8    The privilege should apply, Your Honor, and they don't have a

9    basis for, I would say, invading the privilege, Your Honor.

10            THE COURT:  Well, do you have any authority?  Because

11   it just sounds wrong.  He's not an employee of your client.

12   He doesn't have any contractual arrangement with your client.

13            MR. SBAITI:  Your Honor, I would dispute the idea

14   that he has no contractual arrangement with my client.  The

15   question was asked, do you have a -- do you have a written

16   agreement, and then the question was, so you don't have a

17   contract, and the answer was no, I don't have a contract,

18   building upon that first -- that first question.  But the

19   testimony as he just recounted is that there is an agreement

20   that he would advise Mr. Patrick and he would advise the DAF.

21            THE COURT:  Okay.

22            MR. SBAITI:  That's -- that's a contract.

23            THE COURT:  Okay.  My question was, do you have any

24   legal authority?  That's what I meant when I said authority.

25   Any legal authority to support the privilege applying in this

Dondero - Direct                    183

1   kind of --

2           MR. SBAITI:  In an informal arrangement, Your Honor?

3   I don't have one at my fingertips at the moment, Your Honor,

4   but I don't know that that should be a reason to invade the

5   privilege.

6       And I would just add, Your Honor, I would just add, we've

7   already -- because of the purpose of these questions, you've

8   heard Mr. Morris state several times that the purpose is to

9   show that Mr. -- that Mr. Dondero had some role in advising

10  and participating in the creation of this complaint.  That's

11  been conceded by myself.  I believe it was conceded by Mr.

12  Dondero.

13      The actual specific facts, the actual specific

14  conversations, Your Honor, shouldn't be relevant at this point

15  and they shouldn't be admissible, given -- given the

16  relevancy, given the perspective of the privilege.

17          THE COURT:  Okay.

18          MR. MORRIS:  If I might --

19          THE COURT:  I overrule your objection.  I don't think

20  a privilege has been shown here --

21          MR. SBAITI:  And Your Honor, --

22          THE COURT:  -- and I think it's relevant.

23          MR. SBAITI:  -- I would ask if we could *voir dire* the

24  witness on the basis of the privilege, if that's --

25          THE COURT:  All right.  You may do so.

Dondero - Voir Dire                        184

1                    VOIR DIRE EXAMINATION

2    BY MR. SBAITI:

3    Q    Mr. Dondero, do you have a relationship with the DAF?

4    A    Yes.

5    Q    How would you describe that relationship?

6    A    I view myself and my firm as the investment advisor.  I

7    was actually surprised by the testimony today that there

8    wasn't a contract in place, but there should be one.  There

9    should be one soon, in my opinion.

10   Q    Have you -- did you hear Mr. Patrick testify earlier that

11   he comes to you for advice?

12   A    Yes.

13   Q    Is that --

14   A    As he should.  Yeah.

15   Q    Is that true?

16   A    Yes.

17   Q    When you render that advice, do you render that advice

18   with some expectation about him following or listening to that

19   advice?

20   A    Okay, I think there's only been one investment or one

21   change in the DAF portfolio since Mark Patrick's been

22   involved, only one, and it was a real estate investment that I

23   wasn't directly involved in.  And so the people who put that

24   investment forward worked with Mark without my involvement,

25   and then I think Mark got third-party appraisal firms and

Dondero - Voir Dire                    185

1   third-party valuation firms involved to make sure he was

2   comfortable, which was a good process.

3   Q   When you supplied information to Mr. Patrick, do you do so

4   under the belief that there is a contractual, informal or

5   formal, relationship?

6          MR. MORRIS:  Objection to the form of the question.

7          THE COURT:  Overruled.

8          MR. SBAITI:  What specific form?

9          THE COURT:  Overruled.

10         MR. SBAITI:  Thank you.

11         THE WITNESS:  Yes.  I believe it -- it's a

12  relationship that can and should be papered as -- soon.

13  That's my -- I mean, unless I get some reason from counsel not

14  to, I think it's something that should be memorialized.

15  BY MR. SBAITI:

16  Q   And when you have that -- in that relationship, when you

17  communicate with Mr. Patrick about matters, investment or

18  otherwise, is there an expectation of privacy?

19  A   Yes.

20  Q   When Mr. Patrick -- did Mr. Patrick request that you

21  interface with my firm and myself, as he testified earlier?

22  A   Yes.

23  Q   And when he did so, did he ask you to do so in an

24  investigatory manner?

25         MR. MORRIS:  Objection to the form of the question.

Dondero - Voir Dire                                186

1          THE COURT:  Sustained.  Rephrase.

2   BY MR. SBAITI:

3   Q   Did he tell you why he wanted you to talk to us?

4   A   Yeah.  At that point, he had started an investigation into

5   the HarbourVest transaction.

6   Q   And -- and when he -- when you were providing information

7   to us, did he tell you whether he wanted you to help the

8   Sbaiti firm conduct the investigation?

9   A   The -- overall, the financial numbers and tables in there

10  were prepared by not myself, but I -- I did -- I did help on

11  -- on the -- some of the registered investment advisor issues

12  as I understood them.

13  Q   Okay.  And the communications that you had with us, was

14  that part of our investigation?

15         MR. MORRIS:  Objection to the form of the question.

16         THE COURT:  Overruled.

17         THE WITNESS:  Yes.

18  BY MR. SBAITI:

19  Q   And did you understand that we had been retained by Mr.

20  Patrick on behalf of the DAF and CLO Holdco?

21  A   Yes.

22  Q   And did you appreciate or have any understanding of

23  whether or not you were helping the law firm perform its legal

24  function on behalf of the DAF and CLO Holdco?

25  A   Perform its legal function?  I was just helping with

Dondero - Voir Dire                                187

1   regard to the registered investment advisor aspects of the

2   overall, you know, like that.

3   Q    Let me ask a more simple question.  Did you -- did you

4   appreciate that you were assisting a law firm in its

5   representation of the DAF?

6   A    Yes.

7   Q    And you were helping the law -- and were you helping the

8   law firm develop the facts for a complaint?

9   A    Yes.  I would almost say, more importantly, I wanted to

10  make sure that there weren't errors in terms of understanding

11  either how CLOs worked or how the Investment Advisers Act

12  worked.  So I was -- it was almost more of a proofing.

13          MR. SBAITI:  Your Honor, based upon that, I mean,

14  he's helping a law firm perform its function for the client.

15  That's an agency relationship that gets cloaked.  You can call

16  him a consulting expert.  You can call him, to a certain

17  extent, a fact witness, Your Honor.  If we want to take a

18  break, I'm sure we could find authority on that basis for a

19  work product privilege pretty easily.

20      But he's an agent of the DAF.  Even if it's an informal

21  agency relationship, that's still agency.  He's in some

22  respects, I guess, an agent of the law firm, to the extent

23  he's helping us perform our legal work.  And it seems like

24  invading that privilege at this juncture is (a) unnecessary,

25  because we've already conceded that there's been

Dondero - Voir Dire                    188

1  conversations, which I think is the relationship they wanted

2  to establish.  And it's not unusual for a law firm to use

3  someone with specialized knowledge to understand some of the

4  intricacies of the actual issues that they're -- that they're

5  getting ready to litigate.

6          THE COURT:  Okay.  I find no privilege.  All right.

7  That's the ruling.

8          MR. BRIDGES:  Your Honor, may I add one thing to the

9  objection for the record?

10         THE COURT:  Okay, we have a rule, one lawyer per

11  witness.  Okay?  So, thank you.  A District Court rule, by the

12  way, not mine.

13         MR. SBAITI:  Your Honor, may we take a short recess,

14  given the Court's ruling?

15         THE COURT:  Well, I'd really like to finish this

16  witness.  How much longer do you have?

17         MR. MORRIS:  About eight more questions.

18         THE COURT:  All right.  We'll take a break after the

19  direct, okay?

20         MR. SBAITI:  Your Honor, I would ask that we -- if

21  he's going to ask him more questions about the content of the

22  communications, I ask respectfully for a recess so we can

23  figure out what to do about that.  Because, right now, there's

24  a ruling that he's going to have to reveal privileged

25  information, and we don't have a way to go around and figure

Dondero - Voir Dire                         189

 1  out how to resolve that issue if we needed to.

 2          THE COURT:  Okay.  I've ruled it's not privilege.

 3  Okay?

 4          MR. SBAITI:  I understand that, Your Honor, but --

 5          THE COURT:  Your client is CLO Holdco and the DAF.

 6          MR. SBAITI:  Yes, Your Honor.

 7          THE COURT:  Representative, Mark Patrick.  No

 8  contract with Mr. Dondero.  The fact that he may be very

 9  involved I don't think gives rise to a privilege.  That's my

10  ruling.

11          MR. SBAITI:  I understand, Your Honor.  I understand,

12  Your Honor, but I'm asking for a recess so that we can at

13  least undertake to provide Your Honor with some case law on a

14  reconsideration before we go there, because that bell can't be

15  unrung.

16          MR. MORRIS:  Your Honor, if I may?

17          MR. SBAITI:  And it's --

18          THE COURT:  Uh-huh.

19          MR. MORRIS:  I'm happy to give them ten minutes, Your

20  Honor, as long as they don't talk to the witness.

21          THE COURT:  Okay.

22          MR. MORRIS:  I want to give them the opportunity.  Go

23  right ahead.

24          THE COURT:  All right.  We'll take a ten-minute

25  break.

Dondero - Voir Dire                    190

1           MR. SBAITI:  Thank you.

2           THE COURT:  It's 3:05.

3           THE CLERK:  All rise.

4     (A recess ensued from 3:03 p.m. until 3:17 p.m.)

5           THE CLERK:  All rise.

6           THE COURT:  Okay.  Please be seated.  Going back on

7     the record in Highland.  Mr. Sbaiti?

8           MR. SBAITI:  Yes, Your Honor.  May I approach?

9           THE COURT:  You may.

10          MR. SBAITI:  Your Honor, we have some authority to

11    support the position we'd taken.  We'd ask the Court to

12    reconsider your ruling on the privilege.

13       The first bit of authority is Section 70 of the

14    Restatement (Third) of Law Governing Lawyers.  Privileged

15    persons within the meaning of Section 68, which governs the

16    privilege, says that those persons include either agents of

17    either the lawyer or the client who facilitate communications

18    between the two in order for the lawyers to perform their

19    function.

20       Another case that we found is 232 F.R.D. 103 from the

21    Southern District of New York, 2005.  It's *Express Imperial*

22    *Bank of U.S. v. Asia Pulp Company*.  And in that case, Your

23    Honor, the consultant was a -- had a close working

24    relationship with the company and performed a similar role to

25    that of the employee and was assisting the law firm in

Dondero - Voir Dire                    191

1  performing their functions, and the court there found that the

2  work product privilege -- actually, the attorney-client

3  privilege -- attached in what they called a Functional

4  Equivalents Doctrine, Your Honor.

5      And here we have pretty much the same set of facts that's

6  pretty much undisputed.  The fact that there -- and the fact

7  that there isn't a written agreement doesn't mean there isn't

8  a contractual arrangement for him to have rendered services

9  and advice.  And the fact that he's, you know, recruited by us

10 to help us perform our functions puts him in the realm, as I

11 said, of something of a consulting expert.

12     Either way, the work product privilege, Your Honor, should

13 apply, and we'd ask Your Honor not to invade that privilege at

14 this point, Your Honor.  And I'll ask you to reconsider your

15 prior ruling.

16     Furthermore, I believe Mr. Morris, you know, in making his

17 argument, is trying to create separation.  The fact that he

18 has no relationship, that the privilege can be invaded, seems

19 to defeat the whole premise of his whole line of questioning.

20     So, once again, Your Honor, I just -- it's a tit for a tat

21 there, and it seems to kind of eat itself.  Either he is

22 working with us, which we've admitted he is working with us,

23 us being the law firm, and helping us do our jobs, or he's

24 not.  And if he's not, then this should be done.

25          THE COURT:  Okay.

Dondero - Voir Dire                    192

1            MR. MORRIS:  Your Honor, briefly?

2            THE COURT:  Well, among other things, what do you

3     want me to do?  Take a break and read your one sentence from

4     the Restatements and your one case?  And could you not have

5     anticipated this beforehand?

6            MR. SBAITI:  Your Honor, --

7            THE COURT:  This is not the way we work in the

8     bankruptcy courts, okay?  We're business courts.  We have

9     thousands of cases.  We expect briefing ahead of time.

10           MR. SBAITI:  Your Honor, this has been a rather

11    rushed process anyway.  And to be honest, --

12           THE COURT:  When was the motion filed?

13           MR. SBAITI:  Your Honor, --

14           THE COURT:  More than a month ago.

15           MR. SBAITI:  -- his deposition was a week ago.

16           THE COURT:  Well, okay.  So you could not have

17    anticipated this issue until his deposition one week ago?

18           MR. SBAITI:  Your Honor, this issue arose at the

19    deposition, obviously, because that's what he's quoting from.

20    However, at least to us, this is such a well-settled area, and

21    to be honest, --

22           THE COURT:  Such a well-settled area that you have

23    one sentence from the Restatement and one case from the

24    Southern District of New York?

25           MR. SBAITI:  No, Your Honor.  I think the work

Dondero - Voir Dire                    193

1   product privilege lexicon -- we had ten minutes to try to find

2   something more on point than the general case law that applies

3   the work product privilege to people that work with lawyers,

4   consultants who work with lawyers, employees who work with

5   lawyers, even low-down employees who normally wouldn't enjoy

6   the privileges that attach to the corporation, when they work

7   with the company for -- when they work with the company

8   lawyers, it typically attaches.

9           THE COURT:  You know, obviously, I know a few things

10  about work product privilege, but he doesn't check any of the

11  boxes you just listed out.

12          MR. SBAITI:  I disagree, Your Honor.

13          THE COURT:  He's not an employee.  He's not a low-

14  level employee.

15          MR. SBAITI:  He's a consultant.

16          THE COURT:  With no agreement.

17          MR. SBAITI:  With a verbal agreement.  He's an

18  advisor.  And he was recruited by us, and at the request of

19  the DAF, of the head of the DAF, Mr. Patrick, to help us do

20  our job for the DAF.  I don't --

21          THE COURT:  Okay.  Mr. Morris, what do you want to

22  say?

23          MR. MORRIS:  Just briefly, Your Honor.  This issue

24  has been ripe since last Tuesday.  They directed him not to

25  answer a whole host of questions about his involvement at the

Dondero - Voir Dire                194

1   deposition last Tuesday, so they've actually had six days to

2   deal with this.  That's number one.

3       Number two, there's absolutely nothing inconsistent with

4   the Debtor's position that Mr. Dondero is participating in the

5   pursuit of claims and at the same time saying that his

6   communications with the Sbaiti firm are not privileged.

7   There's nothing inconsistent about that.

8       So the argument that he just made, that somehow because

9   we're trying to create separation, that that's inconsistent

10  with our overall arching theme that Mr. Dondero is precisely

11  engaged in the pursuit of claims against Mr. Seery, I think

12  that takes care of that argument.

13      Finally, your Honor, with respect to this consultancy

14  arrangement, not only isn't there anything in writing, but

15  either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero

16  the terms of the agreement.  Is he getting paid?  Is he doing

17  it for free?  Who retained him?  Was it Mr. -- because the --

18  there's no such thing.  There's no such thing.

19      The fact of the matter is what happened is akin to I have

20  a slip-and-fall case and I go to a personal injury lawyer and

21  I bring my brother with me because I trust my brother with

22  everything.  It's not privileged.  Any time you bring in

23  somebody who is not the attorney or the client, the privilege

24  is broken.  It's really quite simple.  Unless there's a common

25  interest.  They can't assert that here.  There is no common

Dondero - Voir Dire                                195

1    interest.  So --

2           THE COURT:  Okay.  Mr. Sbaiti, I'll give you up to

3    three more minutes to *voir dire* Mr. Dondero to try to

4    establish some sort of agency relationship or other evidence

5    that you think might be relevant.

6                       VOIR DIRE, RESUMED

7    BY MR. SBAITI:

8    Q    Mr. Dondero, when you provided information to the law

9    firm, were you doing so under an agency relationship?  Do you

10   know what an agency relationship is?

11   A    Generally.  When you're working on the -- or why don't you

12   tell me?

13   Q    Tell me your understanding, so we can use --

14   A    That you're working for the benefit or as a proxy for the

15   other entity or the other firm or the other person.

16   Q    Right.  So you're working for the DAF?

17   A    Yes.

18   Q    Do you do work for the DAF?

19   A    Yes.  As I stated, I'm surprised there isn't -- when we

20   reconstituted after leaving Highland, we put in shared

21   services agreements in place and asset management agreements

22   in place and tasked people with doing that for most of the

23   entities.  There might be still a few contracts that are being

24   negotiated, but I thought most of them were in place.

25          So I would imagine that there'll be an asset management

1   agreement with the DAF back to NexPoint sometime soon, so it

2   -- it's --

3   Q   Let me ask you this question.  When you were providing

4   information to us and having conversations with us, were you

5   doing that as an agent of the DAF, the way you described it,

6   --

7   A   Yes.

8   Q   -- on their behalf?

9   A   Yes.

10  Q   Were you also doing it to help us do our jobs for the DAF?

11  A   Yes.

12  Q   Did you respond to requests for information from myself?

13  A   Yes.

14  Q   Did you help coordinate other -- finding other witnesses

15  or sources of information at my request?

16  A   Yes.

17  Q   Did you do so based upon any understanding that I was

18  working on behalf of the DAF for that?

19  A   Yes.  I knew -- I knew you were working for the DAF.  No

20  one else, yeah.

21  Q   And so -- and so did you provide any expertise or any in-

22  depth understanding to myself in helping me prepare that

23  complaint?

24  A   I think so, but I give a lot of credit to your firm for

25  researching things that I -- I knew reasonably well but then

Dondero - Voir Dire                    197

1    you guys researched in even more depth.

2            MR. MORRIS:  I'd move to strike the answer as

3    nonresponsive.

4            THE COURT:  Sustained.

5    BY MR. SBAITI:

6    Q   Let me ask the question again.  When you were providing us

7    information and expertise, were you doing so knowing you were

8    working -- helping us work for the DAF?

9    A   Yes.

10   Q   Now, did you demand any compensation for that?

11   A   No.

12   Q   Do you require compensation necessarily to help the DAF?

13   A   No.

14   Q   Do you do other things for the DAF sometimes without

15   compensation?

16   A   Right.  We do the right thing, whether we get paid for it

17   or not.  Yes.

18   Q   Had you known that our communications were not necessarily

19   part of an agency relationship with the DAF, as you understood

20   it, that you were just some guy out on the street, would you

21   have had the same conversations with us?

22   A   (sighs)

23   Q   Let me ask a better question.  If I had come to you

24   working for someone that wasn't the DAF, you didn't already

25   have a relationship with, would you have given us the same

Dondero - Voir Dire                    198

1   help?

2   A   I wouldn't have been involved if it was somebody else.

3   Q   Is the reason you got involved because we were the lawyers

4   for the DAF?

5   A   Correct.

6          MR. MORRIS:  Objection.  It's just leading.  This is

7   all leading.

8          THE WITNESS:  Correct.

9          THE COURT:  Sustained.

10         MR. SBAITI:  Can --

11         THE WITNESS:  Yeah.  Sorry.

12  BY MR. SBAITI:

13  Q   Do you get -- do -- did you -- did you do work for the --

14  did you provide the help for the DAF laboring under the

15  understanding that there was an agreement?

16         MR. MORRIS:  Objection; leading.

17         THE COURT:  Sustained.

18  BY MR. SBAITI:

19  Q   Earlier you testified you believed there was an agreement?

20  A   I thought that was an agreement, and I thought there will

21  be one shortly if there isn't one, yes.

22  Q   Okay.

23  A   And so we -- I've been operating in a bona fide way in the

24  best interests of the DAF throughout -- assuming there was an

25  agreement, but even if there wasn't a formal one, I would

Dondero - Voir Dire                                199

1   still be moving in the best interests of the DAF and helping

2   your firm out or --

3   Q   And you did that because you believed there was an

4   agreement or soon would be?

5   A   Yes.

6           MR. SBAITI:  Your Honor, I mean, I believe we've

7   established a dual role here, both as an agent of the DAF and

8   as an agent of the law firm, Your Honor.

9           THE COURT:  Okay.  Just a minute.  I'm looking at

10  Texas authority on common interest privilege to see if there's

11  anything that --

12      (Pause.)

13          THE COURT:  All right.  Again, it would have been

14  very nice to get briefing ahead of time.  I think this

15  absolutely could have been anticipated.

16      I do not find the evidence supports any sort of protection

17  of this testimony under work product privilege, common

18  interest privilege.  I just haven't been given authority or

19  evidence that supports that conclusion.  So the objections are

20  overruled.

21      Mr. Morris, go ahead.

22                  DIRECT EXAMINATION, RESUMED

23  BY MR. MORRIS:

24  Q   Can you describe for the Court the substance of your

25  communications with Mr. Sbaiti concerning the complaint?

Dondero - Direct                                    200

1    A    As I've stated, directing him toward the Advisers Act and

2    then largely in a proofing function regarding CLO nomenclature

3    and some of the other fund nomenclature that sometimes gets

4    chaotic in legal briefs.

5    Q    Did you communicate in writing at any time with anybody at

6    the Sbaiti firm regarding any of the matters that are the

7    subject of the complaint?

8    A    I can't remember anything in writing.  Almost everything

9    was verbal, on the phone.

10   Q    You don't tend to write much, right?

11   A    Periodically.

12   Q    Did you communicate with Mr. Patrick?  Did you communicate

13   with anybody in the world in writing regarding the substance

14   of anything having to do with the complaint?

15          MR. SBAITI:  Objection, Your Honor.  Argumentative.

16          THE COURT:  Overruled.

17          THE WITNESS:  I --

18          MR. SBAITI:  Your Honor, may I just -- one

19   housekeeping.  Rather than raise the same objection, may we

20   have a standing objection, just so we're not disruptive, as to

21   the privilege, just for preservation purposes, on the content

22   of these communications?  Otherwise, I'll just make the same

23   objections and we can go through it.

24          THE COURT:  Well, disruptive as it may be, I think

25   you need to object to every --

 1          MR. SBAITI:  Okay.

 2          THE COURT:  -- question you think the privilege

 3  applies to.

 4          MR. SBAITI:  I will do so.  Thank you, Your Honor.

 5  Uh-huh.

 6  BY MR. MORRIS:

 7  Q   Mr. Dondero, the question was whether you've ever

 8  communicated with anybody in the world in writing concerning

 9  anything having to do with the complaint?

10  A   Not that I remember.

11  Q   Okay.

12          MR. MORRIS:  I will point out, Your Honor, that last

13  week, when the privilege was asserted, I had requested the

14  production of a privilege log.  I was told -- I forget exactly

15  what I was told, but we never received one.  I'll just point

16  that out as well.

17          THE COURT:  Okay.

18  BY MR. MORRIS:

19  Q   You provided comments to the drafts of the complaint

20  before it was filed, correct?

21  A   Yes, a few.

22  Q   Can you describe for the Court all of the comments that

23  you provided to earlier drafts of the complaint?

24          MR. SBAITI:  Your Honor, we object on the basis of

25  privilege and work product and joint -- joint interest

Dondero - Direct                                202

1    privilege.

2              THE COURT:  Overruled.

3              THE WITNESS:  It's along the lines of things I've

4    said in this court several times.  The obligations under the

5    Advisers Act cannot be negotiated away and they cannot be

6    waived by the people involved, full stop.  I remember giving

7    the -- Mazin the example of the only reason why we're in a

8    bankruptcy is from an arbitration award that, even though we

9    did what was in the best interests of the investors, we got

10   the investors out more than whole over an extended period of

11   time, they got an arbitration award that said when we

12   purchased some of the secondary interests we should have

13   offered them up to the other 800 members in the committee

14   besides the -- the 800 investors in the fund besides the eight

15   people on the committee who had approved it and that the

16   committee couldn't approve a settlement that went against the

17   Advisers Act and the Advisers Act stipulates specifically that

18   you have to offer it up to other investors before you take an

19   opportunity for yourself.  And someday, hell or high water, in

20   this court or some other, we will get justice on that.  And

21   that was the primary point that I reminded Mazin about.

22   BY MR. MORRIS:

23   Q    And that's exactly the conversation you had with Mark

24   Patrick that started this whole thing, correct?

25   A    No.

Dondero - Direct                                203

1   Q    You told Mark Patrick that you believe the Debtor had

2   usurped a corporate opportunity that should have gone to the

3   DAF, didn't you?

4   A    That was not our conversation.

5   Q    So when Mr. Patrick testified to that earlier today, he

6   just got it wrong, right?

7   A    Well, maybe later on, but it wasn't that in the beginning.

8   The beginning, any conversation I had with Mark Patrick in the

9   beginning was smelling a rat in the way that the Debtor had

10  priced the portfolio for HarbourVest.

11  Q    Hmm.  So you're the one, again, who started that piece of

12  the discussion as well, correct?

13  A    Started the -- I -- I guess I smelled a rat, but I put the

14  person who could do all the numbers in touch with the Sbaiti

15  firm.

16  Q    And was the rat Mr. Seery?

17  A    Was the rat Mr. Seery?  Or the independent board.  Or a

18  combination thereof.  I believe the independent board knew

19  exactly what Seery was doing with --

20  Q    Do you have any idea --

21  A    -- HarbourVest.

22  Q    Do you have any idea why, why the Sbaiti firm didn't name

23  the whole independent board in the -- in the motion for leave

24  to amend?

25  A    I don't know.  Maybe they will at some point.

Dondero - Direct                                          204

1   Q    Yeah.

2   A    I don't know.

3   Q    But did you tell the Sbaiti firm that you thought the

4   whole independent board was acting in bad faith and was a rat?

5            MR. SBAITI:  Your Honor, I object on the basis of

6   privilege.

7            THE COURT:  Overruled.

8            MR. SBAITI:  All three.

9            THE WITNESS:  I knew Jim Seery was and I knew Jim

10  Seery had weekly meetings with the other independent board

11  members, so the HarbourVest settlement was significant enough

12  that it would have been approved, but I don't have direct

13  knowledge of their involvement.

14  BY MR. MORRIS:

15  Q    And so you -- but you believed Jim Seery was certainly a

16  rat, right?

17  A    Oh, I -- there was a defrauding of third-party investors

18  to the tune of not insignificant 30, 40, 50 million bucks, and

19  it was obfuscated, it was -- it was highly obfuscated in the

20  9019.

21  Q    Did you think Mr. Seery was a rat, sir?  Yes or no?

22  A    I believe he had monthly financials.  He knew that the

23  numbers presented in the 9019 were wrong.  And if that makes

24  him a rat, that makes him a rat.  Or maybe he's just being

25  aggressive for the benefit of his incentive or for the estate.

Dondero - Direct                                    205

 1   But I -- I believe those things wholeheartedly.
 2   Q   Did you tell the Sbaiti firm you thought Jim Seery was a
 3   rat?
 4             MR. SBAITI:  Objection, Your Honor.  Privilege.
 5             THE COURT:  Overruled.
 6             THE WITNESS:  I -- I don't remember using those
 7   words.
 8   BY MR. MORRIS:
 9   Q   Did you tell the Sbaiti Firm that you thought Jim Seery
10   had engaged in wrongful conduct?
11             MR. SBAITI:  Your Honor, objection.  Privilege.
12             THE COURT:  Overruled.
13             THE WITNESS:  I believe he violated the Advisers Act,
14   and I was clear on that throughout.
15   BY MR. MORRIS:
16   Q   Listen carefully to my question.  Did you tell the Sbaiti
17   firm that you believed that Jim Seery engaged in wrongful
18   conduct?
19             MR. SBAITI:  Objection, Your Honor.  Calls for
20   privileged communications.
21             THE COURT:  Overruled.
22             THE WITNESS:  I think I gave the answer.  I'll give
23   the same answer.  I believe he violated the Advisers Act.
24   BY MR. MORRIS:
25   Q   What other wrongful conduct did you tell the Sbaiti firm

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 207
Case 3:23-cv-00726-S   Document 8-24   Filed 09/29/23   Page 418 of 1598   PageID 13465

Dondero - Direct                      206

1   you thought Mr. Seery had engaged in?

2            MR. SBAITI:  Same objection, Your Honor.

3            THE COURT:  Overruled.

4            MR. SBAITI:  Calls for privileged communications.

5            THE COURT:  Overruled.

6            THE WITNESS:  I -- I just remember the obfuscating

7   and mispricing portfolio violations of the Advisers Act was

8   all I discussed with the Sbaiti firm regarding Seery's

9   behavior.

10  BY MR. MORRIS:

11  Q   Did you talk to them about coming to this Court under the

12  gatekeeper order to see if you could get permission to sue Mr.

13  Seery?

14  A   I --

15           MR. SBAITI:  Objection, Your Honor.  Calls for

16  privileged communication.

17           THE COURT:  Overruled.

18           THE WITNESS:  I wasn't involved in any of the --

19  BY MR. MORRIS:

20  Q   Did you --

21  A   -- tactical stuff on who to sell or -- who to sue or when

22  or whatever.

23  Q   Did you tell the Sbaiti firm that you thought they should

24  sue Mr. Seery?

25           MR. SBAITI:  Objection, Your Honor.  Calls for

Dondero - Direct                          207

```
 1   privileged communication.

 2              THE COURT:  Overruled.

 3              MR. SBAITI:  I'll also say, Your Honor, the question

 4   is getting a little argumentative.

 5              THE WITNESS:  I didn't get directly --

 6              THE COURT:  Overruled.

 7              THE WITNESS:  I didn't get directly involved in who

 8   was -- who was specifically liable.

 9   BY MR. MORRIS:

10   Q    How many times did you speak with the Sbaiti firm

11   concerning the complaint?

12   A    Half a dozen times, maybe.

13   Q    Did you ever meet with them in person?

14   A    I've only met with them in person a couple, three times.

15   And I don't think any of them -- no, it was, excuse me, it was

16   on deposition or other stuff.  It wasn't regarding this.

17   Q    Did you send them any information that was related to the

18   complaint?

19   A    I did not.

20   Q    Did you ask anybody to send the Sbaiti firm information

21   that related to the complaint?

22   A    I did not.  I -- I was aware that Hunter Covitz was

23   providing the historic detailed knowledge to the firm, but it

24   -- it wasn't -- I don't believe it was me who orchestrated

25   that.
```

Dondero - Direct                                    208

1    Q    Did you talk to anybody at Skyview about the allegations

2    that are contained in the complaint before it was filed?

3    A    I don't -- I don't remember.

4    Q    Have you ever talked to Isaac Leventon or Scott Ellington

5    about the allegations in the complaint?

6    A    No.  They weren't involved.

7    Q    How about -- how about D.C. Sauter?  You ever speak to him

8    about it?

9    A    I don't --

10            MR. TAYLOR:  Objection, Your Honor.

11            THE WITNESS:  I don't remember.

12            MR. TAYLOR:  At this point, D.C. Sauter is indeed an

13   employee of Skybridge and is a general counsel for some of the

14   entities which he worked for.  And to the extent he's trying

15   to ask for those communications, that would be invasion of the

16   privilege.

17            MR. MORRIS:  I'll withdraw it, Your Honor.  That's

18   fair.

19            THE COURT:  Okay

20            MR. MORRIS:  That's fair.

21            THE COURT:  Question withdrawn.

22            THE WITNESS:  I thought you only had eight more

23   questions.

24            MR. MORRIS:  Opened the door.

25   BY MR. MORRIS:

Dondero - Direct                              209

1   Q    Can you describe the general fact -- withdrawn.  You

2   provided facts and ideas to the Sbaiti firm in connection with

3   your review of the draft complaint, correct?

4   A    Ideas and proofreading.

5   Q    Anything beyond what you haven't described already?

6   A    Nope.

7   Q    Okay.  Who is your primary contact at the Sbaiti firm, if

8   you had one?

9   A    Mazin.

10  Q    Okay.  Did you suggest to Mr. Sbaiti that Mr. Seery should

11  be named as a defendant in the lawsuit before it was filed?

12         MR. SBAITI:  Your Honor, calls for privileged

13  communication.  We object --

14         THE COURT:  Overruled.

15         MR. SBAITI:  -- to that answer.

16         MR. SBAITI:  Okay.

17         THE WITNESS:  Again, no.  I wasn't involved with the

18  tactics on who would be defendants and when or if other people

19  would be added.

20  BY MR. MORRIS:

21  Q    Did you -- are familiar with the motion to amend that was

22  filed by the Sbaiti firm?

23  A    I'm more familiar with it after today --

24  Q    Right.

25  A    -- than I was before.

Dondero - Direct                                210

1   Q    And were you aware that that motion was going to be filed

2   prior to the time that it actually was filed?

3   A    I -- I don't remember.  Probably.

4   Q    And who would have been the source of that information?

5   Would that have been Mr. Sbaiti?

6   A    Yes.

7   Q    Okay.  And did you express any support for the decision to

8   file the motion for leave to amend in the District Court?

9   A    I -- I wasn't involved.  It was very complicated legal

10  preservation conver... -- I wasn't involved.  I knew the

11  conversations were going on between different lawyers, but I

12  wasn't involved in the ultimate decision.  I didn't encourage,

13  applaud, or even know exactly what court it was going to be

14  filed in.

15          MR. MORRIS:  All right.  I have no further questions,

16  Your Honor.

17          THE COURT:  All right.  Pass the witness.

18          MR.

19  ANDERSON:  We have no questions, Your Honor.

20          THE COURT:  Okay.  Any questions from Respondents?

21          MR. SBAITI:  No questions.

22          THE COURT:  Okay.  Mr. Taylor?

23                    CROSS-EXAMINATION

24  BY MR. TAYLOR:

25  Q    Mr. Dondero, --

Dondero - Cross                                     211

1   A    Yes, sir.

2   Q    -- you are not the authorized representative of CLO

3   Holdco, are you?

4   A    No.

5   Q    You're not the authorized representative for the DAF, are

6   you?

7   A    No.

8   Q    Do you know who that person is as we sit here today?

9   A    Yes.

10  Q    Who is that?

11  A    Mark Patrick.

12  Q    Thank you.

13       MR. TAYLOR:  No further questions.

14       THE COURT:  Any redirect on that cross?

15       MR. MORRIS:  I do not, Your Honor.  I would just like

16  to finish up the Debtor's case in chief by moving my exhibits

17  into evidence.

18       THE COURT:  Okay.  Mr. Dondero, you're excused.

19   (The witness steps down.)

20       THE COURT:  All right.  So you have no more

21  witnesses; you're just going to offer exhibits?

22       MR. MORRIS:  Yes, Your Honor.

23       THE COURT:  Okay.

24       MR. MORRIS:  So, at Docket #2410, --

25       THE COURT:  Uh-huh.

212

1          MR. MORRIS:  -- the Court will find Exhibits 1

2     through 53.

3          THE COURT:  Uh-huh.

4          MR. MORRIS:  In advance, Your Honor, I've conferred

5     with the Respondents' counsel.  They had previously objected

6     to Exhibits 15 and 16, which I believe were the Grant Scott

7     deposition transcripts.  They objected to them on the grounds

8     of lack of completeness because I had taken the time to make

9     deposition designations, but I'm happy to put the entirety of

10    both transcripts into evidence, and I hope that that will

11    remove the objections to Exhibits 15 and 16.

12         THE COURT:  All right.  Before we confirm, let's just

13    make sure we have the right one.

14         MR. MORRIS:  Oh, I apologize.

15         THE COURT:  I have 16 as the July order.

16         MR. MORRIS:  I apologize.  You're absolutely right,

17    Your Honor.  What I was referring to was -- oh, goodness.  One

18    second.  (Pause.)  I was referring to Exhibits 23 and 24.

19    Those are Mr. Scott's deposition designations.  They had

20    lodged an informal objection with me on grounds of

21    completeness.  And in order to resolve that objection, we're

22    happy to put the entirety of both transcripts in.

23         THE COURT:  All right.  So if our Respondents could

24    confirm with the agreement to put in the entire depos at 23

25    and 24, you stipulate to 1 through 53?

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 214
Case 3:23-cv-00726-S   Document 8-24   Filed 09/29/23   Page 425 of 1598   PageID 13472

213

```
 1              MR. PHILLIPS:  We also -- Your Honor, --

 2              MR. MORRIS:  Yeah, I was going to take them one at a

 3    time.  Just take those two.

 4              MR. PHILLIPS:  Yeah, can we just take those two?

 5    Confirmed?

 6              MR. MORRIS:  Okay.

 7              THE COURT:  Oh, okay.

 8              MR. PHILLIPS:  Because there are other -- there are

 9    other -- we exchanged objections to each other's witness and

10    exhibit lists.  And so I think you can handle the rest of them

11    kind of in a bunch, right?

12              MR. MORRIS:  Yeah.  Yeah, there's two bunches,

13    actually.

14              MR. PHILLIPS:  Yeah.

15              THE COURT:  Okay.  So you have just now stipulated to

16    23 and 24 being admitted --

17              MR. MORRIS:  Correct.

18              THE COURT:  -- with the full depos?  Okay.

19              MR. PHILLIPS:  Yes, ma'am.  Thank you.

20              THE COURT:  All right.

21        (Debtor's Exhibits 23 and 24 are received into evidence.)

22              MR. MORRIS:  And then the next two that they objected

23    to are Exhibits 15 and 16.  15 is the January order and 16 is

24    the July order.  They objected on relevance grounds.  I think

25    16 -- these are the two orders that the Debtors contend the
```

214

 1   Respondents have violated, so I don't understand the relevance

 2   objection, but that's what it was and that's my response.

 3          MR. PHILLIPS:  Resolved, Your Honor.

 4          THE COURT:  Okay.  15 and 16 are admitted.

 5      (Debtor's Exhibits 15 and 16 are received into evidence.)

 6          MR. MORRIS:  Okay.  And then the last objection

 7   relates to a group of exhibits.  They're Exhibits 1 through

 8   11.  Those exhibits I think either come in together or stay

 9   out together.  They are exhibits that relate to the

10   HarbourVest proceedings, including deposition notices,

11   including I think the transcript from the hearing, the Court's

12   order, the motion that was filed.

13      The Debtor believes that those documents are relevant

14   because they go right to the issue of the gatekeeper order and

15   had they filed, had the Respondents followed the gatekeeper

16   order, this is -- this is why they didn't do it.  You know

17   what I mean?  That's the argument, is that the Respondents,

18   one of the reasons the Respondents -- argument -- one of the

19   reasons the Respondents didn't come to this Court is because

20   they knew this Court had that kind of record before it.  And I

21   think that's very relevant.

22          THE COURT:  All right.  Response?

23          MR. PHILLIPS:  Your Honor, we think that these

24   exhibits are not relevant.  We have a very focused, we think,

25   -- we have the Court's order.  Those objections are withdrawn.

215

1    We have the complaint.  We have the motion to amend.  And the

2    issue is whether the motion to amend, which was dismissed one

3    day, or the next day after it was filed, constitutes criminal

4    -- constitutes contempt.

5        So we think the prior proceedings go to their underlying

6    argument, which is the lawsuit or the complaint is no good,

7    and that has nothing to do with -- there's been no foundation

8    laid and it's not relevant what happened in connection with

9    the HarbourVest settlement.  It is what it is, and there's no

10   dispute that it is what it is, but it's not relevant to

11   establish any type of -- they've even said intent is not even

12   relevant here.  So we -- that's -- we think all of that goes

13   out and simplifies the record, because it has nothing to do

14   with whether or not there was a contempt.

15             THE COURT:  Response?

16             MR. MORRIS:  We withdraw the exhibits, Your Honor.

17   I'm just going to make it simple for the Court.

18             THE COURT:  Okay.

19             MR. MORRIS:  I'm just going to make it simple for the

20   Court.

21             THE COURT:  1 through 11 are withdrawn.

22        (Debtor's Exhibits 1 through 11 are withdrawn.)

23             MR. MORRIS:  So, the balance, there was no objection.

24   So all of the Debtor's exhibits on Docket #2410 -- let me

25   restate that.  Exhibits 12 through 53 no longer have an

216

```
 1   objection.  Is that correct?
 2              MR. PHILLIPS:  Yes.
 3              MR. MORRIS:  Okay.  And then --
 4              MR. PHILLIPS:  Confirmed.
 5              THE COURT:   Okay.
 6       (Debtor's Exhibits 12 through 53 are received into
 7   evidence.)
 8              MR. MORRIS:  Okay.  Thank you.  And then we filed an
 9   amended list, I believe, yesterday --
10              THE COURT:  Uh-huh.
11              MR. MORRIS:  -- to add Exhibits 40 -- 54 and 55.
12              THE COURT:  Uh-huh.
13              MR. MORRIS:  And those exhibits are simply my firm's
14   billing records.
15              THE COURT:  Okay.
16              MR. MORRIS:  You know, we added Mr. Demo to the
17   witness list in case there was a need to establish a
18   foundation.  That's the only thing he would testify to.  I
19   don't know if there's an objection to those two exhibits,
20   because we hadn't had an opportunity to confer.
21              THE COURT:  Any objection?
22              MR. PHILLIPS:  Your Honor, we're not going to require
23   authenticity and foundation for -- we have the right, we
24   think, to say that they're not a ground -- we're not going to
25   challenge that they are the bills, and the bills say what they
```

 1   say.  We don't need Mr. -- we don't need a witness to

 2   authenticate those exhibits.  But we reserve all substantive

 3   rights with respect to the effect of those exhibits.

 4          THE COURT:  All right.  54 and 55 are admitted.

 5       (Debtor's Exhibits 54 and 55 are received into evidence.)

 6          MR. MORRIS:  And with that, Your Honor, the Debtor

 7   rests.

 8          THE COURT:  Okay.  All right.  Respondents?

 9       (Counsel confer.)

10          MR. PHILLIPS:  If I could have a second?

11          THE COURT:  Okay.

12          A VOICE:  Sorry, Your Honor.

13       (Pause.)

14          MR. PHILLIPS:  Your Honor, we have filed in our

15   witness and exhibit list, and I have to say I don't have the

16   number, but we'll get the docket entry number, but we have 44

17   exhibits.  There's an objection to Exhibit #2, which is --

18   thank you -- it's Document 2411, Your Honor.  Thank you.

19          THE COURT:  Uh-huh.

20          MR. PHILLIPS:  There is a pending objection to

21   Exhibit #2 which we have not resolved.  There's no objection

22   to any other exhibit.  But in reviewing our exhibit list, I

23   found that we had some -- some mistakes and duplications.

24       So, with respect to 2411, we would withdraw Exhibit 13,

25   14, and 29, and we would offer Exhibit 1, and then 30 through

218

1  44, with 13, 14, and 29 deleted.

2          THE COURT:  Okay.  So 1, 3 through 12, --

3          MR. PHILLIPS:  Yes.

4          THE COURT:  -- 15 through 28, and then 30 --

5          MR. PHILLIPS:  And then 30 through 44.

6          THE COURT: -- through 44?  Do you confirm, Mr.

7  Morris?

8          MR. MORRIS:  Yes, Your Honor.  The only objection we

9  have is to Exhibit #2.

10         THE COURT:  And that's -- he's not offering that?

11         MR. MORRIS:  Yeah.

12         MR. PHILLIPS:  Not at this time, Your Honor.

13         THE COURT:  Okay.

14         MR. PHILLIPS:  We would have to have testimony about

15  that.

16         THE COURT:  Okay.  All right.  So those are admitted.

17         MR. PHILLIPS:  Okay.

18     (Mark Patrick's Exhibits 1, 3 through 12, 15 through 28,

19  and 30 through 44 are received into evidence.)

20         THE COURT:  By the way, it looks like Exhibit 44 is

21  at a different docket number, Docket 2420.  Correct?  You have

22  --

23         MR. SBAITI:  Your Honor, I believe Exhibit 44 is the

24  hearing transcript from the July approval hearing.  At least

25  that's what it's supposed to be.

219

1              THE COURT:  Okay.

2              MR. SBAITI:  It was Exhibit 2 on the Debtor's list,

3    and then I think they took it off, so we had to add it.

4              MR. PHILLIPS:  Oh, okay.  I was looking -- oh, that's

5    right.  They -- that's correct, Your Honor.

6              THE COURT:  Okay.

7              MR. PHILLIPS:  Exhibit 44 was added --

8              THE COURT:  Okay.

9              MR. PHILLIPS:  -- because the Debtor's withdrew it,

10   and so it was added in the second -- in the supplemental and

11   amended list.  The -- the one that I was talking about was the

12   prior list.

13             THE COURT:  Okay.  So that's at Docket 2420?

14             MR. PHILLIPS:  Yes.

15             THE COURT:  You're not offering 45 or 46?

16             MR. PHILLIPS:  No, I think we'd offer 45 and 46 as

17   well.  I'm sorry.

18             THE COURT:  Okay.  Any objections, Mr. Morris?

19             MR. MORRIS:  No, Your Honor.

20             THE COURT:  Okay.  So 45 and 46 are admitted as well.

21   They're at Docket Entry 2420.

22      (Mark Patrick's Exhibits 45 and 46 are received into

23   evidence.)

24             THE COURT:  All right.  Your witnesses?

25             MR. PHILLIPS:  Your Honor, could we have five minutes

220

 1   to just see what we're -- our plan is, and then we'll be back

 2   at 4:00?

 3              THE COURT:  Okay.  We'll be back at 4:00.

 4              MR. PHILLIPS:  Thank you.

 5              THE CLERK:  All rise.

 6         (A recess ensued from 3:55 p.m. until 4:04 p.m.)

 7              THE CLERK:  All rise.

 8              THE COURT:  Please be seated.  All right.  Back on

 9   the record in Highland.  Mr. Phillips?

10              MR. PHILLIPS:  Your Honor, with the introduction of

11   the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick,

12   those Respondents, and we consider Mark Patrick a Respondent

13   although not formally named as a Respondent because he is the

14   party who authorized the filing of the Seery motion -- we

15   rest.

16              THE COURT:  You rest?  Okay.  Well, Mr. Morris,

17   closing arguments?

18              MR. MORRIS:  How much time do I have?

19              THE COURT:  You've got a lot more time than you

20   probably thought you were going to.  You're under an hour.

21              MR. MORRIS:  42 minutes?

22              THE COURT:  How much?

23              THE CLERK:  42 minutes.

24              THE COURT:  42 minutes?  Feel free not to use it all.

25              MR. SBAITI:  Out of curiosity, how long do we have?

221

```
 1            THE COURT:  You have a lot of time, which I hope you
 2    won't use.
 3            THE CLERK:  Hour and twenty-five minutes or so.
 4            MR. SBAITI:  I was afraid it was going to be an hour
 5    and twenty, so --
 6            MR. PHILLIPS:  No, not either.
 7            MR. MORRIS:  I don't suspect I'll use all the time.
 8            THE COURT:  Okay.  Thank you.
 9            MR. MORRIS:  May I proceed?
10            THE COURT:  You may.
11              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR
12            MR. MORRIS:  Good afternoon, Your Honor.  John
13    Morris; Pachulski Stang Ziehl & Jones; for the Debtor.  I'd
14    like to just make some closing remarks after the evidence has
15    closed.
16        This is a very, very important motion, Your Honor.  I take
17    this stuff seriously.  It's only the second contempt motion
18    I've ever brought in my life.  I've never gone after another
19    law firm.  But these facts and circumstances require it,
20    because my client is under attack, and these orders were
21    entered to prevent that.
22        It is serious stuff.  There's no question in my mind,
23    there's no question the evidence showed, clear and
24    convincingly, beyond reasonable doubt, that they violated this
25    Court's order.
```

222

1     I started off with three very simple prongs.  So simple

2  you'd think I'd remember them.  Number one, was a court order

3  in effect?  There is no dispute.  The court order was in

4  effect.

5     Number two, did the order require certain conduct by the

6  Respondent?  We believe it did.  We heard an hour-long

7  argument styled as an opening statement, but it was really

8  argument and not an opening statement, about all the defects

9  in the order.  But the one thing that is crystal clear in the

10  order are the words commence or pursue.  You've been told many

11  times by the Respondent that nobody has commenced an action

12  against Mr. Seery.  That is true.  We all know what the word

13  commence means.  We all know what the word pursue means.

14     I heard argument this morning that pursue means after a

15  claim is filed you pursue a case.  That's the way lawyers talk

16  about it.  But that doesn't make any sense, Your Honor,

17  because once you've commenced the action you've violated the

18  order.  It's commence or pursue, it's in the disjunctive, and

19  you can't read out of the order the concept of pursuit by

20  making it an event that happens after the commencement,

21  because that's exactly what they're trying to do.  They're

22  trying to read out of the order the word pursuit.

23     And I ask you to use very simple common sense.  If filing

24  a motion for leave to amend a complaint to add Mr. Seery as a

25  defendant is not pursuit, what is?  What is?  There's nothing

223

1    left.  You commence an action or you do something less than

2    commencing an action when you're going after the man.  That's

3    what pursuit means.  They're going after the man.  And they

4    asked the District Court to do what they knew they couldn't.

5         Mr. Phillips is exactly right.  I made the point about

6    Rule 15 because they knew they couldn't do it.  I'm not

7    suggesting that they should have.  I'm suggesting that the

8    reason that they didn't is because they knew they were -- they

9    were in a bad place.  Because if they really just wanted to

10   name Mr. Seery as a defendant, they wouldn't have done it.

11   They knew commence was crystal clear.

12        What they're trying to do is claim that somehow there's an

13   ambiguity around the word pursuit.  Does that make any sense

14   at all?  Filing a motion for leave to amend the complaint.

15   And Mr. Patrick, to his credit, candidly admitted that if the

16   motion was granted, they were suing, yeah, as long -- as long

17   as the Sbaiti firm, you know, recommended it.  That's what

18   would have happened.

19        Those orders that you signed, nothing, absolutely

20   meaningless from their point of view.  They believed they were

21   wrong.  They believed that they were overbroad.  They believed

22   they were too narrow.  They believed they were vague.  They

23   believed they were without authority.  They don't get to be

24   the gatekeeper.  They want to be the gate -- that's this

25   Court's decision.  That's why we went through all of the

224

 1   processes that we did.  And they just flagrantly said, I don't

 2   agree.  I don't agree because it's wrong this way and it's

 3   wrong that way and it's wrong the other way, and therefore let

 4   me go find a higher authority to validate my thinking.  That's

 5   not the way this process is supposed to work.

 6        The independent directors and Mr. Seery relied on the

 7   gatekeeper in accepting their positions.  It was a quid pro

 8   quo.  Mr. Dondero agreed to the exact same provision, the

 9   exact same gatekeeper provision in the January order that he

10   now complains about today, that the DAF complains about today.

11   Where were these people?

12        As the Court knows, nobody appealed either order.  The

13   Debtor, the independent board, Mr. Seery expected that the

14   plain and unambiguous words would be honored and enforced.  I

15   think that's fair.  I think that's the way the process is

16   supposed to work.

17        Instead, we have games.  We have these linguistic

18   gymnastics.  We have statements that are too cute by half.

19   Mr. Dondero won't even admit that he appointed Mr. Scott back

20   in 2012.  I couldn't even get him to do that, really, even

21   though the documents say it, even though Mr. Patrick says it.

22        I'll take the Respondents one at a time in a moment, but I

23   just want to deal with some of the more interesting arguments

24   they make.  The order was vague because it didn't say you

25   can't seek leave from the District Court to amend your

225

 1   complaint to add Mr. Seery.  They said that that's what makes

 2   the order vague.

 3       Your Honor, if you had thought to put that language in,

 4   you know what they would have done?  They would have sued Mr.

 5   Seery in New York State Supreme Court, where he lives, and

 6   said, the order didn't say I couldn't do that.  Where does it

 7   end?

 8       There's a reason why the order was crafted broadly to say

 9   no commencement or pursuit without Bankruptcy Court  approval.

10   You have to bring a colorable claim.

11       We heard an argument this morning that they couldn't

12   possibly have brought that motion for reconsideration first.

13   You know, the one they filed about eight hours after we filed

14   the contempt motion.  They couldn't possibly have brought that

15   motion before the motion for leave to amend because somehow

16   they would have been estopped or they would have been found to

17   have waived some right.

18       How could it be that anybody reasonably believes that

19   complying with a court order results in a waiver of some

20   right?  It just -- these are games.  These are not good

21   arguments.  And they certainly don't carry the day on a

22   contempt motion.

23       We've heard repeatedly, the District Court denied the

24   motion without prejudice, how have you been harmed?  They

25   shouldn't be able to rely on the District Court's prudence to

226

1  protect themselves.  The question shouldn't be, have you been

2  harmed since the District Court didn't grant the motion?  No.

3  The question should be, were we harmed by the attempt to name

4  Mr. Seery a defendant, in violation of court orders, without

5  notice?  Without notice.

6      I'm told they assumed that I'd be checking the dockets.  I

7  wasn't checking the docket, Your Honor.  I hadn't filed an

8  appearance in the case.  And, in fact, if you look at the

9  exhibits, because I could pull it out, but we put in the

10  communications between the lawyers.  The last communication

11  was from Mr. Pomerantz, and the last communication from Mr.

12  Pomerantz said, Don't do it or we're going to file a motion

13  for contempt.  That's now in the evidence.

14      So, having sent that message, I wasn't going to check the

15  docket to see if they really were going to go ahead and do it.

16  I didn't think they would.  And if they did, I certainly

17  thought I'd get notice of it.  Nothing.

18      And, again, I don't really need to establish intent at all

19  in order to meet my burden of clear and convincing evidence of

20  a contempt of court, but I think it is relevant when the Court

21  hopefully finds liability and is considering damages, because

22  that's really the most important point I have to make right

23  now, is the Court needs to enforce its own orders, because if

24  the Court doesn't, or doesn't impose a penalty that's

25  meaningful, this is just going to continue.  And Your Honor,

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 228
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 439 of 1598 PageID 13486

227

1   it's all in the record.  Your Honor knows this.  Mr. Daugherty

2   has gone through it.  Right?  Mr. Terry went through it.  UBS

3   went through it.  You've seen litigation now for a year and a

4   half.  It's happening in New York, right, the Sbaiti firm is

5   reopening the Acis case.  we've got this other lawsuit that's

6   filed by an entity with like a five-tenths of one percent

7   interest who's complaining about the SSP transaction that Mr.

8   -- that the Debtor engaged in.  There's no end here.

9       We need the Court to pump the brakes.  We need the Court

10  to exercise its authority.  We need the Court to protect the

11  estate fiduciary that it approved.

12      It is true, Mr. Seery is not a trustee.  But it is also

13  true that he is a third-party outsider who came into this case

14  with the expectation and the promise in an order that he

15  wouldn't be subjected to frivolous litigation, that this Court

16  would be the arbiter of whether claims could be pursued

17  against him.  That was the code of conduct.  That was the quid

18  pro quo.  That was the deal that Mr. Seery made.  It's the

19  deal that the board members made.

20      What gives these people the right to just say, your order

21  is wrong, and because I think your order is wrong I'm going to

22  go to the District Court, and if the District Court agrees,

23  too bad, and if the District Court doesn't agree, we'll be

24  back before Your Honor, and no harm, no foul?  No.  It can't

25  be.  It can't be that that's the way this process works.  It

228

1  just can't.

2       So, Your Honor, let me take the Defendants one at a time,

3  the Respondents one at a time. CLO Holdco and the DAF are

4  corporate entities. They've done what they've done. Mr.

5  Patrick, bless him, I think he's a lovely man. I don't think

6  he quite bargained for what he's getting right now, but

7  nevertheless he is where he is and he's willing to stand up

8  and be counted, and for that, at least, I admire his courage.

9  He's willing to say, I authorized those. But you know what?

10 It's a violation of the law, it's a violation of this Court's

11 order to file that motion, and so he has -- and he was very

12 candid today. He knew of the order. Right? He knew it was

13 in effect. He pointed out that it was in their papers.

14 Right?

15      They're trying to be cute, they're trying to thread this

16 needle, but it has no hole in it. They keep -- they keep

17 doing this. Well, maybe if we do it this way, maybe if we do

18 it -- no. The order was crystal clear.

19      The Sbaiti firm. They're probably fathers and husbands

20 and good people and I wish them no ill will, but this is

21 wrong. This is wrong. To come into a court you've never been

22 in before and in less than twelve days to jump the shark like

23 this in twelve -- in less than twelve days, because Mr.

24 Patrick said they weren't hired until April, and the complaint

25 was filed on the 12th.

229

1        We're told that they understood this was an overwhelming

2    case with two -- why don't you take your time?  What was the

3    rush?  Why not wait until the Defendant -- the Debtor appeared

4    in the action before rushing to do this?

5        It's bad conduct, Your Honor, and that's really a very

6    important point that I have to make, is that there's lots of

7    lawyers who are engaging in highly-questionable conduct here

8    that, from my perspective, goes well beyond the bounds of

9    zealous advocacy.

10        It's not aggressive lawyering.  I love aggressive

11    lawyering.  I really do.  Respectful, honest -- and I don't,

12    you know, I don't want to say that they're dishonest people.

13    I don't mean to do that.  But I think, I think they made a

14    gross error in judgment, and there's no question that they

15    violated this Court's order.

16        And then that leaves Mr. Dondero.  I don't even know what

17    to say about his testimony, Your Honor.  He pursued claims

18    against Mr. Seery.  He thinks he's a rat.  He's the one who

19    started the whole process.  He's the one who put the bug in

20    Mark Patrick's ear.  All of this is uncontested.  Right?

21    Uncontested.

22        I don't have to go back in time.  We can talk about what

23    happened to Grant Scott.  It's a very sad story.  Mr. Scott, I

24    think, did his honest best to do what he believed, on the

25    advice of counsel, was in the best interest of the DAF.  And

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 231
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 442 of 1598 PageID 13489

230

1   Mr. Dondero, as you hear time and time again when he speaks

2   about Mr. Seery, it was inappropriate.  He's the arbiter of

3   what's in the best interest of entities that other people

4   control.  And they pay a price.  And they pay a price.  And so

5   Mr. Dondero felt it was his job, even though he tries to

6   distance himself from the DAF -- I have no responsibility, I

7   don't -- I'm not involved -- until, until somebody wants to

8   sue Seery and the Debtor.  Then he'll go all in on that, no

9   matter how specious the claim may be.

10      The Debtor's not going to fold its tent because a motion

11  for leave to amend was denied without prejudice.  That's not

12  the point.  The point is that people need to respect this

13  Court, people need to respect the Court's orders, and those

14  that aid and abet or otherwise support the violation of court

15  orders ought to be held to account, Your Honor.

16      I have nothing further.

17          THE COURT:  All right.  Thank you.  Respondents?

18          CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

19          MR. SBAITI:  Your Honor, the fact that we're here on

20  a motion for leave, and the motion for leave is what they're

21  saying is pursuing a claim under the Court's order, and then

22  you hear that the mere act of investigating a claim against

23  Mr. Seery is also pursuing a claim, this goes to the infinite

24  regression problem with this word pursue the way they want to

25  construe it, Your Honor.  Asking for permission is not

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 232
Case 3:23-cv-00726-S Document 8-24 Filed 05/29/23 Page 443 of 1598 PageID 13490

231

1  pursuing a claim and can't be the definition of pursuing a

2  claim because it's not doing anything other than asking for

3  permission.

4      We didn't file a suit.  We didn't commence a suit.  I

5  think that's established.  We did not pursue a claim.  Mr.

6  Morris ignores, I think, the very commonsensical aspect that

7  we put out in the opening, which is that the reason pursue --

8  and sometimes the language in these types of orders is,

9  instead of pursue, it's maintain -- but the reason that word

10 is there is because sometimes the case has already been

11 started when the order is entered.  And so to pursue a claim,

12 *i.e.*, one that's already been filed as of the date of the

13 order, that would be lost if the commencement of that claim

14 hadn't happened until after the -- until the -- if the

15 commencement happened before the order was filed.  That's the

16 --

17          THE COURT:  Okay.  So are you saying it's a

18 sequential thing?

19          MR. SBAITI:  I'm not sure I understood your question,

20 Your Honor.  I'm sorry.

21          THE COURT:  Well, I'm trying to understand what it is

22 you're saying about how pursue should be interpreted.

23          MR. SBAITI:  Sure.

24          THE COURT:  I think you're saying you have to -- you

25 can either have -- well, we've got a prohibition on commencing

232

1  an action.

2          MR. SBAITI:  Yes.

3          THE COURT:  And then the separate word pursue, I

4  think you're saying that must refer to you already have an

5  action that's been commenced and you're continuing on with it.

6  Is that what you're saying?

7          MR. SBAITI:  Yes, Your Honor.

8          THE COURT:  Then why not use the word continue?

9          MR. SBAITI:  Well, Your Honor, the choice of --

10         THE COURT:  Kind of like 362(a) of the Bankruptcy

11  Code, you know, is worded.

12         MR. SBAITI:  Well, Your Honor, the choice of the

13  wording of pursue at that point, Your Honor, I believe ends up

14  being ambiguous, because by filing the motion here that would

15  be pursuing a claim under that definition.  So before I got

16  permission to pursue a claim, I've got to pursue a claim.

17  That's the problem that they have with the words that they're

18  trying to get you to adopt, or the meaning of the words

19  they're trying to get you to adopt.

20     If I came to this Court and said, Judge, I need

21  permission, I need leave to file suit against Mr. Seery, and

22  then the question is, well, you're not allowed to seek leave

23  because that's pursuing the claim, it's infinitely regressive.

24  And in fact, his closing argument just proved how it's

25  infinitely regressive.

233

1          THE COURT:  Okay.  Let me -- I'm not following this

2     infinitely regressive or whatever the term was.

3          MR. SBAITI:  Yes.

4          THE COURT:  Just answer this very direct question.

5     Why did you not file a motion for leave in the Bankruptcy

6     Court?  That would have clearly, clearly complied with the

7     July order.

8          MR. SBAITI:  Your Honor, I believe we explained this

9     in the opening.  I took a stab at it.  Mr. Bridges took a stab

10    at it.  We did not believe coming here and asking for leave

11    and asking for -- for Your Honor to do what we don't believe

12    Your Honor can do, would effectuate an estoppel or a waiver,

13    which we didn't think was in the best interest of our client

14    to have.  Your Honor, this happens -- I don't believe this is

15    the --

16         THE COURT:  Okay.  Connect the dots.  Make that clear

17    as clear can be for me.  You file a motion for leave --

18         MR. SBAITI:  Yes.

19         THE COURT:  -- to file this District Court action

20    against the Debtor and Seery, and if I say yes, everything is

21    fine and dandy from your perspective.  If I say no, tell me

22    again what your estoppel argument is.

23         MR. SBAITI:  Your Honor, the key question is whether

24    us putting the Court's ability to decide colorability and the

25    Court's gatekeeper functions, for us to invoke those functions

Case 19-34054-sgj11  Doc 3445-52  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 235
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23    Page 446 of 1598  PageID 13493

234

 1   concerned us because there's case law that says that that

 2   effectuates an estoppel.  And so we don't get our chance in

 3   front of an Article III judge to make that in the first

 4   instance.

 5          THE COURT:  Okay.  Tell me what cases you're talking

 6   about and the exact context of those cases.

 7          MR. SBAITI:  Your Honor, I would have to defer to my

 8   partner on this one, Your Honor.

 9          THE COURT:  Okay.

10          MR. SBAITI:  So, --

11          THE COURT:  Because I'm just letting you know --

12          MR. SBAITI:  Yes.

13          THE COURT:  -- I am at a complete loss.  I'm at a

14   complete loss understanding what you're saying.  I am.

15          MR. SBAITI:  Well, Your Honor, the --

16          THE COURT:  I don't understand.  If you have followed

17   the order to the letter and I tell you no, --

18          MR. SBAITI:  Then --

19          THE COURT:  -- what, you're saying you were worried

20   you'd be estopped from appealing my order to the District

21   Court and saying abuse of discretion or invalid order in the

22   first place?  You'd be estopped from taking an appeal?

23          MR. SBAITI:  No, Your Honor.  We wouldn't be estopped

24   from taking an appeal.

25          THE COURT:  Then why didn't you follow the letter of

235

1   the order?

2           MR. SBAITI:  For one thing, Your Honor, asking the

3   District Court made sense to us, given the order and given our

4   understanding of the law.  Certainly, we had other options, as

5   Your Honor is pointing out.  We could have come here.  Our

6   read of the law, our understanding of what we were doing, made

7   it -- put us in, like I said, put us in the sort of

8   jurisdictional and paradoxical position.

9           THE COURT:  This is your chance to tell me exactly

10  which law you think applies here.  What case?  What statute?

11          MR. SBAITI:  Your Honor, like I said, I don't have

12  those at the moment.

13          THE COURT:  Why not?  Your whole argument rides on

14  this, apparently.

15          MR. SBAITI:  Well, Your Honor, I don't know that our

16  whole argument rides on that.

17          THE COURT:  Okay.

18          MR. SBAITI:  I mean, our argument rides on we don't

19  think we violated the letter of the order.  I think that's

20  really what I'm -- what we're here to say, is that we didn't

21  commence a lawsuit and we didn't pursue a claim by filing for

22  leave in the District Court, just like filing for leave in

23  this Court would not be pursuing a claim.  It would be filing

24  for leave.

25          THE COURT:  I agree.  Filing a motion for leave in

Case 19-34054-sgj11   Doc 3445-52   Filed 08/15/22   Entered 08/15/22 16:45:41   Page 237
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 448 of 1598   PageID 13495

236

1   this Court would be exactly what the order contemplated.

2          MR. SBAITI:  I understand, Your Honor.

3          THE COURT:  What you did is not exactly what the

4   order contemplated.

5          MR. SBAITI:  Your Honor, but we're -- we're moving

6   back and forth between two concepts.  One, your question is

7   why didn't we file for leave?

8          THE COURT:  Uh-huh.

9          MR. SBAITI:  And the answer to that, I've tried to

10   explain.  And if we -- if you'd like us to bring up the case

11   law or to give you a better articulation of our concern, I'm

12   happy to defer to my partner.

13      What I'm really here to say, Your Honor, is a very simple

14   point, though.  Just because we didn't file for leave here and

15   we filed for leave in the District Court doesn't mean we

16   violated your order, and that's the point I'm trying to make,

17   Your Honor.  And I think that's the simplest point I can make.

18   Asking the Article III judge for leave to amend, for leave to

19   amend to add Mr. Seery, doesn't violate, facially, at least as

20   we read it, Your Honor's order.  It's not commencing a suit

21   and it's not -- it's not pursuing a claim against him.  It's

22   all preliminary to pursuing a claim against him, because a

23   claim hasn't even been filed.

24      The judge could have -- the judge could have -- the

25   District Court could have denied it, the District Court could

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 238
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 449 of 1598 PageID 13496

237

1  have referred it down here, the District Court could have

2  decided part of it and then asked Your Honor to rule on some

3  portion of it.  There are innumerable ways that could have

4  gone.  That fork -- those forks in the road is precisely why

5  we say this is not pursuing the claim.  Otherwise, where does

6  it stop?

7       Does pursuing a claim happen just when we file the motion

8  for leave?  Why didn't it happen when we started the

9  investigation?  If pursuing a claim means having the intent

10  and taking steps towards eventually filing a lawsuit, that's

11  the point that I'm making that it is infinitely regressive,

12  and that's exactly what Mr. Morris argued to you.

13       He said Mr. Dondero, by merely speaking to me, is pursuing

14  a claim and that violates your order.  Speaking to me.  Even

15  if we had never filed it.  Speaking is pursuing a claim.

16            THE COURT:  I don't agree with that, for what it's

17  worth.

18            MR. SBAITI:  Okay.  But that was his argument.  I'm

19  just responding to it.

20            THE COURT:  Okay.

21            MR. SBAITI:  And if that's not pursuing a claim,

22  filing a motion for leave likewise wouldn't be pursuing a

23  claim.  I understand it's an official act in a court, but we

24  did it in a Court that is an adjutant to this Court.  This

25  Court is an adjutant to that Court.  It's the Court with

238

1    original jurisdiction over the matter.  So we didn't go to New

2    York.  We didn't go to the state court in New York where I

3    learned Mr. Seery lives.  We came to the Northern District of

4    Texas, understanding that this Court and this Court's orders

5    had to be -- had to be addressed.  And that's the very first

6    thing we did.  We asked the Court to address it.

7        That judge could either decide to send it down here, which

8    is normally what I think -- what we understood would happen.

9    So it's not like we were avoiding it.  But we wanted to invoke

10   the jurisdiction which we, as the Plaintiff, we believe we had

11   the right to invoke.  We're allowed to choose our forum.  So

12   that's the forum we chose for the primary case, which there's

13   not a problem, no one's raised an issue with us filing the

14   underlying lawsuit.

15       Adding Mr. Seery to that lawsuit and filing a motion for

16   leave in the same court where we actually had the lawsuit,

17   knowing that it might get -- that might get decided or

18   referred in some way, doesn't strike me as being anything

19   improper, because he didn't get sued and we don't know what

20   Judge Boyle would have said had the motion gone forward.  And

21   for them to speculate and to say that, well, this is exactly

22   the type of thing you have to protect against, I completely

23   disagree.

24       The case law that they cited for you on these -- on most

25   of these orders really do discuss the fact that you have

1   somebody who is actually protecting the underlying property of

2   the Debtor.  This claim comes from a complete third party that

3   Mr. Seery himself has admitted under oath he owes a fiduciary

4   duty to.  Two third parties.  One is an investor of a fund

5   that he manages, and one to a fund that the Debtor, with Mr.

6   Seery as the head of it, was an advisor for up until recently.

7        Those fiduciary duties exist.  We felt like there was a

8   valid claim to be brought against Mr. Seery.  And the only

9   reason -- and he says this like it's a negative; I view it as

10  a positive -- the reason he wasn't named is because of Your

11  Honor's orders.  And so we asked a Court, the Court with

12  general jurisdiction, to address it for us or to tell us what

13  to do.  And I don't see how that is a violation of this

14  Court's order, nor is it contemptuous of this Court's order.

15       If every time one of these issues came up it was a

16  contempt of the court that appointed a trustee, we'd see a lot

17  more contempt orders.

18       Interestingly, the cases that were thrown out to you in

19  the opening argument by the other side, for example, *Villages*

20  [sic] *v. Schmidt*, was a trustee case, but not one that

21  involved a sanction.  And the trustee case specifically in

22  that case held that the Barton Doctrine didn't have an

23  exception for *Stern* cases, whereas the cases we cited to you,

24  *Anderson*, for example, in the Fifth Circuit, which is 520 F.2d

25  1027, expressly held that Section 959 is an exception to the

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 241
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 452 of 1598 PageID 13499

240

1  Barton Doctrine.

2      And my partner, Mr. Bridges, can walk through the issues

3  that we had on the enforceability of the order, but all -- to

4  me, all of that is sort of a secondary issue because, *prima*

5  *facie*, we didn't violate this order.  I understand it may

6  irritate the Debtor and may raise questions about why the

7  motion wasn't filed here versus the District Court.  But it

8  was a motion for leave.  In order to sanction us, Your Honor

9  would have to find that asking for permission is sanctionable

10 conduct in the gatekeeper order.  Even if we ask the wrong

11 court.  Simply asking the wrong court is sanctionable, not

12 knowing what that court would have done, not knowing what that

13 court's mindset was, not even having the benefit of the

14 argument.  And that's, I guess, where this bottom -- the

15 bottom line is for me.

16      The evidence that they put on for you, Your Honor.

17 Everything you heard was evidence in the negative.  You know,

18 they talk about the transition from Mr. Dondero to Mr. Scott

19 and Mr. Scott to Mr. Patrick, but if you actually look at the

20 evidence he wants you to see and he wants you to rule on, it's

21 the evidence that wasn't there.  It's the evidence that Mr.

22 Dondero had no control.  In fact, I believe that was the basis

23 he argued for why there should be no privilege.  And all he

24 said is that he was promoting it.

25      But the fact of the matter is, like I said, all of that is

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 242
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 453 of 1598 PageID 13500

241

```
 1    secondary to the core issue that we didn't violate the order.

 2    We didn't take steps to violate the order.  We took steps to

 3    try to not violate the order.  And they want you to punish us

 4    to send a message.  Even used words like the Court needs to

 5    enforce its own orders.  And he did that as a transition away

 6    from the idea that there were no damages, Your Honor, and I

 7    think that has implications.

 8        And then he said you have to enforce a meaningful penalty.

 9    Well, Your Honor, I don't think that is the purpose of these

10    sanctions.  These sanctions are supposed to be remedial,

11    according to the case law, according to the case law that they

12    cite.  So a meaningful --

13            THE COURT:  Coercive or remedial.

14            MR. SBAITI:  Sorry?

15            THE COURT:  Coercive or remedial.  Civil contempt.

16            MR. SBAITI:  Sure, Your Honor.  But usually coercive

17    sanctions require someone to do something or they are

18    sanctioned until they do it.

19            THE COURT:  Coerced compliance.  Coerced compliance

20    --

21            MR. SBAITI:  Yes.

22            THE COURT:  -- with an existing order.

23            MR. SBAITI:  Yes.

24            THE COURT:  Uh-huh.

25            MR. SBAITI:  The last thing, he says you have to
```

242

1   protect the estate of the fiduciary and his expectation -- I

2   believe he's talking about Mr. Seery -- his expectation that

3   the Court would be the gatekeeper. And Your Honor, that

4   argument rings a little bit hollow here, given that what

5   they're really saying is that we should have come here first

6   and asked for permission. But that insinuates that, by coming

7   here, the case is dead on arrival, which I don't think is the

8   right argument.

9       I think the issue for us has been, who do we have to ask

10  and who can we ask to deal with the Court's gatekeeper order?

11  I believe we chose a court, a proper court, a court with

12  jurisdiction, to hear the issue and decide the issue. Your

13  Court's -- Your Honor's indication of the jurisdiction of this

14  Court we believed invoked the District Court's jurisdiction at

15  the same time.

16      And so the last thing is he said -- the last thing, and

17  getting back to the core issue, is Mr. Morris wants you to

18  believe that we intended to violate the order, and now, as an

19  afterthought, we're using linguistic gymnastics to get around

20  all of that. But it's not linguistic gymnastics. Linguistic

21  gymnastics is saying that pursue means doing anything in

22  pursuit of a claim. That's a little -- I believe that's

23  almost a direct quote. They're chasing the man. Well, that's

24  the infinite regression that I talked about, Your Honor, that

25  it's going to be impossible in any principled way to reconcile

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 244
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 455 of 1598 PageID 13502

243

1   Mr. Morris's or the Debtor's definition of pursue with any

2   logical, reasonable limitation that is readable into the

3   order, Your Honor.

4       And I'm going to defer to my partner, Mr. Bridges -- oh,

5   go ahead.

6           THE COURT:  I'm going to stop you.  I mean, we have

7   the linguistic argument.  But how do you respond to this?

8           MR. SBAITI:  Sure.

9           THE COURT:  What if I tell you, in my gut, this

10  appears to be an end run?  An end run.  I mean, I'm stating

11  something that should be obvious, right?  An end run around

12  this Court.  This Court spent hours, probably, reading a

13  motion to compromise issues with HarbourVest, issues between

14  the Debtor and HarbourVest.  I had objections.  An objection

15  from CLO Holdco that was very document-oriented, as I recall.

16  Right of first refusal.  HarbourVest can't transfer its 49.98

17  percent interest in HCLOF, right?  Talk about alphabet soup.

18  We definitely have it.

19          MR. SBAITI:  Yes.

20          THE COURT:  Without giving CLO Holdco the first right

21  to buy those assets.  Read pleadings.  Law clerk and I stay up

22  late.  And then, you know, we get to the hearing and there's

23  the withdrawal -- we heard a little bit about that today --

24  withdrawal of the objection.  We kind of confirmed that two or

25  three different ways on the record.  And then I remember going

244

```
1    to Mr. Draper, who represents the Dugaboy and Get Good Trusts.
2    You know, are you challenging the legal propriety of doing
3    this?  And he backed off any objection.
4        So the Court ended up having a hearing where we went
5    through what I would call the standard 9019 prove-up, where we
6    looked at was it in the best interest, was it fair and
7    equitable given all the risks, rewards, dah, dah, dah, dah.
8    You know, HarbourVest had initially, you know, started at a
9    $300 million proof of claim, eye-popping, but this all put to
10   bed a very complicated claim.
11             MR. SBAITI:  Yeah.
12             THE COURT:  Tell me something that would make me feel
13   better about what is, in my core, in my gut, that this is just
14   a big, giant end run around the Bankruptcy Court approval of
15   the HarbourVest settlement, which is not on appeal, right?
16   There are a gazillion appeals in this case, but I don't think
17   the HarbourVest --
18             A VOICE:  It is on -- it is on appeal, Your Honor.
19             THE COURT:  Is it?  Oh, it is on appeal?  Okay.  So I
20   may be told --
21             MR. SBAITI:  I didn't know.
22             THE COURT:  I may be told, gosh, you got it wrong,
23   Judge.  You know, that happens sometimes.
24       So, this feels like an end run.  You know, the appeal is
25   either going to prevail or not.  If it's successful, then, you
```

245

1   know, do you really need this lawsuit?  You know, I don't --

2   okay.  Your chance.

3           MR. SBAITI:  Thank you, Your Honor.

4           THE COURT:  Uh-huh.

5           MS. SBAITI:  Your Honor, this wouldn't be the first

6   case where finality or where there was a settlement -- I'm not

7   familiar as well with bankruptcy, but certainly in litigation

8   -- where the settlement then reveals -- well, after a

9   settlement is done, after everyone thinks it's done, some new

10  facts come to light that change people's views about what

11  happened before the settlement or before the resolution.  And

12  that's what happened here, Your Honor.  This is what we've

13  pled.  And this is what we understand.

14      There were the instances of Mr. Seery's testimony where he

15  testified to the value of the HarbourVest assets.  I believe,

16  as I recall, he testified in I believe it's the approval

17  hearing that Your Honor is talking about that the settlement

18  gave HarbourVest a certain amount of claims of I think it's,

19  Series 8 and then Series 9 claims, and that those were

20  discounted to a certain dollar value that he quantified as

21  about $30, $31 million.  And the way he ratified and justified

22  the actual settlement value, the actual money or value he was

23  conferring on HarbourVest, given the critique of HarbourVest

24  claims that he was settling, is he explained it this way.  He

25  said $22-1/2 million of this whole pot that I'm giving them

246

 1    pays for the HarbourVest -- HarbourVest's interests in HCLOF

 2    -- it's alphabet soup again -- and Highland CLO Funding,

 3    Limited.  And so it's the other $9 million that's really

 4    settling their claims.  And given the amount of expense it's

 5    going to take, so on and so forth, $9 million seems like a

 6    reasonable amount to settle them with, especially since we're

 7    just giving them claims.

 8        So that $22-1/2 million everyone apparently took to the

 9    bank as being the value, including CLO Holdco at the time,

10    because they didn't have the underlying valuations.  Highland

11    was supposed to give the updated valuations.

12        So, fast-forward a couple of months -- and this is what

13    we've played in our lawsuit, Your Honor; this is why I don't

14    think it's an end run -- we pled in our lawsuit just a couple

15    months later Highland -- I believe some of the people that

16    worked at Highland started leaving, according to some

17    mechanisms that I saw where Highland didn't want to keep all

18    the staff and so the staff was migrated to other places.  And

19    one of those gentlemen, I believe Mr. Dondero referred to him

20    as a gentleman named Hunter Covitz, and Hunter Covitz, who's

21    also an investor in HCLOF, he owns a small piece of HCLOF, he

22    had the data, he had some of the information that showed that,

23    actually, in January, when Mr. Seery said that the HarbourVest

24    settlement was worth 22 -- excuse me, the HarbourVest

25    interests in HCLOF were worth $22-1/2 million, that they're

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 248
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 459 of 1598 PageID 13506

247

1    actually worth upwards of $45 million.

2        And so that information, Your Honor, we believe gives us a

3    different -- a different take on what happened and what was

4    supposed to happen.  This is strictly about the lack of

5    transparency.

6            THE COURT:  Okay.  Assuming --

7            MR. SBAITI:  Yeah.

8            THE COURT:  -- I buy into your argument that this is

9    newly-discovered evidence --

10            MR. SBAITI:  Yes.

11            THE COURT:  -- CLO Holdco would not have had reason

12    to know -- I guess that's what you're saying, right?

13            MR. SBAITI:  I'm saying they -- they didn't know.

14            THE COURT:  That they didn't know.

15            MR. SBAITI:  Uh-huh.

16            THE COURT:  And didn't have reason to know.  I'm

17    trying to figure out who's damaged here.

18            MR. SBAITI:  Well, CLO Holdco, my client, is damaged,

19    Your Honor.

20            THE COURT:  How?

21            MR. SBAITI:  Because one of the aspects of the -- of

22    Highland, one of the issues under, excuse me, of Highland's

23    advisory, is that it has a fiduciary duty.  And that fiduciary

24    duty, at least here, entails two, if not, three prongs.  The

25    first prong is they have to be transparent.  You can't say --

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 249
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 460 of 1598 PageID 13507

248

 1          THE COURT:  How is -- you know, I know a lot about

 2    fiduciary duties, believe it or not.  How is CLO Holdco harmed

 3    and the DAF harmed?

 4          MR. SBAITI:  Because, Your Honor, they lost out on an

 5    investment opportunity to buy the piece of -- the HarbourVest

 6    piece.  They would have been able to go out and raise the

 7    money.  They had the opportunity --

 8          THE COURT:  Okay.

 9          MR. SBAITI:  They would have had the opportunity to

10    make a different argument.

11          THE COURT:  What you're saying, you're saying, if

12    they had known what they didn't have reason to know, that it

13    was worth, let's say, $45 million, that they would have gone

14    out and raised money and said, oh, we do want to exercise this

15    right of first refusal that we decided we didn't have and gave

16    in on, we're going to press the issue and then outbid the $22

17    million, because we know it's worth more?  Is that where

18    you're going? I'm trying to figure out where the heck you're

19    going, to be honest.

20          MR. SBAITI:  That's -- Your Honor, I'd push back on a

21    little of the phrasing, only because the way these duties --

22    the way we understand the SEC's duties work when you're an

23    investment advisor is you have a transparency obligation and

24    an obligation --

25          THE COURT:  Yes.  Yes.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 250
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 Page 461 of 1598 PageID 13508

249

1        MR. SBAITI: -- not to divert these. So, yes, CLO

2   Holdco would have at least had the opportunity and been

3   offered the opportunity, which it could have taken advantage

4   of, to, if the assets were really on the block for $22-1/2

5   million, they should have been able to buy their percentage

6   pro rata share of that $22-1/2 million deal. I mean, in a

7   nutshell, that's -- that's where we believe we've been harmed.

8   And we believe that the obfuscation of those values and, to a

9   certain extent, the misrepresentation of those values in the

10  settlement is not cleansable by the argument, well, you should

11  have asked.

12       Well, you should have asked is fine in normal litigation,

13  but when the person you should have asked actually owes you a

14  positive duty to inform, we believe that the should-have-asked

15  piece doesn't really apply and there's -- and that's, that's

16  the basis of our case.

17       So it's not an end run around the settlement, Your Honor.

18  I think I opened with we're not trying to undo the settlement.

19  We're not saying HarbourVest has to take its interest back.

20  We're not saying the settlement has to go on. We're not even

21  saying any of the things that happened in Bankruptcy Court

22  need to change. But Section 959 is pretty clear that this is

23  management of third-party property --

24       THE COURT: I guess -- okay. Again, rabbit trail,

25  maybe. But CLO Holdco still owns its same 49.02 percent

1   interest that it did before this transaction.  So if there's

2   value galore in HCLOF, it still has its 49.02 percent

3   interest.  What am I missing?

4           MR. SBAITI:  Oh, I think Your Honor's assuming that

5   HCLOF bought the piece back from HarbourVest.  It didn't.

6           THE COURT:  No, I'm not.

7           MR. SBAITI:  Oh.

8           THE COURT:  I'm not assuming that.

9           MR. SBAITI:  Well, --

10          THE COURT:  I know that now the Debtor has, what,

11  fifty point, you know, five percent of HCLOF, whereas it only

12  had, you know, a fraction.

13          MR. SBAITI:  Point six-ish.  Yeah.

14          THE COURT:  Point six-ish, and HarbourVest had 49.98.

15          MR. SBAITI:  Right.

16          THE COURT:  So, again, please educate me.  I'm really

17  trying to figure out how this lawsuit isn't just some crazy

18  end run around a settlement I approved.  And moreover, what's

19  the damages?

20          MR. SBAITI:  Well, Your Honor, --

21          THE COURT:  What's the damages?  CLO Holdco still has

22  its 49.02 percent interest in HCLOF.

23          MR. SBAITI:  Your Honor, again, --

24          THE COURT:  What am I missing?  I must be missing

25  something.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 252
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 463 of 1598   PageID 13510
of 292

251

```
 1              MR. SBAITI:  I think so, Your Honor.

 2              THE COURT:  What?

 3              MR. SBAITI:  The damages is the lost opportunity, the

 4    lost opportunity to own more of HCLOF.

 5              THE COURT:  Oh, it could have owned the whole darn

 6    thing?

 7              MR. SBAITI:  I could have owned 90 -- whatever 49

 8    plus 49.98, 98.98 percent.

 9              THE COURT:  But --

10              MS. SBAITI:  Or some pro rata portion.

11              THE COURT:  But Mr. Seery had some information that

12    you think he was holding back from CLO Holdco that CLO Holdco

13    had no reason to know?

14              MR. SBAITI:  Yes, Your Honor.  The -- the -- what he

15    testified to that the value of those assets, excuse me, the

16    value of the HarbourVest interests in HCLOF or its share of

17    the underlying assets being $22-1/2 million was either, one,

18    intentionally obfuscated, or, two, and I don't think this

19    excuses it at all, he simply used ancient data and simply

20    never updated himself, not for the Court and not for any

21    representations to the investors, who he himself testified

22    under oath in this Court that he has a fiduciary duty to under

23    the Investment Advisers Act.

24              THE COURT:  This could get very --

25              MR. SBAITI:  So that's injury to my client, Your
```

1   Honor.

2          THE COURT:  This could get really dangerous.  Maybe

3   --

4          MR. SBAITI:  I'm sorry.

5          THE COURT:  This could get really dangerous.  Maybe I

6   should cut off where I'm going on this.

7          MR. SBAITI:  Okay.

8          THE COURT:  Of course, someone dangled it out there

9   in a pleading.  You know where I'm going, right?

10         MR. SBAITI:  I'm not sure I do, Your Honor.

11         THE COURT:  Hmm.  I do read the newspaper, but

12  someone put it in a pleading.  HCLOF owns MGM stock, right?

13  Is that what this is all about?  Is that what this is all

14  about?  Or shall we not do this on the record?

15         MR. SBAITI:  Well, Your Honor, this has nothing -- I

16  don't -- I don't think this has anything to do with the MGM

17  stock one way or the other.

18         THE COURT:  You don't?  OH?

19         MR. SBAITI:  Your Honor, my charge as a counsel for

20  the DAF is pretty straightforward.  We looked at the claims.

21  We looked at the newly-discovered information.  We talked to

22  the people who had it, Your Honor.  That was our

23  investigation.  We put together a complaint.  We believed that

24  we had a good basis to file suit, despite Your Honor's -- the

25  settlement approval.  We expressly, because we understand how

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 254
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 465 of 1598   PageID 13512

253

1    finality is so critical in a bankruptcy context, we expressly

2    didn't ask for rescission.  We expressly didn't ask for

3    anything that would undo the settlement.

4        Asking for damages because of how the settlement happened,

5    through no fault of the Court's, of course, but asking for

6    damages is not, at least not as I see it, an end run around

7    the Court's settlement, and it's a legitimate claim.  And I

8    don't think this is far from the first time that new evidence

9    has come up that's allowed someone to question how something

10   was done that actually -- that actually damaged them.

11           THE COURT:  Usually, they come in for a motion to

12   reopen evidence to the court who issued the order approving

13   the settlement.

14           MR. SBAITI:  Well, Your Honor, I mean, that's --

15           THE COURT:  Newly-discovered evidence.

16           MR. SBAITI:  That would be the case in a final

17   judgment, Your Honor.  But, you know, our understanding of the

18   way the settlement worked was that that was not necessarily

19   going to be -- not the direction anybody wanted to go, but

20   seeking damages on a straight claim for damages, which we're

21   allowed to seek, which I think is our prerogative to seek, we

22   went that direction.

23           THE COURT:  Okay.  Okay.

24           MR. SBAITI:  But this --

25           THE COURT:  My last question.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 255
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 466 of 1598 PageID 13513

254

 1          MR. SBAITI:  Yes, Your Honor.

 2          THE COURT:  Again, I have to know.  You have filed

 3   some sort of pleading to reopen litigation against Acis in New

 4   York?  I'm only asking this because it's part of what's going

 5   on here.  What is going on here?

 6          MR. SBAITI:  Your Honor, that's a -- that's a

 7   separate lawsuit, and it's not to reopen litigation against

 8   Acis.  It deals with post-plan confirmation mismanagement by

 9   Acis.

10          THE COURT:  Oh, okay.  Okay.

11          MR. SBAITI:  Yeah.

12          THE COURT:  All right.

13          MR. SBAITI:  But I believe there's a motion in front

14   of Your Honor, just to -- that gave notice that the suit was

15   filed, but I believe Mr. -- well, a bankruptcy lawyer filed

16   it.  I don't know.

17          THE COURT:  A motion or a notice?  I don't know.

18          MR. SBAITI:  I don't know, Your Honor.  That's above

19   my paygrade.

20          THE COURT:  I have not seen it.  Okay?

21          MR. SBAITI:  Okay.

22          THE COURT:  Maybe it's there, but no one has called

23   it to my attention.

24          MR. SBAITI:  With the Court's permission, I'm going

25   to yield time to Mr. Bridges.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 256
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 467 of 1598 PageID 13514

255

1          THE COURT:  Okay.  Mr. Bridges?

2          CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

3          MR. BRIDGES:  Thank you, Your Honor.  I'm grateful

4    that you asked most of those questions to Mr. Sbaiti.  I would

5    not have been able to answer them.  The one I can answer is

6    the one about judicial estoppel.  Apparently, I did a pretty

7    lousy job earlier.  I think I'm prepared to do a better job

8    now.

9        The case law I'd like to refer you to is the Texas Supreme

10   Court's 2009 decision in *Ferguson v. Building Materials*, 295

11   S.W.3d 642.  And this was my concern and my issue, perhaps

12   because I used to teach it and so it was at the front of my

13   mind.  But contrary to what you would think and what you said

14   earlier, it's not your ruling against us that would create a

15   judicial estoppel problem.  It's if you ruled in our favor.

16   And I know that seems weird.  Let me explain.

17       The two things that have to take place for there to be

18   judicial estoppel are, first, successfully maintaining a

19   position in one proceeding, and then taking an inconsistent

20   position in another.  And Your Honor, what we talked about

21   earlier is the notion that your July order forecloses the key

22   claim that Mr. Sbaiti was just describing, that Mr. Seery

23   should have known.  Not that he was grossly negligent or did

24   intentional wrong, but that he breached fiduciary duties

25   because he should have known and should have disclosed.

256

```
 1        And if your order forecloses that and we come and convince

 2   you that we nonetheless have colorable claims, colorable

 3   claims of gross negligence or willful wrongdoing, that we

 4   ultimately are unable to prove, our lawsuit could fail, even

 5   though we had proved -- in the lawsuit we had proved he should

 6   have known and that he breached fiduciary duties, but we would

 7   be estopped, having succeeded from coming here and asking in

 8   compliance with the order and its colorability rule, that we

 9   would be estopped from then saying that this Court lacked the

10   authority to have issued that order in the first place, to

11   have released the claim on the mere breach of fiduciary duty

12   or ordinary negligence.  That's the inconsistency that I was

13   concerned about.

14        By coming here rather than trying to make our objection

15   and our position known without submitting to the foreclosure

16   of that claim that is, in many ways, the most important, the

17   headliner from our District Court complaint, is the concern,

18   Your Honor.  And frankly, if Your Honor's order does foreclose

19   that, then we're in serious trouble.  That's the claim that

20   we're trying to preserve.

21        But Your Honor, I don't think it was in anyone's

22   contemplation in July of 2000 that what that order would do is

23   terminate -- 2020; sorry, Your Honor -- in July of 2020, that

24   that order would terminate future claims that might arise

25   based on future conduct that had not yet happened in Mr.
```

257

1   Seery's role.  Not in his role as a manager of the Debtor's

2   property, but in his role as a registered investment advisor

3   on behalf of his clients and their property.  And that is the

4   concern that the judicial estoppel argument is about.

5           THE COURT:  I still don't understand.  I'm very well

6   aware of judicial estoppel, the old expression, you can't play

7   fast and loose with the court.  Take one position in one

8   court, you're successful, and then take another position in

9   another court.  That's the concept.

10          MR. BRIDGES:  Coming here --

11          THE COURT:  How is this judicial estoppel if you had

12  done what I think the order required and asked this Court for

13  leave?  What -- and I said fine, you have leave.  Where's the

14  judicial estoppel problem?

15          MR. BRIDGES:  If you say fine, you have leave, but

16  that leave is only, as the order states, because we have

17  colorable claims of gross negligence, colorable claims of

18  intentional wrongdoing, what happens to our mere negligence

19  and mere breach of fiduciary duty claims?  Are they

20  foreclosed?  The order on its face --

21          THE COURT:  Well, I would interpret the order to be

22  yes, and then you could appeal me, and the Court would either

23  say it's too late to appeal that because you didn't appeal it

24  in July 2020, or fine, I'll hear your appeal.  Where's the

25  estoppel?

258

1          MR. BRIDGES:  Your Honor, our claims that this Court
2    lacks the authority either to have made that order in the
3    first place or the jurisdiction to rule on colorability now
4    because of Section -- the mandatory abstention provision,
5    whose section number I've now lost.  That if we come to you
6    and ask you to rule on those things, have we not thereby
7    waived on appeal our claim that you couldn't rule in the first
8    place on those things?
9        That is what our motion for leave in the District Court
10   argues, is that there's -- there are jurisdictional
11   shortcomings with your ability to decide what we're asking
12   that Court to decide.  And Your Honor, by coming here first
13   and then appealing, that's what we fear we would have lost.
14   And instead of coming here and appealing, what we -- what we
15   would have done, in the alternative, I guess, would be to come
16   here and ask you not to rule but move to withdraw the
17   reference of our own motion.
18       That two-step, filing here and filing a motion to withdraw
19   the reference on the thing we filed here, we didn't think was
20   required, nor could we find any case law or rule saying that
21   that was appropriate.
22          THE COURT:  Okay.
23          MR. BRIDGES:  These are not games, Your Honor.  We
24   were not trying to play games.  We aren't bankruptcy court
25   lawyers.  We're not regularly in front of the Bankruptcy

 1    Court.  So the notion why didn't we come here first isn't

 2    exactly at the top of our mind.  The question for trial

 3    lawyers typically is, where can we file this, what are the

 4    permissible venues, not why don't we come to Bankruptcy Court?

 5    Especially when your order appears to say that causes of

 6    action that don't rise to the level of gross negligence or

 7    intentional wrongdoing are already foreclosed.

 8        Your Honor, the January order, I think I have to just

 9    briefly address again, even though I don't understand why it

10    makes a difference.  Apparently, counsel thinks it makes a

11    difference because Mr. Dondero apparently supported it in some

12    way.  Our position is, for whatever difference it makes, the

13    January versus the July, we don't believe there's anything in

14    the District Court complaint putting at issue Mr. Seery's role

15    as a director, so we don't understand how that order is

16    implicated.

17        Again, I'm not sure that matters at all.  I'm not raising

18    it as a defense.  I'm just telling Your Honor this is all

19    about the July order, from our perspective.  Certainly, the

20    July order puts his role as a CEO -- certainly, the District

21    Court case puts his role as a CEO at issue, and that's what

22    the July order is about.

23        Your Honor, the *Applewood* case requires specifics in order

24    to terminate our rights to sue and to bring certain causes of

25    action, and without that kind of specificity, Your Honor, we

1    believe that that order fails to preclude, fails to have

2    preclusive effect as to these later-arising claims.  And we

3    would submit not only that it was not contemplated, but that

4    it was not intended to have that effect, and that even Mr.

5    Seery's testimony suggests that that's not how he understood

6    that order to be effective.

7         Counsel argued that the Barton Doctrine does apply here

8    and rattled off the names of cases that don't -- to my

9    knowledge, no case, no case that I can find deals with this

10   type of deferential order where someone is asked -- where a

11   court is asked to defer to the business judgment of an entity

12   in approving an appointment, and nonetheless deciding that the

13   Barton Doctrine applies.  That's not what *Villegas* holds.

14   That's not what *Espinosa* holds.  I don't think *Barton* is

15   applicable in a situation like that.  Certainly, it's outside

16   of the context of what *Barton* anticipated itself over a

17   century ago when it was decided.

18        Your Honor, if we're wrong, please know we're wrong in

19   earnest.  These are not games.  These are not sneakiness.  No

20   such motivation is at issue here.  I was hopeful that that

21   would be plain from the text of the motion for leave itself.

22   If it's not, I'd offer this in addition.  The docket at the

23   District Court shows that immediately upon filing the motion

24   for leave, a proposed order was filed with it asking to have

25   the proposed complaint deemed filed, which as soon as I saw I

 1   asked us to immediately retract it and to substitute a new

 2   proposed order that does not ask for the amended complaint to

 3   be deemed filed.  That is not what we wanted.

 4       And the fear was what if our motion is granted because the

 5   District Court says you have the right, you don't even need

 6   leave, but as to the Bankruptcy Court, you're on your own,

 7   this is at your own risk, I'm not going to rule on any of the

 8   jurisdictional questions that you attempt to raise?  We did

 9   not want our complaint deemed filed for that reason.  What we

10   did want was for a court where we did not risk judicial

11   estoppel to decide whether or not our key claim under the

12   Advisers Act had been foreclosed by your July order, and that

13   was the key and motivating factor.

14       On top of that, Your Honor, instead of arguing the meaning

15   of the word pursue, let me just say this.  We understood

16   pursue in that context to refer to claims or causes of action,

17   not potential, unfiled, unasserted, contemplated claims or

18   causes of action.  That until a claim or cause of action is

19   actually asserted in some way, that it can't be pursued, and

20   that the reference here was to two kinds of action, those that

21   had not yet been commenced -- and your order foreclosed the

22   commencing of them without permission -- and those that had

23   been commenced.  And your order couldn't foreclose the

24   commencing of them because they hadn't been commenced yet, but

25   your order did foreclose pursuing them.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 263
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 474 of 1598 PageID 13521

262

1       And that was my reading of what that order said.  And it

2   fits with this notion that a claim or cause of action isn't

3   something you're considering or even researching.  It didn't

4   dawn on us that researching or talking to a client about a

5   potential claim could violate the order because in some

6   respect that conversation could be in pursuit of the claim.

7       By the same notion, we didn't think asking a court with

8   original jurisdiction according to Congress, asking a court to

9   decide whether or not we were foreclosed from bringing our

10  claims in a motion for leave was violating your order.

11      We don't have much else, Your Honor.  In terms of the need

12  to enforce compliance with your orders, if we understand them,

13  we sure as heck are going to follow them.  And if we've

14  misconstrued the term pursue, I'm certainly very sorry about

15  that.

16      I appreciate counsel saying he thinks we're probably good

17  people.  I did not think what we did was any kind of gross

18  error in judgment.  I thought that what we were doing was

19  preserving our clients' rights, going to a court of competent

20  jurisdiction, and asking the question, can we do what we think

21  we ought to be able to do, but is -- frankly, Your Honor,

22  we're a bit confused about because of the order that seems on

23  its face to foreclose the very lawsuit that we think we should

24  be bringing on behalf on this charitable organization that

25  foreclosed it months before the conduct at issue that gave

263

1  rise to the complaint.  And with that conundrum, knowing what

2  to do was not obvious or easy for the lawyers or for the

3  client who was dependent on his lawyers to give him good,

4  sound advice.

5      I'm very grateful for you giving us the time and for your

6  very pointed questions.  Thank you, Your Honor.

7              THE COURT:  Thank you.  All right.  Who's next?

8              CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

9              MR. ANDERSON:  May it please the Court, Michael

10  Anderson on behalf of Mr. Patrick, Mark Patrick.

11      You know, this is a contempt proceeding.  It's very

12  serious.  And, you know, my stomach aches for the people here.

13              THE COURT:  Mine does, too, by the way.

14              MR. ANDERSON:  It truly aches.

15              THE COURT:  Uh-huh.

16              MR. ANDERSON:  And I mean what I said when I did

17  opening, when I said we don't need a hearing, an evidentiary

18  hearing.  And I still don't believe we did, because it comes

19  down to what does the word pursue mean, because there's

20  already been an acknowledgement --

21              THE COURT:  Do you all want to withdraw all your

22  exhibits?  I've got a lot of exhibits that I now need to go

23  through.  If I admit them into evidence, I'm going to read

24  them.

25              MR. ANDERSON:  No, I understand.

264

1          THE COURT:  Uh-huh.

2          MR. ANDERSON:  But it does come down to the word

3   pursue.  Counsel has already said commence doesn't do it, and

4   so then it's pursue.

5      And I could ask Your Honor, what did you mean when you

6   said pursue in the July order, but I'm not going to say that.

7   And I asked my client on the stand, you know, did you pursue a

8   claim or cause of action?  And then it was very telling.  What

9   happened with counsel?  He stood up and objected to me even

10  asking if it was pursued.  And it dawned on me, if he's going

11  to object, does pursue have some sort of legal -- that was his

12  objection.  It was he objected on legal grounds.  Does that

13  have some sort of legal meaning?

14     This is contempt.  You can't be held in contempt unless it

15  is bright-line clear that you have deviated from a standard of

16  conduct and there's no ambiguity.  Well, clearly, there is

17  ambiguity, because over on this side of the room we say filing

18  a motion for leave can't be pursue.  We can look at the order

19  and we know it doesn't mean pursue because I just heard Your

20  Honor say you should have filed a motion for leave in this

21  Court before doing anything.  All right?  So if that -- if

22  that is what without the Bankruptcy Court first determining,

23  if that's what the motion for leave is, well, then if we go up

24  to the first sentence, No entity may commence or pursue a

25  claim or cause of action, then it has this, without the

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 266
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 477 of 1598 PageID 13524

265

1   Bankruptcy Court first determining, that means -- if pursue

2   means a motion for leave, if that's what that means, then that

3   order says you can't commence or file a motion for leave

4   before you file a motion for leave.  Because that's what it

5   means.  If pursue means motion for leave and you've said you

6   should have come here and filed a motion for leave because it

7   says, Debtor, without the Bankruptcy Court first determining

8   that notice that such claim or cause of action represents a

9   colorable claim, and specifically authorizing.  The vehicle to

10  do that would be a motion for leave, right?  And you can't

11  pursue anything until a motion for leave has been filed.

12      Now, where was the motion for leave?  And I understand,

13  Your Honor, you know, no expert at reading the room,

14  obviously, you're frustrated that the motion for leave was

15  filed in the District Court and not in this Court.  But it

16  doesn't change the fact, and neither did any of the evidence,

17  change anything, is what does pursue mean?

18      And if someone says, well, it's obviously clear it means

19  x, well, is it really obviously clear it means filing a motion

20  for leave?  Because nobody on my side, when you read it, when

21  you say pursue, can read it that way.  And if we're going to

22  have contempt sanctions being posed, and there has to be clear

23  and convincing evidence or beyond reasonable doubt, depending

24  upon, you know, I don't think you have to get to that part,

25  but clear --

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 267
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 478 of 1598 PageID 13525

266

1       THE COURT:  This is not criminal contempt.

2       MR. ANDERSON:  Clear and convincing is the civil

3  standard for contempt.

4       THE COURT:  Right.

5       MR. ANDERSON:  And if pursue is open to that much

6  interpretation, it's not the kind of thing that can be held in

7  contempt on.  And I understand the frustration.  I hear the

8  frustration.  I hear counsel talk about that was not their

9  intent when they filed it.  You know, I heard Mr. Patrick get

10  up there.  I heard counsel say, hey, Mr. Patrick's doing his

11  job, he's a good guy, seems like a good guy.  Well, Mr.

12  Patrick's up there.  Look, they filed the underlying lawsuit.

13  Nobody -- there's no motion for that in this Court about the

14  underlying lawsuit.  It's only about the motion for leave.

15  That's all we're here about.

16      And so you go to that, and we've heard all these arguments

17  about it, and we've been here almost as long as the motion for

18  leave was actually on file before it was sua sponte dismissed

19  without prejudice.

20      And so I go back to that and I say that, if pursue means

21  filing a motion for leave, then that order would require an

22  order for anyone to violate -- it would be violated upon the

23  filing of a motion for leave, because you can't pursue

24  something until the Bankruptcy Court has already first

25  determined, after notice, that such claim or cause of action

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 268
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 479 of 1598   PageID 13526

267

 1   represents a colorable claim and specifically authorizing the

 2   entity to bring such a claim.  Because that -- we already know

 3   that's a motion for leave in and of itself.  Therefore,

 4   pursue, just simply filing a motion for leave will put you in

 5   that.

 6      But that gets into all these -- we don't need to be having

 7   this discussion about, you know, is a motion for leave pursue?

 8   Is pursue a motion for leave?  I've heard both arguments here.

 9   It doesn't justify contempt.  And I know -- and so certainly

10   with respect to my side, I, you know -- given that, I would

11   request that the Court deny the request for contempt.

12      And again, I want to say, too, look, we hear you.

13   Absolutely hear you.  Understand the frustration.  Totally

14   hear you on that.

15      I'm going to turn over the balance of my time to Mr.

16   Phillips, --

17              THE COURT:  Okay.

18              MR. ANDERSON:  -- unless you have any questions, Your

19   Honor.  I appreciate it.

20              THE COURT:  Okay.  I do not.

21              CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

22              MR. PHILLIPS:  Your Honor, Louis M. Phillips, and

23   I'll be brief.  I'm going to try to bring it down to -- I was

24   not involved.  We are -- we are here because of the

25   indemnification provisions of CLO Holdco representing Mr.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 269
Case 3:23-cv-00726-S Document 8-24 Filed 05/29/23 Page 480 of 1598 PageID 13527

268

1    Patrick individually.  My firm was not involved in the

2    litigation.  We were hired to represent CLO Holdco and some of

3    the defendants in the UCC litigation, and our role has

4    expanded to do some other stuff, particularly represent Mr.

5    Patrick because of the indemnification provisions of the

6    Holdco entity documents.  He's entitled to indemnification and

7    we're providing a defense for him.  That's why we're here.

8         So I come way after the order.  We have not been involved

9    in anything.  But I think I'm just going to try to distill

10   everything about the order and about the concern and about the

11   litigation, because the Court is asking about is this an end

12   run on the settlement?  The Court is also saying, all you had

13   to do was come here first.

14        But let's look.  We're here about one thing, the motion

15   for leave.  And as Mr. Anderson pointed out, the commence or

16   pursue a claim, according to the order, commence or pursue can

17   only occur after the Court has authorized the litigation.

18   Okay.  So that's what the order says.  You can't commence or

19   pursue.

20        Counsel for the Debtors says, well, it can't be after

21   commencement because you've already commenced the action.  So

22   pursue has to mean something before the commencement of the

23   action.  It would mean something before the commencement of

24   the action under this order.

25        But it doesn't mean something before the Court approves

1    the commencement of the action, because commence or pursue

2    under this order does not occur before the Court has acted.

3    That's the language of the order.  It only occurs after the

4    Court has authorized it.  That's the context in which commence

5    or pursue exists, after this Court has authorized.

6        Okay.  So it can't be pursuit before the Court has

7    authorized without commencement because it only is triggered

8    by the Court's authorization of the action, which means,

9    before you commence it, actions in time take time, before you

10   commence the action, you have to pursue the action to commence

11   it.  But you can't do that until you've approved it.  All

12   right?

13       That's the temporal concern and why we say the motion for

14   leave can't be pursuit of an action under this order.  It

15   might be pursuit under another definition or another order.

16   In other words, maybe an order could be issued saying, you

17   can't file a motion for leave in any other court but this one.

18   I don't know whether it'd be a good order, but the order could

19   say that.  But when you say all you had to do was file a

20   motion for leave in this Court and everything would be okay,

21   no.  The motion for leave is not, under this order, pursuit.

22   Pursuit only occurs under this order after you've done

23   something, after Your Honor has done something.

24       So if a motion for leave is violative at the District

25   Court, the motion for leave would be violative here, because

270

1  it occurs before Your Honor has taken action.

2      Now, clearly, you want people to ask, but just as clearly,

3  and this was the point of my remarks earlier at the tail-end

4  of opening, just as clearly, I have a question, because

5  frankly, I understand what these guys are saying.  These guys

6  haven't really said it.  They're a little shame-faced at what

7  these guys are asking.  Because what these guys are asking is

8  whether or not an employee Seery, as the CRO -- and we heard,

9  oh, he bargained for it, he wouldn't have done it without

10  getting the order and the protections because -- did he

11  bargain for not having to comply with the Investor Advisory

12  Act?  Did he bargain for not having a fiduciary duty to third

13  parties?  Because the one thing that Mr. Bridges has been

14  trying to tell you is that, under this order, if it's

15  interpreted one way, you would never authorize a violation of

16  the Investment Advisory Act because it wouldn't necessarily be

17  gross negligence or willful misconduct.

18      In other words, in employing Seery, did the Debtor go out

19  in this disclosure statement and say, we are advisor to $1.2

20  billion of third-party money, and guess what, our CRO has no

21  fiduciary duty to you?  We have forestalled any claim under

22  the Investment Advisory Act in our employment order.  Did that

23  happen?

24      Because if that happened, I don't know if the Court was

25  really thinking that way, because that -- that can't happen in

271

 1  a confirmation order before, under the Fifth Circuit

 2  authority, after disclosure statement, plan, et cetera, et

 3  cetera, because that's a third party release of claims that

 4  may -- that haven't occurred yet.  You would be releasing

 5  because you would be saying you have no right.  You have no

 6  right.  This is not temporal.  This is saying you have no

 7  right, if it's saying that, to bring an Investment Advisory --

 8  Investment Advisory Act or a Breach of Fiduciary Duty Act

 9  that's not gross negligence or willful misconduct forever upon

10  an employment order.

11      Now, if that's not what it means, then we have another

12  conundrum.  The other conundrum -- and I'm new to this, maybe

13  this has been thought out by everybody, but I don't think so.

14  The other conundrum is this order doesn't apply to actions

15  that don't involve willful -- gross negligence or willful

16  misconduct.  It only applies to those types of actions.  So,

17  frankly, I don't know what the order does.

18      I think the problem -- I probably shouldn't be the

19  purviewer of who ought to know because my standard's probably

20  really low, given my capacity here.  But I'm a guy off the

21  street.  Seery gets hired to run the Debtor.  Seery testifies

22  and he admits, we've got Investment Advisory  Act all over the

23  place.  We're making lots of fees out of administering all

24  this third-party money.  Do they know?  Do they know he's

25  immune?  Do the third parties know?

272

```
 1        Now, a standard about managing the Debtor?  Absolutely.
 2   That's just pure D Chapter 11, pure D corporate, pure D
 3   standard liability if you're operating an entity.  You're not
 4   liable for gross negligence or willful misconduct.  You're
 5   not.  And so any claim for damage to the Debtor or to the
 6   estate by actions taken in the CRO capacity, absolutely.
 7   Absolutely.  You don't want a bunch of yoyos suing, you did
 8   something against the Debtor and the Debtor is now worth $147
 9   less than it was because you did something, you were negligent
10   and you forgot to put the dog out.  No.  It's got to be gross
11   negligence or willful misconduct if you are talking about
12   running the Debtor and running the estate.
13        But that's not what we have here.  And you can ask all the
14   questions you want about whether the lawsuit's any good, but
15   that's not what's up before the Court.  What's up before the
16   Court is whether filing a motion for leave is contempt.  And
17   under this order, you're saying, all you had to do is come
18   here.  Well, in one reading of it, you'd have never got relief
19   because you can't bring the kind of action.  I foreclosed it
20   by employing Seery.  He no longer has a fiduciary duty and is
21   no longer bound by the Investment Advisory Act.  Case closed.
22   Get out of here.  Unless you can formulate something around so
23   that you can establish gross negligence or willful misconduct,
24   I've done away with all those causes of action.
25        I don't think that's what happened.  And if that's not
```

273

 1  what happened, this doesn't apply because it shouldn't apply

 2  to third-party actions.  It should apply to actions for damage

 3  to the estate by creditors of the estate for whom Seery is

 4  acting as CRO of the Debtor, who is the -- in possession of

 5  the estate.  That makes perfect sense.  Perfect sense.  And

 6  nobody would say that you shouldn't have sole authority to

 7  determine whether a CRO who's acting for the estate and

 8  damages the estate -- because that'd be a claim against the

 9  estate.  That would be an administrative claim against the

10  estate.  That is just hornbook law.

11      That's the way I see this order.  And I admit I didn't

12  write it.  I admit I didn't submit it.  I admit I didn't

13  litigate it.  I admit I'm coming in late.  But sometimes maybe

14  a fresh pair of elderly, trifocal-assisted eyes doesn't hurt.

15  Because I will tell you, Judge, on one read this Court says

16  don't bother coming here because you don't have the kind of

17  claim that can be brought, even if you're a third party.  And

18  the only way that happens is if Seery's released from any

19  obligation under the Investment Advisory Act, and I think

20  everybody would like to know that.  And he can't be sued for

21  breach of fiduciary duty to third parties that he admits he

22  owes.  I think people would like to know that.

23      And if it doesn't, then this is not -- this order is not

24  about that.  But the fact -- I've been at this 40 years, and I

25  usually don't want to talk about myself.  There's really not a

274

```
 1   lot to talk about.  But I hear Mr. Morris how he's never done

 2   this, he's never done that.  I hear this, I'm a good -- you

 3   know, whatever.  I'm confused.  I've been doing this 41 years.

 4   Bankruptcy, 39.7.  I must be crazy, but that's what I've been

 5   doing.  And I'm confused because I don't even know if they

 6   needed to come here.  I don't even know if, had they come

 7   here, if they could have even presented an action for gross --

 8   for negligence or breach of fiduciary duty, could have --

 9   gross negligence or willful misconduct?  I don't know whether

10   this order just applies to Seery's duties as CRO vis-a-vis

11   creditors of the estate and property of the estate and damage

12   to the estate.  Because that's not what we're dealing with

13   here.

14       The point is, Judge, this is contempt.  And I understand

15   Your Honor knows all about contempt.  Your Honor knows about

16   Matter of Hipp.  Your Honor knows about civil contempt

17   authorization for bankruptcy courts.  Your Honor knows that

18   you can't operate without the right to impose civil contempt

19   sanctions.  And Your Honor knows, and I agree with Your Honor,

20   that civil contempt is both remedial and coercive.

21       But how do you coerce around my questions?  Maybe I am all

22   wet, but if I am, I don't think I am, and I don't understand

23   that I am, and that's why I'm concerned about going off into

24   this contempt wilderness and millions in fees, when the motion

25   for leave was dismissed and when the lawsuit doesn't ask for
```

275

1    or includes most of its claims. I don't even -- I have not

2    studied the lawsuit. I wasn't involved in it. But if it's a

3    breach of fiduciary duty and Advisory Act and it says what

4    you've been told it says, that he should have pulled up

5    different stuff, that the valuation metrics were different,

6    that he shouldn't have used it, I don't know that they're

7    saying fraud. I don't know that they're saying he knew he was

8    doing -- I think they're saying he breached the Investment

9    Advisory Act. And that's not gross negligence or willful

10   misconduct. Then does this order apply or this order -- does

11   this order foreclose that?

12       The fact is, I think we could have decided this on the

13   pleadings and on the order. We didn't. The fact that Mr.

14   Dondero did A, B, C. And I will tell you this. Mr. Patrick

15   has stood up. He's going to get a harpoon, he's going to get

16   a harpoon, subject to his right to appeal. But he has told

17   this Court. We represent him. We're not trying to get him

18   out of having authorized the order. It's very important for

19   this Court to understand. Mr. Patrick is one of these

20   entities. Mr. Dondero can holler and scream all he wants to.

21   Mr. -- and look, did he terminate Grant Scott? If I'm Grant

22   Scott, and this is my best friend and I was in his wedding and

23   I was his roommate and I was his best friend and I'm doing

24   this stuff for $5,000 and I do something and $5,000 a month

25   and I do something and I get hollered at and I've got a full a

276

 1  law practice, I'm an IP lawyer, why don't I just tell him to

 2  go jump in a lake, which is the other way you could look at

 3  Grant Scott leaving.  I want you to jump in a lake.  I'm out

 4  of here.  I don't need this.

 5      Thank you.

 6              THE COURT:  All right.  Thank you.

 7              MR. DEMO:  Your Honor, how much time do they have

 8  left, --

 9              THE COURT:  Um, --

10              MR. DEMO:  -- to be honest?

11              THE COURT:  Nate, are you -- 26 minutes?  All right.

12              MR. TAYLOR:  I'll go way under, Your Honor.

13              THE COURT:  Okay.

14              CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

15              MR. TAYLOR:  Your Honor, Clay Taylor.  I'm here on

16  behalf of Mr. Dondero.  He was named as an individual alleged

17  violator within the order.

18              THE COURT:  Okay.  I'm getting lawyers mixed up.  Mr.

19  Anderson, who did you represent?

20              MR. ANDERSON:  Mr. Patrick.  Mr. Phillips and I

21  represent --

22              THE COURT:  You're Mr. Patrick?

23              MR. PHILLIPS:  We're Mr. Patrick.

24              THE COURT:  You're both --

25              MR. PHILLIPS:  Mr. Patrick.

277

 1          THE COURT:  Okay.  I'm sorry.  I'm getting my Fort

 2   Worth law firms mixed up.  Okay.

 3          MR. TAYLOR:  That's quite all right.  Clay Taylor

 4   from Bonds Ellis here on behalf of Mr. Dondero.  And we're

 5   here because he was named in the alleged violator motion

 6   within the order as an alleged violator.  We don't think that

 7   he is, for the reasons that we're about to explain, but we

 8   were ordered to appear --

 9          A VOICE:  No.

10          MR. TAYLOR:  -- and so therefore we are appearing and

11   telling you why we're not an alleged violator.

12       First of all, for all the reasons that Mr. Sbaiti and Mr.

13   Bridges and Mr. Phillips and Mr. Anderson said, the court

14   order was in effect.  We agree with that.  It required certain

15   conduct to be done.  Yes, it did.  It said you couldn't

16   commence something.  It said you couldn't pursue it.  I think

17   we have gone through what the pursuit and commence.  Nobody is

18   arguing that anything was commenced.  It comes down to

19   pursuit.

20       But let's talk about what the evidence shows about Mr.

21   Dondero.  It shows that Mr. Dondero believes that there have

22   been breaches of fiduciary duty.  He thinks that there has

23   been negligence committed.  He believes that actions should be

24   taken.  We don't run away from that.  He, frankly, told you

25   that.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 279
Case 3:23-cv-00726-S Document 8-24 Filed 09/29/23 Page 490 of 1598 PageID 13537

278

1    But here, he didn't take any action to pursue it.  The DAF

2    did.  CLO Holdco did.  It's undisputed that he's not an

3    officer, director, or control person for either of those

4    entities.  The act we're here on is a motion for leave to file

5    an amended complaint to include Mr. Seery.  That's -- Mr.

6    Dondero didn't take any of those acts.  He believes it should

7    have been done, but he's not the authorizing person.

8        He might have -- let's just pretend that he thought he was

9    authorizing something.  It doesn't matter that he thought he

10   could authorize something or that he was trying to push for

11   it.  The fact remains he can't authorize it.  You know, he can

12   say, I declare war on Afghanistan.  Well, he can't.  Congress

13   can't.  He can write a letter to his Congressman.  He already

14   wrote a letter to his Congressman.  He talked.  He talked with

15   the head of the acting CLO -- CLO Holdco and he said, I think

16   there's something wrong here.  I think you should be looking

17   into it.  You know what, he goes, you might be right.  Go talk

18   with Mazin about it.  Give him some data.  Conduct an

19   investigation.  They did.  And then they went to the

20   authorizing person and they filed a motion for leave to

21   include Mr. Seery.  Mr. Dondero did nothing wrong in that.

22       Now, there is some personal animosity.  I think that Your

23   Honor has probably seen there seems to be some personal

24   animosity between Mr. Seery and Mr. Dondero, and that's

25   unfortunate.  But just because there's some personal animosity

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 280
Case 3:23-cv-00726-S   Document 8-24   Filed 09/29/23   Page 491 of 1598   PageID 13538

279

```
1    doesn't mean that maybe something wasn't done wrong.  Maybe
2    that Mr. Dondero -- he's certainly allowed to at least tell
3    people, well, I think there was something done wrong.  And if
4    there is an action to be had, then those appropriate entities
5    can take it.  But he didn't do those things.
6        And so even if he says, just like Michael Scott, "I
7    declare bankruptcy," it doesn't matter.  You have to take the
8    certain actions.
9            THE COURT:  I got it.  I don't know if everyone did.
10           MR. TAYLOR:  Yes, well, yeah, you have to be a *The*
11   *Office* fan.
12       But so that's where we stand.  And for all the reasons the
13   prior people have discussed, I don't think that there was any
14   violation of this Court's order.  But even if there was, Mr.
15   Dondero in this situation was not the one.  We're going to
16   have to deal with the other order that came out yesterday in
17   due course, but for this discrete issue that is before this
18   Court today, Mr. Dondero didn't violate anything.
19       Thank you.
20           THE COURT:  All right.  Mr. Morris, you get the last
21   word.
22        REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR
23           MR. MORRIS:  Thank you, Your Honor.  These are going
24   to be discrete points because it's truly rebuttal.  I'm going
25   to try to respond to certain points.
```

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 281
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 492 of 1598 PageID 13539

280

```
 1        Mr. Bridges and Mr. Phillips made extensive arguments
 2   about why they believe the order is wrong, why it's
 3   overreaching.  They tried to get into your head to think about
 4   what you intended or what you thought.  The fact of the matter
 5   is, the answer to all of those questions -- first of all, none
 6   of it's relevant to this motion because we've got the order --
 7   but the answer is very simple.  Forget about coming here to
 8   seek leave to amend to add Mr. Seery.  We can avoid Mr.
 9   Sbaiti's concerns about judicial estoppel or something.  Why
10   didn't they just file the motion for reconsideration?  They
11   filed that after they filed the motion for leave to amend,
12   after we filed the motion for contempt.  Only then did they
13   file the motion for reconsideration.
14        Now, we think it's ill-thought-out.  We think it's
15   problematic.  Probably not today, is my guess, we'll argue to
16   you as to why we think that motion ought to be denied.  But if
17   they truly believed that the order was infirm in any way,
18   wouldn't the proper thing to have been to come here and tell
19   you that?  Wouldn't the proper thing to be to come to the
20   court that issued the order that you have a problem with and
21   ask the court to review it again?  And if Your Honor overruled
22   the motion, to appeal it.
23        Why are we even doing this?  Why did they do it?  It's not
24   we.  Why did they do it?  Right?  And that solves almost
25   everything they've said.  That's point one.
```

281

 1    Point two, the January order.  The January order is very

 2   important.  It's important not just because it applies to

 3   directors, but it's important because Mr. Dondero agreed to

 4   it, and it also applies -- I want to get it -- Paragraph 10.

 5   It's Exhibit 15.  It applies to the independent directors and

 6   the independents directors' agents.  If a CEO is not an agent

 7   of an independent director, I'm not sure what is.  The

 8   independent directors are the body that appointed the CEO.

 9   The CEO, Mr. Seery, is acting on behalf of the board.  This is

10   the order that Mr. Dondero agreed to.  It's the order -- take

11   out the word independent director; put in Mr. Seery -- it's

12   the order everybody's complaining about.  But even the January

13   order certainly applied to Mr. Seery.  That's point two.

14    Point three.  I've heard a lot of concerns about the

15   slippery slope and what does pursuit mean and does talking to

16   a lawyer mean pursuit and doing an investigation being

17   pursuit.  I don't know, Your Honor, and I don't care, because

18   that's not what we're here to talk about.  We're here to talk

19   about a specific act -- not a hypothetical, not a slippery

20   slope.  We're talking about the filing of a motion for leave

21   to amend a complaint to add Mr. Seery as a defendant.  That's

22   all we're talking about.  So, you know, the rest of it, it's

23   just noise.  And the only question is whether, and I think

24   it's pretty clear, that means pursuit.

25    Another version on the theme of was there any alternative

282

 1    to filing the motion in the District Court, I think there was.

 2    The Sbaiti firm did file that suit against Acis in New York.

 3    And if Your Honor checks the docket in the Acis bankruptcy, I

 4    think you'll find that there's a motion from Mr. Rukavina, for

 5    a comfort order, basically, saying that -- asking the court to

 6    declare that the filing of the complaint in New York against

 7    Acis didn't violate the plan injunction.  I think I have that

 8    right.

 9        But I point that out, Your Honor -- it's not evidence in

10    the record, but the Court can certainly take judicial notice

11    of what's on its docket -- I point that out because there's

12    another example of a lawyer who is very active in this case

13    who actually -- now, he already commenced the suit, so he did

14    -- they did both simultaneously, so I don't want to suggest

15    that that's the perfect thing to have done, but at least he's

16    here asking for -- he's bringing it to your attention, he's

17    telling you it's happened, he's asking for a comfort order,

18    and someday Your Honor may rule on it.  I don't know.

19        Number six, what's with the pursuit of Mr. Seery?  What is

20    with the pursuit of Mr. Seery?  Is there any doubt in

21    anybody's mind that the Debtor is going to have to indemnify

22    Mr. Seery and will bring in another law firm?  And while I

23    don't think it will ever happen in a hundred billion years, if

24    there is a judgment against Mr. Seery, isn't that going to be

25    the Debtor's responsibility?  Why are they even bothering to

283

```
 1  do this?  I think it's a fair question for the Court to ask.
 2      I think Mr. Taylor came up and talked about animosity.
 3  How do you explain going after Jim Seery?  How do you do it?
 4  He's going to be indemnified.  It's in -- it's in like three
 5  different orders.  It's in the confirmation order.  It's in
 6  the CEO order.  It's -- it's probably as a matter of law.
 7  It's in the Strand partnership agreement.  It's -- he's been
 8  indemnified like 12 different times.  What is the purpose,
 9  other than to make Mr. Seery's life miserable?  There is none.
10  You'll never hear a rational explanation for why they're doing
11  this.
12          THE COURT:  Just so you know, I've not looked at any
13  of the pleadings in the District Court --
14          MR. MORRIS:  And I'm not asking you to.
15          THE COURT:  -- other than what has been presented to
16  me today.
17          MR. MORRIS:  Yeah.  That's fine, Your Honor.
18          THE COURT:  But I'm very flipped out about the causes
19  of action against the Debtor, --
20          MR. MORRIS:  Yeah.
21          THE COURT:   -- who hasn't reached an effective date.
22          MR. MORRIS:  Well, --
23          THE COURT:  And I'm most interested to know what the
24  defenses, motions --
25          MR. MORRIS:  We'll get to that.
```

284

1          THE COURT:  -- are going to be raised in that regard.

2          MR. MORRIS:  We will get to that in due course.

3      I do want to point out, just to be clear, because we keep

4  hearing that they learned about, you know, all of these

5  horrible things after the fact.  In the complaint, which I

6  think is Exhibit 12, --

7          THE COURT:  I'm there.

8          MR. MORRIS:  -- at Paragraph 127, the Plaintiffs

9  allege, "Mr. Seery was informed in late December 2020 at an

10 in-person meeting in Dallas, to which Mr. Seery had to fly,

11 that HCO" -- excuse me "HCLF and HCM had to suspend trading in

12 MGM Studios' securities because Seery had learned from James

13 Dondero, who was on the board, of a potential purchase of the

14 company.  The news of the MGM purchase should have caused

15 Seery to revalue."

16     I cannot begin to tell you the problems with that

17 paragraph.  We're not going to discuss them today.  I made a

18 promise to these folks that we wouldn't get into the merits of

19 the complaint.  But Your Honor was onto something before, and

20 those issues, you know, may see the light of day one day.  And

21 if they do, folks are going to have to deal with it.  But I

22 will point out that at the time the communication was made,

23 the other TRO was in effect.  We didn't bring that one to the

24 Court's attention.  But the important point there, Your Honor,

25 is December 2020.  It is December 2020.  That is the

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 286
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 497 of 1598 PageID 13544

285

1   allegation that's being made against Mr. Seery.  And the fact

2   of the matter is, because I've done the research myself, the

3   Court will find that on December 23rd, the day the HarbourVest

4   settlement motion was filed, it was fully public knowledge

5   that Amazon and Apple, I think, had shut down negotiations

6   with MGM at that time.  Right?  So the big secret information,

7   it was in the public domain on December 23rd.

8       There will also never be any evidence ever that Mr. Seery

9   got on a plane and flew to Dallas in December 2020, but that's

10  a minor point.

11      I'd like to just conclude, Your Honor, by saying I've

12  heard pleas that they understand.  They understand, Your

13  Honor, now they understand.  It would be good if they promised

14  the Court that they won't seek to assert claims against Mr.

15  Seery anywhere but in this Court and comply with the order as

16  it's written.  That, that, that would be taking a little bit

17  of responsibility.

18      I have nothing further, Your Honor.

19          THE COURT:  Okay.  Thank you.

20      All right.  Let me give you some clue of when I'm going to

21  be able to rule.  I've been glancing at my email in hopes that

22  something set tomorrow would go away, but that's not

23  happening.  I've got a hearing that I've been told will take

24  all day tomorrow on a case involving a half-built hotel,

25  luxury hotel in Palm Springs, California.  So I have to spend

286

    1   the next I don't know how long getting ready for that hearing

    2   tomorrow, and then I have what looks like a full day of

    3   hearings Thursday, including you people coming back on

    4   something.

    5          MR. POMERANTZ:  Your Honor, I was going to address

    6   that.  We have Dugaboy's motion to enforce compliance on the

    7   2015(3) reports.

    8          THE COURT:  That's what it was.

    9          MR. POMERANTZ:  Since we haven't gotten to the motion

   10   to modify the Seery order, my suggestion would be we use that

   11   time -- of course, Dugaboy, I'm not sure if they're on the

   12   phone.  They're not here.  I'm not sure that's time sensitive.

   13   But if Your Honor wanted to have a hearing on that motion,

   14   which was contemplated to take place today, the Debtor would

   15   be okay having that motion heard on Thursday, perhaps by

   16   WebEx, unless Your Honor wants us to stay here, which we would

   17   if you do, and then reschedule the 2015(3) motion.

   18      But again, that wasn't my motion.  It's Dugaboy's.  I'm

   19   not sure Mr. Draper is on.  But we obviously have some

   20   calendar issues.

   21          MR. MORRIS:  And Your Honor, just to complete it, I

   22   think also on Thursday the Court is supposed to hear HCRE and

   23   Highland Capital Management Services motions for leave to

   24   amend their complaint in the promissory note litigation

   25   against each of them.  I think that's also on the calendar for

287

1    Thursday.  I don't expect that -- I hope that doesn't take

2    very long, but that's also, I believe, on the calendar.

3              THE COURT:  Okay.  Mr. Draper, are you out there?

4              MR. PHILLIPS:  I didn't see him on the list, Your

5    Honor.  I was just looking.  But --

6              THE COURT:  Okay.  All right.  Well, --

7              MR. PHILLIPS:  What is the question?  I can send him

8    a text real quick.

9              THE COURT:  Well, just have -- if you all could

10   follow up with Traci Ellison, my courtroom deputy, tomorrow, I

11   am perfectly happy to continue the motion to modify the Seery

12   order to Thursday morning at 9:30 if Draper is willing to

13   continue the 2015 motion.

14             MR. POMERANTZ:  I know, if I was him, my first

15   question would be is what times does the Court have available?

16   We could work that through Ms. Ellison.

17             THE COURT:  Yes.  And I'm just letting you know --

18   talk to her.  Okay.  Number one, I'll do these by video, okay?

19   WebEx.  But I know I don't have any time Wednesday, and

20   Thursday's a busy day.

21      We have court Friday morning at 9:30 in--?

22             THE CLERK:  Cici's Pizza.

23             THE COURT:  Cici's Pizza?  That's not going to take

24   very long, right?

25             THE CLERK:  I don't think so.

Case 19-34054-sgj11  Doc 3445-52  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 289
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 500 of 1598  PageID 13547

288

```
1           THE COURT:  I can potentially do something, you know,

2    10:00 o'clock Friday morning.  Other than that, then you've

3    got to wait a while, because I have a seven-day trial, live

4    human beings in the courtroom starting next Monday.  And so my

5    point is mainly to tell you, as much as I would like to rule

6    very, very fast, it's going to be, it looks like, a couple of

7    weeks or so before I can give you a ruling on this.

8           MR. BRIDGES:  Your Honor?

9           THE COURT:  Yes?

10           MR. BRIDGES:  May I?  It's our motion.  I would

11    propose, if counsel would agree, that we just submit it on the

12    papers.

13           THE COURT:  Everybody good with that?  I'm certainly

14    good with that.

15           MR. POMERANTZ:  Your Honor, I'd like there to be

16    argument.  I have a lengthy argument.  I think I'd like to

17    address a number of the things that -- Mr. Bridges made his

18    argument today.  Okay?

19           THE COURT:  Okay.

20           MR. POMERANTZ:  His deck, it was entitled, Motion to

21    Modify.

22           THE COURT:  Okay.

23           MR. POMERANTZ:  So that's very nice of him, but I

24    would like to make my argument.

25           THE COURT:  Okay.  Let's try to nail this down right
```

289

1   now.  Friday at 10:00 o'clock, can we do the oral argument

2   WebEx?

3          MR. POMERANTZ:  On that one, yes, Your Honor.

4          THE COURT:  On that one?  Everybody good?  Okay.  So

5   we'll come back Friday, 10:00 o'clock, WebEx, for that motion.

6      You know, I'm going to say a couple of things where --

7   I've leaned toward thinking this is a pretty simple motion

8   before me, the motion for contempt, but when people offer into

9   evidence documents, I read your documents.  Okay?  That's my

10  duty.  And so I have however many exhibits I admitted today

11  that I am going to look at and see how they sway me one way or

12  another on this issue.  But I will tell you that my gut is

13  there has been contempt of court.  Okay?  I don't see anything

14  ambiguous at all about Paragraph 5 of my July 16th, 2020

15  order.  Somebody may think I overreached, but if that was the

16  case, someone should have argued at the time I was

17  overreaching.  Someone should have appealed the order.  And I

18  think it's a *Shoaf/Espinosa* problem at this point for anyone

19  to argue about the enforceability of that order.

20     I think there's nothing ambiguous in the wording. Pursue

21  is not ambiguous.  There's nothing confusing about the

22  requirement that any entity who wanted to sue or pursue a

23  claim, you know, commence claim, pursue a claim against Mr.

24  Seery, had to come to the Bankruptcy Court.  Standard-fare

25  gatekeeping order.

290

 1   So what I'm going to be looking at is, do these documents

 2   I admitted into evidence change my view on that, and then the

 3   harder question is who of the alleged contemnors am I going to

 4   think it's clear and convincing committed contempt and -- who

 5   are the contemnors, and then, of course, what are the damages?

 6   Coercive or compensatory damages?

 7   So, again, you know how I feel, to the extent that's

 8   helpful in your planning purposes.  I'm pretty convinced

 9   contempt of court has occurred.  It's just a matter of who's a

10   contemnor and what are the damages.

11   I'll say a couple of remaining things.  I continue to be

12   frustrated, I think was the word people used, about

13   unproductive ways we all spend our time.  I am going to spend

14   I don't know how many more hours drafting another ruling on a

15   contempt motion, and attorneys' fees are through the roof.

16   And, you know, I dangled out there a question I couldn't

17   resist about MGM.

18   And I will tell you, I mean, someone mentioned about their

19   stomach aching.  Personal story, I could hardly sleep the

20   night it became public about the Amazon purchase, because,

21   silly me, maybe, I'm thinking game-changer.  This is such

22   potentially a windfall, an economic windfall.  Maybe this

23   could be the impetus to make everyone get in a room and say

24   look, we've got this wonderful windfall of money.  I don't

25   know how much is owned directly or indirectly by the Debtor of

291

1    MGM stock.  I don't know how much the Debtor  manages.  I

2    don't know how much, you know, some other entity.  I know it's

3    probably spread out in many different entities.  But I know, I

4    know because I listen, that one or more of the Highland-

5    managed CLOs has some of this, and I think I read -- remember

6    that HCLOF, which now Highland owns more than 50 percent of,

7    has some of this stock.  Right?

8            MR. DONDERO:  Do you want to know what happened?

9            THE COURT:  Oh.

10           A VOICE:  No.

11           THE COURT:  Well, okay.  So, you know, I can

12   understand I'm getting into maybe uncomfortable territory in a

13   public proceeding, so I'll stop.

14       But, you know, do we need to set up a status conference?

15   Do you all need to like talk about this?  Am I just being

16   naïve?  Couldn't this be a game-changer, where maybe it would

17   give new incentive to --

18           MR. POMERANTZ:  Your Honor, I would -- he's been

19   pretty quiet through the whole hearing, Mr. Clemente.  He has

20   the Committee, that a couple of people you've heard have sold

21   claims.  They're now held by other parties.

22       You know, the door is always open.  I don't think this is

23   going to be game-changer, unfortunately.  We would like

24   nothing more, as Debtor's counsel.  We don't enjoy coming to

25   Your Honor for contempt hearings.

292

 1      Mr. Clemente said that it was productive.  We would sure

 2  participate.  But right now, we have creditors who are very

 3  angry that millions and millions of dollars have been spent on

 4  really a waste of time and a waste of the Court's time and a

 5  waste of everyone's time and eating into the creditors' money.

 6  So I would ask Mr. Clemente to address that.

 7            MR. CLEMENTE:  I'm here.

 8            THE COURT:  Yes, he's way in the back, hoping to be

 9  ignored.

10            MR. CLEMENTE:  It's too cold, Your Honor, where I was

11  sitting.  For the record, Your Honor, --

12            THE COURT:  I noticed some entity called Muck

13  Holdings bought HarbourVest, according to the docket.

14            MR. CLEMENTE:  That's correct.  Muck Holdings bought

15  HarbourVest, and I believe also the Acis claim, and then

16  there's a different entity that bought the Redeemer claim.

17            THE COURT:  Uh-huh.

18            MR. CLEMENTE:  So, as we mentioned in our -- one of

19  our pleadings, I think it was the retention pleading for

20  Teneo, the Committee consists of two members currently, Meta-e

21  and UBS.

22            THE COURT:  Uh-huh.

23            MR. CLEMENTE:  Obviously, Your Honor just approved

24  the UBS settlement recently.  The U.S. Trustee is aware of the

25  make-up of the Committee, and is currently comfortable with

293

1  the Committee maintaining a two-person membership at this

2  point.

3      In terms of whether the MGM transaction is a game-changer,

4  we've not yet seen, to Your Honor's point, how all of that

5  rolls up through the various interests that the Debtor may or

6  -- you know, may have --

7          THE COURT:  Okay.

8          MR. CLEMENTE:  -- that would be implicated by the MGM

9  transaction.  If ultimately the MGM transaction has to

10  actually occur, right?  I mean, so, you know, just based on

11  what I read in the public documents, we're not sure when that

12  transaction may actually happen.  But obviously it's a good

13  thing for the Debtor's estate because it's going to recognize

14  value for the estate.

15      In terms of whether it ultimately changes how Mr. Dondero,

16  you know, wishes to proceed, that's entirely up to him, Your

17  Honor.  But we don't see it as something at this point that

18  would suggest that there's an overall back to let's talk about

19  a pot plan because of where the MGM transaction might

20  ultimately come out.

21      So I don't know if that's helpful to Your Honor, but those

22  are -- that's my perspective.

23          THE COURT:  Well, and I'm not trying to, you know,

24  push a pot plan on anyone.

25          MR. CLEMENTE:  No, I understand.

294

```
1          THE COURT:  I'm just saying it looked like an
2   economic windfall.  I just -- I don't know how much is
3   Highland versus other entities in the so-called byzantine
4   complex, but, gosh, I just hoped that there might be something
5   there to change the dynamic of, you know, lawsuit, lawsuit,
6   lawsuit, lawsuit, motion for contempt, motion for contempt.
7          MR. CLEMENTE:  Agreed, Your Honor.
8          THE COURT:  Uh-huh.
9          MR. CLEMENTE:  And like I said, it was a very
10  positive development obviously for the creditors for the
11  Debtor.  But whether it's the game-changer that Your Honor
12  would envision, I'm not sure that I can suggest at this point
13  that it is.
14      I think that, you know, obviously, we don't like to see
15  these lawsuits continue to be filed.  That's the whole point
16  of the gatekeeper order, Your Honor.
17          THE COURT:  Uh-huh.
18          MR. CLEMENTE:  I didn't say anything during the
19  hearing, but obviously the January 9th order, as Your Honor
20  has said many times, was in the context of a trustee being
21  appointed.
22          THE COURT:  Right.  Right.
23          MR. CLEMENTE:  Right?  So, and the July 16th order,
24  very similar vein, it's an outshoot of that.  In fact, it was
25  contemplated in the January 9th settlement that a CEO could be
```

295

1  appointed.

2      So I think, again, it's just -- it's important, the

3  context in which that January 9th order came into play, for

4  this very reason, so we could avoid this type of litigation,

5  Your Honor.

6          THE COURT:  Uh-huh.

7          MR. CLEMENTE:  And so again, I didn't -- I obviously

8  didn't rise to mention that during the hearing, but Your Honor

9  is already aware of that.  I didn't need to remind Your Honor

10  of that.

11          THE COURT:  Uh-huh.  Okay.

12          MR. CLEMENTE:  Anything else for me, Your Honor?

13          THE COURT:  No.  Thank you.

14          MR. CLEMENTE:  Okay, then, Your Honor.

15          THE COURT:  Sorry I picked on you.  But, all right.

16  Well, again, I hope the message has landed in the way I hope

17  will matter, and that is I'm going to look at your documents

18  but I feel very strongly that, unless there's something in

19  there that, whoa, is somehow eye-opening, I'm going to find

20  contempt of court.  It's just a matter of who and what the

21  damages are.  There's just not a thing in the world ambiguous

22  about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23  it as soon as we humanly can get to it.

24      Mr. Morris, anything else?

25          MR. MORRIS:  Nothing.  No, thank you.

296

1          THE COURT:  I guess I'll see you Thursday on the

2    WebEx.  Thank you.

3          THE CLERK:  All rise.

4      (Proceedings concluded at 6:00 p.m.)

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21     I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                        **06/09/2021**

24   _____      _____

     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

297

                                  INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS (Show Cause)
- Mr. Morris                                                  21
- Mr. Sbaiti                                                  31
- Mr. Bridges                                                 52
- Mr. Anderson                                                80
- Mr. Phillips                                                83
- By Mr. Taylor                                               87
- By Mr. Pomerantz                                            88

WITNESSES

Debtor's Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                            95
- Cross-Examination by Mr. Anderson                          132
- Cross-Examination by Mr. Sbaiti                            135
- Redirect Examination by Mr. Morris                         137
- Examination by the Court                                   138
- Recross-Examination by Mr. Sbaiti                          142
- Recross-Examination by Mr. Phillips                        143
- Further Redirect Examination by Mr. Morris                 144

James D. Dondero
- Direct Examination by Mr. Morris                           147
- *Voir Dire* Examination by Mr. Sbaiti                      184
- Direct Examination (Resumed) by Mr. Morris                 199
- Cross-Examination by Mr. Taylor                            210

EXHIBITS

Debtor's Exhibits 1 through 11                 Withdrawn 215
Debtor's Exhibits 12 through 53                 Received 216
Debtor's Exhibits 15 and 16                     Received 214
Debtor's Exhibits 23 and 24                     Received 213
Debtor's Exhibits 54 and 55                     Received 217

Mark Patrick's Exhibits 1, 3 through 12,        Received 218
15 through 28, and 30 through 44

Mark Patrick's Exhibits 45 and 46               Received 219

298

                                    INDEX
                                   Page 2

CLOSING ARGUMENTS

- Mr. Morris                                              221
- Mr. Sbaiti                                              230
- Mr. Bridges                                             255
- Mr. Anderson                                            263
- Mr. Phillips                                            267
- Mr. Taylor                                              276
- Mr. Morris                                              279

RULINGS

Motion for Entry of an Order Further Extending the Period    19
Within Which It May Remove Actions Pursuant to 28 U.S.C.
§ 1452 and Rule 9027 of the Federal Rules of Bankruptcy
Procedure filed by Debtor (2304)

Show Cause Hearing (2255) - *Taken Under Advisement*       285

Motion to Modify Order Authorizing Retention of James      285
Seery filed by Plaintiffs CLO Holdco, Ltd., The
Charitable DAF Fund, L.P. (2248) - *Taken Under Advisement*

END OF PROCEEDINGS                                         296

INDEX                                                  297-298

# EXHIBIT 53

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 512 of 1598   PageID 13559
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 1 of 8

Docket #2454  Date Filed: 06/16/2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | ) )  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | )  Case No. 19-34054-sgj11 )  ) |
| Debtor. | ) ) |

**DEBTOR'S SECOND AMENDED WITNESS AND EXHIBIT LIST WITH**
**RESPECT TO EVIDENTIARY HEARING TO BE HELD ON JUNE 8, 2021**

Highland Capital Management, L.P. (the "Debtor") submits the following second

amended witness and exhibit list with respect to the *Order Requiring the Violators to Show*

*Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

---

**SECOND AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE**
DOCS_NY:43337.3 36027/002



1934054210616000000000004

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 513 of 1598   PageID 13560
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 2 of 8

No. 2255] (the "Show Cause Order"), which the Court set for hearing at 9:30 a.m. (Central

Time) on June 8, 2021 (the "Hearing") in the above-styled bankruptcy case (the "Bankruptcy

Case").

    **A.**    **Witnesses:**

        1.    James Dondero;

        2.    Mark Patrick;

        3.    Grant Scott (by deposition designation);

        4.    Gregory V. Demo;[2]

        5.    Any witness identified by or called by any other party; and

        6.    Any witness necessary for rebuttal.

    **B.**    **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| 1. | Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-1] | | |
| 2. | Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-2] | | |
| 3. | Exhibit A, the [Proposed] Order on the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-3] | | |
| 4. | James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest [Docket No. 2237-4] | | |

---

[2] If needed, Mr. Demo will be called as a witness for the sole purpose of authenticating Exhibits 54 and 55, time records from Pachulski Stang Ziehl & Jones, LLP relating to the Show Cause Order.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 514 of 1598 PageID 13561
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 3 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 5. | Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-5] | | |
| 6. | CLO Holdco's Objection to HarbourVest Settlement. [Docket No. 2237-6] | | |
| 7. | Notice of Deposition to James Dondero [Docket No. 2237-7] | | |
| 8. | Transcript of January 11, 2021 Deposition of Michael Pugatch [Docket No. 2237-8] | | |
| 9. | Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-9] | | |
| 10. | Transcript of January 14, 2021 Hearing [Docket No. 2237-10] | | |
| 11. | Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-11] | | |
| 12. | Original Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) (GScott000389) [Dondero June 1, 2021 Deposition Exhibit 7] [Docket No. 2237-12] | | |
| 13. | Email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-13] | | |
| 14. | Second email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-14] | | |
| 15. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 2237-15] | | |
| 16. | Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring | | |

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 515 of 1598 PageID 13562
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 4 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| | Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Docket No. 2237-16] | | |
| 17. | Plaintiff's Motion for Leave to File First Amended Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) [Docket No. 2237-17] | | |
| 18. | CM/ECF Notice dated April 20, 2020 and lodged as Docket No. 8 in the DAF Action [Docket No. 2237-18] | | |
| 19. | Transcript of March 22, 2021 Hearing [Docket 2351-1] | | |
| 20. | Email from DAF counsel to Debtor's counsel dated April 20, 2021 [Docket 2351-2] | | |
| 21. | All communications between Debtor's counsel and the Bankruptcy Court courtroom deputy [Docket 2355-3] | | |
| 22. | Debtor's Motion for an Order to Enforce the Order of Reference [Docket 2351-4] | | |
| 23. | Grant Scott January 21, 2021 Deposition Transcript | | |
| 24. | Grant Scott June 1, 2021 Deposition Transcript | | |
| 25. | DAF/CLO Holdco Structure Chart (GScott000007) [Dondero June 1, 2021 Deposition Exhibit 1] | | |
| 26. | Amended and Restated Limited Liability Company Agreement of Charitable DAF GP, LLC, effective as of January 1, 2012 (PATRICK_000031) [Dondero June 1, 2021 Deposition Exhibit 2] | | |
| 27. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (GScott000325) [Dondero June 1, 2021 Deposition Exhibit 3] | | |
| 28. | January 31, 2021 Meeting Appointment (GScott000011) [Dondero June 1, 2021 Deposition Exhibit 4] | | |
| 29. | Email chain re Grant Scott's notice of intent to resign (GScott000018) [Dondero June 1, 2021 Deposition Exhibit 5] | | |

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 516 of 1598 PageID 13563
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 5 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 30. | Email chain re Highland Adherence Agreement in connection with HarbourVest shares (GScott000085) [Dondero June 1, 2021 Deposition Exhibit 6] | | |
| 31. | Email and attached A&R Service and Advisory Agreements and GP Resolutions (GScott000312) [Scott June 1, 2021 Deposition Exhibit 8] | | |
| 32. | Notice of CLO Holdco Settlement Agreement [Scott June 1, 2021 Deposition Exhibit 9] | | |
| 33. | Email between Grant Scott and Mark Patrick re Complaint (GScott000080) [Scott June 1, 2021 Deposition Exhibit 10] | | |
| 34. | Email chain re TerreStar Corporation Equity Investment and Residual Assets held by HOCF (GScott000138) [Scott June 1, 2021 Deposition Exhibit 11] | | |
| 35. | Email chain re request for information from Elysium Fund Management, Ltd. (GScott000361) [Scott June 1, 2021 Deposition Exhibit 12] | | |
| 36. | Assignment and Assumption of Membership Interest Agreement between Grant J. Scott and Mark E. Patrick dated March 24, 2021 (PATRICK_000006) [Scott June 1, 2021 Deposition Exhibit 13] | | |
| 37. | Written Resolutions of the Sole Director of the Company Dated March 25, 2021 (PATRICK_000003) [Scott June 1, 2021 Deposition Exhibit 14] | | |
| 38. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 24, 2021 (PATRICK_000012) [Scott June 1, 2021 Deposition Exhibit 15] | | |
| 39. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 31, 2021 (PATRICK_000001) [Scott June 1, 2021 Deposition Exhibit 16] | | |
| 40. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on April 2, 2021 (PATRICK_000002) [Scott June 1, 2021 Deposition Exhibit 17] | | |
| 41. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (PATRICK_000923) | | |

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 517 of 1598 PageID 13564
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 6 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 42. | Amended and Restated Service Agreement by and among HCMLP, Charitable DAF Fund, L.P., and Charitable DAF GP, LLC , effective July 1, 2014 (PATRICK_000938) | | |
| 43. | Email from Mark Patrick to Grant Scott dated April 6, 2021 re Urgent Questions (PATRICK_001129) | | |
| 44. | Original Complaint (Docket No. 1, PCMG Trading Partners XXIII, LP v. Highland Capital Management, L.P., Case No. 21-cv-01169, U.S. District Court Northern District of TX) | | |
| 45. | Defendant's Motion For Leave to Amend Answer (Docket No. 32, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., Adv. Pro. No. 21-03004) | | |
| 46. | Email chain re NDA for D&O Insurance Quote (GScott000172) | | |
| 47. | Check Request dated April 7, 2021 (D1 Landscape & Irrigation) (GScott000354) | | |
| 48. | Check Request dated April 7, 2021 (Sanders Lawn & Maintenance) (GScott000355) | | |
| 49. | Check Request dated April 7, 2021 (BB Services) (GScott000358) | | |
| 50. | Highland Capital Management, L.P.'S Notice of Amended Subpoena to Grant Scott [Docket No. 2366] | | |
| 51. | Certificate of Service for Notice of Deposition of Grant Scott (Docket No. 41, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al., Adv. Pro. No. 21-03000) | | |
| 52. | Email re Zoom Instructions for June 1, 2021 Deposition of Grant Scott | | |
| 53. | Email re Zoom Instructions for January 21, 2021 Deposition of Grant Scott | | |
| 54. | Pachulski Stang Billing Detail (April 18 – April 30, 2021) | | |
| 55. | Pachulski Stang Billing Detail (May 1 – June 7, 2021) | | |

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 518 of 1598 PageID 13565
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 7 of 8

| Letter | Exhibit | Offered | Admitted |
|:---:|---|:---:|:---:|
| 56. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| 57. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 58. | All exhibits identified by or offered by any other party at the Hearing | | |

*[Remainder of Page Intentionally Blank]*

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 519 of 1598    PageID 13566
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 8 of 8

Dated:  June 16, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 520 of 1598    PageID 13567
235

# EXHIBIT 23

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 521 of 1598 PageID 13568
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 2 of
110

Page 1

1          GRANT SCOTT - 1/21/2021

2        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
3                 DALLAS DIVISION

4    IN RE:                    )
                               )    Chapter 11
5    HIGHLAND CAPITAL MANAGEMENT,   )
     L.P.                       )      Case No.
6                              )  19-34054-sgj11
              Debtor.          )
7    ----------------------------   )
     HIGHLAND CAPITAL MANAGEMENT,   )
8    L.P.,                      )
              Plaintiff,       )
9                              )      Adversary
       vs.                     )    Proceeding No.
10                             )      21-03000-sgj
     HIGHLAND CAPITAL MANAGEMENT    )
11    FUND ADVISORS, L.P.; NEXPOINT  )
     ADVISORS, L.P.; HIGHLAND        )
12    INCOME FUND; NEXPOINT          )
     STRATEGIC OPPORTUNITIES FUND;  )
13    NEXPOINT CAPITAL, INC.; and    )
     CLO HoldCo, LTD.,         )
14                             )
              Defendants.      )
15    -------------------------------

16

17      VIDEOCONFERENCE DEPOSITION OF Grant SCOTT

18          Thursday, 21st of January, 2021

19

20

21

22

23   Reported by: Lisa A. Wheeler, RPR, CRR

24   Job No: 188910

25

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 522 of 1598    PageID 13569
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 3 of
110

Page 2

1        GRANT SCOTT - 1/21/2021

2                January 21, 2021

3                2:02 p.m.

4

5

6        Videoconference deposition of Grant

7   SCOTT, pursuant to the Federal Rules of

8   Civil Procedure before Lisa A. Wheeler,

9   RPR, CRR, a Notary Public of the State of

10   North Carolina.  The court reporter

11   reported the proceeding remotely and the

12   witness was present via videoconference.

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 523 of 1598   PageID 13570
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 4 of
110

Page 3

1          GRANT SCOTT - 1/21/2021

2   REMOTE APPEARANCES:

3       PACHULSKI STANG ZIEHL & JONES

4       Attorneys for Debtor

5           780 Third Avenue

6           New York, NY 10017

7       BY:   JOHN MORRIS, ESQ.

8

9       LATHAM & WATKINS

10       Attorneys for UBS

11          885 Third Avenue

12          New York, NY 10022

13      BY:   SHANNON McLAUGHLIN, ESQ.

14

15       SIDLEY AUSTIN

16       Attorneys for the Creditors Committee

17          2021 McKinney Avenue

18          Dallas, TX 75201

19      BY:   PENNY REID, ESQ.

20          ALYSSA RUSSELL, ESQ.

21          PAIGE MONTGOMERY, ESQ.

22

23

24

25

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 524 of 1598    PageID 13571
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 5 of
110

Page 4

1           GRANT SCOTT - 1/21/2021

2    REMOTE APPEARANCES:  (Continued)

3        KING & SPALDING

4        Attorneys for Highland CLO Funding, Ltd.

5            500 West 2nd Street

6            Austin, TX 78701

7        BY:  REBECCA MATSUMURA, ESQ.

8

9        K&L GATES

10        Attorneys for Highland Capital Management

11        Fund Advisors, L.P., et al.

12            4350 Lassiter at North Hills Avenue

13            Raleigh, NC 27609

14        BY:   A. LEE HOGEWOOD, III, ESQ.

15            EMILY MATHER, ESQ.

16

17        HELLER DRAPER & HORN

18        Attorneys for The Dugaboy Investment Trust

19        and The Get Good Trust

20            650 Poydras Street

21            New Orleans, LA 70130

22        BY:  MICHAEL LANDIS, ESQ.

23

24

25

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 525 of 1598 PageID 13572
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 6 of
110

Page 5

1        GRANT SCOTT - 1/21/2021

2    REMOTE APPEARANCES:  (Continued)

3      KANE RUSSELL COLEMAN & LOGAN

4      Attorneys for Defendant CLO HoldCo Limited

5          Bank of America Plaza

6          901 Main Street

7          Dallas, TX 75202

8      BY:   BRIAN CLARK, ESQ.

9          JOHN KANE, ESQ.

10

11    ALSO PRESENT:  La Asia Canty

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 526 of 1598 PageID 13573
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 7 of
110

Page 6

1          GRANT SCOTT - 1/21/2021

2   G R A N T   S C O T T,

3       called as a witness, having been duly sworn

4       by a Notary Public, was examined and

5       testified as follows:

6           MR. MORRIS:  Good afternoon.  My

7       name is John Morris.  I'm an attorney with

8       Pachulski Stang Ziehl & Jones, a law firm

9       who represents the debtor in the bankruptcy

10       known as In Re: Highland Capital

11       Management, L.P., and we're here today for

12       the deposition of Grant Scott.

13           Before I begin, I would just like to

14       have confirmation on the record that

15       everybody here who's representing their

16       respective parties agrees that this

17       deposition can be used in evidence in any

18       subsequent hearing, notwithstanding the

19       fact that it's being conducted remotely,

20       and that the witness is not in the same

21       room as the court reporter.

22           Does anybody have an objection to

23       the admissibility of the transcript subject

24       to any reservation of -- of actual

25       objections on the record to using this

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 527 of 1598 PageID 13574
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 8 of
110

Page 7

1          GRANT SCOTT - 1/21/2021

2     transcript going forward?

3          Okay.  Nobody's spoken up, so I --

4     I'd like to begin.

5                    EXAMINATION

6   BY MR. MORRIS:

7     Q.    Good afternoon, Mr. Scott.  As I

8   mentioned, my name is John Morris, and we're

9   here for your deposition today.  Have you ever

10   been deposed before?

11     A.    On two occasions.

12     Q.    And -- and when did the -- when did

13   those depositions take place?

14     A.    This past October and maybe six to

15   eight years ago.

16     Q.    Okay.  Can you just tell me

17   generally what the subject matter was of the

18   deposition this past October.

19     A.    It was relating to Jim Dondero's --

20   it was a family law issue in -- in -- with

21   respect to Jim Dondero.

22     Q.    Okay.  And did you testify in a

23   courtroom, or was it a deposition like this?

24     A.    I -- right here, actually.

25     Q.    Okay.  Super.  And -- and what about

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 528 of 1598 PageID 13575
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 9 of
110

Page 8

1           GRANT SCOTT - 1/21/2021

2   the -- the deposition six to eight years ago,

3   do you have a recollection as to what that was

4   about?

5       A.   Yeah.  It was a -- it was a patent I

6   wrote for Samsung Electronics.

7       Q.   Okay.

8       A.   And as being the person that I --

9   that wrote it and the patent was in litigation,

10   not -- not being handled by me, but by virtue

11   of having written the patent, I was -- I was

12   deposed --

13      Q.   Okay.  So you --

14      A.   -- on the -- on the patent.

15      Q.   Okay.  So you've had a little bit of

16   experience with depositions.  But just

17   generally speaking, I'm going to ask you a

18   series of questions.  It's very important that

19   you allow me to finish my question before you

20   begin your answer.

21           Is that fair?

22      A.   Absolutely.

23      Q.   And I will certainly try to extend

24   the same courtesy to you, but if I -- if I step

25   on your words, will you let me know that?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 529 of 1598 PageID 13576
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 10 of
110

Page 9

1        GRANT SCOTT - 1/21/2021

2    A.    Okay.

3    Q.    And if there's anything that I ask

4  that you don't understand, will you let me know

5  that as well?

6    A.    Yes.  I'll try -- I'll do my best.

7    Q.    Okay.  So this is a virtual

8  deposition.  We're not in the same room.  I am

9  going to be showing you documents today.  The

10  documents will be put up on the screen.  This

11  isn't a -- a trick of any kind.  If at any time

12  you see a document up on the screen and either

13  you believe or you have any reason to want to

14  read other portions of the document, will you

15  let me know that?

16    A.    Yes, I -- yes, I will.  Uh-huh.

17    Q.    With respect to the Dondero family

18  matter, I really don't want to go into the

19  substance of that, but I do want to know

20  whether you testified voluntarily in that

21  matter or whether you -- whether you testified

22  pursuant to subpoena.

23    A.    I would have done that, but the

24  first time I found out about it was a -- was a

25  subpoena that I received.  I wasn't given the

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 530 of 1598 PageID 13577
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 11 of
110

Page 10

1           GRANT SCOTT - 1/21/2021

2   choice.

3      Q.   Okay.  And do you recall who served

4   the subpoena on you?  Actually, let me ask a

5   different question because I'm really not

6   interested in the -- in the details.

7        Did Mr. Dondero serve that subpoena

8   on you or did somebody else?

9     A.   His counsel for his ex-wife.

10     Q.   Mr. -- so -- so the lawyer acting on

11  behalf of Mr. Dondero's ex-wife served you with

12  the subpoena?

13    A.   Correct.

14    Q.   Okay.  You're familiar with an

15  entity called CLO HoldCo Limited; is that

16  right?

17    A.   Yes.

18    Q.   Do you know what that entity is?

19    A.   Yes.

20    Q.   What -- what -- can you describe for

21  me what CLO HoldCo Limited is.

22    A.   It's a holding company of assets

23  including collateralized loan obligation-type

24  assets.  That's a portion of the overall

25  portfolio.  It's an organization that is

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 531 of 1598 PageID 13578
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 12 of
110

Page 11

1        GRANT SCOTT - 1/21/2021

2    integrated with other entities as part of a

3    charitable -- loosely what we -- what we refer

4    to as a charitable foundation equivalent.

5    Yeah.

6        Q.    All right.  We'll -- we'll get into

7    some detail about the corporate structure in a

8    moment.  Do you personally play any role at CLO

9    HoldCo Limited?

10        A.    Yes.  My technical title is

11    director, but I -- I don't necessarily know

12    specifically what that title means other than I

13    act, as I understand it, as -- as a trustee for

14    those -- for those assets.

15        Q.    And where did you get that

16    understanding?

17        A.    Approximately ten years ago from the

18    group that -- that set up the hierarchy.

19        Q.    And which group set up the

20    hierarchy?

21        A.    Employees at Jim Don- -- as I

22    understand it, employees of Highland along with

23    outside counsel, as I understand it, and also,

24    I guess, input from -- from Jim Dondero.

25        Q.    At the time that you assumed the

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 22 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 532 of 1598   PageID 13579
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 13 of
110

Page 12

1        GRANT SCOTT - 1/21/2021

2   role of director of CLO HoldCo Limited, was

3   that entity already in existence?

4       A.   I believe so.  I'm not certain.  I'm

5   not certain.

6       Q.   What are your duties and

7   responsibilities as a director of CLO HoldCo

8   Limited?

9       A.   Well, my day-to-day responsibilities

10   are to interface with -- with the manager of

11   the -- of the assets of CLO.  I do have some

12   role in -- with respect to some of the entities

13   that are -- I -- I have a limited role with

14   respect to a subset of the charitable

15   foundations that receive money from the CLO

16   HoldCo structure, which is commonly referred to

17   as the DAF.  There's -- sometimes those are

18   used interchangeably.

19       Q.   What terms are used interchangeably?

20       A.   Well, the DAF and CLO HoldCo are

21   frequently -- by -- by other people they're --

22   it's the short -- it's the -- I guess it's

23   easier to use the acronym DAF than CLO HoldCo

24   Limited, so I'm frequently having to -- there

25   is a DAF entity so -- that's above -- above CLO

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 533 of 1598   PageID 13580
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 14 of
110

Page 13

1            GRANT SCOTT - 1/21/2021

2   in terms of the management, and so it's

3   frequently confusing and I'm having to clarify

4   at times which entity we're talking about,

5   but -- but other parties frequently use those

6   terms interchangeably.

7        Q.    Okay.

8            MR. MORRIS:  Lisa, when we use the

9        phrase DAF, because you'll hear that a lot,

10        it's all caps, D-A-F.

11   BY MR. MORRIS:

12        Q.    You mentioned that you interface

13   with the manager of assets of CLOs.  Do I have

14   that right?

15        A.    Well, of all the assets.

16        Q.    Okay.  Who is the manager of the

17   assets that you're referring to?

18        A.    Highland Capital Management.

19        Q.    Highland Capital Management manages

20   all of the assets -- withdrawn.

21            Is it your understanding that

22   Highland Capital Management manages all the

23   assets that are owned by CLO HoldCo Limited?

24        A.    Yes.

25        Q.    Who makes the investment decisions

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 534 of 1598 PageID 13581
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 15 of
110

Page 14

1        GRANT SCOTT - 1/21/2021

2   on behalf of CLO HoldCo Limited?

3       A.    Highland -- those managers that you

4   mentioned.

5       Q.    Okay.  I didn't mention anybody in

6   particular.

7       A.    Oh, I'm sorry.  The -- the -- the

8   money manager -- could you repeat that

9   question?  I'm sorry.  I'm so sorry.

10      Q.    Can you just -- can you just

11  identify for me the person who makes investment

12  decisions on behalf of CLO HoldCo Limited.

13      A.    It's -- well, it's -- it's persons

14  as I understand it.  I inter- -- interface with

15  a -- with a group, but it's -- it's Highland

16  Capital employee -- Highland Capital Management

17  employees.

18      Q.    Okay.  Can you just name any of

19  them, please.

20      A.    Hunter Covitz, Jim Dondero.  Mark

21  Okada's no longer there, but I believe he was

22  involved, and there are others that I interface

23  with.

24      Q.    Can you -- can you recall the name

25  of anybody other than Mr. Okada and Mr. Dondero

APPX. 10582

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 535 of 1598 PageID 13582
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 16 of
110

Page 15

1        GRANT SCOTT - 1/21/2021

2   and Mr. Covitz?

3        A.    Yeah.  Over the years I've worked

4   with Tim Cournoyer, Thomas Surgent, but I

5   think -- I think that's the core -- the core

6   group.

7        Q.    All right.  And is there anybody

8   within that core group who has the final

9   decision-making authority concerning the

10   investments in CLO HoldCo Limited?

11       A.    I don't -- I don't know.  I'm sorry.

12   Say that again.  I just want to -- I'm sorry.

13   I'm trying to be -- I'm not trying to -- I'm

14   trying to be --

15       Q.    I understand.  And --

16       A.    Sorry.  If you could just repeat it.

17       Q.    Sure.  Is there any particular

18   person who has the final decision-making

19   authority for investments that are being made

20   on behalf of CLO HoldCo Limited?

21       A.    Amongst that group I am -- I am not

22   sure.

23       Q.    Okay.  So are there any other

24   directors of CLO HoldCo besides yourself?

25       A.    No.

Page 16

1          GRANT SCOTT - 1/21/2021

2     Q.    Is it fair to say that you do not

3  make decisions, investment decisions, on behalf

4  of CLO HoldCo Limited?

5     A.    Yes.

6     Q.    Does CLO HoldCo Limited have any

7  employees that you know of?

8     A.    No.

9     Q.    Does CLO HoldCo have any --

10  withdrawn.

11          Does CLO HoldCo Limited have any

12  officers that you know of?

13     A.    No.

14     Q.    So am I correct that you're the only

15  representative in the world of CLO HoldCo in

16  terms of being a director, officer, or

17  employee?

18     A.    Yes.

19     Q.    Do you receive any compensation from

20  CLO HoldCo for your services as the director?

21     A.    I do now.

22     Q.    When did that begin?

23     A.    I believe in the middle of 2012.

24     Q.    Okay.  And had you served as a

25  director prior to that time without

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 537 of 1598 PageID 13584
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 18 of
110

```
                                                        Page 17
 1          GRANT SCOTT - 1/21/2021

 2   compensation?

 3      A.   Yes.

 4      Q.   And have you been the sole director

 5   of CLO HoldCo Limited since the time of your

 6   appointment approximately ten years ago?

 7      A.   Yes.

 8      Q.   Nobody else has served in that

 9   capacity; is that right?

10      A.   That is correct.

11      Q.   There have been no employees or

12   officers of that entity during the time that

13   you've served as director, correct?

14      A.   Yes.

15      Q.   Do you know who formed CLO HoldCo

16   Limited?

17      A.   I do not.

18      Q.   Do you know why CLO HoldCo Limited

19   was formed?

20      A.   I believe so.

21      Q.   Can you explain to me why -- your

22   understanding as to why CLO HoldCo was formed.

23      A.   So as I understand things, Jim

24   Dondero wanted to create a charitable

25   foundation-like entity or entities, and tax
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 538 of 1598 PageID 13585
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 19 of
110

Page 18

GRANT SCOTT - 1/21/2021

1

2    people particularly, I guess, finance people,

3    lawyers, they created this network of entities

4    to carry out that charitable goal.  At one

5    point, I thought it was a novel type of

6    institution, if you want to call it, or a

7    novel -- novel type of group of entities, but

8    over time, I came to understand that although

9    not cookie cutter, it -- it follows a general

10   arrangement of entities for legal and tax

11   purposes, compliance purposes, IRS purposes,

12   various insulating purposes to maintain -- or

13   to meet the necessary requisites to carry out

14   that charitable function.

15       Q.    When did you come to that

16   understanding?

17       A.    Over the last couple of years.  I

18   periodically have to refresh my recollection.

19   It's -- it's fairly complex.

20       Q.    Okay.  In your capacity as the sole

21   director of CLO HoldCo Limited, do you report

22   to anybody?

23       A.    No.

24       Q.    Other than interfacing with the

25   manager of the assets of the CLO, do you have

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 29 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 539 of 1598   PageID 13586
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 20 of
110

Page 19

1          GRANT SCOTT - 1/21/2021

2   any other duties and responsibilities as a

3   director of CLO HoldCo Limited?

4       A.   Yes.  Sorry.  My mouth is a little

5   dry.

6       Q.   By the way, if you ever need to take

7   a break, just let me know.

8       A.   Okay.  Thank you.  Now I forgot your

9   question.  The -- the -- the --

10      Q.   I understand.

11      A.   The answer -- the -- the answer is

12  yes.  I -- why don't you ask -- ask your

13  question again.  I'm sorry.

14      Q.   Sure.  Other than interfacing with

15  the manager of the assets of the CLO, do you

16  have any other duties and responsibilities as

17  the sole director of CLO HoldCo Limited?

18      A.   Yes.  So Highland Capital because of

19  its -- the way it's set up to manage or service

20  CLO HoldCo and the DAF, it has a relatively

21  large group of people that I have to interface

22  with to do everything from -- everything from

23  soup to nuts.  Finances and the money

24  management is one aspect, but most of my

25  time -- on a day-to-day or week-to-week basis,

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 540 of 1598 PageID 13587
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 21 of
110

Page 20

1          GRANT SCOTT - 1/21/2021

2    most of my time is spent working with the

3    various compliance and other people for

4    addressing issues of get- -- you know, getting

5    taxes filed.  It runs -- it runs the gamut of

6    every aspect of the organization being -- being

7    handled by Highland.

8        Q.    Okay.

9        A.    You know, unlike -- unlike my

10   financial -- unlike a financial planner that

11   might, you know, manage assets, they -- they do

12   it all, and I interface with them regularly to

13   maintain -- mostly to deal with compliance

14   issues.

15       Q.    Who's the com- -- is there a person

16   who's in charge of compliance?

17       A.    I believe Thomas Surgent.  I

18   mentioned him.  I believe he also has that

19   role, but it's -- you know, they do have

20   turnover, I guess, in that.  It's -- I guess

21   they refer to it as the back office.  I've

22   heard that term be used, but -- basically, it's

23   a large number of people that have changed over

24   time, but it's -- it's more -- I believe it's

25   more than one collectively.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23    Page 541 of 1598    PageID 13588
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 22 of
110

Page 21

| 1 | GRANT SCOTT - 1/21/2021 |
|---|---|

2    Q.    How much time do you devote -- you

3    know, can you estimate either on a weekly or a

4    monthly basis how many -- how much time do you

5    devote to serving as the director of CLO HoldCo

6    Limited?

7        A.    I thought about that.  Well, let --

8    let's put it this way:  There was the

9    prebankruptcy time I spent per day, and then

10   there was the postbankruptcy time I've spent

11   per -- per -- or per week -- excuse me, or

12   per -- I've estimated it as probably a day --

13   it's so intermittent it's -- it's hard, okay?

14   It's -- I don't dedicate my Mondays to only

15   doing that and then Tuesday through Friday I

16   don't, right?  I -- it's -- I have to piece

17   together everything that occurs during the

18   week.  There might be some weeks where I don't

19   have any contact.  There might be every day of

20   the week I have multiple contact.  There may be

21   days where from morning to night there is so

22   much contact, it precludes me from doing

23   anything else meaningfully.  So -- but I would

24   estimate it's probably three or four -- maybe

25   three days, four days a month when things are

APPX. 05839

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 32 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 542 of 1598   PageID 13589
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 23 of
110

Page 22

1          GRANT SCOTT - 1/21/2021

2    going well.

3        Q.    And -- and I think you -- you

4    testified just now that there was kind of a

5    difference between prebankruptcy and

6    postbankruptcy.  Do I have that right?

7        A.    Yes.

8        Q.    And can you tell me -- is it fair to

9    say that before the bankruptcy, you didn't

10   devote much time to CLO HoldCo, or do I have

11   that wrong?

12       A.    Well, I -- just the time that --

13   that I mentioned just -- I'm sorry.  The -- the

14   time I just mentioned now when you asked me,

15   that was the pre period.  Excuse me.  I haven't

16   talked about the postbankruptcy period.

17       Q.    So are you -- are you -- are you

18   devoting more time or less time since the

19   bankruptcy?

20       A.    Much more.

21       Q.    Much more since the bankruptcy

22   filing?

23       A.    Yes.

24       Q.    And so why did the bankruptcy filing

25   cause you to spend more time as a director of

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 33 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 543 of 1598   PageID 13590
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 24 of
110

Page 23

1        GRANT SCOTT - 1/21/2021

2   CLO HoldCo Limited?

3       A.    Well, initially, and this would

4   be -- this would be late 2019, it was --

5   aft- -- after the bankruptcy was -- was filed

6   and I obtained counsel, who are on the phone

7   now -- or in this deposition now, excuse me,

8   that was -- that transition occurred because

9   CLO was a debtor -- excuse me, a creditor to --

10  to the debtor and had to take steps to

11  establish its -- its claim.  So if I understand

12  the -- things correctly, the -- the debtor

13  identified as part of the filing -- I don't

14  know how bankruptcy works, but if I under- --

15  if my recollection is correct, there's a

16  hierarchy from biggest to smallest, and we were

17  relatively high up.  And when I say we or I,

18  I -- I just mean CLO was relatively high up.

19  And so initially, for the first period of so

20  many months, the -- the exclusive focus was on

21  our position as a creditor -- a creditor having

22  a certain claim against a debtor.

23      Q.    Can you describe for me your

24  understanding of the nature of the claim

25  against the debtor.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 544 of 1598 PageID 13591
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 25 of
110

Page 24

1          GRANT SCOTT - 1/21/2021

2     A.    It was various obligations that were

3  owed to -- to CLO, things that had been

4  previously donated or -- or agreements that had

5  been set up that transferred certain assets,

6  and it was basically the -- the -- the amounts

7  were derived from those sorts of transactions.

8     Q.    Okay.  You're a patent lawyer; is

9  that right?

10    A.    I -- I'm exclusively a patent

11  attorney, yes.

12    Q.    Have you been a patent lawyer on an

13  exclusive basis since the time you graduated

14  from law school?

15    A.    From law school, yes.

16    Q.    Can you just describe for me

17  generally your educational background.

18    A.    So I'm an electrical engineer by

19  training.  I graduated from the University of

20  Virginia in 1984.  I then went to graduate

21  school at the University of Illinois.  I

22  received my master's degree in 1986, and then I

23  immediately joined IBM Research at the Thomas

24  Watson Institute in New York where I was a --

25  my title was research scientist, but I was -- I

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 35 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 545 of 1598   PageID 13592
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 26 of
110

Page 25

1          GRANT SCOTT - 1/21/2021

2    guess I was more of a research engineer, if

3    that matters.  And I did that until I

4    transitioned -- or I began law school in the

5    fall of 1988, and then I graduated law school

6    in May of 1991.

7          Q.    And where did you go to law school?

8          A.    University of North Carolina.

9          Q.    Do you have any formal training in

10   investing or finance?

11         A.    I do not.

12         Q.    Do you hold yourself out as an

13   expert in any field of investment?

14         A.    None -- none at all.

15         Q.    Have you had any formal training

16   with respect to compliance issues?  You

17   mentioned compliance issues earlier.

18         A.    No.

19         Q.    Now, do you have any knowledge about

20   compliance rules or regulations?

21         A.    Minimal that I've -- that have

22   occurred organically but -- but generally, no.

23         Q.    You don't hold yourself out as an

24   expert in com- -- in the area of compliance,

25   correct?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 546 of 1598    PageID 13593
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 27 of
110

Page 26

1          GRANT SCOTT - 1/21/2021

2      A.    No.  No.  I'm -- no.

3      Q.    Do you have any particular

4    investment philosophy or strategy?

5          MR. CLARK:  I'm going to object to

6      the form of the question.  And, John,

7      can -- can we get an agreement that -- I

8      know you were objecting just simply on the

9      form basis yesterday -- that objection to

10     form is sufficient today?

11         MR. MORRIS:  Sure.

12         MR. CLARK:  Okay.  And I object to

13     form.  Grant, you can answer to the extent

14     you can.

15         THE WITNESS:  I forget the question

16     now that you interrupted.  I'm sorry.

17   BY MR. MORRIS:

18     Q.    So -- so -- and I'm going to ask a

19   different question because in hindsight, that's

20   a good objection.

21         In your capacity as the director

22   of -- withdrawn.

23         Do the employees of Highland that

24   you identified earlier, do they make investment

25   decisions on behalf of CLO HoldCo Limited

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 37 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 547 of 1598   PageID 13594
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 28 of
110

Page 27

1          GRANT SCOTT - 1/21/2021

2    without your prior knowledge on occasion?

3        A.    On occasion, they do.

4        Q.    So there's no rule that your prior

5    approval is needed before investments are made,

6    right?

7        A.    I don't know whether they have an

8    internal guideline as to the amount that

9    triggers when they get in touch with me or

10   whether it's a new -- a change, something new,

11   or -- versus recurring.  So I don't -- I don't

12   know what they use internally for that metric.

13       Q.    Okay.  Are you aware of any

14   guideline that was ever used by the Highland

15   employees whereby they were required to obtain

16   your consent prior to effectuating transactions

17   on behalf of CLO HoldCo Limited?

18       A.    I understand there was one or more,

19   but I do not know that.

20       Q.    Okay.  Did you ever see such a

21   policy or list of rules that would require your

22   prior consent before the Highland employees

23   effectuated transactions on behalf of CLO

24   HoldCo Limited?

25       A.    Possibly some time ago, but I -- I

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 38 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 548 of 1598    PageID 13595
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 29 of
110

Page 28

1          GRANT SCOTT - 1/21/2021

2    don't recall.

3         Q.    Okay.  So -- withdrawn.  I'll --

4    I'll go on.

5              How did you come to be the director

6    of CLO HoldCo?

7         A.    I was asked either by Jim Dondero

8    or -- directly or indirectly by -- by Jim

9    Dondero.

10        Q.    And who is Jim Dondero?

11        A.    Well, at the time, he was the head

12   or one of the heads of Highland Capital

13   Management, a friend of mine.

14        Q.    How long have you known Mr. Dondero?

15        A.    Since high school so that -- 1976.

16        Q.    Where did you and Mr. Dondero grow

17   up?

18        A.    In northern New Jersey.

19        Q.    Do you consider him among the

20   closest friends you have?

21        A.    I think he is my closest friend.

22        Q.    Did you two go to college together?

23        A.    We actually -- for the last -- last

24   two years I was at UVA, University of Virginia,

25   excuse me, he and I were -- were at UVA.  So we

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 39 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 549 of 1598   PageID 13596
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 30 of
110

Page 29

1          GRANT SCOTT - 1/21/2021

2   did not start out at UVA initially, but -- but

3   we both transferred -- I transferred my

4   sophomore year.  I was actually a chemical

5   engineer at the University of Delaware when I

6   transferred in, and then he transferred in his

7   junior year.  So we were there at college for

8   two years.

9       Q.    And -- and based on your

10   relationship with him, is it your understanding

11   that one of the reasons he chose to transfer to

12   UVA is -- is to -- because you were there?

13       A.    Oh, no.  He transferred -- he --

14   he -- he transferred there because of the -- so

15   he went to the University of -- he -- he went

16   to Virginia Tech University, which is more

17   known as being an engineering school, which I

18   might have wanted to go to, and less a finance

19   business school.  And if I understand things

20   correctly, and I believe I do, he transferred

21   to UVA because of the well-known

22   business/finance program, accounting program.

23       Q.    And did you -- did you and

24   Mr. Dondero become roommates at UVA?

25       A.    We weren't roommates, but we lived

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 550 of 1598    PageID 13597
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 31 of
110

Page 30

1            GRANT SCOTT - 1/21/2021

2    in the -- we were housemates.  I'm sorry.  We

3    were housemates.

4        Q.    So you shared a house together.  How

5    would you describe your relationship with

6    Mr. Dondero today?

7        A.    It's -- it's been strained a while,

8    for some time, but -- but generally, very good.

9    Good to very good.

10        Q.    Without -- without getting personal

11    here, can you just generally identify the

12    source of the strain that you described.

13        A.    This -- I think it would be fair to

14    say that this bankruptcy, particularly events

15    in 2020 so some months after the bankruptcy was

16    declared, things have become -- we -- we still

17    have a close friendship, but -- but things

18    are -- are a bit -- are a bit more difficult.

19        Q.    Were you ever married?

20        A.    I've never been married.

21        Q.    Did you serve as Mr. Dondero's best

22    man at his wedding?

23        A.    I did.

24        Q.    Is it fair to say that -- that

25    Mr. Dondero trusts you?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 551 of 1598 PageID 13598
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 32 of
110

Page 31

1          GRANT SCOTT - 1/21/2021

2          MR. CLARK:  Objection, form.

3    BY MR. MORRIS:

4      Q.    Withdrawn.

5          Do you believe that Mr. Dondero

6    trusts you?

7      A.    I do.

8      Q.    Over the years, is it fair to say

9    that Mr. Dondero has confided in you?

10          MR. CLARK:  Objection, form.

11    BY MR. MORRIS:

12     Q.    You can answer if you understand it.

13     A.    I think so.

14     Q.    I -- I -- what's your answer?  You

15    think so?

16     A.    Maybe you can de- -- I think of

17    confide as -- could you define confide, please.

18     Q.    Sure.  Is it -- is it fair to say

19    that over the -- let me -- you've known

20    Mr. Dondero for almost 45 years, right?

21     A.    Yes.

22     Q.    And you consider him to be your

23    closest friend in the world, right?

24     A.    Yes.

25     Q.    And is it fair to say over the

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 552 of 1598    PageID 13599
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 33 of
110

Page 32

1          GRANT SCOTT - 1/21/2021

2    course of those 45 years, Mr. Dondero has

3    shared confidential information with you that

4    he didn't want you to reveal publicly to other

5    people?

6          A.    Yes.

7          Q.    And is it your understanding that

8    because of the nature of your relationship with

9    him, he asked you to serve as the director of

10   CLO HoldCo Limited?

11         A.    Yes.  I believe it's because he --

12   he trusted -- trusted me with -- with assets

13   relating to his charitable vision.  I -- I --

14   yeah.  Yes.

15         Q.    And is it your understanding that he

16   thought you would help him execute his

17   charitable vision?

18         A.    That was the point of attraction

19   initially.  It wasn't for money.  I wasn't

20   being paid.  That was -- the charitable mission

21   was the attraction.

22         Q.    Does Mr. Dondero play any role in

23   the management of the CLO HoldCo Limited asset

24   pool?

25              MR. CLARK:  Objection, form.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 553 of 1598 PageID 13600
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 34 of
110

Page 33

1        GRANT SCOTT - 1/21/2021

2     A.    I'm sorry.  Could you repeat that?

3   My -- my screen went small and then big again.

4   I was distracted.

5     Q.    What role does Mr. Dondero play with

6   respect to the management of the CLO HoldCo

7   Limited asset pool?

8        MR. CLARK:  Objection, form.

9     A.    He is with the company that manages

10  that asset pool.  He's one of the people I

11  named previously as managing those assets.

12    Q.    He is -- he -- he is the -- do you

13  understand that he has the final

14  decision-making power with respect to the

15  management of the assets that are held by CLO

16  HoldCo Limited?

17        MR. CLARK:  Objection, form.

18    A.    I believe I ansel -- answered that

19  previously.  I -- I don't know who has -- for

20  certainty I do not know who has that within

21  that company.  I don't.  If -- if -- I -- I

22  don't know, consistent with my prior answer.

23    Q.    Did you ever ask anybody who had the

24  final decision-making authority for investments

25  on behalf of CLO HoldCo Limited?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 554 of 1598 PageID 13601
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 35 of
110

Page 34

1          GRANT SCOTT - 1/21/2021

2     A.    I -- I did not.

3     Q.    Did you ever make a decision on

4   behalf of -- withdrawn.

5          In your capacity as a director --

6   withdrawn.

7          In your capacity as the sole

8   director of CLO HoldCo Limited, can you think

9   of any decision that you've ever made that

10  Mr. Dondero disagreed with?

11    A.    Since -- prior to the bankruptcy,

12  no, not that I'm aware of.

13    Q.    And since the bankruptcy?

14    A.    There are decisions that I've made

15  that he's disagreed with.

16    Q.    Can you identify them?

17    A.    Yes.

18    Q.    Please do so.

19    A.    Okay.  So the reason I'm pausing is

20  I'm trying to put these in chronological order

21  and, at the same time, identify maybe some of

22  the more important ones versus the lesser

23  important ones.  One of the decisions I made

24  related to a request that I received from the

25  independent board of Highland.  I don't know

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 45 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 555 of 1598   PageID 13602
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 36 of
110

1          GRANT SCOTT - 1/21/2021

2    how the request was transmitted to me, but I

3    believe the way it played out is as follows:  I

4    believe I was asked to call Jim Seery, and the

5    other -- and Russell Nelms, and the third

6    independent director, I believe his name is

7    John.  I -- I forget right now what his last

8    name is.  They were in New York, said they were

9    in a conference room.  I called in.  They were

10   very pleasant.  They identified who they were,

11   and they had a request, and the request was

12   that I agree to a transfer -- or that I -- that

13   I agree to allow certain assets that were not

14   Highland's assets but they were CLO's as- --

15   assets -- apparently, there was no dispute

16   about that at any point in time, but that I

17   agree to allow certain assets that were due CLO

18   to be transferred to the registry of the

19   bankruptcy court.  And either on that call I

20   immediately agreed or ended the call, called my

21   attorney, and then immediately agreed.  It was

22   a very -- I accommodated the request quickly.

23        Q.    Okay.  And can you just tell me at

24   what point in time you spoke with Mr. Dondero,

25   and what did he say that you recall?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 556 of 1598 PageID 13603
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 37 of
110

Page 36

1        GRANT SCOTT - 1/21/2021

2        A.    I don't know when he became aware of

3    that decision.  I'm not sure I ever volunteered

4    that the decision was even made, but at some

5    point, it became an issue because he found out

6    through -- if I understand the sequence of

7    events correctly, he found out possibly through

8    his counsel because there was ultimately

9    litigation about that issue.  It became known

10   to everyone at some point what I had done, I --

11   I think.  And subsequent to that, it became an

12   issue because of CLO HoldCo having fairly

13   significant cash flow issues with respect to

14   its expenses and obligations, including payment

15   of management fees as well as some of the

16   scheduled charitable giving that was -- that

17   was by contract already predefined.  My

18   decision to tuck that money -- or to agree

19   to -- my agreement to let that money be tucked

20   away created some -- created some -- created

21   some problems --

22       Q.    And -- and --

23       A.    -- for CLO HoldCo.

24       Q.    Okay.  And I just want you to focus

25   specifically on my question, and that is, what

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 557 of 1598 PageID 13604
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 38 of
110

Page 37

1          GRANT SCOTT - 1/21/2021

2    did Mr. Dondero say to you that -- that causes

3    you to testify as you did, that this is one

4    issue that he didn't agree with?

5         A.    I believe his concern was that

6    because it was money that was undisputably to

7    flow to CLO HoldCo that -- which had many, many

8    other nonliquid assets -- this was a form of a

9    liquid asset.  It was cash in effect, proceeds.

10    -- that the money should have been allowed to

11    flow to be available for obligations.  He

12    didn't under- -- I -- I -- I don't know what he

13    was thinking, but the -- the issue was that the

14    decision to put it into escrow was -- was --

15    was in- -- incorrect, that there was no basis

16    for it.

17         Q.    That -- that's an issue where after

18    learning of your decision, he didn't agree with

19    it; is that fair?

20         A.    That's right.

21         Q.    Okay.  Can you think of any decision

22    that you've ever made on behalf of CLO HoldCo

23    Limited where Mr. Dondero had advance knowledge

24    of what you were going to do and he objected to

25    it, but you nevertheless overruled his

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 558 of 1598 PageID 13605
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 39 of
110

Page 38

1    GRANT SCOTT - 1/21/2021

2  objection and went ahead and did what -- did

3  what you thought was right?

4    A.   Okay.  Let me -- let me -- I have --

5  I'm sorry.

6    Q.   We're here.

7    A.   Oh, I'm sorry.  I'm having some

8  issues with my screen.  So that may have

9  occurred with respect to the original proof of

10  claim.  Then there was a subsequent amendment

11  to the proof of claim, and I -- I believe it --

12  I believe that he might have been aware of both

13  of those and was in disagreement with -- with

14  those.  But after working with my attorney, we

15  just -- you know, we did what we thought was

16  right, and I still think what we did was right.

17  There was an issue with respect to Har- --

18  HarbourVest that occurred relatively recently

19  where he objected to a decision that I had

20  made.  As I understand it, I could have

21  contacted my attorney and changed the decision,

22  but I didn't, and I still think that was the

23  right decision.

24          We have filed plan objections.  I

25  can't say if he has any -- in that regard, I --

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 49 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 559 of 1598    PageID 13606
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 40 of
110

Page 39

1            GRANT SCOTT - 1/21/2021

2   I -- I don't know what his thoughts are on

3   objections.  They would not have been

4   communicated with -- by me to him, but my

5   attorney might have consulted with his

6   attorney, and there -- they may know what that

7   difference is, but I -- that was just another

8   big decision.  I -- I -- maybe that --

9       Q.    All right.  Let me see if I can --

10  let me see if I can summarize this.  So two

11  proofs of claim.  Is it fair to say that

12  Mr. Dondero saw those proofs of claim before

13  they were filed?

14          MR. CLARK:  Objection, form.

15  BY MR. MORRIS:

16      Q.    Withdrawn.

17      A.    It --

18      Q.    Do -- do you know whether

19  Mr. Dondero saw the proofs of claim before they

20  were filed?

21      A.    I don't believe he did.

22      Q.    What -- what steps in filing the

23  proofs of claim did he object to that you

24  overruled?  Did he think there was -- something

25  should be different about them?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 560 of 1598 PageID 13607
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 41 of
110

Page 40

1          GRANT SCOTT - 1/21/2021

2     A.    So we had to interface with Highland

3  employees at some point to get information to

4  support our proof of claim, and my guess, and

5  it's just a guess, is that he was aware of

6  those inquiries.  I -- I'm sorry.  I shouldn't

7  speculate.  I don't know.  But he -- with

8  respect to the original proof of claim, I'm --

9  I'm not aware of what specifically he was

10  objecting to or was -- thought should have been

11  different, but the -- with respect to the

12  amended proof of claim, which reduced the

13  original proof of claim to zero, I think that's

14  where he had a -- an issue.

15     Q.    And did you speak with him about

16  that topic prior to the time the amended claim

17  was filed, or did you only speak with him after

18  it was filed?

19     A.    I'm not sure the timing of that.

20     Q.    And with respect to HarbourVest, did

21  he ask you to object to the settlement on

22  behalf of CLO HoldCo Limited, and is that

23  something that you declined to do?

24          MR. CLARK:  Objection, form.

25     A.    I'm -- I'm sorry.  I was confused

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 51 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 561 of 1598   PageID 13608
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 42 of
110

Page 41

1        GRANT SCOTT - 1/21/2021

2    with the word.  Could you please repeat that?

3        Q.    Yes.  You mentioned HarbourVest

4    before, right?

5        A.    Yes.

6        Q.    And you mentioned that there was an

7    issue with Mr. Dondero and you concerning

8    HarbourVest; is that right?

9        A.    Yes.

10       Q.    And did that have to do with whether

11   or not CLO HoldCo Limited would -- would object

12   to the debtor's motion to get the HarbourVest

13   settlement approved?

14       A.    Would -- would get the

15   HarbourVest --

16       Q.    Settlement approved by the court.

17       A.    I'm not trying to be difficult.

18   I'm -- I'm -- could you just repeat that one

19   more time?  I'm --

20       Q.    What was -- what was --

21       A.    There was --

22       Q.    Let me try again.

23       A.    Okay.

24       Q.    What was the issue with respect to

25   HarbourVest that he objected to and -- and you

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 52 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 562 of 1598    PageID 13609
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 43 of
110

Page 42

1          GRANT SCOTT - 1/21/2021

2    overrode his objection and did what you thought

3    was right anyway?

4          A.    Okay.  Okay.  That's -- that's

5    easier for me to understand.  I'm sorry.  So I

6    had worked with my attorney or he did the work

7    and consulted with -- we consulted, but we had

8    filed an objection, motion objecting to the

9    settlement, if I understand the terminology and

10   nomenclature correctly.  Okay.  He had -- we

11   had come to an agreement that we had a very

12   valid argument.  That argument was evidenced

13   by, I guess it was, our motion that was

14   submitted to the court.  On the day of the

15   hearing to resolve this issue, we pulled our

16   request, and that was because I believed it did

17   not have a good-faith basis in law to move

18   forward on.

19          Q.    And did you discuss that issue with

20   Mr. Dondero before informing the court that CLO

21   HoldCo Limited was withdrawing its objection,

22   or did he learn about that for the first time

23   during the hearing --

24          MR. CLARK:  Objection, form.

25   BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 53 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 563 of 1598   PageID 13610
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 44 of
110

Page 43

1        GRANT SCOTT - 1/21/2021

2      Q.   -- if you know?

3      A.   I -- I understand that he learned it

4    during the hearing.  I don't know the -- I -- I

5    don't know the -- whether there was any -- I --

6    I don't know for certain on the second half of

7    your question.

8      Q.   Let me -- let me try it -- let me

9    try it this way:  Did you speak with

10   Mr. Dondero about your decision to withdraw the

11   objection to the HarbourVest settlement prior

12   to the time your counsel made the announcement

13   in court?

14     A.   I don't -- I don't believe so.  No.

15   No.  No.  I'm sorry.  No.

16     Q.   And did --

17     A.   Okay.  No.  Here -- here's where

18   I'm -- I can clarify, okay?  I'm sorry.  I can

19   clarify.

20     Q.   That's all right.

21     A.   I gave the decision to my

22   attorney -- I -- I agreed with the

23   recommendation of my attorney, okay?  It wasn't

24   my --

25     Q.   Did you have a good --

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 54 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 564 of 1598   PageID 13611
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 45 of
110

Page 44

1           GRANT SCOTT - 1/21/2021

2    A.   -- thought, okay?

3         THE REPORTER:  I didn't --

4    A.   Okay.  So he --

5    Q.   It was a recommendation.

6    A.   Yeah.  So he -- he called me with a

7    recommendation.  It was highly urgent.  You

8    know, I was coming out of the men's room, had

9    my phone with me.  I got the call.

10        MR. CLARK:  Hey, Grant, I -- Grant,

11        I just want to caution you not to -- to --

12        and I don't think counsel is looking for

13        this but not to disclose the -- the

14        substance of any of your communications

15        with counsel, okay?

16        THE WITNESS:  Thank you.

17   A.   So --

18        THE WITNESS:  Thank you.  I'm -- I'm

19        sorry.

20   BY MR. MORRIS:

21   Q.   It's -- it's really a very simple

22   question.  Do you recall --

23   A.   He made a recommendation.  I -- I --

24   I think I can answer your question without

25   going off tangent.  I'm sorry.  So he -- my

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 565 of 1598 PageID 13612
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 46 of
110

Page 45

1          GRANT SCOTT - 1/21/2021

2    attorney made a recommendation.  I agreed with

3    it.  We with- -- I -- I told him to withdraw --

4    or I authorized him to withdraw.

5          Q.    Okay.

6          A.    Then I received a communication, and

7    I -- I guess the most likely scenario is the

8    motion had been withdrawn by the time Jim

9    Dondero found out.

10         Q.    And -- and did he write to you, or

11   did he call you?  Did he send you a text?

12         A.    He called me.

13         Q.    What did he say?

14         A.    He was asking why, and I explained,

15   and I said I agreed with the decision and I was

16   sticking with the decision.

17         Q.    Let's just -- let's just move on to

18   a new topic, and let's talk about the structure

19   of -- of CLO HoldCo.  Are you generally

20   familiar with the ownership structure of CLO

21   HoldCo?

22         A.    Yeah.  I mean, in terms --

23         Q.    Are -- are you -- are you generally

24   familiar with it?  It's not a test.  I'm just

25   asking do you have a general familiarity --

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 566 of 1598 PageID 13613
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 47 of
110

Page 46

1          GRANT SCOTT - 1/21/2021

2     A.    With CLO HoldCo or the entities

3     associated with CLO HoldCo?

4     Q.    The latter.

5     A.    Yes, I believe so.

6     Q.    All right.  I've prepared what's

7     called a demonstrative exhibit.  It's just --

8     A.    Yes.

9     Q.    -- just -- it's a document that, I

10    think, reflects facts, but I want to ask you

11    about it.

12         MR. MORRIS:  La Asia, can we please

13         put up Exhibit 1.

14         (SCOTT EXHIBIT 1, Organizational

15         Structure:  CLO HoldCo, Ltd., was marked

16         for identification.)

17    BY MR. MORRIS:

18    Q.    Okay.  Can you see that, Mr. Scott?

19    A.    Yes, I can.

20    Q.    Okay.  So I think I took the

21    information from resolutions that were attached

22    to the CLO HoldCo proof of claim, and that's

23    why you got that little footnote there at the

24    bottom of the page.  But let's start in the

25    lower right-hand corner and see if this chart

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 57 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 567 of 1598   PageID 13614
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 48 of
110

Page 47

1          GRANT SCOTT - 1/21/2021

2    comports with your understanding of the facts.

3            Do you know that CLO HoldCo Limited

4    was formed in the Cayman Islands?

5        A.    Yes.

6        Q.    And to the best of your knowledge,

7    is CLO HoldCo Limited 100 percent owned by the

8    Charitable DAF Fund, L.P.?  If you're not sure,

9    just say you're not sure if you don't know.

10   It's not a test.

11       A.    So the -- the -- the familiarity

12   I -- I'm -- I'm familiar with the different --

13   I'm confused with the arrangement of the boxes

14   and the ownership interest versus managerial

15   interest.  I believe that's -- that's right.

16       Q.    Okay.  And -- and you're the sole

17   director of CLO HoldCo Limited, right?

18       A.    Yes.

19       Q.    And this whole structure was -- the

20   idea for this structure, to the best of your

21   knowledge, was to implement Mr. Dondero's plan

22   for charitable giving; is that fair?

23       A.    Yes.  Ultimately, yes.

24       Q.    And is it fair to say then that

25   he -- he made the decision to establish this

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 58 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 568 of 1598 PageID 13615
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 49 of
110

Page 48

1                GRANT SCOTT - 1/21/2021

2    particular structure, to the best of your

3    knowledge?

4        A.   I -- I didn't -- I'm sorry.  I

5    didn't hear you very well.

6        Q.   To the best of your knowledge, did

7    Mr. Dondero make the decisions to establish the

8    structure that's reflected on this page?

9        A.   Oh, I don't know if he made the

10   decision to establish this structure, although

11   it's -- it's -- I'm sorry.  Strike that.  I --

12   if -- if what you're saying is did he approve

13   of this structure, to my knowledge, yes.

14       Q.   Okay.  Do you hold any position with

15   respect to Charitable DAF Fund, L.P.?

16       A.   I -- I -- your chart says no.  I --

17   I -- I thought I had a role there, too.

18       Q.   I don't know.  I don't have

19   information on that.  That's why I'm asking the

20   question.

21       A.   I -- I -- I believe -- yes, I

22   believe I have the same role as I do in -- in

23   CLO HoldCo.

24       Q.   And that would be director?

25       A.   Yes.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 59 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 569 of 1598   PageID 13616
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 50 of
110

Page 49

1        GRANT SCOTT - 1/21/2021

2        Q.    And to the best of your knowledge,

3    is the Charitable DAF GP, LLC, the general

4    partner of Charitable DAF Fund, L.P.?

5        A.    Yes.

6        Q.    And is it your understanding that

7    you are the managing member of Charitable DAF

8    GP, LLC?

9        A.    Yes.

10        Q.    Does Charitable DAF GP, LLC, have

11    any employees?

12        A.    No.

13        Q.    Does Charitable DAF GP, LLC, have

14    any officers or directors?

15        A.    No.

16        Q.    Are you the only person affiliated

17    with Charitable DAF GP, LLC, to the best of

18    your --

19        A.    I believe so.

20        Q.    Do you receive any compensation for

21    serving as the managing member of Charitable

22    DAF GP, LLC?

23        A.    No.  The -- I don't interact with it

24    very often.  It's -- no, I don't receive any

25    compensation.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 60 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 570 of 1598   PageID 13617
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 51 of
110

Page 50

1         GRANT SCOTT - 1/21/2021

2      Q.    Can you tell me in your capacity as

3    the managing member of Charitable DAF GP, LLC,

4    what's the nature of that entity's business?

5      A.    It -- it doesn't perform any

6    day-to-day operations.  My understanding is --

7    is that it's -- it's there for purposes of

8    compliance.  I can't recall the last time I had

9    any activity with respect to that.

10      Q.    How about the Charitable DAF Fund,

11    L.P.?  I apologize if I've asked you these

12    questions.

13      A.    It -- it's the same.  I -- I -- my

14    activity is almost exclusively CLO HoldCo.

15      Q.    All right.  Let me just ask the

16    questions nevertheless.  Does Charitable DAF

17    Fund, L.P., have any employees?

18      A.    Employees?  No.

19      Q.    Does it have any officers and

20    directors?

21      A.    No.

22      Q.    Are you the sole director of

23    Charitable DAF Fund, L.P.?

24      A.    Yes, I believe so.

25      Q.    So if we -- if we put under

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 571 of 1598 PageID 13618
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 52 of
110

Page 51

1          GRANT SCOTT - 1/21/2021

2   Charitable DAF Fund, L.P., Grant Scott,

3   director, and we put under CLO HoldCo Limited

4   Grant Scott, director, would everything on the

5   right side of that page be accurate, to the

6   best of your --

7       A.   I believe so.

8       Q.   Well, let's move to the left side of

9   the page.  Have you heard of the entity

10   Charitable DAF HoldCo Limited?

11      A.   Yes.

12      Q.   Are you the sole director of

13   Charitable DAF HoldCo Limited?

14      A.   Yes.

15      Q.   How did you become -- how did you

16   come to be the char- -- the sole director of

17   Charitable DAF HoldCo Limited?

18      A.   That was when it was established.

19      Q.   And did Mr. Dondero ask you to serve

20   in that capacity?

21      A.   Yes.

22      Q.   And did Mr. Dondero ask you to serve

23   as the managing member of Charitable DA- -- DAF

24   GP, LLC?

25      A.   Yes.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 62 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 572 of 1598 PageID 13619
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 53 of
110

Page 52

1            GRANT SCOTT - 1/21/2021

2       Q.    And did Mr. Dondero ask you to serve

3    as the director of Charitable DAF, L.P. --

4    withdrawn.

5            Did Mr. Dondero ask you to serve as

6    director of Charitable DAF Fund, L.P.?

7       A.    Yes.

8       Q.    To the best of your knowledge, does

9    Charitable DAF HoldCo Limited own 99 percent of

10   the limited partnership interests in Charitable

11   DAF Fund, L.P.?

12      A.    Yes.  The -- the feed -- the -- the

13   feeds -- the -- the three horizontal blocks

14   there that identify Highland Dallas Foundation,

15   Kansas City, Santa Barbara -- there's a fourth

16   of -- relatively de minimus in terms of

17   participation.  There's a fourth entity that's

18   missing.  It's Dallas -- I forget the name.

19   That -- that -- that structure is -- is a bit

20   dated --

21      Q.    Okay.

22      A.    -- as it -- as is shown.

23      Q.    Okay.  So I will tell you and we can

24   look the documents if you want, but attached to

25   CLO HoldCo Limited's claim are a number of

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 63 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 573 of 1598   PageID 13620
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 54 of
110

Page 53

GRANT SCOTT - 1/21/2021

1

2   resolutions, and there's one that I have in

3   mind that shows Charitable DAF HoldCo Limited

4   holding 99 percent of the limited partnership

5   interests of Charitable DAF Fund, L.P., and

6   there's another that shows it being a hundred

7   percent.  Do you -- do you know which is

8   accurate at least at this time?

9       A.    There's a 1 percent/99 percent

10  division, and I am -- I believe it's the 99

11  percent, but I'm -- I'm getting confused by

12  the -- by the arrangement.  I'm so used to

13  another arrangement.  I -- I believe the 99

14  percent is correct.

15      Q.    Okay.  Do you have any understanding

16  as to who owns the other 1 percent of the

17  limited partnership interests of Charitable DAF

18  Fund, L.P.?

19      A.    No.  This -- this is confusing to

20  me.  No.

21      Q.    Okay.  There are, at least on this

22  page, three foundations that I think you've

23  identified.  Are those three foundations

24  together with the fourth that you mentioned the

25  owners of the Charitable DAF HoldCo Limited?

APPX. 10873

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 64 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 574 of 1598 PageID 13621
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 55 of
110

Page 54

1          GRANT SCOTT - 1/21/2021

2     A.    Owners?

3     Q.    Yes.

4          MR. CLARK:  Objection, form.

5     A.    They -- they only participate in the

6    money that flows up to them.

7     Q.    And what does that mean exactly?

8     A.    What's that?

9     Q.    What does that -- what do you mean

10   by that?  Do the foundations fund Charitable

11   DAF Fund HoldCo Limited?

12    A.    Initially.  Initially, as I

13   understand it, the money flows downward into

14   the Charitable DAF HoldCo Limited before it

15   ultimately makes its way to CLO HoldCo, and

16   then each of those three entities, the various

17   foundations, obtain participation interest in

18   the money that flows back to them.

19    Q.    And -- and is that par- -- are those

20   participation interests in Charitable -- you

21   know what, let -- let me just pull up one

22   document and see if that helps.

23          MR. MORRIS:  Can we put up -- I

24      think it's Exhibit Number 5.

25          (SCOTT EXHIBIT 2, Unanimous Written

APPX. 05574

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 65 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 575 of 1598 PageID 13622
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 56 of
110

Page 55

1           GRANT SCOTT - 1/21/2021

2      Consent of Directors In Lieu of Meeting,

3      was marked for identification.)

4           MR. MORRIS:  I apologize.  Let's go

5      to --

6           MS. CANTY:  I'm sorry, John.  I

7      can't hear you.  Was that not the exhibit?

8           MR. MORRIS:  4.

9           MS. CANTY:  Okay.

10           THE REPORTER:  And Mr. Morris, you

11      are -- Mr. Morris, you are breaking up just

12       a little bit at the end of your questions.

13   BY MR. MORRIS:

14      Q.    Okay.  Do you see the document on

15   the screen, sir?

16      A.    Yes, I do.

17      Q.    Okay.  And so this is a unanimous

18   written consent of the directors of the

19   Highland Dallas Foundation.  That's one of the

20   entities that was on the chart.

21           MR. MORRIS:  Can we scroll down to

22       the -- the bottom of the document where the

23       signature lines are.  Right there.

24   BY MR. MORRIS:

25      Q.    Are you a director of the Highland

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 66 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 576 of 1598   PageID 13623
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 57 of
110

Page 56

1          GRANT SCOTT - 1/21/2021

2    Dallas Foundation?

3          A.    Yes, selected by them.

4          Q.    Selected by whom?

5          A.    By that foundation.

6          Q.    Are you -- are you a director of all

7    of the four foundations that feed into the

8    Charitable DAF HoldCo Limited entities that --

9          A.    No.

10         Q.    Which of the four foundations are

11   you a director of?

12         A.    This and the Santa Barbara -- I'm

13   sorry, Santa Barbara and Kansas City.

14         Q.    So is -- there's one that you're not

15   a director of; is that right?

16         A.    Yes.

17         Q.    And which one is that?

18         A.    The -- could you go back to the --

19         Q.    Yeah.

20         MR. MORRIS:  Go back to the

21   demonstrative.

22         A.    It's the Highland Dallas Foundation

23   and Santa Barbara Foundation.

24         Q.    Those are the two that you're a

25   director of?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 67 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 577 of 1598    PageID 13624
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 58 of
110

Page 57

1          GRANT SCOTT - 1/21/2021

2     A.    Yes.

3     Q.    To the best of your knowledge, does

4   Mr. Dondero serve as the president for each of

5   the foundations that we're talking about?

6     A.    Yes.

7     Q.    To the best of your knowledge, is

8   Mr. Dondero a director of each of the

9   foundations that we're talking about?

10    A.    Say that again.  I'm sorry.

11    Q.    Is he also a director of each of the

12  foundations?

13    A.    Yes.

14    Q.    Do you know whether any of the

15  foundations has any employees?

16    A.    I believe they do, but I -- I -- I

17  can't say for certain.

18    Q.    Does -- withdrawn.

19          Do you know if there are any

20  officers of any of the four foundations other

21  than Mr. Dondero's service as president?

22    A.    I'm sorry.  Say that one more time,

23  please.

24    Q.    Yes.  Do you know whether any of the

25  four foundations has any officers other than

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 68 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 578 of 1598   PageID 13625
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 59 of
110

Page 58

1         GRANT SCOTT - 1/21/2021

2    Mr. Dondero's service as president?

3        A.    No.

4        Q.    You don't know, or they do not?

5        A.    I -- I don't believe anyone else

6    has.  I -- actually, I should say I don't -- I

7    don't recall.  I -- I don't know.  I don't -- I

8    don't know.

9        Q.    As a director of the Dallas and

10   Santa Barbara foundations, are you aware of any

11   officers serving for either of those

12   foundations other than Mr. Dondero?

13       A.    No.

14       Q.    Do you know who the beneficial owner

15   of the Charitable DAF HoldCo Limited entity is?

16       A.    The beneficial owner?

17       Q.    Correct.

18       A.    The various -- various trusts that

19   were used to -- that were the vehicles by which

20   the money originally was established within --

21   within -- within CLO HoldCo.

22       Q.    Would that be -- would one of them

23   be the Get Good Nonexempt Trust?

24       A.    Yes.

25       Q.    And you're a trustee of the Get Good

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 69 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 579 of 1598 PageID 13626
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 60 of
110

Page 59

1          GRANT SCOTT - 1/21/2021

2    Nonexempt Trust, right?

3        A.    Yes.

4        Q.    When did you become a trustee of the

5    Get Good Nonexempt Trust?

6        A.    Many years ago.  I -- I don't

7    remember.

8        Q.    Are there any other trustees of the

9    Get Good Nonexempt Trust?

10       A.    No.

11       Q.    Does the Get Good Nonexempt Trust

12   have any officers, directors, or employees?

13       A.    No.

14            MR. CLARK:  Objection, form.  Sorry.

15   BY MR. MORRIS:

16       Q.    Withdrawn.

17            Do you know whether the Get Good

18   Nonexempt Trust has any officers, directors, or

19   employees?

20       A.    It does not.

21       Q.    And I apologize if I asked this, but

22   are you the only trustee of the Get Good

23   Nonexempt Trust?

24       A.    Yes.

25       Q.    Is the Dugaboy Investment Trust also

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 70 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 580 of 1598    PageID 13627
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 61 of
110

Page 60

1          GRANT SCOTT - 1/21/2021

2      one of the trusts that has an interest in

3      Charitable DAF HoldCo Limited?

4          A.    Yes.

5          Q.    Are you a trustee of the Dugaboy

6      Investment Trust?

7          A.    I am not.

8          Q.    Do you know who is?

9          A.    I believe it's his sister.

10         Q.    And is that -- you're referring to

11     Mr. Dondero's sister?

12         A.    I'm sorry.  Yes.

13         Q.    And what's the basis for your

14     understanding that Mr. Dondero's siv- -- sister

15     serves as the trustee of the Dugaboy Investment

16     Trust?

17         A.    Many years ago there was a -- there

18     was a clerical error that identified me as the

19     trustee of the Dugaboy.  That error was present

20     for approximately two weeks or a week and a

21     half before it was detected and corrected, and

22     so I know from that correction that it's Nancy

23     Dondero.

24         Q.    Are there any other trusts that have

25     an interest in Charitable DAF HoldCo Limited

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 71 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 581 of 1598    PageID 13628
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 62 of
110

Page 61

1          GRANT SCOTT - 1/21/2021

2    besides those trusts, to the best of your

3    knowledge?

4        A.    No.

5        Q.    Is it your understanding based on

6    what we've just talked about that the Get Good

7    Nonexempt Trust and the Dugaboy Investment

8    Trust are the indirect beneficiaries of CLO

9    HoldCo Limited?

10       A.    Yes.

11       Q.    Can you tell me who the

12   beneficiaries are of the Get Good trust?

13       A.    I mean, Jim Dondero.

14       Q.    And -- and what is that -- is that

15   based on the trust agreement -- your knowledge

16   of the trust agreement?

17       A.    Yes.

18       Q.    Do you have an understanding of who

19   the beneficiary is of the Dugaboy Investment

20   Trust?

21       A.    I don't know anything about that

22   trust.

23          MR. MORRIS:  Okay.  All right.

24   Let's take a short break and reconvene at

25   3:30 Eastern Time.  We've been going for a

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 72 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 582 of 1598   PageID 13629
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 63 of
110

Page 62

1         GRANT SCOTT - 1/21/2021

2    while.

3         MR. CLARK:  Thank you.

4         MR. MORRIS:  Okay.  Thank you.

5         (Whereupon, there was a recess in

6    the proceedings from 3:20 p.m. to

7    3:31 p.m.)

8  BY MR. MORRIS:

9    Q.    Mr. Scott, earlier I think you

10  testified that you interfaced with the folks at

11  Highland in connection with your duties as the

12  director of CLO HoldCo Limited, right?

13    A.    Yes.

14    Q.    Are you aware of any written

15  agreement between Highland Capital Management

16  and CLO HoldCo Limited?

17    A.    Yes, the various servicer

18  agreements.

19    Q.    Okay.  Are you aware that

20  Mr. Dondero resigned from his position at

21  Highland Capital Management sometime in

22  October?

23    A.    No.

24    Q.    Have you communicated with anybody

25  at Highland Capital Management about the

Case 19-34054-sgj11  Doc 3445-53  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 73 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 583 of 1598   PageID 13630
Case 19-34054-sgj11  Doc 2454-1  Filed 06/16/21    Entered 06/16/21 16:18:26    Page 64 of
110

Page 63

1          GRANT SCOTT - 1/21/2021

2     affairs of CLO HoldCo Limited at any time since

3     October?

4          A.    Yes.

5          Q.    Anybody other than Jim Seery?

6          A.    Yes.

7          Q.    Okay.  Let's start with Mr. Seery.

8     You've spoken with him before, right?

9          A.    Yes.

10         Q.    Do you have his phone number?

11         A.    Yes.

12         Q.    How many times have you spoken with

13    Mr. Seery, to the best of your recollection,

14    just generally?  It's not a test.

15         A.    Three, maybe four times.

16         Q.    Okay.  Can you identify by name

17    anybody else at Highland that you've spoken

18    with since -- in the last two or three months?

19         A.    I spoke to Jim Dondero.  I've spoken

20    with Mike Throckmorton.  The usual suspects, so

21    to speak.  Mark Patrick, Mel- -- Melissa

22    Schroth.

23         Q.    Can you recall anybody else?

24         A.    No.  No.  Sorry.

25         Q.    Did you -- did you -- withdrawn.

APPX. 10573

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 74 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 584 of 1598   PageID 13631
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 65 of
110

Page 64

1          GRANT SCOTT - 1/21/2021

2          Do you recall the subject matter of

3   your discussions with Mr. Throckmorton?

4          MR. CLARK:  Objection, form.

5   BY MR. MORRIS:

6      Q.    Withdrawn.

7          Do you recall your -- the subject

8   matter of your communications with

9   Mr. Throckmorton?

10          MR. CLARK:  Objection, form.

11   BY MR. MORRIS:

12      Q.    You can answer.

13      A.    I -- I regularly interface with

14   Mr. Throckmorton regarding approvals of

15   expenses, and he's my sort of -- he's my point

16   person for approving wire transfers and things

17   of that nature.

18      Q.    How about Mr. Patrick, what -- what

19   area of responsibility does he have with

20   respect to CLO HoldCo Limited?

21      A.    He -- he doesn't, to my knowledge.

22      Q.    Do you recall the nature of the

23   substance of any communications that you've had

24   with Mr. Patrick since -- you know, the last

25   two or three months?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 75 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 585 of 1598   PageID 13632
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 66 of
110

Page 65

1          GRANT SCOTT - 1/21/2021

2     A.   Yes.  Or -- yes.

3     Q.    And what -- what are the nature of

4   those conversations or the substance?

5     A.    He was -- he was one of the

6   individuals that helped to establish the

7   hierarchy for the -- what I keep referring to

8   as the charitable foundation.

9     Q.    And -- and do you recall why you

10   spoke to him in the last -- or -- withdrawn.

11        Do you recall the nature of your

12   communications in the last two or three months

13   with Mr. Patrick?

14     A.   I --

15        MR. CLARK:  And hold on, Grant.  I'm

16     going to caution -- my understanding -- I

17     believe Mr. Patrick's an attorney, and so

18     I'm going to caution you that you shouldn't

19     disclose the substance of -- of those

20     communications based on the attorney-client

21     privilege.

22        MR. MORRIS:  Well, I'm -- I -- I am

23     the lawyer for the company so -- I guess

24     there are other people on the phone and I

25     appreciate that, but let's see if we can --

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 76 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 586 of 1598  PageID 13633
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21  Entered 06/16/21 16:18:26  Page 67 of
110

Page 66

1          GRANT SCOTT - 1/21/2021

2      I don't mean to be contentious here, so it

3      wouldn't -- I -- I'd be part of the

4      privilege anyway.

5    BY MR. MORRIS:

6      Q.    But in any event, can you tell me

7    generally -- I'm just looking for general

8    subject matter of your conversations with

9    Mr. Patrick.

10     A.    I asked him how I would go about

11   re- -- resigning my position.

12     Q.    And when did that conversation take

13   place?

14     A.    Within the last two weeks.

15     Q.    Have you made a decision to resign?

16     A.    No.

17     Q.    I think you mentioned Melissa

18   Schroth.  Do I have that right?

19     A.    Yes.

20     Q.    Can you describe generally the

21   communications you had with Ms. Schroth in the

22   last few months.

23     A.    They -- she has e-mailed me certain

24   documents that I needed to sign.  I had a

25   conversation with her about -- about some

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 77 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 587 of 1598   PageID 13634
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 68 of
110

Page 67

1          GRANT SCOTT - 1/21/2021

2    home -- home improvements, home construction

3    with respect to Jim Dondero's home in Colorado,

4    and that's -- I -- I think that's -- that's it.

5       Q.    Okay.  Do you recall communicating

6    with anybody at Highland in the last three

7    months other than Mr. Dondero,

8    Mr. Throckmorton, Mr. Patrick, and Ms. Schroth?

9       A.    I -- I spoke with Jim Seery this

10   week.

11      Q.    Anybody else?

12      A.    I don't -- I don't know.

13      Q.    Okay.

14      A.    I don't think so.

15      Q.    In your communications with

16   Mr. Seery, did you two ever discuss his reasons

17   for making any trade on behalf of any CLO?

18      A.    No.

19      Q.    In your discussions with Mr. Seery,

20   did you ever tell him that you believed that

21   Highland Capital Management had breached any

22   agreement in relation to any CLO?

23      A.    Have I had that discussion with Jim

24   Seery?

25      Q.    Yes.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 78 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 588 of 1598 PageID 13635
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 69 of
110

Page 68

1          GRANT SCOTT - 1/21/2021

2     A.    No.

3     Q.    In your discussions with Mr. Seery,

4   did you ever tell him that you thought Highland

5   Capital Management was in default under any

6   agreement in relation to the CLOs?

7     A.    No.

8     Q.    I want to focus in particular on the

9   shared services agreement.  In -- in your

10   discussions with Mr. Seery, did you ever tell

11   him that you believed that Highland Capital

12   Management was in default or in breach of its

13   shared services agreement with CLO HoldCo

14   Limited?

15     A.    No.

16     Q.    In your communications with

17   Mr. Seery, did you ever indicate any concern on

18   the part of CLO HoldCo Limited with respect to

19   Highland Capital's Man- -- Highland Capital

20   Management's performance under the shared

21   services agreement?

22     A.    No.

23     Q.    As you sit here today, do you have

24   any reason to believe that Highland Capital

25   Management has done anything wrong in

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 79 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 589 of 1598 PageID 13636
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 70 of
110

Page 69

1          GRANT SCOTT - 1/21/2021

2    connection with its performance as the

3    portfolio manager of the CLOs in which CLO

4    HoldCo Limited has invested?

5          MR. CLARK:  Object to form.

6    A.    In terms of the -- are you saying --

7    please say that again.  I'm sorry.

8    Q.    That's okay.  I ask long questions

9    sometimes so forgive me, but I'm trying to

10   get -- I'm trying to be precise so that's why

11   it's difficult sometimes.  But let me try

12   again.

13          Does CLO HoldCo Limited contend that

14   Highland Capital Management has done anything

15   wrong in the performance of its duties as

16   portfolio manager of the CLOs in which CLO

17   HoldCo has invested?

18          MR. CLARK:  Objection, form.

19   A.    Yes.  It's -- it's outlined in our

20   objections to -- to the plan.

21   Q.    Okay.  Any -- are you aware of

22   anything that's not contained within CLO Holdco

23   Limited's objection to the plan?

24          MR. CLARK:  Objection, form.

25   A.    I don't know if this is responsive

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 80 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 590 of 1598   PageID 13637
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 71 of
110

Page 70

1          GRANT SCOTT - 1/21/2021

2    to your quest -- request, but two -- two

3    issues, I believe, also pose an in- -- a

4    problem for CLO HoldCo.  One is we are paying

5    for services.  I think I referred to the

6    services as being soup to nuts, but we are not

7    getting the full services.  We haven't been for

8    some time.  So we're likely overpaying.  There

9    was a Highland Select Equity issue, 11-month

10   payment that was delayed which I was unaware of

11   was due.  Normally, I would have interfaced

12   with someone at Highland about that, but my

13   attorney -- but my -- my attorney had to make a

14   request for payment, and that payment was

15   ultimately made.  I -- other than that, I -- I

16   don't -- I don't know.  I don't believe so.

17       Q.    I want to distinguish between the

18   shared services agreement between Highland

19   Capital Management and CLO HoldCo Limited on

20   the one hand and on the other hand the

21   management agreements pursuant to which

22   Highland Capital Management manages certain

23   CLOs that CLO HoldCo invests in.

24          You understand the distinction that

25   I'm making?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 81 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 591 of 1598    PageID 13638
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 72 of
110

Page 71

1        GRANT SCOTT - 1/21/2021

2      A.    Now I do.  I'm sorry.  I didn't

3    appreciate that.

4      Q.    Okay.  So let's just take each of

5    those pieces one at a time.  You mentioned your

6    concern about services.  That's a concern that

7    arises under the shared services agreement,

8    right?

9      A.    Yes.

10      Q.    And you mentioned something about a

11    delayed payment having to do with Highland

12    Select.  Do I have that generally right?

13      A.    Correct.

14      Q.    And is that a concern that you have

15    that arises under the shared services

16    agreement?

17      A.    It's not the agreement with respect

18    to the CLOs as I understand it.

19      Q.    Okay.  So then let's turn to that

20    second bucket.  You were aware -- you are

21    aware, are you not, that Highland Capital

22    Management has certain agreements with CLOs

23    pursuant to which it manages the assets that

24    are owned by the CLOs?

25      A.    I'm so sorry.  Could you please --

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 82 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 592 of 1598   PageID 13639
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 73 of
110

Page 72

1          GRANT SCOTT - 1/21/2021

2     Q.    I'll try again.

3     A.    I'm just -- I'm sorry.  I was

4   distracted and -- and I -- I'm sorry for asking

5   you to repeat it again.  Please --

6     Q.    Okay.

7     A.    Please re- --

8     Q.    Are you aware that CLO HoldCo

9   Limited has made investments in certain CLOs?

10    A.    Oh, yes, certainly.

11    Q.    And are you aware that those CLOs

12  are managed by Highland Capital Management?

13    A.    Yes.  As the -- as the servicer,

14  yes.

15    Q.    Okay.  Have you ever seen any of the

16  agreements pursuant to which Highland Capital

17  Management acts as a servicer?

18    A.    I've seen a few, yes.

19    Q.    Does CLO HoldCo Limited contend that

20  it is a party to any agreement between Highland

21  Capital Management and the CLOs?

22        MR. CLARK:  Object to form.  And I

23      just want to note for the record that

24      Mr. Scott is here testifying in his

25      individual capacity, I believe, not as a

APPX. 005892

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 83 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 593 of 1598 PageID 13640
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 74 of
110

Page 73

1          GRANT SCOTT - 1/21/2021

2     corporate representative.

3          MR. MORRIS:  Fair enough.  But he is

4     the only representative so...

5          MR. CLARK:  Fair enough.  I just

6     want that made -- stated for the record,

7     but I also object as to form.

8          MR. MORRIS:  Got it.

9     A.    It's a third-party beneficiary under

10    the agreements.

11    Q.    And is that because of something you

12    read in the document, or is that just your

13    belief and understanding?

14    A.    My belief and understanding.

15    Q.    And is that belief and understanding

16    based on anything other than conversations with

17    counsel?

18    A.    In -- in -- recently it has, but I

19    don't recall from previous interactions over

20    the years how we discussed that or how I came

21    to -- to understand that.

22    Q.    Does HCLO [sic] HoldCo -- did -- in

23    your capacity as the sole director of HCLO

24    HoldCo Limited, are you aware of anything that

25    Highland Capital Management has done wrong in

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 84 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 594 of 1598    PageID 13641
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 75 of
110

Page 74

1          GRANT SCOTT - 1/21/2021

2    connection with the services provided under the

3    CLO management agreements?

4          MR. CLARK:  Objection, form.

5      A.    I -- I don't -- I don't -- I

6    don't -- your answer's no.

7      Q.    In your capacity as the director of

8    CLO HoldCo Limited, are you aware of any

9    default or breach under the CLO management

10   agreements that -- that Highland Capital

11   Management has caused?

12         MR. CLARK:  Objection, form.

13     A.    We have raised the issue about

14   ongoing sales in various -- I'm not sure

15   whether they represent a technical breach,

16   though.

17     Q.    Okay.  Are you aware of any

18   technical breach?

19         MR. CLARK:  Objection, form.

20     A.    No.

21     Q.    I'm sorry.  You said, no, sir?

22     A.    My answer's no.

23     Q.    Thank you.  Do you know who made the

24   decision to cause the CLO HoldCo Limited entity

25   to invest in the CLOs that are managed by

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 85 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 595 of 1598   PageID 13642
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 76 of
110

1      GRANT SCOTT - 1/21/2021

2  Highland Capital?

3      A.   The select -- ultimately, I had to.

4      Q.   I thought you testified earlier that

5  you didn't make decisions as to investment.  Do

6  I have that wrong?

7      A.   The selection.

8      Q.   Okay.

9      A.   I -- I'm --

10     Q.   So -- so explain to me --

11     A.   I have to approve -- I have to

12  approve the selection.  I'm sorry.  But the

13  people making -- I was putting that in the camp

14  of the people that make the selection.

15     Q.   Okay.  Do you know if -- do you know

16  if there are CLOs in the world that exist that

17  aren't managed by Highland Capital Management?

18         MR. CLARK:  Objection, form.

19     A.   Are there CLOs in the -- in the

20  world that are not --

21     Q.   Yes.

22     A.   Yes.  It's -- it's a well-known --

23  it's a well-known --

24     Q.   In your capacity as the director of

25  CLO HoldCo Limited, did you ever consider

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 86 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 596 of 1598 PageID 13643
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 77 of
110

Page 76

1              GRANT SCOTT - 1/21/2021

2    making an investment in a CLO that wasn't

3    managed by Highland?

4        A.    No.

5        Q.    Is there any particular reason why

6    you haven't given that any consideration?

7        A.    That hasn't been my role.  That's

8    not my expertise.  That's been something

9    Highland has done and, quite frankly, over the

10   years brilliantly so, no.

11       Q.    You're aware that HCM, L.P., has

12   filed for bankruptcy, right?

13       A.    Yes.

14       Q.    When did you learn that Highland had

15   filed for bankruptcy?

16       A.    After the fact sometime in late --

17   late 2019.

18       Q.    Since the bankruptcy filing, have

19   you made any attempt to sell CLO HoldCo

20   Limited's position in any of the CLOs that are

21   managed by Highland?

22       A.    No.

23       Q.    So notwithstanding the bankruptcy

24   filing, you as the director haven't made any

25   attempt to transfer out of the CLOs that are

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 87 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 597 of 1598   PageID 13644
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 78 of
110

1        GRANT SCOTT - 1/21/2021

2   managed by Highland, correct?

3       A.    Correct.

4       Q.    Did you ever give any thought to

5   exiting the CLO vehicles that were managed by

6   Highland in light of its bankruptcy filing?

7       A.    No.

8       Q.    Have you ever discussed with

9   Mr. Seery anything having to do with the

10   management -- withdrawn.

11           Have you ever discussed with

12   Mr. Seery any aspect of the debtor's management

13   of the CLOs in which CLO HoldCo Limited is

14   invested?

15      A.    No.

16      Q.    You mentioned earlier a request to

17   stop trading.  Do I have that right?

18      A.    Yes.

19      Q.    Okay.  And are you aware that a

20   letter was written purportedly on behalf of CLO

21   HoldCo Limited in which a request to stop

22   trading was made?

23      A.    As a cos- -- yeah.  Yes.

24      Q.    Okay.  Have you ever seen that

25   letter before?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 88 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 598 of 1598   PageID 13645
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 79 of
110

Page 78

1          GRANT SCOTT - 1/21/2021

2    A.   Yes.

3          MR. MORRIS:  Can we put up on the

4    screen -- I think it's now Exhibit 6.  It's

5    Exhibit DDDD.

6          (SCOTT EXHIBIT 3, Letter to James A.

7    Wright, III, et al., from Gregory Demo,

8    December 24, 2020, with Exhibit A

9    Attachment, was marked for identification.)

10          MR. MORRIS:  Can we scroll down to,

11    I guess, what's Exhibit A.  Ri- -- right

12    there.

13   BY MR. MORRIS:

14    Q.    You see this is a letter Dece- --

15   dated December 22nd?

16    A.   Yes.

17    Q.    In the first paragraph there there's

18   a reference to the entities on whose behalf

19   this letter is being sent.

20          Do you see that?

21    A.   Yes.

22    Q.    Okay.  So this letter was sent on

23   December 22nd.  Did you see a copy of it before

24   it was sent?

25    A.    A -- a draft -- an earlier draft of

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 89 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 599 of 1598 PageID 13646
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 80 of
110

Page 79

1           GRANT SCOTT - 1/21/2021

2   this I did.

3       Q.   Okay.  Did you provide any comments

4   to it?

5       A.   I did.

6           MR. CLARK:  Well, hold on.  Grant,

7       let me caution you.  To the extent you

8       provided comments to counsel, we're going

9       to assert the attorney-client privilege on

10       those comments.

11          MR. MORRIS:  It's just a yes-or-no

12       question.  I'm not looking for the

13       specifics.

14          MR. CLARK:  Thank you.

15      A.   Yes.

16      Q.   Are you aware that earlier letters

17   were -- withdrawn.

18          Are you aware that prior to December

19   22nd, the entities other than CLO HoldCo

20   Limited that are listed in this pers- -- first

21   paragraph had sent a letter making the same

22   request?

23      A.   With respect to a letter, no.  No,

24   I -- I did not.

25      Q.   Are you aware as you sit here now

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 600 of 1598 PageID 13647
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 81 of
110

Page 80

```
 1            GRANT SCOTT - 1/21/2021

 2    that the entities other than CLO HoldCo Limited

 3    that are listed in the first paragraph made a

 4    motion in the court asking the court for an

 5    order that would have prevented Highland from

 6    making any transactions for a limited period of

 7    time?

 8        A.    Yes.

 9        Q.    Did you know that motion was being

10    made prior to the time that it was made?

11        A.    I'm not sure.

12        Q.    Did you ever think about whether CLO

13    HoldCo Limited should join that particular

14    motion?

15        A.    I believe we were -- my attorney was

16    aware of it.  I don't recall our discussion

17    about it.  We were aware -- when I say we, I

18    mean collectively -- and did not join it.

19        Q.    Okay.  Can you tell me why you did

20    not join it.

21            MR. CLARK:  And, again, Grant, to --

22        to the extent it's based on communications

23        with counsel, you're free to say that

24        but -- but not to disclose any substance of

25        communications with counsel.
```

APPX. 05890

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 91 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 601 of 1598   PageID 13648
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 82 of
110

Page 81

1        GRANT SCOTT - 1/21/2021

2      A.   The subject of this letter on the

3   22nd which yielded the original letter you

4   briefly showed me on the 24th as well as an

5   additional letter on the 28th identified two

6   points as I understand it.  The first point is

7   what I believe is the somewhat innocuous

8   request to halt sales, not a demand in any way.

9   And the second more substantive issue has to do

10   with steps to remove Highland or a subsequent

11   derived entity from Highland from the various

12   services agreements that you had previously --

13   we had previously discussed.  Neither of those

14   issues met the require- -- neither of those

15   issues led us to believe that a motion such as

16   what you've just mentioned was -- was right --

17      Q.   Okay.

18      A.   -- because no -- no decision has

19   been made on that.

20      Q.   Okay.

21         MR. MORRIS:  So I want to go back to

22      my question and move to strike as

23      nonresponsive, and I'll just ask my

24      question again.

25   BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 92 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 602 of 1598   PageID 13649
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 83 of
110

Page 82

1        GRANT SCOTT - 1/21/2021

2      Q.    Why did CLO HoldCo Limited decide

3   not to participate in the earlier motion that

4   was brought by the other entities that are

5   identified in Paragraph 1 that asked the court

6   to stop Highland from engaging in trades?

7      A.    John, I'm so sorry.  There was a

8   feedback loop that came up when you started to

9   re- -- re- -- recite -- restate your question.

10  I'm sorry.

11     Q.    That's okay.  Why did CLO HoldCo

12  Limited decide not to join in the earlier

13  motion where the entities listed in Paragraph 1

14  asked the court to order Highland not to make

15  any further trades?  Why did they not join that

16  motion?

17     A.    The -- the issue didn't rise to

18  the -- I don't believe we had formulated a

19  legal basis sufficient to justify such steps.

20  We hadn't laid the foundation necessary to --

21  to do that.

22     Q.    Are you aware of what the court

23  decided?

24     A.    By virtue of the original letter you

25  sent me dated the -- or show -- showed

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 93 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 603 of 1598 PageID 13650
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 84 of
110

Page 83

1          GRANT SCOTT - 1/21/2021

2    initially dated the 24th, I have a general

3    understanding of what they decided.

4      Q.    Did you -- did you ever review the

5    transcript of the hearing where the other

6    parties asked the court to stop Highland from

7    engaging in any further trades on the CLOs?

8      A.    I did not.

9      Q.    Is there anything different about

10   the request in this letter, to the best of your

11   knowledge, from the request that was made of

12   the court just six days earlier?

13        MR. CLARK:  Objection, form.

14     A.    Yes.  There's a -- in -- in my -- my

15   view there's a substantial difference between

16   filing an action converting a request into

17   essentially a demand versus a gentle request

18   with multiple caveats, that that request is not

19   a demand.

20     Q.    Okay.  Let me ask you this:  Are you

21   aware -- what -- when did you first learn that

22   Highland was making trades in its capacity as

23   the servicer of the CLOs?  When -- when did you

24   first learn that Highland was doing that?  Ten

25   years ago, right?  I mean --

Page 84

1          GRANT SCOTT - 1/21/2021

2     A.    Oh.  Oh.  Oh, I'm -- yeah.  Yeah.

3    Oh, yes.  I'm sorry.  Of course.

4     Q.    Right?  I mean, Highland has been

5    making trades on behalf of CLOs for years,

6    right?

7     A.    Yes.

8     Q.    And Highland was making trades on

9    behalf of CLOs throughout 2020, to the best of

10   your knowledge, right?

11    A.    Yes.

12    Q.    And you know when Jim Dondero was

13   still with Highland, he was making trades on

14   behalf of CLO -- on behalf of the CLOs, right?

15    A.    Yes.

16    Q.    And you never objected when Jim

17   Dondero was doing it; is that right?

18    A.    That is correct.

19    Q.    Okay.  So what changed that caused

20   you in your capacity as the director of CLO

21   HoldCo to request a full stoppage of trading?

22    A.    It was my understanding that because

23   of the bankruptcy and the removal of Jim

24   Dondero that the replacement decision-makers

25   did not have the expertise where I felt

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 95 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 605 of 1598   PageID 13652
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 86 of
110

Page 85

1          GRANT SCOTT - 1/21/2021

2   comfortable with them making those decisions,

3   but...

4      Q.    I thought you testified earlier that

5   you weren't aware that Mr. Dondero left

6   Highland.  Am I mistaken in my recollection?

7      A.    I think you said in October, and

8   I -- as I -- there's some con- -- I have

9   confusion about when he left versus when he was

10  still there but other -- but he was not making

11  those trades.

12     Q.    Okay.  Fair enough.  The bankruptcy

13  has nothing to do with your desire to stop

14  trading, right, because Highland traded for a

15  year after the bankruptcy and never took any

16  action to try to stop Highland from trading on

17  behalf of the CLOs, fair?

18     A.    The -- Highland as of right now

19  isn't the same entity it was -- well, the

20  decision-making team -- the -- the financial

21  decision-making team for CLO Holdco's is no

22  longer the team I have worked with, and upon

23  discussion with counsel, we agreed -- I agreed

24  to this letter, which I did, to just maintain

25  the status quo.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 96 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 606 of 1598   PageID 13653
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 87 of
110

Page 86

1      GRANT SCOTT - 1/21/2021

2      Q.    How did you form your opinion that

3   the debtor doesn't have the expertise to

4   execute trades on behalf of the CLOs today?

5   What's the basis for that belief?

6      A.    I -- as I understood it, the -- the

7   people historically making that decision were

8   no longer making that decision.

9      Q.    Who besides Mr. Dondero --

10  withdrawn.

11          Who are you referring to?

12     A.    Well, Mr. Dondero is one.  I don't

13  know the names, but I -- I understood it to

14  mean that the group previously responsible, for

15  exam- -- for example, Hunter Covitz, including

16  Hun- -- him, were no longer involved in the

17  decision-making process, but...

18     Q.    How did you -- how -- how -- who

19  gave you the information that led you to

20  conclude that Hunter Covitz was no longer

21  involved in the decision-making process?

22     A.    Specifically him and that name being

23  mentioned, I -- I -- I wasn't informed of his

24  speci- -- him -- him being removed.  I was

25  under the impression that the team that had

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 97 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 607 of 1598 PageID 13654
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 88 of
110

Page 87

1        GRANT SCOTT - 1/21/2021

2    previously been doing that was no longer doing

3    it.

4        Q.    And what gave you that impression?

5        A.    Was communications I had with my

6    attorney.

7        Q.    Okay.  Is there any source for your

8    information that led you to conclude that the

9    team was no longer there that was able to

10   engage in the trades on behalf of the CLOs

11   other than your attorneys?

12       A.    Well, this -- this letter -- I -- I

13   think the answer is no.

14       Q.    Thank you.  Do you know if Jim -- do

15   you have an opinion or a view as to whether Jim

16   Seery is qualified to make trades?

17       A.    This --

18          MR. CLARK:  Objection, form.

19       A.    I don't know -- I spoke to Jim Seery

20   earlier this week.  You -- you asked me whether

21   I had his number.  I said I did.  That's only

22   because he called me.  My phone rang with his

23   number.  It was a number I did not recognize,

24   it was not in my contacts, but he left me a

25   voice mail so I called him back.  Then I

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 98 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 608 of 1598 PageID 13655
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 89 of
110

Page 88

1          GRANT SCOTT - 1/21/2021

2    updated my contacts to -- to add his name so

3    now I have his name.  And during that

4    conversation he informed me that he did have

5    that expertise --

6        Q.    And --

7        A.    -- without me making any inquiry.

8    He volunteered that.

9        Q.    But you hadn't made any inquiry

10   prior to the time that you authorized the

11   sending of this letter; is that fair?

12       A.    That's correct.

13       Q.    Do you know whether Mr. Seery, in

14   fact, engaged in transactions on behalf of the

15   debtor since he was appointed back in January?

16       A.    I do not.

17       Q.    Did you ask that question prior to

18   the time you authorized the sending of this

19   letter?

20       A.    I did not.

21       Q.    Can you identify a single

22   transaction that Jim Seery has ever made that

23   you disagree with?

24       A.    No.

25       Q.    Can you identify any transaction

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 99 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 609 of 1598   PageID 13656
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 90 of
110

Page 89

1          GRANT SCOTT - 1/21/2021

2   that the debtor made on behalf of any of the

3   CLOs since the time that you understand

4   Mr. Dondero left Highland that you disagree

5   with?

6        A.    No.

7        Q.    Did you have any discussion with any

8   representative of any of the entities listed on

9   this document where they told you they believe

10  Jim Seery didn't have the expertise to engage

11  in transactions on behalf of the whole -- of

12  the CLOs?

13       A.    You -- your question -- I'm -- I'm

14  sorry.  I'm trying to be -- I'm trying to be a

15  hundred perc- -- I'm trying to be accurate

16  here.

17       Q.    Let me interrupt you and just say,

18  I'm very grateful for your testimony.  I know

19  this is not easy, and I do believe that you're

20  earnestly and honestly trying to answer the

21  questions the best you can.  So no apologies

22  necessary anymore.  If you need me to repeat

23  the question or rephrase it, just say that,

24  okay?

25       A.    Please -- yes.

Page 90

1    GRANT SCOTT - 1/21/2021

2    Q.    Okay.

3    A.    Please -- please repeat that.

4    Q.    Did you ever communicate with any

5   employee, officer, director, representative of

6   any of the entities that are on this page

7   concerning the debtor's ability to service the

8   CLOs?

9    A.    I believe so.

10    Q.    And can you identify the person or

11   persons?

12    A.    I think it's Jim Dondero.

13    Q.    Anybody else other than Mr. Dondero?

14    A.    No.

15    Q.    When did you have that conversation

16   or those conversations with Mr. Dondero?

17    A.    This letter is dated the 22nd --

18    Q.    Correct.

19    A.    -- right?

20    Q.    Yes.

21    A.    I believe that's the Tuesday before

22   Christmas, and this would have been on the

23   21st, the Monday.

24    Q.    What do you recall about your

25   conversation on the 21st regarding the

APPX. 08900

Page 91

GRANT SCOTT - 1/21/2021

1   

2   substance of this particular letter?

3        A.    Jim Dondero described why he

4   believed sales being made on an ongoing basis

5   after a request was made to stop was im- --

6   improper.

7        Q.    Do you -- do you rely on what

8   Mr. Dondero said to you during that phone call

9   on December 21st in -- in deciding to join in

10   this particular letter?

11        A.    No.

12        Q.    Did you only then rely on the

13   information you obtained from counsel?

14        A.    Yes.  I -- I -- I -- I considered

15   this letter to be nearly the most gentle

16   request imaginable amongst lawyers to maintain

17   the status quo.

18        Q.    And the request that's made in this

19   letter is perfectly consistent with what

20   Mr. Dondero told you on the 21st of December,

21   correct?

22        A.    I don't -- no.

23        Q.    How --

24        MR. MORRIS:  Can we go to the end of

25   this letter, please.  All right.  Right

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 102
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 612 of 1598   PageID 13659
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 93 of
110

Page 92

1          GRANT SCOTT - 1/21/2021

2    there.

3  BY MR. MORRIS:

4    Q.   Do you see the request that's in the

5  last sentence?

6    A.   Yes.

7    Q.   Is that the same thing that

8  Mr. Dondero told you should happen, that --

9  that there should be no further CLO

10  transactions at least until the issues raised

11  and addressed by the debtor's plan were

12  resolved substantively?

13    A.   Yes.

14    Q.   Is there anything that he said

15  that's inconsistent with the request that's

16  made here?

17        MR. CLARK:  Objection, form.

18    A.   This -- and can you -- can you show

19  me earlier parts?

20    Q.   Of course.  You know what, I'll

21  withdraw the question.

22        And let me see if I can do it this

23  way:  In your discussion with Mr. Dondero, did

24  he indicate that he had seen a draft of this

25  letter?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 103
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 613 of 1598   PageID 13660
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 94 of
110

Page 93

1        GRANT SCOTT - 1/21/2021

2      A.    No.  And I didn't -- I didn't have a

3   discussion with him.  I -- I merely listened to

4   him.  There was no -- I -- I had no input to

5   the conversation.

6      Q.    Okay.  I -- I did -- I didn't --

7   I -- I appreciate that.  So he called you; is

8   that right?

9      A.    We -- we called in.

10     Q.    Oh, was it --

11     A.    I --

12     Q.    Was it --

13     A.    I don't know --

14     Q.    Was it --

15     A.    I don't know the sequence of the

16   calls.  I'm sorry.

17     Q.    Was there anybody on the call other

18   than you and Mr. Dondero, the call that you're

19   describing on December 21st?

20     A.    Yes, my attorney and an attorney --

21   I believe the attorney that signed this letter.

22     Q.    Okay.  And I just want to focus on

23   what Mr. Dondero said.  Did he -- did he say

24   during the call that Highland should not be

25   engaging in any further CLO transactions?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 104
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 614 of 1598 PageID 13661
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 95 of 110

Page 94

1        GRANT SCOTT - 1/21/2021

2        A.    He took a more -- if I can

3    characterize his mental -- I looked at the

4    issue of maintaining the status quo since there

5    was somebody that was complaining about it,

6    that that -- because it -- it isn't assets of

7    Highland, it doesn't adversely affect Highland.

8    If -- if stopping the sales -- you know, my --

9    my thought was -- is if stopping the sales

10   reduces the likelihood of litigation

11   disputes -- you already saw that there was the

12   one from middle of December.  I -- I thought

13   that would be the more appropriate way to go.

14   I didn't think there'd be any harm.

15       Q.    And was that your --

16       A.    I think -- I think Jim Dondero had a

17   more legalistic view of its impro- -- im- --

18   improper nature.

19       Q.    And did he share that view with you?

20       A.    On Monday, yes.

21       Q.    Can you describe for me your

22   recollection of what he said about the

23   legalistic view?

24       A.    Just the mention of -- all I recall

25   is in terms of -- the law associated with it

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 105
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 615 of 1598 PageID 13662
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 96 of
110

Page 95

GRANT SCOTT - 1/21/2021

1

2     was -- the Advisers Act was mentioned --

3         Q.    Did you have --

4         A.    -- but I don't -- I don't know what

5     that is.  You know, I don't know what that is.

6         Q.    And you -- and -- and you never --

7     it never occurred to you to pick up the phone

8     and -- and to speak with Mr. Seery to see why

9     it was he thought he should be engaging in

10    transactions?

11        A.    No.  And -- but I -- my lack of

12    volunteering a phone call to Jim Seery isn't --

13    it's -- it's because of -- I -- I thought any

14    phone call by me to Jim Seery would be

15    inappropriate because he's represented by

16    counsel.  I mean, we were working on claims

17    against him --

18        Q.    Okay.

19        A.    -- right, so...

20        Q.    Did you -- did you -- did you think

21    to instruct your lawyers to reach out to

22    Mr. Seery to actually speak to him instead of

23    just sending a letter like this and to -- and

24    to ask -- and to maybe inquire as to why he

25    thought it was appropriate to engage in

APPX. 10303

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 106
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 616 of 1598 PageID 13663
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 97 of
110

Page 96

1                  GRANT SCOTT - 1/21/2021

2    transactions before they made a request six

3    days after the court threw out their suit as

4    frivolous?  I'll withdraw that.  That's too

5    much.

6            A few days later did you authorize

7    the sending of another letter to the debtor in

8    which you suggested that the -- the entities on

9    behoove -- on -- on whose behalf the letter was

10   sent might take steps to terminate the CLO

11   management agreements?

12     A.   I did not see -- so there is a --

13   there is a December 28th letter.

14          MR. MORRIS:  Let's just go to the

15      next letter, and -- and let's just call

16      that up.

17   BY MR. MORRIS:

18     Q.   I think it's -- I think it's

19   actually dated December 23rd.  It was the next

20   day.

21     A.   Yes.

22          (SCOTT EXHIBIT 4, Letter to James A.

23      Wright, III, et al., from Gregory Demo,

24      December 24, 2020, with Exhibit A

25      Attachment, was marked for identification.)

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 107
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 617 of 1598  PageID 13664
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21  Entered 06/16/21 16:18:26  Page 98 of
110

Page 97

GRANT SCOTT - 1/21/2021

1

2  BY MR. MORRIS:

3      Q.    And do you recall that the next day

4  CLO HoldCo Limited joined in another letter to

5  the debtors?  Do you have that recollection?

6      A.    Yes.  Not -- not be- -- yes, I do,

7  but -- yes, I do.

8      Q.    Did you see this letter before it

9  was sent?

10     A.    I don't believe so.

11     Q.    Did you authorize the sending of

12  this letter?

13     A.    I gave -- I relied on my attorney to

14  guide me through this process.

15     Q.    I appreciate that.

16     A.    I let him make that call on this

17  letter, which is -- copies most of the prior

18  letter and then adds another issue.

19     Q.    Okay.  Do you have an understanding

20  of what that issue is?

21     A.    Yes.

22     Q.    And what is your understanding of

23  what that additional issue is?

24     A.    Somewhere in this letter of the 23rd

25  there's an -- there's an -- an inclusion of

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 108
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 618 of 1598    PageID 13665
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 99 of
110

Page 98

1          GRANT SCOTT - 1/21/2021

2   a -- a statement of an -- a future intent.

3        Q.    A future intent to do what?

4        A.    To remove Highland as the servicer

5   of the agreements you talked to me about

6   previously.

7        Q.    Can you tell me whether there's a

8   factual basis on which CLO HoldCo Limited

9   believes that the debtor should be removed as

10  the servicer of the portfolio manager of the

11  CLOs?

12       A.    Yes.  There are -- there are

13  multiple bases to consider subject to all the

14  other conditional language in the request of

15  these letters to consider that going forward

16  but no decision.  That intent is an intent to

17  evaluate, not an intent to take any action.  I

18  haven't authorized any action.  I don't feel

19  comfortable with my knowledge base at this

20  time, but it's something being explored.

21       Q.    So knowing everything that you know

22  as of today, you have not yet formed a decision

23  as to whether CLO HoldCo Limited will take any

24  steps to terminate Highland's portfolio

25  management agreements, correct?

Page 99

1          GRANT SCOTT - 1/21/2021

2      A.    I don't -- I don't want to be

3    difficult, but I'm -- I'm confused yet again

4    with your question.  But I have not -- there --

5    there are a number of cr- -- a number of issues

6    that with my nonfinance background would

7    suggest to me that they -- they may be bases

8    for -- for cause, to -- to assert a cause.  And

9    I've been conferring with my attorney about

10   that, but it's very preliminary and no -- no

11   decision has been made.  I -- no decision is

12   being made.

13      Q.    So what -- what are the factors that

14   are causing you to consider possibly seeking to

15   begin the process of terminating the CLO

16   management agreements?

17      A.    Well, I guess I would break them

18   down into maybe two categories, maybe more.

19   The one that resonates most with me -- I don't

20   know -- maybe because even though I'm a patent

21   attorney, I guess at one point I was an

22   attorney.  But the thing that resonates most

23   with me --

24      Q.    You are an attorney.

25      A.    -- at the moment -- well, now you

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 110
Case 3:23-cv-00726-S   Document 8-24   Filed 03/29/23   Page 620 of 1598   PageID 13667
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 101 of
110

1          GRANT SCOTT - 1/21/2021

2   know why I'm a patent attorney and not one of

3   you guys.  But the thing that resonates with me

4   the most from a legal substantive, black letter

5   law sort of issue is the plan for

6   reorganization, which we've objected to.  I've

7   re- -- I've reviewed the objection, and that

8   sets forth our -- that sets forth my position,

9   and I consider that to be quite material.  The

10   others are issues of practical effects of

11   what's happened thus far with the bankruptcy,

12   the termination of the experts with a long

13   track record of success, the soon-to-be

14   termination of all employees, the cancellation

15   of various representation agreements, things of

16   that nature looked at from an additive sort of

17   perspective.

18      Q.   You know that -- can we refer to the

19   counterparties under the CLO management

20   agreements as the issuers?  Are you familiar

21   with that term?

22      A.   I -- I am familiar with the term

23   issuers, yes.

24      Q.   Okay.  And do you understand --

25      A.   There's an agreement between the --

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 111
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 621 of 1598 PageID 13668
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 102 of 110

Page 101

1    GRANT SCOTT - 1/21/2021

2  I'm sorry.

3    Q.   There's an agreement between the

4  issuers and Highland pursuant to which Highland

5  manages the CLO assets, right?

6    A.   With res- -- yes.

7    Q.   Okay.  And do you understand what's

8  going to happen to those management contracts

9  in connection with the plan of reorganization?

10   A.   Partially.

11   Q.    What's your partial understanding?

12   A.    Well, I -- I wouldn't want to

13  characterize it as a partial understanding.  I

14  mean, with respect to part of the agreement.

15   Q.   Okay.

16   A.   Okay.  Our plan objection lays out

17  our basis for objecting to steps that Highland

18  is actively taking to preclude us from the full

19  rights that we have as third-party

20  beneficiaries under that agreement, and they're

21  not de minimus.  They're quite material.  They

22  relate to cause issues and no-cause issues, for

23  example, as out- -- as outlined in our --

24  our -- our objections.

25   Q.   Okay.  Did you ever make any attempt

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 112
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 622 of 1598   PageID 13669
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 103 of
110

Page 102

1          GRANT SCOTT - 1/21/2021

2   to speak with any issuer concerning Highland's

3   performance under the CLO management

4   agreements?

5       A.   No.

6       Q.   Why not?

7       A.   I -- I don't have any facts --

8   understand I -- I get all of the reports

9   periodically from Highland -- from Highland.

10   I -- I don't have a basis that I'm aware of to

11   complain about performance issues.  This is a

12   legal issue that I'm talking about.

13       Q.   So you have no basis to suggest that

14   Highland hasn't performed under the CLO

15   management agreements, correct?

16       A.   Well, Highland as of right now,

17   the -- the issue really is as -- as to what's

18   next, not -- not -- I -- I don't -- I don't

19   believe I have facts that support a com- --

20   a -- an issue right now.  It's -- it's --

21   it's -- it's going forward that is the problem.

22       Q.   I --

23       A.   That's -- you know, that's --

24       Q.   Have you given any thought to

25   speaking with the issuers to try to get their

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 113
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 623 of 1598 PageID 13670
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 104 of 110

Page 103

GRANT SCOTT - 1/21/2021

1  views as to what they think is going to happen

2  [sic]

3  in the future?

4  A.  No.

5  Q.  They're the -- they're the actual

6  direct beneficiaries under the CLO management

7  agreements, to the best of your understanding,

8  right?

9  A.  Yes.  Their rights may not be

10  impacted; it's CLO Holdco's rights that are

11  going to be adversely impacted.  So it's -- I

12  don't know that our view is in alignment with

13  their view.  But to answer your question, no,

14  we did not contact them.

15  Q.  Do you have any knowledge or

16  information as to any assertion by the issuers

17  that Highland is in breach of any of the CLO

18  management agreements?

19  A.  No.

20  Q.  Do you have any knowledge or

21  information as to whether or not any of the

22  issuers believe that Highland is in default

23  under the CLO management agreements?

24  A.  No, I don't have any of those facts.

25  Q.  Are you aware that the issuers are

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 114
Case 3:23-cv-00726-S  Document 8-24   Filed 12/29/23   Page 624 of 1598  PageID 13671
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 105 of 110

Page 104

1      GRANT SCOTT - 1/21/2021

2   negotiating with Highland to permit Highland to

3   assume the CLO management agreements and to

4   continue operating under them?

5      A.   I believe so --

6      Q.   Is that --

7      A.   -- but they're --

8      Q.   Go ahead.  I'm sorry.

9      A.   As I understand it, Highland

10  wants -- Highland or its subsidiary -- or

11  its -- its -- its postbankruptcy relative --

12  post- -- excuse me, that Highland

13  postbankruptcy -- or postplan confirmation

14  wants to move forward, substitute itself for

15  the prior issuer -- no, sorry, substitute

16  itself for the prior servicer under those

17  agreements to assume those agreements but in

18  the process of assuming those agreements,

19  carving out a bunch of provisions that from a

20  legal standpoint and a potentially future

21  practical and monetary standpoint are quite

22  substantial, and that has to relate to the

23  removal rights based on cause and without

24  cause.  As I understand it, that's all set

25  forth in our plan objection.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 115
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 625 of 1598   PageID 13672
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 106 of
110

Page 105

1          GRANT SCOTT - 1/21/2021

2     Q.    Okay.  Are you aware of a third

3   letter that was sent to Highland on behalf of

4   CLO HoldCo and the other entities that are

5   listed in this document?

6     A.    The December 28th letter, is that

7   what you mean?

8     Q.    It's actually December 31st, if I

9   can refresh your recollection.

10          MR. MORRIS:  Can we put up Exhibit

11     F?

12          (SCOTT EXHIBIT 5, Letter to Jeffrey

13     N. Pomerantz from R. Charles Miller,

14     December 31, 2020, was marked for

15     identification.)

16   BY MR. MORRIS:

17     Q.    You remember that there was a letter

18   dated on or about December 31st that was

19   sent -- oh, actually, you know, I apologize.

20   If we scroll down to the -- to the next -- to

21   the first box, there actually is no mention of

22   CLO HoldCo.

23          Are you aware that Mr. Dondero was

24   evicted from Highland's offices as of the end

25   of the year?

Page 106

1        GRANT SCOTT - 1/21/2021

2     A.   I -- I didn't know the time, but I

3  understand he's no longer there.

4     Q.    Does CLO HoldCo Limited contend that

5  it was damaged in any way by Mr. Dondero's

6  eviction from the Highland suite of offices?

7        MR. CLARK:  Objection, form.

8     A.   I -- I don't have any information to

9  support that as of this time.

10     Q.   It's not -- it's not a belief that

11   you hold today?

12     A.    I don't have a belief of that, yes.

13        MR. MORRIS:  All right.  Let's take

14     a short break.  I may be done.  I -- I'm

15     grateful, Mr. Scott, and don't want to

16     abuse your time.  Give me -- let -- just

17     let -- let's come back at 4:50, just eight

18     minutes, and if I have anything further, it

19     will be brief.

20        (Whereupon, there was a recess in

21     the proceedings from 4:42 p.m. to

22     4:49 p.m.)

23        MR. MORRIS:  Okay.  Mr. Scott, thank

24     you very much for your time.  I have no

25     further questions.

Page 107

1          GRANT SCOTT - 1/21/2021

2          THE WITNESS:  Thank you.

3          MR. CLARK:  We will reserve our

4    questions.

5          THE WITNESS:  I appreciate it, John.

6          MR. MORRIS:  Take care.  Thanks for

7    your time and your -- and your diligence.

8    I do appreciate it.  Take care, guys.

9          THE REPORTER:  Okay.

10         MR. CLARK:  Thank you.

11         MR. HOGEWOOD:  No questions from us.

12         (Time Noted:  4:50 p.m.)

13

14

15          ---------------------

16             GRANT SCOTT

17

18   Subscribed and sworn to before me

19   this       day of            2021.

20

21   --------------------------------------

22

23

24

25

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 118
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 628 of 1598    PageID 13675
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 109 of
110

Page 108

1        GRANT SCOTT - 1/21/2021

2          C E R T I F I C A T E

3    STATE OF NORTH CAROLINA  )

4                    ) ss.:

5    COUNTY OF WAKE          )

6

7        I, LISA A. WHEELER, RPR, CRR, a

8    Notary Public within and for the State of New

9    York, do hereby certify:

10          That GRANT SCOTT, the witness whose

11    deposition is hereinbefore set forth, having

12    produced satisfactory evidence of

13    identification and having been first duly sworn

14    by me, according to the emergency video

15    notarization requirements contained in G.S.

16    10B-25, and that such deposition is a true

17    record of the testimony given by such witness.

18          I further certify that I am not

19    related to any of the parties to this action by

20    blood or marriage; and that I am in no way

21    interested in the outcome of this matter.

22          IN WITNESS WHEREOF, I have hereunto

23    set my hand this 21st day of January, 2021.

24          -------------------------

25          LISA A. WHEELER, RPR, CRR

Page 109

1          GRANT SCOTT - 1/21/2021

2     --------------------I N D E X------------------

3                              PAGE

4     EXAMINATION BY MR. MORRIS                    7

5

6

     --------------------EXHIBITS------------------
7
                             PAGE
8
       EXHIBIT 1  Organizational Structure:      46
9            CLO HoldCo, Ltd.

10    EXHIBIT 2  Unanimous Written Consent of     54
             Directors In Lieu of Meeting
11
       EXHIBIT 3  Letter to James A. Wright,      78
12           III, et al., from Gregory
             Demo, December 24, 2020, with
13           Exhibit A Attachment

14    EXHIBIT 4  Letter to James A. Wright,       96
             III, et al. From Gregory
15            Demo, December 24, 2020, with
             Exhibit A Attachment
16
       EXHIBIT 5  Letter to Jeffrey N.           105
17            Pomerantz from R. Charles
             Miller, December 31, 2020
18

19

20

21

22

23

24

25

# EXHIBIT 24

Page 1

1                          Grant Scott

2            IN THE UNITED STATES BANKRUPTCY COURT

3              FOR THE NORTHERN DISTRICT OF TEXAS

4                        DALLAS DIVISION

5     In Re:                          Case No.

6     HIGHLAND CAPITAL MANAGEMENT L.P.,   19-34054

7                  Debtor,              Chapter 11

8     _____

9     HIGHLAND CAPITAL MANAGEMENT,      Adversary No.

10    L.P.,                            21-03003-sgi

11                  Plaintiff,

12    Vs.

13    JAMES D. DONDERO,

14                  Defendant.

15

16          Virtual Zoom Deposition of Grant Scott

17                  Tuesday, June 1, 2021

18                     At 2:00 p.m.

19

20

21

22

23    Reported by LeShaunda Cass-Byrd, CSR, RPR

24    TSG Job No. 194692

25

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 122
Case 3:23-cv-00726-S   Document 8-24   Filed 05/29/23   Page 632 of 1598   PageID 13679
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 3 of
116

Page 2

1                          Grant Scott

2       Videoconference Deposition of Grant Scott,

3   pursuant to Federal Rules of Civil Procedure, before

4   LeShaunda Cass Byrd, CSR, RPR, a Notary of the State

5   of North Carolina.  The Court Reporter reported the

6   proceeding remotely and the witness was present via

7   videoconference

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 123
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 633 of 1598 PageID 13680
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 4 of 116

```
                                                    Page 3
 1                    Grant Scott

 2   APPEARANCES OF COUNSEL:

 3   On behalf of Debtor:

 4         BY: GREGORY DEMO, Esq.
               JOHN MORRIS, Esq.
 5         Pachulski Stang Ziehl & Jones
           780 Third Avenue
 6         New York, New York 10017

 7         BY: SHANNON McLAUGHLIN, Esq.
           Latham & Watkins
 8         885 Third Avenue
           New York, New York 10022.
 9
     On behalf of the Creditors Committee:
10
           BY: PAIGE MONTGOMERY, Esq.
11         Sidley Austin
           2021 McKinney Avenue
12         Dallas, Texas 75201.

13   On behalf of the Witness:

14         BY: JOHN KANE, Esq.
           Kane Russell Coleman & Logan
15         901 Main Street
           Dallas, Texas 75202
16
17   On behalf of CLO HoldCo & the DAF:

18         BY: JONATHAN BRIDGES, Esq.
           Sbaiti & Company
19         1201 Elm Street
           Dallas, Texas 75270
20
21   Also Present:

22         Mark Patrick
           Amelia Hurt
23         La Asia Canty, Paralegal

24

25
```

```
                                                            Page 4
 1                     Grant Scott

 2              EXAMINATION OF GRANT SCOTT

 3    By Mr. Morris                                6

 4    By Mr. Kane                                103

 5    By Mr. Morris                              105

 6                 DEPOSITION EXHIBITS

 7    EXHIBIT    DESCRIPTION                     PAGE

 8    Exhibit 1  DAF CLO HoldCo Structure Chart   8

 9    Exhibit 8  E-mail Exchange, Bates GScott000312   19

10    Exhibit 9  Notice of Settlement            44

11    Exhibit 10 E-mail Exchange, Bates GScott000080   75

12    Exhibit 11 E-mail Exchange, Bates GScott000138   80

13    Exhibit 12 E-mail Exchange, Bates GScott000361   88

14    Exhibit 13 Assignment and Assumption of

15               Membership Interest Agreement

16    Exhibit 14 Written Resolutions of the Sole

17               Director of the Company, Dated

18               March 25, 2021                  94

19    Exhibit 15 Written Resolutions of the Sole

20               Shareholder of the Company, Dated

21               March 24, 2021                  97

22    Exhibit 16 Written Resolutions of the Sole

23               Shareholder of the Company, Dated

24               March 31, 2021                  97

25
```

1                    Grant Scott

2

     Exhibit 17 Written Resolutions of the Sole

3

              Shareholder of the Company, Dated

4

              April 2, 2021                          98

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

```
 1                      Grant Scott

 2                      GRANT SCOTT,

 3   having been first duly sworn, was examined and

 4   testified as follows:

 5                      EXAMINATION

 6   BY MR. MORRIS:

 7       Q.    Good afternoon, Mr. Scott.

 8       A.    Good afternoon, John.

 9       Q.    Okay.  As you recall, my name is John

10   Morris.  I'm an attorney with Pachulski Stang Ziehl &

11   Jones.  We represent Highland Capital Management LP, a

12   debtor in a bankruptcy case that is pending in the

13   Northern District of Texas.

14             Do you recall any of that?

15       A.    Yes.

16       Q.    Okay.  And we are here today for your

17   deposition, and I appreciate your compliance with the

18   subpoena.  Just a few ground rules to remind you, I'm

19   going to ask you a series of questions, and it's

20   important that you allow me to finish my question

21   before you begin your answer; is that fair?

22       A.    Yes.

23       Q.    And I will attempt to give you the same

24   courtesy, but if for some reason I step on your words,

25   just let me know that because I don't mean to cut you
```

Page 7

                              Grant Scott

1

2    off.  Okay?

3         A.      Okay.

4         Q.      If there's anything that I ask you that you

5    do not understand, will you let me know?

6         A.      Yes, sir.

7         Q.      If you need a break at any time, will you

8    let me know?

9         A.      Yes.

10        Q.      Okay.  Because this deposition is being

11   conducted remotely, we are going to be putting

12   documents on the screen.  I'm not attempting to trick

13   you in any way.  If you believe there is any of

14   portion of a document that you need to see, either to

15   put something in context or to refresh your

16   recollection, I encourage to let me know that, and I

17   will be happy to accommodate you.  Okay?

18        A.      Okay.

19        Q.      Okay.  Have you seen the subpoena that the

20   debtors served on your lawyer in this case?

21        A.      The one relating to my deposition?

22        Q.      Correct.

23        A.      Yes.

24        Q.      And are you here today pursuant to that

25   subpoena?

Page 8

1                              Grant Scott

2        A.     Yes.

3        Q.     So today's deposition concerns a particular

4    motion that the debtor filed recently where the debtor

5    is seeking to hold certain individuals and entities in

6    contempt of court.  Have you seen or reviewed the

7    debtor's motion that was filed?

8        A.     I have seen the e-mails which I kept, but I

9    have not read them.

10       Q.     Okay.  I want to just begin with some

11   background.

12              MR. MORRIS:  And then I would ask Ms.

13        Canty to put up what we will mark as

14        Exhibit -- you know, let's pick up the

15        numbering from this morning, La Asia.  Did

16        we use 7 this morning?

17              Actually, this is going to be Exhibit

18        1.  It's the same document that we had this

19        morning.

20              MS. CANTY:  Yes.

21              MR. MORRIS:  We will call it Exhibit

22        1, and it's an organizational chart.  If we

23        can just put that on the screen.

24              (Deposition Exhibit 1 was marked for

25        identification.)

Page 9

```
 1                        Grant Scott

 2   BY MR. MORRIS:

 3        Q.      Okay.  Have you seen this before,

 4   Mr. Scott?

 5        A.      Yes.

 6        Q.      Do you know what it is?

 7        A.      It's the -- yes.  The DAF CLO HoldCo

 8   structure chart.

 9        Q.      And this is structure chart that you

10   produced in response to the subpoena; is that right?

11        A.      Correct.

12        Q.      You are familiar with the gentleman named

13   Mark Patrick; is that right?

14        A.      Yes.

15        Q.      Is it your understanding that Mr. Patrick

16   was one of the individuals that helped establish the

17   hierarchy that is depicted on Exhibit 1?

18        A.      Yes.

19        Q.      And what is the basis for that

20   understanding?

21        A.      That goes back many years to the

22   origination of my role.

23        Q.      Okay.  And do you recall that you assumed

24   your role in or around 2012?

25        A.      Yes.
```

```
                                                      Page 10
 1                        Grant Scott

 2        Q.     Okay.  Did you know Mr. Patrick prior to

 3   the time that you assumed your role?

 4        A.     I did not.

 5        Q.     Okay.  Do you know -- withdrawn.

 6               Do you have any knowledge as to whether

 7   anybody other than Mr. Patrick helped establish the

 8   hierarchy that is depicted on Exhibit 1?

 9        A.     There was a law firm name that came to

10   mind, and there was an expert, I gather, a lawyer that

11   was familiar with charitable entities that I believe

12   was involved.

13        Q.     Can you identify any -- withdrawn.

14               At the time that you understood Mr. Patrick

15   had helped to create this hierarchy, did you

16   understand who employed Mr. Patrick?

17        A.     Yes.  I believe so.

18        Q.     Who did you believe Mr. Patrick worked for

19   at that time?

20        A.     Highland Capital Management.

21        Q.     Can you identify any other person at

22   Highland Capital Management who was involved in the

23   creation of this hierarchy?

24        A.     No.

25        Q.     Okay.  Now for looking at the hierarchy
```

```
                                                          Page 11
 1                     Grant Scott

 2   here, for the period for approximately 10 years prior

 3   to March 24th, 2021, you served as the managing member

 4   of the charitable DAF GP, LLC, correct?

 5        A.     Correct.

 6        Q.     And for approximately 10 years prior to

 7   March 30 -- 20 -- withdrawn.

 8               For approximately 10 years prior to March

 9   24th, 2021, you were the sole director of charitable

10   DAF HoldCo, LTD, correct?

11        A.     Correct.

12        Q.     And for approximately 10 years prior to

13   March 24th, 2021, you were the sole director of

14   charitable DAF Fund LP, correct?

15        A.     I believe that is correct.

16        Q.     And for approximately 10 years prior to

17   March 24, 2021, you served as the sole director of CLO

18   HoldCo Limited, correct?

19        A.     Yes.  That is correct.

20        Q.     Did you serve in any capacity for any other

21   entity that is depicted on this sheet at any time

22   prior to March 24th, 2021?

23        A.     If you go -- if you look at the top of that

24   chart where it's directed at the charitable giving

25   components, I had some involvement with various
```

Page 12

1                      Grant Scott

2    members of some of those organizations.

3         Q.      And would they be the ones that are

4    labelled as third parties or as supporting

5    organizations?

6         A.      The -- the third party organizations.

7    And -- and possibly the supporting organizations.

8         Q.      Do you know what the difference is between

9    a third party and a supporting organization as those

10   phrases are used on Exhibit 1?

11        A.      I don't recall anymore what the delineation

12   is between those two.

13        Q.      Okay.  Do you hold any position today with

14   any of the entities that are depicted on Exhibit 1?

15        A.      I do not -- I do not believe so.  Well, I

16   believe technically, I'm still -- I may still be a

17   director of CLO HoldCo, but I -- I'm not certain of

18   the status as of today.

19        Q.      Is there a particular reason why you may

20   remain today as a director of CLO HoldCo Limited?

21        A.      I don't know if the -- I don't know if the

22   transfer after my resignation has been completely

23   finalized, and I haven't -- yeah.  I don't know how

24   close it is to being completely finalized.  I'm not --

25   I'm not sure.

APPX. 03632

Page 13

1                        Grant Scott

2      Q.    But your intent is to resign as the

3   director of CLO HoldCo Limited; is that right?

4      A.    Yes.

5      Q.    And the only reason that that hasn't

6   happened yet, is it fair to say, is for administrative

7   reasons?

8               MR. BRIDGES:  Objection.  Assumes

9       facts not in evidence.

10  BY MR. MORRIS:

11     Q.    You can answer.

12     A.    I --

13     Q.    Withdrawn.  I will ask a different

14  question.

15               Do you know why your intended resignation

16  from CLO HoldCo Limited has not yet become effective?

17               MR. BRIDGES:  The same objection.

18       Facts not in evidence.

19  BY MR. MORRIS:

20     Q.    You can go ahead.

21               MR. KANE:  I object to form, also.

22               Grant, go ahead.

23               THE WITNESS:  I do not.

24  BY MR. MORRIS:

25     Q.    Okay.  Do you hold any positions of any

```
                                                     Page 14
1                        Grant Scott

2   kind today with any entity that you believe is either

3   directly or indirectly owned or controlled by

4   Mr. Dondero?

5        A.    I don't believe so.

6        Q.    Do you have -- I'm just going to explore

7   that for a little bit.

8             Do you know have -- do you know whether you

9   continue to HoldCo any position with any NexBank

10  entity?

11       A.    I'm not in -- no, I don't have any

12  involvement with NexBank.

13       Q.    Okay.

14            MR. KANE:  Hey, John, can you shed a

15        little light on why that is relevant?

16            MR. MORRIS:  I'm just trying to find

17        connections between Mr. Scott and

18        Mr. Dondero because I -- I just -- I

19        think -- I think the purpose of the

20        deposition is to try to -- to try to deduce

21        facts that are related to whether or not

22        Mr. Dondero is going to be a responsible

23        party under the contempt motion.  So I'm

24        just looking for --

25            MR. KANE:  I understand.  I'm just
```

APP. 03334

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 135
Case 3:23-cv-00726-S   Document 8-24   Filed 05/29/23   Page 645 of 1598   PageID 13692
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 16 of
116

Page 15

```
 1                      Grant Scott

 2        trying to figure out Grant's -- you know,

 3        whether he has a --

 4               MR. MORRIS:  That is all right.  I'm

 5        moving on anyway.

 6               MR. KANE:  Appreciate it.

 7   BY MR. MORRIS:

 8        Q.    Now looking at the chart, Mr. Scott, I

 9   believe you testified that you were either the

10   managing member or a director of each of the DAF

11   entities and CLO HoldCo Limited.

12               Do I have that right?

13        A.    I believe that is correct.

14        Q.    All right.  Is it your understanding that

15   Mr. --

16        A.    Excuse me.  I am sorry.  Currently or was?

17        Q.    Was.  Up until March 24th.

18        A.    Okay.  Correct.

19        Q.    All right.  Let me ask the question again

20   so it's clean.

21               Did you serve as either the managing member

22   or the director for each of the charitable DAF

23   entities and the CLO HoldCo Limited entity for

24   approximately 10 years prior to March 24th, 2021?

25               MR. KANE:  Objection.  Form.  Go
```

Page 16

                            Grant Scott

1

2        ahead, Grant.

3              (Reporter clarification.)

4              THE WITNESS:  I believe so.

5   BY MR. MORRIS:

6        Q.    And is it your understanding that Mr. Mark

7   Patrick replaced you in those capacities on or about

8   March 24th, 2021?

9        A.    It's my understanding that on March 24th,

10  the management shares that I had previously -- that

11  had been in my name were transferred to him.  I am not

12  sure how that impacts the current status in the

13  various other entities.

14       Q.    Okay.  During the time that you served as

15  the managing member of the charitable DAF GP LLC, that

16  entity had no officers or employees, correct?

17       A.    I believe that is correct.

18             MR. KANE:  Object to the form.

19  BY MR. MORRIS:

20       Q.    And you served as the sole director of that

21  entity during the time that you served as the

22  director, correct?

23       A.    I believe that is correct.

24       Q.    And during the period of time that you

25  served as a director of charitable DAF HoldCo Limited,

Page 17

                              Grant Scott

1

2   you were the only person to serve in that capacity; is

3   that correct?

4        A.    I believe so.

5        Q.    And during the period that you served as

6   director of charitable DAF HoldCo Limited, that entity

7   had no officers or employees, correct?

8        A.    I believe that is correct.

9        Q.    During the time that you served as a

10  director of charitable DAF Fund LP, you were the sole

11  director of that entity, correct?

12       A.    Correct.

13       Q.    And during the time that you served as the

14  sole director of charitable DAF Fund LP, that entity

15  had no officers or employees, correct?

16       A.    I believe that is correct.

17       Q.    You served as the sole director of CLO

18  HoldCo Limited; is that right?

19       A.    Yes.  That is correct.

20       Q.    And during the period that you served as

21  the sole director of CLO HoldCo Limited, that entity

22  had no officers or employees, correct?

23       A.    That is correct.

24       Q.    Is that why the DAF had certain agreements

25  with Highland Capital Management LP pursuant to which

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 138
Case 3:23-cv-00726-S   Document 8-24   Filed 05/29/23   Page 648 of 1598   PageID 13695
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 19 of 116

Grant Scott

2  HCMLP provided back office and advisory and investment

3  services?

4          MR. KANE:  Objection.  Form.

5          THE WITNESS:  I think that is

6      correct.

7  BY MR. MORRIS:

8      Q.    Do you recall that that DAF had agreements

9  with Highland Capital Management that were amended and

10  restated in 2014?

11         MR. KANE:  Objection.  Form.

12         THE WITNESS:  I understand there were

13     various agreements over the years that had

14     been restated.  I'm not entirely sure

15     anymore of the dates that we received

16     that --

17         MR. MORRIS:  Okay.  Let's mark --

18         THE WITNESS:  I'm sorry?

19         MR. MORRIS:  Let's mark as Exhibit

20     8 --

21         MR. BRIDGES:  Objection.  Objection.

22     Please let the witness answer his question.

23         MR. MORRIS:  Let's mark this --

24         MR. BRIDGES:  No.  Please allow the

25     witness to continue his answer.

```
                                                            Page 19
1                          Grant Scott

2     BY MR. MORRIS:

3          Q.    Grant, do you have anything else to add?

4          A.    You had asked me -- you asked about a

5     specific date, I think, 2014.  I just -- I don't know

6     what the dates are or were.

7          Q.    That is what I heard you say.  Is there

8     anything else that you have to add?

9          A.    No, I don't -- I don't think so.

10         Q.    I didn't think so either.

11               MR. MORRIS:  Let's go to Exhibit 8,

12          please, the next document.

13               (Deposition Exhibit 8 was marked for

14     identification.)

15               MR. MORRIS:  Okay.  If we could just

16          scroll down a little bit.  Just to the

17          e-mail.

18     BY MR. MORRIS:

19         Q.    All right.  Were you familiar with Caitlin

20     Nelson and Helen Kim and Thomas Surgent and David Klos

21     in and around August 2004?

22         A.    I believe they were all Highland employees.

23         Q.    Okay.

24               MR. MORRIS:  Can we just scroll up to

25          the next e-mail, please?
```

Page 20

1                         Grant Scott

2    BY MR. MORRIS:

3        Q.      Okay.  Do you see that Mrs. Kim sends you

4    an e-mail on August 26th, 2014?

5        A.      Yes.  I see that.

6        Q.      And do you see that she had attached for

7    your review and execution, drafts of an amended and

8    restated service agreement and amended and restated

9    advisory agreement and GP resolutions?

10       A.      I do see that.

11       Q.      Okay.  Do you have any recollection as to

12   whose idea it was to amend and restate those

13   agreements at that moment in time?

14       A.      I do not.

15       Q.      Do you have any recollection as to why

16   those agreements were amended and restated at that

17   time?

18       A.      No, I do not.

19       Q.      Okay.  Let's just scroll down and just show

20   Mr. Scott the agreements.  I'm not going to ask

21   anything substantive about it.  But do you see here is

22   the -- if we can stop right there -- the Amended and

23   Restated Service Agreement that is dated from the

24   first day of July, 2014, and it's between the DAF

25   Fund -- the charitable DAF Fund LP, the charitable DAF

Page 21

1              Grant Scott

2   GP LLC, as well as Highland Capital Management LP.

3              Do you see that?

4       A.    I do see that.

5       Q.    Do you recall that the entity that is

6   commonly referred to as the DAF had a service

7   agreement with Highland Capital Management LP?

8       A.    I believe that is correct.  Yes.

9       Q.    Do you recall whether -- whether the

10  service agreement was ever the subject of any

11  negotiations?

12      A.    I don't know.

13      Q.    Did you participate in any negotiations

14  concerning the service agreement that was entered --

15  entered in between the entity known as the DAF and

16  Highland Capital Management LP?

17              MR. KANE:  Objection to form.

18              John, will you clarify the time

19     period?

20  BY MR. MORRIS:

21      Q.    Right here.  2014.

22      A.    Sir, I don't recall anything about this

23  with respect to 2014.

24      Q.    Do you know if -- if the agreement was ever

25  amended at any time after 2014?  And when I use the

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 142
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 652 of 1598    PageID 13699
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 23 of
116

Page 22

1                      Grant Scott

2    phrase "agreement," I'm specifically referring to the

3    Amended and Restated Service Agreement that we are

4    looking at.

5         A.    I believe -- I think there was a further

6    amended and restated agreement.

7         Q.    Okay.  Did you participate in any

8    negotiations concerning that further amended and

9    restated agreement?

10        A.    I don't remember.

11        Q.    Do you remember offering any comments

12   concerning any subsequent amendment or restatement?

13        A.    I don't -- I don't remember.

14        Q.    Did you ever hire outside counsel to assist

15   you in the negotiation of any service agreements with

16   Highland Capital Management LP?

17        A.    I did not.

18        Q.    Do you -- do you recall who prepared each

19   of the service agreements to which the DAF was a

20   party?

21        A.    I don't remember.

22        Q.    To the best of your recollection, would it

23   have been inhouse counsel at Highland Capital

24   Management?

25             MR. KANE:  Objection.  Form.

APPX. 08942

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 143
Case 3:23-cv-00726-S    Document 8-24    Filed 02/29/23    Page 653 of 1598    PageID 13700
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 24 of
116

Page 23

1                       Grant Scott

2               THE WITNESS:  I don't -- I don't

3       know.

4    BY MR. MORRIS:

5        Q.    Can you recall the name of any law firm

6    that was involved in the drafting or the negotiation

7    of any service agreement between the entity known as

8    the DAF and Highland Capital Management LP?

9               MR. KANE:  Objection.  Form.

10              THE WITNESS:  I don't remember any.

11   BY MR. MORRIS:

12       Q.    Can you recall during your tenure as the

13   managing member of the DAF GP LLC, whether there was

14   any particular term or provision in any service

15   agreement that was the subject of negotiation or even

16   discussion?

17       A.    I don't remember those -- any of those

18   discussions.

19       Q.    Do you know if they took place or you just

20   can't remember them?

21       A.    I just can't remember them.

22       Q.    Do you recall ever seeing multiple drafts

23   of any service agreement that you -- withdrawn.

24              Did you personally sign service agreements

25   on behalf of the entity known as the DAF?

Page 24

```
1                          Grant Scott

2        A.      I believe so.

3        Q.      And the agreements that you signed on

4    behalf of that entity, were any of them -- were there

5    multiple drafts of any such agreement?

6        A.      There were frequently multiple drafts or

7    agreements.  But I just don't remember them.

8        Q.      Do you remember whether you personally ever

9    provided any comments to any particular draft?

10       A.      I do not.

11       Q.      Let me ask you this:  Are you familiar with

12   the phrase "arm's length negotiations"?

13       A.      Yes.

14       Q.      And can you tell me what your understanding

15   is of an arm's length negotiation?

16       A.      Well, it would depend on the nature of the

17   parties.  For example, a -- two strangers would

18   have -- arm's length would differ from the nature of

19   an agreement between parties maybe having fiduciary or

20   related obligations.

21       Q.      Let me ask you this --

22       A.      I don't know what the black -- I don't know

23   what the blackball definition is to that term.

24       Q.      Would you agree that arm's length

25   negotiations take place between two parties that are
```

Page 25

1                              Grant Scott

2    acting out of their own self interest?

3                   MR. KANE:  Objection.

4                   MR. BRIDGES:  Objection to form and

5           foundation.

6    BY MR. MORRIS:

7       Q.     Withdrawn.  Withdrawn.

8                   MR. BRIDGES:  Calls for a legal

9           opinion.

10   BY MR. MORRIS:

11      Q.     Mr. Scott, do you believe that the service

12   agreements between the entity known as the DAF and

13   the -- and Highland Capital Management LP were arm's

14   length agreements?

15                  MR. BRIDGES:  Objection.  Again, lack

16          of foundation, calls for a legal opinion.

17                  MR. MORRIS:  Okay.  I'm not asking

18          for a legal opinion.  I'm asking for

19          Mr. Scott's view of it, so I will try one

20          more time.

21   BY MR. MORRIS:

22      Q.     Mr. Scott, do you believe that the service

23   agreements between the DAF and HCMLP were the subject

24   and result of arm's length negotiations?

25                  MR. BRIDGES:  Objection.  Foundation,

```
                                                        Page 26
 1                        Grant Scott
 2       calls for legal opinion.
 3   BY MR. MORRIS:
 4       Q.    You can answer, sir.
 5       A.    I don't have any reason to believe they
 6   weren't.  But I --
 7       Q.    Well --
 8       A.    I don't recall them.  I -- I can't give --
 9   I mean, I don't know.
10       Q.    Did get any advice from anybody at any time
11   before entering into the agreement on behalf of the
12   DAF?
13             MR. BRIDGES:  Objection to form.
14             THE WITNESS:  With respect to
15       agreements generally, I often received
16       advice, sometimes in writing, sometimes by
17       telephone.  I just -- with respect to this
18       agreement and -- I just don't recall.
19   BY MR. MORRIS:
20       Q.    Yeah, okay.  Maybe I asked a bad question,
21   so let me try again, Mr. Scott.
22             Do you recall whether you ever got any
23   advice from anybody at any time with respect to any
24   service agreement that you entered into on behalf of
25   the entity known as the DAF and HCMLP?
```

Page 27

```
 1                         Grant Scott

 2              MR. BRIDGES:  Objection, asked and

 3      answered.

 4              MR. KANE:  Form.

 5   BY MR. MORRIS:

 6      Q.    You can answer sir.

 7      A.    Yes, I just -- I don't recall.

 8      Q.    Okay.  How about with respect to the

 9   advisory agreement?  Can we scroll down to page -- I

10   think it's 341?  Oh, no, those are the resolutions.

11              Did Highland Capital Management take

12   responsibility for preparing the corporate resolutions

13   for the DAF entities and CLO HoldCo Limited?

14              MR. BRIDGES:  Objection, foundation.

15              MR. KANE:  Object to the form.

16   BY MR. MORRIS:

17      Q.    You can answer, sir.

18      A.    Do I know who prepared those documents?

19      Q.    Yeah.

20      A.    I don't.

21      Q.    Did you prepare -- have you ever prepared

22   any corporate resolutions for any of the DAF entities

23   or CLO HoldCo Limited?

24      A.    I have not.

25      Q.    To the best of your knowledge, have all of
```

Page 28

```
 1                      Grant Scott

 2   the corporate resolutions for each of the DAF entities

 3   and CLO HoldCo Limited been prepared by inhouse

 4   counsel at HCMLP?

 5              MR. BRIDGES:  Objection.  Form.

 6              THE WITNESS:  I don't know the

 7         division of labor within HCMLP, whether it

 8         was inhouse and/or outside counsel.  I

 9         just -- I just don't know.

10   BY MR. MORRIS:

11      Q.     Are you aware that inhouse counsel prepared

12   resolutions on behalf of the DAF entities and CLO

13   HoldCo Limited?

14              MR. BRIDGES:  Objection.  Form.

15              THE WITNESS:  Yes.

16   BY MR. MORRIS:

17      Q.     You are aware of that, right?

18      A.     I believe inhouse counsel was -- no,

19   that's -- I've frequently worked with inhouse counsel.

20   I -- but I just don't know with respect to these

21   agreements whether I worked with them on -- on these

22   agreements.  I just don't have a present recollection

23   of any of this.

24      Q.     And I'm just asking if you have a present

25   recollection of anybody other than inhouse counsel
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 149
Case 3:23-cv-00726-S  Document 8-24  Filed 11/29/23  Page 659 of 1598  PageID 13706
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21  Entered 06/16/21 16:18:26  Page 30 of
116

Page 29

1                        Grant Scott

2    ever preparing any resolutions for any of the DAF

3    entities or CLO HoldCo Limited?

4              MR. BRIDGES:  Objection.  Asked and

5         answered.

6              MR. KANE:  Objection.  Form.

7    BY MR. MORRIS:

8         Q.    You can answer, Mr. Scott.

9         A.    It's -- it's conceivable that documents

10   were forwarded to me exclusively, but who prepared

11   them in the background?  I don't know.

12        Q.    Okay.  I don't want to know what's

13   conceivable.  I'm again, asking you to focus on what

14   you know or what you don't know or what you recall.

15             Do you have any recollection in your mind

16   of anybody other than Highland inhouse counsel

17   preparing any resolutions on behalf of any DAF entity

18   or CLO HoldCo, Limited?

19             MR. KANE:  Objection to form.

20             He has answered that question three

21        times.

22             MR. MORRIS:  He has not.  But thank

23        you.  He told me --

24   BY MR. MORRIS:

25        Q.    Just ask it again -- answer again, please.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 150
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 660 of 1598 PageID 13707
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 31 of
116

Page 30

                        Grant Scott

1

2       A.      Sir, inhouse counsel can -- let's say

3   inhouse counsel exclusively provided me with all of

4   the agreements.  I don't necessarily know who prepared

5   them.  I thought that's what you were asking me.  I'm

6   sorry.

7       Q.      From the time you assumed the role of sole

8   authorized representative of the DAF and CLO HoldCo

9   through January 1st, 2021, can you think of any

10  resolution or consent or corporate document that was

11  not prepared by HCMLP?

12              MR. KANE:  Objection.  Form.

13              THE WITNESS:  If "prepared" means it

14          was forwarded to me by them, then I am -- I

15          don't recall receiving any documents

16          outside them as -- outside of that conduit

17          of -- of information flow, I guess.

18  BY MR. MORRIS:

19      Q.      Okay.  And during that same period of time,

20  can you think of any resolution or consent or

21  corporate document that you signed after you

22  personally had provided substantive comments or asked

23  for changes?

24              MR. BRIDGES:  Objection.  Asked and

25          answered.

APPX. 03950

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 151
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 661 of 1598 PageID 13708
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 32 of 116

```
                                                        Page 31
 1                    Grant Scott

 2             THE WITNESS:  I don't -- I don't

 3       recall.

 4  BY MR. MORRIS:

 5       Q.    Okay.  From the time you assumed your role

 6  as the sole authorized representative of the DAF and

 7  CLO HoldCo through the beginning of this year, can you

 8  think of any resolution or consent or other corporate

 9  document that you signed where you or the DAF or

10  CLO HoldCo obtained independent counsel?

11             MR. BRIDGES:  Objection.  Asked and

12       answered.

13             MR. KANE:  Objection to form.

14             THE WITNESS:  Since January 1st of

15       this year?

16  BY MR. MORRIS:

17       Q.    Prior to January 1st of this year.

18             MR. BRIDGES:  Same objection.  Asked

19       and answered.

20             THE WITNESS:  Yeah, I don't recall.

21  BY MR. MORRIS:

22       Q.    Okay.  Do you recall that I took your

23  deposition back in January; is that right, sir?

24       A.    Correct.

25       Q.    And do you recall that you testified that
```

Page 32
```
 1                      Grant Scott

 2    during the two-week period leading up to the

 3    deposition you discussed the possibility of resigning

 4    from your positions with Mr. Patrick?

 5        A.    Yes.  I'm not sure -- I'm not sure of the

 6    exact timing.  We had -- we had multiple conversations

 7    about it.

 8        Q.    When was the first time you thought about

 9    resigning?

10        A.    The -- I don't know the exact date.  I know

11    the event.  It was the day I -- I had a conversation

12    with my -- my attorney, John Kane, about.

13              MR. KANE:  Grant, hold on.  You don't

14         need to have any discussions about

15         conversations between you and counsel.

16         That's attorney client privileged.

17              THE WITNESS:  Understood.  I'm sorry.

18              It's when I became aware of the

19         outcome of the escrow hearing sometime in I

20         guess early or mid 2020.

21    BY MR. MORRIS:

22        Q.    And can you describe for me your

23    understanding of what the escrow hearing was about?

24        A.    So I had agreed to allow certain CLO HoldCo

25    and calculated assets to be put in the court registry,
```

```
                                                          Page 33
 1                      Grant Scott

 2    and there was a motion that was made to have those

 3    released.  There was an evidentiary hearing that my

 4    attorney attended -- or rather CLO HoldCo's attorney

 5    attended, John Kane, and based on our discussions of

 6    the outcome, I began contemplating my -- my

 7    resignation.

 8        Q.     And what about the outcome that prompted

 9    you to consider resigning?

10        A.     It -- it was the first time, I guess, where

11    I thought my friendship with Jim Dondero would likely

12    adverse or could adversely affect CLO HoldCo from the

13    standpoint of demonstrating independence.  I thought

14    maybe I -- yeah.

15        Q.     Did -- did you and Mr. Dondero have a

16    conversation at around the time of the escrow hearing

17    that caused you concern about your relationship with

18    Mr. Dondero?

19        A.     It wasn't with respect to concern over my

20    relationship with Mr. Dondero.  It -- it was my

21    concern about CLO HoldCo.  I'm sorry, I didn't

22    understand your question.

23        Q.     I may have misunderstood.  So what was your

24    concern about CLO HoldCo?

25               MR. KANE:  Objection.  Asked and
```

Page 34

Grant Scott

```
1
2       answered.
3   BY MR. MORRIS:
4       Q.     You can answer, sir.
5       A.     My concern was that my friendship with
6   Jim Dondero would eventually provide a presumption
7   that anything that I did in my role was in some way
8   influenced by my friendship and not independence.
9              And so I -- that's when I started thinking
10  about resigning.  That was one of the reasons why I
11  was thinking about resigning, but that's -- that's
12  when it began, to my recollection.
13      Q.     And what were the other reasons that you
14  can recall that caused him to consider resigning at
15  around the time of the escrow hearing?
16      A.     Around the escrow hearing that was at -- it
17  was later.
18      Q.     When was the next time that you recall
19  thinking again about the possibility of resigning?
20      A.     Well, there was a -- I mean, it was as 2020
21  went on, I guess maybe over the course of about six
22  months, there were certain developments during that
23  time that led me to have other reasons for thinking --
24  resigning was something I should -- I should do.
25      Q.     Were you -- were you ever concerned prior
```

Page 35

1                        Grant Scott

2      to the date that you gave notice of your intent to

3      resign, that you didn't have the ability to act

4      independently from what Mr. Dondero wanted you to do?

5          A.      No.

6                 MR. KANE:  Object to form.

7                 THE WITNESS:  If I understand your

8           question -- well, actually could you repeat

9            that question.

10     BY MR. MORRIS:

11         Q.      You know, I'll try and get to specific

12     conversations.  That might be the better way to deal

13     with this.

14                 Do you recall that there came a point in

15     time when CLO HoldCo filed an objection to a proposed

16     settlement with the group of entities known as

17     HarbourVest?

18         A.      Yes.  CLO HoldCo filed an objection.  Yes.

19         Q.      And -- and do you recall that prior to the

20     hearing where the Court was going to consider whether

21     or not to approve the HarbourVest settlement, you

22     caused CLO HoldCo to withdraw the objection?

23         A.      I authorized the withdraw.

24         Q.      And did you believe that you were acting in

25     CLO HoldCo's best interest when you made the decision

Page 36

```
1                      Grant Scott

2    to withdraw CLO HoldCo's objection to the HarbourVest

3    settlement?

4        A.     I was following counsels' advice,

5    CLO HoldCo's counsel's advise.  So...

6              MR. KANE:  Be careful, Grant.

7    BY MR. MORRIS:

8        Q.     I'm just asking you if you believed at the

9    time that you made the decision you were acting in

10   CLO HoldCo's best interest?

11             MR. BRIDGES:  Objection.  Foundation.

12             THE WITNESS:  I believe --

13   BY MR. MORRIS:

14       Q.     What is your answer, sir?

15       A.     Yes, I believe I was acting in CLO HoldCo's

16   best interest.

17       Q.     Did you have any motivation to withdraw

18   CLO HoldCo's objection to the HarbourVest settlement

19   other than your belief that you thought that was the

20   right thing to do, based on the advice of counsel that

21   you received and your own assessment of the situation?

22             MR. BRIDGES:  Objection.  Form,

23        foundation, compound.

24             MR. KANE:  Objection, form.

25   BY MR. MORRIS:
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 157
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 667 of 1598 PageID 13714
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 38 of 116

Page 37

1               Grant Scott

2      Q.     You can answer, sir.

3      A.     Yes.  I was following advice of counsel,
4  and I thought that was the best thing to do.

5      Q.     You thought you were doing the right thing,
6  right?

7      A.     At that time, yes.

8      Q.     Did you ever discuss your decision to
9  withdraw CLO HoldCo's objection to the HarbourVest
10 settlement with Mr. Dondero?

11     A.     Decision?  No.

12     Q.     Did you discuss with Mr. Dondero the fact
13 that the objection had been withdrawn at your
14 direction?

15     A.     Yes.

16     Q.     Can you tell me everything you remember
17 about your communications with Mr. Dondero on that
18 topic?

19     A.     He just asked whether I had indeed
20 authorized it.  That's it.

21     Q.     That's the only question that he asked?

22     A.     Yes.  And I said yes.

23     Q.     Did he -- did he suggest that you had acted
24 inappropriately in any way?

25     A.     He didn't make any suggestion.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 158
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 668 of 1598   PageID 13715
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 39 of
116

```
 1                    Grant Scott

 2      Q.     Did he say that you had acted

 3   inappropriately?

 4      A.     No.

 5      Q.     Did he suggest that you had breached your

 6   fiduciary duties to anybody?

 7             MR. BRIDGES:  Objection.  Asked and

 8      answered.

 9   BY MR. MORRIS:

10      Q.     You can answer, sir.

11      A.     He just wanted to know if I had in fact

12   authorized it, and I said yes.  And then the

13   conversation was over.

14      Q.     Okay.  Do you recall that there came a

15   subsequent time -- actually withdrawn.

16             Before that, do you recall that you

17   authorized CLO HoldCo to amend its proof of claim?

18      A.     Yes.

19      Q.     And do you remember that pursuant to the

20   amended proof of claim, the value of the claim was

21   reduced to zero?

22      A.     That is correct.

23      Q.     Did you ever discuss with Mr. Dondero the

24   amended proof of claim?

25      A.     No.
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 159
Case 3:23-cv-00726-S   Document 8-24   Filed 05/29/23   Page 669 of 1598   PageID 13716
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 40 of
116

Page 39

1                          Grant Scott

2      Q.     You never had a conversation with him about

3  the decision to amend the proof of claim?

4      A.     No, I don't think so.

5      Q.     And you never discussed with him your

6  decision to reduce the proof of claim to zero dollars?

7            MR. BRIDGES:  Objection to form.

8            THE WITNESS:  I don't believe so.

9  BY MR. MORRIS:

10     Q.     Okay.  Do you recall that in late January,

11 CLO HoldCo was a defendant in a lawsuit that was

12 commenced by the debtor?

13     A.     Yes.

14     Q.     And do you recall that you authorized

15 CLO HoldCo to enter into a settlement agreement with

16 the debtor?

17     A.     Correct.

18     Q.     Did you ever discuss that settlement

19 agreement with Mr. Dondero?

20     A.     I was on a phone call where the agreement

21 was discussed.

22     Q.     And what do you recall about the

23 discussions?

24            MR. BRIDGES:  Objection to the

25      extent -- to the extent that lawyers were

```
                                                        Page 40
 1                      Grant Scott

 2       privy to those discussions.  We haven't

 3       made that clear yet.

 4            THE WITNESS:  I'm sorry.  I had a

 5       conversation -- well, actually, I

 6       participated in a call.  I was on the call.

 7       A number of the attorneys were on the call.

 8            MR. BRIDGES:  Objection.  Objection.

 9       Privileged.  On behalf of CLO HoldCo and

10       the DAF, I'm instructing the witness not to

11       answer that question.

12            MR. MORRIS:  He is not your client,

13       number 1.  Number 2, he hasn't identified

14       who was on the call.  How are you doing

15       this?  How are you doing this?  He hasn't

16       even told you who was on the call.

17            MR. BRIDGES:  I'm happy to answer

18       your question if you don't shout over my

19       answer.

20            The privilege belongs to the

21       entities, not to him, and those entities

22       are my clients, I'm asserting a privilege.

23            MR. MORRIS:  You don't --

24  BY MR. MORRIS:

25       Q.   Mr. -- Mr. Scott, can you please tell me
```

```
                                                       Page 41
 1                     Grant Scott

 2    who was on the call?

 3               THE WITNESS:  Am I allowed to answer?

 4               MR. BRIDGES:  Yes, you are.  You can

 5        answer that question, who was on the call.

 6               THE WITNESS:  Oh.  John Kane was on

 7        the call.  Jim Dondero was on the call.  I

 8        was on the call, and there were at least

 9        two other attorneys on the call, but I'm

10        not -- I'm not sure who -- I'm not sure who

11        they were -- I mean, their names.

12    BY MR. MORRIS:

13        Q.    What was the subject matter of the call?

14        A.    The call was to give clarification of a --

15    on how a lack of communication had occurred, and that

16    communication related to --

17               MR. BRIDGES:  Objection.  Objection.

18        Just the subject matter is all that you can

19        answer without violating privilege here,

20        the general subject matter.

21               THE WITNESS:  The general subject

22        matter related to the flow of information

23        between the time I settled, signed off on

24        the --

25               MR. KANE:  I think -- Grant, you're
```

Page 42

1                              Grant Scott

2         going -- you're going too specific.

3         Talking about the general subject matter of

4         the call, so you avoid privilege issues.

5         Just big picture.

6              MR. BRIDGES:  Flow of information

7         sounds like a big picture.  Mr. Morris, I

8         think we're done on this line of

9         questioning.

10   BY MR. MORRIS:

11        Q.     Mr. Scott, at the time of this

12   conversation, had CLO HoldCo already settled with the

13   debtor?

14        A.     Yes.

15        Q.     So CLO HoldCo was no longer a defendant in

16   the litigation; is that right?

17        A.     Correct.

18        Q.     Okay.  Can you tell me what was discussed

19   during the conversation?

20              MR. BRIDGES:  Objection.  Privileged

21         for the same reasons we just discussed.  I

22         am instructing the witness not to answer

23         because the privilege belongs to CLO HoldCo

24         and the DAF.

25   BY MR. MORRIS:

```
                                                      Page 43
 1                     Grant Scott

 2      Q.    Are you going to follow that instruction,

 3   Mr. Scott?

 4      A.    Yes.

 5      Q.    Did you ever have a discussion other than

 6   the one that counsel is preventing you from describing

 7   with Mr. Dondero on the subject of CLO HoldCo's

 8   settlement with the debtor?

 9           MR. BRIDGES:  Objection to the set

10      up, to the lack of foundation to that

11      question.

12           Sir, if you've got an issue with my

13      privilege objection, please feel free to

14      explain.  If there's a factual mistake you

15      think I'm making, please feel free to

16      explain.

17           But -- but using pejoratives to

18      describe the objection to the witness is

19      improper.  I object to it.

20           MR. MORRIS:  Okay.  That's fine.  I

21      don't see what -- you prevented him from

22      answering the question, right?  So I don't

23      know what's pejorative.  Your sense of

24      pejorative is very different from mine.

25   BY MR. MORRIS:
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 164
Case 3:23-cv-00726-S   Document 8-24   Filed 05/29/23   Page 674 of 1598   PageID 13721
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 45 of 116

Page 44

1                       Grant Scott

2      Q.     Mr. -- Mr. Scott, did you have any other

3    conversation with Mr. Dondero besides the one that I'm

4    not being allowed to inquire about?

5      A.     I'm sorry, is there any objection to my

6    answer?

7      Q.     No.

8      A.     No, I do not.

9      Q.     Did you resign -- did you give notice of

10   your intent to resign at around the same time that you

11   had this conversation with all of the lawyers?

12     A.     No.  It was beforehand.

13     Q.     Okay.  Let's -- let's put up the settlement

14   agreement first.  I think it's the next exhibit,

15   Exhibit 9?

16            (Deposition Exhibit 9 was marked for

17   identification.)

18   BY MR. MORRIS:

19     Q.     Okay.  Just to refresh your recollection,

20   sir, do you see that this is -- if we can just scroll

21   down a little bit, it's dated January 26th.

22            And do you see it's signed by your lawyer

23   and my law firm?

24     A.     Correct.

25     Q.     And if we can scroll down to the agreement

1                    Grant Scott

2    itself, is that the agreement that you entered into on

3    behalf of CLO HoldCo, on or around January 26th, 2021?

4       A.     I believe so.

5       Q.     And did you tell Mr. Dondero of your

6    intention to enter into this agreement before you did

7    so?

8       A.     No.

9       Q.     And Mr. Dondero never told you that he

10   disagreed with your decision to enter into this

11   agreement; is that right?

12              MR. KANE:  Objection to form.

13              THE WITNESS:  It's correct that he

14        never did.

15              MR. MORRIS:  Yeah.  Okay.  Can we go,

16        please, to the document that is marked

17        Scott Bates stamp 18.  It's at the bottom

18        of page 5 of the exhibit, La Asia.

19              If we can start at the bottom.

20   BY MR. MORRIS:

21      Q.     Do you know what this e-mail is, sir?

22      A.     Yes.  This is my resignation e-mail, for

23   lack of a better word.

24      Q.     And why did you send your resignation

25   e-mail at that moment in time?

Page 46

1                             Grant Scott

2        A.      Why did I send it at the end of January?

3        Q.      What caused you to send this e-mail at that

4    moment in time?

5        A.      Well, I mean, there are a couple of

6    reasons.  It was -- it was necessary that I do it, and

7    the time seemed right in view of the events in

8    January.  It was like a good transition point from my

9    perspective.

10       Q.      And why was it necessary at that time?

11       A.      Well, there was --

12               MR. BRIDGES:  Objection.  Assumes

13        facts not in evidence.

14   BY MR. MORRIS:

15       Q.      You can answer.

16       A.      I previously testified during this

17   deposition that throughout 2020, the desire -- or,

18   rather, the appropriateness of my wanting to resign

19   was expanding, and based on what had happened in

20   January and December as well, but mostly January, I

21   basically just did a critical mass on whether I could

22   sustain my role, given my commitments to my existing

23   firm and given my discussions with the managing

24   members of my existing firm.

25               And it -- there was just no way I could

Page 47

1              Grant Scott

2    continue with the time commitment required.  I had

3    made various promises and representations to my firm

4    throughout 2020 that the bankruptcy would be handled

5    relatively efficiently and wouldn't require a great

6    deal of time commitment.  And then I guess the straw

7    that broke the camel's back was the second lawsuit,

8    meaning me personally, and it just -- from a personal

9    standpoint, the most significant factor was just my --

10   my being overwhelmed, trying to sustain my career and

11   engage in what seem like the 2021 that was going to

12   involve my having to defend two lawsuits.  And I felt

13   like I got CLO HoldCo through the bankruptcy and then

14   that was a good jumping off point.

15        Q.    What -- why did you send this e-mail to

16   Mr. Dondero?

17        A.    I knew, or at least I reasonably believed

18   he would know where to who to send it to because I

19   wasn't exactly sure.

20        Q.    So you were the managing member of the

21   general partnership and the director of the other DAF

22   entities and CLO HoldCo Limited, and you were not sure

23   who to send your notice of resignation to.

24              Do I have that right?

25              MR. KANE:  Objection.  Form.  That's

Page 48

Grant Scott

1

2      John Kane.

3              THE WITNESS:  Yes.  I didn't know who

4         best to inform my decision.

5   BY MR. MORRIS:

6      Q.     And why did you think that Mr. Dondero

7   would know?

8              MR. BRIDGES:  Objection.  Asked and

9         answered.

10             THE WITNESS:  He knows a lot more

11        about the workings of -- I mean, it was --

12        CLO HoldCo and the charitable admission was

13        something that he worked to develop with

14        others 10 years ago, and he was committed

15        to the charity and he knew all of the

16        players and I just -- I guess I just

17        assumed he would know where to direct it.

18  BY MR. MORRIS:

19     Q.     Did you ever ask?

20     A.     He knew how to effectuate -- he knew how to

21  effectuate -- or I thought he knew how to effectuate

22  my resignation by directing it to the appropriate

23  personnel.

24     Q.     Did you ever ask him who it should be

25  directed to?

APPX. 08978

Page 49

```
1                        Grant Scott

2       A.      No.

3       Q.      Looking at the third paragraph, it says,

4   quote, my resignation will not be effective until I

5   approve of the indemnification provisions and obtain

6   any and all releases.

7               Do you see that?

8       A.      Yes.

9       Q.      Why did you condition the effectiveness of

10  your resignation on those things?

11      A.      Well, although I'm a patent attorney and

12  basically just a technical writer that doesn't deal

13  with legal issues all of the time, it seemed like

14  appropriate language.

15              I have a number of outstanding litigations

16  where I am named personally, and the actions that I

17  took which resulted in my being sued were actions I

18  took on behalf of CLO HoldCo solely in that position,

19  and so I thought just to have the appropriate notice

20  that I would like indemnification to help -- to help

21  deal with those litigation matters.  That is all.

22      Q.      Did anybody suggest to you at any time

23  prior to the time that you sent this e-mail, that any

24  of the DAF entities or CLO HoldCo Limited might have

25  claims against you?
```

Page 50

1                         Grant Scott

2       A.      No.  No.

3       Q.      Were you concerned that Mr. Dondero or

4    anyone acting on his behalf might sue you?

5       A.      No.

6       Q.      Did Mr. Dondero ever threaten to sue you?

7       A.      No.

8       Q.      Did you ever obtain the Indemnity provision

9    and any and all necessary releases that you asked for

10   in this e-mail?

11      A.      Not yet.

12      Q.      And what does that mean?

13      A.      I understand that those provisions are --

14   indemnification proposals are in the works, I think.

15      Q.      And do you know who is negotiating --

16   withdrawn.

17              Is somebody negotiating those

18   indemnification and release provisions on your behalf?

19      A.      My -- my attorney would be.

20      Q.      And do you know if your attorney is

21   negotiating with anybody concerning potential

22   indemnification and release provisions for you?

23      A.      I don't know specifically, no.

24      Q.      Do you know if he is -- if -- from whom do

25   you want to obtain releases?

```
                                                      Page 51
 1                      Grant Scott

 2              MR. BRIDGES:  Objection.  Facts not

 3         in evidence.

 4    BY MR. MORRIS:

 5         Q.      Withdrawn.

 6              When you refer to any and all necessary

 7    releases, who did you want to obtain releases from?

 8         A.      CLO HoldCo.

 9         Q.      Anybody else?

10         A.      Well, I mean, and -- and the related

11    entities in that structure chart that you showed.

12    I'm -- I'm -- understand that to me, that is just

13    boilerplate legal language to put in a resignation,

14    you know, just to cross the T's, dot the I's, so to

15    speak.  I'm not anticipating that will be -- that will

16    be a problem.  I am sorry.

17         Q.      You asked for this more than three months

18    ago now, right?

19         A.      Correct.

20         Q.      Do you know why you haven't gotten what you

21    asked for more than three months ago?

22              MR. BRIDGES:  Objection.  Form.

23              THE WITNESS:  I -- I don't.

24    BY MR. MORRIS:

25         Q.      But you still want the releases, right?
```

```
                                                      Page 52
 1                       Grant Scott

 2       A.     I would like to, yes.

 3       Q.     Did you ever have any discussion with

 4  Mr. Dondero about the releases that you wanted?

 5       A.     No.

 6       Q.     Have you communicated with Mr. Dondero

 7  since -- since you sent this e-mail?

 8       A.     Yes.

 9       Q.     Other than the birth date text that he sent

10  to you, have you spoken with him?

11       A.     In February.

12       Q.     So you haven't spoken to him since then?

13       A.     That is correct.

14       Q.     What did you speak to him about in

15  February?

16       A.     He called me to ask me if I knew anything

17  about in particular -- I think it might have been an

18  asset of CLO HoldCo, if I was aware of whether it had

19  been purchased or sold, and I just told them I didn't

20  know what he was -- I didn't know what -- I didn't

21  know what he was referring to.  That was the last

22  conversation that we had.

23       Q.     Can I refer to the period from the date of

24  this --

25              MR. MORRIS:  Actually, let's look
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 173
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 683 of 1598 PageID 13730
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 54 of
116

```
                                                    Page 53
 1                        Grant Scott

 2        at -- let's scroll up a little bit, please.

 3   BY MR. MORRIS:

 4        Q.     Did Mr. Dondero ever try to talk you out of

 5   resigning?

 6        A.     No.

 7              MR. MORRIS:  Can you scroll up?

 8              THE WITNESS:  I -- I am sorry.  I

 9        need to correct that.  I had conversations

10        with him where I had expressed, not so much

11        a desire to resign, but a belief that it --

12        it made strategic sense or was appropriate.

13        And it had to do with this issue of my

14        independence, and he suggested that family

15        members and friends are not precluded from

16        occupying positions of trust like trustees

17        and things like that, and that there was

18        nothing per se wrong with my -- my activity

19        with CLO HoldCo by virtue of being a friend

20        of his.  So in that sense, he was trying to

21        talk me out of that, I guess.

22   BY MR. MORRIS:

23        Q.     When did that conversation take place?

24        A.     We had a number of those in 2020 and

25   January of 2021.
```

APPX. 08983

Page 54

<div align="center">Grant Scott</div>

```
 1                     MR. MORRIS:  Can we scroll up just a
 2         little bit on this e-mail, please?
 3                     MR. BRIDGES:  May I ask what exhibit
 4         number this is?  I've lost track.  I am
 5         sorry.
 6                     MS. CANTY:  This is Exhibit 5 from
 7         earlier.  We are continuing the numbers.
 8         So this was marked as Exhibit 5 in this
 9         morning's deposition.
10                     MR. BRIDGES:  Thank you so much.
11   BY MR. MORRIS:
12       Q.    Do you see where Mr. Dondero wrote to
13   you -- it's just of above the yellow highlighting
14   at -- 9:57 a.m.  This is the next day.  Quote, you
15   need to tell me ASAP that you have no intent to divest
16   assets.
17             Do you see that?
18       A.    Yes.
19       Q.    Did Mr. -- do you have any understanding as
20   to why he said that to you?
21       A.    I know that he was mistaken in that
22   statement.
23       Q.    Right.  Do you have any understanding as to
24   whether Mr. Dondero had the ability to stop you from
```


```
 1                     MR. MORRIS:  Can we scroll up just a
 2         little bit on this e-mail, please?
 3                     MR. BRIDGES:  May I ask what exhibit
 4         number this is?  I've lost track.  I am
 5         sorry.
 6                     MS. CANTY:  This is Exhibit 5 from
 7         earlier.  We are continuing the numbers.
 8         So this was marked as Exhibit 5 in this
 9         morning's deposition.
10                     MR. BRIDGES:  Thank you so much.
11   BY MR. MORRIS:
12       Q.    Do you see where Mr. Dondero wrote to
13   you -- it's just of above the yellow highlighting
14   at -- 9:57 a.m.  This is the next day.  Quote, you
15   need to tell me ASAP that you have no intent to divest
16   assets.
17             Do you see that?
18       A.    Yes.
19       Q.    Did Mr. -- do you have any understanding as
20   to why he said that to you?
21       A.    I know that he was mistaken in that
22   statement.
23       Q.    Right.  Do you have any understanding as to
24   whether Mr. Dondero had the ability to stop you from
```

APPX. 08974

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 175
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 685 of 1598 PageID 13732
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 56 of 116

Page 55

1                          Grant Scott

2    selling assets?

3        A.    No.  It wasn't -- it was a misunderstanding

4    about what the word "divest" meant in the subject

5    line.

6        Q.    And did you understand that until you

7    corrected him, he was concerned and he expressed the

8    concern to you not to sell any assets?

9              MR. KANE:  Objection to form.

10             THE WITNESS:  No.  It had -- I am

11        sorry.  There -- the term "divest" was

12        maybe not a term I should have used.

13        However, my understanding was that my -- my

14        status at CLO HoldCo had a property related

15        aspect to it.  And I used that term to

16        emphasize that I would need to -- that that

17        property aspect would need to be

18        transferred, meaning to the next entity or

19        person.  He mistook it as something being

20        sold.  It had nothing to do with that.

21        That is all.

22   BY MR. MORRIS:

23        Q.    I understand that.  But did you

24   understand -- did you have any understanding as to

25   what interest he had and whether or not assets were

```
                                                    Page 56
1                     Grant Scott

2    being sold?

3              MR. BRIDGES:  Object to form.

4              MR. KANE:  Objection.  Asked and

5        answered.

6    BY MR. MORRIS:

7        Q.    You can answer.

8        A.    No.  I had -- I had no idea what he was --

9        Q.    Okay.  Let's -- let's -- can we -- can we

10   call the period of time between the time you sent this

11   notice of your intent to resign in March 24, 2021 as

12   the interim period?

13       A.    Sure.

14       Q.    And that's the period during which you had

15   expressed your intent to resign, but your resignation

16   had not yet become effective; is that fair?

17       A.    I guess it was the period of time when --

18   yes.  I guess that is correct.

19       Q.    Okay.  Is it fair to say that there were

20   certain things you needed to do during the interim

21   period on behalf of CLO HoldCo and the DAF entities

22   before -- even before your resignation became

23   effective?

24       A.    Yes.

25       Q.    Okay.  Was someone designated to act as
```

Page 57

```
1                         Grant Scott
2    your liaison with respect to matters concerning the --
3    the DAF entities and the CLO HoldCo during the interim
4    period?
5              MR. KANE:  Objection.  Form.
6              THE WITNESS:  I had conversations
7         with Mark Patrick in February when I came
8         to -- to believe he -- he would be director
9         elect, so to speak, in terms -- in terms of
10        moving forward.
11   BY MR. MORRIS:
12        Q.    During the interim period, did you have any
13   understanding as to whether Mr. Patrick had any
14   authority to act on behalf of any of the DAF entities
15   or CLO HoldCo?
16             MR. KANE:  Objection.  Form.
17             THE WITNESS:  I came to believe he
18        did, upon signing the management shared
19        transfer agreement.
20   BY MR. MORRIS:
21        Q.    Okay.  So that was -- that was on or about
22   March 24th, 2021, right?
23        A.    Correct.
24        Q.    So I'm asking just about the interim period
25   between January 31st, 2021 when you sent your notice
```

Page 58

1                          Grant Scott

2    of intent to resign, and March 24th.  That is what I

3    am defining as the interim period.

4              So with that understanding, did you have

5    any reason to believe that Mr. Patrick had any

6    authority to act on behalf of any of the DAF entities

7    or CLO HoldCo during the interim period?

8        A.    Well, it was -- he was part of a group of

9    entity -- a group of individuals that were with an

10   entity that had taken over from -- from Highland, and

11   so in -- certainly in that capacity, he -- as -- as

12   occurred for 10 years or more prior, that -- in that

13   role, you certainly had rights to -- to perform or to

14   act on CLO's behalf here.

15       Q.    And what entity are you referring to?

16       A.    I think it's the Highgate Consulting Group,

17   the Highland employees that took over -- or that

18   created that entity.

19       Q.    And did the -- do you have an understanding

20   as to whether the Highgate Employment Group succeeded

21   to Highland Capital Management LP in the shared

22   services capacity or in the investment advisory

23   capacity or something else?

24             MR. BRIDGES:  Object to form.

25             (Reporter clarification.)

APPX. 08986

Page 59

```
                          Grant Scott

 1
 2              THE WITNESS:  I'm not entirely sure
 3      of that.
 4    BY MR. MORRIS:
 5       Q.    So is --
 6       A.    But he -- but --
 7       Q.    I am sorry.  Did you finish your answer?
 8       A.    I'm not -- I'm not sure of the delineation
 9    between the two.
10       Q.    So on what basis did you believe that
11    Mr. Patrick had the authority to act on behalf of the
12    DAF entities and CLO HoldCo during the interim period?
13              MR. BRIDGES:  Objection.  Asked and
14         answered.
15              THE WITNESS:  We had -- we had had a
16         number of conversations.  And over the
17         course of a number of weeks, I came to -- I
18         came to understand that he would be the
19         director going forward.  So...
20    BY MR. MORRIS:
21       Q.    How did you come to that understanding?
22       A.    Through the conversations that we had had,
23    I guess.
24       Q.    What conversations did you have with Mr. --
25    were these conversations with Mr. Patrick?
```

Page 60

```
 1                       Grant Scott

 2        A.      They were conversations about the workings

 3   with outside counsel to arrange the -- to arrange the

 4   transfer of my responsibilities to another person or

 5   entity at first, and then I came to learn that that

 6   person was -- was -- would be Mark.

 7        Q.      Do you know who selected mark?

 8        A.      I do not.

 9        Q.      Do you know how Mark was selected?

10        A.      I -- I do not.

11        Q.      Did you ever ask Mark how he was selected?

12        A.      I did not.

13        Q.      Did you ever ask Mark who selected him?

14        A.      I did not.

15        Q.      Did you ever ask anybody at any time how

16   Mr. Patrick was selected to succeed you?

17        A.      No, I did not.

18        Q.      Did you ask anybody at any time as to who

19   made the decision to select Mr. Patrick to succeed

20   you?

21        A.      No, I did not.

22              MR. BRIDGES:  Objection.  Facts not

23        in evidence and foundation.

24   BY MR. MORRIS:

25        Q.      Okay.  Do you have any understanding today,
```

APP. 08988

Page 61

1                        Grant Scott

2      as to who has the authority to select your --

3      withdrawn.

4              Do you have any understanding today, as to

5      who had the authority to select your replacement?

6      A.      I do not.

7              MR. MORRIS:  All right.  Let's take a

8          short break.  And I am certainly -- I'm

9          closer to the end than the beginning.  It's

10         3:22 Eastern Time.  Let's come back at

11         3:35, please, and hopefully I will be

12         finished by about 4, 4:15.

13             (Recess taken.)

14     BY MR. MORRIS:

15     Q.      I want to go back, Mr. Scott, to the time

16     that you became appointed the managing member of the

17     general partnership and to the director of the other

18     DAF entities and CLO HoldCo.  Do you remember how that

19     came to be?

20     A.      My recollection is that various law firms

21     and Mark Patrick had a role in its creation and

22     configuration following some -- it's -- I believe it's

23     modeled after some expert -- expert in the field.  I

24     am sorry.  I don't know if I answered your question.

25     Q.      You did not.  So let me try it again.  Do

```
                                                    Page 62
1                    Grant Scott

2   you recall how it came to be that you assumed those

3   positions?

4        A.      Ten years ago I accepted that role.

5        Q.      And who offered the role to you?

6        A.      Jim Dondero.

7        Q.      Did -- did you communicate with anybody

8   other than Mr. Dondero concerning the opportunity that

9   he presented to you to assume these roles prior to the

10  time you accepted the position?

11               MR. KANE:  Objection.  Form.

12  BY MR. MORRIS:

13       Q.      Withdrawn.

14       A.      Possibly or --

15       Q.      Withdrawn.  Let me ask -- let me ask --

16  it's a good objection.

17               Mr. Scott, prior to the time that you

18  assumed your positions with the DAF entities and

19  CLO HoldCo, did you speak with anybody other than

20  Mr. Dondero, about the duties and responsibilities of

21  those positions?

22               MR. KANE:  Objection to form.

23               THE WITNESS:  The only thing that

24         comes to mind is Hunton & Williams.  But

25         I -- I'm not sure.  I don't know.
```

```
                                                          Page 63
 1                         Grant Scott

 2   BY MR. MORRIS:

 3       Q.     Do you have any memory of interviewing with

 4   anybody?

 5       A.     I don't have any recollection of that, no.

 6       Q.     Did you submit a resume of any kind?

 7       A.     Possibly a CV.  But I -- I just don't

 8   remember anymore.

 9       Q.     Do you know who made the decision to select

10   you to serve in those capacities?

11             MR. KANE:  Objection.  Form.

12             THE WITNESS:  I don't know.

13   BY MR. MORRIS:

14       Q.     Did anybody -- withdrawn.

15             Did you meet with Patrick before or after

16   you assumed these roles?

17       A.     It's going back 10 years.  I -- I'm not

18   sure.

19             MR. MORRIS:  Can we put up on the

20        screen a document that we marked this

21        morning.  I believe it's Exhibit 2.

22   BY MR. MORRIS:

23       Q.     And this is a document titled An Amended

24   and Restated Limited Liability Company Agreement of

25   Charitable DAF GP LLC.
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 184
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 694 of 1598 PageID 13741
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 65 of
116

<div style="text-align: right">Page 64</div>

```
 1                     Grant Scott

 2             Do you see that?

 3     A.     Yes.

 4     Q.     And do you see that it's effective January

 5  1, 2012?

 6             And if we could go to the last page.  And

 7  is that your signature, sir?

 8     A.     That is correct.

 9     Q.     And is this the document that you signed on

10  March 12th, 2012, pursuant to which you became the

11  general partner of the DAF GP?

12             MR. KANE:  Objection.  Form.

13             THE WITNESS:  It's not March 12th.

14      It's dated as March 21st, just to clarify,

15       but I believe so.

16  BY MR. MORRIS:

17     Q.     I appreciate that.  I'm going to ask the

18  question again, just because I was wrong and I want to

19  get it right.

20             Is this the document you signed on or about

21  March 21, 2012, pursuant to which you became the

22  managing member of the DAF GP, LLC?

23     A.     I believe so.

24     Q.     Okay.  And you replaced Mr. Dondero in that

25  capacity; is that right?
```

Page 65

                              Grant Scott

1

2       A.      Yes.

3       Q.      And your recollection is that Mr. Dondero

4    presented the opportunity to you; is that right?

5               MR. KANE:  Objection.  Form.

6               THE WITNESS:  Yes.  I guess you could

7        call it an opportunity.

8    BY MR. MORRIS:

9       Q.      And do you have any recollection as to

10   whether or not anybody else was involved in the

11   decision to offer the opportunity to you?

12      A.      I -- I don't recall.

13      Q.      Okay.  We can take that down, please.

14              Do you recall whether Mr. Patrick was

15   involved in your selection as the replacement

16   management member of the DAF GP, LLC in 2012?

17      A.      I have no recollection.

18              MR. KANE:  Objection to form.

19              Yes.  Okay.

20   BY MR. MORRIS:

21      Q.      I want to go back to what we had defined

22   earlier as the interim period, and that was the period

23   between January 31st, 2021, when you sent in that

24   notice and March 24, 2021, when you transferred the

25   shares.  That is what we were calling the interim

Page 66

Grant Scott

1

2    period, right?

3        A.    Yes.

4        Q.    Okay.  Is it fair to say that Mr. Patrick

5    served as your primary contact with respect to matters

6    concerning CLO HoldCo and the DAF during the interim

7    period?

8        A.    Yes.

9        Q.    Okay.  And, in fact, Mr. Patrick gave you

10   instructions on what to do for the DAF and the

11   CLO HoldCo on certain matters during the interim

12   period, correct?

13            MR. KANE:  Objection to form.

14            THE WITNESS:  Periodically, yes.

15   BY MR. MORRIS:

16       Q.    I am sorry.  What is the answer?

17       A.    Periodically, yes.

18       Q.    Okay.  Did somebody ever tell you that you

19   should follow Mr. Patrick's instructions?

20       A.    No, I don't believe so.

21       Q.    And, Mr. Patrick, to the best of your

22   knowledge, didn't HoldCo any positions with any of the

23   DAF entities or CLO HoldCo Limited, correct?

24            MR. KANE:  Objection to form.

25            MR. BRIDGES:  Object to foundation.

```
                                                        Page 67
 1                      Grant Scott

 2   BY MR. MORRIS:

 3        Q.      You can answer.

 4        A.      During the interim period?

 5        Q.      Correct.

 6        A.      I do not believe so.

 7        Q.      If Mr. Patrick didn't hold any positions,

 8   why did you follow his instructions?

 9                MR. BRIDGES:  Objection.

10                MR. KANE:  Objection.  Go ahead,

11      sorry.

12                MR. BRIDGES:  Facts not in evidence.

13                MR. KANE:  And objection to form.

14   BY MR. MORRIS:

15        Q.      You can answer, sir.

16        A.      Yes.  Well, there -- I mean, there was a

17   lot of activity that was required to transfer over

18   from how things had been handled under Highland, to

19   how they would now be handled under -- with the

20   services being provided by Highgate, and he was a

21   member, and he was the point person, I guess, and he

22   was my main interface to get those large numbers of

23   issues resolved.

24                There was -- you know, it was a very busy,

25   challenging time.
```

APP.10637

```
                                                          Page 68
 1                          Grant Scott

 2        Q.     Did you sign any agreement on behalf of any

 3   of the DAF entities or CLO HoldCo with the entity that

 4   you are referring to as Highgate?

 5        A.     I'm not sure.

 6        Q.     Do you have any recollection at all of ever

 7   signing any agreements in your capacity as the

 8   authorized representative of any of the DAF entities

 9   or CLO HoldCo and Highgate?

10               MR. KANE:  Objection.  Form.

11               THE WITNESS:  I -- I don't recall.

12   BY MR. MORRIS:

13        Q.     And I may have asked you this already.  If

14   I have, I'm sure there will be an objection.  But do

15   you recall if Highgate was providing services

16   equivalent to the shared services that Highland

17   previously provided, or was it providing investment

18   advisory services of the type Highland previously

19   provided?

20               MR. KANE:  Objection to form.

21               MR. BRIDGES:  Objection.

22   BY MR. MORRIS:

23        Q.     You can answer.

24        A.     I don't know the delineation of the

25   services they were providing.
```

Page 69

1                         Grant Scott

2       Q.      Do you know whether during the interim

3   period, any entity other than Highgate was providing

4   services on behalf of any of the DAF entities or

5   CLO HoldCo?

6       A.      Well, I knew from various wires that were

7   approved, that various entities were providing

8   services.  Law firms, for example.

9       Q.      But was there any -- any entity other than

10  Highgate that was providing any of the services that

11  had previously been provided by Highland?

12      A.      Well, Highland provided a lot of legal

13  services.  I don't know that Highgate had the same

14  capability.  So I don't know how to answer that.

15      Q.      All right.  I'm going to try a different

16  way.

17              Before -- before 2021, the DAF entities had

18  both a shared services arrangement and an investment

19  advisory arrangement with Highland.

20              Do I have that right?

21      A.      Yes.

22      Q.      During the interim period, Highland was no

23  longer providing any of those services, correct?

24      A.      That's what I understand, yes.

25      Q.      Did anybody replace Highland in the

```
                                                      Page 70
 1                      Grant Scott
 2   provision of those services during the interim period?
 3            MR. BRIDGES:  Objection, asked and
 4       answered.
 5   BY MR. MORRIS:
 6       Q.    You can answer, sir.
 7       A.    I mean, besides the services Highgate
 8   were -- was -- were providing, I'm not sure.
 9       Q.    And -- and I do know that I've asked this
10   before, but now with that context:  Do you know
11   whether Highgate was providing services of the shared
12   services type, or the investment advisory type, or you
13   just don't know?
14            MR. BRIDGES:  Objection to the form.
15            THE WITNESS:  At least I would think
16       mostly the shared services type.
17   BY MR. MORRIS:
18       Q.    Okay.  Is it your understanding that under
19   the shared services agreement, that Highgate had the
20   ability to make decisions on behalf of any of the DAF
21   entities or CLO HoldCo?
22            MR. BRIDGES:  Objection.
23            MR. KANE:  Objection to form.
24            MR. BRIDGES:  Misstates testimony.
25            THE WITNESS:  Yeah, my prior
```

Grant Scott

1

2        testimony was I didn't see the agreements,

3        so I don't know.

4    BY MR. MORRIS:

5        Q.    You haven't seen any agreement with

6    Highgate; is that right?

7        A.    I don't recall that I have.

8        Q.    Do you have any understanding as to whether

9    Highgate had the authority to bind any of the DAF

10   entities or CLO HoldCo during the interim period?

11            MR. BRIDGES:  Objection.  Calls for a

12       legal conclusion.

13            THE WITNESS:  I don't know.

14   BY MR. MORRIS:

15       Q.    Do you have any understanding as to whether

16   Mark Patrick had the ability as an individual to bind

17   any of the DAF entities or CLO HoldCo during the

18   interim period?

19            MR. BRIDGES:  Objection.  Calls for a

20       legal conclusion.

21            MR. KANE:  Objection.  Calls for a

22       legal conclusion.

23            THE WITNESS:  I don't know.

24   BY MR. MORRIS:

25       Q.    Okay.  And I'm just asking as a matter of

Page 72

1                        Grant Scott

2    fact, to be clear.  I'm not asking for any legal

3    conclusions.  I'm asking for your understanding as the

4    authorized representative of the DAF entities and

5    CLO HoldCo during the interim period.

6               So with that -- with that background as the

7    authorized entity, that -- withdrawn.

8               As the authorized representative during the

9    interim period, did you have any understanding as to

10   whether Mr. Patrick had the authority to bind any of

11   the DAF entities or CLO HoldCo during that time?

12              MR. KANE:  Objection.

13              MR. BRIDGES:  Objection.  Calls for

14       legal conclusion.  Also, objection as to

15       vagueness of the question.

16   BY MR. MORRIS:

17       Q.    I'm sorry, Mr. Scott, did you answer?

18       A.    I did not.  No, I have not.  I --

19       Q.    I apologize.

20       A.    I don't know what the status of his legal

21   authorization was.

22       Q.    Do you recall that in early March, you

23   bought a couple of events to Mr. Patrick's attention?

24       A.    I know that I forwarded documents to his

25   attention, yes.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 193
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 703 of 1598   PageID 13750
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 74 of 116

Page 73

Grant Scott

2      Q.      And why did you forward documents to

3  Mr. Patrick's attention during the interim period?

4      A.      Because I was resigning, and I understood

5  that he was essentially going to be, or was the

6  director elect, and I just thought it appropriate to

7  bring such things to his attention.

8      Q.      And when did you -- when did you learn that

9  he was doing to be the director elect?

10     A.      I -- I believe it was February.  Sometime

11 in February.

12     Q.      Do you recall how you learned that he was

13 going to become the director elect?

14     A.      I can't point to a specific conversation.

15 I can't -- I can't point to the specific conversation.

16 At some point, it went from being some future third

17 party, and I came to believe it would be him.  I'm

18 not -- I'm not sure of the timing.

19     Q.      Okay.  Do you know from whom you learned

20 that he was going to be the director elect?

21     A.      I believe it was him.

22     Q.      Okay.  So he told you that he was going to

23 replace you; is that right?

24     A.      I don't know that he said it specifically.

25 I don't remember our conversations.

APPX. 07003

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 194
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 704 of 1598   PageID 13751
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 75 of 116

Page 74

1                            Grant Scott

2       Q.     Did you ever do anything to confirm with

3   anybody that Mark Patrick was going to be the director

4   elect, or did you just take his word for it?

5       A.     I did not independently confirm it, no.

6       Q.     Did you ever ask Mr. Dondero if -- if he

7   approved of the selection of Mr. Patrick as your

8   successor?

9       A.     I did not.

10      Q.     Did you ever discuss with Mr. Dondero, the

11  topic of who would be your successor?

12      A.     Going back.  Prior to the interim period, I

13  had recommended him, Mark.

14      Q.     Did you -- did you discuss Mr. Patrick's

15  selection as your successor with anybody in the world

16  at any time other than Mr. Patrick?

17      A.     I talked with my attorney about it.  But I

18  don't think so.  No.

19      Q.     Did you talk with anybody that you believed

20  was authorized to make the decision on behalf of the

21  DAF entities and CLO HoldCo about your successor?

22      A.     No, I did not.

23             MR. MORRIS:  Can we put up the

24       document that was marked, La Asia, on Page

25       7, as Bates number 80.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 195
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 705 of 1598  PageID 13752
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21  Entered 06/16/21 16:18:26  Page 76 of
116

Page 75

1              Grant Scott

2           (Deposition Exhibit 10 was marked for

3    identification.)

4    BY MR. MORRIS:

5       Q.    Do you see that -- if you scroll just down

6    a little bit.  I guess not.

7              Mr. Patrick wrote an e-mail to you and

8    said, "The successor will respond to this complaint,"

9    and at the top you wrote "understood" --

10      A.    Yes.

11      Q.    -- or the top of the e-mail.

12             Do you recall that in early March, you

13   received a new complaint in which CLO HoldCo was named

14   the defendant?

15      A.    I believe this -- this was the unsecured

16   creditors' committee complaint; is that correct?

17      Q.    I think so, but it's your testimony.  I'm

18   just asking you if you recall that in early March,

19   CLO HoldCo was sued?

20      A.    Yes.  I think this was the second lawsuit

21   that I was referring to personally.

22      Q.    Okay.  And so this -- this actually

23   occurred after the time you had already given notice,

24   right?

25      A.    Yes.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 196
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 706 of 1598   PageID 13753
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 77 of
116

Page 76

1                          Grant Scott

2      Q.     Yeah.  And was the first lawsuit, the one

3   that you settled, before you gave notice?

4      A.     No.  The -- no, both lawsuits are pending.

5      Q.     Okay.  Do you know when the -- who's the

6   plaintiff in the first one?

7      A.     Acis.

8             (Reporter clarification.)

9             THE WITNESS:  Acis, A-C-I-S.

10  BY MR. MORRIS:

11     Q.     So the debtor never sued you personally; is

12  that right?

13     A.     Not yet.

14     Q.     And is it right that Mr. Patrick told you

15  that -- that the successor will respond to the

16  complaint?

17     A.     Yes.

18     Q.     Now, he's not referring to himself yet, is

19  he?

20     A.     That appears correct, yes.

21     Q.     Does that refresh your recollection that

22  you had not known yet as of March 2nd who the

23  successor would be?

24     A.     I guess it does.

25            MR. MORRIS:  Can we put up the next

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 197
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 707 of 1598 PageID 13754
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 78 of
116

```
                                                            Page 77
 1                        Grant Scott

 2        exhibit, please, the one ending in -- the

 3        one Bates number 85.  And please remind us,

 4        La Asia, what exhibit number are we up to?

 5             MS. CANTY:  We're up to 10, but the

 6        one I'm about to put up is Exhibit 6 from

 7        earlier today.

 8             MR. MORRIS:  Thank you very much.

 9   BY MR. MORRIS:

10        Q.    Now, if we can just scroll down a little

11   bit.  Do you remember something called an Adherence

12   Agreement being discussed in March of 2021?

13        A.    A what agreement?

14        Q.    Adherence Agreement.

15        A.    I see that.  Was it directed to me?

16        Q.    Yeah.  If we can just scroll up.

17             Okay.  So right there, do you see that

18   Thomas Surgent sends it to Mr. Kane?  The subject is

19   'Adherence Agreement."

20        A.    Yes.

21        Q.    And you do see that you forwarded that

22   e-mail to Mr. Patrick on the same day, March 2nd?

23        A.    Yes.

24        Q.    And it says "This relates to the second

25   issue from the debtor."
```

```
                                                      Page 78
 1                      Grant Scott

 2              Do you see that?

 3     A.     Yes.

 4     Q.     And the first issue was the complaint that

 5   we just looked at; is that right?

 6     A.     I believe that's correct.

 7     Q.     And the Adherence Agreement is the second

 8   issue that you wanted to bring to Mr. Patrick's

 9   attention on March 2nd, correct?

10     A.     Yes.

11     Q.     And did you understand that the debtor had

12   requested that CLO HoldCo sign the Adherence Agreement

13   in connection with the consummation -- or in

14   connection with the HarbourVest settlement?

15     A.     I don't know that I formed an opinion of

16   what was being requested.  I just forwarded it to the

17   person the best to be able to handle going forward.

18     Q.     Okay.  And can we just scroll up a little

19   bit on this e-mail.

20              Do you see that Mr. Patrick gave you

21   instructions, quote, "Do not sign the Adherence

22   Agreement from the debtor," close quote.

23     A.     Yes.

24     Q.     Okay.  And you followed Mr. Patrick's

25   instructions, right?
```

Page 79

1                          Grant Scott

2      A.     Yes.  I resigned.  I wasn't going to do

3  anything to -- yes.  Yes.

4      Q.     You actually hadn't resigned yet.  Well,

5  withdrawn.

6             Your resignation had not become effective

7  yet, correct?

8      A.     Yes.  I guess I gave a March 1st date, but

9  it dragged on, so technically, I was still in that

10  role, but quite frankly, any issue that could be

11  pushed to the future for the -- I was going to push it

12  to the future.

13      Q.     Did -- did Mr. Patrick ever tell you that

14  he had spoken with Mr. Dondero about any of the issues

15  that you were communicating with him about?

16      A.     No.

17      Q.     Do you recall also on March 2nd --

18  March 2nd seems like it was a busy day.  Do you recall

19  also, on March 2nd, that you were informed of an

20  opportunity, whereby, CLO HoldCo Limited could

21  purchase certain equity in a company called TerreStar?

22             MR. KANE:  Objection.  Form.

23             THE WITNESS:  I'm familiar with the

24      name TerreStar.

25  BY MR. MORRIS:

APPX. 13909

Page 80

1                              Grant Scott

2        Q.      And do you remember communicating with

3    Mr. Patrick about an opportunity that had been

4    presented to CLO HoldCo in early March about the

5    opportunity to purchase certain equity in TerreStar?

6        A.      Vaguely.

7        Q.      Okay.

8                MR. MORRIS:  Can we put up the next

9        exhibit, please?

10               (Deposition Exhibit 11 was marked for

11   identification.)

12   BY MR. MORRIS:

13       Q.      And if we can just scroll down, there's Joe

14   Sowin.  Do you know who Joe Sowin is?

15       A.      I've worked with him over the years.

16       Q.      And do you see that Joe Sowin is the next

17   point?

18       A.      I see that.

19               MR. KANE:  Objection.  Form.

20   BY MR. MORRIS:

21       Q.      And does this refresh your recollection

22   that on or about March 2nd, 2021, Mr. Sowin wrote to

23   you about an opportunity to purchase from HOCF

24   approximately 5,000 shares issued by TerreStar?

25       A.      I see that.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 201
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 711 of 1598 PageID 13758
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 82 of
116

Page 81

1                               Grant Scott

2      Q.     Okay.  Did you communicate with Mr. Sowin

3   from time to time?

4      A.     Yes.

5      Q.     Did you ever tell Mr. Sowin that he should

6   direct all communications to Mr. Patrick?

7      A.     I don't know if I did or not.  Who -- who

8   did I get this -- did this come through Highgate?

9      Q.     I can only look at what you see.

10            Can we scroll up to the next e-mail.

11            And you forwarded it to Mr. Patrick; is

12   that right?

13     A.     Yes.  It appears so.

14     Q.     And -- and you asked him for his thoughts,

15   right?

16     A.     Yeah.  I didn't -- yeah.

17     Q.     Okay.  And if we can scroll up and just

18   take a look at Mr. Patrick's response.  It says --

19     A.     Okay.  I see that.

20     Q.     Yeah.  It's at the top.  "Please --"

21     A.     I see that.

22     Q.     Okay.  And did you act -- withdrawn.

23            Did you follow Mr. Patrick's instructions,

24   as set forth in this e-mail?

25     A.     I think I responded favorably to Joe's

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 202
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 712 of 1598   PageID 13759
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 83 of
116

Page 82

                          Grant Scott

 1

 2   recommendation.

 3       Q.    Well, Mr. Patrick told you to act on the

 4   request below.  Do you see that?

 5            MR. BRIDGES:  Objection.  Form.

 6        Objection.  Misstates the exhibit.

 7   BY MR. MORRIS:

 8       Q.    Okay.  I will quote the exhibit.  Do you

 9   see that Mr. Patrick said, quote, "Please act on the

10   request below"?

11       A.    I do see that, yes.

12       Q.    And did you act on the request below?

13            MR. KANE:  Objection to form.  Asked

14        and answered.

15            THE WITNESS:  I did.

16   BY MR. MORRIS:

17       Q.    Thank you.

18            Do you recall any issues coming up

19   concerning directors' and officers' insurance for the

20   DAF entities or CLO HoldCo Limited?  And I'm

21   specifically referring to the interim period.

22       A.    Relating to --

23            MR. BRIDGES:  Objection.  Vague.

24   BY MR. MORRIS:

25       Q.    Directors' and officers' insurance.  Let me

```
                                                      Page 83
 1                      Grant Scott

 2   ask the question again, Mr. Scott.

 3              During the interim period, do you remember

 4   any issues arising with respect to directors' and

 5   officers' insurance for any of the DAF entities or

 6   CLO HoldCo?

 7       A.    I don't -- I don't recall.

 8       Q.    Do you know who Chris Rice is?

 9       A.    Yes.

10       Q.    Who is Chris Rice?

11       A.    He is an employee at Highgate.

12       Q.    Are you familiar with an entity called

13   Elysium?

14       A.    The name sounds familiar.

15       Q.    All right.

16              MR. MORRIS:  La Asia, can we mark the

17        next exhibit?  It's in the middle of page

18        9, Bates number 361.

19              MS. CANTY:  This is going to be 12.

20              MR. MORRIS:  Thank you.  And if we

21        can scroll towards the bottom.

22              (Deposition Exhibit 12 was marked for

23   identification.)

24   BY MR. MORRIS:

25       Q.    Do you remember that there was this firm
```

Page 84

1                          Grant Scott

2    called Elysium?

3         A.     Yes.  Now I remember.

4         Q.     And they were asking you for information?

5         A.     That is correct.

6         Q.     Did you ever provide the information to

7    Elysium that had been requested back in February?

8         A.     No, I did not.

9         Q.     Is there a reason why you didn't respond to

10   Elysium's request for information?

11        A.     Because of the transition, I thought much

12   of the information that they were requesting was going

13   to be changing, so I -- I -- I didn't know that it was

14   particularly urgent.  But I -- I figured it would be a

15   waste of time to give him information which would be

16   changed in any -- at any moment.

17        Q.     Okay.  Can we just scroll up a little bit

18   and see what happened with this request.

19               So you actually responded the same day and

20   told Mr. -- Mr. Robins that you were working on it.

21   Do I have that right?

22        A.     Yes.  That's correct.

23        Q.     Is that a true statement at the time you

24   wrote it?

25        A.     Yes.  I'm working on this, meaning not me

Page 85

1                          Grant Scott

2    personally.  I mean, I'm work- -- I wanted to let him

3    know that I'd received the e-mail, and then I

4    forwarded it to Highgate, thinking that at any moment,

5    they would be able to provide the information, so I

6    just wanted, as a courtesy, to let them know that I'd

7    received it and was aware of this request.  That's --

8    that's all.

9         Q.    Okay.  You didn't let him know that there

10   was a transition in the works, right?

11        A.    No.  No, I -- I may have.

12        Q.    Yeah, you may have.  Let's see what happens

13   next.

14              So in early March, he asked -- he follows

15   up; is that fair?

16        A.    Yes.

17        Q.    Okay.  Let's go to the next e-mail.

18              And you forwarded to Mark Patrick, a month

19   later; is that right?

20        A.    Yes.  I'm -- there may have been an interim

21   e-mail where I --

22        Q.    Okay.  But the long and the short of it is

23   you never -- you -- you didn't respond to these

24   inquiries from Elysium; is that right?

25              MR. KANE:  Objection.

```
                                                      Page 86
1                    Grant Scott

2            MR. BRIDGES:  Objection.

3            MR. MORRIS:  Withdrawn.  Withdrawn.

4  BY MR. MORRIS:

5      Q.    You didn't provide a substantive response

6  to Elysium; is that right?

7            MR. KANE:  Objection.  Assumes facts

8      not in evidence.

9            MR. MORRIS:  That is why I'm asking

10     the question.

11 BY MR. MORRIS:

12     Q.    Go ahead, Mr. Scott.  You can answer.

13     A.    I did not provide a substantive response to

14 their inquiry.

15     Q.    Okay.  Thank you.

16           Can we go to the top.  In fact -- in fact,

17 you were instructed by Mr. Patrick to do nothing,

18 correct?

19           MR. BRIDGES:  Objection.  Misstates

20     the testimony.

21           THE WITNESS:  No.

22 BY MR. MORRIS?

23     Q.    Sir, the e-mail says "Do nothing," correct?

24     A.    That is correct, and they were handling it,

25 not me.
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 207
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 717 of 1598   PageID 13764
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 88 of
116

Page 87

1                     Grant Scott

2      Q.     Okay.  Now, did you resign on or about

3   March 24th, 2021?

4      A.     Yes.  That's -- that's when the transfer --

5   share of transfer.

6      Q.     Okay.

7             MR. MORRIS:  Can we put the next

8        exhibit up, please.  It's the one at the

9        top at page 10.  It's file 3, document 5.

10            MR. BRIDGES:  Mr. Morris, can I ask

11       you how it is for time because you told us

12       earlier -- you teased us with a 4:15 end

13       time, potentially.

14            MR. MORRIS:  Yeah, I'm just on the

15       last couple of documents.

16            MR. BRIDGES:  Thank you.

17            MR. MORRIS:  You bet.

18   BY MR. MORRIS:

19      Q.     Do you see this is a document called an

20   Assignment and Assumption of Membership Interest

21   Agreement?

22      A.     Yes.

23            MR. MORRIS:  And if we can scroll

24       down.

25   BY MR. MORRIS:

Page 88

                            Grant Scott

1

2      Q.      Did you sign this document?

3      A.      Yes, sir.

4      Q.      Okay.  Do you know what this document is?

5      A.      I believe it's the Management Share

6   Transfer Agreement.

7      Q.      Okay.  And do you know who prepared it?

8      A.      I do not.

9      Q.      Did you assign something pursuant to this

10   document?

11     A.      Yes.  The -- the -- the management shares.

12             MR. MORRIS:  Okay.  Can we go to the

13      first page, please?

14   BY MR. MORRIS:

15     Q.      And do you see in paragraph 1, there is a

16   description of the assignment and assumption of the

17   signed interest?

18     A.      Yes, I see that.

19     Q.      Okay.  Does that paragraph describe

20   everything that you assigned to Mr. Patrick?

21     A.      In this agreement.  Yes.

22             MR. BRIDGES:  Objection.  Calls --

23      objection.  Calls for a legal conclusion.

24             MR. KANE:  I join the objection.

25   BY MR. MORRIS:

```
                                                      Page 89
 1                        Grant Scott

 2        Q.    You can answer, sir.

 3        A.    Yes.  I mean, it says what it says.  But

 4   yes, that is what I was transferring.

 5        Q.    And can you identify for me anything that

 6   you know that you ever assigned to Mr. Patrick that is

 7   not set forth in paragraph 1?

 8             MR. BRIDGES:  Objection.  Form.

 9             THE WITNESS:  I'm unaware of

10        anything.

11   BY MR. MORRIS:

12        Q.    Do you know if -- if the items and assets

13   that are set forth in paragraph 1 had any value?

14             MR. KANE:  Objection.  Form.

15             THE WITNESS:  They had value, maybe

16        not monetary.

17   BY MR. MORRIS:

18        Q.    And what value did they have?

19        A.    I believe they had the property interest

20   that I referred to previously.

21        Q.    And what property interest are you

22   referring to?

23             MR. KANE:  Objection.  Form.  Calls

24        for a legal conclusion.

25   BY MR. MORRIS:
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 210
Case 3:23-cv-00726-S Document 8-24 Filed 05/29/23 Page 720 of 1598 PageID 13767
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 91 of 116

Page 90

1                          Grant Scott

2      Q.     You can answer.  Sir, it's your words we

3   need.

4      A.     The shares were the -- these management

5   shares were the -- I was treating as property.

6      Q.     Do you have any understanding as to what

7   the value of the management shares was at the time you

8   entered into this agreement?

9      A.     I did not.

10     Q.     Did you have any understanding as to

11   whether those management shares held any particular

12   rights at the time you entered into this agreement?

13            MR. KANE:  Objection to form.

14            THE WITNESS:  My understanding was

15       they had my rights previously.  Ultimately.

16   BY MR. MORRIS:

17     Q.     And what rights did you believe flowed from

18   the management shares?

19     A.     The controlling rights that flowed down to

20   the various entities.

21     Q.     Did you receive anything in return in

22   exchange for your assignment of these property

23   interests and the other assets set forth in paragraph

24   1?

25     A.     It allowed me to finally resign.  That is

```
                                                        Page 91
 1                       Grant Scott
 2    what I received.  I mean, it ended my -- it ended my
 3    role as a -- maybe as an agent, or an employee or
 4    whatever.  Those are my substantive rights, as I
 5    understood it.
 6        Q.    Okay.  So you -- you surrendered the
 7    substantive rights in an exchange -- you no longer had
 8    your substantive rights?
 9              MR. BRIDGES:  Objection.  Asked and
10       answered.
11              MR. KANE:  Objection.  Form.
12    BY MR. MORRIS:
13        Q.    You can answer, sir.  Did you get anything
14    other than -- withdrawn.
15              Did you get anything other than what you
16    already described?
17        A.    Relief.  Yes.
18        Q.    Excellent.  Did you ever consider assigning
19    these interests or assets to anybody other than
20    Mr. Patrick?
21        A.    I did not.
22        Q.    Did you ever consider -- did you have any
23    belief as to whether the interests that were assigned
24    were freely tradeable?
25              MR. BRIDGES:  Objection.  Calls for a
```

```
                                                            Page 92
1                        Grant Scott

2       legal conclusion.

3                MR. KANE:  I join the objection.

4                THE WITNESS:  I didn't make -- I did

5        not make an assessment of that.

6   BY MR. MORRIS:

7       Q.    Do you know -- withdrawn.

8             Do you have any understanding as to whether

9   there were any restrictions on the transferability of

10  the interests that you assigned pursuant to this

11  agreement?

12               MR. KANE:  Objection.  Calls for a

13       legal conclusion.

14               THE WITNESS:  I did not.

15  BY MR. MORRIS:

16      Q.    Did you let anybody know that you were

17  willing to assign the interests that are described in

18  paragraph 1 other than Mr. Patrick?

19      A.    Anyone that I -- conceivably, anyone that I

20  let know that was at all familiar with the structure,

21  anyone that was informed of my desire to resign would

22  have arguably have known that.

23      Q.    Okay.  I'm not asking you to put yourself

24  in the shoes of anybody else.  I'm asking for what you

25  recall telling people.
```

Page 93

Grant Scott

1

2          Did you ever tell anybody at any time that

3    you were ready, willing and able to transfer and

4    assign the interests that are in this document other

5    than Mr. Patrick and your lawyers?

6          A.    I am sorry.  I misunderstood your question.

7    The answer is no.

8          Q.    Did you ever think to try to assign these

9    interests for a profit?

10         A.    Good grief, no.

11               (Reporter clarification.)

12         A.    No.

13         Q.    Did you -- was anybody, other than

14   Mr. Patrick, ever identified as a potential assignee

15   of the interests that are described in paragraph 1?

16               MR. KANE:  Objection to form.

17               THE WITNESS:  I was unaware of any.

18   BY MR. MORRIS:

19         Q.    Okay.  Did you make any effort to identify

20   anybody other than Mr. Patrick as a potential assignee

21   for the interests that are set forth in paragraph 1?

22         A.    No, I did not.

23         Q.    Did any -- did anybody acting on your

24   behalf, to the best of your knowledge, ever make any

25   efforts to identify any potential assignee other than

1              Grant Scott

2   Mr. Patrick for the interests set forth in paragraph

3   1?

4              MR. BRIDGES:  Objection.  Foundation.

5              THE WITNESS:  I don't have that

6       knowledge.  No.

7              MR. MORRIS:  Can we go to the next

8       exhibit, please?

9              (Deposition Exhibit 14 was marked for

10   identification.)

11   BY MR. MORRIS:

12      Q.    Okay.  And do you see that these are

13   written resolutions dated the next day, March 25th?

14      A.    Yes.

15      Q.    And these resolutions provide for the

16   shared transfer described in the document?

17      A.    It appears so, yes.

18      Q.    And are these the management shares that

19   you were referring to earlier?

20      A.    I believe so.

21      Q.    Did you believe at the time that you owned

22   all of the management shares of charitable DAF HoldCo

23   Limited?

24      A.    That was my understanding.

25      Q.    How did you acquire those shares?

Case 19-34054-sgj11  Doc 3445-53  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 215
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 725 of 1598   PageID 13772
Case 19-34054-sgj11  Doc 2454-2  Filed 06/16/21   Entered 06/16/21 16:18:26   Page 96 of
116

```
                                                          Page 95
 1                        Grant Scott

 2      A.     I'm not sure the exact timing, but I

 3  believe that was all established when I became

 4  involved.

 5      Q.     Did you pay anything of value for the

 6  shares at the time that you acquired them?

 7      A.     I am -- I don't believe so, no.

 8      Q.     Did you need to obtain anybody's approval

 9  before you could transfer the shares?

10      A.     No.  I don't believe so.

11      Q.     Did you make any effort to obtain anybody's

12  approval before you transferred the shares?

13      A.     I did not.

14      Q.     Did you have any reason to believe that

15  Mr. Dondero approved of the transfer of the management

16  shares to Mr. Patrick?

17      A.     I -- I don't know that.

18      Q.     Did you testify earlier, that you had

19  discussed with Mr. Dondero in January, Mark Patrick

20  succeeding you?

21             MR. BRIDGES:  Objection.  Misstates

22       prior testimony.

23  BY MR. MORRIS:

24      Q.     You can answer, sir.

25      A.     I believe it was prior to that.
```

Page 96

1                         Grant Scott

2        Q.      Were you paid anything of value for your

3   services as the, either the managing member of the DAF

4   GP, or as a director of any of the other DAF or

5   CLO HoldCo Limited entities at any time?

6        A.      For a majority of the years, yes, I

7   received a monthly statement.

8        Q.      And is that -- how much was the monthly

9   statement?

10       A.      I believe it was $5,000.

11       Q.      Did it ever increase to an amount more than

12  $5,000?

13       A.      No.

14       Q.      Did you receive anything else of value for

15  your service to the DAF entities and CLO HoldCo

16  Limited other than the $5,000 monthly stipend that you

17  just described?

18       A.      I did not.

19       Q.      Do you recall that after you resigned, you

20  got reappointed, and then subsequently replaced again

21  by Mr. Patrick?

22               MR. KANE:  Objection to form.

23               (Reporter clarification.)

24               THE WITNESS:  Can you repeat -- did

25        you say -- it went away, and then it came

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 217
Case 3:23-cv-00726-S Document 8-24 Filed 05/29/23 Page 727 of 1598 PageID 13774
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 98 of
116

```
                                                        Page 97
 1                       Grant Scott

 2       back.  I don't understand the question.  I

 3       am sorry.

 4    BY MR. MORRIS:

 5       Q.     That is okay.  I just saw this in the

 6    documents, and I thought it was odd.  But let me put

 7    the documents up and see if you can shed any light.

 8             MR. MORRIS:  Let's start with the

 9       next exhibit, Patrick File 3, Document 9.

10             (Deposition Exhibit 15 was marked for

11    identification.)

12    BY MR. MORRIS:

13       Q.     And do you see in the resolutions, if we

14    can go up just a bit, dated March 24th, and it was

15    resolved that you were removed as a director of the

16    company and Mr. Patrick was appointed as your

17    replacement, if that is a fair characterization?

18             Do you see that?

19       A.     I see that.

20             MR. MORRIS:  And now if we can put up

21       the next document.

22             (Deposition Exhibit 16 was marked for

23    identification.)

24    BY MR. MORRIS:

25       Q.     So this is a week later.  It's March 31st.
```

```
                                                        Page 98
 1                      Grant Scott

 2          MR. MORRIS:  And if we can just

 3      scroll down and see if it's signed.

 4  BY MR. MORRIS:

 5      Q.    Do you see that Mr. Patrick was removed as

 6  the director and you were reappointed?

 7      A.    Yes, I do see that.

 8      Q.    Do you have any understanding as to why

 9  Mr. Patrick resigned and reappointed you as the

10  director a week later?

11      A.    I don't have -- I don't -- I don't know.

12      Q.    Did you even know this happened?

13      A.    Is my signature on that agreement?

14      Q.    No.

15      A.    I'm not sure.

16      Q.    Do you have any -- do you have any

17  recollection as -- as to whether or not you were ever

18  reappointed as the director of the company on or about

19  March 31st, 2021?

20      A.    I don't know if I have received any

21  communication about this or not.

22      Q.    Okay.

23          MR. MORRIS:  Can we go to the next

24      document, please?

25          (Deposition Exhibit 17 was marked for
```

Page 99

                          Grant Scott

1

2      identification.)

3              MR. KANE:  Mr. Morris, can you help

4         me with the exhibit numbers?  Was that 16,

5         or are we still on 15, additional portions

6         of it?

7              MS. CANTY:  That was 16 but not going

8         to 17.

9              MR. KANE:  Thank you.  I apologize.

10             MR. MORRIS:  That is okay, Jonathan.

11        We will get to everything and clear up any

12        confusion.

13   BY MR. MORRIS:

14        Q.    So if you go to the bottom of that

15   document, can you see that it was signed?

16             All right.  Do you see Mr. Patrick signed

17   this document?

18        A.    Yes, I see that.

19        Q.    Do you see that it's dated -- if we can go

20   back up to the top.  It's April 2nd, and do you see

21   that you are -- pursuant to these resolutions, you

22   were removed as the director again and replaced by

23   Mr. Patrick?

24        A.    Yes, I see that.  And they seem to be

25   correcting an error of some sort.

```
                                                      Page 100
 1                      Grant Scott

 2      Q.     Did anybody ever describe for you or

 3  explain to you what error had been made?

 4      A.     I am sorry.  I'm not familiar with these

 5  documents.

 6      Q.     Okay.  Is it fair to say that -- well, I

 7  will just leave it at that.

 8             So nobody ever informed you that there was

 9  a mistake that had to be corrected; is that right?

10             MR. BRIDGES:  Objection.  Asked and

11      answered.

12  BY MR. MORRIS:

13      Q.     You can answer.

14      A.     I don't know that there was this -- this

15  may have -- I don't know that there was a mistake.

16      Q.     You have no knowledge of --

17      A.     I have no knowledge of this.  I was in a

18  very complex process.  I think there...

19      Q.     And nobody ever asked -- nobody ever asked

20  your consent to be reappointed as the director of the

21  company, correct?

22             MR. BRIDGES:  Objection.  Asked and

23      answered.

24             THE WITNESS:  I didn't receive any

25      communications about this.
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 221
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 731 of 1598   PageID 13778
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 102 of 116

Page 101

1                          Grant Scott

2    BY MR. MORRIS:

3         Q.     And so you didn't provide your consent to

4    be reappointed as the director of the company,

5    correct?

6              MR. BRIDGES:  Objection.  Asked and

7         answered.

8              THE WITNESS:  That's correct.

9    BY MR. MORRIS:

10        Q.     Okay.  Did you become aware that after you

11   resigned, that DAF and CLO HoldCo started a lawsuit

12   against the debtor and some other defendants related

13   to the HarbourVest settlement?

14        A.     I did become aware of it, yes.

15        Q.     And were you aware of the lawsuit -- were

16   you aware that DAF and CLO HoldCo were considering

17   filing the lawsuit before it was actually commenced?

18        A.     No.

19        Q.     Did you have any communications with

20   anybody at any time about the possibility that the DAF

21   and CLO HoldCo would commence a lawsuit against the

22   debtor and others relating to the HarbourVest

23   settlement prior to the time that the lawsuit was

24   commenced?

25        A.     I did not.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 222
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 732 of 1598   PageID 13779
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 103 of
116

Page 102
1                          Grant Scott

2       Q.     So is it fair to say that you did not

3    provide any information to anybody at any time to

4    support the claim -- the complaint that was filed

5    against the debtor and the other defendants in the

6    lawsuit that was brought by the DAF and CLO HoldCo?

7              MR. BRIDGES:  Objection.  Foundation.

8              THE WITNESS:  I didn't provide

9         anything with respect to the litigation

10         that was filed.

11   BY MR. MORRIS:

12      Q.     And did anybody ever ask you for

13   information relating to potential claims against the

14   debtor and others?

15      A.     No.

16      Q.     Did you ever have any discussions with

17   anybody at any time as to whether Jim Seery should be

18   named as a defendant in the lawsuit that was bought by

19   the DAF and CLO HoldCo against the debtor and others?

20      A.     No.

21              MR. MORRIS:  I have no further

22         questions.  Thank you, Mr. Scott.

23              MR. BRIDGES:  I don't have any

24         questions.

25              MR. KANE:  Can I -- I've got a couple

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 223
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 733 of 1598   PageID 13780
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 104 of
116

Page 103

1                      Grant Scott

2       just follow-up for clarification purposes.

3                      EXAMINATION

4   BY MR. KANE:

5       Q.      Grant, earlier you were testifying about

6   resigning and noted -- I believe your testimony was

7   one of the reasons was an issue of independence.  Can

8   you clarify what you meant by issue of independence?

9       A.      I came to believe that there was a

10  perception, and my friendship with Jim Dondero

11  precluded my -- my independence.

12      Q.      Perception by whom?

13      A.      The judge in the case.

14              (Reporter clarification.)

15      A.      The judge in the bankruptcy case.

16      Q.      Was there a specific reason or instance

17  that caused you to have that belief?

18      A.      Yes.  When I spoke with you about the --

19      Q.      Well, I don't want to go into any

20  attorney-client communications.

21      A.      I am sorry.

22      Q.      So let me ask you a different question.

23  Were you provided a transcript of the Court's ruling

24  on the escrow hearing for the registry dispute?

25      A.      I believe so.

Page 104

```
1                         Grant Scott

2       Q.     And did you read that transcript?

3       A.     I believe we discussed it.  I'm not -- I'm

4   not sure.

5       Q.     Did you have a recollection that Judge

6   Jernigan made a comment or comments about you and

7   Jim Dondero during her ruling?

8       A.     Yes.

9       Q.     Do you believe that Judge Jernigan's

10  comments were inaccurate?

11             MR. MORRIS:  Objection to the form of

12      the question.  No foundation.  Leading.

13  BY MR. KANE:

14      Q.     I will rephrase.  I will rephrase.

15             I will ask it -- a different question.

16             Mr. Scott, do you believe that you acted

17  independently during the bankruptcy case?

18      A.     Yes.

19      Q.     Do you believe you acted in the best

20  interests of CLO HoldCo?

21      A.     Yes, I do.

22             MR. KANE:  I'm done.

23             MR. MORRIS:  Just some follow-up

24      questions, Mr. Scott.

25
```

```
                                                          Page 105
 1                      Grant Scott

 2                      EXAMINATION

 3    BY MR. MORRIS:

 4         Q.    Did you ever testify before Judge Jernigan?

 5         A.    I have not.

 6         Q.    So is it fair to say that you had no reason

 7    to believe that she could ever access your credibility

 8    as a witness?

 9               MR. BRIDGES:  I'm going to object.

10        That calls for a legal conclusion.

11    BY MR. MORRIS:

12         Q.    You can answer.

13         A.    From -- from what I understand from the

14    transcript of that hearing, a number of comments were

15    made by the judge regarding my independence, that sort

16    of thing, that made me -- that made me think that

17    maybe I could just remove that as an issue in the case

18    by resigning.  That is essentially, what my conclusion

19    was from that hearing.

20         Q.    But you didn't resign at the time that the

21    judge made those statements, did you?

22               MR. BRIDGES:  Objection.

23         Argumentative.

24    BY MR. MORRIS:

25         Q.    You can answer.
```

Page 106

```
                            Grant Scott
 1

 2      A.      I did not at that time.

 3      Q.      In fact, you didn't resign for probably

 4  seven months after, correct?

 5              MR. BRIDGES:  Objection.  Asked and

 6        answered.  Really?

 7              THE WITNESS:  Yes.

 8  BY MR. MORRIS:

 9      Q.      And you continued to actively participate

10  in the bankruptcy case, correct?

11      A.      That is correct.

12      Q.      And months later, you made the decision to

13  amend CLO HoldCo's proof of claim, correct?

14      A.      Correct.

15      Q.      And months later, you made the decision to

16  file an objection to the HarbourVest settlement,

17  correct?

18      A.      Correct.

19      Q.      And months after this hearing, you made the

20  decision to withdraw that objection, correct?

21              MR. BRIDGES:  Objection to repeating

22        the same questions from the last two hours

23        over and over again.  Are we going to keep

24        going all the way to the end.

25  BY MR. MORRIS:
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 227
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 737 of 1598    PageID 13784
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 108 of
116

Page 107

1                      Grant Scott

2      Q.      Only -- only if people keep opening the

3   door.

4              Can you please answer my question?

5      A.      Yes, I removed the objection.

6      Q.      And -- and you remained in the case, and

7   you remained active in the case, and you filed on

8   behalf of your -- withdrawn.

9              You stayed in the case even after

10  CLO HoldCo was sued by the debtor, correct?

11     A.      Yes.

12     Q.      And you stayed in the case long enough to

13  negotiate a settlement on behalf of CLO HoldCo with

14  the debtor, correct?

15     A.      Correct.

16     Q.      And you can't identify anything that the

17  judge said following the escrow hearing that had

18  anything to do with you personally, correct?

19            MR. KANE:  Objection.  Form.

20            MR. MORRIS:  Withdrawn.

21  BY MR. MORRIS:

22     Q.      Can you identify anything that the judge

23  said following the escrow hearing that had to do with

24  your independence?

25     A.      I don't remember -- I'm -- what I'm telling

Page 108

1                        Grant Scott

2   you is -- let's just be clear here since I think the

3   point is -- is being missed.  The issue of when I

4   wanted to resign or when I first thought about

5   resigning has been raised.  It was raised during my

6   first deposition with you as well.  And what I'm

7   saying is -- is that after I heard about the hearing,

8   and what was said, I don't remember the exact

9   language.  My first reflection was, hey, maybe that

10  is -- maybe that is -- if I'm going to be in this

11  court having to make a claim, maybe it would be best

12  if it wasn't being made by me.  That is all.

13       Q.    And I appreciate that.  And I am just

14  trying to test the credibility of that statement.

15  Okay?

16            MR. BRIDGES:  Objection to the

17       sidebar.

18  BY MR. MORRIS:

19       Q.    Did Judge Jernigan ever issue a ruling

20  against you personally?

21            MR. BRIDGES:  Asked and answered.

22       Objection.

23            MR. MORRIS:  It is not asked and

24       answered.

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 229
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 739 of 1598   PageID 13786
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 110 of 116

```
                                                        Page 109
 1                         Grant Scott

 2        Q.      But go ahead, sir.

 3        A.      Not against me personally.

 4        Q.      Did Judge Jernigan ever issue a ruling

 5    against CLO HoldCo Limited?

 6        A.      Well, to my --

 7                MR. BRIDGES:  Objection.  Objection.

 8        Calls for legal conclusion as to the

 9        meaning of "against."

10                (Reporter clarification.)

11                THE WITNESS:  The denial of the

12        escrow motion created a fairly big headache

13        for CLO HoldCo in the remainder of 2020.

14                So I believe that was a ruling

15        against CLO HoldCo, to answer your

16        question.

17    BY MR. MORRIS:

18        Q.      Okay.  Are you aware of any others?

19                MR. BRIDGES:  Objection.  Calls for a

20        legal conclusion as to the meaning of

21        "against."

22    BY MR. MORRIS:

23        Q.      You can answer.

24        A.      I don't know that she's made any other

25    rulings except to approve the settlement.
```

```
                                                           Page 110
 1                         Grant Scott

 2      Q.     Which settlement are you referring to?

 3      A.     The -- the TRO settlement.

 4      Q.     And were you on the -- did you listen in to

 5  the hearing during that hearing when -- when the judge

 6  approved the settlement?

 7      A.     I did not.

 8      Q.     Did you read the transcript?

 9      A.     I did not.

10      Q.     Did anybody ever tell you that the judge

11  said anything during that hearing to question your

12  independence?

13             MR. KANE:  Objection to the extent it

14       calls for attorney/client privileged

15       information.

16             THE WITNESS:  No.  No, I think you

17       misunderstand.  I had one data point to go

18       on, and that's what made me start the

19       process of thinking of resigning.  That's

20       all.

21  BY MR. MORRIS:

22      Q.     I appreciate that.

23      A.     The issue -- the issue has been raised

24  repeatedly, whether it was my idea or somebody else's

25  idea, that's all I'm saying.  If you can, it was my
```

```
                                                           Page 111
 1                      Grant Scott

 2   idea.

 3      Q.    Okay.  And I'm asking you if you have any

 4   other data points after that hearing to support the

 5   notion that Judge Jernigan questioned your

 6   independence?

 7      A.    No.

 8           MR. MORRIS:  I have no further

 9    questions.

10           MR. BRIDGES:  Me either.

11           MR. KANE:  I'm done.  Thank you.

12    Mr. Scott.

13           (Deposition adjourned at 4:42 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 232
Case 3:23-cv-00726-S   Document 8-24   Filed 05/29/23   Page 742 of 1598   PageID 13789
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 113 of 116

Page 112

```
 1                        Grant Scott

 2                  REPORTER'S CERTIFICATE

 3        I, LESHAUNDA CASS-BYRD, CSR No. B-2291, RPR,

 4   Registered Professional Reporter, certify that the

 5   foregoing proceedings were taken before me at the time

 6   and place therein set forth, at which time the witness

 7   was put under oath by me;

 8        That the testimony of the witness, the questions

 9   propounded, and all objections and statements made at

10   the time of the examination were recorded

11   stenographically by me and were thereafter

12   transcribed;

13        That the foregoing is a true and correct

14   transcript of my shorthand notes to taken.

15   I further certify that I am not a relative or employee

16   of any attorney or the parties, nor financially

17   interested in the action.

18        I declare under penalty of perjury under the laws

19   of North Carolina that the foregoing is true and

20   correct.

21        Dated this June 1, 2021.

22

23        _Leshaunda Byrd_
          _____

24          LESHAUNDA CASS-BYRD, CCR-B-2291, RPR

25
```

```
                                                                   Page 113
 1                          ERRATA SHEET

 2   Case Name:

 3   Deposition Date:

 4   Deponent:

 5   Pg.   No. Now Reads        Should Read   Reason

 6   ____  ____ _____      _____    _____

 7   ____  ____ _____      _____    _____

 8   ____  ____ _____      _____    _____

 9   ____  ____ _____      _____    _____

10   ____  ____ _____      _____    _____

11   ____  ____ _____      _____    _____

12   ____  ____ _____      _____    _____

13   ____  ____ _____      _____    _____

14   ____  ____ _____      _____    _____

15   ____  ____ _____      _____    _____

16   ____  ____ _____      _____    _____

17   ____  ____ _____      _____    _____

18   ____  ____ _____      _____    _____

19   ____  ____ _____      _____    _____

20

                                 _____
21                               Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS _____ DAY OF _____, 2021.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____
```

```
                                                          Page 114
 1

 2    WITNESS SIGNATURE:_____

 3              * * * * * * * * * * * * * * *

 4    State of _____

 5    County of _____

 6    Subscribed and sworn to before me this _____ day of

 7    _____, 2021.

 8

 9                    _____

10                         Notary Public

11    My Commission expires_____

12    (Seal)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 115

1                     Grant Scott

2    J U R A T

3    I,              , do hereby certify under penalty of

4    perjury that I have read the foregoing transcript of

5    my deposition taken on;_____that I have made

6    such corrections as appear noted herein in ink,

7    initialed by me; that my testimony as contained

8    herein, as corrected, is true and correct.

9    Dated this ____ day of _____, 2021, at

10   _____,

11

12

13   _____

14   SIGNATURE OF WITNESS

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 54

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 747 of 1598 PageID 13794
Case 19-34054-sgj11 Doc 2518 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 1 of 2

Docket #2518 Date Filed: 07/02/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DECLARATION OF JOHN A. MORRIS
## IN SUPPORT OF DEBTOR'S MOTION TO SUPPLEMENT
## THE RECORD IN THE CONTEMPT HEARING HELD ON JUNE 8, 2021

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as

follows:

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210702000000000007

APPX. 10703

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 748 of 1598    PageID 13795
Case 19-34054-sgj11 Doc 2518 Filed 07/02/21    Entered 07/02/21 16:02:39    Page 2 of 2

1.      I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP (the "Firm"), counsel to the above-referenced Debtor, and I submit this Declaration in support of the *Debtor's Motion to Supplement the Record in the Contempt Hearing Held on June 8, 2021* (the "Motion").  Unless stated otherwise, this Declaration is based on my personal knowledge and review of the documents listed below.

2.      On June 8, 2021, this Court held an evidentiary hearing (the "Hearing") on the *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2247] (the "Contempt Motion").

3.      During the Hearing, the Court admitted into evidence without objection Debtor's Exhibits 54 and 55 (together, the "Applicable Exhibits").

4.      The Applicable Exhibits were time records maintained in the ordinary course of business by my Firm in connection with the Contempt Motion for the periods (a) April 18 through April 30, 2021 (Exhibit 54), and (b) as labelled, May 1 through June 7, 2021 (Exhibit 55), respectively.

5.      Exhibit 55 contained very few time entries for the month of June for the simple reason that they had not yet been uploaded into my Firm's accounting records.

6.      Attached as proposed **Exhibit 56** is a true and correct copy of my Firm's time records for the period June 1 through June 8, 2021, in connection with the Contempt Hearing, exclusive of any time captured in Exhibit 55.

7.      The Debtor is requesting that the Court permit the Debtor to supplement the record in the Hearing on the Contempt Motion to admit Exhibit 56 under the doctrine of completeness.

Dated: July 2, 2021.                                 */s/ John A. Morris*
                                                          John A. Morris

# EXHIBIT 56

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21    Entered 07/02/21 16:02:39    Page 2 of 13

## Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX  75201

June 28, 2021
Invoice   0
Client   36027
Matter   00002
**JNP**

RE:  Postpetition

### STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH   06/28/2021



Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 751 of 1598 PageID 13798

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 3 of 13

Pachulski Stang Ziehl & Jones LLP                                    Page:     65
Highland Capital Management LP                                       Prebill#283721
36027    -00002                                                      June 28, 2021



**DAF**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| JAM Bill | 06/01/2021 | | DAF | 8.70 | 8.70 | 1,245.00 | 10,831.50 |
| 06/01/2021 | JAM | DAF | Prepare for Dondero deposition (2.2); Dondero deposition (2.6); tel c. w/ J. Pomerantz re: Dondero deposition (0.2); prepare for Scott deposition (0.3); Scott deposition (2.8); tel c. w/ G. Demo re: Scott deposition (0.1); tel c. w/ J. Pomerantz re: Scott deposition (0.2); tel c. w/ J. Seely re: depositions (0.3) | 8.70 | 1245.00 | $10,831.50 |
| LSC Bill | 06/01/2021 | | DAF | 5.50 | 5.50 | 460.00 | 2,530.00 |
| 06/01/2021 | LSC | DAF | Preparation for and assist at deposition of Jim Dondero (contempt motion) | 5.50 | 460.00 | $2,530.00 |
| LSC Bill | 06/01/2021 | | DAF | 2.70 | 2.70 | 460.00 | 1,242.00 |
| 06/01/2021 | LSC | DAF | Assist at deposition of Grant Scott (contempt motion) | 2.70 | 460.00 | $1,242.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 752 of 1598 PageID 13799

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 4 of 13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

Page:    66
Prebill#283721
June 28, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | | | | |
| JAM Bill | 06/02/2021 | | DAF | 1.80 | 1.80 | 1,245.00 | | 2,241.00 |
| 06/02/2021 | JAM | DAF | Tel c. w/ J. Dubel re: depositions in contempt proceeding (0.4); ███████████████████ tel c. w/ T. Surgent, D. Klos, G. Demo re: DAF issues (0.9); ███████████████ e-mail to L. Canty, G. Demo, H. Winograd re: Witness & Exhibit List for contempt hearing (0.3); e-mail to L. Canty, G. Demo, H. Winograd re: hearing binders for contempt hearing (0.2) | 1.80 | 1245.00 | $2,241.00 |
| LSC Bill | 06/02/2021 | | DAF | 1.00 | 1.00 | 460.00 | | 460.00 |
| 06/02/2021 | LSC | DAF | Begin preparation of exhibit and witness list for DAF contempt hearing. | 1.00 | 460.00 | $460.00 |
| LSC Bill | 06/02/2021 | | DAF | 2.40 | 2.40 | 460.00 | | 1,104.00 |
| 06/02/2021 | LSC | DAF | Begin retrieval and compilation of exhibits in connection with DAF contempt hearing. | 2.40 | 460.00 | $1,104.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 753 of 1598 PageID 13800

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 5 of 13

| | | |
|---|---|---|
| Pachulski Stang Ziehl & Jones LLP | Page: | 67 |
| Highland Capital Management LP | Prebill#283721 | |
| 36027 -00002 | June 28, 2021 | |

| | | Hours | Rate | Amount |
|---|---|---|---|---|

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JAM Bill | 06/03/2021 | DAF | 4.80 | 4.80 | 1,245.00 | 5,976.00 |

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/03/2021 | JAM | DAF | Document review (latest production from Patrick) (2.5); tel c. w/ G. Demo re: document review (0.1); e-mail to counsel for respondents re: logistics and trial matters (0.6); tel c. w/ L. Phillips re: logistics and trial matters (0.2); prepare for Patrick deposition (1.4) | 4.80 | 1245.00 | $5,976.00 |

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| J E Bill | 06/03/2021 | DAF | 0.40 | 0.40 | 1,195.00 | 478.00 |

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 06/03/2021 | JE | DAF | Review Reply brief; correspondence with Mr. Morris regarding same. | 0.40 | 1195.00 | $478.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 754 of 1598 PageID 13801

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 6 of 13

Pachulski Stang Ziehl & Jones LLP                                              Page:      68
Highland Capital Management LP                                                 Prebill#283721
36027   -00002                                                                 June 28, 2021

|  | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| **Bill** | | | | | | |
| 06/04/2021 | J N P | DAF | Emails with John A. Morris and Gregory V. Demo regarding DAF response. | 0.20 | 1295.00 | $259.00 |
| JAM Bill | 06/04/2021 | | DAF | 7.80 | 7.80 | 1,245.00 | 9,711.00 |
| 06/04/2021 | JAM | DAF | Prepare for Patrick deposition (4.4); Patrick deposition (including calls w/ G. Demo at breaks) (3.1); tel c. w/ Seery re: Patrick deposition (0.3) | 7.80 | 1245.00 | $9,711.00 |
| LSC Bill | 06/04/2021 | | DAF | 4.10 | 4.10 | 460.00 | 1,886.00 |
| 06/04/2021 | LSC | DAF | Prepare for and assist at deposition of Mark Patrick. | 4.10 | 460.00 | $1,886.00 |
| LSC Bill | 06/04/2021 | | DAF | 4.70 | 4.70 | 460.00 | 2.162.00 |
| 06/04/2021 | LSC | DAF | Continued preparation of exhibits in connection with contempt hearing. | 4.70 | 460.00 | $2,162.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 10 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 755 of 1598   PageID 13802

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21   Entered 07/02/21 16:02:39   Page 7 of 13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

Page:   69
Prebill#283721
June 28, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JNP Bill | 06/05/2021 | | DAF | 0.60 | 0.60 | 1,295.00 | | 777.00 |
| 06/05/2021 | JNP | DAF | Emails regarding witness and exhibit list; Conference with Gregory V. Demo and John A. Morris regarding same. | 0.60 | 1295.00 | $777.00 |
| JNP Bill | 06/05/2021 | | DAF | *0.50* | *0.50* | 1,295.00 | | 647.50 |
| 06/05/2021 | JNP | DAF | Conference with John A. Morris regarding upcoming evidentiary hearing on contempt and motion for reconsideration. | 0.50 | 1295.00 | $647.50 |
| JAM Bill | 06/05/2021 | | DAF | 7.30 | 7.30 | 1,245.00 | | 9,088.50 |
| 06/05/2021 | JAM | DAF | Review/analyze Scott deposition transcript (2.9); e-mail to L. Canty, H. Winograd re: deposition designations (0.2); tel c. w/ G. Demo re: contempt hearing (0.2); review documents (1.1); communications w/ L. Canty, G. Demo, Z. Annable re: W&E list (0.4); prepare for hearing (1.4); tel c. w/ J. Pomerantz re: trial matters (0.5); tel c. w/ J. Pomerantz, G. Demo re: exhibits, trial matters (0.5); e-mails w/ L. Phillips re: trial matters (0.1) | 7.30 | 1245.00 | $9,088.50 |
| LSC Bill | 06/05/2021 | | DAF | 2.90 | 2.90 | 460.00 | | 1,334.00 |
| 06/05/2021 | LSC | DAF | Further revise witness and exhibit list for contempt motion and prepare additional exhibits (2.9); ▮▮▮▮▮ | 2.90 | 460.00 | $1,334.00 |
| GVD Bill | 06/05/2021 | | DAF | 0.30 | 0.30 | 950.00 | | 285.00 |
| 06/05/2021 | GVD | DAF | Multiple conferences with J. Morris re preparation for contempt hearing | 0.30 | 950.00 | $285.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 756 of 1598 PageID 13803
Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 8 of 13

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027  - 00002

Page:    70

Prebill#283721

June 28, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| GVD Bill | 06/05/2021 | | DAF | 0.40 | 0.40 | 950.00 | 380.00 |
| 06/05/2021 | GVD | DAF | Conference with J. Morris and J. Pomerantz re preparation for June 8 hearing | | 0.40 | 950.00 | $380.00 |
| GVD Bill | 06/05/2021 | | DAF | 0.90 | 0.90 | 950.00 | 855.00 |
| 06/05/2021 | GVD | DAF | Compile and file witness and exhibit list for June 8 hearing | | 0.90 | 950.00 | $855.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 757 of 1598 PageID 13804

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 9 of 13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

Page:    71
Prebill#283721
June 28, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 06/06/2021 | JAM | DAF | Prepare for trial (4.4); review respondents' documents (0.4); e-mails w/ respondents' counsel re: objections to exhibits (0.3); tel c. w/ J. Seery re: DAF hearing and evidence (0.4) | 5.50 | 1245.00 | $6,847.50 |
| GVD Bill | 06/06/2021 | | DAF | 0.30 | 0.30 | 950.00 | | 285.00 |
| 06/06/2021 | GVD | DAF | Review demonstratives for June 8 hearing | 0.30 | 950.00 | $285.00 |
| GVD Bill | 06/06/2021 | | DAF | 0.40 | 0.40 | 950.00 | | 380.00 |
| 06/06/2021 | GVD | DAF | Conference with J. Morris and J. Pomerantz re preparation for June 8 hearing | 0.40 | 950.00 | $380.00 |
| GVD Bill | 06/06/2021 | | DAF | 1.60 | 1.60 | 950.00 | | 1,520.00 |
| 06/06/2021 | GVD | DAF | Review transcripts re evidence for June 8 hearing | 1.60 | 950.00 | $1,520.00 |
| GVD Bill | 06/06/2021 | | DAF | 0.60 | 0.60 | 950.00 | | 570.00 |
| 06/06/2021 | GVD | DAF | Compile witness and exhibit lists for June 8 hearing | 0.60 | 950.00 | $570.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 758 of 1598 PageID 13805

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 10 of
13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    72
Prebill#283721
June 28, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JNP Bill | 06/07/2021 | | DAF | 0.10 | 0.10 | 1,295.00 | | 129.50 |
| 06/07/2021 | JNP | DAF | Conference with J. Dubel regarding DAF hearing. | 0.10 | 1295.00 | $129.50 |

| JNP Bill | 06/07/2021 | | DAF | 1.00 | 1.00 | 1,295.00 | | 1,295.00 |
| 06/07/2021 | JNP | DAF | Working dinner with John A. Morris and Gregory V. Demo preparing for DAF hearing. | 1.00 | 1295.00 | $1,295.00 |
| JAM Bill | 06/07/2021 | | DAF | 11.20 | 11.20 | 1,245.00 | | 13,944.00 |
| 06/07/2021 | JAM | DAF | Prepare for contempt hearing (9.8); communications with L. Canty, H. Winograd re: exhibits/time records (0.4); working dinner with J. Pomerantz, G. Demo re: prepare for hearing (1.0). | 11.20 | 1245.00 | $13,944.00 |
| LSC Bill | 06/07/2021 | | DAF | 4.60 | 4.60 | 460.00 | | 2,116.00 |
| 06/07/2021 | LSC | DAF | Review, retrieve, and prepare additional exhibits in connection with contempt hearing and correspondence with J. Morris and G. Demo regarding the same. | 4.60 | 460.00 | $2,116.00 |
| GVD Bill | 06/07/2021 | | DAF | 1.00 | 1.00 | 950.00 | | 950.00 |
| 06/07/2021 | GVD | DAF | Working dinner in preparation for DAF/CLOH contempt hearing | 1.00 | 950.00 | $950.00 |
| GVD Bill | 06/07/2021 | | DAF | 0.20 | 0.20 | 950.00 | | 190.00 |
| 06/07/2021 | GVD | DAF | Review discovery re DAF action | 0.20 | 950.00 | $190.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 759 of 1598 PageID 13806

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 11 of
13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 73
Prebill#283721
June 28, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|



| GVD Bill | 06/07/2021 | | DAF | 0.50 | 0.50 | 950.00 | | 475.00 |
|---|---|---|---|---|---|---|---|---|

| 06/07/2021 | GVD | DAF | Review demonstratives and trial exhibits | | 0.50 | 950.00 | $475.00 |
|---|---|---|---|---|---|---|---|



| HRW Bill | 06/07/2021 | | DAF | 0.50 | 0.50 | 695.00 | | 347.50 |
|---|---|---|---|---|---|---|---|---|

| 06/07/2021 | HRW | DAF | Prepare exhibit for hearing on DAF contempt motion (0.5) | | 0.50 | 695.00 | $347.50 |
|---|---|---|---|---|---|---|---|

| JNP Bill | 06/08/2021 | | DAF | 10.80 | 10.80 | 1,295.00 | | 13,986.00 |
|---|---|---|---|---|---|---|---|---|

| 06/08/2021 | JNP | DAF | Participate in hearing on contempt motion. | | 10.80 | 1295.00 | $13,986.00 |

| JNP Bill | 06/08/2021 | | DAF | 0.10 | 0.10 | 1,295.00 | | 129.50 |
|---|---|---|---|---|---|---|---|---|

| 06/08/2021 | JNP | DAF | Conference with Ira D. Kharasch regarding results of hearing. | | 0.10 | 1295.00 | $129.50 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 15 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 760 of 1598   PageID 13807
Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21   Entered 07/02/21 16:02:39   Page 12 of 13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

Page:   74
Prebill#283721
June 28, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| ████████ | ████████ | ████████ | ████████ | ████ | ████ | ████ |
| JAM Bill | 06/08/2021 | DAF | 10.80 | 10.80 | 1,245.00 | 13,446.00 |
| 06/08/2021 | JAM | DAF | Participate in hearing on contempt motion (10.80). | 10.80 | 1245.00 | $13,446.00 |
| LSC Bill | 06/08/2021 | DAF | 9.50 | 9.50 | 460.00 | 4,370.00 |
| 06/08/2021 | LSC | DAF | Prepare for and assist at contempt hearing against DAF, et al. | 9.50 | 460.00 | $4,370.00 |
| ████████ | ████████ | ████████ | ████████ | ████ | ████ | ████ |
| GVD Bill | 06/08/2021 | DAF | 10.80 | 10.80 | 950.00 | 10,260.00 |
| 06/08/2021 | GVD | DAF | Prepare for and attend contempt hearing | 10.80 | 950.00 | $10,260.00 |
| ████████ | ████████ | ████████ | ████████ | ████ | ████ | ████ |
| HRW Bill | 06/08/2021 | DAF | 6.50 | 6.50 | 695.00 | 4,517.50 |
| 06/08/2021 | HRW | DAF | Attend hearing on DAF contempt motion (partial) (6.5) | 6.50 | 695.00 | $4,517.50 |
| ████████ | ████████ | ████████ | ████████ | ████ | ████ | ████ |
| JNP | 06/09/2021 | DAF | 0.30 | 0.30 | 1,295.00 | 388.50 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 761 of 1598    PageID 13808
Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21    Entered 07/02/21 16:02:39    Page 13 of
13

Pachulski Stang Ziehl & Jones LLP                                        Page:      75
Highland Capital Management LP                                           Prebill#283721
36027    - 00002                                                        June 28, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 06/09/2021 | JNP | DAF | Conference with Robert J. Feinstein regarding hearing on contempt and related issues. | 0.30 | 1295.00 | $388.50 |

**TOTAL FEES: $128,783.00**

# EXHIBIT 55

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 763 of 1598    PageID 13810
Case 19-34054-sgj11 Doc 1875 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 1 of 4

Docket #1875 Date Filed: 02/01/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

## DEBTOR'S NOTICE OF FILING OF PLAN SUPPLEMENT TO THE FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PLEASE TAKE NOTICE** that on January 22, 2021, the Debtor filed the *Fifth Amended*

*Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808]

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



APPX. 10763

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 764 of 1598 PageID 13811
Case 19-34054-sgj11 Doc 1875 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 2 of 4

(as subsequently amended and/or modified, the "Plan").[2]

      **PLEASE TAKE FURTHER NOTICE** that Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor"), filed the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* on November 24, 2020 [Docket No. 1473] (the "Disclosure Statement").

      **PLEASE TAKE FURTHER NOTICE** that attached as Exhibit C to the Disclosure Statement was the Debtor's Liquidation Analysis/Financial Projections.

      **PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** are the Debtor's amended Liquidation Analysis/Financial Projections (the "Amended Liquidation Analysis/Financial Projections"), which supersede the Liquidation Analysis/Financial Projections filed on November 24, 2020, with the Disclosure Statement.

      **PLEASE TAKE FURTHER NOTICE** that a prior version of the Amended Liquidation Analysis/Financial Projections was provided to parties in interests on January 28, 2021, in advance of the deposition of James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer, and that the Amended Liquidation Analysis/Financial Projections differ from such version in two respects:

- The Amended Liquidation Analysis/Financial Projections include the settlement in principle between UBS and the Debtor, which provides for UBS receiving a Class 8 (General Unsecured Claim) of $50,000,000 and a Class 9 (Subordinated Claim) of $25,000,000. The prior Liquidation Analysis/Financial Projections included a Class 8 (General Unsecured Claim) in the amount of $94,761,076 pursuant to the Court's order temporarily allowing the UBS claim in that amount for voting purposes; and

- The Debtor inadvertently understated the aggregate amount of Class 8 (General Unsecured Claims) by $4,392,937, which error is corrected in the Amended Liquidation Analysis/Financial Projections.

      **PLEASE TAKE NOTICE** that the Debtor hereby files the documents included herewith

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Plan.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 765 of 1598 PageID 13812
Case 19-34054-sgj11 Doc 1875 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 3 of 4

as **Exhibits DD-FF** (collectively, the "Fifth Plan Supplement") as Exhibits DD-FF to the Plan:

> **Exhibit DD**: Schedule of Retained Causes of Action (supersedes Exhibits E, L, and Q);
>
> **Exhibit EE**: Revisions to Form of Claimant Trust Agreement (amends Exhibit R); and
>
> **Exhibit FF**: Schedule of Contracts and Leases to Be Assumed (supersedes Exhibit H, I, and X).[3]

**PLEASE TAKE NOTICE** that the Debtor hereby gives notice of supplemental amendments (the "Plan Amendments") to the Plan, which are set forth in the redlined excerpts of the Plan attached hereto as **Exhibit B**.

*[Remainder of Page Intentionally Blank]*

---

[3] The Schedule of Contracts and Leases includes an agreement with Bloomberg Finance, L.P. ("Bloomberg"). The Debtor is currently in discussions with Bloomberg regarding the assumption of such agreement.

DOCS_NY:42174.4 36027/002

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 766 of 1598    PageID 13813
Case 19-34054-sgj11 Doc 1875 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 4 of 4

Dated: February 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:42174.4 36027/002

**APPX. 07764**

# EXHIBIT A

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 768 of 1598   PageID 13815
Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21   Entered 02/01/21 16:22:31   Page 2 of 8

*Highland Capital Management, L.P.*
*Disclaimer For Financial Projections*

This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

This document includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 769 of 1598   PageID 13816
Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21   Entered 02/01/21 16:22:31   Page 3 of 8

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is March 1, 2021
B. All investment assets are sold by December 31, 2022.
C. All demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021
D. Dugaboy term note with maturity date beyond 12/31/2022 are sold in Q1 2022; in the
    interim interest income and principal payments are not collected due to prepayment on note
E. Fixed assets currently used in daily operations are sold in June 2021 for $0
F. Highland bonus plan has been terminated in accordance with its terms. Accrual for employee bonuses as of January 2021 are reversed and not paid.
G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter
H. Post-effective date, the reorganized Debtor would retain up to ten HCMLP employees (or hire similar employees) to help monetize the remaining assets.
I. Litigation Trustee budget is $6,500,000.
J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.
K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100%
    of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or
    interest of junior priority.
L. Plan assumes zero allowed claims for IFA and Hunter Mountain Investment Trust ("HM").
M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
    Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets
N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.
O. Class 7 payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $10.3 million.
P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date (no Plan requirement to do so):
    o By September 30, 2021 - $50,000,000
    o By March 31, 2022 – additional $50,000,000
    o By June 30, 2022 – additional $25,000,000
    o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.
Q. Assumptions subject to revision based on business decision and performance of the business

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 770 of 1598 PageID 13817
Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 4 of 8

**Highland Capital Management, L.P.**
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $ 24,290 | $ 24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution[1][3] | (59,573) | (41,488) |
| Total estimated $ available for distribution | 222,658 | 174,748 |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 - Other Secured Claims | (62) | (62) |
| Class 4 – Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims [5] | - | - |
| Class 7 – Convenience Claims [7][8] | (10,280) | - |
| Subtotal | (27,793) | (17,514) |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims included in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General Unsecured Claims [8][10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated Claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C Limited Partnership Interests | *no distribution* | *no distribution* |
| Class 11 – Class A Limited Partnership Interest | *no distribution* | *no distribution* |

*Footnotes:*

*[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee*
  *Assumes Chapter 7 Trustee engages new professionals to help liquidate assets and terminates any management agreements with funds or CLOS*
*[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable; Plan includes revenue from managing CLOs*
*[3] Estimated expenses through final distribution exclude non-cash expenses:*
  *Depreciation of $462 thousand in 2021; Bad debt of $124K in 2021*
*[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court*
*[5] Represents $4.7 million in unpaid professional fees, $4.5 million in timing of payments to vendors and $1.2 million to pay PTO*
*[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold*
*[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million*
*[8] Plan: Class 7 includes $1.2 million estimate for aggregate contract rejections damage; Liquidation Class 8 includes $2.0 million for estimated rejection damages*
*[10] Class estimates $0 allowed claim for the following creditors: IFA and HM; assumes RCP claims offset against HCMLP interest in RCP fund*
  *UBS claim included at $50.0 million.*

*Notes:*
*All claim amounts are estimated as of February 1, 2020 and subject to change*

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 771 of 1598    PageID 13818
Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 5 of 8

*Highland Capital Management, L.P.*
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |
| Other Current Assets | 13,182 | 13,651 | 13,784 | 15,172 | 14,671 | 14,220 | 9,943 | 8,268 | 8,417 | 8,567 | |
| Investment Assets | 320,912 | 305,961 | 283,812 | 280,946 | 233,234 | 171,174 | 47,503 | 47,503 | 25,888 | 25,888 | |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,542 | $ 103,823 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 142,730 | $ 135,597 | $ 131,230 | $ 12,891 | $ 10,249 | $ 10,503 | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 9,861 | 9,884 | 10,000 | - | - | - | - | - | - | - | |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | |
| Class 2 - Frontier Secured Claim | - | - | - | 5,528 | - | - | - | - | - | - | |
| Class 3 - Other Secured Claims | - | - | - | - | - | - | - | - | - | - | |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | |
| Class 6 – PTO Claims | - | - | - | - | - | - | - | - | - | - | |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | |
| Class 8 – General Unsecured Claims | - | - | - | 273,219 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| Class 9 – Subordinated Claims [1] | - | - | - | - | - | - | - | - | - | - | |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | |
| Claim Payable | 9,861 | 9,884 | 10,000 | 278,747 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| **TOTAL LIABILITIES** | $ 152,591 | 145,481 | 141,230 | 291,639 | 283,468 | 233,723 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 190,005 | 16,154 | 4,500 | (5,495) | (30,636) | (36,715) | (41,677) | (44,396) | (78,354) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,543 | $ 103,823 | $ - |

*[1] Class 9 has $60 million of subordinated claims; Debtor anticipates no distributions to Class 9*

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 772 of 1598 PageID 13819
Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 6 of 8

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast ---> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,804 | $ 11,325 | $ 1,329 | $ 856 | $ 856 | $ 856 | $ 3,897 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,373 | 45 | 45 | - | 1,463 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 316 | 274 | - | - | 591 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,931 | $ 30,554 | $ 3,018 | $ 1,176 | $ 901 | $ 856 | $ 5,951 |
| Operating Expenses [1] | 13,328 | 9,171 | 9,399 | 31,899 | 12,168 | 4,897 | 3,973 | 3,333 | 24,371 |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,468) | $ (1,345) | $ (9,149) | $ (3,722) | $ (3,072) | $ (2,477) | $ (18,420) |
| Professional Fees | 17,522 | 7,707 | 8,351 | 33,581 | 7,478 | 6,583 | 2,268 | 1,810 | 18,138 |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,059 | 4,879 | (156,042) | 326 | (93) | 29 | (155,781) |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (9,761) | $ (30,046) | $ (172,669) | $ (9,978) | $ (5,433) | $ (4,259) | $ (192,339) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (1,013) | 522 | - | - | (491) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (8,850) | (35,719) | (168) | (2,198) | (4,563) | (7,581) | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | 4,523 | (32,857) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (364) | (364) | - | - | - | (13,301) | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (4,692) | $ (151,422) | $ (1,182) | $ (1,675) | $ (4,563) | $ (20,882) | $ (28,302) |
| Net Income | $ (150,307) | $ (16,708) | $ (14,453) | $ (181,468) | $ (173,851) | $ (11,654) | $ (9,996) | $ (25,141) | $ (220,641) |

*Footnotes:*
[1] Operating expenses include an adjustment in January 2021 to account
for expenses that have not been accrued or paid prior to effective date.
[2] Other income and expenses of $197.3 million in Q1 2021 includes:
[a] $209.7 million was expensed to record for the increase of
allowed claims.
[b] Income of $11.7 million for the accrued, but unpaid payroll liability related to
the Debtor's deferred bonus programs amount written-off.

2/1/2021

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 773 of 1598 PageID 13820
Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 7 of 8

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | | Forecast ---> | | | | |
|---|---|---|---|---|---|---|
| | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
| **Revenue** | | | | | | |
| Management Fees | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 6,215 |
| Shared Service Fees | - | - | - | - | - | 1,463 |
| Other Income | - | - | - | - | - | 591 |
| Total revenue | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 8,269 |
| Operating Expenses | 3,635 | 2,679 | 1,739 | 6,425 | 14,478 | 38,849 |
| Income/(loss) From Operations | $ (3,056) | $ (2,099) | $ (1,159) | $ (5,846) | $ (12,160) | $ (30,580) |
| Professional Fees | 2,921 | 2,761 | 1,461 | 2,176 | 9,318 | 27,455 |
| Other Income/(Expenses) | (103) | (101) | (100) | (350) | (654) | (156,434) |
| Operating Gain/(Loss) | $ (6,079) | $ (4,961) | $ (2,719) | $ (8,371) | $ (22,131) | $ (214,470) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (25,587) | (25,587) | (26,078) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (25,587) | $ (25,587) | $ (53,889) |
| Net Income | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,958) | $ (47,718) | $ (268,359) |

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 774 of 1598   PageID 13821
Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 8 of 8

*Highland Capital Management, L.P.*
*Cash Flow Indirect*
*(US $000's)*

| | Forecast ----> | | | | | | | | | |
| | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net (Loss) Income | $ (16,708) | $ (14,453) | $ (173,851) | $ (11,654) | $ (9,996) | $ (25,141) | $ (6,079) | $ (4,961) | $ (2,719) | (33,958) |
| **Cash Flow from Operating Activity** | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/ loss | - | - | 1,013 | (522) | - | - | - | - | - | 25,587 |
| Investment realized (gain)/ loss | (1,549) | 9,214 | 168 | 2,198 | 4,563 | 20,882 | - | - | - | - |
| Unrealized (gain) / loss | (9,150) | 4,523 | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | (133) | (1,388) | 501 | 450 | 4,277 | 1,675 | (149) | (150) | 908 |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (44,172) | (2,643) | 255 | (10,503) | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (4,868) | (217,998) | (11,889) | (4,727) | (10,485) | (4,404) | (5,110) | (2,870) | (7,463) |
| | | | | | | | | | | |
| **Cash Flow From Investing Activities** | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| | | | | | | | | | | |
| **Cash Flow from Financing Activities** | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 278,747 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,865) |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 194,580 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,865) |
| | | | | | | | | | | |
| Net Change in Cash | $ (9,107) | $ 25,159 | $ (20,719) | $ 29,735 | $ 2,770 | $ 92,303 | $ (54,404) | $ (8,495) | $ (2,870) | (69,368) |
| Beginning Cash | 14,994 | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 |
| Ending Cash | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |

Case 19-34054-sgj11 Doc 1875-2 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 1 of 7

# **EXHIBIT B**

61.     "*Estate Claims*" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [D.I. 354].

62.     "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, ~~direct and indirect majority owned subsidiaries, and the Managed Funds~~, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.     "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.     "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.     "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.     "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

~~9~~

<u>9</u>

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to ~~11 U.S.C. § 510 or~~an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.      Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed Priority Tax Claim, (b) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however,* that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

<div align="center">

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

</div>

**A.      Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within

**I.**      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.**      **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  ~~Under section 510 of the Bankruptcy Code, upon~~Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.**      **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

~~25~~

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the ~~Effective~~Confirmation Date.  Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.      Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts

~~39~~

39

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 781 of 1598 PageID 13828
49

Case 19-34054-sgj11 Doc 1875-2 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 7 of 7

forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.**   **Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee) and any applicable parties in Section VII.A of this Plan, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or

47

Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 1 of 18

# EXHIBIT DD

Schedule of Causes of Action

The Causes of Action shall include, *without limitation*, any cause of action based on the following:

breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, usurpation of corporate opportunities, breach of implied covenant of good faith and fair dealing, conversion, misappropriation of assets, misappropriation of trade secrets, unfair competition, breach of contract, breach of warranty, fraud, constructive fraud, negligence, gross negligence, fraudulent conveyance, fraudulent transfer, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, fraudulent inducement, tortious interference, *quantum meruit*, unjust enrichment, abuse of process, alter ego, substantive consolidation, recharacterization, business disparagement, indemnity, claims for recovery of distributions or dividends, claims for indemnification, promissory estoppel, quasi-contract claims, any counterclaims, equitable subordination, avoidance actions provided for under sections 544 or 547 of the Bankruptcy Code, claims brought under state law, claims brought under federal law, claims under any common-law theory of tort or law or equity, and any claims similar in nature to the foregoing claims.

The Causes of Action shall include, *without limitation*, any cause of action against the following persons and entities:

James Dondero, Mark Okada, Grant Scott, John Honis, any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, Nexbank Capital, Inc. Highland Capital Management Services, Inc., NexPoint Advisors GP, LLC, NexPoint Advisors, L.P., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on the attached **Annex 1** hereto, any current or former employee of the Debtor, and any entity directly or indirectly owned, controlled, or operated for the benefit of the foregoing persons or entities.

The Causes of Action shall include, *without limitation*, any cause of action arising from the following transactions:

The transfer of ownership interests in the Debtor to Hunter Mountain Investment Trust, the creation or transfer of any notes receivable from the Debtor or from any entity related to the Debtor, the creation or transfer of assets to or from any charitable foundation or trust, the formation, performance, or breach of any contract for the Debtor to provide investment management, support services, or any other services, and the distribution of assets or cash from the Debtor to partners of the Debtor.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 784 of 1598    PageID 13831
49

Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 3 of 18

**Annex 1**

11 Estates Lane, LLC

1110 Waters, LLC

140 Albany, LLC

1525 Dragon, LLC

17720 Dickerson, LLC

1905 Wylie LLC

2006 Milam East Partners GP, LLC

2006 Milam East Partners, L.P.

201 Tarrant Partners, LLC

2014 Corpus Weber Road LLC

2325 Stemmons HoldCo, LLC

2325 Stemmons Hotel Partners, LLC

2325 Stemmons TRS, Inc.

300 Lamar, LLC

3409 Rosedale, LLC

3801 Maplewood, LLC

3801 Shenandoah, L.P.

3820 Goar Park LLC

400 Seaman, LLC

401 Ame, L.P.

4201 Locust, L.P.

4312 Belclaire, LLC

5833 Woodland, L.P.

5906 DeLoache, LLC

5950 DeLoache, LLC

7758 Ronnie, LLC

7759 Ronnie, LLC

AA Shotguns, LLC

Aberdeen Loan Funding, Ltd.

Acis CLO 2017-7 Ltd

Acis CLO Management GP, LLC

Acis CLO Management GP, LLC *(fka Acis CLO Opportunity Funds GP, LLC)*

Acis CLO Management Holdings, L.P.

Acis CLO Management Intermediate Holdings I, LLC

Acis CLO Management Intermediate Holdings II, LLC

Acis CLO Management, LLC *(fka Acis CLO Opportunity Funds SLP, LLC)*

Acis CLO Trust

Acis CLO Value Fund II Charitable DAF Ltd.

Acis CMOA Trust

Advisors Equity Group LLC

Alamo Manhattan Hotel I, LLC (Third Party)

Allenby, LLC

Allisonville RE Holdings, LLC

AM Uptown Hotel, LLC

Apex Care, L.P

Asbury Holdings, LLC *(fka HCSLR Camelback Investors (Delaware), LLC)*

Ascendant Advisors

Atlas IDF GP, LLC

Atlas IDF, LP

BB Votorantim Highland Infrastructure, LLC

BDC Toys Holdco, LLC

Beacon Mountain, LLC

Bedell Trust Ireland Limited (Charitable trust account)

Ben Roby (third party)

BH Equities, LLC

BH Heron Pointe, LLC

BH Hollister, LLC

BH Willowdale Manager, LLC

Big Spring Partners, LLC

Blair Investment Partners, LLC

Bloomdale, LLC

Brave Holdings III Inc.

Brentwood CLO, Ltd.

Brentwood Investors Corp.

Brian Mitts

Bristol Bay Funding Ltd.

Bristol Bay Funding, Ltd.

BVP Property, LLC

C-1 Arbors, Inc.

C-1 Cutter's Point, Inc.

C-1 Eaglecrest, Inc.

C-1 Silverbrook, Inc.

Cabi Holdco GP, LLC

Cabi Holdco I, Ltd

Cabi Holdco I, Ltd.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 785 of 1598 PageID 13832
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 4 of 18

Cabi Holdco, L.P.

California Public Employees' Retirement System

Camelback Residential Investors, LLC

Camelback Residential Investors, LLC *(fka Sevilla Residential Partners, LLC)*

Camelback Residential Partners, LLC

Capital Real Estate - Latitude, LLC

Castle Bio Manager, LLC

Castle Bio, LLC

Cayco Admin Ltd.

Cayco Insolvency Ltd.

CG Works, Inc.

CG Works, Inc. (fka Common Grace Ventures, Inc.)

Charitable DAF Fund, L.P.

Charitable DAF GP, LLC

Charitable DAF HoldCo, Ltd

Charitable DAF HoldCo, Ltd.

Claymore Holdings, LLC

CLO HoldCo, Ltd

CLO Holdco, Ltd.

Corbusier, Ltd.

Cornerstone Healthcare Group Holding, Inc.

Corpus Weber Road Member LLC

CP Equity Hotel Owner, LLC

CP Equity Land Owner, LLC

CP Equity Owner, LLC

CP Hotel TRS, LLC

CP Land Owner, LLC

CP Tower Owner, LLC

CRE - Lat, LLC

Credit Suisse, Cayman Islands Branch

Crossings 2017 LLC

Crown Global Insurance Company (third party)

Dallas Cityplace MF SPE Owner LLC

Dallas Lease and Finance, L.P.

Dana Scott Breault
James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Dana Sprong (Third Party)

David c. Hopson

De Kooning, Ltd.

deKooning, Ltd.

DFA/BH Autumn Ridge, LLC

Dolomiti, LLC

DrugCrafters, L.P.

Dugaboy Investment Trust

Dugaboy Management, LLC

Dugaboy Project Management GP, LLC

Eagle Equity Advisors, LLC

Eames, Ltd.

Eastland CLO, Ltd.

Eastland Investors Corp.

EDS Legacy Heliport, LLC

EDS Legacy Partners Owner, LLC

EDS Legacy Partners, LLC

Empower Dallas Foundation, Inc.

ENA 41, LLC

Entegra Strat Superholdco, LLC

Entegra-FRO Holdco, LLC

Entegra-FRO Superholdco, LLC

Entegra-HOCF Holdco, LLC

Entegra-NHF Holdco, LLC

Entegra-NHF Superholdco, LLC

Entegra-RCP Holdco, LLC

Estates on Maryland Holdco, LLC

Estates on Maryland Owners SM, Inc.

Estates on Maryland Owners, LLC

Estates on Maryland, LLC

Falcon E&P Four Holdings, LLC

Falcon E&P One, LLC

Falcon E&P Opportunities Fund, L.P.

Falcon E&P Opportunities GP, LLC

Falcon E&P Royalty Holdings, LLC

Falcon E&P Six, LLC

Falcon E&P Two, LLC

Falcon Four Midstream, LLC

Falcon Four Upstream, LLC

Falcon Incentive Partners GP, LLC

Falcon Incentive Partners, LP

Falcon Six Midstream, LLC

Flamingo Vegas Holdco, LLC *(fka Cabi Holdco, LLC)*

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 25 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 786 of 1598   PageID 13833
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21   Entered 02/01/21 16:22:31   Page 5 of 18

Four Rivers Co-Invest GP, LLC

Four Rivers Co-Invest, L.P.

FRBH Abbington SM, Inc.

FRBH Abbington, LLC

FRBH Arbors, LLC

FRBH Beechwood SM, Inc.

FRBH Beechwood, LLC

FRBH C1 Residential, LLC

FRBH Courtney Cove SM, Inc.

FRBH Courtney Cove, LLC

FRBH CP, LLC

FRBH Duck Creek, LLC

FRBH Eaglecrest, LLC

FRBH Edgewater JV, LLC

FRBH Edgewater Owner, LLC

FRBH Edgewater SM, Inc.

FRBH JAX-TPA, LLC

FRBH Nashville Residential, LLC

FRBH Regatta Bay, LLC

FRBH Sabal Park SM, Inc.

FRBH Sabal Park, LLC

FRBH Silverbrook, LLC

FRBH Timberglen, LLC

FRBH Willow Grove SM, Inc.

FRBH Willow Grove, LLC

FRBH Woodbridge SM, Inc.

FRBH Woodbridge, LLC

Freedom C1 Residential, LLC

Freedom Duck Creek, LLC

Freedom Edgewater, LLC

Freedom JAX-TPA Residential, LLC

Freedom La Mirage, LLC

Freedom LHV LLC

Freedom Lubbock LLC

Freedom Miramar Apartments, LLC

Freedom Sandstone, LLC

Freedom Willowdale, LLC

Fundo de Investimento em Direitos Creditorios BB Votorantim Highland Infraestrutura

G&E Apartment REIT The Heights at Olde Towne, LLC

G&E Apartment REIT The Myrtles at Olde Towne, LLC

GAF REIT, LLC

GAF Toys Holdco, LLC

Gardens of Denton II, L.P.

Gardens of Denton III, L.P.

Gleneagles CLO, Ltd.

Goverannce RE, Ltd.

Governance Re, Ltd.

Governance, Ltd.

Grant Scott

Grant Scott, Trustee of The SLHC Trust

Grayson CLO, Ltd.

Grayson Investors Corp.

Greater Kansas City Community Foundation (third party)

Greenbriar CLO, Ltd.

Greg Busseyt

Gunwale LLC

Gunwale, LLC

Hakusan, LLC

Hammark Holdings LLC

Hampton Ridge Partners, LLC

Harko, LLC

Harry Bookey/Pam Bookey (third party)

Haverhill Acquisition Co., LLC

Haygood, LLC

HB 2015 Family LP (third party)

HCBH 11611 Ferguson, LLC

HCBH Buffalo Pointe II, LLC

HCBH Buffalo Pointe III, LLC

HCBH Buffalo Pointe, LLC

HCBH Hampton Woods SM, Inc.

HCBH Hampton Woods, LLC

HCBH Overlook SM, Inc.

HCBH Overlook, LLC

HCBH Rent Investors, LLC

HCMS Falcon GP, LLC

HCMS Falcon, L.P.

HCO Holdings, LLC

HCOF Preferred Holdings, L.P.

HCOF Preferred Holdings, LP

HCOF Preferred Holdings, Ltd.

HCRE 1775 James Ave, LLC

HCRE Addison TRS, LLC

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 787 of 1598    PageID 13834

Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 6 of 18

HCRE Addison, LLC *(fka HWS Addison, LLC)*

HCRE Hotel Partner, LLC *(fka HCRE HWS Partner, LLC)*

HCRE Las Colinas TRS, LLC

HCRE Las Colinas, LLC *(fka HWS Las Colinas, LLC)*

HCRE Plano TRS, LLC

HCRE Plano, LLC *(fka HWS Plano, LLC)*

HCREF-I Holding Corp.

HCREF-II Holding Corp.

HCREF-III Holding Corp.

HCREF-IV Holding Corp.

HCREF-IX Holding Corp.

HCREF-V Holding Corp.

HCREF-VI Holding Corp.

HCREF-VII Holding Corp.

HCREF-VIII Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

HCREF-XIII Holding Corp.

HCREF-XIV Holding Corp.

HCREF-XV Holding Corp.

HCSLR Camelback Investors (Cayman), Ltd.

HCSLR Camelback, LLC

HCT Holdco 2 Ltd.

HCT Holdco 2, Ltd.

HE 41, LLC

HE Capital 232 Phase I Property, LLC

HE Capital 232 Phase I, LLC

HE Capital Asante, LLC

HE Capital Fox Trails, LLC

HE Capital KR, LLC

HE Capital, LLC

HE CLO Holdco, LLC

HE Mezz Fox Trails, LLC

HE Mezz KR, LLC

HE Peoria Place Property, LLC

HE Peoria Place, LLC

Heron Pointe Investors, LLC

Hewett's Island CLO I-R, Ltd.

HFP Asset Funding II, Ltd.

HFP Asset Funding III, Ltd.

HFP CDO Construction Corp.

HFP GP, LLC

HFRO Sub, LLC

Hibiscus HoldCo, LLC

Highland - First Foundation Income Fund

Highland 401(k) Plan

Highland 401K Plan

Highland Argentina Regional Opportunity Fund GP, LLC

Highland Argentina Regional Opportunity Fund, L.P.

Highland Argentina Regional Opportunity Fund, Ltd.

Highland Argentina Regional Opportunity Master Fund, L.P.

Highland Brasil, LLC

Highland Capital Brasil Gestora de Recursos *(fka Highland Brasilinvest Gestora de Recursos, LTDA; fka HBI Consultoria Empresarial, LTDA)*

Highland Capital Management (Singapore) Pte Ltd

Highland Capital Management AG

Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management Ltd)

Highland Capital Management Fund Advisors, L.P.

Highland Capital Management Fund Advisors, L.P. *(fka Pyxis Capital, L.P.)*

Highland Capital Management Korea Limited

Highland Capital Management Latin America, L.P.

Highland Capital Management LP Retirement Plan and Trust

Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.

Highland Capital Management Real Estate Holdings I, LLC

Highland Capital Management Real Estate Holdings II, LLC

Highland Capital Management Services, Inc.

Highland Capital Management, L.P.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 788 of 1598 PageID 13835
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 7 of 18

Highland Capital Management, L.P. Charitable Fund

Highland Capital Management, L.P. Retirement Plan and Trust

Highland Capital Management, L.P., as trustee of Acis CMOA Trust and nominiee for and on behalf of Highland CLO Assets Holdings Limited

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominiee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, LP

Highland Capital Management, LP Charitable Fund

Highland Capital Multi-Strategy Fund, LP

Highland Capital of New York, Inc.

Highland Capital Special Allocation, LLC

Highland CDO Holding Company

Highland CDO Opportunity Fund GP, L.P.

Highland CDO Opportunity Fund, L.P.

Highland CDO Opportunity Fund, Ltd.

Highland CDO Opportunity GP, LLC

Highland CDO Opportunity Master Fund, L.P.

Highland CDO Trust

Highland CLO 2018-1, Ltd.

Highland CLO Assets Holdings Limited

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd. *(fka Acis Loan Funding, Ltd.)*

Highland CLO Gaming Holdings, LLC

Highland CLO Holdings Ltd.

Highland CLO Holdings, Ltd. (as of 12.19.17)

Highland CLO Management Ltd.

Highland CLO Trust

Highland Credit Opportunities CDO Asset Holdings GP, Ltd.

Highland Credit Opportunities CDO Asset Holdings, L.P.

Highland Credit Opportunities CDO Financing, LLC

Highland Credit Opportunities CDO, Ltd.

Highland Credit Opportunities Holding Corporation

Highland Credit Opportunities Japanese Feeder Sub-Trust

Highland Credit Opportunities Japanese Unit Trust (Third Party)

Highland Credit Strategies Fund, L.P.

Highland Credit Strategies Fund, Ltd.

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Master Fund, L.P.

Highland Dallas Foundation, Inc.

Highland Dynamic Income Fund GP, LLC

Highland Dynamic Income Fund GP, LLC *(fka Highland Capital Loan GP, LLC)*

Highland Dynamic Income Fund, L.P.

Highland Dynamic Income Fund, L.P. *(fka Highland Capital Loan Fund, L.P.)*

Highland Dynamic Income Fund, Ltd.

Highland Dynamic Income Fund, Ltd. *(fka Highland Loan Fund, Ltd.)*

Highland Dynamic Income Master Fund, L.P.

Highland Dynamic Income Master Fund, L.P. *(fka Highland Loan Master Fund, L.P.)*

Highland Employee Retention Assets LLC

Highland Energy Holdings, LLC

Highland Energy MLP Fund *(fka Highland Energy and Materials Fund)*

Highland Equity Focus Fund, L.P.

Highland ERA Management, LLC

Highland eSports Private Equity Fund

Highland Financial Corp.

Highland Financial Partners, L.P.

Highland Fixed Income Fund

Highland Flexible Income UCITS Fund

Highland Floating Rate Fund

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 789 of 1598 PageID 13836
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 8 of 18

Highland Floating Rate Opportunites Fund

Highland Floating Rate Opportunities Fund

Highland Fund Holdings, LLC

Highland Funds I

Highland Funds II

Highland Funds III

Highland GAF Chemical Holdings, LLC

Highland General Partner, LP

Highland Global Allocation Fund

Highland Global Allocation Fund
*(fka Highland Global Allocation Fund II)*

Highland GP Holdings, LLC

Highland HCF Advisor Ltd.

Highland HCF Advisor, Ltd., as Trustee for
and on behalf of Acis CLO Trust, as nominee
for and on behalf of Highland CLO Funding,
Ltd. (as of 3.29.18)

Highland Healthcare Equity Income and
Growth Fund

Highland iBoxx Senior Loan ETF

Highland Income Fund

Highland Income Fund *(fka Highland
Floating Rate Opportunities Fund)*

Highland Kansas City Foundation, Inc.

Highland Latin America Consulting, Ltd.

Highland Latin America GP, Ltd.

Highland Latin America LP, Ltd.

Highland Latin America Trust

Highland Legacy Limited

Highland LF Chemical Holdings, LLC

Highland Loan Funding V, LLC

Highland Loan Funding V, Ltd.

Highland Long/Short Equity Fund

Highland Long/Short Healthcare Fund

Highland Marcal Holding, Inc.

Highland Merger Arbitrage Fund

Highland Multi Strategy Credit Fund GP, L.P.

Highland Multi Strategy Credit Fund GP, L.P.
*(fka Highland Credit Opportunities CDO GP,
L.P.)*

Highland Multi Strategy Credit Fund, L.P.

Highland Multi Strategy Credit Fund, L.P. *(fka
Highland Credit Opportunities Fund, L.P., fka
Highland Credit Opportunities CDO, L.P.)*

Highland Multi Strategy Credit Fund, Ltd.

Highland Multi Strategy Credit Fund, Ltd. *(fka
Highland Credit Opportunities Fund, Ltd.)*

Highland Multi Strategy Credit GP, LLC

Highland Multi Strategy Credit GP, LLC *(fka
Highland Credit Opportunities CDO GP, LLC)*

Highland Multi-Strategy Fund GP, LLC

Highland Multi-Strategy Fund GP, LP

Highland Multi-Strategy IDF GP, LLC

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Master Fund, LP

Highland Multi-Strategy Onshore Master
SubFund II, LLC

Highland Multi-Strategy Onshore Master
Subfund, LLC

Highland Opportunistic Credit Fund

Highland Park CDO 1, Ltd.

Highland Park CDO I, Ltd.

Highland Premier Growth Equity Fund

Highland Premium Energy & Materials Fund

Highland Prometheus Feeder Fund I, L.P.

Highland Prometheus Feeder Fund I, LP

Highland Prometheus Feeder Fund II, L.P.

Highland Prometheus Feeder Fund II, LP

Highland Prometheus Master Fund, L.P.

Highland Receivables Finance I, LLC

Highland Restoration Capital Partners GP,
LLC

Highland Restoration Capital Partners Master,
L.P.

Highland Restoration Capital Partners
Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Santa Barbara Foundation, Inc.

Highland Select Equity Fund GP, L.P.

Highland Select Equity Fund, L.P.

Highland Select Equity GP, LLC

Highland Select Equity Master Fund, L.P.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 790 of 1598 PageID 13837
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 9 of 18

Highland Small-Cap Equity Fund

Highland Socially Responsible Equity Fund

Highland Socially Responsible Equity Fund
*(fka Highland Premier Growth Equity Fund)*

Highland Special Opportunities Holding
Company

Highland SunBridge GP, LLC

Highland Tax-Exempt Fund

Highland TCI Holding Company, LLC

Highland Total Return Fund

Highland's Roads Land Holding Company,
LLC

Hinduja Bank (Switzerland) Ltd

Hirst, Ltd.

HMCF PB Investors, LLC

HMx2 Investment Trust
(Matt McGraner)

Hockney, Ltd.

HRT North Atlanta, LLC

HRT Timber Creek, LLC

HRTBH North Atlanta, LLC

HRTBH Timber Creek, LLC

Huber Funding LLC

Hunter Mountain Investment Trust

HWS Investors Holdco, LLC

Internal Investors

Intertrust

James D. Dondero
Reese Avry Dondero
Jameson Drue Dondero

James Dondero

James Dondero and Mark Okada

James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Japan Trustee Services Bank, Ltd.

Jasper CLO, Ltd.

Jewelry Ventures I, LLC

JMIJM, LLC

Joanna E. Milne Irrevocable Trust dated Nov
25 1998 (third party)

John Honis

John L. Holt, Jr.

John R. Sears, Jr.

Karisopolis, LLC

Keelhaul LLC

KHM Interests, LLC (third party)

Kuilima Montalban Holdings, LLC

Kuilima Resort Holdco, LLC

KV Cameron Creek Owner, LLC

Lakes at Renaissance Park Apartments
Investors, L.P.

Lakeside Lane, LLC

Landmark Battleground Park II, LLC

Lane Britain

Larry K. Anders

LAT Battleground Park, LLC

LAT Briley Parkway, LLC

Lautner, Ltd.

Leawood RE Holdings, LLC

Liberty Cayman Holdings, Ltd.

Liberty CLO Holdco, Ltd.

Liberty CLO, Ltd.

Liberty Sub, Ltd.

Long Short Equity Sub, LLC

Longhorn Credit Funding LLC

Longhorn Credit Funding LLC - A

Longhorn Credit Funding LLC - B

Longhorn Credit Funding LLC (LHB)

Longhorn Credit Funding, LLC

Lurin Real Estate Holdings V, LLC

Maple Avenue Holdings, LLC

MaplesFS Limited

Marc C. Manzo

Mark and Pam Okada Family Trust - Exempt
Descendants' Trust

Mark and Pam Okada Family Trust - Exempt
Trust #2

Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust

Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust #2

Mark and Pamela Okada Family Trust -
Exempt Trust #2

Mark K. Okada

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 791 of 1598 PageID 13838
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 10 of
18

Mark Okada

Mark Okada and Pam Okada

Mark Okada and Pam Okada, as joint owners

Mark Okada/Pamela Okada

Markham Fine Jewelers, L.P.

Markham Fine Jewelers, LP

Matt McGraner

Meritage Residential Partners, LLC

MGM Studios HoldCo, Ltd.

Michael Rossi

ML CLO XIX Sterling (Cayman), Ltd.

N/A

Nancy Dondero

NCI Apache Trail LLC

NCI Assets Holding Company LLC

NCI Country Club LLC

NCI Fort Worth Land LLC

NCI Front Beach Road LLC

NCI Minerals LLC

NCI Royse City Land LLC

NCI Stewart Creek LLC

NCI Storage, LLC

Neil Labatte

Neutra, Ltd.

New Jersey Tissue Company Holdco, LLC
*(fka Marcal Paper Mills Holding Company, LLC)*

NexAnnuity Holdings, Inc.

NexBank Capital Trust I

NexBank Capital, Inc.

NexBank Land Advisors, Inc.

NexBank Securities Inc.

NexBank Securities, Inc.

NexBank SSB

NexBank Title, Inc.
(dba NexVantage Title Services)

NexBank, SSB

NexPoint Advisors GP, LLC

NexPoint Advisors, L.P.

NexPoint Capital REIT, LLC

NexPoint Capital, Inc.

NexPoint Capital, Inc. *(fka NexPoint Capital, LLC)*

NexPoint CR F/H DST, LLC

NexPoint Credit Strategies Fund

NexPoint Discount Strategies Fund
*(fka NexPoint Discount Yield Fund)*

NexPoint DRIP

NexPoint Energy and Materials Opportunities
Fund *(fka NexPoint Energy Opportunities Fund)*

NexPoint Event-Driven Fund
*(fkaNexPoint Merger Arbitrage Fund)*

NexPoint Flamingo DST

NexPoint Flamingo Investment Co, LLC

NexPoint Flamingo Leaseco, LLC

NexPoint Flamingo Manager, LlC

NexPoint Flamingo Property Manager, LlC

NexPoint Healthcare Opportunities Fund

NexPoint Hospitality Trust

NexPoint Hospitality, Inc.

NexPoint Hospitality, LLC

NexPoint Insurance Distributors, LLC

NexPoint Insurance Solutions GP, LLC

NexPoint Insurance Solutions GP, LLC
*(fka Highland Capital Insurance Solutions GP, LLC)*

NexPoint Insurance Solutions, L.P.
*(fka Highland Capital Insurance Solutions, L.P.)*

NexPoint Latin American Opportunities Fund

NexPoint Legacy 22, LLC

NexPoint Lincoln Porte Equity, LLC

NexPoint Lincoln Porte Manager, LLC

NexPoint Lincoln Porte, LLC
*(fka NREA Lincoln Porte, LLC)*

NexPoint Multifamily Capital Trust, Inc.

NexPoint Multifamily Capital Trust, Inc.
*(fka NexPoint Multifamily Realty Trust, Inc., fka Highland Capital Realty Trust, Inc.)*

NexPoint Multifamily Operating Partnership,
L.P.

NexPoint Peoria, LLC

NexPoint Polo Glen DST

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 31 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 792 of 1598   PageID 13839
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21   Entered 02/01/21 16:22:31   Page 11 of
18

NexPoint Polo Glen Holdings, LLC

NexPoint Polo Glen Investment Co, LLC

NexPoint Polo Glen Leaseco, LLC

NexPoint Polo Glen Manager, LLC

NexPoint RE Finance Advisor GP, LLC

NexPoint RE Finance Advisor, L.P.

NexPoint Real Estate Advisors GP, LLC

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors III, L.P.

NexPoint Real Estate Advisors IV, L.P.

NexPoint Real Estate Advisors V, L.P.

NexPoint Real Estate Advisors VI, L.P.

NexPoint Real Estate Advisors VII GP, LLC

NexPoint Real Estate Advisors VII, L.P.

NexPoint Real Estate Advisors VIII, L.P.

NexPoint Real Estate Advisors, L.P.

NexPoint Real Estate Capital, LLC

NexPoint Real Estate Capital, LLC *(fka
Highland Real Estate Capital, LLC, fka
Highland Multifamily Credit Fund, LLC)*

NexPoint Real Estate Finance OP GP, LLC

NexPoint Real Estate Finance Operating
Partnership, L.P.

NexPoint Real Estate Finance, Inc.

NexPoint Real Estate Opportunities,  LLC

NexPoint Real Estate Opportunities, LLC *(fka
Freedom REIT LLC)*

NexPoint Real Estate Partners, LLC
(fka HCRE Partners, LLC)

NexPoint Real Estate Partners, LLC (fka
HCRE Partners, LLC)

NexPoint Real Estate Strategies Fund

NexPoint Residential Trust Inc.

NexPoint Residential Trust Operating
Partnership GP, LLC

NexPoint Residential Trust Operating
Partnership, L.P.

NexPoint Residential Trust Operating
Partnership, L.P.

NexPoint Residential Trust, Inc.

NexPoint Securities, Inc.
*(fka Highland Capital Funds Distributor, Inc.)*
*(fka Pyxis Distributors, Inc.)*

NexPoint Strategic Income Fund
*(fka NexPoint Opportunistic Credit Fund, fka
NexPoint Distressed Strategies Fund)*

NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund
*(fka NexPoint Credit Strategies Fund)*

NexPoint Texas Multifamily Portfolio DST
*(fka NREA Southeast Portfolio Two, DST)*

NexPoint WLIF I Borrower, LLC

NexPoint WLIF I, LLC

NexPoint WLIF II Borrower, LLC

NexPoint WLIF II, LLC

NexPoint WLIF III Borrower, LLC

NexPoint WLIF III, LLC

NexPoint WLIF, LLC (Series I)

NexPoint WLIF, LLC (Series II)

NexPoint WLIF, LLC (Series III)

NexStrat LLC

NexVest, LLC

NexWash LLC

NFRO REIT Sub, LLC

NFRO TRS, LLC

NHF CCD, Inc.

NHT 2325 Stemmons, LLC

NHT Beaverton TRS, LLC
*(fka NREA Hotel TRS, Inc.)*

NHT Beaverton, LLC

NHT Bend TRS, LLC

NHT Bend, LLC

NHT Destin TRS, LLC

NHT Destin, LLC

NHT DFW Portfolio, LLC

NHT Holdco, LLC

NHT Holdings, LLC

NHT Intermediary, LLC

NHT Nashville TRS, LLC

NHT Nashville, LLC

NHT Olympia TRS, LLC

NHT Olympia, LLC

NHT Operating Partnership GP, LLC

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 793 of 1598 PageID 13840
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 12 of
18

NHT Operating Partnership II, LLC

NHT Operating Partnership, LLC

NHT Salem, LLC

NHT SP Parent, LLC

NHT SP TRS, LLC

NHT SP, LLC

NHT Tigard TRS, LLC

NHT Tigard, LLC

NHT TRS, Inc.

NHT Uptown, LLC

NHT Vancouver TRS, LLC

NHT Vancouver, LLC

NLA Assets LLC

NMRT TRS, Inc.

NREA Adair DST Manager, LLC

NREA Adair Investment Co, LLC

NREA Adair Joint Venture, LLC

NREA Adair Leaseco Manager, LLC

NREA Adair Leaseco, LLC

NREA Adair Property Manager LLC

NREA Adair, DST

NREA Ashley Village Investors, LLC

NREA Cameron Creek Investors, LLC

NREA Cityplace Hue Investors, LLC

NREA Crossing Investors LLC

NREA Crossings Investors, LLC

NREA Crossings Ridgewood Coinvestment,
LLC (*fka NREA Crossings Ridgewood
Investors, LLC*)

NREA DST Holdings, LLC

NREA El Camino Investors, LLC

NREA Estates Inc.

NREA Estates Investment Co, LLC

NREA Estates Leaseco, LLC

NREA Estates Manager, LLC

NREA Estates Property Manager, LLC

NREA Estates, DST

NREA Gardens DST Manager LLC

NREA Gardens DST Manager, LLC

NREA Gardens Investment Co, LLC

NREA Gardens Leaseco Manager, LLC

NREA Gardens Leaseco, LLC

NREA Gardens Property Manager, LLC

NREA Gardens Springing LLC

NREA Gardens Springing Manager, LLC

NREA Gardens, DST

NREA Hidden Lake Investment Co, LLC

NREA Hue Investors, LLC

NREA Keystone Investors, LLC

NREA Meritage Inc.

NREA Meritage Investment Co, LLC

NREA Meritage Leaseco, LLC

NREA Meritage Manager, LLC

NREA Meritage Property Manager, LLC

NREA Meritage, DST

NREA Oaks Investors, LLC

NREA Retreat Investment Co, LLC

NREA Retreat Leaseco, LLC

NREA Retreat Manager, LLC

NREA Retreat Property Manager, LLC

NREA Retreat, DST

NREA SE MF Holdings LLC

NREA SE MF Holdings, LLC

NREA SE MF Investment Co, LLC

NREA SE MF Investment Co, LLC

NREA SE Multifamily LLC

NREA SE Multifamily, LLC

NREA SE One Property Manager, LLC

NREA SE Three Property Manager, LLC

NREA SE Two  Property Manager, LLC

NREA SE1 Andros Isles Leaseco, LLC

NREA SE1 Andros Isles Manager, LLC

NREA SE1 Andros Isles, DST
(Converted from DK Gateway Andros, LLC)

NREA SE1 Arborwalk Leaseco, LLC

NREA SE1 Arborwalk Manager, LLC

NREA SE1 Arborwalk, DST
(Converted from MAR Arborwalk, LLC)

NREA SE1 Towne Crossing Leaseco, LLC

NREA SE1 Towne Crossing Manager, LLC

NREA SE1 Towne Crossing, DST
(Converted from Apartment REIT Towne
Crossing, LP)

NREA SE1 Walker Ranch Leaseco, LLC

NREA SE1 Walker Ranch Manager, LLC

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 794 of 1598 PageID 13841
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 13 of
18

NREA SE1 Walker Ranch, DST
(Converted from SOF Walker Ranch Owner,
L.P.)

NREA SE2 Hidden Lake Leaseco, LLC

NREA SE2 Hidden Lake Manager, LLC

NREA SE2 Hidden Lake, DST

NREA SE2 Hidden Lake, DST
(Converted from SOF Hidden Lake SA Owner,
L.P.)

NREA SE2 Vista Ridge Leaseco, LLC

NREA SE2 Vista Ridge Manager, LLC

NREA SE2 Vista Ridge, DST

NREA SE2 Vista Ridge, DST
(Converted from MAR Vista Ridge, L.P.)

NREA SE2 West Place Leaseco, LLC

NREA SE2 West Place Manager, LLC

NREA SE2 West Place, DST
(Converted from Landmark at West Place,
LLC)

NREA SE3 Arboleda Leaseco, LLC

NREA SE3 Arboleda Manager, LLC

NREA SE3 Arboleda, DST
(Converted from G&E Apartment REIT
Arboleda, LLC)

NREA SE3 Fairways Leaseco, LLC

NREA SE3 Fairways Manager, LLC

NREA SE3 Fairways, DST
(Converted from MAR Fairways, LLC)

NREA SE3 Grand Oasis Leaseco, LLC

NREA SE3 Grand Oasis Manager, LLC

NREA SE3 Grand Oasis, DST
(Converted from Landmark at Grand Oasis,
LP)

NREA Southeast Portfolio One Manager, LLC

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio Three Manager,
LLC

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Two Manager, LLC

NREA Southeast Portfolio Two, DST

NREA Southeast Portfolio Two, LLC

NREA SOV Investors, LLC

NREA Uptown TRS, LLC

NREA VB I LLC

NREA VB II LLC

NREA VB III LLC

NREA VB IV LLC

NREA VB Pledgor I LLC

NREA VB Pledgor I, LLC

NREA VB Pledgor II LLC

NREA VB Pledgor II, LLC

NREA VB Pledgor III LLC

NREA VB Pledgor III, LLC

NREA VB Pledgor IV LLC

NREA VB Pledgor IV, LLC

NREA VB Pledgor V LLC

NREA VB Pledgor V, LLC

NREA VB Pledgor VI LLC

NREA VB Pledgor VI, LLC

NREA VB Pledgor VII LLC

NREA VB Pledgor VII, LLC

NREA VB SM, Inc.

NREA VB V LLC

NREA VB VI LLC

NREA VB VII LLC

NREA Vista Ridge Investment Co, LLC

NREC AR Investors, LLC

NREC BM Investors, LLC

NREC BP Investors, LLC

NREC Latitude Investors, LLC

NREC REIT Sub, Inc.

NREC TRS, Inc.

NREC WW Investors, LLC

NREF OP I Holdco, LLC

NREF OP I SubHoldco, LLC

NREF OP I, L.P.

NREF OP II Holdco, LLC

NREF OP II SubHoldco, LLC

NREF OP II, L.P.

NREF OP IV REIT Sub TRS, LLC

NREF OP IV REIT Sub, LLC

NREF OP IV, L.P.

NREO NW Hospitality Mezz, LLC

NREO NW Hospitality, LLC

NREO Perilune, LLC
NREO SAFStor Investors, LLC
NREO TRS, Inc.
NRESF REIT Sub, LLC
NXRT Abbington, LLC
NXRT Atera II, LLC
NXRT Atera, LLC
NXRT AZ2, LLC
NXRT Barrington Mill, LLC
NXRT Bayberry, LLC
NXRT Bella Solara, LLC
NXRT Bella Vista, LLC
NXRT Bloom, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine LP, LLC
NXRT Brandywine LP, LLC
NXRT Brentwood Owner, LLC
NXRT Brentwood, LLC
NXRT Cedar Pointe Tenant, LLC
NXRT Cedar Pointe, LLC
NXRT Cityview, LLC
NXRT Cornerstone, LLC
NXRT Crestmont, LLC
NXRT Crestmont, LLC
NXRT Enclave, LLC
NXRT Glenview, LLC
NXRT H2 TRS, LLC
NXRT Heritage, LLC
NXRT Hollister TRS LLC
NXRT Hollister, LLC
NXRT LAS 3, LLC
NXRT Master Tenant, LLC
NXRT Nashville Residential, LLC
NXRT Nashville Residential, LLC *(fka
Freedom Nashville Residential, LLC)*
NXRT North Dallas 3, LLC
NXRT Old Farm, LLC
NXRT Pembroke Owner, LLC
NXRT Pembroke, LLC
NXRT PHX 3, LLC

NXRT Radbourne Lake, LLC
NXRT Rockledge, LLC
NXRT Sabal Palms, LLC
NXRT SM, Inc.
NXRT Steeplechase, LLC
NXRT Stone Creek, LLC
NXRT Summers Landing GP, LLC
NXRT Summers Landing LP, LLC
NXRT Torreyana, LLC
NXRT Vanderbilt, LLC
NXRT West Place, LLC
NXRTBH AZ2, LLC
NXRTBH Barrington Mill Owner, LLC
NXRTBH Barrington Mill SM, Inc.
NXRTBH Barrington Mill, LLC
NXRTBH Bayberry, LLC
NXRTBH Cityview, LLC
NXRTBH Colonnade, LLC
NXRTBH Cornerstone Owner, LLC
NXRTBH Cornerstone SM, Inc.
NXRTBH Cornerstone, LLC
NXRTBH Dana Point SM, Inc.
NXRTBH Dana Point, LLC
NXRTBH Foothill SM, Inc.
NXRTBH Foothill, LLC
NXRTBH Heatherstone SM, Inc.
NXRTBH Heatherstone, LLC
NXRTBH Hollister Tenant, LLC
NXRTBH Hollister, LLC
NXRTBH Madera SM, Inc.
NXRTBH Madera, LLC
NXRTBH McMillan, LLC
NXRTBH North Dallas 3, LLC
NXRTBH Old Farm II, LLC
NXRTBH Old Farm Tenant, LLC
NXRTBH Old Farm, LLC
NXRTBH Radbourne Lake, LLC
NXRTBH Rockledge, LLC
NXRTBH Sabal Palms, LLC
NXRTBH Steeplechase, LLC
(dba Southpoint Reserve at Stoney Creek)-VA
NXRTBH Stone Creek, LLC
NXRTBH Vanderbilt, LLC

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 796 of 1598    PageID 13843
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 15 of
18

NXRTBH Versailles SM, Inc.
NXRTBH Versailles, LLC
Oak Holdco, LLC
Oaks CGC, LLC
Okada Family Revocable Trust
Oldenburg, Ltd.
Pam Capital Funding GP Co. Ltd.
Pam Capital Funding, L.P.
PamCo Cayman Ltd.
Park West 1700 Valley View Holdco, LLC
Park West 2021 Valley View Holdco, LLC
Park West Holdco, LLC
Park West Portfolio Holdco, LLC
Participants of Highland 401K Plan
Patrick Willoughby-McCabe
PCMG Trading Partners XXIII, L.P.
PCMG Trading Partners XXIII, LP
PDK Toys Holdco, LLC
Pear Ridge Partners, LLC
Penant Management GP, LLC
Penant Management LP
PensionDanmark Holding A/S
PensionDanmark
Pensionsforsikringsaktieselskab
Peoria Place Development, LLC
(30% cash contributions - profit participation
only)

Perilune Aero Equity Holdings One, LLC
Perilune Aviation LLC
PetroCap Incentive Holdings III. L.P.
PetroCap Incentive Partners II GP, LLC
PetroCap Incentive Partners II, L.P.
PetroCap Incentive Partners III GP, LLC
PetroCap Incentive Partners III, LP
PetroCap Management Company LLC
PetroCap Partners II GP, LLC
PetroCap Partners II, L.P.
PetroCap Partners III GP, LLC
PetroCap Partners III, L.P.
Pharmacy Ventures I, LLC
Pharmacy Ventures II, LLC
Pollack, Ltd.
Powderhorn, LLC

PWM1 Holdings, LLC
PWM1, LLC
RADCO - Bay Meadows, LLLP
RADCO - Bay Park, LLLP
RADCO NREC Bay Meadows Holdings, LLC
RADCO NREC Bay Park Holdings, LLC
Ramarim, LLC
Rand Advisors Series I Insurance Fund
Rand Advisors Series II Insurance Fund
Rand Advisors, LLC
Rand PE Fund I, L.P.
Rand PE Fund I, L.P. - Series 1
Rand PE Fund Management, LLC
Rand PE Holdco, LLC
Realdania
Red River CLO, Ltd.
Red River Investors Corp.
Riverview Partners SC, LLC
Rockwall CDO II Ltd.
Rockwall CDO II, Ltd.
Rockwall CDO, Ltd.
Rockwall Investors Corp.
Rothko, Ltd.
RTT Bella Solara, LLC
RTT Bloom, LLC
RTT Financial, Inc.
RTT Hollister, LLC
RTT Rockledge, LLC
RTT Torreyana, LLC
SALI Fund Partners, LLC
SAS Management
SAS Asset Recovery Ltd.

San Diego County Employees Retirement
Association
Sandstone Pasadena Apartments, LLC
Sandstone Pasadena, LLC
Santa Barbara Foundation (third party)
Saturn Oil & Gas LLC
SBC Master Pension Trust
Scott Matthew Siekielski
SE Battleground Park, LLC
SE Battleground Park, LLC

SE Glenview, LLC

SE Governors Green Holdings, L.L.C.

SE Governors Green Holdings, L.L.C.
*(fka SCG Atlas Governors Green Holdings, L.L.C.)*

SE Governors Green I, LLC

SE Governors Green II, LLC

SE Governors Green II, LLC

SE Governors Green REIT, L.L.C.

SE Governors Green REIT, L.L.C.
*(fka SCG Atlas Governors Green REIT, L.L.C.)*

SE Governors Green, LLC
*(fka SCG Atlas Governors Green, L.L.C.)*

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles LP, LLC

SE Gulfstream Isles LP, LLC

SE Heights at Olde Towne, LLC

SE Heights at Olde Towne, LLC

SE Lakes at Renaissance Park GP I, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park LP, LLC

SE Lakes at Renaissance Park LP, LLC

SE Multifamily Holdings LLC

SE Multifamily Holdings, LLC

SE Multifamily REIT Holdings LLC

SE Myrtles at Olde Towne, LLC

SE Myrtles at Olde Towne, LLC

SE Oak Mill I Holdings, LLC

SE Oak Mill I Holdings, LLC *(fka SCG Atlas Oak Mill I Holdings, L.L.C.)*

SE Oak Mill I Owner, LLC *(fka SCG Atlas Oak Mill I, L.L.C.)*

SE Oak Mill I REIT, LLC

SE Oak Mill I REIT, LLC *(fka SCG Atlas Oak Mill I REIT, L.L.C.)*

SE Oak Mill I, LLC

SE Oak Mill I, LLC

SE Oak Mill II Holdings, LLC

SE Oak Mill II Holdings, LLC *(fka SCG Atlas Oak Mill II Holdings, L.L.C.)*

SE Oak Mill II Owner, LLC *(fka SCG Atlas Oak Mill II, L.L.C.)*

SE Oak Mill II REIT, LLC

SE Oak Mill II REIT, LLC *(fka SCG Atlas Oak Mill II REIT, L.L.C.)*

SE Oak Mill II, LLC

SE Oak Mill II, LLC

SE Quail Landing, LLC

SE River Walk, LLC

SE Riverwalk, LLC

SE SM, Inc.

SE Stoney Ridge Holdings, L.L.C. *(fka SCG Atlas Stoney Ridge Holdings, L.L.C.)*

SE Stoney Ridge Holdings, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge REIT, L.L.C. *(fka SCG Atlas Stoney Ridge REIT, L.L.C.)*

SE Stoney Ridge REIT, LLC

SE Stoney Ridge, LLC *(fka SCG Atlas Stoney Ridge, L.L.C.)*

SE Victoria Park, LLC

SE Victoria Park, LLC

Sentinel Re Holdings, Ltd.

Sentinel Reinsurance Ltd.

Sentinel Reinsurance Limited

SFH1, LLC

SFR WLIF I, LLC
*(fka NexPoint WLIF I, LLC)*

SFR WLIF II, LLC
*(NexPoint WLIF II, LLC)*

SFR WLIF III, LLC
*(NexPoint WLIF III, LLC)*

SFR WLIF Manager, LLC
*(NexPoint WLIF Manager, LLC)*

SFR WLIF, LLC
*(NexPoint WLIF, LLC)*

SFR WLIF, LLC Series I

SFR WLIF, LLC Series II

SFR WLIF, LLC Series III

SH Castle BioSciences, LLC

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 798 of 1598 PageID 13845
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 17 of
18

Small Cap Equity Sub, LLC

Socially Responsible Equity Sub, LLC

SOF Brandywine I Owner, L.P.

SOF Brandywine II Owner, L.P.

SOF-X GS Owner, L.P.

Southfork Cayman Holdings, Ltd.

Southfork CLO, Ltd.

Specialty Financial Products Designated
Activity Company *(fka Specialty Financial
Products Limited)*

Spiritus Life, Inc.

SRL Sponsor LLC

SRL Whisperwod LLC

SRL Whisperwood Member LLC

SRL Whisperwood Venture LLC

SSB Assets LLC

Starck, Ltd.

Stemmons Hospitality, LLC

Steve Shin

Stonebridge Capital, Inc.

Stonebridge-Highland Healthcare Private
Equity Fund

Strand Advisors III, Inc.

Strand Advisors IV, LLC

Strand Advisors IX, LLC

Strand Advisors V, LLC

Strand Advisors XIII, LLC

Strand Advisors XVI, Inc.

Strand Advisors, Inc.

Stratford CLO, Ltd.

Summers Landing Apartment Investors, L.P.

Term Loan B
(10% cash contributions - profit participation
only)

The Dallas Foundation

The Dallas Foundation (third party)

The Dondero Insurance Rabbi Trust

The Dugaboy Investment Trust

The Dugaboy Investment Trust U/T/A Dated
Nov 15, 2010

The Get Good Non-Exempt Trust No. 1

The Get Good Non-Exempt Trust No. 2

The Get Good Trust

The Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust

The Mark and Pamela Okada Family Trust -
Exempt Trust #2

The Ohio State Life Insurance Company

The Okada Family Foundation, Inc.

The Okada Insurance Rabbi Trust

The SLHC Trust

The Trustees of Columbia University in the
City of New York

The Twentysix Investment Trust
(Third Party Investor)

Thomas A. Neville

Thread 55, LLC

Tihany, Ltd.

Todd Travers

Tranquility Lake Apartments Investors, L.P.

Tuscany Acquisition, LLC

Uptown at Cityplace Condominium
Association, Inc.

US Gaming OpCo, LLC

US Gaming SPV, LLC

US Gaming, LLC

Valhalla CLO, Ltd.

VB GP LLC

VB Holding, LLC

VB One, LLC

VB OP Holdings LLC

VBAnnex C GP, LLC

VBAnnex C Ohio, LLC

VBAnnex C, LP

Ventoux Capital, LLC
(Matt Goetz)

VineBrook Annex B, L.P.

VineBrook Annex I, L.P.

VineBrook Homes Merger Sub II LLC

VineBrook Homes Merger Sub LLC

VineBrook Homes OP GP, LLC

VineBrook Homes Operating Partnership, L.P.

VineBrook Homes Trust, Inc.

VineBrook Partners I, L.P.

VineBrook Partners II, L.P.

VineBrook Properties, LLC

Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21   Entered 02/01/21 16:22:31   Page 18 of
18

Virginia Retirement System

Vizcaya Investment, LLC

Wake LV Holdings II, Ltd.

Wake LV Holdings, Ltd.

Walter Holdco GP, LLC

Walter Holdco I, Ltd.

Walter Holdco, L.P.

Warhol, Ltd.

Warren Chang

Westchester CLO, Ltd.

William L. Britain

Wright Ltd.

Wright, Ltd.

Yellow Metal Merchants, Inc.

# **EXHIBIT EE**

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 801 of 1598   PageID 13848
Case 19-34054-sgj11 Doc 1875-4 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 2 of 2

accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)    The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)    The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

3.13    Compensation and Reimbursement; Engagement of Professionals.

(a)    Compensation and Expenses.

(i)    Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary a base salary, (b) a success fee, and (c) severance.

(ii)    Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

19

# **EXHIBIT FF**

Case 19-34054-sgj11  Doc 3445-55  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23    Page 803 of 1598    PageID 13850
49
Case 19-34054-sgj11  Doc 1875-5  Filed 02/01/21    Entered 02/01/21 16:22:31    Page 2 of 9

## Schedule of Contracts and Leases to Be Assumed

1.  Advisory Services Agreement, dated November 21, 2011, effective June 20, 2011, by and between Carey International, Inc., and Highland Capital Management, L.P.

2.  Amended and Restated Advisory Services Agreement, dated March 4, 2013, by and between Trussway Holdings, Inc., and Highland Capital Management, L.P.

3.  Reference Portfolio Management Agreement, dated March 4, 2004, by and between Highland Capital Management, L.P., and Citibank N.A.

4.  Advisory Services Agreement, dated May 25, 2011, by and between CCS Medical, Inc., and Highland Capital Management, L.P.

5.  Amended and Restated Advisory Services Agreement, dated February 28, 2013, by and between Cornerstone Healthcare Group Holding, Inc., and Highland Capital Management, L.P.

6.  Prime Brokerage Agreement by and between Jefferies LLC and Highland Capital Management, L.P., dated May 24, 2013.

7.  Amended and Restated Shared Services Agreement, dated August 21, 2015, by and between Highland Capital Management, L.P., and Falcon E&P Opportunities GP, LLC.

8.  Amended and Restated Administrative Services Agreement, effective as of August 21, 2015, by and between Highland Capital Management, L.P., and Petrocap Partners II GP, LLC.

9.  Office Lease, between Crescent Investors, L.P., and Highland Capital Management, L.P.

10. Paylocity Corporation Services Agreement, between Highland Capital Management, L.P., and Paylocity Corporation, dated November 19, 2012.

11. Electronic Trading Services Agreement, between SunTrust Robinson Humphrey Inc., and Highland Capital Management, L.P., dated February 6, 2019.

12. Letter Agreement, between FTI Consulting, Inc., and Highland Capital Management, L.P., dated November 19, 2018.

13. Administrative Services Agreement, dated January 1, 2018, between Highland Capital Management, L.P., and Liberty Life Assurance Company of Boston.

14. Electronic Communications:  Customer Authorization & Indemnification, between Highland Capital Management, L.P., and The Bank of New York Mellon Corporation, dated August 9, 2016.

15. Letter Agreement, dated August 9, 2016, Electronic Access Terms and Conditions, by and between The Bank of New York Mellon Trust Company, N.A., and Highland Capital Management, L.P.

16. Shared Services Agreement by and between Highland HCF Advisor, Ltd., and Highland Capital Management, L.P., dated effective October 27, 2017.

Case 19-34054-sgj11  Doc 3445-55  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 43 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 804 of 1598  PageID 13851
Case 19-34054-sgj11  Doc 1875-5  Filed 02/01/21  Entered 02/01/21 16:22:31  Page 3 of 9

17.  Sub-Advisory Agreement, by and between Highland HCF Advisors, Ltd., and Highland Capital Management, dated effective October 27, 2017.

18.  Collateral Management Agreement, dated November 2, 2006, by and between Highland Credit Opportunities CDO Ltd. and Highland Capital Management, L.P.

19.  Management Agreement, dated November 15, 2007, between Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Partners Master L.P., Highland Restoration Capital Partners GP, LLC, and Highland Capital Management, L.P.

20.  Investment Management Agreement, between Highland Capital Multi-Strategy Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

21.  Investment Management Agreement, between Highland Capital Multi-Strategy Master Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

22.  Management Agreement, dated August 22, 2007, between and among Highland Capital Management, L.P., and Walkers Fund Services Limited, as trustee of Highland Credit Opportunities Japanese Unit Trust.

23.  Third Amended and Restated Investment Management Agreement, by and among Highland Multi Strategy Credit Fund, Ltd., Highland Multi Strategy Credit Fund, L.P., and Highland Capital Management, L.P., dated November 1, 2013.

24.  Investment Management Agreement, dated March 31, 2015, by and among Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., and Highland Capital Management, L.P.

25.  Amended and Restated Investment Management Agreement, dated February 27, 2017, by and among Highland Prometheus Master Fund L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland SunBridge GP, LLC, and Highland Capital Management, L.P.

26.  Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

27.  Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

28.  Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

29.  Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

30.  Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

31.  Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

32.  Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 805 of 1598 PageID 13852
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 4 of 9

33. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

34. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

35. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

36. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

37. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

38. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

39. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

40. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

41. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

42. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

43. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

44. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

45. AT&T Managed Internet Service, between Highland Capital Management, L.P. and AT&T Corp., dated February 24, 2015.

46. ViaWest, Master Service Agreement, dated October 3, 2011, between Highland Capital Management, L.P. and ViaWest

47. Stockholders' Agreement, dated April 15, 2005, by and between American Banknote Corporation and Highland Capital Management, L.P.

48. Stockholders' Agreement and Amendment No. 1, dated January 25, 2011, by and between Carey Holdings, Inc. and Highland Capital Management, L.P.

49. Stockholders' Agreement and Amendment, dated March 24, 2010, by and between Cornerstone Healthcare Group Holding, Inc. and Highland Capital Management, L.P.

50. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

51. Stock Purchase and Sale Agreement and Amendment, dated January 16, 2013, by and between Progenics Pharmaceuticals, Inc. and Highland Capital Management, L.P.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 806 of 1598 PageID 13853
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 5 of 9

52.     Stockholders' Agreement and Amendments, dated October 24, 2008, by and between JHT Holdings, Inc. and Highland Capital Management, L.P.

53.     Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., dated February 25, 2013, by and between Highland Dynamic Income Fund GP, LLC and Highland Capital Management, L.P.

54.     Highland Multi-Strategy Fund, L.P. Limited Partnership Agreement, dated July 6, 2006, by and between Highland Multi-Strategy Fund GP, L.P. and Highland Capital Management, L.P.

55.     Operating Agreement of HE Capital, LLC (as amended), dated September 27, 2007, by and between ENA Capital, LLC Ellman Management Group, Inc. and Highland Capital Management, L.P.

56.     Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund II, LLC, dated February 27, 2007, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

57.     Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund, LLC, dated July 19, 2006, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

58.     Highland Capital Management, L.P., Limited Liability Company Agreement of Highland Receivables Finance 1, LLC, by and between Highland Capital Management, L.P. and Highland Capital Management, L.P.

59.     Agreement of Limited Partnership of Highland Restoration Capital Partners, L.P. and Amendments, dated November 6, 2007, by and between Highland Restoration Capital Partners GP, LLC and Highland Capital Management, L.P.

60.     Agreement of Limited Partnership of Highland Select Equity Fund GP, L.P., dated October 2005, by and between Highland Select Equity Fund GP, LLC and Highland Capital Management, L.P.

61.     Agreement of Limited Partnership of Penant Management LP, dated December 12, 2012, by and between Penant Management GP, LLC and Highland Capital Management, L.P.

62.     Agreement of Limited Partnership of Petrocap Incentive Partners III, LP, dated April 12, 2018, by and between Petrocap Incentive Partners III GP, LLC, Petrocap Incentive Holdings III, LP and Highland Capital Management, L.P.

63.     Amended and Restated Agreement of Limited Partnership of Petrocap Partners II, LP, dated October 30, 2014, by and between Petrocap Partners II GP, LLC, Petrocap Incentive Partners II, LP and Highland Capital Management, L.P.

64.     Agreement of Limited Partnership of Highland Credit Opportunities CDO GP, L.P., dated December 29, 2005, by and between Highland Credit Opportunities CDO GP, LLC and Highland Capital Management, L.P.

65.     Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P., dated November 1, 2014, by and between Highland Multi Strategy Credit Fund GP, L.P. and Highland Capital Management, L.P.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 807 of 1598 PageID 13854
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 6 of 9

66. DUO Security, 2 factor authentication, by and between DUO Security and Highland Capital Management, L.P.

67. GoDaddy Domain Registrations, by and between GoDaddy and Highland Capital Management, L.P.

68. Highland Loan Fund, Ltd. et al, Investment Management Agreement, dated July 31, 2001, by and between Highland Loan Fund, Ltd. et al and Highland Capital Management, L.P.

69. E Mailflow Monitoring, by and between Mxtoolbox and Highland Capital Management, L.P.

70. Cloud single sign on for HR related employee login, by and between Onelogin and Highland Capital Management, L.P.

71. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

72. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

73. Order Addenda, dated January 28, 2020, by and between CenturyLink Communications, LLC and Highland Capital Management, L.P.

74. Service Agreement (as amended), dated April 1, 2005, by and between Intex Solutions, Inc. and Highland Capital Management, L.P.

75. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

76. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

77. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

78. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

79. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

80. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

81. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

82. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 808 of 1598   PageID 13855
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 7 of 9

83.   Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

84.   Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

85.   Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

86.   Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

87.   Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

88.   Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

89.   Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

90.   Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

91.   Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

92.   Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

93.   Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

94.   Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

95.   Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

96.   Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

97.   Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 809 of 1598 PageID 13856
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 8 of 9

98.  A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

99.  A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

100.  Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

101.  Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

102.  Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

103.  Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

104.  Securities Account Control Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Highland CDO Opportunity Fund, Ltd.; JPMorgan Chase Bank, National Association

105.  Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

106.  Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

107.  Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

108.  Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

109.  Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

110.  Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

111.  Extension/Buy-Out Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Citigroup Financial Products Inc.; Citigroup Global Markets Inc.

112.  Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

113.  Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

114.  Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

APPX. 07799

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 49 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 810 of 1598    PageID 13857
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 9 of 9

115. Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery

116. Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel

117. Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms

118. Colocation Service Order dated October 14, 2019 between Highland Capital Management and Dawn US Holdings, LLC d/b/a Evoque Date Center Solutions

119. Tradesuite Web Module Services/Agreement between Highland Capital Management and DTCC ITP LLC

120. Bloomberg (Terminal) Agreement No. 306371 between Highland Capital Management and Bloomberg Finance, L.P.[1]

121. Master Service Agreement between Highland Capital Management and Via West

122. Amendment to Bloomberg Order Management System Addendum and Bloomberg Order Management System Schedule of Services Account No. 167969 between Highland Capital Management and Bloomberg Finance, L.P.

123. Fourth Amendment to Software License and Services Agreement between Highland Capital Management and Markit WSO Corporation

124. Master Services Agreement, First Amendment to Master Services Agreement, Second Amendment and Restatement of Master Services Agreement between Highland Capital Management and Siepe Services, LLC

125. Internet Agreement Account No. 831-000-7888-651 between Highland Capital Management and AT&T

126. Landline Fax Agreement Account No. 831-000-2532-176 between Highland Capital Management and AT&T

127. Amazon Web Services Account No. 353534426569 between Highland Capital Management and Amazon Web Service, Inc.

128. Website Hosting Agreement   Account No. 325667 between Highland Capital Management and WP Engine

---

[1] The Debtor is currently in discussions with Bloomberg regarding the assumption of this agreement.

# EXHIBIT 56

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 9
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 812 of 1598 PageID 13859
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 1 of 8

Docket #1661 Date Filed: 01/05/2021

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Joshua N. Eppich
State Bar I.D. No. 24050567
J. Robertson Clarke
State Bar I.D. No. 24108098
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054** |
| **L.P.,** | § | |
| | § | |
| **Debtor.** | § | **Chapter 11** |

## JAMES DONDERO'S OBJECTION TO FIFTH AMENDED PLAN OF
## REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

James Dondero ("Respondent"), a creditor, indirect equity security holder, and party in interest in the above-captioned bankruptcy case, hereby files this objection (the "Objection") to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan").[1] In support thereof, Respondent respectfully represents as follows:

### PRELIMINARY STATEMENT

1. On October 16, 2019, Highland Capital Management, L.P. ("Highland" or the "Debtor") initiated a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware. The Chapter 11 Case was subsequently transferred to this Court. The case was

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

1934054210105000000000007

App. 0302

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 9
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 813 of 1598    PageID 13860
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 2 of 8

commenced with the expectation that Highland would emerge from Chapter 11 as a going concern. However, during the case and leading up to the confirmation hearing on the Plan, Highland's assets have been liquidated at below value prices. Under the Plan, Highland's assets will continue to be liquidated for less than optimal prices, with a view to ultimately terminating Highland's existence.

2.      Confirmation of the Plan should be denied due to numerous deficiencies and improprieties. The problems with the Plan as drafted include, but are not limited to, exculpation and injunction provisions that extend far beyond permissible limits, a lack of transparency following confirmation, inappropriate post-confirmation jurisdictional terms, and the wrongfully obtained votes of certain affiliates of HarbourVest Partners, LLC (collectively, "HarbourVest"). The Plan severs Respondent's rights and fails to comply with the Bankruptcy Code and applicable case law. Therefore, confirmation of the Plan should be denied.

## OBJECTION

### I.      Both the Exculpation and Injunction Sections Violate Fifth Circuit Precedent.

3.      The proposed exculpatory and injunction provisions are simply impermissible. Both contravene established case law in the Fifth Circuit regarding the proper boundaries of such provisions and merit denial of Plan confirmation.

4.      First, Article IX.D proposes to exculpate each and every "Exculpated Party" for all post-petition liability relating to the Debtor's bankruptcy case. The term "Exculpated Party" includes not just the Debtor but also, among others, the Debtor's Employees, the Independent Directors, the CEO/CRO, and the Related Persons of such parties. These exculpations in favor of the Exculpated Parties are prohibited under Fifth Circuit precedent. *See, e.g., In re Pacific Lumber, Co.*, 584 F.3d 229 (5th Cir. 2009); *Dropbox Inc. v. Thru Inc.*, Case No. 17-1958-G, 2018 U.S. Dist.

---

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 9
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 814 of 1598    PageID 13861
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 3 of 8

LEXIS 179769 * 66-68 (N.D. Tex. Oct. 19, 2018) (finding that the scope of an exculpation clause provided insulation to nondebtor third parties in contravention of Fifth Circuit law).

5.      In *Pacific Lumber*, the Fifth Circuit made clear that section 524(e) prohibits the exoneration of nondebtors such as a debtor's management and professionals, but excluding official committees and their members acting within the scope of their official duties, from negligence during the course of their participation in the bankruptcy. The Fifth Circuit in *Pacific Lumber* stated: "[T]he essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Pacific Lumber*, 584 F.2d at 252. Despite these clear limits, the exculpation provisions in the Plan go far beyond what is permissible through the Bankruptcy Code's intended "fresh start" to encompass virtually all acts or omissions taken in connection with the Debtor's bankruptcy case by a wide range of parties, thus effectively exculpating an unknown number of individuals.

6.      Second, Article IX.F creates a channeling injunction with respect to certain "Protected Parties." The injunction requires Bankruptcy Court approval to pursue any claims related to the Debtor brought by any entity, including claims arising from a Protected Party's post-confirmation conduct. Much like the overbroad definition of "Exculpated Parties", the definition for "Protected Parties" includes a wide swath of individuals and entities beyond simply the Debtor. As a result, the channeling injunction would bring into the Bankruptcy Court all claims against such Exculpated Parties by any party who happens to have a claim or interest in the Debtor. The proposed injunction is effectively a non-consensual third-party release, which is expressly prohibited. *See Dropbox*, 2018 U.S. Dist. LEXIS 179769 * at 65 (disallowing similar injunction). Moreover, the Fifth Circuit has held that a permanent injunction cannot be justified under the broad

---

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 9
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 815 of 1598    PageID 13862
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 4 of 8

equity powers of Bankruptcy Code section 105 "if it effectively discharges a nondebtor." *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746, 760 (5th Cir. 1995) (overturning permanent injunction effectively discharging a nondebtor because such an injunction violates section 524 of the Bankruptcy Code, which was designed only to discharge the debtor, not nondebtor parties).

7.      Furthermore, the channeling injunction in Article IX.F limits the jurisdiction to hear claims against Protected Parties to only the Bankruptcy Court. In doing so, the Plan would improperly disregard parties' rights to bring claims even in courts with exclusive jurisdiction and would ignore those courts with specialized jurisdiction to hear certain types of cases. Respondent therefore objects to isolating (and potentially even providing) jurisdiction of any and all claims against Protected Parties in the Bankruptcy Court through this channeling injunction.

8.      In addition, the proposed injunction in Article IX.F is impermissibly vague and broad and, as noted, applies to post-confirmation conduct and claims.

9.      FED. R. BANKR. P. 3016(c) requires that, "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." The Debtor fails to provide such "specific and conspicuous language" about the proposed injunction here. The Plan instead issues a blanket prohibition on entities from:

> (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the

---

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 9
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 816 of 1598 PageID 13863
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 5 of 8

> Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, . . . ; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Plan at IX.F. Much like the overbroad exculpation and channeling injunction provisions, this vague and potentially limitless injunction is improper. As a result, the Plan should not be confirmed.

## II.     The Plan Fails to Meet Section 1129(a)(7) due to Lack of Appropriate Sale Procedures for Post-Confirmation Operations.

10.     The Plan envisions the liquidation of the Debtor's assets by the Reorganized Debtor and the Claimant Trust. This wind down, however, is subject to no oversight or predetermined procedures to ensure that the process is both value-maximizing and transparent. This is critically important because, during the course of the Debtor's bankruptcy case, Respondent would allege on information and belief that the Debtor has sold a number of assets of significant value outside the ordinary course of the Debtor's business as it was conducted prepetition without notice to parties in interest or a complete marketing plan.

11.     The proposed Plan's lack of appropriate marketing and the resulting dampening of competitive bidding requirements for the Reorganized Debtor's assets indicates that the Debtor's creditors and equity holders could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sales procedures are governed by the Bankruptcy Court to ensure maximization of value through auction or other market-testing means. As it is, for the Debtor to meet its burden to establish all elements of 11 U.S.C. § 1129, specifically including the best interest test of section 1129(a)(7), the Debtor must detail why the proposed liquidation process will test the market as fully as would be the case in Chapter 7.

12.     Moreover, Respondent believes that notice and an opportunity for other potential bidders to come forward will not only provide transparency to the process but also will result in

---

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 817 of 1598   PageID 13864
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 6 of 8

competitive bidding, increasing the value received by the beneficiaries of the Debtor's liquidation.

An asset sale without transparency, on the other hand, will presumptively be done without

comprehensive market exposure. Courts have long recognized the need for competitive bidding

when approving sales. *In re Muscongus Bay Company,* 597 F.2d 11 (1st Cir. 1979); *In re Alves,* 52

B.R. 353 (Bankr. D. R.I. 1985); *In re Dartmouth Audio Inc.,* 42 B.R. 871, 874 (Bankr. D. N.H.

1984). Competitive bidding yields higher offers and thus benefits the estate. The objective is "to

maximize the bidding, not to restrict it." *In re The Ohio Corrugating Company,* 59 B.R. 11, 13

(Bankr. N.D. Ohio 1985) (quoting *In re Beck Industries Inc.,* 605 F.2d 624, 637 (2d Cir. 1979)).

Additionally, because the Plan states that equity will receive some recovery under the Plan—

Article III.F states that there are no Classes deemed to reject the Plan or being excluded from

recovery—equity holders as well as all creditors should receive, *inter alia*, notice and an

opportunity to be heard on all significant liquidations and other transactions performed by the

Reorganized Debtor.

### III.    <u>Post-Confirmation Jurisdiction under the Plan is Improper.</u>

13.    The various jurisdictional provisions of the Plan are overbroad and mandate that

the Bankruptcy Court hear any matter involving the Debtor or its operations post-Effective Date.

First, as noted above, the injunction with respect to "Protected Parties" requires that "the

Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of

the Bankruptcy Court to commence or pursue has been granted." Plan at Art. IX.F. There is no

legal basis for barring recourse to other courts with exclusive jurisdiction—possibly providing the

Bankruptcy Court with jurisdiction it does not legally have, especially post-confirmation. *See, e.g.,*

*Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390

(5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and

---

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 818 of 1598   PageID 13865
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 7 of 8

thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan."). Second, the Bankruptcy Court's jurisdiction should not encompass claims and causes of action arising from the Reorganized Debtor's post-confirmation operations.

### IV.    The Subordination Provisions are Improper.

14.    The elimination of vacant Classes pursuant to Article IV.I would potentially eliminate certain Classes on the Effective Date and any recovery for such Classes, including Class 9 for Subordinated Claims (assuming the HarbourVest claim in Class 9 is disallowed), despite the later re-allocation of claims into such eliminated Classes.

15.    The Plan contemplates subordination of Claims and Equity Interests yet provides no mechanism, hearing requirement, or deadlines for such subordination. Instead, the Debtor reserves in Article III.J the right to subordinate any Claim and the Claimant's resulting Plan treatment apparently without hearing.

### V.    Any Acceptance of the Plan by HarbourVest Should be Disallowed.

16.    HarbourVest agreed to accept the Plan pursuant to the settlement with the Debtor submitted to the Court pursuant to FED. R. BANK. P. 9019. If that settlement is approved by the Court, HarbourVest will have, under the Plan, a Class 8 claim of $45 million and a Class 9 claim of $35 million. Respondent would allege on information and belief that the Debtor's CEO/CRO has stated on multiple occasions that HarbourVest has no valid claim against the Debtor and that its dispute with the Debtor could be settled for $5 million or less.

17.    By including in the settlement agreement the requirement that HarbourVest vote both its Class 8 and Class 9 claim to accept the Plan, the settlement agreement, on its face, reflects the exchange of HarbourVest's acceptance of the Plan for the vastly inflated claims agreed to by

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of 9
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 819 of 1598    PageID 13866
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 8 of 8

the Debtor. In other words, the Debtor *purchased* HarbourVest's acceptance. This constitutes a violation of Bankruptcy Code section 1129(a)(3) in that HarbourVest's acceptance and the payment for it were not in good faith.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that the Bankruptcy Court enter an order (i) denying confirmation of the Plan, and (ii) granting Respondent such other and further relief to which he may be justly entitled.

Dated: January 5, 2021                          Respectfully submitted,

                                                */s/ D. Michael Lynn*
                                                D. Michael Lynn
                                                State Bar I.D. No. 12736500
                                                John Y. Bonds, III
                                                State Bar I.D. No. 02589100
                                                Joshua N. Eppich
                                                State Bar I.D. No. 24050567
                                                J. Robertson Clarke
                                                State Bar I.D. No. 24108098
                                                BONDS ELLIS EPPICH SCHAFER JONES LLP
                                                420 Throckmorton Street, Suite 1000
                                                Fort Worth, Texas 76102
                                                (817) 405-6900 telephone
                                                (817) 405-6902 facsimile
                                                Email: michael.lynn@bondsellis.com
                                                Email: john@bondsellis.com
                                                Email: joshua@bondsellis.com
                                                Email: robbie.clarke@bondsellis.com

                                                **ATTORNEYS FOR JAMES DONDERO**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 5, 2021, a true and correct copy of the foregoing document was served via the Bankruptcy Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

                                                */s/ J. Robertson Clarke*
                                                J. Robertson Clarke

---

APPX. 10909

# EXHIBIT 57

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 821 of 1598   PageID 13868
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21   Entered 01/05/21 15:34:33   Page 1 of 7

Docket #1662  Date Filed: 01/05/2021

Laurie A. Spindler
Linebarger Goggan Blair & Sampson, LLP
2777 N Stemmons Fwy, Suite 1000
Dallas, Texas 75207
(214) 880-0089 Telephone
(469) 221-5003 Facsimile
Attorneys for Dallas County,
City of Allen, Allen ISD, City
of Richardson and Kaufman
County

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054-SGJ** |
| **LP,** | § | |
| Debtor. | § | |

### OBJECTION OF DALLAS COUNTY, CITY OF ALLEN, ALLEN ISD,
### CITY OF RICHARDSON AND KAUFMAN COUNTY TO CONFIRMATION OF
### THE FIFTH AMENDED PLAN OF REORGANIZATION OF
### HIGHLAND CAPITAL MANAGEMENT, L.P.

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Come now Dallas County, City of Allen, Allen ISD, City of Richardson and Kaufman

County (collectively, the "Tax Authorities"), creditors and parties-in-interest, and file this, their

objection to confirmation of the Fifth Amended Plan of Reorganization of Highland Capital

Management, L.P. (the "Plan") and would respectfully show the Court as follows:

#### Background

1.      Dallas County, City of Allen, Allen ISD and the City of Richardson, duly

organized governmental units of the State of Texas, are the holders of secured claims against the

Debtor for unpaid ad valorem business personal property taxes for tax year 2019 in the aggregate

amount of $65,181.49.

2.      The Tax Authorities are the holders of administrative expense claims against the

1934054210105000000000008

**APPX. 07819**

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 822 of 1598   PageID 13869
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21    Entered 01/05/21 15:34:33    Page 2 of 7

Debtor for year 2020 and estimated 2021 ad valorem real and business personal property taxes.

3.    The prepetition claims and the administrative expense claims are secured by unavoidable, first priority, perfected liens on all property of the Debtor's estate pursuant to sections 32.01 and 32.05 of the Texas Property Tax Code and 11 U.S.C. Section 362(b)(18).  *In re Winn's Stores, Inc.*, 177 B.R. 253 (Bankr. W.D. Tex. 1995); *Central Appraisal District of Taylor County v. Dixie-Rose Jewels, Inc.*, 894 S.W.2d 841 (Tex. App.-Eastland 1995).  These liens are *in solido* and attach on January 1 of each year to all business personal property of the property owner and to property subsequently acquired.  *In re Universal Seismic Associates, Inc.*, 288 F.3d 205 (5th Cir. 2002); *City of Dallas v. Cornerstone Bank, N.A.*, 879 S.W.2d 264 (Tex. App.-Dallas 1994).

4.    Texas Tax Code Section 32.01 provides:

(a)    On January 1 of each year, a tax lien attaches to property to secure the payment of all taxes, penalties, and interest ultimately imposed for the year on the property, whether or not the taxes are imposed in the year the lien attaches.  The lien exists in favor of each taxing unit having power to tax the property.

(b)    A tax lien on inventory, furniture, equipment, or other personal property is a lien in solido and attaches to all inventory, furniture, equipment, and other personal property that the property owner owns on January 1 of the year the lien attaches or that the property owner subsequently acquires.

…

(d)    The lien under this section is perfected on attachment and … perfection requires no further action by the taxing unit.

Tex. Tax Code § 32.01.  Texas Tax Code Section 32.05(b) provides:

(b)    . . . a tax lien provided by this chapter takes priority over the claim of any creditor of a person whose property is encumbered by the lien and over the claim of any holder of a lien on property encumbered by the tax lien, whether or not the debt or lien existed before attachment of the tax lien.

Tex. Tax Code § 32.05(b).

## Objection to Confirmation

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 823 of 1598   PageID 13870
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21   Entered 01/05/21 15:34:33   Page 3 of 7

The Tax Authorities object to confirmation of the plan for numerous reasons.

5.      The Tax Authorities object to confirmation of the Plan because it defines the "Disputed Claims Reserve Amount" as the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions . . . are made to the Holders of Allowed Claims."  (Plan, Art. I. Sec. B. 50 at 7).  The Tax Authorities object to the failure to pay all postpetition and posteffective date interest that they are entitled to receive on their prepetition claims pursuant to 11 U.S.C. Sections 506(b), 511 and 1129 as well as all penalties and interest that may accrue on their administrative expense claims, which are fully collectible, if the administrative claims are not paid before the state law delinquency date.

6.      The Tax Authorities object to confirmation of the Plan because it fails to provide for payment of postpetition ad valorem property taxes in the ordinary course of business prior to the state law delinquency date.

7.      The Tax Authorities object to confirmation of the Plan because it fails to provide that they shall receive all penalties and interest that accrue on postpetition ad valorem property taxes if the taxes are not paid prior to the state law delinquency date.

8.      The Tax Authorities object to confirmation of the Plan because it violates the provisions of 11 U.S.C. Section 503(b)(1)(D) which very specifically states that a governmental unit is not required to file a request for payment of an administrative expense as a condition of allowance.

9.      The Tax Authorities object to confirmation of the Plan because it fails to specifically provide for the retention of the liens that secure postpetition ad valorem property taxes plus all penalties and interest that may accrue.

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 824 of 1598 PageID 13871
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21 Entered 01/05/21 15:34:33 Page 4 of 7

10. The Tax Authorities object to confirmation of the plan because it fails to provide for the retention of the liens that secure the prepetition claims until they receive payment in full of their claims in violation of 11 U.S.C. Section 1129.

11. The Tax Authorities object to confirmation of the Plan because it provides that all Reorganized Debtor Assets[1] will vest in the Reorganized Debtor free and clear of all liens except those that are specifically preserved in the plan. (Plan, Art. IV. Sec. C.5 at 33.)

12. The Tax Authorities object to confirmation of the Plan because it fails to specifically provide for the payment of postpetition preeffective date interest at the state statutory rate of 1% per month, which the Tax Authorities are entitled to pursuant to 11 U.S.C. Sections 506(b) and 511.

13. The Tax Authorities object to confirmation of the Plan because it fails to specifically provide for the payment of posteffective date interest at the state statutory rate of 12% per annum, which the Tax Authorities are entitled to pursuant to 11 U.S.C. Sections 511 and 1129.

14. The Tax Authorities object to confirmation of the Plan because it provides that except as otherwise provided in the Plan the Holders of Claims shall not be entitled to interest in violation of 11 U.S.C. Sections 506(b), 511 and 1129. (Plan, Art. VI, Sec. A. at 39.) The Tax Authorities also object to this provision because it could result in the nonpayment of penalties and interest that accrues on postpetition taxes, which are fully secured and collectible. *See U.S. v. Noland*, 571 U.S. 535 (1996).

15. The Tax Authorities object to confirmation because the Plan provides that distributions to disputed claims that become allowed claims shall be made in the amount that the

---

[1] All capitalized terms that are not defined herein shall have the same meaning as provided in the Plan.

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 825 of 1598 PageID 13872
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21 Entered 01/05/21 15:34:33 Page 5 of 7

holder would have received if it been an allowed claim on the Effective Date. (Plan, Art. VI. Sec.

E. at 40.)  This provision violates 11 U.S.C. Sections 506(b), 511 and 1129.  The Tax Authorities

also object to this provision because it could result in the nonpayment of penalties and interest

that accrues on postpetition taxes, which are fully secured and collectible.  *See U.S. v. Noland*,

571 U.S. 535 (1996).

16.     The Tax Authorities object to confirmation of the Plan because it does not provide

that failure to timely pay postpetition taxes is an event of default under the Plan and because the

Plan does not provide a remedy in the event of such a default.  The Plan should be amended to

provide that in the event of default the Tax Authorities shall send written notice of the default to

counsel for the Debtor/Reorganized Debtor via electronic mail, the Debtor/Reorganized Debtor

will have 10 days from the date of the notice to cure its default and if the default is not cured, the

Tax Authorities shall be entitled to pursue all state law remedies available to them without the

need for recourse to the Bankruptcy Court.  The Plan should further provide that the Tax

Authorities are only required to give the Debtor/Reorganized Debtor two notices of default and if

the Debtor defaults a third time, the Tax Authorities will be entitled to pursue collection of all

amounts owed pursuant to state law outside the Bankruptcy Court without further notice to the

Debtor.  An event of default shall include the Debtor's failure to make a payment to one or both

of the Tax Authorities under the plan and the Debtor's failure to pay post-petition ad valorem

taxes prior to the state law delinquency date.ih38SW!615.00

17.     The Tax Authorities object to the definition of "Other Unsecured Claim," which

the Plan defines as "any Secured Claim other than the Jeffries Secured Claim and the Frontier

Secured Claim."   (Plan Art. I, Sec. B. 88 at 17.)  Defining a secured claim as an "Other

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 826 of 1598 PageID 13873
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21 Entered 01/05/21 15:34:33 Page 6 of 7

Unsecured Claim" is not sufficient to reclassify a secured claim or to avoid a creditor's lien or security interest.

Based on the foregoing, the Tax Authorities request that the Court enter an order denying confirmation of the Debtor's plan.

WHEREFORE, PREMISES CONSIDERED, the Tax Authorities request that the Court enter an order denying confirmation of the Debtor's Fifth Amended Plan of Reorganization.

Dated: January 5, 2021.

Respectfully submitted,

Linebarger Goggan Blair & Sampson, LLP
2777 N Stemmons Fwy, Suite 1000
Dallas, TX 75207
Ph. No. (214) 880-0089
Dir. No. (469) 221-5125
Fax No. (469) 221-5003
dallas.bankruptcy@publicans.com

By:     /s/Laurie A. Spindler_____
        Laurie A. Spindler SBN 24028720
        Laurie.Spindler@lgbs.com

        ATTORNEYS FOR DALLAS COUNTY,
        CITY OF ALLEN, ALLEN ISD, CITY OF
        RICHARDSON AND KAUFMAN
        COUNTY

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 8
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 827 of 1598    PageID 13874
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21    Entered 01/05/21 15:34:33    Page 7 of 7

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 5, 2021, a true and correct copy of the foregoing was served electronically through the Court's electronic case filing system or *via* electronic mail upon: Jeffrey N. Pomerantz, email: jpomerantz@pszjlaw.com ; Ira D. Kharasch, email: jkharasch@pszjlaw.com; Gregory V. Demo, email: gdemopszjlaw.com; Melissa S. Hayward, email: mhayward@haywardfirm.com; Zachery Z. Annable, email: zannable@haywardfirm.com; Matthew A. Clemente, email: mclemente@sidley.com; Alyssa Russell, email: alyssa.russell@sidley.com and Lisa L . Lambert, email: Lisa.L.Lambert@usdoj.gov.

/s/Laurie A. Spindler_____
Laurie A. Spindler

# EXHIBIT 58

Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 6
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 829 of 1598 PageID 13876
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21 Entered 01/05/21 16:14:15 Page 1 of 5

Docket #1666  Date Filed: 01/05/2021

Daniel P. Winikka (TX 00794873)
**LOEWINSOHN FLEGLE DEARY SIMON LLP**
12377 Merit Drive, Suite 900
Dallas, TX 75251
Telephone: (214) 572-1700
Facsimile: (214) 572-1717
danw@lfdslaw.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE :** | § | **CHAPTER 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** [1] | § | **CASE NO. 19-34054-SGJ** |
| | § | |
| | § | |
| **Debtors.** | § | |

## LIMITED OBJECTION OF JACK YANG AND BRAD BORUD TO FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

Jack Yang ("Yang") and Brad Borud ("Borud"), by and through undersigned counsel, file

this limited objection to the Fifth Amended Plan of Reorganization of Highland Capital

Management, L.P. pursuant to Chapter 11 of the Bankruptcy Code [ECF No. 1472] (the "Plan")

and, in support hereof, respectfully represent as follows:

### Limited Objection

Borud and Yang are former employees and limited partners of the Debtor. They both

timely filed proofs of claim for contingent and unliquidated amounts in respect of, among other

things, the Debtor's obligation to make them whole on certain compensation promised to them

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1



Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 6
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 830 of 1598 PageID 13877
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21 Entered 01/05/21 16:14:15 Page 2 of 5

for their performance in 2008. In particular, as a form of compensation for their performance, the Debtor promised to make them whole if certain tax refunds they received turned out to be less than what was estimated at the time. This is an obligation in respect of compensation they were awarded and promised for their efforts as employees in 2008. The IRS subsequently challenged the Debtor's 2008 tax elections and that audit/dispute is still ongoing. Accordingly, Borud and Yang's claims in respect of this promised compensation if their tax refunds turn out to be less than the estimate remain unliquidated and contingent.

The Debtor has indicated that it believes the claims of Borud and Yang should be "Subordinated Claims" under the Plan and therefore constitute Class 9 claims to the extent such claims are ultimately liquidated and allowed. Borud and Yang disagree that there is any basis to subordinate their claims under section 510 of the Bankruptcy Code. Whether their claims could be subordinated under section 510 of the Bankruptcy Code, however, is not an issue that needs to be addressed at this time and can and should be addressed when and if the Debtor objects to those claims and seeks to have such claims subordinated.

Borud and Yang are concerned, however, that the Plan attempts to achieve a subordination of their claims beyond what would be permissible under section 510 of the Bankruptcy Code. Specifically, "Subordinated Claim" under the Plan is defined as not only a claim that is determined to be subordinated under section 510 of the Bankruptcy Code but also any claim that "arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest." This language goes beyond the language of section 510(b) of the Bankruptcy Code, which is limited to claims "arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement of contribution allowed under section 502 on

APPX. 10320

Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 6
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 831 of 1598   PageID 13878
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21   Entered 01/05/21 16:14:15   Page 3 of 5

account of such a claim." Indeed, this language is potentially so broad as to encompass any claims of any person that was or is a limited partner, no matter what the nature of the claim is, including claims solely in respect of compensation owed to such person for their services as an employee.

The Debtor should not be permitted to achieve subordination beyond the bounds of section 510 of the Bankruptcy Code.

For all the foregoing reasons, Yang and Borud request that the Court (a) either require that the Plan be clarified to provide that claims in Class 9 are limited to claims that are subordinated under section 510 of the Bankruptcy Code or deny confirmation of the Plan and (b) grant them such other and further relief as is appropriate.

DATED:  January 5, 2021                    Respectfully submitted,

                                           /s/ Daniel P. Winikka
                                           Daniel P. Winikka (TX 00794873)
                                           **LOEWINSOHN FLEGLE DEARY
                                           SIMON LLP**
                                           12377 Merit Drive, Suite 900
                                           Dallas, TX 75251
                                           Telephone:  (214) 572-1700
                                           Facsimile:  (214) 572-1717
                                           danw@lfdslaw.com

                                           **COUNSEL FOR JACK YANG
                                           AND BRAD BORUD**

APPX. 07329

Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 6
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 832 of 1598    PageID 13879
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21    Entered 01/05/21 16:14:15    Page 4 of 5

## CERTIFICATE OF SERVICE

The undersigned hereby certifies, that on this 5th day of January, 2021, he caused to be served a true and correct copy of this Limited Objection to Fifth Amended Plan of Reorganization, by electronically filing it with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system and to the following Notice Parties:

Pachulski Stang Ziehl & Jones LLP
101000 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Jeffrey N. Pomerantz
Ira D. Kharasch
Gregory V. Demo
jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

Hayward & Associates PLLC
10501 N. Central Expressway, Suite 106
Dallas, TX  75231
Melissa S. Hayward
Zachery Z. Annable
MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

**COUNSEL FOR DEBTOR**

Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603
Matthew A. Clemente
Alyssa Russell
mclemente@sidley.com
Alyssa.Russell@sidley.com

**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of 6
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 833 of 1598   PageID 13880
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21   Entered 01/05/21 16:14:15   Page 5 of 5

U.S. Department of Justice, Region 6
Northern District of Texas
Office of the United States Trustee
Earle Cabell Federal Building
1100 Commerce Street, Room 976
Dallas, TX  75242
Lisa L. Lambert
Lisa.L.Lambert@usdoj.gov

**COUNSEL FOR THE OFFICE OF THE UNITED STATES TRUSTEE**

*/s/ Daniel P. Winikka*
Daniel P. Winikka

# EXHIBIT 59

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 835 of 1598    PageID 13882
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 1 of 34

Docket #1667  Date Filed: 01/05/2021

Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**OBJECTION TO CONFIRMATION OF THE
DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The Dugaboy Investment Trust and Get Good Trust (jointly, "Movants"), submit this

Objection for the purpose of objecting to the *Fifth Amended Plan of Reorganization of Highland*

*Capital Management, L.P.* [Dkt. 1472] (the "Plan") submitted by Highland Capital Management,

L.P. ("Debtor").  The Dugaboy Investment Trust is an equity owner of the Debtor and has filed

proofs of claim. See Claim Numbers 131 and 177. The Get Good Trust has filed proofs of claim

in this case.  See Claim Numbers 120, 128 and 129.  If the Claims[1] filed by Movants are allowed,

---

[1] Capitalized terms not defined in this Objection are taken from the Plan and shall have the meanings given to them in the Plan.

{00374857-13}                                    1



APPX. 07123

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 836 of 1598 PageID 13883
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 2 of 34

Claimants possess claims in Class 7 or 8. The Dugaboy Investment Trust is a member of Class 11 of the Plan.

Movants assert that the Plan does not meet the requirements contained in the Bankruptcy Code, Rules, and applicable case law to be confirmed.

**The Plan Violates 11 U.S.C. § 1129(a)(1)**

In order to confirm a plan, the plan must meet the requirements set forth in 11 U.S.C. §§ 1122, 1123 and 1129. The Plan proposed by the Debtor fails to meet the requirements set forth in the Bankruptcy Code and, as such, confirmation of the Plan must be denied. 11 USC § 1129(a) (1) requires that the Plan comply with the applicable provisions of this title. The cases interpreting this section have held that a plan must meet the requirements of 11 U.S.C. §§ 1122 and 1123. See *In re Star Ambulance Service*, 540 B.R. 251, 260 (N.D.Tex. 2015); *In re Save Our Springs,* 632 F.3d 168 174 5th Cir. 2011); *In Re Counsel of Unit Owners of 100 Harborview Drive Condo*, 572 B.R. 131, 137-139 (Bankr.D.Md. 2017).

**The Plan Contains an Impermissible Claim Subordination Provision**

Article III.J of the Plan contains the following provision:

Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or seek to subordinate, any Claim. . . .

The section gives the named parties the discretion upon "notice" to either subordinate a Claim or re-characterize a Claim whether or not a legal basis exists to either re-characterize the Claim or subordinate it. The term "notice" is nowhere defined, and any time the Bankruptcy Code uses the term notice, it is always accompanied by the words "and a hearing". 11 U.S.C. §§ 1112, 707 and 554 are examples of Bankruptcy Code sections that require both notice and a hearing prior to a party obtaining the relief sought in a pleading. Nowhere in the Bankruptcy

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 837 of 1598    PageID 13884
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 3 of 34

Code can a debtor obtain relief without affording the parties affected by the requested relief an opportunity for a hearing.

Under Bankruptcy Rule 7001(8), the subordination of a claim, as a general rule, requires the filing of an adversary proceeding.  However, an exception to the rule is that a subordination of a claim can occur through a Plan.  The Plan provision, as written, allows the designated parties the ability to subordinate a claim or re-characterize a claim merely by sending a letter.

The Plan, Plan Supplements and Disclosure Statement do not identify any specific Claim for which subordination is sought.  Rather, in the recent Plan Supplement that was filed on January 4th (Dkt. No. 1656), retained claims are lumped in with all other possible claims and a laundry list of possible targets.    (See Plan Supplement Dkt. No. 1656-1 Exhibit L.) Notwithstanding the conflicting 5th circuit case law concerning the necessary designation for the retention of claims (See *In re SI Restructuring*, 714 F.3d 860 (5th Cir. 2013) and *In re Texas Wyoming Drilling,* 647 F.3d 547, 549 and 551 (5th Cir 2011) and *In re United Operating,* LLC, 540 F.3d 351 (5th Cir. 2008), the cases do require some notice to the creditor of the potential for the subordination of such creditor's claim.  Bankruptcy Rule 7001 (8) cannot be read to allow a complex "equitable subordination claim" that requires evidence and findings consistent with *In Re Mobile Steel*, 563 F.2d 692 (5th Cir. 1977) to occur with only written notice immediately prior to a confirmation hearing.   The  provision, as written, does not provide any party subject to the so-called notice with due process and violates 11 U.S.C. § 1129(a)(1).

**The Plan is Not Final and Contains an Impermissible Plan Modification Provision**

In addition to the Plan, the Debtor must file a Plan Supplement which will include various documents that will 1) govern the operations of the Highland Claimant Trust and the

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 838 of 1598 PageID 13885
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 4 of 34

Litigation Trust, 2) identify retained causes of action; and 3) list the executory contracts and leases that will be assumed by the Debtor and Plan Documents.

The problem with the Plan Supplement is that, as of the writing of this Objection and possibly even after the hearing on the confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan. Article IV.J on page 36 of the Plan states:

> The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the Order Directing Mediation entered on August 3, 2020 [D.I. 912].

It is clear that no requirement exists in the Plan that the Plan Documents be finalized prior to hearing on the confirmation of the Debtor's Plan so that creditors can object if any terms of the Plan Documents filed in the Plan Supplement adversely impact a creditor's rights or are inconsistent with the Bankruptcy Code and Rules.

The Plan contains a provision allowing modification of the Plan. It is not clear from the language of the modification section the extent of judicial oversight that exists with respect to a Plan modification and whether this Court will have the ability to determine if the proposed plan modification is material or an immaterial. Article XII.B (p. 55) of the Plan provides that the Debtor reserves the right in accordance with the Bankruptcy Code and Rules to amend or modify the Plan prior to the entry of the Confirmation Order with the "consent" of the Committee. The provision does not require compliance with 11 U.S.C. § 1127(a) which specifically provides that the proposed modification prior to confirmation must meet the requirements of 11 U.S.C. §1122 and 11 U.S.C. §1123. In contrast to the Plan provision concerning modification prior the entry of the Confirmation Order, Article XII.B of the Plan does recognize that any modification after the entry of the Confirmation Order must meet the requirements set forth in 11 U.S.C. §§

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 6 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 839 of 1598  PageID 13886
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21  Entered 01/05/21 16:22:08  Page 5 of 34

1127(b).  From a textual point of view, modifications of the Plan both before and after the entry

of the Confirmation Order must meet the requirements of 11 U.S.C. §§ 1122 and 1123.

**The Plan violates 11 U.S.C. § 1129(a)(7)**

Under 11 U.S.C. § 1129(a)(7), in order for a plan to be confirmed, each creditor as of the

effective date of the plan will receive or retain under the plan on account of claim or interest an

amount that is not less than the amount such holder would receive or retain if the debtor were

liquidated under chapter 7.

While the Debtor's Plan is a liquidation plan, creditors from a valuation point of view are

receiving an amount less than they would receive if the Debtor were liquidated under chapter 7.

The amount received by creditors under the Debtor's Plan cannot be viewed solely in the dollars

they receive but, rather, the amount actually received must be discounted by two provisions in

the Debtor's Plan that reduce the present value of the creditors' recovery under the Plan.  The

two discounting factors are the following provisions in the Highland Claimant Trust:

a)  The  Reorganized Debtor has  no affirmative obligation to report any activity or

results to the holders of beneficial interests in the Claimant Trust or potential holders

of beneficial interests; and

b)  The holders of beneficial interests in the Claimant Trust are required to agree to a

standard of liability for the Claimant Trustee that only allows claims against the

Claimant Trustee for acts that constitute "fraud, willful misconduct or gross

negligence" (See Article 8 of the Highland Claimant Trust).  A notable omission

from the standard of liability is a breach of fiduciary duty.  This omission is contrary

to the statement contained in the Plan "In all circumstances, the Claimant Trustee

shall act in the best interests of the Claimant Trust Beneficiaries and with the same

fiduciary duty as a Chapter 7 trustee." (See Plan Page 28)

{00374857-13}                                    5

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 840 of 1598 PageID 13887
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 6 of 34

    c)    A Chapter 7 trustee, if it attempted to sell assets, would have to obtain Court authority for the sale and would provide Notice to creditors of the sale. Under the Plan no such requirement exists.

**The Plan And Related Documentation Provide For Impermissible Non-debtor Exculpation, Releases and Injunctions That Are Not Allowed Under Applicable 5th Circuit Case Law**

    **A. Exculpation and Releases**

Article IX of the Plan contains extensive exculpation and release provisions that far exceed those allowed in the Fifth Circuit.

Article IX.C (the "Exculpation Clause") exculpates each "Exculpated Party" from, *inter alia*, any liability for conduct occurring **on** or after the Petition Date in connection with or arising out of the filing and administration of the case, the funding, consummation and implementation of the Plan, and any negotiations, transactions and documents pertaining to same that could be asserted in their own name or on behalf of any holder of a claim or interest excluding acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.

The term "Exculpated Parties" is defined[2] in Article I.B.61 of the Plan to include:

1. The Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the "Managed Funds," which is defined in Article I.B.83 of the Plan to include Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to the executory contracts assumed under the Plan;

2. Strand Advisors, Inc., the Debtor's general partner ("Strand");

---

[2] The definition of "Exculpated Parties" includes references to numerous other defined terms that also are defined in Article I.B, some of which are summarized here. For the sake of brevity, the definition of each defined term contained in the definition of Exculpated Parties is not reproduced here *verbatim*.

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 841 of 1598    PageID 13888
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 7 of 34

3. John S. Dubel, James P. Seery, Jr. and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors appointed between then and the effective date of the Plan (collectively, the "Independent Directors");

4. The Official Committee of Unsecured Creditors appointed in the case (the "Committee");

5. The members of the Committee in their official capacities;

6. Professionals retained by the Debtor and the Committee in the case (the "Professionals");

7. James P. Seery, Jr., the Debtor's chief executive office and chief restructuring officer (the "CEO/CRO"); and

8. "Related Persons" of the Independent Directors, the Committee, the members of the Committee, the Professionals and the CEO/CRO, which is defined to include, *inter alia*, predecessors, successors, assigns, officers, directors, employees, managers, attorneys, consultants, subsidiaries thereof.

The definition does expressly exclude from the definition certain named individuals and entities.

In addition to Article IX of the Plan, the Claimant Trust Agreement [Dkt. 1656-2, Exhibit M] for which approval is sought as part of the Plan confirmation, also provides in Section 8.1 for a reduced standard of care by the parties described therein as the Claimant Trustee, the Delaware Trustee, and the Oversight Board, any individual member thereof, by limiting their liability to that for fraud, willful misconduct, or gross negligence.[3]

---

[3] With respect to the Claimant Trustee, this appears to contradict Plan Article IV.B.5 (p. 28), which provides: "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee."

APPX. 07839

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 842 of 1598 PageID 13889
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 8 of 34

The scope of the Exculpation Clause is ambiguous because it does not specify a time frame to which the exculpation applies. Rather than stating that it applies for actions during a definite time period, such as occurring between the petition date and the effective date of the plan, it runs from the petition date through "implementation of the Plan." The word "implementation" is not defined, which leaves the term subject to interpretation. Does it mean the execution of documents to be executed pursuant to the Plan or the actual implementation of the Plan through administration of assets and payment of claims? The ambiguity is exacerbated by the introduction to the Exculpation Clause, which provides for its effect "to the maximum extent permitted by applicable law". Thus, one could expect that Debtor intends the Exculpation Clause to apply to actions of exculpated parties for actions taken far into the future.

Article IX.D (the "Release Clause") provides that each Released Party is deemed released by the Debtor and the Estate, including the trusts created by the Plan (the Claimant Trust and Litigation Sub-Trust) release each Released Party from, *inter alia*, any and all Causes of Action that the Debtor or its estate could legally assert, except for obligations of the party under the Plan certain other agreements, confidentiality and noncompetition agreements, avoidance actions, or acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.[4]

The term "Released Parties" is defined in Article I.B.111 of the Plan to include:

1. The Independent Directors

2. Strand, solely from the date of the appointment of the Independent Directors through the effective date of the Plan;

3. The CEO/CRO;

4. The Committee;

5. The members of the Committee;

---

[4] There are some additional limitations specific to "Senior Employees."

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 843 of 1598    PageID 13890
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 9 of 34

6. The Professionals; and

7. The "Employees," which is defined as the employees of the Debtor set forth in the
   plan supplement.

The term "Causes of Action" is an 18 line definition in Article I.B.19 to include just
about any type of cause of action, whether arising before or after the commencement of the
bankruptcy case.

The Release Clause applies to causes of action having no relationship to the case. The
Release Clause also waives claims of the newly created Claimant Trust and Litigation Sub-Trust
"existing or hereafter arising," which means that these entities, which have conducted no
business as of the confirmation of the Plan, are releasing future, unknown claims against the
Released Parties, such as a future negligent breach of fiduciary duty claim.

The Exculpation Clause, the Release Clause and the Claimant Trust Agreement clearly
bestow protection from liability upon numerous non-debtor parties.  Some of the parties covered
by the Exculpation Clause as Exculpated Parties, namely Managed Funds Highland Multi-
Strategy Credit Fund, L.P. and Highland Restoration Capital Partners, L.P., and possibly by the
use of "catch-all phrasing, SSPI Holdings, Inc., recently were argued to be outside the scope of
this Court's oversight but for an agreement reached by the Debtor with the Committee allowing
for some notice protocols.  *See* Debtor's Response to Mr. James Dondero's Motion For Entry of
An Order Requiring Notice And Hearing For Future Estate Transactions Occurring Outside The
Ordinary Course Of Business [Dkt. 1546]¶ 12

The Fifth Circuit decision in *In re Pacific Lumber Co*. 584 F.3d 229 (5th Cir. 2009) is
dispositive.    In that case, the plan proposed to release the plan proponents and post-
reorganization owners of the reorganized debtor, the two new entities created by the plan, and

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 844 of 1598    PageID 13891
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 10 of 34

the creditor's committee (and their personnel) from liability—other than for willfulness and
gross negligence—related to proposing, implementing and administering the plan. *Pacific*, 584
F.3d at 251.  This language is similar to the language of the Exculpation Clause.  The *Pacific*
court cited the principle of 11 U.S.C. § 524(e), which states that "discharge of a debt of the
debtor does not affect the liability of any other entity on . . . such debt." *Id.*  The court noted
that: "We see little equitable about protecting the released non-debtors from negligence suits
arising out of the reorganization."  Pacific, 584 F.3d at 252.  It went on to cite other Fifth Circuit
authority establishing that 11 U.S.C. 524(e) only releases the debtor, not co-liable third parties,
and that the cases seem broadly to foreclose non-consensual non-debtor releases and permanent
injunctions.  *Pacific*, 584 F.3d at 252, citing *In re Coho Resources, Inc.¸* 345 F.3d 338, 342 (5th
Cir. 2003); *Hall v. National Gypsum Co.,* 105 F.3d 225, 229 (5th Cir. 1997); *Matter of
Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993), *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir.
1995).   Finally, the court stated:

> There are no allegations in this record that either [plan proponents/owners
> of reorganized debtors] or their or the Debtors' officers or directors were jointly
> liable for any of [debtors'] pre-petition debt.  They are not guarantors or sureties,
> nor are they insurers.  Instead, the essential function of the exculpation clause
> proposed here is to absolve the released parties from any negligent conduct that
> occurred during the course of the bankruptcy.  The fresh start § 524(e) provides to
> debtors is not intended to serve this purpose.

*Pacific,* 584 F.3d at 252-253.

The *Pacific* court struck down all of the non-debtor releases except those in favor of the
creditor's committee and its members.   The rationale for allowing the exculpation of the
creditor's committee and its members is that the law effectively grants them qualified immunity
for actions within the scope of their duties.  *Pacific*, 584 F.3d at 253.  The court also noted that
the creditor's committee and its members were the only disinterested volunteers among those
among the parties sought to be released, and reasoned that it would be extremely difficult to find

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 845 of 1598 PageID 13892
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 11 of 34

members to serve on the committee if they can be sued by persons unhappy with the committee's performance or the outcome of the case. *Id.*

The Fifth Circuit noted the continuing viability of the rule of *Pacific* in *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1059 (5th Cir. 2012) (". . . a non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief," citing *Pacific.)* Lower courts from within the Fifth Circuit have strictly followed the precedent and struck down various plan clauses dealing with releases and exculpation. *See In re Thru, Inc.*, 2018 WL 5113124, *22 (D.C.N.D.Tex 2018), affirmed 782 Fed.Appx. 339 (5th Cir. 2019) (exculpation provision and injunction); *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit has concluded that a bankruptcy court may not confirm a plan that provides "non-consensual non-debtor releases."); *In re National Truck Funding LLC*, 588 B.R. 175, 177 (Bankr. S.D. Miss. 2018) ("At hearing, the parties agreed that the Release and Exculpation . . . of the Plan . . . will be further amended by language protecting only the Official Committee of Unsecured Creditors and its representatives, as the Court has previously approved."); *In re LMCHH PCP LLC*, 2017 WL 4408162, at *16 (Bankr. E.D. La. Oct. 2, 2017) ("The modification [to the plan] filed was done to ensure that the exculpation provision complied with [*Pacific*] which held that a plan could not exculpate outside of the Debtors, the Official Unsecured Creditors Committee, and those who act for them, where 'the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy.'"); *In re Patriot Place, Ltd.*, 486 B.R. 773, 823–24 (Bankr. W.D. Tex. 2013) (Non-debtor releases and exculpation clauses struck down as violative of Fifth Circuit precedent and render the plan unconfirmable.).

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 846 of 1598    PageID 13893
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 12 of 34

All parties exculpated and released other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed from the Plan and the Claimant Trust Agreement, or the Plan is not confirmable.

**B. Injunction Provisions**

Article IX.F of the Plan contains extensive injunction provisions (the "<u>Injunction Provisions</u>") that far exceed those allowed in the Fifth Circuit.  Although not broken down into sections, the Article contains multiple separate and distinct provisions, as follows:

1.  The first paragraph enjoins claimants and equity holders from interfering with plan implementation of consummation;

2.  The second paragraph **permanently** enjoins entities with claims or equity interests and their related persons from, with respect to such interests, *inter alia*, commencing actions, enforcing judgments, creating or enforcing encumbrances, setting off against or affecting the Debtor, the Independent Directors, the Reorganized Debtor created by the Plan or the Claimant Trust created by the Plan, except as otherwise provided by the Plan or other order of this Court;

3.  The third paragraph extends the injunctions of the Article to any successors of the Debtor, the Reorganized Debtor and the Claimant Trust and their respective property and interests in property; and

4.  The fourth paragraph provides that no "Entity[5]" may commence or pursue a claim or cause of action against a "Protected Party"[6] that arose from or is related to the

---

[5] Defined as any "entity" as defined in 11 U.S.C. § 101(15) and also includes any "Person" or any other entity.
[6] The Plan does not define the term "Protected Party."  It defines "Protected Parties" as follows:
"*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 847 of 1598 PageID 13894
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 13 of 34

bankruptcy case, the negotiation of the Plan, the administration of the Plan, the wind

down of the business, the administration of the Claimant Trust, or transactions in

furtherance of the foregoing, without this Court first finding that the claim or cause of

action represents a colorable claim of bad faith, criminal misconduct, fraud or gross

negligence against the Protected Party, and specifically authorizes such Entity to

bring a claim against the Protected Party.[7] It further provides that this Court has the

sole jurisdiction to adjudicate any such claim for which approval to pursue the claim

has been granted.

Even the most cursory reading of the language of Article IX.F, especially the fourth

paragraph, reveals that it goes farther than the exculpation and release provisions in terms of the

parties protected by the permanent injunctions.

Although the Court in *Pacific* did not appear to expressly deal with an injunction, as

noted above the court concluded that its own cases ". . . seem broadly to foreclose non-

consensual non-debtor releases and permanent injunctions." *Pacific*, 584 F.3d at 252. In addition,

the Fifth Circuit in *Vitro*, *supra*, construed *Pacific* as denying a non-debtor permanent injunction,

wherein it cited *Pacific* and added: "(discharge of debtor's debt does not affect liability of other

entities on such debt and denying non-debtor release and permanent injunction.)" *Vitro*, 701

F.3d at 1059. The logic for applying the same principle to both releases/exculpations and

injunctions is simple to understand—if a non-debtor cannot be released from claims but

---

Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the
Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt,
none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities),
the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed
entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB
(and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and
managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy
Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."
[7] The provision is expressly limited as to Strand and Employees to the period from the date of appointment to the
effective date of the Plan.

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 15 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 848 of 1598   PageID 13895
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 14 of 34

claimants can be enjoined by the bankruptcy court from prosecuting them against the non-debtor, the exclusion of a release *ab initio* or the striking of a release from a plan is meaningless. For example, the fourth paragraph effectively releases from negligence claims a broad category of persons and entities not entitled to exculpation or releases under *Pacific,* because the paragraph only allows an aggrieved party to proceed after this court has determined that their allegations represent a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud or gross negligence. As noted by the Fifth Circuit in *Zale, supra*, "Accordingly, we must overturn a § 105 injunction if it effectively discharges a nondebtor."  *Zale*, 62 F.3d at 760, citing *In re Vitek*, 51 F.3d 530, 536, n. 27, as follows: "('[N]on-debtor property thus should not ordinarily be shielded by the powers of the bankruptcy court.')" *Id. See also In re Thru, Inc.*, 2018 WL 5113124, *21-22 (striking down a plan injunction that "would effectively discharge numerous non-debtor third parties").

All parties protected by the Injunction Provisions other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed or the Plan is not confirmable.

### C. The Claims Released Do Not Meet the Few Exceptions Allowing Release or Injunctions in Favor of Third Parties

There are a few situations where it may be *possible* to argue that third party releases are permissible within the Fifth Circuit, but none are applicable here.   The *Pacific* court distinguished one set of cases cited by the plan proponents by saying that they concerned global settlements of mass claims.   *Pacific*, 584 F.3d at 252.   Another has cited *Pacific* for the proposition that, absent a **meaningful** contribution by the released party, the release would probably be invalid under *Pacific.  In re Texas Rangers Baseball Partners*, 431 B.R. 706, 717 FN 29 (Bankr. N.D. Tex. 2010); *See also Zale*, 62 F.3d at 762 (holding that one plan provision temporarily enjoining certain contract claims was valid as an unusual circumstance because it

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 16 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 849 of 1598   PageID 13896
35
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 15 of 34

involved a settlement providing substantial consideration being paid into to the estate). Another

referred to a narrowly tailored release of the type found in § 363(f) sales of property free and

clear of liens. *In re Patriot Place, Ltd.,* 486 B.R. 773, 821-822 (Bankr. W.D. Tex. 2013). Such

releases and injunctions are entered to ensure that the purchaser of the debtor's property (as well

as the debtor's property being sold) is insulated from claims that creditors might have against the

debtor and the property being sold by the debtor to the purchaser. *Id.*

The court in *Zale* indicated that a **temporary** injunction **may** be proper when unusual

circumstances exist. *Zale*, 62 F.3d at 761. These conditions are when the non-debtor and the

debtor party enjoy such an identity of interests that the suit against the non-debtor is essentially a

suit against the debtor and when the third party action will have an adverse impact upon the

debtor's ability to accomplish reorganization. *Id.* Even in such cases, neither of which is

applicable here, an injunction would not be permanent, but would only delay the actions.

None of the foregoing exceptions are applicable in the instant case.

### D. Jurisdiction

Even if the Bankruptcy Code were to permit some exculpation, releases and injunctions

protecting non-debtor parties, this Court does not have the power to retain exclusive, indefinite,

post-confirmation jurisdiction to determine whether actions against Protected Parties may

proceed or, thereafter, to adjudicate claims pertaining thereto.

The fourth paragraph of the Injunction Provisions prohibits the commencement of certain

actions against any Protected Party with respect to claims or causes of action that arose from or

are related to the case, administration of the case, the wind down of the business of the Debtor or

Reorganized Debtor, and the administration of the Claimant Trust.  It also channels claims by

requiring that any such claims or causes of action be first brought to this Court to determine that

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 850 of 1598    PageID 13897
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 16 of 34

the claims are outside the scope of protection granted a Protected Party, and to obtain an express authorization from this Court allowing the action to proceed.  It then provides that this Court has sole jurisdiction to adjudicate the claim. Because the Reorganized Debtor and the Claimant Trust have engaged in no activity as of the confirmation of the Plan, this provision clearly is intended to extend to unknown, future conduct by Protected Parties in addition to pre-confirmation Protected Parties.

As noted by the Fifth Circuit in *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores)*, 266 F.3d 388, 389 (5th Cir. 2001), bankruptcy court jurisdiction does not last forever.  Under 28 U.S.C. § 1334, a federal district court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11."  *In re Superior Air Parts, Inc.*, 516 B.R. 85, 92 (Bankr.N.D.Tex. 2014). The district court is authorized under 28 U.S.C. § 157 to refer to the bankruptcy court "any or all proceedings arising under title 11 or arising in or related to a case under title 11." *Id.*  By virtue of an order adopted on August 3, 1984, this Court has jurisdiction over any or all proceedings arising under title 11 or arising in or related to a case under title 11.  *Id.*

"Arising Under" jurisdiction involves causes of action "created or determined by a statutory provision of title 11."  *Wood v. Wood (Matter of Wood)*, 825 F.2d 90, 96 (5th Cir. 1987); *Superior*, 516 B.R. at 93.  Nothing involved in the exculpations, releases or injunctions on non-debtor parties involves such a cause of action.  By their nature, negligence claims and intentional tort claims arise by operation of law generally applicable to all persons and entities regardless of whether or not they are in bankruptcy.  They could exist totally outside a bankruptcy context.

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 851 of 1598 PageID 13898
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 17 of 34

"Arising in" jurisdiction involves those actions "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Wood*, 825 F.2d at 97; *Faulkner v. Eagle View Capital Mgmt. (In re Heritage Org., LLC)*, 454 B.R. 353, 360 (Bankr.N.D.Tex. 2011); *Superior*, 516 B.R. at 94-95. The example given the by the *Wood* court is "'administrative' matters that arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 97 (emphasis supplied by the court). Again, negligence claims and intentional torts against non-debtors obviously do not meet these criteria.

The final category, "related to" jurisdiction, involves the issue of "'whether the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy.'" *Wood*, 825 F.2d at 93, citing *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984) (emphasis supplied by the court). Because it is obvious that the non-debtor claims being released, exculpated and enjoined do not "arise under" or "arise in" a bankruptcy case, the only possibly arguable basis for jurisdiction is "related to" jurisdiction. The fourth paragraph of the Injunction Provisions contemplates application to any claim or cause of action "that arose from or is related" to the case.

Initially, it should be noted that there simply is no way that even a massive judgment against the non-debtors could have any impact whatsoever on the estate. Considering that there will be no **estate** being administered **in bankruptcy** post-confirmation, it is inconceivable how releases of non-debtor parties could possibly impact the administration of a now defunct bankruptcy estate of the Debtor. The court in *Craig's* appeared to recognize this principle when it adopted the view that confirmation of a plan changes bankruptcy court jurisdiction. *Craig's*, 266 F.3d at 390. Expansive bankruptcy court jurisdiction is no longer "required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id.*

APPX. 07349

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 852 of 1598    PageID 13899
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 18 of 34

In *Craig's,* the Fifth Circuit was dealing with a fact pattern that differs from the instant case in two ways.  First, the case involved a dispute between the aggrieved party and the reorganized debtor, not totally non-debtor parties.  Second, it only partially involved the fact pattern of the instant case, because it only dealt with claims characterized as post-confirmation rather than the mix of pre- and post-confirmation claims against the non-debtor parties protected by the Exculpation Clause, Release Clause and Injunction Provisions.  The case involved a pre-confirmation contract that had been assumed, and a post-confirmation dispute involving state law for damages that at least partially arose post-confirmation.[8]  The court held that there was no jurisdiction over a claim that "principally dealt with post-confirmation relations between the parties." *Craig's*, 266 F.3d at 390.

The later Fifth Circuit case of *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325 (5th Cir. 2008) also involved the issue of post-confirmation jurisdiction.[9]  The court summarized the *Craig's* decision as one dealing with the post-confirmation relations between the parties, where there was no antagonism between the parties as of the date of the reorganization, and no facts or law deriving from the plan were necessary to the claim. *Enron*, 535 F.3d at 335.

Under the general principles of *Craig's*, there should be not "related to" jurisdiction involving the claims involved in this case, which purely involve non-debtor parties and non-bankruptcy related claims with no potential impact upon the pre- or post-confirmation estates.

---

[8] The facts are not totally clear.  They indicate that the plan was confirmed in December 1994, and that the claims for damages arose in 1994 and 1995.  *Craig's*, 266 F.3d at 389.  Therefore, at least the 1995 claims arose post-confirmation.

[9] The *Enron* case involved lawsuits against non-debtors that had been removed prior to the commencement of the case, that were dismissed with prejudice after the confirmation of the plan. *Enron*, 535 F.3d at 333.  The plaintiffs alleged that there was no jurisdiction to dismiss the case because "related to" jurisdiction had ceased after the plan was confirmed. 535 F.3d at 334.  However, the parties did not dispute whether the federal courts had "related to" bankruptcy jurisdiction over the cases at the time of removal, so the court framed the question as whether the court, after confirming Enron's plan, maintained "related to" jurisdiction. 535 F.3d at 334-335.  Therefore, the case stands for the proposition of whether "related to" jurisdiction, once conferred, continues post-confirmation. 535 F.3d at 335-336.

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 853 of 1598   PageID 13900
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 19 of 34

This is especially true with respect to post-confirmation future releases of non-debtor parties involved with as yet uncreated entities.

The case of *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594 (2011), decided after *Wood*, *Craig's* and *Enron*, adds additional jurisdictional barriers to confirmation of a Plan containing the language of Article IX.(C), (D) and (F). In *Stern*, Pierce had filed a proof of claim in Marshall's bankruptcy proceedings, alleging a right to recover damages as a result of alleged defamation on the part of Marshall. *Stern*, 131 S.Ct. at 2601. Marshall filed a counterclaim against Pierce alleging tortious interference with a gift that Marshall had expected to receive from her husband, who was Pierce's father. *Id.* The claim was classified by the Supreme Court as a common law tort claim. *Id.* The Supreme Court found that Pierce had consented to resolution of the counterclaim by the Bankruptcy Court. 131 S.Ct. at 2606. After being cast in judgment by the Bankruptcy Court in the amount of over $425 Million, Pierce argued that the Bankruptcy Court did not have jurisdiction over the counterclaim. 131 S.Ct. at 2601. The Supreme Court agreed with Pierce, holding that Article III of the U.S. Constitution did not permit the Bankruptcy Court to enter a final judgement on Marshall's counterclaim. 131 S.Ct. at 2608.

Some claims involved in the instant case are simple tort claims against non-debtors. They occupy the same category as the defamation suit in *Stern*. Movants are entitled to an actual adjudication of their claims, which would mean an adjudication by a state court or an Article III federal court of competent jurisdiction and venue. This Court's submission of a report and recommendation on confirmation to the District Court would not constitute an actual adjudication. Because the Plan provision at issue provides that this Court will **actually adjudicate** the claims, it runs afoul of *Stern* on its face. Similarly, the provision literally would

APPX. 10343

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 854 of 1598 PageID 13901
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 20 of 34

preclude Movants from seeking to withdraw the reference to have the case actually decided by an Article III court. Because this Court could not adjudicate the case, the Plan's attempt to grant to this Court sole jurisdiction to adjudicate the claims renders the Plan nonconfirmable.

Even if jurisdiction *could* exist for the purpose of determining whether a claim could go forward against a Protected Party, it does not follow that this Court would have jurisdiction to adjudicate the claim. At the point at which this Court determines that a claim could proceed, the action no longer involves any interpretation of either bankruptcy law or the Plan, nor could it have any impact upon the pre- or post-confirmation estate.[10]

**The Plan Prohibits Claimants From Asserting Rights Under The Plan Rendering the Plan Not Confirmable**

Aside from protecting parties not entitled to protection, the Exculpation, Release Injunction Provisions contain provisions that far exceed the scope permitted by bankruptcy law.

The second paragraph of the Injunction Provisions is broad enough to permanently preclude claimants from pursing their rights under the Plan against the Reorganized Debtor and the Claimant Trust because it precludes any attempt to enforce rights, many of which are created pursuant to the Plan, and the third paragraph of the Injunction Provisions goes even farther by extending the injunctions to any successors of the Reorganized Debtor and the Claimant Trust. Under the Plan, the Class 2 claimant is to be given a new promissory in treatment for its claim, the Class 3 claimants have the option to retain collateral, and Class 5 claims are reinstated. If the Reorganized Debtor defaults under any of its obligations, the Injunction Provisions literally prevent any attempt to enforce their rights under the Plan.

---

[10] Movants are aware of *In re Pilgrim's Pride*, 2010 WL 200000 (Bankr.,N.D.Tex 2010) and *In re Camp Arrowhead, Ltd.*, (Bankr.W.D.Tex 2011). Movants believe that these cases blatantly disregard the letter and spirit of *Pacific* and are, therefore, wrongfully decided. In addition, they were decided before *Stern v. Marshall*.

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 855 of 1598    PageID 13902
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 21 of 34

The best way to demonstrate this issue is to cite a different plan.  Although the injunction

in *In re Thru, Inc.*, *supra*, was struck down on the basis that it impermissibly released third

parties, the injunction contained language that the second paragraph in the instant case is

missing.  It starts out:

> Except as otherwise expressly provided in this Plan or in the Confirmation Order **and except in connection with the enforcement of the terms of this Plan (including the payment of Distributions hereunder) or any documents provided for or contemplated in this Plan**, all entities . . . are permanently enjoined from. . . .
>
> *Thru*, 2018 WL 5113124, *21

Compare this language to the second paragraph of the Injunction Provisions, which

provides:

> Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities . . . are permanently enjoined. . . .

The Plan literally would require a claimant to come back to this Court for an order if the

Reorganized Debtor or the Plan-created trusts default.  This goes against the concept espoused

by the Fifth Circuit in *Craig's*, indicating that confirmation allows the debtor to go about its

business without further supervision or approval, but also without the protection of the

bankruptcy court.  *Craig's*, 266 F.3d at 390, citing *Pettibone Corp. v. Easley*, 935 F.2d 120, 122

(7th Cir. 1991).

**The Plan Contains a DeFacto Channeling Injunction**

As noted earlier, paragraph 4 of the Injunction Provisions in the Plan provide that no

Entity may commence or pursue a claim or cause of action against a Protected Party without this

Court:

> (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; . . . .

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 856 of 1598 PageID 13903
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 22 of 34

Plan, Article IX.F, fourth unnumbered paragraph.

Thereafter, the Plan provides that this Court retains sole jurisdiction to adjudicate the claim. *Id.*

The above provisions have the effect of channeling all post-petition claims against the Reorganized Debtor, the Creditor Trust and others into the Bankruptcy Court to determine whether a claim can be asserted and then as the forum with the "exclusive jurisdiction" to adjudicate the claim. The provisions are not authorized under the Bankruptcy Code.

Congress, when it enacted 11 U.S.C. § 524(g), provided a limited channeling injunction for asbestos and in some mass tort cases. Section 524(g) was not created to shield parties that are liquidating a debtor and its reach does not extend to garden variety unsecured creditors or serve as a barrier to claims that arose after the Effective Date of the Plan. The impact of Section 524(g) is to address pre-petition claims and future claims arising out of pre-petition activity where the claims have yet to manifest.

In addition, 11 USC 524 § (g) is only applicable to a Debtor that obtains a discharge pursuant to 11 USC § 1141. The Debtor in its approved Disclosure Statement [See DKT 1473, pp. 8-9] classifies the Debtor's post confirmation activities as one of "wind down" of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. In addition, the Claimant Trust formed pursuant to the Plan is a "liquidation trust" [See DKT 1656-2 section 2.2], which makes the Plan a Plan that " liquidates all or substantially all of the property of the estate". Pursuant to 11 U.S.C. § 1141(d)(3), a Debtor whose Plan is none that liquidates all or substantially all of the property of the estate is not eligible for a discharge. 11 U.S.C. § 524(g) cannot authorize any channeling injunction for the Debtor in its Plan.

**Conclusion**

For the reasons set forth herein, confirmation of the Plan must be denied.

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 857 of 1598    PageID 13904
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 23 of 34

January 5, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
 *and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 5th day of January, 2021, a copy of the above and foregoing *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com,kjohnson@joneswalker.com,sbuchanan@joneswalker.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com ;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com, joyce.rehill@bondsellis.com

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 858 of 1598 PageID 13905
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 24 of 34

- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com,
  lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-
  8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel
  l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com,
  gpronske@spencerfane.com;jkathman@spencerfane.com;lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com
- Casey William Doherty    casey.doherty@dentons.com,
  dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@d
  entons.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 859 of 1598 PageID 13906
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 25 of 34

- A. Lee Hogewood    lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;m
  ary-beth.pearson@klgates.com
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txfilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-
  0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txfefilingnotice@sidley.com;penny-reid-
  4098@ecf.pacerpro.com;ncade@sidley.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com,
  cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com,
  scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com,
  plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com,
  michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 860 of 1598    PageID 13907
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 26 of 34

- Martin A. Sosland    martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

I also caused same to be served on January 5, 2021, by Docusource via U.S. First Class Mail,
postage prepaid upon the following parties who are **not** on the list to receive email notice/service
for this case (who therefore require manual noticing/service):

Paul N. Adkins
11 Mount Emily Road #07-27
Singapore, 228493

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Jeffrey E. Bjork
LATHAM & WATKINS LLP
355 South Grand Avenue, Ste. 100

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 861 of 1598 PageID 13908
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 27 of 34

Los Angeles, CA 90071

Jessica Boelter
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

Matthew G. Bouslog
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612

William P. Bowden
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899

Candace C. Carlyon
CARLYON CICA CHTD.
265 e. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Joseph L. Christensen
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Louis J. Cisz
Nixon Peabody LLP
One Embarcadero Center, 32nd Fl
San Francisco, CA 94111

Kevin M. Coen
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Debra A. Dandeneau
Baker & McKenzie LLP
425 5th Ave.
New York, NY 10018

Deloitte Tax LLP
1111 Bagby Street, Ste. 4500

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 862 of 1598    PageID 13909
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 28 of 34

Houston, TX 77002

Mark. L. Desgrosseilliers
Chipman, Brown, Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801

Development Specialists, Inc.
333 South Grand Ave., Ste. 4070
Los Angeles, CA 90071

Fair Harbor Capital, LLC
Ansonia Finance Station
PO Box 237037
New York, NY 10023

Bojan Guzina
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

Emily M. Hahn
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd. Ste. 300
McKinney, TX 75069

Hain Capital Group, LLC
301 Route 17, 6th Floor
Rutherford, NJ 07070

Marc B. Hankin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Michelle Hartman
Baker & McKenzie LLP
1900 N. Pearl, Ste. 1500
Dallas, TX 75201

Hayward & Associates PLLC
10501 N. Central Expwy., Ste 106
Dallas, TX 75231

William A. Hazeltine

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 863 of 1598 PageID 13910
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 29 of 34

Sullivan Hazeltine Allinson LLC
901 North Market Street
Suite 1300
Wilmington, DE 19801

Kuan Huang
Latham & Watkins LLP
855 Third Avenue
New York, NY 10022

Ira D Kharasch
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067

Marshall R. King
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
Suite 1400
New York, NY 10066

Alan J. Kornfeld
Pachulski Stang Ziehl & Jones LLPL
10100 Santa Monica Blvd., 13 Fl
Los Angeles, CA 90067

Kurtzman Carson Consultants LLC
Attn: Drake Foster
222 N. Pacific Coast Highway, 3rd Floor
El Segundo, CA 90245

Kurtzman Carson Consultants, LLC
222 N. Pacific Coast Highway, Ste. 300
El Segundo, CA 90245

M. Natasha Labovitz
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Richard B. Levin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Maxim B Litvak

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 864 of 1598    PageID 13911
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 30 of 34

Pachulski Stang Ziehl & Jones LLP
150 California Street
15th Floor
San Francisco, CA 94111

John E. Lucian
Blank Rome LLP
1201 N. Market Street, Sutie 800
1000 North King Street
Wilmington, DE 19801

Lauren Macksoud
1221 Avenue of the Americas
New York, NY 10020-1089

Mark M. Maloney
King & Spalding LLP
191 Peachtree St.
Suite 4900
Atlanta, GA 30303-1763
mmaloney@kslaw.com, pwhite@kslaw.com

Mark M. Maloney
King & Spalding LLP
1180 Peachtree Steet, NE
Atlanta, GA 30309

Terri L. Mascherin
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456

Patrick C. Maxcy
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361

R. Stephen McNeill
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Mercer (US) Inc.
155 N. Wacker Drive, Ste. 1500
Chicago, IL 60606

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 32 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 865 of 1598    PageID 13912
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 31 of 34

Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
one Rodney Square
920 North King Street
Wilmington, DE 19801

Curtis S. Miller
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Josef W. Mintz
Blank Rome LLP
1201 Market Street, Suite 800
1000 North King Street
Wilmington, DE 19801

Joseph T. Moldovan
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Alan A. Moskowitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Michael R. Nestor
YOUNG CONAWAY STARGATT & TAYLOR, LL
Rodney Square
1000 North King Street
Wilmington, DE 19801

James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Fl.
Wilmington, DE 19801

Tracy M. O'Steen
CARLYON CICA CHTD.
265 E. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP

{00374857-13}                          31

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 866 of 1598    PageID 13913
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 32 of 34

10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Kathleen Preston
Winston & Strawn LLP
800 Capitol Street, Ste. 2400
Houston, TX 77002

Michael A. Rosenthal - DO NOT USE
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Jeremy W. Ryan
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

James P. Seery
795 Columbus Ave., 12A
New York, NY 10025

Sally T. Siconolfi
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Sarah E. Silveira
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

D. Ryan Slaugh
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Tracy K. Stratford
Jones Day
North Point

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 867 of 1598   PageID 13914
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 33 of 34

901 Lakeside Ave.
Cleveland, OH 44114

Daniel E. Stroik
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304

Stephen G. Topetzes
K&L Gates LLP
1601 King St., N.W.
Washington, DC 20006

Thomas A. Uebler
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Michael L. Vild
CROSS & SIMON, LLC
1105 N. Market Street, Suite 901
1000 North King Street
Wilmington, DE 19801

Elissa A. Wagner
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003

Erica S. Weisgerber
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

James A. Wright
K&L Gates LLP

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 35 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 868 of 1598   PageID 13915
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 34 of 34

State Street Financial Center
One Lincoln St.
Boston, MA 02111

Sean M. Young Conway Stargatt & Taylor, LLP
Young Conway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801


*/s/Douglas S. Draper*
Douglas S. Draper, LA Bar No. 5073

APPX. 07158

# EXHIBIT 60

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 7
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 870 of 1598   PageID 13917
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21   Entered 01/05/21 16:25:54   Page 1 of 6

DAVID G. ADAMS
State Bar No. 00793227
U.S. Department of Justice, Tax Div.
717 N. Harwood St., Suite 400
Dallas, Texas 75201
Ph: (214) 880-9737
Fax:  (214) 880-9742
david.g.adams@usdoj.gov
ATTORNEY FOR THE UNITED STATES (IRS)

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No.:  19-34054-sgj-11** |
| | § | **Chapter 11** |
| Debtor. | § | |

**UNITED STATES' (IRS) LIMITED OBJECTION TO**
**DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION**

The United States of America, on behalf of its agency the Internal Revenue Service, a

creditor and governmental unit, files this limited objection to Highland Capital Management,

L.P.'s Fifth Amended Plan of Reorganization as the Debtor has failed to comply with its

prepetition tax obligations under the Internal Revenue Code, and the Plan contains provisions

that violate the Bankruptcy Code and other applicable law.  In support of this limited objection,

the United States states as follows:

**Objections**

1.     The United States objects to the Debtor's Plan because the Plan at Article II,

Paragraph C. fails to state that the IRS' priority tax claim will be paid in accordance with

Bankruptcy Code section 1129(a)(9)(C), which requires that the total value of the priority taxes,

as of the effective date, must be paid over a period ending not later than five years after the

petition date.  11 U.S.C. § 1120(a)(9)(C).  In addition, the Debtor's Plan fails to specifically state

1

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 7
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 871 of 1598    PageID 13918
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21    Entered 01/05/21 16:25:54    Page 2 of 6

that the Debtor will pay the value of the IRS' priority tax claim as of the Effective Date, as the Debtor's Plan contemplates payments on the IRS' priority tax claim on a date other than, *i.e.*, subsequent to, the Plan's Effective Date, thus allowing the Debtor to avoid its obligation to pay the total value of the IRS' priority tax claim as of the Effective Date.  The Debtor's Plan at Article VI, Paragraph A.  *Dates of Distributions* provides that "Except as otherwise provided in this Plan, Holders of Claims … shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date."  In order to comply with the provisions of 1129(a)(9)C), the Debtor must pay an applicable interest rate on the IRS' priority claim as outlined in Section 511 of the Bankruptcy Code.

2.    The United States objects to the Debtor's Plan on the grounds that the Debtor has outstanding prepetition tax obligations, including the filing of certain tax returns with the IRS, and thus the Debtor is not in compliance with its federal tax reporting requirements under the Internal Revenue Code.  In particular, under 26 U.S.C. § 4376, the Debtor is obligated to file Quarterly Federal Excise Tax Returns (Form 720) with respect to its self-insured health plan. However, as shown on the IRS' latest filed proof of claim (filed April 14, 2020), the IRS does not have a record of the Debtor filing its Form 720 for the June 30, 2014, June 30, 2016 or the June 30, 2017 tax periods.

As a result of the Debtor's non-compliance with its required tax return filings and tax payments, the United States requests that the Debtor's Plan be amended to include the following default language as to the Internal Revenue Service:

<u>Default Provision - IRS</u>.  Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim):

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 7
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 872 of 1598    PageID 13919
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21    Entered 01/05/21 16:25:54    Page 3 of 6

(1)  Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS:

> (A)  The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

> (B)  The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire imposed liability owed to the IRS, together with any unpaid current liabilities, may become due and payable immediately; and

> (C)  The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(2)  If the IRS declares the Debtor, the Reorganized Debtor, or any successor in interest to be in default of the Debtor's, the Reorganized Debtor's and/or any successor in interest's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, and/or any successor in interest.  Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(3)  If full payment is not made within fourteen (14) days of such demand, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code.  The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default the IRS shall be entitled to proceed as set out in paragraphs (A), (B), and/or (C) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel.  The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan.

APPX. 07672

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 7
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 873 of 1598    PageID 13920
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21    Entered 01/05/21 16:25:54    Page 4 of 6

(4)  The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS.  The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(5)  The term "any payment required to be made on federal taxes," as used herein above, is defined as:  any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.  The term "any required tax return," as used herein above, is defined as:  any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

3.    The United States objects to the Debtor's Plan and specifically Article VI, Paragraph A, which states that "Upon the Effective Date, all Claims … against the Debtor shall be deemed fixed and adjusted pursuant to the Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims … except as set forth in this Plan and in the Confirmation Order."  Because the Debtor has failed to comply with its tax return filing requirements under the Internal Revenue Code as shown on the IRS' proof of claim listing unfiled tax returns and estimates of taxes for the unfiled tax periods, the IRS is unable to fully ascertain the Debtor's tax liability until all the Debtor's tax returns are filed, processed and the tax liabilities assessed by the IRS against the Debtor.  The Debtor should be required to amend or modify its Plan – as to the Internal Revenue Service – to provide that until all required tax returns are filed with the Internal Revenue Service, the IRS' proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest after the Debtor has filed all unfiled tax returns.

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 7
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 874 of 1598    PageID 13921
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21    Entered 01/05/21 16:25:54    Page 5 of 6

4.      All checks are to be made payable to:  Department of the Treasury, and mailed to

Internal Revenue Service, 1100 Commerce Street, M/S MC 5027DAL, Dallas, Texas 75242.

Reference the Debtor's bankruptcy case number on the memo line on the check.

The United States respectfully request that the Court sustain the United States' objections

to the Debtor's Fifth Amended Chapter 11 Plan as set forth above.  The United States request

such further relief to which it is entitled.

Date:  January 5, 2021.                              RICHARD E. ZUCKERMAN
                                                     Principal Deputy Assistant Attorney General

                                                      /s/ David G. Adams
                                                     DAVID G. ADAMS
                                                     State Bar No. 00793227
                                                     Attorney, Tax Division
                                                     U.S. Department of Justice
                                                     717 N. Harwood St., Suite 400
                                                     Dallas, Texas 75201
                                                     Phone: (214) 880-9737
                                                     Fax: (214) 880-9742
                                                     david.g.adams@usdoj.gov
                                                     ATTORNEY FOR THE UNITED STATES (IRS)


## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2020, I electronically filed the foregoing document
with the Clerk of the Court using the ECF system, which will send notification of such filing to
counsel requesting notice, including:

Jeffrey N. Pomerantz  (jpomerantz@pszjlaw.com)
Ira Kharasch  (ikharasch@pszjlaw.com)
Gregory Demo  (gdemo@pszjlaw.com)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd. 13th Floor
Los Angeles, California 90067

Melissa Hayward  (mhayward@haywardfirm.com)
Zachery Annable  (zannable@haywardfirm.com)
Hayward & Associates PLLC
10501 N. Central Expressway, Suite 106
Dallas, Texas 75231

APPX. 00364

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of 7
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 875 of 1598   PageID 13922
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21   Entered 01/05/21 16:25:54   Page 6 of 6

Matthew Clemente  (mclemente@sidley.com)
Alyssa Russell  (alyssa.russell@sidley.com)
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603

Lisa L. Lambert  (lisa.l.lambert@usdoj.gov)
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242

/s/ David G. Adams
_____
DAVID G. ADAMS

APPX. 07973

Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 876 of 1598   PageID 13923

**EXHIBIT 61**

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 877 of 1598    PageID 13924
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 1 of 16

Docket #1669  Date Filed: 01/05/2021

Judith W. Ross
State Bar No. 21010670
Frances A. Smith
State Bar No. 24033084
Eric Soderlund
State Bar No. 24037525
**Ross & Smith, PC**
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: judith.ross@judithwross.com
        frances.smith@judithwross.com
        eric.soderlund@judithwross.com

Michelle Hartmann
State Bar No. 24032402
**BAKER & McKENZIE LLP**
1900 North Pearl
Suite 1500
Dallas, TX 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Email: michelle.hartmann@bakermckenzie.com

Debra A. Dandeneau
**BAKER & McKENZIE LLP**
452 Fifth Ave
New York, NY 10018
Telephone: 212-626-4875
Email: debra.dandeneau@bakermckenzie.com
(*Pro hac vice motion pending*)

**COUNSEL FOR SCOTT ELLINGTON, THOMAS SURGENT,
FRANK WATERHOUSE, AND ISAAC LEVENTON**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

---

| | | |
|---|---|---|
| **In re: Highland Capital** | § | **Case No. 19-34054-sgj-11** |
| **Management, L.P.,** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

---

**SENIOR EMPLOYEES' LIMITED OBJECTION TO DEBTOR'S
FIFTH AMENDED PLAN OF REORGANIZATION**

Scott Ellington, Frank Waterhouse, Isaac Leventon, and Thomas Surgent

(collectively, the "**Senior Employees**") file this limited objection to the Debtor's Fifth

Amended Plan of Reorganization (Dkt. No. 1472) (the "**Plan**") and in support thereof

respectfully state as follows:

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 878 of 1598 PageID 13925
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 2 of 16

I. **THE SENIOR EMPLOYEES' CLAIMS FOR COMPENSATION ARE ENTITLED TO ADMINISTRATIVE PRIORITY.**

As a threshold matter, the Senior Employees' compensation-related claims against the Debtor's estate are entitled to administrative priority, as the Debtor has previously argued to the Court and the Debtor's independent directors repeatedly have represented to the Senior Employees. The Senior Employees will be filing a motion seeking payment of claims as administrative expenses and are not seeking to argue the merits of such claims in the context of the confirmation hearing except as the Debtor's disparate treatment of the Senior Employees is reflected in the terms of the Plan. To the extent, however, that any portion of the Senior Employees' claims are found to be pre-petition claims, the deficiencies in the Plan identified in this objection would apply to such claims. The Senior Employees do not waive any of their rights by filing this limited objection, casting (or not casting) ballots, or making elections for treatment under the Plan. The Senior Employees reserve all their rights with respect to their claims, including without limitation their rights to insurance coverage and indemnification.

II. **THE PLAN AS CURRENTLY DRAFTED IS NOT CONFIRMABLE.**

The Debtor's Plan is not confirmable because (A) it violates Bankruptcy Code § 1123(a)(4)'s requirement that claims in the same class be treated the same by (1) unfairly imposing conditions on the Senior Employees that are not imposed on all other employees, (2) arbitrarily providing some members of Class 8 but not others the option to elect treatment under Class 7, and (3) not allowing the Senior Employees to make the Convenience Class Election, resulting in disparate treatment of holders of Class 8 Claims; (B) the Plan appears to impermissibly grant the Debtor, the Reorganized Debtor, and the

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 879 of 1598   PageID 13926
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21   Entered 01/05/21 16:37:19   Page 3 of 16

Claimant Trustee the unfettered power to "re-classify" any claim as a Subordinated Claim; and (C) the Plan violates Bankruptcy Code § 1127 by failing to provide creditors with all material information required to make an informed decision in voting on the Plan.

### A.    The Plan Violates Bankruptcy Code § 1123(A)(4).

The Plan violates the Bankruptcy Code's requirement that the contents of a confirmable plan of reorganization must "provide the same treatment for each claim or interest of a particular class" unless an affected claimant agrees to the less favorable treatment proposed by the Debtor. 11 U.S.C. § 1123(a)(4).

### 1.    The Plan Provides Senior Employees with Less Favorable Treatment than Other Employees in the Same Class by Requiring them to Sign a "Stipulation" to Obtain Releases and Exculpations.

Under the Plan, the Debtor proposes to treat the great majority of its employees the same while singling out the similarly situated Senior Employees (whose claims are classified in the same class as the other employees) for disparate—and less favorable—treatment without their consent. Specifically, the Plan grants broad releases to "Employees," but impermissibly conditions the release of four "Senior Employees"—and only these four Employees—on the Senior Employees agreeing to take less favorable treatment on their claims than what other creditors (including Employees) are receiving. *See* Plan Art. IX.D. No other Employees are required to sign a stipulation to be included as a Released or Exculpated Party. And no other Employees in the same class are provided different and lesser treatment with respect to the Plan's treatment of their claims. This violates § 1123(a)(4) because the Plan is providing less favorable treatment to creditors (Employees vs Senior Employees) whose claims are classified in the same class.

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 880 of 1598   PageID 13927
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 4 of 16

### 2.    The Stipulation Suffers from Numerous Defects.

The form of the stipulation the Debtor drafted has not been approved or accepted by any "Senior Employee," for good reason. The form itself suffers from a number of substantial defects. The following are just some of the examples of defects in the Debtor's proposed stipulation.

- The draft stipulation wrongly states that "the Committee objected to the Senior Employee receiving the Earned Amounts during the Chapter 11 Case and the Earned Amounts, although earned, was [sic] not paid" (with no reference to the record of any such alleged objection).

- It fails to explain why the supposed Committee objection is relevant, given that the Debtor obtained Court authority to pay *all* Employees (other than James Dondero and Mark Okada) their bonus amounts. That authority to pay all Employees their bonus payments in the ordinary course of business was not conditioned on Committee approval (or made subject to a Committee veto);

- The draft stipulation contains a vague standard for what constitutes "Confidential Information" that the Senior Employee is required to keep confidential, including "discussions, information, and observations" and undefined "business sensitive information."

- It vests sole authority in the Claimant Trustee and the "Independent Member" of the Claimant Trust Oversight Committee ("CTOC") (who is only "independent" because they do not hold a claim, but otherwise is selected exclusively by the CTOC) to determine whether the Senior Employee has complied with the conditions for a release, with no right of the Senior Employee to dispute such determination and seek a court decision on whether that determination was justified.

- With respect to the "Earned Amount" of a Senior Employee's compensation, the stipulation requires the Senior Employee to reduce his claims to Convenience Claims and then further reduce such claims by 40% in exchange for the possibility that the Senior Employee will be released on the date at some point in the distant future when the Claimant Trust is dissolved. The stipulation provides no mechanism, however, for the Senior Employee to recover claims and distributions that he forfeited, or even to preserve such rights as defenses or offsets against any claims that might be asserted.

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 881 of 1598    PageID 13928
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 5 of 16

In addition to the defects listed above, the stipulation also is rife with vague standards with which the Senior Employee has to comply if the Senior Employee ultimately wants to be released from claims. Moreover, the stipulation provides no requirement that the Claimant Trustee provide notice to the Senior Employee of any purported violation of the Stipulation and ability to cure. The vague requirements include the following: (1) The Senior Employee "works with or assists any person to sue, attempt to sue, or threaten" a number of parties, including any "Released Party" "in connection with any claim or cause of action arising prior to the Effective Date." (What does it mean to "work with or assist"? What if the Senior Employee is compelled to provide information by means of a subpoena or other requirement under applicable law? Read literally, the "causes of action" (which are not defined) do not even have to relate to the Debtor); (2) The Senior Employee "has taken any action that, [sic] impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets" (This language, read literally, could apply even to actions taken prepetition. The draft stipulation provides no specifics about what kinds of action could "impair" the value and does not even require a material impairment as a basis for taking away the Senior Employee's release.); (3) The Senior Employee "has violated the confidentiality provision" (Again, this is not defined by any time frame, could include any discussions that occurred prior to execution of the stipulation, and fails to carve out any disclosure required by a subpoena or otherwise in accordance with applicable law); (4) The Senior Employee, "upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith ... or has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor." (The stipulation should set forth what

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 882 of 1598 PageID 13929
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 6 of 16

actions will be required of the Senior Employee to comply with this standard and should provide for reimbursement to the Senior Employee if compliance with the provision would require the Senior Employee to incur any expenses; otherwise, the Senior Employee should be relieved from any obligation to comply with such provision.).

> 3. **The Debtor Improperly Has Attempted to Prevent the Senior Employees from Making the Convenience Class Election.**

Each of the Senior Employees has filed a proof of claim in these cases. That proof of claim asserts PTO Claims under the Plan, claims for compensation amounts that have been earned and not paid (the "*Liquidated Awards*"), and other claims that might arise in the future, including contingent indemnification claims and claims for future compensation amounts (the "*Other Claims*"). As reflected in a chart prepared by the Debtor summarizing the Liquidated Awards, attached hereto as **Exhibit A** (the "*Liquidated Awards Spreadsheet*"), the Debtor does not dispute the amount of the Liquidated Awards. The Debtor also does not dispute that the Senior Employees' PTO Claims, which were part of the Senior Employees' proofs of claim, will be paid under Class 6 of the Plan. As of the date hereof, no objection has been filed to any of the claims asserted by the Senior Employees. As such, the PTO Claims, the Liquidated Awards, and the Other Claims all constitute allowed claims within the meaning of § 502(a) of the Bankruptcy Code.[1]

What is in dispute is the priority of the Liquidated Awards and the Other Claims— the Senior Employees assert that the Liquidated Awards and Other Claims are entitled to administrative expense priority, while the Debtor disagrees. The Senior Employees will file

---

[1] Section 502(a) provides, in relevant part, that a "claim ..., proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects."

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 883 of 1598    PageID 13930
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 7 of 16

a motion requesting payment of such claims as administrative expenses, and the Senior Employees are not asking the Court to address that issue in connection with confirmation. Without prejudice to such such issue, however, the Senior Employees seek to protect their rights under the Plan to elect to have the Liquidated Awards, which otherwise would be General Unsecured Claims within the scope of Class 8 of the Plan, be treated as Convenience Claims under Class 7 the Plan if it is determined that the Liquidated Awards are prepetition claims.

> a)    *The Plan Gives Class 8 Creditors the Right to Make the Convenience Class Election.*

Article I.B.43 of the Plan defines a "Convenience Claim" as "any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or *any General Unsecured claim* that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims" (emphasis added). With respect to holders of General Unsecured Claims in Class 8, Article III.H.8 of the Plan allows any holder of an "Allowed Class 8 Claim" to "make[] a valid Convenience Class Election." The "Convenience Class Election" is "the option provided to each Holder of *a General Unsecured Claim that is a liquidated Claim* as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims." Plan Art. I.A.43 (emphasis added). Nowhere does the Plan define what is meant by requiring that a claim be "liquidated," as opposed to "Allowed." In addition, nowhere does the Plan purport to require that a creditor aggregate all their claims within a Class for the purposes of making the Convenience Class Election.

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 884 of 1598    PageID 13931
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 8 of 16

Moreover, nowhere does the Plan condition the right of the Senior Employees to make the Convenience Class Election on their execution of the Senior Employee Stipulation. Although the definition of "Convenience Claim" makes it clear that execution of the Senior Employee Stipulation gives rise to a "Reduced Employee Claim" that will be treated as a Convenience Claim, nowhere does the Plan provide for the converse -- that the failure to sign the Senior Employee Stipulation would deprive the Senior Employees of their right to make the Convenience Class Election. Indeed, the only consequence of failing to sign the Senior Employee Stipulation is set forth in Article IX.D. of the Plan, which conditions the release of Senior Employees under Article IX.D. upon execution of the Senior Employee Stipulation. This is consistent with the representations made by the Debtor and its counsel (as reflected in the Liquidated Awards Spreadsheet) -- the Senior Employees could elect not to be released but to have their Liquidated Awards treated as Convenience Claims in the same manner as other holders in Class 7, or the Senior Employees could sign the Senior Employee Stipulation, receive a release, and limit their recovery to the Reduced Employee Claim amount.

> **b)** ***The Debtor Has Contradicted the Plan in Answering Questions Raised by the Senior Employees Concerning the Convenience Class Election.***

Although the Senior Employees had not signed the Senior Employee Stipulation as of the distribution of the solicitation packages, each of the Senior Employees received two ballots -- a Class 7 (Convenience Class) ballot in the Reduced Employee Claim amount and a Class 8 (General Unsecured Claims) ballot in the amount of $1.00 (for voting purposes only).

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 885 of 1598 PageID 13932
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 9 of 16

Because of the confusion created by the ballots and given the Debtor's failure to define "liquidated" in the Plan, the Senior Employees, through their counsel, sought to clarify that their understanding of the Convenience Class Election was consistent with how the Plan had been described to them by the Debtor's advisers—the Liquidated Awards would be "dropped down" to Class 7, but the Other Claims would remain as Class 8. The text of the ensuing email exchange with the Debtor's counsel is attached hereto as **Exhibit B**. In short, the Debtor, for the first time has taken the position that (1) a Class 8 Creditor may only make the Convenience Class Election for all of its Class 8 Claims, and (2) a Class 8 Creditor may only make the Convenience Class Election if all of its Class 8 Claims are liquidated as of the Confirmation Date. As a result, the Debtor's counsel has stated that the Senior Employees have no right to make the Convenient Class Election. This is inconsistent with numerous other representations of the Debtor and its counsel to the Senior Employees.

> c) ***The Debtor's Interpretation of the Convenience Class Election Is Inaccurate and Inconsistent with its Prior Positions.***

The Senior Employees object to this interpretation because (1) it is not supported by the text of the provisions relating to the Convenience Class Election, (2) is inconsistent with the other terms in the Plan, (3) is inconsistent with the Debtor's statements about the Plan in its discussions with the Senior Employees, (4) seemingly ignores that that a creditor may hold multiple claims within a class, and (5), if applied to exclude Class 8 creditors having Claims that also are unliquidated, violates § 1123(a)(4) of the Bankruptcy Code.

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 886 of 1598 PageID 13933
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 10 of 16

As set forth above, the plain language of the Plan regarding the Convenience Class Election provides that the Convenience Class Election may be exercised with respect to ***any*** General Unsecured Claim that is liquidated. It does not require that ***all*** of a holder's General Unsecured Claims be liquidated. Nor does it require that a holder of a General Unsecured Claim make the election with respect to all its claims. The text clearly states that the election is available to ***a*** General Unsecured Claim that is ***a*** "liquidated claim."

Moreover, the "all or nothing" approach to the Convenience Class Election ignores that the Plan otherwise generally recognizes that a proof of claim may comprise multiple claims. That is why, for example, the Senior Employees' PTO Claims (which are asserted in the same proofs of claim that cover the Liquidated Awards and the Other Claims) are being classified and treated in Class 6. The approach also ignores that the Plan specifically recognizes in the form of Senior Employee Stipulation that ***only*** the Liquidated Awards (defined in the Senior Employee Stipulation as the "Earned Amounts") would be subject to the Convenience Class Election. Nothing in the form of the Senior Employee Stipulation even purports to characterize allowing only the Senior Employees to opt into the Convenience Class only for the Liquidated Awards as a modification of an "all or nothing" requirement in the Plan.

The Debtor's last-minute interpretation also flies in the face of statements that the Debtor and its counsel made to the Senior Employees about the Convenience Class Election. The Liquidated Awards Spreadsheet, ***which was prepared by the Debtor's counsel***, makes this clear -- it shows the recovery to the Senior Employees if they do not sign the Senior Employee Stipulation but make the Convenience Class Election, and it

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 887 of 1598    PageID 13934
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 11 of 16

separately shows the reduced recovery for the Senior Employees if they elect to be released and sign the Senior Employee Stipulation.

In the absence of specific aggregation language in the Plan, a holder of a Class 8 General Unsecured Claim should be allowed to make the Convenience Class Election with respect to all, some, or none of its claims within Class 8. The Debtor seemingly ignores the well-supported principle that a single creditor may hold multiple claims, even within the same class.[2]

Finally, the Plan may not impose a condition to eligibility for the Convenience Class Election that provides some General Unsecured Claims in Class 8 with more favorable treatment than other General Unsecured Claims in Class 8. Putting aside whether the requirement that a particular claim be "liquidated" is itself a valid condition to making the Convenience Class Election, arbitrarily excluding the claims of creditors such as the Senior Employees from making the election with respect to their admittedly liquidated General Unsecured Claims because such creditors also have other claims that have not been liquidated violates § 1123(a)(4)'s proscription against unequal treatment of claims within the same class under a plan.

---

[2] *See, e.g., Figter Ltd. v. Teachers Ins. Annuity Ass'n* (*In re Figter Ltd.*), 118 F.3d 635, 640-641 (9th Cir. 1997) (allowing claims purchaser to vote separately each purchased claim within the same class); *In re Vicor Techs., Inc.*, No. 12-39329-EPK, 2013 WL 1397460, at *9 (Bankr. S.D. Fla. Apr. 5, 2013) ("a single creditor may hold multiple claims against an alleged debtor."); *In re Cohn-Phillips, Ltd.*, 193 B.R. 757, 763 n.8 (Bankr. E.D. Va. 1996) (In applying section 303(b) of the Bankruptcy Code,"The claims of a holder of multiple claims are not dismissed merely because one of them is subject to a bona fide dispute.")*Concord Square Apartments of Wood Cty, Ltd. v. Ottawa Properties, Inc.* (*In re Concord Square Apartments of Wood Cty., Ltd.*), 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) (creditor with "multiple claims has a voting right for each claim it holds"); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) ("[Creditor with two unsecured claims] is entitled to one vote for each of his unsecured Class X claims").

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 888 of 1598 PageID 13935
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 12 of 16

### 4. The Plan Identifies No Basis for its Disparate and Unfair Treatment of Senior Employees.

With respect to the draft stipulation, the Debtor has not provided any justification for why it is singling out certain "Senior Employees" for disparate treatment, or explained how the Debtor even selected which employees were placed into the "Senior Employees" category. The Debtor has not disclosed why the four apparently arbitrarily selected Senior Employees are not entitled to be released and protected from third party claims under the Plan in the same manner as other similarly situated and classified employees. The Plan identifies no claims or causes of action against any of the Senior Employees. Nor does the Plan identify any reason why the Senior Employees have not been paid their promised bonus payments, which were approved by the Court over a year ago and for which the Debtor has reserved and reported cash being held to pay. Nothing in the Plan or the Debtor's prior representations to the Court and to the Senior Employees throughout the pendency of the bankruptcy case provides any justification for providing disparate and less favorable treatment of the Senior Employees than what all other Employees are receiving.

What the Debtor is offering the Senior Employees is essentially a Hobson's choice: either accept the lesser treatment imposed on them by the terms of the non-negotiable stipulation the Debtor seeks to force on them as a condition for being included as a Released or Exculpated Party (along with treatment of their Class 8 claims that is less favorable treatment than what their fellow employees receive or have received) or receive the same treatment but without the benefit of the Plan's releases and exculpations that are made available to all other Employees who are not required to sign the "stipulation." This is the illusion of choice, and is impermissible under Bankruptcy Code § 1123(a)(4).

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 889 of 1598    PageID 13936
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 13 of 16

Likewise, concerning the Convenience Class Election, the Debtor has provided no justification for arbitrarily permitting Class 8 holders of fully liquidated claims the choice to have their claims treated as Class 7 Convenience Claims while not permitting holders of claims that have not been liquidated or holders of multiple claims (some of which have been liquidated and others not) to do the same. Again, the Debtor has singled out the Senior Employees for disparate and less favorable treatment without explanation and without legal basis, in violation of § 1123(a)(4) of the Bankruptcy Code.

### B.      Under the Plan any Claim Can Be Re-Classified and Subordinated.

The Debtor's Plan provides that claims classified as Subordinated Claims are placed in Class 9, which is subordinate in treatment to Convenience and General Unsecured Claims. This is typical for plans of reorganization. But the Plan also provides the Debtor—and after confirmation, the Claimant Trustee—with apparently unfettered discretion and power to "re-classify" as a Subordinated Claim any claim that had previously been classified differently. This is neither typical nor legally permissible.

Plan Article 3.J provides that "the Debtor the Reorganized Debtor, and the Claimant Trustee *reserve the right to re-classify*, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination." (Emphasis added).

Under the Plan as drafted, then, the Debtor is classifying claims and soliciting votes from claim holders based on those classifications, but at any time and, apparently, for any reason (or no reason at all), the Debtor, the Reorganized Debtor, or Claimant Trustee

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 15 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 890 of 1598   PageID 13937
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21   Entered 01/05/21 16:37:19   Page 14 of 16

"reserve the right" to change the classification of and re-classify it as a Subordinated Claim. There is no basis in law to support such a sweeping power.

### C.      *The Plan Violates Bankruptcy Code §§ 1125 and 1127.*

Section 1127(a) of the Bankruptcy Code allows the Debtor to modify the Plan at any time before confirmation, and § 1127(b) allows the Debtor to modify the Plan after confirmation but before the Plan is substantially consummated. Such modifications, however, are subject to a number of conditions, including the requirement under §1127(c) that the Debtor comply with § 1125 with respect to the Plan, as modified. By reserving the right to make changes without Court approval, failing to provide final versions of the Plan Documents (which are expressly part of the Plan), and asking the Court to approve the Plan in what is essentially draft form, the Debtor is asking the Court to ignore the express requirements of §§ 1125 and 1127.

The Plan provides that, to the extent that the Committee and the Debtor cannot agree upon the terms of any particular document, the issue will be submitted to non-binding mediation. The Plan also provides that finalizing the Plan Documents is a condition to the Effective Date, but the Committee and the Debtor have the right to waive that condition in their sole discretion. And the Plan does not require the Debtor to demonstrate that, upon a document that is part of the Plan being finalized, the Plan as modified complies with the applicable provisions of the Bankruptcy Code. The Debtor and the Committee simply can agree upon terms, and those terms apparently are binding on all creditors without any further Court approval.

Senior Employees' Limited Objection to Fifth Amended Plan                                    14

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 891 of 1598    PageID 13938
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 15 of 16

Essentially, the Debtors are asking creditors and the Court to consider and approve the Plan before the Plan is even finalized, and the Plan impermissibly grants the Debtor and the Committee carte blanche to make amendments to the Plan post-confirmation without complying with § 1127 of the Bankruptcy Code.

## III.    CONCLUSION

The Plan should not be confirmed unless the defects identified in this limited objection are corrected, and the Court should allow the Senior Employees to make the Class 7 Convenience Class Election if they so choose.

*Remainder of Page Intentionally Left Blank*

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 892 of 1598    PageID 13939
27
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 16 of 16

Respectfully submitted January 5, 2021

By:  */s/ Frances A. Smith*
Judith W. Ross
State Bar No. 21010670
Frances A. Smith
State Bar No. 24033084
Eric Soderlund
State Bar No. 24037525
**ROSS & SMITH, PC**
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: judith.ross@judithwross.com
frances.smith@judithwross.com
eric.soderlund@judithwross.com

Michelle Hartmann
State Bar No. 24032402
**BAKER & McKENZIE LLP**
1900 North Pearl
Suite 1500
Dallas, TX 75201
Telephone:  214-978-3000
Facsimile:  214-978-3099
Email: michelle.hartmann@bakermckenzie.com

Debra A. Dandeneau
**BAKER & McKENZIE LLP**
452 Fifth Ave
New York, NY 10018
Telephone: 212-626-4875
Email: debra.dandeneau@bakermckenzie.com
(*Pro hac vice motion pending*)

**COUNSEL   FOR   SCOTT   ELLINGTON,
THOMAS SURGENT, FRANK WATERHOUSE,
AND ISAAC LEVENTON**

# Exhibit A

Case 19-34054-sgj11 Doc 1669-1 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 2 of 2

| Employee | Earned Bonus | Convenience Class Reduction | Total Convenience Class Claim | Convenience Class Treatment (85%) | Add'l Reduction (40%) | Total Payment | % of Earned Bonus |
|---|---|---|---|---|---|---|---|
| Scott Ellington | $ 1,367,197.00 | $ 367,197.00 | $ 1,000,000.00 | $ 850,000.00 | $ 340,000.00 | $ 510,000.00 | 37% |
| Frank Waterhouse | $ 791,579.00 | $ - | $ 791,579.00 | $ 672,842.15 | $ 269,136.86 | $ 403,705.29 | 51% |
| Thomas Surgent | $ 1,191,748.00 | $ 191,748.00 | $ 1,000,000.00 | $ 850,000.00 | $ 340,000.00 | $ 510,000.00 | 43% |
| Isaac Leventon | $ 589,198.00 | $ - | $ 589,198.00 | $ 500,818.30 | $ 200,327.32 | $ 300,490.98 | 51% |

Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 1 of 8

# Exhibit B

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 896 of 1598   PageID 13943
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 2 of 8

**Dandeneau, Debra A.**

| | |
|---|---|
| **From:** | Jeff Pomerantz <jpomerantz@pszjlaw.com> |
| **Sent:** | Monday, January 4, 2021 9:19 PM |
| **To:** | Dandeneau, Debra A. |
| **Cc:** | Gregory V. Demo; Ira Kharasch; Frances A. Smith; Eric Soderlund; Hartmann, Michelle; Jeff Pomerantz |
| **Subject:** | Re: [EXTERNAL] RE: HIGHLAND:  Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S CORRECT EMAIL |

Raise your concerns with the Judge Debra.

Jeff

From: "Dandeneau, Debra A." <Debra.Dandeneau@bakermckenzie.com>
Date: Monday, January 4, 2021 at 9:17 PM
To: Jeffrey Pomerantz <jpomerantz@pszjlaw.com>
Cc: Greg Demo <GDemo@pszjlaw.com>, Ira Kharasch <ikharasch@pszjlaw.com>, "Frances A. Smith" <Frances.Smith@judithwross.com>, Eric Soderlund <Eric.Soderlund@judithwross.com>, "Hartmann, Michelle" <Michelle.Hartmann@bakermckenzie.com>
Subject: Re: [EXTERNAL] RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S CORRECT EMAIL

Dear Jeff,

A claim is a right to payment, and a claimant may hold multiple claims.  Nowhere in the plan does it state that a claimant must make the Convenience Class Election with respect to all of its claims.  To the contrary, the definition of "Convenience Class Election" refers to a "claim" in the singular:  "the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims." (Emphasis added)

There are ways for a plan to provide that a creditor's claims must be aggregated for the purposes of the convenience claim election (and I am sure that Pachulski has come across numerous examples in its practice).  Your plan, however, is not one of these examples.

Best,

Deb

Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Ave<x-apple-data-detectors://0/1>
New York, NY  10018<x-apple-data-detectors://0/1>
Tel: +1 212 626 4875<tel:+1%20212%20626%204875>
Mobile: +1 973 477 6220<tel:+1%20212%20626%204875>

RESTRUCTURING
& INSOLVENCY


Baker's Global Restructuring & Insolvency Blog:
http://restructuring.bakermckenzie.com<http://restructuring.bakermckenzie.com>


On Jan 4, 2021, at 8:39 PM, Jeff Pomerantz <jpomerantz@pszjlaw.com> wrote:
Debra –

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 897 of 1598 PageID 13944
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 3 of 8

Greg responded below that the term liquidated, as that term is used in the plan, means a claim in a sum certain. Your clients do not have a liquidated claim as their claims include amounts which are not in a sum certain. Accordingly, the convenience class treatment is not available to them

Best,
Jeff

From: "Dandeneau, Debra A." <Debra.Dandeneau@bakermckenzie.com>
Date: Monday, January 4, 2021 at 7:53 PM
To: Greg Demo <GDemo@pszjlaw.com>
Cc: Jeffrey Pomerantz <jpomerantz@pszjlaw.com>, Ira Kharasch <ikharasch@pszjlaw.com>, "Frances A. Smith" <Frances.Smith@judithwross.com>, Eric Soderlund <Eric.Soderlund@judithwross.com>, "Hartmann, Michelle" <Michelle.Hartmann@bakermckenzie.com>
Subject: Re: [EXTERNAL] RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S CORRECT EMAIL

Dear Greg,

Thank you for your response. I think you are conflating the term "Allowed" (which actually is defined in the plan) with the term "liquidated" (which nowhere is defined in the plan). It would be helpful to understand how a claim becomes "liquidated" in your view if it means something other than allowance. Moreover, I would note that, pursuant to section 502(a) of the Bankruptcy Code, a claim, proof of which is properly filed, is deemed allowed unless and until a party in interest objects. I am not aware of any pending objections to our clients' claims, proofs of which were properly filed. If you interpret "liquidated" to mean something more stringent than "allowed," please let me know what that definition is.

In any event, it is helpful to understand that your position is that claimants who do not have allowed claims as of the confirmation date cannot receive the same treatment under the plan as claimants who have "liquidated" claims.

If your view changes, please let me know.

Best,

Deb

Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Ave<x-apple-data-detectors://0/1>
New York, NY 10018<x-apple-data-detectors://0/1>
Tel: +1 212 626 4875<tel:+1%20212%20626%204875>
Mobile: +1 973 477 6220<tel:+1%20212%20626%204875>

RESTRUCTURING
& INSOLVENCY

Baker's Global Restructuring & Insolvency Blog:
http://restructuring.bakermckenzie.com<http://restructuring.bakermckenzie.com><http://restructuring.bakermckenzie.com <http://restructuring.bakermckenzie.com>>

On Jan 4, 2021, at 7:42 PM, Gregory V. Demo <GDemo@pszjlaw.com> wrote:
Your clients' claims are not entitled to make the convenience class election because they are not fully liquidated, which for purposes of the plan provisions means a claim in a sum certain. The component parts of your clients' claims do not matter for purposes of this analysis. They are not entitled to make the convenience class election because their claims are not liquidated.

Your clients had the opportunity to sign the Senior Employee Stipulation, which would have given them a reduced convenience claim amount with respect to three parts of their claim with the balance of their claims being treated as GUCs. That stipulation and the resulting convenience claim provided the consideration for the release. As your clients'

APPX. 07997

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 898 of 1598 PageID 13945
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 4 of 8

have rejected the Senior Employee Stipulation, there is no pathway to any portion of their claims receiving convenience class treatment.

Gregory V. Demo
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Fax: 212.561.7777
GDemo@pszjlaw.com<mailto:GDemo@pszjlaw.com>
vCard<https://urldefense.com/v3__http://www.pszjlaw.com/vcard-
130.vcf__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZFyOyEpA
$<https://urldefense.com/v3__http://www.pszjlaw.com/vcard-
130.vcf__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZFyOyEpA
$>> | Bio<https://urldefense.com/v3__http://www.pszjlaw.com/attorneys-
130.html__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZY8MhLG
A$<https://urldefense.com/v3__http://www.pszjlaw.com/attorneys-
130.html__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZY8MhLG
A$>> | LinkedIn<https://urldefense.com/v3__https://www.linkedin.com/in/gregory-demo-
482aa112__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcarZZ_Yp
w$<https://urldefense.com/v3__https://www.linkedin.com/in/gregory-demo-
482aa112__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcarZZ_Yp
w$>>

<https://urldefense.com/v3__http://www.pszjlaw.com/__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c
8d1Q14y7xeCHFwYFqNBPJlpkbcZjsiDugQ$<https://urldefense.com/v3__http://www.pszjlaw.com/__;!!Hj9Y_P0nvg!A1iO
3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZjsiDugQ$>>
<image002.jpg><https://urldefense.com/v3__http://www.pszjlaw.com/__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRB
vvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZjsiDugQ$<https://urldefense.com/v3__http://www.pszjlaw.com/__;!!Hj
9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZjsiDugQ$>>


Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

From: Dandeneau, Debra A. [mailto:Debra.Dandeneau@bakermckenzie.com]
Sent: Monday, January 04, 2021 8:34 PM
To: Gregory V. Demo; Jeff Pomerantz; Ira Kharasch
Cc: 'Frances A. Smith'; 'Eric Soderlund'; Hartmann, Michelle
Subject: RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S
CORRECT EMAIL

Thanks, Greg. I don't mean to be dense about this, but I want to make sure that we are all on the same page in terms of what you mean by "liquidated," especially as I have never seen this kind of qualification in a plan before. I am not trying to box anyone into anything in terms of the debtor's ability to object to our clients' claims, but I would like to make sure it is clear what claims will not be subject to the dropdown election and what claims are permitted to make the dropdown election. The three categories below are what comprise the "Earned Amounts" category in the draft stipulation. The draft stipulation provides that all rights are reserved with respect to other claims. I know that our clients have not signed the stipulation, but we would like to make sure that any future awards or other claims will be part of Class 8 and not subject to Class 7 treatment if our clients make the Class 7 election. Conversely, we also want to make sure that, subject to whatever rights the debtor has to object to our clients' claims, if our clients do not prevail in asserting their administrative expenses, the categories of claims that I listed below are subject to treatment under Class 7.

I think these are fair questions to ask, and I did not see any explanation of your use of the term "liquidated" in the disclosure statement that would help me understand how the debtor intends for the provision to work.

Finally, in case you are concerned about duplication of effort, I first checked with David Neier to see if he had clarified this issue, and he confirmed that he has not clarified this outside of the context of the draft stipulation.

Best,

Deb

Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 899 of 1598   PageID 13946
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21   Entered 01/05/21 16:37:19   Page 5 of 8

United States
Tel: +1 212 626 4875
Mobile: +1 973 477 6220
debra.dandeneau@bakermckenzie.com<mailto:debra.dandeneau@bakermckenzie.com>

<image003.png>

bakermckenzie.com<http://www.bakermckenzie.com/en<http://www.bakermckenzie.com/en>> |
Facebook<https://urldefense.com/v3/__https://www.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTd
Kzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcZrv5Yaog$<https://urldefense.com/v3/__https://ww
w.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeC
HFwYFqNBPJIpkbcZrv5Yaog$>> | LinkedIn<https://urldefense.com/v3/__https://www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcZ6Rgef1g
$<https://urldefense.com/v3/__https://www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcZ6Rgef1g
$>> |
Twitter<https://urldefense.com/v3/__https://twitter.com/bakermckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRB
vvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcYyoyVXcw$<https://urldefense.com/v3/__https://twitter.com/bakermcke
nzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcYyoyVXcw$>>


From: Gregory V. Demo <GDemo@pszjlaw.com>
Sent: Monday, January 4, 2021 5:17 PM
To: Dandeneau, Debra A. <Debra.Dandeneau@bakermckenzie.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Ira
Kharasch <ikharasch@pszjlaw.com>
Cc: 'Frances A. Smith' <Frances.Smith@judithwross.com>; 'Eric Soderlund' <Eric.Soderlund@judithwross.com>;
Hartmann, Michelle <Michelle.Hartmann@bakermckenzie.com>
Subject: [EXTERNAL] RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN
WITH GREG'S CORRECT EMAIL


Ms. Dandeneau,

As we conveyed to Mr. Neier, only fully liquidated claims are allowed to elect convenience class treatment.  Art. I.B.43;
Art. III.H.8.  Assuming that any portion of your clients' claim is allowed and/or liquidated, partially liquidated claims, like
your clients', are not eligible for conversion.

Best,
Greg
Gregory V. Demo
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Fax: 212.561.7777
GDemo@pszjlaw.com <mailto:GDemo@pszjlaw.com>
vCard<https://urldefense.com/v3/__http:/www.pszjlaw.com/vcard-
130.vcf__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcTKa1-
_Sw$<https://urldefense.com/v3/__http:/www.pszjlaw.com/vcard-
130.vcf__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcTKa1-
_Sw$>> | Bio<https://urldefense.com/v3/__http:/www.pszjlaw.com/attorneys-
130.html__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcSqMu
P9BA$<https://urldefense.com/v3/__http:/www.pszjlaw.com/attorneys-
130.html__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcSqMu
P9BA$>> | LinkedIn<https://urldefense.com/v3/__https://www.linkedin.com/in/gregory-demo-
482aa112__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcT-
iwCu7Q$<https://urldefense.com/v3/__https://www.linkedin.com/in/gregory-demo-
482aa112__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcT-
iwCu7Q$>>
<https://urldefense.com/v3/__http:/www.pszjlaw.com/__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8
UENohmXbycpJ08D0ubpNEqelUnLjLcS61sTc0A$<https://urldefense.com/v3/__http:/www.pszjlaw.com/__;!!Hj9Y_P0nvg!
AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcS61sTc0A$>>
<image002.jpg><https://urldefense.com/v3/__http:/www.pszjlaw.com/__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUm
e92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcS61sTc0A$<https://urldefense.com/v3/__http:/www.pszjlaw.com/_
_;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcS61sTc0A$>>

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 900 of 1598 PageID 13947
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 6 of 8

Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

From: Dandeneau, Debra A. [mailto:Debra.Dandeneau@bakermckenzie.com]
Sent: Monday, January 04, 2021 7:43 PM
To: Jeff Pomerantz; Ira Kharasch; Gregory V. Demo
Cc: 'Frances A. Smith'; 'Eric Soderlund'; Hartmann, Michelle
Subject: RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S
CORRECT EMAIL


Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
United States
Tel: +1 212 626 4875
Mobile: +1 973 477 6220
debra.dandeneau@bakermckenzie.com<mailto:debra.dandeneau@bakermckenzie.com>

<image003.png>

bakermckenzie.com<http://www.bakermckenzie.com/en<http://www.bakermckenzie.com/en>> |
Facebook<https://urldefense.com/v3/__https:/www.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrP
R4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQM8vZt-
w$<https://urldefense.com/v3/__https:/www.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88
B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQM8vZt-w$>> |
LinkedIn<https://urldefense.com/v3/__https:/www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcRuO
N0gQw$<https://urldefense.com/v3/__https:/www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcRuO
N0gQw$>> |
Twitter<https://urldefense.com/v3/__https:/twitter.com/bakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUm
e92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQkfs4q0g$<https://urldefense.com/v3/__https:/twitter.com/bakermc
kenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQkfs4q0
g$>>


This message may contain confidential and privileged information. If it has been sent to you in error, please reply to
advise the sender of the error and then immediately delete this message. Please visit
www.bakermckenzie.com/disclaimers<http://www.bakermckenzie.com/disclaimers><http://www.bakermckenzie.com/discl
aimers<http://www.bakermckenzie.com/disclaimers>> for other important information concerning this message.


From: Dandeneau, Debra A.
Sent: Monday, January 4, 2021 4:33 PM
To: 'jpomerantz@pszjlaw.com' <jpomerantz@pszjlaw.com<mailto:jpomerantz@pszjlaw.com>>; 'ikharasch@pszjlaw.com'
<ikharasch@pszjlaw.com<mailto:ikharasch@pszjlaw.com>>; 'gdemo@pszjglaw.com'
<gdemo@pszjglaw.com<mailto:gdemo@pszjglaw.com>>
Cc: 'Frances A. Smith' <Frances.Smith@judithwross.com<mailto:Frances.Smith@judithwross.com>>; Eric Soderlund
<Eric.Soderlund@judithwross.com<mailto:Eric.Soderlund@judithwross.com>>; Hartmann, Michelle
<Michelle.Hartmann@bakermckenzie.com<mailto:Michelle.Hartmann@bakermckenzie.com>>
Subject: HIGHLAND: Question re Convenience Class Election under the Plan

Dear Pachulski friends,

As you know, Baker McKenzie and the Ross & Smith firm have been retained by Scott Ellington, Frank Waterhouse, Isaac
Leventon, and Thomas Surgent (the "Senior Employees") to represent them in connection with the Highland Capital
Management case.

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 901 of 1598   PageID 13948
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21   Entered 01/05/21 16:37:19   Page 7 of 8

As you also know, the Senior Employees also assert that they have a right to payment in full of all their compensation-related claims as administrative expenses. I acknowledge that the debtor disagrees. Therefore, reserving all of our respective rights with respect to the administrative expense issue, I want to clarify how the plan works with respect to the election by Class 8 to drop down to Class 7 assuming that the debtor prevails in treating such claims as General Unsecured Claims.

The definition of "Convenience Class Election" in the plan references "a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date." With respect to the Senior Employees, it is our understanding that what is meant by "a liquidated Claim as of the Confirmation Date" only refers to the PY 2018 Bonus Installment 3 2/28/2020, the 2017 Deferred Award 3 Year Cliff Vest 5/31/2020, and the PY 2018 Bonus Installment 4 8/31/2020 and that all other claims that might be characterized as General Unsecured Claims will remain in Class 8 notwithstanding the Class 7 election.

Is this consistent with the debtor's understanding?  If not, could you please explain what the debtor's understanding is and what "a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date" means?

As the deadline for returning ballots is tomorrow, I would appreciate a quick response on this.

Thanks and best regards,

Deb

Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
United States
Tel: +1 212 626 4875
Mobile: +1 973 477 6220
debra.dandeneau@bakermckenzie.com<mailto:debra.dandeneau@bakermckenzie.com>

<image003.png>

bakermckenzie.com<http://www.bakermckenzie.com/en/<http://www.bakermckenzie.com/en/>> |
Facebook<https://urldefense.com/v3/__https:/www.facebook.com/officialbakermckenzie/__;!!Hj9Y_P0nvg!AeuXWQZthwr
PR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcSnkZ_cBA$<https://urldefense.com/v3/__https:/
www.facebook.com/officialbakermckenzie/__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXb
ycpJ08D0ubpNEqelUnLjLcSnkZ_cBA$>> |
LinkedIn<https://urldefense.com/v3/__https:/www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcRuO
N0gQw$<https://urldefense.com/v3/__https:/www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcRuO
N0gQw$>> |
Twitter<https://urldefense.com/v3/__https:/twitter.com/bakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUm
e92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQkfs4q0g$<https://urldefense.com/v3/__https:/twitter.com/bakermc
kenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQkfs4q0
g$>>


This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakermckenzie.com/disclaimers<http://www.bakermckenzie.com/disclaimers> for other important information concerning this message.

_____

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 902 of 1598 PageID 13949
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 8 of 8

strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

_____

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

_____

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

_____

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

APPX. 07302

# EXHIBIT 62

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 904 of 1598 PageID 13951
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 1 of 42
Docket #1670 Date Filed: 01/05/2021

<table>
<tr><td>

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management Fund
Advisors, L.P., NexPoint Advisors, L.P., Highland
Funds I and its series Highland Healthcare
Opportunities Fund, Highland/iBoxx Senior Loan
ETF, Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund, Highland Funds II
and its series Highland Small-Cap Equity Fund,
Highland Socially Responsible Equity Fund,
Highland Fixed Income Fund, and Highland Total
Return Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland Income
Fund, Highland Global Allocation Fund, and
NexPoint Real Estate Strategies Fund, and NexPoint
Latin America Opportunities Fund*

</td><td>

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Highland Capital Management Fund
Advisors, L.P., NexPoint Advisors, L.P., Highland
Funds I and its series Highland Healthcare
Opportunities Fund, Highland/iBoxx Senior Loan
ETF, Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund, Highland Funds II
and its series Highland Small-Cap Equity Fund,
Highland Socially Responsible Equity Fund,
Highland Fixed Income Fund, and Highland Total
Return Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland Income
Fund, Highland Global Allocation Fund, and
NexPoint Real Estate Strategies Fund, and NexPoint
Latin America Opportunities Fund*

</td></tr>
</table>

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

In re:                                       )    Chapter 11
                                             )
HIGHLAND CAPITAL MANAGEMENT, L.P.,           )    Case No. 19-34054 (SGJ11)
                                             )
        Debtor.                              )    (Jointly Administered)
                                             )

**OBJECTION TO CONFIRMATION OF FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.**

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 905 of 1598 PageID 13952
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 2 of 42

Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P. (each, an "**Advisor**," and collectively, the "**Advisors**"), Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund (each, a "**Fund**," and collectively, the "**Funds**," and together with the Advisors, the "**Funds and Advisors**" or "**Objectors**"), by and through their undersigned counsel, hereby submit this objection (the "**Objection**") to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1472], together with that certain Plan Supplement [Dkt. No. 1648] filed December 30, 2020 (the "**Fifth Amended Plan**").[1]  In support of the Objection, the Funds[2] and Advisors respectfully submit to the Court as follows:

## <u>SUMMARY OF OBJECTION</u>

The Debtor owes strict statutory and contractual fiduciary obligations to manage the billions of dollars of other peoples' money that it manages.  No actual or hypothetical conflict of interest is allowed.  Yet, the Fifth Amended Plan, by purporting to assume various agreements pursuant to which the Debtor manages portfolios of assets, places the interests of the Debtor's creditors ahead of the interests of the beneficial interest holders in those portfolios,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] The Funds are investment companies and a business development company registered under the Investment Company Act of 1940 as open-end or "mutual" funds, closed end funds or a business development company. None of the Funds are private or hedge funds.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 906 of 1598 PageID 13953
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 3 of 42

thereby representing a clear conflict of interest and breach of fiduciary duty in violation of the Advisers Act (defined below) and the 1940 Act (defined below).

This is because the Plan provides for the assumption of numerous management agreements in connection with, among other investments, interests in collateralized loan obligations ("**CLOs**") owned in part by the Funds and/or Advisors, together with other investors. In some cases, either the Funds, the Advisors or these entities in conjunction with other objecting creditor(s) own or manage a majority of the remaining beneficial interests in such CLOs. To be clear, the CLO -- not the Funds nor the Advisors nor the Debtor -- is the issuer of these interests. Nevertheless, it is the Funds and Advisors who hold the beneficial and economic interests and who, pursuant to the underlying agreements, in many instances have the ability to control who the servicer or manager of the portfolios is. However, the Plan reveals that the Debtor intends to dismiss its investment management employees by the end of January 2021 and to employ a subagent to perform its current portfolio manager/servicer role. The Debtor intends to effectively wind-down and liquidate the CLOs' assets within two years—an arbitrary proposition having nothing to do with what is in the best interests of the CLOs. The Debtor also intends to strip the Funds and the Advisors of their contractual and statutory rights, and to improperly insulate itself from potential future liabilities that it may incur on account of its portfolio management.

The Plan cannot be confirmed so long as it provides for the assumption of these agreements. First, these agreements cannot be assigned under the Advisers Act or the 1940 Act, meaning that they cannot be assumed pursuant to section 365(c) of the Bankruptcy Code. Second, these agreements cannot be assumed under section 365(b) of the Bankruptcy Code because the Debtor cannot adequately assure its future performance under the agreements.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 907 of 1598   PageID 13954
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 4 of 42

Third, these agreements cannot be assumed if the Plan purports to change their provisions or relieve the Debtor from its fiduciary obligations and resulting potential liabilities.  Fourth, the Plan is not feasible and is illusory so long as it depends on future income from these non-assumable agreements.  Fifth, the Plan fails to comply with applicable law by seeking to relieve the Debtor of the strict duties imposed on it by the Advisers Act and 1940 Act.  Indeed, the Plan is an invitation for future litigation against the Debtor for future breaches by the Debtor of its contractual obligations and violations by the Debtor of federal law.

The Plan is not merely a disagreement between the Debtor, on the one hand, and the Funds and Advisers, on the other hand, as to how to manage the CLOs.  The Plan instead represents an attempt by the Debtor to strip beneficial interest holders of their contractual and statutory rights, to improperly insulate itself against its future actions and liabilities, to avoid the dictates of the Advisers Act, and to use assets that it manages—assets that do not belong to the Debtor—to benefit the Debtor's creditors at the expense of the actual owners of those assets. It is one thing for the Debtor to liquidate and to seek to repay its creditors, but it is another thing entirely for the Debtor to do this on the backs, and at the expense, of those investors whose interests the Debtor is charged with serving first.

For these and other reasons argued below, the Objectors object to the confirmation of the Plan.

The purported contract assumption is also illusory in that the Debtor's plan is premised upon the liquidation of assets in which the Debtor has no interest and which a majority of the beneficial owners has expressed, and continue to express, a desire for a different portfolio management strategy than the one the Debtor intends to continue to employ.  The contracts the Debtor proposes to assume contain provisions requiring the maximization of the return to or

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 908 of 1598   PageID 13955
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 5 of 42

preservation of the value of the collateral for the preference shareholders; these parties prefer that the assets not be liquidated, but maximized or preserved. Moreover, the Advisers Act[3] requires the Debtor to comply with the portfolio management contracts for the protection of the investors in the Funds, CLOs and other products. The Debtor's purported assumption of these agreements, while other provisions of the Fifth Amended Plan make clear key provisions of the assumed contracts will be ignored and rejected in this context, is a similar form of "cherry picking" that section 365 does not countenance.[4]

## BACKGROUND

**A.    _General Background on Funds and Advisors_**

1.        Each Advisor is registered with the U.S. Securities and Exchange Commission ("**SEC**") as an investment adviser under the Investment Advisers Act of 1940, as amended, 15 U.S.C. § 80b-1 *et. seq.* (the "**Advisers Act**").

2.        Each of the Funds is a registered investment company or business development company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1, *et. seq.* (the "**1940 Act**") and is advised by one of the Advisors.

3.        As an investment company or business development company, each Fund is managed by an independent board of trustees subject to 1940 Act requirements. That board determines and contracts with one of the Advisors for each Fund. As is typical for nearly all

---

[3] The Advisers Act and the 1940 Act (defined in numbered paragraph 2 below) are two separate acts, both adopted in 1940, and provide the essential statutory and regulatory structure for the Debtor's business, as well as the Advisors and the Funds, to operate legally and transparently for the benefit of the public.

[4] The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 909 of 1598 PageID 13956
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 6 of 42

investment companies, the Funds do not have employees. Instead, pursuant to the 1940 Act, each Fund's board oversees the Advisor and the Advisor, acting pursuant to the advisory agreements, provides the services necessary to the Fund's operations.[5] The Funds are each managed by one of the two Advisors. The Advisors have some employees, but they also rely heavily on the Debtor to provide a variety of services. Further, certain individuals employed or affiliated with the Debtor also hold roles for the Advisors and/or the Funds, and some of these roles are fiduciary in nature (the "**Fiduciaries**"). The Fiduciaries are privy to confidential commercial information about the Funds and Advisors, including data relating to the Funds' investment holdings and investment strategies.

### B. *Shared Services and Payroll Reimbursement Agreements with the Debtor*

4.    Each Advisor is party with the Debtor to a shared services agreement. Specifically, NexPoint Advisors, L.P. ("**NexPoint**") and the Debtor are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (as amended, the "**NexPoint SSA**"), and Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and the Debtor are parties to a Second Amended and Restated Shared Services Agreement dated February 8, 2013 (as amended, the "**HCMFA SSA**," and collectively with the NexPoint SSA, the "**Shared Services Agreements**").[6]

5.    Under the Shared Services Agreements, the Debtor provides a variety of services, including operational, financial and accounting, human resources, information technology, legal, tax, and compliance services, to the Advisors. As part of its provision of

---

[5] Each of the Funds' respective boards meets quarterly and, consistent with statutory requirements, each is advised by independent counsel.

[6] Copies of the Shared Services Agreements and the Payroll Reimbursement Agreements (as defined below) are attached to the proofs of claim filed by the Advisors at Claim Nos. 95, 104, 108 and 119.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 910 of 1598    PageID 13957
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 7 of 42

services, the Debtor maintains books and records (the "**Books and Records**") on behalf of the Advisors.

6.      Under the HCMFA SSA, the costs of the Debtor's services are allocated on a percentage of use basis.  The Debtor submits quarterly expense statements to HCMFA to reconcile amounts due to the Debtor.  In addition, with respect to certain taxes related to the Shared Services, the Debtor collects those taxes from HCMFA on the same basis as with the Debtor's other customers.  To the extent of a related tax refund, the Debtor is obligated to submit the refund to HCMFA.

7.      Under the NexPoint SSA, NexPoint pays the Debtor a fixed monthly fee for the provision of services.

8.      The Advisors and the Debtor are also parties to separate payroll reimbursement agreements (as amended, the "**Payroll Reimbursement Agreements**").  The Payroll Reimbursement Agreements address the splitting of costs for certain employees that are "dual employees" of the Debtor and an Advisor and who provide advice to funds, such as the Funds, advised by the Advisors.  The Payroll Reimbursement Agreements provide for the subject Advisor to reimburse the Debtor at a set cost.

9.      The Advisors also participate in the Debtor's self-insured healthcare plan (the "**Self-Insured Plan**"), which provides employee healthcare coverage.  Depending on the contributions made and the claims submitted to the Self-Insured Plan at any given time, an Advisor may be owed money by, or owe additional contributions to, the Self-Insured Plan.

10.      The Plan proposes to reject those executory contracts [Fifth Am. Plan, Dkt. No. 1472 at p. 37] that are not otherwise listed for assumption in a plan supplement.  The Debtor has filed its Plan Supplement listing executory contracts to be assumed [Dkt. No. 1648], which

Case 19-34054-sgj11  Doc 3445-62  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 9 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 911 of 1598  PageID 13958
Case 19-34054-sgj11  Doc 1670  Filed 01/05/21  Entered 01/05/21 16:42:55  Page 8 of 42

Plan Supplement does not include the foregoing executory contracts. Accordingly, it appears that the Plan proposes to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan. The Advisors will therefore have potentially sizable rejection damages claims, on account of which they are preparing to file corresponding proofs of claim.

### C.  *The CLOs*

11.     The Funds also have economic interests in certain collateralized loan obligations (the "**CLOs**") (the Fifth Amended Plan refers to the CLOs as "Issuers"), for which the Debtor serves as portfolio manager.

12.     The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC,[7] and Westchester CLO, Ltd.

13.     The CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preferred shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual priority of payments, or waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preferred shares.

14.     The CLOs were created many years ago. Most of the CLOs have, at this point, paid off all the tranches of notes or all but the last tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preferred

---

[7] The portfolio management agreements with Loan Funding VII, LLC is not proposed to be assumed.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 912 of 1598   PageID 13959
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 9 of 42

shares.

15.     Further, such ownerships represent in many cases the total remaining outstanding interests in such CLOs, the noteholders otherwise having been paid.  In others, the remaining noteholders represent a small percentage only of remaining interests.  Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco represent a majority of the investors in the CLOs as follows:

> a.   CLOs in which NexPoint or HCMFA manage owners of a majority of the preference shares:  Stratford CLO, Ltd. 69.05%, Grayson CLO, Ltd. 60.47% and Greenbriar CLO, Ltd. 53.44%.

> b.   CLOs in which a combination of NexPoint and HCMFA managed funds and CLO Holdco hold all, a supermajority or majority of preference shares:  Liberty CLO, Ltd. 70.43%, Stratford CLO, Ltd. 69.05%*[8], Aberdeen Loan Funding, Ltd. 64.58%, Grayson CLO, Ltd. 61.65%*, Westchester CLO, Ltd. 58.13%, Rockwall CDO, Ltd. 55.75%, Brentwood CLO, Ltd. 55.74%, Greenbriar CLO, Ltd. 53.44%*

16.     The issuer of each CLO has separately contracted with the Debtor for the Debtor to serve as the CLO's portfolio manager or servicer (the "**Servicing Agreements**").[9]  In this capacity, the Debtor is responsible for, among other things, making decisions to buy or sell the CLOs' assets in accordance with the indenture and its obligations under the Servicing Agreements.  Although the Servicing Agreements vary, they generally impose a duty on the

---

[8] CLOs marked with an asterisk (*) appear in the foregoing list as well.

[9] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Objection, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

APPX. 07912

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 913 of 1598   PageID 13960
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 10 of 42

Debtor when acting as portfolio manager to maximize the value of the CLOs' assets for the

benefit of the CLOs' noteholders and preferred shareholders.   In particular, the Servicing

Agreements contain language providing for the maximization or preservation of value for the

benefit of the preference shares as shown in the following examples:

> In performing its duties hereunder, the Portfolio Manager shall seek to maximize
> the value of the Collateral for the benefit of the Noteholders and the Holders of
> the Preference Shares taking into account the investment criteria and limitations
> set forth herein and in the Indenture and the Portfolio Manager shall use
> reasonable efforts to manage the Collateral in such a way that will (i) permit a
> timely performance of all payment obligations by the Issuer under the Indenture
> and (ii) subject to such objective, maximize the return to the Holders of the
> Preference Shares; provided, that the Portfolio Manager shall not be responsible
> if such objectives are not achieved so long as the Portfolio Manager performs its
> duties under this Agreement in the manner provided for herein, and provided,
> further, that there shall be no recourse to the Portfolio Manager with respect to
> the Notes or the Preference Shares.

Liberty Portfolio Management Agreement, Sec. 2(b) containing language above.

> In performing its duties hereunder, the Servicer shall seek to preserve the value
> of the Collateral for the benefit of the Holders of the Securities taking into
> account the Collateral criteria and limitations set forth herein and in the
> Indenture and the Servicer shall use reasonable efforts to select and service the
> Collateral in such a way that will permit a timely performance of all payment
> obligations by the Issuer under the Indenture; provided, that the Servicer shall
> not be responsible if such objectives are not achieved so long as the Servicer
> performs its duties under this Agreement in the manner provided for herein, and
> provided, further, that there shall be no recourse to the Servicer with respect to
> the Notes or the Preference Shares. The Servicer and the Issuer shall take such
> other action, and furnish such certificates, opinions and other documents, as may
> be reasonably requested by the other party hereto in order to effectuate the
> purposes of this Agreement and to facilitate compliance with applicable laws
> and regulations and the terms of this Agreement.

Aberdeen Servicing Agreement, Sec. 2(b).

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 914 of 1598 PageID 13961
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 11 of 42

17.    Moreover, each of the Servicing Agreements contain express language that the portfolio manager's obligations thereunder are for the benefit of and "shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or Holders of Preference Shares, as applicable, as provided in the Indenture of the Preference Share Paying Agency Agreement, as applicable." Servicing Agreement Sec. 9.

18.    The Servicing Agreements also generally allow the holders of preference shares to remove the portfolio manager for cause, while their affirmative consent is required to an assignment of the agreements. Cause includes the anticipated "ipso facto" provisions related to insolvency and bankruptcy, but cause is not so limited and includes material breach of the Servicing Agreement which would clearly include the failure to maximize value or the failure to preserve collateral. Servicing Agreement, Sec. 14. However, certain Servicing Agreements provide for a certain percentage of holders of preference shares to remove the portfolio manager without cause. *See, e.g.*, Gleneagles CLO , Ltd., Portfolio Management Agreement, Sec. 12(c).

   **E.    *The Fifth Amended Plan and Disclosure Statement***

19.    On November 24, 2020, the Debtor filed the Fifth Amended Plan and the Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1473] (the "**Disclosure Statement**").

APPX. 07914

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 915 of 1598    PageID 13962
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 12 of 42

20.     The Fifth Amended Plan provides for the transfer of the majority of the Debtor's

assets to a Claimant Trust that will be established for the benefit of the Claimant Trust

Beneficiaries.  The Debtor's rights to manage investment vehicles managed by the Debtor

pursuant to executory contracts that are assumed pursuant to the Fifth Amended Plan, defined

as the "Managed Funds," are to remain with the Reorganized Debtor, which, in turn, is to be

managed by New GP LLC, a wholly-owned subsidiary of the Claimant Trust.  The Disclosure

Statement states that "[t]his structure will allow for continuity in the Managed Funds and an

orderly and efficient monetization of the Debtor's Assets." Dkt. No. 1473 at 11.  Ultimately,

however, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise

monetize all Claimant Trust Assets and Reorganized Debtor Assets." *Id.*  More specifically,

the Reorganized Debtor will manage the wind down of the Managed Funds in addition to any

other remaining Assets.  Moreover, the Financial Projections attached as Exhibit C to the

Disclosure Statement make clear that, assuming confirmation of the Plan in its current form, the

Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over

the next two years, concluding in December 2022.

21.     The Disclosure Statement further states that the Debtor does not anticipate either

the Reorganized Debtor or the Claimant Trust assuming or assuming and assigning the contracts

between the Debtor and certain of its Related Entities[10] pursuant to which the Debtor provides

shared services and sub-advisory services relating to such Related Entities.  Dkt. No. 1473 at

42.  Accordingly, it appears that the Debtor's intent is to reject the Shared Services Agreements,

the Payroll Reimbursement Agreements, and the Self-Insured Plan.

---

[10] Footnote 10 to the Disclosure Statement clarifies that the Debtor does not consider any of the Issuers to be a
Related Entity.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 916 of 1598    PageID 13963
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 13 of 42

22.     With respect to the Shared Services Agreements, the Disclosure Statement provides that the cost of staffing to fulfil the agreements has historically resulted in a net loss to the Debtor and is not beneficial to the estate.  The Disclosure Statement further states that the agreements contain anti-assignment provisions which it believes to be enforceable under section 365(c) of the Bankruptcy Code, and moreover, are terminable at will by either party.  In light of these considerations, the Debtor apparently does not believe that the agreements may be assumed or assumed and assigned, and even if they could, there would not be any corresponding benefit to the estate.  Notwithstanding the foregoing, the Disclosure Statement indicates that the Debtor is still assessing whether to assume and assign the agreements with a Related Entity. Dkt. No. 1473 at 42.

23.     The Disclosure Statement also discusses the Debtor's role as portfolio manager for the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32). After explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.
>
> The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

24.     The Debtor's Supplement to the Plan, filed on December 30, 2020 at Dkt. No. 1648, indicates that the Debtor intends to assume the Servicing Agreements with all of the CLOs except Loan Funding VII, LLC.  *See* Dkt. No. 1648, Sched. A.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 917 of 1598   PageID 13964
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 14 of 42

## OBJECTION

**A.** ***The Debtor Cannot Assume the Servicing Agreements Pursuant to Section 365(c)(1) of the Bankruptcy Code***

25.     The Objectors object to the assumption of the Servicing Agreements for the fundamental reason that the Debtor will not manage the CLOs' assets appropriately in order to maximize value for the CLOs and the Objectors, but will instead breach its fiduciary duties by managing a winding-down those CLOs and assets in order to provide a recovery for its creditors, in what is an obvious and irreconcilable conflict of interest.

26.     As explained below, the Debtor and the Servicing Agreements which it seeks to assume are subject to the Advisers Act.  As the Supreme Court has repeatedly held, it is a fundamental purpose of the Advisers Act to impose strict fiduciary duties on investment advisors and to "eliminate conflicts of interest between the investment adviser and the clients." *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963).  This extends to any "conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Id*.  "[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations." *Transamerica Mort. Advisors v. Lewis*, 444 U.S. 11, 17 (1979).

27.     Under the Plan, the Debtor would be owned by its creditors.  The Debtor and the Claimant Trust would be managed by a person holding fiduciary duties to the Debtor's creditors.  The Debtor would manage and presumably wind-down and liquidate the assets of the CLOs within a span of two years, not for the benefit of the CLOs and their beneficial interest holders, but for the benefit of the Debtor's creditors.  And, it would do this without employees or resources, or by impermissibly delegating its duties to yet a different party—something that it is not permitted to do under applicable law and the governing contracts.  In sum, the Debtor

14

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 918 of 1598   PageID 13965
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 15 of 42

would manage the CLOs and their assets for the benefit of the Debtor's creditors, which it is fundamentally impossible to do without simultaneously violating the Debtor's strict fiduciary duties to others and which represents a clear conflict of interest under the Advisers Act.

28.    This inescapable conclusion is precisely why the Bankruptcy Code prohibits an assumption of personal service contracts like the Servicing Agreements.  The Bankruptcy Code provides that:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

29.    The first question is whether "applicable law" excuses the counterparties to the Servicing Agreements from accepting performance from the Debtor.  In this respect, both the Advisers Act and the 1940 Act represent "applicable law" that provides for precisely that.

30.    The Advisers Act governs "investment advisors."  The Advisers Act defines an investment advisor as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

31.    There is no question that the Debtor receives compensation under the Servicing Agreements.  The only question is whether, under the Servicing Agreements, and in connection

15

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 919 of 1598 PageID 13966
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 16 of 42

with managing the investments and securities of the CLOs, the Debtor satisfies the remaining

element(s). Case law confirms that, in providing investment services and investment

management under the Servicing Agreements, is acting as an "investment advisor" under the

Advisers Act. The Second Circuit authoritatively considered and decided the issue of whether

a portfolio manager is an investment advisor in *Abrahamson v. Fleschner*, 568 F.2d 862 (2d

Cir. 1977). The case concerned general partners who managed various investments on behalf

of limited partners. *See id*. at 866. Regarding whether the general partners were investment

advisors on account of managing the investments, the court concluded that they were "on two

independent grounds":

> First, the monthly reports which contained the alleged fraudulent representations
> were reports which provided investment advice to the limited partners. The
> general partners' compensation depended in part upon the firm's net profits and
> capital gains. These in turn were affected by the size of the total funds under
> their control. The monthly reports were an integral part of the general partners'
> business of managing the limited partners' funds. In deciding whether or not to
> withdraw their funds from the pool, the limited partners necessarily relied
> heavily on the reports they received from the general partners.
>
> Second, wholly aside from the monthly reports, we believe that the general
> partners as persons who managed the funds of others for compensation are
> 'investment advisers' within the meaning of the statute. This is borne out by the
> plain language of Section 202(a)(11) and its related provisions, by evidence of
> legislative intent and by the broad remedial purposes of the Act.

*Id*. at 870. Thus, by virtue of managing the underlying investments and related activities, the

general partners were providing investment advice and were therefore investment advisors

subject to the Advisers Act.

32. The court in *SEC v. Smith*, 1995 U.S. Dist. LEXIS 22352 (E.D. Mich. 1995),

considered a similar issue. In that case, the SEC sought summary judgment that the defendant

was an investment adviser under the Advisers Act. The defendant argued that he was not an

investment adviser merely by virtue of managing a portfolio of accounts on behalf of third

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 18 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 920 of 1598   PageID 13967
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 17 of 42

parties.  *See id.* at *12-*13.  Specifically, the defendant argued that he was not giving investment advice, but that he was instead "a professional trustee who exercises sole discretionary control over trust investments. . .  I am the trustee. I have absolute full power and authority to make all buy, hold and sell decisions. And, therefore, I am the one that receives information and research and I make the decisions."  *Id*. at *13.  In other words, because he had sole discretion and control over how to manage the invested assets, he was not giving "advice" within the meaning of the Advisers Act.  The court rejected this argument: "Smith is clearly an investment advisor under the Advisers Act."  *Id*. at *15.

33.     The court in *SEC v. Saltzman*, 127 F. Supp. 2d 660 (E.D. Pa. 2000) reached the same conclusion with respect to a portfolio manager:

> Saltzman maintained exclusive control over the investment portfolio, brokerage accounts, and bank account of Saltzman Partners, L.P.  He made all investment decisions for the portfolio. As the Act intended to embrace those who wield power over their clients' money, as Saltzman did over the investments of the limited partners, the facts alleged qualify Saltzman as an investment adviser.

*Id*. at 669.  Therefore, the Debtor, by virtue of managing the CLO assets, and even though it has the sole control and authority over that management, is providing investment advice and is therefore an investment advisor with respect to the Servicing Agreement.

34.     More particularly, the Servicing Agreements, because they provide for investment advice, are "Investment Advisory Contracts" under the Advisers Act.  This is further confirmed by the language of the Advisers Act with respect to the definition of Investment Advisory Contract:

> any contract or agreement whereby a person agrees to act as investment adviser to <u>or to manage any investment</u> or trading account <u>of another person</u> other than an investment company registered under title I of this Act.

15 U.S.C. § 80b-5(d) (emphasis added).  Managing the investments of others is of course

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 921 of 1598    PageID 13968
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 18 of 42

precisely what the Debtor does under the Servicing Agreements.

35.    There should therefore be no question that the Servicing Agreements are "investment advisory contracts" subject to the Advisers Act.  Should there be any doubt, the Servicing Agreements in multiple places reference the Advisers Act and subject the agreements to the requirements of the Advisers Act.

36.    The Advisers Act prohibits an assignment of an investment advisory contract without consent.  The Advisers Act defines "assignment" as including "any direct or indirect transfer or hypothecation of an investment advisory contract."  15 U.S.C. § 80b-2(a)(1).  With respect to an assignment, the Advisers Act provides as follows:

> No investment adviser registered or required to be registered with the Commission shall enter into, extend, or renew any investment advisory contract, or in any way perform any investment advisory contract entered into, extended, or renewed on or after the effective date of this title, if such contract—
>
> (2) fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract.

15 U.S.C. § 80b-5(a)(2).

37.    Each of the Servicing Agreements contain substantially similar provisions related to any assignment:

> any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares.

38.    Accordingly, the Advisers Act represents "applicable law" under section 365(c)(1) that excuses the counterparty to an investment advisory contract from accepting performance from an assignee.  As such, because the agreement cannot be assigned, it cannot

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 922 of 1598 PageID 13969
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 19 of 42

be assumed by the Debtor without consent.

39.     It is true that courts in this District construe section 365(c)(1) such that, where the applicable law is merely a general prohibition on assignment, the section does not prevent an assumption. *See, e.g., In re Lil' Things*, 220 B.R. 583, 590-91 (Bankr. N.D. Tex. 1998). Here, however, the Advisers Act is not a general law that would prohibit an assignment; it is a very specific law, applicable to a very narrow set of persons, and one which prohibits only the assignment of an investment advisory agreement.

40.     Even so, this District recognizes that section 365(c)(1) becomes paramount "where the identity of the party rendering performance under the contract is material to the contract, and the contract is non-delegable under applicable non-bankruptcy law." *Id*. at 591. This is certainly true where, as here, a party has contracted with someone to manage that party's property and investments: that is a fiduciary relationship of the highest trust where the identity of the person providing the services is absolutely paramount. The Fifth Circuit recognized this fundamental principle the highly analogous situation of an attorney retention agreement: the contract was not assumable under otherwise applicable law because the contract was a highly personal one involving elements of trust, legal, and ethical considerations. *See In re Tonry*, 724 F.2d 467, 468-69 (5th Cir. 1984).

41.     In *In re Mirant Corp.*, 303 B.R. 319 (Bankr. N.D. Tex. 2003), this Court concluded that the debtor-in-possession may assume a contract even if section 365(c) would prevent a trustee from being able to assume the contract. In large part, the Court construed the addition, in 1984, of the term "debtor-in-possession" into the statute as evidence that Congress intended for a debtor-in-possession to be able to assume its contracts even if section 365(c) would otherwise prohibit a trustee from assuming the contract. *See id*. at 333. "The specific

19

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 923 of 1598    PageID 13970
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 20 of 42

use of the words 'the debtor or the debtor in possession' leads the court to conclude that a

contract to be performed by a debtor or debtor in possession (as opposed to a trustee) is subject

to assumption whether or not applicable law limits its assignability.  *Id*.  However, the Fifth

Circuit has not adopted this view and the logic of *In re Mirant Corp.* is not correct.

42.    The statute begins by providing that the "trustee may not assume or assign any

executory contract . . ." 11 U.S.C. § 365(c)(1).  That "trustee" must include a debtor-in-

possession, for it is the same "trustee" as in section 365(a) which provides that a "trustee . . .

may assume or reject any executory contract."  *Id*. at § 365(a).  Thus, the section 365(c)(1)

prohibition on a trustee must also extend to a "debtor-in-possession," unless the Court concludes

that the use of the word "trustee" in the same statute means two different things.  Rather, what

*In re Mirant Corp.* was referring to was the following language in section 365(c)(1):

> applicable law excuses a party, other than the debtor, to such contract or lease
> from accepting performance from or rendering performance to an entity other
> than the debtor or the debtor in possession.

*Id*. at § 365(c)(1).

43.    The addition of the term "debtor-in-possession" to this statute does not change

the result; *i.e.* it does not mean that a debtor-in-possession, unlike a trustee, may assume, but

not assign, its own contracts.  The question is whether applicable law excuses a party from

accepting performance from an entity other than the debtor-in-possession.  The Debtor is a

debtor-in-possession and, if the counterparty is excused by applicable law from accepting

performance from anyone else, then the contract may not be assumed by the Debtor.  *In re*

*Mirant Corp*. was simply wrong in concluding that the 1984 amendment somehow excepted a

debtor-in-possession's assumption of its own contracts from the operation of section 365(c)(1).

44.    The Fifth Circuit's opinion in *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 924 of 1598    PageID 13971
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 21 of 42

(5th Cir. 2001) is on point.  That opinion was rendered after the 1984 amendment at issue in *Mirant*, and that opinion concerned a Chapter 11 debtor.  The question was whether a non-assignable partnership agreement could be assumed under section 365(c)(1).  The Fifth Circuit held that "the agreement was *not* assumable under § 365(c)(1)."  *Id*. at 402 (emphasis in original).  And, as here, the confirmed plan provided for a postconfirmation liquidating trust.  *See id*. at 396.  The only difference was that, in *In re O'Connor*, a Chapter 11 trustee proposed the confirmed plan.  This difference does not matter because the Fifth Circuit held that the agreement itself was not assumable; not that one person may assume it while a second not.  *See id*. at 402 and 404 (twice holding that the "agreement is *not* assumable" (emphasis in original)).[11]  Only one person may assume an executory contract, and that person is the trustee, even if the debtor-in-possession is exercising the powers of a trustee.  Thus, if the contract itself is not assumable, then it is not assumable period.  This difference also does not matter because the identity of the plan proponent is immaterial: the question is still whether it is the debtor-in-possession, or the estate, that can assume the executory contract.

45.     The Debtor will respond that the Fifth Circuit, in *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006), rejected the so-called "hypothetical test" and adopted instead the "actual test" regarding the assignment of an executory contract or lease.  In *Mirant*, the issue concerned section 365(e)(2) of the Bankruptcy Code and whether an *ipso facto* clause was enforceable against a debtor-in-possession because the executory contract was not assignable.  The

---

[11] In *Strumpf*, the Fifth Circuit held that, because the agreement was not assumable, it passed through the Chapter 11 unaffected.  However, *Strumpf* itself concluded that this "pass-through" principle does not apply in a liquidating plan, as further confirmed by *In re Tex. Rangers Baseball Partners*, 521 B.R. 134,183 (Bankr. N.D. Tex. 2014).  Even if the agreements could pass through unaffected to the reorganized debtor, even though it is liquidating, the Plan cannot limit the ability to terminate the agreements in the future based on the change in control and other facts that are present.  Otherwise, the agreements would be affected by the Plan, meaning that they would have to first be assumed, as recognized in *Strumpf* by holding that a plan effect on the executory contract means that it cannot pass through bankruptcy unaffected.  *Strumpf*, 258 F.3d at 405.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 925 of 1598    PageID 13972
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 22 of 42

"hypothetical test" required a court to review whether a hypothetical assignment was prohibited by applicable law; if it was, then the *ipso facto* clause could be enforced even though no assignment was proposed.  *See id*. at 246-47.  The Fifth Circuit rejected this approach and instead applied the "actual test," which looked at whether an assignment was actually being proposed.  *See id*. at 249-50.  The Debtor will argue that this same logic should apply to section 365(c)(1) such that, when no actual assignment is being proposed, the section is not implicated.

46.     *Mirant* and its logic, however, do not apply to section 365(c)(1).  First, and most obviously, the Fifth Circuit stated that "[a]lthough this Circuit has addressed § 365(c)(1), we have yet to address § 365(e)," and then it cited to its *In re O'Connor* and *In re Braniff Airways* precedent.  *See id*. at 248-49.  The circuit, in analysing this prior precedent, noted that it was the contract itself that was not assumable ("declaring the contract unassumable," *id*.) and reaffirmed the holdings of both prior opinions notwithstanding the change in the language of section 365(c)(1).  Thus, and having been afforded the opportunity to revisit its prior precedent or to find that the added "debtor-in-possession" language to section 365(c)(1) compelled a different result, the circuit instead reaffirmed its prior precedent holding that the contract itself was not assumable.  More precisely, the "actual test" cannot apply to section 365(c)(1) because that section provides that a trustee may not "assume <u>or</u> assign" an executory contract.  If the test were an actual one, *i.e.* whether an actual assignment was being proposed, then the section would simply provide that the trustee may not "assume and assign" the executory contract.  But, in preventing an assumption even without a proposed assignment, section 365(c)(1) necessarily applies the "hypothetical test" such that, even though no assignment is proposed, if an assignment is prohibited then so is an assumption.

47.     Thus, were the Fifth Circuit presented with the precise issue with respect to

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 926 of 1598    PageID 13973
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 23 of 42

section 365(c)(1), to the extent it was not in *In re O'Connor*, the Objectors submit that the Fifth

Circuit would join its sister circuits in concluding that, so long as even a hypothetical

assignment would be prohibited, so too is an assumption, whether by a trustee, debtor, or debtor-

in-possession.  *See In re Catapult Entertainment*, 165 F.3d 747, 750 (9th Cir. 1999) ("a debtor

in possession may not assume an executory contract . . . if applicable law would bar assignment

to a hypothetical third party, even where the debtor in possession has no intention of assigning

the contract in question to any such third party"); *In re James Cable Partners L.P.)*, 27 F.3d

534, 537 (11th Cir. 1994); (holding that debtor-in-possession may not assume executory

contract under section 365(c)(1) notwithstanding that no assignment was proposed); *In re

Catron*, 1994 U.S. App. LEXIS 14585 (4th Cir. 1994) (affirming holding that "agreement was

the type of executory contract that could not be assumed by Catron, a debtor-in-possession,

absent consent of the nondebtor parties as required by § 365(c)(1)(B)"); *In re West Electronics

Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) ("the relevant inquiry is not whether [applicable law] would

preclude an assignment from West as a debtor to West as a debtor in possession, but whether it

would foreclose an assignment by West to another defense contractor");[12] *but see Institut

Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir. 1997).

     48.    The result may not be to the liking of the Debtor and, in other circumstances, the

result may be harsh on a debtor-in-possession.  But this case aptly demonstrates why the section

---

[12] In fact, as recognized in *West*, the addition of the term "debtor-in-possession" into section 365(c)(1)
demonstrates Congress's intent to prevent a debtor-in-possession from assuming its own personal services
contracts:

> We think that by including the words "or the debtor in possession" in 11 U.S.C. § 365(c)(1)
> Congress anticipated an argument like the one here made and wanted that section to reflect its
> judgment that in the context of the assumption and assignment of executory contracts, a solvent
> contractor and an insolvent debtor in possession going through bankruptcy are materially distinct
> entities.

*In re West Electronics*, 852 F.2d at 83.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 927 of 1598    PageID 13974
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 24 of 42

exists and why the result is fair.  Many innocent parties have entrusted billions of dollars of their property to the Debtor to manage, for their benefit.  Now, the Debtor wants to manage that property for the benefit of its creditors, and with insufficient experience, resources, and employees at that.  This is not a case where the debtor is a person, who holds investment management contracts.  That person is the same before, during, and after a Chapter 11 case.  But here the Debtor is the same entity in name only: no reasonable fund would contract with the postconfirmation Debtor here to manage a penny, let alone life savings and the investments of many.  That is the whole point of why personal services contracts cannot be assumed without consent.

49.    Moreover, the Court should not permit the Debtor to place form over substance, especially when the rights of innocent, third party funds and investors are concerned.  While technically the post-confirmation Debtor will still be the same corporate shell, it will have been gutted of everything that made the Debtor the Debtor.  It is in substance and in every real and practical consideration an assignment of the contracts.  Indeed, it appears that the only reason why the Debtor will even maintain a corporate existence after confirmation is an attempt to obviate the prohibition on assumption under section 365(c)(1), as all other property of the Debtor is transferred to the Claimant Trust.  On this point, the Plan expressly provides that the "Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees." Plan at p. 32-33.  If the intent of this provision is to provide services required by the Servicing Agreements, then this is a blatant violation of the Servicing Agreements' and the Advisers Act's anti-assignment and anti-delegation provisions.  In other words, this admission in the Plan may well be precisely the type of assignment, or subsequent assignment, that would be prohibited by section 365(c)(1) regardless of any

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 928 of 1598 PageID 13975
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 25 of 42

discussion between the "hypothetical test" and the "actual test."

50.     Separate and apart from the above discussion, and understand that there is uncertainty in the law as to the interplay between sections 365(f) and 365(c)(1), it is clear that a "personal services contract" falls squarely within the protection of section 365(c)(1). As the Fifth Circuit has held, a personal services contract is subject to section 365(c)(1): "Congress' enactment of § 365(c) was to preserve the pre-Code rule that 'applicable law' precluding assignment of personal service contracts is operative in bankruptcy." *In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983). A personal services contract is one which "involves a matter of personal trust and confidence between the original contracting parties." *In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996). "A personal services contract has been defined as a contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability." *In re Wofford*, 608 B.R. 494, 496 (Bankr. E.D. Tex. 2019) (internal quotation omitted).

> It is well settled that when an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, <u>the debtor-in-possession or trustee</u> is unable to assume or assign the rights of the bankrupt in such contract.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996) (emphasis added).

51.     The Service Agreements are clearly personal service contracts: the Debtor's position is one of trust and that of a fiduciary, the Debtor's performance requires personal confidence and high skill and knowledge, the agreements provide that the Debtor's duties are not delegable, and no person entrusting another with managing billions of dollars in assets would want the underlying contract to be assumable by a trustee or a liquidating debtor. Indeed, the Supreme Court has recognized the "personalized character of the services of investment advisors." *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963). This Court

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 929 of 1598   PageID 13976
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 26 of 42

has characterized financial advisory and brokerage contracts as personal services contracts.  *See
In re Consolidated Capital Equities Corp.*, 157 B.R. 280, 283 (Bankr. N.D. Tex. 1993).  Other
courts have held that the Investors Act imposes a trust relationship.  *See e.g. In re Peterson*, 96
B.R. 314, 323 (Bankr. D. Colo. 1988).  The strict fiduciary and anti-assignment provisions of
the Advisor Act and the 1940 Act further confirm Congress' strong view that these contracts
are in the nature of personal service contracts.

52.    Even if the Court is inclined to adopt the "actual test" under section 365(c)(1)
such that an assumption is possible where there is no assignment, and recognizing that section
365(c)(1) is broader in application than to only personal services contracts, the law
overwhelmingly confirms that a personal services contract is not assumable in the first instance.
*See, e.g., In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).

53.    The final issue concerning section 365(c)(1) is consent.  Assuming that the CLOs
do not object to the assumption of the Servicing Agreements, the statute requires affirmative
consent to the assumption.  The statute prohibits the assumption if "such party does not consent
to such assumption."  11 U.S.C. § 365(c)(1)(B).  The plain meaning of this language is that
consent is required, as opposed to merely the absence of an objection.  In *Strumpf v. McGee (In
re O'Connor)*, 258 F.3d 392 (5th Cir. 2001), the issue concerned an executory contract that was
neither expressly assumed nor assigned under a Chapter 11 plan.  The Fifth Circuit held that the
contract was not assumable under section 365(c)(1) and concluded that the counterparty "did
not consent" to an assumption.  *See id*. at 402.  If the absence of an objection was all that was
required, then the Fifth Circuit would not have so held.  In fact, the Fifth Circuit expressly
rejected the argument that the "Appellees consented to the assumption by failing to object to
the Plan."  *Id*. at 400.  This is in line with the case law, which requires affirmative, or actual,

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 930 of 1598    PageID 13977
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 27 of 42

consent to the assumption. *See In re Allentown Ambassadors Inc.*, 361 B.R. 422, 448 n. 60
(Bankr. E.D. Pa. 2007).

54.    Finally, there is the issue of the Objectors' standing to make the foregoing
arguments. The Objectors have standing for at least four reasons. First, as creditors and parties
in interest,[13] they have the right to object to the Plan. 11 U.S.C. § 1109(b). Insofar as it is the
Fifth Amended Plan that provides for assumption of the Servicing Agreements, the Objectors
may object to said assumption, especially because assumption of the Servicing Agreements and
future performance thereunder affect the feasibility of the Plan as a whole. Second, the
Objectors have standing and the right to object to confirmation of the Fifth Amended Plan under
sections 1129(a)(1), (a)(2), and (a)(3) of the Bankruptcy Code. Insofar as the Fifth Amended
Plan and the Debtor propose to impermissibly assume the Servicing Agreements in violation of
the law, the Objectors may object to such assumption on those bases. Third, in several of the
Servicing Agreements, the Objectors have the right to remove the Debtor or to control who the
servicer under the agreements is. They have similar rights under the Indentures with respect to
assignment or modification of the Servicing Agreements. Insofar as the Fifth Amended Plan
purports to limit or to take those rights away from them, and to change their rights, the Objectors
have standing to object to their rights being limited or eliminated. Likewise, under the 1940
Act, an investment adviser must be approved by a majority of the voting securities, and the
Servicing Agreements cannot continue in effect for more than two years without the consent of
either the CLOs' boards of directors or a majority of the outstanding voting securities--i.e., the
Objectors. 15 U.S.C. § 80a-15(a)(2). Insofar as the Fifth Amended Plan purports to limit the

---

[13] "The term 'party in interest' is not defined in the Bankruptcy Code." *Khan v. Xenon Health, LLC (In re Xenon Anesthesia of Tex., PLLC)*, 698 Fed. Appx. 793, 794 (5th Cir. 2017) (quoting *In re Megrelis*, No. 13-35704-H3-7, 2014 Bankr. LEXIS 3905, at *2 (Bankr. S.D. Tex. Sept. 12, 2014)). "It generally 'means anyone who has a legally protected interest that could be affected by the bankruptcy case.'" *Id.*

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 931 of 1598 PageID 13978
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 28 of 42

Objectors' right to withhold their consent or influence the CLOs' boards of directors, the Objectors have standing to challenge any modification of those rights. Fourth, in several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the Objectors. The Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the Objectors.

55. The Fifth Amended Plan does not comply with section 1129(a)(1) of the Bankruptcy Code because it violates a fundamental principal of contract assumption under section 365 of the Bankruptcy Code. Contracts must be assumed or rejected; there is no such thing as a partial assumption. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*--the debtor accepts both the obligations and the benefits of the executory contract."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("An executory contract cannot be rejected in part and assumed in part; the debtor must assume both the benefits and the burdens on the contract.").

56. The Fifth Amended Plan contravenes established law with respect to the proposed treatment of the CLOs and the Debtor's obligations under the portfolio management agreements.

57. First, the Fifth Amended Plan reveals that the Debtor, while claiming to assume the various Servicing Agreements, also intends to deprive the counterparties to those agreements from exercising their rights to change management.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 932 of 1598    PageID 13979
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 29 of 42

58.     Under the Servicing Agreements at issue, either a majority, or in some cases, a supermajority of owners may initiate a change in management.  See attached Exhibit A.

59.     The Debtor's Plan makes clear, however, that it intends to engage a subagent to perform the management and servicing function and, implicitly to deprive the CLOs as issuers from exercising contractual rights with respect to making a change in management.

60.     Second, the Debtor's duties under the Servicing Agreements, which themselves have been adopted under the Advisers Act, subject to Rule 206(4)-8 thereunder as noted below, are owed to, and provide the rights of, the preference shareholders under the portfolio management agreements.  The Debtor's proposed liquidation of Managed Assets (which it does not own) is contrary to the performance of its contractual and statutory duties under the portfolio management agreements.

61.     The preference shareholders, as the only remaining owners of the Managed Assets of many of the CLOs, contend that the Debtor's (i) sales of  Managed Assets and  (ii) continued management of the Managed Assets, notwithstanding the Debtor's stated intention to wind down and liquidate all assets, violates the provisions of Section 2(b) of the portfolio management agreements.

62.     These violations are detrimental to the counterparties to the assumed contracts because:

    a.   liquidation sales of Managed Assets the Debtor does not own are unlikely to maximize the value of the Managed Assets when compared to the long term investment horizon of the beneficial owners of the Managed Assets;

    b.   liquidation sales of Managed Assets are likely to subtract value when duress sales occur based on the short term horizon and liquidation

APP. 10732

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 933 of 1598    PageID 13980
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 30 of 42

strategy of the Debtor;

c.   the Debtor has announced the termination of its personnel, resulting in loss of knowledgeable portfolio managers; and

d.   any potential consultant engaged by the Debtor in the absence of its terminated personnel will be subservient to the Debtor's short-term objective of liquidation in violation of the assumed contracts and applicable securities law.

63.     Manifestly, where the investors in a pooled vehicle state to the manager both that their objectives and desires differ from those of the portfolio manager, and that the portfolio manager's actions are contrary to the manager's duties to maximize returns for the benefit of the investors established under the agreement, that portfolio manager is not acting reasonably under or in accordance with its agreement.  The owners of the Managed Assets, in requisite majority or supermajority,[14] have expressly requested that the Managed Assets not be liquidated as contemplated by the Debtor's business plan.  In that context, the Debtor is unreasonably acting contrary to the required contractual objective and therefore statutory obligation to maximize value for the preference shareholders.  In implementing the Fifth Amended Plan, the Debtor is likely to violate its duty of reasonableness under Section 2(b) under these circumstances, because the Debtor is not "perform[ing] its duties under [the] Agreement in the manner provided for" in the Agreement.

64.     As the Debtor is an investment management firm familiar with established securities laws, the Fifth Amended Plan's violations of such laws is blatant and should not be permitted.

---

[14] Objectors acknowledge that they do not hold a majority in all of the CLOs, for example, Jasper.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 934 of 1598 PageID 13981
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 31 of 42

65.     Based upon the Fifth Amended Plan's attempt to assume contracts partially, and not fully, the Court should find that the Fifth Amended Plan fails to satisfy section 1129(a)(1) of the Bankruptcy Code and cannot be confirmed

66.     Moreover, as discussed below, with respect to the injunction and release provisions of the Fifth Amended Plan, the Plan purports to release the Debtor from its contractual and statutory obligations with respect to the Servicing Agreements.  As explained above, those agreements require the Debtor to preserve and to maximize the value of the CLOs assets, for the benefit of the CLOs and the holders of beneficial interests in them.  The Advisers Act requires the same.  The Fifth Amended Plan purports to enjoin parties from "taking any actions to interfere with the implementation or consummation of this Plan."  Plan at p. 50.  This is an unprecedented, overbroad injunction that does not comport with fundamental due process, as what "interference," "implementation," or "consummation" mean is not specified.  Are the Objectors to be enjoined from enforcing future rights under the Servicing Agreements even if the Debtor commits future malfeasance?

67.     The Fifth Amended Plan likewise enjoins all creditors and other parties, and their "Related Persons" (who may not even have notice of the injunction) from "commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor."  Plan at p. 51.  Read literally, this means that the Objectors and the CLOs will not be able to assert any claims, or seek any relief, against the Debtor or Reorganized Debtor for any present or future actionable wrongs under the Servicing Agreements and the Advisers Act.  Again, so broad an injunction, not limited in time, is unprecedented, legally impermissible, violates due

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 935 of 1598    PageID 13982
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 32 of 42

process, and seeks to strip parties of their contractual and Advisers Act rights—even as the
Debtor purports to assume the Servicing Agreements which, as is black letter law, means that
the Debtor is requiring to provide full future performance (and suffer potential future obligations
and liabilities).

68.    The balance of the Plan injunction is equally fatally defective.  If there are future
obligations and defaults, and even if there are present ones, under the Servicing Agreements
and applicable law, affected parties have to have the right to seek legal redress, enforce awards
and injunctions, and assert setoff rights.  On this last basis in particular, if there are setoff rights
under the CLOs or other agreements, those rights cannot be permanently enjoined.  And, the
same injunction applies to any "successors" of the Debtor and its property interests, meaning
that, if the Debtor assigns or delegates its duties under the Servicing Agreements, some future
and unknown party may claim protections under these injunctions without any protection to the
Objectors or the CLOs.

69.    The Plan's channeling injunction is similarly improper and defective, at least
with respect to post-confirmation actions.  *See* Plan at p. 51.  That injunction requires *anyone*
with any complaint against a "Protected Party" that is "related to the Chapter 11 Case," or to
the "wind down of the business of the Debtor or the Reorganized Debtor," to first seek relief
from this Court, including by proving that a colourable claim exists and obtaining leave.  The
same section then purports to grant "sole jurisdiction" to this Court to "adjudicate" any such
dispute.  Read literally, this means that the Objectors and the CLOs will have to first seek leave
from this Court before enforcing any right under the Servicing Agreements and the Advisers
Act, which is unprecedented and is incompatible with respect to the assumption of those
agreements for post-assumption claims, and then this Court would adjudicate the claims.  This

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 936 of 1598    PageID 13983
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 33 of 42

Court will have no jurisdiction to adjudicate such post-confirmation claims, however, and the
channeling injunction is am impermissible attempt to confer such jurisdiction where none
exists.

70.      All of the foregoing affects, limits, and eviscerates future rights under the
assumed Servicing Agreements—something that defeats the whole purpose of an assumption
of an executory contract and that contradicts the established law that an executory contract, and
its future obligations, must be assumed *in toto*.

**B.      *Other objections to the Fifth Amended Plan***

The Debtor's Fifth Amended Plan is objectionable for other reasons as well.  Those
Objections are discussed briefly below.  The Funds and Advisors reserve the right to object
upon any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of
the Bankruptcy Code. The Funds and Advisors also reserve the right to join in and support the
objections asserted by other parties at the Confirmation Hearing.

***Section 1129(a)(5)***

71.      In order to be confirmed, the Debtor must satisfy the following non-waiveable
requirements:

> (i) the proponent of the plan has disclosed the identity and affiliations of any
> individual proposed to serve, after confirmation of the plan, as a director, officer,
> or voting trustee of the debtor, an affiliate of the debtor participating in a joint
> plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is
> consistent with the interests of creditors and equity security holders and with
> public policy.

11 U.S.C. § 1129(a)(5).

72.      This is of particular importance here, where the Debtor proposes to manage
billions of dollars of other entities' assets, and ties in as well to section 362(b)'s requirement of

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 937 of 1598    PageID 13984
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 34 of 42

demonstrating adequate assurance of future performance. Yet, the Debtor fails completely with respect to even an attempt to satisfy these requirements.

73.    In this respect, the sole disclosure in the Plan and Disclosure Statement with respect to who will manage these billions of dollars in assets is as follows:

> Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

Plan at p. 32-33.

74.    Neither the identity nor the compensation of the people who will control and manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer. While Mr. Seery is disclosed as the Claimant Trustee who will be responsible for "winding down the Reorganized Debtor's business operations," this is insufficient. All the more so because, without additional disclosures and facts, not only can adequate assurance of future performance not be proven, but the Debtor cannot prove that the employment and compensation of these unnamed officers and managers of the Reorganized Debtor is "is consistent with the interests of creditors and equity security holders and with public policy." Public policy in particular, given the dictates of the Advisers Act, is implicated.

Accordingly, the Plan is fatally defective with respect to section 1129(a)(5) and cannot be confirmed on that basis alone.

### ***The Fifth Amended Plan is not feasible***

75.    Section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by liquidation or the need for further reorganization. "Establishing a likelihood that a plan itself will be successful is a question of feasibility." *In re Dernick*, Case No. 18-32417,

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 938 of 1598   PageID 13985
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 35 of 42

2020 WL 6833833, at *17 (Bankr. S.D. Tex. Nov. 20, 2020).  Feasibility contemplates whether the plan is workable and offers a reasonable assurance of success.  *Id.*; *see also In re Frascella Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007).  "An obvious illegality . . . exposes the plan on feasibility grounds."  *In re Food City*, 110 B.R. at 813 n. 12; *see also In re McGinnis*, 453 B.R. at 773 (chapter 13 plan premised on illegal activity could not be confirmed); *In re Frascella*, 360 B.R. at 445, 456 (citing *Food City*, 110 B.R. at 812 n. 10) (debtor failed to establish plan was feasible where it rested on questionable legal basis).

76.     As discussed above, the proposed treatment with respect to the portfolio management agreements and the CLOs contravenes section 365 of the Bankruptcy Code and the Adviser Act.  This illegality hampers the feasibility of the Fifth Amended Plan, and accordingly, the Court should find that it is not feasible and deny confirmation.

### *The Debtor's proposed assumption of the Servicing Agreements is improper under section 365 because there is no adequate assurance of future performance*

77.     Under section 365(b) of the Bankruptcy Code, an executory contract may only be assumed if the Debtor "provides adequate assurance of future performance under such contract[.]"  11 U.S.C. § 365(b)(1)(C).

78.     Although the Fifth Amended Plan provides for the assumption of the Servicing Agreements with many of the CLOs, it does not offer any assurance with respect to the Debtor's ability to perform under such agreements.  Indeed, given the Debtor's plan to wind down and liquidate its remaining assets, and in light of the contractual and statutory breaches discussed above, the Debtor cannot possibly provide such assurance.  Furthermore, it is uncertain whether sufficient employees will be retained by the Debtor to fulfil its obligations under the portfolio management agreements, even its most significant duties are delegated to a Sub-Advisor.  Accordingly, assumption is improper and must be disallowed under section 365(b).

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 939 of 1598 PageID 13986
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 36 of 42

79.     Equally important, the Debtor's failure to offer or provide adequate assurance is intensified because the purported assumption is, in reality, a *sub rosa* assumption *and assignment* to an as yet unnamed third party. This unidentified third party has also not offered adequate assurance of future performance as required in the context of such assignments.

### *The Release and Exculpation Provisions of the Fifth Amended Plan are overly broad and extend beyond the Effective Date*

80.     In the Fifth Circuit, permanent injunctions against nondebtors are not permissible. *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995). In fact, and quite to the contrary, the case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009). Such permanent injunctions would "improperly insulate nondebtors in violation of section 524(e)," and "without any countervailing justification of debtor protection." *Id.* at 760 (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990)); *see also In re Pac. Lumber*, 584 F.2d at 252 (noting that costs that the released parties might incur defending against suits are unlikely to swamp such parties or the reorganization).

81.     Indeed, courts within this District have found that injunctions and release provisions substantively identical to that proposed in Fifth Amended Plan, and which purport to release causes of action against non-debtor third parties, violate Fifth Circuit precedent and are impermissible. *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018) (finding that bankruptcy court erred by approving injunction that would have effectively discharged non-debtor third parties); *In re Pac. Lumber*, 584 F.3d at 251-53 (striking release provision purporting to release non-

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 940 of 1598 PageID 13987
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 37 of 42

debtor third parties from liability relating to the proposal, implementation, and administration of the plan).

82.    The injunction contained in Article XI.F of the Fifth Amended Plan is almost identical to that struck down in *In re Thru*. Like the injunction provision in *In re Thru*, the Debtor's proposed injunction would bar the Debtor's creditors "from pursuing causes of action against a number of non-debtor third parties, if those causes of action relate to the creditors' claims against the debtor." 2018 WL 5113124, at *21. The Fifth Amended Plan purports to release creditors' claims against not only the Debtor, but also the Independent Directors. Dkt. No. 1472 at 56-57. Not only that, but the Fifth Amended Plan purports to release creditors' claims stemming from the bankruptcy case, as well as the negotiation, administration and implementation of the Plan, as against many of the specific third parties that the courts in this Circuit have found to be impermissible, including, but not limited to, employees, officers and directors, and professionals retained by the Debtor, among others. *Id.*; *In re Thru*, 2018 WL 5113124, at *21 (concluding it was "clearly erroneous" for the bankruptcy court to approve an injunction covering causes of action against such parties); *In re Pac. Lumber*, 584 F.3d at 252-53.

83.    Furthermore, the exculpation provision contained in Article XI.C of the Fifth Amended Plan is incompatible with Fifth Circuit precedent, as explained by the court in *In re Thru*. The court in *In re Thru* found that it was clear error for the bankruptcy court to approve an exculpation provision that exculpated non-debtor third parties, including the debtor's employees, officers, directors, advisors, affiliates and professionals, from liability in connection with formulating, implementing, and consummating the plan of reorganization. 2018 WL 5113124, at *22. The exculpation provision in the Fifth Amended Plan provides the "same

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 941 of 1598 PageID 13988
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 38 of 42

insulation" as the impermissible provision in the *In re Thru* plan, and as such, it cannot be

approved. *See also In re Pac. Lumber*, 584 F.3d at 252 ("We see little equitable [sic] about

protecting the released non-debtors from negligence suits arising out of the reorganization.").

84.     In sum, the Fifth Amended Plan impermissibly seeks to exculpate certain non-

debtor third parties from a broad array of claims relating to such entities' pre- and post-petition

conduct.  The Funds and Advisors submit there is no authority that would permit such broad

exculpatory and/or injunctive language in favor of third parties.

### The Fifth Amended Plan appears to eliminate the right of setoff

85.     The Funds and Advisors object to the extent that the Plan purports to divest them

of their rights of setoff against the Debtor.

### The Fifth Amended Plan violates section 365(d)(2) by impermissibly allowing the Debtor to assume or reject executory contracts and unexpired leases after confirmation

86.     Section 365(d)(2) of the Bankruptcy Code provides that, in a case under chapter

11, the debtor may assume or reject an executory contract or unexpired lease "at any time *before*

*confirmation of a plan* . . . ."  11 U.S.C. § 365(d)(2) (emphasis added).

87.     Notwithstanding this clear language, the Fifth Amended Plan authorizes the

Debtor to amend the Plan Supplement by adding or removing a contract or lease from the list

of contracts to be assumed, or assign an Executory Contract or Unexpired Lease, at any time up

until the Effective Date.  Dkt. No. 1472 at 43.  Further, the Disclosure Statement indicates that

the Debtor is still evaluating whether to assume and assign the Shared Services Agreements.

This is contrary to the explicit language of the Bankruptcy Code.

88.     Accordingly, the Advisors object to the Fifth Amended Plan to the extent that it

purports to reserve the Debtor's right and ability to assume or assume and assign the Shared

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 942 of 1598 PageID 13989
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 39 of 42

Services Agreements or the Payroll Reimbursement Agreements post-confirmation. Furthermore, the Funds object to the Fifth Amended Plan to the extent it purports to reserve the Debtor's right and ability to alter the proposed treatment of the Servicing Agreements.

### *The Debtor is not entitled to a discharge*

89.     Although section 1141(d) of the Bankruptcy Code discharges a debtor from most pre-confirmation debt, it expressly <u>does not</u> discharge a debtor if:

> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
> (B) the debtor does not engage in business after consummation of the plan; and
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

90.     Here, the Plan provides for liquidation of all of the Debtor's property over a period of time. Although the Debtor may technically continue business for a brief period of time, its ultimate goal is liquidation. Further, the Debtor would be denied a discharge under section 727(a)(1) because it is not an individual. Accordingly, the Court should find that the Debtor is not entitled to a discharge under section 1141 of the Bankruptcy Code.

### *The Fifth Amended Plan may violate the absolute priority rule*

91.     Section 1129(b)(2)(B)(ii) provides that the holder of any claim or interest that is junior to the claims of unsecured creditors may not retain any property unless general unsecured creditors are paid in full. 11 U.S.C. § 1129(b)(2)(B)(ii). The "absolute priority rule is a bedrock principle of chapter 11 practice." *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 703 (Bankr. N.D. Tex. 2013). "Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009) (comparing subordination

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 943 of 1598 PageID 13990
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 40 of 42

under section 510 to absolute priority rule) (quoting *In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002)).

92. In the event the unsecured creditor classes (Class 7 and 8) vote against the Fifth Amended Plan, the absolute priority rule prohibits the retention of equity in the Reorganized Debtor by existing equity holders in the absence of a new investment and opportunity for competitive bidding for that investment opportunity.

## **CONCLUSION**

93. For the reasons set forth above, the Funds and Advisors respectfully request that the Court deny confirmation of the Fifth Amended Plan and grant such other and further relief as the Court deems just and proper.

Dated:     January 5, 2020

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email:     drukavina@munsch.com

    - and -

    K&L GATES LLP

    Artoush Varshosaz (TX Bar No. 24066234)
    1717 Main Street, Suite 2800
    Dallas, TX 75201
    Tel: (214) 939-5659
    artoush.varshosaz@klgates.com

    Stephen G. Topetzes (*pro hac vice*)
    1601 K Street, NW
    Washington, DC 20006-1600

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 944 of 1598    PageID 13991
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 41 of 42

Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management
Fund Advisors, L.P., NexPoint Advisors,
L.P., Highland Funds I and its series
Highland Healthcare Opportunities Fund,
Highland/iBoxx Senior Loan ETF,
Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund,
Highland Funds II and its series Highland
Small-Cap Equity Fund, Highland Socially
Responsible Equity Fund, Highland Fixed
Income Fund, and Highland Total Return
Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland
Income Fund, Highland Global Allocation
Fund, and NexPoint Real Estate Strategies
Fund, and NexPoint Latin America
Opportunities Fund*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 5th day of January, 2021, and in addition to electronic service on parties entitled to notice thereon through the Court's ECF system, the undersigned caused the foregoing document to be served, by U.S. first class mail, postage prepaid, on the following:

Pachulski Stang Ziehl & Jones LLP
Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Hayward & Associates PLLC
Attn: Melissa S. Hayward and Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Sidley Austin LLP
Attn: Matthew A. Clemente and Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603

Office of the United States Trustee
U.S. Department of Justice, Region 6: Northern District of Texas
1100 Commerce Street, Room 976
Dallas, TX 75242

and, on the same day, by e-mail, on the following:

jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com
MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
mclemente@sidley.com
Alyssa.russell@sidley.com
Lisa.L.Lambert@usdoj.gov

/s/  Davor Rukavina
Davor Rukavina

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 946 of 1598    PageID 13993
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 1 of 8

**Highland Capital Management Fund Advisors, L.P.**

**CLOs Review**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Aberdeen Loan Funding, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Shares Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Brentwood CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

1

Exhibit A

APP. 10336

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 45 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 947 of 1598    PageID 13994
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 2 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Eastland CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Gleneagles CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(c).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date). PMA § 12(c).<br><br>For cause removal may be effected in connection with the Portfolio Manager | 66 2/3% of Preference Shares Holders. PMA § 12(c). |

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 948 of 1598 PageID 13995
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 3 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | |
| **Grayson CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Greenbriar CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. The Indenture references a Preference Shares Paying Agency Agreement. Indenture § 1.1 (Definitions-- Preference Share Documents). | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

3

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 949 of 1598 PageID 13996
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 4 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| Jasper CLO, Ltd. | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(a).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 15% IRR since the Closing Date). PMA § 12(a).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | 66 2/3% of Preference Shares Holders. PMA § 12(a). |
| Liberty CLO, Ltd. | Requisite percentage of Class E Certificates Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Class E | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Class E Certificates holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Class E Certificates Holders (excluding Class E Certificates held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(c). | 66 2/3% of Class E Certificates Holders. PMA § 12(c). |

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 950 of 1598 PageID 13997
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 5 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Certificates Paying Agency Agreement. PMA § 9. | | The Portfolio Manager may avoid removal by purchasing all Class E Certificates voting for removal (and Class E Certificates not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date). PMA § 12(c).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | |
| **Red River CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

APPX. 07246

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 951 of 1598 PageID 13998
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 6 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Rockwall CDO Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |
| **Rockwall CDO II Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |

308393059.4

**APPX. 07349**

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 50 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 952 of 1598    PageID 13999
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 7 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| Southfork CLO, Ltd. | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 63% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).<br><br>For cause removal may be effected upon the Portfolio Manager authorizing or filing a voluntary petition in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | 63% of Preference Shares Holders. PMA § 12(c). |
| Stratford CLO Ltd. | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Servicer | 66 2/3% of Preference Shares Holders. SA § 14. |

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 51 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 953 of 1598    PageID 14000
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 8 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Servicer, as provided in the Indenture.  SA § 9.  The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions-- Preference Share Documents). | | and affiliates, or for which they have discretionary voting authority, but HFP may vote Preference Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | |
| **Valhalla CLO, Ltd.** | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | |
| **Westchester CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

8

APP.107253

# EXHIBIT 63

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 7
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 955 of 1598 PageID 14002
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 1 of 6

Docket #1671 Date Filed: 01/05/2021

United States Department of Justice
Office of the United States Trustee
1100 Commerce St. Room 976
Dallas, Texas 75242
(202) 834-4233

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| | § | |
| Debtors-in-Possession. | § | |

---

### United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization (Docket Entry No. 1472)

---

**To the Honorable Stacey J. Jernigan,**
**United States Bankruptcy Judge:**

The United States Trustee for Region 6 files this Limited Objection (the "**Objection**") to the Debtor's Fifth Amended Plan of Reorganization (the "Plan" -- docket entry [D.E.] 1472, filed 11/24/2020). In support of the relief requested, the United States Trustee respectfully submits as follows:

<u>**Summary**</u>

The United States Trustee objects to confirmation of the Plan because the releases exceed the scope permitted by Fifth Circuit precedent. The United States Trustee has resolved other objections with the Debtors, and these resolutions will be announced and incorporated in the confirmation order.

**United States Trustee's Confirmation Objection**

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 7
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 956 of 1598    PageID 14003
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 2 of 6

## Facts: Relevant Plan Provisions

**Salient Definitions:**

1.    The Plan defines exculpated and released parties as follows:

a.    "Exculpated Parties" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

b.    "Released Parties" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

Plan, D.E. 1472; definitions 61, 111, p. 16.

**Releasing Third Parties:**

2.    The Plan releases third parties who would share liability with the Debtor:

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 7
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 957 of 1598 PageID 14004
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 3 of 6

"[E]ach Released Party is deemed to be, hereby conclusively, absolutely, unconditionally,

irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on

behalf of themselves and their respective successors, assigns, and representatives, including,

but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of

Action, including any derivative claims, asserted on behalf of the Debtor, whether known or

unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law,

equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally

entitled to assert in their own right (whether individually or collectively) or on behalf of the

holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, D.E. 1472, p. 48.

3.      The releases for Released Parties exclude "any Causes of Action arising from

willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released

Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction."

Plan, D.E. 1472, pp. 48-49.

4.      The Plan releases do not contemplate any type of channeling injunction.

**Exculpating Third Parties:**

5.      The exculpation provisions broadly cover third parties:

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted

by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is

hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt,

right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the

Petition Date in connection with or arising out of (i) the filing and administration of the

Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or

the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or

consummation of the Plan (including the Plan Supplement) or any related agreements,

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 7
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 958 of 1598    PageID 14005
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 4 of 6

instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); provided, however, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## **Argument and Authority**

**Plan Contains Non-Consensual Third-Party Releases and Exculpation in Contravention of Fifth Circuit Precedent.**

6.      The Plan contains non-consensual third-party releases that should be stricken under Fifth Circuit precedent.

7.      The Plan's exculpation provisions are similarly overbroad.

8.      While the Plan specifies that the releases and exculpation are allowed to "the maximum extent allowed by law," the law in the Fifth Circuit is that they are not allowed.

9.      Like the Highland Capital Plan, the *Pacific Lumber* plan contained exculpation and release provisions that carved out willful or intentional conduct. *Scotia Pacific Co., LLC v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.),* 584 F.3d 229

**United States Trustee's Confirmation Objection**                                                **Page 4 of 6**

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 7
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 959 of 1598 PageID 14006
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 5 of 6

(5th Cir. 2009). Reviewing four prior Fifth Circuit bankruptcy cases, the *Pacific Lumber* court concluded these cases "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252 (citations omitted). The Fifth Circuit struck these non-consensual provisions as to parties who were co-liable with the debtor but noted that committee members and committee professionals received qualified immunity. *Id.*

10.     The *Pacific Lumber* court disallowed the exculpation and releases of the debtors' officers, directors, and professionals because there was no evidence that they "were jointly liable for any . . . pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Id.* at 252-53.

11.     Bankruptcy Courts in the Northern District of Texas have resolved objections to exculpation or release provisions by replacing such provisions with channeling injunctions. *See* Memorandum Opinion and Order, Docket Entry No. 4614, *In re Pilgrim's Pride Corporation, et al.*, Case No. 08-45664-DML-11 (January 14, 2010); Fourth Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors (Section 10.8), Docket Entry No. 1701, *In re CHC Group, Ltd.*, Case No. 16-31854-BJH-11, United States Bankruptcy Court for the Northern District of Texas, Dallas Division (February 16, 2017).

12.     The Plan release and exculpation provisions should be limited. Unless they exclude the Debtors' professionals, the Debtors' officers and directors, and others not protected by quasi-immunity, confirmation should be denied.

**United States Trustee's Confirmation Objection**                    **Page 5 of 6**

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 7
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 960 of 1598    PageID 14007
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 6 of 6

## Conclusion

Wherefore, the United States Trustee requests that the Court deny approval of the Plan and grant to the United States Trustee such other and further relief as is just and proper.

DATED: January 5, 2021        Respectfully submitted,

WILLIAM T. NEARY
UNITED STATES TRUSTEE

*/s/ Lisa L. Lambert*
Lisa L. Lambert
Asst. U.S. Trustee, TX 11844250
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas  75242
(202) 834-4233

## Certificate of Service

There undersigned hereby certifies that on January 5, 2020, a copy of the foregoing pleading was served via ECF to parties requesting notice via ECF.

*/s/  Lisa L. Lambert*
Lisa L. Lambert

# EXHIBIT 64

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 962 of 1598 PageID 14009
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 1 of 7

Docket #1673 Date Filed: 01/05/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC**
**F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |

---

## NEXPOINT REAL ESTATE PARTNERS LLC'S OBJECTION
## TO DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION

---

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP") files this Objection to the Debtor's Fifth Amended Plan of Reorganization (the "Objection") and respectfully states as follows:

### I. INTRODUCTION

1.    On November 24, 2020, the Debtor filed the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1472] and Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1473] (the "Disclosure Statement"). On November 13, 2020, the Debtor filed its Initial Plan Supplement [Docket No. 1389], on December 18, 2020, the Debtor filed its Second Plan Supplement [Docket No. 1606] and on January 4, 2021, the Debtor filed its Third Plan Supplement [Docket No. 1656]

---

1934054210105000000000020

APPX. 07962

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 963 of 1598   PageID 14010
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 2 of 7

(together with the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., the "<u>Fifth Amended Plan</u>").

2.      The hearing on confirmation of the Fifth Amended Plan is scheduled for January 13, 2021 at 9:30 a.m. (the "<u>Confirmation Hearing</u>") and the deadline to file any objections to confirmation of the Fifth Amended Plan is January 5, 2021. *See* Docket No. 1476.

3.      The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries. However, ultimately, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets." *See* Disclosure Statement, p. 11. Based on the Financial Projections attached as Exhibit C to the Disclosure Statement, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

4.      NREP filed a proof of claim in this case. *See* Claim Number 146. The Debtor has objected to NREP's claim. If NREP's claim is allowed, NREP possesses a claim in Class 7 or Class 8 under the Fifth Amended Plan.

5.      The Fifth Amended Plan also contains provisions to subordinate unidentified claims, a seemingly unfettered ability to set-off claims, and extremely broad exculpation, injunction, and release provisions, all of which fail to comply with the Bankruptcy Code. For the reasons set forth in detail below, NREP respectfully requests the Court deny confirmation of the Fifth Amended Plan.

## II. OBJECTIONS

6.      A debtor in bankruptcy bears the burden of proving every element of Bankruptcy Code Section 1129(a) by a preponderance of the evidence in order to attain confirmation of its

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 964 of 1598 PageID 14011
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 3 of 7

plan. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160 (5th Cir. 1993); *In re Barnes*, 309 B.R. 888, 895 (Bankr. N.D. Tex. 2004) (citing *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997)). In addition, a court has a mandatory duty to determine whether a plan has met all the requirements for confirmation, whether specifically raised by dissenting parties in interest or not. *Williams v. Hibernia Nat'l Bank*, 850 F.2d 250, 253 (5th Cir. 1988). The Debtor in this case is unable to meet its burden for confirmation.

**A.    The Fifth Amended Plan provides for the improper subordination of unidentified claims.**

7.    The Fifth Amended Plan provides for a class of subordinated claims, which claims may be subordinated to the general unsecured claims or both the general unsecured claims and convenience class. The Fifth Amended Plan then provides that

> Under section 510 of the Bankruptcy Code, upon written notice, the Debtor, the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

*See* Fifth Amended Plan, Article III(J).

8.    In the Fifth Circuit, equitable subordination is appropriate when (i) the claimant engaged in inequitable conduct; (ii) the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the Bankruptcy Code. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 121 (5th Cir. 2019). Further, a claim should only be subordinated to the extent necessary to offset the harm which the creditors have suffered as a result of the inequitable conduct. *Id.*

9.    However, section 510 of the Bankruptcy Code only allows equitable subordination of claims "after notice and a hearing." 11 U.S.C. § 510(c). Equitable subordination generally

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 8
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 965 of 1598    PageID 14012
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 4 of 7

requires an adversary proceeding and while it may be satisfied through a chapter 11 plan, the debtor

must at least satisfy its burden of demonstrating such claim should be subordinated under equitable

subordination principles. Fed. R. Bankr. P. 7001(8).

10.    Here, the Fifth Amended Plan does not provide for the subordination of any specific

claims but, instead, provides for a procedure to subordinate claims that fails to comply with the

statutory requirements under section 510 of the Bankruptcy Code or applicable case law. The Fifth

Amended Plan provides no notice of the potential targets of such subordination, the basis upon

which such subordination of claims may be justified, or any evidence supporting equitable

subordination principles. Nor does the Fifth Amended Plan provide any means for due process,

adequate notice, or opportunity to oppose such unidentified subordinations. Instead, the Fifth

Amended Plan attempts to provide a means by which the Debtor, Reorganized Debtor, and

Claimant Trustee can escape the "notice and hearing" requirements of section 510. This does not

comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to

satisfy 1129(a)(1) and confirmation should be denied.

**B.    The Fifth Amended Plan provides for the improper set-off of unidentified claims against the Debtor.**

11.    Similarly, the Fifth Amended Plan also provides the Distribution Agent unfettered

set-off rights in violation of section 553 of the Bankruptcy Code. The Fifth Amended Plan provides

that:

> The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim…. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 966 of 1598   PageID 14013
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 5 of 7

*See* Fifth Amended Plan, Article VI(M). Thus, under the Fifth Amended Plan, the Distribution Agent may setoff the distribution amount on account of any Allowed Claim, without otherwise providing notice to the Holder of such Allowed Claim and without providing any support for or evidence that such setoff is justified. Instead, after the Distribution Agent arbitrarily determines a setoff is appropriate, the Holder of the Allowed Claim must initiate a proceeding challenging such setoff and seeking its full distribution under the Fifth Amended Plan. In addition, under the Fifth Amended Plan, the Distribution may setoff a pre-petition Allowed Claim on account of not only pre-petition claims but also post-petition claims of the Reorganized Debtor and/or Distribution Agent.

12.     However, setoff is only available in bankruptcy when the opposing obligations arise on the same side of the bankruptcy date—*i.e.,* both had arisen prior to the petition date or both subsequent to the petition date. *In re Thomas*, 529 B.R. 628, 637 n.2 (Bankr. W.D. Pa. 2015); *In re Univ. Med. Center*, 973 F.2d 1065, 1079 (3d Cir. 1992). A creditor's pre-petition claims against the debtor cannot be set off against post-petition debts owed to the debtor. *In re Univ. Med. Center*, 973 F.2d at 1079. In addition, the burden of proof is on the party asserting the right to setoff. *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). The party seeking to enforce a setoff right must establish (i) it has a right to setoff under nonbankruptcy law; and (ii) this right should be preserved in bankruptcy under section 553. *Id.*

13.     Here, contrary to the provisions in section 553 of the Bankruptcy Code, the Fifth Amended Plan attempts to both expand the right to setoff by allowing post-petition claims be setoff against pre-petition Allowed Claims and transfer the burden of proof to the Holder of such Allowed Claim, requiring such Holder disprove the Distribution Agent's right to setoff. This does not

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 8
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 967 of 1598    PageID 14014
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 6 of 7

comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**C.    The Fifth Amended Plan provides for improper and overly broad injunctions, releases and exculpation.**

14.    In addition, the Fifth Amended Plan provides for broad releases and permanent injunctions against nondebtors. *See* Article IX(F). However, permanent injunctions against nondebtors are not permissible in the Fifth Circuit because such a permanent injunction would "improperly insulate nondebtors in violation of section 524(e)…without any countervailing justification of debtor protection." *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995) (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co.* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 601-02 (10th Cir. 1990)). Contrary to such prohibition, the Fifth Amended Plan seeks to exculpate certain "Exculpated Parties" and "Protected Parties" from a broad array of claims relating to such entities' post-petition conduct and would bar creditors from pursing claims against various non-debtor parties if such claims relate to their claims against the Debtor. In addition, the language purports to release creditors' claims arising not only from the bankruptcy case but also the administration and implementation of the Fifth Amended Plan and the period of time covered by the release and exculpation provisions extend beyond the effective date and purport to cover post-effective date conduct. Neither the Bankruptcy Code nor applicable case law permits such broad exculpatory and/or injunctive language in favor of third parties. *See In re Zale Corp.*, 62 F.3d at 761, *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009). The injunction, release, and exculpation provisions in the Fifth Amended Plan do not comply with section 524(e) of the Bankruptcy Code or applicable case law and the Court should deny confirmation.

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 8
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 968 of 1598    PageID 14015
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 7 of 7

**D.    Reservation of Rights**

15.    NREP reserves the right to amend or supplement this Objection to add any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. In addition, NREP reserves the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### III.  CONCLUSION

For these reasons, the NREP respectfully requests that the Court deny confirmation of the Fifth Amended Plan and grant NREP such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
         lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

### CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2021, a true and correct copy of the foregoing Joinder was served via the Court's CM/ECF system upon counsel for the Debtor and all other parties requesting or consenting to such service in this bankruptcy case.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

---

# EXHIBIT 65

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 970 of 1598    PageID 14017
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21    Entered 01/05/21 16:53:55    Page 1 of 12

Docket #1675  Date Filed: 01/05/2021

Joseph M. Coleman (State Bar No. 04566100)
John J. Kane (State Bar No. 24066794)
**KANE RUSSELL COLEMAN LOGAN PC**
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-SGJ |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

## CLO HOLDCO, LTD.'S JOINDER TO OBJECTION TO CONFIRMATION OF FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. [DKT NO 1670] AND SUPPLEMENTAL OBJECTIONS TO PLAN CONFIRMATION

**TO THE HONORABLE STACEY G. JERNIGAN, U.S. BANKRUPTCY JUDGE:**

CLO Holdco, Ltd. (**"CLO Holdco"**) respectfully files this *Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1670] and Supplemental Objection to Plan Confirmation* (the **"CLO Holdco Objection"**) which seeks entry of an order from this Court denying confirmation of the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the **"Plan"**) [Dkt. No. 1472] for the reasons stated in that certain *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* filed by the entities defined therein as the "Funds and Advisors" on January 5, 2020 [Dkt. No. 1670] (the

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 971 of 1598    PageID 14018
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21    Entered 01/05/21 16:53:55    Page 2 of 12

"**F&A Objection**"), and the additional reasons set forth below.  In support of the CLO Holdco

Objection, CLO Holdco respectfully states as follows:

I.
**PRELIMINARY STATEMENT**

1.    CLO Holdco owns interests in certain funds managed by the Debtor pursuant to

portfolio management and servicing agreements, including the following funds ("**Managed**

**CLOs**"): Aberdeen Loan Funding, Ltd.; Acis CLO 2017-7; Brentwood CLO, Ltd.; Grayson CLO,

Ltd.; Liberty CLO, Ltd.; Red River CLO, Ltd.; Rockwall CDO, Ltd.; Loan Funding II, LLC

(Valhalla); and Westchester CLO, Ltd.  As evidenced by the Debtor's *Notice of (I) Executory Contracts*

*and Unexpired Leases to be Assumed by the Debtor pursuant to the Fifth Amended Plan, (II) Cure Amounts, if*

*any, and (III) Related Procedures in Connection Therewith* (the "**Plan Assumption Notice**") [Dkt. No.

1648], the Debtor intends to assume management contracts for substantially all of the

aforementioned Managed CLOs (the "**CLO Management Contracts**").

2.    In many instances, CLO Holdco, the Funds, and Advisors, collectively own or

manage a majority or even super-majority of the remaining beneficial interests in the Managed

CLOs.  Accordingly, CLO Holdco and the Funds and Advisors have a vested interest in the

successful management of the Managed CLOs on a going-forward basis.  That interest is real, and

many millions of dollars are at stake.  Astonishingly, though the Debtor intends to assume the CLO

Management Contracts, the Debtor discloses in its Plan and *Disclosure Statement for the Fifth Amended*

*Plan of Reorganization of Highland Capital Management, L.P.* (the "**Disclosure Statement**") [Dkt. No.

1473] that it may terminate its investment management employees by the end of January 2021 and

that the Reorganized Debtor may employ a Sub-Servicer to perform the Debtor's current portfolio

management duties and obligations.

3.    Moreover, the Debtor intends to wind down all "Managed Funds" under the Plan.

The term Managed Funds is defined in the Plan to include "any other investment vehicle managed

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 972 of 1598 PageID 14019
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 3 of 12

by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan." PLAN, Art. I.B.83. The CLOs subject to assumed CLO Management Contracts are therefore "Managed Funds" under the Plan, and will be wound down by the Reorganized Debtor regardless of the will of the financial interest holders in those Managed Funds. The Plan lacks flexibility for the appropriate management of Managed Funds, enjoins fund interest owners like CLO Holdco from challenging the appropriateness of a fund wind down, and effectively strips fund interest owners of their contractual rights to seek alternative management for the funds under the agreements assumed by the Debtor.

4.      In its most distilled essence, the Plan would allow the Debtor to assume only select Debtor-favorable provisions of the CLO Management Contracts, while effectively discarding potentially adverse governance provisions. The Debtor's proposed assumption of the CLO Management Contracts under the Plan is so illusory that it would empower the Debtor—or a designated Sub-Servicer—to liquidate funds in which the Debtor has no interest for the purported benefit of the Debtor's creditors: (i) in direct contravention of the expressed interests of a majority of the beneficial owners of those funds; and (ii) with no recourse despite express provisions of the CLO Management Contracts that entitle interest holders to replace the Debtor as manager.

5.      In conjunction with the Debtor's proposed "cherry picking" of provisions of assumed contracts, the Plan's excessively broad injunction, exculpation, and release provisions render it unconfirmable under applicable United States Supreme Court and Fifth Circuit precedent.

## II.
## BACKGROUND

6.      CLO Holdco is a Cayman limited partnership that owns interests in various funds and serves as part of a greater philanthropic endowment generally referred to as the DAF, or Donor Advised Fund. While often painted as a pernicious bad actor before this Court, CLO Holdco facilitates the annual donation of millions of dollars to charitable organizations, and has paid tens of

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 973 of 1598   PageID 14020
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21   Entered 01/05/21 16:53:55   Page 4 of 12

millions of dollars to the Debtor in recent years pursuant to a Second Amended and Restated Investment Advisory Agreement, dated January 1, 2017, and a Second Amended and Restated Service Agreement dated January 1, 2017, both of which the Debtor is terminating in Q1, 2021.

7.      While CLO Holdco willingly complied with a Debtor request that it amend its claim from more than $11 million to $0 following this Court's approval of the Debtor's settlement with the Redeemer Committee [Dkt. No. 1273], it still has interests affected by the Debtor's proposed Plan.  As described above, CLO Holdco owns interests in certain collateralized loan obligations referred to herein as the Managed CLOs.  The Managed CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations.  The Managed CLOs also issued various tranches of notes and preferred shares, which are intended to be repaid from proceeds of the subject Managed CLO's pool of debt obligations.  The notes issued by the Managed CLOs are paid according to a contractual waterfall, and after the notes are paid in full all remaining value in the Managed CLOs flows to holders of the preferred shares.

8.      Most of the Managed CLOs have paid off all the tranches of notes or all but the last tranche.  Accordingly, most of the economic value remaining in the Managed CLOs, and all of the upside, belongs to the holders of the preferred shares, like CLO Holdco.  As detailed in the F&A Objection, CLO Holdco, "the registered investment companies, [and] business development company…represent a majority of the investors in the CLOs as follows: … Liberty CLO, Ltd. 70.43%, Stratford CLO, Ltd. 69.05%, Aberdeen Loan Funding, Ltd. 64.58%, Grayson CLO, Ltd. 61.65%*, Westchester CLO, Ltd. 58.13%, Rockwall CDO, Ltd. 55.75%, Brentwood CLO, Ltd. 55.74%, Greenbriar CLO, Ltd. 53.44%." F&A OBJECTION, ¶ 15.

9.      As more fully set forth in the F&A Objection, each of the aforementioned CLOs entered into contracts pursuant to which the Debtor would serve as the fund's portfolio manager. While the contracts vary to some degree, each imposes a duty on the Debtor to maximize the value

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 974 of 1598   PageID 14021
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21   Entered 01/05/21 16:53:55   Page 5 of 12

of the CLO's assets for the benefit of the CLO's noteholders and preference shareholders. Each also allows a majority or supermajority of the CLO's noteholders to replace the Debtor as portfolio manager either for cause or, in some instances, without cause.

10.    Correspondence with Debtor's counsel, in addition to language found in the Plan and Disclosure Statement, makes it abundantly clear that the Debtor intends to assume the CLO Management Contracts, but preclude CLO Holdco and other similarly situated preference shareholders from exercising their contractual rights to remove the Debtor as portfolio manager under those agreements either upon a finding of cause, where required, or requisite majority or super majority vote where no cause is required.

## JOINDER

11.    CLO Holdco hereby joins the objections to plan confirmation set forth in the F&A Objection.

## SUPPLEMENTAL OBJECTIONS

### A.    PARTIAL ASSUMPTION – THE PLAN VIOLATES CONTROLLING SUPREME COURT PRECEDENT

12.    As detailed above, the CLO Management Contracts provide preference shareholders an opportunity to replace the CLO manager, in this case the Debtor, for cause and, in some instances, even without cause upon satisfaction of a requisite vote. The Debtor's Plan would allow the Debtor to assume the CLO Management Contracts, while precluding preference shareholders from exercising their contractual rights under the assumed agreements. The result is de facto "cherry picking" in which the Debtor assumes only favorable provisions of the CLO Management Contracts to the detriment of contract parties. Such "cherry picking" violates controlling Supreme Court and Fifth Circuit precedent, and precludes confirmation of the Plan.

(i)    **The Plan Deprives Preference Shareholders Their Remedies Under Assumed CLO Management Contracts**

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 975 of 1598 PageID 14022
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 6 of 12

13. In its Disclosure Statement, the Debtor explains that under the Plan "The Reorganized Debtor will manage the wind down of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets." DISCLOSURE STATEMENT, Art. I.C.1 (emphasis added). The Debtor further states that "The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds." Id. at Art. III.F.1. Rather, "[t]he Reorganized Debtor may, in its discretion…utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees" post confirmation to effectuate the wind down of the Managed Funds. Id. at Art. III.F.3.d.

14. In other words, while the Plan guarantees that the Managed Funds, including the Managed CLOs, will be wound down, the Reorganized Debtor may terminate its employee-advisors and delegate the wind down to an unidentified third party sub-servicer. Should the Reorganized Debtor and Sub-Servicer's conduct constitute cause for removal under the assumed CLO Management Contracts, the CLO preference shareholders must be entitled to effectuate their contractual rights and remedies. Alternatively, where the CLO Management Contracts do not require cause for removal of the portfolio manager, the preference shareholders must remain entitled to effectuate their contractual rights and remedies. For instance if the preference shareholders determine that an expedited liquidation is not in their best interests and desire a longer investment horizon, or if they have reason to believe that the Reorganized Debtor or Sub-Servicer is negligently managing their investments, they should be able to seek the replacement of the portfolio manager. It is important to remember, after all, that it is the preference shareholders' money that is at stake, and that the portfolio manager operates for the benefit of the investors, not vice versa.

15. Unfortunately, the injunction found in Article IX.F. of the Plan precludes parties in interest—like preference shareholders of CLO Managed Funds—from "taking any actions to

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 976 of 1598   PageID 14023
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21    Entered 01/05/21 16:53:55    Page 7 of 12

interfere with the implementation or consummation of the Plan." Under this egregious injunction, preference shareholders appear barred from "taking any actions" that would in any way interfere with the Reorganized Debtor's efforts to "wind down…the Managed Funds." *See* PLAN, Art. IX.F.

16.    By assuming the CLO Management Contracts through the Plan, defining them as Managed Funds, and subjecting parties-in-interest under the agreements to the Plan's staggeringly expansive injunction, the Debtor has effectively carved out the preference shareholders' rights and remedies under the CLO Management Contracts in contravention of section 365 of the Bankruptcy Code. The preference shareholders are left without recourse—despite their contractual rights— even if the Reorganized Debtor's winding up of the Managed Funds is negligent, a breach of its duties under the CLO Management Contracts, or cause for removal as portfolio manager.

### (ii)    Controlling Case Authority Precludes the Debtor's Proposed Partial Assumption of the CLO Management Contracts

17.    A debtor seeking to assume an executory contract under section 365 of the Bankruptcy Code must assume the contract in its entirety, *cum onere*. *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984) (citing *In re Italian Cook Oil Corp.*, 190 F.2d 994, 996 (3d Cir. 1951)). As explained by the Third Circuit in a ruling adopted by the United States Supreme Court, a debtor-in-possession seeking to assume an executory contract "may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other." *Italian Cook Oil*, 190 F.2d at 996. This Court recently adopted and cited the Supreme Court's *Bildisco* holding in the *Senior Care* bankruptcy cases, ruling that "If a debtor chooses to assume an unexpired lease, it must assume the lease *in its entirety*." *In re Senior Care Centers*, 607 B.R. 580, 587 (Bankr. N.D. Tex. 2019) (emphasis added).

18.    Like this Court, the Fifth Circuit also agreed with the Third Circuit and Supreme Court's reasoning in *In re National Gypsum Co. See In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000). In that case the Fifth Circuit ruled that "Where the debtor assumes an executory contract, it

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 977 of 1598 PageID 14024
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 8 of 12

must assume the entire contract, *cum onere*—the debtor accepts both the obligations and the benefits of the executory contract." *Id.*

19. Importantly, the Fifth Circuit also recognizes that a court cannot, through orders or otherwise, effectively modify an executory contract over the objection of parties to the contract. *In re Escarent Entities, L.P.*, 423 Fed.Appx, 462, 466 (5th Cir. 2011). In that case, the Fifth Circuit noted that "The court, moreover, effectively rewrote the parties' contract by adding" certain terms disadvantageous to the counterparty, and that the "un-agreed-to modification betokened more than a mere assumption of the parties' contract." *Id.* The Fifth Circuit condemned the lower court's actions, ruling that they "violated its obligation to ensure that [the debtor] assumed the contract *in toto.*" *Id.* Other courts have similarly ruled that a debtor cannot modify an executory contract through assumption without the agreement of parties to the contract. *See, e.g., In re Network Access Solutions, Corp.*, 330 B.R. 67, 74 (Bankr. D. Del. 2005) (citing *In re Fleming Cos.*, No. 03–10945, 2004 WL 385517 at *3 (Bankr. D. Del. Feb. 27, 2004) ("[A] debtor's assumption ... cannot modify an agreement's express terms[.]").

20. Courts should scrutinize whether a debtor is using a proposed plan of reorganization to effectively modify assumed executory contracts. *See Nat'l Gypsum Co.*, 208 F.3d at 506-07. As the Fifth Circuit ruled in *National Gypsum*, payment obligations due under an assumed executory contract could not be nullified by discharge provisions of the debtor's plan. *Id.* Similarly, the court in *In re Cajun Electric Power Co-Op, Inc.* ruled that the debtor's plan of reorganization was improper where the "natural effect" of the plan was the nonconsensual modification of an assumed executory contract. *In re Cajun Elec. Power Co-Op., Inc.*, 230 B.R. 693, 712-14 (M.D. La. 1999). The court's decision in *Cajun Electric* is pertinent here. As ruled by that court:

> The court finds that the natural effect of the Trustee's Plan results in an improper modification of the Supply Contracts. The court has determined that the Trustee may assume and assign the Supply Contracts; however, in designing a plan which *inter alia* binds the Members for 25 years to treatment which they do not want and

Case 19-34054-sgj11  Doc 3445-65  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 978 of 1598   PageID 14025
Case 19-34054-sgj11  Doc 1675  Filed 01/05/21    Entered 01/05/21 16:53:55    Page 9 of 12

for which they did not contract, the Trustee has, in effect, achieved a result inconsistent with those jurisprudential directives denying the ability to modify such contracts.

*Id.* at 713-14. A debtor cannot construct a plan that would, in effect, alter the terms and conditions of the very executory contracts the debtor seeks to assume. *Id.*

21.     Other courts have similarly ruled that a debtor cannot modify its contracts through its plan of reorganization without consent, including the consent of *third-party beneficiaries*, regardless of whether the contract was executory. *In re Texas Rangers Baseball Partners*, 498 B.R. 679, 704-05 (Bankr. N.D. Tex. 2013); *In re Coates*, No. 17-00481, 2017 WL 6520456, at *1 (Bankr. M.D. Pa. 2017); *In re Exide Technologies*, 378 B.R. 762, 765 (Bankr. D. Del. 2007) (Noting that purported assumption of executory contracts under plan must comply with the express requirements of section 365 of the Bankruptcy Code).

22.     In *Texas Rangers*, the debtor sought to assume and amend a contract through its plan of reorganization. *Texas Rangers*, 498 B.R. at 704-05. The debtor then used certain language in the plan to effectuate an amendment to the contract that reduced the remaining term of the contract from seven years to three months, without the express consent of third-party beneficiaries to the agreement. *Id.* When the amendment was later challenged, the court ruled that the amendment was invalid and unenforceable "since done without the consent of the third-party beneficiary," and that the debtor's efforts to amend the contract through the plan assumption process without the consent of the third-party beneficiaries "circumvented proper procedures under section 365 of the Bankruptcy Code." *Id.* at 705.

23.     In this case, the Debtor, through its injunction and exculpation provisions, would effectively preclude parties to the CLO Management Contracts, including CLO Holdco, from taking any actions that could, in any way, affect the Reorganized Debtor's efforts to wind down the Managed CLOs. Approving the Plan, as written, would therefore affect the nature of the CLO

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 979 of 1598 PageID 14026
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 10 of 12

Management Contracts and result in a non-consensual modification of those agreements in violation of *Bildisco*, *Escarant*, *National Gypsum*, and *Texas Rangers*. As ruled by the Supreme Court in *Bildisco*, should the Debtor seek to assume the CLO Management Contracts, it must assume them in their entirety, taking benefits with risks. *Bildisco*, 465 U.S. at 531-32.

**B.     THE PLAN'S EXCULPATION AND INDEMNIFICATION PROVISIONS OPERATE AS THIRD PARTY RELEASES AND VIOLATE CONTROLLING CASE PRECEDENT**

24.     The exculpation and release clauses found in Article IX of the Plan are excessive, and violate controlling Fifth Circuit precedent. The Plan defines "Exculpated Parties" to include, among others, all of the Debtor's majority-owned subsidiaries, all Managed Funds, the Independent Directors, and all of the aforementioned parties' "Related Persons," a term itself staggeringly expansive. PLAN, Art. I.B.61., 110. The Plan similarly defines "Protected Parties", which also includes all Managed Funds and their Related Persons. *Id.* at Art. 1.B.104.

25.     Under the Plan, all Exculpated Parties are absolved of potential liability associated with any claims or causes of action that may arise related to the implementation of the Plan. *Id.* at Art. IX.C. That would inherently include all actions related to the wind down of the Managed Funds, including any breaches of contract, duties, or even the Advisers Act of 1940. While not expressly worded as a release, the Plan's exculpation clause effectively releases the Exculpated Parties from all such claims or causes of action.

26.     Similarly, Protected Parties are effectively released from all claims in any way related to "the administration of the Plan…the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing…" other than those arising from "bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence…." *Id.* at Art. IX.F.

27.     The Fifth Circuit has addressed the issue of release and exculpation clauses that applied to non-debtor third parties and held that such releases are overly broad. *See, e.g., In re Pacific*

---

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 980 of 1598    PageID 14027
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21    Entered 01/05/21 16:53:55    Page 11 of 12

*Lumber Co.*, 584 F.3d 229, 251 (5th Cir. 2009) (citing 11 U.S.C. § 524(e)). Section 524(e) releases only the debtor, not co-liable third parties, and certainly not the Debtor's contract counterparties like the Managed Funds. *See id.* at 252 (citing *See, e.g., In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir.2003); *Hall v. National Gypsum Co.*, 105 F.3d 225, 229 (5th Cir.1997); *Matter of Edgeworth*, 993 F.2d 51, 53–54 (5th Cir.1993); *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir.1995)).

28.     The Bankruptcy Court for the Northern District of Texas has also ruled that exculpation clauses must be so narrow that they cannot extend to employees and officers and directors of a debtor. *In re ReoStar Energy Corp.*, 2012 WL 1945801 (Bankr. N.D. Tex. May 30, 2012). Even, post-confirmation permanent injunctions that *effectively* release non-debtors from liability are prohibited. *In re Zale Corp.*, 62 F.3d at 761; 11 U.S.C. § 524(e). In line with this holding, the District Court for the Northern District of Texas recently found clear error where a bankruptcy court confirmed a debtor's plan that provided for injunctions shielding various non-debtor third parties. *In re Thru, Inc.* 2018 WL 5113124, at *21 (N.D. Tex. 2018).

29.     The Plan injunction and exculpation provisions, which effectively release the Managed Funds and non-debtor parties from liability for post-confirmation activities, therefore violate well established and controlling Fifth Circuit and Northern District case precedent and preclude confirmation.

## IV.
### PRAYER FOR RELIEF

WHEREFORE, CLO Holdco requests that this Court grant the CLO Holdco Objection and enter an order denying confirmation of the Debtor's Plan.

---

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 981 of 1598   PageID 14028
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21    Entered 01/05/21 16:53:55    Page 12 of 12

DATED: January 5, 2020

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By: ___/s/ John J. Kane_____
        Joseph M. Coleman
        State Bar No. 04566100
        John J. Kane
        State Bar No. 24066794

901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2020, a true and correct copy of the foregoing CLO Holdco Objection was served via the Court's electronic case filing (ECF) system upon all parties receiving such service in this bankruptcy case; and via e-mail upon the United States Trustee at Lisa.L.Lambert@usdoj.gov and upon the following parties:

Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue, Suite 2000
Dallas, Texas 74201
Email: pmontgomery@sidley.com
       preid@sidley.com
       jhoffman@sidley.com

Bojan Guzina
Matthew A. Clemente
Dennis M. Twomey
Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603
Email: bguzina@sidley.com
       mclemente@sidley.com
       dtwomey@sidley.com
       alyssa.russell@sidley.com

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com

Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com

        /s/ John J. Kane_____
        John J. Kane

---

# EXHIBIT 66

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 983 of 1598 PageID 14030
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21 Entered 01/05/21 16:54:33 Page 1 of 7

Docket #1676 Date Filed: 01/05/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXBANK CAPITAL, INC.,**
**NEXBANK SECURITIES, INC. NEXBANK TITLE, INC.,**
**AND NEXBANK**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |

## NEXBANK'S OBJECTION TO DEBTOR'S
## FIFTH AMENDED PLAN OF REORGANIZATION

NexBank Capital Inc., NexBank Securities, Inc., NexBank Title, Inc. and NexBank (collectively, "NexBank") files this Objection to the Debtor's Fifth Amended Plan of Reorganization (the "Objection") and respectfully states as follows:

### I. INTRODUCTION

1.      On November 24, 2020, the Debtor filed the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1472] and Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1473] (the "Disclosure Statement"). On November 13, 2020, the Debtor filed its Initial Plan Supplement [Docket No. 1389], on December 18, 2020, the Debtor filed its Second Plan Supplement [Docket No. 1606] and on January 4, 2021, the Debtor filed its Third Plan Supplement [Docket No. 1656]

1934054210105000000000023

APPX. 10733

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 984 of 1598 PageID 14031
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21 Entered 01/05/21 16:54:33 Page 2 of 7

(together with the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., the "Fifth Amended Plan").

2.      The hearing on confirmation of the Fifth Amended Plan is scheduled for January 13, 2021 at 9:30 a.m. (the "Confirmation Hearing") and the deadline to file any objections to confirmation of the Fifth Amended Plan is January 5, 2021. *See* Docket No. 1476.

3.      The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries. However, ultimately, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets." *See* Disclosure Statement, p. 11. Based on the Financial Projections attached as Exhibit C to the Disclosure Statement, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

4.      The Fifth Amended Plan also contains provisions to subordinate unidentified claims, a seemingly unfettered ability to set-off claims, and extremely broad exculpation, injunction, and release provisions, all of which fail to comply with the Bankruptcy Code. For the reasons set forth in detail below, NexBank respectfully requests the Court deny confirmation of the Fifth Amended Plan.

## II. OBJECTIONS

5.      A debtor in bankruptcy bears the burden of proving every element of Bankruptcy Code Section 1129(a) by a preponderance of the evidence in order to attain confirmation of its plan. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160 (5th Cir. 1993); *In re Barnes*, 309 B.R. 888, 895 (Bankr. N.D. Tex. 2004) (citing *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997)). In addition, a court has a mandatory duty

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 985 of 1598   PageID 14032
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21   Entered 01/05/21 16:54:33   Page 3 of 7

to determine whether a plan has met all the requirements for confirmation, whether specifically raised by dissenting parties in interest or not. *Williams v. Hibernia Nat'l Bank*, 850 F.2d 250, 253 (5th Cir. 1988). The Debtor in this case is unable to meet its burden for confirmation.

**A.    The Fifth Amended Plan provides for the improper subordination of unidentified claims.**

6.      The Fifth Amended Plan provides for a class of subordinated claims, which claims may be subordinated to the general unsecured claims or both the general unsecured claims and convenience class. The Fifth Amended Plan then provides that

> Under section 510 of the Bankruptcy Code, upon written notice, the Debtor, the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

*See* Fifth Amended Plan, Article III(J).

7.      In the Fifth Circuit, equitable subordination is appropriate when (i) the claimant engaged in inequitable conduct; (ii) the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the Bankruptcy Code. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 121 (5th Cir. 2019). Further, a claim should only be subordinated to the extent necessary to offset the harm which the creditors have suffered as a result of the inequitable conduct. *Id*.

8.      However, section 510 of the Bankruptcy Code only allows equitable subordination of claims "after notice and a hearing." 11 U.S.C. § 510(c). Equitable subordination generally requires an adversary proceeding and while it may be satisfied through a chapter 11 plan, the debtor must at least satisfy its burden of demonstrating such claim should be subordinated under equitable subordination principles. Fed. R. Bankr. P. 7001(8).

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 8
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 986 of 1598    PageID 14033
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21    Entered 01/05/21 16:54:33    Page 4 of 7

9.      Here, the Fifth Amended Plan does not provide for the subordination of any specific claims but, instead, provides for a procedure to subordinate claims that fails to comply with the statutory requirements under section 510 of the Bankruptcy Code or applicable case law. The Fifth Amended Plan provides no notice of the potential targets of such subordination, the basis upon which such subordination of claims may be justified, or any evidence supporting equitable subordination principles. Nor does the Fifth Amended Plan provide any means for due process, adequate notice, or opportunity to oppose such unidentified subordinations. Instead, the Fifth Amended Plan attempts to provide a means by which the Debtor, Reorganized Debtor, and Claimant Trustee can escape the "notice and hearing" requirements of section 510. This does not comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**B.      The Fifth Amended Plan provides for the improper set-off of unidentified claims against the Debtor.**

10.      Similarly, the Fifth Amended Plan also provides the Distribution Agent unfettered set-off rights in violation of section 553 of the Bankruptcy Code. The Fifth Amended Plan provides that:

> The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim…. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

*See* Fifth Amended Plan, Article VI(M). Thus, under the Fifth Amended Plan, the Distribution Agent may setoff the distribution amount on account of any Allowed Claim, without otherwise providing notice to the Holder of such Allowed Claim and without providing any support for or

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 987 of 1598   PageID 14034
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21    Entered 01/05/21 16:54:33    Page 5 of 7

evidence that such setoff is justified. Instead, after the Distribution Agent arbitrarily determines a setoff is appropriate, the Holder of the Allowed Claim must initiate a proceeding challenging such setoff and seeking its full distribution under the Fifth Amended Plan. In addition, under the Fifth Amended Plan, the Distribution may setoff a pre-petition Allowed Claim on account of not only pre-petition claims but also post-petition claims of the Reorganized Debtor and/or Distribution Agent.

11.     However, setoff is only available in bankruptcy when the opposing obligations arise on the same side of the bankruptcy date—*i.e.,* both had arisen prior to the petition date or both subsequent to the petition date. *In re Thomas*, 529 B.R. 628, 637 n.2 (Bankr. W.D. Pa. 2015); *In re Univ. Med. Center*, 973 F.2d 1065, 1079 (3d Cir. 1992). A creditor's pre-petition claims against the debtor cannot be set off against post-petition debts owed to the debtor. *In re Univ. Med. Center*, 973 F.2d at 1079. In addition, the burden of proof is on the party asserting the right to setoff. *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). The party seeking to enforce a setoff right must establish (i) it has a right to setoff under nonbankruptcy law; and (ii) this right should be preserved in bankruptcy under section 553. *Id.*

12.     Here, contrary to the provisions in section 553 of the Bankruptcy Code, the Fifth Amended Plan attempts to both expand the right to setoff by allowing post-petition claims be setoff against pre-petition Allowed Claims and transfer the burden of proof to the Holder of such Allowed Claim, requiring such Holder disprove the Distribution Agent's right to setoff. This does not comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

---

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 988 of 1598   PageID 14035
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21    Entered 01/05/21 16:54:33    Page 6 of 7

C.      **The Fifth Amended Plan provides for improper and overly broad injunctions, releases and exculpation.**

13.      In addition, the Fifth Amended Plan provides for broad releases and permanent injunctions against nondebtors. *See* Article IX(F). However, permanent injunctions against nondebtors are not permissible in the Fifth Circuit because such a permanent injunction would "improperly insulate nondebtors in violation of section 524(e)…without any countervailing justification of debtor protection." *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995) (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co.* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 601-02 (10th Cir. 1990)). Contrary to such prohibition, the Fifth Amended Plan seeks to exculpate certain "Exculpated Parties" and "Protected Parties" from a broad array of claims relating to such entities' post-petition conduct and would bar creditors from pursing claims against various non-debtor parties if such claims relate to their claims against the Debtor. In addition, the language purports to release creditors' claims arising not only from the bankruptcy case but also the administration and implementation of the Fifth Amended Plan and the period of time covered by the release and exculpation provisions extend beyond the effective date and purport to cover post-effective date conduct. Neither the Bankruptcy Code nor applicable case law permits such broad exculpatory and/or injunctive language in favor of third parties. *See In re Zale Corp.*, 62 F.3d at 761, *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009). The injunction, release, and exculpation provisions in the Fifth Amended Plan do not comply with section 524(e) of the Bankruptcy Code or applicable case law and the Court should deny confirmation.

D.      **Reservation of Rights**

14.      NexBank reserves the right to amend or supplement this Objection to add any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 989 of 1598 PageID 14036
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21 Entered 01/05/21 16:54:33 Page 7 of 7

Code. In addition, NexBank reserves the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### III. CONCLUSION

For these reasons, the NexBank respectfully requests that the Court deny confirmation of the Fifth Amended Plan and grant NexBank such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email: jason.rudd@wickphillips.com
lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXBANK CAPITAL, INC., NEXBANK SECURITIES, INC., NEXBANK TITLE, INC., AND NEXBANK**

### CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2021, a true and correct copy of the foregoing Joinder was served via the Court's CM/ECF system upon counsel for the Debtor and all other parties requesting or consenting to such service in this bankruptcy case.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

# EXHIBIT 67

Case 19-34054-sgj11 Doc 3445-67 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 5
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 991 of 1598   PageID 14038
Case 19-34054-sgj11 Doc 1678 Filed 01/05/21    Entered 01/05/21 17:00:20    Page 1 of 4

Docket #1678  Date Filed: 01/05/2021

Jason P. Kathman
State Bar No. 24070036
Spencer Fane LLP
5700 Granite Parkway, Suite 650
Plano, Texas 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Facsimile
Email: jkathman@spencerfane.com

**COUNSEL FOR
PATRICK HAGAMAN DAUGHERTY**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CASE NO. 19-34054-SGJ-11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P** | § | |
| | § | **CHAPTER 11** |
| | § | |
| **Debtor.** | § | |

### PATRICK HAGAMAN DAUGHERTY'S OBJECTION TO
### CONFIRMATION OF FIFTH AMENDED PLAN OF REORGANIZATION

Patrick Hagaman Daugherty ("**Daugherty**") a creditor and party-in-interest in the above-captioned bankruptcy case, files this Objection to Confirmation of Fifth Amended Plan of Reorganization (the "**Objection**") and represents as follows:

1.      The Plan does not "provide the same treatment for each claim or interest of a particular class," as required by section 1123(a)(4). *See* 11 U.S.C. § 1123(a)(4). Bankruptcy Code Section 1129(a)(1) requires that a chapter 11 plan comply with the applicable provisions of the Bankruptcy Code before it may be confirmed. 11 U.S.C. § 1129(a)(1); *In re Schwarzmann*, 203 B.R. 919 (Bankr. E.D. Va. 1995). A principal objective of Section 1129(a)(1) is to assure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization. *In re Mirant Corp.*, 2007 WL 1258932

PATRICK HAGAMAN DAUGHERTY'S OBJECTION TO CONFIR

Case 19-34054-sgj11 Doc 3445-67 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 5
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 992 of 1598 PageID 14039
Case 19-34054-sgj11 Doc 1678 Filed 01/05/21 Entered 01/05/21 17:00:20 Page 2 of 4

(Bankr. N.D. Tex. Apr. 27, 2007). Because the Plan provides different treatment for "disputed" claims and "allowed" claims, the Plan does not comply with section 1123(a)(4).

2.     The Debtor's Plan provides that the Claimant Trust[1] may make Trust Distributions to the Claimant Trust Beneficiaries "at any time and/or use Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law."[2] Further, the Plan and Claimant Trust Agreement provide that there will be no distributions on account of "Disputed Claims" while it is pending allowance.[3] A "Disputed Claim" is one that is not yet allowed.[4] For "Disputed Claims," the Debtor proposes to create a "Disputed Claim Reserve."[5] However, the amount placed in the "Disputed Claim Reserve" shall be:

> (a) The amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim or (d) as otherwise ordered by the Bankruptcy Court, *including an order estimating the Disputed Claim*.[6]

Upon a claim being allowed, the Plan provides:

> To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.[7]

A serious problem with this construct arises if the Debtor under-estimates the amount of the

---

[1] Capitalize terms not expressly defined herein, shall have the meanings ascribed to them in the Plan.
[2] *See* Plan at 31.
[3] *See* Plan at 44; Claimant Trust Agreement at § 6.4.
[4] *See* Plan at 7.
[5] *See* Plan at 40.
[6] *See* Definition of "Disputed Claims Reserve Amount" Plan at 7 (emphasis added).
[7] *See* Plan at 40.

**PATRICK HAGAMAN DAUGHERTY'S OBJECTION TO CONFIRMATION – Page 2**

Case 19-34054-sgj11 Doc 3445-67 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 5
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 993 of 1598   PageID 14040
Case 19-34054-sgj11 Doc 1678 Filed 01/05/21    Entered 01/05/21 17:00:20    Page 3 of 4

Disputed Claim Reserve, which is a major risk considering (1) the significant amount of "Disputed Claims" and the ability of the Debtor to utilize an order estimating a claim to determine how much to reserve. If any one of the "Disputed Claims" is adjudicated in an amount great than what was reserved (or estimated), then holders of "Disputed Claims" will receive disparate treatment from other creditors in the same case. By way of an example, in Daugherty's case, if his claim is ultimately allowed in an amount in excess of $9,134,019.00, then any amounts paid over and above the amount reserved and estimated will come at the expense of other holders of "Disputed Claims." Because holders of "disputed" claims in Class 8 will very likely receive a different percentage recovery from holders of "allowed" claims in Class 8, the Plan does not comply with section 1123(a)(4), and confirmation should accordingly be denied.

WHEREFORE, Daugherty respectfully requests that the Court enter an order (i) denying confirmation of the Plan, and (ii) granting Daugherty such other and further relief, legal or equitable, special or general, to which he may show himself justly entitled.

Case 19-34054-sgj11 Doc 3445-67 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 5
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 994 of 1598    PageID 14041
Case 19-34054-sgj11 Doc 1678 Filed 01/05/21    Entered 01/05/21 17:00:20    Page 4 of 4

Dated: January 5, 2021.                     Respectfully submitted,

                                            */s/ Jason P. Kathman*
                                            Jason P. Kathman
                                            State Bar No. 24070036
                                            SPENCER FANE LLP
                                            5700 Granite Parkway, Suite 650
                                            Plano, Texas 75024
                                            (972) 324-0300- Telephone
                                            (972) 324-0301 – Facsimile
                                            Email: jkathman@spencerfane.com

                                            **COUNSEL FOR
                                            PATRICK HAGAMAN DAUGHERTY**

                        **CERTIFICATE OF SERVICE**

        The undersigned hereby certifies that on January 5, 2021 a copy of the attached Objection
was served via the Court's electronic transmission facilities upon all parties receiving notice via
the Court's ECF system, and has been served via email upon counsel for the Debtor and the
Committee via e-mail.


                                            */s/ Jason P. Kathman*
                                            Jason P. Kathman

# EXHIBIT 68

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                            DALLAS DIVISION

 3                                   )    Case No. 19-34054-sgj-11
          In Re:                     )    Chapter 11
 4                                   )
          HIGHLAND CAPITAL           )    Dallas, Texas
          MANAGEMENT, L.P.,          )    Friday, January 8, 2021
 5                                   )    9:30 a.m. Docket
                                     )
 6             Debtor.               )
          _____)
 7                                   )
          HIGHLAND CAPITAL           )    Adversary Proceeding 20-3190-sgj
          MANAGEMENT, L.P.,          )
 8                                   )
                                     )
 9             Plaintiff,            )    PRELIMINARY INJUNCTION
                                     )    HEARING [#2]
10        v.                         )
                                     )
11        JAMES D. DONDERO,          )
                                     )
12             Defendant.            )
          _____)

13                       TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                   UNITED STATES BANKRUPTCY JUDGE.

15        WEBEX/TELEPHONIC APPEARANCES:

16        For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                                      PACHULSKI STANG ZIEHL & JONES, LLP
17                                    10100 Santa Monica Blvd.,
                                       13th Floor
18                                    Los Angeles, CA  90067-4003
                                      (310) 277-6910
19
          For the Debtor/Plaintiff:   John A. Morris
20                                    PACHULSKI STANG ZIEHL & JONES, LLP
                                      780 Third Avenue, 34th Floor
21                                    New York, NY  10017-2024
                                      (212) 561-7700
22

23

24

25
```

2

1   APPEARANCES, cont'd.:

2   For James Dondero,        D. Michael Lynn
    Defendant:               John Y. Bonds, III
3                            Bryan C. Assink
                             BONDS ELLIS EPPICH SCHAFER
4                              JONES, LLP
                             420 Throckmorton Street,
5                              Suite 1000
                             Fort Worth, TX  76102
6                            (817) 405-6900

7   For the Official Committee  Matthew A. Clemente
    of Unsecured Creditors:    SIDLEY AUSTIN, LLP
8                             One South Dearborn Street
                              Chicago, IL  60603
9                             (312) 853-7539

10  For the Funds and         Davor Rukavina
    Advisors:                 MUNSCH HARDT KOPF & HARR, P.C.
11                            500 N. Akard Street, Suite 3800
                              Dallas, TX  75201-6659
12                            (214) 855-7554

13  For Certain Employees:    Frances A. Smith
                              ROSS & SMITH, P.C.
14                            Plaza of the Americas
                              700 N. Pearl Street, Suite 1610
15                            Dallas, TX  75201
                              (214) 593-4976
16
    Recorded by:              Michael F. Edmond, Sr.
17                            UNITED STATES BANKRUPTCY COURT
                              1100 Commerce Street, 12th Floor
18                            Dallas, TX  75242
                              (214) 753-2062
19
    Transcribed by:           Kathy Rehling
20                            311 Paradise Cove
                              Shady Shores, TX  76208
21                            (972) 786-3063

22

23

24
            Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.

3

```
 1          DALLAS, TEXAS - JANUARY 8, 2021 - 9:41 A.M.

 2          THE COURT:  All right.  We are here for Highland

 3   Capital Management, L.P. versus James Dondero, a preliminary

 4   injunction hearing.  This is Adversary 20-3190.

 5       All right.  Let's start out by getting appearances from

 6   counsel.  First, for the Plaintiff/Debtor, who do we have

 7   appearing?

 8          MR. MORRIS:  Your Honor, John Morris; Pachulski Stang

 9   Ziehl & Jones.  I'm here with my partner, Jeff Pomerantz, and

10   others.

11          THE COURT:  All right.  Good morning.  All right.

12   For Mr. Dondero, who do we have appearing?

13          MR. LYNN:  Michael Lynn, together with John Bonds,

14   for Mr. Dondero.

15          THE COURT:  Good morning.

16       All right.  I know we have a lot of parties in interest

17   represented on the video or phone today.  I'm not going to go

18   through a roll call, other than I'll see if we have the

19   Committee, the Unsecured Creditors' Committee counsel on the

20   line.  Do we have anyone appearing for them?

21          MR. CLEMENTE:  Yes, good morning, Your Honor.

22   Matthew Clemente from Sidley Austin on behalf of the

23   Committee.

24          THE COURT:  Okay.  Thank you.  All right.

25          MR. CLEMENTE:  Thank you, Your Honor.
```

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 999 of 1598   PageID 14046
206

4

```
 1          THE COURT:  Well, as I said, I'm not going to do a
 2   roll call.  I don't think we had any specific parties in
 3   interest, you know, file a pleading, or any other parties
 4   other than the Debtor and Mr. Dondero in this adversary.  So
 5   I'll just let the others kind of listen in without appearing.
 6      All right.  Mr. Morris, are you going to start us off this
 7   morning with, I don't know, an opening statement or any
 8   housekeeping matters?
 9          MR. MORRIS:  I have both an opening statement and
10   housekeeping matters.  I just wanted to see if Mr. Pomerantz
11   has anything he wants to convey to the Court before I begin.
12          MR. POMERANTZ:  (garbled)
13          THE COURT:  Mr. Pomerantz, if you could take your
14   device off mute, please.
15          THE CLERK:  He's off mute.  I don't know what --
16          THE COURT:  Okay.  Well, we're showing you're not on
17   mute, but we can't hear you.  What now?
18          THE CLERK:  He's not on mute now.  He's --
19          THE COURT:  Okay.  Go ahead, Mr. Pomerantz.
20      (Pause.)
21          THE CLERK:  He's not coming through.
22          THE COURT:  We're -- you're not coming through, and
23   we're not sure what the problem is.  We're not showing you on
24   mute.
25      (Pause.)
```

5

```
 1          THE COURT:  All right.  Should we have him call back

 2   in on his phone?  All right.  If you could, if you have a

 3   phone, maybe you can try calling in on your phone and speak

 4   through your phone, not your computer.

 5          MR. MORRIS:  You know what, Your Honor?  I'm going to

 6   proceed, and Mr. Pomerantz will address the Court at the

 7   conclusion of the hearing on the motion.

 8          THE COURT:  Okay.  Very good.  We usually hear him

 9   loud and clear, so I don't know what's going on this morning.

10   Go ahead, Mr. Morris.

11          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

12          MR. MORRIS:  Yes.  Thank you very much, Your Honor.

13   John Morris; Pachulski Stang; for the Debtor.

14      We are here this morning, Your Honor, on the Debtor's

15   motion for preliminary injunction against Mr. Dondero.  We

16   filed last night also an emergency motion for an order to show

17   cause as to why this Court should not hold Mr. Dondero in

18   contempt of court --

19          THE COURT:  All right.

20          MR. MORRIS:  -- for violating a previously-issued

21   TRO.

22          THE COURT:  Yes.  Let me just interject, in case

23   there's any confusion by anyone.  I am not going to hear the

24   motion for show cause order this morning.  While I understand

25   you think there might be some efficiency and overlap in
```

6

1  evidence, it's not enough notice.  So we'll talk about

2  scheduling that at the end of the presentations this morning.

3  All right?

4          MR. MORRIS:  Thank you for addressing that, Your

5  Honor.

6          THE COURT:  Okay.

7          MR. MORRIS:  Your Honor, then let's just proceed

8  right to the preliminary injunction motion.  There is ample

9  evidence to support the Debtor's motion for a preliminary

10  injunction.  There would have been substantial evidence to

11  support it based on the conduct that occurred prior to the

12  issuance of the TRO, but the conduct that did occur following

13  the TRO only emphasizes the urgent need for an injunction in

14  this case.

15     I want to begin by just telling Your Honor what evidence

16  we intend to introduce here today.  We filed at Docket 46 in

17  the adversary proceeding our witness and exhibit list.  The

18  exhibit list contains Exhibits A through Y.  And at the

19  appropriate time, I will move for the admission into evidence

20  of those exhibits.

21     The exhibit list and the witness list also identifies

22  three witnesses for today.  Mr. Dondero.  Mr. Dondero is here

23  today.  Notwithstanding Your Honor's comments on December 10th

24  and on December 16th, when I deposed him on Tuesday he was

25  unsure whether he was going to come here today to testify.

7

1    And he will inform Your Honor of that on cross-examination.

2    And so the Debtor was forced to prepare and serve a subpoena

3    to make sure that he was here today.  But Mr. Dondero is here

4    today.

5        Following the conclusion of Mr. Dondero's deposition on

6    Tuesday, and based in part on the evidence adduced during that

7    deposition, the Debtor terminated for cause Scott Ellington

8    and Isaac Leventon.  We had asked counsel for those former

9    employees to accept service of a trial subpoena so that they

10   would appear today.  We were told that they would do so if we

11   gave them a copy of the transcript of Mr. Dondero's

12   deposition.

13       We thought that was inappropriate and we declined to do

14   so, and they declined to accept service of the subpoenas.  We

15   have spent two days with a professional process server

16   attempting to effectuate service of the trial subpoenas for

17   Mr. Ellington and Mr. Leventon, but we were unsuccessful in

18   doing that.  So we'll only have one witness today, unless we

19   have cause to call anybody on rebuttal, and that witness will

20   be Mr. Dondero.

21       I want to talk for a few moments as to what Mr. Dondero

22   will testify to and what the evidence will show.  Mr. Dondero

23   will testify that he never read the TRO, Your Honor.  He will

24   testify that he didn't participate in the motion on the

25   hearing for the TRO, that he never read Mr. Seery's

8

1  declaration in support of the Debtor's motion for the TRO,

2  that he never bothered to read the transcript of the

3  proceedings on December 10th so that he could understand the

4  evidence that was being used against him.  He had no knowledge

5  of the terms of the TRO when he was deposed on Tuesday.

6       And that's the backdrop of what we're doing here today,

7  because he didn't know what he was enjoined from doing, other

8  than speaking to employees.  He actually did testify and he

9  will testify that he knew he wasn't supposed to speak with the

10 Debtor's employees, but he spoke with the Debtor's employees

11 in all kinds of ways, as the evidence will show.

12      The evidence will also show that Mr. Dondero violated the

13 TRO by throwing away the cell phone that the company bought

14 and paid for after the TRO was entered into.  He's going to be

15 unable to tell you who threw it away.  He's going to be unable

16 to tell you who gave the order to throw it away.  He's going

17 to be unable to tell you when after the TRO was entered the

18 phone was thrown away.

19      But we do have as one fact and as I believe one violation

20 of the TRO --

21           MR. POMERANTZ:  So, I'm on a WebEx.

22           MR. MORRIS:  Jeff, --

23           THE COURT:  Mr. Pomerantz, we heard you.  We heard

24 you say something.  So, apparently, you got your audio

25 working.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1004 of 1598   PageID 14051
206

9

1        All right.  Mr. Morris, continue.

2            MR. MORRIS:  Yeah.  And what Mr. Dondero may tell

3    you, Your Honor, is that it's really Mr. Seery's fault that

4    the phone got thrown away, because Mr. Seery announced that

5    all of the employees were going to be terminated at the end of

6    January, and because Mr. Seery did that, he and I believe Mr.

7    Ellington thought it was appropriate to just throw their

8    phones away, without getting the Debtor's consent, without

9    informing the Debtor, and switching the phone numbers that

10   were in the Debtor's account to their own personal names.  So

11   that's Item No. 1.

12       Item No. 2 -- and this is in no particular order, Your

13   Honor.  I don't want you to think that I'm bringing these

14   things up in terms of priority.  But they're just the order in

15   which they came up in the deposition, and so I'm just

16   following it as well.

17       Item No. 2 is trespass.  On December 22nd, you will hear

18   evidence that Mr. Dondero personally intervened to yet again

19   stop trades that Mr. Seery was trying to effectuate in his

20   capacity as portfolio managers of the CLOs.  He did that just

21   six days after Your Honor dismissed as frivolous a motion

22   brought by the very Advisors and Funds that he owns and

23   controls.

24       Therefore, the very next day, the Debtor sent him a

25   letter, sent through counsel a letter, evicting him from the

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1005 of 1598   PageID 14052
206

10

1  premises, demanding the return of the phone, and telling him

2  that he had to be out by December 30th.

3      I was stunned, Your Honor, stunned, when I took his

4  deposition on Tuesday and he was sitting in Highland's

5  offices.  He hadn't asked for permission to be there.  He

6  hadn't obtained consent to be there.  But he just doesn't care

7  what the Debtor has to say here.  He just doesn't.

8      I don't know when he got there or when he left.  I don't

9  know if he spoke to anybody while he was there.  But he just

10  took it upon himself to show up in the Debtor's office,

11  notwithstanding the very explicit eviction notice that he got

12  on December 23rd.

13      Mr. Dondero, as I mentioned, clearly violated the TRO by

14  knowingly and intentionally and purposely interfering with the

15  Debtor's trading as the portfolio manager of the CLOs.  This

16  has just gone on too long.  There have been multiple hearings

17  on this matter, but he doesn't care.  So he gave the order to

18  stop trades that Mr. Seery had effectuated.  That's a clear

19  violation of the TRO, and it certainly supports the imposition

20  of a preliminary injunction.

21      Mr. Seery -- Mr. Dondero is going to testify that multiple

22  letters -- that I'm going to refer to them, Your Honor, as the

23  K&L Gates Parties, and those are the two Advisors and the

24  three investment funds and CLO Holdco that are all owned and/

25  or controlled by Mr. Dondero -- after that hearing on the

11

1   16th, K&L Gates, the K&L Gates Parties sent not one, not two,

2   but three separate letters.  They said they may take steps to

3   terminate the CLO management agreements.  After we evicted Mr.

4   Dondero, sent a letter suggesting that we would be held liable

5   for damages because we were interfering with their business.

6       And Mr. Dondero is going to tell you, Your Honor, that he

7   encouraged the sending of those letters, that he approved of

8   those letters, that he thought those letters were the right

9   things to send to the Debtor, even after -- even with the

10  knowledge of what happened on December 16th.

11      He's going to tell you he knew about that hearing and he

12  still, he still approves of those letters, and never bothered

13  to exercise his control to have those letters withdrawn upon

14  the Debtor's request.  We asked them to withdraw it, and when

15  they wouldn't do it, Your Honor, that's what prompted the

16  filing of yet another adversary proceeding.  And we're going

17  to have another TRO hearing next Wednesday because they won't

18  stop.

19      Next, a preliminary injunction should issue because Mr.

20  Dondero violated the TRO by communicating with the Debtor's

21  employees to coordinate their legal strategy against the

22  Debtor.  The evidence will show, in documents and in

23  testimony, that on December 12th, while he was prohibited from

24  speaking to any employee except in the context of shared

25  services, you're going to see the documents and you're going

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1007 of 1598 PageID 14054

12

1  to hear the evidence that on December 12th Scott Ellington was

2  actively involved in identifying a witness to support Mr.

3  Dondero's interests at the December 16th hearing.

4       You will receive evidence that on December 15th Mr.

5  Ellington and Mr. Leventon collaborated with Mr. Dondero's

6  lawyers to prepare a common interest agreement.

7       You will hear evidence that on the next day, December

8  16th, the day of that hearing, that Mr. Dondero solicited Mr.

9  Ellington's help to coordinate all of the lawyers representing

10 Mr. Dondero's interests, telling Mr. Ellington that he needed

11 to show leadership, and Mr. Ellington readily agreed to do

12 just that.

13      You will hear evidence that on December 23rd Mr. Ellington

14 and Grant Scott communicated in connection with calls that

15 were being scheduled with Mr. Dondero and with K&L Gates, the

16 very K&L Gates Clients who filed the frivolous motion that was

17 heard on December 16th and that persisted in sending multiple

18 letters threatening the Debtor thereafter.

19      You will hear evidence that late in December Mr. Dondero

20 sought contact information for Mr. Ellington and Mr.

21 Leventon's lawyer, and he will tell you that he did it for the

22 explicit purpose of advancing their mutual shared interest

23 agreement, while they were employed by the Debtor.  While they

24 were employed by the Debtor.

25      Finally, you will hear evidence, and it will not be

13

```
 1   disputed, you will see the evidence, it's on the documents,

 2   that Mr. Dondero personally intervened to stop the Debtor from

 3   producing the financial statements of Get Good and Dugaboy,

 4   two entities that he controls, that the U.C.C. had been asking

 5   for for some time, that the Debtor had been asking of its

 6   employees for some time to produce.  And it was only when we

 7   got, frankly, the discovery from Mr. Dondero when there's a

 8   text message that says, Not without a subpoena.

 9       The documents are on the Debtor's system.  We just don't

10   know where they are because they're hidden someplace.  But Mr.

11   Dondero knows where they are.  He can certainly force -- he

12   can certainly get them produced.  And one of the things we'll

13   be asking for when we seek the contempt motion is the

14   production of those very documents.

15       So, Your Honor, that's what the evidence is going to show.

16   I don't think there's going to be any question that a

17   preliminary injunction ought to issue.  But I do want to spend

18   just a few minutes rebutting some of the assertions made in

19   the filing by Mr. Dondero last night.

20       Of course, they offer no evidence.  There is no

21   declaration.  There is no document.  There is merely argument.

22   It's been that way throughout this case.  For a year, Mr.

23   Dondero has never stood before Your Honor to tell you why

24   something was wrong being done to him, why -- he hasn't

25   offered to be here at all, and he's here today, again, only
```

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1009 of 1598 PageID 14056
206

14

1    because he got a subpoena.  That's the only reason we know

2    he's here today.

3        So let's just spend a few minutes talking about the

4    assertions made in the document last night.  Mr. Dondero

5    complains about the scope of the injunction, and I say to

6    myself, in all seriousness, Are you kidding me?  You didn't

7    even read the TRO and you're going to be concerned about what

8    the scope of the injunction is?  You didn't even have enough

9    respect for the Court to read the TRO and we're going to worry

10   about the scope of some future injunction?  Doesn't make any

11   sense to me.

12       But let's talk about the specific arguments that they

13   make.

14       Third parties.  They're concerned that somehow third

15   parties don't have notice of the injunction.  Your Honor,

16   third parties are not impacted by the injunction.  The only

17   third parties that are impacted by the injunction are those

18   that are owned and/or controlled by Mr. Dondero.  If he

19   doesn't tell them, that's his breach of duty.  He created the

20   Byzantine empire of over 2,000 entities, and he wants the

21   Debtor to have the burden of notifying all of them so that

22   they can all come in here and make 2,000 arguments as to why

23   they shouldn't be enjoined?

24       He owns and controls them.  They are the only third

25   parties who are impacted by this proposed preliminary

Case 19-34054-sgj11  Doc 3445-68  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1010 of 1598   PageID 14057
206

15

1    injunction, and he has the responsibility, he has the duty to

2    inform them, because he owns and controls them.

3        We know of the K&L Gates Parties.  We know Get Good and

4    Dugaboy are in this courtroom.  We know CLO Holdco.  So many

5    of these parties have been so -- they're on the phone now.

6    They don't have notice?  It is insulting, frankly, to suggest

7    that the Debtor somehow has some obligation to figure out who

8    Mr. Dondero owns and controls.  He should know that.  That's

9    number one.

10       Number two, there is a statement in there about employees

11   and how he should be able to speak with them about personal

12   and routine matters.  As to that, Your Honor, he has forfeited

13   that opportunity.  He cannot be trusted.  There cannot be any

14   communication because nobody can police it.  And so we think a

15   complete bar to any discussion with any employee, except as it

16   relates to shared services -- because we do have a contractual

17   obligation; that's what was in it -- ought to be barred.

18   That's number one.

19       Number two, there's a reference in the objection to Mr.

20   Dondero's personal assistant.  I'd like to know who that is,

21   Your Honor.  I wasn't aware that he still was using a personal

22   assistant at the Debtor.  I want to know specifically who that

23   is.  I don't know that they -- you know, I just -- we need to

24   cut that off.  And he should not be communicating with any

25   employee.  The Debtor should not be paying for his personal

16

1   assistant.

2       It's offensive to think that he's still doing that,

3   particularly after he was terminated or his resignation was

4   requested back in October precisely because his interests were

5   adverse to the Debtor.

6       Number three, he's concerned that the Debtor is somehow

7   preventing him from speaking to former employees.  We now

8   know, Your Honor, that that's a, I'm sure, a very specific

9   reference to Mr. Ellington and Mr. Leventon.  Right?  He wants

10  a green light to be able to do that.  And you know, I'll leave

11  it to Your Honor as to whether that's appropriate.  I'll leave

12  it to their counsel as to whether, going forward, colluding

13  together against the Debtor at this point in time is in

14  anybody's best interest.  But I will -- what I will demand in

15  the preliminary injunction is a very explicit statement that

16  Mr. Ellington and Mr. Leventon are not to share any

17  confidential or privileged information that they received in

18  their capacity as general counsel and assistant general

19  counsel of the Debtor.

20      The pot plan.  He's afraid somehow the order is going to

21  prevent him from pursuing the pot plan.  He's had over a year

22  to pursue this pot plan, Your Honor.  Frankly, I don't, you

23  know, I don't know what to say.  He has never made a proposal

24  that has gotten any traction with the only people who matter.

25  And it's not the Debtor.  It's the creditors.  It's the

17

1    Creditors' Committee.

2        If you want to put in an exception that he can call Matt

3    Clemente, I don't mean to put this on Mr. Clemente, he can

4    decide whether or not that's appropriate, but the creditors

5    are the only ones who matter here.  Your Honor, it's not the

6    Debtor.

7        And I'll let Mr. Dondero's counsel explain to Your Honor

8    why he thinks he still needs to pursue a pot plan, and Your

9    Honor can decide.  I trust Your Honor to decide what

10   boundaries and what guardrails might be appropriate for him to

11   continue to pursue his pot plan.

12       That's all I have, Your Honor.  Not much.

13            THE COURT:  All right.

14            MR. MORRIS:  But I think there's going to be --

15   there's going to be an awful lot of evidence.  This is going

16   to be a lengthy examination.  I ask the Court for your

17   patience.

18            THE COURT:  I've got --

19            MR. MORRIS:  But that's all I have.

20            THE COURT:  I've got all day, if we need it.

21            MR. MORRIS:  Okay.

22            THE COURT:  I hope we don't, but I've got all day if

23   we need it.  All right.

24            MR. MORRIS:  That's what I have, Your Honor.

25            THE COURT:  All right.  Mr. Dondero's counsel, your

18

1   opening statement?

2          MR. BONDS:  Your Honor, I would reserve my opening

3   statement to the end of the hearing.

4      I would also point out that anything that Mr. Morris just

5   said was not evidence, and we think that the evidence will

6   show completely differently than argued or articulated by Mr.

7   Morris.

8          THE COURT:  All right.

9          MR. BONDS:  That's all.

10          THE COURT:  Thank you, Mr. Bonds.

11      Mr. Morris, you may call your witness.

12          MR. MORRIS:  The Debtor calls James Dondero.

13          THE COURT:  All right.  Mr. Dondero, this is Judge

14   Jernigan.  I would ask you to say, "Testing, one, two," so we

15   pick up your video so I can swear you in.

16      All right.  Mr. Dondero, if you're speaking up, we're not

17   hearing you, so please make sure you're unmuted and have your

18   video --

19      (Echoing.)

20          MR. DONDERO:  Hello.  One, two.

21          THE COURT:  Okay.  We got you.

22          MR. DONDERO:  One, two three.

23          THE COURT:  We got you now.

24          JAMES D. DONDERO, PLAINTIFF'S WITNESS, SWORN

25          THE COURT:  All right.  Thank you.

```
                       Dondero - Direct                    19
```

1       Mr. Morris, go ahead.

2            MR. MORRIS:  Thank you, Your Honor.

3       (Echoing.)

4            THE COURT:  I'm going to ask everyone except Mr.

5   Dondero and Mr. Morris to put your device on mute.  We're

6   getting a little distortion.

7       All right.  Go ahead.

8                      DIRECT EXAMINATION

9   BY MR. MORRIS:

10  Q    Good morning, Mr. Dondero.  Can you hear me?

11  A    Yes.

12       (Echoing.)

13           THE COURT:  Ooh.  Okay.  We're having a little echo

14  when you speak, Mr. Dondero.  Do you have -- well, first, you

15  have headphones.  That always helps.

16       (Echoing.)

17           THE COURT:  Okay.  That may help as well.

18       (Pause.)

19           THE COURT:  Okay.  Let's try again.  If you could

20  say, "Testing, one, two."

21           THE WITNESS:  Is that better?

22           THE COURT:  That is better, yes.

23       All right.  Go ahead.

24           THE WITNESS:  Okay.  Great.

25           MR. MORRIS:  Thank you.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 21 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1015 of 1598   PageID 14062
206

                              Dondero - Direct                    20

1   BY MR. MORRIS:

2   Q   Can you hear me, Mr. Dondero?

3   A   You're a bit faint.  Give me one second.  Okay.  Got you.

4   Q   Okay.  Thank you.  Who is in the room with you right now?

5   A   Bonds, Lynn, and a tech.

6           A VOICE:  Bryan Assink.

7           THE WITNESS:  Oh, is Assink here?  Oh, okay, I'm

8   sorry.  All right.  I'm sorry.  Bonds, Lynn, and Bryan Assink.

9   BY MR. MORRIS:

10  Q   Okay.  You're testifying today pursuant to a subpoena,

11  correct?

12  A   Yes.

13  Q   Okay.

14          MR. MORRIS:  And Your Honor, that subpoena can be

15  found at Docket No. 44 in the adversary proceeding.

16          THE COURT:  All right.

17  BY MR. MORRIS:

18  Q   In the absence of a subpoena, in the absence of a

19  subpoena, you didn't know if you would show up to testify at

20  this hearing; is that right?

21  A   I -- I do what my counsel directs me to do, and I didn't

22  know at that time whether they would direct me to come or not.

23  Q   Okay.  And when I -- when I deposed you earlier this week,

24  you agreed that you may or may not testify; is that right?

25  A   It depends on what counsel instructs me to do, correct.  I

                    Dondero - Direct                21

1  didn't know at the time.

2  Q   Okay.  And you didn't mention anything about counsel when

3  I asked you the questions earlier this week, correct?

4  A   That was the undertone in almost all my answers, that I

5  relied on counsel.

6        MR. MORRIS:  Your Honor, I move to strike.  I'm

7  asking very specific questions.  And if I need to go to the

8  deposition transcript, I'm happy to do that.

9        THE COURT:  All --

10        MR. MORRIS:  Just going forward, Your Honor, this is

11  cross-examination.  It's really yes or no at this point.

12  That's what I would request, anyway.

13        THE COURT:  All right.  Mr. Dondero, do you

14  understand --

15     (Echoing.)

16        THE COURT:  Do you understand what Mr. Morris was

17  raising there?  We really need you to give specific answers --

18  and usually they're going to be yes or no answers -- to Mr.

19  Morris's questioning.  Okay?  So let's try again.  Mr. Morris,

20  go ahead.

21        THE WITNESS:  Yeah.

22  BY MR. MORRIS:

23  Q   Mr. Dondero, you're aware that Judge Jernigan granted the

24  Debtor's request for a TRO against you on December 10th,

25  correct?

                         Dondero - Direct                    22

 1   A    Yes.

 2   Q    But you never reviewed the declaration that Mr. Seery

 3   filed in support of the Debtor's motion for a TRO, correct?

 4   A    I relied on counsel.

 5   Q    Sir, you never reviewed the declaration that Mr. Seery

 6   filed in support of the Debtor's motion for a TRO, correct?

 7   A    Correct.

 8   Q    You didn't even know the substance of what Mr. Seery

 9   alleged in his declaration at the time that I deposed you on

10   Tuesday, correct?

11   A    Correct.

12   Q    And that's because you didn't even think about the fact

13   that the Debtor was seeking a TRO against you; isn't that

14   right?

15   A    No.

16   Q    That's not right?

17   A    No.

18   Q    All right.

19        MR. MORRIS:  Your Honor, could I ask my assistant,

20   Ms. Canty, to put up on the screen what had been designated as

21   the Debtor's Exhibit Z in connection with the motion for

22   contempt?  Exhibit Z is the transcript from Tuesday's hearing.

23        THE COURT:  All right.

24        MR. MORRIS:  And I would like to -- I'd like to

25   cross-examine Mr. Dondero on his testimony on Tuesday.

                        Dondero - Direct                    23

 1              THE COURT:  All right.  You may.

 2              MR. MORRIS:  Can we put up Page 15, please?  And go

 3    to Lines 15 through 17.

 4    BY MR. MORRIS:

 5    Q    Sir, you recall being deposed on Tuesday by my -- by me,

 6    correct?

 7    A    Yes.

 8    Q    Okay.  Did you hear this question and did you hear this

 9    answer?

10         "Q   Did  you  care  that  the  Debtor  was  seeking  a  TRO

11         against you?

12         "A   I didn't think about it."

13    Q    Is that -- is that your testimony from the other day?

14    A    Yes.

15    Q    You didn't dial in to the hearing when the Court

16    considered the Debtor's motion for a TRO against you, did you?

17    A    I -- I don't recall.  I don't think so.

18    Q    You never read the transcript in order to understand what

19    took place in this courtroom when Judge Jernigan decided to

20    enter a TRO against you; isn't that right?

21    A    I relied on counsel, which has been my testimony all

22    along.

23              MR. MORRIS:  Can we go to Page 13 of the transcript,

24    please?  Beginning at Line 24.

25    BY MR. MORRIS:

Case 19-34054-sgj11  Doc 3445-68  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1019 of 1598   PageID 14066
206

                        Dondero - Direct                    24

 1   Q    (reading)

 2        "Q    Did you read a transcript of the hearing?

 3        "A    No."

 4   Q    Did you testify on Tuesday that you did not read a

 5   transcript of the hearing?

 6   A    Yes.

 7   Q    In fact, as of at least last Tuesday, you hadn't even

 8   bothered to read the TRO that this Court entered against you.

 9   Isn't that right?

10        MR. BONDS:  Your Honor, I'm going to object.

11        (Echoing.)

12        THE COURT:  Okay.  We're getting that echo from you

13   now, Mr. Bonds.  So maybe you need to turn your volume down a

14   little.  But what is the basis for your objection?

15        (Echoing.)

16        MR. BONDS:  Leading and rhetorical.

17        MR. MORRIS:  I think it's because they're in the same

18   room.

19        THE COURT:  Okay.  Do you have -- I don't know what

20   you're doing.  I guess you're moving to a different room?

21        MR. BONDS:  I am, Your Honor.

22        THE COURT:  Okay.

23        (Echoing.)

24        THE COURT:  Okay.  I'm waiting for the objection

25   basis.

Dondero - Direct                            25

1          MR. BONDS:  The basis of the objection, Your Honor,

2     is that --

3          (Echoing.)

4          THE COURT:  Okay.  We're going to have to do

5     something different here.  We can't have this issue for the

6     entire hearing.  Do you need to get a tech person in there, or

7     maybe call in on your phone?  I don't know.

8          MR. BONDS:  Your Honor, I'm going into the conference

9     room.

10         (Pause.)

11         THE COURT:  Okay.  Are we going to try again here?

12         MR. BONDS:  Yes.  Is this working?

13         THE COURT:  Yes.

14         MR. BONDS:  Perfect.  Your Honor, my objection is

15    that Mr. Dondero has already testified that he relied on his

16    lawyers.  I don't know where Mr. Morris is going with this,

17    but it's pretty clear that Mr. Dondero simply relies on his

18    lawyers to tell him what happened.  I don't know that that's

19    that different than any other layperson.

20         MR. MORRIS:  Your Honor, if this is --

21         THE COURT:  Well, --

22         MR. MORRIS:  If I may?

23         THE COURT:  Yes.

24         MR. MORRIS:  I believe it's terribly relevant to know

25    how seriously Mr. Dondero takes this Court and this Court's

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1021 of 1598 PageID 14068
206

Dondero - Direct                        26

1   proceedings and this Court's orders.  If the Court decides

2   that it doesn't matter whether or not he read the transcript,

3   you're the fact-finder and you'll make that decision.  But I

4   believe it's at least relevant.

5            THE COURT:  Okay.  I agree and I overrule the

6   objection.

7        Go ahead.

8   BY MR. MORRIS:

9   Q    Mr. Dondero, as of at least Tuesday, you never bothered to

10  read the TRO that was entered against you, correct?

11  A    I'm sorry.  We're dealing with some tech stuff here for a

12  second.  Can you repeat the question?

13  Q    Yes.

14       (Echoing.)

15  Q    As of Tuesday, you had not bothered to read the TRO that

16  was entered against you?

17       (Echoing.)

18            MR. MORRIS:  Your Honor, can we take a break?  I

19  can't do this.  I just --

20            THE COURT:  Okay.  I agree.  Okay.  Mr. Bonds, what

21  do we need to do to fix these technical problems?  Do I need

22  to get my IT guy in here and help you?  This is terrible.

23  This connection is terrible.  And I understand people have

24  technical problems sometimes, but we've been doing these video

25  hearings since March, so --

                          Dondero - Direct                    27

 1              MR. BONDS:  Your Honor, I have simply gone to another

 2    conference room.  The Debtor (garbled) I think that Mr.

 3    Dondero should be fine.

 4              THE COURT:  Okay.  I don't know what you said except

 5    that you think Mr. Dondero should be fine.  I --

 6              MR. MORRIS:  Is there anybody in that room with a

 7    cell phone on, Mr. Dondero?

 8              THE WITNESS:  No.

 9              MR. BONDS:  And I'm completely over in --

10              THE COURT:  Okay.

11              MR. MORRIS:  Can I try and proceed?

12              THE COURT:  Try to proceed.

13              MR. MORRIS:  Okay.

14         (Echoing.)

15    BY MR. MORRIS:

16    Q   Mr. Dondero, as of Tuesday you only had a general view of

17    what this Court restrained you from doing; is that correct?

18         (Echoing.)

19              MR. MORRIS:  I'd still -- I -- there's too much

20    noise, Your Honor.  I can't do it.

21              THE COURT:  Okay.  We're going to take a five-minute

22    break.  Mr. Bonds, can you get a technical person there to

23    work through these problems?

24         And Mike, let's get Bruce up here to --

25              THE CLERK:  It's because they're in the same room.

Dondero - Direct                    28

1    That's the problem.

2            THE COURT:  They're -- they're --

3            THE CLERK:  Judge Jernigan, this is Traci.  Bruce is

4    on his way up there.

5            THE COURT:  Thank you.

6        Mike, explain it to me, because I don't understand.

7    You're saying if they have two devices on in the same room?

8            THE CLERK:  The same -- that's the problem.  They're

9    so close.  And they're trying to use the same device, give it

10   back to you.

11           A VOICE:  He has a phone on in the room.

12           MR. MORRIS:  I asked that question.

13           THE COURT:  Okay.

14           MR. MORRIS:  Please instruct the witness to exclude

15   everybody from the room, to turn off all electronic devices

16   except the device that's being used for this (garbled).  At

17   least have --

18           THE COURT:  All right.  So, the consensus of more

19   technical people than me is you've got two devices on in the

20   same room and that's what's causing the distortion and echo.

21   So I don't know if it's somebody's phone that needs to be

22   turned off or if you have two iPads or laptops.

23       (Court confers with Clerk.)

24       (Pause.)

25           MR. BONDS:  I think I'm unmuted.  Can people hear me?

Dondero - Direct                           29

1         THE WITNESS:  Yes.

2      (Pause.)

3         THE COURT:  Okay.  Bruce, can you walk their office

4  through?  They have, I think, two devices in the same room.

5  It's a horrible echo.  So, Mr. Bonds or some --

6         MR. BONDS:  Yes, Your Honor.

7         THE COURT:  We have a lawyer and the lawyer's client

8  who is testifying right now in the same room.

9         I.T. STAFF:  Uh-huh.

10         THE COURT:  And --

11         I.T. STAFF:  Yeah.  Yeah.  Because -- is one a call-

12  in user on a telephone?

13         THE COURT:  I don't know.  I don't --

14         I.T. STAFF:  Yeah.  Whatever's coming -- the audio is

15  feeding back in.  They need to separate if they're both on.

16  Or just use one and the attorney can slide over and the client

17  can --

18         THE COURT:  Okay.

19         I.T. STAFF:  -- go in his place.  Just use one --

20         THE COURT:  Our IT person is confirming what everyone

21  else has been saying, that you really can only have one device

22  in the same room.  It's just unavoidable, the echoing.

23         I.T. STAFF:  Unless everybody has --

24         THE COURT:  Unless everyone has headphones on.

25         I.T. STAFF:  Right.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 Page 1025 of 1598 PageID 14072
206

Dondero - Direct                        30

1           THE COURT:  So we either need everyone to have

2    headphones on, or one device in the room.  And you all,

3    awkward as it is, just have to share.  Or I guess you could

4    have two laptops, but one person has to --

5           I.T. STAFF:  Has to have a headset.

6           THE COURT:  Has to --

7           I.T. STAFF:  Because the other one, the audio is

8    going to be feeing into the microphone of the other one.

9           THE COURT:  Okay.  So, Mr. Bonds, I don't know if

10   you've heard any of that, but --

11          THE CLERK:  He needs to unmute himself.

12          THE COURT:  You're on mute, Mr. Bonds.

13          MR. BONDS:  I'm sorry, Your Honor.  I'm going to sit

14   next to Mr. Dondero and answer any questions that may come up.

15          THE COURT:  Okay.

16          MR. BONDS:  If any objections --

17          THE COURT:  Okay.  So we're going to have one device?

18          MR. BONDS:  Yes.

19          THE COURT:  Okay.  Let's try again.

20      Okay.  Go ahead, Mr. Morris.

21   BY MR. MORRIS:

22   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

23          THE COURT:  I didn't hear you, Mr. Morris.  What?

24   BY MR. MORRIS:

25   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

1   A    I have no idea.

2   Q    Is Mr. Leventon listening to this hearing?

3   A    I have no idea.  I haven't spoken with him.

4   Q    Okay.  So let's try again.  At least as of today, you

5   never bothered to read the TRO that was entered against you,

6   correct?

7   A    Correct.

8   Q    As of Tuesday, you only had a general understanding of

9   what the Court restrained you from doing, correct?

10       (Echoing.)

11  A    I had an adequate understanding.

12  Q    You had a what?

13  A    Adequate understanding.

14  Q    Your understanding --

15            A VOICE:  Your Honor?

16  BY MR. MORRIS:

17  Q    -- was that you were prohibited from speaking to the

18  Debtor's board without counsel and from speaking to the

19  Debtor's employees; is that right?

20  A    No.

21  Q    Okay.

22            MR. MORRIS:  Can we go to Page 13, Line 8, please?

23  BY MR. MORRIS:

24  Q    Were you asked this question and did you give this answer?

25       "Q    Tell me your understanding of what the temporary

Dondero - Direct                          32

1       restraining order restrains you from doing.

2       "A   To talk to Independent Board directly or talking

3       directly with employees.

4       "Q   Is there any other aspect of the temporary

5       restraining order that you're aware of that would

6       otherwise constrain or restrain your conduct?

7       "A   Those are the points I (garbled)."

8    Q   Did you give those answers to the questions that I asked?

9    A   Yes.

10   Q   And even with that general understanding, you went ahead

11   and communicated directly (garbled) employees many, many, many

12   times after the TRO was entered?

13   A   Only with regard to shared services, pot plan, and

14   Ellington, the settlement counsel.

15   Q   Does the restraining order permit you to speak with

16   Debtor's employees about the pot plan?

17       (Echoing.)

18          THE COURT:  Mr. Morris, let me stop.

19          MR. MORRIS:  Yeah.  I appreciate that, Your Honor.

20          THE COURT:  Even --

21          MR. MORRIS:  It's not working.

22          THE COURT:  Even your sound is not coming through

23   clearly.  And I think it's the echo coming out of their

24   speakers, Mr. Dondero and Mr. Bonds' speakers.  But before we

25   conclude that, would you turn off your video and ask your

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 34 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1028 of 1598   PageID 14075
206

Dondero - Direct                    33

1  question again and see if it's any better, just to confirm

2  it's not a bandwidth issue on your end?  I doubt it is, but --

3  okay.  So, try asking your question again, and I'm going to

4  see if it's still distorted.

5  BY MR. MORRIS:

6  Q    There's nothing in the TRO that permitted you to speak

7  with Debtor employees about the pot plan, correct?

8          THE COURT:  Okay.  Mr. Morris, it's not at your end.

9  It's -- it's their end.  Okay.  So you can turn your video

10  back on.

11     Mr. Bonds?

12          MR. BONDS:  Yes, ma'am.

13          THE COURT:  You all are going to have to use earbuds,

14  apparently.  We're getting -- we're getting a feedback loop,

15  okay?  Whenever Mr. Morris talks or I talk, we're hearing

16  ourselves echo through your speakers.

17          MR. BONDS:  Can you check right now to see if it's

18  true, if we're experiencing the same problem?

19          THE WITNESS:  In other words, is this better?  We

20  unplugged the cord here.

21          THE COURT:  Well, when you all speak, it's -- it's

22  better now.  But when --

23          MR. MORRIS:  It is better.

24          THE COURT:  But when Mr. Morris asks a question, it's

25  echoing through your speakers.  But I don't hear myself

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1029 of 1598   PageID 14076
206

Dondero - Direct                        34

1    echoing through your speakers.

2             I.T. STAFF:  Can Mr. Morris say something, please?

3             THE COURT:  Mr. Morris, say something.

4             MR. MORRIS:  They may have solved the problem.  They

5    may have solved the problem.  How's that?

6             THE COURT:  Okay.  I think the problem is solved,

7    whatever you did, so let's try once again.

8        Go ahead, Mr. Morris.  Repeat your last question.  I

9    didn't hear it.

10   BY MR. MORRIS:

11   Q    Mr. Dondero, the temporary restraining order doesn't

12   permit you to speak with the Debtor's employees about a pot

13   plan; isn't that right?

14   A    There was a presentation on the pot plan given to the

15   Independent Board after the restraining order was put in

16   place.  What are you implying, that that wasn't proper?

17            MR. MORRIS:  Your Honor, I move to strike.  It's a

18   very simple question.

19            THE COURT:  Okay.  Sustained.  If you could just

20   answer the specific question, Mr. Dondero.

21            THE WITNESS:  I don't know.

22   BY MR. MORRIS:

23   Q    Fair enough.  Sir, let's talk about some of the events

24   that led up to the imposition of the TRO.  I appreciate the

25   fact that you hadn't read Mr. Seery's declaration or any of

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 36 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1030 of 1598   PageID 14077
206

Dondero - Direct                    35

1    the evidence that was submitted in connection with the TRO, so

2    let's spend some time talking about that now.  CLO stands for

3    Collateralized Loan Obligation, correct?

4    A    Yes.

5    Q    And the Debtor is party to certain contracts that give it

6    the exclusive right and responsibility to manage certain CLOs,

7    correct?

8    A    Yes.

9    Q    NexPoint Advisors, LP is an advisory firm.  Do I have that

10   right?

11   A    Yes.

12   Q    And we can refer to that, that firm, as NexPoint; is that

13   fair?

14   A    Yes.

15   Q    You have a direct or indirect ownership interest in

16   NexPoint, correct?

17   A    Yes.

18   Q    You're the president of NexPoint; isn't that right?

19   A    Yes.

20   Q    And as the president of NexPoint, it's fair to say that

21   you control that entity, correct?

22   A    To a certain extent.

23   Q    Sir, as the president of NexPoint, it's fair to say that

24   you control that entity, correct?

25   A    To a certain extent.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 37 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1031 of 1598   PageID 14078
206

Dondero - Direct                              36

 1           MR. MORRIS:  Can we go to Page 18 of the transcript,

 2    please?  Lines 19 and 21.

 3    BY MR. MORRIS:

 4    Q    Were you asked this question and did you give this answer?

 5         "Q   As the president of NexPoint, it's fair to say

 6         that you control that entity?

 7         "A   Generally."

 8    Q    Is that the right answer that you gave the other day?

 9    A    I think it's similar to what I just said, yeah, yeah.

10    Q    Sir, you're familiar with Highland Capital Management Fund

11    Advisors, LP; is that right?

12    A    Yes.

13    Q    And we'll call that Fund Advisors; is that fair?

14    A    Yes.

15    Q    And we'll refer to Fund Advisors and NexPoint together as

16    the Advisors; is that okay?

17    A    Yes.

18    Q    Fund Advisors is also an advisory firm, correct?

19    A    Yes.

20    Q    You have a direct or indirect ownership interest in Fund

21    Advisors, correct?

22    A    Yes.

23    Q    You're the president of Fund Advisors, correct?

24    A    Yes.

25    Q    And you also have an ownership interest in the general

Dondero - Direct                                    37

1  partner of Fund Advisors; isn't that right?

2  A    I believe so.

3  Q    It's fair to say that you control Fund Advisors, correct?

4  A    Generally.

5  Q    NexPoint and Fund Advisors manage certain investments

6  funds; is that right?

7  A    Yes.

8  Q    Among the funds that they manage are High Point Income

9  Fund; is that right?

10  A    I don't think that's a name that we manage.

11  Q    Let's put it this way.  There are three funds that are

12  represented by K&L Gates that are managed by the Advisors,

13  correct?

14  A    I don't know.

15  Q    Okay.  You're the portfolio manager of the investment

16  funds advised by NexPoint and Fund Advisors, correct?

17  A    Largely.

18  Q    And NexPoint and Fund Advisors caused the investment funds

19  that they manage to invest in CLOs that are managed by the

20  Debtors, correct?

21  A    Years ago, they bought the equity interests, if that -- if

22  that's what you're asking me, in various CLOs.

23  Q    The two Advisors that you own and control caused the

24  investment funds to purchase interests in CLOs that are

25  managed by the Debtor, correct?

Dondero - Direct                        38

 1  A    Not recently.  Not recently.  Years ago.  Yes.

 2  Q    And they still hold those interests today, correct?

 3  A    Yes.

 4  Q    And K&L Gates represents all of those entities, correct?

 5  A    Yes.

 6  Q    And we'll call those the K&L Gates Clients; is that fair?

 7  A    Yes.

 8  Q    Before the TRO was entered, the K&L Gates Clients sent two

 9  letters to the Debtor concerning the Debtor's management of

10  certain CLOs, right?

11  A    Yes.

12  Q    Okay.

13         MR. MORRIS:  Your Honor, I just want to take a moment

14  now, because we're going to start to look at some documents.

15  The Debtor would respectfully move into evidence Exhibits A

16  through Y that are on their exhibit list.

17         THE COURT:  All right.

18         MR. BONDS:  Your Honor, we have no objection.

19         THE COURT:  A through Y are admitted.  And for the

20  record, these appear at Docket No. 46 in this adversary.

21      (Plaintiff's Exhibits A through Y are received into

22  evidence.)

23         MR. MORRIS:  Okay.  Can we please put up Exhibit B as

24  in boy?  (Pause.)  Ms. Canty?  If you need a moment, just let

25  us know.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 40 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1034 of 1598   PageID 14081
206

Dondero - Direct                          39

1          MS. CANTY:  Yeah.  I'm pulling it up right now.

2          MR. MORRIS:  Thank you.  (Pause.)  Can you scroll

3    down just a bit?

4    BY MR. MORRIS:

5    Q   All right.  Can you see this letter was sent on October

6    16th?

7    A   Yes.

8    Q   And we see the entities that are reflected on this letter.

9    We've got Highland Capital Management, LP.  That's the

10   question that they're asking.  And the questions and the

11   statements are being asserted on behalf of NexPoint Advisors,

12   LP.  Do you see that?

13   A   Yes.

14   Q   And Highland Capital Management Fund Advisors, LP.  Those

15   are the two Advisors that you own and control, correct?

16   A   Control to a large extent.

17   Q   Okay.

18          MR. MORRIS:  And can we put up Exhibit C, please?

19   BY MR. MORRIS:

20   Q   This is a second letter sent by NexPoint on November 24th.

21   Do you see that?

22   A   Yes.

23   Q   Okay.  And you're familiar with the substance of these

24   letters, correct?

25   A   Yes.

Dondero - Direct                          40

1   Q    And you were familiar -- you were aware of these letters

2   before they were sent.  Is that correct?

3   A    Yes.

4   Q    And you generally discussed the substance of these letters

5   with NexPoint; is that right?

6   A    Generally, yes.

7   Q    And you discussed the substance of the letters with the

8   Advisors' internal counsel; is that right?

9   A    Yes.

10  Q    That's D.C. Sauter?

11  A    Yes.

12  Q    And you have been on some calls with K&L Gates about these

13  letters, right?

14  A    I believe so.

15  Q    And you knew these letters were being sent, correct?

16  A    Yeah, they're -- they're reported.

17  Q    You knew these letters for being sent; isn't that right,

18  sir?

19  A    Yes.

20  Q    And you didn't object to the sending of these letters,

21  correct?

22  A    No.

23  Q    In fact, you supported the sending of these letters.  Is

24  that right?

25  A    Yes.

Dondero - Direct                        41

1   Q    And you have never directed NexPoint to withdraw these

2   letters, correct?

3   A    No.

4   Q    Around Thanksgiving, you learned that Mr. Seery had given

5   a direction to sell certain securities owned by the CLOs

6   managed by the Debtors, correct?

7   A    Yes.

8   Q    And when you learned that, you personally intervened to

9   stop the trades, correct?

10  A    Yes.  I believe they were inappropriate.

11          MR. MORRIS:  I move to strike the latter part of the

12  answer, Your Honor.

13          THE COURT:  It's stricken.

14          MR. MORRIS:  Can we put up Exhibit D, please?

15  BY MR. MORRIS:

16  Q    We looked at this email string the other day.  Do you

17  recall that?

18  A    Yes.

19          MR. MORRIS:  Can we start at the bottom, please?

20  BY MR. MORRIS:

21  Q    There's an email from Hunter Covitz.  Do you see that?

22  A    Yes.

23  Q    Now, this is November 24th.  It's before the TRO.  Is that

24  fair?

25  A    Yes.

                         Dondero - Direct                    42

1   Q    Mr. Covitz is an employee of the Debtor, right?

2   A    I believe so.

3   Q    And Mr. Covitz helps manage the CLOs on behalf of the

4   Debtor.  Is that your understanding?

5   A    Yes.

6   Q    And Mr. Covitz in this email is giving directions to Matt

7   Pearson and Joe Sowin to sell certain securities held by the

8   CLOs.  Is that correct?

9   A    No.  He's giving Jim Seery's direction.

10            MR. BONDS:  And Your Honor, I'm going to object.

11  This is all before the TRO was ever entered.  It doesn't have

12  anything to do with today's hearing.

13            THE COURT:  Overruled.

14            MR. MORRIS:  May I respond, Your Honor?

15            THE COURT:  I --

16            MR. MORRIS:  Okay.  Thank you.

17            THE COURT:  I think it's relevant.  Go ahead.

18            MR. MORRIS:  Thank you.  Okay.

19  BY MR. MORRIS:

20  Q    Mr. Seery is the CEO of the Debtor; is that right?

21  A    Yes.

22  Q    And the Debtor is the contractual party with the CLOs

23  charged with the exclusive responsibility of managing the

24  CLOs, correct?

25  A    I don't believe so.  The Debtor is in default of the

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1038 of 1598   PageID 14085
206

                            Dondero - Direct                    43

 1  agreements.

 2            MR. MORRIS:  I move to strike, Your Honor.

 3            THE COURT:  Sustained.

 4  BY MR. MORRIS:

 5  Q    Sir, the Debtor has the exclusive contractual right and

 6  obligation to manage the CLOs, correct?

 7  A    I don't agree with that.

 8  Q    Okay.

 9            MR. MORRIS:  Can we scroll up to the -- just --

10  BY MR. MORRIS:

11  Q    Do you see that Mr. Pearson acknowledges receipt of Mr.

12  Covitz's email?

13  A    Yes.

14  Q    And you received a copy of Mr. Covitz's email, did you --

15  did you not?

16  A    Yes.

17            MR. MORRIS:  Can you scroll up a little bit, please?

18  BY MR. MORRIS:

19  Q    And can you just read for Judge Jernigan your response

20  that you provided to Mr. Pearson, Mr. Covitz, and Mr. Sowin on

21  November 24th?

22  A    (reading)  No, do not.

23  Q    You instructed the recipients of Mr. Covitz's email not to

24  sell the SKY securities as had been specifically instructed by

25  Mr. Seery, correct?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 45 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1039 of 1598   PageID 14086
206

Dondero - Direct                    44

1  A    Yes.

2  Q    And you understood when you gave that instruction that the

3  people on the email were trying to execute trades that Mr.

4  Seery had authorized, correct?

5  A    No.  I -- no, that isn't how I would describe it.

6            MR. MORRIS:  A second, Your Honor?

7            THE COURT:  Okay.

8       (Pause.)

9  BY MR. MORRIS:

10 Q    Sir, when you gave the instruction reflected in this

11 email, you knew that you were stopping trades that were

12 authorized and directed by Mr. Seery, correct?

13 A    I don't think -- I -- I wasn't -- I wasn't sure at the

14 moment I did that.  I didn't find out until later that it was

15 Seery who directed it.

16           MR. MORRIS:  Can we please go back to the deposition

17 transcript, Debtor's Exhibit Z, at Page 42?  Line 12.

18 BY MR. MORRIS:

19 Q    Were you asked this question and did you give this answer?

20       "Q   At the time that you gave the instruction, "No, do

21       not," you knew that you were stopping trades that had

22       been authorized and directed by Mr. Seery, correct?

23       "A    Yes."

24 Q    Did you give that answer to my question on Tuesday?

25 A    I'd like to clarify it, but yes, I did give that answer.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 46 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1040 of 1598   PageID 14087
206

Dondero - Direct                45

1   Q    Okay.  You didn't speak with Mr. Seery before sending your

2   instructions interfering with his trade, the trades that he

3   had authorized, correct?

4   A    No, I did not.

5   Q    And you took no steps to seek the Debtor's consent before

6   instructing the recipients of your email to stop executing the

7   SKY transactions that had been authorized by Mr. Seery,

8   correct?

9   A    I'm sorry.  Can you repeat the question?

10  Q    You took no steps to seek the Debtor's consent before

11  stepping in to stop the trades that Mr. Seery had authorized,

12  correct?

13  A    I took other actions instead.

14  Q    Okay.  But you didn't seek the Debtor's consent?  That's

15  not one of the actions you took, right?

16  A    No, I educated the traders as to why it was inappropriate.

17        MR. MORRIS:  I move to strike, Your Honor.

18        THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    Sir, did you seek the Debtor's consent before stepping in

21  to stop the trades that Mr. Seery had authorized?

22  A    No, I did not seek consent.

23  Q    In response to your instruction, Mr. Pearson canceled all

24  of the trades that Mr. Seery had authorized, correct?

25  A    Yes.

Dondero - Direct                            46

1            MR. MORRIS:  Can we go back to the exhibit, please?

2    And if we could just scroll -- stop right there.

3    BY MR. MORRIS:

4    Q    That's -- that's Mr. Pearson's response to your email,

5    confirming that he had canceled both the SKY and the AVAYA

6    trades that had not yet been executed, correct?

7    A    Yes.

8            MR. MORRIS:  Can we scroll to the response to that?

9    BY MR. MORRIS:

10   Q    Is this your response?

11   A    Yes.

12   Q    Can you read that aloud, please?

13   A    (reading)  HFAM and DAF have instructed Highland in

14   writing not to sell any CLO underlying assets.  There is

15   potential liability.  Don't do it again, please.

16   Q    The writings that you're referring to are the two letters

17   from NexPoint, Exhibits B and C that we just looked at,

18   correct?

19   A    Yeah.  There might have been a third letter.  I don't

20   know.  But, yes, generally, those letters.

21   Q    Okay.  And at this juncture, the reference to potential

22   liability was a statement intended for Mr. Pearson.  Is that

23   correct?

24   A    Um, I -- no.  Pearson wouldn't have had any personal

25   liability.  It was -- it was meant for the -- there was

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 48 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1042 of 1598   PageID 14089
206

Dondero - Direct                          47

1   potential liability to the Debtor or to the compliance

2   officers at the Debtor.

3          MR. MORRIS:  Can we go to Page 45 of the deposition

4   transcript, please?  Line -- beginning at Line 11, through 18.

5   BY MR. MORRIS:

6   Q    Did I ask these questions and did you give these answers?

7        "Q   Do  you  see  the  reference  there  in  the  latter

8        portion  of  your  email,  'There  is  potential  liability.

9        Don't do it again'?

10       "A   Yes.

11       "Q   Who  was  the  intended  recipient  of  that  message?

12       "A   At this juncture, it's Matt Pearson, I believe."

13  Q    Did you give those answers to my questions on Tuesday?

14  A    Yeah.  That's not inconsistent.

15         MR. MORRIS:  Let's go back to the email, please.

16  BY MR. MORRIS:

17  Q    Mr. Sowin responded to your email; is that right?

18         MR. MORRIS:  Can we scroll up?

19  BY MR. MORRIS:

20  Q    Okay.  Who's Mr. Sowin?

21  A    He's the head trader.

22  Q    Who's he employed by?

23  A    I believe he's employed by HFAM but not the Debtor.

24  Q    Okay.  So he's -- he's somebody who's employed by one of

25  the Advisors; is that right?

                        Dondero - Direct                 48

1   A    I believe so.

2   Q    And Mr. Sowin responded to your email and he indicated

3   that he would follow your instructions.  Is that right?

4   A    Yeah.  He understands that it's inappropriate.  That's

5   what he's reflecting.  Yes.

6            MR. MORRIS:  I move to strike, Your Honor.

7            THE COURT:  Sustained.

8   BY MR. MORRIS:

9   Q    Sir, Mr. Sowin responded and indicated that he would

10  follow your instructions, correct?

11  A    (no audible response)

12  Q    Did you answer?  I'm sorry.

13  A    No, I didn't answer.  It's -- I don't know if you could

14  expressly say that from that email.  Maybe we should read the

15  email.

16           MR. MORRIS:  Let's just move on, Your Honor.

17           THE COURT:  Okay.

18  BY MR. MORRIS:

19  Q    A few days later, you learned -- you learned that Mr.

20  Seery was trying a workaround to effectuate the trades anyway,

21  correct?

22  A    I believe so.

23  Q    Uh-huh.  And when you learned that, you wrote to Thomas

24  Surgent; is that right?

25  A    I -- I believe so.

                         Dondero - Direct                      49

1   Q    I don't -- I don't mean to -- this is not a test here.

2            MR. MORRIS:  Can we just scroll up to the next email,

3   please?  Okay.  Stop right there.

4   BY MR. MORRIS:

5   Q    When you -- when you learned that Mr. Seery was trying a

6   workaround, you wrote to Mr. Surgent when you learned that,

7   right?

8   A    Yes.

9   Q    And Mr. Surgent is an employee of the Debtor; is that

10  correct?

11  A    I believe he's still the chief compliance officer of the

12  Debtor.

13  Q    Okay.  Now, as a factual matter, you never asked Mr. Seery

14  why he wanted to make these trades; isn't that right?

15  A    I -- I did not.

16  Q    Okay.  And before the TRO was entered, there was nothing

17  that prevented you from picking up the phone and asking Mr.

18  Seery why he wanted to make these trades, correct?

19  A    That's not true.

20           MR. MORRIS:  One second, please, Your Honor.

21           THE COURT:  Okay.

22       (Pause.)

23           MR. MORRIS:  Can we go to Page 60 of the transcript?

24  Mr. Bonds says -- beginning at Line 14.  There is an objection

25  there, Your Honor, and I would ask that the Court rule on the

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1045 of 1598 PageID 14092
206

Dondero - Direct                                    50

1    objection before I read from the transcript.

2              THE COURT:  Okay.

3              MR. MORRIS:  There you go.

4              THE COURT:  (sotto voce)  (reading)  Is there

5    anything that you're aware of that prevented you from picking

6    up the phone and asking Mr. Seery for his business

7    justification for these trades prior to December 10.

8    Objection, form.

9        I overrule the objection to the form of that question.

10             MR. MORRIS:  Okay.

11   BY MR. MORRIS:

12   Q   Mr. Dondero, were you asked this question and did you give

13   this answer?

14       "Q   Is there anything that you're aware of that

15       prevented you from picking up the phone and asking Mr.

16       Seery for his business justification for these trades

17       prior to December 10, 2010?

18       "A   No.  I expressed my disapproval via email."

19   Q   Is that right?

20   A   I'd like to adjust that answer to the answer I just gave.

21   Q   Okay.

22             MR. MORRIS:  And I move to strike.

23   BY MR. MORRIS:

24   Q   I'm just asking you if that's the answer you gave on

25   Tuesday.

Dondero - Direct                          51

```
 1            THE COURT:  Sustained.

 2            THE WITNESS:  Yes.

 3   BY MR. MORRIS:

 4   Q    Thank you.  Now, you wrote to Mr. Surgent because you

 5   wanted to remind him of his personal liability for regulatory

 6   breaches and for doing things that aren't in the best interest

 7   of investors, correct?

 8   A    Yes.

 9   Q    And you actually thought about this and you -- because you

10   didn't believe that Mr. Surgent had extra insurance and

11   indemnities like Mr. Seery, right?

12   A    No.

13   Q    Didn't you testify to that the other day?

14   A    I don't remember, but that isn't the only reason.

15   Q    I didn't ask you if it was the only reason.  Listen

16   carefully to my question.  Did you send this email because you

17   -- because you wanted to remind him of his personal liability

18   for regulatory breaches and for doing things that aren't in

19   the -- I apologize.  Withdrawn.

20        You did not believe at the time that you sent this email

21   that he, Mr. Surgent, had insurance and indemnities like Mr.

22   Seery, correct?

23   A    Yes.

24   Q    Okay.

25            MR. MORRIS:  Can we go back to the email, please?
```

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 53 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1047 of 1598   PageID 14094
206

                        Dondero - Direct                      52

1   BY MR. MORRIS:

2   Q    Can you just read the entirety of your email to Mr.

3   Surgent out loud?

4   A    (reading)  I understand Seery is working on a workaround

5   to trade these securities anyway, trades that contradict

6   investor desires and have no business purpose or investment

7   rationale.  You might want to remind him and yourself that the

8   chief compliance officer has personal liability.

9   Q    Okay.  That's -- that's the message you wanted to convey

10  to Mr. Surgent, right?

11  A    Yes.

12  Q    And, again, you never bothered to ask Mr. Seery what his

13  businessperson -- purpose or investment rationale was,

14  correct?

15  A    I -- I didn't believe I could talk to him directly.

16  Q    This is before the --

17  A    That's why I never picked up the phone.

18  Q    Okay.  You intended to convey the message to Mr. Surgent

19  that, by following Mr. Seery's orders to execute the trades,

20  that Mr. Surgent faced personal liability, correct?

21  A    Yes, he does.

22  Q    And that's the message you wanted to send to him, right?

23  A    It's a true and accurate message, yes.

24  Q    Okay.  Just a few days earlier, you also threatened Mr.

25  Seery, right?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 54 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1048 of 1598   PageID 14095
206

                          Dondero - Direct                      53

1  A    I wouldn't use the word "threatened."

2  Q    Okay.  Let's let -- let's let it speak for itself.

3         MR. MORRIS:  Can we go to Exhibit E, please?  Keep

4  scrolling down just a bit.

5  BY MR. MORRIS:

6  Q    This is an email that you sent to Mr. Seery on November

7  24th.  And as always, Mr. Dondero -- this is the third time

8  we're meeting -- if there's something in the document that you

9  need to see, please just let me know, because I don't -- I

10 don't mean to test your memory if the document can help

11 refresh your recollection.

12        MR. MORRIS:  Can we just scroll up a little bit

13 further to the top to see the date?

14 BY MR. MORRIS:

15 Q    Okay.  So, Jim, there, JD, who is that?

16 A    That's me.

17 Q    Okay.  And can you tell by the substance of the email, of

18 the text messages, this is communications between you and Mr.

19 Seery, right?

20 A    Yes.

21 Q    Okay.  And you see that it's dated November 24th there?

22 A    Yes.  Right after we were discussing the pipeline.  Or

23 right when we were working on the pipeline.

24 Q    Okay.

25        MR. MORRIS:  Can you scroll down a little bit,

Dondero - Direct                    54

1    please?

2    BY MR. MORRIS:

3    Q    At 5:26 p.m., you sent Mr. Seery a text, correct?

4    A    Yes.

5    Q    Can you read that, please?

6    A    (reading)  Be careful what you do.  Last warning.

7    Q    Okay.  This was a warning telling Mr. Seery to stop

8    selling assets out of the CLOs or the beneficial owners would

9    take more significant action against him, correct?

10   A    It was a general statement that what he was doing was

11   regulatorily inappropriate and ethically inappropriate and he

12   was in breach of the contracts he was operating.

13   Q    Neither you nor any entity owned or controlled by you are

14   parties to the contracts you just referred to; isn't that

15   correct?

16   A    I believe they're indirectly parties to those contracts,

17   especially when they're in default.

18   Q    Neither you nor any entity owned or controlled by you is a

19   signatory to any CLO management contract pursuant to which the

20   Debtor is a party, correct?

21   A    I -- I don't know and I don't want to make legal

22   conclusions on that.

23   Q    Okay.  At the deposition the other day, some of the things

24   that you suggested the beneficial owners of the CLO interests

25   might do against Mr. Seery and the Debtor are class action

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1050 of 1598 PageID 14097
206

Dondero - Direct                         55

1  lawsuits.  Is that right?

2  A   I -- I did not suggest the entities I control would do

3  that.  If anybody on this call were to call a class action

4  lawsuit -- a class action law firm and tell them what's been

5  going on with the CLOs, I think a class action law firm would

6  file it on their own regard, not on the behalf of my entities.

7          MR. MORRIS:  I move to strike, Your Honor.

8          THE COURT:  Sustained.

9  BY MR. MORRIS:

10  Q   Let's talk about that cell phone.  Okay?  Until at least

11  December 10th, the day the TRO was entered, you had a cell

12  phone that was bought and paid by the Debtor, right?

13  A   Yes.

14  Q   But sometime after December 10th, your phone was disposed

15  of or thrown in the garbage; is that right?

16  A   Yes.

17  Q   And you don't know when after December 10th the cell phone

18  that was the Debtor's property was disposed of, right?

19  A   I don't believe at that point it was the Debtor's

20  property.  I think I paid it off in full and the Debtor had

21  announced that they were canceling everybody's cell phones so

22  it was appropriate for me to get another one.

23          MR. MORRIS:  I move to strike, Your Honor.

24          THE COURT:  Sustained.

25          MR. BONDS:  Your Honor, at some point, I mean, Mr.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 57 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1051 of 1598   PageID 14098
206

Dondero - Direct                          56

1    Morris just ought to go on and testify.

2           MR. MORRIS:  No, this is Mr. Dondero's testimony,

3    Your Honor.  He gave it the other day.  I'm just asking him to

4    confirm it, basically.

5           THE COURT:  Okay.  I overrule the objection, if any

6    there was, on the part of Mr. Bonds.

7    BY MR. MORRIS:

8    Q    Sometime after December 10th, the cell phone that prior to

9    that time had been owned and paid for by the Debtor was thrown

10   in the garbage or otherwise disposed of, correct?

11   A    Yes.

12   Q    And you don't know when after December 10th that was --

13   the phone was disposed of, correct?

14   A    It was on or about that date, I'm sure.

15   Q    Well, we know it was after December 10th, right?

16   A    Okay.  Or about that date.

17   Q    You testified the other day that you just don't know who

18   made the decision to throw your phone away, right?

19   A    I could find out, but I don't know.  I would have to talk

20   to employees.

21   Q    Did you make any request of the Debtor since your

22   deposition to try to find out the answer as to who made the

23   decision to throw your phone away?

24   A    No.

25   Q    How did you learn that your phone was thrown away?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1052 of 1598   PageID 14099
206

Dondero - Direct                        57

 1  A    As I testified, it's standard operating procedures every

 2  time a senior executive gets a new phone.

 3  Q    Hmm.  You don't know exactly who threw the phone away; is

 4  that right?

 5  A    No, but I can find out.

 6  Q    Okay.  I'm just asking -- I'm not asking you to find out.

 7  I'm just asking you if you know.  Do you know who threw your

 8  phone away?

 9  A    No.

10  Q    Do you know who made the decision to throw your phone

11  away?

12  A    It -- there wasn't a decision.  It was standard operating

13  procedure.

14        MR. MORRIS:  I move to strike.

15        THE COURT:  Sustained.

16  BY MR. MORRIS:

17  Q    You and Mr. Ellington disposed of your phones at the same

18  time, correct?

19  A    I don't have specific awareness regarding what Mr.

20  Ellington did with his phone.

21  Q    It never occurred to you to get the Debtor's consent

22  before throwing the phone that they had purchased away, right?

23  A    I'm not permitted to talk to the Debtor.

24  Q    Sir, it never occurred to you to get the Debtor's consent

25  before throwing the phone away, correct?

Dondero - Direct                    58

```
 1   A    I'm going to stick with the answer I just gave.
 2              MR. MORRIS:  Can we go to Page 75 of the transcript?
 3   Lines 12 through 15.  There is an objection there, Your Honor.
 4   I would respectfully request that the Court rule on the
 5   objection before I read the testimony.
 6              THE COURT:  Okay.  Starting at Line 12?
 7              MR. MORRIS:  12.
 8              THE COURT:  (sotto voce)  (reading)  Did it ever
 9   occur to you to get the Debtor's consent before doing this?
10   Objection, form.
11       That objection is overruled.
12   BY MR. MORRIS:
13   Q    All right.  Mr. Dondero, did you give this answer to my
14   question on Tuesday?
15       "Q   Did it ever occur to you to get the Debtor's
16       consent before doing this?
17       "A   No."
18   A    Yes, I gave that testimony.
19   Q    Okay.  And you also had the phone number changed from the
20   Debtor's account to your own personal account; is that right?
21   A    The phone number changed?  The phone number stayed the
22   same.
23   Q    But you had the number changed from the Debtor's account
24   to your own personal account, correct?
25   A    The Debtor said they wouldn't pay for it anymore.  Who
```

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 60 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1054 of 1598   PageID 14101
206

                              Dondero - Direct                    59

1   else could I change it to?

2            MR. MORRIS:  Your Honor, I move to strike.  It's a

3   very simple question.

4            THE COURT:  Sustained.

5   BY MR. MORRIS:

6   Q   I'll ask it one more time, Mr. Dondero.  You had the phone

7   number changed from the Debtor's account to your personal

8   account, correct?

9   A   I didn't change the number.  I had the billing changed to

10  my personal account versus the company account.

11  Q   And you never asked the Debtor for permission to do that,

12  correct?

13  A   No.

14  Q   And you never told Debtor you were doing that, correct?

15  A   No.

16  Q   And nobody ever told Mr. Seery or anybody at my firm that

17  the phone was being thrown in the garbage, correct?

18  A   Well, --

19           MR. BONDS:  To the extent he knows.

20           THE WITNESS:  Yeah.  I have no idea.  But I didn't.

21  BY MR. MORRIS:

22  Q   You didn't believe it was necessary to give the Debtor

23  notice that you were taking the phone number for your own

24  personal account and throwing the phone in the garbage,

25  correct?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 61 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1055 of 1598   PageID 14102
206

Dondero - Direct                              60

1  A    Correct.

2  Q    The phone --

3           MR. BONDS:  Your Honor, I'm going to object.  He --

4  Mr. Dondero did not testify he personally threw the phone in

5  the garbage.

6           MR. MORRIS:  Withdrawn.

7           THE COURT:  Okay.

8  BY MR. MORRIS:

9  Q    Mr. Dondero, the phone was in Highland's offices on

10  December 10th, the date the TRO was in effect, correct?

11  A    I -- I don't -- I -- I -- I don't know.  You know, I don't

12  know.  It's -- I remember going over to -- well, anyway, I --

13  I don't know.  We'll leave it at that.

14           MR. MORRIS:  Can we go to Exhibit G, please?

15  BY MR. MORRIS:

16  Q    Who's Jason Rothstein, while we wait?

17  A    Jason, Jason is our -- is the Highland head of technology.

18  Q    Okay.  And did you text with him from time to time?  On or

19  about December 10th?

20  A    Yes.

21  Q    Okay.

22           MR. MORRIS:  Can we just scroll up a little bit?

23  BY MR. MORRIS:

24  Q    Is that Mr. Rothstein there?

25  A    Yes.  Yeah.

Dondero - Direct                    61

1  Q   Okay.  And do you see that there's a text message that you

2  sent to him on December 10th, right at the top?  Can you read

3  -- can you read the text message Mr. Rothstein --

4  A   He sent that to me.  At the top.

5  Q   I apologize.  Thank you for the correction.  Can you read

6  what Mr. Rothstein told you on December 10th?

7  A   That my old phone is in the top drawer of Tara's desk.

8  Q   And who's Tara?

9  A   My assistant.

10 Q   Is she still your assistant today?

11 A   Yes.

12 Q   And has she been serving as your assistant since the TRO

13 was entered into on December 10th?

14 A   Yes.

15 Q   Okay.  Is it fair to say that you were informed on

16 December 10th that the phone was not thrown in the garbage,

17 had not been disposed of, but was instead sitting in Tara's

18 desk?

19 A   As of that moment, yes.

20 Q   Okay.  And it's also fair to say that, as of December

21 10th, Mr. Rothstein didn't take it upon himself to throw your

22 old phone in the garbage, right?

23 A   Not as of that moment.  But like I said, I can find out

24 how it was disposed of.

25 Q   If you were curious to do that, would you have done that

                          Dondero - Direct                    62

1  before today?

2  A    I haven't been curious.

3  Q    Thank you very much.  Someone you can't identify made the

4  decision after December 10th to throw the phone in the garbage

5  without asking the Debtor for permission or seeking the

6  Debtor's consent, correct?

7          MR. BONDS:  I'm going to object, Your Honor.  To the

8  extent that the witness knows, he can answer.

9          THE COURT:  I -- I didn't hear --

10          THE WITNESS:  I don't know.

11          THE COURT:  I didn't hear what your objection was,

12  Mr. Bonds.  Repeat.

13          MR. BONDS:  Your Honor, my objection was along the

14  lines of to the extent that the witness knows, he could

15  testify, but if he doesn't know, he doesn't need to speculate.

16          THE COURT:  All right.  Well, I don't hear an

17  objection there, but go ahead, Mr. Dondero, if you have

18  knowledge and can answer the question.

19          THE WITNESS:  I don't know.

20  BY MR. MORRIS:

21  Q    Do you recall that the Debtor subsequently gave notice to

22  you to vacate its offices and to return its cell phone?

23  A    I don't know.

24  Q    Did you ever --

25  A    I know I -- I know I was told to vacate the offices.  I

                        Dondero - Direct                63

1   didn't see the specific --

2   Q    Uh-huh.  Your lawyer -- your lawyers never told that

3   Debtor that the cell phone had been disposed of or thrown in

4   the garbage, consistent with company practice, right?

5   A    I don't know.

6         MR. MORRIS:  Can we put up Exhibit K, please?

7   BY MR. MORRIS:

8   Q    This is the letter that my firm sent to your lawyer on

9   December 23rd.  Do you see that?

10  A    Yeah, I see it.

11  Q    Okay.

12        MR. MORRIS:  Can we scroll down a little bit?  Keep

13  going.  Okay.  Stop right there.

14  BY MR. MORRIS:

15  Q    Do you see that it says that, as a result of the conduct

16  described above, that the Debtor "has concluded that Mr.

17  Dondero's presence at the HCMLP office suite and his access to

18  all telephonic and information services provided by HCMLP are

19  too disruptive"?

20  A    Yeah, I see it.

21  Q    And this is the letter that gave you notice that you had

22  to vacate the premises by December 30th, correct?

23  A    I believe so.

24        MR. MORRIS:  Can we scroll down a little bit?

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 65 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1059 of 1598   PageID 14106
206

Dondero - Direct                    64

1  Q    You see at the bottom there's a reference to a defined

2  term of "cell phones"?

3  A    Yes.

4  Q    And it says that the Debtor "will also terminate Mr.

5  Dondero's cell phone plan and those cell phone plans

6  associated with parties providing personal services to Mr.

7  Dondero."  Do you see that?

8  A    Yes.  Yeah.

9  Q    Have I read that accurately?

10 A    Yes.

11 Q    And then my colleagues went on to write, "HCMLP demands

12 that Mr. Dondero immediately turn over the cell phones to

13 HCMLP by delivering them to you, Mr. Lynn."  Do you see that?

14 A    Yes.

15 Q    Have I read that accurately?

16 A    Yes.

17 Q    The last sentence on the page begins, "The cell phones

18 and."

19        MR. MORRIS:  And let's scroll down further.

20 BY MR. MORRIS:

21 Q    "The cell phones and the accounts are property of HCMLP.

22 HCMLP further demands that Mr. Dondero refrain from deleting

23 or wiping any information or messages on the cell phone.

24 HCMLP, as the owner of the account and cell phones, intends to

25 recover all information related to the cell phones and

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 66 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1060 of 1598   PageID 14107
206

Dondero - Direct                    65

 1  accounts, and reserves the right to use the business-related

 2  information."  Have I read that accurately?

 3  A    Yes.

 4  Q    Okay.  We were a couple of weeks too late, huh?

 5  A    It sounds like it.

 6  Q    Yeah.  Because the phones were already in the garbage,

 7  right?

 8  A    Yes.

 9  Q    Uh-huh.  But that's not what Mr. Lynn told the Debtor on

10  your behalf, right?

11  A    I don't know.

12  Q    Mr. Lynn -- all right.  Let's -- let's see what Mr. Lynn

13  said.

14          MR. MORRIS:  Can we go to Exhibit U, please?

15  BY MR. MORRIS:

16  Q    It took Mr. Lynn six days to write a one-paragraph letter

17  in response, right?  December 29th, he responded?

18          MR. MORRIS:  Can we scroll down a bit?

19  BY MR. MORRIS:

20  Q    Let me read beginning with the second sentence of the

21  first substantive paragraph.  "We are at present not sure of

22  the location of the cell phone issued to Mr. Dondero by the

23  Debtor, but we are not prepared to turn it over without

24  ensuring the privacy of the attorney-client communications."

25  And then he goes on.

Dondero - Direct                    66

1        Have I read that correctly?

2   A    Yes.

3   Q    Okay.  So Mr. Lynn didn't say anything about the phone

4   being thrown in the garbage, right?

5   A    No.

6   Q    He didn't say that it was disposed of, did he?

7   A    No.

8   Q    He didn't refer to any company practice or policy, right?

9   A    No.

10  Q    Mr. Lynn's not a liar, is he?

11  A    No, he's not.

12  Q    He's a decent and honest professional.  Wouldn't you agree

13  with that?

14  A    Yes.

15  Q    And is it fair to say that he conveyed only the

16  information that he had at the time?

17  A    I don't know.

18  Q    Do you have any reason to believe that Mr. Lynn would

19  withhold from the Debtor the information that the cell phone

20  had been thrown in the garbage, consistent with company

21  practice?

22  A    No, I don't believe he would withhold whatever he knew.

23  Q    All right.  Let's talk about -- let's talk about other

24  matters.  You do know, sir, do you not, that the Debtor is

25  subject to the Bankruptcy Court's jurisdiction?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 68 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1062 of 1598   PageID 14109
206

Dondero - Direct                          67

 1  A    Yes.

 2  Q    Okay.  And we just saw in the December 23rd letter that

 3  the Debtor demanded that you vacate their offices a week

 4  later, right?

 5  A    Yes.

 6  Q    And you knew that at or around the time the letter was

 7  sent on December 23rd, correct?

 8  A    I -- I don't remember when I knew.

 9  Q    Well, in fact, in fact, you or through counsel asked for

10  an accommodation and asked for an extension of time to

11  December 31st; isn't that right?

12  A    I had to pack up 30 years of stuff in three days.  I -- I

13  know we asked for some forbearance.  I don't think we got any.

14  I don't remember the details.  I don't understand why it's

15  important.

16  Q    Okay.  It was actually -- withdrawn.  The Debtor actually

17  gave you seven days' notice, right?  They sent the letter on

18  December 23rd and asked you to vacate on December 30th,

19  correct?

20  A    I don't -- I don't remember.  But, again, I think the

21  initial response was it was inconsistent with shared services

22  agreement.  No Highland employees are coming into the office

23  anyway.  So kicking me out of my office was -- seemed

24  vindictive and overreaching.  And we tried to get some, you

25  know, forbearance.

Dondero - Direct                    68

1   Q    Okay.

2          MR. MORRIS:  I move to strike, Your Honor.

3          THE COURT:  Sustained.

4   BY MR. MORRIS:

5   Q    Mr. Dondero, you were given seven days' notice before --

6   before you were going to be barred from the Debtor's office,

7   correct?

8   A    I don't know.

9   Q    Okay.

10         MR. MORRIS:  Can we go back to Exhibit K, please?

11  Oh, actually, it's okay.

12  BY MR. MORRIS:

13  Q    We just read, actually, the piece from the Debtor's letter

14  of December 23rd barring you from the Debtor's office.  Do you

15  remember that?  And we can go back and look at it if you want.

16  A    Yes.

17  Q    Was there anything ambiguous that you recall about the

18  Debtor's demand that you not enter their offices after

19  December 30th?

20  A    Ambiguous?  I can tell you what my understanding was or I

21  can tell you what the letter says.  What would you like to

22  know?

23  Q    I'd just like to know if, as you sit here right now, you

24  believe there was anything ambiguous about the Debtor's demand

25  that you vacate the offices as of December 30th?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 70 of
Case 3:23-cv-00726-S    Document 8-24    Filed 02/29/23    Page 1064 of 1598    PageID 14111
206

Dondero - Direct                         69

1   A    I mean, I did vacate the offices as of December 30th.

2   Q    Correct.  And you knew that -- and you were complying with

3   the Debtor's demand you do that, right?

4   A    Well, with the Court's demand, I guess.

5   Q    Okay.  And it's your understanding that you would not be

6   permitted in the Debtor's offices after that time, correct?

7   A    Um, (pause), uh, I don't know how to answer that question.

8   I knew I wouldn't be residing in the offices anymore.  But for

9   legitimate business purposes, to visit the people at NexPoint

10  who were in the office, since there are no Highland people in

11  the office, or to handle a deposition, you know, there was

12  nothing I thought inappropriate about that.

13  Q    Did the Debtor tell you that they would allow you to enter

14  the offices any time you just believed that it would be

15  appropriate to do that?

16  A    I used my business judgment.

17          MR. MORRIS:  I move to strike.

18  BY MR. MORRIS:

19  Q    I'm asking you a very --

20          THE COURT:  Sustained.

21  BY MR. MORRIS:

22  Q    -- specific question, sir.  Did the Debtor ever tell you

23  that they -- that you would be permitted to enter their

24  offices after December 30th if you, in your own personal

25  discretion, believed it to be appropriate?

Dondero - Direct                        70

1   A    No.

2   Q    Did the Debtor provide you any exception to their demand

3   that you vacate the offices, without access, by and after

4   December 30th?

5   A    I always do what I think is appropriate and in the best

6   interests.  I don't know.  I didn't know the specifics of the

7   Debtor's -- okay, yeah, what the specifics of the Debtor was.

8   Q    Despite the unambiguous nature of the Debtor's demands

9   letter, on Tuesday you just walked right into the Debtor's

10  office and sat for the deposition, correct?

11  A    I believe that was reasonable, yes.

12  Q    Okay.  But you didn't -- you didn't have the Debtor's

13  approval to do that, correct?

14  A    We didn't have technology to do it anywhere else, so if

15  the deposition was going to occur, it had to occur there.

16  Q    Sir, --

17         MR. MORRIS:  Move to strike.

18         THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    And I ask you to just listen very carefully.  And if it's

21  not clear to you, please let me know.  You did not have the

22  Debtor's approval to enter their offices on Tuesday to give

23  your deposition, correct?

24  A    No.

25  Q    And you did not even bother to ask the Debtor for

Dondero - Direct                     71

1   permission, correct?

2   A   I'm prohibited from contacting them, so no, I did not.

3   Q   Okay.  Let's talk about other events that occurred after

4   the entry of the TRO.  We talked earlier about how you

5   interfered with Mr. Seery's trading activities on behalf of

6   the CLOs around Thanksgiving.  Do you remember that?

7   A   Yes.

8   Q   But after the TRO was entered, the K&L Gates Clients also

9   interfered with the Debtor's trading activities, correct?

10  A   No.

11         MR. MORRIS:  Can we go to Exhibit K, please?  Can we

12  start at the first page?  And scroll down just a bit.

13  BY MR. MORRIS:

14  Q   Do you see there's an explanation there about the Debtor's

15  management of CLOs?

16  A   Yes.

17  Q   And there's a recitation of the history that we talked

18  about earlier, where around Thanksgiving you intervened to

19  block those trades?

20  A   Yes.

21  Q   And then the next paragraph refers to the prior motion

22  that was brought by the CLO entities?  I mean, the K&L Gates

23  entities, right?

24  A   Yes.

25  Q   And you were aware of that motion at the time it was made,

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 73 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1067 of 1598   PageID 14114
206

Dondero - Direct                              72

 1  right?

 2  A    Yes.

 3  Q    And you were supportive of the making of that motion,

 4  right?

 5  A    Supportive?  Yes.

 6          MR. MORRIS:  And scroll down to the next paragraph,

 7  please.

 8  BY MR. MORRIS:

 9  Q    Okay.  So, my colleague wrote that, "On December 22nd,

10  2020, employees of NPA and HCMFA notified the Debtor that they

11  would not settle the CLO sale of the AVAYA and SKY

12  securities."  Have I read that right?

13  A    Yes.

14  Q    And that took place six days after the motion that the

15  Court characterized as frivolous was denied on December 16th?

16  A    Yes.  I wasn't aware of that, for what that's worth.

17  Q    Okay.  You personally instructed the employees --

18  withdrawn.  NPA -- that refers to NexPoint, correct?

19  A    Yes.

20  Q    That's an entity you own and control, right?

21  A    I -- largely.

22  Q    And that's one of the Advisors we defined earlier, right?

23  A    Yes.

24  Q    And HCMFA, that's Fund Advisors, another advisory firm

25  that you own and control, correct?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 74 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1068 of 1598   PageID 14115
206

Dondero - Direct                          73

1   A     Yes.

2   Q    And you personally instructed, on or about December 22nd,

3   2020, employees of those Advisors to stop doing the trades

4   that Mr. Seery had authorized with respect SKY and AVAYA,

5   right?

6   A     Yeah.  Maybe we're splitting hairs here, but I instructed

7   them not to trade them.  I never gave instructions not to

8   settle trades that occurred.  But that's a different ball of

9   wax.

10  Q    Okay.  But you did instruct them not to execute trades

11  that had not been made yet, right?

12  A     Yeah.  Trades that I thought were inappropriate, for no

13  business purpose, I -- I told them not to execute.

14  Q    Okay.  You actually learned that Mr. Seery wanted to

15  effectuate these trades the Friday before, right?

16  A    I don't know, but what did I do?  When did I know it?

17  What did I do?  When I knew things are inappropriate, I

18  reacted immediately.  I don't -- I don't -- whenever --

19  whenever I found out about inappropriate things, I reacted to

20  the best of my ability.

21  Q    Okay.

22          MR. MORRIS:  I move to strike, Your Honor.

23          THE COURT:  Sustained.

24      Mr. Dondero, I'm going to -- I'm going to interject some

25  instructions once again here.  Remember we talked about early

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1069 of 1598 PageID 14116
206

Dondero - Direct                    74

 1    on, and I know you've testified before, but I'll repeat it:

 2    You need to just give direct yes or no answers.

 3        And let me just say that we see witnesses all the time do

 4    what you're doing here, and that is they feel they need to say

 5    more than yes or no.  They feel the need to clarify or

 6    supplement the yes or no answer they give.  And just to remind

 7    you how this works, your lawyer, Mr. Bonds, is going to be

 8    given the opportunity when Mr. Morris is through to ask you

 9    all the questions he wants, and that will be your chance to

10    clarify yes and no answers to the extent he asks you to

11    revisit certain of these questions and answers.  Okay?

12        So I'm going to remind you once again:  yes or no or

13    direct -- you know, other appropriate direct answers.  Mr.

14    Bonds can let you clarify later.  All right?

15        Mr. Morris, continue.

16            MR. MORRIS:  Okay.  Thank you, Your Honor.

17        Can we please put up on the screen Exhibit L?  And at the,

18    I guess, the bottom of Page 1.

19    BY MR. MORRIS:

20    Q    This is an email string.  And --

21            MR. MORRIS:  Go to the email below that, please.

22    Yeah.  Okay.  Right there.

23    BY MR. MORRIS:

24    Q    This is an email from Mr. Seery dated December 18th at

25    (garbled) :30 p.m.  Do you see that?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1070 of 1598   PageID 14117
206

                        Dondero - Direct                    75

 1    A    Yes.

 2    Q    And in the substantive portion of his email, continuing on

 3    to the next page, he's giving instructions to sell certain SKY

 4    and AVAYA securities that are held by CLOs, correct?

 5    A    Yes.

 6    Q    And Mr. Sowin forwarded this email to you, right?

 7    A    Yes.

 8            MR. MORRIS:  If we can scroll up.

 9    BY MR. MORRIS:

10    Q    And you forwarded it to Mr. Ellington, right?  I'm sorry.

11    Let's just give Ms. Canty a chance.

12            MR. MORRIS:  Keep scrolling up.

13    BY MR. MORRIS:

14    Q    So, Mr. Sowin forwarded it to you at 3:34 p.m.  Do you see

15    that?

16    A    Yes.

17    Q    And if we scroll up, you turn around and give it to Mr.

18    Ellington a few minutes later, right?

19    A    Yes.

20    Q    So that you and Mr. Ellington and Mr. Sowin are all aware

21    that Mr. Seery wants to sell AVAYA and SKY securities on

22    behalf of the CLOs, right?

23    A    Yes.

24    Q    Why did you decide to forward this email to Mr. Ellington?

25    A    Ellington's role has been of settlement counsel that

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 77 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1071 of 1598   PageID 14118
206

Dondero - Direct                          76

1   supposedly everybody is able to talk to to try and bridge some

2   kind of settlement.  Ellington, I thought, should be aware of

3   things that would make settlement more difficult or create

4   liabilities for the Debtor.  And so I thought it was

5   appropriate for him to know.

6   Q    Okay.  This is the email that caused you to put a stop to

7   the trades that Mr. Seery wanted to effectuate, correct?

8   A    This is the -- I'm sorry.  Ask the question again.  This

9   is the email that what?

10  Q    This is -- this is how you learned that Mr. Seery wanted

11  to effectuate rates in AVAYA and SKY securities, right?

12  A    I -- I learned about it pretty early on of him trading it.

13  I don't know if it was this email or -- or one of the others.

14  But yes, it was from -- it was from Joe Sowin.

15  Q    And you would agree with me, would you not, that you

16  personally instructed the employees of the Advisors not to

17  execute the very trades that Mr. Seery identifies in this

18  email, correct?

19  A    Yes.

20  Q    At no time after December 10th, when the TRO was entered

21  into, did you instruct the employees of the Funds that you own

22  and control not to interfere or impede the Debtor's management

23  of the CLOs, correct?

24        MR. BONDS:  Can you repeat the question?  I'm sorry.

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 78 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1072 of 1598 PageID 14119
206

Dondero - Direct                    77

1  Q   At no time after December 10th, when the TRO was entered,

2  did Mr. Dondero instruct any employee of either of the

3  Advisors that he owns and controls not to interfere or impede

4  with the Debtor's business and management of the CLOs,

5  correct?

6  A   I did not.

7  Q   Okay.  Neither you nor anybody that you know of ever

8  provided a copy of the TRO to the employees of the Advisors

9  that you own and control, correct?

10 A   I don't know.

11 Q   Okay.  After the TRO was entered, the K -- after the TRO

12 was entered, and after the hearing on December 16th, the K&L

13 Gates Clients sent three more letters to the Debtor, right?

14 A   Yes.

15 Q   Okay.

16        MR. MORRIS:  Your Honor, those are Exhibits M as in

17 Mary, N as in Nancy, and X as in x-ray.

18        THE COURT:  Okay.

19        MR. MORRIS:  Unless the witness thinks there is a

20 need to look at them specifically -- oh, let me just ask a

21 couple of questions.

22 BY MR. MORRIS:

23 Q   Mr. Dondero, in those letters, it's your understanding

24 that the K&L Gates Clients again requested that the Debtor not

25 trade any securities on behalf of the CLOs, right?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 79 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1073 of 1598   PageID 14120
206

Dondero - Direct                                78

```
 1   A    Yes.
 2   Q    And it's your understanding that in those letters the K&L
 3   Gates Clients suggested that they might seek to terminate the
 4   CLO management agreements to which the Debtor was a party,
 5   correct?
 6   A    I don't know specifically, but that wouldn't surprise me.
 7   Q    Okay.
 8   A    So, --
 9   Q    Is it your understanding that the K&L Gates Clients also
10   sent the letter a Debtor -- the Debtor a letter in which they
11   asserted that your eviction from the offices might cause them
12   damages and harm?
13   A    I know there was objections to me -- I assume so.  I don't
14   know specifically.
15   Q    And you were aware of these letters at the time that they
16   were being sent, right?
17   A    I'm sorry, what?
18   Q    You were aware of these letters at the time they were
19   being sent by the K&L Gates Clients, right?
20   A    Generally, yes.
21   Q    And you were generally supportive of the sending of those
22   letters, right?
23   A    I'm always supportive of doing what we believe is the
24   right thing, yes.
25   Q    And in this case, you were supportive of the sending of
```

Dondero - Direct                              79

1  these three letters, correct?

2  A   I -- yes.

3  Q   In fact, you pushed and encouraged the chief compliance

4  officer and the general counsel to send these letters, right?

5  A   I push them to do the right thing.  I didn't push them

6  specifically.

7  Q   Okay.  At the time the letters were sent, you were aware

8  that the K&L Gates Clients had filed that motion that was

9  heard on the 16th of December, correct?

10 A   Yes.

11 Q   And you were aware that they advanced the very same --

12 withdrawn.  You're aware that in the letters they advance some

13 of the very same arguments that Judge Jernigan had dismissed

14 as frivolous just six days earlier, right?

15 A   I wasn't at the hearing.  I don't know if it was the same

16 arguments or similar arguments.  I -- I can't -- I can't

17 corroborate the similarity or contrast the differences between

18 the two.

19 Q   All right.  So it's fair to say, then, that you were

20 supportive of the sending of these letters, you were aware of

21 the December 16 argument, but you didn't take the time to see

22 whether or not any of the arguments being advanced in the

23 letters were consistent or any different from the arguments

24 that were made at the December 16th hearing, correct?

25 A   Correct.  I wasn't directly involved, but still believed

Dondero - Direct                           80

1    that fundamentally Seery's behavior was wrong.

2    Q    You never instructed the K&L Gates Clients to withdraw the

3    three letters that were sent after December 10th, correct?

4    A    No.

5    Q    And you're aware that the Debtor had demanded that those

6    letters be withdrawn or it would seek a temporary restraining

7    order against the K&L Gates Clients, correct?

8    A    I'm not aware of the back and forth.

9    Q    Okay.  Let's talk about your communications with Mr.

10   Ellington and Mr. Leventon.  You communicated with them on

11   numerous occasions after December 16th, correct?

12   A    No.

13   Q    No, you didn't communicate with them many times after

14   December 10th?

15   A    You're lumping in Ellington and Isaac, and numerous times

16   is a bad clarifier, so the answer is no.

17   Q    I appreciate that.  You communicated many times with Mr.

18   Ellington after December 10th, right?

19   A    Not -- not outside shared services, pot plan, and him

20   being the go-between between me and Seery.  I would say

21   virtually none.

22   Q    Okay.  On Saturday, December 12th, two days after the

23   temporary restraining order was entered against you, Mr.

24   Ellington was involved in discussions with your personal

25   counsel about who would serve as a witness at the upcoming

Dondero - Direct                    81

 1  December 16th hearing, correct?

 2  A    I don't -- I don't remember.

 3  Q    Let's see if we can refresh your recollection.

 4          MR. MORRIS:  Can we please put up Exhibit P?  Can we

 5  scroll down?  Okay.

 6  BY MR. MORRIS:

 7  Q    Do you see where Mr. Lynn writes you an email on Saturday,

 8  December 12th, and he says, among other things, it looks like

 9  trial?

10  A    Yes.

11  Q    And then if we scroll up a little bit, he wrote further,

12  "That said, we must have a witness now."  Have I read that

13  accurately?

14  A    Yes.

15  Q    Okay.

16          MR. MORRIS:  Can we scroll back up?

17  BY MR. MORRIS:

18  Q    And this is Mr. Ellington's response, right?

19  A    Yes.

20  Q    Can you read Mr. Ellington's response for Judge Jernigan?

21  A    (reading)  It will be J.P. Sevilla.  I'll tell him that he

22  needs to contact you first thing in the morning.

23  Q    Is it your testimony that this email relates to --

24  withdrawn.  Mr. Ellington is not your personal lawyer, right?

25  A    No.  Mr. Ellington has been functioning as settlement

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 83 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1077 of 1598   PageID 14124
206

Dondero - Direct                          82

1  counsel, trying to bridge settlement, --

2  Q    Okay.

3  A    -- which is what this email looks like to me.

4  Q    Okay.  I'll let -- I'll let the judge --

5         MR. MORRIS:  I move to strike, Your Honor.

6         THE COURT:  Sustained.

7  BY MR. MORRIS:

8  Q    So, after the TRO was entered, you and Mr. Ellington not

9  only communicated but Mr. Ellington was actively involved in

10 identifying witnesses to testify on behalf of your interests

11 at the December 16th hearing, correct?

12 A    I -- I don't know what the witness was for, but I believe

13 Ellington was doing his job as settlement counsel, trying to

14 facilitate settlement.  I don't -- I have no reason to think

15 this was anything more nefarious.

16 Q    Okay.  You looked to Mr. Ellington for leadership in

17 coordinating with all of the lawyers who were working for you

18 and your personal interests, right?

19 A    I'm not agreeing with that.

20 Q    No?  All right.

21        MR. MORRIS:  Let's look at the next exhibit.  I think

22 it's Exhibit Q.  And if we could stop right there.

23 BY MR. MORRIS:

24 Q    There's an email from Douglas Draper, do you see that, on

25 December 16th?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 84 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1078 of 1598 PageID 14125
206

Dondero - Direct                          83

1   A    Yes.

2   Q    So this is after the TRO was entered into, right?

3   A    I believe so.

4   Q    And Mr. Draper represents Get Good and Dugaboy; is that

5   right?

6   A    I believe so.

7   Q    And he was new to the case at that moment in time, right?

8   A    On or about, I believe so.

9   Q    And he was looking to -- he was looking for a joint

10  meeting among all of the lawyers representing your personal

11  interests, right?

12  A    No.  I think he was trying to coordinate -- coordinate or

13  understand whatever.  But not everybody -- he doesn't just

14  talk to lawyers around my interests.  I mean, and he hasn't

15  sought agreements with just lawyers reflecting my interests.

16  Q    You forwarded Mr. Draper's email to Mr. Ellington, right?

17  A    Yes.

18  Q    But you can't remember why you did that, right, or at

19  least -- withdrawn.  You couldn't remember as of Tuesday's

20  deposition why you forwarded this email to Mr. Ellington,

21  right?

22  A    Not specifically.  But, again, Ellington is settlement

23  counsel.

24        MR. MORRIS:  I move to strike, Your Honor, after the

25  initial phrase "Not specifically."

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 85 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1079 of 1598 PageID 14126
206

Dondero - Direct                                84

```
 1              THE COURT:  Sustained.

 2              MR. MORRIS:  Can we scroll up a little bit, please?

 3   BY MR. MORRIS:

 4   Q    Mr. Lynn responded initially with a reference to the

 5   assumption that a particular lawyer was with K&L Gates, right?

 6   A    Yes.

 7              MR. MORRIS:  And if we could scroll up a little bit.

 8   BY MR. MORRIS:

 9   Q    That's where you forward this email to Mr. Ellington,

10   right?

11   A    Yes.

12   Q    And can you read to Judge Jernigan what you wrote at 1:33

13   p.m.?

14   A    (reading)  I'm going to need you to provide leadership

15   here.

16   Q    But at least as of Tuesday's deposition, you couldn't

17   remember why you needed Mr. Ellington to provide leadership,

18   right?

19   A    Correct.  Nor if he did.

20              MR. MORRIS:  I move to strike the latter portion of

21   the answer, Your Honor.

22              THE COURT:  Sustained.

23   BY MR. MORRIS:

24   Q    So you have no --

25         (Echoing.)
```

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 86 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1080 of 1598   PageID 14127
206

                      Dondero - Direct                    85

 1            MR. MORRIS:  We're getting --

 2            THE WITNESS:  Can I -- can I hold -- can I hold on

 3    for one second here?  Can I just put you guys on mute, please?

 4            MR. MORRIS:  Sure.

 5       (Pause.)

 6            THE COURT:  All right.

 7            THE CLERK:  John, there's some feedback again.  I'm

 8    sorry.

 9            MR. MORRIS:  That's okay.

10            THE COURT:  Mr. Bonds, --

11            MR. MORRIS:  We lost Mr. --

12            THE COURT:  Mr. Bonds, what's going on?

13            MR. MORRIS:  We've lost -- the screen --

14            THE COURT:  You know you can't counsel your client in

15    the middle of court testimony.  I thought maybe Mr. Dondero

16    had some non-legal thing going on in the background.  Mr.

17    Bonds?

18            MR. BONDS:  Your Honor, I -- I did not in any way

19    counsel Mr. Dondero.

20            THE COURT:  Okay.  Well, I'll take your

21    representation on that.  Are we ready to go forward?

22            MR. MORRIS:  I'll readily accept Mr. Bonds'

23    representation as well, Your Honor.

24            THE COURT:  Okay.

25            MR. MORRIS:  But I'd ask that it not happen again.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 87 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1081 of 1598   PageID 14128
206

Dondero - Direct                               86

 1            THE COURT:  Well, fair enough.  I think Mr. Bonds

 2    understands.

 3    BY MR. MORRIS:

 4    Q    Mr. Dondero, you have no recollection of why you forwarded

 5    this email to Mr. Ellington and why you told him you needed

 6    him to provide leadership, correct?

 7    A    Correct.

 8            MR. MORRIS:  And if we can scroll up, can we just see

 9    how Mr. Ellington responded?

10    BY MR. MORRIS:

11    Q    All right.  And can you just read for Judge Jernigan what

12    Mr. Ellington said on December 16th in response to your

13    statement that you're going to need him to provide leadership

14    here?

15    A    (reading)  On it.

16    Q    Thank you.  In your deposition, you testified without

17    qualification that Scott Ellington and Isaac Leventon did not

18    participate in the drafting of a joint interest or mutual

19    defense agreement.  Do you recall that testimony?

20    A    Yes, as far as I knew.

21    Q    And you also testified that you never discussed with

22    either of them the topic of a joint defense or mutual defense

23    agreement; is that right?

24    A    Correct.  That was Draper.

25    Q    Okay.

Dondero - Direct                          87

1              MR. MORRIS:  Can we put up Exhibit 11, please?  I

2    apologize.  It's Exhibit W.  Okay.  Can we stop right there?

3    BY MR. MORRIS:

4    Q    This is an email between some of your counsel and Mr.

5    Ellington.  Do you see that?

6    A    Yes.

7    Q    And a common interest agreement is attached to the

8    communication.  Is that a fair reading of the portion of the

9    exhibit that's on the screen?

10   A    Yes.

11             MR. MORRIS:  And can we scroll to the top of the

12   exhibit, please?

13   BY MR. MORRIS:

14   Q    And do you see that there is an email exchange between Mr.

15   Ellington and Mr. Leventon concerning the common interest

16   agreement?

17   A    Yes.

18   Q    Okay.  So it's your testimony that this email may exist

19   but you had no idea that Mr. Ellington and Mr. Leventon were

20   working with your lawyers to draft a common interest

21   agreement?  Is that your testimony?

22   A    I wasn't part of this.  It looks to me like they were just

23   included in a -- a final draft.  And, again, Ellington is

24   settlement counsel.  I -- but I don't want to speculate why or

25   what they were doing.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 89 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1083 of 1598   PageID 14130
206

Dondero - Direct                    88

1   Q    Do you remember that I asked you a few questions the other

2   day about Multi-Strat financial statements and whether or not

3   you'd ever given -- you'd ever received any of those documents

4   from Mr. Ellington and Mr. Leventon?

5   A    Yes.

6   Q    Okay.  And you testified under oath that you never got any

7   financial information, including balance sheets, concerning

8   Multi-Strat from either of those lawyers, correct?

9   A    I -- hmm.  I -- I don't remember.  Yeah, I don't remember.

10  I may have to clarify that, but I don't remember.

11  Q    You testified under oath the other day that you wouldn't

12  even think to ask them for financial information relating to

13  Multi-Strat because it's not natural for them to have it,

14  right?

15  A    I -- I'm sorry.

16          THE WITNESS:  Your Honor, do I just have to answer

17  these questions yes or no, or is that the -- can I clarify at

18  all, or can I --

19          THE COURT:  Well, I mean, if the question simply

20  directs a yes or no answer, that's correct, you just answer

21  yes or no.  And I think this one did.

22      Again, your lawyer is going to have the chance to do

23  follow-up examination later.

24  BY MR. MORRIS:

25  Q    So let me try again.  During your deposition, you

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1084 of 1598 PageID 14131
206

Dondero - Direct                                    89

1   testified under oath without qualification that you never got

2   any financial information, including balance sheets,

3   concerning Multi-Strat from Scott Ellington or Isaac Leventon,

4   correct?

5   A    I believe I might have misspoken there.

6   Q    Okay.  But that was your testimony the other day, right?

7   A    Yes.

8   Q    And today, you believe you might have gotten that

9   information from them, right?

10  A    Only because Ellington was supposed to be the go-between

11  and I couldn't go directly to somebody.  But he wouldn't

12  normally have that information, which is what I was saying.

13            MR. MORRIS:  Your Honor, I have an exhibit that's not

14  on the Debtor's exhibit list, and I was going to use it for

15  impeachment purposes to establish the fact that Mr. Ellington

16  and Mr. Leventon in fact gave to Mr. Dondero, after December

17  10th, financial information concerning Multi-Strat, which Mr.

18  Dondero had previously denied receiving.  May I -- may I use

19  that document to impeach Mr. Dondero?

20            THE COURT:  You may.

21            MR. BONDS:  Your Honor, I'm going to object.  This is

22  pretty clearly something that should have been disclosed and

23  it wasn't.

24            THE COURT:  Well, he says it's purely to impeach the

25  testimony that Mr. Dondero just now gave.  So we'll -- we'll

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 91 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1085 of 1598   PageID 14132
206

Dondero - Direct                      90

```
 1   see the document and, you know, I'll either agree with that

 2   being impeachment or not.  So, he may proceed.

 3           MR. BONDS:  Your Honor, I think that the testimony

 4   -- Your Honor, I'm sorry.  I think that the testimony that was

 5   (inaudible) given was that he thought that he may have talked

 6   to Scott or Isaac, not that he did not.

 7           MR. MORRIS:  Your Honor, if I may, the testimony the

 8   other day was unequivocal and unambiguous that not only didn't

 9   he get this information from the two lawyers, but that he had

10   no reason to believe he would ever get the information from

11   those two lawyers.

12      I appreciate the fact that Mr. Dondero today is suggesting

13   that he may have, but I -- I would still like to use this

14   document to refresh his recollection and to impeach even the

15   possibility that he's giving this qualified testimony that he

16   may have.

17           THE COURT:  All right.

18           MR. MORRIS:  There's no doubt that he did.

19           THE COURT:  I overrule the objection.  You can go

20   forward.

21           MR. MORRIS:  Can we please put up on the screen -- I

22   believe it's Debtor's Exhibit AA.  And if we can scroll down,

23   please.  And just stop, yeah, towards the top.  All right.

24   Stop right there.

25   BY MR. MORRIS:
```

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 92 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1086 of 1598   PageID 14133
206

Dondero - Direct                          91

1   Q    Do you see in the first email Mr. Klos -- he's an employee

2   of the Debtor, right?

3   A    Yes.

4   Q    And he provides Multi-Strat balance sheet and financial

5   information to Mr. Leventon, Mr. Ellington, and Mr.

6   Waterhouse.  Do you see that?

7   A    Yes.  He's the person I would normally go to.

8   Q    Okay.  And they're all Debtor employees, right?

9   A    Yes.

10  Q    Okay.  And then Mr. Leventon sends it to you and Mr.

11  Ellington on February 4th, 2020; is that correct?

12  A    Yes.

13  Q    And this is confidential information; is that fair?

14  A    No.

15  Q    Okay.  Let's -- let's talk about the next --

16  A    No, it's not -- wait, wait, hold on a second.  Judge, I

17  need to clarify this.  I -- it's not confidential information.

18  It's available to every investor, of which I was one of them.

19  Okay?  So, let's -- let's not mischaracterize this as some

20  corporate secret.

21  Q    Okay.  You interfered with the Debtor's production of

22  documents; isn't that right?

23  A    No.

24  Q    Several times in the last year, various entities have

25  requested that Dugaboy produce its financial statements,

Dondero - Direct                              92

1  correct?

2  A    Dugaboy is my personal trust.  It's not an entity of the

3  Debtor in any form or fashion.

4  Q    Sir, you're aware that several times in the last year

5  various entities requested that the Debtor produce Dugaboy

6  financial information, correct?

7  A    The Debtor is not in a position to do it.  I -- I don't

8  know if it's been several times or whatever, but it's not

9  appropriate.

10         MR. MORRIS:  I move to strike, Your Honor.

11         THE COURT:  Sustained.

12  BY MR. MORRIS:

13  Q    I'll try one more time.  If we need to go to the

14  transcript, we can.  It's a very simple question.  You knew

15  and you know that several times in the last year various

16  entities have requested that the Debtor produce Dugaboy

17  financial statements, correct?

18  A    Yes.

19  Q    Do you recall at the deposition the other day I asked you

20  whether you had ever discussed with Mr. Ellington and Mr.

21  Leventon whether or not the Dugaboy financial statements

22  needed to be produced, and you were directed not to answer the

23  question by counsel and you followed those directions?

24  A    Yes.

25  Q    But you communicated with at least one employee concerning

Dondero - Direct                          93

1   the production of the Dugaboy financial statements, correct?

2   A    Yes.

3   Q    And that's Melissa Schroth; is that right?

4   A    Yes.

5   Q    She's an executive accountant employed by the Debtor,

6   right?

7   A    Yes.

8   Q    And on December 16th, after the TRO was entered into, you

9   instructed Ms. Schroth not to produce the Dugaboy financials

10  without a subpoena, correct?

11  A    That was the advice I had gotten from counsel, yes.

12  Q    Okay.  The Dugaboy and Get Good financial statements are

13  on the Debtor's platform, correct?

14  A    I do not know.

15  Q    There is no shared services agreement between Dugaboy or

16  Get Good and the Debtor, correct?

17  A    I don't know.

18  Q    You're not aware of any; is that fair?

19  A    Yes.

20  Q    Okay.

21       MR. MORRIS:  Can we put on the screen Exhibit R?  And

22  can you scroll down a bit?

23  BY MR. MORRIS:

24  Q    Okay.  That's Melissa Schroth at the top there; is that

25  right?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 95 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1089 of 1598   PageID 14136
206

Dondero - Direct                    94

1   A    Yes.

2   Q    And these are texts that you exchanged with her after the

3   TRO was entered into, correct?

4   A    Yes.

5              MR. MORRIS:  Can we scroll down a little bit?

6   BY MR. MORRIS:

7   Q    And do you see on December 16th you sent Ms. Schroth an

8   email -- I apologize -- a text that says, "No Dugaboy details

9   without subpoena"?

10  A    Yeah.

11  Q    But you can't remember why you sent this text, correct?

12  At least you couldn't as of Tuesday?

13  A    I believe it was on advice of counsel.

14  Q    But that's not what you said on Tuesday, correct?

15  A    I don't remember.

16  Q    You sent this text even though you knew that various

17  entities had requested the Dugaboy financials, but you have no

18  recollection of ever talking to anyone at any time about the

19  production of those documents, right?

20  A    Can you repeat the question?

21  Q    I'll move on.  Let me just -- last topic, and then I'm

22  going to respectfully request that we just take a short break.

23  You're familiar with the law firm of Baker & McKenzie; is that

24  right?

25       (Echoing.)

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 96 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1090 of 1598   PageID 14137
206

Dondero - Direct                              95

1   A    I'm sorry.  You broke up on us there.

2   Q    No problem.  You're familiar with the law firm Baker &

3   McKenzie, correct?

4   A    Yes.

5   Q    That firm has never -- never represented you or any entity

6   in which you have an ownership interest, correct?

7   A    Correct.

8   Q    But in December, the Employee Group, of which Mr. Leventon

9   and Mr. Ellington was a part, was considering changing counsel

10  from Winston & Strawn to Baker & McKenzie, right?

11  A    I believe so.

12  Q    And you asked -- and because of that, you specifically

13  asked Mr. Leventon for the contact information for the lawyers

14  at Baker & McKenzie, right?

15  A    I believe so.

16  Q    Okay.

17          MR. MORRIS:  Can we put up Exhibit S, please?

18  BY MR. MORRIS:

19  Q    And who is that email sent from?  I apologize.  Withdrawn.

20  Who is that text message exchange with?

21  A    Isaac Leventon.

22  Q    Okay.  And Mr. Leventon was an employee of the Debtor

23  after December 10th, correct?

24  A    Yes.

25          MR. MORRIS:  Can we scroll down a little bit?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 97 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1091 of 1598   PageID 14138
206

Dondero - Direct                        96

1   BY MR. MORRIS:

2   Q    And on December 22nd, you asked Mr. Leventon for the

3   contact information at Baker & McKenzie, correct?

4   A    Yes.

5   Q    And the reason you asked Mr. Leventon for the contact

6   information, that was in connection with the shared defense or

7   mutual defense agreement, right?

8   A    I -- I don't remember why.  It might have just been for my

9   records.  I don't know.

10  Q    The only reason that you could think of for asking for

11  this information was for the shared defense or mutual defense

12  agreement, correct?

13  A    I -- no, it -- I don't know and I don't want to speculate.

14  I don't want to -- I don't want to speculate.  I -- did -- I

15  don't think I ever got -- I don't know what your point is.

16         MR. MORRIS:  May we please go back to the transcript

17  at Page 136?  At the bottom, Line 23.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20         "Q   Do  you  recall  asking  Isaac  Leventon  for  the

21         contact  information  for  the  --  for  the  lawyers  at

22         Bakers & McKenzie?

23         "A   I -- I don't -- I don't -- it might have been for

24         part  of  the  shared  defense,  mutual  defense  whatever

25         agreement, but that's -- that's the only reason I would

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 98 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1092 of 1598   PageID 14139
206

Dondero - Direct                    97

1      have asked for it."

2   Q    Did you give that answer to my question?

3   A    Yeah.  I shouldn't have speculated.

4   Q    Okay.  But that's the answer you gave the other day; is

5   that right?

6   A    I shouldn't have speculated.  That's my answer today.

7   Q    And today -- withdrawn.  In fact, you wanted the Baker

8   contact information in order to help Mr. Draper coordinate the

9   mutual defense agreement, correct?

10  A    I don't want to speculate.

11          MR. MORRIS:  Can we go to Page 139, please?  Lines 2

12  to 5.

13  BY MR. MORRIS:

14  Q    Did you -- did you hear this question and did you give

15  this answer on Tuesday?

16       "Q   Why did you want the Baker & McKenzie contact

17       information?

18       "A   I was trying to help Draper coordinate the mutual

19       shared defense agreement, period."

20  Q    Did you give that answer to my question on Tuesday?

21  A    Yes.

22          MR. MORRIS:  Your Honor, I'd respectfully request a

23  short break to see if I've got anything more.

24          THE COURT:  All right.  Well, I was going to ask you

25  how much more do you think you have.  We've been going almost

Case 19-34054-sgj11  Doc 3445-68  Filed 08/15/22   Entered 08/15/22 16:45:41   Page 99 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1093 of 1598   PageID 14140
206

Dondero - Direct                         98

1  two hours.

2        So we'll take a break.  Let's make it a ten-minute break.

3  And then, depending on how much more you have and how much Mr.

4  Bonds is going to have, we'll figure out are we going to need

5  a lunch break in just a bit.

6        All right.  So it's 12:00 noon Central.  We'll come back

7  at 12:10.  Ten minutes.

8              MR. MORRIS:  Your Honor, may I have an instruction of

9  the witness not to check his phone for any purposes, not to

10  make -- not to communicate with anybody until -- until his

11  testimony is completed?

12             THE COURT:  All right.  Any -- any --

13             MR. BONDS:  Your Honor, he's going to speak with me.

14             THE COURT:  Pardon?

15             MR. BONDS:  I assumed he will speak to me about just

16  general events.  I mean, I don't want to be in breach of some

17  order.

18             MR. MORRIS:  Yeah.  I would -- I would -- I would ask

19  for -- you know, it's not -- he's on the stand.  He's still on

20  the stand.

21             THE COURT:  Yeah.  He --

22             MR. MORRIS:  He shouldn't be conferring with counsel,

23  either.  No disrespect to Mr. Bonds at all.

24             THE COURT:  Exactly.  I mean, you all can talk about,

25  you know, the national champion football game or whatever, but

Dondero - Direct                                99

1  it would be counseling your client in the middle of testimony

2  if you -- if you talk about this case at the moment.  So, you

3  know, --

4              MR. BONDS:  I understand, Your Honor.

5              THE COURT:  All right.

6              MR. BONDS:  I just didn't want to be --

7              THE COURT:  All right.  So now we'll come back at

8  12:11.

9              THE CLERK:  All rise.

10             MR. MORRIS:  Thank you, Your Honor.

11       (A recess ensued from 12:01 p.m. until 12:12 p.m.

12             THE CLERK:  All rise.

13             THE COURT:  Please be seated.  This is Judge

14  Jernigan.  We're going back on the record in Highland Capital

15  versus Dondero.  We have taken an 11-minute break.  It looks

16  like we have Mr. Dondero and counsel back.  And Mr. Morris,

17  are you out there, ready to proceed?

18             MR. MORRIS:  I am, Your Honor.  And I do have just a

19  few more questions.

20             THE COURT:  Okay.  I'm sorry.  Mr. Lynn, I see you're

21  there in the room with Mr. Dondero.  Now, did you want to --

22             MR. LYNN:  Here's Mr. Bonds.  I apologize.  He was in

23  the restroom.

24             THE COURT:  Okay.  All right.  Everyone ready to

25  proceed?

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Okay.  Mr. Morris, go ahead.

3          MR. MORRIS:  Thank you, Your Honor.

4                  DIRECT EXAMINATION, RESUMED

5    BY MR. MORRIS:

6    Q    Can you hear me, Mr. Dondero?

7    A    Yes.

8    Q    Did you ever discuss the request of any party to produce

9    the financial statements of Get Good and Dugaboy with Scott

10   Ellington?

11   A    Not that I recall.

12   Q    Did you ever communicate with Mr. Leventon on the subject

13   matter of whether or not the financial statements for Get Good

14   and Dugaboy needed to be produced by the Debtor?

15   A    No.

16   Q    Those are the two questions that you were directed not to

17   answer the other day, right?

18   A    I don't remember.

19   Q    Okay.  You mentioned that Mr. Ellington serves in some

20   capacity as settlement counsel.  Do I have that right?

21   A    Yes.

22   Q    Do you know if there's any exception in the TRO that

23   permits you to communicate directly with Mr. Ellington in his

24   so-called capacity as settlement counsel?

25   A    There was no change in his status in the TRO.  It's -- and

Dondero - Direct                          101

1   I think he was still used by both the Debtor and by me in that

2   function.

3   Q    You said that -- you testified earlier that you understood

4   that you were prohibited from speaking with the Debtor's

5   employees, correct?

6   A    Except for -- except for with regard to the pot plan,

7   shared services, and Ellington as settlement counsel.  But I

8   continued to talk to employees about the pot plan as recently

9   as the end of the year, and I continued to talk to employees

10  about shared services based on the shared services proposal

11  that was sent to Ellington and forwarded to me as recently as

12  two days ago.

13  Q    You never -- you never read the TRO, right?

14  A    No.

15          MR. MORRIS:  Can we have it put up on the screen?  I

16  don't know the exhibit number, Ms. Canty, but hopefully it's

17  clear on the exhibit list.

18          MS. CANTY:  I'm sorry, John.  Can you repeat what

19  you're looking for?

20          MR. MORRIS:  The TRO.  (Pause.)  Can we scroll down

21  to Paragraph 2, please?  Okay.

22  BY MR. MORRIS:

23  Q    I appreciate the fact that you've never seen this before,

24  Mr. Dondero, but let me know if I'm reading Section 2(c)

25  correctly.  "James Dondero is temporarily enjoined and

Dondero - Direct                              102

1   refrained from" -- subparagraph (c) -- "communicating with any

2   of the Debtor's employees, except for specifically -- except

3   as it specifically relates to shared services currently

4   provided to affiliates owned or controlled by Mr. Dondero."

5        Have I read that correctly?

6   A    Yes.

7   Q    Does that provide for any exceptions concerning the pot

8   plan?

9   A    The Independent Board requested a meeting on the pot plan.

10  Q    Okay.  But does it -- I appreciate that, and we'll talk

11  about that in a moment, but my question is very specifically

12  looking at the order.  And I, again, appreciate that you've

13  never seen it before.  But looking at the order now, is there

14  any exception for you to communicate with the Debtor's

15  employees concerning the pot plan?

16  A    I would think the pot plan would fall under that, since

17  some of the pot plan value is coming from affiliated entities

18  that are subject to the shared services agreement.  I would

19  think that would be reasonable, again, plus the -- well, it

20  was the subject of a meeting with the Independent Board at the

21  end of the month.

22  Q    Okay.

23  A    I still think it's the best alternative for this estate.

24  Q    Okay.  Did you -- did you ever -- did you ever ask

25  anybody, on your behalf, have asked the Debtors whether they

Dondero - Direct                          103

 1   agreed with what you believed was a reasonable interpretation

 2   of the restraining order?

 3   A    I did not.

 4   Q    Okay.  And let's just deal with the notion of settlement

 5   counsel.  Do you see anywhere in this TRO -- and if you want

 6   to read anything more, please let me know -- do you see

 7   anything in this TRO that would permit you to speak with Mr.

 8   Ellington in his so-called role as settlement counsel?

 9   A    Well, I would say, more importantly, I don't see anything

10   that takes away his role as settlement counsel, which was

11   formally done six months ago.

12   Q    Okay.  I did read Section 2(c) correctly, right?

13   A    Yes.

14   Q    And the only exception that's in Judge Jernigan's

15   restraining order that she entered against you relates to

16   shared services.  Have I read that correctly?

17   A    Yes.

18   Q    Okay.  Let's talk about the pot plan for a moment.  After

19   the TRO was entered, you were interested in continuing to

20   pursue the pot plan; is that right?

21   A    I still believe it's the best possible result for this

22   estate.

23   Q    And you sought a forum with the Debtor's board, correct?

24   A    Yes.

25   Q    And you knew that you couldn't speak directly with any

Dondero - Direct                                    104

 1   member of the Debtor's board unless your counsel and the
 2   Debtor's counsel was -- was present at the same time.
 3   Correct?
 4   A    Yeah.  As a matter of fact, I didn't go.  I just had
 5   counsel go.
 6   Q    And the Debtor's board gave Mr. Lynn a forum for him to
 7   present your pot plan after the TRO was entered.  Isn't that
 8   right?
 9   A    I believe so.
10   Q    And are you aware that the Debtor's board spent more than
11   an hour and a half with Mr. Lynn talking about your pot plan
12   after the TRO was entered?
13   A    Yes.
14   Q    And is it fair to say that, notwithstanding Mr. Lynn's
15   goodwill and Mr. Lynn's efforts to try to get to a successful
16   resolution here, the terms on which the pot plan were offered
17   were unacceptable to the Debtor?
18   A    I wasn't there.  I -- I don't know.
19   Q    The Debtor never made a counteroffer, did it?
20   A    Not that I heard.
21   Q    You'll admit, will you not, that over the last year you or
22   others acting on behalf -- on your behalf have made various
23   pot plan proposals to the Official Committee of Unsecured
24   Creditors?
25   A    Quite generous pot plans that I think will exceed any

1  other recoveries.

2  Q    Okay.  So you're aware that your pot plan was delivered

3  either by you or on your behalf to the U.C.C., correct?

4  A    I -- some were.  Some, I don't know.

5  Q    Okay.  Has the U.C.C. ever made a counterproposal to you?

6  A    Nope.

7          MR. MORRIS:  I have no further questions, Your Honor.

8          THE COURT:  All right.  Pass the witness.

9      Mr. Bonds, do you have any time estimate for me,

10 guesstimate?

11         MR. BONDS:  My guess is, Your Honor, it'll be about

12 an hour.  I would hope that we could take some type of a

13 break, just because I'm a diabetic and need to have some --

14         THE COURT:  All right.  Well, --

15         MR. MORRIS:  I have no objection, Your Honor.

16 Whatever suits the Court.  I'm willing to accommodate Mr.

17 Bonds always.

18         THE COURT:  Okay.  Let's take a 45-minute break.

19 Forty-five minutes.  So, it's 12:22.  We'll come back at seven

20 minutes after 1:00 Central time.

21     All right.  We're in recess.

22         THE CLERK:  All rise.

23     (A luncheon recess ensued from 12:23 p.m. to 1:15 p.m.)

24         THE CLERK:  All rise.

25         THE COURT:  Please be seated.  This is Judge

Dondero - Cross                                    106

1    Jernigan.  We are going back on the record in Highland Capital

2    Management versus Dondero.  We took a lunch break.  And when

3    we broke, Mr. Bonds was going to have the chance to examine

4    Mr. Dondero.

5         Let me just make sure we have, first, Mr. Dondero and Mr.

6    Bonds.  Are you there?

7              MR. BONDS:  Yes, we are.

8              THE COURT:  All right.  Very good.  I don't see your

9    video yet, but -- there you are.  All right.  Mr. Morris, are

10   you there?

11             MR. MORRIS:  I am here.  Can you hear me, Your Honor?

12             THE COURT:  I can.  All right.

13             MR. MORRIS:  Thank you.

14             THE COURT:  Well, we've got lots of other people, but

15   that's all I'll make sure we have at this moment.  All right.

16   Mr. Bonds, you may proceed.

17        And, Mr. Dondero, I know you know this, but I'm required

18   to remind you you're still under oath.

19        Okay, go ahead.

20                       CROSS-EXAMINATION

21   BY MR. BONDS:

22   Q   Before you resigned as portfolio manager, how long had you

23   had with Highland Capital Management?

24   A   Since inception in 1994.

25   Q   Okay.  And how long have your offices been at the

Dondero - Cross                               107

1  Crescent?

2  A    Eight years.

3  Q    Okay.  Before you resigned as portfolio manager, did you

4  spend a lot of time in the office?

5  A    Yes.  I spent every business day this -- or 2020,

6  including COVID, in the office.

7  Q    Okay.  And this is the first time that you are not in the

8  office, is that right, in decades?

9  A    Yes.

10 Q    Can you tell us about the shared services agreement that

11 exists between the Debtor and the other entities in which you

12 have an interest?

13 A    NexPoint, NexBank, the DAF, HFAM, primarily.  I don't know

14 what other entities paid.  Shared services, which is typical

15 in finance, for centralized tax, accounting, RICO function, so

16 that we don't have to have redundant, multiple high-paid

17 people in different entities.  We'd have them centralized and

18 with collective experience and collective functionality.  And

19 so, historically and recently, they pay Highland for those --

20 fees for those services.  And I, as a non-paid employee, or a

21 non-employee of Highland but a paid employee of NexBank -- of

22 NexPoint, was -- and my occupancy and support were part of

23 those shared services agreement.

24 Q    What do those agreements allow those entities to do?

25 A    Would it allow those entities to do?  Well, to access the

Dondero - Cross                    108

 1  Highland functionality as appropriate, because most of those

 2  entities, as is typical in finance, did not have their own

 3  functionality, legal, tax, and -- legal, tax, and accounting,

 4  but although they've been -- they've been building it lately

 5  in anticipation of the pot plan not going through at Highland.

 6  Q   Okay.  Do those agreements allow you to share office space

 7  with --

 8              MR. MORRIS:  Objection --

 9              THE WITNESS:  Yes.

10              MR. MORRIS:  -- to the form of the question, Your

11  Honor.  I think the exhibits and the agreements themselves

12  would be the best evidence.  They're not in evidence.  They

13  haven't been offered in evidence.  I have no way to challenge

14  the witness on anything he's saying.  And on that basis, I'd

15  -- it's not fair to the Plaintiff.

16              THE COURT:  All right.  Mr. Bonds, can I ask you to

17  repeat your question?  It was muffled and I was about to ask

18  you to repeat it before I got the objection.  So, repeat the

19  question so I can --

20              MR. BONDS:  Okay.  I'm going to repeat it and amend

21  it.

22              THE COURT:  Okay.

23  BY MR. BONDS:

24  Q   Is it your understanding that those agreements allow you

25  to share office space with the Debtor?

Dondero - Cross                                    109

1  A    Yes.  Virtually all of NexPoint's employees share the

2  Highland office space as part of a shared services agreement.

3  Q    Do those agreements allow you to share -- I'm sorry,

4  excuse me.  Strike that.  What else do they allow?

5  A    Typically is used in coordination of systems, servers,

6  software, cloud software, Internet software, office software,

7  tax, accounting, and legal functionality are all part of the

8  shared services agreement, although, you know, much of -- much

9  of that was stripped, you know, four or five months ago,

10 especially legal functionality and the accounting

11 functionality, without the concurrent adjustment in the

12 building.

13 Q    Okay.  And you previously testified that you generally

14 control NexPoint; is that correct?

15 A    Generally.  And the distinction I was trying to make is,

16 you know, following the financial crisis in '08, compliance

17 and the chief compliance officer has personal liability. along

18 with the rest of the C Suite, and operates independently, with

19 primary loyalty to the regulatory bodies.  And they're --

20 they're not controlled, bamboozled, or segued away from their

21 responsibility.  And at all times, they're supposed to be

22 doing what they believe is right, regulatorily-compliant, and

23 in the best interest of investors.

24      So that was the distinction I was drawing between, A, what

25 I was trying to remind Thomas of, that he should be

Dondero - Cross                        110

1    independent of Seery, in terms of following what he believes

2    is correct and regulatory-compliant.  And I don't have to push

3    the NexPoint compliance people and general counsel to do

4    anything specific, nor could I.  They are supposed to do what

5    is right from a regulatory investor standpoint, and I believe

6    that's what they've done.

7    Q    All right.  And what do you mean by the term or the usage

8    of the word "generally"?

9    A    Well, that's the distinction I was just drawing.  I mean,

10   generally, on regular business strategy, you know, major

11   investments, you know, other business items, I'm in control of

12   those entities.  But in terms of the content and allegations,

13   regulatory opinions that come from compliance and the general

14   counsel, that is their best views on their own, knowing they

15   have compliance obligations and personal liability.

16   Q    Do you believe that NexPoint and its other owners and

17   interest holders have rights independent from your own in this

18   case?

19   A    Right, yes, and obligations, and responsibilities to

20   investors.  I believe the attempt by the Debtor or Seery to

21   hide behind contracts that the Debtor has with the CLOs are --

22   are a spurious, incomplete argument.  You know, they're not in

23   compliance with those contracts.  Bankruptcy alone is an event

24   of default.  Not having the key man -- the key men, the

25   required requisite professionals that they're obligated to

Dondero - Cross                    111

1    contractually have working at the Debtor is a clear breach, in

2    violation of those CLO contracts.  Not having adequate staff

3    or investment professionals to analyze, evaluate, or follow

4    the investments in the portfolio is a clear violation.  And

5    specifically telling investors in the marketplace that you

6    plan to terminate all employees, a date certain January 24th,

7    is a proclamation that you're not going to be in any form able

8    to be a qualified registered investment advisor or qualified

9    in any which way to manage the portfolio or be in compliance

10   with the CLO contracts.

11       I would -- I would further add that the selling of the

12   securities, and the SKY securities, represent incomplete

13   intentional incurring of loss against the investors.  You have

14   securities that are less liquid with, you know, restructured

15   securities that have been owned for ten years, and they were

16   sold during the most illiquid weeks of the year, the couple

17   days before and after Thanksgiving, couple days before and

18   after Christmas, where the investors could have gotten 10 or

19   15 percent more on their monies if they were just sold in a

20   normal week.  It's -- it's preposterous to me.  It's

21   consistent with Seery not being an investment (garbled).

22       But it's preposterous to me that -- that this treatment of

23   investors is allowed or being camouflaged as some kind of

24   contractual obligation, when the investors have said these

25   funds are clearly in transition and the manager clearly is

Dondero - Cross                              112

1    incapable of managing them.  You know, please don't transact

2    until the transition is complete.  But Jim Seery has traded

3    every day, including -- I don't know about today, but every

4    day this week, selling securities for no investment rationale

5    and no business purpose.

6    Q    Are you also portfolio manager for NexPoint?

7    A    Yeah, I'm a portfolio manager for the closed-end retail

8    funds, which do have a higher fiduciary obligation than

9    anything on the institutional side.  I'm a portfolio manager

10   for those '40 Act funds that are the primary owners of the

11   CLOs that Seery is selling securities in for some unknown

12   reason.

13   Q    And what shared service agreements exist between NexPoint

14   and the Debtor?

15   A    Those are the shared service agreements I spoke of.  I

16   don't want to repeat myself.

17   Q    And I'm going to call Highland Capital Management Fund

18   Advisors, LP just Fund Advisors.  Is that okay with you?

19   A    Yes.

20   Q    Okay.  And you testified generally -- that you generally

21   control Fund Advisors; is that correct?

22   A    Yes.

23   Q    Do you believe that Fund Advisors and its owners and

24   interest holders have rights independent from your own in this

25   case?

Dondero - Cross                        113

1  A    Yes.

2  Q    Are you the portfolio manager for Fund Advisors?

3  A    Yes.

4  Q    What shared services agreements exist between Fund

5  Advisors and the Debtor?

6         MR. MORRIS:  Objection, Your Honor.  The agreements

7  themselves are the best evidence of the existence in terms of

8  any agreement between the Debtor and these entities.

9         MR. BONDS:  Your Honor, I can fix that.

10         THE COURT:  Okay.

11  BY MR. BONDS:

12  Q    I'm just asking:  What is your understanding, Mr. Dondero,

13  of the shared service agreements between the Debtor and Fund

14  Advisors?

15  A    It's similar to the agreement I mentioned earlier.  It

16  covers a broad range of centralized services historically

17  provided by Highland, but now those, while still paying

18  smaller than historic fees, those entities now have been

19  required to incur the expenses of duplicating those functions.

20  Q    Okay.  Do you recall the email string dated November 24th

21  regarding SKY equity that the Debtor talked about?

22  A    Yes.

23  Q    What did you mean when you sent that email about the

24  trade?  What did you mean, I'm sorry?

25  A    I was trying to inform the traders, and once they knew --

Dondero - Cross                    114

1   they weren't willing to do the trades anymore once they knew

2   that the underlying investors had requested that their

3   accounts not being traded until the transition be -- until the

4   transition of the CLOs was effectuated.

5       It's -- it's standard by, you know, statute or

6   understanding, in the money and management business, when

7   you're moving accounts from one asset manager to another, and

8   someone requests that you don't do anything to their account,

9   you don't trade it whimsically.  And so I was -- I was making

10  sure the traders knew that the underlying investors had

11  requested that no trades occur in their accounts.

12      And then I believed it was a clear violation of the

13  Registered Investment Adviser's Act.  I believe that people

14  involved at a senior level or at a compliance level could have

15  material liability, and could create material liability for

16  the Debtor.  And I think if, as I said before, I think if

17  anybody on this call were to call the SEC, they would start on

18  audit on this.

19          MR. MORRIS:  Your Honor, I move to strike the first

20  portion of the answer prior to when he started to describe

21  what he believes and what he thinks.  The first portion of the

22  answer was devoted to testifying about what is in the

23  knowledge of the people who he was communicating with.

24  There's no evidence.  Mr. Dondero, of course, was free to call

25  any witness he wanted.  He could have called the chief

Dondero - Cross                              115

1    compliance officer.  He could have called the general counsel.

2    He could have called all the people he's now testifying on

3    behalf of, and he did not.

4        So I move to strike anything in the record that purports

5    to reflect or suggest the knowledge on behalf of any party

6    other than Mr. Dondero.

7                THE COURT:  Okay.  I'm --

8                MR. BONDS:  Let me rephrase -- Your Honor, I'm going

9    to rephrase the question.

10               THE COURT:  Okay.  Very well.

11               MR. BONDS:  I'm sorry.

12               THE COURT:  So the motion to strike is granted.  If

13   you're going to rephrase, go ahead.

14               MR. BONDS:  Okay.

15   BY MR. BONDS:

16   Q    Mr. Dondero, what did you mean when you said -- that the

17   emails about the trade?

18   A    Okay.  I'll give my intention by sending emails to stop

19   the trade and my basis for those emails.  My intentions were

20   to inform the traders and to inform the compliance people that

21   I believe there was a trade that wasn't in the best interest

22   of the employees that had no business purpose for its

23   occurring.  And the people involved weren't aware that the

24   investors had sent over requests not to trade their accounts

25   while they were in transition.

Dondero - Cross                    116

1      So I made the traders aware of that.  I made compliance

2  aware of that also.  And it's my belief, based on 30 years'

3  experience in the industry, that it is entirely inappropriate

4  to trade the accounts of investors that are in transition, and

5  especially when you're not -- you're not contractually -- you

6  are contractually in default with that client, to trade their

7  account whimsically, for no business purpose.  And I thought

8  it was a clear breach of both regulatory, ethical, and

9  fairness with regard to the investors.

10     So I -- what did you know, when did you know it, what did

11 you do?  I did what I felt was the right thing, which I try

12 and do every day, and made all the relevant parties aware of

13 what was going on.

14 Q   Mr. Dondero, do you recall the text message you sent to

15 Mr. Seery in which you said, "Be careful what you do"?

16 A   Yes.

17 Q   What did you mean by that message?

18 A   It's -- I even said, Last warning.  I mean, I -- he's

19 doing things against the interests of investors.  He's

20 purposely incurring losses by trading in days and weeks and

21 time of the year, the day before and after Thanksgiving, where

22 any novice knows the markets are illiquid and anybody who can

23 read a computer screen can see you get ten percent less --

24 five or ten percent less than you would the week before or the

25 week after.  And with as much professional umbrage as

Dondero - Cross                               117

1    possible, I was recommending that he stop.

2    Q    Did you intend to personally threaten Mr. Seery in any

3    way?

4    A    No.  It was bad -- bad intentional professional acts

5    against the interests of investors that flow through to '40

6    Act retail mom-and-pop investors.  I was trying to prevent

7    those losses and those bad acts from occurring.  And I believe

8    everybody who's -- everybody around that issue should be

9    ashamed of themselves, in my opinion.

10   Q    Do you now regret sending the text?

11   A    No.  No, I mean, I could have worded it differently.  I

12   was angry on behalf of the investors.

13   Q    And Mr. Dondero, you have management ownership interest in

14   that entity; is that right?

15   A    Yes.

16   Q    Do you believe the interests or other entities in which

17   you are involved are independent from your personal rights in

18   this case?

19   A    Yes.

20   Q    And do you believe you caused anyone to violate the TRO?

21   A    No.  I've been -- I've been very conscious to just try and

22   champion the thing that -- things that I think are important

23   and the things that I've been tasked to do, like an attractive

24   pot plan to help resolve this case.  I spend time on that.

25   But every once in a while, do I have to access, let's say,

Dondero - Cross                        118

1    David Klos, who is the person who put the model together, who

2    has been working on it for six or nine months, and no one else

3    S has a copy of?  Yes.  Yeah, I have to -- I have to access

4    him.  I don't believe that's the -- inappropriate or in any

5    way violating the spirit of the TRO.

6        I believe settlement in this case is only going to happen

7    with somebody fostering communication.  And Ellington's role,

8    which I thought was a good one and I thought he was performing

9    well as settlement counsel, was an important role.  And I used

10   him for things like -- and Seery also used him for things.  As

11   recently as two days before Ellington was fired, Seery gave

12   him a shared services proposal to negotiate with me.

13   Ellington has always been the go-between from a settlement and

14   a legal standpoint.  I think his role there was -- it was

15   valued.  To try to honor the TRO was things like Multi-Strat,

16   that I didn't remember correctly.  Ninety percent of the time

17   or for the last 20 years I would have gone directly to

18   Accounting and Dave Klos for it, but I purposely went to

19   settlement counsel in terms of Ellington in order to get the

20   Multi-Strat information which we needed in order to put the

21   pot plan together that we went to the Independent Board with

22   at the end of December.

23   Q    (faintly)  And do you recall the questions that Debtor's

24   counsel had regarding the letters sent by K&L Gates to clients

25   of the Debtor?

Dondero - Cross                            119

1          MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2    hearing that question.

3          THE COURT:  Please repeat.

4          MR. BONDS:  Sure.

5    BY MR. BONDS:

6    Q   Do you recall the questions Debtor's counsel had regarding

7    the letters sent by K&L Gates to the clients of the Debtor --

8    to the Debtor?

9    A    Yes.

10   Q   You testified on direct that the letters were sent to do

11   the right thing; is that correct?

12   A    Yes.

13   Q   What did you mean by that?

14   A    I don't want to repeat too much of what I just said, but

15   the Debtor has a contract to manage the CLOs, which in no way

16   is it not in default of.  It doesn't have the staff.  It

17   doesn't have the expertise.  Seery has no historic knowledge

18   on the investments.  The investment staff of Highland has been

19   gutted, with me being gone, with Mark Okada being gone, with

20   Trey Parker being gone, with John Poglitsch being gone.

21        And there's -- there's a couple analysts that are a year

22   or two out of school.  The overall portfolio is in no way

23   being understood, managed, or monitored.  And for it to be

24   amateur hour, incurring losses for no business purpose, when

25   the investors have requested numerous times for their account

Dondero - Cross                          120

1    not to be traded, is crazy to me.  Where the investors say, We

2    just want our account left alone.  We just want to keep the

3    exposure.  And Jim Seery decides no, there's -- I'm going to

4    turn it into cash for no reason.  I'm just going to sell your

5    assets and turn them to cash and incur losses by doing it the

6    week of Thanksgiving and the week of Christmas.  I think it's

7    -- it's shameful.  I'm glad the compliance people and the

8    general counsel at HFAM and NexPoint saw it the same way.  I

9    didn't edit their letters, proof their letters, tell them how

10   to craft their letters.  They did that themselves, with

11   regulatory counsel and personal liability.  They put forward

12   those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14   Mr. Dondero just gave about these people saw it.  They're not

15   here to testify how they saw it.  We know that Mr. Dondero

16   personally saw and approved the letters before they went out.

17   He can testify what he thinks, what he believes.  I have no

18   problem with that.  But there should be no evidence in the

19   record of what the compliance people thought, believed,

20   understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24   lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25   response?

Dondero - Cross                          121

1          MR. BONDS:  Your Honor, my response would be that

2   there are several exhibits the Debtor introduced today that

3   stand for the proposition that the compliance officers were

4   concerned.  So I think there is ample evidence of that in the

5   record.

6          THE COURT:  I didn't --

7          MR. MORRIS:  Your Honor, the letter --

8          THE COURT:  I did not understand what you said is in

9   the record.  Say again.

10          MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11   -- there are references that are replete in the record that

12   have to do with the compliance officers' understanding of the

13   transactions.

14          THE COURT:  I don't know what you're referring to.

15          THE WITNESS:  Your Honor?

16          THE COURT:  I've got a lot of exhibits.  You're going

17   to have to point out what you think --

18          THE WITNESS:  Can I -- can I -- can I -- can I answer

19   for -- that for a second?  The letters that were signed by the

20   compliance people or by the businesspeople at NexPoint and

21   HFAM objecting to the transactions, those letters were their

22   beliefs, their researched beliefs.  They weren't --

23          THE COURT:  Okay.

24          THE WITNESS:  -- micromanaged by me.  You know, they

25   weren't -- I agree with them, but those weren't my beliefs

Dondero - Cross                                   122

1  that they've stated.  Those were their own beliefs and their

2  own research, --

3           THE COURT:  All right.

4           THE WITNESS:  -- and the record should reflect --

5           THE COURT:  This is clearly hearsay.  I mean, it's

6  one thing to have a letter, but to go behind the letter and

7  say, you know, what the beliefs inherent in the words were is

8  inadmissible.  All right?  So I strike that.

9           THE WITNESS:  Maybe ask your question again.

10 BY MR. BONDS:

11 Q   Yeah.  What is your understanding of the rights that these

12 parties had and what do you believe that was intended to be

13 conveyed by the compliance officers?

14          MR. MORRIS:  Objection.  Calls -- calls for Mr.

15 Dondero to divine the intent of third parties.  Hearsay.

16          THE COURT:  I sustain.

17          MR. BONDS:  Your Honor, --

18          MR. MORRIS:  No foundation.

19          MR. BONDS:  -- I don't agree.  I think that this is

20 asking Mr. Dondero what he thinks.

21          MR. MORRIS:  The letters speak for themselves, Your

22 Honor.

23          THE COURT:  Okay.  I sustain --

24          MR. MORRIS:  And Mr. --

25          THE COURT:  I sustain the objection.

Dondero - Cross                         123

1            MR. MORRIS:  All right.  Thank you.

2            THE WITNESS:  Ask me what I know.  Or ask me what my

3    concerns --

4    BY MR. BONDS:

5    Q    Let me ask you this.  What were your concerns relating to

6    the compliance officers' exhibit?

7    A    My concerns regarding the transaction, the transactions,

8    which may repeat what I've said before, but I do want to make

9    sure it gets in the record.  So if we have to make a -- these

10   were my concerns, whether or not they were the compliance

11   people's concerns.  I believe they were, and I believe they

12   were similar, but I'm just going to say these are -- these

13   were my concerns.

14       The Debtor, with its contractual -- with its contract with

15   the CLOs, were in no way -- was in no way compliant with that

16   contract or not in default of that contract.  Bankruptcy is a

17   reason for default.  Not having the key men specified in the

18   contract currently employed by the Advisor is a violation.

19   Not having adequate investment staff to manage the portfolio

20   is a violation of that contract.  Announcing that you're

21   laying off everybody and will no longer be a registered

22   investment advisor is proclaiming that you, if you even have

23   any -- any -- pretend that you're qualified or in compliance

24   with the contract now, you're broadcasting that you won't be

25   in three weeks, are -- are all mean that you're not in good

Dondero - Cross                        124

1   standing.  Okay?  Number one.

2       Number two, when the investors know that it's in

3   transition, you're not in compliance as a manager, you're not

4   going to be an RIA in three weeks, the accounts are going to

5   have to transition to somebody else in three weeks, and the

6   investors ask you, Please don't trade my accounts between now

7   and then, that is -- that is a -- if it's not a *per se*, it's

8   an ethical and a spirit violation of any relationship between

9   an investor and an asset manager.

10      To then sell assets -- not replace assets, just sell

11  assets for cash -- and purposely do it on the least liquid

12  days of the year -- the day before Thanksgiving, the day after

13  Thanksgiving, the week of Christmas, this past week, whatever

14  -- to purposely incur losses so that the investors suffer ten

15  or fifteen percent losses that other -- on each of those sales

16  that they wouldn't otherwise have to incur, and for no stated

17  business purpose, for no investment rationale, with no staff

18  to even say whether the investment is potentially going up or

19  down, is -- is -- is -- I've never seen anything else like it.

20      And I will stand up and say it every day:  I'm glad the

21  letters went out from HFAM and from NexPoint.  I would never

22  recommend they get retracted.  And I believe everybody who

23  signed those letters meant everything in those letters.  And I

24  believe the letters are correct.  And I believe the whole

25  selling of CLO assets is a travesty.

Dondero - Cross                     125

1    My personal opinion, we need an examiner or somebody here

2    to look at this junk and look at some of the junk that

3    occurred earlier this year.  This -- this stuff is

4    unbelievable to me.

5    Q    Generally, who holds interests in the CLOs?

6    A    A vast majority of the CLOs that we're speaking of that

7    Seery has been selling the assets of are owned by the two

8    mutual funds, the two '40 Act -- the two '40 Act mutual funds

9    and the DAF.  Between them, I think out of -- eleven out of

10   the sixteen CLOs, they own a vast majority, and then I think,

11   whatever, two or three they own a hundred percent, and I think

12   two or three they own a significant minority.

13        And just because they don't own a hundred percent doesn't

14   somehow allow a registered investment advisor to take

15   advantage of an investor.  And I -- I've never understood that

16   defense.  I wouldn't be able -- in my role of 30 years, I

17   wouldn't be able to tell that to an investor, that, hey, you

18   had a contract with us, we did something that wasn't in your

19   best interest, but we got away with it because you didn't own

20   a hundred percent, you only owned eighty percent.

21             MR. MORRIS:  Your Honor, I move to strike.  There's

22   no contract between the Debtor and Mr. Dondero's -- and the

23   entities that he owns and controls for purposes of the CLO.

24   The only contract is between the Debtor and the CLOs

25   themselves.

Dondero - Cross                    126

1        THE COURT:  All right.  Well, I overrule whatever

2   objection that is.  Again, if you want to bring something out

3   on cross-examination or through Mr. Seery, you know, you're

4   entitled to do that.

5        All right.  Please continue.

6   BY MR. BONDS:

7   Q   Do you believe these letters were sent by the Funds to the

8   Advisors because they are trying to protect the independent

9   entities?

10  A   They're trying to protect their investors.  They were

11  trying to protect their regulatory liability for activities

12  they see that are not in the best interests of investors.

13       MR. MORRIS:  Objection, Your Honor.  I move to

14  strike.  He's again testifying as to the intent of the people

15  who sent the letters who are not here to testify today.

16       THE COURT:  Sustained.

17  BY MR. BONDS:

18  Q   Mr. Dondero, what is your belief as to the letters that

19  were sent by the Funds and Advisor?  Is -- are they trying to

20  protect their independent interests?

21       MR. MORRIS:  Objection, Your Honor.  Asked and

22  answered.

23       THE COURT:  Sustained.

24       THE WITNESS:  Ask me --

25  BY MR. BONDS:

Dondero - Cross                           127

1  Q    What is your understanding of why the letters were sent?

2              MR. MORRIS:  Objection, Your Honor.  Asked and

3  answered.

4              THE COURT:  Sustained.

5  BY MR. BONDS:

6  Q    Mr. Dondero, would you have sent the letters?

7  A    I would have sent the letters exactly or very similar or

8  probably even more strongly than the letters were stated, for

9  the purposes of protecting investors, to protecting mom-and-

10  pop mutual fund investors from incurring unnecessary losses by

11  an entity that was no longer in compliance with their -- with

12  their asset management contract and because the investors had

13  requested that their account just be frozen until it was

14  transitioned.

15      That's why I would have sent the letter.  That's why I

16  believe the letter should be sent.  That's why I'm happy they

17  were sent.  That's why we've never retracted.

18  Q    Mr. Dondero, who is Jason Rothstein?

19              THE COURT:  I did not hear the question.

20              THE WITNESS:  Jason -- Jason --

21              MR. BONDS:  Who --

22              THE COURT:  Please repeat.

23              MR. BONDS:  Yes.  I asked Mr. Dondero who Jason

24  Rothstein was.

25              THE WITNESS:  Jason Rothstein heads up our systems

1    department at Highland Capital.

2    BY MR. BONDS:

3    Q    Can you explain what your text message to Mr. Rothstein

4    was about?

5    A    Which text message?  The one where it was in the drawer?

6    Q    Yeah.

7    A    Uh, --

8    Q    And that was actually from him, not you.

9    A    Yeah.  That was from him.  I think he transferred icons or

10   set up personal stuff to the new phone, and he was just saying

11   that the old phone was in Tara's drawer.

12   Q    And you don't know whether -- what's happened to the

13   phones, do you?

14   A    No.  Like I said, I believe they've been destroyed, but I

15   -- I can find out.  I mean, I can query and find out who

16   destroyed it, if that's important.

17   Q    And you understood that you were not supposed to talk to

18   the Debtor's employees; is that correct?

19   A    Like I said, except for my roles regarding shared

20   services, the pot plan, and trying to reach some type of

21   settlement, I've had painfully few conversations with the

22   Debtor's employees.

23   Q    When you talked to certain employees, did you think it was

24   an -- under an exception to the TRO, like shared services,

25   related to the pot plan, or settlement communications?

                        Dondero - Cross                    129

 1    A    Yes.

 2            MR. MORRIS:  Your Honor, I move to strike.  Mr.

 3    Dondero never read the TRO.  He's got no basis to say what the

 4    TRO required and didn't require.

 5            MR. BONDS:  That wasn't the -- that wasn't the

 6    question.

 7            THE COURT:  Okay.

 8            MR. BONDS:  I'm sorry.

 9            THE COURT:  Okay.  Rephrase the question, please.

10            MR. BONDS:  Okay.  I'm sorry.

11    BY MR. BONDS:

12    Q    When you talked to these -- to certain employees, did you

13    think it was under an exception to the TRO, like shared

14    services, relating to the pot plan, or settlement

15    communications?

16    A    Yes.  Absolutely.

17            MR. MORRIS:  I object.  No foundation.

18            THE COURT:  Sustained.

19    BY MR. BONDS:

20    Q    Mr. Dondero, do you understand -- did your lawyers explain

21    to you the TRO?

22    A    Yes.

23    Q    And who was the lawyer that explained the TRO to you?

24            MR. MORRIS:  Your Honor, I don't know if we're

25    getting into a waiver of privilege, but I just want to tell

Dondero - Cross                        130

1   you that my antenna are up very high.

2            THE COURT:  Okay.  Mine are as well, Mr. Bonds.  Are

3   you about to waive the privilege?

4            MR. BONDS:  No, Your Honor, I am not.

5            THE COURT:  Okay.  Well, it sounded like perhaps we

6   were about to have the witness testify about conversations he

7   had with lawyers.

8            MR. BONDS:  I'm sorry, Your Honor.  That was not my

9   intention.  Again, I'm asking Mr. Dondero to explain for us

10  his contact with -- or, his impression of the TRO.

11  BY MR. BONDS:

12  Q    What did the TRO mean to you?

13  A    The TRO meant to me that I was precluded from talking to

14  Highland employees -- which, again, very few, if any, were

15  coming into the office.  I was not talking to Highland

16  employees with any regularity anyway.  But there was an

17  exception with regard to Scott Ellington regard -- Scott

18  Ellington in terms of him functioning as settlement attorney

19  to try and bridge the U.C.C., the Independent Board, Jim

20  Seery, other people, and things that impacted me or other

21  entities.

22       I also viewed that there was an exception for the pot

23  plan, which had been presented and gone over as recently as

24  December 18th and 20th.  And -- or December 18th, I think, was

25  the date.

                        Dondero - Cross                    131

 1      And you know what, I want to clarify a characterization of

 2   the pot plan.  I still believe it's the best and most likely

 3   alternative for this estate in the long run.  I think what

 4   we've proposed numerous times is more generous than what

 5   anyone will receive in a liquidation and in a more timely

 6   fashion.

 7      And the last time we presented it to the Independent

 8   Board, the Independent Board thought it was attractive and

 9   thought we should go forward with it to the U.C.C. and other

10   parties.

11           MR. MORRIS:  Your Honor, I move to strike the last

12   portion of the answer that purports to describe what the

13   Independent Board thought.

14           THE COURT:  Well, --

15           MR. MORRIS:  No foundation.  Hearsay.

16           THE COURT:  What is your response to the hearsay

17   objection, Mr. Bonds?

18           MR. BONDS:  Your Honor, I don't have one.

19           THE COURT:  Okay.  I sustain.

20   BY MR. BONDS:

21   Q   What exceptions did you believe there were for

22   communications with employees?

23   A   Okay.  Thank you.  Yeah.  Like I said, I covered Scott

24   Ellington and settlement counsel.  I covered the pot plan.

25   Q   Okay.

Dondero - Cross                           132

1   A    My -- my view of the pot plan as -- my view of the pot

2   plan was that it was very attractive, and I had received

3   encouragement to go forward with it as something that should

4   be workable.  That's my testimony on that.

5        And then -- and we talk about negotiating shared services.

6   So, there's shared services in terms of overlap in

7   functionality, but there's also, in terms of negotiating the

8   shared services agreement, which, as I said, was something

9   that Ellington was put in charge of three or four days ago by

10  Jim Seery to negotiate with us.  And he reached out to me to

11  negotiate it.  And I think the Pachulski deadline on it was

12  three days later.  That whole process was something that I

13  viewed as separate from the TRO, especially since it was

14  initiated by Jim Seery, DSI, et cetera, and consistent with

15  what Scott Ellington's role had been for the last six, nine

16  months.

17  Q    As to the Debtor's request that you vacate the office

18  space, did you comply with this request?

19  A    Yes.

20  Q    What did you think that vacating meant?

21  A    I moved out all my -- my personal items to a new office at

22  NexBank.

23  Q    (faintly)  And, in fact, did you work on the last day over

24  to 3:00 a.m.?

25  A    Yes.  4:00.

Dondero - Cross                                    133

1                THE COURT:  Mr. Bonds, I didn't hear your question.
2       I didn't hear your question.
3                MR. BONDS:  Okay.  I'm sorry.
4       BY MR. BONDS:
5       Q    Did -- isn't it true that you worked through the night, to
6       3:00 or 4:00 a.m., to vacate the premises?
7       A    Yes.  Until 4:00 a.m. on the last day, to organize and
8       pack up all my stuff, yes.
9       Q    Did you think your presence in the office, with no other
10      employees there, violated the spirit of the TRO?
11      A    No.  I thought it was over the top and meant to tweak me,
12      but, yeah, there's no -- there's not Debtor employees coming
13      in since COVID.
14      Q    (faintly)  Okay.  And you thought you could talk to Mr.
15      Ellington and -- as settlement counsel; is that correct?
16               MR. MORRIS:  I'm having trouble hearing it, Your
17      Honor.
18               THE WITNESS:  Yes.
19               THE COURT:  Yeah.  We're -- Mr. Bonds, please make
20      sure you speak into the device.
21               MR. BONDS:  I'm sorry.  I'll try to get closer.
22      Okay.  I asked the Debtor -- or I, excuse me, I asked Mr.
23      Dondero if he thought he could talk to Ellington as a go-
24      between or settlement counsel.  And I asked him if that was
25      correct.

Dondero - Cross                     134

1           THE WITNESS:  Yes.  For settlement, shared services,

2    the pot plan.  Nothing that interrupts or affects the Debtor,

3    but for those purposes, as has consistently occurred for the

4    last six months.

5    BY MR. BONDS:

6    Q    Okay.  And you saw the texts and emails presented by the

7    Debtor between you and Mr. Leventon; is that correct?

8    A    The one regarding Multi-Strat?

9    Q    Yes.

10   A    Yes.

11   Q    In your understanding, did you believe those

12   communications were allowed under the TRO?

13   A    Well, yes.  And, again, to clarify my -- my contrasting

14   testimony, I would never typically have gone to them for that

15   kind of information, but to be compliant with the TRO, for

16   Multi-Strat information, which I needed in order to put

17   together the pot plan that the Independent Board audienced on

18   December 18, I needed the information on Multi-Strat, and I

19   requested it as appropriate through settlement counsel

20   Ellington.  And I think Ellington requested it from Isaac, who

21   requested it from David Klos.

22        The whole purpose, I believe -- my belief is the whole

23   purpose of this TRO is to make it impossible for us to get

24   information to come up with alternatives other than a -- the

25   plan proposed by Jim Seery.  It's our -- if -- if -- without

Dondero - Cross                               135

1   Ellington in the go-between, which he's now no longer an

2   employee, I assume the only way we get any information,

3   balance sheet or anything from Highland Capital, is with a

4   subpoena.

5       And as much as I've tried to engage or make an attractive

6   pot plan for everybody, each one of them has been a complete

7   shot in the dark, without even knowing the assets and

8   liabilities of Highland, but just estimating where they were

9   or were likely to be.

10  Q   Do you believe your text message with Leventon caused any

11  harm to the Debtor's business?

12  A   No.  It potentially fostered a pot plan, because, you have

13  to know, the pot plan needed -- one of the aspects of the pot

14  plan was the --

15  Q   Do you still want to advocate for your pot plan?

16  A   I think that's eventually where we ultimately end up.  Or

17  -- or should end up.  Otherwise, I fear it's going to be an

18  extended, drawn-out process.

19  Q   And how much did you initially propose to pay creditors in

20  this case?

21  A   The most recent -- the most recent pot plan?

22  Q   No.  The -- initially.

23  A   The initial pot plan, I believe, was $160 million.

24  Q   And what about the notes?

25  A   There was $90 [million] of cash and I believe $70

Dondero - Cross                          136

1   [million] of notes.

2   Q    And what is Multi-Strat?

3   A    Multi-Strat is a fund that's managed by Highland.  They

4   used to have $40 or $50 million in value.  It used to contain

5   a lot of life settlement policies.  And I believe now has $5

6   or $6 million of value, after assets have been sold.

7   Q    Do you recall the email Debtor's counsel presented

8   regarding the balance sheet today?

9   A    The balance sheet of Multi-Strat?

10  Q    Correct.

11  A    Yes.

12  Q    Do you believe you were entitled to see that document?

13  A    Yes.  It's just -- again, for the pot plan, I needed it.

14  But also I'm an investor in that fund and I'm entitled to it.

15  It's -- there was nothing in there that was improper or

16  untoward or in any way damaged the Debtor.

17  Q    And you recall the request for documents sent by the

18  Debtor; is that correct?

19  A    On my -- my personal estate plan?

20  Q    No, on Multi-Strat.

21  A    The Debtor's request on -- I'm sorry.  What was that?

22  Q    The Debtor sent you a request for Multi-Strat.  For Duga

23  -- I'm sorry.

24  A    For Dugaboy?  Okay.

25  Q    Dugaboy.

Dondero - Cross                    137

1  A    Yeah.  There's -- there's personal estate planning trusts.

2  Some are active.  Some are inactive.  Some have been around

3  for 15 years.  But they're -- they're not assets or anything

4  that's related to the estate.  And that was -- that was my

5  text to Melissa that said, you know, Not without a subpoena.

6  Q    Mr. Dondero, if you remember back on Exhibit K, there was

7  some request that you terminate your offices at the Crescent,

8  and I think you were given seven days' notice to do that.  Do

9  you know if Christmas occurred during that time?

10 A    I believe it did.

11 Q    So, if Christmas and Christmas Eve are both holidays, how

12 many days, business days, did they give you to terminate or to

13 get out of the space?

14 A    There would have been three business days.  It was Monday

15 through Wednesday that I moved out.

16          MR. BONDS:  Your Honor, I'll pass the witness.

17          THE COURT:  All right.  Mr. Morris?

18          THE WITNESS:  Take a break.  I hope.

19          MR. BONDS:  Your Honor, I'm sorry, can I take a ten-

20 minute break?  I think that I'm going to be through, but I

21 don't know.

22          THE COURT:  All right.  I'll give you a ten-minute

23 break.

24          MR. BONDS:  All right.  Thank you, Your Honor.

25          THE COURT:  We're coming back at 2:15.

Dondero - Cross                                        138

1          THE CLERK:  All rise.

2       (A recess ensued from 2:06 p.m. until 2:16 p.m.)

3          THE CLERK:  All rise.

4          THE COURT:  All right.  Please be seated.  We're back

5    on the record in Highland versus Dondero.  Mr. Bonds, do you

6    have more examination?

7          MR. BONDS:  Your Honor, I have one question.

8          THE COURT:  Okay.

9          MR. BONDS:  And that's --

10          MR. LYNN:  And one more witness.

11          MR. BONDS:  And one more witness.

12                   CROSS-EXAMINATION, RESUMED

13    BY MR. BONDS:

14    Q    Do you think that Scott Ellington and Isaac Leventon were

15    treated appropriately by the Debtor?

16    A    No, I do not.  I don't think they've been treated fairly,

17    nor do I think other senior employees have been treated

18    fairly.  I've never seen a bankruptcy like this where, during

19    complex unwinding of 20 years of various different entities

20    and structures, relying on the staff, working them hard,

21    working overtime, a lot of investment professionals like

22    lawyers and DSI just putting their name on the work of stuff

23    that was done by internal employees, getting to the end of the

24    year, trying to pay people zero bonuses and retract prior

25    years' bonuses, and try and come up with legal charges against

Dondero - Cross                            139

1    those people is unusual to this case and my experience, in the

2    bankruptcies we've been involved in, where typically

3    management teams get paid multiples of current salary to stay

4    on and be the experts.

5        I also think they were put in difficult spots from the

6    very beginning.  It was Jim Seery that made Scott Ellington

7    the settlement counsel six, seven months ago.  It was a

8    broadly-defined role that was never retracted, never adjusted,

9    never modified, yet somehow he and Isaac violated it.  I don't

10   know.  I haven't spoken to them since they've been terminated.

11   They aren't allowed to speak to me, from what I hear.  But I

12   wish them luck in their claims.

13              THE COURT:  Okay.  You pass the witness?

14              MR. BONDS:  Yes, Your Honor.

15              THE COURT:  All right.  Mr. Morris, do you have

16   further examination?

17              MR. MORRIS:  Just a few questions.

18                         REDIRECT EXAMINATION

19   BY MR. BONDS:

20   Q    Mr. Dondero, you knew about this hearing for some time,

21   right?

22   A    No.

23   Q    When did you first learn this hearing was going to take

24   place?

25   A    Two days ago.

Dondero - Redirect                    140

1   Q    Two days ago?

2   A    When was the depo, three days ago?  Whatever.

3   Q    And you didn't know prior to the deposition that we would

4   be having a hearing today on the Debtor's motion for a

5   preliminary injunction?

6   A    No.  I thought it was going to be postponed or canceled.

7   I was waiting for the text last night.

8   Q    You had an opportunity to call any witness in the world

9   you wanted to today, right?

10  A    I guess.

11  Q    You could have called -- you could have called the chief

12  compliance officer at the Advisors if you thought the Court

13  should hear from him as to the compliance issues that you've

14  testified to, right?

15  A    I think their letters stand on their own.

16  Q    Okay.  So you didn't think that it was important for the

17  Court to hear from Mr. Sowin directly, correct?

18  A    Sowin is a trader.

19  Q    I'm sorry.  Who's the chief compliance officer of the

20  Advisors?

21  A    Jason Post, as far as NexPoint is concerned.  He's the one

22  that would have been behind the K&L -- K&L letters.

23  Q    And he is not here today to testify, right?

24  A    I think his letters stand on their own and I think

25  everybody should read them, make sure they read them.

Dondero - Redirect                    141

1   Q    Okay.  But Mr. Post is not here to answer any questions;
2   is that right?
3   A    I don't know if there are any questions beyond what's
4   obviously stated in the letters.  You should read the letters
5   carefully.  They're -- they're -- they talk about clear
6   violations.
7            MR. MORRIS:  Your Honor, I move to strike.  It's a
8   very simple question.
9            THE COURT:  Sustained.  That was another yes or no
10  answer, Mr. Dondero.  Go ahead.
11           THE WITNESS:  I'm sorry.
12  BY MR. MORRIS:
13  Q    Mr. Dondero, Mr. Post is not here to testify in order to
14  explain to the Court what he thinks the regulatory issues are,
15  correct?
16  A    He's not here today.
17  Q    And you could have called him as a witness, correct?
18  A    Yes.
19  Q    And you thought Mr. Ellington and Mr. Leventon were
20  treated unfairly, right?
21  A    Yes.
22  Q    And there's no reason why they couldn't have come today to
23  testify, correct?
24  A    I guess they could have.
25  Q    And there's no reason why anybody on behalf of the K&L

Dondero - Redirect                    142

1    Gates clients couldn't have been here to testify, correct?

2    A    I didn't deem it necessary, I guess.

3    Q    Okay.  You could have offered into evidence, at least

4    offered into evidence, any document you wanted, right?

5    A    Yes.

6    Q    And you could have offered the judge, for example, the

7    shared services agreement, the shared services agreements for

8    which you gave the Court your understanding, right?

9    A    Which shared services, the one that Seery gave Ellington

10   three days ago or the original one from years ago?

11   Q    Any of the ones -- any of the ones that you have referred

12   to today.  You could have given any of them to the judge,

13   right?

14   A    Correct.

15   Q    And you didn't, right?

16   A    I did not.

17   Q    In fact, there's not a single piece of evidence in the

18   record that corroborates anything you say; isn't that right?

19   A    I -- I believe all those documents are in the record.

20   They're just not in the record of this TRO.  But they're all

21   --

22   Q    Oh.

23   A    They're all in the record.

24   Q    Do you remember that there was a hearing on December 16th?

25   I think you -- you testified that you're fully aware of that

Dondero - Redirect                    143

1    hearing that was brought by the K&L Gates Clients.  Do you

2    remember that?

3    A    Yes.

4    Q    Who testified at that hearing on behalf of the K&L Gates

5    Clients?  Dustin Norris?

6    A    I believe -- I believe Dustin Norris testified.

7    Q    Uh-huh.  And what's Mr. Norris's role at the Advisors?

8    A    He's one of the senior managers.

9    Q    Is he a compliance officer?

10   A    No.

11   Q    Is he a trader?

12   A    No.  But he's one of the senior managers.

13   Q    Okay.  They could have called anybody they wanted, to the

14   best of your understanding, right?

15   A    I don't think they got a chance to.  Wasn't it an

16   abbreviated hearing?

17   Q    They offered Mr. Norris as a witness.  Do you understand

18   that?

19   A    I -- all I -- I wasn't there.  I didn't attend virtually.

20   I -- but I did know that Norris testified.  But I don't know

21   who else was called, wasn't called, was going to be called,

22   was on the witness list.  I have no awareness.

23   Q    Okay.  You were pretty critical of the trades that Mr.

24   Seery wanted to make that you interfered to stop, right?

25   A    I think he's subsequently done most of those trades.

Dondero - Redirect                    144

1    Q    And you called them preposterous because he wanted to do

2    it around Thanksgiving or around Christmas, at least based on

3    your testimony, correct?

4    A    That's when it did occur.

5    Q    And is it your testimony -- is it your testimony that

6    every single person in the world who trades securities near a

7    holiday is making a preposterous trade?

8    A    I think it's amateur and not what an investment

9    professional would do.

10   Q    So you never trade on holidays; is that your testimony?

11   You've never done it once in your life?

12   A    Very rarely, unless there's another overriding reason.

13   And there was no overriding reasons, period.

14   Q    How would you know that when you didn't even ask Mr. Seery

15   why he wanted to make the trades?

16   A    I asked Joe Sowin, who asked Jim Seery.  And Joe Sowin

17   said that Jim Seery just said for risk reduction.

18            MR. MORRIS:  I move to strike on the grounds that

19   it's hearsay, Your Honor.

20            THE COURT:  Sustained.

21   BY MR. MORRIS:

22   Q    You never asked Mr. Seery why he wanted to make the

23   trades, correct?

24   A    I'm not allowed to talk to Mr. Seery.

25   Q    You certainly were around Thanksgiving; isn't that right?

```
 1   A    I don't know.

 2   Q    There was no TRO in place at that time, correct?

 3   A    That's true.

 4   Q    You're pretty critical of Mr. Seery and his capabilities;

 5   is that right?

 6   A    He's a lawyer.  He's not an investment professional.

 7   Q    Did you object to his appointment as the CEO of the

 8   Debtor?

 9   A    No.

10   Q    Have you made any motion to the Court to have him removed

11   as unqualified?

12   A    Not yet.

13   Q    Okay.  But with all the knowledge of all the preposterous

14   things that he's been doing for months now, you haven't done

15   it, right?

16   A    No.

17   Q    When you -- when -- before you threw the phone in the

18   garbage, did you back it up?

19   A    No.

20   Q    Did it occur to you that maybe you should save the data?

21   A    No.

22   Q    You said that the only way you think you might be able to

23   get information going forward is through a subpoena.  Do I

24   have that right?

25   A    I mean, that's how it seems.  I mean, it seems at every
```

Dondero - Redirect                           146

1  turn -- and now with Scott Ellington being gone and Isaac

2  being gone -- I have no idea how the Debtor is ever going to

3  defend against UBS.

4           THE COURT:  I did not --

5           THE WITNESS:  I have no idea how --

6           THE COURT:  I didn't hear the answer after with

7  Ellington and Leventon being gone.  I didn't hear the rest of

8  the answer.  Could you repeat?

9           THE WITNESS:  I said I have no idea how the Debtor is

10 ever going to defend itself against UBS.  But I also have no

11 idea how we're ever going to get any information or ever push

12 forward any kind of settlement without having any access to

13 information or anybody to talk to.

14 BY MR. MORRIS:

15 Q   Do you trust Judge Lynn?

16     (Echoing.)

17 A   Yes.

18 Q   Is he a good advocate?

19 A   Yes.  If anybody returns his phone calls.

20 Q   Do you recall that on October 24th Judge Lynn specifically

21 asked my law firm to provide information on your behalf in

22 connection with the Debtor's financial information, their

23 assets and their liabilities?

24 A   Yes.

25 Q   Do you recall that the Debtor simply asked that you

Dondero - Redirect                    147

1   acknowledge in an email between and among counsel that you

2   would abide by the confidentiality agreement that was entered

3   by the Court?

4   A    I wasn't involved in those details.

5   Q    Didn't you send an email in which you agreed to receive

6   the financial information subject to the protective order that

7   this Court entered?

8   A    I'm sure I would.  I just don't remember.

9   Q    That was a condition that the Debtors made.  That doesn't

10  refresh your recollection?

11  A    I'm not denying it.  I just don't remember, and --

12  Q    Okay.  And --

13  A    (overspoken)

14  Q    I'm sorry, I don't mean to cut you off.  And in fact, on

15  December 30th, the day you were supposed to vacate the office,

16  the Debtor voluntarily provided to Judge Lynn all of the

17  information that had been requested on your behalf without the

18  need for a subpoena, right?

19  A    Yeah.  It took a week.  It's 40,000 pages of mixed

20  gobbledygook that we're -- we're going through.  But it should

21  provide enough information for us to negotiate a pot plan if

22  anybody so chose.

23  Q    So you didn't need to (echoing) the 40,000 pages of

24  financial information from the Debtor; all you needed was an

25  agreement that you would abide by the protective order.

Dondero - Redirect                    148

1  Correct?

2  A   I think that was the first thing that was ever produced on

3  request that I can remember.  But yes.

4  Q   And it was just a week ago, right?

5  A   Yes.

6         MR. MORRIS:  I have no further questions, Your Honor.

7         THE COURT:  All right.  Mr. Bonds, do you have

8  anything else?

9         MR. BONDS:  I do not, Your Honor, as to this witness.

10  I have one other witness.

11         THE COURT:  All right.

12         MR. MORRIS:  Your Honor, I don't know who they plan

13  on calling, but he's not on the witness list.

14         THE COURT:  All right.  Well, --

15         MR. BONDS:  Your Honor, this other witness --

16         THE COURT:  Just a moment.  This concludes, for the

17  record, Mr. Dondero's testimony.  But, obviously, stick

18  around, because we're going to have a lot to talk about when

19  this is finished as far as the evidence.

20     All right.  Now, who are you wanting to call that you did

21  not identify?

22         MR. BONDS:  I'd like to call Mike Lynn for the

23  purpose -- or, to -- as a rebuttal witness.

24         THE COURT:  Lawyer as witness?

25         MR. MORRIS:  Your Honor?

Case 19-34054-sgj11  Doc 3445-68  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 150
Case 3:23-cv-00726-S   Document 8-24   Filed 06/29/23   Page 1144 of 1598   PageID 14191
of 206

149

1              THE COURT:  Well, you know, first off, rebuttal of

2    what?  Rebuttal --

3              MR. MORRIS:  Exactly.  He's going to rebut his own

4    client, Your Honor?  He's going to rebut his own client?

5    There's only been one witness to testify here.  He was on

6    their exhibit list.  How do they call a witness to rebut their

7    own client?

8              THE COURT:  Yes.  What -- I don't --

9              MR. BONDS:  Your Honor?

10             THE COURT:  Go ahead.

11             MR. BONDS:  Mr. Morris testified or attempted to

12   testify that the pot plan didn't gain any traction.  We will

13   submit Mike Lynn on that issue.

14             THE COURT:  No.

15             MR. MORRIS:  Your Honor?

16             THE COURT:  I'm not going to allow a lawyer to

17   testify to rebut lawyer argument.  That's very inappropriate,

18   in my view.  So, not going to happen.

19             MR. LYNN:  (garbled)

20             MR. BONDS:  Your Honor, he would be a fact witness to

21   discussions with the other side.

22             MR. MORRIS:  Your Honor, I strenuously object.

23   They're -- he's only rebutting -- my questions are not

24   evidence.  The only evidence in the record is Mr. Dondero's

25   testimony.  Mr. Dondero is their client.  Mr. Dondero was on

150

```
 1   their witness list.  They should not be permitted to call any

 2   witness, with all due respect to Mr. Lynn, to rebut their own

 3   witness.

 4            THE COURT:  All right.

 5            MR. BONDS:  Your Honor, we're not rebutting our

 6   witness.  We are rebutting the testimony that Mr. Morris gave.

 7            THE COURT:  Mr. Morris is a lawyer.  He makes

 8   argument.  He asks questions.  He was not a witness today.

 9   Okay?

10       So if you want to say whatever you want to say as lawyers

11   in closing arguments, then obviously you can do that.  But I'm

12   not going to allow a lawyer to be a witness to rebut something

13   another lawyer said in argument or in a question.  I -- it's

14   -- so, I disallow that.

15       Anything else, then?

16            MR. BONDS:  No.

17            THE COURT:  Okay.  And while we're talking about

18   procedure, actually, Mr. Morris, it's the Debtor's motion, and

19   I'm not even sure that's all of your evidence.  So, do you

20   have any more evidence as Movant?

21            MR. MORRIS:  No, Your Honor.  The Plaintiff and the

22   Debtor rest.

23            THE COURT:  All right.  So, at the risk of repeating,

24   now that the Movant has rested, it would be Mr. Dondero's

25   chance to put on supplemental evidence.  But what I'm hearing
```

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 152
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 Page 1146 of 1598 PageID 14193

151

1   from Mr. Morris is there were no witnesses identified on your

2   witness list?

3          MR. BONDS:  Other than Mr. Dondero, Your Honor.

4          THE COURT:  Okay.  All right.  Well, was there any

5   stipulated documentary evidence that -- that you had --

6          MR. BONDS:  No, Your Honor.

7          THE COURT:  All right.  Well, I guess we're done with

8   evidence.

9       Mr. Morris, your closing argument?

10         MR. MORRIS:  All right.  Before I get to that, Your

11  Honor, I just want to make a very brief statement.  When the

12  Debtor objected to Mr. Dondero's emergency motion for a

13  protective order, the Debtor stated that it sought discovery

14  from Mr. Dondero to determine whether Mr. Dondero may have

15  violated the TRO by interfering and impeding the Debtor's

16  business, including by potentially colluding with UBS.  After

17  that motion was decided, both Mr. Dondero and UBS produced

18  documents to the Debtor.

19      Based on the review of that information, the Debtor found

20  no evidence that Mr. Dondero and UBS colluded to purchase

21  redeemed limited partnership interests of Multi-Strat, nor any

22  inappropriate conduct by UBS or its counsel.

23      The Debtor appreciates the opportunity to clear that part

24  of the record.

25         THE COURT:  All right.

1              CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

2              MR. MORRIS:  Now, with respect to the motion at hand

3    today, Your Honor, I want to take you back just about a month

4    ago to December 10th, 2020.  At that time, we had a hearing on

5    the Debtor's motion for a TRO.  The motion had been filed in

6    advance.  Mr. Dondero had filed an objection.  He had concerns

7    about the scope and the language of the terms of the proposed

8    TRO.

9         And at that hearing, Your Honor, if you'll recall, you

10   listened carefully to the arguments that were made on behalf

11   of Mr. Dondero.  You heard carefully -- you listened carefully

12   to the proposed changes that he sought to make.  And you went

13   through that proposed TRO word by word, Paragraph 2 and 3, and

14   you read them out loud, and you made decisions at that time as

15   to whether the Court believed any portion of that was

16   ambiguous or whether it was clear.  You made determinations at

17   that time whether or not the provisions were reasonable.

18        Mr. Dondero wasn't there.  He didn't read the transcript.

19   He has no idea what you said.  But his lawyers were there, and

20   they had an opportunity to object and they had an opportunity

21   to make comments, and the order is what the order is.  And for

22   whatever reason, Mr. Dondero chose not to read it, or,

23   frankly, even understand it, based on his testimony.

24        The fact is, Your Honor, the one thing that the evidence

25   shows very clearly here is that Mr. Dondero thinks that he is

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 154
Case 3:23-cv-00726-S   Document 8-24   Filed 06/29/23   of 206   Page 1148 of 1598   PageID 14195

153

1    the judge.  He believes that he is the decider.  He believes

2    that he decides what the TRO means, even though he never read

3    it.  He believes that he decides what exceptions exist in the

4    TRO, even though he never read it.

5         He believes that he decides that it's okay to ditch the

6    Debtor's cell phone without even seeking, let alone obtaining,

7    the Debtor's consent.  I guess he decides that he can ditch

8    the phone and trash it without seeking to back it up or

9    informing the Debtor.

10        Mr. Dondero believes that he gets to decide that it's okay

11   to take a deposition from the Debtor's office, even when the

12   Debtor specifically says you're evicted and you're not allowed

13   to have access.

14        Mr. Dondero believes that he gets to decide that Mr. Seery

15   has no justification for making trades, even though he

16   couldn't take the time to pick up the phone or otherwise

17   inquire as to why Mr. Seery wanted to do that.

18        Mr. Seery -- Mr. Dondero believes that he is the arbiter

19   and the decision-maker and gets to decide to stop trades,

20   notwithstanding the TRO, notwithstanding the CLO agreements

21   that he is not a party to, that his entities are not a party

22   to.

23        Mr. Dondero thinks that he gets to decide that the Debtor

24   has breached the agreements with the CLOs.  He gets to decide

25   that the Debtor is in default under those agreements.  He gets

154

1  to decide that it's perfectly fine for Ellington and Leventon

2  to support his interests while they have obvious duties of

3  loyalty to the Debtor.

4       It is not right, Your Honor.  It is not right.  I stood

5  here, I sat here, about four hours ago, five hours ago, and

6  told the Court what the evidence was going to show, and it

7  showed every single thing that I expected it to show and

8  everything I just described for the Court about Mr. Dondero's

9  belief that he's the decider.

10      He's not the decider, Your Honor.  You are.  And you made

11  a decision on June -- on December 10th that he ignored.

12      There is ample evidence in the record to support the

13  imposition of a preliminary injunction.  And Your Honor, I'm

14  putting everybody on notice now that we're amending our

15  complaint momentarily to add all of the post-petition parties,

16  because this has to stop.  The threats have to stop.  The

17  interference has to stop.  Mr. Dondero can always make a

18  proposal if he thinks that there's something that will capture

19  the imagination and the approval -- more importantly, the

20  approval -- of the Debtor's creditors.  We have no interest in

21  stopping him from doing that.  He's got very able and

22  honorable counsel, and he can go to them and through them any

23  time he wants.

24      But the record is crystal clear here that, notwithstanding

25  Your Honor's order, one entered after serious deliberation, is

155

 1   of no meaning to him.  And we'll be back at the Court's

 2   convenience on the Debtor's motion to hold him in contempt.

 3   It'll just be a repeat of what we've heard today, because,

 4   frankly, the evidence is exactly the same.

 5        With that, Your Honor, unless you have any questions, the

 6   Debtor rests.

 7             THE COURT:  All right.  I do not.

 8        Mr. Bonds?

 9             MR. BONDS:  Your Honor, we would like to divide our

10   time between Mike Lynn and myself.  Is that a problem?

11             THE COURT:  That's fine.  Go ahead.

12             MR. LYNN:  Are we on mute?

13             MR. BONDS:  No.

14             CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

15             MR. LYNN:  Your Honor, I'm taking a leaf out of Mr.

16   Phelan's book.  I happened to read the confirmation hearing in

17   the *Acis* case regarding what was referred to as Clients A, B,

18   and C.  And Mr. Phelan, who testified, really gave an oral

19   argument to the Court which was very persuasive and very

20   thorough.  So I'm going to sort of do the reverse, because I

21   hope that the Court would find useful some information

22   regarding the pot plan about which you've heard many words

23   spoken but very little to do with what that plan was or how it

24   came about.

25        The pot plan was proposed by Mr. Dondero for the first

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 157
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 Page 1151 of 1598 PageID 14198

156

1    time in September of 2020, shortly after the conclusion of the

2    first round of mediations.  Though there had been versions of

3    it before, and lesser versions, the pot plan was finally in

4    the form that would more or less survive it in September.

5    Under the pot plan, Mr. Dondero proposed to come up with $90

6    million of cash and $70 million in promissory notes, and that

7    was to form a pot which creditors would share in.

8        The proposal was provided to the Debtor and then shared

9    with the Committee.  Mr. Seery responded with a degree, a

10   degree only, of enthusiasm to the pot plan, and indeed

11   provided a counter-term sheet to the pot plan.  He also, so he

12   said, and I believe him, approached the Committee and said

13   this is a proposal to be taken seriously.

14       He proposed some improvements in his view to the pot plan.

15   No response was received from the Creditors' Committee at that

16   time.

17       After going back and forth with the Debtor -- and Mr.

18   Seery, not unreasonably, was unwilling to propose the pot plan

19   without some support on the Creditors' Committee -- I

20   contacted Matt Clemente.  We had a nice conversation.  And at

21   that time, Mr. Clemente raised two particular concerns.  The

22   $160 million, which creditors did not think was enough, was

23   not enough, in part, because that included no consideration

24   for the acquisition of promissory notes executed some by Mr.

25   Dondero and some by entities controlled by Mr. Dondero, which

157

 1   notes total approximately $90 million.

 2       The second concern was that Mr. Dondero would get a

 3   release under the plan.  During that call, I said the issue of

 4   the notes is subject to negotiation and might well result in a

 5   transfer of those notes, possibly with some amendments, to the

 6   pot, and that Mr. Dondero was prepared, in all likelihood, to

 7   forego a release.

 8       Mr. Clemente agreed to get back to me.  He did.  And he

 9   said to me, I have talked to the Committee about this and they

10   would like you to go to or they want you to go first to Mr.

11   Seery, work off of his revised timesheet -- or term sheet,

12   sorry -- and after you have reached an agreement with him,

13   come to us, come to the Committee, and we'll negotiate with

14   you.

15       Now, I might have agreed that that was a reasonable

16   approach if there were a possibility that Mr. Seery would

17   propose a plan without the agreement of creditors.  But the

18   way I took it was that the Committee was saying go make a deal

19   with Seery and then we'll start negotiating, and we know,

20   correctly, that Mr. Seery will not propose a plan that does

21   not have our support.

22       So, effectively, we get to go through two rounds of

23   negotiations, even though effectively everything that is in

24   the estate, everything -- causes of action against Mr.

25   Dondero, promissory notes from Mr. Dondero -- everything that

158

1    they would get under a plan or under a liquidation, they would

2    get under the pot plan.

3         Now, I wanted you to know that, Your Honor, not because

4    I'm now trying to get you or anyone else to sell the pot plan.

5    But I think it's important that Your Honor know that Mr.

6    Dondero's approach in this case has not been a hostile

7    approach.

8         I know the Court had what it found to be an unsatisfactory

9    experience with Mr. Dondero in the *Acis* case.  But from the

10   time I became involved in this case and Mr. Bonds became

11   involved, we have been quiet, we have said nothing, and we've

12   done virtually nothing in the case, up until the time after

13   the mediation, when negotiations regarding a pot plan broke

14   down.

15        Since that time, regrettably, there has been a good deal

16   of hostility, and it's spreading.  I would like to see it stop

17   spreading.  I will do what I can to make it stop spreading.

18   But I need others to help me on that.  And it's my hope that I

19   can count on the Pachulski law firm, the Sidley law firm, and

20   the firms representing the major creditors to help make that

21   happen.

22        I do not think, and I would submit that it is not to the

23   benefit of the estate, it is not to the likely workout of this

24   case, that it would be best served by entering a preliminary

25   injunction, which it appears to me prevents Mr. Dondero from

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 160
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 of 206 Page 1154 of 1598 PageID 14201

159

1  saying good morning to one of the employees of the Debtor that

2  he knows.

3      It seems to me, Your Honor, that the injunction, by its

4  terms, as Mr. Morris would have it, is an injunction that

5  would prevent Mr. Dondero from discussing politics with Mr.

6  Ellington. And it seems to me that an injunction that broad,

7  that extensive, and one which lasts, as far as I can tell,

8  until infinity, that such an injunction is not the right thing

9  to do, given, if nothing else, the First Amendment to the

10 United States Constitution.

11     That will conclude my presentation, and I will turn it

12 over to the wiser and better-spoken colleague, John Bonds.

13 Thank you, Your Honor.

14         THE COURT: Thank you. Mr. Bonds, what else do you

15 have to say?

16         CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17         MR. BONDS: Your Honor, has the Debtor met the

18 requirements for the issuance of a preliminary injunction? We

19 submit that they have not. And the Fifth Circuit's rules are

20 fairly clear as to the awarding of a preliminary injunction.

21     First, let's look at the type of preliminary injunction

22 that the Debtor would like you to enter today. It provides

23 that Mr. Dondero cannot talk to any employee, regardless of

24 what is being communicated. Mr. Dondero can pass an employee

25 on the street, but he can't acknowledge the employee, with

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 161
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 of 206 Page 1155 of 1598 PageID 14202

160

1    whom he may have worked for years.  Nor can he talk to his

2    personal assistants, again, which he has worked with for

3    years.  Does that violate the First Amendment of the

4    Constitution?

5        What about the shared services agreement?  What about the

6    pot plan which he is advocating as a means of reorganizing the

7    Debtor?  Not the liquidation proposed by the Debtor.  Can Mr.

8    Dondero communicate with creditors about the pot plan and the

9    other proposals without violating the TRO or the preliminary

10   injunction which deals with interfering with the Debtor's

11   business?

12       Your Honor, I think it's important to note that a

13   preliminary injunction is an extraordinary remedy that may

14   only be awarded upon a clear showing that the Plaintiff is

15   entitled to such relief.  Plaintiffs are entitled to a

16   preliminary injunction if they show, one, a substantial

17   likelihood that they will prevail on the merits of their

18   claims; two, a substantial threat that they will suffer an

19   irreparable injury if the injunction is not granted; three,

20   their threatened injury outweighs the harm to the estate or

21   the other party; and four, the public interest will not be

22   disserved, misserved, if the preliminary injunction is

23   granted.

24       The party seeking the preliminary injunction bears the

25   burden of persuasion on all four requirements.  We believe

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 162
of 206
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 Page 1156 of 1598 PageID 14203

161

1   that the Debtor today has failed to carry its burden of

2   persuasion of proof with regard to the second element, which

3   I'm going to refer to as the irreparable injury requirement.

4   In order to show irreparable harm to the Court, the Plaintiff

5   must prove that if the District Court denied the grant of a

6   preliminary injunction, irreparable harm would be the result.

7   Injuries are irreparable only when they cannot be undone

8   through monetary remedies.  There is no evidence before the

9   Court today that Mr. Dondero cannot respond to any judgment

10   that is rendered against him by this Court.

11       Your Honor, this preliminary injunction does not involve

12   real property.  Unlike the *Saldana* case, this request for the

13   issuance of a preliminary injunction involves personal

14   property only.  The request that Mr. Dondero cease and desist

15   all contact with employees is just wrong and may violate the

16   First Amendment of the Constitution, as I previously stated.

17       We have other concerns regarding the issuance of a

18   preliminary injunction.  We feel that the preliminary

19   injunction is too broad.  It lacks a beginning and an end.

20   When does the preliminary injunction terminate?  What about

21   the former employees?  Once they are terminated, can Mr.

22   Dondero speak to them?  What about the pot plan?  Is it gone

23   forever?  Can Mr. Dondero talk with the mediators about the

24   pot plan?  Can Mr. Dondero speak with the members of the

25   U.C.C.?

162

1       It is easy to criticize Mr. Dondero.  Did he violate the

2   TRO?  We submit that he didn't and the Debtor says that he

3   did.  What matters going forward is the lack of evidence of

4   irreparable harm.

5       Mr. Seery sure wants to keep Mr. Dondero from talking to

6   anyone in this case.  Why is that?  Does Mr. Seery believe

7   that the only way to get his liquidation plan confirmed is to

8   keep Mr. Dondero from talking to anyone?  How will the

9   preliminary injunction help the Debtor's creditors?  Does

10  keeping Mr. Dondero from talking with anyone mean that there

11  will be a greater return to the creditor body?  Does

12  precluding Mr. Dondero from talking about his pot plan mean

13  that the creditors will take home more money on their claims,

14  or does it eliminate the possibility that they may take home

15  more money on their claims?

16      Your Honor, what we are seeing here today is an attempt by

17  a group to destroy what Mr. Dondero has built over the last

18  few years.  That isn't the way Chapter 11 should work.

19      Just one last thing to keep in mind, Your Honor.  Mr.

20  Seery's plan is a liquidation of the Debtor.  Mr. Dondero's

21  pot plan is a reorganization of the Debtor.

22      Thank you, Your Honor.

23          THE COURT:  All right.  Mr. Morris, you get the last

24  word.  Anything in rebuttal?

25          MR. MORRIS:  I would just point out, Your Honor, that

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 164
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 Page 1158 of 1598 PageID 14205

163

1    nobody here has objected to the Debtor's motion for the entry

2    of a preliminary injunction except Mr. Dondero.  While I

3    appreciate that this is an adversary proceeding, anybody who

4    felt strongly about the matter certainly could have moved to

5    intervene.  The Creditors' Committee could have moved to

6    intervene.  Mr. Clemente could have stood at the podium and

7    begged Your Honor not to impose the injunction because he

8    thought it was in the best interest of creditors to allow Mr.

9    Dondero to interfere with the Debtor's business and to speak

10   with their employees.  Nobody has done that, Your Honor.

11   Nobody's here speaking on behalf of Mr. Dondero.  Nobody's

12   here to testify on his behalf.  Nobody's -- there's no

13   evidence in the record that supports or corroborates anything

14   that he said at all, Your Honor.

15       Unless Your Honor has any specific questions, the Debtor

16   is prepared to rest.

17            THE COURT:  All right.  I do not have any follow-up

18   questions.

19       All right.  I have a lot to say.  I'm sorry, I apologize

20   in advance, but I've got a heck of a lot to say right now.

21   I'm going to give you a ruling on the motion before me, but

22   I've got a lot to add onto that, so I hope all the key parties

23   in interest are listening carefully.  Mr. Bonds, in the video,

24   I can only see you.  I hope Mr. Dondero is just right there

25   out of the video camera view.  Okay, there you are.  I wanted

164

1   to make sure you didn't wander off to take a bathroom break or

2   anything.  So, again, I have a whole lot to say here today.

3       First, I'm going to rule on the motion.  The Court does

4   find there is sufficient compelling evidence to grant a

5   preliminary injunction that is completely consistent with the

6   prior TRO.  Okay?  So, specifically, the Court today is going

7   to continue to prevent Mr. Dondero from (a) communicating in

8   any way, directly or indirectly, with any of the Debtor's

9   board members -- I think that's really Strand board members --

10  unless Mr. Dondero's counsel and counsel for the Debtor are

11  included.  Okay.  I'm saying those words slowly and carefully.

12  There is no bar on Mr. Dondero talking to the board about a

13  pot plan or anything else in the universe Mr. Dondero wants to

14  talk to them about.  There's just a preclusion from him doing

15  it without his counsel and the Debtor's counsel present.

16  Okay?

17      I did that before and I'm doing it now because I've seen

18  concerning evidence that some communications to Mr. Seery and

19  others had an intimidating tone, a threatening tone one or two

20  times, an interfering tone.  So, guess what, we're just going

21  to have lawyers involved if any more conversations happen.

22  Okay.

23      So (b) the preliminary injunction, just as the TRO did, is

24  going to prevent Mr. Dondero from making any threats of any

25  nature against the Debtor or any of its directors, officers,

165

1   employees, professionals, or agents.  Okay.  It's almost

2   embarrassing having to say that or order that with regard to

3   such an accomplished and sophisticated person, but, you know,

4   I saw the evidence.  I've got to do what I've got to do.  You

5   know, words in a text like, Don't do it, this is your last

6   warning, and some of the other things, that has a threatening

7   tone, so I'm going to order this.

8       Third, the preliminary injunction will prevent Mr. Dondero

9   from communicating with any of the Debtor's employees except

10  as it specifically relates to shared services provided to

11  affiliates owned or controlled by Mr. Dondero.

12      Now, I'm going to elaborate in a couple of ways here.  I

13  think in closing argument there was a suggestion that he can't

14  even talk to his friend, Mr. Ellington, about anything.  Well,

15  I heard today that Mr. Ellington and Mr. Leventon are no

16  longer employees of the Debtor, so actually that's not an

17  issue.  But while this is very restrictive, while this

18  prevents Mr. Dondero from engaging in small talk with Debtor

19  employees about the weather or the football game or whatever,

20  it's regrettable, but I feel like I'm forced to order this

21  now, because, again, the communications that were put in the

22  record.  Okay?  We just can't take any chances, as far as I'm

23  concerned, with regard to there being potential interference

24  with the Debtor's operations that might be harmful or contrary

25  to creditors' interests.

1      Fourth, the preliminary injunction, just like the TRO,

2   will prevent Mr. Dondero from interfering with or otherwise

3   impeding the Debtor's business, including but not limited to

4   the Debtor's decisions concerning its operations, management,

5   treatment of claims, disposition of assets owned or controlled

6   by the Debtor, and pursuit of any plan or alternative to the

7   plan.

8      Now, I understand the argument that this is pretty broad

9   and might be, I don't know, subject to some disputes regarding

10  was it interference, did it impede the Debtor's business or

11  not?  You know what, if you follow the other prongs of the

12  preliminary injunction, that you don't talk to the board

13  without your counsel, Mr. Dondero, and the Debtor's counsel,

14  and you don't talk to Debtor's employees except with regard to

15  matters pertaining to the shared services agreement, and,

16  bottom line, if you just run everything by your attorneys,

17  you'll be okay.  We won't have this ambiguous, vague,

18  problematic territory.

19     Fifth, I will go ahead and, for good measure, belts and

20  suspenders, whatever you want to call it, prevent Mr. Dondero

21  from otherwise violating Section 362(a) of the Bankruptcy

22  Code.

23     Now, I read the response filed at 9:30 last night by Mr.

24  Dondero's counsel.  It's a good response.  It makes legal

25  arguments about that being, you know, it just being too vague.

 1  Well, to the contrary, it just restates what's already in the

 2  Bankruptcy Code, right?  Persons are prohibited from violating

 3  Section 362(a) of the Bankruptcy Code.  If anything, it's the

 4  sky is blue, right, just stating what is true.  But I

 5  understand Debtor wanting some clarity in an order, because we

 6  want you to take this seriously, Mr. Dondero, and not just do

 7  something and then say, well, you didn't know what was in the

 8  Code.  You know, you need to consult with your lawyer.  That's

 9  going to be in there.

10      Bottom line, I want that language in there because, Mr.

11  Dondero, I want you to see an order that this Court expects

12  you to comply with the Bankruptcy Code.  And again, if you

13  don't understand, if you're unsure whether you can take action

14  $x$ or $y$, consult with your very capable lawyers.

15      I note that if you listened carefully to these words,

16  there was nothing in here that stopped Mr. Dondero from

17  talking to the Creditors' Committee about a pot plan.  Nothing

18  in this injunction, nothing in the previous TRO, ever

19  prohibited that.

20      Last, with regard to the ruling -- and again, I've got a

21  lot more to say when I'm done -- I am going to further enjoin

22  Mr. Dondero from what we said in the TRO:  causing,

23  encouraging, or conspiring with any entity controlled by him

24  and/or any person or entity acting on his behalf from directly

25  or indirectly engaging in any of the aforementioned items.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 169
of 206
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 Page 1163 of 1598 PageID 14210

168

1   This is not an injunction as to nonparties to the adversary

2   proceeding.  It is an injunction as to Mr. Dondero from doing

3   the various enjoined acts that I previously listed under the

4   guise of another entity or a person that he controls.

5        Again, if you're dealing with and through your attorneys,

6   Mr. Dondero, I don't think this will be hard to maneuver.

7        I guess I'm actually not through with my ruling yet.  I do

8   want to add that the Court rules that the injunction shall

9   last through the time of confirmation of a plan in this case

10  unless otherwise ordered by this Court.

11       And as to the legal standards, I want to be clear for the

12  record that the Court believes this injunction is necessary to

13  avoid immediate and irreparable harm to the Debtor's estate

14  and to its reorganization prospects.  I believe that there's a

15  strong likelihood the Debtor will succeed in a trial on the

16  merits of this adversary proceeding.  I believe the public

17  interest strongly favors this injunction.  And I believe the

18  balance of harms weighs in favor of the Debtor on all of these

19  various issues.

20       Again, I want to reiterate, the intimidation and

21  interference that came through in some of these email and text

22  communications was concerning to the Court and is a motivation

23  for this preliminary injunction.

24       Now, I'm going to add on a couple of things today.  The

25  first thing I'm going to add on -- and I want this, Mr.

169

1    Morris, in the order you submit.  You didn't ask me for this,
2    but I'm going to do it.  I'm going to order you, Mr. Dondero,
3    to attend all future hearings in this bankruptcy case unless
4    and until this Court orders otherwise.  And I'm doing this --
5    it's not really that unusual a thing for me to do.  I
6    sometimes order this in cases when I'm concerned about, you
7    know, is the businessperson paying attention to what's going
8    on in the case and is he engaged, is he invested, is he
9    available when we need him?
10        In this case in particular, the evidence was that you
11   didn't read the TRO.  You were not aware of its basic terms
12   and you didn't read it.  Okay?  So that was what sent me over
13   the edge as far as requiring this new element that you're
14   going to attend every hearing.  Obviously, we're doing video
15   court, so that's not that much of a burden or imposition.  You
16   can pretty much be anywhere in the world and patch in by
17   video, since we're in the pandemic and not doing live court.
18   But I think it's necessary so I know you hear what I rule and
19   what goes on in this case.
20        I will tell you that I was having a real hard time during
21   your testimony deciding if I believe you didn't read the TRO
22   or know about the different things that were prohibited.  You
23   know, I was thinking maybe you're not being candid to help
24   yourself in a future contempt hearing, or actually maybe
25   you're being a hundred percent honest and candid but you're

170

1   kind of hiding behind your lawyers so that you can argue the

2   old plausible deniability when it suits you.

3       But no more.  No more.  I'm not going to risk this

4   situation again of you not knowing what's in an order that

5   affects you.  So you must be in court by video until I order

6   otherwise.

7       Second, and I regret having to do this, but I want it

8   explicit in the preliminary injunction that Mr. Dondero shall

9   not enter Highland Capital Management's offices, regardless of

10  whether there are subleases or agreements of Highland

11  affiliates or Dondero-controlled entities to occupy the

12  office, unless Mr. Dondero has explicit written permission

13  that comes from Highland's bankruptcy counsel to Dondero's

14  bankruptcy counsel.  Okay?  If he does, it will be regarded as

15  trespassing.

16      And, I don't know, are there security guards on the

17  premises?  I mean, gosh, I hate to be getting into this

18  minutia, but -- well, I just want it explicit in the order

19  that Mr. Dondero, I'm sorry, but you can't go to these offices

20  without written permission.  And again, that can only be given

21  from Debtor's counsel to Mr. Dondero's counsel.  Okay?  So

22  it's going to be trespassing.  You know, someone can call the

23  Dallas Police Department and have you escorted out.  Again, I

24  hate having to do that.  It's just, it's embarrassing for me.

25  I think it's embarrassing for everyone.  But I'm backed up in

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 172
Case 3:23-cv-00726-S   Document 8-24   Filed 06/29/23    Page 1166 of 1598   PageID 14213
of 206

171

1   that corner.

2       Next, I am going to ask that it be clear that Mr. Dondero

3   can deal with the Unsecured Creditors' Committee and its

4   professionals with regard to talking about a pot plan.

5       And next, I'm going to add -- and I think, Mr. Morris, you

6   requested this at some point today in oral argument -- Mr.

7   Ellington and Mr. Leventon shall not share any confidential

8   information that they received as general counsel, assistant

9   general counsel for the Debtor, without Debtor's counsel's

10  explicit written permission.  Okay?  So we've got that in

11  writing.

12      And, you know, that's a little awkward because they're not

13  here, they weren't parties to the injunction, but they were

14  Debtor employees until recently.  If they want to risk

15  violating that and come back to the Court and argue about

16  whether they got notice and whatnot of that, they can argue

17  that, but I want it in the order regardless.

18      So that is the ruling.  And now I want to kind of talk

19  about a few other things.  And before we're done here, Mr.

20  Morris, I'll ask do you have questions, does Mr. Bonds have

21  questions, does anyone have questions about the ruling.  But I

22  want to talk about a couple of things.  And again, I hope that

23  I'm coming through loud and clear, Mr. Bonds, in your office

24  for Mr. Dondero to hear this.  It's really, really important

25  that he heard what I'm about to say.  I'm going to say some

172

 1   kind of unpleasant things and then I'm going to say some

 2   hopeful things, okay?

 3      Mr. Dondero?  Okay.  Mr. Dondero, I'm going to -- Mr.

 4   Morris, you've got your hands on your head.  Did I miss

 5   something?

 6            MR. MORRIS:  No.  I was just surprised to see Mr.

 7   Dondero on his phone.  I apologize, Your Honor.

 8            THE COURT:  Oh, my goodness.  Were you on your phone,

 9   Mr. Dondero?

10            MR. DONDERO:  No, I was not.

11            THE COURT:  Okay.  I want you to listen to this

12   really closely, and then I promise I'm going to have something

13   hopeful to say after this very unpleasant stuff.  You know, I

14   keep a whiteboard up at my bench.  I don't know if you can

15   read it.  But sometimes I hear something in a hearing and I

16   think, okay, this is one of my major takeaways from what I

17   heard today.  And I've got two, I've got two big takeaways

18   here.  Number one on my whiteboard is Dondero's spoliated

19   evidence.  Game-changer for all future litigation.  Okay.

20            MR. DONDERO:  I'm sorry.  I didn't hear that.  I

21   didn't hear that.  Could you repeat that, please?

22            THE COURT:  Mr. Dondero, spoliated evidence, game-

23   changer in future litigation.

24      Okay.  Let me tell you, the throwing away of the phone,

25   that was the worst thing I heard all day.  That was far and

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 174
Case 3:23-cv-00726-S    Document 8-24    Filed 06/29/23    Page 1168 of 1598    PageID 14215

173

 1   away the worst thing I heard all today.  I don't know what I'm

 2   going to hear down the road to fix this, but if it's really

 3   gone, let me tell you how bad this is.  We have all sorts of

 4   Federal Rules of Civil Procedure that talk about this being a

 5   bad thing, but I wrote an opinion a couple years ago dealing

 6   with spoliation of electronic evidence, and I think it might

 7   be helpful for everyone to read.  It was called *In re Correra*,

 8   C-O-R-R-E-R-A.  I have no idea what the cite on it is.  But in

 9   this case, *Correra*, we had a debtor who had a laptop, and he

10   gave the laptop to his personal assistant, who took it away to

11   another state.  And at some point during the case, parties

12   discovered, oh, there's a laptop that may have a treasure

13   trove of information.  Who knows?  Maybe it does; maybe it

14   doesn't.  But there's a laptop that we just now learned about

15   that the personal assistant has.

16       And so I issued an order that she turn it over, and there

17   were subpoenas and depositions, blah, blah, blah.  Long story

18   short, the evidence ended up being that she deleted everything

19   on the laptop, and then -- this would almost be funny if it

20   wasn't so serious -- she downloaded thousands of pictures of

21   cats onto the laptop.  I kid you not, cats.  Meow, meow, cats.

22   And she downloaded a hundred-something full-length movies.

23   And we had two days of forensic experts come in and take the

24   witness stand and tell me about how, okay, this is like an

25   amateurish -- you've talked about amateur hour today -- this

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 175
Case 3:23-cv-00726-S    Document 8-24    Filed 06/29/23    Page 1169 of 1598    PageID 14216

174

1   is kind of an amateurish way of deleting data, right.  You

2   first delete all the files on the laptop and then you cover

3   over all the space to make sure the information is not

4   retrievable.  You know, this genius ended up retrieving some

5   of the information.

6       But the long story short is I sanctioned the debtor and

7   his assistant jointly and severally.  You'll have to go back

8   and look at the opinion.  I'm pretty sure it was over a

9   million dollars.  And I can't remember if that was attorneys'

10  fee-shifting only, or monetary, like penalty on top of the

11  attorneys' fees-shifting.  I just can't remember.  But maybe

12  poor Tara needs to be advised of that opinion, too.  I mean,

13  --

14      But the other reason I put game-changer in future

15  litigation is, in my *Correra* case, it wasn't just the monetary

16  million-dollar sanction or whatever it was; it was a game-

17  changer in future litigation because the adverse party to the

18  debtor ended up arguing -- and it was the state of New Mexico,

19  by the way -- they ended up saying, in all future litigation,

20  we want you -- some adversaries, we want you to make an

21  adverse inference.  In other words, for all of these elements

22  that we're trying to prove in our fraudulent transfer

23  litigation and whatever else was going on, we want you to make

24  an adverse inference that there would have been evidence there

25  on that laptop that would have supported some of our causes of

175

 1   action and it was destroyed to keep us from having that

 2   evidence.

 3       And they brought forth all kinds of case law.  It's a hard

 4   area.  It's a really, really hard area.  But I ended up --

 5   again, it's not in the main opinion.  It was in subsequent

 6   orders.  I ended up saying, yeah, I think you've met the

 7   standard here to draw adverse inferences.

 8       So, again, this is a very unpleasant message for me to

 9   deliver today.  But the destruction of the phone is my biggest

10   takeaway of concern today, how that might have ramifications.

11   You know, there are other bad things, too, about that.  I'm

12   not even going to go there right now.  But the, you know,

13   Title 18, you can ask your lawyer what that means, but okay.

14       My second big takeaway before we get to the hopeful stuff

15   is -- and this is kind of harsh, what I'm about to say -- but

16   Ellington and Leventon maybe care more about you, Mr. Dondero,

17   than their law license.  You know, I guess it's great to have

18   people in your life who are very, very loyal to you.  I mean,

19   loyalty is a wonderful thing.  But I am just so worried about

20   things I've heard.  Again, the phone and in-house lawyers.

21   The biggest concerns in my brains right now.  I have worried

22   about them for a while.

23       You all will -- well, Mr. Dondero, you might not know

24   this.  But we had a hearing a few months ago, maybe September,

25   October, where the Creditors' Committee was trying to get

176

```
 1   discovery of documents.  And we had some sort of hearing,
 2   maybe a motion to compel production.  And we had many, many
 3   entities that you control file objections:  NexPoint, NexBank.
 4   I can't even remember.  We just had a whole slew.  CLO Holdco.
 5   Many, many of these entities objected.  And I was trying to
 6   figure out that day who was instructing them.  And oh my
 7   goodness, I hope the in-house layers are not involved in this
 8   document discovery dispute, because, you know, they have
 9   fiduciary duties.  And are -- you know, is it -- it feels like
10   it's breaching a duty to the bankruptcy estate when it's in
11   the bankruptcy estate's best interest to get these documents
12   if you're meanwhile hiring lawyers for these other entities,
13   Holdco, et cetera, and saying, Fight this.
14       I never really pressed it very hard back then, but I
15   raised the issue and I said, I'm really, really concerned
16   about this.  And I continue to be concerned about it.  I had
17   experiences with Mr. Ellington in the *Acis* case where he
18   testified on the witness stand, and later it looked a heck of
19   a lot like he might have committed perjury.  I hate to use
20   such blunt terms.  But I let it go.  I'm just like, you know,
21   I'm not going to -- you know, I'm going to just hope for the
22   best that he misspoke.
23       But I'm getting a really bad taste in my mouth about
24   Ellington and Leventon, and I hope that they will be careful
25   and you will be careful, Mr. Dondero, in future actions.
```

1        Is Mr. -- I can't see Mr. Dondero.  I want to make sure

2   he's not on the phone.  Okay.  Okay.  Thank you.

3        So where was I going to head next?  I guess I want to say

4   a couple of things now that I would describe as a little bit

5   more hopeful, and that is pertaining to this whole pot plan

6   thing.

7        You know, I tend to think, without knowing what's being

8   said outside the courtroom, that a pot plan would be the best

9   of all worlds, okay, because the plan that we have set for

10  confirmation next week, I understand we have a lot of

11  objections, and if I approve it, if I confirm the plan, we're

12  going to have a lot of appeals and motions for stay pending

13  appeal, and no matter how that turns out, we're going to have

14  a lot of litigation.  Okay?  You know, we're going to have

15  adversaries.  And we have a not-very-workable situation here

16  where we have these Dondero-controlled affiliates questioning

17  Mr. Seery's every move.

18       I would love to have a pot plan that would involve, Mr.

19  Dondero, you getting to keep your baby, okay?  I acknowledge,

20  everyone here acknowledges, you are the founder of this

21  company.  This is your baby.  You created a multi-billion-

22  dollar empire, okay?  I would be shocked if you didn't want to

23  keep your baby.  Okay?  If there was a reasonable pot plan, I

24  would love it.

25       But I'm telling you, the numbers I heard didn't impress me

178

```
 1    a heck of a lot.  I'm not an economic stakeholder.  It's not

 2    my claim that would be getting paid.  But I can see where

 3    these Creditor Committee members, they're not going to think

 4    $160 million -- $90 million in cash, $70 million in notes, or

 5    vive-versa -- is nearly enough.  Okay?

 6        So I am going -- what just happened?  What just happened?

 7    I lost Mr. Dondero.  Okay.  This is getting kind of humorous,

 8    almost.

 9        Okay.  I am going to order that between now and the end of

10    the day Tuesday there be good-faith, and I'll say face-to-face

11    -- Zoom, WebEx, whatever -- negotiations between Mr. Dondero

12    and his counsel and at least the Committee and its

13    professionals regarding this pot plan.

14        Now, the train is leaving the station next Wednesday,

15    okay?  If we don't have Creditors' Committee and Debtor and

16    Dondero rushing in here saying, Please continue the

17    confirmation hearing next Wednesday, if we don't have like

18    unanimous sentiment to do that, you know, this is a 15-month-

19    old case, I'm going to go forward with the plan that's on

20    file.

21        And it's been a long, expensive case.  I had great

22    mediators try to give it their best shot to get a grand

23    compromise.  I just, I'm not going to drag this out unless you

24    all tell me Wednesday morning, We want you to continue this a

25    week or two.
```

179

1      And let me tell you -- this may be the stars lining up, or

2    it may not be -- I was supposed to have a seven-day trial

3    starting the week after next, and then I was supposed to have

4    a four- or five-day day trial starting immediately after that.

5    And all of those lawyers came in and asked for a continuance

6    because of COVID.  They wanted a face-to-face trial, and so

7    I've put them off until April.

8      So if you wanted to postpone the confirmation hearing to

9    the following week or even the following week, I have the gift

10   of time to give you.  But I'm not going to do it lightly.

11   I'm, again, I'm just going to order face-to-face meetings.

12   And I said Dondero and his counsel and the Committee and its

13   professionals.  You know, if -- I'm not slighting the Debtor

14   here or Mr. Seery, but I'm kind of taking a cue from what Mr.

15   Morris, I think I heard you say, that at this point it's the

16   Committee, it's the Committee's money, and I think that's the

17   starting place.  And if they want to join the Debtor in at the

18   beginning or midway through, you know, wonderful, but I think

19   it needs --

20          MR. POMERANTZ:  Your Honor, this is Jeff -- this is

21   Jeff Pomerantz.  I hate to interrupt, and I never do that to a

22   judge, but I did have something to say in my comments about a

23   continuance that we've talked about with the Committee and

24   some other developments in the case.

25          THE COURT:  Oh.

180

```
1        MR. POMERANTZ:  I'm happy to wait.  But it has -- it
2   has nothing to do with the comments you said, although, as I
3   think you've heard from me before, the Debtor has been a
4   supporter, a supporter of a pot plan.  Mr. Seery has done a
5   tremendous amount of work working with Mr. Dondero, working
6   with Mr. Lynn, to try to make that happen.  And if the
7   Committee is willing to engage in a pot plan, we would
8   definitely support that.  Because we do agree with Your Honor
9   that, absent a pot plan, we are looking at a lot of
10  litigation.
11      Some of the issues you're going to have to deal with at
12  the confirmation hearing if we do not have a peace-in-the-
13  valley settlement is exculpations, releases, moratoriums on
14  litigation, extensions of your January 9th order --
15        THE COURT:  Uh-huh.
16        MR. POMERANTZ:  -- with respect to pursuing certain
17  people.
18      So, we get it, and we've gotten it from the beginning.
19  And Mr. Seery, sometimes even at a fault, has been
20  singlehandedly focused on trying to get that done.  It's just
21  unfortunate where we are here.
22      But having said that, I wanted to first apprise the Court
23  of a recent major development in the case.  I'm pleased to
24  report that the Debtor and UBS have reached a settlement in
25  principle which will resolve all of UBS's claims against the
```

181

```
 1   estate, all of UBS's claims against Multi-Strat.  The parties
 2   are working on documentation.  The settlement is subject to
 3   internal approvals from UBS, but we've been led to believe
 4   those approvals will occur, and we would hope to file a Rule
 5   9019 motion in the near future.
 6       I'm sure Your Honor is quite pleased to hear that.  The
 7   UBS matters have taken a substantial amount of time.  And with
 8   the settlement of UBS's claims, the only material unresolved
 9   claim, unrelated to Mr. Dondero or the employees, are Mr.
10   Daugherty.  And Mr. Seery will continue to work with Mr.
11   Daugherty to try to settle that.
12            THE COURT:  Okay.
13            MR. POMERANTZ:  With respect to the scheduling, with
14   respect to the scheduling, Your Honor, there are three
15   significant matters on for hearing on the 13th.  The first is
16   the Debtor's motion to approve a settlement with HarbourVest,
17   which Mr. Dondero is contesting.  Depositions are being
18   conducted on Monday, and we anticipate an evidentiary hearing
19   in connection therewith.
20       The Debtors, as Mr. Morris indicated earlier on in the
21   hearing, have also filed a complaint and a motion for a
22   temporary restraining order against certain of the Advisors
23   and Funds owned and controlled by Mr. Dondero which relate to
24   the CLO management agreements for which Your Honor has heard a
25   lot of testimony today.  We also expect that TRO to be
```

1    contested and for the Court to have an evidentiary hearing.

2        And as Your Honor mentioned, the confirmation of the plan

3    was scheduled for Wednesday, and there were 15 objections.  I

4    would point out, Your Honor, all but four of which were Mr.

5    Dondero, his related entities that he owns or controls, and

6    employees or former employees.

7        The Court previously gave us time on the 13th and the

8    14th, I think anticipating that we would have a lot and it may

9    be necessary to go into two days.  However, Your Honor, those

10   two days are not going to be enough to deal with all the

11   issues that we have before Your Honor.

12       So what we suggest, and we've spoken to the Committee and

13   the Committee is supportive, that we continue confirmation to

14   a day around January 27th.  This will enable the Debtor to not

15   only -- and the Committee -- not only to take Your Honor up on

16   what you'd like to see accomplished in the next few days.  I'm

17   sure the Debtor is supportive and will be supportive, and we

18   hope the Committee will engage in good-faith negotiations, and

19   if there's a way to do a pot plan, we are all for it.  It'll

20   give time for that to happen.

21       But at the same time, and I think what you'll hear from

22   Mr. Clemente, that we're willing to give a continuance, we all

23   know that if there is not a settlement to be had, if there is

24   not a pot plan to be had, this case has to confirm, it has to

25   exit bankruptcy, and at least from the Debtor's perspective, a

 1   lot of protections will have to be in place that basically

 2   this has not just been a pit stop in Bankruptcy Court and we

 3   return to the litigation ways that Highland is involved in.

 4        So, Your Honor, we believe that the two evidentiary

 5   hearings on for next week probably will fill up both days.  We

 6   would suggest that the first day be the complaint and the TRO

 7   against the Advisors and the Funds for the 13th, and the 14th

 8   be the HarbourVest.

 9        We also recognized as we were preparing for today, Your

10   Honor, looking ahead, that we thought it was not fair for us,

11   although we know Your Honor works tirelessly and as hard as

12   anyone on this hearing and that Your Honor would be prepared

13   for confirmation and would be prepared for each of those

14   trials, given the gravity of these issues, the extensive

15   pleadings, pleadings that you would get in confirmation on

16   Monday from the Debtor, that it made sense to continue the

17   hearing.

18        So, again, fully supportive of Your Honor's mandate to try

19   to see if we could work things out, fully supportive of a

20   continuance until the 27th, if that date works for Your Honor,

21   but we believe we do need to go ahead with the two matters

22   that are on for calendar next week.

23            MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

24   May I be heard briefly?

25            THE COURT:  Oh my goodness.  Who do you represent,

184

1   Mr. Rukavina?

2        MR. RUKAVINA:  And I apologize -- Your Honor, I am

3   the new counsel who will be representing the Funds and

4   Advisors.  I will probably be taking the laboring oar at

5   confirmation.

6      I apologize I'm not wearing a suit and tie.  I did not

7   anticipate speaking right now.

8      I support -- to the extent that that's an oral motion for

9   continuance by Mr. Pomerantz, I certainly support that.  I

10  would suggest that the Court give us an understanding of that

11  today, because we do have depositions and discovery lined up

12  which we can then push if the hearing on confirmation is

13  pushed to the 27th.  And we have no problem going forward on

14  the other matters on the 13th.

15     So, I am co-counsel to K&L Gates, Your Honor, so whoever

16  the K&L Clients are, they're now my clients as well.  I just

17  wanted to be heard briefly that we support the recommendation

18  by Mr. Pomerantz and just urge that the Court give us finality

19  on that issue today so that we're not burning the midnight

20  oil, many sets of lawyers preparing for confirmation on the

21  13th.

22     Thank you for hearing me, Your Honor.

23        THE COURT:  All right.  So, just to be clear, the

24  proposal is that we go forward next Wednesday on the newest

25  request for a TRO with regard to -- is -- the CLO Funds and

185

```
 1    the Advisors.  I'm forgetting the exact names.  And then that
 2    would take likely the whole day, but whether it does or does
 3    not, we would roll over to Wednesday of next week -- that'd be
 4    the 14th -- to do the HarbourVest.  It's a compromise motion,
 5    right?  Is there anything else?
 6            MR. POMERANTZ:  No, correct, it's the compromise
 7    motion, Your Honor.  There are two pending objections on this
 8    and discovery scheduled for Monday.
 9            THE COURT:  All right.  Well, as far as --
10            MR. CLEMENTE:  Your Honor?
11            THE COURT:  Yes, who is that?
12            MR. CLEMENTE:  Oh, Your Honor, it's Matt Clemente at
13    Sidley on behalf of the Committee.  I'm here, and I thought
14    maybe I'd offer just a couple of comments at this point, but
15    I'm happy to hold them.
16            THE COURT:  Well, --
17            MS. SMITH:  And Your Honor, this is Frances Smith.  I
18    would also like to be heard before you wrap up.
19            THE COURT:  Okay.  Well, I guess generally I want to
20    know, does anyone have any objection -- I can't imagine they
21    would -- but any objection to pushing confirmation out to
22    around the 27th?  I'm going to say that because I have an
23    issue middle of the day the 28th.  If we do it the 27th, I
24    could only go a day and a half, okay?  I have to go out of
25    town the evening of the 28th, and I would be out the 29th as
```

 1  well.  That's Thursday and Friday.  So we'll talk about that.

 2  But anyone, Mr. Clemente or anyone else, want to say anything

 3  about continuing the confirmation?

 4          MR. CLEMENTE:  Your Honor, it's Matt Clemente at

 5  Sidley.  No, Your Honor, we're supportive of that schedule.

 6      And Your Honor, just briefly, I heard my name discussed

 7  quite a bit at this hearing as well as the Committee.  I'm not

 8  going to get into it unless Your Honor would like me to, but

 9  let me be very clear:  The committee has taken very seriously

10  the pot plan proposals that Mr. Dondero has presented, and

11  there's much more to the discussion other than what Mr. Lynn

12  suggested in his remarks.

13      So I'm not going to get into all that unless Your Honor

14  thinks it's necessary.  I think it's of no moment here.  But I

15  did want Your Honor to know that we have carefully considered

16  the pot plan proposals and have communicated a variety of

17  issues about that to Mr. Lynn and will continue to take the

18  direction of Your Honor and engage on a pot plan, Your Honor.

19  But I did not want there to be any suggestion that we did not

20  take it seriously and that there was much, much more

21  consideration and discussion about it than what was suggested.

22          THE COURT:  Uh-huh.

23          MR. CLEMENTE:  Thank you, Your Honor.

24          THE COURT:  All right.

25          MS. SMITH:  Your Honor, this is Frances Smith.

187

 1            THE COURT:  Who do you represent, Ms. Smith?

 2            MS. SMITH:  Your Honor, we were recently retained by

 3      the four senior employees:  Tom Surgent, Frank Waterhouse,

 4      Scott Ellington, Isaac Leventon, along with Baker & McKenzie,

 5      and I believe we have the Baker & McKenzie lawyers Deb

 6      Dandeneau and Michelle Hartmann on the line.

 7         Your Honor, we have listened to the whole hearing.  And I

 8      was not going to make an appearance.  I was following your

 9      instructions and listening carefully.  But Your Honor, I --

10      first of all, we hate to be before you for the first time in a

11      discovery dispute.  We did file a very limited objection to

12      the plan because of the disparate treatment of our clients,

13      which we are not arguing today, of course.  We received -- it

14      is our usual practice, Your Honor -- you've known me for a

15      long time -- to cooperate on having witnesses appear.  We got

16      -- we were notified very late Tuesday that the Debtor's

17      counsel would like two of our clients to appear.  We made what

18      we thought was a reasonable request for a copy of the

19      transcript from the deposition.  We were invited to the

20      deposition and then told we could not attend, or our clients

21      could not attend.  When we offered to make it lawyers-only,

22      they said no.  So we did not produce our clients without a

23      subpoena.

24         Our clients have not been evading service.  As far as we

25      know, they were each attempted service one time, late

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 189
Case 3:23-cv-00726-S   Document 8-24   Filed 06/29/23   Page 1183 of 1598   PageID 14230
of 206

188

1  Wednesday, when they were -- around dinnertime.  Mr. Leventon

2  was home all day today.  Didn't go any -- or yesterday.

3  Didn't go anywhere.  Was not served.  Wasn't served this

4  morning.  The same, as far as we know, with Mr. Ellenton.

5       Your Honor, on the order that you just entered, I am a

6  little unclear of where your findings of fact stopped.  First

7  of all, I do not think that you can enjoin Mr. Ellenton and

8  Mr. Leventon.  They are not parties to the adversary

9  proceeding.

10      You know, we did some very quick research.  There's a

11  Seventh Circuit case, a district court may not enjoin

12  nonparties who are not either acting in concert with an

13  enjoined party nor in the capacity of agents, employees,

14  officers of the enjoined party.  Mr. Ellington and Mr.

15  Leventon are not agents, employees, officers of Mr. Dondero.

16  So I think that, Your Honor, you cannot make that ruling.

17      Of course, you can rule that Mr. Dondero cannot talk to

18  Mr. Leventon and Mr. Ellington.  That might be a way to fix

19  that one part.  But as nonparties, I don't believe that you

20  can enjoin them.

21      Also, Your Honor, there was just no evidence against them

22  to support that.  Out of more than two dozen exhibits, there

23  was one mention of Mr. Leventon, where all he did was give Mr.

24  Dondero Matt Clemente's phone number.  And you yourself ruled,

25  Your Honor, that Mr. Dondero could speak with the Committee,

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 190
Case 3:23-cv-00726-S Document 8-24 Filed 06/29/23 Page 1184 of 1598 PageID 14231
of 206

189

1  so that wouldn't even have been a violation of your orders.

2  There's three related to Mr. Ellington, but no evidence of

3  confidential information.

4      And, Your Honor, I'm very concerned about the comments

5  that you made about Mr. Ellington and perjury.  I just want to

6  make sure that it's clear on the record that those were not

7  findings of fact.  That did not -- there was no evidence about

8  that today.  And I understand Your Honor's frustration.  I was

9  -- but I just want to be very clear on the record that those

10  were not findings of fact that you were making during that

11  part of your comments.  I was a little unclear about where the

12  ruling exactly stopped when you said you wanted to add onto

13  the order and then you were going to make a few more comments.

14      So that's all I have, Your Honor.

15          THE COURT:  Okay.

16          MS. SMITH:  Thank you for listening and --

17          THE COURT:  Thank you.  Fair comments, one and all.

18  I'm first going to tweak.  I was concerned.  You heard me

19  express concern about, you know, Ellington and Leventon aren't

20  parties to this adversary.  Not here.  So here's -- Mr.

21  Morris, I assume you're the scrivener.  Let's change what I

22  said earlier and have the injunction read that Mr. Dondero

23  shall not request that Mr. Ellington or Mr. Leventon share any

24  confidential information they received as general counsel or

25  assistant general counsel for the Debtor without Debtor's

190

 1   counsel's explicit written permission, nor accept any

 2   confidential information that the two of them may have

 3   received as general counsel or assistant general counsel for

 4   the Debtor.  Okay?  So the injunction is --

 5           MR. MORRIS:  Your Honor, if I may, --

 6           THE COURT:  Who?

 7           MR. MORRIS:  Your Honor, if I may, that is not

 8   sufficient for us, because that means that they can actually

 9   share it with him as long as he doesn't request it.  I'm a

10   little surprised --

11           THE COURT:  No.  You didn't hear the accept -- the

12   last part.

13           MR. MORRIS:  Okay.

14           THE COURT:  I added on at the end, nor shall Mr.

15   Dondero accept any confidential information.  They -- he shall

16   not request that they share it, nor shall he accept it.  Okay?

17   I --

18           MR. MORRIS:  So, but that -- my concern is that that

19   makes Mr. Dondero the arbiter of what's confidential and

20   what's privileged.  And I think that's improper.  I think it's

21   really reasonable, and I'm surprised -- you know, we're all

22   advocates here, so I take no issue with counsel, but the order

23   was going to be pretty simple:  Don't disclose privileged or

24   confidential information.  If they don't like that, that's

25   fine.  Just bar Mr. Dondero from speaking to either one of

1    them, period, full stop. Because we should not be in a

2    position where he doesn't request it but somehow they send it

3    to him. It is confidential.

4        I mean, who's deciding what's confidential here? Mr.

5    Ellington? Mr. Leventon? Mr. Dondero? Just stop their

6    communication. Mr. Dondero is subject to the Court's order.

7    He's the one who's subject to this motion. Bar him from

8    speaking to either one of them. It's a very -- very simple

9    solution.

10         MR. BONDS: Your Honor, I agree that it's a simple

11    solution. It's, I mean, not correct to assume that Mr.

12    Dondero is in any way going to breach his obligations to the

13    Court or to Mr. Ellington and Mr. Leventon. I don't see where

14    -- what we're talking about.

15         MS. SMITH: Also, Your Honor, I have to object to him

16    disparaging my clients that way. There's been no evidence

17    that they improperly shared any information. They are

18    licensed lawyers and they know the Rules of Professional --

19    they know the rules of professionalism, so --

20         THE COURT: Okay. I, you know, I didn't make a

21    finding earlier when I held out my two giant takeaways, to get

22    to your later question, no findings. But I really hope you

23    share with them everything I said, the concerns I expressed.

24    Maybe get the transcript.

25         MS. SMITH: Absolutely, Your Honor.

192

1    THE COURT:  Because I have huge concerns about

2    conflicts of interest here.  Okay?  Huge, huge concerns.  I

3    had them back when we had the discovery fight, Committee

4    wanting documents, and, you know, and I still have them.  You

5    know, did Ellington know about the TRO?

6    MS. SMITH:  Understood, Your Honor.

7    THE COURT:  Okay.  So let me backtrack.  We already

8    had a TRO that prevented Mr. Dondero from talking to any

9    employees of the Debtor unless it was about shared services

10   agreement.

11   So, Mr. Bonds, I'm going to flip it back to you on this

12   one.  Why shouldn't I at this point just say, okay, guess

13   what, no talking to Mr. Leventon or Ellington for the time

14   being?  Why --

15   MR. BONDS:  First of all, --

16   MS. SMITH:  Your Honor, that's acceptable to us.

17   THE COURT:  Okay.  What's wrong with that, Mr. Bonds?

18   MR. BONDS:  Your Honor, we don't believe that Mr.

19   Dondero has violated the TRO.

20   And secondly and more importantly, we don't believe that

21   there's any way that you can enter an order that singles out

22   two former employees.  I mean, that's bizarre.

23   THE COURT:  If I'm concerned that it's thwarting the

24   reorganization efforts and there are conflicts of interest

25   here, why can't I?

193

 1    You know, this is -- I hate to say it, but I feel like
 2  I've been in the role of a divorce judge today.  We have very
 3  much a corporate divorce that has been in the works, unless we
 4  get this pot plan on track, okay, and I'm a judge having to
 5  enter interim orders keeping one spouse away from the other,
 6  keeping one spouse out of the house, keeping one spouse away
 7  from the kids.  It's not pleasant at all.  But I don't -- the
 8  more I think about it, the more I have authority to do it just
 9  to protect, to protect the nest egg here.
10        MS. SMITH:  Your Honor, we are perfectly fine with
11  you enjoining Mr. Dondero from speaking to our clients, and we
12  will convey that to our clients.
13        THE COURT:  Okay.  Mr. Bonds, I can't hear you.
14        MR. BONDS:  I'm sorry, Your Honor.  What evidence is
15  there of irreparable harm as to Mr. Dondero talking with
16  either Mr. Leventon or Mr. Ellington?
17        THE COURT:  Okay.  Do I need to parse through the
18  communications I saw?  Do I need to parse-
19        MR. BONDS:  Yeah, I think so.  I mean, I don't
20  understand.
21        THE COURT:  Okay.  I never authorized Mr. Ellington
22  to be the settlement lawyer or whatever, okay?  I never would
23  have, okay?  And maybe Mr. Seery, you know, said something to
24  -- early on in the case to make him think he had that
25  authority, but no, we're done.  Okay?  And I feel like it's

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 195
Case 3:23-cv-00726-S   Document 8-24   Filed 06/29/23   Page 1189 of 1598   PageID 14236
of 206

194

1   causing more harm than good right now.  Okay?

2       I don't know who instructed all of these Dondero-

3   controlled entities to hire lawyers.  I don't know if

4   Ellington and Leventon have been giving instructions to these

5   entities.  But we've got conflicts everywhere now.  Okay?

6   We've got -- and by the way, I'm just going to list them now.

7   We have, of course, Bonds Ellis representing Dondero.  We have

8   Doug Draper, Heller Draper, now representing these trusts, Get

9   Good Trust, Dugaboy Investment Trust.  We have K&L Gates and

10  now Munsch Hardt also representing the Advisors, NexPoint and

11  the various CLO or other Funds.  We have CLO Holdco

12  represented by Kane Russell Coleman Logan.  We have NexPoint

13  Real Estate represented by Wick Phillips.  Who have I left --

14  and, of course, the employees, Baker & McKenzie and Ms. Smith.

15  We have Spencer Fane in there for other current or former

16  employees.  We have Loewinsohn Flegle in there for certain

17  former or current employees.

18      I mean, the proliferation of lawyers.  And again, I don't

19  know if Mr. Ellington and Mr. Leventon have had a role in

20  hiring counsel, wearing their hat for these other entities or

21  not.  Can anyone tell me?  Maybe I'm worried about something I

22  shouldn't be worried about.

23          MR. DONDERO:  You're worried about something you

24  shouldn't worry about, Your Honor.

25          THE COURT:  Okay.  So Ellington --

195

1          MR. MORRIS:  Your Honor, I would just point to the

2    evidence that's in the record, Your Honor.  You have Mr.

3    Dondero asking Mr. Ellington to show leadership in

4    coordinating all of the lawyers you just mentioned.  It's in

5    the record.

6          THE COURT:  Yes.  I'm just going to, until otherwise

7    ordered, no conversations between Dondero and Ellington and

8    Leventon, and that's just going to be my ruling until further

9    order.  That's what I feel best about.

10        Now, let me ask you, knowing that I could only give you a

11   half a day on the 28th of January, if we start the

12   confirmation hearing on whatever the plan looks like on

13   January 27th, I mean, do people want to go with that, --

14        MR. POMERANTZ:  Your --

15        THE COURT:  -- even knowing we might not finish that

16   day, or no?

17        MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

18   Maybe if we could start on the 26th, have the 26th, 27th, and

19   then maybe half of the 28th.  I would think two and a half

20   days should be enough, notwithstanding the volume of

21   objections, because I think you'll find that, while there may

22   be some evidence, I think the majority of the objections are

23   really legal in nature.

24        THE COURT:  All right.  Traci, are you out there in

25   video-land?

196

```
 1              THE CLERK:  Yes, I'm here.
 2              THE COURT:  Okay.  Have I overcommitted the 26th?  If
 3    we start the 26th at 9:30 in the morning, can we do that?  Or
 4    --
 5              MR. BONDS:  Your Honor?
 6              THE CLERK:  That'd be fine.
 7              THE COURT:  Okay.
 8              THE CLERK:  Just remember that you have an
 9    appointment at lunchtime that day at noon on the 26th.
10              THE COURT:  Okay.  I --
11              THE CLERK:  You don't have any court hearings.
12              THE COURT:  Okay.
13              MR. BONDS:  Your Honor, I'm sorry.
14              THE COURT:  Go ahead.
15              MR. BONDS:  Your Honor, I'm sorry.  This is John
16    Bonds.  I have a hearing on the 26th that I can't miss.
17              THE COURT:  Well, can someone else --
18              MR. POMERANTZ:  Your Honor, we would request, right,
19    that Mr. Lynn lead the confirmation hearing.  There's a lot of
20    lawyers.  If we try to look at everyone's calendar, we're
21    never going to be able --
22              THE COURT:  Yes.
23              MR. POMERANTZ:  -- to get something that's good for
24    everyone.
25              THE COURT:  Okay.  Yes.  Well, Mr. Lynn or Mr. Assink
```

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 198
Case 3:23-cv-00726-S   Document 8-24   Filed 06/29/23    Page 1192 of 1598   PageID 14239

197

1    can handle it, Mr. Bonds.

2        So we're going to start the 26th at 9:30.  We'll go all

3    day, except I have something at lunchtime, apparently.  And

4    then we'll go all day on the 27th, and then I can give you

5    half a day on the 28th.

6        So you'll upload immediately a notice to that effect, Mr.

7    Pomerantz.

8            MR. POMERANTZ:  Yes, we would.

9        Your Honor, in terms of our documents in support of

10   confirmation, we want to make it convenient with the Court.

11   We know your Court would at least need one business day, so we

12   would prefer to file, say, by 2:00 Central on the 24th, on a

13   Sunday.  Everyone will have it, and have one business day.  I

14   mean, the old order only had one business day in advance as

15   well.  So that's what we would propose for our confirmation

16   documents to be filed.

17           MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

18   An important issue here is how the creditors have voted, and I

19   have no idea how they have voted.  The voting deadline has

20   expired.  So I have no problem with what Mr. Pomerantz

21   suggests, but I do think that the Debtor should file its

22   tabulation of votes sooner rather than later so we all know

23   one of the central elements for the hearing that we'll have.

24           THE COURT:  Okay.

25           MR. POMERANTZ:  That's fair, Your Honor.  We're

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 199
Case 3:23-cv-00726-S   Document 8-24   Filed 06/29/23   Page 1193 of 1598   PageID 14240

198

1    prepared to file the summary of voting and tabulation by the

2    15th of January.

3              THE COURT:  Okay.  Very good.

4        So, backing up, Mr. Pomerantz, you asked that I approve

5    you filing any plan modifications by noon on Sunday, the 24th?

6    Is that what you said?

7              MR. POMERANTZ:  Yeah.  So, there's a couple of

8    things.  There's our confirmation brief.

9              THE COURT:  Uh-huh.

10             MR. POMERANTZ:  There is our -- any evidence we would

11   submit, although I suspect we are likely to provide live

12   testimony, as opposed to a declaration.  There was our summary

13   of ballots, which we will now do on the 15th.  And to the

14   extent we have any modifications, we would provide them on

15   Sunday by 12:00 noon Central time as well.  Yes.

16             THE COURT:  All right.

17             MR. RUKAVINA:  Well, Your Honor, this is Davor

18   Rukavina.  Does that mean the witness and exhibit lists also

19   will not be due until Sunday at noon?  Because I would request

20   that we have the normal period of time to exchange exhibits

21   and witnesses.

22             MR. BONDS:  Your Honor, I think that the normal time

23   period is also important in this case.

24             THE COURT:  Okay.  I'm going to --

25             MR. POMERANTZ:  Your Honor, we could -- if everyone

199

1    agrees on witness lists, we could do those by 5:00 p.m.

2    Central on the 22nd.

3              THE COURT:  Okay.  Let's do that.  Okay.

4              MR. POMERANTZ:  But that -- but that needs to be for

5    everybody.

6              THE COURT:  Oh, it will be for everyone.

7              MR. RUKAVINA:  Your Honor, no problem.

8              THE COURT:  Okay.  Let's --

9              MR. POMERANTZ:  5:00 p.m. Central Standard Time.

10             THE COURT:  No more discussions.  That'll be the

11   ruling, okay?  Everything is going to be due by 5:00 p.m.

12   Central time on Friday, the 22nd.  All right.

13             MR. POMERANTZ:  Your Honor, is that our brief as

14   well, or --

15             THE COURT:  Yes.

16             MR. POMERANTZ:  -- was that just the witness list?

17             THE COURT:  Everything.  Brief, witness list, and --

18             MR. POMERANTZ:  Okay.

19             THE COURT:  -- plan mods.

20        Let me look through my notes and see if there's anything

21   else I want to say.  You know, let me do some quick math here.

22   I know there was one other thing I wanted to say that involves

23   math.  Okay.  I think my math is right here.  Okay.  You know,

24   I mentioned the proliferation of lawyers.  And let me just say

25   this.  We had -- we've had about 90 people on the -- showing

200

 1  up on the video screen today -- 89, 90, 91, 92.  A few, a

 2  little over 90.  Okay?  So let's say 90.  It's been up to 95

 3  earlier.  But let's pretend that 60 of those are lawyers

 4  billing by the hour.  That's very conservative.  Probably many

 5  more than 60.  And let's assume conservatively that the

 6  average billing rate is $700 an hour.  That's probably very

 7  low, right?  We probably don't have many baby lawyers on the

 8  phone.  So that's a very low average.  So, 60 lawyers times

 9  $700 an hour, $42,000 an hour this hearing has cost.  And then

10  we've been going over seven hours.  So let's say seven,

11  conservatively, times $42,000.  This hearing has cost $294,000

12  today.  A preliminary injunction hearing.  I mean, no one

13  thinks that's chump change.  I don't know, maybe some people

14  do.  This just seems like a ridiculous way to spend resources.

15  No offense to all the wonderful lawyers, but this is just --

16  it's crazy-town, right?  It is crazy-town.  So I implore you,

17  okay, how about I use that word, I implore you to have these

18  good-faith discussions on a pot plan.

19      Please, Mr. Dondero, I mean, don't waste people's time.

20  $160 million, I know that's not going to cut it.  Okay?  So

21  it's going to have to be more meaningful.  I just know that in

22  my gut.

23      But having said that, I mean, I honestly mean I think a

24  pot plan -- I think you getting your baby back is the best

25  thing for everyone.  Okay?  I think it's the best thing for

201

1  everyone.  So I want you all to --

2          MR. DONDERO:  Judge, I -- Judge, I just need to

3  interject for a second, because no one follows the big

4  picture.  We filed for bankruptcy with $450 million of assets.

5  $360 million of third-party net assets, $90 million of

6  affiliated notes.  The third-party assets are down to $130

7  million and falling fast.

8          MR. POMERANTZ:  Your Honor, I hate to interrupt Mr.

9  Dondero, but that is not the purpose of this hearing.

10          THE COURT:  Well, --

11          MR. POMERANTZ:  Mr. Dondero's statement of the assets

12  and value is just not something that the Debtors would agree

13  and support.  I'm sure it's not something the creditors -- I

14  think we understand what Your Honor is saying.  I think the

15  Committee understands.  And Your Honor knows that the Debtor

16  and the Committee are close to the asset values.  And Mr.

17  Dondero should be making his argument to the Debtor and the

18  Committee, not Your Honor, in this open forum.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  It's just not appropriate.

21          THE COURT:  And I understand where you're both coming

22  from.  And he's saying that because I made the comment I made

23  about $160 million not being enough.

24      I've seen the evidence.  I've heard the evidence at prior

25  hearings, Mr. Dondero.  We've had a lot of hearings.  And I

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 203
of 206
Case 3:23-cv-00726-S   Document 8-24   Filed 06/29/23   Page 1197 of 1598   PageID 14244

202

1    remember writing that down.  Wow, why did that happen?  Seeing

2    the dissipation of value.  I couldn't remember the exact

3    numbers, but I thought it was like $500 million something and

4    then $300 million or whatever.  And I remember Multi-Strat,

5    that being sold, and blah, blah, blah, blah.

6        But having said that, there are a lot of causes of action

7    that have been hinted at by the Creditors' Committee and

8    others.  So, causes of action is one of the things they are

9    looking at when they start thinking about what's appropriate

10   value.

11       So I just, I get where everyone is coming from.  I get

12   where everyone is coming from.  But, again, let's take one

13   more stab at this, please.  Okay?

14           MR. POMERANTZ:  Yeah.  And Your Honor, my last

15   comment.  We're commercial people.  The creditors are

16   commercial people.  I think we've done a tremendous job in

17   being able to resolve most every one of the significant

18   claims.  I think the Court should trust the process.  Mr.

19   Dondero should trust the process.

20       And again, if there's a commercial deal to be worked out,

21   I don't think there's anyone more than of course the Debtor

22   and the people on the Committee, who have been litigating in

23   many cases with Mr. Dondero and Highland for ten years, I

24   don't think it's anyone's desire.  So if there's a reasonable,

25   rational proposal that the creditors can get behind and want

1  to engage, then there'll be a discussion.  If they don't

2  believe it's a reasonable, rational proposal, they won't.

3        THE COURT:  Yes.  All right.  Well, I do feel very

4  good about what I've heard about the UBS issues being worked

5  out.  I mean, we have come a long way in 15 months, even

6  though it's frustrating to me and others.  But, again, I know

7  you all are going to do what you need to do.  And I'll look

8  for the form of order.  I'm going to see you all, Mr. Dondero,

9  including you, next Wednesday.  And if there's nothing else,

10  we stand adjourned.

11        MS. SMITH:  Your Honor, I'd like to review the form

12  of order as it regards my clients before it's submitted.

13        THE COURT:  Okay.

14        MS. SMITH:  If I could have a courtesy copy, please.

15        THE COURT:  Yes.  Well, yes.  I'm not going to

16  require 90 lawyers to get the order, but I will ask Mr.

17  Pomerantz, Mr. Morris, make sure Ms. Smith gets it and

18  obviously Mr. Dondero's counsel gets it.  And I probably won't

19  get it until Monday, it sounds like, but --

20        MR. POMERANTZ:  That's likely.

21        THE COURT:  But I'll be on the lookout for it.  Okay.

22  Thank you.  We stand adjourned.

23        MS. SMITH:  Thank you, Your Honor.

24        THE CLERK:  All rise.

25        MR. MORRIS:  Thank you, Your Honor.

204

1          MR. BONDS:  Thank you, Your Honor.

2      (Proceedings concluded at 4:09 p.m.)

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                    CERTIFICATE

19      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
20   above-entitled matter.

21   **/s/ Kathy Rehling**                        **01/11/2021**

22   _____    _____
     Kathy Rehling, CETD-444                     Date
23   Certified Electronic Court Transcriber

24

25

205

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Morris                                               5

WITNESSES

Plaintiff's Witnesses

James D. Dondero
- Direct Examination by Mr. Morris              19
- Cross-Examination by Mr. Bonds                106
- Redirect Examination by Mr. Morris            139

EXHIBITS

Plaintiff's Exhibits A through Y             Received 38

CLOSING ARGUMENTS

- By Mr. Morris                                 152
- By Mr. Lynn                                   155
- By Mr. Bonds                                  159

RULINGS                                      163/189

END OF PROCEEDINGS                              204

INDEX                                          205

# EXHIBIT 69

Case 19-34054-sgj11 Doc 3445-69 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 3
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1202 of 1598 PageID 14249
Case 19-34054-sgj11 Doc 2362 Filed 05/24/21 Entered 05/24/21 11:20:14 Page 1 of 2

Docket #2362 Date Filed: 05/24/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed May 21, 2021

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Highland Capital Management, L.P. | § | CASE NO. 19-34054-SGJ-11 |
| | § | |
| Debtor. | § | |

## ORDER REQUIRING JAMES DONDERO TO APPEAR AT ALL HEARINGS IN THE BANKRUPTCY CASE

The above-referenced bankruptcy case was commenced in the District of Delaware on October 16, 2019, by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Bankruptcy Case was transferred to this court on December 4, 2019. James Dondero is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020 as part of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in*

1

1934054210524000000000004

APPX. 07592

Case 19-34054-sgj11 Doc 3445-69 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 3
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1203 of 1598   PageID 14250
Case 19-34054-sgj11 Doc 2362 Filed 05/24/21    Entered 05/24/21 11:20:14    Page 2 of 2

*the Ordinary Course* [DE # 339]. Mr. Dondero was retained as an unpaid employee of the Debtor until his resignation in October 2020.

Previously, on December 10, 2020, in Adversary No. 21-03003 *Highland v. Dondero*, a temporary restraining order ("TRO") was entered against Mr. Dondero restricting him from taking certain actions against the Debtor and its business. On January 8, 2021, a hearing was conducted on a preliminary injunction. At the Preliminary Injunction Hearing, Mr. Dondero claimed to be unaware of the provisions of the TRO. Due to this testimony, the court found it necessary to include in the Preliminary Injunction [DE # 59 in the AP] a provision requiring Mr. Dondero to appear in all hearings in the Bankruptcy Case moving forward.

The court enters this Order to have a directive in the main bankruptcy case similar to the provision that was included in the Preliminary Injunction. The court enters this Order to ensure Mr. Dondero is aware of orders affecting his rights and that he remains engaged in a case where his attorneys continue to take positions in numerous proceedings on his behalf.  Mr. Dondero is ordered to attend all future hearings in this Bankruptcy Case, unless otherwise ordered by the court. This directive does not apply only to evidentiary hearings or "substantive" hearings, and it applies to the underlying bankruptcy case as well as related adversary proceedings in which Mr. Dondero is a party or takes a position. Therefore, it is

**ORDERED** that James Dondero appear in all future hearings in this Bankruptcy Case, as well as all adversary proceedings where James Dondero is a party or takes a position, unless otherwise ordered by the court.

### END OF ORDER ###

2

# EXHIBIT 70

Case 19-34054-sgj11 Doc 3445-70 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 4
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1205 of 1598 PageID 14252
Case 19-34054-sgj11 Doc 2458 Filed 06/17/21 Entered 06/17/21 12:17:26 Page 1 of 3

Docket #2458 Date Filed: 06/17/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 16, 2021**

_____
United States Bankruptcy Judge

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **Highland Capital Management, L.P.** | § | **CASE NO. 19-34054-SGJ-11** |
| | § | |
| **Debtor.** | § | |

## ORDER REQUIRING A TRUSTEE OF THE DUGABOY INVESTMENT TRUST AND THE GET GOOD TRUST TO APPEAR AT ALL HEARINGS IN THE BANKRUPTCY CASE IN WHICH THEY TAKE POSITIONS

The above-referenced bankruptcy case was commenced in the District of Delaware on

October 16, 2019, by Highland Capital Management, L.P. filing its voluntary petition for relief

under Chapter 11 of the Bankruptcy Code. The Bankruptcy Case was transferred to this court on

December 4, 2019. James Dondero is the co-founder of the Debtor and was the Debtor's President

1934054210617000000000001

Case 19-34054-sgj11 Doc 3445-70 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 4
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1206 of 1598   PageID 14253

Case 19-34054-sgj11 Doc 2458 Filed 06/17/21    Entered 06/17/21 12:17:26    Page 2 of 3

and Chief Executive Officer until his resignation on January 9, 2020, as part of the *Order
Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of
the Debtor and Procedures for Operations in the Ordinary Course* [DE # 339]. Mr. Dondero was
retained as an unpaid employee of the Debtor until his resignation on or around October 9, 2020.

     The Dugaboy Investment Trust and the Get Good Trust (together, the "Trusts")—which
are the two entities that are the subject of this Order—are two of Mr. Dondero's family trusts. The
court has previously noted that the standing of these Trusts in the bankruptcy case seems very
tenuous. It is a little difficult to discern if their interests are truly those that the Bankruptcy Code
is designed to protect.  Specifically, it has been represented that the Dugaboy Trust owns a mere
0.1866% of the junior equity in the Debtor. There is an infinitesimal chance of this interest being
entitled to any recovery in this bankruptcy case, under any reasonable estimation.  And while
the Get Good Trust has filed a proof of claim against the Debtor, and the Dugaboy Trust has filed
several proofs of claim, these claims have been objected to and not yet allowed, and the court is
very unclear regarding the nature or amount of these claims, except that the court has been apprised
that: (a) one Dugaboy proof of claim alleges that Highland is obligated on a debt owed to Dugaboy
by an entity known as Highland Select, allegedly because Highland is Highland Select's general
partner and might also be its alter ego; and (b) another proof of claim asserts ***postpetition
mismanagement*** by the Debtor of assets of one or more Debtor subsidiaries. While the court knows
nothing about the Get Good proof of claim, it does know that the Get Good Trust (along with
others) has been sued for alleged fraudulent transfers in an adversary proceeding in this case (Adv.
Proc. # 20-3195)—which may affect the allowability of its proof of claim.

     The Trusts have filed numerous substantive motions and objections in the Bankruptcy
Case. The objections include those to the *Debtor's Motion for Entry of an Order Approving*

*Settlement with HarbourVest* [DE # 1625], *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch* [DE # 2199], and the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [DE # 1808]. Further, the Trusts have filed appeals to all three of the orders approving the above-mentioned motions and plan, and those appeals remain pending before the United States District Court for the Northern District of Texas and the United States Court of Appeals for the Fifth Circuit.

In addition to having concerns about the tenuousness of the Trusts' party-in-interest status, the court also has concerns whether these Trusts are simply acting at the direction of Mr. Dondero and are not independent parties.  Accordingly, the court enters this Order to ensure that the trustees of the Trusts are fully engaged in this case, considering that the Trusts continue to take numerous positions requiring extensive attention and time of the court.  The Trusts are ordered to have a trustee acting on their behalf attend all future hearings in this Bankruptcy Case in which the Trusts have taken or are taking a position, unless otherwise ordered by the court. This directive does not apply merely to evidentiary hearings or "substantive" hearings, and it applies to the underlying bankruptcy case as well as related adversary proceedings in which the Trusts are parties or take positions. Therefore, it is

**ORDERED** that the Dugaboy Investment Trust and the Get Good Trust must have a trustee appear in all future hearings in this Bankruptcy Case, as well as all adversary proceedings where either of the Trusts are a party or take a position, unless otherwise ordered by the court.

### END OF ORDER ###

# EXHIBIT 71

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1209 of 1598 PageID 14256
Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 1 of 12
Docket #0854 Date Filed: 07/16/2020



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed July 16, 2020**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| | § | **Case No. 19-34054** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Chapter 11** |
| **L.P.,** | § | |
| | § | **Re: Docket No. 774** |
| Debtor. | § | |

---

### ORDER APPROVING DEBTOR'S MOTION UNDER
### BANKRUPTCY CODE SECTIONS 105(a) AND 363(b)
### AUTHORIZING RETENTION OF JAMES P. SEERY, JR., AS
### CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER, AND
### FOREIGN REPRESENTATIVE NUNC PRO TUNC TO MARCH 15, 2020

Upon the *Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* (the "Motion"),[1] and the

---

[1] All terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.

1934054200716000000000007

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1210 of 1598 PageID 14257
Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 2 of 12

Court finding that: (i) this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) due and sufficient notice of the Motion has been given; (v) entry into the Agreement was an exercise of the Debtor's sound business judgment; and (vi) it appearing that the relief requested in the Motion is necessary and in the best interests of the Debtor's estate and creditors; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, and DECREED** that:

1.     The Motion is **GRANTED**.

2.     Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Agreement attached hereto as **<u>Exhibit 1</u>** and all terms and conditions thereof are approved, *nunc pro tunc* to March 15, 2020.

3.     The Debtor is hereby authorized to enter into and perform under the Agreement.

4.     The Debtor is authorized to indemnify Mr. Seery pursuant to the terms of the Agreement.  Mr. Seery is also entitled to any indemnification or other similar provisions under the Debtor's existing or future insurance policies, including any policy tails obtained (or which may be obtained in the future), by the Debtor.  The Debtor and Strand are authorized to enter into any agreements necessary to execute or implement the transactions described in this paragraph. For avoidance of doubt and notwithstanding anything to the contrary in this Order, Mr. Seery shall be entitled to any state law indemnity protections to which he may be entitled under applicable law.

DOCS_SF:103156.19 36027/002

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1211 of 1598   PageID 14258
Case 19-34054-sgj11 Doc 854 Filed 07/16/20    Entered 07/16/20 14:00:44    Page 3 of 12

5.      No entity may commence or pursue a claim or cause of action of any kind against
Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring
officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such
claim or cause of action represents a colorable claim of willful misconduct or gross negligence
against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The
Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of
the Court to commence or pursue has been granted.

6.      Notwithstanding anything in the Motion, the Agreement or the Order to the
contrary, the Agreement shall be deemed terminated upon the effective date of a confirmed plan
of reorganization unless such plan provides otherwise.

7.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order
shall be immediately effective and enforceable upon its entry.

8.      This Court shall retain jurisdiction over any and all matters arising from or related
to the interpretation and/or implementation of this Order.

9.      The Foreign Representative Order is hereby amended to substitute James P.
Seery, Jr., as the chief executive officer, in place of Bradley S. Sharp, as the Debtor's Foreign
Representative, Bermuda Foreign Representative and Cayman Foreign Representative.  All other
provisions of the Foreign Representative Order shall remain in full force and effect.

### ###END OF ORDER###

Case 19-34054-sgj11 Doc 854 Filed 07/16/20    Entered 07/16/20 14:00:44    Page 4 of 12

## **EXHIBIT 1**

**Engagement Agreement**

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1213 of 1598   PageID 14260

Case 19-34054-sgj11 Doc 854 Filed 07/16/20 & Entered 07/16/20 14:00:44   Page 5 of 12



June 23, 2020

CONFIDENTIAL

The Board of Directors of Strand Advisors, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Re:   Highland Capital Management L.P. (the "Company")

Dear Fellow Board Members:

This letter agreement ("Agreement") sets forth the terms and conditions of the engagement of the undersigned James P. Seery, Jr. ("I", "me" or "my"), as Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"), effective as of March 15, 2020 (the "Commencement Date"), by the Company and its affiliates to perform financial advisory services as detailed below.

I appreciate the trust you have placed in me by asking me to assume these roles and thank you for the opportunity to continue to work with you to restructure the Company.

Roles:

I will serve as the CEO and CRO of the Company during its Chapter 11 bankruptcy case (the "Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").

In those roles, I will be responsible for overall management of the business of the Company in Chapter 11 including, directing the reorganization and restructuring of the Company, monetization of assets, resolution of claims, development and negotiation of a plan of reorganization or liquidation, and implementation of such a plan.

My direct reports will include the individuals at the Company that currently report to the Board of Directors of Strand Advisors, Inc. (the "Board") or such other individuals employed by the Company as I determine should report to directly to me.  In the event that the Board determines to restructure the reporting lines or functions of the Company, my direct reports will be amended in accordance with the Board approved restructuring.

At all times, I will remain a full member of the Board entitled to vote on all matters other than those on which I am conflicted.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1214 of 1598   PageID 14261
Case 19-34054-sgj11 Doc 854 Filed 07/16/20   Entered 07/16/20 14:00:44   Page 6 of 12

I will devote as much time to this engagement as I determine is required to execute my responsibilities as CEO and CRO.  I will have no specific on-site requirements in Dallas, but will be on site as much as I determine is necessary to execute my responsibilities as CEO and CRO, consistent with Covid-19 orders applicable to Dallas and New York City.

Limitations on Services

My services under this engagement are limited to those specifically noted in this Agreement and do not include legal, accounting, or tax-related assistance or advisory services.  For the avoidance of doubt, I am not providing any legal services in connection with this engagement and will have not any duties as a lawyer to the Company, the Board, or any of the Company's employees.  The accuracy and completeness of all information submitted to me by the Company are the sole responsibility of the Company, and I will be entitled to rely on such information without independent investigation or verification.

In my role as CEO and CRO, I will act as an independent professional contractor to the Company and will not be an employee of the Company.  I will provide and pay for my own benefits, including medical benefits, by J.P Seery & Co. LLC or otherwise.

Fees and Expenses:

In consideration of my acceptance of this engagement and performance of the services pursuant to this Agreement, the Company shall pay the following:

1.  Compensation for Services:
    a.  Base Compensation:  As compensation for my services as CEO and CRO of the Company, the Company shall pay me $150,000.00 per calendar month ("Base Compensation").  Base Compensation shall be due and payable at the start of each calendar month.  Consistent with current Board compensation practice, invoices rendered by me to the Company are due and payable by the Company on receipt. Payment of the Base Compensation will be retroactive to March 15, 2020.
    b.  Bonus Compensation/Restructuring Fee:
        i.   The Company has agreed to pay me a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "Restructuring Fee").
        ii.  Case Resolution Restructuring Plan
            1.  On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "Case Resolution Plan"):
                a.  $1,000,000 on confirmation of the Case Resolution Plan;
                b.  $500,000 on the effective date of the Case Resolution Plan; and
                c.  $750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1215 of 1598   PageID 14262

Case 19-34054-sgj11 Doc 854 Filed 07/16/20    Entered 07/16/20 14:00:44    Page 7 of 12

      iii.  Debtor/Creditor Monetization Vehicle Restructuring Fee:

          1.  On confirmation of any plan or reorganization or liquidation based on a debtor/creditor trust or similar asset monetization and claims resolution vehicle that does not include agreement among the debtor and creditors on a material amount of the outstanding claims and their respective treatment at confirmation (a "Monetization Vehicle Plan"):

             a.  $500,000 on confirmation of the Monetization Vehicle Plan;

             b.  $250,000 on the effective date of the Monetization Vehicle Plan; and

             c.  A contingent restructuring fee to be determined by the board or oversight committee installed to oversee the implementation of any Monetization Vehicle Plan based on the CEO/CRO (or acting as trustee) based upon performance under the plan after all material distributions under the Monetization Vehicle Plan are made.

2.  <u>Out-of-Pocket Expenses</u>:  In addition to the Base and Bonus Compensation, I shall be entitled to reimbursement for actual and reasonable out-of-pocket expenses ("Expenses") incurred in connection with the provision of services hereunder.  Expenses will be billed along with Base Compensation and shall be paid by the Company at the same time. Expenses will be generally consistent with expenses incurred to date as a member of the Board.

<u>Bankruptcy Court Approval</u>

Notwithstanding anything herein to the contrary, I understand that this Agreement is contingent, in all respects, on the approval of the Bankruptcy Court.  I also understand that the Company will seek approval of this Agreement in stages and that the Company will first seek approval of my retention as CEO and CRO and the payment of the Base Compensation and will defer seeking Bankruptcy Court approval of the Restructuring Fee until there have been further developments in the Bankruptcy Case.

<u>Conflicts and Other Engagements</u>

I am not aware of any potential conflicts of interest based on my understanding of the various parties involved in this matter to date.

The Company is aware that this engagement is not an exclusive engagement of my time, and that I have and will continue to have other business engagements and investments unrelated to the Company.  Nothing in this Agreement or otherwise precludes me from representing or working with or for any other person or entity in matters not directly related to the services being provided to the Company under this Agreement.  However, I will not take on any engagements directly adverse to the Company during the term of this engagement.

<u>Privilege</u>

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1216 of 1598 PageID 14263

Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 8 of 12

I understand that in the course of this engagement, I may become party to or my services may become part of work product of legal counsel to the Company (the Company's in-house and outside counsel are collectively referred to as "Counsel"), and all communications between Counsel and me relating to this engagement shall be protected from disclosure to third parties under the attorney work product doctrine and/or the attorney-client privilege, and, therefore, shall be treated by me as privileged and confidential. I further understand that the Company has the exclusive right to waive the attorney-client privilege, and Counsel has the exclusive right to waive the protections afforded under the attorney work-product doctrine.

Termination of Engagement

This Agreement may be terminated at any time by either the Company or by me upon two weeks advance written notice given to the other party. The termination of this Agreement shall not affect my right to receive, and the Company's obligation to pay, any and all Base Compensation and Expenses incurred (even if not billed) prior to the giving of the termination notice; provided, however, that (i) if this Agreement is terminated by me, the amount of Base Compensation owed shall be calculated based on the actual number of days worked during the applicable month and I will return any Base Compensation received in excess of such amount and (ii) if this Agreement is terminated by the Company, Base Compensation shall be deemed fully earned as of the first day of any month. Bonus Compensation shall be earned by me immediately upon termination of me by the Company; provided, however, I shall not be entitled to Bonus Compensation if (a) the Bankruptcy Case is converted to chapter 7 or dismissed; (b) a chapter 11 trustee is appointed in the Bankruptcy Case; (c) I am terminated by the Company for Cause; or (d) I resign prior to confirmation of a plan or court approval of a sale as described in the Fees and Expense/Compensation for Services section hereof. For purposes of this Agreement, "Cause" means any of the following grounds for termination of my engagement, in each case as reasonably determined by the Board within 60 days of the Board becoming aware of the existence of the event or circumstance: (A) fraud, embezzlement, or any act of moral turpitude or willful misconduct on my part; (B) conviction of or the entry of a plea of nolo contendere by me for any felony; (C) the willful breach by me of any material term of this Agreement; or (D) the willful failure or refusal by me to perform my duties to the Company, which, if capable of being cured, is not cured on or before fifteen (15) days after my receipt of written notice from the Company.

Conditional Requirement to Seek Further Bankruptcy Court Approval of Agreement

The official committee of unsecured creditors in the Bankruptcy Case (the "Committee") may, upon two weeks advance written notice to the Company, require the Company to file a motion with the Bankruptcy Court on normal notice seeking a continuation of this Agreement and if such motion is not filed, this Agreement will terminate at the expiration of such two week period. If the Company files such motion, I will be entitled to my Base Compensation through and including the date on which a final order is entered on such motion by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Committee may not deliver such notice to the Company until a date which is more than ninety days following the date the Bankruptcy Court enters an order approving this Agreement.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1217 of 1598   PageID 14264

Case 19-34054-sgj11 Doc 854 Filed 07/16/20    Entered 07/16/20 14:00:44    Page 9 of 12

Indemnification

As a material part of the consideration to me under this Agreement, the Company agrees (i) to indemnify and hold harmless me and any of my affiliates (the "Indemnified Party"), to the fullest extent lawful, from and against any and all losses, claims, costs, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, my engagement under this Agreement, or any actions taken or omitted to be taken by me or the Company in connection with this Agreement and (ii) to reimburse the Indemnified Party for all expenses ( including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including, without limitation, any shareholder or derivative action, or any fee dispute), arising out of or relating to this Agreement, or such engagement, or actions.  However, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of the Indemnified Party.

The indemnification and insurance currently covering my role as a director shall be extended to me and fully cover me as provided therein in my roles as CEO and CRO.

Miscellaneous

This Agreement (a) constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements among the parties with respect to the subject matter hereof, and (b) may be modified, amended or supplemented only by written agreement among all the parties hereto.

This Agreement is subject to approval by the Bankruptcy Court.  As part of such approval the Company shall request that any such order approving this Agreement contain a provision extending the protections afforded to me as a Board Member pursuant to Paragraph 10 of the Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course entered by the Bankruptcy Court on January 9, 2020 [Docket No. 339] to my role as CEO and CRO, which Order prohibits the commencement of any action against me without first obtaining Bankruptcy Court approval to initiate such action.

This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York.  The parties hereby submit to the jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1218 of 1598   PageID 14265

Case 19-34054-sgj11 Doc 854 Filed 07/16/20    Entered 07/16/20 14:00:44    Page 10 of 12

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

James. P. Seery, Jr.

AGREED AND ACCEPTED

HIGHLAND CAPITAL MANAGEMENT L.P.

By: Strand Advisors, Inc., its general partner


_____          _____
John Dubel                                    Russell Nelms
Director                                      Director
Strand Advisors, Inc.                         Strand Advisors, Inc.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 12 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1219 of 1598   PageID 14266
13

Case 19-34054-sgj11 Doc 854 Filed 07/16/20   Entered 07/16/20 14:00:44   Page 11 of 12

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


_____          _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1220 of 1598 PageID 14267
Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 12 of 12

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner

_____          _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

# EXHIBIT 72

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S    Document 8-24    Filed 02/29/23    Page 1222 of 1598    PageID 14269
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 1 of 161

Docket #1943  Date Filed: 02/22/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed February 22, 2021

_____
_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

### ORDER (I) CONFIRMING THE FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
### MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.    entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below).  The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

DOCS_SF:104487.21 36027/002


1934054210222000000000018

APPX. 10759

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1223 of 1598   PageID 14270
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 2 of 161

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "<u>Disclosure Statement</u>") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.      set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "<u>Objection Deadline</u>"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "<u>Plan</u>");

c.      set January 5, 2021, at 5:00 p.m. prevailing Central Time,  as the deadline for voting on the Plan (the "<u>Voting Deadline</u>") in accordance with the Disclosure Statement Order;

d.      initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.      reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "<u>Confirmation Hearing Notice</u>"), the form of which is attached as <u>Exhibit 1-B</u> to the Disclosure Statement Order;

f.      reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "<u>Plan Supplements</u>");

g.      reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

2

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1224 of 1598   PageID 14271
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 3 of 161

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.    reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.    reviewed: (i) the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1225 of 1598   PageID 14272
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 4 of 161

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.    reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.    conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.    heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.    considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor,

the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of

law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

4

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1226 of 1598   PageID 14273
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 5 of 161

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.    **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.    **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1227 of 1598 PageID 14274
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 6 of 161

for this process, among other duties specified in the Plan's Claimant Trust Agreement. There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3. **Confirmation Requirements Satisfied.** The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7. Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code. The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4. **Not Your Garden Variety Debtor.** The Debtor's case is not a garden variety chapter 11 case. The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940. It was founded in 1993 by James Dondero and Mark Okada. Mark Okada resigned from his role with Highland prior to the

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1228 of 1598    PageID 14275
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 7 of 161

bankruptcy case being filed on October 16, 2019 (the "Petition Date").  Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below.  Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020.  Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

5.      **The Debtor**.  The Debtor is headquartered in Dallas, Texas.  As of the

Petition Date, the Debtor employed approximately 76 employees.  The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

6.      **The Highland Enterprise.**  Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments.  Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella.  None of these

affiliated entities filed for chapter 11 protection.  Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor.  Many of the Debtor's affiliated companies are

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1229 of 1598   PageID 14276
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 8 of 161

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See Disclosure Statement*, at 17-18.

7.   **Debtor's Operational History.**   The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.   For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.   The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."   The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8.   **Not Your Garden Variety Creditor's Committee**.   The Debtor and this chapter 11 case are not garden variety for so many reasons.   One of the most obvious standouts in this case is the creditor constituency.   The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.   For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.   The Debtor also did not have problems with its trade vendors or landlords.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1230 of 1598 PageID 14277
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 9 of 161

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a. **The Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b. **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("Acis")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1231 of 1598   PageID 14278
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 10 of 161

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

    c.    **UBS Securities LLC and UBS AG London Branch ("UBS").** UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

    d.    **Meta-E Discovery ("Meta-E").** Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

    9.    **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1232 of 1598   PageID 14279
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 11 of 161

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor.  The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose).  Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations.  HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10.    **Other Claims Asserted.**  Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11.    **Not Your Garden Variety Post-Petition Corporate Governance Structure**.  Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure.  Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best.  First, the Committee moved for a change of venue from

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1233 of 1598 PageID 14280
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 12 of 161

Delaware to Dallas. Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

12. **Post-Petition Corporate Governance Settlement with Committee.** After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5] As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand. As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor. The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1234 of 1598   PageID 14281
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 13 of 161

13.    **Appointment of Independent Directors.**    As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor).   The three independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.   Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent directors.  They were the right solution at the right time.  Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1235 of 1598 PageID 14282
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 14 of 161

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a

chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was

a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience.

While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland

complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis

trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the

case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the

Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14.     **Conditions Required by Independent Directors.** Given the experiences

in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified

persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer,

as it would be in an ordinary chapter 11 case. The independent board members were stepping into

a morass of problems. Naturally, they were worried about getting sued no matter how defensible

their efforts—given the litigation culture that enveloped Highland historically. Based on the

record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything

always ended in litigation at Highland. The Bankruptcy Court heard credible testimony that none

of the independent directors would have taken on the role of independent director without (1) an

adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification

from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims;

and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent

directors without the Bankruptcy Court's prior authority. This gatekeeper provision was also

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 16 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1236 of 1598   PageID 14283
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 15 of 161

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's

Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on

July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are

precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine"

(first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)).

The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16

Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the

Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy

Court finds that, like the Committee, the independent board members have been resilient and

unwavering in their efforts to get the enormous problems in this case solved.  They seem to have

at all times negotiated hard and in good faith, which culminated in the proposal of the Plan

currently before the Bankruptcy Court.  As noted previously, they completely changed the

trajectory of this case.

15.    **Not Your Garden Variety Mediators.**  And still another reason why this

was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine

months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis,

UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators

because mediation among these parties seemed like such a Herculean task—especially during

COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1237 of 1598 PageID 14284
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 16 of 161

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 18 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1238 of 1598   PageID 14285
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 17 of 161

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a.   *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b.   *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c.   A *Joinder to the Objection filed at 1670 by:  NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d.   *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e.   *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676].  The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17.   **Questionability of Good Faith as to Outstanding Confirmation**

**Objections.**  Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1239 of 1598 PageID 14286
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 18 of 161

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors. Mr. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan. As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring. The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18. **Remote Interest of Outstanding Confirmation Objectors.** To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately. First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture). Mr. Dondero owns no equity in the Debtor directly. Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor. Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good"). The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor. *See* Disclosure Statement at 7, n.3. The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero. Get Good

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1240 of 1598   PageID 14287
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 19 of 161

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief.  Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated.  Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863.  The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888].  At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years.  Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero.  Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1241 of 1598 PageID 14288
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 20 of 161

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities. Finally, various NexBank entities objected to the Plan. The Bankruptcy Court does not believe they have liquidated claims against the Debtor. Mr. Dondero appears to be in control of these entities as well.

19.     **Background Regarding Dondero Objecting Parties.** To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith. Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero. In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence. Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing. The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20.     **Other Confirmation Objections.** Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 22 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1242 of 1598   PageID 14289
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 21 of 161

Debtor release provisions.  In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

a.  *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

b.  *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

c.  *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

d.  *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679].  This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

e.  *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

f.  *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].  This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

21.   **Capitalized Terms.**  Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1243 of 1598   PageID 14290
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 22 of 161

22.    **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.    **Chapter 11 Petition.**   On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.    **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1244 of 1598   PageID 14291
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 23 of 161

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25.    **Plan Supplement Documents.**    Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements.    The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26.    **Retained Causes of Action Adequately Preserved.**    The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27.    **Plan Modifications Are Non-Material.**    In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1245 of 1598    PageID 14292
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 24 of 161

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's*

*Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital*

*Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the

"Plan Modifications").  Section 1127(a) of the Bankruptcy Code provides that a plan proponent

may modify its plan at any time before confirmation so long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code.  None of the modifications set

forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant

to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because,

among other things, they do not materially adversely change the treatment of the claims of any

creditors or interest holders who have not accepted, in writing, such supplements and

modifications.  Among other things, there were changes to the projections that the Debtor filed

shortly before the Confirmation Hearing (which included projected distributions to creditors and

a comparison of projected distributions under the Plan to potential distributions under a

hypothetical chapter 7 liquidation).  The Plan Supplements and Plan Modifications did not mislead

or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity

Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.

Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021

[Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors

or interest holders but, rather, simply update the estimated distributions based on Claims that were

settled in the interim and provide updated financial data.  The filing and notice of the Plan

Supplements and Plan Modifications were appropriate and complied with the requirements of

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1246 of 1598 PageID 14293
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 25 of 161

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required. The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code. The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28. **Notice of Transmittal, Mailing and Publication of Materials.** As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29. **Voting.** The Bankruptcy Court has reviewed and considered the Voting Certifications. The procedures by which the Ballots for acceptance or rejection of the Plan were

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1247 of 1598 PageID 14294
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 26 of 161

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30.     **Bankruptcy Rule 3016(a).**  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31.     **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**  As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32.     **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).**  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33.     **Classification of Secured Claims.**  Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors.  Class 3 (Other

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1248 of 1598   PageID 14295
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 27 of 161

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34. **Classification of Priority Claims.** Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims. Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35. **Classification of Unsecured Claims.** Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8. Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims). The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor. Class 8 Creditors

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1249 of 1598   PageID 14296
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 28 of 161

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims.  The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified.  Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8.  Class 7 creditors largely consist of liquidated trade or service providers to the Debtor.  In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8.  Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed.  The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor.  Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.**  The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.**  Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

APPX. 107549

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1250 of 1598   PageID 14297
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 29 of 161

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38.     **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1251 of 1598   PageID 14298
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 30 of 161

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests.  The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39.    **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).**  Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan.  Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40.    **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).**  Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes.  Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41.    **No Discrimination (11 U.S.C. § 1123(a)(4)).**  The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest.  The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan.  Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 32 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1252 of 1598   PageID 14299
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 31 of 161

42.    **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**  Article IV of the

Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the

establishment of:  (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor;

and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are

included in the Plan Supplements.

    a.    **The Claimant Trust.**   The Claimant Trust Agreement provides for the
management of the Claimant Trust, as well as the Reorganized Debtor with the
Claimant Trust serving as the managing member of New GP LLC (a wholly-owned
subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its
general partner).  The Claimant Trust, the Claimant Trustee, the management and
monetization of the Claimant Trust Assets, and the management of the Reorganized
Debtor (through the Claimant Trust's role as managing member of New GP LLC)
and the Litigation Sub-Trust will all be managed and overseen by the Claimant
Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the
Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the
Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and
for the Claimant Trust Assets to automatically vest in the Claimant Trust free and
clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant
Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant
Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as
provided under the Plan and the Claimant Trust Agreement contained in the Plan
Supplements.

    b.    **The Litigation Sub-Trust.**   The Plan and the Litigation Sub-Trust Agreement
provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights,
title, and interest in and to all of the Estate Claims (as transferred to the Claimant
Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and
for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear
of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-
Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the
Litigation Sub-Trust Agreement.   The Litigation Trustee is charged with
investigating, pursuing, and otherwise resolving any Estate Claims (including those
with respect to which the Committee has standing to pursue prior to the Effective
Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-
Trust Agreement and the Plan, regardless of whether any litigation with respect to
any Estate Claim was commenced by the Debtor or the Committee prior to the
Effective Date.

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1253 of 1598   PageID 14300
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 32 of 161

      c.    **The Reorganized Debtor**.  The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action. The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan. The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors. Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests). Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan. Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents. Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

      43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).**  The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1254 of 1598   PageID 14301
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 33 of 161

44.    **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).**  Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee.  The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board.  The Claimant Trust Oversight Board will consist of:  (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker.   Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee.  Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors.  They are therefore intimately familiar with the Debtor, its business, and assets.  The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties.  The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1255 of 1598   PageID 14302
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 34 of 161

45. **Selection of Trustees.** The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee.  As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record.   The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan.  Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee.  Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks.  Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally.  Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date.  The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae.  Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

DOCS_SF:104487.21 36027/002

APPX. 07553

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1256 of 1598 PageID 14303
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 35 of 161

Confirmation Hearing and in the Confirmation Brief. Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries. The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders. Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46. **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47. **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.** Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order. In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 37 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1257 of 1598   PageID 14304
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 36 of 161

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not

entitled to vote on the Plan pursuant to the Disclosure Statement Order.  The Disclosure Statement

Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity

Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan,

and the deadlines for voting on and objecting to the Plan.  The Debtor and KCC each complied

with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying

sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and

Publication.  The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides

that the same disclosure statement must be transmitted to each holder of a claim or interest in a

particular class.  The Debtor caused the same Disclosure Statement to be transmitted to all holders

of Claims and Equity Interests entitled to vote on the Plan.  The Debtor has complied in all respects

with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure

Statement Order.  The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain

Dondero Related Entities that the changes made to certain assumptions and projections from the

Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation

Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the

Plan.  The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to

the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections.

Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the

changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial

Projections do not constitute materially adverse change to the treatment of Claims or Equity

DOCS_SF:104487.21 36027/002

APPX. 017557

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 38 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1258 of 1598   PageID 14305
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 37 of 161

Interests.  Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data.  Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets.  The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48.     **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).**  The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

a.     The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 39 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1259 of 1598   PageID 14306
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 38 of 161

b.  The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.  Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.  While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.  On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation.  As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.  On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero.  The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.  The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020.  The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.  Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.  Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful.  This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 40 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1260 of 1598   PageID 14307
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 39 of 161

49.     **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

Article II.B of the Plan provides that Professionals will file all final requests for payment of

Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an

adequate period of time for interested parties to review such claims.  The procedures set forth in

the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in

connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter

11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy

Code.

50.     **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**  Article IV.B

of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the

Claimant Trust Oversight Committee and the members thereto.  For the reasons more fully

explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of

section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation

of any insider to be employed or retained by the Reorganized Debtor, if applicable, and

compensation for any such insider.  The appointment of such individuals is consistent with the

interests of Claims and Equity Interests and with public policy.  Thus, the Plan satisfies section

1129(a)(5) of the Bankruptcy Code.

51.     **No Rate Changes (11 U.S.C. § 1129(a)(6)).**  The Plan does not provide for

any rate change that requires regulatory approval.  Section 1129(a)(6) of the Bankruptcy Code is

thus not applicable.

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 41 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1261 of 1598   PageID 14308
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 40 of 161

52.     **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**  The "best interests"

test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity

Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date

of the Plan, that is not less than the amount that such Holder would so receive or retain if the

Debtor were liquidated under chapter 7 of the Bankruptcy Code.  On October 15, 2020, the Debtor

filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its

advisors and which was attached as Exhibit C to the Disclosure Statement.  On January 29, 2021,

in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor

provided an updated version of the Liquidation Analysis to the then-objectors of the Plan,

including Mr. Dondero and the Dondero Related Entities.  On February 1, 2021, the Debtor filed

the  Amended  Liquidation  Analysis/Financial  Projections.    The  Amended  Liquidation

Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues,

and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the

Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued

at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in

market conditions and other factors; (3) expected revenues and expenses arising in connection with

the Debtor's continued management of the CLOs pursuant to management agreements that the

Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding

two or three employees to assist in the management of the CLOs, the Debtor also increased

modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and

professional fees; and (5) an increase in projected recoveries on notes resulting from the

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1262 of 1598   PageID 14309
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 41 of 161

acceleration of term notes owed to the Debtor by the following Dondero Related Entities:
NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC
(n/k/a NexPoint Real Estate Partners, LLC).  Under the Plan, as of the Confirmation Date, (a) Class
7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b)
Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on
account of their Claims.  Under a hypothetical chapter 7 liquidation, all general unsecured creditors
are projected to receive approximately 55% on account of their Claims.  The Bankruptcy Court
finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive
under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation
based on Mr. Seery's testimony, including the following credible reasons he posited, among
others:

a.  The nature of the Debtor's assets is complex.  Certain assets relate to complicated
real estate structures and private equity investments in operating businesses.  Mr.
Seery's extensive experience with the Debtor during the thirteen months since his
appointment as an Independent Director and later Chief Executive Officer and
Chief Restructuring Officer, provides him with a substantial learning curve in
connection with the disposition of the Debtor's assets and are reasonably expected
to result in him being able to realize tens of millions of dollars more value than
would a chapter 7 trustee.

b.  Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's
business under chapter 7 of the Bankruptcy Code and hire the necessary personnel
with the relevant knowledge and experience to assist him or her in selling the
Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's
assets in a forced sale liquidation which would generate substantially less value for
the Debtor's creditors than the asset monetization plan contemplated by the Plan.

c.  A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals
to assist in its efforts to monetize assets, resulting in delays, increased expenses,
and reduced asset yields for the chapter 7 estate.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1263 of 1598   PageID 14310
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 42 of 161

     d.     The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

     e.     The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.     **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.     **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S    Document 8-24    Filed 02/29/23    Page 1264 of 1598    PageID 14311
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 43 of 161

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy

Code.

      55.    **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**  Class 2

(Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims

that voted to accept the Plan, determined without including any acceptance of the Plan by any

insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

      56.    **Feasibility (11 U.S.C. § 1129(a)(11)).**  Article IV of the Plan provides for

the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the

Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize

and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation

Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing

provide a reasonable probability of success that the Debtor will be able to effectuate the provisions

of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective

Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that

the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier

Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this

note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly

opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the

Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to

receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1265 of 1598 PageID 14312
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 44 of 161

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57. **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code. The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.

58. **Retiree Benefits.** The Plan provides for the assumption of the Pension Plan (to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to the extent applicable.

59. **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).** Sections 1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii) is not a nonprofit corporation (section 1129(a)(16)).

60. **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)).** The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11, which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1266 of 1598   PageID 14313
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 45 of 161

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

> a. <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

> b. <u>Class 10 and Class 11</u>.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1267 of 1598   PageID 14314
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 46 of 161

61.     **Only One Plan (11 U.S.C. § 1129(c)).**  The Plan is the only chapter 11 plan

confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy

Code are therefore satisfied.

62.     **Principal Purpose (11 U.S.C. § 1129(d)).**  Mr. Seery testified that the

principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application

of section 5 of the Securities Act of 1933, and no governmental unit has objected to the

confirmation of the Plan on any such grounds.  Accordingly, section 1129(d) of the Bankruptcy

Code is inapplicable.

63.     **Satisfaction of Confirmation Requirements.**  Based upon the foregoing,

the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy

Code and should be confirmed.

64.     **Good Faith Solicitation (11 U.S.C. § 1125(e)).**  The Debtor, the

Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted

in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance

with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with

all of their respective activities relating to the solicitation of acceptances of the Plan and their

participation in the activities described in section 1125 of the Bankruptcy Code, and they are

entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.     **Discharge (11 U.S.C. § 1141(d)(3)**).  The Debtor is entitled to a discharge

of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code.  Under the Plan, the Claimant

Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1268 of 1598 PageID 14315
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 47 of 161

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund. Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude. Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66. **Retention of Jurisdiction.** The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

67. **Additional Plan Provisions (11 U.S.C. § 1123(b)).** The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68. **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case. The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 49 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1269 of 1598    PageID 14316
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 48 of 161

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts").  With respect

to the Assumed Contracts, only one party objected to the assumption of any of the Assumed

Contracts, but that objection was withdrawn.[8]  Any modifications, amendments, supplements, and

restatements to the Assumed Contracts that may have been executed by the Debtor during the

Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or

the validity, priority, or amount of any Claims that may arise in connection therewith.  Assumption

of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant

to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether

monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition or other bankruptcy-related defaults, arising under any assumed

Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69.    **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).**  All of the settlements and compromises pursuant to and in connection

with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and

Bankruptcy Rule 9019.

70.    **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).**  The

Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the

jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the

transactions incorporated into the Plan, and inextricably bound with the other provisions of the

Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 50 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1270 of 1598    PageID 14317
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 49 of 161

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71.    **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties.  Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties.  The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties.  The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases.  The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 51 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1271 of 1598   PageID 14318
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 50 of 161

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.  The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions").  Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date.  The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring.   The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

72.    **Exculpation.**  Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision").  As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent.  First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 52 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1272 of 1598    PageID 14319
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 51 of 161

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order.  The January 9 Order was not appealed.  In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence.  Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73.    **Existing Exculpation of Independent Directors.**  The Bankruptcy Court also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order.  The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 53 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1273 of 1598   PageID 14320
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 52 of 161

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987).  The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

      74.     **The Exculpation Provision Complies with Applicable Law.**  Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co*., 584 F.3d 229 (5th Cir. 2009), for several reasons:

    a.    First, the statutory basis for *Pacific Lumber'*s denial of exculpation for certain
parties other than a creditors' committee and its members is that section 524(e) of
the Bankruptcy Code "only releases the debtor, not co-liable third parties."  *Pacific
Lumber*, 253 F.3d. at 253.   However, *Pacific Lumber* does not prohibit all
exculpations under the Bankruptcy Code and the court in such case specifically
approved the exculpations of a creditors' committee and its members on the
grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers,
implies committee members have qualified immunity for actions within the scope
of their duties…. [I]f members of the committee can be sued by persons unhappy
with the committee's performance during the case or unhappy with the outcome of
the case, it will be extremely difficult to find members to serve on an official
committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al,
Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008)).  *Pacific Lumber's*
rationale for permitted exculpation of creditors' committees and their members
(which was clearly policy-based and based on a creditors' committee qualified
immunity flowing from their duties under section 1103(c) of the Bankruptcy Code
and their disinterestedness and importance in chapter 11 cases) does not preclude
exculpation to other parties in a particular chapter 11 case that perform similar roles
to a creditors' committee and its members.  The Independent Directors, and by
extension the Chief Executive Officer and Chief Restructuring Officer, were not

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 54 of
Case 3:23-cv-00726-S  Document 8-24   Filed 02/29/23    Page 1274 of 1598   PageID 14321
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 53 of 161

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.    Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

APPX. 10757

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 55 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1275 of 1598   PageID 14322
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 54 of 161

75.    **Injunction.**  Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision").  The Injunction Provision is necessary to implement the provisions in the Plan.  Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value.  In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities.  Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors.  The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142.  The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release."  The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.  The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76.    **Gatekeeper Provision**.  Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision").   The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties.  Thereafter, if the Bankruptcy Court determines that the action is

APPX. 07573

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 56 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1276 of 1598    PageID 14323
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 55 of 161

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action.  The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan.  The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77.    **Factual Support for Gatekeeper Provision.**  The facts supporting the need for the Gatekeeper Provision are as follows.  As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade.  Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor.  During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor.  Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 57 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1277 of 1598   PageID 14324
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 56 of 161

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

78.    **Findings Regarding Dondero Post-Petition Litigation.** The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place." The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1278 of 1598   PageID 14325
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 57 of 161

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79.    **Necessity of Gatekeeper Provision.**  The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles.  The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance.  Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision.  Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017).  Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.  Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1279 of 1598 PageID 14326
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 58 of 161

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80. **Statutory Authority to Approve Gatekeeper Provision.** The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a). The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour*, 104 U.S. 126

(1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue*

*Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll*, 850 F.3d 811 (5th Cir.

2017).

81. **Jurisdiction to Implement Gatekeeper Provision.** The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d

296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge*

*Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005). Based upon the rationale of the Fifth Circuit in *Villegas*

*v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall*. The Bankruptcy Court's determination of whether

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 60 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1280 of 1598   PageID 14327
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 59 of 161

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82. **Resolution of Objections of Scott Ellington and Isaac Leventon**. Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

    a. Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00. Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection. If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

    b. Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

    c. The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims. The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 61 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1281 of 1598   PageID 14328
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 60 of 161

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.      The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.      Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.      Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 62 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1282 of 1598    PageID 14329
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 61 of 161

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.    The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date.  If the Debtor does not make an election, then Option A will apply.

h.    Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.    Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.    The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.    For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court

at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

    **A.    Confirmation of the Plan.**  The Plan is approved in its entirety and

**CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, including the

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 63 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1283 of 1598 PageID 14330
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 62 of 161

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

       **B.**     **Findings of Fact and Conclusions of Law**. The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014. All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order. To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

       **C.**     **Objections**. Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference. All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

       **D.**     **Plan Supplements and Plan Modifications.** The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 64 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1284 of 1598   PageID 14331
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 63 of 161

sufficient notice thereof.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and

Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional

disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126

of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded

an opportunity to change previously cast acceptances or rejections of the Plan.  The Plan

Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the

Bankruptcy Code.  Accordingly, the Plan, as modified, is properly before the Bankruptcy Court

and all votes cast with respect to the Plan prior to such modification shall be binding and shall

apply with respect to the Plan.

        **E.**      **Deemed Acceptance of Plan.**  In accordance with section 1127 of the

Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted

to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have

accepted the Plan as modified by the Plan Modifications.  No holder of a Claim shall be permitted

to change its vote as a consequence of the Plan Modifications.

        **F.**      **Vesting of Assets in the Reorganized Debtor.**  Except as otherwise

provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized

Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or

other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to

such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan

upon the Effective Date.  The Reorganized Debtor shall be the exclusive trustee of the Reorganized

Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

APPX. 007584

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 65 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1285 of 1598   PageID 14332
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 64 of 161

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

      **G.**    **Effectiveness of All Actions.**  All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

      **H.**    **Restructuring Transactions.**  The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 66 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1286 of 1598   PageID 14333
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 65 of 161

I.    **Preservation of Causes of Action.**  Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order).  In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

J.    **Independent Board of Directors of Strand.**  The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors.  For avoidance of doubt, the Assumed Contracts

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 67 of
Case 3:23-cv-00726-S    Document 8-24    Filed 02/29/23    Page 1287 of 1598    PageID 14334
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 66 of 161

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

**K.** **Cancellation of Equity Interests and Issuance of New Partnership Interests.** On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement. As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 68 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1288 of 1598   PageID 14335
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 67 of 161

Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed

consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.

The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee

will be the sole officer of New GP LLC on the Effective Date.

        **L.**     **Transfer of Assets to Claimant Trust.**  On or prior to the Effective Date,

the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the

Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in

accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall

automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or

interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided

for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate

transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.  Following

the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the

Plan and the Claimant Trust Agreement.

        **M.**     **Transfer of Estate Claims to Litigation Sub-Trust**.  On or prior to the

Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have

irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and

interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance

with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the

Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to

the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses.  The Litigation Trustee will

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 69 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1289 of 1598   PageID 14336
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 68 of 161

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor or Committee, as applicable, in any litigation commenced prior to the Effective Date in which Estate Claims are asserted.

    **N.**  **Compromise of Controversies.** In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

    **O.**  **Objections to Claims**. The Claims Objection Deadline shall be the date that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise provided under the Plan.

    **P.**  **Assumption of Contracts and Leases.** Effective as of the date of this Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the Plan. Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to any of the

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 70 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1290 of 1598   PageID 14337
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 69 of 161

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith.  Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

Q. **Rejection of Contracts and Leases.**  Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan.  To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

R. **Assumption of Issuer Executory Contracts.**  On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 71 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1291 of 1598   PageID 14338
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 70 of 161

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a

cumulative amount of $525,000 (the "Cure Amount") as follows:

a.    $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

b.    $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

S.    **Release of Issuer Claims.**  Effective as of the Confirmation Date, and to

the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and

former advisors, trustees, directors, officers, managers, members, partners, employees,

beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 72 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1292 of 1598   PageID 14339
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 71 of 161

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits,

remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals

retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the

CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related

Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts,

liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses

(including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions,

and causes of action of whatever kind or nature, whether known or unknown, suspected or

unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in

equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative

defenses, whether known or unknown, including, without limitation, those which were or could

have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the

"Issuer Released Claims").

     **T.**     **Release of Debtor Claims against Issuer Released Parties.** Upon entry

of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally,

fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and

covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura

Chisholm (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit

Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David

Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch,

(xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 73 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1293 of 1598 PageID 14340
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 72 of 161

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties")],] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts. Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

U. **Authorization to Consummate.** The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan. The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

V. **Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 74 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1294 of 1598 PageID 14341
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 73 of 161

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

> **W.** **Release, Exculpation, Discharge, and Injunction Provisions. The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

> **X.** **Discharge of Claims and Termination of Interests.** To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

DOCS_SF:104487.21 36027/002

APPX. 107594

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1295 of 1598 PageID 14342
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 74 of 161

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y. **Exculpation.** Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1296 of 1598   PageID 14343
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 75 of 161

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

      **Z.**      **Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 77 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1297 of 1598    PageID 14344
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 76 of 161

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance
Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual
fraud, or gross negligence of such applicable Released Party as determined by Final Order of the
Bankruptcy Court or any other court of competent jurisdiction.

**AA.    Injunction.    Upon entry of this Confirmation Order, all Enjoined
Parties are and shall be permanently enjoined, on and after the Effective Date, from taking
any actions to interfere with the implementation or consummation of the Plan.    Except as
expressly provided in the Plan, this Confirmation Order, or a separate order of the
Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after
the Effective Date, with respect to any Claims and Equity Interests, from directly or
indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or
other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative
or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing,
levying, attaching (including any prejudgment attachment), collecting, or otherwise
recovering, enforcing, or attempting to recover or enforce, by any manner or means, any
judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii)
creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or
encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any
right of setoff, directly or indirectly, against any obligation due to the Debtor or against
property or interests in property of the Debtor, except to the limited extent permitted under
Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 78 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1298 of 1598   PageID 14345
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 77 of 161

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.  Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

DOCS_SF:104487.21 36027/002

APP. 01596

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 79 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1299 of 1598   PageID 14346
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 78 of 161

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

      **BB.    Duration of Injunction and Stays.  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.**

      **CC.    Continuance of January 9 Order and July 16 Order.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020  shall remain in full force and effect from the Confirmation Date and following the Effective Date.

      **DD.    No Governmental Releases.**  Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 80 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1300 of 1598   PageID 14347
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 79 of 161

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

EE.    **Exemption from Transfer Taxes.**    Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1301 of 1598 PageID 14348
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 80 of 161

including any deeds, bills of sale, assignments, or other instrument of transfer executed in

connection with any transaction arising out of, contemplated by, or in any way related to the Plan,

shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or

similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial

Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental

assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon

entry of this Confirmation Order, the appropriate state or local governmental officials or agents

shall forego the collection of any such tax or governmental assessment and accept for filing and

recordation of any of the foregoing instruments or other documents without the payment of any

such tax, recordation fee, or governmental assessment.

FF.     **Cancellation of Notes, Certificates and Instruments.**  Except for the

purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in

the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements,

instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest

and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no

force or effect.  The holders of or parties to such cancelled instruments, Securities, and other

documentation will have no rights arising from or related to such instruments, Securities, or other

documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and

the obligations of the Debtor thereunder or in any way related thereto will be fully released,

terminated, extinguished and discharged, in each case without further notice to or order of the

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 82 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1302 of 1598   PageID 14349
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 81 of 161

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

GG.    **Documents, Mortgages, and Instruments.**    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

HH.    **Post-Confirmation Modifications.**    Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

II.    **Applicable Nonbankruptcy Law.**    The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

JJ.    **Governmental Approvals Not Required.**    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 83 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1303 of 1598 PageID 14350
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 82 of 161

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

KK.    **Notice of Effective Date.**   As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

LL.    **Substantial Consummation.**   On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

MM.   **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 84 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1304 of 1598   PageID 14351
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 83 of 161

NN.    **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.    **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.    **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.    **Resolution of Objection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 85 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1305 of 1598   PageID 14352
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 84 of 161

applicable nonbankruptcy law.  In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a.    The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law.  The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan.  The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b.    The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full.  In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default.  Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default.  If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith.  The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 86 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1306 of 1598   PageID 14353
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 85 of 161

**RR.    Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects.  The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date.  If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

  a.    Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

  b.    The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

  c.    Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan.  Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

  d.    The Senior Employees' Objection is deemed withdrawn.

**SS.    No Release of Claims Against Senior Employee Claimants**.  For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 87 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1307 of 1598   PageID 14354
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 86 of 161

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

      **TT.**    **Resolution of Objection of Internal Revenue Service.**  Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the "IRS Claim"):

    (a)  Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

        (1)  The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

        (2)  The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

        (3)  The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

    (b)  If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 88 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1308 of 1598   PageID 14355
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 87 of 161

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest.  Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c)  The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel.  The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d)  The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS.  The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e)  Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f)  The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.  The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

> **UU.    IRS Proof of Claim.**  Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 89 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1309 of 1598   PageID 14356
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 88 of 161

**VV.    CLO Holdco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.  The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.    Dissolution of the Committee.**  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1310 of 1598 PageID 14357
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 89 of 161

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

ZZ. **Miscellaneous.** After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 91 of
Case 3:23-cv-00726-S    Document 8-24    Filed 02/29/23    Page 1311 of 1598    PageID 14358
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 90 of 161

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post

confirmation reporting requirements.

### ###END OF ORDER###

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 92 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1312 of 1598   PageID 14359
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 91 of 161

## Exhibit A

**Fifth Amended Plan (as Modified)**

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 93 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1313 of 1598   PageID 14360
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 92 of 161

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) |
|  | ) Case No. 19-34054-sgj11 |
| Debtor. | ) |
|  | ) |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
         ikharasch@pszjlaw.com
         gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 94 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1314 of 1598    PageID 14361
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 93 of 161

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ..............................................1

    A.   Rules of Interpretation, Computation of Time and Governing Law....................1

    B.   Defined Terms ...............................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS................16

    A.   Administrative Expense Claims................................................16

    B.   Professional Fee Claims..........................................................17

    C.   Priority Tax Claims.................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY INTERESTS ...............................................................18

    A.   Summary.................................................................................18

    B.   Summary of Classification and Treatment of Classified Claims and Equity Interests .........................................................................18

    C.   Elimination of Vacant Classes ................................................19

    D.   Impaired/Voting Classes .........................................................19

    E.   Unimpaired/Non-Voting Classes.............................................19

    F.   Impaired/Non-Voting Classes.................................................19

    G.   Cramdown...............................................................................19

    H.   Classification and Treatment of Claims and Equity Interests............................19

    I.   Special Provision Governing Unimpaired Claims................................24

    J.   Subordinated Claims...............................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN .....................................24

    A.   Summary.................................................................................24

    B.   The Claimant Trust ................................................................25

        1.   Creation and Governance of the Claimant Trust and Litigation Sub-Trust...................................................................25

        2.   Claimant Trust Oversight Committee......................................26

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 95 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1315 of 1598   PageID 14362
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 94 of 161

**Page**

3.    Purpose of the Claimant Trust. ...................................................27

4.    Purpose of the Litigation Sub-Trust..........................................27

5.    Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6.    Compensation and Duties of Trustees. ....................................29

7.    Cooperation of Debtor and Reorganized Debtor. ...................29

8.    United States Federal Income Tax Treatment of the Claimant
      Trust. .........................................................................................29

9.    Tax Reporting. .........................................................................30

10.   Claimant Trust Assets. ...........................................................30

11.   Claimant Trust Expenses. ......................................................31

12.   Trust Distributions to Claimant Trust Beneficiaries...............31

13.   Cash Investments. ..................................................................31

14.   Dissolution of the Claimant Trust and Litigation Sub-Trust. ................31

C.    The Reorganized Debtor ...................................................................32

1.    Corporate Existence ...............................................................32

2.    Cancellation of Equity Interests and Release..........................32

3.    Issuance of New Partnership Interests ...................................32

4.    Management of the Reorganized Debtor .................................33

5.    Vesting of Assets in the Reorganized Debtor .........................33

6.    Purpose of the Reorganized Debtor ........................................33

7.    Distribution of Proceeds from the Reorganized Debtor Assets;
      Transfer of Reorganized Debtor Assets...................................33

D.    Company Action ................................................................................34

E.    Release of Liens, Claims and Equity Interests..................................35

F.    Cancellation of Notes, Certificates and Instruments..........................35

- ii -

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 96 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1316 of 1598 PageID 14363
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 95 of 161

**Page**

G.    Cancellation of Existing Instruments Governing Security Interests ..................35

H.    Control Provisions ..................................................................................35

I.    Treatment of Vacant Classes ................................................................36

J.    Plan Documents ...................................................................................36

K.    Highland Capital Management, L.P. Retirement Plan and Trust ......................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
           LEASES .........................................................................................37

A.    Assumption, Assignment, or Rejection of Executory Contracts and
    Unexpired Leases ...............................................................................37

B.    Claims Based on Rejection of Executory Contracts or Unexpired
    Leases .................................................................................................38

C.    Cure of Defaults for Assumed or Assigned Executory Contracts and
    Unexpired Leases ...............................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................39

A.    Dates of Distributions .........................................................................39

B.    Distribution Agent ..............................................................................39

C.    Cash Distributions ..............................................................................40

D.    Disputed Claims Reserve ....................................................................40

E.    Distributions from the Disputed Claims Reserve ...............................40

F.    Rounding of Payments ........................................................................40

G.    *De Minimis* Distribution ....................................................................41

H.    Distributions on Account of Allowed Claims ....................................41

I.    General Distribution Procedures .........................................................41

J.    Address for Delivery of Distributions .................................................41

K.    Undeliverable Distributions and Unclaimed Property ........................41

L.    Withholding Taxes ..............................................................................42

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 97 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1317 of 1598   PageID 14364
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 96 of 161

**Page**

M.       Setoffs ............................................................................................ 42

N.       Surrender of Cancelled Instruments or Securities ............................. 42

O.       Lost, Stolen, Mutilated or Destroyed Securities ................................ 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS ............................................ 43

A.       Filing of Proofs of Claim ................................................................. 43

B.       Disputed Claims .............................................................................. 43

C.       Procedures Regarding Disputed Claims or Disputed Equity Interests .............. 43

D.       Allowance of Claims and Equity Interests ......................................... 44

        1.       Allowance of Claims ............................................................. 44

        2.       Estimation ............................................................................ 44

        3.       Disallowance of Claims ......................................................... 44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ........................................ 45

A.       Conditions Precedent to the Effective Date ........................................ 45

B.       Waiver of Conditions ....................................................................... 46

C.       Dissolution of the Committee ........................................................... 46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ............... 47

A.       General ............................................................................................ 47

B.       Discharge of Claims ......................................................................... 47

C.       Exculpation ..................................................................................... 47

D.       Releases by the Debtor ..................................................................... 48

E.       Preservation of Rights of Action ...................................................... 49

        1.       Maintenance of Causes of Action .......................................... 49

        2.       Preservation of All Causes of Action Not Expressly Settled or
                Released ............................................................................... 49

- iv -

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 98 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1318 of 1598   PageID 14365
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 97 of 161

|  |  | **Page** |
|---|---|---|
| F. | Injunction | 50 |
| G. | Duration of Injunctions and Stays | 51 |
| H. | Continuance of January 9 Order | 51 |
| ARTICLE X. BINDING NATURE OF PLAN | | 51 |
| ARTICLE XI. RETENTION OF JURISDICTION | | 52 |
| ARTICLE XII. MISCELLANEOUS PROVISIONS | | 54 |
| A. | Payment of Statutory Fees and Filing of Reports | 54 |
| B. | Modification of Plan | 54 |
| C. | Revocation of Plan | 54 |
| D. | Obligations Not Changed | 55 |
| E. | Entire Agreement | 55 |
| F. | Closing of Chapter 11 Case | 55 |
| G. | Successors and Assigns | 55 |
| H. | Reservation of Rights | 55 |
| I. | Further Assurances | 56 |
| J. | Severability | 56 |
| K. | Service of Documents | 56 |
| L. | Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code | 57 |
| M. | Governing Law | 58 |
| N. | Tax Reporting and Compliance | 58 |
| O. | Exhibits and Schedules | 58 |
| P. | Controlling Document | 58 |

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 99 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1319 of 1598   PageID 14366
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 98 of 161

---

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 100
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1320 of 1598 PageID 14367
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 99 of 161

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B. **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 101
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1321 of 1598   PageID 14368
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 100 of 161

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.      "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.      "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.      "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.      "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

APPX. 07519

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 102
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1322 of 1598   PageID 14369
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 101 of
161

15.    "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16.    "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19.    "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20.    "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21.    "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22.    "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23.    "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

APPX. 07522

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 103
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1323 of 1598 PageID 14370
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 102 of 161

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 104
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1324 of 1598   PageID 14371
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 103 of
161

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31.    "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33.    "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34.    "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35.    "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36.    "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37.    "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38.    "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41.    "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 105
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1325 of 1598 PageID 14372
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 104 of
161

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

7

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 106
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1326 of 1598   PageID 14373
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 105 of
161

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51.    "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52.    "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53.    "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54.    "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55.    "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56.    "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57.    "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58.    "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59.    "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60.    "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61.    "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 107
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1327 of 1598   PageID 14374
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 106 of
161

62.    "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.    "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.    "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.    "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.    "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 108
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1328 of 1598   PageID 14375
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 107 of
161

69.     "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.     "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.     "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.     "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.     "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.     "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.     "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.     "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.     "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.     "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.     "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

APPX. 07528

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 109
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1329 of 1598   PageID 14376
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 108 of
161

81.   "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.   "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.   "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.   "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.   "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.   "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.   "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.   "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.   "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.   "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.   "Petition *Date*" means October 16, 2019.

92.   "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

11

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 110
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1330 of 1598   PageID 14377
of 162
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 109 of
161

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93.    "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94.    "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95.    "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96.    "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97.    "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98.    "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99.    "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100.    "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101.    "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 111
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1331 of 1598 PageID 14378
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 110 of
161

102.    "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103.    "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 112
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1332 of 1598   PageID 14379
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 111 of 161

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

14

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 113
Case 3:23-cv-00726-S    Document 8-24    Filed 02/29/23    Page 1333 of 1598    PageID 14380
of 162
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 112 of
161

117.    "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.    "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

APP.10523

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 114
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1334 of 1598 PageID 14381
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 113 of
161

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.    Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 115
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1335 of 1598   PageID 14382
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 114 of
161

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 116
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1336 of 1598 PageID 14383
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 115 of
161

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

<div align="center">

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

</div>

**A.**     **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**     **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C.**     **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.**     **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.**     **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.**     **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.**     **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.**     **Classification and Treatment of Claims and Equity Interests**

1.     *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

19

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 118
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1338 of 1598   PageID 14385
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 117 of
161

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.    *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.    *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 119
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1339 of 1598   PageID 14386
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 118 of
161

4.      <u>*Class 4 – Priority Non-Tax Claims*</u>

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.      <u>*Class 5 – Retained Employee Claims*</u>

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.      <u>*Class 6 – PTO Claims*</u>

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 121
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1341 of 1598   PageID 14388
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 120 of 161

9.     *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.    *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.    *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

APPX. 10739

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 122
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1342 of 1598 PageID 14389
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 121 of
161

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I. Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J. Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

## A. Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 123
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1343 of 1598 PageID 14390
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 122 of
161

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

## B.   The Claimant Trust[2]

1.   *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 124
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1344 of 1598   PageID 14391
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 123 of 161

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.    *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 125
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1345 of 1598   PageID 14392
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 124 of
161

The Claimant Trust Oversight Committee will initially consist of five members.  Four of the five members will be representatives of the members of the Committee:  (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery.  The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor.  The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement.  The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement.  Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.    *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.    *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims.  Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 126
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1346 of 1598 PageID 14393
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 125 of 161

(i)      the payment of the Claimant Trust Expenses;

(ii)      the payment of other reasonable expenses of the Claimant Trust;

(iii)      the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)      the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)      the orderly monetization of the Claimant Trust Assets;

(vi)      litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)      the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)      the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)      the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court.  Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee.  The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)      the payment of other reasonable expenses of the Litigation Sub-Trust;

APPX. 107646

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 127
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1347 of 1598 PageID 14394
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 126 of
161

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     _Cooperation of Debtor and Reorganized Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.     _United States Federal Income Tax Treatment of the Claimant Trust._

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 128
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 of 162 Page 1348 of 1598 PageID 14395
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 127 of 161

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trust makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9. *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

APPX. 107549

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 129
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1349 of 1598 PageID 14396
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 128 of
161

11.    _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.    _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.    _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.    _Dissolution of the Claimant Trust and Litigation Sub-Trust._

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; _provided, however,_ that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 130
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1350 of 1598 PageID 14397
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 129 of 161

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

### C. **The Reorganized Debtor**

#### 1. *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

#### 2. *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

#### 3. *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 131
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1351 of 1598 PageID 14398
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 130 of 161

4.     *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.     *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.     *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.     *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 132
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1352 of 1598   PageID 14399
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 131 of 161

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

D.    **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person.  On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 133
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1353 of 1598 PageID 14400
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 132 of 161

E.        **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

F.        **Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

G.        **Cancellation of Existing Instruments Governing Security Interests**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

H.        **Control Provisions**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 134
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1354 of 1598   PageID 14401
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 133 of
161

**I.      Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

**J.      Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.      Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 135
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1355 of 1598   PageID 14402
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 134 of 161

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 136
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1356 of 1598   PageID 14403
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 135 of
161

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.**     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.**     **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 137
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1357 of 1598   PageID 14404
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 136 of
161

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.    Dates of Distributions**

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

**B.    Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 138
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1358 of 1598   PageID 14405
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 137 of 161

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

C.    **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

D.    **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

E.    **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

F.    **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 139
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1359 of 1598 PageID 14406
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 138 of 161

G.    *De Minimis* **Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

H.    **Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

I.    **General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

J.    **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

K.    **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 140
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1360 of 1598   PageID 14407
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 139 of
161

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes.  Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

## L.    Withholding Taxes

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements.  The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws.  If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

## M.    Setoffs

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder.  Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

## N.    Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 141
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1361 of 1598    PageID 14408
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 140 of
161

**O.**     **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

<div align="center">

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

</div>

**A.**     **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**     **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.**     **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 142
of 162
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1362 of 1598 PageID 14409
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 141 of
161

### D.     Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

### 1.     *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### 2.     *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

### 3.     *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 143
Case 3:23-cv-00726-S  Document 8-24   Filed 02/29/23   Page 1363 of 1598   PageID 14410
of 162
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 142 of
161

ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE
DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE
WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF
THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT
RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH
LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

## ARTICLE VIII.
## EFFECTIVENESS OF THIS PLAN

### A.    Conditions Precedent to the Effective Date

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the
Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the
Committee with such consent not to be unreasonably withheld), pursuant to the provisions of
ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the
  Reorganized Limited Partnership Agreement, and all schedules, documents,
  supplements and exhibits to this Plan shall have been Filed in form and substance
  reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and
  substance reasonably acceptable to the Debtor and the Committee.  The Confirmation
  Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor,
  the Claimant Trustee, or the Litigation Trustee are authorized to take all actions
  necessary or appropriate to effectuate and consummate this Plan, including, without
  limitation, (a) entering into, implementing, effectuating, and consummating the
  contracts, instruments, releases, and other agreements or documents created in
  connection with or described in this Plan, (b) assuming the Executory Contracts and
  Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and
  issuances as required under this Plan; and (d) entering into any transactions as set forth
  in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are
  nonseverable and mutually dependent; (iii) the implementation of this Plan in
  accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy
  Code, the delivery of any deed or other instrument or transfer order, in furtherance of,
  or in connection with this Plan, including any deeds, bills of sale, or assignments
  executed in connection with any disposition or transfer of Assets contemplated under
  this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the
  Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the
  Reorganized Debtor, in each case as of the Effective Date free and clear of liens and
  claims to the fullest extent permissible under applicable law pursuant to section 1141(c)
  of the Bankruptcy Code except with respect to such Liens, Claims, charges and other
  encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without
  limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 144
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1364 of 1598 PageID 14411
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 143 of 161

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.    Waiver of Conditions

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.    Dissolution of the Committee

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

the Effective Date or filed and served after the Effective Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.    Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing

APPX. 107563

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 146
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1366 of 1598   PageID 14413
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 145 of
161

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.      Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 147
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1367 of 1598 PageID 14414
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 146 of
161

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

E. **Preservation of Rights of Action**

1. *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

2. *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 148
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1368 of 1598   PageID 14415
of 162
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 147 of
161

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

F.    **Injunction**

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 149
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1369 of 1598   PageID 14416
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 148 of
161

**(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim or cause of action of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party;** *provided, however,* **the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.**

G.      <u>Duration of Injunctions and Stays</u>

**ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.**

H.      <u>Continuance of January 9 Order</u>

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

<div align="center">

**ARTICLE X.**
**BINDING NATURE OF PLAN**

</div>

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 150
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1370 of 1598   PageID 14417
of 162
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 149 of
161

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided, however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 152
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1372 of 1598   PageID 14419
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 151 of
161

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

#### A.    Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

#### B.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

#### C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 153
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1373 of 1598   PageID 14420
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 152 of
161

### D.    Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

### E.    Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### F.    Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

### G.    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### H.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 154
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1374 of 1598 PageID 14421
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 153 of
161

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.    Further Assurances

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.    Severability

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.    Service of Documents

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

### If to the Claimant Trust:

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 155
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1375 of 1598   PageID 14422
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 154 of
161

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

## L.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 156
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1376 of 1598   PageID 14423
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 155 of 161

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.    Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.    Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.    Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.    Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 157
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1377 of 1598 PageID 14424

Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 156 of 161

Dated: January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 157 of 161

**Exhibit B**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 159
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1379 of 1598   PageID 14426
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 158 of 161

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1.    Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2.    Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3.    Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4.    Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5.    Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6.    Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7.    Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8.    Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9.    Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10.    Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11.    Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12.    Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13.    Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14.    Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15.    Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16.    Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17.    Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18.    Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19.    Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20.    Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21.    Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22.    Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23.    Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24.    Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25.    Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26.    Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27.    Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28.    Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29.    Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30.    Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31.    Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32.    Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33.    Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34.    Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35.    Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

DOCS_NY:42355.1 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 161
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1381 of 1598   PageID 14428
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 160 of 161

36.     Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37.     Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38.     Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39.     Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40.     Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41.     Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42.     Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43.     Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44.     Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45.     Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46.     A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47.     A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48.     Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49.     Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50.     Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 162
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1382 of 1598   PageID 14429
of 162
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 161 of
161

51.     Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52.     Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53.     Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54.     Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55.     Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56.     Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57.     Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58.     Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59.     Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60.     Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

4

# EXHIBIT 73

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1384 of 1598   PageID 14431
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21    Entered 07/09/21 14:46:33    Page 1 of 8

Docket #2541  Date Filed: 07/09/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Dugaboy Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**RESPONSE OF DUGABOY INVESTMENT TRUST
TO ORDER REQUIRING DISCLOSURES**

COMES NOW Dugaboy Investment Trust ("Dugaboy") and files this response of Dugaboy Investment Trust to *Order Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered by the Court *sua sponte* in the above styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), respectfully stating as follows:

**I.    RESPONSE**

1.    The Court has entered an order requiring Dugaboy to make certain disclosures relative to its standing in connection with the above captioned matter.  The Court has already

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 9
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1385 of 1598    PageID 14432
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21    Entered 07/09/21 14:46:33    Page 2 of 8

ruled on a number of matters before this Court that Dugaboy has possessed the requisite standing on matters that it has taken a position or filed a support pleading.

2.      Dugaboy is named as a "Related Entity" and is enjoined by the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan"). *See* Dkt. No. 1811-9 at p. 19.  As an enjoined party, Dugaboy has standing to seek relief from the Plan.  *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").

3.      The numerous adversary proceedings in which Dugaboy has been named a party give it standing to participate not just in the adversary proceedings, but in the bankruptcy case itself.

4.      Further, Dugaboy has standing based upon the proofs of claim that it filed in this bankruptcy case.  Although the Debtor has challenged Dugaboy's claims, it has the right to assert the claims and participate in these bankruptcy proceedings as a party in interest.

## II.      DISCLOSURES

5.      Dugaboy is a Delaware Trust.  As a Trust, it has no owners, rather, beneficiaries and a trustee.  Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents.  The Trust Agreement is dated October 2010 and it is styled "Trust Agreement between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees."

6.      The Trust has three (3) trustees each with a different function.  The Trust creates an Administrative Trustee, a Family Trustee and an Independent Trustee.  The initial Trustees were Commonwealth Trust Company as Administrative Trustee, James D. Dondero as Family

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1386 of 1598   PageID 14433
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21    Entered 07/09/21 14:46:33    Page 3 of 8

Trustee and Grant Scott as Independent Trust.   The present Independent Trustee is Nancy

Dondero, the sister of James D. Dondero.

7.      The Trust Agreement creates three (3) separate trusts under the Dugaboy

Investment Trust.  The first is for the benefit of James D. Dondero, the second is for children and

the third is for descendants.

8.      The Trust owns an 0.1866% Class A interest in the Debtor and has filed proofs

claim numbered 113, 131, and 177.

9.      Proof of Claim No. 177 is an administrative proof of claim for the

mismanagement of certain funds by the Debtor.

10.     Proof of Claim No. 113 relates to the Debtor's 2008 tax return, which is currently

being audited, which audit may result in the Debtor being liable to its limited partners, including

Dugaboy.   Proof of Claim No. 113 also relates to the Debtor's failure to make certain tax

distributions to the limited partners, including Dugaboy, from 2004 through 2018. The amount of

this claim is uncertain, but Dugaboy has requested certain information from the Debtor in order

to calculate a precise amount.   Dugaboy obtained its status as a limited partner in the Debtor

through its status as successor-in-interest to the Canis Major Trust.

11.     Lastly, Proof of Claim 131 relates to two Master Securities Lending Agreements

that Dugaboy entered into with Highland Select Equity Master Fund in 2014 and 2015.

Dugaboy made various loans to Highland Select in the form of 2,015,000 shares of NexPoint

Credit Strategies Fund valued at $20,270,900.  Dugaboy made various other loans in 2015.  The

Master Securities Lending Agreements were mostly terminated in July 2019.  Pursuant to the

Termination of Loan, Select and Dugaboy agreed to terminate the 2015 MSLA and partially

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 9
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1387 of 1598 PageID 14434
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21 Entered 07/09/21 14:46:33 Page 4 of 8

terminate the 2014 MSLA such that a large number of the loaned securities remained due and owing to Dugaboy under the Loan Agreements.

12.     From 2015 until the termination of the Loan Agreements in 2019, Select and/or the Debtor made numerous repayments of the securities loaned by Dugaboy. However, a substantial number of the loaned securities have not been repaid and remain outstanding.

13.     As of the Petition Date, Dugaboy has not been repaid the outstanding shares and is owed repayment of the loaned securities or the cash value of the loaned securities, plus accrued interest, in the amount of $12,041,438. A summary of the loan account is attached as Exhibit B to the *Response of the Dugaboy Investment Trust to the Debtor's First Omnibus Objection to Certain Proofs of Claim* [Dkt. No. 1153].

14.     The gist of Dugaboy's claim is premised on the fact that the Debtor was general partner or *de facto* general partner of Highland Select and directed that the loaned funds be used for the sole benefit of the Debtor, thereby obligating the Debtor on the loans.

15.     Objections are pending to each of the proofs of claim that have been filed.

16.     In addition, Dugaboy is the maker of a note held by the Debtor that is the subject of the Creditors' Committee Adversary Proceeding.

July 9, 2021.

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Michael E. Landis, La. Bar No. 36542
mlandis@hellerdraper.com

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1388 of 1598   PageID 14435
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21   Entered 07/09/21 14:46:33   Page 5 of 8

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*

### CERTIFICATE OF SERVICE

I, Douglas S. Draper, counsel for The Dugaboy Investment Trust, do hereby certify that I caused a copy of the above and foregoing to be served on **July 9, 2021**, via the Court's ECF Notification System as follows:

- David G. Adams     david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen     michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson     aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable     zannable@haywardfirm.com
- Bryan C. Assink     bryan.assink@bondsellis.com
- Asif Attarwala     asif.attarwala@lw.com
- Joseph E. Bain     JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird     baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach     bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette     pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com ;rmatsumura@kslaw.com
- John Y. Bonds     john@bondsellis.com
- Matthew Glenn Bouslog     mbouslog@gibsondunn.com
- Larry R. Boyd     lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner     jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy     gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant     dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson     Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello     achiarello@winstead.com
- Shawn M. Christianson     schristianson@buchalter.com, cmcintire@buchalter.com
- James Bentham Clarke     robbie.clarke@bondsellis.com
- Matthew A. Clemente     mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz     mclontz@spencerfane.com, lvargas@spencerfane.com

APPX. 10738

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1389 of 1598   PageID 14436
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21   Entered 07/09/21 14:46:33   Page 6 of 8

- Andrew Clubok     andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com
- Leslie A. Collins     lcollins@hellerdraper.com
- David Grant Crooks     dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Deborah Rose Deitsch-Perez     deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo     gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com
- Casey William Doherty     casey.doherty@dentons.com, dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dentons.com
- Douglas S. Draper     ddraper@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com
- Lauren Kessler Drawhorn     lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver     Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright     jenright@winstead.com
- Robert Joel Feinstein     rfeinstein@pszjlaw.com
- Matthew Gold     courts@argopartners.net
- Bojan Guzina     bguzina@sidley.com
- Margaret Michelle Hartmann     michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins     thaskins@btlaw.com
- Melissa S. Hayward     MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held     mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse     ghesse@HuntonAK.com, astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman     jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood     lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;mary-beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com
- Warren Horn     whorn@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell     william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane     jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman     jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer     pkeiffer@romclaw.com, bwallace@romclaw.com

APPX. 10739

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1390 of 1598   PageID 14437
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21   Entered 07/09/21 14:46:33   Page 7 of 8

- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Michael Justin Lang    mlang@cwl.law,
  nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen    eleen@mkbllp.com
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Brant C. Martin    brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain    brent.mcilwain@hklaw.com,
  robert.jones@hklaw.com;brian.smith@hklaw.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txefilingnotice@sidley.com;paige-montgomery-
  7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sid
  ley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com,
  jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com, txefilingnotice@sidley.com;charles-
  persons-5722@ecf.pacerpro.com
- Louis M. Phillips    louis.phillips@kellyhart.com, june.alcantara-
  davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok    jprostok@forsheyprostok.com,
  jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.co
  m;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-
  4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen    srosen@forsheyprostok.com,
  jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.c
  om;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti    mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com

APPX. 07580

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1391 of 1598   PageID 14438
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21   Entered 07/09/21 14:46:33    Page 8 of 8

- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Clay M. Taylor    clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek    jvasek@munsch.com
- Donna K. Webb    donna.webb@usdoj.gov, brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@ldsrlaw.com, craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com


*/s/Douglas S. Draper.*

# EXHIBIT 74

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1393 of 1598   PageID 14440
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21    Entered 07/09/21 16:30:37    Page 1 of 9

Docket #2545  Date Filed: 07/09/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Dugaboy Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**AMENDED RESPONSE OF DUGABOY INVESTMENT TRUST
TO ORDER REQUIRING DISCLOSURES**

COMES NOW Dugaboy Investment Trust ("Dugaboy") and files this response of Dugaboy Investment Trust to *Order Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered by the Court *sua sponte* in the above styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), respectfully stating as follows:

**I.    RESPONSE**

1.    The Court has entered an order requiring Dugaboy to make certain disclosures relative to its standing in connection with the above captioned matter. The Court has already

1934054210709000000000013
APPX. 10703

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1394 of 1598 PageID 14441
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 2 of 9

ruled on a number of matters before this Court that Dugaboy has possessed the requisite standing

on matters that it has taken a position or filed a support pleading.

2.     Dugaboy is named as a "Related Entity" and is enjoined by the Debtor's *Fifth*

*Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the

"Plan").  *See* Dkt. No. 1811-9 at p. 19.  As an enjoined party, Dugaboy has standing to seek

relief from the Plan.  *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d

258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely

affects its interest, even when it was not a party to the litigation").

3.     Dugaboy is a named defendant in the matter styled *Official Committee of*

*Unsecured Creditors vs. CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF*

*Fund, LP, Highland Dallas Foundation, Inc., The Dugaboy Investment Trust, Grant James Scott*

*III in his individual capacity, as Trustee of The Dugaboy Investment Trust, and as Trustee of The*

*Get Good Nonexempt Trust, and James D. Dondero* (Case No. 20-03195) and has been advised

that it will be added as a defendant in an additional adversary proceeding to be filed going

forward.  In the adversary proceeding where Dugaboy is named as a defendant the standing of

Dugaboy is not at issue.  What will be at issue in those cases is whether Dugaboy should be a

named party and whether the Plaintiff in those cases has asserted a recognizable cause of action

against Dugaboy.

4.     Further, Dugaboy has standing based upon the proofs of claim that it filed in this

bankruptcy case.  Although the Debtor has challenged Dugaboy's claims, it has the right to assert

the claims and participate in these bankruptcy proceedings as a party in interest.

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1395 of 1598 PageID 14442
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 3 of 9

## II.    DISCLOSURES

5.      Dugaboy is a Delaware Trust.  As a Trust, it has no owners, rather, beneficiaries and a trustee.  Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents.  The Trust Agreement is dated October 2010 and it is styled "Trust Agreement between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees."

6.      The Trust has three (3) trustees each with a different function.  The Trust creates an Administrative Trustee, a Family Trustee and an Independent Trustee.  The initial Trustees were Commonwealth Trust Company as Administrative Trustee, James D. Dondero as Family Trustee and Grant Scott as Independent Trust.  The present Independent Trustee is Nancy Dondero, the sister of James D. Dondero.

7.      The Trust Agreement creates three (3) separate trusts under the Dugaboy Investment Trust.  The first is for the benefit of James D. Dondero, the second is for children and the third is for descendants.

8.      The Trust owns an 0.1866% Class A interest in the Debtor and has filed proofs claim numbered 113, 131, and 177.

9.      Proof of Claim No. 177 is an administrative proof of claim for the mismanagement of certain funds by the Debtor.

10.      Proof of Claim No. 113 relates to the Debtor's 2008 tax return, which is currently being audited, which audit may result in the Debtor being liable to its limited partners, including Dugaboy.  Proof of Claim No. 113 also relates to the Debtor's failure to make certain tax distributions to the limited partners, including Dugaboy, from 2004 through 2018. The amount of this claim is uncertain, but Dugaboy has requested certain information from the Debtor in order

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1396 of 1598 PageID 14443
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 4 of 9

to calculate a precise amount. Dugaboy obtained its status as a limited partner in the Debtor through its status as successor-in-interest to the Canis Major Trust.

11.     Lastly, Proof of Claim 131 relates to two Master Securities Lending Agreements that Dugaboy entered into with Highland Select Equity Master Fund in 2014 and 2015. Dugaboy made various loans to Highland Select in the form of 2,015,000 shares of NexPoint Credit Strategies Fund valued at $20,270,900. Dugaboy made various other loans in 2015. The Master Securities Lending Agreements were mostly terminated in July 2019. Pursuant to the Termination of Loan, Select and Dugaboy agreed to terminate the 2015 MSLA and partially terminate the 2014 MSLA such that a large number of the loaned securities remained due and owing to Dugaboy under the Loan Agreements.

12.     From 2015 until the termination of the Loan Agreements in 2019, Select and/or the Debtor made numerous repayments of the securities loaned by Dugaboy. However, a substantial number of the loaned securities have not been repaid and remain outstanding.

13.     As of the Petition Date, Dugaboy has not been repaid the outstanding shares and is owed repayment of the loaned securities or the cash value of the loaned securities, plus accrued interest, in the amount of $12,041,438. A summary of the loan account is attached as Exhibit B to the *Response of the Dugaboy Investment Trust to the Debtor's First Omnibus Objection to Certain Proofs of Claim* [Dkt. No. 1153].

14.     The gist of Dugaboy's claim is premised on the fact that the Debtor was general partner or *de facto* general partner of Highland Select and directed that the loaned funds be used for the sole benefit of the Debtor, thereby obligating the Debtor on the loans.

15.     Objections are pending to each of the proofs of claim that have been filed.

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1397 of 1598   PageID 14444
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21    Entered 07/09/21 16:30:37    Page 5 of 9

16.     In addition, Dugaboy is the maker of a note held by the Debtor that is the subject

of the Creditors' Committee Adversary Proceeding.

July 9, 2021.

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Michael E. Landis, La. Bar No. 36542
mlandis@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, counsel for The Dugaboy Investment Trust, do hereby certify that I
caused a copy of the above and foregoing to be served on **July 9, 2021,** via the Court's ECF
Notification System as follows:

- David G. Adams    david.g.adams@usdoj.gov,
  southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com;amy-
  anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-
  8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1398 of 1598 PageID 14445
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 6 of 9

- Paul Richard Bessette    pbessette@KSLAW.com,
  ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com
  ;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com
- Matthew Glenn Bouslog    mbouslog@gibsondunn.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com,
  lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-
  8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel
  l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com;ny-
  courtmail@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Deborah Rose Deitsch-Perez    deborah.deitschperez@stinson.com,
  patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com;lsc@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com,
  dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dento
  ns.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbro
  uphy@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1399 of 1598 PageID 14446
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 7 of 9

- Margaret Michelle Hartmann    michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txfilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;mary-
  beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.co
  m;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell    william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Michael Justin Lang    mlang@cwl.law,
  nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen    eleen@mkbllp.com
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Brant C. Martin    brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain    brent.mcilwain@hklaw.com,
  robert.jones@hklaw.com;brian.smith@hklaw.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txfilingnotice@sidley.com;paige-montgomery-
  7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sid
  ley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com,
  jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com, txfilingnotice@sidley.com;charles-
  persons-5722@ecf.pacerpro.com

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1400 of 1598 PageID 14447
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 8 of 9

- Louis M. Phillips   louis.phillips@kellyhart.com, june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt   mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz   jpomerantz@pszjlaw.com
- Kimberly A. Posin   kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok   jprostok@forsheyprostok.com, jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece   lreece@pbfcm.com
- Penny Packard Reid   preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen   srosen@forsheyprostok.com, jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina   drukavina@munsch.com
- Amanda Melanie Rush   asrush@jonesday.com
- Alyssa Russell   alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti   mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller   douglas.schneller@rimonlaw.com
- Michelle E. Shriro   mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich   nskolnekovich@hunton.com, astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith   frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund   eric.soderlund@judithwross.com
- Martin A. Sosland   martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler   Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer   jsundhimer@btlaw.com
- Kesha Tanabe   kesha@tanabelaw.com
- Clay M. Taylor   clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons   bankruptcy@abernathy-law.com
- Dennis M. Twomey   dtwomey@sidley.com
- Basil A. Umari   BUmari@dykema.com, pelliott@dykema.com
- United States Trustee   ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz   artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek   jvasek@munsch.com
- Donna K. Webb   donna.webb@usdoj.gov, brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber   bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller   dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka   danw@ldsrlaw.com, craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1401 of 1598   PageID 14448
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21    Entered 07/09/21 16:30:37    Page 9 of 9

- Hayley R. Winograd     hwinograd@pszjlaw.com
- Megan Young-John     myoung-john@porterhedges.com

*/s/Douglas S. Draper.*

APPX. 07599

# EXHIBIT 75

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1403 of 1598 PageID 14450
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21 Entered 07/09/21 14:48:13 Page 1 of 7

Docket #2542 Date Filed: 07/09/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Get Good Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**RESPONSE OF GET GOOD TRUST
TO ORDER REQUIRING DISCLOSURES**

COMES NOW Get Good Trust and files this response of Get Good Trust to *Order
Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered by the Court *sua sponte* in the above
styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital
Management, L.P. (the "Debtor"), respectfully stating as follows:

**I.      RESPONSE**

1.      The Court has entered an order requiring Get Good Trust to make certain
disclosures relative to its standing in connection with the above captioned matter. The Court has
already ruled on a number of matters before this Court that Get Good Trust has possessed the
requisite standing on matters that it has taken a position or filed a support pleading.

{00376112-7}                                    1

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1404 of 1598   PageID 14451
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21    Entered 07/09/21 14:48:13    Page 2 of 7

2.      The Get Good Trust is actually three different trust, the Get Good Trust, The Get Good Non Exempt Trust No. 1, and the Get Good Non Exempt Trust No. 2 (together, the "Trusts").  The Trusts are all named as "Related Entities" which are enjoined by Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan").  *See* Dkt. No. 1811-9 at p. 19.  As enjoined parties, the Trusts have standing to seek relief from the Plan.  *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").

3.      The numerous adversary proceedings in which Get Good Trust has been named a party give it standing to participate not just in the adversary proceedings, but in the bankruptcy case itself.

4.      Further, Trusts have standing based upon the proofs of claim that they have filed in this bankruptcy case.  Although the Debtor has challenged the Trusts' claims, they have the right to assert the claims and participate in these bankruptcy proceedings as parties in interest.

## II.      DISCLOSURES

5.      Get Good Trust is a **Delaware** Trust.  As a Trust, it has no owners, rather, beneficiaries and a trustee.  Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents.  The inception of the Trust was in 2001 and Jim Dondero is the settlor of the Trust and Grant Scott is the Trustee.  Grant Scott is the current Trustee.   The Trust has two parts within the Trust which are designated as Part A and Part B.  One part is designated as exempt and the other non exempt.  Both Part A and Part B were created under the 2001 Trust Document executed by Scott as Trustee and Dondero as Settlor.

APPX. 10704

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 8
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1405 of 1598    PageID 14452
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21    Entered 07/09/21 14:48:13    Page 3 of 7

6.      Ultimate beneficiaries of the Get Good Trust are the Children and Descendants of Jim Dondero.

7.      A search of the KCC site for proofs of claim in this case reveals that Get Good and Get Good Non Exempt Trusts 1 and 2 have filed proofs of claim. The claims are numbered 120 (the Get Good Trust), 128 (Get Good Non Exempt Trust 1) and 129 (Get Good Non Exempt Trust 2).  The claims are based upon and audit of the Debtor's 2008 tax return, which audit may result in the Debtor being liable to its limited partners, including the three Get Good Trusts.  The Claims also relate to the Debtor's failure to make tax distributions for the period 2004 through 2018.

                                .

July 9, 2021.

                                                    Respectfully submitted,

                                                    /s/Douglas S. Draper.
                                                    Douglas S. Draper, La. Bar No. 5073
                                                    ddraper@hellerdraper.com
                                                    Leslie A. Collins, La. Bar No. 14891
                                                    lcollins@hellerdraper.com
                                                    Greta M. Brouphy, La. Bar No. 26216
                                                    gbrouphy@hellerdraper.com
                                                    Michael E. Landis, La. Bar No. 36542
                                                    mlandis@hellerdraper.com

                                                    Heller, Draper & Horn, L.L.C.
                                                    650 Poydras Street, Suite 2500
                                                    New Orleans, LA  70130
                                                    Telephone: (504) 299-3300
                                                    Fax: (504) 299-3399
                                                    Attorneys for Get Good Trust


**<u>CERTIFICATE OF SERVICE</u>**

        I, Douglas S. Draper, counsel for Get Good Trust, do hereby certify that I caused a copy of the above and foregoing to be served on **July 9, 2021**, via the Court's ECF Notification

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1406 of 1598 PageID 14453
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21 Entered 07/09/21 14:48:13 Page 4 of 7

System as follows:

- David G. Adams      david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen      michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson      aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable      zannable@haywardfirm.com
- Bryan C. Assink      bryan.assink@bondsellis.com
- Asif Attarwala      asif.attarwala@lw.com
- Joseph E. Bain      JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird      baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach      bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette      pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds      john@bondsellis.com
- Matthew Glenn Bouslog      mbouslog@gibsondunn.com
- Larry R. Boyd      lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner      jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy      gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant      dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson      Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello      achiarello@winstead.com
- Shawn M. Christianson      schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke      robbie.clarke@bondsellis.com
- Matthew A. Clemente      mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz      mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok      andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com
- Leslie A. Collins      lcollins@hellerdraper.com
- David Grant Crooks      dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Deborah Rose Deitsch-Perez      deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo      gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1407 of 1598   PageID 14454
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21   Entered 07/09/21 14:48:13   Page 5 of 7

- Casey William Doherty     casey.doherty@dentons.com,
  dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dento
  ns.com
- Douglas S. Draper     ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbro
  uphy@hellerdraper.com
- Lauren Kessler Drawhorn     lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver     Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright     jenright@winstead.com
- Robert Joel Feinstein     rfeinstein@pszjlaw.com
- Matthew Gold     courts@argopartners.net
- Bojan Guzina     bguzina@sidley.com
- Margaret Michelle Hartmann     michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins     thaskins@btlaw.com
- Melissa S. Hayward     MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held     mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse     ghesse@HuntonAK.com,
  astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman     jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood     lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;mary-
  beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.co
  m;Artoush.varshosaz@klgates.com
- Warren Horn     whorn@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell     william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane     jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman     jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer     pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman     kurtzman@kurtzmansteady.com
- Phillip L. Lamberson     plamberson@winstead.com
- Lisa L. Lambert     lisa.l.lambert@usdoj.gov
- Michael Justin Lang     mlang@cwl.law,
  nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen     eleen@mkbllp.com
- Paul M. Lopez     bankruptcy@abernathy-law.com
- Faheem A. Mahmooth     mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns     ryan.manns@nortonrosefulbright.com
- Brant C. Martin     brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain     brent.mcilwain@hklaw.com,
  robert.jones@hklaw.com;brian.smith@hklaw.com

{00376112-7}                              5

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1408 of 1598   PageID 14455
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21    Entered 07/09/21 14:48:13    Page 6 of 7

- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com, txefilingnotice@sidley.com;charles-persons-5722@ecf.pacerpro.com
- Louis M. Phillips    louis.phillips@kellyhart.com, june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok    jprostok@forsheyprostok.com, jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen    srosen@forsheyprostok.com, jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti    mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 8
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1409 of 1598    PageID 14456
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21    Entered 07/09/21 14:48:13    Page 7 of 7

- Kesha Tanabe     kesha@tanabelaw.com
- Clay M. Taylor     clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons     bankruptcy@abernathy-law.com
- Dennis M. Twomey     dtwomey@sidley.com
- Basil A. Umari     BUmari@dykema.com, pelliott@dykema.com
- United States Trustee     ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz     artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek     jvasek@munsch.com
- Donna K. Webb     donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber     bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller     dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka     danw@ldsrlaw.com,
  craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com
- Hayley R. Winograd     hwinograd@pszjlaw.com
- Megan Young-John     myoung-john@porterhedges.com


*/s/Douglas S. Draper.*

APPX. 107305

# EXHIBIT 76

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1411 of 1598   PageID 14458
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21    Entered 07/09/21 16:31:32    Page 1 of 7

Docket #2546  Date Filed: 07/09/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Get Good Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**AMENDED RESPONSE OF GET GOOD TRUST
TO ORDER REQUIRING DISCLOSURES**

COMES NOW Get Good Trust and files this response of Get Good Trust to *Order Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered by the Court *sua sponte* in the above styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), respectfully stating as follows:

**I.    RESPONSE**

1.    The Court has entered an order requiring Get Good Trust to make certain disclosures relative to its standing in connection with the above captioned matter.  The Court has already ruled on a number of matters before this Court that Get Good Trust has possessed the requisite standing on matters that it has taken a position or filed a support pleading.

{00376112-8}                                    1

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1412 of 1598 PageID 14459
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21 Entered 07/09/21 16:31:32 Page 2 of 7

2.    The Get Good Trust is actually three different trust, the Get Good Trust, The Get Good Non Exempt Trust No. 1, and the Get Good Non Exempt Trust No. 2 (together, the "Trusts"). The Trusts are all named as "Related Entities" which are enjoined by Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan"). *See* Dkt. No. 1811-9 at p. 19. As enjoined parties, the Trusts have standing to seek relief from the Plan. *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").

3.    Get Good Trust is a named defendant in the matter styled *Official Committee of Unsecured Creditors vs. CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., The Dugaboy Investment Trust, Grant James Scott III in his individual capacity, as Trustee of The Dugaboy Investment Trust, and as Trustee of The Get Good Nonexempt Trust, and James D. Dondero* (Case No. 20-03195). In the adversary proceeding where Get Good Trust is named as a defendant, the standing of Get Good Trust is not at issue. The suit challenges a transfer of a note by Get Good to the Debtor for certain assets and then the transfer of the acquired assets to other parties.

4.    Further, Trusts have standing based upon the proofs of claim that they have filed in this bankruptcy case. Although the Debtor has challenged the Trusts' claims, they have the right to assert the claims and participate in these bankruptcy proceedings as parties in interest.

## II.    DISCLOSURES

5.    Get Good Trust is a **Delaware** Trust. As a Trust, it has no owners, rather, beneficiaries and a trustee. Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents. The inception of the Trust was in 2001 and Jim

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1413 of 1598   PageID 14460
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21   Entered 07/09/21 16:31:32   Page 3 of 7

Dondero is the settlor of the Trust and Grant Scott is the Trustee.   Grant Scott is the current Trustee.   The Trust has two parts within the Trust which are designated as Part A and Part B. One part is designated as exempt and the other non exempt.  Both Part A and Part B were created under the 2001 Trust Document executed by Scott as Trustee and Dondero as Settlor.

6.      Ultimate beneficiaries of the Get Good Trust are the Children and Descendants of Jim Dondero.

7.      A search of the KCC site for proofs of claim in this case reveals that Get Good and Get Good Non Exempt Trusts 1 and 2 have filed proofs of claim. The claims are numbered 120 (the Get Good Trust), 128 (Get Good Non Exempt Trust 1) and 129 (Get Good Non Exempt Trust 2).  The claims are based upon and audit of the Debtor's 2008 tax return, which audit may result in the Debtor being liable to its limited partners, including the three Get Good Trusts.  The Claims also relate to the Debtor's failure to make tax distributions for the period 2004 through 2018.

.

July 9, 2021.

                              Respectfully submitted,

                              /s/Douglas S. Draper.
                              Douglas S. Draper, La. Bar No. 5073
                              ddraper@hellerdraper.com
                              Leslie A. Collins, La. Bar No. 14891
                              lcollins@hellerdraper.com
                              Greta M. Brouphy, La. Bar No. 26216
                              gbrouphy@hellerdraper.com
                              Michael E. Landis, La. Bar No. 36542
                              mlandis@hellerdraper.com

                              Heller, Draper & Horn, L.L.C.
                              650 Poydras Street, Suite 2500
                              New Orleans, LA  70130
                              Telephone: (504) 299-3300

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 8
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1414 of 1598   PageID 14461
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21    Entered 07/09/21 16:31:32    Page 4 of 7

Fax: (504) 299-3399
*Attorneys for Get Good Trust*

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, counsel for Get Good Trust, do hereby certify that I caused a copy of the above and foregoing to be served on **July 9, 2021**, via the Court's ECF Notification System as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com
- Matthew Glenn Bouslog    mbouslog@gibsondunn.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1415 of 1598 PageID 14462
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21 Entered 07/09/21 16:31:32 Page 5 of 7

- David Grant Crooks    dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Deborah Rose Deitsch-Perez    deborah.deitschperez@stinson.com,
  patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com;lsc@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com,
  dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dento
  ns.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbro
  uphy@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Margaret Michelle Hartmann    michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;mary-
  beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.co
  m;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell    william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1416 of 1598 PageID 14463
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21 Entered 07/09/21 16:31:32 Page 6 of 7

- Michael Justin Lang    mlang@cwl.law,
  nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen    eleen@mkbllp.com
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Brant C. Martin    brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain    brent.mcilwain@hklaw.com,
  robert.jones@hklaw.com;brian.smith@hklaw.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txfilingnotice@sidley.com;paige-montgomery-
  7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sid
  ley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com,
  jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com, txfilingnotice@sidley.com;charles-
  persons-5722@ecf.pacerpro.com
- Louis M. Phillips    louis.phillips@kellyhart.com, june.alcantara-
  davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok    jprostok@forsheyprostok.com,
  jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.co
  m;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txfilingnotice@sidley.com;penny-reid-
  4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen    srosen@forsheyprostok.com,
  jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.c
  om;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti    mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Michelle E. Shriro    mshriro@singerlevick.com,
  scotton@singerlevick.com;tguillory@singerlevick.com

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of 8
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1417 of 1598 PageID 14464
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21 Entered 07/09/21 16:31:32 Page 7 of 7

- Nicole Skolnekovich    nskolnekovich@hunton.com,
  astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith    frances.smith@judithwross.com,
  michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-
  Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Clay M. Taylor    clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek    jvasek@munsch.com
- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@ldsrlaw.com,
  craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com


*/s/Douglas S. Draper.*

# EXHIBIT 77

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1419 of 1598   PageID 14466
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21    Entered 07/09/21 15:40:59    Page 1 of 8

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR NEXPOINT ADVISORS, L.P. AND
HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**RESPONSE OF THE ADVISORS TO ORDER REQUIRING DISCLOSURES**

COME NOW NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," with NexPoint, the "Advisors"), and file this their *Response to Order Requiring Disclosures* (the "Order"), entered by the Court *sua sponte* in the above styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), respectfully stating as follows:

## I.  THE ADVISORS HAVE CLEAR STANDING

1.  The Court appears to question the standing of the Advisors with respect to past, present, and potentially future actions.  The Court also appears to believe that the Advisors "frequently file lengthy and contentious pleadings," while the mere fact of the Order implies that the Advisors have been opaque regarding their ownership and control.  Respectfully, any concerns along these lines are not warranted.

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 9
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1420 of 1598    PageID 14467
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21    Entered 07/09/21 15:40:59    Page 2 of 8

2.      First, the Advisors are expressly named as parties enjoined by the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan"). "Enjoined Parties" under the Plan is defined as including any "Related Entity."  Plan at p. 8. "Related Entity" includes "affiliates" of the Debtor and any entity on the "Related Entity List." Plan at p. 14.  This list is filed as a Plan Supplement,  *see* Plan at p. 14, and it includes both Advisors.  *See* Docket No. 1811-9 at pp. 9 and 12.

3.      As the Advisors are both subject to the Plan's injunctions, the Advisors have unquestionable standing to seek relief from the Plan, including objecting to the Plan, appealing the Plan, and seeking to stay the Plan.  *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party ha[s] standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").  Thus, even if the Advisors did not have a direct economic interest under the Plan—a point on which the Court focused—the fact that the Plan enjoined them and took from them the rights they otherwise had conferred standing.  As the Advisors informed the Court, if they were not being enjoined under the Plan from advising their clients to take certain actions, or causing their clients to take certain actions, which they believed to be necessary and proper pursuant to their own fiduciary duties, and if the Plan was not exculpating various persons, including of their fiduciary duties to the Advisors and their clients, then the Advisors would not have contested the Plan.  The Plan need not have enjoined the Advisors or provided broad exculpations, but it did, and the Advisors should not be faulted for contesting and continuing to contest the Plan.

4.      Next, the Debtor has filed four adversary proceedings against the Advisors.  It was the Debtor who filed these, and sought preliminary injunctive relief and mandatory final injunctions.  The Advisors have reasonably and lawfully *defended* themselves against the Debtor's claims and causes of action.  That is not vexatiousness of any kind.

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1421 of 1598   PageID 14468
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21   Entered 07/09/21 15:40:59   Page 3 of 8

5.     On January 6, 2021, the Debtor filed a complaint against the Advisors and others, thereby initiating Adversary Proceeding No. 21-03000.  The Debtor alleged that the Advisors and others tortiously interfered with contracts and violated the automatic stay, and the Debtor sought a preliminary injunction preventing the Advisors and others from seeking to remove the Debtor as the manager of various third-party CLOs.  The Advisors agreed to a continuing temporary restraining order and the matter has been settled, subject to an imminent 9019, with the Debtor dismissing with prejudice all of its claims against the Advisors and the Advisors agreeing that they are controlled by Mr. Dondero—something they have always admitted.  That the Debtor is dismissing these claims without any settlement payment demonstrates that these claims were always baseless.  The Advisors had the right and standing to defend themselves and the interests of their clients, and they acted reasonably throughout.

6.     Next, the Debtor filed separate adversary proceedings against each of the Advisors, seeking monetary damages for amounts allegedly owing under promissory notes.  On January 22, 2021, the Debtor filed its complaint against HCMFA, thereby initiating Adversary Proceeding No. 21-03004, seeking damages of at least $7,687,653.07 under alleged promissory notes.  Also on January 22, 2021, the Debtor filed its complaint against NexPoint, thereby initiating Adversary Proceeding No. 21-03005, seeking damages of at least $23,071,195.03.  The Advisors deny any liability and have asserted various affirmative defenses.  The Advisors have the right and standing to defend themselves, and have been so doing.  The Court recently agreed that the reference for these adversary proceedings will have to be withdrawn, over the Debtor's objection.  The Advisors will note that the Debtor argued that this Court could try these promissory note suits under section 542 of the Bankruptcy Code, a proposition rejected by this Court on multiple occasions before and by most of the case law.  It was the Debtor that forced a contested hearing on what should have been, respectfully, an obvious issue and an obvious conclusion.

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1422 of 1598   PageID 14469
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21   Entered 07/09/21 15:40:59   Page 4 of 8

7.      Next, the Debtor filed a fourth adversary proceeding against the Advisors, seeking unspecified contract damages but, more importantly, seeking an exotic, if not unprecedented, mandatory injunction.  The Debtor filed this Complaint on February 17, 2021, thereby initiating Adversary Proceeding No. 21-03010.  The Debtor convinced the Court of an emergency, and an emergency, all-day trial was held on the mandatory injunction action on six days' notice.  Even though it was reasonably clear to the Debtor that there was no issue and any issue was moot, the Debtor proceeded with its case, at the conclusion of which the Court denied the injunction as moot. The Advisors had every right and standing to contest this action, and they were proven right.  It was the Debtor that chose to force an all-day hearing on an issue that never existed, never was an emergency, and was moot even under the Debtor's allegations.

8.      Separately, as the Court noted in the Order, the Advisors have filed an application for allowance of administrative claims of approximately $14 million, resulting from postpetition overpayments under shared service agreements between the Advisors and the Debtor.  *See* Docket No. 1826.  The Advisors' points and arguments are simple: the Debtor billed the Advisors for many employees under shared services agreements, who were actually no longer employed by the Debtor and could not have been providing the Advisors with any services, while the Advisors paid for these services without return value and in violation of the contracts.  The Debtor contests the allowance of these claims and the Court will decide the claims in due course.  The Advisors have the right and standing to prosecute these administrative claims, which claims are neither absurd, baseless, nor without *prima facie* evidence.

9.      Finally, NexPoint has acquired the prepetition (and potentially postpetition) claims of various former employees of the Debtor, who are now employed by NexPoint or by a staffing company engaged by NexPoint.  These employees are: Bhawika Jain, Michael Beispiel, Sang Kook (Michael) Jeong, Phoebe Stewart, and Sahan Abayaratha.  *See* Docket Nos. 2044, 2045,

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1423 of 1598   PageID 14470
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21   Entered 07/09/21 15:40:59   Page 5 of 8

2046, 2047, and 2266.  The amount of these employees' claims is not yet known, and remains subject to ongoing discovery.  While the Debtor has objected to these employee claims, *see* Docket No. 2059, that objection has yet to be sustained.  And, while the details are not clear to NexPoint, at least for Plan voting purposes the Court estimated the claims of these employees at $1 each.  In any event, as the holder of prepetition claims, which have yet to be disallowed, NexPoint has full standing in the Bankruptcy Case the same as any creditor.  And, since even the Court estimated these claims at *some* amount, the claims are neither absurd, baseless, nor without *prima facie* evidence.

10.    As defendants in four lawsuits, it cannot be suggested that the Advisors lacked standing to defend themselves.  As parties subject to this Court's permanent injunctions, they have the standing to contest those injunctions.  As counterparties to executory contracts with the Debtor, which were only terminated at the end of February, 2021, the Advisors were also "parties-in-interest" in the Bankruptcy Case, separate and apart from being creditors.  *See, e.g., In re Suffolk Reg'l Off-Track Betting Corp.*, 426 B.R. 397 (Bankr. E.D.N.Y. 2011).  As a "party-in-interest," the Advisors "may raise and may appear and be heard on any issue in a case under this chapter," at least until the rejection of the shared services agreements.  11 U.S.C. § 1109(b).  As unsecured and as postpetition administrative creditors—with claims that have not been disallowed or paid— the Advisors have full standing for all matters in the Bankruptcy Case due to their unsatisfied pecuniary interests.  *See, e.g., In re Mandel*, 2016 U.S. App. LEXIS 4274 (5th Cir. 2016) (holding that pecuniary interest confers bankruptcy standing); *In re Gulley*, 436 B.R. 878, 892 (Bankr. N.D. Tex. 2010) ("a mortgage servicer has standing to participate in a debtor's bankruptcy case by virtue of its pecuniary interest in collecting payments under the terms of a note").

11.    The Court was correct in previously holding that the Advisors had standing, and there is no legal or factual ground to reconsider that ruling.  Furthermore, the interests of the

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1424 of 1598   PageID 14471
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21   Entered 07/09/21 15:40:59   Page 6 of 8

Advisors are different from various of the other entities affiliated with Mr. Dondero. As the Court

knows, the Advisors are fiduciaries to many third-party clients. The injunctions on the Advisors

place the Advisors in a difficult position that other entities affiliated with Mr. Dondero do not have.

The Advisors' postpetition claims are based on executory contracts under which they paid tens of

millions of dollars to the Debtor—something that other entities affiliated with Mr. Dondero did

not do. The Advisors' prepetition claims are based on claims acquired from former employees,

something that is categorically different from the claims of other entitles affiliated with Mr.

Dondero. Other than on plan related matters, the Advisors do not believe that there are at present,

or are likely to be in the future, contested matters and motion practice that would be suitable for

combined pleadings with other entities affiliated with Mr. Dondero, and the Advisors would object

to any such proposal or requirement.[1]

## II.   <u>DISCLOSURES</u>

HCMFA is owned by the following:

(i)  Strand Advisors XVI, Inc., general partner with a 1% interest;
(ii)  Highland Capital Management Services, Inc., limited partner with a 89.6667% interest; and
(iii) Okada Family Revocable Trust, limited partner with a 9.3333% interest.

HCMFA is managed by its general partner, Strand Advisors XVI, Inc., which is managed by the
following:

(i)  James Dondero, Director
(ii)  Dustin Norris, Executive Vice President
(iii) Frank Waterhouse, Treasurer
(iv)  Will Mabry, Assistant Treasurer
(v)  Stephanie Vitiello, Secretary
(vi) Jason Post, Chief Compliance Officer/Anti-Money Laundering Officer

---

[1]       Finally, and respectfully, the Advisors would note the seeming inequity in requiring detailed disclosures from the Advisors, implying that the Advisors had acted inappropriately, while apparently relieving the Debtor of its obligations (or not enforcing those obligations) under Bankruptcy Rule 2015.3 regarding tens or hundreds of millions of dollars of indirect value in the estate at the same hearing. Just as the Debtor forced contested hearings against the Advisors (losing several), yet labeled the Advisors "vexatious" and "Dondero Tentacles," so too the Court appears to be applying a different standard of disclosure to the Advisors than to the Debtor

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1425 of 1598   PageID 14472
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21    Entered 07/09/21 15:40:59    Page 7 of 8

Strand Advisors XVI, Inc. is owned 100% by James Dondero.

Highland Capital Management Services, Inc. is owned 75% by James Dondero and 25% by Mark Okada.

Highland Capital Management Services, Inc. is managed by the following:

(i)  James Dondero, Director
(ii) James Dondero, President
(iii) Scott Ellington, Secretary
(iv) Frank Waterhouse, Treasurer

It is not known who is interested in the Okada Family Revocable Trust, but it is not believed to be James Dondero or any of his family and is believed instead to me Mr. Mark Okada and his family members.

HCMFA is a postpetition creditor of the Debtor, holding an administrative claim together with NexPoint in the combined amount of approximately $14 million, which amount has not been broken down between HCHFA and NexPoint, pending discovery.  The claim has been objected to and neither allowed nor disallowed as of this filing.

HCMFA is not a prepetition creditor of the Debtor.

NexPoint is owned by the following:

(i) NexPoint Advisors GP, LLC, general partner with 1% ownership; and
(ii) The Dugaboy Investment Trust, limited partner with 99% ownership.

NexPoint is managed by its general partner, NexPoint Advisors GP, LLC, which is managed by the following:

(i)  James Dondero, Member
(ii) James Dondero, President
(iii) Dustin Norris, Executive Vice President
(iv) Frank Waterhouse, Treasurer
(v) Will Mabry, Assistant Treasurer
(vi) Stephanie Vitello, Secretary
(vii) D.C. Sauter, General Counsel
(viii) Jason Post, Chief Compliance Officer/Anti-Money Laundering Officer

NexPoint Advisors GP, LLC is owned 100% by James Dondero.

The Dugaboy Investment Trust is affiliated with Mr. Dondero and, as it will be filing its own disclosure pursuant to the Order, the Advisors would respectfully refer the Court to said disclosure.

NexPoint is a postpetition creditor of the Debtor, holding an administrative claim together with HCMFA in the combined amount of approximately $14 million, which amount has not been

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1426 of 1598   PageID 14473
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21    Entered 07/09/21 15:40:59    Page 8 of 8

broken down between HCHFA and NexPoint, pending discovery.  The claim has been objected to and neither allowed nor disallowed as of this filing.

NexPoint is a prepetition creditor of the Debtor by virtue of having acquired five (5) former employee claims, as identified above.  The amount of these claims is not known, as this depends, in part, on certain "award letters" issued by the Debtor that have not been produced in discovery yet, pending confirmation from the employees that the same may be released to NexPoint.  The claims have been objected to and neither allowed nor disallowed as of this filing.

RESPECTFULLY SUBMITTED this 9th day of July, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P.**

# EXHIBIT 78

Docket #2544 Date Filed: 07/09/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NREP, HCMS, NREC,**
**THE REAL ESTATE ADVISORS, NMCT,**
**NREF, NXRT, NHT, AND VB** (AS DEFINED BELOW)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |

### NOTICE AND DISCLOSURE OF NEXPOINT RE
### ENTITIES AND HIGHLAND CAPITAL MANAGEMENT SERVICES INC.
### IN RESPONSE TO COURT'S SUA SPONTE ORDER REQUIRING DISCLOSURES

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP"), NexPoint Real

Estate Capital, LLC ("NREC"), NexPoint Real Estate Advisors, L.P., NexPoint Real Estate

Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P.,

NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real

Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P. (collectively, the "Real Estate

Advisors"), NexPoint Real Estate Finance Inc. ("NREF"), NexPoint Residential Trust, Inc.

("NXRT"), NexPoint Hospitality Trust ("NHT"), NexPoint Multifamily Capital Trust, Inc.

("NMCT"), VineBrook Homes, Trust, Inc. ("VB"), and Highland Capital Management Services,

Inc. ("HCMS"), by and through their undersigned counsel, make the following disclosures (the

1934054210709000000000012

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1429 of 1598   PageID 14476
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21   Entered 07/09/21 15:54:20   Page 2 of 7

"Disclosures") as required by this Court's June 18, 2021 *Order Requiring Disclosures* [Dkt. No.

2460] (the "Order").

## I. DISCLOSURES

A.     **NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC.**

1.     **NREP ownership, officers, directors, managers, and/or trustees.**

| Owners | Type | % | Manager | Officers |
|---|---|---|---|---|
| The Dugaboy Investment Trust | Member | 70 | James Dondero | Matt McGraner – Vice President<br>Scott Ellington – Secretary |
| Highland Capital Management Real Estate Holdings I, LLC | Member | 25 |  |  |
| Highland Capital Management Real Estate Holdings II, LLC | Member | 5 |  |  |

2.     **NREP ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

The Dugaboy Investment Trust owns a 70% interest in NREP.

3.     **NREP's status as creditor of the Debtor.**

NREP timely filed a proof of claim against the Debtor's estate on April 8, 2020. [Proof of

Claim No. 146]. The Debtor objected to the NREP Proof of Claim through its First Omnibus

Objection [Dkt. No. 906]. On October 19, 2020, NREP filed its Response, asserting a claim against

the Debtor because the SE Multifamily Holdings LLC company agreement improperly allocates

the ownership percentages of the members due to mutual mistake, lack of consideration, and/or

failure of consideration and seeking to reform, rescind, and/or modify the company agreements

(the "Contested Matter"). [Dkt. No. 1212]. The Contested Matter is not yet resolved; however, the

result of a finding in favor of NREP will result in the modification of the SE Multifamily Holdings,

LLC company agreement, not a setoff against the Debtor's estate. [1]

---

[1]    The Debtor filed a Motion to Compel Disqualify Wick Phillips Gould & Martin ("WPGM") from representing
NREP in the contested matter only. [Dkt. No. 2196]. Wick Phillips disputes the Debtor's allegations in the Motion for
the reasons set forth in Wick Phillips' Response and Brief in Opposition [Dkt. Nos. 2278, 2279]. The hearing on the
Debtor's Motion is currently set for October 25, 2021. [Dkt. No. 2361].

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1430 of 1598   PageID 14477
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21    Entered 07/09/21 15:54:20    Page 3 of 7

The Debtor also initiated an adversary proceeding, Adversary No. 21-03007, against NREP based on certain demand and promissory notes. NREP filed its First Amended Answer to the Debtor's Complaint on June 11, 2021. [Dkt. No. 34]. In addition, NREP filed a Motion to Withdraw the Reference and Brief in Support on June 3, 2021. [Dkt. Nos. 20, 21]. A status conference on the Motion to Withdraw the Reference was held on July 8, 2021. [Dkt. No. 30].

**B.**     **Highland Capital Management Services, Inc.**

    **1.**     **HCMS ownership, officers, directors, managers, and/or trustees.**

| Owners | Type | % | Director | Officers |
|---|---|---|---|---|
| James Dondero | Shareholder | 75 | James Dondero | James Dondero – President |
| Mark Okada | Shareholder | 25 | | Scott Ellington – Secretary Frank Waterhouse – Treasurer |

    **2.**     **HCMS ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

Mr. Dondero owns 75% of the direct ownership interest in HCMS.

    **3.**     **HCMS' Status as creditor of the Debtor.**

HCMS timely filed two proofs of claim against the Debtor's estate on April 23, 2020 [Proofs of Claim Nos. 175, 176]; however, such claims were expunged on October 20, 2020. [Dkt. No. 1233].

The Debtor initiated an adversary proceeding, Adversary No. 21-03006, against HCMS based on certain demand and promissory notes. HCMS filed its First Amended Answer to the Debtor's Complaint on June 11, 2021. [Dkt. No. 34]. In addition, NREP filed a Motion to Withdraw the Reference and Brief in Support on June 3, 2021. [Dkt. Nos. 19, 20]. A status conference on the Motion to Withdraw the Reference was held on July 8, 2021. [Dkt. No. 29].

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of 9
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1431 of 1598   PageID 14478
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21   Entered 07/09/21 15:54:20   Page 4 of 7

C.      **NexPoint Real Estate Capital, LLC.**

   1.      **NREC ownership, directors, officers, managers, and/or trustees.**

| Owner | Type | % | Manager |
|---|---|---|---|
| NexPoint Strategic Opportunities Fund | Member | 100 | NexPoint Strategic Opportunities Fund |

   2.      **HCMS ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

Mr. Dondero and/or his family trusts have an indirect ownership interest in NREC through their ownership of 7.43% of shares of NREC's sole member, NexPoint Strategic Opportunities Fund.

D.      **NexPoint Real Estate Advisors, LP; NexPoint Real Estate Advisors II, LP; NexPoint Real Estate Advisors III, LP; NexPoint Real Estate Advisors IV, LP; NexPoint Real Estate Advisors V, LP; NexPoint Real Estate Advisors VI, LP; NexPoint Real Estate Advisors VII, LP; and NexPoint Real Estate Advisors VIII, LP.**

   1.      **The Real Estate Advisors' ownership, directors, officers, managers, and/or trustees.[2]**

| Owners | Type | % | Manager | Officers |
|---|---|---|---|---|
| NexPoint Real Estate Advisors GP, LLC | General Partner | 0.1 | NexPoint Real Estate Advisors GP, LLC, the General Partner | James Dondero – President<br>Scott Ellington – GC/Secretary<br>Brian Mitts – EVP<br>Matt McGraner – EVP<br>Frank Waterhouse – Treasurer<br>Dustin Norris – Asst. Treasurer |
| NexPoint Advisors, LP | Limited Partner | 99.9 | | |

   2.      **The Real Estate Advisors ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

Mr. Dondero has a .01% indirect ownership interest in the Real Estate Advisors through their General Partner, NexPoint Advisors GP, LLC, of which Mr. Dondero is the sole member (100%). Mr. Dondero's family trusts have a 99.9% indirect ownership interest in the Real Estate Advisors through their Limited Partner, NexPoint Advisors, LP.

---

[2]   The ownership, directors, and officers are the same for each of the Real Estate Advisors entities.

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 6 of 9
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 1432 of 1598  PageID 14479
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21  Entered 07/09/21 15:54:20  Page 5 of 7

E.    **NexPoint Multifamily Capital Trust Inc.**

1.    **NMCT ownership, directors, officers, managers, and/or trustees.**

| Owner | Type | % | Manager | Officers |
|---|---|---|---|---|
| NHT Operating Partnership, LLC | Member | 100 | N/A | James Dondero – President<br>Scott Ellington – GC/Secretary<br>Brian Mitts – CFO/EVP-Finance/Treasurer<br>Matt McGraner – CIO/EVP<br>Matt Goetz – VP-Investment & Asset Mgmt. |

2.    **NMCT ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

NMCT is wholly owned by NHT Operating Partnership, LLC, the operating partnership of NHT (defined below). Any indirect ownership of Mr. Dondero and his family trusts are set forth in Exhibit A next to NHT.

F.    **NexPoint Real Estate Finance Inc, NexPoint Residential Trust Inc., NexPoint Hospitality Trust, and VineBrook Homes Trust, Inc.**

NexPoint Real Estate Finance, Inc. ("NREF"), NexPoint Residential Trust Inc. ("NXRT"), NexPoint Hospitality Trust ("NHT"), and VineBrook Homes Trust, Inc. ("VB" and together with NREF, NXRT, and NHT, the "Public Entities") are all governed by a Board of Trustees or Directors (depending on its form of organization). Shares of NXRT and NREF are publicly held by investors and are traded on the New York Stock Exchange. Shares of NHT are publicly held by investors and are traded on the TSX Venture Exchange. As such, each of NREF, NXRT, and NHT are owned by "retail" investors, meaning public shareholders that trade interests daily on the public markets. Because many of the shares of NREF, NXRT, and NHT are held in omnibus accounts or "street names," the actual number of shareholders is greater than the total number of account holders. Accordingly, it is not possible to list all the owners of the Public Entities publicly or by name. Shares of VB are not publicly traded but are owned by over 2,000 individual shareholders. Additionally, VB is conducting a continuous placement of its Class A common stock and, as a

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 9
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1433 of 1598 PageID 14480
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21 Entered 07/09/21 15:54:20 Page 6 of 7

result, the number of shareholders continues to increase on an ongoing basis. As such, while possible, it is not practicable to list the owners of VB publicly or by name.

The directors/trustee, officers, directors, and Mr. Dondero's and/or his family trusts' interest in the Public Entities are set forth in the chart attached to these Disclosures as **Exhibit A**.

**G.** **The Public Entities, NREC, NMCT, and the Real Estate Advisors' status as creditors of the Debtor.**

The Public Entities, NREC, NMCT and the Real Estate Advisors are not creditors of the Debtor.[3] Other than the filing an Objection to Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor and Request for Protective Order [Dkt. 847] and a Joinder to Highland Capital Management Fund Advisors, LP, NexPoint Advisors, LP, and Related Funds' Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization [Dkt. No. 1677], the Public Entities, NREC, NMCT, and the Real Estate Advisors have not otherwise been involved in the Bankruptcy Case.

---

[3] The Public Entities, NREC, NMCT, and the Real Estate Advisors objected to the Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor [Dkt. No. 808] based on the fact that it required disclosure of data and information belonging to the Public Entities, NREC, NMCT and the Real Estate Advisors were housed on the Debtor's servers pursuant to various shared services agreements.

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of 9
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1434 of 1598 PageID 14481
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21 Entered 07/09/21 15:54:20 Page 7 of 7

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email: jason.rudd@wickphillips.com
         lauren.drawhorn@wickphillips.com

**COUNSEL FOR NREP, HCMS, NREC, THE REAL
ESTATE ADVISORS, NMCT, NREF, NXRT, NHT,
AND VB**

## CERTIFICATE OF SERVICE

       I hereby certify that on July 9, 2021, a true and correct copy of the foregoing Joinder was
served via the Court's CM/ECF system upon counsel for the Debtor and all other parties requesting
or consenting to such service in this bankruptcy case.

*/s/ Lauren K. Drawhorn*
       Lauren K. Drawhorn

Case 19-34054-sgj11 Doc 2544-1 Filed 07/09/21   Entered 07/09/21 15:54:20   Page 1 of 1

EXHIBIT A

Disclosures

| Name | Ticker | Owners | Ownership Type | Ownership % | Dondero or Family Trust Ownership % | Director/Manager/Trustee | Officers |
|---|---|---|---|---|---|---|---|
| NexPoint Real Estate Finance Inc. | NREF | Various retail Investors. | Shareholders | Varies | James Dondero owns approx. .3323% of the total shares.<br>The Dugaboy Trust owns approx. 3.013% of the total shares. | Directors<br>James Dondero (Chairman)<br>Brian Mitts<br>Edward Constantino (Ind. Dir)<br>Scott Kavanaugh (Lead Ind. Dir)<br>Arthur Laffer (Ind. Dir)<br>Catherine Wood (Ind. Dir) | James Dondero-President<br>Brian Mitts-CFO/EVP-Finance/ Secretary/Treasurer<br>Matt McGraner-CIO/EVP<br>Matt Goetz-SVP-Investments & Asset Mgmt<br>Paul Richards-VP-Originations & Investments<br>David Willmore-VP-Finance |
| NexPoint Residential Trust Inc. | NRXT | Various retail Investors. | Shareholders | Varies | James Dondero directly or indirectly owns approx. 8.23% of the total shares. | Directors<br>James Dondero<br>Brian Mitts<br>Edward Constantino<br>Scott Kavanaugh<br>Arthur Laffer<br>Catherine Wood | James Dondero-President<br>Brian Mitts-CFO/EVP-Finance/Secretary/Treasurer<br>Matt McGraner-EVP/CIO<br>Matt Goetz-SVP-Investment & Asset Mgmt<br>DC Sauter-General Counsel |
| NexPoint Hospitality Trust | NHT-U.V | Various retail Investors<br>NexPoint Strategic Opportunities Fund (45.91%)<br>Liberty CLO Holdco, Ltd. (7.13%)<br>Highland Dallas Foundation (5.15%)<br>NHT Holdco, LLC (5.87%)<br>The Debtor (5.03%)<br>Governance RE Ltd. (3.62%) | Shareholders | Varies | James Dondero and his family trusts own approx. 18.56% of the total shares. | Trustees<br>Neil Labatte (independent)<br>Graham Senst (Indepent)<br>James Dondero | James Dondero - CEO<br>Brian Mitts - CFO, EVP-Finance, Treasurer, Corporate Secretary<br>Matt McGraner - CIO, EVP<br>Jessie Blair III - EVP, Head of Lodging<br>Paul Richards - VP, Asset Management |
| VineBrook Homes Trust, Inc. | N/A | Various. | Shareholders | Varies | James Dondero owns approx. .09% of the total shares. | Directors<br>James Dondero<br>Brian Mitts<br>Ed Constantino<br>Scott Kavanaugh<br>Art Laffer<br>Dana Sprong | James Dondero-CEO/President<br>Matt McGraner-EVP/CIO/Secretary<br>Brian Mitts-CFO/Treasurer/Asst Secretary<br>Dana Sprong-SVP-Acquisition & Disposition<br>Ryan McGarry-SVP-Asset Mgmt |

# EXHIBIT 79

# RESERVED

# EXHIBIT 80

Case 19-34054-sgj11 Doc 3445-80 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 3
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1438 of 1598   PageID 14485
Case 21-03003-sgj Doc 49 Filed 05/24/21   Entered 05/24/21 14:07:13   Page 1 of 2



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 24, 2021**

_____
**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | Chapter 11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | Adversary No. 21-03003-sgj |
| | § | |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

## ORDER DENYING MOTION TO COMPEL DEPOSITION TESTIMONY
## FROM JAMES P. SEERY, JR.

On this date, the Court considered the *Motion to Compel Deposition Testimony from James*

*P. Seery, Jr.* filed by James D. Dondero, the Defendant in the above-captioned adversary

proceeding, on May 13, 2021 (the "Motion").

Case 19-34054-sgj11 Doc 3445-80 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 3
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1439 of 1598   PageID 14486
Case 21-03003-sgj Doc 49 Filed 05/24/21    Entered 05/24/21 14:07:13    Page 2 of 2

Upon consideration of the Motion, the Plaintiff's objection thereto, and the arguments of counsel made during the hearing on the Motion, the Court finds that the Motion should be DENIED in its entirety for the reasons stated on the record during the hearing.

IT IS SO ORDERED.

### # # # END OF ORDER # # #

John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

-and-

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

# EXHIBIT 81

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23    Page 1441 of 1598   PageID 14488
Case 22-03003-sgj Doc 1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 1 of 9

JASON S. BROOKNER
Texas Bar No. 24033684
ANDREW K. YORK
Texas Bar No. 24051554
DRAKE M. RAYSHELL
Texas Bar No. 24118507
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:  jbrookner@grayreed.com
        dyork@grayreed.com
        drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | |
| SCOTT BYRON ELLINGTON. | Adv. No. _____ <br> *Removed from the 101st Judicial District Court of Dallas County, Texas Cause No. DC-22-00304* |
| Petitioner, <br> v. | |
| PATRICK DAUGHERTY, | |
| Respondent. | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

4857-9065-1402.7

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1442 of 1598 PageID 14489
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 2 of 9

## NOTICE OF REMOVAL

Patrick Daugherty ("Daugherty") files this Notice of Removal ("Notice") of Cause No. DC-22-00304 ("State Court Action") from the 101st Judicial District Court of Dallas County, Texas to the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

As the Court is well aware, Daugherty is a creditor of the Debtor, asserting the fourth largest claim of all creditors in this bankruptcy proceeding. The dispute between Daugherty and the Debtor began a decade ago when the Debtor filed suit against Daugherty in Texas state court (the "Texas Action"). After a three-week trial, the jury in the Texas Action found for Daugherty against Debtor and James Dondero ("Dondero") for defamation with malice, and on Daugherty's claim for breach of good faith and fair dealing against Debtor's affiliate Highland Employee Retention Assets LLC ("HERA") for $2.6 million plus interest that has been accruing since May 2012.

After being unable to collect on the HERA judgment, Daugherty commenced an action against Debtor, Dondero, HERA and ERA Management, LLC ("ERA") in Delaware Chancery Court. The Delaware court found that the Dondero-related defendants wrongfully withheld dozens of documents in discovery based on improper assertions of privilege and that there was a reasonable basis to believe that a fraud had been perpetrated such that the crime-fraud exception applied to any attorney-client privilege assertion.

Two days into trial in the Delaware case, Debtor filed its chapter 11 petition. Daugherty subsequently filed a second lawsuit in Delaware Chancery Court against Dondero, HERA, ERA, Debtor's former general counsel Scott Byron Ellington ("Ellington"), the Debtor's former in-house counsel Isaac Leventon ("Leventon") and the Debtor's outside counsel, Hunton Andrews Kurth LLP ("HAK"), Marc Katz ("Katz"), and Michael Hurst ("Hurst") for conspiracy to commit fraud, among other claims.

-2-

4857-9065-1402.7

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1443 of 1598 PageID 14490
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 3 of 9

Daugherty and the Reorganized Debtor have entered into a settlement agreement that is awaiting Court approval, and a hearing is set with respect to the same on March 1, 2022. The settlement agreement contains releases of claims against certain parties, but notably, it expressly excludes Dondero, Ellington, Leventon, HAK, Katz and Hurst from the definition of the "HCMLP Released Parties," meaning Daugherty will retain his claims against those parties in the Delaware litigation.

On January 12, 2022, a month after the proposed settlement was filed with the Court, Ellington initiated the State Court Action against Daugherty. Hurst is listed as one of Ellington's attorneys in the State Court Action. The petition in the State Court Action asserts that the State Court Action "arises out of the same transaction or occurrence which is the subject of" the Texas Action, and requests transfer of the State Court Action to the 68th Judicial District Court of Dallas County, Texas that is presiding over the Texas Action. Ellington's counsel also informed the undersigned that Ellington intends to file such a transfer motion.

Ellington and Daugherty are both interested parties in Debtor's bankruptcy. Removal is appropriate, and this Court has jurisdiction, pursuant to 28 U.S.C. § 1452(a) and Rule 9027 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), because the State Court Action relates to Debtor's bankruptcy in several respects: (i) Daugherty is a creditor; (ii) Ellington is a Defendant to claims asserted by the Trustee in the bankruptcy; (iii) Daugherty and the Reorganized Debtor have entered into, and requested Court approval of, a proposed settlement that disfavors Ellington; and (iv) the State Court Action offends this Court's gatekeeper orders, which essentially forbid pursuing legal action involving parties related to the bankruptcy—specifically Debtor's principals—without this Court's approval, requiring any such action to be adjudicated in this Court. *See* Docket No. 2660 at 12-13, 26-27. The State Court Action is an attempt to: (1)

4857-9065-1402.7

APPX. 10733

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1444 of 1598 PageID 14491
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 4 of 9

improperly evade this Court's clear gatekeeping orders; (2) derail this Court's pending consideration of a proposed settlement; and (3) pursue the Reorganized Debtor through otherwise impermissible discovery in the State Court Action.

## BACKGROUND

1. The Debtor filed for bankruptcy on October 16, 2019 in the U.S. Bankruptcy Court for the District of Delaware. The Debtor's chapter 11 case was transferred to this Court on December 4, 2019, and is pending as captioned above, under Case No. 19-34054. Docket No. 1.

2. Ellington is a named defendant in action filed by the Litigation Trustee on October 15, 2021. *See generally* Adversary No. 21-03076. He is also a former principal of the Debtor, having served as the Debtor's Chief Legal Officer and General Counsel until his termination for cause in January 2021. Docket No. 2934 at 8, ¶ 19.

3. Daugherty is a former employee and limited partner of the Debtor and previously served in other positions with current and former affiliates of the Debtor. At the time of his resignation from the Debtor, Daugherty owned 19.1% of the preferred units of HERA. Since that time, his ownership interest in HERA increased to 100%.

4. Shortly after Daugherty's resignation, Debtor commenced the Texas Action against Daugherty. Daugherty obtained a $2.6 million award plus interest which continues to accrue against HERA (the "<u>HERA Judgment</u>"), which was upheld on appeal in December 2016.

5. In July 2017, unable to collect on the HERA Judgment, Daugherty commenced an action against the Debtor and several of its principals, in their individual capacities, in the Delaware Chancery Court in the case captioned *Daugherty v. Highland Capital Management, L.P., et al.*, C.A. No. 2017-0488-MTZ, for, *inter alia*, fraudulent transfer, promissory estoppel, unjust enrichment, indemnification, and "fees on fees" (the "<u>Highland Chancery Case</u>").

-4-

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1445 of 1598 PageID 14492
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 5 of 9

6.      Prior to trial, the Delaware Chancery Court ruled that the defendants wrongfully withheld dozens of documents in discovery based on improper assertions of privilege. Specifically, the Delaware Chancery Court ruled there was a reasonable basis to believe that a fraud had been perpetrated on Daugherty, resulting in the crime-fraud exception precluding any attorney-client privilege to the withheld documents.

7.      The Highland Chancery Case, however, was automatically stayed when the Debtor filed its chapter 11 petition in the middle of trial on October 16, 2019.

8.      On December 1, 2019, Daugherty filed a separate lawsuit in the Delaware Chancery court captioned *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ, against various principals, agents, and attorneys affiliated with Debtor—including Ellington—for conspiracy to commit fraud, along with other claims (the "Ellington Chancery Case," and together with the Highland Chancery Case, the "Chancery Cases").

9.      Daugherty and the Reorganized Debtor engaged in settlement negotiations in an attempt to resolve Daugherty's claim in the chapter 11 case. The parties' negotiations ultimately resulted in the filing of the Reorganized Debtor's *Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* on December 8, 2021, at Docket No. 3088 ("Settlement Approval Motion").

10.      The Settlement Approval Motion requests approval of a proposed settlement agreement ("Proposed Settlement"), executed in late November 2021. Pursuant to the Proposed Settlement, Daugherty will release his claims against the Reorganized Debtor's estate and many of the Reorganized Debtor's agents, representatives, and subsidiaries. Exhibit 6, ¶ 6. However, the Proposed Settlement expressly and specifically retains Daugherty's claims against Ellington and select other individuals and entities. Exhibit 6, ¶ 7.

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1446 of 1598 PageID 14493
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 6 of 9

11. On January 12, 2022, a little over a month after submission of the Settlement Approval Motion, Ellington filed the State Court Action against Daugherty.

12. On the first page of the petition, Ellington's counsel asserts that "this case, in part, arises out of the same transaction or occurrence which is the subject of *Highland Capital Management, L.P. v. Patrick Daugherty*, Cause No. 12-04005, in the 68th Judicial District Court of Dallas County, Texas. Hence, the undersigned believes that this case is subject to transfer . . ." Exhibit 1 at 1.

13. On January 14, 2022, Ellington's lead counsel doubled down on the relationship between the State Court Action and the Texas Action in an email to the undersigned:

> We believe this case is a related case and should be transferred to Judge Hoffman's court. We do not know yet if the transfer will be automatic. If it is not automatically transferred, we intend to file a Motion to Transfer. Please let us know today if we can mark you as unopposed on our motion to transfer.

Exhibit 5.

## BASIS FOR REMOVAL

14. "A party may remove any claim or cause of action in a civil action… to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under 1334[.]" 28 U.S.C. § 1452(a). According to 28 U.S.C. § 1334(b), "the district courts shall have original but not exclusive jurisdiction of all civil proceedings… related to cases under title 11." A matter is "related to" a bankruptcy if its outcome "could 'conceivably have an effect on the estate being administered in the bankruptcy.'" *In re Brooks Mays Music Co.*, 363 B.R. 801, 808 (Bankr. N.D. Tex. 2007) (Jernigan, J.) (quoting *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987)). "Conceivably" is the watchword—neither certainty, nor even probability, is required. *See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 587 (5th Cir. 1999); *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991). Thus,

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1447 of 1598   PageID 14494
Case 22-03003-sgj Doc 1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 7 of 9

bankruptcy jurisdiction exists and a matter is "'related to' bankruptcy if the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate." *In re TXNB Internal Case*, 483 F.3d 292, 298 (5th Cir. 2007).

15.     Removal directly to this Court is appropriate pursuant to the Northern District of Texas's Standing Order of Reference of Bankruptcy Cases and Proceedings.  Misc. Order No. 33 (Aug. 3, 1984).  This Standing Order provides that "any or all cases … related to a case under Title 11 … are referred to the Bankruptcy Judges of this district for consideration and resolution consistent with law."  *Id.*  Removal directly to the Bankruptcy Court is a regular and accepted practice.  *See, e.g.,* Local Bankr. R. 9027-1(a); *TNT Quadrangle Partners, LP v. SPRF B/Quadrangle Prop., LLC*, No. 3:20-AP-03103, Dkt. 1, 59 (Bankr. N.D. Tex. Feb. 26, 2021) (Jernigan, J.) (granting summary judgment in adversary proceeding removed directly from Texas state court); *Lycoming Engines v. Superior Air Parts, Inc.*, No. 3:12-AP-03035, Dkt. 1, 38 (Bankr. N.D. Tex. July 6, 2012) (Houser, J.) (denying motion to remand in action removed directly from Texas state court).

16.     This Notice is filed within (30) days of the date the State Court Action was commenced and is therefore timely pursuant to 28 U.S.C. § 1446(b) and Bankruptcy Rule 9027(a)(2).  A copy of this Notice is also being filed with the Court Clerk in the State Court Action. Moreover, Daugherty consents to entry of final orders and judgments by this Court.  *See* Fed. R. Bankr. P. 9027.

17.     As discussed above, the State Court Action is "related to" the Debtor's bankruptcy, and Ellington admits as much on the face of the state court petition.  The Proposed Settlement between Daugherty and the Reorganized Debtor addresses both the Texas Action and portions of

-7-

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 9 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 1448 of 1598  PageID 14495
Case 22-03003-sgj Doc 1 Filed 01/18/22  Entered 01/18/22 09:25:21  Page 8 of 9

the Chancery Cases, and expressly excludes Ellington as a released party. This is more than sufficient to vest this Court with jurisdiction over Ellington's new lawsuit.

18.     Moreover, Ellington appears to seek discovery in the State Court Action to use in defending against the Litigation Trustee's action. On January 13, 2022, Ellington's counsel sent the undersigned counsel a litigation hold letter. *See* Exhibit 7. Among the categories of documents and materials that Ellington requested be retained were "[a]ll documents and communications with any other party, person, or entity regarding . . . the observation, surveillance, or investigation of any Ellington Party or Ellington Location." *Id.* at 2. Combined with the fact that Ellington wants to immediately seek written discovery in the State Court Action, *see* Exhibit 5, it is clear that Ellington's lawsuit attempts to circumvent this Court's gate-keeping orders by seeking information concerning Daugherty's communications with the Official Committee of Unsecured Creditors, the Reorganized Debtor, and Jim Seery concerning Ellington's attempts to conceal his assets to keep them out of the reach of his creditors. The timing of the State Court Action is indicative of its retaliatory nature because Daugherty expressly retained his claims against Ellington in the Proposed Settlement.

19.     Ellington's State Court Petition is attached as Exhibit "1." Attached hereto as Exhibit "2" is a copy of the docket sheet for the State Court Action (last visited January 17, 2022). Attached hereto as Exhibit "3" are all process and other pleadings regarding the State Court Action. Additionally, attached hereto as Exhibit "4" is a listing of counsel involved in the State Court Action, along with their contact information.

4857-9065-1402.7

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1449 of 1598 PageID 14496
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 9 of 9

## NOTICE

20.     Pursuant to Bankruptcy Rule 9027, Daugherty will file a copy of this Notice of Removal with the Clerk of the Court for the 101st Judicial District Court in Dallas County, and will serve a copy on all parties to the removed action.

Respectfully submitted this 18th day of January, 2022.

**GRAY REED**

By: /s/ *Jason S. Brookner*
           JASON S. BROOKNER
           Texas Bar No. 24033684
           ANDREW K. YORK
           Texas Bar No. 24051554
           DRAKE M. RAYSHELL
           Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:      jbrookner@grayreed.com
           dyork@grayreed.com
           drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of January, 2022, he caused a true and correct copy of the foregoing pleading to be served via the Court's electronic case filing system (ECF) on all parties to this proceeding who have so-subscribed.

/s/ *Jason S. Brookner*
JASON S. BROOKNER

4857-9065-1402.7

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-24   Filed 112/29/23   Page 1450 of 1598   PageID 14497
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 1 of 106

JASON S. BROOKNER
Texas Bar No. 24033684
ANDREW K. YORK
Texas Bar No. 24051554
DRAKE M. RAYSHELL
Texas Bar No. 24118507
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:  jbrookner@grayreed.com
        dyork@grayreed.com
        drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.[1] | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | |
| SCOTT BYRON ELLINGTON. | |
| Petitioner, | Adv. No. _____<br>*Removed from the 101st Judicial District*<br>*Court of Dallas County, Texas*<br>*Cause No. DC-22-00304* |
| v. | |
| PATRICK DAUGHERTY, | |
| Respondent. | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1451 of 1598   PageID 14498
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 2 of 106

## APPENDIX TO NOTICE OF REMOVAL

Pursuant to N.D. Tex. Local Bankruptcy Rule 9027-1(c), Respondent Patrick Daugherty

submits this appendix of the docket sheet and all pleadings from the court from which this action

is being removed.

- **Exhibit 1** is the Petition filed to initiate Cause No. DC-22-00304 in the 101st Judicial District of Dallas County, Texas ("State Court Action").
- **Exhibit 2** is a copy of the docket sheet for the State Court Action (last visited January 17, 2022).
- **Exhibit 3** contains copies of the remaining documents filed on the docket in the State Court Action.
- **Exhibit 4** is a listing of counsel involved in the State Court Action along with their contact information.
- **Exhibit 5** is a true and correct copy of January 14, 2022, email correspondence from Julie Pettit, The Pettit Law Firm, to Drew York and Ruth Ann Daniels, Gray Reed.
- **Exhibit 6** is a true and correct copy of the Proposed Settlement Agreement between Reorganized Debtor and Daugherty.
- **Exhibit 7** is a true and correct copy of the January 13, 2022, Litigation Hold letter from Ellington's counsel to Daugherty.

Respectfully submitted this 18th day of January, 2022.

**GRAY REED**

By: /s/ *Jason S. Brookner*
       JASON S. BROOKNER
       Texas Bar No. 24033684
       ANDREW K. YORK
       Texas Bar No. 24051554
       DRAKE M. RAYSHELL
       Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:     jbrookner@grayreed.com
          dyork@grayreed.com
          drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1452 of 1598   PageID 14499
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 3 of 106

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of January, 2022, he caused a true and correct copy of the foregoing pleading to be served via the Court's electronic case filing system (ECF) on all parties to this proceeding who have so-subscribed.

/s/ Jason S. Brookner
JASON S. BROOKNER

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 4 of 106

# EXHIBIT 1

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1454 of 1598   PageID 14501
1 CIT ES   Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 5 of 106
1 NOTE ES

FILED
1/11/2022 6:09 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Kayla Buckley DEPUTY

DC-22-00304

NO. _____

| | | |
|---|---|---|
| **SCOTT BYRON ELLINGTON** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | 101st |
| **v.** | § | _____ **JUDICIAL DISTRICT** |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| | § | |
| *Defendant.* | § | **DALLAS COUNTY, TEXAS** |

---

## PLAINTIFF'S ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

---

Comes Now, Scott Byron Ellington, Plaintiff herein, and files this *Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* against Defendant Patrick Daugherty, and in support thereof, would respectfully show the Court the following:

### Dallas County LR 1.08 Disclosure

Dallas County Local Rule 1.08 provides that the attorneys of record for the parties in any case within the categories of Local Rule 1.07 must notify the judges of the respective courts in which the earlier and later cases are assigned of the pendency of the latter case. The attorney filing a case that is so related to another previously filed case shall disclose in the original pleading or in a separate simultaneous filing that the case is so related and identify by style, cause number, and court of the related case. Accordingly, and pursuant to L.R. 1.08, the undersigned hereby notifies the Court that this case, in part, arises out of the same transaction or occurrence which is the subject of *Highland Capital Management, L.P. v. Patrick Daugherty*, Cause No. 12-04005, in the 68th Judicial District Court of Dallas County, Texas. Hence, the undersigned believes that this case is subject to transfer under L.R. 1.07(a) or otherwise pursuant to L.R. 106 because the transfer would "facilitate orderly and efficient disposition of the litigation."

---

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1455 of 1598 PageID 14502
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 6 of 106

## I.   Discovery Control Plan

1.      Pursuant to TEXAS RULE OF CIVIL PROCEDURE 190.3, Plaintiff requests a Level 2

discovery control plan.

## II.   Parties & Service

2.      Plaintiff Scott Byron Ellington, an individual, is a resident of the state of Texas.

3.      Defendant Patrick Daugherty is an individual and resident of Dallas County, Texas.

Defendant may be served at his residence located at 3621 Cornell Ave, Dallas, Texas 75205, or

wherever he may be found.

## III. Rule 47(c) Disclosure

4.      Plaintiff seeks damages within the jurisdictional limits of the Court. Specifically,

Plaintiff seeks monetary relief over $1,000,000 and non-monetary relief.

## IV. Jurisdiction & Venue

5.      The Court has jurisdiction over Defendant because he resides in Texas, has done

business in Texas, committed torts, in whole or in part, in Texas, has continuing contacts with

Texas, and is amenable to service by a Texas Court.

6.      Venue in Dallas County is proper in this case under Sections 15.002(a)(1) and (a)(3)

of the TEXAS CIVIL PRACTICE AND REMEDIES CODE because this is the county in which all or a

substantial part of the events or omissions giving rise to the claim occurred and it is the county

where Defendant resides.

## V.   Facts

7.      Plaintiff Scott Ellington ("Plaintiff" or "Ellington") was, until January of 2021, the

general counsel of Highland Capital Management ("Highland").

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction                                    Page 2

App. 10743

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1456 of 1598 PageID 14503
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 7 of 106

8.      Defendant Daugherty ("<u>Defendant</u>" or "<u>Daugherty</u>") previously worked for Highland.

9.      In 2012, Highland sued Daugherty. In response, Daugherty filed counterclaims against Highland then sued its affiliate, Highland Employee Retention Assets LLC ("<u>HERA</u>"), and three Highland executives. A jury ultimately determined that Daugherty breached his employment agreement and fiduciary duties. It also found that HERA breached the implied duty of good faith and fair dealing, but also found that the executives subject to the counter-claim were not liable to Daugherty. The jury awarded Highland $2,800,000 in attorney's fees and injunctive relief; and awarded Daugherty $2,600,000 in damages against HERA.

10.     Since the 2012 lawsuit's filing, Daugherty and Highland—or Highland related entities and individuals—engaged in protracted litigation in several different forums across the country. Daugherty's expressed goal is to "get" the founder and former CEO of Highland, Jim Dondero, and its former general counsel, Ellington. As part of this campaign, Daugherty personally sued Ellington in December 2019 in Delaware Chancery Court. Ellington's motion to dismiss currently pends in that matter.

11.     While Daugherty's previously limited his vendetta to the courtroom, he began a campaign of harassment against Ellington and his family starting in January 2021 that continues to this day. *See* **Exhibit A** (Declaration of Gregory Allen Brandstatter, the personal security guard of Scott Ellington) (detailing Daugherty's harassment and stalking of Ellington, his family, and loved ones); **Exhibit B** (Declaration of Scott Byron Ellington).

12.     Specifically, Daugherty has been observed outside Ellington's office, his residence, the residence of his long-time girlfriend, Stephanie Archer, his sister's residence, and his father's residence no less than **143 times**, often taking photographs and video recordings while either

---

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction                             Page 3

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1457 of 1598   PageID 14504
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 8 of 106

parked or driving slowly by. Indeed, on April 21, 2021, Daugherty was observed driving by Ellington's office nine (9) times that day alone.

13.     Daugherty most recently was confirmed taking video or photo recordings outside of Ellington's residence on December 11, 2021. For reasons set forth in the Brandstatter Declaration, attached herein at **Exhibit A**, Daugherty likely stalked Ellington and his loved ones more recently than the latest confirmed date.

14.     Daugherty's harassing conduct is "textbook" behavior that precedes a physical attack that a reasonable person would consider a threat to their safety as well as that of their family and property. Indeed, Ellington has been forced to hire personal security, and his family are in fear for their personal and physical safety.

15.     As evidenced by the over 143 times Daugherty has been observed stalking Ellington and his family, he has the apparent ability to carry out this threat of continued harassment and violence.

16.     Both Mr. Ellington's sister and girlfriend have both demanded to Mr. Daugherty that he stop his harassment. Despite this clear demand for Daugherty to stop engaging in this harassing behavior, he refuses to stop and continues to harass Ellington and his family.

17.     Daugherty's constant stalking and harassment of Ellington and his family reasonably cause them to fear for their safety.

18.     Ellington reported Daugherty's harassing and disturbing behavior to the police.

## VI. Causes of Action

### A.  Count One: Stalking.

19.     All facts alleged above, herein, and below are hereby incorporated by reference.

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction                                          Page 4

APPX. 10745

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 19 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1458 of 1598   PageID 14505
Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 9 of 106

20.  Pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE § 85.002, a defendant is liable to a claimant for damages arising from stalking of the claimant by the defendant.

21.  A claimant proves stalking against a defendant by showing:

(1) on more than one occasion the defendant engaged in harassing behavior;
(2) as a result of the harassing behavior, the claimant reasonably feared for the claimant's safety or the safety of a member of the claimant's family; and
(3) the defendant violated a restraining order prohibiting harassing behavior or:

(A) the defendant, while engaged in harassing behavior, by acts or words threatened to inflict bodily injury on the claimant or to commit an offense against the claimant, a member of the claimant's family, or the claimant's property;
(B) the defendant had the apparent ability to carry out the threat;
(C) the defendant's apparent ability to carry out the threat caused the claimant to reasonably fear for the claimant's safety or the safety of a family member;
(D) the claimant at least once clearly demanded that the defendant stop the defendant's harassing behavior;
(E) after the demand to stop by the claimant, the defendant continued the harassing behavior; and
(F) the harassing behavior has been reported to the police as a stalking offense.

22.  "Harassing behavior" is defined by the statute as "conduct by the defendant directed specifically toward the claimant, including following the claimant, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the claimant." TEX. CIV. PRAC. & REM. CODE § 85.001(4).

23.  First, Defendant has engaged in harassing behavior toward the Plaintiff and his family in the above-described manner. Second, because of the harassing behavior, Plaintiff reasonably feared for his safety and the safety of his family. Third, Defendant, while engaging in the harassing behavior, by acts or words threatened to inflict bodily injury on the Plaintiff or to commit an offense against the Plaintiff, his family, or his property. Specifically, Defendant's

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction                        Page 5

APPX. 10758

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1459 of 1598 PageID 14506
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 10 of 106

conduct is consistent with behavior leading up to a physical attack and is, therefore, an inherent threat of physical violence. Defendant had the apparent ability to carry out the threat, the Defendant's apparent ability to carry out the threat caused Plaintiff to reasonably fear for his safety or the safety of a family member, the Plaintiff (or his representative) at least once clearly demanded that the Defendant stop his harassing behavior, after the demand to stop by the Plaintiff, the Defendant continued the harassing behavior, and the harassing behavior has been reported to the police as a stalking offense.

24.     Plaintiff seeks recovery of his actual damages caused by Defendant's stalking, exemplary damages, and injunctive relief.

### B. Count Two: Invasion of Privacy by Intrusion.

25.     All facts alleged above, herein, and below are hereby incorporated by reference.

26.     A claim of invasion of privacy by intrusion has the following elements: (1) an intentional intrusion, (2) upon the seclusion, solitude, or private affairs of another, (3) that would be highly offensive to a reasonable person.

27.     Here, Defendant has intentionally intruded upon the seclusion, solitude, and private affairs of Plaintiff by regularly appearing at his office, his residence, his girlfriend's residence, his father's residence, and his sister's residence, and taking photographs and other recordings of Ellington and his loved ones at these residences. The appearances are unsolicited, uninvited, and constant. These unwanted "visits" by Defendant are highly offensive to a reasonable person.

28.     Plaintiff seeks recovery of his actual damages caused by Defendant's conduct alleged herein, exemplary damages, and injunctive relief.

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction                                                                          Page 6

App. 10749

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1460 of 1598 PageID 14507
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 11 of 106

### VII. Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction

**A. Elements for Injunctive Relief.**

29. All facts alleged above, herein, and below are hereby incorporated by reference.

30. In light of the above-described facts, Plaintiff seeks recovery from Defendant.

31. Plaintiff is likely to succeed on the merits of this lawsuit because Defendant has been stalking Plaintiff and his family and has been engaged in otherwise harassing conduct.

32. Unless this Honorable Court immediately restrains the Defendant and his agents the Plaintiff and his family will suffer immediate and irreparable injury, for which there is no adequate remedy at law to give Plaintiff complete, final and equal relief. More specifically, Plaintiff will show the court the following:

   a. The harm to Plaintiff and his family is imminent and ongoing as Defendant has harassed and stalked Plaintiff and his family, including his father, his sister, and girlfriend, almost constantly this entire year.

   b. The imminent harm will cause Plaintiff irreparable injury as the harassment will continue if not restrained. Further, Plaintiff reasonably fears that Defendant may cause him or his family bodily harm, and the accompanying anxiety interferes with his ability to conduct his normal, daily activities. *See, e.g., Quinn v. Harris*, 03-98-00117-CV, 1999 WL 125470, at *11 (Tex. App.—Austin Mar. 11, 1999, pet. denied) ("[I]njunctions designed to prevent harassment are permissible."); *Kramer v. Downey*, 680 S.W.2d 524, 525 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) ("Further, this right to be left alone from unwanted attention may be protected, in a proper case, by injunctive relief."); and

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction
Page 7

APPX. 017750

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1461 of 1598 PageID 14508
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 12 of 106

      c.   There is no adequate remedy at law which will give Plaintiff complete, final and equal relief because the imminent harm is irreparable. *See e.g., Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.) ("Issues one (no evidence of inadequate remedy at law) and two (no evidence of irreparable injury) are intertwined under Texas case law.").

## B. Bond.

33.    Plaintiff is willing to post a reasonable temporary restraining order and temporary injunction bond and requests the Court to set such bond.

## C. Remedy.

34.    Plaintiff met his burden by establishing each element which must be present before injunctive relief can be granted by this Court. Thus, Plaintiff is entitled to the requested temporary injunction, and upon a successful trial on the merits, for the temporary injunction to be made permanent.

35.    Plaintiff requests that, while the temporary injunction is in effect, the Court to restrain Defendant and his agents from:

      a.   Being within 500 feet of Ellington;

      b.   Being within 500 feet of Ellington's office located at 120 Cole Street, Dallas, Texas 75207;

      c.   Being within 500 feet of Ellington's residence located at 3825 Potomac Ave, Dallas, Texas 75205;

      d.   Being within 500 feet of Stephanie Archer;

      e.   Being within 500 feet of Stephanie Archer's residence located at 4432 Potomac, Dallas, Texas 75025;

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction                         Page 8

App. 1075

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1462 of 1598 PageID 14509
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 13 of 106

    f.    Being within 500 feet of Marcia Maslow;

    g.    Being within 500 feet of Marcia's residence located at 430 Glenbrook Dr., Murphy, Texas 75094;

    h.    Being within 500 feet of Byron Ellington;

    i.    Being within 500 feet of Byron Ellington's residence located at 5101 Creekside Ct., Parker, Texas 75094;

    j.    Photographing, videorecording, or audio recording Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington;

    k.    Photographing or videorecording the residences or places of business of Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington; and

    l.    Directing any communications toward Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington.

## VIII. Exemplary Damages

36.    The conduct of Defendant described above constitutes malice and, therefore, Plaintiff is entitled to, and hereby seeks, an award of exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(1).

## IX. Conditions Precedent

37.    All conditions precedent to Plaintiff's suit have occurred or have been performed.

## X. Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that:

    a.    Defendant be cited to appear and answer;

    b.    The Court determine any issue of fact and, upon final hearing of this cause, the Court award to Plaintiff:

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction    Page 9

APPX. 10452

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1463 of 1598 PageID 14510
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 14 of 106

     i.   Actual damages;

    ii.   Exemplary damages;

   iii.   A temporary restraining order;

   iv.   A temporary injunction;

    v.   A permanent injunction; and

   vi.   Court costs;

c.  The Court grant any other relief to which Plaintiff may be entitled.

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction              Page 10

APPX. 10763

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 25 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1464 of 1598   PageID 14511
Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 15 of 106

Respectfully submitted,


*/s/ Julie Pettit*
Julie Pettit
State Bar No. 24065971
jpettit@pettitfirm.com
David B. Urteago
State Bar No. 24079493
durteago@pettitfirm.com
**THE PETTIT LAW FIRM**
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076

Michael K. Hurst
State Bar No. 10316310
mhurst@lynnllp.com
Mary Goodrich Nix
State Bar No. 24002694
mnix@lynnllp.com
Nathaniel A. Plemons
State Bar No. 24121059
nplemons@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN,
LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

**ATTORNEYS FOR PLAINTIFF**

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction                                    Page 11

APPX. 01454



EXHIBIT

**A**

---

## DECLARATION OF GREGORY ALLEN BRANDSTATTER

---

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

Gregory Allen Brandstatter declares as follows:

      1.      My name is Gregory Allen Brandstatter. I am over 21 years of age, have never been

convicted of a felony or other crime involving moral turpitude, and suffer from no mental or

physical disability that would render me incompetent to make this declaration.

      2.      I am able to swear, and hereby do swear under penalty of perjury, that the facts

stated in this declaration are true and correct and within my personal knowledge.

      3.      I am a Licensed Texas Master Peace Officer with fifteen (15) years of experience,

a U.S. Government Contractor with over twelve (12) years of experience in the areas of high threat

protection, counterterrorism, and counternarcotics, and I am also a licensed private investigator

and security consultant.

      4.      On Feb 3, 2021, Scott Ellington ("Scott") called, advising me that he believed

someone was stalking himself and his girlfriend Stephanie Archer ("Stephanie"). The day prior to

his calling me (Feb 2, 2021), Stephanie had been followed to 120 Cole Street, Dallas, Texas, where

Scott has an office. Stephanie stated that for the past month or so she had noticed a large Black

SUV possibly following her. On Feb 2, 2021, she noticed that the person in the Black SUV was

actively taking pictures of her, and she attempted to confront the individual while she

simultaneously took pictures of the Black SUV and its driver. Her picture shows the vehicle Make

and License Number, BX9K764. In Stephanie's photo you can also see the person driving holding

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1466 of 1598   PageID 14513
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 17 of 106

up a cell phone as if taking pictures. A true and correct copy of this photograph is attached hereto as **<u>Exhibit A-1</u>**.

5.       The following day Scott was in his office on Cole Street, when he noticed a vehicle resembling a "Toyota 4 Runner, Tan in color, stop in front of his office. He observed the driver of the taking pictures and or video of his officer and the vehicles parked in front. Scott was able to obtain the License Number of the Vehicle, GPF9512, he also noted that vehicle had a "WMR sticker on the rear window. Scott stated the driver of the vehicle looked like Pat Daugherty ("<u>Daugherty</u>"). Scott and Daugherty both previously worked at an investment firm in Dallas and are currently opponents in financial litigation. Scott believes that Daugherty is attempting to harass him, his friends and coworkers due to the litigation. It should be noted that Daugherty has a history of anger issues and he believes Daugherty may be trying to intimidate him.

6.       Scott asked if I could assist him in determining who the person(s) were taking the photos/videos. I advised Scott that I could check some open sources intelligence ("<u>OSINT</u>") sites and see what I could come up with in reference to the vehicle registrations. I also suggested that we set up a counter surveillance program to determine if these were random acts or an organized surveillance effort.

7.       On Feb 4, 2021, an investigation was opened along with a counter surveillance operation. OSINT sources showed Daugherty to be the registered owner of the Black SUV BX9K764 and that Daugherty currently is listed on the vehicle registration of the Infiniti QX4 GPF9512. The Infiniti QX4 closely resembles a Toyota 4 Runner (as observed by Scott above). We believe that Daugherty sold the Infiniti to one of his domestic employees and "borrowed" the vehicle to avoid detection.

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1467 of 1598 PageID 14514
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 18 of 106

8.      On February 4, 2021, at approximately 11:20 A.M., I observed the Infiniti GPF9512 driven by a while male with sandy blonde hair drive by west bound on Cole slow when passing Scott's office (120 Cole St.) and then proceed west on Cole, south on Levee, east on Alley (rear of 120 Cole), U-turn, south on Levee and east on Leslie. I viewed the driver of this vehicle as he was exiting Alley and can verify, after comparing photos, that Daugherty was the driver of the Infiniti.

9.      At approximately 1:22 P.M. on Feb 4, 2021, Scott advised that Daugherty had followed him to 120 Cole, I was parked on Cole and Levee. As Scott parked, I observed the Infiniti driving west on Cole towards me. I observed Daugherty driving Infiniti GPF9512. Daugherty turned south on Levee, U-turn, north on Levee then east on Cole. I kept my distance as the Infiniti slowed and then stopped in front of Scott's office. While stopped in front of Scott's office, Daugherty verbally engaged Stephanie and Joe (friend of Scott). Daugherty proceeds east on Cole, I followed, Daugherty turned left on Rivers Edge, I am unable to follow due to traffic conditions. Stephanie and Joe identified the driver as Daugherty after comparing to photos. A true and correct copy of a photograph of the back of the Infiniti taken on February 4, 2021, on Cole St. is attached hereto as **Exhibit A-2**.

10.      At approximately 5:15 P.M. on February 4, 2021, Reese Morgan ("Reese"), a private investigator with whom I regularly work, drove by Daugherty's residence and confirmed two vehicles parked in the carport. One is a white Lincoln Navigator LPG9001 and the other is a Black GMC Yukon BX9K764, which is the same vehicle that followed Stephanie on February 3, 2021. The Infiniti GPF9512 (with a "WMR" sticker on the back window) is parked on the street across the street from Daugherty's carport. Attached as **Exhibit A-3** is a true and correct copy of a photograph of the Yukon parked at Daugherty's residence, attached as **Exhibit A-4** is a true and

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1468 of 1598 PageID 14515
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 19 of 106

correct copy of a photograph of the Navigator parked at Daugherty's residence, and attached as **Exhibit A-5** is a true and correct coy of a photograph of the Infiniti parked across the street from Daugherty's residence.

11. February 5, 2021, approximately 1:40 P.M., Reese drove by Daugherty's Residence and verified the Infiniti GPF9512 parked across street from carport.

12. February 8, 2021, at approximately 10:10 A.M., I drove by Daugherty's Residence and verified that the Infiniti GPF9512 was parked across street from carport.

13. Additional screen captures clearly identify Daugherty as the driver videoing and/or photographing Scott's office. *See* **Exhibit A-6** (March 29, 21, three passes by Daugherty in the Infiniti), **Exhibit A-7** (April 16, 2021, Daugherty in the Yukon); **Exhibit A-8** (April 23, 2021, Daugherty in the Yukon). Daugherty also is clearly identifiable outside of Scott's sister's home. *See* **Exhibit A-9** (April 25, 2021, Daugherty in the Infiniti). It is clear that he is recording Scott, his family, and friends. *See* **Exhibit A-10** (May 3, 2021, Daugherty in the Navigator).

14. Attached hereto as **Exhibit A-11** is a true and correct copy of a report that I wrote that contains my counter-surveillance log. As documented by the report, following verification that Daugherty was the individual in the Black Yukon with license plate BX9K764 and the Infiniti QX4 with license plate GPF9512, Daugherty was observed an additional 143 times outside Scott's office or the homes of his family or girlfriend between February 19, 2021, and November 23, 2021. In fact, there were many instances where Daugherty would drive by Scott's office several times in a single day. For example, Daugherty was observed driving by Scott's office at least nine (9) times on April 21, 2021. During many of these visits, Daugherty was observed taking photographs or video recordings from the inside of his vehicle.

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1469 of 1598   PageID 14516
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 20 of 106

15.     Additionally, Daugherty was observed at least eight (8) times outside of the home of Marcia Maslow, Scott's sister.  Mrs. Maslow resides with her husband and two minor daughters. Mrs. Maslow resides in Murphy, Texas, approximately a thirty minute drive (without traffic) from the residences of both Scott and Daugherty.  Mrs. Maslow sent me a written message after she observed Daugherty at her residence in which she describes the emotional trauma experienced by both her and her family.

16.     Finally, Daugherty has been observed at least seven (7) times outside the home of Scott's widower father Byron Ellington.   Mr. Byron Ellington lives in Parker, Texas, approximately a thirty-five minute drive (without traffic) from the residences of both Scott and Daugherty.

17.     While the verified instances whereby Daugherty was visited Scott's office or the home of his friends and family are extensive, Daugherty's harassment is almost certainly more extensive. The following factors lead to this conclusion:

   a.   Daugherty was only first spotted because of Stephanie's lay person observations, so the stalking likely started earlier;

   b.   Each photograph and video clip must be manually extracted from manual review of hours of raw video taken during daytime hours, so there is likely to be more encounters unidentified or unrecorded;

   c.   It is difficult to record Daugherty when his vehicle is following Scott's or those of his family;

   d.   There may be other locations associated with Scott that Daugherty stalked where I did not conduct counter-surveillance.

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1470 of 1598   PageID 14517
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 21 of 106

18.    In my experience on the United States Department of State High Threat Protection Team, the sort of conduct exhibited by Daugherty is a precursor to a physical attack. I therefore called the Dallas Police Department to report the stalking, but could not find anyone to take the report. I was told that Scott needed to call 911 instead and report situation.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 32 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1471 of 1598   PageID 14518

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 22 of 106

FURTHER DECLARANT SAYETH NOT.

My name is Gregory Allen Brandstatter. My date of birth is ████ 1954. My address is

1001 County Road 26100, Roxton, Texas 75477. I declare under penalty of perjury that the

foregoing is true and correct.

Executed in Dallas County, State of Texas, on the 28th day of December, 2021.

_Gregory Allen Brandstatter_
Gregory Allen Brandstatter

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1472 of 1598 PageID 14519
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 23 of 106



EXHIBIT

A-1



EXHIBIT

A-2

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1474 of 1598 PageID 14521

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 25 of 106



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1475 of 1598 PageID 14522

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 26 of 106



**EXHIBIT**

**A-4**

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1476 of 1598 PageID 14523

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 27 of 106



EXHIBIT

A-5

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1477 of 1598 PageID 14524

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 28 of 106





Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1478 of 1598 PageID 14525

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 29 of 106





Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1480 of 1598 PageID 14527

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 31 of 106



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1481 of 1598 PageID 14528
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 32 of 106



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1482 of 1598   PageID 14529

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 33 of 106



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 44 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23  Page 1483 of 1598  PageID 14530

Case 22-03003-sgj Doc 1-1 Filed 01/18/22  Entered 01/18/22 09:25:21  Page 34 of 106




Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 45 of
Case 3:23-cv-00726-S   Document 8-24   Filed 11/29/23   Page 1484 of 1598   PageID 14531

Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 35 of 106



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1485 of 1598   PageID 14532

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 36 of 106



111521

Greg Brandstatter, Pat D Investigation / Counter Surveillance log

On Feb 3 2021, Scott Ellington (Scott) called, advising me that he believed someone was stalking himself and his girlfriend Stephanie Archer (Stephanie). The day prior, Feb 2 2021 to his calling me Stephanie had been followed to 120 Cole Street, Dallas, Texas, where Scott has an office. Stephanie stated that she had noticed that for the past month or so she had noticed a large Black SUV possibly following her. On Feb 2 2021 she noticed that the person in a Black SUV actively taking pictures, she had, had enough and attempted to confront the individual while taking a picture of the vehicle. Her picture shows the vehicle Make and License Number, BX9K764. In Stephanie's photo you can also see the person driving holding up a cell phone as if taking pictures. See Stephanie's photo.

The following day Scott was in his office on Cole Street, when he noticed a vehicle resembling a "Toyota 4 Runner, Tan in color, stop in front of his office. He observed the driver of the taking pictures and or video of his officer and the vehicles parked in front. Scott was able to obtain the License Number of the Vehicle, GPF9512, he also noted that vehicle had a "WMR sticker on the rear window. Scott stated the driver of the vehicle looked like Pat Daugherty (Pat). Scott and Pat both previously worked at an investment firm in Dallas, and are currently opponents in financial litigation. Scott believes that Pat is attempting to harass him, his friends and coworkers due to the litigation. It should be noted that Pat has a history of anger issues and he believes Pat may be trying to intimidate him.

Scott asked if I could assist him in determining who the person(s) were taking the photos/videos. I advised Scott that I could check some Open Sources Intelligence sites and see what I could come up with in reference to the vehicle registrations. I also suggested that we set up a counter surveillance program to determine if these were random acts of an organized surveillance effort.

On Feb 4 2021 an investigation was opened along with a counter surveillance operation. OSINT sources showed Pat to be the registered owner of the Black SUV BX9K764 and that Pat was the previous owner of the Infinity QX4 GPF9512. The Infinity QX4 closely resembles a Toyota 4 Runner ( as observed by Scott above). We believe that Pat sold the Infinity to one of his domestic employees and "borrowed" the vehicle to avoid detection.

At approx. 1120 on Feb 4th the Infinity GPF9512 driven by a W/M Sandy Blonde hair drives by WB on Cole slows when passing 120 proceeds W on Cole, S on Levee, E on Alley (rear of 120 Cole), U-turn, S on Levee and E on Leslie. I viewed the driver of this vehicle as he was exiting alley and can verify after comparing Photos, that Pat was the driver of the infinity.

At approx 1322 on Feb 4th Scott advises that the Pat had followed him to 120 Cole, I was parked on at Cole and Levee as Scott parked I observe the Infinity drives W on Cole towards me, I observe Pat driving infinity GPF9512. Pat turns south on Levee, U-turn, N on Levee then E on Cole. I keep my distance as Infinity slows and then stops in front of 120, While stopped in front of 120, Pat verbally engages Stephanie and Joe (friend of Scott). Pat proceeds E on Cole, I follow, Pat turns left on Rivers Edge, I am

EXHIBIT

A-11

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 48 of
Case 3:23-cv-00726-S   Document 8-24   Filed 112/29/23   Page 1487 of 1598   PageID 14534
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 38 of 106

unable to follow due to traffic conditions. Stephanie and Joe are able to Identify the Driver as Pat after comparing to photos. See photos for rear of Infinity, on Cole Street, Note Sticker (WMR).

At Approx 1715 on Feb 4, Reese Morgan (Reese) PI drives by Pat's residence and is able to confirm two vehicles parked in carport, White Lincoln Navigator LPG9001 and Black GMC Yukon BX9L764, same vehicle that followed Stephanie on Feb 3, The Infinity GPF9512 is parked on the street across the street from Pat's carport, see photos

Feb 5 2021, approx 1340, Reese drive by Pat's Residence verify Infinity GPF9512 parked across street from carport.

Feb 8 2021, approx. 1010, Drive by Pats Residence verify Infinity GPF9512 parked across street from carport

Feb 19 2021 approx 1700 Sarah Goldsmith, moving files to 120 Cole St, confronted my W/M Sandy Blonde, Graying hair, driving a "Silver Toyota 4 Runner" (Infinity). Driver ask "Do you know if Scott is back in town?" She ignored him and went into office space until he left. She did not feel safe, she departed and had her husband accompany her back to Cole St. After viewing a picture of Pat, Sarah was able to verify the driver who confronted her was Pat.

Feb 23 2021 approx 1707 Black GMC Yukon BX9K764, Driven by Pat (visual), business attire blue shirt, E-W on Cole, slows at 120, proceeds N on Levee, E on Oaklawn. (Day in Court)

March 4 2021 approx 1113, Black GMC Yukon BX9K764, drives by E-W on Cole slows when passing 120, S on Levee, pulls over appears to be taking notes, continues S on Levee, turns E on Leslie at.

March 9 2021 approx 1110, Black GMC Yukon BX9K764, drives by E-W on Cole, slows, then N on Levee.

approx 1340, Black GMC Yukon BX9K764, drives by E-W on Cole, slows, then N on Levee.

March 23 2021 approx 1450, Black GMC Yukon BX9K764, driven by Pat, drives by E-W on Cole, Stops in front of 120, (note Scott's Vic out front with door open), S on Levee, U-turn, N on Levee. Visually confirm Pat driving.

approx 1700, Black GMC Yukon BX9K764, driven by Pat, drives by E-W on Cole, Stops in front of 120, Scott is in office and observes Pat taking pictures or video of building and vehicles, Pat proceeds W on Cole , N on Levee

March 25 2021 approx 1414, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole Stops short of 120, I observed Pat, dressed in business attire, exit vehicle and put trash in trash container, then proceed W on Cole where he stopped in front of 120 for an extend period of time, before proceeding W on Cole

Approx. 1417, Black GMC Yukon BX9K764, driven by Pat, drives by E-W on Cole, Stops in front of 120, another extended stop at 120 before proceeding W on Cole.

March 26 2021, approx 1414, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole. I pass in opposite direction. Pat is wearing business attire, talking on cell phone

March 29 2021, approx 1430, Infinity QX4 GPF9512, with "WMR sticker on the rear window, driven by Pat, drives by E-W Stops front of 120, peers into building.

Approx 1433, Infinity QX4 GPF9512, driven by Pat, drives by E-W Stops front of 120, appears to be taking pictures of building and vehicles.

Approx 1450, Infinity QX4 GPF9512, driven by Pat, drives by E-W Slows front of 120

March 31 2021, approx 1508, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, opens door slightly

Approx 1511, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole stops front of 120, takes pictures

Approx 1518, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole stops front of 120, takes video

Approx 1522, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole stops front of 120, takes extensive video of inside garage door and vehicles out front

April 13 2021, approx 1428, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole

Approx 1430, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, slows at 120, takes video of building and vehicles

Approx 1433, Black GMC Yukon BX9K764, driven by Pat, driving W-E on Cole

April 14 2021  Scott's Sister Marcia Reports, Black GMC Yukon Denali, stopped in front of her house and was taking pictures of her home, family and vehicles, she reports this is the second instance. First instance was 3 25 2021, She provides Video of second instance, See Marcia's report. Stealthcam deployed.

April 16 2021, approx 1453, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, slows takes pics/video of vehicles

Approx 1455, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole,I nterested in Scott' new assistant Charleigh.

Approx 1456, Black GMC Yukon BX9K764, driven by Pat, driving W-E on Cole, Passenger in vehicle, New Player

April 19 2021, approx 1423, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, Stops takes Video

Approx 1426, Black GMC Yukon BX9K764, driven by Pat, driving W-E on Cole

April 20 2021, approx 1335, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1338, Black GMC Yukon BX9K764, driven by Pat drives by, E-W on Cole slows takes pictures

Approx 1340, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

April 21 2021,   approx 1028, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1038, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1040, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1043, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, stops for extended period looking inside garage door, car behind him honks

Approx 1055, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, fast

Approx 1058, Black GMC Yukon BX9K764, driven by Pat drives by W-E on Cole

Approx 1215, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, stops and takes pictures of vehicles

Approx 1217, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, slows at 120 and takes video

Approx 1448, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, Stops and takes video of vehicles, Scott confirms he saw, Black GMC Yukon

April 22 2021,   approx 1010, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, talking on phone or into voice recorder

Approx 1013, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, talking on phone or into voice recorder

Approx 1220, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, takes picture of Charleigh Vehicle

Approx 1325, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1547, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

April 23 2021, approx 1027, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1321, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, Pics of Ryan's and Trevor Vehicles

Approx 1324, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1457, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, Good Facial Picture

Approx 1500, Black GMC Yukon BX9K764, driven by Pat drives by W-E on Cole

Infinity QX4 GPF9512, driven by Pat, drives by E-W,  E-W on Cole

Approx 1432, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

April 24 2021, (Sat) approx 1158, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

approx 1432, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

approx 1605 Black GMC Yukon, driven by Pat drives by Marcia's House

April 25 2021, (Sun) approx 1608, Infinity QX4 GPF9512, driven by Pat drives by Marcia's House

April 26 2021, approx 1533, Infinity QX4 GPF9512, driven by Pat drives by Byron's House

approx 1534, Infinity QX4 GPF9512, driven by Pat drives by Byron's House


April 27 2021 Infinity QX4 GPF9512, drives by E-W on Cole, Video only, Not typical behavior, cannot confirm.

April 28 2021, approx 1030, Infinity QX4 GPF9512, driven by Pat, drives by E-W, slows takes Video, Faster than normal, visual only

approx 1510, Infinity QX4 GPF9512, driven by Pat, drives by E-W, slows but behavior atypical

approx. 1650, Infinity QX4 GPF9512, driven by Pat, drives by E-W, Video confirmation

approx 1745, Black Yukon drives by, Cam Only no Confirmation, (note change vehicle)

April 30 2021, approx. 1634 Infinity QX4 GPF9512, driven by Pat, drives by E-W, Cam only **Atypical**

May 3 2021,  approx. 1506 Lincoln Navigator XXXXXX, driven by Pat, drives by E-W, note vehicle change

approx. 1546 Lincoln Navigator XXXXXX, driven by Pat, drives by W-E

May 4 20212  approx 1642 Infinity QX4 GPF9512, driven by Pat, drives by E-W

approx 1651 Infinity QX4 GPF9512, driven by Pat, drives by W-E, License Plate

approx 1652 Infinity QX4 GPF9512, driven by Pat, drives by E-W

May 5 2021  approx 1123 Infinity QX4 GPF9512, driven by Pat, drives by E-W, Video on site

approx 1254 Infinity QX4 GPF9512, driven by Pat, drives by E-W

approx 1040 Infinity QX4 GPF9512, driven by Pat, drives by Marcia's house

May 12 2021  Approx 0955 Infinity QX4 GPF9512, drives by E-W, License Plate

approx 1308 Infinity QX4 GPF9512, driven by Pat, drives by E-W, takes video, sticker

approx 1311 Infinity QX4 GPF9512, drives by E-W, License Plate, sticker

May 13 2021  approx 1055 Infinity QX4, drives by, E-W

approx  1213 Infinity QX4, drives by, E-W, License Plate

May 14 2021  approx 1523 Infinity QX4, drives by, E-W

May 18 2021  approx  1416 Infinity QW4, drives by E-W

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1491 of 1598 PageID 14538
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 42 of 106

| | | |
|---|---|---|
| May 19 2021 | approx 1411 | Infinity QW4, drives by E-W, License Plate |
| May 18 2021 | approx 1436 | Infinity QW4, drives by 4432 Potomac |
| May 21 2021 | approx 1147 | Infinity QW4, drives by E-W, License Plate |
| May 22 2021 | approx 1345 | Infinity QW4, drives by E-W, License plate |
| May 24 2021 | approx 1132 | Infinity QW4, drives by E-W |
| | approx 1436 | Infinity QW4, drives by W-E, License Plate |
| | approx 1526 | Infinity QW4, drives by Marcia's house |
| May 26 2021 | approx 1035 | Infinity QW4, drives by E-W |
| | approx 1329 | Infinity QW4, drives by E-W |
| | approx 1330 | Infinity QW4, drives by W-E |
| | approx 1333 | Infinity QW4, drives by E-W, License Plate |
| | approx 1334 | Infinity QW4, drives by W-E, License Plate, Sticker |
| | approx 1428 | Infinity QW4, drives by Byron's house |
| | approx 1430 | Infinity QW4, drives by Byron's house, Sticker |
| May 27 2021 | approx 1336 | Infinity QW4, drives by E-W |
| May 28 2021 | approx 1043 | Black GMC Yukon, drives by E-W, reverts to GMC, Baseball cap |
| May 29 2021 | approx 1126 | Black GMC Yukon, drives by E-W, License Plate |
| | approx 1430 | Black GMC Yukon, drives by E-W, License Plate |
| | approx 1432 | Black GMC Yukon, drives by W-E |
| | approx 1432 | Black GMC Yukon, drives by E-W, License Plate |
| | approx 1433 | Black GMC Yukon, drives by W-E, License Plate |
| | approx 1506 | Black GMC Yukon, drives by W-E, License Plate |
| June 1 2021 | approx 1325 | Black GMC Yukon, drives by W-E, License Plate |
| June 2 2021 | approx 1012 | Black GMC Yukon, drives by W-E, License Plate, Stop |
| | approx 1012 | Black GMC Yukon, drives by W-E, License Plate, Stop |
| June 4 2021 | approx 1406 | Black GMC Yukon, drives by E-W, License Plate |
| | approx 1411 | Black GMC Yukon, drives by W-E, License Plate |
| June 5 2021 | approx 0959 | Black GMC Yukon, drives by E-W, driven by Pat Blue Shirt |
| | approx 1007 | Black GMC Yukon, drives by E-W, License Plate |

| June 7 2021 | approx 1504 Black GMC Yukon, drives by E-W gb Visual from office BX9 |
| June 9 2021 | approx 1022 Black GMC Yukon, drives by E-W taking Pics, Trevor |
| | approx 1023 Black GMC Yukon, drives by W-E, stopped |
| | approx 1023 Black GMC Yukon, drives by W-E, stopped |
| | approx 1024 Black GMC Yukon, drives by E-W,  License Plate, Video |
| | approx 1423 Black GMC Yukon, drives by E-W License Plate Red Shirt |
| | approx 1524 Black GMC Yukon, drives by E-W, License Plate + Visual Red Shirt |
| | |
| July 7 2021 | approx 1037 Black GMC Yukon, drives by E-W, License Plate, visual id |
| Aug 9 2021 | approx 1017 Black GMC Yukon, drives by E-W, License Plate |
| Aug 11 2021 | approx 1141  Black GMC Yukon, drives by E-W, License Plate |
| Aug  21 2021 | approx  1658 Black GMC Yukon, drives by Byron house in |
| Aug  21 2021 | approx  1500 Black GMC Yukon , drives by Byron house out |
| Aug  21 2021 | approx  1509 Black GMC Yukon, drives by Byron house out |
| Aug  22 2021 | approx  1230 Black GMC Yukon, drives by Cole E-W |
| Aug  22 2021 | approx  1316 Black GMC Yukon, drives by Marcia house L-R |
| Aug  24 2021 | approx  1331 <u>Infinity</u>, drives by Cole E-W |
| Aug  26 2021 | approx  1458 Black GMC Yukon, drives by Cole W-E |
| Sept 18 2021 | approx  1720 Black GMC Yukon, drives by Cole E-W |
| Sept 21 2021 | approx  1419 Black GMC Yukon, drives by Cole E-W |
| Oct 16 2021 | approx 1235 Black GMC Yukon, drives by Cole E-W ?? enhance LP |
| Oct 23 2021 | approx 1245 Black GMC Yukon, drives by 3825 Potomac W-E, ID by LP |
| | approx 1635 Black GMC Yukon, drives by 3825 Potomac W-E, ?? enhance LP |
| | approx 1635 Black GMC Yukon, drives by 3825 Potomac E-W, ?? enhance LP |
| Oct 30 2021 | approx 0953 Black GMC Yukon, drives by 3825 Potomac E-W |
| | approx 0956 Black GMC Yukon, drives by 3825 Potomac E-W |
| Nov 3 2021 | approx 1555 Black GMC Yukon, drives by 3825 Marcia' house W-E Profile ID |
| | approx 1557 Black GMC Yukon, drives by 3825 Marcia' house W-E Profile ID, either stopped for 2 mins or returned after 2 mins |

Nov 6 2021        approx  1004 Black GMC Yukon, drives by Cole E-W, D clearly visible – driver

Nov 8 2021        approx 1027 Black GMC Yukon, drives by Cole E-W, got in behind PI visual on LP and
                  Driver, Nest Cam Confirm

Nov 10 2021       approx  0747 Black GMC Yukon, drives by Cole W-E, lengthy stop Nest cam confirm

Nov 20 2021       approx 1128 Black GMC Yukon, drives by Cole W-E, Driver Visual

Nov 21 2021       approx 1410 Black GMC Yukon, drives by 3825 W-E, Passenger female? LP

Nov 22 2021       approx 1109 Black GMC Yukon, drives by Cole E-W, Driver visual

Nov 23 2021       approx 1803 Black GMC Yukon, drives by Cole E-W, Driver visual, taking pictures

                  Note SE on Cole earlier

                  approx 1806 Black GMC Yukon, drives by Cole W-E

                  approx 1810 Black GMC Yukon, drives by Cole E-W, Driver visual, taking pictures

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 55 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1494 of 1598   PageID 14541

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 45 of 108



EXHIBIT
**B**

---

## DECLARATION OF SCOTT BYRON ELLINGTON

---

STATE OF TEXAS              §
                            §
COUNTY OF DALLAS            §

Scott Byron Ellington declares as follows:

1.      My name is Scott Byron Ellington. I am over 21 years of age, have never been convicted of a felony or other crime involving moral turpitude, and suffer from no mental or physical disability that would render me incompetent to make this declaration.

2.      I am able to swear, and hereby do swear under penalty of perjury, that the facts stated in this declaration are true and correct and within my personal knowledge.

3.      Starting in January of 2021, my longtime girlfriend, Stephanie Archer ("Stephanie"), noticed a large, Black SUV possibly following her. On February 2, 2021, she was followed by the SUV to my office located at 120 Cole Street, Dallas, Texas. She noticed that the driver in the SUV was taking pictures from inside the vehicle. She confronted the individual while simultaneously taking pictures of the SUV and the driver. The license plate number of the black SUV was BX9K764.

4.      The next day, on February 3, 2021, I was at my office when I noticed a vehicle resembling a tan Toyota 4 Runner stopped in front of my office with the driver either taking photographs or making a videorecording, or both. The license plate number of the vehicle was GPF9512. The driver of the vehicle appeared to be Patrick Daugherty ("Daugherty").

5.      Until January of 2021, I was the general counsel for Highland Capital Management, L.P. ("Highland"). Daugherty is a former employee of Highland. In 2012, Highland sued Daugherty and Daugherty counterclaimed. The lawsuit was ultimately resolved by a jury trial, with

DECLARATION OF SCOTT BYRON ELLINGTON

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1495 of 1598 PageID 14542
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 46 of 106

a jury determining that Daugherty breached his employment agreement and his fiduciary duties and awarding Highland $2,800,000 in attorney's fees and injunctive relief. The jury likewise found that a Highland affiliate, Highland Employee Retention Assets LLC ("HERA") breached the implied duty of good faith and fair dealing and awarded Daugherty $2,600,000 in damages.

6.      Since the filing of the original lawsuit in 2012, Daugherty and Highland—or Highland related entities and individuals—have engaged in protracted litigation in several different forums across the country. Daugherty's expressed goal in his campaign is to "get" me and the founder and former CEO of Highland, Jim Dondero.

7.      Daugherty has a history of anger issues and I believed that his "drive by" of my office and following Stephanie was his attempt to intimidate me.

8.      I hired a private investigator, Greg Brandstatter ("Brandstatter"), to assist in confirming the identity of the driver of the black SUV with license plate BX9K764 and the tan SUV with the license plate GPF9512.

9.      Brandstatter's investigation found that Daugherty was the individual following Stephanie and driving by my office. Further, I have reviewed photographs and video recordings of Daugherty outside my home located at 3825 Potomac Ave, Dallas, Texas 75205, my office, the house of my sister, Marcia, and the house of my father, Byron Ellington.

10.     Daugherty has been documented outside my office, my home, and the homes of my family 143 times since January of 2021. Both Marcia and Stephanie have confronted Daugherty at times and demanded that he stop his harassment, but he has continued to visit my office and home, and the homes of my family members, despite these demands.

11.     I have moved residences three times from January 2021 to today. Daugherty has been recorded outside of the second and third residences to which I moved. The second residence

DECLARATION OF SCOTT BYRON ELLINGTON

was Stephanie's house and was not under my name.  For the third residence, my address was not searchable under my name on the Dallas County Central Appraisal District website.  Nonetheless, Daugherty was recorded outside of that address within two months of me moving. On information and belief, Daugherty could not have located me at either residence without physically following me or others to those locations.

12.    I believe that Daugherty's actions are leading up to a physical attack by him on either myself, Stephanie, or members of my family. I understand that Brandstatter has reported Daugherty's harassment and stalking to the Dallas Police Department. I also called the Dallas Police Department to report the harassment and stalking.  The harassment has caused me fear and anxiety and will continue to cause me fear and anxiety.

13.    Daugherty's harassment further interferes with my daily activities. I am constantly looking out for him when I am at my home or at my office. I had to hire Brandstatter to confirm that Daugherty was the individual stalking me and my family and then document the extent of the harassment. I have had security devices, such as cameras, installed at my personal home and office in response to the harassment. I have had to hire personal security. I have also had to change my daily routine to try and avoid being followed by Daugherty.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1497 of 1598   PageID 14544
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 48 of 106

FURTHER DECLARANT SAYETH NOT.

My name is Scott Byron Ellington. My date of birth is ███ 1971 . My address is

3825 Potomac Ave., Dallas, Texas 75205. I declare under penalty of perjury that the foregoing is

true and correct.

Executed in Dallas County, State of Texas, on the 11th Day of January, 2022.

_____

Scott Ellington

DECLARATION OF SCOTT BYRON ELLINGTON

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 59 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1498 of 1598   PageID 14545

Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 49 of 106

### Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Patricia Perkins Mayes on behalf of Julie Pettit
Bar No. 24065971
pperkins@pettitfirm.com
Envelope ID: 60728974
Status as of 1/12/2022 8:55 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Julie Pettit | | jpettit@pettitfirm.com | 1/11/2022 6:09:57 PM | SENT |
| Beverly Congdon | | bcongdon@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |
| Patricia Perkins Mayes | | pperkins@pettitfirm.com | 1/11/2022 6:09:57 PM | SENT |
| Michael K.Hurst | | mhurst@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |
| Mary GoodrichNix | | mnix@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |
| Nathaniel A.Plemons | | nplemons@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |

# EXHIBIT 2

## Case Information

DC-22-00304 | SCOTT BYRON ELLINGTON vs. PATRICK DAUGHERTY

| Case Number | Court | Judicial Officer |
|---|---|---|
| DC-22-00304 | 101st District Court | WILLIAMS, STACI |
| File Date | Case Type | Case Status |
| 01/11/2022 | OTHER (CIVIL) | OPEN |

## Party

PLAINTIFF
ELLINGTON, SCOTT BYRON

Active Attorneys ▾
Lead Attorney
PETTIT, JULIE A
Retained

DEFENDANT
DAUGHERTY, PATRICK

Address
3621 CORNELL AVE.
DALLAS TX 75205

## Bond

| Bond Type | Bond Number | Bond Amount | Current Bond Status |
|---|---|---|---|

| TRO CASH BOND | $2,500.00 | POSTED |

## Events and Hearings

01/11/2022 NEW CASE FILED (OCA) - CIVIL

01/11/2022 ORIGINAL PETITION ▾

ORIGINAL PETITION

01/11/2022 ISSUE CITATION

01/11/2022 ISSUE TRO AND NOTICE

01/12/2022 TRO HEARING ▾

ORIGINAL PETITION

Judicial Officer
WILLIAMS, STACI

Hearing Time
3:30 PM

Comment
JULIE PETTIT * AD HOC PER JUDGE WILLIAMS

01/12/2022 ORDER - TEMPORARY RESTRAINING ORDER ▾

ORDER - TEMPORARY RESTRAINING ORDER

01/12/2022 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

(PROPOSED) TEMPORARY RESTRAINING ORDER

Comment
(PROPOSED) TEMPORARY RESTRAINING ORDER

01/14/2022 BOND FILED

01/14/2022 CORRESPONDENCE - LETTER TO FILE ▾

CORRESONDENCE LETTER

01/26/2022 Temporary Injunction ▾

Judicial Officer
WILLIAMS, STACI

Hearing Time
9:30 AM

## Financial

ELLINGTON, SCOTT BYRON

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $379.00 |
| | Total Payments and Credits | | | $379.00 |
| 1/12/2022 | Transaction Assessment | | | $366.00 |
| 1/12/2022 | CREDIT CARD - TEXFILE (DC) | Receipt # 1565-2022-DCLK | ELLINGTON, SCOTT BYRON | ($229.00) |
| 1/12/2022 | STATE CREDIT | | | ($137.00) |
| 1/14/2022 | Transaction Assessment | | | $5.00 |
| 1/14/2022 | PAYMENT (CASE FEES) | Receipt # 2349-2022-DCLK | ELLINGTON, SCOTT BYRON | ($5.00) |
| 1/14/2022 | Transaction Assessment | | | $8.00 |
| 1/14/2022 | CREDIT CARD - TEXFILE (DC) | Receipt # 2553-2022-DCLK | ELLINGTON, SCOTT BYRON | ($8.00) |

## Documents

APPX. 107802

ORIGINAL PETITION

ORDER - TEMPORARY RESTRAINING ORDER

(PROPOSED) TEMPORARY RESTRAINING ORDER

CORRESONDENCE LETTER

APPX. 07493

# EXHIBIT 3

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 66 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1505 of 1598 PageID 14552

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 56 of 106

## CAUSE NO. DC 22-00304

| | | |
|---|---|---|
| **SCOTT ELLINGTON** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § | **JUDICIAL DISTRICT** |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| | § | |
| *Defendant.* | § | **DALLAS COUNTY, TEXAS** |

---

### TEMPORARY RESTRAINING ORDER

---

On this day, the Application for a Temporary Restraining Order of Scott Ellington, Plaintiff herein, was heard before this Court.

Based upon the pleadings, records, documents filed by counsel, and the arguments of counsel at the hearing, IT CLEARLY APPEARS:

1. That unless restrained Defendant Patrick Daugherty ("Defendant") will continue to harass Plaintiff Scott Ellington, his girlfriend (Stephanie Archer), his sister (Marcia Maslow), and his father (Byron Ellington) before notice and a hearing on Plaintiff's Application for Temporary Injunction, including committing the following acts:

   a. Traveling, on a near daily basis, to the personal residences of Scott Ellington, Stephanie Archer, Marcia Maslow, and Byron Ellington without invitation and parking outside or drivingly slowly past the residences;

   b. Taking pictures and video recordings of the personal residences of Scott Ellington, Stephanie Archer, Marcia Maslow, and Byron Ellington;

   c. Traveling, on a near daily basis, to Scott Ellington's office without invitation and parking outside or drivingly slowly past the building where the office is located;

---

Temporary Restraining Order                                        Page 1 of 3

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 67 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1506 of 1598 PageID 14553

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 57 of 106

and

d.  Taking pictures and video recordings of the office of Scott Ellington.

2.      Plaintiff will suffer irreparable harm if Defendant is not restrained immediately from continuing to harass Plaintiff and his family. Specifically, Plaintiff reasonably fears that Defendant may cause him or his family bodily harm, and the accompanying anxiety interferes with his ability to conduct his normal, daily activities.

3.      Given the foregoing, there is no adequate remedy at law to grant Plaintiff complete, final and equal relief.

4.      IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Patrick Daugherty and his agents, servants, and employees are ORDERED to immediately cease and desist from the following acts from the date of this Order until fourteen (14) days thereafter, or until further order of this Court:

a.  Being within 500 feet of Ellington;

b.  Being within 500 feet of Ellington's office located at 120 Cole Street, Dallas, Texas 75207;

c.  Being within 500 feet of Ellington's residence located at 3825 Potomac Ave, Dallas, Texas 75205;

d.  Being within 500 feet of Stephanie Archer;

e.  Being within 500 feet of Stephanie Archer's residence located at 4432 Potomac, Dallas, Texas 75025;

f.  Being within 500 feet of Marcia Maslow;

g.  Being within 500 feet of Marcia's residence located at 430 Glenbrook Dr., Murphy, Texas 75094;

Temporary Restraining Order                                                   Page 2 of 3

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1507 of 1598 PageID 14554

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 58 of 106

h. Being within 500 feet of Byron Ellington;

i. Being within 500 feet of Byron Ellington's residence located at 5101 Creekside Ct., Parker, Texas 75094;

j. Photographing, videorecording, or audio recording Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington;

k. Photographing or videorecording the residences or places of business of Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington; and

l. Directing any communications toward Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington.

5. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff's Application for Temporary Injunction be heard on _____ at _____ M.; Defendant is commanded to appear at that time and show cause, if any exist, why a temporary injunction should not be issued against said Defendant.

6. The clerk of the above-entitled court shall issue a temporary restraining order in conformity with the law and the terms of this order upon the filing by Plaintiff of the bond hereinafter set.

7. This order shall not be effective until Plaintiff deposits with the Clerk, a bond in the amount of $_____ in conformity with the law.

SIGNED and ENTERED on _____ at _____ M.

_____
PRESIDING JUDGE

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 69 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1508 of 1598   PageID 14555

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 59 of 106
PAID TRO

FILED
1/14/2022 2:00 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Alicia Mata DEPUTY



**2101 Cedar Springs, Suite 1540 | Dallas, Texas 75201**
**Phone: 214-329-0151 | Fax: 214-329-4076**

January 14, 2022

*Via Email*
Chief Clerk
101st Civil District Court
600 Commerce Street
6th Floor West
Dallas, TX 75202

      RE:    Cause Number DC-22-00304; *Scott Byron Ellington v. Dr. Patrick Daugherty*; in
             the 101st Civil District Court, Dallas County, Texas.

Dear Clerk:

      Plaintiff hereby pays the fee of $8.00 for the Temporary Restraining Order along with this
filing.  Thank you for your attention to this matter.

                Sincerely,

                /s/ Julie Pettit

                Julie Pettit

JP/ppm

APPX. 107496

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 70 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1509 of 1598   PageID 14556
Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 60 of 106

### Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Patricia Perkins Mayes on behalf of Julie Pettit
Bar No. 24065971
pperkins@pettitfirm.com
Envelope ID: 60838852
Status as of 1/14/2022 4:21 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Julie Pettit | | jpettit@pettitfirm.com | 1/14/2022 2:00:21 PM | SENT |
| Beverly Congdon | | bcongdon@lynnllp.com | 1/14/2022 2:00:21 PM | SENT |
| Patricia Perkins Mayes | | pperkins@pettitfirm.com | 1/14/2022 2:00:21 PM | SENT |
| Michael K.Hurst | | mhurst@lynnllp.com | 1/14/2022 2:00:21 PM | SENT |
| Mary GoodrichNix | | mnix@lynnllp.com | 1/14/2022 2:00:21 PM | SENT |
| Nathaniel A.Plemons | | nplemons@lynnllp.com | 1/14/2022 2:00:21 PM | SENT |

CAUSE NO. DC 22-00304

| SCOTT ELLINGTON | § | IN THE DISTRICT COURT |
|---|---|---|
| *Plaintiff,* | § | |
| | § | |
| | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| PATRICK DAUGHERTY, | § | |
| | § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

## TEMPORARY RESTRAINING ORDER

On this day, the Application for a Temporary Restraining Order of Scott Ellington, Plaintiff herein, was heard before this Court.

Based upon the pleadings, records, documents filed by counsel, and the arguments of counsel at the hearing, IT CLEARLY APPEARS:

1.      That unless restrained Defendant Patrick Daugherty ("Defendant") will continue to harass Plaintiff Scott Ellington, his girlfriend (Stephanie Archer), his sister (Marcia Maslow), and his father (Byron Ellington) before notice and a hearing on Plaintiff's Application for Temporary Injunction, including committing the following acts:

   a. Traveling, on a near daily basis, to the personal residences of Scott Ellington, Stephanie Archer, Marcia Maslow, and Byron Ellington without invitation and parking outside or drivingly slowly past the residences;

   b. Taking pictures and video recordings of the personal residences of Scott Ellington, Stephanie Archer, Marcia Maslow, and Byron Ellington;

   c. Traveling, on a near daily basis, to Scott Ellington's office without invitation and parking outside or drivingly slowly past the building where the office is located;

APP. 01306

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 72 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1511 of 1598    PageID 14558

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 62 of 106

and

    d.  Taking pictures and video recordings of the office of Scott Ellington.

2.    Plaintiff will suffer irreparable harm if Defendant is not restrained immediately from continuing to harass Plaintiff and his family. Specifically, Plaintiff reasonably fears that Defendant may cause him or his family bodily harm, and the accompanying anxiety interferes with his ability to conduct his normal, daily activities.

3.    Given the foregoing, there is no adequate remedy at law to grant Plaintiff complete, final and equal relief.

4.    IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Patrick Daugherty and his agents, servants, and employees are ORDERED to immediately cease and desist from the following acts from the date of this Order until fourteen (14) days thereafter, or until further order of this Court:

    a.  Being within 500 feet of Ellington;

    b.  Being within 500 feet of Ellington's office located at 120 Cole Street, Dallas, Texas 75207;

    c.  Being within 500 feet of Ellington's residence located at 3825 Potomac Ave, Dallas, Texas 75205;

    d.  Being within 500 feet of Stephanie Archer;

    e.  Being within 500 feet of Stephanie Archer's residence located at 4432 Potomac, Dallas, Texas 75025;

    f.  Being within 500 feet of Marcia Maslow;

    g.  Being within 500 feet of Marcia's residence located at 430 Glenbrook Dr., Murphy, Texas 75094;

---

APPX. 107309

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 73 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1512 of 1598   PageID 14559

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 63 of 106

h.  Being within 500 feet of Byron Ellington;

i.  Being within 500 feet of Byron Ellington's residence located at 5101 Creekside Ct.,
Parker, Texas 75094;

j.  Photographing, videorecording, or audio recording Ellington, Stephanie Archer,
Marcia Maslow, or Byron Ellington;

k.  Photographing or videorecording the residences or places of business of Ellington,
Stephanie Archer, Marcia Maslow, or Byron Ellington; and

l.  Directing any communications toward Ellington, Stephanie Archer, Marcia
Maslow, or Byron Ellington.

5.      IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff's
Application for Temporary Injunction be heard on _____ at _____M.
Defendant is commanded to appear at that time and show cause, if any exist, why a temporary
injunction should not be issued against said Defendant.

6.      The clerk of the above-entitled court shall issue a temporary restraining order in
conformity with the law and the terms of this order upon the filing by Plaintiff of the bond
hereinafter set.

7.      This order shall not be effective until Plaintiff deposits with the Clerk, a bond in
the amount of $_____ in conformity with the law.


SIGNED and ENTERED on _____ at _____ M.


_____
PRESIDING JUDGE

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 74 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1513 of 1598 PageID 14560
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 64 of 106

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Beverly Congdon on behalf of Michael K. Hurst
Bar No. 10316310
bcongdon@lynnllp.com
Envelope ID: 60766800
Status as of 1/13/2022 8:43 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Julie Pettit | | jpettit@pettitfirm.com | 1/12/2022 4:06:06 PM | SENT |
| Beverly Congdon | | bcongdon@lynnllp.com | 1/12/2022 4:06:06 PM | SENT |
| Patricia Perkins Mayes | | pperkins@pettitfirm.com | 1/12/2022 4:06:06 PM | SENT |
| Michael K.Hurst | | mhurst@lynnllp.com | 1/12/2022 4:06:06 PM | SENT |
| Mary GoodrichNix | | mnix@lynnllp.com | 1/12/2022 4:06:06 PM | SENT |
| Nathaniel A.Plemons | | nplemons@lynnllp.com | 1/12/2022 4:06:06 PM | SENT |

# EXHIBIT 4

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1515 of 1598    PageID 14562
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 66 of 106

<u>**Exhibit 4:**</u> **Counsel of Record in the State
Court Action**

**GRAY REED**

Ruth Ann Daniels
State Bar No. 15109200
rdaniels@grayreed.com
Andrew K. York
State Bar No. 24051554
dyork@grayreed.com
Drake M. Rayshell
State Bar No. 24118507
drayshell@grayreed.com
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332


**ATTORNEYS FOR PATRICK
DAUGHERTY**

**THE PETTIT LAW FIRM**

Julie Pettit
State Bar No. 24065971
jpettit@pettitfirm.com
David B. Urteago
State Bar No. 24079493
durteago@pettitfirm.com
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076

**LYNN PINKER HURST &
SCHWEGMANN, LLP**

Michael K. Hurst
State Bar No. 10316310
mhurst@lynnllp.com
Mary Goodrich Nix
State Bar No. 24002694
mnix@lynnllp.com
Nathaniel A. Plemons
State Bar No. 24121059
nplemons@lynnllp.com
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839


**ATTORNEYS FOR SCOTT BYRON
ELLINGTON**

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 67 of 106

# EXHIBIT 5

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 78 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1517 of 1598   PageID 14564
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 68 of 106

**Drew K. York**

| | |
|---|---|
| **From:** | Julie Pettit <jpettit@pettitfirm.com> |
| **Sent:** | Friday, January 14, 2022 11:21 AM |
| **To:** | Drew K. York; Ruth Ann Daniels |
| **Cc:** | Michael K. Hurst; Mary Nix; Nathaniel Plemons |
| **Subject:** | [EXTERNAL] DC-22-00304 Ellington v. Daugherty |
| **Attachments:** | 2022-01-11 Plaintiff's Original Petition and Appl for TRO.pdf; 2022-01-12 Temporary Restraining Order.pdf |

Ruth Ann and Drew,

We have several pressing issues we would like to address with you regarding the upcoming injunction hearing.

1.  Attached is the TRO signed by Judge Williams and the file-stamped petition. You all have already made an appearance in the case, so please let this email serve as service of the petition on you. Will you likewise accept service of the TRO, or would you like us to serve Mr. Daugherty?

2.  We believe this case is a related case and should be transferred to Judge Hoffman's court.  We do not yet know if the transfer will be automatic.  If it is not automatically transferred, we intend to file a Motion to Transfer. Please let us know today if we can mark you as unopposed on our motion to transfer.

3.  We would like to exchange written discovery on an expedited basis prior to the injunction hearing. Would you all agree that the parties will exchange a maximum of 8 RFPs with responses and documents to be produced at least 4 days prior to the hearing? Please let us know today, as we will be filing a motion for expedited discovery if we do not have an agreement on this.

4.  We will agree to accept a subpoena for Mr. Ellington's appearance at the injunction. Are you authorized to do the same for Mr. Daugherty?

Please let us know your position on these issues. If you would prefer to talk by phone, let me know a time today that works for you and I will give you a call.

Best Regards,

Julie Pettit Greeson
The Pettit Law Firm
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Direct: 214-329-1846
Fax: 214-329-4076
jpettit@pettitfirm.com

THE**PETTIT**
LAWFIRM

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 79 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1518 of 1598 PageID 14565
118

# EXHIBIT 6

Case 19-34054-sgj11 Doc 3089-4 Filed 02/28/21 Entered 02/28/22 15:01:15 Page 70 of 160

# **EXHIBIT 1**

**Final Execution Copy**

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement") is made and entered into by and between (i) Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), and (ii) Patrick Hagaman Daugherty ("Daugherty" and together with HCMLP, the "Parties," and individually as a "Party"). This Settlement provides for the treatment of certain claims asserted by Daugherty against the Debtor, and for the Parties to take certain other specified actions in settlement thereof.

## RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Debtor's chapter 11 case (the "Bankruptcy") is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, on February 2 and 3, 2021, the Court conducted a confirmation hearing with respect to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1808] (the "Plan");

WHEREAS, on February 8, 2021, the Court rendered an opinion from the bench in which it confirmed the Plan [Docket No. 1924];

WHEREAS, on February 22, 2021, the Court issued an order confirming the Plan [Docket No. 1943];

WHEREAS, on August 11, 2021, the Effective Date (as defined in the Plan) occurred [Docket No. 2700];

WHEREAS, Daugherty is a former employee and limited partner of the Debtor and has

DOCS_NY:42669.9 36027/002

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 82 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1521 of 1598 PageID 14568
Case 22-40854-sgj11 Doc 3089-4 Filed 08/08/23 Entered 08/08/23 15:01:15 Page 82 of 160

served in other positions with affiliates and former affiliates of the Debtor;

WHEREAS, at the time of his resignation, Daugherty owned 19.1% of the preferred units of Highland Employee Retention Assets LLC ("HERA"), an employee deferred compensation vehicle managed by the Debtor and Highland ERA Management, LLC ("ERA") and contends that he owned or had the right to own all of the preferred units of HERA;

WHEREAS, prior to his resignation from HCMLP, Daugherty was awarded units of HERA, which vehicle owned interests in Restoration Capital Partners, LP ("RCP"), an HCMLP managed private equity fund, and other investments;

WHEREAS, in April 2012, the Debtor commenced an action against Daugherty in Texas state court (the "Texas Action"), and Daugherty subsequently asserted counterclaims for breach of contract and defamation, and third-party claims against HERA and others;

WHEREAS, after a three-week trial, the jury returned a verdict partially in favor of the Debtor, but Daugherty prevailed on his claims against the Debtor and James Dondero ("Dondero") for defamation with malice and a third-party claim against HERA and was awarded damages of $2.6 million against HERA, plus prejudgment and post-judgment interest at 5% (the "HERA Judgment");[1]

WHEREAS, in July 2017, after being unable to collect on the HERA Judgment, Daugherty commenced an action against the Debtor, Dondero, HERA, and ERA Management in the Delaware Chancery Court (the "Delaware Court"), in a case captioned *Daugherty v. Highland Capital Management, L.P., et al.*, C.A. No. 2017-0488-MTZ, for fraudulent transfer, promissory estoppel, unjust enrichment, indemnification, and fees on fees (the "Highland Delaware Case");

---

[1] The Debtor prevailed on its claims against Mr. Daugherty for breach of contract and breach of fiduciary duty for non-monetary damages and obtained an award of $2.8 million in attorney's fees. The HERA Judgment was affirmed on appeal on December 1, 2016.

2

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 83 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1522 of 1598 PageID 14569
Case 22-40930-sgj11 Doc 3089-4 Filed 08/22/23 Entered 08/22/23 15:20:11 Page 26 of 30

WHEREAS, the Delaware Court in the Highland Delaware Case (i) found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Delaware Court applied the "crime-fraud exception" to the attorney-client privilege assertion, and such rulings have not been overturned;

WHEREAS, Daugherty asserts that such withholding of documents and the failure to search defendants' and their employees personal electronic devices for stored documents and texts as well as other emails and domain names such as sasmgt.com and gmail.com which were in their possession and control and to provide required discovery injured him by undermining his attempts to build an evidentiary record to support his claims against the Debtor and the other defendants in the Highland Delaware Case;

WHEREAS, on October 14, 2019, the Highland Delaware Case proceeded to trial and two days later, on October 16, 2019, before the completion of the trial and before the Delaware Court ruled on Daugherty's and the Debtor's cross-motions for summary judgment regarding indemnification and fees on fees, the Debtor filed for bankruptcy;

WHEREAS, on December 1, 2019, Daugherty filed a separate lawsuit in the Delaware Court, captioned *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ, against Dondero, HERA, ERA, Hunton Andrews Kurth LLP ("Andrews Kurth"), Marc Katz ("Katz"), Michael Hurst ("Hurst"), the Debtor's Chief Compliance Officer, the Debtor's then in-house counsel (Isaac Leventon ("Leventon")), and the Debtor's then general counsel (Scott Ellington ("Ellington")), for conspiracy to commit fraud, among other claims (the "HERA Delaware Case" and together with the Highland Delaware Case, the "Delaware Cases");

WHEREAS, on April 1, 2020, Daugherty filed a general, unsecured, non-priority claim

3

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 84 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1523 of 1598 PageID 14570
Case 22-03003-sgj11 Doc 13087-4 Filed 08/28/23 Entered 08/28/23 15:20:01 Page 7 of 30

against the Debtor in the amount of at "least $37,483,876.59," and such claim was denoted by the Debtor's claims agent as Proof of Claim No. 67 ("Proof of Claim No. 67");

WHEREAS, on April 6, 2020, Daugherty filed a general, unsecured, non-priority claim against the Debtor in the amount of at "least $37,482,876.62" that superseded Proof of Claim No. 67 and that was denoted by the Debtor's claims agent as Proof of Claim No. 77 ("Proof of Claim No. 77");

WHEREAS, on August 31, 2020, the Debtor commenced an adversary proceeding against Daugherty by filing a complaint (the "Complaint") in which the Debtor: (1) objected to Proof of Claim No. 77 on various grounds (the "Claim Objection"), and (2) asserted a cause of action for the subordination of part of Daugherty's claim pursuant to section 510(b) of the Bankruptcy Code. Adv. Proc. No. 20-03107 (the "Adv. Proc.") [Adv. Docket No. 1] (the "Adversary Proceeding");

WHEREAS, on September 29, 2020, Daugherty filed his answer to the Complaint [Adv. Docket No. 8] (the "Answer");

WHEREAS, on September 24, 2020, Daugherty filed his *Motion to Confirm Status of Automatic Stay, or Alternatively to Modify Automatic Stay* [Docket No. 1099] (the "Stay Motion") pursuant to which he sought to sever the Debtor from the Highland Delaware Case and then consolidate the remaining claims in the Highland Delaware Case into the HERA Delaware Case and proceed with one case against the non-Debtor parties;[2]

WHEREAS, on October 23, 2020, Daugherty filed a motion seeking leave to amend his Proof of Claim No. 77 [Docket No. 1280] (the "POC Amendment Motion"). The amended proof

---

[2] On October 8, 2020, the Debtor commenced a second adversary proceeding against Daugherty (the "Second Adversary Proceeding"), seeking to enjoin him from prosecuting the Delaware Cases. Adv. Proc. 20-03128 ("2d Adv. Proc.") [2d Adv. Proc. Docket No. 1]. On January 29, 2021, the parties filed a Settlement that resolved the Second Adversary Proceeding, and the Second Adversary Proceeding was subsequently dismissed with prejudice. [2d Adv. Proc. Docket No. 12].

4

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 85 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1524 of 1598 PageID 14571
Case 19-34054-sgj11 Doc 3089-1 Filed 01/18/22 Entered 01/18/22 15:21:15 Page 75 of 130

of claim attached to the POC Amendment Motion increased Daugherty's general, unsecured, non-priority claim against the Debtor to the amount of at "least $40,410,819.42" and sought to supersede Proof of Claim No. 67 and Proof of Claim No. 77;

WHEREAS, on October 23, 2020, Daugherty filed his *Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 Motion*, seeking for his Claim to be temporarily allowed for voting purposes in this amount of $40,410,819.42 [Docket No. 1281] (the "3018 Motion");

WHEREAS, on November 3, 2020, the Court granted the Stay Motion [Docket No. 1327];

WHEREAS, the Debtor opposed the 3018 Motion, and after conducting an evidentiary hearing for the limited purpose of determining the 3018 Motion, the Court entered an order temporarily allowing Daugherty's Claim only for voting purposes in the amount of $9,134,019 [Docket No. 1474];

WHEREAS, on December 10, 2020, the Court entered an order [Docket No. 1533] granting the POC Amendment Motion, and Daugherty was permitted to file an amendment to his proof of claim. On December 23, 2020, Daugherty filed an amended proof of claim, designated by the Debtor's claim agent as Proof of Claim No. 205 ("Proof of Claim No. 205" or the "Daugherty Claim"). Proof of Claim No. 205 superseded Proof of Claim No. 77 and increased the amount of the Daugherty's Claim to $40,710,819.42;

WHEREAS, on November 30, 2020, Daugherty filed his Motion to Lift the Automatic Stay (the "Lift Stay Motion") [Docket No. 1491] seeking to lift the automatic stay to allow him to finish his trial in the Delaware Court and liquidate his claims. The Debtor opposed the Lift Stay Motion, and after a hearing was held on December 17, 2020, the Court denied the relief requested in the Lift Stay Motion [Docket No. 1612];

5

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 86 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1525 of 1598   PageID 14572
Case 19-34054-sgj11 Doc 3089-4 Filed 08/22/23 Entered 08/22/23 22:57:01 Page 76 of 630

WHEREAS, except with respect to the Reserved Claim (as defined below), the Parties have agreed to settle and resolve all claims and disputes between them and their respective current affiliates, managed entities, and employees, including the Daugherty Claim, on the terms set forth in this Settlement:

<div align="center">AGREEMENT</div>

**NOW, THEREFORE**, after good-faith, arms-length negotiations, and in consideration of the foregoing, it is hereby stipulated and agreed that:

1.     Allowed Claims:  In full satisfaction of the entirety of the Daugherty Claim against the Debtor and HCMLP Released Parties (defined below), excluding the Reserved Claim, Daugherty shall receive (a) an allowed general unsecured Class 8 claim in the amount of $8,250,000; (b) an allowed subordinated general unsecured Class 9 claim in the amount of $3,750,000; and (c) a one-time lump sum cash payment in the amount of $750,000 to be paid within 5 business days of Bankruptcy Court approval of this Settlement Agreement.

2.     Recovery:  The Debtor makes no representation or warranty as to the recovery on Class 8 or Class 9 claims under the Plan.

3.     Observation Access:  As soon as practicable following entry of an order of the Bankruptcy Court approving this Settlement, HCMLP shall use reasonable efforts to petition the Claimant Trust Oversight Board[3] to permit Daugherty to have access as an observer to meetings of the Claimant Trust Oversight Board, subject to policies, procedures, and agreements applicable to other observers of the Claimant Trust Oversight Board, including policies, procedures, and agreements related to confidentiality and common interest.  Whether Daugherty will be granted observer access and any continuing observer access is and will remain at the sole discretion of the

---

[3] The Claimant Trust Oversight Board refers to the Oversight Board as defined in the August 11, 2021 Highland Claimant Trust Agreement establishing the Claimant Trust, as defined therein.

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1526 of 1598 PageID 14573
Case 22-40350-sgj11 Doc 3089-4 Filed 08/08/23 Entered 08/08/23 22:57:01 Page 87 of 160

Claimant Trust Oversight Board.

    4.    <u>RCP Track Record</u>:  HCMLP shall use reasonable efforts to provide Daugherty with data constituting the investment performance track record of RCP during Daugherty's tenure at HCMLP.  Daugherty shall not be entitled to any compensation with respect to the performance of RCP.  HCMLP makes no representations or warranties regarding such data and takes no responsibility with respect to the use of such data for any purposes.

    5.    <u>Daugherty Releases</u>:  Except as specifically provided in this paragraph 5, and to the maximum extent permitted by applicable law, the Debtor, on behalf of itself and each of the HCMLP Entities and HCMLP Parties (as those terms are defined in paragraph 6 below), hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue Daugherty, his successors, affiliates, and assigns, (and in each such category to include their respective advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, and designees) (collectively, the "<u>Daugherty Additional Release Parties</u>" and together with Daugherty, the "<u>Daugherty Released Parties</u>"), in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, or the Delaware Cases, all existing as of the date hereof (collectively, the "<u>HCMLP Released Claims</u>"); <u>provided</u>, <u>however</u>, that such release shall not

<div align="center">7</div>

apply with respect to any and all defenses that HCMLP or the HCMLP Entities may have to the Reserved Claim or the Reserve Motion (as those terms are defined herein) or Daugherty's obligations under this Settlement.  For the avoidance of doubt, the HCMLP Released Claims include all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

6.     <u>HCMLP Releases</u>:  Except as specifically provided in this paragraph 6, and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Released Parties, hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (a)(i) HCMLP; (ii) Strand Advisors Inc.; (iii) the Claimant Trust; (iv) the Claimant Trust Oversight Board; (v) the Highland Litigation Sub-Trust; (vi) the Highland Indemnity Trust; (vii) any entity of which greater than fifty percent of the voting ownership is held directly or indirectly by HCMLP as of the date hereof and any entity otherwise directly or indirectly controlled by HCMLP as of the date hereof,; and (viii) any entity managed by either HCMLP or a direct or indirect subsidiary of HCMLP, including Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Master, L.P. (and all of their respective general partners, feeder funds, managers, and affiliates) (the foregoing (a)(i) through (a)(viii) the "<u>HCMLP Entities</u>"), and (b) with respect to each such HCMLP Entity, such HCMLP Entity's respective current (meaning employed in their respective roles as of the date hereof) advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders (but not the shareholders of Strand Advisors Inc.), agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "<u>HCMLP Parties</u>," and together with the

8

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 89 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1528 of 1598   PageID 14575
Case 19-34054-sgj11 Doc 3089 Filed 08/12/22 Entered 08/12/22 15:17:01 Page 73 of 106
30

HCMLP Entities, the "HCMLP Released Parties"),[4] in each case acting in such capacity, for and

from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens,

losses, costs and expenses (including, without limitation, attorney's fees and related costs),

damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated,

contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those

which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding,

the Texas Action, the Daugherty Claim, or the Highland Delaware Case (collectively, the

"Daugherty Released Claims"); provided, however, that such release shall not apply with respect

to the Reserved Claim or the Reserve Motion (as those terms are defined in paragraph 9 below) or

HCMLP's obligations under this Settlement.    This release expressly applies to all current

employees of HCMLP as the Reorganized Debtor (as defined in the Plan), in their capacities as

such.  For the avoidance of doubt, the Daugherty Released Claims includes all claims or causes of

action and facts, known or unknown, that exist as of the date hereof but do not include or apply to

claims or causes of action based on facts occurring after the date hereof.

   7. <u>Reservation of Daugherty Rights</u>: Notwithstanding anything contained herein to

the contrary, the term HCMLP Released Parties shall not include (a) NexPoint Advisors, L.P. (or

any of its subsidiaries and employees, advisors, or agents), (b) the Charitable Donor Advised Fund,

L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and any of their respective

employees, advisors, or agents), (c) NexBank, SSB (or any of its subsidiaries, employees, advisors,

or agents), (d) James Dondero or any trust in which Dondero or any of his family members are a

trustee or beneficiary (or any trustee acting for such trust), including but not limited to Hunter

---

[4] The Daugherty Additional Released Parties and the HCMLP Released Parties are collectively referred to as the "Additional Released Parties."

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 90 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1529 of 1598   PageID 14576
Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
30

Mountain Investment Trust, The Get Good Trust, Dugaboy Investment Trust, SLHC Investment

Trust, (e) HERA (subject to paragraph 8 below), (f) ERA (subject to paragraph 8 below), (g) Grant

Scott, (h) Mark Okada and any trust in which Mark Okada or any of his family members are a

beneficiary (or any trustee acting for such trust in their respective capacities), (i) Ellington, (j)

Leventon, (k) Katz, (l) Hurst, (m) Andrews Kurth, or (m) any other former employee (as of the

date hereof) of the HCMLP Released Parties.

     8.     <u>HERA and ERA</u>:  The Parties acknowledge and agree that as of the date hereof,

HERA and ERA have no material assets other than potential claims that may exist against persons

or entities not released at or prior to the date hereof, and no claims against the HCMLP Released

Parties. The allowed claims provided in paragraph 1 hereof are expressly agreed to in order to

satisfy any liability the Debtor may have in connection with the HERA Judgment.  To facilitate

recovery of such potential claims – which expressly excludes any and all claims by or in the name

of HERA and ERA against any of the HCMLP Released Parties --  HCMLP will transfer its

interests in HERA and ERA to Daugherty.  Such transfer will include the HERA and ERA books

and records (spreadsheet) maintained on HCMLP's system.   Such transfer will be without

representation or warranty of any type; including, for the avoidance of doubt, without any

representation or warranty as to the merits of the potential claims or the efficacy of the transfer of

the potential claims.  Such transfer will be without any liability or material cost to HCMLP or its

affiliates or the other HCMLP Released Parties, including any liability in respect of any assets that

HERA or ERA ever actually or allegedly owned, possessed, or controlled and that were actually

or allegedly transferred, conveyed, sold, written off or otherwise disposed of (in any such case, a

"<u>Disposition</u>").  In connection with the transfer, HERA and ERA have expressly released the

HCMLP Released Parties from any and all claims, including any claims actions or remedies related

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 91 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1530 of 1598 PageID 14577
Case 19-34054-sgj11 Doc 3089 Filed 12/08/21 Entered 12/08/21 17:01:25 Page 12 of
30

to any Disposition, either of them may have against any HCMLP Released Party now or in the future (the "HERA and ERA Release"). Daugherty on behalf of himself and each of the Daugherty Released Parties acknowledges, accepts, and agrees not to challenge the HERA and ERA Release or support any challenge thereto. A copy of the HERA and ERA Release is annexed hereto as **Exhibit A**. Daugherty acknowledges and agrees that even though HERA and ERA are not HCMLP Released Parties under this Agreement, Daugherty and all Daugherty Released Parties shall (a) not seek to hold any HCMLP Released Party liable for any action or inaction taken by or on behalf of HERA or ERA, including through any derivative, veil-piercing or similar cause of action or remedy; and (b) not seek to recover damages or obtain any form of relief against any HCMLP Released Party on account of any action or inaction taken by or on behalf of HERA or ERA, including through any veil piercing or similar cause of action or remedy. If, for any reason, HERA or ERA, or any person or entity acting on their behalf, recovers anything from any HCMLP Released Party, Daugherty shall promptly turnover to HCMLP or its successors and assigns any amounts actually recovered by Daugherty or any Daugherty Released Party, from HERA or ERA arising from, related to, or derived from any claim that HERA or ERA or any person or entity acting on their behalf has or may have against any HCMLP Released Party. HCMLP will provide reasonable assistance to Daugherty to assist with the preparation of any required HERA K-1s for 2021, but any requirement to provide such K-1s will be the obligation, if any, of HERA.

        9.     IRS Compensation Claim: In section 4(ii) of the Addendum to Proof of Claim No. 205, Daugherty contends that he has a contingent, unliquidated claim against the Debtor arising out of a 2008/2009 compensation letter (the "Reserved Claim"), which claim is also related to an audit/dispute between the Debtor and the Internal Revenue Service (the "IRS") (the dispute between the Debtor and IRS being referred to herein as the "IRS Audit Dispute"). The Debtor

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 92 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1531 of 1598 PageID 14578
Case 19-34054-sgj11 Doc 3095 Filed 08/12/22 Entered 08/12/22 15:17:01 Page Page 13 of
30

disputes the validity and amount of the Reserved Claim. Daugherty shall retain the Reserved

Claim solely against the Debtor and not against any other HCMLP Released Party, and the Debtor

reserves the right to assert any and all defenses thereto. Any litigation by and between the Debtor

and Daugherty concerning the validity and amount of the Reserved Claim shall be stayed until the

IRS makes a final determination with respect to the IRS Audit Dispute; provided, however, that

Daugherty may file a motion with the Bankruptcy Court to have the Reserved Claim estimated for

purposes of establishing a reserve as a "Disputed Claim" under the Debtor's Plan (the "Reserve

Motion"), and the Debtor (and any successor) reserves the right to assert any and all defenses

thereto. Notwithstanding the foregoing, Daugherty may address any personal claim or personal

liability to the IRS as a result of the IRS Audit Dispute, including settlement of any such claims;

provided, however, Daugherty agrees to forego settling or addressing any claims with the IRS

without the written consent of the Debtor until March 31, 2022.

10. Current HCMLP Employees: The HCMLP Parties set forth on **Appendix A** hereto

are currently employed by the Debtor are HCMLP Released Parties. By executing a copy of this

Settlement and delivering it to Daugherty, each of the persons on Appendix A agrees not to sue,

attempt to sue, or threaten or work with or assist any entity or person to sue, attempt to sue, or

threaten any Daugherty Released Party on or in connection with any claim or cause of action

arising prior to the date of this Settlement.

11. Dismissal and Motions in Other Actions. Within ten business days after approval

of this Settlement by the Bankruptcy Court, the Parties shall take all steps necessary (a) to dismiss

with prejudice (i) the Highland Delaware Case, as against the Debtor and any HCMLP Released

Party, and (ii) the HERA Delaware Case, as against every HCMLP Released Party, (b) to file an

agreed motion and proposed order to partially vacate the final judgment entered against Daugherty

12

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 93 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1532 of 1598   PageID 14579
Case 19-34054-sgj11 Doc 3089 Filed 12/08/21 Entered 12/08/21 17:10:13 Page Page 14 of
30

in the Texas Action, (c) withdraw HCMLP's objection to the Daugherty motion to recuse in the
Texas Action, and (d) to dismiss the Adversary Proceeding with prejudice. The parties shall file
the foregoing motions and withdrawals substantially in the form of the documents annexed hereto
as **Exhibit B**.

12.    Additional Third Party Claims Discovery: The Debtor (a) shall accept service of
any subpoenas via email served by Daugherty in connection with the Delaware Cases on behalf of
itself, the HCMLP Entities, the HCMLP Parties (but only in their capacity as employees of
HCMLP); and (b) acknowledge and consent to the jurisdiction of the Delaware Chancery Court
for purposes of enforcing any such subpoenas, subject in all respects to the rights that the HCMLP
Entities and HCMLP Parties to defend the requested production, if any.

13.    Settlement of Third Party Claims: Daugherty shall not settle any claims or causes
of action against any current or former director, officer, employee, agent or representative of
HCMLP or Strand Advisors Inc. (collectively, the "Potentially Indemnified Parties") to the extent
such claims have been brought or could have been brought against any Potentially Indemnified
Parties, if any such settlement designates, defines or describes the settled claims as arising out of
or relating to simple negligence or as having otherwise been within the scope of employment of
the Potentially Indemnified Party.

14.    Claims Register: As soon as practicable after the Settlement Effective Date,
HCMLP shall instruct the claims agent in the Debtor's chapter 11 case to adjust the claims register
in accordance with this Settlement.

15.    Daugherty Representations: Daugherty represents and warrants to each of the
HCMLP Released Parties that (a) he has full authority to release the Daugherty Released Claims
and has not sold, transferred, or assigned any Daugherty Released Claim to any other person or

13

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 94 of
Case 3:23-cv-00726-S Document 8-24 Filed 02/29/23 Page 1533 of 1598 PageID 14580
Case 19-34054-sgj11 Doc 3088-1 Filed 12/08/21 Entered 12/08/21 17:01:15 Page Page 156 of
30

entity and that (b) no person or entity other than Daugherty has been, is, or will be authorized to
bring, pursue, or enforce any Daugherty Released Claim on behalf of, for the benefit of, or in the
name of (whether directly or derivatively) Daugherty.

16.    <u>HCMLP Representations</u>: Each of HCMLP and each HCMLP Released Party who
has signed this Settlement represents and warrants to Daugherty that (a) he, she or it has not sold,
transferred, pledged, assigned or hypothecated any HCMLP Released Claim to any other person
or entity and (b) he, she, or it has full authority to release any HCMLP Released Claims that such
HCMLP Released Party personally has against Daugherty.

17.    <u>Additional HCMLP Representations</u>:  HCMLP represents and warrants that it is
releasing the HCMLP Released Claims on behalf of the HCMLP Entities to the maximum extent
permitted by any contractual or other legal rights HCMLP possesses.  To the extent any of the
HCMLP Entities dispute HCMLP's right to release the HCMLP Released Claims on behalf of any
of the HCMLP Entities, HCMLP shall use commercially reasonable efforts to support Daugherty's
position, if any, that such claims were released herein.  For the avoidance of doubt, HCMLP will
have no obligations to assist Daugherty under this paragraph if HCMLP has been advised by
external counsel that such assistance could subject HCMLP to liability to any third party or if such
assistance would require HCMLP to expend material amounts of time or money.  HCMLP shall
not argue in any forum that the non-signatory status of any of the HCMLP Entities to this
Settlement shall in any way affect the enforceability of this Settlement vis-à-vis any of the HCMLP
Entities.  The Parties agree that all of the HCMLP Entities are intended third-party beneficiaries
of this Release.

18.    <u>HCMLP Covenant</u>:  HCMLP and the HCMLP Entities covenant and agree that
they will not pursue or seek to enforce any injunctions entered in the Texas Action against

14

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 95 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1534 of 1598   PageID 14581
Case 19-34054-sgj11 Doc 3088 Filed 12/08/21 Entered 12/08/22 15:17:01 Page 5 of 100
30

Daugherty.

    19.   <u>Entire Agreement; Modification</u>:  This Settlement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties.  This Settlement may not be modified other than by a signed writing executed by the Parties.

    20.   <u>Bankruptcy Court Approval</u>:  Notwithstanding anything to the contrary contained herein, the effectiveness of HCMLP and the Claimant Trust's execution of this Settlement shall be subject to entry of an order of the Bankruptcy Court approving this Settlement.  HCMLP shall take all steps necessary to file with the Bankruptcy Court a motion for an order approving this Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code (the "<u>Motion</u>").  The parties agree to cooperate in the preparation and prosecution of the Motion which shall be filed no later than 5 business day after execution of this Settlement, unless such time is extended by mutual agreement.

    21.   <u>Counterparts</u>:  This Settlement may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument and shall be effective against a Party or Additional Released Party upon approval of the Settlement by the Bankruptcy Court.

    22.   <u>Governing Law; Jurisdiction</u>: This Settlement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of law principles, and all claims relating to or arising out of this Settlement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Delaware, excluding Delaware's conflicts of law principles. The Bankruptcy Court will retain exclusive jurisdiction over all disputes relating to this Settlement.

<div align="center">15</div>

23.    <u>Headings</u>:  Paragraph headings included herein are for convenience and shall have

no impact whatsoever on the meaning or interpretation of any part of this Settlement.

[Remainder of page intentionally left blank]

APPX. 07328

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 97 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1536 of 1598   PageID 14583
Case 19-34054-sgj11 Doc 3089 Filed 12/08/21 Entered 12/08/21 17:01:25 Page 17 of
30

In witness whereof, the parties hereto, intending to be legally bound, have executed this

Settlement as of the day and year set forth below:

Dated:  11-2-21

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name:  James P. Seery, Jr.
Title:   Chief Executive Officer

HIGHLAND CLAIMANT TRUST

By: _____
Name:  James P. Seery, Jr.
Title:  Claimant Trustee

PATRICK HAGAMAN DAUGHERTY

Dated:  11/22/21

By: _____
Name:  Patrick Hagaman Daugherty

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 98 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1537 of 1598 PageID 14584
Case 19-34054-sgj11 Doc 3089 Filed 08/12/20 Entered 08/12/20 15:17:01 Page Page 1 of
30

# EXHIBIT A

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 99 of
Case 3:23-cv-00726-S   Document 8-24   Filed 02/29/23   Page 1538 of 1598   PageID 14585
Case 19-34054-sgj11 Doc 3085 Filed 11/22/08 Entered 11/22/08 21:51:10 Page Page 20 of
30

## HERA RELEASE AGREEMENT

This HERA Release Agreement ("HERA Release Agreement") is entered into as of November 21, 2021 by and among Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), Patrick Hagaman Daugherty ("Daugherty"), Highland Employee Retention Assets, LLC ("HERA") and Highland ERA Management, LLC ("ERA" and together with HCMLP, and HERA, the "Parties," and individually as a "Party").

WHEREAS, reference is hereby made to the Settlement Agreement (the "Settlement") of even date herewith and attached hereto made and entered into by and between the Debtor, the Highland Claimant Trust, and Daugherty.

WHEREAS, the Settlement settles all of Daugherty's claims against the HCMLP Released Parties, including all claims against the HCMLP Released Parties relating to transfers of assets from HERA.

WHEREAS, the Settlement includes, among other things, the transfer by HCMLP to Daugherty of HCMLP's interests in HERA and ERA.

WHEREAS, under the Settlement such transfer is being made without any liability to any of the HCMLP Released Parties of any type and is conditional on the full release of, and covenant not to sue, each of the HCMLP Released Parties, by and from HERA, ERA, Daugherty and the Daugherty Released Parties.

WHEREAS, neither HERA nor ERA filed proofs of claim in the Bankrupty and have no claims against HCMLP.

WHEREAS, out of an abundance of caution to confirm that HERA, ERA, Daugherty, and the Daugherty Released Parties have no claims against the HCMLP Released Parties, this HERA Release Agreement is being entered into contemporaneously with the Settlement and constitutes an

essential part thereof.

WHEREAS, capitalized terms used herein but not otherwise defined herein have the respective meanings set forth in the Settlement.

NOW, THEREFORE, in consideration of the entry into of the Settlement, the transfer of the equity interests in HERA and ERA to Daugherty in accordance with the Settlement, and for other good and valuable consideration, including the provisions set forth herein, the parties hereto further agree as follows:

1. Upon entry of an order of the Bankruptcy Court approving this Settlement and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Additional Release Parties, together with each of HERA and ERA (Daugherty, the Daugherty Additional Release Parties, HERA and ERA shall be collectively referred to herein as the "HERA Releasing Parties"), each hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, any of the HCMLP Released Parties for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, Highland Delaware Case, or the HERA Delaware Case (collectively, "Claims"), in each case that in any way arise from or otherwise in any way relate to HERA or ERA, including, without limitation, any actual or potential claims, whether known or unknown, in any way related to or

arising out of the formation, management, operation or assets of HERA, ERA or any of their respective predecessors or successors, including the transfer of any assets to or from HERA or ERA, it being understood that all remaining assets of HERA have been transferred to HCMLP prior to the date hereof, and in addition to the releases set forth above, each of the HERA Releasing Parties irrevocably waives and releases and covenants not to sue with respect to any Claims against any of the HCMLP Released Parties in any way related to any such transfers or assets, whether *in personam* with respect to the HCMLP Released Parties or *in rem* with respect to any of their assets (collectively, the "HERA Released Claims") or any other Disposition.

2.      This Release constitutes a part of, and is supplemental to, the provisions of the Settlement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 102
Case 3:23-cv-00726-S   Document 8-24   Filed 11/29/23   Page 1541 of 1598   PageID 14588
Case 19-34054-sgj11 Doc 3088 Filed 08/12/20 Entered 08/12/20 21:57:10 Page Page 230 of 30

In witness whereof, the parties hereto, intending to be legally bound, have executed this

HERA Release Agreement as of the date set forth above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name:  James P. Seery, Jr.
Title:    Chief Executive Officer

PATRICK HAGAMAN DAUGHERTY

By: _____
Name:  Patrick Hagaman Daugherty

HIGHLAND EMPLOYEE RETENTION ASSETS, LLC

By: Highland ERA Management, LLC, its manager

By: Highland Capital Management. LP

By: _____
Name:  James P. Seery, Jr.
Title:    Chief Executive Officer

HIGHLAND ERA MANAGEMENT, LLC

By: _____
Name:  James P. Seery, Jr.
Title:    Authorized Signatory

**EXHIBIT B**

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 104
Case 3:23-cv-00726-S   Document 8-24   Filed 11/29/23   Page 1543 of 1598   PageID 14590
Case 19-34054-sgj11 Doc 3083-8 Filed 08/12/22 Entered 08/12/22 15:17:01 Page Page 25 of
30

**CAUSE NO. 12-04005**

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| PATRICK DAUGHERTY, | § | |
| | § | |
| Defendant and Counter-Plaintiff, | § | DALLAS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM L. BRITAIN, | § | |
| | § | |
| Third-Party Defendants. | § | |
| | § | 68th JUDICIAL DISTRICT |

## AGREED MOTION TO PARTIALLY VACATE THE FINAL JUDGMENT DATED JULY 14, 2014

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Highland Capital Management, LP ("Highland") and Defendant Patrick Daugherty ("Daugherty" and together with Highland, the "Parties") file this *Agreed Motion to Partially Vacate the Final Judgment dated July 14, 2014* (the "Motion"), and respectfully show the following:

1.      On July 14, 2014, this Court entered a *Final Judgment* (the "Judgment") that, among other things, granted Highland's motion for injunctive relief against Daugherty.

2.      The Judgment was amended on March 23, and June 23, 2017.

3.      On October 16, 2019, filed a petition under chapter 11 in the United States Bankruptcy Court for the District of Delaware ("Highland's Bankruptcy Case"). On October 24,

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 1 OF 5**
4851-6473-6986.4

2019, as a result of the commencement of Highland's Bankruptcy Case, the Supreme Court of Texas issued an order abating a related case that Daugherty had brought in that court, Case No. 19-0758. Highland's Bankruptcy Case was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas.

4.     Daugherty asserted certain claims against Highland in Highland's Bankruptcy Case. The Parties have fully and finally resolved their disputes pursuant to a settlement agreement (the "Settlement Agreement") reached in the Highland Bankruptcy Case pursuant to which, among other things, (a) all of Daugherty's known and unknown claims against each of the Highland Released Parties (as those terms are defined in the Settlement Agreement) are resolved, and (b) this Motion seeking the *vacatur* of certain provisions of the Judgment specifically set forth below is being filed.

5.     Highland and Daugherty hereby agree and stipulate that the Court has plenary power to issue an order granting this Motion because the Court retained authority to enforce the permanent injunction rendered in the Judgment, and that changed circumstances have now arisen such that the Court should dissolve the permanent injunction. Highland and Daugherty further agree and stipulate that this Motion shall be treated as an agreement of the Parties pursuant to Texas Rule of Civil Procedure 11, and is fully enforceable. *See Coale v. Scott*, 331 S.W.3d 829, 831-32 (Tex. App.—Amarillo 2011, no pet.) ("Irrespective of whether a trial court lost its plenary jurisdiction over its judgment, the trial court's authority to approve a Rule 11 agreement does not depend on whether it has such jurisdiction.").

6.     Highland and Daugherty agree that the following portions of the Judgment shall be vacated pursuant to their settlement in the Highland Bankruptcy:

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 2 OF 5**
4851-6473-6986.4

a. The second full paragraph on Page 2 of the Judgment, which begins "The Court, after considering the jury's findings regarding Daugherty's breaches of contract and breaches of fiduciary duty . . .";

b. The permanent injunction rendered against Daugherty in the third full paragraph on Page 2 of the Judgment, which begins "It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from . . .";

c. The fourth and fifth full paragraphs on Page 2 of the Judgment awarding Highland a monetary judgment against Daugherty for reasonable and necessary attorney's fees, as well as post-judgment interest on that award[1]; and

d. The jury's answers to Questions 1, 2, 5, 6, 9 and 12 in the Verdict, which was attached as Exhibit 1 to the Judgment.

7.      Highland and Daugherty further agree that, as a result of the vacation of the permanent injunction in the Judgment, Highland hereby withdraws any pending motions to show cause or motions for contempt against Daugherty that allege Daugherty violated or is violating the permanent injunction. Highland also agrees not to seek to enforce the permanent injunction in any manner in the future.

---

[1] Daugherty previously satisfied the monetary judgment awarded to Highland, and Highland filed a release of the monetary judgment. Although Highland and Daugherty have agreed to vacate the monetary judgment awarded to Highland, Daugherty waives and relinquishes any right or claim to recover any amount previously paid in satisfaction of the Judgment and Highland shall not be required to reimburse Daugherty for his prior satisfaction of the monetary judgment. To the extent Daugherty is entitled to indemnification for any liabilities, losses, and damages allegedly incurred by him for actions taken in connection with Highland's business, including the liabilities Daugherty allegedly incurred in connection with this action and the Judgment, such indemnification claims have been fully and finally satisfied and resolved under the Settlement Agreement.

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 3 OF 5**
4851-6473-6986.4

8.      Concurrent with the filing of this Motion, Daugherty will file a motion to dismiss his as-yet unfiled petition for review pending before the Supreme Court of Texas under Case No. 19-0758.

9.      Highland and Daugherty further agree that any portions of the Judgment that are not specifically vacated pursuant to this Motion shall remain in full force and effect.

WHEREFORE, Highland and Daugherty pray that the Court grant this Motion in its entirety, and for all further relief, at law or in equity, the Court deems necessary.

Respectfully submitted,

GRAY REED & McGRAW LLP

By:    */s/ Sonya D. Reddy*_____
     ANDREW K. YORK
     State Bar No. 24051554
     E-mail: dyork@grayreed.com
     SONYA D. REDDY
     State Bar No. 24079188
     E-mail: sreddy@grayreed.com

1601 Elm Street, Suite 4600
Dallas, Texas 75201
(214) 954-4135
(214) 953-1332 (Fax)

**ATTORNEYS FOR PATRICK DAUGHERTY**

**CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing document has been transmitted by electronic transmission to all counsel of record on February ___, 2021, as follows:

| | |
|---|---|
| Marc D. Katz | Michael K. Hurst |
| Crystal J. Woods | A. Shonn Brown |
| DLA PIPER LLP (US) | Jonathan Childers |
| 1717 Main St., Suite 3700 | LYNN PINKER COX HURST, LLP |
| Dallas, Texas 75201 | 2100 Ross Ave., Suite 2700 |
| 214-743-4545 (Fax) | Dallas, Texas 75201 |
| marc.katz@dlapiper.com | (214) 981-3839 (Fax) |
| crystal.woods@dlapiper.com | mhurst@lynnllp.com |
| | sbrown@ lynnllp.com |
| Attorneys for Highland Capital | jchilders@ lynnllp.com |
| Management, L.P. | |
| | Attorneys for Third-Party Defendants HERA, |
| | Patrick Boyce, and William Britain |

    */s/ Sonya D. Reddy*_____
    SONYA D. REDDY

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 5 OF 5**
4851-6473-6986.4

**APPENDIX A** (signatures to follow)

1. James P. Seery, Jr.
2. Cameron Baynard
3. Nathan Burns
4. Timothy Cournoyer
5. Naomi Chisum
6. Stetson Clark
7. Sean Fox
8. Matthew Gray
9. Kristin Hendrix
10. David Klos
11. Vishal Patel
12. Thomas Surgent
13. Michael Throckmorton

Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 100 of 106

# EXHIBIT 7

# LYNN PINKER HURST SCHWEGMANN

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839
mhurst@lynnllp.com

Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
**lynnllp.com**

January 13, 2022

***Via FedEx and E-Mail***
Patrick Daugherty,
c/o Ruth Ann Daniels & Drew York
rdaniels@grayreed.com
dyork@grayreed.com
GRAY REED & MCGRAW, LLP
1601 Elm Street, Suite 4600
Dallas, Texas 75201

**Re:**   ***Litigation Hold:  Preservation of Information. Scott Byron***
***Ellington v. Patrick Daugherty Cause No. DC-22-00304, in the***
***101st Judicial District, Dallas County (the "Lawsuit").***

Dear Counsel:

Our Firm represents Scott Byron Ellington in the above-referenced Lawsuit.  Texas law requires Defendant Patrick Daugherty to preserve, maintain, and not destroy or delete documents and communications (whether in hard copy or electronic form) that are relevant or could be relevant to this litigation.

Please accept this letter as Mr. Ellington's formal written request that Mr. Daugherty, and any affiliated entities, employees, agents, or representatives of Mr. Daugherty, preserve documents and other evidence, including that stored in magnetic and/or electronic form ("Hold Notice").

The following definitions shall apply in this letter:

- "You" and "your" refers to Mr. Daugherty, your agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions, and their predecessors, successors or affiliates, and their respective agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.

- "Ellington Party" refers to Plaintiff Scott Ellington, Byron Ellington, Marcia Maslow, Adam Maslow, the two minor children of Marcia and Adam Maslow, Stephanie Archer and her minor child, and any person who was then accompanying any of the aforementioned individuals.

Ruth Ann Daniels
Drew York
January 13, 2022
Page 2

- "Ellington Location" refers 120 Cole Street, Dallas, Texas 75207, 3825 Potomac Ave, Dallas, Texas 75205, 4432 Potomac, Dallas, Texas 75025, 430 Glenbrook Dr., Murphy, Texas 75094, 5101 Creekside Ct., Parker, Texas 75094, any other residence or place of business of any Ellington Party, and any other location Mr. Daugherty believed to be associated with any Ellington Party.

- "Ellington Recordings" shall mean all electronic recordings of any Ellington Party or Ellington Location, including any persons or vehicles at such Ellington Locations.

## **Litigation Hold: Preservation of Information**

You are directed to immediately initiate a litigation hold for potentially relevant evidence comprised of (without limitation), documents, communications, tangible things, and as more fully defined below, electronically stored information (hereinafter "ESI") relating to:

(1) All claims and allegations contained within the Original Petition in this case;

(2) All factual, legal, affirmative, or other defenses Mr. Daugherty may assert in the Lawsuit;

(3) All counter-claims or third-party claims Mr. Daugherty may assert in the Lawsuit;

(4) All Ellington Recordings;

(5) All documents and communications evidencing the transmission of any Ellington Recording to any other party, person, or entity;

(6) All documents and communications with any other party, person, or entity regarding the Ellington Recordings and/or the observation, surveillance, or investigation of any Ellington Party or Ellington Location;

(7) All electronic or hand-written notes, memoranda, or other documents related to or evidencing Mr. Daugherty's recordation, observation, surveillance, or investigation of any Ellington Party or Ellington Location; and

(8) All documents and communications regarding any Ellington Party or Ellington Location from 1/1/2021 – present (or from the date Mr. Daugherty began his observation, surveillance, or investigation of any Ellington Party, if earlier than 1/1/2021).

Ruth Ann Daniels
Drew York
January 13, 2022
Page 3

You must act diligently and in good faith to secure compliance with such litigation hold and thereby preserve the aforementioned documents, tangible things, and ESI (hereinafter, the "Evidence").

You should anticipate that much of the information subject to disclosure or responsive to discovery in this matter is likely stored on current and former computer systems and other media and devices (including but not limited to personal digital assistants, voice-messaging systems, online repositories, e-mail servers, computer servers, and cellular telephones/smart phones) that belong to you or are in your possession, custody, or control.  For the avoidance of doubt, this includes any documents, communications, and information exchanged with your attorneys or otherwise subject to the attorney-client, work product, or other applicable claims of privilege as such information may be the subject of a privilege log or related motion practice.

"ESI" should be afforded the broadest possible definition and includes (by way of example, only, and not as an exclusive list) potentially relevant information electronically, magnetically, or optically stored (whether in final or draft form) as:

- Digital communications (e.g., e-mail, voice mail, text messages, instant messaging, messaging apps);
- Word-processed documents (e.g., Google Docs and Word documents);
- Email, Calendar and Diary Application Data (e.g., Outlook, Yahoo, blog tools);
- Spreadsheets and tables (e.g., Excel or Google Sheets);
- Social media communications (e.g., Facebook, Snapchat, Instagram, LinkedIn)
- Image and Facsimile Files (e.g., .pdf, .tiff, .jpg, .gif images);
- Sound Recordings (e.g., .wav and .mp3 files);
- Video and Animation (e.g., .avi, .mpg, .mpeg, .mp4, .flv, .mov files);
- Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations);
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Computer Aided Design/Drawing Files; and
- Back Up and Archival Files (e.g., Zip, .GHO).

Ruth Ann Daniels
Drew York
January 13, 2022
Page 4

## Suspension of Routine Destruction

You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations include:

- Purging the contents of e-mail repositories by age, capacity, or other criteria;
- Using data or media wiping, disposal, erasure, or encryption utilities or devices;
- Overwriting, erasing, destroying, or discarding back up media;
- Re-assigning, re-imaging, or disposing of systems, servers, devices, or media;
- Running antivirus or other programs effecting wholesale metadata alteration;
- Releasing or purging online storage repositories;
- Using metadata stripper utilities;
- Disabling server or IM logging; and
- Executing drive or file defragmentation or compression programs.

Adequate preservation of potentially relevant evidence requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of the Evidence. *Be advised that sources of ESI are altered and erased by continued use of your computers and other devices.* Booting a drive, examining its contents, or running any application will irretrievably alter the information it contains and may constitute unlawful spoliation of the Evidence.

## Guard Against Deletion

You should take affirmative steps to prevent anyone with access to your data, systems, and archives from seeking to modify, destroy, or hide ESI on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography, or the like). One way to protect existing data on local hard drives is by the creation and authentication of a forensically qualified image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bit stream image or clone of the drive. Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space and the swap file.

Ruth Ann Daniels
Drew York
January 13, 2022
Page 5

## Preservation in Native Form

You should anticipate that certain Evidence, including but not limited to spreadsheets and databases, may be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should preserve such Evidence in such native forms, and you should not select methods to preserve the Evidence that remove or degrade the ability to search it by electronic means or make it difficult or burdensome to access or use the information efficiently in a lawsuit. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make it not reasonably accessible and/or illegible.

## Metadata

You should further anticipate that the need to disclose and produce system and application metadata will arise, and you should immediately act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location, and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including: deleted content, draft language, commentary, collaboration and distribution data, and dates of creation and printing.  All electronically stored documents will contain metadata. You should preserve all metadata associated with any Evidence or other preserved information.

## Servers

With respect to servers like those used to manage electronic mail (e.g., Microsoft Exchange, Lotus Domino) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved.

## Paper Preservation of ESI is Inadequate

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you must preserve both forms.

## Agents, Attorneys and Third Parties

Your preservation obligation extends beyond Evidence in your care, possession, or custody and includes Evidence in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian, or contractor in possession of Evidence and instruct same to preserve such

Ruth Ann Daniels
Drew York
January 13, 2022
Page 6

Evidence to the full extent of their obligation to do so, and you must take reasonable steps to secure their compliance.

## **Failure to Comply – Sanctions**

Failure to preserve potentially relevant evidence resulting in the corruption, loss, or delay in production of evidence to which we are entitled would constitute spoliation of evidence and could subject you to severe court-imposed sanctions.

This preservation demand is continuing in nature and requires Mr. Daugherty's preservation of potentially relevant documents and materials that come into his possession, custody, or control after the date of this Hold Notice.

Please acknowledge receipt of this Hold Notice and promptly confirm that Mr. Daugherty will comply with this preservation demand. Please have your legal counsel contact me at the first opportunity so that we may discuss this matter.

Respectfully,

Michael K. Hurst

cc:    Mary Goodrich Nix (*of the Firm*)
       Nathaniel A. Plemons (*of the Firm*)
       Julie Pettit Greeson (*Co-counsel*)

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>  Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>  19-34054 (SGJ) | |
| DISTRICT IN WHICH CASE IS PENDING<br>  Northern District of Dallas | DIVISION OFFICE<br>  Dallas Division | NAME OF JUDGE<br>  Stacey G. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>  */s/ Jason S. Brookner* | | |
| DATE<br><br>  January 18, 2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>  Jason S. Brookner<br>  Gray Reed<br>  Attorney for Patrick Daugherty | |

## INSTRUCTIONS

   The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

   A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

   The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 82

Case 19-34054-sgj11 Doc 3445-82 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 4
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1559 of 1598   PageID 14606

Case 22-03003-sgj Doc 33 Filed 04/11/22   Entered 04/11/22 16:00:32   Page 1 of 3



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 11, 2022**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| SCOTT BYRON ELLINGTON,<br><br>     Petitioner,<br><br>    v.<br><br>PATRICK DAUGHERTY,<br><br>     Respondent. | Adv. Pro. No. 22-03003-sgj<br>*Removed from the 101st Judicial District Court of Dallas County, Texas Cause No. DC-22-0304* |

## ORDER GRANTING SCOTT ELLINGTON'S
## EMERGENCY MOTION TO ABSTAIN AND TO REMAND

This matter having come before the court on *Scott Ellington's Emergency Motion to Abstain and to Remand* in the above-captioned case; and this Court having considered all papers filed in support of or in opposition to the Motion, the oral argument of counsel, if any, and all other pleadings and papers on file herein, the Court finds as follows:

Case 19-34054-sgj11 Doc 3445-82 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 4
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1560 of 1598   PageID 14607
Case 22-03003-sgj Doc 33 Filed 04/11/22   Entered 04/11/22 16:00:32   Page 2 of 3

Scott Ellington's Emergency Motion to Abstain and to Remand is GRANTED; the Court abstains from hearing and trying this proceeding; and this action is remanded immediately to the 101st Judicial District Court in Dallas County, Texas.

IT IS SO ORDERED

### # # # End of Order # # #

Case 19-34054-sgj11 Doc 3445-82 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 4
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1561 of 1598 PageID 14608
Case 22-03003-sgj Doc 33 Filed 04/11/22 Entered 04/11/22 16:00:32 Page 3 of 3

Proposed form of order prepared by:

Frances A. Smith
State Bar No. 24033084
Eric Soderlund
State Bar No. 24037525
**ROSS & SMITH, PC**
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: frances.smith@judithwross.com
eric.soderlund@judithwross.com

Michelle Hartmann
State Bar No. 24032402
**BAKER & MCKENZIE LLP**
1900 North Pearl, Suite 1500
Dallas, Texas 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Email: michelle.hartmann@bakermckenzie.com

Debra A. Dandeneau
Blaire Cahn
**BAKER & MCKENZIE LLP**
452 Fifth Ave
New York, NY 10018
Telephone: 212-626-4875
Email: debra.dandeneau@bakermckenzie.com
Email: frank.grese@bakermckenzie.com
(*Admitted pro hac vice*)

*Co-Counsel for Scott Ellington*

**ORDER GRANTING SCOTT ELLINGTON'S**
**EMERGENCY MOTION TO ABSTAIN AND TO REMAND - Page 3**

# EXHIBIT 83

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 7
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1563 of 1598   PageID 14610
Case 19-34054-sgj11 Doc 912 Filed 08/03/20   Entered 08/03/20 12:52:52   Page 1 of 6

Docket #0912  Date Filed: 08/03/2020



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 3, 2020**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | § Case No. 19-34054-sgj11 |
| Debtor. | § |

### ORDER DIRECTING MEDIATION

      The Court has determined that mediation would aid and assist in the resolution of

numerous issues in the above-captioned case.  Accordingly, pursuant to 11 U.S.C. § 105 and this

Court's inherent authority to regulate its docket, **IS HEREBY ORDERED THAT:**

_____

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054200803000000000004

App. 1563

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 7
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1564 of 1598   PageID 14611
Case 19-34054-sgj11 Doc 912 Filed 08/03/20   Entered 08/03/20 12:52:52   Page 2 of 6

1.    The following parties are ordered to mediate as set forth below:  (i) Highland Capital Management, L.P. (the "Debtor"); (ii) the official committee of unsecured creditors appointed in the Debtor's bankruptcy case (the "Committee"); (iii) Acis Capital Management, L.P. and Acis Capital Management GP, LLC; (iv) UBS Securities LLC and UBS AG, London Branch; (v) the Redeemer Committee of the Highland Crusader Fund; and (vi) James Dondero.  The foregoing are collectively referred to herein as the "Parties" and individually as a "Party."

2.    One or more mediation sessions may be scheduled.  Such sessions are referred to herein collectively as the "Mediation" regardless of the number of days.  While exact date(s) have not yet been determined, it is currently anticipated that the Mediation will be held between August 21, 2020 and September 2, 2020.  The Mediation will be conducted via video conference.

3.    The Mediation will be administered by the American Arbitration Association ("AAA").  Retired Judge Allan Gropper and Sylvia Mayer are appointed to serve as co-mediators (the "Mediators").  The Mediators will confer and determine, in their discretion, whether one or both Mediators will participate in all or part of each mediation session.  The Mediators' fee will be $5,000 per Mediator per mediation session.  (For the avoidance of doubt, to the extent a Mediator does not participate in a particular mediation session, that Mediator will not bill for that session.)  A mediation session is one day of mediation.  There will not be an overtime charge if any of the mediation sessions go into the evening.  In addition to the daily fee per mediation session, Judge Gropper bills at an hourly rate of $600 and Ms. Mayer bills at an

APPX. 07364

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 7
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1565 of 1598   PageID 14612
Case 19-34054-sgj11 Doc 912 Filed 08/03/20   Entered 08/03/20 12:52:52   Page 3 of 6

hourly rate of $425 for time spent preparing for mediation sessions, including study time and communications with the Parties and/or between the Mediators.  The Mediators will each maintain time records provided that they may redact or exclude any confidential information.  In addition, the Mediators will submit invoices to AAA for their hourly fees for preparation and daily fees for mediation sessions.  At a minimum, the Mediators will respectively submit to AAA their first invoice prior to the start of the first mediation session and their final invoice within five (5) business days following conclusion of the last mediation session.  In their discretion, the Mediators may submit additional invoices.  The Mediators will provide the Parties with a copy of any invoices submitted to AAA.

4.      On or as soon as reasonably practicable following the date of this Order, the Debtor will deposit with AAA the sum of $90,000 (the "Deposit").  To the extent requested by AAA, the Debtor will supplement the Deposit as needed.  The Deposit will be credited against any fees or expenses incurred by AAA or invoiced by the Mediators.  Following conclusion of the Mediation and payment of AAA's fees and the Mediators' respective fees, any remaining funds on deposit shall be refunded to the Debtors.

5.      The Debtor will bear the costs of the Mediators' and AAA's fees and their reasonable and necessary expenses; *provided, however,* that, for the avoidance of doubt, with the exception of the Committee, each Party will bear its own legal and professional fees and expenses.  Payment will be tendered to the Mediators and AAA on the day of the Mediation.  Neither the Mediators nor AAA will be required to file a fee application or seek further approval from this Court for payment of the foregoing fees and expenses.

DOCS_NY:40872.7 36027/002

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 7
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1566 of 1598   PageID 14613
Case 19-34054-sgj11 Doc 912 Filed 08/03/20    Entered 08/03/20 12:52:52    Page 4 of 6

6.      Each Party will attend the Mediation and must continue participating in the Mediation as requested by the Mediators.  Each Party will designate a client representative with authority to settle on behalf of the respective Party any and all matters, subject to Bankruptcy Court approval in the case of any settlement(s) affecting the administration of the Debtor's bankruptcy estate; provided that, with respect to the Committee, the client representatives shall be the designated representatives of each of the members of the Committee, and the authority to settle on behalf of the Committee remains subject to the vote of such Committee member representatives in accordance with the Committee by-laws; and provided further that, it is understood that any final settlement, depending on its terms, magnitude and scope, may be subject to additional internal approvals such as Board approval.  The client representative of each Party will personally attend the Mediation as requested by the Mediators.

7.      The Mediators have the authority to require each Party and their client representatives and lawyers to attend additional days of Mediation, in their sole discretion, if the Mediators believe it may be fruitful.

8.      Each Party shall submit a written mediation statement to the Mediators. Each Party may share some or all of their mediation statement with other parties.  Any Party will, if requested to do so by the Mediators, provide written or oral proposals or counter-proposals, that can be circulated to a Party or the Parties pursuant to the Mediators' direction, during the course of Mediation.

9.      The Parties acknowledge that the Mediators may have *ex parte* communications with one or more Parties prior to or during the course of the Mediation.

DOCS_NY:40872.7 36027/002

APPX. 107366

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of 7
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1567 of 1598   PageID 14614
Case 19-34054-sgj11 Doc 912 Filed 08/03/20   Entered 08/03/20 12:52:52   Page 5 of 6

10.     Each of the Parties and their client representatives will participate in the Mediation in good faith.  The Mediators have the authority (but not the obligation) to report to this Court if they believe that any of the respective Parties is not participating in the Mediation in good faith.  The Court may sanction any of the respective Parties for failure to participate in the Mediation in good faith.

11.     Within five (5) business days after the conclusion of the Mediation, the Mediators will file a report with the Court stating only whether a settlement, in whole or in part, has been reached (the "Report").  Alternatively, in lieu of the Mediators filing the Report, the Mediators may provide the Parties with such a Report to be filed by the Debtors.

12.     Regardless of the outcome of the Mediation, it is the order of this Court that the contents of the Mediation, including any statements or representations made by the Mediators, any Party, or any client representative (or attorney or agent of a client representative), agent, or attorney of a Party during the course of the Mediation, are confidential and privileged. None of the Parties, their client representatives (or attorney or agent of a client representative), agents, or attorneys, or the Mediators may reveal such information to any non-party or to the Court, including, without limitation, in any pleadings or submissions, and none may be examined in any judicial or administrative proceeding (or any discovery relating to such a proceeding) regarding anything they may have said, seen, or heard during the course of the Mediation.  No term sheet or other document or draft thereof prepared in the course of the Mediation will ever be the subject of discovery nor will such documents ever be admissible at any trial. "In the course of the mediation" includes the Mediation sessions themselves, as well as materials

DOCS_NY:40872.7 36027/002

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of 7
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1568 of 1598   PageID 14615
Case 19-34054-sgj11 Doc 912 Filed 08/03/20   Entered 08/03/20 12:52:52   Page 6 of 6

submitted to the Mediators in advance of or during the Mediation, telephone conversations with one or both of the Mediators (or including the Mediators) before or after the Mediation sessions, and communications among the Parties specifically denominated as "in the course of mediation" and memorialized as such via electronic mail or otherwise among the Parties contemporaneously or in advance of that communication.  Without limiting any provision of this Order, all communications occurring, and information exchanged, in the course of the Mediation will be entitled to all protections applicable under Federal Rule of Evidence 408, or any other protections afforded to settlement and compromise communications under other applicable law.

13.    Notwithstanding anything to the contrary herein, it will be the responsibility of the Mediators to determine the structure of the Mediation and which Parties should be invited or required to participate in any particular Mediation session depending upon the content of such session.

<div align="center">

###END OF ORDER###

</div>

DOCS_NY:40872.7 36027/002

# EXHIBIT 84

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 6
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1570 of 1598   PageID 14617
Case 19-34054-sgj11 Doc 339 Filed 01/09/20   Entered 01/09/20 10:01:25   Page 1 of 5

Docket #0339  Date Filed: 01/09/2020



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 9, 2020**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § Related to Docket Nos. 7 & 259 |

### ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF
### UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR
### AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of*

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the*

*Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.



1934054200109000000000008

APPX. 07366

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 6
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1571 of 1598   PageID 14618
Case 19-34054-sgj11 Doc 339 Filed 01/09/20   Entered 01/09/20 19:01:35   Page 2 of 5

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED on the terms and conditions set forth herein, and the United States Trustee's objection to the Motion is OVERRULED.

2.    The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3.    The Debtor is authorized (A) to compensate the Independent Directors for their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of the following six months, provided that the parties will re-visit the director compensation after the sixth month and (B) to reimburse each Independent Director for all reasonable travel or other expenses, including expenses of counsel, incurred by such Independent Director in connection with its service as an Independent Director in accordance with the Debtor's expense reimbursement policy as in effect from time to time.

DOCS_NY:39973.13 36027/002

APPX. 10369

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 6
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1572 of 1598   PageID 14619
Case 19-34054-sgj11 Doc 339 Filed 01/09/20   Entered 01/09/20 19:01:35   Page 3 of 5

4.      The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.      The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.      All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.      Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.      Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.      Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.      No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

DOCS_NY:39973.13 36027/002

APPX. 107872

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 6
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1573 of 1598 PageID 14620
Case 19-34054-sgj11 Doc 339 Filed 01/09/20 Entered 01/09/20 19:01:35 Page 4 of 5

Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

        11.    Nothing in the Protocols, the Term Sheet or this Order shall affect or impair Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code. The Debtor shall not conduct any transactions or cause any transactions to be conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the Court. For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code, and shall be entitled to take all actions authorized therein without further order of the Court

        12.    Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

DOCS_NY:39973.13 36027/002

APPX. 107573

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 6
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1574 of 1598   PageID 14621
Case 19-34054-sgj11 Doc 339 Filed 01/09/20   Entered 01/09/20 19:01:35   Page 5 of 5

13.     The Court shall retain jurisdiction over all matters arising from or related to

the interpretation and implementation of this Order, including matters related to the Committee's

approval rights over the appointment and removal of the Independent Directors.

**## END OF ORDER ##**

DOCS_NY:39973.13 36027/002

**APPX. 07372**

# EXHIBIT 85

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1576 of 1598 PageID 14623
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:33 Page 1 of 9

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Dugaboy Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**SECOND AMENDED RESPONSE OF DUGABOY INVESTMENT TRUST
TO ORDER REQUIRING DISCLOSURES**

COMES NOW Dugaboy Investment Trust ("Dugaboy") and files this response of
Dugaboy Investment Trust to *Order Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered
by the Court *sua sponte* in the above styled and numbered Chapter 11 bankruptcy case (the
"Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), respectfully stating
as follows:

**I. RESPONSE**

1. The Court has entered an order requiring Dugaboy to make certain disclosures
relative to its standing in connection with the above captioned matter. The Court has already

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1577 of 1598 PageID 14624
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:22 Page 2 of 9

ruled on a number of matters before this Court that Dugaboy has possessed the requisite standing on matters that it has taken a position or filed a support pleading.

2. Dugaboy is named as a "Related Entity" and is enjoined by the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan"). *See* Dkt. No. 1811-9 at p. 19. As an enjoined party, Dugaboy has standing to seek relief from the Plan. *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").

3. Dugaboy is a named defendant in the matter styled *Official Committee of Unsecured Creditors vs. CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., The Dugaboy Investment Trust, Grant James Scott III in his individual capacity, as Trustee of The Dugaboy Investment Trust, and as Trustee of The Get Good Nonexempt Trust, and James D. Dondero* (Case No. 20-03195) and has been advised that it will be added as a defendant in an additional adversary proceeding to be filed going forward. In the adversary proceeding where Dugaboy is named as a defendant the standing of Dugaboy is not at issue. What will be at issue in those cases is whether Dugaboy should be a named party and whether the Plaintiff in those cases has asserted a recognizable cause of action against Dugaboy.

4. Further, Dugaboy has standing based upon the proofs of claim that it filed in this bankruptcy case. Although the Debtor has challenged Dugaboy's claims, it has the right to assert the claims and participate in these bankruptcy proceedings as a party in interest.

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1578 of 1598   PageID 14625
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21   Entered 07/09/21 19:02:22   Page 3 of 9

## II.    DISCLOSURES

5.      Dugaboy is a Delaware Trust.  As a Trust, it has no owners, rather, beneficiaries and a trustee.  Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents.  The Trust Agreement is dated October 2010 and it is styled "Trust Agreement between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees."

6.      The Trust has three (3) trustees each with a different function.  The Trust creates an Administrative Trustee, a Family Trustee and an Independent Trustee.  The initial Trustees were Commonwealth Trust Company as Administrative Trustee, James D. Dondero as Family Trustee and Grant Scott as Independent Trust.  The current Family Trustee is Nancy Dondero, the sister of James D. Dondero.

7.      The Trust Agreement creates three (3) separate trusts under the Dugaboy Investment Trust.  The first is for the benefit of James D. Dondero, the second is for children and the third is for descendants.

8.      The Trust owns an 0.1866% Class A interest in the Debtor and has filed proofs claim numbered 113, 131, and 177.

9.      Proof of Claim No. 177 is an administrative proof of claim for the mismanagement of certain funds by the Debtor.

10.      Proof of Claim No. 113 relates to the Debtor's 2008 tax return, which is currently being audited, which audit may result in the Debtor being liable to its limited partners, including Dugaboy.  Proof of Claim No. 113 also relates to the Debtor's failure to make certain tax distributions to the limited partners, including Dugaboy, from 2004 through 2018. The amount of this claim is uncertain, but Dugaboy has requested certain information from the Debtor in order

{00376120-1}                                          3

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S    Document 8-24    Filed 12/29/23    Page 1579 of 1598    PageID 14626
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21    Entered 07/09/21 19:02:22    Page 4 of 9

to calculate a precise amount.  Dugaboy obtained its status as a limited partner in the Debtor through its status as successor-in-interest to the Canis Major Trust.

11.    Lastly, Proof of Claim 131 relates to two Master Securities Lending Agreements that Dugaboy entered into with Highland Select Equity Master Fund in 2014 and 2015. Dugaboy made various loans to Highland Select in the form of 2,015,000 shares of NexPoint Credit Strategies Fund valued at $20,270,900.  Dugaboy made various other loans in 2015.  The Master Securities Lending Agreements were mostly terminated in July 2019.  Pursuant to the Termination of Loan, Select and Dugaboy agreed to terminate the 2015 MSLA and partially terminate the 2014 MSLA such that a large number of the loaned securities remained due and owing to Dugaboy under the Loan Agreements.

12.    From 2015 until the termination of the Loan Agreements in 2019, Select and/or the Debtor made numerous repayments of the securities loaned by Dugaboy. However, a substantial number of the loaned securities have not been repaid and remain outstanding.

13.    As of the Petition Date, Dugaboy has not been repaid the outstanding shares and is owed repayment of the loaned securities or the cash value of the loaned securities, plus accrued interest, in the amount of $12,041,438. A summary of the loan account is attached as Exhibit B to the *Response of the Dugaboy Investment Trust to the Debtor's First Omnibus Objection to Certain Proofs of Claim* [Dkt. No. 1153].

14.    The gist of Dugaboy's claim is premised on the fact that the Debtor was general partner or *de facto* general partner of Highland Select and directed that the loaned funds be used for the sole benefit of the Debtor, thereby obligating the Debtor on the loans.

15.    Objections are pending to each of the proofs of claim that have been filed.

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1580 of 1598 PageID 14627
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:22 Page 5 of 9

16. In addition, Dugaboy is the maker of a note held by the Debtor that is the subject
of the Creditors' Committee Adversary Proceeding.

July 9, 2021.

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Michael E. Landis, La. Bar No. 36542
mlandis@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, counsel for The Dugaboy Investment Trust, do hereby certify that I
caused a copy of the above and foregoing to be served on **July 9, 2021**, via the Court's ECF
Notification System as follows:

- David G. Adams    david.g.adams@usdoj.gov,
  southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com;amy-
  anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-
  8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com

{00376120-1}                          5

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:23-cv-00726-S  Document 8-24  Filed 12/29/23   Page 1581 of 1598  PageID 14628
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21    Entered 07/09/21 19:02:22    Page 6 of 9

- Paul Richard Bessette    pbessette@KSLAW.com,
  ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com
  ;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com
- Matthew Glenn Bouslog    mbouslog@gibsondunn.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com,
  lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-
  8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel
  l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com,ny-
  courtmail@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Deborah Rose Deitsch-Perez    deborah.deitschperez@stinson.com,
  patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com;lsc@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com,
  dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dento
  ns.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbro
  uphy@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1582 of 1598 PageID 14629
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:22 Page 7 of 9

- Margaret Michelle Hartmann    michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com, astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;mary-beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell    william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Michael Justin Lang    mlang@cwl.law, nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen    eleen@mkbllp.com
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Brant C. Martin    brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain    brent.mcilwain@hklaw.com, robert.jones@hklaw.com;brian.smith@hklaw.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com, txefilingnotice@sidley.com;charles-persons-5722@ecf.pacerpro.com

APPx. 073370

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1583 of 1598 PageID 14630
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:22 Page 8 of 9

- Louis M. Phillips   louis.phillips@kellyhart.com, june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt   mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz   jpomerantz@pszjlaw.com
- Kimberly A. Posin   kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok   jprostok@forsheyprostok.com, jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece   lreece@pbfcm.com
- Penny Packard Reid   preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen   srosen@forsheyprostok.com, jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina   drukavina@munsch.com
- Amanda Melanie Rush   asrush@jonesday.com
- Alyssa Russell   alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti   mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller   douglas.schneller@rimonlaw.com
- Michelle E. Shriro   mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich   nskolnekovich@hunton.com, astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith   frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund   eric.soderlund@judithwross.com
- Martin A. Sosland   martin.sosland@butlersnow.com, ecf.notices@butlersnow.com;velvet.johnson@butlersnow.com
- Laurie A. Spindler   Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer   jsundhimer@btlaw.com
- Kesha Tanabe   kesha@tanabelaw.com
- Clay M. Taylor   clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons   bankruptcy@abernathy-law.com
- Dennis M. Twomey   dtwomey@sidley.com
- Basil A. Umari   BUmari@dykema.com, pelliott@dykema.com
- United States Trustee   ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz   artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek   jvasek@munsch.com
- Donna K. Webb   donna.webb@usdoj.gov, brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber   bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller   dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka   danw@ldsrlaw.com, craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com

App. 01383

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 10 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1584 of 1598   PageID 14631
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21   Entered 07/09/21 19:02:22   Page 9 of 9

- Hayley R. Winograd     hwinograd@pszjlaw.com
- Megan Young-John     myoung-john@porterhedges.com

*/s/Douglas S. Draper.*

# EXHIBIT 86

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1586 of 1598   PageID 14633
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 1 of 13



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 17, 2021**

United States Bankruptcy Judge

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

## ORDER REQUIRING DISCLOSURES

### I.    Introduction.

This Order is issued by the court *sua sponte* pursuant to Section 105 of the Bankruptcy Code

and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties

who ask for relief in the above-referenced case. More specifically, the Order is directed at clarifying

the party-in-interest status or standing of numerous parties who are regularly filing pleadings in the

above-referenced 20-month-old Chapter 11 bankruptcy case. The court has determined that there is

_____

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1587 of 1598 PageID 14634
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 2 of 13

a need to: (a) fully understand whether such parties (defined below) have statutory or constitutional standing with regard to recurring matters on which they frequently file lengthy and contentious pleadings and, if so, (b) ascertain whether their interests are sufficiently aligned such that the parties might be required to file joint pleadings hence forth, rather than each file pleadings that are similar in content. The court has commented many times that certain active parties (*i.e.,* Mr. James Dondero and numerous non-debtor entities that he controls—hereinafter the "Non-Debtor Dondero-Related Entities") seem to have tenuous standing. Mr. Dondero is, of course, the Debtor's co-founder, former President, Chief Executive Officer ("CEO"), and indirect beneficial equity owner.[2] Since standing is a subject matter jurisdiction concern, the court has determined that it is in the interests of judicial economy to gain some clarity with regard to the standing of the various Non-Debtor Dondero-Related Entities. It is also in the interests of judicial economy, the interests of other parties in this case, and in the interest of reducing administrative expenses of this estate that there be consolidation of pleadings, wherever possible, of the Non-Debtor Dondero-Related Entities.

---

[2] In addition to being the former CEO, Mr. Dondero represents that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. This court has stated on various occasions that this assertion is ostensibly true, but somewhat tenuous. Mr. Dondero filed five proofs of claim in the Debtor's bankruptcy case. Two of those proofs of claim were withdrawn with prejudice on November 23, 2020 [DE # 1460]. The other three are unliquidated, contingent claims, each of which stated that Mr. Dondero would "update his claim in the next ninety days." Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge. With regard to Mr. Dondero's assertion that he is an "indirect equity security holder," the details have been represented to the court many times to be as follows (undisputed): Mr. Dondero holds no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests. The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

APPX. 10733

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1588 of 1598   PageID 14635
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 3 of 13

## II.    Background: The Chapter 11 Case.[3]

On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief

under Chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that is in the

business of buying, selling, and managing assets on behalf of its managed investment vehicles.  It

manages billions of dollars of assets—to be clear, the assets are spread out in numerous, separate

fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-

possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the

bankruptcy case and ultimately terminated. The Debtor's current CEO is an individual selected by

the creditors named James P. Seery.

Specifically, early in the case, the Official Unsecured Creditors Committee ("UCC") and

the U.S. Trustee ("UST") desired to have a Chapter 11 Trustee appointed—absent some major

change in corporate governance[4]—due to conflicts of interest and the alleged self-serving, improper

acts of Mr. Dondero and possibly other officers (for example, allegedly engaging, for years, in

fraudulent schemes to put Highland's assets out of the reach of creditors).  Under this pressure, the

Debtor negotiated a term sheet and settlement with the UCC (the "January 2020 Corporate

Governance Settlement"), which was executed by Mr. Dondero and approved by a court order on

January 9, 2020 (the "January 2020 Corporate Governance Order").[5] The settlement and term sheet

contemplated a complete overhaul of the corporate governance structure of the Debtor.  Mr.

Dondero resigned from his role as an officer and director of the Debtor and of its general partner.

Three new independent directors (the "Independent Board") were appointed to govern the Debtor's

---

[3] For a more detailed factual description of some of the disputed issues in this case, see the Memorandum of Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO, entered June 7, 2021, DE # 190, in AP # 20-3190.

[4] The UST was steadfast in wanting a Trustee.

[5] *See* DE ## 281 & 339.

APPX. 10738

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1589 of 1598 PageID 14636
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 4 of 13

general partner Strand Advisors, Inc.—which, in turn, managed the Debtor. All of the new Independent Board members were selected by the UCC and are very experienced within either the industry in which the Debtor operates, restructuring, or both (Retired Bankruptcy Judge Russell Nelms, John Dubel, and James P. Seery). As noted above, one of the Independent Board members, James P. Seery ("Mr. Seery"), was ultimately appointed as the Debtor's new CEO and CRO.[6] As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as and retain the title of a portfolio manager for certain separate *non-Debtor* investment vehicles/entities whose funds are managed by the Debtor. The court approved this arrangement when the UCC ultimately did not oppose it. Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board, and Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities. Significant to the court and the UCC was a provision in the order, at paragraph 9, stating that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."

To be sure, this was a complex arrangement. Apparently, there were well-meaning professionals in the case that thought that having the founder and "face" behind the Highland brand still involved with the business might be value-enhancing for the Debtor and its creditors (even though Mr. Dondero was perceived as not being the type of fiduciary needed to steer the ship through bankruptcy). For sake of clarity, it should be understood that there are at least hundreds of

---

[6] "CRO" means Chief Restructuring Officer. *See* DE # 854, entered July 16, 2020.

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1590 of 1598 PageID 14637
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 5 of 13

entities—the lawyers have sometimes said 2,000 entities—within the Highland byzantine organizational structure (sometimes referred to as the "Highland complex"), most of which are ***not*** subsidiaries of the Debtor, nor otherwise owned by Highland. And only Highland itself is in bankruptcy. However, these entities are very much intertwined with Highland—in that they have shared services agreements, sub-advisory agreements, payroll reimbursement agreements, or perhaps, in some cases, less formal arrangements with Highland. Through these agreements Highland (***through its own employees***) has historically provided resources such as fund managers, legal and accounting services, IT support, office space, and other overhead. Many of these non-Debtor entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio manager for many or most of them—although Mr. Dondero and certain of these entities stress that these entities have board members with independent decision making power and are not the mere "puppets" of Mr. Dondero. This court has never been provided a complete organizational chart that shows ownership and affiliations of all 2,000 Non-Debtor Dondero-Related Entities, but the court has, on occasion, been shown information about some of them and is aware that a great many of them were formed in non-U.S. jurisdictions, such as the Cayman Islands.

Eventually, the Debtor's new Independent Board and management concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity. Various events occurred that led to the termination of his employment with the Debtor. For one thing, Mr. Dondero prominently opposed certain actions taken by the Debtor through its CEO and Independent Board including: (a) objecting to a significant settlement that the Debtor had reached in court-ordered mediation[7] with creditors Acis Capital Management and Josh and Jennifer Terry (the "Acis

---

[7] The court appointed Retired Bankruptcy Judge Allan Gropper, S.D.N.Y., and Attorney Sylvia Mayer, Houston, Texas (both with the American Arbitration Association), to be co-mediators over multiple disputes in the Bankruptcy Case, including the Acis dispute. The co-mediators, among other things, attempted to mediate disputes/issues with Mr. Dondero.

APPX. 10736

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1591 of 1598 PageID 14638
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 6 of 13

Settlement")—which settlement helped pave the way toward a consensual Chapter 11 plan, and (b) pursuing, through one of his family trusts (the Dugaboy Investment Trust), a proof of claim alleging that the Debtor (including Mr. Seery) had mismanaged one of the Debtor's subsidiaries, Highland Multi Strategy Credit Fund, L.P. ("MSCF") with respect to the sale of certain of its assets during the bankruptcy case (in May of 2020).[8] The Debtor's Independent Board and management considered these two actions to create a conflict of interest— if Mr. Dondero was going to litigate significant issues against the Debtor in court, that was his right, but he could not continue to work for the Debtor (among other things, having access to its computers and office space) while litigating these issues with the Debtor in court.

But the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero. In fact, literally a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain Non-Debtor Dondero-Related Entities, on the one hand, and the Debtor on the other.

At the present time, 11 adversary proceedings have been filed related to this bankruptcy case involving Non-Debtor Dondero-Related Entities. Additionally, Non-Debtor Dondero-Related entities have filed 11 appeals of bankruptcy court orders. Non-Debtor Dondero-Related entities have begun filing lawsuits relating to the bankruptcy case in other *fora* that are the subject of contempt motions.

III.    **The Non-Debtor Dondero-Related Entities**.

The following are the Non-Debtor Dondero-Related Entities encompassed by this Order and their known counsel[9]:

---

[8] *See, e.g.,* Proof of Claim No. 177 and DE # 1154.
[9] There are three other entities that the court is not including in this Order at this time, since, although they have appeared in the past, they are no longer active in the case because of either resolving issues with the Debtor or other reasons: (a) Highland CLO Funding Ltd. (previously represented by the law firm of King and Spaulding); (b) Hunter

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23    Page 1592 of 1598   PageID 14639
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 7 of 13

A.  *James D. Dondero*

Mr. Dondero has had three law firms representing him in the bankruptcy proceedings:  Bonds Ellis Eppich Schafer Jones LLP; Stinson L.L.P.; and Crawford Wishnew Lang.

As earlier mentioned, Mr. Dondero has three pending proofs of claim that are unliquidated, contingent claims. Each of these claims state that Mr. Dondero would "update his claim in the next ninety days."  Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge.  While this court is unclear what the alleged amount of Mr. Dondero's three unliquidated, contingent proofs of claim might be, the court takes judicial notice that the Debtor has filed an adversary proceeding (Adv. Proc. # 21-3003) alleging that Mr. Dondero is liable to three bankruptcy estate on three demand notes, on which the total amount due and owing is $9,004,013.07. Mr. Dondero has also been sued along with CLO Holdco, Grant Scott, Charitable DAF Holdco, Charitable DAF Fund, Highland Dallas Foundation, and the Get Good Trust for alleged fraudulent transfers in Adv. Proc. # 20-3195.

As far as equity interests in the Debtor, the Debtor is a Delaware limited partnership. The general partner is named Strand Advisors, Inc. ("Strand"). Mr. Dondero owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner, but gave up control of Strand pursuant to a court-approved corporate governance agreement reached in this case in January 2020, to which Mr. Dondero agreed. As of the Petition Date, the Debtor's limited partnership interests were held: (a) 99.5% by an entity called Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust (Mr. Dondero's family trust—described below), (c) 0.0627% by the retired co-founder of the Debtor, Mark Okada, personally and through family trusts, and (d) 0.25% by Strand. These limited partnership interests were in three classes (Class A, Class B, and Class C).  The

---

Mountain Trust (previously represented by Sullivan Hazeltine Allinson and Rochelle McCullough); and (c) NexBank (previously represented by Alston & Bird).

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1593 of 1598 PageID 14640
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 8 of 13

Class A interests were held by The Dugaboy Investment Trust, Mark Okada, and Strand. The Class B and C interests were held by Hunter Mountain Investment Trust and Hunter Mountain. The significance of this is that the Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. And, of course, Mr. Dondero's recovery on his equity interest in Strand is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

B. _The Dugaboy Investment Trust ("Dugaboy") and Get Good Nonexempt Trust ("Get Good")_

The Dugaboy and Get Good Trusts are represented by the law firm Heller Draper & Horn.

Mr. Dondero is the beneficiary of Dugaboy and the settlor of Get Good (and family members are the beneficiaries). It has been represented in pleadings that Get Good is a trust established under the laws of the State of Texas. It has been represented in pleadings that Dugaboy is a trust established under the laws of the State of Delaware. At least as of the Petition Date, an individual named Grant Scott (a long-time friend of Mr. Dondero's, who is a patent lawyer and resides in Colorado) is the trustee of both. Mr. Dondero's sister may also be a trustee of Dugaboy.

As mentioned above, Dugaboy owns a 0.1866% of the Class A junior limited partnership interest in the Debtor.

Get Good has filed a proof of claim in this Bankruptcy Proceeding (submitted by Grant Scott). Dugaboy has filed several proofs of claim in this Bankruptcy Proceeding (all were submitted by Grant Scott). The court is not aware of the nature or amount of these claims, except the court has been apprised that: (a) one Dugaboy proof of claim alleges that Highland is obligated on a debt

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 10 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1594 of 1598   PageID 14641
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21   Entered 06/18/21 09:09:15   Page 9 of 13

owed to Dugaboy by an entity known as Highland Select, allegedly because Highland is Highland Select's general partner and might also be its alter ego; and (b) another proof of claim asserts postpetition mismanagement by the Debtor of assets of one or more Debtor subsidiaries. While the court knows nothing about the Get Good proof of claim, it does know that the Get Good Trust (along with others, including Grant Scott) has been sued for alleged fraudulent transfers in an adversary proceeding in this case (Adv. Proc. # 20-3195)—which may affect the allowability of its proof of claim.

C. *Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA") (sometimes collectively referred to as the "Advisors")*

These entities have been represented by the K&L Gates law firm at times and currently are represented by the law firm of Munsch Hardt Kopf & Harr. The entities are registered investment advisors that previously had shared services agreements with the Debtor.

It has been represented that Mr. Dondero directly or indirectly owns and/or effectively controls each of the Advisors. He is the President of each of them.

It is the court's understanding that both of these entities withdrew their original proofs of claim. However, the Advisors filed an application for an administrative expense claim on January 24, 2021, relating to services the Advisors allege the Debtor did not perform under a shared services agreement. The Debtor has since filed an objection to the claim and the matter is set for trial on September 28, 2021. Further, the Debtor has filed an adversary proceeding (Adv. Pro. # 21-3004) alleging that HCMFA owes the Debtor an aggregate of $7,687,653.07 pursuant to two promissory notes and the Debtor has filed an adversary proceeding (Adv. Pro. # 21-3005) alleging that NPA owes the Debtor $23,071,195.03 pursuant to a promissory note.

APPX. 07594

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1595 of 1598 PageID 14642
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 10 of 13

D. *Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund*

These entities are represented by the K&L Gates law firm. They are apparently each managed by the Advisors and these funds are specifically managed by Mr. Dondero as portfolio manager.

The court has no idea who owns these companies (assuming they should be regarded as separate companies). The court does not know which, if any of them, have filed proofs of claims.

E. *Charitable DAF Holdco, Ltd. ("DAF Holdco"), Charitable DAF Fund, LP ("DAF"), Highland Dallas Foundation, Inc., ("Highland Dallas Foundation")*

These entities are represented by the law firms of Kelly Hart Pitre and Sbaiti & Company PLCC.

It has been represented to the court that the DAF is managed by DAF Holdco, which is the managing member of the DAF. It has further been represented to the court that DAF Holdco is owned by three different purported charitable foundations: Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. (collectively, the "Highland Foundations"). DAF Holdco is an exempted company incorporated in the Cayman Islands. Grant Scott has apparently, until recently, served as its managing member. The DAF is an exempted company incorporated in the Cayman Islands. Highland Dallas Foundation is a Delaware nonprofit, nonstock corporation.

Mr. Dondero is the president and one of the three directors of each of the Highland Foundations. Apparently, Grant Scott was recently replaced by a former Highland employee named Mark Patrick (who is now an employee of Skyview Group, an entity created by former Highland employees). Although the Debtor is the non-discretionary investment advisor to the

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-24 Filed 12/29/23 Page 1596 of 1598 PageID 14643
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 11 of 13

DAF, the Debtor does not have the right or ability to control or direct the DAF or CLO Holdco. Instead, the DAF takes and considers investment and payment advice from the Debtor, but ultimate decisions are in the control of Mr. Patrick, presumably at Mr. Dondero's direction.

The court is not aware whether these entities have filed proofs of claim. However, they, along with Messrs. Dondero and Scott, CLO Holdco and the Get Good have been sued for fraudulent transfers in Adv. Proc. # 20-3195.

F. *CLO Holdco, Ltd.*

This entity was previously represented by the law firm of Kane Russell Coleman & Logan and more recently is represented by the law firm of Sbaiti & Company PLLC.

CLO Holdco is a wholly owned and controlled subsidiary of the DAF. CLO Holdco is an exempted company incorporated in the Cayman Islands. CLO Holdco has filed two proofs of claim in this Bankruptcy Proceeding. Both proofs of claim were submitted by Grant Scott in his capacity as Director of CLO Holdco.

CLO Holdco, along with Messrs. Dondero and Scott, DAF Holdco, DAF Fund, Highland Dallas Foundation, and the Get Good have been sued for fraudulent transfers in Adv. Proc. # 20-3195.

G. *NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes, Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by any of the foregoing and any of their subsidiaries (sometimes collectively referred to as "NPRE")*

These entities are represented by the law firm of Wick Phillips Gould & Martin, LLP.

The entity known as HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) is alleged to owe the Debtor over $11 million pursuant to five promissory notes (as asserted in Adv.

11

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-24   Filed 12/29/23   Page 1597 of 1598   PageID 14644
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 12 of 13

Pro. # 21-3007). The court understands this same entity has filed a proof of claim relating to its alleged interest in "SE Multifamily Holdings, LLC," which has been objected to and has not been resolved.

The court has no idea who owns or manages these companies or what exact function they play in the Highland complex of companies. The court does not know anything about the substance of the proof of claims.

### H.  *Highland Capital Management Services, Inc.*

This entity appears to be represented by both Wick Phillips Gould & Martin, LLP (which also represents NPRE) and Stinson L.L.P. (which also sometimes represents Mr. Dondero personally).

This entity earlier filed two proofs of claim that were objected to and disallowed.  Also, this entity is alleged to owe the Debtor approximately $7.7 million pursuant to five different promissory notes (as asserted in Adv. Pro. # 21-3006).  The court has no idea who owns or manages this company or what exact function it plays in the Highland complex of companies.

### IV.  Disclosure Requirement

Accordingly, in furtherance of this court's desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings (rather than have a proliferation of similar pleadings) it is hereby **ORDERED** that:

Within 21 days of the entry of this Order, the Non-Debtor Dondero-Related Entities named in this Order shall file a Notice in this case disclosing thereon: (a) who owns the entity (showing percentages);[10] (b) whether Mr. Dondero or his family trusts have either a direct or indirect

---

[10] With regard to any minor children who may be beneficiaries of trusts, actual names should not be used (Child 1, Child 2, *etc.* would be sufficient).

12

ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the

officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity; and (d)

whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and

substance of its claims).

### End of Order ###