PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Reorganized Debtor. | ) |
| | ) |

## APPENDIX IN SUPPORT OF HIGHLAND'S OBJECTION TO RENEWED
## MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 AND BRIEF IN SUPPORT

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.


1934054221031000000000000003

| Ex. | Description | Appx. # |
|---|---|---|
| 1. | *Order* affirming Bankruptcy Court's Contempt Order, Case No. 3:21-cv-01590-N, Docket No. 42 (N.D. Tex. August 17, 2022) | 1-14 |
| 2. | Transcript of August 31, 2022 Hearing | 15-42 |
| 3. | **RESERVED** | 43-76 |
| 4. | **RESERVED** | 77-183 |
| 5. | *Answering Brief of Appellee Highland Capital Management, L.P.*, Case No. 3:21-cv-00879-K, Docket No. 20 (N.D. Tex. July 28, 2021) | 184-244 |
| 6. | *Appendix in Support of Answering Brief of Appellee Highland Capital Management, L.P. Brief*, Case No. 3:21-cv-00879-K, Docket No. 21 (N.D. Tex. July 28, 2021) | 245-2048 |
| 7. | *Appellants' Response to Debtor's Motion for Leave to Intervene in Appeal of Recusal Order*, Case No. 3:21-cv-00879-K, Docket No. 5 (N.D. Tex. May 17, 2021) | 2049-2064 |
| 8. | *Order* on Debtor's Motion for Leave to Intervene in Appeal of Recusal Order, Case No. 3:21-cv-00879-K, Docket No. 10 (N.D. Tex. June 10, 2021) | 2065-2068 |
| 9. | *Memorandum Opinion and Order*, Case No. 3:21-cv-00879-K, Docket No. 28 (N.D. Tex. December 10, 2021) | 2069-2073 |
| 10. | *Appellants' Response to the Court's December 10, 2021 Memorandum Opinion and Order*, Case No. 3:21-cv-00879-K, Docket No. 29 (N.D. Tex. December 15, 2021) | 2074-2084 |
| 11. | *Debtor's Response to Appellants' Brief Regarding the Court's December 10, 2021 Memorandum Opinion and Order*, Case No. 3:21-cv-00879-K, Docket No. 31 (N.D. Tex. December 20, 2021) | 2085-2097 |
| 12. | *Memorandum Opinion and Order*, Case No. 3:21-cv-00879-K, Docket No. 39 (N.D. Tex. February 9, 2022) | 2098-2112 |
| 13. | *Partial Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (March 6, 2019) | 2113-2175 |
| 14. | *Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (April 29, 2019) | 2176-2199 |
| 15. | *May 17, 2019 Transcript,* Daugherty v. Highland Capital Management, L.P., C.A. No. 2018-0488-MTZ (Del. Ch. May 17, 2019) | 2200-2297 |
| 16. | *Order Denying Application to Certify Interlocutory Appeal,* C.A. No. 2018-0488-MTZ (Del. Ch. July 8, 2019) | 2298-2311 |

APP.14687

| Ex. | Description | Appx. # |
|---|---|---|
| 17. | *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry For Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) | 2312-2316 |
| 18. | *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*, Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) | 2317-2546 |
| 19. | *Opinion* affirming Confirmation Order, Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) | 2547-2631 |
| 20. | *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) | 2632-2636 |
| 21. | *Motion for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) | 2637-2796 |
| 22. | Transcript of December 2, 2019 hearing (Bankr. D. Del. December 2, 2019) | 2797-2935 |
| 23. | Transcript of January 9, 2020 hearing | 2936-3027 |
| 24. | Transcript of February 19, 2020 hearing | 3028-3216 |
| 25. | Transcript of March 4, 2020 hearing | 3217-3338 |
| 26. | Transcript of December 16, 2020 hearing | 3339-3405 |
| 27. | Letter from K&L Gates dated December 22, 2020 | 3406-3409 |
| 28. | Letter from K&L Gates dated December 23, 2020 | 3410-3413 |
| 29. | Transcript of January 26, 2021 hearing | 3414-3671 |
| 30. | Transcript of February 8, 2021 Bench Ruling on Confirmation Hearing | 3672-3723 |
| 31. | Transcript of January 8, 2021 hearing, Adversary Proc. No. 20-03190-sgj (Bankr. N.D. Tex. January 8, 2021) | 3724-3929 |
| 32. | Transcript of May 20, 2021 hearing | 3930-4016 |
| 33. | *Memorandum Opinion and Order*, Case No. 21-cv-03129-B, Docket No. 28 (N.D. Tex. Sep. 2, 2022) | 4017-4038 |

| Ex. | Description | Appx. # |
|---|---|---|
| 34. | *Debtor's Amended Witness and Exhibit List With Respect to Evidentiary Hearing to be Held on June 8, 2021* [Docket No. 2421] | 4039-4102 |
| 35. | Transcript of September 12, 2022 hearing | 4103-4164 |
| 36. | Chart re: Matters Awaiting Final Judgment | 4165-4169 |

*[Remainder of Page Intentionally Blank]*

Dated:  October 31, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88   Exhibit 1   Filed 12/29/23   Page 7 of 1392   PageID 14749
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 1 of 13   PageID 11629

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAMES DONDERO,                     §
                                   §
          Appellant,               §
                                   §
v.                                 §          Civil Action No. 3:21-CV-1590-N
                                   §
HIGHLAND CAPITAL                   §
MANAGEMENT, L.P.,                  §
                                   §
          Appellee.                §

## ORDER

This Order addresses James Dondero's appeal [16] from an Order of Contempt of

the Bankruptcy Court for the Northern District of Texas against him. *See Highland Cap.*

*Mgmt., L.P. v. Dondero* (*In re Highland Cap. Mgmt., L.P.*), 2021 WL 2326350 (Bankr.

N.D. Tex. June 7, 2021) (the "Contempt Order"). The parties agree that one of the

monetary sanctions exceeded the Bankruptcy Court's authority, and the Court therefore

reverses that penalty. With respect to all other challenged components of the contempt

order, however, the Court finds neither clear error nor abuse of discretion and affirms.

### I. THE ORIGINS OF THE DISPUTE

This is an appeal from an Order of the Bankruptcy Court for the Northern District

of Texas finding Dondero in contempt for violating the terms of a Temporary Restraining

Order ("TRO") and assessing monetary sanctions. In its order, the Bankruptcy Court

thoroughly detailed the history of the bankruptcy case that ultimately led to the adversary

proceeding in which Dondero was held in contempt. Contempt Order, at *2–3. The

ORDER – PAGE 1

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 1 Filed 12/30/23   Page 8 of 1392   PageID 14750
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 2 of 13   PageID 11630

bankruptcy involved a large alternative asset manager, Highland Capital Management, L.P.

("Highland"). *Id.* at *2. Dondero co-founded Highland and at the time of its entry into

Chapter 11 bankruptcy served as its President and CEO. *Id.* at *1.

　　　To understand the contempt finding at issue in this appeal requires some discussion

of the relationship between the bankruptcy debtor — Highland Capital Management, L.P.

— and many related entities that were not part of the bankruptcy case, some of which

remain under Dondero's control to this day. As the Bankruptcy Court cogently explained:

> [I]t should be understood that there are at least hundreds of entities—the
> lawyers have sometimes said 2,000 entities—within the Highland byzantine
> organizational structure (sometimes referred to as the "Highland complex"),
> most of which are not subsidiaries of the Debtor, nor otherwise owned by
> Highland. And only Highland itself is in bankruptcy. However, these entities
> are very much intertwined with Highland—in that they have shared services
> agreements, sub-advisory agreements, payroll reimbursement agreements, or
> perhaps, in some cases, less formal arrangements with Highland. Through
> these agreements Highland (through its own employees) has historically
> provided resources such as fund managers, legal and accounting services, IT
> support, office space, and other overhead. Many of these non-Debtor entities
> appear to be under the de facto control of Mr. Dondero—as he is the president
> and portfolio manager for many or most of them—although Mr. Dondero and
> certain of these entities stress that these entities have board members with
> independent decision-making power and are not the mere "puppets" of Mr.
> Dondero [(the "Dondero-Affiliated Entities")].

*Id.* at *3.

　　　Early in the case — under pressure from the Unsecured Creditors Committee

("UCC") and U.S. Trustee, who wanted a Chapter 11 trustee appointed — Dondero agreed

to resign to permit a "complete overhaul of the governance structure" at Highland. *Id.* at

*2. A new board of Independent Directors came in, one of whom ultimately became

Highland's CEO. *Id.* Dondero remained an unpaid employee of Highland while

ORDER – PAGE 2

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88    Filed 12/29/23    Page 9 of 1392    PageID 14751
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 3 of 13    PageID 11631

continuing to serve as a portfolio manager for several non-debtor investment vehicles (whose assets Highland managed on their behalf).  *Id.*

Permitting Dondero to retain a formal relationship with Highland soon became "untenable" after he began vocally opposing aspects of the bankruptcy process and challenging actions taken by the new CEO.  *Id.* at *3.  Highland terminated Dondero, after which the tension only increased.  *Id.*

In November 2020, shortly after Dondero's termination, Highland's new CEO ordered the disposition of assets — SKY and AVYA equity securities — held by several special-purpose entities ("SPEs") managed by Highland.  *Id.* at *6, *14.  The SPEs held assets, which backed claims on the cashflows generated by those assets.  Each SPE issued different classes of these claims, each with different payment priority.  This general scheme describes a wide variety of debt investments collectively referred to as "structured products."  In this case specifically, the claims were collateralized loan obligations ("CLOs"), though the relevant investments owned by the SPEs were actually stocks instead of loans.  *Id.* at *6.  Some of the Dondero-Affiliated Entities owned the riskiest category of the structured products issued by the SPEs managed by Highland.  *Id.*  Crucially, the terms of this investment did not imbue the owner of these investments with any right to control the manner in which Highland managed the SPEs' assets.  *Id.*

Dondero (on behalf of certain Dondero-Affiliated Entities) contacted Highland employees and instructed them to stop trading the securities.  *Id.*  Based on this interference, Highland moved for entry of a TRO.  *Id.* at *7.  The Bankruptcy Court held a hearing and

ORDER – PAGE 3

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 11-1 Exhibit 1 Filed 08/30/23    Page 10 of 1392    PageID 14752
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 4 of 13    PageID 11632

entered a TRO against Dondero on December 10, 2020. *Id.* at *10.  The TRO prohibited

Dondero from:

> (a) communicating (whether orally, in writing, or otherwise), directly or
> indirectly, with any Board member unless Mr. Dondero's counsel and
> counsel for the Debtor are included in any such communication; (b) making
> any express or implied threats of any nature against the Debtor or any of its
> directors, officers, employees, professionals, or agents; (c) communicating
> with any of the Debtor's employees, except as it specifically relates to shared
> services currently provided to affiliates owned or controlled by Mr. Dondero;
> (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's
> business, including but not limited to the Debtor's decisions concerning its
> operations, management, treatment of claims, disposition of assets owned or
> controlled by the Debtor, and pursuit of the Plan or any alternative to the
> Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code.

*Id.* at *7.

Almost immediately, Highland became aware that Dondero was continuing to

behave adversely to its interests in ways that arguably violated the terms of the TRO. *Id.*

at *14.  Less than a month after the Bankruptcy Court entered the TRO — before the

hearing on a preliminary in junction could even be held — Highland filed a motion for

contempt. *Id.* at *7, *8 n.44.  After a two-day hearing, the Bankruptcy Court found that

Dondero had attempted to interfere in Highland's trading in SKY and AVYA securities

after the TRO went into effect. *Id.* at *21.  It also found that he had impermissible contacts

with Highland employees. *Id.* at *22.  The Bankruptcy Court held him in contempt and

assessed two monetary sanctions: $450,000 in compensatory damages for Highland's legal

expenses and a further $100,000 for each unsuccessful appeal (or request for

reconsideration) of the contempt order. *Id.* at *25–26.

ORDER – PAGE 4

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 1   Filed 02/28/24   Page 11 of 1392   PageID 14753
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 5 of 13   PageID 11633

Dondero appeals the Bankruptcy Court's contempt order. He asserts that the finding that he interfered with Highland's trading activity after the TRO lacks any evidentiary support. He also argues that the provision of the TRO pertaining to permissible contacts with Highland employees is impermissibly vague. Finally, he contends that the monetary sanctions are marred — in whole or in part — by various deficiencies.

## II. STANDARD OF REVIEW

A district court "reviews a bankruptcy court's findings of fact for clear error, and its legal conclusions de novo." *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 261 (5th Cir. 2009). It reviews contempt orders for abuse of discretion. *FDIC v. LeGrand*, 43 F.3d 163, 166 (5th Cir. 1995). A court may hold a party in contempt where it has found by clear and convincing evidence that "1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). The movant bears the burden of proof on these points. *Id.*

## III. THE BANKRUPTCY COURT'S FINDING OF POST-TRO VIOLATIONS IS NOT CLEARLY ERRONEOUS

The Bankruptcy Court found that Dondero had violated the TRO by interfering with Highland's sales of SKY and AVYA equity securities in late December 2020. Dondero objects that no evidence in the record supports a finding of interference in any dispositions occurring after the TRO went into effect. The Court concludes, however, that evidence in

ORDER – PAGE 5

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1-33 Filed 07/02/23   Page 12 of 1392   PageID 14754
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 6 of 13   PageID 11634

the record (and cited by the Bankruptcy Court in its Order) reasonably supports the finding of a post-TRO violation.

Though the Bankruptcy Court's order does quote from emails and reference events that occurred prior to the TRO, the record supports the Court's ultimate conclusion that Dondero interfered with Highland's trading in late December.  For one, Dondero admitted at a deposition in early January that he had interfered with dispositions in late December.  R. 06838–06839.[1]  On appeal, Dondero suggests without explicitly asserting (because it would be an incorrect statement) that the transcript of the deposition was not properly in evidence in the contempt proceeding.[2]  Even were that true, however, it would not suffice to demonstrate clear error.  Without a doubt, Dondero denied any post-TRO interference in his live testimony at the hearing on the motion for contempt.  R. 08958.  But Highland's counsel impeached him with his earlier inconsistent testimony.  R. 08959.  At that point, the Bankruptcy Court as fact finder properly weighed the witness's credibility to determine which of the inconsistent statements was true.  It concluded that the earlier admission was truthful.  Nothing more need be said on this point.  The Bankruptcy Court's factual conclusion does not constitute clear error.

---

[1] For clarity, the Court refers to material in the Record on Appeal by reference to Bates numbers.  An index for the record can be found at Docket Entry 7-1.
[2] The transcript came in as part of Highland's Exhibit 28, which the Bankruptcy Court admitted into evidence.  R. 08912.

ORDER – PAGE 6

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 1  Filed 09/08/23 4  Page 13 of 1392    PageID 14755
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 7 of 13    PageID 11635

## IV.  THE TRO STATED ITS TERMS
## WITH SUFFICIENT CLARITY

Dondero next asserts two purely legal arguments why the TRO cannot serve as a basis for contempt.  Both arguments turn on whether the TRO met the specificity requirements of Federal Rule of Civil Procedure 65(d).  First, he argues that the TRO impermissibly required reference to a document other than the TRO itself.  Alternatively, Dondero contends that the TRO failed to state clearly and unambiguously the conduct that it prohibited.  Neither argument is availing.

The TRO proscribed "communication with any of [Highland's] employees, except as it specifically relates to shared services currently provided to" Dondero-affiliated entities connected to Highland.  Contempt Order, at *7.  Dondero argues that this clause requires reference to the written agreements between these affiliated entities and Highland.  As a matter of pure textual analysis, this argument fails.  It does not expressly refer the reader to any written agreement at all.  Rather than incorporate the specifics of an outside writing, the TRO merely refers to the operational reality — those "services currently provided" — as of the time the TRO took effect.  As the former lead executive at Highland no one was as well-placed to understand the way Highland and the relevant entities had conducted themselves previously.  Dondero's attempts to muddy the waters by casting doubt on the future arrangement between Highland and the Dondero-affiliated entities (as Highland emerged from bankruptcy) fails to establish that the TRO required reference to documents presumably predating the bankruptcy.  And, as Highland points out by way of a parade of horribles, it is difficult to identify a limiting principle in Dondero's argument.  Appellee's

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 1-1    Filed 03/30/23    Page 14 of 1392    PageID 14756
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 8 of 13    PageID 11636

Br., at 22 [34] (asking whether Dondero's argument implies that the TRO's reference to Highland's employees requires resort to a written employee roster).  The Court agrees that Dondero's interpretation of Rule 65(d) would create an unworkable standard.

As an alternate argument, Dondero contends that the same section of the TRO fails to state the conduct it prohibits with adequate specificity, thereby violating Rule 65(d). Much of this argument repackages the objection to the purported incorporation of the shared services agreements raised in the first argument.  Dondero draws heavily from several clauses of these agreements to demonstrate the ambiguity they create with respect to what conduct is or is not permitted by the TRO.  But the language of these agreements only matters insofar as the TRO requires resort to them, a position this Court has already rejected.  The principle of fair notice guides the application of the specificity standard — the TRO's proscriptive language should "be framed so that those enjoined will know what conduct the court has prohibited." *Am. Airlines*, 228 F.3d at 578 (quoting *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981)).  Consequently, the "mere fact that . . . interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him." *Martin's Herend Imps., Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999).  The Court holds that the challenged provision of the TRO meets this fair notice standard considering that the enjoined individual was the long-time chief executive of the Highland empire and had sufficient insight into how services were shared between Highland and the related entities to enable him to comply.

ORDER – PAGE 8

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 1 Filed 12/29/0814 Page 15 of 1392    PageID 14757
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 9 of 13    PageID 11637

At the conclusion of his challenge to the TRO's specificity, in a single short paragraph, Dondero also challenges the factual findings supporting the conclusion that he failed to comply with the TRO.  The Bankruptcy Court enumerated numerous offending contacts between Dondero and Highland employees, only a subset of which he challenges.  The Court concludes that the myriad communications identified by the Bankruptcy Court substantiate its factual finding sufficiently to surpass the low bar of clear error review easily.

### V.  THE COURT REVERSES THE UNSUCCESSFUL-APPEAL SANCTION BUT AFFIRMS THE COMPENSATORY SANCTION

Dondero attacks both categories of monetary sanctions awarded by the Bankruptcy Court.  First, he argues that it lacked the authority to impose a $100,000 sanction for "each level of rehearing, appeal, or petition for *certiorari*" unsuccessfully pursued.  Contempt Order, at *26.  Highland concedes this point in its brief.  Accordingly, this Court reverses the forward-looking sanction applicable to unsuccessful appeals.

The Bankruptcy Court also awarded the Highland $450,000 to compensate it for the "loss and expense resulting from [Dondero's] non-compliance with the TRO." *Id.*  This award consists of $365,921 in attorney's fees incurred in December 2020 and January 2021, $33,400 in estimated legal fees preparing for and conducting the hearing on the motion for contempt, and an additional $50,000 in estimated additional expenses.  *Id.* at *25.  Dondero complains that (i) the fees from December 2020 and January 2021 lack proper support, (ii) the Bankruptcy Court lacked authority to award compensatory damages for the latter two categories at all, and (iii) that all three categories include fees for work

ORDER – PAGE 9

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-1 Filed 12/29/23 Page 16 of 1392   PageID 14758
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 10 of 13   PageID 11638

not associated with the claims on which Highland prevailed.  The Court rejects all of these

arguments and affirms the Bankruptcy Court's compensatory damages award.

Courts possess an inherent power to enforce their orders via civil contempt.  *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977).  "Discretion, including the discretion to award attorneys' fees, must be left to a court in the enforcement of its decrees." *Id.*  Quite logically, then, a Bankruptcy Court's assessment of monetary sanctions for civil contempt is reviewed for abuse of discretion.  *In re Bradley*, 588 F.3d at 261.  Likewise, the basis for the *amount* of attorney's fees awarded by the court is also assessed under an abuse of discretion standard.  *See Cook*, 559 F.2d at 273 (holding that amount of attorney's fees awarded as compensatory damages in civil contempt proceeding must conform to standard articulated in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

The Court first dispenses with Dondero's objection that the Bankruptcy Court abused its discretion in awarding fees incurred during the period from December 2020 to January 2021.  In support of this amount, Highland provided eighty-seven pages of line-by-line time entries that specified the biller and the work performed.  R. 008108–008196. That these records date back to November (before issuance of the TRO) is of no moment because the Bankruptcy Court only awarded attorney's fees for work performed during December and January.  Contempt Order at *25.  The Bankruptcy Court, relying on its familiarity with the work provided by Highland's counsel garnered in the course of this proceeding scrutinized the time entries to ensure that it included only work that pertained to the contempt proceeding.  The amount awarded for December 2020 constitutes less than

ORDER – PAGE 10

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-1   Filed 12/29/23   Page 17 of 1392   PageID 14759
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 11 of 13   PageID 11639

a third of the total amount billed to Highland for December 2020 by its counsel. The Bankruptcy Court concluded that the documentation before it adequately established the reasonableness and necessity of the fees charged. It had ample experience with Highland's counsel — both in terms of the nature of the work and its cost — garnered over the course of this years-long proceeding. Relying on those voluminous records does not constitute an abuse of discretion.

The Court next addresses Dondero's contention that the Bankruptcy Court impermissibly included fees predating the contemptuous conduct. Assuming the Bankruptcy Court included fees incurred in preparing or arguing the motion for TRO, did it abuse its discretion? Dondero argues, citing *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017), that the Bankruptcy Court could only award fees that would not have been incurred but-for his misconduct. While this rule did apply to restrict the Bankruptcy Court's authority to grant fees, Dondero's frames his but-for test far more narrowly than the language of *Goodyear Tire* requires. A trial court "may decide, for example, that all (or a set percentage) of a particular category of expenses — say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct." *Goodyear Tire*, 137 S. Ct. at 1187. Some circumstances warrant the shifting of all fees in a case (or from a moment in the case). *Id.* Where a specific course of litigant misconduct sets off a new phase of litigation that results in a party incurring fees which it would not have incurred absent the misconduct, a court may properly shift fees for that entire phase of the case. *See id.* at 1188 (noting that a court may shift fees from some moment onward if "all fees in the litigation, or a phase of it, . . . would not have been incurred except for the misconduct").

ORDER – PAGE 11

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-1 Filed 12/23/2314 Page 18 of 1392    PageID 14760
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 12 of 13    PageID 11640

This phase of the case began with Dondero's November misconduct which resulted in the issuance of a TRO. That pattern of conduct — the behavior found contemptuous closely mirrors the interference giving rise to the TRO — continued largely unabated through the relevant period in time. The Bankruptcy Court did not abuse its discretion in concluding that the fees related to the TRO would not have been incurred but-for the discrete pattern of misconduct giving rise to the ultimate finding of contempt.

Dondero's argument that the but-for test prohibits the inclusion of fees incurred in support of non-contemptuous conduct also fails. Unlike in *Fox v. Vice*, 563 U.S. 826 (2011), a precursor case to *Goodyear Tire*, the issue is one of *factual allegations* and not discrete *legal claims*. Highland alleged a broad set of facts in support of the same legal theory. The level of specificity in billing that Dondero seeks to impose is utterly unworkable because no attorneys segregate their billing based on the factual allegation they are currently working in support of. Moreover, as the Supreme Court squarely addressed this kind of nit-picky argument when it noted:

> The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of the district court's superior understanding of the litigation.

*Fox*, 563 U.S. at 838 (internal citations omitted). In sum, the Bankruptcy Court did not abuse its discretion in awarding attorney's fees for the work related to the contempt motion, including work addressing factual allegations ultimately found noncontemptuous.

ORDER – PAGE 12

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-1 Filed 12/14/2 /23 14   Page 19 of 1392   PageID 14761
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 13 of 13   PageID 11641

Finally, the Court affirms the Bankruptcy Court's inclusion of estimated fees related to the contempt hearing itself as well as for additional expenses.  Again, "trial courts may take into account their overall sense of a suit[] and may use estimates in calculating and allocating" attorney's fees.  *Id.*  The Bankruptcy Court used extremely conservative assumptions regarding the additional time expended in preparing for and conducting the hearing.  The Bankruptcy Court likewise drew on its substantial knowledge of the scope of work required in this case to arrive at a conservative estimate for legal work and other necessary expenses associated with prosecuting Dondero's contemptuous conduct.  While Dondero may seek "auditing perfection," that is not the standard.  This Court rejects the contention that the Bankruptcy Court's compensatory sanction rose to the level of an abuse of discretion.

## CONCLUSION

In consideration of the foregoing, the Court affirms all challenged components of the Bankruptcy Court's Contempt Order, save for its sanction of $100,000 for each unsuccessful appeal of that Order.  As to the unsuccessful-appeal penalty, the Court reverses the Bankruptcy Court's sanction as an abuse of discretion.

Signed August 17, 2022.

David C. Godbey
United States District Judge

ORDER – PAGE 13

# EXHIBIT 2

```
 1                   IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                            DALLAS DIVISION

 3                              )   Case No. 19-34054-sgj-11
    In Re:                      )   Chapter 11
 4                              )
    HIGHLAND CAPITAL            )   Dallas, Texas
 5  MANAGEMENT, L.P.,           )   August 31, 2022
                                )   9:30 a.m. Docket
 6       Reorganized Debtor.    )
                                )   STATUS CONFERENCE RE: MOTION
 7                              )   FOR FINAL APPEALABLE ORDER
                                )   FILED BY JAMES DONDERO
 8  _____    )   [3406]

 9                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                UNITED STATES BANKRUPTCY JUDGE.

11  APPEARANCES:

12  For the Reorganized        Jeffrey Nathan Pomerantz
    Debtor:                    PACHULSKI STANG ZIEHL & JONES, LLP
13                             10100 Santa Monica Blvd.,
                                11th Floor
14                             Los Angeles, CA  90067
                               (310) 277-6910
15
    For the Reorganized        Melissa S. Hayward
16  Debtor:                    HAYWARD, PLLC
                               10501 N. Central Expressway,
17                              Suite 106
                               Dallas, TX  75231
18                             (972) 755-7104

19  For James Dondero,         Michael Justin Lang
    Movant:                    CRAWFORD WISHNEW & LANG, PLLC
20                             1700 Pacific Avenue, Suite 2390
                               Dallas, TX  75201
21                             (214) 817-4500

22  Recorded by:               Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
23                             1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
24                             (214) 753-2062

25
```

2

1     Transcribed by:              Kathy Rehling
                                   311 Paradise Cove
2                                  Shady Shores, TX   76208
                                   (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
         Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

3

```
 1              DALLAS, TEXAS - AUGUST 31, 2022 - 9:40 A.M.

 2              THE COURT:  All right.  We have a status conference

 3    in the Highland matter.  So, before I get appearances, let me

 4    just kind of set the stage here.  The impetus for this was a

 5    motion filed by six different entities, including James

 6    Dondero and NexPoint and HCMFA and Dugaboy Family Trust.  It

 7    was titled a Motion for Final Appealable Order and Supplement

 8    to Motion to Recuse Pursuant to 28 U.S.C. Section 455.

 9         So that was filed, and then Highland filed a motion to

10    strike certain items that were in the appendix.  And there was

11    -- how many -- I've been counting pages here.  I think there

12    was a 365-page appendix.  And Highland wanted to strike

13    certain documents in that appendix.  And then there was an

14    alternative request by Highland to compel depositions of

15    certain persons if those documents weren't stricken.

16         So I felt the need for a status conference.  After

17    originally setting this motion for hearing, I decided to

18    convert today to a status conference because, to be perfectly

19    honest, I didn't understand what in the heck the Movants were

20    procedurally seeking.

21         Okay.  So, I'm aware that Highland's motion to strike and

22    Highland's motion to compel were later resolved by

23    stipulation, but -- and then I guess an amended motion was

24    filed by Movants.  But I'm still confused, and so I just want

25    to kind of talk about process and procedure.
```

4

1      I will say -- and I see Mr. Pomerantz on the video, and

2  Ms. Hayward and many others -- if we want to talk more

3  generally status, I'm open to that, because I have become

4  aware that the Fifth Circuit affirmed in substantial part the

5  confirmation order, so I don't know if, in light of that, the

6  parties want to talk about big-picture status.

7              MR. POMERANTZ:  Your Honor, I could address that

8  briefly.  I don't think we're prepared today --

9              THE COURT:  Okay.

10             MR. POMERANTZ:  -- for a number of reasons.  One

11 because the other adversaries aren't here.  But suffice it to

12 say we read the order and we intend to bring an appropriate

13 motion before Your Honor to implement the Fifth Circuit

14 opinion, and will do so relatively soon.

15             THE COURT:  Okay.  Thank you.  All right.  So, with

16 that, let me go ahead and get formal appearances on the motion

17 before the Court.  So, for the Movants, Mr. Lang, are you the

18 one appearing for the Movants?

19             MR. LANG:  Yes, Your Honor.

20             THE COURT:  All right.  And for Highland, who do we

21 have appearing on this motion, the status conference?

22             MR. POMERANTZ:  Good morning.  Jeff Pomerantz;

23 Pachulski Stang Ziehl & Jones; on behalf of Highland Capital.

24             THE COURT:  Okay.  And I'll just ask.  I know we have

25 observers, but is there anyone else who wanted to make an

5

1  appearance on this particular motion?

2      (No response.)

3          THE COURT:  All right.  Well, Mr. Lang, I'm turning

4  it over to you.  Can you explain to me exactly what you're

5  seeking with your motion?  I know it's about recusal, --

6          MR. LANG:  Sure.

7          THE COURT:  -- but we've plowed a lot of ground, and

8  I'm kind of confused about the --

9          MR. LANG:  No, that's good.  That's fair.

10         THE COURT:  -- procedure.

11         MR. LANG:  And I just want to let you know that we

12  conferred with Highland's counsel, and they have no objection

13  -- and I understand the Court, you know, has some issues that

14  you want to discuss -- but they have no objection to our

15  request to remove the reservation language.

16     Highland also, now that we have stipulated to the removal

17  of the three documents that they had an issue with, Highland

18  also doesn't object to Movants' appendix and supplementing the

19  record.  And likewise, Movants do not object to Highland's

20  appendix and supplementation of the record.  Just so you know,

21  that's unopposed on those issues.

22     With respect to what we are seeking, we are seeking for

23  the Court just to issue an order removing the reservation

24  language.  As the Court is aware, Judge Kinkeade raised the

25  issue about that reservation language in the response

6

 1   briefing.  Highland seized upon that language and -- or,

 2   argued that the recusal order was not final because Your Honor

 3   had, you know, could potentially supplement or amend the

 4   recusal order in the future.

 5       And we are trying to get this in a position to get this

 6   reviewed on appeal, even if it's through mandamus, and are

 7   trying to eliminate any obstacles that might pop up due to

 8   that reservation language.  So, it's really that simple on

 9   that issue.

10           THE COURT:  Okay.  Let me --

11           MR. POMERANTZ:  Your Honor, may I --

12           THE COURT:  Well, yes, but let me just ask this one

13   very basic question.  If all you are seeking at the end of the

14   day is for this Court to remove the one sentence at the end of

15   the March order that provided the Court reserves the right to

16   supplement or amend, why didn't you just file a motion saying

17   that?

18           MR. LANG:  Well, we say --

19           THE COURT:  And what I'm talking about is it's a

20   lengthy motion.  As I mentioned, it had 365 pages of

21   supplemental material.  And that's why we're here on a status

22   conference, because I didn't understand exactly what you were

23   seeking to do.  You know, why would you file such a thick

24   motion if all you were seeking was for me to remove?  Why

25   wouldn't you have just said -- you know, I guess cited Rule

7

1   54?  I guess that would be the applicable authority.  I mean,

2   so help me to understand.  Have you evolved your approach?

3   Did you originally think you wanted more and then now you're

4   seeking to narrow it to just having the Court delete that

5   sentence, or what?

6              MR. LANG:  No.  That goes to your second issue about

7   the supplementation.  You know, the United States Supreme

8   Court in the *Liteky* case states that, you know, when you've

9   got a recusal, you look at events occurring in the course of

10  the proceedings that evidence deep-seated favoritism or

11  antagonism.  So you look at the entire course of the

12  proceeding.

13      We put in additional examples.  I think all but one of the

14  transcripts was after the recusal motion was filed and after

15  the order.  And it is, you know, this isn't a single-issue

16  case and it's not a situation where, you know, for example,

17  the Court owns stock in a company that was one of the parties.

18  This is, you know, from our perspective, it's an ongoing case

19  that's still in process, and that in the course of the

20  proceedings there have been statements made and things that

21  happened that we believe are going to be reviewed to apply the

22  standard.

23      And so it is -- the supplementation goes to things that

24  happened after the recusal.  And so we are supplementing to

25  add that.  And that's -- even the Fifth Circuit says that you

Case 19-34054-sgj11   Doc 3596-2   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 2   Filed 09/30/23   Page 28 of 1392   PageID 14770

8

1  look at the entire course of the judicial proceedings when

2  reviewing a recusal motion.

3      So that's -- that was the second point that you raised,

4  which is why, 17 months after the order, are we supplementing?

5  It is because the proceedings continued and we believe it's

6  just additional examples and -- that support the relief that

7  we request, and we're putting it in the record, and we wanted

8  the Court to review it.

9      I think we say in the motion, or in the reply, you know,

10  we don't -- we don't think the Court is going to come to a

11  different conclusion, but regardless, we wanted to put the

12  information in the record and put it before the Court, and the

13  Court can review it and make the ruling that the Court is

14  going to make, and then we'll just go from there.

15          THE COURT:  All right.  One more question for now,

16  and then, Mr. Pomerantz, I'll hear from you.

17      Again, I care about procedure, as I hope any court does.

18  It occurred to me that there were two ways that might

19  procedurally be proper to raise the issues here.  One, as I

20  mentioned, just a simple, I guess, Rule 54 motion:  Please,

21  Judge, take out that last sentence of your order, because some

22  day we want to have a final order that we can appeal.  And I

23  don't think taking out that order, I mean, that one sentence,

24  is going to make it a final order.

25      But then the second -- so that could have been the motion.

9

1  Or you could have filed just a new motion to recuse, I guess,

2  and added a new record.

3      But it just felt like you were -- well, I was just

4  confused.  That's why we're here.  And I said I was going to

5  turn to Mr. Pomerantz, but one more question for you.  Do you

6  think if I remove the one sentence from my March 2021 order,

7  all of a sudden you have a final appealable order that you

8  could immediately file a new appeal on?

9          MR. LANG:  No.  What I previously said was that that

10  language, as Highland argued, creates, you know, an argument

11  that the Court has left open the issue on recusal.  And we

12  think that removing that language makes Your Honor's ruling on

13  this final for purposes of allowing us to seek mandamus.  So

14  that's -- that's why we -- just remove the argument that if we

15  seek mandamus, that, no, the Court is not done with this

16  issue, the Court has left open the prospect, you know,

17  prospect of later amending or supplementing the ruling.  And

18  so we're just trying to get that hurdle out of the way.

19          THE COURT:  Okay.  So you acknowledge that if the

20  last sentence is removed, it's still not going to be a final

21  appealable order because of the posture of the bankruptcy

22  case, but you think it somehow gives you the ability to seek a

23  petition for writ of mandamus?

24          MR. LANG:  I think it removes an argument when we

25  seek a petition for writ of mandamus that this is not -- that

1    the Court is not done with this issue and therefore it would

2    be premature.

3        So we're just removing -- again, the argument was made

4    after Judge Kinkeade raised the issue about that language in

5    the order, the argument was made by Highland that that

6    language means that the Court is not done with the issue,

7    potentially not done, and the Court reserved the right to

8    visit that issue at a later date, and therefore, you know, the

9    judge -- the Court's not done dealing with the issue.

10        So we are asking the Court, just remove that language,

11    remove that potential obstacle, and allow us to go forward

12    with whatever procedural rights we have.

13            THE COURT:  Okay.

14            MR. LANG:  We're not asking the Court --

15            THE COURT:  I'm just trying --

16            MR. LANG:  -- to declare --

17            THE COURT:  I'm trying not to waste judicial

18    resources.  And as I understood the Judge Kinkeade ruling,

19    which I went back and read -- I hadn't read it before you

20    filed this new motion -- while he makes a passing reference to

21    the last sentence of my March 2021 order, he gives about five

22    reasons why an order denying a motion to recuse is not a final

23    appealable order until the end of the proceedings it's filed

24    in.

25        And so I read the opinion as there was established case

11

 1  law that, even if that last sentence hadn't been in there, you

 2  didn't have a final appealable order.  Do you read it

 3  differently?

 4           MR. LANG:  No, I don't read his opinion differently.

 5  And that's why I said that, you know, as far as the petition

 6  for writ of mandamus, we don't have to have a final -- the

 7  proceeding doesn't have to be final.  It's a different avenue

 8  for appeal.

 9       And so Judge Kinkeade did not consider, even though we

10  asked him to go ahead and just consider this a petition for

11  writ of mandamus, Judge Kinkeade denied that request, so he

12  did not rule on that issue.  And that's why, again, removing

13  the language eliminates the argument under the mandamus --

14  when the mandamus is filed, it just eliminates the argument

15  that the Court is not done dealing with the issue.

16           THE COURT:  He denied -- okay.  Well, there was

17  something in that ruling that made you think, hey, if you go

18  back and get this last sentence removed, then maybe I would

19  consider a petition for writ of mandamus in this context?

20           MR. LANG:  No.  At the end of the order, he said he

21  denies Appellants' request to construe their appeal as a

22  petition for writ of mandamus.  So the way it was procedurally

23  postured, he said it could not be appealed.

24           THE COURT:  Did --

25           MR. LANG:  But the mandamus position remains open.

12

 1   And when he, being Judge Kinkeade, after the briefs were

 2   filed, he obviously was looking at it, he questioned his

 3   jurisdiction, he requested briefing on the jurisdiction,

 4   because in that order that he sent out requesting the

 5   briefing, he pointed out -- you know, one of the issues he

 6   pointed out was the Court's language, the reservation language

 7   in the order.  And, again, Highland argued that because of

 8   that language, among other things, that language made the

 9   order not final.

10       So all we're saying, all we're asking is just remove that

11   language so when we file the writ of mandamus that argument

12   isn't there.  The Court is done dealing with the issue.

13   Nobody can disagree with it.

14       You know, nobody -- Highland is not agreeing that we, you

15   know, can seek mandamus, so I'm not saying that.  And I'm not

16   asking the Court to agree to that.  Mandamus is a -- we

17   believe is an option.  It's still on the table.  And we're

18   just dealing with one issue that came up before and just

19   trying to head it off before -- so that we don't have to come

20   back down and ask the Court to remove it later.

21           THE COURT:  All right.  Mr. Pomerantz, what do you

22   want to say about this?

23           MR. POMERANTZ:  So, Your Honor, this is extremely

24   frustrating.  I know Your Honor had said you didn't want to

25   waste Court time.  There has already been a tremendous amount

13

 1  of Court time that's wasted.

 2      When we got this motion, it was a head-scratcher.  We read

 3  it as seeking way more things than what Mr. Lang is saying

 4  now.  If he had called up and asked us if we had any issue,

 5  subject to Your Honor's agreement, to remove that last

 6  sentence, we would have said we don't, because the briefing

 7  before the District Court and the District Court's decision

 8  have really nothing to do with that last sentence.  Maybe the

 9  -- Judge Kinkeade mentioned it in his December order, but it's

10  clear, as Your Honor mentions, from the reading of the

11  District Court opinion that it is irrelevant.

12      And the argument that the Court, the District Court which

13  denied interlocutory appeal is somehow, once that sentence is

14  eliminated, going to entertain and grant a writ of mandamus is

15  farcical.  It's just not going to happen.  And unfortunately,

16  what's going to happen is we're going to have to spend more

17  time, more money, and more effort.

18      And Your Honor, I know the motion to strike has been

19  resolved, but I'd just like to mention it, because this is --

20  continues to be frustrating from the Highland side.  They

21  filed an appendix that sought to slip in three letters written

22  by attorneys for various Dondero entities that were

23  essentially a smear campaign, a smear campaign on Mr. Seery, a

24  smear campaign on the Independent Directors, incidentally,

25  which may be actionable in its own right.

14

1        That had nothing to do with bias.  They wanted to slip

2    that in, somehow it would get into the appellate record, if

3    and when they ever got to an appeals court.

4        So what do we do, Your Honor?  We called them up, called

5    Mr. Lang up and said, will you withdraw the letters?  There's

6    no basis for those to be included in the appendix.  He said

7    no.  Said, okay, will you make the deponents -- the people who

8    wrote the letters available for deposition?  Wouldn't agree to

9    that, either.

10       And then we go to the time and the money, we file our

11   motion to strike, and lo and behold, which has become a

12   considerable pattern in this case, Your Honor, what does Mr.

13   Lang do?  He calls up and says, I will withdraw the letters.

14   Okay?  That's aside.  We got what we wanted.  There's nothing

15   we can do.  But it is kind of frustrating, how that -- how

16   that played out.

17       Your Honor, this motion, to the extent it asks for that

18   sentence to be removed, that's fine.  Again, we think it's a

19   legal nullity.  What Mr. Lang asked for in his motion is for

20   Your Honor to issue a final order.  Your Honor can't determine

21   whether your order is final.  We've made that point in our

22   opposition.  It seems maybe now Mr. Lang is walking back on

23   that.  There's nothing you can do.  Your Honor can issue an

24   order; it'll be up to the District Court.

25       With respect to the supplement, Your Honor, as we put in

15

1  the record, we think all the quote/unquote evidence that was

2  submitted just is a severe mischaracterization of the record.

3  And it's important, Your Honor, that not only does the -- we

4  agree that the evidence can come in, but we think Your Honor

5  has to make a determination whether those additional

6  allegations of bias and evidence do in fact demonstrate bias.

7  What we think Mr. Lang wanted to do, or the Appellants wanted

8  to do, or the Movants, they wanted to have that information

9  come in and argue at first blush to the Appellate Court that

10  that is bias, without having had Your Honor make the initial

11  determination, as you would have if there was a motion to

12  reconsider, as you would have if there was a new motion.

13      And so we think it's very important that Your Honor

14  consider those additional allegations.  We think categorically

15  they do not demonstrate any bias, and our Exhibit A goes

16  through each item and points out the severe

17  mischaracterizations.

18      So, Your Honor, we've wasted a lot of time.  We've wasted

19  a lot of money.  But if all they want is to remove that

20  sentence, supplement the record, have Your Honor deny the

21  motion yet again after considering the additional evidence, we

22  do not have an opposition to that.  But it was -- kind of took

23  a long time and a lot of money to get to this place.

24      Thank you, Your Honor.

25          THE COURT:  All right.  And Mr. Lang, on the subject

16

1  of it took a lot of time and a lot of money, estate resources,

2  to get to this place, I just want to note a couple of things.

3  And I guess I'm happy to hear any response to these things

4  that I feel very frustrated about.

5      Again, my focus at this point is judicial resources as

6  well as estate resources.  And no judge, no judge looks

7  lightly on a motion to recuse.  Okay?  Any judge, I would

8  think, is going to have some self-introspection.  Like, oh my

9  goodness, what would motivate someone to think this needs to

10 be urged?

11     But, so on the topic of -- again, I want you to respond to

12 this, Mr. Lang -- my concern about judicial resources and

13 estate resources.

14     The timeline here -- and I always talk about timelines, I

15 know -- but this Court signed the confirmation order in this

16 case February 22, 2021, and your motion to recuse was filed

17 about a month later, March 18, 2021.  Now, here's the first

18 thing I'll mention about judicial resources and estate

19 resources.  Your motion and brief to recuse included an

20 appendix that was 200 -- no, excuse me, 2,722 pages long.

21 Okay?

22     So any judge, again, has to take it seriously when a

23 motion to recuse is filed.  And the standard is I have to

24 stand back and look at would a reasonable person have concerns

25 here.  So I can't just say, I know I'm not biased, I don't

Case 19-34054-sgj11   Doc 3596-2   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 28-2 Filed 12/29/23   Page 37 of 1392   PageID 14779
Exhibit 2 Page 28 of 33

17

1  think I'm biased; I have to look at what a reasonable person

2  might think.

3      So you presented to me a 2,722-page appendix for me to do

4  my job and look at what would a reasonable person think.  So,

5  then would it raise a doubt in the mind of a reasonable

6  observer as to the judge's impartiality?

7      So I think here's another point that goes to judicial

8  resources.  I had my law clerk, just out of curiosity, count

9  up for me how many orders that I had signed as of the day that

10 the motion to recuse was filed, March 18, 2021, and I had

11 presided over the bankruptcy case for 15 months at that point,

12 but it had been in Delaware for two months before Dallas.  On

13 the day you had filed your motion to recuse, March 18, 2021, I

14 had signed 263 orders in the Highland bankruptcy case and the

15 adversary proceedings.  It's a lot more now, of course.  But

16 so I suppose, if I was really to do my job thoroughly, I might

17 look not merely at your 2,722 pages of appendix attached to

18 your motion to recuse, but all 263 orders I had entered to

19 see, hmm, would a reasonable observer question my

20 impartiality?

21     So, anyway, this is all about judicial resources and

22 estate resources.  So, going down the timeline, March 23,

23 2021, five days after you filed the motion to recuse -- after,

24 I will tell you, I won't say I dropped everything to pore

25 through this, but spent a lot of time -- I issued an order

18

1  denying the motion to recuse.

2      Now, here's inside baseball, okay, if there ever was:  The

3  last sentence, reserving the right to supplement or amend,

4  here's why I did it.  I didn't know it would cause a brouhaha.

5  Maybe I didn't give it enough thought.  But in reading the

6  case law during those many days and hours I spent focusing on

7  your motion to recuse, I realized that most of the case law

8  says you don't have to have a hearing, okay, the statute

9  doesn't require a hearing, the case law says you don't have to

10 have a hearing.  And I cited some of that my order.  But I

11 thought, these Movants, after seeing this order, they may come

12 back and say, you didn't give us our day in court.  We wanted

13 a hearing.  We weren't just going to rely on our 2,722-page

14 appendix.  We wanted to put on witnesses.

15     So I didn't have to stick that sentence in there, but I

16 was just sort of anticipating what the Movants might do.

17     Okay.  So, live and learn.  I guess I won't, if I'm ever

18 confronted with the situation again, do that.  But that's what

19 that was about.

20     So, my law clerk went and looked at the appellate record

21 in the past few days, because, I mean, again, head-scratcher.

22 We were trying to get a feel for how big a deal was this

23 sentence, okay, to the District Court, if at all.  But anyway,

24 we happened to note that in July, July 20, 2021, the District

25 Court record on appeal was supplemented with 1,001 more pages

19

1    of record.  So I guess, goodness gracious, poor Judge Kinkeade

2    and his staff, they had 3,723 pages of appendix.  I don't even

3    know if that's all.  You know, I don't know.

4        But so Judge Kinkeade dismissed the appeal because he said

5    my order was interlocutory on February 9, 2022, and then we

6    didn't see a motion for rehearing or an appeal to the Fifth

7    Circuit or a petition for writ of mandamus to the Fifth

8    Circuit.  Five and half months later, this new motion for

9    final appealable order and supplement to the motion to recuse

10   is filed, containing 365 more pages.  And then I see that, Mr.

11   Lang, you filed an amended motion to take out certain of the

12   items, with the agreement, the stipulation that was reached

13   with Debtor's counsel, so it's now a 154-page appendix.

14       But I should add that, in Highland's objection to your

15   latest motion, they attached 86 exhibits, and I couldn't count

16   all those exhibits, but it was more than 5,500 pages.  And it

17   was, as I understood it, sort of almost like a rule of

18   optional completeness.  If you're going to submit these 154

19   pages to supplement the record, we think you need to attach

20   more than snippets of a transcript here and there.  You need

21   to have the whole context.

22       So, anyway, I -- you know, look at what you're doing.  I'm

23   just -- and I guess I could totally appreciate and understand

24   if there had been a brief order from Judge Kinkeade saying,

25   because of that one sentence, this is an interlocutory order,

20

1    no leave to appeal an interlocutory order is warranted, end of

2    order.  And, frankly, when you filed your motion, this latest

3    motion, having not seen Judge Kinkeade's order, I thought

4    that's what it was going to say.

5       So, from the tone of your motion, it sounded like that's

6    all his order was about, just:  I have a problem with this

7    last sentence, it makes the whole order interlocutory.  And

8    then I go back and read it and he gives four or five different

9    reasons why an order denying a motion to recuse is

10   interlocutory until the end of the case.  I know that's a

11   bizarre concept in the world of bankruptcy, but he considered

12   this is even the rule in the world of bankruptcy.

13      So, anyway, help me to understand why this isn't

14   unnecessary carpet-bombing the Court, me and whoever might

15   hear your petition for writ of mandamus, and the Debtor

16   estate, carpet-bombing us with paper and causing us to expend

17   resources.  And, again, we've got this backdrop of the

18   original motion to recuse being filed 15 months after I

19   started presiding over the case and after I had signed 263

20   orders.

21      Please, Mr. Lang, please help me to understand if this is

22   warranted.  Why, I mean, help me to understand why this is not

23   wasting resources in your view and why this isn't just some

24   strategy.  Again, I'm trying to not play psychologist, I'm

25   really trying to understand why you think this is fine.

1          MR. LANG:  Well, Your Honor, we've moved to recuse,

2     and we've stated the grounds, and we have put in documents

3     from the record that we think support those grounds.  We have

4     not unnecessarily carpet-bombed.  We've cited to the various

5     transcripts.  The length of the record is directly related to

6     the length of the transcripts mostly, the various transcripts

7     throughout the proceeding.  And so, you know, with respect to

8     the 2,722 pages of appendix, most of those are just complete

9     copies of transcripts.

10         But again, we're just creating our record to support our

11    position on our motion.  And the current motion is eight

12    pages.  It's got reference to the additional grounds that

13    we've set forth that we think support our motion.  And we

14    attached the various documents and transcripts that, again,

15    support -- we think support our position.  And we're making

16    our record for appeal.

17         And as far as Mr. Pomerantz and the withdrawing of the

18    letters, you know, I was getting ready for trial when Mr.

19    Morris called.  And he said, they're hearsay.  We had a brief

20    conversation.  I disagreed.  They filed their motion.  When I

21    got the time to look at it, I read through it, and Mr. Morris

22    and I had a conversation, and we decided, you know what, we

23    don't need them, we'll pull them out.  Let's just do away with

24    this issue.  It's not worth the time to deal with it.

25         I'm sorry they had to file their motion.  But, you know, I

22

1    couldn't drop everything at that moment to look through.  And

2    again, the reason that he gave was hearsay.  So, you know,

3    it's not gamesmanship.  It was just, look, you know, when we

4    got down to looking at it, when I looked at it, I decided it

5    wasn't worth the effort and the hassle, and we agreed to pull

6    them down and withdraw them.  And that's why I filed the

7    amended motion.

8        As far as the current appendix, Your Honor, we're just

9    making a record.  You know, we're trying to get this thing

10   reviewed.  We're making sure the Court is aware of all the

11   grounds and having considered all the grounds and all the

12   actions that we think support our motion.  We're giving the

13   Court the opportunity to look at it, and then just enter the

14   order without that language and we'll deal with the mandamus.

15       Again, the issue is ultimately going to be reviewed.

16   We're trying to get it reviewed.  And you're right, you know,

17   we don't have to, you know, you didn't have to have a hearing

18   on the first deal, you don't have to have a hearing on this

19   one.

20            THE COURT:  Okay.

21            MR. POMERANTZ:  Your Honor, this is -- this is just

22   one more match in furtherance of Mr. Dondero's stated desire,

23   as you've heard many times, to burn the place down.  We would

24   have hoped, and I guess it would have been naïve to hope, as I

25   know Your Honor has hoped throughout the case, that at some

1   point in time the Dondero side would stop blaming Your Honor,

2   blaming Mr. Seery, blaming the estate, and actually look at

3   what he can do to put an end to this.  Pay his notes, stop

4   raising frivolous claims, so everyone can go on with his life.

5   That's what the estate wanted to do and wants to do.  That's

6   what Mr. Seery wants to do.  Unfortunately, Mr. Dondero

7   doesn't seem capable of it, and this is just one more match on

8   the flames.  And Mr. Lang, doing his job, following his

9   client's wishes, is just one more player in that.  But it is

10   extremely frustrating.

11         THE COURT:  Okay.  All right.  Here's what I'm going

12   to do.  First, I'm simply going to deny the pending amended

13   motion for final appealable order and supplement to motion to

14   recuse, as it is procedurally improper as framed.  Okay?  It

15   was kind of like a Rule 54 motion.  It was kind of like a new

16   motion to recuse.  It was kind of like a Rule 59 motion for,

17   you know, new -- to put in new evidence, have a new trial, but

18   way untimely for that.

19     So I'm just denying the motion that's before me.  Okay?

20   And by doing that, I mean, I guess, I guess the stipulation

21   and order that's before me on the motion to strike and the

22   motion to compel, I guess I'll -- it's in my queue, I'll sign

23   it, unless someone tells me there is a reason it doesn't make

24   sense to sign it.

25     But I'm denying the motion before me.  But just so it's

24

 1    clear, Mr. Lang, it's without prejudice to you either filing a

 2    simple Rule 54 motion, without attachments, that simply asks

 3    me to strike the last sentence of my original order denying

 4    your motion to recuse from March 2021.

 5        If you give me a simple Rule 54-based motion simply asking

 6    me to strike that sentence, I'll sign it.  Without a waiting

 7    period.  Without a hearing.  And I assume Mr. Pomerantz

 8    doesn't have a problem with that.

 9            MR. POMERANTZ:  That is correct, Your Honor.  If all

10    that motion asks for, we would not oppose that.

11            THE COURT:  Okay.  It's also, my ruling today denying

12    your motion, is without prejudice to you filing a new motion

13    to recuse, if that's what you want to do, to start this over

14    and supplement the record.

15        But, you know, proceed as you will.  This Court is going

16    to do its duty.  And, well, if you want to do that, you do

17    that, but I'll have a more elaborate order if I have to rule

18    on a new motion to recuse.  Among other things, I'm going to

19    point out to the Court above, whoever hears this, that because

20    I think timeliness was always an issue I raised in your

21    original order, you know, filing a motion to recuse after

22    confirmation, 15 months after this judge was assigned to the

23    case, and after the judge had signed 263 orders.

24        You know, we have case authority, as I'm sure you

25    researched and know, that talk about timeliness.  Even though

25

1    it's not baked into the statute, 28 U.S.C. Section 455, it is

2    a factor.  And so this is not *A v. B* litigation.  This is a

3    case affecting many, many people.  And at some point, don't we

4    have to wonder why a motion would be filed after 263 orders?

5    If your clients legitimately think there was bias, I don't

6    know why they didn't raise the issue way, way earlier in the

7    case.

8         And that's why these appendices are so huge, right?  It

9    dovetails with the timeliness.  Okay?  Fifteen months.

10   There's a huge, huge, huge, huge record.

11        So, anyway, do you have any questions, Mr. Lang?

12        Again, I  will say it for at least the third time this

13   morning:  I'm worried about judicial resources and estate

14   resources.  Okay?  And, you know, I have to worry about I'll

15   loosely call my bosses, okay, you know, the courts that grade

16   my papers.  The District Court who hears appeals and hears

17   petitions for writ of mandamus.  The Fifth Circuit.  They're

18   going to get frustrated with me if -- well, you know, if, for

19   example, I had ruled on this motion before me today, a clearly

20   procedurally defective motion.  And if I just willy-nilly let

21   people put things in the record without a procedurally proper

22   basis, it just makes more work for the Court of Appeals,

23   right?

24        So it's not just about the lawyers here.  It's not just

25   about me and my staff.  It's about the people who grade my

26

```
1   papers.  If I granted your motion as it's pending here before
2   me today, I have every reason to think, whether it's Judge
3   Kinkeade or the Fifth Circuit, they would think, what is this
4   judge doing?  Okay?  So it's just procedurally defective, what
5   you filed.  Okay?  But, again, you've got the ruling.  Do you
6   have any questions?
7            MR. LANG:  I don't.
8            THE COURT:  We're adjourned.
9            THE CLERK:  All rise.
10      (Proceedings concluded at 10:25 a.m.)
11                        --oOo--
12
13
14
15
16
17
18
19
20                      CERTIFICATE
21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.
23   /s/ Kathy Rehling                    08/31/2022
24  _____    _____
    Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber
```

27

INDEX

PROCEEDINGS                                          3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                             23

END OF PROCEEDINGS                                  26

INDEX                                               27

APPX. 00732

# EXHIBIT 3

APP.14733

# EXHIBIT 4

# EXHIBIT 5

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 5 Filed Page 29 of 61   Page 51 of 1392   PageID 14793
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 1 of 60   PageID 10087
Docket #0020  Date Filed: 7/28/2021

Case No. 3:21-cv-00879-K

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

## JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, AND NEXPOINT REAL ESTATE PARTNERS, LLC,

### Appellants,

### v.

## HON. STACEY G. C. JERNIGAN AND HIGHLAND CAPITAL MANAGEMENT, L.P.

### Appellees.

---

**On Appeal from the United States Bankruptcy Court**
**Northern District of Texas, Dallas Division**
**The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court**

**In re:  Highland Capital Management, L.P.**
**Case No. 19-34054 (Jointly Administered)**

---

## ANSWERING BRIEF OF APPELLEE
## HIGHLAND CAPITAL MANAGEMENT, L.P.

---

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-5   Filed 09/29/23   Page 52 of 1392   PageID 14794
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 2 of 60   PageID 10688

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        jelkin@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 5    Filed 10/21/21    Page 53 of 1392    PageID 14795
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 3 of 60    PageID 10689

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................1

I.    STATEMENT OF ISSUES AND STANDARD OF REVIEW ........................2

II.   SUMMARY OF THE RESPONSE .................................................................3

III.  STATEMENT OF FACTS ..............................................................................6

    A.   The Bankruptcy Court Presides Over the Acis Bankruptcy Case, and the Delaware Court Transfers this Case to the Bankruptcy Court for that Very Reason ...........................................................................6

    B.   Appellants File the Recusal Motion ...................................................11

        1.    The December 2019 Transfer Motion .......................................12

        2.    The January 2020 Settlement Hearing ......................................12

        3.    The February 19, 2020 Application to Employ Hearing ...........13

        4.    The December 2020 Restriction Motion ...................................16

        5.    The January 2021 Hearing on the Debtor's Motion for Injunctive Relief .......................................................................20

        6.    The February 2021 Confirmation Hearing ................................22

        7.    Article Referencing PPP Loans ................................................28

        8.    Mandatory Injunction ...............................................................29

    C.   The Bankruptcy Court Denies the Recusal Motion ...........................31

    D.   Appellants Appeal the Bankruptcy Court's Recusal Order ................32

IV.  SUMMARY OF THE ARGUMENT ............................................................33

V.   ARGUMENT .................................................................................................35

    A.   The Bankruptcy Court Properly Exercised Its Discretion in Finding the Recusal Motion Was Untimely ......................................35

    B.   The Bankruptcy Court Properly Exercised Its Discretion in Denying the Recusal Motion on the Merits .........................................43

        1.    There Is No Extrajudicial Bias Present Here ............................45

        2.    The Bankruptcy Court Does Not Harbor Deep-Seated Antagonism Toward Appellants .................................................49

CONCLUSION ......................................................................................................52

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 5 File Page 29 02 61    Page 54 of 1392    PageID 14796
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 4 of 60    PageID 10690

# TABLE OF AUTHORITIES

## CASES

*Andrade v. Chojnacki*,
  338 F.3d 448 (5th Cir. 2003) ................................................................ passim
*Apple v. Jewish Hosp. & Med. Ctr.*,
  829 F.2d 326 (2d Cir. 1987) ......................................................................39
*Bossart v. Havis*,
  389 B.R. 511 (S.D. Tex.), aff'd sub nom. *In re Bossart*, 296 F. App'x 398
  (5th Cir. 2008) ........................................................................................3
*Brown v. Oil States Skagit Smatco*,
  664 F.3d 71 (5th Cir. 2011) .......................................................................46
*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009) .................................................................................49
*Conkling v. Turner*,
  138 F.3d 577 (5th Cir. 1998) ................................................................. 45, 46
*Da Silva Moore v. Publicis Groupe*,
  868 F. Supp. 2d 137 (S.D.N.Y. 2012) ......................................................... 38, 40
*Davis v. Board of School Comm'rs*,
  517 F.2d 1044 (5th Cir. 1975) ...................................................................32
*Delesdernier v. Porterie*,
  666 F.2d 116 (5th Cir. 1982) .....................................................................36
*Garcia v. Woman's Hosp. of Texas*,
  143 F.3d 227 (5th Cir. 1998) .....................................................................51
*Grambling University Nat. Alumni Ass'n v. Board of Sup'rs for La. System*,
  286 Fed.Appx. 864 (5th Cir. 2008) ..............................................................35
*Henderson v. Department of Public Safety and Corrections*,
  901 F.2d 1288 (5th Cir. 1990) ............................................................... 48, 51
*Hill v. Breazeale*,
  197 Fed.Appx. 331 (5th Cir. 2006) ........................................................... 37, 43
*Hill v. Schilling*,
  495 Fed. Appx. 480 (5th Cir. 2012) ..................................................... 2, 3, 35, 42
*Hill v. Schilling*,
  No. 3:07–CV–2020–L, 2014 WL 1516193, (N.D. Tex. Apr. 17, 2014)..............38
*Hirczy v. Hamilton*,
  190 Fed. Appx. 357 (5th Cir. 2006) ........................................................... 39, 43
*In re Chevron U.S.A., Inc.*,
  121 F.3d 163 (5th Cir. 1997) .....................................................................49

iv

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 5 Filed Page 6802.61   Page 55 of 1392   PageID 14797
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 5 of 60   PageID 10691

*In re Ramba, Inc.*,
    416 F.3d 394 (5th Cir. 2005) ...................................................................3
*Johnson v. Mississippi*,
    403 U.S. 212 (1971) ............................................................................49
*Lieb v. Tillman (In re Lieb)*,
    112 B.R. 830 (Bankr. W.D.Tex 1990) ...................................................32
*Liteky v. U.S.*,
    510 U.S. 540 (1994) ..................................................................... passim
*Love v. Tyson Foods, Inc.*,
    677 F.3d 258 (5th Cir. 2012) ..................................................................3
*Marshall v. Jerrico*,
    446 U.S. 238 (1980) ............................................................................48
*Martin v. Monumental Life Ins. Co.*,
    240 F.3d 223 (3d Cir. 2001) ..................................................................42
*Miller v. Sam Houston State University*,
    986 F.3d 880 (5th Cir. 2021) ................................................................48
*Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc.*,
    485 F.3d 793 (5th Cir. 2007) ..................................................................3
*Travelers Ins. Co. v. Liljeberg Enters., Inc.*,
    38 F.3d 1404 (5th Cir. 1994) ................................................................35
*U.S. v. Jordan*,
    49 F.3d 152 (5th Cir. 1995) ..................................................................44
*U.S. v. Olis*,
    571 F.Supp.2d 777 (5th Cir. 2008) ........................................................41
*U.S. v. Sanford*,
    157 F.3d 987 (5th Cir. 1998) .................................................... 35, 36, 38
*U.S. v. Williams*,
    127 Fed. Appx. 736 (5th Cir. 2005) .......................................................51
*U.S. v. York*,
    888 F.2d 1050 (5th Cir. 1989) ..............................................................42
*United States v. Bremers*,
    195 F.3d 221 (5th Cir. 1999) ................................................................43
*United States v. Landerman*,
    109 F.3d 1053 (5th Cir. 1997) ..............................................................51
*Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*,
    948 F.2d 1436 (5th Cir. 1991) ..............................................................44
*Weisshaus v. Fagan*,
    456 Fed.Appx. 23 (2d Cir. 2012) ..................................................... 40, 42

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 31-5    Filed 09/29/23    Page 56 of 1392    PageID 14798
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 6 of 60    PageID 10692

**STATUTES**

11 U.S.C. § 330 ...................................................................................................14

28 U.S.C. § 455 ............................................................................................. passim

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5   Filed 09/09/21   Page 57 of 1392   PageID 14799
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 7 of 60   PageID 10693

## CORPORATE DISCLOSURE STATEMENT

Appellee Highland Capital Management, L.P. is a limited partnership, the general partner of which is Strand Advisors, Inc., a privately held corporation. No publicly held corporation owns 10% or more of the interest in either entity.

DOCS_NY:43746.8 36027/002

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5   Filed 09/09/23   Page 58 of 1392   PageID 14800
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 8 of 60   PageID 10694

Appellee Highland Capital Management, L.P. ("Highland" or the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case"),  hereby submits its Answering Brief to the Opening Brief of appellants James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA," and together with HCMFA, the "Advisors"), The Dugaboy Investment Trust ("Dugaboy"), The Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"), and NexPoint Real Estate Partners, LLC (collectively, "Appellants") in respect of their appeal from the *Order Denying Motion to Recuse, Pursuant to 28 U.S.C. § 455, (see* R. 31)[1] (the "Recusal Order"), entered by the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on March 18, 2021.

## I.     STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issue on appeal is whether the Bankruptcy Court properly exercised its discretion in denying Appellants' *Motion to Recuse, Pursuant to 28 U.S.C. § 455*, (*see* R. 2338) (the "Recusal Motion").  The standard of review for a denial of a motion to recuse is abuse of discretion. *See Andrade v. Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003); *Hill v. Schilling*, 495 Fed. Appx. 480, 483 (5th Cir. 2012). "[D]eference ... is the hallmark of abuse-of-discretion review." *Love v. Tyson Foods,*

---

[1] Refers to Appellants' Record on Appeal [Docket No. 9].  Any reference to "Supp. R." refers to Appellants' Supplemental Record [Docket No. 19].

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5   Filed 12/29/23   Page 59 of 1392   PageID 14801
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 9 of 60   PageID 10695

*Inc.*, 677 F.3d 258, 262 (5th Cir. 2012). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Hill*, 495 Fed. Appx. at 483 (internal quotations omitted). "A finding of fact is clearly erroneous only when although there may be evidence to support it, the reviewing court on the entire [record] is left with the definite and firm conviction that a mistake has been committed." *Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc.*, 485 F.3d 793, 796–97 (5th Cir. 2007) (internal quotations omitted). "Stated differently, a 'factual finding is not clearly erroneous if it is plausible in the light of the record read as a whole.'" *Bossart v. Havis*, 389 B.R. 511, 515 (S.D. Tex.), *aff'd sub nom. In re Bossart*, 296 Fed. App'x 398 (5th Cir. 2008) (quoting *In re Ramba, Inc.*, 416 F.3d 394, 402 (5th Cir. 2005)). For the reasons below, the Bankruptcy Court properly exercised its discretion in denying the Recusal Motion.

## II.    SUMMARY OF THE RESPONSE

Under Mr. Dondero's direction, the Debtor was forced to file for bankruptcy in October 2019 to protect itself from an avalanche of adverse rulings entered against Highland and Dondero-controlled affiliates. For nearly a decade, courts and arbitration panels in Texas, Delaware, New York, and in foreign jurisdictions such as the Cayman Islands, Bermuda, and Guernsey, issued a series of rulings against Mr. Dondero and his enterprise, some with stinging rebukes.

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-5 Filed 12/29/0361 Page 60 of 1392   PageID 14802
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 10 of 60   PageID 10696

Now, over a year after the Debtor's bankruptcy proceeding was transferred to

the Bankruptcy Court,[2] Appellants complain that the Bankruptcy Court is biased

against Mr. Dondero, as if no other judge or fact-finder had previously ruled against

him and the entities he controls.  Appellants base their appeal on snippets of out-of-

context quotes and on eight specific rulings out of the dozens entered by the

Bankruptcy Court, while ignoring the mountain of evidence justifying that Court's

rulings.

While Appellants' egregious omissions of evidence and other portions of the

record are addressed below, it is noteworthy that Appellants have appealed only one

of the eight orders and judgments they complain of.  If the Bankruptcy Court's bias

and prejudice was as open and notorious as Appellants now contend, Appellants

would have appealed all of them, and their failure to do so is telling.

Rather than seeking disqualification "at the earliest possible moment," as

litigants are required under applicable Fifth Circuit precedent, Appellants sat on their

hands for almost a year and a half after supposedly first concluding that the

Bankruptcy Court was biased.  According to Appellants, the Debtor first expressed

these concerns in the fall of 2019 when—then under Mr. Dondero's control—it

opposed a motion to transfer venue to the Bankruptcy Court on the express basis that

_____

[2] "Bankruptcy Court" refers to the United States Bankruptcy Court for the Northern
District of Texas, The Hon. Stacey G. C. Jernigan presiding.

Case 19-34054-sgj11  Doc 3596-5  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 5  Filed 12/29/23  Page 61 of 1392  PageID 14803
Case 3:21-cv-00879-K  Document 20  Filed 07/28/21  Page 11 of 60  PageID 10697

it was not objective.  App. Brief ¶¶ 1-2.  Appellants contend that the Bankruptcy

Court's bias was on full display during hearings held on (i) January 9, 2020, (ii)

February 19, 2020, (iii) June 30, 2020, (iv) July 8, 2020, and (v) September 2020.

*Id*. ¶¶ 3-6, 24-26.  Rather than seek recusal at any time during 2020, Appellants

waited until mid-March 2021 (after at least three additional adverse rulings were

entered against them),[3] days before the Bankruptcy Court was to conduct an

evidentiary hearing on the Debtor's motion to hold Mr. Dondero in contempt of

court.[4]  Based on Appellants' collective failure to promptly seek disqualification, the

Bankruptcy Court properly denied the Recusal Motion as "untimely."

Appellants have not—and cannot—meet their heavy burden of proving that

the Bankruptcy Court abused its discretion in denying the Recusal Motion on the

---

[3] Appellants contend that the Bankruptcy Court's rulings and comments in (a)
December 2020, (b) January 2021, and (c) and early February 2021, all conveyed
bias and prejudice.  App. Brief ¶¶ 7-22.

[4] Notably, Appellants *do not* contend that the Bankruptcy Court exhibited any bias
or prejudice against Mr. Dondero with respect to its (a) *Order Granting Debtor's
Motion for Temporary Restraining Order Against James Dondero*, entered on
December 10, 2020 (R. 7233) ("Mr. Dondero's TRO"), or its (b) *Order Granting
Debtor's Motion for Preliminary Injunction Against James Dondero*, entered on
January 12, 2021 (R. 7382).  The Bankruptcy Court held an evidentiary hearing on
the Debtor's contempt motion promptly after denying the Recusal Motion and on
June 7, 2021, issued a 55-page *Memorandum Opinion and Order Granting in Part
Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged
Violation of TRO* (*see* Supp. R. 474) (the "Contempt Order").  The Contempt Order
included an exhaustive recitation of facts and over 170 detailed footnotes as well as
(ironically) express findings in Mr. Dondero's favor that mitigated the consequences
of the Contempt Order.

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-5Exhibit 5Filed 12/29/23Page 2/23 of 361    Page 62 of 1392    PageID 14804
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 12 of 60    PageID 10698

merits.   Seen in context, the record demonstrates that (a) numerous courts and
tribunals have consistently ruled against Mr. Dondero and his enterprise, thereby
demonstrating that the Bankruptcy Court does not stand alone, (b) the Bankruptcy
Court's rulings and orders are unassailable (as evidenced by, among other things,
Appellants' decision to appeal only one of those complained of), (c) there is ***no***
evidence presented of extrajudicial bias or prejudice, and (d) no objective person
would find that Mr. Dondero and his enterprise are the victims of improper judicial
conduct rising to the extraordinary remedy of recusal.

## III.    STATEMENT OF FACTS

### A.    The Bankruptcy Court Presides Over the Acis Bankruptcy Case, and the Delaware Court Transfers this Case to the Bankruptcy Court for that Very Reason

Between 2008 and October 16, 2019, courts and arbitration panels in multiple
domestic and foreign jurisdictions handed down a plethora of judgments and orders
against Mr. Dondero, the Debtor, and other entities then under Mr. Dondero's
control.[5]

For example, in March 2019, a blue-ribbon arbitration panel issued a 56-page
decision in which it (a) rejected nearly every argument advanced by the Debtor and

---

[5] An overview of some of the prepetition litigation involving the Debtor and other
Dondero-related parties is set forth in the *Disclosure Statement for the Fifth
Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No.
19-34054-sgj11, Docket No. 1473 (Bankr. N.D. Tex. Nov. 24, 2020) at 20-24 (Appx.
1:31-35).

6

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-5 Filed 12/29/23    Page 63 of 1392    PageID 14805
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 13 of 60    PageID 10699

made highly critical assessments of the credibility of Highland's witnesses, (b) found that the Debtor had breached its fiduciary duties to its investors, breached certain agreements, and engaged in other wrongful conduct, and (c) rendered an award against the Debtor in excess of $150 million.[6]  Just two months later, in an unrelated case, the Chancery Court in the state of Delaware (i) found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Chancery Court applied the "crime-fraud exception" to the attorney-client privilege in any event.[7]

The adverse rulings against Mr. Dondero and his controlled entities are legion—and have resulted in the imposition of judgments and awards totaling more than $1 billion (inclusive of interest).  The Bankruptcy Court had no involvement in any of these cases.

---

[6] *See Partial Final Award* rendered in the arbitration captioned *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.*, Case No. 01-16-0002-6927.  (Appx. 2:181-242).  The Partial Final Award was incorporated into the arbitration panel's final award (Appx. 3:244-266), and a hearing in the Delaware Chancery Court to have the award confirmed was about to begin when Mr. Dondero caused the Debtor to file for bankruptcy protection for the purpose of gaining the protection of the automatic stay.

[7] *Daugherty v. Highland Capital Management, L.P.*, C.A. No. 2018-0488-MTZ, May 17, 2019 transcript (bench ruling on motion to compel production of documents) at 10-15.  (Appx. 4:277-282).  The Dondero-related defendants made three desperate but unsuccessful attempts to overturn or stay the Chancery Court's rulings.  *See Order Denying Application to Certify Interlocutory Appeal*, entered in C.A. No. 2018-0488-MTZ on July 8, 2019 ¶ K-L.  (Appx. 5:366-378).

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88    Filed 12/15/0361    Page 64 of 1392    PageID 14806
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 14 of 60    PageID 10700

The Bankruptcy Court's experience with Mr. Dondero and the Debtor began in January 2018, when it was assigned a case captioned *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) (the "<u>Acis Bankruptcy</u>"). The Acis Bankruptcy was involuntarily commenced by Joshua Terry, a former Highland executive who had obtained an arbitration award against the Acis entities then under Mr. Dondero's control, but who could not collect on the judgment because Mr. Dondero allegedly orchestrated a fraudulent transfer of assets that left the Acis debtors judgment proof. Mr. Dondero and Mr. Terry were the chief antagonists in the highly contested Acis Bankruptcy, and the Bankruptcy Court made numerous credibility findings against Mr. Dondero and his associates before confirming a plan of reorganization that effectively transferred control of a valuable business from Mr. Dondero and Highland to Mr. Terry.[8]

With various judgment creditors bearing down, on October 16, 2019, the Debtor filed this case in the United States Bankruptcy Court for the District of Delaware (the "<u>Delaware Court</u>") expecting it to be a more hospitable forum. Less

---

[8] *See*, *e.g.*, (a) *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) (Appx. 7:540-543); and (b) *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified,* Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) (Appx. 8:545-773).

Case 19-34054-sgj11 Doc 3596-5 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 5 Filed 12/20/23 Page 65 of 1392 PageID 14807
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 15 of 60 PageID 10701

than two weeks later, on November 1, 2019, the Official Committee of Unsecured

Creditors (the "UCC") filed their *Motion for an Order Transferring Venue of this*

*Case to the United States Bankruptcy Court for the Northern District of Texas,* Case

No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) (Appx. 6:380-

538)[9] (the "Transfer Motion"). The UCC laid out its intentions in filing the Transfer

Motion:

> [T]he Dallas Bankruptcy Court is already intimately familiar with the
> Debtor's principals and complex organizational structure [because the
> Acis Bankruptcy is pending in that Court]. Specifically, the Dallas
> Bankruptcy Court has (a) heard multiple days' worth of material
> testimony from the Debtor's principal owner (James Dondero), the
> Debtor's minority owner (Mark Okada), the Debtor's general counsel,
> at least two assistant general counsels, and numerous other employees
> of the Debtor and other witnesses; and (b) issued at least six published
> opinions . . . [The Bankruptcy Court is] intimately familiar with the
> Debtor's business, principal owner, and key executives. For these
> reasons, the Dallas Bankruptcy Court is uniquely positioned to
> oversee this chapter 11 case.

(*Id.* ¶ 2).

The Delaware Court agreed. During a December 2, 2019 hearing, the

Delaware Court stated that it would grant the Transfer Motion, reasoning:

> This is a unique case … [T]his case is very focused on responding to
> existing [Acis] litigation. And that existing litigation of a former
> affiliate, as of a few months ago, and a pending appeal that could make
> it a current affiliate, is located in the Northern District of Texas. The
> [Bankruptcy Court] has done a tremendous amount of work and has

---

[9] Refers to the Debtor's appendix filed with this brief.

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-5 Filed 12/29/23   Page 66 of 1392   PageID 14808
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 16 of 60   PageID 10702

… issued a number of opinions, had a number of trials.  That work creates a familiarity with the facts, issues, and players in a case …

(R. 2488:23-35-2499:1-11).

Mr. Dondero and Appellants knew **on December 2, 2019** that they were being sent back to the very Bankruptcy Court that took a justifiably stern view of Mr. Dondero and his associates.[10]  Indeed, that is exactly why the Debtor (then under Mr. Dondero's control) opposed the Transfer Motion.[11]

Fully cognizant that he would soon face a Bankruptcy Court with substantial knowledge of (some of) his business practices, Mr. Dondero never caused the Debtor to (a) appeal the Delaware Court's order granting the Transfer Motion, or (b) seek the Bankruptcy Court's recusal on the basis of bias or prejudice (at least not until March 2021).

_____

[10] Mr. Dondero and entities controlled by him appealed the Acis confirmation order, but the appeals were denied by the United States District Court for the Northern District of Texas and the United States Court of Appeals for the Fifth Circuit.  *See* (a) *Opinion* affirming Confirmation Order Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) (Appx. 9:775-858); (b) *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) (Appx. 10:860-863).

[11] *See Objection of the Debtor to Motion of Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 118 (Bankr. D. Del. Nov. 12, 2019) (Appx. 11:865-891).

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/29/23   Page 67 of 1392   PageID 14809
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 17 of 60   PageID 10703

**B.      Appellants File the Recusal Motion**

On March 18, 2021, Appellants filed their Recusal Motion requesting that the Bankruptcy Court recuse itself from any adversary proceedings and future contested matters involving Appellants or any entity connected to Mr. Dondero.   In their Recusal Motion, Appellants argue that the Bankruptcy Court is "predisposed against Mr. Dondero" because it: (i) had "negative opinions about Mr. Dondero formed during the Acis case;" (ii) "made repeated reference to proceedings in the Acis case to justify findings made in this case" and made "repeated negative statements about Mr. Dondero;" (iii) "threatened sanctions on" Appellants and "questioned the good-faith basis" of certain of their positions; (iv) declared Appellants "vexatious" litigants; (v) concluded that an entity "connected to or controlled by Mr. Dondero" is "no more than a tool of Mr. Dondero;" and (vi) purportedly disregarded "the testimony of any witness with a connection to Mr. Dondero as *per se* less credible." Recusal Motion ¶ 67.   In support of their Recusal Motion, Appellants cite to a number of proceedings that occurred between December 2019 and February 2021 in an attempt to show that the Bankruptcy Court's comments and rulings demonstrate a "deep-seeded antagonism" toward Appellants resulting from "extrajudicial" bias emanating from the Acis Bankruptcy. *See id.* ¶ 68.   Appellants mischaracterize the facts of these hearings by cherry-picking quotes out of context and by ignoring the considerable evidence underlying each of the orders at issue.

11

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/29/23   Page 68 of 1392   PageID 14810
Exhibit 5   Page 29 of 361
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 18 of 60   PageID 10704

1. __The December 2019 Transfer Motion__

Appellants argue that "the risk of prejudice to Mr. Dondero in this [Bankruptcy] Court has been apparent since this Bankruptcy's inception in Delaware," citing to comments made during the hearing on the Transfer Motion where Debtor's counsel "expressly acknowledged that the UCC's actual motive in seeking transfer to [the Bankruptcy Court] was [that] Court's pre-existing negative views" of Mr. Dondero from the Acis Bankruptcy. Recusal Motion ¶¶ 4-5. As noted *supra*, Mr. Dondero controlled the Debtor and directed its counsel to oppose the Transfer Motion on this basis during the December 2, 2019 hearing. The Delaware Court rejected this argument, and in fact relied on the Bankruptcy Court's extensive familiarity with the parties as one of the bases for transferring venue of the Highland Bankruptcy Case to the Bankruptcy Court. (*See* R. 2488).

2. __The January 2020 Settlement Hearing__

Appellants cite to the Bankruptcy Court's comments made during a January 9, 2020 hearing as evidence of the Bankruptcy Court's alleged bias toward Mr. Dondero resulting from the Acis Bankruptcy. Recusal Motion ¶¶9-13. On January 9, 2020, the Bankruptcy Court held an evidentiary hearing, (R. 2519), on the *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*), Case No. 19-34054-sgj11, Docket No. 281 (Bankr. N.D. Tex.

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/29/23   Page 69 of 1392   PageID 14811
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 19 of 60   PageID 10705

Dec. 27, 2019) (Appx. 12:893-992) (the "Settlement Motion").  The settlement set forth in the Settlement Motion was prompted by (a) concerns expressed by the UCC about the integrity of the Debtor's management (under Mr. Dondero's stewardship) due to its history of self-dealing, creditor avoidance asset transfers, and other breaches of fiduciary duty, and (b) the possibility that the UCC might seek the appointment of a trustee.

The Bankruptcy Court entered an order granting the Settlement Motion (R. 7291) (the "Settlement Order").  Pursuant to the Settlement Order, Mr. Dondero, the Debtor's founder and former CEO, voluntarily surrendered control of the Debtor to an independent board of three directors, Russell Nelms, John Dubel, and James P. Seery, Jr. (the "Board").  The Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor."  (R. 7293).  In finding that this "language is very important" to protect the Debtor, the Bankruptcy Court noted that in the Acis Bankruptcy, "Mr. Dondero was surreptitiously liquidating funds," and "doing things behind the scenes that were impacting the value of the Debtor in a bad way." (R. 2597).  Mr. Dondero did not object to this language and signed off on the Settlement Order.

### 3.    The February 19, 2020 Application to Employ Hearing

Appellants cite to the February 19, 2020, hearing on the Debtor's *Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley &*

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5 Filed 02/29/2361   Page 70 of 1392   PageID 14812
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 20 of 60   PageID 10706

*Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Foley Application") (R. 415) as another example of the Bankruptcy Court's "predisposition against Mr. Dondero." Recusal Motion ¶¶ 14-15.  Appellants argue that the Bankruptcy Court discounted "the testimony of demonstrably independent witnesses who testified" in support of the Foley Application on a "pre-determined basis that any person sharing an opinion with Mr. Dondero … was somehow being unduly influenced by him." Recusal Motion ¶¶ 14-16.  Appellants mischaracterize the facts of this hearing.

Through the Foley Application, the Debtor sought to retain Foley on behalf of both the Debtor ***and*** a non-Debtor entity, Neutra Ltd. ("Neutra"), in the appeal of the Acis confirmation order and related matters (the "Acis Appeal").  In support of the Foley Application, the Debtor disclosed that: (i) Neutra was wholly owned by Mr. Dondero and his partner, Mark Okada, and (ii) the Debtor intended to pay for Foley's representation of Neutra in the Acis Appeal.[12]  The UCC and Acis objected

---

[12] The Debtor justified its payment of Neutra's fees under 11 U.S.C. § 330 (which does not allow the payment of non-debtor legal fees) by arguing, *inter alia*, that if Neutra were successful in its appeal of the involuntary petition entered in the Acis Bankruptcy (a) the Acis Bankruptcy would be unwound, (b) the equity in Acis would return to the Debtor, (c) the Debtor would regain the benefit of certain management fees that were otherwise being paid to Acis for the benefit of its new owner, Mr. Terry, and (d) the Debtor would have negotiating leverage with respect to Acis' $75 million claim against the Debtor's estate.  *See* R. 2761:10-25-R. 2762:1-16. *See* (i) *Debtor's Omnibus Reply in Support of (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date,* Case No. 19-12239 (CSS),

14

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/29/23   Page 71 of 1392   PageID 14813
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 21 of 60   PageID 10707

to the Foley Application on the ground that the Debtor should not be permitted to use estate assets to support Neutra, a Dondero-controlled entity.[13]

Russell Nelms testified in support of the Application. Mr. Nelms was subject to a lengthy cross-examination which undermined the Debtor's arguments. (R. 2666-2723). The Bankruptcy Court approved the Debtor's retention of Foley, but determined that the evidence was insufficient to justify expending estate assets to pay the legal fees of Neutra, a non-Debtor entity in which the Debtor held no interest. (R. 2785-2790). The Bankruptcy Court's ruling on the Foley Application was not, as Appellants contend, premised on any "pre-determined" bias toward Mr. Dondero to "contest positions that could benefit Mr. Dondero." (App. Brief ¶ 16). It was

---

Docket No. 159 (Bankr. D. Del. Nov. 21, 2019) (Appx. 13:994-1258), *and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 70 (Bankr. D. Del. Oct. 29, 2019) (Appx. 14:1260-1296).

[13] *See* (i) *Limited Objection to the Debtor's: (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 116 (Bankr. D. Del. Nov. 12, 2019) (Appx. 15:1298-1391); *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP and Lynn Piker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 120 (Bankr. D. Del. Nov. 12, 2019) (Appx. 16:1393-1398).

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5   Filed 02/23/2361   Page 72 of 1392   PageID 14814
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 22 of 60   PageID 10708

based on its determination that the Debtor failed to prove that the estate would benefit by paying a non-Debtor's legal fees, as required by applicable law.

Neither Mr. Dondero nor Neutra appealed the Bankruptcy Court's evidence-based order on the Foley Application.

### 4.     The December 2020 Restriction Motion

Appellants cite to certain of Judge Jernigan's comments and rulings made at the conclusion of an evidentiary hearing held on December 16, 2020 (the "December Hearing") [14] as evidence of bias.   Appellants argue that the Bankruptcy Court improperly denied their Restriction Motion as "frivolous," despite being filed in "good faith." (Recusal Motion ¶¶ 18-26).

In their Restriction Motion, the movants (*i.e.*, the Advisors and certain investment funds managed by the Advisors (the "Retail Funds," and with the Advisors, the "Movants")) asked the Bankruptcy Court to "impose a temporary restriction on the Debtor's ability, as portfolio manager, to cause CLOs to sell assets." (Restriction Motion ¶ 17).   The Movants called as their only witness Dustin Norris, the Executive Vice President of each of the Movants ("Mr. Norris").   During the December Hearing, Mr. Norris made the following admissions:

---

[14] The December Hearing was held in connection with that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles*, (R. 2798), brought by the Advisors and the Retail Funds (the "Restriction Motion").

16

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 5 Filed 12/29/23 61   Page 73 of 1392   PageID 14815
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 23 of 60   PageID 10709

**The Debtor Had the Exclusive Contractual Right to Buy and Sell CLO Assets**

- The Debtor is the portfolio manager for each of the CLOs in which the Advisors caused the Retail Funds to invest (December 2020 Transcript at 41:18-24) (R. 6265);
- The Debtor's management of the CLOs is governed by written agreements (*id.* at 41:25-42:3) (R. 6265-6266);
- None of the Movants are parties to the Debtor's CLO management agreements (*id.* at 42:4-11) (R. 6266);
- The Debtor, as the CLO Portfolio Manager, has the responsibility to buy and sell assets on behalf of the CLOs (*id.* at 42:12-24) (R. 6266);
- Nobody other than the Debtor has any right or authority to buy and sell assets in the CLOs in which the Retails Funds invested (*id.* at 42:25-43:3) (R. 6266-6267); and
- Holders of preferred CLO shares, such as the Retail Funds, "do not make investment decisions on behalf of the CLOs" and the Advisors knew that when they caused the Retail Funds to make their investments (*id.* at 43:4-17) (R. 6267).

**The Movants Did Not Accuse the Debtor of Any Wrongdoing**

- The Movants did not allege or contend that the Debtor (a) engaged in fraudulent conduct; (b) breached any agreement by effectuating any transactions; or (c) violated any CLO management agreement (*id.* at 49:5-50:10) (R. 6273-6274); and
- The Movants did not question the Debtor's business judgment nor could they since they did not know why the Debtor executed the transactions and never even asked (*id.* at 50:11-51:15) (R. 6274-6275).

**Mr. Dondero Controls the Movants and Caused the Restriction Motion to Be Filed**

- Mr. Dondero owns and controls the Advisors (*id.* at 28:20-22) (R. 6252); (35:14-36:15) (R. 6259-6260);
- The Advisors manage the Retail Funds; Mr. Dondero serves as the Portfolio Manager of each of the Retail Funds and caused the Retail Funds to invest in the CLOs managed by the Debtor (*id.* at 28:23-29:4) (R. 6252-6253), 36:16-22 (R. 6260);

17

APPX. 010297

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5   Filed 12/29/23   Page 74 of 1392   PageID 14816
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 24 of 60   PageID 10710

- The "whole idea" for the Restriction Motion initiated with Mr. Dondero (*id.* at 29:19-22 (R. 6253), 41:6-10 (R. 6265)); and
- The Retail Funds' Boards did not authorize the filing of the Restriction Motion (*id.* at 37:23-38:6 (R. 6261-6262).

## Mr. Norris Was Not a Competent Witness and Had No Credibility

- Mr. Norris admitted that he does not make investment decisions, is not an investment manager, and has never worked for a CLO (*id.* at 39:7-16) (R. 6263);
- Mr. Norris (a) did not write his Declaration filed in support of the Restriction Motion, (b) did not provide any substantive comments to his Declaration, and (c) relied on the Advisors' "management" (including Mr. Dondero) for all "key information" in his Declaration (*id.* at 40:11-24) (R. 6264); and
- Mr. Norris did not bother to review the very CLO management agreements the Movants were seeking to interfere with (*id.* at 42:12-16) (R. 6266).

## The Movants Did Not Notify Any Other CLO Investors of the Restriction Motion

- The Movants hold (a) less than 50% of the preferred interests in 12 of the 15 CLOs at issue, and (b) less than 70% of the preferred interests in the other three CLOs at issue (*id.* at 44:22-45:7) (R. 6268-6269);
- Yet, the Restriction Motion was pursued solely on behalf of the Movants (*id.* at 46:22-25) (R. 6270);
- The Movants did not notify any other holder of CLO interests of the Restriction Motion and made no attempt to do so (*id.* at 47:1-12) (R. 6271);
- The Movants made no attempt to obtain the consent of all of the holders of the preferred shares to seek the relief sought in the Restriction Motion (*id.* at 47:13-16 (R. 6271));
- Mr. Norris did not know whether any other holder of CLO preferred shares wanted the relief sought in the Restriction Motion (*id.* at 47:17-21) (R. 6271);
- Mr. Norris did not know whether the Debtor's counterparties in the CLO management agreements (*i.e.*, the CLOs) wanted the relief sought in the Restriction Motion (*id.* at 47:22-48:1) (R. 6271-6272); and

18

Case 19-34054-sgj11 Doc 3596-5 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 5 Filed 12/20/23 Page 75 of 1392 PageID 14817
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 25 of 60 PageID 10711

- Mr. Norris had no personal knowledge of the two transactions described in his Declaration; he testified that he was "very remote" and he didn't have "much knowledge." (*id.* at 53:22-55:13) (R. 6277-6279).

Based, in large part, on Mr. Norris's testimony, the Bankruptcy Court (a) found that there was no factual or legal basis for the Restriction Motion, and (b) declared the Restriction Motion "frivolous," and (c) granted the Debtor's motion for a directed verdict. (December Hearing Transcript at 64:1-7) (R. 6287). While Appellants contend that the "Bankruptcy Court inscrutably blamed Mr. Dondero" for the Restriction Motion, (App. Brief ¶ 11), Mr. Norris provided all the evidence the Court needed to reach its conclusion:

Q:     The whole idea for this motion initiated with Mr. Dondero; isn't that right?

A:     The concern, yes, the concern originated, and his concern was voiced to our legal and compliance team.

(*Id.* at 41:6-9) (R. 6265).[15]

The Restriction Motion was a misguided effort by Mr. Dondero and his associates to exert control over the Debtor. The Motion was frivolous.

---

[15] *See also id.* at 29:21-22 ("the initial cause for concern was raised by Mr. Dondero himself") (R. 6253); 28:20-22 (Mr. Dondero has a control relationship with the Advisors) (R. 6252); 26:11-17 (responsibility for the Retail Funds' portfolio management and investment decisions are delegated to the Advisors) (R. 6250); 35:14-36:15 (Mr. Dondero owns and controls the Advisors); (R. 6259-6260); 37:23-38:6 (the Retail Funds' Boards did not authorize the filing of the Restriction Motion) (R. 6261-6262).

19

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 5   Filed 12/29/0361   Page 76 of 1392   PageID 14818
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 26 of 60   PageID 10712

5.     **The January 2021 Hearing on the Debtor's Motion for
Injunctive Relief**

Unchastened by the debacle of the December Hearing, Mr. Dondero caused
the Advisors and Retails Funds to continue to interfere with and unjustifiably
threaten the Debtor.  Consequently, on January 6, 2021, the Debtor filed its *Verified
Original Complaint for Declaratory and Injunctive Relief* against the Advisors and
Retail Funds (R. 1962) seeking injunctive relief after they interfered with the
Debtor's trading activities and sent the Debtor a flurry of written correspondence
(the "K&L Gates Letters") (R. 4158-4160, 4161-4163) threatening to terminate the
Debtor's CLO management agreements and asserting specious claims. (R. 8069).
The Bankruptcy Court held an exhaustive evidentiary hearing on the TRO Motion
on January 26, 2021 (the "TRO Hearing"), during which it admitted voluminous
documentary evidence and assessed the credibility of multiple witnesses, including
that of Mr. Dondero. (*See* TRO Hearing Transcript) (R. 6291).  At the conclusion of
the TRO Hearing, the Bankruptcy Court determined that the TRO was necessary to
protect the Debtor's interests pending a hearing on the preliminary injunction. (*See
id.)*

Appellants cite to certain aspects of the TRO Hearing as evidence of the
Bankruptcy Court's bias against Mr. Dondero while minimizing their conduct and

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5   Filed 12/29/23   Page 77 of 1392   PageID 14819
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 27 of 60   PageID 10713

noting that the Debtor did not prove specific damages. (App. Brief ¶¶ 12-17.)[16] But, consistent with the balance of the Recusal Motion, Appellants fail to disclose keys facts that caused the Bankruptcy Court to focus on Mr. Dondero: (a) the evidence established that he controlled the Advisors and Retails Funds and was involved in all of the acts complained of, and (b) their conduct implicated two court orders.

*First*, the Settlement Order expressly prohibited Mr. Dondero from "caus[ing] any Related Entity to terminate any agreements with the Debtor." (Settlement Order ¶ 9).  The evidence established that the Advisors were "Related Entities" for purposes of the Settlement Order,[17] yet the K&L Gates Letters expressly and improperly threatened to seek to terminate the Debtor's CLO management agreements.

*Second*, Mr. Dondero's TRO enjoined him from, among other things, "causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly"

---

[16]  Notably, the Debtor never attempted to prove damages during the TRO Hearing as it would have undermined its claim for equitable relief.

[17] This fact was (a) first established during the December Hearing (*see supra* at 12), (b) was confirmed at the TRO Hearing, and (c) was subsequently admitted to by the Advisors as part of the resolution of the adversary proceeding.  *See Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11, Docket No. 2590 (Bankr. N.D. Tex. July 20, 2021) Ex. A ¶ 2(c) (*see* Appx. 17:1408) (settlement agreement in which each of the Advisors represents and warrants that it (i) is controlled by Mr. Dondero and (ii) is a "Related Party" for purposes of paragraph 9 of the Settlement Order).

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88   Exhibit 5   Filed 02/29/24 Page 78 of 1392   PageID 14820
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 28 of 60   PageID 10714

making express or implied threats against the Debtor or interfering with the Debtor's

business. (*See* R. 7235). Yet, that is precisely what the evidence showed Mr.

Dondero did. (*TRO Hearing Transcript* at 42:9-107:10) (R. 6332-6397).

Given the evidence and the clear and unambiguous orders in effect, it would

have been shocking if the Bankruptcy Court ignored Mr. Dondero and instead

treated the Advisors and Retail Funds as if they were independent third-party actors.

Mr. Dondero controlled the Advisors and the Retail Funds. He clearly "caused" or

"encouraged" or "conspired" with them to engage in wrongful conduct. The Court's

focus on Mr. Dondero was entirely justified—particularly when seen in the context

of the applicable Bankruptcy Court orders that the Appellants pretend did not exist.

### 6.    <u>The February 2021 Confirmation Hearing</u>

Appellants cite to the February 2021 confirmation hearing on the Debtor's

Plan[18] (the "<u>February 2021 Confirmation Hearing</u>") in support of their argument that

the Bankruptcy Court was biased against Appellants. *See* Recusal Motion ¶¶ 38-50.

Appellants principally contend that during the February 2021 Confirmation Hearing,

the Bankruptcy Court: (i) "summarily rejected ***all*** of the objections" to the Plan when

such objections were no different than those raised by the U.S. Trustee whose good

faith was "not questioned;" (ii) found the objections were not asserted in good faith,

---

[18] Refers to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (as amended, the "<u>Plan</u>").

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5  Filed 12/30/23  Page 79 of 1392   PageID 14821
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 29 of 60   PageID 10715

(iii) concluded, "without basis," that the entity Appellants were "controlled by Mr. Dondero"; (iv) disregarded witness testimony of Mr. Jason Post on the ground that the witness had left the Debtor's employ to work for one of the Advisors; and (v) wrongfully accused of Appellants of being "vexatious litigants." *See id.*

First, Appellants' confirmation objections were far more extensive than those filed by the U.S. Trustee, and included objections to (i) plan provisions that had no impact on them as they held no claims in the subject classes (the absolute priority rule), (ii) the assumption of certain executory contracts to which they were not party (the actual contract counterparties had consented to assumption of the contracts by the Debtor), and (iii) common plan provisions like debtor releases, plan supplements and a plan injunction.[19]

Moreover, the Bankruptcy Court included Appellants in the process by considering their objections. (R. 2085 ¶¶ 18-19); (R. 2102-2104).   Appellants'

---

[19]  Appellants did not include their objections to confirmation in the record on appeal. They can be found at Bankruptcy Docket Nos. 1661 (Dondero) (Appx. 18:1423-1430), 1667 (Trusts) (Appx. 19:1432-1465), 1670 (Funds and Advisors) (Appx. 20:1467-1516), and 1673 (NexPoint Real Estate Partners) (Appx. 21:1518-1524). The *Limited Objection of the U.S. Trustee* is at Docket No. 1671(Appx. 22:1526-1531).  All Appellants' objections to confirmation were addressed at length in the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (Appx. 23:1533-1600) and *Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management* [Docket No. 1807] (Appx. 24:1602-1726) and by the Bankruptcy Court in its February 8, 2021 oral ruling on confirmation (R. 3371) and in the Confirmation Order (R. 2085).

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 5   Filed 12/29/2361   Page 80 of 1392   PageID 14822
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 30 of 60   PageID 10716

objections were not overruled "summarily." Rather, the Bankruptcy Court conducted a two-day evidentiary hearing, at the conclusion of which it made detailed findings of fact and conclusions of law supporting the overruling of all the objections, including those of Appellants. Appellants were not treated any differently than any other objector at the February 2021 Confirmation Hearing.

The Bankruptcy Court also did not "disregard" the testimony of Mr. Post "solely" because Mr. Post had left the employ of the Debtor to work for the Advisors. This only was one of many factors the Bankruptcy Court considered in determining that Mr. Post's testimony was not credible. For instance:

1. Mr. Post testified at the confirmation hearing on behalf of both the Advisors and the Funds. (February 2021 Confirmation Hearing Transcript at 51:12 (R. 4872)). For twelve years, Mr. Post served as the Assistant Chief Compliance Officer ("CCO") for the Debtor, the Advisors and the Retail Funds, but left to become the CCO for the Advisors and the Retail Funds contemporaneously with Mr. Dondero leaving the Debtor. (*Id.* at 56:14-57:1). Mr. Post had no knowledge about the relationship between the board members for each of the Retail Funds and either the Debtor (during the years it was controlled by Mr. Dondero) or Mr. Dondero, and no board member (who presumably had knowledge and who Appellants contend are independent

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5 Filed 02/22/2361 Page 81 of 1392   PageID 14823
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 31 of 60   PageID 10717

actors) ever testified at any hearing or proceeding.  (*Id.* at 57-61) (R. 4878-4882).

2.     Mr. Post testified that the Advisors manage and provide investment advice to the Retail Funds, and that the Advisors have been owned and controlled by Mr. Dondero for the entire period of time he served in the capacity of assistant CCO for the various entities. (*Id.* at 61:12-62:6) (R. 4882-4883).

3.     Mr. Post testified that he left the Debtor because of "conflicts that were created by being an employee of the Debtor and by also serving as the assistant CCO to the named Funds and the Advisors, and it coincided with Jim [Dondero] toggling over from HCMLP [the Debtor] to NexPoint [one of the Advisors].  It just made sense more functionally and from a silo perspective for me to be the named CCO for that entity since he [Mr. Dondero] was no longer an employee of HCMLP [the Debtor]." (*Id.* at 62:16-63:8) (R. 4883-4884). On cross-examination, Mr. Post acknowledged that the conflicts he mentioned had existed as of the Petition Date but claimed they had become "more evident as time progressed."  (*Id.* at 63:15-23) (R. 4884).

Based on this testimony, the Bankruptcy Court concluded that Mr. Post had left the employ of the Debtor to follow Mr. Dondero, that the alleged conflicts only became an issue when Mr. Dondero started his feud with the Debtor, and that his

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-5  ExhibitFiled 12/23/0261  Page 82 of 1392    PageID 14824
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 32 of 60    PageID 10718

testimony about the alleged independence of the Retail Funds' boards was not within the scope of his knowledge and was contradicted by the prior testimony of Mr. Norris, as discussed below.

In finding Mr. Post's testimony not to be credible, the Bankruptcy Court also considered the testimony of Mr. Dustin Norris.[20]  Mr. Post acknowledged that he had never reviewed Mr. Norris's testimony and was unaware of the nature or extent of his testimony.  (February 3, 2021 Confirmation Hearing Transcript at 59:12-19) (R. 4880).  Mr. Norris testified that Mr. Dondero had a control relationship with the Advisors, and that he is a portfolio manager for each of the Retail Funds, but that relationship is subject to the annual review by the Funds' boards.  (*Id*. at 28:20-29:4) (R. 6252-6253).

Mr. Norris acknowledged that the Advisors were owned and controlled by Mr. Dondero.  (February 3, 2021 Confirmation Hearing Transcript at 35:14-36:15) (R. 6259-6260).  Mr. Norris further acknowledged that the Retail Funds are managed by the Advisors, the Advisors control the Retail Funds' investment decisions, and Mr. Dondero is either the (or one of the) portfolio managers of each of the Retail Funds. (*Id*. at 36:19-37:13) (R. 6260-6261).  Mr. Norris further testified that the Funds' boards make no investment decisions, (*id*. at 37:14-22) (R. 6261), and did not participate in or approve the filing of the motion then at issue because it wasn't part

---

[20] (*See id.* at 63) (R. 6287).

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88 5 Filed 12/34/0361    Page 83 of 1392    PageID 14825
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 33 of 60    PageID 10719

of their duties. (*Id.* at 37:23-38:6) (R. 6261-6262). Mr. Norris testified that the
directors were nearly identical for the dozen or so funds managed by the Advisors
(who were controlled by Mr. Dondero), including the Retail Funds, and that many
of the board members had, at various times, worked for Mr. Dondero at the Debtor
or otherwise had long-standing relationships with him. (*Id.* at 55:19-58:6) (R. 6279-
6282). Based on this evidence, the Bankruptcy Court determined that the Advisors
and the Retail Funds were controlled by Mr. Dondero. The Bankruptcy Court's
conclusion in this regard was thus not based, as Appellants represent, on the
Bankruptcy Court's "disregard" of Mr. Post's testimony, but rather the entirety of
the evidence presented and credibility of all witnesses.

Appellants' allegation that the Bankruptcy Court unfairly determined them to
be "vexatious litigants" is equally unfounded. The Bankruptcy Court did not
actually find Appellants to be "vexatious litigants." Rather, as part of the Court's
analysis of the legal basis for approving the Plan's Gatekeeper Provision, the
Bankruptcy Court determined that a court may approve a gatekeeper provision when
the evidence shows a party may be subject to extensive and frivolous litigation.
(Confirmation Order ¶¶ 80-81) (R. 2142-2143); (R. 6548 at 45:12-47:17 R. 6592-
6594). The Debtor presented such evidence, and, accordingly, the Bankruptcy Court
took judicial notice of all the actions that had been filed by Appellants through
objections, appeals or adversary proceedings, as well as all the litigation the Debtor

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88    Exhibit 5    Filed 12/15/2361    Page 84 of 1392    PageID 14826
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 34 of 60    PageID 10720

was forced to participate in due to the actions of Mr. Dondero and his related entities.[21]  For the convenience of the Court, the Debtor has summarized all this litigation in a chart that was filed as an exhibit to *Debtor's Reply in Support of the Debtor's Motion to Enforce the Order of Reference*, Case No. 21-842 [Docket No. 43] and is included herein. (*See* Appx. 29:1786-1797).[22]  The chart was created from the public record in this Bankruptcy Case which is part of the confirmation record. Based on this evidence, the Bankruptcy Court determined that the Gatekeeper Provision was necessary and appropriate to protect the Debtor from litigation of the type and magnitude that had been filed during the case.  The vexatious litigant analogy was only one part of the legal basis for the Bankruptcy Court's approval of the Plan Gatekeeper Provision.  (R. 6548 at 45:12-47:17 R. 6592-6594).

### 7.    Article Referencing PPP Loans

Appellants contend that the Bankruptcy Court's inquiries into COVID-related "PPP loans" was evidence of bias against Mr. Dondero.  Recusal Motion ¶ 52.  As fully disclosed by the Bankruptcy Court, the inquiries were prompted by an extrajudicial source (a newspaper article) that purportedly noted that "Mr. Dondero

---

[21] The exhibits entered into the record at the confirmation hearing included the dockets from certain specified litigation as well as all documents and exhibits on the docket of the bankruptcy case and all exhibits necessary for impeachment.  *See Debtor's Witness and Exhibit Lists for Confirmation Hearing* (as amended) (Docket Nos.  1822, 1866, 1877 and 1895) (Appx. 25:1728-1740; Appx. 26:1742-1754; Appx. 27:1756-1769; and Appx. 28:1771-1784).

[22] This chart reflects the status of Dondero-related litigation as of July 13, 2021.

28

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/30/23   Page 85 of 1392   PageID 14827
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 35 of 60   PageID 10721

or affiliates" received PPP loans.  Because of the vagueness of the article, the Bankruptcy Court sought information about the Debtor and ordered it to disclose any PPP loans it had received.  The Debtor responded to the court at a subsequent hearing that the Debtor had not obtained any PPP loans.  Neither Mr. Dondero nor any of his affiliated entities were asked to provide any information, no action was taken against them and the issue was never raised in court again.  Appellants' reliance on this event is emblematic of the lack of merit – and candor -- in the Recusal Motion and this appeal.

### 8.    <u>Mandatory Injunction</u>

Appellants cite to the February 23, 2021 hearing on the Debtor's motion for a mandatory injunction (the "<u>Mandatory Injunction</u>").  (Recusal Motion ¶ 27).  The Mandatory Injunction related to Appellants' failure to provide for a transition of the services previously provided by the Debtor under certain shared service agreements (the "<u>SSAs</u>").  Historically, the Debtor had provided back and middle office support to certain of the Appellants under the SSAs, including the Advisors.  The Debtor publicly disclosed that it would be materially reducing its work force and would no longer provide services under the SSAs.  Consistent therewith, the Debtor exercised its contractual rights to terminate the SSAs in November 2020 with the termination of the Advisors' SSAs becoming effective January 31, 2021.  (R. 4178).  The Advisors, which manage a series of retail funds, failed to adopt or implement a

29

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-5   Filed 12/30/23   Page 86 of 1392   PageID 14828
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 36 of 60   PageID 10722

transition plan that would replace the services provided under the SSAs and allow them to manage their funds without risk of default following termination of the SSAs. (*See id.*)  Because the Advisors manage retail, (*i.e.*, "mom and pop,") money, the Debtor was rightfully concerned that there would be significant legal and regulatory exposure both to the Advisors and the Debtor if the Advisors' funds could not operate and, to prevent a catastrophic result, the Debtor agreed to a series of extensions of the SSAs.  This position was untenable.  To avert the potential liability and to extricate itself from its unwanted contractual relationship with the Advisors, the Debtor sought, on an emergency basis, an order requiring the Advisors to implement a transition plan by the end of February before the Debtor would be forced to reduce its workforce and be unable to provide services under the SSAs. (*Id.*)  Thus, this Mandatory Injunction was not "frivolous," as Appellants imply, (*see* Recusal Motion ¶ 50), but wholly necessary to protect the Debtor's estate from significant loss or risk of litigation.  During the hearing, the Advisors (for the first time) stated unequivocally that they had adopted an operating plan to obtain or provide all services previously provided by the Debtor under the SSAs and could manage their funds without the Debtor's assistance. (*See* R. 4199-4437).  Having credited the Advisors' testimony, the Bankruptcy Court issued its order finding the Debtor's motion for a Mandatory Injunction "moot." (R. 4194-98).

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/28/23   Page 87 of 1392   PageID 14829
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 37 of 60   PageID 10723

**C.** **The Bankruptcy Court Denies the Recusal Motion**

On March 23, 2021, the Bankruptcy Court issued its Recusal Order denying the Recusal Motion on the grounds that it was (i) not "timely," and (ii) without merit. Regarding timeliness, the Bankruptcy Court found that "the timing does not seem to pass muster," reasoning that the Recusal Motion (i) "was filed more than 15 months after" the Case was transferred to the Bankruptcy Court; (ii) "comes after many dozens of orders have been issued by the [Bankruptcy] Court," and (iii) "comes on the eve of a contempt hearing." (Recusal Order at 7). The Bankruptcy Court further found that, even if the Recusal Motion had been timely, recusal was not warranted on the merits.

The Bankruptcy Court noted that Appellants' allegations of "extrajudicial" bias resulting from the Acis Bankruptcy were "at the heart of the" Recusal Motion. (Recusal Order at 7). The Bankruptcy Court explained that it did not form any animus or bias toward Appellants during the Acis Bankruptcy and concluded that any knowledge learned from the Acis Bankruptcy did not constitute "extrajudicial" knowledge warranting recusal. (*Id.*)

The Bankruptcy Court also found that "more generally," it does not harbor, and has not shown, any "personal bias or prejudice" against Appellants. (Recusal Order at 10). The Bankruptcy Court explained that it "has merely addressed motions, objections and other pleadings as they have been presented," and "has

Case 19-34054-sgj11  Doc 3596-5  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 188-5 Filed 12/29/23 Page 88 of 1392  PageID 14830
Case 3:21-cv-00879-K  Document 20  Filed 07/28/21  Page 38 of 60  PageID 10724

issued and enforced orders where requested and warranted." *Id.* The Bankruptcy Court noted that: "This court and all courts sometimes use strong words as part of managing a complex and contentious case. None of this should be interpreted as 'bias' or 'prejudice." *Id.* The Bankruptcy Court reasoned that "clashes between a court and counsel for a party [are] an insufficient basis for disqualification under Section 455. (Citing *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D. Tex 1990) (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975) (holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel.")). To that end, the Bankruptcy Court explained, it has "the utmost respect for [Appellants]" and it has "no disrespect for Mr. Dondero on a personal level or any of the [Appellants]." (*Id.*)

Accordingly, the Bankruptcy Court determined, in an exercise of its discretion, that Appellants' assertions did not "rise to the threshold standard of raising a doubt in the mind of a reasonable observer as to" the Bankruptcy Court's impartiality. (Recusal Order at 10).

## D.    Appellants Appeal the Bankruptcy Court's Recusal Order

On April 1, 2021, Appellants appealed the Bankruptcy Court's Recusal Order on the grounds that (i) the Recusal Motion was "timely" and (ii) the Bankruptcy Court "erred in denying the Recusal Motion on the merits." (App. Brief at 19-20).

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5 Exhibit Filed 12/20/23 61 Page 89 of 1392   PageID 14831
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 39 of 60   PageID 10725

In support of their appeal, Appellants argue that the Bankruptcy Court abused its discretion in finding that the Recusal Motion was untimely because, in pertinent part: (i) "timeliness is not an express condition of a recusal motion under § 455," and (ii) the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021." (*Id.* at 19).  Appellants further argue that: (i) the Bankruptcy Court exhibits "deep-seated antagonism toward" Appellants "that went well beyond 'normal' admonishment," (*id.* at 20), and (ii) even if there is a "lack of extrajudicial knowledge, it is not fatal" to the Recusal Motion because "Appellants are entitled a full and fair opportunity to make their case in an impartial forum." (*Id.* at 19-20). For the reasons that follow, the Bankruptcy Court properly exercised its discretion in denying the Recusal Motion.

## IV.    <u>SUMMARY OF THE ARGUMENT</u>

The Bankruptcy Court properly exercised its discretion in denying the Recusal Motion pursuant to 28 U.S.C. § 455 ("<u>Section 455</u>") on the grounds that it was (i) untimely and, independently, (ii) without merit.   First, the Bankruptcy Court properly applied the "timeliness" requirement to Section 455, as mandated by the statute and applicable case law.  In order to be timely, a party must move for recusal at the "earliest moment" after learning the facts forming the basis for recusal.  The Bankruptcy Court properly determined that the Recusal Motion was untimely because Appellants waited 15 months to bring the Recusal Motion, after dozens of

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-5   Exhibit 5   Filed 12/29/23   Page 90 of 1392   PageID 14832
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 40 of 60   PageID 10726

orders had been issued by the Bankruptcy Court, and on the eve of a hearing on a pending contempt motion against Mr. Dondero.

The Bankruptcy Court also properly exercised its discretion in finding that, had the Recusal Motion been timely, it was without merit on the grounds that: (i) there was no "extrajudicial" bias present, and (ii) the facts of this case do not rise to the extreme circumstance of showing a "deep seated antagonism" toward Appellants warranting recusal.  The law is clear that recusal is not warranted where comments or opinions formed by the court result from events that transpire during current or prior proceedings, *i.e.*, intrajudicial bias, unless the movant can demonstrate such comments rise to the rare level of a "deep-seated antagonism" or "favoritism."  Here, there was no "extrajudicial" source forming the Bankruptcy Court's alleged "bias."  Rather, all events cited by Appellants relate to either judicial rulings or judicial comments, or "intrajudicial" sources.  These types of events are nearly exempt from recusal.   There is also no evidence of the Bankruptcy Court's "deep seated antagonism" toward Appellants such that a reasonable person would question its impartiality in this Case.   Based on the entirety of the proceedings, the exceptional and rare remedy of recusal is not warranted.

DOCS_NY:43746.7 36027/002

APPX. 10724

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5 Exhibit 5 Filed 12/22/23 Page 91 of 1392   PageID 14833
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 41 of 60   PageID 10727

# V.   ARGUMENT

## A.   The Bankruptcy Court Properly Exercised Its Discretion in Finding the Recusal Motion Was Untimely

The Bankruptcy Court properly exercised its discretion in denying the Motion to Recuse on the basis that it was untimely.  Appellants argue that the Bankruptcy Court abused its discretion in finding that the Recusal Motion was untimely principally on the grounds that: (i) "timeliness is not an express condition of a recusal motion under § 455," (ii) the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021," and (iii) that the Debtor's motion for contempt against Mr. Dondero was "pending" when Appellants filed the Recusal Motion is "irrelevant." (*See* App. Brief. ¶¶ 36-44).  Appellants' arguments are without merit.

As the Bankruptcy Court correctly stated, recusal motions brought under Section 455(a) must be "timely." *Hill*, 495 Fed. App'x at 483; *see also Grambling Univ. Nat'l Alumni Ass'n v. Board of Supervisors for La. System*, 286 Fed. App'x 864, 867 (5th Cir. 2008) (noting that while "[s]ection 455 does not contain an explicit timeliness requirement … this Court has consistently inferred such a requirement") (citing *U.S. v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998)).  "The timeliness rule requires that 'one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification.'" *Sanford*, 157 F.3d at 988–89 (quoting *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994)).

35

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88  Filed 12/43/0361 Page 92 of 1392    PageID 14834
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 42 of 60    PageID 10728

"The most egregious delay—the closest thing to *per se* untimeliness—occurs when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal." *Sanford*, 157 F.3d at 988–89.  Courts have "rejected recusal challenges on appeal when the challenger waited to see if he liked an outcome before springing the recusal issue," and "rejected other challenges on appeal as simply too late under the facts to be timely." *Id.* at 989; *see also Delesdernier v. Porterie*, 666 F.2d 116, 122 (5th Cir. 1982) ("Congress did not enact § 455(a) to allow counsel to make a game of the federal judiciary's ethical obligations; we should seek to preserve the integrity of the statute by discouraging bad faith manipulation of its rules for litigious advantage.") The Bankruptcy Court, therefore, correctly applied the "timeliness" requirement in analyzing the Recusal Motion.

The Bankruptcy Court also properly exercised its discretion in determining that the Motion to Recuse was "untimely" because it was filed: (i) "more than 15 months after the case was transferred to the Bankruptcy Court," (b) "after many dozens of orders" were issued by the Bankruptcy Court, and (iii) "on the eve of a contempt hearing." (Recusal Order at 7).

As the Bankruptcy Court found, Appellants learned about the facts purportedly showing an "appearance of impropriety" fifteen (15) months before

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-5    Filed 12/29/23    Page 93 of 1392    PageID 14835
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 43 of 60    PageID 10729

filing their Motion to Recuse. *See, e.g.*, Recusal Motion ¶ 1 (discussing Appellants' awareness of Bankruptcy Court's alleged "pre-existing, negative views of" Mr. Dondero during December 2, 2019 Motion to Transfer hearing); *id.* at 3 (alleging that the "prejudice to Mr. Dondero has been apparent since the inception of this Case").[23]   Appellants learned about the Bankruptcy Court's purported "bias" in open court around this same time. *See id.* ¶ 3 (citing Bankruptcy Court's language from January 9, 2020 hearing as evidence of bias).   Appellants cite to adverse decisions rendered by the Bankruptcy Court from as early as February 2020, which they contend show its "predisposition against Mr. Dondero." *See id.* ¶¶ 5-6.

Despite learning the requisite facts giving rise to their Recusal Motion as early as December 2019, and throughout the following 15 months, Appellants did not move to recuse until March 2021.   During these 15 months, the Bankruptcy Court expended significant judicial resources overseeing the Bankruptcy Case and Appellants' litigation.   Appellants fail to offer any credible explanation for their delay in bringing the Recusal Motion at any point after the first moments of learning of the Bankruptcy Court's purported "bias" over one year ago.   This, alone, constitutes "*per se* untimeless." *See Hill v. Breazeale*, 197 Fed. App'x 331, 335 (5th Cir. 2006) (holding district court did not abuse its discretion in denying motion to recuse as untimely where party "waited, for no given reason, to raise the issue until

---

[23] *See also supra* at 5-7.

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-5    Filed 12/45/0361    Page 94 of 1392    PageID 14836
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 44 of 60    PageID 10730

after the district court ruled against him"); *Sanford*, 157 F.3d at 989 (affirming district court's denial of recusal motion as untimely where party "knew of the facts purportedly causing an appearance of impropriety," but waited until after an adverse decision to raise the recusal issue); *Grambling*, 286 Fed. App'x at 867-88 (affirming denial of recusal motion as "*per se*" untimely where "despite having knowledge of the facts underlying its recusal argument," party "did not immediately move to have this case assigned to a judge from another division or district and instead allowed the case to linger … for nearly ten months. When the [party] finally acted, it did so only after [the judge] had dismissed its claims"); *Hill v. Schilling*, No. 3:07–CV–2020–L, 2014 WL 1516193, at *3 (N.D. Tex. Apr. 17, 2014) (affirming judge's finding that motion to recuse was untimely where it was brought "some eleven months after [plaintiff] and his counsel first became aware of the" facts giving rise to alleged perception of bias); *Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d 137, 155 (S.D.N.Y. 2012) ("Plaintiffs here had the requisite knowledge no later than January 4, 2012, but the recusal request did not come until nearly three months later," noting "I have made no efforts to hide my views, relationships or affiliations. If plaintiffs truly believed that any of these issues, individually or collectively, created a bias or the appearance of partiality, they should have promptly moved for my recusal.")

38

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-5 Filed 12/20/23    Page 95 of 1392    PageID 14837
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 45 of 60    PageID 10731

Based on their own pleading and allegations, Appellants' contention that the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021" is without merit. (App. Brief ¶¶ 38-42).  Such an assertion also contradicts Appellants' own argument that the Bankruptcy Court's "bias" against Mr. Dondero was "apparent" from this Case's inception. (*See* Recusal Motion ¶ 3).  Even assuming it was not until "late 2020" that such a "manifestation" of bias presented itself, the Recusal Motion would still be untimely because Appellants waited several months to bring the Recusal Motion, during which time the Bankruptcy Court held evidentiary hearings for injunctive relief in *three* separate adversary proceedings as well as a two-day contested confirmation hearing—all of which involved some or all of the Appellants.  As discussed *supra*, this is precisely the type of delay that courts routinely find "untimely." *See Hirczy v. Hamilton*, 190 Fed. App'x 357, 360 (5th Cir. 2006) (affirming district court's denial of motion to recuse as "untimely" where party "learned directly" from the judge in open court of potential bias, yet "he waited over two months until and after the adverse decision to file his motion to recuse" further noting that because motion was untimely, "a substantive review for abuse of discretion is unnecessary"); *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 334 (2d Cir. 1987) (motion untimely where party waited two months after events giving rise to charge of bias or prejudice before making its recusal motion);

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 5    Filed 12/27/23    Page 96 of 1392    PageID 14838
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 46 of 60    PageID 10732

*Da Silva*, 868 F. Supp. 2d at 155.  Appellants otherwise offer no credible legal or factual basis in support of their "manifestation" argument. [24]

The Bankruptcy Court also appropriately considered the fact that the Recusal Motion came on the "eve of the contempt hearing." (Recusal Order at 7); *see Weisshaus v. Fagan,* 456 Fed. App'x 23, 34 (2d Cir. 2012) (noting that "[a]lthough there was no dispositive ruling as to [defendant] at the time [plaintiff] brought her recusal motion, the district court aptly noted that the motion came on the heels of its direction that [plaintiff] submit to a deposition, thus strongly suggesting that the motion was a mere fall-back position in response to an adverse ruling."); *Da Silva*, 868 F. Supp. 2d at 154 (denying recusal motion where "[i]t appears that plaintiffs are improperly using the recusal motion as a 'fall-back position' to an unfavorable ruling.")

Appellants' remaining contentions regarding "timeliness" are equally frivolous.  Nevertheless, they warrant a response.  Appellants' attempt to distinguish the Bankruptcy Court's cite to *Davies* is in vain.  Appellants assert that *Davies* "does not support the Order" because there, a party moved to recuse "almost a year after an adverse ruling." (App. Brief ¶¶ 36-37 (quoting *Davies,* 68 F.3d at 1130-31)).  But that is exactly what happened here.  *See supra* at 27-29.  As alleged by Appellants,

---

[24] The only case Appellants cite in support of this contention is *Davies*—the same case they try to distinguish from the present facts, (*see* App. Brief ¶ 37), and a case which does not even support that statement.

40

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88 Exhibit 5 Filed 12/29/23 Page 97 of 1392    PageID 14839
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 47 of 60    PageID 10733

the Recusal Motion was filed more than one year after (a) an adverse ruling was granted (*i.e.*, the Transfer Motion) in December 2019 (App. Brief ¶¶1-2); (b) the Bankruptcy Court improperly relied on its opinions of Mr. Dondero to include certain provisions in the Settlement Order on January 9, 2020 (*id.* at ¶¶3-4); and (c) the Bankruptcy Court's bias allegedly caused it reached conclusions without evidence and render an adverse ruling in connection with the February 2020 hearing on the Foley Application (*id.* ¶¶ 5-6).

Finally, Appellants' cite to the Delaware Bankruptcy Court's statements regarding the "presumption" that the Bankruptcy Court would follow the "rules of evidence" early in the Case, (App. Brief. ¶ 9), is entirely irrelevant for purposes of this Appeal, and should be disregarded by the Court.[25]  Indeed, Appellants' failure to appeal any of the orders complain of (other than the Confirmation Order) demonstrates that Appellants themselves generally find no fault in the actual conclusions reached and orders entered by the Bankruptcy Court.

In light of the expansive nature of this Case and the Bankruptcy Court's extensive knowledge of the proceedings that it has overseen throughout the last 21 months, interests of judicial economy also support the Bankruptcy Court's denial of the Recusal Motion. *See U.S. v. Olis*, 571 F. Supp. 2d 777 (5th Cir. 2008) (affirming

---

[25] Nothing in the Recusal Motion alleges the Bankruptcy Court has failed to follow the Federal Rules of Evidence.

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 5 Filed 12/49/0261 Page 98 of 1392    PageID 14840
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 48 of 60    PageID 10734

denial of recusal motion as untimely where party was aware of facts stated in recusal motion "well before he filed" the motion, noting that party "had duty to file [ ] motion for recusal before the court's judicial resources were spent on resolution of motions" and party "neither argues nor explains why his delay" was reasonable); *Hill*, 495 Fed. App'x at 484 ("Particularly in light of the expansive nature of these proceedings, considerations of judicial economy likewise countenance our conclusion that the district court did not abuse its discretion"); *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989) ("The motivation behind a timeliness requirement [for Section 455] is [] to a large extent one of judicial economy"); *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001) ("After a massive proceeding such as this, when the court has invested substantial judicial resources and there is indisputably no evidence of prejudice, a motion for recusal of a trial judge should be supported by substantial justification, not fanciful illusion"); *Weisshaus*, 456 Fed. App'x at 34 (affirming district court's denial of recusal motion as untimely where party "waited almost nineteen months" to file the recusal motion, at which point the district court had already expended substantial judicial resources overseeing and adjudicating" the parties' claims).

Accordingly, the Bankruptcy Court was well within its discretion in finding Appellants' Recusal Motion untimely. For this reason alone, the Recusal Motion was properly denied. *See Hill*, 495 Fed. App'x at 482 (affirming denial of recusal

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5 Filed 12/30/23   Page 99 of 1392   PageID 14841
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 49 of 60   PageID 10735

motion solely because it was "untimely," noting "[b]ecause we affirm on the basis of untimeliness, we do not reach the merits of the recusal issue"); *Hirczy*, 190 Fed. App'x at 360 (noting that because recusal motion was untimely, "a substantive review for abuse of discretion is unnecessary."); *Andrade*, 338 F.3d at 459 ("[U]ntimely motions to recuse are ordinarily rejected.")

## B.   The Bankruptcy Court Properly Exercised Its Discretion in Denying the Recusal Motion on the Merits

Even if the Recusal Motion had been timely, the Bankruptcy Court did not abuse its discretion in denying Appellants' Motion to Recuse on the merits.  A motion for recusal is committed to the sound discretion of the district court. *Hill*, 197 Fed. Appx'x at 335.  "The judge abuses [their] discretion in denying recusal where a reasonable [person], cognizant of the relevant circumstances surrounding [the] judge's failure to recuse, would harbor legitimate doubts about that judge's impartiality." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999).

Pursuant to Section 455:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned.

(b) [They] shall also disqualify [themselves] in the following circumstances:

(1) Where [they] has a personal bias or prejudice concerning a party, a personal knowledge of disputed evidentiary facts concerning the proceeding.

28 U.S.C. § 455(a) and (b)(1).

DOCS_NY:43746.7 36027/002

App. 00733

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 5 Filed 26/36/61   Page 100 of 1392   PageID 14842
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 50 of 60   PageID 10736

*"*The standard for bias is not 'subjective,' as it once was, but, rather, 'objective.'" *Andrade*, 338 F.3d at 454-55 (citing *Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*, 948 F.2d 1436, 1448 (5th Cir. 1991)). In other words, it "is with reference to the 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person' that the objective standard is currently established." *Id.* (quoting *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995)). "Another maxim is that review should entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents." *Id.* at 455. Finally, the common-law doctrine called the "extrajudicial source rule" under Section 455 "divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal." *Id.* Ultimately, to succeed in an appeal of a denial of a recusal motion, the appellant must: (1) demonstrate that the alleged comment, action, or circumstance was of "extrajudicial" origin, (2) place the offending event into the context of the entire trial, and (3) do so by an "objective" observer's standard. They must also demonstrate that the "district court's refusal to recuse was not merely erroneous, but, rather, an abuse of discretion." *Id.* at 456-62.

As the Bankruptcy Court properly determined, none of the circumstances requiring disqualification under Section 455 are present here.

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 81-5 Filed 52/28/23 61 Page 101 of 1392    PageID 14843
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 51 of 60    PageID 10737

## 1.    There Is No Extrajudicial Bias Present Here

The Bankruptcy Court correctly found that any knowledge learned from the Acis Bankruptcy is insufficient to constitute "extrajudicial" knowledge warranting recusal. (*See* Recusal Order at 9).  The core of Appellants' argument on appeal is that the Bankruptcy Court's "extrajudicial" bias toward Appellants stemmed from opinions formed during the Acis Bankruptcy. (*See* App. Brief. ¶¶ 3-4).  Appellants' argument is frivolous.

As articulated by the most prominent Supreme Court case on recusal, "[o]pinions formed by the judge on the basis of facts of prior proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Conkling v. Turner*, 138 F.3d 577, 592 (5th Cir. 1998) ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).  Rather, opinions or beliefs formed from events on the record or from prior proceedings, or "intrajudicial" opinions, are subject to a "deferential" review, and are the "type of opinions/expressions that *Liteky* holds nearly exempt from causing recusal." *Andrade*, 338 F.3d at 460-62.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 5    Filed 02/23/23    Page 102 of 1392    PageID 14844
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 52 of 60    PageID 10738

Any opinion allegedly formed by the Bankruptcy Court from the Acis Bankruptcy, a prior proceeding, is thus not contemplated by the "extrajudicial" source rule and is precisely the type of opinion that is exempt from warranting recusal. *See Litkey*, 510 U.S. at 555; *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 81 (5th Cir. 2011) (affirming denial of motion for recusal where "the only facts the [judge] learned about [party's] conduct were learned from judicial proceedings in the instant case and in previous cases"); *Conkling*, 138 F.3d at 592 ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).[26]

For these same reasons, Appellants' reliance on the Bankruptcy Court's rulings as evidence of "antagonism" is equally deficient. (*See, e.g.*, App. Brief ¶¶ 55-56). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion … and can only in the rarest circumstances evidence the degree of favoritism or antagonism required … when no extrajudicial source is involved." *Liteky*, 510 U.S. at 555. Here, Appellants rely on various rulings issued by the

---

[26] Appellants rely on only one allegedly "extrajudicial" source relating to the Bankruptcy Court's inquiries into COVID-related "PPP loans." (App. Brief. ¶ 24). However, as noted *supra*, the Bankruptcy Court took no action against Mr. Dondero or any of the Appellants and did not even ask them to respond.

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5 Filed 11/20/23 Page 103 of 1392   PageID 14845
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 53 of 60   PageID 10739

Bankruptcy Court to demonstrate "bias." *See* App. Brief. ¶¶ 7-11 (citing to Bankruptcy Court's grant in part and denial in part on Foley Application; *id.* ¶¶ 12-17 (citing to Bankruptcy Court's denial of Appellants' Restriction Motion), *id.* ¶¶ 27-28 (citing to Bankruptcy Court's grant of Debtor's TRO Motion against Advisors and Funds); *id.* ¶ 57 (citing to Bankruptcy Court's holding that Debtor's motion for Mandatory Injunction against Advisors and Funds was "moot"); *id.* ¶ 57 (citing to Bankruptcy Court's denial of Dugaboy's motion to compel the Debtor to file "unduly burdensome" financial reports); *id.* ¶ 58 (citing June 17 Order requiring Appellants to disclose inter alia, whether they are "creditors" of the Debtor and Mr. Dondero's ownership interest in entities "with ties to Mr. Dondero"). These rulings, none of which involve an extrajudicial source, simply do not rise to the rare circumstance of evidencing the degree of antagonism warranted for recusal. *See Liteky*, 510 U.S. at 555 ("Almost invariably, judicial rulings are proper grounds for appeal, not for recusal"); *Andrade*, 338 F.3d at 456 (denying recusal based on judicial rulings where events cited "are embodied in judicial actions that Appellants could have, but did not, appeal"). Appellants fail to even address the established law set forth under *Liteky*, which plainly forecloses their remedy of recusal, and instead merely cite to *Liteky* in a few footnotes while twisting its holdings. (*See* App. Brief ¶¶ 54-55 fn. 114, 115, 117). Simply put, Appellants offer no credible legal or factual basis for recusal. *See Henderson v. Dep't of Pub. Safety and Corrs.*, 901 F.2d 1288,

DOCS_NY:43746.7 36027/002

App. 00237

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 5   Filed 09/26/23   Page 104 of 1392   PageID 14846
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 54 of 60   PageID 10740

1296 (5th Cir. 1990) ("[E]ven the most superficial research would have put [the party] on notice that the factual circumstances he alleged were not grounds for recusal" under *Liteky*, noting "there is absolutely no case authority cited by [party] to the contrary.")

Appellants' "due process" argument that "even a lack of extrajudicial knowledge is not fatal because Appellants are entitled to make their case in an impartial forum," App Brief. ¶¶50, 54, is frivolous and should be summarily rejected by the Court.  Appellants fail to support any notion of a "due process" violation.  Nor could they.  The record of this Case shows the great extent to which the Bankruptcy Court has respected the due process rights of Appellants, notwithstanding their limited, if any, skin in the game.  The cases cited by Appellants in support of their contention are entirely inapplicable.  *Miller v. Sam Houston State Univ.,* 986 F.3d 880, 893 (5th Cir. 2021) does not address the standard for "recusal" under Section 455 or the "extrajudicial" source rule.  Rather, *Miller* deals with whether a case should be reassigned to a different district court judge on remand after the original judge did not give plaintiff the opportunity for discovery and *sua sponte* dismissed a plaintiff's claim of sex discrimination and retaliation under the Fair Labor Standers Act. *Marshall v. Jerrico*, 446 U.S. 238 (1980) also does not address recusal motions, but deals with whether the "reimbursement provision of the [Fair Labor Standards] Act violate the Due Process Clause." *Id.* at 243.  Appellants' remaining case cites on

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 5 Filed 06/20/23 Page 105 of 1392    PageID 14847
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 55 of 60    PageID 10741

this point are equally irrelevant.[27]    The types of exceptional circumstances warranting recusal in those cases are not present here.  Appellants otherwise offer no legal basis in support of their argument.  Accordingly, the Bankruptcy Court properly exercised its discretion in finding that there was no "extrajudicial" source warranting recusal.

### 2.    The Bankruptcy Court Does Not Harbor Deep-Seated Antagonism Toward Appellants

The Bankruptcy Court also properly exercised its discretion in finding that it did not harbor any "deep-seated antagonism" toward Appellants such that it would raise "doubt in the mind of a reasonable observer" as to the Bankruptcy Court's impartiality. (Recusal Order at 10).  Appellants contend that the Bankruptcy Court's "repeated negative statements about Mr. Dondero" and "reference to proceedings in the Acis Bankruptcy to justify findings made in the Highland" case justify recusal. (App. Brief ¶¶ 51-58).  Appellants' arguments are without merit.

---

[27] For example, the Court in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), reversed a denial of a recusal motion as a "matter of due process" where, following entry of a $50 million judgment against a corporation in favor of the CEO, that CEO contributed $3 million to help elect the same judge who the CEO knew would preside over corporation's appeal.  The Court in *Johnson v. Mississippi*, 403 U.S. 212 (1971), found recusal of a judge was necessary where that judge "was a defendant in one of petitioner's civil rights suits and a losing party at that."  *Id.* at 215.  The Court in *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 167 (5th Cir. 1997), denied a petition for writ of mandamus challenging denial of recusal premised on racist remarks, where, although a "reasonable person might indeed harbor doubts about the trial judge's impartiality" in a "racially-charged case such as the instant one," the judge had already presided over the case for so long such that recusal at that stage "would be unprecedented."

49

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 5 Filed 07/21/23 61 Page 106 of 1392   PageID 14848
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 56 of 60   PageID 10742

"Judicial remarks that are critical or disapproving of, or even hostile to, counsel for the parties or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. In support of their argument that the Bankruptcy Court harbored "bias" toward Appellants, Appellants refer to a number of the Bankruptcy Court's remarks regarding, *inter alia*: (i) the "importance" of the language in Settlement Order and Mr. Dondero abiding by its terms, (App. Brief ¶¶ 3-4), (ii) its "concern" regarding Mr. Dondero's appeal of Acis, (*id.* ¶ 6), (iii) the Restriction Motion as "frivolous," (*id.* ¶ 11); and (iv) its reminder to Mr. Dondero that the Settlement Order prohibits him from terminating the Debtor's agreements after evidence established that he was likely behind the K&L Gates Letters, (*id.* ¶ 17).

In relying on such statements, Appellants again disregard the law on recusal. *See Andrade*, 338 F.3d at 459 (affirming denial of recusal motion premised on judge's negative comments made on the record – including describing a witness as "crazy, murdering son-of-a-bitch" and referring to parties' attempt to introduce certain evidence as "bullcrap," – noting that appellants "brief omits citing the most prominent Supreme Court statement on point (citing *Liteky*, 510, U.S. at 555)). As the Bankruptcy Court properly found, Appellants' cited remarks are, at best, "clashes between a court and counsel," and such remarks are "simply insufficient" for recusal. (Recusal Order at 10). *See United States v. Landerman*, 109 F.3d 1053, 1066 (5th

DOCS_NY:43746.7 36027/002

APPX. 00730

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5   Filed 08/28/23   Page 107 of 1392   PageID 14849
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 57 of 60   PageID 10743

Cir. 1997) (affirming denial of motion to recuse where district judge allowed "the Government more leeway during its questioning and did interrupt defense counsel's questioning more often than the Government's questioning"); *Garcia v. Woman's Hosp. of Texas*, 143 F.3d 227, 230 (5th Cir. 1998) (affirming denial of motion to recuse where district judge had made unflattering comments about plaintiff's ability to prove her case).

Based on the entirety of the proceedings before the Bankruptcy Court, in which all events raised by Appellants relate to either the Bankruptcy Court's knowledge of prior proceedings or the Bankruptcy Court's remarks during these proceedings, the exceptional remedy of recusal is not warranted. *See United States v. Williams*, 127 Fed. App'x 736, 737-38 (5th Cir. 2005) ("As our review of the entire context of the judicial proceedings in which the events challenged in this case arose reveals no disqualifying judicial bias, we conclude that there was no abuse of discretion in the district court's denial of [the] recusal motion"); *Henderson*, 901 F.2d at 1296 (affirming court's denial of recusal motion, where "none of the circumstances requiring disqualification under § 455 are present here" and "the trial judge was well within his discretion in finding that the motion for recusal was not well founded, either in fact or in law.")  The Bankruptcy Court, therefore, properly exercised its discretion in finding that Appellants' assertions do not "rise to the

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 5 Filed 09/20/23 61 Page 108 of 1392    PageID 14850
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 58 of 60    PageID 10744

threshold standard of raising doubt in the mind of a reasonable observer' as to the

judge's impartiality." (Recusal Order at 10).

Accordingly, the Bankruptcy Court was well within its discretion in denying

the Recusal Motion on the merits.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtor respectfully requests that this Court

affirm the Recusal Order.

DOCS_NY:43746.7 36027/002

APPX. 00742

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 5 Filed 08/20/23   Page 109 of 1392   PageID 14851
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 59 of 60   PageID 10745

Dated:  July 28, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        jelkin@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:43746.7 36027/002

APP.100733

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-5 Filed 12/29/23    Page 110 of 1392    PageID 14852
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 60 of 60    PageID 10746

## CERTIFICATE OF COMPLIANCE WITH RULE 8015

This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(i) because, according to Microsoft Word, it contains 12,803 words, excluding the portions of the document exempted by Fed. R. Bankr. P. 8015(g).


By: */s/ Zachery Z. Annable*
Zachery Z. Annable

# EXHIBIT 6

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88 Filed 10/28/2804 Page 112 of 1392    PageID 14854
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1 of 1803    PageID 10747

Case No. 3:21-cv-00879-K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY
INVESTMENT TRUST, THE GET GOOD TRUST, AND NEXPOINT REAL
ESTATE PARTNERS, LLC,

**Appellants,**

v.

HON. STACEY G. C. JERNIGAN AND HIGHLAND CAPITAL
MANAGEMENT, L.P.

**Appellees.**

On Appeal from the United States Bankruptcy Court
Northern District of Texas, Dallas Division
The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court

In re:  Highland Capital Management, L.P.
Case No. 19-34054 (Jointly Administered)

APPENDIX IN SUPPORT OF ANSWERING BRIEF OF
APPELLEE HIGHLAND CAPITAL MANAGEMENT, L.P.

1934054210728000000000007

App. 00248

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 ExhibitFile 6 Filed 09/28/04 Page 113 of 1392   PageID 14855
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 2 of 1803   PageID 10748

Appellee Highland Capital Management, L.P. ("Highland" or the "Debtor"),

the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy

case (the "Bankruptcy Case"), hereby files this appendix in support of the Answering

Brief of Appellee Highland Capital Management, L.P. (the "Brief").

## **TABLE OF CONTENTS**

| Appx. | Description |
|-------|-------------|
| 1. | *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1473 (Bankr. N.D. Tex. Nov. 24, 2020) |
| 2. | *Partial Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (March 6, 2019) |
| 3. | *Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (April 29, 2019) |
| 4. | *May 17, 2019 Transcript,* Daugherty v. Highland Capital Management, L.P., C.A. No. 2018-0488-MTZ (Del. Ch. May 17, 2019) |
| 5. | *Order Denying Application to Certify Interlocutory Appeal,* C.A. No. 2018-0488-MTZ (Del. Ch. July 8, 2019) |
| 6. | *Motion for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) |
| 7. | *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) |
| 8. | *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*, Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/29/23   Page 114 of 1392   PageID 14856
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 3 of 1803   PageID 10749

| 9. | *Opinion* affirming Confirmation Order, Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) |
|---|---|
| 10. | *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) |
| 11. | *Objection of the Debtor to Motion of Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 118 (Bankr. D. Del. Nov. 12, 2019) |
| 12. | *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, Case No. 19-34054-sgj11, Docket No. 281 (Bankr. N.D. Tex. Dec. 27, 2019) |
| 13. | *Debtor's Omnibus Reply in Support of (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 159 (Bankr. D. Del. Nov. 21, 2019) |
| 14. | *Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 70 (Bankr. D. Del. Oct. 29, 2019) |
| 15. | *Limited Objection to the Debtor's: (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 116 (Bankr. D. Del. Nov. 12, 2019) |
| 16. | *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP and Lynn Piker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 120 (Bankr. D. Del. Nov. 12, 2019) |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 6 Filed 12/29/23 04 Page 115 of 1392   PageID 14857
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 4 of 1803   PageID 10750

| | |
|---|---|
| 17. | *Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11, Docket No. 2590 (Bankr. N.D. Tex. July 20, 2021) |
| 18. | *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1661 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 19. | *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* filed by Get Good Trust, The Dugaboy Investment Trust, Case No. 19-34054-sgj11, Docket No. 1667 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 20. | *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund, Case No. 19-34054-sgj11, Docket No. 1670 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 21. | *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)*, Case No. 19-34054-sgj11, Docket No. 1673 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 22. | *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization*, Case No. 19-34054-sgj11, Docket No. 1671 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 23. | *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1814 (Bankr. N.D. Tex. Jan. 22, 2021) |
| 24. | *Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management,* |

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6   Filed 02/09/2804   Page 116 of 1392   PageID 14858
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 5 of 1803   PageID 10751

| | Case No. 19-34054-sgj11, Docket No. 1807 (Bankr. N.D. Tex. Jan. 22, 2021) |
|---|---|
| 25. | *Debtor's Witness and Exhibit List with Respect to Confirmation Hearing to be Held on January 26, 2021*, Case No. 19-34054-sgj11, Docket No. 1822 (Bankr. N.D. Tex. Jan. 22, 2021) |
| 26. | *Debtor's Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 2, 2021*, Case No. 19-34054-sgj11, Docket No. 1866 (Bankr. N.D. Tex. Jan. 29, 2021) |
| 27. | *Debtor's Second Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 2, 2021*, Case No. 19-34054-sgj11, Docket No. 1877 (Bankr. N.D. Tex. Feb. 1, 2021) |
| 28. | *Debtor's Third Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 3, 2021*, Case No. 19-34054-sgj11, Docket No. 1895 (Bankr. N.D. Tex. Feb. 4, 2021) |
| 29. | *Summary of Dondero Entity Litigation*, Case No. 3:19-cv-00842-B, Docket No. 43 at 546-557 (N.D. Tex. July 13, 2021) |

DOCS_NY:43760.2 36027/002

APPX. 00250

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-6 Filed 12/29/23 4 Page 117 of 1392    PageID 14859
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 6 of 1803    PageID 10752

Respectfully submitted,

Dated:  July 28, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          rfeinstein@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 02/29/2304   Page 118 of 1392   PageID 14860
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 7 of 1803   PageID 10753

# APPENDIX 1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 3-88    Filed 12/29/23 804 Page 119 of 1392    PageID 14861
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 8 of 1803    PageID 10754
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 1 of 178

Docket #1473  Date Filed: 11/24/2020

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) ) ) Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) ) Case No. 19-34054-sgj11 |
| Debtor. | ) ) ) ) |

### DISCLOSURE STATEMENT FOR THE FIFTH AMENDED PLAN OF
### REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054201124000000000002
Appellee Appx. 00002
Appx. 00353

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-6   Filed 11/02/23   Page 120 of 1392   PageID 14862
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 9 of 1803   PageID 10755
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 2 of 178

**ARTICLE I. EXECUTIVE SUMMARY** ........................................................................... 6

    **A.**    **Summary of the Plan** ......................................................................... 6

    **B.**    **An Overview of the Chapter 11 Process** ........................................... 8

    **C.**    **Purpose and Effect of the Plan** ....................................................... 8

        1.    The Plan of Reorganization ..................................................... 8

        2.    Plan Overview ........................................................................ 9

        3.    Voting on the Plan ................................................................ 10

        4.    Confirmation of the Plan ....................................................... 11

        5.    Confirming and Effectuating the Plan .................................... 12

        6.    Rules of Interpretation .......................................................... 12

        7.    Distribution of Confirmation Hearing Notice and Solicitation
            Package to Holders of Claims and Equity Interests ............... 12

        8.    Instructions and Procedures for Voting .................................. 14

        9.    The Confirmation Hearing ..................................................... 15

        10.   The Deadline for Objecting to Confirmation of the Plan ........ 16

        11.   Notice Parties ....................................................................... 16

        12.   Effect of Confirmation of the Plan ........................................ 16

    **D.**    **Effectiveness of the Plan** ............................................................... 17

    **E.**    **RISK FACTORS** ............................................................................ 17

**ARTICLE II. BACKGROUND TO THE CHAPTER 11 CASE AND
SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE** ................ 17

    **A.**    **Description and History of the Debtor's Business** ........................ 17

    **B.**    **The Debtor's Corporate Structure** ............................................... 17

    **C.**    **Business Overview** ....................................................................... 18

    **D.**    **Prepetition Capital Structure** ..................................................... 18

        1.    Jefferies Margin Borrowings (Secured) .................................. 18

        2.    The Frontier Bank Loan (Secured) ......................................... 19

        3.    Other Unsecured Obligations ................................................. 19

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16   Filed 212963 1804age 121 of 1392   PageID 14863
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 10 of 1803   PageID 10756
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 3 of 178

|     |     | 4.  | Equity Interests | 20 |
| E.  | SEC Filings | | | 20 |
| F.  | Events Leading Up to the Debtor's Bankruptcy Filings | | | 20 |
| G.  | Additional Prepetition Litigation | | | 21 |
| H.  | The Debtor's Bankruptcy Proceeding | | | 24 |
| I.  | First Day Relief | | | 24 |
| J.  | Other Procedural and Administrative Motions | | | 25 |
| K.  | United States Trustee | | | 25 |
| L.  | Appointment of Committee | | | 26 |
| M.  | Meeting of Creditors | | | 26 |
| N.  | Schedules, Statements of Financial Affairs, and Claims Bar Date | | | 26 |
| O.  | Governance Settlement with the Committee | | | 27 |
| P.  | Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer | | | 27 |
| Q.  | Mediation | | | 28 |
| R.  | Postpetition Settlements | | | 28 |
|     |     | 1.  | Settlement with Acis and the Terry Parties | 28 |
|     |     | 2.  | Settlement with the Redeemer Committee | 29 |
| S.  | Certain Outstanding Material Claims | | | 30 |
| T.  | Treatment of Shared Service and Sub-Advisory Agreements | | | 31 |
| U.  | Portfolio Managements with Issuer Entities | | | 32 |
| V.  | Resignation of James Dondero | | | 33 |
| W.  | Exclusive Periods for Filing a Plan and Soliciting Votes | | | 33 |
| X.  | Negotiations with Constituents | | | 34 |
| Y.  | Highland Capital Management, L.P. Retirement Plan and Trust | | | 34 |
| **ARTICLE III.** | **SUMMARY OF THE PLAN** | | | 35 |
| A.  | Administrative and Priority Tax Claims | | | 35 |
|     |     | 1.  | Administrative Expense Claims | 35 |
|     |     | 2.  | Professional Fee Claims | 36 |
|     |     | 3.  | Priority Tax Claims | 37 |
| B.  | Classification and Treatment of Classified Claims and Equity Interests | | | 37 |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18 Filed 21/23/804age 122 of 1392    PageID 14864
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 11 of 1803    PageID 10757
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 4 of 178

|  | 1. | Summary ................................................................. | 37 |
|  | 2. | Elimination of Vacant Classes .................................. | 38 |
|  | 3. | Impaired/Voting Classes ........................................... | 38 |
|  | 4. | Unimpaired/Non-Voting Classes ............................... | 38 |
|  | 5. | Impaired/Non-Voting Classes .................................... | 38 |
|  | 6. | Cramdown................................................................ | 39 |
| **C.** | **Classification and Treatment of Claims and Equity Interests** ...... | | 39 |
|  | 1. | *Class 1 – Jefferies Secured Claim* ........................... | 39 |
|  | 2. | *Class 2 – Frontier Secured Claim* ........................... | 39 |
|  | 3. | *Class 3 – Other Secured Claims* .............................. | 40 |
|  | 4. | *Class 4 – Priority Non-Tax Claims* .......................... | 40 |
|  | 5. | *Class 5 – Retained Employee Claims* ....................... | 41 |
|  | 6. | *Class 6 – PTO Claims* .............................................. | 41 |
|  | 7. | *Class 7 – Convenience Claims* .................................. | 41 |
|  | 8. | *Class 8 – General Unsecured Claims* ........................ | 42 |
|  | 9. | *Class 9 – Subordinated Claims* ................................ | 43 |
|  | 10. | *Class 10 – Class B/C Limited Partnership Interests* ...... | 44 |
|  | 11. | *Class 11 – Class A Limited Partnership Interests* ......... | 44 |
| **D.** | **Special Provision Governing Unimpaired Claims** ...... | | 45 |
| **E.** | **Subordinated Claims** .............................................. | | 45 |
| **F.** | **Means for Implementation of the Plan** ...................... | | 45 |
|  | 1. | Summary ................................................................. | 45 |
|  | 2. | The Claimant Trust ................................................... | 46 |
|  | (a) | *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.* ............................................. | 46 |
|  | (a) | *Claimant Trust Oversight Committee* ........................ | 47 |
|  | (b) | *Purpose of the Claimant Trust.* ................................ | 48 |

- iii -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 11-186   Filed 12/29/23   Page 123 of 1392   PageID 14865
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 12 of 1803   PageID 10758
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 5 of 178

| | | |
|---|---|---|
| (c) | *Purpose of the Litigation Sub-Trust.* | 48 |
| (d) | *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* | 48 |
| (e) | *Compensation and Duties of Trustees.* | 50 |
| (f) | *Cooperation of Debtor and Reorganized Debtor.* | 50 |
| (g) | *United States Federal Income Tax Treatment of the Claimant Trust.* | 50 |
| (h) | *Tax Reporting.* | 50 |
| (i) | *Claimant Trust Assets.* | 51 |
| (j) | *Claimant Trust Expenses.* | 51 |
| (k) | *Trust Distributions to Claimant Trust Beneficiaries.* | 51 |
| (l) | *Cash Investments.* | 51 |
| (m) | *Dissolution of the Claimant Trust and Litigation Sub-Trust.* | 52 |
| 3. | <u>The Reorganized Debtor</u> | 52 |
| (a) | *Corporate Existence* | 52 |
| (b) | *Cancellation of Equity Interests and Release* | 53 |
| (c) | *Issuance of New Partnership Interests* | 53 |
| (d) | *Management of the Reorganized Debtor* | 53 |
| (e) | *Vesting of Assets in the Reorganized Debtor* | 53 |
| (f) | *Purpose of the Reorganized Debtor* | 54 |
| (g) | *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* | 54 |
| 4. | <u>Company Action</u> | 54 |
| 5. | <u>Release of Liens, Claims and Equity Interests</u> | 55 |
| 6. | <u>Cancellation of Notes, Certificates and Instruments</u> | 55 |
| 7. | <u>Cancellation of Existing Instruments Governing Security Interests</u> | 56 |

Appellee Appx. 00006
Appx. 00957

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/07/23    Page 124 of 1392    PageID 14866
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 13 of 1803    PageID 10759
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 6 of 178

8.    Control Provisions ............................................................56

9.    Treatment of Vacant Classes ...........................................56

10.   Plan Documents ................................................................56

11.   Highland Capital Management, L.P. Retirement Plan and
      Trust ..................................................................................56

A.    **Treatment of Executory Contracts and Unexpired Leases**.............57

      1.    Assumption, Assignment, or Rejection of Executory Contracts
            and Unexpired Leases.................................................57

      2.    Claims Based on Rejection of Executory Contracts or
            Unexpired Leases.......................................................58

      3.    Cure of Defaults for Assumed or Assigned Executory
            Contracts and Unexpired Leases...............................58

B.    **Provisions Governing Distributions** .........................................59

      1.    Dates of Distributions ...............................................59

      2.    Distribution Agent .....................................................60

      3.    Cash Distributions .....................................................60

      4.    Disputed Claims Reserve ...........................................60

      5.    Distributions from the Disputed Claims Reserve ......61

      6.    Rounding of Payments ...............................................61

      7.    *De Minimis* Distribution ...........................................61

      8.    Distributions on Account of Allowed Claims ...........62

      9.    General Distribution Procedures ...............................62

      10.   Address for Delivery of Distributions .......................62

      11.   Undeliverable Distributions and Unclaimed Property..............62

      12.   Withholding Taxes.....................................................63

      13.   Setoffs ........................................................................63

      14.   Surrender of Cancelled Instruments or Securities .....63

      15.   Lost, Stolen, Mutilated or Destroyed Securities .......63

- v -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-6   Filed 12/02/23   Page 125 of 1392   PageID 14867
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 14 of 1803   PageID 10760
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 7 of 178

**C.**    **Procedures for Resolving Contingent, Unliquidated and Disputed Claims** ...............................................................................64

    1.    Filing of Proofs of Claim ...............................................................64

    2.    Disputed Claims ...............................................................................64

    3.    Procedures Regarding Disputed Claims or Disputed Equity Interests ...........................................................................................64

    4.    Allowance of Claims and Equity Interests ................................64

*Allowance of Claims* ............................................................................................64

*Estimation* ............................................................................................................65

*Disallowance of Claims* ......................................................................................65

**D.**    **Effectiveness of the Plan** .....................................................................66

    1.    Conditions Precedent to the Effective Date ..............................66

    2.    Waiver of Conditions .....................................................................67

    3.    Effect of Non-Occurrence of Conditions to Effectiveness ......67

    4.    Dissolution of the Committee .....................................................67

**E.**    **Exculpation, Injunction, and Related Provisions** ..........................68

    1.    General ..............................................................................................68

    3.    Exculpation .....................................................................................69

    4.    Releases by the Debtor ..................................................................70

    5.    Preservation of Rights of Action ................................................71

*Maintenance of Causes of Action* ....................................................................71

*Preservation of All Causes of Action Not Expressly Settled or Released* .........72

    6.    Injunction ........................................................................................72

    7.    Term of Injunctions or Stays .......................................................73

    8.    Continuance of January 9 Order .................................................73

**F.**    **Article XII.D of the Plan** ....................................................................74

**G.**    **Binding Nature of Plan** .......................................................................74

**H.**    **Statutory Requirements for Confirmation of the Plan** ..................74

    1.    Best Interests of Creditors Test ...................................................75

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 02/23/04    Page 126 of 1392    PageID 14868
Exhibit 6    Page 128 of 180
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 15 of 1803    PageID 10761
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 8 of 178

|   | 2. | Liquidation Analysis | 75 |
|---|----|---------------------|----|
|   | 3. | Feasibility | 76 |
|   | 4. | Valuation | 77 |
|   | 5. | Acceptance by Impaired Classes | 77 |
|   | 6. | Confirmation Without Acceptance by Impaired Classes | 78 |
|   | 7. | No Unfair Discrimination | 78 |
|   | 8. | Fair and Equitable Test | 78 |

**ARTICLE IV. RISK FACTORS** ........................................................................... 79

A. **Certain Bankruptcy Law and Other Considerations** ................. 79

1. Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests, or Designation as Unimpaired. ........ 79

2. The Debtor May Not Be Able to Secure Confirmation of the Plan. ................................................................................................. 79

3. The Conditions Precedent to the Effective Date of the Plan May Not Occur. ................................................................................ 80

4. Continued Risk Following Effectiveness. ...................................... 80

5. The Effective Date May Not Occur. .............................................. 80

6. The Chapter 11 Case May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code .................................................. 81

7. Claims Estimation ......................................................................... 81

8. The Financial Information Contained Herein is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit was Performed. ................................................................. 81

B. **Risks Related to Recoveries under the Plan** ............................... 81

1. The Reorganized Debtor and/or Claimant Trust May Not Be Able to Achieve the Debtor's Projected Financial Results ............ 81

2. Claim Contingencies Could Affect Creditor Recoveries ............... 82

3. If Approved, the Debtor Release Could Release Claims Against Potential Defendants of Estate Causes of Action With Respect to Which the Claimant Trust Would Otherwise Have Recourse .......................................................................................... 82

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186  FiledExhibit 27 of 1804age 127 of 1392    PageID 14869
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 16 of 1803    PageID 10762
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 9 of 178

C.    **Investment Risk Disclaimer** ................................................................82

    1.    Investment Risks in General. .....................................................82

    2.    General Economic and Market Conditions and Issuer Risk. ......82

D.    **Disclosure Statement Disclaimer** .....................................................83

    1.    The Information Contained Herein is for Disclosure Purposes
Only. ...........................................................................................83

    2.    This Disclosure Statement was Not Approved by the SEC. ......83

    3.    This Disclosure Statement Contains Forward-Looking
Statements. .................................................................................83

    4.    No Legal or Tax Advice is Provided to You by This
Disclosure Statement. ................................................................83

    5.    No Admissions Are Made by This Disclosure Statement. .........84

    6.    No Reliance Should Be Placed on Any Failure to Identify
Litigation Claims or Projected Objections. ...............................84

    7.    Nothing Herein Constitutes a Waiver of Any Right to Object
to Claims or Equity Interests or Recover Transfers and Assets. ...............84

    8.    The Information Used Herein was Provided by the Debtor and
was Relied Upon by the Debtor's Advisors. .............................84

    9.    The Disclosure Statement May Contain Inaccuracies. .............84

    10.    No Representations Made Outside the Disclosure Statement
Are Authorized. .........................................................................85

**ARTICLE V. ALTERNATIVES TO CONFIRMATION AND
EFFECTIVENESS OF THE PLAN**....................................................85

**ARTICLE VI. U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN** .......................................................................................................85

A.    **Consequences to the Debtor**................................................................86

    1.    Cancellation of Debt ..................................................................86

    2.    Transfer of Assets ......................................................................87

B.    **U.S. Federal Income Tax Treatment of the Claimant Trust** .........87

C.    **Consequences to Holders of Allowed Claims** ..................................88

    1.    Recognized Gain or Loss...........................................................88

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6136    Filed 21/06/23 1804age 128 of 1392    PageID 14870
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 17 of 1803    PageID 10763
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 10 of 178

2.    Distribution in Discharge of Accrued Unpaid Interest ..............................89

3.    Information Reporting and Withholding ...................................................89

D.    **Treatment of the Disputed Claims Reserve**.......................................................89

**ARTICLE VII. RECOMMENDATION** ...................................................................90

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 12/29/23   Page 129 of 1392   PageID 14871
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 18 of 1803   PageID 10764
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 11 of 178

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned cases (the "Debtor"), is sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor or interest holder in connection with the *Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management, L.P.*, dated November 24, 2020, as the same may be amended from time to time (the "Plan").[2] The Debtor has filed a voluntary petition under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

This Disclosure Statement has not yet been approved by the Bankruptcy Court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code. The Debtor intends to seek an order or orders of the Bankruptcy Court (a) approving this Disclosure Statement as containing adequate information and (b) confirming the Plan.

A copy of the Plan is attached hereto as **Exhibit A**.

The Debtor believes that the Plan is fair and equitable, will maximize the value of the Debtor's Estate, and is in the best interests of the Debtor and its constituents. Notably, the Plan provides for the transfer of the majority of the Debtor's Assets to a Claimant Trust. The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor. The Reorganized Debtor will be managed by New GP LLC – a wholly-owned subsidiary of the Claimant Trust. This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets.

The Claimant Trust, the Litigation Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant Trust Agreement, or the Reorganized Limited Partnership Agreement.

---

**IMPORTANT INFORMATION ABOUT THIS
DISCLOSURE STATEMENT FOR YOU TO READ**

---

**The Debtor is providing the information in this Disclosure Statement to Holders of Claims and Equity Interests in connection with the Debtor's Plan. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any purpose other than with respect to confirmation of the Plan. The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.**

**This Disclosure Statement has not been filed for approval with the Securities and Exchange Commission ("SEC") or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon**

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

Appellee Appx. 00012
Appx. 10264

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6186   Filed 09/22/23   Page 130 of 1392   PageID 14872
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 19 of 1803   PageID 10765
Case 19-34054-sgj11  Doc 1473  Filed 11/24/20   Entered 11/24/20 10:24:41   Page 12 of 178

the merits of the Plan.  Any representation to the contrary is a criminal offense.  This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The Debtor considers all statements regarding anticipated or future matters to be forward-looking statements.  Forward-looking statements may include statements about:

- the effects of insolvency proceedings on the Debtor's business and relationships with its creditors;

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- financial strategy, budget, projections, and operating results;

- variation from projected operating and financial data;

- substantial capital requirements;

- availability and terms of capital;

- plans, objectives, and expectations;

- the adequacy of the Debtor's capital resources and liquidity; and

- the Claimant Trust's or the Reorganized Debtor's ability to satisfy future cash obligations.

Statements concerning these and other matters are not guarantees of the Claimant Trust's or Reorganized Debtor's future performance.  There are risks, uncertainties, and other important factors that could cause the Claimant Trust's or Reorganized Debtor's actual performance or achievements to be different from those that may be projected.  The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and is not necessarily in accordance with federal or state securities laws or other similar laws.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 22/06/13 04 Page 131 of 1392   PageID 14873
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 20 of 1803   PageID 10766
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 13 of 178

No legal or tax advice is provided to you by this Disclosure Statement. The Debtor urges each Holder of a Claim or an Equity Interest to consult with its own advisers with respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein.

Pachulski Stang Ziehl & Jones LLP ("PSZ&J") is general insolvency counsel to the Debtor. Development Specialists, Inc. ("DSI") is the Debtor's financial advisor. PSZ&J, DSI, and the Independent Board (as defined below) have relied upon information provided by the Debtor in connection with preparation of this Disclosure Statement. PSZ&J has not independently verified the information contained herein.

This Disclosure Statement contains, among other things, summaries of the Plan, the management of the Reorganized Debtor, the Claimant Trust, certain statutory provisions, certain events in the Debtor's Chapter 11 Case, and certain documents related to the Plan that are attached hereto and incorporated herein by reference or that may be filed later with the Plan Supplement. Although the Debtor believes that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any conflict, inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern and control for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtor's management. The Debtor does not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtor relied on financial data derived from the Debtor's books and records and on various assumptions regarding the Debtor's business. The Debtor's management has reviewed the financial information provided in this Disclosure Statement. Although the Debtor has used its reasonable business judgment to ensure the accuracy of this financial information, the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited (unless otherwise expressly provided herein) and no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtor's business and its, the Reorganized Debtor's, and the Claimant Trust's future results. The Debtor expressly cautions readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. Rather, this Disclosure Statement shall constitute a statement made in settlement negotiations related to potential contested matters, potential adversary proceedings and other pending or threatened litigation or actions.

Appellee Appx. 00014
APPX. 010266

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 22/03/3804 Page 132 of 1392   PageID 14874
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 21 of 1803   PageID 10767
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 14 of 178

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in the Disclosure Statement. Except as provided under the Plan, the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, may seek to investigate, file and prosecute Claims and Causes of Action and may object to Claims or Equity Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies any such Claims or Equity Interests or objections to Claims or Equity Interests on the terms specified in the Plan.

The Debtor is generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so. Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the Disclosure Statement was sent. Information contained herein is subject to completion, modification, or amendment. The Debtor reserves the right to file an amended or modified Plan and related Disclosure Statement from time to time.

The Debtor has not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtor has not authorized any representations concerning the Debtor or the value of its property other than as set forth in this Disclosure Statement.

Holders of Claims or Equity Interests must rely on their own evaluation of the Debtor and their own analyses of the terms of the Plan in considering the Plan. Importantly, each Holder of a Claim should review the Plan in its entirety and consider carefully all of the information in this Disclosure Statement and any exhibits hereto, including the risk factors described in greater detail in ARTICLE IV herein, "Risk Factors."

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Equity Interests in, the Debtor will be bound by the terms of the Plan and the transactions contemplated thereby.

The effectiveness of the Plan is subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to become effective will be satisfied (or waived).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 51-36    Filed 12/13/23    Page 133 of 1392    PageID 14875
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 22 of 1803    PageID 10768
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 15 of 178

## <u>EXHIBITS</u>

**EXHIBIT A** – Plan of Reorganization

**EXHIBIT B** – Organizational Chart of the Debtor

**EXHIBIT C** – Liquidation Analysis/Financial Projections

---

THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH
FULLY SET FORTH HEREIN.

---

Appellee Appx. 00016
Appx. 10267

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Filed 229d13804age 134 of 1392 PageID 14876
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 23 of 1803 PageID 10769
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 16 of 178

# ARTICLE I.
## EXECUTIVE SUMMARY

**This Disclosure Statement is provided for informational purposes only.**

**In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distributions to the Debtor's creditors and interest holders. The Debtor believes that any delay in confirmation of the Plan would result in significant administrative expenses resulting in less value available to the Debtor's constituents. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan. Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.**

This Executive Summary is being provided to Holders of Allowed Claims and Equity Interests as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (including all exhibits attached hereto and to the Plan and the Plan Supplement), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan. Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization or liquidation. As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement includes, without limitation, information about:

- the Debtor's operating and financial history;

- the significant events that have occurred to date;

- the Confirmation process; and

- the terms and provisions of the Plan, including key aspects of the Claimant Trust and the Reorganized Debtor, certain effects of Confirmation of the Plan, certain risk factors relating to the Plan, and the manner in which distributions will be made under the Plan.

The Debtor believes that any alternative to Confirmation of the Plan would result in significant delays, litigation, and additional costs, and ultimately would diminish the Debtor's value. **Accordingly, the Debtor strongly supports confirmation of the Plan.**

A. **Summary of the Plan**

The Plan represents a significant achievement for the Debtor. As discussed herein, the Plan provides that the Claimant Trust will receive the majority of the Debtor's assets, including Causes of Action. The assets being transferred to the Claimant Trust are referred to, collectively, as the Claimant Trust Assets. The Claimant Trust will – for the benefit of the Claimant Trust

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 225ad3804age 135 of 1392    PageID 14877
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 24 of 1803    PageID 10770
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 17 of 178

Beneficiaries – monetize the Claimant Trust Assets, pursue the Causes of Action, and work to conclude the various lawsuits and litigation claims pending against the Estate.

The Plan also provides for the reorganization of the Debtor. This will be accomplished by the cancellation of the Debtor's current Equity Interests, which consist of partnership interests held by: The Dugaboy Investment Trust;[3] the Hunter Mountain Investment Trust ("Hunter Mountain"); Mark Okada, personally and through family trusts; and Strand, the Debtor's general partner. On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. The Reorganized Debtor will be managed by the Claimant Trust, as the managing member of New GP LLC.

The Reorganized Debtor will oversee the monetization of the Reorganized Debtor Assets, which consist of, among other Assets, the management of the Managed Funds. The net proceeds from the Reorganized Debtor Assets will ultimately be distributed to the Claimant Trust and available for distribution to the Claimant Trust Beneficiaries.

The following is an overview of certain other material terms of the Plan:

- Allowed Priority Non-Tax Claims will be paid in full;

- Allowed Retained Employee Claims will be Reinstated;

- Allowed Convenience Claims will receive the lesser of (i) 85% of their Allowed Claim or (ii) such Holder's Pro Rata share of the Convenience Claims Cash Pool (*i.e.*, $13,150,000). Holders of Convenience Claims can elect the treatment provided to General Unsecured Claims by making the GUC Election on their Ballots;

- Allowed General Unsecured Claims and Allowed Subordinated Claims will receive their Pro Rata share of Claimant Trust Interests. The Claimant Trust Interests distributed to Allowed General Unsecured Claims will be senior to those distributed to Allowed Subordinated Claims as set forth in the Claimant Trust Agreement. Holders of General Unsecured Claims that are liquidated as of the Confirmation Date can elect the treatment provided to Convenience Class Election by reducing their Claims to $1,000,000 and making the Convenience Class Election on their Ballots; and

- Allowed Class B/C Limited Partnership Interests and Allowed Class A Limited Partnership Interests will receive their Pro Rata share of the Contingent Claimant Trust Interests.

---

[3] The Dugaboy Investment Trust is a Delaware trust created to manage the assets of James Dondero and his family.

Appellee Appx. 00018
Appx. 10339

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 02/22/23   Page 136 of 1392   PageID 14878
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 25 of 1803   PageID 10771
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 18 of 178

### B.      An Overview of the Chapter 11 Process

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors, and other parties in interest.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The commencement of a Chapter 11 case creates an estate comprised of all of the legal and equitable interests of a debtor in property as of the date that the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession," unless the bankruptcy court orders the appointment of a trustee.  The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the consummation of a plan of reorganization or liquidation, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.  Please see ARTICLE II for a discussion of the U.S. Trustee and the statutory committees.

Upon the commencement of a chapter 11 bankruptcy case, all creditors and equity interest holders generally have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan is the principal objective of a chapter 11 case. The plan sets forth the means of satisfying the claims against and equity interests in the debtor.

### C.      Purpose and Effect of the Plan

1.      The Plan of Reorganization

The Debtor is reorganizing pursuant to chapter 11 of the Bankruptcy Code.  As a result, the Confirmation of the Plan means that the Debtor's business will continue to operate following confirmation of the Plan through the Claimant Trust and the Reorganized Debtor to monetize assets for distribution to Holders of Allowed Claims.  The Claimant Trust will hold the Claimant Trust Assets and manage the efficient monetization of, the Claimant Trust Assets.  The Claimant Trust will also manage the Reorganized Debtor through the Claimant Trust's ownership of the Reorganized Debtor's general partner, New GP LLC.  The Claimant Trust will also be the sole limited partner in the Reorganized Debtor.  The Reorganized Debtor will manage the wind down

- 8 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 22/02/2 1804age 137 of 1392    PageID 14879
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 26 of 1803    PageID 10772
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 19 of 178

of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets.  The Claimant Trust will also establish a Litigation Sub-Trust in accordance with the Plan, which will also be for the benefit of the Claimant Trust Beneficiaries.  The Litigation Sub-Trust will receive the Estate Claims.  The Litigation Trustee shall be the exclusive trustee of the Estate Claims included in the Claimant Trust Assets subject to oversight by the Claimant Trust Oversight Committee

A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

2.     Plan Overview

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtor.  For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests.  These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.[4]  Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for eight Classes of Claims against and/or Equity Interests in the Debtor.

**The projected recoveries set forth in the table below are estimates only and therefore are subject to change.  For a complete description of the Debtor's classification and treatment of Claims or Equity Interests, reference should be made to the entire Plan and the risk factors described in ARTICLE IV below.  For certain classes of Claims, the actual amount of Allowed Claims could be materially different than the estimated amounts shown in the table below.**

---

[4] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

Appellee Appx. 00020
APPX. 10872

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16   Filed 02/28/23   Page 138 of 1392   PageID 14880
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 27 of 1803   PageID 10773
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 20 of 178

| Class | Type of Claim or Interest | Estimated Prepetition Claim Amount [1] | Impaired | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Jefferies Secured Claim | $0.00 | No | No | 100% |
| 2 | Frontier Secured Claim[2] | $5,209,964 | Yes | Yes | 100% |
| 3 | Other Secured Claims | $551,116 | No | No | 100% |
| 4 | Priority Non-Tax Claim | $16,489 | No | No | 100% |
| 5 | Retained Employee Claim | $0 | No | No | 100% |
| 6 | PTO Claims [3] | $1,181,886 | No | No | 100% |
| 7 | Convenience Claims[4] | $12,064,333 | Yes | Yes | 85.00% |
| 8 | General Unsecured Claims[5] | $180,442,199 | Yes | Yes | 85.31% |
| 9 | Subordinated Claims | Undetermined | Yes | Yes | Undetermined |
| 10 | Class B/C Limited Partnership Interests | N/A | Yes | Yes | Undetermined |
| 11 | Class A Limited Partnership Interests | N/A | Yes | Yes | Undetermined |

[1] Excludes Priority Tax Claims and certain other unclassified amounts totaling approximately $1.1 million owed to Joshua and Jennifer Terry and Acis under a settlement agreement.

[2] Excludes interest accrued postpetition estimated at $318,000, which will be paid on the Effective Date. The Liquidation Analysis/Financial Projections provide for the payment of postpetition interest.

[3] Represents outstanding PTO Claims as of September 30, 2020. PTO Claims are subject to adjustment depending on the amount of actual prepetition PTO Claims outstanding as of the Effective Date. PTO claims are accounted for in the Liquidation Analysis/Financial Projections as an administrative claim and will be paid out in ordinary courses pursuant to applicable state law.

[4] Represents the estimated gross prepetition amount of Convenience Claims with a total payout amount estimated at 85% of $12.06 million, or $10.25 million. This number includes approximately $1.113 million of potential Rejection Claims and assumes that Holders of Allowed General Unsecured Claims that are each less than $2.50 million opt into the Convenience Class.

[5] Assumes no recovery for UBS, the HarbourVest Entities, IFA, Hunter Mountain, and an Allowed Claim of only $3,722,019 for Mr. Daugherty (each as discussed further below). Assumes $1.440 million of potential rejection damage claims. The Liquidation Analysis/Financial Projections assume Highland RCP, LP and Highland RCP Offshore, LP offset their Claim of $4.4 million against amounts owed to the Debtor.

    3.    <u>Voting on the Plan</u>

       Under the Bankruptcy Code, acceptance of a plan by a Class of Claims or Equity Interests is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims or Equity Interests voting on the Plan. Acceptance by a Class of Claims requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan. Acceptance by a Class of Equity Interests requires at least two-thirds in amount of the total Allowed Equity Interests in the Class to vote in favor of the Plan.

- 10 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 05/09/23   Page 139 of 1392   PageID 14881
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 28 of 1803   PageID 10774
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 21 of 178

Under the Bankruptcy Code, only Classes of Claims or Equity Interests that are "Impaired" and that are not deemed as a matter of law to have rejected a plan under Section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan. Any Class that is "Unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted the Plan. As set forth in Section 1124 of the Bankruptcy Code, a Class is "Impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered.

Pursuant to the Plan, Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims and Equity Interests in those Classes are entitled to vote to accept or reject the Plan. Whether a Holder of a Claim or Equity Interest in Class 2 and Class 7 through Class 11 may vote to accept or reject the Plan will also depend on whether the Holder held such Claim or Equity Interest as of November 23, 2020 (the "Voting Record Date"). The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

Pursuant to the Plan, Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, there are no Classes that will not receive or retain any property and no Classes are deemed to reject the Plan.

4.    Confirmation of the Plan

(a)    Confirmation Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

The confirmation of a plan by the Bankruptcy Court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

(b)    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Debtor will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an

- 11 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Filed 02/03/24 Page 140 of 1392 PageID 14882
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 29 of 1803 PageID 10775
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 22 of 178

announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

5. _Confirming and Effectuating the Plan_

It is a condition to the Effective Date of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtor and the Official Committee of Unsecured Creditors (the "Committee"). Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

6. _Rules of Interpretation_

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

7. _Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests_

As set forth above, Holders of Claims in Class 1 and Class 3 through Class 6 are not entitled to vote on the Plan. As a result, such parties will not receive solicitation packages or ballots but, instead, will receive this a notice of non-voting status, a notice of the Confirmation Hearing, and instructions on how to receive a copy of the Plan and Disclosure Statement.

The Debtor, with the approval of the Bankruptcy Court, has engaged Kurtzman Carson Consultants LLC (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots for each Class entitled to vote on the Plan and to generally oversee the voting process. The following materials shall constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

- 12 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 03/29/23   Page 141 of 1392   PageID 14883
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 30 of 1803   PageID 10776
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 23 of 178

- • The Bankruptcy Court order approving this Disclosure Statement (the "<u>Disclosure Statement Order</u>") (excluding exhibits);

- • The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "<u>Confirmation Hearing Notice</u>");

- • A single Ballot, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "<u>Voting Instructions</u>");

- • A pre-addressed, postage pre-paid return envelope; and

- • Such other materials as the Bankruptcy Court may direct or approve.

The Debtor, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available at the Debtor's restructuring website at www.kccllc.net/hcmlp.

On November 13, 2020, the Debtor filed the Plan Supplement [D.I. 1389] that included, among other things, the form of Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Reorganized Limited Partnership Agreement, New GP LLC Documents, the New Frontier Note, the Senior Employee Stipulation, and the identity of the initial members of the Claimant Trust Oversight Committee. The Plan Supplement also includes a schedule of the Causes of Action that will be retained after the Effective Date. The Plan Supplement may be supplemented or amended through and including December 18, 2020. If the Plan Supplement is supplemented, such supplemented documents will be made available on the Debtor's restructuring website at www.kccllc.net/hcmlp.

If you are the Holder of a Claim or Equity Interest and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to Kurtzman Carson Consultants LLC, via email at HighlandInfo@kccllc.com and reference "Highland Capital Management, L.P." in the subject line or by telephone at toll free: (877) 573-3984, or international: (310) 751-1829. If your Claim or Equity Interest is subject to a pending claim objection and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim or Equity Interest for voting purposes or you will not be entitled to vote to accept or reject the Plan. Any such motion must be filed so that it is heard in sufficient time prior to the Voting Deadline to allow for your vote to be tabulated.

**THE DEBTOR, THE REORGANIZED DEBTOR, AND THE CLAIMANT TRUSTEE, AS APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM OR EQUITY INTEREST FOR DISTRIBUTION PURPOSES.**

- 13 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 03/29/23 1804    Page 142 of 1392    PageID 14884
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 31 of 1803    PageID 10777
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 24 of 178

8.    <u>Instructions and Procedures for Voting</u>

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtor or the Voting Agent.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed November 23, 2020, as the Voting Record Date for the determination of the Holders of Claims and Equity Interests who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.  The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is January 5, 2021 at 5:00 p.m. (prevailing Central Time) (the "<u>Voting Deadline</u>")**.  In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and received no later than the Voting Deadline at the following address, as applicable:

**<u>If by first class mail, personal delivery, or overnight mail to:</u>**

<div align="center">

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

</div>

**<u>If by electronic voting:</u>**

**You may submit your Ballot via the Balloting Agent's online portal.  Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.  IMPORTANT NOTE: You will need the Unique Electronic Ballot ID Number and the Unique Electronic Ballot PIN Number set forth on your customized ballot in order to vote via the Balloting Agent's online portal.  Each Electronic Ballot ID Number is to be used solely for voting on those Claims or Interests on your electronic ballot.  You must complete and submit an electronic ballot for each Electronic Ballot ID Number you receive, as applicable.  Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

Only the Holders of Claims and Equity Interests in Class 2 and Class 7 through Class 11 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline.  Each Holder of a Claim and Equity Interest must vote its entire Claim or Equity Interest, as applicable, within a particular Class either to accept or reject the Plan and may not split such votes.  If multiple Ballots are received from the same Holder with respect to the same Claim or Equity Interest prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to

<div align="center">- 14 -</div>

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 03/23/23    Page 143 of 1392    PageID 14885
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 32 of 1803    PageID 10778
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 25 of 178

reflect that voter's intent and will supersede and revoke any prior Ballot. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific instructions provided on each Ballot.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR EQUITY INTEREST IN THE CLASSES ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the Solicitation Package that you have received, or (c) the amount of your Claim or Equity Interest, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or Exhibits to such documents, please contact the Voting Agent at the address specified above. Copies of the Plan, Disclosure Statement and other documents filed in these Chapter 11 Case may be obtained free of charge on the Voting Agent's website at www.kccllc.net/hcmlp or by calling toll free at: (877) 573-3984, or international at: (310) 751-1829. You may also obtain copies of pleadings filed in the Debtor's case for a fee via PACER at pacer.uscourts.gov. Subject to any rules or procedures that have or may be implemented by the Court as a result of the COVID 19 Pandemic, documents filed in this case may be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Central Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, Earle Cabell Federal Building, 1100 Commerce Street, Room 1254, Dallas, Texas 75242-1496.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") by January 11, 2021. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTOR URGES HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

       9.      The Confirmation Hearing

**The Bankruptcy Court has scheduled Confirmation Hearing Dates on January 13, 2021, and January 14, 2021, at 9:30 a.m. prevailing Central time.** The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-186   Filed 23/01/04   Page 144 of 1392   PageID 14886
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 33 of 1803   PageID 10779
Case 19-34054-sgj11  Doc 1473  Filed 11/24/20   Entered 11/24/20 10:24:41   Page 26 of 178

10.     The Deadline for Objecting to Confirmation of the Plan

**The Bankruptcy Court has set a deadline of January 5, 2021, at 5:00 p.m. prevailing Central time, for the filing of objections to confirmation of the Plan (the "Confirmation Objection Deadline").**  Any objection to confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim of such Entity or the amount of Equity Interests held by such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "Notice Parties").

**CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.  INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING APPROVED BY THE BANKRUPTCY COURT.**

11.     Notice Parties

•     Debtor:  Highland Capital Management, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (Attn:  James P. Seery, Jr.);

•     Counsel to the Debtor:  Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067-4003 (Attn:  Jeffrey Pomerantz, Esq.; Ira Kharasch, Esq., and Gregory Demo, Esq.);

•     Counsel to the Committee:  Sidley Austin, LLP, One South Dearborn, Chicago, Illinois 60603 (Attn:  Matthew Clemente, Esq., and Alyssa Russell, Esq.); and

•     Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242 (Attn: Lisa Lambert, Esq.).

12.     Effect of Confirmation of the Plan

The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests; (b) exculpation of certain parties; and (c) the release of claims against certain parties by the Debtor.

**The Plan shall bind all Holders of Claims against and Equity Interests in the Debtor to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder (i) will receive or retain any property or interest in property under the Plan, (ii) has filed a proof of claim in the Chapter 11 Case, or (iii) did not vote to accept or reject the Plan.**

- 16 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 51-36    Filed 02/23/24    Page 145 of 1392    PageID 14887
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 34 of 1803    PageID 10780
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 27 of 178

D.      **Effectiveness of the Plan**

It will be a condition to the Effective Date of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will go into effect on the Effective Date.

E.      **RISK FACTORS**

**Each Holder of a Claim or an Equity Interest is urged to consider carefully all of the information in this Disclosure Statement, including the risk factors described in ARTICLE IV herein titled, "Risk Factors."**

<div align="center">

**ARTICLE II.**
**BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE**

</div>

A.      **Description and History of the Debtor's Business**

Prior to the Petition Date, the Debtor was a multibillion-dollar global alternative investment manager founded in 1993 by James Dondero and Mark Okada.  A pioneer in the leveraged loan market, the firm evolved over twenty-five years, building on its credit expertise and value-based approach to expand into other asset classes.

As of the Petition Date, the Debtor operated a diverse investment platform, serving both institutional and retail investors worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built around specialized teams. Additionally, the Debtor provided shared services to its affiliated registered investment advisers.

B.      **The Debtor's Corporate Structure**

The Debtor is headquartered in Dallas, Texas.  The Debtor itself is a Delaware limited partnership and one of the principal operating arms of the Debtor's business.  As of the Petition Date, the Debtor employed approximately 76 people, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.

Pursuant to various contractual arrangements, the Debtor, as of the Petition Date, provided money management and advisory services for approximately $2.5 billion of assets under management shared services for approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors. None of these affiliates filed for Chapter 11 protection.  As of September 30, 2020, the Debtor provided money management and advisory services for approximately $1.641 billion of assets under management and shared services for approximately $7.136 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.  Further, on the Petition Date, the value of the Debtor's Assets was approximately

<div align="center">

- 17 -

</div>

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 6    Page 236 of 3 Page 146 of 1392    PageID 14888
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 35 of 1803    PageID 10781
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 28 of 178

$566.5 million. As of September 30, 2020, the total value of Debtor's Assets totaled approximately $328.3 million.

The drop in the value of the Debtor's Assets and assets under management was caused, in part, by the COVID-19 global pandemic. Specifically, the decline was the result of, among other things, the drop in value of the Debtor's assets generally, the loss of value in the Prime Accounts discussed below, the professional and other costs associated with the Chapter 11 Case, and the reserve of approximately $59 million against a loan receivable listed as an asset.

| **Asset** | | **10/16/2019** | **9/30/2020** |
|---|---|---|---|
| Investments (FV)[1] | | $232,620,000 | $109,479,000 |
| Investments (Equity) | | $161,819,000 | $101,213,000 |
| Cash/Cash Equivalents | | $2,529,000 | $5,888,000 |
| Management/Incentive Fees Receivable | | $2,579,000 | $3,350,000 |
| Fixed Assets, net | | $3,754,000 | $2,823,000 |
| Loan Receivables | | $151,901,000 | $93,445,000[2] |
| Other Assets | | $11,311,000 | $12,105,000 |
| | **Totals** | $566,513,000 | $328,302,000 |

[1] Includes decrease in value of assets, costs of Chapter 11 Cases, and assets sold to satisfy liabilities.

[2] Net of reserve of $59 million.

The Debtor's organizational chart is attached hereto as Exhibit B. The organizational chart is not all inclusive and certain entities have been excluded for the sake of brevity.

## C.    Business Overview

The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course held through its prime brokerage account at Jefferies, LLC ("Jefferies"), as described in additional detail below. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and distribute those proceeds to the Debtor in the ordinary course of business. During calendar year 2018, the Debtor's stand-alone annual revenue totaled approximately $50 million. During calendar year 2019, the Debtor's stand-alone revenue totaled approximately $36.1 million.

## D.    Prepetition Capital Structure

### 1.    Jefferies Margin Borrowings (Secured)

The Debtor is party to that certain *Prime Brokerage Customer Agreement* with Jefferies dated May 24, 2013 (the "Brokerage Agreement"). Pursuant to the terms of the Brokerage Agreement and related documents, the Debtor maintains a prime brokerage account with

- 18 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 03/07/13804    Page 147 of 1392    PageID 14889
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 36 of 1803    PageID 10782
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 29 of 178

Jefferies (the "Prime Account"). A prime brokerage account is a unique type of brokerage account that allows sophisticated investors to, among other things, borrow both money on margin to purchase securities and common stock to facilitate short positions. A prime brokerage account also serves as a custodial account and holds client securities in the prime broker's street name.

As of the Petition Date, the Debtor held approximately $57 million of equity in liquid and illiquid securities (the "Securities") in the Prime Account. Pursuant to the Brokerage Agreement, the Debtor granted a lien in favor of Jefferies in the Securities and all of the proceeds thereof.

However, because of the economic distress caused by the COVID-19 global pandemic, the value of the Securities held in the Prime Account dropped since the Petition Date, and Jefferies has exerted significant pressure on the Debtor to liquidate the Securities to satisfy margin calls. As of September 30, 2020, the equity value of the Securities in the Prime Account was approximately $23.3 million, and the Debtor owed no amounts to Jefferies. The Debtor has been actively selling Securities to cover operating expenses and professional fees.

2.    The Frontier Bank Loan (Secured)

The Debtor and Frontier State Bank ("Frontier Bank") are parties to that certain *Loan Agreement* dated as of August 17, 2015 (the "Original Frontier Loan Agreement"), pursuant to which Frontier Bank loaned to the Debtor the aggregate principal amount of $9.5 million. On March 29, 2018, the Debtor and Frontier Bank entered into that certain First Amended and Restated Loan Agreement (the "Amended Frontier Loan Agreement"), amending and superseding the Original Frontier Loan Agreement. Pursuant to the Amended Frontier Loan Agreement, Frontier Bank made an additional $1 million loan to the Debtor (together with the borrowings under the Original Frontier Loan Agreement, the "Frontier Loan"). The Frontier Loan matures on August 17, 2021.

Pursuant to that certain Security and Pledge Agreement dated August 17, 2015, between Frontier Bank and the Debtor, as amended by the Amended Frontier Loan Agreement, the Debtor's obligations under the Frontier Loan are secured by 171,724 shares of voting common stock of MGM Holdings, Inc. (collectively, the "Frontier Collateral").

The aggregate principal balance of the Frontier Loan was approximately $5.2 million. As of September 30, 2020, the value of the Frontier Collateral was approximately $13.1 million, and approximately $318,000 in postpetition interest had accrued.

3.    Other Unsecured Obligations

As discussed below, the Plan provides for four Classes of unsecured claims: (i) PTO Claims, (ii) the Convenience Claims, (iii) the General Unsecured Claims, and (iv) the Subordinated Claims.

The Debtor has various substantial litigation claims asserted against it, which have been classified as General Unsecured Claims. In addition, as of the Petition Date, the Debtor had ordinary course trade debt, unaccrued employee bonus obligations and loan repayment, and

- 19 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6-18 Filed 02/13/24 Page 148 of 1392 PageID 14890
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 37 of 1803 PageID 10783
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 30 of 178

contractual commitments to various affiliated and unaffiliated non-Debtor entities for capital calls, contributions, and other potential reimbursement or funding obligations that were potentially in the tens of millions of dollars. The Debtor is still assessing these claims and its liability for such amounts. These Claims have been classified as Convenience Claims and Subordinated Claims.

     4.    <u>Equity Interests</u>

The Debtor is a Delaware limited partnership. As of the Petition Date, the Debtor had three classes of limited partnership interest (Class A, Class B, and Class C). The Class A interests were held by The Dugaboy Investment Trust, Mark Okada, personally and through family trusts, and Strand, the Debtor's general partner. The Class B and C interests were held by Hunter Mountain.

In the aggregate, the Debtor's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by The Dugaboy Investment Trust, (c) 0.0627% by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand.

**E.    SEC Filings**

The Debtor is an investment adviser registered with the SEC as required by the Investment Advisers Act of 1940. As a registered investment adviser, the Debtor is required to file (at least annually) a Form ADV. The Debtor's current Form ADV is available at https://adviserinfo.sec.gov/.

Following the Effective Date, it is anticipated that the Reorganized Debtor will maintain its registration with the SEC as a registered investment adviser.

**F.    Events Leading Up to the Debtor's Bankruptcy Filings**

The Chapter 11 Case was precipitated by the rendering of an Arbitration Award (as that term is defined below) against the Debtor on May 9, 2019, by a panel of the American Arbitration Association (the "<u>Panel</u>"), in favor of the Redeemer Committee of the Highland Crusader Fund (the "<u>Redeemer Committee</u>").

The Debtor was formerly the investment manager for the Highland Crusader Funds (the "<u>Crusader Funds</u>") that were formed between 2000 and 2002. In September and October 2008, as the financial markets in the United States began to fail, the Debtor was flooded with redemption requests from Crusader Funds' investors, as the Crusader Funds' assets lost significant value.

On October 15, 2008, the Debtor placed the Crusader Funds in wind-down, thereby compulsorily redeeming the Crusader Funds' limited partnership interests. The Debtor also declared that it would liquidate the Crusader Funds' remaining assets and distribute the proceeds to investors.

However, disputes concerning the distribution of the assets arose among certain investors. After several years of negotiations, a Joint Plan of Distribution of the Crusader Funds

- 20 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 02/23/24    Page 149 of 1392    PageID 14891
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 38 of 1803    PageID 10784
Case 19-34054-sgj11  Doc 1473  Filed 11/24/20    Entered 11/24/20 10:24:41    Page 31 of 178

(the "Crusader Plan"), and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors (the "Crusader Scheme"), were adopted in Bermuda and became effective in August 2011.  As part of the Crusader Plan and the Crusader Scheme, the Redeemer Committee was elected from among the Crusader Funds' investors to oversee the Debtor's management of the Crusader Funds.

Between October 2011 and January 2013, in accordance with the Crusader Plan and the Crusader Scheme, the Debtor distributed in excess of $1.2 billion to the Crusader Funds' investors.  The Debtor distributed a further $315.3 million through June 2016.

However, disputes subsequently arose between the Redeemer Committee and the Debtor. On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor (the "Arbitration"), and (c) commenced litigation in Delaware Chancery Court, to, among other things, obtain a status quo order in aid of the arbitration, which order was subsequently entered.

Following an evidentiary hearing, the Panel issued (a) a *Partial Final Award,* dated March 6, 2019 (the "March Award"), (b) a *Disposition of Application for Modification of Award,* dated March 14, 2019 (the "Modification Award"), and (c) a *Final Award,* dated May 9, 2019 (the "Final Award" and together with the March Award and the Modification Award, the "Arbitration Award").  Pursuant to the Arbitration Award, the Redeemer Committee was awarded gross damages against the Debtor in the aggregate amount of $136,808,302; as of the Petition Date, the total value of the Arbitration Award was $190,824,557, inclusive of interest

Prior to the Petition Date, the Redeemer Committee moved in the Chancery Court to confirm the Arbitration Award.  For its part, the Debtor moved to vacate parts of the Final Award contending that certain aspects were procedurally improper.  The Redeemer Committee's motion to confirm the Arbitration Award and the Debtor's motion to vacate were fully briefed and were scheduled to be heard by the Chancery Court on the day the Debtor filed for bankruptcy

On the Petition Date, the Debtor believed that the aggregate value of its assets exceeded the amount of its liabilities; however, the Debtor filed the Chapter 11 Case because it did not have sufficient liquidity to immediately satisfy the Award or post a supersedeas bond necessary to pursue an appeal.

G.    **Additional Prepetition Litigation**

In addition to the litigation with the Redeemer Committee described above, the Debtor, both directly and through certain subsidiaries, affiliates, and related entities, was party to substantial prepetition litigation.  Although the Debtor disputes the allegations raised in this litigation and believes it has substantial defenses, this litigation has resulted in substantial Claims against the Debtor's Estate, each of which has been classified as a General Unsecured Claim.  To the extent that these litigation Claims cannot be resolved consensually, they will be litigated by the Claimant Trustee or Reorganized Debtor, as applicable.  The Debtor's major prepetition litigation is as follows:

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 6    Filed 12/09/23 04    Page 150 of 1392    PageID 14892
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 39 of 1803    PageID 10785
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 32 of 178

- **Redeemer Committee**: The dispute with the Redeemer Committee is described in ARTICLE II.F above.  As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves the Redeemer Committee's claims against the Estate; however, that order is currently subject to appeal.

- **Acis Capital Management, L.P., & Acis Capital Management GP, LLC**:  On January 30, 2018, Joshua Terry filed involuntary bankruptcy petitions against both Acis Capital Management, L.P. ("Acis LP") and its general partner, Acis Capital Management GP, LLC ("Acis GP," and collectively with Acis LP, "Acis") in the Bankruptcy Court for the Northern District of Texas, Dallas Division, the Honorable Judge Jernigan presiding (the same judge presiding over the Chapter 11 Case), Case No. 18-30264-SGJ (the "Acis Case").  Mr. Terry had been an employee of the Debtor and a limited partner of Acis LP.  Mr. Terry was terminated in June 2016, and obtained a multi-million dollar arbitration award against Acis.  Overruling various objections, the Bankruptcy Court entered the orders for relief for the Acis debtors in April 2018, and a chapter 11 trustee was appointed.  The Debtor filed a proof of claim against Acis and an administrative claim.  Acis disputes the Debtor's claim, and the Debtor has not received any distributions on its claim to date.  On January 31, 2019, Acis's chapter 11 plan was confirmed, and Mr. Terry become the sole owner of reorganized Acis. Several appeals remain pending, including an appeal of the entry of the Acis orders for relief and the Acis confirmation order.

  The Acis trustee commenced a lawsuit against the Debtor, among others, alleging fraudulent conveyance and other causes of action in relation to the Debtor's alleged prepetition effort to control and transfer away Acis's assets to avoid paying Mr. Terry's claim.  After the confirmation of the Acis plan, reorganized Acis allegedly supplanted the Acis Trustee as plaintiff and filed an amended complaint against the Debtor and other defendants, which claims comprise Acis's pending proof of claim against the Debtor.

  As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves  Acis's claims against the Estate; however, that order is currently subject to appeal.

- **UBS Securities LLC and UBS AG London Branch**:  UBS Securities LLC ("UBS Securities") filed a proof of claim in the amount of $1,039,957,799.40 [Claim No. 190] (the "UBS Securities Claim"), and UBS AG, London Branch ("UBS London," and together with UBS Securities, "UBS") filed a substantively identical proof of claim in the amount of $1,039,957,799.40 [Claim No. 191] (the "UBS London Claim" and together with the UBS Securities Claim, the "UBS Claim").  The UBS Claim was based on the amount of a judgment UBS received on a breach of contract claim against funds related to the Debtor that were unable to honor margin calls in 2008.  Although the Debtor had no obligation under UBS's contracts with the funds, UBS alleges the Debtor is liable for the judgment because it (i) breached an alleged duty to ensure that the funds could pay UBS, (ii) caused or permitted $233 million in alleged fraudulent transfers to be made by

Appellee Appx. 00033
APPX. 00334

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 24 2023 1804   Page 151 of 1392   PageID 14893
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 40 of 1803   PageID 10786
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 33 of 178

Highland Financial Partners, L.P. ("HFP") in March 2009, and (iii) is an alter ego of the funds.  The Debtor believes there are meritorious defenses to most, if not all, of the UBS Claim for numerous reasons, including: (i) decisions by the New York Appellate Division that limited UBS's claims to the March 2009 transfers that it alleges were fraudulent; (ii) those decisions should also apply to any alter ego claim (which at this time has not been formally asserted against the Debtor); (iii) UBS settled claims relating to $172 million of the $233 million in alleged fraudulent transfers and the Debtor is covered by the release; and (iv) the March 2009 transfers were in any event part of a wholly legitimate transaction that did not target UBS and for which HFP received fair consideration.  Those and several additional defenses are described in the *Debtor's Objection to Proofs of Claim 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 928].

On October 19, 2020, both the Debtor and the Redeemer Committee filed motions seeking partial summary judgment of the UBS Claim, which, if granted, will significantly decrease the UBS Claim.[5]  UBS responded to these motions on November 6, 2020 [D.I. 1341].  On November 20, 2020, the Bankruptcy Court granted partial summary judgment in favor of the Debtor and the Redeemer Committee.  It is anticipated that the Bankruptcy Court will enter a formal order within the next couple of weeks.

- Patrick Daugherty:  Patrick Daugherty has Filed a Proof of Claim for "at least $37,483,876.62" [Claim Nos. 67; 77] (the "Daugherty Claim").[6]  Mr. Daugherty is a former limited partner and employee of the Debtor.  The Daugherty Claim has three components, and Mr. Daugherty asserts claims: (1) for indemnification for any taxes Mr. Daugherty is required to pay as a result of the IRS audit of the Debtor's 2008-2009 tax return; (2) for defamation arising from a 2017 press release posted by the Debtor; and (3) arising from a pending Delaware lawsuit against the Debtor, which seeks to recover a judgment of $2.6 million in respect of Highland Employee Retention Assets ("HERA"), plus interest, from assets Mr. Daugherty claims were fraudulently transferred to the Debtor.  The Daugherty Claim also seeks (a) the value of Mr. Daugherty's asserted interest in HERA, which he values at approximately $26 million; and (b) indemnification for fees incurred in the Delaware action and in previous litigation in Texas State Court. The Debtor believes that the Daugherty Claim should be allowed in the amount of

---

[5] See *Debtor's Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1180]; *Debtor's Opening Brief in Support of Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1181]; *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1183]; and *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Brief in Support of Motion for Partial Summary Judgment and Joinder in the Debtor's Motion for Partial Summary Judgment on Proof of Claim No. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1186].

[6] On October 23, 2020, Mr. Daugherty filed *Patrick Hagaman Daugherty's Motion for Leave to Amend Proof of Claim No. 77* [D.I. 1280] pursuant to which Mr. Daugherty has asked leave to amend the Daugherty Claim to assert damages of $40,710,819.42.  On November 17, 2020, the Bankruptcy Court approved Mr. Daugherty's request to amend the Daugherty Claim from the bench.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-186   Filed 12/29/23   Page 152 of 1392   PageID 14894
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 41 of 1803   PageID 10787
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 34 of 178

$3,722,019; however, the Debtor believes, for various reasons, that the balance of the Daugherty Claim lacks merit. The Debtor's defenses to the Daugherty Claim are described in the *Debtor's (i) Objection to Claim No. 77 of Patrick Hagaman Daugherty and (ii) Complaint to Subordinate Claim of Patrick Hagaman Daugherty* [D.I. 1008].

**H.      The Debtor's Bankruptcy Proceeding**

On October 16, 2019, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). On December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Chapter 11 Case to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").[7]  The Debtor continues to operate its business and manage its properties as debtor-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

An immediate effect of commencement of the Chapter 11 Case was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor during the pendency of the Chapter 11 Case. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the later of the Effective Date and the date indicated in any order providing for the implementation of such stay or injunction.

**I.      First Day Relief**

On or about the Petition Date, the Debtor filed certain "first day" motions and applications (the "First Day Motions") with the Delaware Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of this Chapter 11 Case and to facilitate the Debtor's transition to debtor-in-possession status. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Frank Waterhouse in Support of First Day Motions* [D.I. 11] (the "First Day Declaration"). At a hearing on October 19, 2019, the Delaware Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions [D.I. 39, 40, 42-44].

The Delaware Bankruptcy Court subsequently entered an order authorizing the Debtor to pay critical vendor claims on a final basis [D.I. 168]. Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Bankruptcy Court entered an order authorizing the Debtor to continue its cash management system on a final basis [D.I. 379].

The First Day Motions, the First Day Declaration, and all orders for relief granted in this case can be viewed free of charge at https://www.kccllc.net/hcmlp.

---

[7] All docket reference numbers refer to the docket maintained by the Bankruptcy Court.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 02/03/23    Page 153 of 1392    PageID 14895
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 42 of 1803    PageID 10788
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 35 of 178

**J.      Other Procedural and Administrative Motions**

On and after the Petition Date, the Debtor also filed a number of motions and applications to retain professionals and to streamline the administration of the Chapter 11 Case, including:

- Interim Compensation Motion. On October 29, 2019, the Debtor filed the *Debtor's Motion Pursuant o Sections 105(a), 330 and 331 of the Bankruptcy Code for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 72] (the "Interim Compensation Motion"). The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to section 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to section 330 and 331 of the Bankruptcy Code. On November 14, 2019, the Delaware Bankruptcy Court entered an order granting the Interim Compensation Motion [D.I. 141].

- Ordinary Course Professionals. On October 29, 2019, the Debtor filed the Motion of the Debtor for an Order Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course of Business [D.I. 75] (the "OCP Motion"). The OCP Motion sought authority for the Debtor to retain and compensate certain professionals in the ordinary course of its business. On November 26, 2019, the Delaware Bankruptcy Court entered an order granting the OCP Motion [D.I. 176].

- Retention Applications. During the course of the chapter 11 case, the Delaware Bankruptcy Court or Bankruptcy Court, as applicable, have approved a number of applications by the Debtor seeking to retain certain professionals pursuant to sections 327, 328 and/or 363 of the Bankruptcy Code, including Pachulski Stang Ziehl & Jones LLP as legal counsel [D.I. 183], Development Specialists, Inc. as chief restructuring officer and financial advisor [D.I. 342], Kurtzman Carson Consultants LLC as administrative advisor [D.I. 74], Mercer (US) Inc. as compensation consultant [D.I. 381], Hayward & Associates PLLC as local counsel [D.I. 435], Foley Gardere, Foley & Lardner LLP as special Texas counsel [D.I. 513], Deloitte Tax LLP as tax services provider [D.I. 551], Wilmer Cutler Pickering Hale and Dorr LLP as regulatory and compliance counsel [D.I. 669], and Hunton Andrews Kurth LLP as special tax counsel [D.I. 763].

**K.      United States Trustee**

While the Chapter 11 Case was pending in the Delaware Bankruptcy Court, the U.S. Trustee for Region 3 appointed Jane Leamy as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "Delaware U.S. Trustee"). Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Delaware U.S. Trustee no longer represented the U.S. Trustee, and the U.S. Trustee for Region 6 appointed Lisa Lambert as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "Texas U.S. Trustee," and together with the

- 25 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 04/24/23   Page 154 of 1392   PageID 14896
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 43 of 1803   PageID 10789
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 36 of 178

Delaware U.S. Trustee, the "U.S. Trustee"). The Debtor has worked cooperatively to address concerns and comments from the U.S. Trustee's office during this Chapter 11 Case.

**L.    Appointment of Committee**

On October 29, 2019, the Delaware U.S. Trustee appointed the Committee in this Chapter 11 Case [D.I. 65]. The members of the Committee are (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP, LLP. Meta-E Discovery is a vendor to the Debtor. The other members of the Committee are litigants in prepetition litigation with the Debtor as described in ARTICLE II.G. The Bankruptcy Court approved the retention of Sidley Austin LLP as counsel to the Committee [D.I. 334], Young Conaway Stargatt & Taylor, LLP as Delaware co-counsel to the Committee [D.I. 337], and FTI Consulting, Inc. as financial advisor to the Committee [D.I. 336].

**M.    Meeting of Creditors**

The meeting of creditors under section 341(a) of the Bankruptcy Code was initially scheduled for November 20, 2019, at 9:30 a.m. (prevailing Eastern Time) at the J. Caleb Boggs Federal Building, 844 N. King Street, Room 3209, Wilmington, Delaware 19801, and was rescheduled to December 3, 2019, at 10:30 a.m. (prevailing Eastern Time). At the meeting of creditors, the Delaware U.S. Trustee and creditors asked questions of a representative of the Debtor.

Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Texas U.S. Trustee scheduled an additional meeting of creditors under section 341(a) for January 9, 2020, at 11:00 a.m. (prevailing Central Time) at the Office of the U.S. Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242, at the conclusion of that meeting, the Texas U.S. Trustee continued the meeting to January 22, 2020. The Texas U.S. Trustee and creditors asked questions of a representative of the Debtor at the January 9 and January 22, 2020 meetings.

**N.    Schedules, Statements of Financial Affairs, and Claims Bar Date**

The Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules") on December 19, 2019 [D.I. 247-248]. A creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated or disputed may have elected to file a proof of claim against the Debtor.

The Bankruptcy Court established (i) April 8, 2020 as the deadline for Creditors (other than governmental units) to file proofs of claim against the Debtor; (ii) April 13, 2020, as the deadline for any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code), (iii) April 23, 2020, and as the deadline for any investors in any fund managed by the Debtor to file proofs of claim against the Debtor; and (iv) May 26, 2020 as the deadline for the Debtor's employees to file proofs of claim against the Debtor pursuant to and accordance with Court's order entered on April 3, 2020 [D.I. 560].[8] Consequently, the bar date for filing proofs

---

[8] During the course of its Chapter 11 Case, the Debtor entered into stipulations to extend the Bar Date for certain other claimants or potential claimants.

Appellee Appx. 00037
Appx. 10239

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 61-86    Filed 04/2023 1804age 155 of 1392    PageID 14897
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 44 of 1803    PageID 10790
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 37 of 178

of claims has passed and any claims filed after the applicable bar date will be considered late filed.

**O.    Governance Settlement with the Committee**

On January 9, 2020, the Bankruptcy Court entered the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] (the "Settlement Order").

Among other things, the Settlement Order approved a term sheet (the "Term Sheet") agreed to by the Debtor and the Committee pursuant to which the Debtor agreed to abide by certain protocols governing the production of documents and certain protocols governing the operation of the Debtor's business (the "Operating Protocols"). Under the Operating Protocols, the Debtor agreed to seek consent from the Committee prior to entering into certain "Transactions" (as defined in the Operating Protocols. The Operating Protocols were amended on February 21, 2020, with the consent of the Committee [D.I. 466].

Pursuant to the Term Sheet, the Debtor also granted the Committee standing to pursue certain estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and the Related Entities (as defined in the Operating Protocols) (collectively, the "Estate Claims"). To the extent permitted, the Estate Claims and the ability to pursue the Estate Claims are being transferred to either the Claimant Trust or Litigation Sub-Trust pursuant to the Plan.

In connection with the Settlement Order, an independent board of directors was also appointed at Strand, the Debtor's general partner (the "Independent Board"). The members of the Independent Board are John S. Dubel, James P. Seery, Jr., and Russell Nelms. The Independent Board was tasked with managing the Debtor's operations during the Chapter 11 Case and facilitating a reorganization or orderly liquidation of the Debtor's Estate.

**P.    Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer**

Following their appointment in January 2020, the Independent Board determined that it would be more efficient for the Debtor to have a traditional corporate management structure, i.e. a fully engaged chief executive officer supervised by the Independent Board. The Independent Board ultimately determined that Mr. Seery – a member of the Independent Board – had the requisite experience and expertise to lead the Debtor. On June 23, 2020, the Debtor filed *Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 774] (the "Seery Retention Motion") to retain Mr. Seery as chief executive officer, chief restructuring officer, and foreign representative).

The Bankruptcy Court entered an order approving the Seery Retention Motion on July 16, 2020 [D.I. 854]. Mr. Seery was retained as the Debtor's chief executive officer and the duties of Bradley Sharp of DSI as the Debtor's chief restructuring officer and foreign representative were transferred to Mr. Seery.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 02/03/23   Page 156 of 1392   PageID 14898
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 45 of 1803   PageID 10791
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 38 of 178

**Q.     Mediation**

On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [D.I. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation and appointed Sylvia Mayer and Allan Gropper as the mediators (the "Mediators").  The mediation began on August 27, 2020, and is still open as of the date of this Disclosure Statement

**R.     Postpetition Settlements**

1.     Settlement with Acis and the Terry Parties

With the assistance of the Mediators, on September 9, 2020, (i) the Debtor, (ii) Acis LP, (iii) Acis GP, and (iv) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, and Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan (together, the "Terry Parties") executed that certain Settlement Agreement and General Release.  On September 23, 2020, the Debtor filed the *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] (the "Acis Settlement Motion").

The Settlement Agreement and General Release contain the following material terms, among others:

- The proof of claim filed by Acis [Claim No. 23] will be Allowed in the amount of $23,000,000 as a General Unsecured Claim.

- On the Effective Date of the Plan (or any other plan of reorganization confirmed by the Bankruptcy Court), the Debtor will pay in cash to:

  o     Mr. and Mrs. Terry in the amount of $425,000 plus 10% simple interest (calculated on the basis of a 360-day year from and including June 30, 2016), in full and complete satisfaction of the proof of claim filed by the Terry Parties [Claim No. 156];

  o     Acis LP in the amount of $97,000, which amount represents the legal fees incurred by Acis LP with respect to the N*WCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018), in full and complete satisfaction of the proof of claim filed by Acis LP [Claim No. 159]; and

  o     Mr. Terry in the amount of $355,000 in full and complete satisfaction of the legal fees assessed against Highland CLO Funding, Ltd., in *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey;

- 28 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 04/26/23   Page 157 of 1392   PageID 14899
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 46 of 1803   PageID 10792
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 39 of 178

The Settlement Agreement also provides that within five days of the Bankruptcy Court's approval of the Settlement Agreement and the General Release, the Debtor will move to withdraw, with prejudice, the proofs of claim that the Debtor filed in the Acis bankruptcy cases and the motion filed by the Debtor in the Acis bankruptcy cases seeking an administrative claim for postpetition services provided to Acis.

On October 5, 2020, James Dondero filed an objection to the Acis Settlement Motion [D.I. 1121] (the "Dondero Objection"). On October 28, 2020, the Bankruptcy Court entered an order approving the Acis Settlement Motion and overruling the Dondero Objection in its entirety [DI.I. 1347]. On November 9, 2020, Mr. Dondero filed a notice of his intent to appeal the order approving the Acis Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Acis Settlement Motion and related documents for additional information on the Settlement Agreement and General Release.

2.      Settlement with the Redeemer Committee

The Debtor, Eames, Ltd., the Redeemer Committee, and the Crusader Funds (collectively, the "Settling Parties") executed a settlement (the "Redeemer Stipulation"). The Redeemer Stipulation was also executed, solely with respect to paragraphs 10 through 15 thereof, by Hockney, Ltd., Strand,  Highland CDO Opportunity Master Fund, L.P., Highland Credit Strategies Master Fund, L.P., Highland Credit Opportunities CDO, L.P., House Hanover, LLC, and Alvarez & Marsal CRF Management, LLC (collectively, the "Additional Release Parties"). On September 23, 2020, the Debtor filed *Debtor's Motion for Entry of an Order Approving Settlements with (A) the Redeemer Committee of the Highland Crusader Funds (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [D.I. 1089] seeking approval of the Redeemer Stipulation (the "Redeemer Settlement Motion").

The Redeemer Stipulation contains the following material terms, among others:

•       The proof of claim filed by the Redeemer Committee [Claim No. 72] will be Allowed in the amount of $137,696,610 as a General Unsecured Claim;

•       The proof of claim filed by the Crusader Funds [Claim No. 81] will be Allowed in the amount of $50,000 as a General Unsecured Claim;

•       The Debtor and Eames, Ltd., each (a) consented to the cancellation of certain interests in the Crusader Funds held by them, and (b) agreed that they will not object to the cancellation of certain interests in the Crusader Funds held by the Charitable Donor Advised Fund;4

•       The Debtor and Eames each acknowledged that they will not receive any portion of certain reserved distributions, and the Debtor further acknowledged that it will not receive any payments from the Crusader Funds in respect of any deferred fees, distribution fees, or management fees;

- 29 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6-6 Exhibit Filed 02/23/24 Page 158 of 1392 PageID 14900
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 47 of 1803 PageID 10793
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 40 of 178

- The Debtor and the Redeemer Committee agreed to a form of amendment to the shareholders' agreement for Cornerstone Healthcare Group and to a process to monetize Cornerstone Healthcare Group;

- Upon the effective date of the Redeemer Stipulation, the Settling Parties and the Additional Release Parties shall exchange releases as set forth in the Redeemer Stipulation; and

- All litigation between the Debtor, Eames, Ltd., and the Additional Highland Release Parties (as defined in the Redeemer Stipulation) on the one hand, and the Redeemer Committee and the Crusader Funds, on the other hand, will cease.

On October 16, 2020, UBS filed an objection to the Redeemer Settlement Motion [D.I. 1190] (the "UBS Objection"). On October 22, 2020, the Bankruptcy Court entered an order approving the Redeemer Settlement Motion and overruling the UBS Objection in its entirety [DI.I. 1273]. On November 6, 2020, UBS filed a notice of its intent to appeal the order approving the Redeemer Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Redeemer Settlement Motion and related documents for additional information on the Redeemer Stipulation.

**S.      Certain Outstanding Material Claims**

As discussed above, April 8, 2020, was the general bar date for filing proofs of claim. The Debtor has begun the process of resolving those Claims. Although each Claim represents a potential liability of the Estate, the Debtor believes that, in addition to UBS's Claim, the Claims filed by Integrated Financial Associates, Inc. ("IFA"), the HarbourVest Entities,[9] and Hunter Mountain represent the largest unresolved Claims against the Estate.

- IFA Proof of Claim. IFA filed a proof of claim [Claim No. 93] (the "IFA Claim") seeking damages in the amount of $241,002,696.73 arising from the purported joint control of the Debtor and NexBank, SSB, and the Debtor's management of various lenders to IFA. The Debtor believes that IFA's claim should be disallowed in its entirety. IFA's claim and the Debtor's defenses thereto are described in greater detail in the *Objection to Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 868]. On October 4, 2020, the Bankruptcy Court entered the *Order Approving Stipulation Regarding Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 1126], which capped the IFA Claim, for all purposes, at $8,000,000.

- HarbourVest Entities Proofs of Claim. The HarbourVest Entities are investors in Highland CLO Funding, Ltd. ("HCLOF") and filed proofs of claim against the

---

[9] "HarbourVest Entities" means HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6186 Filed 24/20/3104age 159 of 1392   PageID 14901
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 48 of 1803   PageID 10794
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 41 of 178

Debtor's Estate [Claim No. 143, 147, 149, 150, 153, 154] (the "HarbourVest Claims"). The Debtor included an assertion of "no liability" in respect of the HarbourVest Claims in its Debtor's *First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No-Liability Claims; and (f) Insufficient Documentation Claims* [D.I. 906]. HarbourVest provided a response in its *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [D.I. 1057]. The HarbourVest Entities' response argued that the Debtor's objection should be overruled, and set forth allegations in support of claims under federal and state law and Guernsey law, including claims for fraud, violations of securities laws, breaches of fiduciary duties, and RICO violations. The Debtor intends to vigorously defend the HarbourVest Claims on various grounds, including, among others, the failure to state a claim upon which relief can be granted, the lack of reasonable reliance, the lack of misrepresentations, the lack of reasonable reliance, the failure to mitigate damages, the parties' agreements bar or otherwise limit the Debtor's liability, and waiver and estoppel. The HarbourVest Entities invested approximately $80 million in HCLOF but seek an allowed claim in excess of $300 million dollars (after giving effect to treble damages for the alleged RICO violations).

- Hunter Mountain Proof of Claim. Hunter Mountain is one of the Debtor's limited partners. Hunter Mountain filed a proof of claim [Claim No. 152] seeking a $60,298,739 indemnification claim against the Debtor because of the Debtor's alleged failures to make priority distributions to Hunter Mountain under the Debtor's Partnership Agreement. The Debtor believes that it has meritorious defenses to Hunter Mountain's claim. Hunter Mountain's claim and the Debtor's defenses to such claim are described in greater detail in the *Debtor's (i) Objection to Claim No. 152 of Hunter Mountain Investment Trust and (ii) Complaint to Subordinate Claim of Hunter Mountain Investment Trust and for Declaratory Relief* [D.I. 995]. The Debtor believes that Hunter Mountain's proof of claim should either be disallowed in its entirety or subordinated in its entirety.

In addition to the foregoing, the UBS Claim (in the amount of $1,039,957,799.40) and the Daugherty Claim (in the amount of $40,710,819.42) remain outstanding. As set forth above, partial summary judgment on the UBS Claim was granted in favor of the Debtor and the Redeemer Committee on November 20, 2020, and a formal order is expected to be entered within the next couple of weeks.

The Daugherty Claim has been allowed for voting purposes only in the amount of $9,134,019 [D.I. 1422]. In a bench ruling on November 20, 2020, the Bankruptcy Court allowed UBS Claims for voting purposes only in the amount of $94,761,076 [D.I. 1646].

## T.   Treatment of Shared Service and Sub-Advisory Agreements

As discussed in the Plan, the Reorganized Debtor will manage the wind down of the Managed Funds. However, it is not anticipated that either the Reorganized Debtor or the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 09/06/23    Page 160 of 1392    PageID 14902
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 49 of 1803    PageID 10795
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 42 of 178

Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.

Currently, the Debtor receives approximately $2.2 million per month in revenue from such contracts. However, in order to service those contracts, the Debtor must maintain a full staff and the cost of providing services under such contracts, among other factors, has historically resulted in a net loss to the Debtor. As such, the Debtor does not believe that assuming these contracts would benefit the Estate.

Further, the contracts generally contain anti-assignment provisions which the Debtor believes may be enforceable under 11 U.S.C. § 365(c). These provisions, therefore, would arguably prevent the assignment of such contracts without the consent of the Debtor's contract counterparty. However, even if 11 U.S.C. § 365(c) would not prevent assignment, the contracts are generally terminable at will by either party. As such, assuming and assigning such contracts without the consent of the contract counterparty would be of nominal or no benefit to the Estate. It is doubtful that any assignee would provide consideration to the Debtor for the assignment of such contract as the contract counterparty could simply terminate the contract immediately following assignment. As such, the Debtor does not believe that there is any benefit to the Estate in attempting to assign these contracts.

Notwithstanding the foregoing disclosure, the Debtor is currently assessing whether it is both possible and in the best interests of the Estate to assume and assign such shared services and sub-advisory agreements to a Related Entity.

During the course of this Chapter 11 Case, Mr. Daugherty stated that he would be willing to assume the Debtor's obligations under the shared service and sub-advisory contracts. The Independent Directors reviewed Mr. Daugherty's proposal and for the foregoing reasons, among others, determined that it was not workable and would provide no benefit to the Estate.

**U.    Portfolio Managements with Issuer Entities**

The Debtor is party to certain portfolio management agreements (including any ancillary agreements relating thereto collectively being the "Portfolio Management Agreements" and each a "Portfolio Management Agreement") with ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd. (each an "Issuer" and collectively the "Issuers") wherein the Debtor agreed to generally provide certain services to each Issuer in the Debtor's capacity as a portfolio manager in exchange for certain fees as described in the applicable Portfolio Management Agreement.

---

[10] For the avoidance of doubt, the Debtor does not consider any of the Issuers (as defined herein) to be a Related Entity.

Appellee Appx. 00043
Appx. 10295

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-11   Filed 05/26/23   Page 161 of 1392   PageID 14903
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 50 of 1803   PageID 10796
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 43 of 178

The Issuers filed proofs of claim [Claim No. 165, 168, and 169] asserting claims against the Debtor for damages arising from, relating to or otherwise concerning (i) such Issuer's Portfolio Management Agreement(s) with the Debtor, including, without limitation, failure to perform or other breach of the Portfolio Management Agreement(s), rejection of the Portfolio Management Agreement(s), any cure amount as a result of assumption of the Portfolio Management Agreement(s), any adequate assurance of future performance as a result of assumption of the Portfolio Management Agreement(s), and any failure to provide and pay for indemnification or other obligations under the Portfolio Management Agreement(s); and (ii) the action or inaction of the Debtor to the detriment of such Issuer (collectively, the "Issuer Claims"). The Debtor believes that it has satisfied its obligations to the Issuers; that the Issuer Claims lack merit; and that the Debtor will have no liability with respect to the Issuer Claims. However, such proofs of claim remain outstanding.

The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

## V.     Resignation of James Dondero

On October 9, 2020, Mr. Dondero resigned as an employee and portfolio manager of the Debtor.

## W.     Exclusive Periods for Filing a Plan and Soliciting Votes

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtor filed motions to extend the exclusive period, and the Bankruptcy Court entered the following orders granting such applications:

- Order Granting Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 460];

- Agreed Order Extending Exclusive Periods by Thirty Days [D.I. 668];

- 33 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 22/23/3804 Page 162 of 1392   PageID 14904
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 51 of 1803   PageID 10797
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 44 of 178

- • Order Granting Debtor's Third Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Further Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 820]; and

- • Order Further Extending the Debtor's Exclusive Period for Solicitation of Acceptance of a Chapter 11 Plan [D.I. 1092].

Pursuant to the foregoing orders, the Bankruptcy Court extended the exclusivity period through June 12, 2020, for the filing of a plan, which was subsequently extended through July 13, 2020, and again through August 12, 2020. The Bankruptcy Court also extended the exclusivity period for the solicitation of votes to accept such plan through August 11, 2020, which was subsequently extended through September 10, 2020, and again through October 13, 2020, and December 4, 2020.

## X.    Negotiations with Constituents

The Debtor, Mr. Dondero, and certain of the creditors have been negotiating a consensual reorganization plan for the Debtor that contemplates the Debtor continuing its business largely in its current form. Those negotiations have yet to reach conclusion but are continuing, and the negotiations were part of the previously discussed mediation. There is no certainty that those negotiations will reach a consensual resolution of the Debtor's bankruptcy case.

## Y.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461.

The Debtor is the contributing sponsor of the Pension Plan. As such, the PBGC asserts that Debtor is liable to contribute to the Pension Plan the amounts necessary to satisfy the minimum funding standards in ERISA and the Internal Revenue Code of 1986, as amended ("IRC"). *See* 29 U.S.C. §§ 1082, 1083; 26 U.S.C. §§ 412, 430. As the sponsor of the Pension Plan, the PBGC asserts Debtor is also liable for insurance premiums owed to PBGC. *See* 29 U.S.C. §§ 1306, 1307. The PBGC asserts that any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are also jointly and severally liable with the Debtor for such obligations relating to the Pension Plan.

The Pension Benefit Guaranty Corporation ("PBGC"), the federal agency that administers the pension insurance program under Title IV of ERISA, filed contingent proofs of claims against the Debtors for (1) the Pension Plan's potential underfunded benefit liabilities; (2) the potential  unliquidated unpaid minimum funding contributions owed to the Pension Plan; and (3) the potential unliquidated insurance premiums owed to PBGC. The PBGC acknowledges that, as of the date of this Disclosure Statement, there is nothing currently owed by the Debtor to the PBGC.

The Debtor reserves the right to contest any claims filed by the PBGC for any reason.

- 34 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 05/30/23   Page 163 of 1392   PageID 14905
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 52 of 1803   PageID 10798
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 45 of 178

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

No provision contained in the Disclosure Statement, the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof), shall be construed as discharging, releasing, exculpating, or relieving any person or entity, including the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, government policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions for satisfaction, release, injunction, exculpation, and discharge of claims in the Plan, Confirmation Order, or the Bankruptcy Code.

### ARTICLE III.
### SUMMARY OF THE PLAN

**THIS ARTICLE III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

**A.     Administrative and Priority Tax Claims**

    1.     Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions

- 35 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 05/09/23   Page 164 of 1392   PageID 14906
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 53 of 1803   PageID 10799
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 46 of 178

relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

2.   Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

- 36 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 02/09/23   Page 165 of 1392   PageID 14907
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 54 of 1803   PageID 10800
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 47 of 178

     3.    <u>Priority Tax Claims</u>

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**B.**    **Classification and Treatment of Classified Claims and Equity Interests**

     1.    <u>Summary</u>

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

- 37 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16186 Filed 25/09/13 1804 Page 166 of 1392   PageID 14908
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 55 of 1803   PageID 10801
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 48 of 178

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

2.      Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

3.      Impaired/Voting Classes

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

Please refer to "Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests" and "Instructions and Procedures for Voting" in ARTICLE I.C.7 and ARTICLE I.C.8 for a discussion of how the how votes on the Plan will be solicited and tabulated.

4.      Unimpaired/Non-Voting Classes

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

5.      Impaired/Non-Voting Classes

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

- 38 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18 Filed 2576/23:804age 167 of 1392    PageID 14909
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 56 of 1803    PageID 10802
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 49 of 178

6.    <u>Cramdown</u>

If any Class of Claims or Equity Interests is deemed to reject the Plan or does not vote to accept the Plan, the Debtor may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms of the Plan and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**C.    Classification and Treatment of Claims and Equity Interests**

1.    <u>*Class 1 – Jefferies Secured Claim*</u>

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

2.    <u>*Class 2 – Frontier Secured Claim*</u>

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- 39 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6 Filed 25/90/23 1804age 168 of 1392    PageID 14910
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 57 of 1803    PageID 10803
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 50 of 178

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

  The New Frontier Note will include the following terms:  (i) an extension of the maturity date to December 31, 2022; (ii) quarterly interest only payments; (iii) a payment on the New Frontier Note equal to fifty percent of the outstanding principal on December 31, 2021, if the New Frontier Note is not paid in full on or prior to such date; (iv) mandatory prepayments from the proceeds of the sale of any collateral securing the New Frontier Note; and (v) the payment of fees and expenses incurred in negotiating the terms of the New Frontier Note.

3.    <u>*Class 3 – Other Secured Claims*</u>

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

4.    <u>*Class 4 – Priority Non-Tax Claims*</u>

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- 40 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 25/90/13 1804 Page 169 of 1392    PageID 14911
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 58 of 1803    PageID 10804
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 51 of 178

- • *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

5. <u>*Class 5 – Retained Employee Claims*</u>

- • *Classification*: Class 5 consists of the Retained Employee Claims.

- • *Allowance and Treatment*: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- • *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

6. <u>*Class 6 – PTO Claims*</u>

- • *Classification*: Class 6 consists of the PTO Claims.

- • *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- • *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

  "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

7. <u>*Class 7 – Convenience Claims*</u>

- • *Classification*: Class 7 consists of the Convenience Claims.

- • *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is

- 41 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6186   Filed 26/02/1804   Page 170 of 1392   PageID 14912
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 59 of 1803   PageID 10805
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 52 of 178

Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

  *"Convenience Claim"* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

  *"Convenience Claim Pool"* means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

  By making the GUC Election on their Ballots, each Holder of a Convenience Claim can elect the treatment provided to General Unsecured Claims.

8.  <u>*Class 8 – General Unsecured Claims*</u>

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes the Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and

- 42 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5-86   Filed 12/29/23   Page 171 of 1392   PageID 14913
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 60 of 1803   PageID 10806
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 53 of 178

will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

   "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

   "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

9.   <u>*Class 9 – Subordinated Claims*</u>

- *Classification*: Class 9 consists of the Subordinated Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

   Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

   "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a

- 43 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6 Filed 2/29/13804age 172 of 1392    PageID 14914
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 61 of 1803    PageID 10807
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 54 of 178

Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

10.    *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject the Plan.

11.    *Class 11 – Class A Limited Partnership Interests*

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- 44 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Filed 09/29/23   Page 173 of 1392   PageID 14915
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 62 of 1803   PageID 10808
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 55 of 178

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject the Plan.

**D.     Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**E.     Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**F.     Means for Implementation of the Plan**

1.     <u>Summary</u>

The Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Appellee Appx. 00056
APPX. 10807

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/09/23    Page 174 of 1392    PageID 14916
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 63 of 1803    PageID 10809
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 56 of 178

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement.  Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in the Plan and the Claimant Trust Agreement.

> 2.    The Claimant Trust[11]

> > (a)    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries.  Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets.  The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust.  Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims.  The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee.  The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant

---

[11] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Appellee Appx. 00057
Appx. 10809

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Filed 26/90/3 1804age 175 of 1392 PageID 14917
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 64 of 1803 PageID 10810
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 57 of 178

Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

(a) *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

- 47 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66    Filed 06/23/23    Page 176 of 1392    PageID 14918
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 65 of 1803    PageID 10811
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 58 of 178

(b)      *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in the Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in Article IV.C of the Plan.

(c)      *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

(d)      *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

- the payment of the Claimant Trust Expenses;

- the payment of other reasonable expenses of the Claimant Trust;

- the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

- the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

- the orderly monetization of the Claimant Trust Assets;

- litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

- the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

- 48 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66    Filed 06/20/23    Page 177 of 1392    PageID 14919
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 66 of 1803    PageID 10812
Case 19-34054-sgj11  Doc 1473  Filed 11/24/20    Entered 11/24/20 10:24:41    Page 59 of 178

   &bull; the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

   &bull; the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

  Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

  In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

  The Litigation Sub-Trust Agreement generally will provide for, among other things:

   &bull; the payment of other reasonable expenses of the Litigation Sub-Trust;

   &bull; the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

   &bull; the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

  The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

  The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

Appellee Appx. 00060
APPX. 10832

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 06/30/23    Page 178 of 1392    PageID 14920
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 67 of 1803    PageID 10813
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 60 of 178

     (e)    *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

     (f)    *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

     (g)    *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

     (h)    *Tax Reporting.*

The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

Appellee Appx. 00061
APPX. 10812

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 06/29/23   Page 179 of 1392   PageID 14921
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 68 of 1803   PageID 10814
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 61 of 178

The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

    (i)    *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in the Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

    (j)    *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

    (k)    *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

    (l)    *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

Appellee Appx. 00062
APPX. 10854

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6 Exhibit 6 Filed 27 of 13 04   Page 180 of 1392   PageID 14922
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 69 of 1803   PageID 10815
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 62 of 178

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

(m)    *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

3.    The Reorganized Debtor

(a)    *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

Appellee Appx. 00063
APPX. 10815

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 07/29/21    Page 181 of 1392    PageID 14923
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 70 of 1803    PageID 10816
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 63 of 178

(b)    *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

(c)    *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

(d)    *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

(e)    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16   Filed 07/22/23 Page 182 of 1392   PageID 14924
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 71 of 1803   PageID 10817
Case 19-34054-sgj11  Doc 1473  Filed 11/24/20   Entered 11/24/20 10:24:41   Page 64 of 178

(f)     *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court

(g)     *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in Article IV.B.1 of the Plan, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

4.     <u>Company Action</u>

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement

- 54 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 27 of 3 1804 age 183 of 1392    PageID 14925
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 72 of 1803    PageID 10818
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 65 of 178

of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

5.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

6.    Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the

- 55 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 07/29/2023    Page 184 of 1392    PageID 14926
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 73 of 1803    PageID 10819
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 66 of 178

cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of
the Debtor thereunder or in any way related thereto will be fully released, terminated,
extinguished and discharged, in each case without further notice to or order of the Bankruptcy
Court, act or action under applicable law, regulation, order, or rule or any requirement of further
action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this
section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

7.    Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or
promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver
to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or
other property of the Debtor held by such Holder, together with any termination statements,
instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1
or Allowed Class 2 Claim that may be reasonably required to terminate any related financing
statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or
documents.

8.    Control Provisions

To the extent that there is any inconsistency between the Plan as it relates to the Claimant
Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited
Partnership Agreement, the Plan shall control.

9.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under Article III.C of the Plan
shall receive no Plan Distributions.

10.    Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any
documents filed with the Plan Supplement, and any amendments, restatements, supplements, or
other modifications to such documents, and any consents, waivers, or other deviations under or
from any such documents, shall be incorporated herein by this reference (including to the
applicable definitions in Article I of the Plan) and fully enforceable as if stated in full herein.

11.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a
single-employer defined benefit pension plan covered by Title IV of the Employee Retirement
Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is
the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any
members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§
1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the
Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal

Appellee Appx. 00067
APPX. 10839

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 07/29/23   Page 185 of 1392   PageID 14927
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 74 of 1803   PageID 10820
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 67 of 178

Revenue Code (the "<u>IRC</u>"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

A.      **Treatment of Executory Contracts and Unexpired Leases**

1.      <u>Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases</u>

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts

- 57 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 07/28/23    Page 186 of 1392    PageID 14928
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 75 of 1803    PageID 10821
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 68 of 178

and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [D.I. 1122].

2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date.  Any Rejection Claims that are not timely Filed pursuant to the Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

3.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure amount (if any).

- 58 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6   Filed 27/9023 3804age 187 of 1392   PageID 14929
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 76 of 1803   PageID 10822
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 69 of 178

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

**B.    Provisions Governing Distributions**

1.    Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in the Plan. Except as otherwise provided in the Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to the Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 66 Filed 07/28/23 Page 188 of 1392 PageID 14930
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 77 of 1803 PageID 10823
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 70 of 178

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

2.   Distribution Agent

Except as provided herein, all distributions under the Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

3.   Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

4.   Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

As used above, "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant

Appellee Appx. 00071
APPX. 10873

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 07/29/23   Page 189 of 1392   PageID 14931
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 78 of 1803   PageID 10824
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 71 of 178

Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

"*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

HarbourVest and Mr. Daugherty have objected to the mechanisms for calculating the amount of the Disputed Claims Reserve with respect to the HarbourVest Claim and the Daugherty Claim, respectively, and intend to press their objections at the hearing for confirmation of the Plan.

5.    Distributions from the Disputed Claims Reserve

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

6.    Rounding of Payments

Whenever the Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under the Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under the Plan.

7.    *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under the Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in Article VI.I of the Plan within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall

Appellee Appx. 00072
Appx. 10824

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 08/06/23    Page 190 of 1392    PageID 14932
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 79 of 1803    PageID 10825
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 72 of 178

revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

8.    Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

9.    General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under the Plan shall not be subject to any claim by any Person.

10.    Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

11.    Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under the Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

Appellee Appx. 00073
Appx. 10825

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 28190/123804    Page 191 of 1392    PageID 14933
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 80 of 1803    PageID 10826
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 73 of 178

12.    Withholding Taxes

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  As a condition to receiving any distribution under the Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws.  If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

13.    Setoffs

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or the Claimant Trustee possesses against such Holder.  Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

14.    Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to Article IV of the Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

15.    Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any

- 63 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6 Exhibit 6 Filed 2829 of 1804 Page 192 of 1392   PageID 14934
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 81 of 1803   PageID 10827
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 74 of 178

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with Article VI.O of the Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**C.    Procedures for Resolving Contingent, Unliquidated and Disputed Claims**

1.    Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

2.    Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of the Plan.

3.    Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

4.    Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

*Allowance of Claims*

After the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and

- 64 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-6 Filed 02/23/24 Page 193 of 1392 PageID 14935
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 82 of 1803 PageID 10828
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 75 of 178

defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### Estimation

Subject to the other provisions of the Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with the Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

### Disallowance of Claims

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6    Filed 08/23/24    Page 194 of 1392    PageID 14936
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 83 of 1803    PageID 10829
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 76 of 178

D.    **Effectiveness of the Plan**

1.    <u>Conditions Precedent to the Effective Date</u>

The Effective Date of the Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of Article VIII.B of the Plan of the following:

- the Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to the Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate the Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in the Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under the Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; (iii) the implementation of the Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

- All documents and agreements necessary to implement the Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- 66 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186   Filed 285.9013804age 195 of 1392    PageID 14937
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 84 of 1803    PageID 10830
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 77 of 178

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement the Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to the Plan in an amount determined by the Debtor in good faith.

2.    <u>Waiver of Conditions</u>

The conditions to effectiveness of the Plan set forth in Article VIII of the Plan (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate the Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

3.    <u>Effect of Non-Occurrence of Conditions to Effectiveness</u>

Unless waived as set forth in Article VIII.B of the Plan, if the Effective Date of the Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw the Plan and, if withdrawn, the Plan shall be of no further force or effect.

4.    <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

- 67 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 28 90213 804 age 196 of 1392    PageID 14938
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 85 of 1803    PageID 10831
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 78 of 178

E.    **Exculpation, Injunction, and Related Provisions**

1.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

For purposes of the following provisions:

- "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

- "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

- "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO

- 68 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 6    Filed 28796 2 1304 age 197 of 1392    PageID 14939
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 86 of 1803    PageID 10832
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 79 of 178

Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

2.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

3.    Exculpation

Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation  in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

Appellee Appx. 00080
Appx. 10832

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 61-6    Filed 08/03/23    Page 198 of 1392    PageID 14940
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 87 of 1803    PageID 10833
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 80 of 178

4.    <u>Releases by the Debtor</u>

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to Article IX.D of the Plan (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "<u>Reduced Employee Claim</u>"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "<u>Independent Members</u>"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with

- 70 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16   Filed 08/03/23   Page 199 of 1392   PageID 14941
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 88 of 1803   PageID 10834
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 81 of 178

respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to Article IX.D of the Plan will vest and the Employee will be indefeasibly released pursuant to Article IX.D of the Plan if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

In addition to the obligations set forth in Article IX.D of the Plan, as additional consideration for the foregoing releases, the Senior Employees will waive their rights to certain deferred compensation owed to them by the Debtor.  As of the date hereof, the total deferred compensation owed to the Senior Employees was approximately $3.9 million, which will be reduced by approximately $2.2 million to approximately $1.7 million.  That reduction is composed of a reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

As of the date of this Disclosure Statement, the Debtor has not identified any Causes of Action against any Released Parties.  However, as set forth above, during the Chapter 11 Case, the Committee was granted sole standing to investigate and pursue the Estate Claims, which may include Causes of Action against certain of the Released Parties.  As of the date of this Disclosure Statement, the Committee has not identified any Estate Claims against any Released Parties.  The Debtor currently believes that there are no material Estate Claims or other Causes of Action against any Released Party.

5.      Preservation of Rights of Action

*Maintenance of Causes of Action*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as

- 71 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66    Filed 07/06/23    Page 200 of 1392    PageID 14942
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 89 of 1803    PageID 10835
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 82 of 178

appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

*Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

     6.    <u>Injunction</u>

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any

Appellee Appx. 00083
Appx. 10835

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16   Filed 10/11/23   Page 201 of 1392   PageID 14943
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 90 of 1803   PageID 10836
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 83 of 178

judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to Article XII. D of the Plan, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; *provided, however,* the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. As set forth in Article XI of the Plan, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

       7.     Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

       8.     Continuance of January 9 Order

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course,* entered by the Bankruptcy Court on

- 73 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6186   Filed 29 of 1804   Page 202 of 1392   PageID 14944
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 91 of 1803   PageID 10837
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 84 of 178

January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

**F.    Article XII.D of the Plan**

Article XII.D of the Plan provides that, notwithstanding anything in the Plan to the contrary, nothing in the Plan will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**G.    Binding Nature of Plan**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in Article IX of the Plan, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a)

**H.    Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtor has complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Debtor's bankruptcy case, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the

- 74 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 10/23/23   Page 203 of 1392   PageID 14945
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 92 of 1803   PageID 10838
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 85 of 178

approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor thereto under the Plan;

- The Debtor has paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits, if applicable.

1.   <u>Best Interests of Creditors Test</u>

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.   To make these findings, the Bankruptcy Court must:  (a) estimate the net Cash proceeds (the "<u>Liquidation Proceeds</u>") that a chapter 7 trustee would generate if the Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (b) determine the distribution (the "<u>Liquidation Distribution</u>") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

2.   <u>Liquidation Analysis</u>

Any liquidation analysis, including the estimation of Liquidation Proceeds and Liquidation Distributions, with respect to the Debtor (the "<u>Liquidation Analysis</u>") is subject to numerous assumptions and there can be no guarantee that the Liquidation Analysis will be accurate.  No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims and Equity Interests  at the projected amounts of Allowed Claims

- 75 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16-6    Filed 07/28/23    Page 204 of 1392    PageID 14946
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 93 of 1803    PageID 10839
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 86 of 178

and Equity Interests set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims and Equity Interests that represents its best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims and Equity Interests.  The estimate of the amount of Allowed Claims and Equity Interests set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Plan Distribution to be made on account of Allowed Claims and Equity Interests under the Plan and Disclosure Statement.

The full Liquidation Analysis is attached hereto as **Exhibit C**.

Furthermore, any chapter 7 trustee appointed in a chapter 7 liquidation would have to confront all of the issues described in this Disclosure Statement, including the prepetition litigation claims.  This process would be significantly time-consuming and costly, and reduce any recoveries available to the Debtor's Estate.  The Debtor believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of executory contracts in connection with the cessation of the Debtor's operations, and (iii) the failure to realize greater value from all of the Debtor's assets.

Therefore, the Debtor believes that confirmation of the Plan will provide each Holder of a Claim with a greater recovery than such Holder would receive pursuant to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor, unless the plan contemplates such liquidation or reorganization.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Claimant Trust and the Reorganized Debtor to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.  A copy of the financial projections prepared by the Debtor is attached hereto as **Exhibit C**.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtor believes that its available Cash and any additional proceeds from the Debtor's Assets will be sufficient to allow the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, to make all payments required to be made under the Plan.  Accordingly, the Debtor believes that the Plan is feasible.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 5186    Filed 09/03/2014    Page 205 of 1392    PageID 14947
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 94 of 1803    PageID 10840
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 87 of 178

4.    <u>Valuation</u>

In order to provide information and full disclosure to parties in interest regarding the Debtor's assets, the Debtor estimates that its value and the total value of its Assets, as of September 30, 2020, was approximately $328.3 million.

5.    <u>Acceptance by Impaired Classes</u>

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accepts the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (a) cures any such default that occurred before or after the commencement of the Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (d) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders.  Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of equity interests as acceptance by holders of at least two-thirds in amount of the allowed interests of such class.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims or Equity Interests in any voting class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 56   Filed 09/01/23   Page 206 of 1392   PageID 14948
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 95 of 1803   PageID 10841
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 88 of 178

6.       Confirmation Without Acceptance by Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtor's request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

7.       No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

8.       Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that:  (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed

- 78 -

Appellee Appx. 00089
APPX. 10840

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 02/06/23    Page 207 of 1392    PageID 14949
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 96 of 1803    PageID 10842
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 89 of 178

amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests rejects the Plan, the Debtor reserves the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.C of the Plan.

The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## ARTICLE IV.
## RISK FACTORS

> **ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

A.    **Certain Bankruptcy Law and Other Considerations**

1.    Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests, or Designation as Unimpaired.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Holders of Claims or Equity Interests or the Bankruptcy Court will reach the same conclusion.

There is also a risk that the Holders of Claims or Equity Interests could object to the Debtor's designation of Claims or Equity Interests as Unimpaired, and the Bankruptcy Court could reach the same conclusion.

2.    The Debtor May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a

Appellee Appx. 00090
APPX. 10842

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 5186   Filed 02/09/23   Page 208 of 1392    PageID 14950
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 97 of 1803    PageID 10843
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 90 of 178

need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Plan.  The Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan.  In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

       3.    <u>The Conditions Precedent to the Effective Date of the Plan May Not Occur.</u>

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

       4.    <u>Continued Risk Following Effectiveness.</u>

Even if the Effective Date of the Plan occurs, the Debtor, the Reorganized Debtor, and Claimant Trust will continue to face a number of risks, including certain risks that are beyond its control, such as changes in assets, asset values, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of liquidation reflecting the Plan will achieve the Debtor's stated goals.

In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtor will have retained the exclusive right to propose the Plan upon filing its petition.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

       5.    <u>The Effective Date May Not Occur.</u>

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 09/01/23   Page 209 of 1392   PageID 14951
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 98 of 1803   PageID 10844
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 91 of 178

6.   The Chapter 11 Case May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the assets in an orderly and controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

7.   Claims Estimation

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

8.   The Financial Information Contained Herein is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit was Performed.

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtor relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtor has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtor believes that such financial information fairly reflects its financial condition, the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**B.    Risks Related to Recoveries under the Plan**

1.   The Reorganized Debtor and/or Claimant Trust May Not Be Able to Achieve the Debtor's Projected Financial Results

The Reorganized Debtor or Claimant Trust, as applicable, may not be able to achieve their projected financial results.  The Financial Projections represent the best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor or Claimant Trust, as well as the United States and world economies in general, and the investment industry in which the Debtor operates.  The Debtor's Financial Projections include key assumptions on (i) target asset monetization values, (ii) timing of asset monetization, and (iii) costs to effectuate the Plan. In terms of achieving target asset monetization values, the Debtor faces issues including investment assets with cross-ownership across related entities and challenges associated with

- 81 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-35   Filed 1/09/23 1804 age 210 of 1392   PageID 14952
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 99 of 1803   PageID 10845
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 92 of 178

collecting notes due from affiliates. The Debtor's Financial Projections anticipate that all investment assets will be sold by 2022, which may be at risk due to the semi-liquid or illiquid nature of the Debtor's assets, as well as general market conditions, including the sustained impact of COVID-19. Costs are based on estimates and may increase with delays or any other unforeseen factor. If the Reorganized Debtor or Claimant Trust do not achieve their projected financial results, the recovery for Claimant Trust Beneficiaries may be negatively affected and the Claimant Trust may lack sufficient liquidity after the Effective Date.

      2.    <u>Claim Contingencies Could Affect Creditor Recoveries</u>

The estimated Claims and projected creditor recoveries set forth in this Disclosure Statement are based on various assumptions the actual amount of Allowed Claims may differ from the estimates. Should one or more of the underlying assumptions ultimately prove incorrect, the actual Allowed amounts of Claims may vary materially from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

      3.    <u>If Approved, the Debtor Release Could Release Claims Against Potential Defendants of Estate Causes of Action With Respect to Which the Claimant Trust Would Otherwise Have Recourse</u>

The Claimant Trust Assets will include, among other things, Causes of Action, including Estate Claims that will be assigned to the Litigation Sub-Trust. The Committee's investigation of potential Estate Claims is still ongoing. Because the Committee has not concluded its investigation as of the date hereof, and such investigation will be transferred to the Litigation Trustee, there is no certainty of whether there are viable Estate Claims against any of the Released Parties. In the event there are viable Estate Claims against any of the Released Parties, such claims cannot be pursued for the ultimate benefit of Claimant Trust Beneficiaries if the Debtor Release is approved.

**C.    Investment Risk Disclaimer**

      1.    <u>Investment Risks in General.</u>

The Reorganized Debtor is and will remain a registered investment adviser under the Investment Advisers Act of 1940, and the Reorganized Debtor will continue advising the Managed Funds. No guarantee or representation is made that the Reorganized Debtor's or the Managed Funds' investment strategy will be successful, and investment results may vary substantially over time.

      2.    <u>General Economic and Market Conditions and Issuer Risk.</u>

Any investment in securities carries certain market risks. Investments by the Reorganized Debtor, the Managed Funds, or the Claimant Trust may decline in value for any number of reasons over which none of the Managed Funds, the Reorganized Debtor, the Claimant Trust, or the Claimant Trustee may have control, including changes in the overall

Appellee Appx. 00093
APPX. 10844

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 02/09/23 180 Page 211 of 1392   PageID 14953
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 100 of 1803   PageID 10846
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 93 of 178

market and other general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws, currency exchange rates and controls and national, international political circumstances (including wars and security operations), and acts of God (including pandemics like COVID-19). The value of the Managed Funds or the assets held by the Reorganized Debtor or Claimant Trust may also decline as a result of factors pertaining to particular securities held by the Managed Funds, Reorganized Debtor, or Claimant Trust, as applicable, such as perception or changes in the issuer's management, the market for the issuer's products or services, sources of supply, technological changes within the issuer's industry, the availability of additional capital and labor, general economic conditions, political conditions, acts of God, and other similar conditions. All of these factors may affect the level and volatility of security prices and the liquidity and the value of the securities held by the Managed Fund, Reorganized Debtor, or Claimant Trust. Unexpected volatility or illiquidity could impair the Managed Funds', Reorganized Debtor's, or Claimant Trust's profitability or result in it suffering losses.

**D.      Disclosure Statement Disclaimer**

      1.      <u>The Information Contained Herein is for Disclosure Purposes Only.</u>

The information contained in this Disclosure Statement is for purposes of disclosure in connection with the Plan and may not be relied upon for any other purposes.

      2.      <u>This Disclosure Statement was Not Approved by the SEC.</u>

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

      3.      <u>This Disclosure Statement Contains Forward-Looking Statements.</u>

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.

      4.      <u>No Legal or Tax Advice is Provided to You by This Disclosure Statement.</u>

**This Disclosure Statement is not legal or tax advice to you**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

<div align="center">- 83 -</div>

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 11/09/23    Page 212 of 1392    PageID 14954
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 101 of 1803    PageID 10847
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 94 of 178

     5.     <u>No Admissions Are Made by This Disclosure Statement.</u>

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, the Claimant Trust, Holders of Allowed Claims or Equity Interests, or any other parties in interest.

     6.     <u>No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.</u>

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtor or the Reorganized Debtor or Claimant Trustee, as applicable, may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

     7.     <u>Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.</u>

The Debtor, the Reorganized Debtor, the Claimant Trustee, or any party in interest, as the case may be, reserve any and all rights to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

     8.     <u>The Information Used Herein was Provided by the Debtor and was Relied Upon by the Debtor's Advisors.</u>

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

     9.     <u>The Disclosure Statement May Contain Inaccuracies.</u>

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, the information contained in this Disclosure Statement is as of the date of the Disclosure Statement and does not address events that may occur after such date. The Debtor may update this Disclosure Statement but is not required to do so.

Appellee Appx. 00095
APPX. 10846

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 11/03/23   Page 213 of 1392   PageID 14955
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 102 of 1803   PageID 10848
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 95 of 178

    10.    <u>No Representations Made Outside the Disclosure Statement Are Authorized.</u>

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

## ARTICLE V.
## ALTERNATIVES TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets. If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

## ARTICLE VI.
## U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Implementation of the Plan will have federal, state, local or foreign tax consequences to the Debtor and Holders of Equity Interests as well as Holders of Claims. No tax opinion or ruling has been sought or will be obtained with respect to any tax consequences of the Plan, and the following discussion does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtor and to Holders of Claims. This discussion assumes that each Holder of Claims is for United States federal income tax purposes:

- An individual who is a citizen or resident of the United States for federal income tax purposes;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- any other person that is subject to U.S. federal income taxation on a net income basis.

- an estate the income of which is subject to United States federal income tax without regard to its source; or

- a trust (1) that is subject to the primary supervision of a United States court and the control of one or more United States persons or (2) that has a valid election in effect under applicable treasury regulations to be treated as a United States person.

Appellee Appx. 00096
Appx. 10847

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 11/24/23   Page 214 of 1392   PageID 14956
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 103 of 1803   PageID 10849
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 96 of 178

This discussion also assumes that each Holder holds the Claims as capital assets under Section 1221 of the Internal Revenue Code.

The summary provides general information only and does not purport to address all of the federal income tax consequences that may be applicable to the Debtor or to any particular Holder of Claims in light of such Holder's own individual circumstances.  In particular, the summary does not address the federal income tax consequences of the Plan to Holders of Claims that may be subject to special rules, such as non-U.S. persons, insurance companies, financial institutions, regulated investment companies, broker-dealers, persons who acquired Claims as part of a straddle, hedge, conversion transaction or other integrated transaction, or persons who acquired Claims  in connection with the performance of services; persons who hold Claims through a partnership or other pass-through entity and tax-exempt organizations.  The summary does not address foreign, state, local, estate or gift tax consequences of the Plan, nor does it address the federal income tax consequences to Holders of Equity Interests.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), the final, temporary and proposed Treasury regulations promulgated thereunder, judicial decisions and administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, judicial decision or administrative action. Moreover, due to a lack of definitive authority, substantial uncertainties exist with respect to various tax consequences of the Plan.

**THE TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS OR EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

**A.      Consequences to the Debtor**

It is anticipated that the consummation of the Plan will not result in any federal income tax liability to the Debtor.  The Debtor is a partnership for federal income tax purposes. Therefore, the income and loss of the Debtor is passed-through to the Holders of its Equity Interests, and the Debtor does not pay federal income tax.

1.      Cancellation of Debt

Generally, the discharge of a debt obligation of a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income that must be included in the debtor's income.  Due to the nature of the Impaired Claims, it is anticipated that

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 02/05/23 Page 215 of 1392    PageID 14957
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 104 of 1803    PageID 10850
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 97 of 178

the Debtor will not recognize any material amount of COD income.  If any such COD income is recognized, it will be passed-through to the Holders of its Equity Interests, and the Holders of such Equity Interest generally will be required to include such amounts in income, unless a Holder is entitled to exclude such amounts from income under Section 108 of the Internal Revenue Code, based on the Holder's individual circumstances.

2.    Transfer of Assets

Pursuant to the Plan, the Debtor's assets (including the Claimant Trust Assets and Reorganized Debtor Assets) will be transferred directly or indirectly to the Claimant Trust.  For federal income tax purposes, any such assets transferred to the Claimant Trust will be deemed to have been transferred to the Claimant Trust Beneficiaries followed by the transfer by such Holders to the Claimant Trust of such assets in exchange for the respective Holders' beneficial interests in the Claimant Trust.  The Claimant Trust thereafter will be treated as a grantor trust for federal income tax purposes.  See U.S. Federal Income Tax Treatment of the Claimant Trust, below.

The Debtor's transfer of its assets pursuant to the Plan will constitute a taxable disposition of such assets.  As discussed above, the Debtor is a partnership for federal income tax purposes.  Any gain or loss recognized as a result of the taxable disposition of such assets will be passed through to the Holders of Equity Interests in the Debtor.  The Debtor will not be required to pay any tax as a result of such disposition.

**B.    U.S. Federal Income Tax Treatment of the Claimant Trust**

It is intended that the Claimant Trust will be treated as a "grantor trust" for U.S. federal income tax purposes.  In general, a grantor trust is not a separate taxable entity.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Revenue Procedure 94-45, the Claimant Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the Debtor's assets to the Claimant Trust as (i) a transfer of such assets to the Claimant Trust Beneficiaries (to the extent of the value of their respective interests in the applicable Claimant Trust Assets) followed by (ii) a transfer of such assets by such beneficiaries to the Claimant Trust (to the extent of the value of their respective interests in the applicable Claimant Trust Assets), with the beneficiaries being treated as the grantors and owners of the Claimant Trust.

The Plan and the Claimant Trust Agreement generally provide that the Claimant Trust Beneficiaries must value the assets of the Claimant Trust consistently with the values determined by the Claimant Trustee for all U.S. federal income tax purposes.  As soon as possible after the Effective Date, the Claimant Trustee, based upon his good faith determination after consultation with his counsel and other advisors, shall inform the beneficiaries in writing as to his estimate of the value of the assets transferred to the Claimant Trust and the value of such assets allocable to each Class of beneficiaries.

Consistent with the treatment of the Claimant Trust as a grantor trust, the Claimant Trust Agreement will require each beneficiary to report on its U.S. federal income tax return its allocable share of the Claimant Trust's income, gain, loss or deduction that reflects the

- 87 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6835 Filed 1/06/03 1804age 216 of 1392 PageID 14958
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 105 of 1803 PageID 10851
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 98 of 178

beneficiary's interest in the interim and final distributions to be made by the Claimant Trust. Furthermore, certain of the assets of the Claimant Trust will be interests in the Reorganized Debtor, which will be a partnership for U.S. federal income tax purposes. The income, gain, loss or deduction of the Reorganized Debtor will also flow through the Claimant Trust to the beneficiaries of the Claimant Trust. Therefore, a beneficiary may incur a federal income tax liability with respect to its allocable share of the income of the Claimant Trust (including the income of the Reorganized Debtor) whether or not the Claimant Trust has made any distributions to such beneficiary. The character of items of income, gain, deduction, and credit to any beneficiary and the ability of such beneficiary to benefit from any deduction or losses will depend on the particular situation of such beneficiary. The interests of the beneficiaries may shift from time to time as the result of the allowance or disallowance of claims that have not been allowed at the Effective Date, which could give rise to tax consequences both to the Holders of claims that have, and have not been, allowed at the Effective Date. The Claimant Trustee will file with the IRS tax returns for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Trust income, gain, loss, deduction, or credit. Each beneficiary will be required to report such items on its U.S. federal income tax return. Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of distributions from the Claimant Trust.

The discussion above assumes that the Claimant Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Claimant Trust and the beneficiaries could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Claimant Trust).

**C.     Consequences to Holders of Allowed Claims**

1.     <u>Recognized Gain or Loss</u>

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). In general, the "amount realized" by a Holder will equal the sum of any cash and the aggregate fair market value of any property received by such Holder pursuant to the Plan (for example, such Holder's undivided beneficial interest in the assets of the Claimant Trust). A Holder that receives or is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its receipt or deemed receipt. See U.S. Federal Income Tax Treatment of the Claimant Trust, above for more information regarding the tax treatment of the Claimant Trust Interests.

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at

Appellee Appx. 00099
Appx. 00950

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 13-5    Filed 11/09/23    Page 217 of 1392    PageID 14959
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 106 of 1803    PageID 10852
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 99 of 178

a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction.

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled to a deduction for U.S. federal income tax purposes. The rules governing the character, timing and amount of such a deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

2.    Distribution in Discharge of Accrued Unpaid Interest

Pursuant to the Plan, a distribution received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. In general, to the extent that an amount received (whether cash or other property) by a Holder of a claim is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the Holder as interest income if not previously included in the Holder's gross income. Conversely, a Holder generally recognizes a deductible loss to the extent that it does not receive payment of interest that has previously been included in its income. Holders of Claims are urged to consult their tax advisors regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

3.    Information Reporting and Withholding

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements. Under federal income tax law, interest, dividends, and other reportable payments, may, under certain circumstances, be subject to "backup withholding" (currently at a rate of up to 24%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**D.    Treatment of the Disputed Claims Reserve**

Pursuant to the Plan, the Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity. Such taxes will be paid out of the Disputed Claims Reserve and therefore may reduce amounts paid to Holders of Allowed Claims from the Claimant Trust. If the Claimant Trustee does not make such an election to treat the Disputed Claims Reserve as a separate taxable entity, the net income, if any, earned in the Disputed Claims Reserve will be taxable to the Holders of Allowed Claims in accordance with

- 89 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 11/08/23   Page 218 of 1392   PageID 14960
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 107 of 1803   PageID 10853
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 100 of
178

the principles discussed above under the heading "U.S. Federal Income Tax Treatment of the Claimant Trust", possibly in advance of any distributions to the Holders.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.**

### ARTICLE VII.
### RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distribution to the Debtor's creditors and interest holders.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan. Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.

Appellee Appx. 00101
Appx. 010952

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6833   Filed 12/09/23 180 Page 219 of 1392   PageID 14961
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 108 of 1803   PageID 10854
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 101 of
178

Dated:  November 24, 2020

Respectfully submitted,

HIGHLAND CAPITAL MANAGEMENT, L.P.

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.Com:

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/20/23    Page 220 of 1392    PageID 14962
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 109 of 1803    PageID 10855
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 102 of
178

# EXHIBIT A

## PLAN OF REORGANIZATION

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/29/23180 4Page 221 of 1392    PageID 14963
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 110 of 1803    PageID 10856
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 103 of
178

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND**
**CAPITAL MANAGEMENT, L.P.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

- 1 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23 1804   Page 222 of 1392   PageID 14964
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 111 of 1803   PageID 10857
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 104 of
178

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS ...............................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law.....................1

    B.    Defined Terms ......................................................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS................16

    A.    Administrative Expense Claims...........................................................................16

    B.    Professional Fee Claims......................................................................................17

    C.    Priority Tax Claims.............................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
AND EQUITY INTERESTS ........................................................................18

    A.    Summary .............................................................................................................18

    B.    Summary of Classification and Treatment of Classified Claims and
Equity Interests ..................................................................................................18

    C.    Elimination of Vacant Classes ...........................................................................18

    D.    Impaired/Voting Classes.....................................................................................19

    E.    Unimpaired/Non-Voting Classes ........................................................................19

    F.    Impaired/Non-Voting Classes.............................................................................19

    G.    Cramdown...........................................................................................................19

    H.    Classification and Treatment of Claims and Equity Interests.............................19

    I.    Special Provision Governing Unimpaired Claims...............................................24

    J.    Subordinated Claims ..........................................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN .......................................24

    A.    Summary .............................................................................................................24

    B.    The Claimant Trust .............................................................................................25

    *1.*    *Creation and Governance of the Claimant Trust and Litigation Sub-
Trust.* ................................................................................................................25

    *2.*    *Claimant Trust Oversight Committee* .................................................................26

- ii -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/29/23 180age 223 of 1392    PageID 14965
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 112 of 1803    PageID 10858
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 105 of
178

**Page**

| | | |
|---|---|---|
| 3. | *Purpose of the Claimant Trust.* | 27 |
| 4. | *Purpose of the Litigation Sub-Trust.* | 27 |
| 5. | *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* | 28 |
| 6. | *Compensation and Duties of Trustees.* | 29 |
| 7. | *Cooperation of Debtor and Reorganized Debtor.* | 29 |
| 8. | *United States Federal Income Tax Treatment of the Claimant Trust.* | 30 |
| 9. | *Tax Reporting.* | 30 |
| 10. | *Claimant Trust Assets.* | 30 |
| 11. | *Claimant Trust Expenses.* | 31 |
| 12. | *Trust Distributions to Claimant Trust Beneficiaries.* | 31 |
| 13. | *Cash Investments.* | 31 |
| 14. | *Dissolution of the Claimant Trust and Litigation Sub-Trust.* | 31 |
| C. | The Reorganized Debtor | 32 |
| 1. | *Corporate Existence* | 32 |
| 2. | *Cancellation of Equity Interests and Release* | 32 |
| 3. | *Issuance of New Partnership Interests* | 32 |
| 4. | *Management of the Reorganized Debtor* | 32 |
| 5. | *Vesting of Assets in the Reorganized Debtor* | 33 |
| 6. | *Purpose of the Reorganized Debtor* | 33 |
| 7. | *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* | 33 |
| D. | Company Action | 34 |
| E. | Release of Liens, Claims and Equity Interests | 34 |
| F. | Cancellation of Notes, Certificates and Instruments | 35 |
| G. | Cancellation of Existing Instruments Governing Security Interests | 35 |

- iii -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 13    Filed 12/04/23    Page 224 of 1392    PageID 14966
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 113 of 1803    PageID 10859
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 106 of
178

**Page**

H.    Control Provisions ................................................................................. 35

I.    Treatment of Vacant Classes ................................................................. 36

J.    Plan Documents ...................................................................................... 36

K.    Highland Capital Management, L.P. Retirement Plan and Trust ...................... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
          LEASES ............................................................................................. 37

A.    Assumption, Assignment, or Rejection of Executory Contracts and
      Unexpired Leases ................................................................................... 37

B.    Claims Based on Rejection of Executory Contracts or Unexpired
      Leases ....................................................................................................... 38

C.    Cure of Defaults for Assumed or Assigned Executory Contracts and
      Unexpired Leases ................................................................................... 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................ 39

A.    Dates of Distributions ............................................................................ 39

B.    Distribution Agent .................................................................................. 40

C.    Cash Distributions .................................................................................. 40

D.    Disputed Claims Reserve ....................................................................... 40

E.    Distributions from the Disputed Claims Reserve .............................. 40

F.    Rounding of Payments ........................................................................... 41

G.    *De Minimis* Distribution ........................................................................ 41

H.    Distributions on Account of Allowed Claims .................................... 41

I.    General Distribution Procedures .......................................................... 41

J.    Address for Delivery of Distributions .................................................. 41

K.    Undeliverable Distributions and Unclaimed Property ...................... 42

L.    Withholding Taxes .................................................................................. 42

M.    Setoffs ...................................................................................................... 42

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-8    Filed 12/29/23    Page 225 of 1392    PageID 14967
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 114 of 1803    PageID 10860
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 107 of
178

**Page**

N.    Surrender of Cancelled Instruments or Securities ................................................43

O.    Lost, Stolen, Mutilated or Destroyed Securities ................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
         UNLIQUIDATED AND DISPUTED CLAIMS............................................43

A.    Filing of Proofs of Claim ..................................................................................43

B.    Disputed Claims.................................................................................................43

C.    Procedures Regarding Disputed Claims or Disputed Equity Interests ...............44

D.    Allowance of Claims and Equity Interests..........................................................44

1.    *Allowance of Claims* ........................................................................................44

2.    *Estimation* ......................................................................................................44

3.    *Disallowance of Claims* ..................................................................................45

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ...............................................................45

A.    Conditions Precedent to the Effective Date ........................................................45

B.    Waiver of Conditions.........................................................................................46

C.    Effect of Non-Occurrence of Conditions to Effectiveness ..................................47

D.    Dissolution of the Committee .............................................................................47

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS .................47

A.    General................................................................................................................47

B.    Discharge of Claims...........................................................................................47

C.    Exculpation ........................................................................................................48

D.    Releases by the Debtor.......................................................................................48

E.    Preservation of Rights of Action........................................................................50

1.    *Maintenance of Causes of Action* ....................................................................50

2.    *Preservation of All Causes of Action Not Expressly Settled or Released*...........50

F.    Injunction ...........................................................................................................50

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-3    Filed 12/20/23180ge 226 of 1392    PageID 14968
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 115 of 1803    PageID 10861
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 108 of
178

|  |  |  | **Page** |
|---|---|---|---|
| G. | Term of Injunctions or Stays | | 51 |
| H. | Continuance of January 9 Order | | 52 |
| ARTICLE X. BINDING NATURE OF PLAN | | | 52 |
| ARTICLE XI. RETENTION OF JURISDICTION | | | 52 |
| ARTICLE XII. MISCELLANEOUS PROVISIONS | | | 54 |
| A. | Payment of Statutory Fees and Filing of Reports | | 54 |
| B. | Modification of Plan | | 55 |
| C. | Revocation of Plan | | 55 |
| D. | Obligations Not Changed | | 55 |
| E. | Entire Agreement | | 55 |
| F. | Closing of Chapter 11 Case | | 55 |
| G. | Successors and Assigns | | 56 |
| H. | Reservation of Rights | | 56 |
| I. | Further Assurances | | 56 |
| J. | Severability | | 57 |
| K. | Service of Documents | | 57 |
| L. | Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code | | 58 |
| M. | Governing Law | | 58 |
| N. | Tax Reporting and Compliance | | 58 |
| O. | Exhibits and Schedules | | 59 |
| P. | Controlling Document | | 59 |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 12/29/23 1804 Page 227 of 1392   PageID 14969
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 116 of 1803   PageID 10862
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 109 of
178

---

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>"), proposes the following chapter 11 plan of reorganization (the "<u>Plan</u>") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 11/29/23   Page 228 of 1392   PageID 14970
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 117 of 1803   PageID 10863
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 110 of
178

(h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B.**    **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code and also includes any other Entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such affiliate.  For the purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not

2

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6865    Filed 11/29/23 180ge 229 of 1392    PageID 14971
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 118 of 1803    PageID 10864
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 111 of
178

unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.   "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.   "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.   "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

**Appellee Appx. 00112**
**Appx. 10364**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 11/20/23    Page 230 of 1392    PageID 14972
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 119 of 1803    PageID 10865
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 112 of
178

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

Appellee Appx. 00113
APPX. 10365

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 11/29/23   Page 231 of 1392   PageID 14973
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 120 of 1803   PageID 10866
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 113 of
178

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

Appellee Appx. 00114
APPX. 10366

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 12/29/23 184 of Page 232 of 1392    PageID 14974
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 121 of 1803    PageID 10867
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 114 of
178

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. *"Convenience Claim"* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 11/29/23 1804 Page 233 of 1392    PageID 14975
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 122 of 1803    PageID 10868
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 115 of
178

distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests"* means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

Appellee Appx. 00116
APPX. 10367

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 11/24/20 3804age 234 of 1392   PageID 14976
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 123 of 1803   PageID 10869
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 116 of
178

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

57. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

58. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

59. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

60. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

61. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the

8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-5   Filed 11/29/23   Page 235 of 1392   PageID 14977
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 124 of 1803   PageID 10870
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 117 of
178

Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

62. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

63. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

64. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

65. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

66. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

67. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

68. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

69. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

70. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

71. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

9

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 11/20/23    Page 236 of 1392    PageID 14978
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 125 of 1803    PageID 10871
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 118 of
178

72. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

73. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

75. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

76. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

77. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

78. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

79. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

80. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

81. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

82. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

Appellee Appx. 00119
APPX. 00370

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/29/23    Page 237 of 1392    PageID 14979
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 126 of 1803    PageID 10872
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 119 of
178

83. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

84. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

85. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

86. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

87. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

88. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

89. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

90. "*Petition Date*" means October 16, 2019.

91. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

92. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

93. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

94. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/29/23   Page 238 of 1392    PageID 14980
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 127 of 1803    PageID 10873
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 120 of
178

Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

95. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

96. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

97. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

98. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

99. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

100. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

101. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

102. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

103. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/29/23   Page 239 of 1392   PageID 14981
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 128 of 1803   PageID 10874
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 121 of
178

104.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

105.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

106.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

107.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

108.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

109.    "*Related Entity*" means, without duplication, (a) James Dondero, (b) Mark Okada, (c) Grant Scott, (d) Hunter Covitz, (e) any entity or person that was an insider of the

Appellee Appx. 00122
APPX. 10874

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/30/23   Page 240 of 1392   PageID 14982
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 129 of 1803   PageID 10875
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 122 of
178

Debtor on the Petition Date under Section 101(31) of the Bankruptcy Code, including any non-statutory insider, (f) any entity that, after the Effective Date, is controlled directly or indirectly by James Dondero, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, and (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries.

110. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present and former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case solely in their capacity as such.

111. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

112. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

113. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

114. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

115. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

116. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

117. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

118. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the

14

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 13-3   Filed 12/29/23   Page 241 of 1392   PageID 14983
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 130 of 1803   PageID 10876
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 123 of
178

creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

119.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

120.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

121.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

122.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

123.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

124.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

125.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

126.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

127.    "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

128.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

129.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

130.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

15

**Appellee Appx. 00124**
**APPX. 10876**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/22/23   Page 242 of 1392   PageID 14984
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 131 of 1803   PageID 10877
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 124 of 178

131.     "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

132.     "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133.     "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

134.     "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

135.     "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A.     Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 11/30/23    Page 243 of 1392    PageID 14985
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 132 of 1803    PageID 10878
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 125 of
178

B.    **Professional Fee Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

C.    **Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

17

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 11/24/23 1804age 244 of 1392    PageID 14986
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 133 of 1803    PageID 10879
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 126 of
178

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.**    **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**    **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
| --- | --- | --- | --- |
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C.**    **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68    Filed 12/15/23    Page 245 of 1392    PageID 14987
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 134 of 1803    PageID 10880
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 127 of
178

voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.    Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.    Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.    Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.    Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.    Classification and Treatment of Claims and Equity Interests**

*1.    Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan

19

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 11/30/23   Page 246 of 1392   PageID 14988
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 135 of 1803   PageID 10881
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 128 of 178

pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.  *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.  *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.  *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

20

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 11/29/23 Page 247 of 1392   PageID 14989
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 136 of 1803   PageID 10882
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 129 of
178

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.   *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.   *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-16    Filed 12/29/23    Page 248 of 1392    PageID 14990
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 137 of 1803    PageID 10883
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 130 of
178

7.    _Class 7 – Convenience Claims_

- _Classification_: Class 7 consists of the Convenience Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- _Impairment and Voting_:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    _Class 8 – General Unsecured Claims_

- _Classification_: Class 8 consists of the General Unsecured Claims.

- _Treatment_:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- _Impairment and Voting_:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.    _Class 9 – Subordinated Claims_

- _Classification_: Class 9 consists of the Subordinated Claims.

Appellee Appx. 00131
Appx. 10332

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.3    Filed 12/30/8104    Page 249 of 1392    PageID 14991
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 138 of 1803    PageID 10884
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 131 of
178

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.    <u>Class 10 – Class B/C Limited Partnership Interests</u>

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

23

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 04/20/23 1804 Page 250 of 1392   PageID 14992
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 139 of 1803   PageID 10885
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 132 of 178

11.   *Class 11 – Class A Limited Partnership Interests*

- *Classification*:   Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*:   On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:   Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I.     Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.     Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.   Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.     Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 251 of 1392   PageID 14993
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 140 of 1803   PageID 10886
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 133 of
178

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement.  Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.    The Claimant Trust**[2]

*1.        Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries.  Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Appellee Appx. 00134
Appx. 10936

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-3    Filed 12/29/23    Page 252 of 1392    PageID 14994
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 141 of 1803    PageID 10887
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 134 of
178

rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.          *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be

Appellee Appx. 00135
Appx. 10135

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 11/29/23    Page 253 of 1392    PageID 14995
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 142 of 1803    PageID 10888
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 135 of
178

overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.        *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.        *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6 & 3 & Filed 12/44/23 180 Page 254 of 1392    PageID 14996
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 143 of 1803    PageID 10889
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 136 of
178

*5.*                    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

     (i)    the payment of the Claimant Trust Expenses;

     (ii)    the payment of other reasonable expenses of the Claimant Trust;

     (iii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

     (iv)    the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

     (v)    the orderly monetization of the Claimant Trust Assets;

     (vi)    litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

     (vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

     (viii)    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

     (ix)    the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 11/29/23    Page 255 of 1392    PageID 14997
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 144 of 1803    PageID 10890
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 137 of
178

The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)    the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)    the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.    _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.    _Cooperation of Debtor and Reorganized Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 12/05/23    Page 256 of 1392    PageID 14998
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 145 of 1803    PageID 10891
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 138 of 178

8.          *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.          *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.          *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the

Appellee Appx. 00139

Appx. 00340

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 12/20/23    Page 257 of 1392    PageID 14999
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 146 of 1803    PageID 10892
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 139 of
178

Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.      _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.      _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.      _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.      _Dissolution of the Claimant Trust and Litigation Sub-Trust._

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the

31

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 11/29/23    Page 258 of 1392    PageID 15000
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 147 of 1803    PageID 10893
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 140 of
178

Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.    The Reorganized Debtor

### 1.    *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.    *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.    *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

### 4.    *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant

Appellee Appx. 00141
APPX. 10342

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 11/29/23    Page 259 of 1392    PageID 15001
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 148 of 1803    PageID 10894
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 141 of
178

Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.        *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.        *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.        *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust

Appellee Appx. 00142
Appx. 10344

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 12/30/23    Page 260 of 1392    PageID 15002
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 149 of 1803    PageID 10895
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 142 of
178

will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.**     **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

**E.**     **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the

Appellee Appx. 00143
APPX. 00345

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23   Page 261 of 1392   PageID 15003
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 150 of 1803   PageID 10896
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 143 of
178

Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

F.      **Cancellation of Notes, Certificates and Instruments**

        Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

G.      **Cancellation of Existing Instruments Governing Security Interests**

        Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

H.      **Control Provisions**

        To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

Appellee Appx. 00144
APPX. 00346

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/29/23   Page 262 of 1392   PageID 15004
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 151 of 1803   PageID 10897
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 144 of
178

I.      **Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

J.      **Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

K.      **Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/23   Page 263 of 1392   PageID 15005
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 152 of 1803   PageID 10898
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 145 of 178

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**    **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Appellee Appx. 00146
APPX. 10347

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6816   Filed 12/04/23   Page 264 of 1392   PageID 15006
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 153 of 1803   PageID 10899
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 146 of
178

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts

Appellee Appx. 00147
Appx. 10349

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 12/29/23   Page 265 of 1392   PageID 15007
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 154 of 1803   PageID 10900
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 147 of
178

or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.  Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 12/20/23180Page 266 of 1392    PageID 15008
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 155 of 1803    PageID 10901
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 148 of
178

**B.    Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

**C.    Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

**D.    Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

**E.    Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

Appellee Appx. 00149
APPX. 10040

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68 5   Filed 11/29/23   Page 267 of 1392   PageID 15009
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 156 of 1803   PageID 10902
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 149 of
178

**F.    Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

**G.    *De Minimis* Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim.  *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H.    Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order.  Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I.    General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise.  All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J.    Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

**Appellee Appx. 00150**
**APPX. 10492**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-6   Filed 12/29/23 Page 268 of 1392   PageID 15010
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 157 of 1803   PageID 10903
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 150 of 178

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.    Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.    Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.    Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to

Appellee Appx. 00151
APPX. 10093

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Exhibit 6   Filed 12/29/23   Page 269 of 1392   PageID 15011
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 158 of 1803   PageID 10904
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 151 of
178

such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.**      <u>Surrender of Cancelled Instruments or Securities</u>

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

**O.**      <u>Lost, Stolen, Mutilated or Destroyed Securities</u>

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest.  Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

<div align="center">

**ARTICLE VII.**
**<u>PROCEDURES FOR RESOLVING CONTINGENT,</u>**
**<u>UNLIQUIDATED AND DISPUTED CLAIMS</u>**

</div>

**A.**      <u>Filing of Proofs of Claim</u>

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**      <u>Disputed Claims</u>

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such

<div align="center">43</div>

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 685 Filed 1/20/23 Page 270 of 1392 PageID 15012
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 159 of 1803 PageID 10905
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 152 of
178

Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

### C. Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

### D. Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

#### 1. *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

#### 2. *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

44

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 12/29/23    Page 271 of 1392    PageID 15013
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 160 of 1803    PageID 10906
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 153 of
178

3.    _Disallowance of Claims_

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

**A.    Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering

45

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6 Exhibit 6   Page 1/2 of 1804 ge 272 of 1392   PageID 15014
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 161 of 1803   PageID 10907
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 154 of
178

into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.    <u>Waiver of Conditions</u>**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized

Appellee Appx. 00155
Appx. 10045

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/23/23   Page 273 of 1392   PageID 15015
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 162 of 1803   PageID 10908
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 155 of
178

Debtor, or the Claimant Trust, as applicable.

**C.**     **Effect of Non-Occurrence of Conditions to Effectiveness**

Unless waived as set forth in ARTICLE VIII.B, if the Effective Date of this Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw this Plan and, if withdrawn, the Plan shall be of no further force or effect.

**D.**     **Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto).  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

**A.**     **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.**     **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose

47

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 12/04/23    Page 274 of 1392    PageID 15016
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 163 of 1803    PageID 10909
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 156 of
178

before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## C.    Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.    Releases by the Debtor

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal

48

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/05/23    Page 275 of 1392    PageID 15017
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 164 of 1803    PageID 10910
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 157 of
178

misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims

Appellee Appx. 00158
APPX. 010409

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 01/06/23   Page 276 of 1392   PageID 15018
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 165 of 1803   PageID 10911
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 158 of
178

brought by the Litigation Trustee and not collection or other actions brought by the Claimant
Trustee).

**E.      Preservation of Rights of Action**

      *1.      Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized
Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as
appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant
Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any
court or other tribunal including, without limitation, in an adversary proceeding Filed in the
Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will
have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to
do any of the foregoing) any or all of the Causes of Action without notice to or approval from the
Bankruptcy Court.

      *2.      Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity
is expressly waived, relinquished, released, compromised or settled in this Plan or any Final
Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly
reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable
(including, without limitation, Causes of Action not specifically identified or of which the
Debtor may presently be unaware or that may arise or exist by reason of additional facts or
circumstances unknown to the Debtor at this time or facts or circumstances that may change or
be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine,
including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion,
claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such
Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this
Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such
Causes of Action have been expressly released in this Plan or any other Final Order (including,
without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or
the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a
plaintiff, defendant or an interested party, against any Entity, including, without limitation, the
plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.      Injunction**

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and
other parties in interest, along with their respective Related Persons, shall be enjoined from
taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of
the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity
Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not
and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or
are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest,

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68 Exhibit 6    Filed 12/07/23 1804 age 277 of 1392    PageID 15019
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 166 of 1803    PageID 10912
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 159 of
178

along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to ARTICLE XII.D, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; *provided, however,* the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  As set forth in ARTICLE XI, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

### G.    Term of Injunctions or Stays

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 11/29/23   Page 278 of 1392   PageID 15020
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 167 of 1803   PageID 10913
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 160 of 178

**H.**     **Continuance of January 9 Order**

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan as legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/23   Page 279 of 1392   PageID 15021
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 168 of 1803   PageID 10914
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 161 of
178

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

Appellee Appx. 00162
APPX. 10914

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/20/23    Page 280 of 1392    PageID 15022
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 169 of 1803    PageID 10915
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 162 of 178

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

**A.**    **Payment of Statutory Fees and Filing of Reports**

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

Appellee Appx. 00163
Appx. 100165

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 11/29/23 Page 281 of 1392    PageID 15023
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 170 of 1803    PageID 10916
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 163 of 178

**B.    Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**C.    Revocation of Plan**

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

**D.    Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E.    Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F.    Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

Appellee Appx. 00164
Appx. 10916

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/23   Page 282 of 1392   PageID 15024
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 171 of 1803   PageID 10917
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 164 of
178

G.      **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

H.      **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

I.      **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 11/29/23 Page 283 of 1392   PageID 15025
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 172 of 1803   PageID 10918
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 165 of
178

**J.**      **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.**      **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> **If to the Claimant Trust:**
>
> Highland Claimant Trust
> c/o Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  James P. Seery, Jr.
>
> **If to the Debtor:**
>
> Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  James P. Seery, Jr.
>
> **with copies to:**
>
> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA 90067
> Telephone: (310) 277-6910
> Facsimile:  (310) 201-0760
> Attn:   Jeffrey N. Pomerantz, Esq.
>           Ira D. Kharasch, Esq.
>           Gregory V. Demo, Esq.

**Appellee Appx. 00166**

**Appx. 10048**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 12/29/23    Page 284 of 1392    PageID 15026
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 173 of 1803    PageID 10919
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 166 of
178

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
          Ira D. Kharasch, Esq.
          Gregory V. Demo, Esq.

L.      **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

        To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

M.      **Governing Law**

        Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

N.      **Tax Reporting and Compliance**

        The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 285 of 1392   PageID 15027
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 174 of 1803   PageID 10920
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 167 of
178

**O.      Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.      Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.   The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-35    Exhibit 6    Filed 12/20/23    Page 286 of 1392    PageID 15028
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 175 of 1803    PageID 10921
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 168 of
178

Dated:  November 24, 2020

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief
Restructuring Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:  MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 12/29/23    Page 287 of 1392    PageID 15029
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 176 of 1803    PageID 10922
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 169 of
178

**EXHIBIT B**

**ORGANIZATIONAL CHART OF THE DEBTOR**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6.3    Filed 12/29/23 Page 288 of 1392    PageID 15030
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 177 of 1803    PageID 10923

Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 170 of
178



Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/29/23    Page 289 of 1392    PageID 15031
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 178 of 1803    PageID 10924
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 171 of
178

# EXHIBIT C

**LIQUIDATION ANALYSIS/FINANCIAL PROJECTIONS**

Appellee Appx. 00172
Appx. 10924

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-6    Filed 12/30/23 1804    Page 290 of 1392    PageID 15032
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 179 of 1803    PageID 10925
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 172 of
178

*Highland Capital Management, L.P.*
*Disclaimer For Financial Projections*

  This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

  This Memorandum includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

  These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

  Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

  These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-13   Filed 12/29/23   Page 291 of 1392   PageID 15033
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 180 of 1803   PageID 10926
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 173 of 178

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is January 31 ,2021.

B. All investment assets are sold by December 31, 2022.

C. All demand notes are collected in the year 2021.

D. All notes receivable with maturity dates beyond 12/31/2022 are sold in Q4 2022; in the interim interest income and principal payments are collected as they become due.

E. Fixed assets used in daily business operations are sold in February 2021.

F. Accrual for employee bonuses as of January 2021 are reversed and not paid.

G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H. Post-effective date, the reorganized Debtor would retain three HCMLP employees as contractors to help monetize the remaining assets.

I. Litigation Trustee budget is $6,500,000.

J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100% of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or interest of junior priority.

L. Plan assumes zero allowed claims for UBS, IFA, the HarbourVest entities (collectively "HV") and Hunter Mountain Investment Trust ("HM").

M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for UBS, IFA, HM and HV.
Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O. Class 7  payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $9.96 million.

P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date:

    o By September 30, 2021 - $50,000,000

    o By March 31, 2022 – additional $50,000,000

    o By June 30, 2022 – additional $25,000,000

    o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 51-6    Filed 11/22/20 10:04    Page 292 of 1392    PageID 15034
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 181 of 1803    PageID 10927
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 174 of
178

**Highland Capital Management, L.P.**
**Plan Analysis Vs. Liquidation Analysis**
**(US $000's)**

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $ 25,076 | $ 25,076 |
| Estimated proceeds from monetization of assets [1][2] | 190,445 | 149,197 |
| Estimated expenses through final distribution[1][3] | (33,642) | (36,232) |
| Total estimated $ available for distribution | 181,879 | 138,042 |
|  |  |  |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,078) | (1,078) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,463) | (5,463) |
| Class 3 - Other Secured Claims | (551) | (551) |
| Class 4 – Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims | - | - |
| Class 7 – Convenience Claims [7][8][9] | (10,255) | - |
| Subtotal | (27,937) | (17,682) |
| Estimated amount remaining for distribution to general unsecured claims | 153,942 | 120,359 |
|  |  |  |
| Class 8 – General Unsecured Claims [8][10] | 176,049 | 192,258 |
| Subtotal | 176,049 | 192,258 |
|  |  |  |
| % Distribution to general unsecured claims | 87.44% | 62.60% |
|  |  |  |
| Estimated amount remaining for distribution | - |  |
|  |  |  |
| Class 9 – Subordinated Claims | no distribution | no distribution |
| Class 10 – Class B/C Limited Partnership Interests | no distribution | no distribution |
| Class 11 – Class A Limited Partnership Interest | no distribution | no distribution |

Footnotes:
[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee
    Assumes Chapter 7 Trustee engages new professionals to help liquidate assets
[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable
[3] Estimated expenses through final distribution exclude non-cash expenses:
    Depreciation of $462 thousand in 2021
[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court
[5] Represents $4.7 million in unpaid professional fees and $4.5 million in timing of payments to vendors
[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold
[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million
[8] Class 7 includes $1.1 million estimate for aggregate contract rejections damage and Class 8 includes $1.4 million for contract rejection damages
[9] Assumes 3 claimants with allowed claims less than $2.5 million opt into Class 7 along with claims of Senior Employees
[10] Class estimates $0 allowed claim for the following creditors: IFA, HV, HM and UBS; assumes RCP claims offset against HCMLP interest in RCP fund

Notes:
All claim amounts are estimated as of November 20, 2020 and subject to change

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18 Filed 01/09/24 Page 293 of 1392 PageID 15035
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 182 of 1803 PageID 10928
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 175 of 178

*Highland Capital Management, L.P.*
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |
| Other Current Assets | 13,182 | 13,651 | 10,559 | 9,629 | 7,746 | 7,329 | 5,396 | 6,054 | 6,723 | 7,406 | - |
| Investment Assets | 320,912 | 305,961 | 261,333 | 258,042 | 133,026 | 81,793 | 54,159 | 54,159 | 54,159 | 54,159 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 26,226 | $ 19,138 | $ 19,280 | $ 2,891 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 126,365 | 126,343 | 121,950 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 – Frontier Secured Claim | - | - | - | 5,210 | - | - | - | - | - | - | - |
| Class 3 – Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 – PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 176,049 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| Class 9 – Subordinated Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 126,365 | 126,343 | 121,950 | 181,259 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| **TOTAL LIABILITIES** | $ 152,591 | 145,481 | 141,230 | 184,150 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 161,596 | 89,802 | 61,635 | 53,501 | 40,309 | 36,486 | 33,473 | 31,860 | (22,107) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16    Filed 01/03/24    Page 294 of 1392    PageID 15036
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 183 of 1803    PageID 10929
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 176 of
178

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast ---> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,651 | $ 11,173 | $ 779 | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,263 | - | - | - | 1,263 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 113 | - | - | - | 113 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,779 | $ 30,401 | $ 2,154 | $ - | $ - | $ - | $ 2,154 |
| | | | | | | | | | |
| Operating Expenses [1] | 13,328 | 9,171 | 9,079 | 31,579 | 8,428 | 1,646 | 1,807 | 2,655 | 14,536 |
| | | | | | | | | | |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,301) | $ (1,177) | $ (6,274) | $ (1,646) | $ (1,807) | $ (2,655) | $ (12,381) |
| | | | | | | | | | |
| Professional Fees | 17,522 | 7,707 | 7,741 | 32,971 | 5,450 | 5,058 | 2,048 | 1,605 | 14,160 |
| | | | | | | | | | |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,057 | 4,878 | (59,016) | 573 | 423 | 423 | (57,598) |
| | | | | | | | | | |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (8,985) | $ (29,270) | $ (70,741) | $ (6,130) | $ (3,432) | $ (3,837) | $ (84,139) |
| | | | | | | | | | |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (763) | 522 | - | - | (241) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (12,167) | (39,036) | (290) | 19 | (4,702) | (8,006) | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | - | (37,380) | - | - | - | - | - |
| Net Realized Gain (Loss) from Equity Method Investees | - | - | (94) | (94) | - | (22,578) | - | (1,349) | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (12,262) | $ (158,992) | $ (1,053) | $ (22,037) | $ (4,702) | $ (9,355) | $ (37,147) |
| | | | | | | | | | |
| Net Income | $ (150,307) | $ (16,708) | $ (21,247) | $ (188,262) | $ (71,794) | $ (28,167) | $ (8,134) | $ (13,192) | $ (121,287) |

<u>Footnotes:</u>
*[1] Operating expenses include an adjustment in January 2021 to account*
  *for expenses that have not been accrued or paid prior to effective date.*
*[2] Other income and expenses of $61.2 million in January 2021 includes:*
  *[a] $77.7 million was expensed to record for the increase of*
    *allowed claims.*
  *[b] Income of $15.8 million for the accrued, but unpaid payroll liability related to*
    *the Debtor's deferred bonus programs amount written-off.*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 03/30/24    Page 295 of 1392    PageID 15037
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 184 of 1803    PageID 10930
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 177 of
178

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

|  | Forecast ---> | | | | | |
|  | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Management Fees | $ - | $ - | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | - | - | - | - | - | 1,263 |
| Other Income | - | - | - | - | - | 113 |
| Total revenue | $ - | $ - | $ - | $ - | $ - | 2,154 |
| Operating Expenses | 1,443 | 643 | 758 | 1,088 | 3,932 | 18,468 |
| Income/(loss) From Operations | $ (1,443) | $ (643) | $ (758) | $ (1,088) | $ (3,932) | $ (16,314) |
| Professional Fees | 2,788 | 2,788 | 1,288 | 1,288 | 8,153 | 22,313 |
| Other Income/(Expenses) | 408 | 419 | 434 | 184 | 1,444 | (56,154) |
| Operating Gain/(Loss) | $ (3,823) | $ (3,013) | $ (1,613) | $ (2,193) | $ (10,641) | $ (94,780) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (51,775) | (51,775) | (52,016) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (51,775) | $ (51,775) | $ (88,922) |
| Net Income | $ (3,823) | $ (3,013) | $ (1,613) | $ (53,967) | $ (62,415) | $ (183,702) |

Appellee Appx. 00178
APP. 10929

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/26/23   Page 296 of 1392   PageID 15038
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 185 of 1803   PageID 10931
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 178 of 178

**Highland Capital Management, L.P.**
**Cash Flow Indirect**
**(US $000's)**

|  | Forecast ----> | | | | | | | | | |
|  | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net (Loss) Income | $ (16,708) | $ (21,247) | $ (71,794) | $ (28,167) | $ (8,134) | (13,192) | $ (3,823) | $ (3,013) | $ (1,613) | $ (53,967) |
| **Cash Flow from Operating Activity** | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/ loss | - | - | 763 | (522) | - | - | - | - | - | 51,775 |
| Investment realized (gain)/ loss | (1,549) | 12,262 | 290 | 22,559 | 4,702 | 9,355 | - | - | - | - |
| Unrealized (gain) / loss | (9,150) | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | 3,092 | 930 | 1,884 | 417 | 1,933 | (658) | (669) | (684) | 2,010 |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (54,172) | (2,891) | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (9,913) | (123,752) | (6,907) | (3,015) | (1,904) | (4,481) | (3,681) | (2,297) | (182) |
| **Cash Flow From Investing Activities** | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | 250 | 1,639 | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 32,366 | 3,002 | 102,457 | 46,531 | 18,278 | - | - | - | 7,780 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 32,366 | 3,252 | 104,096 | 46,531 | 18,278 | - | - | - | 7,780 |
| **Cash Flow from Financing Activities** | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 181,259 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 97,092 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| Net Change in Cash | $ (9,107) | $ 22,454 | $ (23,408) | $ 91,979 | $ (6,484) | 16,374 | $ (54,481) | $ (28,681) | $ (2,297) | (21,344) |
| Beginning Cash | 14,994 | 5,888 | 28,342 | 4,934 | 96,913 | 90,428 | 106,803 | 52,322 | 23,641 | 21,344 |
| Ending Cash | $ 5,887 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |

11/13/2020

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/29/23   Page 297 of 1392   PageID 15039
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 186 of 1803   PageID 10932

# APPENDIX 2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/29/23   Page 298 of 1392   PageID 15040
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 187 of 1803   PageID 10933

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

                Claimant,

v.                             Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                Respondent.

---

### PARTIAL FINAL AWARD

    WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

I.     Introduction
      A.    The Parties
          1.     Claimant is a Committee of Redeemers in the Highland Crusader Fund (the "Committee"). Pursuant to the Joint Plan of Distribution of the Crusader Funds ("the Plan") and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors ("the Scheme")[1], HC300, the Committee was elected from among the investors in the Crusader Fund to oversee the management of the Crusader Fund by Highland Capital Management, L.P. (Highland Capital). The Plan and the Scheme are the governing documents which contain the arbitration agreements giving rise to this arbitration. The Committee is represented by Terri Mascherin, Andrew Vail, and Shaun Van Horn of Jenner & Block LLP.

          2.     Respondent, or Highland, is an investment manager and, until July 2016, served as such for the Highland Crusader Funds ("Crusader Funds" or the "Funds") that were formed between 2000 and 2002. The Funds consisted of one "Onshore Fund" and two "Offshore Funds," and the capital that was raised through these entities was pooled into a "Master

---

[1] The Plan was implemented with respect to Highland Crusader Offshore Funds by a "Scheme of Arrangement" ("Scheme") sanctioned by the Supreme Court of Bermuda. The Scheme incorporates the Plan and, unless otherwise noted, the Plan and Scheme contain effectively identical provisions. Unless the context requires otherwise, we will refer primarily to the Plan.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 685    Filed 12/29/23    Page 299 of 1392    PageID 15041
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 188 of 1803    PageID 10934

Fund." The capital was invested primarily in "undervalued senior secured loans and other securities of financially troubled firms" among other asset types. HC-17, at HC-117.0010[2]. Highland is represented by Gary Cruciani, Travis DeArmand, Michael Fritz of McKool Smith, LLP.

B.    The Arbitrators

1.    The three arbitrators, whose appointment was formalized by the International Center for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), were David M. Brodsky, Chair, John S. Martin, Jr., and Michael D. Young.

II.    Background of the Dispute

A.    The 2008 Financial Crisis

1.    From 2000 until 2007, the Crusader Funds had double-digit annual returns, but in September and October 2008, as the financial markets in the United States began to fail, Highland Capital was flooded with redemption requests from Crusader Fund investors, as the Crusader Funds' assets lost significant value.

2.    On October 15, 2008, Highland Capital placed the Crusader Funds in wind-down, "compulsorily redeeming" Crusader Fund's limited partnership interests. Highland Capital also declared that it would liquidate the remaining assets and distribute the proceeds to investors. However, disputes over the appropriate distribution of the assets arose between those investors who had voluntarily redeemed their interests earlier in 2008 but had not yet been paid their redemption amount ("Prior Redeemers") and those who were compulsorily redeemed in October 2008 ("Compulsory Redeemers") (collectively, the "Redeemers").

B.    The Plan and Scheme

1.    At about the same time, an investor raised allegations of misconduct by Highland Capital and filed a wind-up petition in the Supreme Court of Bermuda. In 2011, after several years of negotiations among the Prior Redeemers, Compulsory Redeemers, and Highland, the Plan and Scheme were adopted and became effective in August 2011. The adoption of the Scheme and Plan was to "enable the orderly management, sale, and distribution of the assets" by Highland and the right of the Redeemers Committee to oversee Highland's services. HC-300 at 300.017.

---

[2] There are three sets of exhibits that will be referred to herein, Joint Exhibits (referred to as JX- —), Redeemer Committee Exhibits (RC- —), and Highland Capital Exhibits (HC- __).

Appellee Appx. 00182
Appx. 10934

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 12/20/23    Page 300 of 1392    PageID 15042
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 189 of 1803    PageID 10935

2.      Central to the Scheme and Plan was the role of the Redeemer Committee, which was created so as to allow the investors in the Funds to have a greater level of influence over the affairs of Highland Capital than an ordinary creditors' committee would have in the liquidation of the Fund; that increased "level of influence" was particularly manifest in the Committee's ability to approve or disapprove of actions that Highland was contemplating taking, right of first refusal on other activities Highland wished to engage in, and the Committee's ability to terminate the services of Highland on 30 days' notice "with or without Cause."  HC-300 at 300.016. Thus, the relationship between the Redeemer Committee and Highland, although grounded in contract, was designed to become one of mutual cooperation and confidence.

3.      Pursuant to §2.04 of the Plan, a ten-person committee of Crusader Fund investors, composed of five representatives of the Prior Redeemers and five representatives of the Compulsory Redeemers, was created. HC-300, § 2.04. As part of the Plan and Scheme, Highland Capital continued to serve as the investment manager for the Crusader Funds. As part of its duties as investment manager, Highland Capital was to liquidate fund assets and distribute the proceeds to the Crusader Fund investors pursuant to an agreed 43-month distribution schedule. In addition, as an incentive to Highland in its liquidation of assets, the Scheme and Plan provided that the Deferred Fees would be paid to Highland if it completed the full liquidation.

4.      It is not disputed that, between October 2011 and January 2013, Highland Capital distributed in excess of $1.2 billion to the Crusader Fund investors. It is also not disputed that the Crusader Funds were not completely liquidated when Highland paid itself the Deferred Fees in January and April 2016 and the Funds remain unliquidated as of the time of these hearings.

C.      The Arbitration Agreement

1.      Sections 2.09 and 9.03 set forth the terms and conditions by which these disputes are to be resolved in arbitration. Section 2.09 provides, in relevant part, that "in the event of a dispute between the Crusader Funds or the Redeemer Committee and HCMLP, ... the applicable representatives shall confer in god faith in an attempt to resolve the dispute...If the dispute cannot be resolved by mediation it will be referred to arbitration in accordance with Section 9.03."

2.      Section 9.03 provides, in relevant part, that "Any dispute referred to in Section 2.09...shall be subject to and decided by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof pursuant to applicable law. Arbitration shall be conducted in New York, New York."

D.      Termination of Highland Capital and Ensuing Litigation

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 12/29/23    Page 301 of 1392    PageID 15043
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 190 of 1803    PageID 10936

1.      For reasons set forth below, disputes began to arise between the Redeemer Committee and Highland Capital, culminating in the termination of Highland Capital as investment manager by letter and notice dated July 5, 2016, for cause and without cause, with termination being effective on August 4, 2016, RC-318. Highland Capital was replaced as investment manager by Alvarez & Marsal CRT Management, LLC ("A&M"). JX-31.

2.      On July 5, 2016, the Committee filed a Notice of Claim before the AAA, commencing an arbitration against Highland, RC-319, and also commenced litigation in Delaware Chancery Court, inter alia, to obtain a status quo order in aid of the arbitration. On July 8, 2016, a Vice Chancellor entered an oral status quo order in aid of this arbitration, pending the adjudication of the Committee's request for interim relief by an AAA arbitrator on an emergency basis pursuant to AAA Rule 38. On August 2, 2016, an Emergency Interim Order was entered by an Emergency Arbitrator appointed by the ICDR, which order replicated the oral status quo order entered in Delaware Chancery Court.

3.      On July 21, 2016, Highland filed its Answering Statement, denying the claims and asserting affirmative defenses.

E.      The Arbitration

1.      This Tribunal was established as of October 31, 2016. The parties consented to the appointment of the Tribunal.

2.      On October 14, 2016, Claimant filed an Amended Notice of Claim, seeking specific performance, injunctive relief, declaratory relief, money damages, and disgorgement arising out of the allegedly willful misconduct and violations of fiduciary and contractual duties by Highland Capital as investment manager of the Highland Crusader Fund. Claimant sought four species of relief: (a) an award requiring Highland Capital to provide to the Committee all information about the Fund and its assets as required by Section 2.05 of the Plan and Section 4.6 of the Scheme; (b) an award of money damages, including disgorgement, for Highland Capital's allegedly willful misconduct and breaches of its fiduciary and contractual duties, and for any unjust enrichment; (c) an injunction requiring Highland to return the so-called Deferred Fees and Distribution Fees to the Crusader Fund; and (d) declarations that the Consenting Compulsory Redeemers are entitled to payment of the Deferred Fee Account, and that Highland is not entitled to advancement of expenses and legal fees.

4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/22/23   Page 302 of 1392   PageID 15044
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 191 of 1803   PageID 10937

3.      On December 14, 2016, Respondent filed a motion for partial summary adjudication, seeking dismissal of those claims seeking monetary damages, seeking relief as both breaches of contract and of fiduciary duties, and seeking relief barred by the applicable Statute of Limitations; by Order of March 1, 2017, we denied such motions without prejudice to their being renewed upon the development of a fuller record.

4.      On February 16, 2017, Claimant filed a motion for partial summary adjudication, seeking an order compelling Highland to comply with its alleged contractual obligation under the Plan and Scheme to provide the Committee with the Crusader Fund's books, records and other information from 2011 to 2016. By Order, dated April 21, 2017, we entered a Partial Final Award, granting the relief sought by Claimant, and ordering Highland, inter alia, to produce non-privileged documents, as described in the Order.

5.      On April 11, 2017, Respondent moved for Summary Adjudication of its counterclaim for advancement to defend against the claims brought by the Claimant in the Arbitration and in the parallel Delaware action, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., C.A. No. 12533-VCG (Del. Ch.) (the "Delaware Action").  Respondent sought a mandatory injunction requiring the Fund to escrow and segregate Crusader Fund assets to cover its indemnification and advancement rights.  By Order and Partial Final Award in favor of Claimant, dated July 20, 2017, we denied Highland's motions for advancement in this Arbitration and in the parallel Delaware Action and for the mandatory injunction, on the ground that the "inter-party indemnification exception" applies.

6.      On December 8, 2017, Highland moved to amend its Counterclaims against the Redeemer Committee of the Highland Crusader Fund and for leave to file a third party demand for arbitration against Alvarez & Marsal CRF Management, LLC ("A&M CRF"), Alvarez & Marsal North America, LLC ("A&M NA"), and House Hanover, LLC ("House Hanover").  On January 11, 2018, following a pre-hearing conference call, Respondent filed a revised proposed amended Counterclaim against the Committee alone, raising counterclaims of breach of the covenant of good faith and fair dealing in the its performance and enforcement of the Plan, breach of its fiduciary duty, and aiding and abetting the breach of fiduciary duty by A&M CRF, A&M NA and House Hanover.

5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 12/23/23    Page 303 of 1392    PageID 15045
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 192 of 1803    PageID 10938

7.     By Order dated January 25, 2018, we granted the motion to amend Highland's counterclaims that raised direct claims of breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing arising out of the so-called Deferred Fees allegedly owed to Highland, and denied the balance of Highland's request for leave to file Counterclaims and Third Party Claims.

8.     On February 1, 2018, Respondent filed an Amended Answer and Counterclaims, seeking an order that the Committee account to Highland as an investor therein for all payments, gains, profits, and advantages obtained as a result of the Committee's alleged wrongful actions; that the Committee pay money damages, disgorge, and make restitution to Highland for damages arising from the Committee's alleged breaches of contract, breaches of the covenant of good faith and fair dealing, and breaches of fiduciary duty, including by awarding Highland the Deferred Fees allegedly improperly withheld, as well as an award of Highland's fees and expenses, including reasonable attorneys' fees incurred in this action; and such other relief as the Panel deems fair and equitable.

9.     On February 15, 2018, Claimant moved to strike portions of the Counterclaims on the grounds that certain of the new pleadings went beyond the limitations set by the Panel in the January 25 Order by including allegations that relate directly to claims the Panel had ordered not be included in the revised Counterclaim.  By Order dated April 1, 2018, we granted the motion of the Claimant to strike portions of the Counterclaim and directed Respondent to submit a revised Counterclaim to Claimant and the Panel.

10.     By Order dated March 19, 2018, we directed that "any party wishing to make a motion shall write a letter to the Panel, with copy to opposing counsel, seeking permission to make such motion..."

11.     By letter dated March 28, 2018, Highland requested permission to file a motion for partial summary adjudication with respect to the Committee's breach of fiduciary duty claims that accrued before July 5, 2013, which Highland contends are barred by the statute of limitations.  By Order dated April 5, 2018, relying upon AAA Commercial Arbitration Rule 33, we denied Highland's application to make a motion for partial summary adjudication, without prejudice to their doing so at the close of the Committee's main case at the hearing, if such factual and legal issues were briefed in the Pre-Hearing Briefs.

12.     On April 5, 2018, Respondent filed its revised Amended Counterclaims, seeking relief, as earlier, for alleged breaches of contract, of fiduciary duty, and of the covenant of good faith and fair dealing.

6

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 12/24/03180 4    Page 304 of 1392    PageID 15046
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 193 of 1803    PageID 10939

13.    On July 12, 2018, Highland moved to strike what it characterized as a new claim by the Committee.  The Committee opposed the motion. By Order dated July 22, 2018, the motion to strike was denied.

14.    On August 19, 2018, after a series of discovery motions were decided, the Parties entered into a Joint Proposed Pre-Hearing Consent Order, which was So Ordered by the Panel.

F.    Hearing Dates and Witnesses

1.    An evidentiary hearing was held in New York, N. Y. on September 12-14, 17-18, 20-21, and 24-25, 2018.

2.    Claimant presented the oral testimony of Eric Felton, Burke Montgomery, David Morehead, and Brian Zambie, all Members of the Redeemer Committee; Steven Varner, Alvarez & Marsal ("A&M"); Robert Collins, PriceWaterhouseCoopers; and two experts, Scott Meadow, Analysis Group; and Basil Imburgia, FTI Consulting.

3.    Respondent presented the oral testimony of Isaac Leventon, Esq., Highland internal counsel; Brant Behr, Redeemer Committee Member; Matt Jameson, formerly employed by Highland Capital; Scott Ellington, General Counsel, Highland Capital; the deposition testimony of Thomas Sargent, the Compliance Officer of Highland; and two experts, James Finkel, Duff and Phelps, and Karl Snow, Bates and White.

G.    Post-Hearing

1.    On October 24, 2018, Claimant filed its Post-Hearing Memorandum on its Claims and Respondent filed its Post-Hearing Memorandum on its Counterclaim.

2.    On November 17, 2018, Claimant filed its Reply to Respondent's Post-Hearing Memorandum and Respondent filed its Reply to Claimant's Post-Hearing Memorandum.

3.    On November 30, 2018, the Panel heard closing arguments from counsel to the Parties.

4.    On December 10, 2018, the Parties filed Supplemental Post-Trial Memoranda, dealing with questions asked by the Panel during closing arguments.

5.    On December 12, 2018, the record was declared closed.

Appellee Appx. 00187
APPX. 10439

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6.8.3    Filed 12/25/23 184    Page 305 of 1392    PageID 15047
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 194 of 1803    PageID 10940

6.    On January 5, 2019, at the request of the Panel, the Parties consented to the adjournment of the timing of the award from January 11, 2019 to February 28, 2019. On February 25, at the request of the Panel, the Parties consented to the extension of the deadline to March 7, 2019.

H.    Issues to be Determined

1.    Claimant has pleaded four claims of breaches of fiduciary duty and of breaches of contract, arising out of similar fact patterns, as follows:

    a)    The taking of the Deferred Fees;
    b)    The payment of Distribution Fees;
    c)    The purchase of Plan claims without Redeemer Committee approval; and
    d)    The transfer of Barclays' Fund interests without Redeemer Committee approval.

2.    Separately, Claimant has pleaded claims of breach of fiduciary duty, as follows:

    a)    Engaging in related party transactions without Redeemer Committee approval
    b)    Refusing to settle claims brought by Credit Suisse;
    c)    Refusing to resolve the claims brought by UBS, which included a Temporary Restraining Order ("TRO"); and
    d)    Failing to make a good faith effort to sell the Cornerstone asset.

3.    In addition, Claimant seeks a declaratory judgment that there should be an immediate distribution of the Deferred Fee Account to the Consenting Compulsory Redeemers.

4.    Respondent has pleaded one counterclaim against the Redeemer Committee, alleging that the Committee breached its contractual and fiduciary duties by delaying liquidation of the Fund's assets after July 2016, and depriving Respondent of its right to receive the remaining funds in the Deferred Fees account payable upon complete liquidation of the Fund.

8

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/06/23 Page 306 of 1392    PageID 15048
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 195 of 1803    PageID 10941

5.      Both Claimant and Respondent have also made claims for the recovery of their attorneys' fees and costs.

I.      Applicable Law

1.      At the outset, we address which law applies to which claims.  It is not in dispute that Claimant's breach of contract claims are governed by the law of New York State.  However, Claimant contends that the law of New York State also applies to the breach of fiduciary duty claims, as the breaches are claimed to arise from Highland's relationship with the Fund and its investors under the Plan, which provides for New York law. Respondent argues that any fiduciary duties owed by Highland arise under its services as investment manager of the Crusader Fund, and, thus, are governed by the law governing the Fund's Governing Documents, the state of Delaware.

2.      Although there are few, if any, significant differences between New York and Delaware regarding fiduciary duties of entities in the position of Highland vis-a-vis its investors and the Committee, we find that the governing law on the breach of fiduciary duty claims is most appropriately that of New York, the state whose law governs regarding the Plan and rights of the parties under the Plan.

III.    Discussion of The Issues

A.      We recognize and appreciate the exemplary efforts by counsel for each Party. The results set forth herein are not a reflection of any difference in the quality of those presentations, but of our review of the evidentiary record and of the relevant law.

B.      Taking of Deferred Fees

1.      When the Plan and Scheme were adopted, a prominent feature was the creation of a Deferred Fee Account which was designed to provide an incentive to Highland to liquidate expeditiously the Crusader Fund of its assets. Deferred Fees were annual performance fees payable to Highland but deferred until, as, and when there would be a "complete liquidation" of the Crusader Funds' assets," Scheme §1.5.2, Plan §2.02, HC-300.

9

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/29/23    Page 307 of 1392    PageID 15049
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 196 of 1803    PageID 10942

2.      The evidence is uncontested that, as of the close of the hearing record in this matter, the Crusader Funds have not been completely liquidated. It is also uncontested that, on January 21 and April 6, 2016, Highland distributed to itself a total of $32,313,000 in Deferred Fees. JX-25 at 14; JX-26 at 13.  Highland's stated rationale, or "position," for making the payment without there first having been complete liquidation was set forth in the financial statements of the Funds for the year-end 2015, issued on April 22, 2016: the UBS TRO "prevented the full liquidation" and that Highland "would have received the Deferred Fees...but-for the impact of the restraining order still in place." Thus, Highland "believe[d] its right to receive the [Deferred Fees] crystalized as of the date the [TRO] was lifted," or January 21, 2016, JX-025.0010.

3.      The core of Highland's position was that, in January 2016, it sought, received, and relied on the advice of its outside counsel Akin Gump that the UBS TRO created an impossibility for it to have earned the Deferred Fees, thus allowing the self-payment. However, based upon the evidence heard, we do not find that Highland relied upon any such advice in executing its plan to take the Deferred Fees.

4.      We find that in January 2016, Highland's CEO James Dondero raised the possibility of taking the Deferred Fees before complete liquidation with Thomas Surgent, a Deputy General Counsel and Chief Compliance Officer at Highland, who then discussed the idea with Highland's General Counsel, Scott Ellington. Surgent Dep. 133:4-19.  Mr. Ellington testified that, in January 2016, he and others spoke on several occasions with lawyers from Akin Gump regarding the premature taking of the Deferred Fees, and that he received the advice that "the deferred fees could be taken under the circumstances," that it was a "calculated risk," and that, if successfully challenged, Highland would owe only "nominal interest." Tr. 10 167:14-168:25; 167:14-168:25.

5.      However, Mr. Ellington's testimony is not supported by the hourly billing records of Akin Gump, which do not show any time being billed in January 2016 for anything having to do with this or any other Highland-related issue. RC-523; Tr. 11 136:9-14. Furthermore, Highland's Assistant General Counsel, Isaac Leventon, testified that neither he, nor, he was certain, anyone else at Highland, consulted with outside counsel in January 2016 regarding taking the Deferred Fees.  Tr. 7 236:11-24.   When Highland executed on its "position" by paying itself the Deferred Fees in January and again in early April, Highland did not disclose the self-payment to its independent auditor or the Redeemer Committee.

10

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 11/29/23   Page 308 of 1392   PageID 15050
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 197 of 1803   PageID 10943

6.      It was not until April 11, 2016, almost a week after it took the second tranche of Deferred Fees that Highland belatedly informed its independent auditor, PriceWaterhouse Coopers (PwC), of what it had done by sending it draft financial statements for the year ending December 31, 2015, in which Highland disclosed, without explanation, a "change ... related to how [they were] ... treating the deferred fee distribution." RC-288. On April 12, a meeting was held between Highland and PwC, at which PwC sought an explanation from Highland for the change in position and asked for a memorandum from Highland's counsel and a "copy of the letter that was sent [to the Redeemers Committee] notifying them of the position," JX-28.

7.      On April 12, Highland proceeded to have, apparently for the first time in 2016, discussions with Akin Gump about a justification for its taking the Deferred Fees prior to "complete liquidation." According to Akin Gump's billable time records, on April 12, there was a telephone "call with Thomas Surgent regarding interpretation of distribution plan and charging of fees during period of TRO." Following that call, on April 19, there was another call with Mr. Surgent and Mr. Leventon "regarding audit disclosures with respect to legal doctrine applicable to fee dispute…," following which an Akin Gump attorney started to draft a memo on the "impossibility" issue. After further calls and discussions regarding the drafting of the disclosure to the auditor, a memorandum was finalized and sent to PwC on April 22, 2016, the day that the financials were issued. See RC-523; Tr. 11 136:9-14.)

8.      Although Mr. Ellington testified the Akin Gump memo was "entirely generated by Akin Gump," without any participation by anyone from Highland, Tr. 10 189:14-21, there is contrary and indisputable evidence that, in fact, someone at Highland drafted footnotes to the financials that were then provided to Akin Gump and appear in the Akin Gump memo, see Tr. 7 283:19-284:9; compare RC-289 with HC-277.  Further, Mr. Leventon exchanged with Akin Gump and commented upon at least four separate drafts of the Akin Gump memo before it was finalized. RC-291; RC-295; -RC300; RC-302; JX-29; Tr. 7 291:4-295:19.

9.      We find that Highland made a deliberate and calculated decision to make no disclosure to the Committee of the actual taking of the Deferred Fees until the issuance of the 2015 financial statements on April 22, 2016, but that, in the course of communicating with PwC about its "position," Highland allowed PwC to conclude that it had informed the Redeemer Committee of its position regarding the payment of the Deferred Fees, and did not correct the misimpression. RC-441. It did so to induce PwC to provide the opinion Highland needed to have clean financials.

11

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/29/23   Page 309 of 1392   PageID 15051
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 198 of 1803   PageID 10944
Exhibit 36   Page 299 of 1804

10.     This was not the first time that Highland had sought to use the so-called
"impossibility defense" as a basis for suspending its obligations under the Plan. In 2013,
Highland had proposed to use the doctrine in an attempt to avoid making distributions
pursuant to the Realization Schedule, attached to the Plan and Scheme. Highland's then-
outside counsel, Christopher Panos, now a federal bankruptcy judge, was asked to provide an
opinion to allow such action but he expressed strong reservations about the use of that
doctrine in an affirmative context, RC-153.

11.     Thereafter, Highland tried to secure another opinion that would be more supportive
of its position and received a PowerPoint presentation from Akin Gump in November 2014,
HC-356, that provided some additional arguments but, ultimately, focused on the doctrine
being able to be used only as a defense, see, e.g., HC-356 at 16.

12.     Finally, when in early 2015, Highland asserted to Committee counsel that, by reason
of the UBS TRO, "all applicable distribution dates, distribution thresholds and fees payable"
were tolled, by reason of the UBS TRO, JX-22, Committee counsel had strongly rejected such
use of the TRO to attempt to justify Highland's failure to meet "either the Realisation
Schedule or the distribution threshold for the Deferred Fee Account." RC-219.

13.     Notwithstanding two prior and unsuccessful attempts to use the doctrine to evade its
obligations, Highland was not deterred and in late 2015 and early 2016, with the assistance of
its inside counsel, but not on the advice of Akin Gump, planned for and then executed on the
strategy to take the Deferred Fees.

14.     Under New York law, the doctrine of impossibility does not create an affirmative
right to engage in any conduct; rather, under certain circumstances, it acts as a defense to
claims of breach of contract. When an unforeseeable event, such as an injunction, occurs,
and the actions of the non-performing contract party have not contributed to the
occurrence, and the occurrence renders the performance of a contractual obligation
objectively impossible, a party's contractual obligation can be excused. Kel Kim Corp. v.
Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987) ("While such defenses [as impossibility] have
been recognized in the common law, they have been applied narrowly, due in part to judicial
recognition that the purpose of contract law is to allocate the risks that might affect
performance and that performance should be excused only in extreme circumstances"); JJ.
Cassone Bakery, Inc. v. Consolidated Edison Co. of New York, Inc., 168 Misc.2d 272, 278,
638 N.Y.S.2d 898 (N.Y. Sup. 1996), rev'd in part on other grounds, 240 A.D.2d 634, 659
N.Y.S.2d 293 (2d Dept. 1997).  Absent such factors, the doctrine of impossibility is not
available to excuse a party's performance and cannot be used to justify affirmative conduct.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 12/09/23  Page 310 of 1392    PageID 15052
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 199 of 1803    PageID 10945

15.      Highland attempts to squeeze itself into the four conditions, but its effort fails.  First, Highland argues that it is defending itself against accusations of breach of contract by invoking, defensively, the impossibility defense.  But it is Highland's illegitimate use of the impossibility defense to justify an affirmative act — the taking of the Deferred Fees — that is under attack, not its citation of the impossibility defense in 2018 as a defense to its breach of contract in 2016.

16.      Highland also argues that the TRO "rendered the complete liquidation of the Fund under the Plan's Realization Schedule objectively impossible." Closing Brief at 61. But Highland confuses the Realization Schedule which deals with timely distributions with the Deferred Fees which come into play only upon complete liquidation of the Fund with no deadline. Plan §2.02; Scheme §1.5.2.  In any case, when the UBS TRO was dissolved on January 21, 2016, there was nothing that prevented Highland from completing the liquidation.

13

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/20/23    Page 311 of 1392    PageID 15053
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 200 of 1803    PageID 10946

17.     None of the factors allowing the doctrine of impossibility apply to the taking of the Deferred Fees.  Indeed, we find that Highland — and its inside counsel —knew none of the factors were applicable when Highland asserted the defense. First, the UBS TRO was not unforeseeable; in fact, as Mr. Panos had advised his client in 2013, "UBS had already filed suit and was threatening to get an injunction at the time of the approval of the Scheme."  Second, Highland's own acts gave rise to the accusation of the UBS TRO, as it was UBS's accusation of Highland's fraudulent transfer of assets that gave rise to the TRO, as Mr. Panos again had advised Highland.  Third, as Mr. Leventon himself testified at the hearings, "the TRO did not do away with Highland's obligation to complete liquidation of the fund." Tr. 7 262:6-10. Finally, the doctrine of impossibility gives rise to no affirmative rights to take action in violation of a contract. Once again, Mr. Panos had given this critical advice to Highland in 2013.

18.     We have considered the other elements of Highland's defense to this claim and find them similarly wanting. We find that Highland's paying itself the Deferred Fees in 2016 constituted a breach of both the Scheme and Plan.  Given that finding, we need not reach the issue of whether the self-payment also constituted a breach of fiduciary duty by Highland to the Committee.

19.     As to remedy, under New York law, damages may be awarded for a breach of contract based upon the damages suffered by the claimant. Here, the damage suffered is the full amount of the Deferred Fees prematurely taken, plus prejudgment interest from the date of the taking.  "Prejudgment interest is generally granted 'in order to compensate the injured party for the loss, over a period of time, of the use of the property to which it was entitled.'" Panix Prods., Ltd v. Lewis, 2003 WL 21659370, at *2 (S.D.N.Y. 2003)(citing Lewis v. S.L. & E., Inc. 831 F.2d 37, 40 (2d Cir.1987)).  Although Respondent has raised good arguments as to why the interest rate should be nominal at best, we exercise our discretion to award statutory pre-judgment interest at 9% from the date of the taking, so as to measure as accurately as possible the totality of the damage that we perceive the Fund suffered by reason of the Deferred Fees being taken prematurely.

20.     Respondent also argues that the Tribunal lacks the authority to order a return of the moneys taken.  But measuring the damages suffered by the Fund by referencing the full amount of the Deferred Fees taken is not the same as literally ordering a return of the moneys. It is an appropriate measure of the damages because the Fees were to have stayed within the Fund until they were appropriately earned, and while in the Fund, they were to serve as a protection and cushion against creditors. In addition, very importantly, keeping the Deferred Fees was to have acted as an incentive to Highland to complete liquidation of the portfolio, an event that had not occurred when Highland was terminated and still has not occurred. Taking the Deferred Fees deprived the investors of all of those benefits. The Deferred Fees in the amount of $33,313,000 should be returned in full, and with full statutory interest of 9% from the dates of taking in January and April 2016 through the date of this Partial Final Award.

14

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/06/23 Page 312 of 1392    PageID 15054
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 201 of 1803    PageID 10947

C.    Distribution Fees

1.    Under the Plan, Highland was to receive fees in the amount of 125 basis points based on "all amounts actually Distributed to Redeemers during each quarter following the Effective Date . . . provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over.)" (Emphasis added) (Plan §2.01; Scheme §4.4.)

2.    Claimant alleges that Highland breached the provisions of the Plan by paying itself distribution fees totaling $14.5 million despite not having "actually" distributed to the Redeemers each quarter the minimum required to have been paid by the Realisation Schedule (Plan Appx. A).  The Committee alleges that Highland paid itself distribution fees eight times, but that the only time Highland met or exceeded the goals set by the Realization Schedule was in the quarters ending January 31, 2013, and April 30, 2013. Other than those two quarters, Claimant contends that Highland missed the target in every other time period.  Claimant also charged Highland with a breach of fiduciary duty, arising out of similar facts.

3.    The Committee alleges that six of the distribution fee payments were improper because Highland improperly calculated the amount paid to the Redeemers in one or more of the following ways: (1) in treating Deferred Fees as Distributions; (2) in withholding tax obligations from payments to Redeemers, but counted them for purposes of qualifying for its fee; (3) in improperly including amounts that it reserved to pay Barclays, amounts used to pay the Barclays settlement, and amounts paid to its affiliate Eames in its calculation of Distributions; and (4) in borrowing on margin and improperly treating such borrowings as "excess cash" under the Plan and, therefore, as Distributions.

4.    In addition, Claimant argues that if Highland missed any quarterly hurdle set in the Realisation Schedule, its deficiency would carry over to the next quarter, giving Highland an accordingly higher hurdle, or watermark, to meet in that next quarter.  In other words, Claimant urges that the Realisation Schedule was intended to be cumulative.

5.    Cumulative Quarterly Hurdles

a)    Starting with the last issue first, the language in the Plan in question is as follows: "HCMLP will receive fees in cash ... (b) provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over)." HC-300 at 74 (emphasis added). Plan §2.01.

15

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/09/23 Page 313 of 1392    PageID 15055
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 202 of 1803    PageID 10948

b)     Claimant argues that, although the foregoing language is not explicit regarding both the positive and negative cumulative nature of the Realisation Schedule, there is evidence sufficient to establish that requirement from the text itself and from the testimony of those who negotiated the clause in the Plan, citing the testimony of Mr. Montgomery ("The Realisation Schedule was a cumulative concept. 100 million during one period, 100 million to the next, 200 million during the next. . . . it was designed to be cumulative. It was a stack.") Tr. 3 307:5-19.  The Committee also points out that Highland kept internal accounting schedules that treated the Schedule as cumulative, including RC-364 at pp. 10, 23, 36, 49, 62, 75, 88, 101, 114, 127, 140; see also Tr. 4 196:17-197:19; Tr. 9 256:14-259.

c)     Finally, the Committee urges that there would be "perverse incentives" if Highland were allowed to treat the Schedule as cumulative if it got ahead of the distribution schedule but not if it fell behind, because if Highland knew it could not make a quarterly target, it would have the incentive to skip that quarter and wait until the next quarter where it would meet the Realisation Schedule for only that quarter. This would have the undesirable effect of delaying liquidation but not adversely affecting Highland's receipt of incentive fees.

d)     Highland strongly urges that the clause in question is unambiguous in requiring only a positive carry-forward, with no hint that a failure to meet a quarterly hurdle imposed an obligation to reach a high water mark that would meet both the prior hurdle and the present quarterly hurdle. In addition, Highland argues that, as Mr. Montgomery conceded on cross-examination, the Plan could have contained a cumulative shortfall provision, but that the inclusion of such language was never discussed with Highland, Tr. 3 at 308:7-13, and such could have been incorporated into the Plan had that been the Parties' intent.

e)     Highland also criticizes the Committee's "perverse incentive" argument, arguing, first, that Highland was highly incentivized to liquidate as quickly as possible so it could receive Distribution Fees during the pendency of the 36-month Realisation Schedule (§2.02) and obtain the $10 million Deferred Fee by distributing $1.7 billion within 43 months of the Plan's Effective Date (§6.02); and, secondly, "if Highland fell too far behind," it would lose its incentive to continue expeditious liquidation of the Fund's assets. Respondent's Post-Hearing Brief at 57. See Tr. Day 12 at 169:3-18 (Snow).

16

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/04/23   Page 314 of 1392   PageID 15056
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 203 of 1803   PageID 10949

f)      In interpreting the section of the Plan, it is significant that the language regarding a positive carry-forward appears in a parenthetical phrase, not in the main operative text. Without considering the parenthetical, we read the main operative text as setting a test that Highland has to meet — each quarter, assets "equal to or in excess of the amount scheduled in the Realisation Schedule" must be distributed to Redeemers, or else Highland will not "receive fees in cash" that quarter.  Thus, each separate quarter, Highland has to make a required distribution or will not be paid fees.  But if each quarter there is a test that Highland has to meet, it would defeat the purpose of the quarterly test for Highland to be able to garner fees by just meeting the goal for one particular quarter without regard to how it had performed the prior quarter. Without a reward or a penalty each quarter dependent upon whether it met (or exceeded) the goal, Highland could undermine the objective of the clause. The supplemental parenthetical phrase simply makes explicit one benefit to Highland of overachieving such quarterly goal. We conclude that §2.01 requires both a positive and negative cumulative process.

g)      To read it otherwise would create a perverse incentive of encouraging Highland to skip quarters. The contrary is not true: by having both a positive and negative cumulative obligation, Highland loses no incentive to continue to liquidate, perhaps at a faster pace than it in fact adopted, if it were to fall behind.

h)      Though we reach our conclusion without need to rely on extrinsic evidence, we note that our interpretation is supported by Mr. Montgomery's testimony regarding Highland's request to include a parenthetical to make clear that it would not lose the benefit of an over-distribution and could carry it forward. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

D.      Deferred Fees as Distributions
1.      With respect to Highland's treating Deferred Fees as Distributions, the Committee urges that Deferred Fees being reserved in an account for possible later distribution were not amounts "actually Distributed" or the kind of Distributions made to Redeemers as part of the return to them of their investment.

2.      Highland defends on the basis that the Committee's position that Deferred Fees should not be included in calculating Distribution Fees is inconsistent with the parties' course of performance. From the outset, Highland argues that it included Deferred Fees in its calculation of Distribution Fees and gave written notice of its inclusion to the Committee on at least four occasions. HC-552; HC-591; HC-592; HC-593. However, Highland is not making the argument that the Plan was amended by what it says was its known conduct.

17

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 12/05/23  Page 315 of 1392    PageID 15057
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 204 of 1803    PageID 10950

3.      Highland also argues that its successor, A&M, also included Deferred Fees in its calculation of Distribution Fees based upon the substantively identical language in the A&M investment management agreement, HC-56 at 6, and received a Distribution Fee based on that calculation in October 2016.

4.      We find that whether Highland's conduct was disclosed to the Committee or whatever A&M may have done are both irrelevant to the issue in this case, because, as we analyze the evidence adduced, the only relevant issue is whether including Deferred Fees in the calculation of Distribution Fees is authorized by the language of the Plan, and we find that it is not.

5.      The Plan sets forth a program of fees capable of being paid to Highland: if Highland met certain quarterly goals of distributions made to Redeemers, as set forth in the Realisation Schedule, it was entitled to receipt of certain Distribution Fees; if it distributed at least $1.7 billion to the Redeemers prior to the 43d month following the Effective Date, it was entitled to receive payment of the fees in the Deferred Fee Account in accordance with Section 2.02 of the Plan.

6.      The Plan distinguished what Highland had to do to qualify to receive each category of Fees. With respect to Deferred Fees, the Plan provides that "Highland shall not be deemed to be a Redeemer in respect of the deferred fees." We read that sentence as making clear that Highland's setting aside of Deferred Fees into a account that it might eventually be able to draw upon should not be construed as a form of distribution such that, if it were a Redeemer, it could be construed as an "actual" distribution.  Because Highland is not "deemed to be a Redeemer," its payment to a fund is not equivalent to a Distribution to an investor.

7.      We find that this language is not ambiguous and does not allow for the practice used by Highland to beef up the amount of Distribution Fees it received.

18

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/06/23    Page 316 of 1392    PageID 15058
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 205 of 1803    PageID 10951

E.    Withholding Taxes as Distributions

1.    The evidence at the hearing was that, as required in the Plan, HC-300 at 80, Highland took into account the amount of taxes that should be withheld and paid those amounts to the appropriate taxing authorities; however, Highland also included those withheld amounts in the calculation of amounts "actually" distributed to Redeemers.  The Committee contends that such withheld amounts were not "actually Distributed to Redeemers," and points out that, in fact, only a subset of Redeemers — the Offshore Fund investors — were subject to tax withholding, RC-62; Tr. 9 275:5-23, while some investors were nonprofits that did not pay taxes at all,  Tr. 12 167:5-24.  The Committee also points out that, when first informed in 2012 that Highland had counted tax withholdings toward the May 1, 2012 Distribution, the Committee objected, demanding successfully that Highland make up that shortfall. RC-68; Tr. 3 301:6-12; Tr. 9 278:4-279:16.

2.    Highland makes two points in its defense: first, tax withholdings made on behalf of an employee are considered "compensation," so tax withholdings for Crusader investors should also be treated in a "common-sense manner" as "distributions" to those investors; and second, Highland disclosed its methodology in at least one monthly report in November 2013, HC-591 at 14 (Nov. 2013 Summary Report), to which the Committee never objected.

3.    We need not consider either of these defenses because we find the language of the Plan supports the treatment by Highland of these amounts. As stated above, "Distributions" is defined as "Amounts to be paid to Redeemers under the Plan, including amounts to be paid to Redeemers under the Scheme..." §1.01. The operative language regarding withholding for taxes is as follows: "In connection with ... all Distributions to be made hereunder, the Crusader Funds shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any ... taxing authority, and all Distributions hereunder shall be subject to any such withholding ... requirements. The Crusader Funds are hereby authorized to take any and all actions that may be necessary or appropriate to comply with any such requirements."

4.    Read together, we find that "the amounts paid to Redeemers" were "subject to ... withholding requirements" and thus, were appropriately included within the calculation of amounts distributed to Redeemers, even if, in fact, it was an indirect payment. We find for Highland on this branch of the Committee's claim.

19

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-5    Filed 12/08/23    Page 317 of 1392    PageID 15059
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 206 of 1803    PageID 10952

F.      Payments to Barclays and Eames as Distributions

1.      In 2006 and 2007, Barclays and a Highland affiliate entered into two securities transactions — a prepaid forward transaction and an accreting strike option transaction.  In connection with those two transactions, Barclays became an investor in the Highland Funds. JX-5. In late 2008, Barclays submitted redemptions for its full interests in the Highland Funds, which Highland did not honor. Litigation between Barclays and Highland entities ensued. When the Plan and Scheme were adopted, Barclays did not consent and became what it is referred to as a Non-Consenting Redeemer. HC-300, at HC-300.0075.

2.      Thereafter, when Fund assets were disposed of and amounts distributed to Redeemers, no amounts were actually paid to Barclays; instead, amounts equivalent to those that Barclays would have received if it was a Consenting Redeemer were paid into the Redeemer Trust Account. That Account was set up for the purpose of segregating the deposited funds so they could be "used to pay all costs of HCM-Related Parties and the Redeemer Committee to defend, respond to, settle and satisfy any Claims by Crusader Fund Redeemers excluding Plan Claims ("Redeemer Claims") and … to defend, respond to, settle and satisfy any such Redeemer Claims in advance of any amounts otherwise properly available for such purposes out of the assets of the Crusader Funds."  Plan 6.01.

3.      Notwithstanding such amounts remained in a designated account at a major financial institution, Highland treated such reserves as "actual" Distributions and paid itself fees based on the amounts reserved. The Committee argues that amounts reserved in the Redeemer Trust Account were not "actually Distributed" and that fees taken by Highland for such deposits were taken in breach of the Plan.

4.      We find that Highland's treatment of the reserves as Distributions violated the terms of the Plan.

5.      In July 2012, Highland, Barclays, and other entities entered into a settlement agreement, resolving all of the claims between and among them. JX-5. As part of the settlement, Barclays received both the cash reserved since August 2011 and several additional cash distributions expected between July and December 2012, essentially the exact distribution amounts that it was entitled to as a Consenting Redeemer. Tr. Day 9 at 146:12-19 (Palmer); HC-275; HC Demo 10 at 4.  Pursuant to the settlement, Barclays became a Consenting Redeemer, see JX-5 at 12 (§ 11.3). Highland treated such portion of the settlement payments as "Distributions" and paid itself the fees associated with that amount of Distributions. The Committee contends that any payments to Barclays were in settlement of various claims, in exchange for which there was a "relinquishment and/or abandonment" of all of Barclays' rights and interests in the Highland Funds, JX-5 at 3, and, thus, such payments were not Distributions.

20

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16-35    Filed 12/29/23    Page 318 of 1392    PageID 15060
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 207 of 1803    PageID 10953

6.      Finally, as part of the settlement, the two limited partner interests that Barclays had
in the Funds were transferred to a newly-formed and wholly-owned affiliate of Highland,
Eames; amounts equivalent to what Barclays would have received as an investor after the
settlement were paid to Eames, totaling $35.1 million, and Highland treated such amounts as
Distributions and paid itself the appropriate fees.  The Committee urges that the transfer of
LP interests was in violation of Section 2.05(f) which gives that the Committee "the
authority to approve or disapprove the assignment or transfer of interests in the Feeder
Funds or Plan Claims," HC-300, and that the transfer was explicitly disapproved, RC-79
("The Crusader Redeemer Committee does not believe that Highland has the right to take
assignment of Barclays' interest in the Crusader Fund. The Committee believes its approval is
required for any such assignment under the Plan/Scheme, and the Committee is not willing
to approve that assignment."). Furthermore, the Barclays Settlement Agreement provided
that the settlement was subject to Highland's receiving all necessary approvals under the
Crusader Plan of Liquidation, which the Committee contends Highland did not receive. HC-
330, §12.3.2, at HC-330.0014.

7.      Highland argues, first, that the Committee's right to approve or disapprove of the
transfer of interests under Section 2.05(f) is not applicable because under Section 2.05(g)[3], the
Barclays settlement did not give Barclays more than it would have received as a Consenting
Compulsory Redeemer; that, in any case, 2.05(f) is subject to the "reasonableness" test under
Section 2.07[4]; and, finally, that it was entitled to keep the LP interests because the LP
interests were in the Redeemer Trust account, citing to HC-275. We find that Highland
breached the Plan and Scheme by transferring the LP interests to a wholly-controlled
affiliate after the Committee had specifically disapproved of the transfer. Its rejection was
reasonable in that it was acting in the best interests of the other investors to have a smaller
investment base that would have a greater portion of the asset distributions. The accounting
ledger maintained by Highland, which created much confusion at the hearing, was not
evidence that the LP interests were in the Redeemer Trust account; we agree with the
Committee that the spreadsheet was an accounting convenience for Highland.

8.      We also find that Highland breached the Plan by taking fees in connection with
amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could
one reasonably conclude — or argue — that an amount reserved in an account that was
available to settle and pay costs in connection with all forms of Redeemer Claims could be
considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the
amounts reserved, no Redeemer received any Distribution in the quarters when Highland
claimed fees.

---

[3] "The Redeemer Committee will have, subject to the execution and delivery of customary and reasonable confidentiality agreements:... (g) the authority to approve or disapprove any settlement by the Crusader Funds with Barclays that would be in excess of what Barclays would receive as a Consenting Compulsory Redeemer..."

[4] "The approval of the Redeemer Committee with respect to any matter submitted for approval under Sections 2.05 or 2.06 shall not be unreasonably withheld."

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/09/23    Page 319 of 1392    PageID 15061
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 208 of 1803    PageID 10954

9.    We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

10.    Finally, we find that when Barclays received the amounts, as part of the Settlement Agreement, that had been set aside in 2012 as if Barclays was then a Consenting Redeemer, it did not receive such amounts as Distributions "actually" paid to a Redeemer but rather as part of the Settlement amount. Although Barclays was "deemed" to have become a "Consenting Redeemer," it had that status only for the moment in time sufficient to transfer its LP interests to Eames. As the Settlement Agreement noted, "certain payments will be made by the Highland Entities to Barclays … in consideration of the settlement of the Claims hereunder and the assignment, relinquishment and/or abandonment by Barclays of all rights and interests it had in the Fund Interests…" HC-330 at HC-330.0003. Highland breached the Plan by treating the amounts paid to Barclays as if they had been received as a Consenting Compulsory Redeemer as Distributions.

11.    We conclude that it was improper for Highland to include in the calculation of the amounts distributed to the Redeemers:

    a)    The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

    b)    The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims; and

    c)    The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames.

22

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/20/23    Page 320 of 1392    PageID 15062
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 209 of 1803    PageID 10955

G.     Margin Borrowings as Distributions

1.     In January and April 2012, Highland caused the Fund to borrow $60 million from its Jefferies brokerage account to distribute to Redeemers. The Committee contends that it did so because Highland had not liquidated enough assets to meet the Realisation Schedule. After learning about the loans in September 2012, the Committee protested and directed Mr. Dondero at the September 2012 meeting to take no further margin loans without its consent. Tr. 2 353:2-22; RC-85; JX-8. The Committee contends that Highland's taking such margin loans to reach the Realisation Schedule and then paying itself Distribution Fees based on having reached the quarterly goal with the assistance of the margin borrowing breached the Plan because the margin borrowing did not constitute Excess Cash resulting from the liquidation of assets from which Distributions must come. Plan §§1.01, 3.01; Scheme §§2.4.1, 2.4.2.

2.     Highland maintains that, as it was authorized under the Plan, to engage in margin borrowing, and that amounts were actually distributed to the Redeemers, such payments to the Redeemers were appropriately treated as Distributions qualifying it to receive Distribution Fees.

3.     We find that such margin borrowings, which were authorized under the Plan, did not qualify as the type of Distribution that would entitle Highland to receive a Distribution Fee. The plain language of the Plan requires that any Distribution Fee be paid to Highland only upon the appropriate amount of Excess Cash having been accumulated from the sale of "assets equal to or in excess of the amount scheduled in the Realisation Schedule…" The "assets" referred to are the "assets, respectively, of the Onshore Fund, Offshore Fund I and Offshore Fund II…" §2.01. No such assets were sold and therefore no Excess Cash was accumulated to be distributed to the Redeemers.

23

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 12/29/23 180 Page 321 of 1392    PageID 15063
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 210 of 1803    PageID 10956

4.      The Committees expert, Mr. Imburgia, determined that the result of Highland's including the above improper items in the calculation of Distributions to Redeemers in calculating its entitlement to Distribution Fees, resulted in Highland paying itself Distribution Fees to which it was not entitled by an overpayment of $14,452,275 in Distribution Fees. The Committee is entitled to judgment in that amount plus interest at the rate of 9% from the date of each improper fee. RX 408, Schedule 2.1

H.      Purchase of Plan Claims[5]

1.      From December 2013 through January 2016, Highland purchased twenty-seven Plan Claims from Crusader investors for itself, without the approval of the Committee [ Tr. 5 50:5-8.] The Committee contends that such purchases breached the Plan, because if it had known that the Plan Claims were available for sale, it would have exercised its ROFR. Tr. 3 163:11-24; Tr. 4 389:3-390:23. The Committee urges that the UBS TRO, said by Highland to block any purchases by the Fund during its pendency, does not in fact bar such purchases; in any event, the Committee points out that it is conceded that the Fund had assets other than the allegedly restrained assets with which to make purchases outside of the restrained assets. The Committee seeks damages equivalent to the value of the Claims at the time they were sold, any profits or benefits realized by Highland, and pre-judgment interest at 9%, for a total of $8,897,899 plus interest.

2.      Highland raises a number of defenses. First, it argues that, during the period that the TRO was in effect, the Committee agreed with the advice given by the Fund's (and Highland's) counsel in the UBS case, Lackey Hershman, that the TRO, at minimum, prevented the Fund from spending cash to buy-out other investors before UBS's claims were resolved. See Tr. Day 7 at 319:17-332:3. Thus, Highland contends that the Committee cannot prove it would have purchased the Claims had they been offered to it.

---

[5] Plan §1.01: "Plan Claim. The claim of a Redeemer to payment of, or based upon, the Redemption Amount relating to the redemption of its shares or withdrawal of its capital account balance, as the case may be, in the Crusader Funds as detailed in Section 4.01."

24

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16-8    Filed 12/29/23    Page 322 of 1392    PageID 15064
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 211 of 1803    PageID 10957

3.      But the record doesn't support that interpretation. First, refuting the idea that the
Committee agreed with the advice being relayed to them is the exchange of correspondence
between counsel for the Committee counsel and Highland set forth in RC-360, in which
Committee counsel rejected the advice said to have been received from outside counsel, and
stated how the Plan Claims should be dealt with if Highland were to persist in asserting that
the TRO so blocked the Committee's exercise of its ROFR: "the Committee does not agree
with Highland's interpretation of the UBS TRO because the expenditure of money to redeem
interests is not a "Distribution" and, in any event, if Highland feels strongly that it cannot use
the Funds' assets in this way, any acquisition of the interests by Highland or an affiliate is
subject to the Committee's exercising its rights under Section 5.04 when the TRO is lifted or
when the interests can, in Highland's opinion, be acquired by the Fund consistent with the
UBS TRO. Otherwise, the Committee did not approve of the transfer of the Scheme Claims."
RC-360 at 87-88.

4.      Furthermore, before the TRO, when presented with the opportunity to purchase Plan
Claims, the Committee exercised its right of first refusal (ROFR) on five occasions, see RC-
358. During the pendency of the TRO, the Committee was informed about only five of
twenty-eight Plan Claims purchases and disapproved each of the purchases by Highland, but
the disapprovals were ignored. The Committee informed Highland that it disagreed about
the scope of the TRO but that if Highland, as Fund Manager believed the TRO prevented the
Fund from purchasing the Plan Claims, then it would be consistent with the Committee's
ROFR for the right to be exercised when the TRO was lifted. HC-580.

5.      We find that the Committee would have exercised its ROFR if it had been given full
information and had not Highland been preventing the exercise of the ROFR by invoking
the TRO and misrepresenting to buyers that it had the ROFR.

25

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 12/29/23 Page 323 of 1392    PageID 15065
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 212 of 1803    PageID 10958

6.      As a second defense, Highland contends that during the period that the UBS TRO was in effect, it relied on advice of counsel that the TRO prevented the Crusader Fund from acquiring any Plan Claims, thus opening the door for Highland to purchase the Plan Claims that would otherwise have been subject to the Committee's ROFR under §§2.05(f)[6] and 5.04[7] of the Plan.

7.      Mr. Leventon testified that the TRO was obtained by UBS in response to UBS's allegation that Crusader Funds had participated in a fraudulent transfer of assets from a UBS debtor; the TRO restricted transfer of assets but because those assets had been acquired about four years previously and disposed of in the ordinary course of business, "the UBS TRO was essentially designed to 'collateralize' UBS against the March 25, 2009 asset transfer. And if they couldn't be collateralized with those exact assets and the exact actual cash … or cash equivalent, then it had to be collateralized with something else. And that something else was the assets of the fund." Day 7 at 328:12-20.  That testimony would suggest that from the moment that the TRO went into effect, the Fund was under constraints not to purchase any Plan Claims or other assets.

8.      But this explanation is not convincing.  Regarding the advice received from Lackey Hershman, Mr. Leventon testified that the majority of the advice received was orally and over time, and that the advice was "an evolving interpretation" that "crystallized…in the first quarter of 2014." Id. at 330:9-17.  The advice consisted of "a bunch of verbal conversations, but a lot of that advice is embodied in that memo [HC259] that Lackey wrote to the Crusader Fund. Because we wanted the Committee to understand our quandary."  Day 7 at 319:17-332:3 (Emphasis added).

---

[6] Plan §2.07(f): "The Redeemer Committee shall have … the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims; provided that such proposed assignment or transfer shall be deemed to be rejected if not affirmatively approved in writing within 30 days of submission to the Redeemer Committee…"

[7] Plan § 5.04: "No assignment or transfer of a Plan Claim after the Effective Date may be purchased by [Highland] or its affiliates without such Plan Claim first being offered to, and rejected by, the Crusader Funds."

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8.5   Filed 12/14/23   Page 324 of 1392   PageID 15066
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 213 of 1803   PageID 10959

9.      The Lackey Hershman memo, dated July 23, 2014, HC-259, deals only with the practical consequences of seeking an amendment to the UBS TRO while an appeal was pending, and does not provide any advice regarding the scope or interpretation of the UBS TRO.[8]  Notably, there is no other document from Lackey Hershman presented at the hearing, even including emails, that supports Mr. Leventon's explanation.

10.      Perhaps in recognition of the thin basis for its claim that it relied on the advice of counsel, Highland requests that the Panel draw no inferences from the "relatively few written communications on this issue," because there was, Highland contends, "unrebutted testimony" of the "contemporaneous advice of counsel." Highland points to a letter from an internal counsel at Highland to the Committee that cites advice from outside counsel regarding the effect of the TRO on the Committee's ability to purchase Plan Claims, RC-360 ("outside counsel to HCMLP has advised that the temporary restraining order which has been imposed by the Court in UBS Securities LLC et al. v. Highland Capital Management, L.P. prohibits the Crusader Funds from purchasing the Scheme Claims using assets of the Crusader Funds").

11.      The statement by internal counsel is the type of hearsay that was received in evidence only because this was an arbitration but to which, under the circumstances, we accord little substantive weight. We find more persuasive the absence of any writing, even an e-mail, directly from the law firm regarding the scope of the TRO and restrictions against the Fund using its assets to purchase Plan Claims or similar items.

12.      Further, we find that, even before the TRO went into effect, and thus well before any advice from counsel would have been received, Highland was laying the groundwork for purchasing the Plan Claims for itself and bypassing the Committee's ROFR.

---

[8] On questioning by members of the Panel, Mr. Leventon referred to the Lackey Hershman memo in broad terms:

  "As set forth in the Lackey memorandum, which we all have, Lackey reported that UBS said that, Crusader and Highland Credit Strategies could neither distribute cash to anybody, nor sell assets, nor make any payments outside of the normal course of business...ARBITRATOR BRODSKY: Is the Lackey Hershman memo you're referring to the one that is HC-259, dated July 23, 2014? THE WITNESS: I believe that's correct. ARBITRATOR BRODSKY: I don't see any reference to conversations relayed to you by counsel about what UBS said. I see a sentence on page RC-3208 at the top, it says, "UBS counsel stated that they're not willing to enter into such a stipulation unless Crusader provided detailed discovery of its cash and asset holdings," et cetera, et cetera. Is that what you were referring to? THE WITNESS: Yes. They were not willing to modify the TRO in order to permit the sale of assets unless Credit Strategies, Crusader and other defendants handed over detailed financial information that they would not otherwise be entitled to in discovery. And we were advised that that was a prohibitive risk."

Day 8 170:10-17, 173:4-174:7.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/29/23    Page 325 of 1392    PageID 15067
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 214 of 1803    PageID 10960

13.     On May 29, 2013, Highland caused the Board of the Master Fund, which it controlled, to adopt a resolution, as follows:  "Whereas, ... (2) certain investors from time-to-time desire to sell their interests as redeemed, unpaid shareholders, in the Company ... (any such shares, 'Offered Shares'); (3) one or more principal accounts (the "Related Accounts') in which James Dondero ... and/or Highland ... have material, direct and indirect, financial and ownership interests, have enters a bid to purchase certain of Offered Shares; (4) the bid of the Related Account(s) is equal to or greater than the highest bid; ...Now Therefore Resolved That (1) the undersigned Directors hereby consent to the Proposed Transaction and any future transfers of Offered Shares to the Related Account(s)..." RC-276 at 5; Tr. 7 63:25-68:14.

14.     This pre-approval of transfers of interests in the Fund to Mr. Dondero, Highland, or its affiliates does not reference the Committee's ROFR, but it enabled Highland, falsely, to claim that it had a ROFR.  Using that Resolution, Mr. Leventon informed multiple investors interested in possible transfers of their interests, that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. RC276[9]; RC280; RC434. This conduct alone constituted a breach of the Plan, because it deprived the Committee from having any insight into the transactions as to which the Plan gave them rights to purchase the underlying interests.

15.     Furthermore, by the time Highland received the Lackey Hershman memo in July 23, 2014, Highland had purchased fourteen Plan Claims, nine of which were not disclosed to the Committee. Thereafter, Highland purchased another thirteen Plan Claims without any disclosure to the Committee. Mr. Leventon testified that the only reason for Highland not to consult the Committee about the 27 purchases in 2013, 2014, and 2015 was its interpretation of the TRO. Day 7, 172:2-10.

16.     Additional actions by Highland further demonstrate that the reliance on the TRO was a facade, designed to enable Highland to attempt to purchase a majority interest in the Fund without the Committee's knowledge. In May 2014 and again in January 2016, Highland hired a broker to solicit all Fund investors, except those who were on the Committee, to buy their interests at half or approximately half of the NAV that Highland had itself set. RC417; Tr. 7 95:8-20, 96:8-23; RC425.

---

[9] "By way of Written Resolution, the Board of Directors of [the Fund] determined that if the Investment Manager or an affiliate offers to purchase the shares in the Fund, then that bid shall be accepted if it is the highest bid. See Written Resolution of the Directors of the Fund dated May 29, 2013. The Board may, in its absolute discretion, approve transfers. ... Accordingly, the Investment Manager, as authorized by the applicable documents, hereby bids 60.25 cents of NAV for purchase of 100% of Crown Alpha's capital balance as of the November 2015 NAV date"

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 12/06/23   Page 326 of 1392   PageID 15068
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 215 of 1803   PageID 10961

17.     The broker, Wake2O, used talking points drafted by Highland that misrepresented on whose behalf Wake2O was acting, represented, without apparent foundation, that the offering price of 50% or 55% of NAV was "[t]he current best market bid" and that price would go down in the future, and, finally, that the TRO prevented the Fund from making distributions and that the Fund held many illiquid assets. RC420; Tr. 7 101:4-11 ("Q: And so one of the things that Highland wanted Wake to convey to investors was, hey, you might want to sell your interest in Crusader because right now there's this TRO and you're not going to be able to get any distributions, right?  A.· · That's probably a fair paraphrasing.").

18.     Throughout Wake2O's engagements, it was under pressure from Highland's CEO to pursue investors so that Highland could obtain a greater share of the Fund. See, e.g., RC-250 ("[K]eep pushing as much and many as quickly as possible....")(August 2015); and RC-426 ("Our CEO is keen on starting the process as soon as possible. Please let us know if we can start Monday.") (January 2016); Tr. 7 135:6-137:18.

19.     It was also in this period that Highland undertook a renewed effort to keep the Redeemers Committee in the dark about their purchasing activities. Mr. Leventon was significantly involved in providing direction, as well as drafting talking points, to Wake2O to "reach out to all non-committee members,"  (emphasis added); Tr. 7 146:16-149:7.  Highland offered Wake2O an incentive fee to acquire interests representing $200 million of NAV, but made clear to Wake2O that they should try to achieve that goal without contacting members of the Redeemer Committee. Tr. 7 157:13-161:2. The amount of $200 million was not an accidental target; it was just $4 million of NAV more than what the Redeemer Committee held, Tr. 7 155:15-23.  Wake2O's efforts resulted in the acquisition by Highland of a significant number of Plan Claims, amounting to just shy of $200 million, RC418; RC360; RC419; RC422; RC423; RC424.

29

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6.3.6   Filed 4/29/23 1804ge 327 of 1392   PageID 15069
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 216 of 1803   PageID 10962

20.     Finally, Highland continued misrepresenting to investors that it had a ROFR and never mentioned in its communications that the Committee was the entity actually possessing that right.  Mr. Leventon was the principal instrument through which this misrepresentation and omission were communicated, Tr. 55:19-25 ("Q.·Mr. Leventon, have you ever sent an e-mail to an investor telling the investor that Highland Capital has a right of first refusal in the event the investor wants to sell its interest in the fund? A. With respect to the Crusader Fund, I don't recall having done so."); but see RC-276; RC-280; RC434; Tr. 7 74:22-76:23.)[10]

21.     Based upon the testimony at the hearing, we have serious doubts about the scope of the advice given, if any.  In addition, as now conceded, there were adequate untainted funds under the control of the Crusader Funds to have enabled the Committee to exercise its ROFR as to the Plain Claims, had they been informed in a timely way, as mandated by the Plan. 10/24/18 Highland Ltr. to Panel at 2; RC-408 at 37.

22.     Further, from our examination of the language[11] in the TRO, we conclude that the restrained assets were narrowly circumscribed, and the broad position taken by Highland was not well-grounded. The TRO restrained the Crusader Fund only from transferring or disposing of property received, or its cash equivalent, in March 2009 "from Highland Financial Partners, L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009." JX13; RC134. The TRO did not preclude the Fund's sale of unrestricted assets or use of a significant amount of cash in the Fund. JX13.

23.     We also find that Highland's reliance on the UBS TRO was pretextual to support Highland's true goal of benefiting itself over the interests of the Fund and the Committee. We find that Highland breached the Plan and Scheme by its actions and injured the Committee by its breach. We also found that Highland breached its fiduciary duty to the Committee by so acting.

---

[10] It appears that Mr. Leventon was also involved in a misrepresentation to the Committee about the purchase of a Plan Claim after the TRO had expired. In June 2016, he requested the Committee's approval for the purchase of a Plan Claim by an entity he described as a third party that was not affiliated with Highland. But in the course of soliciting the sale of the Plan Claim, Mr. Leventon represented that Highland was exercising a ROFR on behalf of itself or its affiliates. Tr. 7 87:6-89:11; RC-434. In fact, we find that the third party, Charitable DAF Fund, L.P. ("DAF"), was an affiliate of Highland. RC-435; Tr. 7 82:1384:21.  Based on what Mr. Leventon stated, the Committee approved the transfer. RC-316.

[11] "ORDERED, that pending the hearing on this motion, Defendants Highland Crusader Offshore Partners, L.P., and Highland Credit Strategies Master Fund, L.P., are temporarily restrained from transferring or otherwise disposing of property received (or if property has already been transferred or disposed to, the cash equivalent) in March 2009 from Highland Financial Partner,s L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009."

Appellee Appx. 00210
Appx. 15062

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-3    Filed 12/29/23    Page 328 of 1392    PageID 15070
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 217 of 1803    PageID 10963

24.     In the calculation of damages owed to the Redeemer Committee by Highland, we have assumed that any Plan or Scheme Claims purchased by Highland would have been purchased at the same discounted price as Highland did. However, the damages methodology used by the Committee's expert witness on damages makes the assumption that the fair market value of each of the Plan Claims was the NAV that Highland had established in each of the relevant months. We do not adopt this methodology because of the uncertainty as to whether a discount should be applied to the NAV in calculating the appropriate fair market value.

25.     Rather, we adopt the alternative approach suggested by the Committee, which is rescission.  We order Highland to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase. We will leave the hearing open until the parties have worked out the exact financial details to comply with this order.

I.      Related Party Transactions

1.      The Committee contends that Highland breached its fiduciary duties by engaging in multiple related-party transactions without seeking or gaining the approval of the Committee  The Plan provision in questions requires the Committee's approval of "all transactions between the Crusader Funds and any other HCM-Related Party, while it serves as investment manager of the Crusader Funds, including any 'cross trade' between the Crusader Funds and any other account managed or advised by HCMLP," Plan §2.06; Scheme §4.7.1 (emphasis added).

2.      First, we must resolve the interpretation question left open by the Order of March 1, 2017, denying Respondent's motion for partial summary adjudication regarding these claims. We found that the language cited above was ambiguous because while Respondent argued that "Crusader Funds" is defined as meaning only four entities, the Master Fund, Onshore Fund, Offshore Fund I and Offshore Fund II, Id., § 1.01, and does not include Crusader Fund "portfolio companies" and other affiliated "entities," Claimant argued that if Crusader Fund meant only those four entities, there would be no meaning to the "including 'cross trades' language of §2.06, because none of the four entities directly owns assets and thus could not engage in cross trades with each other or with any other account managed by Highland. Thus, the language 'including "cross trades" must refer to entities broader than just the defined entities within Crusader Funds, or else that portion of §2.06(a) prohibiting cross trades would be read out of the Plan. Accordingly, we denied without prejudice the motion to dismiss the breach of contract and fiduciary duty claims based on the so-called affiliate transactions until after the record has been more fully developed.

31

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/29/23 180age 329 of 1392    PageID 15071
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 218 of 1803    PageID 10964

3.      At the hearing, testimony was taken from two Redeemer Committee members, Messrs. Montgomery and Behr, regarding the drafting of the section in question. Mr. Montgomery testified that he negotiated the terms of the Plan with Michael Colvin, who was then Highland's General Counsel, telling him that the Committee "needed a related-party transaction prohibition, and he agreed to that. And the understanding was that it included everything on the Highland side and everything on the Crusader side… we thought there was agreement that it was including everything on the Highland side and everything on the Crusader side…" Tr. 2, 234:2-6, 235:2-5. Although in response to a question from a member of the Panel, Mr. Montgomery could not recall the specific language he and Mr. Colvin used to convey this understanding, and on cross-examination, he could not provide a reason for how the specific clause was drafted on this point, we credit Mr. Montgomery's testimony on this point.

4.      Although of limited evidentiary significance, Mr. Behr's testimony that before the adoption of the Plan and Scheme he had had discussions with someone at Highland, whom he recalled was Mr. Colvin, about concerns regarding Highland expensing board fees paid to its portfolio companies, Tr. 9 76:17-25, 77:2, supported Mr. Montgomery's testimony, cited above, that the subject of prohibiting certain related party transactions was part of the negotiations over the Plan. His recollection was supported in part by his contemporaneous notes of having raised that subject in the negotiations. HC508 at 142.

32

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 12/20/23    Page 330 of 1392    PageID 15072
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 219 of 1803    PageID 10965

5.      In addition, the Committee makes the point that the occasional course of conduct between the parties before the relationship between the parties became a matter of some dispute reflected the belief that the Plan and Scheme required that Highland seek the Committee's approval before engaging in transactions that involved entities other than the four specific Crusader Fund entities in the definition. See, e.g., Tr. 4 213:6-9.[12] Under the established law relating to contract interpretation, "How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed." Gulf Ins. Co. v. Transatlantic Reinsurance Co., 886 N.Y.S.2d 133, 143 (First Dept. 2009);  "[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.' … 'Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'" Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (First Dept. 1999).

6.      Based on the foregoing evidence, we resolve the ambiguity in favor of a broad definition of the term "Crusader Funds" to include not only the four specific entities named in §2.06 but also the Crusader Fund "portfolio companies" and other affiliated "entities. The Committee contends that Highland engaged in two types of transactions that required but did not receive its consent: (1) transactions between Highland affiliates and Fund portfolio companies, and (2) transactions directly between Highland affiliates and the Fund entities.

J.      Related Party Transactions with Portfolio Companies.

1.      The Committee contends that Highland breached §2.06 by causing Fund portfolio companies to pay board fees, advisory fees and D&O insurance premiums.

2.      Highland responds that transactions between Highland affiliates and Fund portfolio companies were expressly disclosed to the Fund's investors, see HC-230 at 34-36, and that the investors specifically agreed such transactions were permissible, see HC-118 at 7. Accordingly, Highland urges that there can be no fiduciary duty breaches.

3.      Furthermore, Highland urges that the claims arose in 2011 or 2012, and in any case were disclosed to Highland counsel by April 6, 2013, JX-12, and, thus, would be barred by the three-year statute of limitations. Highland characterizes the proof regarding such claims as failing to establish more than the occurrence of "isolated or sporadic acts."

---

[12] We note that one of Highland's outside counsel also occasionally used the term "Crusader Funds" or "Crusader" when describing transactions between portfolio companies and Highland affiliates, RC83 at 2-3; see JX12; JX10.

33

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/29/23   Page 331 of 1392   PageID 15073
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 220 of 1803   PageID 10966

4.      The Committee claims that the statute of limitations should be tolled under the "continuing violation doctrine," which applies where "separate violations of the same type, or character, are repeated over time," and not where the claims are "based on a single decision that results in lasting negative effects." Moses v. Revlon, 2016 U.S. Dist. LEXIS 106431, *18 (S.D.N.Y. 2016).  Under prevailing New York law, "The continuing violations doctrine 'will toll the limitations period to the date of the commission of the last wrongful act where there is a series of continuing wrongs.' Shelton v. Elite Model Mgt., 11 Misc.3d 345, 361 (Sup Ct, New York County 2005); 78/79 York Assoc. v. Rand, 175 Misc.2d 960, 966 (Civ Ct, New York County 1998) … However, 'it will only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct.' Selkirk v. State of New York, 249 A.D.2d 818, 819 (3d Dept 1998)." Pankin v. Perlongo, 2012 WL 7868667, at *2 (Sup. Ct. N.Y. Cnty. 2012).

5.      The evidence brought forth by the Committee failed to show that the payments made by Highland for insurance premiums or for advisory fees were parts of a series of continuing wrongs. Rather, there appear to have been a series of discrete payments made in no regular or consistent pattern and in no similar amounts.[13] Under the circumstances, we find in favor of Highland on these claims. We do not reach the issue of whether disclosure to investors would bar a claim for breach of fiduciary duty.

K.      Related Party Transactions with Highland Affiliates

1.      The Committee contends that in 2013 and 2014, without seeking its permission as required under §2.06, Highland sold shares in four CLO assets held by the Master Fund, known as Eastland CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO, Ltd. (the "CLOs"), in what it characterizes as "pre-approved" transactions to Highland affiliates, without seeking the Committee's approval, as required by §2.06(a), which, as noted above, prohibits "any 'cross-trades' between the Crusader Funds and any other account managed or advised by HCMLP."

2.      The proof at the hearing showed that, with no disclosure to the Committee, Highland sold CLOs to brokers it used for other securities transactions who, within a very short time of purchasing the CLOs, sold some or all of the CLOs to Highland affiliates.[14] The Committee urges that such sales were breaches of fiduciary duty as well as breaches of the Plan.

---

[13] Insurance premiums were paid on behalf of four entities (American Home Patient, Inc., Cornerstone Healthcare, Nex-Tech Aerospace, and Trussway Holdings) in 2011 and 2012; no payment to any of the entities was the same as to any other entity. RC355, Schedule 6.1. As to the portfolio company advisory fees, various fees were paid over varying years between 2011 and 2016 by six different portfolio entities to Barrier or NexBank as advisors; with the exception of two years for one of the entities, each payment of an advisory fee was of a different amount.

[14] As set forth in the Expert Report of Basil Imburgia, RC408, Highland engaged in the following transactions:
- It sold 32,500 shares of Grayson CLO at a settlement amounts of $560 and $570 per share, of which $25,500 were sold to NexPoint, with a reported value of $570 per share, Table 19;
- It sold 32,250 shares of Eastland CLO at settlement amounts of $611.40 and $613.90, of which 25,250 were sold to NexPoint, with a reported value of $730 and $670, Table 20;

34

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/29/23    Page 332 of 1392    PageID 15074
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 221 of 1803    PageID 10967

3.    Highland contends that the sales in question were not cross trades but were rather "market-bearing transactions" between Highland and an independent financial institution, which then sold to a Highland affiliate. But this contention is belied by the fact that the transactions bore all of the hallmarks of pre-arranged trades, designed to avoid obtaining the consent of the Committee. See JX-30 at 3 ("Trading assets between two affiliated accounts through a broker may be considered a Cross Trade…"). Indeed, Mr. Dondero, the Chief Executive Officer, is heard on a tape made by then-Chief Portfolio Manager Joshua Terry, suggesting "run[ning a CLO trade] through some broker," RC-263A. By using a middleman between itself and its affiliate, Highland sought to avoid the description of a "cross trade," but the reality is that the transactions were effectively cross trades and we will treat them as such.

4.    That said, however, the substance of the transaction, arguably, benefitted the Committee, because assets of the Fund were liquidated, which was a principal goal of the Plan and Scheme.  Yet the problem with these transactions is that Highland had a perfectly clear path to effectuate these trades without any question being raised as to their bona fides – it could have sought the consent of the Committee under §2.06, which consent could not be unreasonably withheld under §2.07, HC-300. We find that Highland's failure to do so constitutes a breach of the Plan.

5.    We are left with the question of whether Highland's roundabout trading method caused any damage to the Fund.  It appears Highland sold the CLOs to a broker for one value and then the broker turned around and sold the CLOs to the Highland affiliate for a higher value. Thus, the Fund received less than it was entitled to receive had the transaction been done without the middleman, and the damage to the Fund is the difference in the two values. While the Committee's expert Basil Imburgia did not use that methodology to calculate the damages associated with these trades, the information on the price paid to the funds and the price paid to the broker is set forth in the expert report of Highland's expert, Mr. Snow, HC-526 at 41.  The Committee contends that the difference is approximately $450,000. The Committee is entitled to judgment for the amount of the difference with interest from the date of the sale from the funds, Since none of the experts did the appropriate calculation, as with other items, we leave it for the parties to confer and agree upon the total amount of damages including 9% interest and we will leave the record open to resolve that amount.

---

- It sold 31,000 shares of Greenbriar at settlement amounts of $713.60 and $665.00, of which all of the shares were sold to NexPoint at reported values of $730.00 and $670.00, Table 21; and
- It sold 31,500 shares of Stratford at settlement amounts of $661.70 and $660.00, of which 25,500 were sold to NexPoint at reported values of $724.49 and $665.00, Schedule 22.

35

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6816    Filed 12/29/23    Page 333 of 1392    PageID 15075
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 222 of 1803    PageID 10968

L.    Failure to Settle Credit Suisse Trades/Litigation

1.    The Committee contends that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, both by failing to settle two trades Highland made on behalf of the Fund in September 2008 with Credit Suisse (relating to the purchase from Credit Suisse of syndicated loans in the amount of $23.5/9 for properties known as Goldfield and Westgate) and by failing to settle the litigation initiated by Credit Suisse in July 2013 regarding the same trades. The Committee asserts that, despite clear legal authority requiring that Highland settle the trades and the subsequent litigation, Highland refused to do so because it sought to use its refusal to settle the trades and litigation as leverage against Credit Suisse with respect to other claims not involving the Fund that Highland had against Credit Suisse. Thus, the Committee contends Highland put its own interests ahead of the interests of the Fund. Consequently, the Committee further alleges, that by its delaying the settlement of the trades and then of the litigation, Highland caused the Fund to incur seven-plus years of statutory interest that could have been avoided but which the Fund had to pay in January 2016 when the trades and the litigation were ultimately settled.

2.    Highland poses multiple defenses to the Committee contentions. First, Highland argues that the Committee's claim first accrued in 2008 when it allegedly failed to settle the trades and therefore was released by Section 7.01 of the Plan,[15] releasing Highland from all claims, known or unknown, "from the beginning of the world to the Effective Date" of the Plan in August 2011. Second, Highland contends that even if this claim was resurrected after the effective date of the Plan and Scheme, said claim would have arisen in 2011 and was thus barred by the three years statute of limitations for breach of fiduciary duty claims. Third, Highland argues that it did not breach its fiduciary duty as it was only exercising its legitimate business judgment in not settling the trades or the litigation and that the Committee has otherwise failed to show that Highland committed willful misconduct in this regard. Finally, Highland asserts that if the Tribunal finds that it breached its fiduciary duty, any damages that might be owing should be at a reduced amount from what the Committee claims.

---

[15] Section 7.01 provides, as follows: "Section7.01. Upon the Effective Date, each of the Consenting Redeemers, for themselves and on behalf of any of their respective officers, directors, shareholders, partners, members, employees, affiliates, investors, agents and representatives and any other person or entity entitled to assert a Claim (defined below) by, through, under, or on behalf of any Consenting Redeemer, hereby releases each of the HCM-Related Parties and each of the other Consenting Redeemers, from any and all accounts, actions, agreements, causes of action, claims, contracts, covenants, controversies, damages, debts, demands, executions, expenses, judgments, liabilities, obligations, omissions, promises, representations, and fights to payment, and all other liabilities of every kind, nature and description whatsoever, liquidated and unliquidated, fixed and contingent, matured and unmatured, disputed and undisputed, legal and equitable, state and federal, secured and unsecured, accrued and unaccmed, known and unknown, choate and inchoate (each, a "Claim"), which each Consenting Redeemer has, may have or ever had against any or all of the HCM-Related Parties and the other Consenting Redeemers from the beginning of the world to the Effective Date related to each of the Crusader

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 11/24/23    Page 334 of 1392    PageID 15076
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 223 of 1803    PageID 10969

Funds, including without limitation its administration and wind-down; provided, however, that such release shall not operate to release any claims arising from this Plan or based on larceny within the meaning of Section 155.05 of the New York Penal Code ("Larceny Claims"), provided that such exception shall not apply to Larceny Claims within the scope of knowledge of the releasing party as of the Effective Date. The benefit of the release in this Section 7.01, as it related to the HCM-Related Parties, is held in trust by the Crusader Funds for the HCM-Related Parties, and the Crusader Funds hereby assign the benefit of the release in this Section 7.01 in their favor."

37

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68.36    Filed 12/29/23 1804ge 335 of 1392    PageID 15077
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 224 of 1803    PageID 10970

3.    With respect to the issue of the release, the Tribunal concludes that Section 7.01 releases any claims that the Committee might have with respect to the failure by Highland to settle the Credit Suisse trades through the Effective Date of the Plan, but the Committee has not released any claims that arose after the Effective Date of the Plan. The Tribunal need not decide whether the continuous post-August 2011 failure to settle the trades automatically gives rise to new post-Effective Date claims; once Credit Suisse commenced litigation in July 2013 and the Committee renewed its demand that Highland settle the trades  and the litigation, and once Highland again failed to do so, a new claim arose, at least as of that point in time. This new claim would not be released under Section 7.01 since it arose after the Effective Date of the Plan. Accordingly, Tribunal views Highland's continuous failure to settle the trades and litigation after July 2013 (until January 2016, and subject to the temporary withdrawal by the Committee of its demand that Highland settle the trades and litigation in September of 2013, as discussed below) as the potentially actionable conduct that the Tribunal will analyze below.

4.    As to the statute of limitations issue, the Tribunal agrees with Highland that a three years statute of limitations applies to breach of fiduciary duty claims and therefore any conduct outside the three years limitations period is not actionable.  The Committee filed in this Arbitration its breach of fiduciary claim with respect to the unsettled Credit Suisse trades and litigation on July 5, 2016. Consequently, given the application of the statute of limitations, any claim for relief for any period prior to July 5, 2013 is barred by the statute of limitations and the Tribunal will not consider conduct prior to this date to be actionable nor will it consider any claim for damages for the period prior to July 5, 2013.

5.    The Tribunal finds that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, by failing to settle the two subject trades with Credit Suisse. The Tribunal finds that, whatever strategy Highland intended or whatever judgment calls it made, or purported to make, with respect to the settlement of these trades, it was under a clear legal obligation to settle the trades but failed to do so.

38

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 2/20/23 180 Page 336 of 1392    PageID 15078
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 225 of 1803    PageID 10971

6.      Highland's then General Counsel admitted to at least a general awareness of the legal obligation under the LSTA regime to settle trades promptly (and to litigate later if there is a dispute regarding same). Tr. 10 288:2-12, 290:13-22, 291:15-20; and there is other evidence to the same effect. See, e.g., JX-12 at RC00100770-771. Despite this clear legal obligation, and despite Committee requests that it do so, Highland refused to settle the trades in order to provide itself with leverage vis-a-vis Credit Suisse on another dispute. Even if, as argued by Highland, its prevailing on this other dispute would advantage the Fund, once the Committee demanded that Highland settle the trades, as it first did during the limitations period on August 7, 2013, Highland should have done so given both the acknowledged weakness in its defenses and that its purported goal in not doing so at least primarily advantaged itself and not the Fund (even if the Fund might have gained some marginal potential advantage if Highland prevailed in the other dispute). In light of the preceding, Highland's refusal to settle the trades constitutes willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors.

7.      The Tribunal finds that the actionable willful misconduct by Highland for which damages will be due occurred during the period September 8, 2014 through January 14, 2016. The reason for the end date is clear and undisputed: on that date, Highland caused the Fund to pay for the trades and the interest due. As for the start date, the earliest possible start date, in light of the above analysis, is August 7, 2013 which is when the Committee first demanded during the limitations period that the trades be settled. But, in September 2013, counsel for the parties interacted and the Committee withdrew its demand that Highland settle the trades. HC-476a. The Committee argues that it was not apprised by Highland of relevant information at the time, and therefore the Fund should not be bound by its agent's withdrawal of the demand, but the Tribunal concludes that, notwithstanding Highland's failure to provide this information, the Committee's counsel independently analyzed the relevant issues and the Committee is responsible for the decisions flowing from that analysis. On or around September 8, 2014, after the trial court entered summary judgment in favor of Credit Suisse in the litigation, the Committee reinstated its demand that Highland settle the trades; since Highland did not do so until January 14, 2016, it is, under our analysis above, responsible for damages accruing during the period from September 8, 2014 through January 14, 2016.

39

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 685    Filed 12/29/23 Page 337 of 1392    PageID 15079
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 226 of 1803    PageID 10972

8.      The Tribunal adopts the damages theory advanced by the Committee: the pre-judgment interest that the Fund had to pay during September 8, 2014 through January 14, 2016, minus the gain it achieved during the same period by virtue of having the use of the subject $23.5 million. However, neither party presented a damages analysis consistent with the preceding parameter. Accordingly, the Tribunal directs that the Parties jointly confer to calculate an amount of damages that takes into account the following parameters: (i) the damages period is between September 8, 2014 and January 14 , 2016; (ii) the 9% statutory interest (ordered by the New York State Supreme Court in September 2014) is to be applied on a simple basis to the total principal amount due ($23.5 million); (iii) the amount of the "off-set" is to be calculated using the factor utilized by Claimant's expert – the Treasury Yield Rates for the damages periods specified in (i); and (iv) 9% statutory, pre-judgment interest is to be applied on a simple basis to the result of the calculations in (i) – (iii) from January 14, 2016 to the date of this Partial Final Award.

M.      The Delay in Settling the UBS Litigation

1.      As noted above, Highland, Crusader and Credit Strategies were parties to an action commenced by UBS which alleged that certain securities had been fraudulently transferred by Highland to the funds. As a result, the funds were enjoined from transferring the subject assets during the course of the litigation.

2.      In May 2015, UBS, Highland, Crusader and Credit Strategies reached an agreement in principle to settle the litigation. Under the terms of that agreement Crusader was to pay UBS $25 million and Highland was to pay $35.75 million. A separate agreement between the Committee and Highland provided that, no sooner than December 30, 2016, Highland could recapture $33.75 million through incentive fees that could be generated through the liquidation of Crusader assets. RC-227.

3.      The settlement agreement was to be finalized on May 30, 2015, but Highland refused to go through with the settlement because Credit Strategies would not release claims against Highland. Tr. 3 21:10-22:3; Tr. 3 24:16-25:6; Tr. 10 316:20-317:23. Ultimately the Committee negotiated a its own settlement, pursuant to which Crusader paid UBS $25 million on July 1, 2015, and an additional amount of $30 million on December 29, 2015.

4.      The Committee argues that, had Highland not blown up the original settlement, it would not have had to pay the $30 million to UBS on December 29, 2015, and it would have retained those funds at least until December 30, 2016, when that amount might have been transferred to Highland if it had earned that amount in incentive fees. The Committee, therefore, seeks as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

40

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/29/23   Page 338 of 1392   PageID 15080
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 227 of 1803   PageID 10973

5.      Highland denies that it has any liability and asserts that is protected by the business judgment rule. It also argues that 9% interest is not appropriate. Further, Highland urges that the Committee's expert did not otherwise account for the fact that Highland might have earned $33.75 million in incentive compensation and, therefore, there was a net benefit to the fund.

6.      There is no basis for Highland's claim that its conduct is protected by the business judgment rule. In deciding whether or not to settle the UBS litigation, Highland was acting as a fiduciary with respect to Crusader and had a fiduciary duty not to place its own interests above that of Crusader. As the New York Court of Appeals stated in Birnbaum v. Birnbaum, 73 N.Y. 461, 466 (1989):"It is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect . . . . This is a sensitive and ' inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a  fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (Citations omitted.)"

7.      Thus, Highland was not free to place its own interests above that of Crusader and had an obligation to settle UBS's claims against Crusader regardless of its concerns about possible claims against it by Credit Strategies.

8.      There can be no question that Highland's action in refusing to settle with UBS resulted in Crusader being deprived the use of $30 million in cash between July 1, 2015 and December 30, 2016, the first day on which Highland would have been entitled to receive any of the incentive fees. Here, as with the Deferred Fees, it is appropriate to award interest on that amount at the rate of 9% to compensate Crusader for that loss.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/29/23    Page 339 of 1392    PageID 15081
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 228 of 1803    PageID 10974

9.      The problem with Highland's claim that it might have earned an incentive fees of $33.75 million is that Highland offered no evidence that would suggest that its incentives fees would ever have reached even the $30 million amount that the Committee is willing to concede might have been reached. Since the original settlement agreement was negotiated at a time when there was no plan in place to terminate Highland as the fund manager, the incentive fee structure was based on events that would ultimately occur in periods after the Committee terminated Highland. Since neither party made any effort at the hearing to calculate incentive fees, it seems apparent that such a calculation was not possible. In these circumstances, the Committee's assumption that Highland would have earned $30 million in incentive fees by December 29, 2016 is generous and there is no basis for a finding that Highland would have earned more than that in incentive fees.

10.      We award Claimant as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

N.      Cornerstone

1.      Highland Cornerstone Healthcare Group ("Cornerstone") is a company that owns Long Term Acute Care (LTAC) hospitals in which the Fund owns a minority equity interest. At the time of the adoption of the Plan and Scheme, Highland owned or controlled 100% of the shares of Cornerstone. Two groups of funds, Crusader Funds and Highland Credit Strategies Fund ("Credit Strat"), owned more than 50% of the shares of Cornerstone. Between 2011 and 2013, Highland was secretly engaged in the process of valuing and, eventually, selling the interest held by Credit Strat in Cornerstone. In September 2013, after a process in which the Credit Strat Redeemer Committee was kept completely in the dark as to the sales process that was underway, and which was later found to be unfair to the investors in Credit Strat, see RC-306, Highland arranged for the purchase of Credit Strat's interest by Cornerstone itself at the price of $2,956.03 per share, see JX-16. This price was below the most recent mark set by Highland, and below the value of between $3,424 and $4,434 per share that Highland's investment bankers, Houlihan Lokey, found to be fair for the purchase of the minority interest, see HC-431.

42

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-16 Filed 2/30/23 Page 340 of 1392 PageID 15082
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 229 of 1803 PageID 10975

2.       Following the purchase of the Credit Strat interest, the Crusader Funds owned 41.8% of Cornerstone, see RC-138 at 7. The Crusader Funds learned of the sale and made known their interest to Highland in having their interest in Cornerstone sold.  But when Highland offered to buy their interest for the same price of $2,956.03 per share as the Credit Strat interest, the Committee engaged Ernst & Young ("E&Y") as its advisor to analyze the offer and prepare a response. E&Y prepared two analyses of the value of the Cornerstone asset. The first, HC-577, found that, as of the fall of 2013, "Cornerstone's offer to purchase Crusader's share for $43.8 mm is below Crusader's current carrying value and at the low end of the range of values developed in this Report" and that "based on information provided and reviewed to date it would appear that the lower end of the range is more reasonable to expect that (sic) the higher end of the range," Id. at 5.

3.       The Committee then requested that E&Y prepare a supplemental report, and, in January 2014, E&Y rendered a second report, finding that Cornerstone underperformed expectations for 2013 and that the changes occurring in the healthcare field were creating uncertainty in the industry in which Cornerstone operated.  HC-577 at 19. E&Y reduced its range to $44 million to $63 million, by imposing a discount from its prior range as of year-end 2013 by 10% to 25%. In discussions with counsel to the Committee, E&Y suggested countering with a purchase price in the range of $50 million to $54 million "for negotiation purposes." Id.

4.       Thereafter, on March 28, 2014, after the Committee had considered its options, it made a counter-offer within the range suggested by E&Y at $52,342,188, or $3,529 per share, plus a 50% recapture provision in the event of a sale within three years. JX-18.  The counter-offer was at the 2013 year-end market value, as calculated by Highland. Id. Highland never responded to this counter-offer despite repeated overtures to Highland by the Committee, and despite the desire of the Claimant Redeemer Committee and the mandate of the Scheme and Plan to liquidate all of the assets of the Crusader Fund, the interest in Cornerstone held by the Crusader Funds has not been sold.

5.       Claimant contends that the failure of Highland, during the period it was the investment manager of the Funds, to make any good faith effort to sell the Funds' shares in Cornerstone, constituted a breach of fiduciary duty.

6.       As part of its claim of breach of fiduciary duty, the Committee urges that Highland is collaterally estopped from denying the findings of the arbitration tribunal in the arbitration brought by the Redeemer Committee of Credit Strat arbitration tribunal regarding, inter alia, the Cornerstone transaction. RC-306 (4/6/16 Credit Strategies Fund Final Award).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 12/30/23    Page 341 of 1392    PageID 15083
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 230 of 1803    PageID 10976

7.      In particular, as it bears on this dispute, the Committee contends that Highland is estopped from denying the following findings: (1) Highland controlled Cornerstone; (2) the per share price at which Highland sold Credit Strat's interest was unfair; and (3) a price of $3,929 per share was a fair price, based upon the Houlihan Lokey valuation.

8.      Highland contends that the Credit Strat Tribunal's findings do not bind Highland in this proceeding, because the two arbitration proceedings deal with "fundamentally different" issues, such that collateral estoppel does not apply.

9.      First, Highland urges that the Credit Strat Tribunal was dealing with the ramifications of a consummated sale, where it found that Highland controlled both Cornerstone's offer and Credit Strat's acceptance. HC-220 at 8, 30, whereas in this proceeding, the evidence is that Cornerstone made an offer to the Committee, but Highland had no role in the Crusader Fund's evaluation of or counter to that offer and no sale occurred.

10.     Secondly, Highland points out that in Credit Strat, the retention of Houlihan Lokey and the entire process that Houlihan Lokey engaged in was a secret that the Credit Strat Committee was unaware of, whereas, in this proceeding, the Houlihan report as well as other financial information was made available to the Crusader Committee, HC-577 at 577.0002, Tr. Day 5 at 114:12-117:18 (Zambie).

11.     The doctrine of collateral estoppel requires that an issue being litigated in the second case be the same as was fully litigated by the same party in the first action. Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002) ("[C]ollateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate.") (internal quotations and citations omitted).

12.     Although there are differences in the way in which the sale process took place, we do not find that such differences obscure the fact that some issues are substantially identical in both proceedings.

44

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-36 Filed 2/22/23 180 Page 342 of 1392 PageID 15084
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 231 of 1803 PageID 10977

13.     The principal finding that we think is binding on Highland in this proceeding is that the price of $3,929 per share, based upon Houlihan Lokey's valuation, was a fair price. Claimant also argues that Respondent is bound by the finding that the offering price Highland made for the Credit Strat position, which was the same price as offered to the Redeemers Committee here, was unfair. But we think that finding would fly in the face of Claimant's own adviser, E&Y, who found that such a price was at the low end of a fair range. Accordingly, we do not think it appropriate to adopt such a finding as binding in this proceeding.

14.     Highland also contends that, with respect to the possible sale of the Cornerstone interest, it was not in a fiduciary relationship with the Committee, which was relying on EY for negotiating assistance, not on Highland, as Highland was sitting opposite to the Committee in the negotiation. Tr. Day 5 at 116:10-117:18 (Zambie).

15.     While the Committee was not relying on Highland for financial advice or guidance with respect to Cornerstone in the period between the Fall of 2013, when an offer of $2,956.03 per share was made, and the early Spring of 2014, when the counter-proposal were made, the Committee did rely on Highland, in its role as investment manager, both before and after those dates, to liquidate the Fund as rapidly as possible.

16.     But by Highland's choosing to have the Crusader Funds, along with several other entities controlled by Highland, invest in Cornerstone, Highland voluntarily placed itself in a conflict position: it owed fiduciary obligations to the Crusader Funds to maximize the liquidation process, while being the control person of Cornerstone whose own interests were to have any purchase price be as low as possible. As investment manager, Highland was obligated to be fully responsible to the Committee, but could not do so as long as it also continued to play an active role as controlling party of Cornerstone with respect to the Committee's desire to sell.

17.     The hearing record is that, other than making the offer in September 2013, Highland took no steps to market or sell the Fund's interest in Cornerstone. Tr. 1 347:16-349:2; 364:12-22. At meetings held with representatives of the Committee, the Committee asked about plans to sell assets and Highland never discussed, or appeared to have a plan by which it proposed to sell the Cornerstone asset. Tr. 1 349:4-22; 365:13-17; Tr. 4 55:14-20; RC-317 at 2("Mr. Jameson noted that for the remainder of the portfolio, formal strategies for disposition are not in place."). When Committee representatives met periodically with Jim Dondero, the CEO, he made it clear that he ran the sales operation completely and did not wish to be questioned or have the portfolio managers questioned as to the timing of any particular sale.

45

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 2/23/23    Page 343 of 1392    PageID 15085
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 232 of 1803    PageID 10978

18.    We find that Highland had a fiduciary duty not to place its own interests above that of Crusader, Birnbaum v. Birnbaum, 73 N.Y. at 466 (1989), but rather to subordinate its own economic interests behind its fiduciary obligation to the Crusader Funds. Guth v. Loft, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."); Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del.1983) ("There is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."); see also Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618 (Del. 2013).  Highland's failure to subordinate its own interests to those of the Committee led directly to its failure to engage in a fair negotiating process with the Committee. By failing to do so, Highland breached its fiduciary duty to the Fund.  Caruso v. Metex Corp., 1992 WL 237299, at *16 (E.D.N.Y. July 30, 1992), People ex rel. Spitzer v. Grasso, 50 A.D.3d 535, 546 (1st Dep't 2008). That breach of fiduciary duty was a continuing offense through the period of time that Highland was the investment manager of the Crusader Fund, as Highland never itself took, or authorized Cornerstone to take, any action in response to the counter-offer that was made in February 2014.

19.    Highland argues that the Committee must overcome the business judgment rule that "the defendant [fiduciaries] have acted on an informed basis and in the honest belief they acted in the best interest of the [client]," citing CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd., No. 03 CIV. 7936 (DAB), 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007), in turn citing Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984)("While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,' unless the plaintiff shows that the presumption does not apply.").

20.    But here, we find that Highland's decisions regarding the purchase of the Cornerstone shares from the Crusader Funds — from the offer to purchase, the ignoring of the counteroffer, and the failure to engage in or authorize a negotiation process — were made with the willful intent to benefit itself and not the Crusader Funds investors. See JX-19; Tr. 1 379:17-380:8.  The Business Judgment Rule does not protect Highland or its officers from scrutiny for alleged breaches of fiduciary duty under these circumstances.

46

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/34/23   Page 344 of 1392   PageID 15086
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 233 of 1803   PageID 10979

21.     The question then is what is the appropriate price at which the sale should take place.  "[I]n determining whether a fiduciary has acted prudently, a court may examine a fiduciary's conduct throughout the entire period during which the investment at issue was held. The court may then determine, within that period, the 'reasonable time' within which divesture of the imprudently held investment should have occurred. What constitutes a reasonable time will vary from case to case and is not fixed or arbitrary. The test remains 'the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs' (id., at 511 [citations omitted])." Matter of Estate of Janes, 90 N.Y.2d 4, 54 (1997); Public Service Co. of Colorado v. Chase Manhattan Bank, N.A., 577 F.Supp. 92, 107 (S.D.N.Y.1983) (Lumbard, CJ, sitting by designation)("where there is no sale, it is impossible to fix exactly the moment by which the loan should have been sold or the amount that could have been obtained; "[p]robably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time," (quoting Scott on Trusts)).

22.     To satisfy its obligation under the Plan to liquidate the Fund's assets as rapidly and as fairly as possible, Highland did not have "to cause Cornerstone to purchase the Fund's Cornerstone shares for a specific price and at the specific time demanded by the Committee…," Highland Post-Hearing Brief at 11, but it did have a duty to place the Funds' interest above its own and to obtain the best price possible for the Funds' Cornerstone interest. Thus, when it decided it wished to make an offer to purchase the Funds' Cornerstone shares, it was obligated to do so at the fair market value and not to attempt to take advantage of the fact that it had placed the funds in a position where it was the only available buyer.

23.     Highland argues that it makes no sense to assess damages based upon a hypothetical sale of the Cornerstone asset, because, first, since the shares have never been sold, there is no realized loss; and, second, "other than Cornerstone's $43.8 million offer, there is no evidence of any other willing buyer for Cornerstone's assets at any price."

24.     We reject the first argument because it ignores what we have found to be the breach of fiduciary duty —the obligation to pursue and consummate a sale at a fair and reasonable price. The Fund was damaged by reason of Highland's failure to fulfill that obligation.

47

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 11/25/23    Page 345 of 1392    PageID 15087
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 234 of 1803    PageID 10980

25.    As to the second argument, Highland defeats its own argument by pointing out that, in the real world, there is only Cornerstone available as a buyer.  But, because of Highland's own financial objectives, there has been no indication since April 2014 when it failed to authorize a counteroffer that Highland was interested in directing Cornerstone, which it controlled, to make an offer to purchase the shares at anything other than a bargain basement and unfair price.

26.    Using our equitable powers, we believe that a fair price can be derived by using the fair market value of the shares of $3,929 per share, based upon Houlihan's valuation prepared on July 15, 2013, adjusted downward by 10-25% by the year-end discount caused by several factors cited by E&Y. The average of that discount results in a fair market valuation of $3,241.43, which amount is what we find should have been offered to pay for the Cornerstone shares.

27.    We order that Highland pay to the Committee $3,241.43 per share, or $48,070,407, and order that the Committee simultaneously cause the Crusader Fund to surrender its interest in Cornerstone to Highland.

28.    With respect to an award of pre-judgment interest, "[a]lthough an action for breach of fiduciary duty is generally considered of an equitable nature, '[e]ven on [such] a claim with equitable underpinnings ... prejudgment interest [is] mandatory where the only relief sought was compensatory damages.' Lewis v. S.L. & E., Inc. 831 F.2d 37, 39 (2d Cir.1987) (citing Spector v. Mermelstein, 485 F.2d 474, 481 (2d Cir.1973))(emphasis added).

29.    Regarding the rate of pre-judgment interest to be applied, Claimant argues for the application of New York's statutory rate of interest of 9% as most appropriate. Under CPLR §5001(a), "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." See  212 Inv. Corp. v. Kaplan, 16 Misc. 3d 1125(A), at *9 (Sup. Ct. N.Y. Cnty. 2007); Panix Prods., Ltd v. Lewis, id; Summa Corp. v. Trans World Airlines, 540 A.2d 403, 409 (Del. 1988).

30.    Under CPLR §5004, New York applies pre-judgment interest at 9%, simple annual interest. Under the circumstances here, where the breach of fiduciary duty deprived the investors of the Crusader Funds of a significant distribution and partial return of their equity, we exercise our "broad discretion, subject to principles of fairness, in fixing the rate to be applied," Summa Corp. v. Trans World Airlines, Inc., id., and we award interest at the statutory rate of 9%, simple annual interest, pursuant to New York law, from April 15, 2014, through the date of this Partial Final Award. We pick this date as it is the date by which we believe Highland and/or Cornerstone (as controlled by Highland) should have responded to the Committee offer.

IV.    The Return of the Deferred Fees

48

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 2/26/23 Page 346 of 1392    PageID 15088
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 235 of 1803    PageID 10981

A.      Under §§2.02 and 6.02 of the Plan, if Highland distributed $1.7 billion within 43 months of the Plan's Effective Date, Highland could obtain $10 million in Deferred Fees that had been placed in the special account at the outset to incentivize Highland's rapid liquidation.  There is no question that Highland did not meet that goal by the 43rd month and, thus, in Count Three of its Amended Demand, the Committee seeks the immediate return to the Fund of those proceeds by a declaration that the Fund should distribute the right to receive payment in respect of the funds in the Deferred Fee Account to the Consenting Compulsory Redeemers.

B.      Highland objects on the ground that the UBS TRO eliminated the 47-month schedule applicable to the Deferred Fee Account, invoking the Impossibility Doctrine, discussed in detail above, and argues that, upon the eventual complete liquidation of the Fund, it will be entitled to the $10 million in the Deferred Fee Account.

C.      For reasons set forth earlier, we reject the argument that, under the Impossibility Doctrine, Highland was relieved of the requirement that it achieve complete liquidation of the Fund within 43 months, and, thus, is entitled to the $10 million in Deferred Fees upon complete liquidation. Highland had the opportunity to achieve the complete liquidation despite the duration of the UBS TRO, but chose, for its own reasons, not to do so. The Impossibility Doctrine does not provide a basis for granting Highland affirmative relief.

D.      We order the return to the Crusader Fund the $10 million in the Deferred Fee Account.

V.      Counterclaims

A.      Respondent has brought two principal counterclaims: first, it seeks to recover the remainder of Deferred Fees to which it says it is entitled now because Claimant should have completed the complete liquidation of the Fund's assets by December 31, 2017, at the latest; and, second, it seeks damages against the Committee for breach of the Plan and of its fiduciary duties to Highland by failing to oversee A&M's liquidation of Fund assets and for approving, without adequate, if any, scrutiny, A&M's fees, said to be exorbitant.

B.      As to the breach of fiduciary duty claim, the fiduciary duty relation is said to arise from Highland's status as an investor in the Crusader Funds.  Highland's Post-Hearing Brief at at 3-5. However, we have previously stricken those portions of Highland's Amended Counterclaim that alleged it was suing as an investor. Panel Order, April 1, 2018, at 4. Furthermore, even assuming that, as an investor, Highland had standing to bring a claim for breach of fiduciary duty, as stated below, we find that no breach of duty has been proved with respect to any of the allegations in Respondent's Amended Counterclaim.

49

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/29/23    Page 347 of 1392    PageID 15089
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 236 of 1803    PageID 10982

C.      Specifically, we have examined the record thoroughly and, aside from the testimony of
Highland's expert, James Finkel, and its former portfolio manager, Mr. Jameson, there is insufficient
evidence of a purposeful and wrongful delay in liquidation or a failure by the Committee to oversee
and scrutinize A&M's performance, nor any activity of A&M that the Committee aided and abetted
that was proved wrongful.

D.      Mr. Finkel had a distinguished thirty-plus year career in capital markets, investment
banking, and investment advisory work, including as a liquidator of the assets of alternative
investment funds. But his opinion that Highland or any reasonable manager or liquidator would
have completed liquidation by the end of 2017, at the latest, was not based on anything more than
his unverified judgment, and not on a close examination of the facts in this record. For example, he
conceded that, in reaching his opinions, he didn't consider the amount of information A&M
provided to investors, didn't review A&M's time records or evaluate the quality of the work
performed by A&M, and didn't consider the consequences of the lack of cooperation of Highland
with A&M, among other critical deficiencies. Tr.10 367:10-372:3. Similarly, his opinion that,
because of what he regarded as a flawed compensation structure, A&M's primary focus was on the
time it spent on projects, rather than on results achieved, was based on one assumption that time-
based work is, inevitably, less likely to be focused, an assumption that we reject as a sound basis of
criticism of A&M's contribution. We find that Mr. Finkel's opinions were not soundly based and
we reject them.

Appellee Appx. 00230
Appx. 10482

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 12/29/23 Page 348 of 1392    PageID 15090
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 237 of 1803    PageID 10983

E.      Mr. Jameson worked for Highland for almost seven years as co-head of Private Equity, responsible for sourcing and executing private equity investments and monetizing existing portfolio companies. He testified that he was aware of the UBS TRO and had been advised that he could not sell assets during its pendency. He was aware that Cornerstone did not comply with requests by A&M for information but did not think he had the power to direct Cornerstone to do so Tr 10 28:18-30:3. He also testified that, had Highland remained as its investment manager, it would have sold the Cornerstone asset by December 31, 2017, and that Highland Capital's purchase of Cornerstone from the Crusader Fund at a negotiated price around the mark set by Highland would have been logical. Tr. 10 30:4-35:23. He also testified, in response to questioning by the Tribunal, that little, if anything, would have changed in Highland's ability to negotiate a sale with the Committee when it was replaced by A&M as its investment manager, Tr. 10 119:8-121:23.  On balance, despite Mr. Jameson's on-the-ground role as portfolio manager, his testimony did not support the allegations of Highland in its counterclaims; if anything, his intimate understanding of the Cornerstone asset and how Highland controlled the process by which Cornerstone was or wasn't being marketed supported the Committee's contentions that Highland could have negotiated a fair disposition of the Cornerstone asset had it chosen to do so.

F.      As to an alleged delay in the liquidation of the Fund's assets, the weight of the credible evidence is that Highland, not A&M, was responsible for any delay in liquidating the balance of the assets in the Crusader Fund after Highland was discharged and A&M was retained.

    1.      We note that we have previously found that Highland, after refusing to respond to numerous requests by the Committee for books and records, should make a thorough search of its books and records and produce all non-privileged documents in its possession, custody, or control on certain relevant topics. Thus, we rejected several arguments put up by Highland to prevent the Committee and A&M from gaining access to critical books and records. Order and Partial Award, April 21, 2017.

51

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/29/23    Page 349 of 1392    PageID 15091
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 238 of 1803    PageID 10984

2.      But, even when ordered to do so, Highland again refused to produce documents on at
least two other occasions, requiring additional motions addressed to this Tribunal, Order,
June 20, 2017; Order, October 21, 2017.

3.      In addition, there was unrebutted testimony that Highland produced "hundreds of
thousands" of documents in single-page PDF format, requiring the better part of three or
more months of A&M's time to correlate and organize. Tr. 6 25:4-19.

4.      By contrast, other than Mr. Finkel's testimony, there was little or no evidence of
A&M's procrastinating or proceeding with deliberate slowness or that the Committee failed
in its oversight of A&M.

5.      We have considered all of the other factual and legal arguments made by Highland in
support of its counterclaims and conclude that Highland is not entitled to recover the
remaining Deferred Fees being held in the Fund's cash account and that the Committee did
not breach Sections 2.02 of the Plan and 1.5.2 of the Scheme, the covenant of good faith and
fair dealing, or its fiduciary duties to Highland and other investors. We dismiss Highland's
counterclaims in their entirety.

VI.    Attorneys' Fees and Other Costs

A.      Both parties have requested attorneys' fees relating to all claims asserted in the Amended
Demand, Highland's Answer, Highland's Amended Counterclaims, and Claimant's Answer to the
Counterclaims. Am. Dem. at 53-54; Highland Answer, October 16, 2016, at 21-22; Highland Am.
Counterclaim, April 15, 2018; Committee Answer to Counterclaims. Under AAA Commercial
Arbitration Rules, Rule 47(d)(ii), those mutual demands for attorneys' fees submitted the issue to
arbitration and gave this Panel the authority to award attorneys' fees, in its discretion. AAA Rule
47(d)(ii). "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an
agreement to submit the issue to arbitration, with the resultant award being valid and enforceable."
R.F. Lafferty & Co., Inc. v. Winter, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks
and citations omitted).

B.      The Committee urges that an award of attorneys' fees to it is justified by Highland's having
"acted in bad faith, vexatiously, wantonly, or for oppressive reasons," InterChem 59 Asia 2000 Pte.
Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005) (citation omitted), and that
the record shows numerous examples of Highland acting in bad faith.

52

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-5    Filed 2/40/03180ge 350 of 1392    PageID 15092
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 239 of 1803    PageID 10985

C.    Highland acknowledges the Tribunal's discretion to order an award of attorneys' fees but opposes an imposition of attorneys' fees here. First, Highland argues that denying the Committee's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." HC-300 at 86. But this section of the Plan does not deal with the issue of fee-shifting being ordered by an arbitral tribunal. Nor, given Rule 47(d)(ii), would an order of this Tribunal shifting the responsibility of fees from one party to another be contrary to the so-called American rule, as both parties have sought this relief which is authorized under the prevailing rules of this Tribunal.

D.    Second, Highland urges that the only basis upon which the Committee is seeking an award is that Highland allegedly engaged in bad faith and vexatious conduct, citing only InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005). Highland points out that the Court in InterChem Asia justified an arbitrator's imposition of an award of attorneys' fees because of one party's "bad faith" conduct during the arbitration, principally concerning discovery issues. Here, the Committee cites seven examples of alleged bad faith, but only one dealt with such conduct during the arbitration, "failing to provide the Committee with the books and records of the Fund, resulting in an extensive discovery process, producing records as single-paged TIFs, and resulting in a Panel ruling against them," citing the Tribunal's Panel Opinion and Final Partial Award, dated April 17, 2017.

E.    We are exercising our discretion to grant Claimant's request for attorneys' fees and costs and to deny Respondent's request for the same relief. We do not base our award on any concern of bad faith or oppressive conduct by Highland's able trial counsel, who acted professionally throughout these proceedings. However, with respect to each of the claims on which we have determined that the Committee is entitled to prevail, we have noted above the many occasions where, during the time it was investment manager and thereafter, Highland engaged in conduct that breached the Plan, breached fiduciary duties, involved secrecy, misrepresentations, and false statements by the most senior executives, and constituted willful misconduct. Furthermore, large portions of the defense set forth by Highland's witnesses were unworthy of belief and reflect the fact that Highland knew that it had no legitimate defense to many of the Committee's claims. Accordingly, in our discretion, based on the foregoing, we award Claimant its legal fees and costs for the litigation of this arbitration.

VII.    CONCLUSION AND AWARD

A.    With respect to the claims below for which we find liability and direct the payment of damages and interest, if the Parties are not able to agree on the amount of damages or interest, we direct them to submit simultaneous briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award; there will be no reply briefs unless otherwise directed.

B.    We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of contract claims as follows:

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/29/23   Page 351 of 1392    PageID 15093
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 240 of 1803    PageID 10986

1.      The taking of the Deferred Fees: We order that, within twenty (20) days of the date of this Partial Final Award, Respondent, Highland Capital Management, pay to the Claimant the Deferred Fees in the amount of $33,313,000, with statutory interest of 9%, calculated on a simple basis, from the dates of taking in January and April 2016 through the date of this Partial Final Award.

2.      The payment of Distribution Fees: As found above, with respect to each of the following categories, we find that the Respondent is liable for damages in the amount set forth in the Expert Report of Claimant's damages expert, Basil Imburgia, $14,452,275, plus 9% interest, calculated on a simple basis, from the respective dates such Fees were taken:

a)      The Distribution Fees attributable to the payment of Deferred Fees;

b)      The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

c)      The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims;

d)      The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames;

e)      The Distribution Fees attributable to the amount of margin borrowings; and

f)      The Distribution Fees attributable to the cumulative nature of the calculation, as discussed above.

54

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/29/23   Page 352 of 1392   PageID 15094
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 241 of 1803   PageID 10987

C.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of fiduciary duty claims as follows:

1.      Engaging in related party transactions without Redeemer Committee approval:

2.      Purchase of Plan claims without Redeemer Committee approval: Within twenty (20) days of the date of this Partial Final Award, we order Respondent, Highland Capital Management, to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase, calculated on a simple basis;

3.      Sale of CLO interests - The Committee is entitled to judgment for the amount of the difference between the sale and repurchase prices with interest from the date of the sale from the funds. We direct the Parties promptly to confer and agree upon the total amount of damages including 9% interest, calculated on a simple basis; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

4.      Failure to settle Credit Suisse claims: We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on this claim and direct the Parties promptly to confer to calculate an amount of damages that takes into account the parameters set forth in the body of this Award; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

5.      The UBS litigation: We find in favor of Claimant, Redeemers Committee of the Highland Crusader Fund, and award damages in the amount of 9% simple interest on $30 million from December 29, 2015 to December 30, 2016, which shall be paid to the Redeemer Committee by Highland Capital Management within twenty (20) days of the date of this Partial Final Award; and

6.      The Cornerstone Asset: We find in favor of Claimant and direct Highland Capital Management, within twenty (20) days of the date of this Partial Final Award, to pay the Redeemer Committee the amount of $48,070,407, plus interest at 9%, on simple basis, in return for which the Fund will transfer title to the shares to Highland.

D.      We grant Claimant's request for a declaratory judgment, seeking the immediate distribution of the Deferred Fee Account, and order the payment of the $10 million in the Account to the Committee for disbursal to the Consenting Compulsory Redeemers within twenty (20) days of the date of this Partial Final Award.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/23   Page 353 of 1392   PageID 15095
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 242 of 1803   PageID 10988

E.      We find against Respondent on its counterclaim and dismiss the counterclaim with prejudice.

F.      We grant Claimant's request for reasonable attorneys' fees and costs and deny Respondent's request for an award of attorneys' fees and costs. With respect to the amount of fees and expenses that Claimant seeks, the parties should promptly confer to determine whether they can agree on an amount. If the parties can not agree, Claimant shall file an affidavit or petition setting out its claim with appropriate documentation within fifteen (15) days of the date of this Award, unless counsel agree otherwise. Respondent shall respond within fifteen (15) days thereafter, unless counsel agree otherwise. There will be no reply opportunity absent leave of the Tribunal.

G.      We will leave the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S  Document 68-36  Filed 12/29/23 180Page 354 of 1392  PageID 15096
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 243 of 1803   PageID 10989

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

David M. Brodsky, Chair

John S. Martin, Jr.

Michael D. Young

54

Appellee Appx. 00237
Appx. 00739

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/25/23   Page 355 of 1392   PageID 15097
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 244 of 1803   PageID 10990

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/20/23   Page 356 of 1392   PageID 15098
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 245 of 1803   PageID 10991

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____

David M. Brodsky, Chair

_____

John S. Martin, Jr.

_____

Michael D. Young

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-3   Filed 2/29/23 180 Page 357 of 1392   PageID 15099
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 246 of 1803   PageID 10992

State of NEW YORK        )

                                  ) SS:

County of NEW YORK       )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.


_3/6/19_
Date

_David M. Brodsky, Chairperson_


State of NEW YORK        )

                                  ) SS:

County of NEW YORK       )

On this __6__ day of MARCH, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


_____
Notary Public

MEENA M. GULATI
Notary Public, State of New York
No. 01GU5015872
Qualified in New York County
Commission Expires August 2, 2021

55

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5-3   Filed 12/29/23   Page 358 of 1392   PageID 15100
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 247 of 1803   PageID 10993

State of FLORIDA ⟩

⟩ SS:

County of LEE ⟩

I, JOHN S. MARTIN, JR.,, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

Date  March 5, 2019

John S. Martin, Jr.

State of Florida ⟩

⟩ SS:

County of Lee ⟩

On this 5th day of MARCH, 2019, before me personally came and appeared John S. Martin, Jr.,, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/29/23    Page 359 of 1392    PageID 15101
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 248 of 1803    PageID 10994

State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.


3 -5 -19                                    _Michael Young_

Date                                        Michael D. Young


State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )

On this _5_ day of MARCH, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


_Vickie L. Johnston_

Notary Public
        VICKIE L. JOHNSTON
    Notary Public - State of New York
          No. 01JO6113098
      Qualified in Queens County
    My Commission Expires July 19, 20 20

1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/20/23 Page 360 of 1392   PageID 15102
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 249 of 1803   PageID 10995

# APPENDIX 3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-8   Filed 12/19/23   Page 361 of 1392   PageID 15103
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 250 of 1803   PageID 10996

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

               Claimant,

v.                                                            Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

               Respondent.

---

**FINAL AWARD**

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with
Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into
between the above-named parties and adopted in July 2011, and having been duly sworn, and
having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

A. On March 6, 2019, we issued a Partial Final Award, finding Respondent Highland
Capital Management, L.P. ("Respondent") liable in a number of respects and awarding
damages, interest, attorneys' fees, and costs to Claimant Redeemer Committee of the
Highland Crusader Fund ("Claimant"), as described, in relevant part, below. We "le[ft]
the hearing open until all issues set forth ... have been agreed upon by the Parties or
decided by the Tribunal."

B. In response to an email from Claimant, dated March 7, 2019, seeking clarification on an
apparent omission from the Partial Final Award, we issued a Disposition of Application
for Modification of Award dated March 14, 2019 ("Modification of Award").[1]

C. This Final Award incorporates the Partial Final Award and the Modification of Award
(together, the "Partial Award"). We re-adopt all prior findings and conclusions of the
Partial Award, except as specifically modified hereinafter.

D. We have before us the following:

---

[1] The Modification of Award referred to Rule R-46 of the AAA Commercial Arbitration Rules, instead of
Rule R-50, as the basis for the modification of a clerical error, relying upon the predecessor version of
Rule R-50. The substantive text of old Rule R-46 and present Rule R-50 are the same.

1

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-3 Filed 12/29/23 Page 362 of 1392 PageID 15104
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 251 of 1803 PageID 10997

a.  Respondent's Memorandum, dated March 17, 2019, requesting that (1) the Panel withdraw its Modification of Award entered on March 16, 2019; (2) cease any further attempts to award additional damages, attorneys' fees, or costs that are not expressly set forth in the Partial Award; and (3) reconfirm that the hearing and all evidence is closed and the Panel is not empowered to take any further action beyond the issuance of its Partial Award ("Respondent's March 17 Memorandum").

b.  Claimant's Submission Regarding Fees and Costs, dated March 21, 2019, made pursuant to Rules R-28, R-47, R-53, R-54, and R-55, AAA Commercial Arbitration Rules, seeking an award of $11,865,181.28 in attorneys' fees and costs, including Claimant's attorneys' fees, AAA administrative fees, arbitration expenses, fees incurred by A&M, expert fees, and Panel compensation paid by the Respondent Highland on behalf of the Committee in this arbitration ("Claimant's Fee Submission").

c.  Claimant's Application, dated March 25, 2019, made pursuant to Rule 50, AAA Commercial Arbitration Rules, to modify the Partial Award, issued by this Panel on March 6, 2019 (Claimant's March 25 Application").

d.  Claimant's and Respondent's Joint Submission on Damages dated April 5, 2019, in which the Parties agreed on the mathematical calculation of the amount of damages and interest contained in the Partial Award and Modification of Award, subject to Highland's objections to the inclusion of any damages awards that were not specified in the Partial Award and subject to objections on two specific issues: (1) whether the Eames residual LP interests would be extinguished; and (2) whether prejudgment interest awarded by the Panel will continue to run after March 6, 2019 until the earlier of the date the amount awarded is paid to the Committee for the benefit of the Fund, or the date on which a Final Judgment is issued on the Award ("Joint Submission").

e.  Respondent's Memorandum dated April 5, 2019 opposing the motion to modify the Partial Award; and opposing any award for damages, attorneys' fees, or costs ("Respondent's April 5 Memorandum").

f.  Claimant's Memorandum dated April 5, 2019 arguing that (1) the Panel should award further damages in connection with the Barclays claim measured by the Fund's loss of the residual value of the Eames LP interests, either by extinguishing the former Barclays LP interests, or alternatively, by awarding an appropriate amount of damages to compensate the Fund for loss of the value of those interests, which the Committee puts at $11,589,474; and (2) the Panel should award prejudgment interest through the date the Award is paid or final judgment is entered ("Claimant's April 5 Memorandum").

g.  On April 10, 2019, Respondent sought leave, which we granted on consent, to file an additional Memorandum on two issues raised by Claimant in its April 5

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 12/29/23   Page 363 of 1392   PageID 15105
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 252 of 1803   PageID 10998

Memorandum, namely, that Claimant adds a new and improper request that
interest after March 6, 2019 be compound, and not simple, interest by applying an
additional 9% statutory interest to both (a) the damages awarded and (b) the
interest accrued through March 6, 2019; and that Claimant has provided a new
and improper damages calculation relating to the extinguishment of the Eames LP
interests.

h.   Having reopened the record on March 6, 2019, for additional submissions, as
described above, we deem the record closed as of April 10, 2019.

E.   Issues

   a.   Fees and costs

      1.   In the Partial Award, we evaluated the competing claims made by
Claimant and Respondent regarding an award of fees, which both
sides had sought in their pleadings. As we noted in the Partial
Award, ¶VI.A, 52, AAA Commercial Arbitration Rule R-47 (d)(ii)
authorizes the Arbitrator to award attorneys' fees if, as here, "all
parties have requested such an award . . . " "[M]utual demands for
counsel fees in an arbitration proceeding constitute, in effect, an
agreement to submit the issue to arbitration, with the resultant
award being valid and enforceable." *R.F. Lafferty & Co., Inc. v.
Winter*, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation
marks and citations omitted); *In re U.S. Offshore, Inc. and Seabulk
Offshore Ltd.*, 753 F. Supp. 86, 92 (S.D.N.Y. 1990) ("If both
parties sought attorney's fees, . . . then both parties agreed *pro
tanto* to submit that issue to arbitration, and the arbitrators had
jurisdiction to consider that issue and to award them.")."

      2.   During closing oral arguments, Respondent did not mention its
own request for an award of fees, but "*acknowledge[d] the
Tribunal's discretion* to order an award of attorneys' fees…"
Indeed, Respondent made oral and written closing arguments that
conceded that it was "*not disputing the discretion that the Panel
has* [to award fees]." Tr. 13 444:2-3 (emphasis added). In its
closing slides, Respondent also urged that "The Panel *should
exercise its discretion in applying the American Rule*." Respondent
Closing Slides at 261 (emphasis added).

      3.   Respondent also argued that denying the Claimant's request for
attorneys' fees would be consistent with Section 9.02 of the Plan
which provides that "each of the Crusader Funds retains
obligations it has to pay . . . legal fees." Second, Respondent urged
that the only basis upon which Claimant is seeking an award is that
Respondent allegedly engaged in bad faith and vexatious conduct.

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/24/23    Page 364 of 1392    PageID 15106
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 253 of 1803    PageID 10999

4. Respondent now chooses to oppose the grant of fees on grounds
distinctly different from those set forth above. It belatedly argues
an alleged lack of proof and the Panel's being *functus officio* to
award fees.

    1. Respondent argues that the Panel "found that the evidence
in the record was insufficient to determine many of the
Committee's claims for damages, as well as its claims for
costs and fees." Resp. April 5 Mem. 14.

    2. But that is incorrect; we did not find any insufficiency;
instead, with no objection, we adopted a well-recognized
method of dealing with attorneys' fees and costs by
deciding entitlement before amount. See *Franco v. Dweck*,
87 N.Y.3d 5 (2018) ("Contrary to respondents'
contention, the final award did not run afoul of the doctrine
of *functus officio*, which precludes an arbitrator from
altering in substance a prior award (see *Matter of Wolff &
Munier [Diesel Constr. Co.]*, 41 A.D.2d 618, 340 N.Y.S.2d
455 [1st Dept. 1973] ). As the partial final award *expressly
reserved* the issue of attorneys' fees, it cannot bar a
*subsequent* award of those fees (see *Shimon v. Silberman*,
26 Misc.3d 910, 914–915, 891 N.Y.S.2d 891 [Sup. Ct.,
Kings County 2009] )."

5. Accordingly, we reject Respondent's new positions. From at least
the time the pre-hearing briefs, witness lists, and list of exhibits
were mutually filed, it was clear that whichever side that was going
to seek attorneys' fees if it prevailed was reserving on the specific
rates and amounts of legal fees, as well as costs and expenses,
many of which had not yet been incurred. To do otherwise would
be a waste of resources. Not once did Respondent ever raise the
question of proof regarding attorneys' fees and costs; by its silence
and conduct, Respondent consented to the process regarding proof
of attorneys' fees that the Panel was following, see CCA Guide to
Best Practices in Commercial Arbitration (3d edition), 246.

6. Second, we explicitly denominated the award of March 6 as a
"Partial Final Award," making clear to the Parties that the arbitral
proceeding was still ongoing. We also explicitly left the hearing
open so that the Parties could meet and confer or make
submissions, including providing additional evidence, "until *all
issues* set forth ... have been agreed upon by the Parties or decided
by the Tribunal." Under these circumstances, the doctrine of
*functus officio* does not apply. *Kennecott Utah Copper Corp. V.
Becker, 186 F.3d 1261, 1270–71 & n.4* (10th Cir. 1999) (*Functus*

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/23/22    Page 365 of 1392    PageID 15107
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 254 of 1803    PageID 11000

*officio* provides that, "once an arbitrator has issued a *final* award
and thus discharged his or her office, that arbitrator lacks any
continuing power to revise the award or issue a new
one.")(emphasis added).

i.   Accordingly, we turn to an examination of the application for attorneys'
fees and costs, sought by Claimant:

    a.   Claimant seeks the following in fees and costs:

        i.   Jenner & Block Fees - $9,278,248.99

            1.   In support of its fee application, Claimant
has provided detailed time records, billing
records, and a declaration of Andrew Vail, a
partner of Jenner & Block, that establishes
that records were maintained on a
contemporaneous basis, that time billed on
duplicative, inefficient, or extraneous to the
arbitral proceeding was excluded from the
application, and that hourly rates, and a
fixed-fee discount, where applicable, were
discounted by 15%. Vail Declaration ¶¶13-
18. The hourly rates are shown to be
comparable to rates charged by other similar
firms and consistent with prevailing market
rates for attorneys of similar high levels of
expertise and experience. We note that
Respondent does not object to the amount
sought, except on the bases previously
discussed. We find the request for legal fees
to be reasonable, especially given the
complex factual and legal setting, and grant
Claimant's application.

        ii.   FTI Expert Fees - $1,274,853.26; and A&M
Arbitration Fees - $655,160.00

            1.   In support of the FTI fees, Claimant
submitted a declaration, with supporting
exhibits, of Mr. Vail, who affirmed that the
fees reflected "services that were necessary
for the Committee to prosecute its claims
against [Respondent] and to defend against
[Respondent's] counterclaims, and … the
amounts charged for such services were
reasonable given the necessity of those
services." Vail Declaration ¶26.

5

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 2/20/23   Page 366 of 1392   PageID 15108
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 255 of 1803   PageID 11001

2. In support of the A&M Arbitration Fees, Claimant has provided the declaration of Steven Varner, a Managing Director of A&M, who affirms that A&M maintained billing records on a contemporaneous basis for its services throughout the course of this arbitration, but did not keep detailed descriptions of its billed time for specific matters within that engagement. He further affirmed that he and another managing director compiled a "conservative estimate of the time that A&M personnel spent on matters that were specifically required in connection with HCMLP's failure to timely provide A&M with books and records relating to the Fund." That work totaled approximately $655,160.00, after discounts were applied to their normal billing rates. Varner Declaration ¶¶6, 7, and 10.

3. Claimant is not seeking recovery for over $140,000 in attorneys' fees and costs for A&M's counsel to pursue information from Cornerstone pursuant to Del. Code Ann. tit. 8 § 220. Varner Declaration ¶8.

4. Respondent principally opposes the fees of FTI and A&M on the grounds that "while the AAA Rules permit the award of certain expenses (e.g. administrative costs and Panel compensation), they are much more restrictive when it comes to witness costs for the parties. In fact, Rule 54 expressly divides expenses into two categories: (i) witness expenses—which are to be borne by the party presenting the witness; and (ii) '[a]ll other expenses'—which may be apportioned by the arbitrator(s)."

5. While acknowledging some dispute among the courts as to whether Rule R-54 permits a prevailing party to recover its expert witness fees, Claimant urges that the weight of authority provides that both consulting and testifying witness fees are recoverable under the AAA's rules, citing *Dealer Comp.*

6

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 2/29/23 180 4ge 367 of 1392    PageID 15109
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 256 of 1803    PageID 11002

*Servs., Inc. v. Hammonasset Ford Lincoln-Mercury, Inc.*, 2008 WL 5378065, at *2, *4 (S.D. Tex. Dec. 22, 2008) (confirming final arbitration award that included expert witness fees); *In re Pos'tive Produc, Inc. v Thermal C/M Services, Inc.*, 2011 WL 13220365, at *4 (N.Y. Sup. Ct. Nov. 18, 2011) (confirming award that included "expert fees and costs"); and *Cardno Int'l Pty, Ltd. v. Merino*, 2017 WL 6034172 (S.D. Fla. Oct. 30, 2017).

6. Rule 47(a) gives the Tribunal the power to "grant any remedy or relief that the arbitrator deems *just and equitable* and within the scope of the agreement of the parties…", while Rule 47(c) provides that "In the final award, the arbitrator *shall* assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator *may apportion* such fees, expenses, and compensation among the parties in such amounts *as the arbitrator determines is appropriate*." (Emphasis added.) Parsing these sections in conjunction with R-54 leads us to conclude that we have the power to award the expenses of the arbitration, including expert fees, as we deem just, equitable, and appropriate. *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, No. 3:07-CV-752-J-25JRK, 2010 WL 11507082, at *4 (M.D. Fla. Sept. 13, 2010) (confirming award where tribunal awarded prevailing party its expert fees), *aff'd*, 660 F.3d 1277 (11th Cir. 2011).

7. Under the complex circumstances presented here, we find that the experts were essential to the prosecution of the Claimant's case and that their services, and consequent fees, were a necessary obligation the Claimant was bound to its members to undertake in its pursuit of the claims against Respondent.

7

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-3    Filed 2/28/23 Page 368 of 1392    PageID 15110
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 257 of 1803    PageID 11003

8.  We note, specifically with respect to the A&M fees, that a large portion of the fees appear to relate to "time spent organizing the tens of thousands of individual page PDF files that HCMLP provided as books and records instead of complete documents." Varner Declaration ¶7.

9.  From our observations at the hearing and our review of the reported rates and fees of FTI and A&M, we conclude that such fees were fair and reasonable and we find that it would be "just and equitable" and "appropriate" relief to award Claimant all of the expert fees it seeks, and we do so.

iii.  Respondent does not object to the following categories of fees sought by Claimant:

1.  AAA Administrative Costs - $64,750.00;
2.  Court Reporter Hr'g Costs - $114,697.77;
3.  Court Reporter Dep. Costs - $28,890.04; and
4.  AAA Panel Compensation - $448,581.22 (to date).

b.  Accordingly, in our discretion, we award Claimant the total sought in fees, costs, and expenses, as detailed and updated in section F. below.

b.  Claimant's Motion for Modification of the Partial Final Award
   i.  On March 25, 2019, Claimant moved, pursuant to AAA Rule 50, to modify the Partial Final Award in several respects.

1.  First, with respect to the Partial Final Award regarding the finding of liability of Respondent with respect to the Barclays LP interests, Claimant moved to correct a clerical error that resulted in the omission of a Barclays damages paragraph from the Partial Final Award by modifying that Award to include the paragraph set forth in the Panel's March 14, 2019 Modification of Award.

2.  Second, also pursuant to Rule 50, Claimant moved that the Panel modify the award to address other clerical, typographical, and computational errors in the Partial Final Award.

3.  AAA Rule 50 provides in relevant part, as follows: "R-50. Modification of Award. Within 20 calendar days after the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-3    Filed 2/29/23180-4    Page 369 of 1392    PageID 15111
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 258 of 1803    PageID 11004

transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto."

4. With respect to the Barclays issues, Respondent contends both that Rule 50 does not apply and that the doctrine of *functus officio* divests the Panel of the power to modify the Partial Final Award, as the Panel would be adding an "additional award" that "represents an entirely new award of $34 million in damages not included in the [Partial Final Award] ... constitut[ing] a material revision of the award."(Respondent's April 5 Memorandum at 5).

5. First, we are not adding an "additional award," as it is clear from the structure of the Partial Final Award that a paragraph was missing from the damages portion; all other findings of liability were accompanied by a section delineating the applicable damages except for the finding of a breach of the Plan and Scheme by reason of the transfer of LP interests to Eames. In other words, we found liability in two respects but omitted a paragraph regarding the remedy for Respondent's breach of the Plan and Scheme that we had found with respect to the transfer, without the required Committee approval, of Barclays' fund interests to itself through entities it controlled as part of the settlement. That omission is a classic example of a clerical error.

6. Second, although the effect of the Modification was to add additional damages to the award against the Respondent, the Panel did not "materially revise" the Partial Final Award since liability had already been found.

7. In addition, as previously discussed, the doctrine of *functus officio* "provides that, *while an arbitrator may correct clerical, typographical, or computational errors in a final award, he has no power to revisit the merits of the award after it has issued...*" *Int'l Broth. Of Elec. Workers, Local Union 824 v. Verizon Florida, LLC*, 803 F.3d 1241, 1250 (11th Cir. 2015). However, we did not issue a final award; it was explicitly labeled a Partial Final Award and was explicitly subject to being supplemented by subsequent presentations of damages analyses by both Parties.

9

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 09/08/23   Page 370 of 1392   PageID 15112
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 259 of 1803   PageID 11005

8. Finally, there is ample case law for the proposition that the Panel is not divested of power, even when issuing a final award, from correcting clerical, typographical, or computational errors. See *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472-73 (5th Cir. 2012); *E. Seaboard Const. Co., Inc. v. Gray Const., Inc.*, 553 F.3d 1, 5-6 (1st Cir. 2008).

9. Respondent also argues that the Panel is barred from correcting the Partial Final Award by AAA Rule 45, which provides that "The award shall be made ... no later than 30 calendar days from the date of closing the hearing..." Respondent urges that "the parties agreed that the final award would be made on or before March 7, 2019. Accordingly, any award made after that date is untimely and beyond the scope of the Panel's authority." (Resp. April 5 Mem. at 7). But, once again, this argument ignores the explicit nature of the March 6 Partial Final Award, which "le[ft] the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal."

10. Respondent also argues that we are "reopening" the record in violation of AAA Rule 40. That rule provides, in relevant part, as follows: "The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award..."

11. We acknowledge that a communication from the AAA, dated December 12, 2018, stated that the "no additional evidence is to be submitted and that the hearings are declared closed as of December 12, 2018," but this statement was subsequently withdrawn by the previously-quoted language of the Partial Final Award where we explicitly left the record open "until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

12. That language is equivalent to the language that "we will reopen the hearing." *Int'l Bhd. of Teamsters Local 959 v. Horizon Lines of Alaska, LLC*, 22 F. Supp. 3d 1005, 1007–08 (D. Alaska 2014) ("Where an arbitrator specifically retains jurisdiction to resolve disputes regarding damages, that indicates that the arbitrator did not intend the award to be Final. Put simply, an arbitration award that postpones the determination of a remedy should not constitute

10

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.6    Filed 2/09/23 180 Page 371 of 1392    PageID 15113
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 260 of 1803    PageID 11006

a final and binding award"); *Golden v. Lim*, 2016 WL 520302, at
*3, *9 (E.D. Mich. Feb. 10, 2016)(holding that the arbitrator had
the authority under the AAA Rules to reopen the hearing to accept
further submissions on attorneys' fees).

13. Second, even if the relief sought required a reopening of the
record, Rule 40 authorizes the Panel to do so "upon the application
of a party," so long as doing so did not violate "the specific time
agreed to by the parties in the arbitration agreement" for the
making of the award. No such time period is set forth in the
arbitration agreement. Finally, we interpret Rule 40 to be speaking
to the instance of reopening the hearing after the final award is
made, which is, again, not the situation we are in.

ii. We grant Claimant's application under AAA Rule 50[2] and formally
correct the clerical error by re-adopting the additional paragraph,
previously included in the Panel's March 16 Modification of Award, as
follows:

1. "Insert the following paragraph at page 54, immediately after
VII.B.2.f: "3. The transfer of Barclays Fund interests: By
transferring, without the required Committee approval, Barclays'
fund interests to itself through entities it controlled as part of the
settlement, Highland breached the Plan and Scheme. We award the
Committee damages measured by the benefits Highland received
in excess of the amount it would have been entitled to receive from
the Redeemer Trust Account because Barclays claim was settled
for less than its value. In Table 11, Version 2, Claimant's damages
expert, Basil Imburgia, calculated that such an amount totaled
$34,661,749. RC-522. As with other amounts awarded, the Parties
are to confer to determine the actual amount of damages including
the 9% interest to date."

iii. Claimant also moves under Rule 50 to correct four other clerical errors, set
forth below, as to which Respondent does not object. The motion is
granted; the clerical errors are set forth below and corrected as noted:

1. The Partial Final Award reference to the amount of Deferred Fees
improperly taken from the Fund by Highland as "$33,313,000"
(Partial Final Award at 14, 54) is corrected to read "$32,313,000."

---

[2] We acknowledge Respondent's interesting linguistic analysis of the differences between ICDR Article
33 and AAA Rule 50, see Respondent April 5 Memorandum at 5-6, but we deny the underlying premise
that what we are being asked to do is to make an "additional award as to claims, counterclaims, or setoffs
presented but omitted from the award." We had found liability as to two claims involving the Barclays LP
interests but omitted the damages component of one of the two liability findings. That does not constitute
an award as to a claim argued by Claimant but omitted from the partial final award.

11

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68 3    FRiled 12/29/23 1804age 372 of 1392    PageID 15114
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 261 of 1803    PageID 11007

2. The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

3. The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

4. The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

iv. Eames

1. In the March 6 Partial Final Award, as modified herein, we found Respondent liable for having transferred the Barclays LP interests to an entity which it wholly controlled, Eames [LLC].[3] We awarded damages "measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value." We estimated — but did not find — that amount by referring to a damages calculation by Claimant's damages expert, Basil Imburgia, who "calculated that such an amount totaled $34,661,749. RC-522." "As with other amounts awarded," we directed "the Parties ... to confer to determine the actual amount of damages including the 9% interest to date."

2. The Parties have conferred and disagree as to the appropriate amount of damages for Respondent's breach of the Plan and Scheme. Claimant asserts that the appropriate amount of damages is $29,609,015, which is lower than the amount estimated by its expert and cited in the Partial Final Award, because "the value of the Barclays interests which [Respondent] now controls through Eames is expressly excluded, as it would be extinguished and that value would be spread amongst the remaining Fund investors." Claimant April 5 Memorandum, 5.

3. Thus, Claimant urges that "the Panel should either (1) award $29,609,015 and order the extinguishment of the Barclays LP interests owned and controlled by Highland, or (2) award $29,609,015 plus the current value of those LP interests, which its

---

[3] We found, and it is not disputed, that Highland controls Eames through an entity, Hockney, Ltd., that Highland wholly owns, and which, along with Eames, was created solely for the purpose of holding the Barclays LP interests for Highland's financial benefit. JX24; Tr. Day 8 83:21-86:13; Tr. Day 9 144:21-25, 220:18-25.)

12

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/29/23   Page 373 of 1392   PageID 15115
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 262 of 1803   PageID 11008

damages expert estimates to be $11,589,474. Claimant April 5 Mem. at 10; Imburgia April 5 Declaration, ¶15.

4. Respondent urges that the "March 16 Modification contains specific language awarding the Committee a specific amount of monetary damages." However, as discussed above, that is not what the Panel did. We directed the Parties to confer on the exact amount to be awarded and to come to the Panel if they could not agree.

5. Respondent further argues that nowhere in the March 6 Partial Final Award or the March 16 Modification did the Panel award Claimant equitable relief concerning the Barclays Claim, and that had the Panel wanted to do so, it knew how to do so.

6. Respondent goes on to argue that Eames is not a party to this arbitration, and, therefore, the Panel lacks the authority to issue an award determining Eames' legal rights and obligations." Even if the Panel determines that the remaining equity interest should have been extinguished at the time of the 2012 settlement, "the fact remains that the equity interest was transferred to—and is still held by—Eames." Respondent April 5 Memorandum, 21-22.

7. Finally, in its April 10 submission, Respondent objects to the Claimant's calculation of interest on any award regarding Barclays or the other claims, to wit, Claimant's April 5 Request adds an improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019.

8. We disagree with Respondent's arguments except as relating to the compounding of interest sought by Claimant, which we discuss more fully below. First, when we found that "Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer," we sought a remedy to deprive Respondent of the benefits that it had received illegitimately, or, in other words, to void the Eames transaction and put the parties back into the position they should have been in. Respondent may not benefit in the future by its breach of the Plan and Scheme, and the illegitimate transaction it engaged in, by forfeiting some, but receiving future, benefits through its absolute control of the entity it created, Eames.

13

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/04/23  Page 374 of 1392    PageID 15116
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 263 of 1803    PageID 11009

9.  Second, although Eames is not a party in this proceeding, that is irrelevant to the relief we grant. The operating party throughout all of the machinations that resulted in the transfer of Barclays' LP interests to an entity it created solely for the purpose of holding such interests was, and remains, Respondent. It is completely within its power to unwind the transfer and re-transfer those interests back to the Fund for the benefit of its investors, as we now order.

10. Regarding the appropriate amount upon which to award interest, for reasons set forth below, we reject Claimant's argument that $29,609,015 is the appropriate amount upon which to award interest, as to do so would be to violated well-settled law in New York regarding pre-judgment interest, CPLR §§5003-5004.

11. We award Claimant monetary damages against Respondent in the amount of $21,768,743, plus 9% simple prejudgment interest from the date of the breach until the earlier of either (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

12. We further order that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be returned to Claimant within sixty (60) days from the date of transmittal of this Final Award to the Parties.

v.  Interest

1.  In the March 6 Partial Final Award, we awarded damages and interest through the date of that award, but then, as already referred to, directed the Parties to confer regarding all damages and interest issues.  Claimant now urges that we award 9% prejudgment interest on the damage amounts awarded until the earlier of: (1) the date on which the amounts due are paid to the Committee for the benefit of the Fund; or (2) the date on which a court of competent jurisdiction enters a final judgment on the Final Award.

2.  However, as Respondent points out, Claimant is, in effect, arguing for a compounding of interest upon interest.  We agree. The effect of Claimant's interest calculations would violate New York law, as an award of 9% interest post-March 6 on an amount that already includes 9% interest from the breach through March 6, would amount to compound interest after March 6, 2019. "[T]he statutory

14

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 12/05/23  Page 375 of 1392    PageID 15117
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 264 of 1803    PageID 11010

scheme [in New York] for awarding …, where applicable, prejudgment interest, does not provide for compound interest." *520 East 81st Street Associates* v. *State of New York*, 19 AD3d 24 (2005).

3. Respondent also contends that the March 6 Partial Final Award contained specific language awarding interest "through the date of this Partial Final Award"— i.e., March 6, 2019, and that awarding interest through any other date would constitute an untimely modification of the Partial Final Award.

4. We disagree with Respondent that changing the termination date of prejudgment interest would constitute an untimely modification. Although the Partial Final Award did use the date of March 6 as a reference point for calculation of interest, that fact is not determinative of this issue. We also explicitly left open calculations of damages and interest until the Parties had fully conferred on the extremely complex financial calculations that had to be made. Among the calculations was a further calculation of interest.  It is not an unlawful modification of the Partial Final Award to make, as we do here, a final award on all damages and interest issues based upon a final record.

5. Furthermore, failing to continue the running of interest through payment or entry of a final judgment could well, under the circumstances presented here, result in Fund investors with no compensation for their documented losses during that time, as well as provide an incentive to Respondent to prolong the confirmation process. We have already had occasion to comment on Respondent's tactics of putting forth witnesses who were "unworthy of belief" and an "[il]legitimate defense to many of the Committee's claims." Partial Award ¶VI(E). We will not adopt a result that would allow Respondent to impose more hardships on the Fund Investors.

6. We award Claimant 9% prejudgment simple interest on all sums awarded from the dates of each breach through the earlier of the date paid or the entry of a final judgment.

F.  FINAL AWARD

a.  We reaffirm the findings of fact, conclusions of law, and findings of liability as set forth in the March 6 Partial Award, and make the following awards with respect to such findings and conclusions:

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-13   Filed 12/09/23   Page 376 of 1392   PageID 15118
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 265 of 1803   PageID 11011

i.   Claimant's Application to modify the Partial Final Award is granted pursuant to the Disposition of Application for Modification dated March 14, 2019.

ii.  Claimant's Motion to Correct Errors is granted, on consent; the clerical errors are set forth below and corrected as noted:

    1.  The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

    2.  The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

    3.  The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

    4.  The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

    5.  In all other respects, the Partial Final Award dated March 6, 2019 and the Disposition of Application for Modification dated March 14, 2019 are reaffirmed and incorporated by reference.

iii. For the Deferred Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the Deferred Fees in the amount of $32,313,000 as directed in the Partial Final Award, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

iv.  For the Distribution Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $14,457,275, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

v.   For the Taking of Plan Claims, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21,

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 02/09/23 Page 377 of 1392   PageID 15119
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 266 of 1803   PageID 11012

2019, the amount of $3,106,414. The Panel further orders that LP interests identified in RC411 be transferred to Claimant for the benefit of the Crusader Fund or that Claimant cause the Fund to extinguish those claims. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to $3,106,414 beginning on March 7, 2019 and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vi.   For the CLO Trades Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $449,375.00. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple, from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vii.   For the Credit Suisse Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,735,411. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple on that sum, from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

viii.   For the UBS Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,041,664. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of breach until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

ix.   For the Cornerstone Claim, the Panel awards the following relief: the Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $48,070,407 for the sale of the Crusader Fund's shares in Cornerstone. The Panel also awards pre-prejudgment interest at the New York statutory rate of 9% simple on that sum from the date of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award. When the amount awarded for the Cornerstone claim is paid by Respondent, Claimant shall cause the Crusader Fund to tender its Cornerstone shares to Respondent.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/29/23   Page 378 of 1392   PageID 15120
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 267 of 1803   PageID 11013

    x.  For the Barclays Claim, the Panel awards the following relief:

        1.  The Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $21,768,743. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

        2.  Further to the Barclays Claim, the Panel orders that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant for the benefit of the Crusader Fund within sixty (60) days from the date of transmittal of this Final Award to the Parties, or, alternatively, that Claimant cause the Fund to extinguish those interests.

    xi.  For Claimant's Application for Legal Fees, Costs, and Expenses, we award Claimant $11,351,850.06 in fees, costs, and expenses as per the following:

        1.  Jenner & Block Fees - $9,278,248.99;
        2.  FTI Expert Fees - $1,274,853.26;
        3.  A&M Arbitration Fees - $655,160.00;
        4.  Court Reporter Hr'g Costs - $114,697.77;
        5.  Court Reporter Dep. Costs - $28,890.04

    xii.  The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$94,693.88 and the compensation and expenses of the Tribunal totaling US$887,427.89 shall be borne by Respondent. Therefore, Respondent shall reimburse Claimant the additional sum of US$514,163.97, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

G.  We have carefully considered, although not discussed in their entirety herein, all arguments made by Claimant and Respondent. Any other claims or requests for relief, made by either Party, are denied.

18

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 12/29/23   Page 379 of 1392   PageID 15121
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 268 of 1803   PageID 11014

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

Appellee Appx. 00262
Appx. 10544

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/20/23   Page 380 of 1392   PageID 15122
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 269 of 1803   PageID 11015

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____

David M. Brodsky, Chair

_____

John S. Martin, Jr.

_____

Michael D. Young

Appellee Appx. 00263
Appx. 105715

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-35   Filed 2/29/23 1804age 381 of 1392   PageID 15123
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 270 of 1803   PageID 11016

State of New York     )
                      ) SS:
County of New York   )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____5/9/19_____
Date

_____
David M. Brodsky, Chairperson

State of New York     )
                      ) SS:
County of New York   )

On this ___9___ day of May, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ISAIAS MATEO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6274151
Qualified in New York County
My Commission Expires 12-31-2020

20

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/23   Page 382 of 1392   PageID 15124
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 271 of 1803   PageID 11017

State of Florida     )  
                )   SS:  
County of Lee     )

I, John S. Martin, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our        Final Award.

_Date April 29, 2019

_____
John S. Martin, Jr., Arbitrator

State of Florida     )  
                )   SS:  
County of Lee     )

On this 29th day of April, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

21

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/29/23   Page 383 of 1392   PageID 15125
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 272 of 1803   PageID 11018

State of New York          )
                           )   SS:
County of New York         )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our          Final Award.

_____4/29/19_____

Date

_____Michael Young_____

Michael D. Young, Arbitrator

State of New York          )
                           )   SS:
County of New York         )

On this 29 day of April, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____Vickie Johnston_____

Notary Public

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

22

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-3   Filed 04/24/23   Page 384 of 1392   PageID 15126
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 273 of 1803   PageID 11019

# APPENDIX 4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/29/23   Page 385 of 1392   PageID 15127
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 274 of 1803   PageID 11020

1

         IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                    :
                                      :
                Plaintiff,            :
                                      :
         v                            :   C. A. No.
                                      :   2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,    :
HIGHLAND EMPLOYEE RETENTION ASSETS    :
LLC, HIGHLAND ERA MANAGEMENT LLC, and :
JAMES DONDERO,                        :
                                      :
                Defendants,           :
                                      :
         and                          :
                                      :
HIGHLAND EMPLOYEE RETENTION ASSETS    :
LLC,                                  :
                                      :
                Nominal Defendant.    :

                        - - -

                    Chancery Courtroom No. 12D
                    Leonard L. Williams Justice Center
                    500 North King Street
                    Wilmington, Delaware
                    Friday, May 17, 2019
                    1:30 p.m.

                        - - -

BEFORE:  HON. MORGAN T. ZURN, Vice Chancellor

                        - - -

RULINGS OF THE COURT ON PLAINTIFF'S MOTION TO COMPEL
         AND MOTIONS FOR COMMISSIONS
ORAL ARGUMENT AND RULINGS OF THE COURT ON PLAINTIFF'S
MOTION FOR STATUS QUO ORDER AND DEFENDANTS' MOTION TO
DISMISS COUNT IX OF SECOND AMENDED VERIFIED COMPLAINT
------------------------------------------------------
           CHANCERY COURT REPORTERS
        Leonard L. Williams Justice Center
        500 North King Street - Suite 11400
           Wilmington, Delaware 19801
               (302) 255-0533

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/20/23   Page 386 of 1392   PageID 15128
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 275 of 1803   PageID 11021

```
                                                          2


1    APPEARANCES:

2          THOMAS A. UEBLER, ESQ.
           JOSEPH L. CHRISTENSEN, ESQ.
3          McCollom D'Emilio Smith Uebler LLC
             for Plaintiff
4

5          JOHN L. REED, ESQ.
           DLA Piper LLP (US)
6                  -and-
           MARC D. KATZ, ESQ.
7          of the Texas Bar
           DLA Piper LLP (US)
8            for Defendants

9

10                           - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/29/23   Page 387 of 1392   PageID 15129
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 276 of 1803   PageID 11022

3

1              THE COURT:  Good afternoon.  Please be

2     seated.

3              First I wanted to acknowledge, we have

4     an honored guest with us today.  We have the Honorable

5     Essam Yahyaoui, who is a judge from Tunisia.  He

6     presides over the commercial chamber of Tunisia's

7     First Instance Court.  So he's here to observe with

8     his colleagues.

9              Welcome, sir.

10             All right.  I'm going to start with

11    the motion to compel, and then we'll move on to the

12    motion for commission.  And then there may be

13    questions, and maybe take a break and regroup and we

14    can move on with the other motions.

15             I'm going to grant Daugherty's motion

16    to compel in part.  For simplicity, I'm going to refer

17    to Abrams & Bayliss as A&B.  And I see four categories

18    of documents at issue here.  The first is regarding

19    the initiation, negotiation, and establishment of A&B

20    as Highland's escrow agent.  The second is regarding

21    A&B's legal work during the pendency of the Texas

22    action to determine whether and how Daugherty might

23    access the escrowed assets.  The third is A&B's work

24    responding to the Texas subpoena.  And the fourth is

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 7/29/2318 Page 388 of 1392    PageID 15130
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 277 of 1803    PageID 11023

4

```
 1   documents regarding A&B's resignation as Highland's
 2   escrow agent.
 3               I grant the motion to compel as to
 4   Categories 1, 2, and 4 for one of two reasons.
 5               The first reason is unfortunately my
 6   in camera review confirmed Daugherty's fear that
 7   Highland is improperly withholding documents in
 8   Categories 1 and 4 illustrating A&B's service and
 9   resignation as escrow agent, which are nonprivileged
10   materials.
11               In a hearing on September 18, 2018,
12   concerning an earlier subpoena, Vice Chancellor
13   Glasscock stated that "... information regarding the
14   actions of Abrams & Bayliss in connection with its
15   operation of the escrow as agents of Highland, HERA,
16   those documents, that information is relevant, and it
17   doesn't appear to me to be generally privileged."
18   That's a quote from the transcript.
19               Highland has been adamant that it was
20   only withholding documents that implicated its role as
21   legal counsel, and not in its role as escrow agent.
22   For example, on page 28 of the transcript from the
23   April 12th argument, Highland's counsel stated that,
24   "We do not assert any privilege based solely on Abrams
```

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 885    Filed 07/28/23    Page 389 of 1392    PageID 15131
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 278 of 1803    PageID 11024

5

1    & Bayliss's roles as escrow agents.  It's purely

2    because they have the dual roles both as escrow agents

3    and also legal counsel, that when they were in the

4    capacity of legal counsel, those communications were

5    privileged."

6                    At that argument, I requested the

7    documents and stated I would review them *in camera*.  I

8    expressed my frustration that I had already given

9    Highland multiple chances, and invited it to redo its

10   privilege log for a final time.

11                   In reviewing the documents, I

12   concluded that more than 70 documents that were

13   withheld based on claims of privilege or work product

14   protection were improperly withheld.  Those documents

15   were Privilege Log No. 1 through 25, 27 through 29,

16   35, 36, 41, 54, 56, 62, 85 through 87, and 336 through

17   372.

18                   This represents nearly 20 percent of

19   the 372 documents in the log.  But even that doesn't

20   tell the full story, because more than 200 of the

21   listed documents were simply attachments to e-mails

22   collecting documents in response to the Texas

23   subpoena.  Excluding those, more than 50 percent of

24   the documents listed were improperly withheld as

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-35    Filed 2/20/23 f 1304ge 390 of 1392    PageID 15132
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 279 of 1803    PageID 11025

6

1    privileged.

2                Documents regarding A&B's nonlegal

3    work and resignation as escrow agent are not

4    privileged or work product because when A&B agreed to

5    be an escrow agent, it stepped into a nonlegal role

6    despite its status as a law firm.

7                The cases are clear on that point.

8    *Northeast Credit Union v. CUMIS*: "It is well

9    understood ... that the services of an escrow agent,

10   even when that escrow agent is an attorney, are not

11   legal services."  *CCS Associates v. Altman*: "[C]ourts

12   have specifically held that an attorney in the role of

13   escrow agent does not transform communications

14   pertaining to the administration of the escrow account

15   into privileged documents."  The first case is from

16   the District of New Hampshire, and the second one is

17   from the Eastern District of Pennsylvania.

18                These non-Delaware decisions more

19   specifically enunciate a principle common in our own

20   law.  Including an attorney, or having an attorney

21   perform nonlegal work, does not attach the privilege

22   to the communications or the work.  That is because

23   "... the attorney-client privilege protects legal

24   advice only, [and] not business or personal advice."

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 13-8    Filed 12/29/23    Page 391 of 1392    PageID 15133
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 280 of 1803    PageID 11026

7

1   That's a quote from *MPEG v. Dell* from this court in

2   2013.

3                   And as Vice Chancellor Laster said in

4   the *Facebook Class C Reclassification* litigation,

5   "Making the lawyer the point person creates a pretext

6   for invoking the attorney-client privilege, but it is

7   only a pretext."  That's from his December 12th, 2016

8   order in Case No. 12286-VCL.

9                   Categories 1 and 4 reflect

10  communications between A&B and Highland concerning the

11  start of the escrow relationship, or A&B resigning as

12  escrow agent.  To be sure, there were legal

13  ramifications and issues regarding the work A&B was

14  doing in setting up and then ending the escrow

15  relationship.  But any legal component of A&B's

16  escrow-related work was secondary to the role as

17  escrow agent.  A&B was a contractual counterparty with

18  Highland under the escrow agreement, and each had

19  obligations under that agreement.

20                  A&B did perform legal work on the

21  escrow issue.  For example, A&B attorneys analyzed

22  what document 351 on the log calls the "HERA

23  Strategy."  But that legal advice was not for the

24  benefit of Highland, who was A&B's contractual

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6635   Filed 2/29/23 1804age 392 of 1392   PageID 15134
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 281 of 1803   PageID 11027

8

1    counterparty.  A&B could potentially claim that its

2    attorneys were providing legal services to A&B as

3    escrow agent.  But that is not what is before me; A&B

4    has claimed no privilege.  The only issue is whether

5    Highland can claim a privilege and withhold the

6    communications containing A&B's legal analysis

7    regarding its service as escrow agent.

8                    I think an example here might be

9    helpful.  If Highland had retained a bank or other

10   repository to act as escrow agent rather than a law

11   firm, the result would be more clear.  If the

12   employees of that non-law firm escrow agent

13   communicated internally about the relationship or the

14   contract, it would not be privileged.

15                   If those employees received legal

16   advice from attorneys about how to structure the

17   escrow, what the terms of the escrow agreement meant,

18   or how it could fulfill Highland's request to unwind

19   the escrow and transfer the assets back, Highland

20   could not claim that the in-house or outside counsel

21   retained by the escrow agent was providing legal

22   advice for Highland's benefit.  It would be much

23   clearer that the attorneys were providing legal advice

24   to, and for the benefit of, the escrow agent, not its

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 2/03/23   Page 393 of 1392   PageID 15135
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 282 of 1803   PageID 11028

9

1   contractual counterparty, Highland.

2                The facts here are more muddied

3   because there are only lawyers involved because

4   Highland selected a law firm, that otherwise

5   represented Highland, to act as escrow agent.  But the

6   result should be the same.  A&B's privilege over its

7   in-house advice regarding its conduct under the escrow

8   agreement does not belong to Highland just because A&B

9   is itself Highland's attorney.

10               The next question is one of remedy for

11  improperly withholding so many of the documents as

12  privileged.  Waiver "... has been characterized as a

13  'harsh result' typically only justified 'in cases of

14  the most egregious conduct by the party claiming the

15  privilege.'"  That's from *TCV v. TradingScreen*.

16               "If a party falls substantially short

17  of the well-established requirements, then waiver is

18  an appropriate consequence that helps dissuade parties

19  from engaging in dilatory tactics."  That's from

20  *Mechel Bluestone v. James C. Justice Companies*.

21               Daugherty has been dogged in his

22  pursuit of these documents, and Highland was just as

23  resolute in refusing to produce them.  Vice Chancellor

24  Glasscock said last September these types of documents

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 2/24/23 1804 age 394 of 1392   PageID 15136
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 283 of 1803   PageID 11029

10

1    are not privileged.  I gave Highland multiple

2    opportunities to address this.  Because Highland stuck

3    by its position and continued to assert such a large

4    percentage of improper privilege assertions while

5    claiming it was producing documents concerning A&B's

6    role as escrow agent, any privilege related to that

7    topic is waived, and a full waiver of Highland's

8    privilege could be an appropriate consequence.

9                   But I am reluctant to go that far

10   because Categories 2 and 3 were properly withheld and

11   logged adequately.  Category 2 relates to a memorandum

12   A&B prepared analyzing avenues available for Daugherty

13   to pursue the escrowed assets.  This work started in

14   February 2014.  Category 3 relates to efforts to

15   collect documents in response to the subpoena for the

16   Texas case.  I conclude Highland's unjustified

17   withholding of other documents related to the escrow

18   was not so egregious as to waive any privilege over

19   these two sets of documents.

20                   This brings me to the crime-fraud

21   exception.  If Categories 1 and 4 were privileged, I

22   would conclude that the crime-fraud exception applies

23   and so A&B should produce those documents regardless.

24   I reach the same conclusion for Category 2, the subset

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 2/25/23   Page 395 of 1392   PageID 15137
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 284 of 1803   PageID 11030

11

1   of documents related to A&B's 2014 memorandum that

2   were privileged and properly logged.

3                    Rule of Evidence 502(d)(1) says that

4   "There is no privilege ... If the services of the

5   lawyer were sought or obtained to enable or aid anyone

6   to commit or plan to commit what the client knew or

7   reasonably should have known to be a crime or fraud."

8                    To fall within this exception, "... a

9   mere allegation of fraud is not sufficient; there must

10   be a prima facie showing that a reasonable basis

11   exists to believe a fraud has been perpetrated or

12   attempted."  That's from *Princeton Insurance Company*

13   *v. Vergano.*  That case also explains that "... when a

14   client seeks out an attorney for the purpose of

15   obtaining advice that will aid the client in carrying

16   out a crime or a fraudulent scheme, the client has

17   abused the attorney-client relationship and stripped

18   that relationship of its confidential status."

19                    The client must intend the

20   communications to be used as a bases for the fraud.

21   "The advice must advance, or the client must intend

22   the advice to advance the client's ... fraudulent

23   purpose."  That's from *Buttonwood Tree Partners v.*

24   *R.L. Polk.*

Appellee Appx. 00278
Appx. 00529

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 2/20/23 1804 age 396 of 1392   PageID 15138
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 285 of 1803   PageID 11031

12

1            As Chief Justice Strine wrote while

2    Vice Chancellor in *Princeton Insurance v. Vergano*,

3    "The quintessential circumstance [when this exception

4    applies] is when the client obtains the advice of the

5    lawyer in order to help shape a future course of

6    criminal or fraudulent activity.  This is the classic

7    situation when the privilege gives way, as the

8    societal purpose of the confidential relationship has

9    been entirely subverted, with the client seeking the

10   expertise of someone learned in the law not so as to

11   comply with the law or mitigate legitimately the

12   consequences of his prior behavior, but to craft a

13   course of future unlawful behavior in the most

14   insidiously effective manner."

15           Here, there is a reasonable basis to

16   believe a fraud has been perpetrated.  Daugherty's

17   claim for fraudulent conveyance survived a motion to

18   dismiss, and I will refer the parties to Vice

19   Chancellor Glasscock's January 16, 2018 opinion on

20   that point.

21           The question is whether Highland

22   sought the services of attorneys to enable or aid it

23   in furtherance of that fraud.  I believe there is a

24   reasonable basis to believe that as well.  Highland's

Appellee Appx. 00279
APPX. 10530

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-5    Filed 12/29/23    Page 397 of 1392    PageID 15139
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 286 of 1803    PageID 11032

13

1    attorney at Andrews Kurth contacted A&B almost

2    immediately after the Texas judgment became final and

3    nonappealable.  That's at Exhibit K.

4                    Highland claims A&B then provided it

5    legal advice interpreting the escrow agreement, and

6    A&B resigned as escrow agent intending to cause, and

7    in fact causing, the assets to return to

8    Highland/HERA.  That is the transfer that Daugherty

9    claims was fraudulent.

10                    This was not the first legal work A&B

11   performed in pursuit of keeping the escrowed assets

12   from Daugherty.  Starting in February 2014, it

13   analyzed Daugherty's ability to get at the assets

14   while the appeal was pending.  Because that appears to

15   be the beginning of the efforts that culminated in the

16   allegedly fraudulent acts, the crime-fraud exception

17   strips the privilege from these documents.

18                    Daugherty has made a *prima facie*

19   showing that a reasonable basis exists to believe that

20   a fraud has been perpetrated, and that Highland sought

21   A&B to serve as escrow agent and to provide legal

22   analysis in furtherance of that fraud; specifically,

23   to protect the escrowed assets from Daugherty while

24   the Texas case was pending, and then to transfer them

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 09/25/23    Page 398 of 1392    PageID 15140
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 287 of 1803    PageID 11033

14

1   back to Highland after the Texas verdict was

2   finalized.  I conclude any privilege Highland claims

3   over A&B's legal advice regarding the escrow

4   arrangement and A&B's resignation has been stripped

5   under the crime-fraud exception.

6               I want to be clear on what I am not

7   saying.  I am not saying that a fraud claim merely

8   surviving a motion to dismiss permits the supposed

9   victim to invade the defendant's privilege for any

10  legal advice the defendant received in regards to the

11  underlying transaction or act.  This is a unique case

12  in which it presently appears that the law firm that

13  provided the legal advice, one, was a contractual

14  counterparty to the defendant in the very contract

15  under which the fraudulent transfer was allegedly

16  made; two, provided legal advice interpreting that

17  agreement and charting the course for the transfer;

18  and, three, implemented its own advice to effectuate

19  the transfer.

20              On these allegations, which are

21  supported by the documents I have reviewed, it appears

22  the defendant sought the firm's legal advice to

23  further the alleged fraud based on the terms of the

24  contract to which the defendant and the firm were

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23   Page 399 of 1392   PageID 15141
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 288 of 1803   PageID 11034

15

1   parties.  Based on these uncommon facts, the
2   crime-fraud exception applies here.
3             Accordingly, the privilege is either
4   nonexistent or waived as I just described for
5   Categories 1, 2, 4; in other words, all documents
6   regarding A&B's service as escrow agent.  The
7   crime-fraud exception also applies to documents in
8   these categories designated as work product, under
9   *Playtex v. Columbia* out of the Superior Court.
10            I find that Category 3, regarding the
11  Texas subpoena, was properly logged as privileged, and
12  that the crime-fraud exception does not reach those
13  documents.  Daugherty has not alleged that the
14  subpoena response was in furtherance of the fraud.
15  Category 3 comprises the families associated with
16  lines 91 through 327, which are the parent e-mails
17  attaching documents collected in response to a
18  subpoena.
19            Mr. Katz, is any of that unclear?
20            MR. KATZ:  No, Your Honor.  It's
21  clear.
22            THE COURT:  Mr. Uebler, any questions?
23            MR. UEBLER:  No questions, Your Honor.
24  Thank you.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8335   Filed 09/23/18   Page 400 of 1392   PageID 15142
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 289 of 1803   PageID 11035

16

1                    THE COURT:   Thank you.

2                    We'll turn to the motion for

3    commissions.

4                    Daugherty seeks commissions to take

5    the depositions of James C. Bookhout and Marc D. Katz,

6    both of DLA Piper.  I will refer to Mr. Bookhout and

7    Mr. Katz collectively as "the requested deponents."

8    Both requested deponents represented Highland in its

9    dispute with Daugherty in Texas, beginning in 2012,

10   and Mr. Katz and his colleagues at DLA represent

11   Highland in this action as well.  Daugherty seeks fact

12   testimony from the requested deponents on five topics,

13   all pertaining to the events surrounding the escrow as

14   alleged in Daugherty's operative complaint.

15                   The discovery Daugherty seeks is

16   clearly within the bounds of Court of Chancery

17   Rule 26.  And, based on the privilege log Highland

18   produced for the escrow-related documents, the

19   requested deponents have personal knowledge of at

20   least some of the escrow events.

21                   The parties disagree on the threshold

22   standard for evaluating whether counsel can be

23   deposed.  Highland contends this court has adopted the

24   *Shelton* test, while Daugherty points to a series of

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23180 Page 401 of 1392   PageID 15143
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 290 of 1803   PageID 11036

17

```
 1   standards from Rainbow Navigation, Sealy Mattress,

 2   Kaplan & Wyatt, and Dart.

 3              I note that in a transcript ruling

 4   from 2018 in LendUS, LLC v. Goede, Vice Chancellor

 5   Glasscock considered in the first instance whether it

 6   was necessary to gather the evidence sought from

 7   counsel, given the risk of disqualification.  I agree

 8   this is a threshold consideration present in all the

 9   cases the parties have cited.  And I conclude, like

10   Vice Chancellor Glasscock did in LendUS, that

11   Daugherty has not made a sufficient showing that he

12   needs to depose Mr. Bookhout and Mr. Katz at this

13   juncture.

14              As I just explained in my ruling on

15   Daugherty's motion to compel, Daugherty will receive

16   A&B's documents regarding the escrow.  Daugherty can

17   also depose the escrow agents.  He can depose the

18   Highland principals who were involved.  And I do not

19   see that any of this has happened yet.  He should

20   pursue those avenues before pursuing one that

21   jeopardizes Highland's choice of counsel.  His motions

22   for commission for the proposed deponents are denied

23   without prejudice.

24              I am mindful that trial is scheduled
```

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 02/22/03 1804   Page 402 of 1392   PageID 15144
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 291 of 1803   PageID 11037

18

1    for September, and that -- if Daugherty renews his

2    motions after taking the rest of the fact discovery --

3    the risk of disqualification carries more prejudice to

4    Highland the closer we get to trial.  I also note that

5    the discovery cutoff in this case is June 28, 2019.  I

6    am, therefore, interspersing an intermediate discovery

7    cutoff.

8              Escrow discovery, including

9    depositions of fact witnesses other than the requested

10   deponents, must be complete by June 14th, 2019, and

11   Daugherty must make any renewed motion for commission

12   by June 17, 2019, with briefing on that motion to be

13   expedited.

14             The burden this timeframe places on

15   both parties I think is appropriate in light of the

16   requested deponents' apparent knowledge of significant

17   aspects of Daugherty's allegations, and in light of

18   the desire to protect Highland's choice of counsel.

19   Any renewed motion by Daugherty must demonstrate what

20   gaps in the record he needs to fill, and why he

21   believes the requested deponents can fill those gaps.

22             Mr. Uebler, is any of that unclear?

23             MR. UEBLER:  Your Honor, nothing is

24   unclear about that ruling, but I do have a question

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/29/23   Page 403 of 1392   PageID 15145
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 292 of 1803   PageID 11038

19

```
 1   about the escrow agent depositions.  Can the parties

 2   assume that the ruling that the Court has made with

 3   respect to the documents will also apply to deposition

 4   testimony? in other words, categories that may be

 5   subject to privilege such as the subpoena response,

 6   but all other escrow-related categories would

 7   presumably be fair game and not subject to privilege

 8   in a deposition?

 9                    THE COURT:  That's correct, at least

10   as to A&B.  I note that we haven't really tested the

11   boundaries of where my ruling might go with regard to

12   DLA.  And I think that's probably another conversation

13   we would need to have.

14                    MR. UEBLER:  Understood.  Thank you.

15                    THE COURT:  Thank you.

16                    Mr. Katz, is any of that unclear?

17                    MR. KATZ:  No, Your Honor.  That's

18   clear.

19                    THE COURT:  I'll give you-all maybe

20   ten minutes to kind of regroup a little bit, and then

21   I'll hear the motion for status quo order first.

22                    We're in recess.

23          (Recess taken from 1:53 p.m. until 2:00 p.m.)

24                    THE COURT:  Mr. Uebler?
```

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-35    Filed 12/04/23    Page 404 of 1392    PageID 15146
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 293 of 1803    PageID 11039

20

1              MR. UEBLER:  Your Honor, my colleague,

2    Mr. Christensen, is going to argue the status quo

3    motion.  But I'd just like to point out, we had an

4    issue with our File & Serve converting Word documents

5    to pdf, and it would drop the occasional citation in

6    footnotes.  I don't know if it's our system or theirs.

7    But, in any event, we've brought revised copies of our

8    papers with all the citations for the Court.

9              THE COURT:  Thank you.

10             MR. UEBLER:  You're welcome.

11             MR. CHRISTENSEN:  Good afternoon, Your

12   Honor.  Joseph Christensen from McCollom D'Emilio for

13   the plaintiff, Pat Daugherty.

14             I just want to start very briefly with

15   how we got here.  Your Honor is familiar with the

16   facts, so I won't go over that in too much detail.

17   But I do want to highlight some of the additional

18   points that we included in our briefing related to

19   what Highland was saying about these assets during the

20   Texas action.

21             So Thomas Surgent, during the Texas

22   action, he was the chief compliance officer of

23   Highland.  During the Texas action, he testified that

24   the assets listed in the escrow agreement were being

Appellee Appx. 00287
APPX. 10539

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 2/25/23 Page 405 of 1392    PageID 15147
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 294 of 1803    PageID 11040

21

1    held for Pat's benefit for his interest in HERA.

2    These are all from Exhibit V.  That one is at page 15

3    of 53.

4                Jim Dondero, the head of Highland,

5    testified that Pat's share of all the assets,

6    including the cash, is in escrow.  He also testified

7    that Pat's *pro rata* share of all the assets, including

8    the cash, are all sitting in escrow.  There's been

9    nothing deducted or removed from Pat's account.  And

10   he also said that the escrow agreement was to protect

11   Pat Daugherty.

12               The point of all these statements was

13   to convince everybody who would listen that these

14   assets were being held for Pat Daugherty, and that if

15   he prevailed in the Texas action, he would obtain

16   those assets.  And we haven't done anything with them.

17   We haven't offset any legal expenses, which is also

18   noted in our reply brief.

19               Coupled with the statements that Pat

20   continued to hold the HERA units, this was a clear

21   expression that Highland was trying to convince people

22   that they intended to hold onto these assets but give

23   them to Pat if he prevailed in the Texas action.

24               In HERA's closing argument its counsel

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 06/23/204ge 406 of 1392   PageID 15148
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 295 of 1803   PageID 11041

22

```
1    said, "If Pat Daugherty happens to prevail in his
2    lawsuit against Lane, Patrick and HERA you heard Jim
3    Dondero testify he gets his interest, which is
4    currently escrowed in the third-party escrow account,
5    all of it."
6                    And the jury clearly believed that the
7    escrow meant to preserve Daugherty's interest.  One of
8    the questions the jury sent back to the judge in the
9    Texas action referred to his -- that is Pat's -- HERA
10   units currently in escrow.  That's the third to the
11   last page in Exhibit U.
12                   The defendants now say, "Well, sure,
13   Pat continued to be an owner of HERA, but there was
14   never anything in HERA, at least during the Texas
15   action and before the Texas action."  Which reminds me
16   of a scene from my life at a movie theater with my two
17   sons, where the younger one was complaining that his
18   brother wouldn't give him the box of candy.  He asked
19   me to intervene, and I told him to give him the box of
20   candy, at which point the older brother emptied the
21   candy into his popcorn and gave him the empty box.
22                   That's exactly what happened here.
23   When they told everyone they were holding assets for
24   Pat's benefit, they would now have you believe that
```

Appellee Appx. 00289
APPX. 10540

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 407 of 1392   PageID 15149
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 296 of 1803   PageID 11042

23

1   what they really meant was that he was just entitled

2   to an empty box, and they had no intention -- and Pat

3   should have known that they never had any intention of

4   ever letting him have them.

5                  There are two possibilities to explain

6   the contrast between what they said during the Texas

7   action and what they're saying now.  One is that they

8   knew at the time that they were never going to give

9   them back.  The other is that they believed at the

10  time and were sincere in saying that they would give

11  them back, but they later changed their mind.

12                 Under either of those circumstances,

13  Daugherty prevails on at least one of his claims.  If

14  they changed their mind but initially intended it, his

15  promissory estoppel claim is very strong.  If they

16  never intended from the beginning to give them to him,

17  then his fraud and unjust enrichment claims are

18  equally strong.  The status quo order should be

19  entered to make sure that they can't do either of

20  those things this time.

21                 I think that's all the background we

22  need, except for a clarification on what Daugherty is

23  seeking.  He is seeking those assets.  His relief --

24  Your Honor will note that we did not include in our

Appellee Appx. 00290
APPX. 10542

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 2/28/23 Page 408 of 1392   PageID 15150
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 297 of 1803   PageID 11043

24

1   briefing any discussion of our claims for

2   indemnification.  Our indemnification claim is

3   effectively a monetary relief sort of claim.  But we

4   did discuss promissory estoppel, unjust enrichment,

5   and fraudulent transfer.  Each one of those theories

6   includes potential relief divesting those assets from

7   whoever holds them, which brings me to the next point,

8   which is that we do not know where these assets are.

9              We have asked the defendants where

10  these assets are; were they ever transferred after

11  December 2016.  They told us they would not provide

12  any information on those requests.  And that's at our

13  Exhibit L, Request No. 8 and 11, and Exhibit W, our

14  Request No. 34 and 37.

15             THE COURT:  I'm certainly not inviting

16  more or different motions.  But isn't the remedy for

17  that a motion to compel instead of a motion for a

18  status quo order?

19             MR. CHRISTENSEN:  It would be.  And we

20  are not seeking through this status quo order

21  effectively a back door to answering these requests

22  for documents and interrogatories.  But the fact that

23  they will not tell us where these assets are is

24  consistent with the prior behavior in the Texas action

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 2/29/2 3180 Page 409 of 1392   PageID 15151
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 298 of 1803   PageID 11044

25

1   and gives us a lot of pause about waiting until the

2   end of this trial.

3                    So we started out this case with -- I

4   guess I should first turn to the defendants' argument

5   that the Court doesn't have power to enter this status

6   quo order.  Clearly it does.  The kind of relief that

7   we're seeking is in aid of the ultimate relief that we

8   are seeking.  Because we are trying to obtain or move

9   particular assets, we are seeking the status quo order

10  to make sure those assets are still available for the

11  court to issue an effective ruling at the end of this

12  case.

13                   THE COURT:  And how do you get around

14  the *Hillsboro* and *HEM* cases that discourage

15  intermediate injunctive relief for the purpose of

16  preserving assets?

17                   MR. CHRISTENSEN:  Well, I think

18  generally the cases are referring to when you're

19  seeking monetary relief.  And that's not what we're

20  doing in this case.  And I think the history is

21  probably the most important point in this situation.

22                   One simply cannot ignore that the very

23  assets and the very parties in this litigation -- the

24  reason we're here is because we were chasing after

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 03/03/04    Page 410 of 1392    PageID 15152
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 299 of 1803    PageID 11045

26

```
 1    these assets that we believe we obtained the right to
 2    in the previous action.  So it's a unique situation.
 3    None of the cases involve the same parties and the
 4    same assets.
 5              And the cases -- even the cases that
 6    have history as a basis for granting the status quo
 7    order, none of them have this kind of sort of clear
 8    evidence that there was a fraud and moving of assets
 9    to defeat a judgment in an earlier iteration of the
10    dispute between the parties.
11              THE COURT:  And how does that sort of
12    long history or long series of allegations of fraud
13    and hiding assets, how does that square up with the
14    requirement that the harm to be prevented by the
15    status quo order be imminent?
16              MR. CHRISTENSEN:  The imminence, Your
17    Honor, to be frank, is probably the most difficult
18    aspect of our situation to square with the law.
19    Because -- in part because they haven't told us
20    whether things have been transferred, where things
21    are, we cannot give Your Honor very many facts about
22    some imminent action that is going to take place.
23              But at the same time, we -- again, we
24    started as a frog in a pot at a very high temperature
```

Appellee Appx. 00293
Appx. 10544

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/09/23180 Page 411 of 1392    PageID 15153
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 300 of 1803    PageID 11046

27

1  having come out of the experience in Texas.  Then

2  adding to that was the fact that they will not tell us

3  where these assets are.  They will not tell us whether

4  they are currently in a solvent entity or not.  They

5  will not really just come out and say whether those

6  assets are still in Highland or not.  There's a

7  suggestion in their brief that can be read as a

8  representation that they are in the Highland and never

9  have left, but they also make the argument in their

10  brief that the assets never went over to Abrams &

11  Bayliss; that during the whole time that Abrams &

12  Bayliss was holding the assets, that really Highland

13  held the assets, retained legal title, and Abrams &

14  Bayliss was simply holding onto them in trust.  We

15  don't know if something like that is happening in this

16  case either.

17            On top of that, we had -- and what

18  spurred us to action was the affidavit of Highland

19  saying that they did not have current assets to

20  satisfy the judgment in the *Crusader Redeemer* action.

21  So that's on the front end of that judgment.  We, at

22  this point, don't know what Highland is going to look

23  like from a solvency standpoint on the back end of

24  that after those assets have gone out the door, and so

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 09/08/23   Page 412 of 1392   PageID 15154
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 301 of 1803   PageID 11047

28

1    at some point we have to act.  We need to act before

2    the end of this case.

3                    We didn't believe that we had enough

4    imminence at the beginning of this case that we would

5    get a status quo order or a preliminary injunction.

6    But when they filed that affidavit saying that in a

7    cash flow basis they were insolvent for purposes of

8    satisfying a judgment, against the backdrop of all the

9    history, it starts to look like we're doing a replay

10   of what happened in Texas.

11                   Your Honor referred to, I think, a

12   memo from Abrams & Bayliss talking about the HERA

13   strategy.  And what we're afraid of is that there is a

14   HERA Strategy Version 2 that we do not know about

15   right now and they just won't tell us.  So at some

16   point, in order to avoid them doing the same thing

17   again, we have to act.  We can't, unfortunately,

18   identify when they're going to do that in the same

19   clean kind of way that one often can in a status quo

20   or preliminary injunction case.  But the danger, I

21   would submit, is just as high as in those cases.

22                   I've talked some about the history.

23   And the defendants do talk about three of the cases

24   that we talked about regarding the history.  They

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/29/23    Page 413 of 1392    PageID 15155
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 302 of 1803    PageID 11048

29

1    address the *Crusader Redeemer* action that Your Honor

2    is familiar with, the *UBS* litigation, and the *Acis*.

3    The ones that they don't mention are *Trussway*, for

4    example.

5                    *Trussway*, in this court under Vice

6    Chancellor Glasscock, he actually already found that

7    the kind of history that one would have to establish

8    to obtain a status quo order was found with respect to

9    these principals.  He said he took into account the

10    "... prior history of the controllers of the entities

11    in examining equitable matters that come before us."

12    And true to the way he is, he said, "... I would just

13    as soon not list all the reasons I have that make me

14    suspicious that a remedy will not be available here

15    ...."  "But I think it suffices to say that I have

16    experience with other cases involving the principals

17    here."  And he went on.  That's from page 40 of

18    Exhibit S, which is the transcript in the *Trussway*

19    action.

20                    On the next page he said that, "...

21    given ... some of the factors that I've mentioned,

22    including the Acis bankruptcy and my other experiences

23    with the principals here ... there is a reasonable

24    probability that without some action, any victory will

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 3 Filed 02/08/23  Page 414 of 1392   PageID 15156
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 303 of 1803   PageID 11049

30

1    be a Pyrrhic victory."

2              THE COURT:  It sounds like what you're

3    suggesting is that given the track record of Highland

4    in this action and in other actions, that you're

5    suggesting that the imminence requirements be

6    dispensed with because of what's going on here.

7              MR. CHRISTENSEN:  I don't think I

8    would say that, Your Honor.  I would say that given

9    the caginess on discovery, we are not able to identify

10   the moment of imminence.  But we are, through the

11   history, able to establish the same point as

12   imminence.

13             Imminence is this -- the point of

14   addressing imminence is that if you don't address

15   this, it is going to happen, and it's going to happen

16   very soon.  We can't tell you that it's going to

17   happen very soon, but we can tell you that there's

18   every reason to believe that it will happen before the

19   end of this trial.

20             THE COURT:  But what about the -- I

21   think many times when one is considering imminence,

22   there's sort of a *laches*-esque element that comes into

23   it.  And this case was filed in 2017.  So this "it"

24   that we're discussing very well may have already

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 13   Filed 03/03/23   Page 415 of 1392   PageID 15157
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 304 of 1803   PageID 11050

31

1    happened.

2                     And so I wonder what the justification

3    is for sort of after the fact -- maybe, I don't

4    know -- after the fact then seizing up Highland simply

5    based on the way that things have played out in other

6    cases.

7                     MR. CHRISTENSEN:  So I think I can

8    explain why we didn't act earlier, and why it wouldn't

9    have been justified to act earlier, and so why we

10   shouldn't be subject to *laches* on this argument.

11                    When we started, we had no reason to

12   believe that those assets had gone anywhere other than

13   Highland.  Then the Acis bankruptcy discussed that

14   Dondero was moving out tens of millions of dollars to

15   his charitable foundation.  That was another brick in

16   the wall.  Then we got the discovery responses that

17   were not responsive.

18                    And to be clear, we have not given up

19   on that.  We had a meet-and-confer as recently as this

20   morning, and one on Friday of last week, in which we

21   are trying to get these documents.  It doesn't appear

22   that we're going to have much success on our own.  But

23   we are absolutely pursuing that and have pursued those

24   documents as vigorously as we pursued the Abrams &

Appellee Appx. 00298
Appx. 10759

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 03/03/23   Page 416 of 1392   PageID 15158
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 305 of 1803   PageID 11051

32

 1   Bayliss documents.

 2                    To mix the metaphors, the straw that

 3   broke the camel's back was the *Crusader Redeemer*

 4   action where Highland said:  We cannot pay this

 5   judgment right now.  We have more assets than

 6   liabilities, but we cannot pay this right now.

 7                    And it's also important to remember

 8   that it's not just large judgments that Highland has a

 9   history of not paying, and it's not only Daugherty's

10   relatively small judgment that they refused to pay.

11   But in the Acis bankruptcy, it was an $8 million claim

12   at issue, and they made him go through -- or are still

13   going through involuntary bankruptcy.

14                    So I think we acted when it was

15   prudent to act.  And before that occurred, I don't

16   think any member of this court would have been likely

17   to give us relief without something to point to, a

18   reason to believe that Highland wouldn't pay apart

19   from the history.

20                    THE COURT:  And the reason is that

21   affidavit in the *Redeemer* case stating that Highland

22   doesn't have the liquid assets to pay the $175 million

23   judgment?  That's what you're interpreting to say that

24   they will not pay or will somehow manage to avoid

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 63 Filed 12/09/23 Page 417 of 1392 PageID 15159
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 306 of 1803 PageID 11052

33

1   paying Mr. Daugherty's -- what is allegedly owed to

2   him?

3               MR. CHRISTENSEN:  We aren't sure about

4   the damages, but effectively, yes.  That Highland --

5   which is, we assume, the most solvent of any of the

6   entities -- now has a cash flow solvency issue.  And

7   so at that point we felt we needed to act.

8               THE COURT:  Understand.

9               MR. CHRISTENSEN:  The other thing that

10  I think Your Honor should consider, it doesn't fit

11  exactly within the three factors of a status quo or a

12  preliminary injunction standard; but I think Your

13  Honor should also take into account that it may not be

14  a question of whether or not Highland is able to

15  satisfy the judgment, but whether it will, even if it

16  is able.

17              THE COURT:  That's what I'm wondering.

18  That's the part that I'm wondering how that's being

19  derived from the affidavit in the *Redeemer* case, if

20  that's the precipitating factor.  Am I understanding

21  you to read that affidavit only to inform solvency and

22  not intent?

23              MR. CHRISTENSEN:  It is consistent

24  with an intent to make people work for their

Appellee Appx. 00300
APPX. 00552

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6865    Filed 4.309/03/18 Page 418 of 1392    PageID 15160
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 307 of 1803    PageID 11053

34

1   judgments, but I mostly consider it separately.  And

2   what I'm really referring to, the short name for it is

3   spite.  It appears, if you look, not only at the

4   previous action in Texas, but also the Josh Terry

5   situation, that a major factor motivating whether or

6   not Highland pays judgments is how Highland feels or

7   how Jim Dondero feels about the people who are trying

8   to collect that judgment.

9                   And so you have the court in the

10   bankruptcy case in *Acis* said that the expenditures

11   were out of whack versus what's at stake.  Or in the

12   *Credit Strategies Fund* case -- which the defendants

13   did not address -- the factual findings there refer to

14   some notes from a call between those parties and

15   Dondero.  Those notes read, "Dondero directly

16   threatens Concord and Brant personally.  We are very

17   good at being spiteful."

18                   And so that spite doesn't -- it's not

19   one of the factors normally considered on a status quo

20   motion or a preliminary injunction.  I do think, as a

21   matter of equity, Your Honor ought to consider that.

22   And I think it's consistent with, and maybe grows out

23   of the kind of considerations that Vice Chancellor

24   Glasscock was taking into account in the *Trussway*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 03/09/23 3180 Page 419 of 1392   PageID 15161
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 308 of 1803   PageID 11054

35

```
 1   action.

 2               I think I'll skip to likelihood of

 3   success on the merits.  We do think the likelihood of

 4   success on the merits prong of this analysis is fairly

 5   straightforward.  At a big-picture level, Daugherty

 6   had a claim on these assets, either directly or

 7   through HERA.  He was entitled to that compensation,

 8   he earned it, and it was taken from him after he

 9   proved his entitlement not only to damages -- which he

10   received in the amount of 2.6 million and has never

11   seen, but also the underlying assets.

12               So for fraudulent transfer purposes,

13   we think actual intent to hinder, delay, or defraud

14   based on the documents that we have seen so far is

15   compelling evidence that there was actual intent to

16   hinder, delay, or defraud.

17               Your Honor only has to find that we

18   have a reasonable probability of success on one of our

19   claims.  You do not have to decide that we have a

20   reasonable probability of success on all of them.  And

21   that comes out of the *Destra Targeted Income* case.

22               But we also think our other claims are

23   quite strong, the alternative bases under fraudulent

24   transfer law.  We do not believe that HERA got
```

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-6    Filed 12/20/23    Page 420 of 1392    PageID 15162
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 309 of 1803    PageID 11055

36

 1  equivalent value, for example, in the transfer.

 2  Unjust enrichment, it's an equitable doctrine, so in

 3  some sense you back away and look at what really

 4  happened, what's the substance.

 5              And again, what happened was Daugherty

 6  earned compensation, he proved his entitlement to it,

 7  and then it was taken from him.  That enriched

 8  Highland; it impoverished Daugherty to the extent that

 9  he was entitled to it.  There was obviously a

10  connection between those two results.

11              And as far as their defense of

12  justification, the evidence doesn't seem to show that.

13  I take their justification argument to mean that they

14  were justified in taking the money because of the

15  legal expenses.  But the bills that we have seen so

16  far do not support that HERA was receiving the benefit

17  of those legal expenses.

18              And just briefly on the promissory

19  estoppel claim -- I'm not going to spend much time on

20  that; you'll hear a lot about that in a minute.  But I

21  do want to refer to those quotations from the Texas

22  trial as additional reasons that support our

23  probability of success on the merits of that claim.

24  They demonstrate that throughout the trial, the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/29/23    Page 421 of 1392    PageID 15163
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 310 of 1803    PageID 11056

37

```
1    strategy appears to have been to convince the jury
2    that Highland was the good guy because they were --
3    don't worry, they're going to hold on to the assets
4    for Pat.  Pat is going to get those assets if he
5    proves his entitlement to them.  But -- you know, so
6    don't think we're bad for taking them.  Tell us that
7    we win now and we don't have to give them to him.
8              The narrowest way to grant the motion,
9    I think, is based on probability of success of the
10   fraudulent transfer claim for actual intent to hinder,
11   delay, or defraud.  And Your Honor only needs to find
12   that to issue the status quo order.
13             On the balance of equities, also seems
14   very clear to us.  On the one hand, our client would
15   go through potentially another half a decade or decade
16   of litigation if he has to chase these assets again.
17   And it would be a real shame to have to do that twice.
18   On the other hand, the defendants, the harm that they
19   identify on their side is that it would lower the bar
20   for future plaintiffs against Highland that are
21   seeking monetary damages to obtain a status quo order.
22   And on that point, I just have to point out, again,
23   that it is not only monetary damages that we are
24   seeking, but seeking to move the escrow assets.
```

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 422 of 1392   PageID 15164
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 311 of 1803   PageID 11057

38

1                The other harm that they identify is

2    the harm to their reputation if they're required to

3    freeze these assets for what I take them to perceive

4    as a very small claim.  But again, we're not only

5    seeking monetary assets, so this is not just, as they

6    characterize it, a $3 million claim but a claim on

7    specific assets.  And their history of paying small

8    claims is not great.  So we think the balance of

9    equity also favors Daugherty.

10                Unless Your Honor has any other

11   questions, that's all I have.

12                THE COURT:  I don't.  Not at this

13   time.  Thank you.

14                MR. REED:  Good afternoon, Your Honor.

15   John Reed from DLA Piper for the defendants.

16                First of all, I want to apologize for

17   what happened at the last hearing.  We were only into

18   the case for like two days.  I had no idea that the

19   lawyer that was going to present was not going to be

20   able to answer Your Honor's questions.  I was not

21   happy about that, probably much more unhappy than the

22   Court was and the Court was very unhappy.

23                Mr. Katz is the lawyer most familiar

24   with everything in this case.  And he's here today to

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 23/29/23 1804 Page 423 of 1392   PageID 15165
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 312 of 1803   PageID 11058

39

1    present the arguments and should be able to answer all

2    of Your Honor's questions.

3                    THE COURT:  I appreciate your comment.

4    Thank you.

5                    MR. KATZ:  Your Honor, may I approach?

6                    THE COURT:  Yes.

7                    MR. KATZ:  Thank you for letting me be

8    heard today.

9                    And as Mr. Reed said, I echo his

10   apologies for the last hearing.  I apologize that I

11   was not able to be here at that last hearing.  But if

12   Your Honor does have questions about -- I understand

13   Your Honor's ruling, but if Your Honor does have

14   questions about any of those matters, I'm happy to

15   address those as well.

16                   THE COURT:  Thank you.

17                   MR. KATZ:  With respect to the status

18   quo motion.  Obviously, the Court is aware of the

19   legal standard.  I'm not going to go into that.  I

20   just want to address a few of the points that counsel

21   addressed.

22                   And I'd like to start with the

23   irreparable harm element, which is one of the required

24   elements.  And counsel said a number of times that

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/24/23180 Page 424 of 1392    PageID 15166
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 313 of 1803    PageID 11059

40

1    they're seeking the assets, not just monetary relief.

2    And I presume that that argument is being proffered

3    because they recognize, otherwise, the issue with

4    irreparable harm component that they have to show.

5                    And I note, just by way of background,

6    is that the Texas award was not in favor of

7    Mr. Daugherty vis-a-vis HERA.  It was not for specific

8    assets; it was a monetary award.  And, moreover,

9    Mr. Daugherty never had ownership of -- direct

10   ownership of any assets in HERA.  Mr. Daugherty was a

11   shareholder in an LLC and the LLC owned some assets.

12                   So if their lawsuit is now seeking

13   recovery of specific assets as opposed to monetary

14   relief, I note that there's a host of procedural and

15   substantive issues with that which I think goes well

16   to the likelihood of success on the merits.

17                   But the point for us today, Your

18   Honor, is that a monetary award would certainly be

19   sufficient to recompense Mr. Daugherty if he were to

20   prevail on any of his claims in this case.  And

21   there's no evidence -- and maybe more importantly,

22   there's no evidence that's been offered to the Court

23   in support of the status quo motion that would

24   demonstrate otherwise.  And when I say "demonstrate

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/29/23   Page 425 of 1392   PageID 15167
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 314 of 1803   PageID 11060

41

1  otherwise," demonstrate that there are assets that
2  were in HERA that can't be valued, or some other basis
3  to show some sort of irreparable harm.  That issue is
4  not even addressed.
5            We're -- this is, I think, very
6  apparently a case that -- where there is no
7  irreparable harm.  And money can certainly compensate
8  for any harm that Mr. Daugherty may be able to prove
9  ultimately that he suffered.  The only evidence on
10 that issue, I think as Your Honor correctly pointed
11 out, was the affidavit of Scott Ellington.  And that
12 affidavit says to the contrary.  It says, "... the
13 value of Highland's assets exceed[s] the amount of the
14 ... Award."
15           There's absolutely no evidence in
16 connection with the status quo motion that would show
17 that there is irreparable harm or there is insolvency.
18 In fact, what a good counsel wants to do is make
19 allegations of what they believe is inappropriate
20 conduct some by Highland, some by Highland's
21 affiliates.  And I note that the conduct that they've
22 cited to in their motion are allegations taken from
23 pleadings in other cases, as opposed to direct
24 evidence of anything that has been done by Highland.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 2/20/23 180 Page 426 of 1392    PageID 15168
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 315 of 1803    PageID 11061

42

1    And most of it, again, is not directly Highland

2    allegations to any extent.

3                  There is -- and then also as Your

4    Honor appropriately, I believe, questioned counsel

5    about, there's no evidence of anything imminent on the

6    horizon that might give rise to any potential concern

7    that would support the status quo order.  And what

8    they're seeking is really, truly an extraordinary

9    remedy.  And I don't believe that they've pointed to

10   any concrete basis which they can meet the high

11   standard that they need to show to justify a status

12   quo order.

13                  THE COURT:  How do you justify the

14   situation here from the one in *Trussway*?

15                  MR. KATZ:  Well, I guess, Your Honor,

16   in two ways.  One, in *Trussway*, there's allegations of

17   specific conduct.  Where here, we've got -- there's no

18   allegations of any conduct that they believe is about

19   to occur or evidence to support that.

20                  THE COURT:  I suspect they would say

21   that's because you haven't answered their questions,

22   but I don't know.

23                  MR. KATZ:  Well, but, Your Honor, I

24   guess that it would also go back to the irreparable

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-5   Filed 2/27/23   Page 427 of 1392   PageID 15169
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 316 of 1803   PageID 11062

43

1   harm issue that, you know, there's nothing that --

2   even the allegations, that if they were able to

3   provide some supportive allegations in this case as

4   opposed to relying on allegations in other cases,

5   there would still be -- they still have not shown that

6   there's any risk of insolvency or potential

7   irreparable harm.

8            And the *Mitsubishi* case that they

9   cited in their brief I think is very on point.  And on

10  this issue where they had -- the Court noted that

11  there was an allegation -- actually more than an

12  allegation -- there actually was a prior incident that

13  the Court had very serious concerns about but that on

14  its own wasn't enough.  It was -- the Court

15  specifically found that the defendant in that case was

16  insolvent.  And they also found that there was a sale

17  being negotiated, actual evidence of a sale, where the

18  assets were going to be transferred.  But we don't

19  have that type of evidence with us in this case, Your

20  Honor.

21           On the likelihood of success on the

22  merits, Counsel spent a little bit of time on that

23  issue.  But I think it's important, Your Honor, again,

24  that this is an extraordinary remedy they're seeking

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 3/29/2301804ge 428 of 1392    PageID 15170
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 317 of 1803    PageID 11063

44

1   that has a heightened standard.  And their motion on

2   the likelihood of success on the merits simply has

3   conclusory allegations, that they believe they're

4   going to be able to prevail on the merits without

5   addressing the specific elements and what evidence

6   they've got to show the specific elements.

7                    I note, you know, Counsel, in a number

8   of pleadings has -- and I know Your Honor has noted

9   this as well -- that Judge Glasscock had expressed his

10  skepticism about when he was trying to determine what

11  the nature of the escrow agreement was.  And I note

12  that Judge Glasscock, when he was doing that, also

13  when he was talking about the formation of the escrow

14  agreement, he was not talking about the resignation of

15  Abrams & Bayliss or the -- what happened to the assets

16  that formerly were held by HERA.

17                   And, in fact, even Judge Glasscock

18  indicated at that time that it may be that this

19  fraudulent transfer claim was appropriate for summary

20  judgment.  I think his direct quote -- I know I wrote

21  it down.  His direct quote was that it wasn't

22  prepared -- on page 79 and 80 of the transcript, that,

23  "It may be ... perfectly fit ... for a motion for

24  summary judgment.  I'm just not convinced I can get

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-35   Filed 2/29/23 Page 429 of 1392   PageID 15171
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 318 of 1803   PageID 11064

45

```
 1   rid of it on a motion to dismiss ...."  That was his
 2   quote.
 3                But I think that has been turned on
 4   its head a little bit to say that because he didn't
 5   understand the purpose of the escrow agreement and why
 6   that was formed, that somehow that shows that the
 7   fraudulent transfer claim is a sure-fire winner.  In
 8   fact, I also note that Judge Glasscock dismissed the
 9   same fraudulent transfer claim against Mr. Dondero in
10   the motion to dismiss.
11                So we think there's a number of
12   problems with each of the claims.  And I know we're
13   going to get to the promissory estoppel claim.  But I
14   think a couple of issues with that is that we've
15   got -- that claim is predicated on two statements that
16   were by individuals that I don't believe were clear
17   and unequivocal type of statements that could support
18   a promissory estoppel claim.  But moreover, they went
19   to the representation of what was in the terms of the
20   escrow agreement.
21                And I believe the law is fairly clear
22   that if there is a contract provision that addresses
23   the issue at hand, then you cannot have a promissory
24   estoppel claim based on a representation about that
```

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 2/29/03 1804 Page 430 of 1392    PageID 15172
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 319 of 1803    PageID 11065

46

1    contract claim.  And Mr. Daugherty is absolutely

2    seeking relief pursuant to the provisions in the

3    escrow agreement.  And that, in and of itself, would

4    knock out his promissory estoppel claim.

5              And then -- and maybe the biggest

6    problem -- I think he's got a number of problems with

7    the promissory estoppel claim, but maybe the biggest

8    one is reasonable reliance.  Again, Mr. Daugherty

9    hasn't even alleged that any of the statements were

10    made for the purpose of causing Mr. Daugherty to

11    reasonably -- to rely, and that it would be reasonable

12    to expect him to do so.

13              But Mr. Daugherty's conduct -- he

14    alleges that he would not have paid the judgment and

15    that he would have sought to invalidate the escrow

16    agreement at trial.  And I think both of those are --

17    they're also, again, conclusory allegations that he's

18    made without sufficient -- he has not made allegations

19    in his complaint in this action sufficient to

20    withstand, I believe, a motion to dismiss, and

21    certainly not to show a likelihood of success on the

22    merits for the status quo motion.

23              But what he's really said and what he

24    explained in the briefing that he meant by that is

Appellee Appx. 00313
Appx. 00565

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 02/29/03 1804 Page 431 of 1392    PageID 15173
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 320 of 1803    PageID 11066

47

 1  that he would have sought offset.  The problem that

 2  Mr. Daugherty has there is he -- offset is an

 3  affirmative defense.

 4                 THE COURT:  I mean, we're all about to

 5  get into that very deeply, so ...

 6                 MR. KATZ:  Okay, Your Honor.  Thank

 7  you, I appreciate that.

 8                 But the likelihood of success on the

 9  merits on the promissory estoppel claim, I think, is

10  very low.  He's got similar issues on the unjust

11  enrichment claim because of the representations and

12  because of the equivalent value that HERA received in

13  exchange for the assets.

14                 On the fraudulent transfer claim, we

15  don't believe that there was a transfer and there's

16  been evidence of a transfer.  And Counsel may respond

17  to that and say, "Well, that's because Highland hasn't

18  shown where the assets are."  I'm anticipating that to

19  be their response on that.

20                 But I think Your Honor identified the

21  point that that's not why you get a status quo motion.

22  If they think there's evidence that they need, you

23  know, there's a motion to compel.  But for purposes of

24  their motion, they have not produced any -- have not

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/29/23   Page 432 of 1392   PageID 15174
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 321 of 1803   PageID 11067

48

```
 1    cited to any evidence, have not even made the

 2    allegation that -- other than a conclusory

 3    allegation -- that they have a likelihood to succeed

 4    on the merits.

 5              And then finally, Your Honor, I think

 6    they have the same -- the last element, that with the

 7    harm to him, the harm to Mr. Daugherty would outweigh

 8    the harm to Highland.  They simply have a conclusory

 9    allegation in their motion without providing any

10    support for that, Your Honor.

11              And again, I just -- I'm happy to talk

12    about that issue further, but I think on a motion of

13    this seriousness with the heightened standard, that

14    they need to show that conclusory allegations are not

15    sufficient.

16              THE COURT:  Thank you.

17              MR. KATZ:  Thank you, Your Honor.

18              MR. CHRISTENSEN:  Just briefly, Your

19    Honor.

20              I suppose it's an interesting

21    philosophy of language, a question of what counts as

22    something being conclusory.  But we have certainly

23    done more than offer a conclusion.  We have laid out a

24    timeline of actual intent to delay or defraud with
```

Appellee Appx. 00315
Appx. 00513

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-5   Filed 02/23/23   Page 433 of 1392   PageID 15175
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 322 of 1803   PageID 11068

49

1    respect to the fraudulent transfer claim.

2                    And just the items that are attached

3    to our motion at Exhibit N, O, P, and Q, are a series

4    of e-mails and events that I think anybody bringing a

5    fraudulent transfer claim might characterize any one

6    of them as a smoking gun.  That is more than a

7    conclusion.  Our conclusion that this transfer was

8    done with actual intent to defraud is based on very

9    particular, very detailed, minute-by-minute documents.

10   So it is certainly not conclusory.  It's sort of

11   conclusory to call that conclusory.

12                    And it's important, also, to remember

13   that when Vice Chancellor Glasscock suggested that

14   potentially the fraudulent transfer claim could be fit

15   for summary judgment disposition, he also said things

16   like "Maybe there's a perfectly reasonable explanation

17   for this."  I think discovery has shown that there is

18   not a perfectly reasonable explanation for this.  And

19   he did not have access to those documents, nor did we

20   at the time that he made that statement.

21                    As far as seeking this relief rather

22   than simply monetary damages, that has been in our

23   complaint since the beginning.

24                    THE COURT:  What is the -- can you

Appellee Appx. 00316
APPX. 10567

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6835 Filed 12/29/23 Page 434 of 1392 PageID 15176
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 323 of 1803 PageID 11069

50

1    address the point that the Texas award is monetary and

2    not for the specific assets that are mentioned now in

3    your briefing?

4                    MR. CHRISTENSEN:  Sure.  I can.

5                    I'll address that by saying, quoting

6    again HERA's closing argument in the Texas trial.

7    "... [I]f Pat Daugherty happens to prevail in his

8    lawsuit against Lane, Patrick and HERA you heard Jim

9    Dondero testify, he gets his interest, which is

10   currently escrowed in the third-party escrow account,

11   all of it."

12                   We have made a claim for promissory

13   estoppel that statements like that with codefendants

14   show clear evidence of a promissory estoppel claim.

15   That kind of statement shows how the statement was

16   meant to be perceived, it shows how people did

17   perceive it.

18                   And I want to go to the jury question

19   because we actually have -- unlike many cases where

20   the idea of an objective standard, what would a

21   reasonable person do, is sort of an academic question.

22   But in this case we have a jury, which is sort of the

23   quintessential reasonable person, writing back to the

24   judge, "If we assign a dollar value to 'Fair Market

Appellee Appx. 00317
Appx. 10569

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 53-5    Filed 12/29/23    Page 435 of 1392    PageID 15177
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 324 of 1803    PageID 11070

51

1  Value of Daugherty's HERA units' in Question 18" --

2  that's the question that awarded him $2.6 million --

3  "is this in exchange for his HERA units currently in

4  escrow, or in addition to them?"  The judge instructed

5  back, "Do not discuss or consider the effect your

6  answers will have."

7                    And then the final judgment made clear

8  that it was not in exchange for those assets in

9  escrow, that it was in addition to them.  And there

10  was appellate litigation about that issue, and it was

11  settled that it was not a replacement for those units.

12  But my point really is:  We have very clear evidence

13  that the Texas judgment and the people making the

14  Texas judgment believed that those assets were being

15  held in escrow for Pat Daugherty, which is exactly

16  what the defendants tried to tell the jury to believe

17  in their closing arguments.

18                    So the fact that the Texas judgment

19  was purely monetary is, A, not entirely true; and, B,

20  it's not -- does not defeat the promises that they

21  made throughout that trial, nor the fact that they

22  transferred the assets once the judgment came through.

23                    Let's see.  On the promissory estoppel

24  claim, it's just not what they said at trial, that Pat

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8 Filed 3/20/23 180 age 436 of 1392   PageID 15178
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 325 of 1803   PageID 11071

52

1   Daugherty had an interest in this LLC but, by the way,

2   there's nothing in it.  So if you award him anything,

3   it's going to be completely valueless.

4              I want to respond just briefly to the

5   point that these assets can be valued.  And they can

6   be.  This court is very experienced in appraisals.

7   But the easiest and most efficient way to deal with

8   this, the value, is to give the assets themselves

9   rather than require, effectively, a -- more than one

10  appraisal inside of this case, because there are

11  assets held by a private equity fund, and those assets

12  include private companies.  So we would have to have a

13  sort of quasi-appraisal action contained inside of

14  this, instead of doing what is much easier for the

15  parties and the Court and just addressing those assets

16  in an equitable manner and providing an equitable

17  remedy.

18             The affidavit does say that they are

19  solvent.  I believe the affidavit was also given by

20  the same person that the -- it was either the

21  arbitration panel in *Credit Strategies Fund* or the

22  Bankruptcy Court in *Acis* said that Isaac Levinson's

23  statements were not credible and that his statements

24  contradicted documentary evidence in a clear way.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 437 of 1392   PageID 15179
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 326 of 1803   PageID 11072

53

1          In addition, they don't say by how

2    much they are solvent.  It could be the case, based on

3    the face of that affidavit, that they are solvent by a

4    million dollars.  We simply don't know.  And again,

5    the question of solvency as it relates to irreparable

6    harm in most of these cases is in a sort of antiseptic

7    environment where it really is just a matter of:  Does

8    this party have sufficient assets?

9          And again, that's not the only

10   question in this case.  The question in this case is:

11   If the Court does nothing, what is the risk that

12   Highland will do exactly what it has done to these

13   assets vis-a-vis this litigant before?

14          That's all I have, Your Honor.

15          THE COURT:  Thank you.

16          My intention is to hear the status quo

17   order and the motion to dismiss and then take a break

18   and see if I can get something together to share my

19   thoughts.  So let's move on to the motion to dismiss,

20   unless folks want to take a short break.

21          MR. KATZ:  I'm prepared to proceed,

22   unless Counsel wants a break.

23          MR. UEBLER:  I'm prepared to go

24   forward.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 438 of 1392   PageID 15180
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 327 of 1803   PageID 11073

54

1                    THE COURT:  All right.  You may

2     proceed.

3                    MR. KATZ:  Thank you, Your Honor.

4                    So I won't belabor the procedural

5     background, because I know Your Honor is familiar with

6     it, other than to say that after Judge Glasscock had

7     dismissed a large number of Mr. Daugherty's claims,

8     there was -- a promissory estoppel claim was then

9     added.  And we filed the motion to dismiss as to that

10    claim, and that's the motion that we're here for

11    today.

12                    To prevail on a promissory estoppel

13    claim, Mr. Daugherty has to allege a conceivable set

14    of circumstances that would allow a showing that there

15    was a promise that was made, that it was reasonable,

16    that the expectation of the promisor was to induce the

17    action of forbearance on the part of the promisee,

18    that the promisee reasonably relied on the promise and

19    took action to his detriment, and such promise is

20    binding because injustice can be avoided only by

21    enforcement of the promise.

22                    And I do want to -- I will be

23    efficient, but I want to address each of these

24    elements, Your Honor.  And the -- I want to start with

Appellee Appx. 00321
Appx. 10573

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-16   Filed 03/29/23   Page 439 of 1392   PageID 15181
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 328 of 1803   PageID 11074

55

1    the reasonable reliance.  As I mentioned a moment ago

2    in connection with the status quo order, that

3    Mr. Daugherty is really claiming that he would have

4    sought offset had Mr. Dondero -- actually, I

5    apologize, I want to take a quick step back.

6                   Although Counsel's pointed to a

7    closing argument of HERA, that I believe he attributed

8    to Highland's counsel, I just want to be clear for the

9    record that the statement that Counsel just read from

10   the closing argument was for HERA, not for Highland,

11   and there was separate counsel.

12                   THE COURT:  Hasn't there separately

13   been an assertion of a common interest?

14                   MR. KATZ:  There was, Your Honor.  But

15   I just believe Counsel -- I'm sure it was

16   inadvertent -- said "Highland."  And I just want to be

17   clear for the record that that statement was on behalf

18   of HERA at closing argument.

19                   But, more importantly, in the

20   complaint they only allege two statements: a statement

21   by Jim Dondero at trial and a statement by Mr. Klos in

22   a declaration made several months after the final

23   judgment.  And so when Mr. Daugherty claims that his

24   reasonable reliance was not seeking offset at the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 03/31/04180 Page 440 of 1392   PageID 15182
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 329 of 1803   PageID 11075

56

1   trial, the second statement can't be a basis of that;

2   and the issue that Mr. Daugherty has, that there can't

3   be a reasonably conceivable set of circumstances to

4   show reasonable reliance for a couple of reasons.

5              One, the date that Mr. Daugherty filed

6   his counterclaims with his claims, he had -- the LLC

7   agreement with Highland's offset provision against the

8   value of HERA was in that document.  In fact, that was

9   the basis of one of Mr. Daugherty's claims, that there

10  was going to be -- there was the risk of this improper

11  offset.  He was challenging those provisions.

12             But yet he never pled offset as a

13  defense.  And it is a required affirmative defense

14  under Texas law.  And it is clear that when the final

15  judgment was entered, that's *res judicata*, that issue

16  was barred.

17             So Mr. Daugherty is saying that now

18  had Jim Dondero not testified as he did on the stand,

19  that he would have filed the declaratory judgment

20  action to offset the judgment that Highland obtained

21  against him from the judgment he obtained against HERA

22  cannot serve as the basis for a promissory estoppel

23  claim in this action because he would be barred as a

24  matter of law.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-3   Filed 12/20/23   Page 441 of 1392   PageID 15183
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 330 of 1803   PageID 11076

57

1              THE COURT:  Is that a little too

2    technical?  I mean, is the point a little more

3    abstract than that, which is that had Dondero not

4    testified as he did and assured everyone in the

5    courtroom that the escrow was there for Daugherty's

6    satisfaction down the road, that there are plenty of

7    different options he could have taken?  I mean, any

8    sort of resistance or leverage or anything like that

9    in regards to paying his own judgment, whether or not

10   a technical offset was procedurally available to him,

11   seems to be kind of reducing this a little bit too far

12   down into the technicalities.

13              MR. KATZ:  Well, I don't believe so,

14   for two reasons.  But the most important one being

15   there's no reasonably conceivable set of circumstances

16   where he could have taken action.  And I'll address

17   that momentarily.

18              But to the point, that was his

19   response.  That's what's in his pleading, both in his

20   complaint and in response to the motion to dismiss.

21   That's what he said he would have done.  And that

22   wasn't available to him.

23              And it wasn't just filing a

24   declaratory judgment action for offset that he would

Appellee Appx. 00324
APPX. 10576

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-35    Filed 12/20/23    Page 442 of 1392    PageID 15184
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 331 of 1803    PageID 11077

58

1   have been barred from doing.  He had two years to

2   plead offset as a defense or to plead facts in the

3   Texas action that arguably could have given rise to

4   some reliance claim.

5              THE COURT:  It seems odd to claim that

6   there was no reliance because he didn't do something

7   before the act in question happened.

8              MR. KATZ:  Well, Your Honor, in fact,

9   quite the opposite.  As Mr. Daugherty said in his

10  reply brief to the status quo motion -- and this is on

11  page 2 and 3 of Daugherty's reply brief -- "In fact,

12  during the trial and before Daugherty won his

13  judgment, Defendants stressed that Daugherty was an

14  owner of HERA units."  Then he puts in a footnote, "At

15  the same time, Defendants took the position that

16  Daugherty held no economic interest in HERA.

17  Accordingly, Daugherty did not take the purported

18  admissions at face value and litigated for a judgment

19  that he retained his HERA units."

20             And the significance of that, Your

21  Honor -- it's the same significance as what I was

22  trying to say a moment ago and I probably did not say

23  it very clearly -- is from the moment he filed this

24  claim, he was aware that, as he says here, that his

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68    Filed 03/08/24    Page 443 of 1392    PageID 15185
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 332 of 1803    PageID 11078

59

1    value -- the value of his shares in HERA were

2    valueless, as Highland was saying they were.  Because

3    that was one of his claims in the lawsuit.  And he did

4    not do anything to try to protect that vis-a-vis a

5    judgment that Highland might get against him at any

6    time during the trial.

7                    So to think that, "Oh, well, he was

8    about to do it" after two years, knowing everything

9    that he knew, the LLC agreement allowing the offset,

10   Highland taking the position that his units were

11   valueless even though he was suing for it, that

12   somehow he was going to try to offset his claim

13   against HERA against Highland's claim against him, and

14   he just didn't do it because Jim made the statement he

15   did on the stand is not a reasonably credible

16   position.  It's not something that could have a -- or

17   there could be a reasonably conceivable set of

18   circumstances to show a reasonable and detrimental

19   reliance.

20                   And I think -- and, Your Honor, if you

21   also look at the whole circumstances around

22   Mr. Dondero's statement on the stand, was not -- in

23   fact, the question -- it was by HERA's counsel that

24   was questioning him at the time.  And the question

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 685   Filed 23/03/18 Page 444 of 1392   PageID 15186
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 333 of 1803   PageID 11079

60

```
 1   was:  The assets that are being escrowed, or the money

 2   that's being escrowed right now, what happens to them?

 3   And I think it's significant for a couple of reasons.

 4              One, right now they're talking about

 5   the day that the question was asked.  They're not

 6   talking about a day in the future.  And I think it's

 7   also significant that that was --

 8              THE COURT:  Maybe that was the

 9   question, but the answer was, "In the future they will

10   go to him."

11              MR. KATZ:  That's -- Your Honor,

12   respectfully, that's not the way I read it.  But I

13   think the point is -- two points, Your Honor.  One,

14   that was a question by HERA's counsel; that was not a

15   question by Daugherty's counsel.

16              If this was so important that

17   Daugherty was going to forego seeking to invalidate

18   the escrow agreement or trying to do trial amendment

19   and get a new claim in, there was no action by his

20   counsel to follow up and say:  Let's be clear.  Let's

21   not talk about right now, let's talk about in the

22   future.  And again -- or ask about what about the

23   resignation provisions, what about the termination

24   provisions.
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-6   Filed 03/03/04 Page 445 of 1392   PageID 15187
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 334 of 1803   PageID 11080

61

```
 1              There's a whole host of conditional
 2   circumstances that show that Mr. Daugherty,
 3   purportedly relying on that statement to not try to
 4   bring a declaratory judgment action for offset or to
 5   seek to invalidate the escrow agreement would have
 6   been reasonable reliance.  Again -- because, in fact,
 7   up until that point, Mr. Daugherty not only waited two
 8   years, he waited past the amended pleading deadlines.
 9   In the face of what he says, I'm being told by
10   Highland that my assets are valueless.  You know, and
11   to the extent they say that I'm still owning HERA
12   units, I never believed that there was anything there.
13   But yet he didn't do anything about it before
14   Mr. Dondero made the statement to HERA's counsel.
15              So, again, all of those, all of that
16   goes to whether he could have -- show any circumstance
17   where he could have reasonably relied.
18              Similarly, I think if you look -- and
19   I bring in these things to show Your Honor what is not
20   in the complaint or not in the response to the motion
21   to dismiss.  After the judgment, he claims that he was
22   entitled to this offset, but yet he paid his full
23   judgment.  He could have just paid the difference in
24   the judgment.
```

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 2/20/23 1804age 446 of 1392    PageID 15188
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 335 of 1803    PageID 11081

62

1              THE COURT:  That's the point, is that
2    he paid the whole judgment; right?  Kind of chipperly
3    wrote the check and thought it was all going to work
4    out in the end.
5              MR. KATZ:  Right.  Well, without --
6    but with the whole circumstances and you look at his
7    allegations, if his allegations are to be believed,
8    it's not reasonable to believe that somebody who was
9    going to do what he did but for Jim Dondero's
10   statement would have, again, waited for two years, not
11   filed -- not done -- taken the legal actions that he's
12   now claiming he would have taken.
13             He did seek to amend his pleadings
14   right before trial.  These were not in there.  That
15   was, again, before these statements.  Again, it's not
16   credible to believe that he reasonably relied.  And he
17   hasn't alleged anything.
18             Again -- and so that was why I said
19   initially to Your Honor's question, there are two
20   points.  One, when you look at the totality of what he
21   didn't allege and what he didn't do, that there can be
22   no set of circumstances where he reasonably relied,
23   but then when you look at what he says he would have
24   done, which is the offset.  And he would have been

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 02/10/23    Page 447 of 1392    PageID 15189
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 336 of 1803    PageID 11082

63

 1   legally barred from doing that because he waived it.

 2   Also because -- and the law is cited in our motion,

 3   that because Highland and HERA are separate entities,

 4   there wouldn't have been an offset between those

 5   judgments anyway.

 6              So the two things he says that he

 7   would have done was seek to invalidate the escrow;

 8   which, again, he was aware of that escrow agreement

 9   before trial.  He sought to amend his pleadings before

10   trial but did not address that escrow agreement at

11   all.

12              He has shown that he believes that

13   his -- before Mr. Dondero made that statement, he

14   didn't -- he thought his HERA units had been rendered

15   valueless and that's how he was litigating the case.

16   But he didn't try to "invalidate" the escrow

17   agreement.  He also doesn't explain or provide any

18   allegation of what that means, to invalidate the

19   escrow settlement.

20              He doesn't provide any legal theory or

21   allegation of evidence to support a legal theory that

22   would show that had he sought to invalidate the escrow

23   agreement that the court would have allowed that

24   amendment and it would have changed the outcome.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 03/31/04   Page 448 of 1392   PageID 15190
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 337 of 1803   PageID 11083

64

1              The next element I want to talk about

2    was that a promise was made.  And, again, he's

3    identified two promises: one by David Klos, one by Jim

4    Dondero.  There's -- the one by Mr. Klos, again, was

5    done several months after trial.  The one by

6    Mr. Dondero is obviously during trial.  But both of

7    those statements, when you look at them, are not

8    unequivocal statements of -- there was no set of

9    circumstances where Mr. Daugherty will not be paid

10   this money on a final, nonappealable judgment.  And --

11   which is what --

12              THE COURT:  Why is that not exactly

13   what Mr. Dondero said?

14              MR. KATZ:  Well, Your Honor,

15   Mr. Dondero was being asked a question about the

16   language in the escrow agreement, that specific

17   provision.  And he was being asked based on

18   circumstances right now.  And perhaps if I give you an

19   analogy.  If I hire an employee and I'm paying the

20   employee $50,000 a year and they're an at-will

21   employee, and somebody asks me, "Well, how much does

22   that employee make?" I'm not likely going to say,

23   "Well, annually $50,000 a year, but I can terminate

24   them at any time."  Or "$50,000 a year, but less

Appellee Appx. 00331
Appx. 10582

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-35   Filed 03/29/23   Page 449 of 1392   PageID 15191
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 338 of 1803   PageID 11084

65

```
 1    withholding," or other caveats.
 2                    And the question that was asked to
 3    Mr. Dondero is the -- right now the assets that are --
 4    and I apologize, I don't -- I can grab the quotation.
 5    I don't have it right in front of me.  But the key
 6    part was that it was predicated on right now, what
 7    happens right now if there's a final judgment.
 8                    So -- and, again, this is Mr. Dondero
 9    who's an individual defendant who is not being
10    questioned as a representative of Highland.  And what
11    they want to do is take that statement and say this is
12    an unequivocal statement that was binding Highland.
13    And it just doesn't rise to that level under the legal
14    standard.
15                    And, you know -- but, moreover --
16    again, because what -- Mr. Dondero was reading the
17    escrow agreement on the stand as a layman, but that's
18    really more significantly the point, is that if the
19    alleged promises are subject to termination by a
20    contract -- I know this is in our pleading, the
21    TrueBlue HRS Holding case -- promissory estoppel does
22    not apply where a fully integrated and enforceable
23    contract governs the promise at issue.
24                    And that's the issue, is the contract
```

Appellee Appx. 00332
Appx. 10584

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68.35   Filed 04/20/23   Page 450 of 1392   PageID 15192
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 339 of 1803   PageID 11085

66

1   is the contract; it means what it means.  And the --

2   unless there -- I don't believe, Your Honor, that they

3   even alleged that there is some promise, unequivocal

4   promise, that Mr. Dondero or Mr. Klos made that was

5   not subsumed by the escrow agreement.  And that's

6   really the basis of their claim here.

7               They also have to show that the claim

8   is necessary to avoid injustice.  And obviously, they

9   have brought a fraudulent transfer claim and an unjust

10  enrichment claim arising out of the same course of

11  conduct, that they claim these representations are

12  related to those claims.  And I think the case law is

13  fairly clear on this, that this is exactly the type of

14  situation where a promissory estoppel claim is not

15  necessary to avoid injustice.

16              THE COURT:  But is the conclusion to

17  be taken from your argument that nothing can ever be

18  pled in the alternative to a promissory estoppel

19  claim?

20              MR. KATZ:  No, not at all.  But I

21  believe that you would have to have a set of

22  circumstances where there wasn't a fully integrated

23  enforceable contract, and that the underlying promises

24  weren't about the interpretation of that contract.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 3596-6   Filed 10/31/22   Page 451 of 1392   PageID 15193
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 340 of 1803   PageID 11086

67

 1                   And then, finally, Your Honor, I'm
 2       going to use the word "conclusory" again, that they --
 3       well, actually not even conclusory, Your Honor.  They
 4       didn't even plead that Highland intended to induce
 5       reliance or that Highland should have reasonably
 6       expected to induce reliance by Mr. Daugherty.
 7                   And I don't think that's necessarily
 8       an accident.  I think that's because the statements
 9       that they're relying on were not statements that were
10       made on behalf of Highland.  They're individual
11       statements.  And I think that it would be fairly
12       tortured to say otherwise.
13                   So, Your Honor, again, for each of
14       those reasons, we don't think that they have pled any
15       reasonably conceivable set of circumstances that could
16       support the promissory estoppel claim.
17                   THE COURT:  Thank you.
18                   MR. KATZ:  Thank you, Your Honor.
19                   MR. UEBLER:  Good afternoon again,
20       Your Honor.
21                   THE COURT:  Good afternoon.
22                   MR. UEBLER:  I'll start with the
23       promise that was made.  And before I do, I think I
24       heard Mr. Katz talking about the standard to prevail

Appellee Appx. 00334
Appx. 10536

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23   Page 452 of 1392   PageID 15194
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 341 of 1803   PageID 11087

68

1   on a claim.  And I understand we're a little bit late

2   in the game of this lawsuit.  But this is a 12(b)(6)

3   motion and the standard is reasonably conceivable.

4              So I just want to reset where we are

5   on this motion and talk about the promise that was

6   made, briefly.  So what was the promise?  The promise

7   was Jim Dondero testifying at trial, under oath, that

8   Mr. Daugherty's assets would be held in escrow and

9   released to him through HERA if he won in Texas.  I

10  mean, it was as simple as that.

11             You may have been left with the

12  impression from Mr. Katz's presentation that the line

13  of questioning was about the terms of the escrow

14  agreement.  I can save all of us and just refer to the

15  pages of the testimony, or I'd be glad to read the

16  preceding three or four questions to set that up.  But

17  it was not interpreting the escrow agreement.  And

18  Mr. Katz didn't have the testimony on hand, but I do.

19  And the question was:

20             "Question:  Okay, so -- so if

21  Mr. Daugherty somehow prevails in his lawsuit against

22  Patrick Boyce and Lane Britian and HERA, what happens

23  to Mr. Daugherty's interest that's being escrowed

24  right now with a third-party escrow agent?

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 03/23/04 Page 453 of 1392   PageID 15195
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 342 of 1803   PageID 11088

69

1              "Answer:    They go to him.

2              "Question:    I'm sorry?

3              "Answer:    They go to him via to HERA

4   and then to him."

5              Is that promise consistent with the

6   escrow agreement?  Yes.  Is that promise separate and

7   apart from the escrow agreement?  Yes.  Mr. Dondero

8   wasn't there interpreting a contract.  He was there

9   making a promise to Daugherty and to the jury.

10             And just as we allege in paragraph 131

11  of our complaint, it was the reasonable expectation of

12  Highland, when that promise was made, that it was

13  going to be relied on.

14             THE COURT:  Tell me more how the

15  statement was separate and apart from the contract.

16             MR. UEBLER:  The statement is separate

17  and apart from the contract because I think --

18  Mr. Katz would be the first one to tell you that

19  Mr. Daugherty was not a party to the escrow agreement.

20  Mr. Daugherty, on the face of it, has no rights under

21  that escrow agreement.

22             So this idea that Highland proposes

23  that because there's a contract out there that also

24  addresses the subject matter of the promise, the

Appellee Appx. 00336
Appx. 10587

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 04/24/23   Page 454 of 1392   PageID 15196
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 343 of 1803   PageID 11089

70

1    promisee is, therefore, precluded from relying on that

2    promise, it just -- it doesn't hold water.  They

3    don't -- they didn't cite any cases.

4               We said it's not the law of Delaware

5    and never should be.  Highland shouldn't be allowed to

6    contract with Abrams & Bayliss and then use that

7    contract to say that a promise made to Daugherty that

8    Daugherty seeks to enforce, that is -- you know,

9    follows the terms of that contract but doesn't

10   expressly give any rights to Daugherty, that's just --

11   that's not an argument that the Court should accept,

12   in our view.  So that's why I say it's separate from

13   the contract.

14              And that also gets into the

15   alternative claim argument, too.  Are we entitled to

16   bring promissory estoppel and a fraudulent transfer

17   claim and an unjust enrichment claim?  I think the

18   *Chrysler* case in the Supreme Court settled that

19   question a long time ago.  And I think Rule 8 of this

20   court does, too.

21              So, of course, there's overlap in what

22   was promised and what's in the escrow.  Although, I

23   will point out, the escrow -- Mr. Katz said something

24   like -- he referred to a host of conditional

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 2/25/03 1804   Page 455 of 1392   PageID 15197
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 344 of 1803   PageID 11090

71

1    circumstances in the escrow agreement.  And I think

2    his point was paragraph 5 and paragraph 10 that they

3    had relied on when Abrams & Bayliss resigned.  Well,

4    you won't find any of that in the promise that was

5    made by Jim Dondero under oath to Pat Daugherty and

6    the jury.  So whatever conditional circumstances may

7    be in that contract, they're not in that promise.

8              And the notion that Jim Dondero was

9    testifying in his individual capacity, I think we

10   debunked that in Exhibit A to our answering brief --

11   which was Highland's own witness list -- that provided

12   an entire paragraph of what Mr. Dondero would be

13   testifying about, including testimony in support of

14   Highland's and Cornerstone's claims against Daugherty

15   and the damages suffered and the third-party

16   defendants' defenses to claims asserted against them.

17             So Jim Dondero is Highland.  He is

18   HERA.  He's HERA ERA management.  He controls them

19   all.  Mr. Katz pointed out that the closing argument

20   by HERA's lawyer in Texas was just HERA's lawyer.

21   Well, Jim Dondero controls HERA, just as he controls

22   Highland.  So I view that as a distinction without a

23   difference.

24             But what that closing argument did was

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/20/23   Page 456 of 1392   PageID 15198
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 345 of 1803   PageID 11091

72

1   reaffirm the promise -- I thought I had it here.  So

2   what was said on closing argument by HERA's counsel,

3   just after Jim Dondero made the promise, was "... if

4   Pat Daugherty happens to prevail in his lawsuit

5   against Lane, Patrick and HERA you heard Jim Dondero

6   testify he gets his interest, which is currently

7   escrowed in the third-party escrow account, all of

8   it."

9                    Then we had the other promise, which

10  was that September -- September of 2014, the Klos

11  affidavit.  It restated the promise.  This gets to the

12  reasonableness of the reliance of Daugherty's

13  promise -- the promise to Daugherty.  He kept hearing

14  this.

15                   And the idea that Daugherty should

16  have somehow foreseen in either the six weeks between

17  when Highland sprung the escrow agreement on him

18  before trial or when Dondero testified or when Klos

19  submitted his affidavit -- by the way, as the senior

20  finance of Highland Capital -- that Daugherty should

21  have foreseen two years from now when he went to pay

22  the judgment that Highland was going to break that

23  promise.

24                   So the idea that Daugherty should have

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-5   Filed 04/20/23   Page 457 of 1392   PageID 15199
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 346 of 1803   PageID 11092

73

1    done something between December 2013 and December of

2    2016, I think entirely misses the point of our claim.

3    The reliance that we allege -- and it's paragraph 133

4    of our complaint -- is "In further reliance on the

5    promises of Highland Capital and its agents, on

6    December 14, 2016, nine days after Highland Capital

7    secretly obtained the Escrow funds, Daugherty wired

8    approximately $3.2 million in cash to Highland Capital

9    in satisfaction of its award of attorneys' fees in the

10   Texas Action."

11                  That was the reliance.  What could

12   have been done, other than a cash payment, Daugherty

13   could have just engaged in self-help.  He could have

14   paid the difference between the 2.6 and the 2.8 of the

15   judgments.  He could have not paid anything at all.

16   He at least should have had the chance to go to court

17   like the petitioner did in the *Bonham Bank* case that

18   we cite from Texas to explain to a judge why, under

19   these circumstances, even though there are three

20   different litigants involved, these claims should be

21   offset.  But he didn't even get that chance because he

22   relied on Highland's promises and he wired the full

23   amount.  They took away that chance from him.

24                  We don't have to prove today whether

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-15   Filed 12/29/23   Page 458 of 1392   PageID 15200
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 347 of 1803   PageID 11093

74

1    he would have won on that setoff claim in Texas or

2    anywhere else.  We just have to prove that it's

3    reasonably conceivable that he was deprived of that

4    chance because he reasonably relied, to his detriment,

5    on a promise that was made under oath and repeated.

6                    In their opening brief, the defendants

7    stated that "Injustice can (and should) be avoided

8    through collection efforts in the Texas Action, which

9    Daugherty has not even attempted to pursue, making

10   this claim premature."

11                   I just wanted to point out, this was

12   in Exhibit B to Highland's own opening brief.  They

13   attached Mr. Daugherty's interrogatory responses.  And

14   if you look at Interrogatory 36 on page 25,

15   Mr. Daugherty stated that "... apart from filing this

16   action to collect his Texas judgment, he filed for a

17   writ of execution in Texas on July 7, 2017, which was

18   unsuccessful because Highland Capital claimed HERA had

19   no assets.  The return of service was dated

20   September 26, 2017."

21                   I think that's totally irrelevant to

22   the questions before the Court, but I wanted to point

23   out that Mr. Daugherty did, in fact, attempt some

24   collection efforts in Texas and those were

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 03/30/23   Page 459 of 1392   PageID 15201
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 348 of 1803   PageID 11094

75

 1   unsuccessful.

 2               I'd also like to point out that in

 3   addition to being able to plead alternative claims,

 4   this is one of those cases where injustice can only be

 5   avoided through the enforcement of this promise,

 6   notwithstanding the other claims out there.  The

 7   injustice to be avoided is allowing Highland Capital

 8   to walk away with both judgments from the Texas

 9   action.  They got Daugherty's 3.2 million, and they

10   got his HERA assets.  And that's the injustice to be

11   avoided.

12               When you and Mr. Katz were discussing

13   this element, he referred to a fully integrated

14   contract.  Again, he would be the first to tell you,

15   I'm sure, that Daugherty has no rights under that

16   fully integrated contract.  So the fact that there is

17   a similar contract out there is not relevant to the

18   analysis.

19               That's all I have, Your Honor.

20               THE COURT:  Thank you.

21               MR. UEBLER:  Thank you.

22               MR. KATZ:  Your Honor, can I just

23   address a couple points?

24               THE COURT:  Yes.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 09/29/23    Page 460 of 1392    PageID 15202
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 349 of 1803    PageID 11095

76

1              MR. KATZ:  For clarity purposes,

2    Counsel -- this is the second time they've read the

3    statement from HERA's counsel during the closing

4    argument.  That was not part of the statements that

5    were alleged to be part of the detrimental reliance in

6    either the complaint or in the response to the motion

7    to dismiss.

8              And I think that's significant, again,

9    because Counsel is certainly correct that what they

10   say is that Daugherty would not have paid the judgment

11   against him by Highland.  But their explanation of

12   what that means is that he would have sought offset or

13   sought to invalidate the escrow agreement, both of

14   which could only have been done, been sought, during

15   trial.  I suspect that's why they are not relying on

16   the statement that was made at closing argument where

17   it would have been too late for them to make those

18   allegations.

19             Highland had a judgment, a fully

20   perfected final judgment, collectible judgment that

21   Mr. Daugherty paid.  And from the motion to dismiss

22   perspective, claiming that he would have filed either

23   or both of two things that were barred by *res judicata*

24   does not provide the basis to avoid -- where there's a

Appellee Appx. 00343
APPX. 10545

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-3   Filed 05/03/18   Page 461 of 1392   PageID 15203
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 350 of 1803   PageID 11096

77

1    reasonably conceivable set of circumstances that those

2    allegations could support to avoid a motion to

3    dismiss.

4                    And, again, we're really just talking

5    about Jim Dondero's statement because, as Counsel

6    recognized, the Klos statement was made, I believe,

7    roughly five months after the -- four or five months

8    after the final judgment was entered.

9                    And then, finally, lastly, I just want

10   to touch on the escrow agreement.  Of course we

11   recognize Mr. Daugherty is not a party to that

12   agreement.  But Mr. Daugherty's case is that he is

13   asserting rights under that escrow agreement.  He is

14   certainly saying that there was a transfer under that

15   agreement and that that agreement required the assets,

16   the money being held pursuant to that escrow

17   agreement, to go to HERA, which then Mr. Daugherty as

18   the shareholder of HERA would have had rights to.

19                   And, you know, we disagree with some

20   of the underlying factual basis.  We don't agree that

21   there was a transfer.  But I think counsel for

22   Mr. Daugherty would certainly not say that there's not

23   a fully enforceable promise in that escrow agreement

24   that they are seeking relief under.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/23/03   Page 462 of 1392   PageID 15204
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 351 of 1803   PageID 11097

78

1                    And that's -- and just as importantly,

2    Mr. Dondero's statement was exclusively an

3    interpretation of that promise.  And that's why -- and

4    I think that's exactly what the *TrueBlue* case is

5    referring to.  And there's a fully integrated contract

6    that has the promise that legally and factually

7    determines what the rights under that contract are.

8                    And Mr. Dondero's interpretation of

9    that contract -- even if it's the exact same as the

10   contract or even if it's different than the

11   contract -- doesn't change that the claim is pursuant

12   to the contract and not for promissory estoppel.

13                   THE COURT:  What is your understanding

14   of Mr. Daugherty's ability to sue to enforce the

15   escrow agreement in a way that benefits him?

16                   MR. KATZ:  Well, he is a shareholder

17   of HERA.  And as a shareholder of HERA -- I mean, I'd

18   have to think through all the *res judicata*, collateral

19   estoppel, statute of limitations issues that all have

20   come out about all the issues that have been

21   litigated.

22                   THE COURT:  I just mean from the terms

23   of the contract.

24                   MR. KATZ:  I don't believe that

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/29/23    Page 463 of 1392    PageID 15205
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 352 of 1803    PageID 11098

79

 1   Mr. Daugherty is a third-party beneficiary of the

 2   contract, if that's Your Honor's question.  He's

 3   certainly not a direct party to the contract, but he

 4   is a shareholder of HERA.  And their allegations are

 5   that Highland was contractually obligated to send

 6   money to HERA under that agreement.

 7                    I think there are potentially

 8   technical legal issues under that.  That's, of course,

 9   not the claim that Mr. Daugherty has brought.  And --

10   but if Mr. Daugherty had any rights, it would be

11   through HERA.

12                    THE COURT:  So is it your

13   understanding that the point of the doctrine that

14   you're relying on, that there can't be both a contract

15   and a claim for promissory estoppel, is that those

16   rights substantially overlap?

17                    MR. KATZ:  I would suspect that's

18   probably the policy reason behind those decisions.

19                    THE COURT:  So if Mr. Daugherty

20   doesn't have contractual rights under the escrow

21   agreement, why does that knock out his promissory

22   estoppel claim?

23                    MR. KATZ:  Because it's the same --

24   because whatever rights he has under the contract,

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 02/24/23    Page 464 of 1392    PageID 15206
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 353 of 1803    PageID 11099

80

1    whether he has rights or not, are no different than

2    any rights he would have vis-a-vis Mr. Dondero's

3    interpretation of what that contract said, what that

4    contractual language says.

5                  THE COURT:  Go ahead.

6                  MR. KATZ:  I think that the policy is

7    is not to create quasi-contractual claims when there

8    is a contract, regardless of who's the party to the

9    contract.

10                 And, actually, I think it's even --

11   there's no wiggle room around this situation because

12   it's not -- Mr. Dondero was -- I mean, I think the

13   quote was, "They go to Mr. Daugherty through HERA" is

14   the quote.  He wasn't saying something -- there's not

15   been an allegation, for example, that Mr. Dondero's

16   statement or Mr. Klos' statement created a separate

17   contract between Mr. Dondero or Mr. Daugherty.

18                 I mean -- and that's not what -- I

19   mean, there hasn't been an allegation that that's what

20   they were saying -- that Mr. Dondero was saying that

21   or Mr. Klos was saying that.  The allegation is they

22   were saying that's what the contract, the escrow

23   agreement, means.  And that's why you can't have a

24   separate claim, because the contract means what it is

Appellee Appx. 00347
Appx. 10599

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/29/23   Page 465 of 1392   PageID 15207
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 354 of 1803   PageID 11100

81

1   and the contract determines the rights.

2                   THE COURT:  I understand.

3                   MR. KATZ:  Thank you, Your Honor.

4                   THE COURT:  Thank you.

5                   MR. UEBLER:  May I, briefly?

6                   THE COURT:  Briefly.

7                   MR. UEBLER:  Just to be clear, Your

8   Honor, we very much rely on the Klos statement as a

9   separate promise on behalf of Highland in the

10  affidavit.  We think it also supports the

11  reasonableness of the reliance on Mr. Dondero's

12  promise on behalf of Highland.  But we view the Klos

13  affidavit as part of the promise generally.

14                  With respect to the closing argument

15  by HERA, we didn't use it sooner because we just --

16  actually, I have to give credit where credit is due --

17  my colleague, Mr. Christensen just found it.  We

18  didn't try the Texas case, so we did find it in the

19  record.

20                  And fortunately for us, Highland

21  agrees on pages 13 and 14 of their own motion to

22  dismiss that the Court can "[consider] additional

23  materials from related litigation that were not

24  attached to the complaint if the plaintiff relied on

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-35   Filed 2/20/23184ge 466 of 1392   PageID 15208
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 355 of 1803   PageID 11101

82

1    those materials in casting his complaint, as Daugherty

2    has done with regard to the Texas Action."

3                  The last paragraph on page 14 goes on

4    to say, "To the extent the Court finds that the Texas

5    Action materials are not already subject to

6    consideration based on Daugherty's extensive reliance

7    on them, Defendants respectfully request that the

8    Court take judicial notice of the documents under

9    Delaware Rule of Evidence 202(d)(2)."

10                 So we submit that the Court certainly

11   can consider the trial transcript from the Texas

12   action as further support for the reasonableness of

13   Mr. Daugherty's reliance.

14                 And my final point with respect to the

15   escrow agreement and the notion -- I think that what

16   Mr. Katz said is that Daugherty, in his view, has no

17   direct rights under that agreement.  The only real

18   direct relevance of the escrow agreement with respect

19   to the promissory estoppel claim is that it's even

20   more evidence of the reasonableness of Mr. Daugherty's

21   reliance on the promise because it's consistent with

22   that promise.

23                 Thank you, Your Honor.

24                 THE COURT:  Thank you.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/29/23   Page 467 of 1392   PageID 15209
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 356 of 1803   PageID 11102

83

1          Anything to -- Mr. Katz, I'll give you

2    the last word.

3          MR. KATZ:  No, Your Honor.

4          Just to address Counsel's last point

5    about just finding the statement.  You know, again, I

6    think that the issue is what did Mr. Daugherty

7    actually rely on.  Their claim is that when he wired

8    $3.2 million -- not what statements Counsel has found

9    in the record recently that could be retroactively

10   applied that way.

11         And Counsel's -- again, the complaint

12   that is in front of Your Honor that has the

13   allegations rely on the two statements and is very

14   clear that -- it is explained in their briefing --

15   that the remedies -- that the detrimental reliance was

16   forbearance from taking action in the Texas lawsuit.

17         So anything that occurred anytime

18   after they could raise issues in a Texas lawsuit could

19   not have been a basis for detrimental reliance.

20         THE COURT:  Thank you.

21         I'm going to take a recess.  It will

22   be at least 20 minutes.  So stretch your legs, do

23   whatever.  It'll probably be longer than that.  But --

24   thanks for your patience, but it's faster this way in

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23   Page 468 of 1392   PageID 15210
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 357 of 1803   PageID 11103

84

1    the short term.

2                      So we are in recess.

3         (Recess taken from 3:35 p.m. until 4:18 p.m.)

4                      THE COURT:  Thank you for your

5    patience.

6                      I'm going to start with the motion for

7    a status quo order.  It is denied.  We have some time

8    constraints this afternoon, so I will cut to the

9    chase.  Daugherty has not established a threat of

10   imminent irreparable harm as he must.  It is clear

11   that Daugherty is pursuing this relief now based on

12   what happened in the *Redeemer* case.  This complaint

13   was filed in July 2017, and he did not seek the relief

14   that he's now seeking until after the papers on the

15   status quo order dispute were filed in the *Redeemer*

16   case.  And Daugherty cites Highland's submissions in

17   that case in his brief.

18                     I disagree with Daugherty's reading of

19   the *Redeemer* papers as indicating that Highland is in

20   "severe financial distress" and is "unable to satisfy"

21   the arbitration judgment at issue there.  And the

22   facts are very different as between the two cases.

23   Before going to arbitration, there were issues

24   involving control over assets that led to Highland

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-36   Filed 03/03/23   Page 469 of 1392   PageID 15211
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 358 of 1803   PageID 11104

85

1    making representations to the Court in the *Redeemer*

2    case.  And in the more recent request for a status quo

3    order related to confirming an arbitration judgment,

4    there was no separate claim that this court needed to

5    adjudicate, like Daugherty's fraudulent transfer claim

6    here.

7                    And, finally, the *Redeemer* parties

8    ultimately stipulated to a status quo order.  So I

9    don't think that anything that this court did in

10   entering the agreed-upon status quo order is helpful

11   in deciding whether to issue one in this case.

12                   Daugherty says that Highland has a

13   pattern of avoiding judgments, but has given me no

14   reason to think that Highland is going to do something

15   between now and a post-trial opinion that would make

16   it incapable of satisfying a judgment, nor is there

17   anything in the *Redeemer* case that leads me to believe

18   that.

19                   Quite frankly, if Highland is as good

20   at avoiding judgments as Daugherty claims, Highland

21   would have already moved the assets.  Daugherty, in

22   his reply, touches on that point and raises concerns

23   about whether the assets have already been

24   transferred.  He used a metaphor about the straw

Appellee Appx. 00352
APPX. 00694

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 02/23/18 Page 470 of 1392   PageID 15212
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 359 of 1803   PageID 11105

86

1   breaking the camel's back.  I'm going to use a

2   different ungulate.  He's provided no reason to

3   believe the horse is not already out of the barn or

4   that the horse is going to imminently flee the barn.

5            So I fully appreciate that Daugherty

6   says that this is what happened to him in Texas, and

7   I've indicated before that I agree with Vice

8   Chancellor Glasscock's sentiment that what happened

9   here fails more than the smell test.  But that doesn't

10  mean that there is a sufficient imminent threat that

11  it's going to happen here with Highland.

12           I also distinguish this case from Vice

13  Chancellor Glasscock's entry of a status quo order in

14  the *Trussway* matter, which admittedly was, in part,

15  based on Highland's "prior history."  In that ruling,

16  Vice Chancellor Glasscock noted the unique appraisal

17  remedy that was at issue there, and distinguished that

18  property right -- which is meant to substitute for a

19  stockholder's ability to insist on unanimity in a

20  merger -- from recovery in a tort or contract case.

21  Daugherty is seeking the more common sort of recovery

22  here, so I do not find *Trussway* instructive.

23           So, in sum, because Daugherty's motion

24  for a status quo order is based on a recent

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 2/09/23 1804 Page 471 of 1392   PageID 15213
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 360 of 1803   PageID 11106

87

1    development that does not support a conclusion that

2    Daugherty faces imminent irreparable harm, the motion

3    for a status quo order is denied.

4            Mr. Christensen, do you have any

5    questions about that?

6            MR. CHRISTENSEN:  No, I do not.

7            THE COURT:  Okay.  Anything from DLA?

8            MR. KATZ:  No, Your Honor.

9            THE COURT:  Thank you.

10           Moving on to the motion to dismiss.

11   Highland's motion to dismiss Count IX of the amended

12   complaint is denied.  Count IX is a claim for a

13   promissory estoppel.  And to state a claim for

14   promissory estoppel, a plaintiff must plead four

15   elements.

16           The first is that a promise was made.

17   The second is that it was the reasonable expectation

18   of the promisor to induce action or forbearance on the

19   part of the promisee.  The third is the promisee

20   reasonably relied on the promise and took action to

21   his detriment.  The fourth is that the promise is

22   binding because injustice can be avoided only by

23   enforcement of the promise.  That's all from the

24   *Chrysler* case out of the Supreme Court in 2003.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/02/23   Page 472 of 1392   PageID 15214
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 361 of 1803   PageID 11107

88

1            On Highland's motion to dismiss, I

2    applied a reasonable conceivability standard of

3    Rule 12(b)(6).  Under that standard, I must accept all

4    well-pleaded factual allegations as true, accept even

5    vague allegations in the complaint as well-pleaded if

6    they provide the defendant notice, draw all reasonable

7    inferences in favor of the plaintiff, and deny the

8    motion unless the plaintiff could not recover under

9    any reasonably conceivable set of circumstances

10   susceptible of proof.  That familiar standard is from

11   *Century Mortgage Company v. Morgan Stanley.*

12            Applying this standard, plaintiff has

13   adequately pled the four elements.  First, Highland

14   made promises through representations it and its

15   agents made in the Texas action.  Highland, through

16   testimony, explained that Daugherty would receive the

17   escrowed assets upon a judgment being finalized.

18            Daugherty cites testimony from James

19   Dondero, Highland's cofounder and president.  On

20   direct examination, Dondero was asked what would

21   happen to Daugherty's interest that was being held in

22   escrow, and Dondero stated that it would go to

23   Daugherty via HERA if he won.  This testimony is cited

24   in paragraphs 43 and 129 of the complaint.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-16    Filed 03/23/23    Page 473 of 1392    PageID 15215
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 362 of 1803    PageID 11108

89

1            Highland tries to distance itself from

2    Dondero, but it cannot do so at this stage.  Highland

3    says Dondero was testifying in a personal capacity.

4    But the witness list Highland filed in the Texas

5    action shows that is not the case.  That is Exhibit A

6    to Daugherty's answering brief.  Highland had no

7    response to this in its reply brief, beyond

8    reiterating its original argument that Dondero was not

9    speaking on Highland's behalf.

10           Based on the allegations of the

11   complaint, including Dondero's role, it is reasonably

12   conceivable he was speaking on behalf of Highland.

13           Other support for the alleged promise

14   comes from an affidavit attached as Exhibit I to the

15   complaint from David Klos.  Klos submitted the

16   affidavit and stated he had "... personal knowledge of

17   the facts stated in this affidavit as the Senior

18   Manager of Finance for Highland Capital ..." and

19   because he oversaw accounting relating to HERA.  Klos

20   reiterated in his affidavit what the escrow agreement

21   says, and Dondero testified to, which is that after a

22   final nonappealable judgment, A&B, as the escrow

23   agent, would transfer the deposit assets to HERA.

24           Highland also tries to distance itself

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/04/23   Page 474 of 1392   PageID 15216
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 363 of 1803   PageID 11109

90

1   from Klos.  And it cannot do so, as the document

2   presented to the Texas court states Klos was providing

3   the affidavit in his capacity as Highland's Senior

4   Manager of Finance.  At this stage, that is

5   sufficient.

6                    Together, these allegations are

7   sufficient to establish that Highland made a promise

8   that the assets would be held in escrow and released

9   to Daugherty, via HERA, if Daugherty won in Texas.

10                    Second, the reasonable expectation of

11   Highland as the promisor was to induce action or

12   forbearance on the part of Daugherty as promisee.

13                    In briefing, Highland says the

14   statements were not directed to Daugherty, "... but

15   rather [to] the jury, the judge, legal counsel, the

16   public, and so forth."  That's a quote from page 20 of

17   Highland's reply.  It simply makes no sense to say

18   that the statements were directed to everyone else

19   involved in the legal proceeding -- indeed, in the

20   world by virtue of including "the public" -- but not

21   Daugherty, who had the greatest interest in that

22   proceeding.  It is reasonably conceivable the

23   reasonable expectation of someone discussing the

24   escrow agreement, as Highland did, would have been to

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8.5   Filed 1/23/23 1804  Page 475 of 1392   PageID 15217
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 364 of 1803   PageID 11110

91

1   induce action or forbearance by their adversary in the

2   litigation.

3              Third, it is reasonably conceivable

4   that Daugherty reasonably relied on the promise and

5   took action to his detriment.

6              Daugherty could have pursued other

7   strategies if the escrow was not in place.  Daugherty

8   paid a judgment in the same case to Highland, which he

9   alleges was in the amount of $3.2 million.  If

10  Daugherty knew what would happen with the escrow, he

11  could have fought tooth and nail for an offset of the

12  judgment amounts.

13             Highland focuses on the availability

14  of a triangular offset in this situation, asserting

15  that even if HERA owed Daugherty money, Daugherty was

16  legally unable to offset the judgment he owed Highland

17  by what he was owed from HERA.  I think that misses

18  the point, which is that Daugherty forewent even

19  trying to obtain the offset, and bringing the issue to

20  the attention of the Texas court.

21             He could have argued for other

22  provisions in the final judgment, but he didn't.  He

23  paid his judgment and expected HERA and Highland would

24  do the same as set forth in the escrow agreement.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 06/23/2017 Page 476 of 1392    PageID 15218
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 365 of 1803    PageID 11111

92

 1             Other members of this court have

 2    adopted a "no-chumps policy," meaning that good guys

 3    should not feel like chumps for following the rules.

 4    Daugherty played the game straight, and alleges

 5    Highland and HERA didn't.  It is at least reasonably

 6    conceivable that Daugherty pursued the strategy he did

 7    because of the promises Highland made during the

 8    course of the litigation.

 9             And that reliance was reasonable.

10    Highland says Daugherty should have expected the worst

11    because the language of the escrow agreement allowed

12    the escrow agent to resign at any time, and so it was

13    never a sure thing that the assets would be available

14    to Daugherty.

15             In its reply, Highland says there was

16    never any promise "... that the Escrow Agreement would

17    never be terminated or that the Deposit Assets would

18    never be transferred back to Highland ...."  That

19    reflects a dim view of the world, the way adversaries

20    should evaluate the representations and promises made

21    during litigation, and how the people making those

22    promises should conduct themselves.  Daugherty has

23    adequately pled it was reasonable for him to rely on

24    the statements he's identified.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 03/09/23   Page 477 of 1392   PageID 15219
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 366 of 1803   PageID 11112

93

1          Fourth and finally, it is reasonably

2    conceivable that the promise is binding because

3    injustice can be avoided only by enforcement of the

4    promise.

5          Daugherty has made the point that

6    Highland walked away from the Texas litigation with

7    the benefit of both judgments.  It received the assets

8    supposedly held in escrow to satisfy the judgment for

9    Daugherty, and it received payment from Daugherty to

10   satisfy the judgment against him.

11          Black's Law Dictionary defines

12   "injustice" as "an unjust state of affairs;

13   unfairness."  As myself and Vice Chancellor Glasscock

14   have indicated, Daugherty's allegations raise serious

15   concerns over the fairness of how things played out in

16   Texas.  It may be that the only way to avoid injustice

17   is to enforce the promises.

18          It is not fatal to Daugherty that he

19   has pled alternative theories of relief.  Our Rule 8

20   allows it, and our Supreme Court has blessed doing so

21   for promissory estoppel in the *Chrysler v. Chaplake*

22   *Holdings* case.  At the pleadings stage, those

23   alternative theories of relief can go forward.

24          Highland also claims promissory

Appellee Appx. 00360
APPX. 00632

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 2/63/23 1804age 478 of 1392    PageID 15220
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 367 of 1803    PageID 11113

94

1    estoppel is not needed to prevent injustice because

2    the alleged promises are incorporated within the

3    escrow agreement, an enforceable contract.   But

4    Daugherty is not a party or a third-party beneficiary,

5    and so cannot sue under the contract's terms.   For

6    those reasons, the motion to dismiss is denied.

7                    Mr. Katz, any questions?

8                    MR. KATZ:   No, Your Honor.

9                    THE COURT:   Anything from you,

10   Mr. Uebler?

11                   MR. UEBLER:   No, Your Honor.

12                   THE COURT:   I'd like to, then, talk

13   about how we're going to get the summary judgment

14   briefing done in time for trial and in time for me to

15   have a minute to think about it.

16                   MR. KATZ:   Your Honor, we conferred --

17   my colleague conferred with Mr. Uebler this morning.

18   I think we've worked out a schedule.

19                   THE COURT:   How long does that

20   schedule leave me to think about it?

21                   MR. UEBLER:   Let me take a stab at

22   this, Your Honor, and see if it makes any sense to

23   you.   So it's my understanding that the defendants are

24   going to cross-move, or Highland -- it's a claim

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6   Filed 12/09/23 104 Page 479 of 1392    PageID 15221
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 368 of 1803    PageID 11114

95

1    against Highland.  Highland will cross-move for

2    summary judgment, and we will receive an answering

3    brief/opening brief by June 14th.  We'll reply by

4    June 28th.  And then looks like July 17th will be the

5    final brief.

6              And I'm sure I speak for all the

7    parties when I say we have no intention of imposing a

8    burden on the Court to resolve that motion prior to

9    trial.  I think -- at least my view, and Mr. Katz and

10   Mr. Reed can chime in -- we don't necessarily need to

11   resolve the summary judgment/indemnification claim

12   before trial because there's really not that much, if

13   any, issue of fact to try regarding indemnification.

14             I would propose that we resolve on the

15   papers, when the Court's able to do so, the issue of

16   entitlement.  And then, to the extent there's an issue

17   of allocation or reasonableness, we can get together

18   and propose something similar to Vice Chancellor

19   Laster's *Fitracks* opinion.  That was an advancement

20   case, but I would envision something similar here.

21             So we're working in parallel and not

22   burdening anybody prior to trial on those issues.

23             THE COURT:  Anything to add?

24             MR. KATZ:  No, Your Honor.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/20/23   Page 480 of 1392   PageID 15222
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 369 of 1803   PageID 11115

96

1                    THE COURT:  All right.  That works for

2       me, then, especially with the logical conclusion that

3       this can just kind of float in parallel to the real

4       merits issues to be handled at trial.

5                    Anything else that we need to discuss

6       today while we're all together?

7                    MR. KATZ:  Not from our side.

8                    THE COURT:  We pretty much handled

9       every aspect of the case today.  Thank you, all, for

10      your presentations, they were helpful.  And we'll be

11      in touch.

12                   We're adjourned.

13                   (Court adjourned at 4:33 p.m.)

14                         - - -

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/20/23   Page 481 of 1392   PageID 15223
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 370 of 1803   PageID 11116

97

1                          CERTIFICATE

2

3                    I, KAREN L. SIEDLECKI, Official Court

4     Reporter for the Court of Chancery of the State of

5     Delaware, Registered Merit Reporter, and Certified

6     Realtime Reporter, do hereby certify that the

7     foregoing pages numbered 3 through 96 contain a true

8     and correct transcription of the proceedings as

9     stenographically reported by me at the hearing in the

10    above cause before the Vice Chancellor of the State of

11    Delaware, on the date therein indicated, except for

12    the rulings at pages 3 through 19 and 84 through 94

13    which were revised by the Vice Chancellor.

14                    IN WITNESS WHEREOF I have hereunto set

15    my hand at Wilmington, this 22nd day of May, 2019.

16

17

18

19              /s/Karen L. Siedlecki

20         ----------------------------
                 Karen L. Siedlecki
21             Official Court Reporter
              Registered Merit Reporter
22           Certified Realtime Reporter

23

24

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/29/23   Page 482 of 1392   PageID 15224
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 371 of 1803   PageID 11117

# APPENDIX 5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/30/23    Page 483 of 1392    PageID 15225
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 372 of 1803    PageID 11118

EFiled:  Jul 08 2019 04:21PM EDT
Transaction ID 63518449
Case No. 2017-0488-MTZ

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| PATRICK DAUGHERTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0488-MTZ |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, | ) | |
| L.P., HIGHLAND EMPLOYEE | ) | |
| RETENTION ASSETS LLC, | ) | |
| HIGHLAND ERA MANAGEMENT LLC, | ) | |
| and JAMES DONDERO, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HIGHLAND EMPLOYEE | ) | |
| RETENTION ASSETS LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## ORDER DENYING APPLICATION TO
## CERTIFY INTERLOCUTORY APPEAL

WHEREAS:

A.    Plaintiff Patrick Daugherty was a partner and senior executive of
Defendant Highland Capital and certain of its affiliates from 1998 until his
resignation in 2011.

B.    Highland sued Daugherty in Texas, and Daugherty countered with
claims against Highland and Highland Employee Retention Assets LLC ("HERA")
(the "Texas Action").

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-5    Filed 12/29/23    Page 484 of 1392    PageID 15226
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 373 of 1803    PageID 11119

C.    During the course of the Texas Action, Defendants represented to the Texas court that Highland had placed Daugherty's HERA interests, worth approximately $3.1 million, in escrow with Abrams & Bayliss LLP as escrow agent.

D.    Highland received a judgment against Daugherty, and Daugherty received a judgment against HERA.  Daugherty paid the judgment against him.  HERA did not pay the judgment against it.  The day after the Texas judgment became final and non-appealable, Abrams & Bayliss resigned as escrow agent and transferred the escrow assets it held back to Highland.  HERA claimed to have no assets to satisfy a judgment.

E.    Daugherty responded by filing his complaint in this action on July 6, 2017.  Vice Chancellor Glasscock, who previously presided over this case, dismissed some of Daugherty's claims.  Daugherty then filed his first amended complaint.  The case was reassigned to me in October 2018.  After Daugherty filed his second amended complaint, I denied a motion to dismiss.  The surviving claims are for fraudulent transfer, unjust enrichment, and indemnification.

F.    On February 2, 2018, Daugherty served a subpoena on Abrams & Bayliss.[1]  Defendants moved to quash the subpoena "in its entirety given the privileged and sensitive nature of the information requested and Daugherty's

_____

[1] D.I. 52.

2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 12/29/23   Page 485 of 1392   PageID 15227
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 374 of 1803   PageID 11120

failure to demonstrate relevance to this lawsuit."[2]   Vice Chancellor Glasscock heard the motion to quash.   He started the argument by stating "general principles":

> First, information regarding the actions of Abrams & Bayliss in connection with its operation of the escrow as agents of Highlands, HERA, those documents, that information is relevant, and it doesn't appear to me to be generally privileged. Second, to the extent the subpoena requests attorney client privilege material, I'm going to need a privilege log to decide issues of privilege, waiver, and common interest doctrine. Third, it is appropriate to seek discovery from the escrow agent as well as from the defendants.  Fourth, the subpoena in question is overbroad as it seeks information far beyond Abrams & Bayliss' documents as escrow agents, and I'm not going to require a third party to answer overbroad discovery requests that surely implicate attorney-client privilege.  Fifth, I am therefore disposed to quash the subpoena with leave to file a more narrow subpoena. And once that subpoena is issued, there needs to be a meaningful meet and confer as to what is producible and what is not so that the disputes that come to me are tailored to the discoverability of the documents and any privilege that may apply.[3]

G.     Daugherty again subpoenaed Abrams & Bayliss, which produced 285 documents.   Daugherty and Abrams & Bayliss met and conferred.   Defendants asserted more than 300 documents were privileged.

H.     Daugherty challenged Defendants' privilege assertions by moving to compel (the "Motion").   Daugherty challenged whether documents relating to Abrams & Bayliss's work as escrow agent were properly withheld, and argued the

---

[2] D.I. 61 ¶ 2.

[3] D.I. 97 at 3-4.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 835    Filed 3/28/23    Page 486 of 1392    PageID 15228
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 375 of 1803    PageID 11121

crime-fraud exception vitiated any proper assertion of privilege. I heard argument on April 12.[4] The hearing was not productive as Defendants could not articulate the scope of their claimed privilege. I gave Highland yet another chance to defend its privilege and reconsider its privilege log, and specifically requested Abrams & Bayliss's engagement letter and billing records. I also requested to review the withheld documents *in camera*.[5]

I.    After receiving and reviewing the documents on the Defendants' privilege log *in camera*, I granted the Motion (the "Motion to Compel Ruling"). The privilege log was organized chronologically, and the withheld documents fell into four categories. The first comprised documents regarding the initiation, negotiation, and establishment of Abrams & Bayliss as Highland's escrow agent. The second comprised Abrams & Bayliss's legal work during the pendency of the Texas action to determine whether and how Daugherty might access the escrowed assets. The third category comprised Abrams & Bayliss's work responding to a subpoena in Texas. And the fourth comprised documents regarding Abrams & Bayliss's resignation as Highland's escrow agent.

J.    For reasons set forth at length in the Motion to Compel Ruling, I concluded that "unfortunately my *in camera* review confirmed Daugherty's fear

---

[4] D.I. 181.

[5] D.I. 181 at 37-38.

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 07/28/23    Page 487 of 1392    PageID 15229
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 376 of 1803    PageID 11122

that Highland is improperly withholding documents in categories 1 and 4 illustrating A&B's service and resignation as escrow agent, which are nonprivileged materials."[6]   I decided any privilege related to the topics in categories 1 and 4 was waived, but stopped short of a broader waiver.[7] Additionally, I concluded that even assuming categories 1 and 4 were privileged, the crime fraud exception applied to categories 1, 2 and 4.[8]

K.    On May 24, 2019, Defendants moved for reargument.[9]   On June 3, Defendants moved to stay the implementation of the Ruling pending interlocutory appeal.   On June 17, I denied Defendants' motion for reargument and declined to stay the decision pending interlocutory appeal (the "Reargument Ruling" and together with the "Motion to Compel Ruling," the "Rulings").[10]   I ordered the parties to agree upon a framework under Delaware Rule of Evidence 510(f) to govern discovery under the Rulings, which was entered on June 27.

_____

[6] D.I. 218 at 4.

[7] *Id*. at 10 ("Because Highland stuck by its position and continued to assert such a large percentage of improper privilege assertions while claiming it was producing documents concerning A&B's role as escrow agent, any privilege related to that topic is waived, and a full waiver of Highland's privilege could be an appropriate consequence. … I conclude Highland's unjustified withholding of other documents related to the escrow was not so egregious as to waive any privilege over these two sets of documents.").

[8] *Id*. at 10-15.

[9] D.I. 211.

[10] D.I. 253 (unredacted, filed under seal); D.I. 254 (redacted).

5

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6-36 Filed 3/29/23 Page 488 of 1392 PageID 15230
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 377 of 1803 PageID 11123

L.      On June 17, Defendants applied for certification of an interlocutory appeal of the Rulings (the "Application").[11]   Defendants identified three issues for certification:

> 1.      Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection without sufficient prima facie evidence that a party committed or attempted a fraud?
>
> 2.      Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection with respect to communications years before an alleged fraudulent transfer and without specific findings that each communication at issue was made in furtherance of the alleged fraud?
>
> 3.      Can the Court impose a waiver of privilege as punishment from a party's good faith, but ultimately incorrect, assertion of privilege?[12]

M.      Plaintiff filed his opposition to the Application on June 27.

N.      Under Supreme Court Rule 42(b), there are to be no interlocutory appeals "unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment."[13]

O.      "If the 'substantial issue' requirement is met, this Court will then analyze whether 'there are substantial benefits that will outweigh the certain costs

---

[11] D.I. 231.

[12] D.I. 231 at 5.

[13] Supr. Ct. R. 42(b)(i).

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6835 Filed 12/29/23 Page 489 of 1392 PageID 15231
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 378 of 1803 PageID 11124

that accompany an interlocutory appeal.'"[14]  Under Supreme Court Rule 42(b)(iii)

the Court weighs the following factors along with "its own assessment of the most

efficient and just schedule to resolve the case":

> (A) The interlocutory order involves a question of law resolved for the
> first time in this State; (B) The decisions of the trial courts are
> conflicting upon the question of law; (C) The question of law relates
> to the constitutionality, construction, or application of a statute of this
> State, which has not been, but should be, settled by this Court in
> advance of an appeal from a final order; (D) The interlocutory order
> has sustained the controverted jurisdiction of the trial court; (E) The
> interlocutory order has reversed or set aside a prior decision of the
> trial court, a jury, or an administrative agency from which an appeal
> was taken to the trial court which had decided a significant issue and a
> review of the interlocutory order may terminate the litigation,
> substantially reduce further litigation, or otherwise serve
> considerations of justice; (F) The interlocutory order has vacated or
> opened a judgment of the trial court; (G) Review of the interlocutory
> order may terminate the litigation; or (H) Review of the interlocutory
> order may serve considerations of justice.

P.      "If the balance is uncertain, the trial court should refuse to certify the

interlocutory appeal."[15]

**IT IS ORDERED**, this 8th day of July, 2019, that the Application is

DENIED based on the following:

1.      The Rulings did not decide "a substantial issue of material importance

that merits appellate review before a final judgment."[16]  "The 'substantial issue'

---

[14] *Sider v. Hertz Glob. Hldgs., Inc.*, 2019 WL 2501481, at *4 (Del. Ch. June 17, 2019)
(quoting Supr. Ct. R. 42(b)(ii)).

[15] Supr. Ct. R. 42(b)(iii).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 03/31/04    Page 490 of 1392    PageID 15232
Exhibit 5    Page 389 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 379 of 1803    PageID 11125

requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters."[17]  "Generally speaking, the substantive element of the appealability of an interlocutory order must relate to the merits of the case, not to matters of discovery."[18]  That "proscription against interlocutory review of discovery rulings 'does not change merely because the discovery/disclosure order implicates the attorney-client privilege.'"[19]  The Rulings decided the application and waiver of the attorney-client and work product privileges, not a main issue on the merits.  The Rulings did not decide a substantial issue of material importance that warrants appellate review before a final judgment.

2.    Highland argues that it is not seeking "appellate review simply so that an appellate court can re-review each communication at issue and evaluate the privilege determinations made. . . . What [it] seeks is different.  It challenges the

---

[16] Supr. Ct. R. 42(b)(i).

[17] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008).

[18] *In re Examworks Grp., Inc.*, 2018 WL 1672991, at *2 (Del. Ch. Apr. 05, 2018) (ORDER) (quoting *Castaldo v. Pittsburgh-Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973)); *accord Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1993 WL 478084, at *1 (Del. Nov. 16, 1993) (ORDER); *see also Deloitte LLP v. Klig*, 2010 WL 3736141, at *1 (Del. Sept. 27, 2010) (ORDER) (refusing interlocutory appeal of order finding waiver of privilege).

[19] *Certain Underwriters at Lloyd's, London v. Monsanto Co.*, 1991 WL 134471, at *1 (Del. June 7, 1991) (ORDER) (citations omitted) (quoting *In re Rinehardt*, 575 A.2d 1079, 1081 (Del. 1990)).

8

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 03/31/04 Page 491 of 1392    PageID 15233
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 380 of 1803    PageID 11126

Order's _legal conclusions_ that will reverberate throughout this action."[20]  This is a

distinction without a difference.  Whether a party properly asserted a privilege, or

whether an exception to the privilege applies, is a legal conclusion.  The question

is whether it is the type of legal conclusion that warrants interlocutory review.  It is

not.

3.     Turning to the factors underpinning whether there are substantial

benefits that will outweigh the costs of interlocutory appeal, Highland identifies

only Supreme Court Rule 42(b)(iii)(B) and (H) as favoring its Application.  I

therefore "limit[] my review principally to those" issues.[21]  In short, the high costs

of piecemeal litigation and interlocutory appeals outweigh the value of this

Application.  This is particularly true here where trial will start on September 10

and there are other ongoing discovery disputes requiring the parties' attention.[22]

4.     The Rulings do not conflict with decisions of other trial courts.[23]

Defendants have not identified any Delaware decision at odds with the Rulings on

the crime-fraud exception.  Defendants cite authorities, such as _Buttonwood Tree_

---

[20] D.I. 231 at 6 (emphasis in original).

[21] _Chemours Co. v. DowDuPont Inc._, 2019 WL 2404817, at *3 (Del. Ch. June 7, 2019).

[22] On July 5, I attempted to quantify and remedy Defendants' other discovery shortcomings by appointing a third-party neutral to collect documents.  D.I. 255.  It is possible that trial will have to be postponed.  But this possibility, borne from Defendants' failure to collect their own documents, should not support the relief Defendants seek here.

[23] Supr. Ct. R. 42(b)(iii)(B).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Exhibit 5    Filed 04/03/18   Page 492 of 1392    PageID 15234
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 381 of 1803    PageID 11127

*Value Partners, L.P. v. R.L. Polk & Co.*,[24] and *Princeton Ins. Co. v. Vergano*,[25]

discussed in the Rulings, and argue the Court erred in ruling Daugherty had made a

*prima facie* showing of fraud.  Defendants do not dispute that Abrams & Bayliss

assisted Highland in the transaction that Daugherty claims was fraudulent, but

argue he "has not established through a prima facie showing [] that the transaction

*was* fraudulent."[26]

      5.    Distilled, Defendants' argument is that Daugherty has not shown

sufficient evidence of fraud in Highland's "desire to avoid paying money to

Daugherty."[27]   In arguing the Court applied a standard that was too low,

Defendants advocate for a standard that is too high.   As explained in the

Reargument Ruling, "the party opposing the privilege is not required to introduce

evidence sufficient to support a verdict of crime or fraud or even to show that it is

more likely than not that the crime or fraud occurred."[28]  Discovery to date, and *in

camera* review, indicate that Defendants used Abrams & Bayliss as their escrow

agent, made numerous representations to the Texas court and Daugherty that assets

to satisfy any judgment were held in escrow, held the assets in escrow differently

---

[24] 2018 WL 346036 (Del. Ch. Jan. 10, 2018).

[25] 883 A.2d 44 (Del. Ch. 2005).

[26] D.I. 231 at 9 (emphasis in original).

[27] *Id*. at 9 n.2.

[28] D.I. 254 at 11 (quoting *Kickflip, Inc. v. Facebook, Inc.*, 2016 WL 5929003, at *5 (D. Del. Sept. 14, 2016)).

Appellee Appx. 00375
APPX. 10572

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 03/03/23    Page 493 of 1392    PageID 15235
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 382 of 1803    PageID 11128

than represented, and then at the end of it all directed Abrams & Bayliss to transfer assets from that same escrow to Highland to avoid satisfying the judgment to Daugherty.[29]  Daugherty met his burden of showing a *prima facie* case of fraud sufficient to warrant the crime-fraud exception.  Defendants cite no Delaware decisions that conflict with this analysis.  As a result, they have not shown interlocutory review is warranted to resolve conflicting decisions.

6.    Defendants also argue that the Court applied the crime-fraud exception too broadly and "did not make the factual finding needed to support its conclusion that each communication [] 'was made in furtherance of a fraud' and thus fell within the exception."[30]  In fact, *in camera* review showed that the documents in category 2 reflected "efforts that culminated in the allegedly fraudulent acts."[31]  The Court made the factual finding Defendants seek.  Again, Defendants cannot identify Delaware decisions that conflict with this analysis, and so have not shown interlocutory review is warranted.

7.    Finally, Defendants argue the Rulings conflict with precedent concerning the sanction of a punitive waiver.  Defendants have failed to present a conflict among trial court decisions that merits interlocutory review.  Waiver was

---

[29] I described specific documents in the Reargument Ruling, but sealed that portion of the transcript pending resolution of Defendants' Application and will not repeat that description here.  *See* D.I. 253 at 13-15.

[30] D.I. 231 at 10.

[31] D.I. 218 at 13.

Appellee Appx. 00376
Appx. 10673

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/21/23   Page 494 of 1392   PageID 15236
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 383 of 1803   PageID 11129

based on Defendants' persistence in claiming privilege over the work of their escrow agent, after Vice Chancellor Glasscock informed them that work was not privileged, and after they were given multiple opportunities to follow those instructions.[32]  The waiver component of the Rulings "applied settled principles of law" on the application and waiver of privilege.[33]  "An improperly asserted claim of privilege is no claim at all."[34]  Further, for reasons explained in the Reargument Ruling, Defendants misconstrued the Motion to Compel Ruling: I concluded categories 1 and 4 were not privileged, but went on to make the point that even if they were, that privilege would have been waived.  Defendants have not identified any documents or testimony that they assert are privileged but that they must produce as a result of the waiver.

8.    The second factor Defendants address is that interlocutory review may serve considerations of justice.[35]  Defendants seek interlocutory relief on the secondary holding that categories 1 and 4 would be waived if they were privileged, and on the crime-fraud exception, in pursuit of a different set of guideposts for the remainder of the case.  The Supreme Court has declined to intervene to move discovery guideposts, even where the attorney-client privilege (and any harm

---

[32] Ex. 254 at 19-22.

[33] *Klig v. Deloitte LLP*, 2010 WL 3489735, at *9 (Del. Ch. Sept. 7, 2010) (describing decisions applying principle).

[34] *Id*. at *4.

[35] Supr. Ct. R. 42(b)(iii)(H).

Appellee Appx. 00377
APPX.10673

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66-3   Filed 03/03/24   Page 495 of 1392   PageID 15237
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 384 of 1803   PageID 11130

flowing from disclosure) is at issue.[36]  This factor does not support interlocutory appeal.

9.      Neither side argues any of the remaining factors set out in Supreme Court Rule 42(b)(iii).  None of those factors apply here.

10.      In line with our State's general preference against interlocutory appeals, I decline to certify the Rulings for interlocutory review.

  _/s/ Morgan T. Zurn_____
Vice Chancellor Morgan T. Zurn

---

[36] *Supra* ¶ 1.

13

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 08/20/23   Page 496 of 1392   PageID 15238
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 385 of 1803   PageID 11131

# APPENDIX 6

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-6   Filed 03/31/04   Page 497 of 1392   PageID 15239
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 386 of 1803   PageID 11132
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 1 of 16

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Hearing Date: TBD** |
| | ) **Objection Deadline: TBD** |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**FOR AN ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED**
**STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS**

The official committee of unsecured creditors (the "Committee") of Highland Capital

Management, L.P. (the "Debtor"), hereby submits this motion (this "Motion") for entry of an order,

substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to

28 U.S.C. §§ 1408 and 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure

("Bankruptcy Rules"), transferring the venue of the above-captioned chapter 11 case to the United

States Bankruptcy Court for the Northern District of Texas.

**PRELIMINARY STATEMENT**

1.     Although a debtor's choice of venue generally warrants deference, this case

presents unique facts that make a change in venue appropriate.  The Debtor has only one location

in the United States—its Dallas, Texas headquarters, which houses the Debtor's management and

key personnel.  In fact, the Debtor's headquarters sit less than two miles from the United States

Bankruptcy Court for the Northern District of Texas (the "Dallas Bankruptcy Court"), making the

venue clearly more convenient for the Debtor and its management than Delaware.  Additionally,

---

[1]     The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 885   Filed 12/23/2304   Page 498 of 1392   PageID 15240
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 387 of 1803   PageID 11133
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 2 of 16

although the Debtor's creditors span the nation, a substantial number of the Debtor's creditors (including several of the top twenty unsecured creditors and Committee members) are concentrated in Texas, or the Midwest more broadly.  Likewise, nearly all of the professionals active in this case are concentrated in Texas, Chicago, or Los Angeles.  The Dallas Bankruptcy Court is more centrally located and easily accessible to the key parties in this case, along with their advisors.  Transferring venue from Wilmington, Delaware to Dallas, Texas would result in greater efficiencies and significant cost savings for the Debtor's estate.

2. Moreover, the Dallas Bankruptcy Court is already intimately familiar with the Debtor's principals and complex organizational structure—the involuntary chapter 11 cases of the Debtor's former affiliates and current Committee members, Acis Capital Management, L.P. and Acis Capital Management GP, L.P. (collectively, "Acis") are pending in the Dallas Bankruptcy Court.  Specifically, the Dallas Bankruptcy Court has (a) heard multiple days' worth of material testimony from the Debtor's principal owner (James Dondero), the Debtor's minority owner (Mark Okada), the Debtor's general counsel, at least two assistant general counsels, and numerous other employees of the Debtor and other witnesses; and (b) issued at least six published opinions to date, many of which have been affirmed on appeal to the United States District Court for the Northern District of Texas (the "Dallas District Court") in subsequent published opinions.  The Dallas Bankruptcy Court is still presiding over an adversary proceeding commenced by the Debtor and its affiliates, and the Debtor's appeal of Acis's confirmed chapter 11 plan is still pending before the Fifth Circuit.  As evidenced by the published opinions, the Dallas Bankruptcy Court and the Dallas District Court are intimately familiar with the Debtor's business, principal owner, and key executives.  For these reasons, the Dallas Bankruptcy Court is uniquely positioned to oversee this chapter 11 case.

ACTIVE 250501748

**Appellee Appx. 00381**
**Appx. 10032**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 08/08/24 Page 499 of 1392    PageID 15241
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 388 of 1803    PageID 11134
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 3 of 16

3.       The Committee respectfully submits that, for the reasons set forth above and discussed more fully below, based on the unique facts of this case, both the interests of justice and convenience of the parties justify an exception to the general deference granted to a debtor's choice of venue and warrant the transfer of venue to the Dallas Bankruptcy Court.

## JURISDICTION

4.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Committee confirms its consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.       The statutory and other bases for the relief requested herein are 28 U.S.C. §§ 1408 and 1412, Bankruptcy Rule 1014, and Local Rule 1014-1.

## BACKGROUND

6.       On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").   The Committee was appointed by the United States Trustee on October 29, 2019 [Docket No. 65].

**I.       The Debtor's Connections to Dallas.**

7.       As noted in the Voluntary Petition [Docket No. 1], the Debtor's principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201, which also serves as the Debtor's

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 03/03/23    Page 500 of 1392    PageID 15242
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 389 of 1803    PageID 11135
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 4 of 16

international headquarters, and, in fact, its only office in the United States.  *See Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 9] (the "First Day Declaration"), ¶ 7.  Although it is unclear how many of the Debtor's 76 employees are based in the Debtor's international offices, presumably those employees based in the U.S. live in or around the Debtor's headquarters in Dallas, Texas.  Furthermore, all but one of the Debtor's equity holders are also located in Dallas, Texas.  *See* Voluntary Petition [Docket No. 1], at pg. 14.  In sum, Dallas, Texas is the epicenter of the Debtor's operations.

## II.    The Dallas Bankruptcy Court's Familiarity with the Debtor.

8.    Prior to the commencement of this chapter 11 case, the Debtor was (and currently remains) actively involved in the involuntary chapter 11 case of Acis, its then-affiliate and current Committee member, captioned *In re Acis Capital Mgmt., L.P.*, Case No. 18-30264 (SGJ) (the "Acis Bankruptcy").  Until 2019, Acis was the "structured credit arm of Highland."  *In re Acis Capital Mgmt., L.P.*, Nos. 18-30264 (SGJ), 2019 Bankr. LEXIS 292, at *17 n. 21 (Bankr. N.D. Tex. Jan. 31, 2019) (the "Acis Confirmation Opinion"), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019).[2] Acis did not have any of its own employees and, instead, contracted with the Debtor to perform all day-to-day functions, meaning that all Acis corporate representatives and witnesses in the Acis Bankruptcy were employees of the Debtor.  *Id.* at *9.  Moreover, there was complete overlap between Acis and the Debtor at the executive level, with the Debtor's CEO James Dondero serving as President of Acis and the Debtor's CFO, and first day declarant, Frank Waterhouse serving as Treasurer.

9.    The Acis Bankruptcy commenced on January 30, 2018, when Joshua N. Terry filed involuntary petitions against Acis to commence chapter 7 cases in the Dallas Bankruptcy Court.

---

[2] The Acis Confirmation Opinion is attached hereto as **Exhibit B**.

Appellee Appx. 00383
Appx. 10634

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 63 Filed 09/01/04 Page 501 of 1392 PageID 15243
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 390 of 1803 PageID 11136
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 5 of 16

In connection with a hotly-contested trial on the involuntary petitions, the Dallas Bankruptcy Court heard seven days of testimony and argument, entered orders for relief and issued a written opinion, which is attached hereto as **Exhibit C** (the "<u>Acis Involuntary Opinion</u>").  Testimony included that of the Debtor's co-founder and CEO, James Dondero, the Debtor's co-founder and then-Chief Investment Officer, Mark Okada, the Debtor's General Counsel, Scott Ellington, the Debtor's Controller, David Klos, and the Debtor's Assistant General Counsel, Isaac Leventon.

10.     In May 2018, the Acis bankruptcy cases were converted from Chapter 7 to Chapter 11, and a Chapter 11 Trustee was appointed "due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management."  *See* Acis Confirmation Op. at *15.

11.     The Debtor and its affiliates were, and remain, exceptionally active throughout the Acis Bankruptcy, objecting to virtually every action proposed by the Chapter 11 Trustee throughout the case.  *See In re Acis Capital Mgmt., L.P.*, 603 B.R. 300, 302 (Bankr. N.D. Tex. 2019).  As a result, the Dallas Bankruptcy Court was forced to conduct many evidentiary hearings, during which the Debtor's executives and employees were often called to testify.  Overall, between the Acis Bankruptcy and related adversary proceedings, the Dallas Bankruptcy Court has to date reviewed approximately 700 exhibits, heard more than thirty days of testimony and oral argument, and issued six opinions.  The Dallas District Court has also ruled on three appeals related to the Acis Bankruptcy, all of which were filed by the Debtor and/or its affiliates.  The Debtor's appeal of the Acis confirmation order is now pending before the Fifth Circuit.[3]

12.     The Dallas Bankruptcy Court is also currently adjudicating a number of fraudulent transfer causes of action that Acis has brought against the Debtor and certain of its non-debtor

---

[3]     *See generally Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel* Nunc Pro Tunc *to the Petition Date* [Docket No. 69] and

ACTIVE 250501748

Appellee Appx. 00384
APPX. 10036

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/22/23    Page 502 of 1392    PageID 15244
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 391 of 1803    PageID 11137
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 6 of 16

affiliates in a consolidated adversary case (the "<u>Acis Adversary Proceeding</u>"). Distilled to its essence, the Acis Adversary Proceeding concerns actions taken by the Debtor and its affiliates to denude the Acis debtors' estates of their value and frustrate an imminent, substantial judgment against Acis. *See Acis Capital Mgmt., GP, LLC v. Highland Capital Mgmt., L.P. (In re Acis Capital Mgmt., L.P.)*, 600 B.R. 541, 549 (Bankr. N.D. Tex. 2019) (the "<u>Acis Arbitration Opinion</u>").[4]

13.    In sum, the Dallas Bankruptcy Court and the Dallas District Court are already intimately familiar with the Debtor's complex structure, its management, and key personnel, and are well-versed in the contentious relationship between the Debtor and several of its largest creditors, including members of the Committee. Accordingly, the Dallas Bankruptcy Court is uniquely situated to oversee this chapter 11 case.

## RELIEF REQUESTED

14.    By this Motion, the Committee requests entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, transferring the venue of this chapter 11 case to the Dallas Bankruptcy Court.

## BASIS FOR RELIEF

### III.    The Dallas Bankruptcy Court is an Appropriate Venue Under 28 U.S.C. § 1408.

15.    Section 1408 of title 28 of the United States Code provides that bankruptcy cases may be commenced in the district court for the district "in which the domicile, residence, principal place of business in the United States, or principal assets in the United States" of the debtor is

---

*Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel* Nunc Pro Tunc *to the Petition Date* [Docket No. 70] (describing the Debtor's ongoing litigation and involvement with the Acis Bankruptcy).

[4] A copy of the Acis Arbitration Opinion is attached hereto as **Exhibit D**.

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 03/08/24   Page 503 of 1392   PageID 15245
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 392 of 1803   PageID 11138
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 7 of 16

located or the district "in which there is a pending case under title 11 concerning such person's affiliate."

16.     The Debtor's headquarters, and indeed its only office in the United States, is located in Dallas, Texas.  Moreover, had this chapter 11 case commenced mere months ago, the Acis Bankruptcy would be a "pending case under title 11 concerning" the Debtor's affiliate.[5]  The Dallas Bankruptcy Court easily satisfies the statutory venue requirements under 28 U.S.C. § 1408.

**IV.     The Court Should Exercise its Discretion to Transfer Venue to the Dallas Bankruptcy Court.**

17.     It is within a court's discretion to transfer a case to another venue if it is "in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.  Courts have interpreted this statutory provision to create two distinct bases upon which transfer of venue may be granted: interest of justice *or* convenience of the parties.  *See In re Qualtec Inc.*, No. 11-12572 (KJC), 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012).  Movants for transfer of venue have the burden of showing that a transfer is warranted based on the preponderance of the evidence.[6]  *Id.* at *5.

**A.     Transferring Venue to the Dallas Bankruptcy Court Would Serve the Convenience of the Parties.**

18.     In determining whether a venue transfer would serve the convenience of the parties, courts generally examine the following six factors: "(a) proximity of the creditors of every kind to the court; (b) proximity of the debtor; (c) proximity of the witnesses who are necessary to the administration of the estate; (d) the location of the debtor's assets; (e) the economic administration of the estate; and (f) the necessity for ancillary administration in the event of liquidation."  *In re*

---

[5] The Debtor ceased to be an affiliate of Acis following confirmation of the Acis plan of reorganization in January 2019, when equity in reorganized Acis was distributed to Mr. Terry in exchange for a reduction of his allowed claim.

[6] To meet its burden herein, the Committee is relying on the record of this case, including the First Day Declaration, and the established record of the Acis Bankruptcy.  The Committee therefore does not anticipate there being any need to hold an evidentiary hearing on this Motion.

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 04/08/24   Page 504 of 1392   PageID 15246
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 393 of 1803   PageID 11139
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 8 of 16

*Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at \*2 (Bankr. D. Del. Mar. 4, 2016) (*quoting Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979)). Under this analysis, the factor given the most weight is the economic and efficient administration of the estate. *Id.*

### 1.     Proximity of Creditors of Every Kind to the Court.

19.     Of the Debtor's twenty largest unsecured creditors, at least seven[7] are listed as having Texas addresses: Acis, Joshua and Jennifer Terry, McKool Smith, P.C., Foley Gardere, DLA Piper LLP (US), Lackey Hershman LLP, and Andrews Kurth LLP. *See* Voluntary Petition [Docket No. 1]. Additionally, of the total known claims at this juncture, it appears that a significant number of the Debtor's creditors are located in Texas, and the rest of the creditors appear to be scattered across the United States. No known creditors appear to be based in Delaware. *See id.*

20.     Courts may also focus on the location of the debtor's and creditors' professionals in deciding whether to transfer venue. *See In re Caesars Entm't Operating Co., Inc.*, No. 15-10047 (KG), 2015 WL 492529, at \*6 (Bankr. D. Del. Feb. 2, 2015). The Committee's proposed counsel is primarily located in Chicago, Illinois, but also maintains an office in Dallas, Texas (where its litigation team for this case is based). If this case were to proceed before this Court, the Committee would have to retain Delaware co-counsel.[8] Additionally, several of the Debtor's largest creditors are separately represented by counsel based in the Midwest: the Acis is represented by the Rogge Dunne Group and Winstead PC in Dallas [Docket No. 81], the Redeemer Committee of the Highland Crusader Fund is represented by Jenner & Block LLP primarily out of its Chicago office

---

[7] Additionally, although listed with a North Carolina address, CLO Holdco, Ltd. is an affiliate of and controlled by the Debtor, whose principal place of business is in the Northern District of Texas. The Debtor also lists Reid Collins & Tsai's New York office, despite the fact that the firm is a Texas limited liability partnership based in Texas.

[8] Under Local Rule 9010-1(d), the Committee has until November 27, 2019, to obtain Delaware co-counsel, if necessary.

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-3   Filed 03/23/23   Page 505 of 1392   PageID 15247
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 394 of 1803   PageID 11140
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 9 of 16

[Docket Nos. 1, 36], and USB Securities LLC and UBS AG London Branch is represented by Latham & Watkins LLP, which has an office in Houston [Docket No. 85].

21.     Considering the proximity of both the Debtor's creditors and their professionals to the Dallas Bankruptcy Court, this factor should weigh in favor of transfer.  *See In re Rehoboth Hosp., LP*, No. 11-12798 (KG), 2011 WL 5024267, at *3 (Bankr. D. Del. Oct. 19, 2011) (concluding that, on balance, this factor favored transfer to Texas when the overwhelming majority of creditors were located in Texas).

### 2.     Proximity of the Debtor to the Court.

22.     Courts have noted that this inquiry should focus primarily on the parties that must appear in court.  *See Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6.  The Debtor's headquarters, and only office located in the United States, is in Dallas, Texas.  *See* First Day Decl., at ¶ 7.  As a result, it is likely that any of the Debtor's personnel who would have to appear in court are located in Dallas, Texas.  The Debtor has no connection to Delaware other than the fact that it was formed there.

23.     The Committee concedes that Debtor's counsel maintains an office in Delaware but does not have an office in Dallas.  That said, Debtor's counsel represents itself as having a "national presence," including in the Fifth Circuit,[9] and its lead lawyers on this matter are based in Los Angeles.  The Debtor's proposed financial advisor team is also predominantly based in Los Angeles with several members located in Chicago.  No proposed advisor from Development Specialists, Inc. is located on the East Coast, let alone in Delaware.  *See Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and*

---

[9] *See* http://www.pszjlaw.com/about-presence.html#circuit5.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 03/31/04   Page 506 of 1392   PageID 15248
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 395 of 1803   PageID 11141
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 10 of 16

*Restructuring-Related Services,* Nunc Pro Tunc *as of the Petition Date* [Docket No. 75], Ex. A. Accordingly, the Committee respectfully submits that this factor weighs in favor of transferring venue to the Dallas Bankruptcy Court.

### 3.    Proximity of the Witnesses Necessary to the Administration of the Estate.

24.    The Committee anticipates that the witnesses likely to be necessary in this chapter 11 case are the Debtor's management, who are all located in Dallas, Texas, or the Debtor's financial advisors, who are all located in either Chicago, Illinois, or Los Angeles, California. Dallas, Texas, is significantly closer to any potential witness than Wilmington, Delaware.  Thus, the Committee respectfully submits that this factor also weighs in favor of transferring venue to the Dallas Bankruptcy Court.

### 4.    Location of the Assets.

25.    The location of the Debtor's assets is not as important as other factors where "the ultimate goal is rehabilitation rather than liquidation." *See In re Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6 (quoting *In re Enron Corp.*, 274 B.R. 327, 347 (Bankr. S.D.N.Y. 2002)).  Although the Committee believes that the Debtor's U.S. assets would be located at the Debtor's headquarters in Dallas, Texas, the Committee does not believe this factor important to the Court's decision.

### 5.    Economic Administration of the Estate.

26.    As noted above, the most important factor is the economic and efficient administration of the Debtor's estate.  *Id.*  The Committee does not dispute the ability of this Court to administer this chapter 11 case in a just and efficient manner.  That said, there are many factors that make the Dallas Bankruptcy Court the more economical venue.  As discussed in more detail below as part of the "interests of justice" analysis: (1) there is a higher concentration of creditors

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 09/08/23    Page 507 of 1392    PageID 15249
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 396 of 1803    PageID 11142
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 11 of 16

and creditors' counsel in Texas and the Midwest than elsewhere in the country; (2) the Debtor and

all of its U.S. personnel are in Dallas, Texas; (3) Dallas, Texas is more centrally located in the

United States than Wilmington, Delaware and arguably easier and cheaper for parties to travel to;

(4) most creditors would need to obtain Delaware co-counsel if venue remains before this Court;

and (5) the Dallas Bankruptcy Court and the Dallas District Court has already expended great time

and effort familiarizing itself with the Debtor, the Debtor's operations, and the disputes between

the Debtor and some of its largest creditors.  For these reasons and the reasons set forth below in

Section II.B, this factor weighs heavily in favor of transferring venue to the Dallas Bankruptcy

Court.  *See In re Qualteq, Inc.* 2012 WL 527669, at *6 (noting that same considerations for this

factor arise in applying the "interest of justice" prong).

### 6.    Necessity for Ancillary Administration if Liquidation Should Result.

27.    "Most cases do not consider liquidation because it is illogical to focus on liquidation

contingencies when the goal of the bankruptcy is reorganization."  *In re Dunmore Homes, Inc.*,

380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008).  However, should this case be converted to a

liquidation, the Debtor's personal property would be predominantly located in Dallas, Texas.  As

a result, this factor also weighs in favor of transfer.

### B.    Interests of Justice.

28.    When determining whether a transfer would serve the interests of justice, courts

consider whether such transfer "would promote the efficient administration of the estate, judicial

economy, timeliness, and fairness."  *Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *7

(quotations omitted).  The interests of justice standard is a "broad and flexible standard which must

be applied on a case-by-case basis."  *In re Safety-Kleen Corp.*, Adv. Proc. No. 00-1984, 2001

Bankr. LEXIS 1296, at *6 (Bankr. D. Del. Aug. 27, 2001) (citing *Gulf States Expl. Co. v. Manville*

*Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990)).

Appellee Appx. 00390
Appx. 10732

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/20/23    Page 508 of 1392    PageID 15250
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 397 of 1803    PageID 11143
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 12 of 16

1.    **Judicial Economy.**

29.    Judicial economy would be served by transferring this case to the Dallas Bankruptcy Court. At the time of this filing, this Court has only held one hearing, granting interim relief for a handful of routine "first day" motions. In contrast, the Dallas Bankruptcy Court has heard at least 30 days of testimony, including that of the Debtor's executives, and conducted countless hearings in the Acis Bankruptcy. With the exception of the Debtor's proposed chief restructuring officer and Mr. Waterhouse, the Dallas Bankruptcy Court is familiar with nearly all of the Debtor's senior management. As summarized above, the Dallas Bankruptcy Court and Dallas District Court have already devoted multiple days of court time to the Debtor.

30.    Additionally, Acis's claim against the Debtor (which is listed on the list of twenty largest unsecured creditors) and the Debtor's proof of claim and administrative claim against Acis (which is technically an asset of the Debtor's estate) are currently pending in the Dallas Bankruptcy Court. Judicial economy would best be served by utilizing the time and resources already extended by the Dallas Bankruptcy Court in connection with these claims. This factor weighs overwhelmingly in favor of transfer. Indeed, it is hard to imagine a case where judicial economy would be better served by a transfer of venue under 28 U.S.C. § 1412.

31.    Courts in this district have historically placed a particular emphasis "on the "learning curve" that typically militates against a transfer. *See In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *5 (Bankr. D. Del. Mar. 4, 2016). This case is unique in that the "learning curve" that typically militates against a transfer in the interests-of-justice basis is actually *inverted*. That is, it is not the proposed transferee court that will have a "learning curve," but rather it is this Court that would. Given that this Court has only considered first day relief, and on an interim basis, while the Dallas Bankruptcy Court and Dallas District Court both have

ACTIVE 250501748

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-6    Filed 12/30/23    Page 509 of 1392    PageID 15251
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 398 of 1803    PageID 11144
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 13 of 16

intimate familiarity with the parties and their businesses, transferring the venue would be in furtherance of judicial economy.

### 2. Economic and Efficient Administration of the Bankruptcy Estate.

32.     As previously noted, there are economic efficiencies available in Dallas, Texas that are not available in Wilmington, Delaware. Venue in Dallas would allow the Debtor's employees to easily attend hearings in this case and thus eliminate the need for air travel for most witnesses. The Debtor's headquarters are located in The Crescent in Dallas, Texas, approximately 1.2 miles from the Dallas Bankruptcy Court. By contrast, this Court is located approximately 1,437 miles from the Debtor's headquarters. Travel to this Court from the Debtor's headquarters requires, at a minimum, a 30-minute car ride to Dallas/Fort Worth International Airport, approximately three hours flying time to Philadelphia International Airport, and then a 30-minute car ride to Wilmington, Delaware. The foregoing does not take into account recommended early arrival times at airports for check-in, flight delays, traffic, or the need for overnight stays in Wilmington. If this case remains in Delaware, critical management personnel will be required to spend extended periods away from their offices when they should be focused on maximizing value for all creditors.

33.     Additionally, as the Debtor's professionals and proposed CRO are primarily located in Los Angeles, venue in Dallas would eliminate hours of travel time and the administrative expense associated with the same. Dallas-Fort Worth International Airport, consistently the third-busiest airport in the country (behind Chicago O'Hare and Atlanta Hartsfield-Jackson), offers nearly 1,800 flights per day. American Airlines alone offers approximately 14 non-stop flights per day from LAX to DFW. According to FlightSphere.com, there are approximately 20 total flights per day from LAX to DFW and 7 flights per day from DAL to LAX. By contrast, according to FlightSphere.com, there are approximately 10 flights per day from DFW to Philadelphia and approximately 8 flights per day from DAL to Philadelphia. The flight from LAX to DFW is

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 4/09/03180 Page 510 of 1392   PageID 15252
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 399 of 1803   PageID 11145
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 14 of 16

approximately 3 hours, whereas the flight from LAX to Philadelphia is approximately 6 hours. *See In re Rehoboth Hosp., LP,* No. 11-1279 (KG), 2011 Bankr. LEXIS 3992, at *15 (Bankr. D. Del. October 19, 2011) (transferring venue of a single asset real estate case from Delaware to Texas because "the estate may incur significant travel costs to obtain the testimony of witnesses that are located in Texas").

34.     Additionally, Rule 45 of the Federal Rules of Civil Procedure, incorporated by Bankruptcy Rule 9016, mandates that contested non-party discovery disputes (potentially like those related to the Debtor's approximately 2,000 non-debtor affiliates) be heard in the place of compliance, which would most likely be in the Northern District of Texas.  The Committee is already aware of the Debtor's history of contesting discovery.  *See, e.g., Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.*, CV 6547-VCN, 2016 WL 61223, at *1 (Del. Ch. Feb. 2, 2016). It is therefore likely that the Dallas District Court and Dallas Bankruptcy Court will need to hear and resolve multiple discovery disputes.  In light of that inevitability, it would be sensible to transfer this case so that related disputes aren't being heard in multiple venues.

35.     There is no doubt that transferring venue to Dallas would promote the economic and efficient administration of this chapter 11 case.  This factor weighs in favor of transfer.

### 3.     Timeliness.

36.     As of the date of this Motion, this case has only been pending for 16 days.  The Committee is also seeking to have this Motion heard on an expedited basis, as set forth in the motion to shorten notice filed concurrently herewith.  *Cf. In re Jones*, 39 B.R. 1019, 1020 (Bankr. S.D.N.Y. 1984) ("[t]he debtor's motion to change venue is untimely given the fact that this case was commenced over one and one-half years ago").  The Court has only considered the Debtor's request for first day relief on an interim basis.  The next hearing is not scheduled until November 19, 2019.  The Motion is timely and this factor weighs in favor of transfer.

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 685   Filed 04/25/23   Page 511 of 1392   PageID 15253
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 400 of 1803   PageID 11146
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 15 of 16

**4.      Fairness.**

37.      Transferring this chapter 11 case to a venue where employees, creditors, and numerous other parties-in-interest may more easily participate in the restructuring process would be manifestly fair.  To the extent the Debtor chose this forum in order to distance itself from largely unfavorable findings, fairness dictates that this case should be transferred.

*        *        *        *        *

38.      For the foregoing reasons, it is both in the interest of justice and for the convenience of the parties that this chapter 11 case be transferred to the Dallas Bankruptcy Court.  The majority of the parties and professionals involved in this chapter 11 cases are more centrally located to Dallas, Texas than Wilmington, Delaware, which would create significant costs savings to the Debtor's estate compared to keeping the case in Delaware.  Moreover, the Dallas Bankruptcy Court and Dallas District Court are both well-versed in the facts and issues that will undoubtedly need to be addressed in this chapter 11 case.  As such, the Committee respectfully requests that this Court transfer venue of this case to the Dallas Bankruptcy Court.

<u>**NOTICE**</u>

39.      Notice of this Motion will be provided to (i) the Debtor, (ii) the Office of the United States Trustee for the District of Delaware, and (iii) any party that has requested notice pursuant to Local Rule 2002-1 as of the date of this Motion.  In light of the nature of the relief requested herein, the Committee submits that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

ACTIVE 250501748

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38    Exhibit 6    Page 4 of 2022/03/18 Page 512 of 1392    PageID 15254
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 401 of 1803    PageID 11147
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 16 of 16

WHEREFORE, the Committee respectfully requests that the Court enter the Proposed

Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein

and such other and any further relief as the Court may deem just and proper.

Dated:  November 1, 2019                        SIDLEY AUSTIN LLP
        Wilmington, Delaware

                                        */s/ Bojan Guzina*
                                        Bojan Guzina
                                        Matthew A. Clemente
                                        Alyssa Russell
                                        One South Dearborn Street
                                        Chicago, Illinois 60603
                                        Telephone:  (312) 853-7000
                                        Facsimile:  (312) 853-7036

                                            -and-

                                        Jessica C. K. Boelter
                                        787 Seventh Avenue
                                        New York, New York 10019
                                        Telephone: (212) 839-5300
                                        Facsimile: (212) 839-5599

                                            -and-

                                        Penny P. Reid
                                        Paige Holden Montgomery
                                        2021 McKinney Avenue
                                        Suite 2000
                                        Dallas, Texas 74201
                                        Telephone: (214) 981-3300
                                        Facsimile: (214) 981-3400

                                        PROPOSED ATTORNEYS FOR THE OFFICIAL
                                        COMMITTEE OF UNSECURED CREDITORS

ACTIVE 250501748

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 04/03/23  Page 513 of 1392    PageID 15255
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 402 of 1803    PageID 11148
Case 19-12239-CSS    Doc 86-1    Filed 11/01/19    Page 1 of 3

**Exhibit A**

**Proposed Order**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68 Exhibit 6    Filed 04/09/23 Page 1 of 3 Page 514 of 1392    PageID 15256
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 403 of 1803    PageID 11149
Case 19-12239-CSS    Doc 86-1    Filed 11/01/19    Page 2 of 3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Ref. Docket No.:** ___ |

### ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

Upon the motion (the "Motion")[2] of the Committee requesting entry of an order (this "Order") transferring the venue of the above-captioned chapter 11 case to the United States Bankruptcy Court for the Northern District of Texas; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the opportunity for a hearing on, the Motion having been given; and it appearing that no other or further notice need be provided; and this Court having found that the relief requested in the Motion and provided for herein is in the best interest of the Debtor, creditors of the Debtors, and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record herein, and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 04/05/23    Page 515 of 1392    PageID 15257
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 404 of 1803    PageID 11150
Case 19-12239-CSS    Doc 86-1    Filed 11/01/19    Page 3 of 3

     1.      Pursuant to Rule 1014(b), in the interest of justice and for the convenience of parties, the above-captioned chapter 11 case shall proceed in the Dallas Bankruptcy Court. Accordingly, the Court will transfer this case to the Dallas Bankruptcy Court pursuant to 28 U.S.C. § 1412.

Dated: _____, 2019
Wilmington, Delaware

                                    _____
                                      Honorable Christopher S. Sontchi
                                      United States Bankruptcy Judge

Appellee Appx. 00398
Appx. 10549

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 10/03/23    Page 516 of 1392    PageID 15258
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 405 of 1803    PageID 11151
Case 19-12239-CSS    Doc 86-2    Filed 11/01/19    Page 1 of 48

## Exhibit B

**Acis Confirmation Opinion**

ACTIVE 250501748

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 12/07/23 1804 Page 517 of 1392    PageID 15259
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 406 of 1803    PageID 11152
Case 18-30264-sgj11    Doc 3892735 Filed 01/31/19    Entered 11/01/19 15:12:0448 Page 1 of 47



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 31, 2019**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-11 |
| | § | (Chapter 11) |
| Debtor. | § | |

---

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, | § | CASE NO. 18-30265-SGJ-11 |
| L.L.C., | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

## BENCH RULING AND MEMORANDUM OF LAW IN SUPPORT OF:
## (A) FINAL APPROVAL OF DISCLOSURE STATEMENT; AND (B)
## CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN

Before this court is a request by the Chapter 11 Trustee (herein so called) for final

approval of the adequacy of a disclosure statement and for confirmation of his Third Amended

1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 02/09/23   Page 518 of 1392   PageID 15260
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 407 of 1803   PageID 11153
Case 18-30264-sgj11   Doc 1392-5   Filed 01/31/19   Entered 01/31/19 15:13:04   Page 2 of 47

Joint Plan of Reorganization,[1] as amended, modified or supplemented (the "Plan"), for the two

above-referenced debtors: (1) Acis Capital Management, L.P. (the "Debtor-Acis"), a Delaware

limited partnership, and (2) Acis Capital Management GP, LLC, a Delaware limited liability

company (the general partner of the Debtor-Acis; collectively, the "Debtors"). The two chapter

11 cases have been administratively consolidated.[2]

      The hearing on these matters transpired over multiple days in December 2018, and the

court considered the testimony of more than a dozen witnesses, more than 700 exhibits, and

hundreds of pages of legal briefing. Based on the foregoing, the court **overrules all objections**

and will confirm the Plan, including all proposed modifications to it. The Chapter 11 Trustee has

demonstrated, by a preponderance of the evidence, that the Plan, as modified, satisfies the

applicable provisions of the Bankruptcy Code including but not limited to Sections 1122, 1123,

1127, and 1129 of the Bankruptcy Code.[3] The court also approves on a final basis the adequacy

of the accompanying disclosure statement to the Plan, determining that it meets the requirements

set forth in Section 1125 of the Bankruptcy Code. Notice and solicitation with respect to the

---

[1] Exhs. 508 & 509; *see also* DE ## 660, 661, 693, 702, & 769. References to "DE # __" from time to time in this ruling relate to the docket number at which a pleading or other item appears in the docket maintained in these administratively consolidated Bankruptcy Cases, in Case # 18-30264.

[2] Note that the Debtor-Acis is, essentially, the debtor that is the operating company. As a general partner, Acis Capital Management GP, LLC is legally obligated on all of the operating company's debt. *See* 6 Del. C. § 17-403(b) ("Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners."); *see also* 6 Del. C. § 15-306(a) ("(a) Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law"). The Plan jointly addresses both of the Debtors' debts.

[3] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Sears Methodist Ret. Sys.,* No. 14-32821-11, 2015 Bankr. LEXIS 709, at *8 (Bankr. N.D. Tex. Mar. 5, 2015); *In re Couture Hotel Corp.,* 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015); *In re Mirant Corp.,* No. 03-46590, 2007 Bankr. LEXIS 4951, at *19-20 (Bankr. N.D. Tex. Apr. 27, 2007).

Appellee Appx. 00401
Appx. 10552

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 2/09/23 Page 519 of 1392    PageID 15261
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 408 of 1803    PageID 11154
Case 18-30264-sgj11    Doc 892-5 Filed 01/31/19    Entered 01/31/19 13:11:48 Page 3 of 47

Plan is determined to have complied with the applicable Bankruptcy Rules and due process. The court provides reasoning for its ruling below. The court directs the Chapter 11 Trustee to submit to the court for signing the proposed Findings of Fact and Conclusions of Law and Order that were filed at DE # 814. This Bench Ruling supplements those Findings of Fact and Conclusions of Law and Order and, where appropriate, should be considered additional findings and conclusions as contemplated by Fed. R. Bankr. Proc. 7052.

## I.      **Background.**[4]

The above-referenced bankruptcy cases (the "Bankruptcy Cases") have been pending since January 30, 2018 and have been astonishingly contentious. The Chapter 11 Trustee has been in place since on or about May 14, 2018. The Plan (which is the fourth one proposed by the Chapter 11 Trustee) has been objected to by three related entities: (a) Highland Capital Management, L.P. ("Highland"), (b) Highland CLO Funding Ltd. ("HCLOF Guernsey"), and (c) Neutra, Ltd. ("Neutra Cayman"). The Chapter 11 Trustee loosely refers to these three objectors (the "Objectors") as "the Highlands" because they are not only related to each other (*i.e.,* they are all, directly or indirectly, part of the Highland 2,000-member corporate organizational structure), but they also have been in "lockstep" with one another in objecting to virtually every position taken by the Chapter 11 Trustee during the Bankruptcy Cases.[5] These Objectors' parties-in-interest status will be explained below.

---

[4] For a complete set of background facts, the court incorporates herein by reference its Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Petitions, entered April 13, 2018. DE # 118. Exh. 243.

[5] It is also undisputed that, prior to the appointment of the Chapter 11 Trustee, **the Debtors** and Highland were affiliated and had a close relationship. Exhs. 17, 18, 22-27, 251, 619 & 649.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 12/20/23    Page 520 of 1392    PageID 15262
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 409 of 1803    PageID 11155
Case 18-30264    Case 19-12239-CSS    Filed 01/31/19    Entered 01/31/19 15:04:48    Page 4 of 47
Doc 3603-7    Filed 01/31/19    Page 15 of

In simplest terms, the Debtor-Acis, which was formed in the year 2011, is primarily a

CLO portfolio manager. [6]  It manages hundreds of millions of dollars' worth of CLOs (which is

an acronym for "collateralized loan obligations").  Specifically, it provides fund management

services to various special purpose entities that hold CLOs.  The Debtor-Acis was providing

management services for five such special purpose entities (the "Acis CLOs") as of the time that

it and its general partner were put into the involuntary Bankruptcy Cases.  The parties have

informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-

Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs") are

structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of

senior debt owed by large corporations and, therefore, earn revenue from the variable interest

payments made by those corporations on such senior debt; and (b) on the liability side of their

balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest

rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are

mostly institutions and pension funds (these tranches of notes are usually rated anywhere from

Triple A to Single B, depending upon things such as their interest rate and perceived risk).  The

CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of

interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the

fixed rates of interest that the CLO SPEs must pay on their own tranches of debt.  At the bottom

of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes,"

but these "notes" are genuinely equity).  As portfolio manager, the Debtor-Acis manages the

CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs'

---

[6] The Debtor-Acis has managed other funds, from time to time, besides CLOs.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-35   Filed 12/29/23   Page 521 of 1392   PageID 15263
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 410 of 1803   PageID 11156
Case 18-30264-sgj11   Doc 1339-2   Filed 01/31/19   Entered 01/31/19 16:04:48   Page 5 of 47

portfolios) and communicates with investors in the CLO SPEs.  The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves are in bankruptcy.  This has never been threatened or a concern.  Only the Debtor-Acis which **_manages_** the CLO business is in bankruptcy.  For the most part, the CLO SPEs have continued somewhat "business as usual" during the Chapter 11 Bankruptcy Cases (*i.e.,* they have continued to receive interest payments on their baskets of loans; the usual interest payments on their tranches of debt have been paid;[7] and baskets of loans have been bought and sold from time to time).  The CLO SPEs have retained their own separate counsel during the Chapter 11 cases, have appeared from time-to-time on matters, and are not currently objecting to the Plan.  There is also an indenture trustee (U.S. Bank National Association) for the CLO SPEs' debt, that has seemingly faithfully carried on its role during the Chapter 11 Bankruptcy Cases without many objections to the bankruptcy process—only making occasional statements aimed at ensuring that the indentures for the CLOs are not interfered with or disrespected.  The indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan.

Historically, the Debtor-Acis has had four main sets of contracts that were at the heart of its business and allowed it to function.  The Chapter 11 Trustee has from time-to-time credibly

---

[7] The evidence reflected that there have been a couple of occasions recently when there were insufficient funds to make distributions to the equity.  *E.g.,* Transcript 12/11/18 (PM) [DE # 790], at p. 15 (line 2) through p. 16 (line 18).  But it appears to this court that these missed distributions were due to actions of Highland—as later explained herein—in improperly, surreptitiously attempting to liquidate the Acis CLOs, from the time period after the Chapter 11 Trustee was appointed, until the bankruptcy court issued an injunction to temporarily halt Highland's actions.  *E.g.,* Transcript 12/11/18 (AM) [DE # 789], p. 67 (line 14) through p. 68 (line 6).

Appellee Appx. 00404
APPX. 00556

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 53-5   Page 4/29/23 1804   Page 522 of 1392   PageID 15264
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 411 of 1803   PageID 11157
Case 18-30264-sgj11   Doc 3892-5   Filed 10/31/19   Entered 11/01/19 15:17:04   Page 6 of 47

testified that these agreements essentially created an "eco-system" that allowed the Acis CLOs to

be effectively and efficiently managed by the Debtor-Acis.

      1.   The PMAs with the CLO SPEs.[8]

      First, the Debtor-Acis has various portfolio management agreements (the "PMAs") ***with***

***the CLO SPEs***, pursuant to which the Debtor-Acis earns management fees.  The PMAs have

been the primary "assets" (loosely speaking) of the Debtor-Acis (to be more precise, the PMAs

are executory contracts pursuant to section 365 of the Bankruptcy Code).  They are what

generate revenue for the Debtor-Acis.

      2.   The Sub-Advisory Agreement with Highland.[9]

      Second, the Debtor-Acis had a Sub-Advisory Agreement (herein so called) with an

insider, ***Highland*** (*i.e.,* one of the Objectors).  Highland's "insider" status will be further

explained below.  Pursuant to this agreement, the Debtor-Acis essentially sub-contracted for the

use of Highland front-office personnel/advisors to perform management services for the Debtor-

Acis (*i.e.,* so that the Debtor-Acis could fulfill its obligations to the CLO SPEs under the PMAs).

The Debtor-Acis paid handsome fees to Highland pursuant to this agreement.  This, too, was an

executory contract pursuant to section 365 of the Bankruptcy Code.  As explained below, this

agreement was rejected (with bankruptcy court approval)[10] by the Chapter 11 Trustee during the

Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found

resources to provide these services at a much lower cost to the estate, but he also had begun to

---

[8] Exhs. 6-10.

[9] Exh. 17.

[10] *See* 11 U.S.C. § 365(a).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/29/23 180-4 Page 523 of 1392    PageID 15265
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 412 of 1803    PageID 11158
Case 18-30264-sgj11    Doc 3802-3    Filed 01/31/19    Entered 01/31/19 15:18:04    Page 7 of 47

believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment

of the Debtor-Acis's creditors.[11]

        3.   The Shared Services Agreement with Highland.[12]

        Third, the Debtor-Acis also had a Shared Services Agreement (herein so called) with

Highland, pursuant to which the Debtor-Acis essentially sub-contracted for the use of Highland's

back-office services (again, so that the Debtor-Acis could fulfill its obligations to the CLO SPEs

under the PMAs).  To be clear, the Debtor-Acis had no employees of its own—only a couple of

officers and members.  The Debtor-Acis paid handsome fees to Highland for the personnel and

back-office services that Highland provided to the Debtor-Acis.  This, too, was an executory

contract pursuant to section 365 of the Bankruptcy Code.  As explained below, this agreement

was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with bankruptcy court

approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

        4.   The Equity PMA.[13]

        Fourth, until a few weeks before the Bankruptcy Cases were filed, the Debtor-Acis also

had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs)

whereby the Debtor-Acis provided services not just to the CLO SPEs themselves, but separately

to the equity holder in the CLO SPEs.  This portfolio management agreement with the equity

holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would

probably be easier to refer to it as the "Equity PMA" (for ease of reference, the court will refer to

---

[11] *See* Transcript 12/11/18 (AM) [DE # 789], at p. 48 (line 15) through p. 49 (line 16); p. 50 (line 12) through p. 52 (line 7).

[12] Exh. 18.

[13] Exh. 11.

Appellee Appx. 00406
Appx. 10255

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16 Exhibit 6    Filed 12/24/23 180 Page 524 of 1392    PageID 15266
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 413 of 1803    PageID 11159
Case 18-30264-sgj11 Doc 3927 Filed 01/31/19    Entered 01/31/19 15:04:48 Page 8 of 47

it as the "Equity/ALF PMA"). [14]  The Debtor-Acis did not earn a specific fee pursuant to the

Equity/ALF PMA, but the Chapter 11 Trustee and certain of his witnesses credibly testified that

the Debtor-Acis considered the agreement valuable and very important, because it essentially

gave the Debtor-Acis the ability to control the whole Acis CLO eco-system—in other words,

gave the Debtor-Acis the ability to make substantial decisions on behalf of the CLO SPEs'

*equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs.

The more credible evidence before the court suggests that the Equity/ALF PMA delegated to the

portfolio manager (*i.e.,* the Debtor-Acis) the right to control the terms of any liquidation of

collateral in an optional redemption under the terms of the CLO indentures. [15]  In any event,

shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling the

Debtor-Acis (including but not limited to Mr. James Dondero—the chief executive officer of

both the Debtor-Acis and of Highland):  (a) caused the Debtor-Acis to terminate this Equity/ALF

PMA (notably, the counter-party to this agreement, the equity owner, would have only been able

to terminate it "for cause"[16]); and (b) then caused the equity owner to enter into a new Equity

PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. ("Highland

HCF"). [17]  Mr. Dondero, in addition to being the chief executive of Highland and the Debtor-

Acis, also became the president of the newly formed Highland HCF. [18]  The Equity/ALF PMA

---

[14] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

[15] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 11 at §§ 5 and 6.

[16] The Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager "for cause" at § 14(a)-(e).  Exh. 11.  On the contrary, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.

[17] Exh. 23 (testimony of Scott Ellington), p. 175 (lines 6-25); *see also* Transcript 12/11/18 (AM) [DE # 789], at p. 54 (line 11) through p. 55 (line 5).

[18] *Id.* at p. 266 (lines 1-4).

Appellee Appx. 00407
APPX. 10659

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 12/29/23 1804 Page 525 of 1392    PageID 15267
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 414 of 1803    PageID 11160
Case 18-30264-sgj11    Doc 892    Filed 06/29    Entered 01/31/19 15:10:04    Page 9 of 47

would have been an executory contract of the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if it had not been terminated shortly before the Bankruptcy Cases. The court has heard credible testimony that leads it to conclude that the Equity/ALF PMA would have been assumed by the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if not terminated by agents of Highland on the eve of bankruptcy. The court has heard credible testimony that it is important for a portfolio manager to have not only the PMAs with the CLO SPEs themselves, but also with the equity owners of the CLO SPEs.

## II.    A Few More Basics About CLOs.

In the world of CLOs (like other public debt instruments) there are occasionally redemptions, refinancings, and resets. A redemption is essentially when the equity in the CLO, before maturity, calls for the liquidation of the collateral in the CLO and the repayment of the tranches of notes, so that the CLO comes to an end. A refinancing is when a lower interest rate can be accomplished in the market place on the tranches of debt of the CLO, but the maturity date and other terms remain in place (similar to a refinancing on a home mortgage). This can happen typically after a two-year non-call period. A reset is when the maturity date, the reinvestment period, or other changes in the terms of a CLO (beyond simply interest rate) are accomplished.[19]

It should be noted that the top tranche of notes in the CLO SPEs (AAA-rated) is considered the "controlling" class, and a majority of holders in this class can terminate the CLO manager (*i.e.*, the Debtor-Acis LP) for cause on 45 days' notice, but these folks have apparently been content to ignore the Bankruptcy Cases and the fighting between the Debtor-Acis and

---

[19] *See generally* Transcript 2/9/2018 [DE # 26], at p. 74-75.

Appellee Appx. 00408
Appx. 00569

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 2/20/23 18:04    Page 526 of 1392    PageID 15268
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 415 of 1803    PageID 11161
Case 18-30264-sgj11    Doc 3392-55    Filed 01/31/19    Page 10 of 47

Highland (as further described below)—no doubt because they are earning their fixed income

stream without a hitch.  And the bottom tranche of "notes" in the CLO SPEs (the equity) has

voting rights and is a capital provider and, in certain ways, controls the CLO SPEs, by virtue of

having the ability to make a redemption call after a certain "no-call" period—which would force

a liquidation of the basket of loans in the CLO, with the proceeds paying down the tranches of

notes, starting at the top with the Triple A's.  But, by virtue of the Equity/ALF PMA, the Debtor-

Acis was really acting for the equity.  It seems substantially likely to the court that this is why

Highland and its agents caused the Debtor-Acis to terminate the Equity/ALF PMA (which, as

mentioned above, was an agreement that the equity could have only terminated "for cause"—and

it appears there would have been no "cause").

### III.    The Non-Insider Creditors.

The Debtor-Acis does not have many creditors.  The non-insider creditors are, for the

most part, Joshua Terry ("Mr. Terry") and a few vendors (most of which are law firms).

Mr. Terry commenced the Bankruptcy Cases with the filing of involuntary bankruptcy

petitions.  Mr. Terry was the human being who formerly, quite successfully served as the

portfolio manager for the Debtor-Acis for many years.  Mr. Terry was terminated under

contentious circumstances on June 9, 2016, after getting into disagreements with Mr. Dondero.

Mr. Terry was technically an employee of Highland itself (like all employees are, in the

Highland family of companies—no matter which subsidiary or affiliate they work for).  After his

employment termination, Highland sued Mr. Terry in September 2016.  Mr. Terry asserted

claims back against Highland and both of the above-referenced Debtors.  The litigation was

referred to arbitration, and, after a ten-day arbitration trial in September 2017 before "JAMS,"

Mr. Terry obtained an Arbitration Award (herein so called), on October 20, 2017, jointly and

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 04/29/23804ge 527 of 1392    PageID 15269
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 416 of 1803    PageID 11162
Case 18-30264-sgj11    Doc3927-3 Filed10/3101209   Entered 01/03/19 Page 11 of 49 Page 11 of 47

severally, against both of the Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate. A Final Judgment (the "Terry Judgment") confirming the Arbitration Award was entered on December 18, 2017, in the same amount as that contained in the Arbitration Award—$7,949,749.15.

Mr. Terry commenced the Bankruptcy Cases when he became concerned that the Debtor-Acis was being rendered insolvent and unable to pay creditors including himself, due to actions undertaken by Highland and its agents immediately after entry of the Arbitration Award (*e.g.,* transfers of assets, contracts, and business away from the Debtor-Acis).

The Debtor-Acis also is obligated on large administrative expense claims, since: (a) a Chapter 11 Trustee was appointed very early—due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management; and (b) the Objectors have opposed virtually every action taken by the Chapter 11 Trustee during the Bankruptcy Cases, resulting in many long hearings.

## IV.    The Objectors (all of which are "Insiders").

*There are no non-insider creditors objecting to the Plan*. Mr. Terry supports the Plan. The CLO SPEs and Indenture Trustee do not oppose the Plan. None of the vendors oppose the Plan. The U.S. Trustee is not opposing the Plan. As a technical matter, two impaired classes of creditors voted to accept the Plan.[20] *So who are the Objectors to the Plan (which Plan will be further described below) and what is their party-in-interest status here?*

As earlier mentioned, the Objectors are: (a) Highland, (b) HCLOF Guernsey, and (c) Neutra Cayman. As noted earlier, the Chapter 11 Trustee frequently refers to them collectively as "The Highlands"—but the Objectors do not like this conflation. At one time Highland and

---

[20] Classes 2 and 3. *See* Exh. 613.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Page 2/29/23 18:04 Page 528 of 1392    PageID 15270
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 417 of 1803    PageID 11163
Case 18-30264-sgj11  Doc 3927  Filed 01/31/19  Entered 01/31/19 Page 12 of 47

HCLOF Guernsey had the same lawyers.  They do not anymore.  However, they frequently file joint pleadings and take the same positions.  Highland and Neutra Cayman do still have the same lawyers.

    1.  <u>Highland.</u>

Highland is a Dallas, Texas-based company that is a Registered Investment Advisor. Highland was founded in 1993 by Mr. Dondero, originally with a 75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.  As mentioned earlier, Mr. Dondero is the chief executive of Highland.  Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles including CLOs, private equity funds, and mutual funds.  Highland provides employees to entities in the organizational structure, such as it did with the Debtor-Acis, through the mechanism of shared services agreements and sub-advisory agreements (as mentioned above).  ***Notably, Highland's chief executive, Mr. Dondero, served as the President of the Debtor-Acis at all relevant times prepetition***.[21]  Highland claims to be a large creditor of the Debtor-Acis for services provided to the Debtor-Acis under the Shared Services Agreement and the Sub-Advisory Agreement.  The Chapter 11 Trustee disputes these claims and has asserted numerous claims back against Highland in an adversary proceeding (the "Highland Entities Adversary Proceeding").

    In any event, Highland is a ***disputed insider creditor***.  It is an "insider," as contemplated by Bankruptcy Code section 101(31)(C), because it, beyond any shadow of a doubt, controlled the Debtor-Acis until these Bankruptcy Cases developed to the point of having a Chapter 11

---

[21] One witness, Hunter Covitz, referred to the Debtor-Acis as the "structured credit arm of Highland." Transcript 12/13/18 (AM) [DE # 793], at p. 57.

Appellee Appx. 00411
APPX. 10562

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/29/23   Page 529 of 1392   PageID 15271
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 418 of 1803   PageID 11164
Case 18-30264-sgj11   Doc 1392   Filed 01/31/19   Page 13 of 47
Case 18-30264-sgj11   Doc 1279-3   Filed 01/11/19   Page 14 of 49

Trustee take charge of the Debtor-Acis.  Highland does not seem to dispute that it is an insider.[22]

But, for the avoidance of doubt, Highland should be considered an insider of the Debtor-Acis for

at least the following reasons:  (a) the same human being (Mr. Dondero) was president of the

Debtor-Acis and was the chief executive of Highland; (b) Highland's General Counsel, Scott

Ellington, testified that Mr. Dondero controlled them both;[23] and (c) Highland provided the

Debtor-Acis with employees and management services pursuant to the Sub-Advisory Agreement

and Shared Services Agreement.[24]

  Additionally, the court believes that the Chapter 11 Trustee made a convincing argument

in connection with Plan confirmation (and his justification for the separate classification of

Highland's claim in the Plan from other general unsecured creditors) that Highland should also

be regarded as a "competitor" of the Debtor-Acis at this juncture, since they are both in the fund

management business and Highland's control over the Debtor-Acis has now been divested.

Highland's competitor status, in addition to its insider status, warrants additional scrutiny of its

---

[22] Under section 101(31) of the Bankruptcy Code, an insider includes certain enumerated parties, such as an officer of the debtor, affiliate, *etc.*  Further, the list of enumerated "insiders" is not exclusive or exhaustive.  *See Wilson v. Huffman (In re Missionary Baptist Foundation of Am., Inc.),* 712 F.2d 206, 210 (5th Cir. 1983). Recently, the United States Supreme Court stated: "Courts have additionally recognized as insiders some persons not on that [101(31)] list—commonly known as 'nonstatutory insiders.'  The conferral of that status often turns on whether the person's transactions with the debtor (or another of its insiders) were at arm's length."  *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018). The Fifth Circuit has noted that "cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the parties and (2) whether the transaction . . . [was] conducted at arm's length."  *Browning Interests v. Allison* (*In re Holloway*), 955 F.2d 1008, 1011 (5th Cir. 1992).

[23] *E.g.,* Exh. 23, at pp. 160 (line 15) through 161 (line 4); p. 196 (lines 14-19); p. 219 (lines 1-21).

[24] *See* 11 U.S.C. §§ 101(2)(D); (31)(C)(5).  The court notes that, although Highland has, from time to time, alleged that Mr. Terry is a "non-statutory insider" of the Trustee, it has never put on any credible evidence to support this contention.

Appellee Appx. 00412
Appx. 00564

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6.3   Page 530 of 1392   PageID 15272
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 419 of 1803   PageID 11165
Case 18-30264-sgj11   Doc 1392   Filed 01/31/19   Page 14 of 47

motivations in objecting to the Plan.  More importantly, it provides a sound legal and business

justification for separately classifying its claim in the Plan.

    2.  <u>HCLOF Guernsey.</u>

        The second Objector, HCLOF Guernsey, is an entity formed in the island nation of

Guernsey.  It has two allegedly independent Directors from Guernsey who have provided

testimony in connection with confirmation of the Plan.  It was enormously clear to the court (as

will be elaborated upon below) that the two Directors of HCLOF Guernsey are—stated in the

kindest way possible—mere "figureheads" for HCLOF Guernsey and they defer to Highland

*entirely* to tell them what to do, what to say, and when.  In any event, HCLOF Guernsey is the

owner of the equity in the CLO SPEs (as earlier mentioned, this equity is sometimes referred to

as the "subordinated notes" in the CLO SPEs).  According to HCLOF Guernsey's 2017 Annual

Report and Audited Financials, all of its subordinated notes issued by the Acis CLOs are

physically held at and are pledged to HCLOF Guernsey's lender, NexBank, which happens to be

a Dallas bank that is an affiliate of Highland.[25]  HCLOF Guernsey was created in the year 2015

and was formerly known as "ALF."[26]  Its name was changed on October 30, 2017 (ten days after

Mr. Terry's Arbitration Award was entered), to allegedly distance itself from the Debtor-Acis.

The equity owner HCLOF Guernsey, in turn, has three equity owners:  (i) a 49% equity owner

that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that was seeded with contributions

from **Highland**, is managed/advised by **Highland**, and whose **independent trustee is a long-time**

**friend of Highland's chief executive officer, Mr. Dondero**; (ii) 2% is owned by **Highland**

**employees**; and (iii)  a 49% equity owner that is a third-party institutional investor based in

---

[25] Exh. 647.

[26] "ALF" is short-hand for Acis Loan Funding, Ltd.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/29/23   Page 531 of 1392   PageID 15273
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 420 of 1803   PageID 11166
Case 18-30264-sgj11   Doc 3929-73   Filed 01/31/19   Entered 01/31/19 15:11:04   Page 15 of 47

Boston, Massachusetts that only recently invested in HCLOF Guernsey (*i.e.,* in November 2017, just after the Terry Arbitration Award was issued), and desires to remain passive and anonymous (hereinafter, the "Passive Investor").[27]  Notably, the Debtor-Acis itself owned a small percentage of HCLOF Guernsey, in addition to providing management services to it, until October 24, 2017 (four days after the Terry Arbitration Award was issued).

The court has allowed HCLOF Guernsey to vigorously participate in the confirmation hearing (and other hearings during the Bankruptcy Cases), although its party-in-interest status has been questionable.  So how is HCLOF Guernsey a party-in-interest?  The answer is a bit of a stretch—but the court has decided it is impacted by the Plan, so it should have the right to object. Its party-in-interest status has evolved during the Bankruptcy Cases.

First, early on in these Bankruptcy Cases, HCLOF Guernsey (together with Highland) sued the Chapter 11 Trustee in the above-mentioned "Highland Entities Adversary Proceeding"—mostly, if not entirely, seeking injunctive relief.  At that point, the Chapter 11 Trustee treated HCLOF Guernsey as a disputed creditor,[28] since it was seeking equitable relief that could arguably be monetized.[29]  However, HCLOF Guernsey subsequently withdrew its requests for relief in that Highland Entities Adversary Proceeding.  But then, the Chapter 11 Trustee subsequently filed claims *against* HCLOF Guernsey in the Highland Entities Adversary Proceeding (along with his claims against Highland and a couple of other Highland entities) asserting avoidance actions and other causes of action against HCLOF Guernsey (among other

---

[27] The testimony was that the Passive Investor committed to a $150 million investment ($75 million immediately and $75 million callable over the next several years).

[28] In fact, on August 15, 2018, the Chapter 11 Trustee filed a proof of claim on behalf of HCLOF Guernsey.  HCLOF Guernsey has since objected to the proof of claim.

[29] *See* 11 U.S.C. §§ 101(5)(B) & 101(10).

Appellee Appx. 00414
Appx. 00566

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6856   Filed 02/29/03 1804   Page 532 of 1392    PageID 15274
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 421 of 1803    PageID 11167
Case 18-30264-sgj11   Doc 1239-27   Filed 01/31/19   Entered 01/31/19 11:04   Page 16 of 47

things, the Chapter 11 Trustee alleged that HCLOF Guernsey schemed with Highland to terminate the Equity/ALF PMA, in a step toward systematically dismantling the Debtor-Acis of its value). Thus, HCLOF Guernsey may ultimately owe money to this estate. But most importantly, HCLOF Guernsey should be deemed a party-in-interest because of a proposed temporary injunction in the Plan that essentially would enjoin (for a finite, defined period) HCLOF Guernsey from exercising certain of its rights with regard to its equity in the CLO SPEs, pending resolution of the Highland Entities Adversary Proceeding. This temporary injunction in the Plan, directed towards HCLOF Guernsey and affiliates, will be further described below.

   3.   Neutra Cayman.

   Neutra Cayman is a Cayman island exempted company that is the equity owner *of the Debtor-Acis itself* (in contrast to HCLOF Guernsey, which only owns equity in the CLO SPEs). Neutra Cayman only acquired its equity interest in the Debtor-Acis the day after the Terry Judgment was entered (on December 18, 2017), and for no consideration, from the Dugaboy Investment Trust (a family trust on which Mr. Dondero's sister is named trustee, that previously owned 74.9% of the Debtor-Acis) and from Mr. Akada (who previously owned 25% of the Debtor-Acis).[30] The court concludes that Neutra Cayman has standing to object to the Plan,

---

[30] The court is repeatedly referring to the Debtor-Acis but, to be clear, there are two consolidated Debtors: Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP/LLC"). *See* note 2, *supra*. When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners: (a) the Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest. When Acis GP/LLC was formed (*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment Trust. After Mr. Terry was terminated by Highland, his 25% limited partnership interest in Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his interest by 10% up to 25%), and the Dugaboy Investment Trust (increasing its interest by 15% up to 74.9%). But, most importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on December 18, 2017), both Mr. Akada and the Dugaboy Investment Trust conveyed their entire limited partnership interests in Acis LP—25% and 74.9%, respectively—to Neutra Cayman. The Dugaboy Investment Trust also conveyed its 100% membership interest in Acis GP/LLC to Neutra Cayman.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 4/29/03 Page 533 of 1392    PageID 15275
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 422 of 1803    PageID 11168
Case 18-30264-sgj11  Doc 2239  Filed 01/31/19  Entered 01/31/19 15:18:04  Page 17 of 47

since it is an equity owner of the Debtors (albeit only having acquired its equity about a month

before the bankruptcy). As with HCLOF Guernsey, the court also concludes that Neutra-

Cayman is absolutely, beyond any reasonable doubt, controlled by Highland, as explained

further below.

## V.    The Plan.

The Plan is fairly simple, considering the complexity of the business and the

relationships, and the contentiousness of the Bankruptcy Cases. Again, there aren't many

creditors.

The Plan proposes[31] that the Debtor-Acis, as a "Reorganized Debtor," will continue with

the business operations of the Debtors after the Effective Date[32] of the Plan. Specifically, the

Debtor-Acis will assume, pursuant to section 365 of the Bankruptcy Code, its CLO PMAs and

continue to serve as the portfolio manager to the CLO SPEs (and as to any resets of the CLOs

therein). The Reorganized Debtor will continue to earn fees and will pay claims from post-

Effective Date income as provided in the Plan. The Reorganized Acis will actively pursue

additional fund management contracts. Again, there is no objection by the CLO SPEs to the

Plan, and the indenture trustee on the tranches of CLO notes has no objection.

Mr. Terry (again, the former human manager of the Debtor-Acis and also the largest

creditor) shall receive 100% of the equity interests in the Reorganized Debtor, in exchange for a

negotiated $1 million reduction in his partially secured claim.[33] The remainder of his claim will

---

[31] This is merely a high-level summary of the Plan. The Plan terms, as modified, shall in all ways govern, not this summary.

[32] The "Effective Date" is defined, essentially, as the first business day which is fourteen (14) days after entry of an order confirming the Plan, if the confirmation order is not stayed.

[33] Mr. Terry has asserted partial secured status as to his claim in the proofs of claim he has filed in these cases. The Chapter 11 Trustee credibly testified that there was no other logical party to take the equity of

Appellee Appx. 00416

APPX. 00563

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 12/24/03 1804   Page 534 of 1392   PageID 15276
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 423 of 1803   PageID 11169
Case 18-30264-sgj11   Doc 3927   Filed 01/31/19   Page 18 of 47

be treated as an unsecured claim.  Each unsecured creditor will receive on the Plan Effective

Date an unsecured cash flow note in the full amount of its claim, which notes will mature three

years after the Effective Date of the Plan, with equal quarterly payments of principal and interest,

at 5% interest per annum.  These cash flow notes are expected to yield payment in full (actually

102%) to the unsecured creditors.[34]

      As for the sub-advisory and shared services agreements with Highland, as noted earlier,

the Chapter 11 Trustee, with bankruptcy court approval, has already (as of August 2018) rejected

these during the Bankruptcy Cases, pursuant to section 365 of the Bankruptcy Code.  The

Chapter 11 Trustee caused the Debtor-Acis to subsequently contract, with bankruptcy court

approval, with a different entity, Brigade Capital Management, L.P. ("Brigade"), to provide the

sub-advisory and shared services going forward, for a minimum two-year term (unless the

Reorganized Debtor and Brigade otherwise agree), at a much cheaper cost than Highland.[35]

Thus, Brigade will provide sub-servicing and sub-advisory services to the Reorganized Debtor.

---

[34] the Reorganized Debtor, at this juncture, and that he had negotiated this reduction to Mr. Terry's secured claim, and he thought it was justified by the circumstances of this case.  While the Objectors have argued that the secured status of Mr. Terry's claim may be subject to challenge under section 547(b) of the Bankruptcy Code, section 547(b) is discretionary (*e.g.*, a "trustee may avoid any transfer" that might be avoidable as a preference).  The Chapter 11 Trustee credibly emphasized that this was negotiated treatment of an asserted secured claim, and he had no "exclusivity" on proposing a plan if someone else had wanted to propose something different.  Transcript 12/11/18 (AM) [DE # 789], at p. 70 (line 3) through p. 71 (line 2).

[34] Insider claims—namely Highland—are separately classified from general unsecured claims under the Plan.  To the extent such claims are ultimately allowed (after any allowed defenses and offsets), and to the extent such claims are not equitably subordinated by Bankruptcy Court adjudication, these claims will receive the same treatment as other general unsecured claims (cash flow notes).  To the extent any of these claims are ultimately allowed but equitably subordinated, they will receive subordinated promissory notes, accruing interest at 5% per annum, that will not be payable until all non-subordinated claims have been paid in full (they will have maturity dates to occur on the earlier of:  (i) the date that is two years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five years after the Effective Date).  The expected recovery under the Plan for the insider claims is from 65% to 100%.

[35] An entity named Cortland Capital Markets Services LLC ("Cortland") is actually providing some of the back-office shared services agreement type functions.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23   Page 535 of 1392   PageID 15277
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 424 of 1803   PageID 11170
Case 18-30264-sgj11   Doc 3927-55   Filed 01/31/19   Page 200 of 49   Page 19 of 47

As for the Equity/ALF PMA, it is not an agreement with the Debtor-Acis anymore to either be assumed or rejected, pursuant to section 365. However, in the Highland Entities Adversary Proceeding, the Chapter 11 Trustee seeks to avoid the termination of the Equity/ALF PMA. Pursuant to the Plan, the Reorganized Debtor will be vested with certain Assets of the Debtors, including Estate Claims and Estate Defenses, to be administered and liquidated by the Reorganized Debtor.

1.   The Highland Entities Adversary Proceeding (Adv. Proc. No. 18-03212).

Suffice it to say that the Highland Entities Adversary Proceeding is a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan. With regard to the Highland Entities Adversary Proceeding, the Defendants in it (there are five of them) are: (i) Highland; (ii) HCLOF Guernsey; (iii) Highland HCF (*i.e.,* the Cayman Island entity that was recently formed to essentially replace the Debtor-Acis under the Equity/ALF PMA); (iv) Highland CLO Management, Ltd. ("Highland Management") (an entity registered in the Cayman Islands on October 27, 2017—seven days after Mr. Terry's Arbitration Award); and (v) Highland CLO Holdings, Ltd. (yet another entity incorporated in the Cayman Island on October 27, 2017). The Highland Entities Adversary Proceeding is essentially a multi-faceted fraudulent transfer action. The statutory predicates for the relief sought are sections 502, 542, 544, 547, 548, and 550 of the Bankruptcy Code and Texas Business & Commerce Code § 24.001 et seq. ("TUFTA").

Distilled to its essence, the Highland Entities Adversary Proceeding argues that Highland, along with its related Co-Defendants, ***orchestrated a systematic transfer of value away from the Debtor-Acis to other Highland entities*** (all of those transferee-entities are offshore entities— whereas the Debtor-Acis is a Delaware entity), beginning almost immediately after Mr. Terry

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 2/26/03    180    Page 536 of 1392    PageID 15278
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 425 of 1803    PageID 11171
Case 18-30264-sgj11  Doc 2392-35 Filed 01/38/19  Entered 11/01/19 15:27:04  Page 20 of 47

was terminated in June 2016, and continuing on during Mr. Terry's litigation/arbitration with the
Debtor-Acis, and then rapidly unfolding after the Arbitration Award. This was allegedly done to
denude the Debtor-Acis of value and make the Debtors "judgment proof." This was allegedly
also done to ensure that the Debtor-Acis's very valuable business as portfolio manager would be
taken over by other Highland entities and remain under Highland's and Mr. Dondero's control.[36]

The evidence is rather startling on this point. Among other things, pursuant to
amendments made to the Debtor-Acis's Sub-Advisory Agreement and Shared Services
Agreements with Highland, starting soon after Mr. Terry was terminated, the fees owed by the
Debtor-Acis to Highland under these agreements shot up to an enormously higher level. Then,
in April 2017, a new CLO was issued (or actually a former Acis CLO was reset) and a new
Highland-affiliated Cayman Island entity was ultimately put in place to manage it instead of the
Debtor-Acis (even though the Debtor-Acis managed all other CLOs in the Highland corporate
empire). Numerous other transactions were undertaken through the Fall of 2017, removing
assets and agreements away from the Debtor-Acis. For example, a multi-million dollar note
receivable owed to the Debtor-Acis by Highland was transferred out of the Debtor-Acis,[37] and

---

[36] Exh. 627.

[37] On November 3, 2017, the Debtor-Acis, Highland, and Highland Management (a newly created,
offshore Highland affiliate) entered into that certain Agreement for Assignment and Transfer of
Promissory Note (the "Note Assignment and Transfer Agreement"). Exh. 225. The Note Assignment
and Transfer Agreement, among other things, transferred a $9.5 million principal amount promissory note
executed by Highland and payable to the Debtor-Acis (the "Note"), Exh. 218, from the Debtor-Acis to
Highland Management (the "Note Transfer"). The Assignment and Transfer Agreement memorializing
this transaction is signed by Mr. Dondero for the Debtor-Acis. The document recites that (i) Highland is
no longer willing to continue providing support services to the Debtor-Acis, (ii) the Debtor-Acis,
therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland Management agrees to
step into the collateral manager role if the Debtor-Acis will assign the Note to it. Notably, Highland
Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note
Transfer. Thus, Highland Management had no portfolio or collateral management experience whatsoever
when it entered the Assignment and Transfer Agreement. To the contrary, it appears Highland
Management was an entity that was created specifically to hold the Note and eventually take possession
of the CLO PMAs in an international forum that would be difficult for Mr. Terry to reach. The Debtor-

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 12/29/23 Page 537 of 1392    PageID 15279
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 426 of 1803    PageID 11172
Case 18-30264-sgj11 Doc 892-75 Filed 11/08/19    Entered 11/08/19 15:12:04 Page 21 of 47 Page 21 of 47

shares in HCLOF Guernsey held by the Debtor-Acis were sold back to HCLOF Guernsey (four days after the Arbitration Award). And then the Equity/ALF PMA was terminated so that the Debtor-Acis would no longer have management-control over HCLOF Guernsey as its portfolio manager—arguably putting Highland in a position to liquidate the Acis CLOs and put the Debtor-Acis out of business. Specifically, on October 27, 2017, just seven days after Mr. Terry's Arbitration Award, the Debtor-Acis ostensibly terminated its own portfolio management rights under the Equity/ALF PMA[38] and transferred its authority and its valuable portfolio management rights—for no value—to Highland HCF, an affiliate of Highland. It appears that the only alleged consideration for these transfers, to the extent there was any, was the satisfaction of purported debts owed to other Highland entities or their representatives.

---

Acis appears to have received no or insufficient consideration for the Note Transfer. The primary consideration for the Note Transfer was an alleged payable due from the Debtor-Acis to Highland in the approximate amount of $7.5 million for participation fees, which was transferred to Highland Management shortly before the Note Assignment and Transfer Agreement was entered. The validity of the alleged "participation fees" is unknown. The remainder of the consideration for the Note Transfer is a promise to pay certain expenses of the Debtor-Acis, which has apparently never occurred. In any event, it appears highly likely that the Note Transfer took away the Note as an asset from which Mr. Terry could collect his judgment.

[38] As mentioned earlier, the Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager by the equity owner (now known as HCLOF Guernsey) *"for cause"* at § 14(a)-(e). Exh. 11. Meanwhile, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c). Exh. 11. It would appear that these terms were wholly ignored by the persons orchestrating the Equity/ALF PMA termination. It appears that the Debtor-Acis was simply manipulated to consent and agree to its removal and replacement as portfolio manager of HCLOF Guernsey. This transfer of the Debtor-Acis's portfolio management rights to the offshore entity Highland HCF was accomplished by way of a new portfolio management agreement entered into by the equity owner (now known as HCLOF Guernsey) and Highland HCF on October 27, 2017, which empowered Highland HCF with the same broad authority to direct the management of HCLOF Guernsey as was previously held by the Debtor-Acis LP under the Equity/ALF PMA. *See* Exh. 19, October 27, 2017 PMA §§ 1 & 5(a)-(q). This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017. Exh. 215. The Debtor-Acis received no consideration for this transfer.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 4/29/23 Exhibit 6 Page 538 of 1392    PageID 15280
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 427 of 1803    PageID 11173
Case 18-30264-sgj11    Doc 1389 Filed 01/39/19    Entered 01/31/19 15:12:04    Page 22 of 47

The Highland Defendants argue that the Equity/ALF PMA (its termination being arguably the most significant transfer referenced in the Highland Entities Adversary Proceeding) did not have value. But the evidence convinces the court that it absolutely did. A witness, Mr. Zachary Alpern, credibly testified that the portfolio manager (under the Equity/ALF PMA) made decisions regarding the underlying financial instruments including seeking an optional redemption and negotiating a reset. Mr. Alpern also credibly testified about the importance, in the CLO industry, of the portfolio manager having control of a CLO's equity to ensure an "evergreen fee stream."[39] Additionally, Mr. Terry also credibly testified that the portfolio manager (not the CLO equity interest holder) has the right to control the terms of the liquidation of collateral in an optional redemption under the terms of the indentures.[40] The Chapter 11 Trustee also credibly testified that the Equity/ALF PMA allowed the Debtor-Acis to have control of an optional redemption.[41] Finally, a witness, Mr. Klein, credibly testified about the value of the Equity/ALF PMA and the negative impact of its transfer on the Debtor-Acis LP.[42]

To be clear, Highland and HCLOF Guernsey have argued in opposition to the Chapter 11 Trustee's position that it is HCLOF Guernsey—the actual equity holder of the CLO SPEs—that had/has the absolute power and authority to control the CLO SPEs' destinies and it is ludicrous to suggest otherwise. However, not only does the Equity/ALF PMA appear to this court to have delegated the relevant power and authority **to the Debtor-Acis**, but Highland's own expert on this

---

[39] Exh. 404, Transcript 8/23/18 (AM) at pp. 65-67, 81-93 and Transcript 8/23/18 (PM) at pp. 34-35, 38-40, 46, and 49.

[40] Transcript 12/18/18 [DE # 804], at pp. 77-78. *See also* Exh. 405, Transcript 8/27/18 (AM) at pp. 63-75.

[41] Exh. 405, Transcript 8/27/18 (AM) at p. 53.

[42] Exh. 405, Transcript 8/27/18 (PM) at pp. 143-144, 147-159 and 205-207.

Appellee Appx. 00421

APPX. 10573

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/29/23    Page 539 of 1392    PageID 15281
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 428 of 1803    PageID 11174
Case 18-30264-sgj11    Doc 3927-5    Filed 01/31/19    Page 23 of 47

topic, Mr. Castro, testified that the "actual humans" who would make the decision for HCLOF

Guernsey as to whether to request an optional redemption of the Acis CLOs were not the

HCLOF Guernsey directors but, rather, Highland executives Mr. Dondero, Mr. Okada, and

Highland employee Mr. Covitz (acting for Highland HCF).[43]  Moreover, Mr. Alpern credibly

testified that, before the Terry Arbitration Award, the Debtor-Acis, as the portfolio manager

under the Equity/ALF PMA, rather than the HCLOF Guernsey's directors, issued the notices of

optional redemption for HCLOF Guernsey.[44]

       The court concludes that the Chapter 11 Trustee has demonstrated a likelihood of

success on the merits with regard to his claims set forth in the Highland Entities Adversary

Proceeding.  Therefore, the Temporary Injunction that is part of the Plan is supportable (as

further explained below).  Of course, the nature and extent of the rights ultimately recovered by

the Debtor-Acis will either be determined in the Highland Entities Adversary Proceeding or, as

HCLOF Guernsey's own Guernsey expert conceded, in a binding arbitration in Dallas, Texas

under the terms of the Equity/ALF PMA.[45]

       2.    The Plan Injunction.

       The most controversial aspect of the Plan—the aspect of it that seems to be the primary

focus of the Objectors—is a ***portion*** of an injunction in the Plan (the "Temporary Injunction").

The Temporary Injunction would ***temporarily*** enjoin the following parties ***from effectuating an***

***optional redemption or liquidating the Acis CLOs*** and related actions: (i) Highland; (ii) HCLOF

---

[43] Exh. 406, Transcript 8/28/18 (PM) at pp. 61-63.

[44] Exh. 404, Transcript 8/23/18 (AM) at pp. 85-89 and Exhs. 323-325 (Notices of Optional Redemption
signed by the Debtor-Acis as portfolio manager of HCLOF).

[45] Transcript 12/13/18 (PM) [DE #794], at pp. 116, 118-19, 122, 124 (Corfield); *see also*, p. 140
(McGuffin).

Appellee Appx. 00422
Appx. 10574

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 2/20/23   Page 540 of 1392   PageID 15282
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 429 of 1803   PageID 11175
Case 18-30264-sgj11   Doc 3922   Filed 01/31/19   Page 24 of 47

Guernsey; (iii) CLO Holdco, Ltd. (the donor advised fund, seeded with Highland contributions

and managed by Highland that owns 49% of HCLOF Guernsey); (iv) Neutra Cayman; (v)

Highland HCF (the Cayman Island entity created shortly before the Bankruptcy Cases to replace

the Debtor-Acis under the Equity/ALF PMA); (vi) Highland Management (the Highland-created

entity that entered into a portfolio management agreement with a new Acis-CLO that was

established in 2017); and (vii) any affiliates of Highland and their respective employees, agents,

representatives, transferees, assigns, and successors.[46]  This Temporary Injunction is proposed to

only last until the earlier of when:  (a) the creditors of the Debtors are paid in full; (b) resolution

of the Highland Entities Adversary Proceeding; (c) a material breach in the Plan; or (d) the

bankruptcy court terminates the Temporary Injunction upon request of a party-in-interest.  ***Fully

consensual resets of the Acis CLOs are permissible if HCLOF Guernsey, as the equity owner

in the CLO SPEs, chooses to agree to resets***.  The basis for the Temporary Injunction is as

follows:  The Chapter 11 Trustee has asserted numerous claims in the Highland Entities

Adversary Proceeding against Highland, HCLOF Guernsey, and affiliates, including claims to

recover the Debtor-Acis's rights under the Equity/ALF PMA.[47]  The Temporary Plan Injunction

essentially provides for the continuation, after the Effective Date, of injunctive relief that the

bankruptcy court previously granted in its Preliminary Injunction Order (the "Preliminary

Injunction") [DE # 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the Highland

Entities Adversary Proceeding.  The Preliminary Injunction was originally set to expire by its

---

[46] There is another portion of this Plan injunction that is more of a general plan injunction (*i.e.,* very typical) that would prohibit actions against the Debtors, Reorganized Debtor and the Estate Assets, based on acts occurring before the Effective Date, which would be permanent and would not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

[47] *See* Exh. 627, Trustee's Counterclaims and Claim Objection.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6835 Filed 12/29/23 Page 541 of 1392 PageID 15283
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 430 of 1803 PageID 11176
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19 Page 25 of 47

own terms upon confirmation of the Plan but would be extended pursuant to an order confirming the Plan, through the Effective Date of the Plan.

As the Fifth Circuit has stated, the four elements to justify a preliminary injunction are (a) substantial likelihood of success on the merits; (b) substantial threat that the plaintiff will suffer irreparable injury; (c) the threatened injury outweighs any harm the injunction might cause the defendant; and (d) the injunction is in the public interest.[48] Each element is present in these cases.

*Immediate and Irreparable Harm.* The court finds and concludes that the Temporary Injunction is legally permissible, necessary, and appropriate to avoid immediate and irreparable harm to the Reorganized Debtor (*i.e.,* evisceration of the Acis CLOs, by parties with unclean hands, that would have no authority to effectuate a liquidation of the CLOs, absent the prepetition wrongful termination of the Equity/ALF PMA). Mr. Scott, a director of HCLOF Guernsey, testified that, absent the Temporary Plan Injunction, HCLOF Guernsey would call for an optional redemption of the Acis CLOs.[49] The testimony of Ms. Bestwick, the other director of HCLOF Guernsey, also implied that, when the injunction expires, HCLOF Guernsey would redeem the Acis CLOs so that they could once again be managed by Highland.[50] The Chapter 11 Trustee credibly testified that if the Acis CLOs are liquidated, there is nothing for the Debtor-Acis to manage.[51] The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction

---

[48] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Women's Med. Ctr. of N.W. Houston v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

[49] Exh. 721, Mr. Scott Depo. at pp. 204.

[50] Exh. 719, Bestwick Depo. at p. 112.

[51] Exh. 405, Transcript 8/27/18 (AM) at p. 40.

25

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 12/22/23180Page 542 of 1392    PageID 15284
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 431 of 1803    PageID 11177
Case 18-30264-sgj11  Doc 3927-5  Filed 01/31/19  Entered 01/31/19 15:12:04 Page 26 of 47

is very important because it protects the revenues under the Acis PMAs, which is a source of potential recovery to creditors under the Plan.[52]  Mr. Terry credibly testified that the Temporary Plan Injunction is a critical component of the Plan and that the Debtor-Acis would have no going concern value without it.  In fact, without the Plan Injunction, Mr. Terry will be precluded from reorganizing the business and paying creditors.[53]

The Objectors have argued that the Chapter 11 Trustee cannot suffer irreparable harm because he has an adequate remedy at law.  This argument misses the mark.  The destruction of the Debtors' ongoing business, which has the potential to repay creditors under the Plan in two years, constitutes irreparable harm.  The fact that the estate possesses a number of avoidance claims for damages against Highland and its affiliates, and could potentially obtain damages on such claims, does not render the destruction of the Debtor-Acis's ongoing business any less harmful.  Indeed, according to the Fifth Circuit:

> [T]he mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.' For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions.[54]

*Likelihood of Success on the Merits.*  The Chapter 11 Trustee has also demonstrated a likelihood of succeeding on the merits in the Highland Entities Adversary Proceeding.

---

[52] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[53] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[54] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934) ("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold the remedy by injunction.")).

Appellee Appx. 00425
Appx. 05276

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 4/29/23 1804Page 543 of 1392   PageID 15285
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 432 of 1803   PageID 11178
Case 18-30264-sgj11   Doc 2392-35   Filed 11/28/19   Entered 11/31/19 15:28:04   Page 27 of 47
Case 18-30264-sgj11   Doc 3396-6   Filed 01/31/19   Page 27 of 47

The record contains substantial evidence of both intentional and constructive fraudulent transfers with regard to the Equity/ALF PMA and other assets.[55]  The numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear more likely than not to have been made to deprive the Debtor-Acis of value and with actual intent to hinder, delay or defraud the Debtors' creditors.  Highland's only purported business justifications for the prepetition transfers were that the Passive Investor demanded it and that the Debtor-Acis's brand was toxic in the market place.[56]  However, these business justifications were not supported (and, in fact, were contradicted) by the evidence.

Indeed, while representatives of Highland and its affiliates said that the Passive Investor's demands were the reason for the termination (*i.e.,* essentially a "transfer") of the Equity/ALF PMA, the Passive Investor's representative testified that this was untrue and that these alleged demands were never made by the Passive Investor.[57]  In fact, the Passive Investor was just that— a passive, minority investor in HCLOF Guernsey with no ability to influence or control any of

---

[55] *E.g.,* Exh. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein; Exh. 201, Transcript 3/21/18 at pp. 110-133 & 186-191; Exh. 24, Transcript 3/22/18 at pp. 71-75 & pp. 204-205; Transcript 12/11/18 [DE # 789], at pp. 52-56; *see also* Transcript 8/27/18 (AM) [DE # 552], at p. 52; Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98;

[56] Highland General Counsel Scott Ellington testified that the Passive Investor said it had no interest in doing business with the Debtor-Acis because the Debtor-Acis brand was purportedly toxic and, consequently, nothing associated with the Debtor-Acis could be managed or marketed as a CLO.  Exh. 23, Transcript 2/7/18 at pp. 55-58.  Mr. Ellington further testified that the Passive Investor demanded that the Equity/ALF PMA be transferred.  Exh. 23, Transcript 2/7/18 at pp. 203-204.  Mr. Ellington also testified that, because the Passive Investor would be putting in additional capital in connection with any reset CLOs, it had the ability to "start calling the shots" and dictate the terms of any reset transactions.  Exh. 23, Transcript 2/7/18 at p. 226.  Additionally, Highland executive Mark Okada testified that a reset transaction could not be performed by the Debtor-Acis because the market would not accept the Debtor-Acis as a portfolio manager and the Debtor-Acis was no longer risk-retention compliant.  Exh. 25, Transcript 3/23/18 at p. 53.  Additionally, Mr. Dondero testified that the "Boston investor" deal was contingent on getting away from the Debtor-Acis and getting a new collateral manager.  Exh. 25, Transcript 3/23/18 at pp. 143-144.

[57] *See* Exh. 720 and excerpts read in to the trial record on 12/11/18 (PM) at pp. 149-157.

Appellee Appx. 00426
Appx. 10573

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68.3   Filed 4/24/03 1804   Page 544 of 1392   PageID 15286
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 433 of 1803   PageID 11179
Case 18-3026   Case 19-12392375   Filed 01/33/19   Entered 01/31/19 Page 29 of 48   Page 28 of 47

the actual investment decisions.[58]  The only other business justification Highland and HCLOF

Guernsey have suggested for the prepetition transfers was that the Debtor-Acis "was a shell" and

not capable of being risk retention compliant.[59]  However, Highland portfolio manager Hunter

Covitz testified that in October 2017, prior to the Terry Arbitration Award, there was a structure

in place that would comply with risk retention.[60]  Mr. Covitz could not convincingly distinguish

why the "shell" status of the Debtor-Acis was distinguishable from the "shell" status of other

Highland-related entities that were the recipients of various fraudulent transfers.[61]  Mr. Covitz

also subsequently admitted that the Passive Investor did not request that the Debtor-Acis end its

involvement with HCLOF Guernsey through the Equity/ALF PMA fraudulent transfer or request

that ALF change its name to HCLOF [Guernsey].[62]  Mr. Covitz's testimony contradicted the

testimony provided by Scott Ellington, General Counsel[63] and Mr. Dondero.[64]  And, at bottom, if

the Debtor-Acis was a thinly capitalized "shell," it appears to be only because Highland

systematically made it that way after the Terry Arbitration Award.

     The evidence established overwhelmingly that there is a substantial likelihood that the

transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor.

Highland put on an expert, Mr. Greenspan, who testified that he did not consider whether the

---

[58] Exh. 720, Depo. of Passive Investor representative at pp. 32-33.

[59] Transcript 12/13/18 (AM) [DE # 793], at pp. 55-58.

[60] Transcript 12/13/18 (AM) [DE # 793], at pp. 77-78.

[61] Transcript 12/13/18 (AM) [DE # 793], at p. 78; Transcript 12/18/18 [DE # 804], at pp. 59-63.

[62] Transcript 12/13/18 (AM) [DE # 793], at p. 103.

[63] *See* Exh. 23, Transcript 2/7/18 at pp. 177-178.

[64] *See* Ex. 25, Transcript 3/23/28 at pp. 143-44.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 4/25/23 180Page 545 of 1392   PageID 15287
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 434 of 1803   PageID 11180
Case 18-30264-sgj11   Doc 3892-35   Filed 01/31/19   Entered 01/31/19 15:13:04   Page 29 of 47

Equity/ALF PMA transfer was an "actual" fraudulent transfer, but only considered whether the transfer was "constructively" fraudulent.[65]  While Highland has taken the position that termination of the Equity/ALF PMA was not a transfer, Mr. Greenspan testified that the termination of a contract can constitute a transfer and acknowledged that the definition of a transfer in the Bankruptcy Code does not include a value component.[66]

*Balance of Harms*.  The Chapter 11 Trustee has also shown the balance of harms weighs in his and the estates' favor in granting the Plan's Temporary Injunction.  The Chapter 11 Trustee is entitled to the Temporary Injunction pending resolution of the claims asserted in the Highland Entities Adversary Proceeding.  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction is important to the Plan, because it allows the cash flow from the CLO management to be collected by the Reorganized Debtor, and that is the source of revenue available at this time to pay creditors.[67]  Mr. Terry also credibly testified that the Temporary Plan Injunction is a critical component of the Plan necessary to preserve the Debtors' going concern value and allow the Reorganized Debtor to generate new business and repay creditors.[68]  Conversely, in this court's view, there is no real harm to Highland or the Co-Defendants because they can ask for a reset under the Plan.[69]  Mr. Scott, a director of HCLOF Guernsey, testified that

---

[65] Transcript 12/12/18 (PM) [DE # 792], at pp. 116-117 and 161.

[66] Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98.  Section 548(a)(1)(A) of the Bankruptcy Code only requires that a transfer be made with actual intent to hinder, delay or defraud creditors.  In the context of an intentionally fraudulent transfer claim, questions of value are immaterial. 11 U.S.C. § 548(a)(1)(A).  The definition of "transfer" under the Texas Uniform Fraudulent Transfer Act ("TUFTA") also does not include a value component.  Tex. Bus. & Comm. Code Ann. § 24.002(12) (West, Westlaw through 2017).

[67] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[68] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[69] Transcript 12/11/18 (AM) [DE # 792], at p. 92.

Appellee Appx. 00428

Appx. 10639

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 685    Filed 12/30/23 1804ge 546 of 1392    PageID 15288
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 435 of 1803    PageID 11181
Case 18-30264-sgj11    Doc 392-55    Filed 01/08/19    Entered 01/08/19 15:13:04    Page 30 of 47

HCLOF Guernsey can sell its interest in the subordinated notes in the market.[70]  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction would not impair the value of the subordinated notes because a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan.[71]  Mr. Terry credibly testified that even if the Acis CLOs are not reset, it still does not make sense to redeem the Acis CLOs.[72]

*Public Interest.*  Finally, issuance of the Plan Injunction is consistent with public policy. Public policy favors the equitable collecting of a debtor's assets, maximizing the value of those assets, and distributing the proceeds in an orderly fashion in accordance with the priorities and safeguards set forth in the Bankruptcy Code, rather than in an uncontrolled, piecemeal, and potentially wasteful way.  Public policy also supports successful reorganizations.[73]  The public interest is furthered by confirming a plan that saves the Debtor-Acis's business operations and allows it to pay its creditors under a successful plan of reorganization.  The public interest is also furthered by maintaining the status quo through the Temporary Plan Injunction so that the avoidance action relating to the Equity ALF PMA can be determined on its merits.  The public interest is not furthered by allowing potential wrongdoers to complete the last step in what appears likely to have been a scheme to strip the Debtor-Acis of its assets, steal its business, and leave it unable to pay creditors.  The public interest is not furthered by leaving the Debtors

---

[70] Exh. 721, Mr. Scott Depo. at p. 28.

[71] Transcript 12/11/18 (PM) [DE # 790], at pp. 23-24.

[72] Transcript 12/12/18 (AM) [DE #791], at p. 82.

[73] *Tex. Comptroller of Pub. Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*, 303 F.3d 571, 580 (5th Cir. 2002).

Appellee Appx. 00429
APPX. 10630

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/29/23   Page 547 of 1392   PageID 15289
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 436 of 1803   PageID 11182
Case 18-30264-sgj11   Doc 3892   Filed 11/01/19   Entered 11/01/19   Page 31 of 47

without sufficient resources to pursue and effectively litigate potentially valuable causes of
action.

In sum, the court finds and concludes that the proposed Plan injunction (including the
Temporary Injunction) is legally permissible and justified under all the circumstances.  It is
narrowly tailored to address the specific harm to which it is directed and comports with
governing case and statutory authority and applicable rules of bankruptcy and civil procedure.
The Plan Injunction is consistent with Fifth Circuit precedent.[74]  Such an injunction would not
violate section 524(e) of the Bankruptcy Code.  That subsection provides that "discharge of a
debt of the debtor does not affect the liability of any other entity on, or the property of any other
entity for, such debt."[75]  The Plan Injunction would not affect the liability of any entity, or the
liability of any property.  The injunction would only temporarily prohibit Highland and its Co-
Defendants from exercising one form of economic recourse, thereby preserving the status quo
while the Chapter 11 Trustee and/or Reorganized Debtor has a fair opportunity to prosecute the

---

[74] The Fifth Circuit, in an unpublished opinion, has recognized the propriety of an injunction to preserve
the status quo in cases where equitable relief is sought.  *See Animale Group v. Sunny's Perfume, Inc.,* 256
F. App'x 707, 709 (5th Cir. 2007) ("Because Defendants seek equitable relief, the district court was
authorized to preserve the status quo by entering a limited asset freeze.").  The Chapter 11 Trustee's
claims in the Highland Entities Adversary Proceeding to avoid fraudulent transfers seek equitable relief.
*See United States ex rel. Rahmen v. Oncology Assocs., P.C.,* 198 F.3d 489, 498 (4th Cir. 1999) ("The
complaint's request to void transfers as fraudulent—a form of rescission—is also an equitable remedy.");
*Dong v. Miller,* No. 16-CV-5836 (NGG) (JO), 2018 U.S. Dist. LEXIS 48506, at *30-31 (E.D.N.Y. Mar.
23, 2018) ("The setting-aside of a fraudulent conveyance is a form of equitable relief.").  *See also
Iantosca v. Step Plan Servs.,* 604 F.3d 24, 33 (1st Cir. 2010) (affirming preliminary injunction where
creditors had a "colorable claim that appellants' own supposed interest under the settlement rests upon a
fraudulent conveyance"); *Seidel v. Warner (In re Atlas Fin. Mortg., Inc.),* Adv. No. 13-03222, 2014
Bankr. LEXIS 140 at *10 (Bankr. N.D. Tex. Jan. 14, 2014) (granting preliminary injunction where
complaint sought avoidance of fraudulent transfers under the Bankruptcy Code and the Texas Uniform
Fraudulent Conveyance Act); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* No. 11 Civ. 3489 (JMF),
2013 U.S. Dist. LEXIS 66858, at *7 (S.D.N.Y. May 9, 2013) (authority to grant preliminary injunction
existed because plaintiff alleged not only a legal claim for money damages, but also an equitable claim to
avoid fraudulently transferred assets).

[75] 11 U.S.C. § 524(e).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/29/23 Page 4 of 72/28/1804 Page 548 of 1392    PageID 15290
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 437 of 1803    PageID 11183
Case 18-3026Case 19-1283927 FSiledD01c311612    Filed 01/31/19 11/31/19 Page 132 of 49 Page 32 of 47

Highland Entities Adversary Proceeding.[76]  Likewise, the proposed injunction does not

contravene any other provision of the Bankruptcy Code or the Bankruptcy Rules.[77]  Finally, the

Chapter 11 Trustee's avoidance claim relating to the Equity/ALF PMA transfer under TUFTA

also provides a statutory basis for injunctive relief.[78]

> 3.  Feasibility of the Plan—Specific Findings and Conclusions Regarding Mr. Terry and Brigade.

The Objectors have challenged the feasibility of the Plan.[79]  The court finds and

concludes that the preponderance of the evidence supported the feasibility of the Plan.  Among

other things, the Chapter 11 Trustee credibly testified that Mr. Terry has an excellent track

record as a portfolio manager, and that there is no reason why Mr. Terry will not be able to

obtain new business—that is, new portfolios to manage which will provide additional revenue

streams for the Reorganized Debtor.[80]  The evidence was credible and compelling that Mr. Terry

---

[76] *See In re Seatco, Inc.*, 259 B.R. 279, 283-84 (Bankr. N.D. Tex. 2001) (approving temporary injunction of suit against nondebtor on guaranty of debt treated in plan).

[77] *Compare Omni Mfg. v. Smith (In re Smith),* 21 F.3d 660, 666-67 (5th Cir. 1994) (disapproving injunction extending time to file proof of claim beyond limits set in Bankruptcy Rules 3003(c)(3) and 9006(b)(1)); *Chiasson v. Bingler (In re Oxford Mgmt.),* 4 F.3d 1329, 1334 (5th Cir. 1993) (disapproving injunction ordering payment that altered distribution scheme set forth in § 726(b)); *Unites States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (disapproving injunction ordering spousal support payments contrary to § 523(a)(5)).

[78] Tex. Bus. & Comm. Code Ann. § 24.008 (West, Westlaw through 2017) (providing a creditor may obtain "an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property . . . [or] any other relief the circumstances may require.").  TUFTA's injunction provision is construed broadly and courts have found that "[a] claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction." *Sargeant v. Al Saleh*, 512 S.W.3d 399, 413 (Tex. App.—Corpus Christi 2016, no pet.); *accord, Janvey v Alguire*, 647 F.3d 585, 602-03 (5th Cir. 2011).

[79] 11 U.S.C. § 1129(a)(11).

[80] Transcript 12/11/18 (AM) [DE # 789], at p. 90 (lines 5-12).  Moreover, to the extent there are any gaps, recoveries from the Highland Entities Adversary Proceeding might eventually be available for ongoing operations and payment of creditors.

Appellee Appx. 00431
Appx. 10552

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 4/29/23 1804  Page 549 of 1392    PageID 15291
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 438 of 1803    PageID 11184
Case 18-30264-sgj11  Doc 3927-5 Filed 01/33/19   Entered 01/33/19  Page 340 of 49  Page 33 of 47

will be capable of fulfilling the equity owner position in the Reorganized Debtor (stepping in to essentially run the Reorganized Debtor) and will be able to ensure the feasibility of the Plan. He is well qualified to reorganize the Debtor-Acis. Mr. Terry testified that his role with the Reorganized Debtor will be similar to the role he very successfully performed for the Debtor-Acis.[81] The Debtor-Acis received numerous awards during Mr. Terry's service as the portfolio manager of the Acis CLOs.[82] The arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors.[83] Mr. Terry credibly testified that numerous market participants have expressed an interest in working with the Reorganized Debtor if the Plan is confirmed.[84]

Moreover, the court finds and concludes that Brigade (who stepped in as sub-advisor in place of Highland during the Bankruptcy Cases and is a registered investment advisor) is qualified to serve as a sub-advisor to the Reorganized Acis. Mr. Jared Worman, a portfolio manager for Brigade,[85] credibly testified that Brigade, founded in the year 2007, currently has $20 billion of total assets under management, $5 billion of which consists of six U.S. CLOs, two U.S. CDOs, and three European CLOs.[86] Mr. Worman credibly testified that Brigade has issued 17 CLOs and has reset or refinanced several of them.[87] Mr. Worman and Mr. Terry credibly

---

[81] Transcript 12/11/18 (PM) [DE # 790], at pp. 172-73.

[82] Transcript 12/11/18 (PM) [DE # 790], at pp. 162-163 and Exh. 752.

[83] Transcript 12/11/18 (PM) [DE # 790], at pp. 161-62.

[84] Transcript 12/12/18 (AM) [DE # 791], at pp. 16-18.

[85] Mr. Worman has an undergraduate degree from Emory University and an MBA from Wharton.

[86] Transcript 12/11/18 (PM) [DE # 790], at p. 84.

[87] Transcript 12/11/18 (PM) [DE # 790], at p. 86.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6.35    Filed 2/40/03 1804ge 550 of 1392    PageID 15292
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 439 of 1803    PageID 11185
Case 18-3026 Case 19-12839275Filed 01/38/19    Entered 01/31/19 15:35:04 Page 34 of 47

testified that Brigade is willing to serve as sub-advisor to the Reorganized Acis for fifteen basis points.[88]  Highland attempted to show with evidence and argument that Brigade had made some failed trades since stepping in as sub-advisor to the Acis CLOs and that this perhaps made them unfit to serve in this role.  But Mr. Terry credibly testified that the fact that a few failed trades were made by Brigade does not make them unfit to serve as sub-advisor to Reorganized Acis, and that trades out of compliance with the applicable CLO tests occasionally happen, and Brigade has handled them appropriately.[89]  In fact, the evidence suggested that at least ten failed trades occurred while Highland was acting as sub-advisor to the Debtor-Acis.[90]

Highland's suggestions that Brigade is not up to the task to manage the Reorganized Debtor are specious.  Likewise, HCLOF Guernsey's insistence that it will not be getting the benefit of its bargain if the Acis CLOs are not managed by Highland personnel going forward appears to be a manufactured position aimed at thwarting Mr. Terry at all costs.  Not only is there no credible evidence of Brigade mismanagement but, to the contrary, it appears that Highland (prior to the Debtor-Acis's rejection of the Sub-Advisory Agreement and Shared Services Agreement), intentionally liquidated assets of the CLO SPEs and built up cash without reasonable justification.  Specifically, Mr. Terry credibly testified that there were $85 million in purchases in the Acis CLOs in the hours leading up to the entry of the orders for relief, but virtually no purchases of loans in the CLOs afterwards—only sales.[91]  And Mr. Worman further

---

[88] Transcript 12/11/18 (PM) [DE # 790], at p. 89; Transcript 12/12/18 (AM) [DE # 791], at p. 62.

[89] Transcript 12/11/18 (PM) [DE # 790], at pp. 182-83; Transcript 12/18/18 [DE # 804], at pp. 72-73.

[90] *See* Exhs. 727, 728; Transcript 12/11/18 (PM) [DE # 790], at pp. 71-74, 182-83.

[91] Transcript 12/12/18 (AM) [DE # 791], at pp. 18-19, 28-31; Transcript 12/18/18 [DE # 804], at pp. 87-89; *see also,* Terry Demonstrative.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-35    Filed 11/29/23    Page 551 of 1392    PageID 15293
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 440 of 1803    PageID 11186
Case 18-30264-sgj11    Doc 1223275    Filed 01/31/19    Entered 01/31/19 15:13:04    Page 35 of 47

credibly testified that Highland, while acting as sub-advisor, allowed approximately $380 million in cash to build up in the Acis CLOs.  Meanwhile, Brigade has subsequently reduced that cash balance by $280 million to approximately $100 million.[92]  Mr. Worman also credibly testified that Brigade has purchased approximately $300 million in loans for the Acis CLOs.[93]  The Chapter 11 Trustee and Mr. Terry both credibly testified that the build-up of cash in the Acis CLOs while Highland was sub-advisor, rather than the loans acquired by Brigade, left the Acis CLOs without sufficient interest income to make a distribution to the equity holders.[94]  Certain contradictory testimony of Hunter Covitz was not convincing that:  (a) there were very few conforming loans available to be purchased for the Acis CLOs in the approximately four months that elapsed between the entry of the Order for Relief and the time when Highland was terminated as sub-advisor;[95] and (b) it made more sense to accumulate cash to pay down the AAA notes rather than invest in new loans.[96]  The court found more convincing the testimony of Mr. Terry:  (a) that there was $310 billion of performing loans rated above CCC in the S&P loan index in May of 2018 available for purchase in CLO-6 that would have satisfied the weighted average life test;[97] (b) that Highland purchased loans for CLO-7 that would have satisfied the weighted average life constraints in the Debtor-Acis's CLO-4, CLO-5, and CLO-6;[98] and (c)

---

[92] Transcript 12/11/18 (PM) [DE # 790], at p. 100.

[93] Transcript 12/11/18 (PM) [DE # 790], at pp. 70, 94.

[94] Transcript 12/11/18 (AM) [DE # 789], at pp. 67-69; Transcript 12/11/18 (PM) [DE # 790], at pp. 70-71; Transcript 12/12/18 (AM) [DE # 791] at pp. 34-37.

[95] Transcript 12/13/18 (AM) [DE # 793], at pp. 12-13.

[96] Transcript 12/13/18 (AM) [DE # 793], at pp. 13-16.

[97] Transcript 12/18/18 [DE # 804], at p. 87.

[98] Transcript 12/18/18 [DE # 804], at pp. 87-88.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 2/29/23 Exhibit 36 Page 552 of 1392   PageID 15294
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 441 of 1803   PageID 11187
Case 18-3026-asgj11   D23927S Filed 01/33/619   Entered 01/31/19 Page 1704 49 Page 36 of 47

that, although there was no change in market conditions, Highland essentially stopped buying

collateral for the Acis CLOs[99] after the entry of the Orders for Relief.[100]

> 4.   Resets—Non-impairment of Anyone's Rights.

The Plan only contemplates **consensual** resets of the Acis CLOs—in other words, only if

HCLOF Guernsey requests resets.[101]  Messrs. Worman and Terry both credibly testified that they

believed the Reorganized Acis and Brigade could perform a consensual reset of the Acis

CLOs.[102]  Mr. Terry credibly testified that other asset managers have been able to issue or reset

CLOs after a bankruptcy proceeding.[103]  Mr. Terry also credibly testified that he wants to come

to a resolution with HCLOF Guernsey and consensually reset the Acis CLOs.[104]

HCLOF Guernsey has taken the position that it and its new Passive Investor (new as of

mid-November 2017—just before the Bankruptcy Cases) only want to be involved with CLOs

that are managed by Highland or Highland affiliates.  Is the Plan impairing their rights—to the

extent the Plan (and any subsequent re-sets) brings in Brigade as the sub-advisor to the

Reorganized Debtor (whereas Highland was in that sub-advisor role before)?  It appears no.  The

---

[99] Transcript 12/18/18 [DE # 804], at pp. 88-89.

[100] Highland has also argued that the Plan is not feasible because the administrative expense claims are extremely high (to which the Chapter 11 Trustee responds, it is of Highland's making, since Highland has objected to literally every action proposed by the Chapter 11 Trustee).  The court does not believe there is a legitimate feasibility problem here.  Not only has the court not ruled yet on final professional fee applications, but the Chapter 11 Trustee represented that certain professionals have agreed to defer their fees (beyond payment in full on the Effective Date) as necessary.

[101] *See* Plan § 6.08.

[102] Transcript 12/11/18 (PM) [DE # 790], at pp. 86-90, 176-178; Transcript 12/12/18 (AM) [DE # 793], at pp. 16-18.

[103] Transcript 12/11/18 (PM) [DE # 790], at pp. 179-180.

[104] Transcript 12/18/18 [DE # 804], at p. 74.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 4/29/23   Page 553 of 1392   PageID 15295
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 442 of 1803   PageID 11188
Case 18-30264-sgj11   Doc 3922-55   Filed 01/31/19   Entered 01/31/19   Page 37 of 47

Offering Memorandum between HCLOF Guernsey and the Passive Investor, dated November

15, 2017, pursuant to which the Passive Investor agreed to invest in HCLOF Guernsey, provided

that there may be a change in circumstances following the date of the Offering Memorandum

and that any forward-looking statements in the Offering Memorandum involved risks and

uncertainties "because they relate to events and depend on circumstances that may or may not

occur in the future."[105]  Heather Bestwick, one of the HCLOF Guernsey directors, testified that

the Offering Memorandum does not require HCLOF Guernsey to invest only in Highland-

managed funds[106] and instead expressly provides that HCLOF Guernsey will invest in "CLOs

managed by other asset managers."[107]  Another witness, Mr. McGuffin, testified that the HCLOF

Guernsey directors' fiduciary duties require them to act independently and objectively in the best

interests of HCLOF Guernsey, and also require them to consider a change in circumstances.[108]

HCLOF Guernsey's counsel, HCLOF Guernsey's director, and the Passive Investor have all

testified that they would consider doing a reset with the Reorganized Acis in the event the Plan is

confirmed.[109]

Mr. Terry credibly testified that a reset of the Acis CLOs can occur after the expiration of

the reinvestment periods of the Acis CLOs.[110]  The Plan is feasible regardless of whether a reset

of the Acis CLOs is requested by HCLOF Guernsey.  Messrs. Phelan and Terry both credibly

---

[105] *See* Exh. 90, HCLOF Guernsey Offering Memorandum, at pp. 4-5.

[106] *See* Exh. 719, Bestwick Depo., at pp. 109, 118-121.

[107] *See* Exh. 90, HCLOF Offering Memorandum, at p. 12.

[108] Transcript 12/13/18 (PM) [DE # 794], at pp. 142-145.

[109] *See* Exh. 602, p. 12 of 70 (statement by HCLOF Guernsey's Counsel); Exh. 719 at pp. 166-167 (Heather Bestwick); Exh. 720, p. 72.

[110] Transcript 12/18/18 [DE # 804], at pp. 82-83.

Appellee Appx. 00436
APPX. 01687

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/29/23    Page 554 of 1392    PageID 15296
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 443 of 1803    PageID 11189
Case 18-30264-sgj11    Doc 2375    Filed 01/31/19    Entered 01/31/19 15:13:04    Page 38 of 47

testified that the Reorganized Debtor will have cash flow from multiple potential sources—

including the revenues from the CLO PMAs with the Acis CLOs, potential new business

developed by the Reorganized Acis, and the outcome of any potential litigation claims.[111]

## VI.    General Credibility Assessments.

In ruling in a contested matter such as confirmation, and weighing the preponderance of

the evidence, the credibility of witnesses and contradictions in their testimony naturally can be

significant.  Here, there were some noteworthy problems and contradictions with some of the

testimony provided by the Objectors' witnesses.  They are summarized below.

### 1.    Scott Ellington: A Seemingly Manufactured Narrative to Justify Prior Actions.

Scott Ellington testified on February 7, 2018 at the trial on the involuntary petitions, and

the court was asked to consider his testimony again in connection with confirmation (he did not

attend the confirmation hearing).  He is the General Counsel, Chief Legal Officer, and a Partner

at Highland.  Mr. Ellington testified that the Debtor-Acis's name is "toxic" in the market place

and that, due to the litigation with Mr. Terry and allegations in that litigation, "nothing can be

associated with the Acis brand and be managed as a CLO or marketed as a CLO."[112]   Mr.

Ellington elaborated that it had been determined in late 2016 or 2017 that re-sets or re-financings

of the Acis CLOs were a prudent thing to pursue (in fact, there was indeed a trend of

refinancings and resets for this vintage of CLOs in the market place) and, in connection with

that, the Debtor-Acis's contracts and assets needed to be diverted to different, newly created

entities because:  (a) the "Acis" name was toxic and underwriters and investors were not going to

---

[111] Transcript 12/11/18 (AM) [DE # 789], at pp. 72, 88-90; Transcript 12/12/18 (AM) [DE # 791], at p. 53.

[112] Exh. 23, p. 55 (line 17) through p. 56 (line 7); p. 98 (lines 8-12).

Appellee Appx. 00437
APPX. 001589

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 4/25/23   Page 555 of 1392   PageID 15297
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 444 of 1803   PageID 11190
Case 18-30264-sgj11   Doc 392-75   Filed 01/31/19   Entered 01/31/19   Page 39 of 47

be interested in re-financings or resets for CLOs managed by the Debtor-Acis;[113] and (b) the new Passive Investor wanted the Debtor-Acis out of the picture.[114]  Mr. Ellington further elaborated: "The equity, you know, calls the tune, so to speak, in terms of the CLO . . .."[115]  In summary, an overarching theme of Mr. Ellington's testimony was that the Debtor-Acis was tainted or toxic in the marketplace and the Passive Investor wanted the Debtor-Acis out of the picture—thus, this was the motivation for the prepetition transactions orchestrated by Highland prior to the Bankruptcy Cases.  The problems with the Scott Ellington testimony were at least two-fold.  First, there is no credible evidence that the Debtor-Acis is/was toxic in the market place.  In fact, in April 2017 (well after the litigation with Mr. Terry commenced), the Debtor-Acis issued a new CLO (CLO-7).  And in market publications as recently as August 21, 2017, Highland was touting the *Acis* structure stating "our vehicle will allow us to issue between six and 12 CLOs over the next few years."[116]  Second, the Passive Investor denies demanding that the Debtor-Acis be removed as the CLO manager.  Term sheets as recent as August 21, 2017 contemplated the Debtor-Acis as the continuing portfolio manager of CLOs, with apparently no protestations by the Passive Investor.[117]

---

[113]  *E.g., Id.* at p. 177 (line 21) though p. 178 (line 12); p. 184 (lines 13-17) ("The underwriters in this case, Mizuho, Goldman, et al., the equity, they said we want every possible relation to anything that could be legacy Acis or Acis-related affiliates to be severed").

[114] *Id.* at p. 202 (lines 11-13) ("we have third-party investors that said we don't want to be involved in this brand; and their equity is one of the reasons that new CLOs can be launched"); p. 203 (lines 7-8) ("It was call the deal and terminate the CMAs or transfer the CMAs"); p. 223 (lines 8-12) ("Because if the involuntary remains, and I'm just – I'm just being frank – we've already been told by equity holders, including the separate account, BBK, that you may have seen on some of the exhibits, they're pulling everything.").

[115] *Id.* at p. 74 (lines 3-6).

[116] Exh. 801, pp. 3 & 5.

[117] Exh. 802, p.1.

Appellee Appx. 00438
APPX. 00569

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/20/23   Page 556 of 1392   PageID 15298
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 445 of 1803   PageID 11191
Case 18-30264-sgj11   Doc 1239-2   Filed 01/31/19   Page 40 of 47
Case 19-34054-sgj11   Doc 1336-12   Entered 11/09/19   Page 41 of 49

2.  Michael Pugatch: The Passive Investor Made Into a Scapegoat.

The reality is that Highland, indeed, started working on the concept of doing resets of some of the older vintage Acis CLOs in at least early 2017 (and perhaps late 2016). Highland, in fact, completed a reset of one Acis CLO in April 2017 (with the Debtor-Acis still in place as the portfolio manager for that reset in April 2017). As part of that process of implementing resets for the Acis CLOs, Highland worked on bringing in a new investor or investors to have a share of the equity tranche of the Acis CLOs. Highland finally obtained the commitment of the Passive Investor in November 2017, after starting initial discussions with them in the second quarter of 2017.[118] A representative for the Passive Investor referred to itself as "passive" in a deposition.[119] Concepts and documentation for the Passive Investor's investment in the Acis CLOs were discussed for a while during 2017. As recently as August 2017, the negotiations with the Passive Investor appeared to contemplate the Debtor-Acis still as the portfolio manager for the CLOs.[120] Then the arbitration trial with Mr. Terry began in September 2017 and the Terry Arbitration Award was issued on October 20, 2017. Suddenly, it appears that the dismantling of the Debtor-Acis began with all deliberate speed. The court believes, based on the totality of the evidence, that it was Highland who did not want the Debtor-Acis as CLO manager going forward, so that Highland could keep reaping the benefits of the reset CLOs. Specifically, when deposed on the topic, a representative for the Passive Investor, Mr. Pugatch, denied the accuracy of Mr. Ellington's testimony, stating that the Passive Investor "viewed Acis and Highland as interchangeable from the perspective of the—you know, the actual investment

---

[118] *See* Exh. 720, Pugatch Deposition Transcript dated November 27, 2018, p. 18, lines 14-20.

[119] *Id.* at p. 22 (lines 2-3) ("we're you know, 49 percent sort of passive minority investor").

[120] Exh. 802, p. 1.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/29/23    Page 557 of 1392    PageID 15299
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 446 of 1803    PageID 11192
Case 18-30264-sgj11    Doc 3927-35    Filed 01/31/19    Entered 01/31/19    Page 41 of 47

opportunity."[121]  When asked, "Are you aware that Scott Ellington, general counsel for HCM,

testified that [the Passive Investor] said with absolute certainty that they had no interest in doing

business with Acis because the Acis brand was purportedly toxic and, consequently, nothing

associated with Acis could be managed or marketed as a CLO?" Mr. Pugatch testified that he

had read that testimony and that the statement was not true.[122]  He further stated that "the

ultimate sort of name change did not come from [the Passive Investor]."[123]  In fact, when further

asked whether the Passive Investor knew why Acis CLO Funding Limited changed its name to

Highland CLO Funding Limited (*i.e.,* HCLOF Guernsey), Mr. Pugatch testified, "We were told

that it was a change in the brand or the name, as requested by Highland."[124]  And when asked

"Did [the Passive Investor] request that the name be changed?" he answered "No."[125]  When

asked whether the Passive Investor considered "Acis toxic in the industry?" Mr. Pugatch

answered:  "No. What I would say is, when the suggested name change did occur, there were

commercial reasons given to us as to why that would be beneficial in terms of the ongoing

management of those CLOs and the intended investment thesis around the investment that we

had made, which seemed to make commercial sense."[126]  When Mr. Pugatch was asked, "Those

reasons were given by Highland, correct?" he replied "Correct" and confirmed that they were not

demanded by the Passive Investor.[127]  Mr. Pugatch was emphatic that the Passive Investor was

---

[121] *Id.* at p. 30 (lines 19-20).

[122] *Id.* at p. 31 (lines 6-19).

[123] *Id.* (lines 24-25).

[124] *Id.* at p. 27 (lines 24-25).

[125] *Id.* at p. 28 (lines 1-3).

[126] *Id.* at p. 32 (lines 1-8).

[127] *Id.* at p. 32 (lines 9-12).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-35    Page 429/2018184age 558 of 1392    PageID 15300
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 447 of 1803    PageID 11193
Case 18-30264-sgj11    Doc 392-5    Filed 01/31/19    Entered 01/31/19    Page 42 of 47

just that—a passive investor—that did not have the ability to "start calling the shots" and dictate the terms of any reset transactions.[128]  When asked if the Passive Investor was concerned about the Terry Arbitration Award, Mr. Pugatch replied:  "The award itself, no.  I think the only thing we were concerned about or focused on was that vis-à-vis our equity investment in Highland CLO Funding Limited and, in turn, the equity that that vehicle held in the various CLOs was appropriately, you know, ring-fenced or not exposed to any potential damages or economic loss in value as a result of that arbitration award."[129]

The Passive Investor further testified that Brigade has "a fine reputation in the market" but that it had no interaction with them historically.[130]  The Passive Investor also testified that it was concerned about the cash buildups that had happened recently due to actions while Highland had still been the sub-advisor on the Acis CLOs.[131]

    **3.**   The Seemingly Rehearsed Testimony of the Two HCLOF Guernsey Witnesses.

The court was presented with video depositions of HCLOF Guernsey's two non-executive directors (*i.e.,* its only directors):  Mr. William Scott[132] and Ms. Heather Bestwick.[133] It was very apparent to the court that HCLOF Guernsey is controlled by Highland in every way. Putting things in the kindest way possible, Mr. Scott and Ms. Bestwick appear to be nominal figureheads who are paid to act like they are in charge, while they are not.  They are both

---

[128] *Id.* at p. 32 (lines 16-17); pp. 33-35.

[129] *Id.* at p. 43 (lines 3-9); p. 89.

[130] *Id.* at p. 68 (lines 11-13).

[131] *Id.* at p. 82, lines 9-24.

[132] *See* Exh. 721.

[133] *See* Exh. 719.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 11/29/23 1804ge 559 of 1392    PageID 15301
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 448 of 1803    PageID 11194
Case 18-30264-sgj11    Doc 2392-75    Filed 01/31/19    Entered 01/31/19 15:44:06    Page 43 of 47

basically professional directors-for-hire, for companies that choose to form/organize in the nation of Guernsey.

Ms. Bestwick testified that she is a nonexecutive director for six companies in Guernsey (none of the others are in the CLO business).[134]  She testified that she earned £35,000 per year to serve as a director of HCLOF Guernsey.[135]  She testified that she was selected by Highland[136] and that Highland also made the decision to hire HCLOF Guernsey's law firm in the Bankruptcy Cases.[137]  Ms. Bestwick, when questioned as to why the Equity/ALF PMA it had with the Debtor-Acis was terminated shortly after the Terry Arbitration Award was issued, testified that she was told it was "a condition precedent to the new Passive Investor" coming in and that she was told this by Highland.[138]  She also testified that she had never talked to the Passive Investor (who, of course, is a 49% owner of HCLOF Guernsey)[139] or Grant Scott (the trustee of the charitable organization that owns 49% of HCLOF Guernsey).[140]  She reiterated that she only talks to Highland employees.  She also was under the impression that terminating the Equity/ALF PMA would improve marketability of the CLOs going forward but that it was the same people and "business as usual for us."[141]  She testified that she learned of the Terry

---

[134] *Id.* at pp. 7-8; p. 21 (line 5) through p. 22 (line 20); p. 26 (lines 10-12).

[135] *Id.* at p. 43 (lines 18-19).

[136] *Id.* at p. 42 (lines 17-25).

[137] *Id.* at p. 53 (lines 7-20).

[138] *Id.* at p. 16 (line 13) through p. 17 (line 23); p. 58 (line 21) through p. 60 (line 17).

[139] *Id.* at p. 188 (lines 12-15).

[140] *Id.* at p. 188 (line 19) through p. 189 (line 9).

[141] *Id.* at p. 189 (lines 12-15); p. 200 (line 22).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 2/29/23180 Page 560 of 1392    PageID 15302
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 449 of 1803    PageID 11195
Case 18-30264-sgj11    Doc 3927-5 Filed 01/31/19    Entered 01/31/19 15:15:04 of 49 Page 44 of 47

Arbitration Award in mid-April 2018 (some six months after the fact)[142] and "[y]ou'd have to ask Highland"[143] why it did not inform her sooner.  Her testimony was clear that she defers to Highland on everything, stating that as directors they were "heavily reliant on our service providers, and that means Highland."[144]  With regard to a lawsuit that HCLOF Guernsey filed against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her nor the other director, William Scott's, idea.

Mr. Scott, the other HCLOF Guernsey director, is a "professional director" for 10-15 Guernsey companies[145]—all of which are "paying assignments."[146]  He became rather incensed when testifying, at the suggestion that he and Ms. Bestwick were not in control of HCLOF Guernsey, stating that board minutes and other documents would show that they took a great level of interest in running the company.[147]  He testified that he earned £40,000 per year to serve as a director of HCLOF Guernsey and that, due to the extra work of the Bankruptcy Cases, he also was charging another £350 per hour, after the first 35 hours[148] (the court notes, anecdotally, that it required participation in court hearings by a director of HCLOF Guernsey each time that HCLOF Guernsey took a position in court).  Mr. Scott confirmed that he was not aware of the litigation with Mr. Terry nor the Acis Bankruptcy Cases until April 2018.[149]  He also testified

---

[142] *Id.* at p. 61 (lines 3-19); p. 130 (line 14) through p. 136 (line 2).

[143] *Id.* at p. 137 (line 21).

[144] *Id.* at p. 152 (lines 18-19).

[145] *See* Exh. 721 at p 8 (line 9) through p. 9 (line 5); p. 79 (lines 20-25).

[146] *Id.* at p. 80 (lines 3-5).

[147] *Id.* at p. 13 (lines 1-12); p. 22 (line 23) through p. 23 (line 12).

[148] *Id.* at p. 80 (lines 6-18).

[149] *Id.* at p. 132 (line 20) through p. 135 (line 10).

Appellee Appx. 00443
APPX. 00443

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/29/23   Page 561 of 1392   PageID 15303
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 450 of 1803   PageID 11196
Case 18-30264-sgj11   Doc 3927-5   Filed 01/31/19   Entered 11/01/19 15:14:04   Page 45 of 47

that Highland had proposed the legal counsel HCLOF Guernsey used in the Bankruptcy Cases and that he had never disagreed with Highland's advice.[150]  He confirmed that all investment decisions were made by Highland and that he and Ms. Bestwick's role was to "police" service providers.[151]  Like Ms. Bestwick, Mr. Scott testified that they were told that the Passive Investor had made it a condition precedent to their investment in HCLOF Guernsey that "Acis depart."[152] But he had not talked to the Passive Investor.[153]  As if all this deference to Highland were not enough, HCLOF Guernsey's lender is NexBank (an affiliate of Highland—which is based in Dallas, not Guernsey) and HCLOF Guernsey has given its actual equity notes to NexBank as security for its loans from NexBank.[154]  Also, interestingly, when asked about the adversary proceeding that HCLOF Guernsey filed against the Chapter 11 Trustee a few months ago in the Bankruptcy Cases (*i.e.,* the Highland Entities Adversary Proceeding—it was originally commenced by Highland and HCLOF Guernsey as Plaintiffs), Mr. Scott testified that "we haven't sued the trustee, he has sued us" but later acknowledged his mistake when corrected by counsel.

This court is not naïve—it realizes that so-called "fiduciary services firms" are apparently a typical thing in the world of off-shore jurisdictions that are large financial centers.[155]  Maybe

---

[150] *See generally id.* at pp. 277-280.

[151] *Id.* at p. 106 (lines 1-7).

[152] *Id.* at p. 254 (line 20) through p. 260.

[153] *Id.* at p. 155 (lines 2-25).

[154] *See* Exh. 719 at p. 213 (line 2-22); Exh. 721 at p. 129 (line 10) through p. 130 (line 13).

[155] During the testimony of both Ms. Bestwick and Mr. Scott, the court was reminded of an old TV commercial in which an actor states, "I am not a doctor, but I play one on TV."  The court could not help but conclude that these were not real directors but were playing them (when legally necessary).

45

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 63 Filed 2/22/23 Page 562 of 1392 PageID 15304
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 451 of 1803 PageID 11197
Case 18-30264-sgj11 Doc 1923-75 Filed 01/31/19 Page 46 of 47

the system works, for the most part and in many business contexts. But not when trying to convince a bankruptcy court of the bona fides of transactions that look like attempts to denude another party of value and/or to thwart creditors. And not when accusations are made that you are the alter ego of the party (Highland) who orchestrated the company's creation. The evidence was overwhelming that: (a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf.

In summary, the testimony of these two HCLOF Guernsey Directors was of little or no value in convincing the court that the Objector, HCLOF Guernsey, has valid concerns of its own (separate from Highland's) with regard to the bona fides of the Plan.

**VII.** **Conclusion**.

This Bench Ruling and Memorandum Opinion is intended to address some of the most pertinent facts and issues raised in connection with confirmation of the Plan. Among other things, the court believed it was necessary to stress, in a separate ruling: (a) *the unique status of the Objectors* (they are "insiders" as defined in the Bankruptcy Code whose prepetition actions suggest unclean hands—this seems highly relevant to consider, when there are no non-insider creditors or other relevant parties objecting to the Plan); (b) *the appropriateness and legality of the proposed Plan Injunction* that would temporarily prevent nonconsensual redemptions/liquidations (it is in all ways justified given the allegations in the Highland Entities Adversary Proceeding and under the traditional four-prong test for preliminary injunctions); and

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 04/29/23    Page 563 of 1392    PageID 15305
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 452 of 1803    PageID 11198
Case 18-30264-sgj11    Doc 3892-73    Filed 01/31/19    Entered 01/31/19 15:11:04    Page 47 of 47

(c) *the feasibility of the Plan* (Mr. Terry and Brigade are well qualified to perform their contemplated roles).

The court will separately sign the Findings of Fact, Conclusions of Law and Order Confirming Plan submitted by the Chapter 11 Trustee to address all other relevant issues.

**#### End of Bench Ruling and Memorandum Opinion ####**

**Appellee Appx. 00446**

**Appx. 10543**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/04/23   Page 564 of 1392   PageID 15306
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 453 of 1803   PageID 11199
Case 19-12239-CSS   Doc 86-3   Filed 11/01/19   Page 1 of 54

## Exhibit C

**Acis Involuntary Opinion**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 2/25/03 1804   Page 565 of 1392   PageID 15307
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 454 of 1803   PageID 11200
Case 18-30264-sgj11-1222310873edDedc13613   Entered 04/13/18 Page32:5854 Page 1 of 53



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 13, 2018**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

---

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, L.L.C., | § | CASE NO. 18-30265-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDERS FOR RELIEF ISSUED AFTER TRIAL ON CONTESTED INVOLUNTARY BANKRUPTCY PETITIONS

Joshua N. Terry (the "Petitioning Creditor" or "Mr. Terry") filed involuntary bankruptcy

petitions (the "Involuntary Petitions") against each of the two above-referenced related

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6-3 Filed 12/20/23 Page 566 of 1392 PageID 15308
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 455 of 1803 PageID 11201
Case 18-30264-sgj11 Doc 1338 Filed 04/13/18 Entered 04/13/18 16:35:54 Page 2 of 53

companies (the "Alleged Debtors") on January 30, 2018.[1]  The Involuntary Petitions were

contested, and the court held a multi-day trial (the "Trial") spanning March 21, 22, 23, 27, and

March 29, 2018.[2]  This constitutes the court's findings of fact, conclusions of law and ruling,

pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[3]  As explained below, the court has decided

that Orders for Relief are legally required and appropriate as to each of the Alleged Debtors.

**I.**    **FINDINGS OF FACT**

   **A.    Introduction.**

   1.      The Alleged Debtors—Acis Capital Management, L.P. ("Acis LP"), a Delaware

limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware

limited liability company—are two entities in the mega-organizational structure of a company

that is known as Highland Capital Management, L.P. ("Highland").

   2.      Highland is a Dallas, Texas-based company that is a Registered Investment

Advisor.  Highland was founded in 1993 (changing its original name from "Protective Asset

Management" to Highland in 1997) by James D. Dondero ("Mr. Dondero"), originally with a

---

[1] Exhs. 50 & 51.

[2] Shortly after the Involuntary Petitions were filed, the court held hearings on February 6-7, 2018, on the Petitioning Creditor's Emergency Motion to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets, and Import, Inter Alia, 11 U.S.C. § 363 [DE # 3] (the "303(f) Motion") and the Alleged Debtors' Emergency Motion to Seek Emergency Hearing on the Alleged Debtors' Motion to Dismiss Involuntary Petitions and Request for Award of Fees, Costs, and Damages [DE # 9] (the "Emergency Motion to Set Hearing on Motion to Dismiss").  The court ultimately granted the 303(f) Motion and denied the Emergency Motion to Set Hearing on Motion to Dismiss.  Both the Petitioning Creditor and the Alleged Debtors have proposed that the court should consider the evidence it heard at the hearings held on February 6-7, 2018, in determining whether it should enter orders for relief.  The court has, accordingly, considered such evidence in this ruling.

[3] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C. § 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute— 11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtors have their business headquarters in this district.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 12/29/23    Page 567 of 1392    PageID 15309
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 456 of 1803    PageID 11202
Case 18-30264-sgj11   Doc 218-13   Filed 04/13/18    Entered 04/13/18 16:34:58   Page 3 of 53

75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.[4]

3.    Both Mr. Dondero and Mr. Akada provided witness testimony at the Trial on the Involuntary Petitions, and their names are mentioned numerous times herein—since they were generally the subject of significant evidence and argument presented at the Trial.  Mr. Dondero is the chief executive officer for Highland and Mr. Akada is the chief investment officer.  Mr. Dondero is also the president of each of the two Alleged Debtors.

4.    Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from:  collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.

5.    Highland's CLO business was front-and-center at the Trial on the Involuntary Petitions.  The Alleged Debtor, Acis LP, for approximately the past seven years, has been the vehicle through which Highland's CLO business has been managed.

6.    The Petitioning Creditor, Mr. Terry, became an employee of Highland in the year 2005, starting as a portfolio analyst, promoting to a loan trader, then ultimately becoming the portfolio manager for (and 25% limited partner in) Highland's CLO business—specifically, Mr. Terry was the human being who was acting for the CLO manager, Acis LP.

7.    Mr. Terry was highly successful in his role in the CLO business, managing billions of dollars of assets during his tenure, but Mr. Terry and Mr. Dondero had a bitter parting of ways on June 9, 2016.  Specifically, Mr. Terry's employment was terminated on that date (for

---

[4] Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and Akada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/29/23    Page 568 of 1392    PageID 15310
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 457 of 1803    PageID 11203
Case 18-30264-sgj11    Doc 391-1    Filed 04/13/18    Entered 04/13/18 10:35:58    Page 4 of 53

reasons that have been highly disputed) and his 25% limited partnership interest in Acis LP was deemed forfeited without any payment of consideration to him.

8.    In September 2016, Highland sued Mr. Terry in the 162nd Judicial District Court of Dallas County, Texas ("State Court 1") for breach of fiduciary duty/self-dealing, disparagement, breach of contract, and various other causes of action and theories. Mr. Terry asserted his own claims against Highland, and also claims against the two Alleged Debtors, Mr. Dondero, and others and demanded arbitration. On September 28, 2016, State Court 1 stayed the litigation and ordered the parties to arbitrate. The parties participated in ten days of arbitration in September 2017 before JAMS. On October 20, 2017, Mr. Terry obtained an Arbitration Award (herein so called),[5] jointly and severally against both of the Alleged Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate, which was based on theories of breach of contract and breach of fiduciary duties.

9.    There are still claims pending between and among the Petitioning Creditor, Highland, and others (not including the Alleged Debtors) in State Court 1.

10.    A Final Judgment (herein so called) confirming the Arbitration Award was entered by the 44th Judicial District Court of Dallas County, Texas ("State Court 2") on December 18, 2017, in the same amount as that contained in the Arbitration Award—$7,949,749.15.[6]

11.    Mr. Terry began pursuing post-judgment discovery soon after obtaining his Arbitration Award and even more so after entry of the Final Judgment. Mr. Terry undertook a UCC search on November 8, 2017, to investigate whether there were any liens on the Alleged

---

[5] Exh. 1.

[6] Exh. 105.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 635   Filed 11/09/23   Page 569 of 1392   PageID 15311
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 458 of 1803   PageID 11204
Case 18-30264-sgj11   Doc 3913-53   Filed 04/13/18   Entered 04/13/18 Page 5 of 53

Debtors' assets (none appeared).[7]  Mr. Terry also pursued a garnishment of an Acis LP bank

account (at a time when there was only around $2,000 in the account).  Mr. Terry's counsel

deposed Highland's General Counsel Scott Ellington (who sat for the deposition as a

representative of Acis, LP) on January 26, 2018, and asked numerous questions about: (a) how

many creditors the Alleged Debtors had, [8] and (b) whether Acis LP was able to pay its debts as

they became due,[9] but did not receive meaningful answers.

12.     Mr. Terry requested a temporary restraining order ("TRO") from State Court 2, on

January 24, 2018, after discovering certain transactions and transfers involving Acis LP's

interests, that he believed were pursued without any legitimate business purpose and with the

purpose of denuding Acis LP of its assets and to make it judgment proof.  Most particularly, it

appeared as though Highland was engaged in a scheme to transfer certain fee-generating CLO

management contracts of Acis LP away from it and into a Cayman Island affiliate of Highland.[10]

At a January 24, 2018 hearing on the request for a TRO, Acis LP agreed and State Court 2

ordered that, between that hearing and a later hearing on a request for a temporary injunction, no

CLO management contracts would be transferred away from Acis LP and that no monies would

be diverted from it.[11]

13.     Then, on January 29, 2018, the Controller of and CPA for Highland  (David Klos)

submitted a Declaration to State Court 2 concerning the net worth of the Alleged Debtors, stating

---

[7] Exh. 84.

[8] Exh. 25, pp. 7-9.

[9] *Id.* at pp. 102-04.

[10] Exh. 27.

[11] Exh. 28.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 12/20/23    Page 570 of 1392    PageID 15312
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 459 of 1803    PageID 11205
Case 18-30264-sgj11    Doc 391-8    Filed 04/13/18    Entered 04/13/18 14:58:54    Page 6 of 53

that Acis GP/LLC had a net worth of $0 and that Acis LP might have a net worth, at best, of $990,141.[12] Mr. Terry thought this was preposterous—given the management fees that Acis LP was entitled to and the receivables that should be owing to it. Mr. Terry believes that the collateral management agreements on which Acis LP receives management fees have a present value of $30 million (about $6 million for each of the five CLOs which Acis LP has been managing).

14. On January 29, 2018, the Alleged Debtors filed a motion for leave to post a supersedeas bond in the amount of **$495,070.50** with State Court 2 (purportedly half of the net worth of the two Alleged Debtors—as stated in the David Klos Declaration), so that they could suspend enforcement of the Final Judgment while they appealed it.[13] Although there is a very stringent standard for appealing an Arbitration Award, the Alleged Debtors apparently believe they have an argument that State Court 2 lacked the subject matter jurisdiction to confirm the Arbitration Award (a motion to vacate the Final Judgment based on this argument has previously been denied by State Court 2).[14]

15. Meanwhile, Mr. Terry was learning of more transactions and transfers involving Acis LP's assets and interests. On January 29, 2018, Mr. Terry filed supplemental pleadings with State Court 2, alleging that further shenanigans (*i.e.,* transfers and transactions that would amount to fraudulent transfers) were underway at Acis LP and seeking a receiver.[15] Also, at

---

[12] Exh. 26.

[13] Exh. 73.

[14] *See* DE # 35, in Case No. 18-30264 and DE # 34 in Case No. 18-30265. Unless otherwise noted, references to "DE #" herein refer to the docket entry number at which a pleading appears in the docket maintained with the Bankruptcy Clerk in the Acis Capital Management L.P. bankruptcy case (Case No. 18-30264).

[15] Exhs. 28-31.

Appellee Appx. 00453
Appx. 00795

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/20/23   Page 571 of 1392   PageID 15313
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 460 of 1803   PageID 11206
Case 18-30264-sgj11   Doc 391-835   Filed 04/13/18   Entered 11/04/19   Page 38:585   Page 7 of 53

some point, in the weeks leading up to this, an Acis LP lawyer represented to Mr. Terry's

counsel that the Alleged Debtors were "judgment proof."[16]

16.     At approximately 11:57 p.m. on January 30, 2018 (on the evening before a

scheduled temporary injunction hearing in State Court 2—at which time State Court 2

presumably might have considered the Alleged Debtors' request to post the $495,070.50

supersedeas bond to stay enforcement of the Final Judgment), Mr. Terry filed the Involuntary

Petitions, as a sole petitioning creditor, against both Acis LP and Acis GP/LLC.

17.     For purposes of this Trial (and this Trial only), the Alleged Debtors do not dispute

that Mr. Terry has standing to be a petitioning creditor pursuant to Bankruptcy Code section

303(b)—in other words, they do not dispute that Mr. Terry is a holder of a claim against the

Alleged Debtors that is not contingent as to liability or the subject of a bona fide dispute as to

liability or amount and that aggregates at least $15,775 in unsecured amount.  However, the

Alleged Debtors argue that:  (a) the Alleged Debtors have *12 or more creditors* and, thus, three

or more petitioning creditors were required to prosecute the Involuntary Petitions pursuant to

Bankruptcy Code section 303(b)(1); (b) the Petitioning Creditor did not establish, pursuant to

Bankruptcy Code section 303(h)(1), that the Alleged Debtors are not *generally paying their*

*debts as such debts become due* unless such debts are the subject of a bona fide dispute as to

liability or amount; (c) regardless of whether the Petitioning Creditor has met the statutory tests

in sections 303(b)(1) and (h)(1), the Petitioning Creditor has acted in *bad faith*—which serves as

an equitable basis for dismissal of the Involuntary Petitions; and (d) if the court disagrees with

the Alleged Debtors and determines that the section 303(b) and (h) statutory tests are met, and

also determines that the Petitioning Creditor has not acted in bad faith, the court should

---

[16] Exh. 27 (exhibit 3 thereto).

7

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Page 4 of 6   Page 572 of 1392   PageID 15314
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 461 of 1803   PageID 11207
Case 18-30264-sgj11   Doc 391   Filed 04/13/18   Entered 04/13/18 10:39:55   Page 8 of 53

nevertheless **abstain** in this matter, pursuant to Bankruptcy Code **section 305**, since this is essentially a two-party dispute and the interests of creditors and the debtor would be better served by dismissal.

18.    The Petitioning Creditor argues that he has met the statutory tests of sections 303(b) and (h) but, even if he has not, there is a ***"special circumstances"*** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor—which "special circumstances," Mr. Terry alleges, have been established here.  Moreover, the Petitioning Creditor argues that the facts here ***do not warrant section 305 abstention*** because the interests of creditors and the Alleged Debtors would not be better served by dismissal.

19.    As further explained below, the court finds and concludes that the Petitioning Creditor has met his burden of proving by a preponderance of the evidence that the statutory tests of sections 303(b) and (h) are met here.  Thus, the court does not need to reach the question of whether there is a ***"special circumstances"*** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor, and—if so—whether the exception is applicable here.[17]

20.    Moreover, the Alleged Debtors have not shown by a preponderance of the evidence that the Petitioning Creditor acted in bad faith, such that the Involuntary Petitions should be dismissed.

---

[17] *See e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Appellee Appx. 00455
APPX. 002796

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-36 Filed 12/29/23 180 Page 573 of 1392 PageID 15315
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 462 of 1803 PageID 11208
Case 18-30264-sgj11 Doc 891-1 Filed 04/18/18 Entered 04/13/18 16:34:53 Page 9 of 53

21.     Finally, the Alleged Debtors also have ***not shown facts here that warrant section***

***305 abstention*** because they have not shown that the interests of creditors and the Alleged

Debtors would be better served by dismissal.

> **B.    The CLO Business: Understanding the Alleged Debtors' Business
> Operations, Structure, and What Creditors and Interest Holders They
> Actually Have.**

22.     Highland set up its first CLO in the year 1996. Highland was one of the early

participants in the CLO industry.

23.     The Alleged Debtors were formed in 2011 to be the new "brand" or face of the

Highland CLO business, after Highland's name had suffered some negative publicity in the

marketplace.

24.     Acis LP has acted as the portfolio manager of Highland's CLOs since 2011. Acis

LP currently has a contractual right to CLO portfolio management fees on five CLOs[18] which

were referred to at the Trial as CLO 2013-1; CLO 2014-3; CLO 2014-4; CLO 2014-5; and CLO

2016-6. CLOs typically have an 8-12 year life. Thus, there are still several years of life left on

these CLOs (since the oldest one was established in the year 2013).

25.     The key "players" in and features with regard to the Highland CLOs, during the

time period relevant to the issues adjudicated at the Trial, have been:

(a)     <u>The CLO manager.</u>  As mentioned earlier, the CLO manager is the Alleged

        Debtor, Acis LP. Acis LP, has collateral management agreements (hereinafter,

        the "CLO Collateral Management Agreements") with the CLOs (which CLOs

        were set up as special purpose entities) and, pursuant thereto, receives

---

[18] There is still another Highland CLO (CLO 2017-7, set up in April 2017, as to which Acis LP's
contractual right to manage was terminated shortly before the Petition Date, as will be further described herein.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/09/03 1804 Page 574 of 1392    PageID 15316
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 463 of 1803    PageID 11209
Case 18-3026-sgj11  Doc 91-13  Filed 04/13/18  Entered 04/13/18 Page 10 of 53

management fees[19] from the CLOs in exchange for managing the pool of assets

within the CLOs and communicating with investors in the CLOs.[20]  As mentioned

earlier, Mr. Terry was the human being that performed the management function

at Acis LP until Highland fired him on June 9, 2016 and also terminated his

limited partnership interest in Acis LP.  Mr. Terry, and all employees who have

ever provided services to the CLO manager, are Highland employees—which

were provided to Acis LP through shared and sub-advisory services agreements—

as further explained below.  Thus, to be clear, Acis LP has always essentially

subcontracted its CLO managerial function out to Highland.

(b)      The pool of assets. Within each CLO that the CLO manager manages is a basket

of loans that the CLO manager purchases.  The basket of loans typically consists

of approximately 200 loans-payable (or portions of loans payable), on which large

well-known companies typically are the makers/obligors (and which loans,

collectively, provide a variable rate of interest).[21]  The CLO manager can

typically decide to buy and sell different loans to go into the pool of assets, with

certain restrictions, during a four or five year reinvestment time period.

---

[19] These fees typically include "senior fees" (*e.g.,* 15 basis points); additional "subordinate fees" (*e.g.,* 25 basis points) if the CLOs are passing certain tests; and perhaps even an "incentive fee" beyond a certain hurdle rate (*e.g.,* after the equity in the CLO received an internal rate of return of 10%, the CLO manager would get 15% of the excess).  Exh. 82, p. 59, lines 14-25.

[20] *See,* as an example, Exh. 3 (the collateral management agreement between Acis LP and CLO 2014-3).  Note that the document is entitled "Portfolio Management Agreement" but, to avoid confusion with other similarly titled documents and to highlight the true nature of the agreement, the court uses the defined term "CLO Collateral Management Agreement," which terminology the lawyers also sometimes used at the Trial.

[21] Exh. 8.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/05/23    Page 575 of 1392    PageID 15317
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 464 of 1803    PageID 11210
Case 18-30264-sgj11    Doc 1339-5    Filed 04/13/18    Entered 04/13/18 18:34:25    Page 11 of 53

(c)    <u>The CLO investors</u> (*i.e.,* CLO note holders).  These may be any number of

persons or entities, including pension funds, life insurance companies, or others

who decide to invest in the CLOs and contribute capital to fund the purchase of a

CLO's loan pool, and, in return, receive fixed rate notes payable—the ratings on

which can range anywhere from Triple-A to Single-B, depending upon the risk

option the investor chooses.  There are typically five or six traunches of notes

issued by the CLO (with the top AAA-rated traunche being the least risky and the

bottom traunche being the most risky) and—to be clear—the CLO itself (again, in

each case, the CLO is a special purpose vehicle) is the obligor.  As the CLO

manager receives income from the pool of loans in the CLO, he distributes that

income to the CLO investors, in accordance with their note indentures,[22] starting

with the top traunche of notes and then down to the other traunches.  The top

traunche of notes (AAA-rated) is considered the "controlling" class and a

majority of holders in this class can terminate the CLO manager (*i.e.,* Acis LP) for

cause on 45 days' notice, although all parties seem to agree this would be a rare

event.

(d)    <u>The CLO equity holder</u>.  The CLO equity holder actually is a holder of

subordinated notes issued by the CLOs (*i.e.,* the bottom traunche of notes on

which the CLO special purpose entity is obligated), and has voting rights and is

itself a capital provider, but it takes the most risk and receives the very last cash

---

[22] The indenture trustee on the CLO notes may actually operate as a payment agent in some cases, for purposes of making the quarterly note payments to holders.

11

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/20/23   Page 576 of 1392   PageID 15318
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 465 of 1803   PageID 11211
Case 18-30264-sgj11   Doc 3915-5   Filed 04/13/18   Entered 04/13/18 16:34:58   Page 12 of 53
Exhibit B   Page 460 of 1804

flow from the CLOs.  It, in certain ways, controls the CLO vehicle[23]—for example, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the traunches of notes, starting at the top with the Triple A's.  Note that, until recently, a separate entity known as Acis Loan Funding, Ltd. ("ALF"), which was incorporated under the laws of the island nation of Guernsey,[24] was the CLO equity holder.  To be clear, *ALF was essentially the equity owner in the CLO special purpose entities—not the equity owner of Acis LP.*  Acis LP was a party to a separate portfolio management agreement with ALF (hereinafter, the "ALF Portfolio Management Agreement"—not to be confused with the CLO Collateral Management Agreements that Acis LP separately has with the special purpose CLOs).  No fees were paid from ALF to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees are only paid to Acis LP on the CLO Collateral Management Agreements).  The complicated structure of the CLO business—all parties seemed to agree—has been developed, among other reasons, to comply with "risk-retention requirements" imposed by the U.S. Congress's massive Dodd-Frank financial reform legislation[25] enacted in year 2010, in response to the financial crisis and recession that first began in 2008.

---

[23] The top traunche of AAA notes also has certain control—such as the ability to terminate the portfolio manager for cause, on notice.

[24] Guernsey is located in the English Channel.  ALF was created in August 2015.

[25] Simply put, one of the results of the Dodd-Frank legislation (*i.e.*, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, H.R. 4173, 124 Stat. 1376-2223, 111th Congress, effective July 21, 2010), which was implemented over a period of several years, was that, *subsequent to December 2016*, managers of securitizations needed to retain at least a 5% interest in that securitization.  Thus, if a $400 million CLO were to be

Appellee Appx. 00459
Appx. 10760

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/27/23   Page 577 of 1392   PageID 15319
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 466 of 1803   PageID 11212
Case 18-30264-sgj11   Doc 391-35   Filed 04/13/18   Entered 04/13/18 23:58:57   Page 13 of 53

(e)   <u>The Equity Owners of ALF</u>.  Until recently (*i.e.,* until October 24, 2017—four

days after the Arbitration Award), Acis LP itself, as required for a CLO manager,

had a 15% indirect ownership in ALF, in order to be regulatory compliant.[26]  The

parties sometimes refer to ALF (and the web of ownership between it and Acis

LP) as the "risk retention structure."[27]  The evidence at the Trial revealed that

ALF (which has recently been renamed), now, has three equity owners:  (i) a 49%

equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that

was seeded with contributions from Highland, is managed/advised by Highland,

and whose independent trustee is a long-time friend of Highland's chief executive

officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally,

ALF *may* be 49% owned by a third-party institutional investor based in Boston

that Highland believed it was required to keep anonymous at the Trial.  Not only

is the court unaware of who this independent third-party is, but the evidence

seems to suggest that it may have acquired its interest fairly recently or may have

simply committed to invest recently.[28]

---

issued, the CLO manager would need to retain at least 5% or $20 million of the assets in the CLO (which 5% could be either all at the equity level or vertically, up and down the note tranches).  There are multiple ways to accomplish this 5% retention (*i.e.,* with either the CLO manager directly investing in at least 5% of the CLO or doing it through a controlled subsidiary).  This particular rule was announced in *December 2014* and the SEC thereafter issued a no action letter stating that *if a CLO was issued prior to December 2014*, then any refinancing of such CLO that happens within four years can be done without risk retention in place.  Resets of any CLO (*i.e.,* changes in terms and maturity—as opposed to mere changes in interest rates), on the other hand, must have risk retention in place.  *Four of Acis LP's current CLOs were issued prior to December 2014*.  Thus, these four CLOs are still technically able to do a refinancing without a risk retention structure in place.  In any event, by early-to-middle 2017, Acis LP was risk retention compliant.  Exh. 82, pp. 65-69 & 75.  That was recently changed—on October 24, 2017—four days after the Arbitration Award—as later explained herein.

[26] *See* n.23, *supra*.

[27] *See* Demonstrative Aid No. 3.

[28] *See* Exh. 173, which seems to suggest that the only equity owners of ALF just prior to October 24, 2017 were Acis LP and the DAF, until Acis LP's interest in ALF was sold back to ALF on October 24, 2017.  *See also* Exh. 82, p. 162, lines 2-7.

13

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 2/69/23 1804age 578 of 1392   PageID 15320
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 467 of 1803   PageID 11213
Case 18-30264-sgj11   Doc 391-13   Filed 04/13/18   Entered 04/13/18 Page 14 of 53

(f)  <u>The underwriter for the CLO notes.</u>  As with any publicly traded notes, there is an underwriter for the CLO notes which solicits investors for the CLO notes (examples given at the Trial:  Mizuho Securities USA, LLC; Merrill Lynch; JP Morgan Chase).[29]  The CLO notes are traded on the Over-the-Counter Market.

(g)  <u>The independent indenture trustee for the CLO notes.</u>  As also with any issuance of publicly traded notes, there is an indenture trustee (example given at the Trial: U.S. Bank).[30]

26.  Mr. Terry, the Petitioning Creditor, as earlier mentioned, began working for Highland in 2005 until his employment was terminated on June 9, 2016.

27.  Acis LP and Acis GP/LLC have never had any employees.  Rather, all employees that work for any of the Highland family of companies (including Mr. Terry) have, almost without exception, been employees of Highland itself.  Highland has approximately 150 employees in the United States.  Highland provides employees to entities in the organizational structure, such as Acis LP and Acis GP/LLC, through both the mechanism of:  (a) a Shared Services Agreement (herein so called),[31] which provides "back office" personnel—such as human resources, accounting, legal and information technology to the Highland family of companies; and (b) a Sub-Advisory Agreement (herein so called),[32] which provides "front office" personnel to entities—such as the managers of investments like Mr. Terry.  The evidence indicated that this is typical in the CLO industry to have such agreements.  The court notes that

---

[29] *See* Exh. 193.

[30] *See* Exh. 7.

[31] Exhs. 17, 99, 179 & 5.

[32] Exhs. 18, 178 & 4.

Appellee Appx. 00461

Appx. 10763

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/09/23 1804age 579 of 1392   PageID 15321
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 468 of 1803   PageID 11214
Case 18-30264-sgj11   Doc 139-1   Filed 04/13/18   Entered 04/13/18 16:28:53   Page 15 of 53

all iterations of the Shared Services Agreements and Sub-Advisory Agreements between Acis LP

and Highland were signed by Mr. Dondero both as President of Acis LP and as President of the

General Partner of Highland.

28.     Because Acis LP essentially subcontracts out all of its functions to Highland

pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Acis LP has very

few vendors or creditors.  Rather Highland incurs expenses and essentially bills them to Acis LP

through these two agreements.[33]  In other words, Highland is one of Acis LP's largest and most

frequent creditor.

29.     The evidence reflected that at all times Mr. Dondero has been the President of

both of the Alleged Debtors, and there have been, at all times, very few, if any, other officers. It

appears that the only other officer of Acis GP/LLC that ever existed was Frank Waterhouse,

Treasurer.[34]  It also appears that the only other officer of Acis LP that ever existed was Frank

Waterhouse, Treasurer, Mr. Terry as Portfolio Manager, and someone named Patrick Boyce as

Secretary at one time.[35]

30.     Mr. Dondero testified that he has decision making authority for the Alleged

Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington

(General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant

General Counsel of Highland) and is rarely involved in "nitty gritty negotiations."   Sometimes

instructions will come to him from the compliance group headed up by Chief Compliance

Officer Thomas Surgent.  Additionally, he testified that he signs hundreds of documents per

---

[33] Exh. 83, pp. 228 (line 8)-230 (line 14).

[34] *See, e.g.*, Exh. 10 & Exh. 173, p.3

[35] Exhs. 14 & 15.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 2/20/23 180 Page 580 of 1392    PageID 15322
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 469 of 1803    PageID 11215
Case 18-30264-sgj11  Doc 2391-3  Filed 04/13/18  Entered 04/13/18 Page 16 of 53

week, and much of what he signs is on advice of counsel and he sometimes even delegates to his

assistant the authority to sign his name.  As set forth above, Mr. Ellington (who ***did not*** testify at

the Trial)[36] and Mr. Leventon (who ***did*** testify at the Trial) are not officers, directors, or

employees of the Alleged Debtors.  Mr. Leventon is designated to be the representative for the

Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-Trial discovery)—he

explained that this representative-authority derives from the Shared Services Agreement.  Mr.

Leventon testified that he takes his instructions generally through his direct supervisor, Mr.

Ellington, although Highland partners can ask him to perform legal services for any of

Highland's 2,000 entities.

> ### C.    Transfers and Transactions Involving the Alleged Debtors Since the Litigation with Mr. Terry Commenced—and Especially After the Arbitration Award.

31.    Below is a listing of some (but not necessarily all) of the transfers and

transactions that the Alleged Debtors, Highland, and related parties undertook ***after*** the litigation

with Mr. Terry commenced.

(a)    Acis LP's Sale to Highland of a "Participation Interest" in its CLO Cash Flow

Stream.    On October 7, 2016 (approximately one month after the litigation arose

among Mr. Terry, Highland, and the Alleged Debtors), Acis LP sold to Highland

a participation interest in its expected future cash flow from the CLO Collateral

Management Agreements—specifically, it sold a portion of the cash flow it

expected to earn from November 2016 to August 2019 (not the full life of the

CLOs), for $666,655 cash, plus a $12,666,446 note payable from Highland to

---

[36] Mr. Ellington did testify at a hearing in the bankruptcy court on February 6, 2018—which the parties asked this court to take judicial notice of—and also provided deposition testimony that was submitted into evidence. *See* Exh. 25.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 12/29/23    Page 581 of 1392    PageID 15323
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 470 of 1803    PageID 11216
Case 18-30264-sgj11    Doc 1895    Filed 04/13/18    Entered 04/13/18    Page 17 of 53

Acis LP (hereinafter, the "Acis LP Note Receivable from Highland"). Mr. Dondero signed the purchase and sale agreement for both purchaser and seller.[37] Mr. Dondero signed the Acis LP Note Receivable from Highland, which accrued interest at 3% per annum. It appears that the $666,665 cash down payment was actually paid, and a payment required on the Acis LP Note Receivable from Highland of $3,370,694 on May 31, 2017, was actually made. The Acis LP Note Receivable from Highland was payable in three installments, with a $5,286,243 payment required on May 31, 2018, and a $4,677,690 payment required on May 31, 2019. When viewed in complete isolation, this transaction does not necessarily appear problematic. Although there was evidence that Acis LP had been managing the five CLOs for about $10 million per year of fees, some of the recitals in the purchase and sale agreement suggest that there may have been a sound business reason for the transaction and the arbitration panel,[38] viewing this transaction in isolation, did not think it was necessarily problematic or actionable. In any event, Highland is adamant it was a net neutral transaction.

(b)    Transfer of Acis LP's interest in ALF. Recall that ALF was the entity that held equity (*i.e.,* the subordinated notes) in the CLO special purpose vehicles, and held voting rights and was a capital provider to the overall risk retention structure supporting the CLOs. And Acis LP, in turn, held a 15% indirect interest in ALF. On October 24, 2017 (**four days after the Arbitration Award**), Acis, LP entered into an agreement with ALF whereby ALF acquired back the shares that Acis LP

---

[37] Exhs. 14 & 15.

[38] Exh. 1, p. 18.

Appellee Appx. 00464
APPX. 10216

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-3    Filed 12/29/23    Page 582 of 1392    PageID 15324
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 471 of 1803    PageID 11217
Case 18-3026    Case 19-12239-13    Filed 04/13/18    Entered 04/13/18 Page 18 of 53

indirectly held in ALF (966,679 shares) for the sum of $991,180.13.[39]  No

credible business justification was offered for this transaction, other than mostly

uncorroborated (and self-serving) statements from Highland witnesses that Acis

LP was "toxic" in the market place (due to the litigation with Mr. Terry) and this

was a step in the process of extricating Acis LP from the CLO business.[40]  The

court finds the testimony about Acis LP's toxicity in the marketplace to not be

credible or at all convincing.  For one thing, a new CLO (Acis CLO 2017-7, Ltd.)

was closed on April 10, 2017 with Acis LP as the portfolio manager.  Moreover,

Acis LP subcontracts all of its CLO management function to Highland—and there

was no evidence to suggest that anyone in the marketplace at this juncture

differentiates between Acis LP (whose president is Mr. Dondero) and Highland

(whose president is Mr. Dondero).  ***In any event, the October 24, 2017***

***transaction had the highly consequential effect of making Acis LP***

***"noncompliant" or unable to continue serving as a CLO manager for***

***regulatory purposes for any new CLOs or reset CLOs (or for a refinancing of***

***any of the Highland CLOs that had been created after December 2014)[41]***

***because aspects of the federal Dodd Frank legislation require CLO managers to***

***have "skin in the game" with regard to the CLOs they manage (i.e., they must***

***retain at least 5% of CLOs they manage).***  Mr. Akada, who testified that he had

been involved with the CLO business from the beginning and that the CLO team

---

[39] Exh. 173.

[40] There were also a few hearsay-laden emails offered, that the court did not find probative.  Exhs. 19-22.

[41] *See* n.23 *supra*.

Appellee Appx. 00465
APPX. 00761

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23 1804 Page 583 of 1392   PageID 15325
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 472 of 1803   PageID 11218
Case 18-3026-sgj11   Doc 2391-3 Filed 04/13/18   Entered 04/13/18 Page 20 of 57   Page 19 of 53

reported to him (including Mr. Terry before his termination), testified that he had

no knowledge of this particular transaction. The document effectuating this

transaction was signed by Frank Waterhouse, Treasurer for and on behalf of Acis

LP, acting by its general partner, Acis GP/LLC.[42]

(c)   ALF Next Decides to Jettison Acis, LP as its Portfolio Manager and Replace it

with a new Highland Cayman Island Entity. On October 27, 2017 (seven days

after the Arbitration Award), ALF—having purchased back the ownership interest

that Acis LP had in it, just three days earlier—decided that it would no longer use

Acis LP as its portfolio manager and entered into a new portfolio management

agreement to supersede and replace the ALF Portfolio Management Agreement.

Specifically, on October 27, 2017, ALF entered into a new Portfolio Management

Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd.,

replacing Acis LP in its role with ALF.[43] This agreement appears to have been

further solidified in a second portfolio management agreement dated November

15, 2017.[44]

(d)   The Acis LP Note Receivable from Highland is Transferred from Acis LP to Yet

Another Highland Cayman Island Entity. On November 3, 2017 (10 days after

the Arbitration Award), Acis LP assigned and transferred its interests in the Acis

LP Note Receivable from Highland—which at that point had a balance owing of

over $9.5 million—to a Highland Cayman Island entity known as Highland CLO

---

[42] Exh. 173, p. 3.

[43] Exh. 43.

[44] Exh. 168.

Appellee Appx. 00466

APPX. 00768

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 04/24/23 Page 584 of 1392    PageID 15326
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 473 of 1803    PageID 11219
Case 18-3026 Case 19-18391-sgj11 Filed 04/13/18    Entered 04/13/18 Page 3 of 53 Page 20 of 53

Management Ltd. which apparently was created sometime recently to be the new collateral manager of the CLOs (in other words, the new Acis LP).[45]  The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for Acis LP and Mr. Dondero for Highland and some undecipherable name for Highland CLO Management Ltd.[46]  The document recites that (i) Highland is no longer willing to continue providing support services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into the collateral manager role if Acis  LP will assign to it the Acis LP Note Receivable from Highland.   One more thing:  since Acis LP was expected to potentially incur future legal and accounting/administrative fees, and might not have the ability to pay them when due, ***Highland CLO Management Ltd.*** agreed to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal expenses and up to $1 million of future accounting/administrative expenses.[47]

(e)    Various Additional Transactions that further Transitioned CLO Management and Fees Away from Acis LP to Highland Cayman Island Entity.  On December 19, 2017—just one day after the Arbitration Award was confirmed with the entry of the Final Judgment—the vehicle that can most easily be described as the Acis LP "risk retention structure" (necessitated by federal Dodd Frank law) was transferred away from Acis LP and into the ownership of Highland CLO

---

[45] Exh. 16.

[46] *Id.* at p.6.

[47] *Id.* at pp. 1 & 2.

Appellee Appx. 00467
APPX. 00769

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/15/23   Page 585 of 1392   PageID 15327
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 474 of 1803   PageID 11220
Case 18-30264-sgj11   Doc 1835   Filed 04/13/18   Entered 04/13/18 14:22:58   Page 21 of 53

Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017[48]).

(f)     In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.[49]   In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.[50]

(g)     Change of Equity Owners of the Alleged Debtors.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners:  (a) Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the Trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.   When Acis GP/LLC was formed

---

[48] Exh. 157.

[49] See Ex. 45 (the Transfer Document); see also Exh. 4 (the March 17, 2017 Third Amended and Restated Sub-Advisory Agreement between Acis LP and Highland); Exh. 5 (the March 17, 2017 4th Amended & Restated Shared Services Agreement between Acis LP and Highland); Exh. 165 (March 17, 2017 Staff and Services Agreement between Acis CLO Management, LLC and Acis LP); Exh. 166 (March 17, 2017 Master Sub-Advisory Agreement between Acis CLO Management, LLC and Acis LP).

[50] See Exhs. 161 & 162.

Appellee Appx. 00468
APPX. 10219

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6833    Page 1 of 8 10/31/22 Page 586 of 1392    PageID 15328
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 475 of 1803    PageID 11221
Case 18-30264-sgj11-1833918553 Filed 04/13/18    Entered 04/13/18 Page 22 of 53    Page 22 of 53

(*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment Trust. After Mr. Terry was terminated by Highland, his 25% limited partnership interest in Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his interest by 10% up to 25%), and Dugaboy Investment Trust (increasing its interest by 15% up to 74.9%). But, more importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on December 18, 2017), both Mr. Akada and Dugaboy Investment Trust conveyed their entire limited partnership interests in Acis LP—25% and 74.9%, respectively—to a Cayman Island entity called Neutra, Ltd., a Cayman Islands exempted company. Dugaboy Investment Trust also conveyed its 100% membership interest in Acis GP/LLC to Neutra, Ltd. Mr. Akada testified that he did this on advice of counsel. He also did not dispute that he had made millions of dollars of equity dividends from his equity investment in Acis LP in recent years[51]—which he conveyed away for no consideration on December 18, 2017.

(h)    The Intended Reset of Acis CLO 2014-3. With all of the above maneuverings having been accomplished, Highland was posed to do a reset on Acis CLO 2014-3 in February 2018 (until Mr. Terry filed the Involuntary Petitions). The investment bank Mizuho Securities USA, LLC was engaged November 15, 2017[52] and a final offering circular was issued in January 2018[53]—contemplating a reset of Acis CLO 20-14-3 with the recently created Highland CLO Management Ltd.

---

[51] Exh. 23, p.3.

[52] Exh. 104.

[53] Exh. 31.

Appellee Appx. 00469
APPX. 00720

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 12/29/23    Page 587 of 1392    PageID 15329
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 476 of 1803    PageID 11222
Case 18-30264-sgj11    Doc 391    Filed 04/13/18    Entered 04/13/18    Page 23 of 53

Identified as the new portfolio manager, rather than Acis LP.  The act of
implementing a reset on the CLO was not in itself suspect.  However, the reset
would, of course, have the effect of depriving Acis LP from a valuable asset—an
agreement that could realistically be expected to provide millions of dollars of
future collateral management fees—coincidentally (or not) just after Mr. Terry
obtained his large judgment.

**D.    Findings Regarding Credibility of Witnesses.**

32.    The court found the testimony of Mr. Terry to be very credible.  He was very
familiar with the financial condition of the Alleged Debtors, since he presided over the business
of the Alleged Debtors from their inception until June 9, 2016, and has also closely followed
publicly available information regarding the companies since his termination.  Mr. Terry credibly
testified that the Alleged Debtors have never had a significant number of creditors, since most of
the Alleged Debtors' vendors are engaged by and send their invoices to Highland, and Highland
simply obtains reimbursement from the Alleged Debtors (and other entities in the Highland
family), as its in-house lawyers determine is appropriate, through the Shared Services Agreement
and Sub-Advisory Agreement.  Thus, Highland should at all times be the Alleged Debtors' main
creditor.  The court finds that Mr. Terry had a good faith belief that the Alleged Debtors had only
a handful of creditors (maybe four or so) besides him and Highland.  The court also finds that
Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the
Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort
to denude the Alleged Debtors of their assets and value (*i.e.*, transferring assets and rights for

Appellee Appx. 00470
APPX. 10722

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/29/23   Page 588 of 1392   PageID 15330
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 477 of 1803   PageID 11223
Case 18-30264-sgj11   Doc 239-1   Filed 04/13/18   Entered 04/13/18   Page 24 of 53

less than reasonably equivalent value), which started with intensity after issuance of the
Arbitration Award (if not sooner).[54]

33.     The court found the testimony of almost all of the witnesses for the Alleged
Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey
plausible deniability.  For example, sometimes business decisions concerning the Alleged
Debtors were said to have been made by a "collective," and other times the in-house Highland
lawyers (who, of course, are not themselves officers or employees of Acis LP and Acis GP/LLC)
stressed that Mr. Dondero (the president and manager of the two entities) had ultimate decision
making authority for them.  Meanwhile, Mr. Dondero testified that, while he has decision
making authority at Acis LP, he usually delegates to Highland's in-house lawyers Scott Ellington
and Isaac Leventon.   He testified that he signs hundreds of documents per week and often must
rely on information of others when signing.  Additionally, Mr. Dondero (again, the President of
each of the Alleged Debtors) testified that he had never even read the Arbitration Award.  While
Mr. Dondero is the chief executive of a multi-billion dollar international investment company,
and naturally has widespread responsibilities and must delegate to and rely upon others including
lawyers, this court simply does not believe that he never read the Arbitration Award.  The court
perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous and Mr.
Dondero even testified (as did others) that the litigation with Mr. Terry was hurting Acis LP and
Highland in the CLO marketplace (*i.e.,* no investors or underwriters wanting to be associated

---

[54] The court also found that the deposition testimony of Brian Shaw and Rahkee Patel (counsel for Mr.
Terry) was also credible and did not demonstrate any bad faith on their parts in filing the Involuntary Petitions on
behalf of Mr. Terry.

Appellee Appx. 00471
APPX. 00773

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 12/29/23   Page 589 of 1392   PageID 15331
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 478 of 1803   PageID 11224
Case 18-30264-sgj11   Doc 391-85   Filed 04/13/18   Entered 04/13/18   Page 25 of 53

with the Acis brand).[55]  If that were the case, it strains credulity to suggest Mr. Dondero never even read the Arbitration Award.

34.     As mentioned earlier, in December 2017, Acis GP/LLC became 100% owned by a Cayman Island entity known as Neutra, Ltd. (whose beneficial owner is a Dondero family trust) and Acis LP became 99.9% owned by Neutra, Ltd.  The directors of Acis GP/LLC and Acis LP are provided to it now by an entity known as "Maples Fiduciary Services"—another Cayman Island entity, but the Highland Assistant General Counsel could not remember the names of those directors provided to Acis GP/LLC and Acis LP, except for perhaps one.  Mr. Dondero, when questioned about some of the recent transactions pertaining to Acis LP, testified that there were tax reasons—tax lawyers recommended the recent transactions and transfers.  No tax lawyers testified.  Mr. Dondero also testified that certain transactions were at the directive of the Thomas Surgent group (the Highland chief compliance officer).  Neither Mr. Surgent nor anyone else from the compliance group testified.

35.     Meanwhile, Mr. Akada, who, while testifying, seemed like a generally lovely person and seemed as knowledgeable as a human being could possibly be on the topic of CLOs generally, had no idea if he was an officer or director of the Alleged Debtors, nor did he know whom its officers were.  He could not testify as to the meaning of certain transactions in which Acis LP had engaged in during recent weeks and said that he signed certain documents on advice of counsel.  He also could not even testify as to whether Highland was opposing the Involuntary Petitions.

36.     Again, there was a lot of plausible deniability at Trial as to the "whos" and "whys" for the recent maneuverings involving the Alleged Debtors assets and rights in the weeks

---

[55] No such investors or underwriters provided testimony.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 4/20/23 180 Page 590 of 1392   PageID 15332
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 479 of 1803   PageID 11225
Case 18-30264-sgj11   Doc 391855   Filed 04/13/18   Entered 04/13/18   Page 26 of 53

since the Arbitration Award.  The one thing that the court was wholly convinced of was that conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out for the interests of the Alleged Debtors as a fiduciary should.

### E.    Evidence Regarding the Number of Creditors of the Alleged Debtors.[56]

37.    The Alleged Debtors do not dispute Mr. Terry's claim for the purposes of counting creditors under section 303(b) of the Bankruptcy Code.  However, Mr. Terry asserts that the Alleged Debtors have fewer than 12 creditors, and the Alleged Debtors dispute this fact. Specifically, the Alleged Debtors initially filed on January 31, 2018, a Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Dondero listing 18 creditors (the "Original Notice of Creditors").[57]  The Alleged Debtors subsequently filed on February 5, 2018, a First Amended Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Leventon listing 19 creditors (the "First Amended Notice of Creditors").[58]  Finally, the Alleged Debtors filed on March 6, 2018, a Second Amended Notice of List of Creditors Pursuant to Fed. R. Bank. P. 1003(b) signed by Mr. Leventon listing 20 creditors (the "Second Amended List of Creditors").[59]  The following chart summarizes the name, amount, and nature of the 20 creditors listed by the Alleged Debtors in their Second Amended List of Creditors.

---

[56] The court notes that neither Mr. Terry nor the Alleged Debtors attempted to differentiate between the creditors of Acis GP/LLC versus the creditors of Acis LP, but rather presented evidence regarding the collective number of creditors for both of the Alleged Debtors.  This seems legally appropriate, since Acis LP is the entity that incurred most of the debt, and ACIS GP/LLC would be liable on such debt as the general partner of Acis LP.

[57] *See* DE # 7 in Case No. 18-30264 & # 7 in Case No. 18-30265.

[58] *See* DE # 17 in Case No. 18-30264 & DE # 16 in Case No. 18-30265.

[59] *See* DE # 39 in Case No. 18-30264 & DE # 38 in Case No. 18-30265.

26

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Page 429 of 1804   Page 591 of 1392   PageID 15333
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 480 of 1803   PageID 11226
Case 18-30264-sgj11   Doc 231   Filed 04/13/18   Entered 04/13/18 16:54:58   Page 27 of 53

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness[60] |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

38.     First, the court believes it necessary to remove certain insider creditor claims,
which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.[61]
This would clearly include Highland (the Alleged Debtors do not dispute this).

---

[60] The dollar amounts listed here are based upon the amounts listed in the Second Amended List of Creditors.

[61] *In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000).

Appellee Appx. 00474
Appx. 00726

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 12/22/23   Page 592 of 1392   PageID 15334
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 481 of 1803   PageID 11227
Case 18-3026   Case 19-12239-CSS   Filed 04/13/18   Entered 04/13/18   Page 28 of 53

39.    Additionally, there were certain creditors that filed sworn statements saying they
were not creditors of the Alleged Debtors or were subsequently removed from the creditor list by
agreement of the Alleged Debtors.  These creditors would include Case Anywhere, CSI Global
Deposition Services,[62] Elite Document Technology, JAMS, Inc.,[63] Stanton Advisors LLC,[64] and
the TASA Group, Inc..[65]  Thus, the updated chart now shows 13 creditors of the Alleged
Debtors.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |

---

[62] CSI Global Deposition Services was removed as a creditor by the agreement of the Alleged Debtors.

[63] JAMS, Inc. was removed as a creditor by agreement of the Alleged Debtors.

[64] Stanton Advisors LLC was removed as a creditor by agreement of the Alleged Debtors.

[65] *See* Exh. 40B, Exh. 186, Exh. 92, and Exh. 94.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 635    Exhibit 5    Page 429 of 1392    Page 593 of 1392    PageID 15335
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 482 of 1803    PageID 11228
Case 18-30264-sgj11    Doc 2391    Filed 04/13/18    Entered 04/13/18    Page 29 of 53    Page 29 of 53

| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

40.     Next, the court finds that there are certain creditors included in the "Law Firm Vendor" category (*e.g.*, experts, data hosting, document managers, court reporters) that are really creditors of the individual law firms and/or Highland, and that these law firm vendor creditors should not be considered creditors of the Alleged Debtors.  For these, there was no evidence of a direct contractual obligation on the part of either the Alleged Debtors or Highland—although the court certainly understands that, when the law firms would retain vendors, they would bill these to either the Alleged Debtors or Highland as an expense to be reimbursed.  Most of these were already eliminated with agreement of the Alleged Debtors but, from the remaining list of creditors, this would include David Langford (a Dallas County court reporter).[66]  To be clear, while the individual law firm creditors may ultimately have a right to reimbursement for these vendor expenses from Highland (who may then potentially have a right to reimbursement from the Alleged Debtors via the Shared Services and Sub-Advisory Agreements), the court does not find this vendor to have a claim *directly* against the Alleged Debtors for purposes of section 303(b) of the Bankruptcy Code.

---

[66] *See* Exh. 40D, Exh. 187, Exh. 40O.

Appellee Appx. 00476
APPX. 00728

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-35   Page 484 of 1804   Page 594 of 1392   PageID 15336
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 483 of 1803   PageID 11229
Case 18-3026-sgj11   Doc 39-18   Filed 04/18/18   Entered 04/19/18   Page 30 of 53

41.    Next, as to the Stanton Law Firm, the court finds that this creditor should also be removed from the pool of creditors that "count," for section 303(b) purposes, since this claim appears to be the subject of a "bona fide dispute as to liability or amount,"[67] based on the evidence presented at the Trial.  First, there was no engagement letter between either of the Alleged Debtors and the Stanton Law Firm produced.[68]  Second, the heavily redacted invoice of the Stanton Law Firm dated October 18, 2016 shows only that it was relating to the "Joshua Terry Matter" and that it was billed to Highland.[69]  Third, the Responses and Objections to Mr. Terry's Notice of Intention to Take Depositions by Written Questions sent to the Stanton Law Firm[70] provides the following responses:

> **Question No. 11**: What is the total amount of debt Acis Capital Management L.P. to the Firm. is liable to the Firm.
>
> **Answer**: Acis Capital Management L.P.'s debt to the Firm is unknown at this time.
>
> **Question No. 12**: What is the total amount of debt Acis Capital Management GP, LLC is liable for to the firm?
>
> **Answer**: Acis Capital Management GP, LLC to the Firm is unknown at this time.
>
> **Question No. 13**: Is any other party also liable for the debt of Acis Capital Management L.P. to the Firm? If so, please state the liable party and portion of Acis Capital Management L.P. debt the other party is liable for to the Firm.

---

[67] *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014) (a claimholder does not have standing to file a petition under section 303(b) if its claim is "the subject of a bona fide dispute as to liability or amount"); *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (only "a holder of a claim ... that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" is counted in determining the number of creditors necessary to file an involuntary petition).

[68] Rather, there is only an engagement letter between Lackey Hershman LLP (acting on behalf of its client, Highland) and Stanton Advisors LLC to act as an expert in the Terry litigation.  *See* Exh. 144.  As previously noted, the claim of Stanton Advisors LLC was removed from the creditor list by agreement of the Alleged Debtors.

[69] *See* Exh. 40R.

[70] The court notes that these responses were actually signed by James Michael Stanton, attorney for Stanton LLP.  *See* Exh. 139.

Appellee Appx. 00477
Appx. 00728

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 4/25/23 1804age 595 of 1392    PageID 15337
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 484 of 1803    PageID 11230
Case 18-30264-sgj11    Doc 3918-5    Filed 04/18/18    Entered 04/19/18 Page325 of 53 Page 31 of 53

**Answer**: Whether any other party is also liable to the firm for the debt of Acis Capital Management, L.P. is unknown at this time.

**Question No**. **14**: Is any other party also liable for the debt of Acis Capital Management GP, LLC to Firm? If so, please state the liable party and portion of Acis Capital Management GP, LLC debt the other party is liable for to the Firm.

**Answer**: Whether any other party is also liable for the debt of Acis Capital Management GP, LLC is unknown at this time. . . .

**Question No. 21**: Does the Firm currently represent Acis Capital Management, L.P.? If so, please state the representation.

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time.

**Question No. 22**: Does the Firm currently represent Acis Capital Management GP, LLC? If so, please state the representation?

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time. . . .[71]

The court finds that this evidence demonstrates that the claim of the Stanton Law Firm is the subject of a bona fide dispute as to either liability or amount and should not be counted since there is no real way of even knowing who the Stanton Law Firm was engaged by and, thus, whether the Alleged Debtors are even responsible for these alleged legal fees.  The court would also specifically refer to the testimony of Mr. Leventon, the in-house lawyer employed by Highland who was in charge of allocating all of the bills that came into Highland's legal invoicing system, where he described a process in which all legal bills relating to the "Terry Matter" would automatically be assigned to the Alleged Debtors, without any real regard to whether the particular law firm had even been engaged by the Alleged Debtors or if whether the

---

[71] *See* Exhibit 139.

Appellee Appx. 00478
APPX. 10230

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 1/20/23   Page 596 of 1392   PageID 15338
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 485 of 1803   PageID 11231
Case 18-30264-sgj11   Doc 13613   Filed 11/04/19   Page 32 of 53

representation was actually relating to one of the other parties in the Terry litigation (*e.g.*, Highland, Mr. Dondero, etc.). Accordingly, the court finds that there is a bona fide dispute as to whether the Alleged Debtors are actually liable for the Stanton Law Firm legal fees and that they should not be counted as a creditor for purposes of section 303(b) of the Bankruptcy Code.[72]

42. Thus, it appears, at most, that there are 11 creditors[73] of the Alleged Debtors as set forth in the chart below:

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| ~~4~~ | ~~David Langford~~ | ~~Court Reporter/Law Firm Vendor~~ | ~~$550~~ |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |

---

[72] *See also In re CorrLine Int'l, LLC*, 516 B.R. 106, 152 (Bankr. S.D. Tex. 2014) (bankruptcy court found that creditors contained in the alleged debtor's list of creditors with uncertain or unknown amounts could not be counted towards the numerosity requirement of section 303(b)).

[73] The court notes that, in all likelihood, the list of creditors that should be tallied for purposes of section 303(b) may actually be less than 11, because certain of the remaining creditors (*i.e.*, Drexel Limited, Highfield Equities, Inc., Lackey Hershman LLP, and David Simek) received payments during the 90 days preceding the Petition Date—and, thus, arguably should not be counted as creditors pursuant to section 303(b) of the Bankruptcy Code (which instructs that transferees of voidable transfers should not be counted). *See, e.g.,* Exh. 124 & Exh. 131. Additionally, certain of the remaining law firm creditors that are owed legal fees are also creditors of Highland and Highland-affiliates, not just the Alleged Debtors. To elaborate, many of these law firm creditors were employed to represent not only the Alleged Debtors, but also Highland and Highland-affiliates, so there may be an actual dispute as to the allocation of these legal fees among Highland and the Alleged Debtors (thus there could be bona fide disputes as to the amounts allocated by Highland's in-house lawyers to the Alleged Debtors). *See, e.g.,* Ex. 123 (McKool Smith, P.C. engagement letter referencing representation of numerous parties) & Exhibit 90 (Reid Collins & Tsai's Answers and Objections to Mr. Terry's Deposition by Written Questions, questions 13 & 14, stating that based upon allocation determinations to be made by Highland, other individuals may be liable for the full amount of the debt including Acis LP, Highland, Mr. Dondero, and Mr. Okada).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 13   Filed 12/28/23   Page 597 of 1392   PageID 15339
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 486 of 1803   PageID 11232
Case 18-30264-sgj11   Doc 1238-5   Filed 04/13/18   Entered 04/13/18 Page 33 of 5   Page 33 of 53

| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees[74] | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| ~~16~~ | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| ~~17~~ | ~~Stanton Law Firm~~ | ~~Legal Fees~~ | ~~$88,133.99~~ |
| ~~18~~ | ~~The TASA Group, Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

43.     Finally, on the topic of creditor numerosity, the court further finds that the evidence

strongly suggested hurried manufacturing of creditors on the part of the Alleged Debtors and

Highland, in order to bolster an argument that having a sole petitioning creditor was legally

inadequate in this case.[75]  For example, the Klos Declaration and other information, that was

provided to State Court 2 and in discovery, only days before the Involuntary Petitions were filed,

---

[74] Mr. Terry has also argued that certain of the law firm creditors (McKool Smith, P.C., Lackey Hershman, LLP, and Reid Collins & Tsai) are "insiders" that must be excluded from the creditor list pursuant to section 303(b) of the Bankruptcy Code.  While there may be some support in case law for such an argument, Mr. Terry would ultimately need to show by a preponderance of the evidence that the law firms exercised such control or influence over the Alleged Debtors as to render their transactions not at arm's length.  *See In re CorrLine Intern., LLC*, 516 B.R. 106, 157-58 (Bankr. S.D. Tex. 2014) (citing *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986)).  *See also In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (in evaluating whether insider status existed for purposes of evaluating alleged fraudulent conveyance court considered  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length).  Because there was no evidence suggesting abuse or control by these law firm creditors, nor was there any evidence that would suggest that their dealings with the Alleged Debtors were anything but arm's length, the court finds that these law firm creditors should not be excluded from the creditor list as "insiders" pursuant to section 303(b) of the Bankruptcy Code.

[75] *See* the Original Notice of Creditors, the First Amended Notice of Creditors, and the Second Amended Notice of Creditors.

Appellee Appx. 00480
Appx. 10232

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-5    Filed 4/29/23 Page 598 of 1392    PageID 15340
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 487 of 1803    PageID 11233
Case 18-3026-sgj11  Doc 39-13  Filed 04/13/18  Entered 04/13/18 Page 34 of 53

seemed to show only a small number of creditors of Acis LP—Mr. Terry credibly testified that

he thought there were less than 12 creditors based on his review of such information, as well as

his understanding of the Alleged Debtors' business.  Yet, only a few days later, the Alleged

Debtors filed their Original Notice of Creditors, which showed 18 creditors, which was amended

twice to add another creditor and then yet another.  This simply does not jive in the court's mind

and supports this court's belief that the Alleged Debtors were scurrying to determine which

Highland creditors might cogently be painted as Acis LP creditors—so as to preclude Mr. Terry

from being able to file the Involuntary Petitions as the single, petitioning creditor.

>     **F.    Evidence Regarding Whether the Alleged Debtors are Generally Not Paying
>            Debts as They Become Due (Unless Such Debts are the Subject of a Bona
>            Fide Dispute as to Liability or Amount).**

44.    The evidence submitted reflects that, for the 11 creditors identified above, 9 out of

11 have unpaid invoices that were more than 90 days old.  The remaining 2 of the 11 were

McKool Smith, P.C. (current counsel for the Alleged Debtors) and the Petitioning Creditor.[76]

The court makes findings with regard to each of the 11 creditors below—focusing specifically on

whether the Alleged Debtors have been paying these creditors as their debts have become due.

45.    First, with regard to Andrews Kurth & Kenyon ("AKK"), the evidence reflected

that out of the $211,088.13 allegedly owed by Acis LP to AKK, the great majority of it—

$173,448.42—was invoiced on November 16, 2016[77] (more than 14 months before the Petition

Date).  Other, smaller amounts were invoiced on a monthly basis in each of the months August

2017, September 2017, October 2017, November 2017, and December 2017.  Although

requested in discovery, no engagement letter for AKK was produced and AKK represented in

---

[76] Exhs. 40 & 54.

[77] Exh. 40.

34

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 12/29/23    Page 599 of 1392    PageID 15341
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 488 of 1803    PageID 11234
Case 18-3026-sgj11    Doc 3913-5    Filed 04/13/18    Entered 04/13/18    Page 35 of 53

written discovery that, to its knowledge, none existed.[78]  The court notes anecdotally that AKK's invoices (although allegedly related to Acis LP legal matters) were addressed to Highland.[79]  In any event, AKK represented that both the Alleged Debtors and Highland are jointly and severally liable for the fees owed to it.[80]  AKK also represented that, to its knowledge, the amounts owing to it by Acis LP and Highland are not disputed.[81]  AKK also represented that it has not provided legal work on a contingency basis for the Alleged Debtors or Highland.[82]  The court makes a logical inference that AKK expected timely payment of its invoices—the largest of which was dated more than 14 months prior to the Petition Date—and, thus, it has generally not been paid timely.

46.      Next, with regard to Drexel Limited, the Petitioning Creditor concedes that its $6,359.96 indebtedness (which is a fee rebate owing to it) is not past-due.

47.      Next, with regard to Highfield Equities, Inc., the Petitioning Creditor concedes that its $2,510.04 indebtedness (which is also a fee rebate owing to it) is not past-due.

48.      Next, with regard to the Jones Day law firm, the $368.75 indebtedness owed to it is well more than 90 days old.  Specifically, there is a six-and-a-half-month old invoice dated July 19, 2017 invoice in the amount of $118.75, and two five-month old invoices dated August 30, 2017 (both in the amount of $150).[83]  The court makes a logical inference that Jones Day

---

[78] Exh. 98, Requests 1-2.

[79] Exh. 98, pp. AKK000061-AKK000060.

[80] Exh. 98, Question 13.

[81] Exh. 98, Questions 52-55.

[82] Exh.  98, Questions 73-75.

[83] Exh. 40K.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 2/20/23    Page 600 of 1392    PageID 15342
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 489 of 1803    PageID 11235
Case 18-3026    Case 19-12339    Filed 04/13/18    Entered 04/13/18    Page 36 of 53

expected timely payment of its invoices prior to the Petition Date and, thus, it has generally not been paid timely.

49.    Next with regard to the Petitioning Creditor, Mr. Terry, the court notes that his liquidated claim in the amount of $8,060,827.84 first arose with the final Arbitration Award on October 20, 2017 (although such award was not confirmed by State Court 2 until December 18, 2017).  The judgment was unstayed as of the January 30, 2018 Petition Date, although the Alleged Debtors state that they still desire to appeal it—as difficult as that is in the situation of an arbitration award.  The court makes a logical inference that the Alleged Debtors had, on the Petition Date, no intention of paying this claim any time soon based on their conduct after the Arbitration Award—although the Arbitration Award had only been in existence for three-and-a-half months as of the Petition Date. The cash in the Alleged Debtors' bank accounts is wholly insufficient to cover the Arbitration Award and, meanwhile, corporate transactions have been ongoing to ensure that no cash streams will be coming into Acis LP in the future in the same way that they have in the past.  Thus, this court finds that this large claim, as of the Petition Date, was not being paid timely.

50.    Next with regard to KPMG LLP, the $34,000 indebtedness owed to it was for the service of auditing Acis LP's financial statements, pursuant to an engagement letter with it dated March 1, 2017.[84]  KPMG's engagement letter reflected a $40,000 flat fee was agreed to by Acis LP for the service, of which 40% was due October 2017 (*i.e.,* $16,000), with another 45% was due in January 2018 ($18,000), and the remaining 15% would be due at the time that a final bill was sent.  Acis LP has only paid $6,000 of the agreed upon amount—meaning $28,000 was overdue as of the January 30, 2018 Petition Date (with $10,000 of that being four months past

---

[84] Exh. 40M.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/20/23   Page 601 of 1392   PageID 15343
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 490 of 1803   PageID 11236
Case 18-30264-sgj11   Doc 391   Filed 04/13/18   Entered 04/13/18   Page 37 of 53

due).  The court makes a logical inference that KPMG LLP expected payment of its audit fees in accordance with its engagement letter and, thus, it has generally not been paid timely.

51.      Next with regard to Lackey Hershman LLP, the $236,977.54 indebtedness owed to it was for legal services provided to the Alleged Debtors and Highland in connection with the arbitration and litigation with Mr. Terry.  No engagement letter was provided, but the invoices for their services are all directed to Highland.[85]  The evidence reflected that three invoices had not been paid as of the Petition Date:  an October 31, 2017 invoice in the amount of $56,909.53; a November 30, 2017 invoice setting forth new fees in the amount of $84,789.83; and a December 31, 2017 invoice setting forth new fees in the amount of $95,278.18.[86]  The court makes a logical inference that Lackey Hershman LLP expected prompt payment on its invoices (if nothing else, the statement on its invoice indicating "Total now due")[87] and, thus, it has generally not been paid timely.

52.      Next with regard to Reid Collins & Tsai LLP, the $17,383.75 indebtedness owed to it was billed in an invoice dated August 31, 2017, indicating an August 31, 2017 "Due Date" (five months before the Petition Date).[88]  Although requested in discovery, no engagement letter for this firm was produced and Reid Collins & Tsai LLP in fact represented in written discovery that none existed.[89]  Moreover, written discovery propounded on the law firm indicated that, while Acis LP was liable on this debt, other parties including Acis GP/LLC, Highland, Mr.

---

[85] Demonstrative Aid No. 1 (Lackey Hershman tab).

[86] Exh. 40, p. 3.

[87] Demonstrative Aid No. 1 (Lackey Hershman tab).

[88] Exh. 40P; Exh. 130, pp. 7-8.

[89] Exh. 90, Requests 1 & 2; Ex. 130, Requests 1 & 2.

Appellee Appx. 00484
APPX. 00736

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 685    Filed 12/22/23    Page 602 of 1392    PageID 15344
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 491 of 1803    PageID 11237
Case 18-30264-sgj11    Doc 239-13    Filed 04/13/18    Entered 04/13/18    Page 38 of 53

Dondero, the Dugaboy Trust, and Mr. Akada might also be liable for the full amount of the debt—subject to Highland's allocation determinations.[90]  Based on this evidence, the court makes a logical inference that Reid Collins & Tsai LLP generally has not been paid timely.

53.    Next with regard to CT Corporation and the $517.12 indebtedness that the Alleged Debtors represent is owed, CT Corporation asserts that $4,074.84 is, in fact, owed to it by Acis LP and Acis GP/LLC.[91]  CT Corporation also believes Highland has liability for the Alleged Debtors' indebtedness.[92]  CT Corporation also believes the amount owed to it is undisputed.[93]  CT Corporation further represents that its invoices are due upon receipt.[94] CT Corporation produced several invoices in discovery, all showing due upon receipt, and one was dated as far back as December 31, 2016 (in the amount of $932).[95]  Based on this evidence, the court makes a logical inference that CT Corporation expected prompt payment on its invoices and, thus, has not been paid timely.

54.    Next with regard to David Simek, the Petitioning Creditor concedes that his $1,233.19 indebtedness (which is apparently an expense reimbursement relating to some consulting) is not past-due.

---

[90] Exh. 90, Questions 13 & 14; Exh. 130, Questions 13-14.

[91] Exh. 143, Questions 12 & 13.

[92] *Id.* at Question 14.

[93] *Id.* at Questions 22 & 23.

[94] *Id.* at Question 30.

[95] *Id.* at p. 8; Exh. 40T.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/23/03 1804ge 603 of 1392    PageID 15345
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 492 of 1803    PageID 11238
Case 18-3026sgj19-D3396-35ledD4c361B    Entered 04/13/18 Page 39 of 53

55.     In summary, the evidence reflects that the creditors of the Alleged Debtors are generally not being paid timely (except for perhaps four that are relatively insignificant and which may also be able to look to Highland for payment).[96]

56.     Further on the topic of timeliness, Mr. Leventon (Highland's in-house Assistant General Counsel) testified that 96% of bills submitted get paid more than 90 days after they are submitted, that approximately 70% of bills are later than 120 days after they are submitted, and some are even later than 150 days.  Mr. Leventon testified that this was a result of Acis LP receiving cash on a quarterly basis from the CLOs.  He further elaborated and testified that, for example, if Acis LP got cash on say February 1st, and it received a legal bill on that same day, that he would probably not approve it and allocate it until say February 8th.  By that time, Acis LP would have already used up all its cash, and that particular creditor would need to wait until the next quarterly payment was received in order to be paid.  He further testified that he explained this to law firms before their engagements and that, if they wanted the business, they would need to understand the process.  There are several things the court finds problematic about this testimony.  First, no testimony was offered showing that this was, in fact, the understanding of the law firms or other creditors, and, moreover, none of the engagement letters or invoices submitted into evidence reflect such payment terms.  Without this additional evidence, the court believes that the Alleged Debtors' testimony regarding how it paid invoices was mostly self-serving and did not support a finding that the Alleged Debtors were generally paying their debts

_____

[96] Courts have also held that a debtor is generally not paying its debts as they become due when a debtor is found to have been transferring assets so as to avoid paying creditors.  *See, e.g., In re Moss*, 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (bankruptcy court determined that an alleged debtor was not paying its debts as they came due when the alleged debtor "attempted to delay creditors through the transfers of assets she has made," concluding that "[the alleged debtor's] overall conduct of her financial affairs has been poor").  This court has also found that there may have been significant transfers of the Alleged Debtors' assets prior to the filing of the Involuntary Petitions to potentially avoid paying creditors (*i.e.*, Mr. Terry) and this may provide further support for the court's finding that the Alleged Debtors are generally not paying their debts as they become due under section 303(h).

Appellee Appx. 00486
APPX. 00737

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 2/24/23    Page 604 of 1392    PageID 15346
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 493 of 1803    PageID 11239
Case 18-3026    Case 19-1229    Filed 04/13/18    Entered 04/13/18    Page 40 of 53

as they became due.[97]  Second, to the extent Mr. Leventon's testimony demonstrates that creditors of the Alleged Debtors expected to be paid on a quarterly basis (at the latest), certain of the remaining 11 creditors have debts that are significantly older than four months (*i.e.*, CT Corporation, Jones Day, AKK, and possibly even Reid Collins & Tsai LLP).  Third, the Financial Statements of Acis LP submitted into evidence do not support the notion that the cash balances at Acis LP were only sufficient enough to pay vendors once every quarter.[98]  For example, the balance sheet for January 31, 2017 shows a cash balance in Acis LP bank accounts of $1,061,663.19; the balance sheet for February 28, 2017 shows a cash balance in Acis LP bank accounts of $905,212.36; the balance sheet for March 31, 2017 shows a cash balance in Acis LP bank accounts of $525,626.59; the balance sheet for April 30, 2017 shows a cash balance in Acis LP bank accounts of $117,885.96; the balance sheet for May 31, 2017 shows a cash balance in Acis LP bank accounts of $62,733.31; the balance sheet for June 30, 2017 shows a cash balance in Acis LP bank accounts of $10,329.15; the balance sheet for July 31, 2017 shows a cash balance in Acis LP bank accounts of $701,904.39; the balance sheet for August 31, 2017 shows a cash balance in Acis LP bank accounts of $332,847.05.[99]  In summary, while there may be cash fluctuations with Acis LP, there is not a clear pattern of Acis LP being only able to pay vendors once every quarter.

---

[97] *See In re Trans-High Corp.*, 3 B.R. 1, 2-3 (Bankr. S.D.N.Y. 1980) (bankruptcy court found that evidence showing that the petitioning creditor gave the debtor generous terms of payment (90 days) which were substantially better than the terms set forth in the actual writings between the parties supported finding that the alleged debtors were generally paying debts as they became due and that the involuntary petition must be dismissed).

[98] Exh. 147.

[99] *Id.*

Appellee Appx. 00487
Appx. 100739

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-3    Filed 2/25/03 1804    Page 605 of 1392    PageID 15347
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 494 of 1803    PageID 11240
Case 18-3026 Case 19-1233918 35led 04/13/13    Entered/01/13/18 18:34:25 of 5 Page 41 of 53

## II.    Conclusions of Law

Section 303 of the Bankruptcy Code sets forth the various requirements for initiating an involuntary bankruptcy case.  First, pursuant to section 303(b) of the Bankruptcy Code, an involuntary case may be filed against a person by the filing with the bankruptcy court of a petition under Chapter 7—

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount ... [that] aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . .[100]

Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date, three or more entities must participate in the involuntary filing and must hold unsecured claims aggregating $15,775.00.  If there are less than twelve creditors, a single creditor with an unsecured claim of $15,775.00 may file the involuntary petition.  To the extent a bankruptcy court finds that the requisite number of petitioning creditors have commenced the involuntary case, the court shall order relief against the debtor under the chapter under which the petition was filed only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[101]

Here, as noted earlier, the Alleged Debtors have made four arguments as to why an order for relief should not be entered against the Alleged Debtors: (1) the Alleged Debtors have 12 or

---

[100] 11 U.S.C.A § 303(b) (West 2018).

[101] 11 U.S.C.A § 303(h) (West 2018).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 4/26/23    Page 606 of 1392    PageID 15348
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 495 of 1803    PageID 11241
Case 18-3026    Case 19-12391355    Filed 04/13/18    Entered 04/13/18    Page 42 of 53

more creditors, and, thus, with Mr. Terry being the sole petitioning creditor, the Involuntary

Petitions were not commenced by the requisite number of creditors; (2) the Alleged Debtors are

generally paying their debts as they become due; (3) the Involuntary Petitions were filed in bad

faith by Mr. Terry; (4) the interests of creditors and the debtors would be better served by

dismissal and the court should abstain pursuant to section 305 of the Bankruptcy Code.

> **A.**     ***Have the Requisite Number of Creditors Commenced the Involuntary Proceedings?***

Pursuant to section 303(b)(2) of the Bankruptcy Code, a sole petitioning creditor holding

at least $15,775 in claims can initiate an involuntary bankruptcy case so long as the alleged

debtors have fewer than 12 creditors.  After the Second Amended List of Creditors was filed, Mr.

Terry had the burden, by a preponderance of the evidence, of showing that the Alleged Debtors

actually had less than 12 qualified creditors.[102]  Here, the court has found that the Alleged

Debtors have, ***at most***, 11 qualified creditors.[103]  Accordingly, Mr. Terry has met his burden of

showing that the Alleged Debtors have less than 12 creditors for section 303(b) purposes, and

that he, as the sole petitioning creditor, was permitted to file the Involuntary Petitions.  While

Mr. Terry has made additional arguments as to why certain of these 11 creditors should not be

counted as creditors for purposes of section 303(b) of the Bankruptcy Code, the court does not

believe it necessary to address these arguments at this time.[104]

---

[102] *See In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222, 229 (Bankr. N.D. Tex. 2009).

[103] To be clear, the court believes that even on these 11, there are likely bona fide disputes as to the liability or amount that ***Acis LP*** has—as opposed to the liability or amount that Highland or other insiders bear responsbility.

[104] Moreover, as previously stated, since the court has determined there are fewer than 12 creditors, the court need not address whether there is a "special circumstances" exception to the statutory requirements of section 303, in situations where an alleged debtor may have engaged in fraud, schemes, or artifice to thwart a creditor or creditors.  *See, e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Appellee Appx. 00489

APPx. 00740

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 04/29/20    Page 607 of 1392    PageID 15349
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 496 of 1803    PageID 11242
Case 18-3026    Case 19-12391855    Filed 04/13/18    Entered 04/13/18    Page 43 of 53    Page 43 of 53

**B.**     *Are the Alleged Debtors Generally Paying Their Debts as They Become Due?*

Section 303(h) of the Bankruptcy Code requires that a court shall enter order for relief in

an involuntary case "if … (1) the debtor is generally not paying such debtor's debts as such debts

become due unless such debts are the subject of a bona fide dispute as to liability or amount . . .

."[105]  Again, the burden is on the Petitioning Creditor to prove this element by a preponderance

of the evidence.[106]  The determination is made as of the filing date of the Involuntary

Petitions.[107]  In determining whether an alleged debtor is generally paying its debts as they come

due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such

claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall

conduct in its financial affairs.[108]  No one factor is more meritorious than another; what is most

relevant depends on the facts of each case.[109]  Courts typically hold that "generally not paying

debts" includes regularly missing a significant number of payments ***or*** regularly missing

payments which are significant in amount in relation to the size of the debtor's operation.[110]

---

[105] 11 U.S.C.A § 303(h) (West 2018).

[106] *See Norris v. Johnson (In re Norris)*, No. 96-30146, 1997 WL 256808, at *3-*4 (5th Cir. Apr. 11, 1997) (unpublished).

[107] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993).

[108] *See, e.g., In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[109] *In re Bates*, 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016) (also noting that petitioning creditors' counsel consistently argued that the final prong—overall conduct in financial affairs—should be afforded more weight than the other factors, and the court found no authority to support this assertion).

[110] *See, e.g., In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980).  See also *Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir.1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11–CV–2603–D (N.D.Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged

**Appellee Appx. 00490**
Appx. 10242

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/23   Page 608 of 1392   PageID 15350
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 497 of 1803   PageID 11243
Case 18-30264-sgj11   Doc 3391-35   Filed 04/13/18   Entered 04/13/18   Page 44 of 53

Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due.[111]

Here, the court concludes that the creditors of the Alleged Debtors—what few there are— are generally not being paid as their debts have become due (except for perhaps four[112] that are relatively insignificant and which may also be able to look to Highland for payment). Mr. Terry has met his burden by a preponderance of the evidence as to section 303(h) of the Bankruptcy Code.

> **C.      With the Section 303 Statutory Requirements Being Met by the Petitioning Creditor, Should the Court, Nonetheless, Dismiss the Involuntary Petitions Because They Were Filed in Bad Faith?**

Despite Mr. Terry meeting the necessary statutory requirements for this court to enter orders for relief as to the Alleged Debtors pursuant to section 303 of the Bankruptcy Code, the Alleged Debtors have argued that the Involuntary Petitions must, nonetheless, be dismissed because they were filed in "bad faith" by Mr. Terry. As support for this argument, the Alleged Debtors rely primarily on the Third Circuit's decision in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). While the court certainly acknowledges that authority exists in other circuits that suggests that dismissal of an involuntary bankruptcy case may be appropriate—even when section 303's statutory requirements have been met—based upon an

---

debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

[111] *In re Bates*, 545 B.R. 183, 188 (Bankr. W.D. Tex. 2016).

[112] Those four are: Drexel Limited ($6,359.96); Highfield Equities ($2,510.04); David Simek ($1,233.19); and McKool Smith ($70,082.18).

Appellee Appx. 00491
APPX. 10732

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68 36 Filed 12/29/23 Page 609 of 1392 PageID 15351
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 498 of 1803 PageID 11244
Case 18-30264-sgj11 Doc 391 355 Filed 04/13/18 Entered 04/13/18 Page 45 of 53 Page 45 of 53

independent finding of "bad faith," the court need not ultimately decide the efficacy or applicability of such authority, because the court does not believe that the evidence demonstrated any "bad faith" on the part of Mr. Terry (or his counsel) in filing the Involuntary Petitions. Indeed, the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets and value and that a bankruptcy filing was the most effective and efficient way to preserve value for the Acis LP creditors. The court concludes that Mr. Terry was wholly justified in pursuing the Involuntary Petitions.

**D. Should This Court, Nonetheless, Abstain and Dismiss the Involuntary Petitions Pursuant to Section 305 of the Bankruptcy Code?**

Section 305(a)(1) of the Bankruptcy Code provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension; . . .[113]

Courts construing section 305(a)(1) of the Bankruptcy Code have found that abstention in a properly filed bankruptcy case is an ***extraordinary remedy***.[114] Moreover, granting an abstention motion pursuant to section 305(a)(1) of the Bankruptcy Code requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of ***both*** the ***debtor*** and its ***creditors*** must be served by granting the request to abstain.[115] The moving party bears the

---

[113] 11 U.S.C.A. § 305(a)(1) (West 2018).

[114] *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 726 (Bankr. N.D. Ill. 1996).

[115] *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009) (citing *AMC Investors, LLC*, 406 B.R. at 488).

Appellee Appx. 00492
Appx. 00744

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6   Filed 05/08/23    Page 610 of 1392    PageID 15352
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 499 of 1803    PageID 11245
Case 18-30264-sgj11    Doc 1385    Filed 04/13/18    Entered 04/13/18    Page 46 of 53

burden to demonstrate that dismissal benefits the debtor and its creditors.[116]  Courts must look to

the individual facts of each case to determine whether abstention is appropriate.[117]

Case law has set forth a litany of factors to be considered by the court to gauge the

overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

> (1) the economy and efficiency of administration;
> (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
> (4) whether there is an alternative means of achieving an equitable distribution of assets;
> (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and
> (7) the purpose for which bankruptcy jurisdiction has been sought.[118]

While all factors are considered, not all are given equal weight in every case and the court should

not conduct a strict balancing.[119]

> i.    *Factor 1: The Economy and Efficiency of Administration.*

---

[116] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

[117] *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

[118] *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (citing to *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)); *see also Smith*, 415 B.R. at 239; *AMC Investors, LLC*, 406 B.R. at 488; *In re Euro-American Lodging Corp.*, 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); *but see Spade*, 258 B.R. at 231-32 (Bankr. D. Colo. 2001) (applied a four criteria test in evaluating section 305 abstention which included:  (1) the motivation of the parties who sought bankruptcy jurisdiction; (2) whether another forum was available to protect the interests of both parties or there was already a pending proceeding in state court; (3) the economy and efficiency of administration; and (4) the prejudice to the parties).  The Alleged Debtors cite to the case of *In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016), in particular, as support for why this court should abstain under section 305(a) of the Bankruptcy Code and dismiss the Involuntary Petitions.  However, in *Murray*, Judge Gerber was analyzing dismissal of an involuntary proceeding pursuant to section 707 of the Bankruptcy Code, more specifically for "cause," and not based upon abstention under section 305(a) of the Bankruptcy Code.  Thus, the court is not convinced *Murray* is relevant to this court's section 305 abstention analysis.

[119] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (citing *Monitor Single Lift*, 381 B.R. at 464).

Appellee Appx. 00493
Appx. 00744

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 15/09/23 18:04    Page 611 of 1392    PageID 15353
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 500 of 1803    PageID 11246
Case 18-3026-sgj11  Case 19-12391-CSS  Filed 04/13/18  Entered 04/13/18  Page 358 of 5    Page 47 of 53

The economy and efficiency of administering a case in the bankruptcy court is routinely evaluated in considering abstention under section 305 of the Bankruptcy Code.  Here, the evidence suggests that the most economical and efficient forum for these parties to resolve their disputes is the bankruptcy court.  The court heard ample evidence that the Alleged Debtors are already, essentially, in the process of being liquidated by Highland.  This is not a situation where an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.[120]  Because of the fact that the Alleged Debtors are already in the process of being liquidated, the bankruptcy court (and not a state court) is the most efficient and economical forum to complete this liquidation and distribute whatever assets remain to creditors in accordance with the distribution scheme set forth in the Bankruptcy Code and with the oversight of a neutral third-party trustee.  Thus, with the bankruptcy court being the more economic and efficient forum for administering this case, this factor goes against abstention.

> ii.  *Factors 2, 3, 4, 5, and 6: Whether Another Forum is Available to Protect the Interests of Both Parties or There is Already a Pending Proceeding in State Court; Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; Whether the Debtor and the Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement Which Better Serves All Interests in the Case; and Whether a Non-Federal Insolvency Has Proceeded so Far in Those Proceedings That it Would Be Costly and Time Consuming to Start Afresh With the Federal Bankruptcy Process.*

---

[120] *See, e.g., In re The Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983) (noting that while the dissection of a living business may not properly be the business of a bankruptcy court, the division of a "carcass" and the reclamation of pre-petition gouging may well be); *In re Bos*, 561 B.R. 868, 898-99 (Bankr. N.D. Fla. 2016) (citing as one of the reasons to abstain under section 305 of the Bankruptcy Code the fact that entities and subsidiaries under the alleged debtor's umbrella were still operating successful businesses and had employed more than 500 people); *but see Remex Elecs. Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484-86 (S.D. Fla. 1991) (in affirming the bankruptcy court's decision to dismiss an involuntary bankruptcy case, the district court also found that "the interests of a defunct business enterprise would be little affected by the pendency of a bankruptcy proceeding," which the district court believed favored abstention).

Appellee Appx. 00494
Appx. 10796

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/08/23   Page 612 of 1392   PageID 15354
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 501 of 1803   PageID 11247
Case 18-30264-sgj11   Doc 391385   Filed 04/13/18   Entered 04/13/18 16:34:58   Page 48 of 53

The court believes that factors 2-6 should be grouped together for purposes of its abstention analysis, since all of these factors specifically touch on the availability of an alternative forum to achieve an *equitable* distribution.[121]  By way of example, where bringing a case into the bankruptcy court would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute, some courts have found that abstention is the more appropriate choice since keeping the case would transform the bankruptcy process into a collection device.[122]  Here, the Alleged Debtors have repeatedly argued that, because there is already pending state court litigation involving Mr. Terry, Highland, and the Alleged Debtors, these cases should be dismissed and the parties should go back to state court to resolve their issues.  The court does not agree for several reasons.

First, it is worth noting that this court has already heard multiple days of evidence in this case (including almost five days just for the Trial) and would certainly not be "starting afresh" by any means if things go forward in the bankruptcy court.  Additionally, while the Alleged Debtors have argued that a significant amount of attorney's fees have already been spent litigating this case in state court (which they believe supports abstention), the court surmises that these fees have not been wasted dollars, as the money expended by the parties developed discovery of facts that could assist a bankruptcy trustee in pursuing avoidance actions that may be viable and might lead to value that could pay creditors' claims.[123]

---

[121] *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 460-70 (Bankr. S.D.N.Y. 2008).

[122] *AMC Investors, LLC*, 406 B.R. at 488; *see also Axl Indus., Inc.*, 127 B.R. at 484-86.

[123] *See, e.g., The Ceiling Fan Distributor, Inc.*, 37 B.R. at 703 (the court noted that, despite there being significant legal expenses in the state court, such expenses were not wasted since the legal work done to date would be quite helpful to a trustee).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 09/08/23   Page 613 of 1392   PageID 15355
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 502 of 1803   PageID 11248
Case 18-30264-sgj11   Doc 291-1   Filed 04/13/18   Entered 04/13/18 16:50:58   Page 49 of 53

Second, this court heard considerable evidence involving potentially voidable transfers that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates and, while the state court certainly provides a forum for eventually bringing fraudulent transfer claims, the court also heard evidence that none of these claims have actually been brought in the state court.[124]  Moreover, to the extent fraudulent transfer claims were to be pursued in state court and were successful, the state court would still need the ability to reach the assets of alleged fraudulent transfer recipients (which, in this situation, include certain Highland-affiliates located in the Cayman Islands).  The bankruptcy court has concerns whether a state court process could efficiently accomplish this task.[125]  Similarly, it is worth noting that, while a request for a receiver was filed in the state court by Mr. Terry, such request had not yet been heard and decided by the state court.  Thus, at the present time, it does not appear that there is an alternative forum to address the pertinent issues in this case, without the necessity of significant, additional steps being taken by the parties in the state court.

Third, this court believes that a federal bankruptcy proceeding is necessary in order to achieve an equitable result in this case.  Specifically, the court heard evidence from the Alleged Debtors that, if this court chose to abstain and dismiss the Involuntary Petitions, the Alleged Debtors would ultimately pay all of their creditors in full, except for Mr. Terry.  This clearly demonstrates how keeping the case in the bankruptcy court is necessary to allow an equitable

---

[124] *See, e.g., In re Texas EMC Mgmt., LLC,* Nos. 11-40008 & 11-40017, 2012 WL 627844, at *3 (Bankr. S.D. Tex. 2012) (noting that one of the reasons abstention was proper under section 305 of the Bankruptcy Code was because the issues to be litigated amongst the parties were already joined in the state court litigation); *Spade*, 258 B.R. at 236 (court held that one of the reasons abstention was warranted under section 305 of the Bankruptcy Code was because the petitioning creditors had already filed and had pending a "collection case" in the state court).

[125] *See, e.g., Smith*, 415 B.R. at 239 (the bankruptcy court held that there "are remedies under the Bankruptcy Code that are not available to Rhodes under state law, due to Mr. Smith's transfer of the majority of his assets to the Cook Island Trust," and "federal proceedings may be necessary to reach a just and equitable solution").

Appellee Appx. 00496
APPX. 00798

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 09/03/18 04    Page 614 of 1392    PageID 15356
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 503 of 1803    PageID 11249
Case 18-30264-sgj11    Doc 239    Filed 04/13/18    Entered 04/13/18 Page 50 of 53    Page 50 of 53

distribution to **all creditors**, including Mr. Terry.  Additionally, a federal bankruptcy court has certain tools available to it that are not available to a state court such as the ability to invalidate potential *ipso facto* clauses in contracts pursuant to section 365 of the Bankruptcy Code, sell assets free and clear of liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, and impose the automatic stay pursuant to section 362 of the Bankruptcy Code.  These are all useful tools available to the Alleged Debtors in a bankruptcy case that would be lost if this court were to ultimately abstain.

Finally, there was more than enough evidence showing the acrimonious and bitter relationship that exists between Mr. Terry and Mr. Dondero.  Thus, the availability of an out-of-court arrangement being obtained in this case is, in this court's mind, slim to none.

In summation, the court finds that all of the factors above support this case staying with the bankruptcy court.

> iii.    *Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been Sought.*

The Alleged Debtors have repeatedly argued that Mr. Terry filed this case in bad faith and as a litigation tactic to gain some sort of advantage in the state court proceedings.  The court has already found above that these cases were not filed in bad faith and that Mr. Terry has met the necessary statutory requirements of section 303 of the Bankruptcy Code.  Moreover, it is worth noting that at least one court has stated that the filing of an involuntary bankruptcy petition is always a "litigation tactic," but whether the filing is inappropriate for abstention purposes is a fact-dependent determination.[126]  Here, the facts show that there was no inappropriateness

---

[126] *In re Marciano*, 459 B.R. 27, 50 (B.A.P. 9th Cir. 2011) (noting that while the filing of the involuntary bankruptcy was a litigation tactic, the bankruptcy court did not abuse its discretion in denying the alleged debtor's motion to dismiss based upon the bankruptcy court's primary concern that the issue of equality of distribution would not effectively be dealt with in another forum).

**Appellee Appx. 00497**
**APPX. 00799**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 02/03/18    Page 615 of 1392    PageID 15357
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 504 of 1803    PageID 11250
Case 18-30264-sgj11    Doc 391-35    Filed 04/13/18    Entered 04/13/18 Page 52 of 5    Page 51 of 53

behind Mr. Terry's decision to file the Involuntary Petitions.  Specifically, Mr. Terry repeatedly

and credibly testified that the purpose for filing the Involuntary Petitions was to ensure that

creditors (including him) were treated fairly and received an equal distribution from the Alleged

Debtors' assets, not to gain some sort of advantage in the state court.  This testimony was

absolutely consistent with additional evidence showing that, since the entry of the arbitration

award, there has been a calculated effort (largely by Highland) to effectively liquidate the

Alleged Debtors.  Unlike the bankruptcy court in *In re Selectron Mgmt. Corp.*,[127] which had no

evidence or "smoking gun" showing that steps were being taken by the alleged debtor to evade

payment on the petitioning creditor's judgment, thereby necessitating abstention, this court has

heard ample evidence showing that the Alleged Debtors, with the aid of Highland, were

transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to

look at the end of the day.

In light of the court's analysis of all the seven factors above, the Alleged Debtors have

not credibly shown how both the Alleged Debtors and the creditors are better served outside of

bankruptcy.  If this matter were to remain outside of bankruptcy, there seems to be a legitimate

prospect that the Alleged Debtors and Highland will continue dismantling the Alleged Debtors,

to the detriment of Acis LP creditors.  Abstention would fly in the face of fundamental fairness

and the principles underlying the Bankruptcy Code.

Beyond just addressing the factors above, the Alleged Debtors have also argued that, if

this court were to not abstain under section 305 of the Bankruptcy Code, there would be

---

[127] *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *6-7 (Bankr. E.D.N.Y. Sept. 27, 2010); *see also In re White Nile Software, Inc.*, No. 08–33325–SGJ–11, 2008 WL 5213393, at *4 (Bankr. N.D. Tex. Sept. 16, 2008) (finding that where the filing of a voluntary chapter 11 did not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions, but rather was about changing the forum of ongoing litigation between the parties, abstention under section 305 was proper).

Appellee Appx. 00498
APPX. 10769

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/06/23   Page 616 of 1392   PageID 15358
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 505 of 1803   PageID 11251
Case 18-30264-sgj11   Doc 913   Filed 04/13/18   Entered 04/13/18 16:35:58   Page 52 of 53

significant harm to the "equity" of the Alleged Debtors.  Specifically, the Alleged Debtors have argued that, if this court were to enter orders for relief, the equity would be forced to "call" and ultimately liquidate CLO 2014-3 (and perhaps all of the CLOs Acis LP manages), resulting in substantial losses to the equity on their investments.  First, to be clear, the current equity of the Alleged Debtors is being held by a Highland-affiliate called Neutra, Ltd., which actually only became the equity of the Alleged Debtors on December 19, 2017.  But this is not the "equity" being referred to by the Alleged Debtors in its argument.  Rather, the so-called "equity," about which the Alleged Debtors seemed so concerned, is actually *certain parties that own the equity of the entity that owns the equity in the CLOs*—which includes (a) an unnamed third-party investor out of Boston (49%),[128] (b) a charitable foundation managed by a Highland-affiliate (49%), and (c) Highland employees (2%).  However, abstention under section 305 of the Bankruptcy Code does not require this court to look at what is in the best interests of these third-parties (who are not current creditors or interest holders of the Alleged Debtors), but rather what is in the best interests of the Alleged Debtors and the creditors.  Accordingly, the Alleged Debtors' effort to argue potential harm to these parties is misplaced for purposes of evaluating abstention under section 305 of the Bankruptcy Code, and, if anything, further highlights who the Alleged Debtors are really out to protect—Highland and Highland-affiliates.  Moreover, the court would note that, even if there were to be a "call" and liquidation of CLO 2014-3, thereby ending the Alleged Debtors' right to receive future management fees, there would still be potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which include fraudulent transfers) as well as the Alleged Debtors' contingent claim for approximately

---

[128] Notably, this entity never appeared at the Trial or filed papers stating that it would be harmed by entry of orders for relief in these cases.

Appellee Appx. 00499
Appx. 10750

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66-3   Page 1529/03/1804 Page 617 of 1392   PageID 15359
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 506 of 1803   PageID 11252
Case 18-30264-sgj11   Doc 391-8   Filed 04/13/18   Entered 04/13/18 16:35:53   Page 53 of 53

$3 million in expense reimbursement owing by Highland CLO Management Ltd., as part of the November 3, 2017 transfer of the Acis LP Note Receivable from Highland. Thus, even if the so-called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were to happen, there is still a potential benefit to creditors if this court chooses not to abstain.

### III.    CONCLUSION

In conclusion, these involuntary proceedings were appropriately filed under section 303, and orders for relief will be issued forthwith. This court declines to exercise its discretion to abstain, because a chapter 7 trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP, as discussed above. A chapter 7 trustee appears necessary to resolve the inherent conflicts of interest between the Alleged Debtors and Highland. A chapter 7 trustee will have tools available to preserve value that a state court receiver will not have. The bankruptcy court is single handedly the most efficient place to administer property of the estate for creditors. This is not just a two party dispute between Mr. Terry and the Alleged Debtors, and even if it were, dismissal or abstention is clearly not warranted.

**###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###**

Appellee Appx. 00500
Appx. 00752

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 09/08/23    Page 618 of 1392    PageID 15360
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 507 of 1803    PageID 11253
Case 19-12239-CSS    Doc 86-4    Filed 11/01/19    Page 1 of 31

**Exhibit D**

**Acis Arbitration Opinion**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 2509/03/1804   Page 619 of 1392   PageID 15361
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 508 of 1803   PageID 11254
Case 18-03078-sgj Doc 2396-5 Filed 04/16/94   Filed 11/04/16 19   Page 220 of 3  Page 1 of 30



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed April 16, 2019**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, GP,** | § | **CASE NO. 18-30265-SGJ-11** |
| **LLC,** | § | **(Jointly Administered Under** |
| Debtors. | § | **Case No. 18-30264-SGJ-11)** |
| _____ | § | **(Chapter 11)** |
| | § | |
| **ROBIN PHELAN, CHAPTER 11** | § | |
| **TRUSTEE,** | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 18-03078-SGJ** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND CLO FUNDING** | § | |
| **LTD, HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **HIGHLAND CLO MANAGEMENT, LTD.,** | § | |
| **and HIGHLAND CLO HOLDINGS, LTD.,** | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO COMPEL
## ARBITRATION [DE # 102]

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 12/20/23    Page 620 of 1392    PageID 15362
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 509 of 1803    PageID 11255
Case 18-03078-sgj    Doc 396    Filed 04/16/19    Entered 04/16/19    Page 2 of 30    Page 2 of 30

## I.    Introduction.

Before this court is a Motion to Compel Arbitration (the "Arbitration Motion"),[1]

requesting that the bankruptcy court send to arbitration only a **sub-set** of claims asserted in the

above-referenced adversary proceeding (the "Adversary Proceeding").  Some procedural context

is crucial in analyzing the merits of the Arbitration Motion and, thus, is set forth immediately

below.

This Adversary Proceeding has morphed into a large, complex lawsuit—at this stage

primarily involving 35 claims, 20 of which are grounded in fraudulent transfer theories.[2]  The

Arbitration Motion, as explained below, seeks arbitration of **eight** of the 35 claims (*i.e.,* Counts

1-8).

The Arbitration Motion was filed by party Highland Capital Management, L.P.

("Highland").  Highland and a related company, Highland CLO Funding Ltd. ("HCLOF"), were

originally the plaintiffs in this Adversary Proceeding, suing the Chapter 11 Trustee for injunctive

relief (arguing early during the above-referenced Chapter 11 bankruptcy cases that the Chapter

11 Trustee was interfering with their business rights and decisions, essentially).  The Chapter 11

Trustee fired back with 35 counterclaims against Highland and HCLOF (adding three parties

related to Highland as third-party defendants with regard to some of those 35 counterclaims).

Notably, these 35 counterclaims—**as directed toward Highland**—were also alleged to be

objections to Highland's two $4,672,140.38 proofs of claim filed in the underlying bankruptcy

cases.[3]  In that regard, the Chapter 11 Trustee stated that his Answer and Counterclaims included

---

[1] DE # 102.

[2] There is also a preference count and a section 550 recovery count—thus, 22 out of the 35 claims are chapter 5 avoidance actions and recovery.  11 U.S.C. §§ 544, 547, 548 & 550.

[3] *See Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* (DE # 84), filed November 13, 2018, in response to the *Original Complaint and Request for Preliminary Injunction of*

Appellee Appx. 00503
APPX. 00755

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 05/29/23    Page 621 of 1392    PageID 15363
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 510 of 1803    PageID 11256
Case 18-03078-sgj  Doc 239-6  Filed 04/08/19  Entered 04/16/19 Page 3 of 30

"an objection to Highland Capital's proofs of claim pursuant to Federal Rule of Bankruptcy

Procedure 3007(b), and the counterclaims asserted herein shall constitute recoupment and/or

offset to such proofs of claim, to the extent such claims are otherwise allowed."[4]  In fact, after

the 35 counts were articulated in the Chapter 11 Trustee's Answer and Counterclaims, there were

20 paragraphs (¶¶ 252-271, pp. 70-77) solely articulating the Chapter 11 Trustee's objections to

Highland's proofs of claim.[5]  The Chapter 11 Trustee also filed yet a separate adversary

proceeding, Adv. Proc. No. 18-03212, seeking his own injunctive relief, which has recently been

consolidated with this Adversary Proceeding.[6]

     The Chapter 11 Trustee ultimately proposed and obtained confirmation of a Chapter 11

plan in the underlying bankruptcy cases, and the Reorganized Debtors, now under new

ownership and management, were vested in that plan with the counterclaims in this Adversary

Proceeding (among other rights and claims).  The injunctive relief initially sought by Highland

and HCLOF, as plaintiffs in the Adversary Proceeding, later became mooted by various orders in

---

*Highland CLO Funding, Ltd and Highland Capital Management Against Chapter 11 Trustee of Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (DE # 1), filed May 30, 2018, and also in response to the proofs of claims filed by Highland Capital Management, L.P. (*see Proof of Claim No. 27,* filed in Case No. 18-30264, and *Proof of Claim No. 13* filed in Case No. 18-30265, each in the amount of $4,672,140.38, with the basis of each of the proofs of claim listed as "Sub-Advisory Services and Shared Services"; these proofs of claim are virtually identical).

[4] DE # 84, ¶ 6.  The Chapter 11 Trustee has argued that the Highland proofs of claim should be disallowed under (i) section 502(b)(1) of the Bankruptcy Code (in that the Highland proofs of claim are allegedly unenforceable against the Debtors under the limited partnership agreement of Acis Capital Management, L.P. and applicable law); (ii) section 502(b)(4) of the Bankruptcy Code (in that the proofs of claim are for services of an insider of the Debtors and allegedly exceed the reasonable value of the services); and (iii) under section 502(d) of the Bankruptcy Code (in that the Trustee has asserted avoidance actions against Highland).  Finally, to the extent allowed at all, the Trustee has argued that the Highland proofs of claim should be equitably subordinated under section 510(c) of the Bankruptcy Code.  In summary, pursuant to section 502(b) and (d) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3007, the Trustee has sought entry of an order disallowing and expunging the Highland proofs of claim from the Debtors' claims registers.  *See id.* at ¶¶ 251-272.

[5] *Id.*

[6] DE # 124.

Appellee Appx. 00504
Appx. 10756

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 2/22/23    Page 622 of 1392    PageID 15364
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 511 of 1803    PageID 11257
Case 18-03078-sgj Doc 123 Filed 04/03/19 Entered 04/16/19 Page 4 of 30    Page 4 of 30

the bankruptcy cases and such claims were voluntarily dismissed without prejudice.[7]  Thus,

Highland, which is pursuing the Arbitration Motion, now wears the hat of only a defendant (and

proof of claimant), and the Reorganized Debtors are the plaintiffs asserting the 35 original

"counterclaims" asserted by the Chapter 11 Trustee against Highland (which 35 claims are also

objections to Highland's proof of claim).  The separate adversary proceeding that was filed by

the Chapter 11 Trustee seeking injunctive relief  (Adv. Proc. No 18-03212) was consolidated into

this Adversary Proceeding, and the style of this Adversary Proceeding was adjusted to reflect

that the Chapter 11 Trustee had become situated as plaintiff.[8]  But, to be clear, the Reorganized

Debtors are actually now plaintiffs in place of the Chapter 11 Trustee.  The Reorganized Debtors

are Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis

GP"), and they oppose the Arbitration Motion.[9]

Citing to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq*., Highland argues

that the bankruptcy court must enter an order compelling arbitration as to counts 1-8 because:

(a) these eight counts revolve around the interpretation of certain prior versions of a Sub-

Advisory Agreement and Shared Services Agreement (later defined); and (b) the aforementioned

agreements contained binding arbitration clauses.  Highland also requests that the Adversary

Proceeding be stayed regarding counts 1-8, pending binding arbitration.  The Reorganized

Debtors dispute that there are binding arbitration clauses applicable to counts 1-8.  As explained

further below, the aforementioned agreements were amended many times and the arbitration

clauses were eventually eliminated in the last versions of the agreements.  The Reorganized

---

[7] DE # 79.

[8] DE # 124.

[9] DE # 123.

Appellee Appx. 00505
APPX. 10076

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6815    Exhibit 5    Page 523 of 1804   Page 623 of 1392    PageID 15365
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 512 of 1803    PageID 11258
Case 18-03078-sgj    Doc 236-5    Filed 04/06/19    Entered 04/11/19 Page 868 of 32   Page 5 of 30

Debtors also urge that, even if there are applicable arbitration clauses, the court may and should exercise discretion and decline to order arbitration, since core bankruptcy matters are involved and arbitration would conflict with the purposes of the Bankruptcy Code.  For the reasons set forth below, the Arbitration Motion is denied.  This means that Counts 1-26 & 33-35 will go forward and be adjudicated in this Adversary Proceeding.[10]  But as will be explained in a separate order that is being issued shortly following this order, there are certain counts complaining of *postpetition* state law torts and breaches of contract in this Adversary Proceeding (Counts 27-32) that this court believes should be separated out into a different adversary proceeding and consolidated with a contested matter involving a Highland request for allowance of a postpetition administrative expense claim [DE # 772].

**II.**    **Background Facts**.

**A.**    **First, the Agreements Between the Parties.**

As this court has noted on various occasions, Acis LP was formed in the year 2011, and is primarily a CLO portfolio manager.[11]  Specifically, Acis LP provides fund management services to various special purpose entities that hold CLOs (which is an acronym for "collateralized loan obligations").  Acis LP was providing management services for five such special purpose entities (the "Acis CLOs") as of the time that it and its general partner were put into the above-referenced involuntary bankruptcy cases (the "Bankruptcy Cases").  The parties have informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs")

---

[10] The court notes that a Supplemental Motion to Withdraw the Reference in this Adversary Proceeding has recently been filed by Highland and HCLOF [DE # 134] and that motion will be addressed in due course hereafter.  The ruling herein with regard to the Arbitration Motion does not affect such motion and such motion will be separately addressed, after a status conference, and through a report and recommendation to the District Court.

[11] Acis LP has managed other funds, from time to time, besides CLOs.

Appellee Appx. 00506
Appx. 10753

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 683   Filed 12/14/23   Page 624 of 1392   PageID 15366
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 513 of 1803   PageID 11259
Case 18-030786-sgj11   Doc 1396-5   Filed 04/03/694   Filed 04/16/19   Page 8 of 3   Page 6 of 30

are structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of senior debt owed by large corporations and, therefore, earn revenue from the variable interest payments made by those corporations on such senior debt; and (b) on the liability side of their balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are mostly institutions and pension funds.  The CLO SPEs make a profit, based on the spread or "delta" between:  (a) the variable rates of interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the fixed rates of interest that the CLO SPEs must pay on their own tranches of debt.  At the bottom of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes," but these "notes" are genuinely equity).  As portfolio manager, Acis LP manages the CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs' portfolios) and communicates with investors in the CLO SPEs.  The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves have been in bankruptcy.  Only Acis LP which **manages** the CLO business and its general partner, Acis GP, were put into bankruptcy.

Historically, Acis LP has had four main sets of contracts that were at the heart of its business and allowed it to function.  They are described below.  The second and third agreements set forth below are highly relevant to the Arbitration Motion before the court.  The Chapter 11 Trustee, from time-to-time, credibly testified that these agreements collectively created an "eco-system" that allowed the Acis CLOs to be effectively and efficiently managed by Acis LP.

Appellee Appx. 00507
APPX. 00759

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 2725/0718 04   Page 625 of 1392   PageID 15367
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 514 of 1803   PageID 11260
Case 18-03078-sgj   Doc 2396-7   Filed 04/06/494   Filed 10/11/619 25 18 28 of 32   Page 7 of 30

1.     <u>The PMAs with the CLO SPEs.</u>

First, Acis LP has various portfolio management agreements ("PMAs") ***with the CLO***

***SPEs***, pursuant to which Acis LP earns management fees.  The PMAs have been the primary

"assets" (loosely speaking) of Acis LP.  They are what generate revenue for Acis LP.

2.     <u>The Sub-Advisory Agreement with Highland.</u>

Second, Acis LP had a Sub-Advisory Agreement (herein so called) with ***Highland***.

Pursuant to this agreement, Acis LP essentially sub-contracted for the use of Highland front-

office personnel/advisors to perform management services for Acis LP (*i.e.,* so that Acis LP

could fulfill its obligations to the CLO SPEs under the PMAs).  Acis LP paid handsome fees to

Highland pursuant to this agreement.  This agreement was rejected (with bankruptcy court

approval) by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee

credibly represented that he had not only found resources to provide these services at a much

lower cost to the estate, but he also had begun to believe that Highland was engaging in stealth

efforts to liquidate the Acis CLOs, to the detriment of Acis LP's creditors.

***There were five iterations of the Sub-Advisory Agreement between the parties over***

***time***:  (a) the initial Sub-Advisory Agreement, "made effective January 1, 2011" (which had an

arbitration clause at section 16(f));[12] (b) an Amended and Restated Sub-Advisory Agreement,

"made" May 5, 2011, "to be effective January 1, 2011" (which also had an arbitration clause at

section 16(f))[13]; (c) an Amendment to Amended and Restated Sub-Advisory Agreement "entered

into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

---

[12] Exh. 1 to Arbitration Motion.

[13] Exh. 2 to Arbitration Motion.

**Appellee Appx. 00508**

**Appx. 00759**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 53   Filed 05/26/23   Page 626 of 1392   PageID 15368
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 515 of 1803   PageID 11261
Case 18-03078-sgj   Doc 396-3   Filed 04/03/19   Entered 04/16/19 Page 8 of 30

clause);[14] (d) Second Amended and Restated Sub-Advisory Agreement "made" on July 29, 2016,

"to be effective January 1, 2016" (which had an arbitration clause at section 16(f));[15] and (e) the

Third Amended and Restated Sub-Advisory Agreement "dated as of March 17, 2017" (*which*

*suddenly contained no arbitration clause, with no explanation*).[16]

     3.    The Shared Services Agreement with Highland.

Third, Acis LP also had a Shared Services Agreement (herein so called) with Highland,

pursuant to which Acis LP essentially sub-contracted for the use of Highland's back-office

services (again, so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs).

To be clear, Acis LP had no employees of its own—only a couple of officers and members.  Acis

LP paid handsome fees to Highland for the personnel and back-office services that Highland

provided to Acis LP.  This agreement was also rejected by the Chapter 11 Trustee during the

Bankruptcy Cases (with Bankruptcy Court approval) for the same reasons that the Sub-Advisory

Agreement with Highland was rejected.

*There were five iterations of the Shared Services Agreement between the parties over*

*time*:  (a) the initial Shared  Services Agreement "effective as of January 1, 2011" (which had an

arbitration clause at section 9.14);[17] (b) an Amendment to Shared Services Agreement, "entered

into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

clause);[18] (c) a Second Amended and Restated Shared Services Agreement "dated effective

---

[14] Exh. 3 to Arbitration Motion.

[15] Exh. 4 to Arbitration Motion.

[16] Exh. 5 to Arbitration Motion.

[17] Exh. 6 to Arbitration Motion.

[18] Exh. 7 to Arbitration Motion.

Appellee Appx. 00509
APPX. 00760

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/29/23   Page 627 of 1392   PageID 15369
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 516 of 1803   PageID 11262
Case 18-03078-sgj   Doc 233   Filed 04/16/19   Entered 04/16/19   Page 9 of 30

January 1, 2015" (which had an arbitration clause at section 9.14);[19] (d) a Third Amended and

Restated Shared Services Agreement "dated effective as of January 1, 2016 (which had an

arbitration clause at section 9.14);[20] and (e) a Fourth Amended and Restated Shared Services

Agreement "dated as of March 17, 2017" (**which suddenly contained no arbitration clause, with**

**no explanation**).[21]

    4.    The Equity/ALF-PMA.

Fourth, until a few weeks before the Bankruptcy Cases were filed, Acis LP also had yet

another portfolio management agreement (distinct from its PMAs with the CLO SPEs) whereby

Acis LP provided services not just to the CLO SPEs themselves, but separately to the equity

holder in the CLO SPEs.  This portfolio management agreement with the equity holder in the

CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would probably be

easier to refer to it as the "Equity PMA"[22] (for ease of reference, the court will refer to it as the

"Equity/ALF PMA").  Acis LP did not earn a specific fee pursuant to the Equity/ALF PMA, but

the Chapter 11 Trustee and others credibly testified during the Bankruptcy Cases that Acis LP

considered the agreement valuable and very important, because it essentially gave Acis LP the

ability to control the whole Acis CLO eco-system—in other words, it gave Acis LP the ability to

make substantial decisions on behalf of the CLO SPEs' **equity**—distinct from making decisions

for the CLO SPEs themselves pursuant to the PMAs.  In any event, shortly before the

Bankruptcy Cases were filed, agents of Highland and/or others controlling Acis LP:  (a) caused

---

[19] Exh. 8 to Arbitration Motion.

[20] Exh. 9 to Arbitration Motion.

[21] Exh. 10 to Arbitration Motion.

[22] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

Appellee Appx. 00510
APPX. 00762

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/29/23    Page 628 of 1392    PageID 15370
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 517 of 1803    PageID 11263
Case 18-03078-sgj    Doc 236-3    Filed 04/16/19    Entered 04/16/19 Page 12 of Page 10 of 30

Acis LP to terminate this Equity/ALF PMA; and (b) then caused the equity owner to enter into a

new Equity PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. (one

of the Defendants in this Adversary Proceeding).

     5.      Limited Partnership Agreement of Acis LP.

There is actually a fifth agreement that should be mentioned. Although not as integral as

the previous four agreements, there was a certain Amended and Restated Agreement of Limited

Partnership of Acis Capital Management, L.P., dated to be effective as of January 1, 2011 (the

"LPA"), entered into among the general partner and limited partners of Acis LP. Reorganized

Acis has argued in the Adversary Proceeding that this LPA limited in some respects the

compensation that could be paid to Highland under the Sub-Advisory Agreement and the Shared

Services Agreement.

**B.    Next, the 35 Counts Asserted Against Highland in this Adversary
       Proceeding.**

The Adversary Proceeding, distilled to its essence—and as currently framed—is all about

certain activities of Highland and some of its affiliates and actors who controlled it, which

activities were allegedly aimed at ***denuding Acis LP of all of its value,*** at a time when the former

portfolio manager for Acis LP was on the verge of obtaining a very large judgment claim against

Acis LP. Specifically, these activities of Highland began soon after: (a) it terminated former

Acis CLO manager Joshua Terry ("Terry") in June 2016; (b) it began litigating with him (which

litigation was sent to arbitration) in September 2016; and (c) Terry obtained an approximately $8

million arbitration award against Acis LP in October 2017, which was confirmed by a judgment

in December 2017. The activities and counts revolve around: (a) Highland's alleged

overcharging of Acis LP by more than $7 million for fees/expenses under the Sub-Advisory and

Shared Services Agreement, as limited by the LPA (Counts 1-4); (b) alleged fraudulent transfers

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 633   Filed 12/29/23   Page 629 of 1392   PageID 15371
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 518 of 1803   PageID 11264
Case 18-03078-sgj   Doc 239   Filed 04/16/19   Entered 04/16/19 Page 11 of 30   Page 11 of 30

of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory
and Shared Services Agreements (Counts 5-8); (c) an alleged fraudulent transfer as to the
Equity/ALF PMA (Counts 9-12); (d) an alleged fraudulent transfer pertaining to Acis LP's
conveyance away of its so-called ALF Equity (Counts 13-16); (e) an alleged fraudulent transfer
of a $9.5 million note receivable Acis LP held (Counts 17-20); (f) various other fraudulent
transfers (Counts 21-24); (g) preferences (Count 25); (h) assertion of a section 550 recovery
remedy for the aforementioned avoidance actions (Count 26); and (i) requests for punitive
damages, an alter ego/veil piercing remedy, and attorneys' fees (Counts 33-35).  There are also
some counts complaining of postpetition state law torts and breaches of contract (Counts 27-32).

As mentioned earlier, Highland's Arbitration Motion only requests the court defer to
arbitration Counts 1-8—that is the counts relating to:  (a) Highland's alleged overcharging of
Acis LP  by more than $7 million for fees/expenses under the Sub-Advisory and Shared Services
Agreement, as perhaps limited by the LPA (Counts 1-4); and (b) the alleged fraudulent transfers
of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory
and Shared Services Agreements (Counts 5-8).  Highland argues that, *since all of these counts
pertain to the Sub-Advisory Agreement and Shared Services Agreement* between Acis LP and
Highland, the arbitration clauses in those agreements dictate that the counts be carved out from
this Adversary Proceeding and sent to binding arbitration.  Highland acknowledges that these
two agreements were amended and restated numerous times, and that the last time they were
amended (March 17, 2017) the arbitration clauses were eliminated, but Highland argues that,
since all of the activity complained of in Counts 1-8 occurred *prior* to March 17, 2017, *the older
iterations of the Sub-Advisory and Shared Services Agreements, with arbitration clauses,
govern*.  Highland zeroes in on the fact that Counts 1-4, at their essence, are assertions that the

Appellee Appx. 00512
APPX. 100764

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 5/20/23180 Page 630 of 1392    PageID 15372
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 519 of 1803    PageID 11265
Case 18-03078-sgj11    Doc 22396-758    Filed 04/03/694    Filed 11/04/1159.19 25 3.123 of Page 12 of 30

fees for services charged by Highland in the Sub-Advisory and Shared Services Agreements were excessive for the years 2013, 2014, 2015, and through May 2016 (all before the March 17, 2017 iteration of the agreements).  And Counts 5-8, while articulated as fraudulent transfer claims, pertain to the modifications made to the Sub-Advisory and Shared Services Agreements at various stages up to the March 17, 2017 versions.

The Reorganized Debtors have argued that it is quite clear that the last iterations of the Sub-Advisory and Shared Services Agreements intended to supersede in every way the prior versions.  That includes the provisions directing arbitration.  And, they argue, it does not matter *when* the causes of action occurred/accrued or not.  What matters is that the parties agreed at some point that their disputes would not be sent to arbitration and this was the last governing document.

**C.     The Relevant Language in the Sub-Advisory and Shared Services Agreements Pertaining to (i) Arbitration and (ii) Superseding of Prior Agreements.**

As mentioned earlier, there was an arbitration clause at Section 16(f) of the Sub-Advisory Agreement until the last March 17, 2017 version.  The clause read as follows:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[23]

In the Shared Services Agreement, an arbitration clause appeared at Section 9.14, as follows:

> Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[24]

---

[23] Exh. 1 of Arbitration Motion, at 7-8.

[24] Exh. 6 of Arbitration Motion, at 9-10.

**Appellee Appx. 00513**
**Appx. 00766**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 05/29/03-1804age 631 of 1392   PageID 15373
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 520 of 1803   PageID 11266
Case 18-0307es-gpd12239c758d 04/06/694   Entered 11/04/16/19 25g3:123 of Page 13 of 30

As earlier mentioned, these two agreements were later amended and restated several times. The arbitration provisions remained identical until they were completely eliminated in March 2017. The Reorganized Debtor argues that this is a short analysis: there was no longer an operative arbitration provision as of March 17, 2017.

In the March 17, 2017 version of the Shared Services Agreement, the parties agreed "that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or noncontractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as 'Proceedings') may be brought in such courts."[25]

The same type language appeared in the March 17, 2017 version of the Sub-Advisory Agreement: "The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby."[26]

More generally, the March 17, 2017 versions of the agreements each provided that they "amended, restated and replaced the existing agreements *in [their] entirety*."[27] The March 17, 2017 agreements also each provided that they "supersede[d] all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter."[28]

---

[25] Exh. 10 of Arbitration Motion, § 8.04(b).

[26] Exh. 5 of Arbitration Motion, § 13.

[27] Exhs. 5 and 10 of Arbitration Motion, each at p. 1 (emphasis added).

[28] Exh. 5 of Arbitration Motion, ¶ 20; Exh.10 of Arbitration Motion, ¶ 8.14.

Appellee Appx. 00514
APPX. 00766

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 02/03/2804ge 632 of 1392    PageID 15374
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 521 of 1803    PageID 11267
Case 18-03078-sgj11 Doc 23 Filed 04/05/19    Entered 04/16/19 Page 14 of 30

In summary, the Reorganized Debtors argue that, under Texas common law, basic principles of contract interpretation, and the plain language of the March 17, 2017 version of the agreements, there is no agreement to arbitrate. "A contract's plain language controls."[29] Because the prior versions of the agreements were "amended, restated and replaced in [their] entirety" with the March 17, 2017 agreements—which not only omit an arbitration provision, but also expressly provide for jurisdiction and venue in Texas state or federal courts—the Reorganized Debtors argue that there exists no valid agreement to arbitrate between Highland and Acis LP. The court's inquiry can and should end there. But, if the court concludes the arbitration clauses are still applicable, the Reorganized Debtors argue that the bankruptcy court has discretion *not* to compel arbitration when (a) bankruptcy core matters are involved, and (b) arbitration would conflict with the purposes of the Bankruptcy Code. Therefore, this is further reason why the Arbitration Motion should be denied.

**III.** **Legal Analysis.**

**A.** **The Federal Arbitration Act and Arbitration Clauses Generally**.

The FAA provides that arbitration agreements are always "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[30] Thus, the FAA reflects a liberal federal policy favoring arbitration, and requires arbitration agreements to be rigorously enforced according to their terms.[31] The FAA "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the

---

[29] *Great Am. Ins. Co. v. Primo,* 512 S.W.3d 890, 893 (Tex. 2017).

[30] 9 U.S.C. § 2.

[31] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

Appellee Appx. 00515
Appx. 00766

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 05/23/23   Page 633 of 1392   PageID 15375
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 522 of 1803   PageID 11268
Case 18-03078-sgj   Doc 239   Filed 04/16/19   Entered 04/16/19 Page 15 of 30

arbitrability of claims should be resolved in favor of arbitration."[32]  "There is a strong

presumption in favor of arbitration and the party seeking to invalidate an arbitration agreement

bears the burden of establishing its invalidity."[33]

When considering a motion to compel arbitration, the Fifth Circuit has held there are two

threshold questions:  (1) whether an arbitration agreement is valid; and (2) whether the dispute

falls within the scope of the agreement.[34]  To evaluate the enforceability of an arbitration

agreement, courts apply the contract law of the state that governs the agreement,[35] whereas the

scope of the agreement is a matter of federal substantive law.[36]

**B.     Is There a Valid Agreement to Arbitrate that Applies Here and is Still
         Enforceable?[37]**

With respect to the first element—whether a valid agreement to arbitrate exists—federal

courts "apply ordinary state-law principles that govern the formation of contracts."[38]  Here, the

choice of law provisions of the Highland-Acis Agreements state:  "This Agreement shall be

---

[32] *Primerica Life Ins. Co. v. Brown,* 304 F.3d 469, 471 (5th Cir. 2002) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)).

[33] *Carter v. Countrywide Credit Indus., Inc.,* 362 F.3d 294, 297 (5th Cir. 2004).

[34] *See Agere Sys. Inc. v. Samsung Elecs. Co. Ltd.*, 560 F.3d 337, 339 (5th Cir. 2009).

[35] *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citation omitted).

[36] *Graves v. BP Am., Inc.,* 568 F.3d 221, 222-23 (5th Cir. 2009); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir. 1990) (under federal law, courts "resolve doubts concerning the scope of coverage of an arbitration clause in a contract in favor of arbitration," and arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue").

[37] The court is assuming, without analysis, that the Chapter 11 Trustee (and the Reorganized Debtors) are bound by the arbitration clauses, if Acis LP affirmatively agreed to be bound by them and would still be bound by them outside of bankruptcy.  Case law has stated that a bankruptcy trustee "stands in the shoes of the debtor for the purposes of [an] arbitration clause" and "the trustee-plaintiff is bound by the clause to the same extent as would the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *see also Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910 at *6 (N.D. Tex. July 30, 2014) (quoting *Hays*).

[38] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004).

Appellee Appx. 00516
Appx. 00763

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 2/24/23   Page 634 of 1392   PageID 15376
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 523 of 1803   PageID 11269
Case 18-03078-sgj   Doc 23-6   Filed 04/06/19   Entered 04/06/19 22:13:27   Page 16 of 30

governed by the laws of Texas. . . ."[39]  "Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied."[40]  Accordingly, Texas law governs whether the parties are subject to an enforceable agreement to arbitrate.

Here, obviously the parties entered into an agreement to arbitrate in both the Sub-Advisory Agreement (Section 16(f))[41] and the Shared Services Agreement Section 9.14.[42]  And, it would seem to be beyond peradventure that this was, at one time, enforceable between the parties, with regard to any disputes that arose regarding the agreements.  The tricky conundrum here is that those arbitration provisions were deleted in the most recent iterations of the agreements—that is, the March 17, 2017 versions of the agreements.  Highland argues that, since Counts 1-8 involve alleged overcharges under the agreements in years 2013-2016, and alleged fraudulent transfers up to March 17, 2017 (such fraudulent transfers allegedly occurring by virtue of modifications to the agreements that were made up to March 17, 2017), the pre-March 17, 2017 version of the agreements must be applied with respect to these Counts 1-8 and, thus, the arbitration provisions apply.  In other words, what matters is when causes of action *accrue* not when they are ultimately asserted.

The parties have cited a handful of cases to the court, but the one that the court believes is most analogous is the *Coffman v. Provost * Umphrey Law Firm, L.L.P.* case.[43]  In the *Coffman* case,

---

[39] *See, e.g.,* Exh. 1 to Arbitration Motion, § 16(a); Exh. 5 to Arbitration Motion, § 13; Exh. 6 to Arbitration Motion, § 9.05; Exh. 10 to Arbitration Motion, § 8.04(a).

[40] *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).

[41] Exhs. 1-4 of the Arbitration Motion.

[42] Exhs. 6-9 of the Arbitration Motion.

[43] *Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720 (E.D. Tex. 2001).

Appellee Appx. 00517
Appx. 00760

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 1-13    Filed 03/31/04    Page 635 of 1392    PageID 15377
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 524 of 1803    PageID 11270
Case 18-03078-sgj    Doc 236-3    Filed 04/06/19    Entered 04/16/19 Page 18 of    Page 17 of 30

the plaintiff was a former non-equity partner of a law firm and brought a lawsuit against the firm

and its equity partners, alleging *inter alia*, breach of contract, breach of fiduciary duty, violations

of Title VII and/or the Texas Commission on Human Rights Act ("TCHRA"), and violations of

the Equal Pay Act.  The law firm filed a motion to compel arbitration with regard to all of these

claims.  The law firm's motion to compel was based upon various partnership agreements which

governed the law firm.  The original partnership agreement was first effective on August 26,

1986, and the plaintiff did not sign that agreement.  Subsequent to that time, however, the

original partnership agreement was amended and restated on several occasions.  The plaintiff

admitted that she signed four partnership agreement documents:  (1) a Restated Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P.—Effective January 1, 1994 ("1994

Partnership Agreement"); (2) a Restated Partnership Agreement of Provost * Umphrey Law

Firm, L.L.P.—Effective January 1, 1996 ("1996 Partnership Agreement"); (3) an Amendment

No. 1 to the Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., Dated

January 1, 1996—Effective January 1, 1997 ("1996 Amendment No. 1"); and (4) a Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P., As Restated —Effective January 1, 1998

("1998 Partnership Agreement").  The earlier two agreements—*i.e.,* the 1994 and 1996

Partnership Agreements—did **not** contain an arbitration clause. The 1996 Amendment No. 1 and

the 1998 Partnership Agreement, on the other hand, both contained an identical arbitration clause

as follows:

> Binding Arbitration. The equity partners and non-equity partners shall make a good
> faith effort to settle any dispute or claim arising under this partnership agreement.
> If the equity or non-equity partners fail to resolve a dispute or claim, such equity or
> non-equity partner shall submit the dispute or claim to binding arbitration under the
> rules of the American Arbitration Association then in effect. Judgment on
> arbitration awards may be entered by any court of competent jurisdiction.[44]

---

[44] *Id.* at 723.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-5    Filed 4/26/23 1804    Page 636 of 1392    PageID 15378
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 525 of 1803    PageID 11271
Case 18-03078-sgj Doc 223-6 Filed 04/06/94    Entered 04/11/19 Page 29 of 3 Page 18 of 30

Additionally, all four of the above-referenced partnership agreements contained an integration clause stating that "[t]his agreement contains the entire agreement . . . and all prior agreements . . . are terminated."[45]

Interestingly, the plaintiff *conceded* that claims she asserted involving the 1996 Amendment No. 1 and the 1998 Partnership Agreement were required to go to arbitration (such claims requested determinations regarding:  (1) the enforceability of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (2) breach of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (3) repudiation; and (4) breach of the duty of good faith and fair dealing).  However, the plaintiff disagreed that her remaining claims were also required to go to arbitration and those were:  (a) breach of the 1994 and 1996 Partnership Agreements; (b) breach of fiduciary duty; (c) violations of Title VII and/or TCHRA; and (d) violations of the Equal Pay Act.  The district court granted in part and denied in part the motion to compel arbitration, holding that:  (1) the plaintiff's contract claims arising under *earlier* partnership agreements, which *did not* contain arbitration clauses, were *not arbitrable*; (2) a common law breach of fiduciary duty claim was arbitrable under the agreements (it appears that these claims arose after the 1996 Amendment No. 1 and 1998 Partnership Agreement); and (3) statutory sex-based discrimination claims were not arbitrable under the agreements.[46]

Relevant to the case at bar, the *Coffman* court noted, first, that the conduct underlying the alleged breaches of the 1994 and 1996 contracts occurred at a time when no arbitration clause was in effect.  The plaintiff's complaint specifically alleged that, during the time the four

---

[45] *Id.*

[46] *Id.* at 733.

Appellee Appx. 00519
Appx. 00870

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 01/23/23  Page 637 of 1392    PageID 15379
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 526 of 1803    PageID 11272
Case 18-03078-sgj    Doc 236-6    Filed 04/03/19    Entered 04/16/19 Page 228 of  Page 19 of 30

agreements were in effect, the law firm failed to properly calculate Plaintiff's compensation,

failed to promote her, and deprived her of benefits from a tobacco case.  The court noted that, if

the law firm did participate in such conduct during the time that the 1994 and 1996 Partnership

Agreements were in effect, such conduct could not have "arisen under" the 1996 Amendment

No. 1 or the 1998 Partnership Agreement ***because those agreements did not even exist at that

time***.  But, to the extent that the conduct Plaintiff complained of occurred when the 1996

Amendment No. 1 and the 1998 Partnership Agreement were in effect, her claims would be

subject to arbitration.[47]

     The court further noted that the arbitration clause should not be interpreted as covering

the plaintiff's claims for breach of the 1994 and 1996 Partnership Agreements because the plain

grammatical language of the arbitration clause gave no indication that it would apply

retroactively.  "To interpret the arbitration clause to apply retroactively would cause Plaintiff to

forego her vested right to litigate an accrued claim."[48]

---

[47] *Id.* at 726 (citing *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (arbitration provision in 1994 shipping agreement did not cover conduct that occurred under prior shipping agreements); *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) (claim based on conduct which had arisen "prior to" effective date of arbitration clause was not within scope of arbitration agreement); *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 533-34 (E.D.Va. 1999) (arbitration clause in fourth contract did not cover conduct that occurred when third contract was in effect); *Connett v. Justus Enters. of Kansas, Inc.*, Civ. A. No. 87–1739–T, 1989 WL 47071, at *2 (D. Kan. March 21, 1989) (arbitration clause did not apply when alleged fraudulent conduct occurred before plaintiff executed contract with arbitration clause); *George Wash. Univ. v. Scott*, 711 A.2d 1257, 1260-61 (D.C. Ct. App. 1998) (conduct that occurred before arbitration clause took effect was not arbitrable).

[48] *Coffman*, 161 F. Supp. 2d at 726-27 (citing *Sec. Watch*, 176 F.3d at 372–73 (arbitration clause did not reach disputes arising under earlier agreements because it is "nonsensical to suggest that [the plaintiff] would abandon its established right to litigate disputes arising under the [prior] contracts"); *Choice Sec. Sys. v. AT&T Corp*, No. 97-1774, 1998 WL 153254, at *1 (1st Cir. Feb.25, 1998) (arbitration clause in 1994 contracts did not apply to pre–1994 contracts when the language of the arbitration clause did not indicate "that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements"); *Hendrick*, 50 F. Supp. 2d at 535 (arbitration clause was not retroactive when the text of the clause expressed no language providing that it "reache[d] back in time to require an employee to arbitrate a claim which had accrued before the contract was signed or the [arbitration clause] took effect"); *Connett*, 1989 WL 47071, at *2 (arbitration clause did not apply retroactively when it did not specify that it applied to past conduct); *Kenworth of Dothan, Inc. v. Bruner–Wells Trucking, Inc.*, 745 So.2d 271, 275-76 (Ala. 1999) (arbitration clause was not retroactive when language of the clause did not so state); *George Wash. Univ.*, 711 A.2d at 1261 (arbitration clause was not retroactive when "the arbitration clause itself contained no indication whatsoever that its terms would apply . . . before [its effective date]").

Appellee Appx. 00520
Appx. 10372

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 05/29/23    Page 638 of 1392    PageID 15380
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 527 of 1803    PageID 11273
Case 18-03078-sgj    Doc 236-3    Filed 04/16/19    Entered 04/16/19 Page 22 of 30    Page 20 of 30

Bottom line, the court in *Coffman* seemed to focus on **when each cause of action accrued** and looked to the **agreement that governed at such time**.  This court agrees with that reasoning and sees no reason why the result should be different in the case at bar, simply because the arbitration clauses in the case at bar were in **earlier** versions of the Sub-Advisory and Shared Services Agreements as opposed to being in the **later** versions of those agreements (in other words, the opposite sequence as in the *Coffman* case).

The Reorganized Debtors have cited a couple of cases that they believe justify a determination that there is no binding arbitration clause in the case at bar.  One is the case of *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*[49]  This case involved a motion to compel arbitration that was denied (which denial was affirmed by the Fifth Circuit).  Like the case at bar, it involved a situation where there had been a succession of agreements, with earlier agreements containing arbitration provisions and the last agreement containing no arbitration clause.  Specifically, in the *Goss-Reid* case, there were three agreements that were relevant.  First, a **Franchise Agreement** between a franchisor named Transformational Technologies, Inc. ("TTI") and a party named Rittenhaus-Tate Organization ("RTO").  RTO was a business owned by Tracy Goss and Sheila Reid.  The Franchise Agreement, among other things, provided that RTO's owners Tracy Goss and Sheila Reid would be "licensed franchisees of TTI" and would have use of certain of TTI's intellectual property.  During the term of the Franchise Agreement, Tracy Goss and Sheila Reid developed certain consulting services technology they called "The Winning Strategy" and it apparently was built off of TTI's intellectual property.  This first agreement contained a mandatory arbitration provision.  Second, there was a **License**

---

[49] *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*, 54 Fed. Appx. 405 (5th Cir. 2002) (per curium opinion which is designated as having no precedential effect).

Appellee Appx. 00521
Appx. 10073

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 5/29/23 1804    Page 639 of 1392    PageID 15381
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 528 of 1803    PageID 11274
Case 18-03078-sgj    Doc 23    Filed 04/03/19    Entered 04/16/19 Page 21 of 30

**Agreement** between the apparent successor-in-interest of TTI called Tekniko, Inc., on the one

hand, and Tracy Goss, Sheila Reid and Goss-Reid & Associates, Inc. (collectively, "Goss/Reid"),

on the other, pursuant to which Goss/Reid obtained a "a non-exclusive license to use the same

intellectual property covered by the Franchise Agreement." This second agreement also

contained a mandatory arbitration agreement. Third, there was a **Transfer Agreement** that

appears to have been entered into by the same parties as the second agreement (Tekniko, Inc. and

Goss/Reid). The Transfer Agreement "permanently transferred [to Goss/Reid] the non-exclusive

right to use the intellectual property that was the subject of the prior agreements in exchange for

a percentage of [Goss & Reid's] adjusted gross profits for that year." There was no arbitration

provision in this third agreement and the agreement did not adopt or refer to the arbitration

provisions contained in the earlier agreements. The third agreement stated that it constituted "an

amendment to the License Agreement . . . between you and this company ('TEKNIKO'),

supersedes all prior agreements between you and TEKNIKO and, except as provided below, will

terminate your rights and those of TEKNIKO under the License Agreement."

  At some subsequent time, Goss/Reid filed a lawsuit alleging improper use of "The

Winning Strategy" by the entities Tekniko Licensing Corporation and Landmark Education

Company. These Defendants (hereafter so called) asserted ownership themselves of "The

Winning Strategy" based on the Franchise Agreement. The Defendants—citing to the arbitration

clauses in both the Franchise Agreement and the License Agreement—filed a motion to compel

arbitration, which was denied at the district court level and also at the Fifth Circuit. The district

court determined that New York law applied (*i.e.,* the Transfer Agreement was governed by New

York law and apparently the parties agreed that New York law applied), and that the Transfer

Agreement constituted a novation and extinguished the arbitration provisions of the previous

Appellee Appx. 00522
APPX. 10574

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 05/30/23 1804Page 640 of 1392    PageID 15382
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 529 of 1803    PageID 11275
Case 18-03078-sgj Doc 221-6 Filed 04/16/19 Entered 04/16/19 Page 22 of Page 22 of 30

agreements.  On appeal, the Fifth Circuit stated that the issue before it was "whether the arbitration provisions of the Franchise and License Agreements were superseded by the Transfer Agreement.  Thus, the question before us is one of contractual interpretation."[50]

The Fifth Circuit stated certain principles that apply under both New York and Texas law.  Among other principles, the Fifth Circuit noted that courts construing contracts "should strive to give effect to the intentions of the parties, as expressed in the terms of the contract."[51] The Transfer Agreement stated that "it supersedes all prior agreements" between Goss/Reid and the predecessor-in-interest of one of the Defendants, Tekniko Licensing Corporation.[52] "This type of agreement clearly constitutes a novation under New York law."[53]  The court also noted that it was not appropriate to consider any extrinsic or parol evidence, since there was no ambiguity in the Transfer Agreement.  The court further stated that "[t]he only potential ambiguity raised by the Defendants is that the Transfer Agreement refers to itself as an 'amendment to the License Agreement.'  Read as a whole, however, the Transfer Agreement plainly manifests an intention to supersede all prior agreements between the parties and, except as specifically provided, to terminate all rights and obligations under the License Agreement."[54]

The other case that the Reorganized Debtors have significantly relied upon to justify a determination that there is no binding arbitration clause in the case at bar is *Valero Energy Corp. v. Teco Pipeline Co.*[55]  In *Valero*, there had been numerous agreements entered into over time

---

[50] *Id.* at *1.

[51] *Id.*

[52] *Id.*

[53] *Id.* (citing various New York state court cases).

[54] *Id.* at *2.

[55] *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Appellee Appx. 00523
APPX. 10825

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 07/28/21    Page 641 of 1392    PageID 15383
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 530 of 1803    PageID 11276
Case 18-03078-sgj11    Doc 239-6    Filed 04/06/19    Entered 04/06/19 Page 23 of Page 23 of 30

amongst the litigating parties, all of which involved gas pipelines and transportation rights, and

those various agreements were not amendments or restatements of one initial agreement. Rather,

there was an Operating Agreement, there were documents that were alleged to create a joint

venture or partnership, a Purchase Agreement, an Ownership Agreement, a Transportation

Agreement, and a couple of Settlement Agreements entered into later when various disputes

arose. One of the key agreements, the so-called Operating Agreement, contained an arbitration

clause. When party Teco Pipeline sued party Valero and other related parties, Valero moved to

compel arbitration, arguing that the litigation was subject to the arbitration clause in the

Operating Agreement. The trial court denied Valero's motion, but the court of appeals reversed.

Teco had argued that the claims it was asserting were not based on the Operating

Agreement that contained the arbitration clause but, even if they were, a later Settlement

Agreement essentially redefined the parties' relationship—essentially superseding the parties'

relationship that had been set forth in the numerous prior agreements—and it did not have an

arbitration clause. Rather the Settlement Agreement stated that:

> Each party irrevocably consents and agrees that any legal action, suit or proceeding
> against any of them with respect to their obligations, liabilities, or any other matter
> under or arising out of or in connection with this Agreement may be brought in the
> United States District Court for the Western District of Texas, San Antonio
> Division, or in the courts of the State of Texas, and hereby irrevocably accepts and
> submits to the jurisdiction of each of the aforesaid court in personam, generally and
> unconditionally with respect to any such action, suit or proceeding for itself and in
> respect of its properties, assets and revenues.[56]

Teco asserted that the quoted clause provided for the procedure to be used in future disputes, *i.e.,*

that the parties would go through judicial channels, not arbitration. Teco also asserted that the

intent to revoke the arbitration clause was signified by a typical merger clause contained in the

---

[56] *Id.* at 587.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/22/23    Page 642 of 1392    PageID 15384
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 531 of 1803    PageID 11277
Case 18-03078-sgj    Doc 236    Filed 04/16/19    Entered 04/16/19 Page 225 of Page 24 of 30

Settlement Agreement.  The appeals court disagreed with Teco's argument and determined

arbitration was required.  First, the court determined that the provision regarding litigation

applied only to disputes arising under the Settlement Agreement not the previously executed

Operating Agreement, Purchase Agreement, Ownership Agreement, or Transportation

Agreements.  There was nothing to indicate that all the terms of those previous agreements had

been superseded by the Settlement Agreement.  In fact, it appeared that only select terms of the

earlier agreements were being modified.  Significantly, the Settlement Agreement referred to an

"Amendment No. 1" to the Operating Agreement being attached as an Exhibit D to the

Settlement Agreement—suggesting that it remained in intact (except for the amendment

attached).  Moreover, there was a post-Settlement Agreement letter submitted into evidence

stating that the prior Operating Agreement and arbitration provision were still in effect.  The

court addressed many other arguments made by Teco and, in the end, found nothing had

superseded or otherwise revoked the prior arbitration clause.

     This bankruptcy court does not consider the *Valero* or *Goss-Reid* cases to be dispositive

of the situation in the case at bar.  Those cases clearly dealt with a myriad of agreements—for

example, in *Valero*, one key agreement had an arbitration clause, and an allegedly superseding

Settlement Agreement (with no arbitration clause) was determined not to have been intended to

supersede or replace the agreement with the arbitration clause.  In *Goss-Reid*, there were also a

myriad of agreements (*i.e.,* a franchise agreement, a license agreement and then a transfer

agreement), and the last one containing no arbitration clause was held to have been a novation of

the prior agreements.   In *Valero* and *Goss-Reid*, the various agreements were not amendments or

restatements of one initial agreement.  The case at bar is more analogous to the *Coffman* case

(involving amendments and restatements of an initial agreement) and the logic of that holding

Page 24 of 30

Appellee Appx. 00525
APPX. 00276

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 02/23/18/04    Page 643 of 1392    PageID 15385
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 532 of 1803    PageID 11278
Case 18-03078-sgj    Doc 22-1    Filed 04/03/19    Entered 04/16/19 Page 25 of Page 25 of 30

seems sound to apply here—especially given the fact that there is nothing in the March 17, 2017

version of the agreements that suggests that the agreement to submit disputes to litigation in

Texas and the deletion of the arbitration clauses should be applied retroactively.  The court

believes it should look at when a cause of action accrued and determine if there was a binding

arbitration clause between the parties at that time in the governing version of the agreement.

Thus, the court determines that there were valid arbitration agreements that applied to all

disputes arising out of the Sub-Advisory Agreement and Shared Services Agreement—to the

extent that those disputes involved conduct prior to March 17, 2017.  Since Counts 1-8 involve

conduct prior to March 17, 2017, Counts 1-8 fall within the scope of the arbitration agreements

in the Sub-Advisory Agreement and Shared Series Agreement.

**C.    But Wait, this is Bankruptcy and Core Matters and a Proof of Claim Objection are Involved.**

The analysis does not end here.  Yes, there is an otherwise valid, binding arbitration

clause that was contained in each of the Sub-Advisory and Shared Services Agreements (prior to

March 17, 2017).  And, yes, Counts 1-8 involve conduct and disputes arising under these pre-

March 17, 2017 agreements.  But what about the fact that these disputes arise in an adversary

proceeding that involves mostly, if not entirely, "core" matters (*e.g.,* Counts 5-25 are all

fraudulent transfers or preference claims under Section 544,[57] 547,[58] or 548;[59] Count 2 is a

Section 542 turnover request;[60] Count 26 is a request for Section 550 recovery[61])?  And what

---

[57] *See* 28 U.S.C. § 157(b)(2)(H).

[58] *See* 28 U.S.C. § 157(b)(2)(F).

[59] *See* 28 U.S.C. § 157(b)(2)(H).

[60] *See* 28 U.S.C. § 157(b)(2)(E).

[61] *See* 28 U.S.C. § 157(b)(2)(F) & (H).

Appellee Appx. 00526
APPX. 10773

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 4/24/23    Page 644 of 1392    PageID 15386
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 533 of 1803    PageID 11279
Case 18-03078-sgj Doc 239 Filed 04/08/19 Entered 04/08/19 Page 26 of 30

about the fact that Highland (the counter-party to the Sub-Advisory and Shared Services

Agreement who has asked for enforcement of the arbitration clauses in those agreements) has

filed proofs of claim?[62]   And what about the fact that Counts 1-8 (as with every count in the

Adversary Proceeding) are all urged to be **offsets** to Highland's proofs of claim?[63]   Highland's

proofs of claim are based on the post-March 17, 2017 versions of the Sub-Advisory and Shared

Services Agreements (*i.e.,* the versions that have no arbitration clauses).  Highland has not

argued that its proofs of claim are subject to arbitration (likely because they are governed by the

post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements).  But,

again, Highland argues that Counts 1-8 must be sent to arbitration, and the Reorganized Debtors

argue that each of these counts present potential offsets to Highlands' proofs of claim.  As a

reminder, these counts are:

**COUNT 1**:    Declaratory Judgment of Ultra Vires Acts by Acis LP in Violation of the LPA
(Highland allegedly overcharged expenses by $7M+ (*i.e.*, excessive fees) under
the Sub-Advisory and Shared Services Agreements).

**COUNT 2**:    Turnover of Property of the Estate Under § 542 for Unauthorized Overpayments
(turnover the $7M+ overcharged).

**COUNT 3**:    Money Had and Received for Overcharges and Unauthorized Overpayments
(again, seeking redress for the $7M+ overcharged—implicating the Sub-Advisory
Agreement and Shared Services Agreement).

**COUNT 4**:    Conversion for Unauthorized Overpayments (again, seeking redress for the $7M+
overcharged implicating the Sub-Advisory Agreement and Shared Services
Agreement).

**COUNT 5**:    Actual Fraudulent Transfer under § 548 related to the Sub-Advisory Agreement
(modifications to the Sub-Advisory Agreement in subsequent iterations were
allegedly fraudulent transfer, as were payments thereunder).

---

[62] *See* 28 U.S.C. § 157(b)(2)(B).

[63] *See* 28 U.S.C. § 157(b)(2)(C).

Appellee Appx. 00527
APPX. 10379

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 02/23/24   Page 645 of 1392   PageID 15387
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 534 of 1803   PageID 11280
Case 18-03078-sgj   Doc 139   Filed 04/03/19   Entered 04/16/19 Page 28 of Page 27 of 30

**COUNT 6**:      Actual Fraudulent Transfer Under TUFTA, § 24.005(a)(1) related to the Sub-Advisory Agreement (same theory as Count 5, asserted through section 544 of the Bankruptcy Code).

**COUNT 7**:      Constructive Fraudulent Transfer Under § 548(a)(1)(B) related to the Sub-Advisory Agreement (same facts as Count 5 only constructive not actual fraud).

**COUNT 8**:      Constructive Fraudulent Transfer Under TUFTA §§ 24.005(a)(2) and 24.006(a) related to the Sub-Advisory Agreement (same facts as Count 5, only constructive fraud under TUFTA, and asserted through section 544 of the Bankruptcy Code).

Thus, to recap, ***five of the eight counts that Highland wants arbitrated*** (Counts 2, and 5-8) clearly involve statutory core matters.[64]  Moreover, ***all*** of the counts in the Adversary Proceeding are asserted ***defensively*** to two proofs of claim—meaning ***all eight counts that Highland wants arbitrated*** (even Counts 1, 3, and 4) have transformed into statutory core matters.[65]  Does this matter?  This court believes yes.

The Fifth Circuit has shed some light on this topic in the cases of *In re Gandy* and *In re National Gypsum*.[66]  In those cases, the Fifth Circuit instructed that a bankruptcy court may decline to enforce arbitration clauses when it finds:  (a) the underlying nature of the proceeding

---

[64] *See* 28 U.S.C. § 157(b)(2)(E), (F), and (H).

[65] *See* 28 U.S.C. § 157(b)(2)(C).  This court realizes that, from a *Stern v. Marshall* perspective, 131 S. Ct. 2594 (2011), being a ***statutory*** "core" matter does not necessarily mean a bankruptcy court has Constitutional authority to issue final orders or judgments in the matter.  However, even if this *Stern* pronouncement has any relevance, when evaluating an arbitration clause/right, the court perceives that the various counterclaims here (*i.e.,* all 35 counts) are likely ***inexplicably intertwined*** with the Highland proofs of claim, such that the bankruptcy court would likely have Constitutional authority to adjudicate them.  While Highland's proofs of claim merely seek payment for services under the post-March 17, 2017 versions of the agreements—which is ***after*** the time frame that Counts 1-8 implicate—it is not so simple as dividing claims and counterclaims into discreet time periods.  For one thing, the Reorganized Debtors argue that modifications to the Sub-Advisory and Shared Services Agreements that increased fees that Highland could charge (and that Highland is now seeking in its proofs of claim) were tantamount to fraudulent transfers.  Thus, how does one evaluate the proofs of claim separately from this argument?  Additionally, Highland ***has asserted unliquidated indemnification claims*** in its proofs of claim that presumably reach back to earlier iterations of the Sub-Advisory and Shared Services Agreement (meaning that claims ultimately awarded to the Reorganized Debtors under earlier versions of the agreements might result in indemnification claims being asserted back against them by Highland relating to those very claims).  The point being that all of Highland's assertions in its proofs of claim seem inextricably intertwined with all the Counts in the Adversary Proceeding.

[66] *Gandy v. Gandy (In re Gandy),* 299 F.3d 489 (5th Cir. 2002); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.),* 118 F.3d 1056 (5th Cir. 1997).

Appellee Appx. 00528
Appx. 00739

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/20/23   Page 646 of 1392   PageID 15388
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 535 of 1803   PageID 11281
Case 18-03078-sgj   Doc 22-9   Filed 04/06/94   Entered 10/11/19 Page 29 of   Page 28 of 30

derives from the provisions of the Bankruptcy Code; and (b) that enforcement of the arbitration

provision would conflict with the purposes/goals of the Bankruptcy Code.[67]  Some

purposes/goals of the Code that might support a denial of arbitration, include: (1) the equitable

and expeditious distribution of assets of the Debtor's estate; (2) centralized resolution of pure

bankruptcy issues; (3) protection of creditors and reorganizing debtors from piecemeal litigation,

and (4) the undisputed power of a bankruptcy court to enforce its orders.[68]

The *In re Gandy* opinion from the Fifth Circuit is worthy of discussion here.  In *Gandy*,

an individual Chapter 11 debtor had first, prepetition, filed a state court lawsuit against various

business partners, asserting causes of action against them for making transfers out of a

partnership affecting her ownership interests, and the causes of action included breach of

contract, negligence, breach of fiduciary duty, fraud and constructive trust.  There was an

arbitration clause in the applicable partnership agreement and the state court granted a motion to

compel arbitration.  Then, the debtor filed a Chapter 11 case and removed the state court lawsuit

to the bankruptcy court and filed new claims under sections 544, 548, 550, civil "RICO," and

alter ego in a separate adversary proceeding, and requested substantive consolidation.  The

bankruptcy court granted consolidation of the two actions and then the defendants filed a motion

to compel arbitration.  The bankruptcy court denied the motion, after finding that the debtor was

essentially seeking avoidance of fraudulent transfers.  The Fifth Circuit affirmed the bankruptcy

court's refusal to enforce an arbitration clause contained in the underlying partnership

agreement.  The court agreed with the bankruptcy court that the complaint essentially—more

than anything else—sought avoidance of fraudulent transfers, and the court not only determined

---

[67] *Id.* at 1069.

[68] *Id.*

Appellee Appx. 00529
APPX. 10730

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-36   Filed 12/29/23   Page 647 of 1392   PageID 15389
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 536 of 1803   PageID 11282
Case 18-03078-sgj   Doc 139-3   Filed 04/16/19   Entered 04/16/19 15:32:33   Page 29 of 30

that such rights derived from the Bankruptcy Code (fully acknowledging the fact that there were
state law tort claims and breach of contract also asserted) but also—in looking at whether
enforcing the arbitration clause would conflict with the purposes of the Bankruptcy Code—noted
that one central purpose of the Bankruptcy Code is the expeditious and equitable distribution of
the assets of a debtor's estate.  The court thought the avoidance actions predominated over the
"peripheral" contract and tort claims and, in such a circumstance, "the importance of the federal
bankruptcy forum provided by the Code is at its zenith."[69]  The court stated that "[s]ome of the
purposes of the Code we mentioned in *National Gypsum*[70] as potentially conflicting with the
Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to
protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of
the bankruptcy court to enforce its own orders."[71]

    This court believes, like the court in *Gandy*, that this Adversary Proceeding—more than
anything else—seeks avoidance of fraudulent transfers.  Such avoidance theories derive from the
Bankruptcy Code.  Sections 542, 547, 548 and 550 of the Bankruptcy Code are front and center,
as are the "strong arm" powers of section 544(a).  Enforcing the arbitration clause here would
conflict with the purposes of the Bankruptcy Code—one of the central purposes of which is the

---

[69] *Gandy,* 299 F.3d at 497.

[70] In the *National Gypsum* case, an asbestos litigation trust created under a confirmed plan filed a post-confirmation
adversary proceeding against debtor's liability insurer, seeking a declaratory judgment that the plan had discharged
its obligations to the insurance company.  The insurance company, in response to the litigation, sought to exercise its
rights to seek arbitration under a certain agreement.  The Fifth Circuit, in affirming the lower courts' refusal to
compel arbitration, stated that, "We believe that nonenforcement of an otherwise applicable arbitration provision
turns on the underlying nature of the proceeding, *i.e.*, whether the proceeding derives exclusively from the
provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes
of the Code."  *Nat'l Gypsum Co.*, 118 F.3d at 1067.  Because the debtor sought to bar the insurance company's
actions either by invoking section 524(a)'s discharge injunction or by invoking the terms of a confirmed plan, the
proceeding derived entirely from the provisions of the Bankruptcy Code, and, hence, the *National Gypsum* court
would not send the dispute to arbitration.

[71] *Gandy*, 299 F.3d at 500.

Appellee Appx. 00530
Appx. 00732

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/29/23    Page 648 of 1392    PageID 15390
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 537 of 1803    PageID 11283
Case 18-03078-sgj  Doc 296-3  Filed 04/06/19  Entered 04/16/19  Page 32 of  Page 30 of 30

expeditious and equitable distribution of the assets of a debtor's estate.  The avoidance actions in this Adversary Proceeding predominate over all other counts and, in such a circumstance, "the importance of the federal bankruptcy forum provided by the Code is at its zenith."  Arbitrating Counts 1-8 would seriously jeopardize the Adversary Proceeding because they are an integral part of determining Highland's proofs of claim and the other core counts in the Adversary Proceeding.  The bankruptcy court's quintessential duties are to adjudicate proofs of claim and to provide a central forum for litigation, whenever feasible and jurisdictionally sound.  Indeed, in *Gandy*, the Fifth Circuit noted that when a proof of claim is filed, one of the "peculiar powers" of the bankruptcy court has been invoked and the nature of estate claims becomes "different from [their] nature . . . following the filing of a proof of claim."[72]

In summary, this court believes it has discretion under established Fifth Circuit authority to decline to order arbitration here.[73]  It is, therefore,

**ORDERED** that the Arbitration Motion is **DENIED**.

**#### END OF MEMORANDUM OPINION AND ORDER####**

---

[72] *Id.* at 499 (citing *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).

[73] *See also Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 389-90 (2d Cir. 2018) (in proceeding involving whether section 524 discharge was violated by credit card company whose agreement with debtor contained arbitration clause, Second Circuit held that bankruptcy court had discretion to decline to enforce the arbitration agreement; Second Circuit engaged in a particularized inquiry into the nature of the claim and the facts of the specific bankruptcy and determined that arbitrating claims for violations of the 524 injunction would "seriously jeopardize a particular core bankruptcy proceeding" because: "(1) the discharge injunction is integral to the bankruptcy court's ability to provide debtors with a fresh start, (2) the claim relates to an ongoing matter with continuing court supervision, and (3) the equitable powers of the court to enforce its own injunctions are central to the structure of the Code.").

Appellee Appx. 00531
Appx. 10732

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/29/23    Page 649 of 1392    PageID 15391
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 538 of 1803    PageID 11284

## <u>CERTIFICATE OF SERVICE</u>

I, Elliot Bromagen, certify that I am not less than 18 years of age, and that service of the foregoing was caused to be made on November 1, 2019, in the manner indicated on the parties on the attached service list.

Date:  November 1, 2019                    <u>/s/ Elliot Bromagen</u>
                                            Elliot Bromagen

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 11/23/22 Exhibit 6    Page 650 of 1392    PageID 15392
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 539 of 1803    PageID 11285

Case 19-12239-CSS    Doc 86-5    Filed 11/01/19    Page 2 of 7

**HAND DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE  19899 (Courier 19801)

**OVERNIGHT DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA  90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE  19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Jose F. Bibiloni, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE  19801

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-3    Filed 11/29/23    Page 651 of 1392    PageID 15393
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 540 of 1803    PageID 11286
Case 19-12239-CSS    Doc 86-5    Filed 11/01/19    Page 3 of 7

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Hunter Mountain Trust)
William A. Hazeltine, Esquire
Sullivan Hazeltine Allinson LLC
901 North Market Street, Suite 1300
Wilmington, DE 19801

**OVERNIGHT DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC 20530-0001

**OVERNIGHT DELIVERY**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE 19903

**OVERNIGHT DELIVERY**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE 19904

**OVERNIGHT DELIVERY**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

**OVERNIGHT DELIVERY**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC 20554

**OVERNIGHT DELIVERY**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA 19103

**OVERNIGHT DELIVERY**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY 10281

**OVERNIGHT DELIVERY**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC 20005-4026

**OVERNIGHT DELIVERY**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA 19101

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 04/27/23   Page 652 of 1392   PageID 15394
Exhibit 36   Page 4 of 7
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 541 of 1803   PageID 11287
Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 4 of 7

**OVERNIGHT DELIVERY**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX  75206

**OVERNIGHT DELIVERY**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**OVERNIGHT DELIVERY**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**OVERNIGHT DELIVERY**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**OVERNIGHT DELIVERY**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Frontier State Bank
Attn:  Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**OVERNIGHT DELIVERY**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 03/23/04    Page 653 of 1392    PageID 15395
Exhibit 6    Page 5 of 1392
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 542 of 1803    PageID 11288
Case 19-12239-CSS    Doc 86-5    Filed 11/01/19    Page 5 of 7

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
  and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**OVERNIGHT DELIVERY**
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

Appellee Appx. 00536
Appx. 00733

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 04/24/23   Page 654 of 1392   PageID 15396
Exhibit 35   Page 544 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 543 of 1803   PageID 11289
Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 6 of 7

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

**OVERNIGHT DELIVERY**
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street  NW Suite 1000
Washington, DC 20004-130

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC  20005

**OVERNIGHT DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

Appellee Appx. 00537
Appx. 00739

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-3    Filed 05/03/18-4    Page 655 of 1392    PageID 15397
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 544 of 1803    PageID 11290
Case 19-12239-CSS    Doc 86-5    Filed 11/01/19    Page 7 of 7

**OVERNIGHT DELIVERY**

(Counsel to California Public Employees'
Retirement System ("CalPERS")
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**OVERNIGHT DELIVERY**

(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612

**OVERNIGHT DELIVERY**

(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**OVERNIGHT DELIVERY**

(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207

**OVERNIGHT DELIVERY**

(Counsel to Jefferies)
Patrick Maxcy, Esq.
Dentons US LLP
233 South Wacker Drive Suite 5900
Chicago, Illinois 60606-6361

**OVERNIGHT DELIVERY**

(Proposed Official Committee of Unsecured
Creditors)
Bojan Guzina, Esquire
Matthew Clemente, Esquire
Alyssa Russell, Esquire
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

**OVERNIGHT DELIVERY**

(Proposed Official Committee of Unsecured
Creditors)
Jessica Boelter, Esquire
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

**OVERNIGHT DELIVERY**

(Proposed Official Committee of Unsecured
Creditors)
Penny P. Reid, Esquire
Paige Holden Montgomery, Esquire
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201

**Appellee Appx. 00538**

**APPX. 00749**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 63   Filed 05/26/23   Page 656 of 1392   PageID 15398
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 545 of 1803   PageID 11291

# APPENDIX  7

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 4/27/23180 Page 657 of 1392    PageID 15399
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 546 of 1803    PageID 11292
Case 18-30264-sgj11 Doc 75 Filed 03/20/18    Entered 03/20/18 17:26:53    Page 1 of 4





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 20, 2018**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, L.P., | § | CASE NO. 18-30265-SGJ-7 |
| | § | |
| | § | |
| Alleged Debtor. | § | |

### ORDER DENYING ALLEGED DEBTORS' JOINT MOTION TO DISMISS THE INVOLUNTARY PETITIONS FILED BY JOSHUA N. TERRY FOR LACK OF SUBJECT MATTER JURISDICTION OR, ALTERNATIVELY, TO COMPEL ARBITRATION[1] [DE ## 72 & 73]

---

[1] DE ## 72 & 73 in Case No. 18-30264; DE ## 69 & 70 in Case No. 18-30265.

1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33   Filed 12/29/23   Page 658 of 1392    PageID 15400
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 547 of 1803    PageID 11293
Case 18-30264-sgj11 Doc 75 Filed 03/20/18    Entered 03/20/18 17:26:53    Page 2 of 4

Late at night on March 19, 2018—on the day before a long-scheduled Trial of an Involuntary Bankruptcy Petition filed against the above-referenced Alleged Debtors—and despite the provisions of an Agreed Scheduling Order dated February 26, 2018 (which clearly contemplated that motions to dismiss, supplements, and other pleadings would have been filed significantly prior to March 19, 2018)—the Alleged Debtors filed a Joint Motion to Dismiss the Involuntary Petitions filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, Motion to Compel Arbitration (the "Motions to Dismiss/Compel"),[2] and a supplement thereto on March 20, 2018.[3]  The Motions to Dismiss/Compel argue a lack of subject matter jurisdiction, with regard to this court's ability to adjudicate the Involuntary Bankruptcy Petitions, because allegedly Petitioning Creditor Joshua Terry (the "Petitioning Creditor") lacked standing to file the Involuntary Bankruptcy Petitions because of an arbitration clause in an Amended and Restated Agreement of Limited Partnership of ACIS Capital Management, L.P. (the "Partnership Agreement") dated January 21, 2011, which required parties to the Partnership Agreement to arbitrate disputes.  The arbitration clause at issue is found at Section 6.12 of the Partnership Agreement.  The Motions to Dismiss/Compel alternatively argue that this court should enforce/recognize the arbitration clause and order the parties to arbitrate whether the above-referenced Alleged Debtors should be in bankruptcy.  The Motions to Dismiss/Compel are **DENIED** for the following reasons:

---

[2] DE # 74 in Case No. 18-30264; DE # 71 in Case No. 18-30265.

[3] The court will presume that the Alleged Debtors thought that a subject matter jurisdiction argument—and the fact that courts can consider their subject matter jurisdiction at all times during litigation—warranted their blatant violation of the Agreed Scheduling Order.  The court will expect a good explanation in court as to why this subject matter jurisdiction argument was made 47 days after the case was filed, and after a previous answer and motion to dismiss were filed by the Alleged Debtor, and, of course, in violation of a court order.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 2/31/22    Page 659 of 1392    PageID 15401
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 548 of 1803    PageID 11294
Case 18-30264-sgj11 Doc 75 Filed 03/20/18    Entered 03/20/18 17:26:53    Page 3 of 4

(1)  The parties involved here have already arbitrated prepetition.  In fact, it is undisputed that

the Petitioning Creditor obtained an arbitration award that was confirmed with a

judgment in state court.

(2)  Section 6.12 of the Partnership Agreement is not applicable because filing an involuntary

bankruptcy case is a ***collection remedy*** available to creditors with unsecured claims that

are not the subject of a bona fide dispute and whose claims aggregate at least $15,775 in

amount.  It is not a ***claim*** or ***controversy*** in and of itself, and is certainly not a claim or

controversy "arising of, relating to or in connection with the [Partnership] Agreement."

(3)  Even if Section 6.12 of the Partnership Agreement is applicable, the filing of an

involuntary bankruptcy case, such as in the case at bar, presents a "core" bankruptcy

proceeding and a bankruptcy court has discretion to decline to stay its proceedings in

deference to arbitration where the underlying nature derives exclusively from the

Bankruptcy Code (*i.e.,* is "core") and arbitration conflicts with the purposes of the Code.

Arbitration in the case at bar would irreconcilably conflict with the purposes and goals of

the Bankruptcy Code (including, but not limited to, the goal of centralized resolution of

purely bankruptcy issues, the need to protect creditors and debtors from piecemeal

litigation, and the expeditious and equitable distribution of assets of a debtor's estate).

*See In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1069-70 (5th Cir. 1997) (a bankruptcy court

can deny enforcement of arbitration provisions when it finds either: (1) that enforcement

of the provision would irreconcilably conflict with the Code; or (2) in exercising its

discretion in a core case where the only rights at issue were created by the Code rather

than inherited from pre-petition property of the debtors); *In re Gandy*, 299 F.3d 489, 499-

500 (5th Cir. 2002) (same).

**Appellee Appx. 00542**
**APPX. 00744**
Appx. 00744

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 03/20/18   Page 660 of 1392   PageID 15402
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 549 of 1803   PageID 11295
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 4 of 4

**WHEREFORE** the Motions to Dismiss/Compel are **DENIED.**

### **###END OF ORDER###**

# APPENDIX 8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 683   Filed 05/20/23180 Page 663 of 1392   PageID 15405
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 552 of 1803   PageID 11298
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 2 of 229

copy of which is attached hereto as **Exhibit "1,"** as modified by (i) the *First Modification to the*

*Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management*

*GP, LLC* (the "First Modification") [Docket No. 693], a copy of which is attached hereto as

**Exhibit "2,"** and (ii) the *Second Modification to the Third Amended Joint Plan for Acis Capital*

*Management, L.P. and Acis Capital Management GP, LLC* (the "Second Modification") [Docket

No. 702], a copy of which is attached hereto as **Exhibit "3,"** as supplemented by the

*Supplement to Second Modification to the Third Amended Joint Plan for Acis Capital*

*Management, LP and Acis Capital Management GP, LLC* [Docket No. 769], a copy of which is

attached hereto as **Exhibit "4,"** filed by Robin Phelan (the "Chapter 11 Trustee"), as Chapter 11

Trustee for Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC

("Acis GP," and together with Acis LP, the "Debtors").  The Third Amended Plan, as modified by

the First Modification and Second Modification (as supplemented), is hereafter referred to as the

"Plan;" *provided that*, as provided in the last sentence of paragraph 13 of this Order, the

schedule of assumed executory contracts attached hereto as Exhibit 5 to this Order replaces, is

substituted for, and supersedes Exhibit B to the Third Amended Plan.  Capitalized terms used in

this Order, unless otherwise specifically defined herein, shall be given the same meaning as in

the Plan and/or the Disclosure Statement.

      The Combined Hearing was commenced at the time and date scheduled.  Based on the

testimony, evidence admitted, judicial notice of the records of the Chapter 11 Cases, and the

arguments of counsel, the Court makes this *Findings of Fact, Conclusions of Law, and Order*

*Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan*

*for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*

("Order").

      ACCORDINGLY, IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED

AND ORDERED THAT:

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-35   Filed 05/24/23 Page 664 of 1392   PageID 15406
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 553 of 1803   PageID 11299
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 3 of 229

A.      _Findings and Conclusions_.  All findings of fact or conclusions of law made by the

Court on the record at the Combined Hearing are hereby incorporated in their entirety into this

Order.  All findings of fact contained in the Court's _Findings of Fact and Conclusions of Law in_

_Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petitions_

entered on April 13, 2018 [Docket No. 118] are hereby incorporated in their entirety into this

Order.  The findings and conclusions set forth herein and in the record of the Combined Hearing

constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052

as made applicable herein by Bankruptcy Rule 9014.  To the extent any of the following findings

of fact constitute conclusions of law, they are adopted as such.  To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such.

B.      _Jurisdiction; Venue; Core Proceeding_.  The Court has jurisdiction over these

bankruptcy cases pursuant to 28 U.S.C. sections 157(b) and 1334.  Venue is proper before this

Court pursuant to 28 U.S.C. sections 1408 and 1409.  Final approval of the Disclosure

Statement and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. section

157(b)(2)(A), (L) and (O) over which the Court has exclusive jurisdiction and full constitutional

jurisdiction and authority to enter final orders with respect thereto.

C.      _Eligibility for Relief_.  The Debtors were and are eligible for relief under section

109 of the Bankruptcy Code.[1]

D.      _Commencement and Joint Administration of the Debtors' Cases_.  On January 30,

2018, Joshua N. Terry ("Terry") filed involuntary petitions under chapter 7 of the Bankruptcy

Code against both of the Debtors in the United States Bankruptcy Court for the Northern District

of Texas, Dallas Division (the "Court").  Acis LP's bankruptcy case was assigned Case No. 18-

30264, and Acis GP's bankruptcy case was assigned Case No. 18-30265.  The involuntary

petitions were contested and the Court held a multi-day trial spanning March 21, 22, 23, 27 and

---

[1] Unless otherwise indicated, section references are to the Bankruptcy Code.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 05/03/24   Page 665 of 1392   PageID 15407
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 554 of 1803   PageID 11300
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 4 of 229

29, 2018.  On April 13, 2018, the Court entered an *Order for Relief in an Involuntary Case* in both cases [Docket No. 119 in Case No. 18-30264 and Docket No. 114 in Case No. 18-30265].  Diane G. Reed (the "Chapter 7 Trustee") was appointed Chapter 7 Trustee in both cases.  On motion of the Chapter 7 Trustee, the Court entered an *Order Directing Joint Administration* [Docket No. 137],[2] which provides for the joint administration of the Debtors' respective bankruptcy cases under Case No. 18-30264.

E.   *Conversion of the Debtors' Cases and Appointment of the Chapter 11 Trustee*.  On motion of the Chapter 7 Trustee, the Court entered an *Order Granting Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 205] on May 11, 2018, converting the Debtors' bankruptcy cases to cases under chapter 11 of the Bankruptcy Code.  On motion of Terry, the Court entered an *Order Granting Emergency Motion for an Order Appointing A Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(A)* [Docket No. 206] on May 11, 2018, directing the United States Trustee (the "U.S. Trustee") to appoint a Chapter 11 Trustee in the Chapter 11 Cases.  The U.S. Trustee appointed Robin Phelan as Chapter 11 Trustee in the Chapter 11 Cases.  Mr. Phelan's appointment as Chapter 11 Trustee in Acis LP's case was approved pursuant to an *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 221] entered by the Court on May 17, 2018 and his appointment as Chapter 11 Trustee in Acis GP's case was approved pursuant to an *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 184 in Case No. 18-30265] entered by the Court on June 12, 2018.

F.   *No Official Committee of Unsecured Creditors*.  The U.S. Trustee has not appointed an official committee of unsecured creditors in the Chapter 11 Cases.

G.   *Claims Bar Date*.   October 15, 2018 was originally fixed as the deadline for all holders of alleged Claims (except for governmental units) to file proofs of Claim.  However, on

---

[2] Unless otherwise indicated, all references to the "Docket" refer to the Docket in Case No. 18-30264.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 53   Filed 05/03/18 Page 666 of 1392   PageID 15408
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 555 of 1803   PageID 11301
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 5 of 229

motion of the Chapter 11 Trustee, the Court entered the Bar Date Order on July 9, 2018 [Docket

No. 387].  Pursuant to the Bar Date Order, August 1, 2018 was established as the deadline for

all holders of alleged Claims (except for governmental units) to file proofs of Claim and October

10, 2018 was established as the deadline for governmental units to file proofs of Claim.

H.      *Adequacy of Disclosure Statement*.  The Disclosure Statement contains

"adequate information," as that term is defined in section 1125 of the Bankruptcy Code and

satisfies all requirements of section 1125 of the Bankruptcy Code.

I.       *Solicitation Order Compliance*.  On October 3, 2018, the Chapter 11 Trustee filed

his *Chapter 11 Trustee's Amended Motion for Entry of Order (A) Conditionally Approving*

*Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure*

*Statement and Confirmation of Second Amended Joint Plan, and Setting Related Deadlines; (C)*

*Approving Forms for Voting and Notice; and (D) Granting Related Relief* (the "Conditional

Approval Motion") [Docket No. 622].  The Chapter 11 Trustee filed a *Supplement to Amended*

*Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling*

*Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Second*

*Amended Joint Plan, and Setting Related Deadlines; (C) Approving Forms for Voting and*

*Notice; and (D) Granting Related Relief* (the "Supplement to Conditional Approval Motion")

[Docket No. 646] on October 19, 2018.  The Court conducted a hearing on the Conditional

Approval Motion, as supplemented, on October 24, 2018.  On October 25, 2018, the Court

entered an *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined*

*Hearing on Final Approval of Disclosure Statement and Confirmation of Second Amended Joint*

*Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV)*

*Approving Related Matters* (the "Solicitation Order") [Docket No. 659] granting the Conditional

Approval Motion.  The Conditional Approval Motion was filed in connection with a second

amended plan of reorganization and disclosure statement with respect thereto.  However, for

convenience and ease of review, the modifications to the second amended plan and disclosure

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 6835  Filed 4.5779/22/31804  Page 667 of 1392  PageID 15409
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 556 of 1803  PageID 11302
Case 18-30264-sgj11  Doc 829  Filed 01/31/19  Entered 01/31/19 17:34:06  Page 6 of 229

statement with respect thereto, including modifications discussed at the October 24, 2018

hearing, were incorporated into the Third Amended Plan and Disclosure Statement filed on

October 25, 2018. Consequently, the Solicitation Order approved solicitation of votes on the

Third Amended Plan and distribution of the Disclosure Statement in connection with solicitation

of votes on the Third Amended Plan. Pursuant to the Solicitation Order, the Court, among other

things: (a) conditionally approved the Disclosure Statement for use in soliciting votes on the

Third Amended Plan; (b) established procedures and deadlines for the solicitation and

submission of votes to accept or reject the Third Amended Plan (the "Solicitation Procedures");

(c) fixed deadlines for objections to final approval of the Disclosure Statement and/or

confirmation of the Third Amended Plan and related briefing deadlines; (d) fixed a deadline for

serving notice of the Combined Hearing; and (e) set the Combined Hearing to commence on

December 11, 2018, at 9:30 a.m., Central Time. The Solicitation Order approved the following

documents (collectively the "Solicitation Materials") to be served on Creditors entitled to vote on

the Third Amended Plan:

      (i)     the Third Amended Plan;

      (ii)    the Disclosure Statement;

      (iii)   the Ballots for voting on the Third Amended Plan;

      (iv)   the Solicitation Order;

      (v)    a Notice (the "Combined Hearing Notice") [Docket No. 667] reflecting the deadlines and other information relating to the Combined Hearing; and,

      (vi)   a letter (the "Transmittal Letter") from counsel for the Chapter 11 Trustee.

The Solicitation Order directed the Chapter 11 Trustee to serve the Solicitation Materials on

holders of Claims in Classes 2 and 3 and Subclasses 4A and 4B under the Third Amended

Plan. The Solicitation Order also authorized the tabulation of Ballots on a consolidated basis.

The Solicitation Order further directed the Chapter 11 Trustee to serve on various parties

defined in the Supplement to Conditional Approval Motion as the "Noteholders," "Highlands" and

**Appellee Appx. 00550**
**Appx. 10882**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 05/03/18 04   Page 668 of 1392   PageID 15410
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 557 of 1803   PageID 11303
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 7 of 229

"Notice Parties" certain notices and copies of the following documents (the "Notice-Only Materials"): the Disclosure Statement, the Third Amended Plan, the Solicitation Order and the Combined Hearing Notice. The Chapter 11 Trustee has complied with the Solicitation Order, including the Solicitation Procedures contained therein, in all respects.

J.      *Transmittal and Mailing of Solicitation Materials; Notice*. Due, adequate, and sufficient notice of the Third Amended Plan, Disclosure Statement and Combined Hearing, together with all deadlines for voting on the Third Amended Plan and for objecting to final approval of the Disclosure Statement and/or confirmation of the Third Amended Plan, has been given to known holders of Claims and Interests and, to the extent required, to all other known parties-in-interest, in compliance with the applicable Bankruptcy Rules and the Solicitation Order, as evidenced by the: (i) Combined Hearing Notice (and Certificate of Service included therewith) filed at Docket No. 667; (ii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Noteholders* (and Certificate of Service included therewith) filed at Docket No. 664; (iii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Highland Entities* (and Certificate of Service included therewith) filed at Docket No. 665; (iv) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Notice Parties* (and Certificate of Service included therewith) filed at Docket No. 666; and (v) *Certificate of Service* filed at Docket No. 676. The packages containing the Solicitation Materials, the packages containing the Notice-Only Materials, and all other materials relating in any way to the solicitation process were transmitted and served in substantial compliance with the Solicitation Order and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth in the Solicitation Order, and all other applicable rules, laws and regulations.

K.      *Adequacy of Solicitation*. The Chapter 11 Trustee distributed packages containing the Solicitation Materials to the holders of Claims entitled to vote on the Third

Appellee Appx. 00551
Appx. 00802

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 09/23/18 04 age 669 of 1392   PageID 15411
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 558 of 1803   PageID 11304
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 8 of 229

Amended Plan and sufficient time was prescribed for such holders of Claims to vote on the

Third Amended Plan in substantial compliance with the Solicitation Order and the applicable

provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth

in the Solicitation Order, and all other applicable rules, laws and regulations.  Transmittal and

service were adequate and sufficient, and no further notice is or shall be required.  In addition,

holders of Claims not entitled to vote on the Amended Plan, and certain other parties-in-interest,

were provided with certain non-voting materials approved by the Court in compliance with the

Solicitation Order.  All procedures used to distribute the Solicitation Materials to holders of

Claims entitled to vote on the Third Amended Plan were fair and conducted in good faith and in

accordance with the Bankruptcy Code, Bankruptcy Rules, the Solicitation Procedures contained

in the Solicitation Order, and all other applicable rules, laws and regulations.

   L. *Good Faith Solicitation – Section 1125(e)*.  Based on the Record, the Chapter 11

Trustee and Estate Professionals have acted in good faith within the meaning of sections

1125(e) and 1129(a)(3), and in compliance with the applicable provisions of the Bankruptcy

Code, the Bankruptcy Rules, and the Solicitation Order, in connection with all of their respective

activities relating to the solicitation of acceptances of the Third Amended Plan and their

participation in the activities described in section 1125, and are entitled to the protections

afforded by section 1125(e).

   M. *Voting Tabulation*.  In accordance with the Solicitation Order, on December 3,

2018 the *Tabulation of Ballots in Connection with Confirmation of the Third Amended Joint Plan*

*for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Ballot

Tabulation") [Docket No. 746] was filed and served on all parties that filed a timely objection to

confirmation of the Plan.  All procedures used to tabulate the Ballots (which were tabulated on a

consolidated basis) were fair and conducted in accordance with the Solicitation Order, the

Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations.

---

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED     PAGE 8 of 46

**Appellee Appx. 00552**
**APPX. 00564**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/09/23   Page 670 of 1392   PageID 15412
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 559 of 1803   PageID 11305
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 9 of 229

N.      _Classes Deemed to Have Accepted or Rejected the Third Amended Plan_.  As set forth in the Third Amended Plan and Disclosure Statement: (i) Class 1 is unimpaired and is conclusively deemed to have accepted the Third Amended Plan pursuant to section 1126(f), and (ii) Class 5, consisting of Interests in the Debtors, is Impaired, but because the Third Amended Plan provides that holders of Class 5 Interests shall not receive or retain any property on account of their Interests, Class 5 is conclusively deemed to have rejected the Third Amended Plan pursuant to section 1126(g).

O.      _Impaired Classes of Creditors Voting to Accept or Reject the Third Amended Plan_.  Based upon the Ballot Tabulation, the Court finds that the following Impaired Classes have voted on the Third Amended Plan as follows:

(i)      Class 2 (the Terry Partially Secured Claim) voted to accept the Third Amended Plan as follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $8,060,827.84 100% | 1 100% | $0.00 0.00% | 0 0.00% |

Two Ballots were submitted by Terry in Class 2.  One of the Ballots was based on a proof of Claim recorded in the Claims Register for Case No. 18-30264 as Claim No. 26-1 and filed by Terry for the benefit of his IRAs ("Claim No. 26").  Highland filed an objection [Docket No. 522] on August 17, 2018 seeking an order disallowing Claim No. 26 and striking any vote (on a prior plan of reorganization) by Terry on account of Claim No. 26.  Although the Ballot Tabulation reflects the Ballot submitted by Terry on account of Claim No. 26, the Court disregards that Ballot and does not take it into account in its determination regarding acceptance of the Third Amended Plan.  The other Ballot submitted by Terry accepted the Third Amended Plan.

(ii)      Class 3 (General Unsecured Claims) voted to accept the Third Amended Plan as follows:

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6835 Filed 02/09/2025 Page 671 of 1392 PageID 15413
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 560 of 1803 PageID 11306
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 10 of 229

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $667,550.00<br>100% | 2<br>100% | $0.00<br>0.00% | 0<br>0.00% |

Three Ballots were submitted in Class 3. One of the Ballots was submitted by Jennifer G. Terry.

Such Ballot is based on a proof of Claim recorded in the Claims Register for Case No. 18-30264

as Claim No. 25-1 and filed by Jennifer G. Terry for the benefit of her IRAs and 401k ("Claim

No. 25"). Highland filed an objection [Docket No. 521] on August 17, 2018 seeking an order

disallowing Claim No. 25 and striking any vote (on a prior plan of reorganization) by Jennifer G.

Terry on account of Claim No. 25. Although the Ballot Tabulation reflects the Ballot submitted

by Jennifer G. Terry on account of Claim No. 25, the Court disregards that Ballot and does not

take it into account in its determination regarding acceptance of the Plan. The other two Ballots

submitted in Class 3 accepted the Third Amended Plan.

        (iii)     Class 4 (Insider Claims) voted to reject the Third Amended Plan as

follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $0.00<br>0.00% | 0<br>0.00% | $4,172,140.38<br>100% | 1<br>100% |

       Based on the foregoing, and as evidenced by the Ballot Tabulation, at least one

Impaired Class of Claims (excluding the acceptance by any Insiders of the Debtors) has voted

to accept the Third Amended Plan in accordance with the requirements of sections 1124 and

1126 of the Bankruptcy Code.

       P.     *Modifications to the Third Amended Plan*. The modifications to the Third

Amended Plan set forth in the First Modification, the Second Modification (as supplemented),

and as set forth in this Order constitute non-material or technical changes and do not materially

or adversely affect or change the treatment of any Claims against or Interests in the Debtors

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-13   Filed 12/22/23   Page 672 of 1392   PageID 15414
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 561 of 1803   PageID 11307
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 11 of 229

under the Third Amended Plan (the "Non-Material Modifications"). The filing of the First

Modification on November 8, 2018 constitutes due and sufficient notice thereof under the

circumstances of these Chapter 11 Cases. The filing of the Second Modification on November

16, 2018 (as supplemented on December 10, 2018) constitutes due and sufficient notice thereof

under the circumstances of these Chapter 11 Cases. The Non-Material Modifications neither

require additional disclosure under section 1125 of the Bankruptcy Code nor re-solicitation of

votes on the Plan under section 1126 of the Bankruptcy Code and Bankruptcy Rules 3018 and

3019. In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all

holders of Claims against the Debtors who voted to accept the Third Amended Plan are hereby

deemed to have accepted the Third Amended Plan as modified consistent with the Non-Material

Modifications. No Holder of a Claim against the Debtors who has voted to accept the Third

Amended Plan shall be permitted to change its acceptance to a rejection as a consequence of

the Non-Material Modifications. The Non-Material Modifications incorporated in the Plan comply

with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

       Q.     *Bankruptcy Rule 3016*. The Plan is dated and identifies the Chapter 11 Trustee

as the Person submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the

Disclosure Statement satisfied Bankruptcy Rule 3016(b). The Plan provides for the Temporary

Plan Injunction (as defined herein), which constitutes an injunction against conduct not

otherwise enjoined under the Bankruptcy Code. The Plan and Disclosure Statement both

describe in specific and conspicuous language all acts to be enjoined and identify the entities

subject to the Temporary Plan Injunction. Therefore, the Plan and Disclosure Statement satisfy

the requirements of Bankruptcy Rule 3016(c).

       R.     *Bankruptcy Rule 3017*. The Chapter 11 Trustee has given notice of the

Combined Hearing as required by the applicable provisions of Bankruptcy Rule 3017 and the

Solicitation Order. The materials transmitted and notice given by the Chapter 11 Trustee to

holders of Claims entitled to vote on the Third Amended Plan and the materials transmitted by

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-35    Filed 05/23/23 Page 673 of 1392    PageID 15415
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 562 of 1803    PageID 11308
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 12 of 229

the Chapter 11 Trustee to holders of Interests and other parties-in-interest satisfy the applicable provisions of Bankruptcy Rules 3017(d)-(f) and the Solicitation Order.  Therefore, the requirements of Bankruptcy Rule 3017 have been satisfied.

S.      *Bankruptcy Rule 3018*.  The solicitation of votes to accept or reject the Third Amended Plan satisfies Bankruptcy Rule 3018.  The Third Amended Plan was transmitted to all holders of Claims entitled to vote, sufficient time was prescribed for such parties to accept or reject the Third Amended Plan, and the Solicitation Materials used and Solicitation Procedures followed comply with sections 1125 and 1126, thereby satisfying the requirements of Bankruptcy Rule 3018.  Further, the Chapter 11 Trustee filed the Ballot Tabulation in accordance with the provisions of the Solicitation Order.

T.      *Burden of Proof*.  The Chapter 11 Trustee, as proponent of the Plan, has the burden of proving the elements of sections 1122, 1123 and 1129 of the Bankruptcy Code by a preponderance of the evidence.  The Court finds that the Chapter 11 Trustee has met each element of such burden with respect to the Plan.

U.      *Judicial Notice*.  The Court takes judicial notice of the entire record of proceedings in the Chapter 11 Cases and related adversary proceedings, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Court during the Chapter 11 Cases and related adversary proceedings, including, without limitation, the Combined Hearing.  Any resolutions of objections to final approval of the Disclosure Statement or confirmation of the Plan explained on the record at the Combined Hearing are hereby incorporated by reference.

V.      *The Record*.  The record established at the Combined Hearing (the "Record") to support final approval of the Disclosure Statement and confirmation of the Plan includes:

      (i)      All documents identified by the Chapter 11 Trustee at the Combined Hearing and all exhibits admitted into evidence at the Combined Hearing, including but not limited to admitted exhibits which are listed on the *Joint*

Appellee Appx. 00556
Appx. 10807

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 4/24/23 Page 674 of 1392   PageID 15416
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 563 of 1803   PageID 11309
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 13 of 229

*Witness and Exhibit List* [Docket No. 767] filed jointly by the Chapter 11 Trustee, Highland and HCLOF with the Court on December 7, 2018;

(ii)    The Ballot Tabulation;

(iii)   The testimony of witnesses; and

(iv)   The statements and arguments of counsel.

W.    *Objections to Final Approval of Disclosure Statement and Confirmation of Plan*.

The Solicitation Order established November 26, 2018 as the deadline for filing objections to final approval of the Disclosure Statement and/or confirmation of the Plan.  The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order:

(i)    *Objection by Stinson Leonard Street LLP to Debtors' Second Modification to the Third Amended Joint Plan* [Docket No. 720];

(ii)   *Joint Objection of Highland Capital Management, L.P. and Highland CLO Funding, Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket no. 722]; and

(iii)  *Objection of Neutra Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 723].

X.    *Transfer and Vesting of Assets*.  Pursuant to Article VI of the Plan, all Assets shall be transferred to and vested in the Reorganized Debtor as of the Effective Date.  The transfer of the Assets to the Reorganized Debtor pursuant to the Plan is consistent with, and authorized by, section 1123(a)(5)(B) of the Bankruptcy Code and will be fully effectuated through this Order as of the Effective Date without the necessity of any other or further assignment or transfer.

Y.    *Claim Objections and Resolutions*.  Pursuant to the Plan, the Reorganized Debtor has the sole power and exclusive standing and authority to object to any Claim.  Without limiting the generality of the foregoing, the Reorganized Debtor shall have the power:  (i) to

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 03/03/18 04 age 675 of 1392    PageID 15417
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 564 of 1803    PageID 11310
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 14 of 229

object to any Claim on any legal or equitable basis; (ii) to seek subordination of any Claim on any legal or equitable basis; (iii) to assert any right of setoff or recoupment, including without limitation, any such right pursuant to section 553 of the Bankruptcy Code; (iv) to assert any and all Estate Defenses to any Claim, whether legal or equitable, including any affirmative defenses or any right of setoff; (v) to assert all Estate Claims as a counterclaim against any Claim, whether arising out of the same or different transactions, both for an affirmative recovery and as an offset against any such Claim; and (vi) to object to any Claims on the basis of section 502(d). Vesting such exclusive power and standing in the Reorganized Debtor is reasonable and appropriate, and is authorized by, and in compliance with, section 1123(b)(3) of the Bankruptcy Code.

Z.    _Compliance with the Requirements of Section 1129 of the Bankruptcy Code_. The Plan complies with the applicable provisions of the Bankruptcy Code, as follows:

(i)    _Section 1129(a)(1) – Compliance of the Plan with the Applicable Provisions of the Bankruptcy Code_.  The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.

(a)    _Sections 1122 and 1123(a)(1) – Proper Classification_.  The classification of Claims and Interests in the Plan is proper under the Bankruptcy Code. Pursuant to sections 1122(a) and 1123(a)(1), the Plan provides for the separate classification of Claims and Interests into six (6) Classes (Class 1, Class 2, Class 3, Subclass 4A, Subclass 4B and Class 5), based on differences in the legal nature and priority of such Claims and Interests (other than Claims for Administrative Expenses, Priority Tax Claims and U.S. Trustee's quarterly fees, which are not required to be designated as separate Classes pursuant to section 1123(a)(1)).  Based upon the Record, valid business, factual and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not created for any improper purpose and the creation of such Classes

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 4/26/07 3/18/04ge 676 of 1392   PageID 15418
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 565 of 1803   PageID 11311
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 15 of 229

does not unfairly discriminate between or among holders of Claims or Interests. In accordance with section 1122(a), each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. Accordingly, the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code have been satisfied.

(b)     _Section 1123(a)(2) – Specification of Unimpaired Classes_. The Plan specifies that Claims in Class 1 are unimpaired under the Plan. Therefore, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

(c)     _Section 1123(a)(3) – Specification of Treatment of Impaired Classes_. Other than Class 1, all Classes of Claims and Interests (Class 2, Class 3, Subclass 4A, Subclass 4B and Class 5) are Impaired under the Plan. The Plan specifies the treatment of each Impaired Class of Claims and Interests under the Plan. The treatment of Impaired Classes of Claims and Interests is specified in Article IV of the Plan. Therefore, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

(d)     _Section 1123(a)(4) – No Discrimination_. The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest. Therefore, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

(e)     _Section 1123(a)(5) – Adequate Means for Plan Implementation_. The Plan provides for adequate and proper means for the Plan's implementation. This includes means for implementation set forth in Article VI of the Plan. Therefore, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

(f)     _Section 1123(a)(6) – Prohibition on Issuance of Non-Voting Securities_. The Debtors are not corporations. Therefore, section 1123(a)(6) of the Bankruptcy Code is inapplicable.

(g)     _Section 1123(a)(7) – Selection of Officers, Directors and Trustees_. Under the Plan, Terry shall receive 100% of the equity interests in the Reorganized Debtor. The

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68 6   Filed 2/09/23   Page 677 of 1392   PageID 15419
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 566 of 1803   PageID 11312
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 16 of 229

Plan does not provide for the selection or appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized Debtor's management as he wishes. Therefore, to the extent section 1123(a)(7) of the Bankruptcy Code is applicable to the Plan, its requirements have been satisfied.

(h)     *Section 1123(a)(8) – Payment of Individual Debtor's Earnings*. The Debtors are not individuals.  Therefore, section 1123(a)(8) of the Bankruptcy Code is inapplicable.

(i)     *Section 1123(b) – Discretionary Contents of the Plan*.  The Plan contains various provisions that are properly construed as discretionary and not required for confirmation of the Plan under the Bankruptcy Code.  As set forth below, all such discretionary provisions comply with section 1123(b) of the Bankruptcy Code, are not inconsistent with the applicable provisions of the Bankruptcy Code and are hereby approved.  Therefore, section 1123(b) of the Bankruptcy Code has been satisfied.

(1)     *Section 1123(b)(1) – Impairment / Unimpairment of Claims and Interests*.  The Plan impairs or leaves unimpaired each Class of Claims and Interests. Therefore, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

(2)     *Section 1123(b)(2) – Assumption / Rejection of Executory Contracts and Unexpired Leases*.  Article XI of the Plan provides that all of the Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Court, (b) is identified in **Exhibit 5** to this Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date.  Therefore, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 05/03/23    Page 678 of 1392    PageID 15420
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 567 of 1803    PageID 11313
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 17 of 229

(3)    *Section 1123(b)(3) – Settlement / Retention of Claims and Causes of Action*.  The Chapter 11 Trustee has delineated the Estate Claims and Estate Defenses to be retained in the Plan.  The terms "Estate Claims" and "Estate Defenses" are defined in sections 1.55 and 1.56 of the Plan, respectively, and together include all claims, causes of action, defenses, affirmative defenses, counterclaims, or offsets held by the Debtors' Estate.  The identification and retention of the Estate Claims and Estate Defenses in the Plan is reasonable and appropriate and reflects a proper exercise of the good faith business judgment of the Chapter 11 Trustee.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor and the Reorganized Debtor shall be entitled to file, prosecute and/or settle each of the Estate Claims so reserved in accordance with the terms of the Plan.  The provisions of the Plan regarding reservation of Estate Claims and Estate Defenses are appropriate and in the best interests of the Debtors, the Estate, and holders of Claims and Interests.

(4)    *Section 1123(b)(5) – Modification of Creditors' Rights*.  With the exception of holders of Class 1 Claims, which are unimpaired, the Plan modifies the rights of all holders of Claims against the Debtors.  Accordingly, the Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

(ii)    *Section 1129(a)(2) – Compliance of the Chapter 11 Trustee with the Applicable Provisions of the Bankruptcy Code*.  The Chapter 11 Trustee, as proponent of the Plan, has complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1127 and

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 05/23/2804    Page 679 of 1392    PageID 15421
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 568 of 1803    PageID 11314
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 18 of 229

1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.  Votes to accept or reject the Third Amended Plan were solicited after the Court conditionally approved the adequacy of the Disclosure Statement.  The Chapter 11 Trustee and his present and former representatives, advisors, attorneys, professionals and agents have solicited and tabulated the votes on the Third Amended Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly and in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.  The Chapter 11 Trustee and his present and former representatives, advisors, attorneys, professionals and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with respect to the offering, issuance and distribution of recoveries under the Plan and, therefore, are not (and on account of such distributions, will not be) liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Third Amended Plan or distributions made pursuant to the Plan, so long as distributions are made consistent with and pursuant to the Plan.

　　　　(iii)    *Section 1129(a)(3) – Proposal of the Plan in Good Faith*.  The Chapter 11 Trustee has proposed the Plan (and all other agreements, documents and instruments necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Court has examined and considered the totality of the circumstances surrounding the formulation of the Plan, including both the Record at the Combined Hearing and the record of the Chapter 11 Cases.  The Chapter 11 Trustee's good faith is evident from the facts and Record of the Combined Hearing.  The Chapter 11 Trustee proposed the Plan for legitimate and honest purposes.

Appellee Appx. 00562
Appx. 10564

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 01/20/23   Page 680 of 1392   PageID 15422
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 569 of 1803   PageID 11315
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 19 of 229

(iv)     <u>*Section 1129(a)(4) – Court Approval of Certain Payments as Reasonable*</u>.

All payments made or to be made by the Reorganized Debtor for services or for costs and

expenses in or in connection with the Chapter 11 Cases or in connection with the Plan and

incident to the Chapter 11 Cases, have either been approved by, or are subject to final approval

of, the Court as reasonable.  Notwithstanding anything to the contrary in the Plan, the provisions

of section 3.01(e) of the Plan governing the filing of final fee applications by Estate

Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to

the Chapter 11 Trustee.  Compensation sought by the Chapter 11 Trustee through a final fee

application shall be subject to final approval of the Court as reasonable in accordance with

section 330(a)(3) of the Bankruptcy Code.  Therefore, the requirements of section 1129(a)(4) of

the Bankruptcy Code are satisfied.

(v)     <u>*Section 1129(a)(5) – Disclosure of Identity of Proposed Management,*</u>

<u>*Compensation of Insiders and Consistency of Management Proposals with the Interests of*</u>

<u>*Creditors and Public Policy*</u>.  Under the Plan, Terry, who does not constitute an Insider, shall

receive 100% of the equity interests in the Reorganized Debtor.  The Plan does not provide for

appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and

Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized

Debtor's management as he wishes.  Terry's identity and affiliations have been fully disclosed

and, to the extent that Terry serves as an officer of the Reorganized Debtor after confirmation of

the Plan, Terry's appointment to any such role is consistent with the interests of Creditors,

holders of Interests and public policy.  Therefore, the requirements of section 1129(a)(5) of the

Bankruptcy Code are satisfied.

(vi)     <u>*Section 1129(a)(6) – No Rate Changes*</u>.  The Plan does not contain any

rate changes subject to the jurisdiction of any governmental regulatory commissions and will not

require governmental regulatory approval.  Therefore, section 1129(a)(6) is not applicable to the

Chapter 11 Cases.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 12/29/23 Page 681 of 1392    PageID 15423
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 570 of 1803    PageID 11316
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 20 of 229

(vii)    *Section 1129(a)(7) – Best Interest of Creditors Test*.  The Plan satisfies

section 1129(a)(7).  The Liquidation Analysis attached as Exhibit 4 to the Disclosure Statement

and the other exhibits and evidence proffered or adduced at the Combined Hearing related

thereto: (a) are persuasive and credible; (b) have not been controverted by other evidence; (c)

are based upon sound methodology; and (d) conclusively establish that each holder of an

Impaired Claim or Interest either (1) has accepted the Plan, or (2) will receive or retain under the

Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date,

that is not less than the amount that such holder would receive or retain if the Debtors were

liquidated under chapter 7 of the Bankruptcy Code on such date.

(viii)    *Section 1128(a)(8) – Conclusive Presumption of Acceptance by
Unimpaired Classes; Acceptance of Plan by Each Impaired Class*.  Class 1 is unimpaired under

the Plan and is conclusively presumed to have accepted the Plan under section 1126(f) of the

Bankruptcy Code.  Classes 2 and 3 are Impaired under the Plan and have voted to accept the

Plan.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Class 5 is Impaired

under the Plan.  Holders of Class 5 Interests will not receive or retain any property on account of

their Interests under the Plan and are therefore conclusively deemed to have rejected the Plan

under section 1126(g) of the Bankruptcy Code.  Notwithstanding the fact that the Plan was not

accepted by all Classes of Impaired Claims and Interests, the Plan is confirmable because it

satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

(ix)    *Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to
Section 507(a) of the Bankruptcy Code*.  The treatment of Allowed Claims for Administrative

Expenses and Priority Tax Claims under Article III of the Plan satisfies the requirements of, and

complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.  Accordingly, the

requirements of section 1129(a)(9) are satisfied.

(x)    *Section 1129(a)(10) – Acceptance by at Least One Impaired Class*.  As

set forth in the Ballot Tabulation and in this Order, Classes 2 and 3 voted to accept the Plan.  As

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-35    Filed 05/22/23    Page 682 of 1392    PageID 15424
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 571 of 1803    PageID 11317
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 21 of 229

such, at least one Class of Claims that is Impaired under the Plan has accepted the Plan without including the acceptance of the Plan by any Insider. Therefore, the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

(xi)    *Section 1129(a)(11) – Feasibility of the Plan*. The evidence submitted at the Combined Hearing regarding feasibility, together with all evidence proffered or advanced at or prior to the Combined Hearing, (a) is persuasive and credible, (b) has not been controverted by other evidence, and (c) establishes that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtor. Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been satisfied.

(xii)    *Section 1129(a)(12) – Payment of Bankruptcy Fees*. The Plan provides that all fees due and payable under 28 U.S.C. section 1930 as of the Confirmation Date will be paid in full on the Effective Date or as soon thereafter as is practicable, thus satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

(xiii)    *Section 1129(a)(13), (14), (15) and (16) – Non-Applicability*. The Debtors do not provide any retiree benefits within the meaning of section 1114, do not owe any domestic support obligations, are not individuals, and are not non-profit corporations. Thus, sections 1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16) do not apply to the Chapter 11 Cases.

(xiv)    *Section 1129(b) – Confirmation of the Plan Over Non-Acceptance of Impaired Classes*. Class 4 is Impaired under the Plan and voted to reject the Plan. Holders of Class 5 Interests are deemed to have rejected the Plan. Nevertheless, the Plan may be confirmed pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that the requirements of section 1129(a)(8) have not been met because the Chapter 11 Trustee has demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the other requirements of section 1129(a) of the Bankruptcy Code and (b) does not "discriminate unfairly" and is "fair and equitable" as to each Impaired Class which has not voted to accept (or is

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Exhibit 6   Page 472 of 1804   Page 683 of 1392   PageID 15425
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 572 of 1803   PageID 11318
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 22 of 229

deemed to reject) the Plan.  The Plan therefore satisfies the requirements of section 1129(b) of
the Bankruptcy Code and may be confirmed despite the fact that not all Impaired Classes have
voted to accept the Plan.

(xv)     *Section 1129(c) – Only One Plan*.  Other than the Plan (including
previous versions thereof), no other plan has been filed in the Chapter 11 Cases.  Accordingly,
the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

(xvi)    *Section 1129(d) – Principal Purpose of the Plan is Not the Avoidance of
Taxes*.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of
application of Section 5 of the Securities Act of 1933 and there has been no filing by a
Governmental Unit asserting any such attempted avoidance.  Therefore, the requirements of
section 1129(d) of the Bankruptcy Code are satisfied.

(xvii)   *Section 1129(e) – Small Business Case*.  Neither of the Chapter 11
Cases is a "small business case," as that term is defined in the Bankruptcy Code and,
accordingly, section 1129(e) is inapplicable to the Chapter 11 Cases.

AA.     *Executory Contracts and Unexpired Leases*.  The Chapter 11 Trustee has
satisfied the provisions of section 365 of the Bankruptcy Code with respect to the assumption
and rejection of the Executory Contracts and Unexpired Leases pursuant the Plan.  The
Chapter 11 Trustee has exercised reasonable business judgment prior to the Combined
Hearing in determining whether to assume or reject each of the Executory Contracts and
Unexpired Leases as set forth in Article XI of the Plan, **Exhibit "5"** to this Order, or otherwise.
Each assumption or rejection of an Executory Contract or Unexpired Lease pursuant to this
Order and in accordance with Article XI of the Plan, or otherwise by order of this Court, shall be
valid, legal, and binding upon the applicable Debtor, Reorganized Debtor, Estate, and all non-
Debtor persons or entities party to such Executory Contract or Unexpired Lease.  Executory
Contracts and Unexpired Leases not previously assumed by order of this Court and which the
Chapter 11 Trustee has determined to assume are identified in **Exhibit "5"** to this Order.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-35   Filed 4/24/23 Page 684 of 1392   PageID 15426
Exhibit 35   Page 574 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 573 of 1803   PageID 11319
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 23 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in **Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments, provide any other compensation, cure any nonmonetary defaults, or provide adequate assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to the assumption of such Executory Contracts and Unexpired Leases.

BB.     *Compromise and Settlement*.  The Court finds and concludes that, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of the Distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Impaired Claims and Interests.  Such settlement and compromise, which was made at arms'-length in exchange for good and valuable consideration, is in the best interests of the holders of Impaired Claims and Interests, is within the range of possible litigation outcomes, and is fair, equitable, and reasonable.  Each element of the compromise and settlement reflected in the Plan is integrated and inexorably linked.

CC.     *Plan Injunction*.  The Plan Injunction is necessary and appropriate to facilitate the transactions and distributions to Creditors pursuant to the Plan.  The Plan Injunction constitutes an essential and integral part of the Plan without which the holders of Claims against the Debtors could potentially interfere with implementation and performance of the Plan.  The Plan Injunction protects the best interests of the holders of Allowed Claims and facilitates the efficient performance of the Plan.  Consequently, the Plan Injunction is appropriate pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code.

DD.     *Temporary Plan Injunction*.  The Temporary Plan Injunction (as defined herein) is a temporary injunction which provides for the continuation, after the Effective Date, of injunctive relief the Court previously granted in its *Preliminary Injunction Order* (the "Preliminary Injunction") [Docket No. 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the Trustee's Adversary.  The Preliminary Injunction was originally set to expire by its own terms

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 12/23/23   Page 685 of 1392   PageID 15427
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 574 of 1803   PageID 11320
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 24 of 229

upon confirmation of the Plan, but is extended by this Order through the Effective Date of the Plan. Based on the record of prior proceedings in the Chapter 11 Cases, including in the Trustee's Adversary, and the Record at the Combined Hearing, no grounds have been shown to give the Court reason to reconsider any findings supporting its prior Preliminary Injunction. Furthermore, as set forth below, the Record at the Combined Hearing demonstrates that the four elements required for issuance of injunctive relief are present, the Temporary Plan Injunction is necessary and appropriate in all respects, and it complies with the applicable requirements of the Bankruptcy Rules.

(i)  *Substantial Likelihood of Success on the Merits*. In the Highland Adversary, the Chapter 11 Trustee has asserted a counterclaim seeking to avoid the prepetition transfer of Acis LP's rights under the ALF PMA (the "ALF PMA Transfer") as a fraudulent transfer under the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act. Such fraudulent transfer actions seek an equitable remedy and involve claims to specific assets of Highland HCF. But for the ALF PMA Transfer, HCLOF could not have attempted to direct and effectuate an optional redemption of the Acis CLOs (which it has twice attempted to do postpetition in the Chapter 11 Cases). The rights transferred in the ALF PMA Transfer appear to have been fraudulently transferred for no apparent value. The Court found in the Preliminary Injunction, and the Court finds again for purposes of this Order, that the Chapter 11 Trustee has demonstrated a substantial likelihood of success on the merits of his claim to avoid the ALF PMA Transfer as a fraudulent transfer.

(ii)  *Irreparable Harm*. Revenue to be generated by the Reorganized Debtor under the PMAs is a primary source of funding Distributions to Creditors under the Plan. Absent the Temporary Plan Injunction, HCLOF will be free to direct an optional redemption before this Court can adjudicate the fraudulent transfer actions with respect to the ALF PMA Transfer. Such an optional redemption – or similar call or liquidation of the Acis CLOs – would not only render such fraudulent transfer actions moot, but would effectively terminate and destroy all

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 05/26/23    Page 686 of 1392    PageID 15428
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 575 of 1803    PageID 11321
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 25 of 229

value in the PMAs.  This would, in turn, effectively destroy the Reorganized Debtor's ability to perform under the Plan to the detriment of the Reorganized Debtor, Creditors and other parties-in-interest.  Consequently, the Reorganized Debtor faces immediate and irreparable harm if the Temporary Plan Injunction is not issued.

(iii)    *Balance of Harms*.  The balance of harms weighs in favor of issuing the Temporary Plan Injunction because any alleged harm to HCLOF, Highland or their affiliates is substantially outweighed by the imminent and irreparable harm that would be suffered by the Reorganized Debtor, Creditors and other parties-in-interest if the Temporary Plan Injunction is not issued and an optional redemption, call or other liquidation of the Acis CLOs follows.  At a minimum, the Temporary Plan Injunction is appropriate to maintain the status quo pending adjudication of the fraudulent transfer actions with respect to the ALF PMA Transfer.  Highland, HCLOF and their affiliates will not suffer any material, recognizable harm if temporarily enjoined from pursuing an optional redemption, call or other liquidation of the Acis CLOs before the Court adjudicates the fraudulent transfer actions concerning the ALF PMA Transfer and thereby determines whether HCLOF has any legitimate right to direct an optional redemption, call or other liquidation of the Acis CLOs in the first instance.

(iv)    *Public Policy*.  Public policy favors maximization of a debtor's assets and successful reorganization.  Because an optional redemption, call or other liquidation of the Acis CLOs would destroy the value of the PMAs and the Reorganized Debtor's ability to perform under the Plan, issuance of the Temporary Plan Injunction is consistent with public policy.  Furthermore, public policy favors disposition of cases on their merits.  Absent the Temporary Plan Injunction, HCLOF could be expected to immediately direct an optional redemption, call or other liquidation of the Acis CLOs following confirmation of the Plan, thus rendering the fraudulent transfer actions concerning the ALF PMA Transfer moot.  Issuance of the Temporary Plan Injunction will avoid the potential for such fraudulent transfer actions being mooted prior to adjudication of such actions on their merits and is consistent with public policy.

Appellee Appx. 00569
Appx. 10820

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/29/23 1804age 687 of 1392   PageID 15429
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 576 of 1803   PageID 11322
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 26 of 229

(v)    _Section 105(a)_.  Section 105(a) empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  The Temporary Plan Injunction is essential to the Reorganized Debtor's ability to perform the Plan and to maintain the status quo during prosecution of the fraudulent transfer actions concerning the ALF PMA Transfer.  The Temporary Plan Injunction is therefore both necessary and appropriate to carry out the provisions of the Bankruptcy Code in the Chapter 11 Cases.

(vi)    _Compliance with Technical Requirements_.  Bankruptcy Rule 3020(c) requires that the Temporary Plan Injunction (a) describe the acts enjoined in reasonable detail; (b) be specific in its terms with regard to the injunction; and (c) identify the entities subject thereto.  The Temporary Plan Injunction satisfies each of these requirements.  The description of acts enjoined is specific and particular and the language of the Temporary Plan Injunction is therefore reasonably detailed.  The Temporary Plan Injunction is also specific in its terms, as its language clearly describes the condition triggering the injunction and the specific events which will serve to terminate it.  The Temporary Plan Injunction also specifically identifies the entities subject to its terms.  Federal Rule of Civil Procedure 65(d)(1), made applicable by Bankruptcy Rule 7065, also requires that the Temporary Plan Injunction be specific in its terms and describe the enjoined acts in reasonable detail.  Federal Rule of Civil Procedure 65(d)(1) further requires that the reasons for issuance of the Temporary Plan Injunction are stated.  The reasons for this Court's issuance of the Temporary Plan Injunction are stated herein.  Therefore, the Temporary Plan Injunction satisfies all requirements of the applicable Bankruptcy Rules.

EE.    _Substantive Consolidation of the Debtors_.  The Court finds and concludes that the substantive consolidation of the Debtors for the purpose of implementing the Plan, including for purposes of distributions under the Plan, is in the best interests of the Debtors, the Estate, and holders of Claims and Interests.  Substantive consolidation recognizes the Debtors' common business purpose and the fact that Acis GP's liability is derived from the liabilities of

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/20/23    Page 688 of 1392    PageID 15430
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 577 of 1803    PageID 11323
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 27 of 229

Acis LP based on Acis GP's status as general partner of Acis LP.  The Court further finds that substantive consolidation of the Debtors constitutes an integral part of the Plan.

FF.    *Retention of Jurisdiction*.  This Court finds and concludes that this Court's retention of jurisdiction as set forth herein and in the Plan comports with 28 U.S.C. sections 157 and 1334.  Consequently, the Court may properly retain jurisdiction over the matters set forth in Article XV of the Plan.

GG.    *Implementation of Other Necessary Documents and Agreements*.  All documents and agreements necessary to implement the Plan are essential elements of the Plan and entry into and consummation of the transactions contemplated by each of such documents and agreements is in the best interests of the Debtors, the Estate, and holders of Claims and Interests.  The Chapter 11 Trustee has exercised reasonable business judgment in determining which agreements to enter into and has provided sufficient and adequate notice of such documents and agreements.  The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's length, are fair and reasonable, and are reaffirmed and approved.

HH.    *Conditions Precedent to the Effective Date*.  Each of the conditions precedent to the Effective Date, as set forth in Article XIII of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied or waived.

II.    *Satisfaction of Confirmation Requirements*.  Based upon the foregoing, all other filed pleadings, exhibits and documents filed in connection with confirmation of the Plan and all evidence and arguments made, proffered, or adduced at the Combined Hearing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

## ORDER

Based on the foregoing, it is hereby ORDERED:

1.    <u>Findings of Fact and Conclusions of Law</u>.  The above-referenced findings of fact and conclusions of law are incorporated by reference as though fully set forth herein.  To the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 05/30/23    Page 689 of 1392    PageID 15431
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 578 of 1803    PageID 11324
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 28 of 229

extent any of the prior findings of fact or conclusions of law constitutes an order of this Court, they are adopted as such.

2.    <u>Objections to Final Approval of Disclosure Statement and Confirmation of Plan</u>. To the extent that any of the Objections have not been resolved, withdrawn, waived or settled prior to entry of this Order or otherwise resolved as stated on the Record of the Combined Hearing or as set forth in this Order, they are hereby overruled on their merits.

3.    <u>Final Approval of Disclosure Statement</u>.  The Disclosure Statement is hereby approved on a final basis as containing adequate information as required by section 1125 of the Bankruptcy Code.

4.    <u>Confirmation of Plan</u>.  All requirements for confirmation of the Plan have been satisfied.  The Third Amended Plan, as modified by the First Modification and Second Modification (as supplemented) and as modified herein, is hereby CONFIRMED in accordance with section 1129 of the Bankruptcy Code, and all terms and conditions set forth in the Plan are hereby APPROVED.  The terms of the Plan are incorporated by reference into, and as an integral part of, this Order.

5.    <u>Solicitation and Notice</u>.  Notice of the Combined Hearing complied with the terms of the Solicitation Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and was in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.  The solicitation of votes on the Third Amended Plan and the Solicitation Materials complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

6.    <u>Plan Classification Controlling</u>.  The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-3    Filed 05/03/18    Page 690 of 1392    PageID 15432
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 579 of 1803    PageID 11325
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 29 of 229

accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding upon the Debtors and the Reorganized Debtor except for voting purposes.

7.    <u>Resolution of Stinson Objection</u>.    Stinson Leonard Street LLP ("<u>Stinson</u>") has asserted a Claim against the Debtors for $158,552.98.  On July 31, 2018, Stinson initially asserted its Claim as an unsecured Claim by filing proof of Claim number 12 in the Acis LP case and proof of claim number 2 in the Acis GP case.  Those Claims represent a single Claim for satisfaction of a total alleged debt of $158,552.89.  All proofs of Claim filed by Stinson will be referred to collectively as the "<u>Stinson Claim</u>."  The Stinson Claim is treated as part of Class 3 under the Plan.  On November 9, 2018, Stinson amended the Stinson Claim to assert a secured Claim based on a possessory lien on legal files belonging to the Debtors.  The Chapter 11 Trustee currently intends to object to the Stinson Claim, including Stinson's claim to secured status.  Stinson filed an Objection to the Plan on November 26, 2018 [Docket No. 720] which was subsequently withdrawn based on this proposed paragraph being included in any Order confirming the Plan.  This paragraph resolves Stinson's Objection as follows:  Notwithstanding any contrary provision of the Plan or this Order, the Stinson Claim, to the extent it is Allowed by a Final Order of the Bankruptcy Court as a Secured Claim, shall be considered a separate class under the Plan and paid by the Reorganized Debtor within thirty (30) days after entry of such Final Order.  To the extent it is an Allowed Secured Claim, the Stinson Claim will be removed from Class 3.  To the extent it is an Allowed General Unsecured Claim, the Stinson Claim will remain a Class 3 Claim.  This recognizes that the Stinson Claim may be allowed as partly secured (*i.e.* only secured to the extent of the value of its collateral) and be paid accordingly. The Chapter 11 Trustee reserves all rights to object to Stinson's proofs of Claim, and Stinson reserves all rights to defend its proofs of Claim.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-35   Filed 02/23/18 04 Page 691 of 1392   PageID 15433
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 580 of 1803   PageID 11326
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 30 of 229

8.      <u>Plan Implementation</u>.  Upon the Effective Date of the Plan, the Chapter 11

Trustee and the Reorganized Debtor are hereby authorized and directed to take all actions

necessary or appropriate to implement, effectuate or consummate the Plan, the terms of this

Order and the transactions respectively contemplated therein, and to otherwise fully perform

and execute their duties under the Plan or this Order.  Without limiting the generality of the

foregoing, pursuant to section 1142(b) of the Bankruptcy Code, each and every Person

(including, without limitation, the Chapter 11 Trustee, HCLOF, Highland, any and all affiliates of

HCLOF and Highland, the Issuers and Co-Issuers, and the Indenture Trustee), to the extent

necessary, is hereby directed to execute or deliver, or to join in the execution or delivery of, any

instrument required to effect the transfers of property dealt with under the Plan and this Order,

and to perform all other acts necessary for the consummation of the Plan.  Further pursuant to

section 1142(b) of the Bankruptcy Code, to the extent that any Person fails to execute or deliver

any instrument required to effect the transfers of property pursuant to the Plan and this Order,

the Chapter 11 Trustee is hereby authorized to execute and deliver on behalf of any such

Person (including, without limitation, HCLOF, Highland, and any and all affiliates of HCLOF and

Highland) any instrument required to effect the transfers of property pursuant to the Plan and

this Order.  In the event of an appeal of this Order, the Chapter 11 Trustee and the Reorganized

Debtor are hereby authorized and directed to take all steps necessary to make the Plan

effective and, from and after the Effective Date, execute their duties, responsibilities and

obligations under the Plan, this Order and the Plan Documents unless and until this Order is

stayed by order of a court of appropriate jurisdiction.

9.      <u>Restructuring Transactions</u>.  On the Effective Date or as soon as reasonably

practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or

appropriate to effect any transaction described in, approved by, contemplated by, or necessary

to effectuate the Plan; <u>provided</u>, <u>however</u>, that no such restructuring transactions may violate

the terms of any assumed Executory Contract or Unexpired Lease.

**Appellee Appx. 00574**
**APPX. 10326**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-5   Filed 05/22/23   Page 692 of 1392   PageID 15434
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 581 of 1803   PageID 11327
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 31 of 229

10.     Approval of Plan Documents.  The form and substance of the Plan Documents are all hereby APPROVED.  The Chapter 11 Trustee is authorized and directed, without the need for further corporate or other organizational action by or on behalf of the Debtors or further order or authorization of this Court, to take such actions and do all things as may be necessary or required to implement and effectuate the Plan Documents and to make the Plan effective.

11.     Transfer and Vesting of Assets; Assumption of Obligations.  On the Effective Date, without the execution of any other or further document or any further order by the Court, all Assets shall be deemed as fully, completely and irrevocably transferred to, and vested in, the Reorganized Debtor in accordance with the Plan.  All transfers of Assets to the Reorganized Debtor shall be free and clear of all Liens, Claims, rights, Interests and charges, except as otherwise expressly provided in the Plan or any agreement, instrument, or other document incorporated therein, or this Order.  Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the obligations to make all Distributions pursuant to the Plan and this Order.

12.     Estate Claims and Estate Defenses.  Upon the Effective Date, without the necessity of the execution of any further documents or further order of the Court, all Estate Claims and Estate Defenses, including without limitation all Estate Claims and Estate Defenses identified in Exhibit A to the Plan, shall be deemed as fully, completely and irrevocably transferred to, and vested in, the Reorganized Debtor.  From and after the Effective Date, the Reorganized Debtor shall have the exclusive standing and authority to assert, prosecute, collect, compromise and settle all Estate Claims and Estate Defenses pursuant to the terms of the Plan.

13.     Treatment of Executory Contracts and Unexpired Leases.  The Executory Contract and Unexpired Lease provisions of Article XI of the Plan, as modified herein, are hereby approved in their entirety.  The assumption of Executory Contracts and Unexpired Leases as set forth in the Plan, this Order, and **Exhibit "5"** to this Order are hereby approved.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 03/23/18 04    Page 693 of 1392    PageID 15435
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 582 of 1803    PageID 11328
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 32 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.  All other Executory

Contracts and Unexpired Leases that have not been previously assumed or rejected shall be

deemed as rejected as of the Effective Date in accordance with the terms of the Plan.  All

Rejection Claims must be filed within the time specified in section 11.03 of the Plan, failing

which any such Rejection Claim shall be forever barred and precluded from receiving any

Distribution pursuant to the Plan.  Notwithstanding anything to the contrary herein or in the Plan,

Exhibit 5 to this Order hereby replaces, is substituted for, and supersedes Exhibit B to the Third

Amended Plan and any explicit or inferred references herein or in the Plan to Exhibit B to the

Third Amended Plan shall refer to Exhibit 5 to this Order.

14.    <u>Executory Contracts with Issuers and Co-Issuers</u>.  Pursuant to the Plan and as

provided in this Order, the Debtors are authorized to assume executory contracts that include as

a party ACIS CLO 2014-3 Ltd., ACIS CLO 2014-4 Ltd., ACIS CLO 2014-5 Ltd., ACIS CLO 2015-

6 Ltd., ACIS CLO 2014-3 LLC, ACIS CLO 2014-4 LLC, ACIS CLO 2014-5 LLC, and/or ACIS

CLO 2015-6 LLC solely if and to the extent that one or more of the Debtors is a signatory to

each such executory contract.

15.    <u>Approval of Brigade as Sub-Advisor and Shared Services Provider</u>.  Pursuant to

an *Order Granting Emergency Motion to Approve Replacement Sub-Advisory and Shared*

*Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services*

*LLC* [Docket No. 464] entered on August 1, 2018, the Court authorized the Chapter 11 Trustee

to engage Brigade Capital Management, LP ("<u>Brigade</u>") and Cortland Capital Markets Services

LLC to perform the services previously provided by Highland under the Sub-Advisory

Agreement and Shared Services Agreement, on an interim basis.  The Chapter 11 Trustee

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 04/24/23    Page 694 of 1392    PageID 15436
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 583 of 1803    PageID 11329
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 33 of 229

selected Brigade as the party to provide both sub-advisory and shared services to the

Reorganized Debtor.  Based on the record of prior proceedings in the Chapter 11 Cases and

the Record at the Combined Hearing, the Chapter 11 Trustee has demonstrated that Brigade is

fully qualified to perform such services, and that the Chapter 11 Trustee's selection of Brigade is

an exercise of his sound business judgment.  Furthermore, adequate assurance of future

performance by Brigade has been shown.  Therefore, the selection of Brigade as the provider to

the Reorganized Debtor of the sub-advisory and shared services previously provided by

Highland under the Sub-Advisory Agreement and Shared Services Agreement is hereby

approved in all respects.

16.    <u>Substantive Consolidation</u>.  The substantive consolidation of the Debtors for

purposes of implementation of and distributions under the Plan is hereby approved as of the

Effective Date such that on the Effective Date:  (a) all assets and liabilities of the Debtors will be

deemed merged; (b) all guaranties by one Debtor of the obligations of the other Debtor will be

deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed

by the other Debtor and any joint or several liability of the Debtors will be deemed to be one

obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the

case of either of the Debtors will be deemed filed against the consolidated Debtors and will be

deemed one Claim against and a single obligation of the consolidated Debtors.

17.    <u>Compromise and Settlement</u>.  Pursuant to section 363 of the Bankruptcy Code

and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and

other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith

compromise and settlement of all Claims, Interests and controversies subject to, or dealt with,

under the Plan, including, without limitation, all Claims against the Debtors or Estate arising

prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or

unasserted, fixed or contingent, arising out of, relating to or in connection with the business or

affairs of, or transactions with, the Debtors or the Estate.  The entry of this Order constitutes the

Appellee Appx. 00577
Appx. 10579

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6835 Filed 02/23/18 04 Page 695 of 1392 PageID 15437
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 584 of 1803 PageID 11330
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 34 of 229

Court's approval of each of the foregoing compromises or settlements embodied in the Plan, and all other compromises and settlements provided for in the Plan, as well as a finding by the Court that such compromises and settlements are in the best interest of the Debtors, the Estate, holders of Claims and Interests, and other parties-in-interest, and are fair, equitable and within the range of reasonableness. The rights afforded in the Plan and the treatment of all Claims and Interests therein are in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets. Except as otherwise provided in the Plan or this Order, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's assets, the Estate, or the Assets, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

18. <u>Discharge</u>. Except for the obligations expressly set forth in the Plan or this Order, on the Effective Date, the Debtors, the Reorganized Debtor and their successors in interest and assigns shall be deemed and they each are discharged and released to the fullest extent permitted by applicable law, including pursuant to section 1141(d)(1) of the Bankruptcy Code, from any and all Claims, Interests, demands, debts and liabilities that arose before the Effective Date. Without limiting the generality of the foregoing, the discharge shall apply to and cover both known and unknown Claims although the Court makes no determination in this Order as to which Creditors may constitute holders of unknown Claims. In addition, all such discharged Claims, both known and unknown, shall be subject to the Plan Injunction.

19. <u>Injunctions</u>. The following injunction provisions set forth in Article XIV of the Plan are hereby approved and authorized in their entirety:

(a) **Permanent General Plan Injunction:**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 2/20/23 Page 696 of 1392    PageID 15438
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 585 of 1803    PageID 11331
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 35 of 229

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING:  (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THE PLAN APPLICABLE TO SUCH CLAIM OR INTEREST.**

The above injunction is an integral term of this Order and shall be fully binding upon, and enforceable against, all Persons through and as a part of this Order.  Furthermore, notwithstanding anything to the contrary in the Plan or this Order, the above injunction is permanent and shall not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

(b)      Temporary Injunction Against the Liquidation of the Acis CLOs and Related Actions (the "Temporary Plan Injunction"):

**EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-6   Filed 05/09/23   Page 697 of 1392   PageID 15439
Exhibit 6   Page 589 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 586 of 1803   PageID 11332
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 36 of 229

**THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF: (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS. FOR PURPOSES OF THIS PARAGRAPH, THE TERM "ENJOINED PARTIES" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS. FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

The above Temporary Plan Injunction is an integral term of this Order and the Temporary Plan Injunction shall be fully binding upon, and enforceable against, the Enjoined Parties through and as a part of this Order. For the avoidance of doubt, the occurrence of any event specified in the Temporary Plan Injunction that results in expiration of the Temporary Plan Injunction shall not cause any of the other injunctive relief set forth in the first paragraph of section 14.03 of the Plan and paragraph 18(a) of this Order to expire, such other injunctive relief being permanent.

20.     Notwithstanding anything to the contrary in the Plan or this Order, nothing in the Plan or in this Order shall discharge, release, enjoin or otherwise bar (a) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of Claim, (b) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (c) any valid right of setoff or recoupment of a Governmental Unit, and (d) any police or regulatory action by a Governmental Unit. In addition, nothing in the Plan or this Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 05/30/23    Page 698 of 1392    PageID 15440
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 587 of 1803    PageID 11333
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 37 of 229

Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date.  For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

21.    <u>Extension of the Preliminary Injunction</u>.  Notwithstanding anything to the contrary in the terms of the Preliminary Injunction entered in the Trustee's Adversary, the Preliminary Injunction shall not expire upon confirmation of the Plan.  The Preliminary Injunction is hereby extended to and through the Effective Date of the Plan and shall remain in full force and effect until the Effective Date of the Plan.

22.    <u>Exculpation</u>.  The exculpation provisions set forth in section 16.06 of the Plan are hereby approved in all respects.

23.    <u>Priority and Secured Tax Claims</u>.  The treatment of Priority Tax Claims and Secured Tax Claims is specified in the Plan.  Nothing in the Plan or this Order shall modify or affect the Lien rights of a Taxing Authority under applicable non-bankruptcy law.  In the event of a default on the payment of a Priority Tax Claim or Secured Tax Claim under the Plan, the Taxing Authority to which the payment is owed may pursue all administrative and judicial remedies under applicable law to collect the unpaid Priority Tax Claim or Secured Tax Claim.

24.    <u>Injunctions and Automatic Stay</u>.  Except as otherwise provided in the Plan or this Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

25.    <u>Setoffs</u>.  Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 3835    Filed 4.589/23.1804ge 699 of 1392    PageID 15441
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 588 of 1803    PageID 11334
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 38 of 229

against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of

such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and

Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed

Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such

holder have not been otherwise compromised or settled on or prior to the Effective Date

(whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect

such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a

waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate

may possess against such Claimant.  In no event shall any Claimant or Interest holder be

entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors

without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion

with the Court requesting the authority to perform such setoff notwithstanding any indication in

any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of

setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

        26.    Recoupment.  Except as otherwise expressly provided for in the Plan, in no event

shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any

Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor

unless (a) such holder actually provides notice thereof in writing to the Debtors or the

Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount

to be recouped by the holder of the Claim or Interest and a specific description of the basis for

the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written

response to such Claim or Interest holder, stating unequivocally that the Debtors or the

Reorganized Debtor consents to the requested recoupment.  The Debtors and the Reorganized

Debtor shall have the right, but not the obligation, to seek an order of the Court allowing any or

all of the proposed recoupment.  In the absence of a written response from the Debtors or the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/06/23   Page 700 of 1392   PageID 15442
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 589 of 1803   PageID 11335
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 39 of 229

Reorganized Debtor consenting to a recoupment or an order of the Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

27.     Preservation of Causes of Action.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Such reservation of the Estate Claims and Estate Defenses is hereby approved.  **No person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against any Person, except as otherwise provided in the Plan.**  Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, such causes of action are hereby expressly reserved (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan.

28.     Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor notwithstanding the occurrence of the Effective Date or the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  All such reserved Estate Claims and Estate Defenses shall be vested with the Reorganized Debtor and the Reorganized Debtor shall have the exclusive right, authority and standing to assert, file,

Appellee Appx. 00583
APPX. 10585

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 05/19/23    Page 701 of 1392    PageID 15443
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 590 of 1803    PageID 11336
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 40 of 229

prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment

each of the Estate Claims and Estate Defenses so reserved in accordance with the terms of the

Plan without the consent or approval of any third party or further notice to or action, order or

approval of the Court.

29.    Subordinated Claims.  The allowance, classification and treatment of all Allowed

Claims and Interests and the respective Distributions and treatments under the Plan take into

account and conform to the relative priority and rights of the Claims and Interests in each Class

in connection with any contractual, legal and equitable subordination rights relating thereto,

whether arising under general principles of equitable subordination, the Bankruptcy Code, or

otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves

the right to seek to re-classify any Allowed Claim or Interest in accordance with any contractual,

legal or equitable subordination relating thereto.

30.    Release of Liens.  Except as otherwise provided in the Plan, this Order, or in any

contract, instrument, or other agreement or document entered into or delivered in connection

with the Plan, on the Effective Date all Liens against any Assets transferred to and vested in the

Reorganized Debtor are hereby deemed to be released, terminated and nullified without the

necessity of further order of this Court.

31.    Provisions Governing Distributions.  The distribution provisions of Articles VII and

VIII of the Plan shall be, and hereby are, approved in their entirety; provided, however, that

notwithstanding anything to the contrary set forth in Section 7.02 of the Plan, the Reorganized

Debtor may, but shall not be required to, reserve for Distributions to holders of Allowed

Subclass 4B Claims.  The Reorganized Debtor shall make all Distributions required under the

Plan.

32.    Procedures for Resolving Contested and Contingent Claims.  The Claims

resolution procedures contained in Article X of the Plan are hereby approved.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 05/22/23    Page 702 of 1392    PageID 15444
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 591 of 1803    PageID 11337
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 41 of 229

33.    <u>Section 1145 Exemption</u>.  The solicitation of acceptances and rejections of the Plan was exempt from the registration requirements of the Securities Act of 1933 and applicable state securities laws, and no other nonbankruptcy law applies to the solicitation.

34.    <u>Exemption from Certain Transfer Taxes and Recording Fees</u>.  Section 1146(a) shall apply to the transfers of Assets pursuant to the Plan and, therefore, such transfers may not be taxed under any law imposing a stamp tax or similar tax.

35.    <u>Governmental Approvals Not Required</u>.  This Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement and any documents, instruments or agreements, and any amendments or modifications thereto.

36.    <u>Allowance and Payment of Certain Administrative Expense Claims</u>

(a)    <u>Administrative Expense Claims (Generally)</u>.  The holder of a Claim for an Administrative Expense, other than (i) such a Claim by an Estate Professional, (ii) an Ordinary Course Claim, (iii) a Claim for U.S. Trustee fees under 28 U.S.C. § 1930, or (iv) an Allowed Administrative Expense, must file with the Court and serve upon the Reorganized Debtor and its counsel, as set forth in the Plan, a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date (the "<u>Administrative Bar Date</u>").  Such notice of Claim for an Administrative Expense shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  ***The failure to timely and properly file and serve a notice of Claim for an Administrative Expense on or before the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred and discharged without further order of the Court and the holder thereof shall be barred from receiving any Distribution from the Reorganized Debtor on account***

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 03/23/23    Page 703 of 1392    PageID 15445
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 592 of 1803    PageID 11338
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 42 of 229

*of such Claim for an Administrative Expense.*  A Claim for an Administrative Expense with respect to which a notice of Claim for an Administrative Expense has been timely and properly filed and served shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after the date of filing and service of the applicable notice of Claim for an Administrative Expense, or such later date as may be approved by the Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Claim for an Administrative Expense shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(b)    Estate Professional Compensation.  All final requests for compensation or reimbursement by any Estate Professional shall be filed no later than sixty (60) days after the Effective Date in accordance with the Plan.  A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed shall become an Allowed Administrative Expense only to the extent allowed by Final Order and, if so Allowed, shall be paid in accordance with the terms of the Plan.  Notwithstanding anything to the contrary in the Plan, the provisions of the Plan governing the filing of final fee applications by Estate Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to the Chapter 11 Trustee.  Compensation or reimbursement sought by the Chapter 11 Trustee through a final fee application shall be subject to final approval of the Court as reasonable in accordance with section 330(a)(3) of the Bankruptcy Code.

(c)    U.S. Trustee Fees.  Any U.S. Trustee fees incurred pursuant to 28 U.S.C. § 1930 which are past due as of the Confirmation Date shall be paid in full by the Chapter 11 Trustee on or before the earlier of (i) December 21, 2018, or (ii) that day which is ten (10) days after the Confirmation Date.  After the Confirmation Date, the Reorganized Debtor shall continue to pay U.S. Trustee fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.

---

Appellee Appx. 00586
APPX. 10585

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-5    Filed 02/03/1804    Page 704 of 1392    PageID 15446
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 593 of 1803    PageID 11339
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 43 of 229

37.    <u>Effectuating Documents and Further Transactions</u>.  The Chapter 11 Trustee and the Reorganized Debtor, and their respective representatives, agents and attorneys, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant hereto.  This Order shall constitute all approvals and consents required, if any, by the laws, rules and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, agreements, any amendments or modifications thereto and any other acts and transactions referred to in or contemplated by the Plan, the Plan Documents, the Disclosure Statement, and any documents, instruments, and agreements and any amendments or modifications thereto.

38.    <u>Filing and Recording</u>.  This Order is and shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any document or instruments.  Each and every federal, state and local government agency is hereby directed to accept any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan and this Order.

39.    <u>Inconsistency between Documents</u>.  In the event of an inconsistency between the terms of the Plan and the terms of the Disclosure Statement, the Plan shall control.  In the event of any inconsistency between the terms of the Plan or the terms of the Disclosure Statement and the terms of this Order, this Order shall control.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-3 Filed 02/23/18-4 Page 705 of 1392 PageID 15447
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 594 of 1803 PageID 11340
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 44 of 229

40. <u>References to Plan Provisions</u>. The failure specifically to include or to refer to any particular article, section, or provision of the Plan or any related document in this Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan and any related documents be confirmed in their entirety.

41. <u>Applicable Nonbankruptcy Law.</u> Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of the Plan and this Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

42. <u>Notice of Entry of the Confirmation Order</u>. No later than the third Business Day after the entry of this Order, the Chapter 11 Trustee shall serve a copy of this Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest.

43. <u>Notice of the Effective Date</u>. No later than the third Business Day after the occurrence of the Effective Date, the Reorganized Debtor shall file a notice of occurrence of the Effective Date with the Clerk of the Court and shall serve a copy on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest. Such notice shall include notice of (a) the Administrative Bar Date, (b) the deadline for filing Rejection Claims set forth in section 11.03 of the Plan, and (c) the deadline for filing final requests for compensation and reimbursement by Estate Professionals. The filing of such notice shall conclusively establish that all conditions precedent have been satisfied or waived and shall constitute adequate and sufficient notice to all parties entitled thereto of the occurrence of the Effective Date.

44. <u>Retention of Jurisdiction</u>. The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising in, arising under, and related to, the Chapter 11 Cases, including the matters set forth in Article XV of the Plan and section 1142 of the Bankruptcy Code. Without limitation as to the generality of the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-5    Filed 09/03/18 04    Page 706 of 1392    PageID 15448
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 595 of 1803    PageID 11341
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 45 of 229

preceding sentence, the Court retains exclusive jurisdiction (a) to interpret and enforce this Order and the Plan; (b) to enforce the provisions of this Order and the Plan; (c) to resolve any disputes arising under or related to this Order or the Plan; and (d) over all transactions contemplated in this Order and the Plan.  All Persons are hereby forever prohibited and enjoined from taking any action (including, without limitation, legal action) that would adversely affect or interfere with the ability of any Person to complete any of the transfers of property contemplated by this Order and the Plan other than in this Court or in connection with any appeals from this Court.

45.     Headings.  Paragraph headings contained in this Order are for convenience of reference only and shall not affect the meaning or interpretation of this Order.

46.     Final Order.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

47.     Appeal or Motion for Reconsideration; Reversal.  In the event this Order is appealed or a motion for reconsideration is filed, the Chapter 11 Trustee and the Reorganized Debtor, and their respective representatives, agents and attorneys, are all hereby authorized to proceed with the consummation and performance of the Plan unless and until this Order is stayed, reversed or modified by a court of competent jurisdiction.  If any or all of the provisions of this Order are hereafter reversed, modified, or vacated by subsequent order of this Court or any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Chapter 11 Trustee's or Reorganized Debtor's receipt of written notice of any such order.  Notwithstanding any such reversal, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan (including the Plan Documents) and any amendments or modifications thereto.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-3    Filed 02/09/23    Page 707 of 1392    PageID 15449
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 596 of 1803    PageID 11342
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 46 of 229

### END OF ORDER ###

Appellee Appx. 00590
APPX. 10342

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-36    Filed 05/08/23    Page 708 of 1392    PageID 15450
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 597 of 1803    PageID 11343
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 47 of 229

**SUBMITTED BY:**

/s/  Jeff P. Prostok
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthew G. Maben
State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

-and-

Rakhee V. Patel
State Bar No. 00797213
Phillip Lamberson
State Bar No. 00794134
Joe Wielebinski
State Bar No. 21432400
Annmarie Chiarello
State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Confirmation Order (3rd Amended Plan) 1.31.18.docx

Appellee Appx. 00591
APPX. 10583

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 09/23/1804   Page 709 of 1392   PageID 15451
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 598 of 1803   PageID 11344
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 48 of 229

# EXHIBIT "1"

**[Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 660]**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Page 8.609.03180fPage 710 of 1392   PageID 15452
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 599 of 1803   PageID 11345

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 49 of 229
Case 18-30264-sgj11 Doc 680 Filed 10/25/18   Entered 10/25/18 18:29:08   Page 1 of 62

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | **(Jointly Administered Under Case** |
| | § | **No. 18-30264-SGJ-11)** |
| **DEBTORS.** | § | |
| | § | **Chapter 11** |

**THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND**
**ACIS CAPITAL MANAGEMENT GP, LLC**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

DATED:        October 25, 2018
                    Dallas, Texas

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 09/28/18 04   Page 711 of 1392   PageID 15453
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 600 of 1803   PageID 11346
Case 19-30064-sgj11   Doc 880   Filed 10/25/18   Entered 10/15/18 18:23:68   Page 50 of 229

## ARTICLE I.
## DEFINITIONS

A.    <u>Defined Terms</u>. In addition to such other terms as are defined in other sections of the Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined).

1.01.   "<u>Acis CLOs</u>" refers collectively to CLO-3, CLO-4, CLO-5, and CLO-6.

1.02.   "<u>Acis GP</u>" means Acis Capital Management, GP, LLC, one of the Debtors in the above-referenced Chapter 11 Cases.

1.03.   "<u>Acis LP</u>" means Acis Capital Management, LP, one of the Debtors in the above-referenced Chapter 11 Cases.

1.04.   "<u>Administrative Bar Date</u>" means the deadline to file Claims for Allowance as an Administrative Expense set forth in section 3.01(c) of the Plan.

1.05.   "<u>Administrative Expense</u>" means any cost or expense of administration of the Chapter 11 Cases allowed under subsections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estate of the Debtors, any actual and necessary expenses of operating the business of the Debtors, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930, chapter 123 of title 28 of the United States Code.

1.06.   "<u>Affiliate</u>" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

1.07.   "<u>ALF PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and Acis Loan Funding, Ltd. dated December 22, 2016.

1.08.   "<u>Allowed</u>," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; *provided, however*, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court. "<u>Allowed</u>," when used with respect to an Administrative Expense, shall mean an Administrative Expense approved by application to the Bankruptcy Court.

1.09.   "<u>Assets</u>" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.  Without limiting the foregoing, this shall include all

Appellee Appx. 00594
APPx. 105896

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 06/22/23   Page 712 of 1392   PageID 15454
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 601 of 1803   PageID 11347
Case 18-30264-sgj11   Doc 880   Filed 10/15/18   Entered 10/15/18 18:34:06   Page 51 of 229

1.10.   "Available Cash" means any Cash over and above the amount needed for the Reorganized Debtor to maintain business operations and pursue the Estate Claims, as determined in the sole discretion of the Reorganized Debtor.

1.11.   "Avoidance Action" means a cause of action assertable by the Debtors pursuant to Chapter 5 of the Bankruptcy Code, including without limitation, actions brought or which may be brought under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code. Such causes of action may be asserted to recover, among other things, the transfers listed in the Debtors' respective Schedules, including in response to Question 3 of the statements of financial affairs.

1.12.   "Ballot" means the form of ballot provided to holders of Claims or Interests entitled to vote pursuant to Bankruptcy Rule 3017(d), by which each such holder may accept or reject the Plan.

1.13.   "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified at Title 11 of the United States Code.

1.14.   "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over all or any part of the Chapter 11 Cases.

1.15.   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, including applicable local rules of the Bankruptcy Court.

1.16.   "Brigade" means Brigade Capital Management, LP.

1.17.   "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.18.   "Cash" means legal tender of the United States of America, cash equivalents and other readily marketable securities or instruments, including, but not limited to, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks or commercial paper.

1.19.   "Chapter 11 Cases" refers collectively to the Acis LP bankruptcy case, Case No. 18-30264-sgj11, and the Acis GP bankruptcy case, Case No. 18-30265-sgj11, which are being jointly administered under Case No. 18-30264-sgj11.

1.20.   "Chapter 11 Trustee" refers to Robin Phelan, the chapter 11 trustee for the Debtors.

1.21.   "Claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 06/03/23   Page 713 of 1392   PageID 15455
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 602 of 1803   PageID 11348
Case 18-30264-sgj11   Doc 880   Filed 10/25/18   Entered 10/25/18 18:23:08   Page 52 of 229

1.22.   "Claimant" means the holder of a Claim.

1.23.   "Class" means a class of Claims or Interests as described in the Plan.

1.24.   "CLO" means collateralized loan obligations.

1.25.   "CLO-1" means Acis CLO 2013-1 LTD.

1.26.   "CLO-1 Indenture" means that certain Indenture, dated as of March 18, 2013, issued by CLO-1, as issuer, Acis CLO 2013-1 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.27.   "CLO-1 PMA" means that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013.

1.28.   "CLO-3" means Acis CLO 2014-3 LTD.

1.29.   "CLO-3 Indenture" means that certain Indenture, dated as of February 25, 2014, issued by CLO-3, as issuer, Acis CLO 2014-3 LLC, as co-Issuer and US Bank, as Indenture Trustee

1.30.   "CLO-3 PMA" means that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014.

1.31.   "CLO-4" means Acis CLO 2014-4 LTD.

1.32.   "CLO-4 Indenture" means that certain Indenture, dated as of June 5, 2014, issued by CLO-4, as issuer, Acis CLO 2014-4 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.33.   "CLO-4 PMA" means that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014.

1.34.   "CLO-5" means Acis CLO 2014-5 LTD.

1.35.   "CLO-5 Indenture" means that certain Indenture, dated as of November 18, 2014, issued by CLO-5, as issuer, Acis CLO 2014-5 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.36.   "CLO-5 PMA" means that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014.

1.37.   "CLO-6" means Acis CLO 2015-6 LTD.

1.38.   "CLO-6 Indenture" means that certain Indenture, dated as of April 16, 2015, issued by CLO-6, as issuer, Acis CLO 2015-6 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.39.   "CLO-6 PMA" means that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015.

1.40.   "CLO Holdco" means CLO Holdco, Ltd.

1.41.   "Collateral" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim.

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-6    Filed 01/24/23    Page 714 of 1392    PageID 15456
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 603 of 1803    PageID 11349
Case 18-30264-sgj11 Doc 880 Filed 01/24/19    Entered 01/24/19 17:34:06    Page 58 of 229

1.42.    "<u>Confirmation Date</u>" means the date of entry of the Confirmation Order.

1.43.    "<u>Confirmation Hearing</u>" means the hearing conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as such hearing may be continued from time to time.

1.44.    "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.45.    "<u>Contested</u>," when used with respect to a Claim, means a Claim against the Debtors that is listed in the Debtors' Schedules as disputed, contingent, or unliquidated; that is listed in the Debtors' Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; that is not listed in the Debtors' Schedules, but as to which a proof of Claim has been filed with the Bankruptcy Court; or as to which an objection has been or may be timely filed and has not been denied by Final Order. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

1.46.    "<u>Creditor</u>" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.47.    "<u>Cure Claim</u>" means the payment or other performance required to cure any existing default under an Executory Contract or Unexpired Lease.

1.48.    "<u>Debtors</u>" means, collectively, Acis GP and Acis LP, the debtors in the above-captioned Chapter 11 Cases.

1.49.    "<u>Disallowed</u>," when used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an objection or motion to disallow has been sustained by a Final Order.

1.50.    "<u>Disclosure Statement</u>" means the Disclosure Statement filed with respect to the Plan, as it may be amended, modified, or supplemented from time to time.

1.51.    "<u>Distribution</u>" means any payment or other disbursement of property pursuant to the Plan.

1.52.    "<u>Effective Date</u>" means the first Business Day which is fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) Business Days after the Confirmation Date, and upon which all conditions to the effectiveness of the Plan set forth in Article XIII below are satisfied.

1.53.    "<u>Estate</u>" shall collectively refer to the bankruptcy estates of the Debtors in the Chapter 11 Cases.

1.54.    "<u>Estate Accounts Receivable</u>" shall include all accounts receivable of the Estate, including from all sums payable to the Debtors on account of goods or services provided by the Debtors.

Appellee Appx. 00597
APPX. 10349

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 2.2609/23 3.81804 Page 715 of 1392   PageID 15457
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 604 of 1803   PageID 11350
Case 18-30264-sgj11 Doc 880 Filed 01/31/18   Entered 01/31/18 18:24:06   Page 54 of 229

1.55.   "Estate Claims" shall include all claims and causes of action held by the Debtors' Estate, including, without limitation, the Estate Claims listed on the attached **Exhibit A** and all Avoidance Actions.

1.56.   ""Estate Defenses" means all defenses, affirmative defenses, counterclaims, or offsets by the Debtors' Estate against any Person, including but not limited to any Creditor.

1.57.   "Estate Insurance" means any insurance policy or interest in an insurance policy in which the Estate has an interest or rights.

1.58.   "Estate Professionals" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

1.59.   "Executory Contract" means any executory contract which is subject to section 365 of the Bankruptcy Code and which is not an Unexpired Lease.

1.60.   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body, as to which the time to appeal or seek rehearing or petition for certiorari shall have expired or which order or judgment shall no longer be subject to appeal, rehearing, or certiorari proceeding and with respect to which no appeal, motion for rehearing, or certiorari proceeding or stay shall then be pending.

1.61.   "General Unsecured Claim" means any Claim against the Debtors that is not an Administrative Expense, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Secured Claim, or Insider Claim, but includes any Rejection Claims pursuant to section 502(g) of the Bankruptcy Code.

1.62.   "Governmental Unit" means a "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code.

1.63.   "HCLOF" means Highland CLO Funding, Ltd.

1.64.   "Highland" means Highland Capital Management, L.P.

1.65.   "Highland Adversary" means Adversary Proceeding No. 18-03078-sgj.

1.66.   "Highland Claim" means all Claims asserted by Highland or any Affiliates of Highland against the Debtors, including any Claim resulting from the termination of the Sub-Advisory Agreement and Shared Services Agreement.

1.67.   "Highland CLOM" means Highland CLO Management, Ltd.

1.68.   "Highland HCF" means Highland HCF Advisors, Ltd.

1.69.   "Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.70.   "Indentures" refers collectively to the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture, and the CLO-6 Indenture.

Appellee Appx. 00598
Appx. 10899
Appx. 00899

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 10/25/23   Page 716 of 1392   PageID 15458
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 605 of 1803   PageID 11351
Case 19-30064-sgj11   Doc 280   Filed 10/25/18   Entered 10/25/18 18:23:68   Page 55 of 229

1.71.   "Indenture Trustee" refers to US Bank solely in its capacity as Indenture Trustee under the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture and the CLO-6 Indenture, as applicable

1.72.   "Initial Distribution Date," when used with respect to any Contested Claim or Rejection Claim, shall mean the later of (i) the first Business Day at least thirty (30) days after the date on which any such Contested Claim or Rejection Claim becomes an Allowed Claim, or (ii) if the payment terms of Article IV of this Plan applicable to each such Claim specify a different date, then the date as calculated pursuant to the terms of Article IV of this Plan applicable to each such Claim.  The Initial Distribution Date shall be separately determined with respect to each Contested Claim or Rejection Claim based upon the date each such Claim becomes an Allowed Claim.

1.73.   "Insider" means a Person described in section 101(31) of the Bankruptcy Code.

1.74.   "Insider Claim" means any Claim asserted by Insiders of the Debtors, including but not limited to any Claim asserted by Highland or any Affiliate thereof, unless otherwise indicated in the Plan.

1.75.   "Interests" means any equity or stock ownership interest in the Debtors.

1.76.   "Issuers and Co-Issuers" means CLO-1, CLO-3, CLO-4, CLO-5, CLO-6, Acis CLO 2013-1, Acis CLO-2014-3, LLC, Acis CLO 2014-4, LLC, Acis CLO 2014-5, LLC, and Acis 2015-6, LLC.

1.77.   "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtors contemplated by section 101(37) of the Bankruptcy Code.

1.78.   "Management Fees" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.79.   "Neutra" means Neutra, Ltd.

1.80.   "Objection" means (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.

1.81.   "Objection Deadline" shall mean the later of (a) ninety (90) days following the Effective Date, unless otherwise extended by order of the Bankruptcy Court, or (b) as to any Rejection Claim filed after the Effective Date, ninety (90) days after the date on which the proof of Claim reflecting the Rejection Claim is filed.

1.82.   "Optional Redemption" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.83.   "Person" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

7

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-35   Filed 02/03/23   Page 717 of 1392   PageID 15459
Exhibit 5
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 606 of 1803   PageID 11352
Case 19-30064-sgj11   Doc 830   Filed 10/25/18   Entered 10/25/18 18:43:08   Page 56 of 229

1.84.   "<u>Petition Date</u>" means January 30, 2018.

1.85.   "<u>Plan</u>" means this Third Amended Joint Chapter 11 plan, either in its present form or as it may be altered, amended, or modified from time to time.

1.86.   "<u>Plan Documents</u>" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court.

1.87.   "<u>Plan Rate</u>" means a rate of interest of five percent (5%) per annum.

1.88.   "<u>PMAs</u>" refers collectively to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA.

1.89.   "<u>Priority Claim</u>" means a Claim (other than a Claim for an Administrative Expense) to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.90.   "<u>Priority Non-Tax Claim</u>" means a Priority Claim other than a Priority Tax Claim.

1.91.   "<u>Priority Tax Claim</u>" means a Claim of a Governmental Unit of the kind specified in subsection 507(a)(8) of the Bankruptcy Code.

1.92.   "<u>Professional</u>" means those persons retained pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code.

1.93.   "<u>Pro Rata Distribution</u>" means an optional Distribution made in accordance with section 4.03(c), 4.04(e), or 4.04(i) of the Plan.  Each Creditor entitled to receive a portion of a Pro Rata Distribution shall receive such Creditor's Pro Rata Share of such Distribution.

1.94.   "<u>Pro Rata Share</u>' means, as to the holder of a specific Claim, the ratio that the amount of such holder's Claim bears to the aggregate amount of all Claims included in the particular Class or category in which such holder's Claim is included.

1.95.   "<u>Refinancing Proceeds</u>" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.96.   "<u>Rejection Claim</u>" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract or Unexpired Lease.

1.97.   "<u>Reorganized Debtor</u>" refers collectively to the Debtors, as reorganized, acting from and after the Effective Date if the Plan is confirmed based on the terms and provisions herein.

1.98.   "<u>Reserve</u>" or "<u>Reserves</u>" means any reserves set aside by the Reorganized Debtor pursuant to this Plan, including reserves set aside to fund any Distributions, make payments pursuant to the Plan, or pursue the Estate Claims.

1.99.   "<u>Schedules</u>" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules or statements have been or may be subsequently amended.

1.100.   "<u>Secured Claim</u>" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, and which is duly Allowed, but only to the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 05/08/23   Page 718 of 1392   PageID 15460
Exhibit 6   Page 609 of 1304
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 607 of 1803   PageID 11353
Case 18-30264-sgj11   Doc 880   Filed 10/15/18   Entered 10/15/18 18:43:06   Page 57 of 229

extent of the value of the holder's interest in the Collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the Class of which the Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed.

1.101. "Secured Tax Claim" means any ad valorem tax Claim that arises or is deemed to have arisen on or before the Petition Date, irrespective of the date on which such Claim is assessed or due.

1.102. "Shared Services Agreement" means that certain Fourth Amended and Restated Shared Services Agreement by and between Acis LP and Highland dated March 17, 2017.

1.103. "Sub-Advisory Agreement" means that certain Third Amended and Restated Sub-Advisory Agreement by and between Acis LP and Highland dated March 17, 2017

1.104. "Subordinated Notes" means the subordinated notes in the Acis CLOs held by HCLOF, and expressly does not include any subordinated notes in the Acis CLOs held by any other party.

1.105. "Substantial Consummation" means the day on which a Creditor first receives a Distribution of any kind under the terms and provisions of the Plan.

1.106. "Taxing Authority" shall include the State of Texas or any subdivision thereof, including without limitation any political subdivision of the State of Texas assessing ad valorem taxes against any of the Assets.

1.107. "Terry" means Joshua N. Terry.

1.108. "Terry Partially Secured Claim" means any Claim asserted against the Debtors by Terry, including as asserted in Proof of Claim No. 1 in both Chapter 11 Cases and Proof of Claim No. 26 against Acis LP.

1.109. "Unclaimed Property" means any cash, Distribution, or any other property of the Debtors unclaimed for a period of one (1) year after the applicable Initial Distribution Date.

1.110. "Unexpired Lease" means any unexpired lease or agreement which is subject to section 365 of the Bankruptcy Code and which is not an Executory Contract.

1.111. "US Bank" means U.S. Bank National Association.

1.112. "Other Acis-Managed Funds" refers collectively to CLO-1, Acis CLO 2013-2, Ltd., Hewitt's Island CLO 1-R, Ltd, and BayVK R2 Lux S.A., SICAV-FIS.

   B.   Interpretation. Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the

Appellee Appx. 00601
Appx. 10452

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 02/03/18Page 719 of 1392    PageID 15461
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 608 of 1803    PageID 11354
Case 18-30264-sgj11  Doc 830 Filed 01/28/19    Entered 01/28/19 17:34:08    Page 50 of 229

same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof. The rules of construction set forth in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to construction of the Plan. For the purposes of construction of the Plan, "or" is disjunctive.

C.    Other Terms. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1) of the Bankruptcy Code. Otherwise, a term used herein that is not specifically defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

D.    Exhibits and Plan Documents. All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. Any Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing. Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Forshey & Prostok, LLP, 777 Main Street, Suite 1290, Fort Worth, Texas 76102, Attention: Linda Breedlove; Fax number (817) 877-4151; email: lbreedlove@forsheyprostok.com.

**ARTICLE II.**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

2.01.    The following is a designation of the Classes of Claims and Interests under the Plan. Administrative Expenses, Priority Claims of the kinds specified in sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code and Priority Tax Claims have not been classified, are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code, and their treatment is set forth in Article III of the Plan.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class.  A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

> Class 1 – Secured Tax Claims
> Class 2 – Terry Partially Secured Claim
> Class 3 – General Unsecured Claims
> Class 4 – Insider Claims
> Class 5 – Interests

2.02.    Impaired Classes of Claims and Interests.  Class 1 is unimpaired.  Classes 2 through 5 are Impaired.

2.03.    Impairment or Classification Controversies. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

**ARTICLE III.**
**TREATMENT OF UNCLASSIFIED CLAIMS**

3.01.    Administrative Expenses

Appellee Appx. 00602
Appx. 10453

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 07/20/23   Page 720 of 1392    PageID 15462
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 609 of 1803    PageID 11355
Case 19-30264-sgj11   Doc 830   Filed 01/24/19    Entered 01/24/19 17:34:06    Page 59 of 229

(a)      The Reorganized Debtor shall pay, in accordance with the ordinary business terms applicable to each such expense or cost, the reasonable and ordinary expenses incurred in operating the Debtors' businesses or administering the Estate before the Effective Date ("Ordinary Course Claims").  The remaining provisions of this section 3.01 shall not apply to the Ordinary Course Claims, except that if there is a dispute relating to any such Ordinary Course Claim, the Reorganized Debtor may move the Bankruptcy Court to apply the provisions of Article III below relating to Contested Claims and require the holder of the Contested Ordinary Course Claim to assert such Claim through the Chapter 11 Cases.

(b)      Each holder of an Allowed Administrative Expense (other than Ordinary Course Claims and Administrative Expense Claims by Estate Professionals), shall receive (i) the amount of such holder's Allowed Administrative Expense in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

(c)      Unless the Bankruptcy Court orders to the contrary or the Reorganized Debtor agrees to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim by an Estate Professional, an Ordinary Course Claim, or an Administrative Expense which is already Allowed, shall file with the Bankruptcy Court and serve upon the Reorganized Debtor and its counsel a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date.  This deadline is the "Administrative Bar Date."  Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  **Failure to timely and properly file and serve such notice by the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred and discharged and the holder thereof shall be barred from receiving any Distribution from the Reorganized Debtor on account of such Claim for an Administrative Expense**.

(d)      A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.01(c) above, shall become an Allowed Administrative Expense if no Objection is filed within thirty (30) days of the filing and service of such notice.  If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(e)      The procedures contained in subsections 3.01(a), (c) and (d) above shall not apply to Administrative Expense Claims asserted by Estate Professionals, who shall each file and submit an appropriate final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date.  A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense only to the extent Allowed by order of the Bankruptcy Court and, if so Allowed, shall be paid in accordance with subsection 3.01(b) above.  Professional fees and expenses to any Estate Professional incurred on or after the Effective Date may be paid by the Reorganized Debtor without necessity of application to or order by the Bankruptcy Court.

(f)      If the Reorganized Debtor asserts any Estate Claims as counterclaims or defenses to a Claim for Administrative Expense, the Administrative Expense Claim shall be determined through an adversary proceeding before the Bankruptcy Court.  The Bankruptcy

11

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 06/29/23   Page 721 of 1392   PageID 15463
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 610 of 1803   PageID 11356
Case 18-30264-sgj11   Doc 830   Filed 01/28/19   Entered 01/28/19 17:34:06   Page 62 of 229

Court shall have exclusive jurisdiction to adjudicate and Allow all Claims for any Administrative Expense.

3.02.   <u>Priority Non-Tax Claims</u>.  Each holder of an Allowed Priority Non-Tax Claim shall receive (i) the amount of such holder's Allowed Priority Non-Tax Payment in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim and a determination has been made that such Allowed Priority Non-Tax Claim is not subject to equitable subordination under section 510(c) of the Bankruptcy Code, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

3.03.   <u>Priority Tax Claims</u>. Each holder of an Allowed Priority Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Priority Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Priority Tax Claim may be paid without penalty, no later than sixty (60) days after each such Claim becomes an Allowed Claim, or (b) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Reorganized Debtor.

3.04.   <u>U.S. Trustee's Fees</u>. The Reorganized Debtor shall pay the U.S. Trustee's quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) which are due as of the Confirmation Date in full on the Effective Date or as soon thereafter as is practicable.  After the Confirmation Date, the Reorganized Debtor shall continue to pay quarterly fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.  The Reorganized Debtor shall file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports for each quarter, or portion thereof, that the Chapter 11 Cases remain open.

<div align="center">

**ARTICLE IV.**
**<u>TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS</u>**

</div>

4.01.   <u>Class 1 – Secured Tax Claims</u>. Each holder of an Allowed Secured Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Secured Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Secured Tax Claim may be paid without penalty, on the Initial Distribution Date, or (b) such other treatment as may be agreed to in writing by the holder of the Secured Tax Claim and the Reorganized Debtor.  The Liens securing such Secured Tax Claims shall remain unimpaired and unaffected until each such Class 1 Claim is paid in full.  All Distributions on account of Allowed Class 1 Claims shall be made by the Reorganized Debtor.  Class 1 is unimpaired. Holders of Class 1 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

4.02.   <u>Class 2 – Terry Partially Secured Claim</u>.  In exchange for a one million dollar ($1,000,000.00) reduction in the amount of the Terry Partially Secured Claim, Terry shall receive one hundred percent (100%) of the equity interests in the Reorganized Debtor as of the Effective Date.  The remaining balance of any Allowed Terry Partially Secured Claim shall be treated and paid as a Class 3 General Unsecured Claim.  Class 2 is Impaired.  The Holder of the Class 2 Terry Partially Secured Claim is entitled to vote on the Plan.

4.03.   <u>Class 3 – General Unsecured Claims</u>.

<div align="center">12</div>

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68 5    Filed 12/29/23 1804    Page 722 of 1392    PageID 15464
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 611 of 1803    PageID 11357
Case 19-30264-sgj11    Doc 830    Filed 10/28/19    Entered 10/28/19 16:34:06    Page 613 of 229

(a)     Each holder of an Allowed General Unsecured Claim shall receive a promissory note issued by the Reorganized Debtor (each an "Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's General Unsecured Claim becomes an Allowed Class 3 Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(b)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(c)     If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(d)     Class 3 is Impaired.  Holders of Class 3 Claims are entitled to vote on the Plan.

4.04.    Class 4 – Insider Claims.  Holders of Class 4 Insider Claims shall be treated as follows:

(a)     Class 4 Claims shall be divided into two (2) subclasses.  Subclass 4A shall consist of all Allowed Class 4 claims which are not subject to equitable subordination.  Subclass 4B shall consist of all Class 4 claims which are determined by the Bankruptcy Court to be subject to equitable subordination.  If only a part of a Class 4 Claim is subject to equitable subordination, then the portion of such claim subject to equitable subordination shall be included in Subclass 4B and the remainder not subject to equitable subordination shall be included in Subclass 4A.  Subclass 4A and Subclass 4B will vote separately on the Plan, although Subclass 4B is currently an empty class.

Appellee Appx. 00605
Appx. 10856

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/29/23   Page 723 of 1392   PageID 15465
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 612 of 1803   PageID 11358
Case 19-30264-sgj11   Doc 830   Filed 01/23/19   Entered 01/23/19 16:34:08   Page 64 of 229

(b)     All Class 4 Claims (regardless of which subclass) shall be and remain subject to all Estate Defenses and all Estate Claims, including any rights of offset, recoupment, and/or to an affirmative recovery against the Holder of any Class 4 Claim.

(c)     Each holder of an Allowed Subclass 4A Claim shall receive an Unsecured Cash Flow Note on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(d)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(e)     If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(f)     Unless otherwise provided by Order of the Bankruptcy Court, holders of Allowed Subclass 4B claims shall not be entitled to any Distribution from the Reorganized Debtor until all Allowed Claims included in Classes 1 through 3 and Subclass 4A, including all Unsecured Cash Flow Notes, have been paid in full.

(g)     Holders of Allowed Subclass 4B Claims shall receive a subordinated promissory note issued by the Reorganized Debtor ("Subordinated Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Subordinated Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on the earlier to occur of (i) the date that is two

Appellee Appx. 00606
Appx. 10455

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/24/23   Page 724 of 1392   PageID 15466
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 613 of 1803   PageID 11359
Case 19-30264-sgj11   Doc 820   Filed 01/23/19   Entered 01/23/19 17:34:08   Page 63 of 229

(2) years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five (5) years after the Effective Date.

(h)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of a Subordinated Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 90th day after the payment in full of the Unsecured Cash Flow Notes.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Subordinated Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that a Subordinated Unsecured Cash Flow Note is first issued after payments have been made on one or more other Subordinated Unsecured Cash Flow Notes, the first Distribution made on account of such Subordinated Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Subordinated Unsecured Cash Flow Note had such Subordinated Unsecured Cash Flow Note been issued at the time the first payment on any Subordinated Unsecured Cash Flow Note was made, such that the first Distribution shall bring all payments current on account of such Subordinated Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of a Subordinated Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Subordinated Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Subordinated Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Subordinated Unsecured Cash Flow Note.

(i)     Subject to section 4.04(f) above, if the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Subclass 4B Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Subclass 4B Claims.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Subordinated Unsecured Cash Flow Note.

(j)     The Reorganized Debtor may establish appropriate Reserves as to any Contested Claim included in Class 4.

(k)     Class 4 is Impaired.  Holders of Class 4 Claims are entitled to vote on the Plan.

4.05.   Class 5 – Interests.  All Interests in the Debtors shall be extinguished and shall cease to exist as of the Effective Date. The holders of such Interests shall not receive or retain any property on account of such Interests under the Plan.  Class 5 is Impaired.  Holders of Class 5 Interests are conclusively presumed to have rejected the Plan and, accordingly, are not entitled to vote on the Plan.

### ARTICLE V.
### ACCEPTANCE OR REJECTION OF THE PLAN

5.01.   Classes Entitled to Vote.  Creditors in Classes 2 through 4 are entitled to vote and shall vote separately to accept or reject the Plan.  Any unimpaired Class shall not be entitled to vote to accept or reject the Plan.  Any unimpaired Class is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

Appellee Appx. 00607
APPX. 000859

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 06/29/23    Page 725 of 1392    PageID 15467
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 614 of 1803    PageID 11360
Case 18-30264-sgj11    Doc 830    Filed 10/24/18    Entered 10/24/18 17:34:06    Page 16 of 229

5.02.    <u>Class Acceptance Requirement</u>. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

5.03.    <u>Cramdown</u>. This section shall constitute the request by the Plan proponent, pursuant to section 1129(b) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met.

**ARTICLE VI.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

6.01.    <u>Vesting of Assets</u>. As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets, including the PMAs, all Cash, Estate Accounts Receivable, Estate Insurance, Estate Claims and Estate Defenses, shall be transferred from the Estate to, and vested in, the Reorganized Debtor, free and clear of all rights, title, interests, claims, liens, encumbrances and charges, except as expressly set forth in the Plan.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

6.02.    <u>Continued Existence of the Debtors</u>.  The Debtors shall continue to exist after the Effective Date, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents.  On or after the Effective Date, each Reorganized Debtor may, within its sole and exclusive discretion, take such action as permitted by applicable law and its constituent documents as it determines is reasonable and appropriate.

6.03.    <u>Retention and Assertion of Causes of Action and Defenses</u>.

     (a)    Except as expressly set forth in this Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Estate Claims, Estate Defenses and Avoidance Actions) belonging to the Debtors (collectively, the "<u>Retained Causes of Action</u>") shall, upon the occurrence of the Effective Date, be reserved, retained and preserved for, and transferred to, received by and vested, in the Reorganized Debtor for the benefit of the Debtors and the Debtors' estates.  Without limitation, the Retained Causes of Action include the claims and causes of action described on **Exhibit A** attached hereto.

     (b)    Except as expressly set forth in this Plan, the rights of the Reorganized Debtor to commence, prosecute or settle the Retained Causes of Action shall be retained, reserved, and preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against them. The Debtors and their Estate expressly reserve all rights to prosecute any and all of the Retained Causes of Action (including all**

Appellee Appx. 00608
APPX. 004859

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 8-6  Filed 06/20/23  Page 726 of 1392  PageID 15468
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 615 of 1803  PageID 11361
Case 18-30264-sgj11  Doc 820  Filed 10/24/18  Entered 10/24/18 16:34:08  Page 65 of 229

**Estate Claims, Estate Defenses and Avoidance Actions) against any Person, except as otherwise provided in this Plan**. Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order, the Debtors expressly reserve all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan. The Debtors and the Reorganized Debtor may also assert Estate Defenses as a defense to the allowance of any Claim not otherwise Allowed.

6.04.    Assumption of Obligations to Make Distributions.  The Reorganized Debtor shall be deemed to have assumed the obligations to make all Distributions pursuant to this Plan.

6.05.    Actions by the Debtors and the Reorganized Debtor to Implement Plan.  The entry of the Confirmation Order shall constitute all necessary authorization for the Debtors and the Reorganized Debtor to take or cause to be taken all actions necessary or appropriate to consummate, implement or perform all provisions of this Plan on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (a) all transfers of Assets, including to the Reorganized Debtor, that are to occur pursuant to the Plan; (b) the cancellation of Interests and issuance of 100% of the equity interests in the Reorganized Debtor to Terry; (c) the performance of the terms of the Plan and the making of all Distributions required under the Plan; and (d) subject to the terms of the Plan, entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

6.06.    Termination of Highland as Shared Services Provider and Sub-Advisor.  The Bankruptcy Court authorized the Chapter 11 Trustee to terminate the Shared Services Agreement and Sub-Advisory Agreement and engage Brigade to perform the services previously provided by Highland.  The Shared Services Agreement and Sub-Advisory Agreement were terminated by the Chapter 11 Trustee on or about August 1, 2018, and the services previously performed by Highland were transitioned to Brigade on an interim basis.  Brigade has agreed to continue to provide shared services and sub-advisory services to the Reorganized Debtor with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs) subject to a minimum two (2) year term unless otherwise agreed as between the Reorganized Debtor and Brigade.  Consequently, any agreement between the Reorganized Debtor and Brigade shall provide that Brigade cannot be removed without cause for a period of two (2) years except as may be otherwise agreed as between the Reorganized Debtor and Brigade.

6.07.    Continued Portfolio Management by the Reorganized Debtor.  The PMAs and any other Executory Contracts and Unexpired Leases identified on Exhibit B to the Plan or in the Confirmation Order shall be assumed and the Reorganized Debtor shall, from an after the Effective Date, serve as the portfolio manager with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs).  Consistent with Section 15 of the PMAs, the Reorganized Debtor may only be removed as portfolio manager under the assumed PMAs for cause as set forth in the PMAs.

6.08.    Reset of the Acis CLOs.  HCLOF has maintained that it desires to reset the Acis CLOs. The Reorganized Debtor, with the assistance of Brigade as its shared services provider and sub-advisor, is prepared to promptly seek to perform such reset transactions as set forth herein.

Appellee Appx. 00609
APPX. 00860

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 2/27/23   Page 727 of 1392   PageID 15469
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 616 of 1803   PageID 11362
Case 19-30264-sgj11   Doc 830   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 66 of 229
Exhibit B   Page 620 of 1804
Case 18-30264-sgj11   Doc 830   Filed 01/31/19   Entered 01/31/19 16:23:08   Page 18 of 229

HCLOF shall have the right to submit one or more notice(s) of Optional Redemption solely for the purpose of effectuating a reset of one or more of the Acis CLOs under this section 6.08 of the Plan utilizing Refinancing Proceeds (a "Reset Optional Redemption") for each of the Acis CLOs. If HCLOF requests a Reset Optional Redemption of an Acis CLO, the Reorganized Debtor, with the assistance of Brigade, shall thereafter seek to reset the Acis CLOs, either consecutively or simultaneously, in its good faith business judgment and consistent with then-prevailing market terms; *provided, however*, (i) the Management Fees to be charged by the Reorganized Debtor to any reset Acis CLOs shall remain the same going forward and shall not be increased, and no transaction fee shall be charged by the Reorganized Debtor (other than, for avoidance of doubt, transaction expense reimbursements consistent with market standards), and (ii) HCLOF shall be granted a right of first refusal for any funding of debt or equity required to effectuate a reset of each of the Acis CLOs. The terms of the Indentures shall control any Reset Optional Redemption. If HCLOF elects not to reset one or more of the Acis CLOs, then the Acis CLOs will continue to be managed in accordance with market standards.

6.09.   Post-Effective Date Service List. Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "Service List"): (a) any Person directly affected by the relief sought in the pleading, (b) the U.S. Trustee, (c) parties which have filed a Notice of Appearance in the Chapter 11 Cases, and (d) the Reorganized Debtor.

6.10.   Section 505 Powers. All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date.

6.11.   Section 510(c) Powers. All rights and powers to seek or exercise any right or remedy of equitable subordination are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date as an Estate Defense.

6.12.   Section 506(c) Powers. The Estate hereby reserves all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtor.

6.13.   Plan Injunction. The Reorganized Debtor shall each have full power, standing and authority to enforce the Plan Injunction against any Person, either through an action before the Bankruptcy Court or any other tribunal having appropriate jurisdiction.

6.14.   Cancellation of Interests. Except as otherwise specifically provided herein, upon the Effective Date of the Plan: (a) all Interests in the Debtors shall be cancelled; and (b) all obligations or debts of, or Claims against, the Debtors on account of, or based upon, the Interests shall be deemed as cancelled, released and discharged, including all obligations or duties by the Debtors relating to the Interests in any of their respective formation documents, including Acis LP's limited partnership agreement and bylaws, Acis GP's articles of formation and company agreement, or any similar formation or governing documents.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTION

7.01.   Distributions from Reorganized Debtor. The Reorganized Debtor shall be responsible for making Distributions to holders of Allowed Claims only to the extent this Plan requires Distributions to be made by the Reorganized Debtor. The priority of Distributions from the

Appellee Appx. 00610

Appx. 00862

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6.35   Filed 01/29/23 Page 728 of 1392   PageID 15470
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 617 of 1803   PageID 11363
Case 19-30264-sgj11   Doc 830   Filed 10/28/19   Entered 10/28/19 17:34:08   Page 67 of 229

Reorganized Debtor shall be in accordance with the terms of this Plan and the Confirmation Order as follows:

      (a)    <u>First</u>, to satisfy Allowed Class 1 Secured Tax Claims;

      (b)    <u>Second</u>, to satisfy Allowed Administrative Expenses and Allowed Priority Claims in accordance with Article III above, including all U.S. Trustee quarterly fees due and owing as of the Effective Date;

      (c)    <u>Third</u>, to make Distributions to holders of any Allowed Class 3 General Unsecured Claims and Allowed Subclass 4A Claims; and

      (e)    <u>Fourth</u>, to make Distributions to holders of any Allowed Subclass 4B Claims

7.02.   <u>Reserves</u>.  The Reorganized Debtor may estimate, create and set aside Reserves as may be necessary or appropriate, including without limitation, Reserves on account of Contested Claims.  The Reorganized Debtor may, but shall not be required to, move the Bankruptcy Court to approve: (a) the amount of, and terms on which, such Reserves shall be held, maintained and disbursed, or (b) the amount and timing of any proposed interim Distribution to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The Reorganized Debtor may elect to seek approval by the Bankruptcy Court for the creation and amount of any Reserves or regarding the amount or timing of any Distribution on account of any Allowed Claims.  Except as otherwise expressly provided herein, the Reorganized Debtor, in the exercise of its good faith business judgment, may transfer funds out of any of the Reserves as necessary or appropriate.  However, the Reorganized Debtor shall not be required to create separate accounts for such Reserves which may be created and memorialized by entries or other accounting methodologies, which may be revised from time-to-time, to enable the Reorganized Debtor to determine the amount of Cash available for Distributions under the Plan.  Subject to any specific deadlines set forth herein, the Reorganized Debtor, shall determine, from time-to-time, in the exercise of the Reorganized Debtor's good faith business judgment: (x) the amount of Cash available for Distribution, (y) the timing of any Distributions, and (z) the amount and creation of any Reserves for Contested Claims.  The Reorganized Debtor shall not be entitled to reserve for, and this section 7.02 does not apply to, Distributions to holders of Allowed Subclass 4B Claims.

7.03.   <u>Prosecution and Settlement of Estate Claims</u>.  Upon the Effective Date, the Reorganized Debtor (a) shall automatically be substituted in place of the Chapter 11 Trustee as the party representing the Estate in respect of any pending lawsuit, motion or other pleading pending before the Bankruptcy Court or any other tribunal, and (b) is authorized to file a notice on the docket of each adversary proceeding or the Chapter 11 Cases regarding such substitution.  The Reorganized Debtor shall have exclusive standing and authority to prosecute, settle or compromise Estate Claims for the benefit of the Estate in the manner set forth in this Plan.

7.04.   <u>Plan Injunction</u>.  The Reorganized Debtor shall be entitled to the full protection and benefit of the Plan Injunction and shall have standing to bring any action or proceeding necessary to enforce the Plan Injunction against any Person.

7.05.   <u>Relief from the Bankruptcy Court</u>.  The Reorganized Debtor shall be authorized to seek relief from the Bankruptcy Court or any other tribunal having jurisdiction as to any matter relating or pertaining to the consummation, administration or performance of this Plan, including without

**Appellee Appx. 00611**
**APPX. 000862**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 6/29/23   Page 729 of 1392   PageID 15471
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 618 of 1803   PageID 11364
Case 18-30264-sgj11  Doc 820  Filed 10/23/18   Entered 10/23/18 16:23:08   Page 62 of 229

limitation seeking any relief from the Bankruptcy Court which the Reorganized Debtor deems
necessary or appropriate to the performance of its duties or the administration of this Plan.

### ARTICLE VIII.
### SOURCE OF DISTRIBUTIONS

8.01.   Source of Distributions.  All Distributions under this Plan shall be made by the
Reorganized Debtor in the manner provided in this Plan and the Confirmation Order.

8.02.   Timing and Amount of Distributions.  No Distribution shall be made on account of any
Claim until such Claim is Allowed, except as otherwise set forth in this Plan or otherwise
ordered by the Bankruptcy Court.  No Distribution shall be made on account of any Contested
Claim until such Claim is Allowed.  Except as expressly set forth in the Plan or in the
Confirmation Order, the Reorganized Debtor shall, in the exercise of its good faith business
judgment, determine the timing and amount of all Distributions which are required to be made
under the Plan, consistent with the goal of making such Distributions as expeditiously as
reasonably possible.  The Reorganized Debtor may, but shall not be required to, seek approval
of, or any other appropriate relief from, the Bankruptcy Court with respect to any of such
Distributions.  Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or
otherwise distributed in accordance with the orders of the Bankruptcy Court.

8.03.   Means of Cash Payment.  Cash payments pursuant to this Plan shall be made by check
drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor
and payee.

8.04.   Record Date for Distributions.  As of the close of business on the Effective Date (the
"Distribution Record Date"), the register for Claims will be closed, and there shall be no further
changes in the holders of record of any Claims.  Although there is no prohibition against the
transfer of any Claim by any Creditor, the Reorganized Debtor shall have no obligation to
recognize any transfer of a Claim occurring after the Distribution Record Date, and the
Reorganized Debtor shall instead be authorized and entitled to recognize and deal for all
purposes under this Plan, including for the purpose of making all Distributions, with only those
holders of Claims so reflected as of the Distribution Record Date.  However, the Reorganized
Debtor may, in the exercise of its good faith business judgment, agree to recognize transfers of
Claims after the Distribution Record Date, but shall have no obligation to do so.

8.05.   Delivery of Distributions.  All Distributions, deliveries and payments to the holders of any
Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed
in the Chapter 11 Cases by such Claimants or, if the Distribution is to be made based on a
Claim reflected as Allowed in the Schedules, at the address reflected in the Schedules.  Any
such Distribution, delivery or payment shall be deemed as made for all purposes relating to this
Plan when deposited in the United States Mail, postage prepaid, addressed as required in the
preceding sentence.  If any Distribution is returned as undeliverable, no further Distribution shall
be made on account of such Allowed Claim unless and until the Reorganized Debtor is notified
of such holder's then current address, at which time all missed Distributions shall be made to
the holder of such Allowed Claim.  However, all notices to the Reorganized Debtor reflecting
new or updated addresses for undeliverable Distributions shall be made on or before one
hundred twenty (120) days after the date of the attempted Distribution or such longer period as
the Reorganized Debtor may fix in the exercise of its sole discretion.  After such date, all
Unclaimed Property shall revert to the Reorganized Debtor and the Claim of any holder with
respect to such property shall be discharged and forever barred.

Appellee Appx. 00612
APPX. 00864

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-16    Filed 6/29/23 1804 Page 730 of 1392    PageID 15472
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 619 of 1803    PageID 11365
Case 18-302264-sgj11  Doc 830  Filed 01/28/19    Entered 01/28/19 17:34:06    Page 69 of 229

8.06.    <u>W-9 Forms</u>.  Each holder of an Allowed Claim must provide a W-9 form or other such necessary information to comply with any withholding requirements of any Governmental Unit (collectively the "<u>W-9 Form</u>") to the Reorganized Debtor prior to receiving any Distribution from the Reorganized Debtor.  In the event a holder of an Allowed Claim does not provide a W-9 Form to the Reorganized Debtor within thirty (30) days of the Effective Date, the Reorganized Debtor shall, at an appropriate time, issue a written request to each holder of an Allowed Claim that has not previously provided a W-9 Form to the Reorganized Debtor.  The request shall be in writing and shall be delivered to the last address known to the Debtors or Reorganized Debtor, as appropriate.  The request shall conspicuously advise and disclose that failure to provide a W-9 Form to the Reorganized Debtor within thirty (30) days shall result in a waiver of any right or rights to a Distribution from the Reorganized Debtor.  In the event any holder of an Allowed Claim fails to provide the Reorganized Debtor with a W-9 Form within thirty (30) days after the date of written request described herein, then the holder of such Allowed Claim shall be deemed to have waived the right to receive any Distribution whatsoever from the Reorganized Debtor.

8.07.    <u>Time Bar to Cash Payments</u>.  Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the issuer of the check by the holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before one hundred twenty (120) days after the date of issuance of such check or such longer period as the Reorganized Debtor may fix.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.08.    <u>Cure Period</u>.  Except as otherwise set forth herein, the failure by the Reorganized Debtor to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to this Plan, shall not constitute an event of default unless and until the Reorganized Debtor has been given thirty (30) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure such alleged default.  Until the expiration of such thirty (30) day cure period, the Reorganized Debtor shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes.  Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.

8.09.    <u>Pre-Payment of Claims</u>. Unless the Plan expressly prohibits or conditions the pre-payment of an Allowed Claim, the Reorganized Debtor may pre-pay any Allowed Claim in whole or in part at any time and may do so without penalty.

8.10.    <u>Distributions after Substantial Consummation</u>.  All Distributions of any kind made to any Creditor after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

Appellee Appx. 00613
APPX. 010865

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 02/29/20318-04   Page 731 of 1392   PageID 15473
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 620 of 1803   PageID 11366
Case 18-30264-sgj11   Doc 830   Filed 01/28/19   Entered 01/28/19 17:34:06   Page 72 of 229

## ARTICLE IX.
## RETENTION OF ESTATE CLAIMS AND ESTATE DEFENSES.

9.01.   <u>Retention of Estate Claims</u>.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Claims shall be transferred to, and vested in, the Reorganized Debtor, both for purposes of seeking an affirmative recovery against any Person and for the purposes of offset, recoupment or defense against any Claim asserted against the Estate or Reorganized Debtor.  All Estate Claims shall be deemed to have been transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

Without limiting the effectiveness or generality of the foregoing reservation, out of an abundance of caution, the Debtors and the Estate hereby specifically reserves, retains, and preserves the Estate Claims reflected in the attached **Exhibit A**.  Reference is here made to **Exhibit A** which constitutes an integral part of this Plan.  The provisions of this Article of the Plan, as well as the descriptions and disclosures relating to the Estate Claims in the Disclosure Statement, are provided in the interest of providing maximum disclosure of the Estate Claims of which Debtors are presently aware and shall not act as a limitation on the potential Estate Claims that may exist.  It is the specific intention of this Plan that all Avoidance Actions and all associated remedies, and any other Estate Claims, whether arising before or after the Petition Date, and whether arising under the Bankruptcy Code or applicable state or federal non-bankruptcy laws, shall all be reserved, retained and preserved under this Plan to be transferred to, and vested in, the Reorganized Debtor.  All Estate Claims are reserved, retained and preserved both as causes of action for an affirmative recovery and as counterclaims and for the purposes of offset or recoupment against any Claims asserted against the Estate.

9.02.   <u>Retention of Estate Defenses</u>.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Defenses shall be transferred to, and vested in, the Reorganized Debtor.  For this purpose, all Estate Defenses are hereby reserved, retained and preserved by the Debtors and the Estate, including without limitation all such Estate Defenses available to the Estate pursuant to section 558 of the Bankruptcy Code, and shall be deemed as transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

9.03.   <u>Assertion of Estate Claims and Estate Defenses</u>.  The Reorganized Debtor shall have, and be vested with, the exclusive right, authority and standing to assert all Estate Claims and Estate Defenses for the benefit of the Reorganized Debtor.

## ARTICLE X.
## PROCEDURES FOR RESOLVING AND TREATING
## CONTESTED AND CONTINGENT CLAIMS

10.01.   <u>Claims Listed in Schedules as Disputed</u>.  Any General Unsecured Claim which is listed in the Schedules as unliquidated, contingent or disputed, and for which no proof of Claim has been timely filed, shall be considered as Disallowed as of the Effective Date without the necessity of any further action by the Reorganized Debtor or further order of the Bankruptcy Court other than the entry of the Confirmation Order.

10.02.   <u>Responsibility for Objecting to Claims and Settlement of Claims</u>.  The Reorganized Debtor shall have the exclusive standing and authority to either object to any Claim or settle and compromise any Objection to any Claim, including as follows:

Appellee Appx. 00614
APPX. 10866

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Page 1.622/231804ge 732 of 1392   PageID 15474
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 621 of 1803   PageID 11367
Case 19-30264-sgj11   Doc 830   Filed 10/28/19   Entered 10/28/19 17:34:06   Page 23 of 229

(a)	From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim.  Any Contested Claim may be litigated to Final Order by the Reorganized Debtor; and

(b)	From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court.  Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Effective Date.

10.03.  Objection Deadline.  All Objections to Claims shall be served and filed by the Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim.  The Reorganized Debtor may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim.  Any such motion may be granted without notice or a hearing.  In the event that the Reorganized Debtor files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion.  Any proof of Claim other than one based upon a Rejection Claim and which is filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtor.  Nothing contained herein shall limit the right of the Reorganized Debtor to object to Claims, if any, filed or amended after the Objection Deadline.

10.04.  Response to Claim Objection.  If the Reorganized Debtor files an Objection to any Claim, then the holder of such Claim shall file a written response to such Objection within twenty-four (24) days after the filing and service of the Objection upon the holder of the Contested Claim.  Each such Objection shall contain appropriate negative notice advising the Creditor whose Claim is subject to the Objection of the requirement and time period to file a response to such Objection and that, if no response is timely filed to the Objection, the Bankruptcy Court may enter an order that such Claim is Disallowed without further notice or hearing.  The negative notice language in the Objection shall satisfy the notice requirement in section 3007(a) of the Bankruptcy Rules, and the Reorganized Debtor shall not be required to send a separate notice of the Objection to the Creditor whose Claim is subject to the Objection.

10.05.   Distributions on Account of Contested Claims.  If a Claim is Contested, then the dates for any Distributions as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter Distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan.  No Distribution shall be made on account of a Contested Claim until Allowed.  Until such time as a contingent Claim becomes fixed and absolute by a Final Order Allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan.  Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

10.06.  No Waiver of Right to Object.  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan, or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtor's right to object to any Claim.

10.07.  Offsets and Defenses.  The Reorganized Debtor shall be vested with and retain all Estate Claims and Estate Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant holding a Claim.  Assertion of counterclaims by the

Appellee Appx. 00615
Appx. 10366

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 05/23/23    Page 733 of 1392    PageID 15475
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 622 of 1803    PageID 11368
Case 18-30264-sgj11    Doc 839    Filed 01/28/19    Entered 01/28/19 17:34:06    Page 74 of 229

Reorganized Debtor against any Claim asserted against the Estate or Reorganized Debtor shall constitute "core" proceedings.

10.08.  Claims Paid or Reduced Prior to Effective Date.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court.  To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Debtors or the Reorganized Debtor from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

## ARTICLE XI.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.01.  Assumption and Rejection of Executory Contracts.  All Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected by the Debtors upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is identified in **Exhibit B** to this Plan and/or the Confirmation Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date. The Plan shall constitute a motion to reject all Executory Contracts and Unexpired Leases except as stated in this paragraph.  However, the Debtors may file a separate motion for the assumption or rejection of any Executory Contract or Unexpired Lease at any time through the Confirmation Date.

11.02.  Cure Payments.  All payments that may be required by section 365(b)(1) of the Bankruptcy Code to satisfy any Cure Claim shall be made by the Reorganized Debtor as soon as reasonably practical after the Effective Date or upon such terms as may be otherwise agreed between the Reorganized Debtor and the holder of such Cure Claim; *provided, however*, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, or any other matter pertaining to assumption or assignment of an Executory Contract, the Reorganized Debtor shall make such cure payments and cure such other defaults, all as may be required by section 365(b)(1) of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

11.03.  Bar to Rejection Claims.  Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract or Unexpired Lease shall be forever barred and shall not be enforceable against the Reorganized Debtor or the Reorganized Debtor's assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtor and its counsel by the earlier of thirty (30) days after the Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract or Unexpired Lease.

11.04.  Rejection Claims.  Any Rejection Claim not barred by section 11.03 of the Plan shall be classified as a Class 3 General Unsecured Claim subject to the provisions of sections 502(b)(6) and 502(g) of the Bankruptcy Code; *provided, however*, that any Rejection Claim by a lessor based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.  All Rejection Claims shall be deemed as Contested Claims until Allowed.  Nothing contained herein shall be deemed an admission by the Debtors or the Reorganized

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/24/23    Page 734 of 1392    PageID 15476
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 623 of 1803    PageID 11369
Case 18-30264-sgj11  Doc 830  Filed 01/28/19    Entered 01/28/19 17:34:06    Page 75 of 229

Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Reorganized Debtor of any objections or defenses to any such Rejection Claim if asserted.

11.05.  Reservation of Rights.  Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtor have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XII.
## SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

12.01.  Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the substantive consolidation of the Debtors for the sole purposes of implementing the Plan, including for purposes of voting and Distributions to be made under the Plan.  Pursuant to such order:  (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of the other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by the other Debtor and any joint or several liability of the Debtors will be deemed to be one obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the Chapter 11 Case of either Debtor will be deemed filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors.

## ARTICLE XIII.
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN

13.01.  Conditions to Confirmation and Effectiveness of Plan.  The Plan shall not become effective until the following conditions shall have been satisfied and which may occur concurrently with the Effective Date:  (a) the Confirmation Order shall have been entered, in form and substance acceptable to the Chapter 11 Trustee; (b) the necessary Plan Documents have been executed and delivered, and (c) all other conditions specified by the Chapter 11 Trustee have been satisfied.  Any or all of the above conditions other than (a) may be waived at any time by the Chapter 11 Trustee.

13.02.  Notice of the Effective Date.  On or as soon as reasonably practical after the occurrence of the Effective Date, the Reorganized Debtor shall cause a notice of the Effective Date to be filed with the Bankruptcy Court and served on all Creditors and parties-in-interest.

13.03.  Revocation of Plan.  The Chapter 11 Trustee may revoke and withdraw the Plan at any time before the Effective Date.  If the Chapter 11 Trustee revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then this Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, as the case may be, or any other Person, or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

Appellee Appx. 00617
APPX. 005866

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 04/25/23   Page 735 of 1392   PageID 15477
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 624 of 1803   PageID 11370
Case 18-30264-sgj11   Doc 830   Filed 01/28/19   Entered 01/28/19 17:34:08   Page 76 of 229

**ARTICLE XIV.**
**EFFECT OF THE PLAN ON CLAIMS AND INTERESTS**

14.01.  Compromise and Settlement

(a)      Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under this Plan, including, without limitation, all Claims against the Debtors or Estate arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors or the Estate.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements embodied in this Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtors, the Estate, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets.  Except as otherwise provided herein, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's Assets, or the Estate, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(b)      It is not the intent of this Plan that confirmation of the Plan shall in any manner alter or amend any settlement and compromise (including those contained in agreed orders) between the Debtors and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement").  To the extent of any conflict between the terms of the Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control and such Prior Settlement shall be enforceable according to its terms.

14.02.  Discharge.  The Debtors and their successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(1) of the Bankruptcy Code from any and all Claims provided for in the Plan.

14.03.  **PLAN INJUNCTION.**

**THIS SECTION IS REFERRED TO HEREIN AS THE "PLAN INJUNCTION."  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING:   (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO**

Appellee Appx. 00618
APPX. 00829

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 61-36    Filed 05/26/23    Page 736 of 1392    PageID 15478
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 625 of 1803    PageID 11371
Case 19-30264-sgj11 Doc 8430 Filed 01/28/19    Entered 01/28/19 17:34:08    Page 25 of 29

ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THIS PLAN APPLICABLE TO SUCH CLAIM OR INTEREST. THE PLAN INJUNCTION SHALL ALSO BE INCORPORATED INTO THE CONFIRMATION ORDER.

IN ADDITION TO THE FOREGOING, EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF:  (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS.  FOR PURPOSES OF THIS PARAGRAPH, THE TERM "ENJOINED PARTIES" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF

Appellee Appx. 00619
APPX. 10320

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 6/29/23   Page 737 of 1392   PageID 15479
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 626 of 1803   PageID 11372
Case 19-30264-sgj11   Doc 8330   Filed 01/28/19   Entered 01/28/19 17:34:06   Page 78 of 229

**HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS. FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

Notwithstanding anything to the contrary in the Plan: (a) third-party professionals employed by the Reorganized Debtor shall not be released or exculpated from any losses, claims, damages, liabilities, or expenses arising from their duties and services provided to the Reorganized Debtor; and (b) any third-party professionals employed by the Reorganized Debtor shall only be entitled to be indemnified by the Reorganized Debtor to the extent provided by applicable law.

Notwithstanding anything to the contrary in the Plan or Confirmation Order, nothing in the Plan or in the Confirmation Order shall discharge, release, enjoin or otherwise bar (i) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of claim, (ii) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (iii) any valid right of setoff or recoupment of a Governmental Unit, and (iv) any police or regulatory action by a Governmental Unit. In addition, nothing in the Plan or Confirmation Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date. For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

14.04. <u>Setoffs</u>. Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided, however</u>, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate may possess against such Claimant. In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

14.05. <u>Recoupment.</u> Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor unless (a) such holder actually provides notice thereof in writing to the Debtors or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be

Appellee Appx. 00620
Appx. 10472

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 02/29/03 1804    Page 738 of 1392    PageID 15480
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 627 of 1803    PageID 11373
Case 19-30264-sgj11  Doc 830  Filed 01/25/19    Entered 01/25/19 17:34:06    Page 79 of 229

recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtors or the Reorganized Debtor consents to the requested recoupment.  The Debtors and the Reorganized Debtor shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment.  In the absence of a written response from the Debtors or the Reorganized Debtor consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

14.06.  Turnover.  On the Effective Date, any rights of the Estate to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtor.

14.07.  Automatic Stay.  The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtors, the Estate and all Assets.  As of the Effective Date, the automatic stay shall be replaced by the Plan Injunction.

## ARTICLE XV.
## JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN

15.01.  Retention of Jurisdiction.  Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, to the full extent allowed or permitted by applicable law, including without limitation for the purposes of invoking sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)     To hear and determine any and all objections to, or applications or motions concerning, the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

(b)     To hear and determine any and all applications for payment of fees and expenses pursuant to this Plan to any Estate Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed under this Plan, and any and all objections thereto;

(c)     To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and Unexpired Leases and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract or Unexpired Lease;

(d)     To hear and determine any and all adversary proceedings, applications, or contested matters, including relating to the allowance of any Claim;

(e)     To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset or recoupment; and (iv) determinations of Objections to Contested Claims;

Appellee Appx. 00621
APPX. 004873

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/29/23   Page 739 of 1392   PageID 15481
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 628 of 1803   PageID 11374
Case 19-30264-sgj11   Doc 830   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 30 of 229

(f)     To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g)     To administer Distributions to holders of Allowed Claims as provided herein;

(h)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i)     To enable the Reorganized Debtor to prosecute any and all proceedings which may be brought to set aside transfers, Liens or encumbrances and to recover any transfers, Assets, properties or damages to which the Reorganized Debtor may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between the Reorganized Debtor and any other party, including but not limited to, any causes of action or Objections to Claims, preferences or fraudulent transfers and obligations or equitable subordination;

(j)     To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(k)     To enforce the discharge and Plan Injunction against any Person;

(l)     To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of this Plan and the transactions required or contemplated pursuant thereto;

(m)     To hear and determine any motion or application which the Reorganized Debtor is required or allowed to commence before the Bankruptcy Court pursuant to this Plan;

(n)     To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(o)     To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(p)     To enter a final decree closing the Chapter 11 Cases; and

(q)     To determine any other matter or dispute relating to the Estate, the Estate Claims, the Estate Defenses, the Assets, or the Distributions by the Reorganized Debtor.

15.02.  Abstention and Other Courts.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

15.03.  Non-Material Modifications.  The Reorganized Debtor may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable.  The Reorganized Debtor may undertake such nonmaterial modification pursuant

30

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86-3   Filed 06/30/23 Page 740 of 1392   PageID 15482
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 629 of 1803   PageID 11375
Case 18-30264-sgj11   Doc 830   Filed 10/24/18   Entered 10/24/18 17:34:08   Page 79 of 229

to this section insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

15.04.  Material Modifications.  Modifications of this Plan may be proposed in writing by the Chapter 11 Trustee at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Chapter 11 Trustee shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be modified at any time after confirmation and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.  A holder of a Claim or Interest that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

**ARTICLE XVI.
MISCELLANEOUS PROVISIONS**

16.01.  Severability.  Should the Bankruptcy Court determine any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtor may modify the Plan so that any such provision shall not be applicable to the holder of any Claim or Interest.  Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

16.02.  Oral Agreements; Modification of Plan; Oral Representations or Inducements.  The terms of the Plan, Disclosure Statement and Confirmation Order may only be amended in writing and may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation.  None of the Debtors, any representative of the Estate, including Robin Phelan in his capacity as Chapter 11 Trustee, nor their attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

16.03.  Waiver.  The Reorganized Debtor shall not be deemed to have waived any right, power or privilege pursuant to the Plan unless the waiver is in writing and signed by the Reorganized Debtor.  There shall be no waiver by implication, course of conduct or dealing, or through any delay or inaction by the Reorganized Debtor, of any right pursuant to the Plan, including the provisions of this anti-waiver section.  The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

16.04.  Notice.  Any notice or communication required or permitted by the Plan shall be given, made or sent as follows:

(a)     If to a Creditor, notice may be given as follows: (i) if the Creditor has not filed a proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

(b)     If to the Reorganized Debtor, notice shall be sent to the following addresses:

Appellee Appx. 00623
APPX. 00875

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 03/20/23 180 Page 741 of 1392    PageID 15483
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 630 of 1803    PageID 11376
Case 19-30264-sgj11    Doc 830    Filed 01/28/19    Entered 01/28/19 17:34:06    Page 82 of 229

Jeff P. Prostok
Suzanne K. Rosen
Forshey Prostok LLP
777 Main Street, Suite 1290
Fort Worth, Texas 76102

Josh Terry
c/o Brian P. Shaw
Rogge Dunn Group, PC
1201 Elm Street, Suite 5200
Dallas, Texas 75270

    (c)    Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtor of its new address in accordance with the terms of this section.

    (d)    Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

16.05.  Compliance with All Applicable Laws.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Reorganized Debtor shall comply with such law, rule, regulation, or order; provided, however, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate Reserve has been set aside on the books of the Reorganized Debtor.

16.06.  Duties to Creditors; Exculpation.  Neither the Chapter 11 Trustee nor any agent, representative, accountant, financial advisor, attorney, shareholder, officer, affiliate, member or employee of the Chapter 11 Trustee or the Debtors, including but not limited to Estate Professionals (collectively, the "Exculpated Parties"), shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Debtors' bankruptcy Estate, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following: (a) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date.  All such Exculpated Parties shall be fully exculpated and released from any and all claims and causes of action by any Person, known or unknown, in connection with, or arising out of, or relating to, any of the following: (x) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (y) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (z) any act or omission relating to the administration of the Plan after the Effective Date, except for claims and causes of action arising out of such Exculpated Party's gross negligence or willful misconduct.

16.07.  Binding Effect.  The Plan shall be binding upon, and shall inure to the benefit of, the Reorganized Debtor, the holders of the Claims or Liens, and their respective successors-in-interest and assigns.

16.08.  Governing Law, Interpretation.  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan

Appellee Appx. 00624
Appx. 10976

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6.35   Filed 12/23/18 04 age 742 of 1392   PageID 15484
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 631 of 1803   PageID 11377
Case 19-30264-sgj11   Doc 830   Filed 10/24/19   Entered 10/24/19 17:34:06   Page 83 of 229

Documents without regard to conflicts of law.  The Plan shall control any inconsistent term or provision of any other Plan Documents.

16.09.  <u>Payment of Statutory Fees</u>.  All accrued U.S. Trustee Fees as of the Confirmation Date shall be paid by the Reorganized Debtor on or as soon as practicable after the Effective Date, and thereafter shall be paid by the Reorganized Debtor as such statutory fees become due and payable.

16.10.  <u>Filing of Additional Documents</u>.  On or before Substantial Consummation of the Plan, the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

16.11.  <u>Computation of Time</u>.  Bankruptcy Rule 9006 shall apply to the calculation of all time periods pursuant to this Plan.  If the final day for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act or event shall be extended to the next Business Day.  Any payment or Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

16.12.  <u>Elections by the Reorganized Debtor</u>.  Any right of election or choice granted to the Reorganized Debtor under this Plan may be exercised, at the Reorganized Debtor's election, separately as to each Claim, Creditor or Person.

16.13.  <u>Release of Liens</u>.  Except as otherwise expressly provided in this Plan or the Confirmation Order, all Liens against any of the Assets transferred to and vested in the Reorganized Debtor shall be deemed to be released, terminated and nullified without the necessity of any order by the Bankruptcy Court other than the Confirmation Order.

16.14.  <u>Rates</u>.  The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

16.15.  <u>Compliance with Tax Requirements</u>.  In connection with the Plan, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

16.16.  <u>Notice of Occurrence of the Effective Date</u>. Promptly after occurrence of the Effective Date, the Reorganized Debtor, as directed by the Bankruptcy Court, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of the occurrence of the Effective Date.

16.17.  <u>Notice of Entry of Confirmation Order</u>.  Promptly after entry of the Confirmation Order, the Chapter 11 Trustee, as directed by the Bankruptcy Court in the Confirmation Order, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of entry of the Confirmation Order.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 06/29/23   Page 743 of 1392   PageID 15485
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 632 of 1803   PageID 11378
Case 18-30264-sgj11   Doc 830   Filed 10/25/18   Entered 10/25/18 16:34:06   Page 84 of 229

Dated:  October 25, 2018.

Respectfully submitted,


ACIS CAPITAL MANAGEMENT, L.P.


By:  /s/ *Robin Phelan*
      Robin Phelan
      Chapter 11 Trustee


ACIS CAPITAL MANAGMENET GP, LLC


By:/s/ *Robin Phelan*
      Robin Phelan
      Chapter 11 Trustee


| APPROVED: | APPROVED: |
|---|---|
| /s/ *Jeff P. Prostok* | /s/ *Rahkee V. Patel* |
| Jeff P. Prostok –  State Bar No. 16352500 | Rakhee V. Patel – State Bar No. 00797213 |
| J. Robert Forshey – State Bar No. 07264200 | Phillip Lamberson – State Bar No. 00794134 |
| Suzanne K. Rosen –  State Bar No. 00798518 | Joe Wielebinski – State Bar No. 21432400 |
| Matthew G. Maben – State Bar No. 24037008 | Annmarie Chiarello – State Bar No. 24097496 |
| **FORSHEY & PROSTOK LLP** | **WINSTEAD PC** |
| 777 Main St., Suite 1290 | 500 Winstead Building |
| Ft. Worth, TX 76102 | 2728 N. Harwood Street |
| Telephone: (817) 877-8855 | Dallas, Texas 75201 |
| Facsimile: (817) 877-4151 | Telephone: (214) 745-5400 |
| jprostok@forsheyprostok.com | Facsimile:  (214) 745-5390 |
| bforshey@forsheyprostok.com | rpatel@winstead.com |
| srosen@forsheyprostok.com | plamberson@winstead.com |
| mmaben@forsheyprostok.com | jwielebinski@winstead.com |
| | achiarello@winstead.com |
| **COUNSEL FOR ROBIN PHELAN,** | |
| **CHAPTER 11 TRUSTEE** | **SPECIAL COUNSEL FOR ROBIN PHELAN,** |
| | **CHAPTER 11 TRUSTEE** |

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Third Amended Joint Plan 10.25.18.docx

Appellee Appx. 00626
Appx. 10428

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 58-35    Filed 08/24/23    Page 744 of 1392    PageID 15486
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 633 of 1803    PageID 11379
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 83 of 229

# EXHIBIT A

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

**[ESTATE CLAIMS]**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-5 Filed 03/25/23 Page 745 of 1392 PageID 15487
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 634 of 1803 PageID 11380
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 86 of 229

## EXHIBIT "A"
### to
### Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

1.      <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.      <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.      <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

**Appellee Appx. 00628**
**Appx. 10439**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 02/20/03 1804 Page 746 of 1392   PageID 15488
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 635 of 1803   PageID 11381
Case 18-30264-sgj11 Doc 830 Filed 01/25/19   Entered 01/25/19 17:34:06   Page 85 of 229

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in

---

**Appellee Appx. 00629**
**APPX. 10830**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 02/09/23    Page 747 of 1392    PageID 15489
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 636 of 1803    PageID 11382
Case 18-30264-sgj11    Doc 820    Filed 10/25/19    Entered 10/25/19 17:34:06    Page 86 of 229

control of Highland, and,

> (q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

> (a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

> (b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

> (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

> (d)    All Avoidance Actions against HCLOF;

> (e)    All Claims for breach of the PMAs or the Indentures;

> (f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

> (g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

> (h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

> (i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

> (j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

> (k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

> (l)    All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 02/23/24   Page 748 of 1392   PageID 15490
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 637 of 1803   PageID 11383
Case 18-30264-sgj11 Doc 830 Filed 10/25/19   Entered 10/25/19 17:34:06   Page 57 of 229

HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

       (m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

       (a)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

       (b)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

       (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

       (d)    All Avoidance Actions against Highland HCF;

       (e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

       (f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

       (g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

       (h)    All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

       (i)    All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

       (j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00631
Appx. 10482

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 02/03/25   Page 749 of 1392   PageID 15491
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 638 of 1803   PageID 11384
Case 18-30264-sgj11   Doc 830   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 86 of 229

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 04/30/2018 Page 750 of 1392    PageID 15492
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 639 of 1803    PageID 11385
Case 18-30264-sgj11 Doc 830 Filed 10/25/18    Entered 10/25/18 17:34:06    Page 89 of 229

Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.    <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against CLO Holdco;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

---

Appellee Appx. 00633
APPX. 10485

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 4/29/23 1804age 751 of 1392    PageID 15493
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 640 of 1803    PageID 11386
Case 18-30264-sgj11 Doc 830 Filed 10/25/18    Entered 10/25/18 17:34:06    Page 90 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00634
APPX. 10436

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/22/23   Page 752 of 1392   PageID 15494
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 641 of 1803   PageID 11387
Case 18-30264-sgj11   Doc 830   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 913 of 229

    (j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

    (k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

    (l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

    (m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    9.    <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

    (a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

    (b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

    (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

    (d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

    (e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

    (f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

    (g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

    (h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 04/29/23    Page 753 of 1392    PageID 15495
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 642 of 1803    PageID 11388
Case 18-30264-sgj11 Doc 829 Filed 01/28/19    Entered 01/28/19 17:34:06    Page 92 of 229

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Highland Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets

Appellee Appx. 00636
Appx. 10483

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 04/23/24   Page 754 of 1392   PageID 15496
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 643 of 1803   PageID 11389
Case 18-30264-sgj11 Doc 830 Filed 01/25/19   Entered 01/25/19 17:34:06   Page 93 of 229

owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i) All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k) All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l) All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m) All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.  Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.  Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 48-6   Filed 04/25/23   Page 755 of 1392   PageID 15497
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 644 of 1803   PageID 11390
Case 18-30264-sgj11 Doc 830 Filed 10/25/18   Entered 10/25/18 17:34:06   Page 94 of 229

unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.     Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.     Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.     Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

(a)     William Scott;

(b)     Heather Bestwick;

(c)     Any other Person who may be so named at a later date by the Reorganized Debtor.

---

Exhibit "A" to Second Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                    Page 11

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8 35   Filed 2/26/03 1804 Page 756 of 1392   PageID 15498
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 645 of 1803   PageID 11391
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:32:06   Page 95 of 229

16.   <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17.   <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18.   <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19.   <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20.   <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

21.   <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.  Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6.5   Filed 04/03/180Page 757 of 1392   PageID 15499
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 646 of 1803   PageID 11392
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 96 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 48 of 62
Schedule 1 to Exhibit A to
Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Payments within 90 Days of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| Payments to Insiders within One Year of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/28/23   Page 758 of 1392   PageID 15500
Exhibit 6 Part 4 Page 49 of 62
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 647 of 1803   PageID 11393
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 97 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 49 of 62
Schedule 1 to Exhibit A to

Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 02/23/24   Page 759 of 1392   PageID 15501
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 648 of 1803   PageID 11394
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 98 of 229

# EXHIBIT B

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

### [EXECUTORY CONTRACTS ASSUMED UNDER THE PLAN]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/20/23   Page 760 of 1392   PageID 15502
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 649 of 1803   PageID 11395
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 99 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 51 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1, Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | March 18, 2013 | $0 |

1

Appellee Appx. 00643
APPX. 00845

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 07/28/1804    Page 761 of 1392    PageID 15503
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 650 of 1803    PageID 11396
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 100 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 52 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Supplemental Indenture | February 26, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1, Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |

2

Appellee Appx. 00644
APPX. 004496

Case 18-30264-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-5 Filed 05/23/18 Page 762 of 1392 PageID 15504
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 651 of 1803 PageID 11397
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 101 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 53 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A. 601 Travis Street, 16th Floor Houston, Texas 77002 Attn: Global Corporate Trust – Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A. 601 Travis Street, 16th Floor Houston, Texas 77002 Attn: Global Corporate Trust – Acis CLO 2013-2 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Governing Document (requested from HCM) | -- | $0 |

3

Appellee Appx. 00645
APPX. 008446

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23 1804 age 763 of 1392   PageID 15505
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 652 of 1803   PageID 11398
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 102 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 54 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-3 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | February 25, 2014 | $0 |

4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 02/23/1804   Page 764 of 1392   PageID 15506
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 653 of 1803   PageID 11399
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 103 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Memorandum and Articles of Association<br>of Acis CLO 2014-3 Ltd. | December 24, 2013 | $0 |
| Acis CLO 2014-4 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1 -1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1 -1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | June 5, 2014 | $0 |

5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-5    Filed 05/23/18 Page 765 of 1392    PageID 15507
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 654 of 1803    PageID 11400
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 104 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 56 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | June 5, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-4 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Island KY1-1102 | Memorandum and Articles of Association of Acis CLO 2014-4 Ltd. | April 1, 2014 | $0 |
| Acis CLO 2014-5 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |

6

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 05/02/24   Page 766 of 1392   PageID 15508
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 655 of 1803   PageID 11401
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 105 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 57 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | November 18, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Memorandum and Articles of Association of Acis CLO 2014-5 Ltd. | August 21, 2014 | $0 |
| Acis CLO 2015-6 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |

7

Appellee Appx. 00649
Appx. 10990

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 58-6   Filed 02/09/23   Page 767 of 1392   PageID 15509
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 656 of 1803   PageID 11402
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 106 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | April 16, 2015 | $0 |
| Acis CLO 2015-6 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Indenture | April 16, 2015 | $0 |

8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 2/59/23180-4   Page 768 of 1392   PageID 15510
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 657 of 1803   PageID 11403
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 107 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd.<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, KY1-1102, Cayman Islands | Memorandum and Articles of Association of Acis CLO 2015-6 Ltd. | February 11, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC<br>P.O. Box. 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |
| Acis CLO Value Master Fund II, LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |

9

Appellee Appx. 00651
APPx. 007902
APPx. 004763

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-6 Filed 2/29/23 Page 769 of 1392 PageID 15511
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 658 of 1803 PageID 11404
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 108 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| BayVK R2 Lux S.A., SICAV FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Agreement for the Outsourcing of the<br>Asset Management of BayVK R2 Lux<br>S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Power of Attorney<br>86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement<br>(Requested from HCM) | November 20, 2007 | $0 |

10

Appellee Appx. 00652
Appx. 10964
Appx. 10404

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1883   Filed 12/23/18 Page 770 of 1392   PageID 15512
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 659 of 1803   PageID 11405
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 109 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 61 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 20, 2007 | $0 |
| Deutsche Bank Trust Company Americas 1761 East St. Andrew Place Santa Ana, CA 92705 Attn: CDO Business Unit – Hewett's Island CLO 1-R | Indenture | November 20, 2007 | $0 |
| State Street (Guernsey Limited) First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| Acis Loan Funding, Ltd. First Floor, Dorey Court St. Peter Port, Guernsey GY1 6HJ Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |

11

Appellee Appx. 00653
Appx. 10995

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 02/09/23    Page 771 of 1392    PageID 15513
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 660 of 1803    PageID 11406
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 110 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Capital Management, LP c/o *PHELANLAW* 4214 Woodfin Drive Dallas, Texas 75220 | Amended and Restated Agreement of Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC c/o *PHELANLAW* 4214 Woodfin Drive Dallas, Texas 75220 | Amended and Restated Limited Liability Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1.  Acis CLO 2013-1, Ltd.
2.  Acis CLO 2013-2, Ltd.
3.  Acis CLO 2014-3, Ltd.
4.  Acis CLO 2014-4, Ltd.
5.  Acis CLO 2014-5, Ltd.
6.  Acis CLO 2015-6, Ltd.
7.  Acis CLO Value Fund II, L.P.
8.  Acis CLO Value Fund II (Cayman), L.P.
9.  Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS
11. Hewitt's Island CLO 1-R, Ltd.
12. Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit B.

12

Appellee Appx. 00654
Appx. 10406

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 13-35    Filed 02/28/24    Page 772 of 1392    PageID 15514
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 661 of 1803    PageID 11407
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 111 of 229

# EXHIBIT "2"

**[First Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 693]**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-35    Filed 02/03/23    Page 773 of 1392    PageID 15515
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 662 of 1803    PageID 11408
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:00    Page 1 of 29

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR**
**ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CHAPTER 11 CASES |
| ACIS CAPITAL MANAGEMENT, L.P., ACIS CAPITAL MANAGEMENT GP, LLC, | § § § § | CASE NO. 18-30264-sgj11 (Jointly Administered) |
| Debtors. | § | |

### FIRST MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
### ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this First Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP*

*and Acis Capital Management GP, LLC* [Docket No. 660] (the "Plan").

1.    Reference is here made to the Plan for all purposes.  This First Modification

modifies the Plan.

2.    **Modification to Section 1.09.**  Section 1.09 of the Plan is hereby modified to read

Appellee Appx. 00656
APPX. 10903

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 07/03/23    Page 774 of 1392    PageID 15516
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 663 of 1803    PageID 11409
Case 19-30262-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 13 of 29

as follows:

    1.09   "<u>Assets</u>" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.

    3.    The change to section 1.09 above merely corrects a typographical error in the definition of the term "Assets." Specifically, the revised definition removes the incomplete phrase "Without limiting the foregoing, this shall include all" from the end of the definition of Assets.

    4.    **Modification to Exhibit "A".** The copy of the Exhibit "A" reflecting Estate Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached hereto as **Exhibit "1."**

    5.    A copy of the document reflecting the modifications to Exhibit A to the Plan in redline format is attached hereto as **Exhibit "2."**

    6.    This First Modification is a non-material change. It merely corrects a typographical error and revises the Estate Claims being reserved, retained and preserved under the Plan. Further, even if this First Modification were deemed material, it does not adversely affect any creditor because no ballots have yet been received in relation to the Plan and this First Modification is being sent to all creditors and parties in interest eighteen (18) days in advance of the deadline for parties to submit ballots and any objections to the Plan. Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this modification prior to voting on the Plan.

Dated: November 8, 2018.    Respectfully submitted,

    ACIS CAPITAL MANAGEMENT, L.P.

    By: /s/ *Robin Phelan*
        Robin Phelan
        Chapter 11 Trustee

Appellee Appx. 00657
APPX. 10209

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 06/23/1804   Page 775 of 1392   PageID 15517
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 664 of 1803   PageID 11410
Case 18-30264-sgj11   Doc 835-Filed 01/13/18   Entered 01/13/18 17:34:00   Page 114 of 229
Case 18-30264-sgj11   Doc 835 Filed 01/13/18   Entered 01/13/18 17:34:00   Page 3 of 43

ACIS CAPITAL MANAGMENET GP, LLC

By: /s/ *Robin Phelan*
     Robin Phelan
     Chapter 11 Trustee


APPROVED:                    APPROVED:

/s/ *Jeff P. Prostok*              /s/ *Rahkee V. Patel*
Jeff P. Prostok –  State Bar No. 16352500    Rakhee V. Patel – State Bar No. 00797213
J. Robert Forshey – State Bar No. 07264200   Phillip Lamberson – State Bar No. 00794134
Suzanne K. Rosen –  State Bar No. 00798518  Joe Wielebinski – State Bar No. 21432400
Matthew G. Maben – State Bar No. 24037008  Annmarie Chiarello –State Bar No. 24097496
**FORSHEY & PROSTOK LLP**          **WINSTEAD PC**
777 Main St., Suite 1290             500 Winstead Building
Ft. Worth, TX 76102               2728 N. Harwood Street
Telephone: (817) 877-8855          Dallas, Texas 75201
Facsimile: (817) 877-4151           Telephone: (214) 745-5400
jprostok@forsheyprostok.com       Facsimile:  (214) 745-5390
bforshey@forsheyprostok.com       rpatel@winstead.com
srosen@forsheyprostok.com         plamberson@winstead.com
mmaben@forsheyprostok.com       jwielebinski@winstead.com
                                          achiarello@winstead.com

**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**           **SPECIAL   COUNSEL   FOR   ROBIN**
                                   **PHELAN, CHAPTER 11 TRUSTEE**


<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 8, 2018.

                                  /s/ *Jeff P. Prostok*
                                  Jeff P. Prostok


\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\First Modification to Third Amended Plan 11.8.18.docx

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 02/23/2024    Page 776 of 1392    PageID 15518
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 665 of 1803    PageID 11411
Case 18-30264-sgj11    Doc 829    Filed 01/31/19    Entered 01/31/19 17:34:00    Page 15 of 229
Case 18-30264-sgj11    Doc 895    Filed 13/08/18    Entered 13/08/18 13:49:00    Page 4 of 45

# Exhibit "1"
## [Revised Exhibit "A" to the Third Amended Joint Plan]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 06/02/25   Page 777 of 1392   PageID 15519
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 666 of 1803   PageID 11412
Case 18-30264-sgj11 Doc 849 Filed 01/17/18 Entered 01/17/18 17:34:00 Page 15 of 229

**EXHIBIT "A"**
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.      <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.      <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.      <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

**Appellee Appx. 00660**
**Appx. 10932**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 13-5   Filed 06/08/23   Page 778 of 1392   PageID 15520
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 667 of 1803   PageID 11413
Case 18-30264-sgj11   Doc 829   Filed 01/31/18   Entered 01/31/18 17:34:00   Page 17 of 229

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Appellee Appx. 00661
Appx. 10913

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Exhibit 6   Filed 02/05/24   Page 779 of 1392   PageID 15521
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 668 of 1803   PageID 11414
Case 18-30264-sgj11   Doc 829   Filed 01/13/018   Entered 01/13/019 17:34:00   Page 18 of 29

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     HCLOF Claims.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8835    Filed 12/20/23    Page 780 of 1392    PageID 15522
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 669 of 1803    PageID 11415
Case 18-30264-sgj11    Doc 829    Filed 01/31/18    Entered 01/31/18 17:34:00    Page 19 of 229

(l)    All Claims based on alter ego or rights to pierce the corporate veil of
HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William
Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons
otherwise in control of HCLOF; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF
Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate
and Reorganized Debtor, including without limitation all such Estate Claims asserted by the
Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall
include all Estate Claims set forth in paragraph 2 above, including without limitation, the
following:

(a)    All such Claims against Highland HCF asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Highland Adversary;

(b)    All such Claims against Highland HCF asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland HCF;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Highland HCF for the turnover of Estate Assets,
including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363
of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets
owned by the Debtors or Estate, as well as the turnover of any books, documents, records and
papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Highland HCF for the unauthorized use of Estate
Assets including, without limitation, any intellectual property rights or Assets owned by the
Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or
Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 07/29/23 180age 781 of 1392    PageID 15523
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 670 of 1803    PageID 11416
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 120 of 229

Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.    <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland CLOM;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

**Appellee Appx. 00664**
**Appx. 10936**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 685   Filed 12/29/23 Page 782 of 1392   PageID 15524
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 671 of 1803   PageID 11417
Case 18-90064-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:30:00   Page 20 of 28

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.     CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 6/29/23/Page 783 of 1392   PageID 15525
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 672 of 1803   PageID 11418
Case 18-30064-sgj11 Doc 389 Filed 01/30/18   Entered 01/30/18 17:36:06   Page 22 of 28

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 04/24/23   Page 784 of 1392   PageID 15526
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 673 of 1803   PageID 11419
Case 18-30664-sgj11   Doc 889   Filed 01/30/19   Entered 01/30/19 17:34:00   Page 23 of 28

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)      All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.      Claims against Issuers, Co-Issuers and Indenture Trustee.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)      All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 02/23/23   Page 785 of 1392   PageID 15527
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 674 of 1803   PageID 11420
Case 18-30664-sgj11   Doc 893   Filed 01/30/18   Entered 01/30/18 17:34:06   Page 24 of 29

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Highland Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Page 670/Q3180/Page 786 of 1392   PageID 15528
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 675 of 1803   PageID 11421
Case 18-30664-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:36:20   Page 25 of 49

(h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 787 of 1392   PageID 15529
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 676 of 1803   PageID 11422
Case 18-90064-sgj11   Doc 893   Filed 01/30/18   Entered 01/30/18 13:09:60   Page 26 of 49

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.   Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.   Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.   Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-35    Filed 09/08/23    Page 788 of 1392    PageID 15530
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 677 of 1803    PageID 11423
Case 18-30264-sgj11    Doc 693    Filed 01/30/18    Entered 01/30/18 17:34:06    Page 12 of 28

(a)    Cole Schotz, P.C.

(b)    Michael D. Warner

(c)    Jacob Frumkin

(d)    Warren A. Usatine

(e)    McKool Smith

(f)    Gary Cruciani

(g)    Michael Fritz

(h)    Carson Young

(i)    Lackey Hershman, LLP

(j)    Stinson Leonard Street LLP

(k)    Paul Lackey, Esq.

(l)    Michael Aigen, Esq.

(m)    Abrams & Bayliss, LLP

(n)    Kevin G. Abrams

(o)    A. Thompson Bayliss

(p)    Jones Day

(q)    Hilda C. Galvan

(r)    Michael Weinberg

(s)    Reid Collins & Tsai, LLP

(t)    Lisa Tsai

(u)    Stanton, LLP

(v)    James M. Stanton

(w)    Hunton Andrews Kurth

(x)    Marc Katz

(y)    Greg Waller

(z)    any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

---

Appellee Appx. 00671
APPX. 10973

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/29/23   Page 789 of 1392   PageID 15531
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 678 of 1803   PageID 11424
Case 18-30064-sgj11   Doc 893   Filed 11/06/18   Entered 11/06/18 17:34:06   Page 129 of 289

16.    <u>Retention of Claims Against Specific Persons or Categories of Persons</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Any other Person who may be so named at a later date by the Reorganized Debtor.

17.    <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 05/30/23   Page 790 of 1392   PageID 15532
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 679 of 1803   PageID 11425
Case 18-30064-sgj11   Doc 893   Filed 01/04/18   Entered 01/04/18 17:34:06   Page 129 of 289

22.  <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-36   Filed 06/23/18-04   Page 791 of 1392   PageID 15533
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 680 of 1803   PageID 11426
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 130 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 19 of 45

Schedule 1 to Exhibit "A" to

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Payments within 90 Days of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| Payments to Insiders within One Year of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 02/03/18   Page 792 of 1392   PageID 15534
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 681 of 1803   PageID 11427
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 131 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 20 of 45

Schedule 1 to Exhibit "A" to

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-3    Filed 03/03/23    Page 793 of 1392    PageID 15535
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 682 of 1803    PageID 11428
Case 18-30264-sgj11 Doc 829 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 32 of 289

# Exhibit "2"

## [Redline – Plan Exhibit "A"]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 1234/0231804 Page 794 of 1392   PageID 15536
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 683 of 1803   PageID 11429
Case 18-30064-sgj11 Doc 829 Filed 01/30/19  Entered 01/30/19 17:34:60  Page 33 of 29

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

     1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

     2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, <u>negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior</u>, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

     3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

     (a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

     (b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

     (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC            Page 1

**Appellee Appx. 00677**
**Appx. 10929**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Exhibit 3-6   Page 795 of 1392   PageID 15537
Case 3:23-cv-00726-S   Document 33   Filed 02/03/18   Page 795 of 1392   PageID 15537
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 684 of 1803   PageID 11430
Case 18-30264-sgj11  Doc 893  Filed 11/30/18   Entered 11/30/18 17:34:00   Page 34 of 28
Case 18-30264-sgj11  Doc 893  Filed 11/30/18   Entered 11/30/18 17:34:00   Page 35 of 28

Chapter 11 Trustee or Estate;

(d)   All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)   All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)   All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)   All Claims for breach of the PMAs or the Indentures;

(h)   All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)   All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)   All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)   all claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)   All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)   All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)   All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)   All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)   All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 08/23/18   Page 796 of 1392   PageID 15538
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 685 of 1803   PageID 11431
Case 18-30264-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:30:00   Page 35 of 289

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Exhibit "A" to ~~Second~~<u>Third</u> Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                                 Page 3

**Appellee Appx. 00679**
**Appx. 10930**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 02/06/18 04 Page 797 of 1392   PageID 15539
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 686 of 1803   PageID 11432
Case 18-30664-sgj11 Doc 889 Filed 11/30/18   Entered 01/30/18 17:30:00   Page 36 of 49

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Exhibit "A" to <s>Second</s><u>Third</u> Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                        Page 4

**Appellee Appx. 00680**
**Appx. 10932**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 685   Filed 02/03/18   Page 798 of 1392   PageID 15540
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 687 of 1803   PageID 11433
Case 18-30664-sgj11   Doc 893   Filed 01/30/18   Entered 01/30/18 17:34:06   Page 137 of 289

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1835   Filed 4.529/02/3180 Page 799 of 1392   PageID 15541
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 688 of 1803   PageID 11434
Case 18-30064-sgj11 Doc 893 Filed 11/30/18   Entered 11/30/18 17:30:00   Page 39 of 49

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                      Page 6

Appellee Appx. 00682
Appx. 10934

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 683   Filed 12/20/23   Page 800 of 1392   PageID 15542
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 689 of 1803   PageID 11435
Case 18-30064-sgj11   Doc 829   Filed 11/30/18   Entered 01/30/18 17:36:06   Page 39 of 49

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Exhibit "A" to ~~Second~~<u>Third</u> Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                                              Page 7

**Appellee Appx. 00683**
**APPX. 10935**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-3    Filed 05/03/18    Page 801 of 1392    PageID 15543
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 690 of 1803    PageID 11436
Case 18-30864-sgj11 Doc 893 Filed 01/30/18    Entered 01/30/18 17:36:00    Page 149 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                     Page 8

**Appellee Appx. 00684**
**Appx. 10936**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 02/03/2022 05 of 1392   PageID 15544
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 691 of 1803   PageID 11437
Case 18-30604-sgj11   Doc 893   Filed 11/30/18   Entered 01/30/19 17:36:00   Page 141 of 289

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Highland Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

---

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                    Page 9

**Appellee Appx. 00685**
**APPx. 10936**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 03/03/24   Page 803 of 1392   PageID 15545
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 692 of 1803   PageID 11438
Case 18-30264-sgj11   Doc 880   Filed 01/30/18   Entered 01/30/18 17:30:00   Page 42 of 49

(h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                Page 10

Appellee Appx. 00686
Appx. 10933

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68 Filed 12/04/23 Page 804 of 1392   PageID 15546
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 693 of 1803   PageID 11439
Case 18-30664-sgj11 Doc 883 Filed 11/30/18   Entered 11/30/18 17:34:60   Page 43 of 289

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

<u>15.    Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:</u>

---

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 05/03/24   Page 805 of 1392   PageID 15547
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 694 of 1803   PageID 11440
Case 18-30264-sgj11   Doc 893   Filed 01/30/18   Entered 01/30/18 17:34:06   Page 44 of 48

(a)     Cole Schotz, P.C.

(b)     Michael D. Warner

(c)     Jacob Frumkin

(d)     Warren A. Usatine

(e)     McKool Smith

(f)     Gary Cruciani

(g)     Michael Fritz

(h)     Carson Young

(i)     Lackey Hershman, LLP

(j)     Stinson Leonard Street LLP

(k)     Paul Lackey, Esq.

(l)     Michael Aigen, Esq.

(m)     Abrams & Bayliss, LLP

(n)     Kevin G. Abrams

(o)     A. Thompson Bayliss

(p)     Jones Day

(q)     Hilda C. Galvan

(r)     Michael Weinberg

(s)     Reid Collins & Tsai, LLP

(t)     Lisa Tsai

(u)     Stanton, LLP

(v)     James M. Stanton

(w)     Hunton Andrews Kurth

(x)     Marc Katz

(y)     Greg Waller

(z)     any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                    Page 12

**Appellee Appx. 00688**
**Appx. 10939**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 01/30/18   Page 806 of 1392   PageID 15548
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 695 of 1803   PageID 11441
Case 18-30664-sgj11 Doc 889 Filed 01/30/18   Entered 01/30/18 17:36:06   Page 45 of 289

15.16.  Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

        (a)     William Scott;

        (b)     Heather Bestwick;

        (c)     Any other Person who may be so named at a later date by the Reorganized Debtor.

16.17.  Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17.18.  Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18.19.  Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19.20.  Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20.21.  Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 02/03/804   Page 807 of 1392   PageID 15549
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 696 of 1803   PageID 11442
Case 18-30664-sgj11   Doc 893   Filed 11/06/18   Entered 11/06/18 17:34:06   Page 46 of 289

interest owners of the Debtors, Highland, or any Affiliates thereof.

21. 22. Recharacterization.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Exhibit "A" to Second Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                                Page 14

Appellee Appx. 00690
Appx. 10932

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 09/08/23   Page 808 of 1392   PageID 15550
Exhibit 5   Page 699 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 697 of 1803   PageID 11443
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 147 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18   Entered 11/08/18 13:03:00   Page 36 of 45

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 09/23/18   Page 809 of 1392   PageID 15551
Exhibit A   to   Page 1 of 1
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 698 of 1803   PageID 11444
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 148 of 229

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Schedule 1 to Exhibit "A" to

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

# Exhibit "3"

## [Service Lists]

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-16    Filed 12/29/23   Page 811 of 1392    PageID 15553
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 700 of 1803    PageID 11446
Case 18-30264-sgj11 Doc 893 Filed 01/30/18    Entered 01/30/18 17:34:06    Page 59 of 28

## Notice Service List
## Acis Capital Mgmt./Phelan
### #5980

BNP Paribas Securities Services
Luxembourg Branch
60 Avenue John F. Kennedy
1855 Luxembourg

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis Funding GP, Ltd.
Acis Funding L.P.
c/o Maples Corporate Services Limited
P0 Box 309, Ugland House
Grand Cayman, Cayman Islands KY1 -1104

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

Acis CLO Value Fund II (Cayman), L.P.
Acis CLO Value Fund II GP, LLC
Acis CLO Value Master Fund II, L.P.
PO Box 309, Ugland House
Grand Cayman, Cayman Islands KY1-1104

CLO Holdco, Ltd.
c/o Intertrust Corp. Srvs. (Cayman) Ltd.
190 Elgin Ave., George Town
Grand Cayman, Cayman Islands KY1-9005

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX 76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C. 20530

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

State Street (Guernsey) Limited
First Floor Dorey Court
Admiral Park, St. Peter Port, Guernsey

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

BayVK R2 Lux S.A., SICAV-FIS
15 Rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA  1901-7346

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 02/09/23    Page 812 of 1392    PageID 15554
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 701 of 1803    PageID 11447
Case 18-30264-sgj11 Doc 829 Filed 01/30/18    Entered 01/30/18 17:34:06    Page 51 of 28

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

Universal-Investment-Luxembourg S.A.
15 Rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Andrew Zollinger
DLA Piper LLP
1717 Main St., Suite 4600
Dallas, TX 75201-4629

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Hewett's Island CLO I-R, Ltd.
c/o Maples Finance Limited
PO Box 1093, Queensgate House
South Church St., George Town
Grand Cayman, Cayman Island KY1-1102

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Thomas Califano/Shmuel Klahr
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Highland HCF Advisor, Ltd.
c/o Maples Corporate Services, Ltd.
P.O. Box 309, Ugland House,
South Church Street, George Town
Grand Cayman, Cayman Island KY1-1004

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Maples Corporate Services, Ltd.
P.O. Box 309, Ugland House,
South Church Street, George Town
Grand Cayman, Cayman Island KY1-1004

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn: James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Acis CLO 2013-1 Ltd.
Acis CLO 2013-2
c/o Estera Trust (f/k/a Appleby Trust)
Clifton House 75 Fort St., P.O. Box 1350
Grand Cayman, Cayman Islands KY 1-1108

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 Ltd.
Acis CLO 2014-4 Ltd.
c/o MaplesFS Limited
P.O. Box 1093, Boundary Hall, Cricket Sq
Grand Cayman, Cayman Islands KY1-1102

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 Ltd.
Acis CLO 2015-6 Ltd.
c/o MaplesFS Limited
P.O. Box 1093, Boundary Hall, Cricket Sq
Grand Cayman, Cayman Islands KY1-1102

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 Ltd.
P.O. Box 1093, Boundary Hall, Cricket Sq
Grand Cayman, KY1-1102, Cayman Islands

Deutsche Bank Trust Company Americas
Attn: CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

Acis Loan Funding, Ltd.
First Floor, Dorey Court
St. Peter Port, Guernsey GYI 6HJ
Channel Islands

Acis CLO 2017-7 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/29/23 Page 813 of 1392   PageID 15555
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 702 of 1803   PageID 11448
Case 18-30264-sgj11 Doc 829 Filed 01/30/19 Entered 01/30/19 17:36:06 Page 52 of 28

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-6    Filed 04/03/18    Page 814 of 1392    PageID 15556
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 703 of 1803    PageID 11449
Case 18-30264-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:26  Page 53 of 289
Case 18-30264-sgj11 Doc 693 Filed 11/06/18  Entered 11/06/18 13:43:60  Page 53 of 289

**Noteholders List**

**[Confidential]**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 2/05/23   Page 815 of 1392   PageID 15557
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 704 of 1803   PageID 11450
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:26   Page 54 of 289

**Creditors Service List**
**Acis Capital Mgmt./Phelan**
**#5980**

## Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

## Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
P0 Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/09/23   Page 816 of 1392   PageID 15558
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 705 of 1803   PageID 11451
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 55 of 28

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Directors – Acis CLO 2013-1 Ltd.**
**75 Fort St., Clifton House**
**PO Box 1350**
**George Town, Grand Cayman**
**Cayman Island, KY1-1108**

**Directors – Acis CLO 2014-3 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors – Acis CLO 2014-4 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors – Acis CLO 2014-5 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors – Acis CLO 2015-6 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Acis CLO 2013-1, Ltd.**
**c/o Appleby Trust, Attn: Directors**
**Clifton House 75 Fort St., P0 Box 13**
**Grand Cayman, Cayman Islands KY1-1108**

**Acis CLO 2013-2 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-3 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

**Acis CLO 2017-7 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-35 Filed 07/09/23 Page 817 of 1392 PageID 15559
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 706 of 1803 PageID 11452
Case 18-30264-sgj11 Doc 829 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 156 of 289

## Class 4

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 07/09/23 Page 818 of 1392    PageID 15560
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 707 of 1803    PageID 11453
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 157 of 229

# EXHIBIT "3"

**[Second Modification to the Third Amended Joint Plan for
Acis Capital Management, L.P. and Acis Capital Management
GP, LLC – Dkt. No. 702]**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 03/08/24   Page 819 of 1392   PageID 15561
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 708 of 1803   PageID 11454
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 158 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CHAPTER 11 CASES |
| ACIS CAPITAL MANAGEMENT, L.P., ACIS CAPITAL MANAGEMENT GP, LLC, | § § § | CASE NO. 18-30264-sgj11 (Jointly Administered) |
| Debtors. | § § | |

## SECOND MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
## ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management, GP, LLC (the "Debtors"), files this Second Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP

and Acis Capital Management GP, LLC* [Docket No. 660], as modified by the *First Modification

to the Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital

Management GP, LLC* [Docket No. 693] (together, the "Plan").

1.      Reference is here made to the Plan for all purposes.  This Second Modification

Appellee Appx. 00702
APPX. 10954

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 2/20/23180    Page 820 of 1392    PageID 15562
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 709 of 1803    PageID 11455
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:08    Page 159 of 229

modifies the Plan.

2.    **Modification to Exhibit "A".**  The copy of the Exhibit "A" reflecting Estate

Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached

hereto as **Exhibit "1."**

3.    A copy of the document reflecting the modifications to Exhibit A to the Plan in

redline format is attached hereto as **Exhibit "2."**

4.    This Second Modification is a non-material change.  It merely revises the Estate

Claims being reserved, retained and preserved under the Plan.   Further, even if this First

Modification were deemed material, it is being sent to all creditors and parties in interest ten (10)

days in advance of the deadline for parties to submit ballots and any objections to the Plan.

Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this

modification prior to voting on the Plan or to change their previous acceptance or rejection upon

consideration of the modification.

Dated:  November 16, 2018.          Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ *Robin Phelan*
        Robin Phelan
        Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By:  /s/ *Robin Phelan*
        Robin Phelan
        Chapter 11 Trustee

Appellee Appx. 00703
Appx. 00955

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 53    Exhibit 3    Filed 7/29/23 Page 821 of 1392    PageID 15563
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 710 of 1803    PageID 11456
Case 19-30269-sgj11 Doc 829-2 Filed 01/31/18    Entered 01/31/18 17:34:06    Page 160 of 229
Case 19-30269-sgj11 Doc 829 Filed 01/31/18    Entered 01/31/18 17:34:35    Page 3 of 42

APPROVED:

/s/ *Jeff P. Prostok*
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ *Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL    COUNSEL    FOR    ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 16, 2018.

/s/ *Jeff P. Prostok*
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Second Modification to Third Amended Plan 11.16.18.docx

Appellee Appx. 00704
Appx. 10056

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 12/29/23    Page 822 of 1392    PageID 15564
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 711 of 1803    PageID 11457
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 161 of 229

# Exhibit "1"
## [Revised Exhibit "A" to the Third Amended Joint Plan]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 823 of 1392   PageID 15565
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 712 of 1803   PageID 11458
Case 19-30265-sgj11   Doc 829   Filed 01/31/18   Entered 01/31/18 17:34:05   Page 162 of 229

**EXHIBIT "A"**
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appellee Appx. 00706
Appx. 10955

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/20/23 Page 824 of 1392   PageID 15566
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 713 of 1803   PageID 11459
Case 18-30264-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 17:54:05 Page 163 of 229

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 12/29/23   Page 825 of 1392   PageID 15567
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 714 of 1803   PageID 11460
Case 18-30864-sgj11   Doc 829   Filed 01/31/18   Entered 01/31/18 17:34:06   Page 164 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/20/23   Page 826 of 1392   PageID 15568
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 715 of 1803   PageID 11461
Case 18-30264-sgj11   Doc 829   Filed 01/31/18   Entered 01/31/18 17:34:06   Page 165 of 229

(l)      All Claims based on alter ego or rights to pierce the corporate veil of
HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William
Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons
otherwise in control of HCLOF; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

5.      <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF
Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate
and Reorganized Debtor, including without limitation all such Estate Claims asserted by the
Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall
include all Estate Claims set forth in paragraph 2 above, including without limitation, the
following:

(a)      All such Claims against Highland HCF asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Highland Adversary;

(b)      All such Claims against Highland HCF asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland HCF;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland HCF for the turnover of Estate Assets,
including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363
of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets
owned by the Debtors or Estate, as well as the turnover of any books, documents, records and
papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland HCF for the unauthorized use of Estate
Assets including, without limitation, any intellectual property rights or Assets owned by the
Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or
Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/29/23 Page 827 of 1392   PageID 15569
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 716 of 1803   PageID 11462
Case 18-30264-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 17:34:06 Page 166 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 12/29/23    Page 828 of 1392    PageID 15570
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 717 of 1803    PageID 11463
Case 18-30064-sgj11    Doc 792    Filed 01/16/19    Entered 01/16/19 17:34:05    Page 167 of 289

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.    CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against CLO Holdco;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-3   Filed 07/29/23   Page 829 of 1392   PageID 15571
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 718 of 1803   PageID 11464
Case 18-30664-sgj11   Doc 792   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 168 of 209

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 07/20/23    Page 830 of 1392    PageID 15572
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 719 of 1803    PageID 11465
Case 18-30264-sgj11    Doc 820    Filed 01/31/18    Entered 01/31/18 17:34:05    Page 169 of 209

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.    <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)    All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/29/23    Page 831 of 1392    PageID 15573
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 720 of 1803    PageID 11466
Case 18-30264-sgj11    Doc 792    Filed 01/16/19    Entered 01/16/19 17:34:06    Page 179 of 209

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "<u>Affiliates</u>" and each, an "<u>Affiliate</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 12/29/23    Page 832 of 1392    PageID 15574
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 721 of 1803    PageID 11467
Case 18-30664-sgj11    Doc 879-2    Filed 01/31/19    Entered 01/31/19 17:34:06    Page 71 of 209

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.    <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.    <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/29/23    Page 833 of 1392    PageID 15575
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 722 of 1803    PageID 11468
Case 18-30264-sgj11    Doc 879    Filed 01/31/19    Entered 01/31/19 17:34:05    Page 12 of 20

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

---

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/24/03   Page 834 of 1392   PageID 15576
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 723 of 1803   PageID 11469
Case 18-30264-sgj11   Doc 792   Filed 01/16/18   Entered 01/16/18 17:34:06   Page 13 of 29

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the
following:

    (a)    Cole Schotz, P.C.

    (b)    Michael D. Warner

    (c)    Jacob Frumkin

    (d)    Warren A. Usatine

    (e)    McKool Smith

    (f)    Gary Cruciani

    (g)    Michael P. Fritz

    (h)    Carson D. Young

    (i)    Nicholas Matthews

    (j)    Lackey Hershman, LLP

    (k)    Stinson Leonard Street LLP

    (l)    Jamie R. Welton

    (m)    Paul B. Lackey

    (n)    Michael Aigen

    (o)    Roger L. Mandel

    (p)    Abrams & Bayliss, LLP

    (q)    Kevin G. Abrams

    (r)    A. Thompson Bayliss

    (s)    Jones Day

    (t)    Hilda C. Galvan

    (u)    Michael Weinberg

    (v)    Reid Collins & Tsai, LLP

    (w)    Lisa Tsai

    (x)    Stanton, LLP

    (y)    James M. Stanton

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/29/23    Page 835 of 1392    PageID 15577
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 724 of 1803    PageID 11470
Case 18-30064-sgj11 Doc 792 Filed 01/31/18    Entered 01/31/18 17:34:05    Page 174 of 209

(z)    Hunton Andrews Kurth

(aa)    Marc Katz

(bb)    Greg Waller

(cc)    any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.</u>  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Scott Ellington

(d)    Isaac Leventon

(e)    Jean Paul Sevilla

(f)    Hunter Covitz

(g)    The Dugaboy Investment Trust

(h)    Nancy Dondero, Trustee of the Dugaboy Trust

(i)    Grant Scott

(j)    Any other Person who may be so named at a later date by the Reorganized Debtor.

Appellee Appx. 00718
Appx. 00929

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/20/23   Page 836 of 1392   PageID 15578
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 725 of 1803   PageID 11471
Case 18-30264-sgj11   Doc 792   Filed 01/16/18   Entered 01/16/18 17:34:06   Page 75 of 209

17.     <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.     <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.     <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.     <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.     <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.     <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.  Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6835 Filed 27/09/23 Page 837 of 1392 PageID 15579
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 726 of 1803 PageID 11472
Case 18-30264-sgj11 Doc 829-2 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 176 of 209

# Exhibit "2"
## [Redline – Plan Exhibit "A"]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 683   Filed 12/29/23   Page 838 of 1392   PageID 15580
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 727 of 1803   PageID 11473
Case 18-30264-sgj11 Doc 829-1 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 17 of 29

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.      Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it
is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The
rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.      Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby
reserved, retained and preserved, and shall all be transferred to, and vested in, the
Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate
Claims described below.  In reserving, retaining, and preserving Estate Claims against any
named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and
preserve any and all Estate Claim against each such Person or category of Persons, including
all such Estate Claims pursuant to any applicable common law, based on any contract or
agreement or based upon any law, statute or regulation of any political entity, including the
United States and any state or political subdivision thereof, as well as all applicable remedies,
whether legal or equitable.  Without limiting the generality of the foregoing, the reservation,
retention, and preservation of Estate Claims against any Person, and the term "Estate Claims,"
shall encompass all Estate Claims against any such Person, including without limitation, all such
Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel,
fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander,
conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross
negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability,
respondeat superior, breach of any duty owed under either applicable law or any contract,
breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of
fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil
piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets,
unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the
Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability,
undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit
any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or
participating in any such unlawful act, or claims arising from or relating to the filing of the
involuntary bankruptcy petitions against the Debtors.

3.      Highland Claims.  All Estate Claims against Highland are reserved, retained and
preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all
such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-
sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's
Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in
paragraph 2 above, including without limitation, the following:

        (a)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which
could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which
could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/29/23    Page 839 of 1392    PageID 15581
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 728 of 1803    PageID 11474
Case 18-30264-sgj11 Doc 820 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 73 of 229

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 12/30/23   Page 840 of 1392   PageID 15582
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 729 of 1803   PageID 11475
Case 18-30264-sgj11 Doc 879-2 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 129 of 229
Case 18-30264-sgj11 Doc 820 Filed 01/16/18   Entered 01/16/18 17:34:05   Page 79 of 230

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00723
APP. 10925

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 12/29/23 1804 Page 841 of 1392    PageID 15583
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 730 of 1803    PageID 11476
Case 18-30264-sgj11 Doc 879-2 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 180 of 229

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     Highland HCF Advisor, Ltd. Claims.  All Estate Claims against Highland HCF Advisor, Ltd. ("Highland HCF") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00724
APPX. 10976

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-35   Filed 12/29/23   Page 842 of 1392   PageID 15584
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 731 of 1803   PageID 11477
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 181 of 209
Case 18-30264-sgj11 Doc 792 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 84 of 209

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00725
Appx. 05976

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 07/29/23    Page 843 of 1392    PageID 15585
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 732 of 1803    PageID 11478
Case 18-30264-sgj11 Doc 879 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 182 of 229

(j)    All Claims, rights or remedies for Equitable Subordination or
Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or
Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of
Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or
Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control
of Highland CLOM; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

7.    <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("CLO
Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized
Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in
the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims
set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee
or Estate in, or which could be asserted based on the facts or transactions alleged in, the
Highland Adversary;

(b)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee
or Estate in, or which could be asserted based on the facts or transactions alleged in, the
Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against CLO Holdco;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against CLO Holdco for the turnover of Estate Assets,
including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363
of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets
owned by the Debtors or Estate, as well as the turnover of any books, documents, records and
papers relating to the Debtors' property or financial affairs;

(i)    All Claims against CLO Holdco for the unauthorized use of Estate Assets
including, without limitation, any intellectual property rights or Assets owned by the Debtors or
Estate;

Appellee Appx. 00726
Appx. 10928

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-36 Filed 12/34/23 1304 844 of 1392 PageID 15586
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 733 of 1803 PageID 11479
Case 18-30264-sgj11 Doc 879 Filed 01/31/18 Entered 01/31/18 17:34:06 Page 182 of 229

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.    Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Neutra;

(e)    All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Neutra for the unauthorized use of Estate Assets

Appellee Appx. 00727
Appx. 10929

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 63  Exhibit 6  Filed 12/20/23  Page 845 of 1392  PageID 15587
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 734 of 1803  PageID 11480
Case 18-30264-sgj11 Doc 879 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 134 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)  All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)  All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)  All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)  All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.  Claims against Issuers, Co-Issuers and Indenture Trustee.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)  All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)  All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)  All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)  All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)  All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)  All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)  All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00728
Appx. 00939

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/30/23   Page 846 of 1392   PageID 15588
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 735 of 1803   PageID 11481
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 185 of 209
Case 18-30264-sgj11 Doc 792 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 85 of 109

(h)     All Claims for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     ~~Highland Affiliate~~ Claims. Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against ~~any~~ such Affiliates ~~of Highland~~ shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any ~~Highland~~ Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00729
Appx. 10930

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 12/30/23   Page 847 of 1392   PageID 15589
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 736 of 1803   PageID 11482
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 186 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 10 of 20

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against any ~~Highland~~ Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any ~~Highland~~ Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any ~~Highland~~ Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, ~~or any~~the Affiliates ~~thereof~~, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any ~~Highland~~ Affiliate as to any Person, including as against ~~any other~~Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates ~~of Highland~~, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any ~~Highland~~ Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Exhibit 6   Page 848 of 1392   PageID 15590
Case 3:23-cv-00726-S   Document 33-6   Filed 12/29/23   Page 848 of 1392   PageID 15590
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 737 of 1803   PageID 11483
Case 18-30264-sgj11 Doc 829-1 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 187 of 229
Case 18-30264-sgj11 Doc 670 Filed 01/16/18   Entered 01/16/18 17:34:05   Page 190 of 229

care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.     Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

        **Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.     Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.     Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims

**Appellee Appx. 00731**
**Appx. 10932**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 12/29/23    Page 849 of 1392    PageID 15591
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 738 of 1803    PageID 11484
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 98 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19    Entered 01/16/19 17:34:05    Page 98 of 229

for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit
of the Estate and Reorganized Debtor against all law firms and attorneys who and which
rendered legal services to the Debtors on a prepetition basis including, but not limited to, the
following:

(a)  Cole Schotz, P.C.

(b)  Michael D. Warner

(c)  Jacob Frumkin

(d)  Warren A. Usatine

(e)  McKool Smith

(f)  Gary Cruciani

(g)  Michael P. Fritz

(h)  Carson D. Young

(i)  Nicholas Matthews

(i)(j)  Lackey Hershman, LLP

(j)(k)  Stinson Leonard Street LLP

(l)  Jamie R. Welton

(k)(m)  Paul B. Lackey, Esq.

(l)(n)  Michael Aigen, Esq.

(o)  Roger L. Mandel

(m)(p)  Abrams & Bayliss, LLP

(n)(q)  Kevin G. Abrams

(o)(r)  A. Thompson Bayliss

(p)(s)  Jones Day

(q)(t)  Hilda C. Galvan

(r)(u)  Michael Weinberg

(s)(v)  Reid Collins & Tsai, LLP

(t)(w)  Lisa Tsai

(u)(x)  Stanton, LLP

Appellee Appx. 00732
APPX. 00934

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 07/03/24   Page 850 of 1392   PageID 15592
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 739 of 1803   PageID 11485
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 189 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 92 of 229

(v)(y)  James M. Stanton

(w)(z)  Hunton Andrews Kurth

(x)(aa)  Marc Katz

(y)(bb)  Greg Waller

(z)(cc)  any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

16.    Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Scott Ellington

(d)    Isaac Leventon

(e)    Jean Paul Sevilla

(f)    Hunter Covitz

(g)    The Dugaboy Investment Trust

(h)    Nancy Dondero, Trustee of the Dugaboy Trust

(i)    Grant Scott

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63 5   Filed 12/20/23 1804 Page 851 of 1392   PageID 15593
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 740 of 1803   PageID 11486
Case 18-30264-sgj11 Doc 820 Filed 01/31/18   Entered 01/31/18 17:34:06   Page 99 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/18   Entered 01/16/18 17:34:05   Page 99 of 229

(j)      Any other Person who may be so named at a later date by the Reorganized Debtor.

(c)

17.     Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.     Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.     Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.     Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.     Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.     Recharacterization.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

---

Formatted: Indent: Left:  1",  No bullets or numbering

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc

Case 3:23-cv-00726-S    Document 6835    Filed 07/29/03 1804 age 852 of 1392    PageID 15594

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 741 of 1803    PageID 11487

Case 18-30064-sgj11 Doc 820 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 191 of 209
Case 98-90064-sgj11 Doc 702 Filed 01/16/98    Entered 01/16/98 17:34:05    Page 94 of 209

# Exhibit "3"
## [Service Lists]

Appellee Appx. 00735

Appx. 00735

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 3603-6   Filed 2/29/23 1804   Page 853 of 1392   PageID 15595
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 742 of 1803   PageID 11488
Case 18-30264-sgj11 Doc 820 Filed 01/31/18   Entered 01/31/18 17:34:05   Page 98 of 209

## Notice Service List
## Acis Capital Mgmt./Phelan
## #5980

**BNP Paribas Securities Services**
**Luxembourg Branch**
**60 Avenue John F. Kennedy**
**1855 Luxembourg**

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

**Acis Funding GP, Ltd.**
**Acis Funding L.P.**
**c/o Maples Corporate Services Limited**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1 -1104**

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger, Goggan, Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

**Acis CLO Value Fund II (Cayman), L.P.**
**Acis CLO Value Fund II GP, LLC**
**Acis CLO Value Master Fund II, L.P.**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1-1104**

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX 76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C. 20530

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

**State Street (Guernsey) Limited**
**First Floor Dorey Court**
**Admiral Park, St. Peter Port, Guernsey**
**Channel Islands GYI 6HJ**

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey**

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA 1901-7346

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-3   Filed 7/24/23   Page 854 of 1392   PageID 15596
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 743 of 1803   PageID 11489
Case 18-30264-sgj11 Doc 820 Filed 01/31/19 Entered 01/31/19 17:34:05 Page 93 of 229

US Bank
PO Box 5229
Cincinnati, OH 45201-5229


Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361


Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361


**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**


**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Port St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**


**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**


**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**


**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**


U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603


U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603


U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603


Deutsche Bank Trust Company Americas
Attn:  CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705


Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201


Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801


**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102,**


Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711


Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711


**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 07/25/23   Page 855 of 1392   PageID 15597
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 744 of 1803   PageID 11490
Case 18-30264-sgj11 Doc 879-2 Filed 01/16/19 Entered 01/16/19 17:34:05 Page 94 of 229

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 12/20/23    Exhibit B-5    Page 856 of 1392    PageID 15598
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 745 of 1803    PageID 11491
Case 18-30264-sgj11 Doc 820 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 95 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19    Entered 01/16/19 17:34:06    Page 95 of 229

## Creditors Service List
### Acis Capital Mgmt./Phelan
### #5980

## Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

## Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
PO Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/29/23 1804ge 857 of 1392   PageID 15599
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 746 of 1803   PageID 11492
Case 18-30264-sgj11 Doc 820 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 96 of 229

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Directors – Acis CLO 2013-1 Ltd.
75 Fort St., Clifton House
PO Box 1350
George Town, Grand Cayman
Cayman Island, KY1-1108

Directors – Acis CLO 2014-3 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2014-4 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2014-5 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2015-6 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Acis CLO 2013-1, Ltd.
c/o Appleby Trust, Attn: Directors
Clifton House 75 Fort St., P0 Box 13
Grand Cayman, Cayman Islands KY1-1108

Acis CLO 2013-2 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-3 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-4 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-5 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2015-6 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Acis CLO 2017-7 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 07/28/23    Page 858 of 1392    PageID 15600
Exhibit 35    Page 749 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 747 of 1803    PageID 11493
Case 18-30264-sgj11 Doc 879 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 97 of 209
Case 18-30264-sgj11 Doc 792 Filed 01/16/19    Entered 01/16/19 17:34:06    Page 97 of 209

## Class 4

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-3    Filed 12/29/23    Page 859 of 1392    PageID 15601
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 748 of 1803    PageID 11494
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 198 of 229

# EXHIBIT "4"

**[Supplement to Second Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 769]**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 12/20/23   Page 860 of 1392   PageID 15602
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 749 of 1803   PageID 11495
Case 18-30264-sgj11   Doc 765   Filed 01/31/19   Entered 01/31/19 17:54:06   Page 199 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CHAPTER 11 CASES |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| Debtors. | § § § | |

## SUPPLEMENT TO SECOND MODIFICATION TO THE THIRD AMENDED JOINT
## PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND
## ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this Supplement to the Second

Modification (the "Second Modification") to the *Third Amended Joint Chapter 11 Plan for Acis*

*Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 660], as modified

by the *First Modification to the Third Amended Joint Chapter 11 Plan for Acis Capital*

*Management, LP and Acis Capital Management GP, LLC* [Docket No. 693] (together, the "Plan").

Page 1 of 3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 12/19/23    Page 861 of 1392    PageID 15603
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 750 of 1803    PageID 11496
Case 19-30264-sgj11  Doc 829  Filed 01/31/19  Entered 01/31/19 17:34:06  Page 200 of 229

1.      On November 16, 2018, the Trustee filed the Second Modification.  The Second
Modification modified the Plan to replace the Exhibit "A," reflecting Estate Claims, with a revised
version of Exhibit A.  The Schedule "1" to Exhibit A, which reflects the Estate's Preference
Claims, was not changed from the version attached to the Plan but was inadvertently omitted from
the Second Modification.  For completeness and to avoid any confusion regarding the Preference
Claims being reserved, retained and preserved for the benefit of the Estate and Reorganized
Debtor, the Second Modification is hereby supplemented with the Schedule "1" to Exhibit "A" to
the Plan.

2.      A copy of the Schedule "1" is attached hereto as **Exhibit 1**.

3.      A copy of the complete Exhibit "A" to the Plan, including Schedule "1," is attached
hereto as **Exhibit "2."**

4.      A redline is not necessary because the attached Schedule "1" is unchanged from the
version attached to the Plan and included in the Trustee's solicitation materials.

Dated:  December 10, 2018.            Respectfully submitted,

                                     ACIS CAPITAL MANAGEMENT, L.P.

                                     By:  /s/ *Robin Phelan*
                                            Robin Phelan
                                            Chapter 11 Trustee

                                     ACIS CAPITAL MANAGMENET GP, LLC

                                     By:  /s/ *Robin Phelan*
                                            Robin Phelan
                                            Chapter 11 Trustee

Appellee Appx. 00744
Appx. 00746

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 12/29/23184 Page 862 of 1392    PageID 15604
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 751 of 1803    PageID 11497
Case 18-30264-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 18:40:10 Page 201 of 229
Case 18-30264-sgj11 Doc 765 Filed 12/10/18 Entered 12/10/18 18:40:10 Page 3 of 23

APPROVED:

/s/ *Jeff P. Prostok*
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ *Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL    COUNSEL    FOR    ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system on December 10, 2018.

/s/ *Jeff P. Prostok*
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Supplement to Second Modification to Third Amended Plan 12.10.18.docx

**Appellee Appx. 00745**
**APPX. 009496**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/29/23   Page 863 of 1392   PageID 15605
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 752 of 1803   PageID 11498
Case 19-30264-sgj11   Doc 829-5   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 202 of 229

# EXHIBIT "1"

Schedule "1" to Exhibit "A" to
Third Amended Plan

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 7/24/23   Page 864 of 1392   PageID 15606
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 753 of 1803   PageID 11499
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 203 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18   Entered 12/10/18 15:10:10   Page 5 of 23
Exhibit "A" to
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/8/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $25,000.00 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.3    Filed 12/23/18  Page 865 of 1392    PageID 15607
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 754 of 1803    PageID 11500
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 204 of 229

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Schedule 1 to Exhibit "A" to

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|-------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 12/20/23    Page 866 of 1392    PageID 15608
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 755 of 1803    PageID 11501
Case 19-30264-sgj11    Doc 829    Filed 01/31/19    Entered 01/31/19 17:34:06    Page 205 of 229
Case 19-30264-sgj11    Doc 855    Filed 12/10/18    Entered 12/10/18 19:40:10    Page 205 of 22

# EXHIBIT "2"

[Exhibit "A" to Third Amended Plan
as Supplemented]

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 12/29/23    Page 867 of 1392    PageID 15609
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 756 of 1803    PageID 11502
Case 19-30265-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:54:06    Page 206 of 229

**EXHIBIT "A"**
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Page 1 of 6 Page 868 of 1392   PageID 15610
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 757 of 1803   PageID 11503
Case 19-30264-sgj11   Doc 829-5   Filed 01/31/19   Entered 01/31/19 17:54:06   Page 207 of 229
Case 18-30264-sgj11   Doc 265   Filed 12/10/18   Entered 12/10/18 18:43:10   Page 9 of 23

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 869 of 1392   PageID 15611
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 758 of 1803   PageID 11504
Case 18-30264-sgj11   Doc 829   Filed 01/31/18   Entered 01/31/18 13:40:50   Page 208 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68   Filed 12/20/23   Page 870 of 1392   PageID 15612
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 759 of 1803   PageID 11505
Case 18-30264-sgj11   Doc 820   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 209 of 229

(l)    All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland HCF;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 12/20/23    Page 871 of 1392    PageID 15613
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 760 of 1803    PageID 11506
Case 18-30264-sgj11    Doc 789    Filed 01/31/19    Entered 01/31/19 17:34:06    Page 210 of 229

Estate;

> (k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

> (l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

> 6.    <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

> (a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

> (b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

> (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

> (d)     All Avoidance Actions against Highland CLOM;

> (e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

> (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

> (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

> (h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

> (i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00754
Appx. 15006

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/22/23   Page 872 of 1392   PageID 15614
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 761 of 1803   PageID 11507
Case 18-30064-sgj11   Doc 789   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 211 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/29/23   Page 873 of 1392   PageID 15615
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 762 of 1803   PageID 11508
Case 18-30664-sgj11   Doc 829   Filed 01/31/18   Entered 01/31/18 17:34:06   Page 212 of 229

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.     <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Neutra;

(e)     All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6335 Filed 12/04/23 Page 874 of 1392 PageID 15616
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 763 of 1803 PageID 11509
Case 18-30664-sgj11 Doc 878 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 18 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k) All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l) All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m) All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9. <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>. All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary. The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a) All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b) All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c) All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d) All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e) All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f) All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g) All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/23/23   Page 875 of 1392   PageID 15617
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 764 of 1803   PageID 11510
Case 18-30064-sgj11   Doc 789   Filed 01/31/19   Entered 01/31/19 17:34:00   Page 14 of 23

   (h) All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

   (i) All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

   (j) All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

   (k) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

   (l) All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

  10. <u>Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>. All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "<u>Affiliates</u>" and each, an "<u>Affiliate</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary. The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

   (a) All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

   (b) All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

   (c) All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

   (d) All Avoidance Actions against any Affiliate;

   (e) All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

   (f) All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

   (g) All Clams for usurpation of a corporate opportunity belonging to either of

Appellee Appx. 00758
APPX. 15009

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 683   Exhibit 85   Filed 12/20/23   Page 876 of 1392   PageID 15618
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 765 of 1803   PageID 11511
Case 18-30664-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 215 of 229

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)      All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.      <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.      <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 07/28/23 Exhibit 35    Page 877 of 1392    PageID 15619
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 766 of 1803    PageID 11512
Case 18-30264-sgj11    Doc 820-7 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 16 of 23

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6833    Filed 12/29/23    Page 878 of 1392    PageID 15620
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 767 of 1803    PageID 11513
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 13 of 29

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

    (a)    Cole Schotz, P.C.

    (b)    Michael D. Warner

    (c)    Jacob Frumkin

    (d)    Warren A. Usatine

    (e)    McKool Smith

    (f)    Gary Cruciani

    (g)    Michael P. Fritz

    (h)    Carson D. Young

    (i)    Nicholas Matthews

    (j)    Lackey Hershman, LLP

    (k)    Stinson Leonard Street LLP

    (l)    Jamie R. Welton

    (m)    Paul B. Lackey

    (n)    Michael Aigen

    (o)    Roger L. Mandel

    (p)    Abrams & Bayliss, LLP

    (q)    Kevin G. Abrams

    (r)    A. Thompson Bayliss

    (s)    Jones Day

    (t)    Hilda C. Galvan

    (u)    Michael Weinberg

    (v)    Reid Collins & Tsai, LLP

    (w)    Lisa Tsai

    (x)    Stanton, LLP

    (y)    James M. Stanton

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 12/29/23   Page 879 of 1392   PageID 15621
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 768 of 1803   PageID 11514
Case 18-30064-sgj11   Doc 820   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 218 of 229

(z)     Hunton Andrews Kurth

(aa)    Marc Katz

(bb)    Greg Waller

(cc)    any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.     <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)     William Scott;

(b)     Heather Bestwick;

(c)     Scott Ellington

(d)     Isaac Leventon

(e)     Jean Paul Sevilla

(f)     Hunter Covitz

(g)     The Dugaboy Investment Trust

(h)     Nancy Dondero, Trustee of the Dugaboy Trust

(i)     Grant Scott

(j)     Any other Person who may be so named at a later date by the Reorganized Debtor.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-5   Filed 2/20/23   Page 880 of 1392   PageID 15622
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 769 of 1803   PageID 11515
Case 18-30064-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 19 of 22

17.     <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.     <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.     <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.     <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.     <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.     <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Appellee Appx. 00763
Appx. 15515

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23   Page 881 of 1392   PageID 15623
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 770 of 1803   PageID 11516
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 220 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10   Page 22 of 23
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/23   Page 882 of 1392   PageID 15624
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 771 of 1803   PageID 11517
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 221 of 229

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 12/29/23    Page 883 of 1392    PageID 15625
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 772 of 1803    PageID 11518
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06    Page 222 of 229

# EXHIBIT "5"

**[Executory Contracts and Unexpired Leases to be Assumed by the Trustee]**

Appellee Appx. 00766

APPX. 05017

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 685    Filed 12/29/23    Page 884 of 1392    PageID 15626
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 773 of 1803    PageID 11519
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 223 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn:  Global Corporate Trust –<br>Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |

1

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-3 Filed 12/29/23 Page 885 of 1392 PageID 15627
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 774 of 1803 PageID 11520
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 224 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 Acis CLO 2014-3 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 Acis CLO 2014-4 | Portfolio Management Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |

2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 2/26/23 1804 Page 886 of 1392   PageID 15628
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 775 of 1803   PageID 11521
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 225 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC P.O. Box. 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP. 300 Crescent Court Suite 700 Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |

3

Appellee Appx. 00769
Appx. 15020

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 02/20/23    Page 887 of 1392    PageID 15629
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 776 of 1803    PageID 11522
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 226 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO Value Master Fund II, LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd. 300 Crescent Court Suite 700 Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| BayVK R2 Lux S.A., SICAV FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services Luxembourg Branch 60 Avenue John F. Kennedy 1855 Luxembourg | Power of Attorney 86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd. c/o Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |

4

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 683 Filed 12/29/23 Page 888 of 1392 PageID 15630
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 777 of 1803 PageID 11523
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 227 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. / c/o Maples Finance Limited / P.O. Box 1093, Queensgate House / Grand Cayman, Cayman Islands KY1-1102 | Governing Documents (Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd. / c/o Maples Finance Limited / P.O. Box 1093, Queensgate House / Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd. / c/o Maples Finance Limited / P.O. Box 1093, Queensgate House / Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement (Requested from HCM) | November 20, 2007 | $0 |
| State Street (Guernsey Limited) / First Floor, Dorey Court, Admiral Park, / St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association / 190 S. LaSalle Street, 8th Floor / Chicago, IL 60603 / Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. / 15 rue de Flaxweiler / L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. / 15 rue de Flaxweiler / L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. / 15 rue de Flaxweiler / L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |

5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 02/29/23 Page 889 of 1392    PageID 15631
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 778 of 1803    PageID 11524
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 228 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Loan Funding, Ltd.<br>First Floor, Dorey Court<br>St. Peter Port, Guernsey GY1 6HJ<br>Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |
| Acis Capital Management, LP<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Agreement of<br>Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Limited Liability<br>Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1. Acis CLO 2013-1, Ltd.
2. Acis CLO 2013-2, Ltd.
3. Acis CLO 2014-3, Ltd.
4. Acis CLO 2014-4, Ltd.
5. Acis CLO 2014-5, Ltd.
6. Acis CLO 2015-6, Ltd.
7. Acis CLO Value Fund II, L.P.
8. Acis CLO Value Fund II (Cayman), L.P.
9. Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS

6

Appellee Appx. 00772
APPX. 05024

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 836    Filed 7/20/23  Page 890 of 1392    PageID 15632
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 779 of 1803    PageID 11525

Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 229 of 229

**EXHIBIT "5"**

**Executory Contracts and Unexpired Leases**

**to Be Assumed by the Trustee**

11.   Hewitt's Island CLO 1-R, Ltd.

12.   Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit 5.

7

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/29/23    Page 891 of 1392    PageID 15633
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 780 of 1803    PageID 11526

# APPENDIX 9

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6.35   Filed 7/29/23180age 892 of 1392   PageID 15634
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 781 of 1803   PageID 11527

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 1 of 84   PageID 97994

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| NEUTRA, LTD., et al., | § § § | Civil Action No. 3:18-CV-1056-D (Consolidated with Civil Action Nos. 3:18-CV-1057-D, 3:18-CV-1073-D, and 3:18-CV-1084-D) |
| Appellants, | § § | |
| VS. | § § | (Bank. Ct. Nos. 18-30264-SGJ-7; 18-30265-SGJ-7) |
| JOSHUA N. TERRY, et al., | § § | |
| Appellees. | § § | |
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § § | |
| HIGHLAND CLO FUNDING, LTD., et al., | § § § | Civil Action No. 3:18-CV-1822-D (Bank. Ct. Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11) |
| Appellants, | § § | |
| VS. | § § | |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, et al., | § § § | |
| Appellees. | § | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/09/2181804    Page 893 of 1392    PageID 15635
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 782 of 1803    PageID 11528
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 2 of 84    PageID 97995

| | | |
|---|---|---|
| IN RE ACIS CAPITAL | § | |
| MANAGEMENT, L.P., et al., | § | |
| | § | |
| Debtors. | § | |
| | § | Civil Action No. 3:19-CV-0291-D |
| HIGHLAND CAPITAL | § | (Bank. Ct. Nos. 18-30264-SGJ-11 and |
| MANAGEMENT, L.P., et al., | § | 18-30265-SGJ-11) |
| | § | |
| Appellants, | § | |
| | § | |
| VS. | § | |
| | § | |
| ROBIN PHELAN, CHAPTER 11 | § | |
| TRUSTEE, et al., | § | |
| | § | |
| Appellees. | § | |

APPEALS FROM THE
UNITED STATES BANKRUPTCY COURT
<u>FOR THE NORTHERN DISTRICT OF TEXAS</u>

FITZWATER, Senior Judge:

In multiple appeals taken from two involuntary bankruptcy cases, the principal

questions presented are whether the bankruptcy court erred by issuing orders for relief and

denying the debtors' motion to dismiss or compel arbitration; whether the bankruptcy court

erred by approving a seven-figure break-up fee in favor of a potential transaction partner; and

whether the bankruptcy court erred by confirming a reorganization plan ("the Plan") that

enjoins a non-debtor, non-creditor entity from exercising certain contractual rights. The

court must also decide questions of the bankruptcy court's subject matter jurisdiction and of

one appellant's standing to appeal. For the reasons that follow, the court DISMISSES the

appeal from the orders for relief, AFFIRMS the break-up fee order, and AFFIRMS the order

- 2 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 683   Filed 07/24/23   Page 894 of 1392   PageID 15636
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 783 of 1803   PageID 11529
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 3 of 84   PageID 97996

approving the Plan.  The court need not address the bankruptcy court's denial of the motion to dismiss.

<p style="text-align:center">I</p>

The following factual summary is based on the bankruptcy court's findings of fact in support of the orders for relief and the Plan confirmation order.  *See In re Acis Capital Mgmt., L.P.* (*Acis II*), 2019 WL 417149, at \*2-7 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.) (confirmation order); *In re Acis Capital Mgmt., L.P.* (*Acis I*), 584 B.R. 115, 119-42 (Bankr. N.D. Tex. 2018) (Jernigan, J.) (orders for relief).[1]

<p style="text-align:center">A</p>

Appellant Highland Capital Management, L.P. ("Highland") is a Dallas-based registered investment advisor that manages nearly $15 billion of assets through an organizational structure comprised of roughly 2,000 different entities.  Its investment vehicles include mutual funds, private equity funds, and (relevant here) collateralized loan obligation funds ("CLOs").  Highland conducted its CLO business through an entity called Acis Capital Management, L.P. ("Acis LP") and Acis LP's general partner, Acis Capital Management GP, L.L.C. ("Acis GP") (collectively, "Acis," unless otherwise indicated), both debtors in these appeals.

In 2005 Highland hired appellee Joshua Terry ("Terry") as a portfolio analyst.  Terry

___

[1]"The court reviews the bankruptcy court's . . . fact findings only for clear error." *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000) (Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).

<p style="text-align:center">- 3 -</p>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 07/25/23   Page 895 of 1392   PageID 15637
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 784 of 1803   PageID 11530
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 4 of 84   PageID 97997

rose through the ranks at Highland until he became the portfolio manager for Highland's CLO business, and, in turn, received a 25% limited partnership interest in Acis LP. Terry successfully managed billions of dollars of assets on Highland's behalf until June 2016, when Highland terminated him. The reason for Terry's termination is disputed.[2] As a result of the termination, Terry's partnership interest in Acis LP was deemed forfeited without compensation.

In September 2016 Highland sued Terry in the 162nd Judicial District Court of Dallas County, seeking to recover, *inter alia*, on theories of breach of fiduciary duty, disparagement, and breach of contract. Terry asserted counterclaims against Highland, Acis, and others, and demanded arbitration. The state court stayed the proceeding and ordered arbitration, and in October 2017 the arbitration panel rendered an award in Terry's favor for $7,949,749.15, plus post-judgment interest, against Acis ("the Award"). Terry sought and obtained confirmation of the Award in the 44th Judicial District Court of Dallas County.

After the Award was confirmed, Terry began conducting post-judgment discovery, which revealed some transactions that appeared suspicious to Terry. Terry thought that Highland was denuding Acis of assets in an effort to make Acis judgment-proof. At a January 24, 2018 hearing, Terry requested a temporary restraining order ("TRO") to restrain

---

[2]According to the bankruptcy court, "[t]he arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors." *Acis II*, 2019 WL 417149, at *14; *see also* P. 1st Supp. to Pet. to Confirm Arbitration Award Exh. 1, No. DC-17-15244 (44th Dist. Ct., Dall. Cty., Tex. filed Nov. 13, 2017).

- 4 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-35    Filed 03/06/23    Page 896 of 1392    PageID 15638
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 785 of 1803    PageID 11531
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 5 of 84    PageID 97998

Acis LP from transferring any more assets pending a January 31 temporary injunction
hearing.  Acis LP agreed to the request, and the court issued a TRO.  Five days later, Terry
filed supplemental pleadings alleging that Acis LP was engaging in more wrongdoing, and
requested appointment of a receiver.  Instead of proceeding with the January 31 state-court
hearing, however, Terry took a different tack.  At 11:57 p.m. the night before the hearing,
Terry filed involuntary bankruptcy petitions against both Acis LP and Acis GP.[3]

<div align="center">B</div>

To comprehend some of the key issues in these appeals, it is helpful to recount some
of the fundamentals of CLOs and how Highland structured its CLO business.

At the most basic level, a CLO is a "basket of loans."  *Acis I*, 584 B.R. at 123.  A
special-purpose CLO entity ("CLO-SPE") purchases variable-rate commercial loans at the
direction of the CLO manager, and collects them into a pool of loans.  The obligors of the
loans are usually large, well-known companies.  Investors, such as pension funds, life
insurance companies, and others, buy into the CLO by purchasing fixed-rate, secured notes
on which the CLO-SPE itself is the obligor.  These notes are typically sold in tranches
representing different levels of risk.  The CLO-SPE pays its obligations on the secured notes
using the income it receives from its pool of loans, starting with the top tranche of notes and
then proceeding through the lower tranches.  These payments are made according to the
terms of certain indenture agreements between the CLO-SPE and the indenture trustee (here,

---

[3]The bankruptcy court administratively consolidated the two cases, appointed a single
trustee, and ultimately confirmed one Plan applicable to both alleged debtors.

<div align="center">- 5 -</div>

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 02/09/23 Page 897 of 1392    PageID 15639
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 786 of 1803    PageID 11532
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 6 of 84    PageID 97999

U.S. Bank, N.A.) to whom the CLO-SPE pledges collateral to secure the notes.

The last investor to be paid is the "equity" holder, who does not own actual equity but instead holds a subordinated, unsecured note. The equity investor earns money when the variable interest rates paid to the CLO-SPE on the commercial loans exceed the fixed interest rates that the CLO-SPE must pay to the secured note holders. Although the equity investor assumes the most risk, it also possesses certain rights that allow it to control the CLO—most significantly, the right to call for an optional redemption of the CLO.[4] When an optional redemption is effected, the CLO's pool of loans is liquidated and the resulting cash is used to pay back the outstanding secured notes, beginning with the top tranche and proceeding downward.[5]

In the present cases, Acis LP acts as the portfolio manager—*not* as the equity holder—of four CLO-SPEs, and is contractually entitled to receive portfolio management fees from them. Appellant Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey[6] entity formerly known as Acis Loan Funding, Ltd.,[7] is the primary equity investor in the CLOs.

---

[4]It is disputed whether the equity holder in this case had the right to compel Acis LP to effect an optional redemption of the relevant CLOs against Acis LP's will. The court need not resolve this dispute and therefore suggests no view on this question.

[5]The holders of the top tranche of secured notes also have special rights—namely, the right to terminate the CLO manager for cause on 45 days' notice. The note holders in these cases have so far not exercised that right.

[6]Guernsey is a small island nation located in the English Channel.

[7]For clarity, the court will refer to this entity as HCLOF, even when describing events that occurred before the entity changed its name.

- 6 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 07/28/23 1804    Page 898 of 1392    PageID 15640
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 787 of 1803    PageID 11533
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 7 of 84    PageID 98000

HCLOF does not own Acis; to the contrary, Acis LP once owned an indirect 15% stake in HCLOF for regulatory compliance reasons. Acis itself has never had any employees. Instead, it subcontracts all front office advising and back office support services to another entity. Highland was originally Acis LP's subcontractor, but, under the Plan, an entity called Brigade Capital Management, L.P. ("Brigade") fills that role (for a much lower cost).

Historically, all of these entities—Acis LP, Highland, HCLOF, and the CLO-SPEs—operated within an ecosystem of contracts that allowed Acis to manage the CLOs effectively. First, Acis LP had various fee-generating portfolio management agreements ("PMAs") with the CLO-SPEs . These contracts remain in place under the Plan. Second, Acis LP and Highland had a sub-advisory agreement, which obligated Highland to provide advisory and management services in exchange for substantial fees. Third, Acis LP and Highland had a shared services agreement, through which Highland provided back office services to Acis for a significant fee. And, fourth, Acis LP had a separate PMA with HCLOF ("the Equity PMA"). While the parties dispute the exact effect of the Equity PMA—i.e., to whom it gave power over whom—it is undisputed that Acis LP earned no fees from this contract.

<div align="center">C</div>

Circumstances changed after the state-court litigation between Highland and Terry began. As noted above, Highland and Acis LP engaged in numerous transactions that caused Terry to believe "that Highland was dismantling and denuding Acis LP of all of its assets and value." *Acis I*, 584 B.R. at 144. In October 2017, four days after Terry obtained the Award,

<div align="center">- 7 -</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23 1804 Page 899 of 1392   PageID 15641
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 788 of 1803   PageID 11534
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 8 of 84   PageID 98001

Acis LP sold its stake in HCLOF back to HCLOF in exchange for about $990,000 in cash.

As a result, Acis LP could no longer lawfully manage any new CLOs under the applicable

regulatory scheme.  Three days later, HCLOF entered into a new PMA—a replacement for

the Equity PMA—with a recently-formed Cayman Islands entity called Highland HCF

Advisor, Ltd.  At around the same time, Acis LP terminated the original Equity PMA.  In

early November 2017, Acis LP transferred one of its most significant assets—a $9.5 million

note receivable that Highland owed to it—to another Cayman Islands entity,  Highland CLO

Management, Ltd. ("Highland Management").  Acis LP transferred the note pursuant to a

contract that provided that Highland Management would step into Acis LP's shoes as the

portfolio manager for the CLOs.  Highland Management also promised to reimburse Acis LP

for up to $2 million of future legal fees and up to $1 million of future administrative

expenses.  One day after the Award was confirmed, Acis LP transferred away "the vehicle

that can most easily be described as the Acis LP 'risk retention structure' (necessitated by

[the] federal Dodd Frank law)" to Highland CLO Holdings Ltd., yet another Cayman Islands

entity.  *Acis I*, 584 B.R. at 129.  That same day, Acis LP conveyed to the same Cayman

Islands entity its contractual right to receive management fees from a particular CLO-SPE.

This contractual right was worth $5 million, but all Acis LP received in return was

forgiveness of a $2.8 million receivable that it owed to Highland.

On the day after Terry obtained his final judgment in the 44th Judicial District Court

of Dallas County, Acis LP underwent a sudden change in ownership.  Previously, Acis LP's

limited partners were Mark Okada ("Okada"), Highland's chief investment officer, and the

- 8 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 65   Filed 02/00/23 180 Page 900 of 1392   PageID 15642
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 789 of 1803   PageID 11535
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 9 of 84   PageID 98002

Dugaboy Investment Trust, a family trust of Highland's CEO, James Dondero.  But on December 18, 2017 Okada and the Dugaboy Investment Trust both conveyed their interests in Acis LP to appellant Neutra, Ltd. ("Neutra"), a Cayman Islands exempted company.  The Dugaboy Investment Trust also conveyed its 100% ownership interest in Acis GP to Neutra. Thus Neutra became Acis' sole equity owner.

Highland asserts that these transactions were part of a market-driven restructuring, or "reset," of Highland's CLOs.  According to Highland's witnesses, Acis LP had become "'toxic' in the market place" due to the litigation with Terry, and had to be excised from Highland's CLO business. *Acis I*, 584 B.R. at 128; *accord Acis II*, 2019 WL 417149, at *11. HCLOF also has an anonymous, third-party institutional investor ("the Passive Investor") who purportedly demanded that Acis LP be removed as Highland's CLO manager.  But the Passive Investor's representative testified at a hearing that the Passive Investor had made no such demand, and the bankruptcy court found that Highland's testimony about Acis' supposed toxicity was not credible.  According to the bankruptcy court, Highland's explanations for the transfers described above were "a seemingly manufactured narrative to justify prior actions." *Acis II*, 2019 WL 417149, at *16 (capitalization omitted).  The bankruptcy court rejected this narrative, finding that "[t]he evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor." *Id.* at *12.

- 9 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 133   Filed 07/29/22   Page 901 of 1392   PageID 15643
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 790 of 1803   PageID 11536
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 10 of 84   PageID 98003

D

Terry filed the involuntary petitions against Acis LP and Acis GP in order to stop the apparent transfer of assets away from Acis LP.  *See Acis I*, 584 B.R. at 144.  Fast-paced litigation followed.

On March 19, 2018—two days before the scheduled trial on the involuntary petitions—Acis filed a motion to dismiss for lack of subject matter jurisdiction, or, in the alternative, to compel arbitration ("the Arbitration Motion").  The bankruptcy court's decision to deny this motion is at issue in all three of the instant appeals.  The Arbitration Motion was based on the Acis LP limited partnership agreement ("the Acis LPA"), which governed the relationship between Terry and Acis.  The Acis LPA provides a dispute resolution procedure for "any controversy or claim . . . arising out of, relating to or in connection with the [Acis LPA] or otherwise involving the Partnership, its Partners and/or any GP Party."  Third Appeal R. 4504 (brackets in original).  Under this dispute resolution procedure, the parties must first attempt to mediate any dispute; only after mediating may they resort to binding arbitration.  Any party who fails to mediate a claim, or who files a judicial lawsuit, ostensibly waives that claim.  Acis argued in the Arbitration Motion that the Acis LPA's dispute resolution provisions applied to the involuntary petitions, and that because Terry failed to comply with those provisions, the bankruptcy court lacked subject matter jurisdiction over the controversy.  The bankruptcy court denied the Arbitration Motion on the eve of trial.

In the early morning hours of the day the trial was scheduled to begin (at 2:33 a.m.),

- 10 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/22/23   Page 902 of 1392   PageID 15644
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 791 of 1803   PageID 11537
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 11 of 84   PageID 98004

several Highland-related entities—including Neutra and HCLOF—filed a motion to intervene.   They sought intervention as of right under Fed. R. Bankr. P. 7024, or, alternatively, permissive intervention under Rule 2018.[8]   The putative intervenors did not, however, intend to participate in the trial; they sought only to preserve their right to appeal any adverse ruling.   The bankruptcy court denied the motion.

The trial of the involuntary petitions began as scheduled on March 21, 2018, and spanned five days.  On the first day of trial, the putative intervenors informed the bankruptcy court of their objection to the involuntary petitions, and they appeared via counsel during each day of the trial.  Following the trial, the bankruptcy court ruled in favor of Terry as the petitioning creditor, concluding that  Acis had fewer than 12 eligible creditors; Acis was not generally paying its debts as they came due; Terry filed the involuntary petitions in good faith; and abstention under 11 U.S.C. § 305 was not warranted.  The bankruptcy court issued orders for relief on April 13, 2018.

E

Highland and its related entities continued to participate in the bankruptcy court proceedings after the orders for relief were issued.  The bankruptcy court, after finding that a "trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP . . . [and] to resolve the inherent conflicts of interest between [Acis] and Highland," appointed Robin Phelan ("the Trustee") as trustee.  *See Acis I*, 584 B.R. at 149-

---

[8]Unless otherwise indicated, all citations in this opinion to a "Rule" are to the Federal Rules of Bankruptcy Procedure.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/29/23   Page 903 of 1392   PageID 15645
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 792 of 1803   PageID 11538
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 12 of 84   PageID 98005

50.  On April 30, 2018 HCLOF—acting in its capacity as the equity note holder—sent five notices to Acis LP directing it to effect an optional redemption of the Acis CLOs on June 14, 2018.  The Trustee analyzed the notices and concluded that they were defective.

Highland and HCLOF responded by filing an adversary proceeding against the Trustee, seeking to compel the Trustee to effect a redemption.[9]  The bankruptcy court *sua sponte* issued a TRO forbidding all relevant parties (including HCLOF) from taking any action in furtherance of an optional redemption of the CLOs.  HCLOF then informed the bankruptcy court at a June 14, 2018 hearing that it had withdrawn the optional redemption notices.  Because of HCLOF's representation, the Trustee did not seek to extend the TRO. The next day, HCLOF sent a *second* set of notices to Acis LP, again demanding that Acis LP effect an optional redemption of the CLOs.  The Trustee then filed his own adversary proceeding ("the Trustee Adversary") against Highland, HCLOF, and others, seeking a *second* TRO.[10]  The bankruptcy court granted the TRO, and, after an evidentiary hearing, converted the TRO into a preliminary injunction.

While these adversary proceedings were taking place, the Trustee was preparing a chapter 11 reorganization plan for Acis.[11]  The Trustee initially proposed three plans: Plan A, Plan B, and Plan C.  Under Plan A, the Trustee—using the doctrine of equitable

---

[9]Adversary Proceeding No. 18-03078-SGJ.

[10]Adversary Proceeding No. 18-03212-SGJ.

[11]When the bankruptcy court issued the orders for relief, the cases were under chapter 7 of the Bankruptcy Code.  The bankruptcy court later converted the cases to chapter 11 cases.

Appellee Appx. 00786
APPX. 05933

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/24/23 Page 904 of 1392   PageID 15646
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 793 of 1803   PageID 11539
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 13 of 84   PageID 98006

subrogation—would have transferred HCLOF's subordinated equity notes to a third party—Oaktree Capital Management LP ("Oaktree")—in exchange for a $100 million payment to HCLOF, and would have paid off Acis' other creditors with additional funds provided by Oaktree. Plans B and C would have amended the indenture agreements to prohibit any redemption right from being exercised until all allowed claims were paid in full. The purpose of Plans B and C was to prevent HCLOF from calling for an optional redemption of the CLOs, which would have rendered Acis LP's fee-paying PMAs worthless. The bankruptcy court ultimately held that all three of these proposed plans were unconfirmable.

Before proposing Plans A, B, and C, the Trustee asked the bankruptcy court to approve the payment of a $2.5 million break-up fee ("the Break-Up Fee") to Oaktree if Plan A was not confirmed within a certain time period. This Break-Up Fee was a small percentage of the total value of the Plan A transaction—which was roughly $108 million—but represented a large percentage of the $8.6 million that Acis LP would retain after HCLOF was compensated for its subordinated notes. The Trustee's motion also sought to substitute Oaktree for Highland as Acis LP's investment advisor and service provider. The Trustee also requested that Oaktree be reimbursed for any reasonable expenses it might incur in connection with the proposed transaction ("the Expense Reimbursement"). The bankruptcy court granted the motion with minor modifications.[12]

---

[12]Brigade—not Oaktree—now provides advisory and back office services to Acis.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 683    Filed 12/29/23    Page 905 of 1392    PageID 15647
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 794 of 1803    PageID 11540
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 14 of 84    PageID 98007

After the bankruptcy court rejected Plans A, B, and C, the Trustee proposed—and the bankruptcy court confirmed—Plan D.  Under the confirmed Plan, Terry received full equity ownership of Acis in exchange for a $1 million reduction in the value of his claim.  Acis LP continues to serve as the portfolio manager for the Acis CLOs and continues to earn management fees.  The cash flow resulting from Terry's operation of Acis will be used to pay the claims of Acis' creditors, including Terry.  To prevent Highland and HCLOF from disrupting this cash flow, the bankruptcy court entered an injunction ("the Temporary Injunction")[13] prohibiting various parties and non-parties—including HCLOF—from taking any steps to effect an optional redemption or liquidation of the Acis CLOs.  The Temporary Injunction is actually an extension of the preliminary injunction that the bankruptcy court issued in the Trustee Adversary.  It is set to expire upon the earlier of the following: (1) the entry of a final order in the Trustee Adversary; (2) the satisfaction of all allowed claims against Acis; (3) the bankruptcy court's entry of an order finding that a material default has occurred under the Plan; or (4) any subsequent order of the bankruptcy court providing otherwise as to one or more of the CLOs.

F

Three appeals (the first consisting of four consolidated appeals)[14] taken from the

_____

[13]Because the briefing refers to the plan injunction as a "temporary" injunction rather than a "preliminary" injunction, which is the federal nomenclature, the court will do so as well.

[14]The First Appeal consists of four consolidated appeals.  No. 3:18-CV-1056-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding

- 14 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 13   Filed 07/20/23 Page 906 of 1392   PageID 15648
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 795 of 1803   PageID 11541
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 15 of 84   PageID 98008

bankruptcy court's rulings are now before this court. For clarity, the court will refer to the appeals as the First, Second, and Third Appeals.

In the First Appeal (No. 3:18-CV-1056-D), appellant Neutra[15] contends that the bankruptcy court erred by denying the Arbitration Motion,[16] failing to dismiss the involuntary petitions on the ground that they were filed in bad faith, and declining to abstain under 11 U.S.C. § 305.

---

against Acis GP. No. 3:18-CV-1073-D is an appeal of the order for relief as to Acis LP. No. 3:18-CV-1084-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding against Acis LP.

No. 3:18-CV-1057-D is *supposed* to be an appeal of the order for relief as to Acis GP, but, due to a filing error, the notice of appeal actually challenges the order denying intervention as to Acis GP—the same order at issue in 3:18-CV-1056-D. Neutra attempted to remedy this mistake by filing a second amended notice of appeal in the bankruptcy court, but that notice was erroneously transmitted to the docket of 3:18-CV-1084-D instead of 3:18-CV-1057-D. Because these are ministerial errors that do not affect the court's jurisdiction, the court will correct them at the conclusion of this opinion. *See, e.g., In re Smith*, 133 B.R. 800, 804 (N.D. Tex. 1991) (Fitzwater, J.) ("In contrast to the failure properly to designate an appellant, which is a jurisdictional defect, the failure to specify the correct judgment is irrelevant where it is clear which judgment the appellant is appealing." (citations omitted)).

[15]HCLOF and an entity called CLO Holdco Ltd. are also named as appellants in the First Appeal. Neutra is the only appellant, however, who has submitted briefing.

[16]Neutra did not file a separate notice of appeal with respect to the order denying the Arbitration Motion. Instead, it contends that this order is an interlocutory order that merged into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Terry does not contest this assertion. Neutra also maintains that mandatory arbitration agreements implicate subject matter jurisdiction, which any party can raise at any time.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85   Filed 12/09/23   Page 907 of 1392   PageID 15649
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 796 of 1803   PageID 11542
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 16 of 84   PageID 98009

In the Second Appeal (No. 3:18-CV-1822-D), appellant Highland[17] contends that the bankruptcy court erred by denying the Arbitration Motion and approving the Break-Up Fee and Expense Reimbursement.[18]

In the Third Appeal (No. 3:19-CV-0291-D), appellants Highland and Neutra contend that the bankruptcy court erred by denying the Arbitration Motion; confirming the Plan while the appeal of the orders for relief was still pending; confirming the Plan even though the statutory requirements of 11 U.S.C. § 1129 were not met; and entering the Temporary Injunction.  HCLOF submitted a separate brief in the Third Appeal, arguing that the Temporary Injunction is beyond the constitutional authority of the bankruptcy court, is overbroad, and is not supportable under the four-part preliminary-injunction test.

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal.

The appeals and Acis' motion are before the court for decision.

## II

"The court reviews the bankruptcy court's conclusions of law *de novo*, but reviews its fact findings only for clear error."  *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000)

---

[17]HCLOF is also named as an appellant in the Second Appeal, but it did not submit or join in any briefing.

[18]The notice of appeal in the Second Appeal also challenges the bankruptcy court's decisions to deny a preliminary injunction requested by HCLOF and to grant the Trustee's request for a preliminary injunction in the Trustee Adversary.  These appeals were separately docketed and subsequently dismissed.

Appellee Appx. 00790
Appx. 15042

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 07/28/23   Page 908 of 1392   PageID 15650
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 797 of 1803   PageID 11543
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 17 of 84   PageID 98010

(Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).  "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed."  *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997) (Fitzwater, J.) (quoting *In re Placid Oil Co.*, 158 B.R. 404, 412 (N.D. Tex. 1993) (Fitzwater, J.)).  "If the trier of fact's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it."  *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412). "[T]his court does not find facts.  Neither is it free to view the evidence differently as a matter of choice."  *Id.* (alteration in original) (quoting *Placid Oil Co.*, 158 B.R. at 412). "The bankruptcy judge's unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected."  *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412) (internal quotation marks omitted).

In reviewing matters committed to the bankruptcy court's discretion—such as whether to approve a break-up fee and expense reimbursement—the court applies an abuse of discretion standard.  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010).  "To constitute an abuse of discretion, the [bankruptcy] court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous."  *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/29/23 18/04Page 909 of 1392    PageID 15651
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 798 of 1803    PageID 11544
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 18 of 84    PageID 98011

III

In the First Appeal, appellee Terry contends that appellant Neutra lacks standing to appeal the orders for relief.[19]

A

1

"Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) (citing *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 210 n.18 (5th Cir. 1994)).  But there are still limits on who may appeal a bankruptcy court order. *See In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018).  Before 1978, those limits were provided by the Bankruptcy Act, which granted appellate standing only to "person[s] aggrieved" by a bankruptcy court order. *Coho Energy*, 395 F.3d at 202 (quoting 11 U.S.C. § 67(c) (1976)).  Congress repealed the relevant statutory provision when it passed the Bankruptcy Reform Act of 1978, but courts—including the Fifth Circuit—nonetheless still apply the person aggrieved test to bankruptcy appeals. *See id.*  Because "[b]ankruptcy cases often involve numerous parties with conflicting and overlapping interests," and "[a]llowing each and every party to appeal each and every order

---

[19]The other appellants in the First Appeal have not briefed the issue of standing.  They have therefore failed to meet their burden to assert that they have standing. *See Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994) ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal.").

- 18 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-36   Filed 09/08/18 Page 910 of 1392   PageID 15652
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 799 of 1803   PageID 11545
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 19 of 84   PageID 98012

would clog up the system and bog down the courts," it is necessary for courts to limit who may appeal any given order. *Technicool Sys.*, 896 F.3d at 385.

The person aggrieved test "is 'more exacting' than the test for Article III standing." *Id.* (quoting *In re Delta Produce, L.P.*, 845 F.3d 609, 619 (5th Cir. 2016)). "Rather than showing the customary 'fairly traceable' causal connection, a bankruptcy appellant must instead show that he was 'directly and adversely affected pecuniarily by the order of the bankruptcy court.'" *Id.* (footnotes omitted) (first quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), then quoting *Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806 F.3d 363, 366 (5th Cir. 2015)).[20]

2

Equally important to deciding whether Neutra has standing is the "shareholder standing rule," which is "a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation" absent special circumstances. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The doctrine derives from the third-party standing rule: "the plaintiff generally must assert his

---

[20]Some courts have imposed an additional prerequisite: that the appellant have attended and objected at the underlying bankruptcy proceedings. *See, e.g., In re Palmaz Sci., Inc.*, 262 F.Supp.3d 428, 435 (W.D. Tex. 2017); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 693-94 (Bankr. W.D. Tex. 2011) (quoting *In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010)). But other courts have held that appearance and objection are not indispensable to appellate standing. *See In re Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1192-93 (9th Cir. 2018); *In re Urban Broad. Corp.*, 401 F.3d 236, 244 (4th Cir. 2005). The Fifth Circuit has not yet decided the question. *See Palmaz*, 262 F.Supp.3d at 434. This court need not decide the issue because it disposes of the question of Neutra's standing on other grounds.

- 19 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 08/03/18 04    Page 911 of 1392    PageID 15653
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 800 of 1803    PageID 11546
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 20 of 84    PageID 98013

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002). This court has recognized that "[u]nder federal common law [and] Texas law . . . only a corporation and not its shareholders, not even sole shareholders, can complain of an injury sustained by, or a wrong done to, the corporation." *Rigco, Inc. v. Rauscher Pierce Refsnes, Inc.*, 110 F.R.D. 180, 183 (N.D. Tex. 1986) (Fitzwater, J.). Although the rule is phrased in terms of corporations and shareholders, it applies with equal force to limited partnerships like Acis LP. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122-23 (2d Cir. 2013) (applying federal common law); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 220-22 (5th Cir. 1994) (applying Texas law); *see also In re A.S. Acquisition Corp.*, 56 Fed. Appx. 415, 416 (9th Cir. 2003) (memorandum) (holding that limited partner lacked standing to appeal bankruptcy court order that affected partnership property). It also applies to limited liability companies like Acis GP. *See Heyer v. Schwartz & Assocs. PLLC*, 319 F.Supp.3d 299, 304-05 (D.D.C. 2018) (applying federal common law); *Schoen v. Underwood*, 2012 WL 13029591, at *4 (W.D. Tex. May 15, 2012) (applying Texas law).

The Supreme Court has "treated standing as consisting of two related components: the constitutional requirements of Article III and nonconstitutional prudential considerations." *Franchise Tax Bd.*, 493 U.S. at 335. The shareholder standing rule falls within the latter category, and thus can operate to bar a lawsuit even if Article III standing is satisfied. *See id.* at 336. Recently, the Supreme Court called into question the continuing vitality of

- 20 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 08/25/23    Page 912 of 1392    PageID 15654
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 801 of 1803    PageID 11547
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 21 of 84    PageID 98014

prudential standing, observing that it is in tension with the principle that "a federal court's

obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B.*

*Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static*

*Control Components, Inc.*, 572 U.S. 118, 126 (2014)) (internal quotation marks omitted); *see*

*also Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, 758 F.3d 592, 603

n.34 (5th Cir. 2014) ("[T]he continued vitality of prudential 'standing' is now uncertain in

the wake of the Supreme Court's recent decision in *Lexmark*[.]").  But the Fifth Circuit has

since reaffirmed the third-party standing doctrine in particular. *See Superior MRI Servs., Inc.*

*v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 506 (5th Cir. 2015).  The doctrine therefore

remains binding in this circuit.

    The court is aware of no binding precedent requiring it to apply the shareholder

standing rule in the context of a bankruptcy appeal, but other courts have done so. *See, e.g.,*

*In re Heyl*, 770 F.3d 729, 730 (8th Cir. 2014) (per curiam); *In re AFY*, 734 F.3d 810, 822-23

(8th Cir. 2013); *A.S. Acquisition Corp.*, 56 Fed. Appx. at 416; *In re Troutman Enters.*, 286

F.3d at 365; *In re Dein Host, Inc.*, 835 F.2d 402, 404-06 (1st Cir. 1987); *Rose v. Logan*, 2014

WL 1236008, at *5-7 (D. Md. Mar. 25, 2014).  This court concludes that it should do so as

well, for at least two reasons.

    First, the person aggrieved test already includes a version of the third-party standing

rule.  It requires that the appellant be "*directly* and adversely affected pecuniarily by the

order of the bankruptcy court." *Technicool Sys.*, 896 F.3d at 385 (emphasis added) (quoting

*Fortune Nat. Res. Corp.*, 806 F.3d at 366).  "An 'indirect financial stake' in another's claims

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 03/23/18 04  Page 913 of 1392   PageID 15655
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 802 of 1803   PageID 11548
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 22 of 84   PageID 98015

is insufficient for standing." *In re The Watch Ltd.*, 257 Fed. Appx. 748, 749 (5th Cir. 2007)

(per curiam) (quoting *Rohm*, 32 F.3d at 208).

Second, the person aggrieved doctrine is itself a creature of prudential standing—it

is distinct from, and narrower than, constitutional standing, and it is justified by practical

considerations. *See Coho Energy*, 395 F.3d at 202 ("To prevent unreasonable delay, courts

have created an *additional* prudential standing requirement in bankruptcy cases: The

appellant must be a 'person aggrieved' by the bankruptcy court's order." (quoting *In re

P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))); *see also Technicool Sys.*, 896 F.3d at

384-86 (distinguishing constitutional standing from bankruptcy standing, and offering

prudential justifications for the latter). The policy underlying the person aggrieved doctrine

would be well-served by including within it a third-party standing or shareholder standing

rule. Without such a limitation, any one of a debtor's numerous shareholders could

separately appeal bankruptcy court orders affecting the value of the debtor—thus resulting

in "umpteen appeals raising umpteen issues." *Technicool Sys.*, 896 F.3d at 384. Neutra does

not argue that the shareholder standing rule is inapplicable to bankruptcy appeals generally.

Instead, Neutra maintains that it is asserting a direct, rather than a derivative, interest in the

orders for relief. The court therefore holds that the shareholder standing rule applies in the

context of bankruptcy appeals.

Although no party cites it, the court is aware of one Fifth Circuit decision that allowed

a debtor's majority shareholder to appeal an order of the bankruptcy court. In *In re First

Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), *superseded by statute on other

- 22 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 04/03/24    Page 914 of 1392    PageID 15656
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 803 of 1803    PageID 11549
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 23 of 84    PageID 98016

*grounds as recognized by In re Woerner*, 783 F.3d 266, 274 (5th Cir. 2015) (en banc),[21] the

Fifth Circuit authorized a debtor's majority shareholder to appeal an order awarding

attorney's fees to the trustee's attorneys (one of whom was himself the trustee). But as the

*First Colonial* panel was careful to point out, the case involved unique circumstances. *See

id.* at 1297 ("Although the attorneys and the trustee are correct in stating that in the usual

case the bankrupt and its shareholders do not have an interest in the disposition of the assets

of the estate . . . this is hardly the usual case."). The appeal involved an issue on which the

interests of the trustee and the debtor diverged, because "[w]here the trustee serves as his

own attorney there is no disinterested trustee to ensure that the attorney is paid only for

professional services necessary to the administration of the estate." *Id.* Thus the panel made

an exception: it allowed the shareholder to appeal, thereby "refusing to permit [the trustee]

to use his position as trustee to prevent [the shareholder] from contesting the size of his

attorneys' fee." *Id.* There are no such circumstances present here: the Trustee lacks a

similarly-direct "personal financial stake" in the orders for relief, and he is not using his

special position to insulate a favorable order from review. *Cf. AFY*, 734 F.3d at 823

(distinguishing *First Colonial* because trustee lacked personal financial stake in outcome of

appealed orders). *First Colonial* therefore does not prevent this court from applying the

shareholder standing rule to a bankruptcy appeal.

---

[21]Although *First Colonial* was decided before the passage of the Bankruptcy Reform
Act of 1978, the "person aggrieved" test applied by the courts post-1978 was taken directly
from pre-1978 jurisprudence. *See Coho Energy*, 395 F.3d at 202. *First Colonial*'s analysis
is therefore still relevant.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 08/03/23    Page 915 of 1392    PageID 15657
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 804 of 1803    PageID 11550
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 24 of 84    PageID 98017

B

Neutra asserts four different interests in the orders for relief.  None of these interests

suffices to give Neutra standing to appeal.

Neutra contends that it "is watching its interest in Acis being decimated by

administrative expenses."  Neutra First Appeal Br. 19.  In other words, Neutra's ownership

interest in Acis is losing value as a result of the inherent expenses of bankruptcy.  Under the

shareholder standing rule, however, this interest is quintessentially derivative of Acis' own

interests, and therefore cannot confer standing.  *See, e.g., Stevens v. Lowder*, 643 F.2d 1078,

1080 (5th Cir. Unit B Apr. 1981) ("Plaintiffs' individual injury arises only from the loss in

value of their stock as a result of injury to the corporation.  Under these circumstances,

plaintiffs have no independent cause of action.").  The First Circuit rejected a nearly-identical

argument in *Dein Host*, 835 F.2d 402.  It held that an appellant lacked standing where his

only interest in the bankruptcy court order was "that his beneficial interest in [another

entity]—his stock—[was] in jeopardy and subject to shrinkage."  *Id.* at 405.  In so

concluding, the court relied on the principle that "[t]he fact that the injury may indirectly

harm a stockholder by diminishing the value of his corporate shares does not bestow upon

him a right to sue on his own behalf."  *Id.* at 405-06 (quoting *Papilsky v. Berndt*, 466 F.2d

251, 255 (2d Cir. 1972)).  Thus even if Acis loses value as a result of its plunge into

bankruptcy, Neutra cannot appeal on this basis.

Neutra also posits that it "has lost its right to protect its interest [in Acis] via control

of [Acis]."  Neutra First Appeal Br. 19.  This interest is insufficient to confer standing

- 24 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 06/03/1804   Page 916 of 1392   PageID 15658
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 805 of 1803   PageID 11551
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 25 of 84   PageID 98018

because losing control over an entity is not, in itself, a *pecuniary* injury. *See Technicool Sys.*,
896 F.3d at 385 (requiring that appellant be "directly and adversely affected *pecuniarily* by
the order of the bankruptcy court" (emphasis added)); *see also Rose*, 2014 WL 1236008, at
\*5-7 (holding that shareholder standing rule applies with full force to entity's *sole* equity
owner). Control rights may enhance the value of Neutra's ownership interest, or may allow
Neutra to protect the value of that interest via advantageous business decisions. But, as the
court has already discussed, any diminishment in the value of Neutra's interest in Acis does
not confer standing on Neutra.

Neutra also asserted, at the time it filed its briefing in the First Appeal, that it would
soon "be forced to partner with Oaktree against its wishes, and may be completely divested
from its equity interests without its consent." Neutra First Appeal Br. 19-20. But this
outcome was by no means an inevitable result of the *orders for relief*. The person aggrieved
test does not take into account every injury caused by the bankruptcy case as a whole, but
instead asks whether "the *order* of the bankruptcy court . . . directly and adversely affect[s]
the appellant pecuniarily." *Fortune Nat. Res. Corp.*, 806 F.3d at 367. And "bankruptcy
standing requires 'a higher causal nexus between act and injury'" than does traditional
Article III standing. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*,
806 F.3d at 366). Thus although the orders for relief created the possibility that Neutra might
suffer harm in the future, Neutra was not aggrieved by them for standing purposes because
"[the] speculative prospect of harm is far from a direct, adverse, pecuniary hit." *Id.* at 386;
*see also id.* at 384-86 (concluding that equity owner was not aggrieved by order allowing

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-6    Filed 02/03/18 Page 917 of 1392    PageID 15659
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 806 of 1803    PageID 11552
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 26 of 84    PageID 98019

trustee to employ special counsel, even though special counsel's purpose was to pierce the corporate veil to reach equity owner's other companies and assets).

Of course, the future harms identified by Neutra in the First Appeal did actually come to pass: the bankruptcy court appointed first Oaktree, and then Brigade, as the new service provider for Acis, and later divested Neutra of its equity interest in Acis. But this court cannot take these events into account in its analysis of the First Appeal. A district court hearing a bankruptcy appeal may only consider information if it is "part of the record before the bankruptcy court" or if it "meets the narrow purpose of judicial notice." *In re SI Restructuring Inc.*, 480 Fed. Appx. 327, 329 (5th Cir. 2012) (per curiam). The subsequent events that are asserted to have injured Neutra are not part of the record in the First Appeal. No party has asked this court to take judicial notice of any subsequent bankruptcy court orders in the First Appeal, and the court has no duty to do so *sua sponte*.[22] Moreover, Neutra would lack standing even if the court *did* take these events into account. That a once-speculative harm actually came to pass does not mean that the harm was initially *likely* to happen—so Neutra would still fail to show the "higher causal nexus between act and injury" that the person aggrieved test demands. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366); *cf. Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928) (finding no liability for negligence where, *ex ante*, "there was nothing in the

_____

[22]The Fifth Circuit has indicated that when no party asks the district court to take judicial notice of a fact, and the district court does not do so *sua sponte*, the Fifth Circuit is unlikely to do so for the first time on appeal. *See United States v. Herrera-Ochoa*, 245 F.3d 495, 502 & n.6 (5th Cir. 2001) (citing cases).

Appellee Appx. 00800
APPX. 15052

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 03/03/18 4ge 918 of 1392    PageID 15660
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 807 of 1803    PageID 11553

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 27 of 84    PageID 98020

situation to suggest to the most cautious mind" that defendant's actions would result in harm to plaintiff, even though harm actually occurred).

The court therefore dismisses the First Appeal, i.e., all the appeals of the orders for relief.

<p style="text-align:center">C</p>

The court's conclusion that Neutra lacks standing[23] is buttressed by the fact that the bankruptcy court properly denied Neutra's motion to intervene.[24]

<p style="text-align:center">1</p>

Neither Neutra nor Terry has substantially briefed the question whether the bankruptcy court erred by denying Neutra's motion to intervene. Neutra contends that the ruling on its motion to intervene has no bearing on whether it can appeal as a person

---

[23]This conclusion does not mean that *no one* has standing to appeal. The Trustee likely could have appealed the orders for relief on Acis' behalf had he believed the orders were not in the best interests of the estates. *See In re C.W. Mining Co.*, 636 F.3d 1257, 1261-66 (10th Cir. 2011); *see also* 11 U.S.C. § 323(a) ("The trustee in a case under this title is the representative of the estate.").

[24]The parties agree that this court has jurisdiction over the orders denying intervention because they are interlocutory orders that merged into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Neutra only asserts that it has standing to appeal the orders for relief; it does not contend that it has standing to appeal independently the orders denying intervention. *Cf. Rohm*, 32 F.3d at 208 ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal."). Thus even though the court concludes—in the context of this standing analysis—that the orders denying intervention were correctly decided, it does not affirm them. Instead, it dismisses the entire First Appeal for lack of standing.

<p style="text-align:center">- 27 -</p>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 03/03/04 Page 919 of 1392   PageID 15661
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 808 of 1803   PageID 11554
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 28 of 84   PageID 98021

aggrieved; Terry, meanwhile, maintains that the bankruptcy court's decision was correct, but also contends that any error was harmless because Neutra had no intention of participating in the trial on the involuntary petitions. The court is not persuaded, however, that the question is irrelevant.

Some courts have suggested that the bankruptcy court's proper denial of a motion to intervene is dispositive of the movant's right to appeal. *See, e.g., In re Living Hope Sw. Med. Servs., LLC*, 598 Fed. Appx. 467, 467 (8th Cir. 2015) (per curiam) (concluding that appellant lacked standing because bankruptcy court correctly denied his motion to intervene); *In re Thompson*, 965 F.2d 1136, 1140-46 & n.9 (1st Cir. 1992) (equating person aggrieved test with the test for intervention under Rule 7024, and concluding that because bankruptcy court properly denied motion to intervene in adversary proceeding, appellant lacked standing to appeal judgment); *In re S. State St. Bldg. Corp.*, 140 F.2d 363, 367 (7th Cir. 1943) ("If one who has a right to intervene, but does not, has no standing to appeal, a fortiori, one who has no right to intervene, and does not, has no standing to appeal."); *see also In re Blair*, 2016 WL 8608454, at *5 (D. Colo. Aug. 24, 2016) ("One might expect that [the person aggrieved] doctrine would not apply to a party that sought and was denied intervention. Or, at a minimum, it seems incongruous to permit a party to file an unsuccessful motion to intervene and nonetheless be permitted to appeal under the persons aggrieved doctrine and immediately attack the Bankruptcy Court's substantive rulings, rather than first challenging the denial of intervention."). Other courts disagree. *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (holding that "[Rule 2018,] governing permissive

Appellee Appx. 00802
Appx. 15054

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 3/29/23   Page 920 of 1392   PageID 15662
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 809 of 1803   PageID 11555
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 29 of 84   PageID 98022

intervention, does not limit the rights of a 'person aggrieved' to be heard" on appeal).

It is also possible that, had Neutra been allowed to intervene, it would have had standing to appeal by virtue of its intervention alone. *See First Colonial*, 544 F.2d at 1296-98 (finding that appellant was a person aggrieved, and then adding, as alternative ground for its holding, that "[appellant] has standing to appeal from all of the fee awards because the bankruptcy judge granted its motion to intervene [under what is now Rule 7024] without qualifying its right to participate in the proceeding"); *see also Int'l Trade Admin.*, 936 F.2d at 747 (stating that permissive intervention under Rule 2018 "provides a formal mechanism that expands the right to be heard to a wider class than those who qualify under the 'person aggrieved' standard"). *But see Troutman Enters.*, 286 F.3d at 363-64 (holding that parties who were permitted to intervene in bankruptcy proceeding nonetheless lacked appellate standing because they were not persons aggrieved).

Because the bankruptcy court's decision to deny intervention could affect Neutra's standing to bring the present appeal, the court will consider the merits of Neutra's appeal of that decision.

2

"A ruling denying intervention of right is reviewed *de novo*." *St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969, 973 (5th Cir. 2019) (quoting *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)). Although generally "the timeliness of an intervention motion is reviewed for abuse of discretion," if the bankruptcy court did not explain its ruling on timeliness, review is *de novo*. *See id.* (citing *Sommers v. Bank of Am.,*

- 29 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 03/29/23 Page 921 of 1392    PageID 15663
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 810 of 1803    PageID 11556
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 30 of 84    PageID 98023

*N.A.*, 835 F.3d 509, 513 (5th Cir. 2016)).  The court reviews the denial of a motion for

permissive intervention for "clear abuse of discretion," and will disturb the bankruptcy

court's ruling "only under extraordinary circumstances."  *Id.* (quoting *Edwards*, 78 F.3d at

995).

Neutra sought intervention as of right under Rule 1018, which provides that Rule 7024

applies in proceedings to contest an involuntary petition.  Rule 7024, in turn, states that

"[Fed. R. Civ. P. 24] applies in adversary proceedings."

> A party is entitled to an intervention of right under Rule
> 24(a)(2) if (1) the motion to intervene is timely, (2) the interest
> asserted by the potential intervenor is related to the action, (3)
> that interest may be impaired or impeded by the action, and (4)
> that interest is not adequately represented by the existing parties.

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2012 WL 2133667, at

*1 (N.D. Tex. June 12, 2012) (Fitzwater, C.J.) (citing *In re Lease Oil Antitrust Litig.*, 570

F.3d 244, 247 (5th Cir. 2009); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994)),

*rev'd on other grounds*, 747 F.3d 275 (5th Cir. 2014), *aff'd*, ___ U.S. ___, 135 S. Ct. 2507

(2015).  "Failure to satisfy any one requirement precludes intervention of right."  *Haspel &*

*Davis Milling & Planting Co. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 578 (5th Cir. 2007).

Neutra also sought permissive intervention under Rule 2018.  That rule provides that

"after hearing on such notice as the court directs and for cause shown, the court may permit

any interested entity to intervene generally or with respect to any specified matter."  Rule

2018(a).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 3/29/23   Page 922 of 1392   PageID 15664
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 811 of 1803   PageID 11557
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 31 of 84   PageID 98024

> In deciding whether to permit intervention under Rule 2018(a), courts look to various factors, including (1) whether the moving party has an economic or similar interest in the matter; (2) whether the interest of the moving party [is] adequately represented by the existing parties; [(3)] whether the intervention will cause undue delay to the proceedings; and (4) whether the denial of the movant's request will adversely affect their interest.

*Pasternak & Fidis, P.C. v. Wilson*, 2014 WL 4826109, at *6 (D. Md. Sept. 23, 2014) (collecting cases). Thus "[t]he standards under Rule 2018 and [Rule] 24 overlap." *In re Adilace Holdings, Inc.*, 548 B.R. 458, 462 (Bankr. W.D. Tex. 2016). "The decision whether to allow intervention is wholly discretionary under Rule 2018 . . . even where each required element is met." *Id.* at 463 (citing *Staley v. Harris County*, 160 Fed. Appx. 410, 414 (5th Cir. 2005) (per curiam); *In re Durango Ga. Paper Co.*, 336 B.R. 594, 596 (Bankr. S.D. Ga. 2005)).

3

Neutra was not entitled to intervention of right in the trial of the involuntary petitions because it did not have a sufficiently direct interest in the proceedings. The only interest that Neutra asserted was its property interest in Acis. But in the intervention context, "[t]he term 'interest' is narrowly read to mean a *direct* and substantial interest in the proceedings . . . that the substantive law recognizes as belonging to or being owned by *the party seeking intervention*." *Rigco*, 110 F.R.D. at 183 (emphasis added). Accordingly, the shareholder standing rule applies to Rule 24(a) motions to intervene. *See id.* at 183-84. Neutra's property interest in the alleged debtors therefore could not support Neutra's claimed right to

- 31 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 03/29/23   Page 923 of 1392   PageID 15665
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 812 of 1803   PageID 11558
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 32 of 84   PageID 98025

intervene in the trial on the involuntary petitions. *See supra* § III(B). Because one of the four Rule 24(a) factors was not met, the bankruptcy court did not err by denying Neutra's motion to intervene as of right. *See Haspel*, 493 F.3d at 578.

For similar reasons, the bankruptcy court did not abuse its discretion by denying Neutra permissive intervention under Rule 2018. This is because Neutra lacked a sufficiently direct interest in the proceedings. And even if Neutra had such an interest, this court still would not disturb the bankruptcy court's ruling. This court reviews the bankruptcy court's denial of a Rule 2018 motion under a deferential standard—the bankruptcy court has discretion to deny such a motion even if all four factors are met. *See Adilace Holdings*, 548 B.R. at 463; *see also St. Bernard*, 914 F.3d at 973 (providing that orders as to permissive intervention are reviewed for clear abuse of discretion). Neutra offers no argument on appeal that the bankruptcy court committed a clear abuse of its discretion by denying its motion. *Cf. Brinkmann v. Dall. Cty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (holding that arguments not briefed on appeal are deemed abandoned). In the absence of such an argument, the court will not disturb the bankruptcy court's ruling.

IV

Neutra argues in the First Appeal that, regardless whether it has standing to appeal the orders for relief, it can challenge the bankruptcy court's denial of the Arbitration Motion because mandatory arbitration agreements implicate the court's subject matter jurisdiction. The appellants in the Second Appeal and Third Appeal make the same argument, and contend that every subsequent order entered by the bankruptcy court is void for lack of

- 32 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 3/24/23    Page 924 of 1392    PageID 15666
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 813 of 1803    PageID 11559
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 33 of 84    PageID 98026

subject matter jurisdiction.

The Fifth Circuit recently reiterated that it has not yet decided the question whether a dismissal based on an arbitration provision is a dismissal for lack of subject matter jurisdiction. *See McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch*, 923 F.3d 427, 430 n.5 (5th Cir. 2019); *see also McGee v. W. Express, Inc.*, 2016 WL 1622632, at *2 (N.D. Tex. Apr. 5, 2016) (Horan, J.) (explaining that the Fifth Circuit has not yet decided the issue), *rec. adopted*, 2016 WL 1627662, at *1 (N.D. Tex. Apr. 22, 2016) (Kinkeade, J.). Neutra relies, however, on another Fifth Circuit opinion, *Gilbert v. Donahoe*, 751 F.3d 303 (5th Cir. 2014), in which the panel stated: "We have held that a district court lacks subject matter jurisdiction over a case and should dismiss it pursuant to Federal Rule of Civil Procedure 12(b)(1) when the parties' dispute is subject to binding arbitration." *Id.* at 306. The *Gilbert* panel cited two supporting cases in a footnote: *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012), and *Omni Pinnacle, LLC v. ECC Operating Services, Inc.*, 255 Fed. Appx. 24 (5th Cir. 2007) (per curiam). In both of these supporting cases the Fifth Circuit affirmed a district court's dismissal of a case under Rule 12(b)(1) pursuant to an arbitration agreement. The *Gilbert* opinion also acknowledged precedent indicating that the issue was previously unsettled. *See Gilbert*, 751 F.3d at 306 n.1 (citing *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472 n.3 (5th Cir. 2010) ("Our court has not previously definitively decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause.")). Thus *Gilbert*—if read in a vacuum—appears to settle the issue in a precedential decision.

- 33 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-35    Filed 12/25/23    Page 925 of 1392    PageID 15667
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 814 of 1803    PageID 11560
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 34 of 84    PageID 98027

But in *Ruiz v. Donahoe*, 784 F.3d 247 (5th Cir. 2015) (on petition for rehearing), Judge Owen—who authored *Gilbert* just one year before—wrote for the panel that "[a]lthough in *Gilbert* we spoke in terms of subject-matter jurisdiction, we used the term imprecisely." *Id.* at 249. The *Ruiz* panel observed that whereas subject matter jurisdiction can be raised at any time and cannot be waived by the parties, a party *can* waive its right to compel arbitration. *See id.* And "[i]f a dispute is subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration." *Id.* Thus "agreements to arbitrate implicate forum selection and claims-processing rules *not subject matter jurisdiction*." *Id.* at 250 (emphasis added).

This court is persuaded by the reasoning of *Ruiz* and follows *Ruiz*'s explanation that the *Gilbert* panel was imprecise when it spoke in terms of subject matter jurisdiction. It is well-established in the Fifth Circuit that a party can waive its right to compel arbitration. *See, e.g., Petroleum Pipe Ams. Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009); *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991); *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985). It is equally well-established that a party *cannot* waive challenges to the court's subject matter jurisdiction; the issue can be raised at any time by any party or by the court *sua sponte. See, e.g., Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). Moreover, in the Fifth Circuit a court may order a stay pending arbitration instead of dismissing a case outright. *See, e.g., Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 662 (5th Cir. 1995); *see also* 9 U.S.C. § 3 (authorizing courts to grant stays pending arbitration). But when a court lacks subject matter jurisdiction over a

- 34 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 2/26/23 Page 926 of 1392    PageID 15668
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 815 of 1803    PageID 11561
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 35 of 84    PageID 98028

controversy, it cannot enter a stay order—or *any* order besides an order dismissing the case.

*See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 434 (2007) ("[O]nce a court determines that jurisdiction is lacking, it can proceed no further and must dismiss the case on that account."). Thus if the *Gilbert* panel actually held that a dismissal based on an arbitration clause is jurisdictional, then it impliedly overruled many years of precedent set by many prior panels. Under the Fifth Circuit's rule of orderliness, however, the *Gilbert* panel lacked the power to do so. *See, e.g., Odle v. Flores*, 683 Fed. Appx. 288, 289 (5th Cir. 2017) (per curiam) ("[U]nder the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer language has no effect." (alteration in original) (quoting *Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000))). Fifth Circuit precedent instead supports the conclusion that a dismissal based on an arbitration agreement does *not* implicate the court's subject matter jurisdiction.

Indeed, it would be strange if parties by contract could divest a federal court of subject matter jurisdiction or confer such jurisdiction. "Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) (citing U.S. Const. art. III, § 1). "[N]o action of the parties can confer subject-matter jurisdiction upon a federal court" if such jurisdiction is otherwise lacking. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). And federal courts have long resisted attempts by private parties to manipulate their jurisdiction—including attempts to deprive courts of removal jurisdiction where that jurisdiction properly exists. *See, e.g., Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 576 (5th Cir. 2004) (en banc) ("The

- 35 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 4.29/23 1804    Page 927 of 1392    PageID 15669
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 816 of 1803    PageID 11562
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 36 of 84    PageID 98029

doctrine of improper joinder implements our duty to not allow manipulation of our jurisdiction.").  It follows that "if a court has jurisdiction of an action, the parties cannot deprive the court thereof by contract."  17A C.J.S. *Contracts* § 309 (2019).  Parties may not, in the course of ordering their private affairs, enlarge *or shrink* Article III or the federal statutes governing subject matter jurisdiction.[25]

Nor does the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, mandate that a dismissal based on an arbitration agreement is a dismissal for lack of subject matter jurisdiction.  The Supreme Court has urged caution in interpreting statutory provisions to be jurisdictional.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("'Jurisdiction,' this Court has observed, 'is a word of many, too many, meanings.'  This Court, no less than other courts, has sometimes been profligate in its use of the term." (citation omitted) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998))).  This is because calling an issue "jurisdictional" has profound consequences.  If an issue implicates the court's subject matter jurisdiction, then it cannot be waived or forfeited, and the court has a duty to raise the issue on its own; the trial judge (instead of a jury) can resolve factual disputes underlying the issue; and if subject matter jurisdiction is lacking, the court must dismiss the entire complaint.  *See id.* at 514-15.  The Supreme Court has therefore established clear interpretive rules on the subject:

---

[25]For similar reasons, the waiver clause in the Acis LPA does not divest this court or the bankruptcy court of subject matter jurisdiction.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/23/23    Page 928 of 1392    PageID 15670
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 817 of 1803    PageID 11563
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 37 of 84    PageID 98030

> [i]f the Legislature clearly states that a threshold limitation on a
> statute's scope shall count as jurisdictional, then courts and
> litigants will be duly instructed and will not be left to wrestle
> with the issue. But when Congress does not rank a statutory
> limitation on coverage as jurisdictional, courts should treat the
> restriction as nonjurisdictional in character.

*Id.* at 515-16 (footnote and citation omitted).

Nothing in the FAA indicates that Congress intended arbitration agreements to divest federal courts of subject matter jurisdiction. To the contrary, the FAA authorizes courts to issue orders that would be beyond the power of a court that lacks jurisdiction. *See Sinochem Int'l*, 549 U.S. at 434. For instance, courts must, in certain circumstances, issue orders staying their proceedings pending arbitration, *see* 9 U.S.C. § 3; orders compelling recalcitrant parties to submit to arbitration, *see id.* § 4; orders appointing an arbitrator, *see id.* § 5; and orders compelling witnesses to appear before an arbitrator, *see id.* § 7. Thus the text of the FAA—far from containing a clear statement that arbitration agreements are jurisdictional—suggests instead that the opposite is true. The court therefore concludes that Congress did not intend for dismissals based on arbitration agreements to be dismissals for lack of subject matter jurisdiction.[26]

---

[26]Neutra contends in the First Appeal that the Acis LPA's arbitration clause deprived Terry of *standing*, and that a creditor who lacks *standing* cannot confer subject matter jurisdiction on the bankruptcy court by filing an involuntary petition. But "[s]tanding is a species of subject matter jurisdiction." *In re Rhinesmith*, 450 B.R. 630, 631 (Bankr. W.D. Tex. 2011) (citing *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009)). To conclude that arbitration agreements do not implicate a court's subject matter jurisdiction is also to conclude that they do not implicate standing. Thus Neutra's circuitous logic does not allow it to escape the court's conclusion on this issue.

- 37 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68 05   FHexhibAB 29/GB 180 Page 929 of 1392   PageID 15671
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 818 of 1803   PageID 11564
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 38 of 84   PageID 98031

Because the bankruptcy court's order denying the Arbitration Motion does not implicate subject matter jurisdiction, it can only be challenged by a party with standing. Neutra lacks standing to do so in the First Appeal. *See supra* § III. In the Second and Third Appeals, the appellants who challenge the order do not contend that they have standing to do so; instead, they rely on what they maintain is the jurisdictional nature of the order. They have therefore failed to carry their burden to establish standing. *See Rohm*, 32 F.3d at 208. Thus the court will not consider the merits of appellants' challenges to the bankruptcy court's order denying the Arbitration Motion.

V

Highland argues in the Second Appeal that the Break-Up Fee does not satisfy the requirements of 11 U.S.C. § 503, which governs administrative expenses; the Break-Up Fee is unreasonably large; and the Expense Reimbursement was not a reasonable exercise of the Trustee's business judgment under 11 U.S.C. § 363(b).[27]

A

The court first considers whether the bankruptcy court abused its discretion by finding that the Break-Up Fee satisfies § 503(b)(1)(A).[28]

_____

[27]As a creditor of the estates, Highland has standing to appeal the order approving the Break-Up Fee and Expense Reimbursement because that order disposes of estate assets. *See, e.g., In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997). Neither Oaktree nor the Trustee contends otherwise.

[28]The parties do not dispute that § 503 applies to the bankruptcy court's decision to approve a break-up fee. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (suggesting, in *dicta*, that § 503 is "the proper channel for requesting payment" of a break-up

- 38 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-6   Filed 3/20/23   Page 930 of 1392   PageID 15672
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 819 of 1803   PageID 11565
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 39 of 84   PageID 98032

In bankruptcy, administrative expenses—such as the "actual and necessary costs and expenses of preserving the estate"—are given priority over other non-secured claims in the distribution of the estate. *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001). "In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefi[t]ed the estate." *Id.* (citing *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)). Such claims "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate." *Id.* "Crucial to satisfying the § 503 test is that the estate receive a 'discernible benefit' as a result of the expenditure." *In re ASARCO LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010) (quoting *Jack/Wade Drilling*, 258 F.3d at 387), *aff'd*, 650 F.3d 593 (5th Cir. 2011); *see also In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) ("The court's administrative expense inquiry centers upon whether the estate has received an *actual benefit, as opposed to the loss a creditor might experience*[.]" (quoting *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994))). The claimant bears the burden of proving by a preponderance of the evidence that its claim qualifies as an administrative expense. *See TransAmerican*, 978 F.2d at 1416. Once the claimant has established a prima facie case, the burden of production shifts to the objector—but the burden of persuasion remains at all times upon the claimant. *See id.*

---

fee).

- 39 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-5    Filed 3/29/23 1804ge 931 of 1392    PageID 15673
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 820 of 1803    PageID 11566
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 40 of 84    PageID 98033

The bankruptcy court did not abuse its discretion by concluding that the Break-Up Fee was an actual and necessary expense that conferred a discernible benefit upon the debtors' estates. Courts have recognized that a break-up fee can confer a benefit on the estate even though the contemplated transaction with the claimant was not consummated. *See, e.g., In re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018) (recognizing that break-up fee can benefit estate if, *inter alia*, the "assurance of a break-up fee promote[s] more competitive bidding," or the fee "induce[s] a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely"); *In re Lamb*, 2002 WL 31508913, at *1 (Bankr. D. Md. Oct. 11, 2002) (recognizing that break-up fees are appropriate where they incentivize a "stalking horse" bidder).

Here, the primary benefit identified by the bankruptcy court was that the Break-Up Fee facilitated the plan confirmation process. Without the Break-Up Fee, the Trustee would have had no ready, willing, and able partner for the proposed Plan A transaction, because Oaktree would not have made an offer or undertaken the expense and effort of preparing for the contemplated transaction. In this respect, the present case is similar to a traditional "stalking horse" situation, where a break-up fee induces a bidder to research a potential transaction and make an initial bid. *See, e.g., Energy Future Holdings*, 904 F.3d at 313-14. Without Plan A, the bankruptcy court faced the possible "doomsday" scenario, Second Appeal R. 78, of Acis' fee-generating PMAs being rendered worthless by HCLOF's exercise of its optional redemption right. The bankruptcy court did not abuse its discretion by recognizing these benefits.

- 40 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 03/29/23   Page 932 of 1392   PageID 15674
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 821 of 1803   PageID 11567
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 41 of 84   PageID 98034

The record also reflects that the Break-Up Fee conferred other benefits on the estates, although the bankruptcy court did not expressly acknowledge them. Oaktree's initial bid was meant to start a public sale process. *Cf. Energy Future Holdings*, 904 F.3d at 313-14 (citing *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999)) (acknowledging that break-up fees can benefit estate by initiating a public bidding process, even where claimant was eventually outbid). And the Break-Up Fee was part of a transaction by which Oaktree agreed to step into Highland's shoes as Acis LP's sub-advisory and shared services provider, for a significantly lower price than what Highland was charging.

Of course, the Break-Up Fee is unique in one significant respect: it was expressly conditioned on the bankruptcy court's approval of Plan A. Plan A was based on the doctrine of equitable subrogation, "the legal fiction through which a person or entity, the subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible." *Gen. Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949-50 (5th Cir. 1999). Under the Trustee's theory, HCLOF was to be treated as a creditor of the estates on the basis of its adversary claim against the Trustee seeking specific performance of its optional redemption right. The Trustee proposed to monetize HCLOF's claim, and to satisfy that claim by paying HCLOF the sum of $100 million (provided by Oaktree). The Trustee would then, as subrogee, substitute himself as the holder of HCLOF's rights in the subordinated CLO notes. Finally, the Trustee would use his position as subrogee to transfer HCLOF's interest in the subordinated notes to Oaktree. The bankruptcy court acknowledged that "[t]he legal theories [underpinning Plan A] are not

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 03/20/24   Page 933 of 1392   PageID 15675
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 822 of 1803   PageID 11568
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 42 of 84   PageID 98035

at all clear cut and are likely to be hotly contested by [HCLOF] and Highland."  Second

Appeal R. at 78.  Despite this uncertainty, the bankruptcy court approved the Break-Up Fee.[29]

Break-up fees are by nature contingent upon uncertain future events.  If a transaction

were sure to happen, there would be no need for a break-up fee.  Highland essentially

contends that there was *too much* uncertainty here—that the bankruptcy court abused its

discretion by approving the Break-Up Fee "in the face of [a] huge execution risk and the

substantial legal authority that the Trustee's proposed transaction with Oaktree could not be

approved."  Highland Second Appeal Br. 31.  But Highland overstates the degree to which

the Trustee's theory was foreclosed by existing law.  The bankruptcy court was aware of

authority suggesting that, in some circumstances, an entity's claim for specific performance

may be treated as a monetary claim against the bankruptcy estate under 11 U.S.C. § 101(5).

*See In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993).  And under New York law, which

ostensibly governs the PMAs between Acis and the CLO-SPEs, the doctrine of equitable

subrogation is interpreted

> broad[ly] enough to include every instance in which one party
> pays a debt for which another is primarily answerable and which
> in equity and good conscience should have been discharged by
> the latter, so long as the payment was made either under
> compulsion or for the protection of some interest of the party

---

[29]The bankruptcy court later decided that Plan A was unconfirmable because the
Trustee could not be subrogated to the rights of an entity that did not hold a claim against the
estates.  The bankruptcy court concluded that HCLOF did not hold such a claim because the
Equity PMA was not then in effect, and HCLOF could not sue to enforce the PMAs between
Acis and the CLO-SPEs because HCLOF was not a party to, or a third-party beneficiary of,
those PMAs.  This decision is not part of the record in the Second Appeal.

Appellee Appx. 00816
APPX. 05067

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 4/24/23 1804ge 934 of 1392    PageID 15676
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 823 of 1803    PageID 11569
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 43 of 84    PageID 98036

making the payment, and in discharge of an existing liability.

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 112 (N.Y. App. Div. 2009) (quoting *Gerseta Corp. v. Equitable Tr. Co. of N.Y.*, 150 N.E. 501, 504 (N.Y. 1926)).  The bankruptcy court was thus within its discretion to conclude that the Trustee's theory was at least colorable.

More important, whether the benefits of the Break-Up Fee outweighed the risks is not for this court to decide.  Unless the bankruptcy court committed a clear error of fact or incorrectly applied the law, this court cannot disturb its decision.  *See Grigson*, 210 F.3d at 528.  There is no indication that the bankruptcy court committed such an error here.  The bankruptcy court recognized the potential benefits *and* the potential risks of approving the Break-Up Fee, and it properly applied the correct legal test—the § 503(b)(1)(A) standard—in coming to its conclusion that the Break-Up Fee benefited the estate.

The principal authority on which Highland relies, *Energy Future Holdings*, is not to the contrary.  In that case, the Third Circuit affirmed the bankruptcy court's reconsideration of its own decision to authorize a break-up fee.  *See Energy Future Holdings*, 904 F.3d at 301.  The bankruptcy court originally approved the break-up fee on the premise that the fee would not be paid if a certain regulatory body did not permit the proposed transaction to go forward.  *See id.* at 304.  When the bankruptcy court learned that this premise was incorrect, it reconsidered the order and came to a different conclusion.  *See id.* at 307.  The Third Circuit, in affirming the bankruptcy court, *deferred to the bankruptcy court's discretion* to weigh the potential risks and benefits of allowing the fee:

Appellee Appx. 00817
APPX. 05069

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 685    Filed 03/31/24    Page 935 of 1392    PageID 15677
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 824 of 1803    PageID 11570
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 44 of 84    PageID 98037

> In sum, the Termination Fee provision had the potential of providing a large benefit to the estates, but it also had the possibility to be disastrous.  Once it had a complete understanding, the Bankruptcy Court properly weighed the various considerations and determined that the potential benefit was outweighed by the harm that would result under predictable circumstances.  In other words, the risk was so great that the Fee was not necessary to preserve the value of Debtors' estates.  Having made such a determination, the Bankruptcy Court did not abuse its discretion in denying the Fee in part.

*Id.* at 315 (footnote omitted).  Likewise, the bankruptcy court in the present appeal was within its discretion to conclude that the benefits of the Break-Up Fee outweighed the risks, despite the uncertainty of the Trustee's legal theory.

<div align="center">B</div>

The court considers next whether the Break-Up Fee was so large as to be unreasonable.

Highland cites no binding authority for the proposition that a break-up fee that meets the requirements of § 503(b)(1)(A) must be rejected if it is "unreasonable," nor does Highland explain what test a break-up fee must pass in order to be "reasonable."  *See* Highland Second Appeal Br. 32-33.  Assuming *arguendo* that it would be error to approve an "unreasonable" break-up fee, the court concludes that the bankruptcy court did not err in this respect.  The bankruptcy court found that the Break-Up Fee constituted roughly 2.3% of the total price that Oaktree would pay under the terms of the proposed transaction.  This amount is in line with break-up fees authorized by other courts.  *See, e.g., In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely large transactions,

<div align="center">- 44 -</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 03/20/24   Page 936 of 1392   PageID 15678
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 825 of 1803   PageID 11571
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 45 of 84   PageID 98038

break-up fees ranging from one to two percent of the purchase price have been authorized

by some courts."); *see also Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614,

625 (S.D.N.Y. 1987) (approving 2% break-up fee); *In re Sea Island Co.*, 2010 WL 4393269,

at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving 3% break-up fee).

Highland contends that the relevant benchmark is not the total transaction price, but

is instead the amount of money that Acis LP would retain after the transaction was complete.

Applying Highland's logic, the Break-Up Fee is actually *26%* of the transaction's value. But

Highland's logic does not stand up in light of the legal theory proposed by the Trustee in

support of the transaction. Under Plan A, Oaktree was not purchasing HCLOF's

subordinated notes outright. Rather, it was funding the proposed plan so that Acis could

satisfy all of its creditors' claims—including HCLOF's liquidated claim for specific

performance—in exchange for the Trustee's promise to use the doctrine of equitable

subrogation to transfer the subordinated notes to Oaktree. There is no principled reason to

compare the Break-Up Fee to the amount of money retained by Acis *after* paying off

HCLOF's claim, but *before* paying off any other creditor's claim. Highland's

unreasonableness argument lacks merit.

<div align="center">C</div>

Finally, the court considers whether the bankruptcy court abused its discretion by

concluding that the Expense Reimbursement was a proper exercise of the Trustee's business

judgment.

Expense reimbursements are governed by 11 U.S.C. § 363(b), which incorporates a

<div align="center">- 45 -</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/23/2018 Page 937 of 1392   PageID 15679
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 826 of 1803   PageID 11572
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 46 of 84   PageID 98039

business judgment standard.  *See ASARCO*, 650 F.3d at 601-03.  Section 363(b) permits a trustee, after notice and a hearing, to use, sell, or lease estate property other than in the ordinary course of business.  *See id.* at 601.  "In such circumstances, 'for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.'"  *Id.* (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)).  "The business judgment standard in section 363 is flexible and encourages discretion."  *Id.*; *see also GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) (Lynn, J.) ("Great judicial deference is given to the Trustee's exercise of business judgment.").

The bankruptcy court acknowledged that "Oaktree has spent significant time and expense related to the [Plan A] Transaction," and that "[i]t is reasonable to anticipate that Oaktree will continue to incur additional significant time and expense."  Second Appeal R. 78.  The bankruptcy court found that the Expense Reimbursement, along with the Break-Up Fee, was an "essential inducement[]" for Oaktree's continuing commitment to the Plan A transaction.  *Id.*  Oaktree's commitment to the proposed transaction was beneficial to the estates for the reasons explained *supra* at § V(A).  Thus the bankruptcy court concluded that "the Trustee has established, in his business judgment, that the Expense Reimbursement is necessary here."  *Id.* at 77.  The bankruptcy court did not abuse its discretion.

Highland's arguments to the contrary are unavailing.  Highland contends that the Trustee lacked any reasonable business justification for allowing the Expense

Appellee Appx. 00820
APPX. 15072

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-3    Filed 08/28/23    Page 938 of 1392    PageID 15680
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 827 of 1803    PageID 11573
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 47 of 84    PageID 98040

Reimbursement because he knew in advance that Plan A was unconfirmable, as evidenced by his proposing Plans B and C at the same time. The court disagrees. If the Trustee knew that Plan A could not be confirmed, then he would have had *no reason* to propose it in the first place—let alone any reason to go through the effort and expense of negotiating with Oaktree. Highland also argues that Oaktree "assume[d] the risk" of losing any money it spent in relation to the Plan A transaction, because Oaktree was experienced enough to know that Plan A could not be approved. Highland Second Appeal Reply 16. But the question is not whether Oaktree assumed any particular risk; the question is whether the Trustee had an "articulated business justification for" the Expense Reimbursement. *ASARCO*, 650 F.3d at 601 (quoting *Cont'l Air Lines*, 780 F.2d at 1226). The bankruptcy court did not abuse its discretion by concluding that he did.

The court therefore affirms the bankruptcy court's order approving the Break-Up Fee and Expense Reimbursement.

<div align="center">VI</div>

In the Third Appeal, Highland and Neutra contend that the filing of the First Appeal divested the bankruptcy court of subject matter jurisdiction to confirm the Plan.

<div align="center">A</div>

"It is a fundamental tenet of federal civil procedure that—subject to certain, defined exceptions—the filing of a notice of appeal from the final judgment of a trial court divests the trial court of jurisdiction and confers jurisdiction upon the appellate court." *In re Transtexas Gas Corp.*, 303 F.3d 571, 578-79 (5th Cir. 2002) (citing *Griggs v. Provident*

<div align="center">- 47 -</div>

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-6 Filed 03/08/24 Page 939 of 1392 PageID 15681
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 828 of 1803 PageID 11574
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 48 of 84 PageID 98041

*Consumer Co.*, 459 U.S. 56, 58 (1982)). "This rule applies with equal force to bankruptcy cases." *Id.* at 579. Thus while an appeal is pending, the bankruptcy court cannot exercise control over "those aspects of the case involved in the appeal." *In re Scopac*, 624 F.3d 274, 280 (5th Cir. 2010) (quoting *Griggs*, 459 U.S. at 58), *modified on denial of reh'g*, 649 F.3d 320 (5th Cir. 2011)*.*

But "the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are not the subject of that appeal." *Transtexas*, 303 F.3d at 580 n.2. The Fifth Circuit "has specifically rejected 'the broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order on appeal.'" *Scopac*, 624 F.3d at 280 (quoting *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 727 (5th Cir. 1991)). Instead, the Fifth Circuit has adopted a "functional test: 'once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process.'" *Id.* (quoting *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007)).

Where courts have held that a bankruptcy court was divested of jurisdiction to enter a subsequent order, it is usually because the subsequent order would have modified, or would have been inconsistent with, an order pending on appeal. *See, e.g., Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court was divested of jurisdiction to supplement plan confirmation order that was then pending on appeal); *Whispering Pines*, 369 B.R. at 760

- 48 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-3 Filed 02/03/23 Page 940 of 1392 PageID 15682
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 829 of 1803 PageID 11575
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 49 of 84 PageID 98042

(concluding that bankruptcy court could not issue stay relief order that essentially modified confirmed plan while plan confirmation order was pending on appeal); *In re BNP Petroleum Corp.*, 2012 WL 7620694, at *3 (S.D. Tex. Feb. 27, 2012) (observing that bankruptcy court can consider motion to set aside sale agreement, and can deny that motion, but cannot *grant* it while the order approving the sale agreement is pending on appeal); *In re Southold Dev. Corp.*, 129 B.R. 18, 19, 21 (E.D.N.Y. 1991) (invalidating order that modified reorganization plan, where plan confirmation order was already pending on appeal); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 1648725, at *1, *3-6 (Bankr. D.N.J. Apr. 24, 2014) (refusing to consider motion to clarify plan confirmation order that was pending on appeal, because a court "cannot take action that will alter or modify its prior order while that order is pending on appeal"); *In re New Century TRS Holdings, Inc.*, 2012 WL 2064500, at *1-3 (Bankr. D. Del. June 7, 2012) (dismissing motion for sanctions where motion essentially repackaged issues and arguments then pending in appeal of motion for reconsideration); *In re Wallace's Bookstores, Inc.*, 330 B.R. 193, 195 (Bankr. E.D. Ky. 2005) (denying adversary plaintiff's motion to dismiss claims whose resolution was then pending on appeal); *see also Wireless Agents, LLC v. Sony Ericsson Mobile Comms. AB*, 2006 WL 1189687, at *3 (N.D. Tex. May 3, 2006) (Fitzwater, J.) ("Because Wireless has appealed the court's denial of a preliminary injunction, the Federal Circuit has exclusive jurisdiction over the preliminary injunction motion, and this court cannot modify its preliminary findings of fact and conclusions of law during the pendency of the appeal."). Attempting to modify an order pending on appeal, or issuing a subsequent order that is inconsistent with the order being

- 49 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 03/31/04    Page 941 of 1392    PageID 15683
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 830 of 1803    PageID 11576
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 50 of 84    PageID 98043

appealed, circumvents the appellate process. *Cf. Scopac*, 624 F.3d at 280 (holding that a bankruptcy court cannot "interfere with or effectively circumvent the appeal process").

<div align="center">B</div>

Neutra identifies three issues on appeal in the First Appeal that supposedly divested the bankruptcy court of jurisdiction to confirm the Plan: (1) whether the bankruptcy court erred by denying the Arbitration Motion; (2) whether the bankruptcy erred by not abstaining under 11 U.S.C. § 305; and (3) whether Terry filed the involuntary petitions in good faith.

The appeal of the bankruptcy court's denial of the Arbitration Motion did not divest the bankruptcy court of jurisdiction to issue further orders. In *Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011), the Fifth Circuit held that the appeal of an order denying a motion to compel arbitration does not divest a district court of jurisdiction to decide the merits of a case, even though a motion to compel arbitration—if granted—would effectively end the case. *See id.* at 907-10. The *Weingarten* panel interpreted the divestiture doctrine "narrowly." *See id.* at 908-09. It reasoned that, because the denial of a motion to compel arbitration does not, as a matter of law, determine the merits of the case, the merits question is not an "aspect[] of the case involved in the appeal," and the district court may decide it. *See id.* at 909 (alteration in original) (quoting *Griggs*, 459 U.S. at 58). The Fifth Circuit rejected the Seventh Circuit's reasoning that the appeal of a motion to compel arbitration—much like the appeal of a motion to dismiss based on double jeopardy, sovereign immunity, or qualified immunity—results in an automatic stay of the proceedings below because "the appeal is to determine whether the matter should be litigated in the district court

<div align="center">- 50 -</div>

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63    Filed 12/29/23    Page 942 of 1392    PageID 15684
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 831 of 1803    PageID 11577
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 51 of 84    PageID 98044

at all." *Id.* at 908 (citing *Bradford-Scott Data Corp. v. Physician Comput. Network*, 128 F.3d 504, 505-06 (7th Cir. 1997)). Under *Weingarten*, because the bankruptcy court's ruling on the Arbitration Motion is separate from the merits of Plan confirmation, the appeal of that prior ruling did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The reasoning of *Weingarten* applies with full force to the § 305 abstention issue. Highland and Neutra have not shown that there is any overlap, as a matter of law, between the bankruptcy court's decision to confirm the Plan and its decision not to abstain from ruling on the involuntary petitions. Thus even though the bankruptcy court's abstention decision "determine[d] whether the matter should be litigated in the [bankruptcy] court at all," *id.* at 908, the appeal of that decision did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The issue of Terry's good faith in filing the involuntary petitions presents a closer question. For the bankruptcy court to confirm a plan, it must find, *inter alia*, that the plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Eleventh Circuit has held that where an involuntary petition is filed in bad faith, any subsequently-proposed reorganization plan is *necessarily* proposed in bad faith and cannot be confirmed. *See In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *but see In re Landing Assocs., Ltd.*, 157 B.R. 791, 812 (Bankr. W.D. Tex. 1993) ("Bank United relies on the legal standard established in several bad-faith filing cases for this proposition. However, a different legal standard is employed when evaluating good faith for plan confirmation purposes under [11 U.S.C.] § 1129(a)(3)." (citations omitted)). Under the

- 51 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 03/03/04   Page 943 of 1392   PageID 15685
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 832 of 1803   PageID 11578
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 52 of 84   PageID 98045

Eleventh Circuit's rule, the bankruptcy court's ruling that Terry filed the involuntary petitions in good faith has some bearing on its decision to confirm the Plan.

But even assuming that the Eleventh Circuit's rule applies, the court is not convinced that, under these circumstances, the First Appeal divested the bankruptcy court of jurisdiction to confirm the Plan. In issuing the confirmation order, the bankruptcy court did not directly exercise jurisdiction over the question of Terry's good faith in filing the involuntary petitions—it did not revisit, comment upon, or supplement its earlier decision. *See In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016) ("[A] confirmation order does not 'tamper' with prior rulings in the case; rather, to state the obvious, it confirms a plan of reorganization."); *cf. Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court lacked jurisdiction to supplement plan confirmation order that was then pending on appeal); *Southold Dev. Corp.*, 129 B.R. at 18, 21 (vacating order that modified reorganization plan that was pending on appeal); *710 Long Ridge, II, LLC*, 2014 WL 1648725, at *1, *3-6 (refusing to consider motion to clarify plan confirmation order that was pending on appeal). Nor did the bankruptcy court issue any order that was inconsistent with, or that implicitly modified, its previous ruling. *Cf. Whispering Pines*, 369 B.R. at 760 (concluding that bankruptcy court could not issue stay relief order that was inconsistent with confirmed plan while plan confirmation order was pending on appeal). Instead, the bankruptcy court proceeded in accordance with that ruling. It was entitled to do so—just as it was entitled to carry out the confirmed Plan in the absence of a stay order, even while the Plan confirmation order was pending on appeal. *See In re Prudential Lines, Inc.*, 170 B.R. 222, 243-44

Appellee Appx. 00826
APPX. 15027

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 68-6  Filed 04/24/23  Page 944 of 1392  PageID 15686
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 833 of 1803  PageID 11579
Case 3:19-cv-00291-D  Document 75  Filed 07/18/19  Page 53 of 84  PageID 98046

(S.D.N.Y. 1994).  If the bankruptcy court had instead *denied* plan confirmation on the ground that Terry filed the involuntary petitions in *bad faith*, the divestiture analysis might be different.  *Cf. BNP Petroleum*, 2012 WL 7620694, at *3 (observing that bankruptcy court can deny motion to set aside sale agreement, but cannot grant it while the order approving the sale agreement is pending on appeal).  As it is, however, the bankruptcy court's Plan confirmation order did not in any way interfere with, or circumvent, this court's consideration of the First Appeal.

Moreover, to conclude that Neutra's appeal of the orders for relief divested the bankruptcy court of jurisdiction to confirm the Plan would be to hold that whenever an order for relief is entered, any disappointed litigant—even a litigant who *lacks standing to appeal*—can bring the bankruptcy case grinding to a halt.  But the divestiture doctrine is not intended to "cede control of the conduct of a chapter 11 case to disappointed litigants.  This cannot be, and is not, the law."  *Sabine*, 548 B.R. at 680.  And such a decision would be contrary to Fifth Circuit precedent indicating that "a narrow interpretation [of divestiture doctrine] is normally appropriate."  *See Weingarten*, 661 F.3d at 908.  The court thus concludes that the First Appeal did not divest the bankruptcy court of jurisdiction to confirm the Plan.

VII

The court now turns to the contention of HCLOF (joined by Highland and Neutra) in the Third Appeal that the bankruptcy court erred by confirming the Plan because the Temporary Injunction—a crucial part of the Plan—is unlawful.

- 53 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 03/03/04 Page 945 of 1392   PageID 15687
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 834 of 1803   PageID 11580
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 54 of 84   PageID 98047

A

The bankruptcy court had authority to enter the Temporary Injunction under 11 U.S.C.

§§ 105(a) and 1123(b)(6), and had jurisdiction to do so under 28 U.S.C. § 157(b)(2)(L).

Section 157(b)(2)(L) grants the bankruptcy court jurisdiction to enter final orders concerning

the confirmation of plans.[30]  Section 1123(b)(6) gives bankruptcy courts residual authority

to include in a plan "any other appropriate provision not inconsistent with the applicable

provisions of this title."  11 U.S.C. § 1126(b)(6).  The bankruptcy court can exercise its

residual authority via § 105(a), which provides that "[t]he court may issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).

Section 105(a) permits a bankruptcy court "to fashion such orders as are necessary to

further the substantive provisions of the Bankruptcy Code."  *In re Sadkin*, 36 F.3d 473, 478

(5th Cir. 1994) (per curiam) (quoting *In re Oxford Mgmt. Inc.*, 4 F.3d 1329, 1333 (5th Cir.

1993)).  But the bankruptcy court's § 105(a) powers are not unlimited: the statute "does not

authorize the bankruptcy courts to create substantive rights that are otherwise unavailable

---

[30]To the extent that a temporary plan injunction restrains a third-party *lawsuit*, the bankruptcy court must have statutory "related to" jurisdiction over that lawsuit per 28 U.S.C. § 157(a).  *See In re Seatco, Inc.*, 257 B.R. 469, 475-76 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.).  For the reasons discussed *infra* at note 34, the bankruptcy court has statutory "related to" jurisdiction over all lawsuits potentially restrained by the Temporary Injunction.  For the reasons discussed *infra* at § VII(B), the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), does not affect the bankruptcy court's statutory jurisdiction to issue a temporary plan injunction.

- 54 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 02/20/23   Page 946 of 1392   PageID 15688
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 835 of 1803   PageID 11581
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 55 of 84   PageID 98048

under applicable law, or constitute a roving commission to do equity." *Id.* (quoting *Oxford Mgmt.*, 4 F.3d at 1333). The Trustee[31] contends that the bankruptcy court's § 105(a) powers are broad enough to allow it to temporarily enjoin a non-debtor, non-creditor entity—HCLOF—from attempting to assert certain contractual rights, at least where such an injunction is necessary to the debtors' successful reorganization.[32]

Fifth Circuit precedent indicates that § 105(a) *does*, under some circumstances, permit a bankruptcy court to enjoin a non-debtor, non-creditor entity from taking particular actions. *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), involved a challenge to a § 105(a) injunction that prohibited certain nonparties from filing lawsuits against certain other nonparties. *See id.* at 750-51. The Fifth Circuit—citing 11 U.S.C. § 524, which forbids the discharge of the debts of nondebtors—invalidated the injunction insofar as it constituted a *permanent* release of the nonparties' claims. *See id.* at 760-61. But the court noted that "[t]he impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions." *Id.* at 761. The court provided a non-exhaustive list of "unusual circumstances" that might justify such an injunction: "1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to

---

[31]On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal, arguing that once the Plan took effect, Acis became the Trustee's successor-in-interest. The court addresses this motion *infra* at § XI.

[32]The court expresses no opinion on the question whether the Equity PMA or any other contract presently entitles HCLOF to demand an optional redemption of the CLOs.

- 55 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-3 Filed 12/19/23 Page 947 of 1392 PageID 15689
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 836 of 1803 PageID 11582
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 56 of 84 PageID 98049

accomplish reorganization." *Id.* Bankruptcy judges in this district have approved temporary

injunctions under *Zale* multiple times. *See In re Bernhard Steiner Pianos USA, Inc.*, 292

B.R. 109, 117 (Bankr. N.D. Tex. 2002) (Hale, J.); *In re Seatco, Inc.*, 257 B.R. 469, 476-78

(Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001)

(Houser, J.); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 749-53 (Bankr. N.D. Tex.

2015) (Houser, J.) (applying *Zale* unusual-circumstances test and declining to issue

injunction). As discussed below, the second unusual circumstance described in *Zale* is

present here.[33]

      The court recognizes that the bankruptcy court did not rely on this rationale. Instead,

it based the Temporary Injunction on its ostensible authority over the Trustee Adversary.

The bankruptcy court described the Trustee Adversary as "a somewhat significant part of the

Plan; it is what justifies the temporary injunction that is a critical part of the Plan." *Acis II*,

2019 WL 417149, at *8. It conducted its four-prong preliminary-injunction analysis in the

context of, and based on the likelihood of success of, the Trustee Adversary. *See id.* at *10-

12. This court, of course, can affirm the bankruptcy court on alternative grounds. *See, e.g.,*

*Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1011 (N.D. Tex. 1987)

---

[33]The *Zale* panel ultimately vacated the temporary injunction because it was not issued
after an adversary proceeding, as required at the time by Rule 7001(7). *See Zale*, 62 F.3d at
764-65. But Rule 7001(7) was amended in 1999 so that it does not apply where, as here, "a
. . . chapter 11 . . . plan provides for the [injunctive] relief." Rule 7001(7); *see* Rule 7001
advisory committee's note (1999 amendments). And HCLOF, unlike the objectors in *Zale*,
had a full and fair opportunity to present its objections to the bankruptcy court. *Cf. Zale*, 62
F.3d at 763-64.

Appellee Appx. 00830
APPX. 15682

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/29/23 1804age 948 of 1392   PageID 15690
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 837 of 1803   PageID 11583
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 57 of 84   PageID 98050

(Fitzwater, J.) ("[T]his court may affirm a correct judgment for reasons not given by the court below or advanced to it.").  But here, the bankruptcy court's rationale is significant because "[i]f the bankruptcy court does not determine that unusual circumstances exist, the court may not enter an injunction of the third-party actions."  *Zale*, 62 F.3d at 761.

    The bankruptcy court's factual findings are nonetheless sufficient to satisfy the "unusual circumstances" requirement.  The bankruptcy court expressly found that the Temporary Injunction is a "critical component of the Plan," *Acis II*, 2019 WL 417149, at *10, and that "[t]he Temporary Plan Injunction is essential to [Acis'] ability to perform the Plan," *In re Acis Capital Mgmt., L.P.*, 2019 WL 406137, at *14 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.).  HCLOF has twice demanded that Acis effect an optional redemption of the CLOs, and its directors testified that it will do so again if given the chance.  *See Acis II*, 2019 WL 417149, at *10.  The bankruptcy court found that an optional redemption would be an economically "[ir]rational" transaction that would serve as the last step in Highland's "intentional scheme to keep assets away from Mr. Terry as a creditor."  *Id.* at *12.  It further found that if HCLOF succeeds in forcing an optional redemption, Acis "[will] have no going concern value," and "Terry will be precluded from reorganizing the business and paying creditors" in accordance with the Plan.  *Id.* at *10.  Thus the Temporary Injunction enjoins third-party conduct that would adversely impact the ability of Acis to reorganize.  These are unusual circumstances that justify the bankruptcy court's Temporary Injunction.  *Cf. Zale*, 62 F.3d at 762 ("We hold that [the bankruptcy court's] language satisfies the 'unusual circumstances' requirement because it clearly identifies the settlement as providing

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 03/23/18    Page 949 of 1392    PageID 15691
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 838 of 1803    PageID 11584
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 58 of 84    PageID 98051

'substantial consideration' to the estate and constituting part of a 'key provision' of the plan.").[34]

<div align="center">B</div>

HCLOF argues that the Trustee cannot invoke § 105(a) to support an injunction that is prohibited under *Stern v. Marshall*, 564 U.S. 462 (2011). In *Stern* the Supreme Court concluded that certain claims and controversies must, as a constitutional matter, be resolved by an Article III court, even if they are statutorily committed to the jurisdiction of the bankruptcy court. *See id.* at 482. HCLOF contends that the Trustee Adversary, which "is

---

[34]The Fifth Circuit's recent decision in *SEC v. Stanford International Bank, Ltd.*, 927 F.3d 830, ___, 2019 WL 2496901, at *5-7 (5th Cir. June 17, 2019), is not to the contrary. The *Stanford* panel interpreted *Zale*'s discussion of certain limits on a bankruptcy court's statutory "related to" jurisdiction to be a broad "maxim of law" that applies to all receiverships, regardless of the statutory basis of jurisdiction. *See id.* at ___, 2019 WL 2496901, at *6. *Zale* and *Stanford* thus stand for the proposition that a court overseeing a receivership lacks jurisdiction to enjoin third-party lawsuits whose resolution would have no effect on the *res* of the estate. *See id.* at ___, 2019 WL 2496901, at *7 (stating that courts lack jurisdiction "to permanently bar and extinguish independent, non-derivative third-party claims that do not affect the *res* of the receivership estate"); *Zale*, 62 F.3d at 752 ("Those cases in which courts have upheld 'related to' jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate." (footnotes omitted)); *see also In re FoodServiceWarehouse.com, LLC*, 601 B.R. 396, ___, 2019 WL 1877006, at *10 (E.D. La. Apr. 26, 2019) ("If the outcome of a proceeding could conceivably have *any effect* on the estate being administered in bankruptcy, then 'related to' jurisdiction will generally exist." (citing *Zale*, 62 F.3d at 755)). The Temporary Injunction, however, enjoins certain acts that *would* affect the *res* of the bankruptcy estate. The bankruptcy court found that after an optional redemption, Acis "would have no going-concern value" because it would no longer receive any management fees with which to pay creditors. *Acis II*, 2019 WL 417149, at *10. Thus the equitable principles endorsed by *Stanford* do not prevent the bankruptcy court from issuing the Temporary Injunction pursuant to § 157(b)(2)(L)'s conferral of subject matter jurisdiction.

<div align="center">- 58 -</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 08/03/18   Page 950 of 1392   PageID 15692
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 839 of 1803   PageID 11585
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 59 of 84   PageID 98052

essentially a multi-faceted fraudulent transfer action," *Acis II*, 2019 WL 417149, at *8,

involves such a claim.  Thus, according to HCLOF, the bankruptcy court lacks authority to

grant final relief in the Trustee Adversary, and where a court lacks the power to grant a

litigant *final* relief, it cannot grant *preliminary* relief.  *See* HCLOF Third Appeal Br. 22

(citing *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561-62 (5th Cir. 1987)).

HCLOF maintains that, because *Stern* prohibits the bankruptcy court from issuing the

Temporary Injunction in the context of the Trustee Adversary, the bankruptcy court cannot

issue the Temporary Injunction as part of the confirmed Plan.

Assuming *arguendo* that a fraudulent transfer claim brought by a bankruptcy trustee

against a non-creditor is a *Stern* claim—i.e., "a claim designated for final adjudication in the

bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a

constitutional matter," *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 30-31

(2014)—the court disagrees with HCLOF's contention.  Whatever the precise contours of

*Stern*, it only concerns the power of a bankruptcy court to enter a "final judgment" on certain

causes of action.  *See Stern*, 564 U.S. at 503 ("The Bankruptcy Court below lacked the

constitutional authority to enter a *final judgment* on a state law counterclaim that is not

resolved in the process of ruling on a creditor's proof of claim." (emphasis added)).  When

the bankruptcy court exercises powers that are *independent of* its authority to enter a final

judgment on a claim—e.g., when it makes use of its authority under § 105(a) to issue a

temporary plan injunction—*Stern* simply does not apply.  *See, e.g., In re Yellowstone

Mountain Club, LLC*, 646 Fed. Appx. 558, 558-59 (9th Cir. 2016) (per curiam) (holding that

Appellee Appx. 00833
APPX. 15034

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 04/21/23    Page 951 of 1392    PageID 15693
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 840 of 1803    PageID 11586
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 60 of 84    PageID 98053

*Stern* did not apply because "the bankruptcy court issued a preliminary injunction [pursuant to § 105(a)], not a final judgment"); *In re Quigley Co.*, 676 F.3d 45, 52 (2d Cir. 2012) ("[A]t issue here [is] the stay of litigation during the pendency of [debtor's] bankruptcy, rather than the entry of final judgment on a common law claim.").

This conclusion is consistent with the Article III concerns underlying *Stern*. According to *Stern*, Article III creates an independent judiciary by guaranteeing federal judges life tenure and an irreducible salary. *See Stern*, 564 U.S. at 483-84. But "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Id.* at 484. Thus, as a general rule, "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty,'" and place that matter within the authority of an Article I bankruptcy court. *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)).

The Temporary Injunction does not "withdraw from judicial cognizance any matter" of any kind whatsoever. *Id.* (quoting *Murray's Lessee*, 59 U.S. (18 How.) at 284). Instead, it *temporarily* enjoins a number of parties and non-parties from taking any action—including, presumably, pursuing a lawsuit—in furtherance of an optional redemption or liquidation of the Acis CLOs. To the extent that the Temporary Injunction affects any legal claims, it does not prevent an Article III court from entering a final judgment on those claims after the Temporary Injunction is lifted. In other words, it has no *res judicata* effect on those claims.

- 60 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Page 4 of 4 2/08/18 Page 952 of 1392   PageID 15694
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 841 of 1803   PageID 11587
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 61 of 84   PageID 98054

*Cf.* 43A C.J.S. *Injunctions* § 378 (2019) ("A temporary or preliminary injunction does not adjudicate the ultimate rights in controversy and it is not conclusive on the court on a subsequent hearing."). In this respect, the Temporary Injunction is similar to other mine-run, temporary bankruptcy injunctions—including the automatic stay, a hallmark of bankruptcy law that bars creditors from commencing or continuing any judicial action to recover a debt from the debtor after a bankruptcy petition is filed. *See* 11 U.S.C. § 362(a); *see also In re Quigley*, 676 F.3d at 52 ("Enjoining litigation to protect bankruptcy estates during the pendency of bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts."). Thus even if *Stern* prevents the bankruptcy court from entering a final judgment in the Trustee Adversary, it has no bearing on whether the bankruptcy court can issue the Temporary Injunction as part of the confirmed Plan.[35]

C

When a bankruptcy court issues a temporary injunction under § 105(a) as part of a confirmed plan, the bankruptcy court must still consider the four-prong preliminary injunction test. *See, e.g., Seatco*, 257 B.R. at 477 (applying traditional preliminary-injunction factors in approving a temporary plan injunction under *Zale*). The factors are (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury

---

[35]The present appeal does not involve, and the court does not address, the propriety of a plan provision that finally adjudicates a *Stern* claim. Nor does the court decide whether a bankruptcy court can grant preliminary relief on a *Stern* claim outside the context of a plan confirmation order.

- 61 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 07/03/24    Page 953 of 1392    PageID 15695
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 842 of 1803    PageID 11588
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 62 of 84    PageID 98055

if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *See, e.g., Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

The first factor, when applied to a temporary plan injunction, turns on whether the reorganization plan is likely to succeed. *See Seatco*, 257 B.R. at 477. In support of the Temporary Injunction, the bankruptcy court evaluated the likelihood of success of the Trustee Adversary, not the likelihood of success of the Plan. *See Acis II*, 2019 WL 417149, at *11-12. But the bankruptcy court separately determined that the Plan is feasible, *see id.* at *14, and its factual findings in that context support the conclusion that the Plan is substantially likely to succeed. The bankruptcy court found that Terry has an excellent track record as a portfolio manager; that Terry will be able to generate new business for Acis; and that Brigade is qualified to serve as the sub-advisor to Acis. *See id.* Thus in the absence of an optional redemption, it is substantially likely that the reorganized Acis will be able to satisfy its creditors' claims and emerge from bankruptcy.

The bankruptcy court did not clearly err in finding that, without the Temporary Injunction, Acis faces a substantial threat of irreparable injury: specifically, "evisceration of the Acis CLOs, by parties with unclean hands." *Id.* at *10. The bankruptcy court found that an optional redemption would leave Acis with nothing to manage, and thus no going-concern value and no means of satisfying its creditors' claims. *See id.* Highland and Neutra argue that Acis has an adequate remedy at law because all it stands to lose is money—i.e., the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 04/28/23    Page 954 of 1392    PageID 15696
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 843 of 1803    PageID 11589
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 63 of 84    PageID 98056

management fees generated by the PMAs—and it can recover that money via a final judgment in the Trustee Adversary. But there is more at stake here than money. Without the Temporary Injunction, Acis will have no opportunity to *reorganize* instead of *liquidate*—and, "[a]s the Code contemplates, the Debtor should be given the opportunity to successfully reorganize." *Seatco*, 257 B.R. at 477. To deny Acis the chance to reorganize would be to subject it to a substantial threat of irreparable injury.

The bankruptcy court likewise did not clearly err in finding that the risk of harm to Acis in the absence of an injunction outweighs any potential harm to HCLOF. Indeed, the bankruptcy court found that there *is* no potential harm to HCLOF because "a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan." *Acis II*, 2019 WL 417149, at *12. The Plan allows for just such a reset.[36] Thus HCLOF's complaint that it is losing money on the CLOs as they are currently structured lacks force.

Finally, the bankruptcy court did not clearly err in finding that the public interest favors an injunction. The public has an interest in allowing businesses to reorganize instead of liquidate. And, more important, there is a strong public interest *against* "allowing potential wrongdoers to complete the last step in what appears likely to have been a scheme

---

[36]HCLOF contends that a reset is impossible under the terms of an offering memorandum that it issued in November 2017—i.e., within a month after Terry's arbitration award was issued—but the bankruptcy court did not find this contention to be credible, and this court will not disturb the bankruptcy court's credibility findings in the absence of clear error.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-3    Filed 12/03/24    Page 955 of 1392    PageID 15697
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 844 of 1803    PageID 11590
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 64 of 84    PageID 98057

to strip [Acis] of its assets, steal its business, and leave it unable to pay creditors." *Id.* The

bankruptcy court therefore did not err by concluding that the four-part preliminary injunction

test supports the Temporary Injunction.

## VIII

Highland and Neutra argue that the Trustee proposed the Plan in bad faith, contrary

to 11 U.S.C. § 1129(a)(3).

### A

The first contention that Highland and Neutra advance is that Terry filed the

involuntary petitions in bad faith per 11 U.S.C. § 303(i)(2), and, as a result, any

subsequently-proposed plan was necessarily proposed in bad faith. Highland and Neutra

base their argument on *Natural Land Corp.*, 825 F.2d 296, in which the Eleventh Circuit held

that "the taint of a petition filed in bad faith must naturally extend to any subsequent

reorganization proposal." *Id.* at 298. It is not clear that this rule applies in the Fifth Circuit,

and at least one bankruptcy court has declined to apply it. *See Landing Assocs.*, 157 B.R. at

812. But assuming *arguendo* that *Natural Land Corp.* does apply, Highland and Neutra have

nonetheless failed to establish that Terry filed the involuntary petitions in bad faith.

#### 1

The first question the court must resolve is what standard of review to apply. In their

briefing in the First Appeal, Neutra and Terry agreed that the question whether Terry filed

the involuntary petitions in good faith is a factual determination governed by the clear error

standard. At oral argument, however, Neutra challenged whether this is the correct standard

- 64 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 04/20/23   Page 956 of 1392   PageID 15698
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 845 of 1803   PageID 11591
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 65 of 84   PageID 98058

of review.  But case law supports applying the clear error standard to the question of the petitioner's good faith.  *See, e.g., In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 245 (B.A.P. 9th Cir. 2007) ("The bankruptcy court's finding of the absence of bad faith is reviewed under the clearly erroneous standard."); *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 269 (E.D. Tex. 2016) ("The Court reviews the Bankruptcy Court's determination of bad faith for clear error as a finding of fact."); *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R. 768, 785 (E.D. Pa. 2014) ("'Proving an involuntary petition was filed in bad faith requires an inquiry into the creditor's knowledge,' a factual question that is reviewed for clear error." (quoting *In re Bock Transp., Inc.*, 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005))), *aff'd sub nom. In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).  Moreover, Fifth Circuit case law provides that, post-filing, "[a] bankruptcy court's determination that a debtor has acted in bad faith is a finding of fact reviewed for clear error."  *In re Jacobsen*, 609 F.3d 647, 652 (5th Cir. 2010).  The parties do not cite any cases suggesting that *de novo* review would apply; nor would it make sense to conduct a *de novo* review of what is, in large part, a question of the petitioner's intentions.  The court will therefore apply the clear error standard.[37]

---

[37]There is some case law suggesting that, where a bankruptcy court dismisses an involuntary petition on the ground that the petitioner filed it in bad faith, the *dismissal* is reviewed for abuse of discretion.  *See, e.g., Forever Green*, 804 F.3d at 335.  But even then, the bankruptcy court's finding that the petitioner acted in bad faith is reviewed for clear error. *See In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007); *see also Jacobsen*, 609 F.3d at 652 (observing that "[a] bankruptcy court's determination that a debtor has acted in bad faith is a finding of fact reviewed for clear error," even while "[t]he decision to convert a Chapter 13 case to Chapter 7" on that ground "is reviewed for abuse of discretion").

Appellee Appx. 00839
Appx. 15090

2

The court next considers what legal test governs a determination of bad faith. This is not a clear-cut or easy question: courts have developed a "dizzying array of standards" that can be applied to the issue. *Forever Green*, 804 F.3d at 335. Some of these tests include:

> (1) the "improper use" test, which finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum[;]
>
> (2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition. Cases under this line of reasoning have emphasized that the petition was motivated by ill will, malice or for the purpose of harassing the debtor[;]
>
> (3) the "objective test," which essentially asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;
>
> (4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing; and
>
> (5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).[38]

---

[38]The "combined test" is often guided by principles from Rule 9011, which mirrors Fed. R. Civ. P. 11. *See In re Landmark Distribs., Inc.*, 189 B.R. 290, 310 n.24 (Bankr. D.N.J. 1995). The Second and Eleventh Circuits have likewise observed that "a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011." *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 106 (2d Cir. 2000) (citing *Gen. Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997)).

Appellee Appx. 00840
Appx. 05042

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 885    Filed 04/28/23    Page 958 of 1392    PageID 15700
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 847 of 1803    PageID 11593
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 67 of 84    PageID 98060

*In re Landmark Distribs., Inc.*, 189 B.R. 290, 309-10 (Bankr. D.N.J. 1995) (citations and footnotes omitted).  Courts have also applied a "totality of circumstances" test, which essentially combines the improper use, improper purpose, and objective tests.  *See, e.g., Forever Green*, 804 F.3d at 336 (citing *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 255 n.2 (6th Cir. 2006)).  This test has been used by at least one bankruptcy court in this circuit.  *See In re TRED Holdings, L.P.*, 2010 WL 3516171, at *7 (Bankr. E.D. Tex. Sept. 3, 2010).

The Fifth Circuit has not expressly endorsed any particular standard, but it has considered both objective and subjective factors in deciding whether an involuntary petition was filed in bad faith.  *See In re Sims*, 994 F.2d 210, 222 (5th Cir. 1993) (considering whether "the filing of the petitions was 'motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor[s],'" and whether petitioners "conducted a reasonable inquiry into the facts and the law prior to filing the petitions, as required by Bankruptcy Rule 9011" (alteration in original) (quoting *In re W. Side Cmty. Hosp., Inc.*, 112 B.R. 243, 258 (Bankr. N.D. Ill. 1990))).  Any test that considers *only* subjective or objective factors thus cannot be correct.  The court will therefore apply a totality of circumstances or combined test in analyzing Terry's good faith.

3

Applying the above principles, the court concludes that the bankruptcy court did not clearly err by holding that Terry filed the involuntary petitions in good faith.

On the question of Terry's alleged bad faith, the bankruptcy court found:

- 67 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 03/31/04Page 959 of 1392    PageID 15701
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 848 of 1803    PageID 11594
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 68 of 84    PageID 98061

> the evidence suggested that Mr. Terry and his counsel filed the
> Involuntary Petitions out of a legitimate concern that Highland
> was dismantling and denuding Acis LP of all of its assets and
> value and that a bankruptcy filing was the most effective and
> efficient way to preserve value for the Acis LP creditors.

*Acis I*, 584 B.R. at 144.  This finding is not clearly erroneous.  The record before the

bankruptcy court showed that Acis and Highland had engaged in numerous transactions that

stripped Acis of much of its value, and that Terry only filed the involuntary petitions after

learning about these transactions during post-judgment discovery.  *See supra* § I(C).  Terry

testified that he believed bankruptcy was the best way to stop Acis from making further

fraudulent transfers, so that the entire community of Acis' creditors could receive an

equitable distribution of assets.  The bankruptcy court was entitled to credit this testimony.

Terry also took the objectively reasonable step of consulting with bankruptcy counsel, albeit

briefly, before making the filing.  He reasonably believed that Acis had fewer than 12

creditors based on a net-worth affidavit he received during post-judgment discovery in the

44th Judicial District Court of Dallas County.  As for whether Acis was paying its debts as

they came due, Terry was aware of a number of accruing debts that Acis owed—including

his own judgment against Acis.  He also reasonably concluded that if Acis were stripped of

its assets, then *no* creditor would be paid.  The bankruptcy court did not clearly err by finding

that Terry filed the petitions based on a legitimate, good-faith belief that Acis was

fraudulently transferring assets to the detriment of all creditors.

Terry's motive, as characterized by the bankruptcy court, is a proper bankruptcy

purpose.  The Third Circuit, in a case relied upon by Neutra, describes "protect[ing] against

- 68 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 03/08/04    Page 960 of 1392    PageID 15702
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 849 of 1803    PageID 11595
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 69 of 84    PageID 98062

the preferential treatment of other creditors or the dissipation of the debtor's assets" as legitimate purposes of an involuntary petition. *Forever Green*, 804 F.3d at 335. An additional "purpose of an involuntary procedure is to provide a method for creditors to protect their rights against debtors who are not meeting their debts" by "forc[ing] [them] to submit to the jurisdiction of the bankruptcy court." *In re All Media Props., Inc.*, 5 B.R. 126, 137 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. Unit A May 1981) (adopting opinion of bankruptcy court). The bankruptcy court's characterization of Terry's "concern that Highland was dismantling and denuding Acis LP of all of its assets and value," to the detriment of all of Acis' creditors, fits comfortably into the bankruptcy purposes described above. *See Acis I*, 584 B.R. at 144.

Neutra argues that the timing of Terry's petitions reveals that he was not actually concerned about fraudulent asset transfers. Neutra points out that Terry filed the involuntary petitions mere hours before a scheduled temporary injunction hearing in Texas state court, and following a single meeting with bankruptcy counsel. According to Neutra, Terry's real motive was to collect his judgment in a more favorable forum. But Neutra's argument constitutes, at best, a plausible alternative view of the evidence. On appellate review, this court may not substitute its own interpretation of the evidence for that of the bankruptcy court in the absence of clear error. *See Johnson Sw.*, 205 B.R. at 827. Because the bankruptcy court did not commit clear error, its pertinent factual findings must be affirmed. *See id.*

Neutra cites a number of cases for the proposition that when an involuntary petition

Appellee Appx. 00843
Appx. 15045

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/21/23    Page 961 of 1392    PageID 15703
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 850 of 1803    PageID 11596
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 70 of 84    PageID 98063

is filed as a collection remedy in what is essentially a two-party dispute, the petition is necessarily filed in bad faith. But Neutra's cases are distinguishable.

In *In re Smith*, 243 B.R. 169 (Bankr. N.D. Ga. 1999), the court found bad faith using a combined subjective and objective test where: (1) the petitioning creditor based its petition on the claim that the alleged debtor was fraudulently transferring assets, but had no evidence of any such transfers; (2) the case involved essentially a two-party dispute, and the petitioning creditor had sufficient remedies under state law; (3) the evidence showed that the petitioning creditor was motivated by a desire to shut down the debtor's business operations and to have the debtor criminally prosecuted; (4) the petitioning creditor failed to conduct critical research before filing its petition; and (5) the petitioning creditor failed to disclose the existence of additional creditors. *See id.* at 195-201. Here, by contrast, there *is* evidence that Highland was denuding Acis of assets; the bankruptcy court found that this is not a two-party dispute and that Terry's remedies under state law were insufficient; Terry conducted sufficient research before filing; and the bankruptcy court did not find that Terry was motivated by ill will or malice toward the debtor.

In *In re Frailey*, 144 B.R. 972 (Bankr. W.D. Pa. 1992), the court stated that "[a] bankruptcy court should refuse to enter an order for relief where petitioning creditors can go into state court to satisfy a debt." *Id.* at 977-78. But the cases cited by the *Frailey* court indicate that it did not make this statement in the context of a bad-faith filing analysis. *See id.* (citing *In re Cent. Hobron Assocs.*, 41 B.R. 444, 451 (D. Haw. 1984) (applying balancing test to exclude unpaid debt from "not generally paying" determination); *In re Kass*, 114 B.R.

Appellee Appx. 00844
APPX. 15096

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8855 Filed 2/26/2021 Page 962 of 1392 PageID 15704
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 851 of 1803 PageID 11597
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 71 of 84 PageID 98064

308, 309 (Bankr. S.D. Fla. 1990) (conducting abstention analysis under 11 U.S.C. § 305)).

Indeed, the court in *Frailey* declined (on other grounds) to award the alleged debtor damages

under § 303(i). *See id.* at 978. The case is therefore inapposite.[39]

*In re Tichy Elec. Co.*, 332 B.R. 364 (Bankr. N.D. Iowa 2005), states: "[t]he power of

an involuntary petition must be exercised for the good of the entire creditor body and for

legitimate bankruptcy purposes. It is not intended to be used in an exclusively self-serving

manner as a collection device." *Id.* at 376. But in the present case, the bankruptcy court

found that Terry acted out of concern for the entire body of Acis' creditors. And the

petitioning creditors in *Tichy* did not actually intend to liquidate or reorganize the debtor.

Rather, "[t]hey understood that after filing, some negotiations would occur, payments would

be made, and the case dismissed." *Id.* In other words, the petitioning creditor intended to

use the threat of bankruptcy as leverage to negotiate a settlement with the debtor. That does

not appear to be the case here. Finally, unlike the present appeals, there is no indication in

*Tichy* that the alleged debtor was fraudulently transferring assets in order to frustrate

collection efforts. *See generally id.*

---

[39]Similarly, *In re Tarletz*, 27 B.R. 787 (Bankr. D. Colo. 1983), states that "it is obvious that the use of the bankruptcy court as a routine collection device would quickly paralyze this Court." *Id.* at 794. But this was in the context of 11 U.S.C. § 305 abstention, *not* a bad-faith filing analysis. *See id.* at 793. And *In re Spade*, 258 B.R. 221 (Bankr. D. Colo. 2001), holds that where a petitioning creditor seeks only to gain a litigation advantage over the debtor, and does not seek the orderly distribution of the debtor's assets to all creditors, § 305 abstention is appropriate. *See id.* at 233. Not only does *Spade* not involve a § 303(i) bad-faith analysis, it is also factually inapposite: the bankruptcy court here found that Terry *was* motivated by concern for all of Acis' creditors.

Appellee Appx. 00845
APPX. 15047

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 55  Filed 225/23 3180 Page 963 of 1392    PageID 15705
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 852 of 1803    PageID 11598
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 72 of 84    PageID 98065

In sum, because the bankruptcy court did not commit clear error in determining that Terry filed the involuntary petitions in good faith, its relevant findings on this issue must be affirmed. Neutra and Highland's argument that the proposed Plan was tainted by Terry's bad-faith filing therefore fails to establish that the bankruptcy court committed reversible error.

<div align="center">B</div>

Highland and Neutra maintain that the Plan fails to satisfy § 1129(a)(3) because it effects an unlawful result: allowing a portfolio manager to veto the wishes of the portfolio's owner. They cite *In re Noll*, 172 B.R. 122 (Bankr. M.D. Fla. 1994), for the premise that a reorganization plan cannot be proposed in order to obtain a result that would be unobtainable in state court. Highland and Neutra's reliance on *Noll* is misplaced. *Noll* is, by its own terms, of limited instructive value—it states that "one cannot define [bad faith] but will readily recognize it when one sees it." *Id.* at 124. The case is factually distinguishable because it involves a proposed plan that, in essence, would have constituted self-dealing by the plan proponent (who was not a disinterested trustee). *See id.* And it is difficult to square Highland and Neutra's characterization of the holding of *Noll*—that a reorganization plan cannot be used to obtain results that are unobtainable in state court—with Neutra's argument in the bad-faith filing context that filing involuntary petitions is *only* appropriate when the petitioner lacks adequate remedies in state court.

Highland and Neutra argue that the Plan is unlawful because it contains an overbroad release. They complain about language "vesting assets in the reorganized debtor 'free and

<div align="center">- 72 -</div>

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68 Page 964 of 1392 PageID 15706
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 853 of 1803 PageID 11599
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 73 of 84 PageID 98066

clear of all right, title, interests, claims, liens, encumbrances and charges'; purporting to compromise all claims against the estates; preserving estates' right of setoff and recoupment; and enjoining the 'continuation' of lawsuits against the debtors." Highland & Neutra Third Appeal Br. 30. But this language merely effects the express terms of 11 U.S.C. §§ 524(a) and 1141(c). *See* 11 U.S.C. § 524(a) ("A discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor[.]"); 11 U.S.C. § 1141(c) ("[A]fter confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."); *see also In re Coho Res., Inc.*, 345 F.3d 338, 343 (5th Cir. 2003) ("11 U.S.C. § 524(a) operates as an injunction against actions against a debtor subsequent to a discharge of a debt. The bankruptcy discharge and § 524 injunction serve to give the debtor a financial fresh start." (internal quotation marks, emphasis, and footnote omitted)). The challenged language does not render the Plan unlawful.[40] Highland and Neutra have failed to demonstrate reversible error much less any error.

IX

The court now considers the argument of Highland and Neutra that the Plan fails to meet the requirements of 11 U.S.C. § 1129(a)(5).

---

[40]Highland and Neutra also cite several cases for the proposition that a plan is proposed in bad faith when it seeks merely to delay or frustrate the efforts of a secured creditor. But Highland and Neutra are not secured creditors.

- 73 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 03/03/18 Page 965 of 1392    PageID 15707
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 854 of 1803    PageID 11600
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 74 of 84    PageID 98067

A

Section 1129(a)(5) provides that a plan may only be confirmed if:

> (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and
>
> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
>
> (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

*Id.* Neutra and Highland contend that the Plan is deficient because Terry is actually a non-statutory insider, and because Terry's ownership of Acis is not in the best interests of creditors, Acis' investors, or public policy.[41]

B

The court affirms the bankruptcy court's conclusion that Terry is not an insider.

---

[41]Neutra and Highland also contend that § 1129(a)(5)(A)(i) requires disclosure of the corporate structure of the reorganized debtor, and that the confirmed Plan is deficient because it merely states that Terry will have control over the structure of Acis instead of defining that structure in advance. In support of this argument, Neutra and Highland cite *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 765-66 (Bankr. N.D. Ill. 2013). But the plan in *GAC Storage* did not fail because it left the management structure of the reorganized debtor undefined; rather, it failed because it did not disclose that the reorganized debtor's sole owner "intend[ed] to bring on either himself or another entity which he would control as the manager of [the debtor] and that the manager would have a 1% ownership interest in [the debtor]." *Id.* at 766. Thus *GAC Storage* is not controlling.

- 74 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 05/03/18 04age 966 of 1392    PageID 15708
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 855 of 1803    PageID 11601
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 75 of 84    PageID 98068

11 U.S.C. § 101(31) provides a list of persons who are considered to be "insiders" of the debtor based on their relationship with the debtor. A person not included in the statutory list can nonetheless qualify as a "non-statutory insider" under certain circumstances. In deciding whether a person is a non-statutory insider, the court considers two factors: "(1) the closeness of the relationship between the [putative insider] and the debtor; and (2) whether the transactions between the [putative insider] and the debtor were conducted at arm's length." *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992); *accord In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002). Highland and Neutra contend that a person can be a non-statutory insider based on his relationship with a statutory insider of the debtor, regardless of his relationship with the debtor itself. *See A. Tarricone*, 286 B.R. at 263-64. They then assert that the Trustee, as a person in control of the debtor, is a statutory insider. *See In re GSC, Inc.*, 453 B.R. 132, 158 n.31 (Bankr. S.D.N.Y. 2011). The court will assume *arguendo* that these legal assertions are correct. Highland, Neutra, and the Trustee agree that the bankruptcy court's determination of insider status is a question of fact that is reviewed for clear error. *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, ___ U.S. ___, 138 S. Ct. 960, 966 (2018).

Highland and Neutra posit that the relationship between the Trustee and Terry is unusually close. The controlling question under the first factor is whether the relationship is close enough for the alleged insider to gain advantage due to affinity. *See In re Rexford Props., LLC*, 557 B.R. 788, 797 (Bankr. C.D. Cal. 2016). Among the indicators of closeness cited by Highland and Neutra are: that the lawyers who represented Terry in the filing of the

Appellee Appx. 00849
APPX. 15150

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 833   Filed 02/03/24   Page 967 of 1392   PageID 15709
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 856 of 1803   PageID 11602
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 76 of 84   PageID 98069

involuntary petitions now represent the Trustee; that the Trustee relied on Terry's financial advice for a period of time after the Trustee's appointment; that Terry's expert witness in the arbitration was engaged by the Trustee to testify at the confirmation hearings; that Terry's counsel in related litigation in Guernsey testified as an expert at the confirmation hearings; and that Terry introduced Oaktree to the Trustee's predecessor. As for whether the Plan was negotiated at arm's length, Highland and Neutra point out that the Trustee did not solicit competing bids for Acis' equity, and that there was essentially no negotiation between Trustee and Terry regarding that price.

But after reviewing the record, the court is not "left with the definite and firm conviction that a mistake has been committed." *Johnson Sw.*, 205 B.R. at 827 (quoting *Placid Oil*, 158 B.R. at 412). The Trustee testified that, before the bankruptcy cases, he had no relationship with Terry—and after he was appointed, his relationship with Terry was typical of that between a trustee and the debtor's largest creditor. He relied on Terry's financial advice for a brief time out of necessity, not affinity. Terry appears to have been represented by independent counsel in his dealings with the Trustee. The lack of an auction can be explained by the Trustee's assertion—credited by the bankruptcy court—that no other creditor was a logical choice to be Acis' equity owner. And the record indicates that there was at least some negotiation between Terry and the Trustee regarding the amount of the reduction of Terry's claim against the estates. Indeed, according to the Trustee's testimony, Terry thought the price for Neutra's equity was *too high*, but the Trustee held firm and Terry gave in. These facts plausibly support the findings that Terry and the Trustee were not so

Appellee Appx. 00850
APPX. 15092

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-6    Filed 02/28/23 0418 Page 968 of 1392    PageID 15710
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 857 of 1803    PageID 11603
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 77 of 84    PageID 98070

close as to give Terry an advantage based on affinity, and that the Plan was negotiated at arm's length.  The bankruptcy court thus did not commit clear error by finding that Terry was not an insider.[42]

<div align="center">C</div>

Highland and Neutra's remaining § 1129(a)(5) arguments—that Terry's appointment as Acis' new equity owner is contrary to the interests of creditors, investors, and the public—are unavailing.

Highland and Neutra first contend that "[c]onfirmation of a Chapter 11 plan of reorganization that was designed to allow an *insider* to obtain ownership of the reorganized debtor for an improper purpose is against public policy."  Highland & Neutra Third Appeal Br. 43 (emphasis added) (citing *In re S. Beach Sec., Inc.*, 606 F.3d 366, 371 (7th Cir. 2010)).  But Terry is not an insider, and—as discussed *supra* at § VIII(A)(3)—he pursued Acis' involuntary bankruptcy in good faith and for a proper bankruptcy purpose.

Highland and Neutra also assert that "a bankruptcy court must, by considering the broader public policy interests, prevent the appointment of a proposed leader who has a conflict of interest or other financial or personal affiliation that would make his or her control inappropriate."  Highland & Neutra Third Appeal Br. 44.  They note that Terry is embroiled in a battle with HCLOF over control of the subordinated notes, and with Highland itself over

---

[42]As an additional ground for finding that Terry is an insider, Highland and Neutra assert that Terry had access to voluminous insider information during the pendency of these cases.  But they cite no evidence in the record on appeal in support of this assertion.

<div align="center">- 77 -</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 4/29/2318  Page 969 of 1392   PageID 15711
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 858 of 1803   PageID 11604
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 78 of 84   PageID 98071

myriad issues in state court.  But this assertion is not entirely accurate: it is *Acis*, not Terry,

who is battling with HCLOF over the subordinated notes.   And even if Terry has

disagreements with Highland in state court, this fact is not necessarily dispositive of whether

the Plan is in the public interest.  According to case law cited by Highland and Neutra, there

are numerous factors to consider in deciding whether a proposed plan is in the public interest,

and the weight given to each factor varies depending on the circumstances of the case.  *See*

*In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014).

Relevant factors include whether the appointment "perpetuate[s] incompetence, lack of

direction, [or] inexperience," and whether "the individual [is] capable and competent to serve

in the proposed capacity assigned to him."  *Id.*  The bankruptcy court found that Terry is

"well qualified to reorganize" Acis and that his new role "will be similar to the role he very

successfully performed for" Acis.  *Acis II*, 2019 WL 417149, at *14.  Giving appropriate

weight to all of the public policy factors in the context of this case—particularly in light of

the bankruptcy court's finding that Highland has "unclean hands," *id.* at *10—the court

concludes that the bankruptcy court did not clearly err by finding that confirmation of the

Plan was consistent with public policy.

X

Finally, the court considers the contention of Highland and Neutra that the Plan does

not satisfy the cram-down requirements of 11 U.S.C. § 1129(b).

It is familiar jurisprudence that the acceptance of all impaired classes of claims or

interests required by § 1129(a)(8) is not necessary for plan confirmation when § 1129(b) is

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8836 Filed 03/18/04 Page 970 of 1392 PageID 15712
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 859 of 1803 PageID 11605
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 79 of 84 PageID 98072

satisfied. Section 1129(b) permits confirmation when all other requirements of § 1129(a) are met and "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1). The court reviews the bankruptcy court's finding that the cram-down requirements are met for clear error. *See In re Block Shim Dev. Co.-Irving*, 118 B.R. 450, 452 (N.D. Tex. 1990) (Fitzwater, J.).

Highland and Neutra challenge the bankruptcy court's finding that the Plan meets these requirements, contending the Plan is neither fair nor equitable to them, in violation of § 1129(b)(1).[43] More specifically, Highland and Neutra assert that the Plan violates the absolute priority rule and its corollaries.

Under the absolute priority rule, "fairness and equity require[] that 'the creditors . . . be paid before the stockholders [can] retain [equity interests] for any purpose whatever.'" *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 444 (1999) (last alteration in original) (quoting *N. Pac. R.R. Co. v. Boyd*, 228 U.S. 482, 508 (1913)). The reason for the rule is "the danger inherent in any reorganization plan proposed by a debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners." *Id.* The rule is embodied in § 1129(b)(2)(B)(ii). *See LaSalle*, 526 U.S. at 449. The debtor's old equity owners *can* retain their interest in the debtor if they contribute new value to the bankruptcy estate, and this new value "makes the senior creditors (and the estate as a whole)

---

[43]Highland and Neutra also argue that the requirements of § 1129(a)(3) are not met. For the reasons discussed *supra* at § VIII, the court rejects this argument.

Appellee Appx. 00853
Appx. 15185
Appx. 151595

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 08/23/18 Page 971 of 1392   PageID 15713
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 860 of 1803   PageID 11606
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 80 of 84   PageID 98073

better off." *In re Castleton Plaza, LP*, 707 F.3d 821, 821 (7th Cir. 2013). The way to assess whether the value contributed by the old equity owners makes the senior creditors better off is to allow for a market valuation of the debtor's equity. *See LaSalle*, 526 U.S. at 454-58.

Highland and Neutra contend that the Plan violates the absolute priority rule because there was no market test to assess the value of Acis' equity—instead, the Trustee unilaterally selected the $1 million number without soliciting competing bids. But the absolute priority rule, by its own terms, only applies when the debtor's old equity owners will retain their equity interest after bankruptcy. *See LaSalle*, 526 U.S. at 444. Where, as here, a non-insider creditor becomes the debtor's new owner, there is no "danger . . . that the plan will simply turn out to be too good a deal for the debtor's [old] owners." *Id.* Whatever the significance of the Trustee's failure to solicit competing bids, it does not violate the absolute priority rule in this instance.

Highland and Neutra also argue that the Plan violates a corollary of the absolute priority rule: "that a senior class cannot receive more than full compensation for its claims." *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)). They assert that "to obtain confirmation of a reorganization plan that completely extinguishes equity interests, the plan's proponent must prove that there is no value left once the creditors have had their turn." Highland & Neutra Third Appeal Br. 47 (quoting *In re Dave's Detailing, Inc.*, 2015 WL 4601726, at *16 (Bankr. S.D. Ind. July 30, 2015)). This, in turn, requires a showing that no creditor is paid more than in full. *See In re MCorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D.

Appellee Appx. 00854
Appx. 05396

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 3 Filed 02/03/23 Page 972 of 1392    PageID 15714
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 861 of 1803    PageID 11607
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 81 of 84    PageID 98074

Tex. 1992), *abrogated on other grounds by In re Briscoe Ents., Ltd., II*, 994 F.2d 1160, 1164 n.11 (5th Cir. 1993). Highland and Neutra maintain that the Plan violates this rule in two ways.

First, they contend that the bankruptcy court wrongly inflated the value of the secured portion of Terry's partially-secured claim from approximately $634,000 to $1 million. This argument rests on an erroneous understanding of the Plan. The Plan reduces the *total* value of Terry's partially-secured claim—i.e., the sum of both the secured and unsecured portions of his claim—by $1 million, and then treats the remaining *total* balance of Terry's claim as a general unsecured claim. The Plan does not inflate the value of his secured claim.

Second, Highland and Neutra argue that, without a market test of Acis' value, the bankruptcy court could not have determined whether Terry was overcompensated when he received Acis' equity in exchange for a $1 million reduction in his claim. But there *was* a market valuation in the present case. In *LaSalle* the Supreme Court suggested (but did not decide) that the termination of exclusivity—i.e., allowing any interested person to submit a competing reorganization plan—can constitute a sufficient market test of a debtor's value. *See LaSalle*, 526 U.S. at 458. Since then, courts have concluded in a number of cases that opening the bankruptcy process to competing plan proposals is a valid market test. *See H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 WL 2261483, at *7 (D. Md. June 3, 2011) ("Indeed, if the Bankruptcy Court simply allowed Roebuck to file a competing plan, and the creditors found that plan to be inferior, they could still vote for Alter's original plan, and [*LaSalle*] would have been satisfied."); *Dave's Detailing*, 2015 WL 4601726, at *18

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 03/28/24    Page 973 of 1392    PageID 15715
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 862 of 1803    PageID 11608
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 82 of 84    PageID 98075

("The termination of exclusivity provides an open market for competition in the form of competing plans."); *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 866 (Bankr. D. Mass. 2000) ("[T]he competing plan approach provides for a more informed process for creditors and to interested bidders than an auction of equity interests in the context of a Debtor's plan."); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 716-17 (Bankr. N.D. Ga. 1996) ("Competing plans certainly would foster alternate bids for control of the reorganized debtor, and would thereby dispel any concerns regarding the necessity and value of the shareholder's offer."); *In re SM 104 Ltd.*, 160 B.R. 202, 227 (Bankr. S.D. Fla. 1993) ("[A]t least in all but the largest bankruptcy cases, the disclosure and confirmation procedures provided by Chapter 11 offer an acceptable alternative for marketing the ownership interests of the reorganized debtor.").[44]

No party in the present case held the exclusive right to propose a reorganization plan. Highland and Neutra could have proposed a competing plan if they believed that the Trustee's plan undervalued Acis' equity. They did not do so. Thus the bankruptcy court did not err by approving a Plan that valued Acis' equity at $1 million.

---

[44]Highland and Neutra's argument to the contrary, based on the Seventh Circuit's opinion in *Castleton*, 707 F.3d 821, is unpersuasive. The court in *Castleton* concluded that the termination of exclusivity was insufficient to constitute a market test in the context of the absolute priority rule. *See id.* at 823-24. The court applied that rule because the person receiving the debtor's equity under the plan was an insider. *See id.* In contrast, Terry is not an insider, and the absolute priority rule does not apply in the present case. *See Dave's Detailing*, 2015 WL 4601726, at *18 ("The holding in *Castleton Plaza* applies to shareholders or insiders—not to non-insider third parties—obtaining equity in a reorganized debtor.").

- 82 -

Appellee Appx. 00856
Appx. 151197

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 08/04/23    Page 974 of 1392    PageID 15716
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 863 of 1803    PageID 11609
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 83 of 84    PageID 98076

XI

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third

Appeal. It maintains that, once the Plan took effect, Acis became the Trustee's successor-in-

interest. But as Acis recognizes, "the Federal Rules of Bankruptcy Procedure applicable to

this case, those numbered 8001-8028, do not provide a specific rule governing substitution

of parties in bankruptcy appeals to the district court." Acis Mot. Substitute 3. Acis also fails

to cite, and the court has not found, any case in which a district court allowed such party

substitution while an appeal was pending. Accordingly, the court in its discretion denies

Acis' motion. *Cf. Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th

Cir. 1985) (holding that substitution of parties under an analogous rule, Fed. R. Civ. P. 25(c),

is within court's discretion). If Acis wishes to take the place of the Trustee in any further

appeal to the Fifth Circuit, it may make a request under the procedure prescribed by Fed. R.

App. P. 43.

*      *      *

In the First Appeal, the clerk is directed to strike ECF Doc. No. 2 from the docket of

No. 3:18-CV-1084-D and to refile that document in No. 3:18-CV-1057-D with a filing date

of April 27, 2018.

The court DISMISSES the appeals of the orders denying intervention in Nos. 3:18-

CV-1056-D and 3:18-CV-1084-D, and DISMISSES the appeals of the orders for relief in

Nos. 3:18-CV-1057-D and 3:18-CV-1073-D.

The court AFFIRMS the Break-Up Fee and Expense Reimbursement order at issue

Appellee Appx. 00857
APPX. 05199

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83    Filed 03/03/18 04    Page 975 of 1392    PageID 15717
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 864 of 1803    PageID 11610
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 84 of 84    PageID 98077

in the Second Appeal, No. 3:18-CV-1822-D.

In the Third Appeal, No. 3:19-CV-0291-D, the court AFFIRMS the bankruptcy court's order confirming the Plan and approving the disclosure statement.

The court DENIES Acis' April 12, 2019 motion to substitute party.

AFFIRMED in part; DISMISSED in part.

July 18, 2019.


                                   _____
                                   SIDNEY A. FITZWATER
                                   SENIOR JUDGE

# APPENDIX 10

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 02/03/2804    Page 977 of 1392    PageID 15719
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 866 of 1803    PageID 11612

# United States Court of Appeals
# for the Fifth Circuit

_____

No. 19-10847

_____

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2021

Lyle W. Cayce
Clerk

In the Matter of: Acis Capital Management, L.P.,

*Debtor*,

------------------------------

Neutra Limited;

*Appellant*,

*versus*

Robin E. Phelan, Chapter 11 Trustee,

*Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-291

_____

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 53   Filed 03/03/23   Page 978 of 1392   PageID 15720
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 867 of 1803   PageID 11613
Case: 19-10847   Document: 00515903826   Page: 2   Date Filed: 06/17/2021

No. 19-10847

Before Smith, Ho, and Oldham, *Circuit Judges*.

Per Curiam:*

Having thoroughly reviewed the parties' briefs and arguments, we conclude the district court's judgment affirming the bankruptcy court's order confirming the Chapter 11 plan must be AFFIRMED. We further conclude the appeal of the district court's plan injunction is moot and must be DISMISSED.

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

Appellee Appx. 00861
Appx. 15662

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 08/23/18    Page 979 of 1392    PageID 15721
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 868 of 1803    PageID 11614
Case: 19-10847      Document: 00515903827      Page: 1    Date Filed: 06/17/2021

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 17, 2021

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

          No. 19-10847    Neutra v. Phelan
                          USDC No. 3:19-CV-291

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and 5th Cir. R. 35, 39, and 41
govern costs, rehearings, and mandates.  **5th Cir. R. 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or order.**
Please read carefully the Internal Operating Procedures (IOP's)
following Fed. R. App. P. 40 and 5th Cir. R. 35 for a discussion
of when a rehearing may be appropriate, the legal standards applied
and sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

Direct Criminal Appeals.  5th Cir. R. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

Pro Se Cases.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

Court Appointed Counsel.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari**.  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

**Appellee Appx. 00862**
**APPX. 15064**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 12/20/23   Page 980 of 1392   PageID 15722
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 869 of 1803   PageID 11615

Case: 19-10847     Document: 00515903827     Page: 2     Date Filed: 06/17/2021

The judgment entered provides that appellant pay to appellee the
costs on appeal.  A bill of cost form is available on the court's
website www.ca5.uscourts.gov.

                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              By: _____
                              Charles B. Whitney, Deputy Clerk

Enclosure(s)

Ms. Annmarie Antoniette Chiarello
Mr. Phillip Lewis Lamberson
Mr. Jeffrey Scott Levinger
Mrs. Rakhee V. Patel

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/23   Page 981 of 1392   PageID 15723
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 870 of 1803   PageID 11616

# APPENDIX 11

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16-3    Filed 07/29/23    Page 982 of 1392    PageID 15724
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 871 of 1803    PageID 11617
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 1 of 27

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Related to Docket No. 86** |
| | ) |

**OBJECTION OF THE DEBTOR TO MOTION OF
OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO TRANSFER VENUE OF THIS CASE TO THE UNITED STATES
<u>BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS</u>**

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") hereby

objects to the motion to transfer venue of this case [Docket No. 86] (the "<u>Motion to Transfer</u>") to

the Northern District of Texas (the "<u>Texas Bankruptcy Court</u>"), filed by the Official Committee

of Unsecured Creditors (the "<u>Committee</u>").

In support of this objection, the Debtor respectfully states as follows:

<u>**Preliminary Statement**</u>

1.    The Debtor owns and manages a sophisticated financial services and

money management business that has assets and interests all over the world.  The amounts at

stake in this case involve hundreds of millions of dollars in terms of asset values and asserted

liabilities.  The Debtor's creditors are sophisticated parties who are either represented by highly

qualified counsel or are attorneys themselves.  The top 20 unsecured creditors in this case consist

almost entirely of litigation claimants and law firms.  There are no "mom and pop" creditors who

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-6    Filed 03/03/23    Page 983 of 1392    PageID 15725
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 872 of 1803    PageID 11618
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 2 of 27

would be prejudiced if they were not provided with ready access to a local bankruptcy court.

2.    Further, the Texas Bankruptcy Court has no special familiarity with the Debtor or its current management.  The Debtor's restructuring efforts are now led by Bradley Sharp as Chief Restructuring Officer (the "<u>CRO</u>") who has had no prior involvement with either Acis (as defined below) or the Texas Bankruptcy Court with respect to this matter.  The Texas Bankruptcy Court also knows little about the Debtor's business or financial affairs, aside from its prior relationship with Acis.  The Debtor is no longer affiliated with Acis and, in fact, is directly adverse to Acis, which now asserts various contested litigation claims against the Debtor.  Hence, the Committee's opening position that this case should be transferred to the Texas Bankruptcy Court is little more than a litigation ploy.  The Committee has decided, based on prior rulings of the Texas Bankruptcy Court in the Acis cases, that such forum would be more advantageous from a litigation perspective *vis-à-vis* the Debtor.  That is not an appropriate basis to transfer venue.

3.    The fact that the Debtor is headquartered in Dallas, Texas also does not mean that this case should be transferred there.  The Debtor's assets, interests, and contractual entanglements are dispersed throughout this country and the world.  As an example, the Debtor has assets under management, including its own proprietary assets and those of its clients, through various related parties in Asia, South America, and Europe.  The Debtor has already brought a motion in this case to appoint a foreign representative in order to manage its various foreign interests [Docket No. 68], including those in pending proceedings in Bermuda and the Cayman Islands.  The Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located all over the country.  The Debtor's primary brokerage

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 04/24/23   Page 984 of 1392   PageID 15726
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 873 of 1803   PageID 11619
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 3 of 27

accounts that hold the bulk of the Debtor's liquid and illiquid securities are located in New York City with Jefferies, LLC ("Jefferies").  The Debtor is also the subject of two pending lawsuits in the Delaware Chancery Court, one of which involves claims brought by the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee"), a member of the Committee.  Another member of the Committee, UBS Securities LLC and UBS AG London Branch ("UBS"), has longstanding litigation pending against the Debtor in New York state court (not Texas).  Predictably, the Debtor's professionals and those of its creditors are located around the country.  Given the amounts at stake in this case and the complexity of the Debtor's assets and liabilities, venue should not be determined by how many miles the Debtor's employees or professionals or those of its creditors are located from the courthouse.  All parties reside at various commercial centers around this country and can easily travel wherever necessary in order to handle the important matters in this case.

4.      Further, the pendency of the involuntary bankruptcy cases of Acis Capital Management, L.P. and Acis Capital Management GP, LLP (together, "Acis") in Dallas, Texas does not make the Texas Bankruptcy Court a preferable forum for this case.  Acis's involuntary cases were commenced by Joshua Terry ("Terry"), who now owns and manages Acis and represents that entity on the Committee.  Terry assumed ownership of Acis by virtue of a contested plan of reorganization that was confirmed by the Texas Bankruptcy Court and which is now the subject of a pending appeal.[2]  ***The interests of Acis are directly adverse to those of this***

---

[2]  Although a stay of the confirmation order was sought, no stay was granted despite the ongoing appeal of that order.  The Texas Bankruptcy Court thus has limited ongoing jurisdiction at this juncture.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00867
APPX. 15069

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-6   Filed 08/25/23   Page 985 of 1392   PageID 15727
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 874 of 1803   PageID 11620
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 4 of 27

*estate.*[3]  The Debtor and Acis have been, and continue to be, involved in highly contentious litigation, including matters that are the subject of multiple appeals from decisions of the Texas Bankruptcy Court and pending fraudulent transfer claims brought by Acis against the Debtor in the Texas Bankruptcy Court.  The Debtor and Acis assert various substantial disputed and unliquidated claims against each other.  Further, ***the Debtor's current business is unrelated to Acis***, which is focused on managing certain collateralized loan obligations (or CLOs) in which the Debtor no longer has any direct interest.  The Committee also does not establish how the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the instant chapter 11 case.[4]  Aside from the Debtor's prior relationship with Acis, the Texas Bankruptcy Court is not familiar with the Debtor's business and assets or the Debtor's liabilities that need to be restructured in this case.  ***The Debtor's restructuring efforts are now managed by an independent and highly qualified CRO*** who has had no prior involvement with Acis or its bankruptcy proceedings.  Hence, while it may be in the interests of ***the Acis estate*** for this matter to be transferred to the Texas Bankruptcy Court, it is certainly not in the best interests of ***the Debtor's estate*** or the parties to these proceedings, which is the only thing that matters.

5.      As the Committee admits, the Debtor is entitled to substantial deference with respect to its choice of forum for its bankruptcy case.  This Court is indisputably a legally proper forum given that the Debtor is a Delaware limited partnership.  This Court also presents a convenient forum given that the Debtor's assets are so widely dispersed and there has been

---

[3] Terry, in his personal capacity and on behalf of his spouse, also purports to hold an unsecured claim against the Debtor's estate in the amount of $425,000, which the Debtor has designated as contingent, unliquidated, and disputed.

[4] Presumably, senior management personnel of the Debtor have provided all manner of testimony in the various pending litigation matters around the country involving or otherwise implicating the Debtor.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00868
APPX. 15079

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 3/28/23   Page 986 of 1392   PageID 15728
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 875 of 1803   PageID 11621
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 5 of 27

extensive ongoing litigation against the Debtor in the Delaware Chancery Court, including

litigation commenced by the Redeemer Committee, a member of the Committee.  In sum, aside

from the Committee's perceived litigation advantage before the Texas Bankruptcy Court, there is

no credible, let alone valid, basis for this case to be transferred to the Texas Bankruptcy Court

where an adverse proceeding is pending when this Court presents a perfectly appropriate forum

for effectuating a successful reorganization of the Debtor's affairs.  The Debtor therefore urges

this Court to deny the Motion to Transfer filed by the Committee.

<div align="center">**Background**</div>

**A.**      **The Debtor's Bankruptcy Filing**

6.      On October 16, 2019 (the "Petition Date"), the Debtor commenced this

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The

factual background regarding the Debtor, including its current and historical business operations

and the events precipitating the chapter 11 filing, is set forth in detail in the *Declaration of Frank*

*Waterhouse in Support of First Day Motions*, which is incorporated herein by reference.

7.      The Debtor continues in the possession of its property and continues to

operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.

8.      No trustee or examiner has been appointed in the Debtor's chapter 11

case.

9.      On October 29, 2019, the United States Trustee appointed the Committee,

which consists of four members:  (1) the Redeemer Committee; (2) UBS; (3) Acis; and (4) Meta-

e Discovery.  The Committee is represented by Sidley & Austin, with one of its lead attorneys

<div align="center">5</div>

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 08/23/18 04Page 987 of 1392    PageID 15729
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 876 of 1803    PageID 11622
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 6 of 27

based in New York City. Since retaining counsel, the Committee's first order of business was to file the Motion to Transfer.

**B.    The Debtor's Organizational Structure and Governance**

10.    The Debtor is a Delaware limited partnership. Its limited partnership interests are owned as follows: (a) 99.5% by Hunter Mountain Trust, a Delaware statutory trust based in New York, (b) 0.1866% by Dugaboy Investment Trust, a Delaware trust, (c) 0.0627% by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand Advisors, Inc., a Delaware corporation. In sum, 99.94% of the Debtor's partnership interests are held through Delaware entities. Strand Advisors, Inc. also owns 100% of Debtor's general partnership interest. This Delaware entity, through its principal James Dondero, ultimately controlled the Debtor as of the Petition Date.

11.    There is now new governance in place. On October 29, 2019, the Debtor filed its motion to retain Bradley Sharp as the CRO [Docket No. 75] (the "CRO Motion"). Pursuant to the CRO Motion, the Debtor seeks to retain the CRO with certain independent and exclusive powers and significant restrictions on termination. Specifically, the CRO will have sole authority over claims and transactions involving insiders. The CRO was previously appointed chief restructuring officer in Delaware cases such as *Variant Holding Company LLC* before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before Judge Kevin Carey (retired). The CRO Motion is set for hearing on November 19, 2019, the same date as the Motion to Transfer.[5]

---

[5] In an apparent effort to prevent this Court from considering the CRO Motion, the Committee sought to have the Motion to Transfer set for hearing on shortened notice for November 7, but this Court denied that request before the Debtor filed its response.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00870
APPX. 15172

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6.8 35    Filed 2/23/28180.4age 988 of 1392    PageID 15730
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 877 of 1803    PageID 11623

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 7 of 27

12.      Also on October 29, 2019, the Debtor filed its motion for approval of

certain protocols with respect to ordinary course transactions [Docket No. 77] (the "Protocols

Motion").  Pursuant to the Protocols Motion, the Debtor seeks approval of certain protocols to

allow the Debtor to conduct ordinary course business in an uninterrupted and transparent

manner, both for the benefit of the Debtor's estate and its creditors and for the investors to whom

the Debtor provides services.  The Protocols Motion also is set for hearing on November 19.

13.      The CRO Motion and the Protocols Motion are intended to bring

independence and clarity to the Debtor's governance structure.  Based on these motions, there

should be no doubt that qualified, independent management is in place with the Debtor and will

be operating under a specified set of protocols and procedures to ensure that estate assets are

properly preserved.

### C.      The Debtor's Business, Assets, and Creditor Relationships are Complex and International in Scope

14.      The Debtor is a multibillion-dollar global alternative investment manager.

The Debtor operates a diverse investment platform, serving both institutional and retail investors

worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public

equities, real estate, private equity and special situations, structured credit, and sector- and

region-specific verticals built around specialized teams.  The Debtor also provides shared

services to its affiliated registered investment advisors.

15.      Pursuant to various contractual arrangements, the Debtor provides money

management and advisory services for approximately $2.5 billion of assets under management.

Separately, the Debtor provides shared services for approximately $7.5 billion of assets managed

7

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/23/18 04  Page 989 of 1392    PageID 15731
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 878 of 1803    PageID 11624
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 8 of 27

by a variety of affiliated and unaffiliated entities, including other affiliated registered investment
advisors.

16.      Although the Debtor is headquartered in Dallas, Texas, and most of its
employees are based there, the Debtor's affiliates and related entities maintain offices in many
international locales, including in Buenos Aires, Rio de Janeiro, Singapore, and Seoul.  The
Debtor primarily generates revenue from fees collected for the management and advisory
services provided to funds that it manages, plus fees generated for services provided to its
affiliates.  These funds have investments all over the world.  Specifically, the Debtor has its own
proprietary investment assets and those of its clients held through various affiliates in Asia,
South America, and Europe.

17.      On October 29, 2019, the Debtor filed a motion to appoint a foreign
representative in order to manage its various foreign interests [Docket No. 68] (the "Foreign
Representative Motion"), including those in pending proceedings filed by the Redeemer
Committee in Bermuda and the Cayman Islands.

18.      The Debtor's principal assets in the United States consist of custodial and
non-custodial interests in investments located all over the country.  The Debtor has brokerage
accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and illiquid
securities.  As of the Petition Date, the Debtor owed Jefferies approximately $30 million on
account of margin borrowings.  The Debtor's other principal secured creditor, Frontier State
Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date.

8

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-3   Filed 03/31/04 Page 990 of 1392   PageID 15732
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 879 of 1803   PageID 11625
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 9 of 27

**D.**     **The Debtor Has Litigation Pending in Delaware Chancery Court and New York**

19.     Aside from Acis, no Committee members are based in Dallas and two of them have litigation pending against the Debtor outside of Texas. As discussed further below, the Redeemer Committee commenced litigation against the Debtor in the Delaware Chancery Court and UBS commenced litigation against the Debtor in New York state court. The chairman and the majority of the members of the Redeemer Committee are located in Chicago. UBS's business representatives are based in or around New York City. The only trade vendor on the Committee, Meta-e Discovery, is based in Connecticut. Yet another allegedly substantial creditor of the Debtor, Patrick Daugherty ("Daugherty"), also has litigation pending against the Debtor in Delaware Chancery Court, including a matter that went to trial on October 14, 2019, just prior to the Petition Date, before it was stayed.

20.     *Redeemer Committee Litigation: Delaware Chancery Court and New York Arbitration.* The Debtor's bankruptcy filing was precipitated by an arbitration award in favor of the Redeemer Committee (the "Award") initially issued against the Debtor in March 2019 by a panel of the American Arbitration Association based in New York City. The Debtor was formerly the investment manager for the Highland Crusader Fund (the "Crusader Fund"), which was based in Bermuda and the subject of insolvency proceedings there. On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor in New York City, and (c) commenced litigation against the Debtor in Delaware Chancery Court. In September 2018, the Debtor and the Redeemer Committee participated in a multi-day evidentiary hearing in New York City. In March 2019, following post-trial briefing, the arbitration panel issued its Award

9

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 02/03/18 Page 991 of 1392   PageID 15733
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 880 of 1803   PageID 11626
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 10 of 27

finding in favor of the Redeemer Committee on a variety of claims and requiring the Debtor to

pay a gross amount of $189 million, subject to certain offsets and deductions.  The Redeemer

Committee set a hearing in the Delaware Chancery Court for October 8, 2019, in order to seek

entry of a judgment with respect to the Award.  The hearing was subsequently continued to

October 16, 2019.  The Debtor filed this case just prior to that hearing.  The Redeemer

Committee is represented by Jenner & Block attorneys based in Chicago, Illinois.

     21.    *UBS Litigation:  New York State Court.*  The Debtor and UBS are parties

to a long-running litigation originally filed by UBS in February 2009 in the New York Supreme

Court, County of New York.  At bottom, UBS alleges that the Debtor and certain funds

fraudulently induced UBS to restructure a transaction at the expense of UBS and then these

parties and other entities fraudulently diverted certain assets to prevent UBS from obtaining a

recovery on its claims.  There have been numerous prejudgment motions and appeals in this

case.  The claims that remain consist primarily of breach of contract, fraudulent inducement and

alter ego claims against certain defendants, a breach of implied covenant of good faith and fair

dealing claim against the Debtor, and fraudulent conveyance claims against all defendants.  UBS

has asserted damages in excess of $686 million in the litigation, which the Debtor and the other

defendants continue to vigorously dispute.  The case was bifurcated, and the contract claims

against certain fund defendants as well as the Debtor's counterclaim were addressed at a bench

trial in July 2018.  The court has not yet ruled on phase one of the trial.  If the court finds a

breach of contract occurred and awards damages against the fund defendants, then the remaining

claims will be tried in a second phase of the trial.  While awaiting a decision on phase one, the

defendants filed a motion for judgment before trial with respect to the fraudulent transfer claims

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-3    Filed 03/08/24    Page 992 of 1392    PageID 15734
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 881 of 1803    PageID 11627
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 11 of 27

based on the fact that UBS is not a creditor of the parties who made the alleged fraudulent transfers. The motion was withdrawn due to its timing without prejudice to defendants' right to refile the motion after a decision has been made on phase one of the trial. UBS is represented by Latham & Watkins attorneys based in Washington, DC.

      22.    *Daugherty Litigation: Delaware Chancery Court.* Another allegedly substantial creditor of the Debtor who is not on the Committee, Daugherty, also commenced litigation against the Debtor in Delaware Chancery Court. Daugherty appears on the top 20 list in this case in the amount of $11.7 million, scheduled as contingent, unliquidated, and disputed. Daugherty is a former senior management employee of the Debtor. Among other matters, Daugherty sued the Debtor and certain of its affiliates in Delaware Chancery Court in July 2017 arising from his separation from the Debtor. In June 2018, the Delaware Chancery Court dismissed many of the claims asserted by Daugherty in the litigation. The remaining counts went to trial just prior to the Petition Date and have since been stayed by virtue of the Debtor's bankruptcy filing. Daugherty is represented by Delaware counsel.

**E.**    **<u>The Debtor's Relationship with Acis and Ongoing Adverse Claims and Litigation</u>**

      23.    The Debtor previously provided sub-manager and sub-advisory services to Acis pursuant to certain contractual agreements that were terminated during the course of the Acis bankruptcy in or around August 2018. Since that time, the Debtor has not had, and does not currently have, any direct business dealings with respect to Acis or the CLO assets for which Acis serves as the CLO portfolio manager.[6]

---

[6] The Debtor, through an affiliate, manages a client account that owns a notional value of approximately $150 million in securities issued by Acis CLOs. All of the Debtor's affiliated CLOs are currently in wind-down, meaning that they are not making any new investments.

<div align="center">11</div>

**Appellee Appx. 00875**
**Appx. 15172**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6813    Filed 12/29/23    Page 993 of 1392    PageID 15735
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 882 of 1803    PageID 11628
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 12 of 27

24.    Prior to his termination in June 2016, Terry was one of the Debtor's senior management employees who handled Acis and also had a partnership interest in Acis. After Terry was discovered surreptitiously tape recording internal meetings and conversations with numerous Highland personnel, he was terminated by the Debtor and subsequently asserted claims against Acis that went to arbitration. Terry ultimately obtained an arbitration award against Acis is the approximate amount of $8 million. Notably, although Terry asserted claims against the Debtor and other persons at Highland, the arbitration panel did not find liability against any party besides Acis.

25.    Terry commenced involuntary chapter 7 bankruptcy cases against Acis in the Texas Bankruptcy Court in January 2018 on his own behalf. No other creditors joined in the petitions, which Terry asserted was appropriate on the basis that Acis had fewer than 12 creditors. The Debtor is a major prepetition creditor of Acis, owed in excess of $8 million for various contractual services provided to Acis before and after the Acis bankruptcy filings. Acis, the alleged debtor in those matters, objected to the involuntary bankruptcy filings and presented evidence from certain of the Debtor's employees relating to whether the technical requirements for involuntary bankruptcy filings were met. These objections were ultimately overruled by the Texas Bankruptcy Court, which decision remains on appeal. Acis's bankruptcy cases were later converted to chapter 11 and a chapter 11 trustee (Robin Phelan) (the "Acis Trustee") was appointed in May 2018. No Chief Restructuring Officer was ever appointed in the Acis cases, much less a CRO with expanded powers.

26.    Subsequently, the Debtor and two of its related, affected parties in interest objected to the confirmation of a chapter 11 plan proposed by the Acis Trustee (and supported by

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 03/31/04    Page 994 of 1392    PageID 15736
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 883 of 1803    PageID 11629
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 13 of 27

Terry) for a multitude of reasons, including that certain injunctive provisions were inappropriately targeted at the Debtor and related parties. The Texas Bankruptcy Court ultimately overruled all objections and confirmed the plan in January 2019, which decision remains on appeal. During the course of the Acis bankruptcy cases, the Texas Bankruptcy Court heard no material evidence from the Debtor's employees about the details of its business, assets, or liabilities, aside from its prior involvement with Acis. The Committee does not establish how the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the instant chapter 11 case. Hence, the Texas Bankruptcy Court has no specialized knowledge with respect to the Debtor generally or the issues that will be relevant in this chapter 11 case.

27.    Pursuant to the Acis Trustee's confirmed chapter 11 plan, Terry is Acis's sole equity holder and controls and manages that entity. The Acis Trustee had previously commenced litigation in the Texas Bankruptcy Court against the Debtor and other parties for breach of contract, breach of fiduciary duties, fraudulent transfers, and conspiracy, and has sought to offset and/or subordinate the Debtor's claims against Acis. In a nutshell, the causes of action in that lawsuit revolve around the hotly contested allegations that the Debtor conspired to strip Acis of its assets at Terry's expense. Through his ownership and control of Acis pursuant to the Acis Trustee's confirmed plan, Terry now controls these claims against the Debtor, which remain at an early stage in the Texas Bankruptcy Court and have been stayed as to the Debtor.[7]

---

[7] The defendants have filed motions to withdraw the reference as well as motions to dismiss. The Texas Bankruptcy Court held a status conference on the motions to withdraw the reference on September 4, 2019 and was required to submit a "Report and Recommendation" to the United States District Court for the Northern District of Texas. As of the Petition Date, the Texas Bankruptcy Court had not issued its Report and Recommendation. This adversary proceeding is now subject to the automatic stay of 11 U.S.C. §362(a). This proceeding has yet to reach the procedural stage where any of the defendants have had to file their answers.

13

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 02/03/24   Page 995 of 1392   PageID 15737
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 884 of 1803   PageID 11630
Case 19-12239-CSS    Doc 118   Filed 11/12/19   Page 14 of 27

28.     The respective bankruptcy estates of Acis and the Debtor are adverse to each other.  Acis has claims and pending litigation against the Debtor and the Debtor has outstanding claims against Acis that total no less than $8 million for services rendered.  The various litigation claims of Acis against the Debtor are prepetition claims that have been stayed.

29.     The Committee now seeks to move the Debtor's bankruptcy case to the Texas Bankruptcy Court -- Acis's "home court" -- in order to obtain some perceived litigation advantage.  The Debtor objects to the Motion to Transfer as completely contrary to the interests of this estate.

### Legal Basis for Objection to Motion to Transfer

**A.     The Debtor's Case is Properly Venued in This District Because the Debtor is Organized in the State of Delaware**

30.     The Debtor is a limited partnership formed under the laws of Delaware.  Consequently, venue of this case is proper in Delaware as a matter of law under 28 U.S.C. § 1408. *See, e.g., In re Restaurants Acquisition I, LLC*, 2016 Bankr. LEXIS 684, at *6 (Bankr. D. Del. Mar. 4, 2016) ("Because the Debtor is organized under the laws of Delaware, this forum is proper under the statute."); *In re Innovative Communication Co., LLC*, 358 B.R. 120, 125 (Bankr. D. Del. 2006) ("Venue is appropriate in the state of incorporation, 28 U.S.C. § 1408(1), so venue is proper in Delaware with respect to the corporate Debtors.").  The Committee does not (and cannot) challenge this point.

**B.     The Debtor's Choice of Forum in Delaware is Entitled to Substantial Weight and Should Not Be Disturbed**

31.     Given that venue in this District is legally proper, the Debtor's choice of this forum is entitled to great weight.  *See, e.g., Restaurants Acquisition*, 2016 Bankr. LEXIS at

14

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 08/03/18 04   Page 996 of 1392   PageID 15738
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 885 of 1803   PageID 11631

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 15 of 27

*7 ("movant bears the burden of demonstrating that the factors strongly weigh in favor of a

transfer as courts will generally grant substantial deference to a debtor's choice of forum"); *In re*

*Ocean Properties of Delaware, Inc.*, 95 B.R. 304, 305 (Bankr. D. Del. 1988) (same). Therefore,

a court considering a venue transfer motion "should exercise its power to transfer cautiously, and

the party moving for the transfer must show by a preponderance of the evidence that the case

should be transferred." *In re Commonwealth Oil Refining Co., Inc. (Commonwealth of Puerto*

*Rico v. Commonwealth Oil Refining Co., Inc.)*, 596 F.2d 1239, 1241 (5th Cir. 1979), *cert. denied*,

444 U.S. 1045 (1980) ("*CORCO*") (internal citations omitted); *accord In re Fairfield Puerto*

*Rico, Inc.*, 333 F. Supp. 1187, 1989 (D. Del. 1971) ("This Court should not freely abandon to

any other district its duty to determine a matter clearly within its jurisdiction."); *In re Rehoboth*

*Hospitality, LP*, 2011 WL 5024267, at *3 (Bankr. D. Del. 2011) ("The burden of proof is on the

moving party requesting transfer.").

        32.     These principles apply with even greater force in a case such as this where

a Delaware-organized partnership seeks the protection of Delaware courts. As noted above, over

99% of the Debtor's limited interests and 100% of its general partnership interests are held by

Delaware entities. There is a "fundamental legal tenet that every citizen of a state is entitled to

take advantage of the state and federal judicial process available in that state." *In re PWS*

*Holdings*, 1998 Bankr. LEXIS 549, at *14 (Bankr. D. Del. Apr. 28, 1998). Further, "Delaware

has an interest in protecting the rights of its citizens," and correspondingly, change of venue can

only be granted upon a strong showing of equities favoring the transfer. *Intel Corp. v. Broadcom*

*Corp.*, 167 F. Supp. 2d 692, 706 (D. Del. 2001).

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 09/28/18-Page 997 of 1392   PageID 15739
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 886 of 1803   PageID 11632
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 16 of 27

33.     Given the strong presumption that a debtor's choice of forum should not be disturbed, courts rarely grant such relief.  In those few cases where venue has been transferred, there was generally some unique compelling factor that justified transfer, such as the debtor's consent, the matter was a single asset real estate case, or there was non-stayed litigation that warranted consolidation of cases before a single court or judge.  None of these factors are present here.

34.     In fact, the various adversary claims pending against the Debtor that currently linger in the Texas Bankruptcy Court weigh strongly *against* a transfer of venue there.  The claims asserted by Acis against the Debtor are prepetition claims that are stayed.  Whether those claims are ever unstayed, they are clearly adverse to the interests of the Debtor's estate, particularly where Acis is asserting such claims as a basis to offset and/or subordinate the large claims that the Debtor holds against Acis.  Notably, Acis is no longer affiliated with the Debtor.  It is merely a litigation claimant.  Yet, the Committee chose to file the Motion to Transfer to the Texas Bankruptcy Court in order to achieve a litigation advantage at the expense of this estate.  The Debtor urges the Court to see through this blatant litigation tactic which fails to come close to overcoming the strong presumption in favor of the Debtor's proper choice of venue in Delaware.

C.      **The Convenience of the Parties Weighs in Favor of Retaining Venue in Delaware**

35.     When a bankruptcy court is asked to transfer an entire bankruptcy case to another bankruptcy court, it must examine whether the transfer would be (a) in the interest of justice, or (b) the convenience of the parties.  28 U.S.C. § 1412.  In considering the "convenience

16

Appellee Appx. 00880
APPX. 15132

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 02/03/18    Page 998 of 1392    PageID 15740
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 887 of 1803    PageID 11633
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 17 of 27

of the parties," courts have identified six factors, among others, to help guide their discretion.

These six factors are:

  i. the economic administration of the estate;

  ii. the location of the assets;

  iii. the proximity of creditors of every kind to the court;

  iv. the proximity of the debtor to the court;

  v. the proximity of the witnesses necessary to the administration of the
    estate; and

  vi. the necessity for ancillary administration if liquidation should result.

*See, e.g., CORCO*, 596 F.2d at 1247; *Restaurants Acquisition*, 2016 Bankr. LEXIS at *7

(applying *CORCO* factors); *Innovative*, 358 B.R. at 125 (citing *CORCO* factors and other private

and public interests that may be relevant). As discussed herein, the Committee has failed to meet

its "heavy burden of proof . . . to demonstrate that the balance of convenience weighs in [its]

favor." *Lionel Leisure, Inc. v. Trans Cleveland Warehouses, Inc. (In re Lionel Corp.)*, 24 B.R.

141, 142 (Bankr. S.D.N.Y. 1982). Consequently, the Motion to Transfer must be denied.

   *i. The Economic Administration of the Estate*

  36. The economic and efficient administration of the estate is the most

important factor when considering a motion to transfer venue. *CORCO*, 596 F.2d at 1247; *In re*

*Caesars Entertainment Operating Co.*, 2015 Bankr. LEXIS 314, at *22 (Bankr. D. Del. Feb. 2,

2015); *In re Industrial Pollution Control, Inc.*, 137 B.R. 176, 182 (Bankr. W.D. Pa. 1992).

Despite the importance of this factor, however, the Committee makes little effort to explain why

<div align="center">17</div>

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 08/23/18   Page 999 of 1392   PageID 15741
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 888 of 1803   PageID 11634
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 18 of 27

the economic administration of the estate would be improved if this case was transferred, other than to argue that the Texas Bankruptcy Court heard days of evidence in an unrelated matter of questionable relevance to the chapter 11 proceedings at hand. *See* Motion to Transfer at ¶¶11 – 13, 29 – 31. The pendency of the Acis bankruptcy in the Texas Bankruptcy Court should not form a basis for transferring venue for the following six (6) reasons.

37. <u>First</u>, the Debtor is now managed by the CRO, who is charged with administering the restructuring efforts of the Debtors in this case and has independent authority as to insider claims and insider transactions. Whatever may have been said by the Debtor's management in the context of the Acis bankruptcy is irrelevant to the tasks at hand in this case that will be carried out by the CRO, an independent and highly qualified professional who has had no involvement in the Acis cases.

38. <u>Second</u>, the evidence presented by the Debtor's employees in the Acis bankruptcy cases is irrelevant to the case at hand. Their testimony generally focused on (a) whether Terry satisfied the legal requirements to file involuntary cases against Acis and (b) the structure of actively managed CLOs. None of this testimony by the Debtor's employees is relevant to the Debtor's present chapter 11 case. Acis was the sole branch of the Debtor's affiliated structure that managed active CLOs. As a result of the confirmed chapter 11 plan in the Acis cases, Acis is no longer part of the Debtor's organizational structure. The Debtor owns no equity in Acis. The Debtor no longer advises or sub-advises any active CLOs. The Debtor only has CLOs that are in liquidation -- monetizing their underlying assets and paying off their remaining investors. While the Texas Bankruptcy Court learned much about the complexities of managing active CLOs, that information is irrelevant to this Debtor.

18

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 02/21/24    Page 1000 of 1392    PageID 15742
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 889 of 1803    PageID 11635
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 19 of 27

39.    <u>Third</u>, the core issue in the reorganization of Acis was maintaining the cash flows from Acis's managed CLOs.  However, the CLOs currently managed by the Debtor provide just 10% of the Debtor's revenue, and that number will shrink over time as the CLOs liquidate.  The Debtor derives the other 90% of its revenue from managing asset classes that were never implicated in the Acis proceeding, including private equity, mutual funds, open-ended retail funds, hedge funds, and real estate funds.

40.    <u>Fourth</u>, the Committee neither attaches evidence demonstrating what relevant facts the Texas Bankruptcy Court learned about the Debtor, nor explains how any such evidence could possibly implicate an insurmountable "learning curve" for this Court.  *See* Motion to Transfer at ¶31.  The Committee does not attach any of the 700 allegedly relevant exhibits or any of the testimony from the Acis proceeding.  The Committee references three published opinions of the Texas Bankruptcy Court from the Acis proceeding, but provides no reasoning or even citations demonstrating how these opinions evidence the Texas Bankruptcy Court's purportedly extensive knowledge of the Debtor's current structure and management.

41.    <u>Fifth</u>, even assuming it learned anything relevant about the Debtor's corporate structure, the Texas Bankruptcy Court knows little about the details of the Debtor's business, assets, or liabilities, or its restructuring efforts.  To the extent it addressed the Debtor's business, the evidence in the Acis proceeding focused on a CLO business that the Debtor no longer operates nor manages in any way.  The evidence in the Acis proceeding never focused on the Debtor's assets and liabilities.  Even at this early stage of the Debtor's chapter 11 case, this Court is already more familiar with the Debtor than the Texas Bankruptcy Court, which is appropriately charged with overseeing the Acis proceeding and not this one.

19

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Exhibit 186    Filed 08/01/23    Page 1001 of 1392    PageID 15743
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 890 of 1803    PageID 11636
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 20 of 27

42.    <u>Sixth</u>, the level of conflicts between the Debtor and Acis make the economic and fair administration of this case in the Texas Bankruptcy Court highly problematic. There is a pending adversary proceeding by Acis against the Debtor, which proceeding has been stayed.  The Committee does not explain how the Texas Bankruptcy Court is supposed to preside over the Debtor's estate and the pending adversary proceeding in the Acis case concurrently.[8] Indeed, the only reason for the Committee to seek a transfer of venue to the Texas Bankruptcy Court in the first place is to obtain some perceived litigation advantage *vis-à-vis* the Debtor's estate, which is not a proper basis to transfer venue.[9]  Given the substantial adverse interests that exist between the Debtor and Acis, the Debtor submits that this chapter 11 case can be much more effectively administered by this Court.

### ii.    *The Location of the Assets*

43.    Although the Debtor's headquarters is located in Dallas, Texas and most of its employees are based there, the Debtor's assets are widely dispersed all over the world.  The Debtor has over $2.5 billion of assets under management and receives management and advisory fees from a multitude of sources around the world.  The Debtor also provides shared services for approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.  The Debtor's affiliates and related parties maintain offices in many international locales, including Buenos Aires, Rio de Janeiro,

---

[8] *See supra* n. 8.
[9] As part of this ongoing litigation strategy, Acis has objected to the Debtor retaining Foley & Lardner LLP ("Foley") and Lynn, Pinker, Cox, & Hurst LLP ("Lynn Pinker") as counsel to pursue the Debtor's claims against Acis and to defend the Debtor and certain of its wholly owned subsidiaries against Acis's claims. *See* Dkt. 116. Acis's objection to Foley and Lynn Pinker's retention does not even attempt to explain the benefit to the Debtor's estate of stripping the Debtor of its counsel litigating both affirmative and defensive claims against Acis.  This highlights the conflict that the Texas Bankruptcy Court would face in handling both the Acis and Highland matters.

20

Appellee Appx. 00884
APPX. 15136

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 08/28/23    Page 1002 of 1392    PageID 15744
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 891 of 1803    PageID 11637
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 21 of 27

Singapore, and Seoul. And the Debtor has its own proprietary investment assets and those of its

clients held through various affiliates in Asia, South America, and Europe. The Debtor has

already filed the Foreign Representative Motion in order to assist the Debtor in managing its

various foreign interests.

44.     Similarly, the Debtor's principal assets in the United States consist of

custodial and non-custodial interests in investments located across the country. The Debtor has

brokerage accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and

illiquid securities. As of the Petition Date, the Debtor owed Jefferies approximately $30 million

on account of margin borrowings. The Debtor's other principal secured creditor, Frontier State

Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date.

Relatively speaking, the Debtor has minimal assets in Texas.

45.     Nonetheless, even if most of the Debtor's assets were construed to be

located in Texas (which they are not), numerous courts have found that the location of assets is

not a significant factor in deciding whether venue should be transferred unless the case involves

liquidation as opposed to rehabilitation or is a single asset real estate case. *See Restaurants

Acquisition*, 2016 Bankr. LEXIS at *12 ("the location of a company's assets is not as crucial to

the analysis where the ultimate goal is rehabilitation rather than liquidation"); *In re Safety-Kleen

Corp.*, 2001 Bankr. LEXIS 1296, at *10 (Bankr. D. Del. Aug. 27, 2001) ("location of assets is

generally only significant in a single asset real estate case or liquidation"); *see also In re Enron

Corp.*, 274 B.R. 327, 348 (Bankr. S.D.N.Y. 2002) ("[W]hile a debtor's location and the location

of its assets are often important considerations in single asset real estate cases, these factors take

on less importance in a case where a debtor has assets in various locations.").

<center>21</center>

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 08/31/23    Page 1003 of 1392    PageID 15745
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 892 of 1803    PageID 11638
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 22 of 27

46.    The outcome of this case will not turn on the day-to-day management of the Debtor's assets, but instead will be driven by the Debtor's ability to restructure its balance sheet and maximize the value of its assets, many of which are illiquid. This Court will be focused on matters such as plan confirmation and governance, which the Debtor proposes to place into the capable hands of the CRO pursuant to the terms of the pending CRO Motion and subject to the guidelines set forth in the Protocols Motion. Most of the objections to the key issues that will arise in this case will be grounded in the Bankruptcy Code and not based on any particular facts or circumstances unique to the Debtor's assets wherever located. However, to the extent this Court gives weight to the location of the Debtor's assets, this factor weighs in favor of denying the Motion to Transfer because the Debtor's interests and assets are widely dispersed throughout the country and the world.

### iii.    The Proximity of Creditors of Every Kind

47.    The Committee spends a substantial portion of the Motion to Transfer evaluating the location of the Debtor's creditors and their professionals, and the relative amount of time that it takes to travel to this Court as compared to the Texas Bankruptcy Court. This analysis is misguided and irrelevant under the circumstances of this case. The Debtor does not have thousands of small or unsophisticated creditors who cannot navigate their way to Delaware. The creditors here are generally litigants or attorneys. They are located in commercial centers all over the country. The amounts at stake total hundreds of millions of dollars. It is of no consequence whether a creditor or an attorney is based in Chicago, New York, or Los Angeles. The creditors and professionals involved in this case will travel wherever necessary in order to advocate their respective positions, and Delaware is certainly just as convenient as Dallas.

22

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 08/24/23   Page 1004 of 1392   PageID 15746
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 893 of 1803   PageID 11639
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 23 of 27

*Caesars*, 2015 Bankr. LEXIS 314, at *23 ("in this day of law firms with multiple offices across the nation, convenient and accessible airports, electronic access to information and court dockets at every lawyer's fingertips, it is fair to say that both this [Delaware Bankruptcy] Court and the Illinois Court are convenient forums for purposes of the *CORCO* analysis.").

48.    Further, one of the Committee members and the Debtor's largest creditor, the Redeemer Committee, has commenced litigation that is pending in the Delaware Chancery Court.  In fact, the main trigger for the Debtor's bankruptcy filing was a hearing set by the Redeemer Committee in the Delaware Chancery Court to obtain a judgment on a $189 million Award.  If Delaware is convenient enough for the Redeemer Committee, it is certainly an appropriate forum for this case.  Daugherty is another allegedly significant creditor of the Debtor who chose to commence litigation in Delaware Chancery Court, which matter commenced trial just prior to the Petition Date.  UBS, another member of the Committee, has litigation pending against the Debtor in New York.

49.    The bottom line is that in a case of the size and complexity of this one, involving highly sophisticated and well-represented creditors, there is absolutely no reason to transfer venue on the basis of the proximity of creditors to the Texas Bankruptcy Court.

*iv.  The Proximity of the Debtor and Witnesses Necessary to the Administration of the Estate*

50.    As discussed in *CORCO*, the Court's consideration of the location of the Debtor should focus on the proximity to the Court of the Debtor's employees and representatives who must appear in court, not with the employees who conduct the day-to-day business activities of the Debtor.  *CORCO*, 596 F.2d at 1248; *see also Restaurants Acquisition*, 2016 Bankr. LEXIS

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Filed 08/25/21   Page 1005 of 1392   PageID 15747
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 894 of 1803   PageID 11640
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 24 of 27

at *11 ("Courts have noted the inquiry should focus primarily on the location of parties that must

appear in court.").

51.     In this case, the CRO is expected to take the lead in managing the

Debtor's restructuring efforts and testifying on behalf of the Debtor.  The CRO is a highly

accomplished and independent professional based in Los Angeles who regularly appears in this

Court and was previously chief restructuring officer in Delaware cases such as *Variant Holding*

*Company LLC* before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before

Judge Kevin Carey (retired).  Few Debtor employees should be required to testify in this case on

a going forward basis and, even if they were, travel to this Court is easily accomplished and

consistent with the many prior trips required of such employees by the Redeemer Committee and

Daugherty in choosing to commence litigation in Delaware Chancery Court.  The Debtor's

bankruptcy counsel also has an office in Delaware and has no need to hire local counsel here,

whereas in Dallas, local counsel would need to be retained.

52.     Given what is at stake, the Debtor and its employees, including the CRO,

are conveniently located within sufficient proximity of this Court such that this factor does not

weigh in favor of a venue transfer to the Texas Bankruptcy Court.

*v.*   ***The Necessity for Ancillary Administration if Liquidation Should Result***

53.     The final factor relates to the necessity for ancillary administration if

liquidation should result.  As the courts in *CORCO*, *Enron* and *Fairfield Puerto Rico* recognized,

"anticipation of the failure of the [Chapter 11] proceeding is an illogical basis upon which to

predicate a transfer." *CORCO*, 596 F.2d at 1248; *see also Enron*, 274 B.R. at 349; *In re*

*Fairfield Puerto Rico, Inc.*, 333 F. Supp. at 1191.  Indeed, "[t]his factor is often discounted by

24

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 186 Filed 08/21/18 04ge 1006 of 1392 PageID 15748
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 895 of 1803 PageID 11641
Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 25 of 27

courts." *Enron*, 274 B.R. at 343, n. 11. The Debtor's focus in this case is to propose a chapter 11 plan that will maximize value for all constituents, and the Committee offers no factual basis for this Court to contemplate the failure of the Debtor's chapter 11 case. *See In re Fairfield Puerto Rico, Inc.*, 333 F. Supp. at 1191. Accordingly, this factor does not favor transfer of venue.

**D.      The Interest of Justice is Not Served By Transferring Venue**

54.      In determining whether a transfer would be "in the interest of justice," the court should consider "whether transfer of venue will promote the efficient administration of the estate, judicial economy, timeliness, and fairness." *Enron,* 274 B.R. at 387. These factors have generally been discussed above and support keeping this case in Delaware. Additional concerns that would speak to the "interest of justice" include facts such as the importance of a debtor to the welfare and economic stability of a jurisdiction, and are not present in this case. *See CORCO,* 596 F.2d at 1248 (even though the importance of the debtor, a major supplier of petroleum to Puerto Rico, to the welfare and economic stability of Puerto Rico implicated "interest of justice" considerations, the court determined not to transfer venue to Puerto Rico).

55.      As noted above, venue is legally proper in this Court and the Debtor is entitled to substantial deference as to its choice of forum. But even if the Court considered the interests of justice and the convenience of the parties, there is no legitimate basis to transfer this case to the Texas Bankruptcy Court given the sophistication, complexity, and scope of the Debtors' business, domestic and foreign assets, and creditor constituents, and pendency of creditor actions in the Delaware Chancery Court and New York.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 08/21/23   Page 1007 of 1392   PageID 15749
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 896 of 1803   PageID 11642
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 26 of 27

56.     The Texas Bankruptcy Court is also the venue where the unaffiliated and adverse bankruptcy case of Acis has been pending.  Acis has asserted fraudulent transfer and other disputed claims against the Debtor, which claims are all prepetition in nature.  The Debtor, in turn, has contract claims against Acis totaling in excess of $8 million.  The efficient administration of this estate, judicial economy, timeliness, and fairness would not be served by having the Texas Bankruptcy Court adjudicate these countervailing claims and interests.  The interests of justice also would not be served by transferring venue in order for the Committee to realize a tactical litigation advantage before the Texas Bankruptcy Court.

57.     For all these reasons, the Debtor urges this Court to maintain venue of this case in Delaware.

WHEREFORE, the Debtor respectfully requests that this Court enter an order denying the Motion to Transfer and granting such other and further relief as this Court deems appropriate.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 08/23/23    Page 1008 of 1392    PageID 15750
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 897 of 1803    PageID 11643

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 27 of 27

Dated:  November 12, 2019                    PACHULSKI STANG ZIEHL & JONES LLP

                                             /s/ James E. O'Neill
                                             Richard M. Pachulski (CA Bar No. 62337)
                                             Jeffrey N. Pomerantz (CA Bar No.143717)
                                             Ira D. Kharasch (CA Bar No. 109084)
                                             Maxim B. Litvak (CA Bar No. 215852)
                                             James E. O'Neill (DE Bar No. 4042)
                                             919 North Market Street, 17th Floor
                                             Wilmington, DE 19899 (Courier 19801)
                                             Telephone: (302) 652-4100
                                             Facsimile:  (302) 652-4400
                                             E-mail:     rpachulski@pszjlaw.com
                                                         jpomerantz@pszjlaw.com
                                                         ikharasch@pszjlaw.com
                                                         mlitvak@pszjlaw.com
                                                         joneill@pszjlaw.com

                                             *Proposed Counsel for the Debtor
                                             and Debtor in Possession*

DOCS_SF:102198.7 36027/002

Appellee Appx. 00891
APPX. 15742

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-36   Filed 08/28/23   Page 1009 of 1392   PageID 15751
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 898 of 1803   PageID 11644

# APPENDIX 12

**Appellee Appx. 00892**

**APPX. 10794**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 09/01/23    Page 1010 of 1392    PageID 15752
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 899 of 1803    PageID 11645
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 1 of 18

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## MOTION OF THE DEBTOR FOR APPROVAL OF SETTLEMENT
## WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING
## GOVERNANCE OF THE DEBTOR AND
## PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") files this

motion (the "<u>Motion</u>") for the entry of an order (the "<u>Order</u>") approving the terms of a settlement

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 09/21/23    Page 1011 of 1392    PageID 15753
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 900 of 1803    PageID 11646
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 2 of 18

between the Debtor and the Committee (as defined below) regarding governance of the Debtor

and procedures for operations in the ordinary course of business, as embodied in the term sheet

attached hereto as **Exhibit A** (the "Term Sheet").  In support of this Motion, the Debtor respectfully

represents as follows:

### Preliminary Statement

1.      Following weeks of negotiations, the Debtor and the Committee have

reached a proposed settlement, which contemplates the creation of a new independent board of

directors (the "Independent Directors") at Strand Advisors, Inc. ("Strand"), the Debtor's general

partner and ultimate party in control, and the implementation of certain protocols governing the

operation of the Debtor's business in the ordinary course.  The Independent Directors will consist

of the following three highly qualified and independent individuals:  James Seery, John Dubel,

and a third director to be selected by or otherwise acceptable to the Committee.[2]  Two of the

Independent Directors were chosen by the Committee and the third Independent Director will be

selected by or otherwise acceptable to the Committee.  Background information for each of the

Independent Directors is attached hereto as **Exhibit B**.

2.      Pursuant to the Term Sheet, and effective upon entry of the Order, James

Dondero will no longer be a director, officer, managing member, or employee of the Debtor or

Strand and will have no authority, directly or indirectly, to act on the Debtor's behalf.  Going

forward, the Independent Directors, through Strand, will have sole and exclusive management and

control of the Debtor.  The Independent Directors will have the discretion to appoint an interim

---

[2] The Committee's agreement to the Term Sheet in its entirety is contingent upon the selection of a third
Independent Director acceptable to the Committee.  In the event the Committee and the Debtor cannot reach an
agreement on an acceptable Independent Director to fill the third seat of the Board of Directors, the Term Sheet shall
be null and void.

Appellee Appx. 00894
APPX. 15136

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16-6    Filed 02/23/18-04    Page 1012 of 1392    PageID 15754
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 901 of 1803    PageID 11647
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 3 of 18

Chief Executive Officer (the "CEO") who will manage the Debtor's day-to-day business operations. Subject to Court approval, the Debtor still intends to retain Development Specialists, Inc. ("DSI") to provide a Chief Restructuring Officer (the "CRO") that will serve at the direction of the Independent Directors (or CEO, if appointed).

3.      It bears emphasis that the Independent Directors will not be mere figureheads. The Debtor and the Committee envision that the Independent Directors will be actively involved and intimately familiar with all material aspects of the Debtor's business and restructuring efforts. Moreover, with guidance of the CRO and CEO (if appointed), the Independent Directors will endeavor to prevent any negative influence Mr. Dondero or any of his affiliates or agents may have on the Debtor and its employees. Further, as part of the Term Sheet, the Committee will be granted standing to pursue estate claims against Mr. Dondero and other former insiders of the Debtor who were not employed by the Debtor as of the execution of the Term Sheet. The Committee will also retain the right to move for a chapter 11 trustee.

4.      In sum, the Term Sheet resolves months of litigation between the Debtor and the Committee over the Debtor's governance structure and operating protocols, allowing all parties to refocus on a path forward for this chapter 11 case. With the Independent Directors in place, the Debtor can move forward expeditiously, efficiently, and effectively with the substantive aspects of this case and consider any available restructuring options that will maximize value for all constituents. The Debtor therefore urges the Court to approve the Term Sheet and allow the key economic interest holders to proceed with a productive restructuring effort.

3

Appellee Appx. 00895
APPX. 15137

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-6   Filed 03/21/23   Page 1013 of 1392   PageID 15755
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 902 of 1803   PageID 11648
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 4 of 18

## Jurisdiction and Venue

5.      The United States Bankruptcy Court for the District of Northern District of Texas, Dallas Division (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

8.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9.      To assist and coordinate the restructuring process, the Debtor retained DSI and Bradley D. Sharp to serve as the CRO on October 7, 2019.  On October 29, 2019, the Debtor filed the *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring Related Services, Nunc Pro Tunc as of the Petition Date* [Docket No. 74] (the "CRO Motion") seeking to formally retain the CRO.  The CRO Motion remains pending, and the Debtor is filing a supplement to the CRO Motion concurrently herewith.

10.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.  On November 12, 2019, the Committee filed an omnibus objection to the CRO Motion, cash management motion, and

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-1    Filed 09/01/21    Page 1014 of 1392    PageID 15756
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 903 of 1803    PageID 11649
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 5 of 18

motion for approval of ordinary course protocols [Docket No. 130] (the "Committee Objection"),

raising various concerns regarding the Debtor's governance and business practices.

11.    On December 4, 2019, the Delaware Court entered an order transferring

venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[3]  The Debtor has continued

in the possession of its property and has continued to operate and manage its business as a debtor

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or

examiner has been appointed in this chapter 11 case.

12.    On December 23, 2019, the U.S. Trustee filed a motion in this Court to

appoint a chapter 11 trustee for the Debtor [Docket No. 271] (the "Trustee Motion").  Although

the Debtor will be filing a separate response to the Trustee Motion, it suffices to say that the Trustee

Motion (filed without even considering the proposed Term Sheet) completely lacks merit given

the governance changes and other resolutions encompassed in the Term Sheet agreed to by the

Committee, as the representative of the primary economic stakeholders here.

**Terms of the Proposed Settlement**

13.    Pursuant to the Term Sheet, the Debtor and the Committee have agreed to:

(a) implement certain changes to the Debtor's governance, including the appointment of the

Independent Directors; (b) provide the Committee with additional transparency into the operation

of the Debtor's business; (c) retain the CRO on updated terms; and (d) implement certain protocols

governing the ordinary course business operations of the Debtor.  The terms of this agreement are

contained in the Term Sheet.[4]  A summary of the Term Sheet is as follows:

---

[3] All docket numbers refer to the docket maintained by this Court.

[4] In the event of any inconsistency between the summary of the Term Sheet contained herein and the Term Sheet, the Term Sheet will govern.

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 09/21/23    Page 1015 of 1392    PageID 15757
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 904 of 1803    PageID 11650
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 6 of 18

**Independent Directors**

The Debtor's general partner, Strand will appoint the following three (3) Independent Directors: James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached to the Term Sheet (the "Governing Documents"), which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

The Independent Directors shall be compensated in a manner to be determined, with an understanding that the source of funding, whether directly or via reimbursement, will be the Debtor.

As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether a CEO should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.

The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also

Appellee Appx. 00898
APPX. 16709

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 09/28/23   Page 1016 of 1392   PageID 15758
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 905 of 1803   PageID 11651
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 7 of 18

|  | participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
|---|---|
| **Role of Mr. James Dondero** | Upon approval of the Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | Bradley Sharp and DSI shall, subject to approval of the Court, be retained as the CRO to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO.  Mr. Sharp's and DSI's retention is subject to this Court's approval.  The Debtor has filed the CRO Motion, as supplemented as of the date hereof, which requests authority to retain Mr. Sharp and DSI.[5] |
|  | DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Mark Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached to the Term Sheet, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol"). |
|  | Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are |

---

[5] For the avoidance of doubt, the Debtor is not seeking retention of the CRO pursuant to this Motion.  The Debtor is seeking such relief pursuant to the CRO Motion (as supplemented).

DOCS_NY:39973.7 36027/002

Appellee Appx. 00899
APPX. 15750

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16-13    Exhibit 186    Page 1017 of 1392    PageID 15759
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 906 of 1803    PageID 11652
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 8 of 18

within the Debtor's possession, custody, or control ("Shared Privilege").

With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege.  The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver.

**Reporting Requirements**    The Debtor shall be subject to and comply with the reporting requirements attached to the Term Sheet, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements").

**Plan Exclusivity**    The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code.

**Operating Protocols**    The Debtor shall comply with the operating protocols attached to the Term Sheet, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order (the "Operating Protocols" and, together with the Reporting Requirements, the "Protocols").

14.    By this Motion, the Debtor is seeking the Court's approval of the Term

Sheet, the terms contained therein, and the exhibits attached thereto.  For the avoidance of doubt,

approval of the Term Sheet includes the approval of the following:

DOCS_NY:39973.7 36027/002

**Appellee Appx. 00900**

**Appx. 15752**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 08/01/23    Page 1018 of 1392    PageID 15760
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 907 of 1803    PageID 11653
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 9 of 18

•    <u>Independent Directors</u>:  The appointment of James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee as the Independent Directors of Strand, the Debtor's general partner, with power to oversee the operations of the Debtor as set forth in the Term Sheet.  Mr. Seery and Mr. Dubel were selected by the Committee, and the Debtor agreed to their appointment as Independent Directors.  The Debtor is also seeking approval of the Governing Documents appointing the Independent Directors, to the extent required, and the authority to compensate the Independent Directors either directly from the assets of the Debtor or via the reimbursement of Strand of any compensation paid to the Independent Directors.

•    <u>Document Management and Preservation</u>:  The implementation of the Document Production Protocol, which will govern how the Debtor retains and produces documents and information to the Committee during the pendency of its bankruptcy case.  The Debtor is also agreeing to the allow the Committee to access certain documents that are otherwise subject to the Shared Privilege to assist the Debtor in investigating the Estate Claims.

•    <u>Estate Claims</u>.  The Debtor has agreed to grant the Committee standing to pursue any Estate Claims.  Estate Claims do not include claims or causes of action against any current employees of the Debtor; however, if any employee ceases to be employed by the Debtor, the Committee will have standing to pursue claims against such former employee.

•    <u>Reporting Requirements and Operating Protocols</u>:  The Debtor has agreed to provide certain reporting to the Committee and to operate under certain protocols, which set forth the parameters of how the Debtor can conduct its business without the requirement of Court approval.  The Protocols provide, in certain circumstances, how the CRO and the Independent Directors will oversee the Debtor's operations.  The purpose of the Protocols is to allow the Debtor to function in the ordinary course of its business while providing transparency to the Committee.

15.    The Debtor believes that appointing the Independent Directors and otherwise effectuating the terms of the Term Sheet is in the best interests of the Debtor, its estate, and its creditors.  The Term Sheet will allow the Debtor to proceed with a productive reorganization effort that will maximize value for all constituents.  Accordingly, the Debtor seeks approval of the Term Sheet.

<div align="center"><u>**Relief Requested**</u></div>

16.    By this Motion, the Debtor seeks entry of an order pursuant to sections 105(a), 363(b)(1), and 363(c)(1) of the Bankruptcy Code and Bankruptcy Rule 9019: (a) approving the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b)

Appellee Appx. 00901
APPX. 05152

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 09/21/18    Page 1019 of 1392    PageID 15761
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 908 of 1803    PageID 11654
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 10 of 18

authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of the Term Sheet, including entering into the Governing Documents and compensating – either directly or through reimbursement – the Independent Directors; (c) granting the Committee standing to pursue the Estate Claims; and (d) granting related relief.

### Authority for the Relief Requested

**A.    Section 363(c)(1) of the Bankruptcy Code Authorizes the Debtor to Enter Into Certain Aspects of the Term Sheet in the Ordinary Course**

17.    Because the Debtor is not settling any claims or causes of action through the Term Sheet or otherwise expending estate resources, the Debtor believes that it has the authority to effectuate the majority of the transactions and compromises set forth in the Term Sheet without Court approval under section 363(c)(1) of the Bankruptcy Code.  Specifically, section 363(c)(1) provides:

> [i]f the business of the debtor is authorized to be operated under section. . . 1108. . . of this title. . . the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  As such, a debtor may engage in postpetition actions if the debtor is authorized to operate its business under section 1108 and such transactions are "in the ordinary course of business."

18.    An activity is "ordinary course" if it satisfies both the "horizontal test" and the "vertical test."  *See, e.g., Denton Cty. Elec. Coop. v. Eldorado Ranch, Ltd.* (*In re Denton Cty. Elec. Coop.*), 281 B.R. 876, 882 n.12 (Bankr. N.D. Tex. 2002); *see also In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).  The vertical test looks to "whether the transaction subjects a

Appellee Appx. 00902
Appx. 15765

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Filed 09/01/23 Page 1020 of 1392 PageID 15762
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 909 of 1803 PageID 11655
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 11 of 18

hypothetical creditor to a different economic risk than existed when the creditor originally extended credit." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013). The horizontal test considers "whether the transaction was of the sort commonly undertaken by companies in the industry." *Id.* Here, both the vertical test and horizontal test are satisfied.

19.     Under the Term Sheet, the Debtor is seeking authority to (a) appoint the Independent Directors at Strand (a non-debtor entity), (b) have Mr. Dondero removed from his role at the Debtor and Strand; (c) agree to seek the retention of the CRO under a revised engagement letter that provides that the CRO will report to the Independent Directors; (d) grant the Committee standing to pursue the Estate Claims; (e) enter into and implement the Document Production Protocols; (f) grant the Independent Directors the exclusive right to determine whether to waive exclusivity; and (g) enter into and implement the Protocols. Only the compensation of the Independent Directors, the entrance into the Protocols (which provide the Committee with certain right to object to the Debtor engaging in a "Transaction" (as defined in the Protocols) and allow the Debtor to seek a hearing before this Court on an expedited basis), and the grant of standing to the Committee to pursue Estate Claims could be construed as outside of the ordinary course of business. The balance of the terms of the Term Sheet either involve non-debtors[6] or will be the subject of separate motions seeking Court approval at the appropriate time.

**B.     The Court Should Approve the Term Sheet Under**
        **Rule 9019 of the Bankruptcy Code**

20.     Although the Debtor believes that it has authority to implement the majority of the Term Sheet in the ordinary course of its business under section 363(c), the Debtor is seeking

---

[6] With respect to the Independent Directors, they are being appointed to a new independent board of Strand, the Debtor's general partner, and Strand is not a debtor in this case or subject to this Court's jurisdiction.

Appellee Appx. 00903
Appx. 15755

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 03/31/23   Page 1021 of 1392   PageID 15763
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 910 of 1803   PageID 11656
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 12 of 18

this Court's approval of the Term Sheet under section 105 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules out of an abundance of caution.  Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105(a) has been interpreted to expressly empower bankruptcy courts with broad equitable powers to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain."  *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc); *see also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116 (5th Cir. 1995) (stating that section 105(a) of the Bankruptcy Code "authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code").

21.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

22.     Settlements in bankruptcy are favored as a means of minimizing litigation, expediting the administration of the bankruptcy estate, and providing for the efficient resolution of bankruptcy cases.  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 09/22/23    Page 1022 of 1392    PageID 15764
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 911 of 1803    PageID 11657
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 13 of 18

a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

23.    In making this determination, the United States Court of Appeals for the Fifth Circuit applies a three-party test, "with a focus on comparing 'the terms of the compromise with the rewards of litigation.'" *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey (In re Cajun Elec. Power Coop.)*, 119 F. 3d 349, 356 (5th Cir. 1997) (citing *Jackson Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider the following factors:  "(1) The probability of success in the litigation, with due consideration for the uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.*

24.    Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.; Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; Foster Mortg. Corp., 68 F.3d at 918 (citations omitted).

Appellee Appx. 00905
APPX. 05757

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 09/20/23   Page 1023 of 1392    PageID 15765
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 912 of 1803    PageID 11658
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 14 of 18

25.    Here, the Debtor submits that effectuating the transactions set forth in the Term Sheet satisfies the Fifth Circuit's three-part test. The settlement embodied in the Term Sheet was driven in large part by the Debtor's creditors and has the support of the Committee, which consists of the Debtor's principal creditors. The Term Sheet was negotiated at arm's length, and there was no fraud or collusion in its negotiation. The settlement is also fair and reasonable and in the best interests of the Debtor's estate and also resolves the open disputes regarding the CRO Motion, the *Motion of Debtor for Interim and Final Orders Authorizing (A) Continuance of Existing Cash Management System, (B) Continued Use of the Prime Account, (C) Limited Waiver*, as supplemented [Docket Nos. 51 & 259], and *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76].

26.    The Debtor and members of the Committee have been entangled in highly contentious litigation that has spanned many years and multiple venues. As evidenced by the brief history of the Debtor's bankruptcy case,[7] that contention and mistrust has carried over into this proceeding and could derail any chance that the Debtor has to successfully reorganize and structure a plan to pay its creditors. The governance and operational changes set forth in the Term Sheet, will provide greater transparency to the Committee and start the process of rebuilding the trust necessary to negotiate a successful resolution of this case. Without the Term Sheet, the Debtor

---

[7] *See, e.g., Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 11], *Motion of the Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas* [Docket No. 85], *Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtor's (I) Motion for Final Order Authorizing Continuance of the Existing Cash Management System, (II) Motion to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officers, and (III) Precautionary Motion for Approval of Protocol for "Ordinary Course" Transactions* [Docket No. 130], and *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 271].

Appellee Appx. 00906
APPX. 05755

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 36 Exhibit 6 Filed 09/01/23 18 Page 1024 of 1392 PageID 15766
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 913 of 1803 PageID 11659
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 15 of 18

anticipates that the Committee would move to appoint a chapter 11 trustee and the U.S. Trustee

has already done so (without even seeing the Term Sheet). The Debtor will contest such motions

because the appointment of a chapter 11 trustee could gravely harm the Debtor's business. The

implementation of the Term Sheet will head off any potential issues that could arise, eliminate

costly, time consuming and uncertain litigation, and give the Debtor sufficient breathing room to

work towards rebuilding trust with its creditor body and allow the Debtor to exit bankruptcy and

preserve the value of its business. The Debtor's bankruptcy case has been pending for over two

and a half months, and it is time for the parties to put the acrimony that marked the initial stages

of this case behind them and to move forward in a productive manner – precisely what the Term

Sheet seeks to accomplish.

C.      **Consummating the Settlement Agreement
        is a Sound Exercise of the Debtors' Business Judgment.**

27.     Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession

to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after

notice and a hearing. It is well established in this jurisdiction that a debtor may use property of

the estate outside the ordinary course of business under this provision if there is a good business

reason for doing so. *See, e.g., ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d

593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to

the debtor, creditors, and equity holders, there must be some articulated business justification for

using, selling, or leasing the property outside the ordinary course of business.") (*quoting In re

Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex.

Appellee Appx. 00907
APPX. 15759

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 05/23/24    Page 1025 of 1392    PageID 15767
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 914 of 1803    PageID 11660
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 16 of 18

2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*,
331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

28.    The transactions contemplated by the Term Sheet are within the sound
business judgment of the Debtor.  The Term Sheet resolves potentially costly and protracted
litigation with the Committee over the Debtor's corporate governance and will give the Debtor the
breathing room necessary to negotiate and effectuate the terms of a plan acceptable to the Debtor's
creditors.  Further, providing standing to the Committee to investigate Estate Claims and the
payment of the Independent Directors from the assets of the estate are each necessary components
of the Term Sheet.  The Committee would not have agreed to the Term Sheet without the grant of
standing to investigate Estate Claims.  Moreover, Strand, a non-debtor, is unable to cover the costs
of the Independent Directors.  As such, there is a good business reason for the Debtor's payment
of the Independent Directors' compensation: the Term Sheet and the appointment of the
Independent Directors would not have been agreed to or possible without that condition.[8]  The
foregoing is sufficient grounds to approve the Term Sheet and authorize the Debtor to effectuate
the terms of the Term Sheet under Section 363(b)(1).

## No Prior Request

29.    No previous request for the relief sought herein has been made to this, or
any other, Court.

---

[8] Further, although the Debtor seeks to reimburse Strand for the cost of the Independent Directors, the Debtor is
otherwise obligated to reimburse Strand for any costs or expenses incurred by Strand in its management of the Debtor.
*See* Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., §
3.10(b).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36-6    Filed 02/28/23    Page 1026 of 1392    PageID 15768
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 915 of 1803    PageID 11661
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 17 of 18

**Notice**

30.     Notice of this Motion shall be given to the following parties or, in lieu

thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of

the United States Attorney for the Northern District of Texas; (c) the Debtor's principal secured

parties; (d) counsel to the Committee; and (e) parties requesting notice pursuant to Bankruptcy

Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or

further notice need be given.

        WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests

that the Court enter an Order, substantially in the form attached hereto as **Exhibit C**, (a) approving

the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b)

authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of

the Term Sheet, including entering into the Governing Documents and compensating – either

directly or through reimbursement – the Independent Directors; and (c) granting related relief.

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16    Filed 09/27/23    Page 1027 of 1392    PageID 15769
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 916 of 1803    PageID 11662
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 18 of 18

Dated:  December 27, 2019

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pcszjlaw.com
           mlitvak@pszjlaw.com
           gdemo@pszjlaw.com

-and-

*/s/ Melissa S. Hayward*

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and
Debtor in Possession*

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16   Filed 09/22/18 1804   Page 1028 of 1392   PageID 15770
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 917 of 1803   PageID 11663
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 1 of 61

<u>Highland Capital Management, L.P.</u>

**Preliminary Term Sheet**

This term sheet ("<u>Term Sheet</u>") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "<u>Debtor</u>") and the Official Committee of Unsecured Creditors (the "<u>Committee</u>") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P, Case No. 19-34054 (SGJ) (the "<u>Chapter 11 Case</u>"), pending in the Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125]. This Term Sheet shall be subject to approval by the Bankruptcy Court.

| Topic | Proposed Terms |
|---|---|
| **Parties** | Highland Capital Management, L.P. (the "<u>Debtor</u>"). |
| | The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "<u>Committee</u>"). |
| **Independent Directors** | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "<u>Independent Directors</u>"): James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement). |
| | The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 02/09/21   Page 1029 of 1392   PageID 15771
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 918 of 1803   PageID 11664
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 2 of 61

| | |
|---|---|
| | source of funding, whether directly or via reimbursement, will be the Debtor.<br><br>As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "<u>CEO</u>") should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.<br><br>The Committee shall have regular, direct access to the Independent Directors, <u>provided</u>, <u>however</u> that (1) if the communications include FTI Consulting Inc. ("<u>FTI</u>"), Development Specialists Inc. ("<u>DSI</u>") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("<u>CRO</u>") to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**.<br><br>DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "<u>Estate Claims</u>"); provided, however, that the term Estate Claims will not |

minimalCase 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 09/20/23    Page 1030 of 1392    PageID 15772
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 919 of 1803    PageID 11665
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 3 of 61

| | include any estate claim or cause of action against any then-current employee of the Debtor. |
|---|---|
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **Exhibit D**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **Exhibit D** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-6   Filed 09/21/23   Page 1031 of 1392   PageID 15773
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 920 of 1803   PageID 11666
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 4 of 61

| **Reservation of Rights** | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date. Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |
| --- | --- |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 09/22/23    Page 1032 of 1392    PageID 15774
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 921 of 1803    PageID 11667
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 5 of 61

### Exhibit A

**Debtor's Corporate Governance Documents**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 09/29/23    Page 1033 of 1392    PageID 15775
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 922 of 1803    PageID 11668
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 6 of 61

**Exhibit B**

**Amended DSI Retention Letter**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 09/24/21    Page 1034 of 1392    PageID 15776
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 923 of 1803    PageID 11669
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 7 of 61

**Exhibit C**

**Document Production Protocol**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66-386    Filed 09/25/23    Page 1035 of 1392    PageID 15777
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 924 of 1803    PageID 11670
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 8 of 61

*PSZJ Revisions 12/23/19*
*Privileged & Confidential*
*Subject to FRE 408*

## Exhibit D

## Reporting Requirements

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16-86    Filed 02/26/24    Page 1036 of 1392    PageID 15778
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 925 of 1803    PageID 11671
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 9 of 61

**WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR**

**OF**

**STRAND ADVISORS, INC.**

**[ _____ ]**

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

I.    **AMENDMENT OF BYLAWS**

**WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

**WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors; and

**NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved and the Board is increased from one (1) to three (3) directors;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

II.    **ELECTION OF DIRECTORS**

**WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and _____ to the Board and desires that such individuals constitute the whole Board;

**NOW, THEREFORE, BE IT RESOLVED,** that James Seery, John Dubel, and _____, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as

DOCS_DE:227001.2 36027/002

Exhibit A

**Appellee Appx. 00919**
**APPX. 05720**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6    Filed 09/27/23    Page 1037 of 1392    PageID 15779
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 926 of 1803    PageID 11672
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 10 of 61

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

**RESOLVED FURTHER,** that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

**RESOLVED FURTHER,** that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

### III.    STIPULATION WITH THE BANKRUPTCY COURT

**WHEREAS**, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

**WHEREAS**, the Company is the general partner for HCMLP;

**WHEREAS**, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

**WHEREAS**, the Company and the Stockholder wish to enter into a stipulation with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by this resolutions to be re-elected at upon the expiration of his or her term; and (c) upon the death, disability, or resignation of _____, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and acceptable to the Stockholder and the Committee (the "Stipulation");

**WHEREAS,** for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

**WHEREAS,** it is in the intent of the parties that the Stipulation will no longer be effective or bind Strand or the Stockholder following the termination of the Bankruptcy Case.

**NOW, THEREFORE, BE IT RESOLVED**, that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 61-16    Filed 02/28/23    Page 1038 of 1392    PageID 15780
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 927 of 1803    PageID 11673
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 11 of 61

RESOLVED FURTHER, that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-16    Filed 09/20/23    Page 1039 of 1392    PageID 15781
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 928 of 1803    PageID 11674
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05    Page 12 of 61

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

<div style="text-align:center">

**STOCKHOLDER:**

_____

James Dondero

</div>

*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 09/20/23   Page 1040 of 1392   PageID 15782
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 929 of 1803   PageID 11675
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 13 of 61

**First Amendment to Bylaws of
Strand Advisors, Inc.**

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.**    Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.**    The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the stockholders, (y) a retired bankruptcy judge and nominated jointly by the stockholders and any official committee of unsecured creditors in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Committee") currently pending in the Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11; or (z) nominated by the Committee and reasonably acceptable to the stockholders.

**3.**    The following shall be added as Section 7 to Article III of the Bylaws:

Section 7. Removal of Directors.  Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 61-86    Filed 09/21/23    Page 1041 of 1392    PageID 15783
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 930 of 1803    PageID 11676
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 14 of 61

IN WITNESS WHEREOF, the Company has caused this amendment to be signed this [ __ ] day of [ __ ], 20__.

**STRAND ADVISORS, INC.**

_____

By: Scott Ellington
Its: Secretary

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-186    Filed 02/22/24    Page 1042 of 1392    PageID 15784
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 931 of 1803    PageID 11677
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 15 of 61

# INSERT STRAND ADVISORS, INC. LETTERHEAD

[ _____ ]

[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

**Re:**     **Strand Advisors, Inc. – Director Agreement**

Dear [ _____ ]:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

**1.**     **APPOINTMENT TO THE BOARD OF DIRECTORS.**

a.     Title, Term and Responsibilities.

i.     Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

ii.     You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding pending in the Northern District of Texas (the "Bankruptcy"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

b.     Mandatory Board Meeting Attendance. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board and no fewer than fifty percent (50%) of these meetings of the Board in person, and no more than fifty percent (50%) of such meetings by telephone or teleconference. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

c.     Independent Contractor. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

d.     Information Provided by the Companies. The Company shall: (i) provide you with reasonable access to management and other representatives of the Company, except to the extent that any such access may impair any attorney client privilege to which the Company may be entitled; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows,

Appellee Appx. 00925
APPX. 05776

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 03/23/21 1804age 1043 of 1392    PageID 15785
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 932 of 1803    PageID 11678
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 16 of 61

properties, financial condition and prospects of the Company that you reasonably request in connection with the services to be provided to the Company. You will rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns. You are under no obligation to update data submitted to you or to review any other information unless specifically requested by the Board to do so.

2.    **COMPENSATION AND BENEFITS.**

a.    Retainer. The Company will pay you a retainer for each month you serve on the Board (the "Retainer") to be paid in monthly installments of $[TBD]. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b.    Expense Reimbursement. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c.    Invoices; Payment.

i.    In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment will be due to you within 10 business days after receipt of each such invoice, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii.    You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d.    Indemnification; D&O Insurance. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated December 5, 2019, a copy of which is attached hereto as **Appendix A** (the "Indemnification Agreement"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e.    Tax Indemnification. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3.    **PROPRIETARY INFORMATION OBLIGATIONS.**

a.    Proprietary Information. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

Appellee Appx. 00926
APPX. 15728

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66    Filed 02/24/23    Page 1044 of 1392    PageID 15786
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 933 of 1803    PageID 11679
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 17 of 61

     b.    <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose itto anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

     c.    <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

## 4.    OUTSIDE ACTIVITIES.

     a.    <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

     b.    <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

     c.    <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

## 5.    TERMINATION OF DIRECTORSHIP.

     a.    <u>Voluntary Resignation, Removal Pursuant to Bylaws and Stockholder Action</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law or by an affirmative vote of a majority of the stockholders of the Company.

     b.    <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

     c.    <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

## 6.    GENERAL PROVISIONS.

     a.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 03/31/21    Page 1045 of 1392    PageID 15787
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 934 of 1803    PageID 11680
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 18 of 61

 

 

b.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

c.    <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder without the written consent of the Company.

d.    <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

Appellee Appx. 00928
APPX. 15739

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 08/28/23    Page 1046 of 1392    PageID 15788
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 935 of 1803    PageID 11681
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 19 of 61

**ACCEPTED AND AGREED:**

_____
[NAME]
Date: _____

Appellee Appx. 00929
Appx. 05730

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66    Filed 09/29/23    Page 1047 of 1392    PageID 15789
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 936 of 1803    PageID 11682
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 20 of 61

### INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("**Agreement**"), dated as of [ _____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), and [_____] (the "**Indemnitee**").

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company to retain and attract as directors the most capable Persons is in the best interests of the Company and that the Company therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in <u>Section 1(g)</u> below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties agree as follows:

1.    <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

(b)    "**Claim**" means:

(i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-186   Filed 09/30/25   Page 1048 of 1392   PageID 15790
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 937 of 1803   PageID 11683
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 21 of 61

any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

(ii)   any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

(c)   "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

(d)   "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e)   "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f)   "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit

2

Appellee Appx. 00931
APPX. 05733

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66-6   Filed 02/27/24   Page 1049 of 1392   PageID 15791
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 938 of 1803   PageID 11684
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 22 of 61

plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g)     "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i)     "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j)     "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k)     "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)     "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6186   Filed 09/20/21   Page 1050 of 1392   PageID 15792
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 939 of 1803   PageID 11685
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 23 of 61

benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m)    "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n)    "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o)    References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2.    Indemnification.

(a)    Subject to Section 9 and Section 10 of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)    For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

4

Appellee Appx. 00933
Appx. 05734

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 09/21/23   Page 1051 of 1392   PageID 15793
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 940 of 1803   PageID 11686
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 24 of 61

3.      Contribution.

(a)      Whether or not the indemnification provided in <u>Section 2</u> is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)      The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)      To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.      Advancement of Expenses. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-66   Filed 09/22/23   Page 1052 of 1392   PageID 15794
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 941 of 1803   PageID 11687
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 25 of 61

the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this Section 4, the final sentence of Section 9(b), or Section 11(b) in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to Section 9, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.    Indemnification for Expenses in Enforcing Rights. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with Section 4, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.    Partial Indemnity. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.    Notification and Defense of Claims.

(a)    Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 09/23/21 1804ge 1053 of 1392    PageID 15795
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 942 of 1803    PageID 11688
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 26 of 61

prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)    Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with Section 9 below.

9.    Determination of Right to Indemnification.

(a)    Mandatory Indemnification; Indemnification as a Witness.

(i)    To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with Section 2, and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 09/21/23   Page 1054 of 1392   PageID 15796
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 943 of 1803   PageID 11689
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 27 of 61

(ii)     To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

(b)     Standard of Conduct. To the extent that the provisions of Section 9(a) are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

(i)     if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

(ii)     if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c)     Making the Standard of Conduct Determination. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under Section 9(b) to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under Section 9(b) shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to Section 8 (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 09/25/21   Page 1055 of 1392   PageID 15797
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 944 of 1803   PageID 11690
Case 19-34054-sgj11   Doc 281-1   Filed 12/27/19   Entered 12/27/19 21:33:05   Page 28 of 61

(d)     Payment of Indemnification. If, in regard to any Losses:

(i)     Indemnitee shall be entitled to indemnification pursuant to Section 9(a);

(ii)     no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii)     Indemnitee has been determined or deemed pursuant to Section 9(b) or Section 9(c) to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e)     Selection of Independent Counsel for Standard of Conduct Determination. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(i), the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(ii), the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in Section 1(k), and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this Section 9(e) to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this Section 9(e) or Indemnitee gives its initial notice pursuant to the second sentence of this Section 9(e), as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("Delaware Court") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court

9

Appellee Appx. 00938
APPX. 1071495

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Filed 09/26/23   Page 1056 of 1392   PageID 15798
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 945 of 1803   PageID 11691
Case 19-34054-sgj11  Doc 281-1  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 29 of 61

shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to <u>Section 9(b)</u>.

(f)     <u>Presumptions and Defenses</u>.

(i)     <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii)     <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii)     <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.     <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66    Filed 09/07/23    Page 1057 of 1392    PageID 15799
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 946 of 1803    PageID 11692
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 30 of 61

(a)    indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)    proceedings referenced in Section 4 above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)    where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)    indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)    indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.    Remedies of Indemnitee.

(a)    In the event that (i) a determination is made pursuant to Section 9 that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to Section 4, (iii) no determination of entitlement to indemnification is made pursuant to Section 9 within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant to Section 9(d), Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 11(a). The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)    In the event that Indemnitee, pursuant to this Section 11, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)    In the event that a determination shall have been made pursuant to Section 9 that Indemnitee is not entitled to indemnification, any judicial proceeding commenced

11

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 02/28/24   Page 1058 of 1392   PageID 15800
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 947 of 1803   PageID 11693
Case 19-34054-sgj11   Doc 281-1   Filed 12/27/19   Entered 12/27/19 21:33:05   Page 31 of 61

pursuant to this <u>Section 11</u> shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under <u>Section 9</u>.

       (d)    If a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this <u>Section 11</u>, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.    <u>Settlement of Claims</u>. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this <u>Section 12</u>, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.    <u>Duration</u>. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.    <u>Other Indemnitors</u>. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Losses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other

DOCS_NY:39915.4 36027/002

Appellee Appx. 00941
APPX. 15742

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6186   Filed 09/29/23   Page 1059 of 1392   PageID 15801
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 948 of 1803   PageID 11694
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 32 of 61

Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this Section 14.

15.    Non-Exclusivity. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.    Liability Insurance. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.    No Duplication of Payments. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.    Subrogation. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.    Indemnitee Consent. The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek

13

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 09/20/23   Page 1060 of 1392   PageID 15802
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 949 of 1803   PageID 11695
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 33 of 61

indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.     Amendments. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.     Binding Effect. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.     Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.     Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

        (a)     if to Indemnitee, to the address set forth on the signature page hereto.

        (b)     if to the Company, to:

                Strand Advisors, Inc.
                Attention:     Isaac Leventon

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6186   Filed 05/31/24   Page 1061 of 1392   PageID 15803
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 950 of 1803   PageID 11696
Case 19-34054-sgj11  Doc 281-1  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 34 of 61

|           |                                      |
|-----------|--------------------------------------|
| Address:  | 300 Crescent Court, Suite 700        |
|           | Dallas, Texas 75201                  |
| Email:    | ileventon@highlandcapital.com        |

Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.     Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.     Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.     Enforcement.

(a)     Without limiting Section 15, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)     The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.     Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.     Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-16   Filed 07/28/21   Page 1062 of 1392   PageID 15804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 951 of 1803   PageID 11697
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 35 of 61

same agreement. Facsimile counterpart signatures to this Agreement shall be binding and
enforceable.

16

Appellee Appx. 00945
Appx. 05746

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 03/21/84    Page 1063 of 1392    PageID 15805
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 952 of 1803    PageID 11698
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 36 of 61

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____
Name:
Title:

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-36   Filed 09/21/23   Page 1064 of 1392   PageID 15806
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 953 of 1803   PageID 11699
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 37 of 61

INDEMNITEE:

_____

Name:      [_____]
Address:   _____
           _____
           _____

Email:

[SIGNATURE PAGE – INDEMNIFICATION AGREEMENT]

DOCS_LA:316796.3
DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 166    Filed 05/23/24    Page 1065 of 1392    PageID 15807
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 954 of 1803    PageID 11700
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 38 of 61

December ___, 2019

Attn:  Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX  75201

       Re:     Development Specialists, Inc. ("DSI")
               Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide restructuring support services to Highland Capital Management, L.P. (the "Company").  This Agreement replaces and supersedes in all respects the letter agreement between DSI and the Company, dated October 7, 2019, as amended and revised by the letter agreement dated October 29, 2019.  However, all fees and expenses incurred by DSI prior to the date hereof in accordance with such prior letter agreements will be paid by the Company, subject to allowance of such fees and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").  The Agreement will become effective upon execution by duly authorized representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1. Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2. Subject to the terms of this Agreement, as CRO, Mr. Sharp will assume control of the Company's restructuring and direct the Company with respect to its bankruptcy filed on October 16, 2019 (the "Chapter 11 Case"), which Chapter 11 Case has now been transferred to the Bankruptcy Court.
3. Subject to the terms of this Agreement, Mr. Sharp will report to the Independent Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and will comply with the Company's corporate governance requirements.
4. As directed by the Independent Directors and/or CEO, the CRO will be responsible for the implementation and prosecution of the Chapter 11 Case, including negotiations with creditors, reconciliation of claims, and confirmation of a plan or plans of reorganization.
5. Provide other personnel of DSI ("Additional Personnel") to provide restructuring support services as requested or required to the Company, which may include but are not limited to:

Exhibit B

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 05/23/23   Page 1066 of 1392   PageID 15808
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 955 of 1803   PageID 11701
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 39 of 61

Highland Capital Management, LP
December ___, 2019
Page 2

    a.   assisting the Company in the preparation of financial disclosures required by the Bankruptcy Code, including the Schedules of Assets and Liabilities, the Statements of Financial Affairs and Monthly Operating Reports;

    b.   advising and assisting the Company, the Company's legal counsel, and other professionals in responding to third party requests;

    c.   attending meetings and assisting in communications with parties in interest and their professionals, including the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case;

    d.   providing litigation advisory services with respect to accounting matters, along with expert witness testimony on case related issues; and

    e.   rendering such other general business consulting services or other assistance as the Company may deem necessary and which are consistent with the role of a financial advisor and not duplicative of services provided by other professionals in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information. The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements. The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports. Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16136    Filed 09/22/23    Page 1067 of 1392    PageID 15809
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 956 of 1803    PageID 11702
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 40 of 61

Highland Capital Management, LP
December ___, 2019
Page 3

also be involved, we have listed below certain of the DSI personnel (along with their corresponding billing rates) who would likely constitute the Additional Personnel.  The individuals are:

| | |
|---|---|
| R. Brian Calvert | $640.00/hr. |
| Thomas P. Jeremiassen | $575.00/hr. |
| Eric J. Held | $495.00/hr. |
| Nicholas R. Troszak | $485.00/hr. |
| Spencer G. Ferrero | $350.00/hr. |
| Tom Frey | $325.00/hr. |

The above rates are adjusted as of January 1 of each year to reflect advancing experience, capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company.  The purpose of the retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor should such be required for DSI to continue to provide the Services.  As such, should a need arise to increase this retainer due to the level of Services DSI is providing or projected to provide, we will send the Company a supplement to this Agreement requesting the necessary increases and discuss with the Company the amount and timing of providing such increase to the retainer.

This retainer will be applied to our final invoice.  If the retainer exceeds the amount of our final invoice, we will refund the difference to the Company at that time.  In the event that periodic invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices and, if applicable, any related late charges, and we will stop work until the retainer is replenished to the full amount required.  If the retainer is not replenished within ten (10) days after the application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and expenses may include, among others, charges for messenger services, photocopying, travel expenses, long distance telephone charges, postage and other charges customarily invoiced by consulting firms. Airfare for international flights will be charged at the business class fare; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation, pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be contingent upon such approval.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6186    Filed 02/28/231804ge 1068 of 1392    PageID 15810
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 957 of 1803    PageID 11703
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 41 of 61

Highland Capital Management, LP
December ___, 2019
Page 4

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business days' written notice.  Notwithstanding anything to the contrary contained herein, the Company shall be obligated, in accordance with any orders of or procedures established by the Court, to pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to specific roles for the benefit of the Company. These members will remain as DSI employees during the pendency of this case. Specifically, the parties intend that an independent contractor relationship will be created by this Agreement. Employees of DSI are not to be considered employees of the Company and are not entitled to any of the benefits that the Company provides for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in connection with DSI's engagement is intended solely for the benefit and use of the Company in considering the transaction to which it relates, and that no third party is entitled to rely on any such advice or communication.  DSI will in no way be deemed to be providing services for any person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company in connection with this Agreement or that is developed pursuant to this Agreement, will be treated as confidential and will not be disclosed by DSI, except as required by Court order, or other legal process, or as may be authorized by the Company.  DSI shall not be required to defend any action to obtain an order requiring disclosure of such information, but shall instead give prompt notice of any such action to the Company so that it may seek appropriate remedies, including a protective order. The Company shall reimburse DSI for all costs and fees (including reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall indemnify him on the same terms as provided to the Company's other officers and directors under the Company partnership agreement or other governing document and applicable state law.  Mr. Sharp shall be included as an insured under any insurance policies or coverage available to officers and directors of the Company.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Exhibit H6-23 Page 2059 of 1804 Page 1069 of 1392   PageID 15811
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 958 of 1803   PageID 11704
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 42 of 61

Highland Capital Management, LP
December ___, 2019
Page 5

The Company shall additionally indemnify those persons, and only those persons, serving as executive officers on the same terms as provided to the Company's other officers and directors under the Company's partnership agreement or other governing document and applicable state law, along with insurance coverage under the Company's D&O policies. Any such indemnity shall survive the expiration or termination by either party of this Agreement. Except as provided in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the Company, or any party asserting claims on behalf of the Company, except for direct damages found in a final determination (not subject to further appeal) by a court of competent jurisdiction to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case. Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's professional staff, neither DSI nor its professionals have any known conflicts with the parties in this case. DSI will separately provide its connections to parties in this case and/or their professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business planning and operations. DSI's engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of one year subsequent to the completion and/or termination of this Agreement; provided that the Company shall not be prohibited from (x) making general advertisements for employment not specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited requests for employment.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66-186    Filed 09/20/23    Page 1070 of 1392    PageID 15812
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 959 of 1803    PageID 11705
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 43 of 61

Highland Capital Management, LP
December ____, 2019
Page 6

Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of
DSI employees, and all other provisions necessary to the enforcement of the intent of this
Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of
Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of
this Agreement and supersedes and is intended to nullify any other agreements, understandings
or representations relating to the subject of this Agreement. This Agreement may not be
amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance
by signing an original copy of this Agreement on the signature lines below, then returning one
fully-executed Agreement to DSI's office. The Agreement will become effective upon execution
by duly authorized representatives of the respective parties.

Very truly yours,

Bradley Sharp
Development Specialists, Inc.


AGREED AND ACKNOWLEDGED:


Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner


_____
By: _____, Independent Director
Date: _____

Appellee Appx. 00953
APPX. 05735

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 09/21/23    Page 1071 of 1392    PageID 15813
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 960 of 1803    PageID 11706
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 44 of 61

**A. Definitions**
    a. Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

**B. Preservation of ESI - Generally**
    a. Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

**C. Preservation of ESI – Specific Forms**
    a. For email, Debtor uses Outlook Email on an Exchange server.  Veritas Enterprise Vault is used to archive emails.  Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email .communications have been preserved and are not at risk of deletion due to normal document retention practices.  Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.
    b. The file server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created and stored on a portable hard drive at a secured location.
    c. The Sharepoint server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.
    d. The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago.  A copy of this backup shall be created in a format and stored at a secured location.
    e. The Advent Geneva accounting system used by Debtor was backed up approximately one week ago.  Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva.  Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein..
    f. The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format and stored at a secured location.
    g. For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data.  Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.
    h. Bloomberg data is archived for five years.  Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.

ACTIVE 252191584

<div align="right">

Exhibit C
**Appellee Appx. 00954**
**Appx. 15796**

</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 02/02/23   Page 1072 of 1392   PageID 15814
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 961 of 1803   PageID 11707
Case 19-34054-sgj11  Doc 281-1  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 45 of 61

     i.   Files may be saved locally on laptops/work computers used by employees of Debtor.  This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere.  Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees.  Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

**D.  Not Reasonably Accessible Documents**

  a.  Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost.  The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

     i.   Deleted, slack, fragmented, or other data only accessible by forensics;

     ii.   Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and

     iii.   On-line access data such as temporary internet files, history, cache, cookies, and the like.

  b.  To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

**E.  Collection and Search Methodology**

  a.  Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than [date].  DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates.  Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs).  Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

  b.  The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

  c.  A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 09/23/24   Page 1073 of 1392   PageID 15815
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 962 of 1803   PageID 11708
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 46 of 61

Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

d. The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

e. Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

f. Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

g. Debtor shall propose a format for producing Sharepoint data. The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

**F. Format of Documents Produced**

a. Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

b. The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

c. The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

d. The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

e. In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

f. For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 09/01/23    Page 1074 of 1392    PageID 15816
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 963 of 1803    PageID 11709
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 47 of 61

original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

g.  For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

h.  For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

i.  The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

  i.  Production Bates begin
  ii. Production Bates end
  iii. Production Bates begin attachment
  iv. Production Bates end attachment

Notwithstanding the aforementioned, all parties acknowledge that Debtor's. Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

j.  Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 06/28/21 Page 1075 of 1392   PageID 15817
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 964 of 1803   PageID 11710
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 48 of 61

typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k.  Exceptions to the Production Format

l.  Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

m.  To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

**G.  Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status**

a.  No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b.  Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c.  Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d.  Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e.  Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

**Metadata List**

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the document | 2 |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 06/23/23   Page 1076 of 1392   PageID 15818
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 965 of 1803   PageID 11711
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 49 of 61

| Global Custodian | Custodian name produced in format: Lastname, Firstname. | Smith, Jane; Taylor, Michael |
|---|---|---|
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted: "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID | |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available | |
| Extension | The file extension | .doc |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 09/21/23   Page 1077 of 1392   PageID 15819
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 966 of 1803   PageID 11712
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 50 of 61

| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 08/28/23   Page 1078 of 1392   PageID 15820
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 967 of 1803   PageID 11713
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 51 of 61

I.   **Definitions**

   A.   "Court" means the United States Bankruptcy Court for the Northern District of Texas.

   B.   "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

   C.   "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

   D.   "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

   E.   "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below (the "Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

   F.   "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

   G.   "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

   H.   "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Exhibit D

**Appellee Appx. 00961**

**Appx. 05703**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6186   Filed 09/21/18 Page 1079 of 1392   PageID 15821
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 968 of 1803   PageID 11714
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 52 of 61

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.   "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.   "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

II.   **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.   **Covered Entities**: N/A (See entities above).

B.   **Operating Requirements**

1.   Ordinary Course Transactions do not require Court approval (All Stages).

a)   Stage 1 and Stage 2:  ordinary course determined by the CRO.

b)   Stage 3: ordinary course determined by the Debtor.

2.   Related Entity Transactions

a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   Stage 3:

(1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)   Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.   Third Party Transactions (All Stages)

a)   Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

2

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 09/20/23    Page 1080 of 1392    PageID 15822
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 969 of 1803    PageID 11715
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 53 of 61

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. Redemption requests payable to Related Entities will be held in escrow and will not prevent the winding up or liquidation of any fund or entity.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III.    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    Stage 3:

(1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 07/21/23   Page 1081 of 1392   PageID 15823
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 970 of 1803   PageID 11716
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 54 of 61

(2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.     Third Party Transactions (All Stages)

a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.     **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV.     Transactions involving entities that the Debtor manages but in which the Debtor does <u>not hold a direct or indirect interest</u>**

A.     **Covered Entities**: See **<u>Schedule A</u>** hereto.  **<u>Schedule A</u>** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.     **Operating Requirements**

1.     Ordinary Course Transactions do not require Court approval (All Stages).

a)     <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

b)     <u>Stage 3</u>: ordinary course determined by the Debtor.

2.     Related Entity Transactions

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 07/21/21   Page 1082 of 1392   PageID 15824
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 971 of 1803   PageID 11717
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 55 of 61

a)   <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   <u>Stage 3</u>:

(1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)   Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.   Third Party Transactions (All Stages):

a)   Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.   The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)   The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties.  The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**Appellee Appx. 00965**
**Appx. 10731**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66    Filed 07/31/24    Page 1083 of 1392    PageID 15825
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 972 of 1803    PageID 11718
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 56 of 61

**V.    Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.    Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.    Transactions involving Non-Discretionary Accounts**

A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appellee Appx. 00966
APPX. 15743

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 07/28/21    Page 1084 of 1392    PageID 15826
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 973 of 1803    PageID 11779
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 57 of 61

**VIII.    Additional Reporting Requirements – All Stages (to the extent applicable)**

A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.    Shared Services**

A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.    Representations and Warranties**

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 02/15/21 1304ge 1085 of 1392   PageID 15827
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 974 of 1803   PageID 11720
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 58 of 61

*PSZJ Draft 12/27/19*

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 02/06/23   Page 1086 of 1392   PageID 15828
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 975 of 1803   PageID 11721
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 59 of 61

*PSZJ Draft 12/27/19*

8.   Highland Socially Responsible Equity Fund
9.   Highland Income Fund
10.  Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11.  SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1.   The Dugaboy Investment Trust
2.   NexPoint Capital LLC
3.   NexPoint Capital, Inc.
4.   Highland IBoxx Senior Loan ETF
5.   Highland Long/Short Equity Fund
6.   Highland Energy MLP Fund
7.   Highland Fixed Income Fund
8.   Highland Total Return Fund
9.   NexPoint Advisors, L.P.
10.  Highland Capital Management Services, Inc.
11.  Highland Capital Management Fund Advisors L.P.
12.  ACIS CLO Management LLC
13.  Governance RE Ltd
14.  PCMG Trading Partners XXIII LP
15.  NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16.  NexPoint Real Estate Advisors II LP
17.  NexPoint Healthcare Opportunities Fund
18.  NexPoint Securities
19.  Highland Diversified Credit Fund
20.  BB Votorantim Highland Infrastructure LLC
21.  ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1.   NexBank SSB Account
2.   Charitable DAF Fund LP

9

Appellee Appx. 00969
APPX. 05720

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66-6    Filed 09/26/23    Page 1087 of 1392    PageID 15829
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 976 of 1803    PageID 11722
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 60 of 61

*PSZJ Draft 12/27/19*

## Schedule B

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.14 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66-36    Filed 07/28/21    Page 1088 of 1392    PageID 15830
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 977 of 1803    PageID 11723
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 61 of 61

*PSZJ Draft 12/27/19*

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.14 36027/002

Appellee Appx. 00971
Appx. 05723

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66-86    Filed 09/28/23    Page 1089 of 1392    PageID 15831
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 978 of 1803    PageID 11724
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 1 of 19

November 2019

**James P. Seery, Jr.**

New York, NY



 James P. Seery, Jr. is a high yield and distressed investing professional who was most recently a Senior Managing Director and co-Head of Credit at Guggenheim Securities LLC, where he is responsible for helping direct the development of a leveraged finance and credit distribution business.  Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, a $1.3bn global credit fund manager.  In that role, he developed and led many of the firm's most profitable credit investments.  Mr. Seery is a licensed attorney and was formerly a partner and co-Head of the Sidley Austin LLP New York Corporate Reorganization and Bankruptcy Group, and he also recently served as a Commissioner on The American Bankruptcy Institute's Commission to Study the Reform of Chapter 11.

Before his joining Sidley Austin, Mr. Seery was a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business. In that position, he was responsible for managing the Lehman Brothers' Fixed Income investment grade and high yield loan businesses, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management, and restructuring. Mr. Seery was also a member of the Lehman Brothers' Fixed Income Operating Committee and Global Credit Products Operating Committee as well as the High Yield Commitment and New Business Committees.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for management of distressed corporate debt investments, and in 2008 he was a key member of the small team that successfully sold Lehman to Barclays.

Mr. Seery was selected as one of the Top Restructuring Lawyers in the U.S. Under 40 by *Turnarounds and Workouts* in 1999. Mr. Seery graduated in 1990 from New York Law School, *magna cum laude*, where he was an editor of the Law Review and Colgate University in 1984. He was a member of the Board of Directors of the Loan Syndications and Trading Association from 2006 to 2008 and a member of the INSOL International Lenders Group from 2016-2017.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 02/20/24   Page 1090 of 1392   PageID 15832
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 979 of 1803   PageID 11725

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 2 of 19

# JAMES P. SEERY, JR.

795 Columbus Ave., 12A
New York, New York 10025
631-804-2049 · jpseeryjr@gmail.com

### Experience

**Guggenheim Securities LLC,** New York, New York                     Aug. 2017-Nov. 2019
Senior Managing Director, Co-Head Credit
- Responsible for developing leveraged finance and credit portfolio advisory businesses
- Management of teams of leveraged finance bankers and trading and sales professionals

**River Birch Capital, LLC**, New York, New York                     April 2012-July 2017
President, River Birch Capital, LLC
- President and senior investing partner at New York based $1.3bn global long-short credit fund focused on corporate credit from investment grade to distressed
- Responsible for originating, executing and managing stressed and distressed credit investments with a team of 6 investing partners and 5 analysts and traders
- Led finance and operations team with CFO/CCO; firm grew from approx. $200mm in 2012 to $1.3bn in 2017

**Sidley Austin LLP**, New York, New York                     May 2009-April 2012
Co-head New York Corporate and Reorganization Group
- Built and managed a creditor focused restructuring group as part of an international company side practice in a nearly 2000 attorney firm
- Represented banks, corporations, hedge funds, and structured investment vehicles in a variety of restructuring, financing and litigation matters

**Lehman Brothers**, New York, New York                     April 1999-May 2009
Global Head Fixed Income Loans
- Managing Director responsible for managing the global fixed income loan business, including investment grade and high yield commitments, global distribution, hedging, trading and sales, CLO origination, portfolio management, and restructuring; managed underwritten loan commitments and teams of credit sales and trading professionals as well as structuring, portfolio management and work-out specialists
- Member Fixed Income Operating Committee, Global Credit Products Operating Committee, and High Yield Commitment and New Business Committees
- Responsible for originating, structuring and managing proprietary distressed debt investments, rescue financings, and restructurings 1999-2004
- Key member of team that negotiated and completed the sale of Lehman Brothers to Barclays Sept. 2008; remained at Barclays through April 2009

**Phillips Nizer**, Garden City, New York                     May 1995-April 1999
- Senior Associate in corporate reorganization group of boutique New York City law firm

**Cadwalader, Wickersham & Taft**, New York, New York                     May 1989-May 1995
- Associate in corporate reorganization group of New York City based international law firm

### Education

New York Law School, New York, New York, J.D., *magna cum laude*, Editor Law Review     1990
Colgate University, Hamilton, New York, B.A. History                     1984

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 09/21/23   Page 1091 of 1392   PageID 15833
Exhibit 6   Page 989 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 980 of 1803   PageID 11726

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 3 of 19

**Experience**

| | |
|---|---|
| Director, River Birch International, Ltd. Board | 2015-2017 |
| Director, Camphill Foundation Board | 2017-2019 |
| Member, INSOL International Lenders Group Board | 2016-2017 |
| Commissioner, ABI Commission to Study Reform of Ch. 11 | 2012-2015 |
| Director, Loan Syndications and Trading Association | 2006-2008 |

**Selected River Birch Sample Investments**

Cash America International *5.75% Senior Unsecured Notes due 2018 and Litigation Claim – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper spin of payday lending business; U.S. District Court published decision in note holders' favor led to settlement*

Chesapeake Energy Corp *6.775% Senior Notes due 2019 Litigation Claims – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper call of notes; ultimately prevailed in $450mm judgment discussed in published Second Circuit and U.S. District Court decisions*

Caesars Entertainment Resort Properties *8% 1ˢᵗ Lien Notes due 2020; 11% 2d Lien Notes due 2021 – Developed and led (with senior investment analyst partner) execution of successful bankruptcy investment strategy focused on lower beta part of the capital structure of bankrupt casino operator; investment designed for high return with significant downside protection*

Intelsat Jackson Holdings *9.5% Senior Secured Notes due 2022 – Developed and led (with senior investment analyst partner) execution of successful new issue stressed secured note investment strategy; responsible for structuring and tightening covenant package and increasing size of offering after determining that potential litigation threat was low risk; responsible for recommending ICF 12.5% note investment in the low 80s in February 2018*

Motors Liquidation Company *GUC Trust Publicly Traded Units – Developed and led successful investment strategy in publicly traded bankruptcy liquidation units (GM); took the opposite side of sell-side analyst recommendations and engineered a successful settlement in high return/low downside position*

Hypo Alpe Adria Bank (Hetar) *Senior Guaranteed Notes – Developed and led (with senior investment analyst partner) execution of successful investment strategy in insolvent Austrian bank with notes guaranteed by an Austrian State*

Presidio Inc. *10.25% Senior Notes due 2023 – Developed and led execution of successful investment strategy to purchase newly developed mezzanine part of the capital structure on struggling new issue deal; ultimately sponsor purchased the mezzanine but aggressive structuring and bidding for the mezzanine tranche led to outsized allocation of new notes*

Nortel Networks Ltd. *6.875% Senior Notes due 2023 – Developed and led (with senior investment analyst partner) execution of bankruptcy liquidation strategy based on litigation and ultimate leverage of Canadian liquidating estate*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66-36    Filed 09/22/23    Page 1092 of 1392    PageID 15834
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 981 of 1803    PageID 11727

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 4 of 19

**Selected Speaking Engagements**

American Law Institute/ NYU Law – Credit Markets and Corporate Reorganization, New York City, April 2017
Moderator, *Auctions and Asset Sales In and Out of Bankruptcy*

University of Texas Law/American Bankruptcy Institute -- Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2017
Panelist, *Determining Valuation and the Fulcrum Security*
Panelist, *Distressed Investments Strategies*

NYU Law – Claim Priority Roundtable, New York City, September 2016
Panelist, *Allocating Value in and Out of Bankruptcy*

University of Texas Law/ABI – Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2016
Panelist, *ABI Commission Report Proposed Amendments and Their Impact on Valuation*

The M&A Advisor – Distressed Investing Summit, Palm Beach, January 2016
Panelist, *Using Options to Bridge Value Gaps*

NYU Law – Seligman Bankruptcy and Business Reorganization Workshop, New York City, September 2015
Panelist, *Valuation Approaches and Methodologies*

Skadden Arps/Colgate University – Law and Finance Summit, New York City, November 2014
Presenter, *Recent Developments in Bankruptcy and Distressed Debt*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 36   Filed 09/23/24   Page 1093 of 1392   PageID 15835
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 982 of 1803   PageID 11728



Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 5 of 19

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66   Filed 08/04/23   Page 1094 of 1392   PageID 15836
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 983 of 1803   PageID 11729
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 6 of 19

**Dubel & Associates, L.L.C.**

# John S. Dubel
## Board of Directors Experience

- **Purdue Pharma Inc. – July 2019 to Present** - Independent Board Member and Chair of the Special Committee of Directors

  In addition to being a member of the Board of Directors of Purdue Pharma Inc., I am the Chair of the Special Committee of Independent Directors charged with overseeing the investigation of relationships between Purdue and Purdue owners, the Sackler family.

- **WMC Mortgage, LLC – Indirect Subsidiary GE – July 2018 to December 2019** - Independent Board Member and Chair of the Special Independent Committee of Directors

  WMC's chapter 11 plan was recently confirmed and WMC will emerge from Chapter 11 in early December 2019. I am the Chair of the Special Independent Committee of Independent Directors for this indirect subsidiary of GE. The Special Committee was tasked with reviewing the relationship between the insolvent WMC and GE and resolving its insolvency issues through a court supervised chapter 11 proceeding. I was the lead person responsible for negotiations with the parent concerning the level of support that the parent was required to provide and worked with our creditors to negotiate a resolution amongst all parties.

- **Werner Co.** – January 2013 to Present – Sole Independent Director

  Werner is a global leader in access equipment, secure storage, light duty construction and fall protection products with operations across all geographies. A consortium of private equity investors bought the assets out of a bankruptcy proceeding in 2007. I was asked to serve on the Board as the sole Independent Director by the largest shareholder. Werner more than doubled the size of its business, diversified its product offering and substantially improved its EBITDA prior to its sale in July 2017. As an independent director, working with one other director, we lead the effort in the sale process that achieved an additional $180 million increase in the sale price of the company for its distressed investors.  I am currently the lead director responsible for the resolution of post-sale purchase price adjustments.

- **Old PSG f/k/a Performance Sports Group** – August 2017 to December 2017

  Asked to serve on the Board, by the Official Equity Committee, after the sale of Performance Sports Group's assets. My role was to oversee the plan of reorganization process to drive to a smooth confirmation.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 61-36    Filed 09/21/23    Page 1095 of 1392    PageID 15837
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 984 of 1803    PageID 11730
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 7 of 19

## Dubel & Associates, L.L.C.

- **FXI Holdings** – September 2010 to October 2017 – Independent Director

  FXI is a leading producer of engineered polyurethane foam solutions serving the largest customers in the largest markets. It has the broadest customer and consumer reach of any North American foam producer. FXI's assets where purchased during a bankruptcy proceeding in 2009. I was asked to serve on the board of directors by one of the two private equity firms that owned FXI. Shortly after joining the Board, I was asked to Chair a Special Committee of the Board to manage certain litigation and government investigations related to alleged anti-trust infractions. FXI was the subject of over 50 different class action and individual litigations alleging damages in excess of $3 billion. Over a period of several years, FXI was able to settle all of its litigation for a minor fraction of the alleged damages and all investigations by the government were dropped. During this time, the company's performance improved in a consistent manner with EBITDA more than doubling. Once these litigations were settled, the company was marketed and ultimately sold in October 2017.

- **ResCap Liquidating Trust** – December 2013 to March 2017 – Chairman of the Board - December 2013 to late 2015

  After the ResCap chapter 11 plan was confirmed, I served on the Board of the ResCap Liquidating Trust, as FGIC's representative, to guide the wind down of the remaining assets and prosecute claims in excess of $4 billion against institutions that caused harm to ResCap. During this time, I also served as Liquidating Trustee while we brought on board a new in-house lawyer to prosecute these claims and transitioned this individual into the permanent Liquidating Trustee role.

- **FGIC Corporation and FGIC** - December 2008 to April 2014 – Chairman of the Board during various parts of that time frame – while serving as CEO

- **Barneys New York** – February 2012 to May 2012 – Sole Independent Director

  After Barneys' 2007 sale to Istithmar World, the Government of Dubai's private investment fund, Barneys was impacted by the recession in the late 2000's. I was brought in to serve as the sole independent director during the out of court restructuring process which resulted in a consensual change of control for Barneys to its distressed investor creditors.

- **The Leslie Fay Companies** – April 1993 to May 1996 – while serving as the EVP of Restructuring and CFO

- Mr. Dubel has also served as a member and chairperson of various ad hoc and official creditor committees.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86 Page 2036/21 1804 Page 1096 of 1392   PageID 15838
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 985 of 1803   PageID 11731
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 8 of 19

**Dubel & Associates, L.L.C.**

# John S. Dubel
# Key Management Experience

- **Noble Environmental Power –** Restructuring Advisor to the Company - 2018

  Noble was the owner of two utility scale wind power plants in upstate New York which were in default on their debt instruments. Working closely with Noble's investment bankers we were able to complete a sale of these plants while keeping the companies out of chapter 11 and returning net sale proceeds to its shareholders.

- **SunEdison, Inc.** – Chief Executive Officer and Chief Restructuring Officer – 2016-2017

  SunEdison was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SunEdison had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents. A decline in energy prices along with loss of faith in management by investors and numerous litigations filed against the company caused the closing of the capital markets for SunEdison which led to its filing for chapter 11. I was brought in as a requirement of the DIP agreement. SunEdison's assets were sold in a manner to preserve the greatest value for its creditors. I am currently assisting the wind down SunEdison entity as requested.

- **Financial Guaranty Insurance Company** – Chairman and Chief Executive Officer – 2008-2014

  FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts with over $4 billion of capital. After the collapse of the residential mortgage market in the 2007/08 timeframe, FGIC lost its AAA ratings and experienced tremendous losses on its insurance contracts. This led to an insolvency proceeding under NY State insurance law with an innovative resolution through a pre-arranged rehabilitation plan. This enabled it to continue to pay its policy holders in a timely manner.

- **Residential Capital** – Co-Chairman of the Official Creditors Committee – 2012-2013

  ResCap, a wholly owned subsidiary of Ally Financial, was one of the largest mortgage originators in the US. FGIC was its 2nd largest creditor and after its chapter 11 filing in May of 2012, I was appointed as the Co-Chair of ResCap's Official Unsecured Creditors Committee. As the lead negotiator for the UCC, the UCC was able to negotiate an increase in the contribution to the plan of reorganization by the parent, Ally, from approximately $650 million to $2.1 billion. This contribution settled all of the litigation between Ally and Rescap and enabled ResCap to emerge from chapter 11.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66-16   Filed 09/28/23   Page 1097 of 1392   PageID 15839
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 986 of 1803   PageID 11732
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 9 of 19

## Dubel & Associates, L.L.C.

- **Anchor Glass Container Corporation** – Chief Restructuring Officer – 2005-2006

  Anchor Glass was the 3rd largest manufacturer of glass containers in the US, with Anheuser Busch and Snapple as its largest customers, where it provided "just in time" deliveries to enable its customers plants to operate 24/7. Its third trip through chapter 11 resulted from poor contract pricing and high legacy costs. I worked closely with the CEO to renegotiate these contracts and reduce the cost structure which enabled it to emerge from chapter 11 as a viable business which continues to operate today.

- **RCN Corporation** – President and Chief Operating Officer - 2004

  RCN was a Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets with over $1.7 billion of debt incurred during its build out period. Working with the Lead Director, a pre-arranged chapter 11 plan was negotiated with all of its creditor constituencies to enable it to emerge as a profitable business in its markets where it continues to operate today.

- **Cable & Wireless America** – Chief Executive Officer – 2003-2004

  C&W America was a premier hosting business with 14% share of the US market and world class a Tier 1 IP Network. When its British parent company experienced financial difficulties, they attempted to abandon C&W America which caused stress for its major customers, including Yahoo, Google and others. A plan was put in place, though a chapter 11 process, to dramatically reduce its daily cash burn and sell the entity while maintaining its customer base.

- **Acterna Corporation** – Chief Restructuring Officer  - 2003

  Acterna was a multi-national manufacturer of telecommunications and cable equipment with revenues of approximately $1.7 billion  and debt of $1 billion prior to the industry down turn. I worked closely with the CEO to stabilize the operations and avoid a fire sale of the business. A quick turn through chapter 11 enabled it to emerge as a viable business, where upon the CEO was able to regrow the business and position it for a successful sale to an industry player 18 months later.

- **WorldCom, Inc.** – Chief Financial Officer – 2002, Advisor – 2003

  WorldCom was one of the largest telecommunication companies with assets of over $107 billion and operations across the globe. It filed for chapter 11 during 2002 due to a massive fraud which covered up the significant operational deficiencies and losses it was experiencing. I was brought in as a condition of the DIP agreement and worked closely with the CEO and other members of the senior management to stabilize the company, restructure the operations to reduce opex, provide stability to the international operations and assist with the plan of reorganization negotiations and confirmation.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 09/28/23    Page 1098 of 1392    PageID 15840
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 987 of 1803    PageID 11733

## Dubel & Associates, L.L.C.

- **CellNet Data Systems, Inc.** – Chief Restructuring Officer – 1999-2001

  CellNet was a startup technology company that provided smart grid and smart metering and billing solutions for the utility industry. After burning through in excess of $600 million of initial funding it was not able to access the capital markets to continue to build out its platform and realize the cost synergies across contracts that would make it profitable. Working closely with the new CEO, we reduced the cost structure and sold the company to one of its meter suppliers enabling it to continue to operate in a successful manner.

- **Barneys New York** – Chief Financial Officer – 1996-1999

  Barneys was, at this time, a family owned high end retail store chain operating with over 30 stores and international affiliations in Asia. After an uncontrolled growth plan and management that did not understand its cost structure, it filed for chapter 11. I was brought in a the request of the DIP lender to oversee the family's management, to control its costs, close unprofitable locations, renegotiate store leases and work out a consensual chapter 11 plan that included its largest creditors providing financing through a rights offering to enable Barneys to successfully emerge from chapter 11 as a profitable retailer.

- **The Leslie Fay Companies** – EVP Restructuring and Chief Financial Officer – 1993-1995

  Leslie Fay was one of the larger designer and manufacturer of ladies dresses, sportwear and suits in the US. A public company, it was the victim of fraud by its financial management team to hide the true cost of operations and manufacturing of its products. This led to a chapter 11 filing. I worked closely with the CEO and President to stabilize its financial management team, reduce costs and position it for an emergence from chapter 11.

- **Robert Maxwell Group** – Head of US Private Companies – 1991-1993

  Robert Maxwell was a British entrepreneur who invested heavily in the publishing space. After financial improprieties were uncovered and his subsequent suicide, I was appointed by the UK Administrators to run all of his US operations, which included over 40 private companies. I worked closely with the UK administers to realize value through sales of these US operations and turn those proceeds over to the UK Administrators.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 66-6 Filed 09/28/23 Page 1099 of 1392 PageID 15841
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 988 of 1803 PageID 11734

## Dubel & Associates, L.L.C.

Mr. Dubel is a past board member and officer of the Association of Insolvency and
Reorganization Advisors, a Certified Insolvency and Reorganization Advisor and is
a member of the Turnaround Management Association and the American
Bankruptcy Institute. Mr. Dubel received a Bachelor in Business Administration
degree from the College of William and Mary.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-16    Filed 09/21/23    Page 1100 of 1392    PageID 15842
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 989 of 1803    PageID 11735

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 12 of 19

# Dubel & Associates, LLC

# Selected Case Studies

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 09/21/23    Page 1101 of 1392    PageID 15843
Exhibit 6    Page 299 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 990 of 1803    PageID 11736
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 13 of 19

## SunEdison, Inc.
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

‣ SunEdison (SUNE) was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SUNE had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents

‣ Continued downward pressure on energy prices caused renewable energy projects to experience stress. Lack of proper integration of acquisitions and overpayment on other acquisitions caused a liquidity crisis. Public spin-offs of profitable yieldco assets cut off cash flow that was needed to run the operations.

‣ Senior management control of the Yieldcos enabled borrowings from the Yieldcos which could not be repaid

**Actions Taken**

‣ Hired initially as CRO with a clear mandate to take on CEO responsibilities

‣ An immediate assessment of the opportunity to maintain a going concern was initiated.

‣ Programs were put in place to plug the employee exodus that SUNE was experiencing

‣ In consultation with our lenders made the determination that an orderly sale of assets was the best path to optimum value realization

‣ Maintained an open line of communication with the DIP, 1L and 2 L lenders to build back trust in the company

‣ Engaged with the Board of the Yieldcos, TERP and GLBL, to work towards a resolution of the disputes between the Yieldcos and SUNE

**Results**

‣ Took on CEO role after a short transition with the former CEO

‣ Reorganization of key personnel functions including the hiring of a new CFO and Controller provided stability in the Finance functions for the company to operate within the limits of the DIP agreement.

‣ Executed a global marketing process which resulted in over 60 asset sales with approximately $1.5 billion of gross proceeds

‣ Executed a plan which resulted in the transition of administrative and operational functions from SUNE to the Yieldcos which helped stabilize the value of our ownership stake in these entities

Appellee Appx. 00984
APP. 151236
Appx. 01236

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6Exhibit 6 Filed 2092/2of 1804age 1102 of 1392    PageID 15844
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 991 of 1803    PageID 11737

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 14 of 19

## SunEdison, Inc. (continued)
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ▸ Class and individual litigation against SUNE and the Yieldcos related to these control issues ensued. | ▸ Engaged with the Board and management of the Yieldcos, TERP and GLBL, to start to work towards a resolution of the disputes between the Yieldcos and SUNE | ▸ Drove a plan, through a directed litigation strategy, to force a resolution of the over $3 billion of claims brought against SUNE by the Yieldcos which resulted in a cooperative sale of the Yieldcos netting SUNE approximately $825 million |
| ▸ Shortly after a Feb 2016 2L financing the company has exhausted those funds and was out of available funds to operate the business. | ▸ Put in place a path to seek resolution of all of the Class Action and individual shareholder litigations by seeking a mediation in the District Court and Bankruptcy Court litigation related to both SUNE and the Yieldcos | ▸ A replacement DIP agreement was put in place to eliminate certain concerned creditors and align the interests of the DIP lenders and the prepetition secured creditors. |
| ▸ Additional litigation commenced related to cancelled acquisitions. | ▸ Commenced negotiations to settle the various litigations amongst SUNE's creditor groups and between SUNE and its Yieldcos | ▸ Settlements of the vast majority of class and individual shareholders were negotiated |
| ▸ During this timeframe, the creditors lost faith in the CEO and CFO. | ▸ Worked closely with Chief Judge Morris, the mediator appointed in the case, to craft a resolution to all intercreditor disputes | ▸ A mediated resolution amongst SUNE's creditor resulted in a successful chapter plan of reorg funded by a rights offering led by SUNE's 2L creditors |
| ▸ SUNE filed for chapter 11 in late April 2016 funded by a DIP provided by the 1L and 2L creditors. | | |

Appellee Appx. 00985
APPX. 05733
Appx. 05733

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6136    Filed 09/23/24  Page 1103 of 1392    PageID 15845
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 992 of 1803    PageID 11738

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 15 of 19

## Financial Guaranty Insurance Company
### John Dubel – Chief Executive Officer and member of the Board of Directors

### Situation

- FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts

- At the start of 2008, FGIC was at risk of losing its AAA ratings

- The residential real estate meltdown caused FGIC to face billions of dollars of claims from CDS and RMBS contracts it had insured

- In addition, several of FGIC's largest public finance deals were on the cusp of defaulting

- In late 2009, FGIC's statutory capital went negative and was subject to immediate takeover by the NYS Department of Financial Services

### Actions Taken

- Raised capital surplus by $830 million through reinsurance agreements and preferred stock

- Negotiated settlements of CDS contracts

- Managed the workout of multiple public finance insurance contracts

- Managed affirmative litigation actions to recover from parties that harmed FGIC's insurance contracts

- Developed an innovative restructuring plan to allow FGIC to file a pre-arranged rehabilitation plan in NYS Court

- Positioned the company to be able to operate in the post rehabilitation environment to pay claims to policyholders in a timely manner

### Results

- Planned and executed an orderly Rehabilitation Plan process which resulted in an innovative and precedent setting proceeding for FGIC's policyholders

- Managed down the overall exposure from $312 billion to under $30 billion

- Settled parent/subsidiary issues without litigation

- Recovered in excess of $1.25 billion for policyholders from parties that harmed FGIC's contracts

- All of these results were accomplished while maintaining an independent view towards protecting all policyholders interests

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186 Filed 09/20/23 Page 1104 of 1392    PageID 15846
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 993 of 1803    PageID 11739

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 16 of 19

## RCN Corporation –  Integrated Triple Play Service Provider
### John Dubel – President and Chief Operating Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets
- Revenues of approximately $500 million
- Over 1 million connections
- $1.7 BN of debt in default
- Secured creditors pushing the Company to a forced liquidation
- Lack of confidence in management's business plan and ability to rationalize the business
- Company lacked adequate liquidity to maintain operations

**Actions Taken**

- Hired as President and CRO to lead RCN during this crisis.
- Implemented reorganization of operating costs achieving positive EBITDA and cash flow
- Actions included:
  - Rationalized customer base
  - Segmented Customer Service activity and automated where possible
  - Consolidated Network Operations to drive efficiency
  - Reduced IT functions
  - Reduced customer service call volume through web-based solutions
  - Simplified product offering
  - Generated Tech Operations savings

**Results**

- Streamlined operations and reduced breakeven costs achieving positive cash flow and EBITDA
- Reduced annualized SG&A costs by 20%
- Reduced headcount by 25%
- Improved Customer Service quality
- Company emerged with over $125 million of cash in hand
- Instituted rigorous cost reduction procedures within the company
- Positioned the company for future positive growth

**Appellee Appx. 00987**

**APPX. 01739**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 09/21/23    Page 1105 of 1392    PageID 15847
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 994 of 1803    PageID 11740
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 17 of 19

## Cable & Wireless America – Successfully Positioned the Company for a Sale
### John Dubel – Chief Executive Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

‣ Premier hosting business with 14% share of the US market by revenue and World Class Tier 1 IP Network

‣ Parent company's announcement of intention to exit the US market created uncertainty for customers, suppliers, and employees

‣ Daily cash burn estimated at $2M

‣ Need to stabilize standalone operations and facilitate a sale transaction

**Actions Taken**

‣ Negotiated terms of separation from parent company and obtained ongoing funding commitment

‣ Stabilized skittish customer base

‣ Took control of cash management and forecasting process

‣ Implemented cost cutting strategy to achieve cash flow breakeven within 9 months

‣ Managed extensive due diligence process by multiple bidders

**Results**

‣ Reduced daily cash burn to $0.7M

‣ Planned and executed orderly Chapter 11 filing with the support of a "stalking horse" bidder to facilitate a 363 sale

‣ Active auction process resulted in total bid consideration of $167.5M, a threefold increase over the stalking horse bid value

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 09/21/18 4    Page 1106 of 1392    PageID 15848
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 995 of 1803    PageID 11741

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 18 of 19

## Acterna – Reduced Costs, Drove a Successful Turnaround
### John Dubel – Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- Leading Telecom Network equipment supplier with worldwide operations that was facing a severe liquidity crisis

- Test equipment market was crippled by the drought of capital spending from Telecom Network companies

- Debt levels were not sustainable in then current market conditions

**Actions Taken**

- Assumed role of CRO to lead company through Chapter 11

- Restructured $1.0 BN of debt

- Preserved non-domestic assets across 30 countries necessary to a successful reorganization.

- Focused sales activity on core markets

- Worked with management to reduce SG&A costs

- Rationalized headcount through centralization of manufacturing activity

- Managed the subsidiary divestiture program

- Integrated worldwide cash control procedures improving liquidity

**Results**

- Acterna emerged from Chapter 11 with 80% less debt and a reduction of 85% of interest costs in less than 6 months

- Improved international cash liquidity sufficiently for non-US operations to become self funding

- Cash at emergence was over $60 million

- Reduced operating cash costs so the company was self funding and the DIP was never used to operate the company

- 18 months after C-11, Acterna announced a sale to JDS Uniphase, for a three fold increase in value.

**Appellee Appx. 00989**

**Appx. 01240**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 186    Filed 09/21/23    Page 1107 of 1392    PageID 15849
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 996 of 1803    PageID 11742

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 19 of 19

## WorldCom – Stabilized Operations and Finance Function
### John Dubel – Chief Financial Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- A massive fraud which masked operational, financial and reporting issues crippled the company's credibility
- WorldCom suffered from excess debt with declining value of assets, financial fraud issues, contentious relationship with creditors, and a substantial cash burn
- Significant negative cash flow from international operations
- WorldCom filed for bankruptcy in July of 2002, becoming the largest bankruptcy filing in history at the time

**Actions Taken**

- Assumed role  Chief Financial Officer until a permanent management team could be put in place then worked as financial advisor for pendency of Chapter 11 case
- Put turnaround teams, operational restructuring plans, and cash management plans in place
- Led the international restructuring efforts
- Assisted in negotiations with creditors
- Implemented an achievable 2003 business plan, facilitated several cost reduction initiatives, and managed the 13-week cash flow forecast
- Reduced capital spending

**Results**

- Achieved $2 BN of operational savings
- Increased cash flow by more than $100M in international operations and avoided bankruptcy in many jurisdictions
- Worked with all stakeholders to reach consensus on a plan of reorganization
- Successfully restructured the balance sheet

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66  Exhibit 6  Page 293 of 21 1804  Page 1108 of 1392    PageID 15850
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 997 of 1803    PageID 11743
Case 19-34054-sgj11 Doc 281-3 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 1 of 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | Related to Docket Nos. 7 & 259 |

**ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF
UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR
AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE**

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession (the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66    Filed 09/01/23    Page 1109 of 1392    PageID 15851
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 998 of 1803    PageID 11744
Case 19-34054-sgj11 Doc 281-3 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 2 of 2

jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED on the terms and conditions set forth herein.

2.    The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) entering into the Governing Documents and compensating the Independent Directors for their services either directly or by reimbursing Strand for any costs incurred in connection with the appointment and compensation of the Debtor; (ii) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3.    Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

4.    Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

5.    The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/09/26   Page 1110 of 1392   PageID 15852
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 999 of 1803   PageID 11745

# APPENDIX 13

**Appellee Appx. 00993**

**APPX. 01744**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8 Exhibit 6    Filed 12/09/24    Page 1111 of 1392    PageID 15853
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1000 of 1803    PageID 11746
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 1 of 16

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | **Related to Docket Nos. 69, 70, 116, and 120** |
| | ) | |

**DEBTOR'S OMNIBUS REPLY IN SUPPORT OF (I) APPLICATION FOR AN
ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY
GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC
PRO TUNC* TO THE PETITION DATE; AND (II) APPLICATION FOR AN ORDER
AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER
COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO
TUNC* TO THE PETITION DATE**

The above-captioned debtor and debtor in possession (the "Debtor") hereby

submits this reply (the "Reply") in support of its (i) *Application for an Order Authorizing the*

*Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel,*

*Nunc Pro Tunc to the Petition Date* [Docket No. 69] (the "Foley Application"); and (ii)

*Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox &*

*Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No.

70] (the "Lynn Pinker Application," and together with the Foley Application, the

"Applications").

In further support of the Applications, the Debtor respectfully states as follows:

**Preliminary Statement**

1.      As set forth in the Applications, and as discussed more fully below, Foley

Gardere, Foley & Lardner, LLP ("Foley") and Lynn Pinker Cox & Hurst LLP ("Lynn Pinker")

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-3    Filed 12/09/26    Page 1112 of 1392    PageID 15854
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1001 of 1803    PageID 11747
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 2 of 16

have represented the Debtor and certain of its affiliates and related entities in highly-contested, prepetition litigation against Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, "Acis").  Lynn Pinker also represented the Debtor in litigation concerning Joshua Terry – Acis's sole owner[2] – and Mr. Terry's wife, Jennifer Terry.  In the Applications, the Debtor seeks authority to retain Foley and Lynn Pinker on a postpetition basis to continue the defense of the Debtor and related entities as described herein and the prosecution of the Debtor's rights against Acis and Mr. Terry.

       2.      Two objections to the Applications were filed:  (i) *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP and Lynn Pinker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 120] (the "Committee Objection") and (ii) *Limited Objection to the Debtor's: (I) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (II) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 116] (the "Acis Objection").

       3.      The Committee Objection, filed by the Official Unsecured Creditors Committee (the "Committee"), seeks certain additional disclosures concerning the services to be provided by Foley and Lynn Pinker and the entities to which those services will be provided.

---

[2] Mr. Terry obtained 100% of the equity in the Acis entities through the confirmation of Acis's bankruptcy plan. The Debtor is currently appealing that confirmation order as discussed herein.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 12/09/23    Page 1113 of 1392    PageID 15855
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1002 of 1803    PageID 11748
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 3 of 16

The Committee Objection also seeks additional disclosure concerning how the Debtor will pay for those services and their benefit to the Debtor's estate.  The Debtor has endeavored to provide the additional disclosures requested by the Committee as set forth herein and in the Supplemental Declaration of Michael Hurst (the "Hurst Declaration") attached hereto as **Exhibit A**, the Supplemental Declaration of Holland O'Neil (the "O'Neil Declaration") attached hereto as **Exhibit B**, and the Declaration of Bradley Sharp (the "Sharp Declaration," and together with the Hurst Declaration and the O'Neil Declaration, the "Declarations") attached hereto as **Exhibit C**.

4.        In contrast, the Acis Objection, filed by Acis LP and Acis GP, seeks to import the highly acrimonious and contentious nature of the Debtor's ongoing litigation with Acis and Acis's counsel, Winstead PC ("Winstead"), into this Court and to use the retention process to secure a litigation advantage in its ongoing dispute with the Debtor in Texas.  In short, Acis is seeking to disqualify the Debtor's chosen law firms – law firms that have represented the Debtor for the past twenty (20) months specifically in connection with the Acis and Terry Litigation – from continuing to represent the Debtor in matters adverse to Acis.  That tactic is improper and an abuse of the bankruptcy process.  Regardless, the Debtor has endeavored to be transparent and to respond to Acis's requests for additional disclosures herein and in the Declarations.  Although not relevant to the Applications, the Debtor has also responded to Acis's improper accusations concerning the Acis Litigation.

### Reply

5.        In the Committee Objection, the Committee lists two objections to the Applications.  The first, and the Committee's "principal concern," is "the lack of clear delineation of [Foley's and Lynn Pinker's] proposed engagements and representations, and the

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68 6 FiledEx1hib20426 of 1804ge 1114 of 1392 PageID 15856
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1003 of 1803 PageID 11749
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 4 of 16

Debtor's obligation to pay for the same." (Committee Objection, ¶ 3.) The second is that "the

Applications do not provide for an allocation of attorneys' fees and expenses among the Debtor

and non-debtor defendants." (*Id.*, ¶ 4.) Parsing the vitriol in the Acis Objection, it is apparent

that Acis is generally asserting the same two objections as the Committee. (Acis Objection, ¶¶ 5;

8.) These two concerns are addressed below.

### I.     Foley's and Lynn Pinker's Proposed Engagements

6.     Prior to the Petition Date, the Debtor was represented by both Foley and

Lynn Pinker acting as co-counsel. Lynn Pinker is a highly- regarded litigation boutique based in

Dallas, Texas, but does not have bankruptcy attorneys on staff. Conversely, Foley has a large

and well-established bankruptcy practice. Because each of the matters set forth below includes

both a bankruptcy and litigation component, the Debtor utilized the services of both Foley and

Lynn Pinker. Foley provided the bankruptcy expertise – but, in light of the Debtor's retention of

Lynn Pinker, does not have litigators staffed on the matters – and Lynn Pinker primarily handled

litigation strategy but deferred to Foley on the bankruptcy components. As such, despite both

Lynn Pinker and Foley being retained, there was limited overlap in the services they provided to

the Debtor other than the overlap necessary to collaborate on overall progress and strategy.

7.     The following are the matters in which Foley and Lynn Pinker represented

the Debtor prepetition (collectively, the "Acis Litigation"). The list also includes entities related

to the Debtor which were also represented by Foley and/or Lynn Pinker and whose legal fees

were paid – prepetition – by the Debtor (as discussed below). The Debtor believes that one of

these matters, the Adversary Proceeding (as defined below), has been stayed as a result of the

Debtor's bankruptcy filing, and that there will only be de minimis, if any, legal work required on

DOCS_NY:39826.11 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/05/24    Page 1115 of 1392    PageID 15857
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1004 of 1803    PageID 11750
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 5 of 16

such matter during the Debtor's bankruptcy.[3]  As set forth below, the Debtor is only seeking to

retain Foley and Lynn Pinker with respect to the Acis Bankruptcy, Neutra Appeal, Debtor

Appeal, and the Winstead Matter (each as defined below) at this time.

| Matter | Clients | Case Summary | Procedural Posture |
|---|---|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.*), Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy") | Debtor<br><br>Neutra Limited[4] (Foley client only) | Acis involuntary bankruptcy proceeding initiated by Mr. Terry.  The Debtor has a claim in excess of $8 million for pre- and post-petition services provided to Acis.[5]  Neutra is nominally involved in the Acis Bankruptcy as a party in interest. Other than Mr. Terry, the Debtor is Acis's only material creditor. | The Debtor's claims in the Acis Bankruptcy have been consolidated with the Adversary Proceeding (defined below). |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.*, Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) (collectively, the "Adversary Proceeding") | Debtor<br><br>Highland HCF Advisors, Ltd.<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. | The Debtor is currently a defendant in the Adversary Proceeding.  The bankruptcy court consolidated resolution of the Debtor's claims with this Adversary Proceeding.  The defendants have filed a motion to withdraw the reference, which has been argued to the bankruptcy court and is pending.  The bankruptcy court has not yet produced its Report and Recommendation to the District Court as to whether to withdraw the reference. | The Debtor believes this matter is stayed as to the Debtor and the other defendants, and will likely remain so for the foreseeable future due to the nature of the action. |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) (the "Neutra Appeal") | Neutra (Foley client only) | Neutra is appealing the involuntary order for relief entered in the Acis Bankruptcy.  If successful, certain CLO management agreements may revert to the Debtor.  The Debtor previously received in excess of $12 million annually under those agreements.[6] | The Neutra Appeal is not stayed and is proceeding.  Neutra filed its reply brief on November 20, 2019. |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) (the "Debtor Appeal") | Debtor<br><br>Neutra (Foley client only) | The Debtor and Neutra are appealing entry of the confirmation order in the Acis Bankruptcy. | This appeal is not stayed, and the Debtor's reply brief is due December16, 2019. |

[3] If circumstances change, the Debtor proposes to return to this Court to discuss the changed circumstances and to update the Applications if necessary.

[4] The economic interests in Neutra Limited ("Neutra") are owned, indirectly, 25% by Mark Okada and 75% by James Dondero.  Prior to the confirmation of the contested plan in the Acis Bankruptcy, Neutra owned 100% of the limited partnership interests in Acis LP and 100% of the membership interests in Acis GP.  In his deposition, Mr. Sharp stated that Lynn Pinker represented Neutra; however, Neutra is represented by Foley.

[5] *See* Highland Capital Management, L.P. Proof of Claim #27 in the Acis LP case and Proof of Claim # 13 in the Acis GP case, attached hereto as Exhibit D and E, respectively, and Highland Capital Management, L.P.'s Application for Administrative Expense Claim Pursuant to 11 U.S.C. §503(b), Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. Dec. 11, 2018) [Docket No. 772], attached hereto as Exhibit F.

[6] *See* Acis LP's Statement of Financial Affairs, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. April 30, 2018) [Docket No. 165], relevant excerpts of which are attached hereto as Exhibit G.

Appellee Appx. 00998
Appx. 15739

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-5    Filed 11/06/26    Page 1116 of 1392    PageID 15858
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1005 of 1803    PageID 11751
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 6 of 16

| | | | |
|---|---|---|---|
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee,* Case No. 3:19-cv-1477D (N.D. Tex. 2019) (the "<u>Winstead Matter</u>") | Debtor | The Debtor is appealing a ruling allowing Winstead to represent both Acis's chapter 11 trustee and Mr. Terry, individually and as a creditor of Acis, to the District Court.  If successful, Winstead will be required to disgorge fees and expenses improperly billed to Acis's estate.[7] | The "Record of Appeal" has not yet been docketed and no briefing schedule has been set.  This matter will proceed once docketed. |

8.    In addition, Lynn Pinker represented the Debtor and certain of the

Debtor's officers in the following prepetition matter in which Foley was not involved:

| Matter | Clients | Case Summary | Procedural Posture |
|---|---|---|---|
| *Joshua N. Terry, Individually and on Behalf of IRAs #146771 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al,* Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) (the "<u>Terry Litigation</u>") | Debtor<br><br>J. Dondero<br><br>T. Surgent | The Debtor, Mr. Dondero, and Mr. Surgent are currently defendants in this matter and are facing claims for breach of contract, conversion, violation of Texas Theft Liability Act, and related civil conspiracy claims.  Mr. Dondero is individually facing a claim for defamation. | Currently stayed as to the Debtor. |

9.    As set forth above, the Debtor believes that the Terry Litigation and the

Adversary Proceeding are stayed.  At this time, the Debtor only intends to continue Foley's and

Lynn Pinker's representations post-petition with respect to the Acis Bankruptcy, the Neutra

Appeal, the Debtor Appeal, and the Winstead Matter.  However, the Debtor reserves the right to

supplement the Applications to the extent that Foley and Lynn Pinker's services are needed in

the Adversary Proceeding and the Terry Litigation.   Further, in light of the allegations being

asserted by the Committee in the *Motion of the Official Committee of Unsecured Creditors for*

*an Order Transferring Venue of this Case to the United States Bankruptcy Court for the*

*Northern District of Texas* [Docket No. 86] (the "<u>Venue Motion</u>"), as well as the joinder thereto

by Acis [Docket No. 122], the Debtor's bankruptcy professionals have sought input from these

---

[7] *See* Statement of Issues by Appellant Highland Capital Management, L.P., Case No. 18-30264-SGJ-11 (Bankr. N.D. Texas July 1, 2019) [Docket No. 1058], attached hereto as Exhibit H.

DOCS_NY:39826.11 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-5    Exhibit 6    Filed 12/09/22    Page 1117 of 1392    PageID 15859
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1006 of 1803    PageID 11752
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 7 of 16

firms due to their significant history and familiarity with the Acis Litigation.

10.    The Debtor believes that the continued retention of Foley and Lynn Pinker
in the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter will
provide a substantial benefit to the estate.  The Debtor has significant claims against Acis, and
Foley and Lynn Pinker are an integral part of that litigation.  As discussed above, the Debtor has
a claim in the Acis Bankruptcy in excess of $8 million, and, if the Neutra Appeal is successful,
the Debtor will be in a position to once again receive the benefit of the CLO management
agreements, which historically have provided the Debtor with annual revenues in excess of $12
million.  If the Debtor Appeal is successful, Neutra will regain its interests in Acis and will be
able to reinstate the Debtor to resume providing management services to certain collateralized
loan obligations.  Finally, if the Debtor is successful in the Winstead Matter, Winstead will be
required to disgorge its fees and expenses charged to the Acis estate.  The Debtor believes such
amounts are currently in excess of $2 million.[8]  As such, there is substantial benefit to the
Debtor's estate in the Debtor continuing to protect its rights in the Acis Bankruptcy, the Neutra
Appeal, the Debtor Appeal, and the Winstead Matter.

11.    Conversely, any delay in the retention of Foley and Lynn Pinker will have
a substantial and negative impact on the Debtor's estate and the value of its claims in its
litigation with Acis.  If the Debtor is not allowed to continue with the engagement of Foley and
Lynn Pinker, the Debtor would be severely disadvantaged by the loss of critical knowledge and
expertise these law firms have devoted to this representation over the course of the past twenty

---

[8] For the avoidance of doubt, any of Winstead's fees and expenses that are disgorged will not flow directly to the
Debtor but will instead be returned to the Acis estate for distribution to Acis's creditors of which the Debtor is now
the largest.

Appellee Appx. 01000
APPX. 15852

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/09/22    Page 1118 of 1392    PageID 15860
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1007 of 1803    PageID 11753
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 8 of 16

(20) months.  Further, the costs to replace these firms would be substantial, and the risk of loss of

important tactical litigation strategy would be detrimental to the Debtor.

## II.        Prepetition Allocation of Attorneys' Fees and Expenses

12.        Prior to the Petition Date, legal fees incurred by Foley and Lynn Pinker for

their representations of the Debtor and non-Debtor parties in the Acis Litigation and the Terry

Litigation were paid by either (i) the Debtor or by (2) Highland CLO Funding, Ltd. ("HCLOF")

via an indemnification obligation to the Debtor.  *See* ¶17 *infra*.

### The Acis Litigation:

13.        The Debtor paid for Foley and Lynn Pinker's services in the Acis

Litigation for non-Debtor entities.  However, with the exception of Neutra, each such non-Debtor

entity  (i) is either directly or indirectly 100% owned by the Debtor; (ii) has no assets; (iii) is

only involved in the Acis Litigation because Acis alleged that the Debtor caused such entities to

engage in certain acts that harmed Acis; and (iv) is subject to the exact same claims as the

Debtor.  Additionally, absent funding by the Debtor, the non-Debtor defendants that are wholly

owned by the Debtor would be have no way to defend against Acis's claims.  Any attempt to

collect on those claims from such non-Debtor entities would also lead back to their general

partners or members, which are the Debtor.  As such, the Debtor believed and believes such

entities are only nominal parties to the Acis Litigation and that Foley's and Lynn Pinker's

defense of such parties is part and parcel of the Debtor's defense of itself and its assets.

14.        The Debtor historically paid Foley's fees and expenses incurred by

Neutra.  As disclosed above, the economic interests in Neutra are owned, indirectly, 25% by Mr.

Okada and 75% by Mr. Dondero.  As a special purpose entity, Neutra, however, has no assets,

DOCS_NY:39826.11 36027/002

Appellee Appx. 01001
APPX. 15952

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/09/26 f 1804age 1119 of 1392   PageID 15861
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1008 of 1803   PageID 11754
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 9 of 16

and had no assets prior to the Acis Bankruptcy except for its interests in Acis.  Although the

Debtor is not a direct appellant in the Neutra Appeal,[9] if Neutra is successful in the Neutra

Appeal, Neutra will regain its interests in Acis and intends to cause certain services and advisory

agreements to revert back to the Debtor.  The Debtor then would be in a position to earn revenue

from those agreements, as it did prior to the filing of the involuntary bankruptcy petitions against

Acis LP and Acis GP and prior to its contracts being terminated in the Acis Bankruptcy.  By way

of example, in the one year period prior to the filing of the involuntary petitions, Acis LP

compensated the Debtor more than $12 million for its services.

       15.     Although the economic interests in Neutra are indirectly owned by Mr.

Dondero and Mr. Okada, Mr. Dondero and Mr. Okada will likely not see a return on their equity

for some time.  If the Neutra Appeal is successful, Neutra will regain its interest in Acis and Acis

will also be required to pay the Debtor (i) approximately 85% of its revenue for services

provided under the services agreements and (ii) for its claims against Acis for pre- and

postpetition services rendered, which are currently in excess of $8 million.  As such, it is

estimated that Acis would owe approximately four years of revenue to the Debtor, including

payment of services and pay down of the $8 million previously accrued and unpaid.

       16.     For the foregoing reasons, the Debtor has agreed to pay Neutra's fees in

the Neutra Appeal, the Acis Bankruptcy, and the Debtor Appeal.  Paying those fees makes

economic sense for the Debtor, but does not make sense for Mr. Dondero, Mr. Okada, or any

other party[10] as they would not see a return on that investment for a significant amount of time.

---

[9] Under the "person aggrieved" standing for purposes of appeal, Neutra was the proper appellant.

[10] As previously stated, as a special purpose entity, Neutra has no assets other than its prior ownership of the equity in Acis.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68.3.5    FRage 2/09/26 of 1392    Page 1120 of 1392    PageID 15862
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1009 of 1803    PageID 11755
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 10 of 16

17.     Finally, although the Debtor has agreed to pay Foley and Lynn Pinker for the services provided to the Debtor and the non-Debtors set forth above in the Acis Litigation, the majority of those fees and expenses actually were paid by a non-Debtor entity, HCLOF.[11] The Debtor owns less than 1% of the economic interest in HCLOF.  As part of HCLOF's agreement with the Debtor, HCLOF indemnifies the Debtor if the Debtor incurs any legal fees on HCLOF's behalf.  Pursuant to that indemnification, HCLOF, prior to the Petition Date, either paid directly or reimbursed the Debtor for the majority of Foley's and Lynn Pinker's fees and expenses incurred in the matters set forth above.

**The Terry Litigation:**

18.     The Debtor historically paid all of Lynn Pinker's fees and expenses with respect to their representation of the Debtor, Mr. Dondero, and Mr. Surgent in the Terry Litigation.  The Debtor paid Mr. Dondero's and Mr. Surgent's legal fees in this matter as Mr. Dondero and Mr. Surgent were entitled to indemnification under the Debtor's limited partnership agreement.  (Exh G., § 4.1(h).)

**III.    Postpetition Allocation of Fees**

19.     As set forth above, the Debtor believes that all matters except for the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter are stayed and will remain stayed during the pendency of the Debtor's case.  The Debtor is the only party in the Winstead Matter.  The Debtor, for the reasons set forth above, intends to compensate Foley for its representation of Neutra – the only non-Debtor party – in the Acis Bankruptcy, the Neutra

---

[11] HCLOF is a party to the Acis Bankruptcy, the Debtor Appeal, and the Adversary Proceeding.  HCLOF is represented by the law firm, King & Spalding, and is not represented by Foley or Lynn Pinker.  HCLOF pays King & Spalding's fees and expenses directly.

Appellee Appx. 01003
Appx. 10855

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 5    Filed 12/09/22    Page 1121 of 1392    PageID 15863
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1010 of 1803    PageID 11756
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 11 of 16

Appeal, and the Debtor Appeal, subject to this Court's order.[12]  The Debtor believes that if Neutra is successful in the Neutra Appeal, the Debtor and its estate will be a significant beneficiary of such an outcome and will receive a direct and substantial benefit.  In the Acis Bankruptcy and the Debtor Appeal, Neutra is only a nominal party, and the Debtor is receiving the primary benefit of Foley's legal services in those matters.  Further, a substantial portion of Foley's and Lynn Pinker's fees and expenses may continue to be reimbursed by HCLOF although the exact amount of such reimbursement is not yet known.

20.     To the extent that the other matters set forth above are not stayed, as to any party, the Debtor intends to supplement the Applications to seek authority to pay the costs of the non-Debtor parties represented by Foley and Lynn Pinker.

## IV.     Additional Issues Raised in the Acis Objection

21.     The balance of the issues raised in the Acis Objection are irrelevant or misleading and in all cases constitute an inappropriate attempt by Acis to use this Court's authority and the Bankruptcy Code to secure a litigation advantage against the Debtor. Consequently, the Debtor is compelled to respond to each point.

22.     **Rule 2017(a) of the Federal Rules of Bankruptcy Procedure**:  Acis has reserved its right "to compel disclosure" of information relating to the amounts billed by Foley and Lynn Pinker prior to the Petition Date pursuant to Rule 2017(a).[13]  (Acis Objection, ¶ 5.)  By

---

[12] The Debtor and Neutra currently contemplate entering into an agreement pursuant to which Neutra will repay the Debtor for Foley's fees and expenses incurred on Neutra's behalf.  Under the proposed agreement, Neutra would reimburse the Debtor from any net proceeds it receives as a result of the transactions discussed herein and would also agree not to make any equity distributions or similar payments to any of Neutra's shareholders, Mr. Dondero, Mr. Okada, or any of their affiliates until after the Debtor is repaid for Foley's legal fees and expenses incurred on Neutra's behalf.

[13] Acis has also stated that Foley and Lynn Pinker should disclose payments made to them pursuant to Rule 2017(b), which requires disclosure of fees incurred after a petition is filed.  As set forth in the Applications, Foley and Lynn Pinker intend to comply with Rule 2017(b) – and their other obligations to this Court – and to file fee applications

Appellee Appx. 01004

APPX. 05856

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/09/22   Page 1122 of 1392   PageID 15864
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1011 of 1803   PageID 11757
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 12 of 16

its terms, Rule 2017(a) only applies to payments "in contemplation of the filing of a petition

under the Code by or against the debtor. . . ." FRBP 2017(a).  As set forth in the Declarations,

neither Foley nor Lynn Pinker received payments in contemplation of the bankruptcy.  However,

Acis's reservation of rights is noted, and the Debtor anticipates Acis will continue its attempts to

use this proceeding to influence the Acis Litigation by objecting to Foley's and Lynn Pinker's

fees.  The Debtor will respond appropriately if and when such objections are filed.

23.     **HRA Holdings, LLC**:  Foley initially sought a conflict waiver with

respect to HRA Holdings, LLC, when it entered into its engagement letter with the Debtor in

April 2018.  At that time, the Debtor was contemplating a potential investment in HRA

Holdings, LLC, another Foley client.  However, that investment never occurred, and thus no

conflict ever arose.

24.     **Lynn Pinker Engagement Letter:**  As set forth in the Hurst Declaration,

Lynn Pinker does not have an engagement letter with the Debtor and consequently could not

attach an engagement letter to its retention application.  The terms of Lynn Pinker's engagement

were previously disclosed and are re-disclosed in the Hurst Declaration.

25.     **Expert Retention of Scott Ellington**:  In 2018, Lynn Pinker and the Pettit

Law Firm retained Scott Ellington, the Debtor's general counsel, as an expert witness in *Robert

A. Imel v. Legacy Texas Bank, N.A. and Energy Reserves Group, LLC*, Cause No. DC-16-01372

(134th Judicial District Court of Dallas County, Texas).  The *Imel* litigation was wholly

unrelated to the Debtor and did not involve the Debtor or any entities affiliated or related to the

---

subject to appropriate review following their retention.  If any of Foley's or Lynn Pinker's fees or expenses are
thought to be excessive or inappropriate, parties in interests are entitled to object at the time the fee application is
filed, not before.

DOCS_NY:39826.11 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-6    Filed 12/09/22    Page 1123 of 1392    PageID 15865
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1012 of 1803    PageID 11758
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 13 of 16

Debtor, James, Dondero, or Mark Okada.  (Hurst Decl, ¶ 5.)  Mr. Ellington's retention in the

*Imel* litigation was in Mr. Ellington's individual capacity, not in his capacity as the Debtor's

general counsel, and was limited to Mr. Ellington preparing a six page expert report and offering

his deposition and trial testimony.  As such, Mr. Ellington's retention by Lynn Pinker was not a

representation by Lynn Pinker of the Debtor or any of the Debtor's interested parties.  The *Imel*

litigation concluded in 2018.

26.    **Charitable Donor Advised Fund, L.P. ("Charitable DAF"):**  Despite

Acis's attempts to kick up mud, Lynn Pinker's representation of Charitable DAF is *not* related to

the Debtor's bankruptcy.  Charitable DAF is proceeding against U.S. Bank, N.A., and U.S. Bank,

N.A., is not a party in interest in this case.[14]  Further, Acis admits that Lynn Pinker's

representation of Charitable DAF is at best a step removed from even the Acis Litigation.  Acis

has not alleged that Charitable DAF's proceedings are connected to the Debtor's bankruptcy

proceedings.

27.    **CLO Holdco, Ltd.:**  As disclosed in the O'Neil Affidavit, Foley has not

represented CLO Holdco, Ltd., since approximately May 2018, and, on information and belief,

CLO Holdco, Ltd. has retained separate counsel to represent it in the Debtor's bankruptcy.

28.    **Foley and Lynn Pinker's Prepetition Claims:**  Acis alleges that Foley's

and Lynn Pinker's prepetition claims render them adverse to the Debtor.  While this could be

true with respect to professionals engaged under 11 U.S.C. § 327(a),[15] it is not true with respect

---

[14] As disclosed in the Hurst Declaration, Lynn Pinker also represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund in confidential matters unrelated to the Debtor's bankruptcy.

[15] *See, e.g., Staiano v. Pillowtex (In re Pillowtex, Inc.)*, 304 F.3d 246 (3rd Cir. 2002).

Appellee Appx. 01006

APPX. 15955

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-5 Filed 12/19/24 Page 1124 of 1392 PageID 15866
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1013 of 1803 PageID 11759
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 14 of 16

to professionals, like Foley and Lynn Pinker, seeking retention under 11 U.S.C. § 327(e).

Instead, Section 327(e) contemplates professionals having and retaining prepetition claims

against a debtor so long as they do not "hold any interest adverse to the debtor or to the estate

***with respect to the matter on which such attorney is to be employed***." 11 U.S.C. § 327(e)

(emphasis added); *see also* Colliers on Bankruptcy, 16th ed., ¶327.04[0]. Consequently, Foley

and Lynn Pinker would be disqualified from representing the Debtor under Section 327(e) in the

Acis Litigation and Terry Litigation only if they had a conflict with respect to those specific

matters. They do not, and Acis's allegation of a debilitating conflict on account of their

prepetition claims is not well founded.

29. **Winstead's Conflict of Interest:** Unlike Acis and its counsel, the Debtor

does not wish to litigate in this Court matters properly before another court. However, to clarify

the record, the Debtor believes that it is important to distinguish Foley and Lynn Pinker's

representation of the Debtor in the Acis Litigation from Winstead's representation of both Acis's

Chapter 11 Trustee and Mr. Terry in the Acis Bankruptcy. This matter is currently being

litigated and is referred to as the Winstead Matter above.

30. Mr. Terry was, and currently is, a creditor of Acis, and he was, and

currently is, represented by Winstead in the filing of his involuntary petitions against Acis.

Concurrently with its representation of Mr. Terry as a substantial creditor of Acis (and while the

orders for relief were on appeal), Winstead sought and was retained by the Chapter 11 trustee in

Acis's bankruptcy under 11 U.S.C. § 327(a).[16] Consequently, Winstead represented both Acis's

---

[16] *See Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. May 30, 2018) [Docket No. 246], attached hereto as Exhibit I, and *Order (I) Approving the Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee and (II) Denying the Motion to*

14

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 10/25/26    Page 1125 of 1392    PageID 15867
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1014 of 1803    PageID 11760
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 15 of 16

Chapter 11 trustee and one of Acis's largest creditors at the same time despite being opposed to

Acis in the prosecution of the involuntary petitions.  Further, both the approval of the involuntary

petition and the confirmation of Acis's chapter 11 plan, respectively, are actively being appealed.

Winstead is thus representing Mr. Terry in his action to put Acis into bankruptcy while also

representing Acis's Chapter 11 trustee in the confirmation of Acis's bankruptcy plan.

       31.    Winstead's situation in the Acis Bankruptcy is thus wildly different from

Foley and Lynn Pinker's in the Debtor's bankruptcy.  Neither Foley nor Lynn Pinker have a

conflict of interest with respect to their representation of the Debtor in the Acis and Terry

Litigation.  Unlike Winstead, they have also never been directly or indirectly adverse to their

clients.  In addition, Foley and Lynn Pinker are being retained under 11 U.S.C. § 327(e) in the

Debtor's bankruptcy as special litigation counsel; they are not being retained as the Debtor's

bankruptcy counsel under Section 327(a).

*[Remainder of Page Intentionally Blank]*

---

*Disqualify Winstead PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee*, Case No. 18-30264-
SGJ-11 (Bankr. N.D. Tex. June 21, 2018) [Docket No. 313], attached hereto as Exhibit J.

Appellee Appx. 01008

APPX. 05259

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68.3   Filed 12/09/20   Page 1126 of 1392   PageID 15868
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1015 of 1803   PageID 11761
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 16 of 16

WHEREFORE, for the reasons set forth above, the Debtor's proposed retention of

(i) Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, and (ii) Lynn Pinker Cox &

Hurst LLP as Special Texas Litigation Counsel are in the best interests of the Debtor's estate and

should be approved on the terms set forth in the Applications.


Dated:  November 21, 2019              PACHULSKI STANG ZIEHL & JONES LLP


                                       */s/ James E. O'Neill*
                                       Richard M. Pachulski (CA Bar No. 62337)
                                       Jeffrey N. Pomerantz (CA Bar No.143717)
                                       Ira D. Kharasch (CA Bar No. 109084)
                                       Maxim B. Litvak (CA Bar No. 215852)
                                       James E. O'Neill (DE Bar No. 4042)
                                       919 North Market Street, 17th Floor
                                       Wilmington, DE 19899 (Courier 19801)
                                       Telephone: (302) 652-4100
                                       Facsimile:  (302) 652-4400
                                       E-mail:    rpachulski@pszjlaw.com
                                                  jpomerantz@pszjlaw.com
                                                  ikharasch@pszjlaw.com
                                                  mlitvak@pszjlaw.com
                                                  joneill@pszjlaw.com

                                       *Proposed Counsel for the Debtor*
                                       *and Debtor in Possession*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 69.85    Filed 10/09/26 1804e    Page 1127 of 1392    PageID 15869
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1016 of 1803    PageID 11762

# Exhibit A

**Supplemental Hurst Declaration**

Appellee Appx. 01010

APPX. 05262

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 11/29/22   Page 1128 of 1392   PageID 15870
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1017 of 1803   PageID 11763
Case 19-12239-CSS   Doc 159-1   Filed 11/21/19   Page 2 of 5

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**SUPPLEMENTAL DECLARATION OF MICHAEL K. HURST IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Michael K. Hurst, declare under penalty of perjury as follows:

1.      I am a partner with the law firm of Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), located in Dallas, Texas. I am submitting this supplemental declaration ("Declaration") in further support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2]

2.      In the *Declaration of Michael K. Hurst in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP, as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, dated October 29, 2019 [Docket No. 70-2], I disclosed, that the Firm has represented (a) the Debtor since March 2016; (b) certain other entities related to the Debtor, including the Cayman Defendants in the Pending Acis Proceedings and the defendants in the Texas Lawsuit who are executives of the Debtor; and (c)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/09/22    Page 1129 of 1392    PageID 15871
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1018 of 1803    PageID 11764
Case 19-12239-CSS    Doc 159-1    Filed 11/21/19    Page 3 of 5

the Charitable DAF (the Charitable Donor Advised Fund, L.P.) in a case unrelated to the Debtor

pending before the Southern District of New York, case number 1:19-cv-09857-NRB.

        3.      To supplement that prior disclosure, as of the Petition Date, the Firm

specifically represented the Debtor and the following entities related to the Debtor in the following

matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) | Debtor |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.,* Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Highland HCF Advisors, Ltd.,<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) | Debtor |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) | Debtor |
| *Joshua N. Terry, Individually and on Behalf of IRAs #146771 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) | Debtor<br><br>J. Dondero<br><br>T. Surgent |
| *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association*, Case No. 1:19-cv-09857-NRB (S.D.N.Y. 2019) | Charitable DAF |

        4.      In addition, the Firm represents the following entities related to the Debtor

in a non-public matter:  (i) NexPoint Strategic Opportunities Fund, (ii) Highland Global Allocation

Fund, and (iii) Highland Income Fund.  The Firm inadvertently failed to disclose this

representation as the representation is limited and involves a non-public matter not related to the

Debtor's bankruptcy.

        5.      Additionally, in 2018, the Firm, along with the Pettit Law Firm, retained

Scott Ellington, the Debtor's general counsel, to act as an expert witness in *Robert A. Imel v.*

*Legacy Texas Bank, N.A. and Energy Reserves Group, LLC*, Cause No. DC-16-01372 (134th

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 12/02/26 of 1804e 1130 of 1392    PageID 15872
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1019 of 1803    PageID 11765
Case 19-12239-CSS    Doc 159-1    Filed 11/21/19    Page 4 of 5

Judicial District Court of Dallas County, Texas). The *Imel* litigation was wholly unrelated to the Debtor and did not involve the Debtor or any entities affiliated or related to the Debtor, James, Dondero, or Mark Okada. Mr. Ellington's retention in the *Imel* litigation was in Mr. Ellington's individual capacity, not in his capacity as the Debtor's general counsel, and was limited to Mr. Ellington preparing a six page expert report and offering his deposition and trial testimony. Mr. Ellington was retained by the Firm and the Pettit Law Firm in the *Imel* litigation. The Firm's retention of Mr. Ellington was not previously disclosed as the Firm was not retained to provide legal services to Mr. Ellington. The *Imel* litigation concluded in 2018.

6.      The Firm, as a matter of practice, does not have an engagement letter with the Debtor or any entities related to the Debtor that it represents. However, as previously disclosed, with respect to all matters, the Debtor has (subject to Court approval) agreed to compensate the Firm on an hourly basis at rates that do not (and will not) exceed the rates that the Firm customarily charges to its other clients for work of this type. As of the Petition Date, the applicable hourly rates for timekeepers for the matters that the Firm is engaged to perform legal services ranged from $365 to $800 for attorneys and $180 to $235 for paraprofessionals. The Firm will also charge the Debtor for certain expenses incurred in connection with providing services to the Debtor, including, without limitation, travel, lodging, vendor charges, delivery services and other expenses incurred in providing professional service, and for other services actually provided, including word processing and other charges, excluding secretarial overtime.

7.      The Firm did not bill the Debtor any amounts prior to the Petition Date in contemplation of the Debtor's bankruptcy filing. Any amounts billed and paid prior to the Petition Date by the Debtor were in connection with the matters set forth above.

DOCS_NY:39835.3 36027/002

Appellee Appx. 01013
APPX. 15265

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85    Filed 02/09/26   Exhibit 6    Page 1126 of 1704   Page 1131 of 1392    PageID 15873
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1020 of 1803    PageID 11766
Case 19-12239-CSS    Doc 159-1    Filed 11/21/19    Page 5 of 5

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Dated:  November 21, 2019

/s/ Michael K. Hurst

Michael K. Hurst, Partner

DOCS_NY:39835.3 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66-6    Filed 12/02/22    Page 1132 of 1392    PageID 15874
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1021 of 1803    PageID 11767
Case 19-12239-CSS    Doc 159-2    Filed 11/21/19    Page 1 of 4

# Exhibit B

**Supplemental O'Neil Declaration**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68.35    Exhibit 35    Filed 11/02/23    Page 1133 of 1392    PageID 15875
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1022 of 1803    PageID 11768
Case 19-12239-CSS    Doc 159-2    Filed 11/21/19    Page 2 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) |

**SUPPLEMENTAL DECLARATION OF HOLLAND N. O'NEIL IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Holland N. O'Neil, declare under penalty of perjury as follows:

1.     I am a partner with the law firm of Foley Gardere, Foley & Lardner LLP (the "Firm"), and I maintain my office in Dallas, Texas.[2]  I am submitting this supplemental declaration ("Declaration") in further support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[3]

2.     In the *Declaration of Holland N. O'Neil in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date*, dated October 29, 2019 [Docket No. 69-2] (the "Initial Declaration"), I disclosed that the Firm has represented the Debtor and

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] The Firm has offices in Austin, Boston, Chicago, Dallas, Denver, Detroit, Houston, Jacksonville, Los Angeles, Madison, Mexico City, Miami, Milwaukee, New York, Orlando, Sacramento, San Diego, San Francisco, Silicon Valley, Tallahassee, Tampa, Washington, D.C., Brussels and Tokyo.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/02/24   Page 1134 of 1392   PageID 15876
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1023 of 1803   PageID 11769
Case 19-12239-CSS   Doc 159-2   Filed 11/21/19   Page 3 of 4

certain other related entities, including Neutra, HCLOF and the Cayman Defendants since April

2018 in the Acis Proceedings.

    3.     To supplement that prior disclosure, as of the Petition Date, the Firm

specifically represents the Debtor and the following entities related to the Debtor in the following

matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Neutra Limited |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.,* Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Highland HCF Advisors, Ltd.,<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) | Neutra Limited |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) | Debtor<br><br>Neutra Limited |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) | Debtor |

    4.     As disclosed in the Firm's engagement letter attached to the Initial

Declaration, the Firm initially sought a conflict waiver with respect to HRA Holdings, LLC, when

it entered into that engagement letter. At that time, the Debtor was contemplating a potential

investment in HRA Holdings, LLC, another Foley client. That investment never occurred, and the

Firm does not believe that a conflict ever arose.

    5.     The Firm previously represented CLO Holdco, Ltd., in matters unrelated to

the Debtor's bankruptcy. Since approximately May 2018, the Firm has not represented CLO

Holdco, Ltd.

4850-8126-8394.6

Appellee Appx. 01017
APPX. 15269

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 10/25/26 of 1804e 1135 of 1392    PageID 15877
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1024 of 1803    PageID 11770
Case 19-12239-CSS    Doc 159-2    Filed 11/21/19    Page 4 of 4

6.      The Firm did not bill the Debtor any amounts prior to the Petition Date in contemplation of the Debtor's bankruptcy filing.  Any amounts billed and paid prior to the Petition Date by the Debtor were in connection with the matters set forth above.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 21, 2019

/s/ Holland N. O'Neil
_____
Holland N. O'Neil, Partner

4850-8126-8394.6

Appellee Appx. 01018
APPX. 15829

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 12/02/22   Page 1136 of 1392   PageID 15878
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1025 of 1803   PageID 11771

Case 19-12239-CSS   Doc 159-3   Filed 11/21/19   Page 1 of 6

# EXHIBIT C

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 02/27/24    Page 1137 of 1392    PageID 15879
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1026 of 1803    PageID 11772
Case 19-12239-CSS    Doc 159-3    Filed 11/21/19    Page 2 of 6

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-12239 (CSS) |
| Debtor. | |

**DECLARATION OF BRADLEY SHARP IN SUPPORT OF DEBTOR'S
APPLICATIONS (I) FOR AN ORDER AUTHORIZING THE RETENTION AND
EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL
TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE, AND (II) FOR AN
ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER
COX & HURST, LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO
TUNC* TO THE PETITION DATE**

I, Bradley Sharp, hereby declare under penalty of perjury:

1.    I am the proposed Chief Restructuring Officer of Highland Capital Management,
L.P., the above-captioned debtor and debtor in possession (the "Debtor").

2.    I submit this declaration (the "Declaration") in support of the *Debtor's
Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley &
Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Foley
Application") and *Debtor's Application for an Order Authorizing the Retention and Employment
of Lynn Pinker Cox & Hurst, LLP, as Special Texas Litigation Counsel, Nunc Pro Turn to the
Petition Date* (the "Lynn Pinker Application," and together with the Foley Application, the
"Applications").[2]  Except as otherwise noted, I have personal knowledge of the matters set forth
herein.

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Applications.

4850-8126-8394.6

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-6   Filed 02/28/24   Page 1138 of 1392   PageID 15880
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1027 of 1803   PageID 11773

Case 19-12239-CSS      Doc 159-3   Filed 11/21/19   Page 3 of 6

3.      This Declaration is being submitted to supplement the (i) *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 69-6], and (ii) *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 70-5].

4.      Prior to the Petition Date, Foley and/or Lynn Pinker represented the Debtor and certain the Debtor's related entities in the following matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) (the "Acis Bankruptcy") | Debtor (Foley/Lynn Pinker)<br><br>Neutra Limited (Foley) |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.*, Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) ("Adversary Proceeding") | Debtor (Foley/Lynn Pinker)<br><br>Highland HCF Advisors, Ltd. (Foley/Lynn Pinker)<br><br>Highland CLO Management, LLC (Foley/Lynn Pinker)<br><br>Highland CLO Holdings, Ltd. (Foley/Lynn Pinker) |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) ("Neutra Appeal") | Neutra (Foley) |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) ("Debtor Appeal") | Debtor (Foley/Lynn Pinker)<br><br>Neutra (Foley) |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) ("Winstead Matter") | Debtor (Foley/Lynn Pinker) |
| *Joshua N. Terry, Individually and on Behalf of IRAs #146711 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) (the "Terry Litigation") | Debtor (Lynn Pinker)<br><br>J. Dondero (Lynn Pinker)<br><br>T. Surgent (Lynn Pinker) |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/02/22    Page 1139 of 1392    PageID 15881
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1028 of 1803    PageID 11774

Case 19-12239-CSS    Doc 159-3    Filed 11/21/19    Page 4 of 6

5.      Prior to the Petition Date, the Debtor paid Foley's and/or Lynn Pinker's legal fees and expenses with respect to the Debtor and all the Debtor's related entities in the foregoing matters.

6.      On advice of counsel, I understand that all matters except for the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter are stayed and will remain stayed during the pendency of the Debtor's case.

7.      I believe that it is in the best interests of its estate to continue paying the legal fees incurred by the Debtor's related entities in the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter during the pendency of this bankruptcy case for the following reasons:

8.      <u>Neutra Appeal</u>:  The economic interests in Neutra are owned, indirectly, 25% by Mr. Okada and 75% by Mr. Dondero.  As a special purpose entity, Neutra, however, has no assets, and had no assets prior to the Acis Bankruptcy except for its interests in Acis. Although the Debtor is not a direct appellant in the Neutra Appeal, if Neutra is successful in the Neutra Appeal, I believe that Neutra will regain its interests in Acis and that Neutra intends to cause certain services and advisory agreements to revert back to the Debtor.  The Debtor then would be in a position to earn revenue from those agreements, as it did prior to the filing of the involuntary bankruptcy petitions against Acis LP and Acis GP and prior to its contracts being terminated in the Acis Bankruptcy.  By way of example, in the one year period prior to the filing of the involuntary petitions, Acis LP compensated the Debtor more than $12 million for its services.

9.      If the Neutra Appeal is successful, I believe that Neutra will regain its interest in Acis and Acis will also be required to pay the Debtor (i) approximately 85% of its

Appellee Appx. 01022
APPX. 15874

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6.35   Filed 12/03/26 1 of 1704   Page 1140 of 1392   PageID 15882
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1029 of 1803   PageID 11775
Case 19-12239-CSS   Doc 159-3   Filed 11/21/19   Page 5 of 6

revenue for services provided under the services agreements and (ii) for its claims against Acis for pre- and postpetition services rendered, which are currently in excess of $8 million. As such, it is estimated that Acis would owe approximately four years of revenue to the Debtor, including payment of services and pay down of the $8 million previously accrued and unpaid. For that reason, I also believe that Mr. Dondero and Mr. Okada, as the holders of the economic interests in Neutra, will likely not see a return on their equity for some time.

10.     For the foregoing reasons, I believe paying Neutra's fees in the Neutra Appeal, the Acis Bankruptcy, and the Debtor Appeal makes economic sense for the Debtor, but does not make sense for Mr. Dondero, Mr. Okada, or any other party as they would not see a return on that investment for a significant amount of time.

11.     Acis Bankruptcy and Debtor Appeal: In addition to paying the Debtor's legal fees and expenses, the Debtor historically paid Foley's fees for Neutra, a non-Debtor, in the Acis Bankruptcy and the Debtor Appeal as, discussed above, Neutra's economic interests are owned, indirectly, 25% by Mark Okada and 75% by James Dondero. As a special purpose entity, Neutra has no assets.

12.     Winstead Matter: The Debtor is the only party to the Winstead Matter, and the Debtor intends to continue paying Lynn Pinker's and Foley's fees for the Debtor subject to this Court's approval.

13.     Prior to the Petition Date, the majority of Foley's and Lynn Pinker's fees and expenses were paid by a non-Debtor entity, Highland CLO Funding, Ltd. ("HCLOF").[3] The Debtor owns less than 1% of the economic interest in HCLOF. As part of HCLOF's agreement with the Debtor, HCLOF indemnifies the Debtor if the Debtor incurs any legal fees on HCLOF's

---

[3] HCLOF is represented by the law firm, King & Spalding, and is not represented by Foley or Lynn Pinker. HCLOF pays King & Spalding's fees and expenses directly.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58 ded 1/09/26 Page 1141 of 1392   PageID 15883
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1030 of 1803   PageID 11776

behalf.  Pursuant to that indemnification, HCLOF, prior to the Petition Date, either paid directly or reimbursed the Debtor for the majority of Foley's and Lynn Pinker's fees and expenses incurred in the matters set forth above.  I understand, based on the advice of counsel, that a substantial portion of Foley's and Lynn Pinker's fees and expenses may continue to be reimbursed by HCLOF following the Petition Date but that the exact amount of such reimbursement is not yet known.

14.    Although the Debtor has paid certain of Lynn Pinker's and Foley's invoices for the services it provided in the matters set forth above, all prepetition payments to such firms were made in connection with the matters set forth above and not in contemplation of the Debtor's bankruptcy filing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:    November 21, 2019

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ Bradley Sharp
Bradley Sharp
Proposed Chief Restructuring Officer

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86-6   Filed 11/03/23   Page 1142 of 1392   PageID 15884
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1031 of 1803   PageID 11777

Case 19-12239-CSS    Doc 159-4    Filed 11/21/19    Page 1 of 54

# EXHIBIT D

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/03/26   Page 1143 of 1392   PageID 15885
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1032 of 1803   PageID 11778
Case 18-30264-sgj11   Claim 52-1   Filed 08/01/18   Desc Main Document   Page 1 of 3

**Fill in this information to identify the case:**

Debtor 1    Acis Capital Management, L.P.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Northern District of Texas

Case number   18-30264-sgj11

## Official Form 410
# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Highland Capital Management, L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Holland O'Neil, Foley Gardere, Foley & Lardner
Name

2021 McKinney Ave, Suite 1600
Number    Street

Dallas                    TX        75201
City              State           ZIP Code

Contact phone  214-999-3000

Contact email  honeil@foley.com

Where should payments to the creditor be sent? (if different)

Scott Ellington, Highland Capital Management
Name

300 Crescent Court, Suite 700
Number    Street

Dallas                    TX        75201
City              State           ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Official Form 410                    **Proof of Claim**                    page 1

Appellee Appx. 01026
APPX. 15827

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-16   Exhibit 35   Page 2 of 3   Page 1144 of 1392   PageID 15886
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1033 of 1803   PageID 11779

Case 18-30265-sgj11   Claim 227   Part 3   Filed 08/01/18   Desc Main Document   Page 2 of 54   Page 2 of 3

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| 6. | Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |
|---|---|---|

| 7. | How much is the claim? | $ ___4,672,140.38___ . Does this amount include interest or other charges?<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
|---|---|---|

| 8. | What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Sub-Advisory Services and Shared Services |
|---|---|---|

| 9. | Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property: $ _____<br>Amount of the claim that is secured: $ _____<br><br>Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition: $ _____<br><br>Annual Interest Rate (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |
|---|---|---|

| 10. | Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____ |
|---|---|---|

| 11. | Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |
|---|---|---|

Appellee Appx. 01027
Appx. 15879

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8835    Filed 10/31/22    Page 1145 of 1392    PageID 15887
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1034 of 1803    PageID 11780

Case 18-30264-sgj11-12-23-sgj-CS7    Filed 08/01/18    Filed 12/11/18    Page 4 of 54    Page 3 of 3

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(_3_) that applies. | $ 2,049,564.35 |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  08/01/2018
                  MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Scott Ellington | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | General Counsel | | |
| Company | Highland Capital Management, L.P. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 300 Crescent Court, Suite 700 | | |
| | Number       Street | | |
| | Dallas | TX | 75201 |
| | City | State | ZIP Code |
| Contact phone | | Email | |

Appellee Appx. 01028
APPX. 16239

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Exhibit 6    Filed 10/26/26    Page 1 of 5    Page 1146 of 1392    PageID 15888
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1035 of 1803    PageID 11781
Case 18-30264-sgj11    Doc 2153-9    Filed 08/01/18    Desc Exhibit A 54 Page 1 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

## EXHIBIT A TO PROOF OF CLAIM

1.    <u>Claimant</u>:  Highland  Capital  Management,  L.P.  ("**Highland**")  maintains  its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim (the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below), Highland provided sub-advisory and shared services to the Debtors (defined below). Highland has provided portfolio management and advisory services to the Debtors pursuant to that certain Third  Amended  and  Restated  Sub-Advisory  Agreement  by  and  between  the  Debtors  and Highland  dated  March  17,  2017  ("**Sub-Advisory  Agreement**")  (**Exhibit  1**).  Specifically, Highland has acted as an investment manager and has identified, evaluated, and recommended investments to investment vehicles advised or sub-advised by the Debtors.  Highland has also provided  the  Debtors  with  back  and  middle  office  services  pursuant  to  that  certain  Fourth Amended and Restated Shared Services Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the Debtors  with  all  of  the  employees  and  staff  necessary  to  manage  the  portfolios.   Highland continued to provide the same sub-advisory and shared services to the Debtors throughout the Gap Period (defined below). To date, Highland continues to provide such services.

2.    <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the "**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the United States Bankruptcy Court for the Northern District of Texas. Highland provides the service at the following address:  300 Crescent Court, Suite 700, Dallas, Texas 75201.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/07/23 Page 1147 of 1392    PageID 15889
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1036 of 1803    PageID 11782
Case 18-30265-sgj11    Doc 237    Part 2    Filed 08/01/21    Desc Exhibit A    Page 2 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

3.    Indebtedness: Because the Debtors were put into bankruptcy involuntarily, the

amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims

(defined below).

a.    Pre-Petition: Joshua Terry, the petitioning creditor, filed the involuntary

petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the

outstanding indebtedness owing from the Debtors to Highland was as set forth below by

account number:

| Invoice | Type | Balance |
|---|---|---|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
| | **Totals** | **$2,622,576.03** |

b.    Gap Period: When a debtor files bankruptcy, the order for relief is

typically entered on the date the petition is filed. However, an involuntary bankruptcy

case diverges from the simultaneous entry of an order for relief in that an order for relief

is entered at a later date than when a petition is filed. This creates a period of time,

referred to as the "gap period", where the debtor may accrue post-petition but pre-order

for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the
> debtor's business or financial affairs after the commencement of
> the case but before the earlier of the appointment of a trustee and
> order for relief shall be determined as of the date such claim arises,
> and shall be allowed under subsection (a), (b), or (c) of this
> section…the same as if such claim had arisen before the date of the
> filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-35   Filed 12/18/24   Page 1148 of 1392   PageID 15890
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1037 of 1803   PageID 11783
Case 18-30264-sgj11   Doc 527   Part 2-5   Filed 08/01/18   Desc   Exhibit A   Page 3 of 5

***In re Acis Capital Management, L.P.-* Case No. 18-30264**
***In re Acis Capital Management, G.P.-* Case No. 18-30265**
**United States Bankruptcy Court for the Northern District of Texas**

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
| | **Totals** | **$2,049,564.35** |

c.    Reservation of Rights as to Administrative Claim: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.    Indemnity Claims: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement,  "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16.8.5    Filed 10/29/24    Page 1149 of 1392    PageID 15891
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1038 of 1803    PageID 11784
Case 18-30264-sgj11    Doc 637    Part 2-57    Filed 08/01/21    Desc Exhibit A    Page 4 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30266
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

    4.    <u>Reservation of Rights; Other Rights</u>: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

    5.    <u>Notices</u>: All notices to Highland are to be sent to:

    Highland Capital Management, L.P.
    Attn: David Klos
    300 Crescent Court
    Suite 700
    Dallas, Texas 75201

    *with copies to:*

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/04/26 of 1804  Page 1150 of 1392   PageID 15892
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1039 of 1803   PageID 11785
Case 18-30264-sgj11   Doc 257   Filed 08/01/21/De   Page 9 of 54  Page 5 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Foley Gardere
Foley & Lardner, LLP
c/o Holland O'Neil
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

6.  <u>Payments</u>:  All payments and distributions to Highland with respect to this proof

of claim are to be made as follows:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201
Re:  *In re Acis Capital Management, L.P.*

7.  <u>Miscellaneous</u>:  This proof of claim is filed under compulsion of the bar date

established in this bankruptcy case solely out of an abundance of caution to protect Highland

from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this

proof of claim shall not be construed as an admission by Highland as to the amounts due and

owing outside of this bankruptcy proceeding. The filing of this proof of claim is **not:**  (a) a

waiver or release of and/or Highland's rights or remedies against any person, entity or property;

(b) a consent by Highland to entry of final judgment by this Court in any core proceeding

commenced in this bankruptcy case, consistent with the United States Supreme Court's holding

in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the

reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury

trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a

waiver of the right to assert a different or enhanced classification of priority for its Claim in

respect of the other claims asserted in this bankruptcy case.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86-6   Page 1 of 21e 1151 of 1392   PageID 15893
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1040 of 1803   PageID 11786

Case 18-30264-sgj11   Doc 159-4   Filed 08/01/18   Desc Exhibit D Page 1 of 21

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

**Appellee Appx. 01034**

**Appx. 15236**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-36   Filed 12/04/24   Page 1152 of 1392   PageID 15894
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1041 of 1803   PageID 11787
Case 18-30264-sgj11   Doc 1359-6   Filed 08/01/21   Desc Exhibit 11   Page 2 of 21

# TABLE OF CONTENTS

**Page**

1.   Appointment; Limited Scope of Services ................................................................. 1

2.   Compensation ........................................................................................................ 3

3.   Representations and Warranties............................................................................ 3

4.   Standard of Care; Liability; Indemnification. ....................................................... 4

5.   Limitations on Employment of the Sub-Advisor; Conflicts of Interest................ 7

6.   Termination; Survival ........................................................................................... 8

7.   Cooperation with Management Company ............................................................. 8

8.   Management Agreements and Related Agreements ............................................. 8

9.   Amendments; Assignments .................................................................................. 9

10.  Advisory Restrictions............................................................................................ 9

11.  Records; Confidentiality. ..................................................................................... 10

12.  Notice .................................................................................................................... 11

13.  Governing Law ..................................................................................................... 11

14.  WAIVER OF JURY TRIAL ................................................................................. 11

15.  Severability .......................................................................................................... 11

16.  No Waiver ............................................................................................................. 11

17.  Counterparts ........................................................................................................ 12

18.  Third Party Beneficiaries .................................................................................... 12

19.  No Partnership or Joint Venture ......................................................................... 12

20.  Entire Agreement ................................................................................................ 12

Appellee Appx. 01035
APPX. 15235

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-15  Page 1242 of 1704  Page 1153 of 1392    PageID 15895
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1042 of 1803    PageID 11788
Case 18-30264-sgj11   Doc 1239-6   Doc 27   Doc 159-4   Filed 08/01/18/21/   Desc Exhibit 21   Page 3 of 21

**THIRD AMENDED AND RESTATED
SUB-ADVISORY AGREEMENT**

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.    Appointment; Limited Scope of Services.

(a)    Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/04/26 1874e 1154 of 1392    PageID 15896
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1043 of 1803    PageID 11789
Case 18-30264-sgj11 22339-0627 Doc 359 Filed 08/01/21 Desc Exhibit 131 Page 4 of 21

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of <u>Section 8</u>, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)      Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)      make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)      place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)      identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)      assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)      provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)      assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)      assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "<u>Services</u>."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

Appellee Appx. 01037
APPX. 05839

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 02/24/25    Page 1155 of 1392    PageID 15897
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1044 of 1803    PageID 11790
Case 18-30264-sgj11    Doc 39-6    Filed 08/01/18    Desc Exhibit 14    Page 5 of 21

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)    The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.    <u>Compensation</u>.

(a)    As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)    Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)    Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)    From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.    <u>Representations and Warranties</u>.

(a)    Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)    it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-16    Exhibit 6    Filed 10/24/62    Page 1156 of 1392    PageID 15898
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1045 of 1803    PageID 11791
Case 18-30264-sgj11    Doc 39-06    Filed 12/15/07    Part 159-4    Filed 08/01/11    Desc Exhibit 5    Page 6 of 21

        (ii)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

        (iii)    no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

        (iv)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

        (b)     The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

        (c)     The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

        4.     Standard of Care; Liability; Indemnification.

        (a)     Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

Appellee Appx. 01039
APPX. 15240

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)        <u>Exculpation</u>.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "<u>Covered Person</u>") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "<u>Management Company Related Parties</u>"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01040

APPX. 05242

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/04/26 of 1804   Page 1158 of 1392   PageID 15900
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1047 of 1803   PageID 11793
Case 18-30264-sgj11   Doc 527-9   Filed 08/01/21   Desc Exhibit 7   Page 8 of 21

(c)    <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)    <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

6

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-5   Filed 10/09/26 of 1804ge 1159 of 1392   PageID 15901
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1048 of 1803   PageID 11794
Case 18-30264-sgj11   Doc 3596-5   Filed 08/01/21   Desc Exhibit 18   Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e)     <u>Rights of Heirs, Successors and Assigns</u>.  The indemnification rights provided by <u>Section 4(c)</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f)     <u>Reliance</u>.  A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)     <u>Rights Under Management Agreements and Related Agreements</u>.  The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to <u>Section 8</u> if such indemnification and exculpation rights are not reasonably acceptable to it.

5.     <u>Limitations on Employment of the Sub-Advisor; Conflicts of Interest</u>.

(a)     The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)     So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Appellee Appx. 01042
APPX. 05244

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 66-36   Filed 12/05/26 of 1392   PageID 15902
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1049 of 1803   PageID 11795
Case 18-30264-sgj11   Doc 659   Part 159   Filed 06/01/21   Desc Exhibit 4   Page 10 of 21

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

6.     Termination; Survival.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     Cooperation with Management Company.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     Management Agreements and Related Agreements.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

Appellee Appx. 01043

APPX. 05245

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68 85    Page 1 of 21 Page 1161 of 1392    PageID 15903
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1050 of 1803    PageID 11796
Case 18-30264-sgj11 23-C 8-S27 Doc 159 Filed 08/01/21 Page 20 of 54 Page 11 of 21

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9.    <u>Amendments; Assignments</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)    Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)    The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.    <u>Advisory Restrictions</u>.  This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof.  It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-6    Filed 11/05/22    Page 1162 of 1392    PageID 15904
Exhibit 6    Page 21 of 1744
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1051 of 1803    PageID 11797
Case 18-30264-sgj11    Doc 527    Part 59    Filed 04/11/19    Desc Exhibit 21 of 54    Page 12 of
21
Case 18-30264-sgj11    Doc 539-6    Filed 08/01/18    Document 1    Page 11 of 54

11.  <u>Records; Confidentiality</u>.

(a)    The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)    The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01045
APPX. 15297

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-35   Filed 11/03/22   Page 1163 of 1392   PageID 15905
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1052 of 1803   PageID 11798
Case 18-30264-sgj11   Doc 63-27   Part 159-Filed 08/01/21   Desc Exhibit 22 of 54   Page 13 of
21

12.     <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

    (a)     If to the Management Company:

        Acis Capital Management, L.P.
        300 Crescent Court
        Suite 700
        Dallas, TX 75201

    (b)     If to the Sub-Advisor:

        Highland Capital Management, L.P.
        300 Crescent Court
        Suite 700
        Dallas, TX 75201

13.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.     <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.     <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.     <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 2/05/26    Page 1164 of 1392    PageID 15906
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1053 of 1803    PageID 11799
Case 18-30264-sgj11    Doc 1239-6    Filed 06/01/18    Entered 06/01/18    Page 14 of 21

17.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.    <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.    <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.    <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Appellee Appx. 01047
APPX. 15299

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 10/25/26 1392   Page 1165 of 1392   PageID 15907
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1054 of 1803   PageID 11800
Case 18-30264-sgj11   Doc 1239-6 S27 Doc 159 Filed 02/01/21/19 Desc Exh 24 of 54 Page 15 of
21

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President


ACIS CAPITAL MANAGEMENT, L.P.,
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 3-6   Filed 11/05/26 of 1804e   Page 1166 of 1392   PageID 15908
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21     Page 1055 of 1803   PageID 11801

## Appendix A

     The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

*[Remainder of Page Intentionally Left Blank]*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-5   Filed 11/29/23   Page 1167 of 1392   PageID 15909
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1056 of 1803   PageID 11802
Case 18-30264-sgj11   Doc 1239-6   Filed 11/21/19   Page 17 of 21

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

Appellee Appx. 01050
APPX. 15302

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-36   Filed 12/08/24   Page 1168 of 1392   PageID 15910
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1057 of 1803   PageID 11803
Case 18-30264-sgj11   Doc 658-27   Part 159   Filed 02/01/21   Desc Exhibit 27   Page 18 of
21

## APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account.  Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise.  Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)   serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)   receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)   be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)   be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)   sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)   underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

B-1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8.36   Exhibit B   Page 21 of 1392   Page 1169 of 1392   PageID 15911
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1058 of 1803   PageID 11804
Case 18-30264-sgj11   Doc 1123-6   Filed 08/01/18   Entered 08/01/18   Desc Part 59   Filed 08/01/18   Desc Exhibit 20 of 54   Page 19 of
21

(g)     serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)     act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Appellee Appx. 01052
APPX. 015804

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/06/24   Page 1170 of 1392   PageID 15912
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1059 of 1803   PageID 11805
Case 18-30264-sgj11   Doc 637-4   Filed 08/01/18   Page 20 of 21

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making an investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Appellee Appx. 01053
APPX. 15804

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-36    Filed 12/06/24    Page 1171 of 1392    PageID 15913
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1060 of 1803    PageID 11806
Case 18-30264-sgj11    Doc 689-5    Part 59    Filed 08/11/21    Desc Exhibit 4    Page 21 of
21

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Appellee Appx. 01054
APPX. 05806

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-6   Filed 12/06/22   Page 1172 of 1392   PageID 15914
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1061 of 1803   PageID 11807

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-5   Filed 11/06/23   Page 1173 of 1392   PageID 15915
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1062 of 1803   PageID 11808
Case 18-30264-sgj11   Doc 637   Part 4-9   Filed 08/01/21   Desc Exhibit 22 of 54   Page 2 of 24

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ............................................................................................ 2

    Section 1.01     Certain Defined Terms ........................................................ 2

    Section 1.02     Interpretation .................................................................... 3

ARTICLE II SERVICES ............................................................................................... 4

    Section 2.01     General Authority. ............................................................ 4

    Section 2.02     Provision of Services. ...................................................... 4

    Section 2.03     Shared Employees ............................................................ 6

    Section 2.04     Applicable Asset Criteria and Concentrations. ................... 8

    Section 2.05     Compliance with Management Company Policies and
                         Procedures. ...................................................................... 8

    Section 2.06     Authority. ........................................................................ 8

    Section 2.07     Third Parties. ................................................................... 9

    Section 2.08     Management Company to Cooperate with the Staff and
                         Services Provider. ............................................................ 9

    Section 2.09     Power of Attorney ............................................................ 9

ARTICLE III CONSIDERATION AND EXPENSES ....................................................... 9

    Section 3.01     Consideration ................................................................... 9

    Section 3.02     Costs and Expenses ........................................................ 10

    Section 3.03     Deferral .......................................................................... 10

ARTICLE IV REPRESENTATIONS AND COVENANTS .............................................. 10

    Section 4.01     Representations ............................................................... 10

ARTICLE V COVENANTS .......................................................................................... 10

    Section 5.01     Compliance; Advisory Restrictions. ................................ 10

    Section 5.02     Records; Confidentiality. ................................................ 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION ............................................ 12

    Section 6.01     Standard of Care ............................................................ 12

    Section 6.02     Exculpation. .................................................................. 12

    Section 6.03     Indemnification by the Management Company. ............... 13

    Section 6.04     Other Sources of Recovery etc ....................................... 14

    Section 6.05     Rights of Heirs, Successors and Assigns .......................... 14

    Section 6.06     Reliance ......................................................................... 14

i

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66-36    Filed 06/12/24    Page 1174 of 1392    PageID 15916
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1063 of 1803    PageID 11809
Case 18-30264-sgj11    Doc 627    Part 4-59    Filed 06/01/18    Desc Exhibit 3-2    Page 3 of 24

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE VII TERMINATION ........................................................................ 14

    Section 7.01        Termination........................................................................ 14

ARTICLE VIII MISCELLANEOUS .................................................................. 15

    Section 8.01        Amendments ........................................................ 15

    Section 8.02        Assignment and Delegation. ................................................ 15

    Section 8.03        Non-Recourse; Non-Petition.............................................. 15

    Section 8.04        Governing Law. ................................................................ 16

    Section 8.05        WAIVER OF JURY TRIAL.............................................. 17

    Section 8.06        Severability .................................................................... 17

    Section 8.07        No Waiver ........................................................................ 17

    Section 8.08        Counterparts .................................................................. 17

    Section 8.09        Third Party Beneficiaries .................................................. 17

    Section 8.10        No Partnership or Joint Venture ........................................ 17

    Section 8.11        Independent Contractor .................................................... 17

    Section 8.12        Written Disclosure Statement .......................................... 18

    Section 8.13        Headings ........................................................................ 18

    Section 8.14        Entire Agreement ............................................................ 18

    Section 8.15        Notices .......................................................................... 18

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-6   Filed 12/05/24   Page 1175 of 1392   PageID 15917
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1064 of 1803   PageID 11810

Case 18-30264-sgj11   Doc 837   Part 459   Filed 08/01/18   Desc Exhibit 2   Page 4 of 24

# FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-6    Filed 12/06/23    Page 1176 of 1392    PageID 15918
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1065 of 1803    PageID 11811
Case 18-30264-sgj11    Doc 1223-6    Filed 05/27/19    Desc Exhibit 352    Page 5 of 24

# ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Advisers Act" shall have the meaning set forth in the Recitals to this Agreement.

"Advisory Restriction" shall have the meaning set forth in Section 5.01(b).

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble to this Agreement.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"CLO or Account" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

Appellee Appx. 01059
APPX. 15810

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6 Exh. 6 Page 1177 of 1392 Page 1177 of 1392    PageID 15919
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1066 of 1803    PageID 11812
Case 18-30264-sgj11    Doc 2239-6 Part 4 Filed 08/01/21/19 Desc Exhibit 362 Page 6 of 24
Case 19-34054-sgj11    Doc 459-4    Filed 08/01/21    Desc Page 6 of 24

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 11/06/23 18706 of 1804 Page 1178 of 1392   PageID 15920
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1067 of 1803   PageID 11813
Case 18-30264-sgj11 22-06-37 Doc 459-4 Filed 08/11/21/De   Page 872 of 5 Page 7 of 24

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   <u>General Authority</u>.   Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.   The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   <u>Provision of Services</u>.   Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)   *Legal/Compliance/Risk Analysis*.   Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)   *Management of Collateral Obligations and CLOs and Accounts*. Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)   *Valuation*.   Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/06/22   Page 1179 of 1392   PageID 15921
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1068 of 1803   PageID 11814
Case 18-30264-sgj11   Doc 57   Part 4   Filed 08/01/21   Desc   Page 8 of 24

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)     *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)     *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)     *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)     *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)     *Shared Employees.*  The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j)     *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)     *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01062
APPX. 05834

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-35    Filed 12/07/2026 of 1804    Page 1180 of 1392    PageID 15922
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1069 of 1803    PageID 11815
Case 18-30265-sgj11 2339-06 27 Doc 459-4 Filed 08/01/21 Desc Exhibit 392 of 54 Page 9 of 24

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

Appellee Appx. 01063
APPX. 15915

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6   Filed 12/07/26 of 1804    Page 1181 of 1392    PageID 15923
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1070 of 1803    PageID 11816
Case 18-30264-sgj11 Doc 657 Part 4-9 Filed 08/01/21 Desc Exhibit 40 of 54 Page 10 of
24

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.    To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01064
APPX. 15836

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38    Filed 11/07/22    Page 1182 of 1392    PageID 15924
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1071 of 1803    PageID 11817
Case 18-30264-sgj11    Doc 3527    Filed 08/01/19    Page 11 of 24

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    <u>Applicable Asset Criteria and Concentrations</u>. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with <u>Section 2.2</u> above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    <u>Compliance with Management Company Policies and Procedures</u>. The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    <u>Authority</u>. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Appellee Appx. 01065
APPX. 15918

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 13-5   Filed 12/07/23   Page 1183 of 1392   PageID 15925
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1072 of 1803   PageID 11818
Case 18-30264-sgj11   Doc 659   Part 159   Filed 01/11/21   Desc Exhibit 2   Page 12 of 54   Page 12 of 24

Section 2.07    <u>Third Parties</u>.

(a)     The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)     In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    <u>Power of Attorney</u>. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

<div align="center">

**ARTICLE III**

**CONSIDERATION AND EXPENSES**

</div>

Section 3.01    <u>Consideration</u>.   As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.   The "<u>Staff and Services Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.   Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

<div align="center">9</div>

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.3.6    Filed 11/21/24    Page 1184 of 1392    PageID 15926
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1073 of 1803    PageID 11819
Case 18-30264-sgj11    Doc 657    Part 59    Filed 08/01/19    Page 13 of 24

Section 3.03    <u>Costs and Expenses</u>.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04    <u>Deferral</u>.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    <u>Representations</u>.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    <u>Compliance; Advisory Restrictions</u>.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01067
APPX. 15369

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 3596-6    Page 2/25/26 of 1804    Page 1185 of 1392    PageID 15927
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1074 of 1803    PageID 11820
Case 18-30264-sgj11 Doc 23-66 Filed 08/11/21 Desc Exhibit 4 of 5 Page 14 of 24

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Appellee Appx. 01068
APPX. 15879

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/02/26 of 1794 Page 1186 of 1392   PageID 15928
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1075 of 1803   PageID 11821
Case 18-30264-sgj11   Doc 659-4   Filed 08/01/21   Des Page 45 of 54 Page 15 of
24

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.   To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.   No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.   Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02   Exculpation.   To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.   To

12

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/07/26 of 1304    Page 1187 of 1392    PageID 15929
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1076 of 1803    PageID 11822
Case 18-30264-sgj11    Doc 1239-6    Document 159    Filed 02/11/21    Des Page 46 of 54    Page 16 of
24

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03  Indemnification by the Management Company.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/08/22    Page 1188 of 1392    PageID 15930
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1077 of 1803    PageID 11823
Case 18-30264-sgj11    Doc 6827    Part 459    Filed 08/01/21/19    Des Page 47 of 54    Page 17 of
24

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01071
Appx. 15823

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68.35    Filed 12/07/26 of 1804ge 1189 of 1392    PageID 15931
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1078 of 1803    PageID 11824
Case 18-30264-sgj11239 6 CBS-27 Doc 459 Filed 08/01/21 1 Desc Exhibit Q 5 Page 18 of
24

# ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

Appellee Appx. 01072
APPX. 15324

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-16    Filed 12/08/26 of 1804    Page 1190 of 1392    PageID 15932
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1079 of 1803    PageID 11825
Case 18-30264-sgj11    Doc 1239-6    Doc 159    Filed 06/01/21/19 esc Page 19 of 54 Page 19 of
24

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this <u>Section 8.03</u> shall survive termination of this Agreement for any reason whatsoever.

Section 8.04     <u>Governing Law</u>.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Appellee Appx. 01073
APPX. 15874

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.6    Filed 2/09/26 of 1804    Page 1191 of 1392    PageID 15933
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1080 of 1803    PageID 11826
Case 18-30264-sgj11    Doc 31-27    Part 459-Filed 08/01/11/21/19 esP age 50 of 54  Page 20 of
24

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be
conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO
HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS
IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED
HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS
AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS
RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND
THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS
AGREEMENT.

Section 8.06    Severability.  The provisions of this Agreement are independent of and
severable from each other, and no provision shall be affected or rendered invalid or unenforceable
by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable
in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or
incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so
as to effect the original intent of the Parties.

Section 8.07    No Waiver.  The performance of any condition or obligation imposed upon
any Party may be waived only upon the written consent of the Parties.  Such waiver shall be limited
to the terms thereof and shall not constitute a waiver of any other condition or obligation of the
other Party.  Any failure by any Party to enforce any provision shall not constitute a waiver of that
or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of
counterparts by facsimile or other written or electronic form of communication, each of which
shall be deemed to be an original as against any Party whose signature appears thereon, and all of
which shall together constitute one and the same instrument.  This Agreement shall become
binding when one or more counterparts hereof, individually or taken together, shall bear the
signatures of all of the Parties reflected hereon as the signatories.

Section 8.09    Third Party Beneficiaries.  This Agreement is for the sole benefit of the
Parties hereto and their permitted assigns and nothing herein express or implied shall give or be
construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal
or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and
is not enforceable by any Shared Employee, CLO or Account or any investor (directly or
indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.  Nothing set forth in this Agreement shall
constitute, or be construed to create, an employment relationship, a partnership or a joint venture
between the Parties.  Except as expressly provided herein or in any other written agreement
between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities
on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.  Notwithstanding anything to the contrary, the
Staff and Services Provider shall be deemed to be an independent contractor and, except as

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 13-36   Filed 12/08/22   Page 1192 of 1392   PageID 15934
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1081 of 1803   PageID 11827
Case 18-30264-sgj11   Doc 657   Part 59   Filed 08/01/18   Desc Exhibit 2   Page 21 of
24

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

> (a)   If to the Management Company:
>
> Acis Capital Management, L.P.
> 300 Crescent Court
> Suite 700
> Dallas, TX 75201
>
>
>
> (b)   If to the Staff and Services Provider:
>
> Highland Capital Management, L.P.
> 300 Crescent Court
> Suite 700
> Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

**Appellee Appx. 01075**
**APPX. 15876**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6.36   Filed 11/09/22   Page 1193 of 1392   PageID 15935
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1082 of 1803   PageID 11828
Case 18-30264-sgj11   Doc 1239   Filed 11/01/18   Page 22 of 24

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

**Appellee Appx. 01076**
**Appx. 15323**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 6-35   Filed 02/09/24   Page 1194 of 1392   PageID 15936
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1083 of 1803   PageID 11829

Case 18-30264-sgj11    Doc 1239-27 Part 459-4   Filed 02/01/18   Desc Exhibit 2   Page 23 of
24

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table. Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder. Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 68-5  Filed 12/05/23  Page 1195 of 1392  PageID 15937
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1084 of 1803  PageID 11830

Case 18-30264-sgj11  Doc 1239  Class-27  Part 159-4  Filed 08/01/19  Des  Exhibit 2  Page 54 of 54 Page 24 of
24

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.5    Filed 12/08/22    Page 1196 of 1392    PageID 15938
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1085 of 1803    PageID 11831

Case 19-12239-CSS    Doc 159-5    Filed 11/21/19    Page 1 of 54

# EXHIBIT E

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-36   Filed 12/09/22   Page 1197 of 1392   PageID 15939
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1086 of 1803   PageID 11832
Case 18-30265-sgj11   Doc 123-3   Filed 08/01/18   Filed 15/2 Main Document   Page 2 of 54   Page 1 of 3

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Acis Capital Management, G.P. |
| Debtor 2 (Spouse, if filing) | |

United States Bankruptcy Court for the:  Northern District of Texas

Case number  18-30265-sgj11

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Highland Capital Management, L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Holland O'Neil, Foley Gardere, Foley & Lardner
Name

2021 McKinney Ave, Suite 1600
Number    Street

Dallas          TX        75201
City            State     ZIP Code

Contact phone 214-999-3000

Contact email honeil@foley.com

Where should payments to the creditor be sent? (if different)

Scott Ellington, Highland Capital Management
Name

300 Crescent Court, Suite 700
Number    Street

Dallas          TX        75201
City            State     ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Official Form 410                    **Proof of Claim**                    page 1

Appellee Appx. 01080
APPX. 05832

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-35   Filed 10/28/24   Page 1198 of 1392   PageID 15940
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1087 of 1803   PageID 11833
Case 18-30265-sgj11-230-CS3   Filed 09/01/18   Filed 12/13/18 Main Document Page 3 of 54 Page 2 of 3

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?** $ _____4,672,140.38_____

Does this amount include interest or other charges?

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Sub-Advisory Services and Shared Services

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ _____

Amount of the claim that is secured: $ _____

Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $ _____

Annual Interest Rate (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410              Proof of Claim              page 2

Appellee Appx. 01081
APPX. 10332

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/09/22   Page 1199 of 1392   PageID 15941
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1088 of 1803   PageID 11834

Case 18-30265-sgj11-12239-CSS   Filed 08/01/18   Filed 12/12/18 Main Document   Page 4 of 54   Page 3 of 3

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | | |
|---|---|---|---|
| | ☑ Yes. *Check one:* | | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 3 ) that applies. | | $ 2,049,564.35 |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  08/01/2018
                  MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Scott Ellington | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | General Counsel | | |
| Company | Highland Capital Management, L.P. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 300 Crescent Court, Suite 700 | | |
| | Number        Street | | |
| | Dallas | TX | 75201 |
| | City | State | ZIP Code |
| Contact phone | | Email | |

Appellee Appx. 01082
APPX. 01834

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-6   Filed 11/09/26   Page 1200 of 1392   PageID 15942
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1089 of 1803   PageID 11835
Case 18-30265-sgj11   Doc 153   Part 2   Filed 08/01/18   Desc Exhibit A   Page 1 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

## EXHIBIT A TO PROOF OF CLAIM

1.    <u>Claimant</u>: Highland Capital Management, L.P. ("**Highland**") maintains its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim (the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below), Highland provided sub-advisory and shared services to the Debtors (defined below). Highland has provided portfolio management and advisory services to the Debtors pursuant to that certain Third Amended and Restated Sub-Advisory Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Sub-Advisory Agreement**") (**Exhibit 1**). Specifically, Highland has acted as an investment manager and has identified, evaluated, and recommended investments to investment vehicles advised or sub-advised by the Debtors.  Highland has also provided the Debtors with back and middle office services pursuant to that certain Fourth Amended and Restated Shared Services Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the Debtors with all of the employees and staff necessary to manage the portfolios.  Highland continued to provide the same sub-advisory and shared services to the Debtors throughout the Gap Period (defined below). To date, Highland continues to provide such services.

2.    <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the "**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the United States Bankruptcy Court for the Northern District of Texas. Highland provides the service at the following address:  300 Crescent Court, Suite 700, Dallas, Texas 75201.

**EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND**
4820-3752-6894.1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-6    Filed 12/09/26 of 1874e Page 1201 of 1392    PageID 15943
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1090 of 1803    PageID 11836
Case 18-30265-sgj11   Doc 653 Part 2 5 Filed 08/01/18   Desc Exhibit A   Page 2 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

3.      Indebtedness: Because the Debtors were put into bankruptcy involuntarily, the amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims (defined below).

a.      Pre-Petition: Joshua Terry, the petitioning creditor, filed the involuntary petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the outstanding indebtedness owing from the Debtors to Highland was as set forth below by account number:

| Invoice | Type | Balance |
|---|---|---|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
|  | **Totals** | **$2,622,576.03** |

b.      Gap Period: When a debtor files bankruptcy, the order for relief is typically entered on the date the petition is filed. However, an involuntary bankruptcy case diverges from the simultaneous entry of an order for relief in that an order for relief is entered at a later date than when a petition is filed. This creates a period of time, referred to as the "gap period", where the debtor may accrue post-petition but pre-order for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section…the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

Appellee Appx. 01084
APPx. 15836

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-6    Filed 10/09/24    Page 1202 of 1392    PageID 15944
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1091 of 1803    PageID 11837
Case 18-30264-sgj11    Doc 533    Part 2    Filed 08/01/21    Desc    Exhibit A    Page 3 of 5

***In re Acis Capital Management, L.P.*- Case No. 18-30264**
***In re Acis Capital Management, G.P.*- Case No. 18-30265**
**United States Bankruptcy Court for the Northern District of Texas**

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
|  | **Totals** | **$2,049,564.35** |

c.    <u>Reservation of Rights as to Administrative Claim</u>: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.    <u>Indemnity Claims</u>: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement. According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement, "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 12/09/26   Page 1203 of 1392   PageID 15945
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1092 of 1803   PageID 11838
Case 18-30265-sgj11   Doc 3563   Part 2-5   Filed 08/01/21   Desc Exhibit A   Page 4 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

    4.    <u>Reservation of Rights; Other Rights</u>: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

    5.    <u>Notices</u>: All notices to Highland are to be sent to:

    Highland Capital Management, L.P.
    Attn: David Klos
    300 Crescent Court
    Suite 700
    Dallas, Texas 75201

    *with copies to:*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/09/26 of 1704ge 1204 of 1392   PageID 15946
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1093 of 1803   PageID 11839
Case 18-30265-sgj11   Doc 153   Part 2-5   Filed 08/01/18   Desc Exhibit A   Page 5 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Foley Gardere
Foley & Lardner, LLP
c/o Holland O'Neil
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

6.    <u>Payments</u>:  All payments and distributions to Highland with respect to this proof of claim are to be made as follows:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201
Re:  *In re Acis Capital Management, L.P.*

7.    <u>Miscellaneous</u>:  This proof of claim is filed under compulsion of the bar date established in this bankruptcy case solely out of an abundance of caution to protect Highland from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this proof of claim shall not be construed as an admission by Highland as to the amounts due and owing outside of this bankruptcy proceeding. The filing of this proof of claim is **not:**  (a) a waiver or release of and/or Highland's rights or remedies against any person, entity or property; (b) a consent by Highland to entry of final judgment by this Court in any core proceeding commenced in this bankruptcy case, consistent with the United States Supreme Court's holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a waiver of the right to assert a different or enhanced classification of priority for its Claim in respect of the other claims asserted in this bankruptcy case.

PAGE 5 OF 5

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Appellee Appx. 01087
APPX. 15839

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/09/24   Page 1205 of 1392   PageID 15947
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1094 of 1803   PageID 11840

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/09/26 of 1804    Page 1206 of 1392    PageID 15948
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1095 of 1803    PageID 11841
Case 18-30265-sgj11    Doc 1589-53    Filed 08/01/21    Desc Exhibit 1 of 54    Page 2 of 21

## TABLE OF CONTENTS

<div align="right">**Page**</div>

1.  Appointment; Limited Scope of Services ...................................................................... 1
2.  Compensation .................................................................................................................. 3
3.  Representations and Warranties ...................................................................................... 3
4.  Standard of Care; Liability; Indemnification .................................................................. 4
5.  Limitations on Employment of the Sub-Advisor; Conflicts of Interest ......................... 7
6.  Termination; Survival ...................................................................................................... 8
7.  Cooperation with Management Company ....................................................................... 8
8.  Management Agreements and Related Agreements ......................................................... 8
9.  Amendments; Assignments ............................................................................................. 9
10. Advisory Restrictions ...................................................................................................... 9
11. Records; Confidentiality ................................................................................................. 10
12. Notice ............................................................................................................................... 11
13. Governing Law ................................................................................................................ 11
14. WAIVER OF JURY TRIAL ........................................................................................... 11
15. Severability ...................................................................................................................... 11
16. No Waiver ........................................................................................................................ 11
17. Counterparts ..................................................................................................................... 12
18. Third Party Beneficiaries ................................................................................................ 12
19. No Partnership or Joint Venture ..................................................................................... 12
20. Entire Agreement ............................................................................................................. 12

Appellee Appx. 01089
APPX. 15840

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.85   Page 12:09726 of 1804ge 1207 of 1392   PageID 15949
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1096 of 1803   PageID 11842
Case 18-30265-sgj11 23-06:53 Doc 359-5 Filed 08/01/18/21/Desc agibit 21 of 54ge 3 of 21

### THIRD AMENDED AND RESTATED
### SUB-ADVISORY AGREEMENT

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.    Appointment; Limited Scope of Services.

(a)    Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6136   Filed 2/09/26 of 1804ge 1208 of 1392   PageID 15950
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1097 of 1803   PageID 11843
Case 18-30265-sgj11   Doc 1239-6 S3 Part 1 59 Filed 08/01/18   Desc Exhibit 1 of 5 Page 4 of 21

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of Section 8, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)     Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)     make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)     place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)     identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)     assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)     provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)     assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)     assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "Services."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/09/22 of 1392   Page 1209 of 1392   PageID 15951
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1098 of 1803   PageID 11844
Case 18-30264-sgj11   Doc 3-3   Part 3-5   Filed 08/01/18   Desc Exhibit 1   Page 5 of 21

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein.  The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto.  The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Exhibit B   Page 120 of 174   Page 1210 of 1392   PageID 15952
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1099 of 1803   PageID 11845
Case 18-30264-sgj11   Doc 13-6   Filed 08/01/18   Doc 3-5   Filed 08/01/18   Desc Exhibit 5   Page 6 of 21

(ii)  this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)  no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)  neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)  The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)  The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.  Standard of Care; Liability; Indemnification.

(a)  Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

Appellee Appx. 01093
APPX. 15835

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-6    Filed 12/29/26 of 1804    Page 1211 of 1392    PageID 15953
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1100 of 1803    PageID 11846
Case 18-30265-sgj11  223-06 S13  Doc 3-59-Filed  08/01/21/  Desc  Exhibit 61 of 54  Page 7 of 21

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)        Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01094
APPX. 15846

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 1/27/2 of 1804    Page 1212 of 1392    PageID 15954
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1101 of 1803    PageID 11847
Case 18-30128-sgj11    Doc 13-6    Part 3-5    Filed 08/01/1 21/18    Desc Exhibit 17 of 5    Page 8 of 21

(c)    <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)    <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/09/22    Page 1213 of 1392    PageID 15955
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1102 of 1803    PageID 11848
Case 18-30265-sgj11  Doc 653  Part 3-59  Filed 08/01/21  Desc Exhibit 18  Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e)    Rights of Heirs, Successors and Assigns.    The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f)    Reliance.    A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)    Rights Under Management Agreements and Related Agreements.    The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to Section 8 if such indemnification and exculpation rights are not reasonably acceptable to it.

5.    Limitations on Employment of the Sub-Advisor; Conflicts of Interest.

(a)    The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)    So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company. The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder. It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Appellee Appx. 01096
APPX. 15847

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-6   Filed 12/04/24   Page 1214 of 1392   PageID 15956
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1103 of 1803   PageID 11849
Case 18-30265-sgj11   Doc 6-13   Part 359   Filed 02/01/21   Desc Exhibit of 54   Page 10 of
21

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

6.     Termination; Survival.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     Cooperation with Management Company.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     Management Agreements and Related Agreements.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

Appellee Appx. 01097
APPX. 15899

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-8   Filed 12/05/24   Page 1215 of 1392   PageID 15957
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1104 of 1803   PageID 11850
Case 18-30265-sgj11   Doc 13   Part 4   Filed 01/11/19   Page 20 of 54   Page 11 of
21

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9.    Amendments; Assignments.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 9, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)    Except as otherwise provided in this Section 9, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)    The Sub-Advisor may, without satisfying any of the conditions of Section 9(a) other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.    Advisory Restrictions.  This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof.  It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "Advisory Restrictions").   If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Appellee Appx. 01098
APPX. 15959

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/02/24   Page 1216 of 1392   PageID 15958
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1105 of 1803   PageID 11851
Case 18-30265-sgj11   Doc 683-13   Part 159   Filed 04/01/19   Desc Exhibit 21 of 54   Page 12 of 21

11. <u>Records; Confidentiality</u>.

(a)     The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)     The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01099
APPX. 15950

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8 Exhibit 6   Filed 12/19/23   Page 21 of 1392   PageID 15959
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1106 of 1803   PageID 11852
Case 18-30264-sgj11   Doc 688-13   Part 159   Filed 08/01/21   Desc Exhibit 22 of 54   Page 13 of
21

12.    <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

      (a)    If to the Management Company:

          Acis Capital Management, L.P.
          300 Crescent Court
          Suite 700
          Dallas, TX 75201

      (b)    If to the Sub-Advisor:

          Highland Capital Management, L.P.
          300 Crescent Court
          Suite 700
          Dallas, TX 75201

13.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.    <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.    <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01100
APPX. 05952

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 11/08/26 of 1804    Page 1218 of 1392    PageID 15960
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1107 of 1803    PageID 11853
Case 18-30265-11 1239 CGS13 Doc 159-5 Filed 08/01/21 Des Page 20 of 54 Page 14 of
21

17.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.    <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.    <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.    <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-35   Filed 12/09/22   Page 1219 of 1392   PageID 15961
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1108 of 1803   PageID 11854
Case 18-30265-sgj11   Doc 159-5   Filed 01/11/21   Desc Exh 24 of 54   Page 15 of
21

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____

Name: James Dondero

Title:   President

**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General
Partner

By: _____

Name: James Dondero

Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/19/26 of 1804 Page 1220 of 1392   PageID 15962
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1109 of 1803   PageID 11855

## **Appendix A**

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank*]

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 8-35   Filed 12/29/26 ... Page 1221 of 1392   PageID 15963
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1110 of 1803   PageID 11856
Case 18-30265-sgj11 239-6 CBS13 Doc 159-5 Filed 01/11/19 ... Page 26 of 54 Page 17 of 21

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Appellee Appx. 01104
APPX. 15956

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 11/29/22   Page 1222 of 1392   PageID 15964
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1111 of 1803   PageID 11857
Case 18-30265-sgj11   Doc 6513   Part 59   Filed 08/01/21   Desc Exhibit 4   Page 18 of 21

## APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account.  Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise.  Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)     serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)     receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)     be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)     be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)     sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)     underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

B-1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6 Exhibit 36 Filed 12/12/26 of 1392 Page 1223 of 1392    PageID 15965
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1112 of 1803    PageID 11858
Case 18-30265-sgj11 Doc 1239-6 S13 Part 1 Filed 09/01/18 Desc Exhibit 36 Page 19 of 54 Page 19 of
21

(g)    serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)    act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Appellee Appx. 01106
APPX. 15957

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68.36    Filed 11/21/24 of 1804    Page 1224 of 1392    PageID 15966
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1113 of 1803    PageID 11859
Case 18-30265-sgj11 23-cv-cv-S13 Doc 159   Filed 08/01/21/19es Page 20 of 5 Page 20 of
21

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/19/22   Page 1226 of 1392   PageID 15968
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1115 of 1803   PageID 11861

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68.3 5   Filed 12/19/20 of 1804   Page 1227 of 1392    PageID 15969
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1116 of 1803    PageID 11862
Case 18-30265-sgj11    Doc 653    Part 459   Filed 06/01/11/21/19   Exhibit 82 of 5   Page 2 of 24

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................ 2

    Section 1.01    Certain Defined Terms ................................................ 2

    Section 1.02    Interpretation ............................................................... 3

ARTICLE II SERVICES ................................................................................... 4

    Section 2.01    General Authority. ...................................................... 4

    Section 2.02    Provision of Services. ................................................. 4

    Section 2.03    Shared Employees. ...................................................... 6

    Section 2.04    Applicable Asset Criteria and Concentrations. ........... 8

    Section 2.05    Compliance with Management Company Policies and Procedures. ............................................................. 8

    Section 2.06    Authority. .................................................................... 8

    Section 2.07    Third Parties. ............................................................... 9

    Section 2.08    Management Company to Cooperate with the Staff and Services Provider. ................................................... 9

    Section 2.09    Power of Attorney. ...................................................... 9

ARTICLE III CONSIDERATION AND EXPENSES ................................................ 9

    Section 3.01    Consideration .............................................................. 9

    Section 3.02    Costs and Expenses .................................................... 10

    Section 3.03    Deferral ...................................................................... 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ........................................ 10

    Section 4.01    Representations .......................................................... 10

ARTICLE V COVENANTS ................................................................................ 10

    Section 5.01    Compliance; Advisory Restrictions. ......................... 10

    Section 5.02    Records; Confidentiality. ........................................... 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION ...................................... 12

    Section 6.01    Standard of Care ........................................................ 12

    Section 6.02    Exculpation. ................................................................ 12

    Section 6.03    Indemnification by the Management Company. .......... 13

    Section 6.04    Other Sources of Recovery etc ................................... 14

    Section 6.05    Rights of Heirs, Successors and Assigns .................... 14

    Section 6.06    Reliance. ..................................................................... 14

i

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-3    Filed 12/18/26    Page 1228 of 1392    PageID 15970
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1117 of 1803    PageID 11863
Case 18-30265-sgj11    Doc 653    Part 4-5    Filed 06/01/21    Desc Exhibit 2    Page 3 of 24

## TABLE OF CONTENTS
(continued)

Page

ARTICLE VII TERMINATION ...................................................................... 14

    Section 7.01     Termination .......................................................... 14

ARTICLE VIII MISCELLANEOUS ............................................................... 15

    Section 8.01     Amendments ......................................................... 15

    Section 8.02     Assignment and Delegation. .................................. 15

    Section 8.03     Non-Recourse; Non-Petition ................................. 15

    Section 8.04     Governing Law. .................................................... 16

    Section 8.05     WAIVER OF JURY TRIAL ................................. 17

    Section 8.06     Severability ........................................................... 17

    Section 8.07     No Waiver ............................................................. 17

    Section 8.08     Counterparts ......................................................... 17

    Section 8.09     Third Party Beneficiaries ..................................... 17

    Section 8.10     No Partnership or Joint Venture ........................... 17

    Section 8.11     Independent Contractor ......................................... 17

    Section 8.12     Written Disclosure Statement ............................... 18

    Section 8.13     Headings ............................................................... 18

    Section 8.14     Entire Agreement ................................................. 18

    Section 8.15     Notices ................................................................. 18

Appellee Appx. 01111

Appx. 05362

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-5   Filed 12/1992 of 1804 ge 1229 of 1392   PageID 15971
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1118 of 1803   PageID 11864

Case 18-30265-sgj11 Doc 559 Filed 08/01/18 Desc Page 4 of 24

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-36   Filed 12/22/26 of 1704   Page 1230 of 1392   PageID 15972
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1119 of 1803   PageID 11865
Case 18-30268-sgj11   Doc 3-3   Part 459   Filed 08/01/21   Desc Exhibit 352   Page 5 of 24

# ARTICLE I

## DEFINITIONS

Section 1.01   <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Advisers Act</u>" shall have the meaning set forth in the Recitals to this Agreement.

"<u>Advisory Restriction</u>" shall have the meaning set forth in <u>Section 5.01(b)</u>.

"<u>Affiliate</u>" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble to this Agreement.

"<u>Applicable Asset Criteria and Concentrations</u>" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"<u>Applicable Law</u>" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"<u>CLO or Account</u>" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"<u>Covered Person</u>" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"<u>Governmental Authority</u>" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

2

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Filed 12/22/26 of 1704    Page 1231 of 1392    PageID 15973
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1120 of 1803    PageID 11866
Case 18-30262-sgj11 2289a0613 Poc 459 Filed 08/01/21/De Desc Exhib362 of 54 Page 6 of 24

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02    Interpretation. The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01114
APPX. 15366

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8585    Page 1/2226 of 1804    Page 1232 of 1392    PageID 15974
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1121 of 1803    PageID 11867
Case 18-30264-sgj11    Doc 513    Part 459-5    Filed 08/01/21/De    Descr Exhib 372 of 5    Page 7 of 24

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

### SERVICES

Section 2.01   General Authority.   Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.   The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.   Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)    *Legal/Compliance/Risk Analysis*.   Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)    *Management of Collateral Obligations and CLOs and Accounts*. Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)    *Valuation*.   Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-16    Filed 12/22/22    Page 1233 of 1392    PageID 15975
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1122 of 1803    PageID 11868
Case 18-30264-sgj11    Doc 13    Part 4    Filed 08/01/21    Desc    Page 8 of 24

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)     *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)     *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)     *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)     *Administrative Services.* The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)     *Shared Employees.* The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j)     *Ancillary Services.* Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)     *Other.* Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/12/24    Page 1234 of 1392    PageID 15976
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1123 of 1803    PageID 11869
Case 18-30264-sgj11    Doc 1223-6    Part 4 Filed 08/01/21    Desc Exhibit 9    Page 9 of 24

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

Appellee Appx. 01117
APPX. 15369

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/22/25 of 1804    Page 1235 of 1392    PageID 15977
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1124 of 1803    PageID 11870
Case 18-30265-sgj11    Doc 1123    Part 459    Filed 08/01/18    Desc    Page 10 of Page 10 of
24

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.    To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

7

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68.36   Filed 11/22/26 of 18049   Page 1236 of 1392   PageID 15978
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1125 of 1803   PageID 11871
Case 18-30265-sgj11   Doc 683-13   Part 459-5   Filed 08/01/21/19   Page 41 of 54   Page 11 of
24

        (iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

        (v)     to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

        (vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

        (k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04   <u>Applicable Asset Criteria and Concentrations</u>.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with <u>Section 2.2</u> above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   <u>Compliance with Management Company Policies and Procedures</u>.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   <u>Authority</u>.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Appellee Appx. 01119
APPX. 15370

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18.36    Filed 12/27/26 1804ge 1237 of 1392    PageID 15979
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1126 of 1803    PageID 11872
Case 18-30265-sgj11 2230 6633 13 Part 159 Filed 08/01/21 Des Page 12 of 54 Page 12 of
24

Section 2.07    <u>Third Parties</u>.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    <u>Power of Attorney</u>.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).  Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    <u>Consideration</u>.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "<u>Staff and Services Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 11/28/22 of 1804ge 1238 of 1392    PageID 15980
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1127 of 1803    PageID 11873
Case 18-30265-sgj11    Doc 459    Filed 08/01/19    Page 13 of 24

Section 3.03    <u>Costs and Expenses</u>.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04    <u>Deferral</u>.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    <u>Representations</u>.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    <u>Compliance; Advisory Restrictions</u>.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01121
APPX. 15373

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 36    Filed 12/22/26 of 1804    Page 1239 of 1392    PageID 15981
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1128 of 1803    PageID 11874
Case 18-30265-sgj11 1239 of 1536 13 Part 459 Filed 08/01/21 19 Desc Exhibit 2 of 54 Page 14 of
24

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)     This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02     Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Appellee Appx. 01122
APPX. 15974

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 63-36    Filed 12/30/24    Page 1240 of 1392    PageID 15982
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1129 of 1803    PageID 11875
Case 18-30265-sgj11    Doc 1313    Part 459    Filed 08/01/21    Desc Exhibit 2    Page 15 of
24

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02  Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

Appellee Appx. 01123
APPX. 15975

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/23/26 of 1704 Page 1241 of 1392    PageID 15983
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1130 of 1803    PageID 11876
Case 18-30265-sgj11 Doc 658-13 Part 459 Filed 08/01/21/19 Desc Exhibit 2 Page 16 of
24

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Appellee Appx. 01124
APPX. 15976

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/22/23    Page 1242 of 1392    PageID 15984
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1131 of 1803    PageID 11877
Case 18-30264-sgj11    Doc 3-13    Part 59    Filed 08/01/21    Desc Exhibit 2    Page 17 of
24

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01125
Appx. 15376

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63   Filed 12/23/24   Page 1243 of 1392   PageID 15985
Exhibit 6   Page 17 of 24
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1132 of 1803   PageID 11878
Case 18-30265-sgj11   Doc 513   Part 459   Filed 02/01/21   Desc   Exhibit 2   Page 18 of 24

# ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

15

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8336    Filed 11/23/42 of 1804    Page 1244 of 1392    PageID 15986
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1133 of 1803    PageID 11879
Case 18-30265-19j11239436813    Part 459    Filed 08/01/121/19    Desp age 49 of 54    Page 19 of
24

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this <u>Section 8.03</u> shall survive termination of this Agreement for any reason whatsoever.

Section 8.04     <u>Governing Law</u>.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88.36   Filed 12/26 of 1804   Page 1245 of 1392   PageID 15987
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1134 of 1803   PageID 11880
Case 18-30265-sgj11   Doc 593   Part 459   Filed 01/11/19   Page 50 of 54   Page 20 of
24

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   <u>WAIVER OF JURY TRIAL</u>.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.   EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   <u>Severability</u>.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.   Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   <u>No Waiver</u>.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.   Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.   Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.   This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09   <u>Third Party Beneficiaries</u>.   This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   <u>No Partnership or Joint Venture</u>.   Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.   Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   <u>Independent Contractor</u>.   Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68.5    Filed 12/26/of 18/04ge 1246 of 1392    PageID 15988
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1135 of 1803    PageID 11881
Case 18-30265-sgj11    Doc 659-13    Part 459    Filed 08/01/21/19    Desc Exhibit 2 of 54    Page 21 of
24

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

    (a)    If to the Management Company:

        Acis Capital Management, L.P.
        300 Crescent Court
        Suite 700
        Dallas, TX 75201

    (b)    If to the Staff and Services Provider:

        Highland Capital Management, L.P.
        300 Crescent Court
        Suite 700
        Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

Appellee Appx. 01129
APPX. 05980

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-35    Filed 12/23/24    Page 1247 of 1392    PageID 15989
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1136 of 1803    PageID 11882
Case 18-30265-sgj11    Doc 123    Class 13 Part 59-5    Filed 02/01/18    Desc Exhibit 2 of 54    Page 22 of
24

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President


ACIS CAPITAL MANAGEMENT, L.P.,
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 11/28/23   Page 1248 of 1392   PageID 15990
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1137 of 1803   PageID 11883

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.6    Exhibit 6    Filed 11/29/23    Page 1249 of 1392    PageID 15991
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1138 of 1803    PageID 11884

Case 18-30265-sgj11  Doc 13  Part 9  Filed 01/11/19  Desc Exhibit 4  Page 24 of 24
Case 18-30264-sgj11  Class 13 Doc 459  Filed 08/01/18  Desp Ex 1  Page 54 of 54  Page 24 of 24

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 83-6   Filed 12/29/26 of 1804   Page 1250 of 1392   PageID 15992
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1139 of 1803   PageID 11885

Case 19-12239-CSS    Doc 159-6    Filed 11/21/19    Page 1 of 76

# EXHIBIT F

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6.6    Filed 12/29/22    Page 1251 of 1392    PageID 15993
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1140 of 1803    PageID 11886
Case 18-30264-sgj11    Doc 1597-6    Filed 11/21/18    Page 1 of 12

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

### HIGHLAND CAPITAL MANAGEMENT, L.P.'s APPLICATION FOR
### ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503(b)

Highland Capital Management, L.P. ("**Highland**"), hereby files this *Application for Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)* (the "**Application**") and requests this Court's approval of an administrative expense claim for the actual and necessary costs and expenses for services to Acis Capital Management, LP and Acis Capital Management GP, LLC (the "**Debtors**") rendered post-petition in the current known amount of **$3,554,224.29**, as well as such other amounts that may arise, as referenced herein, related to Highland's indemnity rights and other potential claims that may be asserted against the estates, as applicable. In support of the Application, Highland respectfully states as follows:

### JURISDICTION & VENUE

1.      This Court has jurisdiction over the subject matter of this Application pursuant to 28 U.S.C. §§ 157 and 1334. The subject matter of this Application is a core proceeding within

**PAGE 1**

4817-3498-0226.1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 2/24/22 of 1804    Page 1252 of 1392    PageID 15994
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1141 of 1803    PageID 11887
Case 18-30261-sgj11    Doc 97-25    Filed 02/15/18    Entered 01/21/19 08:29:31    Page 2 of 12    Page 2 of 12

the meaning of 28 U.S.C. § 157(b)(2)(A) and (B).  Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND

**A.      The Contracts**

2.      Debtor Acis Capital Management, L.P. ("**Acis LP**") was formed in 2011 as an affiliated investment advisor to manage Highland's collateralized loan obligations.  Acis LP and Highland are parties to a number of different agreements.  Debtor Acis Capital Management GP, LLC ("**Acis GP**") is the general partner of Acis LP.

*(a)      The PMAs and the CLOs*

3.      Prior to the Petition Date (defined below), Acis LP had contractual obligations to provide portfolio management services to five collateralized loan obligation entities known as Acis CLO 2013-1 Ltd., Acis CLO 2014-3 Ltd., Acis CLO 2014-4 Ltd., Acis CLO 2014-5 Ltd., and Acis CLO 2015-6 Ltd. (the "**CLOs**") through certain portfolio management agreements (the "**PMAs**") with the CLOs.   For those services, Acis LP was entitled to certain portfolio management fees pursuant to the PMAs.

4.      Each CLO holds a portfolio of diversified syndicated leveraged commercial loans through the private placement of rated secured notes (the "**Secured Notes**") and unsecured subordinated securities (the "**Equity Notes**," together with the Secured Notes, the "**Notes**"). Highland CLO Funding, Ltd. ("**HCLOF**") is the holder of the Equity Notes.   Each Note is subject to an indenture (the "**Indenture**") that establishes the rights of the noteholders and indenture trustee investment criteria.  Neither of the Debtors are a party to any of the Indentures. Rather, the Indentures are between each CLO entity, as issuer, and U.S. Bank, N.A. as indenture trustee (the "**Indenture Trustee**").

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Page 1242 of 1392    Page 1253 of 1392    PageID 15995
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1142 of 1803    PageID 11888
Case 18-30264-sgj11    Doc 91    Filed 12/11/18    Entered 11/21/18 Page 3 of 12

5.    Pursuant to the Indentures, the CLOs can redeem the Secured Notes under certain conditions, including at the written direction of 66 2/3% of the aggregate outstanding amount of the Equity Notes.  Through this right of redemption, the Equity Noteholders can restructure the CLOs when they no longer meet their investment objectives.  Because changes in interest rates affect the return on the CLOs' investments, HCLOF has the contractual right to "reset" the CLOs, which is a process of refinancing the existing collateral loan obligations.

*(b)    The Outsourcing Agreement*

6.    Also prior to the Petition Date, Acis LP was party to an Agreement for the Outsourcing of the Asset Management (the "**Outsourcing Agreement**") with Universal-Investment-Luxembourg S.A. ("**Universal**") whereby Universal outsourced to Acis LP the asset management of an entity called BAYVK R2 Lux S.A., SICAV-FS – Highland (the "**Sub-Fund**"), which is a sub-fund of an entity called BAYVK R2 Lux S.A., SICAV-FIS.  A copy of the Outsourcing Agreement is attached hereto as **Exhibit A**.   In return for Acis LP's management services, Universal paid Acis LP management fees, which were ultimately charged to the Sub-Fund, as provided by section 5.3 of the Outsourcing Agreement.  Section 2.6 of the Outsourcing Agreement provided that, subject to the prior consent of Universal, Acis LP was permitted to utilize the asset management services of third parties.  Pursuant to that provision, Acis LP engaged Highland to provide sub-advisory services with respect to the management of the Sub-Fund.[1]

7.    Acis LP does not have, nor has it ever had, any employees.  All employees who have ever provided services to Acis LP were Highland employees, which were provided to Acis LP through shared and sub-advisory services agreements.  Acis LP has always essentially

---

[1] The Sub-Fund is funded indirectly by an entity called Bayerische Versorgungskammer ("**BVK**").  In the case, the term "BVK" has been used by the parties as shorthand to refer to the Sub-Fund arrangement under the Outsourcing Agreement.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-35    Filed 12/24/24    Page 1254 of 1392    PageID 15996
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1143 of 1803    PageID 11889
Case 18-30261-sgj11    Doc 89-2    Filed 02/15/18    Entered 11/21/18 09:25:31    Page 4 of 12

subcontracted its CLO managerial function out to Highland. As a result, independently, Acis LP was not able to provide the services necessary to fulfill the contractual obligations under the PMAs or the Outsourcing Agreement. Since the inception of Acis LP until August 2, 2018, Highland provided all front, middle, and back-office services to Acis LP through sub-advisory and shared services agreements.

### (c)    The Shared Services Agreement

8.    Prior to being replaced on August 2, 2018 (as described below), Highland provided back- and middle-office services to Acis LP pursuant to the Fourth Amended and Restated Shared Services Agreement, executed on March 17, 2017, (as amended and restated from time to time, the "**Shared Services Agreement**"). A copy of the Shared Services Agreement is attached hereto as **Exhibit B** and incorporated herein by reference. The multitude of services provided by Highland are set forth in Article II of the Shared Services Agreement.

9.    Highland provided these shared services in exchange for management fees, currently averaging 15 basis points ("**bps**") of the total balances of the CLO accounts. *See* Exhibit 1 at Section 3.01 and Appendix A. The management fees were due to be paid to Highland approximately every quarter.

### (d)    The Sub-Advisory Agreement

10.    Highland also provided front-office services to Acis LP pursuant to the Third Amended and Restated Sub-Advisory Agreement, executed March 17, 2017 (as amended and restated from time to time, the "**Sub-Advisory Agreement**," collectively with the Shared Services Agreement, the "**Contracts**"). A copy of the Sub-Advisory Agreement is attached hereto as **Exhibit C** and incorporated herein by reference.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Page 1245 of 1804    Page 1255 of 1392    PageID 15997
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1144 of 1803    PageID 11890
Case 18-30264-sgj11    Doc 97-2    Filed 12/11/18    Entered 11/21/19 Page 293 of 76    Page 5 of 12

11.    The Sub-Advisory Agreement appointed Highland "as Sub-Advisor to the Management Company [Acis LP] for the purpose of assisting the Management Company [Acis LP] in managing the Portfolios of each Account . . . ." *See* Sub-Advisory Agreement at Section 1(a)). The Sub-Advisory Agreement directs Highland to perform a multitude of investment advisory services set forth in Section 1(b) of the agreement.

12.    Highland was the sole provider of these services to Acis LP.  *See id* at § 5(6) ("So long as this [Sub-Advisory] Agreement or any extension, renewal or amendment of this [Sub-Advisory] Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.").  Given that Acis LP has no employees, Highland therefore was the sole provider of these services to the CLOs and the BVK Sub-Fund.

13.    For these investment advisory services, Highland received a sub-advisory fee that averaged 20 bps of the total average 40 bps Acis LP received as portfolio manager.  *See id.* at § 2(a) and Appendix A. The sub-advisory fees were due to be paid to Highland approximately every quarter.  Acis LP has not made a payment to Highland for sub-advisory services since November of 2017.

**B.    The Bankruptcy Cases**

14.    On January 30, 2018 (the "**Petition Date**"), Joshua N. Terry ("**Terry**") filed involuntary petitions (the "**Involuntary Petitions**") for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against Acis LP and Acis Capital Management GP, LLC (the "**Debtors**").

15.    The Debtors filed answers to the Involuntary Petitions and moved to dismiss the petitions, asserting among other defenses that the Court lacked subject matter jurisdiction.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/24/24    Page 1256 of 1392    PageID 15998
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1145 of 1803    PageID 11891
Case 18-30264-sgj11    Doc 1594-6    Filed 11/21/18    Page 6 of 12

16.     A five-day contested trial on the Involuntary Petitions was held in late March 2018.  On April 13, 2018, the Court entered orders for relief (the "**Orders for Relief**").  Diane Reed was thereafter appointed as the Chapter 7 trustee (the "**Chapter 7 Trustee**").

17.     On April 17, 2018, the Chapter 7 Trustee filed her Expedited Motion to Operate the Debtors' Business in Chapter 7 [Doc. No. 127] (the "**Motion to Operate**").  By the Motion to Operate, the Chapter 7 Trustee determined there was "an immediate need to obtain authorization to continue the business operations of the Debtors by the [Chapter 7] Trustee continuing Acis LP's performance of the Sub-Advisory Agreement and the Shared Services Agreement."  Motion to Operate at ¶ 5.

18.     During this time period, HCLOF evaluated the situation and determined that having a bankrupt portfolio manager was an untenable situation.  HCLOF therefore decided to take action related to redeeming the CLOs.  Accordingly, on April 30, 2018, HCLOF instructed the Indenture Trustee and Acis LP to initiate an optional redemption (the "**Optional Redemption Notices**").  Pursuant to the terms of the Indentures, there was a 45-day notice period prior to the occurrence of the redemption.  Thus, the redemption was scheduled to occur on June 14, 2018.

19.     Highland, which had related responsibilities as sub-manager, was well-aware of the timeline related to the Optional Redemption Notices and was operating under the assumption that the Debtors would no longer be operating as of June 14, 2018.  As such, on May 3, 2018, Highland filed its *Motion of Highland Capital Management, L.P. for Order Compelling Chapter 7 Trustee to Reject Certain Executory Contracts* [Doc. No. 169] ("**Motion to Reject**").  By the Motion to Reject, Highland sought an order compelling the Debtors to reject the Contracts. Highland's intention was to file the Motion to Reject on a timeline such that any order granting

**Appellee Appx. 01139**

**APPX. 16340**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-5    Filed 12/07/22    Page 1257 of 1392    PageID 15999
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1146 of 1803    PageID 11892
Case 18-30264-sgj11    Doc 911    Filed 12/15/18    Entered 11/21/19 18:09:33    Page 7 of 12

the Motion to Reject would be on or about the same time as the optional redemption on June 14, 2018.

20.     On May 4, 2018, the Chapter 7 trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**"). Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

21.     On May 6, 2018, following an expedited hearing on the matter, the Court entered an order granting the Motion to Operate [Doc. No. 178] (the "**Operation Order**").[2]   The Operation Order authorized the Chapter 7 Trustee to operate the Debtors, explicitly pursuant to the terms of the Contracts with Highland.  The Operations Order did not contemplate long-term operations of the Debtors as illustrated by the fact that the Court set a further status conference for June 25, 2018 to "consider the status of the cases and any modifications to the relief granted" in the Operations Order.  *See* Operations Order at p. 3.

22.     Thereafter, on May 11, 2018, after a hearing on the matter, the Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206]. On May 17, 2018, the Court entered an order granting appointment of Robin Phelan as Chapter 11 Trustee (the "**Chapter 11 Trustee**").

23.     The Chapter 11 Trustee refused to authorize the process to allow Highland, as sub-manager, to take the actions necessary to effectuate the noticed optional redemptions.  The Chapter 11 Trustee, Highland, and HCLOF exchanged a number of letters related to that issue in late May 2018.

---

[2] The Operations Order was preceded by an interim order entered by the Court on April 18, 2018 [Doc. No. 130] pending a hearing on the Motion to Operate.

**Appellee Appx. 01140**

**APPX. 16342**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 685    Filed 12/28/26 1792    Page 1258 of 1392    PageID 16000
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1147 of 1803    PageID 11893
Case 18-30265-sgj11    Doc 2897-2    Filed 11/21/18    Page 9 of 76    Page 8 of 12

24.     On May 24, 2018, the Chapter 11 Trustee filed his *Objection to the Motion of Highland Capital Management, L.P. for Order Compelling Chapter 7 Trustee to Reject Certain Executory Contracts and Request for Expedited Hearing* [Doc. 237] ("**Trustee's Objection**"). By the Trustee's Objection, the Chapter 11 Trustee argued that rejection of the Contracts was premature, given the conversion of the cases to Chapter 11. The Chapter 11 Trustee made clear his intention to continue to bind Highland to the terms of the Contracts, and to enjoy the services provided by Highland that made Acis LP's operations possible.

25.     On May 31, 2018, the Court held a status conference and entered a *sua sponte* temporary restraining order (the "**TRO**") staying the optional redemption process. In recognition of this fact, HCLOF subsequently withdrew the Optional Redemption Notices.

26.      On June 11, 2018, Highland filed a withdrawal [Doc. No. 273] of its Motion to Reject. The conversion of the case and the entry of the TRO made it perfectly clear that the Debtors' business would continue to operate past the late June time period Highland originally contemplated when it filed the Motion to Reject. Thus, Highland continued to perform the sub-advisory and shared services it provided the Debtors pre-petition, throughout the involuntary, and post-petition pursuant to the terms of the Contracts.

27.     On July 30, 2018, less than a month after the Chapter 11 Trustee complained about Highland's attempts to free itself of the obligations under the Contracts, the Chapter 11 Trustee filed his *Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC* [Doc. No. 448] (the "**Replacement Motion**"). By the Replacement Motion, the Chapter 11 Trustee sought to replace Highland with Brigade Capital Management, LP ("**Brigade**") based on vague

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 12/19/22   Page 1259 of 1392   PageID 16001
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1148 of 1803   PageID 11894
Case 18-30264-sgj11   Doc 223   Filed 12/15/18   Entered 11/22/19   Page 9 of 12

allegations by the Chapter 11 Trustee that Highland was "mismanaging" and "overcharging" the Debtors.

28.     The Court held a hearing on the Replacement Motion on August 1, 2018.  At the hearing, counsel for the Chapter 11 Trustee stated that the issue of mismanagement was "not the issue" for the hearing and reserved rights.[3]  Rather, the issue related solely to whether the Chapter 11 Trustee's business judgment supported the relief sought in the Replacement Motion. As such, the Court never took up the mismanagement issue.

29.     On August 1, 2018, the Court entered an order [Doc. 464] granting the Chapter 11 Trustee's Replacement Motion, thereby replacing Highland with Brigade Capital Management, LP as service provider to Acis LP.  Highland provided transitional services through August 2, 2018.

**C.     Highland's Post-Petition Services Under the Contracts**

30.     Highland provided Acis LP with uninterrupted services during three legally-distinct time periods: (i) the period prior to the filing of the Involuntary Petitions; (ii) the "gap" period between the filing of Involuntary Petitions and the entry of the Orders for Relief; and (iii) the post-petition period following the entry of the Orders for Relief until Highland's replacement on August 2, 2018 (the "**Post-Petition Period**").  Highland has filed a proof of claim asserting its pre-petition unsecured claim and its priority gap claim pursuant to Bankruptcy Code section 507(a)(3).[4]  This Application seeks an administrative expense claim relating solely to the Post-Petition Period and Highland reserves all rights related to any other period.

---

[3] See Hr'g Tr (Aug. 1, 2018) at 154:17-24 (MS. PATEL: "And with respect to these – to issues surrounding mismanagement, et cetera, as I said sort of at the opportunity to cross-examine Mr. Covitz, it's just not an issue today.  That's why we would want to reserve our rights at a later date to the extent that that is an actual material issue in dispute.  That's when that needs to be brought up, but that's it.  We reserve our rights, Your Honor.  It's just not an issue for today.  Thank you."
[4] See Proof of Claim [No. 27] filed on August 1, 2018 (the "**Proof of Claim**") whereby Highland asserts an unsecured claim in the amount of $4,672,140.38, constituting $2,622,576.03 for the pre-petition period and

PAGE 9

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Page 1 of 1392   Page 1260 of 1392   PageID 16002
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1149 of 1803   PageID 11895
Case 18-3025-sgj11   Doc 154-6   Filed 12/15/18   Entered 11/21/18   Page 10 of 12

## RELIEF REQUESTED

31.     By this Application, Highland seeks allowance of an administrative expense claim for services rendered under the Contracts during the Post-Petition Period.  The total accrued amount for such services is $3,554,224.29, as set forth in the summary attached hereto as **Exhibit D**, composed of $3,007,678.41 for sub-servicing and sub-advisory fees and $543,545.88 for expenses.

32.     Section 503(b) provides for an administrative expense claim for "the actual, necessary costs and expenses of preserving the estate" as well as "the actual, necessary expenses" incurred by a creditor "in making a substantial contribution" in a Chapter 11 case.  *See* 11 U.S.C. §§ 503(b)(1); *see also In re ASARCO, LLC*, 650 F.3d 593, 601 (5th Cir. 2011) (providing that administrative expense claims under 503 "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate.") (internal citation omitted). "A prima facie case under section 503(b)(1) may be established by evidence that (1) the claim arises from a transaction with the [debtor]; and (2) the goods or services supplied enhanced the ability of the [debtor's] business to function as a going concern." *Matter of TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992).  The burden then shifts to the objector to put on sufficient evidence to rebut the movant's prima facie case. *Id.*  Mere allegations, unsupported by evidence, are insufficient to rebut the movant's prima face case.  *Id.*

33.     It is undisputed that Highland provided services under the Contracts during the Post-Petition Period and that Highland has not been paid for such services.  Because Acis LP has

---

$2,049,564.35 for the gap period.  In the Proof of Claim, Highland specifically reserves its right to seek an administrative expense claim, and also related to contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  *See id.* at Proof of Claim Exhibit A.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-35   Filed 12/15/26 of 1804   Page 1261 of 1392   PageID 16003
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1150 of 1803   PageID 11896
Case 18-3078-sgj11   Doc 89-72   Filed 02/15/16   Entered 11/21/19 Page 131 of 76   Page 11 of 12

no employees, it is self-evident that Highland's services benefited the estates because, absent such services, Acis LP would have been completely incapable of operating.  In addition, while the Chapter 11 Trustee apparently has furthered a theory that Highland overcharged the Debtors (despite the fact that the terms of the Contracts are not in dispute), the Chapter 11 Trustee is required to provide evidence, not simply allegations, to rebut the prima facie case that Highland is entitled to an administrative expense claim.  To date, the Chapter 11 Trustee has provided no such evidence.  Rather, the Contracts speak for themselves and are the best evidence of the validity of the claim asserted by Highland.

34.    In addition, Highland reserves all indemnity rights against the Debtors pursuant to section 6.03 of the Shared Services Agreement and section 4(c) of the Sub-Advisory Agreement. This includes, but is not limited to, in relation to the thirty-for (34) causes of action (the "**Causes of Action**") asserted against Highland by the Chapter 11 Trustee in the *Amended Answer, Counterclaims (Including Claims Objections) and Third Party Claims* filed by the Chapter 11 Trustee on November 13, 2018 in Adversary Proceeding No. 18-03078 [Adv. Proc. Doc. No. 84].  Many – if not all – of such Causes of Action appear to arguably fall within the coverage of the applicable indemnity provisions of the Contracts.

WHEREFORE, Highland respectfully requests that the Court enter an order: (i) awarding it an administrative expense claim at least in the amount of $3,554,224.29; (ii) awarding an administrative expense for any indemnity claims payable to Highland under the Contracts; and (iii) providing any such other relief the Court deems just and proper.

**Appellee Appx. 01144**

**APPX. 05346**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8.35   Filed 12/15/22   Page 1262 of 1392   PageID 16004
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1151 of 1803   PageID 11897
Case 18-30264-sgj11   Doc 1597-2   Filed 12/11/18   Entered 11/21/19 09:13:31   Page 12 of 12

Dated:  December 11, 2018

Respectfully submitted,

*/s/ Jason B. Binford*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas  75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.**

## CERTIFICATE OF SERVICE

This is to certify that on December 11, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Jason B. Binford*
Jason B. Binford

4817-3498-0226.1

**PAGE 12**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/15/22   Page 1263 of 1392   PageID 16005
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1152 of 1803   PageID 11898

Case 18-30264-sgj11   Doc 2397-2   Filed 12/19/18   Entered 12/19/18 09:34:16   Page 1 of 14

# EXHIBIT A

Appellee Appx. 01146
APPX. 01349

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-5    Filed 12/25/26 of 1704ge 1264 of 1392    PageID 16006
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1153 of 1803    PageID 11899
Case 18-3028... Case 19-1239-CSSFiled 12/59/68    Filed 12/91/... Page 25 31 76Page 2 of 14

# Agreement
## for the Outsourcing of the Asset Management (the "Agreement") of

## BayVK R2 Lux S.A., SICAV-FIS (the "Fund")

entered into between

Universal-Investment-Luxembourg S.A.,

with registered office at 15, rue de Flaxweiler, L-6776 Grevenmacher and registered with the
Luxembourg Trade and Companies Register under number B75014

(hereinafter referred to as "**Management Company**")

and

**Acis Capital Management, L.P.**

**with its principal office at 300 Crescent Court, Suite 700, Dallas, Texas, 75201**

(hereinafter referred to as "**Acis**" or "**Asset Manager**")

– referred to individually as the "Party" and jointly as the "Parties" –

### RECITALS

(1)    Universal-Investment-Luxembourg S.A. is a management company within the
meaning of Chapter 15 of the Luxembourg Law of 17 December 2010 on
undertakings for collective investment, as amended (hereinafter the "**Law of 2010**")
which manages, amongst others, investment funds according to part I and part II of
the Law of 2010 and specialised investment funds according to the Luxembourg law
of 13 February 2007 on specialised investment funds (hereinafter the "**Law of 2007**")
as last amended by the Law of 12 July 2013 on alternative investment fund
managers.

(2)    Acis is an investment advisor registered with the U.S. Securities and Exchange
Commission.

<center>1</center>



Appellee Appx. 01147
APPX. 03349



Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 11/15/26 of 1392    Page 1265 of 1392    PageID 16007
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1154 of 1803    PageID 11900

Case 18-30258-sgj11    Doc 3597-2    Filed 12/19/18    Entered 12/19/18 20:31:76    Page 3 of 14

(3)     Under an agreement dated 8 October 2014 (the "**Fund Management Agreement**"), the Fund has appointed the Management Company as its management company in accordance with the Law of 2010 and the Law of 2007. Under the Fund Management Agreement, the Management Company is, among other things, responsible for the asset management of the Fund. Under the Fund Management Agreement, the Management Company may, under its own responsibility and supervision, delegate its functions to third parties.

(4)     By virtue of this Agreement, the asset management of the sub-Fund(s) specified in **ANNEX A** (hereinafter referred to as the "**Sub-Funds**") is to be outsourced by the Management Company to Acis in accordance with Luxembourg legislation, the issuing document of the Fund, as amended from time to time (the "**Issuing Document**"), the articles of association of the Fund, as amended from time to time (the "**Articles**"), attached hereto as **ANNEX B1**, as well as directions by the regulatory authority in Luxembourg, the *Commission de Surveillance du Secteur Financier* (hereinafter referred to as "**CSSF**"). Additional Sub-Funds may be included herein provided that the attached **ANNEXES** (if and to the extent necessary) are amended and signed by both parties and **ANNEX A** is supplemented accordingly.

(5)     In view of the Asset Manager's skills and abilities in asset management and the representations made and obligations assumed by it hereunder, the Management Company intends to engage the Asset Manager for the management of the Sub-Funds listed in **ANNEX A**.

(6)     Therefore, the Parties agree to the following:

<div align="center">

**Section 1**
**Appointment of the Asset Manager**

</div>

1.      The Management Company hereby appoints the Asset Manager to perform the asset management of the Sub-Funds upon the terms hereinafter contained and in accordance with the applicable laws and regulations, the Articles, the Issuing Document or as otherwise determined by the Management Company in accordance with Article 42ter lit. g) of the Law of 2007 from time to time. The Asset Manager hereby accepts its appointment and agrees to assume the obligations set forth herein.

2.      The Asset Manager represents and warrants that it is duly authorised to carry out the activities stipulated in this Agreement and that due to its professional infrastructure and human resources it is capable of providing its services on a secure and permanent basis. Furthermore it represents and warrants that it is familiar with the statutory investment restrictions as well as any other requirements relating to the management of funds in general and in particular with the requirements of the Luxembourg Law of 2007, the relevant circulars issued by the CSSF and all other applicable Luxembourg legislation. The Asset Manager represents and warrants that adequate risk management procedures have been put in place for the management of the relevant Sub-Funds. The Asset Manager will keep itself continuously informed about any amendments or changes in the statutory investment restrictions or other requirements. In particular, the Asset Manager will ensure sufficient professional competence of those employees who are entrusted with the performance of the Asset Manager's duties according to this Agreement, as well as establish and continuously maintain, at

<div align="center">

2

</div>





Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/25/26 of 1804   Page 1266 of 1392   PageID 16008
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1155 of 1803   PageID 11901
Case 18-30265-sgj11   Doc 3597-2   Filed 12/19/18   Entered 12/19/18 09:29:31   Page 4 of 14

least for the term of this Agreement, the necessary infrastructure, especially for the purpose of monitoring compliance with investment restrictions.

3. Neither the regulatory and supervisory responsibility of the Management Company nor the liability of the Management Company under civil law towards the shareholders of the respective Sub-Funds will be affected by the appointment of the Asset Manager.

4. This Agreement shall not confer any right on the part of the Asset Manager to conduct advertising or distribution activities of any kind.

5. The appointment of the Asset Manager does not create any legal relationship between the Asset Manager and the shareholders of the Fund, but between the Parties only.

6. The Asset Manager may provide similar asset management services to other clients and may execute transactions which differ from the transactions executed hereunder.

### Section 2
### Duties of the Asset Manager

1. The Asset Manager will make all asset management decisions on behalf of the Sub-Funds. The Asset Manager shall be entitled and obligated to perform the asset management services of the respective Sub-Funds listed in **ANNEX A** (subject to the approval and supervision of the Management Company).

2. Management tasks include, where applicable, purchasing and selling of assets, securities transactions, futures transactions, entering into and closing out of derivative positions both for investment and hedging purposes, managing cash and implementing corporate actions in accordance with the Issuing Document and the Articles and as applicable to one or more Sub-Funds (please refer to **ANNEX B1**).

However, these tasks do not include the exercise of any proxy voting rights attached to securities contained in the Sub-Funds, which is reserved to the Management Company itself. Business days in the sense of this Agreement are defined as stock exchange days on which banks would be open for general business in Luxembourg and Frankfurt am Main.

3. When performing its management tasks, the Asset Manager will duly observe the provisions of the Law of 2007, the Issuing Document and the Articles, as well as specific instructions/investment guidelines of the Management Company, if any, attached hereto in **ANNEX B2**. The Management Company is obligated to inform the Asset Manager of changes in the investment limits and rules as contained in the **ANNEX B1 and ANNEX B2**.

When rendering management services, the Asset Manager will observe the principle of risk spreading as defined by the Law of 2007, the statutory investment restrictions, the provisions of the code of conduct, conflict of interest, organisational measures and the prohibition of insider trading according to the applicable law, the administrative customs of relevant supervisory authorities and their directives and circulars, as set out in the valid version of the Issuing Document and the Articles as attached hereto as **ANNEX B1**.

3



47

Appellee Appx. 01149
Appx. 15990

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-3    Filed 12/15/26 of 1804ge 1267 of 1392    PageID 16009
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1156 of 1803    PageID 11902

Case 18-30264-sgj11    Doc 3972-5    Filed 12/19/18    Entered 12/19/18 20:38:76    Page 5 of 14

The Management Company reserves the right to give comprehensive instructions to the Asset Manager and any sub-manager, if applicable, in connection with the management of the Sub-Funds, as far as legally required.

4.  Brokers and counterparties will be selected by the Asset Manager at its sole discretion, taking into account all laws and regulations applicable to the Asset Manager and always in accordance with the Asset Manager's best execution policy, which has been communicated to, and is hereby approved by, the Management Company and which is attached hereto as **ANNEX H**. However, the Asset Manager's right to select brokers and counterparties at its sole discretion is limited to the list of brokers and the list of counterparties respectively attached hereto as **ANNEX C**. The Management Company's prior consent has to be obtained for the selection of brokers or counterparties not included in **ANNEX C**. The Asset Manager will issue at all times prompt and complete instructions to the Fund's custodian bank (hereinafter referred to as "**Custodian Bank**") to enable the Custodian Bank to settle transactions with brokers and counterparties. In this regard the Asset Manager is responsible for the careful choice, instruction and monitoring of the brokers or other counterparties.

5.  The Asset Manager may provide similar asset management services to other customers and may effect transactions which differ from the transactions executed hereunder. Furthermore the Asset Manager may consolidate portfolio management measures hereunder with asset or portfolio management measures to be taken on behalf of other customers and aggregate customer orders without prior communication with the Management Company if and to the extent that this is consistent with the fiduciary duties imposed upon it under applicable law and this Agreement as well as the Asset Manager's conflicts of interests policy (the "**Conflicts of Interest Policy**"), which has been communicated to, and is hereby approved by, the Management Company and which is attached hereto as **ANNEX G**.

6.  When fulfilling its obligations hereunder, the Asset Manager may contract the services of third parties if and to the extent that this is permitted under applicable law, particularly in accordance with the Law of 2007. Principally the Asset Manager is entitled to sub-delegate portions of its asset management function to an affiliate of the Asset Manager which consent shall also extend specifically to the modalities of the sub-delegation as defined in a separate sub-delegation agreement. For the avoidance of doubt, the Management Company's prior consent must be obtained for the sub-delegation of asset management services, which will not be unreasonably withheld. The Asset Manager will ensure that any sub-delegation will be in accordance with this Agreement and in particular with Law of 2007. In any case of sub-delegation to third parties the Asset Manager remains the sole party responsible to the Management Company for compliance with the duties pursuant to this Agreement.

7.  The Asset Manager does not guarantee and the Management Company acknowledges and agrees that the Asset Manager does not guarantee, the future performance or any specific level of performance for the Sub-Funds, the success of any investment decision or strategy that the Asset Manager may use, or the success of the Asset Manager's overall management of the Sub-Funds. The Management Company understands that investment decisions made for the Sub-Funds by the Asset Manager are subject to various risks, including but not limited to, market, interest rate, foreign currency, equity, credit, counterparty, economic, political, legal and operational risks and that investment decisions will not always be profitable and may result in significant loss or depreciation in the value of the Sub-Funds.

8.  The Asset Manager shall provide for adequate arrangements for the handling of both avoidable and unavoidable conflicts of interest. The Asset Manager shall be obliged to

4


UNIVERSAL
INVESTMENT
LUXEMBOURG

4R

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/15/22   Page 1268 of 1392   PageID 16010
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1157 of 1803   PageID 11903
Case 18-30264-sgj11   Doc 3972-5   Filed 12/19/18   Entered 12/19/18 09:39:16   Page 6 of 14

identify conflicts of interest in conjunction with the asset management services and to establish, respect and maintain a conflict of interest policy. This policy has to take into consideration conflicts of interest which may arise between the Asset Manager, including its employees and the Management Company and the persons who are directly or indirectly linked with the Asset Manager and its clients or between its clients. The Asset Manager further undertakes to make its conflict of interest policy available to the Management Company. The Asset Manager shall review its conflict of interest policy on an on-going basis, however at least in yearly intervals, and inform the Management Company of material changes to the policy as soon as reasonably practicable.

To the extent that the organisational arrangements of the Asset Manager are not suitable for the prevention of conflicts of interest, the Asset Manager shall be obliged to document the general nature and source of the remaining conflicts of interest, to promptly disclose these conflicts of interest to the Management Company and to initiate corrective measures in consultation with the Management Company.

9.    The Asset Manager has, as of the date hereof, and shall maintain for the term of this Agreement, insurance; the relevant documents have been provided to the Management Company within the due-diligence process. .

10.   The Asset Manager shall at all times observe and comply with the applicable laws and regulations, the Articles and with the applicable provisions of the Issuing Document or any such document relating to the Fund and its Sub-Funds distributed from time to time on behalf of the Fund and all lawful resolutions of the Management Company and other lawful orders and directions given to it from time to time by the Management Company. All activities engaged in by the Asset Manager shall at all times be subject to the control, approval and review by the Management Company.

**Section 3**
**Own dispositions of the Management Company, Authorisations**

1.    To avoid contradicting dispositions with respect to the Sub-Funds' assets, the Management Company will refrain from any direct dispositions of the Sub-Funds' assets without prior consultation with the Asset Manager. This applies in particular to the cash management required to meet liabilities incurred by the Asset Manager on behalf of the Management Company for the account of the respective Sub-Funds. However, if it is deemed imperative by the Management Company, in its sole discretion and under own responsibility, to take its own management measures to protect the shareholders of the Sub-Funds, the Management Company reserves the right to immediately implement its own measures without prior notification of the Asset Manager. In this case the Management Company has to fully inform the Asset Manager either in advance or, as soon as reasonably possible after execution of the relevant management measure.

2.    For the purpose of the asset management of the Sub-Funds, the Management Company will grant the Asset Manager all authorisations as required, in particular, the power to instruct the respective Custodian Bank to settle and accept settlement of transactions for the respective Sub-Fund. These authorisations are restricted to the accounts opened for the respective Sub-Fund. They do not include the Asset Manager's right to debit its remuneration or eventual expenses directly to the Sub-Fund concerned.


UNIVERSAL INVESTMENT
LUXEMBOURG

42

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/29/23   Page 1269 of 1392   PageID 16011
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1158 of 1803   PageID 11904
Case 18-30264-sgj11   Doc 2397-25   Filed 12/31/18   Entered 12/31/18 20:31:76   Page 7 of 14

<div align="center">

**Section 4**
**Reporting**

</div>

1.  The Asset Manager will report to the Management Company each transaction concluded by the Asset Manager on the trading day or in the case of transactions executed after the Management Company's business hours on the following business day to enable the Management Company to duly include the relevant transaction in its Fund accounts.

2.  The Asset Manager will ensure that the Custodian Bank will receive settlement instructions for all transactions according to the Custodian Bank's deadlines. The Asset Manager will also ensure that the Custodian Bank for the relevant Sub-Fund is informed of trades in financial instruments not being settled through a stock exchange or a recognised organised market.

3.  The Asset Manager will inform the Management Company as soon as reasonably practicable after becoming aware of any determined breaches of investment restrictions, whether caused actively or passively, and communicate all essential information and data relating thereto to the Management Company.

<div align="center">

**Section 5**
**Fees and Reimbursement of Expenses**

</div>

1.  The Asset Manager is entitled to receive a fee for its services rendered under this Agreement which is set out in the fee schedule attached as **ANNEX D**. The Asset Manager's fee is understood as inclusive any statutory VAT or other duties and taxes where applicable.

2.  The Asset Manager is not entitled to reimbursement of any expenses incurred in connection with the performance of its obligations hereunder unless any such reimbursement of expenses has been agreed upon with the Management Company in advance in writing or is stated in the Issuing Document of the Fund.

3.  The Asset Manager's fees will be paid by the Management Company and ultimately charged to the respective Sub-Fund.

<div align="center">

**Section 6**
**Liability and Risk Considerations**

</div>

1.  The Asset Manager shall act in compliance with the duties stated in this Agreement and in the relevant Service Level Agreement attached hereto as **ANNEX I** and shall be liable for the violation of investment restrictions and the conduct of unpermitted transactions caused by wilful misconduct, bad faith or negligence of the Asset Manager and shall compensate the Management Company for any losses or damages accordingly. The Asset Manager will not be liable for any action taken, omitted or suffered to be taken by it in its reasonable judgment, in good faith and believed by it to be authorised or within the discretion or rights or powers conferred upon it by this Agreement, or in accordance with (or in the absence of) specific directions or instructions from the Management Company. Notwithstanding anything to the contrary

<div align="center">

6

</div>



Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 88-3 Filed 12/26/23 Page 1270 of 1392 PageID 16012
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1159 of 1803 PageID 11905
Case 18-30264-sgj11 Doc 2397-2 Filed 12/19/18 Entered 12/19/18 09:29:31 Page 8 of 14

contained herein, the Asset Manager shall not be liable to the Management Company, the Sub-Fund or any other party for any losses due to the performance of the Sub-Fund's investments so long as the Asset Manager acted in accordance with the investment guidelines contained in Annex B2.

The Asset Manager is liable in the same manner for its agents of vicarious liability including commissioned third parties. If a transaction executed by the Asset Manager is, at the time of that transaction, in conflict with the provisions hereof, the Asset Manager will, upon the Management Company's request, arrange for the Management Company or the relevant Sub-Fund or the shareholder to be in a position as if, on demand of the Management Company, the transaction had not been executed for the relevant Sub-Fund or alternatively been concluded in accordance with this Agreement.

2. The Asset Manager shall not be liable for losses and/or financial damages arising from transactions initiated by the Management Company (in particular pursuant to Section 3.1) with regard to the assets of the Sub-Funds and/or from transactions executed in accordance with instructions of the Management Company except in case (and to the extent) the Asset Manager materially breached this Agreement and (i) the transactions so initiated and/or instructions given by the Management Company were required and suitable to correct such material breach, and (ii) the Management Company acted with due care and diligence when initiating such transactions and/or giving or implementing such instructions.

3. The Management Company shall indemnify the Asset Manager against any loss sustained or incurred by the Asset Manager in connection with the performance of its duties under this Agreement except to the extent that such losses are due to the wilful misconduct, bad faith or negligence of the Asset Manager.

4. The Asset Manager is expressly authorized to rely upon any and all instructions, approvals and notices given on behalf of the Management Company by any one or more of those persons designated as representatives of the Management Company whose names, titles and specimen signatures appear in ANNEX E attached hereto and incorporated herein by reference.

5. It is mutually understood and agreed that in providing services pursuant to this Agreement, the Asset Manager is at all times performing services as an independent contractor and its employees are at all times performing services as independent contractors and not as agents or employees of Management Company. Nothing contained in this Agreement is intended nor shall be construed to create an employer/employee relationship or to allow Management Company to exercise control or direction over the manner or method by which the Asset Manager performs services which are the subject matter of this Agreement; provided, however that the services to be rendered hereunder shall be rendered in a manner consistent with the standards governing such services, the provisions of this Agreement and all applicable provisions of law and other rules and regulations of any and all governmental authorities relating thereto.

6. Statutory or contractual examination duties of the Management Company or the Custodian Bank do not diminish the Asset Manager's duties of due care.



UNIVERSAL
INVESTMENT
LUXEMBOURG

4R

Appellee Appx. 01153
APPX. 16004

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-35   Filed 12/20/26 of 1392   Page 1271 of 1392   PageID 16013
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1160 of 1803   PageID 11906
Case 18-30264-sgj11   Doc 2397-2   Filed 12/19/18   Entered 12/19/18 22:31:76   Page 9 of 14

7.  Force majeure, as such term is interpreted by Luxembourg courts, which seriously impedes or renders temporarily impossible delivery or performance for one of the parties prolongs the time for fulfilment of the duties by the duration of the impediment and the time necessary to restore normal working conditions. Force majeure is among others defined as lawful labour dispute measures, emergency measures taken by the state or other circumstances for which the affected party is not responsible.

## Section 7
## Confidentiality

1.  It is understood by the parties that - except as otherwise provided in this Section 7 - the conditions hereof must neither be disclosed nor notified to any third parties. For the avoidance of doubt, the Fund shall not be considered as being a third party. This Section 7 does not apply to any legally required disclosure of information or the disclosure of information to shareholder(s) of the Fund, relevant governmental or regulatory authorities, the employees of the parties (on a need-to-know-basis), independent auditors and independent legal advisors. Entities and persons that are affiliated with or a contractual partner of the Asset Manager in accordance with this Agreement for the purpose of performing its obligations hereunder, are not deemed to be third parties within the meaning of this Section 7.

2.  In the event that submission of any information relating to this Agreement, including its **ANNEXES**, is requested by a supervisory authority or other governmental or regulatory authority, the party to which the respective request is addressed shall, to the extent practicable, notify the other party thereof prior to submitting any such information unless the party to which the request is addressed is prohibited to notify the other party thereof under any applicable statutory or administrative regulations or in accordance with any instructions contained in the request of the respective supervisory authority.

3.  Each party undertakes to keep confidential any and all information in its possession which relates to data processing systems and know-how of the other party as well as any and all general information relating to the affairs of the other party and its clients which is not publicly known; in addition, each party agrees to neither use nor disclose any such data except for the purposes hereof, subject to the prior written consent of the other party, or if and to the extent that it is subject to a statutory, regulatory or legal disclosure obligation.

4.  The Asset Manager undertakes to observe the confidentiality rules owed by the Management Company with regard to all data relating to customers of the Management Company; the Management Company will inform the Asset Manager of such confidentiality rules in advance and the Management Company undertakes to only convey data to the Asset Manager which it may lawfully convey under such confidentiality rules; moreover, the Asset Manager agrees to make available any such data in connection herewith only to those employees of the Asset Manager or a sub-manager who are subject to comparable rules of confidentiality owed by the Management Company or any data protection obligations, and to do so only to the extent as is absolutely necessary to perform the management tasks in accordance herewith.

8


UNIVERSAL INVESTMENT
LUXEMBOURG

42

Appellee Appx. 01154
APPx. 159196

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-35   Filed 12/20/23   Page 1272 of 1392   PageID 16014
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1161 of 1803   PageID 11907
Case 18-3026   Case 19-12239-CSS   Filed 12/19/18   Filed 12/21/19   Page 2331 of 76   Page 10 of 14

5.  The Asset Manager will take technical, personnel-related and organisational measures so as to ensure that the confidentiality of all confidential information of the Management Company and the Fund is maintained as provided in Section 7 hereof not only towards any third parties, but also between various other outsourcing institutions on behalf of which the Asset Manager is acting as a service provider and other clients of the Asset Manager.

## Section 8
### Notices and Instructions

1.  All notices and instructions are only binding upon the receiving party if given by representatives of the performing units, whose names and specimen signatures are listed in the attached **ANNEX E** hereto. The parties will inform the respective other party immediately of any changes in the list. Each party shall appoint a head co-ordinator for all service areas.

2.  Notices and instructions given by telephone must be confirmed in writing or by fax as soon as practical.

3.  The parties may record all telephone calls between the Asset Manager and the Management Company. Both parties hereby agree to the recording and storage of such conversations and will inform their employees hereof.

## Section 9
### Duration

1.  This Agreement is concluded for an indefinite period of time. It may be terminated (i) by the Management Company – in respect of one or more of the Sub-Funds – at any time upon providing written notice to the Asset Manager whereupon notwithstanding Section 10 (3) the asset management authorisation is immediately revoked for the relevant Sub-Fund(s) or (ii) by the Asset Manager upon providing 30 (thirty) calendar days' notice to expire at the end of a calendar quarter.

2.  The right to terminate this Agreement immediately for cause is given if

    a)  the other party seriously violates its duties pursuant hereto and such a violation – insofar as it can be remedied or reversed – is not remedied or reversed within 10 (ten) calendar days following receipt of written notice hereof from the respective other party;

    b)  the other party has become the subject of insolvency proceedings opened against it, or said party has applied for insolvency or composition proceedings, or if the opening of insolvency proceedings is refused due to lack of assets sufficient to cover the costs of such proceedings;

    c)  the CSSF orders or demands the ending of this Agreement;

    d)  the other party discontinues its main business operation, pursues liquidation or is dissolved;

    e)  the CSSF or a court of law orders the appointment of an administrator or liquidator or a supervisor for a party;



9



Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 88-35   Filed 12/26/24   Page 1273 of 1392   PageID 16015
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1162 of 1803   PageID 11908
Case 18-3026-sgj11   Doc 2397-35   Filed 12/19/18   Page 2431 of 76   Page 11 of 14

f)    a significant change of the participation or control circumstances occurs at the other party (except as a result of restructuring for economic reasons within the corporate group and which does not foresee distribution or other pay-outs of the company capital to shareholders, unit holders, partners, creditors, or a capital decrease).

3.    In case of a notice of termination of this Agreement (a "**Termination Notice**") being served for whatever reason, all acts, deeds and dealings carried out or instructed prior to the date of receipt of the Termination Notice (the "**Notice Date**") shall be valid and legally binding upon the parties. Transactions instructed by the Asset Manager after the Notice Date must be settled according to the instructions of the Management Company. The parties will co-operate to ensure an orderly transition to another asset manager or to enable the Management Company to take over the asset management itself. The Asset Manager will continue to perform the asset management tasks until the transition is completed regardless of termination of this Agreement. Such a transition must be accomplished within an appropriate timeframe and may not be impeded or postponed without cause. So long as the Asset Manager conducts asset management activities it is entitled to the fee according to this Agreement. This notwithstanding, the Management Company is entitled at any time to terminate the Asset Manager's assignment with immediate effect and without awaiting conclusion of the transition.

4.    If a Sub-Fund under this Agreement is transferred to another management company or is dissolved, the Management Company's contractual relationship under this Agreement in respect of this relevant Sub-Fund shall terminate as per the date of the transfer or dissolution of this Sub-Fund. There is no requirement for a separate notice of termination, but the Management Company is obliged to inform the Asset Manager within a reasonable time frame before such transfer or dissolution of a Sub-Fund.

5.    Section 6 and Section 7 shall survive termination hereof.

### Section 10
### Miscellaneous

1.    This Agreement shall be governed by Luxembourg law. Exclusive place of jurisdiction for any disputes arising from or in connection with this Agreement shall be Luxembourg, Grand Duchy of Luxembourg.

2.    No rights under this Agreement shall be assigned by either party to any third parties in whole or in part without the prior written consent of the other party.

3.    In the event that, for whatever reason, any provision hereof is ineffective, unlawful or impracticable, any such ineffectiveness, unlawfulness or impracticability shall not affect the remaining provisions hereof. Any such ineffective, unlawful or impracticable provision shall be replaced by an effective, lawful and practicable provision corresponding to the economic interests of the parties. The same shall apply for any gaps in this Agreement.



42

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/06/24    Page 1274 of 1392    PageID 16016
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1163 of 1803    PageID 11909
Case 18-30264-sgj11-D2237-CSS-Filed Doc 2153-18    Filed 12/17/19/18 Page 2531 f 76 Page 12 of 14

4.    The **ANNEXES** in their current versions are each an integral part of this Agreement. These contain any and all agreements between the parties concerning the services to be performed according to this Agreement.

5.    Any amendment hereto, including to this Section 10 (5), must be made in writing.

6.    Executed in duplicate. This Agreement will come into effect on 27 February 2015.

*(Signature page follows)*

UNIVERSAL
INVESTMENT
LUXEMBOURG



Appellee Appx. 01157
Appx. 050199

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/05/26 of 18704 age 1275 of 1392    PageID 16017
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1164 of 1803    PageID 11910
Case 18-30264-sgj11-D2239-CS-Filed-Doc 2159-13   Filed 12/11/18 Page 2363 of 76 Page 13 of 14

Grevenmacher, _26 February 2015_          Dallas, _3 March 2015_

**Universal-Investment-Luxembourg S.A.**          **Acis Capital Management, L.P.**

By: _Rainer Krenz    Dirk Schmidt_          By: _____

Name: Rainer Krenz    Dirk Schmidt          Name: _Joshua N Terry_

Title: Senior Manager Authorized Signatory          Title: _Portfolio Manager_

12

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-3   Filed 12/26/23   Page 1276 of 1392   PageID 16018
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1165 of 1803   PageID 11911
Case 18-30264-sgj11   Doc 2397-2   Filed 12/19/18   Entered 12/19/18   Page 14 of 14

## ANNEXES

| | |
|---|---|
| A: | List of Sub-Funds |
| B: | B1: Issuing Document and articles of incorporation of the Fund |
| | B2: Investment Guidelines |
| C: | Lists of Brokers and Counterparties |
| D: | Fee Schedule |
| E: | Lists of Authorised Signatories |
| F: | intentionally omitted |
| G: | Conflicts of interest policy of the Asset Manager |
| H: | Best execution policy of the Asset Manager |
| I: | Operating Memorandum / Service Level Agreement |





Appellee Appx. 01159
APPX. 15960

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/07/2 of 1804    Page 1277 of 1392    PageID 16019
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1166 of 1803    PageID 11912

Case 18-30264-sgj11  Doc 1239-2  Filed 12/19/18  Entered 12/19/18 20:38:16  Page 1 of 25

# EXHIBIT B

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Exhibit 6   Page 1 of 26   Page 1278 of 1392   PageID 16020
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1167 of 1803   PageID 11913

**EXECUTION VERSION**

<br><br><br><br>

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Filed 12/26/26 of 1804ge 1279 of 1392    PageID 16021
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1168 of 1803    PageID 11914
Case 18-30264-sgj11    Doc 3972-2    Filed 12/19/68    Entered 12/19/18 20:31:76    Page 3 of 25

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................. 2

      Section 1.01    Certain Defined Terms ..................................................... 2

      Section 1.02    Interpretation ...................................................................... 3

ARTICLE II SERVICES .................................................................................................... 4

      Section 2.01    General Authority. ............................................................. 4

      Section 2.02    Provision of Services. ....................................................... 4

      Section 2.03    Shared Employees. ............................................................ 6

      Section 2.04    Applicable Asset Criteria and Concentrations. .................. 8

      Section 2.05    Compliance with Management Company Policies and
                    Procedures. ....................................................................... 8

      Section 2.06    Authority. .......................................................................... 8

      Section 2.07    Third Parties. ..................................................................... 9

      Section 2.08    Management Company to Cooperate with the Staff and
                    Services Provider. ............................................................. 9

      Section 2.09    Power of Attorney. ............................................................ 9

ARTICLE III CONSIDERATION AND EXPENSES .......................................................... 9

      Section 3.01    Consideration .................................................................... 9

      Section 3.02    Costs and Expenses ........................................................ 10

      Section 3.03    Deferral .......................................................................... 10

ARTICLE IV REPRESENTATIONS AND COVENANTS .............................................. 10

      Section 4.01    Representations ............................................................... 10

ARTICLE V COVENANTS .............................................................................................. 10

      Section 5.01    Compliance; Advisory Restrictions. ................................ 10

      Section 5.02    Records; Confidentiality. ................................................. 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION ............................................ 12

      Section 6.01    Standard of Care ............................................................. 12

      Section 6.02    Exculpation. .................................................................... 12

      Section 6.03    Indemnification by the Management Company. ............... 13

      Section 6.04    Other Sources of Recovery etc ...................................... 14

      Section 6.05    Rights of Heirs, Successors and Assigns ......................... 14

      Section 6.06    Reliance .......................................................................... 14

i

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/27/24   Page 1280 of 1392   PageID 16022
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1169 of 1803   PageID 11915
Case 18-30264-sgj11   Doc 3972-2   Filed 12/19/18   Entered 12/19/18 09:31:31   Page 4 of 25

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE VII TERMINATION ........................................................................................ 14

    Section 7.01    Termination........................................................................................ 14

ARTICLE VIII MISCELLANEOUS ................................................................................ 15

    Section 8.01    Amendments .................................................................................. 15

    Section 8.02    Assignment and Delegation. ......................................................... 15

    Section 8.03    Non-Recourse; Non-Petition........................................................ 15

    Section 8.04    Governing Law. ............................................................................ 16

    Section 8.05    WAIVER OF JURY TRIAL.......................................................... 17

    Section 8.06    Severability ................................................................................... 17

    Section 8.07    No Waiver ..................................................................................... 17

    Section 8.08    Counterparts ................................................................................. 17

    Section 8.09    Third Party Beneficiaries ............................................................. 17

    Section 8.10    No Partnership or Joint Venture .................................................... 17

    Section 8.11    Independent Contractor................................................................. 17

    Section 8.12    Written Disclosure Statement ...................................................... 18

    Section 8.13    Headings ....................................................................................... 18

    Section 8.14    Entire Agreement ......................................................................... 18

    Section 8.15    Notices ......................................................................................... 18

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/27/24   Page 1281 of 1392   PageID 16023
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1170 of 1803   PageID 11916

Case 18-30264-sgj11   Doc 1239-2   Filed 12/19/18   Entered 12/19/18 22:31:76   Page 5 of 25

# FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-5   Page 21 of 22 of 1794   Page 1282 of 1392   PageID 16024
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1171 of 1803   PageID 11917
Case 18-3025-sgj11   Doc 3972-25   Filed 12/19/18   Entered 12/19/18 09:33:31   Page 6 of 25

# ARTICLE I

## DEFINITIONS

Section 1.01   <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Advisers Act</u>" shall have the meaning set forth in the Recitals to this Agreement.

"<u>Advisory Restriction</u>" shall have the meaning set forth in <u>Section 5.01(b)</u>.

"<u>Affiliate</u>" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble to this Agreement.

"<u>Applicable Asset Criteria and Concentrations</u>" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"<u>Applicable Law</u>" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"<u>CLO or Account</u>" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"<u>Covered Person</u>" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"<u>Governmental Authority</u>" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

Appellee Appx. 01165

APPX. 05961

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/27/23   Page 1283 of 1392   PageID 16025
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1172 of 1803   PageID 11918
Case 18-30264-sgj11   Doc 3972-5   Filed 12/19/18   Entered 12/19/18 23:31:76   Page 7 of 25

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01166
APPX. 05963

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   FiledExhibit 6 FPage 11274 of 1804ge   Page 1284 of 1392   PageID 16026
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1173 of 1803   PageID 11919
Case 18-30264-sgj11-12239-72-3 Filed 02/59/68   Entered 12/91/18age 25:31 76Page 8 of 25

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

### SERVICES

Section 2.01   <u>General Authority</u>.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   <u>Provision of Services</u>.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)      *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)      *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)      *Management of Collateral Obligations and CLOs and Accounts*. Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)      *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68.6    Filed 12/25/22  of 1704  Page 1285 of 1392    PageID 16027
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1174 of 1803    PageID 11920
Case 18-30264-sgj11  Doc 3972-25 Filed 12/19/18  Entered 12/19/18 00:36:31 76Page 9 of 25

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)  *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)  *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)  *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)  *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)  *Shared Employees.*  The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(j)  *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)  *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.5    Filed 12/26 of 17Page 1286 of 1392    PageID 16028
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1175 of 1803    PageID 11921
Case 18-3020-cv    Doc 2397-25    Filed 02/15/18    Entered 02/15/18 Page 10 of 25

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

Appellee Appx. 01169
APPX. 15940

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/27/24   Page 1287 of 1392   PageID 16029
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1176 of 1803   PageID 11922
Case 18-30264-sgj11   Doc 3972-23   Filed 12/15/18   Entered 12/09/18 Page 2936 of 76   Page 11 of 25

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01170
APPX. 15472

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-6  Filed 12/28/26 of 1394  Page 1288 of 1392    PageID 16030
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1177 of 1803    PageID 11923
Case 18-30262  Case 19-D2297-C-25 Filed 10/21/19 13  Entered 12/09/18 Page 2931 of 76  Page 12 of 25

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.2 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Appellee Appx. 01171
APPX. 05423

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-15    Filed 12/29/22 of 1804    Page 1289 of 1392    PageID 16031
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1178 of 1803    PageID 11924
Case 18-3026    Case 19-D2397-2-S    Filed 12/15/18    Entered 12/19/18 Page 2401 of 76    Page 13 of 25

Section 2.07    <u>Third Parties</u>.

      (a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

      (b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    <u>Power of Attorney</u>.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).  Any such power shall be revocable in the sole discretion of the Management Company.

# ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    <u>Consideration</u>.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "<u>Staff and Services Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Appellee Appx. 01172
APPX. 15974

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6835    Page 1290 of 1874    Page 1290 of 1392    PageID 16032
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1179 of 1803    PageID 11925
Case 18-30262-sgj11    Doc 2159-43    Filed 12/09/18    Page 14 of 25

Section 3.03   <u>Costs and Expenses</u>. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04   <u>Deferral</u>. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01   <u>Representations</u>. Each of the Parties hereto represents and warrants that:

(a)     It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)     no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)     neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01   <u>Compliance; Advisory Restrictions</u>.

(a)     The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

10

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5835  Exhibit 6   Page 1/2912 of 1704   Page 1291 of 1392   PageID 16033
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1180 of 1803   PageID 11926
Case 18-30264   Case 19-D0237-2-S   Filed Doc 2159/18   Entered 12/09/18 12/01/18 Page 2423 of 76   Page 15 of 25

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)      This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/22/26 of 1392   Page 1292 of 1392   PageID 16034
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1181 of 1803   PageID 11927
Case 18-3026   Case 19-02379-S   Doc 2159-38   Filed 12/19/18   Page 16 of 25

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure.  This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   <u>Standard of Care</u>.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02   <u>Exculpation</u>.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

Appellee Appx. 01175
APPX. 15975

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Exhibit 6 FPage 1 2832 of 1794e 1293 of 1392    PageID 16035
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1182 of 1803    PageID 11928
Case 18-3026Case 19-D22397-2-25 FileDoct 2159/18  Fihtehd 212/019/18 Pagge 2431 of 76  Page 17 of 25

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/29/23   Page 1294 of 1392   PageID 16036
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1183 of 1803   PageID 11929
Case 18-30264   Case 19-12237-CSS   Doc 2159-8   Filed 11/21/19   Page 18 of 25

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 6.03</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 6.03</u> to the fullest extent permitted by law.

Section 6.04   <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 6.03</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   <u>Termination</u>.  Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01177
Appx. 05429

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8835    Filed 12/25/26 of 1392    Page 1295 of 1392    PageID 16037
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1184 of 1803    PageID 11930
Case 18-30264    Case 19-02297-2-11 Filed 11/15/18    Entered 11/21/19 Page 2963 of 76 Page 19 of 25

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8 Exhibit 6 Filed 12/20 of 18 Page 1296 of 1392 PageID 16038
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1185 of 1803 PageID 11931
Case 18-3026 Case 19-02297-S Document 215-16 Filed 02/09/18 Page 20 of 25

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04     Governing Law.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18.36   Exhibit F   Page 1287 of 1804   Page 1297 of 1392   PageID 16039
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1186 of 1803   PageID 11932
Case 18-30264   Case 19-03397-2-23 Filed Doc 2159-13   Entered 12/31/18   Page 24 of 76   Page 21 of 25

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   <u>WAIVER OF JURY TRIAL</u>.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   <u>Severability</u>.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   <u>No Waiver</u>.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.  Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09   <u>Third Party Beneficiaries</u>.   This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   <u>Independent Contractor</u>.   Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 835    Filed 12/28/22    Page 1298 of 1392    PageID 16040
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1187 of 1803    PageID 11933
Case 18-3026 Case 19-D02397-2-S Filed 01/25/48    Entered 12/09/18 Page 24931 76 Page 22 of 25

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)    If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

Appellee Appx. 01181
Appx. 15432

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8.83   Filed 21/29/26 1804e 1299 of 1392   PageID 16041
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1188 of 1803   PageID 11934
Case 18-3026Case 19-12239-CSS Filed Doc 21594B   Filed 11/27/19/19 Page 2530 of 76 Page 23 of 25

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By: Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:  President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/22   Page 1300 of 1392   PageID 16042
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1189 of 1803   PageID 11935

Case 18-30264-sgj11   Doc 2397-2   Filed 12/19/18   Entered 12/19/18 09:25:13   Page 24 of 25

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

*[Remainder of Page Intentionally Left Blank.]*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/29/26 of 1804   Page 1301 of 1392   PageID 16043
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1190 of 1803   PageID 11936

Case 18-30264-sgj11   Doc 2397-2   Filed 12/21/18   Entered 12/21/18 09:52:31   Page 25 of 76 Page 25 of 25

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture  Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture  Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture  Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture  Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

**Appellee Appx. 01184**

**APPX. 05936**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/29/26 1874   Page 1302 of 1392   PageID 16044
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1191 of 1803   PageID 11937

Case 18-3026   Case 19-12239-CSS   Filed 12/59/68   Filed 12/21/91/19   Page 393 176   Page 1 of 22

# EXHIBIT C

Appellee Appx. 01185
APPX. 05437

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-5    Filed 12/29/26 of 18 Page 1303 of 1392    PageID 16045
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1192 of 1803    PageID 11938

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/26 of 1804   Page 1304 of 1392   PageID 16046
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1193 of 1803   PageID 11939
Case 18-30264-sgj11   Doc 3972-3   Filed 12/19/18   Entered 12/19/18 09:55:31   Page 3 of 22

## TABLE OF CONTENTS

**Page**

1. Appointment; Limited Scope of Services ........................ 1
2. Compensation ........................ 3
3. Representations and Warranties. ........................ 3
4. Standard of Care; Liability; Indemnification. ........................ 4
5. Limitations on Employment of the Sub-Advisor; Conflicts of Interest. ........................ 7
6. Termination; Survival ........................ 8
7. Cooperation with Management Company ........................ 8
8. Management Agreements and Related Agreements ........................ 8
9. Amendments; Assignments ........................ 9
10. Advisory Restrictions. ........................ 9
11. Records; Confidentiality. ........................ 10
12. Notice ........................ 11
13. Governing Law ........................ 11
14. WAIVER OF JURY TRIAL ........................ 11
15. Severability ........................ 11
16. No Waiver ........................ 11
17. Counterparts ........................ 12
18. Third Party Beneficiaries ........................ 12
19. No Partnership or Joint Venture ........................ 12
20. Entire Agreement ........................ 12

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/29/26 of 1804   Page 1305 of 1392   PageID 16047
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1194 of 1803   PageID 11940
Case 18-30264-sgj11   Doc 3972-5   Filed 12/19/18   Entered 12/19/18   Page 36 of 76   Page 4 of 22

**THIRD AMENDED AND RESTATED
SUB-ADVISORY AGREEMENT**

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.      Appointment; Limited Scope of Services.

(a)      Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-35    Filed 1/29/26 of 1804    Page 1306 of 1392    PageID 16048
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1195 of 1803    PageID 11941
Case 18-30264-sgj11 Doc 2372-35 Filed 12/19/68 Entered 12/19/19 20:31:76 Page 5 of 22

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of Section 8, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)    Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)    make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)    place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)    identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)    assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)    provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)    assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)    assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "Services."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/27/22   Page 1307 of 1392   PageID 16049
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1196 of 1803   PageID 11942
Case 18-30264-sgj11   Doc 3972-3   Filed 12/19/18   Entered 12/19/18 23:31:76   Page 6 of 22

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Appellee Appx. 01190

APPX. 15042

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-3   Filed 12/29/26   Page 1308 of 1392   PageID 16050
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1197 of 1803   PageID 11943
Case 18-30264-sgj11   Doc 3072-5   Filed 12/59/68   Entered 12/91/18 09:81:76   Page 7 of 22

(ii)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)    no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)    The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)    The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.    Standard of Care; Liability; Indemnification.

(a)    Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

Appellee Appx. 01191
APPX. 15943

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-36   Filed 12/29/22   Page 1309 of 1392   PageID 16051
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1198 of 1803   PageID 11944
Case 18-30264-sgj11   Doc 1397-2   Filed 12/19/18   Entered 12/19/18 20:31:16   Page 8 of 22

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)       Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/29/26 of 1804   Page 1310 of 1392   PageID 16052
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1199 of 1803   PageID 11945
Case 18-30264-sgj11   Doc 2397-2   Filed 12/19/18   Entered 12/19/18 20:31:76   Page 9 of 22

   (c) <u>Indemnification</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

   Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

   Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

   (d) <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

<div align="center">6</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 1/29/26f 1804   Page 1311 of 1392   PageID 16053
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1200 of 1803   PageID 11946
Case 18-30264 Case 19-D2397 C3 SS Filed Doc 21593 8   Filed 02/20/18 Page 253 of 76 Page 10 of 22

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

     (e)   Rights of Heirs, Successors and Assigns.  The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

     (f)   Reliance.  A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

     (g)   Rights Under Management Agreements and Related Agreements.  The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to Section 8 if such indemnification and exculpation rights are not reasonably acceptable to it.

     5.   Limitations on Employment of the Sub-Advisor; Conflicts of Interest.

     (a)   The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

     (b)   So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 836    Filed 11/29/26 of 1392    Page 1312 of 1392    PageID 16054
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1201 of 1803    PageID 11947
Case 18-3026    Case 19-12397-CSS Filed Doc 21 59-13    Filed 11/27/19 Page 2531 76    Page 11 of 22

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)    The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

6.    Termination; Survival.

(a)    This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)    This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements. Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)    All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.    Cooperation with Management Company. The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor. Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.    Management Agreements and Related Agreements. The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement. The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company. No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

8

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-35    Filed 12/29/26    Page 1313 of 1392    PageID 16055
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1202 of 1803    PageID 11948
Case 18-30264    Case 19-D2239-CS    Filed Doc 21519-3    Entered 12/09/19    Page 12 of 22

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9.    <u>Amendments; Assignments</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)    Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)    The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.    <u>Advisory Restrictions</u>.  This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof.  It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8.5   Filed 1/29/26 of 1804   Page 1314 of 1392   PageID 16056
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1203 of 1803   PageID 11949
Case 18-30264   Case 19-D-2397-C-S3   Filed Doc 215943   Entered 12/09/19   Page 2531 of 76   Page 13 of 22

11. <u>Records; Confidentiality</u>.

(a)    The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)    The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) such information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01197
Appx. 15949

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-36   Filed 12/05/22   Page 1315 of 1392   PageID 16057
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1204 of 1803   PageID 11950
Case 18-3026   Case 19-D2397-S3   Filed Doc 2159-43   Filed 1d 12/19/11/18   Page 9631f 76   Page 14 of 22

12.   <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

    (a)    If to the Management Company:

        Acis Capital Management, L.P.
        300 Crescent Court
        Suite 700
        Dallas, TX 75201

    (b)    If to the Sub-Advisor:

        Highland Capital Management, L.P.
        300 Crescent Court
        Suite 700
        Dallas, TX 75201

13.   <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.   <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.   <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01198
APPX. 01049

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.16    Filed 12/09/22    Page 1316 of 1392    PageID 16058
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1205 of 1803    PageID 11951
Case 18-30264-sgj11    Doc 397-2-3    Filed 02/15/18    Entered 02/11/18 09:25:31 of 76    Page 15 of 22

17.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.  <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.  <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.  <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Appellee Appx. 01199
Appx. 16050

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/20/26 of 1804   Page 1317 of 1392   PageID 16059
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1206 of 1803   PageID 11952
Case 18-3026   Case 19-12237-CSS   Filed Doc 215-18   Filed 12/21/09/18   Page 2683 of 76   Page 16 of 22

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-16    Filed 12/08/26    Page 1318 of 1392    PageID 16060
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1207 of 1803    PageID 11953

Case 18-30264-sgj11    Doc 2397-2    Filed 12/11/18    Page 2030 of 76    Page 17 of 22

### Appendix A

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table. Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder. Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank*]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836   Filed 12/09/26 of 1704 Page 1319 of 1392   PageID 16061
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1208 of 1803   PageID 11954
Case 18-30264-sgj11   Doc 2397-2-SS   Filed 12/15/18   Entered 12/11/18 Page 2031 76 Page 18 of 22

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Appellee Appx. 01202
APPX. 10154

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18.5    Filed 12/29/26 of 18/04    Page 1320 of 1392    PageID 16062
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1209 of 1803    PageID 11955
Case 18-3026-sgj1    Doc 397-2    Filed 12/19/18    Entered 12/19/18 Page 19 of 22

## APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account. Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise. Without limiting the generality of the Sub-Advisor and its Related Entities may:

     (a)    serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

     (b)    receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

     (c)    be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

     (d)    be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

     (e)    sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

     (f)    underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01203

APPX. 01455

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6836    Filed 12/29/26 of 1804    Page 1321 of 1392    PageID 16063
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1210 of 1803    PageID 11956
Case 18-30264    Case 19-D2397-SS    Doc 2159-18    Filed 02/09/18    Page 2023 of 76    Page 20 of 22

(g)     serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)     act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Appellee Appx. 01204
APPX. 16156

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-6   Filed 12/29/22   Page 1322 of 1392   PageID 16064
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1211 of 1803   PageID 11957
Case 18-30264-sgj11   Doc 2397-2   Filed 12/19/18   Entered 12/19/18 22:33:16   Page 21 of 22

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-6    Filed 12/19/22    Page 1323 of 1392    PageID 16065
Exhibit 6    Page 22 of 74
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1212 of 1803    PageID 11958
Case 18-30264-sgj11    Doc 2397-2    Filed 11/09/18    Entered 11/09/18 22:43:17    Page 22 of 22

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 86-3   Filed 12/04/23   Page 1324 of 1392   PageID 16066
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1213 of 1803   PageID 11959

Case 18-30264-sgj11 Doc 2697-23 Filed 12/21/18 Entered 12/21/18 09:25:31 Page 1 of 2

# EXHIBIT D

Appellee Appx. 01207
APPX. 16059

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.6    Filed 12/29/26 of 1804e 1325 of 1392    PageID 16067
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1214 of 1803    PageID 11960
Case 18-30264-sgj11 Doc 2097-CSS  Doc 1259-18 Filed 06/11/21/Page 29 of 176 Page 2 of 2

**HIGHLAND CAPITAL MANAGEMENT, LP**
**POST-PETITION FEE ACCRUAL UNDER THE**
**SUB-ADVISORY AND SHARED SERVCIES AGREEMENTS**

Period:  April 13, 2018 to August 2, 2018

| Management Contact | Sub-Advisory Agreement | Shared Services Agreement | Expense Reimbursement | Subtotal |
|---|---|---|---|---|
| Acis CLO 2013-1, Ltd. | $196,144.32 | $147,108.24 | $62,252.97 | $405,505.53 |
| Acis CLO 2014-3, Ltd. | $238,710.43 | $179,032.82 | $81,545.25 | $499,288.50 |
| Acis CLO 2014-4, Ltd. | $290,184.32 | $217,638.24 | $101,087.78 | $608,910.34 |
| Acis CLO 2014-5, Ltd. | $299,518.82 | $224,639.11 | $107,246.57 | $631,404.50 |
| Acis CLO 2015-6, Ltd. | $340,546.52 | $255,409.89 | $125,264.41 | $721,220.82 |
| BVK | 353,568.97 | $265,176.73 | $66,148.90 | $684,894.60 |
|  |  |  |  |  |
| **TOTAL** |  |  |  | **$3,551,224.29** |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/19/24    Page 1326 of 1392    PageID 16068
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1215 of 1803    PageID 11961

Case 19-12239-CSS    Doc 159-7    Filed 11/21/19    Page 1 of 5

# EXHIBIT G

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/29/26 of 1804   Page 1327 of 1392   PageID 16069
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1216 of 1803   PageID 11962
Case 18-30264-sgj7 Doc 239655 Filed 04/30/987   Filed 01/230918 Page 2 of 5Page 2 of 13

Debtor   Acis Capital Management, L.P.                           Case number (if known) 18-30264

3. Certain payments or transfers to creditors within 90 days before filing this case
   List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before
   filing this case unless the aggregate value of all property transferred to that creditor is less than $6,425. (This amount may be adjusted on 4/01/19
   and every 3 years after that with respect to cases filed on or after the date of adjustment.)

   ☐ None.

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer Check all that apply |
|---|---|---|---|---|
| 3.1. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ☑ Services ☐ Other__ |
| 3.2. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ☑ Services ☐ Other__ |
| 3.3. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ☑ Services ☐ Other__ |
| 3.4. | David Simek 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ☑ Services ☐ Other__ |
| 3.5. | David Simek 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ☑ Services ☐ Other__ |
| 3.6. | David Simek 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ☑ Services ☐ Other__ |
| 3.7. | David Simek 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ☑ Services ☐ Other__ |

Appellee Appx. 01210
APPX. 05462

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-6   Filed 11/29/26 of 1804   Page 1328 of 1392   PageID 16070
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1217 of 1803   PageID 11963

Case 18-30264-sgj11   Doc 205-5   Filed 02/30/19-7   Entered 04/30/19   Page 18 of Page 3 of 13

| Debtor | Acis Capital Management, L.P. | | Case number (if known) | 18-30264 |
|---|---|---|---|---|

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>Check all that apply |
|---|---|---|---|---|
| 3.8. | FINRA<br>1735 K Street, NW<br>Washington, DC 20006 | 11/22/2017 | $70.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>■ Suppliers or vendors<br>☐ Services<br>☐ Other__ |
| 3.9. | Highland CLO Management, Ltd.<br>PO Box 309, Ugland House<br>Grand Cayman, KY1-1104, Cayman<br>Islands | 12/19/2017 | $2,830,459.22 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other__ |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| | Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/1/2017 | $976,688.47 | Contractual payment |
| 4.2. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/1/2017 | $1,096,033.37 | Services |
| 4.3. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/2/2017 | $3,574.80 | Expense reimbursement |
| 4.4. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/14/2017 | $67.44 | Expense reimbursement |
| 4.5 | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/17/2017 | $315,574.30 | Services |
| 4.6 | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/18/2017 | $438,497.51 | Services |
| 4.7. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/18/2017 | $375,055.31 | Contractual payment |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 36    Filed 12/29/26 1804e 1329 of 1392    PageID 16071
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1218 of 1803    PageID 11964
Case 18-30264-sgj11  Doc 336555  Filed 04/30/18    Entered 04/30/18 Page 4 of 5    Page 4 of 13

Debtor __Acis Capital Management, L.P.__                          Case number *(if known)* __18-30264__

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.8. **Highland Capital Management, L.P.**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | 4/19/2017 | $330,249.69 | Services |
| 4.9. **Highland Capital Management, L.P.**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | 5/1/2017 | $974,426.41 | Services |
| 4.10 **Highland Capital Management, L.P.**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | 5/1/2017 | $974,426.41 | Contractual Payment |
| 4.11 Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments<br>incl interest |
| 4.12 **Highland Capital Management, L.P.**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | 5/31/2017 | $581,036.15 | Services |
| 4.13 **Highland Capital Management, L.P.**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | 7/18/2017 | $373,167.08 | Contractual payment |
| 4.14 **Highland Capital Management, L.P.**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | 8/1/2017 | $971,603.02 | Contractual payment |
| 4.15 **Highland Capital Management, L.P.**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | 8/7/2017 | $1,339,422.12 | Services |
| 4.16 Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 8/16/2017 | $53.41 | Expense reimbursement |
| 4.17 **Highland Capital Management, L.P.**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | 10/18/2017 | $372,872.82 | Contractual payment |
| 4.18 **Highland Capital Management, L.P.**<br>**300 Crescent Court**<br>**Suite 700**<br>**Dallas, TX 75201** | 10/18/2017 | $728,702.26 | Services |
| 4.19 Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 10/24/2017 | $501,979.18 | Unsecured loan repayments<br>including interest |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 80-36   Filed 12/22/26 of 1804   Page 1330 of 1392   PageID 16072
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1219 of 1803   PageID 11965
Case 18-30264-sgj7   Doc 3365-5   Filed 04/30/18   Entered 04/30/18   Page 5 of 5   Page 5 of 13

| Debtor | Acis Capital Management, L.P. | | Case number (if known) | 18-30264 |

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.20 Highland Capital Management, L.P.<br>· 300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 10/25/2017 | $46,648.82 | Expense reimbursement |
| 4.21 Highland Capital Management, L.P.<br>· 300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 10/25/2017 | $67,966.85 | Expense reimbursement |
| 4.22 Highland Capital Management, L.P.<br>· 300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 11/1/2017 | $967,223.91 | Contractual payment |

5. Repossessions, foreclosures, and returns
List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

■ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

6. Setoffs
List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

■ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

Part 3:   Legal Actions or Assignments

7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits
List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | Joshua N. Terry v. Acis Capital Management, L.P. and Acis Capital Management GP, LLC<br>DC-17-15244 | Petition to confirm arbitration award | 44th District Court<br>Hon. Bonnie Lee Goldstein, Presiding<br>George L. Allen, Sr. Courts Building<br>600 Commerce Street, 5th Floor New Tower<br>Dallas, TX 75202 | ☐ Pending<br>■ On appeal<br>☐ Concluded |

Appellee Appx. 01213
APPX. 01016

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/29/21    Page 1331 of 1392    PageID 16073
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1220 of 1803    PageID 11966

# EXHIBIT H

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68 35   Filed 12/29/22 11/09 Page 1332 of 1392   PageID 16074
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1221 of 1803   PageID 11967
Case 18-30264-sgj11 Case 19-12390583 Filed 07/05/19   Filed 11/07/19 Page 8:605   Page 1 of 4

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Tel:  214.999.3000
Fax: 214.999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
David S. Coale (TX 00787255)
Ruben A. Garcia (TX 24101787)
LYNN PINKER COX & HURST, LLP
2100 Ross, Suite 2700
Dallas, Texas 75201
Tel:  214.981.3800
Fax: 214.981.3839
mhurst@lynnllp.com

CO-COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P.


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:

ACIS CAPITAL MANAGEMENT, L.P., and

ACIS CAPITAL MANAGEMENT GP, LLC,

Debtors.

§
§
§
§
§
§
§
§
§
§
§
§

Case No. 18-30264-SGJ-11
Case No. 18-30265-SGJ-11

(Jointly administered under
Case No. 18-30264-SGJ-11)

Chapter 11


**STATEMENT OF ISSUES BY APPELLANT
HIGHLAND CAPITAL MANAGEMENT, L.P.**


Appellant Highland Capital Management, L.P. states the following issues for the

appeal of the *Order (I) Approving the Application to Employ Winstead PC as Special

Counsel to the Chapter 11 Trustee and (II) Denying the Motion to Disqualify Winstead

PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* [Doc. No. 313];

*Order Approving in Part and Denying in Part the Supplemental Application Regarding

the Scope of Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8816   Filed 12/23/24   Page 1333 of 1392   PageID 16075
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1222 of 1803   PageID 11968
Case 18-30264-sgj11   Doc 1833-9058   Filed 07/05/19   Entered 07/11/09 09:48:05   Page 2 of 4
Exhibit 6   Page 1292 of 1804

[Doc. No. 703]*; and Findings of Fact, Conclusions of Law, and Order Granting*

*Winstead PC's Fee Application for Compensation and for Reimbursement of Expenses*

[Doc. No. 999]:

1. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given that Winstead represents interests adverse to the estates and is not "disinterested," as required by the Bankruptcy Code?

2. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given that Winstead PC has an actual conflict of interest?

3. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given the broad scope of Winstead PC's actual representation in the case?

4. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's expanded scope of representation as special counsel?

5. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the impropriety of its appointment as special counsel?

6. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the lack of benefit to the estates?

7. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the duplication of effort between Winstead PC and Forshey & Prostok LLP?

8. Did the bankruptcy court commit any error or any abuse of discretion in granting the amount of fees as reasonable in Winstead PC's final fee application given that the fees were disproportionate to the size of the bankruptcy case?

9. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application, even if retention of Winstead PC was otherwise proper?

10. Were fact findings supporting these rulings clearly erroneous?

2

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8.6    Filed 12/22/26 of 1804    Page 1334 of 1392    PageID 16076
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1223 of 1803    PageID 11969
Case 18-3026 Asg j19-1123390585 Filed 07/03/19    Entered 07/11/09 Page 45:405    Page 3 of 4

Respectfully submitted,

_/s/ Jason B. Binford_ _____
Holland N. O'Neil
Texas Bar No. 14864700
Jason B. Binford
Texas Bar No. 24045499
Melina N. Bales
Texas Bar No. 24106851
Foley Gardere
Foley & Lardner LLP
2021 McKinney, Suite 1600
Dallas, Texas 75201
Tel:  214.999.3000
Fax: 214.999.4667
honeil@foley.com
jbinford@foley.com
mbales@foley.com

_/s/ Michael K. Hurst_ _____
Michael K. Hurst
Texas Bar No. 10316310
David S. Coale
Texas Bar No. 00787255
Ruben A. Garcia
Texas Bar No. 24101787
Lynn Pinker Cox & Hurst LLP
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Tel:  214.981.3800
Fax: 214.981.3839
mhurst@lynnllp.com

**Co-Counsel for:**
**Highland Capital Management, L.P.**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-36    Exhibit 36    Filed 1/22/26    Page 1335 of 1392    PageID 16077
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1224 of 1803    PageID 11970
Case 18-30264-sgj11    Doc 3058    Filed 07/01/19    Entered 07/01/19 09:45:05    Page 4 of 4

## CERTIFICATE OF SERVICE

I certify that on July 1, 2019, a copy of this document was served through the court's ECF system on all counsel and on all others who registered for electronic notice.

*/s/ Jason B. Binford*
Jason B. Binford

Appellee Appx. 01218
APPX. 16169

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/22/26    Page 1336 of 1392    PageID 16078
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1225 of 1803    PageID 11971

Case 19-12239-CSS    Doc 159-9    Filed 11/21/19    Page 1 of 34

# EXHIBIT I

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/29/26 of 1804   Page 1337 of 1392   PageID 16079
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1226 of 1803   PageID 11972
Case 18-30264-sgj11   Doc 208-4   Filed 06/30/18   Entered 05/30/18 Page 87 of 34   Page 1 of 16

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

**PROPOSED SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

### APPLICATION TO EMPLOY WINSTEAD PC
### AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

TO THE HONORABLE STACEY G. C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

Robin Phelan (the "Trustee"), the Chapter 11 trustee of Acis Capital Management, L.P.

("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the

"Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the

"Cases"), files this his *Application to Employ Winstead PC as Special Counsel to the Chapter 11*

*Trustee* (the "Application"), and in support thereof, respectfully states as follows:

---

APPLICATION TO EMPLOY WINSTEAD PC
AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-5   Filed 12/22/23   Page 1338 of 1392   PageID 16080
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1227 of 1803   PageID 11973
Case 18-30264-sgj11   Doc 3609   Filed 05/30/18   Entered 05/30/18 07:13:34   Page 2 of 16

## I.   JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334.   This

Application constitutes a "core" proceeding within the meaning of the provisions of 28 U.S.C.

§ 157(b)(2).   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   The statutory predicates

for the relief sought herein are §§ 105, 327, and 328 of title 11 of the United States Code, § 101

*et seq.* (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure

("Bankruptcy Rules"), as well as Rule 2014-1 of the Local Rules of Bankruptcy Procedure for

the Northern District of Texas ("Local Rules").

## II.   RELEVANT PROCEDURAL BACKGROUND

2.     On January 30, 2018 (the "Petition Date"), Joshua N. Terry ("Mr. Terry"), as

petitioning creditor, filed the *Involuntary Petition Against a Non-Individual* [Case No. 18-30264,

Docket No. 1] (the "Acis LP Petition"), thereby initiating the Acis LP bankruptcy case.

3.     On the Petition Date, Mr. Terry, as petitioning creditor, also filed the *Involuntary*

*Petition Against a Non-Individual* [Case No. 18-30265, Docket No. 1] (the "Acis GP Petition,"

together with the Acis LP Petition, the "Involuntary Petitions"), thereby initiating the Acis GP

bankruptcy case.

4.     On April 13, 2018, after six days of testimony and argument, this Court entered

its *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on*

*Involuntary Bankruptcy Petition* [Case No. 18-30264, Docket No. 118 & Case No. 18-30265,

Docket No. 113] and the *Order for Relief in an Involuntary Case* [Case No. 18-30264, Docket

No. 119 & Case No. 18-30265, Docket No. 114] (the "Order for Relief").

5.     Also on April 13, 2018, Diane Reed was appointed as interim Chapter 7 trustee

(the "Chapter 7 Trustee") for the Debtors' bankruptcy estates (the "Estates").   *See* Case No. 18-

30264, Docket No. 120 & Case No. 18-30265, Docket No. 115.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-35   Filed 12/29/26   Page 1339 of 1392   PageID 16081
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1228 of 1803   PageID 11974
Case 18-30264-sgj11   Doc 249-5   Filed 06/05/19   Entered 11/25/19 18:07:10   Page 3 of 16

6.     On April 18, 2018, this Court entered its *Order Directing Joint Administration* [Docket No. 137],[1] ordering that the Cases be jointly administered under Case No. 18-30264.

7.     On May 4, 2018, the Chapter 7 Trustee filed the *Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 171].

8.     Also on May 4, 2018, Mr. Terry filed his *Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 173] (the "Trustee Motion").

9.     On May 11, 2018, this Court entered the *Order Granting Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 205] (the "Conversion Order"), which converted these Cases to Cases under Chapter 11 of the Bankruptcy Code.

10.    Also on May 11, 2018, this Court entered the *Order Granting the Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 206] (the "Trustee Order").

11.    On May 14, 2018, the United States Trustee filed the *Chapter 11 Notice of Appointment of Trustee and of Amount of Bond* [Docket No. 213] (the "Trustee Notice"), which provided notice to the Trustee of his appointment as Chapter 11 Trustee of Acis LP.

12.    On May 16, 2018, this Court entered the *Order Supplementing Order Granting the Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 219] (the "Supplemental Trustee Order"), by which the Court

---

[1] Hereinafter, unless otherwise specified, any docket numbers referenced are under Case No. 18-30264.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-16    Filed 12/23/26 Page 1340 of 1392    PageID 16082
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1229 of 1803    PageID 11975
Case 18-30265-sgj11    Doc 224    Filed 06/01/18    Entered 06/01/18 17:07:34    Page 4 of 16

directed that the United States Trustee "appoint only one Chapter 11 Trustee for the Debtors' estates[.]"

13.    Also on May 16, 2018, the United States Trustee filed the *Application of the United States Trustee to Approve the Appointment of Trustee* [Docket No. 220] (the "Trustee Application"), requesting the Court's approval of the Trustee's appointment as Chapter 11 Trustee of Acis LP.

14.    On May 17, 2018, this Court entered its *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 221], thereby approving of the Trustee's appointment as Chapter 11 Trustee of Acis LP.

15.    Also on May 17, 2018, the Trustee filed his *Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Docket No. 222] (the "F&P Application"), requesting authority to retain Forshey & Prostok, LLP ("Forshey & Prostok") as general counsel to the Trustee.

16.    On May 29, 2018, the United States Trustee filed the *Chapter 11 Notice of Appointment of Trustee and of Amount of Bond* [Case No. 18-30265, Docket No. 182] (the "Second Trustee Notice"), which provided notice to the Trustee of his appointment as Chapter 11 Trustee of Acis GP.

17.    On May 30, 2018, the United States Trustee filed the *Application of the United States Trustee to Approve the Appointment of Trustee* [Case No. 18-30265, Docket No. 183] (the "Second Trustee Application"), requesting the Court's approval of the Trustee's appointment as Chapter 11 Trustee of Acis GP.

### III.    RELIEF REQUESTED

18.    By this Application, the Trustee seeks to employ and retain Winstead PC ("Winstead") as his special counsel to perform certain legal services during the course of the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 83-6    Filed 12/29/26 1 8 04ge 1341 of 1392    PageID 16083
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1230 of 1803    PageID 11976
Case 18-30264-sgj11 Doc 911-2 Filed 05/30/18 Entered 11/25/30 18 Page 76 of 34 Page 5 of 16

Cases. Accordingly, the Trustee requests the entry of an order, pursuant to § 327(a) and (c) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure, permitting him to employ and retain Winstead as his special counsel for the limited purposed described below.[2]

**A.    Basis for Selection of Counsel**

19.    As the Court knows, Winstead represented Mr. Terry in connection with the trial on the Involuntary Petitions.  Indeed, the Trustee's selection of Winstead is based, in part, upon the fact that Winstead has gained significant familiarity with, and considerable knowledge of, the unique factual circumstances and complex legal issues in the Cases through its representation of Mr. Terry.  In addition, due to the need for the Trustee to take immediate action on a variety of fronts after his appointment, as well as the substantial fees that new counsel would incur to familiarize itself with the intricate and impending legal issues in the Cases, the Trustee believes that his engagement of Winstead for the limited purposes described below would lead to efficiencies that would be lost if the Trustee were forced to employ different counsel.

20.    The Trustee has also selected Winstead as special counsel because of Winstead's extensive experience and knowledge in the field of debtor and creditor rights and business reorganizations under Chapter 11 of the Bankruptcy Code, as well as Winstead's experience and expertise in providing legal services related to all aspects of the investment management and private funds industry, including formation, advisor/manager mergers and acquisitions, portfolio transactions, and regulatory and compliance matters.  Accordingly, the Trustee believes that his retention of Winstead as special counsel for the limited purposes described below is in the best interests of the Estates and their creditors.

---

[2] To the extent, however, that the Court finds Winstead's proposed retention more appropriate under section 327(e) of the Bankruptcy Code, the Trustee reserves its rights to seek approval for such retention under section 327(e).

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**                    **Page 5 of 16**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-6   Filed 12/23/23   Page 1342 of 1392   PageID 16084
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1231 of 1803   PageID 11977
Case 18-30256-sgj11   Doc 948-1   Filed 05/30/19   Entered 11/25/18 Page 17.13 Page 6 of 16

21.     Importantly, upon the Trustee's retention of Winstead as set forth in this Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in connection with the pending appeals related to the Involuntary Petitions (the "Appeals") and that Mr. Terry would have to retain new counsel for representation in these Cases.[3]  Mr. Terry has consented to such limited representation by Winstead.  Further, both the Trustee and Winstead believe that such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

22.     The Trustee believes the employment of Winstead is appropriate and necessary to enable the Trustee to execute faithfully his duties under the Bankruptcy Code, and the Trustee further believes that Winstead and its attorneys are fully qualified to perform the specified legal services referenced below.

23.     Winstead maintains its principal offices at 2728 N. Harwood Street, Suite 500, Dallas, Texas 75201; Telephone: (214) 745-5400; Facsimile: (214) 745-5390.  The Trustee and Winstead have designated Rakhee Patel, a shareholder of Winstead who offices in Winstead's Dallas office, to serve as the attorney in charge with respect to the representation.

24.     In support of this Application, the Declaration of Rakhee V. Patel (the "Declaration") is attached hereto as Exhibit "A" and is incorporated herein for all purposes.

---

[3] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed later in this Application, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6835   Filed 12/23/24   Page 1343 of 1392   PageID 16085
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1232 of 1803   PageID 11978
Case 18-30264-sgj11   Doc 2405   Filed 05/30/19   Entered 11/25/18 Page 7 of 16   Page 7 of 16

**B.**   **Services to be Rendered**

25.   The Trustee has requested that Winstead provide legal services to the Trustee for matters specifically involving the:

a)  management, liquidation, disposition, and monetization of the CLO assets;

b)  Investment Advisers Act;

c)  operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

d)  certain other litigation matters related to or arising in these Cases, as requested by the Trustee.

26.   Subject to this Court's approval of the Application, Winstead is willing to serve as the Trustee's special counsel in the Cases to perform the services described above.

27.   Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

**C.**   **Compensation and Reimbursement**

28.   The Trustee proposes to retain Winstead on a customary hourly rate basis, subject in all respects to this Court's authorization for payment.  Winstead's customary hourly rates of attorneys and paralegals for a representation of this nature are presently in a range up to: $785 for shareholders, $485 for associates, and $290 for paralegals.

29.   Winstead's rates are adjusted on a periodic basis.  Winstead will not charge the Trustee at a rate for its services greater than the standard rates Winstead charges to its clients, generally, for similar engagements.

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/23/22    Page 1344 of 1392    PageID 16086
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1233 of 1803    PageID 11979
Case 18-30264-sgj11    Doc 911-2    Filed 06/30/19    Entered 11/25/19 18:37:34    Page 8 of 16

30.     Winstead's billing rates are consistent with rates charged by other professionals in the Northern District of Texas with similar experience.  These rates are set at a level designed to compensate Winstead for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses.  Winstead's hourly rates for the attorneys who it anticipates will most likely be working on the Cases are:

| | |
|---|---|
| Rakhee Patel, Shareholder | $585.00 per hour |
| Philip Lamberson, Shareholder | $655.00 per hour |
| Joseph Wielebinski, Shareholder | $655.00 per hour |
| Toby Galloway, Shareholder | $550.00 per hour |
| Andrew Rosell, Shareholder | $585.00 per hour |
| Annmarie Chiarello, Associate | $380.00 per hour |
| Jason Enright, Associate | $390.00 per hour |
| Courtney Mitchell, Associate | $485.00 per hour |
| Laura Thetford, Associate | $385.00 per hour |

31.     The attorneys who will provide services to the Trustee are duly licensed to practice in the State of Texas and are admitted to practice law in the Northern District of Texas. As necessary, certain other attorneys and/or paraprofessionals may provide services in connection with the engagement.

32.     Subject to this Court's approval, the Trustee has also agreed to the reimbursement of Winstead for all out-of-pocket expenses incurred by Winstead. These expenses include, but are not limited to, costs for long-distance telephone charges, facsimile charges, photocopying, travel, parking, business meals, computerized research, UCC searches, messengers, couriers, postage, filing fees and other fees related to trials and hearings. Winstead will charge for all such actual and necessary expenses in a manner and at rates consistent with charges made generally to Winstead's other clients and consistent with the applicable Local Rules of the Court.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/25/26 of 18/04   Page 1345 of 1392   PageID 16087
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1234 of 1803   PageID 11980
Case 18-30264-sgj11-12389245 Filed D05/359913   Entered 05/39/18 Page870 11f 3Page 9 of 16

33.     Winstead will apply to the Court for compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code and the Local Rules of this District and Court.

34.     As set forth in the Declaration: (i) Winstead has no agreement with any other entity to share any compensation received and no such agreement will be made, except as permitted under section 504(b)(1) of the Bankruptcy Code; and (ii) no attorney at Winstead is related to any United States Bankruptcy Judge or United States District Court Judge for the Northern District of Texas or to the United States Trustee.  Winstead has received no prior consideration to act as special counsel for the Trustee.

35.     Winstead has not received a retainer in connection with this engagement.

**D.     Disinterestedness of Winstead**

36.     To the best of Winstead's knowledge, other than as set out below, the shareholders and associates of Winstead: (i) do not have any connection with the Trustee, the Debtors, their creditors, or any other party-in-interest or their respective attorneys and accountants; (ii) do not have any connection with the United States Trustee or any person employed in the Office of the United States Trustee; (iii) are "disinterested persons," pursuant to §§ 101(14) and 327(c) of the Bankruptcy Code; and (iv) do not hold or represent any interest adverse to the Estates:

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| Joshua N. Terry | Creditor | Winstead previously represented Mr. Terry in connection with the Involuntary Petitions and in connection with governmental investigations of certain non-debtor parties; as of May 14, 2018, Winstead represents Mr. Terry in connection with only the appeals related to the Involuntary Petitions and, as necessary, in connection with governmental investigations of certain non-debtor |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/23/24   Page 1346 of 1392   PageID 16088
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1235 of 1803   PageID 11981
Case 18-30264-sgj11   Doc 2405   Filed 05/30/19   Entered 05/30/18 21:13 Page 10 of 16

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| | | parties-in-interest; such current representations are not adverse to the Debtors or their Estates.[4] |
| U.S. Bank National Association | Counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| BNP Paribas | Affiliate of counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| The Bank of New York Mellon Trust Co., N.A. | Counter-party to executory contract | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Andrews & Kurth LLP | Creditor | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Highland Capital Management, L.P. | Creditor/Affiliate | Winstead is a party to certain litigation, which is wholly unrelated to these Cases, styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC*, DC-15-01816, in the 193rd Judicial District Court of Dallas County, Texas, stemming from Winstead's prior representation of Highland Capital Management, L.P., in connection with a foreclosure. |

37.     As set forth in the herein, Winstead may have rendered, or may now be rendering, legal services to certain creditors or other parties-in-interest, or may have been, or may now be involved, in projects in which attorneys or accountants for these creditors or parties-in-interest were involved and in matters unrelated to the Debtors and the Trustee.  Except as otherwise indicated herein, none of the services provided include any matters related to the Cases and none constitute an interest materially adverse to the Trustee. Accordingly, Winstead does not hold an adverse interest to the Debtors or their Estates.  Moreover, as part of its practice, Winstead appears in cases, proceedings, and transactions involving many different attorneys, accountants,

---

[4] With respect to Winstead's representation of Mr. Terry in connection with such governmental investigations, Winstead is engaged pursuant to a hybrid fee arrangement.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38.6 Filed 12/23/22 2 of 1804 Page 1347 of 1392   PageID 16089
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1236 of 1803   PageID 11982
Case 18-30264-sgj11 Doc 2405 Filed 06/06/19   Entered 06/06/18 Page 11 of 16

financial consultants, and investment bankers, some of whom now, or may in the future, represent creditors and parties-in-interest in the Cases. Winstead will not represent any such entities in the Cases.

38.    As set forth in the Declaration, Winstead has conducted a comprehensive conflict search regarding the creditors and parties-in-interest as provided by the Debtors on their schedules and disclosures. Winstead will supplement its conflicts check as additional creditors are disclosed and shall promptly disclose to the Court any other connections that Winstead discovers it has or has had with any such creditors of the estate pursuant thereto.

39.    Winstead began performing services for the Trustee on May 14, 2018, when he agreed to retain Winstead, subject to the Court's approval, as his special counsel. Accordingly, the Trustee respectfully requests that the approval of this Application be effective as of May 14, 2018. As set forth in Local Rule 2014-1(b)(1), such timing renders this Application contemporaneous with the initiation of services.

## IV.    __AUTHORITIES__

40.    Under the Bankruptcy Code, "the trustee with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties[.]" 11 U.S.C. § 327(a).

41.    Further, a "disinterested person" is defined under the Bankruptcy Code as a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor." *Id.* § 101(14)(C).

42.    The Fifth Circuit has commented that the phrases under sections 101(14)(C) and 327(a) of the Bankruptcy Code, regarding whether a party has an "adverse interest," are "nearly

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18.6    Filed 12/28/22 of 1804    Page 1348 of 1392    PageID 16090
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1237 of 1803    PageID 11983
Case 18-30264-sgj11  Case 19-20892-65  Filed 06/369-9    Entered 10/31/18 Page 87.13 of 3    Page 12 of 16

identical." *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir.

2005)**.** Thus, "with an eye to the specific facts of each case," to determine whether a proposed

professional holds an adverse interest under section 327(a), the Fifth Circuit examines whether

they:

> (1) [] possess or assert any economic interest that would tend to lessen the value
> of the bankruptcy estate or that would create either an actual or potential dispute
> in which the estate is a rival claimant; or
>
> (2) [] possess a predisposition under circumstances that render such a bias against
> the estate.

*Id.*; *accord Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.)*, 676 F.3d 455, 461-

62 (5th Cir. 2012).

43.    Still, in these Cases, "a person is not disqualified for employment under [section

327] solely because of such person's employment by or representation of a creditor, unless there

is objection by another creditor or the United States trustee, in which case the court shall

disapprove such employment if there is an *actual conflict of interest*." 11 U.S.C. § 327(c)

(emphasis added).

44.    To determine whether a proposed professional should be disqualified pursuant to

sections 327(a) and (c), courts look to the nature of any purported conflict of interest: (i) if there

is an *actual* conflict, the professional is *per se* disqualified; (ii) if there is a *potential* conflict, the

court may use its discretion to determine whether the professional should be disqualified; and

(iii) if there is only an *appearance* of a conflict, the court may not disqualify the professional. *In

re AGE Ref., Inc.*, 447 B.R. 786, 802-06 (Bankr. W.D. Tex. 2011) (citing *In re Marvel Entm't

Grp., Inc.*, 140 F.3d 463, 476 (3rd Cir. 1998)).

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66-6    Filed 12/29/26 of 1704    Page 1349 of 1392    PageID 16091
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1238 of 1803    PageID 11984
Case 18-30264-sgj11    Doc 2405    Filed 05/16/19    Filed 11/25/19    Page 13 of 16

45.     In evaluating whether an "actual conflict" exists, courts examine the specific circumstances of the proposed retention and whether there would be a direct conflict between the interests of estate and the creditor that was previously represented by proposed counsel:

> Generally, when an actual conflict exists there is "active competition between two interests, in which one interest can only be served at the expense of another." Actual conflicts arise when (1) the interests of the trustee and the creditor are in direct conflict or (2) the creditor is receiving a preference denied to the other creditors. The conflict must be direct and actual; a court should not disqualify an attorney solely because there is an appearance of a conflict. The burden of proving an actual conflict lies on the objecting party.

*In re Hanckel*, 517 B.R. 609, 614 (Bankr. D.S.C. 2014) (internal citations omitted); *see also In re Humble Place Joint Venture*, 936 F.2d 814, 819 (5th Cir. 1991) (finding an actual conflict when "counsel's loyalty to . . . the debtor's estate would be tested at every turn by the very real, continuing interest of his client [in the prior representation]").

46.     Additionally, to determine whether Winstead has an adverse interest under section 327(a), the Court should examine whether Winstead has such an adverse interest "with respect to the specific [services] for which the Trustee seeks to hire the firm." *In re AGE Ref., Inc.*, 447 B.R. at 802; *see also Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 621-30 (2d Cir. 1999) (holding that, under sections 327(a) and (c), proposed special counsel was not disqualified from representing the trustee for limited purposes, including to pursue Chapter 5 claims against a certain creditor, when proposed counsel had previously represented another creditor).

47.     Here, the issue is whether Winstead's prior representation of Mr. Terry should preclude the Trustee from retaining Winstead as special counsel for the limited purposes set forth herein.   With Winstead's ongoing representation of Mr. Terry related to these Cases being limited only to his representation in connection with the Appeals, the Trustee believes Winstead

---

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6836 Filed 12/24/02 of 1804ge 1350 of 1392   PageID 16092
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1239 of 1803   PageID 11985
Case 18-30264-sgj11   Doc 894-55 Filed 06/369-9   Filed 11/25/19 Page 87 53 of 3 Page 14 of 16

has no *actual* conflict of interest with the Estates as a result of such representation. Further, as a result of Winstead's limited representation of Mr. Terry, the Trustee believes Winstead does not possess any economic interest that would tend to lessen the value of the Estates or that would create either an actual or potential dispute in which either Estate is a rival claimant. *See W. Delta Oil Co.*, 432 F.3d at 356. Moreover, Winstead has no bias against the Estates due to its representation of Mr. Terry. *See id.* Indeed, the Trustee submits that Mr. Terry's interests and the Estate's interests are aligned with the Trustee's goal of maximizing the value of the Estates, which inures to the benefit of all creditors, including Mr. Terry.

48.    As set forth above, the Trustee requests to employ Winstead to provide legal services only regarding matters involving the (i) management, liquidation, disposition, and monetization of the CLO assets; (ii) Investment Advisers Act; and (iii) operation of the portfolio management agreement and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and (iv) certain other litigation matters related to or arising in these Cases, as requested by the Trustee. With respect to these specified purposes, the Trustee submits that Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same.  Accordingly, except to the extent necessary to effectuate the specific services outlined above, Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code.  With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

---

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88.6   Page 1242 of 1804   Page 1351 of 1392   PageID 16093
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1240 of 1803   PageID 11986
Case 18-30264-sgj11   Doc 899-6   Filed 05/31/19   Entered 05/31/19 Page 163 of   Page 15 of 16

49.     In sum, based on Winstead's familiarity with the unique factual circumstances and complex legal issues in the Cases (particularly with respect to the CLO assets, the portfolio management agreement, indentures, and related structures), Winstead's bankruptcy expertise and considerable experience and knowledge in handling such matters, the need for immediate action by the Trustee on a variety of fronts related to these specific matters, as well as the substantial expense the Estates would incur as a result of new counsel needing to familiarize itself with the intricate and impending legal issues in the Cases, the Trustee believes that Winstead's engagement as special counsel for the limited purposes described herein in is in the best interests of the Estates and their creditors.

50.     In accordance with section 327(c) of the Bankruptcy Code, the Trustee submits that Winstead has no actual conflict of interest in these Cases resulting from Winstead's prior representation of Mr. Terry or from Winstead's limited representation of Mr. Terry in connection with the Appeals.

51.     Therefore, the Trustee submits that the employment of Winstead as special counsel is permissible under section 327(a) of the Bankruptcy Code, is advisable, and is in the best interests of the Estates and their creditors.

52.     In addition, Winstead's fees and expenses incurred as special counsel to the Trustee would be subject to such interim and final fee applications as are otherwise appropriate under sections 330 and 331 of the Bankruptcy Code, and under applicable local rules and standing orders.

## V.     **PRAYER**

WHEREFORE, the Trustee respectfully requests that the Court enter an order: (i) approving this Application; (ii) authorizing the Trustee's retention of Winstead as special counsel in accordance with this Application, effective as of May 14, 2018; (iii) providing for the

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 63-6   Filed 12/29/23   Page 1352 of 1392   PageID 16094
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1241 of 1803   PageID 11987
Case 18-30264-sgj11   Doc 869-3   Filed 05/30/18   Entered 05/30/18 07:13:37   Page 16 of 16

compensation of Winstead pursuant to sections 330 and 331 of the Bankruptcy Code; and (iv)

granting the Trustee such other and further relief to which he may be entitled.

**DATED: May 30, 2018**

Respectfully submitted,

*/s/ Robin Phelan*
Robin Phelan, Chapter 11 Trustee
SBT #15903000
PHELANLAW
4214 Woodfin Drive
Dallas, Texas 75220
Phone: (214) 704-0222

**ROBIN PHELAN, CHAPTER 11 TRUSTEE
FOR ACIS CAPITAL MANAGEMENT L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 30th day of May, 2018, true and correct
copies of this document were electronically served by the Court's ECF system on parties entitled
to notice thereof, and that, additionally, on the same date he caused true and correct copies of this
document to be served by U.S. first class mail, postage prepaid, on the parties listed on the
Service List attached hereto.

*/s/ Jason A. Enright*
One of Counsel

---

**Appellee Appx. 01235
APPX. 01435**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 8.3.5   Page 1/2426f 1804ge 1353 of 1392   PageID 16095
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1242 of 1803   PageID 11988



Case 18-30264-sgj11-12039-GSS Filed 05/30/18   Entered 05/90/18 23:38:08   Page 1 of 11

EXHIBIT "A"

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 88-35 Filed 12/24/24 Page 1354 of 1392 PageID 16096
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1243 of 1803 PageID 11989
Case 18-30264-sgj11 Doc 1324-6 Filed 06/30/18 Entered 06/30/18 Page 2 of 11

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | Chapter 11 |

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION TO**
**EMPLOY WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

I, Rakhee V. Patel, hereby declare the following and hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that it is true and correct to the best of my knowledge and belief:

1. "My name is Rakhee V. Patel, I am over the age of 18 years, and I am competent and otherwise qualified to make this Declaration. I am a shareholder in the law firm of Winstead PC ("Winstead"), proposed special counsel for Robin Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the "Cases").[1] I submit this Declaration (the "Declaration") in support of the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Application") for the purposes of making all of the required disclosures pursuant to 11 U.S.C. §§ 327 and 328, and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, and to advise this Court of Winstead's qualifications.

2. "I have personal knowledge of each of the facts stated in this Declaration, except for those facts stated on information and belief, and, as to those facts, I am informed and I

---
[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application.

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE** **Page 1 of 10**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/29/26 of 1804 Page 1355 of 1392   PageID 16097
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1244 of 1803   PageID 11990
Case 18-3026 sgj11-12034-CSS Filed 05/30/18   Entered 05/30/18 20:03 34 Page 3 of 11

believe them to be true. If called as a witness, I would testify as to the matters set forth below based upon my personal knowledge, except where otherwise indicated below. To the extent that I obtain additional information, which requires further disclosure or modification of the Application or this Declaration, a supplemental declaration will be submitted to this Court.

3.     "I am admitted and in good standing to practice before the State Courts of the State of Texas, the United States District and Bankruptcy Courts for the Northern, Eastern, Southern and Western Districts of Texas, and the Fifth Circuit Court of Appeals. The other attorneys of Winstead who are designated as most likely to appear in this representation are also admitted to practice in the State of Texas and are admitted to the U.S. District Court for the Northern District of Texas.

4.     "My office address is 2728 N. Harwood Street, Suite 500, Dallas, Texas 75201; Telephone: (214) 745-5400; Facsimile: (214) 745-5390.

## QUALIFICATIONS OF COUNSEL

5.     "As set forth in the Application, on May 14, 2018, the Trustee requested to retain Winstead, subject to the Court's approval, as his special counsel in these Cases. Winstead immediately began rendering services to and for the Trustee for the limited purposes set forth in the Application.

6.     "Winstead maintains offices in Dallas, Fort Worth, Austin, San Antonio, The Woodlands, and Houston, Texas, as well as in Charlotte, North Carolina. Winstead currently has approximately three-hundred fifty (350) lawyers, and its client base includes many public and private corporations, partnerships, governmental entities, banks, insurance companies, non-profit organizations, and individuals. Winstead has expertise in many fields of law including bankruptcy, business reorganization, restructuring, complex litigation, and creditors' rights, as

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**     Page 2 of 10

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6833    Exhibit 6    Page 1246 of 1804    Page 1356 of 1392    PageID 16098
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1245 of 1803    PageID 11991
Case 18-30264-sgj11    Doc 2345SSSFile0b 05/30/18    Ent10c205/90/Page 27:03:34 Page 4 of 11

well as in the investment management and private funds industry, including with respect to fund formation, advisor/manager mergers and acquisitions, portfolio transactions, and regulatory and compliance matters.

7.      "Winstead has substantial experience in Chapter 11 bankruptcy cases and trustee representations.    I and other attorneys at Winstead have represented debtors, committees, trustees, secured and unsecured creditors, and significant stakeholders in numerous other bankruptcy cases, locally and nationally.  I and other attorneys at Winstead have received various awards and recognition for our reorganization services, have published numerous scholarly reorganization articles, and have spoken at multiple professional seminars.

8.      "In addition, the Trustee's selection of Winstead is based, in part, upon the fact that Winstead has gained significant familiarity with, and considerable knowledge of, the unique factual circumstances and complex legal issues in the Cases through its representation of Mr. Terry in connection with the trial on the Involuntary Petitions.  Once the Court entered orders for relief in the Cases, and the Trustee was appointed, there was an immediate need for the Trustee to seek counsel and advice regarding the various intricate issues impending in the Cases related to the business of the Debtors, for which the Trustee needed to take action. If the Trustee were to retain new counsel for the purposes set forth below, the Estates would incur substantial fees as new counsel would need to familiarize itself with such factual background and legal issues in the Cases, with which Winstead is already familiar. Thus, the engagement of Winstead for the limited purposes described below would lead to efficiencies that would be lost if the Trustee were forced to employ different counsel.

9.      "Importantly, upon the Trustee's retention of Winstead as set forth in the Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in

_____

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**        **Page 3 of 10**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-5    Filed 12/29/26 of 1392    Page 1357 of 1392    PageID 16099
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1246 of 1803    PageID 11992
Case 18-30264-sgj11    Doc 3245-5    Filed 05/30/18    Entered 05/30/18 22:34    Page 5 of 11

connection with the pending appeals related to the Involuntary Petitions (the "Appeals"), and that Mr. Terry would have to retain new counsel for representation in these Cases.[2]  Mr. Terry has consented to such limited representation by Winstead.  Further, such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

10.    "Accordingly, I believe the employment of Winstead is appropriate and necessary to enable the Trustee to execute faithfully his duties under the Bankruptcy Code and that Winstead and its attorneys are fully qualified to perform the specified legal services referenced below.

### SERVICES TO BE RENDERED

11.    "The Trustee has requested that Winstead provide special counsel services to the Trustee for matters specifically involving the:

    a)  management, liquidation, disposition, and monetization of the CLO assets;

    b)  Investment Advisers Act;

    c)  operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

    d)  certain other litigation matters related to or arising in these Cases, as requested by the Trustee.

12.    "Subject to this Court's approval of the Application, Winstead is willing to serve as the Trustee's special counsel in the Cases to perform the services described above.

---

[2] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed later in this Declaration, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**      **Page 4 of 10**

**Appellee Appx. 01240**
**APPX. 01242**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-35    Filed 11/24/26 of 17049    Page 1358 of 1392    PageID 16100
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1247 of 1803    PageID 11993
Case 18-30264-sgj11 Doc 3245-5 Filed 05/30/18    Entered 05/30/18 23:13:34 Page 6 of 11

13.    "Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

14.    "With respect to these specified purposes, Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same. Accordingly, except to the extent necessary to effectuate the specific services outlined above, Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code.  With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

## COMPENSATION AND REIMBURSEMENT

15.    "Winstead has agreed to perform such legal services on an hourly fee basis at its customary hourly rates for cases of the size and complexity as these Cases.  Winstead's customary hourly rates of attorneys and paralegals for a representation of this nature are presently in a range up to: $785 for shareholders, $485 for associates, and $290 for paralegals.

16.    "Winstead's rates are adjusted on a periodic basis.  Winstead will not charge the Trustee at a rate for its services greater than the standard rates Winstead charges to its clients, generally, for similar engagements.

17.    "Winstead's billing rates are consistent with rates charged by other professionals in the Northern District of Texas with similar experience.  These rates are set at a level designed to compensate Winstead for the work of its attorneys and paralegals and to cover fixed and

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**    **Page 5 of 10**

**Appellee Appx. 01241**
**APPX. 01043**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68:35    Filed 12/24/24    Page 1359 of 1392    PageID 16101
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1248 of 1803    PageID 11994
Case 18-30264-sgj11    Doc 3245    Filed 05/30/18    Entered 05/30/18 17:18:34    Page 7 of 11

routine overhead expenses. Winstead's hourly rates for the attorneys who it anticipates will most likely be working on the Cases are:

| | |
|---|---|
| Rakhee Patel, Shareholder | $585.00 per hour |
| Philip Lamberson, Shareholder | $655.00 per hour |
| Joseph Wielebinski, Shareholder | $655.00 per hour |
| Toby Galloway, Shareholder | $550.00 per hour |
| Andrew Rosell, Shareholder | $585.00 per hour |
| Annmarie Chiarello, Associate | $380.00 per hour |
| Jason Enright, Associate | $390.00 per hour |
| Courtney Mitchell, Associate | $485.00 per hour |
| Laura Thetford, Associate | $385.00 per hour |

18.    "Winstead will maintain detailed, contemporaneous records of time and any actual and necessary expenses incurred in connection with the rendering of the legal services for the Trustee as described in the Application and in accordance with the rules of this Court.

19.    "Subject to this Court's approval, the Trustee has also agreed to the reimbursement of Winstead for all out-of-pocket expenses incurred by Winstead. These expenses include, but are not limited to, costs for long-distance telephone charges, facsimile charges, photocopying, travel, parking, business meals, computerized research, UCC searches, messengers, couriers, postage, filing fees and other fees related to trials and hearings. Winstead will charge for all such actual and necessary expenses in a manner and at rates consistent with charges made generally to Winstead's other clients and consistent with the applicable Local Rules of the Court.

20.    "Winstead will apply to the Court for compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code and the Local Rules of this District and Court.

21.    "Winstead has no agreement with any other entity to share any compensation received and no such agreement will be made, except as permitted under section 504(b)(1) of the

DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE        Page 6 of 10

Appellee Appx. 01242
APPX. 11044

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83   Filed 12/25/2 of 174ge 1360 of 1392   PageID 16102
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1249 of 1803   PageID 11995
Case 18-30264-sgj11   Doc 2245-5   Filed 05/30/18   Entered 05/30/18 21:25:13   Page 8 of 11

Bankruptcy Code; and no attorney at Winstead is related to any United States Bankruptcy Judge
or United States District Court Judge for the Northern District of Texas or to the United States
Trustee. Winstead has received no prior consideration to act as special counsel for the Trustee.

22.    "Winstead has not received a retainer in connection with this engagement.

### DISINTERESTEDNESS OF PROFESSIONALS

23.    "To the best of my knowledge, other than as set out below, the shareholders and
associates of Winstead: (i) do not have any connection with the Trustee, the Debtors, their
creditors, or any other party-in-interest or their respective attorneys and accountants; (ii) do not
have any connection with the United States Trustee or any person employed in the Office of the
United States Trustee; (iii) are "disinterested persons," pursuant to §§ 101(14) and 327(c) of the
Bankruptcy Code; and (iv) do not hold or represent any interest adverse to the Estates:

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| Joshua N. Terry | Creditor | Winstead previously represented Mr. Terry in connection with the Involuntary Petitions and in connection with governmental investigations of certain non-debtor parties; as of May 14, 2018, Winstead represents Mr. Terry in connection with only the appeals related to the Involuntary Petitions and, as necessary, in connection with governmental investigations of certain non-debtor parties-in-interest; such current representations are not adverse to the Debtors or their Estates. [3] |
| U.S. Bank National Association | Counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| BNP Paribas | Affiliate of counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |

___

[3] With respect to Winstead's representation of Mr. Terry in connection with such governmental investigations, Winstead is engaged pursuant to a hybrid fee arrangement.

___

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          **Page 7 of 10**

**Appellee Appx. 01243**
**Appx. 16043**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8 Exhibit Filed 1/25/26 of 1 Page 1361 of 1392   PageID 16103
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1250 of 1803   PageID 11996
Case 18-30264-sgj11 Doc 324 SS Filed 05/30/18   Entered 05/30/18 26:13:34 Page 9 of 11

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| The Bank of New York Mellon Trust Co., N.A. | Counter-party to executory contract | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Andrews & Kurth LLP | Creditor | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Highland Capital Management, L.P. | Creditor/Affiliate | Winstead is a party to certain litigation, which is wholly unrelated to these Cases, styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC*, DC-15-01816, in the 193rd Judicial District Court of Dallas County, Texas, stemming from Winstead's prior representation of Highland Capital Management, L.P., in connection with a foreclosure. |

24.     "Due to the diversity of Winstead's practice areas, Winstead may have rendered, or may now be rendering, legal services to certain creditors or other parties-in-interest, or may have been, or may now be involved, in projects in which attorneys or accountants for these creditors or parties-in-interest were involved and in matters unrelated to the Debtors and the Trustee.  Except as otherwise indicated herein, none of the services provided include any matters related to the Cases and none constitute an interest materially adverse to the Trustee. Accordingly, I believe that Winstead does not hold an adverse interest to the Debtors or their Estates. Moreover, as part of its practice, Winstead appears in cases, proceedings, and transactions involving many different attorneys, accountants, financial consultants, and investment bankers, some of whom now, or may in the future, represent creditors and parties-in-interest in the Cases.  Winstead will not represent any such entities in the Cases.

25.     "Importantly, upon the Trustee's retention of Winstead as set forth in the Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in connection with the pending appeals related to the Involuntary Petitions (the "Appeals") and that

_____

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          **Page 8 of 10**

**Appellee Appx. 01244**
**APPX. 01496**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-36    Filed 12/05/22    Page 1362 of 1392    PageID 16104
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1251 of 1803    PageID 11997
Case 18-30264-sgj11    Doc 2396-3    Filed 05/30/18    Entered 05/30/18 Page 2710 of 11    Page 10 of 11

Mr. Terry would have to retain new counsel for representation in these Cases.[4]  Mr. Terry has consented to such limited representation by Winstead.  Further, I believe that such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

26.    "In addition, with Winstead's ongoing representation of Mr. Terry related to these Cases being limited only to his representation in connection with the Appeals, I believe Winstead has no *actual* conflict of interest with the Estates as a result of such representation. Further, as a result of Winstead's limited representation of Mr. Terry, Winstead does not possess any economic interest that would tend to lessen the value of the Estates or that would create either an actual or potential dispute in which either Estate is a rival claimant. Moreover, Winstead has no bias against the Estates due to its representation of Mr. Terry. Indeed, I believe that Mr. Terry's interests and the Estate's interests are aligned with the Trustee's goal of maximizing the value of the Estates, which inures to the benefit of all creditors, including Mr. Terry.

27.    "Winstead has conducted a comprehensive conflict search regarding the creditors and parties-in-interest as provided by the Debtors on their schedules and disclosures.  Winstead will supplement its conflicts check as additional creditors are disclosed and shall promptly disclose to the Court any other connections that Winstead discovers it has or has had with any such creditors of the Estates pursuant thereto.

28.    "I have reviewed the results of the foregoing efforts of Winstead to determine the existence of any interests adverse to the Trustee or which would otherwise create a conflict of interest in connection with its engagement in this matter.  Based on this review, I believe

---

[4] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed above, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          Page 9 of 10

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68.3 6    Filed 12/52/26 of 1804ge 1363 of 1392    PageID 16105
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1252 of 1803    PageID 11998
Case 18-3026 Case 19-D22396-SLS Filed Doc 05/30/93    Filed 11/205/30/18 Page 3781 of 34 Page 11 of 11

Winstead does not have any interest adverse to the Trustee or which would otherwise create a conflict of interest in connection with its limited engagement in this matter.

29.    "In sum, based on Winstead's familiarity with the unique factual circumstances and complex legal issues in the Cases (particularly with respect to the CLO assets, the portfolio management agreement, indentures, and related structures), Winstead's bankruptcy expertise and considerable experience and knowledge in handling such matters, the need for immediate action by the Trustee on a variety of fronts related to these specific matters, as well as the substantial expense the Estates would incur as a result of new counsel needing to familiarize itself with the intricate and impending legal issues in the Cases, I believes that Winstead's engagement as special counsel for the limited purposes described herein in is in the best interests of the Estates and their creditors.

30.    "In light of the foregoing, I believe that the employment of Winstead as counsel for the Trustee is appropriate and in the best interests of the Estates, pursuant to sections 327 and 328 of the Bankruptcy Code, and should be approved.

31.    "I reserve the right to supplement this Declaration.

DECLARED under penalty of perjury this 30th day of May, 2018.

/s/ *Rakhee V. Patel*
Rakhee V. Patel

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**    Page 10 of 10
4813-4254-0390v.2 61588-3

**Appellee Appx. 01246**
**APPX. 01497**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-6 Exhibit 6 Page 1254 of 1784 Page 1364 of 1392 PageID 16106
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1253 of 1803 PageID 11999
Case 18-30264-sgj11 Doc 920-3 Doc 553918 Filed 05/09/18 Entered 05/30/Page 297 1334 Page 1 of 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| In re: | § | Case No. 18-30264-SGJ-11 |
|---|---|---|
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | |
| ACIS CAPITAL MANAGEMENT GP, | § | (Jointly Administered Under Case |
| LLC, | § | No. 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

ORDER APPROVING THE APPLICATION TO EMPLOY
WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

Came on for consideration the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Application"), filed by Robin Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the "Cases"),[1] and having considered the Application, the Declaration of Rakhee V. Patel in support of the Application, arguments of counsel, and any

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/15/26 of 1804ge 1365 of 1392    PageID 16107
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1254 of 1803    PageID 12000
Case 18-30264-sgj11    Doc 920-3    Filed 05/30/18    Entered 05/30/18 30:11334    Page 2 of 3

timely filed objections to the Application, the Court finds that (a) the proposed employment of Winstead PC ("Winstead") as special counsel for the Trustee, for the limited purposes set forth in the Application, is appropriate and in the best interest of the Debtors' Estates and creditors, (b) the Trustee and Winstead have represented to the Court that Winstead and its shareholders and associates do not represent or hold any interest adverse to the Debtors' Estates such that Winstead would be disqualified from representing the Trustee in these Cases, and (c) the Trustee and Winstead have represented to the Court that Winstead and each of its shareholders and associates is a "disinterested person" pursuant to 11 U.S.C. §§ 101(14) and 327(c).  Accordingly, the Court finds that the Application should be approved.  Therefore, pursuant to 11 U.S.C. § 327(a) and (c), it is hereby:

      **ORDERED** that the Application is **APPROVED**.  It is further

      **ORDERED** that the Trustee is authorized to retain and employ Winstead as his special counsel, effective as of May 14, 2018, to perform the services more particularly set forth in the Application.  It is further

      **ORDERED** that Winstead shall be compensated for services rendered and for expenses incurred, subject to the Court's interim and final approval and in accordance with the provisions of sections 330 and 331 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules, and such other procedures as may be fixed by order of this Court.

      **ORDERED** that that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

<div align="center">

**# # # END OF ORDER # # #**

</div>

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-3    Filed 12/26/23    Page 1366 of 1392    PageID 16108
Exhibit 6    Page 1256 of 1704
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1255 of 1803    PageID 12001
Case 18-30241-sgj11    Doc 329-653    Filed 05/30/18    Entered 05/30/18 17:11:34    Page 3 of 3

**SUBMITTED BY**:

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

*PROPOSED SPECIAL COUNSEL FOR ROBIN PHELAN,*
*CHAPTER 11 TRUSTEE*

---

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE**                                                            **Page 3 of 3**
    4812-2677-1046v.1

61588-3 5/30/2018

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88.5    Exhibit 6    Filed 12/27/24    Page 1367 of 1392    Page 1367 of 1392    PageID 16109
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1256 of 1803    PageID 12002
Case 18-30223-sgj11    Doc 2240-5    Filed 05/30/18    Entered 05/30/18 21:37:13    Page 1 of 3

SERVICE

| | | |
|---|---|---|
| Acis Capital Management Gp, LLC<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 | Acis Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201-7849 | Acis CLO 2013- 1, Ltd.<br>c/o Appleby Trust<br>Attn : The Directors Clifton House 75 Fort St.,<br>P. 0. Box 13<br>Grand Cayman, Cayman Islands KY1-1108 |
| Acis CLO 2013-1 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2013-2 Ltd.<br>c/o MaplesFS Limited, Attn: Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Acis CLO 2014- 3 Ltd.<br>c/o MapleFS Limited<br>Attn: The Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 |
| Acis CLO 2014-3 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2014-4 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2014-4 Ltd .<br>c/o MapleFS Limited<br>Attn : The Director<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq.<br>Grand Cayman, Cayman Islands KY1-1102 |
| Acis CLO 2014-5 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2014-5 Ltd.<br>c/o MapleFS Limited<br>Attn: The Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Acis CLO 2015-6 Ltd .<br>c/o MapleFS Limited<br>Attn: The Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman , Cayman Islands KY1 -1102 |
| Acis CLO 2015-6<br>Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington , DE 19801-1120 | Acis CLO 2017-7 Ltd.<br>c/o MapleFS Limited<br>Attn: The Directors<br>PO Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Acis CLO Management, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 |
| Acis CLO Value Fund II (Cayman), L.P.<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Acis CLO Value Fund II GP, LLC<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Acis CLO Value Fund II, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO Value Master Fund II, L.P.<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Acis Funding GP, Ltd.<br>c/o Maples Corporate Service Limited<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands FY1-1104 |
| Acis Funding L.P.<br>c/o Maples Corporate Services Limited<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1101 | Acis Loan Funding, Ltd.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 | Andrews Kurth Kenyon LLP<br>600 Travis, Suite 4200<br>Houston, TX 77002-2929 |
| BayVK R2 Lux S.A.,<br>SICAV-FIS<br>15 Rue de Flaxweiler<br>L-6776 Grevenmacher<br>Luxembourg | BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Case Anywhere LLC<br>218 60 Burbank Boulevard, Suite 125<br>Woodland Hills, CA 91367-7447 |
| CLO Holdco, Ltd.<br>c/o Intertrust Corp. Srvs. (Cayman) Ltd.<br>190 Elgin Ave, George Town<br>Grand Cayman, Cayman Islands KY1-9005 | CLO Holdco, Ltd.<br>Scott R. Larson<br>BELL NUNNALLY & MARTIN LLP<br>3232 McKinney Ave., #1400<br>Dallas, TX 75204-7422 | CSI Global Deposition Services<br>4950 N. O'Connor Road, Suite 152<br>Irving, TX 75062- 2778 |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-5    Filed 1/25/24    Page 1368 of 1392    PageID 16110
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1257 of 1803    PageID 12003
Case 18-30264-sgj11 Doc 2405 Filed 05/30/18 Entered 05/30/18 Page 33 of 34 Page 2 of 3

CT Corporation
P. O. Box 4 34 9
Carol Stream, IL 60197-4349

Dallas County
Linbarger, Goggan, Blair & Sampson LLP
c/o Laurie Spindler
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Dallas County
Linebarger Goggan Blair & Sampson, LLP
c/o Sherrel K Knighton
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Diane G. Reed
Reed & Elmquist, P.C.
501 N. College Street
Waxahachie, TX 75165-3361

Drexel Limited
309 23rd Street 340
Miami Beach, FL  33139-1700

Elite Document Technology
4 00 N. Saint Paul Street Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Avenue, Suite 215
Dallas, TX  75204-2421

Highland Capital Management, L. P.
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, L.P.
c/o Foley Gardere
Holland O'Neil, Jason Binford
2021 McKinney Avenue, Ste. 1600
Dallas, TX 75201-3340

Highland CLO Funding
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave., #1400
Dallas, TX 75204-7422

Highland CLO Funding
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave, #1400

JAMS, Inc.
18881 Von Karman Avenue, Suite 350
Irvine, CA  92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX  75201-1568

Joshua N. Terry
25 Highland Park Village, Suite 100- 848
Dallas, TX 75205-2726

Joshua N. Terry
350 9 Princeton Ave
Dallas, TX  75205-3246

Joshua N. Terry
c/o Winstead PC
Attn: Rakhee V. Patel
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201-1516

Joshua Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2789

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Avenue, Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph Street, Suite 5500
Chicago, IL  60601-6607

Lackey Hershman LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX  75219-4259

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201-6970

Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

Mizuho Securities USA Inc.
320 Park Avenue
12th Floor
New York, NY 10022-6848

Neutra, Ltd.
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave., #1400
Dallas, TX 75204-7422

O. S. Bank National Association
Attn: Michael Zak
60 Livingston Avenue
EP-MN-WS3D
Saint Paul, MN 55107-2292

Rakhee V. Patel
WINSTEAD PC
2728 N. Harwood Street
Suite 500
Dallas, TX 75201-1743

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-6   Filed 12/29/22   Page 1369 of 1392   PageID 16111
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1258 of 1803   PageID 12004

Case 18-30264-sgj11   Doc 2692-6   Filed 05/30/18   Entered 05/30/18 14:21:34   Page 3 of 3

Reid Collins & Tsai, LLP
1301 S. Capital of Texas Highway
Building C, Suite 300
Austin, TX  78746-6500

Robin Phelan
4214 Woodfin Drive
Dallas, TX 75220-6416

Robin Phelan
Chapter 11 Trustee
c/o Matthias Kleinsasser
Forshey & Prostok, LLP
777 Main St., Suite 1290
Fort Worth, TX 76102-5316

Robin Phelan, Chapter 11 Trustee
c/o Suzanne K. Rosen
Forshey & Prostok, LLP
777 Main St., Suite 1290
Fort Worth, TX 76102-5316

Stanton Advisors LLC
300 Coles Street Apartment 802
Jersey City, NJ 07310-1047

Stanton Law Firm
9400 North Central Expressway
Suite 1304
Dallas, TX 75231-5047

State Street (Guernsey) Limited
First Floor Dorey Court
Admiral Park
St. Peter Port, Guernsey
The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street New York, NY 10286-0001

Texas Comptroller of Public Accounts
John Stern
1100 Commerce Street Room 1254
Dallas, TX 75242-1305

Texas Comptroller of Public Accounts
John Stern
1100 Commerce Street Room 1254
Dallas, TX 75242-1305

Texas Comptroller of Public Accounts
John Stern
P.O. Box 12548
Austin, TX 78711-2548

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

U.S. Attorney General
Department of Justice
Washington, DC 20001

U.S. Attorney
1100 Commerce, 3rd Floor
Dallas, TX 75242-1074

United States Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-0996

Universal-Investment-Luxembourg S.A.
15, rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

US Bank National Association
Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court. Ste 350
Dallas, TX 75201-2348

US Bank National Association
Mark D. Kotwick
One Battery Park Plaza
New York, New York 10004-1405

US Bank
P. O. Box 5229
Cincinnati, OH 45201-5229

Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85   Filed 12/26/23   Page 1370 of 1392   PageID 16112
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1259 of 1803   PageID 12005

Case 19-12239-CSS   Doc 159-10   Filed 11/21/19   Page 1 of 6

# EXHIBIT J

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-6   Filed 12/26/23   Page 1371 of 1392   PageID 16113
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1260 of 1803   PageID 12006
Case 18-30264-sgj11   Doc 313   Filed 06/21/18   Entered 06/21/18 Page 1 of 6Page 1 of 5



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed June 21, 2018**

_____

**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

**ORDER (I) APPROVING THE APPLICATION TO EMPLOY
WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE
AND (II) DENYING THE MOTION TO DISQUALIFY WINSTEAD PC AS
PROPOSED SPECIAL COUNSEL TO ROBIN PHELAN, CHAPTER 11 TRUSTEE**

On June 14, 2018, the Court heard: (1) the *Application to Employ Winstead PC as
Special Counsel to the Chapter 11 Trustee* [Docket No. 246] (the "Application"), filed by Robin
Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and
Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or
"Acis"), the debtors in the above captioned and jointly administered bankruptcy cases (the

---

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 83-6   Filed 12/26/23   Page 1372 of 1392   PageID 16114
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1261 of 1803   PageID 12007
Case 18-30264-sgj11   Doc 289   Filed 06/25/18   Entered 06/25/18 Page 2 of 5

"Cases")[1] and (2) the *Motion to Disqualify Winstead P.C. as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* (the "Motion to Disqualify") [Docket No. 244]. Having considered the Application, the *Supplement to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Supplement") [Docket No. 266], Rakhee V. Patel's Declaration and Supplemental Declaration in support of the Application, the Motion to Disqualify, the *Objection of Highland Capital Management, L.P. to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Docket No. 267], the *United States Trustee's Objection to Application to Employ Winstead as Special Counsel to the Chapter 11 Trustee* [Docket No. 279], the arguments of counsel and evidence admitted at the hearing on the Application and the Motion to Disqualify, the Court read its findings of fact and conclusions of law into the record in accordance with Fed. R. Bankr. P. 7052(a).  For the reasons stated, the Court, pursuant to 11 U.S.C. § 327(a) and (c), **ORDERS AS FOLLOWS:**

1**.**     The Motion to Disqualify is **DENIED**.

2.     The Application is **APPROVED** to the extent set forth herein.

3.     The Trustee is authorized to retain and employ Winstead as his special counsel, effective as of May 14, 2018, to provide legal services to the Trustee for matters specifically involving:

    a)  management, liquidation, disposition, and monetization of the CLO assets;

    b)  the Investment Advisers Act of 1940, as amended; and

    c)  operation of the portfolio management agreements and the indentures, issues arising therefrom,[2] and, specifically including, litigation related thereto or arising therefrom.

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application or the Supplement, as applicable.

[2] For the avoidance of doubt, such issues may include issues related to securities laws, including the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended.

---

ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE                                                                                      Page 2 of 5

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8 35   Filed 1/26/26   Page 1373 of 1392   PageID 16115
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1262 of 1803   PageID 12008
Case 18-30264-sgj11   Doc 2393   Filed 06/25/18   Entered 06/21/18 Page 3 of 6 Page 3 of 5

4.      If the Trustee wishes to retain Winstead to provide legal services in any capacity other than in the three items identified in paragraph 2, the Trustee must obtain Court approval by application with the Court.

5.      Winstead may not provide legal services to Joshua Terry or to the Trustee in connection with the preparation or defense of, or any objection to, Joshua Terry's proofs of claim,[3] or such claims as may be amended.

6.      Winstead will establish an ethical wall between any of Winstead's attorneys engaged in these Cases and those of Winstead's attorneys involved in that certain litigation styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC,* DC-15-01816, pending in the 193rd Judicial District Court of Dallas County, Texas. Notwithstanding the foregoing, the Winstead attorneys engaged in these Cases may seek counsel from Don Campbell, in his capacity as Winstead's general counsel, as they deem necessary regarding issues related to any potential conflicts or other ethics issues that may arise during these Cases.

7.      With respect to those certain Appeals pending in the District Court for the Northern District of Texas, specifically under case numbers 3:18-cv-01056-D, 3:18-cv-01057-D, 3:18-cv-01073-D, and 3:18-cv-01084-D, any parties to such Appeals may not seek agreed dismissal of any such Appeals by compromise or settlement without providing proper notice to parties-in-interest in these Cases, as required under the Federal Rules of Bankruptcy Procedure or as otherwise required under applicable law.

8.      Winstead shall be compensated for services rendered and for expenses incurred, subject to the Court's interim and final approval and in accordance with the provisions of sections 330 and 331 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy

---

[3] Joshua Terry has filed two claims in these Cases: Claim No. 1 in the Claims Register for Case No. 18-30264 and Claim No. 1 in the Claims Register for Case No. 18-30265.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 88-6 Exhibit 6 Page 1374 of 1804 Page 1374 of 1392 PageID 16116
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1263 of 1803 PageID 12009
Case 18-30264-sgj11 Doc 2393 Filed 06/29/18 Entered 06/29/18 Page 4 of 6 Page 4 of 5

Procedure, the Local Bankruptcy Rules, and such other procedures as may be fixed by order of this Court.

9.      This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

**# # # END OF ORDER # # #**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-36   Filed 12/26/23   Page 1375 of 1392   PageID 16117
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1264 of 1803   PageID 12010
Case 18-30264-sgj11   Doc 833   Filed 06/15/18   Entered 06/15/18 Page 5 of 5   Page 5 of 5

**SUBMITTED BY:**

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

*SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE*

ORDER  APPROVING  APPLICATION  TO  EMPLOY  WINSTEAD  AS  SPECIAL  COUNSEL  TO  THE
CHAPTER 11 TRUSTEE                                                    Page 5 of 5
4846-6789-0026v.2

62112-1 6/15/2018

Appellee Appx. 01258
APPX. 01509

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 83-6 Filed 12/26/23 Page 1376 of 1392 PageID 16118
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1265 of 1803 PageID 12011

**APPENDIX 14**

**Appellee Appx. 01259**

**APPX. 01510**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-6    Filed 12/20/26 of 1804    Page 1377 of 1392    PageID 16119
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1266 of 1803    PageID 12012

Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 1 of 10

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**Objection Deadline: November 12, 2019 at 4:00 p.m. (Eastern time)**
**Hearing Date: November 19, 2019 at 12:00 p.m. (Eastern time)**

**DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE
RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS
SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION
DATE**

Highland Capital Management, L.P., the debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), files this application (the "Application"), pursuant to section 327(e) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order authorizing the Debtor to retain and employ Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH") as Special Texas Litigation Counsel in this Chapter 11 Case, *nunc pro tunc* to the Petition Date (defined below). In support of the Application, the Debtor relies upon and incorporates by reference the Declaration of Michael K. Hurst the ("Hurst Declaration"), a copy of which is attached hereto as **Exhibit A**. In further support of the Application, the Debtor respectfully states as follows:

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/26/23    Page 1378 of 1392    PageID 16120
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1267 of 1803    PageID 12013

Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 2 of 10

### Jurisdiction

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 327(e) and 328 of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1.

### Background

4.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition"). The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case.

5.      As of the date of the filing of this Application, the Office of the United States Trustee (the "U.S. Trustee") has yet to appoint an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

6.      A more detailed description of the business and operations of the Debtor, and the events leading to the commencement of this chapter 11 case, is provided in the *Declaration of Frank Waterhouse in Support of First Day Motion*, [Docket No. 9] (the "First Day Declaration") and incorporated herein by reference.[2]

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Declaration.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88b7 5    Filed 12/29/26 of 1304e 1379 of 1392    PageID 16121
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1268 of 1803    PageID 12014

Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 3 of 10

## Relief Requested

7.      By this Application, the Debtor seeks entry of an order authorizing the employment of the Firm as its Special Texas Litigation Counsel, *nunc pro tunc* to the Petition Date.  The Debtor requests that the Firm be retained to perform the services described in this Application.

## Basis for Relief

8.      Section 327(e) of the Bankruptcy Code authorizes a debtor, with court approval, to retain

> for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

9.      Section 327(e) of the Bankruptcy Code authorizes the retention of an attorney who represented a debtor prior to the bankruptcy petition date, provided: (a) such retention is for a special purpose; (b) the purpose of the retention is not to conduct the case; (c) the retention is in the best interests of the estate; and (d) the attorney does not hold any interest adverse to the debtor with respect to the subject of its retention.  The Firm's retention as the Debtor's Special Texas Litigation Counsel falls within the scope of section 327(e) of the Bankruptcy Code.

## The Firm's Qualifications

10.      The Debtor believes that the attorneys at the Firm are well qualified to act as Special Texas Litigation Counsel on behalf of the Debtor in this Chapter 11 Case.  The Firm is a boutique trial litigation firm and the specific attorneys engaged to represent the Debtor have substantial experience and expertise in trial litigation, including in complex commercial bankruptcy cases such as this case.

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-5   Filed 12/27/26 of 1804   Page 1380 of 1392   PageID 16122
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1269 of 1803   PageID 12015
Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 4 of 10

11.     The Firm has provided legal services to the Debtor in at least six separate matters since March 2016. In particular, and in regard to active litigation, the Firm acts as trial litigation counsel to the Debtor as it relates to the lawsuit captioned *In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC*, jointly administered under Case No. 18-30264-SGJ-11 pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, and various appeals related thereto (the "Pending Acis Proceedings"). The Debtor expects that the Firm, in its role as Special Texas Litigation Counsel, will continue to provide services to the Debtor with regard to matters that were handled by the Firm before the Petition Date. The Firm also represents entities related to the Debtor in the Pending Acis Proceedings including Highland HCF Advisor, Ltd., Highland CLO Management, Ltd., Highland CLO Holdings, Ltd. (collectively, the "Cayman Defendants").

12.     The Firm also acts as trial litigation counsel to the Debtor in a Texas State court litigation captioned *Joshua N. Terry, Individually and on Behalf of IRAs #1467711 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., James D. Dondero, and Thomas J. Surgent* Cause No. DC-16-11396 (the "Texas Lawsuit"). In the Petition, the Debtor identified an unsecured claim arising from the Texas Lawsuit. Certain disputed matters in the Texas Lawsuit were scheduled to proceed for resolution in a bench trial, scheduled to occur in November 2019. The Firm continues to represent the Debtor in the Texas Lawsuit, albeit that proceeding is currently subject to the automatic stay as to the Debtor.[3]

---

[3] The Firm also represents a related entity, the Charitable Donor Advised Fund, L.P. ("the Charitable DAF"), in a separate lawsuit in the Southern District of New York, case number 1:19-cv-09857-NRB, which is unrelated to the Debtor and this Chapter 11 Case, and unrelated to the Texas Lawsuit and the Pending Acis Proceedings. *See* Hurst Declaration.

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-6    Filed 12/09/22    Page 1381 of 1392    PageID 16123
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1270 of 1803    PageID 12016

Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 5 of 10

13.     Among other services provided to the Debtor in the Texas Lawsuit and/or in the Pending Acis Proceedings, the Firm counsels the Debtor on trial strategy, general litigation strategy, represents the Debtor at oral argument in various hearings, conducts research, conducts motion practice, and during discovery, manages discovery efforts when ongoing.

14.     The Firm's partners Mr. Hurst and Mr. David Coale both provide services to the Debtor in the above-referenced matters. Mr. Hurst, lead counsel for the Debtor within the Firm, is Board Certified in Civil Trial Law by the Texas Board of Legal Specialization. Mr. Coale, lead appellate counsel for the Debtor within the Firm, is Board Certified in Civil Appellate Law by the Texas Board of Legal Specialization.

15.     For these reasons, the Debtor believes that the Firm possesses the requisite expertise to serve as Special Texas Litigation Counsel in this case, and can do so in an efficient and cost-effective manner.

16.     In light of the Firm's relationship with the Debtor and the extensive work it has performed for the Debtor prior to the Petition Date, the Debtor believes that the Firm's retention is in the best interests of its estate and creditors.  Since its engagement, the Firm has become intimately familiar with the Debtor's business and operations as they pertain to the Pending Acis Proceedings and to the Texas Lawsuit, and to obtain new counsel now would result in the additional and unnecessary expenditure of both time and money.  For example, the Firm represents the Debtor in an appeal that is pending at the Fifth Circuit Court of Appeals and another appeal that is pending at the District Court in the Northern District of Texas.  The Firm continues to represent the Debtor in a pending adversary proceeding in the Pending Acis Proceedings, albeit that proceeding is currently subject to the automatic stay as to the Debtor.  The Firm, and co-

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-3    Filed 12/02/22    Page 1382 of 1392    PageID 16124
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1271 of 1803    PageID 12017

Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 6 of 10

litigation counsel, Foley Gardere, Foley & Lardner LLP ("Foley Gardere")[4] have worked cooperatively on the Pending Acis Proceedings and have endeavored to avoid unnecessary duplication of services to the Debtor. The Firm is uniquely qualified to handle the representation in a most efficient and timely manner. As such, the Firm should be retained as the Debtor's Special Texas Litigation Counsel.

### Services to Be Provided By the Firm

17.    The Firm's proposed retention pursuant to section 327(e) of the Bankruptcy Code is for the limited purpose of representing the Debtor as Special Texas Litigation Counsel. Subject to approval by the Bankruptcy Court, the services that the Debtor proposes that the Firm render, and the Firm has agreed to provide, include advising the Debtor in connection with all aspects of the Pending Acis Proceedings and the Texas Lawsuit, and performing the range of services normally associated with matters such as this as the Debtor's Special Texas Litigation Counsel, which the Firm is in a position to provide in connection with the matter referred to above.

18.    The Firm's proposed retention is for the discrete matters referenced above, and the Firm will not be rendering services typically performed by a debtor's bankruptcy counsel. Among other things, the Firm ordinarily will not be involved in interfacing with this Court or be primarily responsible for the Debtor's general restructuring efforts. By delineating the Firm's role, the Debtor has ensured there will be no duplication of services.

### Compensation and Fee Applications

19.    As required by Bankruptcy Code section 329 and Bankruptcy Rule 2016, the Hurst Declaration discloses that, in the one year period preceding the Petition Date, the Firm received payments from the Debtor totaling $1,110,508.49 (the "Prepetition Payments") with respect to

---

[4] The Debtor is simultaneously filing a request to employ the Foley Gardere firm as Special Texas Counsel.

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 63-5   Filed 12/28/22   Page 1383 of 1392   PageID 16125
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1272 of 1803   PageID 12018
Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 7 of 10

services rendered to the Debtor. The Prepetition Payments were paid by, and the sources of such funds were, the Debtor. According to the Hurst Declaration, as of September 30, 2019,[5] the Firm submits that it has earned fees and incurred reimbursable expenses on account of its services to Debtor in the amount of $1,419,928.07 (the "Aggregate Amounts"). As of September 30, 2019, approximately $319,419.58 of the Aggregate Amounts was outstanding and unpaid.

20.      The Firm intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and the guidelines promulgated by the United States Trustee, and pursuant to any additional procedures that may be established by the Court in this Chapter 11 Case. The Firm's fees for professional services are based upon its hourly rates, which are periodically adjusted. The hourly rates are currently $365 to $800 for attorneys and $180 to $235 for paraprofessionals.

21.      The Firm will maintain records in support of any actual and necessary costs and expenses incurred in connection with the rendering of its services in this Chapter 11 Case. Subject to application for and allowance by the Court, the Firm will receive reimbursement for reasonable and documented out-of-pocket expenses incurred in connection with the services rendered to the Debtor.

22.      All compensation and expenses will be sought in accordance with section 328(a) of the Bankruptcy Code, as incorporated in sections 329 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of the Court.

---

[5] Due to the timing of the bankruptcy filing, fees and expenses for October 2019 were not fully reflected in LPCH's accounting system. The Firm will supplement the Hurst Declaration with those additional sums once available.

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-35   Filed 12/24/22   Page 1384 of 1392   PageID 16126
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1273 of 1803   PageID 12019
Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 8 of 10

23.    The Debtor believes that the compensation arrangements with the Firm are reasonable and at market rates, and similar to the rates charged to other clients in similar circumstances.

### Disinterestedness and Disclosure of Connections

24.    To check and clear potential conflicts of interest in this Chapter 11 Case, the Firm researched its client database to determine whether it had any relationships with the following entities in its engagement as Special Texas Litigation Counsel (collectively, the "Interested Parties"):

      a.    the Debtor and its non-debtor affiliates;

      b.    the Debtor's secured creditors;

      c.    the Debtor's directors, officers and board members;

      d.    the Debtor's equity security holders;

      e.    the creditors of the Debtor holding the 20 largest unsecured claims; and

      f.    any person employed in the office of the U.S. Trustee or any Bankruptcy Judge currently serving on the United States Bankruptcy Court for the District of Delaware.

25.    To the extent that the Firm's research of its relationships with the Interested Parties indicates that the Firm has represented, or currently represents any of these entities in matters *unrelated* to this Chapter 11 Case, the identities of such entities and, for current clients, a brief description of the type of work performed by the Firm for these clients are set forth in Schedule 1 to the Hurst Declaration.

26.    In reliance on the Hurst Declaration, the Debtor believes that (a) the Firm has no connection with the Debtor, its creditors, the U.S. Trustee, any person employed in the office of

8

Appellee Appx. 01267
APPX. 16159

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-3   Filed 12/22/23   Page 1385 of 1392   PageID 16127
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1274 of 1803   PageID 12020

Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 9 of 10

the U.S. Trustee or any Bankruptcy Judge currently serving on the United States Bankruptcy Court for the District of Delaware, or any other party with an actual or potential interest in this Chapter 11 Case or their respective attorneys or accountants, except as set forth in the Hurst Declaration; (a) the Firm is not and has not been an investment banker for any outstanding securities of the Debtor; and (b) the Firm neither holds nor represents any interest adverse to the Debtor or its estate with respect to the matter on which the Firm is to be employed. Accordingly, the Debtor believes that the Firm's representation of the Debtor is permissible under section 327(e) of the Bankruptcy Code and is in the best interest of the Debtor's estate.

27.     Where, as here, there is no conflict concerning the subject matter of the proposed special engagement, an application to employ Special Texas Litigation Counsel should be granted. "[Section] 327(e) bars engagement of special counsel only in the presence of an actual conflict of interest concerning the subject matter of the engagement." *In re Carla Leather, Inc.*, 44 B.R. 457, 474 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985) (citations omitted); *see also In re Polaroid Corp.*, 424 B.R. 446, 453 (Bankr. D. Minn. 2010) (section 327(e) only disqualifies counsel when they have conflicts related to the matter on which the attorney is to be employed); *In re J.S. II, LLC*, 371 B.R. 311 (Bankr. N.D. Ill. 2007) (section 327(e) has more relaxed conflict of interest standard than section 327(a)); *In re EBW Laser, Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005) (counsel not disqualified under section 327(e) because it holds prepetition claim).

28.     Finally, the Debtor notes that the Firm will have no involvement with respect to actually conducting the Debtor's Chapter 11 Case. The Debtor has filed an application to retain Pachulski Stang Ziehl & Jones LLP ("<u>PSZ&J</u>") as bankruptcy counsel. The Debtor is specifically retaining PSZ&J, subject to court approval, to conduct its Chapter 11 Case. Although PSZ&J and

Appellee Appx. 01268
APPX. 10579

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 68-5   Filed 12/26 of 1804   Page 1386 of 1392   PageID 16128
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 1275 of 1803   PageID 12021
Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 10 of 10

the Firm may coordinate on matters that generally concern the Debtor, the Firm will not conduct the Debtor's bankruptcy case.

## Notice

29.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the District of Delaware; (c) the Debtor's principal secured parties; (d) counsel to any statutory committee appointed in the case; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

30.     No prior application or motion for the relief requested herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and granting such other and further relief as is just and proper.

Dated:    October 29, 2019              HIGHLAND CAPITAL MANAGEMENT, L.P.

                                        /s/ Frank Waterhouse
                                        By Strand Advisors, Inc., its Sole General Partner
                                        Frank Waterhouse, Treasurer

DOCS_NY:39760.1 36027/002

Appellee Appx. 01269
APPX. 01520

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68 35   Filed 11/29/23 08/22/24   Page 1387 1276 of 1392 1804   PageID 16129
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1276 of 1803   PageID 12022

Case 19-12239-CSS   Doc 70-1   Filed 10/29/19   Page 1 of 3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) |
| | ) Case No. 19-12239 (CSS) |
| Debtor. | ) |
| | ) |

**Objection Deadline: November 12, 2019 at 4:00 p.m. (ET)**
**Hearing Date: November 19, 2019 at 12:00 p.m. (ET)**

**NOTICE OF DEBTOR'S APPLICATION FOR AN ORDER
AUTHORIZING THE RETENTION AND EMPLOYMENT
OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS
LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

TO:   (a) the Office of the United States Trustee; (b) the Office of the United States Attorney
for the District of Delaware; (c) the Debtor's principal secured parties; (d) counsel to any
statutory committee appointed in the case; and (e) any party that has requested notice
pursuant to Bankruptcy Rule 2002.

      **PLEASE TAKE FURTHER NOTICE** that on October 29, 2019, the above-

captioned debtor and debtor in possession (collectively, the "Debtor"), filed the *Debtor's*

*Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox &*

*Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the

"Application") with the United States Bankruptcy Court for the District of Delaware, 824 Market

Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court").  A copy of the

Application is attached hereto.

      **PLEASE TAKE FURTHER NOTICE** that any response or objection to the

Application must be filed with the Bankruptcy Court on or before **November 12, 2019 at 4:00**

**p.m. (Eastern Time)**.

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_DE:226022.1 36027/002

**Appellee Appx. 01270**
**APPX. 01572**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/28/23    Page 1388 of 1392    PageID 16130
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1277 of 1803    PageID 12023
Case 19-12239-CSS    Doc 70-1    Filed 10/29/19    Page 2 of 3

**PLEASE TAKE FURTHER NOTICE** that at the same time, you must also

serve a copy of the response or objection upon: (i) proposed counsel for the Debtor: Pachulski

Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, Attn: James

E. O'Neill, Esq. (joneill@pszjlaw.com) and Pachulski Stang Ziehl & Jones LLP, 10100 Santa

Monica Blvd., 13th Floor, Los Angeles, CA 90067, Attn: Jeffrey N. Pomerantz, Esq.

(jpomerantz@pszjlaw.com); and (ii) the Office of the United States Trustee: 844 King Street,

Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jane M. Leamy, Esq.

(jane.m.leamy@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE** THAT IF YOU FAIL TO RESPOND IN

ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF

REQUESTED IN THE APPLICATION WITHOUT FURTHER NOTICE OR HEARING.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING TO CONSIDER

THE RELIEF SOUGHT IN THE APPLICATION WILL BE HELD ON **NOVEMBER 19, 2019**

**AT 12:00 P.M. (EASTERN TIME)** BEFORE THE HONORABLE CHRISTOPHER S.

SONTCHI, CHIEF UNITED STATES BANKRUPTCY COURT JUDGE, AT THE UNITED

STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH

MARKET STREET, 5TH FLOOR, COURTROOM NO. 6, WILMINGTON, DELAWARE

19801.

DOCS_DE:226022.1 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Exhibit 6    Filed 12/27/22 of 1804    Page 1389 of 1392    PageID 16131
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1278 of 1803    PageID 12024

Case 19-12239-CSS    Doc 70-1    Filed 10/29/19    Page 3 of 3

Dated: October 29, 2019

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 62337)
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      rpachulski@pszjlaw.com
             jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             mlitvak@pszjlaw.com
             joneill@pszjlaw.com

Proposed Counsel for the Debtor and Debtor in
Possession

DOCS_DE:226022.1 36027/002

Appellee Appx. 01272
APPX. 01524

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-35   Filed 12/29/26   Page 1390 of 1392   PageID 16132
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1279 of 1803   PageID 12025
Case 19-12239-CSS   Doc 70-2   Filed 10/29/19   Page 1 of 7

### EXHIBIT A

**Hurst Declaration**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-35    Filed 12/29/26 of 1874    Page 1391 of 1392    PageID 16133
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1280 of 1803    PageID 12026
Case 19-12239-CSS    Doc 70-2    Filed 10/29/19    Page 2 of 7

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) |

**DECLARATION OF MICHAEL K. HURST IN SUPPORT OF DEBTOR'S
APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND
EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS
LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Michael K. Hurst, declare under penalty of perjury as follows:

1.    I am a partner with the law firm of Lynn Pinker Cox & Hurst LLP (the "Firm" or

"LPCH"), located in Dallas, Texas. I am submitting this declaration ("Declaration") in support of

the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker*

*Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the

"Application").[2]

2.    Neither I, the Firm, nor any partner, of counsel or associate thereof, insofar as I

have been able to ascertain, has any connection with Highland Capital Management, L.P., the

above-captioned debtor (the "Debtor" or "Highland"), its creditors or any other parties in interest

herein, or their respective attorneys, except as set forth below.

3.    The Firm has represented the Debtor since March 2016. Since that time, the Firm

has also represented certain other entities related to the Debtor, including the Cayman Defendants

in the Pending Acis Proceedings, the defendants in the Texas Lawsuit who are executives of the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-3    Filed 12/28/23    Page 1392 of 1392    PageID 16134
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1281 of 1803    PageID 12027
Case 19-12239-CSS    Doc 70-2    Filed 10/29/19    Page 3 of 7

Debtor. The Firm also represents the Charitable DAF in case pending before the Southern District

of New York, case number 1:19-cv-09857-NRB, a case that is unrelated to the Debtor, this Chapter

11 Case, the Texas Lawsuit, and the Pending Acis Proceedings.

4.    The Firm has, as of September 30, 2019, received $1,110,508.49 in payments from

Highland during the year before the Petition Date.

5.    With respect to all matters, the Debtor has, subject to Court approval, agreed to

compensate the Firm on an hourly basis at rates that do not (and will not) exceed the rates that the

Firm customarily charges to its other clients for work of this type.  As of the Petition Date, the

applicable hourly rates for timekeepers for the matters that the Firm is engaged to perform legal

services ranged from $365 to $800 for attorneys and $180 to $235 for paraprofessionals.

6.    It is the Firm's policy to charge its clients for certain expenses incurred in

connection with providing certain client services, including, without limitation, travel, lodging,

vendor charges, delivery services and other expenses incurred in providing professional service,

and for other services actually provided, including word processing and other charges, excluding

secretarial overtime.

### Disclosures

7.    The Firm maintains a database containing the name of each current and former

client of the Firm, the name of the parties who are or were related or adverse to such client, and

the names of the Firm personnel who are or were responsible for the matters.  The Firm has

searched its database to determine potential conflicts with the Debtor and its non-debtor affiliates,

the Debtor's secured creditors, the Debtor's directors, officers and board members, the Debtor's

equity security holders, the creditors of the Debtor holding the 20 largest unsecured claims, and

any person employed in the office of the U.S. Trustee or any Bankruptcy Judge currently serving

2