Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 64    Filed 12/20/23 1804   Page 1 of 1104    PageID 16135
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1282 of 1803    PageID 12028

Case 19-12239-CSS    Doc 70-2    Filed 10/29/19    Page 4 of 7

on the United States Bankruptcy Court for the District of Delaware relating to its limited engagement by Debtor as Special Texas Litigation Counsel (collectively, the "Searched Parties"). Using such database, the Firm assessed the Searched Parties to ascertain the Firm's current relationship with parties that may be adverse to the Debtor in this Chapter 11 Case.

8.    Except as disclosed herein or in the attached Schedule 1, the Firm does not represent the Searched Parties or any other known creditor or party-in-interest of the Debtor with respect to the matters for which the Debtor seeks to retain the Firm pursuant to the Application and, therefore the Firm holds no material adverse interest to the Debtor or the Debtor's estate. Accordingly, the Firm is eligible for retention.

9.    The Firm may have performed services in the past, may currently perform services, and may perform services in the future, in matters unrelated to this Chapter 11 Case, for persons that are parties-in-interest in the Debtor's Chapter 11 Case. Except as set forth herein, I am not aware of the Firm performing any services for any such person or entity in connection with this case, or having any relationship with any such person or entity, their attorneys or accountants that we understand are adverse to the Debtor or its estate.

10.    From time to time, the Firm may have provided, and/or may currently provide, services to certain other parties-in-interest, or affiliates thereof, in all instances on matters in which such party does not or did not hold or represent an interest adverse to the Debtor or its estate with respect to the services for which the Firm is being retained.

11.    That said, the Debtor has and will retain various professionals during the pendency of this Chapter 11 Case. The Firm has previously worked with and will continue to work with these professionals on various representations. Further, the Firm and certain of its partners, of counsel, and associates may have in the past represented, may currently represent, and may in the

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 64    Filed 12/29/23    Page 2 of 1104    PageID 16136
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1283 of 1803    PageID 12029
Case 19-12239-CSS    Doc 70-2    Filed 10/29/19    Page 5 of 7

future represent stockholders and creditors of the Debtor and other parties of interest in connection
with matters unrelated to the Debtor and this Chapter 11 Case.  At this time, the Firm is not aware
of such representations except as noted above.  If the Firm identifies any further such
representations, the Firm shall make further disclosures as may be appropriate at that time.

12.     To my knowledge, neither the Firm nor any of its members have any connections
with the United States Trustee or any person employed in the Office of the United States Trustee
and/or the U.S. Bankruptcy Court for the District Of Delaware.

13.     The Firm intends to apply for compensation for professional services rendered and
associated costs in connection with this Chapter 11 Case, subject to approval of this Court and
compliance with applicable provisions of the Bankruptcy Code, as set forth in the Application.

14.     Pursuant to the Appendix B Guidelines for Reviewing Applications for
Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in
Larger Chapter 11 Case (the "2013 UST Guidelines"), the Firm makes certain disclosures herein.

15.     Pursuant to Part D1 of the 2013 UST Guidelines, the Firm is seeking employment
as Special Texas Litigation Counsel for the Debtor under section 327 of the Bankruptcy Code and
it hereby provides the following responses set forth below:

| Questions required by Part D1 of 2013 UST Guidelines: | Answer: | Further explanation: |
|---|---|---|
| Did you agree to any variations from, or alternatives to, your standard or customary billing arrangements for this engagement? | No | N/A |
| Do any of the professionals included in this engagement vary their rate based on the geographic location of the bankruptcy case? | No | N/A |

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 64    Filed 12/05/23    Page 3 of 1104    PageID 16137
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1284 of 1803    PageID 12030
Case 19-12239-CSS    Doc 70-2    Filed 10/29/19    Page 6 of 7

| If you represented the client in the 12 months prepetition, disclose your billing rates and material financial terms for the prepetition engagement, including any adjustments during the 12 months prepetition. If your billing rates and material financial terms have changed postpetition, explain the difference and reasons for the difference. | LPCH's rates are adjusted on an annual basis within the ranges previously disclosed. | Standard annual hourly rate adjustments. |
| Has your client approved your respective budget and staffing plan, and, if so, for what budget period? | The Debtor and the Firm expect to develop a prospective budget and staffing plan. | In accordance with the 2013 UST Guidelines, the budget may be amended as necessary to reflect changed circumstances or unanticipated developments. |

16.    No promises have been received by the Firm or by any member, of counsel, or associate thereof as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code. The Firm has no agreement with any other entity to share with such entity any compensation received by the Firm in connection with this Chapter 11 Case, except among the members, of counsel, and associates of the Firm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 29, 2019

_____
Michael K. Hurst, Partner

5

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 64   Filed 12/06/23   Page 4 of 1104   PageID 16138
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1285 of 1803   PageID 12031

Case 19-12239-CSS   Doc 70-2   Filed 10/29/19   Page 7 of 7

## SCHEDULE 1

**Disclosures**

**None**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 64   Filed 12/27/23   Page 5 of 1104   PageID 16139
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1286 of 1803   PageID 12032
Case 19-12239-CSS   Doc 70-3   Filed 10/29/19   Page 1 of 4

## **EXHIBIT B**

### **Proposed Order**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 64 Filed 12/29/23 Page 6 of 1104 PageID 16140
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1287 of 1803 PageID 12033

Case 19-12239-CSS Doc 70-3 Filed 10/29/19 Page 2 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | **Re docket No. ___** |

**ORDER AUTHORIZING THE RETENTION AND
EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS
LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

Upon consideration of the application (the "Application")[2] of Highland Capital

Management, L.P., debtor and debtor in possession (the "Debtor") in the above-captioned chapter

11 case (the "Chapter 11 Case") for entry of an order (this "Order"), authorizing the Debtor to

retain and employ Lynn Pinker Cox & Hurst LLP (the "Firm") as Special Texas Litigation Counsel

in this Chapter 11 Case; and upon the *Statement Under Rule 2016 of the Federal Rules of*

*Bankruptcy Procedure* (the "Statement"), the *Declaration of Michael K. Hurst in Support of*

*Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox*

*& Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Hurst

Declaration"), and the *Declaration of Frank Waterhouse in Support of Debtor's Application for*

*an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special*

*Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Waterhouse Declaration") that

were submitted concurrently with the Application; and the Court being satisfied based on the

representations made in the Application, the Statement, the Hurst Declaration, and the Waterhouse

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms, unless otherwise defined herein, shall have the meanings ascribed to them in the Application.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 64    Filed 12/29/23    Page 7 of 1104    PageID 16141
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1288 of 1803    PageID 12034
Case 19-12239-CSS    Doc 70-3    Filed 10/29/19    Page 3 of 4

Declaration that the Firm holds no interest materially adverse to the Debtor or the Debtor's estate with respect to the matters upon which it is to be engaged, and that the employment of the Firm as Special Texas Litigation Counsel to the Debtor is necessary and in the best interests of the Debtor and its estate; and it appearing that the Court has jurisdiction to consider the Application; and it appearing that due notice of the Application has been given and no further notice need be given; and upon the proceedings before the Court; and after due deliberation and good and sufficient cause appearing; it is hereby ORDERED that:

7.    The Application is GRANTED as set forth herein.

8.    Pursuant to section 327(e) of the Bankruptcy Code, the Debtor is authorized to retain and employ the Firm as Special Texas in this Chapter 11 Case, *nunc pro tunc* to the Petition Date, pursuant to the terms set forth in the Application.

9.    The Firm shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtor's Chapter 11 Case in compliance with sections 330 and 331 of the Bankruptcy Code and applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any other applicable procedures and orders of the Court. The Firm also intends to make a reasonable effort to comply with the U.S. Trustee's requests for information and additional disclosures as set forth in the Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases Effective as of November 1, 2013 (the "Revised UST Guidelines"), both in connection with this Application and any interim and final fee application to be filed by the Firm in these Chapter 11 Case.

10.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

1

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 64   Filed 12/29/23   Page 8 of 1104   PageID 16142
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1289 of 1803   PageID 12035
Case 19-12239-CSS   Doc 70-3   Filed 10/29/19   Page 4 of 4

Dated: _____, 2019

_____
CHIEF JUDGE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

DOCS_NY:39760.1 36027/002

Appellee Appx. 01283

APPX. 16535

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 64    Filed 12/20/23    Page 9 of 1104    PageID 16143
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1290 of 1803    PageID 12036
Case 19-12239-CSS    Doc 70-4    Filed 10/29/19    Page 1 of 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**STATEMENT UNDER RULE 2016 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), pursuant to Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 329 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), hereby makes this statement in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP, as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2]

1.    The Debtor has agreed to pay the Firm for the legal services rendered or to be rendered by its various attorneys and paralegals, and to reimburse the Firm for its actual and necessary expenses in connection with the matters described in the Application.

2.    In the one year period preceding the Petition Date, the Firm received payments from the Debtor totaling $1,110,508.49 (the "Prepetition Payments") with respect to services rendered to the Debtor.  As of September 30, 2019,[3] the Firm submits that it has earned fees and incurred reimbursable expenses on account of its services to the Debtor in the amount of $1,419,928.07 (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.
[3] Due to the timing of the bankruptcy filing, fees and expenses for October 2019 were not fully reflected in LPCH's accounting system.  The Firm will supplement the Hurst Declaration with those additional sums once available.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Exhibit 34    Page 1292 of 1804    Page 10 of 1104    PageID 16144
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1291 of 1803    PageID 12037
Case 19-12239-CSS    Doc 70-4    Filed 10/29/19    Page 2 of 2

"<u>Aggregate Amounts</u>").  As of September 30, 2019, approximately $319,419.58 of the Aggregate

Amounts was outstanding and unpaid on account of services rendered.  The Prepetition Payments

were paid by, and the source of such funds were, the Debtor.

3.    The Firm will seek approval of the payment of compensation for its hourly services

and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, the

Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the District of

Delaware, and orders of this Court.

4.    The Firm further states that it has neither shared nor agreed to share (a) any

compensation it has received or may receive with another party or person, other than with the

members, of counsel and associates of the Firm, or (b) any compensation another person or party

has received or may receive.

Dated:  October 29, 2019

_____
Michael K. Hurst, Partner

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 64   Filed 12/23/03 18 04   Page 11 of 1104   PageID 16145
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1292 of 1803   PageID 12038

Case 19-12239-CSS   Doc 70-5   Filed 10/29/19   Page 1 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) |

## DECLARATION OF FRANK WATERHOUSE IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

I, Frank Waterhouse, hereby declare under penalty of perjury:

1.     I am the Treasurer of Strand Advisors, Inc., the sole General Partner of Highland Capital Management, L.P., the above-captioned debtor and debtor in possession (the "Debtor").

2.     I submit this declaration (the "Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

### The Debtor's Selection of the Firm as Special Texas Litigation Counsel

3.     Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH") began representing the Debtor in March 2016.   The Firm has provided legal services related to the bankruptcy proceedings, *In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC*, jointly administered under Case No. 18-30264-SGJ-11 in the United States Bankruptcy Court for the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Application.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 54   Page 12 of 1804   Page 12 of 1104   PageID 16146
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1293 of 1803   PageID 12039
Case 19-12239-CSS   Doc 70-5   Filed 10/29/19   Page 2 of 4

Northern District of Texas, Dallas Division, and various appeals related thereto.  Ultimately, the Debtor retained the Firm because of its extensive experience trial litigation in such proceedings and its prepetition representation of the Debtor.  Thus, I believe that the Firm is well qualified to represent the Debtor in this Chapter 11 Case as Special Texas Litigation Counsel in an efficient and timely manner.

### Rate Structure

4.      In my capacity as Chief Financial Officer of the Debtor and Treasurer of the General Partner of the Debtor, I am involved in supervising outside counsel retained by the Debtor in the ordinary course of business along with other executives of the Debtor.  The Firm has informed the Debtor that its rates listed in the Application are comparable to non-bankruptcy representations.  As discussed below, I am also responsible for reviewing the invoices regularly submitted by the Firm, and can confirm that the rates the Firm charged the Debtor in the prepetition period are the same as the rates the Firm charged the Debtor in the post-petition period.  The Firm has informed the Debtor that the Firm's standard hourly rates are subject to periodic adjustment in accordance with the Firm's practice.

### Cost Supervision

5.      The Debtor and the Firm expects to develop a prospective budget and staffing plan, recognizing that in the course of a large chapter 11 case like this Chapter 11 Case, it is possible that there may be a number of unforeseen fees and expenses that will need to be addressed by the Debtor and the Firm.  The Debtor recognizes that it is its responsibility to closely monitor the billing practices of its counsel to ensure the fees and expenses paid by the estate remain consistent with the Debtor's expectations and the exigencies of the Chapter 11 Case.  The Debtor will

DOCS_NY:39760.1 36027/002

Appellee Appx. 01287
APPX. 01539

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1295/031804    Page 13 of 1104    PageID 16147
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1294 of 1803    PageID 12040
Case 19-12239-CSS    Doc 70-5    Filed 10/29/19    Page 3 of 4

continue to timely review the invoices that the Firm regularly submits, and periodically amend the budget and staffing plans, as the case develops.

6.      While every chapter 11 case is unique, the budgets will provide guidance on the periods of time involved and the level of the attorneys and professionals that will work on various matters, as well as projections of average hourly rates for the attorneys and professionals for various matters.

*[remainder of page intentionally left blank]*

DOCS_NY:39760.1 36027/002

**Appellee Appx. 01288**
**APPX. 161539**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Exhibit 6    Page 1296/031804    Page 14 of 1104    PageID 16148
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1295 of 1803    PageID 12041
Case 19-12239-CSS    Doc 70-5    Filed 10/29/19    Page 4 of 4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:    October 29, 2019

/s/ Frank Waterhouse
Frank Waterhouse

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1290 of 1804   Page 15 of 1104   PageID 16149
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1296 of 1803   PageID 12042

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 1 of 7

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## <u>CERTIFICATE OF SERVICE</u>

I, James E. O'Neill, hereby certify that on the 29th day of October, 2019, I caused

a copy of the following document(s) to be served on the individual(s) on the attached service

list(s) in the manner indicated:

**Notice of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, *Nunc Pro Tunc* to the Petition Date**

**Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, *Nunc Pro Tunc* to the Petition Date**

**Statement Under Rule 2016 of the Federal Rules of Bankruptcy Procedure**

**Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, *Nunc Pro Tunc* to the Petition Date**

*/s/ James E. O'Neill*
James E. O'Neill (Bar No. 4042)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_DE:226022.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 12/28/23 18:04 Page 16 of 1104   PageID 16150
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1297 of 1803   PageID 12043

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 2 of 7

Highland Capital 2002 Service List FCM
Case No. 19-12239 (CSS)
Document No. 225797
01 – Interoffice Mail
09 – Hand Delivery
51 – First Class Mail


*([Proposed] Counsel for the Debtor and*
*Debtor in Possession)*
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE  19899 (Courier 19801)

**INTEROFFICE MAIL**
*([Proposed] Counsel for the Debtor and*
*Debtor in Possession)*
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA  90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE  19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

DOCS_DE:225797.1 36027/001

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Exhibit 6   Page 1299 of 1804   Page 17 of 1104   PageID 16151
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1298 of 1803   PageID 12044

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 3 of 7

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE  19801

**FIRST CLASS MAIL**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX  75201

**FIRST CLASS MAIL**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC  20530-0001

**FIRST CLASS MAIL**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE  19903

**FIRST CLASS MAIL**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE  19904

**FIRST CLASS MAIL**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC  20220

**FIRST CLASS MAIL**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC  20554

**FIRST CLASS MAIL**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA  19103

**FIRST CLASS MAIL**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY  10281

**FIRST CLASS MAIL**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC  20005-4026

**FIRST CLASS MAIL**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA  19101

Appellee Appx. 01292
APPX. 16154

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 64    Page 1309/31804    Page 18 of 1104    PageID 16152
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1299 of 1803    PageID 12045

Case 19-12239-CSS    Doc 70-6    Filed 10/29/19    Page 4 of 7

**FIRST CLASS MAIL**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX  75206

**FIRST CLASS MAIL**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**FIRST CLASS MAIL**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**FIRST CLASS MAIL**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**FIRST CLASS MAIL**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**FIRST CLASS MAIL**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**FIRST CLASS MAIL**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**FIRST CLASS MAIL**
Frontier State Bank
Attn:  Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**FIRST CLASS MAIL**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

Appellee Appx. 01293
APPX. 01544

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1329/01804 Page 19 of 1104   PageID 16153
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1300 of 1803   PageID 12046

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 5 of 7

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
  and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

Appellee Appx. 01294
APPX. 01596

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 34    Page 1302 of 1804 age 20 of 1104    PageID 16154
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1301 of 1803    PageID 12047

Case 19-12239-CSS    Doc 70-6    Filed 10/29/19    Page 6 of 7

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

FIRST CLASS MAIL
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street  NW Suite 1000
Washington, DC 20004-130

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC  20005

FIRST CLASS MAIL
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

Appellee Appx. 01295
APPX. 16154

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1303 of 1804    Page 21 of 1104    PageID 16155
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1302 of 1803    PageID 12048
Case 19-12239-CSS    Doc 70-6    Filed 10/29/19    Page 7 of 7

**FIRST CLASS MAIL**
(Counsel to California Public Employees'
Retirement System ("CalPERS")
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**FIRST CLASS MAIL**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA  92612

**FIRST CLASS MAIL**
(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**FIRST CLASS MAIL**
(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX  75207

**FIRST CLASS MAIL**
(Counsel to Jefferies)
Lee S. Attanasio, Esq.
Sidley Austin LLP
787 Seventh Avenue
New York, NY  10019

Appellee Appx. 01296
Appx. 16155

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1304 of 1804   Page 22 of 1104   PageID 16156
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1303 of 1803   PageID 12049

# APPENDIX 15

Appellee Appx. 01297

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1305 of 1804    Page 23 of 1104    PageID 16157
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1304 of 1803    PageID 12050
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 1 of 9

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Case No. 19-12239 (CSS) |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| LP,[1] | § | |
| | § | |
| | § | **Re: Docket Nos. 69, 70** |
| Debtor. | § | |

**Objection Deadline: November 12, 2019 at 4:00 p.m. (Eastern time)**
**Hearing Date: November 19, 2019 at 12:00 p.m. (Eastern time)**

### LIMITED OBJECTION TO THE DEBTOR'S: (I) APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE; AND (II) APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC (collectively "Acis"), creditors and parties-in-interest, object on a limited basis to the Debtor's: (i) *Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 69] (the "Foley Application"); and (ii) *Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 70] (the "Lynn Pinker Application" and together with the Foley Application, the "Applications").

### Statement of Facts

1.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1

**Appellee Appx. 01298**
**APPX. 01539**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Filed 12/06/23    Page 24 of 1104    PageID 16158
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1305 of 1803    PageID 12051
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 2 of 9

2.     On October 29, 2019, the Debtor filed the Foley Application, seeking to employ the law firm of Foley Gardere, Foley & Lardner LLP ("<u>Foley</u>") as special Texas litigation counsel pursuant to 11 U.S.C. §327(e).

3.     Also on October 29, 2019, the Debtor filed the Lynn Pinker Application, seeking to employ the law firm of Lynn Pinker Cox & Hurst LLP ("<u>Lynn Pinker</u>") as special Texas litigation counsel pursuant to 11 U.S.C. § 327(e).

4.     Foley and Lynn Pinker are both being hired to represent the Debtor in connection with Acis' post-confirmation bankruptcy case (the "<u>Acis Bankruptcy Case</u>"),[2] two appeals from the Acis Bankruptcy Case (both initiated by the Debtor as an appellant)[3] and an adversary proceeding pending in the Acis Bankruptcy Case.[4]

<u>Objection</u>

A.     <u>The Applications Lack Important Disclosures.</u>

5.     The Applications disclose that Foley and Lynn Pinker represent and have performed work in the Acis Bankruptcy Case for clients related to the Debtor – clients they identify as Neutra and the Cayman Defendants.  The Foley Application also admits that, before the Petition Date, Foley billed the Debtor for work performed for Neutra and the Cayman Defendants.[5]  There is no disclosure from Lynn Pinker on this point, but presumably its payment arrangements were similar because Lynn Pinker represents many, if not all, of the same clients as

---

[2] Jointly administered Case Nos. 18-30264 and 18-30265 in the United States Bankruptcy Court for the Northern District of Texas.

[3] *Highland Cap. Mgmt, L.P. v. Phelan*, Case No. 19-10847 in the United States Court of Appeals for the Fifth Circuit; *Highland Cap. Mgmt, L.P. v. Winstead PC*, Case No. 3:19-cv-01477-D in the United States District Court for the Northern District of Texas

[4] Adversary No. 18-03078 in the United States Bankruptcy Court for the Northern District of Texas.

[5] See ¶ 3 of Declaration of Holland O'Neil attached as Exhibit A to the Foley Application [Docket No. 69-2] ("The Firm billed Highland for all services as to the related other parties since there was significant overlap among legal issues for Highland, Neutra and the Cayman Defendants.").

2

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 64    Exhibit 34    Page 1302/3 3180 4age 25 of 1104    PageID 16159
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1306 of 1803    PageID 12052
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 3 of 9

Foley in the Acis Bankruptcy Case.  While the Applications disclose the amounts paid by the Debtor to each of Foley and Lynn Pinker during the year prior to the Petition Date, the Applications do not disclose the proportionate amounts billed to and paid by the Debtor for work performed for Neutra and the Cayman Defendants.  Acis reserves its rights to compel disclosure of this information including under Fed. R. Bankr. P. 2017(a).[6]

6.    This structure creates significant fraudulent transfer concerns and highlights the multifarious nature of the Debtor's operations including its pervasive use of offshore shadow companies controlled by James Dondero.   As both District Judge Sidney Fitzwater and Bankruptcy Judge Stacey Jernigan found in published opinions arising from the Acis Bankruptcy Case, Neutra and the Cayman Defendants are actually offshore companies that were created around the time Joshua Terry obtained a judgment against Acis in order receive transfers of Acis' assets and Acis' equity.  *Neutra, Ltd. v. Terry (In re Acis Cap. Mgmt. L.P.)*, 604 B.R. 484, 501-02 (N.D. Tex. 2019); *In re Acis Cap. Mgmt. L.P.*, 584 B.R. 115, 127-31 (Bankr. N.D. Tex. 2018).  Even more, the business justification proffered by the Debtor for these transfers from Acis was found to be "a seemingly manufactured narrative to justify prior actions" and that "the evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from [Terry]."  *Neutra,* 604 B.R. at 502 (citing *In re Acis Cap. Mgmt. L.P.*, 2019 Bankr. Lexis 292 (Bankr. N.D. Tex. January 31, 2019)).  It was clear to everyone in the Acis Bankruptcy Case that Neutra and the Cayman Defendants were simply fronts for Dondero's machinations.

---

[6] Fed. R. Bankr. P. 2017(a) provides:  "Payment or Transfer to Attorney Before Order for Relief.  On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive."

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1309 of 1804    Page 26 of 1104    PageID 16160
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1307 of 1803    PageID 12053
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 4 of 9

7.     The Debtor's Schedules and Statement of Financial Affairs will not be filed by the time parties must object to the Foley Application and Lynn Pinker Application, or by the time the Court will hold a hearing on the Applications.[7]  Thus, the scope of these payments and liabilities (or other connections) will not be disclosed until well after the engagement of Foley and Lynn Pinker.

8.     The Applications also do not disclose whether the Debtor intends to continue to be billed and pay Foley and Lynn Pinker for work performed for Neutra and the Cayman Defendants once Foley and Lynn Pinker are engaged by the Debtor pursuant to the Applications. If this is the Debtor's intent, it should be specifically disclosed and approval of such employment should be requested in accordance with the Bankruptcy Code and the applicable rules.  For example, Bankruptcy Rule 2017(b) specifically requires disclosure of payments made by a debtor to *any attorney* for services *in any way related to the case.*  Fed. R. Bankr. P. 2017(b).[8]  In any event, if the Debtor does intend to pay Neutra and the Cayman Defendants' legal expenses, Acis would oppose this relief.  The fact that Neutra and the Cayman Defendants are sham entities created only to receive fraudulent transfers and, thus, have no substance does not change, and in fact compels, this result.[9]

---

[7] The Debtor has requested an additional 30-day extension of time to file its Schedules and Statement of Financial Affairs [Docket No. 4]. If granted, this would make such disclosures due December 13, 2019.

[8] For example, Fed R. Bankr. P. 2017(b) provides: "Payment or Transfer to Attorney After Order for Relief.  On motion by the debtor, the United States trustee, or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property, or any agreement therefor, by the debtor to an attorney after entry of an order for relief in a case under the Code is excessive, whether the payment or transfer is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any way related to the case."

[9] To be clear, Neutra and the Cayman Defendants' are entitled to hire counsel to represent them and Dondero or some other non-debtor entity that he controls are certainly welcome to pay the litigation costs.  But this is not a cost the Debtor should bear.

Appellee Appx. 01301
APPX. 01153

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 64   Exhibit B   Page 1309 of 1804   Page 27 of 1104   PageID 16161
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1308 of 1803   PageID 12054
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 5 of 9

9.      Further, the Foley engagement letter[10] discloses a conflict with Foley's representation of HRA Holdings, LLC that required the consent of the parties in order for Foley to proceed with its initial representation of the Debtor.  This conflict, or potential conflict, is not disclosed or discussed anywhere in the Foley Application or the various disclosure affidavits that accompany it.  Thus, the nature of the conflict is unclear, and it is unknown how it might limit Foley's representation of the Debtor.

10.     The Debtor did not attach Lynn Pinker's engagement letter to the Lynn Pinker Application, so this Court and the creditors in this case do not know the full terms of the Lynn Pinker engagement.  However, Acis is aware of various connections between Lynn Pinker and the Debtor and its related parties that are not disclosed or are only partially disclosed in the Lynn Pinker Application.  For example, Lynn Pinker hired the Debtor's General Counsel, Scott Ellington, as an expert witness in a case tried in Dallas just last year.[11]  It is unclear if this is a regular occurrence or what compensation Mr. Ellington receives for providing these services to Lynn Pinker and its clients.

11.     Further, in a footnote the Lynn Pinker Application discloses that it represents the Charitable Donor Advised Fund, L.P. (the "DAF") in "unrelated" litigation.  However, this is only the tip of the iceberg in describing this allegedly "unrelated" litigation.

12.     On August 6, 2019, Lynn Pinker, at that time representing NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund and Highland Income Fund (collectively, the "Highland Retail Funds"),[12] sent nearly identical letters to Moody's Investor Services and

---

[10] Attached as Exhibit B to the Foley Application [Docket No. 69-3].

[11] See attached **Exhibit A** found at https://www.pettitfirm.com/legacytexas.  Highlighting has been added to some exhibits.

[12] The Highland Retail Funds are affiliates of, or are managed by affiliates of, the Debtor and Dondero.  *See* attached **Exhibits B, C** and **D** found at https://www.highlandcapital.com/nexpoint-strategic-opportunities-fund-announces-the-regular-monthly-dividend-2/ (NexPoint Strategic Opportunities Fund); https://www.highlandfunds.com/global-

5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 12/29/03180e 28 of 1104    PageID 16162
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1309 of 1803    PageID 12055
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 6 of 9

S&P Global.[13]   In essence, these letters request a ratings downgrade or withdrawal on certain Acis CLO securities which the Highland Retail Funds purport to own.  Obviously, it is highly unusual for an investor to request a ratings downgrade for its own investment.  Curiously, when Lynn Pinker filed the litigation it threatened in these letters, Lynn Pinker no longer represented the Highland Retail Funds, but now represented the DAF.[14]

13.     In its current form, the DAF litigation seeks: (i) damages from US Bank, as indenture trustee for various Acis CLOs, for failing to take what the DAF believes was appropriate action in the Acis Bankruptcy Case and otherwise failing to perform its obligations as indenture trustee; and (ii) damages from Moody's for refusing to downgrade the Acis CLO securities or withdraw the ratings altogether as demanded in Lynn Pinker's letters.[15]   A downgrade or ratings withdrawal in the Acis CLO securities or the resignation of US Bank as indenture trustee may precipitate liquidation of the Acis CLOs, which would violate the plan injunction entered as part of Acis's bankruptcy plan since it was clearly procured by the Debtor and its affiliates (and their proposed counsel).[16]   None of this tangled web is disclosed in the Lynn Pinker Application, rather it is simply written off in a footnote as "unrelated."

---

allocation-fund/ (Highland Global Allocation Fund); https://www.highlandfunds.com/income-fund/ (Highland Income Fund).

[13] Copies of these letters are attached hereto as **Exhibits E** and **F**.  Other letters were later sent to Moody's and S&P, but Acis does not have copies of these later letters.

[14] The Highland Retail Funds are publicly traded closed end funds.  Further, one of the Highland Retail Funds, Highland Global Allocation Fund, and its advisors are already being sued by an investor for self-dealing and conflicts of interest with other funds affiliated with the Debtor.  *See Lanotte v. Highland Capital Mgt. Fund Adv., L.P., et al.*, Case No. 18-cv-02360, in the United States District Court for the Northern District of Texas.  Thus, the Highland Retail Funds may have realized that publicly acknowledging that they inexplicably requested a ratings downgrade or withdrawal for their own investment is not a helpful fact in this or future litigation, and Dondero and Lynn Pinker then simply donned another hat to file the lawsuit.

[15] Amended Complaint attached hereto as **Exhibit G**.

[16] *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 292 * 30-32 (Bankr. N.D. Tex., Jan. 31, 2019) (confirmation opinion from Acis Bankruptcy Case); *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 294 * 59-62 (Bankr. N.D. Tex., Jan. 31, 2019) (confirmation order and confirmed plan from Acis Bankruptcy Case).  Acis reserves all rights in this regard and obviously has been monitoring the situation.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 13/29/03/18/04    Page 29 of 1104    PageID 16163
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1310 of 1803    PageID 12056
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 7 of 9

**B.    Acis Reserves the Right to Seek Disqualification and Disgorgement of Foley and Lynn Pinker Based on Conflict Of Interest Allegations the Debtor Made and is Appealing in the Acis Bankruptcy Case.**

14.    In the Acis Bankruptcy Case, the Debtor has alleged an actual conflict of interest prohibiting employment of special counsel for Acis' Chapter 11 trustee (Winstead) and requiring disgorgement of all fees paid to counsel.  The Debtor's objection to counsel's employment and payment has been rejected and overruled multiple times.  The issue is currently being appealed in the Northern District of Texas, and this is one of the matters for which Foley and Lynn Pinker are to be engaged.

15.    The alleged conflict is based on Winstead's engagement as special counsel by the Chapter 11 trustee for Acis (then a debtor in the Acis Bankruptcy Case) when Winstead represented a creditor of Acis (Josh Terry) and Winstead was retained to be adverse to another creditor of Acis (the Debtor).[17]  Per the Debtor's argument, engagement as counsel to be adverse to a creditor while concurrently representing a different creditor creates a *per se* actual conflict of interest under 11 U.S.C. § 327(c).[18]  Indisputably, Foley represents CLO Holdco, Ltd., which is one of the Debtor's largest creditors.[19]  And in fact, Foley is *itself* one of the Debtor's ten largest creditors, and Lynn Pinker is likewise a significant creditor of the Debtor.[20]  Foley and Lynn Pinker will also be engaged as special counsel to litigate with (and be adverse to) Acis and Mr.

---

[17] *See* ¶ 24 and 25 of Objection of Highland Capital Management, L.P. to Supplemental Application Regarding the Scope of Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee filed in the Acis Bankruptcy Case and attached hereto as **Exhibit H**.

[18] Although neither the Foley Application nor the Lynn Pinker Application reference § 327(c), that section is clearly applicable to their retention. As outlined below, the Foley and Lynn Pinker attorneys that will be engaged by the Debtor are employed by creditors of the Debtor and represent at least one known creditor of the Debtor.

[19] *See* Notice of Appearance filed by Foley in the Acis Bankruptcy Case and attached hereto as **Exhibit I**; *see also* Foley engagement letter attached as Exhibit B to the Foley Application [Docket No. 69-3].

[20] *See* Docket No. 1 disclosing that Foley is owed $1,398,432.44 by the Debtor.  Although it is not listed on the top 20 creditor list, according to its Rule 2016 statement Lynn Pinker is owed $319,419.58 by the Debtor.  *See* Docket No. 70-4.

7

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 13/29/03 1804    Page 30 of 1104    PageID 16164
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1311 of 1803    PageID 12057
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 8 of 9

Terry, also creditors of the Debtor.  Thus, Foley and Lynn Pinker now have the exact "conflict" that they alleged disqualified Winstead and required disgorgement from Winstead in the Acis Bankruptcy Case.

16.    All rights are reserved to raise this as an issue for disqualification and disgorgement of fees by Foley and Lynn Pinker if the Debtor prevails on its argument on appeal.[21]

*[Remainder of page intentionally left blank]*

---

[21] To be clear, Acis believes this argument and related appeal are frivolous, and all rights are reserved to seek sanctions against the Debtor, Foley and Lynn Pinker in the appropriate forum.

Appellee Appx. 01305
APPX. 01556

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1323/03-180-4age 31 of 1104    PageID 16165
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1312 of 1803    PageID 12058
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 9 of 9

WHEREFORE, Acis respectfully (i) requests Foley and Lynn Pinker provide full and complete disclosure of all connections with the Debtor as required under the Bankruptcy Code, Bankruptcy Rules and Local Rules in order to assess their employment Applications; (ii) objects to the employment of Foley and Lynn Pinker to the extent that the Debtor intends to be responsible for fees and expenses incurred by other Foley and Lynn Pinker clients, including the Cayman Defendants and Neutra; (iii) reserves all rights to seek disqualification and disgorgement of fees from Foley and Lynn Pinker based on conflicts of interest that may become apparent as this case moves forward; and (iv) requests such other further relief as is just and proper.

**BLANK ROME LLP**

Dated: November 12, 2019          _/s/ Josef W. Mintz_
Wilmington, Delaware               John E. Lucian (*pro hac vice*)
                                   Josef W. Mintz (DE No. 5644)
                                   1201 N. Market Street, Suite 800
                                   Wilmington, Delaware 19801
                                   Telephone:  (302) 425-6400
                                   Facsimile:  (302) 425-6464
                                   Email:      lucian@blankrome.com
                                               mintz@blankrome.com

**WINSTEAD PC**
Rakhee V. Patel (*pro hac vice*)
Phillip Lamberson (*pro hac vice*)
Annmarie Chiarello (pro hac pending)
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone:  (713) 650-8400
Facsimile:  (713) 650-2400
Email:      rpatel@winstead.com
            plamberson@winstead.com
            achiarello@winstead.com

*Attorneys for Acis Capital Management GP
LLC and Acis Capital Management, L.P.*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 64   Page 1329 of 1804 Page 32 of 1104   PageID 16166
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1313 of 1803   PageID 12059

Case 19-12239-CSS   Doc 116-1   Filed 11/12/19   Page 1 of 3

**Exhibit A**

Press Release re: Scott Eillington

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1315 of 1804

Case 3:23-cv-00726-S    Document 54    Filed 12/29/23    Page 33 of 1104    PageID 16167
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1314 of 1803    PageID 12060

Victory Against Legacy The Pettit Law Firm    Case 19-12239-CSS    Doc 116-1    Filed 11/12/19    Page 2 of 3    Page 1 of 4





# The Pettit Law Firm and Lynn Pinker Cox Hurst Secure a $4.2 Million Fraud and Breach of Fiduciary Duty Judgment Against LegacyTexas Bank

### December 28, 2018

The judgment was signed on December 28, 2018 following a 2-week trial earlier this fall before Judge Dale Tillery in the 134th District Court in Dallas County, Texas.

Co-lead counsel Julie Pettit and Michael K. Hurst represent Plaintiff Robert Imel, an oil and gas entrepreneur in a suit against LegacyTexas bank for fraud, breach of fiduciary duty, declaratory judgment, conspiracy, and breach of contract.

LegacyTexas Bank, through its head of energy finance, Chris Parada, represented to Imel that it would release Imel from a personal guaranty related to his oil and gas company's financing agreement if certain oil and gas assets were sold and a loan by LegacyTexas was paid off by a time certain. LegacyTexas then acted as a broker and persuaded Imel to negotiate the sale of the assets to Energy Reserves Group, LLC ("ERG"). Meanwhile, LegacyTexas Bank and ERG secretly negotiated a sale of the note and Imel's personal guaranty to ERG so that ERG could pursue Imel under the guaranty and force Imel to surrender the assets as well as valuable non-collateral oil and gas assets.

The Court found Legacy liable for its tortious conduct for $3.6 million in actual damages and over $636,000 in attorneys' fees.  The Court also found ERG liable in the amount of $159,000 in attorneys' fees.

"We are pleased with the decision," said Julie Pettit, co-lead counsel for Imel.  "The judgment affirms our position regarding LegacyTexas' misrepresentations and fraudulent conduct toward its own borrower."

"This important judgment underscores that in business, no one has a license to hide the truth, steal and double deal– especially from those who they are entrusted to protect," said Michael K. Hurst, co-lead counsel for Imel.

Along with Pettit and Hurst, the trial team included David Urteago and Jane Cherry of The Pettit Law Firm.

Trial Days:  10

Settlement Negotiations:  Nothing meaningful

Expert for Imel:  Scott Ellington, Chief Legal Officer, General Counsel and Secretary, Highland Capital Management L.P.

The case is Robert A. Imel v. LegacyTexas Bank and Energy Reserves Group, case number DC-16-01372, in the 134th District Court in Dallas County, Texas. LegacyTexas was represented by John Leininger, Steve Shapiro, and Alexis Reller of Shapiro Bieging Barber Otteson LLP. ERG was represented by Marty Brimmage, Molly Whitman, and Keertan Chauhan of Akin Gump Strauss Hauer & Feld LLP.

A copy of the judgment can be found here.

Appellee Appx. 01308
APPx. 01559

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Exhibit 6   Page 1316 of 1804
Case 3:23-cv-00726-S   Document 54   Filed 12/29/23   Page 34 of 1104   PageID 16168
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1315 of 1803   PageID 12061
Victory Against Legacy Texas - Pettit Law Firm   Case 19-12239-CSS   Doc 116-1   Filed 11/12/19   Page 3 of 3   Page 2 of 4



Verdicts and research provided here.

HOME    FIRM    SERVICES    NEWS    TESTIMONIALS    CONTACT US

## CONTACT US

The Pettit Law Firm
2101 Cedar Springs Rd, Suite 1540
Dallas, TX 75201
Phone: 214.329.0151
Fax: 214.329.4076

Name *

Email *

Subject

Message

Send

© 2019 by The Pettit Law Firm.

The principal offices of Pettit Rice PC dba The Pettit Law Firm are located in Dallas, Texas. Attorney responsible for the content of this homepage: Julie Pettit. Pettit Rice PC Phone: 214.329.0151 All Rights Reserved. Member of the Texas State Bar.

Appellee Appx. 01309
Appx. 101560

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1327 of 1804   Page 35 of 1104   PageID 16169
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1316 of 1803   PageID 12062

Case 19-12239-CSS   Doc 116-2   Filed 11/12/19   Page 1 of 5

**Exhibit B**

NexPoint Strategic Opportunities Fund

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 30   Filed 11/28/23   Page 36 of 1104   PageID 16170
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1317 of 1803   PageID 12063

NexPoint Strateg Case 19-12239-CSS An Doc 118-2 Red 11/12/19 Di Page 2 of 5 hl...   Page 1 of 6



HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES ∨    LOG IN

# NexPoint Strategic Opportunities Fund Announces the Regular Monthly Dividend

July 3, 2018    Nexpoint Advisors, Nexpoint Funds, Sites

DALLAS, July 2, 2018 /PRNewswire/ — NexPoint Strategic Opportunities Fund (NYSE: NHF) ("NHF" or the "Fund") today announced its regular monthly dividend on its common stock of **$.20** per share. The dividend will be payable on July 31, 2018 to shareholders of record at the close of business July 23, 2018.

The Fund is a closed-end fund managed by NexPoint Advisors, L.P. (the "Manager"), an affiliated adviser of Highland Capital Management, L.P. The Fund invests primarily in below investment grade debt, equity securities and real estate and has the ability to hedge risk. The Manager attempts to deliver consistent returns in excess of the Dow Jones Credit Suisse Hedge Fund and the HFRX Global Hedge Fund indices in a transparent, registered fund format consistent with monthly dividends.

| Total Returns as of 06/30/18 | 1-year | 3-year | 5-year | 10-year | Since Inception (6/29/06) |
|---|---|---|---|---|---|
| NexPoint Strategic Opportunities Fund (NAV) | 13.63% | 4.71% | 15.21% | 7.07% | 5.17% |
| NexPoint Strategic Opportunities Fund (Market Price) | 16.06% | 4.60% | 14.76% | 6.72% | 3.80% |

Appellee Appx. 01311
Appx. 01563

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-34 Filed 12/29/23 Page 37 of 1104 PageID 16171
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1318 of 1803 PageID 12064

NexPoint StrategicCase 19-12239-CSS AnDoc 116-2 Regist 11/12/19 DiPagen 13 of 8h1... Page 2 of 6

| Total Returns as of 03/31/18 | 1-year | 3-year | 5-year | 10-year | Since Inception (6/29/06) |
|---|---|---|---|---|---|
| NexPoint Strategic Opportunities Fund (NAV) | 17.20% | 3.65% | 16.21% | 7.19% | 5.13% |
| NexPoint Strategic Opportunities Fund (Market Price) | 14.95% | 3.97% | 15.30% | 7.16% | 3.72% |

**HIGHLAND CAPITAL**
**MANAGEMENT**
EXPERIENCED. DISCIPLINED. BOLD.

Total operating expenses as of the most recent fund annual report are 2.21%. Performance data represents past performance, which does not guarantee future results. Current performance may be higher or lower than the figures shown. Investment return and principal value will fluctuate with market conditions, and you may have a gain or loss when you sell your shares. For most recent month-end performance please visit www.nexpointadvisors.com or call 866-351-4440.

**Investors should consider the investment objectives, risks, charges and expenses of the NexPoint Strategic Opportunities Fund carefully before investing. This and other information can be found in the Fund's prospectus, which may be obtained by calling 1-866-351-4440 or visiting www.nexpointadvisors.com. Please read the prospectus carefully before you invest.**

**Interest Rate Risk.** Interest rate risk is the risk that debt securities, and the Fund's net assets, may decline in value because of changes in interest rates. Generally, fixed rate debt securities will decrease in value when interest rates rise and increase in value when interest rates decline.

**Leverage Risk.** The Fund uses leverage through borrowings from notes and a credit facility, and may also use leverage through the issuances of preferred shares. The use of leverage magnifies both the favorable and unfavorable effects of price movements in the investments made by the Fund. Insofar as the Fund employs leverage in its investment operations, the Fund will be subject to substantial risks of loss.

Appellee Appx. 01312
Appx. 101564

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-34 Filed 12/29/23 Page 38 of 1104 PageID 16172
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1319 of 1803 PageID 12065

Exhibit 6

NexPoint Strateg Case 19-12239-CSS Ann Doc 1-16-12 R Filed 11/12/19 Di Page 4 of 5 n...   Page 3 of 6

**Closed-End Fund Risk.** The Fund is a closed-end investment company designed primarily for long-term investors and not as a trading vehicle. No assurance can be given that a shareholder will be able to sell his or her shares on the NYSE when he or she chooses to do so, and no [...] ch any such sale may be effected.

[...] st invest at least 25% of the value of its total assets at the time of purchase in securities of issuers conducting their principal business activities in the real estate industry. The Fund may be subject to greater market fluctuations than a fund that does not concentrate its investments in a particular industry. Financial, economic, business, and other developments affecting issuers in the real estate industry will have a greater effect on the Fund, and if securities of the real estate industry fall out of favor, the Fund could underperform, or its NAV may be more volatile than, funds that have greater industry diversification.

**Credit Risk.** Investments rated below investment grade are commonly referred to as high-yield, high risk or "junk debt." They are regarded as predominantly speculative with respect to the issuing company's continuing ability to meet principal and/ or interest payments. Non-payment of scheduled interest and/or principal would result in a reduction of income to the Fund, a reduction in the value of the asset experiencing non-payment and a potential decrease in NAV of the Fund.

**Illiquidity of Investments Risk.** The investments made by the Fund may be illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Fund.

## About NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund (formerly known as NexPoint Credit Strategies Fund) is a closed-end fund managed by NexPoint Advisors, L.P. The Fund's investment objectives are to provide both current income and capital appreciation. The Fund is invested primarily in below investment grade debt, equity securities and real estate and has the ability to hedge risk. The Fund's investment adviser attempts to deliver consistent returns in excess of the Dow Jones Credit Suisse Hedge Fund and the HFRX Global Hedge Fund indices in a transparent, registered fund format consistent with monthly dividends. No assurance can be given that the Fund will achieve its investment objectives.

Shares of closed-end investment companies frequently trade at a discount to net asset value. The price of the Fund's shares is determined by a number of factors, several of which are

Appellee Appx. 01313
APPX. 101565

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-34   Filed 12/29/23   Page 39 of 1104   PageID 16173
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1320 of 1803   PageID 12066

NexPoint Strateg Case 19-12239-CSS Announce the Reg... Filed 11/12/19 Page 15 of 51...     Page 4 of 6

beyond the control of the Fund. Therefore, the Fund cannot predict whether its shares will trade at, below or above net asset value. Past performance does not guarantee future results.



+1 (972) 419-2555

Recent Posts

Adviser on Highland Capital Management Investment Platform Plans Reorganization, Initiates Voluntary Bankruptcy Proceedings October 16, 2019

CNBC | FA 100: CNBC ranks the top-rated financial advisory firms of 2019 October 10, 2019

Mark Okada to Retire from Highland Capital Management September 30, 2019

NexPoint Selects IHG® as Operator for New InterContinental® Hotel at Cityplace Tower August 14, 2019

Appellee Appx. 01314
Appx. 01566

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1322/23/23 1804age 40 of 1104   PageID 16174
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1321 of 1803   PageID 12067

**Exhibit C**

Highland Global Allocation Fund

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-34 Filed 12/29/23 Page 41 of 1104 PageID 16175
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1322 of 1803 PageID 12068

Global Allocation Highland Funds Doc 116-3 Filed 11/12/19 Page 2 of 11    Page 1 of 7



f  y  📺  in  ✉

HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES    FINRA'S BROKERCHECK    LOG IN

# HIGHLAND CAPITAL
# MANAGEMENT

Q

HOME    ABOUT    FUNDS    ETF    RESOURCE LIBRARY    NEWS CENTER

>    >    >    >

# Global Allocation Fund

PORTFOLIO MANAGER



JAMES DONDERO, CFA
Co-Founder,
President

BIO >

FACTS

## Fund Overview

https://www.highlandfunds.com/global-allocation-fund/    11/8/2019

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 42 of 1104
Case 3:23-cv-00726-S    Document 54    Filed 12/29/23    Page 42 of 1104    PageID 16176
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1323 of 1803    PageID 12069

Global Allocation Fund Highland Funds    Case 19-12239-CSS    Doc 116-3    Filed 11/12/19    Page 3 of 11    Page 2 of 7

### Investment Objective

The Global Allocation Fund, managed by James Dondero, invests primarily in U.S. and foreign equity and debt securities that the portfolio manager considers to be undervalued by the market but have solid growth prospects. Undervalued securities are those securities that are undervalued relative to the market, their peers, their historical valuation or their growth rate.

### Low Correlation to Domestic Equity Markets

The Fund seeks above-average risk-adjusted total returns by investing in U.S. and foreign equities and fixed income securities, along with select alternative investments in the pursuit of long-term capital growth and future income.

- Rigorous top down allocation process
- Collaborative management structure where highly experienced portfolio managers in six disciplines bring their best ideas to the fund
- Global thematic investment style
- Extensive analytical support
- Relative value discipline
- May complement a portfolio of only U.S. securities as well as one of only stocks or fixed income

### Fund NAV (As of Nov 07, 2019)

| SYMBOL | NAV |
|--------|-----|
| HGLB | $12.03 |

### Fund AUM (As of Nov 07, 2019)

| | AUM |
|--|-----|
| Total Net Assets | $271.77 M |

VIEW FULL PERFORMANCE

| Symbol | HGLB |
|--------|------|

Appellee Appx. 01317
Appx. 161569

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 54    Filed 12/29/23    Page 43 of 1104    PageID 16177
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1324 of 1803    PageID 12070
Exhibit 6    Page 1325 of 1804

Global Allocation Case 19-12239-CSS ds Doc 116-3    Filed 11/12/19    Page 4 of 11    Page 3 of 7

| | |
|---|---|
| Inception | 01/05/98 |
| Gross Expense Ratio | 2.67% |
| Net Expense Ratio[1] | 2.67% |

## PERFORMANCE

## LITERATURE

## INSIGHTS

The performance data quoted here represents past performance and is no guarantee of future results. Investment returns and principal value will fluctuate so that an investor's shares when redeemed may be worth more or less than their original cost. Current performance may be lower or higher than performance data quoted.

Note: Effective April 9, 2013, Highland Core America Equity Fund was renamed Highland Global Allocation Fund. At the same time, Highland Capital Management Fund Advisors, L.P. became the sole Adviser to the Fund and the Fund no longer utilizes a sub-adviser. In addition to these changes, the Fund's investment strategies were revised and the Fund will no longer invest at least 80% of its assets in domestic equity securities. For more information, please view the Fund's prospectus which can be found under the "Literature" tab above or by calling 877-665-1287.

Please consider the investment objectives, risks, charges and expenses of Highland Funds carefully before investing. A prospectus with this and other information about Highland's mutual funds can be found on the Literature tab above. You may also obtain a prospectus for our mutual funds by calling 877-665-1287. Please read the prospectus carefully before investing.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 54   Filed 12/29/23   Page 44 of 1104   PageID 16178
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1325 of 1803   PageID 12071

Global Allocation Fund - Highland Funds   Doc 116-3   Filed 11/12/19   Page 5 of 11      Page 4 of 7

1. Performance results reflect the contractual waivers and/or reimbursements of fund expenses by the Advisor. Absent this limitation, performance results would have been lower. The Advisor has contractually agreed to limit the total annual operating expenses through at least January 31, 2019.

\*The maximum sales charge for Class A shares is 5.75%.

**Securities Market Risk.** The value of the securities may go up or down, sometimes rapidly or unpredictably, due to factors affecting particular companies or the securities market generally. A general downturn in the securities market may cause multiple asset classes to decline in value simultaneously, although equity securities generally have greater price volatility than fixed income securities.

**Illiquid and Restricted Securities Risk.** Certain investments made by the Funds are, and others may be, illiquid, and consequently the Funds may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Funds. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale and other factors. Furthermore, the nature of the Funds' investments, especially those in financially distressed companies, may require a long holding period prior to profitability. Restricted securities (i.e., securities acquired in private placement transactions) and illiquid securities may offer higher yields than comparable publicly traded securities. The Funds, however, may not be able to sell these securities when the Investment Adviser considers it desirable to do so or, to the extent they are sold privately, may have to sell them at less than the price of otherwise comparable securities. Restricted securities are subject to limitations on resale which can have an adverse effect on the price obtainable for such securities. Also, if in order to permit resale the securities are registered under the Securities Act at a Fund's expense, the Fund's expenses would be increased. A high percentage of illiquid securities in a Fund creates risk that such a Fund may not be able to redeem its shares without causing significant dilution to remaining shareholders.

**Focused Investment Risk** is the risk that although the Fund is a diversified fund, it may invest in securities of a limited number of issuers in an effort to achieve a potentially greater investment return than a fund that invests in a larger number of issuers. As a result, price movements of a single issuer's securities will have a

Appellee Appx. 01319
APPX. 10170

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-34 Filed 12/29/23 Page 45 of 1104 PageID 16179
Exhibit 6 Page 1327 of 1804
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1326 of 1803 PageID 12072

Global Allocation Fund Highland Funds Doc 116-3 Filed 11/12/19 Page 6 of 11 Page 5 of 7

greater impact on the Fund's net asset value, causing it to fluctuate more than that
of a more widely diversified fund.

MLP Risk is the risk of investing in MLP units, which involves some risks that differ
from an investment in the equity securities of a company. The Fund currently holds
and may in the future hold a significant investment in MLP units. Holders of MLP
units have limited control and voting rights on matters affecting the partnership.
Holders of units issued by an MLP are exposed to a remote possibility of liability for
all of the obligations of that MLP in the event that a court determines that the rights
of the holders of MLP units to vote to remove or replace the general partner of that
MLP, to approve amendments to that MLP's partnership agreement, or to take
other action under the partnership agreement of that MLP would constitute
"control" of the business of that MLP, or a court or governmental agency
determines that the MLP is conducting business in a state without complying with
the partnership statute of that state. Holders of MLP units are also exposed to the
risk that they will be required to repay amounts to the MLP that are wrongfully
distributed to them. Additionally: • A sustained reduced demand for crude oil,
natural gas and refined petroleum products could adversely affect MLP revenues
and cash flows. • Changes in the regulatory environment could adversely affect the
profitability of MLPs. Investments in MLP units also present special tax risks. See
"MLP Tax Risk" in the prospectus.

Value Investing Risk. The risk of investing in undervalued stocks that may not
realize their perceived value for extended periods of time or may never realize their
perceived value. Value stocks may respond differently to market and other
developments than other types of stocks.

Foreign Investment Risk. The risk that investing in foreign (non-U.S.) securities may
result in the Fund experiencing more rapid and extreme changes in value than a
fund that invests exclusively in securities of U.S. companies, due to smaller
markets, differing reporting, accounting and auditing standards, nationalization,
expropriation or confiscatory taxation, currency blockages and political changes of
diplomatic developments. The cost of investing in many foreign markets are higher
than the U.S. and investments may be less liquid.

Currency Risk. The risk that the values of foreign investments may be affected by
changes in the currency rates or exchange control regulations. If a foreign currency

Appellee Appx. 01320
Appx. 01622

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1328 of 1804
Case 3:23-cv-00726-S    Document 54    Filed 12/29/23    Page 46 of 1104    PageID 16180
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1327 of 1803    PageID 12073

Global Allocation Case 19-12239-CSS Funds Doc 116-3    Filed 11/12/19    Page 7 of 11    Page 6 of 7

weakens against the U.S. dollar, the value of a foreign investment denominated in that currency would also decline in dollar terms.

**Credit Risk.** The risk that the Fund could lose money if the issuer or guarantor of a fixed income security, or the counterparty of a derivatives contract or repurchase agreement, is unable or unwilling (or is perceived to be unable or unwilling) to make a timely payment of principal and/or interest, or to otherwise honor its obligations.

**Interest Rate Risk.** The risk that fixed income securities will decline in value because of changes in interest rates. A fund with a longer average portfolio duration will be more sensitive to changes in interest rates than a fund with a shorter average portfolio duration.

**Derivatives Risk.** The risk that an investment in derivatives may not correlate completely to the performance of underlying securities and may be volatile, and may result in a loss greater than the principal amount invested. Equity derivatives may also be subject to liquidity risk as well as the risk the derivative may be different than what would be produced through the use of another methodology or if it had been priced using market quotations.

**Glossary:** Click for important terms and definitions

Source: State Street Bank and Trust Company

Highland Funds' mutual funds are distributed by Highland Capital Funds Distributor

FUND DOWNLOADS

Fund Fact Sheet

Appellee Appx. 01321
APPX. 161673

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1329 of 1804
Case 3:23-cv-00726-S    Document 54    Filed 12/29/23    Page 47 of 1104    PageID 16181
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1328 of 1803    PageID 12074

Global Allocation Fund - Highland Funds    Case 19-12239-CSS    Doc 116-3    Filed 11/12/19    Page 8 of 11    Page 7 of 7



Summary Prospectus

Annual Report



 View all Literature & Forms

© 2018 Highland Capital Management, LP. | All Rights Reserved

Disclosure Statement

Privacy - Terms

Appellee Appx. 01322
APPX. 16574

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1330 of 1804
Case 3:23-cv-00726-S    Document 54    Filed 12/29/23    Page 48 of 1104    PageID 16182
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1329 of 1803    PageID 12075

Highland Global Case 19-12239-CSS eDoc 116-3 ion Filed 11/12/19d Page 9 of 11-... Page 1 of 3

# Highland Global Allocation Fund Completes Conversion from Open-End Fund to Closed-End Fund



NEWS PROVIDED BY
**Highland Capital Management Fund Advisors, L.P. →**
Feb 13, 2019, 19:26 ET

DALLAS, Feb. 13, 2019 /PRNewswire/ -- Highland Capital Management Fund Advisors, L.P. (together with its affiliates "Highland") announced today that the Highland Global Allocation Fund, a series of Highland Funds II (the "Fund") successfully converted from an open-end fund to a closed-end fund (the "Conversion"). The Conversion was approved by shareholders during the November 8, 2018 special meeting. The Fund expects to list its shares for trading on the New York Stock Exchange (the "NYSE") on or about February 19, 2019.

As a result of the Conversion, the Fund will effect a reverse stock split of Class A, Class C and Class Y shares of the Fund and will combine such shares into a single class of common shares under the CUSIP 43010T104 with an initial net asset value of $15.00 per share.

Conversion ratios will be available on February 14, 2019.

**Appellee Appx. 01323**
**APPX. 16175**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Exhibit 6   Page 1331 of 1804
Case 3:23-cv-00726-S   Document 54   Filed 12/29/23   Page 49 of 1104   PageID 16183
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1330 of 1803   PageID 12076

Highland Global... Case 19-12239-CSS... Doc 116-3... Filed 10/12/19... Page 10 of 11 ...   Page 2 of 3

Shareholders will not receive fractional shares because of the Conversion, but instead will receive a number of shares, rounded down to a whole number. Shareholders will receive a cash-in-lieu check related to the fractional portion of their shares shortly after the Conversion.

The shares will be listed under the ticker "HGLB" and at an initial listing price of $15.00. Any shareholder seeking to move shares to a brokerage account will need an adviser or broker dealer to transfer the shares through the Depository Trust Company's ("DTC") Profile System. Shares of the Fund are DTC Eligible.

Effective February 14, 2019, American Stock Transfer & Trust Company, LLC ("AST") will serve as the Fund's transfer agent and dividend disbursing agent. All shareholder records have been transferred to AST. Shareholders may obtain more information on the shareholder services to be offered to the converted Fund by calling AST at the Fund's dedicated toll free number 1-800-357-9167.

Additional details regarding the Conversion are available on the Fund's website at www.highlandfunds.com/global-allocation-fund/.

**About Highland Capital Management Fund Advisors, L.P.**

Highland Capital Management Fund Advisors, L.P. is the retail arm of Highland Capital Management, L.P., a multibillion-dollar global alternative investment manager founded in 1993 by Jim Dondero and Mark Okada. A pioneer in the leveraged loan market, the firm has evolved over 25 years, building on its credit expertise and value-based approach to expand into other asset classes. Today, Highland operates a diverse investment platform, serving both institutional and retail investors worldwide. In addition to high yield credit, Highland's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built round

Appellee Appx. 01324
APPX. 01526

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-34 Filed 12/29/23 Page 50 of 1104 PageID 16184
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1331 of 1803 PageID 12077

Highland Global Allocation Fund Completes Conversion to a New Fund ... Page 3 of 3

specialized teams. Highland is headquartered in Dallas, Texas and maintains offices in New York, Buenos Aires, Rio de Janeiro, Singapore, and Seoul. For more information visit www.highlandfunds.com.

*Before investing, you should carefully consider the Fund's investment objectives, risks, charges and expenses. For a copy of a prospectus or summary prospectus, which contains this and other information, please visit our website at* www.high-landfunds.com *or call 1-877-665-1287. Please read the fund prospectus carefully before investing.*

### CONTACTS

**Media Relations:**
Lucy Bannon
lbannon@highlandcapital.com
1-972-419-6272

**Fund Transfer Agent:**
American Stock Transfer & Trust Company, LLC
1-800-357-9167

SOURCE Highland Capital Management Fund Advisors, L.P

Related Links
https://www.highlandfunds.com

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1233 of 1804 Page 51 of 1104   PageID 16185
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1332 of 1803   PageID 12078

Case 19-12239-CSS   Doc 116-4   Filed 11/12/19   Page 1 of 9

**Exhibit D**

Highland Income Fund

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-34 Filed 12/29/23 Page 52 of 1104 PageID 16186
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1333 of 1803 PageID 12079

Income Fund | Highland Funds Case 19-12239-CSS Doc 116-4 Filed 11/12/19 Page 2 of 9     Page 1 of 8

f   y   ▶   in   ✉



HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES    FINRA'S BROKERCHECK    LOG IN

# HIGHLAND CAPITAL
## MANAGEMENT

Q

HOME    ABOUT    FUNDS    ETF    RESOURCE LIBRARY    NEWS CENTER

# Income Fund



JAMES DONDERO, CFA
Co-Founder, President

Bio »



JON POGLITSCH, CFA
Head of Credit Research

Bio »

∧

Appellee Appx. 01327
Appx. 16179

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Exhibit 6   Filed 12/29/23   Page 53 of 1104   PageID 16187
Case 3:23-cv-00726-S   Document 54   Filed 12/29/23   1804   Page 53 of 1104   PageID 16187
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1334 of 1803   PageID 12080

Income Fund | Highland Funds   Case 19-12239-CSS   Doc 116-4   Filed 11/12/19   Page 3 of 9   Page 2 of 8

## Oct. 4, 2019 - Update on the Claymore Holdings LLC v. Credit Suisse AG Case Related to the Highland Income Fund

October 4, 2019 – The Texas Supreme Court released an order today on the case against Credit Suisse, AG, Cayman Islands Branch, and Credit Suisse Securities (USA), LLC ("Credit Suisse"), which granted a hearing of the case. The case was filed in 2013 by Claymore Holdings LLC, the Highland and NexPoint affiliate (together "Highland") that pursued the collective claims on behalf of the Highland Income Fund (formerly, Highland Floating Rate Opportunities Fund) (NYSE:HFRO) ("HFRO") and the NexPoint Strategic Opportunities Fund (NYSE:NHF) ("NHF") (together the "Funds").

Per the order, the Texas Supreme Court will review the case at a hearing scheduled for January 8, 2020. While this prolongs the legal process, it does not affect Highland's conviction in our claims against Credit Suisse or our commitment to recovering damages for investors.

The total aggregate award stands at $393.2 million today; it is comprised of the $287.5 million judgment initially awarded by the trial court and now twice confirmed on appeal, plus $105.7 million in accrued interest. The award will continue to accrue interest in the event that the judgment becomes final.

Any final judgment amount would be reduced by attorney's fees and other litigation-related expenses. The net proceeds would then be allocated to the Funds based on respective damages (approximately 82% to HFRO and 18% to NHF).

We do not know the exact timing of the Texas Supreme Court's decision following the January hearing; however, the decision should be issued by the end of the Court's term in June 2020 at the latest.

We knew this would be a long process but have been committed to recovering damages for our investors since day one.

Appellee Appx. 01328
Appx. 01639

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-34    Filed 12/29/23 1804ge 54 of 1104    PageID 16188
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1335 of 1803    PageID 12081

Income Fund | H Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 4 of 9    Page 3 of 8

## FACTS

**Effective May 20, 2019, the Highland Floating Rate Opportunities Fund is named the Highland Income Fund. For more information, please read the press release from March 20, 2019.**

## Fund Overview

### Investment Objective

The investment objective of the closed-end Highland Floating Rate Opportunities Fund is to provide a high level of current income, consistent with the preservation of capital.

### Attractive Alternatives for Income-Oriented Investors

- High income potential in all markets
- Yields that reset when short-term interest rates move, which may mitigate price declines in a rising short-term interest rate environment
- Low correlation to other asset classes
- Access to one of the largest and most experienced senior loan managers
- Most fixed rate securities experience price declines when interest rates rise. Floating Rate Senior loans are different.

They are short-duration, floating-rate securities. So, as interest rates rise, yields on bank loans increase, while their short duration helps keep prices relatively stable.

**Fund NAV** (As of Nov 07, 2019)

| SYMBOL | NAV |
|--------|-----|
| HFRO | $13.65 |

**Fund AUM** (As of Nov 07, 2019)

| | AUM |
|--|-----|
| Total Net Assets | $982.33 M |

Appellee Appx. 01329
APPX. 16180

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1337 of 1804
Case 3:23-cv-00726-S    Document 54    Filed 12/29/23    Page 55 of 1104    PageID 16189
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1336 of 1803    PageID 12082

Income Fund | Highland 19-10239-CSS    Doc 116-4    Filed 11/12/19    Page 5 of 9    Page 4 of 8

## Fund AUM (As of Nov 07, 2019)

AUM

VIEW FULL PERFORMANCE

| Symbol | HFRO |
|--------|------|
| Inception | 01/13/00 |
| Gross Expense Ratio | 1.26% |
| Net Expense Ratio[1] | 1.26% |

PERFORMANCE

LITERATURE



THOMSON REUTERS

Lipper Award Winner - Loan Participation Funds

2014 Best Fund Over 3 Years
2015 Best Fund Over 3 Years
2015 Best Fund Over 5 Years
2016 Best Fund Over 3 Years

Appellee Appx. 01330
Appx. 16182

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1339 of 1804
Case 3:23-cv-00726-S    Document 54    Filed 12/29/23    Page 56 of 1104    PageID 16190
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1337 of 1803    PageID 12083

Income Fund | Highland Funds    Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 6 of 9    Page 5 of 8

The performance data quoted here represents past performance and is no guarantee of future results. Investment returns and principal value will fluctuate so that an investor's shares when redeemed may be worth more or less than their original cost. Current performance may be lower or higher than performance data quoted.

Effective shortly after close of business on November 3, 2017, the Highland Floating Rate Fund converted from an open-end fund to a closed-end fund, and began trading on the NYSE under the symbol HFRO on November 6, 2017. The performance data presented above reflects that of Class Z shares of the Fund when it was an open-end fund, HFRZX. The closed-end Fund pursues the same investment objective and strategy as it did before its conversion.

[1] The expense ratio shown is reported in the Fund's Semi-annual Report dated December 31, 2017.

Closed-end funds, unlike open-end funds, are not continuously offered. There is a one-time public offering and once issued, shares of closed-end funds are sold in the open market through a stock exchange and frequently trade at prices lower than their net asset value, which may increase an investor's risk of loss. Net Asset Value (NAV) is total assets less total liabilities, which includes preferred shares, divided by the number of common shares outstanding. At the time of sale, your shares may have a market price that is above or below NAV, and may be worth more or less than your original investment. For additional information, please contact your investment adviser or visit our website www.highlandfunds.com.

Please consider the investment objectives, risks, charges and expenses of Highland Floating Rate Opportunities Fund carefully before investing. A prospectus with this and other information about Highland Floating Rate Opportunities Fund can be found on the Literature tab above.

**Closed-End Fund Risk.** The Fund is a closed-end investment company designed primarily for long-term investors and not as a trading vehicle. No assurance can be given that a shareholder will be able to sell his or her shares on the NYSE when he or she chooses to do so, and no assurance can be given as to the price at which any such sale may be effected.

**Non-Payment Risk.** Senior Loans, like other corporate debt obligations, are subject to the risk of non-payment of scheduled interest and/or principal. Non-payment

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-34 Filed 12/29/23 Page 57 of 1104 PageID 16191
Exhibit 6 Page 1339 of 1804
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1338 of 1803 PageID 12084

Income Fund | Highland Funds Case 19-12239-CSS Doc 116-4 Filed 11/12/19 Page 7 of 9 Page 6 of 8

would result in a reduction of income to the Fund, a reduction in the value of the Senior Loan experiencing non-payment and a potential decrease in the NAV of the Fund.

Credit Risk. The Fund may invest all or substantially all of its assets in Senior Loans or other securities that are rated below investment grade and unrated Senior Loans deemed by Highland to be of comparable quality. Securities rated below investment grade are commonly referred to as "high yield securities" or "junk securities." They are regarded as predominantly speculative with respect to the issuing company's continuing ability to meet principal and interest payments. Non-payment of scheduled interest and/or principal would result in a reduction of income to the Fund, a reduction in the value of the Senior Loan experiencing non-payment and a potential decrease in the NAV of the Fund. Investments in high yield Senior Loans and other securities may result in greater NAV fluctuation than if the Fund did not make such investments.

Senior Loans Risk. The risks associated with senior loans are similar to the risks of below investment grade securities in that they are considered speculative. In addition, as with any debt instrument, senior loans are also generally subject to the risk of price declines and to increases in prevailing interest rates. Senior loans are also subject to the risk that, as interest rates rise, the cost of borrowing increases, which may also increase the risk and rate of default. In addition, the interest rates of floating rate loans typically only adjust to changes in short-term interest rates; long term interest rates can vary dramatically from short term interest rates. Therefore, senior loans may not mitigate price declines in a rising long-term interest rate environment.

Illiquidity of Investment Risk. The investments made by the Fund may be illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Fund.

Ongoing Monitoring Risk. On behalf of the several Lenders, the Agent generally will be required to administer and manage the Senior Loans and, with respect to collateralized Senior Loans, to service or monitor the collateral. Financial diffiulties of Agents can pose a risk to the Fund.

Glossary: Click for important terms and definitions

Appellee Appx. 01332
Appx. 01684

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-34    Filed 12/29/23    Page 58 of 1104    PageID 16192
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1339 of 1803    PageID 12085

Income Fund | Highland Funds
Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 8 of 9    Page 7 of 8

Source: State Street Bank and Trust Company

## FUND DOWNLOADS

Fund Fact Sheet



Summary Prospectus

Annual Report



Fund Commentary



📂   View all Literature & Forms                                                    ⌃

Appellee Appx. 01333
APPX. 01684

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-34   Filed 12/29/23   Page 59 of 1104   PageID 16193
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1340 of 1803   PageID 12086

© 2018 Highland Capital Management, LP. | All Rights Reserved

Disclosure Statement



Privacy - Terms

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1342 of 1804 Page 60 of 1104   PageID 16194
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1341 of 1803   PageID 12087

**Exhibit E**

Letter to Moody's re U.S. Bank

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 123/43/08180Page 61 of 1104   PageID 16195
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1342 of 1803   PageID 12088

Case 19-12239-CSS   Doc 116-5   Filed 11/12/19   Page 2 of 9

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**Via Email:** Shana.Sethi@moodys.com
Shana Sethi
Vice President- Senior Credit Officer
Moody's Investors Service

**Re:** **Mismanagement of the Acis CLOs, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Ms. Sethi:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis Indentures dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

For your reference, enclosed to this correspondence is a copy of the demand letter served by the Highland Retail Funds on August 6, 2019 to U.S. Bank National Association, the Trustee of the Acis Indentures. The demand letter puts U.S. Bank on notice of its material violations of the terms of the Acis Indentures, by among others, mismanaging and allowing the impermissible gaming of the Acis Indentures by the portfolio manager thereof, and failing to perform required tasks with due care. The Highland Retail Funds are prepared to take all actions necessary to protect their rights from further deterioration.

Representatives of the Highland Retail Funds are available to meet with Moody's to discuss whether U.S. Bank's wrongful conduct has caused a default, such that the ratings on some or all rated tranches should be reconsidered or withdrawn.

---

[1] The Acis Indentures collectively include: that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1344 of 1804 Page 62 of 1104    PageID 16196
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1343 of 1803    PageID 12089

Ms. Sethi
Moody's Investors Service
August 6, 2019
Page 2


We look forward to engaging with you on this serious matter.


Yours very truly,


Michael K. Hurst

MKH/ceb

Enclosure

cc:    David Coale (*of the Firm*)
        Chisara Ezie-Boncoeur (*of the Firm*)

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1345/63/1804    Page 63 of 1104    PageID 16197
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1344 of 1803    PageID 12090

Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 4 of 9

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**VIA EMAIL: dnovakov@fbtlaw.com**
Daniel P. Novakov
FROST BROWN TODD LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201
Tel: (214) 580-5840
Fax: (214) 545-3473

Re:    **US Bank's mismanagement of the Acis Indentures, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Mr. Novakov:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis CLOs dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

This letter provides formal notice that your client, U.S. Bank National Association ("US Bank" or "Indenture Trustee"), has: (1) materially violated the terms of the Acis Indentures, and (2) failed to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care. US Bank's wrongful conduct is actionable under New York law, and has caused the Highland Retail Funds to sustain significant damages, discussed below.

---

[1] The Acis Indentures are abbreviated herein as follows: "Indenture 3" means that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 4" means that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 5" means that certain Indenture dated as of November 18, 2014 issued by ACIS CLO 2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; "Indenture 6" means that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee. Together, such CLOs are referred to "Acis CLOs" and each, an "Acis CLO" or "CLO" herein.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 64    Page 124 of 318 04    Page 64 of 1104    PageID 16198
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1345 of 1803    PageID 12091
Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 5 of 9

US Bank
August 6, 2019
Page 2

### I.   US Bank's allowance of continued failure of the collateral quality test, as well as rampant portfolio mismanagement, violates the Acis Indentures.

Every purchase or sale made under the Acis Indentures must satisfy the collateral quality test imposed by each Acis Indenture.[2] As such, US Bank is required to ensure that every purchase or sale made under the Acis Indentures maintains or improves any failing collateral quality test. US Bank failed to satisfy this requirement by, among others, allowing transactions to be effectuated that do not maintain or improve the failing Weighted Average Life Test ("WAL") for trades made under the Acis Indentures.

*First*, US Bank violated its obligation to seek best execution on trades reasonably available to the Acis CLOs. By allowing multiple same day trades, US Bank has disregarded the obligation in the Acis Indentures requiring maintenance or improvement of the collateral quality test in each respective Acis CLO for each individual trade made. US Bank has allowed a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, in so doing, creating the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by US Bank cannot maintain or improve the WAL test on an individual basis. US Bank cannot perform its duties by allowing such Acis CLOs to act as a market taker, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures. Indeed, the value destruction of this forced "bunched trading" is clear when prices at trade date vs. prices on the day before trade date are compared. For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|-----|-------|--------|-----------|------|----------|-----------|-----------------|--------------|-----------------|--------|-----|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

---

[2] *See e.g.*, Indenture 3 at p. 16 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.17, and 12; Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1347/63180 4Page 65 of 1104   PageID 16199
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1346 of 1803   PageID 12092
Case 19-12239-CSS   Doc 116-5   Filed 11/12/19   Page 6 of 9

US Bank
August 6, 2019
Page 3

What's more, this artificial trading philosophy, disguised as "responsible management", has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors. For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

Tellingly, the transaction history authorized by US Bank makes clear that it appreciates the import of trading on specific days. In connection with Indenture 5, US Bank allowed the sale of varying amounts of the same term loan, Doncasters, over three different days: June 28, 2019, July 3, 2019, and July 8, 2019. US Bank allowed this because these selected dates positively impacted the collateral quality of the term loan sold. However, US Bank cannot ensure that the Acis CLOs enjoy best execution on purchases under the Acis Indentures if it turns a blind eye to the date on which purchases are made.

An analysis of the individual trades made under US Bank's approval further underscores the Trustee's failure to adhere to the respective indenture's collateral quality requirements. On July 12, 2019, in connection with Indenture 5, US Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024. But, to maintain or improve the WAL test for Indenture 5, US Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. US Bank facilitated similar misconduct across the Acis Indentures.

*Second*, the Weighted Average Rating Factor ("WARF") of each of the Acis CLO's portfolios has steadily increased this year, further demonstrating US Bank's facilitating the mismanagement of the Acis Indentures' collateral. On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). Plan D approved Brigade Capital Management, LP ("Brigade") to perform certain services related to the Acis Indentures, previously provided by Highland Capital Management.[3] Since the entry of Plan D, and Brigade's "management" of the Acis Indentures, US Bank allowed the collective WARF of the Acis CLO's portfolios to change from one of the cleanest pools in the market, to one of the dirtiest pools in

---

[3] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 13/23/23 18/04    Page 66 of 1104    PageID 16200
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1347 of 1803    PageID 12093
Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 7 of 9

US Bank
August 6, 2019
Page 4

the market in a matter of months. As of August 2019, since Brigade's involvement with the Acis Indentures, the WARF of each Acis CLO has dramatically increased, as follows:

CLO 3: 2522 ⟶ 2678
CLO 4: 2680 ⟶ 2941
CLO 5: 2673 ⟶ 3004
CLO 6: 2627 ⟶ 2917

*Third*, US Bank failed to protect the cash flow levels of its equity holders. Since the entry of Brigade, equity holders under Indentures 3-5 have received a total of <u>zero</u> cash flows. This damage has metastasized into the secured tranches of the CLOs and created direct harm to the Highland Retail Funds. The value decline of the equity positions is obvious:

| ACIS Equity Positions | CUSIP | 1/31/2019 | 2/28/2019 | 3/31/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 |
|---|---|---|---|---|---|---|---|
| ACIS 2014-3A 0.0000% - 2/2026 - SUB - 00100GAE3 @0.0000 02/01/2026 | 00100GAE3 | 14.5000 | 16.5000 | 17.3333 | 15.8333 | 13.0000 | 11.8333 |
| ACIS 2014-4A 0.0000% - 5/2026 - SUB - 00100HAE1 @0.0000 05/01/2026 | 00100HAE1 | 24.8333 | 22.1667 | 22.0000 | 22.1667 | 21.0000 | 19.8333 |
| ACIS 2014-5A 0.0000% - 11/2026 - SUB - 00101WAC1 @0.0000 11/01/2026 | 00101WAC1 | 34.2500 | 33.2500 | 32.7500 | 31.7500 | 31.0000 | 30.0000 |
| ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | 004524AD6 | 36.5000 | 36.5000 | 35.6667 | 35.0000 | 33.6667 | 32.0000 |

*Fourth*, US Bank has allowed the Acis CLOs to incur exorbitant expenses under its watch, at levels which exceed market standards.

In sum, US Bank's facilitation and approval of extensive portfolio mismanagement, and failure to require trades in accordance with industry standards and contrary to the best interests of its investors, violates the express terms of the Acis Indentures. US Bank's wrongful conduct has diluted the value of the Highland Retail Funds' Secured Notes and deteriorated the credit profile of the Acis CLOs. The Highland Retail Funds cannot allow US Bank to shirk its contractual obligations under the Acis Indentures. As Holders of Secured Notes, the Highland Retail Funds negotiated for superior rights under the Acis Indentures with the expectation that at a minimum, their collateral would remain protected in accordance with industry standards. *Indeed, US Bank must explain how this blatant gaming and chicanery in the name of artificially maximizing management fees is not a default under the Acis Indentures or a clear, actionable conflict of interest.*

## II.    US Bank Failed to reserve rights, or otherwise protect the Highland Retail Funds' rights affected by Plan D.

The Acis Indentures do not permit US Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholders, as applicable, in any such

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1249/03180 Page 67 of 1104    PageID 16201
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1348 of 1803    PageID 12094
Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 8 of 9

US Bank
August 6, 2019
Page 5

Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person." (emphasis added).[4] Despite these express terms, US Bank tacitly accepted or adopted the entry of Plan D, which contains provisions that directly affect the Secured Notes that the Highland Retail Funds hold. Among others, Plan D imposes an injunction that adversely affects the Highland Retail Funds' rights by prohibiting beneficial trading activity that would serve to protect Noteholder interests. In addition to other restrictions, Plan D impedes the ability of Noteholders under the Acis Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each Acis CLO.[5]

US Bank did not reserve any Noteholders' rights, or otherwise object to the entry of Plan D. US Bank's election to take no action regarding the entry of Plan D amplified the exposure, and overall risk that the Highland Retail Funds face during the pendency of the Plan D injunction. In fact, the Bankruptcy Court set a deadline for all parties, including US Bank, to submit any objections to the final approval of the Disclosure Statement and/or confirmation of Plan D.[6] As recognized by the Bankruptcy Court, US Bank failed to file objections to Plan D.[7] In fact, the Bankruptcy Court explicitly identified US Bank's failure to oppose the Plan in its opinion, making clear that notably, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan."[8] What's more, US Bank previously filed prior reservations of rights and/or objections in the Adversary Proceeding.[9] In relation to Plan B and Plan C (previously implemented as part of the Chapter 11 Trustee's First Amended Joint Plan), which each proposed re-writing the Acis Indentures to protect Acis' management fee stream for several years, US Bank acknowledged that the Plans "adversely affect[ed] the rights of Noteholders."[10] The same holds true for Plan D. US Bank is not excused from failing to protect the Highland Retail Funds' rights affected by Plan D, and the Adversary Proceeding.

---

[4] See e.g., Indenture 3 at § 5.3; Indenture 4 at § 5.3; Indenture 5 at § 5.3; Indenture 6 at § 5.3.

[5] See e.g., the Adversary Proceeding at Dkt. No. 830 p. 75, Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified Findings of Fact and Conclusions of Law.

[6] See e.g., the Adversary Proceeding at Dkt. No. 829 ¶ W ("The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order [identifying three Objections filed, none of which filed by US Bank].) (emphasis original).

[7] See id.

[8] See e.g., the Adversary Proceeding at Dkt. No. 827 p. 5.

[9] See e.g., the Adversary Proceeding at Dkt. Nos. 499-505.

[10] See e.g., the Adversary Proceeding at Dkt. No. 505 ¶ 3.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1350/631804 Page 68 of 1104    PageID 16202
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1349 of 1803    PageID 12095
Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 9 of 9

US Bank
August 6, 2019
Page 6

**III.    The Highland Retail Funds are not limited to filing contract claims against US Bank.**

In addition to contract claims based on US Bank's violations of the Acis Indentures, US Bank's failure to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care subjects it to additional tort liability. *See e.g.*, *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: **a trustee must still** '(1) avoid conflicts of interest, and (2) **perform all basic, non-discretionary, ministerial tasks with due care**.'") (emphasis added). And, consistent with the Trust Indenture Act, US Bank is not relieved "from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct…"[11] Succinctly, US Bank appears unwilling or unable to fulfill its duties to the Noteholders. The four corners of each Indenture create a framework of Noteholder protections, and such investors deserve an Indenture Trustee that will enforce the spirit and the letter of the Indentures. If US Bank cannot do its duty, it  should resign as Indenture Trustee.

The Highland Retail Funds are prepared to take all action necessary to preserve their rights, and remedy their losses sustained to date due to US Bank's misconduct. The Highland Retail Funds demand that US Bank provide written assurances by **August 15, 2019** detailing: (1) the specific measures that US Bank will take, effective immediately, to remediate  the wrongful conduct described herein, and (2) US Bank's offer to resolve this matter and make the Highland Retail Funds whole.

You are advised to review this letter carefully.  Nothing in this letter shall constitute a waiver of any of the Highland Retail Funds' rights and/or remedies at law and at equity, all of which they expressly reserve should this matter proceed to litigation.

Your immediate attention to this matter is appreciated.

Sincerely,

Michael K. Hurst

MKH/sb

cc:    David Coale (*of the Firm*)
       Chisara Ezie-Boncoeur (*of the Firm*)

---

[11] *Compare* Indenture 3 at § 6.1(c), Indenture 4 at § 6.1(c), Indenture 5 at § 6.1(c), and Indenture 6 at § 6.1(c) with 15 U.S.C. § 77ooo (d).

**Exhibit F**

Letter to S&P Global re U.S. Bank

Appellee Appx. 01344

Appx. 01596

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Exhibit 34    Page 1352 of 1804    Page 70 of 1104    PageID 16204
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1351 of 1803    PageID 12097

Case 19-12239-CSS    Doc 116-6    Filed 11/12/19    Page 2 of 9

# LYNN PINKER COX HURST

| | |
|---|---|
| MICHAEL K. HURST | Lynn Pinker Cox & Hurst, LLP |
| *Partner* | 2100 Ross Avenue |
| *Board Certified – Civil Trial Law* | Suite 2700 |
| *Texas Board of Legal Specialization* | Dallas, Texas 75201 |
| | **lynnllp.com** |
| D 214 981 3838 | |
| F 214 981 3839 | |
| mhurst@lynnllp.com | |

August 6, 2019

**Via Email:** lauren.fastiggi@spglobal.com

Lauren Fastiggi

Director and Lead Analyst

S&P Global

**Re:     Mismanagement of the Acis CLOs, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Ms. Fastiggi:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis Indentures dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

For your reference, enclosed to this correspondence is a copy of the demand letter served by the Highland Retail Funds on August 6, 2019 to U.S. Bank National Association, the Trustee of the Acis Indentures. The demand letter puts U.S. Bank on notice of its material violations of the terms of the Acis Indentures, by among others, mismanaging and allowing the impermissible gaming of the Acis Indentures by the portfolio manager thereof, and failing to perform required tasks with due care. The Highland Retail Funds are prepared to take all actions necessary to protect their rights from further deterioration.

Representatives of the Highland Retail Funds are available to meet with S&P Global to discuss whether U.S. Bank's wrongful conduct has caused a default, such that the ratings on some or all rated tranches should be reconsidered or withdrawn.

---

[1] The Acis Indentures collectively include: that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 34 Page 1253/031804age 71 of 1104 PageID 16205
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1352 of 1803 PageID 12098

Ms. Fastiggi
S&P Global
August 6, 2019
Page 2


We look forward to engaging with you on this serious matter.


Yours very truly,


Michael K. Hurst

MKH/ceb

Enclosure

cc:    David Coale (*of the Firm*)
       Chisara Ezie-Boncoeur (*of the Firm*)

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1354 of 1804    Page 72 of 1104    PageID 16206
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1353 of 1803    PageID 12099
Case 19-12239-CSS    Doc 116-6    Filed 11/12/19    Page 4 of 9

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**VIA EMAIL: dnovakov@fbtlaw.com**
Daniel P. Novakov
FROST BROWN TODD LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201
Tel: (214) 580-5840
Fax: (214) 545-3473

Re:     US Bank's mismanagement of the Acis Indentures, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.

Dear Mr. Novakov:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis CLOs dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

This letter provides formal notice that your client, U.S. Bank National Association ("US Bank" or "Indenture Trustee"), has: (1) materially violated the terms of the Acis Indentures, and (2) failed to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care. US Bank's wrongful conduct is actionable under New York law, and has caused the Highland Retail Funds to sustain significant damages, discussed below.

---

[1] The Acis Indentures are abbreviated herein as follows: "Indenture 3" means that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 4" means that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 5" means that certain Indenture dated as of November 18, 2014 issued by ACIS CLO 2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; "Indenture 6" means that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee. Together, such CLOs are referred to "Acis CLOs" and each, an "Acis CLO" or "CLO" herein.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1355/63180 Page 73 of 1104   PageID 16207
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1354 of 1803   PageID 12100
Case 19-12239-CSS   Doc 116-6   Filed 11/12/19   Page 5 of 9

US Bank
August 6, 2019
Page 2

### I.   US Bank's allowance of continued failure of the collateral quality test, as well as rampant portfolio mismanagement, violates the Acis Indentures.

Every purchase or sale made under the Acis Indentures must satisfy the collateral quality test imposed by each Acis Indenture.[2] As such, US Bank is required to ensure that every purchase or sale made under the Acis Indentures maintains or improves any failing collateral quality test. US Bank failed to satisfy this requirement by, among others, allowing transactions to be effectuated that do not maintain or improve the failing Weighted Average Life Test ("WAL") for trades made under the Acis Indentures.

*First*, US Bank violated its obligation to seek best execution on trades reasonably available to the Acis CLOs. By allowing multiple same day trades, US Bank has disregarded the obligation in the Acis Indentures requiring maintenance or improvement of the collateral quality test in each respective Acis CLO for each individual trade made. US Bank has allowed a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, in so doing, creating the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by US Bank cannot maintain or improve the WAL test on an individual basis. US Bank cannot perform its duties by allowing such Acis CLOs to act as a market taker, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures. Indeed, the value destruction of this forced "bunched trading" is clear when prices at trade date vs. prices on the day before trade date are compared. For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

---

[2] *See e.g.*, Indenture 3 at p. 16 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.17, and 12; Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 34 Page 1350/031804 Page 74 of 1104 PageID 16208
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1355 of 1803 PageID 12101
Case 19-12239-CSS Doc 116-6 Filed 11/12/19 Page 6 of 9

US Bank
August 6, 2019
Page 3

What's more, this artificial trading philosophy, disguised as "responsible management", has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors. For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

Tellingly, the transaction history authorized by US Bank makes clear that it appreciates the import of trading on specific days. In connection with Indenture 5, US Bank allowed the sale of varying amounts of the same term loan, Doncasters, over three different days: June 28, 2019, July 3, 2019, and July 8, 2019. US Bank allowed this because these selected dates positively impacted the collateral quality of the term loan sold. However, US Bank cannot ensure that the Acis CLOs enjoy best execution on purchases under the Acis Indentures if it turns a blind eye to the date on which purchases are made.

An analysis of the individual trades made under US Bank's approval further underscores the Trustee's failure to adhere to the respective indenture's collateral quality requirements. On July 12, 2019, in connection with Indenture 5, US Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024. But, to maintain or improve the WAL test for Indenture 5, US Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. US Bank facilitated similar misconduct across the Acis Indentures.

**Second**, the Weighted Average Rating Factor ("WARF") of each of the Acis CLO's portfolios has steadily increased this year, further demonstrating US Bank's facilitating the mismanagement of the Acis Indentures' collateral. On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). Plan D approved Brigade Capital Management, LP ("Brigade") to perform certain services related to the Acis Indentures, previously provided by Highland Capital Management.[3] Since the entry of Plan D, and Brigade's "management" of the Acis Indentures, US Bank allowed the collective WARF of the Acis CLO's portfolios to change from one of the cleanest pools in the market, to one of the dirtiest pools in

---

[3] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

**Appellee Appx. 01349**
**APPX. 161600**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1357/03/18 04 age 75 of 1104   PageID 16209
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1356 of 1803   PageID 12102
Case 19-12239-CSS   Doc 116-6   Filed 11/12/19   Page 7 of 9

US Bank
August 6, 2019
Page 4

the market in a matter of months. As of August 2019, since Brigade's involvement with the Acis Indentures, the WARF of each Acis CLO has dramatically increased, as follows:

CLO 3: 2522 ⟶ 2678
CLO 4: 2680 ⟶ 2941
CLO 5: 2673 ⟶ 3004
CLO 6: 2627 ⟶ 2917

*Third*, US Bank failed to protect the cash flow levels of its equity holders. Since the entry of Brigade, equity holders under Indentures 3-5 have received a total of <u>zero</u> cash flows. This damage has metastasized into the secured tranches of the CLOs and created direct harm to the Highland Retail Funds. The value decline of the equity positions is obvious:

| ACIS Equity Positions | CUSIP | 1/31/2019 | 2/28/2019 | 3/31/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 |
|---|---|---|---|---|---|---|---|
| ACIS 2014-3A 0.0000% - 2/2026 - SUB - 00100GAE3 @0.0000 02/01/2026 | 00100GAE3 | 14.5000 | 16.5000 | 17.3333 | 15.8333 | 13.0000 | 11.8333 |
| ACIS 2014-4A 0.0000% - 5/2026 - SUB - 00100HAE1 @0.0000 05/01/2026 | 00100HAE1 | 24.8333 | 22.1667 | 22.0000 | 22.1667 | 21.0000 | 19.8333 |
| ACIS 2014-5A 0.0000% - 11/2026 - SUB - 00101WAC1 @0.0000 11/01/2026 | 00101WAC1 | 34.2500 | 33.2500 | 32.7500 | 31.7500 | 31.0000 | 30.0000 |
| ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | 004524AD6 | 36.5000 | 36.5000 | 35.6667 | 35.0000 | 33.6667 | 32.0000 |

*Fourth*, US Bank has allowed the Acis CLOs to incur exorbitant expenses under its watch, at levels which exceed market standards.

In sum, US Bank's facilitation and approval of extensive portfolio mismanagement, and failure to require trades in accordance with industry standards and contrary to the best interests of its investors, violates the express terms of the Acis Indentures. US Bank's wrongful conduct has diluted the value of the Highland Retail Funds' Secured Notes and deteriorated the credit profile of the Acis CLOs. The Highland Retail Funds cannot allow US Bank to shirk its contractual obligations under the Acis Indentures. As Holders of Secured Notes, the Highland Retail Funds negotiated for superior rights under the Acis Indentures with the expectation that at a minimum, their collateral would remain protected in accordance with industry standards. *Indeed, US Bank must explain how this blatant gaming and chicanery in the name of artificially maximizing management fees is not a default under the Acis Indentures or a clear, actionable conflict of interest.*

## II.   US Bank Failed to reserve rights, or otherwise protect the Highland Retail Funds' rights affected by Plan D.

The Acis Indentures do not permit US Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholders, as applicable, in any such

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Exhibit 34    Page 1258/63 1804    Page 76 of 1104    PageID 16210
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1357 of 1803    PageID 12103
Case 19-12239-CSS    Doc 116-6    Filed 11/12/19    Page 8 of 9

US Bank
August 6, 2019
Page 5

Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person." (emphasis added).[4] Despite these express terms, US Bank tacitly accepted or adopted the entry of Plan D, which contains provisions that directly affect the Secured Notes that the Highland Retail Funds hold. Among others, Plan D imposes an injunction that adversely affects the Highland Retail Funds' rights by prohibiting beneficial trading activity that would serve to protect Noteholder interests. In addition to other restrictions, Plan D impedes the ability of Noteholders under the Acis Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each Acis CLO.[5]

US Bank did not reserve any Noteholders' rights, or otherwise object to the entry of Plan D. US Bank's election to take no action regarding the entry of Plan D amplified the exposure, and overall risk that the Highland Retail Funds face during the pendency of the Plan D injunction. In fact, the Bankruptcy Court set a deadline for all parties, including US Bank, to submit any objections to the final approval of the Disclosure Statement and/or confirmation of Plan D.[6] As recognized by the Bankruptcy Court, US Bank failed to file objections to Plan D.[7] In fact, the Bankruptcy Court explicitly identified US Bank's failure to oppose the Plan in its opinion, making clear that notably, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan."[8] What's more, US Bank previously filed prior reservations of rights and/or objections in the Adversary Proceeding.[9] In relation to Plan B and Plan C (previously implemented as part of the Chapter 11 Trustee's First Amended Joint Plan), which each proposed re-writing the Acis Indentures to protect Acis' management fee stream for several years, US Bank acknowledged that the Plans "adversely affect[ed] the rights of Noteholders."[10] The same holds true for Plan D. US Bank is not excused from failing to protect the Highland Retail Funds' rights affected by Plan D, and the Adversary Proceeding.

---

[4] *See e.g.,* Indenture 3 at § 5.3; Indenture 4 at § 5.3; Indenture 5 at § 5.3; Indenture 6 at § 5.3.

[5] *See e.g.,* the Adversary Proceeding at Dkt. No. 830 p. 75, Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified Findings of Fact and Conclusions of Law.

[6] *See e.g.,* the Adversary Proceeding at Dkt. No. 829 ¶ W ("The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "<u>Objections</u>") were timely filed in accordance with the Solicitation Order [identifying three Objections filed, none of which filed by US Bank].) (emphasis original).

[7] *See id.*

[8] *See e.g.,* the Adversary Proceeding at Dkt. No. 827 p. 5.

[9] *See e.g.,* the Adversary Proceeding at Dkt. Nos. 499-505.

[10] *See e.g.,* the Adversary Proceeding at Dkt. No. 505 ¶ 3.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1259/63180 Page 77 of 1104    PageID 16211
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1358 of 1803    PageID 12104
Case 19-12239-CSS    Doc 116-6    Filed 11/12/19    Page 9 of 9

US Bank
August 6, 2019
Page 6

### III.    The Highland Retail Funds are not limited to filing contract claims against US Bank.

In addition to contract claims based on US Bank's violations of the Acis Indentures, US Bank's failure to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care subjects it to additional tort liability. *See e.g.*, *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: **a trustee must still** '(1) avoid conflicts of interest, and (2) **perform all basic, non-discretionary, ministerial tasks with due care**.'") (emphasis added). And, consistent with the Trust Indenture Act, US Bank is not relieved "from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct…"[11] Succinctly, US Bank appears unwilling or unable to fulfill its duties to the Noteholders. The four corners of each Indenture create a framework of Noteholder protections, and such investors deserve an Indenture Trustee that will enforce the spirit and the letter of the Indentures. If US Bank cannot do its duty, it  should resign as Indenture Trustee.

The Highland Retail Funds are prepared to take all action necessary to preserve their rights, and remedy their losses sustained to date due to US Bank's misconduct. The Highland Retail Funds demand that US Bank provide written assurances by **August 15, 2019** detailing: (1) the specific measures that US Bank will take, effective immediately, to remediate  the wrongful conduct described herein, and (2) US Bank's offer to resolve this matter and make the Highland Retail Funds whole.

You are advised to review this letter carefully.  Nothing in this letter shall constitute a waiver of any of the Highland Retail Funds' rights and/or remedies at law and at equity, all of which they expressly reserve should this matter proceed to litigation.

Your immediate attention to this matter is appreciated.

Sincerely,

Michael K. Hurst

MKH/sb

cc:    David Coale (*of the Firm*)
       Chisara Ezie-Boncoeur (*of the Firm*)

---

[11] *Compare* Indenture 3 at § 6.1(c), Indenture 4 at § 6.1(c), Indenture 5 at § 6.1(c), and Indenture 6 at § 6.1(c) with 15 U.S.C. § 77ooo (d).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Filed 12/09/23 Page 78 of 1104    PageID 16212
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1359 of 1803    PageID 12105

Case 19-12239-CSS    Doc 116-7    Filed 11/12/19    Page 1 of 18

**Exhibit G**

Complaint, *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association, et al.*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1369/231804ge 79 of 1104    PageID 16213
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1360 of 1803    PageID 12106
Case 1:19-cv-09857-NRB    Document 7    Filed 11/12/19    Page 2 of 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

THE CHARITABLE DONOR ADVISED
FUND, L.P.,

*Plaintiff,*

v.

U.S. BANK NATIONAL ASSOCIATION and
MOODY'S INVESTORS SERVICE, INC.,

*Defendants.*

</td><td>

CASE NO.: 1:19-CV-09857-NRB

**PLAINTIFF'S FIRST
AMENDED COMPLAINT
AND JURY DEMAND**

</td></tr>
</table>

TO THE HONORABLE COURT:

Plaintiff The Charitable Donor Advised Fund, L.P. ("The Charitable DAF"), by and through its attorneys of record, files this First Amended Complaint against Defendants U.S. Bank National Association ("U.S. Bank") and Moody's Investors Service, Inc. ("Moody's"), and in support thereof, respectfully states and alleges as follows:

**NATURE OF LAWSUIT**

The Charitable DAF files this lawsuit to enforce and protect its rights.  U.S. Bank, which serves as Trustee of certain indentures, has severely compromised The Charitable DAF's rights thereunder through its misconduct and failure to act.  The Charitable DAF, a Holder of Secured Notes under those ACIS indentures, possesses beneficial interests in the collateral that U.S. Bank has mismanaged and failed to protect.  U.S. Bank's wrongful and negligent conduct has diluted the value of The Charitable DAF's Secured Notes, deteriorated the credit profile of the collateralized loan obligations ("CLOs"), and caused The Charitable DAF to incur other direct damages.  To protect its rights, The Charitable DAF seeks two things through this lawsuit.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1362/2318 04 Page 80 of 1104   PageID 16214
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1361 of 1803   PageID 12107
Case 19-12395-CSS   RBD Document 16-7   Filed 11/12/19   Page 3 of 817

*First*, it seeks to recover the losses it sustained in connection with U.S. Bank's negligence and breach of its extra-contractual duties to The Charitable DAF, including the duties to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

*Second*, The Charitable DAF seeks judicial intervention to protect its interests before U.S. Bank commits or facilitates any further wrongful conduct. The Charitable DAF cannot allow U.S. Bank to continue to shirk its duties as indenture Trustee.

## PARTIES

1.      Plaintiff The Charitable Donor Advised Fund, L.P. is a limited partnership, with its principal place of business at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

2.      Defendant U.S. Bank National Association is a national banking association that is Trustee of the ACIS Indentures, as defined further herein. Pursuant to the ACIS Indentures, Defendant U.S. Bank may be served at its corporate office located at 190 South LaSalle Street, 8th Floor, Chicago, Illinois 60603.

3.      Defendant Moody's Investors Service, Inc., is a Delaware corporation registered to do business in New York State. Moody's may be served through its registered agent CT Corporation System, located at 28 Liberty Street, New York, New York 10005. Moody's is a nationally recognized statistical rating organization ("NRSRO").

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizen of a foreign state.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1263/03180 Page 81 of 1104   PageID 16215
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1362 of 1803   PageID 12108
Case 19-12009-CSS   Document 16-7   Filed 11/12/19   Page 4 of 817

5.      Jurisdiction and venue over Moody's are proper in this District because Moody's is registered to do business in New York, and the transactions and occurrences that are the subject of The Charitable DAF's claims against Moody's took place in New York, New York.

6.      Jurisdiction and venue over US Bank are proper in this District because, pursuant to Section 14.10 of the ACIS Indentures, as defined further herein, each party to such indentures, including U.S. Bank:

> [H]ereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of . . . the United States District Court of the Southern District of New York . . . in any action or proceeding arising out of or relating to the notes or th[ese] indenture[s] . . .

7.      Venue is also proper because U.S. Bank waived any objection to venue in this District under the ACIS Indentures, as defined further herein.  Section 14.10 specifically provides that:

> Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to th[ese] indenture[s] in any court referred to in the previous paragraph.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

8.      New York law governs the claims in this lawsuit.

## STATEMENT OF FACTS

**A.  U.S. Bank is Trustee of certain ACIS collateralized loan obligations.**

9.      Between 2014 and 2015, U.S. Bank agreed to serve as the Trustee of three indentures governing CLOs to which The Charitable DAF holds beneficial interests as a Holder of Secured Notes, including: (i) the Indenture dated June 5, 2014 among ACIS CLO 2014-4 LTD., as Issuer, ACIS CLO 2014-4 LLC, as Co-Issuer, and U.S. Bank as Trustee ("Indenture 4"); (ii) the Indenture dated November 18, 2014 among ACIS CLO 2014-5 LTD., as Issuer, ACIS CLO 2014-5

Appellee Appx. 01356
APPX. 01603

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1364 of 1804    Page 82 of 1104    PageID 16216
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1363 of 1803    PageID 12109
Case 19-12095-CSS    RBD Document 16-7    Filed 11/12/19    Page 5 of 817

LLC, as Co-Issuer, and U.S. Bank as Trustee ("Indenture 5"); and (iii) the Indenture dated April 16, 2015 among ACIS CLO 2015-6 LTD., as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and U.S. Bank as Trustee ("Indenture 6", and together with Indenture 4 and Indenture 5, the "ACIS Indentures"). The ACIS Indentures impose a number of obligations on U.S. Bank in connection with its role as Trustee.

10. ***First,*** the ACIS Indentures provide that U.S. Bank shall hold in trust, for the "benefit and security" of the noteholders, all "Collateral Obligations" that secure the Co-Issuers' financial obligations to the noteholders. In connection therewith, the ACIS Indentures also provide that, for future purchases and sales of collateral obligations, the Trustee shall only consummate these transactions where certain investment criteria are satisfied. One such criterion is that, for all purchases, "either (A) each requirement . . . of the . . . Collateral Quality Test will be satisfied or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment." *See, e.g.*, Indenture 4 § 12.2(a)(iv). The ACIS Indentures define "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy . . . the Maximum Moody's Rating Factor Test . . . [and the] Weighted Average Life Test.

*Id*. at 15.

11. These tests are defined, in turn, as follows:

> "<u>Maximum Moody's Rating Factor Test</u>": The test that will be satisfied on any date of determination if the Weighted Average Adjusted Moody's Rating Factor[1] of the Collateral Obligations is

---

[1] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1265/633804 Page 83 of 1104    PageID 16217
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1364 of 1803    PageID 12110
Case 19-12395-CSS    RBD Document 16-7    Filed 11/12/19    Page 6 of 11817

less than or equal to the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Rating Factor Adjustment Amount.

"<u>Weighted Average Life Test</u>": A test that is satisfied if the Aggregate Weighted Average Life[2] on such date of determination is not later than June 5, 2022.

*See, e.g.*, Indenture 4 at 37-38, 66.

12.    These provisions seek to maintain the integrity of the collateral securing the Co-Issuers' obligations by requiring certain parties, including the Trustee, to ensure that any purchase or sale of such collateral complies with detailed, industry-recognized, and bargained-for tests.

13.    ***Second***, the ACIS Indentures provide that, in performing its duties as Trustee, U.S. Bank may not "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof". Like the provisions concerning collateral quality, these provisions also seek to ensure that the Trustee does not prejudice the rights of any secured noteholder under the ACIS Indentures, like The Charitable DAF.

---

as having been updated by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture 4 at 66.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id*.

[2] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (a) the number of years following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such tie of all Collateral Obligations *plus* (B) such date of determination.  *Id*. at 6.

Appellee Appx. 01358
Appx. 161699

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Exhibit 6   Page 84 of 1104   PageID 16218
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1365 of 1803   PageID 12111
Case 19-12239-CSS   RBD Document 6   Filed 11/12/19   Page 7 of 817

14.     The ACIS Indentures do more than require that U.S. Bank observe certain safeguards – they also grant U.S. Bank the broad power to "execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians, or attorneys".

###### ii.     U.S. Bank must also satisfy extra-contractual obligations owed to The Charitable DAF.

15.     U.S. Bank must satisfy certain extra-contractual obligations in connection with its role as Trustee, and the broad powers associated therewith.  These pre-default extra-contractual obligations include the duty to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

16.     For example, U.S. Bank was required to perform all basic, non-discretionary, ministerial tasks with due care, including, but not limited to, the following extra-contractual tasks: reserving noteholder rights impacted by active litigation, such as bankruptcy proceedings; exercising due care in connection with the payment of expenses; collecting and distributing the interest and dividends due on the portfolio securities; and  providing noteholders with periodic reports concerning the interest received, amounts distributed and securities in the portfolio.

17.     Notably, no provisions of the ACIS Indentures "shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct".

### B.   U.S. Bank fails to reserve or otherwise protect The Charitable DAF's rights in connection with bankruptcy proceedings.

18.     The Charitable DAF's rights as a secured noteholder under the ACIS Indentures have been compromised by certain proceedings and judicial rulings in a consolidated Chapter 11 bankruptcy proceeding, and related adversary proceeding, pending before the United States

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Exhibit 36    Page 1367 of 1804    Page 85 of 1104    PageID 16219
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1366 of 1803    PageID 12112
Case 19-12099-CSS    Doc 16-7    Filed 11/12/19    Page 7 of 17

Bankruptcy Court for the Northern District of Texas, jointly administered under case number 18-30264-SGJ-11 (the "Bankruptcy Proceeding").[3]

19.     On July 29, 2018, the Chapter 11 Trustee in the Bankruptcy Proceeding filed a First Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management, GP, LLC (the "First Amended Plan").

20.     The First Amended Plan provided for certain amendments to the ACIS Indentures that would be effected through a certain Plan B and Plan C. These proposals concerned, among other things, re-writing the ACIS Indentures to protect Acis' management fee stream for several years.

21.     In full recognition that the First Amended Plan encroached on the rights of noteholders under the ACIS Indentures like The Charitable DAF, the Trustee filed a Reservation of Rights and Limited Objections to the First Amended Plan in the Bankruptcy Proceeding. The Trustee took prompt measures to protect noteholder rights, filing these pleadings only fifteen days after the filing of the First Amended Plan.

22.     Among other infringements on the rights of noteholders under the ACIS Indentures, the Trustee explained that: "In other words, both Plan B and Plan C purport to ignore the express terms of the Indenture and the rights of the Noteholders with respect to amending the Indenture."[4]

23.     On January 31, 2019, a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC was entered in the Bankruptcy Proceeding ("Plan D").

---

[3] The two case numbers in the consolidated Bankruptcy Proceeding include case numbers 18-30264-SGJ-11 and 18-30265-SGJ-11.

[4] *See* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. Nos. 500, 501, and 500; *see id.* at Dkt. No. 505.

PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND                          PAGE 7

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1368/03 1804 Page 86 of 1104   PageID 16220
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1367 of 1803   PageID 12113
Case 19-12995-CSS-RBD Document 16-7 Filed 11/12/19 Page 9 of 817

24.     Like Plan B and C, Plan D also substantially impacted the rights of noteholders under the ACIS Indentures, including The Charitable DAF.

25.     Among other infringements, Plan D imposes an injunction that adversely affects The Charitable DAF's rights by prohibiting beneficial trading activity that would serve to protect noteholder interests.

26.     In addition to other restrictions, Plan D impedes the ability of noteholders under the ACIS Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each CLO covered by the ACIS Indentures.

27.     Moreover, Plan D conflicts with the express terms of the ACIS Indentures. Specifically, the ACIS Indentures do not permit U.S. Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**". (emphases added).

28.     Tellingly, in its Reservation of Rights filed in 2018, U.S. Bank acknowledged that the specific plans "adversely affect[ed] the rights of Noteholders."[5]  The same holds true for Plan D.

29.     Notwithstanding its ability to do so, U.S. Bank did not reserve any noteholders' rights, or otherwise object to the entry of Plan D.

30.     Instead, as noted by the court's ruling approving confirmation of Plan D on January 31, 2019, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases **and is not currently objecting to the Plan**."[6] (emphasis added).

---

[5] *See e.g.,* Bankruptcy Proceeding at Dkt. No. 505 ¶ 3; *see also,* Bankruptcy Proceeding at Dkt. Nos. 499-505
[6] *See e.g.,* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. No. 827 p. 5.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 64   Page 1369 of 1804   Page 87 of 1104   PageID 16221
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1368 of 1803   PageID 12114
Case 19-12239-CSS   Doc 16-7   Filed 11/11/19   Page 10 of 17

31.      U.S. Bank's election to take no action regarding the entry of Plan D amplified the exposure of The Charitable DAF and the overall risk that it faces during the pendency of the Plan D injunction. Though U.S. Bank has a duty to avoid conflicts of interest, its election to take no action regarding the entry of Plan D underscores the Trustee's self-serving conduct.

### C.  U.S. Bank fails to ensure that certain transactions satisfy the collateral quality tests.

32.      As set forth above, U.S. Bank must ensure that every purchase made under the ACIS Indentures satisfies the collateral quality tests, including the Weighted Average Life Test ("WAL test") and the Minimum Weighted Average Moody's Recovery Rate Test ("WAM test"), or maintains or improves any failing collateral quality tests.  U.S. Bank failed to satisfy these obligations in at least two ways.

33.      *First*, U.S. Bank allowed the "Portfolio Manager" under the ACIS Indentures to effectuate certain transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.  Specifically, U.S. Bank allowed the Portfolio Manager to make multiple same-day trades and to consolidate the weighted average maturity date for these trades.  In so doing, U.S. Bank permitted the Portfolio Manager to create the false appearance of a maintained or improved WAL test.  Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL tests on individual bases.

34.      The value destruction of this forced "bunched trading" is clear when one compares the prices at trade date against the prices from the previous day.  For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|-----|-------|--------|-----------|------|----------|-----------|-----------------|--------------|-----------------|--------|-----|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Exhibit 6    Page 1279 of 1804    Page 88 of 1104    PageID 16222
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1369 of 1803    PageID 12115
Case 19-12099-CSS    Doc 116-7    Filed 11/12/19    Page 110 of 817

| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

35.    What is more, this artificial trading philosophy, disguised as "responsible management," has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors.  For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

36.    The transaction history of the ACIS Indentures makes clear that U.S. Bank appreciates the import of trading on specific days.  In connection with one such indenture, U.S. Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024.  But, to maintain or improve the WAL test for this indenture, U.S. Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. U.S. Bank facilitated similar misconduct across the ACIS Indentures.

37.    **Second**, the Weighted Average Moody's Rating Factor" ("WARF") a factor on which the WAM test turns, has steadily increased this year for each portfolio of the ACIS Indentures.

38.    U.S. Bank turned a blind eye to The Charitable DAF's collateral quality, which has suffered under Plan D's new management. Plan D, which was implemented in the Bankruptcy Proceeding on January 31, 2019, appointed Brigade Capital Management, LP ("Brigade") to

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1379/03180  Page 89 of 1104   PageID 16223
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1370 of 1803   PageID 12116
Case 19-12239-CSS-RBD Doc 116-7  Filed 11/12/19  Page 21 of 48

perform certain services related to the ACIS Indentures, previously performed by Highland Capital
Management, L.P.[7]

39.     Since the entry of Plan D, and Brigade's "management" of the ACIS Indentures,
U.S. Bank has allowed the collective Weighted Average Moody's Rating Factor" ("WARF") of
the portfolios to become one of the dirtiest pools in the market in a matter of months. As of October
2019, and since Brigade's involvement with the ACIS Indentures, the WARF of each such
indenture has dramatically increased, as follows:

| | | |
|---|---|---|
| CLO 4: | ~~2680~~ | 2941 |
| CLO 5: | ~~2673~~ | 3004 |
| CLO 6: | ~~2627~~ | 2917 |

40.     U.S. Bank is not excused from failing to protect The Charitable DAF's rights
affected by Plan D or by the Bankruptcy Proceeding generally.

### D. U.S. Bank's conduct has damaged The Charitable DAF substantially.

41.     U.S. Bank's conduct, described herein, has resulted in myriad damage to The
Charitable DAF, including, but not limited to, the following.

42.     U.S. Bank's failure to ensure that transactions under the ACIS Indentures comply
with the collateral quality tests set forth therein constitute violations of U.S. Bank's contractual
and extra-contractual obligations to The Charitable DAF. By facilitating extensive portfolio
mismanagement, U.S. Bank has further violated its contractual and extra-contractual obligations
to The Charitable DAF.   These violations have compromised, among other things, the credit
profile of the ACIS Indentures and the value of The Charitable DAF's secured notes thereunder.

43.     Under its watch, since the appointment of Brigade, U.S. Bank has allowed the ACIS
Indentures to incur exorbitant fees which have diminished the equity that The Charitable DAF

---

[7] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-
SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 127 of 318 Page 90 of 1104   PageID 16224
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1371 of 1803   PageID 12117
Case 19-12995-CSS RBD Document 116-7 Filed 11/12/19 Page 31 of 48

owns indirectly pursuant to the ACIS Indentures. Specifically, because of the payment of uncharacteristically high fees, equity holders under certain ACIS Indentures have received **zero** cash flows.

44.     Further, as Trustee, U.S. Bank owed a duty to The Charitable DAF to avoid conflicts of interest. It shirked this duty by, among other things, facilitating trades that did not comply with the collateral test in order to artificially maximize certain management fees. Likewise, despite U.S. Bank's duty to avoid conflicts of interest, in failing to object or otherwise reserve **any** noteholder rights impacted by Plan D, U.S. Bank further demonstrated its inability to prioritize or protect the rights of noteholder The Charitable DAF.

### E.   Moody's knowingly or recklessly published false ratings of the ACIS Indentures.

45.     Moody's is a nationally recognized statistical rating organization ("NRSRO"). As an NRSRO, Moody's "evaluate[s] a debt offering based on public, and sometimes nonpublic, information regarding the assets of an issuer and assign[s] the debt offering a rating to convey information to a potential creditor/investor about the creditworthiness of the issuer's debt." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 164 (S.D.N.Y. 2009). This rating is important to issuers and investors because, among other things, a "[debt offering]'s success depends on the credit quality of the [underlying] assets," and "[i]f stable [assets] comprise the [debt offering], then []investors are much less likely to suffer a loss." *Id.* at 165; *see also In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003) ("[Moody's] endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO ratings.")

46.     Between June and November 2014, Moody's gave both Indenture 4 and Indenture 5 a AAA rating. This is a top rating, and the "same as those usually assigned by the Rating

---

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1273 of 1804   Page 91 of 1104   PageID 16225
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1372 of 1803   PageID 12118
Case 19-12395-CSS-RBD   Document 116-7   Filed 11/12/19   Page 41 of 48

Agencies to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills." *Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 165. The rating is "commonly understood in the marketplace to [indicate an investment is] stable, secure, and safe." *Id*.

47.     Still, depending upon the circumstances, an NRSRO like Moody's can downgrade a particular rating to reflect new information. To that end, on August 6, 2019, certain ACIS noteholders provided Moody's with written notice of U.S. Bank's misconduct, including its practice of bunched trading under the ACIS Indentures by effectuating multiple same day transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.

48.     The same noteholders provided Moody's with a supplemental notice of U.S. Bank's trading misconduct on September 13, 2019.

49.     Nevertheless, and since that time, Moody's has continued to publish false ratings of those assets. Indeed, Moody's has continued to rate Indenture 4 and Indenture 5 as AAA investments, notwithstanding its notice of the facts set forth in more detail above.

50.     This, in turn, has allowed U.S. Bank and the portfolio manager to continue disregarding their obligations under the ACIS Indentures, further compromising the value of the assets securing the Co-Issuers' obligations thereunder. Moody's wrongful conduct has therefore diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

## COUNT I: BREACH OF THE DUTY TO PERFORM ALL BASIC, NON-DISCRETIONARY, MINISTERIAL TASKS WITH DUE CARE

51.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

52.     As Trustee, U.S. Bank has an extra-contractual duty to perform all basic, non-discretionary, ministerial tasks under the ACIS Indentures with due care. This duty subjects U.S. Bank to tort liability.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 13/14/03 1804    Page 92 of 1104    PageID 16226
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1373 of 1803    PageID 12119
Case 19-1239957-SRBD Document Filed 11/12/19 Page 51 of 117

53.     U.S. Bank breached this duty in at least two ways.

54.     First, it breached this duty by permitting the ACIS Indentures to incur exorbitant expenses, which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

55.     Second, U.S. Bank breached its duty by negligently failing to act, and by accepting the entry of "Plan D" in the Bankruptcy Proceeding, which directly affects the secured noteholders. Among other things, Plan D adversely impacts the rights of The Charitable DAF by imposing an injunction that prohibits beneficial trading activity, and impeding the ability of noteholders to make optional redemptions.

56.     U.S. Bank's omission to act was not in good faith. In 2018, U.S. Bank filed multiple pleadings in the Bankruptcy Proceeding, including, but not limited to, a Reservation of Rights, and Limited Objections to the entry of the predecessor plans to Plan D. U.S. Bank failed to take any action whatsoever in regard to Plan D.

57.     These breaches were the proximate cause of damages to Charitable DAF.

58.     Based on investigation to date, such damages include, but are not limited to, The Charitable DAF's inability to make certain trades or redemptions, which restriction has decreased the value of The Charitable DAF's investment across the capital stack of each contract.  They also include the diminished value of the collateral securing the issuer and co-issuer's financial obligations to The Charitable DAF. U.S. Bank's failure to reserve or otherwise protect The Charitable DAF's rights impacted by the Bankruptcy Proceeding has caused it to suffer damages.

## COUNT II: BREACH OF THE DUTY TO AVOID CONFLICTS OF INTEREST

59.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1375/031804age 93 of 1104    PageID 16227
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1374 of 1803    PageID 12120
Case 19-12995-CSS    Document 116-7    Filed 11/12/19    Page 16 of 18

60.     As Trustee, U.S. Bank has an extra-contractual duty to avoid conflicts of interest. This duty subjects U.S. Bank to tort liability.

61.     Under this duty, U.S. Bank is prohibited from advancing its own interests at the expense of The Charitable DAF.

62.     U.S. Bank breached this duty by, among other things, facilitating extensive portfolio mismanagement and failing to ensure compliance with the collateral quality tests in order to artificially maximize management fees. Such facilitation of noncompliant trades gives rise to an inference of bad faith.

63.     U.S. Bank also breached this duty by allowing the ACIS Indentures to incur exorbitant fees which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

64.     U.S. Bank's breaches were the proximate cause of damages to The Charitable DAF.

65.     These breaches were the proximate cause of damages to Charitable DAF.

66.     Based on investigation to date, such damages include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to Charitable DAF.

67.     U.S. Bank's breaches, set forth herein, have damaged The Charitable DAF in not less than $5,000,000.00.

## COUNT III: DEFAMATION (AGAINST MOODY'S)

68.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

69.     On August 6, 2019, certain ACIS noteholders provided Moody's with credible information regarding U.S. Bank's wrongful trading conduct and portfolio mismanagement, as

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Exhibit 36    Page 1376 of 1804    Page 94 of 1104    PageID 16228
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1375 of 1803    PageID 12121
Case 19-12959-CSS-RBD    Document 116-7    Filed 11/12/19    Page 17 of 18

described in more detail above. Since that date, Moody's has had actual or constructive notice of

US Bank's wrongful trading conduct.

70.    Notwithstanding such notice, Moody's has continued to publish a false rating of

AAA for Indenture 4 and Indenture 5 to investors.

71.    Moody's published these ratings with knowledge of their falsity or with reckless

disregard thereto.

72.    In so doing, Moody's has caused The Charitable DAF to suffer special damages.

Specifically, by continuing to provide an AAA rating for Indenture 4 and Indenture 5, Moody's

has enabled U.S. Bank and the portfolio manager to compromise the value of the assets securing

the Co-Issuer's obligations under the ACIS Indentures.  Since August 2019, when Moody's first

learned of U.S. Bank's misconduct, these assets have continued to decrease in value.

## CONDITIONS PRECEDENT

73.    Pursuant to Federal Rule of Civil Procedure 9(c), Charitable DAF hereby pleads

that all conditions precedent have occurred or been performed.  Although the ACIS Indentures

contain "no-action" clauses that require certain noteholders to make written request to U.S. Bank

to institute any judicial proceedings in its own name, the Second Circuit has held that

noncompliance with a no-action provision is excused in a suit against the indenture trustee.  *See*

*Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992) ("The district court held that the

'no action' clause applied only to the debenture holder suits against [the issuer], not the Indenture

Trustees . . . This construction of [the limitation on suits provision] obviously is correct, as it would

be absurd to require the debenture holders to ask the Trustee to sue itself.").

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Exhibit 6   Page 1372 of 1804   Page 95 of 1104   PageID 16229
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1376 of 1803   PageID 12122
Case 19-12395-CSS-RBD   Document 116-7   Filed 11/12/19   Page 18 of 18

## DEMAND FOR ATTORNEYS' FEES

74.     Pursuant to Section 5.15 of the ACIS Indentures, Charitable DAF hereby makes a

demand for the attorneys' fees and court costs it has sustained in bringing this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff The Charitable Donor Advised Fund, L.P. respectfully requests

that judgment be entered in its favor and against Defendants U.S. Bank and Moody's as follows:

A.     An award of damages sustained as a result of U.S. Bank National Association's
        activities in not less than $5,000,000.00;

B.     An award of damages sustained as a result of Moody's conduct in an amount to be
        determined at trial;

C.     An award of reasonable attorneys' fees and court costs;

D.     An award of pre-judgment and post-judgment interest on all sums awarded; and

E.     For such other and further relief as the Court may deem just, equitable and
        appropriate.

DATED: November 1, 2019                    Respectfully submitted,

                                            */s/ V. Chisara Ezie-Boncoeur*
                                            Michael K. Hurst (*pro hac admission pending*)
                                            Texas State Bar No. 10316310
                                            *mhurst@lynnllp.com*
                                            V. Chisara Ezie-Boncoeur
                                            New York Bar No. 5333224
                                            *cezie-boncoeur@lynnllp.com*
                                            John R. Christian (*pro hac admission pending*)
                                            Texas State Bar No. 24109727
                                            *jchristian@lynnllp.com*
                                            **LYNN PINKER COX & HURST, LLP**
                                            2100 Ross Avenue, Suite 2700
                                            Dallas, Texas 75201
                                            214-981-3800 – Telephone
                                            214-981-3839 – Facsimile
                                            **ATTORNEYS FOR THE CHARITABLE
                                            DONOR ADVISED FUND, L.P.**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Page 1373/2318 04age 96 of 1104    PageID 16230
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1377 of 1803    PageID 12123

**<u>Exhibit H</u>**

Highland Objection to Supplemental Application re Winstead PC's Retention

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Filed 12/29/23 18 04   Page 97 of 1104   PageID 16231
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1378 of 1803   PageID 12124
Case 18-30264-sgj11   Doc 896-55   Filed 01/05/18   Entered 11/12/05/18   Page 259 of 16   Page 1 of 15

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Highland Capital Management, L.P., party-in-interest and creditor ("Highland") to Acis

Capital Management, L.P. and Acis Capital Management GP, LLC (collectively the "Debtors"),

files this objection (the "Objection") to the *Supplemental Application Regarding the Scope of*

*Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee* [Docket No. 669] (the

"Supplemental Application").  In support of the Objection, Highland states as follows:

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 1**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Exhibit 6   Page 1379 of 1804 Page 98 of 1104   PageID 16232
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1379 of 1803   PageID 12125
Case 18-30264-sgj11   Doc 1208-6   Filed 11/05/18   Entered 11/05/18 Page 3 of 16   Page 2 of 15

## BACKGROUND

**A.     The Bankruptcy Case and the Winstead Application**

1.      On May 30, 2018, after weeks of protesting Winstead's purported representation of the Chapter 11 Trustee in light of Winstead's ongoing representation of Josh Terry – the sole involuntary petitioning creditor who forced the Debtors into bankruptcy – Highland filed the *Motion to Disqualify Winstead PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* (the "Motion to Disqualify") [Doc. No. 244].

2.      After the Motion to Disqualify was filed to compel the conflict issues to be brought before the Court, later that evening on May 30, 2018, the Chapter 11 Trustee filed the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Doc. No. 246] (the "Winstead Application").  The Chapter 11 Trustee had already sought the employment of Forshey & Prostok, LLC ("Forshey & Prostok") to serve as counsel to the estates pursuant to 11 U.S.C. § 327(a), via the *Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Doc. No. 222] (the "Forshey & Prostok Application").  The Forshey & Prostok Application was later approved on June 18, 2018 without contest.  *See Order Granting Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Doc No. 296] (the "Forshey & Prostock Retention Order").  Notably, the Forshey & Prostok Application sought the firm's representation for, among other things, "[p]reparing on behalf of the Trustee all necessary and appropriate motions, pleadings, proposed orders, and other documents that are necessary in connection with these chapter 11 cases, including in connection with any adversary proceedings or appeals associated therewith," and "[i]nvestigating and prosecuting chapter 5 causes of action and other potential litigation that may be brought by the Trustee."  *See* Forshey & Prostock

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Page 1329/23 1804   Page 99 of 1104   PageID 16233
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1380 of 1803   PageID 12126
Case 18-30264-sgj11   Doc 3596-6   Filed 01/05/18   Entered 11/12/05/18 Page 3459f 16   Page 3 of 15

Application at ¶¶ 9(b), (c) (emphasis added).  The Forshey & Prostock Retention Order so provided.  *See* Forshey & Prostok Retention Order at ¶ 2 (granting the Forshey & Prostok Application "on the terms and conditions, set forth in the Application.").

3.      By the Winstead Application, the Chapter 11 Trustee sought to distinguish his retention of Winstead from that of Forshey & Prostok by presenting them as special counsel under 11 U.S.C. § 327(a) and (c)[1] to provide legal services for the following "limited" purposes:

     a.  Management, liquidation, disposition, and monetization of the CLO assets;

     b.  Investment Advisors Act;

     c.  Operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

     d.  <u>Certain other litigation matters related to or arising in these Chapter 11 cases, as requested by the Chapter 11 Trustee</u> (emphasis added).

*See* Winstead Application at ¶ 25(d).  The Winstead Application was supported by the *Declaration of Rakhee Patel in Support of Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "<u>Patel Declaration</u>").

4.      Notably, the Patel Declaration stated:

Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

With respect to these specified purposes, Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same.  Accordingly, except to the extent necessary to effectuate the specific services outlined above,

---

[1] The Winstead Application also provided that the Trustee "reserves its rights to seek approval for such retention under Section 327(e)."  Winstead Application at fn. 2.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 3**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Exhibit 6    Page 12332 of 1804 Page 100 of 1104    PageID 16234
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1381 of 1803    PageID 12127
Case 18-30264-sgj11 Doc 986-8 Filed 12/05/18    Entered 11/12/05/18 Page 359 of 16 Page 4 of 15

Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code. With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

5.      On June 9, 2018, the Trustee filed the *Supplement to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Doc. No. 266] (the "Supplement"). The Supplement acknowledged that Winstead would continue to represent Josh Terry, but asserted that the representation did not conflict with Winstead's representation of the Trustee. The Supplement was supported by the *Supplemental Declaration of Rakhee Patel in Support of the Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Supplemental Patel Declaration"). Again, the Supplement and the Supplemental Patel Declaration reiterated that "Winstead will not represent the estate with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters purely under the Bankruptcy Code." *See* Supplement at ¶ 6; Supplemental Patel Declaration at ¶ 14.

6.      In addition to its pending Motion to Disqualify, on June 11, 2018, Highland filed its objection to the Winstead Application [Doc. No. 267] (the "Highland Objection"). By the Highland Objection, Highland asserted that retention of Winstead as special counsel was impermissible and inappropriate because: (1) the delineated services proposed to encompass the scope of services operated as Winstead's *de facto* general representation of the Trustee; (2) retention under Bankruptcy Code section 327(a) was improper because Winstead was not disinterested; and (3) Winstead had an actual conflict of interest relating to certain state court litigation with Highland (the "Winstead Litigation").

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/23/23    Page 101 of 1104    PageID 16235
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1382 of 1803    PageID 12128
Case 18-30264-sgj11    Doc 309-8    Filed 11/09/18    Entered 11/09/18    Page 5 of 15

7.      Likewise, on June 11, 2018, the Office of the United States Trustee filed its objection to the Winstead Application [Doc. No. 279] (the "<u>U.S. Trustee Objection</u>").  By the U.S. Trustee Objection, the U.S. Trustee asserted substantively similar objections as in the Highland Objection, including that the relief sought in ¶ 12(d) of the Winstead Application was "too broad a delegation of the Court's retention authority" and that "given Winstead's prior retention of Terry, any employment should be cabined and specifically defined, with any necessary supplemental disclosures."  U.S. Trustee Objection at ¶ 23.

8.      The Court held a hearing on the Winstead Application on June 14, 2018.  The following representations were made by the Trustee:

> Winstead is going to do a lot of the CLO stuff.  But Forshey & Prostok, he's doing the real bankruptcy stuff.  For example, they're drafting the plan.  <u>They're doing the turnover stuff.  They will do the claim objections. . . . They're doing the bankruptcy stuff in this Chapter 11 case</u>, but they aren't CLO experts, they'll readily admit that.[2]

9.      After considering the arguments of counsel for Highland and the U.S. Trustee, the Court approved the Winstead Application, in part, but not without materially paring back the scope.  Specifically, the Court did not authorize part (d) of the proposed scope of services, thus rejecting Winstead's employment by the Trustee as to "[c]ertain other litigation matters related to or arising in these Chapter 11 cases, as requested by the Chapter 11 Trustee."  The Court stated:

> We're going to scratch D, Certain Other Litigation Matters.  Anything beyond those three tasks [A, B, and C], Mr. Phelan, you'll have to file another application on notice to creditors and parties in interest, and we'll have a hearing deciding whether an expanded scope is appropriate or not.[3]

---

[2] June 14, 2018 Hr'g Tr. at 63:11-19 (testimony of Trustee, emphasis added).  Excerpts of the hearing transcript are attached hereto as **Exhibit A**.

[3] *Id.* at 68:16-21.

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 5

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/04/23   Page 102 of 1104   PageID 16236
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1383 of 1803   PageID 12129
Case 18-30264-sgj11   Doc 365-5   Filed 11/05/18   Entered 11/05/18 Page 6 of 15

10.     On June 21, 2018, the Court entered its order consistent with its ruling [Doc. No.
313] (the "<u>Winstead Employment Order</u>").[4]

### B.     The Court's Limitations Have Been Ignored

11.     From the inception of these bankruptcy cases and despite the Court's limitations
on the scope of Winstead's employment (and Winstead's own representations in the Winstead
Application and the Supplement), Winstead has appeared on every pleading filed by the Trustee,
appeared at every hearing in this case, and has *de facto* served as lead counsel to the Trustee.
The Court need only review the record in this case as evidence that Winstead has ignored the
limits of the Court's ruling.  In short, it has proceeded in these cases unrestrained.

12.     As an example, representation of the Trustee during the prior failed Plan process
was dominated by Winstead.[5]  In addition, Winstead has taken the lead role in the Adversary
Proceedings and in every one of the Appeals, each as defined and described below.

13.     As the Court is aware, the Trustee is currently in the process of seeking
confirmation of "Plan D."  Once again, any reasonable review of Winstead's role in the plan
process to-date demonstrates that neither Winstead nor the Trustee are taking seriously their
responsibility to adhere to the Court's limits on Winstead's role.

### C.     The Adversary Proceedings

14.     There are currently two adversary proceedings pending in this case that involve
Highland and Highland related entities: Adversary Case No. 18-03078, and Adversary Case No.

---

[4] Highland sought leave to appeal this interlocutory order to the District Court, but was denied leave to appeal.
Highland reserves the rights to appeal and, at this time, intends to pursue the appeal of the Trustee's retention of
Winstead when the matter is otherwise deemed final and appealable.

[5] Winstead attorney Rakhee Patel examined Trustee witness Zach Alpern and cross examined witnesses Daniel
Castro, Hunter Covitz and Isaac Leventon.  Winstead attorney Joseph Wielebinski examined Trustee witness
Richard Klein.  Winstead attorney Rakhee Patel was the only Trustee attorney to make closing arguments.  Notably,
no fee applications reflecting time expended in the failed Plan endeavor have been filed.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 6**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/05/23   Page 103 of 1104   PageID 16237
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1384 of 1803   PageID 12130
Case 18-30264-sgj11   Doc 1489   Filed 11/05/18   Entered 11/05/18 16:33:59   Page 7 of 15

18-03212 (collectively referred to herein as the "Adversary Proceedings"). Adversary Case No. 18-03078 was originally filed by Highland and HCLOF against the Trustee, seeking an injunction related to a June 14, 2018 optional redemption. The Trustee thereafter filed counterclaims and third party claims against Highland and HCLOF, including a fraudulent transfer claim that the Trustee has alleged is fundamental to this bankruptcy case.

15.     Given the passage of time and circumstances that mooted the original relief sought by Highland and HCLOF, the parties in case no. 18-03078 agreed to the form of agreed order dismissing Highland and HCLOF's claims without prejudice and allowing the Trustee to amend his answer. The order was entered on November 1, 2018.

16.     Adversary Case No. 18-03212 was brought by the Trustee against Highland, HCLOF, Neutra, Ltd. and the CLOs seeking a temporary restraining order and preliminary injunction preventing optional redemptions and also seeking related declaratory judgments.

17.     In both Adversary Proceedings, Winstead has taken a lead role, despite the limits of the Court's Order.[6]

18.     Discovery in the Adversary Proceedings and in the bankruptcy case is governed by an *Agreed Protective Order* entered by this Court on August 21, 2018 [Doc. No. 535] (the "Protective Order").

**D.     The Appeals**

19.     There are a number of appeals to the District Court currently pending in relation to this bankruptcy case and the Adversary Proceedings (the "Appeals"). Once again, despite the

---

[6] The Court need only consider one of the most recent hearings on the adversaries held October 9, 2018, where Winstead attorney Phil Lamberson presented all of the arguments on behalf of the Trustee.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 7**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Exhibit 6    Page 12336/23 1804ge 104 of 1104    PageID 16238
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1385 of 1803    PageID 12131
Case 18-302...Case 19-112289 CASS Filed Doc 01/05/18    Entered 11/12/05/18 Page 359 16 Page 8 of 15

limits of this Court's Order, Winstead has consistently taken the lead in such "other litigation

matters related to or arising in these Chapter 11 cases."[7]

### E.    The Supplemental Application

20.    After almost 4½ months of ignoring the limitations prescribed by the Court's

ruling (and contradicting prior representations to the Court), on October 28, 2018, the Trustee

filed the Supplemental Application.  The basis provided for expanding the scope of Winstead's

retention includes:

    a.    The need of Winstead to "reference . . . and [have] a
comprehensive understanding of <u>all agreements and documents
underlying Acis's business</u> . . . ."  Application at ¶ 2 and ¶ 11
(emphasis added).

    b.    The need for Winstead to continue "evaluating the estates'
numerous claims, counterclaims, third-party claims and defenses . .
. ."  Application at ¶ 9.

21.    The Trustee is seeking to employ Winstead in relation to "[a]ny litigation against

Highland Capital and/or any of its affiliates, including Highland CLO Funding, Ltd., Highland

CLO Management, Ltd. and Highland CLO Holdings, Ltd."  Application at ¶ 13(a).  The

Supplemental Application also identifies the pending Adversary Proceedings and appeals

involving Highland and Highland-related entities.  Application at ¶ 13(b) and (c).  But,

practically speaking, the all-inclusive scope of "any litigation" in Application paragraph 13(a)

would make paragraphs 13(b) and (c) superfluous.

---

[7] *See, e.g., Robin Phelan, Chapter 11 Trustee's Response to Emergency Motion of Appellants Highland and HCLOF
to Consolidated Appeals and Expedited Briefing and Brief in Support, filed by Winstead* (signed by Rahkee Patel) on
behalf of the Trustee on July 30, 2018 in District Court Case No. 3:18-cv-01822 (Highland CLO Funding Ltd. v.
Robin Phelan, Chapter 11 Trustee, et al.); *see also Notice of Appearance and Designation of <u>Lead Counsel</u>*
(emphasis added, each signed by Rahkee Patel) in Case Nos. 3:18-cv-01822-B, 3:18-cv-01810-S, and 3:18-cv-
01817-G.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 8**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/27/23   Page 105 of 1104   PageID 16239
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1386 of 1803   PageID 12132
Case 18-30264-sgj11   Doc 696-5   Filed 11/05/18   Entered 11/05/18   Page 9 of 15

22.     On October 29, 2018, the Trustee filed a motion seeking to expedite the hearing

on the Supplemental Application [Doc. No. 672] (the "<u>Motion to Expedite</u>").  The Trustee stated

in the Motion to Expedite that the hearing on the Application will be "merely a rehashing of the

hearing on the [original] Application."  Motion to Expedite at ¶ 4.  Whether or not that is the

case, it would be for good reason, since the Trustee and Winstead have demonstrably ignored the

Court's Order.

<b><u>OBJECTION</u></b>

**A.     The Circumstance of the Case Clearly Demonstrate that Winstead Has a Conflict of Interest**

23.     As noted above, Highland's appeal of the Order was dismissed by the District

Court as interlocutory.   As such, there is nothing preventing the Court at this point from

reconsidering issues that were previously asserted by the parties in this matter.  Both Highland

and the U.S. Trustee asserted that Bankruptcy Code section 327(c) prohibited Winstead's

retention because it has an actual conflict of interest related to the Winstead Litigation and

related to Winstead's on-going representation of Terry.  As to the Winstead Litigation, the Court

ordered Winstead to erect an ethical wall.[8]

24.     The issue of Winstead's representation of Terry, however, remains and constitutes

an unwaivable, actual conflict of interest.  At the June 14, 2018 hearing on the Application, both

Highland and the U.S. Trustee expressed concerns to the Court of various ways Winstead's

concurrent representation was problematic.  Subsequent events have proven the point.  The lead

law firm in the Adversary Proceedings (Winstead) currently represents Highland's principal

adversary (Terry).   The parties are currently engaged in discovery related to the Adversary

---

[8] June 14, 2018 Hr'g Tr. at 71:19-25.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 9**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Page 106 of 1104   PageID 16240
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1387 of 1803   PageID 12133
Case 18-30264-sgj11   Doc 1568   Filed 11/05/18   Entered 11/05/18   Page 10 of 15

Proceedings and Highland has designated certain of the documents "Confidential," and a much smaller portion of the documents "Attorneys Eyes Only," as is permitted under the Protective Order.   Notably, the Trustee has directed Winstead to handle the recent discovery, including documents currently in the process of being produced by Highland to Winstead.   One of Highland's principal concerns is that sensitive documents or information dealing with Highland's business operations will fall into the hands of Terry, who is a current adversary <u>and a potential future competitor.</u>[9]  It simply has to be the case that some of the attorneys at Winstead who are reviewing the produced documents will be the very same attorneys advising Terry in the related appeals.  What if certain Confidential Information reviewed by Winstead has nothing to do with maximizing value for the estate, but would be helpful for Terry to compete against Highland and/or to advance his appeal?  As it stands, Winstead will be under Court order not to discuss or otherwise reveal that information.  Winstead attorneys are in the impossible positon of parsing every piece of information to determine whether it falls under the Trustee's duty to maximize value, as opposed to merely being useful information for an adversary and competitor of Highland.  Furthermore, Winstead attorneys must keep track of exactly where they obtained every piece of information they discuss with their client Terry when prosecuting his appeal.  For that reason alone, it is not possible for Winstead to simultaneously maintain confidences for both the Trustee and Terry.   In addition, Winstead's duty of loyalty is being violated because Winstead is in the position of affirmatively protecting Confidential Information available to one client (the Trustee) against the other client (Terry).

---

[9] The prior Plans attempted, and the current Plan D is attempting again, to put into place a mechanism where Terry will be a direct competitor of Highland.  Terry thus is not motivated simply to recover on his claim.  Terry has a non-creditor interest that is furthered by learning as much non-public information about Highland's recent actions and investment activities as possible.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 10**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Exhibit 6    Page 1339 of 1804    Page 107 of 1104    PageID 16241
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1388 of 1803    PageID 12134
Case 18-30241-sgj11    Doc 968-8    Filed 01/05/18    Entered 01/17/05/18    Page 319 of 18    Page 11 of 15

25.     This is untenable situation and there is no good reason to permit it.  As previously stated in this matter by the U.S. Trustee, these circumstances directly challenge Winstead's ethical duty of loyalty and duty to maintain confidences.  *See* U.S. Trustee Objection at ¶ 15 (citing *In re American Airlines*, 972 F.2d 605, 618 (5th Cir. 1992) and *Humble Place Joint Venture v. Fory (In re Fory)*, 936 F.2d 814, 819 (5th Cir. 1991)).   Winstead is conflicted and Bankruptcy Code section 327(c) prohibits its retention in this case.

**B.      Winstead Cannot Maintain the Façade: It Has Represented, and is Seeking to Represent, the Chapter 11 Trustee Without Any Meaningful Limitation**

26.     This Court chose to limit the scope of Winstead's retention to exclude the broadly-worded "certain other litigation matters."   The Court did that to put into place "prophylactic measures" to ensure that the Trustee's goal of maximizing value lines up with Terry's goal of recovering as a creditor in the case.[10]  The Court recognized that the Application, as originally requested, was not tied in any way to Winstead's alleged CLO expertise and giving Winstead free reign to litigate such matters could create problems relating to changing "bedfellows" and "crossway" motivations.[11]

27.     Since the entry of the Order, a critical point seems to have gotten lost in the various litigation fronts among the parties: Winstead was retained as <u>special</u> counsel based on the Trustee's assertion that Winstead had unique expertise <u>related to CLOs</u>.  The hearing on the Supplemental Application provides the Court with an opportunity to address whether Winstead and the Trustee actually complied with the limitation imposed by the Court.  To that end, at hearing on this matter, the Court should: (1) review the evidence related to the scope of Winstead's representation since being retained, and (2) consider whether the role Winstead

---

[10] June 14, 2018 Hr'g Tr. at 68:4-6.
[11] *Id.*

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 11**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Page 1290 of 1804    Page 108 of 1104    PageID 16242
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1389 of 1803    PageID 12135
Case 18-30264-sgj11    Doc 968-5    Filed 10/05/18    Entered 11/12/15/18 13:59 of 1    Page 12 of 15

proposes going forward has any realistic tie to the concept of "special counsel." To the first

point, as noted above, Winstead clearly did not limit its role to CLO related matters following its

retention. There was absolutely no meaningful distinction between Winstead and Forshey &

Prostok during the failed contested Plan process. Moreover, any assertion by Winstead that it

worked to limit duplication of effort with Forshey & Prostok is not relevant to the <u>scope</u> of

employment point before the Court. *See In re Polaroid Corp.*, 424 B.R. 446, 452 (Bankr. D.

Minn. 2010) (holding that special counsel should not provide general advice to a debtor); *see*

*also In re Abrass*, 250 B.R. 432, 455 (Bankr. M.D. Fla. 2000); *In re Running Horse, L.L.C.*, 371

B.R. 446, 452 (Bankr. E.D. Cal. 2007). Special counsel requires retention based on specialized

knowledge and, naturally, the firm should limit itself to matters involving such knowledge.

Winstead's demonstrated track record fails that test. This is especially problematic given that

every representation by the Trustee and Winstead to this Court was that Winstead would be

taking on such a limited role.

28.     On the second point, after months of violating the Court's Order requiring

limitations on its representation, Winstead has now explicitly dispensed with any pretense of

special counsel and is requesting to be involved in <u>any</u> litigation involving Highland and to allow

Winstead to review and provide analysis on <u>any</u> agreement and document of the Debtors. Any

pretext that Winstead is in this case because of its CLO expertise has been cast aside.

29.     The Trustee has also chosen to challenge Highland's motivations related to this

Objection. Specifically, the Trustee suggests improper motive in the Supplemental Application

by stating that Highland and HCLOF opposed the original Application because they were

"highly motivated to attempt to hamstring and otherwise limit the Trustee's ability to litigate

effectively with them." Supplemental Application at ¶ 6. This is simply inaccurate. Highland is

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION**
**REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE**
**CHAPTER 11 TRUSTEE – Page 12**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/21/23    Page 109 of 1104    PageID 16243
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1390 of 1803    PageID 12136
Case 18-30264-sgj11    Doc 958-3    Filed 11/05/18    Entered 11/05/18 Page 13 of 15

one of the largest creditors in this case and it has valid concerns that enforcing no meaningful

limits on purported special counsel is an impermissible use of estate funds.  The Trustee and

Winstead have ignored the limitations put into place by this Court.  The Court should refuse to

grant the Supplemental Application.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 13**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/22/23   Page 110 of 1104   PageID 16244
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1391 of 1803   PageID 12137
Case 18-30262-sgj11   Doc 968-5   Filed 11/05/18   Entered 11/05/18 13:59:18   Page 14 of 15

**WHEREFORE**, Highland respectfully requests that the Court deny the relief sought in the Supplemental Application and provide such other and further relief that this Court deems just and proper.

Dated:  November 5, 2018

Respectfully submitted,

*/s/ Jason B. Binford*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE
FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas  75201
Telephone:  (214) 999.3000
Facsimile:  (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.**

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 14**

**Appellee Appx. 01385**
**Appx. 01637**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/23/21 1804    Page 111 of 1104    PageID 16245
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1392 of 1803    PageID 12138
Case 18-30264-sgj11    Doc 956-5    Filed 11/05/18    Entered 11/05/18 Page 3 of 15    Page 15 of 15

## CERTIFICATE OF SERVICE

This is to certify that on November 5, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Jason B. Binford*
Jason B. Binford

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 15

Appellee Appx. 01386
APPx. 01637

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Page 1234 of 1804    Page 112 of 1104    PageID 16246
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1393 of 1803    PageID 12139

Case 19-12239-CSS    Doc 116-9    Filed 11/12/19    Page 1 of 4

**Exhibit I**

Foley Notice of Appearance for Highland CLO Funding, Ltd.,
CLO Holdco, Ltd. and Neutra, Ltd.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-86    Filed 12/05/23    Page 113 of 1104    PageID 16247
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1394 of 1803    PageID 12140
Case 18-30264-sgj11    Doc 89-1    Filed 04/18/18    Entered 04/18/18 Page 1 of 3

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

**COUNSEL FOR HIGHLAND CLO FUNDING,**
**LTD., CLO HOLDCO, LTD. AND NEUTRA, LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 18-30264-SGJ7** |
| | § | |
| **Alleged Debtor.** | § | |

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **ACIS CAPITAL MANAGEMENT, GP,** | § | **Case No. 18-30265-SGJ7** |
| **L.L.C.,** | § | |
| | § | |
| **Alleged Debtor.** | § | |

## NOTICE OF APPEARANCE AND
## <u>REQUEST FOR SERVICE OF PAPERS</u>

PLEASE TAKE NOTICE that Holland N. O'Neil, Jason B. Binford, Shiva D. Beck,

Melina N. Bales and the law firm of Foley Gardere, Foley & Lardner LLP, attorneys for

Highland CLO Funding, Ltd., CLO Holdco, Ltd. and Neutra, Ltd. (collectively, the "**Equity**

**Holders**"), parties-in-interest in the above-referenced matter, and pursuant to Rules 2002, 3017,

and 9010 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 1109(b), request that all

notices given or required to be given in this case and all papers served or required to be served in

this case be given to and served upon them at the following address:

**NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF PAPERS**                                        **Page 1**
4840-5970-3906.1

**Appellee Appx. 01388**
**Appx. 01639**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Exhibit 36    Page 114 of 1104    PageID 16248
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1395 of 1803    PageID 12141
Case 18-30264-sgj11    Doc 1911-1    Filed 04/18/19    Entered 04/18/19 Page 2 of 3    Page 2 of 3

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

Please take further notice that the foregoing request includes notices and papers referred to in the Federal Rules of Bankruptcy Procedure and includes, without limitation, any plans of reorganization, objections, notices of hearings, orders, pleadings, motions, applications, complaints, demands, requests, petitions, disclosure statements, memoranda, briefs and any other documents brought before this Court with respect to these proceedings, whether formal or informal, whether written or oral, whether transmitted or conveyed by mail, hand delivery, telephone, telecopier, telegraph, or telex.

This Notice of Appearance and Request for Notices shall not be deemed or construed to be a waiver of the rights of the Equity Holders (i) to have final orders in non-core matters entered only after de novo review by a District Judge, (ii) to trial by jury in any proceeding so triable in this case or any case, controversy, or proceeding related to this case, (iii) to have a District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, (iv) respecting in personam jurisdiction, or (v) any other rights, claims, actions, setoffs, or recoupments to which the Equity Holders are or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Exhibit 6   Page 2297 of 1804 Page 115 of 1104   PageID 16249
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1396 of 1803   PageID 12142
Case 18-30265-sgj11   Doc 8-55   Filed 04/18/18   Entered 04/18/18 Page 2906 of 4 Page 3 of 3

Dated:  April 18, 2018

Respectfully submitted,

*/s/ Holland N. O'Neil*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas  75201
Telephone:  (214) 999.3000
Facsimile:  (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

**COUNSEL FOR HIGHLAND CLO FUNDING,
LTD., CLO HOLDCO, LTD. AND NEUTRA,
LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Appearance and

Request for Service of Papers was served electronically by the Court's PACER system on April

18, 2018.

*/s/Melina N. Bales*
Melina N. Bales

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Exhibit 6    Page 1298 of 1804    Page 116 of 1104    PageID 16250
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1397 of 1803    PageID 12143
Case 19-12239-CSS    Doc 116-10    Filed 11/12/19    Page 1 of 1

## CERTIFICATE OF SERVICE

I, Josef W. Mintz, hereby certify that on November 12, 2019, I served or caused to be served the *Limited Objection to Debtor's: (I) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel,* Nunc Pro Tunc *to the Petition Date; and (II) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel,* Nunc Pro Tunc *to the Petition Date* upon the following persons listed in the manner indicated and upon all subscribed parties via CM/ECF.

Via Email and Hand Delivery:

Pachulski Stang Ziehl &Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Attn: James E. O'Neill, Esq.
joneill@pszjlaw.com

Office of the United States Trustee
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
Attn: Jane M. Leamy, Esq.
jane.m.leamy@usdoj.gov

Via Email and First Class Mail:

Pachulski Stang Ziehl &Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn: Jeffrey N. Pomerantz, Esq.
jpomerantz@pszjlaw.com

*/s/Josef W. Mintz*
Josef W. Mintz (DE No. 5644)

Appellee Appx. 01391
APPX. 01642

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23 1804ge 117 of 1104   PageID 16251
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1398 of 1803   PageID 12144

# APPENDIX 16

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/20/23   Page 118 of 1104   PageID 16252
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1399 of 1803   PageID 12145
Case 19-12239-CSS   Doc 120   Filed 11/12/19   Page 1 of 6

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., [1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) | **Hearing Date: Nov. 19, 2019, at 12:00 p.m. (ET)**<br>**Obj. Deadline: Nov. 12, 2019, at 4:00 p.m. (ET)** |
|  | ) |  |
|  | ) | **Docket Ref. Nos.  69 & 70** |

**LIMITED OBJECTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO THE DEBTOR'S
APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION
AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AND
LYNN PINKER COX & HURST AS SPECIAL TEXAS COUNSEL AND SPECIAL
TEXAS LITIGATION COUNSEL, _NUNC PRO TUNC_ TO THE PETITION DATE**

The official committee of unsecured creditors (the "Committee") of Highland Capital Management, L.P. (the "Debtor" or "Highland"), hereby submits this limited objection (this "Limited Objection") to the Debtors' applications, pursuant to Sections 327(e), 328(a), and 330 of the Bankruptcy Code, for entry of orders authorizing the retention and employment of Foley Gardere, Foley & Lardner LLP ("Foley") and Lynn Pinker Cox & Hurst LLP ("Lynn Pinker," and together with Foley, the "Proposed Special Counsel") as Special Texas Litigation Counsel and Special Texas Litigation Counsel, respectively, _nunc pro tunc_ to the Petition Date (collectively, the "Applications") [Docket Nos. 69 & 70].[2]  In support of this Objection, the Committee respectfully states as follows:

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]    Citations to "Foley Application" are to Docket No. 69 and citations to "Lynn Pinker Application" are to Docket No. 70.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Applications.

25579780.1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/01/23    Page 119 of 1104    PageID 16253
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1400 of 1803    PageID 12146
Case 19-12239-CSS    Doc 120    Filed 11/12/19    Page 2 of 6

## INTRODUCTION

1.      Proposed Special Counsel have represented the both the Debtor and non-debtor defendants – including Mr. James Dondero, the founder of the Debtor – in various matters since 2016.[3]  The Committee was formed two weeks ago, on October 29, 2019,[4] and is in the process of gathering information and familiarizing itself with the Debtor's opaque and complex organizational structure, business operations, and assets under management.  Importantly, the Committee has requested relevant information, but as of yet has not been able to fully familiarize itself with the Debtor's web of contractual relationships and transaction histories with its many non-debtor affiliates.[5]  Without the benefit of a full understanding of the Debtor's relationships and prepetition transactions with its affiliates, the Committee is unable to determine the appropriateness of Proposed Special Counsel representing both the Debtor and non-debtors in matters going forward, and whether it is appropriate for the costs of such non-debtor representation, especially in matters wholly unrelated to the Debtor, to be borne by the Debtor.[6]

2.      The Committee recognizes that Proposed Special Counsel have developed knowledge and expertise from their pre-petition representation of the Debtor.  The Committee

---

[3]    See Lynn Pinker Application Ex. A ¶ 3.

[4]    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief commencing this chapter 11 case, and the United States Trustee appointed the Committee nearly two weeks later on October 29, 2019 [Docket No. 65].  The Committee moved quickly following its appointment to bring in Sidley Austin LLP ("Sidley") as its proposed counsel on October 30, 2019 and FTI Consulting Inc. ("FTI") as its proposed financial advisor on November 6, 2019.  Sidley and FTI quickly engaged the Debtor's advisors to get up to speed on this chapter 11 case, but there has not yet been sufficient time for the Committee to even familiarize itself with the Debtor's prepetition transactions.

[5]    The Committee and its advisors intend to closely scrutinize all prepetition transactions involving the Debtor to determine whether any are avoidable and/or give rise to claims against affiliated entities.

[6]    Relatedly, both the Foley Application and the Lynn Pinker Applications disclose large sums of unpaid fees and expenses that have been billed to the Debtor but remain unpaid as of the Petition Date.  See Foley Application ¶ 16; Lynn Pinker Application ¶ 19.  The Committee is uncertain whether such amounts should be borne by the Debtor and reserves the right to challenge such unsecured claims at the appropriate time.

25579780.1

Appellee Appx. 01394
APPX. 16196

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 12/02/23    Page 120 of 1104    PageID 16254
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1401 of 1803    PageID 12147
Case 19-12239-CSS    Doc 120    Filed 11/12/19    Page 3 of 6

therefore has no objection to the Proposed Special Counsel continuing to represent the Debtor in matters which provide a benefit to the Debtor's estate. The Committee does object, however, to any continuation of Proposed Special Counsels' joint representation of Debtor and non-debtor defendants without certainty of reimbursement for such fees and costs and with no justifying benefit to the Debtor's estate.

## OBJECTION

3.    The principal concern the Committee has with respect to the Applications is the lack of clear delineation of the Proposed Special Counsel's proposed engagements and representation, and the Debtor's obligation to pay for the same. For example, the Hurst Declaration discloses Lynn Pinker's representation of Mr. Dondero in the Texas Lawsuit,[7] and within the application itself describes the services to be provided by Lynn Pinker as "Subject to approval by the Bankruptcy Court, the services that the Debtor proposes that the Firm render, and the Firm has agreed to provide, include advising the Debtor in connection with all aspects of the Pending Acis Proceedings and the Texas Lawsuit, and performing the range of services normally associated with matters such as this as the Debtor's Special Texas Litigation Counsel, which the Firm is in a position to provide in connection with the matter referred to above."[8] It is unclear whether Lynn Pinker's proposed retention is limited to representing the Debtor, or includes representation of non-debtors, including Mr. Dondero. It is also unclear if Lynn Pinker will be limited to representing the Debtor (and others) in connection with the Acis Proceedings and the Texas Lawsuit, or if these are just two matters which have been mentioned in the Lynn

---

[7] *See* Lynn Pinker Application Ex. A ¶ 3.

[8] *See* Lynn Pinker Application ¶ 17

25579780.1

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 12/20/23    Page 121 of 1104    PageID 16255
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1402 of 1803    PageID 12148
Case 19-12239-CSS    Doc 120    Filed 11/12/19    Page 4 of 6

Pinker Application.[9]  As the proposed order approving the Lynn Pinker Application merely approves the retention of Lynn Parker as Special Texas Litigation Counsel "pursuant to the terms set forth in the Application,"[10]  the Committee is unsure which parties Lynn Pinker proposes to represent, and in what matters, and whether the Debtor has agreed to pay for such representations.

4.    The Committee also notes that the Applications do not provide for an allocation of attorneys' fees and expenses among the Debtor and non-debtor defendants.[11]  The Committee is concerned that the Debtor may be bearing the cost for representations of non-debtors without any justifiable benefit to the Debtor's estate, and without any regard for whether such representations may cause a conflict of interest.  Courts have found that such arrangements where the Debtor pays all fees of non-debtor defendants without explicitly justifying such arrangement in the application are improper under Section 327(e).  *See In re Perez*, 389 B.R. 180, 184 (Bankr. D. Colo. 2008) (denying application pursuant to Section 327(e) where bankruptcy estate alone was to pay attorneys' fees of special counsel representing debtor and non-debtor co-defendants in appeal of a state court judgment; that "arrangement *may* have been benign enough and 'all in the family' before the Debtor's bankruptcy was filed, but once the bankruptcy case was filed, things changed" and "Debtor became a fiduciary and others had a stake") (emphasis in original).

---

[9] The Lynn Pinker Application also mentions representation of non-debtor related entity Charitable Donor Advised Fund, L.P. in an unrelated matter.

[10] *See* Lynn Pinker Application Ex. B ¶ 8.

[11] The absence of such an allocation is alone grounds to deny any fee request submitted by Proposed Special Counsel.  *See In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 234 (Bankr. E.D. Cal. 1988) (finding proposed special counsel under Section 327(e) retained to represent debtors and non-debtors in lawsuit not entitled to recovery of fees because "[t]here [was] no allocation of the bill among the various clients" and "[s]ome services were rendered for the ultimate benefit of persons other than the debtor").  In the event this Court authorizes the retention of Proposed Special Counsel to represent Debtor and non-debtor defendants, the Committee reserves its right to contest fee applications for failure to properly allocate fees and expenses among clients.

Appellee Appx. 01396

APPX. 01397

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/04/23    Page 122 of 1104    PageID 16256
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1403 of 1803    PageID 12149
Case 19-12239-CSS    Doc 120    Filed 11/12/19    Page 5 of 6

5.      Without greater clarity into the proposed representations included in the Applications, the Committee must request that the Court reject the Applications to the extent that they seek authorization for the Proposed Special Counsel to represent both the Debtor and non-debtor parties and, to the extent the Court is otherwise inclined to approve the Applications, the Court should require the non-debtor entities to deposit on a monthly basis the highest amount incurred in a single month in the prior 12 months to ensure the Debtor's estate will be reimbursed for the fees and costs incurred in connection with the representation of the non-debtor entities.

*      *      *      *      *

*[Remainder of Page Intentionally Left Blank]*

Appellee Appx. 01397
APPX. 161649

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Page 124/25/23 1804ge 123 of 1104    PageID 16257
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1404 of 1803    PageID 12150
Case 19-12239-CSS    Doc 120    Filed 11/12/19    Page 6 of 6

WHEREFORE, the Committee respectfully requests that the Court deny the relief requested in

the Applications to the extent they seek authorization for the Proposed Special Counsel to

represent both the Debtor and non-debtor parties and provide such other and any further relief as

the Court may deem just and proper.

Date:  November 12, 2019          YOUNG CONAWAY STARGATT & TAYLOR, LLP
Wilmington, Delaware

                                  */s/ Jaclyn C. Weissgerber*
                                  Michael R. Nestor (No. 3526)
                                  Edmon L. Morton (No. 3856)
                                  Sean M. Beach, Esq. (No. 4070)
                                  Jaclyn C. Weissgerber, Esq. (No. 6477)
                                  Rodney Square
                                  1000 North King Street
                                  Wilmington, DE 19801
                                  Telephone:  (302) 571-6600

                                  -and-

                                  SIDLEY AUSTIN LLP

                                  Bojan Guzina, Esq. (*admitted pro hac vice*)
                                  Matthew Clemente, Esq. (*admitted pro hac vice*)
                                  Alyssa Russell, Esq. (*admitted pro hac vice*)
                                  One South Dearborn Street
                                  Chicago, IL 60603
                                  Telephone:  (312) 853-7000

                                  - and –

                                  Jessica Boelter, Esq.
                                  787 Seventh Avenue
                                  New York, NY 10019
                                  Telephone:  (212) 839-5300

                                  - and –

                                  Penny P. Reid, Esq. (*admitted pro hac vice*)
                                  Paige Holden Montgomery, Esq. (*admitted pro hac vice*)
                                  2021 McKinney Avenue, Suite 2000
                                  Dallas, TX 74201
                                  Telephone: (214) 981-3300

                                  *Proposed Counsel for the Official Committee of Unsecured
                                  Creditors*

25579780.1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/08/23   Page 124 of 1104   PageID 16258
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1405 of 1803   PageID 12151

# APPENDIX 17

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/07/23 1804 age 125 of 1104    PageID 16259
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1406 of 1803    PageID 12152
Case 19-34054-sgj11 Doc 2590 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 1 of 2

Docket #2590  Date Filed: 07/20/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Debtor. | | |

### DECLARATION OF JOHN A. MORRIS IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019 AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:43685.1 36027/002



1934054210720000000000003

**Appellee Appx. 01400**

**Appx. 16552**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/28/23   Page 126 of 1104   PageID 16260
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1407 of 1803   PageID 12153
Case 19-34054-sgj11 Doc 2590 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 2 of 2

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1       I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP (the "Firm"), counsel to the above-referenced Debtor, and I submit this Declaration in support of the *Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith* (the "Motion").   Unless stated otherwise, this Declaration is based on my personal knowledge and review of the documents listed below.

2       Attached as **Exhibit 1** is a true and correct copy of that certain Settlement Agreement dated as of July 16, 2021 (the "Settlement Agreement"), by and among the Parties (as that term is defined in the Settlement Agreement).

Dated: July 20, 2021.

/s/ John A. Morris
John A. Morris

DOCS_NY:43685.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/09/23   Page 127 of 1104   PageID 16261
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1408 of 1803   PageID 12154

# **<u>EXHIBIT 1</u>**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Filed 12/20/23 Page 128 of 1104 PageID 16262
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1409 of 1803 PageID 12155
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 2 of 20

## SETTLEMENT AGREEMENT

This settlement agreement (the "Agreement") by and between Highland Capital Management, L.P., as debtor-in-possession (the "Debtor"), on the one hand, and Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA" and together with HCMFA, the "Advisors"), Highland Income Fund ("HIF"), NexPoint Strategic Opportunities Fund ("NSOF"), and NexPoint Capital, Inc. ("NCI" and together with HIF and NSOF, the "Funds," and together with the Advisors, the "Defendants," and the Defendants and the Debtor, together the "Parties"), on the other hand.

## RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is managing and operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtor's chapter 11 case is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, the Debtor manages certain collateralized loan obligations ("CLOs") pursuant to the terms of certain portfolio management and servicing agreements (collectively, the "CLO Management Agreements");[1]

WHEREAS, on January 6, 2021, the Debtor commenced an adversary proceeding (the

---

[1] The CLOs managed by the Debtor include ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Jasper CLO, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., and Valhalla CLO, Ltd.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-86   Filed 12/21/23   Page 129 of 1104   PageID 16263
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1410 of 1803   PageID 12156
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 3 of 20

"Adversary Proceeding") against Defendants by filing its complaint (the "Complaint") [Docket No. 1][2] (the "Complaint");

WHEREAS, on January 8, 2021, the Court issued its *Order Regarding Adversary Proceedings Trial Setting and Alternative Scheduling Order* [Docket No. 12] (the "Alternative Scheduling Order");

WHEREAS, on January 13, 2021, the Court entered that certain *Agreed Order Granting Defendant's Motion for a Temporary Restraining Order Against Certain Entities Owned and/or Controlled by Mr. James Dondero* [Docket No. 20] (the "Consensual TRO");

WHEREAS, on January 24, 2021, the Advisors and Funds moved to dismiss the Complaint [Docket No. 43] (the "Motion to Dismiss");

WHEREAS, on January 26, 2021, the Debtor and CLO Holdco, Ltd. filed that certain *Notice of Settlement* pursuant to which the Debtor and CLO Holdco, Ltd. resolved their disputes and CLO Holdco, Ltd. was dismissed from this Adversary Proceeding [Docket No. 50];

WHEREAS, on January 26, 2021, the Court held an evidentiary hearing on the Debtor's motion for a preliminary injunction (the "Preliminary Injunction Hearing"), and such hearing has been continued;

WHEREAS, on February 10, 2021, the Court entered that certain *Agreed Order Extending Temporary Restraining Order* [Docket No. 64], pursuant to which the Consensual TRO was extended;

WHEREAS, on February 24, 2021, the Court entered that certain *Agreed Order Further Extending Temporary Restraining Order* [Docket No. 76], pursuant to which the Consensual TRO was further extended;

WHEREAS, on March 1, 2021, the Debtor filed its opposition to the Motion to Dismiss

---

[2] Refers to the docket number maintained in the above-captioned Adversary Proceeding.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/29/23   Page 130 of 1104   PageID 16264
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1411 of 1803   PageID 12157
Case 19-34054-sgj11   Doc 2590-1   Filed 07/20/21   Entered 07/20/21 14:01:55   Page 4 of 20

and a memorandum of law in support thereof [Docket Nos. 79, 80] (the "Debtor's Opposition");

WHEREAS, on March 17, 2021, the Defendants filed their reply to the Debtor's Opposition [Docket No. 85];

WHEREAS, on April 21, 2021, the Parties entered into that certain *Stipulation Regarding Agreed (I) Scheduling Order and (II) Order Further Extending Temporary Restraining Order* [Docket No. 91] (the "Scheduling Stipulation") pursuant to which, among other things, the Parties agreed to: (a) dispense with the completion of the Preliminary Injunction Hearing and move to the trial on the merits, (b) hold a single trial on all of the Debtor's claims asserted in this Adversary Proceeding, including the claim for a permanent injunction, (c) entered into a schedule set forth therein, and (d) continued the Consensual TRO until the Court enters an order determining the Debtor's claim for permanent injunctive relief against the Defendants;

WHEREAS, on June 29, 2021, the Parties entered into that certain *Stipulation Converting Trial Dates to Status Conference* [Docket No. 101] ("Second Stipulation") which the Court adopted by its *Order Approving Stipulation Converting Trial Dates to Status Conference* {Docket No. 102] on June 30, 2021;

WHEREAS, the Parties have agreed to settle and resolve all claims and disputes that were brought or that could have been brought in the Adversary Proceeding on the terms set forth in the Second Stipulation as memorialized herein:

## **AGREEMENT**

**NOW, THEREFORE**, after good faith, arms-length negotiations, in consideration of the foregoing, it is hereby stipulated and agreed that:

1.     Restrictions and Limitations on Termination of CLO Management Agreements.

   a.  Each of the Funds agrees that no action will be taken to terminate any CLO Management Agreement to which the Debtor is a party or to remove the

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/13/23    Page 131 of 1104    PageID 16265
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1412 of 1803    PageID 12158
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 5 of 20

portfolio manager thereunder where termination or removal is permissible on a "no cause" basis[3] for a period of twelve (12) months beginning June 1, 2021 and ending May 31, 2022.

b. Each of the Funds agrees that no action will be taken to terminate any CLO Management Agreement to which the Debtor is a party or to remove the portfolio manager thereunder where termination or removal is only permitted on a "for cause" basis,[4] except that a Fund may seek termination or removal by moving for a determination from the Bankruptcy Court that such claim "for cause" is colorable (which means proving to the Bankruptcy Court by a preponderance of the evidence that it has a good faith basis to assert that "cause" exists for termination or removal) for a period that ends on the later of (i) May 31, 2022 or (ii) a decision by the Fifth Circuit Court of Appeals reversing the confirmation order, confirming of the Debtor's Plan of Reorganization, or otherwise eliminating the Gatekeeper provision from the Plan.

2.    <u>Representations and Warranties</u>.

a. To the best of their knowledge after due inquiry, including inquiring of the Advisors, each of the Funds represents and warrants that (i) their ownership interests in any CLO managed by the Debtor as of December 1, 2020, is as set forth on **<u>Exhibit A</u>** hereto, and none of the Funds owned any other interests in

---

[3] The CLOs in which termination is arguably permissible on a "no cause" basis are Liberty CLO, Ltd., Southfork CLO Ltd., Gleneagles CLO, Ltd., Highland Legacy Limited, Jasper CLO, Ltd., Valhalla CLO, Ltd., and ACIS CLO 2017-7 Ltd.

[4] The CLOs in which termination is arguably only permitted on a "for cause" basis are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Westchester CLO, Ltd., Grayson CLO, Ltd., Stratford CLO Ltd., Greenbriar CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Eastland CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Red River CLO, Ltd., PamCo Cayman Ltd.,

4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/19/23   Page 132 of 1104   PageID 16266
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1413 of 1803   PageID 12159
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 6 of 20

any CLO managed by the Debtor as of that date, (ii) they have not sold, transferred, participated, or assigned any ownership interest in any CLO managed by the Debtor since December 1, 2020, and (iii) their respective percentage ownership interests in the CLOs managed by the Debtor are as set forth on **Exhibit B** hereto on the date of the execution of this Agreement and none of the Funds own any other interests in any CLO managed by the Debtor on the date of the execution of this Agreement.

b.  Each of the Funds represents and agrees that it will not transfer any interest in any CLO identified on Exhibits A and B ("Debtor-Managed CLO" or together, "Debtor Managed CLOs") to any current or former Debtor employee or any entity in which any current or former Debtor employee has any direct or indirect interest whatsoever, including, without limitation, (i) a direct or indirect ownership interest (regardless of whether such interest is passive, provides a control right, or is de minimis), (ii) a board seat or management position (regardless of whether such board seat or management position is at the entity, a direct or indirect parent of the entity, or a beneficial owner of such entity), and (iii) any other interest that confers upon such current or former Debtor employee any right to control or the ability to influence management of such entity (collectively, "Prohibited Transferee").  For the avoidance of doubt, Prohibited Transferee includes the Charitable Donor Advised Fund, L.P. and any of its direct and indirect parents and subsidiaries, including CLO Holdco, Ltd. Notwithstanding the foregoing, each of the Funds may transfer (a "Permitted Transfer") any interest in a Debtor-Managed CLO

5

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-6 Filed 12/15/23 Page 133 of 1104 PageID 16267
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1414 of 1803 PageID 12160
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 7 of 20

where no change in beneficial ownership would result from such transfer (such as a transfer between a Fund and its subsidiary or among a Fund's subsidiaries) or where a transfer occurs between the Funds (such as resulting from a Fund merger, reorganization, or similar transaction, to the extent permitted by applicable law) (the recipient of a Permitted Transfer, a "Permitted Transferee").

Further, and notwithstanding the foregoing, each of the Funds may transfer and shall not be prohibited from transferring any interest in any of the Debtor-Managed CLOs to a Prohibited Transferee if such transfer is necessary for a Fund's compliance with tax or other applicable regulatory needs (any such transfer, a "Subject Transfer").

Notwithstanding anything else contained herein, in the event of a Permitted Transfer or a Subject Transfer, the Fund shall (a) notify the Debtor of such Transfer and the Permitted Transferee or Prohibited Transferee, as applicable, shall agree to be bound by the terms of Paragraph 1 and this Paragraph 2(b) of this Agreement by executing an undertaking in the form set forth on **Exhibit C** to this Agreement (the "Undertaking") and (b) deliver the Undertaking to the Debtor before the Transfer becomes effective.

c. Each of the Advisors represents and warrants that it is (a) controlled by James Dondero, and (b) is a "Related Entity" (as that term is defined in section I.D(ii) of Exhibit D to the *Preliminary Term Sheet* (filed at Docket No. 354-1)) for purposes of paragraph 9 of the January 9, 2020 Order (Docket No. 339).

Appellee Appx. 01408
APPX. 10159

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/16/23    Page 134 of 1104    PageID 16268
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1415 of 1803    PageID 12161
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 8 of 20

3.       This Agreement shall become binding and effective on the date an order approving this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "<u>9019 Order</u>") is entered by the United States Bankruptcy Court for the Northern District of Texas (the "<u>Agreement Effective Date</u>"), irrespective of whether the 9019 Order is subject to appeal.   If no appeal of the 9019 Order is timely filed in accordance with Bankruptcy Rule 8002, then the Parties shall thereafter cooperate to take all steps reasonably necessary to dismiss the Adversary Proceeding with prejudice with all Parties bearing their own costs.

4.       Except for the representations and warranties set forth in Section 2 hereof, which shall bind each of the Parties hereto, this Agreement is without prejudice to the Parties' respective positions in connection with all pending appeals arising out of the Bankruptcy Case and each party hereby reserves any and all rights, positions, arguments, claims and defenses in connection with all such appeals, including without limitation, the Defendants' respective appeals of the Confirmation Order and requests for stay pending appeal of the Confirmation Order.

5.       This Agreement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties relating thereto.

6.       This Agreement may not be modified other than by a signed writing executed by the Parties.

7.       Each person who executes this Agreement represents that he or she is duly authorized to do so on behalf of the respective Party and that each Party has full knowledge and has consented to this Agreement.

8.       To the extent a notice is required or appropriate under this Agreement such

7

Appellee Appx. 01409
APPX. 01560

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Page 1247 of 1804    Page 135 of 1104    PageID 16269
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1416 of 1803    PageID 12162
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 9 of 20

notice shall be deemed delivered upon the following business day if sent via email as follows:

<u>If to the Debtor:</u>  By email to James P. Seery, Jr, the Debtor's Chief Executive officer, at

jpseeryjr@gmail.com   with   a   copy   to   Jeffrey   N.   Pomerantz   via   email   at

Jpomerantz@pszjlaw.com.

<u>If to the Advisor:</u> By email to legalnotices@nexpoint.com with a copy to DC Sauter by

email   at   DSauter@Nexpoint.com   and   Davor   Rukavina   by   email   at

drukavina@munsch.com.

<u>If to the Funds:</u> By email to legalnotices@nexpoint.com   with a copy to A. Lee

Hogewood III via email at  lee.hogewood@klgates.com.

9.      This Agreement may be executed in counterparts, each of which will be deemed

an original but all of which together constitute one and the same instrument, and it constitutes

sufficient proof of this Agreement to present any copy, copies, or faxes signed by the Parties to

be charged.

10.      This Agreement will be exclusively governed by and construed and enforced in

accordance with the laws of the State of Texas without regard to its conflicts of law principles,

and all claims relating to or arising out of this Agreement, or the breach thereof, whether

sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of

Texas, excluding Texas conflicts of law principles.

11.      The Court shall retain exclusive jurisdiction over all disputes arising out of or

otherwise concerning the interpretation and enforcement of this Agreement.

[*Remainder of Page Intentionally Blank*]

Appellee Appx. 01410
APPX. 01562

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Page 124-19/23 1804ge 136 of 1104    PageID 16270
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1417 of 1803    PageID 12163
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 10 of 20

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,

By: _____

Its: General Partner

By: _____

James P. Seery

**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**
By: Strand Advisors XVI, Inc., its
general partner

By: _____

Name:    Frank Waterhouse

Title:    Treasurer

**NEXPOINT ADVISORS, L.P.**
By: NexPoint Advisors GP, LLC, its
general partner

By: _____

Name:    Frank Waterhouse

Title:    Treasurer, Principal
Accounting Officer &
Principal Financial Officer

**HIGHLAND INCOME FUND**

By: _____

Name:  Dustin Norris

Title:   Executive Vice President

9

Appellee Appx. 01411
APPX. 01562

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 137 of 1104    PageID 16271
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1418 of 1803    PageID 12164
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 11 of
20

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:


**HIGHLAND  CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,
  By: _____
    Its: General Partner
  By: _____
    James P. Seery


**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**
By: Strand Advisors XVI, Inc., its
general partner

By: _____
Name:    Dustin Norris
Title:      Executive Vice President

**NEXPOINT ADVISORS, L.P.**
By: NexPoint Advisors GP, LLC, its
general partner


By: _____
Name:    James Dondero
Title:      President




**HIGHLAND INCOME FUND**

By: _____
    Name: Dustin Norris
    Title:   Executive Vice President

Appellee Appx. 01412
APPX. 01564

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Page 138 of 1104   PageID 16272
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1419 of 1803   PageID 12165
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 12 of
20

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,

By: _____

Its: General Partner

By: _____

James P. Seery

**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**

By: Strand Advisors XVI, Inc., its
general partner

By: _____

Name:   Dustin Norris

Title:   Executive Vice President

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its
general partner

By: _____

Name:   James Dondero

Title:   President

**HIGHLAND INCOME FUND**

By: _____

Name:   Dustin Norris

Title:   Executive Vice President

Appellee Appx. 01413
APPX. 01564

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/29/23  Page 139 of 1104    PageID 16273
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1420 of 1803    PageID 12166
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 13 of
20

**NEXPOINT STRATEGIC
OPPORTUNITIES FUND**

By:

Name:    James Dondero
Title:    President and
Principal Executive Officer

**NEXPOINT CAPITAL, INC.**

By:

Name:  James Dondero
Title:   President and
Principal Executive Officer

APPROVED AS TO FORM BY COUNSEL DESIGNATED BELOW:

**MUNSCH HARDT KOPF & HARR, P.C.**

Davor Rukavina
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile:  (214) 855-7584
E-mail: drukavina@munsch.com

*Counsel for Highland Capital Management Fund
Advisors, L.P. and NexPoint Advisors, L.P.*

**K&L GATES LLP**

A. Lee Hogewood III (w/ permission)
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, NC 27609
Telephone: (919) 743-7306

Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5659

*Counsel for Highland Income Fund, NexPoint Strategic
Opportunities Fund, Highland Global Allocation Fund,
and NexPoint Capital, Inc.*

10

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Exhibit 36    Page 140 of 1104    PageID 16274
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1421 of 1803    PageID 12167
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 14 of
20

- and -

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569) 10100 Santa
Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail: jpomerantz@pszjlaw.com ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908 MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075 ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**Appellee Appx. 01415**
**Appellee Appx. 01566**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 12/23/21    Page 141 of 1104    PageID 16275
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1422 of 1803    PageID 12168

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 15 of
20

## EXHIBIT A

**FUNDS' INTERESTS IN DEBTOR-MANAGED CLOS
AS OF DECEMBER 1, 2020**

Appellee Appx. 01416
APPX. 01567

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 136    Filed 12/29/23    Page 142 of 1104    PageID 16276
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1423 of 1803    PageID 12169
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 16 of 20

**Exhibit A to Settlement Agreement**

**CLO Equity as of December 1, 2020**

| **CLO** | **Global Equity** | **CLO Equity Held by NexPoint Strategic Opportunities Fund** | **CLO Equity Held by Highland Income Fund** | **CLO Equity Held by NexPoint Capital, Inc.** | **Total** | **Ownership %** |
|---|---|---|---|---|---|---|
| Aberdeen | 48,000,000 | 14,500,000 | - | | 14,500,000 | 30.2% |
| Brentwood | 71,400,000 | 28,600,000 | - | | 28,600,000 | 40.1% |
| Eastland | 123,500,000 | 13,006,000 | 38,480,000 | | 51,486,000 | 41.7% |
| Grayson | 127,500,000 | 13,700,000 | 62,600,000 | 800,000 | 77,100,000 | 60.5% |
| Greenbriar | 80,000,000 | 42,750,000 | - | | 42,750,000 | 53.4% |
| Red River | 81,000,000 | 8,500,000 | - | | 8,500,000 | 10.5% |
| Stratford | 63,000,000 | 43,500,000 | - | | 43,500,000 | 69.0% |
| Westchester | 80,000,000 | 35,507,000 | - | | 35,507,000 | 44.4% |
| Rockwall | 78,600,000 | 10,500,000 | - | | 10,500,000 | 13.4% |
| Rockwall 2 | 86,200,000 | 4,871,000 | 12,553,000 | | 17,424,000 | 20.2% |
| Gleneagles | 91,000,000 | 7,750,000 | 8,860,000 | | 16,610,000 | 18.3% |
| Jasper | 70,000,000 | 5,000,000 | - | | 5,000,000 | 7.1% |
| Liberty | 94,000,000 | 10,000,000 | - | | 10,000,000 | 10.6% |
| Southfork | 82,000,000 | 6,000,000 | - | | 6,000,000 | 7.3% |
| Valhalla | 82,000,000 | 1,500,000 | - | - | 1,500,000 | 1.8% |
| | | | | | | |
| **TOTALS** | 1,258,200,000 | 245,684,000 | 122,493,000 | 800,000 | | |

Appellee Appx. 01417
APPX. 16569

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 6-86   Filed 12/25/23   Page 143 of 1104   PageID 16277
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1424 of 1803   PageID 12170
Exhibit B    Page 1425 of 1804

## EXHIBIT B

**FUNDS' INTERESTS IN DEBTOR-MANAGED CLOS
AS OF THE DATE OF THIS AGREEMENT**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Exhibit B    Filed 12/26/23    Page 144 of 1104    PageID 16278
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1425 of 1803    PageID 12171
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 18 of 20

**Exhibit B to Settlement Agreement**

**CLO Equity as of Date of Settlement Agreement**

| **CLO** | **Global Equity** | **CLO Equity Held by NexPoint Strategic Opportunities Fund** | **CLO Equity Held by Highland Income Fund** | **CLO Equity Held by NexPoint Capital, Inc.** | **Total** | **Ownership %** |
|---|---|---|---|---|---|---|
| Aberdeen | 48,000,000 | 14,500,000 | - | | 14,500,000 | 30.2% |
| Brentwood | 71,400,000 | 28,600,000 | - | | 28,600,000 | 40.1% |
| Eastland | 123,500,000 | 13,006,000 | 38,480,000 | | 51,486,000 | 41.7% |
| Grayson | 127,500,000 | 13,700,000 | 62,600,000 | 800,000 | 77,100,000 | 60.5% |
| Greenbriar | 80,000,000 | 42,750,000 | - | | 42,750,000 | 53.4% |
| Red River | 81,000,000 | 8,500,000 | - | | 8,500,000 | 10.5% |
| Stratford | 63,000,000 | 43,500,000 | - | | 43,500,000 | 69.0% |
| Westchester | 80,000,000 | 35,507,000 | - | | 35,507,000 | 44.4% |
| Rockwall | 78,600,000 | 10,500,000 | - | | 10,500,000 | 13.4% |
| Rockwall 2 | 86,200,000 | 4,871,000 | 12,553,000 | | 17,424,000 | 20.2% |
| Gleneagles | 91,000,000 | 7,750,000 | 8,860,000 | | 16,610,000 | 18.3% |
| Jasper | 70,000,000 | 5,000,000 | - | | 5,000,000 | 7.1% |
| Liberty | 94,000,000 | 10,000,000 | - | | 10,000,000 | 10.6% |
| Southfork | 82,000,000 | 6,000,000 | - | | 6,000,000 | 7.3% |
| Valhalla | 82,000,000 | 1,500,000 | - | - | 1,500,000 | 1.8% |
| | | | | | | |
| **TOTALS** | 1,258,200,000 | 245,684,000 | 122,493,000 | 800,000 | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 12/27/23   Page 145 of 1104   PageID 16279
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1426 of 1803   PageID 12172

## **EXHIBIT C**

**PROHIBITED TRANSFEREE UNDERTAKING**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/28/23   Page 146 of 1104   PageID 16280
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1427 of 1803   PageID 12173

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 20 of 20

**Exhibit C to Settlement Agreement**

**UNDERTAKING TO BE BOUND TO PARAGRAPH 1 AND PARAGRAPH 2(b) OF SETTLEMENT AGREEMENT DATED JULY 16, 2021 ("Agreement")**

**[Prohibited Transferee], upon receipt of a transfer of an interest in one of the Debtor-Managed CLOs (as defined in the Agreement) from one of the Funds (as defined in the Agreement), is and shall forever be bound by the terms of Paragraph 1 and Paragraph 2(b) of the Agreement.**

**This __ day of _____ 202_**

**[Prohibited Transferee]**
**By:  [Authorized signatory]**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 147 of 1104    PageID 16281
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1428 of 1803    PageID 12174

# APPENDIX 18

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Exhibit 6   Page 1430 of 1804   Page 148 of 1104   PageID 16282
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1429 of 1803   PageID 12175
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 1 of 8

Docket #1661   Date Filed: 01/05/2021

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Joshua N. Eppich
State Bar I.D. No. 24050567
J. Robertson Clarke
State Bar I.D. No. 24108098
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | Case No. 19-34054 |
| **L.P.,** | § | |
| | § | |
| Debtor. | § | Chapter 11 |

## JAMES DONDERO'S OBJECTION TO FIFTH AMENDED PLAN OF
## REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

James Dondero ("Respondent"), a creditor, indirect equity security holder, and party in interest in the above-captioned bankruptcy case, hereby files this objection (the "Objection") to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan").[1] In support thereof, Respondent respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      On October 16, 2019, Highland Capital Management, L.P. ("Highland" or the "Debtor") initiated a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware. The Chapter 11 Case was subsequently transferred to this Court. The case was

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

1934054210105000000000007
Appellee Appx. 01423
APPX. 10575

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6-6 Filed 11/21/23 Page 149 of 1104 PageID 16283
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1430 of 1803 PageID 12176
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 2 of 8

commenced with the expectation that Highland would emerge from Chapter 11 as a going concern. However, during the case and leading up to the confirmation hearing on the Plan, Highland's assets have been liquidated at below value prices. Under the Plan, Highland's assets will continue to be liquidated for less than optimal prices, with a view to ultimately terminating Highland's existence.

2. Confirmation of the Plan should be denied due to numerous deficiencies and improprieties. The problems with the Plan as drafted include, but are not limited to, exculpation and injunction provisions that extend far beyond permissible limits, a lack of transparency following confirmation, inappropriate post-confirmation jurisdictional terms, and the wrongfully obtained votes of certain affiliates of HarbourVest Partners, LLC (collectively, "HarbourVest"). The Plan severs Respondent's rights and fails to comply with the Bankruptcy Code and applicable case law. Therefore, confirmation of the Plan should be denied.

## OBJECTION

### I. Both the Exculpation and Injunction Sections Violate Fifth Circuit Precedent.

3. The proposed exculpatory and injunction provisions are simply impermissible. Both contravene established case law in the Fifth Circuit regarding the proper boundaries of such provisions and merit denial of Plan confirmation.

4. First, Article IX.D proposes to exculpate each and every "Exculpated Party" for all post-petition liability relating to the Debtor's bankruptcy case. The term "Exculpated Party" includes not just the Debtor but also, among others, the Debtor's Employees, the Independent Directors, the CEO/CRO, and the Related Persons of such parties. These exculpations in favor of the Exculpated Parties are prohibited under Fifth Circuit precedent. *See, e.g., In re Pacific Lumber, Co.*, 584 F.3d 229 (5th Cir. 2009); *Dropbox Inc. v. Thru Inc.*, Case No. 17-1958-G, 2018 U.S. Dist.

---

**Appellee Appx. 01424**

**APPX. 16576**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 66    Exhibit 6    Page 124 of 1804    Page 150 of 1104    PageID 16284
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1431 of 1803    PageID 12177
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 3 of 8

LEXIS 179769 * 66-68 (N.D. Tex. Oct. 19, 2018) (finding that the scope of an exculpation clause provided insulation to nondebtor third parties in contravention of Fifth Circuit law).

5.      In *Pacific Lumber*, the Fifth Circuit made clear that section 524(e) prohibits the exoneration of nondebtors such as a debtor's management and professionals, but excluding official committees and their members acting within the scope of their official duties, from negligence during the course of their participation in the bankruptcy. The Fifth Circuit in *Pacific Lumber* stated: "[T]he essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Pacific Lumber*, 584 F.2d at 252. Despite these clear limits, the exculpation provisions in the Plan go far beyond what is permissible through the Bankruptcy Code's intended "fresh start" to encompass virtually all acts or omissions taken in connection with the Debtor's bankruptcy case by a wide range of parties, thus effectively exculpating an unknown number of individuals.

6.      Second, Article IX.F creates a channeling injunction with respect to certain "Protected Parties." The injunction requires Bankruptcy Court approval to pursue any claims related to the Debtor brought by any entity, including claims arising from a Protected Party's post-confirmation conduct. Much like the overbroad definition of "Exculpated Parties", the definition for "Protected Parties" includes a wide swath of individuals and entities beyond simply the Debtor. As a result, the channeling injunction would bring into the Bankruptcy Court all claims against such Exculpated Parties by any party who happens to have a claim or interest in the Debtor. The proposed injunction is effectively a non-consensual third-party release, which is expressly prohibited. *See Dropbox*, 2018 U.S. Dist. LEXIS 179769 * at 65 (disallowing similar injunction). Moreover, the Fifth Circuit has held that a permanent injunction cannot be justified under the broad

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/23/23    Page 151 of 1104    PageID 16285
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1432 of 1803    PageID 12178
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 4 of 8

equity powers of Bankruptcy Code section 105 "if it effectively discharges a nondebtor." *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746, 760 (5th Cir. 1995) (overturning permanent injunction effectively discharging a nondebtor because such an injunction violates section 524 of the Bankruptcy Code, which was designed only to discharge the debtor, not nondebtor parties).

7.      Furthermore, the channeling injunction in Article IX.F limits the jurisdiction to hear claims against Protected Parties to only the Bankruptcy Court. In doing so, the Plan would improperly disregard parties' rights to bring claims even in courts with exclusive jurisdiction and would ignore those courts with specialized jurisdiction to hear certain types of cases. Respondent therefore objects to isolating (and potentially even providing) jurisdiction of any and all claims against Protected Parties in the Bankruptcy Court through this channeling injunction.

8.      In addition, the proposed injunction in Article IX.F is impermissibly vague and broad and, as noted, applies to post-confirmation conduct and claims.

9.      FED. R. BANKR. P. 3016(c) requires that, "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." The Debtor fails to provide such "specific and conspicuous language" about the proposed injunction here. The Plan instead issues a blanket prohibition on entities from:

> (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the

---

Appellee Appx. 01426
APPX. 01678

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88   Exhibit 6   Page 124 of 1804 Page 152 of 1104   PageID 16286
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1433 of 1803   PageID 12179
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 5 of 8

Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, . . . ; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Plan at IX.F. Much like the overbroad exculpation and channeling injunction provisions, this vague and potentially limitless injunction is improper. As a result, the Plan should not be confirmed.

## II.   The Plan Fails to Meet Section 1129(a)(7) due to Lack of Appropriate Sale Procedures for Post-Confirmation Operations.

10.   The Plan envisions the liquidation of the Debtor's assets by the Reorganized Debtor and the Claimant Trust. This wind down, however, is subject to no oversight or predetermined procedures to ensure that the process is both value-maximizing and transparent. This is critically important because, during the course of the Debtor's bankruptcy case, Respondent would allege on information and belief that the Debtor has sold a number of assets of significant value outside the ordinary course of the Debtor's business as it was conducted prepetition without notice to parties in interest or a complete marketing plan.

11.   The proposed Plan's lack of appropriate marketing and the resulting dampening of competitive bidding requirements for the Reorganized Debtor's assets indicates that the Debtor's creditors and equity holders could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sales procedures are governed by the Bankruptcy Court to ensure maximization of value through auction or other market-testing means. As it is, for the Debtor to meet its burden to establish all elements of 11 U.S.C. § 1129, specifically including the best interest test of section 1129(a)(7), the Debtor must detail why the proposed liquidation process will test the market as fully as would be the case in Chapter 7.

12.   Moreover, Respondent believes that notice and an opportunity for other potential bidders to come forward will not only provide transparency to the process but also will result in

**Appellee Appx. 01427**
**APPX. 16679**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/25/23   Page 153 of 1104   PageID 16287
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1434 of 1803   PageID 12180
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 6 of 8

competitive bidding, increasing the value received by the beneficiaries of the Debtor's liquidation. An asset sale without transparency, on the other hand, will presumptively be done without comprehensive market exposure. Courts have long recognized the need for competitive bidding when approving sales. *In re Muscongus Bay Company,* 597 F.2d 11 (1st Cir. 1979); *In re Alves,* 52 B.R. 353 (Bankr. D. R.I. 1985); *In re Dartmouth Audio Inc.,* 42 B.R. 871, 874 (Bankr. D. N.H. 1984). Competitive bidding yields higher offers and thus benefits the estate. The objective is "to maximize the bidding, not to restrict it." *In re The Ohio Corrugating Company,* 59 B.R. 11, 13 (Bankr. N.D. Ohio 1985) (quoting *In re Beck Industries Inc.,* 605 F.2d 624, 637 (2d Cir. 1979)). Additionally, because the Plan states that equity will receive some recovery under the Plan—Article III.F states that there are no Classes deemed to reject the Plan or being excluded from recovery—equity holders as well as all creditors should receive, *inter alia,* notice and an opportunity to be heard on all significant liquidations and other transactions performed by the Reorganized Debtor.

### III.    Post-Confirmation Jurisdiction under the Plan is Improper.

13.    The various jurisdictional provisions of the Plan are overbroad and mandate that the Bankruptcy Court hear any matter involving the Debtor or its operations post-Effective Date. First, as noted above, the injunction with respect to "Protected Parties" requires that "the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted." Plan at Art. IX.F. There is no legal basis for barring recourse to other courts with exclusive jurisdiction—possibly providing the Bankruptcy Court with jurisdiction it does not legally have, especially post-confirmation. *See, e.g., Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and

**Appellee Appx. 01428**
**APPX. 10639**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-86    Filed 12/26/23    Page 154 of 1104    PageID 16288
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1435 of 1803    PageID 12181
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 7 of 8

thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan."). Second, the Bankruptcy Court's jurisdiction should not encompass claims and causes of action arising from the Reorganized Debtor's post-confirmation operations.

**IV.    The Subordination Provisions are Improper.**

14.    The elimination of vacant Classes pursuant to Article IV.I would potentially eliminate certain Classes on the Effective Date and any recovery for such Classes, including Class 9 for Subordinated Claims (assuming the HarbourVest claim in Class 9 is disallowed), despite the later re-allocation of claims into such eliminated Classes.

15.    The Plan contemplates subordination of Claims and Equity Interests yet provides no mechanism, hearing requirement, or deadlines for such subordination. Instead, the Debtor reserves in Article III.J the right to subordinate any Claim and the Claimant's resulting Plan treatment apparently without hearing.

**V.    Any Acceptance of the Plan by HarbourVest Should be Disallowed.**

16.    HarbourVest agreed to accept the Plan pursuant to the settlement with the Debtor submitted to the Court pursuant to FED. R. BANK. P. 9019. If that settlement is approved by the Court, HarbourVest will have, under the Plan, a Class 8 claim of $45 million and a Class 9 claim of $35 million. Respondent would allege on information and belief that the Debtor's CEO/CRO has stated on multiple occasions that HarbourVest has no valid claim against the Debtor and that its dispute with the Debtor could be settled for $5 million or less.

17.    By including in the settlement agreement the requirement that HarbourVest vote both its Class 8 and Class 9 claim to accept the Plan, the settlement agreement, on its face, reflects the exchange of HarbourVest's acceptance of the Plan for the vastly inflated claims agreed to by

Appellee Appx. 01429
APPX. 10130

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Exhibit Filed 12/27/23 1804 Page 155 of 1104 PageID 16289
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1436 of 1803 PageID 12182
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 8 of 8

the Debtor. In other words, the Debtor *purchased* HarbourVest's acceptance. This constitutes a violation of Bankruptcy Code section 1129(a)(3) in that HarbourVest's acceptance and the payment for it were not in good faith.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that the Bankruptcy Court enter an order (i) denying confirmation of the Plan, and (ii) granting Respondent such other and further relief to which he may be justly entitled.

Dated: January 5, 2021          Respectfully submitted,

*/s/ D. Michael Lynn*
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Joshua N. Eppich
State Bar I.D. No. 24050567
J. Robertson Clarke
State Bar I.D. No. 24108098
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: joshua@bondsellis.com
Email: robbie.clarke@bondsellis.com

**ATTORNEYS FOR JAMES DONDERO**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 5, 2021, a true and correct copy of the foregoing document was served via the Bankruptcy Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

*/s/ J. Robertson Clarke*
J. Robertson Clarke

# APPENDIX 19

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-86    Page 129 of 1804 Page 157 of 1104    PageID 16291
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1438 of 1803    PageID 12184
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 1 of 34

Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**OBJECTION TO CONFIRMATION OF THE
DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The Dugaboy Investment Trust and Get Good Trust (jointly, "Movants"), submit this

Objection for the purpose of objecting to the *Fifth Amended Plan of Reorganization of Highland*

*Capital Management, L.P.* [Dkt. 1472] (the "Plan") submitted by Highland Capital Management,

L.P. ("Debtor").  The Dugaboy Investment Trust is an equity owner of the Debtor and has filed

proofs of claim.  See Claim Numbers 131 and 177. The Get Good Trust has filed proofs of claim

in this case.  See Claim Numbers 120, 128 and 129.  If the Claims[1] filed by Movants are allowed,

---

[1] Capitalized terms not defined in this Objection are taken from the Plan and shall have the meanings given to them in the Plan.

{00374857-13}                    1

1934054210105000000000013

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Exhibit 6   Page 124 of 1804   Page 158 of 1104   PageID 16292
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1439 of 1803   PageID 12185
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 2 of 34

Claimants possess claims in Class 7 or 8.  The Dugaboy Investment Trust is a member of Class 11 of the Plan.

Movants assert that the Plan does not meet the requirements contained in the Bankruptcy Code, Rules, and applicable case law to be confirmed.

**The Plan Violates 11 U.S.C. § 1129(a)(1)**

In order to confirm a plan, the plan must meet the requirements set forth in 11 U.S.C. §§ 1122, 1123 and 1129.  The Plan proposed by the Debtor fails to meet the requirements set forth in the Bankruptcy Code and, as such, confirmation of the Plan must be denied.  11 USC § 1129(a) (1) requires that the Plan comply with the applicable provisions of this title.  The cases interpreting this section have held that a plan must meet the requirements of 11 U.S.C. §§ 1122 and 1123.  See *In re Star Ambulance Service*, 540 B.R. 251, 260 (N.D.Tex. 2015); *In re Save Our Springs,* 632 F.3d 168 174 5th Cir. 2011); *In Re Counsel of Unit Owners of 100 Harborview Drive Condo*, 572 B.R. 131, 137-139 (Bankr.D.Md. 2017).

**The Plan Contains an Impermissible Claim Subordination Provision**

Article III.J of the Plan contains the following provision:

Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or seek to subordinate, any Claim. . . .

The section gives the named parties the discretion upon "notice" to either subordinate a Claim or re-characterize a Claim whether or not a legal basis exists to either re-characterize the Claim or subordinate it.  The term "notice" is nowhere defined, and any time the Bankruptcy Code uses the term notice, it is always accompanied by the words "and a hearing". 11 U.S.C. §§ 1112, 707 and 554 are examples of Bankruptcy Code sections that require both notice and a hearing prior to a party obtaining the relief sought in a pleading.  Nowhere in the Bankruptcy

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23   Page 159 of 1104   PageID 16293
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1440 of 1803   PageID 12186
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 3 of 34

Code can a debtor obtain relief without affording the parties affected by the requested relief an opportunity for a hearing.

Under Bankruptcy Rule 7001(8), the subordination of a claim, as a general rule, requires the filing of an adversary proceeding.  However, an exception to the rule is that a subordination of a claim can occur through a Plan.  The Plan provision, as written, allows the designated parties the ability to subordinate a claim or re-characterize a claim merely by sending a letter.

The Plan, Plan Supplements and Disclosure Statement do not identify any specific Claim for which subordination is sought.  Rather, in the recent Plan Supplement that was filed on January 4th (Dkt. No. 1656), retained claims are lumped in with all other possible claims and a laundry list of possible targets.   (See Plan Supplement Dkt. No. 1656-1 Exhibit L.) Notwithstanding the conflicting 5th circuit case law concerning the necessary designation for the retention of claims (See *In re SI Restructuring*, 714 F.3d 860 (5th Cir. 2013) and *In re Texas Wyoming Drilling,* 647 F.3d 547, 549 and 551 (5th Cir 2011) and *In re United Operating,* LLC, 540 F.3d 351 (5th Cir. 2008), the cases do require some notice to the creditor of the potential for the subordination of such creditor's claim.  Bankruptcy Rule 7001 (8) cannot be read to allow a complex "equitable subordination claim" that requires evidence and findings consistent with *In Re Mobile Steel*, 563 F.2d 692 (5th Cir. 1977) to occur with only written notice immediately prior to a confirmation hearing.   The  provision, as written, does not provide any party subject to the so-called notice with due process and violates 11 U.S.C. § 1129(a)(1).

**The Plan is Not Final and Contains an Impermissible Plan Modification Provision**

In addition to the Plan, the Debtor must file a Plan Supplement which will include various documents that will 1) govern the operations of the Highland Claimant Trust and the

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 86  Filed 12/22/23 Page 160 of 1104  PageID 16294
Exhibit 6  Page 1442 of 1804
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1441 of 1803  PageID 12187
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21  Entered 01/05/21 16:22:08  Page 4 of 34

Litigation Trust, 2) identify retained causes of action; and 3) list the executory contracts and leases that will be assumed by the Debtor and Plan Documents.

The problem with the Plan Supplement is that, as of the writing of this Objection and possibly even after the hearing on the confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan.   Article IV.J on page 36 of the Plan states:

> The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the Order Directing Mediation entered on August 3, 2020 [D.I. 912].

It is clear that no requirement exists in the Plan that the Plan Documents be finalized prior to hearing on the confirmation of the Debtor's Plan so that creditors can object if any terms of the Plan Documents filed in the Plan Supplement adversely impact a creditor's rights or are inconsistent with the Bankruptcy Code and Rules.

The Plan contains a provision allowing modification of the Plan.  It is not clear from the language of the modification section the extent of judicial oversight that exists with respect to a Plan modification and whether this Court will have the ability to determine if the proposed plan modification is material or an immaterial.  Article XII.B (p. 55) of the Plan provides that the Debtor reserves the right in accordance with the Bankruptcy Code and Rules to amend or modify the Plan prior to the entry of the Confirmation Order with the "consent" of the Committee.  The provision does not require compliance with 11 U.S.C. § 1127(a) which specifically provides that the proposed modification prior to confirmation must meet the requirements of 11 U.S.C. §1122 and 11 U.S.C. §1123.  In contrast to the Plan provision concerning modification prior the entry of the Confirmation Order, Article XII.B of the Plan does recognize that any modification after the entry of the Confirmation Order must meet the requirements set forth in 11 U.S.C. §§

Appellee Appx. 01435
APPX. 16296

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Exhibit B    Page 124 of 1804    Page 161 of 1104    PageID 16295
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1442 of 1803    PageID 12188
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 5 of 34

1127(b).  From a textual point of view, modifications of the Plan both before and after the entry of the Confirmation Order must meet the requirements of 11 U.S.C. §§ 1122 and 1123.

**The Plan violates 11 U.S.C. § 1129(a)(7)**

Under 11 U.S.C. § 1129(a)(7), in order for a plan to be confirmed, each creditor as of the effective date of the plan will receive or retain under the plan on account of claim or interest an amount that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7.

While the Debtor's Plan is a liquidation plan, creditors from a valuation point of view are receiving an amount less than they would receive if the Debtor were liquidated under chapter 7. The amount received by creditors under the Debtor's Plan cannot be viewed solely in the dollars they receive but, rather, the amount actually received must be discounted by two provisions in the Debtor's Plan that reduce the present value of the creditors' recovery under the Plan.  The two discounting factors are the following provisions in the Highland Claimant Trust:

a)  The  Reorganized Debtor has  no affirmative obligation to report any activity or results to the holders of beneficial interests in the Claimant Trust or potential holders of beneficial interests; and

b)  The holders of beneficial interests in the Claimant Trust are required to agree to a standard of liability for the Claimant Trustee that only allows claims against the Claimant Trustee for acts that constitute "fraud, willful misconduct or gross negligence" (See Article 8 of the Highland Claimant Trust).   A notable omission from the standard of liability is a breach of fiduciary duty.  This omission is contrary to the statement contained in the Plan "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duty as a Chapter 7 trustee." (See Plan Page 28)

**Appellee Appx. 01436**
**Appx. 01436**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 12/29/23 1804 Page 162 of 1104    PageID 16296
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1443 of 1803    PageID 12189
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 6 of 34

c)    A Chapter 7 trustee, if it attempted to sell assets, would have to obtain Court authority for the sale and would provide Notice to creditors of the sale.  Under the Plan no such requirement exists.

**The Plan And Related Documentation Provide For Impermissible Non-debtor Exculpation, Releases and Injunctions That Are Not Allowed Under Applicable 5th Circuit Case Law**

    **A.  Exculpation and Releases**

Article IX of the Plan contains extensive exculpation and release provisions that far exceed those allowed in the Fifth Circuit.

Article IX.C (the "Exculpation Clause") exculpates each "Exculpated Party" from, *inter alia*, any liability for conduct occurring **on** or after the Petition Date in connection with or arising out of the filing and administration of the case, the funding, consummation and implementation of the Plan, and any negotiations, transactions and documents pertaining to same that could be asserted in their own name or on behalf of any holder of a claim or interest excluding acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.

The term "Exculpated Parties" is defined[2] in Article I.B.61 of the Plan to include:

1.    The Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the "Managed Funds," which is defined in Article I.B.83 of the Plan to include Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to the executory contracts assumed under the Plan;

2.    Strand Advisors, Inc., the Debtor's general partner ("Strand");

---

[2] The definition of "Exculpated Parties" includes references to numerous other defined terms that also are defined in Article I.B, some of which are summarized here.  For the sake of brevity, the definition of each defined term contained in the definition of Exculpated Parties is not reproduced here *verbatim*.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6   Exhibit 86   Filed 12/15/23   Page 163 of 1104   PageID 16297
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1444 of 1803   PageID 12190
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 7 of 34

3.  John S. Dubel, James P. Seery, Jr. and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors appointed between then and the effective date of the Plan (collectively, the "Independent Directors");

4.  The Official Committee of Unsecured Creditors appointed in the case (the "Committee");

5.  The members of the Committee in their official capacities;

6.  Professionals retained by the Debtor and the Committee in the case (the "Professionals");

7.  James P. Seery, Jr., the Debtor's chief executive office and chief restructuring officer (the "CEO/CRO"); and

8.  "Related Persons" of the Independent Directors, the Committee, the members of the Committee, the Professionals and the CEO/CRO, which is defined to include, *inter alia*, predecessors, successors, assigns, officers, directors, employees, managers, attorneys, consultants, subsidiaries thereof.

The definition does expressly exclude from the definition certain named individuals and entities.

In addition to Article IX of the Plan, the Claimant Trust Agreement [Dkt. 1656-2, Exhibit M] for which approval is sought as part of the Plan confirmation, also provides in Section 8.1 for a reduced standard of care by the parties described therein as the Claimant Trustee, the Delaware Trustee, and the Oversight Board, any individual member thereof, by limiting their liability to that for fraud, willful misconduct, or gross negligence.[3]

---

[3] With respect to the Claimant Trustee, this appears to contradict Plan Article IV.B.5 (p. 28), which provides: "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee."

Appellee Appx. 01438
APPX. 01549

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Exhibit 6    Filed 12/16/23   Page 1246 of 1804   Page 164 of 1104    PageID 16298
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1445 of 1803    PageID 12191
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 8 of 34

The scope of the Exculpation Clause is ambiguous because it does not specify a time frame to which the exculpation applies.  Rather than stating that it applies for actions during a definite time period, such as occurring between the petition date and the effective date of the plan, it runs from the petition date through "implementation of the Plan."  The word "implementation" is not defined, which leaves the term subject to interpretation.  Does it mean the execution of documents to be executed pursuant to the Plan or the actual implementation of the Plan through administration of assets and payment of claims?  The ambiguity is exacerbated by the introduction to the Exculpation Clause, which provides for its effect "to the maximum extent permitted by applicable law". Thus, one could expect that Debtor intends the Exculpation Clause to apply to actions of exculpated parties for actions taken far into the future.

Article IX.D (the "Release Clause") provides that each Released Party is deemed released by the Debtor and the Estate, including the trusts created by the Plan (the Claimant Trust and Litigation Sub-Trust) release each Released Party from, *inter alia*, any and all Causes of Action that the Debtor or its estate could legally assert, except for obligations of the party under the Plan certain other agreements, confidentiality and noncompetition agreements, avoidance actions, or acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.[4]

The term "Released Parties" is defined in Article I.B.111 of the Plan to include:

1.  The Independent Directors

2.  Strand, solely from the date of the appointment of the Independent Directors through the effective date of the Plan;

3.  The CEO/CRO;

4.  The Committee;

5.  The members of the Committee;

---

[4] There are some additional limitations specific to "Senior Employees."

Appellee Appx. 01439
APPX. 001590

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-86    Filed 12/27/23    Page 165 of 1104    PageID 16299
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1446 of 1803    PageID 12192
Case 19-34054-sgj11  Doc 1667  Filed 01/05/21    Entered 01/05/21 16:22:08    Page 9 of 34

6.  The Professionals; and

7.  The "Employees," which is defined as the employees of the Debtor set forth in the

    plan supplement.

The term "Causes of Action" is an 18 line definition in Article I.B.19 to include just

about any type of cause of action, whether arising before or after the commencement of the

bankruptcy case.

The Release Clause applies to causes of action having no relationship to the case. The

Release Clause also waives claims of the newly created Claimant Trust and Litigation Sub-Trust

"existing or hereafter arising," which means that these entities, which have conducted no

business as of the confirmation of the Plan, are releasing future, unknown claims against the

Released Parties, such as a future negligent breach of fiduciary duty claim.

The Exculpation Clause, the Release Clause and the Claimant Trust Agreement clearly

bestow protection from liability upon numerous non-debtor parties.  Some of the parties covered

by the Exculpation Clause as Exculpated Parties, namely Managed Funds Highland Multi-

Strategy Credit Fund, L.P. and Highland Restoration Capital Partners, L.P., and possibly by the

use of "catch-all phrasing, SSPI Holdings, Inc., recently were argued to be outside the scope of

this Court's oversight but for an agreement reached by the Debtor with the Committee allowing

for some notice protocols.  *See* Debtor's Response to Mr. James Dondero's Motion For Entry of

An Order Requiring Notice And Hearing For Future Estate Transactions Occurring Outside The

Ordinary Course Of Business [Dkt. 1546]¶ 12

The Fifth Circuit decision in *In re Pacific Lumber Co*. 584 F.3d 229 (5th Cir. 2009) is

dispositive.   In that case, the plan proposed to release the plan proponents and post-

reorganization owners of the reorganized debtor, the two new entities created by the plan, and

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/28/23   Page 166 of 1104   PageID 16300
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1447 of 1803   PageID 12193
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 10 of 34

the creditor's committee (and their personnel) from liability—other than for willfulness and gross negligence—related to proposing, implementing and administering the plan. *Pacific*, 584 F.3d at 251.  This language is similar to the language of the Exculpation Clause.  The *Pacific* court cited the principle of 11 U.S.C. § 524(e), which states that "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt."  *Id.*  The court noted that: "We see little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization."  Pacific, 584 F.3d at 252.  It went on to cite other Fifth Circuit authority establishing that 11 U.S.C. 524(e) only releases the debtor, not co-liable third parties, and that the cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions. *Pacific*, 584 F.3d at 252, citing *In re Coho Resources, Inc.,* 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.,* 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993), *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir. 1995).  Finally, the court stated:

> There are no allegations in this record that either [plan proponents/owners of reorganized debtors] or their or the Debtors' officers or directors were jointly liable for any of [debtors'] pre-petition debt.  They are not guarantors or sureties, nor are they insurers.  Instead, the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy.  The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Pacific,* 584 F.3d at 252-253.

The *Pacific* court struck down all of the non-debtor releases except those in favor of the creditor's committee and its members.  The rationale for allowing the exculpation of the creditor's committee and its members is that the law effectively grants them qualified immunity for actions within the scope of their duties.  *Pacific*, 584 F.3d at 253.  The court also noted that the creditor's committee and its members were the only disinterested volunteers among those among the parties sought to be released, and reasoned that it would be extremely difficult to find

Appellee Appx. 01441
APPX. 01542
APPX. 01543

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 12/29/23    Page 167 of 1104    PageID 16301
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1448 of 1803    PageID 12194
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 11 of 34

members to serve on the committee if they can be sued by persons unhappy with the committee's

performance or the outcome of the case.  *Id.*

The Fifth Circuit noted the continuing viability of the rule of *Pacific* in *In re Vitro S.A.B.*

*de CV*, 701 F.3d 1031, 1059 (5th Cir. 2012) (". . . a non-consensual, non-debtor release through a

bankruptcy proceeding, is generally not available under United States law. Indeed, this court has

explicitly prohibited such relief," citing *Pacific.)*  Lower courts from within the Fifth Circuit

have strictly followed the precedent and struck down various plan clauses dealing with releases

and exculpation.  *See In re Thru, Inc.*, 2018 WL 5113124, *22 (D.C.N.D.Tex 2018), affirmed

782 Fed.Appx. 339 (5th Cir. 2019) (exculpation provision and injunction); *In re CJ Holding Co.*,

597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit has concluded that a bankruptcy court

may not confirm a plan that provides "non-consensual non-debtor releases."); *In re National*

*Truck Funding LLC*, 588 B.R. 175, 177 (Bankr. S.D. Miss. 2018) ("At hearing, the parties agreed

that the Release and Exculpation . . . of the Plan . . . will be further amended by language

protecting only the Official Committee of Unsecured Creditors and its representatives, as the

Court has previously approved."); *In re LMCHH PCP LLC*, 2017 WL 4408162, at *16 (Bankr.

E.D. La. Oct. 2, 2017) ("The modification [to the plan] filed was done to ensure that the

exculpation provision complied with [*Pacific*] which held that a plan could not exculpate outside

of the Debtors, the Official Unsecured Creditors Committee, and those who act for them, where

'the essential function of the exculpation clause . . . is to absolve the released parties from any

negligent conduct that occurred during the course of the bankruptcy.'"); *In re Patriot Place, Ltd.*,

486 B.R. 773, 823–24 (Bankr. W.D. Tex. 2013) (Non-debtor releases and exculpation clauses

struck down as violative of Fifth Circuit precedent and render the plan unconfirmable.).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16   Filed 12/20/23   Page 168 of 1104   PageID 16302
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1449 of 1803   PageID 12195
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 12 of 34

All parties exculpated and released other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed from the Plan and the Claimant Trust Agreement, or the Plan is not confirmable.

### B. Injunction Provisions

Article IX.F of the Plan contains extensive injunction provisions (the "Injunction Provisions") that far exceed those allowed in the Fifth Circuit. Although not broken down into sections, the Article contains multiple separate and distinct provisions, as follows:

1. The first paragraph enjoins claimants and equity holders from interfering with plan implementation of consummation;

2. The second paragraph **permanently** enjoins entities with claims or equity interests and their related persons from, with respect to such interests, *inter alia*, commencing actions, enforcing judgments, creating or enforcing encumbrances, setting off against or affecting the Debtor, the Independent Directors, the Reorganized Debtor created by the Plan or the Claimant Trust created by the Plan, except as otherwise provided by the Plan or other order of this Court;

3. The third paragraph extends the injunctions of the Article to any successors of the Debtor, the Reorganized Debtor and the Claimant Trust and their respective property and interests in property; and

4. The fourth paragraph provides that no "Entity[5]" may commence or pursue a claim or cause of action against a "Protected Party"[6] that arose from or is related to the

---

[5] Defined as any "entity" as defined in 11 U.S.C. § 101(15) and also includes any "Person" or any other entity.

[6] The Plan does not define the term "Protected Party." It defines "Protected Parties" as follows:

"*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-4   Exhibit 6   Page 1250 of 1804 169 of 1104   PageID 16303
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1450 of 1803   PageID 12196
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 13 of 34

bankruptcy case, the negotiation of the Plan, the administration of the Plan, the wind down of the business, the administration of the Claimant Trust, or transactions in furtherance of the foregoing, without this Court first finding that the claim or cause of action represents a colorable claim of bad faith, criminal misconduct, fraud or gross negligence against the Protected Party, and specifically authorizes such Entity to bring a claim against the Protected Party.[7]  It further provides that this Court has the sole jurisdiction to adjudicate any such claim for which approval to pursue the claim has been granted.

Even the most cursory reading of the language of Article IX.F, especially the fourth paragraph, reveals that it goes farther than the exculpation and release provisions in terms of the parties protected by the permanent injunctions.

Although the Court in *Pacific* did not appear to expressly deal with an injunction, as noted above the court concluded that its own cases ". . . seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Pacific*, 584 F.3d at 252. In addition, the Fifth Circuit in *Vitro*, *supra*, construed *Pacific* as denying a non-debtor permanent injunction, wherein it cited *Pacific* and added: "(discharge of debtor's debt does not affect liability of other entities on such debt and denying non-debtor release and permanent injunction.)"  *Vitro*, 701 F.3d at 1059.  The logic for applying the same principle to both releases/exculpations and injunctions is simple to understand—if a non-debtor cannot be released from claims but

---

Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

[7] The provision is expressly limited as to Strand and Employees to the period from the date of appointment to the effective date of the Plan.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-86   Filed 12/29/23   Page 170 of 1104   PageID 16304
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1451 of 1803   PageID 12197
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 14 of 34

claimants can be enjoined by the bankruptcy court from prosecuting them against the non-debtor, the exclusion of a release *ab initio* or the striking of a release from a plan is meaningless. For example, the fourth paragraph effectively releases from negligence claims a broad category of persons and entities not entitled to exculpation or releases under *Pacific,* because the paragraph only allows an aggrieved party to proceed after this court has determined that their allegations represent a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud or gross negligence. As noted by the Fifth Circuit in *Zale, supra,* "Accordingly, we must overturn a § 105 injunction if it effectively discharges a nondebtor." *Zale,* 62 F.3d at 760, citing *In re Vitek,* 51 F.3d 530, 536, n. 27, as follows: "('[N]on-debtor property thus should not ordinarily be shielded by the powers of the bankruptcy court.')" *Id. See also In re Thru, Inc.,* 2018 WL 5113124, *21-22 (striking down a plan injunction that "would effectively discharge numerous non-debtor third parties").

All parties protected by the Injunction Provisions other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed or the Plan is not confirmable.

### C. The Claims Released Do Not Meet the Few Exceptions Allowing Release or Injunctions in Favor of Third Parties

There are a few situations where it may be *possible* to argue that third party releases are permissible within the Fifth Circuit, but none are applicable here.   The *Pacific* court distinguished one set of cases cited by the plan proponents by saying that they concerned global settlements of mass claims.   *Pacific,* 584 F.3d at 252.   Another has cited *Pacific* for the proposition that, absent a **meaningful** contribution by the released party, the release would probably be invalid under *Pacific.  In re Texas Rangers Baseball Partners,* 431 B.R. 706, 717 FN 29 (Bankr. N.D. Tex. 2010); *See also Zale,* 62 F.3d at 762 (holding that one plan provision temporarily enjoining certain contract claims was valid as an unusual circumstance because it

{00374857-13}                                             14

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/23/23   Page 171 of 1104   PageID 16305
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1452 of 1803   PageID 12198
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 15 of 34

involved a settlement providing substantial consideration being paid into to the estate). Another referred to a narrowly tailored release of the type found in § 363(f) sales of property free and clear of liens. *In re Patriot Place, Ltd.,* 486 B.R. 773, 821-822 (Bankr. W.D. Tex. 2013). Such releases and injunctions are entered to ensure that the purchaser of the debtor's property (as well as the debtor's property being sold) is insulated from claims that creditors might have against the debtor and the property being sold by the debtor to the purchaser. *Id.*

The court in *Zale* indicated that a **temporary** injunction **may** be proper when unusual circumstances exist. *Zale*, 62 F.3d at 761. These conditions are when the non-debtor and the debtor party enjoy such an identity of interests that the suit against the non-debtor is essentially a suit against the debtor and when the third party action will have an adverse impact upon the debtor's ability to accomplish reorganization. *Id.* Even in such cases, neither of which is applicable here, an injunction would not be permanent, but would only delay the actions.

None of the foregoing exceptions are applicable in the instant case.

**D. Jurisdiction**

Even if the Bankruptcy Code were to permit some exculpation, releases and injunctions protecting non-debtor parties, this Court does not have the power to retain exclusive, indefinite, post-confirmation jurisdiction to determine whether actions against Protected Parties may proceed or, thereafter, to adjudicate claims pertaining thereto.

The fourth paragraph of the Injunction Provisions prohibits the commencement of certain actions against any Protected Party with respect to claims or causes of action that arose from or are related to the case, administration of the case, the wind down of the business of the Debtor or Reorganized Debtor, and the administration of the Claimant Trust. It also channels claims by requiring that any such claims or causes of action be first brought to this Court to determine that

{00374857-13}

15

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/29/23   Page 172 of 1104   PageID 16306
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1453 of 1803   PageID 12199
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 16 of 34

the claims are outside the scope of protection granted a Protected Party, and to obtain an express authorization from this Court allowing the action to proceed.  It then provides that this Court has sole jurisdiction to adjudicate the claim. Because the Reorganized Debtor and the Claimant Trust have engaged in no activity as of the confirmation of the Plan, this provision clearly is intended to extend to unknown, future conduct by Protected Parties in addition to pre-confirmation Protected Parties.

As noted by the Fifth Circuit in *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores)*, 266 F.3d 388, 389 (5th Cir. 2001), bankruptcy court jurisdiction does not last forever.  Under 28 U.S.C. § 1334, a federal district court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." *In re Superior Air Parts, Inc.*, 516 B.R. 85, 92 (Bankr.N.D.Tex. 2014). The district court is authorized under 28 U.S.C. § 157 to refer to the bankruptcy court "any or all proceedings arising under title 11 or arising in or related to a case under title 11." *Id.*  By virtue of an order adopted on August 3, 1984, this Court has jurisdiction over any or all proceedings arising under title 11 or arising in or related to a case under title 11. *Id.*

"Arising Under" jurisdiction involves causes of action "created or determined by a statutory provision of title 11."  *Wood v. Wood (Matter of Wood)*, 825 F.2d 90, 96 (5th Cir. 1987); *Superior*, 516 B.R. at 93.  Nothing involved in the exculpations, releases or injunctions on non-debtor parties involves such a cause of action.  By their nature, negligence claims and intentional tort claims arise by operation of law generally applicable to all persons and entities regardless of whether or not they are in bankruptcy.  They could exist totally outside a bankruptcy context.

Appellee Appx. 01447
APPX. 01449

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/25/23   Page 173 of 1104   PageID 16307
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1454 of 1803   PageID 12200
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 17 of 34

"Arising in" jurisdiction involves those actions "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Wood*, 825 F.2d at 97; *Faulkner v. Eagle View Capital Mgmt. (In re Heritage Org., LLC)*, 454 B.R. 353, 360 (Bankr.N.D.Tex. 2011); *Superior*, 516 B.R. at 94-95.  The example given the by the *Wood* court is "'administrative' matters that arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 97 (emphasis supplied by the court).  Again, negligence claims and intentional torts against non-debtors obviously do not meet these criteria.

The final category, "related to" jurisdiction, involves the issue of "'whether the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy.'"  *Wood*, 825 F.2d at 93, citing *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984) (emphasis supplied by the court).  Because it is obvious that the non-debtor claims being released, exculpated and enjoined do not "arise under" or "arise in" a bankruptcy case, the only possibly arguable basis for jurisdiction is "related to" jurisdiction.  The fourth paragraph of the Injunction Provisions contemplates application to any claim or cause of action "that arose from or is related" to the case.

Initially, it should be noted that there simply is no way that even a massive judgment against the non-debtors could have any impact whatsoever on the estate.  Considering that there will be no **estate** being administered **in bankruptcy** post-confirmation, it is inconceivable how releases of non-debtor parties could possibly impact the administration of a now defunct bankruptcy estate of the Debtor.  The court in *Craig's* appeared to recognize this principle when it adopted the view that confirmation of a plan changes bankruptcy court jurisdiction.  *Craig's*, 266 F.3d at 390.  Expansive bankruptcy court jurisdiction is no longer "required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize."  *Id.*

{00374857-13}                                      17

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/26/23   Page 174 of 1104   PageID 16308
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1455 of 1803   PageID 12201
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 18 of 34

In *Craig's,* the Fifth Circuit was dealing with a fact pattern that differs from the instant case in two ways. First, the case involved a dispute between the aggrieved party and the reorganized debtor, not totally non-debtor parties. Second, it only partially involved the fact pattern of the instant case, because it only dealt with claims characterized as post-confirmation rather than the mix of pre- and post-confirmation claims against the non-debtor parties protected by the Exculpation Clause, Release Clause and Injunction Provisions. The case involved a pre-confirmation contract that had been assumed, and a post-confirmation dispute involving state law for damages that at least partially arose post-confirmation.[8] The court held that there was no jurisdiction over a claim that "principally dealt with post-confirmation relations between the parties." *Craig's*, 266 F.3d at 390.

The later Fifth Circuit case of *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325 (5th Cir. 2008) also involved the issue of post-confirmation jurisdiction.[9] The court summarized the *Craig's* decision as one dealing with the post-confirmation relations between the parties, where there was no antagonism between the parties as of the date of the reorganization, and no facts or law deriving from the plan were necessary to the claim. *Enron*, 535 F.3d at 335.

Under the general principles of *Craig's*, there should be not "related to" jurisdiction involving the claims involved in this case, which purely involve non-debtor parties and non-bankruptcy related claims with no potential impact upon the pre- or post-confirmation estates.

---

[8] The facts are not totally clear. They indicate that the plan was confirmed in December 1994, and that the claims for damages arose in 1994 and 1995. *Craig's*, 266 F.3d at 389. Therefore, at least the 1995 claims arose post-confirmation.

[9] The *Enron* case involved lawsuits against non-debtors that had been removed prior to the commencement of the case, that were dismissed with prejudice after the confirmation of the plan. *Enron*, 535 F.3d at 333. The plaintiffs alleged that there was no jurisdiction to dismiss the case because "related to" jurisdiction had ceased after the plan was confirmed. 535 F.3d at 334. However, the parties did not dispute whether the federal courts had "related to" bankruptcy jurisdiction over the cases at the time of removal, so the court framed the question as whether the court, after confirming Enron's plan, maintained "related to" jurisdiction. 535 F.3d at 334-335. Therefore, the case stands for the proposition of whether "related to" jurisdiction, once conferred, continues post-confirmation. 535 F.3d at 335-336.

Appellee Appx. 01449
APPX. 01790

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 12/29/23   Page 175 of 1104   PageID 16309
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1456 of 1803   PageID 12202
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 19 of 34

This is especially true with respect to post-confirmation future releases of non-debtor parties involved with as yet uncreated entities.

The case of *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594 (2011), decided after *Wood*, *Craig's* and *Enron*, adds additional jurisdictional barriers to confirmation of a Plan containing the language of Article IX.(C), (D) and (F).   In *Stern*, Pierce had filed a proof of claim in Marshall's bankruptcy proceedings, alleging a right to recover damages as a result of alleged defamation on the part of Marshall.   *Stern*, 131 S.Ct. at 2601. Marshall filed a counterclaim against Pierce alleging tortious interference with a gift that Marshall had expected to receive from her husband, who was Pierce's father.   *Id.* The claim was classified by the Supreme Court as a common law tort claim.   *Id.* The Supreme Court found that Pierce had consented to resolution of the counterclaim by the Bankruptcy Court.   131 S.Ct. at 2606.   After being cast in judgment by the Bankruptcy Court in the amount of over $425 Million, Pierce argued that the Bankruptcy Court did not have jurisdiction over the counterclaim.   131 S.Ct. at 2601.   The Supreme Court agreed with Pierce, holding that Article III of the U.S. Constitution did not permit the Bankruptcy Court to enter a final judgement on Marshall's counterclaim.   131 S.Ct. at 2608.

Some claims involved in the instant case are simple tort claims against non-debtors. They occupy the same category as the defamation suit in *Stern*.   Movants are entitled to an actual adjudication of their claims, which would mean an adjudication by a state court or an Article III federal court of competent jurisdiction and venue.   This Court's submission of a report and recommendation on confirmation to the District Court would not constitute an actual adjudication. Because the Plan provision at issue provides that this Court will **actually adjudicate** the claims, it runs afoul of *Stern* on its face.   Similarly, the provision literally would

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 176 of 1104    PageID 16310
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1457 of 1803    PageID 12203
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 20 of 34

preclude Movants from seeking to withdraw the reference to have the case actually decided by an Article III court.  Because this Court could not adjudicate the case, the Plan's attempt to grant to this Court sole jurisdiction to adjudicate the claims renders the Plan nonconfirmable.

Even if jurisdiction *could* exist for the purpose of determining whether a claim could go forward against a Protected Party, it does not follow that this Court would have jurisdiction to adjudicate the claim.  At the point at which this Court determines that a claim could proceed, the action no longer involves any interpretation of either bankruptcy law or the Plan, nor could it have any impact upon the pre- or post-confirmation estate.[10]

### The Plan Prohibits Claimants From Asserting Rights Under The Plan Rendering the Plan Not Confirmable

Aside from protecting parties not entitled to protection, the Exculpation, Release Injunction Provisions contain provisions that far exceed the scope permitted by bankruptcy law.

The second paragraph of the Injunction Provisions is broad enough to permanently preclude claimants from pursing their rights under the Plan against the Reorganized Debtor and the Claimant Trust because it precludes any attempt to enforce rights, many of which are created pursuant to the Plan, and the third paragraph of the Injunction Provisions goes even farther by extending the injunctions to any successors of the Reorganized Debtor and the Claimant Trust.  Under the Plan, the Class 2 claimant is to be given a new promissory in treatment for its claim, the Class 3 claimants have the option to retain collateral, and Class 5 claims are reinstated.  If the Reorganized Debtor defaults under any of its obligations, the Injunction Provisions literally prevent any attempt to enforce their rights under the Plan.

---

[10] Movants are aware of *In re Pilgrim's Pride*, 2010 WL 200000 (Bankr.,N.D.Tex 2010) and *In re Camp Arrowhead, Ltd.*, (Bankr.W.D.Tex 2011).  Movants believe that these cases blatantly disregard the letter and spirit of *Pacific* and are, therefore, wrongfully decided.  In addition, they were decided before *Stern v. Marshall*.

Appellee Appx. 01451
Appx. 01792

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-86   Filed 12/29/23   Page 177 of 1104   PageID 16311
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1458 of 1803   PageID 12204
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 21 of 34

The best way to demonstrate this issue is to cite a different plan.  Although the injunction

in *In re Thru, Inc.*, *supra*, was struck down on the basis that it impermissibly released third

parties, the injunction contained language that the second paragraph in the instant case is

missing.  It starts out:

> Except as otherwise expressly provided in this Plan or in the Confirmation Order
> **and except in connection with the enforcement of the terms of this Plan**
> **(including the payment of Distributions hereunder) or any documents**
> **provided for or contemplated in this Plan**, all entities . . . are permanently
> enjoined from. . . .

> *Thru*, 2018 WL 5113124, *21

Compare this language to the second paragraph of the Injunction Provisions, which

provides:

> Except as expressly provided in the Plan, the Confirmation Order, or a separate
> order of the Bankruptcy Court, all Entities . . . are permanently enjoined. . . .

The Plan literally would require a claimant to come back to this Court for an order if the

Reorganized Debtor or the Plan-created trusts default.  This goes against the concept espoused

by the Fifth Circuit in *Craig's*, indicating that confirmation allows the debtor to go about its

business without further supervision or approval, but also without the protection of the

bankruptcy court.  *Craig's*, 266 F.3d at 390, citing *Pettibone Corp. v. Easley*, 935 F.2d 120, 122

(7th Cir. 1991).

**The Plan Contains a DeFacto Channeling Injunction**

As noted earlier, paragraph 4 of the Injunction Provisions in the Plan provide that no

Entity may commence or pursue a claim or cause of action against a Protected Party without this

Court:

> (i) first determining, after notice, that such claim or cause of action represents
> a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud,
> or gross negligence against a Protected Party and (ii) specifically authorizing
> such Entity to bring such claim against any such Protected Party; . . . .

{00374857-13}

Appellee Appx. 01452
APPX. 001794

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-86    Exhibit 86    Page 124 of 1804    Page 178 of 1104    PageID 16312
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1459 of 1803    PageID 12205
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 22 of 34

Plan, Article IX.F, fourth unnumbered paragraph.

Thereafter, the Plan provides that this Court retains sole jurisdiction to adjudicate the claim. *Id.*

The above provisions have the effect of channeling all post-petition claims against the Reorganized Debtor, the Creditor Trust and others into the Bankruptcy Court to determine whether a claim can be asserted and then as the forum with the "exclusive jurisdiction" to adjudicate the claim. The provisions are not authorized under the Bankruptcy Code.

Congress, when it enacted 11 U.S.C. § 524(g), provided a limited channeling injunction for asbestos and in some mass tort cases. Section 524(g) was not created to shield parties that are liquidating a debtor and its reach does not extend to garden variety unsecured creditors or serve as a barrier to claims that arose after the Effective Date of the Plan. The impact of Section 524(g) is to address pre-petition claims and future claims arising out of pre-petition activity where the claims have yet to manifest.

In addition, 11 USC 524 § (g) is only applicable to a Debtor that obtains a discharge pursuant to 11 USC § 1141. The Debtor in its approved Disclosure Statement [See DKT 1473, pp. 8-9] classifies the Debtor's post confirmation activities as one of "wind down" of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. In addition, the Claimant Trust formed pursuant to the Plan is a "liquidation trust" [See DKT 1656-2 section 2.2], which makes the Plan a Plan that " liquidates all or substantially all of the property of the estate". Pursuant to 11 U.S.C. § 1141(d)(3), a Debtor whose Plan is none that liquidates all or substantially all of the property of the estate is not eligible for a discharge. 11 U.S.C. § 524(g) cannot authorize any channeling injunction for the Debtor in its Plan.

**Conclusion**

For the reasons set forth herein, confirmation of the Plan must be denied.

Appellee Appx. 01453
APPX. 01795

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-6 Page 12460/28 1804age 179 of 1104 PageID 16313
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1460 of 1803 PageID 12206
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 23 of 34

January 5, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
*and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 5th day of January, 2021, a copy of the above and foregoing *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson aanderson@joneswalker.com, lfields@joneswalker.com,kjohnson@joneswalker.com,sbuchanan@joneswalker.com
- Zachery Z. Annable zannable@haywardfirm.com
- Bryan C. Assink bryan.assink@bondsellis.com
- Asif Attarwala asif.attarwala@lw.com
- Joseph E. Bain JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds john@bondsellis.com, joyce.rehill@bondsellis.com

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/02/23    Page 180 of 1104    PageID 16314
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1461 of 1803    PageID 12207
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 24 of 34

- Larry R. Boyd      lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner      jbrookner@grayreed.com,
  lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy      gbrouphy@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant      dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson      Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello      achiarello@winstead.com
- Shawn M. Christianson      schristianson@buchalter.com, cmcintire@buchalter.com
- Matthew A. Clemente      mclemente@sidley.com, matthew-clemente-
  8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel
  l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz      mclontz@spencerfane.com,
  gpronske@spencerfane.com;jkathman@spencerfane.com;lvargas@spencerfane.com
- Andrew Clubok      andrew.clubok@lw.com
- Leslie A. Collins      lcollins@hellerdraper.com
- David Grant Crooks      dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Gregory V. Demo      gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com
- Casey William Doherty      casey.doherty@dentons.com,
  dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@d
  entons.com
- Douglas S. Draper      ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn      lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver      Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards      jonathan.edwards@alston.com
- Jason Alexander Enright      jenright@winstead.com
- Robert Joel Feinstein      rfeinstein@pszjlaw.com
- Matthew Gold      courts@argopartners.net
- Bojan Guzina      bguzina@sidley.com
- Thomas G. Haskins      thaskins@btlaw.com
- Melissa S. Hayward      MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held      mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse      ghesse@HuntonAK.com,
  amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman      jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com

Appellee Appx. 01455
Appx. 01797

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/23/23    Page 181 of 1104    PageID 16315
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1462 of 1803    PageID 12208
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 25 of 34

- A. Lee Hogewood    lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;mary-beth.pearson@klgates.com
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com,
  cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com,
  scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com,
  plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com,
  michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com

Appellee Appx. 01456
Appx. 01797

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Exhibit 6    Page 12404 of 1804ge 182 of 1104    PageID 16316
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1463 of 1803    PageID 12209
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08    Page 26 of 34

- Martin A. Sosland    martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

I also caused same to be served on January 5, 2021, by Docusource via U.S. First Class Mail,
postage prepaid upon the following parties who are **not** on the list to receive email notice/service
for this case (who therefore require manual noticing/service):

    Paul N. Adkins
    11 Mount Emily Road #07-27
    Singapore, 228493

    American Express National Bank
    c/o Becket and Lee LLP
    PO Box 3001
    Malvern, PA 19355-0701

    James T. Bentley
    Schulte Roth & Zabel LLP
    919 Third Avenue
    New York, NY 10022

    James T. Bentley
    Schulte Roth & Zabel LLP
    919 Third Avenue
    New York, NY 10022

    Jeffrey E. Bjork
    LATHAM & WATKINS LLP
    355 South Grand Avenue, Ste. 100

**Appellee Appx. 01457**
**Appx. 01799**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-36   Filed 12/05/23   Page 183 of 1104   PageID 16317
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1464 of 1803   PageID 12210
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 27 of 34

Los Angeles, CA 90071

Jessica Boelter
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

Matthew G. Bouslog
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612

William P. Bowden
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899

Candace C. Carlyon
CARLYON CICA CHTD.
265 e. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Joseph L. Christensen
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Louis J. Cisz
Nixon Peabody LLP
One Embarcadero Center, 32nd Fl
San Francisco, CA 94111

Kevin M. Coen
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Debra A. Dandeneau
Baker & McKenzie LLP
425 5th Ave.
New York, NY 10018

Deloitte Tax LLP
1111 Bagby Street, Ste. 4500

{00374857-13}                    27

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-86    Page 184 of 1104    PageID 16318
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1465 of 1803    PageID 12211
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 28 of 34

Houston, TX 77002

Mark. L. Desgrosseilliers
Chipman, Brown, Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801

Development Specialists, Inc.
333 South Grand Ave., Ste. 4070
Los Angeles, CA 90071

Fair Harbor Capital, LLC
Ansonia Finance Station
PO Box 237037
New York, NY 10023

Bojan Guzina
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

Emily M. Hahn
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd. Ste. 300
McKinney, TX 75069

Hain Capital Group, LLC
301 Route 17, 6th Floor
Rutherford, NJ 07070

Marc B. Hankin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Michelle Hartman
Baker & McKenzie LLP
1900 N. Pearl, Ste. 1500
Dallas, TX 75201

Hayward & Associates PLLC
10501 N. Central Expwy., Ste 106
Dallas, TX 75231

William A. Hazeltine

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/07/23    Page 185 of 1104    PageID 16319
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1466 of 1803    PageID 12212
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 29 of 34

Sullivan Hazeltine Allinson LLC
901 North Market Street
Suite 1300
Wilmington, DE 19801

Kuan Huang
Latham & Watkins LLP
855 Third Avenue
New York, NY 10022

Ira D Kharasch
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067

Marshall R. King
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
Suite 1400
New York, NY 10066

Alan J. Kornfeld
Pachulski Stang Ziehl & Jones LLPL
10100 Santa Monica Blvd., 13 Fl
Los Angeles, CA 90067

Kurtzman Carson Consultants LLC
Attn: Drake Foster
222 N. Pacific Coast Highway, 3rd Floor
El Segundo, CA 90245

Kurtzman Carson Consultants, LLC
222 N. Pacific Coast Highway, Ste. 300
El Segundo, CA 90245

M. Natasha Labovitz
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Richard B. Levin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Maxim B Litvak

{00374857-13}                            29

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-86    Page 1468/23 1804ge 186 of 1104    PageID 16320
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1467 of 1803    PageID 12213
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 30 of 34

Pachulski Stang Ziehl & Jones LLP
150 California Street
15th Floor
San Francisco, CA 94111

John E. Lucian
Blank Rome LLP
1201 N. Market Street, Sutie 800
1000 North King Street
Wilmington, DE 19801

Lauren Macksoud
1221 Avenue of the Americas
New York, NY 10020-1089

Mark M. Maloney
King & Spalding LLP
191 Peachtree St.
Suite 4900
Atlanta, GA 30303-1763
mmaloney@kslaw.com, pwhite@kslaw.com

Mark M. Maloney
King & Spalding LLP
1180 Peachtree Steet, NE
Atlanta, GA 30309

Terri L. Mascherin
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456

Patrick C. Maxcy
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361

R. Stephen McNeill
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Mercer (US) Inc.
155 N. Wacker Drive, Ste. 1500
Chicago, IL 60606

Appellee Appx. 01461
Appx. 01763

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/29/23   Page 187 of 1104   PageID 16321
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1468 of 1803   PageID 12214
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 31 of 34

Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
one Rodney Square
920 North King Street
Wilmington, DE 19801

Curtis S. Miller
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Josef W. Mintz
Blank Rome LLP
1201 Market Street, Suite 800
1000 North King Street
Wilmington, DE 19801

Joseph T. Moldovan
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Alan A. Moskowitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Michael R. Nestor
YOUNG CONAWAY STARGATT & TAYLOR, LL
Rodney Square
1000 North King Street
Wilmington, DE 19801

James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Fl.
Wilmington, DE 19801

Tracy M. O'Steen
CARLYON CICA CHTD.
265 E. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP

Appellee Appx. 01462
APPX. 01764

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Page 1470 of 1804    Page 188 of 1104    PageID 16322
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1469 of 1803    PageID 12215
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 32 of 34

10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Kathleen Preston
Winston & Strawn LLP
800 Capitol Street, Ste. 2400
Houston, TX 77002

Michael A. Rosenthal - DO NOT USE
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Jeremy W. Ryan
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

James P. Seery
795 Columbus Ave., 12A
New York, NY 10025

Sally T. Siconolfi
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Sarah E. Silveira
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

D. Ryan Slaugh
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Tracy K. Stratford
Jones Day
North Point

Appellee Appx. 01463
Appx. 16765

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 12/29/23    Page 189 of 1104    PageID 16323
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1470 of 1803    PageID 12216
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 33 of 34

901 Lakeside Ave.
Cleveland, OH 44114

Daniel E. Stroik
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304

Stephen G. Topetzes
K&L Gates LLP
1601 King St., N.W.
Washington, DC 20006

Thomas A. Uebler
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Michael L. Vild
CROSS & SIMON, LLC
1105 N. Market Street, Suite 901
1000 North King Street
Wilmington, DE 19801

Elissa A. Wagner
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003

Erica S. Weisgerber
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

James A. Wright
K&L Gates LLP

{00374857-13}                    33

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Filed 12/22/23 Page 190 of 1104 PageID 16324
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1471 of 1803 PageID 12217
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 34 of 34

State Street Financial Center
One Lincoln St.
Boston, MA 02111

Sean M. Young Conway Stargatt & Taylor, LLP
Young Conway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801

_/s/Douglas S. Draper_
Douglas S. Draper, LA Bar No. 5073

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 6-36    Page 1473 of 1804    Page 191 of 1104   PageID 16325
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1472 of 1803   PageID 12218

# APPENDIX 20

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38    Exhibit 86    Page 1247 of 1804    Page 192 of 1104    PageID 16326
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1473 of 1803    PageID 12219
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 1 of 42

Docket #1670 Date Filed: 01/05/2021

| K&L GATES LLP | Davor Rukavina, Esq. |
|---|---|
| Artoush Varshosaz (TX Bar No. 24066234) | Texas Bar No. 24030781 |
| 1717 Main Street, Suite 2800 | Julian P. Vasek, Esq. |
| Dallas, TX 75201 | Texas Bar No. 24070790 |
| Tel: (214) 939-5659 | MUNSCH HARDT KOPF & HARR, P.C. |
| artoush.varshosaz@klgates.com | 3800 Ross Tower |
| | 500 N. Akard Street |
| Stephen G. Topetzes (*pro hac vice*) | Dallas, Texas 75202-2790 |
| 1601 K Street, NW | Telephone: (214) 855-7500 |
| Washington, DC 20006-1600 | Facsimile: (214) 978-4375 |
| Tel: (202) 778-9328 | |
| stephen.topetzes@klgates.com | *Counsel for Highland Capital Management Fund* |
| | *Advisors, L.P., NexPoint Advisors, L.P., Highland* |
| A. Lee Hogewood, III (*pro hac vice*) | *Funds I and its series Highland Healthcare* |
| 4350 Lassiter at North Hills Ave., Suite 300 | *Opportunities Fund, Highland/iBoxx Senior Loan* |
| Raleigh, NC 27609 | *ETF, Highland Opportunistic Credit Fund, and* |
| Tel: (919) 743-7306 | *Highland Merger Arbitrage Fund, Highland Funds II* |
| Lee.hogewood@klgates.com | *and its series Highland Small-Cap Equity Fund,* |
| | *Highland Socially Responsible Equity Fund,* |
| *Counsel for Highland Capital Management Fund* | *Highland Fixed Income Fund, and Highland Total* |
| *Advisors, L.P., NexPoint Advisors, L.P., Highland* | *Return Fund, NexPoint Capital, Inc., NexPoint* |
| *Funds I and its series Highland Healthcare* | *Strategic Opportunities Fund, Highland Income* |
| *Opportunities Fund, Highland/iBoxx Senior Loan* | *Fund, Highland Global Allocation Fund, and* |
| *ETF, Highland Opportunistic Credit Fund, and* | *NexPoint Real Estate Strategies Fund, and NexPoint* |
| *Highland Merger Arbitrage Fund, Highland Funds II* | *Latin America Opportunities Fund* |
| *and its series Highland Small-Cap Equity Fund,* | |
| *Highland Socially Responsible Equity Fund,* | |
| *Highland Fixed Income Fund, and Highland Total* | |
| *Return Fund, NexPoint Capital, Inc., NexPoint* | |
| *Strategic Opportunities Fund, Highland Income* | |
| *Fund, Highland Global Allocation Fund, and* | |
| *NexPoint Real Estate Strategies Fund, and NexPoint* | |
| *Latin America Opportunities Fund* | |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**OBJECTION TO CONFIRMATION OF FIFTH AMENDED PLAN OF**
**REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.**



1934054210105000000000016

Appellee Appx. 01467

APPX. 16769

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6   Filed 12/15/23   Page 193 of 1104   PageID 16327
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1474 of 1803   PageID 12220
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 2 of 42

Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P. (each, an "**Advisor**," and collectively, the "**Advisors**"), Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund (each, a "**Fund**," and collectively, the "**Funds**," and together with the Advisors, the "**Funds and Advisors**" or "**Objectors**"), by and through their undersigned counsel, hereby submit this objection (the "**Objection**") to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1472], together with that certain Plan Supplement [Dkt. No. 1648] filed December 30, 2020 (the "**Fifth Amended Plan**").[1]  In support of the Objection, the Funds[2] and Advisors respectfully submit to the Court as follows:

## SUMMARY OF OBJECTION

The Debtor owes strict statutory and contractual fiduciary obligations to manage the billions of dollars of other peoples' money that it manages.  No actual or hypothetical conflict of interest is allowed.  Yet, the Fifth Amended Plan, by purporting to assume various agreements pursuant to which the Debtor manages portfolios of assets, places the interests of the Debtor's creditors ahead of the interests of the beneficial interest holders in those portfolios,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] The Funds are investment companies and a business development company registered under the Investment Company Act of 1940 as open-end or "mutual" funds, closed end funds or a business development company. None of the Funds are private or hedge funds.

Appellee Appx. 01468
APPX. 01479

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 12/16/23   Page 194 of 1104   PageID 16328
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1475 of 1803   PageID 12221
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 3 of 42

thereby representing a clear conflict of interest and breach of fiduciary duty in violation of the Advisers Act (defined below) and the 1940 Act (defined below).

This is because the Plan provides for the assumption of numerous management agreements in connection with, among other investments, interests in collateralized loan obligations ("**CLOs**") owned in part by the Funds and/or Advisors, together with other investors.  In some cases, either the Funds, the Advisors or these entities in conjunction with other objecting creditor(s) own or manage a majority of the remaining beneficial interests in such CLOs.  To be clear, the CLO -- not the Funds nor the Advisors nor the Debtor -- is the issuer of these interests.  Nevertheless, it is the Funds and Advisors who hold the beneficial and economic interests and who, pursuant to the underlying agreements, in many instances have the ability to control who the servicer or manager of the portfolios is.  However, the Plan reveals that the Debtor intends to dismiss its investment management employees by the end of January 2021 and to employ a subagent to perform its current portfolio manager/servicer role.  The Debtor intends to effectively wind-down and liquidate the CLOs' assets within two years—an arbitrary proposition having nothing to do with what is in the best interests of the CLOs.  The Debtor also intends to strip the Funds and the Advisors of their contractual and statutory rights, and to improperly insulate itself from potential future liabilities that it may incur on account of its portfolio management.

The Plan cannot be confirmed so long as it provides for the assumption of these agreements.  First, these agreements cannot be assigned under the Advisers Act or the 1940 Act, meaning that they cannot be assumed pursuant to section 365(c) of the Bankruptcy Code.  Second, these agreements cannot be assumed under section 365(b) of the Bankruptcy Code because the Debtor cannot adequately assure its future performance under the agreements.

Appellee Appx. 01469
APPX. 01720

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/07/23    Page 195 of 1104    PageID 16329
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1476 of 1803    PageID 12222
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 4 of 42

Third, these agreements cannot be assumed if the Plan purports to change their provisions or relieve the Debtor from its fiduciary obligations and resulting potential liabilities.  Fourth, the Plan is not feasible and is illusory so long as it depends on future income from these non-assumable agreements.  Fifth, the Plan fails to comply with applicable law by seeking to relieve the Debtor of the strict duties imposed on it by the Advisers Act and 1940 Act.  Indeed, the Plan is an invitation for future litigation against the Debtor for future breaches by the Debtor of its contractual obligations and violations by the Debtor of federal law.

The Plan is not merely a disagreement between the Debtor, on the one hand, and the Funds and Advisers, on the other hand, as to how to manage the CLOs.  The Plan instead represents an attempt by the Debtor to strip beneficial interest holders of their contractual and statutory rights, to improperly insulate itself against its future actions and liabilities, to avoid the dictates of the Advisers Act, and to use assets that it manages—assets that do not belong to the Debtor—to benefit the Debtor's creditors at the expense of the actual owners of those assets. It is one thing for the Debtor to liquidate and to seek to repay its creditors, but it is another thing entirely for the Debtor to do this on the backs, and at the expense, of those investors whose interests the Debtor is charged with serving first.

For these and other reasons argued below, the Objectors object to the confirmation of the Plan.

The purported contract assumption is also illusory in that the Debtor's plan is premised upon the liquidation of assets in which the Debtor has no interest and which a majority of the beneficial owners has expressed, and continue to express, a desire for a different portfolio management strategy than the one the Debtor intends to continue to employ.  The contracts the Debtor proposes to assume contain provisions requiring the maximization of the return to or

Appellee Appx. 01470
APPX. 01721

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Page 1478 of 1804   Page 196 of 1104   PageID 16330
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1477 of 1803   PageID 12223
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 5 of 42

preservation of the value of the collateral for the preference shareholders; these parties prefer

that the assets not be liquidated, but maximized or preserved.  Moreover, the Advisers Act[3]

requires the Debtor to comply with the portfolio management contracts for the protection of the

investors in the Funds, CLOs and other products. The Debtor's purported assumption of these

agreements, while other provisions of the Fifth Amended Plan make clear key provisions of the

assumed contracts will be ignored and rejected in this context, is a similar form of "cherry

picking" that section 365 does not countenance.[4]

### **BACKGROUND**

#### **A.**    ***General Background on Funds and Advisors***

1.       Each Advisor is registered with the U.S. Securities and Exchange Commission

("**SEC**") as an investment adviser under the Investment Advisers Act of 1940, as amended, 15

U.S.C. § 80b-1 *et. seq.* (the "**Advisers Act**").

2.       Each of the Funds is a registered investment company or business development

company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1, *et. seq.*

(the "**1940 Act**") and is advised by one of the Advisors.

3.       As an investment company or business development company, each Fund is

managed by an independent board of trustees subject to 1940 Act requirements.  That board

determines and contracts with one of the Advisors for each Fund.  As is typical for nearly all

---

[3] The Advisers Act and the 1940 Act (defined in numbered paragraph 2 below) are two separate acts, both adopted in 1940, and provide the essential statutory and regulatory structure for the Debtor's business, as well as the Advisors and the Funds, to operate legally and transparently for the benefit of the public.

[4] The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling.  However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed.  Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis.

Appellee Appx. 01471
APPX. 01723

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-86   Filed 12/29/23   Page 197 of 1104   PageID 16331
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1478 of 1803   PageID 12224
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 6 of 42

investment companies, the Funds do not have employees. Instead, pursuant to the 1940 Act, each Fund's board oversees the Advisor and the Advisor, acting pursuant to the advisory agreements, provides the services necessary to the Fund's operations.[5]  The Funds are each managed by one of the two Advisors.  The Advisors have some employees, but they also rely heavily on the Debtor to provide a variety of services.  Further, certain individuals employed or affiliated with the Debtor also hold roles for the Advisors and/or the Funds, and some of these roles are fiduciary in nature (the "**Fiduciaries**"). The Fiduciaries are privy to confidential commercial information about the Funds and Advisors, including data relating to the Funds' investment holdings and investment strategies.

**B.**     ***Shared Services and Payroll Reimbursement Agreements with the Debtor***

4.     Each Advisor is party with the Debtor to a shared services agreement. Specifically, NexPoint Advisors, L.P. ("**NexPoint**") and the Debtor are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (as amended, the "**NexPoint SSA**"), and Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and the Debtor are parties to a Second Amended and Restated Shared Services Agreement dated February 8, 2013 (as amended, the "**HCMFA SSA**," and collectively with the NexPoint SSA, the "**Shared Services Agreements**").[6]

5.     Under the Shared Services Agreements, the Debtor provides a variety of services, including operational, financial and accounting, human resources, information technology, legal, tax, and compliance services, to the Advisors.  As part of its provision of

---

[5] Each of the Funds' respective boards meets quarterly and, consistent with statutory requirements, each is advised by independent counsel.

[6] Copies of the Shared Services Agreements and the Payroll Reimbursement Agreements (as defined below) are attached to the proofs of claim filed by the Advisors at Claim Nos. 95, 104, 108 and 119.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/30/23    Page 198 of 1104    PageID 16332
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1479 of 1803    PageID 12225
Case 19-34054-sgj11  Doc 1670  Filed 01/05/21    Entered 01/05/21 16:42:55    Page 7 of 42

services, the Debtor maintains books and records (the "**Books and Records**") on behalf of the Advisors.

6.      Under the HCMFA SSA, the costs of the Debtor's services are allocated on a percentage of use basis.  The Debtor submits quarterly expense statements to HCMFA to reconcile amounts due to the Debtor.  In addition, with respect to certain taxes related to the Shared Services, the Debtor collects those taxes from HCMFA on the same basis as with the Debtor's other customers.  To the extent of a related tax refund, the Debtor is obligated to submit the refund to HCMFA.

7.      Under the NexPoint SSA, NexPoint pays the Debtor a fixed monthly fee for the provision of services.

8.      The Advisors and the Debtor are also parties to separate payroll reimbursement agreements (as amended, the "**Payroll Reimbursement Agreements**").  The Payroll Reimbursement Agreements address the splitting of costs for certain employees that are "dual employees" of the Debtor and an Advisor and who provide advice to funds, such as the Funds, advised by the Advisors.  The Payroll Reimbursement Agreements provide for the subject Advisor to reimburse the Debtor at a set cost.

9.      The Advisors also participate in the Debtor's self-insured healthcare plan (the "**Self-Insured Plan**"), which provides employee healthcare coverage.  Depending on the contributions made and the claims submitted to the Self-Insured Plan at any given time, an Advisor may be owed money by, or owe additional contributions to, the Self-Insured Plan.

10.     The Plan proposes to reject those executory contracts [Fifth Am. Plan, Dkt. No. 1472 at p. 37] that are not otherwise listed for assumption in a plan supplement.  The Debtor has filed its Plan Supplement listing executory contracts to be assumed [Dkt. No. 1648], which

Appellee Appx. 01473
APPX. 01473

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16-6    Filed 12/29/23   Page 199 of 1104    PageID 16333
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1480 of 1803    PageID 12226
Case 19-34054-sgj11   Doc 1670   Filed 01/05/21    Entered 01/05/21 16:42:55    Page 8 of 42

Plan Supplement does not include the foregoing executory contracts. Accordingly, it appears that the Plan proposes to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan. The Advisors will therefore have potentially sizable rejection damages claims, on account of which they are preparing to file corresponding proofs of claim.

### C.    *The CLOs*

11.    The Funds also have economic interests in certain collateralized loan obligations (the "**CLOs**") (the Fifth Amended Plan refers to the CLOs as "Issuers"), for which the Debtor serves as portfolio manager.

12.    The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC,[7] and Westchester CLO, Ltd.

13.    The CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preferred shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual priority of payments, or waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preferred shares.

14.    The CLOs were created many years ago. Most of the CLOs have, at this point, paid off all the tranches of notes or all but the last tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preferred

---

[7] The portfolio management agreements with Loan Funding VII, LLC is not proposed to be assumed.

Appellee Appx. 01474
APPX. 001726

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Page 12432/23 1804age 200 of 1104   PageID 16334
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1481 of 1803   PageID 12227
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 9 of 42

shares.

15.     Further, such ownerships represent in many cases the total remaining outstanding interests in such CLOs, the noteholders otherwise having been paid.  In others, the remaining noteholders represent a small percentage only of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco represent a majority of the investors in the CLOs as follows:

     a.   CLOs in which NexPoint or HCMFA manage owners of a majority of the preference shares:  Stratford CLO, Ltd. 69.05%, Grayson CLO, Ltd. 60.47% and Greenbriar CLO, Ltd. 53.44%.

     b.   CLOs in which a combination of NexPoint and HCMFA managed funds and CLO Holdco hold all, a supermajority or majority of preference shares:  Liberty CLO, Ltd. 70.43%, Stratford CLO, Ltd. 69.05%*[8], Aberdeen Loan Funding, Ltd. 64.58%, Grayson CLO, Ltd. 61.65%*, Westchester CLO, Ltd. 58.13%, Rockwall CDO, Ltd. 55.75%, Brentwood CLO, Ltd. 55.74%, Greenbriar CLO, Ltd. 53.44%*

16.     The issuer of each CLO has separately contracted with the Debtor for the Debtor to serve as the CLO's portfolio manager or servicer (the "**Servicing Agreements**").[9]  In this capacity, the Debtor is responsible for, among other things, making decisions to buy or sell the CLOs' assets in accordance with the indenture and its obligations under the Servicing Agreements.  Although the Servicing Agreements vary, they generally impose a duty on the

---

[8] CLOs marked with an asterisk (*) appear in the foregoing list as well.

[9] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Objection, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

Appellee Appx. 01475
Appx. 16176

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/23/23    Page 201 of 1104    PageID 16335
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1482 of 1803    PageID 12228
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 10 of 42

Debtor when acting as portfolio manager to maximize the value of the CLOs' assets for the benefit of the CLOs' noteholders and preferred shareholders. In particular, the Servicing Agreements contain language providing for the maximization or preservation of value for the benefit of the preference shares as shown in the following examples:

> In performing its duties hereunder, the Portfolio Manager shall seek to maximize the value of the Collateral for the benefit of the Noteholders and the Holders of the Preference Shares taking into account the investment criteria and limitations set forth herein and in the Indenture and the Portfolio Manager shall use reasonable efforts to manage the Collateral in such a way that will (i) permit a timely performance of all payment obligations by the Issuer under the Indenture and (ii) subject to such objective, maximize the return to the Holders of Preference Shares; provided, that the Portfolio Manager shall not be responsible if such objectives are not achieved so long as the Portfolio Manager performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Portfolio Manager with respect to the Notes or the Preference Shares.

Liberty Portfolio Management Agreement, Sec. 2(b) containing language above.

> In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

Aberdeen Servicing Agreement, Sec. 2(b).

Appellee Appx. 01476
APPX. 01723

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-86   Filed 12/29/23   Page 202 of 1104   PageID 16336
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1483 of 1803   PageID 12229
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 11 of 42

17.     Moreover, each of the Servicing Agreements contain express language that the portfolio manager's obligations thereunder are for the benefit of and "shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or Holders of Preference Shares, as applicable, as provided in the Indenture of the Preference Share Paying Agency Agreement, as applicable." Servicing Agreement Sec. 9.

18.     The Servicing Agreements also generally allow the holders of preference shares to remove the portfolio manager for cause, while their affirmative consent is required to an assignment of the agreements. Cause includes the anticipated "ipso facto" provisions related to insolvency and bankruptcy, but cause is not so limited and includes material breach of the Servicing Agreement which would clearly include the failure to maximize value or the failure to preserve collateral. Servicing Agreement, Sec. 14. However, certain Servicing Agreements provide for a certain percentage of holders of preference shares to remove the portfolio manager without cause. *See, e.g.*, Gleneagles CLO , Ltd., Portfolio Management Agreement, Sec. 12(c).

     ***E.***    ***The Fifth Amended Plan and Disclosure Statement***

19.     On November 24, 2020, the Debtor filed the Fifth Amended Plan and the Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1473] (the "**Disclosure Statement**").

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/05/23    Page 203 of 1104    PageID 16337
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1484 of 1803    PageID 12230
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 12 of 42

20.     The Fifth Amended Plan provides for the transfer of the majority of the Debtor's
assets to a Claimant Trust that will be established for the benefit of the Claimant Trust
Beneficiaries.  The Debtor's rights to manage investment vehicles managed by the Debtor
pursuant to executory contracts that are assumed pursuant to the Fifth Amended Plan, defined
as the "Managed Funds," are to remain with the Reorganized Debtor, which, in turn, is to be
managed by New GP LLC, a wholly-owned subsidiary of the Claimant Trust.  The Disclosure
Statement states that "[t]his structure will allow for continuity in the Managed Funds and an
orderly and efficient monetization of the Debtor's Assets." Dkt. No. 1473 at 11.  Ultimately,
however, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise
monetize all Claimant Trust Assets and Reorganized Debtor Assets."  *Id.*  More specifically,
the Reorganized Debtor will manage the wind down of the Managed Funds in addition to any
other remaining Assets.  Moreover, the Financial Projections attached as Exhibit C to the
Disclosure Statement make clear that, assuming confirmation of the Plan in its current form, the
Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over
the next two years, concluding in December 2022.

21.     The Disclosure Statement further states that the Debtor does not anticipate either
the Reorganized Debtor or the Claimant Trust assuming or assuming and assigning the contracts
between the Debtor and certain of its Related Entities[10] pursuant to which the Debtor provides
shared services and sub-advisory services relating to such Related Entities.  Dkt. No. 1473 at
42.  Accordingly, it appears that the Debtor's intent is to reject the Shared Services Agreements,
the Payroll Reimbursement Agreements, and the Self-Insured Plan.

---

[10] Footnote 10 to the Disclosure Statement clarifies that the Debtor does not consider any of the Issuers to be a
Related Entity.

**Appellee Appx. 01478**
**APPX. 01739**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/06/23    Page 204 of 1104    PageID 16338
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1485 of 1803    PageID 12231
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 13 of 42

22.    With respect to the Shared Services Agreements, the Disclosure Statement provides that the cost of staffing to fulfil the agreements has historically resulted in a net loss to the Debtor and is not beneficial to the estate. The Disclosure Statement further states that the agreements contain anti-assignment provisions which it believes to be enforceable under section 365(c) of the Bankruptcy Code, and moreover, are terminable at will by either party. In light of these considerations, the Debtor apparently does not believe that the agreements may be assumed or assumed and assigned, and even if they could, there would not be any corresponding benefit to the estate. Notwithstanding the foregoing, the Disclosure Statement indicates that the Debtor is still assessing whether to assume and assign the agreements with a Related Entity. Dkt. No. 1473 at 42.

23.    The Disclosure Statement also discusses the Debtor's role as portfolio manager for the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32). After explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.
>
> The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

24.    The Debtor's Supplement to the Plan, filed on December 30, 2020 at Dkt. No. 1648, indicates that the Debtor intends to assume the Servicing Agreements with all of the CLOs except Loan Funding VII, LLC. *See* Dkt. No. 1648, Sched. A.

Appellee Appx. 01479
APPX. 01730

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 36 Exhibit 6 Filed 12/07/23 Page 205 of 1104 PageID 16339
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1486 of 1803 PageID 12232
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 14 of 42

## OBJECTION

**A.**     *The Debtor Cannot Assume the Servicing Agreements Pursuant to Section 365(c)(1) of the Bankruptcy Code*

25.     The Objectors object to the assumption of the Servicing Agreements for the fundamental reason that the Debtor will not manage the CLOs' assets appropriately in order to maximize value for the CLOs and the Objectors, but will instead breach its fiduciary duties by managing a winding-down those CLOs and assets in order to provide a recovery for its creditors, in what is an obvious and irreconcilable conflict of interest.

26.     As explained below, the Debtor and the Servicing Agreements which it seeks to assume are subject to the Advisers Act. As the Supreme Court has repeatedly held, it is a fundamental purpose of the Advisers Act to impose strict fiduciary duties on investment advisors and to "eliminate conflicts of interest between the investment adviser and the clients." *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963). This extends to any "conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Id*. "[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations." *Transamerica Mort. Advisors v. Lewis*, 444 U.S. 11, 17 (1979).

27.     Under the Plan, the Debtor would be owned by its creditors. The Debtor and the Claimant Trust would be managed by a person holding fiduciary duties to the Debtor's creditors. The Debtor would manage and presumably wind-down and liquidate the assets of the CLOs within a span of two years, not for the benefit of the CLOs and their beneficial interest holders, but for the benefit of the Debtor's creditors. And, it would do this without employees or resources, or by impermissibly delegating its duties to yet a different party—something that it is not permitted to do under applicable law and the governing contracts. In sum, the Debtor

14

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Exhibit 6 Filed 12/28/23 1804 Page 206 of 1104 PageID 16340
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1487 of 1803 PageID 12233
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 15 of 42

would manage the CLOs and their assets for the benefit of the Debtor's creditors, which it is

fundamentally impossible to do without simultaneously violating the Debtor's strict fiduciary

duties to others and which represents a clear conflict of interest under the Advisers Act.

28.     This inescapable conclusion is precisely why the Bankruptcy Code prohibits an

assumption of personal service contracts like the Servicing Agreements.  The Bankruptcy Code

provides that:

> The trustee may not assume or assign any executory contract or unexpired lease
> of the debtor, whether or not such contract or lease prohibits or restricts
> assignment of rights or delegation of duties, if—
>
> (1) (A) applicable law excuses a party, other than the debtor, to such contract or
> lease from accepting performance from or rendering performance to an entity
> other than the debtor or the debtor in possession, whether or not such contract or
> lease prohibits or restricts assignment of rights or delegation of duties; and (B)
> such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

29.     The first question is whether "applicable law" excuses the counterparties to the

Servicing Agreements from accepting performance from the Debtor.  In this respect, both the

Advisers Act and the 1940 Act represent "applicable law" that provides for precisely that.

30.     The Advisers Act governs "investment advisors."  The Advisers Act defines an

investment advisor as:

> any person who, for compensation, engages in the business of advising others,
> either directly or through publications or writings, as to the value of securities or
> as to the advisability of investing in, purchasing, or selling securities, or who,
> for compensation and as part of a regular business, issues or promulgates
> analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

31.     There is no question that the Debtor receives compensation under the Servicing

Agreements.  The only question is whether, under the Servicing Agreements, and in connection

Appellee Appx. 01481
APPX. 16732

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 836   Page 207 of 1104   PageID 16341
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1488 of 1803   PageID 12234
Case 19-34054-sgj11   Doc 1670   Filed 01/05/21   Entered 01/05/21 16:42:55   Page 16 of 42

with managing the investments and securities of the CLOs, the Debtor satisfies the remaining

element(s).   Case law confirms that, in providing investment services and investment

management under the Servicing Agreements, is acting as an "investment advisor" under the

Advisers Act.  The Second Circuit authoritatively considered and decided the issue of whether

a portfolio manager is an investment advisor in *Abrahamson v. Fleschner*, 568 F.2d 862 (2d

Cir. 1977).  The case concerned general partners who managed various investments on behalf

of limited partners.  *See id*. at 866.  Regarding whether the general partners were investment

advisors on account of managing the investments, the court concluded that they were "on two

independent grounds":

> First, the monthly reports which contained the alleged fraudulent representations
> were reports which provided investment advice to the limited partners.  The
> general partners' compensation depended in part upon the firm's net profits and
> capital gains.  These in turn were affected by the size of the total funds under
> their control.  The monthly reports were an integral part of the general partners'
> business of managing the limited partners' funds.  In deciding whether or not to
> withdraw their funds from the pool, the limited partners necessarily relied
> heavily on the reports they received from the general partners.
>
> Second, wholly aside from the monthly reports, we believe that the general
> partners as persons who managed the funds of others for compensation are
> 'investment advisers' within the meaning of the statute.  This is borne out by the
> plain language of Section 202(a)(11) and its related provisions, by evidence of
> legislative intent and by the broad remedial purposes of the Act.

*Id*. at 870.  Thus, by virtue of managing the underlying investments and related activities, the

general partners were providing investment advice and were therefore investment advisors

subject to the Advisers Act.

32.     The court in *SEC v. Smith*, 1995 U.S. Dist. LEXIS 22352 (E.D. Mich. 1995),

considered a similar issue.  In that case, the SEC sought summary judgment that the defendant

was an investment adviser under the Advisers Act.  The defendant argued that he was not an

investment adviser merely by virtue of managing a portfolio of accounts on behalf of third

16

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/20/23   Page 208 of 1104   PageID 16342
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1489 of 1803   PageID 12235
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 17 of 42

parties. *See id.* at \*12-\*13. Specifically, the defendant argued that he was not giving investment advice, but that he was instead "a professional trustee who exercises sole discretionary control over trust investments. . . I am the trustee. I have absolute full power and authority to make all buy, hold and sell decisions. And, therefore, I am the one that receives information and research and I make the decisions." *Id*. at \*13. In other words, because he had sole discretion and control over how to manage the invested assets, he was not giving "advice" within the meaning of the Advisers Act. The court rejected this argument: "Smith is clearly an investment advisor under the Advisers Act." *Id*. at \*15.

33.     The court in *SEC v. Saltzman*, 127 F. Supp. 2d 660 (E.D. Pa. 2000) reached the same conclusion with respect to a portfolio manager:

> Saltzman maintained exclusive control over the investment portfolio, brokerage accounts, and bank account of Saltzman Partners, L.P. He made all investment decisions for the portfolio. As the Act intended to embrace those who wield power over their clients' money, as Saltzman did over the investments of the limited partners, the facts alleged qualify Saltzman as an investment adviser.

*Id*. at 669. Therefore, the Debtor, by virtue of managing the CLO assets, and even though it has the sole control and authority over that management, is providing investment advice and is therefore an investment advisor with respect to the Servicing Agreement.

34.     More particularly, the Servicing Agreements, because they provide for investment advice, are "Investment Advisory Contracts" under the Advisers Act. This is further confirmed by the language of the Advisers Act with respect to the definition of Investment Advisory Contract:

> any contract or agreement whereby a person agrees to act as investment adviser to <u>or to manage any investment</u> or trading account <u>of another person</u> other than an investment company registered under title I of this Act.

15 U.S.C. § 80b-5(d) (emphasis added). Managing the investments of others is of course

**Appellee Appx. 01483**

**APPX. 16734**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/21/23 1804 209 of 1104    PageID 16343
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1490 of 1803    PageID 12236
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 18 of 42

precisely what the Debtor does under the Servicing Agreements.

35.    There should therefore be no question that the Servicing Agreements are "investment advisory contracts" subject to the Advisers Act.  Should there be any doubt, the Servicing Agreements in multiple places reference the Advisers Act and subject the agreements to the requirements of the Advisers Act.

36.    The Advisers Act prohibits an assignment of an investment advisory contract without consent.  The Advisers Act defines "assignment" as including "any direct or indirect transfer or hypothecation of an investment advisory contract."  15 U.S.C. § 80b-2(a)(1).  With respect to an assignment, the Advisers Act provides as follows:

> No investment adviser registered or required to be registered with the Commission shall enter into, extend, or renew any investment advisory contract, or in any way perform any investment advisory contract entered into, extended, or renewed on or after the effective date of this title, if such contract—
>
> (2) fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract.

15 U.S.C. § 80b-5(a)(2).

37.    Each of the Servicing Agreements contain substantially similar provisions related to any assignment:

> any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares.

38.    Accordingly, the Advisers Act represents "applicable law" under section 365(c)(1) that excuses the counterparty to an investment advisory contract from accepting performance from an assignee.  As such, because the agreement cannot be assigned, it cannot

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 12/22/23   Page 210 of 1104   PageID 16344
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1491 of 1803   PageID 12237
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 19 of 42

be assumed by the Debtor without consent.

39.     It is true that courts in this District construe section 365(c)(1) such that, where
the applicable law is merely a general prohibition on assignment, the section does not prevent
an assumption.  *See, e.g., In re Lil' Things*, 220 B.R. 583, 590-91 (Bankr. N.D. Tex. 1998).
Here, however, the Advisers Act is not a general law that would prohibit an assignment; it is a
very specific law, applicable to a very narrow set of persons, and one which prohibits only the
assignment of an investment advisory agreement.

40.     Even so, this District recognizes that section 365(c)(1) becomes paramount
"where the identity of the party rendering performance under the contract is material to the
contract, and the contract is non-delegable under applicable non-bankruptcy law."  *Id.* at 591.
This is certainly true where, as here, a party has contracted with someone to manage that party's
property and investments: that is a fiduciary relationship of the highest trust where the identity
of the person providing the services is absolutely paramount.  The Fifth Circuit recognized this
fundamental principle the highly analogous situation of an attorney retention agreement: the
contract was not assumable under otherwise applicable law because the contract was a highly
personal one involving elements of trust, legal, and ethical considerations.  *See In re Tonry*, 724
F.2d 467, 468-69 (5th Cir. 1984).

41.     In *In re Mirant Corp.*, 303 B.R. 319 (Bankr. N.D. Tex. 2003), this Court
concluded that the debtor-in-possession may assume a contract even if section 365(c) would
prevent a trustee from being able to assume the contract.  In large part, the Court construed the
addition, in 1984, of the term "debtor-in-possession" into the statute as evidence that Congress
intended for a debtor-in-possession to be able to assume its contracts even if section 365(c)
would otherwise prohibit a trustee from assuming the contract.  *See id.* at 333.  "The specific

Appellee Appx. 01485
APPX. 01733

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Exhibit 6    Page 1242 of 1804    Page 211 of 1104    PageID 16345
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1492 of 1803    PageID 12238
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 20 of 42

use of the words 'the debtor or the debtor in possession' leads the court to conclude that a
contract to be performed by a debtor or debtor in possession (as opposed to a trustee) is subject
to assumption whether or not applicable law limits its assignability.  *Id.*  However, the Fifth
Circuit has not adopted this view and the logic of *In re Mirant Corp.* is not correct.

42.    The statute begins by providing that the "trustee may not assume or assign any
executory contract . . ." 11 U.S.C. § 365(c)(1).  That "trustee" must include a debtor-in-
possession, for it is the same "trustee" as in section 365(a) which provides that a "trustee . . .
may assume or reject any executory contract."  *Id.* at § 365(a).  Thus, the section 365(c)(1)
prohibition on a trustee must also extend to a "debtor-in-possession," unless the Court concludes
that the use of the word "trustee" in the same statute means two different things.  Rather, what
*In re Mirant Corp.* was referring to was the following language in section 365(c)(1):

> applicable law excuses a party, other than the debtor, to such contract or lease
> from accepting performance from or rendering performance to an entity other
> than the debtor or the debtor in possession.

*Id.* at § 365(c)(1).

43.    The addition of the term "debtor-in-possession" to this statute does not change
the result; *i.e.* it does not mean that a debtor-in-possession, unlike a trustee, may assume, but
not assign, its own contracts.  The question is whether applicable law excuses a party from
accepting performance from an entity other than the debtor-in-possession.  The Debtor is a
debtor-in-possession and, if the counterparty is excused by applicable law from accepting
performance from anyone else, then the contract may not be assumed by the Debtor.  *In re
Mirant Corp.* was simply wrong in concluding that the 1984 amendment somehow excepted a
debtor-in-possession's assumption of its own contracts from the operation of section 365(c)(1).

44.    The Fifth Circuit's opinion in *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23 18:04 age 212 of 1104    PageID 16346
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1493 of 1803    PageID 12239
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 21 of 42

(5th Cir. 2001) is on point.  That opinion was rendered after the 1984 amendment at issue in *Mirant*, and that opinion concerned a Chapter 11 debtor.  The question was whether a non-assignable partnership agreement could be assumed under section 365(c)(1).  The Fifth Circuit held that "the agreement was *not* assumable under § 365(c)(1)."  *Id*. at 402 (emphasis in original).  And, as here, the confirmed plan provided for a postconfirmation liquidating trust. *See id*. at 396.  The only difference was that, in *In re O'Connor*, a Chapter 11 trustee proposed the confirmed plan.  This difference does not matter because the Fifth Circuit held that the agreement itself was not assumable; not that one person may assume it while a second not.  *See id*. at 402 and 404 (twice holding that the "agreement is *not* assumable" (emphasis in original)).[11]  Only one person may assume an executory contract, and that person is the trustee, even if the debtor-in-possession is exercising the powers of a trustee.  Thus, if the contract itself is not assumable, then it is not assumable period.  This difference also does not matter because the identity of the plan proponent is immaterial: the question is still whether it is the debtor-in-possession, or the estate, that can assume the executory contract.

45.    The Debtor will respond that the Fifth Circuit, in *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006), rejected the so-called "hypothetical test" and adopted instead the "actual test" regarding the assignment of an executory contract or lease.  In *Mirant*, the issue concerned section 365(e)(2) of the Bankruptcy Code and whether an *ipso facto* clause was enforceable against a debtor-in-possession because the executory contract was not assignable.  The

---

[11] In *Strumpf*, the Fifth Circuit held that, because the agreement was not assumable, it passed through the Chapter 11 unaffected.  However, *Strumpf* itself concluded that this "pass-through" principle does not apply in a liquidating plan, as further confirmed by *In re Tex. Rangers Baseball Partners*, 521 B.R. 134,183 (Bankr. N.D. Tex. 2014).  Even if the agreements could pass through unaffected to the reorganized debtor, even though it is liquidating, the Plan cannot limit the ability to terminate the agreements in the future based on the change in control and other facts that are present.  Otherwise, the agreements would be affected by the Plan, meaning that they would have to first be assumed, as recognized in *Strumpf* by holding that a plan effect on the executory contract means that it cannot pass through bankruptcy unaffected.  *Strumpf*, 258 F.3d at 405.

Appellee Appx. 01487
APPX. 101739

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/05/23   Page 213 of 1104   PageID 16347
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1494 of 1803   PageID 12240
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 22 of 42

"hypothetical test" required a court to review whether a hypothetical assignment was prohibited by applicable law; if it was, then the *ipso facto* clause could be enforced even though no assignment was proposed. *See id*. at 246-47. The Fifth Circuit rejected this approach and instead applied the "actual test," which looked at whether an assignment was actually being proposed. *See id*. at 249-50. The Debtor will argue that this same logic should apply to section 365(c)(1) such that, when no actual assignment is being proposed, the section is not implicated.

46.     *Mirant* and its logic, however, do not apply to section 365(c)(1). First, and most obviously, the Fifth Circuit stated that "[a]lthough this Circuit has addressed § 365(c)(1), we have yet to address § 365(e)," and then it cited to its *In re O'Connor* and *In re Braniff Airways* precedent. *See id*. at 248-49. The circuit, in analysing this prior precedent, noted that it was the contract itself that was not assumable ("declaring the contract unassumable," *id*.) and reaffirmed the holdings of both prior opinions notwithstanding the change in the language of section 365(c)(1). Thus, and having been afforded the opportunity to revisit its prior precedent or to find that the added "debtor-in-possession" language to section 365(c)(1) compelled a different result, the circuit instead reaffirmed its prior precedent holding that the contract itself was not assumable. More precisely, the "actual test" cannot apply to section 365(c)(1) because that section provides that a trustee may not "assume <u>or</u> assign" an executory contract. If the test were an actual one, *i.e.* whether an actual assignment was being proposed, then the section would simply provide that the trustee may not "assume and assign" the executory contract. But, in preventing an assumption even without a proposed assignment, section 365(c)(1) necessarily applies the "hypothetical test" such that, even though no assignment is proposed, if an assignment is prohibited then so is an assumption.

47.     Thus, were the Fifth Circuit presented with the precise issue with respect to

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 13-6    Filed 12/26/23    Page 214 of 1104    PageID 16348
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1495 of 1803    PageID 12241
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 23 of 42

section 365(c)(1), to the extent it was not in *In re O'Connor*, the Objectors submit that the Fifth

Circuit would join its sister circuits in concluding that, so long as even a hypothetical

assignment would be prohibited, so too is an assumption, whether by a trustee, debtor, or debtor-

in-possession.  *See In re Catapult Entertainment*, 165 F.3d 747, 750 (9th Cir. 1999) ("a debtor

in possession may not assume an executory contract . . . if applicable law would bar assignment

to a hypothetical third party, even where the debtor in possession has no intention of assigning

the contract in question to any such third party"); *In re James Cable Partners L.P.)*, 27 F.3d

534, 537 (11th Cir. 1994); (holding that debtor-in-possession may not assume executory

contract under section 365(c)(1) notwithstanding that no assignment was proposed); *In re

Catron*, 1994 U.S. App. LEXIS 14585 (4th Cir. 1994) (affirming holding that "agreement was

the type of executory contract that could not be assumed by Catron, a debtor-in-possession,

absent consent of the nondebtor parties as required by § 365(c)(1)(B)"); *In re West Electronics

Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) ("the relevant inquiry is not whether [applicable law] would

preclude an assignment from West as a debtor to West as a debtor in possession, but whether it

would foreclose an assignment by West to another defense contractor");[12] *but see Institut

Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir. 1997).

48.    The result may not be to the liking of the Debtor and, in other circumstances, the

result may be harsh on a debtor-in-possession.  But this case aptly demonstrates why the section

---

[12] In fact, as recognized in *West*, the addition of the term "debtor-in-possession" into section 365(c)(1)
demonstrates Congress's intent to prevent a debtor-in-possession from assuming its own personal services
contracts:

> We think that by including the words "or the debtor in possession" in 11 U.S.C. § 365(c)(1)
> Congress anticipated an argument like the one here made and wanted that section to reflect its
> judgment that in the context of the assumption and assignment of executory contracts, a solvent
> contractor and an insolvent debtor in possession going through bankruptcy are materially distinct
> entities.

*In re West Electronics*, 852 F.2d at 83.

Appellee Appx. 01489
APPX. 10740

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/27/23    Page 215 of 1104    PageID 16349
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1496 of 1803    PageID 12242
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 24 of 42

exists and why the result is fair.  Many innocent parties have entrusted billions of dollars of their property to the Debtor to manage, for their benefit.  Now, the Debtor wants to manage that property for the benefit of its creditors, and with insufficient experience, resources, and employees at that.  This is not a case where the debtor is a person, who holds investment management contracts.  That person is the same before, during, and after a Chapter 11 case. But here the Debtor is the same entity in name only: no reasonable fund would contract with the postconfirmation Debtor here to manage a penny, let alone life savings and the investments of many.  That is the whole point of why personal services contracts cannot be assumed without consent.

49.    Moreover, the Court should not permit the Debtor to place form over substance, especially when the rights of innocent, third party funds and investors are concerned.  While technically the post-confirmation Debtor will still be the same corporate shell, it will have been gutted of everything that made the Debtor the Debtor.  It is in substance and in every real and practical consideration an assignment of the contracts.  Indeed, it appears that the only reason why the Debtor will even maintain a corporate existence after confirmation is an attempt to obviate the prohibition on assumption under section 365(c)(1), as all other property of the Debtor is transferred to the Claimant Trust.  On this point, the Plan expressly provides that the "Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees."  Plan at p. 32-33.  If the intent of this provision is to provide services required by the Servicing Agreements, then this is a blatant violation of the Servicing Agreements' and the Advisers Act's anti-assignment and anti-delegation provisions. In other words, this admission in the Plan may well be precisely the type of assignment, or subsequent assignment, that would be prohibited by section 365(c)(1) regardless of any

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-6   Filed 12/28/23   Page 216 of 1104   PageID 16350
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1497 of 1803   PageID 12243
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 25 of 42

discussion between the "hypothetical test" and the "actual test."

50.     Separate and apart from the above discussion, and understand that there is uncertainty in the law as to the interplay between sections 365(f) and 365(c)(1), it is clear that a "personal services contract" falls squarely within the protection of section 365(c)(1).  As the Fifth Circuit has held, a personal services contract is subject to section 365(c)(1): "Congress' enactment of § 365(c) was to preserve the pre-Code rule that 'applicable law' precluding assignment of personal service contracts is operative in bankruptcy." *In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).  A personal services contract is one which "involves a matter of personal trust and confidence between the original contracting parties."  *In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996).  "A personal services contract has been defined as a contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability."  *In re Wofford*, 608 B.R. 494, 496 (Bankr. E.D. Tex. 2019) (internal quotation omitted).

> It is well settled that when an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, <u>the debtor-in-possession or trustee</u> is unable to assume or assign the rights of the bankrupt in such contract.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996) (emphasis added).

51.     The Service Agreements are clearly personal service contracts: the Debtor's position is one of trust and that of a fiduciary, the Debtor's performance requires personal confidence and high skill and knowledge, the agreements provide that the Debtor's duties are not delegable, and no person entrusting another with managing billions of dollars in assets would want the underlying contract to be assumable by a trustee or a liquidating debtor.  Indeed, the Supreme Court has recognized the "personalized character of the services of investment advisors."  *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963).  This Court

25

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Page 217 of 1104   PageID 16351
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1498 of 1803   PageID 12244
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 26 of 42

has characterized financial advisory and brokerage contracts as personal services contracts. *See In re Consolidated Capital Equities Corp.*, 157 B.R. 280, 283 (Bankr. N.D. Tex. 1993). Other courts have held that the Investors Act imposes a trust relationship. *See e.g. In re Peterson*, 96 B.R. 314, 323 (Bankr. D. Colo. 1988). The strict fiduciary and anti-assignment provisions of the Advisor Act and the 1940 Act further confirm Congress' strong view that these contracts are in the nature of personal service contracts.

52.     Even if the Court is inclined to adopt the "actual test" under section 365(c)(1) such that an assumption is possible where there is no assignment, and recognizing that section 365(c)(1) is broader in application than to only personal services contracts, the law overwhelmingly confirms that a personal services contract is not assumable in the first instance. *See, e.g., In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).

53.     The final issue concerning section 365(c)(1) is consent. Assuming that the CLOs do not object to the assumption of the Servicing Agreements, the statute requires affirmative consent to the assumption. The statute prohibits the assumption if "such party does not consent to such assumption." 11 U.S.C. § 365(c)(1)(B). The plain meaning of this language is that consent is required, as opposed to merely the absence of an objection. In *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392 (5th Cir. 2001), the issue concerned an executory contract that was neither expressly assumed nor assigned under a Chapter 11 plan. The Fifth Circuit held that the contract was not assumable under section 365(c)(1) and concluded that the counterparty "did not consent" to an assumption. *See id.* at 402. If the absence of an objection was all that was required, then the Fifth Circuit would not have so held. In fact, the Fifth Circuit expressly rejected the argument that the "Appellees consented to the assumption by failing to object to the Plan." *Id.* at 400. This is in line with the case law, which requires affirmative, or actual,

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-36   Filed 12/20/23   Page 218 of 1104   PageID 16352
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1499 of 1803   PageID 12245
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 27 of 42

consent to the assumption.  *See In re Allentown Ambassadors Inc.*, 361 B.R. 422, 448 n. 60 (Bankr. E.D. Pa. 2007).

54.     Finally, there is the issue of the Objectors' standing to make the foregoing arguments.  The Objectors have standing for at least four reasons.  First, as creditors and parties in interest,[13] they have the right to object to the Plan.  11 U.S.C. § 1109(b).  Insofar as it is the Fifth Amended Plan that provides for assumption of the Servicing Agreements, the Objectors may object to said assumption, especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole.   Second, the Objectors have standing and the right to object to confirmation of the Fifth Amended Plan under sections 1129(a)(1), (a)(2), and (a)(3) of the Bankruptcy Code.  Insofar as the Fifth Amended Plan and the Debtor propose to impermissibly assume the Servicing Agreements in violation of the law, the Objectors may object to such assumption on those bases.   Third, in several of the Servicing Agreements, the Objectors have the right to remove the Debtor or to control who the servicer under the agreements is.  They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements.  Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the Objectors have standing to object to their rights being limited or eliminated.  Likewise, under the 1940 Act, an investment adviser must be approved by a majority of the voting securities, and the Servicing Agreements cannot continue in effect for more than two years without the consent of either the CLOs' boards of directors or a majority of the outstanding voting securities--i.e., the Objectors.  15 U.S.C. § 80a-15(a)(2).  Insofar as the Fifth Amended Plan purports to limit the

---

[13] "The term 'party in interest' is not defined in the Bankruptcy Code."  *Khan v. Xenon Health, LLC (In re Xenon Anesthesia of Tex., PLLC)*, 698 Fed. Appx. 793, 794 (5th Cir. 2017) (quoting *In re Megrelis*, No. 13-35704-H3-7, 2014 Bankr. LEXIS 3905, at *2 (Bankr. S.D. Tex. Sept. 12, 2014)).  "It generally 'means anyone who has a legally protected interest that could be affected by the bankruptcy case.'"  *Id.*

Appellee Appx. 01493
Appx. 10744

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Page 219 of 1104   PageID 16353
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1500 of 1803   PageID 12246
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 28 of 42

Objectors' right to withhold their consent or influence the CLOs' boards of directors, the Objectors have standing to challenge any modification of those rights.  Fourth, in several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the Objectors.  The Objectors have similar rights under the Indentures.  Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the Objectors.

55.     The Fifth Amended Plan does not comply with section 1129(a)(1) of the Bankruptcy Code because it violates a fundamental principal of contract assumption under section 365 of the Bankruptcy Code.  Contracts must be assumed or rejected; there is no such thing as a partial assumption.  *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*--the debtor accepts both the obligations and the benefits of the executory contract."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("An executory contract cannot be rejected in part and assumed in part; the debtor must assume both the benefits and the burdens on the contract.").

56.     The Fifth Amended Plan contravenes established law with respect to the proposed treatment of the CLOs and the Debtor's obligations under the portfolio management agreements.

57.     First, the Fifth Amended Plan reveals that the Debtor, while claiming to assume the various Servicing Agreements, also intends to deprive the counterparties to those agreements from exercising their rights to change management.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-4   Filed 12/02/23 1804 age 220 of 1104   PageID 16354
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1501 of 1803   PageID 12247
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 29 of 42

58.    Under the Servicing Agreements at issue, either a majority, or in some cases, a supermajority of owners may initiate a change in management.  See attached Exhibit A.

59.    The Debtor's Plan makes clear, however, that it intends to engage a subagent to perform the management and servicing function and, implicitly to deprive the CLOs as issuers from exercising contractual rights with respect to making a change in management.

60.    Second, the Debtor's duties under the Servicing Agreements, which themselves have been adopted under the Advisers Act, subject to Rule 206(4)-8 thereunder as noted below, are owed to, and provide the rights of, the preference shareholders under the portfolio management agreements.  The Debtor's proposed liquidation of Managed Assets (which it does not own) is contrary to the performance of its contractual and statutory duties under the portfolio management agreements.

61.    The preference shareholders, as the only remaining owners of the Managed Assets of many of the CLOs, contend that the Debtor's (i) sales of  Managed Assets and  (ii) continued management of the Managed Assets, notwithstanding the Debtor's stated intention to wind down and liquidate all assets, violates the provisions of Section 2(b) of the portfolio management agreements.

62.    These violations are detrimental to the counterparties to the assumed contracts because:

    a.  liquidation sales of Managed Assets the Debtor does not own are unlikely to maximize the value of the Managed Assets when compared to the long term investment horizon of the beneficial owners of the Managed Assets;

    b.   liquidation sales of Managed Assets are likely to subtract value when duress sales occur based on the short term horizon and liquidation

Appellee Appx. 01495
APPX. 01495

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/23/23 1804 Page 221 of 1104    PageID 16355
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1502 of 1803    PageID 12248
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 30 of 42

strategy of the Debtor;

c. the Debtor has announced the termination of its personnel, resulting in loss of knowledgeable portfolio managers; and

d. any potential consultant engaged by the Debtor in the absence of its terminated personnel will be subservient to the Debtor's short-term objective of liquidation in violation of the assumed contracts and applicable securities law.

63.     Manifestly, where the investors in a pooled vehicle state to the manager both that their objectives and desires differ from those of the portfolio manager, and that the portfolio manager's actions are contrary to the manager's duties to maximize returns for the benefit of the investors established under the agreement, that portfolio manager is not acting reasonably under or in accordance with its agreement.  The owners of the Managed Assets, in requisite majority or supermajority,[14] have expressly requested that the Managed Assets not be liquidated as contemplated by the Debtor's business plan.  In that context, the Debtor is unreasonably acting contrary to the required contractual objective and therefore statutory obligation to maximize value for the preference shareholders.   In implementing the Fifth Amended Plan, the Debtor is likely to violate its duty of reasonableness under Section 2(b) under these circumstances, because the Debtor is not "perform[ing] its duties under [the] Agreement in the manner provided for" in the Agreement.

64.     As the Debtor is an investment management firm familiar with established securities laws, the Fifth Amended Plan's violations of such laws is blatant and should not be permitted.

---

[14] Objectors acknowledge that they do not hold a majority in all of the CLOs, for example, Jasper.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/09/23    Page 222 of 1104    PageID 16356
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1503 of 1803    PageID 12249
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 31 of 42

65.      Based upon the Fifth Amended Plan's attempt to assume contracts partially, and not fully, the Court should find that the Fifth Amended Plan fails to satisfy section 1129(a)(1) of the Bankruptcy Code and cannot be confirmed

66.      Moreover, as discussed below, with respect to the injunction and release provisions of the Fifth Amended Plan, the Plan purports to release the Debtor from its contractual and statutory obligations with respect to the Servicing Agreements.  As explained above, those agreements require the Debtor to preserve and to maximize the value of the CLOs assets, for the benefit of the CLOs and the holders of beneficial interests in them.  The Advisers Act requires the same.  The Fifth Amended Plan purports to enjoin parties from "taking any actions to interfere with the implementation or consummation of this Plan."  Plan at p. 50.  This is an unprecedented, overbroad injunction that does not comport with fundamental due process, as what "interference," "implementation," or "consummation" mean is not specified.  Are the Objectors to be enjoined from enforcing future rights under the Servicing Agreements even if the Debtor commits future malfeasance?

67.      The Fifth Amended Plan likewise enjoins all creditors and other parties, and their "Related Persons" (who may not even have notice of the injunction) from "commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor."  Plan at p. 51.  Read literally, this means that the Objectors and the CLOs will not be able to assert any claims, or seek any relief, against the Debtor or Reorganized Debtor for any present or future actionable wrongs under the Servicing Agreements and the Advisers Act.  Again, so broad an injunction, not limited in time, is unprecedented, legally impermissible, violates due

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-86   Filed 12/05/23   Page 223 of 1104   PageID 16357
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1504 of 1803   PageID 12250
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 32 of 42

process, and seeks to strip parties of their contractual and Advisers Act rights—even as the Debtor purports to assume the Servicing Agreements which, as is black letter law, means that the Debtor is requiring to provide full future performance (and suffer potential future obligations and liabilities).

68.     The balance of the Plan injunction is equally fatally defective.  If there are future obligations and defaults, and even if there are present ones, under the Servicing Agreements and applicable law, affected parties have to have the right to seek legal redress, enforce awards and injunctions, and assert setoff rights.  On this last basis in particular, if there are setoff rights under the CLOs or other agreements, those rights cannot be permanently enjoined.  And, the same injunction applies to any "successors" of the Debtor and its property interests, meaning that, if the Debtor assigns or delegates its duties under the Servicing Agreements, some future and unknown party may claim protections under these injunctions without any protection to the Objectors or the CLOs.

69.     The Plan's channeling injunction is similarly improper and defective, at least with respect to post-confirmation actions.  *See* Plan at p. 51.  That injunction requires *anyone* with any complaint against a "Protected Party" that is "related to the Chapter 11 Case," or to the "wind down of the business of the Debtor or the Reorganized Debtor," to first seek relief from this Court, including by proving that a colourable claim exists and obtaining leave.  The same section then purports to grant "sole jurisdiction" to this Court to "adjudicate" any such dispute.  Read literally, this means that the Objectors and the CLOs will have to first seek leave from this Court before enforcing any right under the Servicing Agreements and the Advisers Act, which is unprecedented and is incompatible with respect to the assumption of those agreements for post-assumption claims, and then this Court would adjudicate the claims.  This

Appellee Appx. 01498
APPX. 01749

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16    Exhibit 86    Page 1506 of 1804    Page 224 of 1104    PageID 16358
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1505 of 1803    PageID 12251
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 33 of 42

Court will have no jurisdiction to adjudicate such post-confirmation claims, however, and the channeling injunction is am impermissible attempt to confer such jurisdiction where none exists.

70.    All of the foregoing affects, limits, and eviscerates future rights under the assumed Servicing Agreements—something that defeats the whole purpose of an assumption of an executory contract and that contradicts the established law that an executory contract, and its future obligations, must be assumed *in toto*.

### B.    *Other objections to the Fifth Amended Plan*

The Debtor's Fifth Amended Plan is objectionable for other reasons as well.  Those Objections are discussed briefly below.  The Funds and Advisors reserve the right to object upon any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. The Funds and Advisors also reserve the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### *Section 1129(a)(5)*

71.    In order to be confirmed, the Debtor must satisfy the following non-waiveable requirements:

(i) the proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy.

11 U.S.C. § 1129(a)(5).

72.    This is of particular importance here, where the Debtor proposes to manage billions of dollars of other entities' assets, and ties in as well to section 362(b)'s requirement of

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/07/23 1804 Page 225 of 1104    PageID 16359
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1506 of 1803    PageID 12252
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 34 of 42

demonstrating adequate assurance of future performance. Yet, the Debtor fails completely with respect to even an attempt to satisfy these requirements.

73.    In this respect, the sole disclosure in the Plan and Disclosure Statement with respect to who will manage these billions of dollars in assets is as follows:

> Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

Plan at p. 32-33.

74.    Neither the identity nor the compensation of the people who will control and manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer. While Mr. Seery is disclosed as the Claimant Trustee who will be responsible for "winding down the Reorganized Debtor's business operations," this is insufficient. All the more so because, without additional disclosures and facts, not only can adequate assurance of future performance not be proven, but the Debtor cannot prove that the employment and compensation of these unnamed officers and managers of the Reorganized Debtor is "is consistent with the interests of creditors and equity security holders and with public policy." Public policy in particular, given the dictates of the Advisers Act, is implicated.

Accordingly, the Plan is fatally defective with respect to section 1129(a)(5) and cannot be confirmed on that basis alone.

### ***The Fifth Amended Plan is not feasible***

75.    Section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by liquidation or the need for further reorganization. "Establishing a likelihood that a plan itself will be successful is a question of feasibility." *In re Dernick*, Case No. 18-32417,

Appellee Appx. 01500
APPX. 16752

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Page 122 of 1804   Page 226 of 1104   PageID 16360
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1507 of 1803   PageID 12253
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 35 of 42

2020 WL 6833833, at *17 (Bankr. S.D. Tex. Nov. 20, 2020). Feasibility contemplates whether the plan is workable and offers a reasonable assurance of success. *Id.*; *see also In re Frascella Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007). "An obvious illegality . . . exposes the plan on feasibility grounds." *In re Food City*, 110 B.R. at 813 n. 12; *see also In re McGinnis*, 453 B.R. at 773 (chapter 13 plan premised on illegal activity could not be confirmed); *In re Frascella*, 360 B.R. at 445, 456 (citing *Food City*, 110 B.R. at 812 n. 10) (debtor failed to establish plan was feasible where it rested on questionable legal basis).

76.     As discussed above, the proposed treatment with respect to the portfolio management agreements and the CLOs contravenes section 365 of the Bankruptcy Code and the Adviser Act. This illegality hampers the feasibility of the Fifth Amended Plan, and accordingly, the Court should find that it is not feasible and deny confirmation.

### *The Debtor's proposed assumption of the Servicing Agreements is improper under section 365 because there is no adequate assurance of future performance*

77.     Under section 365(b) of the Bankruptcy Code, an executory contract may only be assumed if the Debtor "provides adequate assurance of future performance under such contract[.]" 11 U.S.C. § 365(b)(1)(C).

78.     Although the Fifth Amended Plan provides for the assumption of the Servicing Agreements with many of the CLOs, it does not offer any assurance with respect to the Debtor's ability to perform under such agreements. Indeed, given the Debtor's plan to wind down and liquidate its remaining assets, and in light of the contractual and statutory breaches discussed above, the Debtor cannot possibly provide such assurance. Furthermore, it is uncertain whether sufficient employees will be retained by the Debtor to fulfil its obligations under the portfolio management agreements, even its most significant duties are delegated to a Sub-Advisor. Accordingly, assumption is improper and must be disallowed under section 365(b).

Appellee Appx. 01501

APPX. 16752

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23   Page 227 of 1104   PageID 16361
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1508 of 1803   PageID 12254
Case 19-34054-sgj11   Doc 1670   Filed 01/05/21   Entered 01/05/21 16:42:55   Page 36 of 42

79.     Equally important, the Debtor's failure to offer or provide adequate assurance is intensified because the purported assumption is, in reality, a *sub rosa* assumption *and assignment* to an as yet unnamed third party. This unidentified third party has also not offered adequate assurance of future performance as required in the context of such assignments.

### *The Release and Exculpation Provisions of the Fifth Amended Plan are overly broad and extend beyond the Effective Date*

80.     In the Fifth Circuit, permanent injunctions against nondebtors are not permissible. *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995). In fact, and quite to the contrary, the case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009). Such permanent injunctions would "improperly insulate nondebtors in violation of section 524(e)," and "without any countervailing justification of debtor protection." *Id.* at 760 (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990)); *see also In re Pac. Lumber*, 584 F.2d at 252 (noting that costs that the released parties might incur defending against suits are unlikely to swamp such parties or the reorganization).

81.     Indeed, courts within this District have found that injunctions and release provisions substantively identical to that proposed in Fifth Amended Plan, and which purport to release causes of action against non-debtor third parties, violate Fifth Circuit precedent and are impermissible. *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018) (finding that bankruptcy court erred by approving injunction that would have effectively discharged non-debtor third parties); *In re Pac. Lumber*, 584 F.3d at 251-53 (striking release provision purporting to release non-

Appellee Appx. 01502
APPX. 010754

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Page 229 of 1804    Page 228 of 1104    PageID 16362
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1509 of 1803    PageID 12255
Case 19-34054-sgj11    Doc 1670    Filed 01/05/21    Entered 01/05/21 16:42:55    Page 37 of 42

debtor third parties from liability relating to the proposal, implementation, and administration of the plan).

82.     The injunction contained in Article XI.F of the Fifth Amended Plan is almost identical to that struck down in *In re Thru*.  Like the injunction provision in *In re Thru*, the Debtor's proposed injunction would bar the Debtor's creditors "from pursuing causes of action against a number of non-debtor third parties, if those causes of action relate to the creditors' claims against the debtor."  2018 WL 5113124, at *21.  The Fifth Amended Plan purports to release creditors' claims against not only the Debtor, but also the Independent Directors.  Dkt. No. 1472 at 56-57.  Not only that, but the Fifth Amended Plan purports to release creditors' claims stemming from the bankruptcy case, as well as the negotiation, administration and implementation of the Plan, as against many of the specific third parties that the courts in this Circuit have found to be impermissible, including, but not limited to, employees, officers and directors, and professionals retained by the Debtor, among others.  *Id.*; *In re Thru*, 2018 WL 5113124, at *21 (concluding it was "clearly erroneous" for the bankruptcy court to approve an injunction covering causes of action against such parties); *In re Pac. Lumber*, 584 F.3d at 252-53.

83.     Furthermore, the exculpation provision contained in Article XI.C of the Fifth Amended Plan is incompatible with Fifth Circuit precedent, as explained by the court in *In re Thru*.  The court in *In re Thru* found that it was clear error for the bankruptcy court to approve an exculpation provision that exculpated non-debtor third parties, including the debtor's employees, officers, directors, advisors, affiliates and professionals, from liability in connection with formulating, implementing, and consummating the plan of reorganization.  2018 WL 5113124, at *22.  The exculpation provision in the Fifth Amended Plan provides the "same

Appellee Appx. 01503
APPX. 16755

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8  Exhibit 36    Filed 12519/23 1804age 229 of 1104    PageID 16363
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1510 of 1803    PageID 12256
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 38 of 42

insulation" as the impermissible provision in the *In re Thru* plan, and as such, it cannot be approved. *See also In re Pac. Lumber*, 584 F.3d at 252 ("We see little equitable [sic] about protecting the released non-debtors from negligence suits arising out of the reorganization.").

84.    In sum, the Fifth Amended Plan impermissibly seeks to exculpate certain non-debtor third parties from a broad array of claims relating to such entities' pre- and post-petition conduct.  The Funds and Advisors submit there is no authority that would permit such broad exculpatory and/or injunctive language in favor of third parties.

### ***The Fifth Amended Plan appears to eliminate the right of setoff***

85.    The Funds and Advisors object to the extent that the Plan purports to divest them of their rights of setoff against the Debtor.

### ***The Fifth Amended Plan violates section 365(d)(2) by impermissibly allowing the Debtor to assume or reject executory contracts and unexpired leases after confirmation***

86.    Section 365(d)(2) of the Bankruptcy Code provides that, in a case under chapter 11, the debtor may assume or reject an executory contract or unexpired lease "at any time *before confirmation of a plan* . . . ."  11 U.S.C. § 365(d)(2) (emphasis added).

87.    Notwithstanding this clear language, the Fifth Amended Plan authorizes the Debtor to amend the Plan Supplement by adding or removing a contract or lease from the list of contracts to be assumed, or assign an Executory Contract or Unexpired Lease, at any time up until the Effective Date.  Dkt. No. 1472 at 43.  Further, the Disclosure Statement indicates that the Debtor is still evaluating whether to assume and assign the Shared Services Agreements. This is contrary to the explicit language of the Bankruptcy Code.

88.    Accordingly, the Advisors object to the Fifth Amended Plan to the extent that it purports to reserve the Debtor's right and ability to assume or assume and assign the Shared

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/12/23 1804 age 230 of 1104   PageID 16364
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1511 of 1803   PageID 12257
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 39 of 42

Services Agreements or the Payroll Reimbursement Agreements post-confirmation. Furthermore, the Funds object to the Fifth Amended Plan to the extent it purports to reserve the Debtor's right and ability to alter the proposed treatment of the Servicing Agreements.

### *The Debtor is not entitled to a discharge*

89.     Although section 1141(d) of the Bankruptcy Code discharges a debtor from most pre-confirmation debt, it expressly <u>does not</u> discharge a debtor if:

> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
> (B) the debtor does not engage in business after consummation of the plan; and
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

90.     Here, the Plan provides for liquidation of all of the Debtor's property over a period of time.  Although the Debtor may technically continue business for a brief period of time, its ultimate goal is liquidation.  Further, the Debtor would be denied a discharge under section 727(a)(1) because it is not an individual.  Accordingly, the Court should find that the Debtor is not entitled to a discharge under section 1141 of the Bankruptcy Code.

### *The Fifth Amended Plan may violate the absolute priority rule*

91.     Section 1129(b)(2)(B)(ii) provides that the holder of any claim or interest that is junior to the claims of unsecured creditors may not retain any property unless general unsecured creditors are paid in full.  11 U.S.C. § 1129(b)(2)(B)(ii).  The "absolute priority rule is a bedrock principle of chapter 11 practice."  *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 703 (Bankr. N.D. Tex. 2013).  "Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009) (comparing subordination

**Appellee Appx. 01505**
**APPX. 16756**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-36 Filed 12/13/23 Page 231 of 1104 PageID 16365
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1512 of 1803 PageID 12258
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 40 of 42

under section 510 to absolute priority rule) (quoting *In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002)).

92.     In the event the unsecured creditor classes (Class 7 and 8) vote against the Fifth Amended Plan, the absolute priority rule prohibits the retention of equity in the Reorganized Debtor by existing equity holders in the absence of a new investment and opportunity for competitive bidding for that investment opportunity.

## **CONCLUSION**

93.     For the reasons set forth above, the Funds and Advisors respectfully request that the Court deny confirmation of the Fifth Amended Plan and grant such other and further relief as the Court deems just and proper.

Dated:      January 5, 2020

                                          **MUNSCH HARDT KOPF & HARR, P.C.**

                                          By:  /s/ Davor Rukavina
                                              Davor Rukavina, Esq.
                                              Texas Bar No. 24030781
                                              Julian P. Vasek, Esq.
                                              Texas Bar No. 24070790
                                              3800 Ross Tower
                                              500 N. Akard Street
                                              Dallas, Texas  75201-6659
                                              Telephone: (214) 855-7500
                                              Facsimile: (214) 855-7584
                                              Email:      drukavina@munsch.com

                                              - and -

                                              K&L GATES LLP

                                              Artoush Varshosaz (TX Bar No. 24066234)
                                              1717 Main Street, Suite 2800
                                              Dallas, TX 75201
                                              Tel: (214) 939-5659
                                              artoush.varshosaz@klgates.com

                                              Stephen G. Topetzes (*pro hac vice*)
                                              1601 K Street, NW
                                              Washington, DC 20006-1600

40

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Exhibit    Page 129/23 1804 Page 232 of 1104    PageID 16366
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1513 of 1803    PageID 12259
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 41 of 42

Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management
Fund Advisors, L.P., NexPoint Advisors,
L.P., Highland Funds I and its series
Highland Healthcare Opportunities Fund,
Highland/iBoxx Senior Loan ETF,
Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund,
Highland Funds II and its series Highland
Small-Cap Equity Fund, Highland Socially
Responsible Equity Fund, Highland Fixed
Income Fund, and Highland Total Return
Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland
Income Fund, Highland Global Allocation
Fund, and NexPoint Real Estate Strategies
Fund, and NexPoint Latin America
Opportunities Fund*

Appellee Appx. 01507
Appx. 16759

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/19/23    Page 233 of 1104    PageID 16367
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1514 of 1803    PageID 12260

Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 42 of 42

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 5th day of January, 2021, and in addition to electronic service on parties entitled to notice thereon through the Court's ECF system, the undersigned caused the foregoing document to be served, by U.S. first class mail, postage prepaid, on the following:

Pachulski Stang Ziehl & Jones LLP
Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Hayward & Associates PLLC
Attn: Melissa S. Hayward and Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Sidley Austin LLP
Attn: Matthew A. Clemente and Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603

Office of the United States Trustee
U.S. Department of Justice, Region 6: Northern District of Texas
1100 Commerce Street, Room 976
Dallas, TX 75242

and, on the same day, by e-mail, on the following:

jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com
MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
mclemente@sidley.com
Alyssa.russell@sidley.com
Lisa.L.Lambert@usdoj.gov

*/s/  Davor Rukavina*
Davor Rukavina

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Filed 12/26/23   Page 234 of 1104   PageID 16368
Exhibit 6   Page 25 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1515 of 1803   PageID 12261
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 1 of 8

**Highland Capital Management Fund Advisors, L.P.**

**CLOs Review**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Aberdeen Loan Funding, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Shares Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Brentwood CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

1

308393059.4

Exhibit A

**Appellee Appx. 01509**

**Appx. 16760**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 12/19/23    Page 235 of 1104    PageID 16369
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1516 of 1803    PageID 12262
Case 19-34054-sgj11    Doc 1670-1    Filed 01/05/21    Entered 01/05/21 16:42:55    Page 2 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| Eastland CLO, Ltd. | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| Gleneagles CLO, Ltd. | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c).

The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).

For cause removal may be effected in connection with the Portfolio Manager | 66 2/3% of Preference Shares Holders. PMA § 12(c). |

2

Appellee Appx. 01510
Appx. 16762

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/19/23    Page 236 of 1104    PageID 16370
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1517 of 1803    PageID 12263
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 3 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | |
| **Grayson CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Greenbriar CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture.  SA § 9.  The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions-- Preference Share Documents). | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Page 125-19 of 180    Page 237 of 1104    PageID 16371
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1518 of 1803    PageID 12264
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 4 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Jasper CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(a).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 15% IRR since the Closing Date). PMA § 12(a).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | 66 2/3% of Preference Shares Holders. PMA § 12(a). |
| **Liberty CLO, Ltd.** | Requisite percentage of Class E Certificates Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Class E | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Class E Certificates holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Class E Certificates Holders (excluding Class E Certificates held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(c). | 66 2/3% of Class E Certificates Holders. PMA § 12(c). |

4

308393059.4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/20/23   Page 238 of 1104    PageID 16372
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1519 of 1803    PageID 12265
Case 19-34054-sgj11  Doc 1670-1  Filed 01/05/21    Entered 01/05/21 16:42:55    Page 5 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|-----|--------------------|----------------------------------|----------------|----------------------------------------|
| | Certificates Paying Agency Agreement. PMA § 9. | | The Portfolio Manager may avoid removal by purchasing all Class E Certificates voting for removal (and Class E Certificates not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | |
| **Red River CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 239 of 1104    PageID 16373
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1520 of 1803    PageID 12266
Case 19-34054-sgj11  Doc 1670-1  Filed 01/05/21    Entered 01/05/21 16:42:55    Page 6 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Rockwall CDO Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |
| **Rockwall CDO II Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |

6

308393059.4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/22/23   Page 240 of 1104   PageID 16374
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1521 of 1803   PageID 12267
Case 19-34054-sgj11   Doc 1670-1   Filed 01/05/21   Entered 01/05/21 16:42:55   Page 7 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | | |
| **Southfork CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 63% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).<br><br>For cause removal may be effected upon the Portfolio Manager authorizing or filing a voluntary petition in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | 63% of Preference Shares Holders. PMA § 12(c). |
| **Stratford CLO Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Servicer | 66 2/3% of Preference Shares Holders. SA § 14. |

7

Appellee Appx. 01515
APPX. 16373

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-34    Filed 12/23/23    Page 241 of 1104    PageID 16375
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1522 of 1803    PageID 12268
Case 19-34054-sgj11   Doc 1670-1   Filed 01/05/21   Entered 01/05/21 16:42:55   Page 8 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Servicer, as provided in the Indenture.  SA § 9.  The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions--Preference Share Documents). | | and affiliates, or for which they have discretionary voting authority, but HFP may vote Preference Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | |
| **Valhalla CLO, Ltd.** | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | |
| **Westchester CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

8

308393059.4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23   Page 242 of 1104   PageID 16376
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1523 of 1803   PageID 12269

# APPENDIX 21

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/29/23   Page 243 of 1104   PageID 16377
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1524 of 1803   PageID 12270
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 1 of 7

Docket #1673  Date Filed: 01/05/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC
F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |

## NEXPOINT REAL ESTATE PARTNERS LLC'S OBJECTION
## TO DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP") files this Objection to the Debtor's Fifth Amended Plan of Reorganization (the "Objection") and respectfully states as follows:

### I. INTRODUCTION

1.      On November 24, 2020, the Debtor filed the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1472] and Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1473] (the "Disclosure Statement"). On November 13, 2020, the Debtor filed its Initial Plan Supplement [Docket No. 1389], on December 18, 2020, the Debtor filed its Second Plan Supplement [Docket No. 1606] and on January 4, 2021, the Debtor filed its Third Plan Supplement [Docket No. 1656]

1934054210105000000000020
Appellee Appx. 01518
Appx. 10739

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/26/23   Page 244 of 1104   PageID 16378
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1525 of 1803   PageID 12271
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 2 of 7

(together with the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., the "Fifth Amended Plan").

2.      The hearing on confirmation of the Fifth Amended Plan is scheduled for January 13, 2021 at 9:30 a.m. (the "Confirmation Hearing") and the deadline to file any objections to confirmation of the Fifth Amended Plan is January 5, 2021. *See* Docket No. 1476.

3.      The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries. However, ultimately, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets." *See* Disclosure Statement, p. 11. Based on the Financial Projections attached as Exhibit C to the Disclosure Statement, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

4.      NREP filed a proof of claim in this case. *See* Claim Number 146. The Debtor has objected to NREP's claim. If NREP's claim is allowed, NREP possesses a claim in Class 7 or Class 8 under the Fifth Amended Plan.

5.      The Fifth Amended Plan also contains provisions to subordinate unidentified claims, a seemingly unfettered ability to set-off claims, and extremely broad exculpation, injunction, and release provisions, all of which fail to comply with the Bankruptcy Code. For the reasons set forth in detail below, NREP respectfully requests the Court deny confirmation of the Fifth Amended Plan.

## II. OBJECTIONS

6.      A debtor in bankruptcy bears the burden of proving every element of Bankruptcy Code Section 1129(a) by a preponderance of the evidence in order to attain confirmation of its

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23   Page 245 of 1104   PageID 16379
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1526 of 1803   PageID 12272
Case 19-34054-sgj11   Doc 1673   Filed 01/05/21   Entered 01/05/21 16:48:48   Page 3 of 7

plan. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160

(5th Cir. 1993); *In re Barnes*, 309 B.R. 888, 895 (Bankr. N.D. Tex. 2004) (citing *In re T-H New*

*Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997)). In addition, a court has a mandatory duty

to determine whether a plan has met all the requirements for confirmation, whether specifically

raised by dissenting parties in interest or not. *Williams v. Hibernia Nat'l Bank*, 850 F.2d 250, 253

(5th Cir. 1988). The Debtor in this case is unable to meet its burden for confirmation.

**A.     The Fifth Amended Plan provides for the improper subordination of unidentified claims.**

7.     The Fifth Amended Plan provides for a class of subordinated claims, which claims

may be subordinated to the general unsecured claims or both the general unsecured claims and

convenience class. The Fifth Amended Plan then provides that

> Under section 510 of the Bankruptcy Code, upon written notice, the
> Debtor, the Reorganized Debtor, and the Claimant Trustee reserve
> the right to re-classify, or to seek to subordinate, any Claim in
> accordance with any contractual, legal, or equitable subordination
> relating thereto, and the treatment afforded any Claim under the Plan
> that becomes a subordinated Claim at any time shall be modified to
> reflect such subordination.

*See* Fifth Amended Plan, Article III(J).

8.     In the Fifth Circuit, equitable subordination is appropriate when (i) the claimant

engaged in inequitable conduct; (ii) the misconduct resulted in harm to the debtor's other creditors

or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not

inconsistent with the Bankruptcy Code. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 121

(5th Cir. 2019). Further, a claim should only be subordinated to the extent necessary to offset the

harm which the creditors have suffered as a result of the inequitable conduct. *Id.*

9.     However, section 510 of the Bankruptcy Code only allows equitable subordination

of claims "after notice and a hearing." 11 U.S.C. § 510(c). Equitable subordination generally

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/29/23    Page 246 of 1104    PageID 16380
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1527 of 1803    PageID 12273
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 4 of 7

requires an adversary proceeding and while it may be satisfied through a chapter 11 plan, the debtor

must at least satisfy its burden of demonstrating such claim should be subordinated under equitable

subordination principles. Fed. R. Bankr. P. 7001(8).

10.     Here, the Fifth Amended Plan does not provide for the subordination of any specific

claims but, instead, provides for a procedure to subordinate claims that fails to comply with the

statutory requirements under section 510 of the Bankruptcy Code or applicable case law. The Fifth

Amended Plan provides no notice of the potential targets of such subordination, the basis upon

which such subordination of claims may be justified, or any evidence supporting equitable

subordination principles. Nor does the Fifth Amended Plan provide any means for due process,

adequate notice, or opportunity to oppose such unidentified subordinations. Instead, the Fifth

Amended Plan attempts to provide a means by which the Debtor, Reorganized Debtor, and

Claimant Trustee can escape the "notice and hearing" requirements of section 510. This does not

comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to

satisfy 1129(a)(1) and confirmation should be denied.

**B.     The Fifth Amended Plan provides for the improper set-off of unidentified claims against the Debtor.**

11.     Similarly, the Fifth Amended Plan also provides the Distribution Agent unfettered

set-off rights in violation of section 553 of the Bankruptcy Code. The Fifth Amended Plan provides

that:

> The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim…. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

---

**NREP's Objection to Debtor's Fifth Amended Plan**                                      **Page 4**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 12/29/23    Page 247 of 1104    PageID 16381
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1528 of 1803    PageID 12274
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 5 of 7

*See* Fifth Amended Plan, Article VI(M). Thus, under the Fifth Amended Plan, the Distribution

Agent may setoff the distribution amount on account of any Allowed Claim, without otherwise

providing notice to the Holder of such Allowed Claim and without providing any support for or

evidence that such setoff is justified. Instead, after the Distribution Agent arbitrarily determines a

setoff is appropriate, the Holder of the Allowed Claim must initiate a proceeding challenging such

setoff and seeking its full distribution under the Fifth Amended Plan. In addition, under the Fifth

Amended Plan, the Distribution may setoff a pre-petition Allowed Claim on account of not only

pre-petition claims but also post-petition claims of the Reorganized Debtor and/or Distribution

Agent.

12.     However, setoff is only available in bankruptcy when the opposing obligations arise

on the same side of the bankruptcy date—*i.e.,* both had arisen prior to the petition date or both

subsequent to the petition date. *In re Thomas*, 529 B.R. 628, 637 n.2 (Bankr. W.D. Pa. 2015); *In

re Univ. Med. Center*, 973 F.2d 1065, 1079 (3d Cir. 1992). A creditor's pre-petition claims against

the debtor cannot be set off against post-petition debts owed to the debtor. *In re Univ. Med. Center*,

973 F.2d at 1079. In addition, the burden of proof is on the party asserting the right to setoff. *In re

Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). The party seeking to enforce a

setoff right must establish (i) it has a right to setoff under nonbankruptcy law; and (ii) this right

should be preserved in bankruptcy under section 553. *Id.*

13.     Here, contrary to the provisions in section 553 of the Bankruptcy Code, the Fifth

Amended Plan attempts to both expand the right to setoff by allowing post-petition claims be setoff

against pre-petition Allowed Claims and transfer the burden of proof to the Holder of such Allowed

Claim, requiring such Holder disprove the Distribution Agent's right to setoff. This does not

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/20/23   Page 248 of 1104   PageID 16382
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1529 of 1803   PageID 12275
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 6 of 7

comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to

satisfy 1129(a)(1) and confirmation should be denied.

**C.**     **The Fifth Amended Plan provides for improper and overly broad injunctions, releases and exculpation.**

14.     In addition, the Fifth Amended Plan provides for broad releases and permanent

injunctions against nondebtors. *See* Article IX(F). However, permanent injunctions against

nondebtors are not permissible in the Fifth Circuit because such a permanent injunction would

"improperly insulate nondebtors in violation of section 524(e)…without any countervailing

justification of debtor protection." *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61

(5th Cir. 1995) (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co.* (*In re W.

Real Estate Fund, Inc.*), 922 F.2d 592, 601-02 (10th Cir. 1990)). Contrary to such prohibition, the

Fifth Amended Plan seeks to exculpate certain "Exculpated Parties" and "Protected Parties" from

a broad array of claims relating to such entities' post-petition conduct and would bar creditors from

pursing claims against various non-debtor parties if such claims relate to their claims against the

Debtor. In addition, the language purports to release creditors' claims arising not only from the

bankruptcy case but also the administration and implementation of the Fifth Amended Plan and

the period of time covered by the release and exculpation provisions extend beyond the effective

date and purport to cover post-effective date conduct. Neither the Bankruptcy Code nor applicable

case law permits such broad exculpatory and/or injunctive language in favor of third parties. *See

In re Zale Corp.*, 62 F.3d at 761, *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors'

Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009). The injunction, release,

and exculpation provisions in the Fifth Amended Plan do not comply with section 524(e) of the

Bankruptcy Code or applicable case law and the Court should deny confirmation.

---

**NREP's Objection to Debtor's Fifth Amended Plan**                              **Page 6**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 12/29/23   Page 249 of 1104   PageID 16383
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1530 of 1803   PageID 12276
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 7 of 7

**D.     Reservation of Rights**

15.     NREP reserves the right to amend or supplement this Objection to add any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. In addition, NREP reserves the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

## III.  CONCLUSION

For these reasons, the NREP respectfully requests that the Court deny confirmation of the Fifth Amended Plan and grant NREP such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email: jason.rudd@wickphillips.com
        lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2021, a true and correct copy of the foregoing Joinder was served via the Court's CM/ECF system upon counsel for the Debtor and all other parties requesting or consenting to such service in this bankruptcy case.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

---

**NREP'S OBJECTION TO DEBTOR'S FIFTH AMENDED PLAN**                                    **PAGE 7**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/22/23    Page 250 of 1104    PageID 16384
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1531 of 1803    PageID 12277

# APPENDIX 22

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/22/23   Page 251 of 1104   PageID 16385
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1532 of 1803   PageID 12278
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 1 of 6

United States Department of Justice
Office of the United States Trustee
1100 Commerce St.  Room 976
Dallas, Texas  75242
(202) 834-4233

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| | § | |
| Debtors-in-Possession. | § | |

---

### United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization (Docket Entry No. 1472)

---

**To the Honorable Stacey J. Jernigan,**
**United States Bankruptcy Judge:**

The United States Trustee for Region 6 files this Limited Objection (the "**Objection**") to the Debtor's Fifth Amended Plan of Reorganization (the "Plan" -- docket entry [D.E.] 1472, filed 11/24/2020).  In support of the relief requested, the United States Trustee respectfully submits as follows:

### Summary

The United States Trustee objects to confirmation of the Plan because the releases exceed the scope permitted by Fifth Circuit precedent.  The United States Trustee has resolved other objections with the Debtors, and these resolutions will be announced and incorporated in the confirmation order.

**United States Trustee's Confirmation Objection**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23   Page 252 of 1104   PageID 16386
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1533 of 1803   PageID 12279
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 2 of 6

<u>**Facts: Relevant Plan Provisions**</u>

**Salient Definitions:**

1.      The Plan defines exculpated and released parties as follows:

a.   "Exculpated Parties" means, collectively, (i) the Debtor and its successors and assigns, direct

and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii)

Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee

(in their official capacities), (vii) the Professionals retained by the Debtor and the Committee

in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the

parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none

of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and

managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries,

including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of

its subsidiaries, members, and managed entities), Highland Capital Management Fund

Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of

its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust),

the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included

in the term "Exculpated Party."

b.   "Released Parties" means, collectively, (i) the Independent Directors; (ii) Strand (solely from

the date of the appointment of the Independent Directors through the Effective Date); (iii) the

CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official

capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11

Case; and (vii) the Employees.

Plan, D.E. 1472; definitions 61, 111, p. 16.

**Releasing Third Parties:**

2.   The Plan releases third parties who would share liability with the Debtor:

**United States Trustee's Confirmation Objection**                                        **Page 2 of 6**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Filed 12/05/23 Page 253 of 1104 PageID 16387
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1534 of 1803 PageID 12280
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 3 of 6

"[E]ach Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, D.E. 1472, p. 48.

3. The releases for Released Parties exclude "any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction." Plan, D.E. 1472, pp. 48-49.

4. The Plan releases do not contemplate any type of channeling injunction.

**Exculpating Third Parties:**

5. The exculpation provisions broadly cover third parties:

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements,

Appellee Appx. 01528
APPX. 16339

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/26/23 1804age 254 of 1104    PageID 16388
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1535 of 1803    PageID 12281
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 4 of 6

instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance,

and Plan Distribution of any securities issued or to be issued pursuant to the Plan,

including the Claimant Trust Interests, whether or not such Plan Distributions occur

following the Effective Date; (iv) the implementation of the Plan; and (v) any

negotiations, transactions, and documentation in connection with the foregoing clauses

(i)-(v); provided, however, the foregoing will not apply to (a) any acts or omissions of an

Exculpated Party arising out of or related to acts or omissions that constitute bad faith,

fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any

Employee other than with respect to actions taken by such Entities from the date of

appointment of the Independent Directors through the Effective Date. This exculpation

shall be in addition to, and not in limitation of, all other releases, indemnities,

exculpations, any other applicable law or rules, or any other provisions of this Plan,

including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.


## Argument and Authority

**Plan Contains Non-Consensual Third-Party Releases and Exculpation in Contravention of Fifth Circuit Precedent.**

6.    The Plan contains non-consensual third-party releases that should be

stricken under Fifth Circuit precedent.

7.    The Plan's exculpation provisions are similarly overbroad.

8.    While the Plan specifies that the releases and exculpation are allowed to

"the maximum extent allowed by law," the law in the Fifth Circuit is that they are not allowed.

9.    Like the Highland Capital Plan, the *Pacific Lumber* plan contained

exculpation and release provisions that carved out willful or intentional conduct. *Scotia Pacific

Co., LLC v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.),* 584 F.3d 229

**United States Trustee's Confirmation Objection**                                    **Page 4 of 6**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/27/23   Page 255 of 1104   PageID 16389
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1536 of 1803   PageID 12282
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 5 of 6

(5th Cir. 2009). Reviewing four prior Fifth Circuit bankruptcy cases, the *Pacific Lumber* court concluded these cases "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252 (citations omitted). The Fifth Circuit struck these non-consensual provisions as to parties who were co-liable with the debtor but noted that committee members and committee professionals received qualified immunity. *Id.*

10.      The *Pacific Lumber* court disallowed the exculpation and releases of the debtors' officers, directors, and professionals because there was no evidence that they "were jointly liable for any . . . pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Id.* at 252-53.

11.      Bankruptcy Courts in the Northern District of Texas have resolved objections to exculpation or release provisions by replacing such provisions with channeling injunctions. *See* Memorandum Opinion and Order, Docket Entry No. 4614, *In re Pilgrim's Pride Corporation, et al.*, Case No. 08-45664-DML-11 (January 14, 2010); Fourth Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors (Section 10.8), Docket Entry No. 1701, *In re CHC Group, Ltd.*, Case No. 16-31854-BJH-11, United States Bankruptcy Court for the Northern District of Texas, Dallas Division (February 16, 2017).

12.      The Plan release and exculpation provisions should be limited. Unless they exclude the Debtors' professionals, the Debtors' officers and directors, and others not protected by quasi-immunity, confirmation should be denied.

**United States Trustee's Confirmation Objection**                                          **Page 5 of 6**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/28/23   Page 256 of 1104   PageID 16390
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1537 of 1803   PageID 12283
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 6 of 6

## Conclusion

Wherefore, the United States Trustee requests that the Court deny approval of the Plan and grant to the United States Trustee such other and further relief as is just and proper.

DATED: January 5, 2021                    Respectfully submitted,

                                          WILLIAM T. NEARY
                                          UNITED STATES TRUSTEE

                                          */s/ Lisa L. Lambert*
                                          Lisa L. Lambert
                                          Asst. U.S. Trustee, TX 11844250
                                          Office of the United States Trustee
                                          1100 Commerce Street, Room 976
                                          Dallas, Texas  75242
                                          (202) 834-4233

## Certificate of Service

There undersigned hereby certifies that on January 5, 2020, a copy of the foregoing pleading was served via ECF to parties requesting notice via ECF.

                                          */s/  Lisa L. Lambert*
                                          Lisa L. Lambert

**United States Trustee's Confirmation Objection**                    **Page 6 of 6**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 8-86    Filed 12/29/23   Page 257 of 1104   PageID 16391
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1538 of 1803   PageID 12284

# APPENDIX 23

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/20/23    Page 258 of 1104    PageID 16392
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1539 of 1803    PageID 12285
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 1 of 68

Docket #1814  Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF THE FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF
HIGHLAND CAPITAL MANAGEMENT L.P.**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:104703.16 36027/002



Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 259 of 1104    PageID 16393
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1540 of 1803    PageID 12286
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 2 of 68

## TABLE OF CONTENTS

**Page**

Preliminary Statement ..................................................................................................... 1

Background ...................................................................................................................... 4

    I.    Procedural Background ..................................................................................... 4

    II.    Solicitation and Notification Process ................................................................ 6

Argument ...................................................................................................................... 13

    III.    The Plan Satisfies Each Requirement for Confirmation ................................. 13

        A.    The Plan Complies with the Applicable Provisions of the
            Bankruptcy Code (Section 1129(a)(1)) ................................................. 13

        B.    The Debtor Has Complied with the Applicable Provisions of the
            Bankruptcy Code (Section 1129(a)(2)) ................................................. 23

        C.    The Debtor Proposed the Plan in Good Faith and Not by Any
            Means Forbidden by Law (Section 1129(a)(3)) ..................................... 26

        D.    The Debtor is Seeking to Pay Certain Professional Fees and
            Expenses Subject to Bankruptcy Court Approval (Section
            1129(a)(4)). .......................................................................................... 28

        E.    The Debtor Has Complied with the Bankruptcy Code's
            Governance Disclosure Requirement (Section 1129(a)(5)) .................... 29

        F.    The Plan Does Not Require Government Regulatory Approval of
            Rate Changes (Section 1129(a)(6)) ........................................................ 34

        G.    The Plan Is in the Best Interests of Holders of Claims and Interests
            (Section 1129(a)(7)) ............................................................................... 34

        H.    The Plan Complies with the Requirements of Section 1129(a)(8) of
            the Bankruptcy Code ............................................................................. 40

        I.    The Plan Complies With Statutorily Mandated Treatment of
            Administrative and Priority Tax Claims (Section 1129(a)(9)). .............. 40

        J.    At Least One Impaired Class of Claims Has Accepted the Plan,
            Excluding the Acceptances of Insiders (Section 1129(a)(10)). .............. 42

**Appellee Appx. 01534**

**APPX. 10736**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/22/23    Page 260 of 1104    PageID 16394
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1541 of 1803    PageID 12287
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 3 of 68

K.   The Plan Is Feasible and Is Not Likely to Be Followed by the Need
     for Further Financial Reorganization (Section 1129(a)(11)). .................. 43

L.   The Plan Provides for the Payment of All Fees Under 28 U.S.C. §
     1930 (Section 1129(a)(12))....................................................................... 44

M.   The Plan Complies with Section 1129(a)(13) of the Bankruptcy
     Code. ........................................................................................................... 44

N.   Sections 1129(a)(14) through Sections 1129(a)(16) of the
     Bankruptcy Code Do Not Apply to the Plan. ........................................... 45

O.   The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ...... 45

P.   The Plan satisfies the "Cramdown" Requirements of the
     Bankruptcy Code. ...................................................................................... 48

Q.   The Plan Complies with the Other Provisions of Section 1129 of
     the Bankruptcy Code (Sections 1129(c)-(e)). .......................................... 51

IV.  The Plan's Release, Exculpation, and Injunction Provisions Are
     Appropriate and Comply with the Bankruptcy Code for the
     Reasons Articulated in the Omnibus Reply. ....................................................... 51

A.   The Debtor Complied with Section 1129(d) of the Bankruptcy
     Code. ........................................................................................................... 52

B.   Modifications to the Plan. .......................................................................... 52

Conclusion .............................................................................................................................. 56

DOCS_SF:104703.16 36027/002

Appellee Appx. 01535
APPX. 16736

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/23/23   Page 261 of 1104   PageID 16395
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1542 of 1803   PageID 12288
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 4 of 68

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 n.13 (1999) ................................................................................ 34, 46, 48

*Boullion v. McClanahan*,
  639 F.2d 213 (5th Cir. 1981) ................................................................................. 39

*In re Acis Capital Management*,
  2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) .................... 38

*In re Ambanc La Mesa Ltd. P'ship*,
  115 F.3d 650 (9th Cir. 1997) ........................................................................... 47, 48

*In re American Solar King Corp.*,
  90 B.R. 808 (Bankr. W.D. Tex. 1988) .................................................................... 53

*In re Aztec Co.*,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................................... 47

*In re Block Shim Dev. Company-Irving*,
  939 F.2d 289 (5th Cir. 1991) ................................................................................. 26

*In re Bowles*,
  48 B.R. 502 (Bankr. E.D. Va. 1985) ...................................................................... 47

*In re Cypresswood Land Partners, I*,
  409 B.R. 396 (Bankr. S.D. Tex. 2009) ....................................................... 13, 23, 26

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................ 47

*In re Friendship Dairies*,
  2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ......................... 54

*In re Global Safety Textiles Holdings LLC*,
  No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) ..................... 53

*In re J T Thorpe Co.*,
  308 B.R. 782 (Bankr. S.D. Tex. 2003) ................................................................... 13

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...................................................................... 47

*In re Joint E. & S. Dist. Asbestos Litig.*,
  982 F.2d 721 (2d Cir. 1992) .................................................................................. 18

*In re Kolton*,
  No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990) .............. 47

*In re Landing Assocs., Ltd.*,
  157 B.R. 791 (Bankr. W.D. Tex. 1993) ............................................................ 29, 43

*In re Lason, Inc.*,
  300 B.R. 227 (Bankr. D. Del. 2003) ....................................................................... 40

DOCS_SF:104703.16 36027/002

**Appellee Appx. 01536**

**APPX. 16788**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-36 Filed 12/29/23 Page 262 of 1104 PageID 16396
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1543 of 1803 PageID 12289
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 5 of 68

*In re Mirant Corp.*,
 348 B.R. 725 (Bankr. N.D. Tex. 2006) ....................................................................... 46

*In re Neff*,
 60 B.R. 448 (Bankr. N.D. Tex. 1985) ........................................................................ 40

*In re Quigley Co., Inc.*,
 377 B.R. 110 (Bankr. S.D.N.Y. 2007) ........................................................................ 18

*In re Sentry Operating Co. of Tex., Inc.*,
 264 B.R. 850 (Bankr. S.D. Tex. 2001) ....................................................................... 14

*In re Sentry Operating Co. of Texas, Inc.*,
 264 B.R. 850 (Bankr. S.D. Tex. 2001) ....................................................................... 53

*In re Star Ambulance Service, LLC*,
 540 B.R. 251 (Bankr. S.D. Tex. 2015) ....................................................................... 43

*In re Sun Country Dev., Inc.*,
 764 F.2d 406 (5th Cir. 1985) ..................................................................................... 26

*In re Tex. Extrusion Corp.*,
 844 F.2d 1142 n. 23 (5th Cir. 1988) ........................................................................... 34

*In re T-H New Orleans Ltd. P'ship*,
 116 F.3d 790 (5th Cir. 1997) ..................................................................................... 43

*In re W.R. Grace & Co.*,
 729 F.3d 311 (3d. Cir 2013) ...................................................................................... 18

*In re Wilson Metal Fabricators*,
 No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020) .................................. 38

*John Hancock*,
 987 F.2d at 157 n.5 .................................................................................................... 48

*Kane v. Johns-Manville Corp.*,
 843 F.2d 636 (2d Cir. 1988) ...................................................................................... 47

*Mabey v. Sw. Elec. Power Co.*
 *(In re Cajun Elec. Power Coop., Inc.)*,
 150 F.3d 503 (5th Cir. 1998) ..................................................................................... 28

*Matter of Cajun Elec. Power Co-op., Inc.*,
 150 F.3d 503 (5th Cir. 1998) ..................................................................................... 24

*Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners*
 *(In re Tex. Rangers Baseball Partners)*,
 521 B.R. 134 (Bankr. N.D. Tex 2014) ....................................................................... 54

*Pub. Fin. Corp. v. Freeman*,
 712 F.2d 219 (5th Cir. 1983) ..................................................................................... 26

## STATUTES

11 U.S.C. § 101 ............................................................................................... 22, 51

11 U.S.C. § 1114 .................................................................................................... 44

11 U.S.C. § 1123 ..................................................................................... 17, 21, 23, 51

iv

Appellee Appx. 01537
APPX. 01739

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/25/23   Page 263 of 1104   PageID 16397
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1544 of 1803   PageID 12290
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 6 of 68

11 U.S.C. § 1125 ............................................................................................................... 23
11 U.S.C. § 1126 ......................................................................................................... 6, 25
11 U.S.C. § 1129 ..................................................................................................... passim

## OTHER AUTHORITIES

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977),
    *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368 ............................................................. 13
S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978),
    *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 ........................................................... 13

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-34    Filed 02/20/24    Page 264 of 1104    PageID 16398
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1545 of 1803    PageID 12291
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 7 of 68

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") files this memorandum of law (this "<u>Memorandum</u>") in support of confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as Modified) (the "<u>Plan</u>").[2] Concurrently herewith, the Debtor has filed its *Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "<u>Omnibus Reply</u>"), which addresses and responds to the each of objections to confirmation of the Plan.[3]

### **<u>Preliminary Statement</u>**

1.      After fourteen long months in a chapter 11 process that has often times been contentious between the Debtor, the Committee, and the estate's largest creditors, the Debtor seeks confirmation of its Plan that enjoys the support of the Committee and virtually all of its non-affiliated creditors.  As the Debtor told the Court when it approved the installation of the Independent Board on January 9, 2020, the new Board intended to change the culture of litigation that was the Debtor's trademark prepetition.  While the negotiations have been difficult and testy at times, the Debtor successfully resolved its disputes with the Redeemer Committee, Acis and HarbourVest and has reached settlements in principal with UBS—an accomplishment that seemed impossible a few months ago.  In fact, the Plan is supported by the holders of approximately 95% of creditors who collectively hold $345 million in claims against the estate that voted on the Plan.  In accomplishing these goals, the Independent Board has resolved litigation that has been pending in some cases for over a decade and in several courts, including

---

[2] Unless otherwise noted, capitalized terms used in this Memorandum have the meanings ascribed in the Plan.

[3] To the extent that a party has raised a specific objection to the statutory provisions set forth in 1123 and 1129 of the Bankruptcy Code, those objections are addressed herein as part of the Debtor's *prima facie* showing that it has satisfied the statutory requirements to confirm the Plan.

Appellee Appx. 01539
Appx. 16740

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 186 Filed 12/27/23 Page 265 of 1104 PageID 16399
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1546 of 1803 PageID 12292
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 8 of 68

this Court in the Acis bankruptcy case, has positioned the Debtor to be able to put contentious litigation with legitimate creditors behind it and promptly monetize its assets and make distributions to general unsecured creditors. The Debtor worked extremely hard during the bankruptcy case to develop a "grand bargain" plan that would achieve a global resolution of all disputes between the Debtor, its creditors and Mr. Dondero. Unfortunately, such a plan was not attainable.

2.    What stands in the Debtor's way to confirmation of the Plan is a series of objections filed by Mr. Dondero and entities owned and/or controlled by him (collectively, the "Dondero Entities") and certain of the Debtor's current and ex-employees, two of whom the Debtor recently terminated for cause and others whose blind fealty to Mr. Dondero led them to vote against the Plan for no apparent economic reason. The common theme in all of the objections is not a desire for better treatment of creditors, which is not surprising since the objectors' economic interests in the Debtor are tenuous at best. Rather, the focus of the objections are challenges to Plan provisions, including the injunction, release and exculpation provisions, which will limit the Dondero Entities' ability to continue their litigation crusade against anyone who dared stand in Mr. Dondero's way long after the Plan has been confirmed. As the Court is aware from its experience, according to Mr. Dondero, no claim is too frivolous to be brought, no appeal too impossible to succeed and no court too far away in which to commence litigation. As will be discussed herein, the Court has the authority and jurisdiction to approve provisions in the Plan which will minimize the Dondero Entities' ability to harass parties with vindictive litigation designed to interfere with post-confirmation efforts. For the

Appellee Appx. 01540
APPX. 16742

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/28/23    Page 266 of 1104    PageID 16400
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1547 of 1803    PageID 12293
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 9 of 68

Court's convenience, attached as **Exhibit A** hereto is a chart that sets for the relationships between the various Dondero Entities.

3.      As more fully set forth in the Omnibus Reply, and as summarized on **Exhibit B** hereto, the Dondero Entities' interests in this case arise primarily from their direct and indirect equity interests in the Debtor.  While certain of the Dondero Entities assert claims against the Debtor, those claims either arise out of their equity interests that the Debtor will seek to subordinate under Section 510 of the Bankruptcy Code or are frivolous claims that target certain conduct of the Independent Directors.  Other Dondero Entities object to the Debtor's attempt to assume certain executory contracts to which they are not a party and lack standing to do so.  Accordingly any objections to the Plan based upon the treatment of claims or the manner in which assets are proposed to be monetized post-confirmation are a smokescreen.

4.      Moreover, any argument that the Dondero Entities are seeking to protect the value of their equity interests is specious.  Mr. Dondero has told the Court on numerous occasions that his so-called "pot plan" proposal to acquire substantially all of the assets of the Debtor for $160 million (which is really $130 million because the proposal acquires approximately $30 million of the Debtor's cash) fairly values the Debtor's assets.  Accordingly, under Mr. Dondero's own assumptions, equity is out of the money as the total amount of allowed claims in this case exceeds Mr. Dondero's valuation by a factor of more than two.  The only way creditors in the Debtor's estate will receive full payment on account of their claims—a prerequisite to any distributions to the Dondero Entities' indirect equity interests and related claims arising from such interests—would be for the Estate to monetize its multiple claims against the Dondero

DOCS_SF:104703.16 36027/002

Appellee Appx. 01541
APPX. 16743

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 267 of 1104    PageID 16401
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1548 of 1803    PageID 12294
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 10 of 68

Entities for well in excess of $100 million.  It is through this lens that the Court should view the Dondero Entities' confirmation objections.

5.        The hard-fought victories obtained by the Debtor in negotiating the settlement of substantially all of the litigation that has plagued it for years should not be singularly undone by the Dondero Entities and his army of loyal employees and ex-employees.  Mr. Dondero should not be allowed to use this Court and his frivolous litigation to upend the settlements achieved to date by the Debtor.  The Plan should be confirmed to allow the Reorganized Debtor and the Claimant Trustee to complete the process of winding down the Debtor's assets, satisfying creditor claims, and implementing the other wind-down provisions of the Plan without interference by the Dondero Entities.

**Background**

**I.   Procedural Background**

6.        On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7.        On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

8.        On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[4]

---

[4] All docket numbers refer to the docket maintained by this Court.

Appellee Appx. 01542
APPX. 01743

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Page 1255 of 1804    Page 268 of 1104    PageID 16402
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1549 of 1803    PageID 12295
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 11 of 68

9.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case. However, on January 9, 2020, the Court entered its *Order Approving Settlement With Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] pursuant to which the Court approved the appointment of an Independent Board of Directors for Strand Advisors, Inc., the general partner of the Debtor (the "Settlement Order").  On July 16, 2020, the Court entered its *Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(A) and 363(B) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 854], pursuant to which James Seery, Jr., was approved as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.

10.      On November 24, 2020, the Bankruptcy Court entered the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling a Hearing to Confirm the Fifth Amended Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; And (E) Approving Form and Manner of Notice* [D.I. No. 1476] (the "Disclosure Statement Order").  The Disclosure Statement Order approved the Disclosure Statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-86    Filed 12/21/23    Page 269 of 1104    PageID 16403
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1550 of 1803    PageID 12296
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 12 of 68

and also approved, among other things, the proposed procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").

11.    The deadline for all Holders of Claims and Equity Interests entitled to vote on the Plan to cast their ballots and the deadline to file objections to confirmation of the Plan was January 5, 2021, at 5:00 p.m. (prevailing Central Time) subject to extension by the Debtor, in its discretion (the "Voting Deadline").  On January 19, 2021, the Debtor filed the Voting Report, which is summarized below.  The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled for January 26, 2021, at 9:30 a.m. (prevailing Central Time).[5]

**II.  Solicitation and Notification Process.**

12.    In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims and Equity Interests in Impaired Classes receiving or retaining property on account of such Claims or Equity Interests were entitled to vote to accept or reject the Plan.[6] Holders of Claims and Equity Interests were not entitled to vote if their rights are Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code).[7]  The voting results, as reflected in the Voting Report, are summarized as follows:

---

[5] The Confirmation Hearing was initially scheduled to take place on January 13, 2021, but was continued by the Bankruptcy Court at the Debtor's request.

[6] *See* 11 U.S.C. § 1126.

[7] There were no Impaired Classes of Claims or Equity Interests conclusively deemed to reject the Plan pursuant section 1126(g) of the Bankruptcy Code.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01544
APPX. 16746

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/23/21    Page 270 of 1104    PageID 16404
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1551 of 1803    PageID 12297
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 13 of 68

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) |
|---|---|---|---|---|
| Class 2 Frontier Secured Claim | $5,209,963.62 (100%) | 1 (100%) | $0 (0%) | 0 (0%) |
| Class 7 Convenience Claims | $2,765,906.51 (100%) | 14 (100%) | $0 (0%) | 0 (0%) |
| Class 8 General Unsecured Claims[8] | $301,826,418.36 (93.54%) | 12 (27.9%) | $20,833,059.67 (6.46%) | 31 (72.10%) |
| Class 9 Subordinated Claims | $35,000,000 (100%) | 6 (100%) | $0 (0%) | 0 (0%) |
| Class 10 B/C Limited Partnership Interests | None | None | None | None |
| Class 11 Class A Limited Partnership Interests | 0% | 0% | $100% | 100% |

13.    <u>Class 2</u>.    Class 2 consists of one member (Frontier Secured Claim) and this creditor voted to accept the Plan.

14.    <u>Class 7</u>.    Class 7 consists of the Convenience Claims.  100% of the fourteen valid members of Class 7 each voted to accept the Plan.[9]  The votes of the Senior Employees—Mr. Ellington and  Mr. Leventon—who attempted to partially vote certain Claims in Class 7 and

---

[8] The Debtor recently settled the objections filed by Senior Employees Thomas Surgent and Frank Waterhouse, who previously were included in the Senior Employee Objection. Mssrs. Surgent and Waterhouse have each agreed to execute the Senior Employee Stipulation and to vote their Class 7 and Class 8 Claims to accept the Plan.  This chart reflects the results of the voting report filed with Court on January 19, 2021 [D.I. 1772] and does not reflect the subsequent settlements with Mssrs. Surgent and Waterhouse and their acceptance of the Plan.

[9] In accordance with the Voting Procedures Order, the Debtor accepted the late vote of Siepe Systems (which was cast on the Voting Deadline, but after the 5:00 Central Time cut off).  The Debtor also accepted the late votes of each of: (i) Stinson Leonard Street, who also voted to accept the Plan on January 14, 2021, and (ii) the HarbourVest entities, who were entitled to both Class 8 General Unsecured Claims and Class 9 Subordinated Claims pursuant to the Court's allowance of these claims at a hearing conducted on January 14, 2021 [D.I. 1788] with respect to the compromise of HarbourVest's claims against the Debtor, as explained below.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01545
APPX. 10747

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/23/21 1804   Page 271 of 1104   PageID 16405
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1552 of 1803   PageID 12298
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 14 of 68

other Claims in Class 8—should be disallowed for the reasons more specifically addressed in the Omnibus Reply.  However, regardless of the invalid votes cast by the Senior Employees are counted, Class 7 Convenience Claims have accepted the Plan in both requisite dollar amount and voting number.  First, each of these two "Senior Employees"[10] filed unliquidated proofs of claim with the Bankruptcy Court, yet are attempting to split their claims between Class 7 and Class 8 without having executed the Senior Employee Stipulation and in violation of the Plan, the Voting Procedures Order, and applicable law.  Second, even if the Senior Employees were deemed to hold separate, liquidated claims on account of their asserted annual bonus and deferred compensation claims that could be split from their Class 8 Claims, the Plan's Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim for voting purposes.  A valid election of the Convenience Class Election would only entitle the electing creditor to receive the <u>treatment</u> under Class 7, not to vote its claim in that class.  *See* Plan, §1.B.43.

15.    Class 8.  Over 93% of the dollar amount of Class 8 Claims voted to accept the Plan.  However, more than 50% of the holders of Class 8 Claims did not accept the Plan as a result of the votes cast by approximately 27 employees holding contingent claims (including the split Class votes cast by Mssrs. Ellington and Leventon[11]) to reject the Plan.  The contingent claims of the Debtor's other employees that voted against the Plan are (i) in respect to the

---

[10] As the Court is aware, the Debtor terminated the employment of both Mssrs. Ellington and Leventon on January 5, 2021 and these individuals are no longer employees of the Debtor.

[11] As noted above, the Debtor has agreed to a settlement of the Senior Employee Objection with respect to Mr. Surgent and Mr. Waterhouse, each of whom will vote their claims to accept the Plan.

DOCS_SF:104703.16 36027/002

**Appellee Appx. 01546**
**APPX. 16747**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/29/23 Page 272 of 1104    PageID 16406
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1553 of 1803    PageID 12299
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 15 of 68

unvested claims under the Debtor's deferred compensation bonus plan[12] for amounts that would not be payable, if at all, until May 2021 and May 2022 and would only be payable if such employees were employed as of those vesting dates, which they will not be; and (ii) PTO Claims, which are unimpaired and treated by either Class 4 (PTO Claim) or Class 6 (Priority Non-Tax Claims).

16.    Class 9.    Class 9 consists of the subordinated claims of HarbourVest that were allowed pursuant to the Court's granting of the *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion") at a hearing conducted on January 14, 2021, pursuant to which HarbourVest was granted both allowed Class 9 Claims in the aggregate amount of $35 million and Allowed Class 8 Claims in the amount of $45 million with respect to the claims filed by HarbourVest.[13]    The HarbourVest Subordinated Claims are the only current members of Class 9.    Although Class 9 has unanimously accepted the Plan, the Debtor is not asserting that Class 9 constitutes the accepting impaired class of claims,

---

[12] On January 14, 2021, the Debtor terminated its annual bonus plan.  The Debtor's employees previously held contingent claims under the annual bonus plan for amounts that would have vested in February 2021 and August 2021 (subject to the employee remaining employed as of those dates and other conditions) and replaced it with a proposed retention plan that is subject of the Debtor's *Motion of the Debtor for Entry of an Order Authorizing the Debtor to Implement a Key Employee Retention Plan with Non-Insider Employees and Granting Related Relief* filed on January 20, 2021.  These employees (except for Mssrs. Surgent, Waterhouse, Ellington and Leventon, who were not paid any postpetition amounts with respect to either bonus plan) were paid the vested amounts owed to them under the annual bonus plan and deferred bonus plan, as applicable, in the ordinary course of business and in accordance with *the Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related relief* [D.I. 380] entered on January 22, 2020.  Thus, the Debtor's non-Senior Employees no longer have any contingent claims under the now-terminated annual bonus plan because they have already been paid their vested amounts.

[13] The $345 million claims estimate includes the claim of UBS Securities, LLC which has been allowed in the amount of $94,761,076 for voting purposes only.  As the Debtor has informed the Court, the Debtor has reached an agreement in principal with UBS to resolve its claims which agreement is subject to internal approvals at UBS and documentation.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 12/29/23   Page 273 of 1104   PageID 16407
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1554 of 1803   PageID 12300
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 16 of 68

exclusive of insiders, required to cram down the Plan pursuant to section 1129(b) of the Bankruptcy Code, as discussed below in the cramdown section of the Memorandum.

17.     Several objections address the mechanics of how Class 9 Claims may be subordinated and the scope of any such subordination.  Mr. Dondero, Dugaboy, NexBank, and NexPoint each argue that section III.J of the Plan provides "no mechanism, hearing requirement or deadline" to subordinate claims.   Dondero Objection, at IV; NexPoint Objection, at 7; NexBank Objection at II.A.

18.     Section III.J of the Plan does not categorically subordinate claims.  Rather, Class 9 provides that holders of Subordinated Claims will receive the treatment provided to General Unsecured Claims unless they are subordinated either pursuant to an order of the Court upon notice to the relevant party or otherwise consensually.  In other words, the Debtor, Reorganized Debtor or Claimant Trustee must obtain an order from the Bankruptcy Court subordinating the subject Claim.  To the extent the Bankruptcy Court orders subordination of the Claim, it will receive the treatment provided for Class 9 Subordinated Claims.  If no subordination order is obtained, then the Claim will receive the treatment afforded to Class 8 General Unsecured Claims.  To illustrate this point, the vote cast by Raymond Joseph Dougherty as a Class 9 Subordinated Claim should be tabulated in Class 8 because there is no order or agreement with this creditor to subordinate his claims to those of Class 8 General Unsecured Claims.  As discussed below, the Plan is being amended to clarify this treatment.   Thus, the Plan does not afford the Debtor (or any other party) with the discretion to subordinate claims on their own. This determination will be made by the Court.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Exhibit 36   Page 1256 of 1804   Page 274 of 1104   PageID 16408
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1555 of 1803   PageID 12301
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 17 of 68

19.     In order to clarify the treatment and procedure to subordinate claims, the Debtor

has made the following amendments to the Plan.  Section III.J of the Plan has been amended

with the bolded language below to clarify the requirement of an opportunity for a hearing with

respect to any proceeding to subordinate any claims:

> Under section 510 of the Bankruptcy Code, upon written notice **and hearing,** the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to **seek entry of an order by the Bankruptcy Court** to re-classify or to ~~seek to~~ subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan.

20.     In addition, the Debtor has amended the treatment of Subordinated Claims in

Section III.H.9 of the Plan to only treat claims that are or have been subordinated under section

510 of the Bankruptcy Court order entered by the Bankruptcy Court and which fall within the

Plan definition of Subordinated Claims:

> *Treatment*:  On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.
>
> ~~*Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.~~

21.     In response to Mr. Dondero's objection asserting the lack of a time period to

commence proceedings to subordinate Claims, the Debtor has amended the Plan to clarify that

the timing by which parties in interest may object to the allowance of a potentially Subordinated

Appellee Appx. 01549
APPX. 16580

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6-6 Filed 12/27/23 18 Page 275 of 1104 PageID 16409
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1556 of 1803 PageID 12302
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 18 of 68

Claim and seek to have the claim treated as a Class 9 Subordinated Claim is now included in the

Claims Objection Deadline by the addition of the bolded language to Section VII.B of the Plan.

> Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, **request the Bankruptcy Court subordinate any Claims to Subordinated Claims**, or any other appropriate motion or adversary proceeding with respect ~~thereto which shall be litigated to Final Order~~ **to the foregoing by the Claims Objection Deadline**, or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court…

22. Finally, the limited objection to the Plan filed by Jack Yang and Brad Borud [D.I.

1666] and joined by Deadman, Travers and Kaufmann [D.I. 1674, 1679] also objects to the Plan

definition of "Subordinated Claims" and asserts that the Plan is not permissible under

Bankruptcy Code section 510 to the extent it intends to subordinate any and all claims of partners

of the Debtor, including claims "solely in respect of compensation owed to such person for their

services as an employee." The Plan does not intend to categorically subordinate these claims or

expand the reach of section 510 of the Bankruptcy Code. However, in order to clarify this

treatment and address the concerns raised by these individuals, the Plan has been amended as set

forth below.

> "Subordinated Claim" means any claim that ~~(i)~~ is ~~or may be~~ subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or order entered by ~~Final Order of~~ the Bankruptcy Court ~~or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest~~.

23. <u>Class 10 and Class 11</u>. Class 10 and 11 consist of the separate classes of Equity

Interests in the Debtor owned by affiliates of Mr. Dondero. Class 10 did not cast a vote to accept

or reject the Plan. Class 11 voted to reject the Plan.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/20/23   Page 276 of 1104   PageID 16410
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1557 of 1803   PageID 12303
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 19 of 68

24.     As explained more fully below, the Debtor may confirm the Plan pursuant to the cram down provisions of 1129(b) of the Bankruptcy Code notwithstanding the rejection and/or non-acceptance of the Plan by Classes 8, 10 and 11.

<u>**Argument**</u>

25.     To confirm the Plan, the Bankruptcy Court must find that the Debtor has satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[14]  As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law.  The Plan is supported by voting creditors holding $345 million in claims consisting of approximately 95% of the claims in this case.  As set forth in this Memorandum and based upon the evidence that will be presented at the Confirmation Hearing, the Debtor will satisfy the evidentiary requirements necessary to confirm the Plan.  The Debtor thus respectfully requests that the Bankruptcy Court confirm the Plan.

**III.    The Plan Satisfies Each Requirement for Confirmation.**

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

26.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[15]  The principal goal of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[16]  Accordingly, the determination of

---

[14] *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).

[15] 11 U.S.C. § 1129(a)(1).

[16] *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01551
APPX. 16802

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/29/23    Page 277 of 1104    PageID 16411
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1558 of 1803    PageID 12304
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 20 of 68

whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

27.     Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining how to classify claims.[17]

28.     The Plan's classification of Claims and Equity Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity Interests into a number of separate Classes, with each Class differing from the Claims and Equity Interests in each other Class in a legal or factual nature or based on other relevant criteria.[18]  Specifically, the Plan provides for the separate classification of Claims and Equity Interests into the following Classes:

> Class 1: Jefferies Secured Claim;
>
> Class 2: Frontier Secured Claim
>
> Class 3: Other Secured Claims;
>
> Class 4: Priority Non-Tax Claims;

---

[17] *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that section 1122 is broadly permissive of any classification scheme that is not specifically proscribed, and that substantially similar claims may be separately classified where separate classification has a basis independent of the plan proponent's efforts to secure a class of claims that will accept the plan).

[18] Plan, Art. III.

14

Appellee Appx. 01552
APPX. 16304

Case 19-34054-sgj11  Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/30/23   Page 278 of 1104   PageID 16412
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1559 of 1803   PageID 12305
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 21 of 68

Class 5: Retained Employee Claims;

Class 6: PTO Claims;

Class 7: Convenience Claims;

Class 8: General Unsecured Claims;

Class 9: Subordinated Claims;

Class 10: Class B/C Limited Partnership Interests; and

Class 11: Class A Limited Partnership Interests.

29.     Claims and Equity Interests assigned to each particular Class described above are substantially similar to the other Claims or Equity Interests in such Class.  Valid business, legal, and factual reasons justify the separate classification of the particular Claims or Equity Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Equity Interests.  For example, the PTO Claims in Class 6 relate solely to claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims.  The treatment of the unsecured Convenience Claims in Class 7 is to allow holders of eligible and liquidated claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's claim or such holders *pro rata* share of the Convenience Claims Cash Pool.  The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01553
APPX. 16304

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 12/23/23   Page 279 of 1104   PageID 16413
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1560 of 1803   PageID 12306
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 22 of 68

30.     Section III.C of the Plan provides for the elimination of classes that do not have a least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for purposes "of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class." Plan, § III.D.  The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan.

31.     Mr. Dondero objects to the elimination of the "vacant" Class provision in Article III.C because such elimination would not provide for treatment of a Claim that may be later classified in vacant class.  Dondero Objection, at IV.14.  However, the reference to vacant Classes in Article III.C refers only to the tabulation of votes cast to accept or reject the Plan, not to the treatment of claims that may later be classified in a class even if there were no voting members as of the Confirmation Hearing.  For example, Class 5 (Retained Employee Claims) does not have any voting members because the existence of any Claims in this Class would not arise except for any current employees of the Debtor who will be employed on the Effective Date.  Plan, § I.B.116.  Thus, Class 5 is disregarded solely for purposes of determining whether or not the Plan has been accepted or rejected under Section 1129(a)(8) of the Bankruptcy Code because there are no current members in that Class.  However, the Plan may treat Claims that may eventually become members of Class 5 post-confirmation.

32.     The Debtor submits that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.  Each of these categories of Claims and Equity Interests have distinct

DOCS_SF:104703.16 36027/002

Appellee Appx. 01554
APPX. 16806

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-36 Filed 12/22/23 Page 280 of 1104 PageID 16414
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1561 of 1803 PageID 12307
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 23 of 68

rights under the Plan (and applicable non-bankruptcy law), and the Debtor has a valid business justification for the respective treatments of the Classes of Claims and Equity Interests. The Plan's classifications not only serve the purpose of facilitating ease of distributions on the Effective Date but also acknowledge the fundamental differences between those types of Claims and Equity Interests. For the foregoing reasons, the Plan satisfies section 1122 of the Bankruptcy Code.

**2.      The Plan Satisfies the Seven Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

33.     The applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan. The Plan satisfies each of these requirements.

34.     <u>Specification of Classes, Impairment, and Treatment</u>. The first three requirements of section 1123(a) are that a plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise nature of their treatment under the plan.[19] The Plan sets forth these specifications in detail in satisfaction of these three requirements in Article III.[20]

35.     <u>Equal Treatment</u>. The fourth requirement of section 1123(a) is that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." The Plan meets this

---

[19] 11 U.S.C. § 1123(a)(1)-(3).

[20] Plan, Art. III.A–B.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 12/23/23    Page 281 of 1104    PageID 16415
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1562 of 1803    PageID 12308
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 24 of 68

requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such Holders' respective Class.  Thus, the Plan satisfies section 1123(a)(4).[21]

36.    Mr. Daugherty and the Senior Employees each argue that the Plan does not satisfy Bankruptcy Code section 1123(a)(4).  Mr. Daugherty asserts that the Plan provides for different treatment of Disputed Claims versus Allowed Claims, and therefore provides disparate treatment in violation of Section 1123(a)(4) of the Bankruptcy Code.  This is not correct because the Plan provides for the same <u>treatment</u> of claims within a particular class.  The Disputed Claims Reserve shall reserve funds for the potential allowance of Claims that are not allowed at the time the Claimant Trustee makes distributions.[22]  The Disputed Claims Reserve also does not allow the Debtor to unilaterally determine the amount of any reserve; that will be decided by the Bankruptcy Court absent agreement by the relevant parties.  The Debtor—or any holder of a Disputed Claim—may file a motion with the Bankruptcy Court and request that the Claimant Trustee set aside a specific amount in the Disputed Claims Reserve pending the ultimate allowance/disallowance of the Claim.

---

[21]  *See In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("[s]ection 1123(a)(4) does not require precise equality, only approximate equality"; and"); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d. Cir 2013) (same); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("[T]he 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money.").

[22] The Plan provides that the Disputed Claims Reserve amount is either (1) the amount set forth on either the Schedules or applicable Proof of Claim; (2) the amount agreed by the Holder of the Disputed Claim and the Reorganized Debtor or Claimant Trustee; (3) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim, or (4) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.  *See* Plan, § 1.B.49.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01556
APPX. 10807

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/04/23   Page 282 of 1104   PageID 16416
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1563 of 1803   PageID 12309
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 25 of 68

37.     Mr. Daugherty's suggestion that the Bankruptcy Court's estimation of disputed claims for purposes of establishing a Disputed Claims Reserve somehow constitutes disparate treatment of similarly classified claims is also devoid of merit.  Mr. Daugherty's argument would effectively mean that the Debtor would have to set aside the asserted amount of any Disputed Claim, regardless of how specious it may be, until the claim is ultimately resolved pursuant to a final order.  Such a requirement would essentially provide a creditor with a stay pending appeal of the ultimate of allowance of the claim.  Moreover, such a requirement would effectively prevent the Debtor from distributing <u>any</u> portion of the reserved funds to holders of Allowed Claims until the Disputed Claim is litigated to final order of the Supreme Court or such other applicable court of last resort—a process that could take years, and as evidenced by the length of time of the pending litigation in this case already waged by Mr. Daugherty, Mr. Dondero and others.  If Mr. Daugherty—or any creditor—believes the Debtor's proposed estimate for its Disputed Claim is insufficient, Mr. Daugherty has an adequate remedy under the Plan and can request that the Bankruptcy Court estimate a sufficient amount for deposit into the Disputed Claims Reserve to satisfy his Claim to the extent it is ultimately Allowed.

38.     The Senior Employees argue that the Plan violates section 1123(a)(4) because the Senior Employees are treated differently than other employees in that they are required to sign the Senior Employee Stipulation in order to obtain the benefit of the Debtor's release provided in Section IX.D.  This assertion is patently false and conflates treatment of claims within a Class with the Debtor's voluntary release of <u>its own</u> claims and causes of action.  First, the treatment of all Class 8 Claims for the Debtor's employees is the same and nothing in the Plan provides for

DOCS_SF:104703.16 36027/002

Appellee Appx. 01557
Appx. 16809

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-84   Filed 12/05/23   Page 283 of 1104   PageID 16417
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1564 of 1803   PageID 12310
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 26 of 68

any disparate or different treatment.  Any affirmative claims that belong to the Debtor against the

Senior Employees (and other parties) are irrelevant to the claims held by creditors against the

Debtor and treated by the Plan.  The Plan provides that in order to obtain the benefit of the

Debtor release, the Debtor's employees must provide sufficient consideration to obtain this

release.  They do not get it for free—this issue was substantially argued before this Court at prior

hearings.[23]  One of the conditions of obtaining the Debtor release for the Senior Employees is

that they would be required to execute the Senior Employee Stipulation (in addition to the

fulfilling the other Plan requirements of the Debtor's release of employee claims) to provide

consideration for the release of claims against these high level Senior Employees, two of whom

were recently terminated for cause.  As the Debtor's counsel explained at the Disclosure

Statement Hearing conducted on November 23, 2020, the decision to purchase the Debtor release

and execute the Senior Employee Stipulation (or not) rested with each Senior Employee, but has

no nexus to the treatment of claims of the Senior Employee against the Debtor.[24]

---

[23] The limitations on the release of all Employees (including the Senior Employees) is also intended to address the Bankruptcy Court's concerns on this issue articulated at the first Disclosure Statement Hearing on October 27, 2020, and at a hearing held on October 28, 2020.

"With regard to these releases—and they are, I'll just be clear, Debtor releases, not third parties releasing third parties.  But nevertheless, you know, I think there's an issue thereof they would need to be fair and equitable, in the best interest of creditors, and in the paramount interest of creditors would be something the Court would focus on there . . .  This is not your normal case where this is the type of provision you see in many, many, many Chapter 11 plans."  Transcript of Proceedings Conducted on October 27, 2020; pg 32, lines 10-20.

[24] As explained at the Disclosure Statement Hearing by Debtor's counsel:

"With respect to senior employees—who include Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent—if they want to obtain a release, and there's no requirement that they agree, they must also execute what we refer to as the Senior Employee Stipulation, which is included in the supplement, in order to receive their release.  If they execute that stipulation, they would receive their release.  If they don't execute that stipulation, they wouldn't."  Transcript of Proceedings Conducted on November 23, 2021, pg 9, lines 12-19.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01558
APPX. 16309

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/26/23   Page 284 of 1104   PageID 16418
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1565 of 1803   PageID 12311
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 27 of 68

39.     Thus, there is no disparate treatment of Claims within each Class and the Plan does not violate section 1123(a)(4) of the Bankruptcy Code.

40.     <u>Adequate Means for Implementation</u>.  The fifth requirement of section 1123(a) is that a plan must provide adequate means for its implementation.[25]  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  Essentially, the Plan's various mechanisms provide for the Debtor's continued operation after the Effective Date, the monetization of the Debtor's remaining assets, and payment of the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, any residual value would then flow to the Debtor's equity security holders in accordance with the Bankruptcy Code's priority scheme.

41.     Article IV of the Plan, in particular, sets forth the means for implementation of the Plan with the establishment of:  (i) the Claimant Trust, (ii) the Litigation Sub-Trust; and (iii) the Reorganized Debtor.  The Claimant Trust Agreement provides for the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust and which will manage the Reorganized Debtor).[26]  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets and the management of the

---

[25] 11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include: retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.  *Id.*

As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor they are no longer eligible to execute the Senior Employee Stipulation.

[26] For the avoidance of doubt, the Reorganized Debtor's general partner will not be named "New GP LLC."  That name is simply a placeholder.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01559
APPX. 01560

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 12/07/23 1804age 285 of 1104    PageID 16419
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1566 of 1803    PageID 12312
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 28 of 68

Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.

42.     The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.  The Litigation Trustee is charged with pursuing any Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  Finally, the Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.  The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub Trust Agreement, and the Schedule of Retained Causes of Action.[27]  Thus, the Plan satisfies section 1123(a)(5).

43.     <u>Non-Voting Stock</u>.  The sixth requirement of section 1123(a) is that, with respect to a corporate debtor, a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.  The Debtor is a limited partnership and there not a corporation.[28]

44.     <u>Selection of Officers and Directors</u>.  Finally, section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity

---

[27] *See* Notices of Filing Plan Supplements [Docket Nos. 1389, 1606, 1656 and on January 22, 2021] (as modified, amended, or supplemented from time to time, the "<u>Plan Supplements</u>").

[28] *See* 11 U.S.C. § 101(9) (B) ("The term 'corporation' . . . does not include limited partnerships").

Appellee Appx. 01560
APPX. 16361

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Page 1268 of 1804   Page 286 of 1104   PageID 16420
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1567 of 1803   PageID 12313
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 29 of 68

security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[29]  The disclosure of the individuals to provide services to the Reorganized Debtor and entities created under the Plan and qualifications of these individuals is discussed below in section I.E of this Memorandum in conjunction with the Debtor's satisfaction of the provisions of section 1125(a)(5) of the Bankruptcy Code which overlap and address similar issues.

### B.     The Debtor Has Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

45.     Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. Case law and legislative history indicate this section principally reflects the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code,[30] which prohibits the solicitation of plan votes without a court-approved disclosure statement.[31]

### 1.     The Debtor Complied with Section 1125 of the Bankruptcy Code.

46.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[32]  Section

---

[29] 11 U.S.C. § 1123(a)(7).

[30] *See Cypresswood*, 409 B.R. at 424 ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

[31] 11 U.S.C. § 1125(b).

[32] *Id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01561
APPX. 10813

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Page 1569 of 1804    Page 287 of 1104    PageID 16421
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1568 of 1803    PageID 12314
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 30 of 68

1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so they may make an informed decision whether to approve or reject a plan.[33]

47.    Section 1125 of the Bankruptcy Code is satisfied here.    Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order.[34]    The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan.[35]    The Debtor, through the Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.    The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.    The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan.[36]

48.    Based on the foregoing, the Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

---

[33] *See Matter of Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[34] *See* Disclosure Statement Order [Docket No. 576].

[35] *See id.*

[36] *See id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01562
APPX. 16364

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Exhibit Page 288 of 1104   PageID 16422
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1569 of 1803   PageID 12315
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 31 of 68

### 2.    The Debtor Complied with Section 1126 of the Bankruptcy Code.

49.    Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[37]   Accordingly, the Debtor did not solicit votes on the Plan from the following Classes:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claims | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |

50.    The Debtor solicited votes only from Holders of Allowed Claims in Classes 2, 7, 8 and 9 and Equity Interests in Classes 10 and 11 (collectively, the "Voting Classes") because each of these Classes is Impaired and entitled to vote to accept or reject the Plan.[38]   The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[39]   Based on the foregoing, the Debtor has satisfied the requirements of section 1129(a)(2).

---

[37] See 11 U.S.C. § 1126.

[38] See Plan, Art. III. A–B.

[39] A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of section 1126, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of section 1126, that have accepted or rejected such plan. 11 U.S.C. § 1126(c). A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan. 11 U.S.C. §1126(d).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01563
APPX. 16365

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/29/23   Page 289 of 1104   PageID 16423
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1570 of 1803   PageID 12316
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 32 of 68

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 2 | Frontier Secured Claim | Impaired | Entitled To Vote |
| 7 | Convenience Claims | Impaired | Entitled To Vote |
| 8 | General Unsecured Claims | Impaired | Entitled To Vote |
| 9 | Subordinated Claims | Impaired | Entitled To Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled To Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled To Vote |

**C.      The Debtor Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

51.      Section 1129(a)(3) of the Bankruptcy Code requires that the proponent of a plan propose the plan "in good faith and not by any means forbidden by law."[40]  In assessing the good faith standard, courts in the Fifth Circuit consider whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[41]  A plan must also achieve a result consistent with the Bankruptcy Code.[42]  The purpose of chapter 11 is to enable a distressed business to reorganize and achieve a fresh start.[43]  Whether a plan is proposed in good faith must be determined in light of the totality of the circumstances of the case.[44]

52.      During the last several months, the Debtor has negotiated extensively with the Committee regarding all aspects of the Plan.  Such negotiations have been hard fought and intense. As the Court will recall, the Committee objected to approval of the Disclosure Statement

---

[40] 11 U.S.C. § 1129(a)(3).

[41] *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

[42] *See In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

[43] *See Sun Country Dev.*, 764 F.2d at 408 ("The requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start.").

[44] *See id.*; *see also Pub. Fin. Corp. v. Freeman*, 712 F.2d 219 (5th Cir. 1983); *Cypresswood*, 409 B.R. at 425.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/12/23    Page 290 of 1104    PageID 16424
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1571 of 1803    PageID 12317
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 33 of 68

at the initial Disclosure Statement hearing which objection resulted in a continuance of that hearing. In the subsequent weeks the Debtor and the Committee continued their negotiations and ultimately reached substantial agreement on the terms of the Plan prior to the November 23, 2020 Disclosure Statement hearing. The parties continued their negotiations over the subsequent weeks which resulted in the Plan currently before the Court for confirmation. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of Section 1129(a)(3).

53.    Moreover, the mechanical distributions contemplated under the Plan were proposed in good faith, are not prohibited by applicable law, and were crafted to efficiently monetize the Debtor's assets and pursue Causes of Action while bestowing the Claimant Trustee Oversight Committee with ultimate oversight over this process. The Plan provides for the transfer of the majority of the Debtor's Assets to the Claimant Trust. The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor. The Reorganized Debtor will be managed by New GP LLC—a wholly-owned subsidiary of the Claimant Trust. This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets. The Claimant Trust, the Litigation Sub-Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant

DOCS_SF:104703.16 36027/002

Appellee Appx. 01565
APPX. 10361

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-36   Filed 12/23/23   Page 291 of 1104   PageID 16425
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1572 of 1803   PageID 12318
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 34 of 68

Trust Agreement, or the Reorganized Limited Partnership Agreement.  The Plan also provides for the reconciliation and potential objection to Claims filed against the Debtor and a procedure to administer Disputed Claims.  Thus, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

      **D.**      **The Debtor is Seeking to Pay Certain Professional Fees and Expenses Subject to Bankruptcy Court Approval (Section 1129(a)(4)).**

54.      Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be approved by the Bankruptcy Court as reasonable or subject to approval by the Bankruptcy Court as reasonable.  The Fifth Circuit has held this is a "relatively open-ended standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.[45]  As to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[46]

55.      In general, the Plan provides that the Claims held by professionals retained by the Debtor or the Committee (the "<u>Professionals</u>") for their services and related expenses are subject to prior Court approval and the reasonableness requirements under sections 328 or 330 of the Bankruptcy Code.  Moreover, Article II.B of the Plan provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective

---

[45] *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 517-18 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

[46] *Id.* at 517.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01566
APPX. 10667

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Exhibit 6   Page 1574 of 1804   Page 292 of 1104   PageID 16426
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1573 of 1803   PageID 12319
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 35 of 68

Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.[47]  The Plan also provides for the establishment of the Professional Fee Escrow Account by the Claimant Trustee to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.  Plan, § I.B.101.  For the foregoing reasons, the Debtor submits that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

### E. The Debtor Has Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).

56.     The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[48]  It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[49]  Lastly, it requires that the plan proponent has disclosed the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider.[50]  Courts have held that these provisions ensure that the post-confirmation governance of a reorganized debtor is in "good hands."[51]

57.     The Plan provides that James P. Seery, Jr., the Debtor's current Chief Executive Officer, Chief Financial Officer and Foreign Representative, shall serve as the Claimant Trustee

---

[47] Plan. Art. II.B.

[48] 11 U.S.C. § 1129(a) (5)(A)(i).

[49] 11 U.S.C. § 1129(a)(5)(A)(ii).

[50] 11 U.S.C. § 1129(a)(5)(B).

[51] *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors").

DOCS_SF:104703.16 36027/002

Appellee Appx. 01567
APPX. 16369

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/15/23   Page 293 of 1104   PageID 16427
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1574 of 1803   PageID 12320
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 36 of 68

and Marc S. Kirschner shall serve as the Litigation Trustee. *See* Plan Supplement at Exhibits M
and O. Mr. Seery currently serves as the Debtor's Chief Executive Officer and Chief
Restructuring Officer and also serves as one of the Independent Directors. Mr. Seery shall be
paid $150,000 per month, for services rendered after the Effective Date and for his services as
Claimant Trustee, plus a success fee that shall be the subject of negotiation between him and the
Claimant Trust Oversight Committee post-Effective Date, which negotiation shall take place
within forty-five (45) days after the Effective Date. Finally, the Claimant Trust Agreement
discloses the five members of the Claimant Trust Oversight Committee, which consists of:
(1) Eric Felton, as representative of the Redeemer Committee; (2) Josh Terry, as representative
of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of
Meta-e Discovery; and (5) David Pauker. *See* Plan Supplement at Exhibits A, M, and N.

58. HCMFA's objection asserts that "neither the identity nor the compensation of the
people who control and manage the Reorganized Debtor is provided, much less as to who may
be a Sub-Servicer." HCMFA Objection ¶ 74. The identity of the individuals who will manage
the Reorganized Debtor, the Claimant Trust, and Litigation Sub-Trust are set forth above, along
with the proposed compensation for any insider. Moreover, the Claimant Trust Agreement
provides that the Claimant Trustee "shall engage professionals from time to time in conjunction
with the services provided hereunder. Claimant Trustee's engagement of such professionals
shall be approved by a majority of the Oversight Committee as set forth in Section 3.3(b) [of the
Claimant Trust Agreement]." Claimant Trust Agreement, § 3.13(b).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01568
APPX. 16379

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/26/23    Page 294 of 1104    PageID 16428
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1575 of 1803    PageID 12321
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 37 of 68

59.     In addition to satisfying the disclosure requirements of Bankruptcy Code section 1125(a)(5), the appointment of Messrs. Seery, Kirschner and the members of the Claimant Trust Oversight Committee is consistent with the interests of creditors and equity security holders and with public policy pursuant to section 1123(a)(7) of the Bankruptcy Code.  As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020.  As set forth in the CEO/CRO Motion, Mr. Seery has extensive management and restructuring experience.  Mr. Seery recently served as a Senior Managing Director at Guggenheim Securities, LLC, where he was responsible for helping direct the development of a credit business.  Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, where he was responsible for originating, executing, and managing stressed and distressed credit investments.  Mr. Seery is also a long-time attorney licensed to practice in New York who has run corporate reorganization groups and numerous restructuring matters.  He also served as a Commissioner of the *American Bankruptcy Institute's Commission to Study the Reform of Chapter 11*.  Mr. Seery was also a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business where he was responsible for managing the firm's investment grade and high yield loans business, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management and restructuring.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for the management of distressed corporate debt investments and was a key member of the small team that successfully sold Lehman Brothers to Barclays in 2008.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01569
APPX. 16320

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Page 1577/2of 1804age 295 of 1104    PageID 16429
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1576 of 1803    PageID 12322
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 38 of 68

60.     In addition to his ample qualifications, as the Court is aware from the numerous times Mr. Seery has testified before the Court, Mr. Seery has made substantial demonstrative contributions to the success of this chapter 11 case through both the resolution of the Debtor's pending litigation claims and the development of the Plan.  In his roles with the Debtor, he is familiar with the Debtor's operations and its business as well as the Claims that will be treated under the Plan.  Accordingly, it is reasonable to continue his employment post-emergence as the Claimant Trustee, subject to the supervision of the Claimant Trust Oversight Committee, which is comprised of several of the largest creditors of the Debtor, including UBS, Redeemer Committee and Acis, as well as Meta-e, all of whom currently serve on the Committee.

61.     Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particular with respect to his prior experience as a litigation trustee.  He serves as the trustee for:  the Tribune Litigation Trust; Millennium Health Corporate Claim and Lender Claims Trusts; and the Nine West Trust.  He is currently a Senior Managing Director at Goldin Associates, LLC specializing, among other things in, restructuring advisory, valuation, solvency/fraudulent conveyance issues.  He is also a member of the American College of Bankruptcy.  Mr. Kirschner was also a partner and the former head of the New York Restructuring of the global law firm of Jones Day.  Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter.[52]  In addition, Mr. Kirchner

---

[52] Mr. Kirschner will receive support services from his consulting firm, Teneo.  Teneo will provide services at a 10% discount from their rates. Teneo has agreed to freeze their rates in effect for 2021 through the end of 2022. Teneo shall also be entitled to reimbursement of expenses.

Appellee Appx. 01570
APPX. 16572

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Page 1257 of 1804   Page 296 of 1104   PageID 16430
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1577 of 1803   PageID 12323
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 39 of 68

will receive a 1.50% fee of any "Net Litigation Trust Proceeds"[53] up to $100 million, and an additional 2% fee of any Net Litigation Trust Proceeds in excess of $100 million.

62.     As noted above, four of the members of the Claimant Trust Oversight Committee are the holders of most of the largest Claims against the Debtor and current members of the Committee.  Each of these creditors have actively participated in the Debtor's case both through their roles as Committee members and in their separate capacities as individual creditors. They are therefore familiar with the Debtor, its operations and assets.

63.     The fifth member of the Clamant Trustee Oversight Committee, David Pauker, is a restructuring advisor and turnaround manager with more than 25 years of experienced advising public and private companies and their investors.  Mr. Pauker is a fellow of the American College of Bankruptcy.   Mr. Pauker has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies and private investor parties, including Lehman Brothers, Monarch Capital, Government Development Bank Debt Recovery Authority of Puerto Rico, MCorp, Refco, and Residential Capital.  Mr. Pauker, who will be the only paid member of the initial Claimant Trust Oversight Board, will be paid $250,000 for the first year of his service and $150,000 per year thereafter.  The Plan therefore satisfies the requirements of Bankruptcy Code

---

[53] Net Litigation Trust Proceeds is defined as gross Litigation Trust proceeds, less Teneo and Litigation Trust counsel hourly fees, expert witness, e-discovery, court and discovery expenses.  Gross recoveries are not to be reduced by the cost of insurance, tax accounting work which would be outsourced, potential contingency fees, or litigation funding financing and/or related contingent fee charges.

Appellee Appx. 01571
APPX. 16372

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/29/23    Page 297 of 1104    PageID 16431
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1578 of 1803    PageID 12324
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 40 of 68

sections 1129(a)(5) and 1123(a)(7) with respect to the individuals responsible for the post-confirmation administration and oversight of the Reorganized Debtor.

**F.    The Plan Does Not Require Government Regulatory Approval of Rate Changes (Section 1129(a)(6)).**

64.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan.  No such rate changes are provided for in the Plan.  Thus, section 1129(a)(6) of the Bankruptcy Code is inapplicable to this chapter 11 case.

**G.    The Plan Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).**

65.    The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[54]  The best interests test applies to each non-consenting member of an impaired class, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[55]

66.    As demonstrated in the liquidation analysis and financial projections attached to the Disclosure Statement as Exhibit C (the "Liquidation Analysis"), which was prepared by the

---

[54] 11 U.S.C. § 1129(a) (7).

[55] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n. 23 (5th Cir. 1988) (stating that under section 1129(a)(7) of the Bankruptcy Code a bankruptcy court was required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

DOCS_SF:104703.16 36027/002

**Appellee Appx. 01572**
**APPX. 16324**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 12/30/23   Page 298 of 1104   PageID 16432
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1579 of 1803   PageID 12325
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 41 of 68

Debtor with the assistance of its advisors, all Holders of Claims and Equity Interests in all Impaired Classes will recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.[56]  Specifically, the projected recoveries under the Plan and the results of the Liquidation Analysis for Holders of Claims estimates a 92.51% distribution to holders of general unsecured claims under the Plan compared to an estimated 66.14% distribution under a hypothetical liquidation of the Debtor.[57]

67.    Mr. Dondero argues that the Plan fails to satisfy the requirements of Bankruptcy Code section 1129(a)(7) due to "lack of appropriate sale procedures for post-confirmation operations" and because there is no oversight or predetermined procedures to ensure that the liquidation of the Debtor's assets is both value maximizing and transparent.  *See* Dondero Objection, ¶10.  Dugaboy—Mr. Dondero's family trust—filed a similar objection and asserts that the absence of reporting requirements to the beneficial holders of Claimant Trust, lack of oversight on the Claimant Trustee's ability to liquidate assets violates section 1129(a)(7) and that a chapter 7 trustee would require to obtain court approval to effect the same sales.  Dugaboy also argues that the Claimant Trustee's limitation of liability only applies to gross negligence and willful misconduct, so that the Claimant Trustee cannot be held liable for breach of fiduciary duty and, therefore, derives great protections than a hypothetical chapter 7 trustee would have.

---

[56] *See* Disclosure Statement Ex. C.

[57] *See* Disclosure Statement Ex C.  With respect to the other impaired classes of Claims and Equity Interests, the Liquidation Analysis projects a 100% distribution on account of the Class 2 Frontier Secured Claim under either scenario and projects no distributions holders of Class 9 Subordinated Claims, Class 10 Class B/C Limited Partnership Interests and Class 11 Class A Limited Partnership Interests either under the Plan or under a hypothetical liquidation of the Debtor.

Appellee Appx. 01573
APPX. 10373

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Page 12589/23 1804ge 299 of 1104    PageID 16433
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1580 of 1803    PageID 12326
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 42 of 68

68.     This objection is being made by parties with virtually no economic interest in the Debtor.  Neither Dugaboy nor Mr. Dondero have any legitimate claims against the Debtor and based upon Mr. Dondero's "pot plan" proposal their equity is completely out of the money. Moreover, as discussed below, the argument that increased reporting obligations to creditor beneficiaries (who they are not), a requirement to seek Court approval of sales and the establishment of a standard of care for the Claimant Trustee somehow translates into creditors doing better in a chapter 7 makes no sense, and, in any event, is not an argument supported by any creditor not related to Mr. Dondero..

69.     As set forth above, the Liquidation Analysis filed with the Disclosure Statement provides a side by side comparison of distributions to creditors under a hypothetical chapter 7 liquidation and under the Plan and clearly demonstrates that creditors will receive at least as much under the Plan as they would in a chapter 7 proceeding.  None of the objectors provide any arguments to refute the analysis in the Liquidation Analysis or how a hypothetical chapter 7 trustee would liquidate the Debtor's remaining assets that would definitively provide a greater distribution to creditors in chapter 7 liquidation rather than in chapter 11. To the contrary, Mr. Dondero suggests (without any factual basis) that the Debtor's creditors and equity holders "could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sale procedures are governed by the Bankruptcy Court to ensure maximization or value through auction or other market-testing means."  Dondero Objection ¶ 11.

70.     Nothing in the opposition suggests that the Claimant Trustee (subject to supervision by the Claimant Trust Oversight Committee) will not undertake the same value

Appellee Appx. 01574
APPX. 10326

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/22/23    Page 300 of 1104    PageID 16434
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1581 of 1803    PageID 12327
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 43 of 68

maximizing measures suggested by Mr. Dondero in order to maximize the value of the Reorganized Debtor's assets. The only difference is that the Claimant Trustee would be able to consummate these sales in the ordinary course of business compared to a trustee, who would have to negotiate (and presumably discount) every sale with the caveat that it is subject to court approval and a period of time by which parties, such as Mr. Dondero has throughout this case, can object and potentially frustrate any proposed sale. Mr. Dondero also assumes that the chapter 7 trustee could operate the Debtor's business in chapter 7.[58] Aside from the complete lack of institutional knowledge of the Debtor and its business, it is doubtful that a chapter 7 trustee would be able to operate the Debtor's business without the benefit of the executory contracts and unexpired leases that the Reorganized Debtor seeks to assume in order to monetize the remaining assets. There is no factual basis to conclude that a hypothetical chapter 7 trustee could monetize the Debtor's remaining assets any better than the Claimant Trustee, who has both the expertise and institutional knowledge of the Debtor and who is subject to an oversight committee consisting of the largest creditors in the Debtor's case.

71. Second, it is standard for a chapter 11 plan to allow the post confirmation administrators (in this case, the Claimant Trustee, the Litigation Trustee, and Reorganized Debtor) to monetize a debtor's assets without having to first obtain court approval or otherwise condition any sales on the consent to the holders of claims or interests. It is neither novel nor unusual for chapter 11 plans to allow the post-confirmation vehicle to sell assets, compromise

---

[58] Even if a hypothetical trustee were appointed under Mr. Dondero's argument, the trustee would be subject to election pursuant 11 U.S.C. § 702. The largest creditors of the Debtor (most of whom are serving on the Claimant Trust Oversight Committee) would control the selection of the trustee of the Debtor after conversion. Yet these creditors support confirmation of the Plan and the structure by which they, as members of the Claimant Trust Oversight Committee, will oversee the Claimant Trustee's monetization of assets.

Appellee Appx. 01575
APPX. 10327

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/28/23   Page 301 of 1104   PageID 16435
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1582 of 1803   PageID 12328
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 44 of 68

controversies and employ professionals without mandatory application to the Court to approve these standard post-confirmation transactions, including chapter 11 cases confirmed by this Court. *See, e.g. In re Acis Capital Management*, 2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) (plan providing "[o]n and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order."); *In re Wilson Metal Fabricators,* No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020), ECF No. 92 (Order confirming plan providing that reorganized debtor "may deal with its assets and property and conduct its affairs without any supervision by, or permission from, the Court or the Office of the United States Trustee, and free of any restriction imposed on the Debtor by the Bankruptcy Code or by the Court during the case.").

72.     Finally, Dugaboy's argument that the standard of liability for the Claimant Trustee provided in the Claimant Trust Agreement is not appropriate and confers greater protections those applicable to a chapter 7 trustee is wrong.  This objection is yet another example of the Dondero Entities' efforts to place as many roadblocks as possible to halt post-confirmation asset sales and maintain the ability to litigate (or threaten to litigate) against the entities charged with implementing the monetization of assets required under the Plan.

73.     The standard of liability imposed on the Claimant Trustee pursuant to the Clamant Trust Agreement is appropriately limited to gross negligence and willful misconduct and Dugaboy and the Dondero Entities do not describe how the standard of liability has any impact

Appellee Appx. 01576
APPX. 10373

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 12/28/23    Page 302 of 1104    PageID 16436
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1583 of 1803    PageID 12329
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 45 of 68

on the distributions creditors will receive under the Plan. First, the Claimant Trustee does have fiduciaries duties to the trust beneficiaries under the terms of the Claimant Trust Agreement, but claims against the Claimant Trustee are limited to acts of gross negligence and willful misconduct.[59]    Second, Dugaboy misstates the standard of liability that would otherwise be imposed on a chapter 7 trustee. A chapter 7 trustee would actually have a more relaxed standard of liability than that imposed on the Claimant Trustee because it is well established that trustees have qualified immunity for acts taken within the scope of their appointment. *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("The question in this case is whether a trustee acting at the direction of a bankruptcy judge is clothed with absolute immunity against tort actions grounded on his conduct as trustee …. In the instant case, the court-approved trustee was acting under the supervision and subject to the orders of the bankruptcy judge. We hold that since [the trustee], as an arm of the Court, sought and obtained court approval of his actions, he is entitled to derived immunity.") Thus, a chapter 7 trustee's qualified immunity would protect it from heightened negligent breach of fiduciary duty claims whereas the Claimant Trust Agreement provides that the Claimant Trustee is only protected from simple negligent breach of fiduciary claims.

---

[59] *See, e.g.* Claimant Trust Agreement Section 2.3(b)(vii).   "The  Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purpose …   (viii) to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds.  The Debtor has amended the Plan to conform with the Claimant Trust Agreement.

Appellee Appx. 01577
APPX. 16329

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Page 1525/26 1804    Page 303 of 1104    PageID 16437
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1584 of 1803    PageID 12330
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 46 of 68

74.    Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.[60]

### H.    The Plan Complies with the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

75.    The Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.[61]  Each of the non-Voting Classes that were not entitled to vote on the Plan are Unimpaired and conclusively deemed to accept the Plan.

### I.    The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).

76.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.   Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—which generally include domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must

---

[60] *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) aff'd, 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan"); *In re Lason, Inc*., 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

[61] 11 U.S.C. § 1129(a) (8).

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-6 Filed 12/26/23 Page 304 of 1104 PageID 16438
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1585 of 1803 PageID 12331
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 47 of 68

receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—i.e., priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim

77. The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. First, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time as defined in Article II.A of the Plan. Second, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[62] Finally, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each Holder of an Allowed Priority Tax Claim shall receive payment in an amount equal to the amount of the Allowed Priority Tax Claim unless otherwise agreed between such holder and the Debtor. .[63] Thus, the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

---

[62] See Plan, Art. III.B.

[63] As noted below in the discussion on Plan modifications, the Debtor has clarified the treatment of priority tax claims in accordance with 11 U.S.C. §1129(a)(9)(C) pursuant to the objection raised on this point by the Internal Revenue Service ("IRS").

DOCS_SF:104703.16 36027/002

Appellee Appx. 01579
APPX. 16330

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Page 1587/20 1804ge 305 of 1104    PageID 16439
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1586 of 1803    PageID 12332
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 48 of 68

78.    The IRS and certain Texas taxing authorities (the "Texas Taxing Authorities") each filed objections to the Plan.  The Debtor is in the process of negotiating "neutrality" language with the Texas Taxing Authorities concerning the application of the Plan injunction and other provisions to the claims asserted by this creditor. The Debtor expects to consensually resolve the Texas Taxing Authorities' objection with agreeable language in the Confirmation Order.  As more fully explained in the Omnibus Reply in response to the IRS's plan objection, the IRS has rejected the Debtor's Plan neutrality language and is insisting on the modification of the Plan to contain litany of provisions that are ambiguous, overbroad and, most importantly, attempt to pre-determine the IRS's rights and remedies as opposed to having these issues determined in accordance with nonbankruptcy law with each parties' rights and defenses preserved.

**J.    At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).**

79.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider."  As detailed herein and in the Voting Report, Class 2 (Frontier Secured Claim) and Class 7 (Convenience Claims) are impaired classes of claims and each voted to accept the Plan, exclusive of any acceptances by insiders. Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. However, as explained below, even though not all of the Voting Classes accepted the Plan, the Plan may still be confirmed by cram down because the requirements of section 1129(b) are satisfied.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6  Exhibit 6    Page 125 of 189 306 of 1104    PageID 16440
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1587 of 1803    PageID 12333
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 49 of 68

### K.    The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)).

80.    Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan."[64]    To satisfy this standard, the Fifth Circuit has held that a plan need only have a "reasonable probability of success."[65]    Indeed, a relatively low threshold of proof will satisfy section 1129(a)(11) so long as adequate evidence supports a finding of feasibility.[66]    In particular, according to Fifth Circuit law, "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible."[67]

81.    The Plan provides for the Reorganized Debtor to manage the wind down of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets.  As set forth in the Liquidation Analysis, the projections prepared by the Debtor show that it will be able to meet its obligations under the Plan.  The Plan also does not provide any guaranty as to what holders of Class 8 General Unsecured Claims will receive; they will receive their *pro rata* payment of whatever net funds realized from the asset monetization process reflected in the projections.  Therefore, the Plan is feasible.  Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code under Fifth Circuit law.

---

[64] 11 U.S.C. § 1129(a)(11).

[65] *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) (quoting *In re Landing Assocs., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993)).

[66] *In re Star Ambulance Service, LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015).

[67] *T-H New Orleans*, 116 F.3d at 802.

43

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Page 1259 of 1804   Page 307 of 1104   PageID 16441
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1588 of 1803   PageID 12334
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 50 of 68

**L.      The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

82.      The Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[68]   The Plan includes an express provision requiring payment of all such fees.[69]   In addition, at the request of the United States Trustee, the Debtor has added language to the Confirmation Order that makes the Reorganized Debtor, the Claimant Trustee and Litigation Trustee jointly and severally liable for payment of statutory fees owed to the United States Trustee.  The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code.

**M.      The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.**

83.      The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  Section 1114(a) of the Bankruptcy Code defines retiree benefits as medical benefits.[70]   Article IV.K of the Plan provides for the assumption of the Pension Plan (to the extent that this plan is governed under section 1114 of the Bankruptcy Code) as well as additional language requested by the Pension Benefits Guaranty Corporation.    Accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

---

[68] 11 U.S.C. § 1129(a) (12).

[69] Plan, Art. XIII.D.

[70] Section 1114(a) defines "retiree benefits" as: ". . . payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained in whole or in part by the debtor prior to filing a petition commencing a case under this title."  11 U.S.C. § 1114(e) (emphasis added).

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/20/23   Page 308 of 1104   PageID 16442
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1589 of 1803   PageID 12335
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 51 of 68

**N.**     **Sections 1129(a)(14) through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

84.     A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan. Section 1129(a)(14) of the Bankruptcy Code does not apply because the Debtor is not subject to any domestic support obligations.[71]  Section 1129(a)(15) of the Bankruptcy Code is inapplicable because the Debtor is not an "individual" as defined in the Bankruptcy Code.[72] Section 1129(a)(16) of the Bankruptcy Code is inapposite because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[73]

**O.**     **The Plan Satisfies the Cramdown Requirements (Section 1129(b)).**

85.     If an impaired class has not voted to accept the plan, the plan must be "fair and equitable" and not "unfairly discriminate" with respect to that class.[74]  The Plan has been accepted by Voting Classes 2, 7, and 9.[75]  Voting Classes 8 (General Unsecured Claims) and Class 11 (Class A Limited Partnership Interests) voted to reject the Plan and Class 10 (Class B/C Limited Partnership Interests), did not vote.  However, the Plan still satisfies the "cramdown" requirements with respect to non-accepting Classes of Claims and Equity Interests.

---

[71] *See* 11 U.S.C. § 1129(a) (14).

[72] *See* 11 U.S.C. § 1129(a)(15).

[73] *See* 11 U.S.C. § 1129(a)(16).

[74] *See* 11 U.S.C. § 1129(b)(1).

[75] As noted below, Class 9 has also accepted the Plan, but the Debtor is not including Class 9 as one of the accepting impaired classes to satisfy the cram down requirements of section 1129(b)(1) of the Bankruptcy Code.

Appellee Appx. 01583

APPX. 01835

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-6 Page 1529/20 1804ge 309 of 1104 PageID 16443
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1590 of 1803 PageID 12336
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 52 of 68

### 3. The Plan Is Fair and Equitable.

86. A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects the plan (or is deemed to reject the plan) if it follows the "absolute priority rule."[76] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[77] The Plan satisfies section 1129(b) of the Bankruptcy Code. The objecting parties' arguments that the Plan is not "fair and equitable" ignore this standard.

87. As explained earlier, all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment and the Plan's classification mechanics rests on a legally acceptable rationale. To the extent any impaired rejecting class of claims or interests is not paid in full, no class junior to the impaired rejecting class will receive any distribution under the Plan on account of its junior claim or interest. Therefore, the Plan satisfies the "fair and equitable" requirement.

### 4. The Plan Does Not Unfairly Discriminate Against the Rejecting Classes.

88. The Bankruptcy Code does not provide a standard for determining "unfair discrimination." Rather, courts typically examine the facts and circumstances of the particular

---

[76] *Bank of Am. Nat'l Tr. & Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42 (1999) ; *In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006).

[77] *Id.*

Appellee Appx. 01584
APPX. 16336

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Page 1252 of 1804   Page 310 of 1104   PageID 16444
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1591 of 1803   PageID 12337
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 53 of 68

case to determine whether unfair discrimination exists.[78]   At a minimum, the unfair

discrimination standard prevents creditors and interest holders with similar legal rights from

receiving materially different treatment under a proposed plan without compelling justifications

for doing so.[79]   The unfair discrimination requirement, which involves a comparison of classes,

is distinct from the equal treatment requirement of section 1123(a)(4), which involves a

comparison of the treatment of claims within a particular class.   A plan does not unfairly

discriminate where it provides different treatment to two or more classes which are comprised of

dissimilar claims or interests.[80]   Likewise, there is no unfair discrimination if, taking into account

the particular facts and circumstances of the case, there is a reasonable basis for the disparate

treatment.[81]

89.     The Plan's treatment of these Classes is proper because all similarly situated

holders of Claims and Equity Interests will receive substantially similar treatment and the Plan's

classification scheme rests on a legally acceptable rationale.   Accordingly, the Plan does not

discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

---

[78] *See In re Kolton*, No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990) (quoting *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis . . . ")); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[79] *See Idearc Inc.*, 423 B.R. at 171, ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[80] *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997) ; *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[81] *Aztec Co.*, 107 B.R. at 590.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 12/23/23   Page 311 of 1104   PageID 16445
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1592 of 1803   PageID 12338
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 54 of 68

**P.      The Plan satisfies the "Cramdown" Requirements of the Bankruptcy Code.**

90.      Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[82]

91.      A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[83]  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[84]  The Debtor submits that the Plan satisfies the "fair and equitable" requirement notwithstanding the non-acceptance of the Plan by Classes 8, 10 and 11.

92.      With respect to Class 8 General Unsecured Claims, there is no Class of equal priority receiving more favorable treatment and no classes that are junior to Class 8 will receive or retain any property under the Plan unless Class 8 creditors receive or retain, on account of

---

[82] *See John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997)  ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[83] *See Bank of Amer.*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[84] *See id.*

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/20/23    Page 312 of 1104    PageID 16446
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1593 of 1803    PageID 12339
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 55 of 68

their claims, a value as of the Effective Date equal to the amount of such Claim, plus interest as provided under the Plan.  Thus, Holders of Class 9 Subordinated Claims will not receive any distributions unless and until Class 8 Claims are fully paid pursuant to section 1129(b)(2)(B) of the Bankruptcy Code.  Holders of Equity Interests in Class 10 and 11 will not receive any distributions absent full payment to holders of Allowed Class 8 General Unsecured Claims and Allowed Class 9 Subordinated Claims.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Therefore, the Plan is fair and equitable as to Equity Interests in Class 10 and 11 because no class junior to equity will receive or retain any property under the Plan.  11 U.S.C. § 1129(b)(2)(C).

93.    Moreover, while Class 8 did not accept the Plan, requiring the Debtor to resort to "cram down" under Section 1129(b), over 93% of the dollar amount of claims in Class 8 voted to accept the Plan.  Those votes included the votes of Redeemer, Acis, UBS, and the HarbourVest entities.  Similarly, the Committee, as the fiduciary for all Class 8 General Unsecured Claims, also enthusiastically supports the Plan. As discussed above, the only reason Class 8 General Unsecured Claims voted to reject the Plan was because of (i) 24 employees holding contingent $1.00 claims with respect to unvested amounts under the Debtor's deferred compensation program voted against the Plan;[85] yet these employees ultimately will not have any General Unsecured Claims because the Debtor will terminate their employment before their entitlement to such amounts will vest, thereby eliminating the contingent claims and (ii) certain other employees, including Scott Ellington and Isaac Leventon who are loyal to Mr. Dondero and who

---

[85] As noted above, the Debtor resolved the confirmation objection of Mr. Surgent and Mr. Waterhouse, each of whom voted to reject (Waterhouse) or voted to abstain (Surgent) with respect to the Plan.

Appellee Appx. 01587
APPX. 16339

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 12/29/23    Page 313 of 1104    PageID 16447
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1594 of 1803    PageID 12340
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 56 of 68

also rejected the Plan.  Based upon the foregoing, the Plan may satisfy the cram down requirements and can be confirmed notwithstanding the non-acceptance of the Plan by Class 8, Class 10 and Class 11.

94.    NPA argues that Plan violates the absolute priority rule with respect to unsecured creditors to the extent that it provides equity in the Reorganized Debtor to existing equity holders.  NPA Objection, ¶ 92.  This assertion is incorrect.  As explained above, Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan until Allowed Claims in Class 8 and Class 9 are paid in full (with appropriate interest) pursuant to the terms of the Plan.  The Contingent Claimant Trust Interests granted to Equity Interests in Classes 10 and 11 will not vest unless and until the Claimant Trustee files a certification that all Holders of Allowed unsecured claims have been indefeasibly paid, inclusive of interest.  *See* Plan, § I.B.44.  Thus, the absolute priority rule is not violated by because the treatment of Class 8 and Class 9 Claims satisfies section 1129(b)(2)(B).[86]  Indeed, the failure to provide a mechanism for the potential distribution of Equity Security Interests after payment of all senior Claims would violate the treatment of the equity security interests in the Debtor because such senior Claims would be receiving more than the full amount of their Claims.  *See* 11 U.S. § 1129(b) (2)(C)(i).

---

[86] The absolute priority rule is also satisfied with respect to Class 7 Convenience Claims. First, Class 7 has accepted the Plan. Second, even if Class 7 were not to have accepted the Plan, the members of Class 7 were afforded the option on their ballots to accept the treatment provided under Class 8 if they so elected.

Appellee Appx. 01588
APPX. 01839

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Filed 12/26/23   Page 314 of 1104   PageID 16448
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1595 of 1803   PageID 12341
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 57 of 68

**Q.      The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)-(e)).**

95.      The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed Plan.[87]

96.      The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

97.      Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because the Debtor's chapter 11 case is not a "small business case."[88]

98.      In sum, the Plan satisfies all of the Bankruptcy Code's mandatory chapter 11 plan confirmation requirements.

**IV.     The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code for the Reasons Articulated in the Omnibus Reply.**

99.      The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[89]  Among other discretionary provisions, the Plan contains certain Debtor releases,[90] an exculpation provision, and an injunction provision.[91]

---

[87] 11 U.S.C. § 1129(c).

[88] 11 U.S.C. § 1129(e). A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,000,000 (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101 (51D)(B)(i).

[89] 11 U.S.C. § 1123 (b)(1)-(6).

[90] Plan, Art. IX

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Page 1527 of 1804    Page 315 of 1104    PageID 16449
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1596 of 1803    PageID 12342
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 58 of 68

Notably, the Plan does <u>not</u> contain a mechanism typically included in chapter 11 plans, which contain broad third party releases by creditors or other parties in interest, unless they opt out of the release.  While certain objectors argue that the Plan nonetheless contains inappropriate third party releases in disguise, such arguments lack merit as set forth in the Omnibus Reply.  These provisions are the product of extensive good faith, arms'-length negotiations and comply with the Bankruptcy Code and prevailing law.  The Debtor has separately responded to the objections filed by certain parties to these provisions in the Omnibus Reply, which also addresses the proposed modifications made to the Plan injunction provision.  Accordingly, the Debtor respectfully requests that the Bankruptcy Court approve the Plan's Debtor release, exculpation, and injunction provisions for the reasons set forth in the Omnibus Reply.

### A.    The Debtor Complied with Section 1129(d) of the Bankruptcy Code.

100.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.

### B.    Modifications to the Plan.

101.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

---

[91] *Id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01590

APPX. 10332

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/28/23    Page 316 of 1104    PageID 16450
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1597 of 1803    PageID 12343
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 59 of 68

accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[92]

102.    The Senior Employees argue that the Debtor and the Committee seek "carte blanche to make amendments to the Plan post-confirmation without complying with § 1127 of the Bankruptcy Code." Senior Employee Objection, at p. 15.

103.    These arguments are baseless and are contradicted by Article XII of the Plan, which explicitly requires that modifications to the Plan be in compliance with section 1127.

> After the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

Plan, Art. XII.B.

104.    Dugaboy objects that the Plan does not comply with section 1127(a) of the Bankruptcy Code and asserts that the Plan is not "final" and "as of the writing of this Objection and possibly even after the hearing on confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan." Dugaboy Objection, page 4.

---

[92] *See, e.g., In re American Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) (finding that nonmaterial modifications that do not adversely impact parties who have previously voted on the plan do not require additional disclosure or resolicitation); *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 857 (Bankr. S.D. Tex. 2001) (same). *See also In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-86   Filed 12/29/23   Page 317 of 1104   PageID 16451
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1598 of 1803   PageID 12344
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 60 of 68

105.    As noted earlier in the Memorandum, the Debtor has already filed three Plan

Supplements and will file a fourth Plan Supplement prior to the Confirmation Hearing.  The Plan

Supplements filed to date already contain the Retained Causes of Action, the Claimant Trust

Agreement, the Litigation Trust Agreement that Dugaboy complains are lacking.  The Debtor

has also filed three notices of executory contracts and unexpired leases to be assumed under the

Plan.    Thus, the Plan will be "final" will contain final version of all of the post-confirmation

documents and executory contracts to be assumed in advance of the Confirmation Hearing, in

compliance with section 1127(a) of the Bankruptcy Code.  *See, e.g., In re Friendship Dairies*,

2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ("Section 1127(a) of the Code

allows a plan proponent, the Debtor here, to modify its plan at any time before confirmation. In

addition, '[a]fter the proponent of a plan files a modification of such plan with the court, the plan

as modified becomes *the plan*.'") (quoting 11 U.S.C. §1127(a) emphasis in original); *Paradigm

Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 521

B.R. 134, 176 (Bankr. N.D. Tex 2014) ("As a modified plan becomes the confirmed plan

pursuant to section 1127(a) of the Bankruptcy Code, this maxim applies equally to plans as

modified").  As Dugaboy concedes, the Plan appropriately restates the standards for post-

confirmation plan modifications under section 1127(b), which would require notice and a

hearing, among other requirements.  *See* Plan, §XII.B.

106.    As noted in this Memorandum, the Debtor has made certain modifications to the

Plan in order to both (1) clarify language in response to certain of the objections raised by the

Objectors and (2) additional modifications to the Plan.  These modifications comply with section

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Filed 12/20/23   Page 318 of 1104   PageID 16452
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1599 of 1803   PageID 12345
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 61 of 68

1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019.   A summary of the Plan

modifications is set forth in the chart below:

| **Plan Modification and Applicable Plan Section** |
|---|
| Treatment of Subordinated Claims Treatment Procedural Requirements.   Modifications that are responsive to the objections to the definition and treatment of Subordinated Claims, including (1) the definition of Subordinated Claims to eliminate categorical subordination of claims relating to limited partnership interests and replacement of Final Order to order entered by the Bankruptcy Court (Section I.B.129); (2) the classification and treatment of Subordinated Claims in Class 9 is only to the extent an order subordinating the claim is entered (Section III.H.9); (3) the addition of requirement of a  hearing, in addition to notice, with respect to any subordination proceeding and subject to entry of order of the Bankruptcy Court (Section III.J); and (4) a requirement to bring subordination proceedings by Claims Objection Deadline and the ability to request that the Bankruptcy Court subordinate claims by the Claims Objection Deadline (Section VII.B). |
| Priority Tax Claims.   Modification in response to IRS Objection to provide that the payment of Allowed Priority Tax Claims to be in accordance with section 1129(a)(9)(C) unless such Allowed Claim is either paid in full on the Initial Distribution Date or otherwise agreed by the parties (Section II.C). |
| Assumption/Rejection of Executory Contracts.   Modifications in response to objections to require assumption/rejection of contracts to be determined by Confirmation Hearing, rather than the Effective Date (Section V.A-C). |
| Claimant Trust and Related Provisions.  Modification to permit Claimant Trustee to set aside a reserve for potential indemnification claims (Section IV.B.5); modification to conform Claimant Trustee's fiduciary duties to Claimant Trust Agreement (Section IV.B.5). |
| Issuance of New Partnership Interests.   Clarifications that Reorganized Limited Partnership Agreement not providing indemnification obligations (Section IV.C.3). |
| Conditions to Effective Date.   Modifications to conditions to effectiveness of Plan to require (1) Confirmation Order must be become a Final Order; (2) obtaining acceptable directors and officers insurance coverage which coverage is acceptable to the Debtor, Committee, the Oversight Committee Board, Claimant Trustee, and Litigation  Trustee (Section VIII.A); (3) deletion of section VIII.C of Plan regarding effect of non-occurrence of conditions to effectiveness. |
| Retention of Jurisdiction.   Modification in response to objections to clarify existing language that provides that the Bankruptcy Court shall retain jurisdiction "to the maximum extent" legally permissible (Section XI). |
| Injunction and Related Provisions.   Modifications to the Plan injunction, term of injunction and continuance of January 9 Order provisions (Sections IX.F, G and H). Inclusion of additional Plan |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/21/23    Page 319 of 1104    PageID 16453
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1600 of 1803    PageID 12346
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 62 of 68

definitional changes/additions for "Affiliate" (Section I.B.5, "Enjoined Parties" (Section I.B.56) and "Related Entity" (Section I.B.110); "Related Entity List" (Section I.B.111) and "Related Persons" (Section I.B.112). Also, Injunction language highlighted pursuant to Bankruptcy Rule 3016 (Section IX.F).

107.    Accordingly, the Debtor submits that no additional solicitation or disclosure is required on account of the Plan modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

## **Conclusion**

108.    For the reasons set forth herein, the Debtor respectfully requests that the Bankruptcy Court confirm the Plan and enter the Confirmation Order.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01594
Appx. 16346

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 12/22/23    Page 320 of 1104    PageID 16454
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1601 of 1803    PageID 12347
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 63 of 68

Dated:  January 22, 2021    PACHULSKI STANG ZIEHL & JONES LLP
             Jeffrey N. Pomerantz (CA Bar No.143717)
             (*admitted pro hac vice*)
             Ira D. Kharasch (CA Bar No. 109084)
             (*admitted pro hac vice*)
             Gregory V. Demo (NY Bar No. 5371992)
             (*admitted pro hac vice*)
             10100 Santa Monica Blvd., 13th Floor
             Los Angeles, CA 90067
             Telephone: (310) 277-6910
             Facsimile: (310) 201-0760
             E-mail: jpomerantz@pszjlaw.com
                 ikharasch@pszjlaw.com
                 gdemo@pszjlaw.com

             -and-

             */s/ Zachery Z. Annable*
             HAYWARD PLLC
             Melissa S. Hayward
             Texas Bar No. 24044908
             MHayward@HaywardFirm.com
             Zachery Z. Annable
             Texas Bar No. 24053075
             ZAnnable@HaywardFirm.com
             10501 N. Central Expy, Ste. 106
             Dallas, Texas 75231
             Tel: (972) 755-7100
             Fax: (972) 755-7110

             *Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01595

APPX. 010595

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/23/23    Page 321 of 1104    PageID 16455
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1602 of 1803    PageID 12348
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 64 of 68

**EXHIBIT A**

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 322 of 1104    PageID 16456
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1603 of 1803    PageID 12349

Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 65 of 68



Plan Objections from Dondero-Related Entities: Organizational Charts

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/05/23 1804 age 323 of 1104   PageID 16457
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1604 of 1803   PageID 12350
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 66 of 68

**EXHIBIT B**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Exhibit 1 Page 1206/23 1804 324 of 1104   PageID 16458
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1605 of 1803   PageID 12351
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 67 of 68

| Objector | Objection | Claim | Status |
|---|---|---|---|
| James Dondero | D.I. 1661 | Claim No. 138 | Withdrawn with prejudice [D.I. 1510] |
| | | Claim No. 141 | Arises from equity; subject to subordination |
| | | Claim No. 142 | Arises from equity; subject to subordination |
| | | Claim No. 145 | Arises from equity; subject to subordination |
| | | Claim No. 188 | Withdrawn with prejudice [D.I. 1510] |
| | | Indirect Equity Interest | Represents an indirect interest in Class A interests. Subordinated to Class B/C. Structurally subordinate. Represents 0.25% of total equity. |
| Get Good Trust | D.I. 1667 | Claim No. 120 | Arises from equity; subject to subordination |
| | | Claim No. 128 | Arises from equity; subject to subordination |
| | | Claim No. 129 | Arises from equity; subject to subordination |
| Dugaboy Investment Trust | D.I. 1667 | Claim No. 113 | Arises from equity; subject to subordination |
| | | Claim No. 131 | Objection filed and in litigation. Seeks to pierce the veil and hold the Debtor liable for subsidiary debts. Debtor believes claim is frivolous. |
| | | Claim No. 177 | Objection filed and in litigation. Seeks damages for postpetition management of estate. Debtor believes claim is frivolous. |
| | | Class A Interests | Subordinated to Class B/C. Represents 0.1866% of total equity. |
| Highland Capital Management Fund Advisors, L.P. | D.I. 1676 | Claim No. 95 | Expunged [D.I. 1233] |
| | | Claim No. 119 | Expunged [D.I. 1233] |
| Highland Fixed Income Fund | D.I. 1676 | Claim No. 109 | Expunged [D.I. 1233] |
| Highland Funds I and its series | D.I. 1676 | Claim No. 106 | Expunged [D.I. 1233] |
| Highland Funds II and its series | D.I. 1676 | Claim No. 114 | Expunged [D.I. 1233] |
| Highland Global Allocation Fund | D.I. 1676 | Claim No. 98 | Expunged [D.I. 1233] |
| Highland Healthcare Opportunities Fund | D.I. 1676 | Claim No. 116 | Expunged [D.I. 1233] |
| Highland Income Fund | D.I. 1676 | Claim No. 105 | Expunged [D.I. 1233] |
| Highland Merger Arbitrate Fund | D.I. 1676 | Claim No. 132 | Expunged [D.I. 1233] |
| Highland Opportunistic Credit Fund | D.I. 1676 | Claim No. 100 | Expunged [D.I. 1233] |
| Highland Small-Cap Equity Fund | D.I. 1676 | Claim No. 127 | Expunged [D.I. 1233] |
| Highland Socially Responsible Equity Fund | D.I. 1676 | Claim No. 115 | Expunged [D.I. 1233] |
| Highland Total Return Fund | D.I. 1676 | Claim No. 126 | Expunged [D.I. 1233] |
| Highland/iBoxx Senior Loan ETF | D.I. 1676 | Claim No. 122 | Expunged [D.I. 1233] |
| NexPoint Advisors, L.P. | D.I. 1676 | Claim No. 104 | Expunged [D.I. 1233] |
| | | Claim No. 108 | Expunged [D.I. 1233] |
| NexPoint Capital, Inc. | D.I. 1676 | Claim No. 107 | Expunged [D.I. 1233] |
| | | Claim No. 140 | Expunged [D.I. 1233] |
| NexPoint Real Estate Strategies Fund | D.I. 1676 | Claim No. 118 | Expunged [D.I. 1233] |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/27/23 1804   Page 325 of 1104   PageID 16459
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1606 of 1803   PageID 12352
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 68 of 68

| NexPoint Strategic Opportunities Fund | D.I. 1676 | Claim No. 103 | Expunged [D.I. 1233] |
|---|---|---|---|
| CLO Holdco, Ltd. | D.I. 1675 | Claim No. 133 | Claim voluntarily reduced to $0.00 |
| | | Claim No. 198 | Claim voluntarily reduced to $0.00 |
| NexBank Title, Inc. | D.I. 1676 | None | N/A |
| NexBank Securities, Inc. | D.I. 1676 | None | N/A |
| NexBank Capital, Inc. | D.I. 1676 | None | N/A |
| NexBank | D.I. 1676 | Claim No. 178 | Expunged [D.I. 1155] |
| NexPoint Real Estate Finance Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Capital, LLC | D.I. 1677 | None | N/A |
| NexPoint Residential Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Hospitality Trust | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners, LLC | D.I. 1677 | None | N/A |
| NexPoint Multifamily Capital Trust, Inc. | D.I. 1677 | None | N/A |
| VineBrook Homes Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors II, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors III, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors IV, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors V, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VI, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VIII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC | D.I. 1673 | Claim No. 146 | Objection filed and in litigation.  Debtor believes claim is frivolous. |
| Scott Ellington | D.I. 1669 | Claim No. 187 | Terminated for cause.  Debtor exploring options. |
| | | Claim No. 192 | Terminated for cause.  Debtor exploring options. |
| Isaac Leventon | D.I. 1669 | Claim No. 184 | Terminated for cause.  Debtor exploring options. |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 8-34   Filed 12/08/23   Page 326 of 1104   PageID 16460
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1607 of 1803   PageID 12353

**APPENDIX 24**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/09/23    Page 327 of 1104    PageID 16461
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1608 of 1803    PageID 12354
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 1 of 106
Docket #1807  Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION OF THE FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT L.P. (WITH TECHNICAL MODIFICATIONS)**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:104855.7 36027/002

1934054210122000000000012

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 10/10/23    Page 328 of 1104    PageID 16462
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1609 of 1803    PageID 12355
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 106

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|

INTRODUCTION ............................................................................................................... 1

OBJECTIONS ..................................................................................................................... 3

I.    Objections Addressed in the Memorandum ................................................... 3

II.   The Plan Impermissibly Allows for Set Off ................................................. 4

III.  The Plan Impermissibly Allows Assumption or Rejection After
      Confirmation .................................................................................................. 6

IV.   The Attack on the Plan's Release Is Baseless ............................................... 6

      A.   Debtor Release Provisions ................................................................. 6

      B.   Objections and Responses .................................................................. 7

V.    The Court Has Already Exculpated the Independent Directors and their
      agents For Negligence Pursuant to the January 9, 2020 Settlement Order
      and, to the Extent Not Covered Therein, the Plan's Exculpation Provisions
      Effectuate Essential Protections for Estate Fiduciaries and their agents,
      and Are Fully Supported by the Bankruptcy Code and Applicable Law. .......... 11

      A.   The Settlement Order Already Exculpates the Independent
           Directors and Their Agents from Claims of Negligence and Those
           Protections Should Be Continued Post-Confirmation ........................... 12

      B.   Plan Exculpation Provisions ............................................................. 14

      C.   Pacific Lumber ................................................................................. 16

      D.   Exculpation of the Exculpated Parties Is Permissible and Not
           Prohibited by *Pacific Lumber*. ........................................................ 19

      E.   Approval of the Exculpation Provisions Is a Legitimate Exercise of
           the Court's Powers and Follows Directly from the Findings and
           Conclusions the Court Must Make to Confirm a Plan .......................... 24

VI.   The Plan Injunction Is Appropriate and is Narrowly Tailored to Effectuate
      the Plan and related provisions of the bankruptcy code. ................................ 28

      A.   Plan Injunction Provisions ................................................................ 29

      B.   Objections ........................................................................................ 32

      C.   An Injunction against Interfering with the Implementation and
           Consummation of the Plan Is Both Common and Appropriate. ............ 33

      D.   The Injunction Is Not a Disguised Non-Debtor Third-Party
           Release. ............................................................................................ 35

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Page 12619/20 1804 ge 329 of 1104   PageID 16463
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1610 of 1803   PageID 12356
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 3 of 106

E.      The Injunction Does Not Prevent the Holders of Claims or Equity
        Interests from Enforcing Rights Arising under the Plan or
        Confirmation Order.................................................................................. 37

VII.    The Gatekeeper Provision Is Necessary and Appropriate, and Supported
        by Applicable Law. ............................................................................................ 38

        A.      The Gatekeeper Provision.......................................................................... 38

        B.      The Gatekeeper Provision Is Permissible under Sections 105,
                1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code................. 39

        C.      The Gatekeeper Provision Is not an Impermissible Extension of the
                Post-Confirmation Jurisdiction of the Bankruptcy Court. ...................... 44

        D.      The Gatekeeper Provision Is Consistent with the Barton Doctrine. ........ 51

        E.      The Gatekeeper Provision Is a Necessary and Appropriate Shield
                against the Actions of Dondero and his Related Entities......................... 54

VIII.   the exception to discharge does not apply ........................................................ 55

IX.     The Senior Employee Objection ........................................................................ 57

        A.      The Senior Employee Objection Should Be Overruled........................... 57

        B.      Background Related to Senior Employees .............................................. 58

        C.      Treatment of Senior Employee Claims Under Plan................................. 62

        D.      Plan Solicitation ...................................................................................... 63

        E.      The Plan Does Not Violate Section 1123(a)(4) ...................................... 64

        F.      The Senior Employees Are Not Permitted to Make Convenience
                Class Election........................................................................................... 66

        G.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Applicable
                Bankruptcy Law ...................................................................................... 66

        H.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Disclosure
                Statement Order for Voting Purposes ...................................................... 68

        I.      Even if Convenience Claim Election Were Available, Convenience
                Claim Election Does Not Impact Voting ................................................. 69

X.      The HCMFA/NPA Gates Objection ................................................................. 70

        A.      The HCMFA/NPA Objection, the CLO Holdco Objection, and
                NREP Joinder Should Be Overruled........................................................ 72

        B.      The CLO Objectors Cannot Override the CLOs' Consent to
                Assumption .............................................................................................. 74

        C.      The CLO Objectors Lack Standing to Object to the Plan........................ 76

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/29/23    Page 330 of 1104    PageID 16464
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1611 of 1803    PageID 12357
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 4 of 106

D.    Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit ............................. 82

E.    Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable................... 86

F.    The Inadequate Assurance of Future Performance Objection is Meritless .................................................................................................. 90

G.    The "Impermissible Partial Assignment" Objection is Meritless ........... 92

XI.    State Taxing Authority Objection ........................................................................ 92

XII.    IRS Objection .................................................................................................... 93

CONCLUSION ............................................................................................................. 99

DOCS_SF:104855.7 36027/002

Appellee Appx. 01605

Appx. 104656

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88   Filed 12/13/23   Page 331 of 1104   PageID 16465
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1612 of 1803   PageID 12358
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 5 of 106

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp.*
  *(In re Peabody Energy Corp.),*
  933 F.3d 918 (8th Cir. 2019) ................................................................................ 65

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm.*
  *(In re Pac. Lumber Co.),*
  584 F.3d 229 (5th Cir. 2009) ................................................................................ 64

*Bonneville Power Admin. v. Mirant Corp.*
  *(In re Mirant Corp.),*
  440 F.3d 238 (5th Cir. 2006) ................................................................................ 83

*Cajun Elec. Members Comm. v. Mabey*
  *(In re Cajun Elec. Power Coop., Inc.),*
  230 B.R. 693 (Bankr. M.D. La. 1999) .......................................................... 84, 85

*Cargill, Inc. v. Nelson (In re LGX, LLC),*
  2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) ............................................ 75

*Concord Square Apartments v. Ottawa Properties*
  *(In re Concord Square Apartments),*
  174 B.R. 71 (Bankr. S.D. Ohio 1994) ................................................................. 67

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC,*
  2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018) .......................... 88

*Figter Ltd. v. Teachers Ins. Annuity Ass'n  (In re Figter Ltd.),*
  118 F.3d 635, 640-641 (9th Cir. 1997) ................................................................ 67

*Goldstein v. SEC,*
  451 F.3d 873 (D.C. Cir. 2006) ............................................................................. 71

*Hertz Corp. v. ANC Rental Corp.*
  *(In re ANC Rental Corp.),*
  278 B.R. 714 (Bankr. D. Del. 2002) ....................................................... 74, 75, 80

*Hertz Corp. v. ANC Rental Corp.*
  *(In Re ANC Rental Corp.),*
  280 B.R. 808 (D. Del. 2002) ................................................................................ 75

*In re Acequia, Inc.,*
  787 F.2d 1352 (9th Cir. 1986) ............................................................................. 65

*In re ANC Rental Corp.,*
  277 B.R. 226 (Bankr. D. Del. 2002) .................................................................... 89

*In re Gilbert,*
  104 B.R. 206 (Bankr. W.D. Mo. 1989) ................................................................ 67

*In re Hartec Enters., Inc.,*
  117 B.R. 865 (Bankr. W.D. Tex. 1990) ............................................................... 85

iv

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 12/19/23    Page 332 of 1104    PageID 16466
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1613 of 1803    PageID 12359
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 6 of 106

*In re Irwin Yacht Sales, Inc.*,
    164 B.R. 678 (Bankr. M.D. Fla. 1994) ...................................................................... 75

*In re Jacobsen*,
    465 B.R. 102 (Bankr. N.D. Miss. 2011) ................................................................... 84

*In re Jones*,
    2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) ........................................... 67

*In re Latham Lithographic Corp.*,
    107 F.2d 749 (2d Cir. 1939) ..................................................................................... 67

*In re Lil' Things, Inc.*,
    220 B.R. 583 (Bankr. N.D. Tex. 1998) .................................................................... 84

*In re Lindell Drop Forge Co.*,
    111 B.R. 137 (Bankr. W.D. Mich. 1990) ................................................................. 66

*In re Riverside Nursing Home*,
    43 B.R. 682 (Bankr. S.D.N.Y. 1984) ....................................................................... 75

*In re Virgin Offshore USA, Inc.*,
    No. 13-79, 2013 U.S. Dist. LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013) ........ 84

*In re Visser*,
    232 B.R. 362 (Bankr. N.D. Tex. 1999) .................................................................... 66

*Mabey v. Sw. Elec. Power Co.*
    *(In re Cajun Elec. Power Coop., Inc.)*,
    150 F.3d 503 (5th Cir. 1998) .................................................................................... 65

*Riemer & Braunstein LLP v. DeGiacomo*
    *(A & E 128 North Corp.)*,
    528 B.R. 190, 199 (1st Cir. B.A.P. 2015) ................................................................ 66

*Texaco Inc. v. Louisiana Land & Exploration Co.*,
    136 B.R. 658 (Bankr. M.D. La.1992) ................................................................. 84, 85

## STATUTES

11 U.S.C. § 365 ............................................................................................................. 83, 86

## OTHER AUTHORITIES

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter
    (12/23/1997) ................................................................................................................ 89

Investment Management Staff Issues of Interest,
    http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] .................. 89

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/15/23    Page 333 of 1104    PageID 16467
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1614 of 1803    PageID 12360
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 7 of 106

The above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>") files this omnibus reply to the objections (this "<u>Reply</u>") to the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with technical modifications)*[2] (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").  Concurrently herewith, the Debtor has filed its *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "<u>Memorandum</u>").  To the extent the Debtor is unable to consensually resolve the Objections, the Debtor respectfully requests that the Bankruptcy Court overrule any remaining or pending Objections as of the Confirmation Hearing and confirm the Plan.

## INTRODUCTION

1.      The Debtor received twelve objections to confirmation of the Plan, inclusive of joinders (collectively, the "<u>Objections</u>" and each objecting party, an "<u>Objector</u>").  As discussed in greater detail in the Memorandum, seven of the twelve objections were filed by Mr. Dondero either individually or via his related entities (collectively, the "<u>Dondero Entities</u>").  **Exhibit A** lists the Dondero Entities and their relationships to each other.[3]  The following are the Objections filed by the Dondero Entities:

- *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661];

- *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667] (the "<u>Dugaboy Objection</u>");

---

[2] Unless otherwise noted, capitalized terms used in this Reply have the meanings ascribed in the Plan.

[3] As set forth in the Memorandum, none of the Dondero Entities, including the NexPoint RE Entities (defined below), has an actual economic interest in the Estate.

Appellee Appx. 01608
APPX. 01859

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Page 1216/23 1804age 334 of 1104    PageID 16468
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1615 of 1803    PageID 12361
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 8 of 106

- *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669] (the "Senior Employee Objection");[4]

- *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670] (the "NPA/HCMFA Objection");[5]

- *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673] (the "NREP Objection");

- *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675] (the "CLOH Objection"); and

- *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676] (the "NexBank Objection").

2.    That leaves the following as the only non-Dondero related Objections:

- *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662] (the "State Taxing Authority Objection");

---

[4] Subsequent to the filing of the Senior Employee Objection, Mr. Waterhouse and Mr. Surgent reached an agreement with the Debtor and will withdraw their objections to the Plan.

[5] The NPA/HCMFA Objection is joined (1) by CLO Holdco, Ltd., through the CLOH Objection, and (2) by the following Dondero-controlled entities: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing (collectively, the "NexPoint RE Entities") [Docket No. 1677] (the "NPRE Joinder").

Appellee Appx. 01609
APPX. 04860

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-6   Filed 12/27/23   Page 335 of 1104   PageID 16469
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1616 of 1803   PageID 12362
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 9 of 106

- *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666];

- *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668] (the "IRS Objection");

- *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671] (the "UST Objection"); and

- *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].

As of the date hereof, the Date is working to resolve certain of the non-Dondero related Objections.

3.      To avoid duplication, this Reply does not address each objection individually. Rather, it is organized by substantive objection where possible because of the cross-over in the issues raised in the Objections.  Also, as discussed below, where the Debtor has addressed an Objection in the Memorandum, the response is not repeated here.  However, parts of the Senior Employee Objection, the NPA/HCMFA Objection, State Taxing Authority Objection, and the IRS Objection, are addressed individually below.  A summary chart addressing each Objection and the Debtor's response thereto is attached as **Exhibit B**.

**OBJECTIONS**

**I.      OBJECTIONS ADDRESSED IN THE MEMORANDUM**

4.      The Memorandum addresses the Debtor's compliance with the statutory requirements of sections 1123 and 1129 of the Bankruptcy Code.  As part of the analysis in the Memorandum, the Debtor addresses the portions of the Objections alleging that the Debtor failed to comply with and/or violated the statutory provisions set forth in sections 1123 and 1129 of the Bankruptcy Code.  Specifically, the Debtor addresses the arguments that (i) the Plan provides for

**Appellee Appx. 01610**
**APPX. 01612**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Exhibit 6    Page 126 of 1804    Page 336 of 1104    PageID 16470
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1617 of 1803    PageID 12363
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 10 of 106

improper subordination; (ii) the Disputed Claims Reserve violates due process; (iii) the Plan does

not satisfy the "best interests test;" (iv) the Plan impermissibly provides no Bankruptcy Court

oversight of post-effective date transactions; (v) the elimination of vacant classes does not allow

for post-Effective Date reclassification of Claims; (vi) the Plan violates the absolute priority rule;

(vii) the Plan does not disclose the insiders or the compensation of insiders retained post-

Effective Date; (viii) the Plan impermissibly allows modifications to the Plan without

Bankruptcy Court approval; and (ix) the Plan is not final because the Plan Supplement is not

final.

## II.    THE PLAN IMPERMISSIBLY ALLOWS FOR SET OFF

5.    The NREP Objection and the NexBank Objection erroneously contend that

Article VI.M of the Fifth Amended Plan provides for "improper set-off of unidentified claims."

NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12.  The challenged language in the NREP Objection

and the NexBank Objection is as follows:

> The Distribution Agent may, to the extent permitted under applicable law, set off
> against any Allowed Claim and any distributions to be made pursuant to this Plan
> on account of such Allowed Claim, the claims, rights and causes of action of any
> nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may
> hold against the Holder of such Allowed Claim….  Any Holder of an Allowed
> Claim subject to such setoff reserves the right to challenge any such setoff in the
> Bankruptcy Court or any other court with jurisdiction with respect to such
> challenge.

Plan, Art. VI.M.

6.    Article VI.M of the Plan accords with Bankruptcy Code section 558 (formerly

section 541(e)), which provides that "[t]he estate shall have the benefit of any defense available

to the debtor as against any entity other than the estate, including statutes of limitation, statutes

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/19/23    Page 337 of 1104    PageID 16471
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1618 of 1803    PageID 12364
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 11 of 106

of frauds, usury, and other personal defenses."  11 U.S.C. § 558; *see In re Braniff Airways, Inc.*,

42 B.R. 443, 447 (Bankr. N.D. Tex. 1984) (a debtor in possession may exercise setoff rights

pursuant to Bankruptcy Code section 558 (then section 541(e)); *In re Circuit City Stores, Inc.*,

2009 Bankr. LEXIS 4011 (Bankr. E.D. Va. Dec. 3, 2009) (same); *In re Women First Healthcare,*

*Inc.*, 345 B.R. 131, 135 (Bankr. D. Del. 2006) (same); *In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr.

D. Del. 2002) (same); *Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft*

*Corp.)*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991) (same).

7.      In support of the argument that the provision is improper, the NREP Objection

and the NexBank Objection contend that Bankruptcy Code section 553 and cases construing that

provision limit parties' right of setoff in bankruptcy only to prepetition claims.  NREP Obj. ¶¶

11-13; NexBank Obj. ¶¶ 10-12.  However, the issue of the scope of the Distribution Agent's

setoff rights and the application of section 553 is not even adjudicated by the Plan.[6]  Rather, on

its face, the Plan states that the Distribution Agent may exercise setoff rights only "to the extent

permitted by law."  Thus, it does not purport to expand setoff rights of the Distribution Agent

beyond what is permitted by the Bankruptcy Code but only preserves whatever setoff rights the

estate has – no more and no less.  Moreover, as quoted above, it expressly preserves the right of

creditors to challenge any setoff that the Distribution Agent seeks to take.

8.      Accordingly, whether the Distribution Agent may take any specific setoffs is

reserved by the Plan for another day.  The NREP Objection and the NexBank Objections on this

issue are not well-taken, and both such objections should be overruled.

---

[6] The Debtor reserves its rights with respect to the applicability of section 553 to the Distribution Agent's preserved
rights of setoff, if any.

Appellee Appx. 01612

APPX. 01864

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Exhibit 6    Filed 12/20/23    Page 338 of 1104    PageID 16472
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1619 of 1803    PageID 12365
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 12 of 106

**III.    THE PLAN IMPERMISSIBLY ALLOWS ASSUMPTION OR REJECTION
AFTER CONFIRMATION**

9.    The NPA/HCMFA Objection contends that the Plan violates section 365(d)(2) because it allows the Debtor to assume or rejection executory contracts or unexpired leases on or prior to the Effective Date.  While the Debtor believes that the original language in the Plan is defensible, the Debtor has elected to amend the Plan to clarify that all executory contracts and leases must be assumed or rejected on or prior to the Confirmation Date.

**IV.    THE ATTACK ON THE PLAN'S RELEASE IS BASELESS.**

**A.    Debtor Release Provisions**

10.    Article IX of the Plan provides for releases only by the Debtor, its Estate, and the Reorganized Debtor (including their successors, the Claimant Trust and the Litigation Sub-Trust) of any and all Causes of Action, including any derivative claims that might be asserted on behalf of, or in the name of, the Debtor, that the Debtor or the Estate could otherwise assert against the Released Parties[7] (the "<u>Debtor Release</u>").  The Debtor Release is the product of extensive good faith, arm's-length negotiations and complies fully with the Bankruptcy Code and prevailing law.

The Debtor Release provides:

> On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged **by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust** from any and all Causes of Action, including any derivative claims, **asserted on behalf of the Debtor,** whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise,

---

[7] The "Released Parties" under the Plan are: (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities); (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.  Plan, Art. I.B., Def. 111.

Appellee Appx. 01613
APPX. 01613

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/29/23 1804  Page 339 of 1104    PageID 16473
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1620 of 1803    PageID 12366
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 13 of 106

*that the Debtor or the Estate would have been legally entitled to assert in their* *own right* (whether individually or collectively) *or on behalf of* the holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, Art. IX.D (emphasis added.)

11.     The Debtor Release releases, among others, the Independent Directors (each of whom was appointed by the Bankruptcy Court post-petition), Strand (solely from January 9, 2020, the date of the appointment of the Independent Directors, through the Effective Date), the CEO/CRO (who is also an Independent Director and whose role was expanded to include the CEO/CRO role on July 16, 2020), the Committee and its members in their official capacities, the Professionals retained with this Court's approval by the Debtor or by the Committee and, to a more limited extent, the Employees.[8]

12.     The Debtor Release is a release of the Released Parties by the Debtor, the Estate and their successors on account of Causes of Action that belong to the Debtor or the Estate, whether directly or derivatively.  *The Debtor Release does not release any Causes of Action of* *any person other than the Debtor, the Estate and their successors and does not release any* *claims that could not have been asserted by the Debtor or the Estate prior to the Effective* *Date.*

B.     <u>Objections and Responses</u>

13.     Three parties in interest have objected to the Debtor Release.  The Dugaboy Objection objects to the Debtor Release under the mistaken view that the Claimant Trust and Litigation Sub-Trust are (in Dugaboy's view) granting releases of claims that have not yet arisen,

---

[8] The Debtor Release contains restrictions on the releases of the Employees, as may be determined by the Claimant Trust Oversight Committee.  Plan, Art. IX.D.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/22/23   Page 340 of 1104   PageID 16474
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1621 of 1803   PageID 12367
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 14 of 106

*i.e.,* causes of action of the Claimant Trust and Litigation Sub-Trust that arise after the Effective Date against the Released Parties. *See Dugaboy Objection* at p. 9. The U.S. Trustee Objection erroneously argues the Debtor Release is an impermissible non-consensual third-party release. *See UST Objection* at pp. 2-3. The Senior Employee Objection objects to the Debtor Release because the Senior Employees believe that the Debtor should not be able to condition a release of the Senior Employees on concessions not required of other Employees obtaining a release. *See Senior Employee Objections* at p. 3.

14. Both Dugaboy and the U.S. Trustee misread the Debtor Release provision. The Claimant Trust and Litigation Sub-Trust are included solely in their capacity as "successors, assigns and representatives" of the Debtor and the Estate, and the Debtor Release applies solely to Causes of Action that ***the Debtor or the Estate*** themselves would have against the Released Parties (whether a direct claim or a derivative claim, but in either case, only Causes of Action owned by the Debtor or the Estate). By its express terms, the Debtor Release does not apply to any future claims or Causes of Action that the Claimant Trust or the Litigation Sub-Trust would have in its own right, based on post-Effective Date acts or omissions, rather than as a successor to or assignee of Causes of Action of the Debtor and the Estate.

15. The U.S. Trustee's contention that the Debtor Release provision includes a third-party release is incorrect. The Debtor Release applies only to claims held by the Debtor and the Estate, on behalf of themselves and each of their successors, assigns and representatives in favor of the Released Parties. Any direct claims and causes of action owned by any other person are not released by the Debtor Release, and nothing in the language of the provision implicates any

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/23/23    Page 341 of 1104    PageID 16475
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1622 of 1803    PageID 12368
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 15 of 106

non-derivative claims or causes of action that any third party might have against any of the Released Parties.

16.    The Senior Employees' objection to the proposed Debtor Release also is devoid of merit.  As discussed at length, in Section IX, herein, Employees are not entitled, either contractually or legally, to any release.  Nor does a release given to one Employee entitle any other employee to a similar release.  Releases are discretionary and can be provided, in an exercise of discretion, to persons who have provided consideration to the Debtor and the Estate. Unlike the other Released Parties, the Senior Employees have not yet fully provided that consideration.  As the Court is aware, the Committee and the Court have consistently voiced concerns regarding the potential release of the Employees, and specifically, the Senior Employees.  The Plan resolves these concerns by imposing significant restrictions and affirmative requirements for any Employee to obtain the benefit of the Debtor Release and additional requirements for the Senior Employees to do so.  *See* Plan, Art. IX.D.

17.    The Bankruptcy Code explicitly provides for and sanctions the inclusion of debtor releases in plans.  Section 1123(b)(3)(A) of the Bankruptcy Code states clearly that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  The Debtor Release is an essential *quid pro quo* for the Released Parties' significant contributions to the Debtor's restructuring, which has been highly complex and contentious.  There are multiple precedents in which courts have approved releases by a debtor's estate of its own claims against a far more extensive group of persons than those

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/24/23    Page 342 of 1104    PageID 16476
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1623 of 1803    PageID 12369
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 16 of 106

included here.[9]  The Committee and its members (who are Released Parties), who have had over a year to investigate potential claims against the Employees, among others, fully support the Debtor Release as to the other identified Released Parties.

18.    It is also important to bear in mind that the Debtor Release applies to claims *of the Debtor or the Estate* against the Released Parties that others might purport to assert derivatively on behalf of the Debtor or the Estate.  To the extent that Released Parties have indemnification rights against the Debtor, the assertion of such derivative claims – no matter how specious – would trigger claims for indemnification that would deplete the assets available for distribution to creditors. Moreover, regardless of such rights of indemnification, the assertion of such purported derivative claims on behalf of the Debtor would subject the Debtor to the costs – both economic, in terms of legal fees, and of the time and distraction of personnel – that would result from becoming embroiled in such derivative litigation – again, no matter how specious the claim.

19.    Both the U.S. Trustee and Dugaboy erroneously cite *Pacific Lumber*[10] for the proposition that releases of third parties – even by the debtor – are always impermissible. *Pacific Lumber*, however, did not involve the release of claims by a debtor.  The issue addressed in *Pacific Lumber* was whether a bankruptcy court could approve injunction and exculpation provisions in a plan that effectively mandated that **holders of claims** release, or be precluded

---

[9] *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provisions were acceptable settlement under § 1123(b)(3) because the debtors and the estate were releasing claims that were property of the estate); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[10] *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)*, 584 F.3d 229, 251-253 (5th Cir. 2009) ("*Pacific Lumber*")

Appellee Appx. 01617
APPX. 001869

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 12/25/23 1804age 343 of 1104   PageID 16477
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1624 of 1803   PageID 12370
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 17 of 106

from imposing liability on, **non-debtor third parties**. Nothing in *Pacific Lumber* prevents a debtor or its estate on its own behalf and on behalf of assignees and successors created pursuant to a plan, from releasing its own claims against third parties. Indeed, any such ruling would be directly contrary to the express provisions of section 1123(b)(3)(A).

20.     The Debtor Release is a customary plan provision consistent with the business judgement rule, is fair and equitable and in the best interest of the Estate and its creditors and should be approved. No party that has objected to it has cited any case or statutory basis for preventing a debtor and its successors from releasing the debtor's own claims against third parties, or has demonstrated any basis for believing that any claims of the Debtor or the Estate even exist against the Released Parties.

## V.     THE COURT HAS ALREADY EXCULPATED THE INDEPENDENT DIRECTORS AND THEIR AGENTS FOR NEGLIGENCE PURSUANT TO THE JANUARY 9, 2020 SETTLEMENT ORDER AND, TO THE EXTENT NOT COVERED THEREIN, THE PLAN'S EXCULPATION PROVISIONS EFFECTUATE ESSENTIAL PROTECTIONS FOR ESTATE FIDUCIARIES AND THEIR AGENTS, AND ARE FULLY SUPPORTED BY THE BANKRUPTCY CODE AND APPLICABLE LAW.

21.     Exculpation provisions effectuate the entitlement of court-supervised fiduciaries to qualified immunity for their actions. *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000); *In re A.P.I., Inc.*, 331 B.R. 828, 868 (Bankr. D. Minn. 2005), *aff'd sub nom., OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 U.S. Dist. LEXIS 34297 (D. Minn. May 25, 2006); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994). Such provisions also allow the parties to a chapter 11 case "to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Page 1226/23 1804 ge 344 of 1104    PageID 16478
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1625 of 1803    PageID 12371
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 18 of 106

potentially negligent actions in those proceedings" and, on that rationale, have even been approved when necessary to protect non-fiduciary participants in the chapter 11 process. *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020).

22.    As discussed in detail below, the Settlement Order[11] previously entered by this Court has already exculpated the Independent Directors and their agents from potential negligence claims. Accordingly, as it relates to the Independent Directors and their agents, the Plan's Exculpation Provisions simply respect the integrity of the Settlement Order.  Moreover, it would be a mistake to construe *Pacific Lumber as* categorically prohibiting exculpation provisions.  In fact, *Pacific Lumber* itself expressly endorsed a plan provision exculpating the committee and its members.  For the reasons set forth below, exculpating the Exculpated Parties in respect of their post-petition services for the Estate is entirely consistent with *Pacific Lumber*, other applicable law, and the purposes and policies of chapter 11.  Exculpation is particularly appropriate in this case to stem the tide of frivolous and vexatious litigation against the Exculpated Parties which Dondero and his Related Entities are seeking so desperately to continue to pursue.

A.    **The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation**

23.    The Objectors challenge the Exculpation Provisions on the grounds that they constitute an impermissible third-party release that is prohibited by *Pacific Lumber*.  What the

---

[11] *See, Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* entered January 9, 2020 [D.I. 339] (the "Settlement Order") and *Order Approving Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* entered July 16, 2020 [D.I. 854].

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 12/27/23    Page 345 of 1104    PageID 16479
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1626 of 1803    PageID 12372
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 19 of 106

Objectors ignore, however, is that this Court has **already** exculpated the Independent Directors and their agents for negligence pursuant to the terms of the Settlement Order – a final order to which Dondero agreed as a means of avoiding the appointment of a chapter 11 trustee, and which has been in place for over a year and was never appealed by any of the Objectors, all of whom had notice of it.[12]  Accordingly, the Court should reject Objectors challenge to exculpation of the Independent Directors and their agents as a collateral attack on the Settlement Order which is indisputably a final order of this Court.[13]

> 24.    Paragraph 10 of the Settlement Order expressly provides:
>
> **No entity may commence or pursue a claim or cause of action of any kind** against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of <u>willful misconduct or gross negligence</u> against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Settlement Order, ¶ 10 (emphasis added).  Thus, as to the Independent Directors and their agents, they have already been exculpated for negligence, and the Plan Exculpation Provisions simply preserve the necessary protections and standard of liability already established by the Court for these court-appointed fiduciaries by final order which continues in effect pursuant to the plan.[14]

---

[12] *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (*res judicata* barred a debtor from bringing a claim that was specifically and expressly released by a confirmed reorganization plan because the debtor failed to object to the release at confirmation and was now collaterally attacking the release).

[13] *See Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) ("[e]ven though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.").

[14] *See* Plan, Art. IX.H (Paragraphs 9 and 10 of the Settlement Order remain in effect post-Confirmation).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/28/23 Page 346 of 1104   PageID 16480
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1627 of 1803   PageID 12373
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 20 of 106

25.     Unlike in *Pacific Lumber*, the Independent Directors (which include the

CEO/CRO) are not prepetition officers and directors of the Debtor.  The Independent Directors

were appointed post-petition by the Court pursuant to the Settlement Order as an urgent measure

to address serious concerns raised by the Committee as to extensive breaches of fiduciary duty

and lack of disinterestedness by the Debtor's prepetition management.  In recognition of the

extraordinarily complex, litigious and volatile situation the Independent Directors were getting

into, the Court expressly exculpated the Independent Directors (including the CEO/CRO) and

their agents from claims for negligence in connection with their actions in the case.

### B.     Plan Exculpation Provisions

26.     Article IX.C of the Plan addresses the exculpation of certain Exculpated Parties[15]

and provides that each Exculpated Party shall be exculpated from any Cause of Action arising

out of acts or omissions in connection with this chapter 11 case and certain related transactions,

except for any acts or omissions that are determined by Final Order to have constituted bad faith,

fraud, willful misconduct, criminal misconduct, or gross negligence (the "Exculpation

Provisions").  Although the Exculpation Provisions apply to Strand and certain Employees, the

Exculpation Provisions apply solely with respect to actions taken by Strand and such Employees

---

[15] The Plan defines the "Exculpated Parties" as: (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO, and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

Appellee Appx. 01621
APPX. 01623

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/29/23    Page 347 of 1104    PageID 16481
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1628 of 1803    PageID 12374
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 21 of 106

from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan, and expressly exclude James Dondero and a number of other specified entities.[16]    The provision provides:

> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); *provided*, *however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

27.    An exculpation provision differs from a release.[17]    An exculpation provision sets a standard of liability that absolves a person from liability for ordinary negligence, but not from liability for more egregious conduct.    In this respect, it is consistent with the duty of care and duty of loyalty standards of the business judgment rule that protects business entities and

---

[16] To the extent there is any conflict between the descriptions of the Exculpation Provisions herein and the Plan, the Plan shall control.

[17] *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans," does not affect the liability of these parties, but rather states the standard of liability under the Code, and as it exculpated the named parties for actions during the course of the case did not implicate section 524(e).)

DOCS_SF:104855.7 36027/002

Appellee Appx. 01622
APPX. 01624

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-36   Page 1630 of 1804   Page 348 of 1104   PageID 16482
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1629 of 1803   PageID 12375
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 22 of 106

individual fiduciaries from liability when their actions are taken within their authority and good faith.[18]

28.     Various objections have been raised to the inclusion of the Exculpation Provisions in the Plan.  Each of the Objectors argues that, except with regard to the Committee and its Professionals, the Exculpation Provisions are impermissible based upon their misunderstanding and overly-broad reading of the opinion of the Fifth Circuit in *Pacific Lumber*.[19]

### C.     Pacific Lumber

29.     Because every argument relied upon by the Objectors as to the permissibility of the Exculpation Provisions is premised on *Pacific Lumber*, it is important to analyze exactly what the Fifth Circuit actually held based on the appeal and the briefing before it.  The portion of the *Pacific Lumber* opinion addressing non-debtor exculpation and releases is less than two pages long and, when appropriately construed, is inapposite to this case, except insofar as it approved the exculpation of the creditors' committee and its members.

30.     In *Pacific Lumber*, a prepetition secured creditor joined with a competitor of one of the debtors to propose a chapter 11 plan (the "MRC/Marathon Plan").  The MRC/Marathon Plan included a provision that exculpated the plan proponents, the reorganized debtors, the unsecured creditors' committee and each of their respective professionals, officers and directors from liability (other than for willful misconduct and gross negligence) relating to proposing, implementing and administering the chapter 11 plan.  The bankruptcy court approved the

---

[18] *See* Bernard S. Sharfman, *Importance of the Business Judgement Rule*, Harvard Law School Forum on Corporate Governance, posted at https://corpgov.law.harvard.edu/2017/01/19/the-importance-of-the-business-judgment-rule/

[19] The Objectors acknowledge the Fifth Circuit expressly held that the exculpation of the unsecured creditors' committee and its members and professionals was appropriate.  Therefore, the Exculpation Provisions as applied to these parties will not be discussed further herein.

16

Appellee Appx. 01623
APPX. 16475

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Page 12637 of 1904    Page 349 of 1104    PageID 16483
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1630 of 1803    PageID 12376
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 23 of 106

discharges, releases, exculpations and injunctions pursuant to sections 105, 524, 1123(a)(5) and

1129.

31.    The appellants were an indenture trustee and certain bondholders who had voted

against the MRC/Marathon Plan and were the unsuccessful proponents of a competing plan

which, incidentally, contained non-debtor third-party releases and exculpation provisions

identical in scope to those in the MRC/Marathon Plan.[20]  On appeal, the Fifth Circuit either

affirmed or dismissed on mootness grounds in respect of every issue raised on appeal, other than

the release and exculpation provisions.  While the issues on appeal had been broadly worded,[21]

the only issue in respect of the release and exculpation provisions actually briefed by the

appellants was the impropriety of the release and exculpation provisions for the benefit of the

non-debtor plan proponents and the committee.[22]

32.    The Fifth Circuit relied ***exclusively*** on section 524(e) of the Bankruptcy Code for

its observation that non-consensual releases or exculpations of non-debtors are not allowed, even

for actions taken during the case.  *Id.* at 252-3.  Section 524 is entitled "Effect of discharge" and

subsection 524(e) provides that a "discharge of a debt of a debtor does not affect the liability of

---

[20] *See First Amended Chapter 11 Plan for Scotia Pacific Company LLC proposed by the Bank of New York Trust Company, N.A., as Indenture Trustee for the Timber Notes (as modified on April 28, 2008)* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 2774], Sections 10.1, 10.3 and 10.4.

[21] *See The Indenture Trustee's Statement of Issues on Appeal of the Order Confirming the MRC/Marathon Plan* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 3431] at p. 4, Issue No. 18.

[22] *See Brief of Appellants* [*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee,* Case No.08-40746, U.S. Court of Appeals for the Fifth Circuit, August 25, 2008], at pp. 55-56 ("The Plan contains an expansive "Exculpation Clause" which purports to release claims of non-consenting creditors against numerous non-debtors, including "officers, directors, professionals, members, agents and employees" of MRC, Marathon and the Committee. . . . ***Having obtained confirmation of the Plan through the erroneous means set forth above, the Plan Proponents propose to use this overbroad release language to exonerate*** themselves.") (emphasis added; record cites omitted)

Appellee Appx. 01624
APPX. 01626

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/22/23    Page 350 of 1104    PageID 16484
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1631 of 1803    PageID 12377
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 24 of 106

any other entity on . . . such debt." Thus, on its face, section 524(e), only prohibits a plan from discharging obligations of third parties who are liable with the debtor on its debts. The Fifth Circuit focused on co-liability for "pre-petition debts,"[23] yet applied the prohibition to causes of action for "any negligent conduct that occurred during the course of the bankruptcy."[24]

33.    Notably, the briefing on the issue presented to the Fifth Circuit had dealt with the impropriety of the exculpation of the non-debtor plan proponents and the committee, <u>but not</u> with the officers and directors of the Debtor. Thus, to the extent the Fifth Circuit included the debtor's officers and directors in its discussion, that discussion constituted mere *dicta*.

34.    Although the Fifth Circuit ruled that section 524(e) did not support exculpation for certain persons, such as the non-debtor plan proponents in that case, the Court did not treat section 524(e) as an absolute bar to exculpation provisions in a plan that were supportable by other sections of the Bankruptcy Code, by other applicable law or by legitimate policy considerations relating to the chapter 11 process. In approving the exculpation as to the committee and its members, the court cited to the qualified immunity of committees under section 1103(c) of the Bankruptcy Code and to an important policy concern regarding the effect of denying exculpation on the chapter 11 process: "actions 'against committee members in their capacity as such should be discouraged. If members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee.' The

---

[23] *Id.* at 252.
[24] *Id.*

Appellee Appx. 01625
APPX. 16487

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Filed 12/23/23   Page 351 of 1104   PageID 16485
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1632 of 1803   PageID 12378
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 25 of 106

Creditors' Committee and its members are the only disinterested volunteers among the parties sought to be released here." *Id.,* at 252 (cites omitted).

35.    The Debtor is, of course, not asking this court to override the Fifth Circuit's holding in *Pacific Lumber*. Rather, as discussed below, the facts of this case are such that the rationale applied by the Fifth Circuit to permit exculpation of the committee and its members fully supports the Plan Exculpation Provisions. The need for exculpation has already been recognized by this Court in the Settlement Order. Furthermore, as the *Pacific Lumber* ruling was based solely on section 524(e), nothing in that opinion precludes approval of the Exculpation Provisions pursuant to other provisions of the Bankruptcy Code or other applicable law.

### D.    Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by *Pacific Lumber*.

36.    The propriety of the Plan Exculpation Provisions should be considered as they apply to each respective Exculpated Party.

37.    <u>The Debtor</u>. The Debtor and its successors and assigns are entitled to the relief embodied in the Exculpation Provision. With exceptions not applicable here, the Debtor, as debtor in possession, has all the rights and powers of a trustee. 11 U.S.C. § 1107(a). Accordingly, the Debtor's right to qualified immunity is co-extensive with that of a trustee. Moreover, granting the Debtor such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code. *See* 11 U.S.C. §§ 524 and 1141. The Claimant Trust and Litigation Sub-Trust are successors to and assigns of the Debtor, and thus, to the extent applicable to the scope of the Exculpation Provisions, should be similarly protected. In the context of this Plan, the Claimant Trust and Litigation Sub-Trust are court-approved fiduciaries

Appellee Appx. 01626
APPX. 01626

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/23/23   Page 352 of 1104   PageID 16486
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1633 of 1803   PageID 12379
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 26 of 106

whose sole purpose is to operate the Debtor's business for a limited period of time to effectuate an orderly monetization of the Debtor's assets and pay the claims of creditors. Post-Confirmation, the Debtor and its successors are entitled to exculpation.

38. <u>The Independent Directors</u>. Even if the Settlement Order did not plainly provide the Independent Directors with exculpation, in the context of this case, the Independent Directors are akin to committee members and the same rationale the Fifth Circuit used in *Pacific Lumber* to uphold the exculpation of committee members applies to the Independent Directors. The use of independent directors has become commonplace in large complex commercial cases, both on the eve of bankruptcy[25] and post-petition,[26] especially where there are allegations of mismanagement, breaches of fiduciary duty or other conflicts that cast shadows on the relationship between the debtor in possession and its creditors, who question whether existing officers and directors can faithfully perform their fiduciary duties as the face of the debtor in possession.[27] Independent directors tend to be either experienced restructuring professionals

---

[25] Some examples of major bankruptcy cases in which independent directors have been appointed just prior to bankruptcy, usually due to accounting  irregularities and other events that resulted in distrust of management by major creditor constituencies, include: *Neiman Marcus Group, Inc.* (S.D. Tex); *WorldCom* (S.D. N.Y.); *Sears* (S.D. N.Y.); *California Pizza Kitchen* (S.D. Tex.); *PG&E Corp.* (N.D. Cal.); *Adelphia Communication Corp.* (S.D. N.Y.); Station Casinos (D. Nev.); and *Cengage Learning Centers* (E.D. N.Y.).

[26] *See* Regina Kelbon and Michael DeBaecke, *Appointment of Independent Directors on the Eve of Bankruptcy: Why the Growing Trend*, paper prepared for the Penn. Bar Institute 19th Annual Bankruptcy Institute, June 27, 2014, at pp. 17-23, available at https://www.blankrome.com/siteFiles/publications//B3795676DF921A7E3BED8A9F15E7FDF3.pdf (discussing use of independent directors both pre- and post-petition and certain cases utilizing same).

[27] *See, e.g., In re Natrol, Inc*., Case No. 14-22446 (Bankr. D. Del.) Motion and Order Appointing Independent Directors [Docket Nos. 248 and 305] (independent directors appointed to settle motion for appointment of trustee by large creditor); *In re 4 West Holdings, Inc.,* Case No. 18-30777 (Bankr. N.D. Tex) Motion and Order Appointing Independent Directors [Docket Nos. 311 and 383] (independent director appointed to review propriety of certain settlements and business and marketing plan); *In re Synergy Pharmaceuticals, Inc*., Case No. 18-14010 (Bankr. S.D.N.Y.) Motion and Stipulation and Order Appointing Independent Directors [Docket Nos. 373 and 553] (independent directors appointed because of pending shareholder derivative actions against prepetition board members); *In re Zohar III, Corp.*, Case No. 18-10512 (Bankr. D. Del.) Order Appointing Independent Director [Docket No. 267] (independent director appointed as part of a mediated settlement over sale of a portfolio of financial services entity debtor]; *In re Interlogic Outsourcing, Inc.*, Case No. 19-31444 (Bankr. N.D. Ind.) Motion

---

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/20/23 Page 353 of 1104    PageID 16487
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1634 of 1803    PageID 12380
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 27 of 106

(attorneys or financial advisors) or seasoned industry professionals with immaculate corporate records.  Reliance on the use of independent directors has thus become a critical tool in proper corporate governance and restoring creditor confidence in management in modern day corporate restructurings.  Failure to protect independent directors from claims of ordinary negligence will discourage sophisticated restructuring personnel from accepting appointment to such roles and will have a substantial negative effect on the efficacy of the chapter 11 process and the efficient realization of its purposes and goals.

39.    The Independent Directors appointed in this case are persons of such stature, as they include a former bankruptcy judge, former commercial bankruptcy practitioners and a person with expertise in hedge fund operations.  As indicated by the Fifth Circuit in *Pacific Lumber*, if estate fiduciaries who are "disinterested volunteers" can be sued for actions taken during the course of a case pursuant to the Bankruptcy Code and under judicial supervision, qualified people would not serve, and the integrity of the chapter 11 process would be compromised.  This policy concern is particularly acute where, as here, the Independent Directors undertook their duties in the midst of a highly contentious and litigious case.

40.    In this case, the Independent Directors also are analogous to bankruptcy trustees. Section 1107(a) of the Bankruptcy Code provides that a debtor in possession has all of the rights and powers, and substantially all of the duties, of a bankruptcy trustee, and the case law makes it clear that the debtor in possession and its officers and directors serve in the same fiduciary capacity as a trustee.  The Independent Directors were approved by the court to serve as post-

---

and Order Appointing Independent Directors [Docket Nos. 198 and 394] (independent director appointed for general corporate oversight).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/26/23    Page 354 of 1104    PageID 16488
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1635 of 1803    PageID 12381
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 28 of 106

petition fiduciaries in this case in order to resolve insistent and urgent demands for the appointment of a trustee to supplant the prepetition directors and senior officers. In fact, the Court denied the U.S. Trustee's motion seeking appointment of a chapter 11 trustee based primarily on its approval of the Independent Directors to act as court-supervised fiduciaries for the Debtor and the Estate – the functional equivalent of a chapter 11 trustee. It is well established that trustees have qualified immunity for acts taken within the scope of their appointment. *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981). Like trustees, the Independent Directors are estate fiduciaries. *In re Houston Regional Sports Network, L.P.*, 505 B.R. 468, 481-82 (Bankr. S.D. Tex. 2014) (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)

41.    For the same reasons that the Fifth Circuit upheld the exculpation of committee members in *Pacific Lumber*, and <u>pursuant</u> to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code and the related applicable non-bankruptcy law governing the immunity and exculpation of fiduciaries, none of which were actually addressed in *Pacific Lumber*, the Exculpation Provisions should be approved as to the Independent Directors and CEO/CRO.

42.    <u>Professionals.</u> The Debtor's Professionals are entitled to exculpation. *See, In re Ondova Ltd. Co. v. Sherman*, 914 F.3d 990 (5th Cir. 2019) (protecting counsel for trustee from suit when acting pursuant to direction of its client within the scope of its employment); *Harris v. Wittman (In re Harris),* 590 F.3d 730 (9th Cir. 2009)(same). There is no distinction in the Bankruptcy Code between counsel for a trustee and counsel for a debtor in possession – both are

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6 Page 122 37 of 18 of 04 ge 355 of 1104    PageID 16489
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1636 of 1803    PageID 12382
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 29 of 106

subject to court approval of their retention, both serve as counsel to estate fiduciaries and both

are subject to their actions and compensation being reviewed and approved by the Court.[28]

43.     Additionally, under applicable Texas law, attorneys are immune from civil

liability to non-clients for actions taken in connection with representing a client in litigation.  *See*

*Cantey Hanger, LLP v. Byrd, 467 S.W.3d 477, 481* (Tex. 2015); *see also Troice v. Proskauer*

*Rose, L.L.P.,* 816 F.3d 341 (5th Cir. 2016) (dismissing securities fraud litigation brought by third

parties against counsel for certain companies related to Ponzi scheme perpetrator Allen

Stanford).

44.     <u>Strand.</u>  It is appropriate to include Strand in the Exculpation Provisions.  Strand

is the Debtor's general partner, and the Independent Directors are the directors of Strand.  Strand

should be protected to the same extent as the Debtor and the Independent Directors, and for the

same reasons.  *See In re Houston Reg'l Sports Network, L.P.,* (directors of a non-debtor general

partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties

to the estate are paramount.)  In regard to Strand, the Exculpation Provisions apply solely with

respect to actions taken by Strand from and after the date of the post-petition appointment of the

Independent Directors, through the Effective Date of the Plan.

45.     <u>Employees.</u>  The Employees, as agents of the Independent Directors, are already

covered by the Settlement Order's exculpation provision for acts taken in furtherance of and

---

[28] *See Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.),* 200 F.3d 382  (5th Cir. 2000) (order approving final fee application of court-appointed professional was *res judicata* in respect of subsequent lawsuit by trustee alleging malpractice and negligence where potential claims were known to trustee at the time of final fee hearing.).  *See also, Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.),* 163 F.3d 925 at 931 (5th Cir.), *cert. denied,* 527 U.S. 1004 (1999) (judgment in bankruptcy court lawsuit brought by reorganized debtor seeking fee disgorgement against accountant for debtor for failure to disclose relationship with potential litigant was *res judicata* in respect of subsequent state court lawsuit by debtor for malpractice).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/28/23    Page 356 of 1104    PageID 16490
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1637 of 1803    PageID 12383
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 30 of 106

under the direction and supervision of the Independent Directors in administering, managing and operating the Debtors.  However, even if the Employees were not already covered by the Settlement Order, it would be appropriate to include the Employees in the Exculpation Provisions.  The Exculpation Provisions apply to the Employees solely with respect to actions taken by the Employees from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

### E.    Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan

46.    The Debtor is seeking approval of the Exculpation Provisions in its Plan pursuant to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code; the qualified immunity of bankruptcy trustees and their agents, and the correlative qualified immunity of debtors in possession; the related applicable non-bankruptcy law on immunity and exculpation of fiduciaries; and the strong policy reasons offered by the Fifth Circuit as to committee members, which apply to the Independent Directors in the same way as the Fifth Circuit applied them to committee members.  The Bankruptcy Code makes it clear that "any appropriate provision not inconsistent with the applicable provisions of this title" may be included in a chapter 11 plan.[29]

47.    The Fifth Circuit's *Pacific Lumber* ruling denying exculpation to certain parties was based on section 524(e).  Some recent court decisions approving exculpation provisions have held, however, that in dealing with complex and litigious bankruptcy cases, section 524(e)

---

[29] 11 U.S.C. § 1123(b)(6).

Appellee Appx. 01631
APPX. 01832

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-36 Filed 12/29/23 Page 357 of 1104 PageID 16491
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1638 of 1803 PageID 12384
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 31 of 106

is not a bar to setting a standard of liability that limits liability for negligence for acts taken during the course of the case in furtherance of the purpose of chapter 11. For example, in *Blixseth*,[30] the Ninth Circuit (which generally does not permit third-party releases in plans) determined that the exculpation clause at issue did not implicate section 524(e) because it related to post-petition actions that occurred during the bankruptcy process, and did not implicate any potential liability on prepetition debts of the debtor. The Court further explained that, despite prior Ninth Circuit decisions disproving third-party releases relating to such prepetition debts of the debtor, exculpation provisions with third-party releases are permissible because chapter 11 cases are often "highly litigious" where "oxes [sic] are gored" and such releases limited in time and scope "allow the settling parties. . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Id*. at 1084. Finally, the court held, as many of its sister circuits have held, that under sections 105(a) and 1123 "the bankruptcy court here had the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable." *Id*. Significantly, the creditor whose exculpation was at issue in *Blixseth* was not even an estate fiduciary. *Id*. at 1081.

48. Another court recently dealing with exculpation issues discussed the need for an appropriately-constructed exculpation of estate fiduciaries and exculpation relating to court approved transactions in order to preserve the basic integrity of the chapter 11 process. In *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y 2019), the bankruptcy

---

[30] 961 F.3d 1074 (9th Cir. 2020)

Appellee Appx. 01632
APPX. 01634

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-36 Filed 12/20/23 Page 358 of 1104 PageID 16492
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1639 of 1803 PageID 12385
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 32 of 106

court was presented with a broad exculpation clause in a plan that protected not only court-supervised fiduciaries, but also entities such as the acquirer, the acquirer's professionals, the pre- and post-petition lenders and the indenture trustees. As here, the exculpation provision pertained to acts and omissions taken in connection with and during the bankruptcy case, but excluded acts of fraud, willful misconduct or gross negligence.

49. The court declined to approve the exculpation provision as written, holding that it was overly broad, but nevertheless provided significant guidance on what an appropriate exculpation provision should provide:

> *I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.* If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do. *Cf. Airadigm Commc'ns., Inc. v. FCC (In Re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57 (7th Cir. 2008) (approving a plan provision that exculpated an entity that funded a plan from liability arising out of or in connection with the confirmation of the Plan, except for willful misconduct); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that was limited to conduct during the bankruptcy case and noting that the effect of the provision is to require "that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation.").

599 B.R. at 720-721 (emphasis added). The Exculpation Provisions in the Plan here are consistent with the policy-based and chapter 11 process-based guidelines provided by Judge Wiles in *Aegean Marine*, in that they apply to court-supervised fiduciaries and transactions entered into under the auspices of the court.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-16    Filed 12/29/23    Page 359 of 1104    PageID 16493
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1640 of 1803    PageID 12386
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 33 of 106

50.    Additionally, the bankruptcy court's power to approve an exculpation provision in a chapter 11 plan flows naturally from the fact that it cannot confirm a chapter 11 plan unless it finds that the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code and the plan has been proposed in good faith.[31]  The plan is the culmination of the chapter 11 case.  By confirming a plan and making the "good faith" finding, the court is determining that the plan proponent (usually, the debtor) and its officers and directors have acted appropriately throughout the case, consistent with their fiduciary duties and have been administering, managing and operating the debtor in accordance with the provisions of the Bankruptcy Code and applicable law.[32]  Once the court makes its good faith finding, it is appropriate to set the standard of liability of the fiduciaries (and, as in *Blixseth*, other parties) involved in the formulation of that chapter 11 plan.[33]

51.    An exculpation provision appropriately prevents future collateral attacks against fiduciaries of the debtor's estate.  Here, the Exculpation Provisions are appropriate because they provide protection to those parties who served as post-petition court-approved fiduciaries during the restructuring process – relief that in this litigious case, as all participants are painfully aware, is indispensable.  The Exculpation Provisions are in consideration for services rendered, hard work, and perseverance in the face of threats to professional reputation and bodily harm.  The Exculpation Provisions should be approved, and the objections, asserted for the most part by the

---

[31] *See* 11 U.S.C. § 1129(a)(2) and (3).

[32] *See* 11 U.S.C. § 1129(a).

[33] *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

DOCS_SF:104855.7 36027/002

Appellee Appx. 01634
Appx. 04836

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6  Exhibit 6   Page 126 of 18 Page 360 of 1104   PageID 16494
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1641 of 1803   PageID 12387
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 34 of 106

very individual and entities that have created the need for such provisions by turning this case into a war zone, should be overruled.

## VI. THE PLAN INJUNCTION IS APPROPRIATE AND IS NARROWLY TAILORED TO EFFECTUATE THE PLAN AND RELATED PROVISIONS OF THE BANKRUPTCY CODE.

52.     The Court should approve the injunction provisions (the "Injunction" or "Injunction Provisions"), set forth in Article IX.F of the Plan.  This is because the Injunction Provisions are necessary and appropriate to enable the Debtor and its successors to carry out, and obtain the benefits of, the provisions of the Bankruptcy Code relating to the Plan and the proper implementation and consummation of the Plan.  Approval of the requested Injunction Provisions is well within this Court's powers.

53.     The Objectors have objected to the Injunction Provisions on several grounds.  The Debtor has reviewed the Injunction Provisions and revised them to address certain of the Objectors' concerns as follows:

- The Injunction and Gatekeeper Provisions have been narrowed to apply only to Enjoined Parties.[34]

- The Independent Directors are no longer included in the second paragraph of the Injunction.

- The Reorganized Debtor and the Claimant Trust have been deleted from the second paragraph of the Injunction in order to eliminate any potential confusion that they were included in any capacity other than as successors to the Debtor, which is now clarified in the third paragraph of the Injunction.

---

[34] "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.  Plan, Art. I.B., Def. 56 (new definition in the Plan (as amended)).

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Page 1243/23 1804 Page 361 of 1104 PageID 16495
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1642 of 1803 PageID 12388
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 35 of 106

- The Injunction is subject to parties' rights to set off to the extent permitted post-confirmation under sections 553 and 1141 of the Bankruptcy Code.

- The Gatekeeper Provision has been amended to clarify the actions for which parties must first seek the approval of the Bankruptcy Court to pursue.

- The grant of exclusive jurisdiction over the merits previously contained in the Gatekeeper Provision has been removed, and the Gatekeeper Provision has been modified to provide that if the Bankruptcy Court, as gatekeeper, decides an action can be brought, the Bankruptcy Court will adjudicate that action on the merits *only* to the extent the court has jurisdiction to do so.

- Articles IX.G and H of the Plan have been modified to clarify the duration of the automatic stay and other injunctions which are either currently in effect or contained in the Plan.

54.     The Injunction Provision, as modified, merely implement and enforce the Plan's discharge, release, and Exculpation Provisions and related provisions of the Bankruptcy Code and enjoin the Enjoined Parties from commencing or maintaining actions to interfere with the implementation or consummation of the Plan.  The Injunction Provisions are a necessary part of the Plan because they protect the Plan implementation provisions required to monetize the Debtor's assets and pursue the Causes of Action, all of which has been vociferously and continually opposed and litigated by Dondero and his numerous Related Entities, with such vexatious opposition likely to continue post-confirmation.  Several parties – principally Dondero, Dugaboy and his Related Entities – have objected to the Injunction, which is not surprising because Dondero and his Related Entities undoubtedly intend to continue their litigation crusade against the Debtor and its successors after confirmation of the Plan.

A.     **Plan Injunction Provisions**

55.     Section IX.F of the Plan is entitled "Injunction" and applies post-Effective Date. The Injunction contains three distinct provisions:

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/24/23    Page 362 of 1104    PageID 16496
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1643 of 1803    PageID 12389
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 36 of 106

56.    Paragraph 1, as amended, provides:

**Upon entry of the Confirmation Order, all** ~~holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons,~~ Enjoined Parties are and **shall be** permanently **enjoined,** on and after the Effective Date, **from taking any actions to interfere with the implementation or consummation of the Plan.**

57.    As revised, paragraphs 2 and 3 provide:

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all** ~~Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan)~~ ~~and other parties in interest, along with their respective Related Persons, are~~ Enjoined Parties are and shall be **permanently enjoined, on and after the Effective Date, with respect to** ~~such~~ any **Claims and Equity Interests, from** directly or indirectly **(i) commencing, conducting, or continuing in any manner** ~~, directly or indirectly~~ **any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering,** enforcing, or attempting to recover or enforce, **by any manner or means** ~~, whether directly or indirectly~~ **, any judgment, award, decree, or order against the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (iii) creating, perfecting, or otherwise enforcing in any manner,** ~~directly or indirectly,~~ **any** security interest, lien or **encumbrance of any kind against the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (iv) asserting any right of setoff, directly or indirectly, against any obligation due** ~~from~~ to **the Debtor** ~~Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or against property or interests in property of** ~~any of the Debtor, Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, **and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to**, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding

Appellee Appx. 01637

Appx. 01839

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-1 Page 1264 of 1804 Page 363 of 1104    PageID 16497
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1644 of 1803    PageID 12390
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 37 of 106

> **paragraph against** any successors of the Debtor, **including, but not limited to,** the Reorganized Debtor, **the Litigation Sub-Trust,** and the Claimant Trust and their respective property and interests in property.

Plan, Art. IX.F.

58.    As amended, paragraph 4 of Section IX.F contains a gatekeeper provision (the "Gatekeeper Provision") which provides:

> **Subject in all respects to ARTICLE XII.D, no ~~Entity~~ Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of ~~this~~ the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such ~~Entity~~ Enjoined Party to bring such claim or cause of action against any such Protected Party; _provided, however,_ the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such ~~Entities~~ Employee from the date of appointment of the Independent Directors through the Effective Date. ~~As set forth in ARTICLE XI, the~~ The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate ~~any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted~~ the underlying colorable claim or cause of action.**

Plan, Art. IX.F.

59.    To the extent an Enjoined Party believes it has any claims against a Protected Party, such Enjoined Party must first seek permission of the Bankruptcy Court to file such action and demonstrate that the claims it seeks to assert are colorable claims.  Subject to certain carve outs, Protected Parties are defined collectively as:

31

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/26/23    Page 364 of 1104    PageID 16498
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1645 of 1803    PageID 12391
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 38 of 106

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); . . . .

Plan, Art. I.B. Def. 105.    If the Bankruptcy Court determines a claim is colorable, the Bankruptcy Court will make a separate determination as to whether it has jurisdiction to adjudicate such claim on its merits in accordance with the terms of the Plan and applicable law.

**B.    Objections**

60.    A number of parties, including Dondero and many of his affiliated, controlled or influenced entities, object to the Injunction Provisions (as identified in the chart of objections attached as Exhibit B).  The Objectors all raise similar arguments and allege:

- The Injunction is ambiguous and overly-broad because the meaning of the phrase "implementation and consummation of the plan" is unclear.

- The Injunction operates post-effective date and enjoins post-confirmation claims against non-debtor third parties for post confirmation conduct.

- The Injunction is a disguised non-debtor third party release.

- The Injunction Provisions prevent holders of Claims and Equity Interests from enforcing rights created by the Plan after the Effective Date.

- The Gatekeeper Provision effectuates an impermissible extension of the jurisdiction of the Bankruptcy Court.

61.    As summarized above and discussed more fully below, the Injunction Provisions, as amended, have addressed certain of these arguments.  The remaining objections, however,

DOCS_SF:104855.7 36027/002

**Appellee Appx. 01639**

**APPX. 10490**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/27/23 1804 age 365 of 1104   PageID 16499
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1646 of 1803   PageID 12392
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 39 of 106

lack merit and are based on either a misreading of the actual Injunction Provisions or a misstatement of applicable law. Each objection will be addressed below.

**C.    An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate.**

62.    Certain objectors argue that the first paragraph of the Plan Injunction, which enjoins all holders of Claims or Equity Interests and other parties in interest, along with their Related Persons, from taking any action to interfere with the "implementation or consummation of the Plan," is overly-broad and ambiguous because the meaning of the phrase "implementation and consummation of the plan" is somehow unclear. These objections are specious.

63.    An injunction in aid of the effectuation of a confirmed plan is typically included in a plan and confirmation order to prevent actions to impede or frustrate the plan proponent's necessary and appropriate actions after confirmation to effectuate the plan and carry out the court's confirmation order. The Injunction is supported by the express provisions of sections 1123(a)(5), 1123(b)(6), 1141(a), 1141(c), and 1142. The Injunction effectuates the purposes of plan confirmation and chapter 11 and preserves and protects the integrity of the chapter 11 process and the court's orders.

64.    The terms "implementation" and "consummation" are neither vague nor overly-broad; they are both terms found in the text of chapter 11 of the Bankruptcy Code and are well understood – and injunctions against interfering with them are common features of plans confirmed throughout the country, including in this District.[35]   Section 1123(a)(5) expressly

---

[35] *See, e.g., In re Tuesday Morning Corp.* (Case No. 20-31476, Bankr. N.D. Tex.) *Debtor's Second Amended Plan of Reorganization* [D.I. 1913-1] attached to *Order Confirming the Revised Second Amended Joint Plan of Reorganization,* at pp. 90-91/137; *In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 886    Filed 12/28/23    Page 366 of 1104    PageID 16500
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1647 of 1803    PageID 12393
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 40 of 106

mandates that "a plan <u>shall</u> . . . provide adequate means for the plan's <u>implementation</u>" (emphasis added) and contains a non-exclusive list of what means that could include.  In compliance with section 1123(a)(5), this Plan expressly sets out the means for its "implementation."  *See* Plan, Article IV: Implementation of Plan.  *See also* 11 U.S.C. § 1142. The Injunction would enjoin any interference with these implementation steps.

65.    The word "consummation" is also found in the Bankruptcy Code and has been discussed by numerous courts.    For example, section 1101(2) defines "substantial consummation" of a plan to be (A) the transfer of the assets to be transferred under the plan; (B) the assumption by the debtor or the successor to the debtor of the management of all of the property dealt with by the plan; and (C) commencement of distribution under the plan.  Of course, the term "consummation," without the qualifier "substantial," is more expansive and would extend, for example, to the completion of distributions under the Plan and the disposition of all of the property dealt with by the Plan.  *See, e.g., United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (distinguishing "substantial consummation" of a plan from final consummation of a plan, which occurs after the effective date when the plan distributions are concluded.)

66.    This portion of the Injunction merely prevents holders of Claims or Equity Interests and other Enjoined Parties from interfering with the actions the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust must take

---

*Bankruptcy Code* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code,* Sec. 10.5.

Appellee Appx. 01641
APPX. 01892

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/29/23    Page 367 of 1104    PageID 16501
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1648 of 1803    PageID 12394
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 41 of 106

to effectuate the terms of the Plan after the Plan is confirmed by the Court.  There is nothing nefarious or unusual about this provision and it should be approved.

**D.    The Injunction Is Not a Disguised Non-Debtor Third-Party Release.**

67.    The Injunction does not contain a non-debtor third-party release.  As set forth in the Plan, as amended, the Debtor has provided clarification to address the concerns of the Objectors who interpreted the prior provision to effectuate a non-debtor third-party release.  The amended second and third paragraphs of the Injunction prevent the Enjoined Parties from taking the enumerated actions on or after the Effective Date against the Debtor or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, except as set forth in the Plan or in the Confirmation Order.  The Debtor has eliminated the Independent Directors from these provisions of the Injunction.  As revised, nothing in this section of the Injunction does anything more than prevent the Enjoined Parties from taking actions that do not comply with or conform to the provisions of the Plan, and limit holders of Claims and Equity Interests with respect to such Claims and Equity Interests to the recoveries provided under the Plan, all as contemplated by sections 1123(b)(6) and 1141 in respect of claims or interests arising either prepetition or post-petition.  The ultimate goal of a chapter 11 case is for a debtor to confirm a plan which, after confirmation, effectively channels all claims and interests of creditors and interest holders to the treatment provided for the pre- and post-petition claims and interests under the plan, and limits the liability of the debtor (including the

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Page 12650 of 1804    Page 368 of 1104    PageID 16502
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1649 of 1803    PageID 12395
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 42 of 106

"reorganized debtor") and any successor that receives property of the debtor dealt with by the plan (such as a plan trust) to the liability imposed by that treatment.

68.     Sections 1123 and 1129 of the Bankruptcy Code require a plan to describe how it will treat the claims of creditors and the interests of equity holders, both those that existed prepetition and those that arise during the course of a case.  The purpose of the Injunction is to protect the Debtor and its successors under the Plan – the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust –against litigation to pursue the very same prepetition and post-petition claims and interests that are being treated under the Plan.  As described below, providing the protection of the Injunction to all of such entities is both legal and appropriate.

69.     As to the Debtor, the Injunction is appropriate, because it implements the injunctive relief the Bankruptcy Code affords the Debtor, whether or not it gets a discharge, as a result of plan confirmation.  If the Debtor is entitled to the discharge as contemplated by the Plan, then it is accorded the injunction provided by sections 1141(d) and 524(a).  But even if the Debtor does not receive a discharge then, pursuant to section 362(c)(2)(A), the automatic stay will remain in effect until the case is closed, and the Injunction is in aid of that stay.  Moreover, pursuant to section 1141(c) of the Bankruptcy Code, because *all* of the Debtor's property is "dealt with by the plan," all of that property will be "free and clear of all claims and interests . . . .," both as to property retained by the Debtor, and property transferred to its successors.  Accordingly, the Injunction is an appropriate means of enforcing section 1141(c).

70.     Nothing in the Injunction effectuates a third-party release in contravention of section 524(e) of the Bankruptcy Code.  As to the "Reorganized Debtor," this term simply means

DOCS_SF:104855.7 36027/002

Appellee Appx. 01643
APPX. 01645

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/21/23   Page 369 of 1104   PageID 16503
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1650 of 1803   PageID 12396
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 43 of 106

the Debtor on and after the Effective Date.  *See* Plan, Art. I.B., Definition 112.  The Reorganized Debtor, therefore, should be entitled to the same injunctive relief as the Debtor.  To hold otherwise would be illogical.

71.     The Claimant Trust and Litigation Sub-Trust are successors to the Debtor – both in structure and in assets.  Neither the Claimant Trust nor the Litigation Sub-Trust come into existence until the Effective Date, and thus, the only liability they could have to the holders of Claims and Equity Interests would be the liability to treat such Claims and Equity Interests as set forth in the Plan.  All of the property of the Claimant Trust and Litigation Sub-Trust is property of the Debtor and the Estate that these Trusts will receive from the Debtor and the Estate pursuant to the Plan on the Effective Date and is "dealt with" by the Plan.  Accordingly, under section 1141(c), that property will be received and held by the Claimant Trust and the Litigation Sub-Trust "free and clear of all claims and interests of creditors and equity security holders."  Paragraph 2 of the Injunction is in aid of this provision and, in the words of section 105, is "necessary or appropriate to carry out the provisions of" the Bankruptcy Code, *i.e.,* section 1141(c).

### E.     The Injunction Does Not Prevent the Holders of Claims or Equity Interests from Enforcing Rights Arising under the Plan or Confirmation Order.

72.     The Injunction does not prevent holders of Claims or Equity Interests from enforcing, after the Effective Date, rights arising under the Plan or the Confirmation Order.  The scope of the Injunction is specifically subject to the Plan, the Confirmation Order and any other order of the Court.  Thus, the right of the holder of a Claim or Equity Interest to receive its plan distributions, as set out in the Plan, is not impacted – such persons are merely enjoined from

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/05/23   Page 370 of 1104   PageID 16504
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1651 of 1803   PageID 12397
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 44 of 106

taking the enumerated actions to enforce their Claims or Equity Interests outside of the Plan process and treatment.  If, for example, the Claimant Trust made distributions to certain creditors but not others, those who did not receive their distribution, would be free to enforce the provisions of the Plan contract.  This is clear from the language of the Injunction, which begins "[e]xcept as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . ."  Plan, Art. IX.F.

73.    The Injunction is not a third-party release, does not prevent enforcement of the provisions of the Plan itself, and is neither vague nor overly-broad.  The Court should overrule the objections and approve the Injunction in aid of the consummation and administration of the Plan as appropriate and consistent with sections 362, 1123 and 1141 of the Bankruptcy Code.

## VII.    THE GATEKEEPER PROVISION IS NECESSARY AND APPROPRIATE, AND SUPPORTED BY APPLICABLE LAW.

### A.    The Gatekeeper Provision

74.    Paragraph 4 of Section IX.F contains neither a release nor an injunction.  Rather, Paragraph 4 contains a provision that requires any Enjoined Party that believes it has any claims against a Protected Party "**that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing**" to first seek leave from the Bankruptcy Court to pursue such alleged claims and present evidence as to why it believes it has a colorable claim against the

Appellee Appx. 01645

APPX. 01645

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/23/23   Page 371 of 1104   PageID 16505
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1652 of 1803   PageID 12398
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 45 of 106

Protected Person.  As discussed below, provisions such as this one, which have been referred to as "gatekeeper" or "channeling" provisions, are neither uncommon nor impermissible.

75.     It should come as no surprise that Dondero and his cohorts are the only ones who object to the Gatekeeper Provision.  The last thing they want is for a court that has had the misfortune of familiarizing itself with their antics to pass on the *bona fides* of any new tactics and lawsuits they may conjure up to stymie this case. However, as set forth below, their challenges to this Court's power and jurisdiction to pre-screen if their new lawsuits are colorable represent wishful thinking.

**B.     The Gatekeeper Provision Is Permissible under Sections 105, 1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code.**

76.     The Gatekeeper Provision is a legitimate exercise of this Court's powers under sections 105,[36] 1123(b)(6),[37] and 1141(a), (b) and (c).[38]  The Bankruptcy Court serves as the literal guardian at the gate – determining whether a litigant has a colorable claim and may pass

---

[36] Section 105 is entitled "Power of court" and provides: (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[37] Section 1123(b)(6) provides: (b) Subject to subsection (a) of this section, a plan may— (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

[38] Section 1141 is entitled "Effect of confirmation" and provides, in relevant part:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01646
APPX. 01497

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/04/23   Page 372 of 1104   PageID 16506
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1653 of 1803   PageID 12399
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 46 of 106

through the gate to the applicable clerk of court and file a lawsuit. The Debtor recognizes that a Gatekeeper Provision is not found in every chapter 11 plan. However, this case is not a typical case. Indeed, recognizing the need for, and importance of, this role under the facts of this case, the Court previously entered the Settlement Order (agreed to by Dondero) which itself contains a gatekeeper provision protecting the Independent Directors. The purpose of the Gatekeeper Provision in the Plan is to insulate the Protected Persons, many of whom will be either successors to the Debtor or the fiduciaries charged with continuing the administration of the Debtor's property and causes of action post-Effective Date (which essentially involves the wind-down of the business, the monetization of the Debtor's assets and the distribution of the proceeds of same to pay the Claims of legitimate creditors), from non-stop, vexatious litigation in multiple jurisdictions over every conceivable action they take to implement and consummate the Plan.

77. Based upon the history and record of this case – including increased activity during the past several weeks – this Court is well aware of the reality of that threat and risk in this case. During the course of this case, many of the significant actions taken by the Independent Directors have been challenged, litigated and appealed. Moreover, Dondero has interfered with the Debtor's business operations, resulting in the Court's entry of a Temporary Restraining Order and Preliminary Injunction against him.[39] A hearing on the Debtor's Motion to Hold Dondero in Contempt is scheduled for February 5, 2021. The Independent Directors, CEO/CRO, Employees, Committee and its members, and the Professionals of the Debtor and the

---

[39] *Highland Capital Management, L.P. v. James D. Dondero (In re Highland Capital Management, L.P)*, Adv. No. 20-03190 (Bankr. N.D. Tex), December 10, 2020 *Order Granting Debtor's Motion for Temporary Restraining Order against James D. Dondero* [D.I. 10] and January 11, 2021 *Order Granting Debtor's Motion for Preliminary Injunction against James D. Dondero* [D.I. 59].

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-6   Page 1265 of 1804   Page 373 of 1104   PageID 16507
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1654 of 1803   PageID 12400
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 47 of 106

Committee have been harassed and threatened by Dondero and his Related Entities.  There is no reason to believe these litigious tactics, threats and intimidation will cease post-Confirmation and post-Effective Date; and their unchecked continuance will seriously impair the ability of the Claimant Trust and the Litigation Sub-Trust to implement and effectuate the Plan and carry out the orders of this Court.  The Gatekeeper Provision is essential to the confirmation of this Plan and the efficient effectuation and consummation of the Plan post-Effective Date.

78.    The need for the Gatekeeper Provision is illustrated by the fact that the Independent Directors would not have been able to obtain Directors' & Officers' insurance coverage, upon their appointment, in the absence of the Settlement Order.  Insurers were unwilling to underwrite coverage without a broad exclusion restricting any type of coverage for the Independent Directors if the Settlement Order did not contain the exculpation and gatekeeper provision found in Paragraph 10 of the Settlement Order.  Similarly, the Claimant Trustee, the Litigation Trustee and the Claimant Trust Oversight Board will not be able to obtain coverage for the period of time after the Effective Date without a similar gatekeeper provision. Accordingly, the failure to approve the Gatekeeper Provision as part of the Plan will completely frustrate the Debtor's ability to carry out the Plan and Confirmation Order.

79.    Gatekeeper provisions are not some new creative attempt to circumvent limitations on bankruptcy court jurisdiction or restrictions on non-consensual third-party releases.  They are utilized by many courts to provide a single clearing court to determine whether a claim is colorable or appropriate under the applicable facts of the main case.  For example, in the *Madoff* cases, the bankruptcy court has served as the gatekeeper for determining

41

Appellee Appx. 01648
Appx. 10409

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-16    Page 265 of 1804    Page 374 of 1104    PageID 16508
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1655 of 1803    PageID 12401
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 48 of 106

whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust.)[40]  In the *General Motors* cases, certain issues arose post-effective date in regard to defects in ignition switches.  Questions arose as to whether the causes of action arising from those defects were such that "New GM" had liability for them, notwithstanding that it had purchased the assets of the debtor "Old GM" free and clear.  The bankruptcy court serves as a gatekeeper for this litigation, determining whether a lawsuit can go forward against New GM or is more properly dealt with as a claim against Old GM.[41]

80.    Gatekeeper or channeling provisions similar to this one, and in some instances, more extensive than the proposed Gatekeeper Provision in this Plan, have been approved by other courts in this district.  In *In re Pilgrim's Pride Corp.*, 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. January 14, 2010), Judge Lynn, after concluding that *Pacific Lumber* precluded the court from granting certain requested releases and exculpations, determined that nothing in *Pacific Lumber* prevented the court from retaining exclusive jurisdiction over some of the suits against third parties which might otherwise have been covered by the third party protections.  *Id*. at *16-17.  Judge Lynn then expressly held that the bankruptcy court would "channel to itself any claims that may be asserted against Debtors' management (including their boards of directors and Chief Restructuring Officer) and the professionals based upon their conduct in pursuit of

---

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussion of court's gatekeeper function).
[41] *See, e.g., In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing court's gatekeeper function); *In re Motors Liquidation Co.*, 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/27/23   Page 375 of 1104   PageID 16509
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1656 of 1803   PageID 12402
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 49 of 106

their responsibilities during the Chapter 11 Cases." *Id.* at *18, 20-21.  In furtherance of this, the confirmation order provided that the court "shall retain **exclusive** jurisdiction over any suit brought on any claim or causes of action related to the Chapter 11 Cases that exists as of the Effective Date against a Committee; any member of a Committee; any Committee's Professionals; Debtors; Reorganized Debtors; or any Protected Person for conduct pertaining to Debtors during the Chapter 11 Cases, and that any entity wishing to bring such suit shall do so in this court;" *Id.* (emphasis added).  Thus, in *Pilgrim's Pride*, the court approved a broad retention of exclusive jurisdiction to adjudicate the ultimate merits of certain types of suits against protected parties, rather than merely a gatekeeper provision.

81.     Other courts in this district have agreed with Judge Lynn and ordered similarly. *See, e.g., In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization*], Section 10.8(b) at p. 57 (court retained **exclusive** jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added).

82.     In regard to the Independent Directors, the proposed Gatekeeper Provision is a continuation of the provision set forth in Paragraph 10 of the Settlement Order, which, by its terms never expires and is expressly to remain in effect after the Effective Date under the Plan. Moreover, because of the Independent Directors' rights of indemnification against the Debtor,

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38   Filed 12/28/23   Page 376 of 1104   PageID 16510
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1657 of 1803   PageID 12403
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 50 of 106

the Gatekeeper Provision serves the important function of protecting assets that would otherwise be available for distribution to creditors from being depleted by indemnification claims resulting from the assertion of frivolous claims against the Independent Directors.

83.     As to the remaining Protected Parties, the Gatekeeper Provision is a valid exercise of the Court's authority under sections 105 and 1123(b)(6) to prevent the Protected Parties from being embroiled in frivolous litigation designed to derail implementation of the Plan. Importantly, if, in the exercise of its gatekeeper role, the Bankruptcy Court were to determine that a colorable claim exists, then it would allow the prosecution of such claim and the filing of the lawsuit in the court with applicable jurisdiction.[42]

### C.     The Gatekeeper Provision Is not an Impermissible Extension of the Post-Confirmation Jurisdiction of the Bankruptcy Court.

84.     Nor is the Gatekeeper Provision an impermissible extension of the post-confirmation jurisdiction of the bankruptcy court.  As discussed above, the Debtor modified the Gatekeeper Provision to eliminate the provision that granted the Bankruptcy Court exclusive jurisdiction to hear any claim that the Court allows to pass through the gate.  The Gatekeeper Provision requires a putative plaintiff to obtain Bankruptcy Court approval prior to bringing an action and is in aid of the Court's enforcement of the Confirmation Order and the Plan.  It is supported by sections 1141(a), (b) and (c), and thus, by section 105.  As amended, nothing in the Gatekeeper Provision is determinative of the jurisdiction of the Court over any particular claim or cause of action.  The Gatekeeper Provision only requires the court to determine <u>if a claim is</u>

---

[42] *Texas & P. R. Co. v. Gulf, C. & S. F. R. Co.*, 270 U.S. 266, 274 (1926) (Court always has jurisdiction to determine its own jurisdiction).

Appellee Appx. 01651
APPX. 104902

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/59/23 1804ge 377 of 1104   PageID 16511
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1658 of 1803   PageID 12404
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 51 of 106

<u>colorable</u>.   This is a determination commonly made by bankruptcy courts in the analogous context of determining whether a creditors' committee should be granted standing to file litigation on behalf of a recalcitrant debtor.   *See, e.g., Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir. 1988) (court must determine that claim is colorable before authorizing a committee to sue in the stead of the debtor).   Thus, the Bankruptcy Court has the jurisdiction to determine if a claim is colorable.

85.   Section 1142(b) provides that post-confirmation, the bankruptcy court may direct any parties to "perform any act" necessary for the consummation of the plan).   *See United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (holding that bankruptcy court had jurisdiction to determine whether arbitration could be used to liquidate claims post-effective date; while the plan had been substantially consummated, it had not been fully consummated, the dispute related directly to the plan, the outcome would affect the parties' post confirmation rights and responsibilities and the proceeding would impact compliance with, or completion of the plan; specifically referencing section 1142(b)).

86.   Several objectors attempt to rely on *Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir.  2001) to argue that the bankruptcy court cannot exercise a gatekeeper role and adjudicate matters related to the administration of the case and the plan.   In fact the opposite is true.   In *Craig's Stores*, the Fifth Circuit expressly recognized that post-confirmation bankruptcy jurisdiction ***continues to exist for "matters pertaining to the implementation or execution of the plan*****.**"  *Id.* at 390 (*citing In re*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/20/23   Page 378 of 1104   PageID 16512
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1659 of 1803   PageID 12405
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 52 of 106

*Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7

F.3d 32, 34 (2d Cir. 1993) (emphasis added).

87.     *Craig's Stores* did not involve a gatekeeper provision necessary to enable the

debtor to implement its plan.[43]   In contrast to *Craig's Stores*, the Plan provision that Dondero and

other Objectors are challenging pertains to the Court's jurisdiction over matters specifically in

aid of the implementation and effectuation of the Plan – acting as gatekeeper – and does not

implicate an improper extension of bankruptcy court jurisdiction.   As previously explained, the

Gatekeeper Provision is necessary to obtain insurance coverage for the Claimant Trustee, the

Litigation Trustee, and the members of the Claimant Trust Oversight Board – all of whom will

play critical roles in the implementation of the Plan.   Moreover, unchecked rampant litigation

against the Protected Persons, many of whom have indemnification rights against the Debtor,

Reorganized Debtor or Claimant Trust would predictably engulf the Reorganized Debtor and

Claimant Trust negatively impacting their ability to effectuate and implement the Plan and

wasting valuable resources.   *See, In re Farmland Industries, Inc.,* 567 F.3d 1010, 1020 (8th Cir.

2010) (bankruptcy court had "related to" jurisdiction over a claim by a disgruntled bidder against

the post-effective date liquidating trustee because the estate was actually paying legal fees of the

non-debtor defendants under the estate's indemnification obligations.); *see also Buffets, Inc. v.*

---

[43] In *Craig's Stores*, the issue was whether the court could hear a post-confirmation action brought by the debtor for damages against a bank that was administering the debtor's post-confirmation private label credit card program under an agreement that had been assumed by the debtor in its chapter 11 plan.  On appeal, the Fifth Circuit held that the bankruptcy court did not have jurisdiction to hear the dispute, reasoning that (1) the debtor's claim principally dealt with post-confirmation relations between the parties, (2) no facts or law derived from the reorganization or the plan were necessary to the claim, and (3) the claim did not bear on the interpretation or execution of the debtor's plan.  *Id.* at 391.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/01/23   Page 379 of 1104   PageID 16513
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1660 of 1803   PageID 12406
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 53 of 106

*Leischow*, 732 F.3d 889 (8th Cir. 2013) (related-to jurisdiction existed where bankruptcy estate was obligated to indemnify non-debtor defendants for attorney's fees and other amounts).

88.     In addition, *Craig's* Stores did not involve a liquidating chapter 11 plan, and this case does involve such a plan.  There is persuasive case law, including this Court's decision in *TMXS Real Estate* (discussed below) and circuit-level authority, holding that the scope of the bankruptcy court's post-confirmation jurisdiction in the case of a liquidating chapter 11 plan is broader than that in the case of a chapter 11 plan that is not a liquidating plan.

89.     In *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr., Inc.)*, 410 F.3d 100 (1st Cir. 2005), the debtor, a charitable hospital, brought an adversary proceeding against a testator trust, seeking to compel payment from the trust of an amount allegedly due to the hospital as a residual beneficiary under the trust.  The testator had died prepetition, but before the estate's assets were distributed, and the litigation was filed after confirmation of the debtor's liquidating plan of reorganization because the hospital had been unaware it was a beneficiary under the trust.  The trustee had argued that the bankruptcy court had no residual jurisdiction over the debtor's lawsuit against the trustee because the plan had been confirmed, but the bankruptcy court found it had "related to" jurisdiction.

90.     The First Circuit first analyzed the long line of cases (including *Craig's Stores*) which hold that after a debtor emerges from bankruptcy, it enters the marketplace and is no longer under the aegis of the bankruptcy court.  *Id.* at 106-107.  The court did not end its analysis there, however, but dug deeper into the significant distinctions between a liquidating plan and a true reorganization.   Under a liquidating plan, the debtor is not really re-entering the

DOCS_SF:104855.7 36027/002

Appellee Appx. 01654
APPX. 104906

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/02/23 1804 Page 380 of 1104    PageID 16514
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1661 of 1803    PageID 12407
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 54 of 106

marketplace; rather its "sole purpose is to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend." *Id.* at 107.  Thus, while a reorganized debtor may have litigation that clearly is outside the scope of its prior bankruptcy proceeding, that is generally not the case with a liquidating debtor.  The court determined that 28 U.S.C. § 1334 had to be applied in conjunction with the applicable facts of the case, and jurisdiction was appropriate.  *Id.*  A "liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court. Any litigation involving such a debtor thus relates much more directly to a proceeding under title 11." *Id.*

91.    This Court has also recognized the jurisdictional distinction between liquidating plans and operational reorganizations.  In *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*, 2020 Bankr. LEXIS 3205 (Bankr. N.D. Tex. Nov. 12, 2020), this Court held it had jurisdiction to hear a post-confirmation dispute concerning the ability of a liquidating trust, which had been formed pursuant to the plan, to liquidate the stock of the reorganized debtor it received under the plan which involved the issue of whether such action would effectuate a "change in control" that would constitute a default under a lease that had been assumed by the reorganized debtor pursuant to the plan.  This Court held that (i) the liquidating trust had been formed for the purpose of liquidating the assets transferred to it pursuant to the plan and distributing the proceeds of those assets to creditors; (ii) the litigation at issue was an attempt to limit the ability of the liquidating trust to effectuate the very purpose for which it had been formed and had to be resolved prior to full consummation of the plan; (iii) resolution of the dispute would require the review of the plan, the confirmation order and possibly other orders of

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 12/23/20 Page 381 of 1104    PageID 16515
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1662 of 1803    PageID 12408
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 55 of 106

the court; (iv) the litigation would impact compliance with, or completion of the plan; and (v) the litigation directly related to the plan's implementation or execution. *Id.* at *21-23.

92.     Just as in the *TXMS Real Estate* and *Boston Regional* cases, the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor exist solely for the purpose of operating the Debtor's business and properties to monetize its assets and pay creditors.    Any "post-confirmation operations" of the Reorganized Debtor will, therefore, be directed towards that monetization process and, furthermore, properly subject to the Court's purview to ensure consummation of the Plan and creditor distributions pursuant to section 1142 of the Bankruptcy Code.    Any prospective, but baseless, litigation over the acts taken by these entities in effectuating the Plan will have a significantly negative impact on the ability of the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor to effectuate the Plan and will deplete the assets otherwise available for distribution to creditors.    The Gatekeeper Provision simply ensures that any such prospective litigation is colorable before it can be filed.

93.     The Fifth Circuit's decision in *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 266-67 (5th Cir. 2005), is instructive.    In *Stonebridge*, the liquidating trustee under a confirmed chapter 11 plan sued a landlord in connection with the landlord's draw on a letter of credit that had been provided as security in connection with a real property lease the debtor had rejected during its bankruptcy case, where the trustee was assigned the issuing bank's claim against the landlord for alleged misrepresentation.    Although the Fifth Circuit had concerns over jurisdiction of the bank's assigned claim to the trustee, the court went on to opine that "[u]pon closer review, however,

Appellee Appx. 01656

APPX. 01907

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-6   Filed 12/04/23   Page 382 of 1104   PageID 16516
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1663 of 1803   PageID 12409
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 56 of 106

additional effects on the estate are evident: a claim by the Bank against [the landlord] affects the need for the Bank to seek reimbursement from Stonebridge's bankruptcy estate. [The landlord's] draw on the Letter of Credit triggered [the debtor's] contractual responsibility to reimburse the Bank for the draw on the Letter of Credit. . . . If the Bank is successful against [the landlord] on its negligent misrepresentation claims, the need for reimbursement from [the bankruptcy] estate is alleviated." *Id.* at 266-267. Accordingly, the court held that the negligent misrepresentation claims of the bank against the landlord fell within bankruptcy jurisdiction. The court noted other cases that involved litigation between third parties that have been found to have an effect on the administration of the bankruptcy estate, including suits by creditors against guarantors and a suit by creditors of a debtor against defendants that allegedly perpetrated a fraud. *Id.* at 267 (*citing* 3 *Collier on Bankruptcy* ¶ 3.01 (15th ed. rev. 2005)).

94.     Based on the reasoning of *Stonebridge*, other courts, including this Court, have held that contingent indemnification rights trigger "related to" subject-matter jurisdiction of state law disputes between two non-debtors in the pre-confirmation context. *See, e.g.*, Principal *Life Ins. Co. v. JP Morgan Chase Bank, N.A. (In re Brook Mays Music Co.)*, 363 B.R. 801 (Bankr. N.D. Tex. 2007) (contingent right of indemnity in pre-confirmation litigation between two non-debtors triggers bankruptcy court's pre-confirmation "related to" jurisdiction (*citing Stonebridge*)). In *In re Farmland Industries, Inc.*, the Eighth Circuit has similarly held that it had <u>post</u>-confirmation subject-matter jurisdiction over state law claims between non-debtors where the liquidating trustee was paying the legal fees incurred to defend individuals (former officers and directors) in the dispute.

50

Appellee Appx. 01657
APPX. 01909

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-36 Filed 12/05/23 Page 383 of 1104 PageID 16517
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1664 of 1803 PageID 12410
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 57 of 106

95.     In sum, in light of the proposed amendments to the Plan and under the circumstances here, Dondero's objection to this Court's jurisdiction to serve as a gatekeeper is not well-taken and should be overruled. The retention of the *de minimis* jurisdiction to perform the gatekeeper function is clearly supported by Fifth Circuit law.

**D.    The Gatekeeper Provision Is Consistent with the Barton Doctrine.**

96.     Support for the Gatekeeper Provision can be found in the Barton Doctrine, which by analogy, should be applied to many of the Protected Parties identified in the Gatekeeper Provision. The Barton Doctrine is based on the U.S. Supreme Court case, *Barton v. Barbour*, 104 U.S. 126, 26 L. Ed. 672 (1881) dealing with receivers. As this Court has recognized, the Barton Doctrine:

> provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.*, the bankruptcy court) must be obtained. The *Barton* doctrine is ***not*** an immunity doctrine but – strange as this may sound – has been held to be a ***jurisdictional*** provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee ***unless and until*** the bankruptcy court has granted leave for the lawsuit to be filed).

Baron v. Sherman (In re Ondova Ltd. Co.), 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, Baron v. Sherman (In re Ondova Co.), 2018 U.S. Dist. LEXIS 13439 (N.D. Tex., Jan. 26, 2018), aff'd., In re Ondova Ltd., 2019 U.S. App. LEXIS 3493 (5th Cir. Tex., Feb. 4, 2019). The Barton Doctrine originated as a protection for federal receivers, but courts have applied the concept to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including trustees,[44] debtors in

---

[44] *Id.*

Appellee Appx. 01658
APPX. 101909

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-4   Filed 12/06/23   Page 384 of 1104   PageID 16518
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1665 of 1803   PageID 12411
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 58 of 106

possession,[45] officers and directors of a debtor,[46] the general partner of the debtor,[47] employees,[48] and attorneys retained by debtors and trustees.[49]  The Barton Doctrine has also been applied to non-court appointed agents who are retained by the trustee for purposes relating to the administration of the estate.[50]  The Barton Doctrine continues to protect those who are within its scope post-Confirmation and post-Effective Date.[51]

97.   The Fifth Circuit has expressly recognized the continuing viability of the Barton Doctrine, notwithstanding the jurisdictional issues raised by *Stern v. Marshall*.[52]  Since the Barton Doctrine is jurisdictional only as to the ability of the prospective plaintiff to file the lawsuit, it does not implicate the issue of expansive post-effective date bankruptcy court jurisdiction as to the actual underlying lawsuit.  Thus, the gatekeeper court can determine if a

---

[45] *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also*, 11 U.S.C §§ 1107(a) of the Bankruptcy Code, providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity.

[46] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[47] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

[48] *Lawrence v. Goldberg*, 573 F.3d 1265, 1270 (11th Cir. 2009) (affirming dismissal of lawsuit under the Barton Doctrine due to the plaintiff's failure to seek leave in the bankruptcy court to file an action against the trustee and other parties assisting the trustee in carrying out his official duties).

[49] *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[50] *See, e.g., Wells Fargo Fin. Leasing, Inc. v. Jones*, 2015 WL 1393257, at *3-*5 (W.D. Ky. Mar. 25, 2015) (holding that because defendant acted as bankruptcy trustee's agent in performing duties at the direction of and in furtherance of the trustee's responsibilities, claims asserted against defendant were essentially clams against trustee, and court lacked jurisdiction over the claims under *Barton* Doctrine); *Ariel Preferred Retail Group, LLC v. CWCapital Asset Mgmt.*, 883 F. Supp. 2d 797, 817 (E.D. Mo. 2012) (property management company engaged by receiver).

[51] *Helmer v. Pogue* at *15, *citing Carter*, 220 F.3d at 1252-53.  *See also, Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972-73 (9th Cir. 2005) (Barton Doctrine applies to trustee of a post-confirmation liquidating trust formed pursuant to a plan of liquidation); *Muratore v. Darr*, 375 F.3d 140, 147 (1st Cir. 2004) (doctrine serves additional purposes even after the bankruptcy case has been closed and the assets are no longer in the trustee's hands; suit was for malfeasance of trustee in performing his duties filed after estate was closed.)

[52] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (holding that a litigant must still seek authority from the bankruptcy court that appointed the trustee before filing suit even if the bankruptcy court might not have jurisdiction over the suit itself.)

DOCS_SF:104855.7 36027/002

Appellee Appx. 01659
APPX. 01910

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-16    Filed 12/07/23    Page 385 of 1104    PageID 16519
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1666 of 1803    PageID 12412
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 59 of 106

proposed lawsuit asserts colorable claims, and, if it does, the gatekeeper court can then turn to

the separate issue of whether it has jurisdiction over the merits of the lawsuit.

98.    The Barton Doctrine requires a litigant to obtain approval of the appointing or

approving court before commencing a suit against court-appointed or court approved officers and

their agents – which arguably encompasses most, if not all, of the Protected Parties.   The

Gatekeeper Provision preserves the integrity of the process, and prevents valuable estate

resources from being spent on specious litigation, without impairing the rights of legitimate

prospective litigants with potentially valid causes of action.   The Gatekeeper Provision is not

only a prudent use of the Court's authority under section 105 and is within the spirit of the

protections afforded fiduciaries and their agents under the Barton Doctrine – it is also critical to

ensuring the success of the Plan.

99.    The Gatekeeper Provision does not effectuate a non-consensual third-party

release.   It merely requires potential litigants to first vet their alleged causes of action with a

single court – the bankruptcy court – before they can be prosecuted.   If there has ever been a case

where a Gatekeeper Provision is appropriate it is this case.   As the Court is well aware, Dondero

appears to thrive on litigation.   This Court has remarked on many occasions during this case that

prepetition, the Debtor operated under a culture of litigation under the control of Dondero.   It

was the years of sharp practices by the Debtor and an avalanche of litigation against it that

resulted in the Debtor commencing a chapter 11 case and the ultimate appointment of the

Independent Directors.   Faced with impending confirmation and the loss of his company forever,

Dondero has turned the tables and the Debtor and the Protected Parties have become his target

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Page 1268/23 1804 386 of 1104   PageID 16520
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1667 of 1803   PageID 12413
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 60 of 106

for litigation.  Left unchecked, there is no doubt that Dondero will continue his litigation crusade after the Effective Date and attempt to thwart implementation of the Plan at every turn by commencing baseless lawsuits.  Requiring this Court, which approved the appointment of the Independent Directors and has extensive familiarity with the Debtor and this case to first determine whether alleged claims are colorable is prudent and within this Court's authority.  Moreover, centralizing the gatekeeper function in one court puts that court in a unique position to ascertain whether there is a pattern of spurious litigation by certain entities and their related parties.

E.     **The Gatekeeper Provision Is a Necessary and Appropriate Shield against the Actions of Dondero and his Related Entities.**

100.    The Fifth Circuit has recognized that in appropriate circumstances, a federal court can enjoin or issue other appropriate sanctions against vexatious litigants – persons who have a history of filing repetitive and spurious litigation for the purposes of harassment and intimidation.  *See* All Writs Act, 28 U.S.C. §1651.  In *Caroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017), the Fifth Circuit held that a bankruptcy court could properly sanction certain debtors as vexatious litigants when the debtors and their various family members continually filed litigation to prevent the bankruptcy trustee from performing his duties.  When considering whether to enjoin future filings, the court must consider the circumstances of the case, including four factors:

> (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/29/23    Page 387 of 1104    PageID 16521
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1668 of 1803    PageID 12414
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 61 of 106

*Id.* at 815, *citing Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008) (*quoting Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004)).

101.    In some circumstances where courts feel that enjoining all future litigation by a vexatious litigant may be too difficult to articulate or have potential due process implications, courts essentially issue a gatekeeper injunction.  *See, e.g., Baum v. Blue Moon Ventures, LLC,* 513 F.3d at 189 (after the bankruptcy court and district court were able to piece together that the Baums interjected themselves in various bankruptcy proceedings by filing vexatious, abusive and harassing litigation, an injunction was entered preventing the Baums from filing litigation without the consent of the district court judge.); *Safir v. United States Lines, Inc.,* 792 F.2d 19, 25 (2d Cir. 1986) (Second Circuit agreed the litigant's conduct warranted a pre-filing injunction, but narrowed the scope such that the litigant had to seek permission from the district court before filing certain types of additional actions.)

102.    Dondero and his Related Entities are the quintessential vexatious litigants, and the Gatekeeper Provision is a legitimate tool for the Bankruptcy Court, properly within the jurisdiction of the Bankruptcy Court, and less burdensome on Dondero and his Related Entities than a full injunction – which the Debtor believes would be justified in seeking in this case.

## VIII.   THE EXCEPTION TO DISCHARGE DOES NOT APPLY

103.    The exception to discharge contained in 11 U.S.C. § 1141(d)(3) does not apply. Section 1141(d)(3) provides that:

> Confirmation of a plan does not discharge a debtor if --
>
>> (A) The plan provides for the liquidation of all or substantially all of the property estate;

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 12/20/23    Page 388 of 1104    PageID 16522
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1669 of 1803    PageID 12415
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 62 of 106

> (B) The debtor does not engage in business after consummation of
> the plan; and

> (C) The debtor would be denied a discharge under section 727(a)
> of this title if the case were a case under Chapter 7 of this title.

*See* 11 U.S.C. § 1141(d)(3).

104.    Since the provisions of § 1141(d)(3) are in the conjunctive, if any one of the three

prongs of the test is lacking, confirmation of a plan results in the discharge of debt. House Rep.

No. 95-595, 95th Cong. 1st Sess. 418-19 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6374-75

("if all or substantially all of the distribution under the plan is of all or substantially all of the

property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue,

***and*** if the debtor would be denied a discharge under section 727 … then the Chapter 11

discharge is not granted.") (emphasis added); *Financial Sec. Assur. v. T-H New Orleans Lt.

Pshp. (In re T-H New Orleans Lt. Pshp.)*, 116 F.3d 790, 804 (5th Cir. 1997) ("[T]his section

requires that all three requirements be present in order to deny the debtor a discharge."); *In re

River Capital Corp.*, 155 B.R. 382, 387 (Bankr. E.D. Va. 1991) (the provisions of § 1141(d)(3)

are in the conjunctive).

105.    Here, only subpart C of § 1141(d)(3) clearly applies.[53]  With respect to the subpart

A of § 1141(d)(3), here, the Plan clearly provides for a gradual liquidation of all or substantially

all the estate's assets.  However, a discharge is nonetheless appropriate because an orderly wind

down is anticipated to last for up to two years, and the Reorganized Debtor will continue to

manage various funds during that period.  Under similar circumstances, at least one court has

suggested that the plan would fall outside the policies of § 1141(d)(3)(A).  *In re Enron Corp.*,

---

[53] As a corporate debtor, the Debtor would not receive a discharge under section 727(a) in a Chapter 7.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6 36    Filed 12/01/23    Page 389 of 1104    PageID 16523
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1670 of 1803    PageID 12416
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 63 of 106

2004 Bankr. LEXIS 2549, **215-17 (Bankr. S.D.N.Y. July 15, 2004) ("[T]the indeterminate period of retention of the assets after the Effective Date and the clear need for ongoing business operations to maximum value for all creditors in liquidating the assets necessitates the application of the section 1141 discharge to the Reorganized Debtors."). Moreover, even if subpart A of § 1141(d)(3) is met, subpart B of § 1141(d)(3) – engaging in business – is lacking. *T-H New Orleans Lt. Pshp.*, 116 F.3d at 804, n. 15 (holding that the reorganized entity's likelihood of conducting business for two years following plan confirmation satisfies § 1141(d)(3)(B)); *In re River Capital Corp.*, 155 B.R. at 387 (discharge warranted where current management stated its intention to continue to engage in business after consummation of the plan).

## IX.    THE SENIOR EMPLOYEE OBJECTION

### A.    The Senior Employee Objection Should Be Overruled

106.    Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent (collectively, the "Senior Employees")[54] filed the Senior Employee Objection. Subsequent to its filing, Mr. Waterhouse and Mr. Surgent executed a Senior Employee Stipulation (as discussed below) and will withdraw their support of the Senior Employee Objection. The only remaining Senior Employees objecting to the Plan are Mr. Ellington and Mr. Leventon. Mr. Ellington and Mr. Leventon argue, among other previously addressed objections, that the Plan is not confirmable because (1) the Plan violates section 1123(a)(4)'s requirement that claims in the same class be treated the same, and (2) the Debtor has prevented the Senior Employees from

---

[54] Although Mr. Ellington and Mr. Leventon are included in the definition of Senior Employees, they were both terminated for cause and are no longer employees of the Debtor.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/27/23    Page 390 of 1104    PageID 16524
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1671 of 1803    PageID 12417
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 64 of 106

making the Convenience Class Election. These objections are meritless, and the Senior Employee Objection should be overruled.

### B.    Background Related to Senior Employees

107.    The Debtor's employees, including the four Senior Employees, were eligible to receive compensation under two separate bonus plans: an annual bonus plan and deferred compensation plan. Both of these plans required the employee to remain employed as of the applicable vesting date to receive the bonus. On December 4, 2019, the Debtor filed a motion seeking authorization to pay bonuses under these plans, to which the Committee objected to the inclusion of the Senior Employees. At a hearing on the motion, the Debtor agreed to remove the Senior Employees (*see* 1/21/2019 Hearing Tr., Docket No. 393 at 119:21-22), and the motion was granted as presented at the hearing [Docket No. 380]. Accordingly, the rank and file employees were paid on account of their bonuses that vested in 2020, with the exception of the Senior Employees who have vested bonus claims.

108.    On May 26, 2020, each of the Senior Employees filed a single proof of claim against the Debtor in an unliquidated amount.[55] *See* Proof of Claim Nos. 192 (claim of Ellington claiming "not less than $7,604,375"); 184 (claim of Leventon claiming "not less than $1,342,379.68"); (collectively, the "Proofs of Claim"). The Proofs of Claim did not provide any calculations or breakdown of amounts to support the minimum claimed.

---

[55] An amended proof of claim was filed by Mr. Ellington on July 16, 2020. Each Senior Employee asserted that a portion thereof, in a liquidated amount pursuant to the statutory cap of section of section 507(a)(4), is entitled to priority under the Bankruptcy Code. In addition, the portion of the claim related to PTO was classified in Class 6 under the Plan.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/23/23    Page 391 of 1104    PageID 16525
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1672 of 1803    PageID 12418
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 65 of 106

109.    Each Proof of Claim sets forth the following with respect to "compensation" owed:

> Claimant is owed compensation for his services, including, without limitation, (i) all salaries and wages; benefits; (ii) bonuses (including performance bonuses, retention bonuses, and similar awards), (iii) vacation and paid time off, and (iv) retirement contributions, pensions and deferred compensation.  The amount of the Claim for such compensation includes both liquidated and unliquidated amounts.

*See* Claim Nos. 192, 182, 184, 183, each at Attachment ¶3.

110.    The official claims register maintained by KCC lists the general unsecured claim amount for each Senior Employee as "UNLIQUIDATED."  The claim of each Senior Employee not requiring separate classification under the Plan (*i.e.*, the priority and PTO portions), was classified as a General Unsecured Claim in Class 8 (each, a "GUC Claim").

111.    On October 27, 2020, during a hearing on the Debtor's then-existing disclosure statement, this Court and the Committee were highly critical of the proposed plan provisions concerning employee releases and strongly suggested that the plan was unlikely to be confirmed as drafted.  As a result, the Debtor began negotiating with the Committee concerning the terms on which Senior Employees would be permitted to obtain a release.  Ultimately, the Debtor and the Committee agreed that the Senior Employee would be required to execute a stipulation with the Debtor providing for the resolution and payment of deferred compensation at reduced rates and other consideration in exchange for a Plan release.  Specifically, the Senior Employee Stipulation, if approved by this Court and signed by the Senior Employee, would allow the "Earned Bonus" (as defined in the Senior Employee Stipulation) portion of the Senior Employees' to be treated as a separate Convenience Claim (subject to reduction as set forth in

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/29/23    Page 392 of 1104    PageID 16526
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1673 of 1803    PageID 12419
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 66 of 106

the Senior Employee Stipulation). In exchange for this reduction, and together with the Senior

Employee's agreement to (a) cooperate with the Claimant Trustee and Reorganized Debtor, (b)

refrain from taking certain actions against those parties, and (c) support and vote in favor of the

Plan, the Senior Employee would receive a Plan release and the treatment provided with respect

to the "Earned Bonus" in the Plan and Senior Employee Stipulation.

112. As part of its settlement discussions with the Senior Employees, the Debtor

provided the Senior Employees with a chart outlining how the reduction of the "Earned Bonus"

would work if the Senior Employees executed the Senior Employee Stipulation. This chart was

the same chart provided to the Committee in connection with the negotiation of the Senior

Employee Stipulation. This chart was never publicly-filed and did not contain "representations"

or promises. It was a chart provided to the Senior Employees to illustrate how a portion of the

Senior Employees' total claims would be treated if they signed the Senior Employee Stipulation

and to describe the consideration that the Senior Employee would provide in exchange for the

release contained in the Plan. Notably, the Disclosure Statement included the same calculation

that was set forth in the chart provided to the Senior Employees.[56]

113. In no world was the chart – provided in settlement discussions and for substantive

purposes – a promise to pay.

---

[56] *See* Disclosure Statement, page 71, which states:

> In addition to the obligations set forth in Article IX.D. of the Plan, as additional consideration for
> the foregoing releases, the Senior Employees will waive their rights to certain deferred
> compensation owed to them by the Debtor. As of the date hereof, the total deferred compensation
> owed to the Senior Employees was approximately $3.9 million, which will be reduced by
> approximately $2.2 million to approximately $1.7 million. That reduction is composed of a
> reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience
> Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment
> of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of
> approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

Appellee Appx. 01667
Appx. 04939

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6 Exhibit 6 Filed 12/15/23 1804 Page 393 of 1104 PageID 16527
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1674 of 1803 PageID 12420
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 67 of 106

114. Despite this, the Senior Employee Objection argues that such chart "shows the recovery to the Senior Employees if they do not sign the Senior Employee Stipulation but make the Convenience Class Election, and it separately shows the reduced recovery" if they sign the Senior Employee Stipulation. The Senior Employees further argue that the chart evidences the Debtor's intent that the Senior Employees could elect Convenience Class treatment of their "Earned Bonus" whether or not they executed the Senior Employee Stipulation. As set forth above, nothing in the chart supports that argument. The chart was simply a illustration of how the Senior Employee Stipulation would work if executed and the consideration that would be given by each Senior Employee for the release.[57]

115. Finally, the Senior Employees' comments were solicited on all but the economic terms of the Senior Employee Stipulation. The Senior Employees were also encouraged to raise any issues they had with the Senior Employee Stipulation to the Committee and/or this Court. The Senior Employees' counsel at Winston & Straw provided comments on the Senior Employee Stipulation, which both the Debtor and the Committee accepted. The Senior Employees themselves, however, refused to comment despite having the opportunity to do so and instead demanded that the Debtor retract the Senior Employee Stipulation because it did not reflect an agreement between the Senior Employees and the Debtor. On information and belief,

---

[57] As part of the Plan negotiations, Mr. Seery engaged in multiple conversations with all or some of the Senior Employees. Some of these conversations were with counsel; some were not. In each case, however, the conversations were part of a broader settlement discussion. During these discussions, the Senior Employees asked questions about how the Senior Employee Stipulation would work but also made blatant threats about how they would react if they were not treated in the manner they deemed appropriate. Mr. Seery made no promises to the Senior Employees during these conversations.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/15/23    Page 394 of 1104    PageID 16528
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1675 of 1803    PageID 12421
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 68 of 106

the Senior Employees never approached the Committee to discuss the Senior Employee Stipulation.  The only communication with this Court has been the Senior Employee Objection.

116.    None of the Senior Employees elected to sign the Senior Employee Stipulation. Subsequent to the filing of the Senior Employee Objection, Mr. Seery discussed with Mr. Waterhouse and Mr. Surgent the possibility of signing the Senior Employee Stipulation, and Mr. Waterhouse and Mr. Surgent elected to sign the Senior Employee Stipulation (with certain revisions).  However, as Mr. Ellington and Mr. Leventon are not currently employed by the Debtor, they are no longer eligible to sign the Senior Employee Stipulation.

### C.    Treatment of Senior Employee Claims Under Plan

117.    The Plan provides the following treatment to the Class 8 GUC Claims of the Senior Employees:

> Treatment:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

Plan, III.H.8.

118.    The Plan provides that a Holder of a General Unsecured Claim may make a "Convenience Class Election" as follows:

> "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim *that is a liquidated Claim as of the Confirmation Date on their Ballot* to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.[58]

---

[58] A "Convenience Claim" is defined as:

DOCS_SF:104855.7 36027/002

Appellee Appx. 01669
APPX. 164920

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-16    Filed 12/07/23    Page 395 of 1104    PageID 16529
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1676 of 1803    PageID 12422
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 69 of 106

Plan, I.B.43 (emphasis added).

119.    As discussed above, the Senior Employees' claims are unliquidated and were disclosed as unliquidated on the official claims register maintained by KCC. As unliquidated and unsecured claims, the Senior Employees' claims are, in each case, Class 8 (General Unsecured Claims), and, as holders of unliquidated GUC Claims, none of the Senior Employees were entitled to make the Convenience Class Election.

120.    Irrespective of their claims, the Senior Employees are not entitled to a release under of the Plan unless they execute a Senior Employee Stipulation. *See* Article IX.D.

**D.    Plan Solicitation**

121.    Although each of the Senior Employee's GUC Claim was classified *in toto* as Class 8 (General Unsecured Claims), the Senior Employees erroneously received both a Class 7 (Convenience Class) and Class 8 (General Unsecured) Ballot.  Except for Mr. Surgent, each of the Senior Employees voted their Class 8 (General Unsecured Claim) ballot to reject the Plan, and each of the Senior Employees voted their erroneously Class 7 (Convenience Class) ballot to reject the Plan.  Mr. Surgent abstained from voting on the Plan.  Because they have now executed the Senior Employee Stipulation, Mr. Waterhouse and Mr. Surgent's votes will be cast to accept the Plan.

---

any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

Plan, I.B.41.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01670
APPX. 01922

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-86   Filed 12/29/23   Page 396 of 1104   PageID 16530
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1677 of 1803   PageID 12423
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 70 of 106

### E.   The Plan Does Not Violate Section 1123(a)(4)

122.    Section 1123(a)(4) requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).

123.    The Senior Employees argue that the Plan does not treat them the same as other Employees in the same class because the Senior Employees are not automatically being granted a release under the Plan, whereas other Employees are being granted a release automatically upon confirmation.  However, the Senior Employees conflate treatment of their claims with the decision not to automatically provide them a release.  The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The releases under the plan are not part of the "treatment" of Class 7 or Class 8 claims.

124.    Indeed, the releases granted under the Plan are part of an entirely different section of the Plan (Article IX).  Debtors are not required to grant releases to anyone nor are they required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees.[59]  Nonetheless, the Debtor, after extensive negotiations with the Committee (which did not want to provide *any* release to the Senior Employees) presented the Senior Employees with a mechanism by which the Senior Employees could obtain a release *if* they agreed to the conditions of the Senior Employee

---

[59] Indeed, the grant of third party releases is heavily scrutinized and could not be granted to all general unsecured creditors across the board as part of the Plan's treatment of general unsecured claims.  *See Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

Appellee Appx. 01671
APPX. 01673

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Exhibit 6   Filed 12/29/23   Page 397 of 1104   PageID 16531
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1678 of 1803   PageID 12424
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 71 of 106

Stipulation.[60]  But just as the Senior Employees were not required to sign the stipulation,[61] the Debtor cannot be forced to provide a release to each Senior Employee just because it has provided releases to other Employees.  Nor would this Court or the Committee have allowed the Debtor to provide releases to the Senior Employees without those Senior Employees providing additional consideration to the Debtor's estate.  As the Court will recall, at the October 28, 2020, the Court specifically told the Debtor that it would be hard-pressed to approve releases to certain of the Debtor's employees if such employees did not provide consideration for the releases.[62] The Senior Employee Stipulation was crafted to address the Court's concerns by conditioning the release of *certain* of the Debtor's employees on the provision of other consideration.

125.    Finally, the Senior Employees devote considerable time arguing that the proposed Senior Employee Stipulation suffers from numerous defects and that the terms are too harsh.  But

---

[60]As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor, they are not eligible to sign the Senior Employee Stipulation.  Accordingly, they are not entitled to a release regardless of the Senior Employee Stipulation.

[61] While voluntary agreement is expressly excepted from section 1123(a)(4) anyway, debtors are permitted to treat one set of claim holders more favorably than another so long as the treatment is not on account of the claim but for distinct, legitimate rights or contributions from the disparately-treated group separate from the claim.  *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 925 (8th Cir. 2019).  The Ninth Circuit, for instance, upheld a plan that provided preferential treatment to one of a debtor's shareholders apparently because the preferential treatment was tied to the shareholder's service to the debtor as a director and officer of the debtor, not to the shareholder's ownership interest.  *See In re Acequia, Inc*., 787 F.2d 1352, 1362-63 (9th Cir. 1986) ("[The shareholder's] position as director and officer of the Debtor is separate from her position as an equity security holder."); *see also Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518-19 (5th Cir. 1998) (plan proponent's payments to certain members of power cooperative did not violate § 1123(a)(4) because the payments were "reimbursement for plan and litigation expenses," not payments "made in satisfaction of the [members'] claims against [the debtor]").  Here, too, the release consideration required from the Senior Employees *solely in order for the Senior Employees' to obtain a release* relates to their positions as senior employees rather than their position as general unsecured creditors.

[62] *See* Hearing Transcript, Oct. 28, 2020, at 30:17-22:

> So, and I'll just throw in one last bit of food for thought. . . the Debtor has had a year now, close to a year now, to knock some of these out, you know, maybe reach some compromises with some of the related Highland parties and officers, to maybe participate in the plan with some sort of contribution, and it's just not happening. It's not happening. . . . So, at this point, I would be hard-pressed to protect any nondebtor defendants who aren't ponying up something to the whole plan reorganization process.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-6 Filed 12/30/23 Page 398 of 1104 PageID 16532
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1679 of 1803 PageID 12425
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 72 of 106

those objections are irrelevant to confirmation. If the Senior Employees believed that the cost of
the release was too high, they had no obligation to sign the Senior Employee Stipulation.

**F.     The Senior Employees Are Not Permitted to Make Convenience Class Election**

126.    The Senior Employees next argue that the Debtor has improperly prevented the
Senior Employees from electing Convenience Class treatment for a portion of their Claims.
Under applicable bankruptcy law, the Plan, and the Disclosure Statement Order, the Senior
Employees are not entitled to split their claims to create a liquidated claim for which
Convenience Class Election would even be possible.[63] Further, even if the Senior Employees
were entitled to elect a Convenience Class Election for a *portion* of their Class 8 Claims for
distribution purposes, as discussed below, their Claims are only entitled to be voted in Class 8 for
voting and numerosity purposes.

**G.     Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Applicable Bankruptcy Law**

127.    The Senior Employees argue that the "Earned Bonus" portion of each GUC Claim
is "liquidated"[64] and therefore eligible for the Convenience Class Election.[65] The "Earned

---

[63] The Senior Employees claim the Debtor's statements contradict the plan; however, any purported contradiction
stems from the Senior Employees' misstatement of the Debtor's position. Indeed, even if the Debtor had made
contradictory statements, it is irrelevant. The Plan says what it says and the Debtor cannot unilaterally change the
terms of the Plan with respect to a select group of creditors. While a Class 7 Ballot was mistakenly sent to the
Senior Employees, the Senior Employees cannot make the Convenience Class Election under the Plan because they
each hold a single, unliquidated Class 8 Claim.

[64] The Plan did not need to define the term "liquidated." Generally, a debt is liquidated if the amount due and the
date on which it was due are fixed or certain, or when they are ascertainable by reference to (1) an agreement or (2)
to a simple mathematical formula. *In re Visser*, 232 B.R. 362, 364-65 (Bankr. N.D. Tex. 1999). However, even if
the Earned Bonus *portion* is liquidated in that the amount is capable of being ascertained, it is not considered
liquidated for purposes of voting where the amount owed or formula for calculation are missing from the proof of
claim. *See In re Lindell Drop Forge Co.*, 111 B.R. 137, 142-43 (Bankr. W.D. Mich. 1990); *see also Riemer &
Braunstein LLP v. DeGiacomo (A & E 128 North Corp.)*, 528 B.R. 190, 199 (1st Cir. B.A.P. 2015) (court looks to
proof of claim forms to determine if they sufficiently demonstrate liquidated claims).

[65] None of the Senior Employees' Proofs of Claim contains any liquidated amount with respect to any component of

---

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/29/23   Page 399 of 1104   PageID 16533
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1680 of 1803   PageID 12426
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 73 of 106

Bonus" portion, even if liquidated, is not a standalone claim entitled to make a Convenience

Class Election, nor can the Senior Employees split their GUC Claim after filing a single proof of

claim.  The Senior Employees do not cite any law to support their contention that claims of a

single creditor in a given class, set forth in a single proof of claim, may be split into multiple

claims.[66]  Indeed, case law holds the opposite.  Courts have found that where a claimant files a

single proof of claim, even if it covers multiple debts, he is not entitled to split his claims.  *In re

Jones*, 2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) (noting that the creditor could have

filed multiple proofs of claim to avoid the issue); *see also In re Latham Lithographic Corp.*, 107

F.2d 749 (2d Cir. 1939) (claimant cannot split claim into multiple claims for the purpose of

creating multiple creditors who could vote in a trustee election).  The Senior Employees each

filed a single proof of claim: they cannot split their GUC Claim in order to make the

Convenience Class Election under the Plan and applicable bankruptcy law.  And the Plan is clear

on this; no other Holder of an unliquidated or partially liquidated Class 8 claim attempted to split

its claim or make the Convenience Class Election.

---

the GUC Claim, including the "Earned Bonus."  The Senior Employees appear to make the stunning assertion that
the Debtors' books and records establish whether a claim is liquidated and the amount of such claim, even when the
proof of claim lists no such amounts.  There is no proof of claim on file listing a liquidated amount, no executed
stipulation agreeing on a liquidated amount, and no order of the Court setting a liquidated amount.  The Senior
Employees' assertion that any portion of their GUC Claims is liquidated is untenable.

[66] The cases the Senior Employees cite only support that separate claims, each covered by a separate proof of claim,
**_purchased_** from other creditors, are entitled to be counted as separate claims.  *See Figter Ltd. v. Teachers Ins.
Annuity Ass'n (In re Figter Ltd.)*, 118 F.3d 635, 640-641 (9th Cir. 1997) (claimant entitled to vote multiple claims
where it "purchased a number of separately incurred and separately approved claims (each of which carried one
vote) from different creditors"); *Concord Square Apartments v. Ottawa Properties (In re Concord Square
Apartments)*, 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) ("purchaser of claims is entitled to a vote for each separate
claim it holds"); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) (purchased claim arose out of a separate
transaction, evidencing a separate obligation for which a separate proof of claim was filed).  Notably, in each of
these cases a separate proof of claim had been filed for each separate claim, evidencing an entirely separate
obligation, and owed to a different party.  Here in contrast, each single Senior Employee filed a single proof of
claim, and the "Earned Bonus" is a mere *component* of an overall compensation claim stemming from obligations
under an employment contract.

67

Appellee Appx. 01674
APPX. 01674

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 02/23/1804    Page 400 of 1104    PageID 16534
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1681 of 1803    PageID 12427
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 74 of 106

**H.      Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Disclosure Statement Order for Voting Purposes**

128.     Even if splitting claims contained in a single proof of claim were allowed under applicable case law (which it is not) and the Senior Employees were entitled to make the Convenience Claim Election with respect to a portion of their GUC Claim, this Court's Disclosure Statement Order prohibits the splitting of claims within a given class for voting purposes:

> Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

Disclosure Statement Order ¶ 25.b.

129.     Similarly, paragraph 23 provides:

> For purposes of the numerosity requirement of section 1126(c), separate claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one claim against the Debtor in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

*Id*. ¶ 23.h.

130.     Read together, these provisions clearly establish that there can be no claim splitting within a class, and no claim splitting between Class 7 and Class 8.  Accordingly, even if claims classified in a given class set forth in a single proof of claim could be split and the Senior Employee were entitled to make the Convenience Class Election, the Disclosure Statement Order precludes the Senior Employees from splitting their claims for voting purposes.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/23/23   Page 401 of 1104   PageID 16535
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1682 of 1803   PageID 12428
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 75 of 106

I.     **Even if Convenience Claim Election Were Available, Convenience Claim Election Does Not Impact Voting**

131.   Even if the Senior Employees were deemed to hold separate, liquidated claims on account of their "Earned Bonuses" that could be split from the remainder of their GUC Claims, a Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim *for voting purposes*.   Specifically, the Class 8 Ballot, approved by the Disclosure Statement Order, provides:

> If you check the box below and elect to have your Class 8 General Unsecured Claim treated as a Class 7 Convenience Claim; ***(i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 8 with respect to the Plan, but your Claim (as reduced) will receive the treatment afforded to Class 7 Convenience Claims;***

Disclosure Statement Order, Exhibit A at 26 (emphasis added).[67]   Accordingly, at most, the Convenience Class Election only impacts the Senior Employees' treatment for distribution purposes.   Moreover, even if the Court finds that Mr. Leventon has a liquidated claim that was entitled to be classified in Class 7 and vote in that class, Mr. Ellington's claim, which exceeds $1 million could not vote in Class 7.   Mr. Ellington would only be entitled to reduce his Class 8 Claim and elect treatment in Class 7 but his claim would otherwise be included in Class 8 for voting purposes.

132.   For each of the foregoing, independent reasons, each Senior Employee holds a single, unliquidated claim in Class 8.   No Senior Employee is entitled to split his GUC Claim under applicable bankruptcy law, and such an action is further prohibited by the Disclosure Statement Order.   Even if any GUC Claim could be split and the Convenience Class Election

---

[67] The Plan itself is also clear that the Convenience Class Election only impacts *treatment*, and does not impact *voting*.  *See* Plan, I.B.43; III.H.8.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-36   Filed 12/24/21   Page 402 of 1104   PageID 16536
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1683 of 1803   PageID 12429
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 76 of 106

was made, the Convenience Class Election only impacts treatment but does not impact voting. Finally, the Senior Employees' argument that their entitlement to make the Convenience Class Election stems from an erroneously mailed ballot is misplaced. As set forth above, the mailing of the Class 7 Ballot was an administrative error and cannot entitle the Senior Employees to rights that contradict the Plan and the Disclosure Statement Order.

## X.      THE HCMFA/NPA GATES OBJECTION

133.    The Debtor manages fifteen collateralized loan obligations ("CLOs") pursuant to certain agreements, which are referred to sometimes as portfolio management agreements and sometimes as servicer agreements (the "Management Agreements"). Each CLO is a Cayman-domiciled entity that owns a portfolio of loans. They are passive single purpose entities with no ability to self-manage. The CLOs have no employees; however, they do have Cayman-based boards of directors, which have limited duties under Cayman law and which do not actively manage the CLOs. Each CLO contracted with the Debtor as a third-party "Portfolio Manager" to manage the loan portfolio pursuant to the terms of the various Management Agreements. As discussed below, the only parties to the Management Agreements are the Debtor and the respective CLO.

134.    To finance its acquisition of the loans, each CLO issued notes to third party investors. Those notes come in different tranches with different payment priorities. The lowest in priority are called "preference shares," which receive the available residual cash flow after the CLO has made the required payments on the notes. Although called equity, the preference shares are not common equity. The CLOs themselves are purely creatures of contract, and

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/05/23   Page 403 of 1104   PageID 16537
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1684 of 1803   PageID 12430
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 77 of 106

investor rights are governed by the terms of the indentures governing the CLOs (collectively, the

"Indentures"), the preference share paying agency agreements, and in certain cases the

Management Agreements.[68]  The Indentures define the procedures for buying, managing, and

selling the CLOs' assets.  *See generally* Indenture § 12.1; Management Agreement § 2.

Fiduciary duties under the Investment Advisers Act of 1940 (the "Advisers Act") are owed

solely to the CLOs and not their investors.[69]   Nothing in the Indentures or the Management

Agreements gives any investor in the CLOs the right to block, interfere with, influence, control,

or otherwise direct the asset sale process.  The Management Agreements set forth the Portfolio

Manager's duties and obligations and the requirements for removing the Portfolio Manager if

investors are not satisfied.

135.    By agreement with CLOs, which are the sole counterparties to the Management

Agreements, the Debtor will assume the Management Agreements pursuant to the Plan.  The

Debtor and the CLOs have agreed, in summary, that in full satisfaction of the Debtor's cure

obligations under section 365(b)(1) of the Bankruptcy Code, the CLOs will receive a total of

$525,000, comprising $200,000 within five days of the Effective Date and $325,000 in four

equal quarterly payments of $81,250, and that the Debtor and the CLOs will exchange mutual

releases.  The Debtor and the CLOs agreed to seek approval of this compromise by adding

---

[68] The Debtor's role is referred to as either the Servicer or Portfolio Manager.  All of the Management Agreements and Indentures are governed by New York law, and the relevant provisions of those agreements are identical in all material respects across the CLOs at issue.

[69] The Debtor's fiduciary duties under the Advisers Act are owed to the CLO, not to its investors.  *Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006) (under Section 206 of the Investment Advisers Act of 1940 and other provisions "[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . . If the investors are owed fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.").  The Debtor's duties, as Portfolio Manager, to the underlying investors in the CLO, if any, are prescribed by contract.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 186   Filed 12/26/23 Page 404 of 1104   PageID 16538
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1685 of 1803   PageID 12431
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 78 of 106

language to the Confirmation Order.  A copy of that language is attached hereto as Exhibit C and
will be included in the Confirmation Order.

>    **A.**     **The HMCFA/NPA Objection, the CLO Holdco Objection, and NREP
>         Joinder Should Be Overruled**

136.    As the Court is well aware, Highland Capital Management Fund Advisors, L.P.
("HCMFA") and NexPoint Advisors, L.P. ("NPA" and, together with HCMFA, the "Advisors"),
are controlled by Mr. James Dondero.  Mr. Dondero is also the portfolio manager of each of the
investment funds objecting to the Debtor's assumption of the Management Agreements (the
"Funds").[70]  The Advisors and three of the Funds have actively interfered in the Debtor's
management of the CLOs and sought to exercise management authority over the CLOs.  This
Court ruled on these issues in connection with the Advisors and Funds' *Motion for Order
Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by
Non-Debtor CLO Vehicles* [Docket No. 1528] (the "CLO Motion").

137.    Now, the Funds and Advisors have objected to confirmation of the Plan and are
joined only in their objection by other Dondero-controlled entities –the NexPoint RE Partners
and CLO Holdco, Ltd. ("CLO Holdco" and, together with the Funds and the Advisors, the "CLO
Objectors").  Although the NPA/HCMFA Objection makes different arguments than those
contained in the CLO Motion, the goal of the NPA/HCMFA Objection is the same.  It seeks to
use this Court to transfer control of the CLOs away from the Debtor and back to Mr. Dondero.

---

[70] The Funds are Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series,
Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland
Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially
Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Capital, Inc.,
NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/07/23    Page 405 of 1104    PageID 16539
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1686 of 1803    PageID 12432
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 79 of 106

138.    The CLO Objectors contend that the Advisers Act prohibits assignment of the Management Agreements and/or that they are non-assignable personal service contracts.  From this, the CLO Objectors argue that the Management Agreements may not be assumed by the Debtor under Section 365(c) because the "*hypothetical test*" applies in the Fifth Circuit.  They also contend that there is inadequate assurance of future performance because of staff reductions and that the contracts are being modified and thus are being only partially (and so impermissibly) assumed.  The CLO Objectors also speculate that they may be harmed by future investment decisions made by the Debtor because the time-frame contemplated by the Plan for disposition of assets may be shorter than what they believe is optimal to maximize the value of the preference shares.  The objections should be overruled on several grounds:

- The contract counterparties – the CLOs – consent to assumption and will release the Debtor from all claims.

- The CLO Objectors are non-contracting parties with no standing to object on behalf of the CLOs and have pointed to no contractual basis for their assertion of management authority over the CLOs.

- The CLO Objectors cannot create standing by asserting they are creditors of the estate.  Each CLO Objector agreed to the expungement of its claims or has no claims.

- Even if the CLO Objectors were creditors, their standing to object to assumption would be limited to whether it benefits the Estate, and they would *still* lack standing to assert rights belonging to the contracting parties.

- Even if the CLO Objectors had the right to object to assignment, that does not give them the standing to object to the Debtor's assumption of the Management Agreements.

- Even if the Management Agreements were non-assignable, the Debtor could still assume the Management Agreements without consent because the *actual test* applies in the Fifth Circuit.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/28/23 1994e 406 of 1104   PageID 16540
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1687 of 1803   PageID 12433
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 80 of 106

- Even if the *hypothetical test* applies, "applicable law" does not prevent assignment of the Management Agreements.

- There is no detriment to the Estate in assuming the Management Agreements, and there is no mismatch in investing timelines between the Debtor and the CLOs' investors.

**B.      The CLO Objectors Cannot Override the CLOs' Consent to Assumption**

139.    The Debtor and its counterparties (the CLOs) agreed to the assumption of the Management Agreements.  Any objections were waived.  Hence the CLO Objectors' argument is *not* that there is no consent to assume the Management Agreements; it is that the *correct* party has not consented.  In other words, the CLO Objectors are arguing that the CLO Objectors (and therefore Mr. Dondero) have the authority and prerogative to dictate the actions of the CLOs and whether the CLOs should consent to assumption.  This has to be the CLO Objectors' argument because unless the CLO Objectors have such right, they have no standing as non-contracting parties to object under section 365 to the assumption of the Management Agreements.

140.    Only parties to contracts have standing to object to assumption, even when the objector claims that assumption will result in a breach of that contract or violate the law.  *See Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.*), 278 B.R. 714, 718-19 (Bankr. D. Del. 2002), *aff'd*, 280 B.R. 808 (D. Del. 2002), 57 F. App'x 912 (3d Cir. 2003).  As the district court explained:

> The language of section 365 is clearly intended to protect the rights of those persons or entities who share contractual relationships with the debtors. In other words, in order to invoke the protections provided in section 365, an entity must be a party to a contract with the debtor.

> *          *          *

> Although section 365 does confer the right to refuse assignment where excused by applicable law, that right is nevertheless conferred only upon parties to the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Exhibit 6    Page 407 of 1104    PageID 16541
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1688 of 1803    PageID 12434
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 81 of 106

> contracts at issue.  It creates no separate right of enforcement for other creditors
> of the estate who are not parties to the contract. Therefore, even if the appellants
> feel that the alleged violation of the law may effect them, they have not
> demonstrated that they have the legal right to enjoin such a violation.

*Hertz Corp. v. ANC Rental Corp. (In Re ANC Rental Corp.)*, 280 B.R. 808, 817-18 (D. Del.

2002); *see also Cargill, Inc. v. Nelson (In re LGX, LLC)*, 2005 Bankr. LEXIS 2072 (10th Cir.

Oct. 31, 2005) (creditor had standing on whether court should approve settlement between

trustee and another creditor, but no standing under § 365 on whether quitclaim license from

trustee to that creditor violated applicable patent law because it was not party to contract); *In re

Riverside Nursing Home*, 43 B.R. 682, 685 (Bankr. S.D.N.Y. 1984) (assignee of rents is not

"party to such contract or lease" so as to confer standing under section 365); *In re Irwin Yacht

Sales, Inc*., 164 B.R. 678 (Bankr. M.D. Fla. 1994) (denying standing to co-owner

notwithstanding her economic interest since she was not party to the lease); *see also ANC Rental*,

57 F. App'x at 916 (citations omitted) ("Third-party standing is of special concern in the

bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of

reorganization based on the rights of third parties who apparently favor the plan.  In this context,

the courts have been understandably skeptical of the litigant's motives and have often denied

standing as to any claim that asserts only third-party rights.")

141.    The only parties to the Management Agreements are the Debtor and the respective

CLOs.  Consequently, the CLO Objectors are effectively asking the Court to treat them as the

contracting parties, so that they, rather than the CLOs, may decide whether to oppose

assumption.  But an adjudication of the CLO Objectors' rights vis-à-vis the CLOs is not before

the Court.  Regardless, this assertion of management authority over the CLOs was already

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-36   Filed 12/20/23   Page 408 of 1104   PageID 16542
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1689 of 1803   PageID 12435
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 82 of 106

rejected by Court as "almost Rule 11 frivolous." In the CLO Motion, the movants sought to restrict sales of the CLOs' assets on terms that they believed might be disadvantageous to the holders of preference shares, but they could not substantiate any contractual basis for the exercise of such management authority.[71]

142.    The only acknowledgement of this Court's ruling in the NPA/HCMFA Objection is offered in a footnote, in which the CLO Objectors suggest that the issues are different "in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed."[72] In all honesty, the Debtor has no idea what the Objector's statement means, but whatever it means, the underlying issue and rationale are the same here as in the CLO Motion. As before, the issue is who has the right to make business decisions for the CLOs, and in both the CLO Motion and here, the proffered justification is a nonspecific risk that investment decisions may be made with which the CLO Objectors disagree.

**C.      The CLO Objectors Lack Standing to Object to the Plan**

**1.      The CLO Objectors Rights Under the Management Agreements Are Not Affected by the Plan**

---

[71] 12/16/20 Tr. of Proceedings at 64:1-10.

> This is almost Rule 11 frivolous to me. You know, we're -- we didn't have a Rule 11 motion filed, and, you know, I guess, frankly, I'm glad that a week before the holidays begin we don't have that, but that's how bad I think it was, Mr. Wright [of K&L Gates] and Mr. Norris. This is a very, very frivolous motion. Again, no statutory basis for it. No contractual basis. You know, you didn't even walk me through the provisions of the contracts. I guess that would have been fruitless. But you haven't even shown something against, some lack of reasonable business judgment.

[72] The CLO Objectors state: "The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis." Obj. at 5, n. 4.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23   Page 409 of 1104   PageID 16543
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1690 of 1803   PageID 12436
Case 19-34054-sgj11   Doc 1807   Filed 01/22/21   Entered 01/22/21 18:52:03   Page 83 of 106

143.    The CLO Objectors offer four bases for standing in the Objection.  The first is that "in several of the Servicing Agreements, the CLO Objectors have the right to remove the Debtor or to control who the servicer under the agreements is.  They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements.  Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the CLO Objectors have standing to object to their rights being limited or eliminated."  Obj. at 27.  Elsewhere they state that the Management Agreements "generally allow the holders of preference shares to remove the portfolio manager for cause" and may provide for a certain percentage of holders of Preference Shares to remove a manager without cause. Obj. at 11.

144.    As an initial matter, nowhere in the NREP Joinder do any of the NexPoint RE Partners allege or state that they have any interest in the CLOs.  Without an interest in the CLOs, the NexPoint RE Partners cannot allege that any of their rights are affected.  Further, nowhere in the NPA/HCMFA Objection is there any attempt to establish any basis on which the CLO Objectors are presently entitled to replace the Debtor as the Portfolio Manager or authorized to decide for the CLOs whether the CLOs should consent to the Debtor's assumption of the Management Agreements.  This is telling.

145.    As set forth in the Management Agreements, the Debtor can only be removed as Portfolio Manager *for cause* by a majority of the preference shares that are *not* held by affiliates of the Debtor.   By the CLO Objectors own admission, they only hold a majority of the preference shares in eight of the fifteen CLOs at issue.  That means that the CLO Objectors have

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 886    Page 12622/23 1804ge 410 of 1104    PageID 16544
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1691 of 1803    PageID 12437
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 84 of 106

*no* right to remove the Portfolio Manager in approximately half of the Management Agreements. However, even with respect to the CLOs in which they hold a majority of the preference shares, the CLO Objectors cannot remove the Debtor unless cause exists – and cause does not exist. Moreover, the CLO Objectors, under the Management Agreements, are prohibited from replacing the Debtor because each of the CLO Objectors should be considered an affiliate of the Debtor for purposes of the Management Agreements and therefore be prohibited from exercising removal rights.  Finally, on January 9, 2020, this Court entered an order (the "January Order"), which, in pertinent part, stated that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."  [Docket No. 339]  It is beyond dispute that each of the CLO Objectors is for all intents and purposes Mr. Dondero, and Mr. Dondero should not be allowed to do by proxy what he was prohibited by this Court from doing directly.

146.    However, whether the CLO Objectors have the right to remove and replace the Debtor as Portfolio Manager is not a question that will be decided by the Plan nor will the CLO Objectors' rights to remove the Debtor – whatever they are – be impacted by the Plan.  On January 6, 2021, the Debtor filed that certain *Debtor's Memorandum of Law in Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero*, Adv. Proc. No. 20-03000-sgj, Docket No. 6] (the "Adversary Complaint").  In the Adversary Complaint, the Debtor seeks a declaratory judgment that the CLO Objectors have no right to replace the Debtor under the Management Agreements for the reasons set forth above, among others.  The CLO Objectors should assert their rights, if any, at the hearing on the Adversary Complaint, not through an objection to

DOCS_SF:104855.7 36027/002

Appellee Appx. 01685
APPX. 104937

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/27/23   Page 411 of 1104   PageID 16545
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1692 of 1803   PageID 12438
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 85 of 106

assumption.  Consequently, the CLO Objectors' rights, if any, under the Management Agreement will be determined by this Court in a separate hearing, and will not be impacted by the Plan.

> ### 2.    The CLO Objectors Lack Standing to Object to Assumption as Creditors or Parties in Interest

147.    Two of the CLO Objectors' four claimed bases for standing are that they are creditors, or at least parties in interest, and as such have standing to object to assumption of the Management Agreements "especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole," and under sections 1129(a)(1)-(3) because assumption of the Management Agreements purportedly violates the law. Obj. at 27.  These arguments fail for numerous reasons.

148.    First, these arguments for standing are circular.  If a party lacks standing to object to assumption of a contract because it has no protected interest in the contract under section 365, it cannot argue that a plan should not be confirmed because of the assumption of such contract. A party cannot use an objection to a plan to create standing under section 365.

149.    Second, the CLO Objectors are not creditors.  As set forth in the Memorandum, each of the Advisors, the Funds, and CLO Holdco filed claims in this Case; however, each of those parties voluntarily agreed to have their Claims expunged or reduced to $0.00.  None of the NexPoint RE Entities filed claims.  As such, the CLO Objectors are barred from asserting that they have prepetition claims against the Debtor or its Estate.  The CLO Objectors also cannot create claims by asserting that they will have claims arising from the rejection of the shared services agreements with the Debtor.  *None* of the shared services agreements are being rejected. Each of the shared services agreements is freely terminable.  In November 2020, the Debtor

Appellee Appx. 01686
APPX. 104937

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-16 Exhibit 6 Page 1694 of 1804 Page 412 of 1104 PageID 16546
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1693 of 1803 PageID 12439
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 86 of 106

provided notice that the shared services and other agreements were being terminated. Such agreements will terminate no later than January 31, 2021, which is prior to the anticipated Effective Date of the Plan. Because none of the shared services agreements are being rejected, none of the CLO Objectors will have a rejection damages claim.

150. Third, *even if* any of the CLO Objectors were creditors: "[E]ven creditors do not have standing to raise the rights of a landlord or contract party under section 365. . . While section 1109 allows a creditor to be heard on any issue in a bankruptcy case, it does not change the general principle of standing that a party may assert only its own legal interests and not the interests of another." *In re ANC Rental*, 278 B.R. at 718-19 (citations omitted). As the bankruptcy court held in *ANC Rental*, the CLO Objectors cannot usurp the CLO's standing to object to assumption.

151. Fourth, as set forth below, there is no "applicable law" prohibiting assumption and/or assignment for purposes of Section 365(c) and therefore no argument under section 1129(a). Each of the Management Agreements can be assumed and could be assigned without the consent of any party (although the CLOs have consented to assignment). Therefore, there is no violation of law.

152. Finally, the CLO Objectors cannot boot strap into standing by arguing that the assumption of the Management Agreements will not benefit the estate. First, it is anticipated that the Debtor's chief executive officer and chief restructuring officer will testify as to how assumption benefits the estate. Second, granting the relief requested by the CLO Objectors would be catastrophic to the Debtor's estate. The Debtor's inability to assume the Management

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-6 Filed 12/05/23 1804ge 413 of 1104 PageID 16547
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1694 of 1803 PageID 12440
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 87 of 106

Agreements does not mean that the CLO Objectors will be magically installed as Portfolio Manager. It means that the Management Agreements will be rejected and that *none* of the CLOs will have a Portfolio Manager following the Confirmation Date. Any damage to the CLOs will presumably be part of the claims asserted by the CLOs against the Debtor in connection with that rejection. Those claims are currently incalculable. The Debtor also has exposure to each of the CLOs and any loss in value caused by having no Portfolio Manager would directly impact the Reorganized Debtor's and Claimant Trust's assets. Even assuming the CLO Objectors can appoint themselves Portfolio Manager in the CLOs in which they hold a majority of the preference shares (which is contested and which in no event would happen by the Confirmation Date), that still leaves approximately half of the CLOs without a manager. It is beyond disingenuous for the CLO Objectors to argue that there is no benefit to the estate in assuming the Management Agreements while at the same time arguing that those same agreements should be rejected with the Debtor suffering the consequences.

### 3. The Contractual Right to Object to Assignment of the Management Agreements Does Not Create Standing to Object to Their Assumption

153. The fourth and final basis for standing is: "[I]n several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the CLO Objectors. The CLO Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the CLO Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the CLO Objectors." Obj. at 28.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/26/23    Page 414 of 1104    PageID 16548
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1695 of 1803    PageID 12441
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 88 of 106

154.    For purposes of standing, the CLO Objectors asserted contractual right to object to assignment of the Management Agreements is irrelevant, for three reasons.  First, there is no assignment here.  The Debtor is assuming the Management Agreements with the consent of the CLOs.  Second, even if it were correct that (a) the CLO Objectors have a contractual right to object to assignment, and (b) the *hypothetical test* applies, they still have no interest in the contract that would permit them to enforce section 365's protections for their benefit in derogation of the rights of the actual contracting parties.  Third, as discussed immediately below, the *actual test* applies in the Fifth Circuit, and thus the Management Agreements would be assumable even if they were not assignable.

## D.    Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit

155.    As the CLO Objectors recognize, there is a split of authority among the circuits regarding the appropriate test to apply to determine whether:

- a contract that is otherwise non-assignable under applicable non-bankruptcy law  can be assumed by a debtor  under Bankruptcy Code section 365(c)(1); and

- whether the same contract can be terminated if it contains an "ipso facto" clause pursuant to Bankruptcy Code section 365(e)(2)(A).

The Fifth Circuit has ordered lower courts to apply the so-called *actual test* in considering whether an ipso facto termination clause can be enforced under Bankruptcy Code section 365(e)(2)(A).  For the reasons set forth below, even though the Fifth Circuit has not ruled on the issue directly, the *actual test* has been applied by every bankruptcy court that has considered the issue in the Fifth Circuit to assumption of contracts under Bankruptcy Code section 365(c)(1).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/29/23    Page 415 of 1104    PageID 16549
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1696 of 1803    PageID 12442
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 89 of 106

Accordingly, the *actual test* should be applied in this Case to conclude that the Management

Contracts can be assumed by the Reorganized Debtor without the consent of any party.

156.    The Fifth Circuit's decision in *Bonneville Power Administration v. Mirant*

*Corporation* applied the *actual test* to a determination of whether a contract can be terminated as

a result of the filing of a bankruptcy case under Bankruptcy Code section 365(e)(2).  *Bonneville*

*Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238 (5th Cir. 2006).  The

reasoning in *Mirant* also supports application of the *actual test* to Bankruptcy Code section

365(c)(1).  Specifically, in *Mirant,* a non-debtor counterparty sought to terminate its executory

contract with the chapter 11 debtor based on an ipso facto clause after the debtor filed for

bankruptcy.    In support of its argument, the non-debtor counterparty relied on section

365(e)(2)(A) and asserted that, under applicable law, the Anti-Assignment Act, 41 U.S.C. § 15

(which generally prohibits the transfer of contracts to which the United States is a party), it was

excused from accepting performance from or rendering performance to the trustee or an

assignee.  Critically, in reaching its conclusion that the *actual test* applied, the Fifth Circuit relied

on cases analyzing section 365(c)(1).

157.    While the CLO Objectors would like this Court to believe there is some risk that

if faced with the direct question of whether the *actual* test also applies under section 365(c)(1),

the Fifth Circuit would reach a different result, that argument strains credibility.

Notwithstanding the technical language differences[73] between the two statutes, the same test

---

[73] Subsection (e)(2) provides that the invalidation of ipso facto clauses does not apply to an executory contract
where "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance
from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract
or lease prohibits or restricts assignment of rights or delegation of duties[.]"  11 U.S.C. § 365(e)(2).  This language
is very similar—but not identical—to the language employed by subsection (c)(1), which speaks to excusing

Appellee Appx. 01690
APPX. 01942

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/29/23    Page 416 of 1104    PageID 16550
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1697 of 1803    PageID 12443
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 90 of 106

must apply to both the assumption of a contract under section 365(c)(1) and the termination of a

contract under section 365(e)(2)(A).  There is no logical reading of these two subsections that

would support application of different tests.  The language of section 365(e)(2)(A) is intended to

allow the counterparty to a contract that cannot be assumed or assigned to enforce its remedy of

termination so that it is not in limbo while the bankruptcy case proceeds.  Section 365(c) cannot

be read in isolation from the other subsections.  It would make no sense for a court to hold that a

contract cannot be assumed because the *hypothetical test* applies, but nonetheless cannot be

terminated because the *actual test* applies.  For this reason, every lower court in the Fifth Circuit

that has considered the issue has held that the *actual test* applies to a debtor's assumption of

contracts under section 365(c).  *See In re Virgin Offshore USA, Inc.*, No. 13-79, 2013 U.S. Dist.

LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013):

> Though the *Mirant* court used the actual test in the context of § 365(e), which was
> not amended in the same way as § 365(c) and thus is not subject to the same
> circuit split, the Court nonetheless finds this decision to be an indicator of the way
> that the Fifth Circuit would undertake an analysis under § 365(c).  Further, in *In
> re O'Connor*, the Fifth Circuit appears to have applied an actual test to determine
> that a partnership interest was strictly personal under Louisiana law, thus not
> assumable under § 365(c).  The court did not expressly adopt the actual test
> because, regardless of the test applied, the partnership interest would have been
> unassumable under § 365(c); however, the language used in the opinion indicated
> a predilection for the actual test.

*See also In re Jacobsen*, 465 B.R. 102, 105-06 (Bankr. N.D. Miss. 2011); *Cajun Elec. Members

Comm. v. Mabey (In re Cajun Elec. Power Coop., Inc.)*, 230 B.R. 693, 705 (Bankr. M.D. La.

1999); *In re Lil' Things, Inc.,* 220 B.R. 583, 587 (Bankr. N.D. Tex. 1998); *Texaco Inc. v.

Louisiana Land & Exploration Co.,* 136 B.R. 658, 669 (Bankr. M.D. La.1992); *In re Hartec*

---

performance from, or rendering performance to, "an entity other than the debtor or the debtor in possession" as
opposed to just "the trustee or [] an assignee." Compare *id*. § 365(c)(1) with § 365(e)(2).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 417 of 1104    PageID 16551
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1698 of 1803    PageID 12444
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 91 of 106

*Enters., Inc.,* 117 B.R. 865, 871 (Bankr. W.D. Tex. 1990), *vacated by settlement*, 130 B.R. 929

(W.D.Tex. 1991).

158.    Moreover, other bankruptcy courts within the Fifth Circuit have expressly

rejected the *hypothetical test*, concluding that:

> If the court were to adopt the [hypothetical test] and focus primarily upon
> assignability, a chapter [sic] 11 filing would have the virtual effect of rejecting
> executory contracts covered by section 365(f). As suggested by the court in
> *Texaco,* this analysis would extend section "365(c) beyond its fair meaning and
> intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's
> enterprise."

*Cajun Elec.,* 230 B.R.at 705 (Bankr. M.D. La. 1999)  (quoting *Texaco,* 136 B.R. at 670).

159.    The CLO Objectors prediction that the Fifth Circuit would apply a different test

under subsection 365(c) than it does under 365(e) is based solely on the use of the word "or"

rather than "and" in subsection 365(c).  However, the language cited by the CLO Objectors in

the statute is the same language that was considered by each of the lower courts in the Fifth

Circuit; each of those courts nonetheless applied the *actual test*.  The CLO Objectors reading is

overly simplistic and imposes a literal reading that, as noted by the *Cajun Electric* Court above,

is "beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation

of the debtor's enterprise."  *Id.*  Accordingly, the argument that assumption of the Management

Contracts must be evaluated using the *hypothetical test* is unavailing and contrary to this

Circuit's case law.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01692
APPX. 01934

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Page 1720 of 1804 418 of 1104    PageID 16552
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1699 of 1803    PageID 12445
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 92 of 106

### E.    Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable

160.    The CLO Objectors, assuming the *hypothetical test* applies, contend the Management Agreements cannot be assigned or assumed under section 365(c)(1) without the consent of the contracting party because they are non-assignable personal services contracts and because Section 205(a)(2) of the Advisers Act proscribes assignment of such contracts without consent.  Under these circumstances, the CLO Objectors argue that "applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from . . . an entity other than the debtor. . . ."  11 U.S.C. § 365(c)(1)(A).

161.    This Court has previously (and correctly) rejected both of these arguments – at that time made by the Debtor under the control of Mr. Dondero – in *In re Acis Capital Management, L.P., et al*, Case No. 18-30264-sgj, Docket No. 549 (Bankr. N.D. Tex. Aug. 30, 2018) (the "Acis Order").  In the Acis Order, this Court held that: (a) the portfolio management agreements at issue were not personal services contracts; and (b) Section 205(a)(2) of the Advisers Act is not "applicable law" precluding assignment under section 365.  Specifically, this Court ruled as follows:

> The court overrules any objection that there is some applicable law that excuses the counterparties to the PMAs [portfolio management agreements] (i.e., the CLO Issuers) from accepting performance from a party other than the debtor. First, these are not personal services contracts. . . . [I]n order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable. Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable. If this were the standard, the exception would swallow the rule – any prudent party contracting for another's services considers the other party's skill, expertise, and reputation – and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-4   Filed 12/21/23   Page 419 of 1104   PageID 16553
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1700 of 1803   PageID 12446
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 93 of 106

providing services is skilled and reputable – it is whether such services are unique in nature.  *See Compass Van & Storage Corp.*, 65 B.R. at 1011. . . .  Here. . . [p]ursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland.  Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs.  While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique – as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers.  Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties: "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties."  2014-3 PMA § 3(h)(iii).  And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement."  *Id.* § 14(a).  Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager."  Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." . . .  As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." . . .  Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs. Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]"  15 U.S.C. § 80b-5(a)(2).

Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision – the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs.  Indeed, in the Southern District of New York, the court held:

> "Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Exhibit 6   Filed 12/22/23   Page 420 of 1104   PageID 16554
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1701 of 1803   PageID 12447
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 94 of 106

> investment adviser's assignment of an investment advisory contract without client consent.  The section merely provides that the contract must contain the specified provision.  Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2)."

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the counterparties to the PMAs from accepting or rendering performance without such consent.

162.    For the exact reasons found by this Court in the Acis Order, the CLO Objectors' argument that "applicable law" prevents assignment under 11 U.S.C. § 365(c) should be overruled.  First, the Management Agreements are on all fours with the management agreements discussed in the Acis Order.  The Management Agreements have the same delegation provisions, the same assignment provisions, and the same provisions on merger, consolidation, and amalgamation.[74]  The Court has already ruled on these exact agreements and found that they preclude a finding that the Management Agreements are personal services contracts.

---

[74] *See, e.g.,* Servicing Agreement, dated as of November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. ("Grayson Agreement"):

> In providing services hereunder the Servicer may employ third parties including its Affiliates to render advice including advice with respect to the servicing of the Collateral and assistance provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.

(*Id.*, § 2(d))

> In addition any successor Servicer must be an established institution which has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder

(*Id.*, § 12(e))

> Any corporation partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated or any corporation partnership or limited liability company resulting from any merger conversion or consolidation to which the Servicer shall be party or any corporation partnership or limited liability company succeeding to all or substantially all of the servicing and collateral management business of the Servicer shall be the successor to the Servicer without any further action by the Servicer the Co-Issuers the Trustee the

DOCS_SF:104855.7 36027/002

Appellee Appx. 01695

APPX. 014937

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Exhibit 6    Filed 12/23/23    Page 421 of 1104    PageID 16555
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1702 of 1803    PageID 12448
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 95 of 106

163.    Second, as this Court ruled, the Advisers Act does not prohibit assignment without consent.  It simply requires that an advisory agreement contain certain language and that any failure to obtain consent is a breach, not a nullification of the assignment.  If the CLO Objectors had done their diligence, they would have realized that the Acis Order is not unique. The SEC has expressly stated that:

> Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2).

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter (12/23/1997); *see also* Investment Management Staff Issues of Interest, http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ("In particular, the staff previously has clarified that Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent.  The section merely provides that the contract must contain the specified provision.").

164.    As such, there is no applicable law prohibiting the assignment – let alone the assumption – of the Management Agreements.  "[F]or section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue."  *In re ANC Rental Corp.*, 277 B.R. 226, 236 (Bankr. D. Del. 2002).

---

Noteholders or any other person or entity

(*Id.*, § 31)

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-86    Filed 12/29/23    Page 422 of 1104    PageID 16556
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1703 of 1803    PageID 12449
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 96 of 106

### F.    The Inadequate Assurance of Future Performance Objection is Meritless

165.    The CLO Objectors contend that the reorganized Debtor will have inadequate resources to perform its obligations under the Management Agreements, and so has not given adequate assurance of future performance.    The CLO Objectors also allege that there is a mismatch between the Debtor's investment timeline and the timeline expected by the investors in the CLOs.    Both of those arguments fail.    First, assurance of future performance is a protection conferred by section 365 on contracting parties, which the CLO Objectors are not.    They lack standing to invoke it when the actual contracting parties – the CLOs – are satisfied.    Second, even if they had standing, the objection is without merit.    The CLO Objectors argue (i) because the Debtor is terminating all of its employees, it will not be able to manage the CLOs post-Effective Date and (ii) the Debtor cannot hire a Sub-Servicer to manage the CLOs without violating the Management Agreements.    As an initial matter, the Debtor is not retaining a Sub-Servicer to manage the CLOs, and, although the Debtor will terminate a number of employees, it will retain sufficient and appropriate staff to manage the CLOs post-Effective Date.    However, even if the Debtor were terminating all employees, the Management Agreements *expressly* allow the Debtor to retain a Sub-Servicer to manage the CLOs.[75]

166.    Similarly, the CLO Objectors' contention that the Debtor's timeline for monetizing the assets in the CLOs is contrary to the timeline expected by the CLOs' investors also ignores the facts.    As disclosed in the CLOs' offering memoranda, the notes and preference shares issued by the CLOs have come due or will, with two exceptions, come due shortly.

---

[75] *See* Grayson Agreement, § 2(d) ("In providing services hereunder **the Servicer may employ third parties** including its Affiliates **to render advice including advice with respect to the servicing of the Collateral and assistance** provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.") (emphasis added).

90

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/05/23    Page 423 of 1104    PageID 16557
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1704 of 1803    PageID 12450
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 97 of 106

| **CLO** | **Note Maturity** | **Preference Share Redemption** |
|---|---|---|
| Aberdeen | November 2018 | November 2018 |
| Brentwood | February 2022 | February 2022 |
| Eastwood | May 2022 | May 2022 |
| Gleneagles | November 2017 | November 2017 |
| Grayson | November 2021 | November 2021 |
| Greenbriar | November 2021 | November 2021 |
| Highland Legacy Limited | June 2011 | N/A |
| Highland Loan Funding V | August 2014 | August 2014 |
| Highland Park CDO I | November 2051 | November 2051 |
| Jasper | August 2017 | August 2017 |
| Pam Capital | May 2010 | N/A |
| PamCo | August 2009 | N/A |
| Red River | July 2018 | July 2018 |
| Rockwall | August 2021 | N/A |
| Rockwall II | August 2021 | N/A |
| Southfork | February 2017 | February 2017 |
| Stratford | November 2021 | November 2021 |
| Valhalla | April 2038 | April 2038 |
| Westchester | August 2022 | August 2022 |

As such, there is no mismatch between the expectations of the CLOs' investors and the Debtor. With the exception of the CLO Objectors who presumably want the CLOs to stay extant forever, the expectations of the CLOs' investors are set by the offering memoranda, which clearly disclose the expected timeline for the CLOs.

167.    Finally, the disingenuousness of the CLO Objectors' arguments on future performance cannot be overstated.  The CLO Objectors are arguing that the Debtor must *reject* the Management Agreements because – in their estimation – the Reorganized Debtor will not be able to satisfactorily manage the CLOs.  The CLO Objectors' argument is therefore that it is

Appellee Appx. 01698
APPX. 16939

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/26/23    Page 424 of 1104    PageID 16558
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1705 of 1803    PageID 12451
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 98 of 106

better for the CLOs to have no manager at all.  The CLO Objectors arguments are an abject danger to the Estate and could create potential liability in the millions of dollars.

### G.    The "Impermissible Partial Assignment" Objection is Meritless

168.    The CLO Objectors contend that their rights are being modified by the Debtor's assumption of the Management Agreements, effectively resulting in an impermissible "partial assumption" of the contracts.  Once again, they are not contracting parties with standing to object on this basis.  But even if they were, the factual predicate is missing.  The Management Agreements are being assumed *in toto*.  There is no modification of any contract rights of the CLO Objectors.  And, as set forth above, the Debtor filed the Adversary Complaint in which it sought a declaratory judgment on the CLO Objectors' rights to replace the Debtor as Portfolio Manager under the Management Agreements.  Regardless of whether the Plan is confirmed, the CLO Objectors will have their rights under the Management Agreements as those rights are determined by this Court in connection with the adjudication of the Adversary Complaint.

### XI.    STATE TAXING AUTHORITY OBJECTION

169.    Following the filing of the State Taxing Authority Objection, the Debtor reached out to Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County (collectively, the "State Authorities") to see whether the State Taxing Authority Objection could be resolved consensually.  Although the Debtor and the State Taxing Authority have not yet reached resolution, the Debtor is optimistic that the State Taxing Authority Objection will be resolved and will continue working with the State Authorities.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6.1.6   Filed 12/29/23   Page 425 of 1104   PageID 16559
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1706 of 1803   PageID 12452
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 99 of 106

## XII.   IRS OBJECTION

170.   The Internal Revenue Service ("IRS") raises three objections to the Plan in the IRS Objection, two of which are not controversial, and the Debtor has amended the plan to address these points.

171.   First, in paragraph 1 of the IRS Objection, the IRS requests that the Debtor provide it with interest on account of its Allowed Claim as required under 11 U.S.C. 1129(a)(9)(C).  The Plan previously provided for payment of the full amount of the Allowed Priority Tax Claims (which would include any applicable interest on account of such Allowed Claim) on the Initial Distribution Date in order to fully satisfy these tax claims and avoid the incurrence of any unnecessary interest.  To clarify this issue and resolve this first objection, the Debtor has amended the Plan to provide for an additional treatment mechanism that provides that Allowed Claims shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code in the event the entirety of the IRS's Allowed Claims (inclusive of any interest pursuant to which such claims are entitled to) are not paid on the Initial Distribution Date, as provided in section II.C of the Plan.

172.   Second, in paragraph 3 of the IRS Objection, the IRS argues that its claims should not be "fixed" unless and until any required tax returns are filed.  The Debtor does not dispute this contention and believes that the proposed language that was provided to the IRS and reprinted below addresses this concern because it provides that the IRS's claims shall survive the bankruptcy as if the cases had not yet been filed, which is standard in chapter 11 confirmation orders.  Further, the Debtor believes that it has filed all applicable returns but, in an effort to resolve the IRS Objection, proposes the language below.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Page 1703 of 1804    Page 426 of 1104    PageID 16560
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1707 of 1803    PageID 12453
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 100 of
106

173.     In paragraph 2 of the IRS Objection, the IRS asserts that it has no record of the
Debtor having filed its Form 720 with respect to its self-insured health plan for the June 30,
2014, June 30, 2016 and June 30, 2018 tax periods.  Because of this alleged non-compliance, the
IRS proposes certain default provisions detailed in the chart below (the "Default Provisions").
The Debtor asserts that the Default Provisions are not warranted because that Debtor has filed all
applicable tax returns.  Specifically, with respect to Form 720, on April 22, 2020, the Debtor
responded to an IRS inquiry about the forms and provided an explanation about forms which
were not required and provided the IRS with Form 720 for the 2015, 2016 and 2017 tax periods.
Further the Default Provisions are not warranted because the IRS has adequate collection and
enforcement remedies available through applicable law and should not be granted additional
remedies through the Plan.  Finally, the Default Provisions are vague and contain undefined
terms which will result in confusion if enforcement is ever attempted.  Certain examples of these
problems are discussed below.

174.     Default Provision (1) provides certain remedies to the IRS in the event of certain
failures to pay taxes or timely file returns by the Debtor, the Reorganized Debtor or any
successor in interest.  The Debtor asserts that the Default Provisions are unnecessary since the
Debtor has provided all applicable returns.  Default Provisions (2) and (3) are not needed and are
problematic because of their vagueness.  The Debtor would agree to Default Provision (1)
provided that it is clarified to state that nothing contained in the Plan or the Confirmation Order
shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of
setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 427 of 1104    PageID 16561
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1708 of 1803    PageID 12454
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 101 of
106

the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States.

175.    Default Provision (2), presumably intended to provide remedies in addition to those provided under Default Provision (1), would allow the IRS to declare the Debtor to be in **"default"** if the certain failures were not cured within fourteen (14) days and then the **"entire imposed liability, together with any unpaid current liabilities, shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, an/or any successor in interest."** The term **"entire imposed liability"** is not defined in the proposed Default Provision. The ability of the IRS to unilaterally declare the Debtor to be in default and the imposition of a fourteen (14) day deadline is inappropriate and the IRS should rely on applicable law without imposing additional requirements through the confirmation process. Further, if this provision is intended to cut off the Debtor's right to challenge any obligation that is asserted against it by the IRS, it goes beyond applicable law and would deprive the Debtor of valuable rights to legitimately challenge such asserted amounts, including applicable appeal rights. Further, to the extent that the Debtor may legitimately dispute certain tax obligations, acceleration of payment of other tax obligations is not appropriate and not in accordance with applicable law.

176.    Default Provision (3) requires full payment of the entire imposed liability, together with an unpaid current liabilities within fourteen (14) days of demand and also purports to extend the collection statute expiration date again attempting to augment remedies available to the IRS. Such remedies are not warranted. Again, the IRS has adequate remedies available to it

Appellee Appx. 01702
APPX. 16954

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/20/23    Page 428 of 1104    PageID 16562
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1709 of 1803    PageID 12455
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 102 of
106

under applicable law and should not seek to augment them through the bankruptcy plan confirmation process.

177.     Aside from the fact that the pre-determination of the parties' applicable rights and defenses under applicable non-bankruptcy law does not belong in a chapter 11 plan or confirmation order, the IRS's language is problematic for another reason.  By grafting these requirements to a chapter 11 plan and or a court order, the IRS is creating additional remedies that it would otherwise not be entitled to under non-bankruptcy law because it could then use the Confirmation Order to hold the Debtor in contempt, and potentially foreclose any applicable defenses or other substantive rights in a later proceeding that contravene the IRS's Court-ordered default language.

178.     The Debtor has proposed (and the IRS has rejected) the standard "neutrality" language that protects the parties' respective rights and defenses and places them in the "the administrative or judicial tribunals in which such rights or claims would have been resolved or adjudicated if the bankruptcy case had not been commenced" which is where they belong.

179.     The Debtor believes that the Court should not pre-adjudicate either the Debtor's or the IRS's applicable rights and remedies with respect to any unfiled tax returns or claims asserted by the IRS and these issues should be preserved for adjudication in the appropriate forums post-confirmation.  The Debtor believes that its neutrality language initially proposed is consistent with language approved by this Court and in other cases without pre-adjudicating the parties' substantive rights.  While the Debtor does not believe that any of the proposed Default Provisions are warranted because it has complied with applicable filing requirements, the Debtor

Appellee Appx. 01703
APPX. 01955

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-36    Filed 12/29/23    Page 429 of 1104    PageID 16563
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1710 of 1803    PageID 12456
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 103 of 106

would agree to include Default Provision (1) as modified below.  The Debtor believes that the

language proposed to the IRS for insertion to the Confirmation Order[76] preserves each party's

respective rights and defenses and adequately protects the IRS form enforcing any statutory

claims or rights it may possess.

| Proposed Resolution of Objection of United States of America. | Default Provision - IRS.  Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): |
|---|---|
| Default Provision - IRS.  Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): | |
| (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: | (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: |
| (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; | (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; |
| (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire | (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire imposed liability owed to the IRS, together with any unpaid current liabilities, may |

---

[76] The Debtor discussed its concerns with IRS counsel provided it with certain neutrality language to resolve the IRS objection.  The IRS responded that it could not agree to such language and would stand on its objection and its requested default language

DOCS_SF:104855.7 36027/002

Appellee Appx. 01704
APPX. 16956

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-4 Exhibit B6 Page 1272/28 1804 Page 430 of 1104 PageID 16564
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1711 of 1803 PageID 12457
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 104 of 106

imposed liability owed to the IRS, together with any unpaid current liabilities, may become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed; and

(3) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service;

(4) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States; and

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(2) If the IRS declares the Debtor, the Reorganized Debtor, or any successor in interest to be in default of the Debtor's, the Reorganized Debtor's and/or any successor in interest's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, **shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, and/or any successor in interest**. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(3) **If full payment is not made within fourteen (14) days of such demand**, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code. **The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default the IRS shall be entitled to proceed as set out in paragraphs (A), (B), and/or (C) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan.**

(4) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 12/13/23    Page 431 of 1104    PageID 16565
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1712 of 1803    PageID 12458
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 105 of
106

| | after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. |
|---|---|

## <u>CONCLUSION</u>

For the reasons set forth herein and in the Memorandum, the Debtor respectfully requests that the Bankruptcy Court overrule the Objections for the reasons set forth herein and confirm the Plan as requested by the Debtor.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01706
APPX. 01957

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/29/23    Page 432 of 1104    PageID 16566
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1713 of 1803    PageID 12459
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 106 of 106

Dated:  January 22, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
                 ikharasch@pszjlaw.com
                 gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/15/23   Page 433 of 1104   PageID 16567
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1714 of 1803   PageID 12460

Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 2

# **EXHIBIT A**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84    Filed 12/26/23    Page 434 of 1104    PageID 16568
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1715 of 1803    PageID 12461
Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 2



Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/19/23 1804age 435 of 1104    PageID 16569
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1716 of 1803    PageID 12462

# **EXHIBIT B**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84    Filed 12/19/23  Page 436 of 1104    PageID 16570
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1717 of 1803    PageID 12463
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 14

## OBJECTION SUMMARY[1]

| Objecting Party | Objection | Response |
|---|---|---|
| U.S. Trustee | The release is overbroad and releases non-debtors in violation of Pacific Lumber | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
|  | The exculpation is overbroad and releases non-debtors in violation of Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| Internal Revenue Service | Plan does not state that the Debtor will pay IRS priority tax claims on the Effective Date. | The Plan provides that Allowed Priority Claims would be paid on the Initial Distribution Date.  In response to this objection, the Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
|  | The plan does not provide for statutory interest on the IRS claims under Section 511 | Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
|  | The IRS asserts that the Debtor failed to file tax Form 720 returns related to its self-insured health plan for 2014, 2016, and 2017 and requests that the Plan be amended to include certain "Default Provisions" that, among other things, allow the IRS to declare defaults, demand that the "entire imposed liability" become due and payable, and the ability to collect unpaid liabilities upon 14 days' notice of demand for payment | The Debtor has provided all applicable tax forms and the proposed Default Provisions are unwarranted.  The Debtor would agree, however, to modified Default Provisions.

The IRS' proposed Default Provisions graft the IRS' potential non-bankruptcy and arguably additional rights and remedies into the Plan, including the IRS' unilateral rights to declare defaults, impose successor liability, and to require payments of "entire imposed liabilities" upon 14 days' notice of demand.  The Debtor does not think it is appropriate for the Plan or Confirmation Order to dictate these rights and they should be determined under applicable non bankruptcy law. |

---

[1] The following are summaries only.  Parties should read the entirety of the Debtor's Reply.

DOCS_LA:335197.6 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Filed 12/19/23   Page 437 of 1104   PageID 16571
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1718 of 1803   PageID 12464
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 3 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County | Plan does not appropriately apply for treatment of postpetition and effective date interest on tax claims, Plan does not provide for continued security interest and Plan does not provide that failure to pay tax claims is a default under the plan | The Debtor is currently negotiating language with these taxing authorities to resolve the issues raised in their objection through insertion of language in the Confirmation Order in order to consensually resolve this objection. |
| Jack Yang and Brad Borud (joined by Deadman, Travers, Kauffman [D.I. 1674; 1679]) | Subordinated Claims are defined overly broad as not just claims subordinated under § 510 but also claims arising from Class A/B/C Limited Partnership interests in a way that impermissibly broadens § 510(b) | The Plan has been amended to clarify that it does not provide for categorical subordination of claims relating to partnership interests to address this objection |
| Patrick Daugherty | The Disputed Claims Reserve allows the Debtor to estimate claims for distribution, which provides for impermissible disparate treatment under § 1123(a)(4) | The Plan does not provide for disparate treatment of claims. The Plan provides for a mechanism for the Debtor or Mr. Daugherty (or any creditor) to file a motion to estimate any Disputed Claim for purposes of establishing the amount of the Disputed Claims Reserve pending the allowance or disallowance of his claim. Neither Daugherty or any other creditor is entitled to a reserve for the full amount of a disputed claim. This procedure does not constitute disparate treatment of claims under section 1123(a)(4) |
| Dugaboy Investment Trust and Get Good Investment Trust | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan is not complete as it doesn't list final documents governing the claimant trust/litigation trust/reorg debtor, retained causes of action, executory contracts | Dugaboy's reference to documents still under negotiation with the Committee was a vestige from a prior draft. Three Plan Supplements have been filed that contain those documents. An additional Plan Supplement is being filed concurrently herewith. |
| | Plan violates 1129(a)(7) because it doesn't provide the value that would be received in a chapter 7 liquidation because: (i) Reorg Debtor has no affirmative obligation to report to holders of beneficial interests in the Claimant Trust, (ii) Claimant Trustee is only liable for fraud, willful misconduct, or gross negligence and not breach of fiduciary duty; and (iii) a chapter 7 trustee would need to get court authority to sell assets and no such requirement exists for Claimant Trustee [ | The Liquidation Analysis provides that creditors will receive distributions under the Plan that are not less than the value they would receive under a hypothetical distribution under chapter 7. This objection does not contest the conclusions set forth in the Liquidation Analysis.

The Plan, consistent with other plans including ones confirmed in this court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. Moreover, a chapter 7 trustee would enjoy qualified immunity for its actions. |

Appellee Appx. 01712
APPX. 16964

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 84 Filed 12/20/23 Page 438 of 1104 PageID 16572
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1719 of 1803 PageID 12465
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 4 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Exculpation provisions are overbroad as (i) they do not relate to a specific time period (just apply from Petition Date through implementation), especially when read in connection with the exculpation provision in the Claimant Trust Agreement, (ii) cover non-Debtors, and (iii) violates Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. The CTA includes standard language limiting liability and is not an improper exculpation. |
| | Release provision (i) is overbroad and releases claims not related to the BK; (ii) waives future claims of the Claimant Trust | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and the LST only as successors to the Debtor, not any claims the CT or LST might subsequently have of their own. No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable. Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The injunction provisions in Article IX.F are overbroad and arguably violates Pacific Lumber as an improper release and In re Zale and Thru, which prevents a non-debtor injunction if it effectively discharges a no debtor | The Injunction Provisions have been modified to address these concerns. The Injunction Provision, as modified, merely implements the Plan's discharge, release, and Exculpation Provisions by enjoining the Enjoined Parties from commencing or maintaining any actions to interfere with the implementation or consummation of the Plan. Implementation and consummation are words used in the Code and have meanings known by practitioners and the Court. The injunction is only applicable to the Debtor and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust – none of whom are non-debtor third parties as the debtor has eliminated the Independent Directors from these provisions. |
| | The release provided to released parties does not meet the standards for a release as there is no meaningful contribution to the BK and is not necessary to protect non-debtor entities that are essentially the debtor | Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The consideration provided by the Released Parties will be presented. The Released Parties are only being released by the Debtor and its successors. |

Appellee Appx. 01713
Appx. 16564

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Page 1722/23 1804    Page 439 of 1104    PageID 16573
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1720 of 1803    PageID 12466
Case 19-34054-sgj11  Doc 1807-2  Filed 01/22/21    Entered 01/22/21 18:52:03    Page 5 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | The "channeling injunction" and retention of jurisdiction is improper because it expands the BK court's jurisdiction to actions not arising under, related to, or arising in the BK.  This is especially so since there is no post-effective date Reorganized Debtor | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the Court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. |
| | The injunction prevents parties from enforcing the rights created by the plan post-effective date | Art. IX.F starts with "Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . . "  It does not prevent enforcement of rights created under the Plan |
| | The "channeling injunction" is not a proper channeling injunction under Section 524(j) and even if it were, 524(j) only applies to debtors that are eligible for a discharge under 1141 and HCMLP is not eligible for a discharge because it is a liquidation plan. | The Gatekeeper Provision has nothing to do with Section 524(j).  Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| James Dondero | The exculpation provision in IX.D is overbroad as it relates to non-debtors under Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | The "channeling injunction" in Article IX.F includes post-confirmation conduct and non-debtors and is effectively a third party release prohibited under Dropbox. | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the Court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6184    Page 1722 of 1894    Page 440 of 1104    PageID 16574
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1721 of 1803    PageID 12467
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 6 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | | and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. There is no "release" in the Gatekeeper Provision as it does not prevent claims from being brought – it merely requires that the Bankruptcy Court determine the claim is colorable before it can be brought. |
| | The "channeling injunction" limits jurisdiction to the Bankruptcy Court and ignores other courts with exclusive jurisdiction and specialized jurisdiction | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. |
| | The "channeling injunction" is impermissibly vague under FRBP 3016(c) | The Gatekeeper Provision is not vague and, to the extent FRBP 3016(c) is applicable, expressly complies with the rule in that the Gatekeeper Provision describes in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identifies the entities that would be subject to the injunction |
| | The Plan does not provide appropriate mechanisms for oversight of post-confirmation sales and would allow impermissible sales similar to that which occurred during the BK | This is the same objection filed by other Dondero Entities to prevent the post-confirmation monetization of assets. The Plan, consistent with other plans including ones confirmed in this Court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. |
| | The jurisdictional provisions are overbroad and would require all claims to be heard in the BK without regard to whether they arise in connection with implementation of the plan or otherwise | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. The Bankruptcy Court has jurisdiction to determine if a claim is colorable |
| | The elimination of vacant classes on the effective date would impermissibly limited later re-allocation of claims | The elimination of the only vacant class (Class 5 (Retained Employees)) is for voting tabulation purposes only. This provision permissibly provides for the treatment of any claims that may arise or become Allowed as a Class 5 Claim post-confirmation. |
| | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |

Appellee Appx. 01715
Appx. 16567

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84   Page 1723 of 1804   Page 441 of 1104   PageID 16575
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1722 of 1803   PageID 12468
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 7 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The "channeling injunction" improperly insulates non-debtors under s. 524(e). | The Gatekeeper Provisions do not implicate section 524(e).  There is no insulation of any non-debtor.  The Gatekeeper Provision simply requires the Bankruptcy Court to determine if a claim is colorable before it can be brought. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | Period of time covered by the release and exculpation provisions impermissibly extends post-effective date. Cf. Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexPoint Advisors, Highland Capital Management Fund Advisors, and related funds<br><br>(joined by CLO Holdco)<br><br>(joined by NexPoint RE Entities [D.I. 1677] | Investment Advisers Act is "applicable law" that prohibits assumption/assignment of the Portfolio Management Agreements ("PMAs") under 365(c) | As this Court has ruled in Acis, and as SEC No Action Letters advise, the Investment Advisers Act does not prohibit assignment.  The "actual test" applies and thus even if the PMAs were nonassignable, they would still be assumable. |
| | PMAs are "personal services contracts" and cannot be assigned under 365(c) | As this Court ruled in Acis, the PMAs are not nonassignable personal services contracts.  Further, the counterparties have consented, and under the "actual test" the PMAs would be assumable even if nonassignable. |

Appellee Appx. 01716
Appx. 16967

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 36 Page 1724 of 1804 Page 442 of 1104 PageID 16576
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1723 of 1803 PageID 12469
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 8 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Fifth Circuit applies the hypothetical test under Section 365(c), not the actual test | Fifth Circuit has applied the actual test under §365(e) and lower courts within the Fifth Circuit have applied the actual test to §365(c). |
| | Even if "actual" test applies, the Reorg Debtor is not the Debtor because of slimmed down staff and use of subservicers | The objectors lack standing to object. As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer. However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date. This is an adequate assurance issue, and the contract counterparties have consented. |
| | There is no consent to assumption under 365(c) | CLO issuers are the counterparties and they consent. The objectors have no contract right to object to assumption. |
| | The objectors have standing because they have claims against the estate or will have large rejection claims under shared services agreements. | The Funds, Advisors and CLO Holdco are not creditors and will not be creditors. They agreed to expungement of their claims or reduction to zero. There will be no rejection damages because the contracts are freely terminable upon notice and are being terminated, not rejected. Even if objectors were creditors, that would give them standing only as to whether assumption benefits the estate, not their particular interests. |
| | The objectors have standing because the plan violates 1129 because it provides for assumption of contracts in violation of law. | The objectors have no standing as creditors, they have no standing to object to assumption of contracts to which they are not parties and to which the counterparties have consented, and assumption of the PMAs does not violate any law. |
| | The objectors have standing because the plan seeks to limit their right to remove the manager | The Plan does not limit their removal rights. |
| | Debtor should take direction from the majority of the preference shareholders in the CLOs | The objectors have no contractual right to control the management of the CLOs. |
| | The injunction and release provisions are overbroad because they do not appropriately define their scope and prevent the movants from suing for future malfeasance | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors. No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable. Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The injunction prevents the objectors and the CLOs from seeking relief against the | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan |

Appellee Appx. 01717
Appx. 16576

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Filed 12/25/23   Page 443 of 1104   PageID 16577
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1724 of 1803   PageID 12470
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 9 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | debtor/reorg debtor from any present or future actionable wrongs under the servicing agreements and advisers act | and attempts to collect the claims and interests dealt with by the Plan. |
| | Injunction prevents set off or other damages under the servicing agreements and to seek legal redress | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | "Channeling Injunction" is defective with respect to post-confirmation actions and is overly broad | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable.  The Bankruptcy Court has jurisdiction to determine if a claim is colorable. |
| | Plan does not disclose who will be operating the reorganized debtor and claimant trust or their comp as required under s 1123(a)(7) or insider compensation under 1129(a)(5) | The Plan Supplement discloses the identity of the Claimant Trustee, Litigation Trustee and Oversight Committee members. The Debtor discloses in the Confirmation Brief the compensation of insiders pursuant 1129(a)(5) under the Plan who will serve post-confirmation in their Confirmation Brief |
| | The plan is not feasible because the treatment of the CLO management agreements is illegal and violates s. 365 | The Plan does not impact any party's rights under the CLO management agreements, and applicable law does not prohibit the Debtor's assumption of the CLO management agreements. |
| | The plan does not provide assurance of future performance with respect to the assumption of the CLO management agreement as required by 365(b) | The objectors lack standing to object.  As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer.  However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date.  This is an adequate assurance issue, and the contract counterparties have consented. |
| | Release and injunction provisions are overbroad under Pacific Lumber because they release third parties | Neither the Release nor the Injunction Provisions release non-debtor third parties. |
| | Exculpation provisions are overbroad under Thru | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |

Appellee Appx. 01718
Appx. 16329

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Filed 12/26/23   Page 444 of 1104   PageID 16578
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1725 of 1803   PageID 12471
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 10 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | The plan divests movants from their set off rights | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The plan provides that contracts can be assumed until the Effective Date in violation of 365(d)(2) | The Plan has been amended to address this objection. |
| | Debtor is not entitled to a discharge under 1141 because it's a liquidating plan | Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| | The plan violates the absolute priority rule because equity gets to keep assets while senior creditors may not be paid in full | This assertion is false.  Equity Interests will not receive any property on account of the their interests pursuant to the Plan unless and until the claims of creditors are full paid, inclusive of interests, as provided in the Plan. |
| CLO Holdco Ltd. | CLO Holdco has standing to object because of its interests in the CLOs | As set forth above, CLO Holdco has no standing to assert the rights of the contracting parties to the PMAs.  It is also not a creditor, having reduced its claim to zero and having no rejection claim.  Even if it was a creditor it would not have standing to object to assumption on the basis of rights held by contracting parties. |
| | Joined NPA/HCMFA objection | NPA/HCMFA objection responses are set forth above. |
| | Plan provides for impermissible "partial assumption" because it cherry picks provisions of the CLO management agreements that are going to be assumed by preventing removal of the CLO manager by the preference shares | For the reasons set forth above, CLO Holdco has no standing to assert objections to assumption held by the contracting parties, who consent to assumption. Further, the Plan does not deprive preference shareholders of removal rights. |
| | Injunction and exculpation prohibits creditors from interfering with implementation or consummation of the plan and would prevent the movants from removing the Debtor as the CLO manager | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The plan impermissibly modifies the movants' rights under the CLO management agreements without their consent | The Plan does not modify CLO Holdco's rights under the PMAs |
| | Exculpation and indemnification provisions are third party releases in violation of applicable law under Pacific Lumber | The Plan does not contain an" indemnification provision." The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity |

Appellee Appx. 01719

APPX. 16570

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84    Filed 12/29/23    Page 445 of 1104    PageID 16579
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1726 of 1803    PageID 12472
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 11 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | | of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexBank Capital, Inc., NexBank Securities, Inc., NexBank Title, Inc., and NexBank | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | The Debtor amended Plan section III.J of the Plan to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | Plan allows Distribution Agent to setoff amounts owed by the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | |
| | The exculpation and release provisions violate Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. The Release is only a release of claims owned by the Debtor and its estate and does not implicate Pacific Lumber which had nothing to do with debtor released which are permitted under section 1123(b)(3). |
| Senior Employees | The Plan violates § 1123(a)(4) because it treats the Senior Employees differently than similarly situated employees by requiring the Senior Employees to sign a Senior Employee Stipulation and reduce a portion of their claim to obtain a release. | The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided. The potential Debtor release of its own claims against employees or ex-employees under the Plan does not constitute "treatment" of Class 7 or Class 8 claims. |

Appellee Appx. 01720

Appx. 16572

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 11/28/23   Page 446 of 1104   PageID 16580
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1727 of 1803   PageID 12473
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 12 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | The Senior Employee Stipulation was not approved by the Senior Employees and contains material problems. | Whether or not the Senior Employees voluntary elect to sign the Senior Employee Stipulation does not constitute a valid basis to object to Plan confirmation.  The voluntary decision to execute the Senior Employee Stipulation was at the option of the employee.  Moreover, the Debtor has settled this objection with respect to Mr. Surgent and Mr. Waterhouse. |
| | The Debtor has improperly prevented the Senior Employees from making the Convenience Class Election because, as reflected in the chart prepared by the Debtor, the Senior Employees have liquidated claims which are not in dispute. | Under applicable bankruptcy law, the Plan and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.

Each Senior Employee filed a single proof of claim and the Senior Employees have not cited any authority supporting the proposition that a claimant may split claims listed in a single proof of claim; to the contrary, courts have stated that claim splitting is impermissible when covered by a single proof of claim.  Further, the Plan and Disclosure Statement Order prohibit claim splitting for voting purposes.  Finally, as explicitly set forth on the ballots approved by the Disclosure Statement Order, even if a Senior Employee could split his claims in order to elect Convenience Class treatment, the Convenience Class Election only impacts *treatment*, and explicitly does not impact voting. |
| | The Plan provides that a Class 8 Creditor can make the Convenience Class Election for a liquidated claim.  Since a portion of each Senior Employee's claim is liquidated, the Senior Employees have a right to make the Convenience Class Election under the Plan.

The Debtor has contradicted the Plan in how in its conversations with the Senior Employees.  Each Senior Employee received two ballots (one Class 7 and one Class 8) and this confusion justifies the Senior Employees review of the Plan.

The fact that the Plan splits employee claims into PTO claims and other claims is evidence that the Plan allows Claim splitting.  The | As set forth directly above, each Senior Employee would have to split his claim in order to also retain the remainder of his Class 8 claim.  This is impermissible under applicable case law and the Plan.

The Debtor's statements have been consistent with the Plan.  In any event, the Plan governs.  The Senior Employee's receipt of two ballots was an administrative error and cannot override the express terms of the Plan and Disclosure Statement Order.

As to the PTO Claims, those were separately classified *by the Plan*.  The Senior Employees seek to split claims *within the same class*.  It is splitting claims within the same class that is prohibited by applicable case law and the Plan and Disclosure Statement Order. |

Appellee Appx. 01721
Appx. 05973

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Filed 12/29/23   Page 447 of 1104   PageID 16581
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1728 of 1803   PageID 12474
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 13 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | exhibit is a representation that the Senior Employee claims have the right to a split claim because it discusses a Convenience Class claim. | |
| | The Plan identifies no basis for disparate and unfair treatment of the Senior Employees. | Debtors are not required to grant releases to anyone nor are their required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees. |
| | The Plan appears to impermissibly grant the Debtor, the Reorganized Debtor, and the Claimant Trustee the unfettered power to "reclassify" any claim as a Subordinated Claim. | Section III.J of the Plan has been amended to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan allows the Debtor to make changes to the Plan without Court approval, including changes to the plan supplement documents. | To the contrary, Article XII of the Plan explicitly requires that modifications to the Plan be in compliance with section 1127. |

Appellee Appx. 01722

Appx. 16974

Appellee Appx. 01723

Appx. 16574

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/21/23   Page 449 of 1104   PageID 16583
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1730 of 1803   PageID 12476

# **EXHIBIT C**

Appellee Appx. 01724

Appx. 16976

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 136   Exhibit 6   Page 1732 of 1804   Page 450 of 1104   PageID 16584
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1731 of 1803   PageID 12477
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 2 of 3

On the Effective Date, the Debtor will assume the agreements set forth on Appendix [\_] hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[1] a cumulative amount of $525,000 (the "Cure Amount") as follows:

- $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

- $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and this Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

Effective as of the Effective Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the

---

[1] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-36    Filed 12/23/23    Page 451 of 1104    PageID 16585
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1732 of 1803    PageID 12478
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 3 of 3

"<u>Debtor Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "<u>Issuer Released Claims</u>").

Effective as of the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe, (xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton  (collectively, the "<u>Issuer Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "<u>Debtor Released Claims</u>"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.

Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs [ _ ] hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

Appellee Appx. 01726
Appx. 16978

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 8-6    Filed 12/23/23    Page 452 of 1104    PageID 16586
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1733 of 1803   PageID 12479

# APPENDIX 25

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/25/23   Page 453 of 1104   PageID 16587
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1734 of 1803   PageID 12480
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 1 of 13

Docket #1822  Date Filed: 1/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § |  |
| Debtor. | § |  |
|  | § |  |

**DEBTOR'S WITNESS AND EXHIBIT LIST WITH RESPECT TO
CONFIRMATION HEARING TO BE HELD ON JANUARY 26, 2021**

Highland Capital Management, L.P. (the "Debtor") submits the following witness and

exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of Reorganization of*

*Highland Capital Management, L.P.* [Docket No. 1472] which the Court has set for hearing at

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000028

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/26/23    Page 454 of 1104    PageID 16588
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1735 of 1803    PageID 12481
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 2 of 13

9:30 a.m. (Central Time) on January 26, 2021 (the "Hearing") in the above-styled bankruptcy

case (the "Bankruptcy Case").

    **A.**    <u>**Witnesses:**</u>

        1.    James P. Seery, Jr.;

        2.    John S. Dubel;

        3.    James Dondero;

        4.    Marc Tauber, a representative of Aon plc;

        5.    Patrick M. Leathem (by certification filed at Docket No. 1772);

        6.    Any witness identified by or called by any other party; and

        7.    Any witness necessary for rebuttal.

    **B.**    <u>**Exhibits:**</u>

| Letter | Exhibit | Offered | Admitted |
|:---:|---|:---:|:---:|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01729
APPX. 16930

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23   Page 455 of 1104   PageID 16589
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1736 of 1803   PageID 12482
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 3 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Appellee Appx. 01730
APPX. 16932

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88   Filed 12/28/23   Page 456 of 1104   PageID 16590
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1737 of 1803   PageID 12483
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 4 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/29/23   Page 457 of 1104   PageID 16591
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1738 of 1803   PageID 12484
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 5 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Appellee Appx. 01732
APPX. 16584

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Filed 12/20/23 Page 458 of 1104 PageID 16592
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1739 of 1803 PageID 12485
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 6 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01733
APPX. 16934

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/20/23    Page 459 of 1104    PageID 16593
Exhibit 6    Page 1742 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1740 of 1803    PageID 12486
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 7 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Appellee Appx. 01734
APPX. 16936

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Filed 12/22/23   Page 460 of 1104   PageID 16594
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1741 of 1803   PageID 12487
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 8 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/23/23    Page 461 of 1104    PageID 16595
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1742 of 1803    PageID 12488
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 9 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01736
APPX. 01737

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-6    Filed 12/24/23    Page 462 of 1104    PageID 16596
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1743 of 1803    PageID 12489
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 10 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

**Appellee Appx. 01737**
**APPX. 16599**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/15/23    Page 463 of 1104    PageID 16597
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1744 of 1803    PageID 12490
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 11 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01738
APPX. 16949

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/26/23   Page 464 of 1104   PageID 16598
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1745 of 1803   PageID 12491
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 12 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| BBBBBBB. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| CCCCCCC. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| DDDDDDD. | All exhibits identified by or offered by any other party at the Hearing | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/20/23   Page 465 of 1104   PageID 16599
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1746 of 1803   PageID 12492
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 13 of 13

Dated:  January 22, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01740
APPX. 01942

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Exhibit 86   Filed 12/28/23   Page 466 of 1104   PageID 16600
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1747 of 1803   PageID 12493

# APPENDIX 26

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/49/23 18:04 467 of 1104   PageID 16601
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1748 of 1803   PageID 12494
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 1 of 13

Docket #1866  Date Filed: 01/29/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-----------------------------------------------------------
In re:

HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]

                Debtor.
-----------------------------------------------------------

§
§   Chapter 11
§
§   Case No. 19-34054-sgj11
§
§
§

## DEBTOR'S AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO
## CONFIRMATION HEARING TO BE HELD ON FEBRUARY 2, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following amended

witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/20/23   Page 468 of 1104   PageID 16602
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1749 of 1803   PageID 12495
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 2 of 13

set for hearing at 9:30 a.m. (Central Time) on February 2, 2021 (the "Hearing") in the above-styled bankruptcy case (the "Bankruptcy Case").

    **A.**    **Witnesses:**

        1.    James P. Seery, Jr.

        2.    John S. Dubel

        3.    James Dondero

        4.    Marc Tauber, a representative of Aon plc

        5.    Patrick M. Leathem (by certification filed at Docket No. 1772)

        6.    Any witness identified by or called by any other party; and

        7.    Any witness necessary for rebuttal.

    **B.**    **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01743
APPX. 16945

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/21/23   Page 469 of 1104   PageID 16603
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1750 of 1803   PageID 12496
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 3 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/22/23    Page 470 of 1104    PageID 16604
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1751 of 1803    PageID 12497
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 4 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/22/23    Page 471 of 1104    PageID 16605
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1752 of 1803    PageID 12498
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 5 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 472 of 1104    PageID 16606
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1753 of 1803    PageID 12499
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 6 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/25/23 1804    Page 473 of 1104    PageID 16607
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1754 of 1803    PageID 12500
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 7 of 13

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Appellee Appx. 01748

APPX. 16599

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/26/23    Page 474 of 1104    PageID 16608
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1755 of 1803    PageID 12501
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 8 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Appellee Appx. 01749
APPX. 102990

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/29/23   Page 475 of 1104   PageID 16609
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1756 of 1803   PageID 12502
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 9 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/28/23   Page 476 of 1104   PageID 16610
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1757 of 1803   PageID 12503
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 10 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01751
APPX. 10300

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 36   Filed 12/29/23   Page 477 of 1104   PageID 16611
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1758 of 1803   PageID 12504
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 11 of 13

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 12/30/23    Page 478 of 1104    PageID 16612
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1759 of 1803    PageID 12505
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 12 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| GGGGGGG. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| HHHHHHH. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| IIIIIII. | All exhibits identified by or offered by any other party at the Hearing | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/21/23    Page 479 of 1104    PageID 16613
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1760 of 1803    PageID 12506
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 13 of 13

Dated:  January 29, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01754
Appx. 16606

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 6-6    Filed 12/22/23   Page 480 of 1104   PageID 16614
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1761 of 1803   PageID 12507

# APPENDIX 27

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/23/23   Page 481 of 1104   PageID 16615
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1762 of 1803   PageID 12508
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 1 of 14
Docket #1877  Date Filed: 02/01/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

### DEBTOR'S SECOND AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT
### TO CONFIRMATION HEARING TO BE HELD ON FEBRUARY 2, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following second

amended witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan*

*of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which the Court

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-6    Filed 12/29/23    Page 482 of 1104    PageID 16616
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1763 of 1803    PageID 12509
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 2 of 14

has set for hearing at 9:30 a.m. (Central Time) on February 2, 2021 (the "Hearing") in the above-

styled bankruptcy case (the "Bankruptcy Case").

    **A.**    <u>**Witnesses:**</u>

        1.    James P. Seery, Jr.;

        2.    John S. Dubel;

        3.    James Dondero;

        4.    Marc Tauber, a representative of Aon plc;

        5.    Patrick M. Leathem (by certification filed at Docket No. 1772);

        6.    Any witness identified by or called by any other party; and

        7.    Any witness necessary for rebuttal.

    **B.**    <u>**Exhibits:**</u>

| Letter | Exhibit | Offered | Admitted |
|:------:|---------|:-------:|:--------:|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01757
Appx. 16309

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/05/23 1804ge 483 of 1104    PageID 16617
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1764 of 1803    PageID 12510
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 3 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Page 1266 of 1804    Page 484 of 1104    PageID 16618
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1765 of 1803    PageID 12511
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 4 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23   Page 485 of 1104   PageID 16619
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1766 of 1803   PageID 12512
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 5 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/28/23   Page 486 of 1104   PageID 16620
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1767 of 1803   PageID 12513
Case 19-34054-sgj11   Doc 1877   Filed 02/01/21   Entered 02/01/21 18:22:33   Page 6 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01761
APPX. 03503

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 86 Filed 12/29/23 Page 487 of 1104 PageID 16621
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1768 of 1803 PageID 12514
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 7 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation [**TO BE OFFERED UNDER SEAL**] | | |
| IIII. | Highland CLO Funding Members Agreement [**TO BE OFFERED UNDER SEAL**] | | |
| JJJJ. | Highland CLO Funding Offering Memorandum [**TO BE OFFERED UNDER SEAL**] | | |

Appellee Appx. 01762
APPX. 10304

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Exhibit 6   Filed 12/19/23   Page 488 of 1104   PageID 16622
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1769 of 1803   PageID 12515
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 8 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Appellee Appx. 01763
APPX. 10305

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/29/23    Page 489 of 1104    PageID 16623
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1770 of 1803    PageID 12516
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 9 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 12/22/23  1804ge 490 of 1104    PageID 16624
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1771 of 1803    PageID 12517
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 10 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/13/23 Page 491 of 1104    PageID 16625
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1772 of 1803    PageID 12518
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 11 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Exhibit 6   Filed 12/29/23   Page 492 of 1104   PageID 16626
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1773 of 1803   PageID 12519
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 12 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Docket, *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent* (Case No. DC- 16-11396) | | |
| GGGGGGG. | Docket, *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018) | | |
| HHHHHHH. | Docket, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) | | |
| IIIIIII. | Docket, *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex.) | | |
| JJJJJJJ. | Docket*, In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (Bankr. N.D. Tex.) | | |
| KKKKKKK. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650097/2009 | | |
| LLLLLLL. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650752/2010 | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/15/23   Page 493 of 1104   PageID 16627
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1774 of 1803   PageID 12520
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 13 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| MMMMMMM. | Docket, *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 12533-VCG) | | |
| NNNNNNN. | Docket, *Daugherty v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 2017-0488-MTZ) | | |
| OOOOOOO. | Court Admitted Exhibits for January 21, 2020 Hearing | | |
| PPPPPPP. | Amended Liquidation Analysis/Financial Projections [Docket No. 1875-1] | | |
| QQQQQQQ. | Stipulation in Support of Settlement with Committee Regarding Governance and Procedures [Docket No. 383] | | |
| RRRRRRR. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| SSSSSSS. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| TTTTTTT. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| UUUUUUU. | All exhibits identified by or offered by any other party at the Hearing | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-6    Filed 12/26/23    Page 494 of 1104    PageID 16628
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1775 of 1803    PageID 12521
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 14 of 14

Dated:  February 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01769
Appx. 16520

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-36   Filed 12/29/23   Page 495 of 1104   PageID 16629
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1776 of 1803   PageID 12522

# APPENDIX 28

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-6 Filed 12/28/23 Page 496 of 1104 PageID 16630
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1777 of 1803 PageID 12523
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 1 of 14

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S THIRD AMENDED WITNESS AND EXHIBIT LIST WITH
RESPECT TO CONFIRMATION HEARING HELD ON FEBRUARY 3, 2021**

Highland Capital Management, L.P. (the "Debtor") submits the following third amended

witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which was set for

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210204000000000004

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/29/23   Page 497 of 1104   PageID 16631
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1778 of 1803   PageID 12524
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 2 of 14

hearing at 9:30 a.m. (Central Time) on February 3, 2021 (the "Hearing") in the above-styled

bankruptcy case (the "Bankruptcy Case").

**A.**     **Witnesses:**

1.     James P. Seery, Jr.;

2.     John S. Dubel;

3.     James Dondero;

4.     Marc Tauber, a representative of Aon plc;

5.     Patrick M. Leathem (by certification filed at Docket No. 1772);

6.     Any witness identified by or called by any other party; and

7.     Any witness necessary for rebuttal.

**B.**     **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01772
APPX. 10392

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/20/23    Page 498 of 1104    PageID 16632
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1779 of 1803    PageID 12525
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 3 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

**THIRD AMENDED WITNESS AND EXHIBIT LIST FOR HEARING HELD ON FEBRUARY 3, 2021**       **PAGE 3 OF 14**
DOCS_NY:42031.4 36027/002

Appellee Appx. 01773
APPX. 16523

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 11/21/23   Page 499 of 1104   PageID 16633
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1780 of 1803   PageID 12526
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 4 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Appellee Appx. 01774
APPX. 03726

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6   Exhibit 86   Page 127 of 201   Page 500 of 1104   PageID 16634
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1781 of 1803   PageID 12527
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 5 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

**THIRD AMENDED WITNESS AND EXHIBIT LIST FOR HEARING HELD ON FEBRUARY 3, 2021**          **PAGE 5 OF 14**
DOCS_NY:42031.4 36027/002

Appellee Appx. 01775
APPX. 05076

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/23/24    Page 501 of 1104    PageID 16635
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1782 of 1803    PageID 12528
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 6 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01776
APPX. 16503

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 12/29/23    Page 502 of 1104    PageID 16636
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1783 of 1803    PageID 12529
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 7 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/28/23    Page 503 of 1104    PageID 16637
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1784 of 1803    PageID 12530
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 8 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

**THIRD AMENDED WITNESS AND EXHIBIT LIST FOR HEARING HELD ON FEBRUARY 3, 2021**        **PAGE 8 OF 14**
DOCS_NY:42031.4 36027/002

Appellee Appx. 01778
Appx. 16939

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/26/23   Page 504 of 1104    PageID 16638
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1785 of 1803    PageID 12531
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 9 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01779
APPX. 16530

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/29/23   Page 505 of 1104   PageID 16639
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1786 of 1803   PageID 12532
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 10 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01780
APPX. 10332

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 86    Filed 12/28/23    Page 506 of 1104    PageID 16640
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1787 of 1803    PageID 12533
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 11 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01781
APPX. 10332

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/29/23   Page 507 of 1104   PageID 16641
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1788 of 1803   PageID 12534
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 12 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Docket, *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent* (Case No. DC- 16-11396) | | |
| GGGGGGG. | Docket, *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018) | | |
| HHHHHHH. | Docket, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) | | |
| IIIIIII. | Docket, *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex.) | | |
| JJJJJJJ. | Docket, *In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (Bankr. N.D. Tex.) | | |
| KKKKKKK. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650097/2009 | | |
| LLLLLLL. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650752/2010 | | |

Appellee Appx. 01782

APPX. 102534

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/20/23   Page 508 of 1104   PageID 16642
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1789 of 1803   PageID 12535
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 13 of 14

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| MMMMMMM. | Docket, *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 12533-VCG) | | |
| NNNNNNN. | Docket, *Daugherty v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 2017-0488-MTZ) | | |
| OOOOOOO. | Court Admitted Exhibits for January 21, 2020 Hearing | | |
| PPPPPPP. | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1875] | | |
| QQQQQQQ. | Stipulation in Support of Settlement with Committee Regarding Governance and Procedures [Docket No. 338] | | |
| RRRRRRR. | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P. (With Technical Modifications) [Docket No. 1807] | | |
| SSSSSSS. | Email exchange between Gregory Demo, Amy Anderson, and Joseph Bain re HCM Issuers  **[REDACTED]** | | |
| TTTTTTT. | Statement of Financial Affairs, with any amendments, filed in 19-34054 [Docket No. 248] | | |
| UUUUUUU. | Schedules filed in 19-34054, with any amendments [Docket No. 247] | | |
| VVVVVVV. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| WWWWWWW. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| XXXXXXX. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| YYYYYYY. | All exhibits identified by or offered by any other party at the Hearing | | |

Appellee Appx. 01783

APPX. 102934

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 8-6   Filed 12/21/23   Page 509 of 1104   PageID 16643
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1790 of 1803   PageID 12536
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 14 of 14

Dated:  February 4, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/22/23   Page 510 of 1104   PageID 16644
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1791 of 1803   PageID 12537

# APPENDIX 29

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/23/21   Page 511 of 1104   PageID 16645
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1792 of 1803   PageID 12538
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 546 of 852   PageID 2451

# EXHIBIT 5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-6    Filed 12/29/23    Page 512 of 1104    PageID 16646
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1793 of 1803    PageID 12539
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 547 of 852    PageID 2452

## UPDATED SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION*

*In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)

| 9/23/20 | | *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] | | |
|---|---|---|---|---|
| | Objectors: | Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal is being briefed. |
| 11/18/20 | | *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements* [D.I. 1424] | | |
| | Objectors: | Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459]. | N/A |
| 11/19/20 | | *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course* [D.I. 1439] | | |
| | Movant: | Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |
| 12/8/20 | | *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1522] | | |
| | Movants: | Advisors Funds | Movants argued that the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |

**\* The following is by way of summary only and does not include discovery disputes or similar matters.  Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact.  The Debtor reserves all rights that it may have whether in law or in equity.**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84    Filed 12/15/23    Page 513 of 1104    PageID 16647
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1794 of 1803    PageID 12540
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 548 of 852    PageID 2453

| | | | | |
|---|---|---|---|---|
| 12/23/20 | **_Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith_ [D.I. 1625]** | | | |
| | **Objectors**: | Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal is being briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |
| 1/14/21 | **_Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)_ [D.I. 1752]** | | | |
| | **Movants**: | Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |
| 1/20/21 | **_James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith_ [D.I. 1784]** | | | |
| | **Objector**: | Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 36    Filed 12/26/23 Page 514 of 1104    PageID 16648
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1795 of 1803    PageID 12541
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 549 of 852    PageID 2454

| 1/22/20 | ***Objections to Fifth Amended Plan of Reorganization* [D.I. 1472]** | | | | |
|---|---|---|---|---|---|
| | **Objectors**:[1] | | All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation. | All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted. | Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed. |
| | Dondero [D.I. 1661] | Trusts [D.I. 1667] | | | |
| | Advisors & Funds[2] [D.I. 1670] | Senior Employees [D.I. 1669] | | | |
| | HCRE [D.I. 1673] | CLOH [D.I. 1675] | | | |
| | NexBank Entities [D.I. 1676] | | | | |
| 1/24/21 | ***Application for Allowance of Administrative Expense Claim* [D.I. 1826]** | | | | |
| | **Movants**: | Advisors | The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement. Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy. | This matter is currently being litigated. | N/A |
| 2/3/21 | ***NexBank's Application for Allowance of Administrative Expense Claim* [D.I. 1888]** | | | | |
| | **Movant**: | NexBank | NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services. | This matter is currently being litigated. | N/A |

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678]. These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

000546

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-86   Filed 12/29/23   Page 515 of 1104   PageID 16649
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1796 of 1803   PageID 12542
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 550 of 852   PageID 2455

| 2/8/21 | *James Dondero Motion for Status Conference* [D.I. 1914] | | | |
|---|---|---|---|---|
| | **Movant**: | Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N/A. |

| 2/28/21 | *Motions for Stay Pending Appeal* | | | |
|---|---|---|---|---|
| | **Movants**: | | The only parties requesting a stay pending appeal were the Dondero Entities.  They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| | Dondero [D.I. 1973] | Advisors [D.I. 1955] | | | |
| | Funds [D.I. 1967] | Trusts [D.I. 1971] | | | |

| 3/18/21 | *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* [D.I. 2060] | | | |
|---|---|---|---|---|
| | **Movants**: | Dondero | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. |
| | | Advisors | | | |
| | | Trusts | | | |
| | | HCRE | | | |

| 4/15/21 | *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [D.I. 2199] | | | |
|---|---|---|---|---|
| | **Movants**: | Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "UBS") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008.  The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293].  The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308].  UBS also filed a reply [D.I. 2310].  The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors have until June 7 to appeal. |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38   Filed 12/28/23   Page 516 of 1104   PageID 16650
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1797 of 1803   PageID 12543
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 551 of 852   PageID 2456

| 4/23/21 | *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [D.I. 2247] | | | |
|---|---|---|---|---|
| **Movants:** | Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders. The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313]. The Debtor filed its reply on May 21, 2021 [D.I. 2350]. | A hearing was held on June 8, 2021. The Court stated that she would find contempt but no formal order has been entered. |

| 4/23/21 | *Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* [D.I. 2242] | | | |
|---|---|---|---|---|
| **Movants:** | Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things. The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | The Court denied DAF and CLOH have appealed. [D.I. 2513] |

| 4/20/21 | *Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief* [D.I. 2229] | | | |
|---|---|---|---|---|
| **Movants:** | Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility. The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness. Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-86   Filed 12/29/23   Page 517 of 1104   PageID 16651
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1798 of 1803   PageID 12544
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 552 of 852   PageID 2457

| 4/29/21 | _Motion to Compel Compliance with Bankruptcy Rule 2015.3_ **[D.I. 2256]** | | |
|---------|---------|---------|---------|
| **Movants:** | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256].  The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343].  The Trusts filed their reply on June 8, 2021 [D.I. 2424] | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. | N/A |

### _Highland Capital Management, L.P. v. James D. Dondero_, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)

| 12/7/20 | _Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero_ **[D.I. 2]** | | |
|---------|---------|---------|---------|
| **Movant:** | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

000549

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5-6   Filed 12/20/23   Page 518 of 1104   PageID 16652
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1799 of 1803   PageID 12545
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 553 of 852   PageID 2458

| 1/7/21 | *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* **[D.I. 48]** | | |
|---|---|---|---|
| **Movant:** | Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

### *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd.*, Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)

| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* **[D.I. 2]** | | |
|---|---|---|---|
| **Movant:** | Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor believes it has reached an agreement in principle with the Funds and Advisors that will settle this matter. | N/A |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

000550

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 86   Filed 12/01/23 1804ge 519 of 1104   PageID 16653
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1800 of 1803   PageID 12546
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 554 of 852   PageID 2459

*Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*, Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [D.I. 2] | | |
|---|---|---|---|
| **Movant**: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the action was moot. | N/A |

*Highland Capital Management, L.P. v. James Dondero*, Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | |
|---|---|---|---|
| **Movant**: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* [D.I. 21] | | |
| **Movant**: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. | N/A |

000551

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6 Exhibit 86    Page 1202/23 1804 age 520 of 1104    PageID 16654
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1801 of 1803    PageID 12547
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 555 of 852    PageID 2460

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.***, **Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | _Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate_ **[D.I. 1]** | | |
|---|---|---|---|
| | **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | _Defendants Motion to Withdraw the Reference_ **[D.I. 20]** | | |
| | **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 52]. | N/A |

***Highland Capital Management, L.P. v. NexPoint Advisors, L.P.***, **Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | _Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate_ **[D.I. 1]** | | |
|---|---|---|---|
| | **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note. NPA did not pay the note when and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | _Defendants Motion to Withdraw the Reference_ **[D.I. 19]** | | |
| | **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 42].. | N/A |

***Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.***, **Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | _Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate_ **[D.I. 1]** | | |
|---|---|---|---|
| | **Movant**: | Debtor | Highland Capital Management Services, Inc. ("HCMS"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | _Defendants Motion to Withdraw the Reference_ **[D.I. 19]** | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. | |

000552

Appellee Appx. 01795

Appx. 02946

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-86   Filed 12/03/21   Page 521 of 1104   PageID 16655
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1802 of 1803   PageID 12548
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 556 of 852   PageID 2461

*Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)

| | | | | |
|---|---|---|---|---|
| 1/22/21 | <u>*Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate*</u> [D.I. 1] | | | |
| | **Movant**: | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | <u>*Defendants Motion to Withdraw the Reference*</u> [D.I. 20] | | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. | |

*Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd.*, Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)

| | | | | |
|---|---|---|---|---|
| 4/12/21 | <u>*Original Complaint*</u> | | | |
| | **Movants**: | DAF CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22]. On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26] | N/A |
| 4/19/21 | <u>*Plaintiff's Motion for Leave to File First Amended Complaint in the District Court*</u> | | | |
| | **Movants**: | DAF CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

000553

**Appellee Appx. 01796**
**Appx. 16796**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-8    Filed 02/28/24    Page 522 of 1104    PageID 16656
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1803 of 1803    PageID 12549
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 557 of 852    PageID 2462

**PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.**, Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)

| 4/12/21 | _Original Complaint_ | | | |
| --- | --- | --- | --- | --- |
| **Movants**: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous.  The Debtor will take all appropriate actions. | The Complaint was recently filed and is currently in litigation. | N/A |

**The Dugaboy Investment Trust v. Highland Capital Management, L.P.**, Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)

| 4/12/21 | _Original Complaint_ | | | |
| --- | --- | --- | --- | --- |
| **Movants**: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

000554

Appellee Appx. 01797
Appx. 02949

# EXHIBIT 7

Case 19-34054-sgj11    Doc 3596-7    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 24-1    Filed 12/29/23    Page 524 of 1104    PageID 16658
Exhibit 7 Page 29 of 316
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 1 of 10    PageID 108
Docket #0005  Date Filed: 5/17/2021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al*., | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

### APPELLANTS' RESPONSE TO DEBTOR'S MOTION FOR LEAVE TO INTERVENE
### IN APPEAL OF RECUSAL ORDER

James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P.,

NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real

Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company

(collectively, "Appellants") file this *Response* (the "*Response*") to Highland Capital Management,

L.P.'s ( "Debtor") *Motion for Leave to Intervene in Appeal of Recusal Order* (the "*Motion to*

*Intervene*").[1] Appellants respectfully state as follows:

## I.    BACKGROUND

### A. Procedural Background

1.      On October 16, 2019, Debtor filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the

---

[1] Dkt 2.

APPELLANTS' RESPONSE TO DEBTOR'S MOTION TO INTERV



APPx. 16950

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 11/29/23   Page 525 of 1104   PageID 16659
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 2 of 10   PageID 109

"Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

2.      On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee"). The Committee then moved to transfer the Highland Bankruptcy Case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

3.      At the hearing on the Committee's Motion to Transfer, the Pachulski firm, counsel for Debtor, expressly acknowledged that the Committee's motive in seeking transfer of the Highland Bankruptcy Case to the Bankruptcy Court was to take advantage of the Bankruptcy Court's preexisting negative views of Debtor's management, including, notably, Mr. Dondero:

> However -- Your Honor pointed to this at the beginning, in mentioning comments about forum-shopping -- the committee and Acis are really being disingenuous, and they have not told you the real reason that they want the case before Judge Jernigan.7 … And it's not because she's familiar with this debtor's business, this debtor's assets, or this debtor's liabilities, because she generally is not. ***It is because she formed negative views regarding certain members of the debtor's management that the committee and Acis hope will carry over to this case***.[2]
>
> ****
> The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, ***without the baggage of what happened in a previous case***, which contrary to what Acis and the committee says [*sic*], has very little to do with this debtor.[3]

4.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to the Bankruptcy Court.[4]

## B.   The *Motion to Recuse*

5.      As the Bankruptcy Court has essentially acknowledged, the Bankruptcy Court carried

---

[2] *See* B.R. Dkt. 2062, the *Appendix to the Motion to Recuse* at Exhibit 1 at 77:18-78:8 [App. 0077-0078] (emphasis added).
[3] *Id.* at 79:14-20 [App. 0079] (emphasis added).
[4] *See* B.R. Dkt. 186.

Case 19-34054-sgj11    Doc 3596-7    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit Filed Page 24/0816    Page 526 of 1104    PageID 16660
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 3 of 10    PageID 110

negative opinions of Mr. Dondero into the Highland Bankruptcy Case that it cannot extricate from its mind.

6.       Moreover, the record in the Highland Bankruptcy Case reflects that these negative opinions have resulted in, if not actual bias against Mr. Dondero (as well as any entity the Bankruptcy Court deems connected to him or under his control (collectively, the "<u>Affected Entities</u>")):[5] (a) the undeniable **perception** of bias against Mr. Dondero and the Affected Entities; and (b) distinct and regular favoritism toward Debtor and other parties (or, at a minimum, the undeniable **perception** of such favoritism).

7.       Specifically, among other things, the record in the Highland Bankruptcy Case reflects that the Bankruptcy Court's bias began to manifest itself in late 2020 and early 2021 as the Bankruptcy Court:

(a)       Repeatedly made statements demonstrating its unfavorable opinions about Mr. Dondero;

(b)       Declared that Mr. Dondero (and, by implication, the Affected Entities and each of their licensed attorneys) are vexatious litigants based on Mr. Dondero and the Affected Entities actions in: (i) defending lawsuits and motions filed against them; (ii) asserting valid legal positions; and/or (iii) preserving legal rights, including on appeal;

(c)       Reasonably appears to have prejudged an issue of fact in the Adversary Proceedings (defined below) by concluding that any entity connected to Mr. Dondero (*i.e.*, the Affected Entities) is essentially Mr. Dondero himself, without evidence being introduced that support disregarding the corporate status of these entities;

(d)       Summarily and/or preemptively disregarded the testimony of any witness who would testify in favor of Appellants, without evidentiary support, as "under [Mr. Dondero's] control" and, if the witness has any connection to Mr. Dondero, *per se* not credible; and

(e)       Entered findings of fact and granted remedies against Appellants that the

---

[5] The term "<u>Affected Entities</u>" should be understood to include Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc.

---

Case 19-34054-sgj11    Doc 3596-7    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit Filed Page 29/0216 Page 527 of 1104    PageID 16661
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 4 of 10    PageID 111

opposing party did not seek, thus depriving Appellants of due process rights.

8.      This bias (or equally problematic perception of bias) has and will continue to impair the ability of Appellants to adequately preserve and protect their legal rights and interests.

9.      Consequently, on March 18, 2021, Appellants moved to recuse Presiding Judge Jernigan (the "*Motion to Recuse*")[6] from the below adversary proceedings (the "Adversary Proceedings"):

| Adversary Proceeding | File Date |
|---|---|
| *UCC v. CLO Holdco Ltd., et al.; Adversary No. 20-03195* | 12/17/2020 |
| *HCMLP v. NexPoint Advisors, L.P., et al.; Adversary No. 21-03000* | 1/6/2021 |
| *HCMLP v. Dondero; Adversary No. 21-03003* | 1/22/2021 |
| *HCMLP v. HCMFA; Adversary No. 21-03004* | 1/22/2021 |
| *HCMLP v. NexPoint Advisors, L.P.; Adversary No. 21-03005* | 1/22/2021 |
| *HCMLP v. HCM; Adversary No. 21-03006* | 1/22/2021 |
| *HCMLP v. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC; Adversary No. 21-03007* | 1/22/2021 |
| *HCMLP v. HCMFA; Adversary No. 21-03010* | 2/17/2021 |
| *HCMLP v. Dondero; Adversary No. 20-03190* | 12/7/2020 |

10.      Notably, while the Bankruptcy Court had presided over many issues in the Highland Bankruptcy Case at the time of the *Motion to Recuse*, Appellants' *Motion to Recuse* sought relief related to recently filed and future, stand-alone Adversary Proceedings, *i.e.*, **proceedings in which institutional knowledge is not required**. Indeed, as shown above, before the Bankruptcy Court's "institutional knowledge" became advantageous for Debtor, Debtor aptly referred to it as "baggage."

11.      Moreover, the Bankruptcy Court has not made any substantive rulings in those Adversary Proceedings, and the defendants therein have moved to withdraw the reference in most, if not all,

---

[6] *See* B.R. Dkt. 2060-2062.

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1-38   Exhibit   Filed 02/02/23   Page 528 of 1104   PageID 16662
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 5 of 10   PageID 112

of those cases on the grounds that most of the claims are based on state law.

## C. The *Recusal Order* and Debtor's Intentional Inaction

12.    On March 19, 2021, the morning after Appellants filed the *Motion to Recuse*, the Bankruptcy Court acknowledged receiving the *Motion to Recuse* in a hearing on a separate issue and stated to all present (which included Debtor) that it would review the *Motion to Recuse* and let the parties know whether responsive pleadings would be necessary.[7]

13.    The Bankruptcy Court's statements that morning clearly indicated that it would likely deny the *Motion to Recuse sua sponte*. Nonetheless, no party, including Debtor, sought to oppose the *Motion to Recuse*; or request time to file a response; or indicate that they, in any way, objected to the foreshadowed ruling without the opportunity to advocate for their interest and create a record. This silence continued in the days following the hearing.

14.    On March 23, 2021, the Bankruptcy Court, as it indicated it would, *sue sponte* denied Appellants' *Motion to Recuse* on three grounds (the "*Recusal Order*"): (a) the *Motion to Recuse* was untimely;[8] (b) the Bankruptcy Court's subjective belief that it was not biased ("[t]he Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants");[9] and (c) criticism of counsel (which was not a ground that Appellants asserted in the *Motion to Recuse*) did not justify recusal.[10]

15.    Appellants timely filed a *Notice of Appeal* of the *Recusal Order* and, since no other party

---

[7] *See* an excerpted copy of the Transcript from March 19, 2021 hearing at 78:3-12 ("All right. Okay. And then there's -- I don't know if the apparently new counsel who has filed a motion of recusal is on the line, but I'll just tell people I will let you all know by the end of today if I think I need a hearing on that or I think I need to give other parties in interest the opportunity to weigh in on that. But I don't think it's going to stop me from going forward, just based on the very quick summary I got from one of my law clerks this morning. But I'll let you know by the end of the day today if I think I need to set that for hearing or need responsive pleadings."), a true and correct copy of which is attached hereto as **Exhibit 1 to this *Response*** and incorporated herein by reference.

[8] B.R. Dkt. 2883 at p. 7.

[9] B.R. Dkt. 2883 at p. 10.

[10] *Id.*

---

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit File Page 29 of 316   Page 529 of 1104   PageID 16663
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 6 of 10   PageID 113

had filed any response to the *Motion to Recuse* (or indicated any position in favor or opposing the *Motion to Recuse*), Appellants listed the Bankruptcy Court as the interested party to the appeal and Debtor (and others) as "Notice Parties."[11] Then, after discussions with the Clerk for the Bankruptcy Court, who had filed correspondence in the Bankruptcy Case requesting Appellants amend their *Notice of Appeal* to add an Appellee, Appellants named the Bankruptcy Court as "Appellee" in an *Amended Notice of Appeal*.[12]

## II.     RESPONSE TO DEBTOR'S *MOTION TO INTERVENE*

16.     In a footnote (fn. 2) to the *Motion to Intervene*, Debtor overstates that Appellants are unopposed to its *Motion to Intervene*.

17.     When counsel for Debtor conferred with counsel for Appellants, counsel for Appellants indicated Appellants would not be opposed to Debtor **seeking intervention** in this appeal of the *Recusal Order*. Specifically, what counsel for Appellants did not oppose was Debtor's request to intervene and defend the *Recusal Oder* against appeal **on the grounds stated by the Bankruptcy Court in the Recusal Order**.

18.     Counsel for Appellants did not indicate that Appellants were unopposed to Debtor using intervention as a back-door attempt to make arguments that Debtor knowingly and intentionally refused to make in response to the *Motion to Recuse* in the Bankruptcy Court.

19.     Regardless, Debtor, as shown herein, has failed to show that intervention is necessary, and Debtor should not be allowed to, through intervention, raise new arguments that it did not previously present to the Bankruptcy Court (or offer new grounds for denying the *Motion to Recuse* that were not raised by the Bankruptcy Court in its own *Recusal Order*).

20.     **First**, Debtor asserts that it "would face substantial adverse consequences if the Recusal

---

[11] B.R. Dkt. 2149.
[12] *See* B.R. Dkt. 2169; Dkt. 1-1.

Case 19-34054-sgj11 Doc 3596-7 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 14-11 Filed 04/29/2016 Page 530 of 1104 PageID 16664
Case 3:21-cv-00879-K Document 5 Filed 05/17/21 Page 7 of 10 PageID 114

Order is overturned on appeal and Judge Jernigan is removed from the Bankruptcy Case."[13] In support of this statement, Debtor asserts that the Bankruptcy Court has issued 2,500 opinions and orders in the Highland Bankruptcy Case (and its various contested matters) and makes the conclusory statement that recusing Judge Jernigan from the Adversary Proceedings would somehow jeopardize the "successful implementation" of Debtor's reorganization plan. However, none of the Bankruptcy Court's institutional knowledge affects the trial of the pending and future Adversary Proceedings referenced above, which can and should stand alone and be determined on a case-by-new-case basis.

21.     More importantly, the core issues on appeal here are: (a) whether "a reasonable man, cognizant of the relevant circumstances surrounding [the Bankruptcy Court's] failure to recuse, would harbor legitimate doubts about that judge's impartiality;"[14] and (b) whether the Bankruptcy Court should be recused from sitting as the judge and jury in the various Adversary Proceedings listed above. Respectfully, Appellants, like every litigant, are entitled to a full and fair opportunity to make their case in a fair and impartial forum.[15]

22.     Under § 455(a), this Court must objectively address the requirements of § 455(a) and, if after such an objective analysis, this Court determines that a reasonable person would question the Bankruptcy Court's impartiality, then recusal is mandatory. Indeed, Debtor's insistence that the Bankruptcy Court's "institutional knowledge" (the same knowledge Debtor previously admitted was biased "baggage") is *required* for the Adversary Proceedings only further supports the positions taken by Appellants in the *Motion to Recuse*.

23.     *Second*, while Debtor contends that its interest will not be adequately protected if it is not

---

[13] Dkt. 2 at ¶ 18.
[14] *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir.1999).
[15] *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 893 (5th Cir. 2021).

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit Filed Page 29 of 316   Page 531 of 1104   PageID 16665
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 8 of 10   PageID 115

permitted to intervene, *Debtor, as shown above, made no attempt to oppose the Motion to Recuse or to represent Debtor's interests in the Bankruptcy Court*—including when the Bankruptcy Court specifically raised the *Motion to Recuse* at a hearing involving Debtor and indicated the likely reality that the Bankruptcy Court would reject the motion without hearing or responsive pleadings.

24.     Moreover, Debtor's claim that this appeal will go unopposed absent its intervention as an "appellant"[16] also lacks merit. Appellants have the burden irrespective of any intervention. As stated above, if a reasonable person would question the Bankruptcy Court's impartiality, then recusal is mandatory.

25.     *Third*, in the *Motion to Intervene*, Debtor provides only conclusory statements as to why participating in this appeal as an *amicus curiae* would be inadequate. Debtor does not explain how filing an amicus brief enabling this Court to view the matter from Debtor's perspective would be insufficient. On the contrary, numerous cases support the proposition that allowing a proposed intervenor to file an amicus brief is an adequate alternative to permissive intervention.[17]

26.     Instead, Debtor states that "although intervention was not sought in the Bankruptcy Court, the Debtor seeks intervention in this Appeal in order to bring relevant issues and facts from the record to the District Court's attention."[18] Notably, as stated above, Debtor never requested that the Bankruptcy Court permit Debtor to respond to the *Motion to Recuse* before ruling, despite the Court's clear indication that it was going to rule on the *Motion to Recuse*. Moreover, Debtor never filed a notice of appeal, and it did not file or intervene to designate the record. In short, Debtor has

---

[16] Dkt. 2 at ¶ 23 ("Based on the foregoing, the Debtor respectfully requests that this Court grant leave for the Debtor to intervene in the instate Appeal, that it be given reasonable opportunity to supplement the record, and that it otherwise *be treated as an "Appellant" for all purposes,* as if originally named as such in the Notice of Appeal.").

[17] *See McHenry v. Comm'r*, 677 F.3d 214, 227 (4th Cir. 2012); *Ruthardt v. United States*, 303 F.3d 375, 386 (1st Cir.2002); *Mumford Cove Ass'n v. Town of Groton*, 786 F.2d 530, 535 (2d Cir.1986); *Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir.1984); *Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1225 (6th Cir.1975).

[18] Dkt. 2 at ¶21.

---

Case 19-34054-sgj11    Doc 3596-7    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 7 Filed 10/20/16    Page 532 of 1104    PageID 16666
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 9 of 10    PageID 116

provided no justification for the arguments contained or the relief requested in the *Motion to Intervene*.

27.    Nonetheless, weeks after making no effort to "advocate for its own interests" in the Bankruptcy Court, it now appears that Debtor is seeking intervention in order to create new arguments it declined to make to the Bankruptcy Court. Debtor cannot use the intervention process this way. To the extent Debtor intervenes, it is stepping into the shoes of the Bankruptcy Court, and it is bound by the Bankruptcy Court's analysis, the Bankruptcy Court's basis, and the Bankruptcy Court's reasoning as stated in the *Recusal Order* denying the *Motion to Recuse*.

28.    As a result, Debtor has failed to satisfy the requirements for intervention.

29.    Moreover, while Appellants do not oppose Debtor filing a brief as an amicus to give this Court Debtor's perspective, Debtor should not be allowed to assert, for the first time on appeal, new arguments that Debtor did not present to the Bankruptcy Court and that the Bankruptcy Court did not raise in its *Recusal Order*. This Court cannot consider such additional grounds to determine whether the Bankruptcy Court abused its discretion in denying Appellants' *Motion to Recuse*.

### III.    <u>CONCLUSION</u>

FOR THE FOREGOING REASONS, Appellants respectfully request the Court deny the relief requested in the *Motion to Intervene* or, alternatively, limit Debtor's intervention to defending the Bankruptcy Court's *Recusal Order* on the grounds stated and the basis set forth in that order.

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 7   Filed 12/19/23   Page 533 of 1104   PageID 16667
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 10 of 10   PageID 117

Dated: May 17, 2021                          Respectfully submitted,


                                             By: */s/ Michael J. Lang*
                                             Michael J. Lang
                                             Texas State Bar No. 24036944
                                             mlang@cwl.law
                                             CRAWFORD, WISHNEW & LANG PLLC
                                             1700 Pacific Ave, Suite 2390
                                             Dallas, Texas 75201
                                             Telephone: (214) 817-4500
                                             *Counsel for Appellants*


## CERTIFICATE OF SERVICE

        The undersigned certifies that, on May 17, 2021, a true and correct copy of the above and
foregoing document was served on all parties and counsel of record via the Court's e-filing
system.


                                             */s/ Michael J. Lang*
                                             Michael J. Lang

# EXHIBIT 1

```
                        IN THE UNITED STATES BANKRUPTCY COURT
1                        FOR THE NORTHERN DISTRICT OF TEXAS
                                    DALLAS DIVISION
2
                                       )    Case No. 19-34054-sgj-11
3    In Re:                            )    Chapter 11
                                       )
4    HIGHLAND CAPITAL                  )    Dallas, Texas
     MANAGEMENT, L.P.,                 )    Friday, March 19, 2021
5                                      )    9:30 a.m. Docket
                                       )
6              Debtor.                 )
                                       )    MOTIONS TO STAY
7    _____)    PENDING APPEAL

8                           TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
9                     UNITED STATES BANKRUPTCY JUDGE.

10   WEBEX APPEARANCES:

11   For the Debtor:              Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
12                                10100 Santa Monica Blvd.,
                                   13th Floor
13                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
14
     For the Debtor:              John A. Morris
15                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
16                                New York, NY  10017-2024
                                  (212) 561-7700
17
     For the Official Committee   Matthew A. Clemente
18   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
19                                Chicago, IL  60603
                                  (312) 853-7539
20
     For James Dondero:           Clay M. Taylor
21                                BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
22                                420 Throckmorton Street,
                                   Suite 1000
23                                Fort Worth, TX  76102
                                  (817) 405-6900
24

25
```

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 7   Exhibit 7   Filed 02/23/23   Page 535 of 1104   PageID 16669

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 2 of 5   PageID 119

2

1    APPEARANCES, cont'd.:

2    For Get Good Trust and        Douglas S. Draper
     Dugaboy Investment Trust:     HELLER, DRAPER & HORN, LLC
3                                  650 Poydras Street, Suite 2500
                                   New Orleans, LA  70130
4                                  (504) 299-3300

5    For Certain Funds and         Davor Rukavina
     Advisors:                     MUNSCH, HARDT, KOPF & HARR
6                                  500 N. Akard Street, Suite 3800
                                   Dallas, TX  75201-6659
7                                  (214) 855-7587

8    For Certain Funds and         A. Lee Hogewood, III
     Advisors:                     K&L GATES, LLP
9                                   4350 Lassiter at North Hills
                                     Avenue, Suite 300
10                                 Raleigh, NC  27609
                                   (919) 743-7306
11

12   Recorded by:                  Michael F. Edmond, Sr.
                                   UNITED STATES BANKRUPTCY COURT
13                                 1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
                                   (214) 753-2062
14

15   Transcribed by:              Kathy Rehling
                                   311 Paradise Cove
16                                 Shady Shores, TX  76208
                                   (972) 786-3063

17

18

19

20

21

22

23

24           Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.
25

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 7   Filed 29/18/16  Page 536 of 1104   PageID 16670

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 3 of 5   PageID 120

78

1   9:30 unless someone notifies my courtroom deputy over the

2   weekend that the Fifth Circuit has said stop, you can't.

3        All right.  Okay.  And then there's -- I don't know if the

4   apparently new counsel who has filed a motion of recusal is on

5   the line, but I'll just tell people I will let you all know by

6   the end of today if I think I need a hearing on that or I

7   think I need to give other parties in interest the opportunity

8   to weigh in on that.  But I don't think it's going to stop me

9   from going forward, just based on the very quick summary I got

10  from one of my law clerks this morning.  But I'll let you know

11  by the end of the day today if I think I need to set that for

12  hearing or need responsive pleadings.

13       All right.  The last thing before I'm late for my

14  engagement is, Mr. Pomerantz, at some point -- no, this is the

15  next-to-last thing.  At some point, you said we have a hearing

16  next week on a preliminary injunction adversary as to the

17  Funds.  Is that next week?

18            MR. POMERANTZ:  Your Honor, I may have misspoke.  I

19  think it's the 29th.

20            THE COURT:  Okay.

21            MR. POMERANTZ:  I could be corrected if I'm wrong.

22  So, --

23            THE COURT:  Okay.  So, with that, I'm going to offer

24  you this.  Traci, correct me if I'm wrong:  I don't think we

25  have anything set right now on Wednesday of next week,

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 7 File Page 15 of 16 Page 537 of 1104   PageID 16671

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 4 of 5   PageID 121

81

 1    by today and then their exhibits by 3:00 p.m. Central Tuesday,

 2    along with any briefs.

 3           THE COURT:  Okay.  So that sounds reasonable.  By the

 4    end of today, the witness and exhibit list, or did we just

 5    want to say witness --

 6           MR. POMERANTZ:  The witness list by the end of today.

 7           THE COURT:  Just the witness list.

 8           MR. POMERANTZ:  Just the witness list.

 9           THE COURT:  3:00 p.m. Central time Tuesday for the

10    exhibit list, with exhibits filed, and any briefing.  Anyone

11    have any contrary views?

12       Okay.  That will be the ruling, then.  And I'll see you

13    Monday, I guess.  We're adjourned.

14           THE CLERK:  All rise.

15           MR. POMERANTZ:  Thank you, Your Honor.

16           MR. RUKAVINA:  Thank you.

17       (Proceedings concluded at 12:20 p.m.)

18                          --oOo--

19

20                       CERTIFICATE

21       I certify that the foregoing is a correct transcript from
      the electronic sound recording of the proceedings in the
22    above-entitled matter.

23     /s/ Kathy Rehling                     03/19/2021

24    _____     _____

25    Kathy Rehling, CETD-444                    Date
      Certified Electronic Court Transcriber

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 7 Filed 05/26/16   Page 538 of 1104   PageID 16672

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 5 of 5   PageID 122

82

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Hogewood                                             6
- By Mr. Rukavina                                            11
- By Mr. Taylor                                             16
- By Mr. Draper                                             18
- By Mr. Pomerantz                                          19
- By Mr. Clemente                                           54

WITNESSES

-none-

EXHIBITS

Movants' Exhibits' A through M                   Received 20
Debtor's Exhibits 1 through 33                   Received 21

RULINGS                                                      66

    Motion to Stay Pending Appeal filed by Interested
    Party Highland Capital Management Fund Advisors, LP,
    Interested Party NexPoint Advisors, LP (1955) - *Denied*

    Motion to Stay Pending Appeal filed by Interested Party
    Highland Global Allocation Fund, Interested Party
    Highland Income Fund, Interested Party NexPoint Capital,
    Inc., Interested Party NexPoint Strategic Opportunities
    Fund (1967) - *Denied*

    Joinder by James Dondero to Highland Capital Management
    Fund Advisors, LP and NexPoint Advisors, LP's Motion for
    Stay Pending Appeal (1973) - *Denied*

    Joinder by Creditor Get Good Trust, Creditor The Dugaboy
    Investment Trust to Motions for Stay Pending Appeal of
    the Court's Order Confirming the Debtor's Fifth
    Amended Plan (1971) - *Denied*

END OF PROCEEDINGS                                           81

INDEX                                                        82

# EXHIBIT 8

Case 19-34054-sgj11   Doc 3596-8   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit Filed Page 22/23 4   Page 540 of 1104   PageID 16674
Case 3:21-cv-00879-K   Document 10   Filed 06/10/21   Page 1 of 3   PageID 9524
Docket #0010  Date Filed: 6/10/2021

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § |
| HIGHLAND CAPITAL | § |
| MANAGEMENT, L.P. | § |
| | § |
| | |
| In re: | § |
| | § |
| JAMES DONDERO, *et al.*, | § |
| | § |
| Appellants, | § |
| | § |
| v. | § |
| | § |
| HON. STACEY G. C. JERNIGAN, | § |
| | § |
| Appellee. | § |

Civil Action No. 3:21-CV-0879-K

## ORDER

Before the Court is Debtor Highland Capital Management, L.P.'s Motion for Leave to Intervene in Appeal of Recusal Order ("Motion") (Doc. No. 2). The Court has considered the Motion, the Response, the Reply, the supporting documentation, and the applicable law. The Court **GRANTS** Debtor Highland Capital Management, L.P.'s Motion.

On March 18, 2021, Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get

ORDER – PAGE 1

Case 19-34054-sgj11   Doc 3596-8   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14   Exhibit Filed 06/29/23   Page 541 of 1104   PageID 16675
Case 3:21-cv-00879-K   Document 10   Filed 06/10/21   Page 2 of 3   PageID 9525

Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC (collectively, "Appellants") filed a Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Motion to Recuse"). R. on Appeal, Volume 10 (Doc. No. 9-10) at 2338. On March 22, 2021, United States Bankruptcy Judge Stacey G. C. Jernigan issued an order denying the Motion to Recuse ("Order"). *Id.*, Volume 1 (Doc. No. 9-1) at 31. Appellants filed their Notice of Appeal as to Judge Jernigan's Order on April 1, 2021, and their Amended Notice of Appeal on April 6, 2021. *Id.* at 1, 16. In their Notices of Appeal, Appellants named Judge Jernigan as the Appellee. *See id.* Debtor filed the instant Motion for Leave to Intervene seeking leave to intervene and to be treated as "Appellee" and also that Debtor be allowed to supplement the appellate record. Appellants filed a Response (Doc. No. 5), opposing Debtor's request to intervene and, alternatively, asking the Court to limit any permitted intervention to defending those reasons stated in the Order. Debtor then filed a Reply (Doc. No. 6).

Federal Rule of Bankruptcy Procedure 8013 addresses, in relevant part, intervening in a bankruptcy appeal. FED. R. BANKR. P. 8013. Rule 8013(g) provides:

> Unless a statute provides otherwise, an entity that seeks to intervene in an appeal pending in the district court or BAP must move for leave to intervene and serve a copy of the motion on the parties to the appeal. The motion or other notice of intervention authorized by statute must be filed within 30 days after the appeal is docketed. It must concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why intervention is being sought at this stage of the

ORDER – PAGE 2

Case 19-34054-sgj11 Doc 3596-8 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document Exhibit Filed 08/29/23 4 Page 542 of 1104 PageID 16676
Case 3:21-cv-00879-K Document 10 Filed 06/10/21 Page 3 of 3 PageID 9526

proceeding, and why participating in an amicus curiae would not be adequate.

FED. R. BANKR. P. 8013(g). Section 1109 of the Bankruptcy Code permits a "party of interest, including the debtor," to raise and appear and "be heard on any issue in a case under this chapter." 11 U.S.C. § 1109.

The Court finds that Debtor has established the requirements for intervening in this bankruptcy appeal. *See* Fed. R. Bankr. P. 8013(g). Therefore, the Court **grants** Debtor leave to intervene. Intervenor-Debtor may file a responsive brief, as accorded to an Appellee under the Bankruptcy Rules, in response to any appellate brief on the merits that Appellants may file. *See* Fed. R. Bank. P. 8018. Intervenor-Debtor may also designate additional items to be included in the appellate record. Intervenor-Debtor **must supplement the record within 14 days from the date of this Order**.

The Court **denies** all other relief.

**SO ORDERED.**

Signed June 10th, 2021.

*Ed Kinkeade*

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 3

APPX. 0000

# EXHIBIT 9

Case 19-34054-sgj11   Doc 3596-9   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84 Exhibit Filed Page 29 of 05   Page 544 of 1104   PageID 16678
Case 3:21-cv-00879-K   Document 28   Filed 12/10/21   Page 1 of 4   PageID 12588

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| Debtor | § | |
| _____ | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-0879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

## MEMORANDUM OPINION AND ORDER

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P.,
NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and
NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively
"Appellants") Notice of Appeal  was filed in this Court on April 18, 2021.  *See* Doc.
No. 1.  Appellants appeal an order of the Bankruptcy Court denying Appellants'
motion to recuse.  *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br.
(Doc. No. 16).  Intervenor/Debtor Highland Capital Management, L.P. filed its
Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc.
No. 23).

ORDER – PAGE 1

Case 19-34054-sgj11 Doc 3596-9 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document Exhibit Filed Page 29 of 21 5 Page 545 of 1104 PageID 16679
Case 3:21-cv-00879-K Document 28 Filed 12/10/21 Page 2 of 4 PageID 12589

Until a final judgment is issued, the bankruptcy court's denial of the motion to recuse "is not an appealable order, not subject to the collateral order doctrine, and is not an appealable interlocutory order under 28 U.S.C. § 1292(a)." *In re Dorsey*, 489 F. App'x 763, 764 (5th Cir. 2012) (citing *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 86 & n.3 (5th Cir. 1992) ("We decline to review the court's denial of the City's motion to recuse, however, because the judge's decision is not an appealable interlocutory order . . . . the City must await a final judgment to appeal the judge's refusal to recuse himself.")); *accord Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001) ("The denial of a recusal motion is not an appealable interlocutory order or an appealable collateral order."); *see also United States v. Henthorn*, 68 F.3d 465, 465 (5th Cir. 1995) ("An order denying a motion for the recusal of a district judge is not immediately appealable."). Moreover, "despite the more flexible definitions of finality accorded to bankruptcy orders, denial of a motion to disqualify is not recognized as an exception to the rule requiring finality of judgment of appeal." *In re Global Marine, Inc.*, 108 B.R. 1007, 1008 (S.D. Tex. 1988) (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368 (1981); *In re Delta Servs. Indus., Etc.*, 782 F.2d 1267 (5th Cir. 1986)).

The bankruptcy court's ruling on a motion to recuse must "conclusively and permanently decide the existence of a conflict of interest" for it to come within the collateral doctrine exception. *In re Global Marine*, 108 B.R. at 1008. In this case, the

ORDER – PAGE 2

Case 19-34054-sgj11   Doc 3596-9   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit Filed 09/29/35   Page 546 of 1104   PageID 16680
Case 3:21-cv-00879-K   Document 28   Filed 12/10/21   Page 3 of 4   PageID 12590

Bankruptcy Court expressly "reserve[d] the right to supplement or amend this ruling" in the Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order").  R. on Appeal, Vol. 1 (Doc. No. 9-1) at 42; *see In re Global Marine*, 108 B.R. at 1008 ("Rather, the Bankruptcy Court reserved the right to review the issue should a conflict appear to arise in the future.").  If the bankruptcy court's order denying recusal is "not a final order appealable by right," leave of the district court is required to bring an interlocutory appeal.  28 U.S.C. § 158(a); *cf. In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL 524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ.) ("Generally, interlocutory appeals are 'sparingly granted' and reserved for 'exceptional' cases.").

In this appeal, it is not apparent from the Bankruptcy Court Record on Appeal that jurisdiction lies over this appeal, nor have Appellants clearly established this Court's jurisdiction over the appeal of this order.  Accordingly, the Court **ORDERS** Appellants to file a brief on this discrete issue of the Court's appellate jurisdiction.  This jurisdictional brief shall be no more than ten (10) pages in length and may cite only to the Bankruptcy Court Record on Appeal already transmitted in this case.  **The brief must be filed on or before December 15, 2021**.  Appellee may file a responsive brief, no more than ten (10) pages in length, **on or before December 20, 2021**. There shall be no reply brief unless otherwise ordered by the Court.

ORDER – PAGE 3

Case 19-34054-sgj11    Doc 3596-9    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document Exhibit 9 Filed Page 25 of 5   Page 547 of 1104    PageID 16681
Case 3:21-cv-00879-K    Document 28    Filed 12/10/21    Page 4 of 4    PageID 12591

Appellants' failure to timely file this jurisdictional brief will result in the immediate dismissal of this appeal without further notice.

**SO ORDERED.**

Signed December 10th, 2021.

_____

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 4

# EXHIBIT 10

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 10    Filed 02/22/23    Page 549 of 1104    PageID 16683
Exhibit 10 Page 2 of 11
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 1 of 10    PageID 12592

**IN THE UNITED STATES DISTICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

**APPELLANTS' RESPONSE TO THE COURT'S DECEMBER 10, 2021**
**MEMORANDUM OPINION AND ORDER**

James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P.,

NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real

Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company

(collectively, "Appellants") file this Response to the Court's December 10, 2021 Memorandum

Opinion and Order [Dkt. 28]:

1.    Appellants recognize that, ordinarily, an order denying recusal is not a final,

appealable order in civil litigation under 28 U.S.C. § 1291 and 1292, at least in the District Court,

until "completion of the entire case, *i.e.*, when the decision terminates the action or ends the

litigation on the merits and leaves nothing for the court to do but execute the judgment."[1]

---

[1] *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) (In civil litigation generally, 28 U.S.C. §
1291 governs appeals from "final decisions." Under that provision, a party may appeal to a court of appeals as of right
from "final decisions of the district courts." The provision on appeals to U. S. district courts from decisions of

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 10 Filed Page 23/20 11 Page 550 of 1104    PageID 16684
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 2 of 10    PageID 12593

2.      However, "[a] bankruptcy case embraces an aggregation of individual controversies," and "[o]rders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."[2] It is therefore common for a bankruptcy court to resolve discrete disputes, thereby allowing separate appeals "from discrete, controversy-resolving decisions," even "while the umbrella bankruptcy case remains pending."[3]

3.      In other words, bankruptcy is not one dispute susceptible to one final judgment, but rather a series of discrete disputes. When a bankruptcy order puts a discrete dispute to rest, it is therefore a final order for appellate purposes.  Accordingly:

> This circuit has long rejected adoption of a rigid rule that a bankruptcy case can only be appealed as a single judicial unit at the end of the entire bankruptcy proceeding.  Instead, an appealed bankruptcy order must constitute either a 'final determination of the rights of the parties to secure the relief they seek,' or a final disposition 'of a discrete dispute within the larger bankruptcy case for the order to be considered final.'[4]

4.      This standard is "a lower threshold" for meeting the finality requirement than that which is ordinary applicable to District Court practice.[5]  Thus, the rule for bankruptcy finality is considered "more liberally or flexibly."[6]

5.      The reasoning for a more flexible finality standard in bankruptcy is demonstrated by the facts of this case: if the Court must await the Final Decree in a Chapter 11 case (the technical instrument that closes a Chapter 11 case) to determine an appeal of an order denying recusal, and the appeal is determined in favor of the appellants, then each and every subset of the Chapter 11

---

bankruptcy courts is 28 U.S.C. § 158(a). Under that provision, an appeal of right lies from "final judgments, orders, and decrees" entered by bankruptcy courts "in cases and proceedings." By providing for appeals from final decisions in bankruptcy "proceedings," as distinguished from bankruptcy "cases," Congress made "orders in bankruptcy cases ... immediately appeal[able] if they finally dispose of discrete disputes within the larger [bankruptcy] case.").

[2] *Id.*

[3] *Ritzen Grp.*, 140 S. Ct. at 586–87.

[4] *In re Bartree*, 212 F.3d 277, 282 (5th Cir. 2000) (internal quotations and citations omitted).

[5] *See In re Orr*, 180 F.3d 656, 659 (5th Cir. 1999).

[6] *In re Bartree*, 212 F.3d at 282.

Page 2

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 10    Filed 10/29/23    Page 551 of 1104    PageID 16685
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 3 of 10    PageID 12594

proceeding will be subject to reversal. This could cause massive uncertainty and burden on bankruptcy courts and the parties.  As the Fifth Circuit has explained:

> a determination that appellate jurisdiction arises only when the bankruptcy judge enters an order which ends the entire bankruptcy case, leaving nothing for the court to do but execute the judgment, would substantially frustrate the bankruptcy system. This is so particularly when, as here, one independent decision materially affects the rest of the bankruptcy proceedings.  Separate and discrete orders in many bankruptcy proceedings determine the extent of the bankruptcy estate and influence creditors to expend or not to expend effort to recover monies due them. The reversal of such an order would waste exorbitant amounts of time, money, and labor and would likely require parties to start the entire bankruptcy process anew. This potential waste of judicial and other resources has influenced this Court and other courts of appeals to view finality in bankruptcy proceedings in a more practical and less technical light.[7]

6.      Consequently, the question is whether the Bankruptcy Court's Recusal Order is a "final determination of the rights of the parties to secure the relief they seek,' or a final disposition 'of a discrete dispute within the larger bankruptcy case.'"[8]  The United States Supreme Court has held that bankruptcy court rulings are final if the motion was: (1) a distinct proceeding which the bankruptcy court fully and unequivocally disposed of all issues and relief requested; and (2) separate from the adversary claims-adjudication process.[9]

7.      Here, both elements are met.  *First*, Appellants moved to recuse. The Bankruptcy Court denied Appellants' motion and the requested relief in its entirety.[10]  There is nothing left for the Bankruptcy Court to do or to consider on the issue. Instead, there is a final disposition of the recusal dispute. Stated differently, the Recusal Order is "an order which ends a discrete judicial unit in the larger case concludes a bankruptcy proceeding and is a final judgment."[11]  *Second*, the Motion to Recuse was separate from the adversary claims-adjudication process. As a result, the

---

[7] *In re England*, 975 F.2d 1168, 1171 (5th Cir. 1992).
[8] *In re Bartree*, 212 F.3d at 282.
[9] *Ritzen Grp., Inc.*, 140 S. Ct. at 586.
[10] R 31.
[11] *In re England*, 975 F.2d at 1172.

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 10    Filed 05/26/11    Page 552 of 1104    PageID 16686
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 4 of 10    PageID 12595

Recusal Order is final and appealable, and this Court has jurisdiction.

8.      Moreover, the Bankruptcy Court's reservation in the Recusal Order to supplement or amend its ruling does not change this conclusion.  Similar to *Ritzen*, the Recusal Order "ended the [motion to recuse adjudication] and left nothing more for the Bankruptcy Court to do in that proceeding",[12] and "conclusively resolved the movant's entitlement to the requested relief."[13] Importantly, allowing catch-all reservation language in an order that conclusively ended the recusal adjudication to prevent finality would unnecessarily delay the appeal of a fully adjudicated issue. This is especially true here, where it is undisputed that the Recusal Order fully resolved all issues presented and relief requested in the Motion to Recuse.

9.      In fact, the Recusal Order itself suggests an expectation that Appellants would immediately appeal it (…"*if a movant appeals a decision not to disqualify and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record*.").[14]  This indicates that the Bankruptcy Court intended for the Recusal Order to be a final order and, perhaps, included its catch-all reservation language in the event of remand (since the Bankruptcy Court did not conduct a hearing on the recusal motion).

10.     Moreover, there is a question as to the Bankruptcy Court's ability to amend the Recusal Order after this appeal was perfected, since "the filing of a notice of appeal is an event of jurisdictional significance –it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."[15]  In a similar bankruptcy

---

[12] *Ritzen Grp., Inc.*, 140 S. Ct. at 592.
[13] *Id.* at 591.
[14] R 37 (Recusal Order at p. 7).
[15] *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). As the Fifth Circuit has held, "[t]his rule applies with equal force to bankruptcy cases."  *In re Transtexas Gas Corp.*, 303 F.3d 571, 579 (5th Cir. 2002).

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 10-84    Filed 06/26/23    Page 553 of 1104    PageID 16687
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 5 of 10    PageID 12596

appeal, this Court concluded that the Bankruptcy Court lacked jurisdiction to enter supplemental findings of fact and conclusions of law after the appeal of the underlying order had been perfected, holding: "[a]s a timely notice of appeal from the sanctions order had been filed, Judge Tillman was powerless—after December 1, 1987—to supplement, amend, or modify his November 17 sanctions order with additional findings of fact or conclusions of law."[16] Thus, if the Bankruptcy Court's reservation language had any application before this appeal, it no longer does, since the Bankruptcy Court is now without jurisdiction to supplement or amend the Recusal Order.

11.    The cases cited in the December 10, 2021 Memorandum Order and Opinion do not change this analysis. For example, *In re Global Marine Inc.* involved a dispute regarding whether a debtor's counsel had a conflict of interest warranting a denial of interim compensation.[17] In that case, the bankruptcy court denied the motion to disqualify the law firm because: (1) it found that, at that time, there was not yet a conflict of interest (but reserved the right to review the issue should a conflict appear to arise in the future); and (2) the interim orders on professional compensation were subject to full review in the context of a final order awarding or denying compensation.[18] The *Global Marine* court effectively denied the motion to disqualify without prejudice.

12.    Here, unlike in *Global Marine*, the Recusal Order is not an "interim" recusal ruling that is subject to a "final recusal application." While the Bankruptcy Court reserved the right to "supplement and amend" the Recusal Order, there are no adjustments of future awards, amendments, or anything for the court to supplement with respect to any relief requested in the Motion to Recuse.

13.    The case *In re Dorsey*, which was also cited in the Recusal Order, involved an

---

[16] *Midwest Props. No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 360 (N.D. Tex. 1988).
[17] *In re Global Marine, Inc.*, 108 B.R. 1007 (S.D. Tex. 1988).
[18] *See id.* at 1008. *See also In re Teraforce Tech. Corp.*, 347 B.R. 838, 850 (Bankr. N.D. Tex. 2006) ("an interim fee award is interlocutory in nature and can be reexamined and adjusted by the awarding court").

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 10    Filed 09/28/23    Page 554 of 1104    PageID 16688
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 6 of 10    PageID 12597

appeal from the district court to the Fifth Circuit Court of Appeals under 28 U.S.C. § 1291.[19]  In

that case, the bankruptcy court denied a motion to recuse.[20] The order denying the recusal was

appealed to the district court, which found error and remanded the case back to the bankruptcy

court.[21] On remand, the bankruptcy court again denied the motion to recuse, and another appeal

followed.[22] The district court dismissed the appeal as moot because, at that time, the judge at issue

no longer presided over the bankruptcy. However, the district court did not rule on a separate

appeal of a "gatekeeper" injunction, which remained pending in the district court.[23] The district

court's dismissal of the appeal on the motion to recuse was appealed to the Fifth Circuit. The Fifth

Circuit expressly considered the "final order" requirement under 28 U.S.C. § 1291 and *not* the

bankruptcy appellate statute of 28 U.S.C. § 158(a), which applies the more liberal and flexible

standard discussed above.[24]   Because the proceeding before the district court had not been

concluded, the Fifth Circuit found that it lacked jurisdiction over the recusal decision under section

1291.[25]

14.    In *Dorsey* or elsewhere, the Fifth Circuit has not addressed the question of the

finality of an order denying recusal under the bankruptcy appellate statutes, *i.e.*, 28 U.S.C. § 158(a)

(applicable to the district courts) or § 158(d) (applicable to the courts of appeal).  The general rule

for finality in the bankruptcy context should therefore control, especially considering the

---

[19] *In re Dorsey*, 489 Fed. Appx. 763 (5th Cir. 2012).

[20] *Id.* at 763-64 ("In a lengthy order from the bench, Judge Hunter denied the motion to disqualify without hearing any evidence. He then orally ruled on the § 727 objection and the injunction, leaving his previous decision on those issues unchanged. Friendly Finance appealed the decision on the injunction and § 727 objection and moved for rehearing of the motion to disqualify. After Judge Hunter denied rehearing, Friendly Finance appealed that decision as well. On appeal, Judge Robert G. James ruled that Judge Hunter erred in failing to give Friendly Finance an opportunity to present evidence to support its motion to disqualify. As a result, Judge James vacated Judge Hunter's order on disqualification and remanded the case for reconsideration.").

[21] *Id.*

[22] *Id.* at 764.

[23] *Id.*

[24] *Id.*

[25] *Id*.

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 10    Filed 10/28/20 11    Page 555 of 1104    PageID 16689
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 7 of 10    PageID 12598

potentially drastic consequences for all involved, including Debtor, if Appellants prevailed on appeal *after* the close of the bankruptcy case.[26] As the Supreme Court noted in *Ritzen*, the appropriate "judicial unit" in a bankruptcy case is not the overall case but the discrete issue.[27]

15. Alternatively, if the Recusal Order is not a final order, then the collateral order doctrine should apply. Under that doctrine, appellate jurisdiction lies "when an order: (1) conclusively determined the disputed question; (2) resolved an important issue separate from the merits of the case; and (3) is effectively unreviewable on appeal from a final judgment."[28] The collateral order doctrine has been applied to bankruptcy appeals,[29] and the elements of this doctrine, which are similar to the elements governing the finality of bankruptcy orders, are met here. ***First***, the Recusal Order fully determined the disputed question of recusal. ***Second***, the issue of a court's impartiality is certainly an important one and is separate from the merits of the underlying disputes. ***Third***, if the Recusal Order cannot be reviewed until the bankruptcy case itself is final and closed, the appeal might be years in the future. At that time, Debtor and others are certain to argue the doctrine of equitable mootness bars appellate review, as the Debtor will have already implemented its plan, paid its creditors, etc. (the estate being fully administered being the standard for the entry of a final decree).[30]

16. If the Court disagrees with the foregoing arguments and concludes that the Recusal

---

[26] *See In re England*, 975 F.2d at 1171; *see also Ritzen Grp., Inc.*, 140 S. Ct. at 591 ("Finally, Ritzen protests that the rule we adopt will encourage piecemeal appeals and unduly disrupt the efficiency of the bankruptcy process. As we see it, classifying as final all orders conclusively resolving stay-relief motions will avoid, rather than cause, 'delays and inefficiencies.' Immediate appeal, if successful, will permit creditors to establish their rights expeditiously outside the bankruptcy process, affecting the relief sought and awarded later in the bankruptcy case. The rule Ritzen urges 'would force creditors who lose stay-relief motions to fully litigate their claims in bankruptcy court and then, after the bankruptcy case is over, appeal and seek to redo the litigation all over again in the original court.'").

[27] *Ritzen Grp., Inc.*, 140 S. Ct. at 586.

[28] *In re Deepwater Horizon*, 793 F.3d 479, 484 (5th Cir. 2015).

[29] *See, e.g., In re Tullius*, 500 Fed. Appx. 286, 291-92 (5th Cir. 2012) (applying collateral order doctrine to bankruptcy order, but denying application of the doctrine under the facts of the appeal).

[30] *See* FED. R. BANKR. P. 3022.

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 10 Filed Page 29/20 11 Page 556 of 1104    PageID 16690
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 8 of 10    PageID 12599

Order is an interlocutory order, then the Court nevertheless can and should review the Recusal Order either: (1) pursuant to its original jurisdiction (by withdrawing the reference of the recusal motion *sua sponte*);[31] (2) by granting a permissive appeal; or (3) by treating the appeal as a petition for a writ of mandamus.[32] The factors normally applicable to a permissive withdraw of the reference include: "the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process."[33] These factors support a withdrawal of the reference here. Appellants are not forum shopping. Appellants are seeking this Court's review of the Recusal Order. In addition, a prompt review of the Recusal Order would conserve the parties' and the bankruptcy court's resources and expedite the bankruptcy process, as opposed to the inevitable future proceedings that would occur if Appellants were forced to wait to appeal until the conclusion of the bankruptcy case.

17. With respect to a permissive appeal, this Court may treat Appellants' Notice of Appeal as a motion for leave to appeal.[34] Permissive appeals generally involve the following factors: "(1) a controlling issue of law must be involved; (2) the question must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of the litigation."[35] Here, while not be a controlling issue of law in the traditional sense, judicial disqualification is solely an issue of law.[36] And, when a recusal

---

[31] *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 *2 (5th Cir. 2003) (*sua sponte* vacating judgment and ordering recusal and reassignment).

[32] *In re City of Houston*, 745 F.2d 925, 927 (5th Cir. 1984) (The question of disqualification is reviewable on a petition for writ of mandamus, but a writ will not lie in the absence of exceptional circumstances.).

[33] *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985).

[34] *See, e.g., Midwest Props. No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 359-60 (N.D. Tex. 1988) (treating notice of appeal of interlocutory order as a motion for permissive appeal and granting same). *See also* FED. R. BANKR. P. 8003(a)(2).

[35] *In re Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991).

[36] *Njie v. Lubbock County, Tex.*, 999 F.Supp. 858, 860 (N.D. Tex. 1998)

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 10    Exhibit 10    Filed 09/29/26    Page 557 of 1104    PageID 16691
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 9 of 10    PageID 12600

motion is based upon section 455 (as here), a failure to disqualify is reviewed by looking to whether it was an "abuse of sound judicial discretion."[37]  A litigant's right to an impartial judge is fundamental. Here, there appears to be grounds for difference of opinion, and an immediate appeal will advance the ultimate termination of this discrete dispute. Indeed, there is nothing else that can.

18.    With respect to a writ of mandamus, Appellants have presented the Court with a substantial case for recusal of the Bankruptcy Court.  At present, the Bankruptcy Court is presiding over a dozen or more proceedings in which Debtor and a post-confirmation trustee are seeking hundreds of millions of dollars from Appellants and entities related to Mr. Dondero.  As set forth above and in *Ritzen*, the inefficiencies that would result if Appellants prevailed on appeal *after* the close of the bankruptcy case create exceptional circumstances that warrant mandamus.[38]

19.    Issues and concerns of such magnitude, made in good faith and with an extensive evidentiary record, merit this Court's review through whatever process is appropriate and available—and there are several. This review is not only to protect Appellants but to protect the integrity of this Court, whose jurisdiction its adjunct exercises.

## CONCLUSION

FOR THE FOREGOING REASONS, Appellants respectfully request the Court determine that the Recusal Order is a final and appealable order; reverse the Bankruptcy Court's order denying the motion to recuse; order that the Bankruptcy Court is recused from the Adversary Proceedings and any future contested matters involving Appellants or any entity connected to Mr.

---

[37] *Id.* at 861.

[38] *See In re England*, 975 F.2d at 1171; *see also Ritzen Grp., Inc.*, 140 S. Ct. at 591 ("Finally, Ritzen protests that the rule we adopt will encourage piecemeal appeals and unduly disrupt the efficiency of the bankruptcy process. As we see it, classifying as final all orders conclusively resolving stay-relief motions will avoid, rather than cause, 'delays and inefficiencies.' Immediate appeal, if successful, will permit creditors to establish their rights expeditiously outside the bankruptcy process, affecting the relief sought and awarded later in the bankruptcy case. The rule Ritzen urges 'would force creditors who lose stay-relief motions to fully litigate their claims in bankruptcy court and then, after the bankruptcy case is over, appeal and seek to redo the litigation all over again in the original court.'").

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 10 Filed Page 29/26 of 11    Page 558 of 1104    PageID 16692
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 10 of 10    PageID 12601

Dondero; and grant Appellants all other further relief, at law or equity, to which they are justly

entitled.

Dated: December 15, 2021                              Respectfully submitted,


                                                     By: */s/ Michael J. Lang*_____
                                                     Michael J. Lang
                                                     Texas State Bar No. 24036944
                                                     mlang@cwl.law
                                                     CRAWFORD, WISHNEW & LANG PLLC
                                                     1700 Pacific Ave, Suite 2390
                                                     Dallas, Texas 75201
                                                     Telephone: (214) 817-4500

                                                     *Counsel for Appellants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 15, 2021, a true and correct copy of the above

and foregoing document was served on all parties of record via the Court's e-filing system.


                                                     */s/ Michael J. Lang*_____
                                                     Michael J. Lang

# EXHIBIT 11

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 11-34 Filed Page 9/26/23 Page 560 of 1104    PageID 16694
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 1 of 12    PageID 12608

**Case No. 3:21-cv-00879-K**

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

### JAMES DONDERO, et al.,

### <u>Appellants,</u>

### v.

### HON. STACEY G. C. JERNIGAN,

### <u>Appellee.</u>

---

**On Appeal from the United States Bankruptcy Court
Northern District of Texas, Dallas Division
The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court**

**In re: Highland Capital Management, L.P.
Case No. 19-34054**

---

### DEBTOR'S RESPONSE TO APPELLANTS' BRIEF REGARDING THE
### COURT'S DECEMBER 10, 2021 MEMORANDUM OPINION AND ORDER

---

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 11 Filed Page 09/20 13 Page 561 of 1104    PageID 16695
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 2 of 12    PageID 12609

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

        -and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 31    Filed 12/29/23    Page 562 of 1104    PageID 16696
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 3 of 12    PageID 12610

Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "HCMLP")[1]

in the above-captioned chapter 11 case and intervenor in this appeal (the "Appeal") from an order

of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the

"Bankruptcy Court"), by and through its undersigned counsel, hereby files this response to the

*Appellants' Response to the Court's December 10, 2021 Memorandum Opinion and Order* filed

on December 15, 2021 [Docket No. 29] (the "Appellants' Brief") pursuant to this Court's

*Memorandum Opinion and Order* [Docket No. 28] (the "Memorandum Opinion")[2] issued on

December 12, 2021.  In support of this response, the Debtor respectfully states as follows:

## A.    The Recusal Order Is Not an Appealable Interlocutory Order under Controlling Fifth Circuit Law

1.    The Memorandum Opinion correctly sets forth the long-standing rule in the Fifth

Circuit that "the denial of a recusal motion is not an appealable interlocutory order or appealable

collateral order."  *Willis v. Kroger*, 2001 U.S. App LEXIS 31841 (5th Cir. June 13, 2001)

(unpublished); *United States v. Henthorn*, 1995 US. App LEXIS 42268 (5th Cir. Aug. 23, 1995)

(unpublished); *Nobby Lobby, Inc. v. Dallas*, 970 F.2d. 82, 86 n.3 (5th Cir. 1992) ("We decline to

review the court's denial of the City's motion to recuse, however, because the judge's opinion is

not an appealable interlocutory order under 28. U.S.C. § 1292(a)"); *Friendly Fin. Serv. - Eastgate

Inc. v Dorsey (In re Dorsey)*, 489 F. App'x 763 (5th Cir. Oct. 12, 2012) ("The denial of a motion

to disqualify is not an appealable final order under 28 U.S.C. § 1291, is not subject to the collateral

order doctrine, and is not an appealable interlocutory order under 28 U.S.C. § 1292(a)."); *Steering*

---

[1] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, as modified (the "Plan").  The Plan became effective on August 11, 2021.

[2] Unless otherwise noted, (i) capitalized terms used herein have the same meanings ascribed in the Memorandum Opinion, and (ii) statutory references herein refer to title 28 of the United States Code.

Case 19-34054-sgj11 Doc 3596-11 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 31-84 Filed 05/26/13 Page 563 of 1104 PageID 16697
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 4 of 12 PageID 12611

*Comm. v Mead Corp. (In re Corrugated Container Antitrust Litig.)*, 614 F.2d 958, 960-61 (5th Cir. 1980) ("Disqualification questions are fully reviewable on appeal from final judgment"); *In re Schweitzer*, 2007 Bankr. LEXIS 75033, *2 (E.D. La. Oct.9, 2007) ("the law is quite clear that an order denying disqualification of a judge is an interlocutory order for which no appeal lies prior to final judgment in the case"); *Moerbe v. U.S. Horticultural Supply, Inc. (In re Moerbe)*, 2005 U.S. Dist. LEXIS 32468, *8 (W.D. Tex. September 1, 2005) ("Because an 'order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable,' it would seem to follow that the order in this case granting the recusal but denying its permanency is likewise interlocutory") (quoting *In re Am. Ready Mix*, 14 F.3d 1497, 1499 (10th Cir. 1994)). Thus, the rule in the Fifth Circuit is crystal clear: denial of a recusal motion is not an appealable interlocutory order or an appealable collateral order.

     2.     Appellants do not dispute these holdings. Rather, Appellants urge the Court to simply disregard the long line of Fifth Circuit authority holding that orders denying a judge's recusal are interlocutory orders. Instead, Appellants propose that the Court apply section 158(a) and then determine that the Recusal Order is a final order because the rule for bankruptcy finality should be "considered more liberally or flexibly."[3] This argument should be rejected. First, as noted above, the law in the Fifth Circuit is clear that appeals of orders denying recusal orders are *interlocutory orders*. Those decisions apply to the recusal of both bankruptcy and district court judges, as section 455(a) applies to "justices, judges, and magistrate judges."[4] Therefore, section

---

[3] Appellants' Brief ¶ 4.

[4] Section 455(a) does not distinguish between bankruptcy judges, district court judges, or appellate judges and broadly states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality may be questioned." 28 U.S.C. § 455(a). Appellants acknowledge that section 455(a) applies to bankruptcy judges because they characterize the issues on appeal as "[w]hether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.SC. § 455 as untimely" and "[w]hether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits." *Appellants' Brief* [Docket 16] at 1 ("Appellants' Opening Brief").

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 11 Exhibit 11 Page 26 of 13 Page 564 of 1104    PageID 16698
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 5 of 12    PageID 12612

158(a)(1) (which grants district courts appellate jurisdiction over final judgments, orders, and decrees)[5] and section 1291(a) (which grants courts of appeals jurisdiction over final orders of district courts) are completely inapplicable to the issues raised in the Memorandum Opinion. Appellants' references to the finality of orders under either section 158(a)(1) or section 1291 are irrelevant because those statutes do not apply to interlocutory orders.  The only available avenues to appeal the interlocutory Recusal Order are if it:  (1) falls into any of the enumerated subsections of section 1292(a)[6] allowing for appellate jurisdiction over certain categories of interlocutory appeals (which it does not); (2) falls within the collateral order exception doctrine articulated by the Supreme Court[7] (which it does not, for the reasons discussed below); or (3) if this Court, in its discretion, finds that the appeal should be granted by leave only if Appellants can satisfy the applicable stringent standards for discretionary appeals (which they do not, as discussed below).

      3.      Appellants acknowledge that the Fifth Circuit has not addressed the finality of an order denying a recusal order under section 158(a), as they request this Court to do.[8]  Appellants primarily rely on two cases to support their attempted end-run around applicable Fifth Circuit law

---

[5] Section 158(a)(1) provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgements, orders and decrees . . . ." 28 U.S.C. § 158(a)(1).

[6] Section 1292(a) governs the court's jurisdiction of appeals from interlocutory orders and provides as follows:

    (a)   Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

       (1)  Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

       (2)  Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

       (3)  Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

28 U.S.C. § 1292(a).

[7] *See Cohen v. Beneficial Indus. Loan Corp.*, 69 S. Ct. 1221 (1949).

[8] Appellants' Brief ¶ 14.

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 1-84    Filed 03/29/23    Page 565 of 1104    PageID 16699
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 6 of 12    PageID 12613

but neither even addresses the issue of recusal.  The narrow issue in *Bartee v Tara Colony Homeowners Ass'n (In re Bartee)*[9] was an appeal of an order sustaining a creditor's objection to a chapter 13 bankruptcy plan.[10]  The Fifth Circuit prefaced its analysis by noting "[s]ince this case *does not involve interlocutory orders*, injunctions, or any other orders specified in § 1292, we have jurisdiction over this case only to the extent that the judgments below are considered 'final' within the meaning of § 158 or § 1291."[11]  Yet this Appeal *does* involve an interlocutory order, so *Bartee* is inapplicable (in addition to being factually inapposite because it addressed the finality of a chapter 13 plan).

4.      Appellants also heavily rely on *Ritzen Grp. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020).  However, *Ritzen* is also legally and factually inapposite to the instant Appeal.  *Ritzen* addressed another narrow issue regarding the finality of a bankruptcy court's order denying a creditor's request for relief from the automatic stay.[12]  The Supreme Court held that the adjudication of a motion for relief from stay "forms a discrete procedural unit within the embracive bankruptcy case.  That unit yields a final, appealable order when the bankruptcy court *unreservedly* grants or denies relief."[13]  The Supreme Court therefore relied on the bankruptcy court's order "conclusively denying that the motion is 'final' and that the "order ended the stay relief adjudication and left nothing more for the Bankruptcy Court to do in that proceeding."[14]

---

[9] 212 F.3d 277 (5th Cir. 2000).

[10] *Id.* at 280.

[11] *Id.* at 282 (emphasis added).

[12] *Ritzen*, 140 S. Ct. at 586 ("The precise issue the Court today decides: Does a creditor's motion for relief from the automatic stay initiate a distinct proceeding in a final appealable order when the bankruptcy court rules dispositively on the motion?")

[13] *Id.* (emphasis added).

[14] *Id.* at 592.

Case 19-34054-sgj11 Doc 3596-11 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 1-5 Filed 09/28/23 Page 566 of 1104 PageID 16700
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 7 of 12 PageID 12614

5.    *Ritzen* is not applicable to the case *sub judice* for several reasons.  **First**, even in the limited context of the appeal of a relief-from-stay order that *Ritzen* addressed, the Supreme Court held that the order had to "conclusively" deny the motion as "final" in order for it to be immediately appealable.  On this critical issue, the Supreme Court stated it did "not decide whether finality would attach to an order denying stay relief if the bankruptcy court enters it 'without prejudice' because further developments might change the stay calculus"[15]  This is precisely the issue identified by this Court in the Memorandum Opinion by which Judge Jernigan "reserve[d] the right to supplement or amend this ruling" in the Recusal Order.[16]  The Recusal Order is not final because, as noted in *Ritzen*, Judge Jernigan's potential future supplementation or amendment of the Recusal Order "might change the calculus" of the order.

6.    **Second**, the Supreme Court expressly limited its decision to the issue of whether the conclusive denial of a motion for relief from the automatic stay was a final order capable of immediate appeal.  *Ritzen* does not address the standard for the appeal of recusal orders, which are interlocutory orders in this Circuit.[17]

7.    **Third**, Appellants' attempt to equate a court's final adjudication of a relief-from-stay order with the denial of a recusal motion misstates the holding of *Ritzen*.  Unlike a relief-from-stay order, recusal of a judge is not a "procedural unit" separate from the remaining case.[18]  A relief-from-stay proceeding constitutes a discrete dispute within the larger context of the general bankruptcy case.  The basis for the *Ritzen* holding is that the adjudication of the stay-relief motion "determines whether a creditor can isolate its claim from those of other creditors and go it alone

---

[15] *Id.* n.4.

[16] ROA Vol.1 (Doc No. 9-1) at 42.

[17] *See supra* n.5.

[18] *Ritzen*, 140 S. Ct. at 591.

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 11    Filed 09/26/23    Page 567 of 1104    PageID 16701
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 8 of 12    PageID 12615

outside of bankruptcy."[19]    However, the Recusal Order is not a discrete issue within the larger case.  It affects the entire case as Appellants seek to recuse Judge Jernigan from presiding over all matters arising under the chapter 11 case, including the more than fifteen pending adversary proceedings that are currently before her.

8.    None of the cases cited by Appellants rebut the authorities cited in the Memorandum Opinion demonstrating that the Recusal Order is interlocutory.  Appellants' attempt to evade the Fifth Circuit law holding that orders denying recusal are interlocutory should be rejected.

## B.    Fifth Circuit Law Provides that Recusal Orders Do Not Fall Within the Collateral Order Doctrine

9.    Appellants next argue that if the Recusal Order is not a final order (which it is not), the collateral-order doctrine should apply.[20]  But as noted above, the Fifth Circuit has already ruled that orders denying recusal motions are not appealable collateral orders.[21]   In addition, the bankruptcy court's ruling on a motion to recuse must "conclusively and clearly decide the existence of a conflict of interest" for the collateral-doctrine exception to apply.[22]  The Recusal Order does not conclusively and clearly decide this issue because Judge Jernigan reserved the right to supplement or amend the Recusal Order.  Finally, the collateral-order doctrine does not apply to this Appeal because the Recusal Order is not "effectively unreviewable on appeal."  As the Fifth Circuit explained, "[d]isqualification questions are *fully reviewable on appeal from final judgment*.

---

[19] *Id*. at 590.

[20] To fall within *Cohen's* collateral order doctrine, an "order must (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment."  *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 171 (5th Cir. 2009).

[21] *Willis*, 2021 U.S. App. LEXIS 31841, at *1 (citing *Nobby Lobby*, 970 F.2d at 85-86 & n.3); *Bank of Am. v. Weil Gotshal & Manges (In re Global Marine)*, 108 B.R. 1007, 1008 (S.D. Tex. 1988); *Dorsey*, 489 F. App'x 763 (denial of a motion to disqualify is not subject to the collateral-order doctrine).

[22] *Global Marine*, 108 B.R. at 1008.

APPX. 16344

Case 19-34054-sgj11   Doc 3596-11   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1-84   Filed 02/09/23   Page 568 of 1104   PageID 16702
Exhibit 11   Page 9 of 12
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 9 of 12   PageID 12616

Precisely because disqualification issues are reviewable following entry of judgment, as a threshold matter the *Cohen* doctrine is unavailing."[23]  Therefore, the collateral-order doctrine is not applicable to the Appeal.

**C.      Appellants Never Filed a Motion for Leave to Appeal the Recusal Order as an Interlocutory Order and Have Not Satisfied the Standards for Discretionary Appeal**

10.      Appellants' final argument is that the Recusal Order may be immediately appealable as an interlocutory order through leave of this Court pursuant to section 1292(b).[24] Interlocutory appeals are, as noted by Judge Fish, "'sparingly granted' and reserved for 'exceptional cases.'"[25]  Appellants have never moved for an interlocutory appeal as required under Rule 8004(a) of the Federal Rules of Bankruptcy Procedure.  Even if the Court were willing to treat the notice of appeal as a motion for leave to appeal, the standards governing interlocutory appeals cited in Appellants' Brief are not satisfied in this case.  First, there is no "controlling issue of law involved" here.  Appellants want Judge Jernigan recused because they allege her to have an "undeniable animus against Mr. Dondero and the resulting prejudicial effect that animus has on the due process rights of Mr. Dondero, the Trusts and the Affected Entities."[26]  This Appeal therefore does not involve any controlling issue of law.  Second, there is no substantial ground for difference of opinion in this Appeal.  A substantial ground for difference of opinion exists when "'a trial court rules in manner which appears contrary to the rulings of all Court of Appeals which

---

[23] *Corrugated Container*, 614 F.2d at 960-61 (emphasis added; citations omitted).

[24] The determination of whether to grant leave to appeal an interlocutory order from a bankruptcy court is the standard used under section 1292(b).  *In re Bernardi & Assocs. v. I. Kunik Co. (In re Delta Produce)*, 2013 U.S. Dist. LEXIS 91579 (W.D. Tex. June 28, 2013).  The standard consists of the following elements: (1) a controlling issue of law must be involved; (2) the question must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of litigation.  *Id.* at **5-6.

[25] *Balestri v. Hunton & Williams LLP (In re Hallwood Energy)*, 2013 U.S. Dist. LEXIS 18165 at *6 (N.D. Tex. Feb. 11, 2013).

[26] *See* Appellants' Opening Brief ¶ 31.

APPX. 07045

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 1    Exhibit 11    Filed 09/26/23    Page 9 of 13    Page 569 of 1104    PageID 16703
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 10 of 12    PageID 12617

have reached the issue.'"[27] There is nothing in the record of this Appeal that demonstrates that the Recusal Order is contrary to the rulings of the Fifth Circuit. Rather, the Recusal Order extensively cites controlling authorities in the Fifth Circuit governing a motion to recuse.[28] As to the third factor, immediate appeal will not advance the ultimate termination of litigation. Appellants, along with their related entities, have filed several civil actions and appeals of orders of the Bankruptcy Court, including an appeal of the order confirming the Debtor's Plan which is currently pending before the Fifth Circuit. The resolution of this Appeal will (unfortunately) not advance the termination of the morass of litigation that has enveloped the Debtor's chapter 11 case, which litigation addresses many substantive issues unrelated to Appellants' request to recuse Judge Jernigan from the bankruptcy case.[29]

## Conclusion

For the reasons set forth herein and in the Memorandum Opinion, Appellants have not established that the Court has appellate jurisdiction to directly review the Recusal Order because it is an interlocutory order, the collateral doctrine exception is not applicable to this case, and Appellants cannot satisfy the standards for a discretionary appeal to the extent that the Court is even willing to consider that relief.

---

[27] *Bernardi*, 2013 U.S. Dist. LEXIS 91579 at *10 (quoting *In re Cent. Grain Co-op*, 489 B.R. 403, 412 (Bankr. M.D. La. 2013)).

[28] ROA Vol.1 (Doc No. 9-1) at 5-10 (Judge Jernigan's reliance on among other cases, *United States v. Jordan*, 49 F.3d 152 (5th Cir. 1995); *Davis v. Board of School Comm'rs*, 517 F.2d 1044 (5th Cir. 1975); and *Chitmacha Tribe of La. v. Harry L. Laws Co*, 690 F.2d 1157 (5th Cir. 1982), with respect to standards governing recusal).

[29] Appellants also request that the Court treat the Appeal as a petition for a writ of mandamus. The Memorandum Opinion required briefing "on the discrete issue of the Court's appellate jurisdiction." The Debtor submits this request is not appropriate under the terms of the Memorandum Opinion, should be denied, and in any event, is not appropriate for the reasons articulated herein. *See In re City of Houston*, 745 F.2d 925, 927 (5th Cir. 1984) (petition for writ of mandamus will not lie in the absence of extraordinary circumstances with respect to appeal of denial of recusal motion); *Corrugated Container Antitrust Litig.*, 614 F.2d at 961 ("In addition to their claim that the decision of the district court is immediately appealable . . . defendants 'out of an abundance of caution' also petition for a writ of mandamus. The contention does not merit extended discussion. We refuse issuance of the writ").

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 11    Filed 02/22/23    Page 570 of 1104    PageID 16704
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 11 of 12    PageID 12618

Dated:  December 20, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Case 19-34054-sgj11   Doc 3596-11   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-1   Filed 09/28/23   Page 571 of 1104   PageID 16705
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 12 of 12   PageID 12619

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on December 20, 2021, a true and correct copy of the foregoing response was served electronically upon all parties registered to receive electronic notice in this case via the Court's CM/ECF system.

*/s/ Zachery Z. Annable*
Zachery Z. Annable

# EXHIBIT 12

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 12-8 Filed 12/22/23 Page 573 of 1104    PageID 16707
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 1 of 14    PageID 12647

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL MANAGEMENT, L.P., <br> Debtor <br> _____ <br><br> JAMES DONDERO, *et al.*, <br><br> Appellants, <br><br> v. <br><br> HON. STACEY G. C. JERNIGAN, <br><br> Appellee. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | <br><br><br><br><br><br><br><br> Civil Action No. 3:21-CV-0879-K |

## MEMORANDUM OPINION AND ORDER

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") appeal the Bankruptcy Court's Order Denying [Appellants'] Motion to Recuse Pursuant to 28 U.S.C. § 455 which was entered March 23, 2021. *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16). Because the Court lacks jurisdiction over this appeal, the Court hereby **dismisses** this appeal.

Case 19-34054-sgj11 Doc 3596-12 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 11-84 12 Filed 02/09/23 20 15 Page 574 of 1104 PageID 16708
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 2 of 14 PageID 12648

## I.     Relevant Background

Appellants filed a Motion to Recuse under § 455 with the Bankruptcy Court, asking United States Bankruptcy Judge Stacey G. C. Jernigan (the "Bankruptcy Judge") to recuse herself from presiding over the bankruptcy proceeding of Debtor Highland Capital Management, L.P. In an 11-page Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order"), the Bankruptcy Judge denied the Motion while also reserving the right to supplement or amend the ruling. *See* Am. Notice of Appeal (Doc. No. 1-1) at 5-15. The Bankruptcy Court entered the Recusal Order on March 23, 2021. *See id.*; Appellants' Br. (Doc. No. 16). On April 18, 2021, the Clerk of the Bankruptcy Court transmitted the Notice of Appeal filed by Appellants on April 6, 2021. *See generally* Doc. No. 1. It is the Recusal Order that forms the basis of this appeal. *See id.* Appellants designated the Bankruptcy Judge as "Appellee". *See id.*

Before appellate briefing began, Debtor Highland Capital Management, L.P. moved the Court for leave to intervene in this appeal. *See* Mot. to Intervene (Doc. No. 2). Debtor Highland Capital Management, L.P. argued that it is the real party-in-interest, not the Bankruptcy Judge. Mot. to Intervene at 3. After the Motion to Intervene was fully briefed and ripe, the Court granted the Motion and allowed Debtor Highland Capital Management, L.P. ("Debtor/Intervenor") to file a responsive brief as accorded to an appellee under the bankruptcy rules. *See generally* Order (Doc. No. 10).

ORDER – PAGE 2

Case 19-34054-sgj11   Doc 3596-12   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 11-84   Filed 12/29/23   Page 575 of 1104   PageID 16709
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 3 of 14   PageID 12649

Appellants then filed their Appellants' Brief identifying and arguing two issues on appeal: (1) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 as untimely; and (2) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits. Appellants' Br. at 1. Intervenor/Debtor filed an Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23). The Bankruptcy Record on Appeal does not reflect that a final judgment has been entered by the Bankruptcy Court in this matter.

Upon an initial review of the appellate briefing, the Court *sua sponte* questioned its jurisdiction over this appeal. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level."). The Court issued an Order (Doc. No. 28) directing the parties to file briefs, respectively, addressing this Court's jurisdiction over an appeal of the Bankruptcy Judge's order denying a motion to recuse when final judgment has not yet been entered. The parties timely filed their respective jurisdictional briefs, and the Court has carefully considered the arguments, the applicable and binding law, and relevant portions of the record. The Court turns now to this threshold jurisdictional issue.

ORDER – PAGE 3

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 12    Filed 12/29/23    Page 576 of 1104    PageID 16710
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 4 of 14    PageID 12650

## II.    Applicable Law

Section 455 of Chapter 28 of the United States Code provides, in relevant part, that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) He shall also disqualify himself in the following circumstances:
>     (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

28 U.S.C. § 455(a) & (b)(1).  Bankruptcy Rule 5004(a) provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case."  FED. R. BANKR. P. 5004(a).

District courts have jurisdiction over appeals from the following entered by a bankruptcy judge:

> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
> (3) with leave of the court , from other interlocutory orders and decrees.

28 U.S.C. § 158(a).

ORDER – PAGE 4

Case 19-34054-sgj11 Doc 3596-12 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 12 Filed 09/28/23 Page 577 of 1104 PageID 16711
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 5 of 14 PageID 12651

III.    **Analysis**

    A.    **Recusal Order is an Interlocutory Order and Not Immediately Appealable as a Matter of Right**

It is well-established law in the Fifth Circuit that a court's order denying a recusal motion is not a final order, is not an appealable interlocutory order, and is not an appealable collateral order, therefore it is reviewable on appeal only from final judgment. *Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001); *United States v. Henthorn*, 68 F.3d 465, 465 (5th Cir. 1995); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1164 n.3 (5th Cir. 1982); *In re Corrugated Container Antitrust Litig.*, 614 F.2d 958, 960 (5th Cir. 1980); *Martin v. Driskell*, 2021 WL 4784756, at *1 (5th Cir. July 12, 2021); *In re Gordon*, 2019 WL 11816606, at *1 (5th Cir. Apr. 10, 2019); *Stancu v. Hyatt Corp./Hyatt Regency Dallas*, Civ. Action No. 3:18-CV-1737-E-BN, 2020 WL 853859, at *2 (N.D. Tex. Jan. 30, 2020), *adopted by* 2020 WL 833645 (Feb. 20, 2020)(Brown, J.); *Prather v. Dudley*, Civ. Action No. 9:06cv100, 2006 WL 3317124, at *2 (E.D. Tex. Oct. 18, 2006); *Hardy v. Fed. Express Corp.*, No. Civ.A 97-1620, 1998 WL 104686, at *1 (E.D. La. Mar. 6, 1998). Moreover, both the Fifth Circuit and district courts in this Circuit have applied this very clear, decades-old law in appeals taken from a bankruptcy court's order denying a motion to recuse. *In re Dorsey*, 489 F. App'x 763, 764 (5th Cir. 2012); *In re Schweitzer*, Civ. Action No. 07-4036, 2007 WL

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 11-84    Filed 10/27/23    Page 578 of 1104    PageID 16712
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 6 of 14    PageID 12652

2965045, at *1 (E.D. La. Oct. 9, 2007); *In re Moerbe*, No. 03-57260-LMC/04-5043-LMC/SA-04-CA-801-FB, 2005 WL 3337634, at *3 (W.D. Tex. Sept. 1, 2005).

In this case, the Bankruptcy Record on Appeal does not establish that a final judgment has been entered.  The law in the Fifth Circuit specifies that a court's order on a motion to disqualify the judge "is not an appealable final order" and "a party 'must await final judgment to appeal [a] judge's refusal to recuse.'"  *In re Dorsey*, 489 F. App'x at 764 (holding court was without jurisdiction to review bankruptcy court's decision on motion to recuse because, although final judgment had been entered, the appeal of it had not yet been resolved).  Appellants attempt to get around this law by arguing that the courts have considered the "finality" of an order on a motion to recuse only under 28 U.S.C. § 1291 (which applies to jurisdiction of courts of appeals over appeals from final orders of district courts) and not § 158(a) (which applies to jurisdiction of district court over appeals from bankruptcy court orders).  Appellants contend this is crucial because the bankruptcy appellate statute, § 158(a), applies here and that statute contemplates the more liberal and flexible "finality" standard accorded to bankruptcy courts, rather than the finality standard under § 1291 pertaining to district court orders.  Resp. Br. (Doc. No. 31) at 2-7.

The Court rejects Appellants' suggestion that the Court should or even can construe this Recusal Order under a different "finality" standard mere because the

ORDER – PAGE 6

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 12-9    Filed 12/29/23    Page 579 of 1104    PageID 16713
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 7 of 14    PageID 12653

Bankruptcy Court entered it. There is nothing in the Court's own research, nor anything provided by Appellants, to suggest that the Court should ignore this binding precedent and apply a more liberal and flexible "finality" standard to this appeal of the Recusal Order merely because it is an order of the Bankruptcy Court. Indeed, courts in this Circuit have not hesitated in applying this well-settled law to an appeal of a bankruptcy court order on a motion to recuse. *See, e.g., In re Schweitzer*, 2007 WL 2965045, at *1 (court found jurisdiction lacking over appeal from bankruptcy court's order denying motion to recuse because "the law is quite clear that an order denying a motion to disqualify a judge is an interlocutory order from which no appeal lies prior to final judgment in the case."); *In re Moerbe*, 2005 WL 3337634, at *3 ("Because an order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable, it would seem to follow that the [the bankruptcy court's] order in this case granting recusal but denying its permanency is likewise interlocutory."). The Court finds no justification for straying from the well-settled law in the Fifth Circuit and finds that the Bankruptcy Court's Recusal Order is not a final appealable order.

The Court also finds that the Recusal Order is not subject to the collateral order doctrine and it is not an interlocutory order that is not immediately appealable. Appellants ask the Court to treat the Recusal Order as subject to the collateral order

ORDER – PAGE 7

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document Exhibit 12 Filed Page 29/20 15 Page 580 of 1104   PageID 16714
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22      Page 8 of 14    PageID 12654

doctrine.   The Court rejects this request as there is no legal basis for doing so.
Appellants again ignore very clear Fifth Circuit law that a court order denying a recusal
motion is not an appealable collateral order. *Willis*, 263 F.3d at 163 (citing *Nobby
Lobby*, 970 F.2d at 85-86 & n.3); *Henthorn*, 68 F.3d at 465; *Chitimacha Tribe of La.*, 690
F.2d at 1164 n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960; *In re Dorsey*,
489 F. App'x at 764; *Martin*, 2021 WL 4784756, at \*1; *In re Gordon*, 2019 WL
11816606, at \*1.   There is no justification to stray from this well-settled law.
Moreover, the Recusal Order is not an appealable interlocutory order under § 1292(a).
*Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Dorsey*, 489 F. App'x at 764.

For these reasons, the Court finds, as it must, that the Recusal Order is an
interlocutory order from which no appeal lies prior to the Bankruptcy Court entering
a final judgment.  *See Willis*, 263 F.3d at 163; *Nobby Lobby*, 970 F.2d at 85-86 & n.3;
*In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960.   Therefore, the Court lacks
jurisdiction over this appeal.

### B.    Leave to Bring an Interlocutory Appeal

Appellants' last hope for their appeal is securing leave of this Court to bring an
interlocutory appeal of the Recusal Order.  28 U.S.C. § 158(a)(3) (district courts may
hear appeals "with leave of the court, from other interlocutory orders" of the
bankruptcy court).   Appellants were required to file a motion for leave to appeal

Case 19-34054-sgj11   Doc 3596-12   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 11 Filed 11/22 Page 581 of 1104   PageID 16715
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 9 of 14   PageID 12655

contemporaneously with their notice of appeal. FED. R. BANKR. P. 8004(a).  The

motion for leave to appeal must also include certain contents.  *Id.* 8004(b).  Despite

these unambiguous requirements of the Bankruptcy Rules, Appellants did not comply

with them.  Their failure, however, does not foreclose the appeal entirely because

Bankruptcy Rule 8004(d) permits the Court to "treat the notice of appeal as a motion

for leave and either grant it or deny it."  FED. R. BANKR. P. 8004(c).  In their

jurisdictional brief, Appellants ask the Court to treat their Notice of Appeal as a motion

for leave to appeal should the Court find the Recusal Order is an interlocutory order.

Appellants' Resp. (Doc. No. 29) at 8.  The Court turns now to this analysis.

Section 158(a)(3) does not articulate the standard a district court must use in

deciding whether to grant leave in its discretion, but "[c]ourts in the Fifth Circuit . . .

have applied 28 U.S.C. § 1292(b), the standard governing interlocutory appeals

generally."  *In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL

524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ) (citing *In re Ichinose*, 946 F.2d 1169,

1177 (5th Cir. 1991); *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, 2011 WL 610016, at

*3 (N.D. Tex. Feb. 14, 2011)(Kinkeade, J.)); *accord Rivas v. Weishart*, 2019 WL

5579726, at *2 (E.D. Tex. Oct. 28, 2019); *Celadon Trucking Servs., Inc. v. Moser*, 2019

WL 4226854, at *2 (E.D. Tex. Sept. 4, 2019).  There are three elements of the

§ 1292(b) standard: "(1) a controlling issue of law must be involved; (2) the question

ORDER – PAGE 9

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 1-84    Exhibit 12   Filed 2/Page 29 of 26 of 15   Page 582 of 1104    PageID 16716
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 10 of 14    PageID 12656

must be one where there is substantial ground for difference of opinion; and (3) an

immediate appeal must materially advance the ultimate termination of the litigation."

*In re Ichinose*, 946 F.2d at 1177.  An appeal of an interlocutory order is appropriate only

where all three elements are satisfied.  *See In re Genter*, Civ. Action No. 3:19-CV-1951-

E, 2020 WL 3129637, at *2 (N.D. Tex. June 12, 2020)(Brown, J.) (citing *Arparicio v.*

*Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981)).  "The Fifth Circuit disfavors

interlocutory appeals and leave to appeal is sparingly granted." *Id.* (internal citations

omitted); *In re Hallwood Energy*, 2013 WL 524418, at *2 ("[I]nterlocutory appeals are

'sparingly granted' and reserved for 'exceptional' cases.") (internal citations omitted).

The decision whether to grant an interlocutory appeal is firmly within the district

court's discretion.  *Panda Energy Int'l*, 2011 WL 610016, at *3.

In this case, there is no controlling question of law with substantial grounds for

disagreement for which resolution would materially advance the end of the bankruptcy

litigation.  It is well-settled that a recusal motion under § 455 is left to the sound

discretion of the judge. *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157,

1166 (5th Cir. 1982); *see In re Pendergraft*, 745 F. App'x 517, 520 (5th Cir. 2018) (citing

*Trevino v. Johnson*, 168 F.3d 173, 178 (5th Cir. 1999)).  "[C]ontrolling issue of law is

one that has 'the potential for substantially accelerating the disposition of the litigation'

and does not concern 'matters that are entrusted to the discretion of the bankruptcy

ORDER – PAGE 10

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 11  Filed 02/22/2of 15   Page 583 of 1104    PageID 16717
Exhibit 12    Page 29 of 15
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 11 of 14    PageID 12657

court.'" *In re Moerbe*, 2005 WL 3337634, at *4 (W.D. Tex. Sept. 1, 2005) (quoting *In re Aquatic Dev. Group, Inc.*, 196 B.R. 666, 669 (S.D.N.Y. 1996)). The Recusal Order was an exercise of the Bankruptcy Judge's discretion, so there is no controlling issue of law presented. *Cf. In re Tullius*, 2011 WL 5006673, at *3 (W.D. Tex. Oct. 20, 2011). Appellants also cannot satisfy the second factor because the Court cannot find there exists substantial ground for difference of opinion as to the Recusal Motion.

> [C]ourts have found substantial ground for difference of opinion where a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not yet spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

*Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 723-24 (N.D. Tex. 2006)(Boyle, J.) (internal citation omitted). The Recusal Order does not fall within any of those categories. Simply because Appellants believe the Bankruptcy Court ruled incorrectly does not demonstrate substantial ground for disagreement. *Id.* at 724. Finally, the third element eludes Appellants as well. An interlocutory appeal of the Recusal Order will in no way materially advance the ultimate end to this bankruptcy matter.

The Fifth Circuit strongly disfavors interlocutory appeals and, accordingly, they are rarely granted and reserved for "exceptional cases". *See, e.g., In re Genter*, 2020 WL 3129637, at *2. Appellants failed to satisfy any of the three § 1292(b) criteria. *Id.*

ORDER – PAGE 11

Case 19-34054-sgj11 Doc 3596-12 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 11 Exhibit 12 Filed 20/20/26 of 15 Page 584 of 1104 PageID 16718
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 12 of 14 PageID 12658

Therefore, in its discretion, the Court **denies** Appellants leave to take an interlocutory appeal of the Bankruptcy Court's Recusal Order.

Finally, the Court turns to the remaining arguments Appellants assert. First, the Court declines to *sua sponte* withdraw the reference of Appellants' motion for the bankruptcy judge to recuse herself. The case Appellants cite in support of this suggestion is inapposite here. In the unpublished Fifth Circuit opinion, *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 (5th Cir. 2003), the appellant sought leave to appeal the dismissal of his 28 U.S.C. § 2254 petition. *See generally Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958. The magistrate judge recommended dismissal the § 2254 petition and the district judge adopted the recommendation and dismissed the petition. *See id.* at *1-2. The Fifth Circuit did not address the merits of the dismissal, but, instead, *sua sponte* vacated the district court's final judgment and remanded with instructions to assign the case to a different district judge. *Id.* at *2. The Fifth Circuit's reasoning—the district judge was the spouse of the magistrate judge and the *pro se* prisoner likely did not know nor could he have reasonably known this. *Id.* Unlike the unusual and exceptional facts in *Maddox*, the Court does not find this appeal to justify *sua sponte* withdrawing the reference of and ruling on Appellants' motion to recuse.

The Court also finds no justification for treating Appellants' notice of appeal as a petition for writ of mandamus, which Appellants also request. A question of recusal

ORDER – PAGE 12

Case 19-34054-sgj11   Doc 3596-12   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 11   Filed 09/20/26 of 15   Page 585 of 1104   PageID 16719
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 13 of 14   PageID 12659

is reviewable on a petition for writ of mandamus. *United States v. Gregory*, 656 F.2d 1132, 1136 (5th Cir. 1981); *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986); *In re Cameron Int'l Corp.*, 393 F. App'x 133, 134-35 (5th Cir. 2010). "However, the writ will not lie in the absence of exceptional circumstances, and the party seeking the writ has the burden of proving a clear and indisputable right to it." *In re Placid Oil Co.*, 802 F.2d at 786 (citing *Gregory*, 656 F.2d at 1136); *accord In re Cameron Int'l Corp.*, 393 F. App'x at 134-35. Appellants fail to make the required showing. The Court refuses to construe Appellants' appeal as a petition for writ of mandamus.

## C.    Conclusion

The well-established precedent in the Fifth Circuit is that no jurisdiction lies over an appeal of a motion to recuse until final judgment has been entered. Appellants make arguments about potential inefficiency and wasted resources if they must wait to appeal the Recusal Order until the final judgment has been entered. But these arguments are not novel. The Court is certain those same arguments have been advanced in other courts considering this same issue and those courts have rejected them, as this Court does here. Appellants would have this Court carve out an exception to the well-settled law for them without any justifiable basis other than because they think the Bankruptcy Judge was wrong. Appellants must await final judgment, or other

ORDER – PAGE 13

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 11  Filed 09/28/23  Page 586 of 1104    PageID 16720
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 14 of 14    PageID 12660

final resolution, of their bankruptcy proceeding in order to appeal the Recusal Order. This Court has no jurisdiction to hear this appeal.

### IV.    Conclusion

The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292(a) and the Court is **without jurisdiction** over this appeal of the Bankruptcy Court's Recusal Order.  The Court further **denies** Appellants leave to appeal the Recusal Order under § 1292(b), **denies** Appellants' request to withdraw the reference of their motion to recuse, and **denies** Appellants' request to construe their appeal as a petition for writ of mandamus.  Accordingly, the Court **dismisses** this appeal for lack of jurisdiction.

**SO ORDERED.**

Signed February 9th, 2022.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE

# EXHIBIT 13

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

            Claimant,

v.                                                        Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

            Respondent.

---

## PARTIAL FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

I.      Introduction
     A.    The Parties
        1.     Claimant is a Committee of Redeemers in the Highland Crusader Fund (the "Committee"). Pursuant to the Joint Plan of Distribution of the Crusader Funds ("the Plan") and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors ("the Scheme")1, HC300, the Committee was elected from among the investors in the Crusader Fund to oversee the management of the Crusader Fund by Highland Capital Management, L.P. (Highland Capital). The Plan and the Scheme are the governing documents which contain the arbitration agreements giving rise to this arbitration. The Committee is represented by Terri Mascherin, Andrew Vail, and Shaun Van Horn of Jenner & Block LLP.

        2.     Respondent, or Highland, is an investment manager and, until July 2016, served as such for the Highland Crusader Funds ("Crusader Funds" or the "Funds") that were formed between 2000 and 2002. The Funds consisted of one "Onshore Fund" and two "Offshore Funds," and the capital that was raised through these entities was pooled into a "Master

---

[1] The Plan was implemented with respect to Highland Crusader Offshore Funds by a "Scheme of Arrangement" ("Scheme") sanctioned by the Supreme Court of Bermuda. The Scheme incorporates the Plan and, unless otherwise noted, the Plan and Scheme contain effectively identical provisions. Unless the context requires otherwise, we will refer primarily to the Plan.

Fund." The capital was invested primarily in "undervalued senior secured loans and other securities of financially troubled firms" among other asset types. HC-17, at HC-117.0010[2]. Highland is represented by Gary Cruciani, Travis DeArmand, Michael Fritz of McKool Smith, LLP.

B.    The Arbitrators

1.    The three arbitrators, whose appointment was formalized by the International Center for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), were David M. Brodsky, Chair, John S. Martin, Jr., and Michael D. Young.

II.    Background of the Dispute

A.    The 2008 Financial Crisis

1.    From 2000 until 2007, the Crusader Funds had double-digit annual returns, but in September and October 2008, as the financial markets in the United States began to fail, Highland Capital was flooded with redemption requests from Crusader Fund investors, as the Crusader Funds' assets lost significant value.

2.    On October 15, 2008, Highland Capital placed the Crusader Funds in wind-down, "compulsorily redeeming" Crusader Fund's limited partnership interests. Highland Capital also declared that it would liquidate the remaining assets and distribute the proceeds to investors. However, disputes over the appropriate distribution of the assets arose between those investors who had voluntarily redeemed their interests earlier in 2008 but had not yet been paid their redemption amount ("Prior Redeemers") and those who were compulsorily redeemed in October 2008 ("Compulsory Redeemers") (collectively, the "Redeemers").

B.    The Plan and Scheme

1.    At about the same time, an investor raised allegations of misconduct by Highland Capital and filed a wind-up petition in the Supreme Court of Bermuda. In 2011, after several years of negotiations among the Prior Redeemers, Compulsory Redeemers, and Highland, the Plan and Scheme were adopted and became effective in August 2011. The adoption of the Scheme and Plan was to "enable the orderly management, sale, and distribution of the assets" by Highland and the right of the Redeemers Committee to oversee Highland's services. HC-300 at 300.017.

---

[2] There are three sets of exhibits that will be referred to herein, Joint Exhibits (referred to as JX- —), Redeemer Committee Exhibits (RC- —), and Highland Capital Exhibits (HC- __).

2.      Central to the Scheme and Plan was the role of the Redeemer Committee, which was created so as to allow the investors in the Funds to have a greater level of influence over the affairs of Highland Capital than an ordinary creditors' committee would have in the liquidation of the Fund; that increased "level of influence" was particularly manifest in the Committee's ability to approve or disapprove of actions that Highland was contemplating taking, right of first refusal on other activities Highland wished to engage in, and the Committee's ability to terminate the services of Highland on 30 days' notice "with or without Cause." HC-300 at 300.016. Thus, the relationship between the Redeemer Committee and Highland, although grounded in contract, was designed to become one of mutual cooperation and confidence.

3.      Pursuant to §2.04 of the Plan, a ten-person committee of Crusader Fund investors, composed of five representatives of the Prior Redeemers and five representatives of the Compulsory Redeemers, was created. HC-300, § 2.04. As part of the Plan and Scheme, Highland Capital continued to serve as the investment manager for the Crusader Funds. As part of its duties as investment manager, Highland Capital was to liquidate fund assets and distribute the proceeds to the Crusader Fund investors pursuant to an agreed 43-month distribution schedule. In addition, as an incentive to Highland in its liquidation of assets, the Scheme and Plan provided that the Deferred Fees would be paid to Highland if it completed the full liquidation.

4.      It is not disputed that, between October 2011 and January 2013, Highland Capital distributed in excess of $1.2 billion to the Crusader Fund investors. It is also not disputed that the Crusader Funds were not completely liquidated when Highland paid itself the Deferred Fees in January and April 2016 and the Funds remain unliquidated as of the time of these hearings.

C.      The Arbitration Agreement

1.      Sections 2.09 and 9.03 set forth the terms and conditions by which these disputes are to be resolved in arbitration. Section 2.09 provides, in relevant part, that "in the event of a dispute between the Crusader Funds or the Redeemer Committee and HCMLP, ... the applicable representatives shall confer in god faith in an attempt to resolve the dispute...If the dispute cannot be resolved by mediation it will be referred to arbitration in accordance with Section 9.03."

2.      Section 9.03 provides, in relevant part, that "Any dispute referred to in Section 2.09...shall be subject to and decided by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof pursuant to applicable law. Arbitration shall be conducted in New York, New York."

D.      Termination of Highland Capital and Ensuing Litigation

3

1.      For reasons set forth below, disputes began to arise between the Redeemer Committee and Highland Capital, culminating in the termination of Highland Capital as investment manager by letter and notice dated July 5, 2016, for cause and without cause, with termination being effective on August 4, 2016, RC-318. Highland Capital was replaced as investment manager by Alvarez & Marsal CRT Management, LLC ("A&M"). JX-31.

2.      On July 5, 2016, the Committee filed a Notice of Claim before the AAA, commencing an arbitration against Highland, RC-319, and also commenced litigation in Delaware Chancery Court, inter alia, to obtain a status quo order in aid of the arbitration. On July 8, 2016, a Vice Chancellor entered an oral status quo order in aid of this arbitration, pending the adjudication of the Committee's request for interim relief by an AAA arbitrator on an emergency basis pursuant to AAA Rule 38. On August 2, 2016, an Emergency Interim Order was entered by an Emergency Arbitrator appointed by the ICDR, which order replicated the oral status quo order entered in Delaware Chancery Court.

3.      On July 21, 2016, Highland filed its Answering Statement, denying the claims and asserting affirmative defenses.

E.      The Arbitration

1.      This Tribunal was established as of October 31, 2016. The parties consented to the appointment of the Tribunal.

2.      On October 14, 2016, Claimant filed an Amended Notice of Claim, seeking specific performance, injunctive relief, declaratory relief, money damages, and disgorgement arising out of the allegedly willful misconduct and violations of fiduciary and contractual duties by Highland Capital as investment manager of the Highland Crusader Fund. Claimant sought four species of relief: (a) an award requiring Highland Capital to provide to the Committee all information about the Fund and its assets as required by Section 2.05 of the Plan and Section 4.6 of the Scheme; (b) an award of money damages, including disgorgement, for Highland Capital's allegedly willful misconduct and breaches of its fiduciary and contractual duties, and for any unjust enrichment; (c) an injunction requiring Highland to return the so-called Deferred Fees and Distribution Fees to the Crusader Fund; and (d) declarations that the Consenting Compulsory Redeemers are entitled to payment of the Deferred Fee Account, and that Highland is not entitled to advancement of expenses and legal fees.

3.       On December 14, 2016, Respondent filed a motion for partial summary adjudication, seeking dismissal of those claims seeking monetary damages, seeking relief as both breaches of contract and of fiduciary duties, and seeking relief barred by the applicable Statute of Limitations; by Order of March 1, 2017, we denied such motions without prejudice to their being renewed upon the development of a fuller record.

4.       On February 16, 2017, Claimant filed a motion for partial summary adjudication, seeking an order compelling Highland to comply with its alleged contractual obligation under the Plan and Scheme to provide the Committee with the Crusader Fund's books, records and other information from 2011 to 2016. By Order, dated April 21, 2017, we entered a Partial Final Award, granting the relief sought by Claimant, and ordering Highland, inter alia, to produce non-privileged documents, as described in the Order.

5.       On April 11, 2017, Respondent moved for Summary Adjudication of its counterclaim for advancement to defend against the claims brought by the Claimant in the Arbitration and in the parallel Delaware action, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., C.A. No. 12533-VCG (Del. Ch.) (the "Delaware Action").  Respondent sought a mandatory injunction requiring the Fund to escrow and segregate Crusader Fund assets to cover its indemnification and advancement rights.  By Order and Partial Final Award in favor of Claimant, dated July 20, 2017, we denied Highland's motions for advancement in this Arbitration and in the parallel Delaware Action and for the mandatory injunction, on the ground that the "inter-party indemnification exception" applies.

6.       On December 8, 2017, Highland moved to amend its Counterclaims against the Redeemer Committee of the Highland Crusader Fund and for leave to file a third party demand for arbitration against Alvarez & Marsal CRF Management, LLC ("A&M CRF"), Alvarez & Marsal North America, LLC ("A&M NA"), and House Hanover, LLC ("House Hanover").  On January 11, 2018, following a pre-hearing conference call, Respondent filed a revised proposed amended Counterclaim against the Committee alone, raising counterclaims of breach of the covenant of good faith and fair dealing in the its performance and enforcement of the Plan, breach of its fiduciary duty, and aiding and abetting the breach of fiduciary duty by A&M CRF, A&M NA and House Hanover.

7.     By Order dated January 25, 2018, we granted the motion to amend Highland's counterclaims that raised direct claims of breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing arising out of the so-called Deferred Fees allegedly owed to Highland, and denied the balance of Highland's request for leave to file Counterclaims and Third Party Claims.

8.     On February 1, 2018, Respondent filed an Amended Answer and Counterclaims, seeking an order that the Committee account to Highland as an investor therein for all payments, gains, profits, and advantages obtained as a result of the Committee's alleged wrongful actions; that the Committee pay money damages, disgorge, and make restitution to Highland for damages arising from the Committee's alleged breaches of contract, breaches of the covenant of good faith and fair dealing, and breaches of fiduciary duty, including by awarding Highland the Deferred Fees allegedly improperly withheld, as well as an award of Highland's fees and expenses, including reasonable attorneys' fees incurred in this action; and such other relief as the Panel deems fair and equitable.

9.     On February 15, 2018, Claimant moved to strike portions of the Counterclaims on the grounds that certain of the new pleadings went beyond the limitations set by the Panel in the January 25 Order by including allegations that relate directly to claims the Panel had ordered not be included in the revised Counterclaim.  By Order dated April 1, 2018, we granted the motion of the Claimant to strike portions of the Counterclaim and directed Respondent to submit a revised Counterclaim to Claimant and the Panel.

10.     By Order dated March 19, 2018, we directed that "any party wishing to make a motion shall write a letter to the Panel, with copy to opposing counsel, seeking permission to make such motion..."

11.     By letter dated March 28, 2018, Highland requested permission to file a motion for partial summary adjudication with respect to the Committee's breach of fiduciary duty claims that accrued before July 5, 2013, which Highland contends are barred by the statute of limitations.  By Order dated April 5, 2018, relying upon AAA Commercial Arbitration Rule 33, we denied Highland's application to make a motion for partial summary adjudication, without prejudice to their doing so at the close of the Committee's main case at the hearing, if such factual and legal issues were briefed in the Pre-Hearing Briefs.

12.     On April 5, 2018, Respondent filed its revised Amended Counterclaims, seeking relief, as earlier, for alleged breaches of contract, of fiduciary duty, and of the covenant of good faith and fair dealing.

6

13.     On July 12, 2018, Highland moved to strike what it characterized as a new claim by the Committee.  The Committee opposed the motion. By Order dated July 22, 2018, the motion to strike was denied.

14.     On August 19, 2018, after a series of discovery motions were decided, the Parties entered into a Joint Proposed Pre-Hearing Consent Order, which was So Ordered by the Panel.

F.     Hearing Dates and Witnesses

1.     An evidentiary hearing was held in New York, N. Y. on September 12-14, 17-18, 20-21, and 24-25, 2018.

2.     Claimant presented the oral testimony of Eric Felton, Burke Montgomery, David Morehead, and Brian Zambie, all Members of the Redeemer Committee; Steven Varner, Alvarez & Marsal ("A&M"); Robert Collins, PriceWaterhouseCoopers; and two experts, Scott Meadow, Analysis Group; and Basil Imburgia, FTI Consulting.

3.     Respondent presented the oral testimony of Isaac Leventon, Esq., Highland internal counsel; Brant Behr, Redeemer Committee Member; Matt Jameson, formerly employed by Highland Capital; Scott Ellington, General Counsel, Highland Capital; the deposition testimony of Thomas Sargent, the Compliance Officer of Highland; and two experts, James Finkel, Duff and Phelps, and Karl Snow, Bates and White.

G.     Post-Hearing

1.     On October 24, 2018, Claimant filed its Post-Hearing Memorandum on its Claims and Respondent filed its Post-Hearing Memorandum on its Counterclaim.

2.     On November 17, 2018, Claimant filed its Reply to Respondent's Post-Hearing Memorandum and Respondent filed its Reply to Claimant's Post-Hearing Memorandum.

3.     On November 30, 2018, the Panel heard closing arguments from counsel to the Parties.

4.     On December 10, 2018, the Parties filed Supplemental Post-Trial Memoranda, dealing with questions asked by the Panel during closing arguments.

5.     On December 12, 2018, the record was declared closed.

6.      On January 5, 2019, at the request of the Panel, the Parties consented to the adjournment of the timing of the award from January 11, 2019 to February 28, 2019. On February 25, at the request of the Panel, the Parties consented to the extension of the deadline to March 7, 2019.

H.      Issues to be Determined

1.      Claimant has pleaded four claims of breaches of fiduciary duty and of breaches of contract, arising out of similar fact patterns, as follows:

      a)      The taking of the Deferred Fees;
      b)      The payment of Distribution Fees;
      c)      The purchase of Plan claims without Redeemer Committee approval; and
      d)      The transfer of Barclays' Fund interests without Redeemer Committee approval.

2.      Separately, Claimant has pleaded claims of breach of fiduciary duty, as follows:

      a)      Engaging in related party transactions without Redeemer Committee approval
      b)      Refusing to settle claims brought by Credit Suisse;
      c)      Refusing to resolve the claims brought by UBS, which included a Temporary Restraining Order ("TRO"); and
      d)      Failing to make a good faith effort to sell the Cornerstone asset.

3.      In addition, Claimant seeks a declaratory judgment that there should be an immediate distribution of the Deferred Fee Account to the Consenting Compulsory Redeemers.

4.      Respondent has pleaded one counterclaim against the Redeemer Committee, alleging that the Committee breached its contractual and fiduciary duties by delaying liquidation of the Fund's assets after July 2016, and depriving Respondent of its right to receive the remaining funds in the Deferred Fees account payable upon complete liquidation of the Fund.

8

5. Both Claimant and Respondent have also made claims for the recovery of their attorneys' fees and costs.

I. Applicable Law

1. At the outset, we address which law applies to which claims.  It is not in dispute that Claimant's breach of contract claims are governed by the law of New York State.  However, Claimant contends that the law of New York State also applies to the breach of fiduciary duty claims, as the breaches are claimed to arise from Highland's relationship with the Fund and its investors under the Plan, which provides for New York law. Respondent argues that any fiduciary duties owed by Highland arise under its services as investment manager of the Crusader Fund, and, thus, are governed by the law governing the Fund's Governing Documents, the state of Delaware.

2. Although there are few, if any, significant differences between New York and Delaware regarding fiduciary duties of entities in the position of Highland vis-a-vis its investors and the Committee, we find that the governing law on the breach of fiduciary duty claims is most appropriately that of New York, the state whose law governs regarding the Plan and rights of the parties under the Plan.

III. Discussion of The Issues

A. We recognize and appreciate the exemplary efforts by counsel for each Party. The results set forth herein are not a reflection of any difference in the quality of those presentations, but of our review of the evidentiary record and of the relevant law.

B. Taking of Deferred Fees

1. When the Plan and Scheme were adopted, a prominent feature was the creation of a Deferred Fee Account which was designed to provide an incentive to Highland to liquidate expeditiously the Crusader Fund of its assets. Deferred Fees were annual performance fees payable to Highland but deferred until, as, and when there would be a "complete liquidation" of the Crusader Funds' assets," Scheme §1.5.2, Plan §2.02, HC-300.

9

2.      The evidence is uncontested that, as of the close of the hearing record in this matter, the Crusader Funds have not been completely liquidated. It is also uncontested that, on January 21 and April 6, 2016, Highland distributed to itself a total of $32,313,000 in Deferred Fees. JX-25 at 14; JX-26 at 13.  Highland's stated rationale, or "position," for making the payment without there first having been complete liquidation was set forth in the financial statements of the Funds for the year-end 2015, issued on April 22, 2016: the UBS TRO "prevented the full liquidation" and that Highland "would have received the Deferred Fees...but-for the impact of the restraining order still in place." Thus, Highland "believe[d] its right to receive the [Deferred Fees] crystalized as of the date the [TRO] was lifted," or January 21, 2016, JX-025.0010.

3.      The core of Highland's position was that, in January 2016, it sought, received, and relied on the advice of its outside counsel Akin Gump that the UBS TRO created an impossibility for it to have earned the Deferred Fees, thus allowing the self-payment. However, based upon the evidence heard, we do not find that Highland relied upon any such advice in executing its plan to take the Deferred Fees.

4.      We find that in January 2016, Highland's CEO James Dondero raised the possibility of taking the Deferred Fees before complete liquidation with Thomas Surgent, a Deputy General Counsel and Chief Compliance Officer at Highland, who then discussed the idea with Highland's General Counsel, Scott Ellington. Surgent Dep. 133:4-19.  Mr. Ellington testified that, in January 2016, he and others spoke on several occasions with lawyers from Akin Gump regarding the premature taking of the Deferred Fees, and that he received the advice that "the deferred fees could be taken under the circumstances," that it was a "calculated risk," and that, if successfully challenged, Highland would owe only "nominal interest." Tr. 10 167:14-168:25; 167:14-168:25.

5.      However, Mr. Ellington's testimony is not supported by the hourly billing records of Akin Gump, which do not show any time being billed in January 2016 for anything having to do with this or any other Highland-related issue. RC-523; Tr. 11 136:9-14. Furthermore, Highland's Assistant General Counsel, Isaac Leventon, testified that neither he, nor, he was certain, anyone else at Highland, consulted with outside counsel in January 2016 regarding taking the Deferred Fees.  Tr. 7 236:11-24.  When Highland executed on its "position" by paying itself the Deferred Fees in January and again in early April, Highland did not disclose the self-payment to its independent auditor or the Redeemer Committee.

10

6.     It was not until April 11, 2016, almost a week after it took the second tranche of
Deferred Fees that Highland belatedly informed its independent auditor, PriceWaterhouse
Coopers (PwC), of what it had done by sending it draft financial statements for the year
ending December 31, 2015, in which Highland disclosed, without explanation, a "change …
related to how [they were] … treating the deferred fee distribution." RC-288. On April 12, a
meeting was held between Highland and PwC, at which PwC sought an explanation from
Highland for the change in position and asked for a memorandum from Highland's counsel
and a "copy of the letter that was sent [to the Redeemers Committee] notifying them of the
position," JX-28.

7.     On April 12, Highland proceeded to have, apparently for the first time in 2016,
discussions with Akin Gump about a justification for its taking the Deferred Fees prior to
"complete liquidation." According to Akin Gump's billable time records, on April 12, there
was a telephone "call with Thomas Surgent regarding interpretation of distribution plan and
charging of fees during period of TRO." Following that call, on April 19, there was another
call with Mr. Surgent and Mr. Leventon "regarding audit disclosures with respect to legal
doctrine applicable to fee dispute…," following which an Akin Gump attorney started to
draft a memo on the "impossibility" issue. After further calls and discussions regarding the
drafting of the disclosure to the auditor, a memorandum was finalized and sent to PwC on
April 22, 2016, the day that the financials were issued. See RC-523; Tr. 11 136:9-14.)

8.     Although Mr. Ellington testified the Akin Gump memo was "entirely generated by
Akin Gump," without any participation by anyone from Highland, Tr. 10 189:14-21, there is
contrary and indisputable evidence that, in fact, someone at Highland drafted footnotes to
the financials that were then provided to Akin Gump and appear in the Akin Gump memo,
see Tr. 7 283:19-284:9; compare RC-289 with HC-277.  Further, Mr. Leventon exchanged
with Akin Gump and commented upon at least four separate drafts of the Akin Gump memo
before it was finalized. RC-291; RC-295; -RC300; RC-302; JX-29; Tr. 7 291:4-295:19.

9.     We find that Highland made a deliberate and calculated decision to make no
disclosure to the Committee of the actual taking of the Deferred Fees until the issuance of
the 2015 financial statements on April 22, 2016, but that, in the course of communicating
with PwC about its "position," Highland allowed PwC to conclude that it had informed the
Redeemer Committee of its position regarding the payment of the Deferred Fees, and did not
correct the misimpression. RC-441. It did so to induce PwC to provide the opinion Highland
needed to have clean financials.

10.     This was not the first time that Highland had sought to use the so-called "impossibility defense" as a basis for suspending its obligations under the Plan. In 2013, Highland had proposed to use the doctrine in an attempt to avoid making distributions pursuant to the Realization Schedule, attached to the Plan and Scheme. Highland's then-outside counsel, Christopher Panos, now a federal bankruptcy judge, was asked to provide an opinion to allow such action but he expressed strong reservations about the use of that doctrine in an affirmative context, RC-153.

11.     Thereafter, Highland tried to secure another opinion that would be more supportive of its position and received a PowerPoint presentation from Akin Gump in November 2014, HC-356, that provided some additional arguments but, ultimately, focused on the doctrine being able to be used only as a defense, see, e.g., HC-356 at 16.

12.     Finally, when in early 2015, Highland asserted to Committee counsel that, by reason of the UBS TRO, "all applicable distribution dates, distribution thresholds and fees payable" were tolled, by reason of the UBS TRO, JX-22, Committee counsel had strongly rejected such use of the TRO to attempt to justify Highland's failure to meet "either the Realisation Schedule or the distribution threshold for the Deferred Fee Account." RC-219.

13.     Notwithstanding two prior and unsuccessful attempts to use the doctrine to evade its obligations, Highland was not deterred and in late 2015 and early 2016, with the assistance of its inside counsel, but not on the advice of Akin Gump, planned for and then executed on the strategy to take the Deferred Fees.

14.     Under New York law, the doctrine of impossibility does not create an affirmative right to engage in any conduct; rather, under certain circumstances, it acts as a defense to claims of breach of contract. When an unforeseeable event, such as an injunction, occurs, and the actions of the non-performing contract party have not contributed to the occurrence, and the occurrence renders the performance of a contractual obligation objectively impossible, a party's contractual obligation can be excused. Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987) ("While such defenses [as impossibility] have been recognized in the common law, they have been applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances"); JJ. Cassone Bakery, Inc. v. Consolidated Edison Co. of New York, Inc., 168 Misc.2d 272, 278, 638 N.Y.S.2d 898 (N.Y. Sup. 1996), rev'd in part on other grounds, 240 A.D.2d 634, 659 N.Y.S.2d 293 (2d Dept. 1997).  Absent such factors, the doctrine of impossibility is not available to excuse a party's performance and cannot be used to justify affirmative conduct.

12

15.     Highland attempts to squeeze itself into the four conditions, but its effort fails.  First,
Highland argues that it is defending itself against accusations of breach of contract by
invoking, defensively, the impossibility defense.  But it is Highland's illegitimate use of the
impossibility defense to justify an affirmative act — the taking of the Deferred Fees — that is
under attack, not its citation of the impossibility defense in 2018 as a defense to its breach of
contract in 2016.

16.     Highland also argues that the TRO "rendered the complete liquidation of the Fund
under the Plan's Realization Schedule objectively impossible." Closing Brief at 61. But
Highland confuses the Realization Schedule which deals with timely distributions with the
Deferred Fees which come into play only upon complete liquidation of the Fund with no
deadline. Plan §2.02; Scheme §1.5.2.  In any case, when the UBS TRO was dissolved on
January 21, 2016, there was nothing that prevented Highland from completing the
liquidation.

13

17.      None of the factors allowing the doctrine of impossibility apply to the taking of the
Deferred Fees.  Indeed, we find that Highland — and its inside counsel —knew none of the
factors were applicable when Highland asserted the defense. First, the UBS TRO was not
unforeseeable; in fact, as Mr. Panos had advised his client in 2013, "UBS had already filed suit
and was threatening to get an injunction at the time of the approval of the Scheme."  Second,
Highland's own acts gave rise to the UBS TRO, as it was UBS's accusation of Highland's
fraudulent transfer of assets that gave rise to the TRO, as Mr. Panos again had advised
Highland.  Third, as Mr. Leventon himself testified at the hearings, "the TRO did not do
away with Highland's obligation to complete liquidation of the fund." Tr. 7 262:6-10. Finally,
the doctrine of impossibility gives rise to no affirmative rights to take action in violation of a
contract. Once again, Mr. Panos had given this critical advice to Highland in 2013.

18.      We have considered the other elements of Highland's defense to this claim and find
them similarly wanting. We find that Highland's paying itself the Deferred Fees in 2016
constituted a breach of both the Scheme and Plan.  Given that finding, we need not reach
the issue of whether the self-payment also constituted a breach of fiduciary duty by
Highland to the Committee.

19.      As to remedy, under New York law, damages may be awarded for a breach of contract
based upon the damages suffered by the claimant. Here, the damage suffered is the full
amount of the Deferred Fees prematurely taken, plus prejudgment interest from the date of
the taking.  "Prejudgment interest is generally granted 'in order to compensate the injured
party for the loss, over a period of time, of the use of the property to which it was
entitled.'" Panix Prods., Ltd v. Lewis, 2003 WL 21659370, at *2 (S.D.N.Y. 2003)(citing Lewis
v. S.L. & E., Inc. 831 F.2d 37, 40 (2d Cir.1987)).  Although Respondent has raised good
arguments as to why the interest rate should be nominal at best, we exercise our discretion to
award statutory pre-judgment interest at 9% from the date of the taking, so as to measure as
accurately as possible the totality of the damage that we perceive the Fund suffered by reason
of the Deferred Fees being taken prematurely.

20.      Respondent also argues that the Tribunal lacks the authority to order a return of the
moneys taken.  But measuring the damages suffered by the Fund by referencing the full
amount of the Deferred Fees taken is not the same as literally ordering a return of the
moneys. It is an appropriate measure of the damages because the Fees were to have stayed
within the Fund until they were appropriately earned, and while in the Fund, they were to
serve as a protection and cushion against creditors. In addition, very importantly, keeping
the Deferred Fees was to have acted as an incentive to Highland to complete liquidation of
the portfolio, an event that had not occurred when Highland was terminated and still has not
occurred. Taking the Deferred Fees deprived the investors of all of those benefits. The
Deferred Fees in the amount of $33,313,000 should be returned in full, and with full
statutory interest of 9% from the dates of taking in January and April 2016 through the date
of this Partial Final Award.

14

C.    Distribution Fees

    1.    Under the Plan, Highland was to receive fees in the amount of 125 basis points based on "all amounts actually Distributed to Redeemers during each quarter following the
        Effective Date . . . provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over.)" (Emphasis added) (Plan §2.01; Scheme §4.4.)

    2.    Claimant alleges that Highland breached the provisions of the Plan by paying itself distribution fees totaling $14.5 million despite not having "actually" distributed to the Redeemers each quarter the minimum required to have been paid by the Realisation Schedule (Plan Appx. A).  The Committee alleges that Highland paid itself distribution fees eight times, but that the only time Highland met or exceeded the goals set by the Realization Schedule was in the quarters ending January 31, 2013, and April 30, 2013. Other than those two quarters, Claimant contends that Highland missed the target in every other time period.  Claimant also charged Highland with a breach of fiduciary duty, arising out of similar facts.

    3.    The Committee alleges that six of the distribution fee payments were improper because Highland improperly calculated the amount paid to the Redeemers in one or more of the following ways: (1) in treating Deferred Fees as Distributions; (2) in withholding tax obligations from payments to Redeemers, but counted them for purposes of qualifying for its fee; (3) in improperly including amounts that it reserved to pay Barclays, amounts used to pay the Barclays settlement, and amounts paid to its affiliate Eames in its calculation of Distributions; and (4) in borrowing on margin and improperly treating such borrowings as "excess cash" under the Plan and, therefore, as Distributions.

    4.    In addition, Claimant argues that if Highland missed any quarterly hurdle set in the Realisation Schedule, its deficiency would carry over to the next quarter, giving Highland an accordingly higher hurdle, or watermark, to meet in that next quarter.  In other words, Claimant urges that the Realisation Schedule was intended to be cumulative.

    5.    Cumulative Quarterly Hurdles
        a)    Starting with the last issue first, the language in the Plan in question is as follows: "HCMLP will receive fees in cash ... (b) provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over)." HC-300 at 74 (emphasis added). Plan §2.01.

15

b)      Claimant argues that, although the foregoing language is not explicit regarding both the positive and negative cumulative nature of the Realisation Schedule, there is evidence sufficient to establish that requirement from the text itself and from the testimony of those who negotiated the clause in the Plan, citing the testimony of Mr. Montgomery ("The Realisation Schedule was a cumulative concept. 100 million during one period, 100 million to the next, 200 million during the next. . . . it was designed to be cumulative. It was a stack.") Tr. 3 307:5-19.  The Committee also points out that Highland kept internal accounting schedules that treated the Schedule as cumulative, including RC-364 at pp. 10, 23, 36, 49, 62, 75, 88, 101, 114, 127, 140; see also Tr. 4 196:17-197:19; Tr. 9 256:14-259.

c)      Finally, the Committee urges that there would be "perverse incentives" if Highland were allowed to treat the Schedule as cumulative if it got ahead of the distribution schedule but not if it fell behind, because if Highland knew it could not make a quarterly target, it would have the incentive to skip that quarter and wait until the next quarter where it would meet the Realisation Schedule for only that quarter. This would have the undesirable effect of delaying liquidation but not adversely affecting Highland's receipt of incentive fees.

d)      Highland strongly urges that the clause in question is unambiguous in requiring only a positive carry-forward, with no hint that a failure to meet a quarterly hurdle imposed an obligation to reach a high water mark that would meet both the prior hurdle and the present quarterly hurdle. In addition, Highland argues that, as Mr. Montgomery conceded on cross-examination, the Plan could have contained a cumulative shortfall provision, but that the inclusion of such language was never discussed with Highland, Tr. 3 at 308:7-13, and such could have been incorporated into the Plan had that been the Parties' intent.

e)      Highland also criticizes the Committee's "perverse incentive" argument, arguing, first, that Highland was highly incentivized to liquidate as quickly as possible so it could receive Distribution Fees during the pendency of the 36-month Realisation Schedule (§2.02) and obtain the $10 million Deferred Fee by distributing $1.7 billion within 43 months of the Plan's Effective Date (§6.02); and, secondly, "if Highland fell too far behind," it would lose its incentive to continue expeditious liquidation of the Fund's assets. Respondent's Post-Hearing Brief at 57. See Tr. Day 12 at 169:3-18 (Snow).

16

f)      In interpreting the section of the Plan, it is significant that the language regarding a positive carry-forward appears in a parenthetical phrase, not in the main operative text. Without considering the parenthetical, we read the main operative text as setting a test that Highland has to meet — each quarter, assets "equal to or in excess of the amount scheduled in the Realisation Schedule" must be distributed to Redeemers, or else Highland will not "receive fees in cash" that quarter.  Thus, each separate quarter, Highland has to make a required distribution or will not be paid fees.  But if each quarter there is a test that Highland has to meet, it would defeat the purpose of the quarterly test for Highland to be able to garner fees by just meeting the goal for one particular quarter without regard to how it had performed the prior quarter. Without a reward or a penalty each quarter dependent upon whether it met (or exceeded) the goal, Highland could undermine the objective of the clause. The supplemental parenthetical phrase simply makes explicit one benefit to Highland of overachieving such quarterly goal. We conclude that §2.01 requires both a positive and negative cumulative process.

g)      To read it otherwise would create a perverse incentive of encouraging Highland to skip quarters. The contrary is not true: by having both a positive and negative cumulative obligation, Highland loses no incentive to continue to liquidate, perhaps at a faster pace than it in fact adopted, if it were to fall behind.

h)      Though we reach our conclusion without need to rely on extrinsic evidence, we note that our interpretation is supported by Mr. Montgomery's testimony regarding Highland's request to include a parenthetical to make clear that it would not lose the benefit of an over-distribution and could carry it forward. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

D.    Deferred Fees as Distributions

1.    With respect to Highland's treating Deferred Fees as Distributions, the Committee urges that Deferred Fees being reserved in an account for possible later distribution were not amounts "actually Distributed" or the kind of Distributions made to Redeemers as part of the return to them of their investment.

2.    Highland defends on the basis that the Committee's position that Deferred Fees should not be included in calculating Distribution Fees is inconsistent with the parties' course of performance. From the outset, Highland argues that it included Deferred Fees in its calculation of Distribution Fees and gave written notice of its inclusion to the Committee on at least four occasions. HC-552; HC-591; HC-592; HC-593. However, Highland is not making the argument that the Plan was amended by what it says was its known conduct.

17

3.    Highland also argues that its successor, A&M, also included Deferred Fees in its calculation of Distribution Fees based upon the substantively identical language in the A&M investment management agreement, HC-56 at 6, and received a Distribution Fee based on that calculation in October 2016.

4.    We find that whether Highland's conduct was disclosed to the Committee or whatever A&M may have done are both irrelevant to the issue in this case, because, as we analyze the evidence adduced, the only relevant issue is whether including Deferred Fees in the calculation of Distribution Fees is authorized by the language of the Plan, and we find that it is not.

5.    The Plan sets forth a program of fees capable of being paid to Highland: if Highland met certain quarterly goals of distributions made to Redeemers, as set forth in the Realisation Schedule, it was entitled to receipt of certain Distribution Fees; if it distributed at least $1.7 billion to the Redeemers prior to the 43d month following the Effective Date, it was entitled to receive payment of the fees in the Deferred Fee Account in accordance with Section 2.02 of the Plan.

6.    The Plan distinguished what Highland had to do to qualify to receive each category of Fees. With respect to Deferred Fees, the Plan provides that "Highland shall not be deemed to be a Redeemer in respect of the deferred fees." We read that sentence as making clear that Highland's setting aside of Deferred Fees into a account that it might eventually be able to draw upon should not be construed as a form of distribution such that, if it were a Redeemer, it could be construed as an "actual" distribution.  Because Highland is not "deemed to be a Redeemer," its payment to a fund is not equivalent to a Distribution to an investor.

7.    We find that this language is not ambiguous and does not allow for the practice used by Highland to beef up the amount of Distribution Fees it received.

18

E.      Withholding Taxes as Distributions

1.      The evidence at the hearing was that, as required in the Plan, HC-300 at 80, Highland took into account the amount of taxes that should be withheld and paid those amounts to the appropriate taxing authorities; however, Highland also included those withheld amounts in the calculation of amounts "actually" distributed to Redeemers.  The Committee contends that such withheld amounts were not "actually Distributed to Redeemers," and points out that, in fact, only a subset of Redeemers — the Offshore Fund investors —  were subject to tax withholding, RC-62; Tr. 9 275:5-23, while some investors were nonprofits that did not pay taxes at all,  Tr. 12 167:5-24.  The Committee also points out that, when first informed in 2012 that Highland had counted tax withholdings toward the May 1, 2012 Distribution, the Committee objected, demanding successfully that Highland make up that shortfall. RC-68; Tr. 3 301:6-12; Tr. 9 278:4-279:16.

2.      Highland makes two points in its defense: first, tax withholdings made on behalf of an employee are considered "compensation," so tax withholdings for Crusader investors should also be treated in a "common-sense manner" as "distributions" to those investors; and second, Highland disclosed its methodology in at least one monthly report in November 2013, HC-591 at 14 (Nov. 2013 Summary Report), to which the Committee never objected.

3.      We need not consider either of these defenses because we find the language of the Plan supports the treatment by Highland of these amounts. As stated above, "Distributions" is defined as "Amounts to be paid to Redeemers under the Plan, including amounts to be paid to Redeemers under the Scheme..." §1.01. The operative language regarding withholding for taxes is as follows: "In connection with ... all Distributions to be made hereunder, the Crusader Funds shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any ... taxing authority, and all Distributions hereunder shall be subject to any such withholding ... requirements. The Crusader Funds are hereby authorized to take any and all actions that may be necessary or appropriate to comply with any such requirements."

4.      Read together, we find that "the amounts paid to Redeemers" were "subject to ... withholding requirements" and thus, were appropriately included within the calculation of amounts distributed to Redeemers, even if, in fact, it was an indirect payment. We find for Highland on this branch of the Committee's claim.

19

F.    Payments to Barclays and Eames as Distributions

1.    In 2006 and 2007, Barclays and a Highland affiliate entered into two securities transactions — a prepaid forward transaction and an accreting strike option transaction.  In connection with those two transactions, Barclays became an investor in the Highland Funds. JX-5. In late 2008, Barclays submitted redemptions for its full interests in the Highland Funds, which Highland did not honor. Litigation between Barclays and Highland entities ensued. When the Plan and Scheme were adopted, Barclays did not consent and became what it is referred to as a Non-Consenting Redeemer. HC-300, at HC-300.0075.

2.    Thereafter, when Fund assets were disposed of and amounts distributed to Redeemers, no amounts were actually paid to Barclays; instead, amounts equivalent to those that Barclays would have received if it was a Consenting Redeemer were paid into the Redeemer Trust Account. That Account was set up for the purpose of segregating the deposited funds so they could be "used to pay all costs of HCM-Related Parties and the Redeemer Committee to defend, respond to, settle and satisfy any Claims by Crusader Fund Redeemers excluding Plan Claims ("Redeemer Claims") and ... to defend, respond to, settle and satisfy any such Redeemer Claims in advance of any amounts otherwise properly available for such purposes out of the assets of the Crusader Funds."  Plan 6.01.

3.    Notwithstanding such amounts remained in a designated account at a major financial institution, Highland treated such reserves as "actual" Distributions and paid itself fees based on the amounts reserved. The Committee argues that amounts reserved in the Redeemer Trust Account were not "actually Distributed" and that fees taken by Highland for such deposits were taken in breach of the Plan.

4.    We find that Highland's treatment of the reserves as Distributions violated the terms of the Plan.

5.    In July 2012, Highland, Barclays, and other entities entered into a settlement agreement, resolving all of the claims between and among them. JX-5. As part of the settlement, Barclays received both the cash reserved since August 2011 and several additional cash distributions expected between July and December 2012, essentially the exact distribution amounts that it was entitled to as a Consenting Redeemer. Tr. Day 9 at 146:12-19 (Palmer); HC-275; HC Demo 10 at 4.  Pursuant to the settlement, Barclays became a Consenting Redeemer, see JX-5 at 12 (§ 11.3). Highland treated such portion of the settlement payments as "Distributions" and paid itself the fees associated with that amount of Distributions. The Committee contends that any payments to Barclays were in settlement of various claims, in exchange for which there was a "relinquishment and/or abandonment" of all of Barclays' rights and interests in the Highland Funds, JX-5 at 3, and, thus, such payments were not Distributions.

20

6.      Finally, as part of the settlement, the two limited partner interests that Barclays had in the Funds were transferred to a newly-formed and wholly-owned affiliate of Highland, Eames; amounts equivalent to what Barclays would have received as an investor after the settlement were paid to Eames, totaling $35.1 million, and Highland treated such amounts as Distributions and paid itself the appropriate fees.  The Committee urges that the transfer of LP interests was in violation of Section 2.05(f) which gives that the Committee "the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims," HC-300, and that the transfer was explicitly disapproved, RC-79 ("The Crusader Redeemer Committee does not believe that Highland has the right to take assignment of Barclays' interest in the Crusader Fund. The Committee believes its approval is required for any such assignment under the Plan/Scheme, and the Committee is not willing to approve that assignment."). Furthermore, the Barclays Settlement Agreement provided that the settlement was subject to Highland's receiving all necessary approvals under the Crusader Plan of Liquidation, which the Committee contends Highland did not receive. HC-330, §12.3.2, at HC-330.0014.

7.      Highland argues, first, that the Committee's right to approve or disapprove of the transfer of interests under Section 2.05(f) is not applicable because under Section 2.05(g)[3], the Barclays settlement did not give Barclays more than it would have received as a Consenting Compulsory Redeemer; that, in any case, 2.05(f) is subject to the "reasonableness" test under Section 2.07[4]; and, finally, that it was entitled to keep the LP interests because the LP interests were in the Redeemer Trust account, citing to HC-275. We find that Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer. Its rejection was reasonable in that it was acting in the best interests of the other investors to have a smaller investment base that would have a greater portion of the asset distributions. The accounting ledger maintained by Highland, which created much confusion at the hearing, was not evidence that the LP interests were in the Redeemer Trust account; we agree with the Committee that the spreadsheet was an accounting convenience for Highland.

8.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

---

[3] "The Redeemer Committee will have, subject to the execution and delivery of customary and reasonable confidentiality agreements:... (g) the authority to approve or disapprove any settlement by the Crusader Funds with Barclays that would be in excess of what Barclays would receive as a Consenting Compulsory Redeemer..."

[4] "The approval of the Redeemer Committee with respect to any matter submitted for approval under Sections 2.05 or 2.06 shall not be unreasonably withheld."

9.     We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

10.     Finally, we find that when Barclays received the amounts, as part of the Settlement Agreement, that had been set aside in 2012 as if Barclays was then a Consenting Redeemer, it did not receive such amounts as Distributions "actually" paid to a Redeemer but rather as part of the Settlement amount. Although Barclays was "deemed" to have become a "Consenting Redeemer," it had that status only for the moment in time sufficient to transfer its LP interests to Eames. As the Settlement Agreement noted, "certain payments will be made by the Highland Entities to Barclays … in consideration of the settlement of the Claims hereunder and the assignment, relinquishment and/or abandonment by Barclays of all rights and interests it had in the Fund Interests…" HC-330 at HC-330.0003. Highland breached the Plan by treating the amounts paid to Barclays as if they had been received as a Consenting Compulsory Redeemer as Distributions.

11.     We conclude that it was improper for Highland to include in the calculation of the amounts distributed to the Redeemers:

   a)     The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

   b)     The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims; and

   c)     The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames.

G.    Margin Borrowings as Distributions

1.    In January and April 2012, Highland caused the Fund to borrow $60 million from its Jefferies brokerage account to distribute to Redeemers. The Committee contends that it did so because Highland had not liquidated enough assets to meet the Realisation Schedule. After learning about the loans in September 2012, the Committee protested and directed Mr. Dondero at the September 2012 meeting to take no further margin loans without its consent. Tr. 2 353:2-22; RC-85; JX-8. The Committee contends that Highland's taking such margin loans to reach the Realisation Schedule and then paying itself Distribution Fees based on having reached the quarterly goal with the assistance of the margin borrowing breached the Plan because the margin borrowing did not constitute Excess Cash resulting from the liquidation of assets from which Distributions must come. Plan §§1.01, 3.01; Scheme §§2.4.1, 2.4.2.

2.    Highland maintains that, as it was authorized under the Plan, to engage in margin borrowing, and that amounts were actually distributed to the Redeemers, such payments to the Redeemers were appropriately treated as Distributions qualifying it to receive Distribution Fees.

3.    We find that such margin borrowings, which were authorized under the Plan, did not qualify as the type of Distribution that would entitle Highland to receive a Distribution Fee. The plain language of the Plan requires that any Distribution Fee be paid to Highland only upon the appropriate amount of Excess Cash having been accumulated from the sale of "assets equal to or in excess of the amount scheduled in the Realisation Schedule…" The "assets" referred to are the "assets, respectively, of the Onshore Fund, Offshore Fund I and Offshore Fund II…" §2.01. No such assets were sold and therefore no Excess Cash was accumulated to be distributed to the Redeemers.

23

4.      The Committees expert, Mr. Imburgia, determined that the result of Highland's including the above improper items in the calculation of Distributions to Redeemers in calculating its entitlement to Distribution Fees, resulted in Highland paying itself Distribution Fees to which it was not entitled by an overpayment of $14,452,275 in Distribution Fees. The Committee is entitled to judgment in that amount plus interest at the rate of 9% from the date of each improper fee. RX 408, Schedule 2.1

H.      Purchase of Plan Claims[5]

1.      From December 2013 through January 2016, Highland purchased twenty-seven Plan Claims from Crusader investors for itself, without the approval of the Committee [ Tr. 5 50:5-8.] The Committee contends that such purchases breached the Plan, because if it had known that the Plan Claims were available for sale, it would have exercised its ROFR.  Tr. 3 163:11-24; Tr. 4 389:3-390.23. The Committee urges that the UBS TRO, said by Highland to block any purchases by the Fund during its pendency, does not in fact bar such purchases; in any event, the Committee points out that it is conceded that the Fund had assets other than the allegedly restrained assets with which to make purchases outside of the restrained assets. The Committee seeks damages equivalent to the value of the Claims at the time they were sold, any profits or benefits realized by Highland, and pre-judgment interest at 9%, for a total of $8,897,899 plus interest.

2.      Highland raises a number of defenses. First, it argues that, during the period that the TRO was in effect, the Committee agreed with the advice given by the Fund's (and Highland's) counsel in the UBS case, Lackey Hershman, that the TRO, at minimum, prevented the Fund from spending cash to buy-out other investors before UBS's claims were resolved. See Tr. Day 7 at 319:17-332:3. Thus, Highland contends that the Committee cannot prove it would have purchased the Claims had they been offered to it.

---

[5] Plan §1.01: "Plan Claim. The claim of a Redeemer to payment of, or based upon, the Redemption Amount relating to the redemption of its shares or withdrawal of its capital account balance, as the case may be, in the Crusader Funds as detailed in Section 4.01."

3.      But the record doesn't support that interpretation. First, refuting the idea that the Committee agreed with the advice being relayed to them is the exchange of correspondence between counsel for the Committee counsel and Highland set forth in RC-360, in which Committee counsel rejected the advice said to have been received from outside counsel, and stated how the Plan Claims should be dealt with if Highland were to persist in asserting that the TRO so blocked the Committee's exercise of its ROFR: "the Committee does not agree with Highland's interpretation of the UBS TRO because the expenditure of money to redeem interests is not a "Distribution" and, in any event, if Highland feels strongly that it cannot use the Funds' assets in this way, any acquisition of the interests by Highland or an affiliate is subject to the Committee's exercising its rights under Section 5.04 when the TRO is lifted or when the interests can, in Highland's opinion, be acquired by the Fund consistent with the UBS TRO. Otherwise, the Committee did not approve of the transfer of the Scheme Claims." RC-360 at 87-88.

4.      Furthermore, before the TRO, when presented with the opportunity to purchase Plan Claims, the Committee exercised its right of first refusal (ROFR) on five occasions, see RC-358. During the pendency of the TRO, the Committee was informed about only five of twenty-eight Plan Claims purchases and disapproved each of the purchases by Highland, but the disapprovals were ignored. The Committee informed Highland that it disagreed about the scope of the TRO but that if Highland, as Fund Manager believed the TRO prevented the Fund from purchasing the Plan Claims, then it would be consistent with the Committee's ROFR for the right to be exercised when the TRO was lifted. HC-580.

5.      We find that the Committee would have exercised its ROFR if it had been given full information and had not Highland been preventing the exercise of the ROFR by invoking the TRO and misrepresenting to buyers that it had the ROFR.

6.     As a second defense, Highland contends that during the period that the UBS TRO was in effect, it relied on advice of counsel that the TRO prevented the Crusader Fund from acquiring any Plan Claims, thus opening the door for Highland to purchase the Plan Claims that would otherwise have been subject to the Committee's ROFR under §§2.05(f)[6] and 5.04[7] of the Plan.

7.     Mr. Leventon testified that the TRO was obtained by UBS in response to UBS's allegation that Crusader Funds had participated in a fraudulent transfer of assets from a UBS debtor; the TRO restricted transfer of assets but because those assets had been acquired about four years previously and disposed of in the ordinary course of business, "the UBS TRO was essentially designed to 'collateralize' UBS against the March 25, 2009 asset transfer. And if they couldn't be collateralized with those exact assets and the exact actual cash ... or cash equivalent, then it had to be collateralized with something else. And that something else was the assets of the fund." Day 7 at 328:12-20.  That testimony would suggest that from the moment that the TRO went into effect, the Fund was under constraints not to purchase any Plan Claims or other assets.

8.     But this explanation is not convincing.  Regarding the advice received from Lackey Hershman, Mr. Leventon testified that the majority of the advice received was orally and over time, and that the advice was "an evolving interpretation" that "crystallized...in the first quarter of 2014." Id. at 330:9-17.  The advice consisted of "a bunch of verbal conversations, but a lot of that advice is embodied in that memo [HC259] that Lackey wrote to the Crusader Fund. Because we wanted the Committee to understand our quandary."  Day 7 at 319:17-332:3 (Emphasis added).

---

[6] Plan §2.07(f): "The Redeemer Committee shall have ... the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims; provided that such proposed assignment or transfer shall be deemed to be rejected if not affirmatively approved in writing within 30 days of submission to the Redeemer Committee..."

[7] Plan § 5.04: "No assignment or transfer of a Plan Claim after the Effective Date may be purchased by [Highland] or its affiliates without such Plan Claim first being offered to, and rejected by, the Crusader Funds."

26

9.      The Lackey Hershman memo, dated July 23, 2014, HC-259, deals only with the
practical consequences of seeking an amendment to the UBS TRO while an appeal was
pending, and does not provide any advice regarding the scope or interpretation of the UBS
TRO.[8] Notably, there is no other document from Lackey Hershman presented at the hearing,
even including emails, that supports Mr. Leventon's explanation.

10.      Perhaps in recognition of the thin basis for its claim that it relied on the advice of
counsel, Highland requests that the Panel draw no inferences from the "relatively few written
communications on this issue," because there was, Highland contends, "unrebutted
testimony" of the "contemporaneous advice of counsel." Highland points to a letter from an
internal counsel at Highland to the Committee that cites advice from outside counsel
regarding the effect of the TRO on the Committee's ability to purchase Plan Claims, RC-360
("outside counsel to HCMLP has advised that the temporary restraining order which has
been imposed by the Court in UBS Securities LLC et al. v. Highland Capital Management,
L.P. prohibits the Crusader Funds from purchasing the Scheme Claims using assets of the
Crusader Funds").

11.      The statement by internal counsel is the type of hearsay that was received in evidence
only because this was an arbitration but to which, under the circumstances, we accord little
substantive weight. We find more persuasive the absence of any writing, even an e-mail,
directly from the law firm regarding the scope of the TRO and restrictions against the Fund
using its assets to purchase Plan Claims or similar items.

12.      Further, we find that, even before the TRO went into effect, and thus well before any
advice from counsel would have been received, Highland was laying the groundwork for
purchasing the Plan Claims for itself and bypassing the Committee's ROFR.

---

[8] On questioning by members of the Panel, Mr. Leventon referred to the Lackey Hershman memo in broad terms:

"As set forth in the Lackey memorandum, which we all have, Lackey reported that UBS said that, Crusader and Highland Credit Strategies could neither distribute cash to anybody, nor sell assets, nor make any payments outside of the normal course of business...ARBITRATOR BRODSKY: Is the Lackey Hershman memo you're referring to the one that is HC-259, dated July 23, 2014? THE WITNESS: I believe that's correct. ARBITRATOR BRODSKY: I don't see any reference to conversations relayed to you by counsel about what UBS said. I see a sentence on page RC-3208 at the top, it says, "UBS counsel stated that they're not willing to enter into such a stipulation unless Crusader provided detailed discovery of its cash and asset holdings," et cetera, et cetera. Is that what you were referring to? THE WITNESS: Yes. They were not willing to modify the TRO in order to permit the sale of assets unless Credit Strategies, Crusader and other defendants handed over detailed financial information that they would not otherwise be entitled to in discovery. And we were advised that that was a prohibitive risk."

Day 8 170:10-17, 173:4-174:7.

13.     On May 29, 2013, Highland caused the Board of the Master Fund, which it controlled, to adopt a resolution, as follows:  "Whereas, ... (2) certain investors from time-to-time desire to sell their interests as redeemed, unpaid shareholders, in the Company ... (any such shares, 'Offered Shares'); (3) one or more principal accounts (the "Related Accounts') in which James Dondero ... and/or Highland ... have material, direct and indirect, financial and ownership interests, have enters a bid to purchase certain of Offered Shares; (4) the bid of the Related Account(s) is equal to or greater than the highest bid; ...Now Therefore Resolved That (1) the undersigned Directors hereby consent to the Proposed Transaction and any future transfers of Offered Shares to the Related Account(s)..." RC-276 at 5; Tr. 7 63:25-68:14.

14.     This pre-approval of transfers of interests in the Fund to Mr. Dondero, Highland, or its affiliates does not reference the Committee's ROFR, but it enabled Highland, falsely, to claim that it had a ROFR.  Using that Resolution, Mr. Leventon informed multiple investors interested in possible transfers of their interests, that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. RC276[9]; RC280; RC434. This conduct alone constituted a breach of the Plan, because it deprived the Committee from having any insight into the transactions as to which the Plan gave them rights to purchase the underlying interests.

15.     Furthermore, by the time Highland received the Lackey Hershman memo in July 23, 2014, Highland had purchased fourteen Plan Claims, nine of which were not disclosed to the Committee. Thereafter, Highland purchased another thirteen Plan Claims without any disclosure to the Committee. Mr. Leventon testified that the only reason for Highland not to consult the Committee about the 27 purchases in 2013, 2014, and 2015 was its interpretation of the TRO. Day 7, 172:2-10.

16.     Additional actions by Highland further demonstrate that the reliance on the TRO was a facade, designed to enable Highland to attempt to purchase a majority interest in the Fund without the Committee's knowledge. In May 2014 and again in January 2016, Highland hired a broker to solicit all Fund investors, except those who were on the Committee, to buy their interests at half or approximately half of the NAV that Highland had itself set. RC417; Tr. 7 95:8-20, 96:8-23; RC425.

---

[9] "By way of Written Resolution, the Board of Directors of [the Fund] determined that if the Investment Manager or an affiliate offers to purchase the shares in the Fund, then that bid shall be accepted if it is the highest bid. See Written Resolution of the Directors of the Fund dated May 29, 2013. The Board may, in its absolute discretion, approve transfers. ... Accordingly, the Investment Manager, as authorized by the applicable documents, hereby bids 60.25 cents of NAV for purchase of 100% of Crown Alpha's capital balance as of the November 2015 NAV date"

17.     The broker, Wake2O, used talking points drafted by Highland that misrepresented on whose behalf Wake2O was acting, represented, without apparent foundation, that the offering price of 50% or 55% of NAV was "[t]he current best market bid" and that price would go down in the future, and, finally, that the TRO prevented the Fund from making distributions and that the Fund held many illiquid assets. RC420; Tr. 7 101:4-11 ("Q: And so one of the things that Highland wanted Wake to convey to investors was, hey, you might want to sell your interest in Crusader because right now there's this TRO and you're not going to be able to get any distributions, right?  A. · · That's probably a fair paraphrasing.").

18.     Throughout Wake2O's engagements, it was under pressure from Highland's CEO to pursue investors so that Highland could obtain a greater share of the Fund. See, e.g., RC-250 ("[K]eep pushing as much and many as quickly as possible....")(August 2015); and RC-426 ("Our CEO is keen on starting the process as soon as possible. Please let us know if we can start Monday.") (January 2016); Tr. 7 135:6-137:18.

19.     It was also in this period that Highland undertook a renewed effort to keep the Redeemers Committee in the dark about their purchasing activities. Mr. Leventon was significantly involved in providing direction, as well as drafting talking points, to Wake2O to "reach out to all non-committee members,"  (emphasis added); Tr. 7 146:16-149:7.  Highland offered Wake2O an incentive fee to acquire interests representing $200 million of NAV, but made clear to Wake2O that they should try to achieve that goal without contacting members of the Redeemer Committee. Tr. 7 157:13-161:2. The amount of $200 million was not an accidental target; it was just $4 million of NAV more than what the Redeemer Committee held, Tr. 7 155:15-23.  Wake2O's efforts resulted in the acquisition by Highland of a significant number of Plan Claims, amounting to just shy of $200 million, RC418; RC360; RC419; RC422; RC423; RC424.

20.     Finally, Highland continued misrepresenting to investors that it had a ROFR and never mentioned in its communications that the Committee was the entity actually possessing that right.  Mr. Leventon was the principal instrument through which this misrepresentation and omission were communicated, Tr. 55:19-25 ("Q. Mr. Leventon, have you ever sent an e-mail to an investor telling the investor that Highland Capital has a right of first refusal in the event the investor wants to sell its interest in the fund? A. With respect to the Crusader Fund, I don't recall having done so."); but see RC-276; RC-280; RC434; Tr. 7 74:22-76:23.)[10]

21.     Based upon the testimony at the hearing, we have serious doubts about the scope of the advice given, if any.  In addition, as now conceded, there were adequate untainted funds under the control of the Crusader Funds to have enabled the Committee to exercise its ROFR as to the Plain Claims, had they been informed in a timely way, as mandated by the Plan. 10/24/18 Highland Ltr. to Panel at 2; RC-408 at 37.

22.     Further, from our examination of the language[11] in the TRO, we conclude that the restrained assets were narrowly circumscribed, and the broad position taken by Highland was not well-grounded. The TRO restrained the Crusader Fund only from transferring or disposing of property received, or its cash equivalent, in March 2009 "from Highland Financial Partners, L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009." JX13; RC134. The TRO did not preclude the Fund's sale of unrestricted assets or use of a significant amount of cash in the Fund. JX13.

23.     We also find that Highland's reliance on the UBS TRO was pretextual to support Highland's true goal of benefiting itself over the interests of the Fund and the Committee. We find that Highland breached the Plan and Scheme by its actions and injured the Committee by its breach. We also found that Highland breached its fiduciary duty to the Committee by so acting.

---

[10] It appears that Mr. Leventon was also involved in a misrepresentation to the Committee about the purchase of a Plan Claim after the TRO had expired. In June 2016, he requested the Committee's approval for the purchase of a Plan Claim by an entity he described as a third party that was not affiliated with Highland. But in the course of soliciting the sale of the Plan Claim, Mr. Leventon represented that Highland was exercising a ROFR on behalf of itself or its affiliates. Tr. 7 87:6-89:11; RC-434. In fact, we find that the third party, Charitable DAF Fund, L.P. ("DAF"), was an affiliate of Highland. RC-435; Tr. 7 82:1384:21.  Based on what Mr. Leventon stated, the Committee approved the transfer. RC-316.

[11] "ORDERED, that pending the hearing on this motion, Defendants Highland Crusader Offshore Partners, L.P., and Highland Credit Strategies Master Fund, L.P., are temporarily restrained from transferring or otherwise disposing of property received (or if property has already been transferred or disposed to, the cash equivalent) in March 2009 from Highland Financial Partner,s L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009."

24.     In the calculation of damages owed to the Redeemer Committee by Highland, we
have assumed that any Plan or Scheme Claims purchased by Highland would have been
purchased at the same discounted price as Highland did. However, the damages methodology
used by the Committee's expert witness on damages makes the assumption that the fair
market value of each of the Plan Claims was the NAV that Highland had established in each
of the relevant months. We do not adopt this methodology because of the uncertainty as to
whether a discount should be applied to the NAV in calculating the appropriate fair market
value.

25.     Rather, we adopt the alternative approach suggested by the Committee, which is
rescission.  We order Highland to transfer the 28 Plan or Scheme Claims to the Redeemer
Committee, to pay to the Committee whatever financial benefits Highland received from the
28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%,
from the date of each purchase. We will leave the hearing open until the parties have
worked out the exact financial details to comply with this order.

I.     Related Party Transactions

1.     The Committee contends that Highland breached its fiduciary duties by engaging in
multiple related-party transactions without seeking or gaining the approval of the
Committee  The Plan provision in questions requires the Committee's approval of "all
transactions between the Crusader Funds and any other HCM-Related Party, while it serves
as investment manager of the Crusader Funds, including any 'cross trade' between the
Crusader Funds and any other account managed or advised by HCMLP," Plan §2.06; Scheme
§4.7.1 (emphasis added).

2.     First, we must resolve the interpretation question left open by the Order of March 1,
2017, denying Respondent's motion for partial summary adjudication regarding these claims.
We found that the language cited above was ambiguous because while Respondent argued
that "Crusader Funds" is defined as meaning only four entities, the Master Fund, Onshore
Fund, Offshore Fund I and Offshore Fund II, Id., § 1.01, and does not include Crusader Fund
"portfolio companies" and other affiliated "entities," Claimant argued that if Crusader Fund
meant only those four entities, there would be no meaning to the "including 'cross trades'
language of §2.06, because none of the four entities directly owns assets and thus could not
engage in cross trades with each other or with any other account managed by Highland.
Thus, the language 'including "cross trades" must refer to entities broader than just the
defined entities within Crusader Funds, or else that portion of §2.06(a) prohibiting cross
trades would be read out of the Plan. Accordingly, we denied without prejudice the motion
to dismiss the breach of contract and fiduciary duty claims based on the so-called affiliate
transactions until after the record has been more fully developed.

31

3.      At the hearing, testimony was taken from two Redeemer Committee members, Messrs. Montgomery and Behr, regarding the drafting of the section in question. Mr. Montgomery testified that he negotiated the terms of the Plan with Michael Colvin, who was then Highland's General Counsel, telling him that the Committee "needed a related-party transaction prohibition, and he agreed to that. And the understanding was that it included everything on the Highland side and everything on the Crusader side… we thought there was agreement that it was including everything on the Highland side and everything on the Crusader side…" Tr. 2, 234:2-6, 235:2-5. Although in response to a question from a member of the Panel, Mr. Montgomery could not recall the specific language he and Mr. Colvin used to convey this understanding, and on cross-examination, he could not provide a reason for how the specific clause was drafted on this point, we credit Mr. Montgomery's testimony on this point.

4.      Although of limited evidentiary significance, Mr. Behr's testimony that before the adoption of the Plan and Scheme he had had discussions with someone at Highland, whom he recalled was Mr. Colvin, about concerns regarding Highland expensing board fees paid to its portfolio companies, Tr. 9 76:17-25, 77:2, supported Mr. Montgomery's testimony, cited above, that the subject of prohibiting certain related party transactions was part of the negotiations over the Plan. His recollection was supported in part by his contemporaneous notes of having raised that subject in the negotiations. HC508 at 142.

32

5.      In addition, the Committee makes the point that the occasional course of conduct
between the parties before the relationship between the parties became a matter of some
dispute reflected the belief that the Plan and Scheme required that Highland seek the
Committee's approval before engaging in transactions that involved entities other than the
four specific Crusader Fund entities in the definition. See, e.g., Tr. 4 213:6-9.[12] Under the
established law relating to contract interpretation, "How the parties perform a contract
necessarily is manifested after execution of the contract, but their performance is highly
probative of their state of mind at the time the contract was signed." Gulf Ins. Co. v.
Transatlantic Reinsurance Co., 886 N.Y.S.2d 133, 143 (First Dept. 2009); "[T]he parties'
course of performance under the contract is considered to be the 'most persuasive evidence
of the agreed intention of the parties.' … 'Generally speaking, the practical interpretation of
a contract by the parties to it for any considerable period of time before it comes to be the
subject of controversy is deemed of great, if not controlling, influence.'" Federal Ins. Co. v.
Americas Ins. Co., 691 N.Y.S.2d 508, 512 (First Dept. 1999).

6.      Based on the foregoing evidence, we resolve the ambiguity in favor of a broad
definition of the term "Crusader Funds" to include not only the four specific entities named
in §2.06 but also the Crusader Fund "portfolio companies" and other affiliated "entities. The
Committee contends that Highland engaged in two types of transactions that required but
did not receive its consent: (1) transactions between Highland affiliates and Fund portfolio
companies, and (2) transactions directly between Highland affiliates and the Fund entities.

J.      Related Party Transactions with Portfolio Companies.
1.      The Committee contends that Highland breached §2.06 by causing Fund portfolio
companies to pay board fees, advisory fees and D&O insurance premiums.

2.      Highland responds that transactions between Highland affiliates and Fund portfolio
companies were expressly disclosed to the Fund's investors, see HC-230 at 34-36, and that
the investors specifically agreed such transactions were permissible, see HC-118 at 7.
Accordingly, Highland urges that there can be no fiduciary duty breaches.

3.      Furthermore, Highland urges that the claims arose in 2011 or 2012, and in any case
were disclosed to Highland counsel by April 6, 2013, JX-12, and, thus, would be barred by
the three-year statute of limitations. Highland characterizes the proof regarding such claims
as failing to establish more than the occurrence of "isolated or sporadic acts."

---

[12] We note that one of Highland's outside counsel also occasionally used the term "Crusader Funds" or "Crusader" when describing transactions between portfolio companies and Highland affiliates, RC83 at 2-3; see JX12; JX10.

33

4.      The Committee claims that the statute of limitations should be tolled under the "continuing violation doctrine," which applies where "separate violations of the same type, or character, are repeated over time," and not where the claims are "based on a single decision that results in lasting negative effects." Moses v. Revlon, 2016 U.S. Dist. LEXIS 106431, *18 (S.D.N.Y. 2016).  Under prevailing New York law, "The continuing violations doctrine 'will toll the limitations period to the date of the commission of the last wrongful act where there is a series of continuing wrongs.' Shelton v. Elite Model Mgt., 11 Misc.3d 345, 361 (Sup Ct, New York County 2005); 78/79 York Assoc. v. Rand, 175 Misc.2d 960, 966 (Civ Ct, New York County 1998) … However, 'it will only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct.' Selkirk v. State of New York, 249 A.D.2d 818, 819 (3d Dept 1998)." Pankin v. Perlongo, 2012 WL 7868667, at *2 (Sup. Ct. N.Y. Cnty. 2012).

5.      The evidence brought forth by the Committee failed to show that the payments made by Highland for insurance premiums or for advisory fees were parts of a series of continuing wrongs. Rather, there appear to have been a series of discrete payments made in no regular or consistent pattern and in no similar amounts.[13] Under the circumstances, we find in favor of Highland on these claims. We do not reach the issue of whether disclosure to investors would bar a claim for breach of fiduciary duty.

K.      Related Party Transactions with Highland Affiliates

1.      The Committee contends that in 2013 and 2014, without seeking its permission as required under §2.06, Highland sold shares in four CLO assets held by the Master Fund, known as Eastland CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO, Ltd. (the "CLOs"), in what it characterizes as "pre-approved" transactions to Highland affiliates, without seeking the Committee's approval, as required by §2.06(a), which, as noted above, prohibits "any 'cross-trades' between the Crusader Funds and any other account managed or advised by HCMLP."

2.      The proof at the hearing showed that, with no disclosure to the Committee, Highland sold CLOs to brokers it used for other securities transactions who, within a very short time of purchasing the CLOs, sold some or all of the CLOs to Highland affiliates.[14] The Committee urges that such sales were breaches of fiduciary duty as well as breaches of the Plan.

---

[13] Insurance premiums were paid on behalf of four entities (American Home Patient, Inc., Cornerstone Healthcare, Nex-Tech Aerospace, and Trussway Holdings) in 2011 and 2012; no payment to any of the entities was the same as to any other entity. RC355, Schedule 6.1. As to the portfolio company advisory fees, various fees were paid over varying years between 2011 and 2016 by six different portfolio entities to Barrier or NexBank as advisors; with the exception of two years for one of the entities, each payment of an advisory fee was of a different amount.

[14] As set forth in the Expert Report of Basil Imburgia, RC408, Highland engaged in the following transactions:
- It sold 32,500 shares of Grayson CLO at a settlement amounts of $560 and $570 per share, of which $25,500 were sold to NexPoint, with a reported value of $570 per share, Table 19;
- It sold 32,250 shares of Eastland CLO at settlement amounts of $611.40 and $613.90, of which 25,250 were sold to NexPoint, with a reported value of $730 and $670, Table 20;

34

3.      Highland contends that the sales in question were not cross trades but were rather "market-bearing transactions" between Highland and an independent financial institution, which then sold to a Highland affiliate. But this contention is belied by the fact that the transactions bore all of the hallmarks of pre-arranged trades, designed to avoid obtaining the consent of the Committee. See JX-30 at 3 ("Trading assets between two affiliated accounts through a broker may be considered a Cross Trade…"). Indeed, Mr. Dondero, the Chief Executive Officer, is heard on a tape made by then-Chief Portfolio Manager Joshua Terry, suggesting "run[ning a CLO trade] through some broker," RC-263A. By using a middleman between itself and its affiliate, Highland sought to avoid the description of a "cross trade," but the reality is that the transactions were effectively cross trades and we will treat them as such.

4.      That said, however, the substance of the transaction, arguably, benefitted the Committee, because assets of the Fund were liquidated, which was a principal goal of the Plan and Scheme.  Yet the problem with these transactions is that Highland had a perfectly clear path to effectuate these trades without any question being raised as to their bona fides – it could have sought the consent of the Committee under §2.06, which consent could not be unreasonably withheld under §2.07, HC-300. We find that Highland's failure to do so constitutes a breach of the Plan.

5.      We are left with the question of whether Highland's roundabout trading method caused any damage to the Fund.  It appears Highland sold the CLOs to a broker for one value and then the broker turned around and sold the CLOs to the Highland affiliate for a higher value. Thus, the Fund received less than it was entitled to receive had the transaction been done without the middleman, and the damage to the Fund is the difference in the two values. While the Committee's expert Basil Imburgia did not use that methodology to calculate the damages associated with these trades, the information on the price paid to the funds and the price paid to the broker is set forth in the expert report of Highland's expert, Mr. Snow, HC-526 at 41.  The Committee contends that the difference is approximately $450,000. The Committee is entitled to judgment for the amount of the difference with interest from the date of the sale from the funds, Since none of the experts did the appropriate calculation, as with other items, we leave it for the parties to confer and agree upon the total amount of damages including 9% interest and we will leave the record open to resolve that amount.

---

- It sold 31,000 shares of Greenbriar at settlement amounts of $713.60 and $665.00, of which all of the shares were sold to NexPoint at reported values of $730.00 and $670.00, Table 21; and
- It sold 31,500 shares of Stratford at settlement amounts of $661.70 and $660.00, of which 25,500 were sold to NexPoint at reported values of $724.49 and $665.00, Schedule 22.

35

L.      Failure to Settle Credit Suisse Trades/Litigation

1.      The Committee contends that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, both by failing to settle two trades Highland made on behalf of the Fund in September 2008 with Credit Suisse (relating to the purchase from Credit Suisse of syndicated loans in the amount of $23.5/9 for properties known as Goldfield and Westgate) and by failing to settle the litigation initiated by Credit Suisse in July 2013 regarding the same trades. The Committee asserts that, despite clear legal authority requiring that Highland settle the trades and the subsequent litigation, Highland refused to do so because it sought to use its refusal to settle the trades and litigation as leverage against Credit Suisse with respect to other claims not involving the Fund that Highland had against Credit Suisse. Thus, the Committee contends Highland put its own interests ahead of the interests of the Fund. Consequently, the Committee further alleges, that by its delaying the settlement of the trades and then of the litigation, Highland caused the Fund to incur seven-plus years of statutory interest that could have been avoided but which the Fund had to pay in January 2016 when the trades and the litigation were ultimately settled.

2.      Highland poses multiple defenses to the Committee contentions. First, Highland argues that the Committee's claim first accrued in 2008 when it allegedly failed to settle the trades and therefore was released by Section 7.01 of the Plan,[15] releasing Highland from all claims, known or unknown, "from the beginning of the world to the Effective Date" of the Plan in August 2011. Second, Highland contends that even if this claim was resurrected after the effective date of the Plan and Scheme, said claim would have arisen in 2011 and was thus barred by the three years statute of limitations for breach of fiduciary duty claims. Third, Highland argues that it did not breach its fiduciary duty as it was only exercising its legitimate business judgment in not settling the trades or the litigation and that the Committee has otherwise failed to show that Highland committed willful misconduct in this regard. Finally, Highland asserts that if the Tribunal finds that it breached its fiduciary duty, any damages that might be owing should be at a reduced amount from what the Committee claims.

---

[15] Section 7.01 provides, as follows: "Section7.01. Upon the Effective Date, each of the Consenting Redeemers, for themselves and on behalf of any of their respective officers, directors, shareholders, partners, members, employees, affiliates, investors, agents and representatives and any other person or entity entitled to assert a Claim (defined below) by, through, under, or on behalf of any Consenting Redeemer, hereby releases each of the HCM-Related Parties and each of the other Consenting Redeemers, from any and all accounts, actions, agreements, causes of action, claims, contracts, covenants, controversies, damages, debts, demands, executions, expenses, judgments, liabilities, obligations, omissions, promises, representations, and fights to payment, and all other liabilities of every kind, nature and description whatsoever, liquidated and unliquidated, fixed and contingent, matured and unmatured, disputed and undisputed, legal and equitable, state and federal, secured and unsecured, accrued and unaccmed, known and unknown, choate and inchoate (each, a "Claim"), which each Consenting Redeemer has, may have or ever had against any or all of the HCM-Related Parties and the other Consenting Redeemers from the beginning of the world to the Effective Date related to each of the Crusader

36

Funds, including without limitation its administration and wind-down; provided, however, that such release shall not operate to release any claims arising from this Plan or based on larceny within the meaning of Section 155.05 of the New York Penal Code ("Larceny Claims"), provided that such exception shall not apply to Larceny Claims within the scope of knowledge of the releasing party as of the Effective Date. The benefit of the release in this Section 7.01, as it related to the HCM-Related Parties, is held in trust by the Crusader Funds for the HCM-Related Parties, and the Crusader Funds hereby assign the benefit of the release in this Section 7.01 in their favor."

3.      With respect to the issue of the release, the Tribunal concludes that Section 7.01 releases any claims that the Committee might have with respect to the failure by Highland to settle the Credit Suisse trades through the Effective Date of the Plan, but the Committee has not released any claims that arose after the Effective Date of the Plan. The Tribunal need not decide whether the continuous post-August 2011 failure to settle the trades automatically gives rise to new post-Effective Date claims; once Credit Suisse commenced litigation in July 2013 and the Committee renewed its demand that Highland settle the trades  and the litigation, and once Highland again failed to do so, a new claim arose, at least as of that point in time. This new claim would not be released under Section 7.01 since it arose after the Effective Date of the Plan. Accordingly, Tribunal views Highland's continuous failure to settle the trades and litigation after July 2013 (until January 2016, and subject to the temporary withdrawal by the Committee of its demand that Highland settle the trades and litigation in September of 2013, as discussed below) as the potentially actionable conduct that the Tribunal will analyze below.

4.      As to the statute of limitations issue, the Tribunal agrees with Highland that a three years statute of limitations applies to breach of fiduciary duty claims and therefore any conduct outside the three years limitations period is not actionable.  The Committee filed in this Arbitration its breach of fiduciary claim with respect to the unsettled Credit Suisse trades and litigation on July 5, 2016. Consequently, given the application of the statute of limitations, any claim for relief for any period prior to July 5, 2013 is barred by the statute of limitations and the Tribunal will not consider conduct prior to this date to be actionable nor will it consider any claim for damages for the period prior to July 5, 2013.

5.      The Tribunal finds that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, by failing to settle the two subject trades with Credit Suisse. The Tribunal finds that, whatever strategy Highland intended or whatever judgment calls it made, or purported to make, with respect to the settlement of these trades, it was under a clear legal obligation to settle the trades but failed to do so.

6.      Highland's then General Counsel admitted to at least a general awareness of the legal
obligation under the LSTA regime to settle trades promptly (and to litigate later if there is a
dispute regarding same). Tr. 10 288:2-12, 290:13-22, 291:15-20; and there is other evidence to
the same effect. See, e.g., JX-12 at RC00100770-771. Despite this clear legal obligation, and
despite Committee requests that it do so, Highland refused to settle the trades in order to
provide itself with leverage vis-a-vis Credit Suisse on another dispute. Even if, as argued by
Highland, its prevailing on this other dispute would advantage the Fund, once the
Committee demanded that Highland settle the trades, as it first did during the limitations
period on August 7, 2013, Highland should have done so given both the acknowledged
weakness in its defenses and that its purported goal in not doing so at least primarily
advantaged itself and not the Fund (even if the Fund might have gained some marginal
potential advantage if Highland prevailed in the other dispute). In light of the preceding,
Highland's refusal to settle the trades constitutes willful misconduct, thereby breaching its
fiduciary duty to the Fund and its investors.

7.      The Tribunal finds that the actionable willful misconduct by Highland for which
damages will be due occurred during the period September 8, 2014 through January 14, 2016.
The reason for the end date is clear and undisputed: on that date, Highland caused the Fund
to pay for the trades and the interest due. As for the start date, the earliest possible start date,
in light of the above analysis, is August 7, 2013 which is when the Committee first demanded
during the limitations period that the trades be settled. But, in September 2013, counsel for
the parties interacted and the Committee withdrew its demand that Highland settle the
trades. HC-476a. The Committee argues that it was not apprised by Highland of relevant
information at the time, and therefore the Fund should not be bound by its agent's
withdrawal of the demand, but the Tribunal concludes that, notwithstanding Highland's
failure to provide this information, the Committee's counsel independently analyzed the
relevant issues and the Committee is responsible for the decisions flowing from that analysis.
On or around September 8, 2014, after the trial court entered summary judgment in favor of
Credit Suisse in the litigation, the Committee reinstated its demand that Highland settle the
trades; since Highland did not do so until January 14, 2016, it is, under our analysis above,
responsible for damages accruing during the period from September 8, 2014 through January
14, 2016.

8.      The Tribunal adopts the damages theory advanced by the Committee: the pre-judgment interest that the Fund had to pay during September 8, 2014 through January 14, 2016, minus the gain it achieved during the same period by virtue of having the use of the subject $23.5 million. However, neither party presented a damages analysis consistent with the preceding parameter. Accordingly, the Tribunal directs that the Parties jointly confer to calculate an amount of damages that takes into account the following parameters: (i) the damages period is between September 8, 2014 and January 14 , 2016; (ii) the 9% statutory interest (ordered by the New York State Supreme Court in September 2014) is to be applied on a simple basis to the total principal amount due ($23.5 million); (iii) the amount of the "off-set" is to be calculated using the factor utilized by Claimant's expert – the Treasury Yield Rates for the damages periods specified in (i); and (iv) 9% statutory, pre-judgment interest is to be applied on a simple basis to the result of the calculations in (i) – (iii) from January 14, 2016 to the date of this Partial Final Award.

M.      The Delay in Settling the UBS Litigation

1.      As noted above, Highland, Crusader and Credit Strategies were parties to an action commenced by UBS which alleged that certain securities had been fraudulently transferred by Highland to the funds. As a result, the funds were enjoined from transferring the subject assets during the course of the litigation.

2.      In May 2015, UBS, Highland, Crusader and Credit Strategies reached an agreement in principle to settle the litigation. Under the terms of that agreement Crusader was to pay UBS $25 million and Highland was to pay $35.75 million. A separate agreement between the Committee and Highland provided that, no sooner than December 30, 2016, Highland could recapture $33.75 million through incentive fees that could be generated through the liquidation of Crusader assets. RC-227.

3.      The settlement agreement was to be finalized on May 30, 2015, but Highland refused to go through with the settlement because Credit Strategies would not release claims against Highland. Tr. 3 21:10-22:3; Tr. 3 24:16-25:6; Tr. 10 316:20-317:23. Ultimately the Committee negotiated a its own settlement, pursuant to which Crusader paid UBS $25 million on July 1, 2015, and an additional amount of $30 million on December 29, 2015.

4.      The Committee argues that, had Highland not blown up the original settlement, it would not have had to pay the $30 million to UBS on December 29, 2015, and it would have retained those funds at least until December 30, 2016, when that amount might have been transferred to Highland if it had earned that amount in incentive fees. The Committee, therefore, seeks as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

40

5.      Highland denies that it has any liability and asserts that is protected by the business judgment rule. It also argues that 9% interest is not appropriate. Further, Highland urges that the Committee's expert did not otherwise account for the fact that Highland might have earned $33.75 million in incentive compensation and, therefore, there was a net benefit to the fund.

6.      There is no basis for Highland's claim that its conduct is protected by the business judgment rule. In deciding whether or not to settle the UBS litigation, Highland was acting as a fiduciary with respect to Crusader and had a fiduciary duty not to place its own interests above that of Crusader. As the New York Court of Appeals stated in Birnbaum v. Birnbaum, 73 N.Y. 461, 466 (1989):"It is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect . . . . This is a sensitive and ' inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a  fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (Citations omitted.)"

7.      Thus, Highland was not free to place its own interests above that of Crusader and had an obligation to settle UBS's claims against Crusader regardless of its concerns about possible claims against it by Credit Strategies.

8.      There can be no question that Highland's action in refusing to settle with UBS resulted in Crusader being deprived the use of $30 million in cash between July 1, 2015 and December 30, 2016, the first day on which Highland would have been entitled to receive any of the incentive fees. Here, as with the Deferred Fees, it is appropriate to award interest on that amount at the rate of 9% to compensate Crusader for that loss.

41

9.      The problem with Highland's claim that it might have earned an incentive fees of $33.75 million is that Highland offered no evidence that would suggest that its incentives fees would ever have reached even the $30 million amount that the Committee is willing to concede might have been reached. Since the original settlement agreement was negotiated at a time when there was no plan in place to terminate Highland as the fund manager, the incentive fee structure was based on events that would ultimately occur in periods after the Committee terminated Highland. Since neither party made any effort at the hearing to calculate incentive fees, it seems apparent that such a calculation was not possible. In these circumstances, the Committee's assumption that Highland would have earned $30 million in incentive fees by December 29, 2016 is generous and there is no basis for a finding that Highland would have earned more than that in incentive fees.

10.      We award Claimant as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

N.      Cornerstone

1.      Highland Cornerstone Healthcare Group ("Cornerstone") is a company that owns Long Term Acute Care (LTAC) hospitals in which the Fund owns a minority equity interest. At the time of the adoption of the Plan and Scheme, Highland owned or controlled 100% of the shares of Cornerstone. Two groups of funds, Crusader Funds and Highland Credit Strategies Fund ("Credit Strat"), owned more than 50% of the shares of Cornerstone. Between 2011 and 2013, Highland was secretly engaged in the process of valuing and, eventually, selling the interest held by Credit Strat in Cornerstone. In September 2013, after a process in which the Credit Strat Redeemer Committee was kept completely in the dark as to the sales process that was underway, and which was later found to be unfair to the investors in Credit Strat, see RC-306, Highland arranged for the purchase of Credit Strat's interest by Cornerstone itself at the price of $2,956.03 per share, see JX-16. This price was below the most recent mark set by Highland, and below the value of between $3,424 and $4,434 per share that Highland's investment bankers, Houlihan Lokey, found to be fair for the purchase of the minority interest, see HC-431.

2.      Following the purchase of the Credit Strat interest, the Crusader Funds owned 41.8%
of Cornerstone, see RC-138 at 7. The Crusader Funds learned of the sale and made known
their interest to Highland in having their interest in Cornerstone sold.  But when Highland
offered to buy their interest for the same price of $2,956.03 per share as the Credit Strat
interest, the Committee engaged Ernst & Young ("E&Y") as its advisor to analyze the offer
and prepare a response. E&Y prepared two analyses of the value of the Cornerstone asset.
The first, HC-577, found that, as of the fall of 2013, "Cornerstone's offer to purchase
Crusader's share for $43.8 mm is below Crusader's current carrying value and at the low end
of the range of values developed in this Report" and that "based on information provided and
reviewed to date it would appear that the lower end of the range is more reasonable to
expect that (sic) the higher end of the range," Id. at 5.

3.      The Committee then requested that E&Y prepare a supplemental report, and, in
January 2014, E&Y rendered a second report, finding that Cornerstone underperformed
expectations for 2013 and that the changes occurring in the healthcare field were creating
uncertainty in the industry in which Cornerstone operated.  HC-577 at 19. E&Y reduced its
range to $44 million to $63 million, by imposing a discount from its prior range as of year-
end 2013 by 10% to 25%. In discussions with counsel to the Committee, E&Y suggested
countering with a purchase price in the range of $50 million to $54 million "for negotiation
purposes." Id.

4.      Thereafter, on March 28, 2014, after the Committee had considered its options, it
made a counter-offer within the range suggested by E&Y at $52,342,188, or $3,529 per share,
plus a 50% recapture provision in the event of a sale within three years. JX-18.  The counter-
offer was at the 2013 year-end market value, as calculated by Highland. Id. Highland never
responded to this counter-offer despite repeated overtures to Highland by the Committee,
and despite the desire of the Claimant Redeemer Committee and the mandate of the Scheme
and Plan to liquidate all of the assets of the Crusader Fund, the interest in Cornerstone held
by the Crusader Funds has not been sold.

5.      Claimant contends that the failure of Highland, during the period it was the
investment manager of the Funds, to make any good faith effort to sell the Funds' shares in
Cornerstone, constituted a breach of fiduciary duty.

6.      As part of its claim of breach of fiduciary duty, the Committee urges that Highland is
collaterally estopped from denying the findings of the arbitration tribunal in the arbitration
brought by the Redeemer Committee of Credit Strat arbitration tribunal regarding, inter alia,
the Cornerstone transaction. RC-306 (4/6/16 Credit Strategies Fund Final Award).

43

7.      In particular, as it bears on this dispute, the Committee contends that Highland is estopped from denying the following findings: (1) Highland controlled Cornerstone; (2) the per share price at which Highland sold Credit Strat's interest was unfair; and (3) a price of $3,929 per share was a fair price, based upon the Houlihan Lokey valuation.

8.      Highland contends that the Credit Strat Tribunal's findings do not bind Highland in this proceeding, because the two arbitration proceedings deal with "fundamentally different" issues, such that collateral estoppel does not apply.

9.      First, Highland urges that the Credit Strat Tribunal was dealing with the ramifications of a consummated sale, where it found that Highland controlled both Cornerstone's offer and Credit Strat's acceptance. HC-220 at 8, 30, whereas in this proceeding, the evidence is that Cornerstone made an offer to the Committee, but Highland had no role in the Crusader Fund's evaluation of or counter to that offer and no sale occurred.

10.     Secondly, Highland points out that in Credit Strat, the retention of Houlihan Lokey and the entire process that Houlihan Lokey engaged in was a secret that the Credit Strat Committee was unaware of, whereas, in this proceeding, the Houlihan report as well as other financial information was made available to the Crusader Committee, HC-577 at 577.0002, Tr. Day 5 at 114:12-117:18 (Zambie).

11.     The doctrine of collateral estoppel requires that an issue being litigated in the second case be the same as was fully litigated by the same party in the first action. Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002) ("[C]ollateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate.") (internal quotations and citations omitted).

12.     Although there are differences in the way in which the sale process took place, we do not find that such differences obscure the fact that some issues are substantially identical in both proceedings.

44

13.     The principal finding that we think is binding on Highland in this proceeding is that the price of $3,929 per share, based upon Houlihan Lokey's valuation, was a fair price. Claimant also argues that Respondent is bound by the finding that the offering price Highland made for the Credit Strat position, which was the same price as offered to the Redeemers Committee here, was unfair. But we think that finding would fly in the face of Claimant's own adviser, E&Y, who found that such a price was at the low end of a fair range. Accordingly, we do not think it appropriate to adopt such a finding as binding in this proceeding.

14.     Highland also contends that, with respect to the possible sale of the Cornerstone interest, it was not in a fiduciary relationship with the Committee, which was relying on EY for negotiating assistance, not on Highland, as Highland was sitting opposite to the Committee in the negotiation.  Tr. Day 5 at 116:10-117:18 (Zambie).

15.     While the Committee was not relying on Highland for financial advice or guidance with respect to Cornerstone in the period between the Fall of 2013, when an offer of $2,956.03 per share was made, and the early Spring of 2014, when the counter-proposal were made, the Committee did rely on Highland, in its role as investment manager, both before and after those dates, to liquidate the Fund as rapidly as possible.

16.     But by Highland's choosing to have the Crusader Funds, along with several other entities controlled by Highland, invest in Cornerstone, Highland voluntarily placed itself in a conflict position: it owed fiduciary obligations to the Crusader Funds to maximize the liquidation process, while being the control person of Cornerstone whose own interests were to have any purchase price be as low as possible. As investment manager, Highland was obligated to be fully responsible to the Committee, but could not do so as long as it also continued to play an active role as controlling party of Cornerstone with respect to the Committee's desire to sell.

17.     The hearing record is that, other than making the offer in September 2013, Highland took no steps to market or sell the Fund's interest in Cornerstone. Tr. 1 347:16-349:2; 364:12-22.  At meetings held with representatives of the Committee, the Committee asked about plans to sell assets and Highland never discussed, or appeared to have a plan by which it proposed to sell the Cornerstone asset. Tr. 1 349:4-22; 365:13-17; Tr. 4 55:14-20; RC-317 at 2("Mr. Jameson noted that for the remainder of the portfolio, formal strategies for disposition are not in place.").  When Committee representatives met periodically with Jim Dondero, the CEO, he made it clear that he ran the sales operation completely and did not wish to be questioned or have the portfolio managers questioned as to the timing of any particular sale.

45

18.     We find that Highland had a fiduciary duty not to place its own interests above that of Crusader, Birnbaum v. Birnbaum, 73 N.Y. at 466 (1989), but rather to subordinate its own economic interests behind its fiduciary obligation to the Crusader Funds. Guth v. Loft, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."); Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del.1983) ("There is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."); see also Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618 (Del. 2013).  Highland's failure to subordinate its own interests to those of the Committee led directly to its failure to engage in a fair negotiating process with the Committee. By failing to do so, Highland breached its fiduciary duty to the Fund.  Caruso v. Metex Corp., 1992 WL 237299, at *16 (E.D.N.Y. July 30, 1992), People ex rel. Spitzer v. Grasso, 50 A.D.3d 535, 546 (1st Dep't 2008). That breach of fiduciary duty was a continuing offense through the period of time that Highland was the investment manager of the Crusader Fund, as Highland never itself took, or authorized Cornerstone to take, any action in response to the counter-offer that was made in February 2014.

19.     Highland argues that the Committee must overcome the business judgment rule that "the defendant [fiduciaries] have acted on an informed basis and in the honest belief they acted in the best interest of the [client]," citing CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd., No. 03 CIV. 7936 (DAB), 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007), in turn citing Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984)("While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,' unless the plaintiff shows that the presumption does not apply.").

20.     But here, we find that Highland's decisions regarding the purchase of the Cornerstone shares from the Crusader Funds — from the offer to purchase, the ignoring of the counteroffer, and the failure to engage in or authorize a negotiation process — were made with the willful intent to benefit itself and not the Crusader Funds investors. See JX-19; Tr. 1 379:17-380:8.  The Business Judgment Rule does not protect Highland or its officers from scrutiny for alleged breaches of fiduciary duty under these circumstances.

46

21.    The question then is what is the appropriate price at which the sale should take place. "[I]n determining whether a fiduciary has acted prudently, a court may examine a fiduciary's conduct throughout the entire period during which the investment at issue was held. The court may then determine, within that period, the 'reasonable time' within which divesture of the imprudently held investment should have occurred. What constitutes a reasonable time will vary from case to case and is not fixed or arbitrary. The test remains 'the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs' (id., at 511 [citations omitted])." Matter of Estate of Janes, 90 N.Y.2d 4, 54 (1997); Public Service Co. of Colorado v. Chase Manhattan Bank, N.A., 577 F.Supp. 92, 107 (S.D.N.Y.1983) (Lumbard, CJ, sitting by designation)("where there is no sale, it is impossible to fix exactly the moment by which the loan should have been sold or the amount that could have been obtained; "[p]robably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time," (quoting Scott on Trusts)).

22.    To satisfy its obligation under the Plan to liquidate the Fund's assets as rapidly and as fairly as possible, Highland did not have "to cause Cornerstone to purchase the Fund's Cornerstone shares for a specific price and at the specific time demanded by the Committee…," Highland Post-Hearing Brief at 11, but it did have a duty to place the Funds' interest above its own and to obtain the best price possible for the Funds' Cornerstone interest. Thus, when it decided it wished to make an offer to purchase the Funds' Cornerstone shares, it was obligated to do so at the fair market value and not to attempt to take advantage of the fact that it had placed the funds in a position where it was the only available buyer.

23.    Highland argues that it makes no sense to assess damages based upon a hypothetical sale of the Cornerstone asset, because, first, since the shares have never been sold, there is no realized loss; and, second, "other than Cornerstone's $43.8 million offer, there is no evidence of any other willing buyer for Cornerstone's assets at any price."

24.    We reject the first argument because it ignores what we have found to be the breach of fiduciary duty —the obligation to pursue and consummate a sale at a fair and reasonable price. The Fund was damaged by reason of Highland's failure to fulfill that obligation.

47

25.     As to the second argument, Highland defeats its own argument by pointing out that, in the real world, there is only Cornerstone available as a buyer.  But, because of Highland's own financial objectives, there has been no indication since April 2014 when it failed to authorize a counteroffer that Highland was interested in directing Cornerstone, which it controlled, to make an offer to purchase the shares at anything other than a bargain basement and unfair price.

26.     Using our equitable powers, we believe that a fair price can be derived by using the fair market value of the shares of $3,929 per share, based upon Houlihan's valuation prepared on July 15, 2013, adjusted downward by 10-25% by the year-end discount caused by several factors cited by E&Y. The average of that discount results in a fair market valuation of $3,241.43, which amount is what we find should have been offered to pay for the Cornerstone shares.

27.     We order that Highland pay to the Committee $3,241.43 per share, or $48,070,407, and order that the Committee simultaneously cause the Crusader Fund to surrender its interest in Cornerstone to Highland.

28.     With respect to an award of pre-judgment interest, "[a]lthough an action for breach of fiduciary duty is generally considered of an equitable nature, '[e]ven on [such] a claim with equitable underpinnings ... prejudgment interest [is] mandatory where the only relief sought was compensatory damages.' Lewis v. S.L. & E., Inc. 831 F.2d 37, 39 (2d Cir.1987) (citing Spector v. Mermelstein, 485 F.2d 474, 481 (2d Cir.1973))(emphasis added).

29.     Regarding the rate of pre-judgment interest to be applied, Claimant argues for the application of New York's statutory rate of interest of 9% as most appropriate. Under CPLR §5001(a), "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." See  212 Inv. Corp. v. Kaplan, 16 Misc. 3d 1125(A), at *9 (Sup. Ct. N.Y. Cnty. 2007); Panix Prods., Ltd v. Lewis, id; Summa Corp. v. Trans World Airlines, 540 A.2d 403, 409 (Del. 1988).

30.     Under CPLR §5004, New York applies pre-judgment interest at 9%, simple annual interest. Under the circumstances here, where the breach of fiduciary duty deprived the investors of the Crusader Funds of a significant distribution and partial return of their equity, we exercise our "broad discretion, subject to principles of fairness, in fixing the rate to be applied," Summa Corp. v. Trans World Airlines, Inc., id., and we award interest at the statutory rate of 9%, simple annual interest, pursuant to New York law, from April 15, 2014, through the date of this Partial Final Award. We pick this date as it is the date by which we believe Highland and/or Cornerstone (as controlled by Highland) should have responded to the Committee offer.

IV.    The Return of the Deferred Fees

48

A.      Under §§2.02 and 6.02 of the Plan, if Highland distributed $1.7 billion within 43 months of the Plan's Effective Date, Highland could obtain $10 million in Deferred Fees that had been placed in the special account at the outset to incentivize Highland's rapid liquidation.  There is no question that Highland did not meet that goal by the 43rd month and, thus, in Count Three of its Amended Demand, the Committee seeks the immediate return to the Fund of those proceeds by a declaration that the Fund should distribute the right to receive payment in respect of the funds in the Deferred Fee Account to the Consenting Compulsory Redeemers.

B.      Highland objects on the ground that the UBS TRO eliminated the 47-month schedule applicable to the Deferred Fee Account, invoking the Impossibility Doctrine, discussed in detail above, and argues that, upon the eventual complete liquidation of the Fund, it will be entitled to the $10 million in the Deferred Fee Account.

C.      For reasons set forth earlier, we reject the argument that, under the Impossibility Doctrine, Highland was relieved of the requirement that it achieve complete liquidation of the Fund within 43 months, and, thus, is entitled to the $10 million in Deferred Fees upon complete liquidation. Highland had the opportunity to achieve the complete liquidation despite the duration of the UBS TRO, but chose, for its own reasons, not to do so. The Impossibility Doctrine does not provide a basis for granting Highland affirmative relief.

D.      We order the return to the Crusader Fund the $10 million in the Deferred Fee Account.

V.    Counterclaims

A.      Respondent has brought two principal counterclaims: first, it seeks to recover the remainder of Deferred Fees to which it says it is entitled now because Claimant should have completed the complete liquidation of the Fund's assets by December 31, 2017, at the latest; and, second, it seeks damages against the Committee for breach of the Plan and of its fiduciary duties to Highland by failing to oversee A&M's liquidation of Fund assets and for approving, without adequate, if any, scrutiny, A&M's fees, said to be exorbitant.

B.      As to the breach of fiduciary duty claim, the fiduciary duty relation is said to arise from Highland's status as an investor in the Crusader Funds.  Highland's Post-Hearing Brief at 3-5. However, we have previously stricken those portions of Highland's Amended Counterclaim that alleged it was suing as an investor. Panel Order, April 1, 2018, at 4. Furthermore, even assuming that, as an investor, Highland had standing to bring a claim for breach of fiduciary duty, as stated below, we find that no breach of duty has been proved with respect to any of the allegations in Respondent's Amended Counterclaim.

49

C.      Specifically, we have examined the record thoroughly and, aside from the testimony of
Highland's expert, James Finkel, and its former portfolio manager, Mr. Jameson, there is insufficient
evidence of a purposeful and wrongful delay in liquidation or a failure by the Committee to oversee
and scrutinize A&M's performance, nor any activity of A&M that the Committee aided and abetted
that was proved wrongful.

D.      Mr. Finkel had a distinguished thirty-plus year career in capital markets, investment
banking, and investment advisory work, including as a liquidator of the assets of alternative
investment funds. But his opinion that Highland or any reasonable manager or liquidator would
have completed liquidation by the end of 2017, at the latest, was not based on anything more than
his unverified judgment, and not on a close examination of the facts in this record. For example, he
conceded that, in reaching his opinions, he didn't consider the amount of information A&M
provided to investors, didn't review A&M's time records or evaluate the quality of the work
performed by A&M, and didn't consider the consequences of the lack of cooperation of Highland
with A&M, among other critical deficiencies. Tr.10 367:10-372:3. Similarly, his opinion that,
because of what he regarded as a flawed compensation structure, A&M's primary focus was on the
time it spent on projects, rather than on results achieved, was based on one assumption that time-
based work is, inevitably, less likely to be focused, an assumption that we reject as a sound basis of
criticism of A&M's contribution. We find that Mr. Finkel's opinions were not soundly based and
we reject them.

E.      Mr. Jameson worked for Highland for almost seven years as co-head of Private Equity, responsible for sourcing and executing private equity investments and monetizing existing portfolio companies. He testified that he was aware of the UBS TRO and had been advised that he could not sell assets during its pendency. He was aware that Cornerstone did not comply with requests by A&M for information but did not think he had the power to direct Cornerstone to do so Tr 10 28:18-30:3. He also testified that, had Highland remained as its investment manager, it would have sold the Cornerstone asset by December 31, 2017, and that Highland Capital's purchase of Cornerstone from the Crusader Fund at a negotiated price around the mark set by Highland would have been logical. Tr. 10 30:4-35:23. He also testified, in response to questioning by the Tribunal, that little, if anything, would have changed in Highland's ability to negotiate a sale with the Committee when it was replaced by A&M as its investment manager, Tr. 10 119:8-121:23.  On balance, despite Mr. Jameson's on-the-ground role as portfolio manager, his testimony did not support the allegations of Highland in its counterclaims; if anything, his intimate understanding of the Cornerstone asset and how Highland controlled the process by which Cornerstone was or wasn't being marketed supported the Committee's contentions that Highland could have negotiated a fair disposition of the Cornerstone asset had it chosen to do so.

F.      As to an alleged delay in the liquidation of the Fund's assets, the weight of the credible evidence is that Highland, not A&M, was responsible for any delay in liquidating the balance of the assets in the Crusader Fund after Highland was discharged and A&M was retained.

    1.      We note that we have previously found that Highland, after refusing to respond to numerous requests by the Committee for books and records, should make a thorough search of its books and records and produce all non-privileged documents in its possession, custody, or control on certain relevant topics. Thus, we rejected several arguments put up by Highland to prevent the Committee and A&M from gaining access to critical books and records. Order and Partial Award, April 21, 2017.

2.      But, even when ordered to do so, Highland again refused to produce documents on at least two other occasions, requiring additional motions addressed to this Tribunal, Order, June 20, 2017; Order, October 21, 2017.

3.      In addition, there was unrebutted testimony that Highland produced "hundreds of thousands" of documents in single-page PDF format, requiring the better part of three or more months of A&M's time to correlate and organize. Tr. 6 25:4-19.

4.      By contrast, other than Mr. Finkel's testimony, there was little or no evidence of A&M's procrastinating or proceeding with deliberate slowness or that the Committee failed in its oversight of A&M.

5.      We have considered all of the other factual and legal arguments made by Highland in support of its counterclaims and conclude that Highland is not entitled to recover the remaining Deferred Fees being held in the Fund's cash account and that the Committee did not breach Sections 2.02 of the Plan and 1.5.2 of the Scheme, the covenant of good faith and fair dealing, or its fiduciary duties to Highland and other investors. We dismiss Highland's counterclaims in their entirety.

VI.    Attorneys' Fees and Other Costs

A.      Both parties have requested attorneys' fees relating to all claims asserted in the Amended Demand, Highland's Answer, Highland's Amended Counterclaims, and Claimant's Answer to the Counterclaims. Am. Dem. at 53-54; Highland Answer, October 16, 2016, at 21-22; Highland Am. Counterclaim, April 15, 2018; Committee Answer to Counterclaims. Under AAA Commercial Arbitration Rules, Rule 47(d)(ii), those mutual demands for attorneys' fees submitted the issue to arbitration and gave this Panel the authority to award attorneys' fees, in its discretion. AAA Rule 47(d)(ii). "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." R.F. Lafferty & Co., Inc. v. Winter, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted).

B.      The Committee urges that an award of attorneys' fees to it is justified by Highland's having "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," InterChem 59 Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005) (citation omitted), and that the record shows numerous examples of Highland acting in bad faith.

C.      Highland acknowledges the Tribunal's discretion to order an award of attorneys' fees but opposes an imposition of attorneys' fees here. First, Highland argues that denying the Committee's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." HC-300 at 86. But this section of the Plan does not deal with the issue of fee-shifting being ordered by an arbitral tribunal. Nor, given Rule 47(d)(ii), would an order of this Tribunal shifting the responsibility of fees from one party to another be contrary to the so-called American rule, as both parties have sought this relief which is authorized under the prevailing rules of this Tribunal.

D.      Second, Highland urges that the only basis upon which the Committee is seeking an award is that Highland allegedly engaged in bad faith and vexatious conduct, citing only InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005).  Highland points out that the Court in InterChem Asia justified an arbitrator's imposition of an award of attorneys' fees because of one party's "bad faith" conduct during the arbitration, principally concerning discovery issues. Here, the Committee cites seven examples of alleged bad faith, but only one dealt with such conduct during the arbitration, "failing to provide the Committee with the books and records of the Fund, resulting in an extensive discovery process, producing records as single-paged TIFs, and resulting in a Panel ruling against them," citing the Tribunal's Panel Opinion and Final Partial Award, dated April 17, 2017.

E.      We are exercising our discretion to grant Claimant's request for attorneys' fees and costs and to deny Respondent's request for the same relief. We do not base our award on any concern of bad faith or oppressive conduct by Highland's able trial counsel, who acted professionally throughout these proceedings. However, with respect to each of the claims on which we have determined that the Committee is entitled to prevail, we have noted above the many occasions where, during the time it was investment manager and thereafter, Highland engaged in conduct that breached the Plan, breached fiduciary duties, involved secrecy, misrepresentations, and false statements by the most senior executives, and constituted willful misconduct. Furthermore, large portions of the defense set forth by Highland's witnesses were unworthy of belief and reflect the fact that Highland knew that it had no legitimate defense to many of the Committee's claims.  Accordingly, in our discretion, based on the foregoing, we award Claimant its legal fees and costs for the litigation of this arbitration.

VII.   CONCLUSION AND AWARD

A.      With respect to the claims below for which we find liability and direct the payment of damages and interest, if the Parties are not able to agree on the amount of damages or interest, we direct them to submit simultaneous briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award; there will be no reply briefs unless otherwise directed.

B.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of contract claims as follows:

53

1.      The taking of the Deferred Fees: We order that, within twenty (20) days of the date of this Partial Final Award, Respondent, Highland Capital Management, pay to the Claimant the Deferred Fees in the amount of $33,313,000, with statutory interest of 9%, calculated on a simple basis, from the dates of taking in January and April 2016 through the date of this Partial Final Award.

2.      The payment of Distribution Fees: As found above, with respect to each of the following categories, we find that the Respondent is liable for damages in the amount set forth in the Expert Report of Claimant's damages expert, Basil Imburgia, $14,452,275, plus 9% interest, calculated on a simple basis, from the respective dates such Fees were taken:

a)      The Distribution Fees attributable to the payment of Deferred Fees;

b)      The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

c)      The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims;

d)      The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames;

e)      The Distribution Fees attributable to the amount of margin borrowings; and

f)      The Distribution Fees attributable to the cumulative nature of the calculation, as discussed above.

C.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach
of fiduciary duty claims as follows:

      1.      Engaging in related party transactions without Redeemer Committee approval:

      2.      Purchase of Plan claims without Redeemer Committee approval: Within twenty (20)
days of the date of this Partial Final Award, we order Respondent, Highland Capital
Management, to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay
to the Committee whatever financial benefits Highland received from the 28 transactions,
less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of
each purchase, calculated on a simple basis;

      3.      Sale of CLO interests - The Committee is entitled to judgment for the amount of the
difference between the sale and repurchase prices with interest from the date of the sale
from the funds. We direct the Parties promptly to confer and agree upon the total amount of
damages including 9% interest, calculated on a simple basis; if the Parties are not able to
agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the
issues within thirty (30) days of the date of this Partial Final Award;

      4.      Failure to settle Credit Suisse claims: We find for Claimant, Redeemers Committee of
the Highland Crusader Fund, on this claim and direct the Parties promptly to confer to
calculate an amount of damages that takes into account the parameters set forth in the body
of this Award; if the Parties are not able to agree on the amount of damages, we direct the
Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this
Partial Final Award;

      5.      The UBS litigation: We find in favor of Claimant, Redeemers Committee of the
Highland Crusader Fund, and award damages in the amount of 9% simple interest on $30
million from December 29, 2015 to December 30, 2016, which shall be paid to the Redeemer
Committee by Highland Capital Management within twenty (20) days of the date of this
Partial Final Award; and

      6.      The Cornerstone Asset: We find in favor of Claimant and direct Highland Capital
Management, within twenty (20) days of the date of this Partial Final Award, to pay the
Redeemer Committee the amount of $48,070,407, plus interest at 9%, on simple basis, in
return for which the Fund will transfer title to the shares to Highland.

D.      We grant Claimant's request for a declaratory judgment, seeking the immediate distribution
of the Deferred Fee Account, and order the payment of the $10 million in the Account to the
Committee for disbursal to the Consenting Compulsory Redeemers within twenty (20) days of the
date of this Partial Final Award.

E.      We find against Respondent on its counterclaim and dismiss the counterclaim with prejudice.

F.      We grant Claimant's request for reasonable attorneys' fees and costs and deny Respondent's request for an award of attorneys' fees and costs. With respect to the amount of fees and expenses that Claimant seeks, the parties should promptly confer to determine whether they can agree on an amount. If the parties can not agree, Claimant shall file an affidavit or petition setting out its claim with appropriate documentation within fifteen (15) days of the date of this Award, unless counsel agree otherwise. Respondent shall respond within fifteen (15) days thereafter, unless counsel agree otherwise. There will be no reply opportunity absent leave of the Tribunal.

G.      We will leave the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair


_____
John S. Martin, Jr.


_____
Michael D. Young

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____

David M. Brodsky, Chair

_____

John S. Martin, Jr.

_____

Michael D. Young

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

_____3/6/19_____                   _____
Date                                 David M. Brodsky, Chairperson

State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )

On this __6__ day of MARCH, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

MEENA M. GULATI
Notary Public, State of New York
No. 01GU5015872
Qualified in New York County
Commission Expires August 2, 2021

55

State of FLORIDA                    )

                                    )   SS:

County of LEE                       )


I, JOHN S. MARTIN, JR.,, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.


_____          _____
Date  March 5, 2019                                John S. Martin, Jr.



State of Florida                    )

                                    )   SS:

County of Lee                       )


On this 5th day of MARCH, 2019, before me personally came and appeared John S. Martin, Jr.,, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


_____
Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

1

State of NEW YORK                    )

                                    )    SS:

County of NEW YORK                   )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

3-5-19                               *Michael Young*

Date                                 Michael D. Young

State of NEW YORK                    )

                                    )    SS:

County of NEW YORK                   )

On this 5 day of MARCH, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

*Vickie L. Johnston*

Notary Public

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

1

# EXHIBIT 14

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

                Claimant,

v.                                     Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                Respondent.

---

## FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

A. On March 6, 2019, we issued a Partial Final Award, finding Respondent Highland Capital Management, L.P. ("Respondent") liable in a number of respects and awarding damages, interest, attorneys' fees, and costs to Claimant Redeemer Committee of the Highland Crusader Fund ("Claimant"), as described, in relevant part, below. We "le[ft] the hearing open until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

B. In response to an email from Claimant, dated March 7, 2019, seeking clarification on an apparent omission from the Partial Final Award, we issued a Disposition of Application for Modification of Award dated March 14, 2019 ("Modification of Award").[1]

C. This Final Award incorporates the Partial Final Award and the Modification of Award (together, the "Partial Award"). We re-adopt all prior findings and conclusions of the Partial Award, except as specifically modified hereinafter.

D. We have before us the following:

---

[1] The Modification of Award referred to Rule R-46 of the AAA Commercial Arbitration Rules, instead of Rule R-50, as the basis for the modification of a clerical error, relying upon the predecessor version of Rule R-50. The substantive text of old Rule R-46 and present Rule R-50 are the same.

a.  Respondent's Memorandum, dated March 17, 2019, requesting that (1) the Panel
    withdraw its Modification of Award entered on March 16, 2019; (2) cease any
    further attempts to award additional damages, attorneys' fees, or costs that are not
    expressly set forth in the Partial Award; and (3) reconfirm that the hearing and all
    evidence is closed and the Panel is not empowered to take any further action
    beyond the issuance of its Partial Award ("Respondent's March 17
    Memorandum").

b.  Claimant's Submission Regarding Fees and Costs, dated March 21, 2019, made
    pursuant to Rules R-28, R-47, R-53, R-54, and R-55, AAA Commercial
    Arbitration Rules, seeking an award of $11,865,181.28 in attorneys' fees and
    costs, including Claimant's attorneys' fees, AAA administrative fees, arbitration
    expenses, fees incurred by A&M, expert fees, and Panel compensation paid by the
    Respondent Highland on behalf of the Committee in this arbitration ("Claimant's
    Fee Submission").

c.  Claimant's Application, dated March 25, 2019, made pursuant to Rule 50, AAA
    Commercial Arbitration Rules, to modify the Partial Award, issued by this Panel
    on March 6, 2019 (Claimant's March 25 Application").

d.  Claimant's and Respondent's Joint Submission on Damages dated April 5, 2019,
    in which the Parties agreed on the mathematical calculation of the amount of
    damages and interest contained in the Partial Award and Modification of Award,
    subject to Highland's objections to the inclusion of any damages awards that
    were not specified in the Partial Award and subject to objections on two specific
    issues: (1) whether the Eames residual LP interests would be extinguished; and
    (2) whether prejudgment interest awarded by the Panel will continue to run after
    March 6, 2019 until the earlier of the date the amount awarded is paid to the
    Committee for the benefit of the Fund, or the date on which a Final Judgment is
    issued on the Award ("Joint Submission").

e.  Respondent's Memorandum dated April 5, 2019 opposing the motion to modify
    the Partial Award; and opposing any award for damages, attorneys' fees, or costs
    ("Respondent's April 5 Memorandum").

f.  Claimant's Memorandum dated April 5, 2019 arguing that (1) the Panel should
    award further damages in connection with the Barclays claim measured by the
    Fund's loss of the residual value of the Eames LP interests, either by
    extinguishing the former Barclays LP interests, or alternatively, by awarding an
    appropriate amount of damages to compensate the Fund for loss of the value of
    those interests, which the Committee puts at $11,589,474; and (2) the Panel
    should award prejudgment interest through the date the Award is paid or final
    judgment is entered ("Claimant's April 5 Memorandum").

g.  On April 10, 2019, Respondent sought leave, which we granted on consent, to file
    an additional Memorandum on two issues raised by Claimant in its April 5

Memorandum, namely, that Claimant adds a new and improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019; and that Claimant has provided a new and improper damages calculation relating to the extinguishment of the Eames LP interests.

h.   Having reopened the record on March 6, 2019, for additional submissions, as described above, we deem the record closed as of April 10, 2019.

E.  Issues

a.  Fees and costs

1.  In the Partial Award, we evaluated the competing claims made by Claimant and Respondent regarding an award of fees, which both sides had sought in their pleadings. As we noted in the Partial Award, ¶VI.A, 52, AAA Commercial Arbitration Rule R-47 (d)(ii) authorizes the Arbitrator to award attorneys' fees if, as here, "all parties have requested such an award . . . " "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." *R.F. Lafferty & Co., Inc. v. Winter*, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted); *In re U.S. Offshore, Inc. and Seabulk Offshore Ltd.*, 753 F. Supp. 86, 92 (S.D.N.Y. 1990) ("If both parties sought attorney's fees, . . . then both parties agreed *pro tanto* to submit that issue to arbitration, and the arbitrators had jurisdiction to consider that issue and to award them.")."

2.  During closing oral arguments, Respondent did not mention its own request for an award of fees, but "*acknowledge[d] the Tribunal's discretion* to order an award of attorneys' fees…" Indeed, Respondent made oral and written closing arguments that conceded that it was "*not disputing the discretion that the Panel has* [to award fees]." Tr. 13 444:2-3 (emphasis added). In its closing slides, Respondent also urged that "The Panel *should exercise its discretion in applying the American Rule*." Respondent Closing Slides at 261 (emphasis added).

3.  Respondent also argued that denying the Claimant's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." Second, Respondent urged that the only basis upon which Claimant is seeking an award is that Respondent allegedly engaged in bad faith and vexatious conduct.

4. Respondent now chooses to oppose the grant of fees on grounds distinctly different from those set forth above. It belatedly argues an alleged lack of proof and the Panel's being *functus officio* to award fees.

    1. Respondent argues that the Panel "found that the evidence in the record was insufficient to determine many of the Committee's claims for damages, as well as its claims for costs and fees." Resp. April 5 Mem. 14.

    2. But that is incorrect; we did not find any insufficiency; instead, with no objection, we adopted a well-recognized method of dealing with attorneys' fees and costs by deciding entitlement before amount. See *Franco v. Dweck*, 87 N.Y.S.3d 5 (2018) ("Contrary to respondents' contention, the final award did not run afoul of the doctrine of *functus officio*, which precludes an arbitrator from altering in substance a prior award (see *Matter of Wolff & Munier [Diesel Constr. Co.]*, 41 A.D.2d 618, 340 N.Y.S.2d 455 [1st Dept. 1973] ). As the partial final award *expressly reserved* the issue of attorneys' fees, it cannot bar a *subsequent* award of those fees (see *Shimon v. Silberman*, 26 Misc.3d 910, 914–915, 891 N.Y.S.2d 891 [Sup. Ct., Kings County 2009] )."

5. Accordingly, we reject Respondent's new positions. From at least the time the pre-hearing briefs, witness lists, and list of exhibits were mutually filed, it was clear that whichever side that was going to seek attorneys' fees if it prevailed was reserving on the specific rates and amounts of legal fees, as well as costs and expenses, many of which had not yet been incurred. To do otherwise would be a waste of resources. Not once did Respondent ever raise the question of proof regarding attorneys' fees and costs; by its silence and conduct, Respondent consented to the process regarding proof of attorneys' fees that the Panel was following, see CCA Guide to Best Practices in Commercial Arbitration (3d edition), 246.

6. Second, we explicitly denominated the award of March 6 as a "Partial Final Award," making clear to the Parties that the arbitral proceeding was still ongoing. We also explicitly left the hearing open so that the Parties could meet and confer or make submissions, including providing additional evidence, "until *all issues* set forth ... have been agreed upon by the Parties or decided by the Tribunal." Under these circumstances, the doctrine of *functus officio* does not apply. *Kennecott Utah Copper Corp. V. Becker*, 186 F.3d 1261, 1270-71 & n.4 (10th Cir. 1999) (*Functus*

*officio* provides that, "once an arbitrator has issued a *final* award and thus discharged his or her office, that arbitrator lacks any continuing power to revise the award or issue a new one.")(emphasis added).

i. Accordingly, we turn to an examination of the application for attorneys' fees and costs, sought by Claimant:

    a. Claimant seeks the following in fees and costs:

        i. Jenner & Block Fees - $9,278,248.99

            1. In support of its fee application, Claimant has provided detailed time records, billing records, and a declaration of Andrew Vail, a partner of Jenner & Block, that establishes that records were maintained on a contemporaneous basis, that time billed on duplicative, inefficient, or extraneous to the arbitral proceeding was excluded from the application, and that hourly rates, and a fixed-fee discount, where applicable, were discounted by 15%. Vail Declaration ¶¶13-18. The hourly rates are shown to be comparable to rates charged by other similar firms and consistent with prevailing market rates for attorneys of similar high levels of expertise and experience. We note that Respondent does not object to the amount sought, except on the bases previously discussed. We find the request for legal fees to be reasonable, especially given the complex factual and legal setting, and grant Claimant's application.

        ii. FTI Expert Fees - $1,274,853.26; and A&M Arbitration Fees - $655,160.00

            1. In support of the FTI fees, Claimant submitted a declaration, with supporting exhibits, of Mr. Vail, who affirmed that the fees reflected "services that were necessary for the Committee to prosecute its claims against [Respondent] and to defend against [Respondent's] counterclaims, and … the amounts charged for such services were reasonable given the necessity of those services." Vail Declaration ¶26.

2. In support of the A&M Arbitration Fees, Claimant has provided the declaration of Steven Varner, a Managing Director of A&M, who affirms that A&M maintained billing records on a contemporaneous basis for its services throughout the course of this arbitration, but did not keep detailed descriptions of its billed time for specific matters within that engagement. He further affirmed that he and another managing director compiled a "conservative estimate of the time that A&M personnel spent on matters that were specifically required in connection with HCMLP's failure to timely provide A&M with books and records relating to the Fund." That work totaled approximately $655,160.00, after discounts were applied to their normal billing rates. Varner Declaration ¶¶6, 7, and 10.

3. Claimant is not seeking recovery for over $140,000 in attorneys' fees and costs for A&M's counsel to pursue information from Cornerstone pursuant to Del. Code Ann. tit. 8 § 220. Varner Declaration ¶8.

4. Respondent principally opposes the fees of FTI and A&M on the grounds that "while the AAA Rules permit the award of certain expenses (e.g. administrative costs and Panel compensation), they are much more restrictive when it comes to witness costs for the parties. In fact, Rule 54 expressly divides expenses into two categories: (i) witness expenses—which are to be borne by the party presenting the witness; and (ii) '[a]ll other expenses'—which may be apportioned by the arbitrator(s)."

5. While acknowledging some dispute among the courts as to whether Rule R-54 permits a prevailing party to recover its expert witness fees, Claimant urges that the weight of authority provides that both consulting and testifying witness fees are recoverable under the AAA's rules, citing *Dealer Comp*.

6

*Servs., Inc. v. Hammonasset Ford Lincoln-Mercury, Inc.*, 2008 WL 5378065, at *2, *4 (S.D. Tex. Dec. 22, 2008) (confirming final arbitration award that included expert witness fees); *In re Pos'tive Produc, Inc. v Thermal C/M Services, Inc.*, 2011 WL 13220365, at *4 (N.Y. Sup. Ct. Nov. 18, 2011) (confirming award that included "expert fees and costs"); and *Cardno Int'l Pty, Ltd. v. Merino*, 2017 WL 6034172 (S.D. Fla. Oct. 30, 2017).

6. Rule 47(a) gives the Tribunal the power to "grant any remedy or relief that the arbitrator deems *just and equitable* and within the scope of the agreement of the parties…", while Rule 47(c) provides that "In the final award, the arbitrator *shall* assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator *may apportion* such fees, expenses, and compensation among the parties in such amounts *as the arbitrator determines is appropriate*." (Emphasis added.) Parsing these sections in conjunction with R-54 leads us to conclude that we have the power to award the expenses of the arbitration, including expert fees, as we deem just, equitable, and appropriate. *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, No. 3:07-CV-752-J-25JRK, 2010 WL 11507082, at *4 (M.D. Fla. Sept. 13, 2010) (confirming award where tribunal awarded prevailing party its expert fees), *aff'd*, 660 F.3d 1277 (11th Cir. 2011).

7. Under the complex circumstances presented here, we find that the experts were essential to the prosecution of the Claimant's case and that their services, and consequent fees, were a necessary obligation the Claimant was bound to its members to undertake in its pursuit of the claims against Respondent.

7

8. We note, specifically with respect to the A&M fees, that a large portion of the fees appear to relate to "time spent organizing the tens of thousands of individual page PDF files that HCMLP provided as books and records instead of complete documents." Varner Declaration ¶7.

9. From our observations at the hearing and our review of the reported rates and fees of FTI and A&M, we conclude that such fees were fair and reasonable and we find that it would be "just and equitable" and "appropriate" relief to award Claimant all of the expert fees it seeks, and we do so.

iii. Respondent does not object to the following categories of fees sought by Claimant:

1. AAA Administrative Costs - $64,750.00;
2. Court Reporter Hr'g Costs - $114,697.77;
3. Court Reporter Dep. Costs - $28,890.04; and
4. AAA Panel Compensation - $448,581.22 (to date).

b. Accordingly, in our discretion, we award Claimant the total sought in fees, costs, and expenses, as detailed and updated in section F. below.

b. Claimant's Motion for Modification of the Partial Final Award

i. On March 25, 2019, Claimant moved, pursuant to AAA Rule 50, to modify the Partial Final Award in several respects.

1. First, with respect to the Partial Final Award regarding the finding of liability of Respondent with respect to the Barclays LP interests, Claimant moved to correct a clerical error that resulted in the omission of a Barclays damages paragraph from the Partial Final Award by modifying that Award to include the paragraph set forth in the Panel's March 14, 2019 Modification of Award.

2. Second, also pursuant to Rule 50, Claimant moved that the Panel modify the award to address other clerical, typographical, and computational errors in the Partial Final Award.

3. AAA Rule 50 provides in relevant part, as follows: "R-50. Modification of Award. Within 20 calendar days after the

transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto."

4. With respect to the Barclays issues, Respondent contends both that Rule 50 does not apply and that the doctrine of *functus officio* divests the Panel of the power to modify the Partial Final Award, as the Panel would be adding an "additional award" that "represents an entirely new award of $34 million in damages not included in the [Partial Final Award] ... constitut[ing] a material revision of the award."(Respondent's April 5 Memorandum at 5).

5. First, we are not adding an "additional award," as it is clear from the structure of the Partial Final Award that a paragraph was missing from the damages portion; all other findings of liability were accompanied by a section delineating the applicable damages except for the finding of a breach of the Plan and Scheme by reason of the transfer of LP interests to Eames. In other words, we found liability in two respects but omitted a paragraph regarding the remedy for Respondent's breach of the Plan and Scheme that we had found with respect to the transfer, without the required Committee approval, of Barclays' fund interests to itself through entities it controlled as part of the settlement. That omission is a classic example of a clerical error.

6. Second, although the effect of the Modification was to add additional damages to the award against the Respondent, the Panel did not "materially revise" the Partial Final Award since liability had already been found.

7. In addition, as previously discussed, the doctrine of *functus officio* "provides that, *while an arbitrator may correct clerical, typographical, or computational errors in a final award, he has no power to revisit the merits of the award after it has issued...*" *Int'l Broth. Of Elec. Workers, Local Union 824 v. Verizon Florida, LLC*, 803 F.3d 1241, 1250 (11th Cir. 2015). However, we did not issue a final award; it was explicitly labeled a Partial Final Award and was explicitly subject to being supplemented by subsequent presentations of damages analyses by both Parties.

9

8. Finally, there is ample case law for the proposition that the Panel is not divested of power, even when issuing a final award, from correcting clerical, typographical, or computational errors. See *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472-73 (5th Cir. 2012); *E. Seaboard Const. Co., Inc. v. Gray Const., Inc.*, 553 F.3d 1, 5-6 (1st Cir. 2008).

9. Respondent also argues that the Panel is barred from correcting the Partial Final Award by AAA Rule 45, which provides that "The award shall be made ... no later than 30 calendar days from the date of closing the hearing..." Respondent urges that "the parties agreed that the final award would be made on or before March 7, 2019. Accordingly, any award made after that date is untimely and beyond the scope of the Panel's authority." (Resp. April 5 Mem. at 7). But, once again, this argument ignores the explicit nature of the March 6 Partial Final Award, which "le[ft] the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal."

10. Respondent also argues that we are "reopening" the record in violation of AAA Rule 40. That rule provides, in relevant part, as follows: "The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award..."

11. We acknowledge that a communication from the AAA, dated December 12, 2018, stated that the "no additional evidence is to be submitted and that the hearings are declared closed as of December 12, 2018," but this statement was subsequently withdrawn by the previously-quoted language of the Partial Final Award where we explicitly left the record open "until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

12. That language is equivalent to the language that "we will reopen the hearing." *Int'l Bhd. of Teamsters Local 959 v. Horizon Lines of Alaska, LLC*, 22 F. Supp. 3d 1005, 1007–08 (D. Alaska 2014) ("Where an arbitrator specifically retains jurisdiction to resolve disputes regarding damages, that indicates that the arbitrator did not intend the award to be Final. Put simply, an arbitration award that postpones the determination of a remedy should not constitute

10

a final and binding award"); *Golden v. Lim*, 2016 WL 520302, at *3, *9 (E.D. Mich. Feb. 10, 2016)(holding that the arbitrator had the authority under the AAA Rules to reopen the hearing to accept further submissions on attorneys' fees).

13. Second, even if the relief sought required a reopening of the record, Rule 40 authorizes the Panel to do so "upon the application of a party," so long as doing so did not violate "the specific time agreed to by the parties in the arbitration agreement" for the making of the award. No such time period is set forth in the arbitration agreement. Finally, we interpret Rule 40 to be speaking to the instance of reopening the hearing after the final award is made, which is, again, not the situation we are in.

ii. We grant Claimant's application under AAA Rule 50[2] and formally correct the clerical error by re-adopting the additional paragraph, previously included in the Panel's March 16 Modification of Award, as follows:

1. "Insert the following paragraph at page 54, immediately after VII.B.2.f: "3. The transfer of Barclays Fund interests: By transferring, without the required Committee approval, Barclays' fund interests to itself through entities it controlled as part of the settlement, Highland breached the Plan and Scheme. We award the Committee damages measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value. In Table 11, Version 2, Claimant's damages expert, Basil Imburgia, calculated that such an amount totaled $34,661,749. RC-522. As with other amounts awarded, the Parties are to confer to determine the actual amount of damages including the 9% interest to date."

iii. Claimant also moves under Rule 50 to correct four other clerical errors, set forth below, as to which Respondent does not object. The motion is granted; the clerical errors are set forth below and corrected as noted:

1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

---

[2] We acknowledge Respondent's interesting linguistic analysis of the differences between ICDR Article 33 and AAA Rule 50, see Respondent April 5 Memorandum at 5-6, but we deny the underlying premise that what we are being asked to do is to make an "additional award as to claims, counterclaims, or setoffs presented but omitted from the award." We had found liability as to two claims involving the Barclays LP interests but omitted the damages component of one of the two liability findings. That does not constitute an award as to a claim argued by Claimant but omitted from the partial final award.

2. The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

3. The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

4. The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

iv. Eames

1. In the March 6 Partial Final Award, as modified herein, we found Respondent liable for having transferred the Barclays LP interests to an entity which it wholly controlled, Eames [LLC].[3] We awarded damages "measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value." We estimated — but did not find — that amount by referring to a damages calculation by Claimant's damages expert, Basil Imburgia, who "calculated that such an amount totaled $34,661,749. RC-522." "As with other amounts awarded," we directed "the Parties ... to confer to determine the actual amount of damages including the 9% interest to date."

2. The Parties have conferred and disagree as to the appropriate amount of damages for Respondent's breach of the Plan and Scheme. Claimant asserts that the appropriate amount of damages is $29,609,015, which is lower than the amount estimated by its expert and cited in the Partial Final Award, because "the value of the Barclays interests which [Respondent] now controls through Eames is expressly excluded, as it would be extinguished and that value would be spread amongst the remaining Fund investors." Claimant April 5 Memorandum, 5.

3. Thus, Claimant urges that "the Panel should either (1) award $29,609,015 and order the extinguishment of the Barclays LP interests owned and controlled by Highland, or (2) award $29,609,015 plus the current value of those LP interests, which its

---

[3] We found, and it is not disputed, that Highland controls Eames through an entity, Hockney, Ltd., that Highland wholly owns, and which, along with Eames, was created solely for the purpose of holding the Barclays LP interests for Highland's financial benefit. JX24; Tr. Day 8 83:21-86:13; Tr. Day 9 144:21-25, 220:18-25.)

12

damages expert estimates to be $11,589,474. Claimant April 5 Mem. at 10; Imburgia April 5 Declaration, ¶15.

4. Respondent urges that the "March 16 Modification contains specific language awarding the Committee a specific amount of monetary damages." However, as discussed above, that is not what the Panel did. We directed the Parties to confer on the exact amount to be awarded and to come to the Panel if they could not agree.

5. Respondent further argues that nowhere in the March 6 Partial Final Award or the March 16 Modification did the Panel award Claimant equitable relief concerning the Barclays Claim, and that had the Panel wanted to do so, it knew how to do so.

6. Respondent goes on to argue that Eames is not a party to this arbitration, and, therefore, the Panel lacks the authority to issue an award determining Eames' legal rights and obligations." Even if the Panel determines that the remaining equity interest should have been extinguished at the time of the 2012 settlement, "the fact remains that the equity interest was transferred to—and is still held by—Eames." Respondent April 5 Memorandum, 21-22.

7. Finally, in its April 10 submission, Respondent objects to the Claimant's calculation of interest on any award regarding Barclays or the other claims, to wit, Claimant's April 5 Request adds an improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019.

8. We disagree with Respondent's arguments except as relating to the compounding of interest sought by Claimant, which we discuss more fully below. First, when we found that "Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer," we sought a remedy to deprive Respondent of the benefits that it had received illegitimately, or, in other words, to void the Eames transaction and put the parties back into the position they should have been in. Respondent may not benefit in the future by its breach of the Plan and Scheme, and the illegitimate transaction it engaged in, by forfeiting some, but receiving future, benefits through its absolute control of the entity it created, Eames.

9.  Second, although Eames is not a party in this proceeding, that is
    irrelevant to the relief we grant. The operating party throughout all
    of the machinations that resulted in the transfer of Barclays' LP
    interests to an entity it created solely for the purpose of holding
    such interests was, and remains, Respondent. It is completely
    within its power to unwind the transfer and re-transfer those
    interests back to the Fund for the benefit of its investors, as we
    now order.

10. Regarding the appropriate amount upon which to award interest,
    for reasons set forth below, we reject Claimant's argument that
    $29,609,015 is the appropriate amount upon which to award
    interest, as to do so would be to violated well-settled law in New
    York regarding pre-judgment interest, CPLR §§5003-5004.

11. We award Claimant monetary damages against Respondent in the
    amount of $21,768,743, plus 9% simple prejudgment interest from
    the date of the breach until the earlier of either (1) the date the
    amount awarded is paid to Claimant for the benefit of the Fund, or
    (2) the date on which a court of competent jurisdiction enters a
    final judgment upon this Award.

12. We further order that Respondent take all necessary steps to cause
    the improperly taken Fund LP interests currently owned and
    controlled by Respondent through Eames, Ltd to be returned to
    Claimant within sixty (60) days from the date of transmittal of this
    Final Award to the Parties.

v.  Interest

1.  In the March 6 Partial Final Award, we awarded damages and
    interest through the date of that award, but then, as already referred
    to, directed the Parties to confer regarding all damages and interest
    issues.  Claimant now urges that we award 9% prejudgment
    interest on the damage amounts awarded until the earlier of: (1) the
    date on which the amounts due are paid to the Committee for the
    benefit of the Fund; or (2) the date on which a court of competent
    jurisdiction enters a final judgment on the Final Award.

2.  However, as Respondent points out, Claimant is, in effect, arguing
    for a compounding of interest upon interest.  We agree. The effect
    of Claimant's interest calculations would violate New York law, as
    an award of 9% interest post-March 6 on an amount that already
    includes 9% interest from the breach through March 6, would
    amount to compound interest after March 6, 2019. "[T]he statutory

14

scheme [in New York] for awarding …, where applicable, prejudgment interest, does not provide for compound interest." *520 East 81st Street Associates* v. *State of New York*, 19 AD3d 24 (2005).

3. Respondent also contends that the March 6 Partial Final Award contained specific language awarding interest "through the date of this Partial Final Award"— i.e., March 6, 2019, and that awarding interest through any other date would constitute an untimely modification of the Partial Final Award.

4. We disagree with Respondent that changing the termination date of prejudgment interest would constitute an untimely modification. Although the Partial Final Award did use the date of March 6 as a reference point for calculation of interest, that fact is not determinative of this issue. We also explicitly left open calculations of damages and interest until the Parties had fully conferred on the extremely complex financial calculations that had to be made. Among the calculations was a further calculation of interest. It is not an unlawful modification of the Partial Final Award to make, as we do here, a final award on all damages and interest issues based upon a final record.

5. Furthermore, failing to continue the running of interest through payment or entry of a final judgment could well, under the circumstances presented here, result in Fund investors with no compensation for their documented losses during that time, as well as provide an incentive to Respondent to prolong the confirmation process. We have already had occasion to comment on Respondent's tactics of putting forth witnesses who were "unworthy of belief" and an "[il]legitimate defense to many of the Committee's claims." Partial Award ¶VI(E). We will not adopt a result that would allow Respondent to impose more hardships on the Fund Investors.

6. We award Claimant 9% prejudgment simple interest on all sums awarded from the dates of each breach through the earlier of the date paid or the entry of a final judgment.

F.  FINAL AWARD

a. We reaffirm the findings of fact, conclusions of law, and findings of liability as set forth in the March 6 Partial Award, and make the following awards with respect to such findings and conclusions:

15

i.  Claimant's Application to modify the Partial Final Award is granted pursuant to the Disposition of Application for Modification dated March 14, 2019.

ii. Claimant's Motion to Correct Errors is granted, on consent; the clerical errors are set forth below and corrected as noted:

   1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

   2. The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

   3. The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

   4. The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

   5. In all other respects, the Partial Final Award dated March 6, 2019 and the Disposition of Application for Modification dated March 14, 2019 are reaffirmed and incorporated by reference.

iii. For the Deferred Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the Deferred Fees in the amount of $32,313,000 as directed in the Partial Final Award, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

iv. For the Distribution Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $14,457,275, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

v.  For the Taking of Plan Claims, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21,

2019, the amount of $3,106,414. The Panel further orders that LP interests identified in RC411 be transferred to Claimant for the benefit of the Crusader Fund or that Claimant cause the Fund to extinguish those claims. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to $3,106,414 beginning on March 7, 2019 and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vi.  For the CLO Trades Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $449,375.00. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple, from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vii.  For the Credit Suisse Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,735,411. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple on that sum, from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

viii.  For the UBS Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,041,664. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of breach until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

ix.  For the Cornerstone Claim, the Panel awards the following relief: the Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $48,070,407 for the sale of the Crusader Fund's shares in Cornerstone. The Panel also awards pre-prejudgment interest at the New York statutory rate of 9% simple on that sum from the date of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award. When the amount awarded for the Cornerstone claim is paid by Respondent, Claimant shall cause the Crusader Fund to tender its Cornerstone shares to Respondent.

> x.  For the Barclays Claim, the Panel awards the following relief:
>
>> 1.  The Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $21,768,743. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.
>>
>> 2.  Further to the Barclays Claim, the Panel orders that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant for the benefit of the Crusader Fund within sixty (60) days from the date of transmittal of this Final Award to the Parties, or, alternatively, that Claimant cause the Fund to extinguish those interests.
>
> xi.  For Claimant's Application for Legal Fees, Costs, and Expenses, we award Claimant $11,351,850.06 in fees, costs, and expenses as per the following:
>
>> 1.  Jenner & Block Fees - $9,278,248.99;
>> 2.  FTI Expert Fees - $1,274,853.26;
>> 3.  A&M Arbitration Fees - $655,160.00;
>> 4.  Court Reporter Hr'g Costs - $114,697.77;
>> 5.  Court Reporter Dep. Costs - $28,890.04
>
> xii.  The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$94,693.88 and the compensation and expenses of the Tribunal totaling US$887,427.89 shall be borne by Respondent. Therefore, Respondent shall reimburse Claimant the additional sum of US$514,163.97, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

G.  We have carefully considered, although not discussed in their entirety herein, all arguments made by Claimant and Respondent. Any other claims or requests for relief, made by either Party, are denied.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

19

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

State of New York            )
                             )   SS:
County of New York           )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____5/9/19_____                    _____
Date                                    David M. Brodsky, Chairperson


State of New York            )
                             )   SS:
County of New York           )

On this __9__ day of May, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ISAIAS MATEO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6274151
Qualified in New York County
My Commission Expires 12-31-2020

20

State of Florida          )
                          )    SS:
County of Lee             )

I, John S. Martin, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our _____ Final Award.

_Date April 29,2019

_____

John S. Martin, Jr., Arbitrator

State of Florida          )
                          )    SS:
County of Lee             )

On this 29th day of April, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

21

State of New York          )
                           )    SS:
County of New York         )


I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our          Final Award.


_____4/29/19_____                          _Michael Young_
Date                                       Michael D. Young, Arbitrator



State of New York          )
                           )    SS:
County of New York         )


On this 29 day of April, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


_Vickie L. Johnston_
Notary Public

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

22

# EXHIBIT 15

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                    :
                                      :
              Plaintiff,              :
                                      :
       v                              :   C. A. No.
                                      :   2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,    :
HIGHLAND EMPLOYEE RETENTION ASSETS    :
LLC, HIGHLAND ERA MANAGEMENT LLC, and :
JAMES DONDERO,                        :
                                      :
              Defendants,             :
                                      :
       and                            :
                                      :
HIGHLAND EMPLOYEE RETENTION ASSETS    :
LLC,                                  :
                                      :
              Nominal Defendant.      :

                    - - -

              Chancery Courtroom No. 12D
              Leonard L. Williams Justice Center
              500 North King Street
              Wilmington, Delaware
              Friday, May 17, 2019
              1:30 p.m.

                    - - -

BEFORE:  HON. MORGAN T. ZURN, Vice Chancellor

                    - - -

RULINGS OF THE COURT ON PLAINTIFF'S MOTION TO COMPEL
         AND MOTIONS FOR COMMISSIONS
ORAL ARGUMENT AND RULINGS OF THE COURT ON PLAINTIFF'S
MOTION FOR STATUS QUO ORDER AND DEFENDANTS' MOTION TO
DISMISS COUNT IX OF SECOND AMENDED VERIFIED COMPLAINT
------------------------------------------------------
           CHANCERY COURT REPORTERS
         Leonard L. Williams Justice Center
         500 North King Street - Suite 11400
           Wilmington, Delaware 19801
                (302) 255-0533

2

1   APPEARANCES:

2       THOMAS A. UEBLER, ESQ.
        JOSEPH L. CHRISTENSEN, ESQ.
3       McCollom D'Emilio Smith Uebler LLC
          for Plaintiff
4

5       JOHN L. REED, ESQ.
        DLA Piper LLP (US)
6            -and-
        MARC D. KATZ, ESQ.
7       of the Texas Bar
        DLA Piper LLP (US)
8         for Defendants

9

10                              - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 11-5 Filed 06/29/23 Page 677 of 1104   PageID 16811
Exhibit 15   Page 29 of 98

3

1                    THE COURT:  Good afternoon.  Please be

2    seated.

3                    First I wanted to acknowledge, we have

4    an honored guest with us today.  We have the Honorable

5    Essam Yahyaoui, who is a judge from Tunisia.  He

6    presides over the commercial chamber of Tunisia's

7    First Instance Court.  So he's here to observe with

8    his colleagues.

9                    Welcome, sir.

10                   All right.  I'm going to start with

11   the motion to compel, and then we'll move on to the

12   motion for commission.  And then there may be

13   questions, and maybe take a break and regroup and we

14   can move on with the other motions.

15                   I'm going to grant Daugherty's motion

16   to compel in part.  For simplicity, I'm going to refer

17   to Abrams & Bayliss as A&B.  And I see four categories

18   of documents at issue here.  The first is regarding

19   the initiation, negotiation, and establishment of A&B

20   as Highland's escrow agent.  The second is regarding

21   A&B's legal work during the pendency of the Texas

22   action to determine whether and how Daugherty might

23   access the escrowed assets.  The third is A&B's work

24   responding to the Texas subpoena.  And the fourth is

1   documents regarding A&B's resignation as Highland's

2   escrow agent.

3              I grant the motion to compel as to

4   Categories 1, 2, and 4 for one of two reasons.

5              The first reason is unfortunately my

6   *in camera* review confirmed Daugherty's fear that

7   Highland is improperly withholding documents in

8   Categories 1 and 4 illustrating A&B's service and

9   resignation as escrow agent, which are nonprivileged

10  materials.

11             In a hearing on September 18, 2018,

12  concerning an earlier subpoena, Vice Chancellor

13  Glasscock stated that "... information regarding the

14  actions of Abrams & Bayliss in connection with its

15  operation of the escrow as agents of Highland, HERA,

16  those documents, that information is relevant, and it

17  doesn't appear to me to be generally privileged."

18  That's a quote from the transcript.

19             Highland has been adamant that it was

20  only withholding documents that implicated its role as

21  legal counsel, and not in its role as escrow agent.

22  For example, on page 28 of the transcript from the

23  April 12th argument, Highland's counsel stated that,

24  "We do not assert any privilege based solely on Abrams

5

1  & Bayliss's roles as escrow agents.  It's purely

2  because they have the dual roles both as escrow agents

3  and also legal counsel, that when they were in the

4  capacity of legal counsel, those communications were

5  privileged."

6            At that argument, I requested the

7  documents and stated I would review them *in camera*.  I

8  expressed my frustration that I had already given

9  Highland multiple chances, and invited it to redo its

10 privilege log for a final time.

11           In reviewing the documents, I

12 concluded that more than 70 documents that were

13 withheld based on claims of privilege or work product

14 protection were improperly withheld.  Those documents

15 were Privilege Log No. 1 through 25, 27 through 29,

16 35, 36, 41, 54, 56, 62, 85 through 87, and 336 through

17 372.

18           This represents nearly 20 percent of

19 the 372 documents in the log.  But even that doesn't

20 tell the full story, because more than 200 of the

21 listed documents were simply attachments to e-mails

22 collecting documents in response to the Texas

23 subpoena.  Excluding those, more than 50 percent of

24 the documents listed were improperly withheld as

6

1   privileged.

2          Documents regarding A&B's nonlegal

3   work and resignation as escrow agent are not

4   privileged or work product because when A&B agreed to

5   be an escrow agent, it stepped into a nonlegal role

6   despite its status as a law firm.

7          The cases are clear on that point.

8   *Northeast Credit Union v. CUMIS*: "It is well

9   understood ... that the services of an escrow agent,

10  even when that escrow agent is an attorney, are not

11  legal services."  *CCS Associates v. Altman*: "[C]ourts

12  have specifically held that an attorney in the role of

13  escrow agent does not transform communications

14  pertaining to the administration of the escrow account

15  into privileged documents."  The first case is from

16  the District of New Hampshire, and the second one is

17  from the Eastern District of Pennsylvania.

18         These non-Delaware decisions more

19  specifically enunciate a principle common in our own

20  law.  Including an attorney, or having an attorney

21  perform nonlegal work, does not attach the privilege

22  to the communications or the work.  That is because

23  "... the attorney-client privilege protects legal

24  advice only, [and] not business or personal advice."

7

1   That's a quote from *MPEG v. Dell* from this court in

2   2013.

3                    And as Vice Chancellor Laster said in

4   the *Facebook Class C Reclassification* litigation,

5   "Making the lawyer the point person creates a pretext

6   for invoking the attorney-client privilege, but it is

7   only a pretext."  That's from his December 12th, 2016

8   order in Case No. 12286-VCL.

9                    Categories 1 and 4 reflect

10  communications between A&B and Highland concerning the

11  start of the escrow relationship, or A&B resigning as

12  escrow agent.  To be sure, there were legal

13  ramifications and issues regarding the work A&B was

14  doing in setting up and then ending the escrow

15  relationship.  But any legal component of A&B's

16  escrow-related work was secondary to the role as

17  escrow agent.  A&B was a contractual counterparty with

18  Highland under the escrow agreement, and each had

19  obligations under that agreement.

20                    A&B did perform legal work on the

21  escrow issue.  For example, A&B attorneys analyzed

22  what document 351 on the log calls the "HERA

23  Strategy."  But that legal advice was not for the

24  benefit of Highland, who was A&B's contractual

8

1    counterparty.  A&B could potentially claim that its

2    attorneys were providing legal services to A&B as

3    escrow agent.  But that is not what is before me; A&B

4    has claimed no privilege.  The only issue is whether

5    Highland can claim a privilege and withhold the

6    communications containing A&B's legal analysis

7    regarding its service as escrow agent.

8                    I think an example here might be

9    helpful.  If Highland had retained a bank or other

10   repository to act as escrow agent rather than a law

11   firm, the result would be more clear.  If the

12   employees of that non-law firm escrow agent

13   communicated internally about the relationship or the

14   contract, it would not be privileged.

15                   If those employees received legal

16   advice from attorneys about how to structure the

17   escrow, what the terms of the escrow agreement meant,

18   or how it could fulfill Highland's request to unwind

19   the escrow and transfer the assets back, Highland

20   could not claim that the in-house or outside counsel

21   retained by the escrow agent was providing legal

22   advice for Highland's benefit.  It would be much

23   clearer that the attorneys were providing legal advice

24   to, and for the benefit of, the escrow agent, not its

9

1   contractual counterparty, Highland.

2                   The facts here are more muddied

3   because there are only lawyers involved because

4   Highland selected a law firm, that otherwise

5   represented Highland, to act as escrow agent.  But the

6   result should be the same.  A&B's privilege over its

7   in-house advice regarding its conduct under the escrow

8   agreement does not belong to Highland just because A&B

9   is itself Highland's attorney.

10                  The next question is one of remedy for

11  improperly withholding so many of the documents as

12  privileged.  Waiver "... has been characterized as a

13  'harsh result' typically only justified 'in cases of

14  the most egregious conduct by the party claiming the

15  privilege.'"  That's from *TCV v. TradingScreen*.

16                  "If a party falls substantially short

17  of the well-established requirements, then waiver is

18  an appropriate consequence that helps dissuade parties

19  from engaging in dilatory tactics."  That's from

20  *Mechel Bluestone v. James C. Justice Companies.*

21                  Daugherty has been dogged in his

22  pursuit of these documents, and Highland was just as

23  resolute in refusing to produce them.  Vice Chancellor

24  Glasscock said last September these types of documents

10

1    are not privileged.  I gave Highland multiple

2    opportunities to address this.  Because Highland stuck

3    by its position and continued to assert such a large

4    percentage of improper privilege assertions while

5    claiming it was producing documents concerning A&B's

6    role as escrow agent, any privilege related to that

7    topic is waived, and a full waiver of Highland's

8    privilege could be an appropriate consequence.

9              But I am reluctant to go that far

10   because Categories 2 and 3 were properly withheld and

11   logged adequately.  Category 2 relates to a memorandum

12   A&B prepared analyzing avenues available for Daugherty

13   to pursue the escrowed assets.  This work started in

14   February 2014.  Category 3 relates to efforts to

15   collect documents in response to the subpoena for the

16   Texas case.  I conclude Highland's unjustified

17   withholding of other documents related to the escrow

18   was not so egregious as to waive any privilege over

19   these two sets of documents.

20             This brings me to the crime-fraud

21   exception.  If Categories 1 and 4 were privileged, I

22   would conclude that the crime-fraud exception applies

23   and so A&B should produce those documents regardless.

24   I reach the same conclusion for Category 2, the subset

11

1    of documents related to A&B's 2014 memorandum that

2    were privileged and properly logged.

3                    Rule of Evidence 502(d)(1) says that

4    "There is no privilege ... If the services of the

5    lawyer were sought or obtained to enable or aid anyone

6    to commit or plan to commit what the client knew or

7    reasonably should have known to be a crime or fraud."

8                    To fall within this exception, "... a

9    mere allegation of fraud is not sufficient; there must

10   be a prima facie showing that a reasonable basis

11   exists to believe a fraud has been perpetrated or

12   attempted."  That's from *Princeton Insurance Company*

13   *v. Vergano.*  That case also explains that "... when a

14   client seeks out an attorney for the purpose of

15   obtaining advice that will aid the client in carrying

16   out a crime or a fraudulent scheme, the client has

17   abused the attorney-client relationship and stripped

18   that relationship of its confidential status."

19                    The client must intend the

20   communications to be used as a bases for the fraud.

21   "The advice must advance, or the client must intend

22   the advice to advance the client's ... fraudulent

23   purpose."  That's from *Buttonwood Tree Partners v.*

24   *R.L. Polk.*

12

1              As Chief Justice Strine wrote while

2    Vice Chancellor in *Princeton Insurance v. Vergano*,

3    "The quintessential circumstance [when this exception

4    applies] is when the client obtains the advice of the

5    lawyer in order to help shape a future course of

6    criminal or fraudulent activity.  This is the classic

7    situation when the privilege gives way, as the

8    societal purpose of the confidential relationship has

9    been entirely subverted, with the client seeking the

10   expertise of someone learned in the law not so as to

11   comply with the law or mitigate legitimately the

12   consequences of his prior behavior, but to craft a

13   course of future unlawful behavior in the most

14   insidiously effective manner."

15             Here, there is a reasonable basis to

16   believe a fraud has been perpetrated.  Daugherty's

17   claim for fraudulent conveyance survived a motion to

18   dismiss, and I will refer the parties to Vice

19   Chancellor Glasscock's January 16, 2018 opinion on

20   that point.

21             The question is whether Highland

22   sought the services of attorneys to enable or aid it

23   in furtherance of that fraud.  I believe there is a

24   reasonable basis to believe that as well.  Highland's

13

1    attorney at Andrews Kurth contacted A&B almost

2    immediately after the Texas judgment became final and

3    nonappealable.  That's at Exhibit K.

4                    Highland claims A&B then provided it

5    legal advice interpreting the escrow agreement, and

6    A&B resigned as escrow agent intending to cause, and

7    in fact causing, the assets to return to

8    Highland/HERA.  That is the transfer that Daugherty

9    claims was fraudulent.

10                   This was not the first legal work A&B

11   performed in pursuit of keeping the escrowed assets

12   from Daugherty.  Starting in February 2014, it

13   analyzed Daugherty's ability to get at the assets

14   while the appeal was pending.  Because that appears to

15   be the beginning of the efforts that culminated in the

16   allegedly fraudulent acts, the crime-fraud exception

17   strips the privilege from these documents.

18                   Daugherty has made a *prima facie*

19   showing that a reasonable basis exists to believe that

20   a fraud has been perpetrated, and that Highland sought

21   A&B to serve as escrow agent and to provide legal

22   analysis in furtherance of that fraud; specifically,

23   to protect the escrowed assets from Daugherty while

24   the Texas case was pending, and then to transfer them

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 134    Filed 02/29/24    Page 688 of 1104    PageID 16822
Exhibit 15    Page 25 of 98

14

 1  back to Highland after the Texas verdict was

 2  finalized.  I conclude any privilege Highland claims

 3  over A&B's legal advice regarding the escrow

 4  arrangement and A&B's resignation has been stripped

 5  under the crime-fraud exception.

 6            I want to be clear on what I am not

 7  saying.  I am not saying that a fraud claim merely

 8  surviving a motion to dismiss permits the supposed

 9  victim to invade the defendant's privilege for any

10  legal advice the defendant received in regards to the

11  underlying transaction or act.  This is a unique case

12  in which it presently appears that the law firm that

13  provided the legal advice, one, was a contractual

14  counterparty to the defendant in the very contract

15  under which the fraudulent transfer was allegedly

16  made; two, provided legal advice interpreting that

17  agreement and charting the course for the transfer;

18  and, three, implemented its own advice to effectuate

19  the transfer.

20            On these allegations, which are

21  supported by the documents I have reviewed, it appears

22  the defendant sought the firm's legal advice to

23  further the alleged fraud based on the terms of the

24  contract to which the defendant and the firm were

15

1   parties.  Based on these uncommon facts, the

2   crime-fraud exception applies here.

3                    Accordingly, the privilege is either

4   nonexistent or waived as I just described for

5   Categories 1, 2, 4; in other words, all documents

6   regarding A&B's service as escrow agent.  The

7   crime-fraud exception also applies to documents in

8   these categories designated as work product, under

9   *Playtex v. Columbia* out of the Superior Court.

10                   I find that Category 3, regarding the

11  Texas subpoena, was properly logged as privileged, and

12  that the crime-fraud exception does not reach those

13  documents.  Daugherty has not alleged that the

14  subpoena response was in furtherance of the fraud.

15  Category 3 comprises the families associated with

16  lines 91 through 327, which are the parent e-mails

17  attaching documents collected in response to a

18  subpoena.

19                   Mr. Katz, is any of that unclear?

20                   MR. KATZ:  No, Your Honor.  It's

21  clear.

22                   THE COURT:  Mr. Uebler, any questions?

23                   MR. UEBLER:  No questions, Your Honor.

24  Thank you.

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 134   Filed 09/29/23   Page 690 of 1104   PageID 16824
Exhibit 15   Page 292 of 98

16

1              THE COURT:  Thank you.

2              We'll turn to the motion for

3    commissions.

4              Daugherty seeks commissions to take

5    the depositions of James C. Bookhout and Marc D. Katz,

6    both of DLA Piper.  I will refer to Mr. Bookhout and

7    Mr. Katz collectively as "the requested deponents."

8    Both requested deponents represented Highland in its

9    dispute with Daugherty in Texas, beginning in 2012,

10   and Mr. Katz and his colleagues at DLA represent

11   Highland in this action as well.  Daugherty seeks fact

12   testimony from the requested deponents on five topics,

13   all pertaining to the events surrounding the escrow as

14   alleged in Daugherty's operative complaint.

15             The discovery Daugherty seeks is

16   clearly within the bounds of Court of Chancery

17   Rule 26.  And, based on the privilege log Highland

18   produced for the escrow-related documents, the

19   requested deponents have personal knowledge of at

20   least some of the escrow events.

21             The parties disagree on the threshold

22   standard for evaluating whether counsel can be

23   deposed.  Highland contends this court has adopted the

24   *Shelton* test, while Daugherty points to a series of

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 134    Filed 02/26/24    Page 691 of 1104    PageID 16825

17

1   standards from *Rainbow Navigation, Sealy Mattress,*

2   *Kaplan & Wyatt*, and *Dart*.

3                   I note that in a transcript ruling

4   from 2018 in *LendUS, LLC v. Goede*, Vice Chancellor

5   Glasscock considered in the first instance whether it

6   was necessary to gather the evidence sought from

7   counsel, given the risk of disqualification.  I agree

8   this is a threshold consideration present in all the

9   cases the parties have cited.  And I conclude, like

10  Vice Chancellor Glasscock did in *LendUS*, that

11  Daugherty has not made a sufficient showing that he

12  needs to depose Mr. Bookhout and Mr. Katz at this

13  juncture.

14                  As I just explained in my ruling on

15  Daugherty's motion to compel, Daugherty will receive

16  A&B's documents regarding the escrow.  Daugherty can

17  also depose the escrow agents.  He can depose the

18  Highland principals who were involved.  And I do not

19  see that any of this has happened yet.  He should

20  pursue those avenues before pursuing one that

21  jeopardizes Highland's choice of counsel.  His motions

22  for commission for the proposed deponents are denied

23  without prejudice.

24                  I am mindful that trial is scheduled

18

1  for September, and that -- if Daugherty renews his

2  motions after taking the rest of the fact discovery --

3  the risk of disqualification carries more prejudice to

4  Highland the closer we get to trial.  I also note that

5  the discovery cutoff in this case is June 28, 2019.  I

6  am, therefore, interspersing an intermediate discovery

7  cutoff.

8              Escrow discovery, including

9  depositions of fact witnesses other than the requested

10 deponents, must be complete by June 14th, 2019, and

11 Daugherty must make any renewed motion for commission

12 by June 17, 2019, with briefing on that motion to be

13 expedited.

14             The burden this timeframe places on

15 both parties I think is appropriate in light of the

16 requested deponents' apparent knowledge of significant

17 aspects of Daugherty's allegations, and in light of

18 the desire to protect Highland's choice of counsel.

19 Any renewed motion by Daugherty must demonstrate what

20 gaps in the record he needs to fill, and why he

21 believes the requested deponents can fill those gaps.

22             Mr. Uebler, is any of that unclear?

23             MR. UEBLER:  Your Honor, nothing is

24 unclear about that ruling, but I do have a question

19

1   about the escrow agent depositions.  Can the parties

2   assume that the ruling that the Court has made with

3   respect to the documents will also apply to deposition

4   testimony? in other words, categories that may be

5   subject to privilege such as the subpoena response,

6   but all other escrow-related categories would

7   presumably be fair game and not subject to privilege

8   in a deposition?

9              THE COURT:  That's correct, at least

10  as to A&B.  I note that we haven't really tested the

11  boundaries of where my ruling might go with regard to

12  DLA.  And I think that's probably another conversation

13  we would need to have.

14             MR. UEBLER:  Understood.  Thank you.

15             THE COURT:  Thank you.

16             Mr. Katz, is any of that unclear?

17             MR. KATZ:  No, Your Honor.  That's

18  clear.

19             THE COURT:  I'll give you-all maybe

20  ten minutes to kind of regroup a little bit, and then

21  I'll hear the motion for status quo order first.

22             We're in recess.

23       (Recess taken from 1:53 p.m. until 2:00 p.m.)

24             THE COURT:  Mr. Uebler?

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-15   Filed 09/29/23   Page 694 of 1104   PageID 16828
Exhibit 15   Page 29 of 98

20

1              MR. UEBLER:  Your Honor, my colleague,

2    Mr. Christensen, is going to argue the status quo

3    motion.  But I'd just like to point out, we had an

4    issue with our File & Serve converting Word documents

5    to pdf, and it would drop the occasional citation in

6    footnotes.  I don't know if it's our system or theirs.

7    But, in any event, we've brought revised copies of our

8    papers with all the citations for the Court.

9              THE COURT:  Thank you.

10             MR. UEBLER:  You're welcome.

11             MR. CHRISTENSEN:  Good afternoon, Your

12   Honor.  Joseph Christensen from McCollom D'Emilio for

13   the plaintiff, Pat Daugherty.

14             I just want to start very briefly with

15   how we got here.  Your Honor is familiar with the

16   facts, so I won't go over that in too much detail.

17   But I do want to highlight some of the additional

18   points that we included in our briefing related to

19   what Highland was saying about these assets during the

20   Texas action.

21             So Thomas Surgent, during the Texas

22   action, he was the chief compliance officer of

23   Highland.  During the Texas action, he testified that

24   the assets listed in the escrow agreement were being

21

1   held for Pat's benefit for his interest in HERA.

2   These are all from Exhibit V.  That one is at page 15

3   of 53.

4                Jim Dondero, the head of Highland,

5   testified that Pat's share of all the assets,

6   including the cash, is in escrow.  He also testified

7   that Pat's *pro rata* share of all the assets, including

8   the cash, are all sitting in escrow.  There's been

9   nothing deducted or removed from Pat's account.  And

10  he also said that the escrow agreement was to protect

11  Pat Daugherty.

12               The point of all these statements was

13  to convince everybody who would listen that these

14  assets were being held for Pat Daugherty, and that if

15  he prevailed in the Texas action, he would obtain

16  those assets.  And we haven't done anything with them.

17  We haven't offset any legal expenses, which is also

18  noted in our reply brief.

19               Coupled with the statements that Pat

20  continued to hold the HERA units, this was a clear

21  expression that Highland was trying to convince people

22  that they intended to hold onto these assets but give

23  them to Pat if he prevailed in the Texas action.

24               In HERA's closing argument its counsel

22

1   said, "If Pat Daugherty happens to prevail in his

2   lawsuit against Lane, Patrick and HERA you heard Jim

3   Dondero testify he gets his interest, which is

4   currently escrowed in the third-party escrow account,

5   all of it."

6                    And the jury clearly believed that the

7   escrow meant to preserve Daugherty's interest.  One of

8   the questions the jury sent back to the judge in the

9   Texas action referred to his -- that is Pat's -- HERA

10  units currently in escrow.  That's the third to the

11  last page in Exhibit U.

12                   The defendants now say, "Well, sure,

13  Pat continued to be an owner of HERA, but there was

14  never anything in HERA, at least during the Texas

15  action and before the Texas action."  Which reminds me

16  of a scene from my life at a movie theater with my two

17  sons, where the younger one was complaining that his

18  brother wouldn't give him the box of candy.  He asked

19  me to intervene, and I told him to give him the box of

20  candy, at which point the older brother emptied the

21  candy into his popcorn and gave him the empty box.

22                   That's exactly what happened here.

23  When they told everyone they were holding assets for

24  Pat's benefit, they would now have you believe that

23

1   what they really meant was that he was just entitled

2   to an empty box, and they had no intention -- and Pat

3   should have known that they never had any intention of

4   ever letting him have them.

5           There are two possibilities to explain

6   the contrast between what they said during the Texas

7   action and what they're saying now.  One is that they

8   knew at the time that they were never going to give

9   them back.  The other is that they believed at the

10  time and were sincere in saying that they would give

11  them back, but they later changed their mind.

12          Under either of those circumstances,

13  Daugherty prevails on at least one of his claims.  If

14  they changed their mind but initially intended it, his

15  promissory estoppel claim is very strong.  If they

16  never intended from the beginning to give them to him,

17  then his fraud and unjust enrichment claims are

18  equally strong.  The status quo order should be

19  entered to make sure that they can't do either of

20  those things this time.

21          I think that's all the background we

22  need, except for a clarification on what Daugherty is

23  seeking.  He is seeking those assets.  His relief --

24  Your Honor will note that we did not include in our

24

1    briefing any discussion of our claims for

2    indemnification.  Our indemnification claim is

3    effectively a monetary relief sort of claim.  But we

4    did discuss promissory estoppel, unjust enrichment,

5    and fraudulent transfer.  Each one of those theories

6    includes potential relief divesting those assets from

7    whoever holds them, which brings me to the next point,

8    which is that we do not know where these assets are.

9              We have asked the defendants where

10   these assets are; were they ever transferred after

11   December 2016.  They told us they would not provide

12   any information on those requests.  And that's at our

13   Exhibit L, Request No. 8 and 11, and Exhibit W, our

14   Request No. 34 and 37.

15             THE COURT:  I'm certainly not inviting

16   more or different motions.  But isn't the remedy for

17   that a motion to compel instead of a motion for a

18   status quo order?

19             MR. CHRISTENSEN:  It would be.  And we

20   are not seeking through this status quo order

21   effectively a back door to answering these requests

22   for documents and interrogatories.  But the fact that

23   they will not tell us where these assets are is

24   consistent with the prior behavior in the Texas action

25

1    and gives us a lot of pause about waiting until the

2    end of this trial.

3              So we started out this case with -- I

4    guess I should first turn to the defendants' argument

5    that the Court doesn't have power to enter this status

6    quo order.  Clearly it does.  The kind of relief that

7    we're seeking is in aid of the ultimate relief that we

8    are seeking.  Because we are trying to obtain or move

9    particular assets, we are seeking the status quo order

10   to make sure those assets are still available for the

11   court to issue an effective ruling at the end of this

12   case.

13             THE COURT:  And how do you get around

14   the *Hillsboro* and *HEM* cases that discourage

15   intermediate injunctive relief for the purpose of

16   preserving assets?

17             MR. CHRISTENSEN:  Well, I think

18   generally the cases are referring to when you're

19   seeking monetary relief.  And that's not what we're

20   doing in this case.  And I think the history is

21   probably the most important point in this situation.

22             One simply cannot ignore that the very

23   assets and the very parties in this litigation -- the

24   reason we're here is because we were chasing after

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 15    Exhibit 15    Page 2972 of 98    Page 700 of 1104    PageID 16834

26

1   these assets that we believe we obtained the right to

2   in the previous action.  So it's a unique situation.

3   None of the cases involve the same parties and the

4   same assets.

5           And the cases -- even the cases that

6   have history as a basis for granting the status quo

7   order, none of them have this kind of sort of clear

8   evidence that there was a fraud and moving of assets

9   to defeat a judgment in an earlier iteration of the

10  dispute between the parties.

11          THE COURT:  And how does that sort of

12  long history or long series of allegations of fraud

13  and hiding assets, how does that square up with the

14  requirement that the harm to be prevented by the

15  status quo order be imminent?

16          MR. CHRISTENSEN:  The imminence, Your

17  Honor, to be frank, is probably the most difficult

18  aspect of our situation to square with the law.

19  Because -- in part because they haven't told us

20  whether things have been transferred, where things

21  are, we cannot give Your Honor very many facts about

22  some imminent action that is going to take place.

23          But at the same time, we -- again, we

24  started as a frog in a pot at a very high temperature

27

1    having come out of the experience in Texas.  Then

2    adding to that was the fact that they will not tell us

3    where these assets are.  They will not tell us whether

4    they are currently in a solvent entity or not.  They

5    will not really just come out and say whether those

6    assets are still in Highland or not.  There's a

7    suggestion in their brief that can be read as a

8    representation that they are in the Highland and never

9    have left, but they also make the argument in their

10   brief that the assets never went over to Abrams &

11   Bayliss; that during the whole time that Abrams &

12   Bayliss was holding the assets, that really Highland

13   held the assets, retained legal title, and Abrams &

14   Bayliss was simply holding onto them in trust.  We

15   don't know if something like that is happening in this

16   case either.

17            On top of that, we had -- and what

18   spurred us to action was the affidavit of Highland

19   saying that they did not have current assets to

20   satisfy the judgment in the *Crusader Redeemer* action.

21   So that's on the front end of that judgment.  We, at

22   this point, don't know what Highland is going to look

23   like from a solvency standpoint on the back end of

24   that after those assets have gone out the door, and so

APPX. 102273

28

1   at some point we have to act.  We need to act before

2   the end of this case.

3               We didn't believe that we had enough

4   imminence at the beginning of this case that we would

5   get a status quo order or a preliminary injunction.

6   But when they filed that affidavit saying that in a

7   cash flow basis they were insolvent for purposes of

8   satisfying a judgment, against the backdrop of all the

9   history, it starts to look like we're doing a replay

10  of what happened in Texas.

11              Your Honor referred to, I think, a

12  memo from Abrams & Bayliss talking about the HERA

13  strategy.  And what we're afraid of is that there is a

14  HERA Strategy Version 2 that we do not know about

15  right now and they just won't tell us.  So at some

16  point, in order to avoid them doing the same thing

17  again, we have to act.  We can't, unfortunately,

18  identify when they're going to do that in the same

19  clean kind of way that one often can in a status quo

20  or preliminary injunction case.  But the danger, I

21  would submit, is just as high as in those cases.

22              I've talked some about the history.

23  And the defendants do talk about three of the cases

24  that we talked about regarding the history.  They

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 134   Filed 12/29/23   Page 703 of 1104   PageID 16837
Exhibit 15   Page 29 of 98

29

1  address the *Crusader Redeemer* action that Your Honor

2  is familiar with, the *UBS* litigation, and the *Acis*.

3  The ones that they don't mention are *Trussway*, for

4  example.

5          *Trussway*, in this court under Vice

6  Chancellor Glasscock, he actually already found that

7  the kind of history that one would have to establish

8  to obtain a status quo order was found with respect to

9  these principals.  He said he took into account the

10  "... prior history of the controllers of the entities

11  in examining equitable matters that come before us."

12  And true to the way he is, he said, "... I would just

13  as soon not list all the reasons I have that make me

14  suspicious that a remedy will not be available here

15  ...."  "But I think it suffices to say that I have

16  experience with other cases involving the principals

17  here."  And he went on.  That's from page 40 of

18  Exhibit S, which is the transcript in the *Trussway*

19  action.

20          On the next page he said that, "...

21  given ... some of the factors that I've mentioned,

22  including the Acis bankruptcy and my other experiences

23  with the principals here ... there is a reasonable

24  probability that without some action, any victory will

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-1   Filed 12/29/23   Page 704 of 1104   PageID 16838

30

1  be a Pyrrhic victory."

2               THE COURT:  It sounds like what you're

3  suggesting is that given the track record of Highland

4  in this action and in other actions, that you're

5  suggesting that the imminence requirements be

6  dispensed with because of what's going on here.

7               MR. CHRISTENSEN:  I don't think I

8  would say that, Your Honor.  I would say that given

9  the caginess on discovery, we are not able to identify

10 the moment of imminence.  But we are, through the

11 history, able to establish the same point as

12 imminence.

13              Imminence is this -- the point of

14 addressing imminence is that if you don't address

15 this, it is going to happen, and it's going to happen

16 very soon.  We can't tell you that it's going to

17 happen very soon, but we can tell you that there's

18 every reason to believe that it will happen before the

19 end of this trial.

20              THE COURT:  But what about the -- I

21 think many times when one is considering imminence,

22 there's sort of a *laches*-esque element that comes into

23 it.  And this case was filed in 2017.  So this "it"

24 that we're discussing very well may have already

31

1   happened.

2              And so I wonder what the justification

3   is for sort of after the fact -- maybe, I don't

4   know -- after the fact then seizing up Highland simply

5   based on the way that things have played out in other

6   cases.

7              MR. CHRISTENSEN:  So I think I can

8   explain why we didn't act earlier, and why it wouldn't

9   have been justified to act earlier, and so why we

10  shouldn't be subject to *laches* on this argument.

11             When we started, we had no reason to

12  believe that those assets had gone anywhere other than

13  Highland.  Then the Acis bankruptcy discussed that

14  Dondero was moving out tens of millions of dollars to

15  his charitable foundation.  That was another brick in

16  the wall.  Then we got the discovery responses that

17  were not responsive.

18             And to be clear, we have not given up

19  on that.  We had a meet-and-confer as recently as this

20  morning, and one on Friday of last week, in which we

21  are trying to get these documents.  It doesn't appear

22  that we're going to have much success on our own.  But

23  we are absolutely pursuing that and have pursued those

24  documents as vigorously as we pursued the Abrams &

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-4   Filed 12/29/23   Page 706 of 1104   PageID 16840
Exhibit 15   Page 23 of 98

32

1   Bayliss documents.

2                   To mix the metaphors, the straw that

3   broke the camel's back was the *Crusader Redeemer*

4   action where Highland said:  We cannot pay this

5   judgment right now.  We have more assets than

6   liabilities, but we cannot pay this right now.

7                   And it's also important to remember

8   that it's not just large judgments that Highland has a

9   history of not paying, and it's not only Daugherty's

10  relatively small judgment that they refused to pay.

11  But in the Acis bankruptcy, it was an $8 million claim

12  at issue, and they made him go through -- or are still

13  going through involuntary bankruptcy.

14                  So I think we acted when it was

15  prudent to act.  And before that occurred, I don't

16  think any member of this court would have been likely

17  to give us relief without something to point to, a

18  reason to believe that Highland wouldn't pay apart

19  from the history.

20                  THE COURT:  And the reason is that

21  affidavit in the *Redeemer* case stating that Highland

22  doesn't have the liquid assets to pay the $175 million

23  judgment?  That's what you're interpreting to say that

24  they will not pay or will somehow manage to avoid

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Filed 03/29/24   Page 707 of 1104   PageID 16841
Exhibit 15   Page 23 of 98

33

1  paying Mr. Daugherty's -- what is allegedly owed to

2  him?

3           MR. CHRISTENSEN:  We aren't sure about

4  the damages, but effectively, yes.  That Highland --

5  which is, we assume, the most solvent of any of the

6  entities -- now has a cash flow solvency issue.  And

7  so at that point we felt we needed to act.

8           THE COURT:  Understand.

9           MR. CHRISTENSEN:  The other thing that

10 I think Your Honor should consider, it doesn't fit

11 exactly within the three factors of a status quo or a

12 preliminary injunction standard; but I think Your

13 Honor should also take into account that it may not be

14 a question of whether or not Highland is able to

15 satisfy the judgment, but whether it will, even if it

16 is able.

17          THE COURT:  That's what I'm wondering.

18 That's the part that I'm wondering how that's being

19 derived from the affidavit in the *Redeemer* case, if

20 that's the precipitating factor.  Am I understanding

21 you to read that affidavit only to inform solvency and

22 not intent?

23          MR. CHRISTENSEN:  It is consistent

24 with an intent to make people work for their

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-4   Exhibit 15   Page 2926 of 98   Page 708 of 1104   PageID 16842

34

1    judgments, but I mostly consider it separately.  And

2    what I'm really referring to, the short name for it is

3    spite.  It appears, if you look, not only at the

4    previous action in Texas, but also the Josh Terry

5    situation, that a major factor motivating whether or

6    not Highland pays judgments is how Highland feels or

7    how Jim Dondero feels about the people who are trying

8    to collect that judgment.

9                   And so you have the court in the

10   bankruptcy case in *Acis* said that the expenditures

11   were out of whack versus what's at stake.  Or in the

12   *Credit Strategies Fund* case -- which the defendants

13   did not address -- the factual findings there refer to

14   some notes from a call between those parties and

15   Dondero.  Those notes read, "Dondero directly

16   threatens Concord and Brant personally.  We are very

17   good at being spiteful."

18                  And so that spite doesn't -- it's not

19   one of the factors normally considered on a status quo

20   motion or a preliminary injunction.  I do think, as a

21   matter of equity, Your Honor ought to consider that.

22   And I think it's consistent with, and maybe grows out

23   of the kind of considerations that Vice Chancellor

24   Glasscock was taking into account in the *Trussway*

35

1  action.

2              I think I'll skip to likelihood of

3  success on the merits.  We do think the likelihood of

4  success on the merits prong of this analysis is fairly

5  straightforward.  At a big-picture level, Daugherty

6  had a claim on these assets, either directly or

7  through HERA.  He was entitled to that compensation,

8  he earned it, and it was taken from him after he

9  proved his entitlement not only to damages -- which he

10  received in the amount of 2.6 million and has never

11  seen, but also the underlying assets.

12              So for fraudulent transfer purposes,

13  we think actual intent to hinder, delay, or defraud

14  based on the documents that we have seen so far is

15  compelling evidence that there was actual intent to

16  hinder, delay, or defraud.

17              Your Honor only has to find that we

18  have a reasonable probability of success on one of our

19  claims.  You do not have to decide that we have a

20  reasonable probability of success on all of them.  And

21  that comes out of the *Destra Targeted Income* case.

22              But we also think our other claims are

23  quite strong, the alternative bases under fraudulent

24  transfer law.  We do not believe that HERA got

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-15 Filed 09/29/23    Page 710 of 1104    PageID 16844

36

1    equivalent value, for example, in the transfer.

2    Unjust enrichment, it's an equitable doctrine, so in

3    some sense you back away and look at what really

4    happened, what's the substance.

5                    And again, what happened was Daugherty

6    earned compensation, he proved his entitlement to it,

7    and then it was taken from him.  That enriched

8    Highland; it impoverished Daugherty to the extent that

9    he was entitled to it.  There was obviously a

10   connection between those two results.

11                   And as far as their defense of

12   justification, the evidence doesn't seem to show that.

13   I take their justification argument to mean that they

14   were justified in taking the money because of the

15   legal expenses.  But the bills that we have seen so

16   far do not support that HERA was receiving the benefit

17   of those legal expenses.

18                   And just briefly on the promissory

19   estoppel claim -- I'm not going to spend much time on

20   that; you'll hear a lot about that in a minute.  But I

21   do want to refer to those quotations from the Texas

22   trial as additional reasons that support our

23   probability of success on the merits of that claim.

24   They demonstrate that throughout the trial, the

37

1    strategy appears to have been to convince the jury

2    that Highland was the good guy because they were --

3    don't worry, they're going to hold on to the assets

4    for Pat.  Pat is going to get those assets if he

5    proves his entitlement to them.  But -- you know, so

6    don't think we're bad for taking them.  Tell us that

7    we win now and we don't have to give them to him.

8                    The narrowest way to grant the motion,

9    I think, is based on probability of success of the

10   fraudulent transfer claim for actual intent to hinder,

11   delay, or defraud.  And Your Honor only needs to find

12   that to issue the status quo order.

13                   On the balance of equities, also seems

14   very clear to us.  On the one hand, our client would

15   go through potentially another half a decade or decade

16   of litigation if he has to chase these assets again.

17   And it would be a real shame to have to do that twice.

18   On the other hand, the defendants, the harm that they

19   identify on their side is that it would lower the bar

20   for future plaintiffs against Highland that are

21   seeking monetary damages to obtain a status quo order.

22   And on that point, I just have to point out, again,

23   that it is not only monetary damages that we are

24   seeking, but seeking to move the escrow assets.

CHANCERY COURT REPORTERS

38

1            The other harm that they identify is

2    the harm to their reputation if they're required to

3    freeze these assets for what I take them to perceive

4    as a very small claim.  But again, we're not only

5    seeking monetary assets, so this is not just, as they

6    characterize it, a $3 million claim but a claim on

7    specific assets.  And their history of paying small

8    claims is not great.  So we think the balance of

9    equity also favors Daugherty.

10            Unless Your Honor has any other

11    questions, that's all I have.

12            THE COURT:  I don't.  Not at this

13    time.  Thank you.

14            MR. REED:  Good afternoon, Your Honor.

15    John Reed from DLA Piper for the defendants.

16            First of all, I want to apologize for

17    what happened at the last hearing.  We were only into

18    the case for like two days.  I had no idea that the

19    lawyer that was going to present was not going to be

20    able to answer Your Honor's questions.  I was not

21    happy about that, probably much more unhappy than the

22    Court was and the Court was very unhappy.

23            Mr. Katz is the lawyer most familiar

24    with everything in this case.  And he's here today to

39

1   present the arguments and should be able to answer all

2   of Your Honor's questions.

3                  THE COURT:  I appreciate your comment.

4   Thank you.

5                  MR. KATZ:  Your Honor, may I approach?

6                  THE COURT:  Yes.

7                  MR. KATZ:  Thank you for letting me be

8   heard today.

9                  And as Mr. Reed said, I echo his

10  apologies for the last hearing.  I apologize that I

11  was not able to be here at that last hearing.  But if

12  Your Honor does have questions about -- I understand

13  Your Honor's ruling, but if Your Honor does have

14  questions about any of those matters, I'm happy to

15  address those as well.

16                 THE COURT:  Thank you.

17                 MR. KATZ:  With respect to the status

18  quo motion.  Obviously, the Court is aware of the

19  legal standard.  I'm not going to go into that.  I

20  just want to address a few of the points that counsel

21  addressed.

22                 And I'd like to start with the

23  irreparable harm element, which is one of the required

24  elements.  And counsel said a number of times that

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 134    Exhibit 15    Page 24 of 98    Filed 08/28/23    Page 714 of 1104    PageID 16848

40

1    they're seeking the assets, not just monetary relief.

2    And I presume that that argument is being proffered

3    because they recognize, otherwise, the issue with

4    irreparable harm component that they have to show.

5                    And I note, just by way of background,

6    is that the Texas award was not in favor of

7    Mr. Daugherty vis-a-vis HERA.  It was not for specific

8    assets; it was a monetary award.  And, moreover,

9    Mr. Daugherty never had ownership of -- direct

10   ownership of any assets in HERA.  Mr. Daugherty was a

11   shareholder in an LLC and the LLC owned some assets.

12                    So if their lawsuit is now seeking

13   recovery of specific assets as opposed to monetary

14   relief, I note that there's a host of procedural and

15   substantive issues with that which I think goes well

16   to the likelihood of success on the merits.

17                    But the point for us today, Your

18   Honor, is that a monetary award would certainly be

19   sufficient to recompense Mr. Daugherty if he were to

20   prevail on any of his claims in this case.  And

21   there's no evidence -- and maybe more importantly,

22   there's no evidence that's been offered to the Court

23   in support of the status quo motion that would

24   demonstrate otherwise.  And when I say "demonstrate

41

1   otherwise," demonstrate that there are assets that

2   were in HERA that can't be valued, or some other basis

3   to show some sort of irreparable harm.  That issue is

4   not even addressed.

5                    We're -- this is, I think, very

6   apparently a case that -- where there is no

7   irreparable harm.  And money can certainly compensate

8   for any harm that Mr. Daugherty may be able to prove

9   ultimately that he suffered.  The only evidence on

10  that issue, I think as Your Honor correctly pointed

11  out, was the affidavit of Scott Ellington.  And that

12  affidavit says to the contrary.  It says, "... the

13  value of Highland's assets exceed[s] the amount of the

14  ... Award."

15                   There's absolutely no evidence in

16  connection with the status quo motion that would show

17  that there is irreparable harm or there is insolvency.

18  In fact, what a good counsel wants to do is make

19  allegations of what they believe is inappropriate

20  conduct some by Highland, some by Highland's

21  affiliates.  And I note that the conduct that they've

22  cited to in their motion are allegations taken from

23  pleadings in other cases, as opposed to direct

24  evidence of anything that has been done by Highland.

CHANCERY COURT REPORTERS

42

1  And most of it, again, is not directly Highland

2  allegations to any extent.

3            There is -- and then also as Your

4  Honor appropriately, I believe, questioned counsel

5  about, there's no evidence of anything imminent on the

6  horizon that might give rise to any potential concern

7  that would support the status quo order.  And what

8  they're seeking is really, truly an extraordinary

9  remedy.  And I don't believe that they've pointed to

10  any concrete basis which they can meet the high

11  standard that they need to show to justify a status

12  quo order.

13            THE COURT:  How do you justify the

14  situation here from the one in *Trussway*?

15            MR. KATZ:  Well, I guess, Your Honor,

16  in two ways.  One, in *Trussway*, there's allegations of

17  specific conduct.  Where here, we've got -- there's no

18  allegations of any conduct that they believe is about

19  to occur or evidence to support that.

20            THE COURT:  I suspect they would say

21  that's because you haven't answered their questions,

22  but I don't know.

23            MR. KATZ:  Well, but, Your Honor, I

24  guess that it would also go back to the irreparable

43

1   harm issue that, you know, there's nothing that --

2   even the allegations, that if they were able to

3   provide some supportive allegations in this case as

4   opposed to relying on allegations in other cases,

5   there would still be -- they still have not shown that

6   there's any risk of insolvency or potential

7   irreparable harm.

8              And the *Mitsubishi* case that they

9   cited in their brief I think is very on point.  And on

10  this issue where they had -- the Court noted that

11  there was an allegation -- actually more than an

12  allegation -- there actually was a prior incident that

13  the Court had very serious concerns about but that on

14  its own wasn't enough.  It was -- the Court

15  specifically found that the defendant in that case was

16  insolvent.  And they also found that there was a sale

17  being negotiated, actual evidence of a sale, where the

18  assets were going to be transferred.  But we don't

19  have that type of evidence with us in this case, Your

20  Honor.

21             On the likelihood of success on the

22  merits, Counsel spent a little bit of time on that

23  issue.  But I think it's important, Your Honor, again,

24  that this is an extraordinary remedy they're seeking

CHANCERY COURT REPORTERS

44

1    that has a heightened standard.  And their motion on

2    the likelihood of success on the merits simply has

3    conclusory allegations, that they believe they're

4    going to be able to prevail on the merits without

5    addressing the specific elements and what evidence

6    they've got to show the specific elements.

7                    I note, you know, Counsel, in a number

8    of pleadings has -- and I know Your Honor has noted

9    this as well -- that Judge Glasscock had expressed his

10   skepticism about when he was trying to determine what

11   the nature of the escrow agreement was.  And I note

12   that Judge Glasscock, when he was doing that, also

13   when he was talking about the formation of the escrow

14   agreement, he was not talking about the resignation of

15   Abrams & Bayliss or the -- what happened to the assets

16   that formerly were held by HERA.

17                   And, in fact, even Judge Glasscock

18   indicated at that time that it may be that this

19   fraudulent transfer claim was appropriate for summary

20   judgment.  I think his direct quote -- I know I wrote

21   it down.  His direct quote was that it wasn't

22   prepared -- on page 79 and 80 of the transcript, that,

23   "It may be ... perfectly fit ... for a motion for

24   summary judgment.  I'm just not convinced I can get

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-15    Filed 04/26/23    Page 719 of 1104    PageID 16853
Exhibit 15    Page 246 of 98

45

1   rid of it on a motion to dismiss ...."  That was his

2   quote.

3                   But I think that has been turned on

4   its head a little bit to say that because he didn't

5   understand the purpose of the escrow agreement and why

6   that was formed, that somehow that shows that the

7   fraudulent transfer claim is a sure-fire winner.  In

8   fact, I also note that Judge Glasscock dismissed the

9   same fraudulent transfer claim against Mr. Dondero in

10  the motion to dismiss.

11                  So we think there's a number of

12  problems with each of the claims.  And I know we're

13  going to get to the promissory estoppel claim.  But I

14  think a couple of issues with that is that we've

15  got -- that claim is predicated on two statements that

16  were by individuals that I don't believe were clear

17  and unequivocal type of statements that could support

18  a promissory estoppel claim.  But moreover, they went

19  to the representation of what was in the terms of the

20  escrow agreement.

21                  And I believe the law is fairly clear

22  that if there is a contract provision that addresses

23  the issue at hand, then you cannot have a promissory

24  estoppel claim based on a representation about that

46

1   contract claim.  And Mr. Daugherty is absolutely

2   seeking relief pursuant to the provisions in the

3   escrow agreement.  And that, in and of itself, would

4   knock out his promissory estoppel claim.

5                    And then -- and maybe the biggest

6   problem -- I think he's got a number of problems with

7   the promissory estoppel claim, but maybe the biggest

8   one is reasonable reliance.  Again, Mr. Daugherty

9   hasn't even alleged that any of the statements were

10  made for the purpose of causing Mr. Daugherty to

11  reasonably -- to rely, and that it would be reasonable

12  to expect him to do so.

13                   But Mr. Daugherty's conduct -- he

14  alleges that he would not have paid the judgment and

15  that he would have sought to invalidate the escrow

16  agreement at trial.  And I think both of those are --

17  they're also, again, conclusory allegations that he's

18  made without sufficient -- he has not made allegations

19  in his complaint in this action sufficient to

20  withstand, I believe, a motion to dismiss, and

21  certainly not to show a likelihood of success on the

22  merits for the status quo motion.

23                   But what he's really said and what he

24  explained in the briefing that he meant by that is

CHANCERY COURT REPORTERS

47

1    that he would have sought offset.  The problem that

2    Mr. Daugherty has there is he -- offset is an

3    affirmative defense.

4              THE COURT:  I mean, we're all about to

5    get into that very deeply, so ...

6              MR. KATZ:  Okay, Your Honor.  Thank

7    you, I appreciate that.

8              But the likelihood of success on the

9    merits on the promissory estoppel claim, I think, is

10   very low.  He's got similar issues on the unjust

11   enrichment claim because of the representations and

12   because of the equivalent value that HERA received in

13   exchange for the assets.

14             On the fraudulent transfer claim, we

15   don't believe that there was a transfer and there's

16   been evidence of a transfer.  And Counsel may respond

17   to that and say, "Well, that's because Highland hasn't

18   shown where the assets are."  I'm anticipating that to

19   be their response on that.

20             But I think Your Honor identified the

21   point that that's not why you get a status quo motion.

22   If they think there's evidence that they need, you

23   know, there's a motion to compel.  But for purposes of

24   their motion, they have not produced any -- have not

48

1    cited to any evidence, have not even made the

2    allegation that -- other than a conclusory

3    allegation -- that they have a likelihood to succeed

4    on the merits.

5               And then finally, Your Honor, I think

6    they have the same -- the last element, that with the

7    harm to him, the harm to Mr. Daugherty would outweigh

8    the harm to Highland.  They simply have a conclusory

9    allegation in their motion without providing any

10   support for that, Your Honor.

11              And again, I just -- I'm happy to talk

12   about that issue further, but I think on a motion of

13   this seriousness with the heightened standard, that

14   they need to show that conclusory allegations are not

15   sufficient.

16              THE COURT:  Thank you.

17              MR. KATZ:  Thank you, Your Honor.

18              MR. CHRISTENSEN:  Just briefly, Your

19   Honor.

20              I suppose it's an interesting

21   philosophy of language, a question of what counts as

22   something being conclusory.  But we have certainly

23   done more than offer a conclusion.  We have laid out a

24   timeline of actual intent to delay or defraud with

49

1    respect to the fraudulent transfer claim.

2                   And just the items that are attached

3    to our motion at Exhibit N, O, P, and Q, are a series

4    of e-mails and events that I think anybody bringing a

5    fraudulent transfer claim might characterize any one

6    of them as a smoking gun.  That is more than a

7    conclusion.  Our conclusion that this transfer was

8    done with actual intent to defraud is based on very

9    particular, very detailed, minute-by-minute documents.

10   So it is certainly not conclusory.  It's sort of

11   conclusory to call that conclusory.

12                  And it's important, also, to remember

13   that when Vice Chancellor Glasscock suggested that

14   potentially the fraudulent transfer claim could be fit

15   for summary judgment disposition, he also said things

16   like "Maybe there's a perfectly reasonable explanation

17   for this."  I think discovery has shown that there is

18   not a perfectly reasonable explanation for this.  And

19   he did not have access to those documents, nor did we

20   at the time that he made that statement.

21                  As far as seeking this relief rather

22   than simply monetary damages, that has been in our

23   complaint since the beginning.

24                  THE COURT:  What is the -- can you

50

1   address the point that the Texas award is monetary and

2   not for the specific assets that are mentioned now in

3   your briefing?

4                    MR. CHRISTENSEN:  Sure.  I can.

5                    I'll address that by saying, quoting

6   again HERA's closing argument in the Texas trial.

7   "... [I]f Pat Daugherty happens to prevail in his

8   lawsuit against Lane, Patrick and HERA you heard Jim

9   Dondero testify, he gets his interest, which is

10  currently escrowed in the third-party escrow account,

11  all of it."

12                   We have made a claim for promissory

13  estoppel that statements like that with codefendants

14  show clear evidence of a promissory estoppel claim.

15  That kind of statement shows how the statement was

16  meant to be perceived, it shows how people did

17  perceive it.

18                   And I want to go to the jury question

19  because we actually have -- unlike many cases where

20  the idea of an objective standard, what would a

21  reasonable person do, is sort of an academic question.

22  But in this case we have a jury, which is sort of the

23  quintessential reasonable person, writing back to the

24  judge, "If we assign a dollar value to 'Fair Market

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 134   Filed 05/22/23   Page 725 of 1104   PageID 16859
Exhibit 15   Page 252 of 98

51

1   Value of Daugherty's HERA units' in Question 18" --

2   that's the question that awarded him $2.6 million --

3   "is this in exchange for his HERA units currently in

4   escrow, or in addition to them?"  The judge instructed

5   back, "Do not discuss or consider the effect your

6   answers will have."

7            And then the final judgment made clear

8   that it was not in exchange for those assets in

9   escrow, that it was in addition to them.  And there

10  was appellate litigation about that issue, and it was

11  settled that it was not a replacement for those units.

12  But my point really is:  We have very clear evidence

13  that the Texas judgment and the people making the

14  Texas judgment believed that those assets were being

15  held in escrow for Pat Daugherty, which is exactly

16  what the defendants tried to tell the jury to believe

17  in their closing arguments.

18            So the fact that the Texas judgment

19  was purely monetary is, A, not entirely true; and, B,

20  it's not -- does not defeat the promises that they

21  made throughout that trial, nor the fact that they

22  transferred the assets once the judgment came through.

23            Let's see.  On the promissory estoppel

24  claim, it's just not what they said at trial, that Pat

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Exhibit 15   Page 252 of 98   Page 726 of 1104   PageID 16860

52

1   Daugherty had an interest in this LLC but, by the way,

2   there's nothing in it.  So if you award him anything,

3   it's going to be completely valueless.

4                   I want to respond just briefly to the

5   point that these assets can be valued.  And they can

6   be.  This court is very experienced in appraisals.

7   But the easiest and most efficient way to deal with

8   this, the value, is to give the assets themselves

9   rather than require, effectively, a -- more than one

10  appraisal inside of this case, because there are

11  assets held by a private equity fund, and those assets

12  include private companies.  So we would have to have a

13  sort of quasi-appraisal action contained inside of

14  this, instead of doing what is much easier for the

15  parties and the Court and just addressing those assets

16  in an equitable manner and providing an equitable

17  remedy.

18                  The affidavit does say that they are

19  solvent.  I believe the affidavit was also given by

20  the same person that the -- it was either the

21  arbitration panel in *Credit Strategies Fund* or the

22  Bankruptcy Court in *Acis* said that Isaac Levinson's

23  statements were not credible and that his statements

24  contradicted documentary evidence in a clear way.

53

1              In addition, they don't say by how

2    much they are solvent.  It could be the case, based on

3    the face of that affidavit, that they are solvent by a

4    million dollars.  We simply don't know.  And again,

5    the question of solvency as it relates to irreparable

6    harm in most of these cases is in a sort of antiseptic

7    environment where it really is just a matter of:  Does

8    this party have sufficient assets?

9              And again, that's not the only

10   question in this case.  The question in this case is:

11   If the Court does nothing, what is the risk that

12   Highland will do exactly what it has done to these

13   assets vis-a-vis this litigant before?

14             That's all I have, Your Honor.

15             THE COURT:  Thank you.

16             My intention is to hear the status quo

17   order and the motion to dismiss and then take a break

18   and see if I can get something together to share my

19   thoughts.  So let's move on to the motion to dismiss,

20   unless folks want to take a short break.

21             MR. KATZ:  I'm prepared to proceed,

22   unless Counsel wants a break.

23             MR. UEBLER:  I'm prepared to go

24   forward.

54

1          THE COURT:  All right.  You may

2   proceed.

3          MR. KATZ:  Thank you, Your Honor.

4          So I won't belabor the procedural

5   background, because I know Your Honor is familiar with

6   it, other than to say that after Judge Glasscock had

7   dismissed a large number of Mr. Daugherty's claims,

8   there was -- a promissory estoppel claim was then

9   added.  And we filed the motion to dismiss as to that

10  claim, and that's the motion that we're here for

11  today.

12          To prevail on a promissory estoppel

13  claim, Mr. Daugherty has to allege a conceivable set

14  of circumstances that would allow a showing that there

15  was a promise that was made, that it was reasonable,

16  that the expectation of the promisor was to induce the

17  action of forbearance on the part of the promisee,

18  that the promisee reasonably relied on the promise and

19  took action to his detriment, and such promise is

20  binding because injustice can be avoided only by

21  enforcement of the promise.

22          And I do want to -- I will be

23  efficient, but I want to address each of these

24  elements, Your Honor.  And the -- I want to start with

55

1    the reasonable reliance.  As I mentioned a moment ago

2    in connection with the status quo order, that

3    Mr. Daugherty is really claiming that he would have

4    sought offset had Mr. Dondero -- actually, I

5    apologize, I want to take a quick step back.

6                    Although Counsel's pointed to a

7    closing argument of HERA, that I believe he attributed

8    to Highland's counsel, I just want to be clear for the

9    record that the statement that Counsel just read from

10   the closing argument was for HERA, not for Highland,

11   and there was separate counsel.

12                    THE COURT:  Hasn't there separately

13   been an assertion of a common interest?

14                    MR. KATZ:  There was, Your Honor.  But

15   I just believe Counsel -- I'm sure it was

16   inadvertent -- said "Highland."  And I just want to be

17   clear for the record that that statement was on behalf

18   of HERA at closing argument.

19                    But, more importantly, in the

20   complaint they only allege two statements: a statement

21   by Jim Dondero at trial and a statement by Mr. Klos in

22   a declaration made several months after the final

23   judgment.  And so when Mr. Daugherty claims that his

24   reasonable reliance was not seeking offset at the

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 134  Filed 25/26/3  Page 730 of 1104    PageID 16864

56

1  trial, the second statement can't be a basis of that;

2  and the issue that Mr. Daugherty has, that there can't

3  be a reasonably conceivable set of circumstances to

4  show reasonable reliance for a couple of reasons.

5              One, the date that Mr. Daugherty filed

6  his counterclaims with his claims, he had -- the LLC

7  agreement with Highland's offset provision against the

8  value of HERA was in that document.  In fact, that was

9  the basis of one of Mr. Daugherty's claims, that there

10  was going to be -- there was the risk of this improper

11  offset.  He was challenging those provisions.

12              But yet he never pled offset as a

13  defense.  And it is a required affirmative defense

14  under Texas law.  And it is clear that when the final

15  judgment was entered, that's *res judicata*, that issue

16  was barred.

17              So Mr. Daugherty is saying that now

18  had Jim Dondero not testified as he did on the stand,

19  that he would have filed the declaratory judgment

20  action to offset the judgment that Highland obtained

21  against him from the judgment he obtained against HERA

22  cannot serve as the basis for a promissory estoppel

23  claim in this action because he would be barred as a

24  matter of law.

57

1              THE COURT:  Is that a little too

2    technical?  I mean, is the point a little more

3    abstract than that, which is that had Dondero not

4    testified as he did and assured everyone in the

5    courtroom that the escrow was there for Daugherty's

6    satisfaction down the road, that there are plenty of

7    different options he could have taken?  I mean, any

8    sort of resistance or leverage or anything like that

9    in regards to paying his own judgment, whether or not

10   a technical offset was procedurally available to him,

11   seems to be kind of reducing this a little bit too far

12   down into the technicalities.

13             MR. KATZ:  Well, I don't believe so,

14   for two reasons.  But the most important one being

15   there's no reasonably conceivable set of circumstances

16   where he could have taken action.  And I'll address

17   that momentarily.

18             But to the point, that was his

19   response.  That's what's in his pleading, both in his

20   complaint and in response to the motion to dismiss.

21   That's what he said he would have done.  And that

22   wasn't available to him.

23             And it wasn't just filing a

24   declaratory judgment action for offset that he would

58

1    have been barred from doing.  He had two years to

2    plead offset as a defense or to plead facts in the

3    Texas action that arguably could have given rise to

4    some reliance claim.

5                    THE COURT:  It seems odd to claim that

6    there was no reliance because he didn't do something

7    before the act in question happened.

8                    MR. KATZ:  Well, Your Honor, in fact,

9    quite the opposite.  As Mr. Daugherty said in his

10   reply brief to the status quo motion -- and this is on

11   page 2 and 3 of Daugherty's reply brief -- "In fact,

12   during the trial and before Daugherty won his

13   judgment, Defendants stressed that Daugherty was an

14   owner of HERA units."  Then he puts in a footnote, "At

15   the same time, Defendants took the position that

16   Daugherty held no economic interest in HERA.

17   Accordingly, Daugherty did not take the purported

18   admissions at face value and litigated for a judgment

19   that he retained his HERA units."

20                   And the significance of that, Your

21   Honor -- it's the same significance as what I was

22   trying to say a moment ago and I probably did not say

23   it very clearly -- is from the moment he filed this

24   claim, he was aware that, as he says here, that his

59

1    value -- the value of his shares in HERA were

2    valueless, as Highland was saying they were.  Because

3    that was one of his claims in the lawsuit.  And he did

4    not do anything to try to protect that vis-a-vis a

5    judgment that Highland might get against him at any

6    time during the trial.

7                     So to think that, "Oh, well, he was

8    about to do it" after two years, knowing everything

9    that he knew, the LLC agreement allowing the offset,

10   Highland taking the position that his units were

11   valueless even though he was suing for it, that

12   somehow he was going to try to offset his claim

13   against HERA against Highland's claim against him, and

14   he just didn't do it because Jim made the statement he

15   did on the stand is not a reasonably credible

16   position.  It's not something that could have a -- or

17   there could be a reasonably conceivable set of

18   circumstances to show a reasonable and detrimental

19   reliance.

20                     And I think -- and, Your Honor, if you

21   also look at the whole circumstances around

22   Mr. Dondero's statement on the stand, was not -- in

23   fact, the question -- it was by HERA's counsel that

24   was questioning him at the time.  And the question

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 134   Filed 09/26/23   Page 734 of 1104   PageID 16868
Exhibit 15   Page 60 of 98

60

1   was:  The assets that are being escrowed, or the money

2   that's being escrowed right now, what happens to them?

3   And I think it's significant for a couple of reasons.

4            One, right now they're talking about

5   the day that the question was asked.  They're not

6   talking about a day in the future.  And I think it's

7   also significant that that was --

8            THE COURT:  Maybe that was the

9   question, but the answer was, "In the future they will

10  go to him."

11           MR. KATZ:  That's -- Your Honor,

12  respectfully, that's not the way I read it.  But I

13  think the point is -- two points, Your Honor.  One,

14  that was a question by HERA's counsel; that was not a

15  question by Daugherty's counsel.

16           If this was so important that

17  Daugherty was going to forego seeking to invalidate

18  the escrow agreement or trying to do trial amendment

19  and get a new claim in, there was no action by his

20  counsel to follow up and say:  Let's be clear.  Let's

21  not talk about right now, let's talk about in the

22  future.  And again -- or ask about what about the

23  resignation provisions, what about the termination

24  provisions.

61

 1              There's a whole host of conditional

 2    circumstances that show that Mr. Daugherty,

 3    purportedly relying on that statement to not try to

 4    bring a declaratory judgment action for offset or to

 5    seek to invalidate the escrow agreement would have

 6    been reasonable reliance.  Again -- because, in fact,

 7    up until that point, Mr. Daugherty not only waited two

 8    years, he waited past the amended pleading deadlines.

 9    In the face of what he says, I'm being told by

10    Highland that my assets are valueless.  You know, and

11    to the extent they say that I'm still owning HERA

12    units, I never believed that there was anything there.

13    But yet he didn't do anything about it before

14    Mr. Dondero made the statement to HERA's counsel.

15              So, again, all of those, all of that

16    goes to whether he could have -- show any circumstance

17    where he could have reasonably relied.

18              Similarly, I think if you look -- and

19    I bring in these things to show Your Honor what is not

20    in the complaint or not in the response to the motion

21    to dismiss.  After the judgment, he claims that he was

22    entitled to this offset, but yet he paid his full

23    judgment.  He could have just paid the difference in

24    the judgment.

CHANCERY COURT REPORTERS

62

1             THE COURT:  That's the point, is that

2    he paid the whole judgment; right?  Kind of chipperly

3    wrote the check and thought it was all going to work

4    out in the end.

5             MR. KATZ:  Right.  Well, without --

6    but with the whole circumstances and you look at his

7    allegations, if his allegations are to be believed,

8    it's not reasonable to believe that somebody who was

9    going to do what he did but for Jim Dondero's

10   statement would have, again, waited for two years, not

11   filed -- not done -- taken the legal actions that he's

12   now claiming he would have taken.

13            He did seek to amend his pleadings

14   right before trial.  These were not in there.  That

15   was, again, before these statements.  Again, it's not

16   credible to believe that he reasonably relied.  And he

17   hasn't alleged anything.

18            Again -- and so that was why I said

19   initially to Your Honor's question, there are two

20   points.  One, when you look at the totality of what he

21   didn't allege and what he didn't do, that there can be

22   no set of circumstances where he reasonably relied,

23   but then when you look at what he says he would have

24   done, which is the offset.  And he would have been

63

1    legally barred from doing that because he waived it.

2    Also because -- and the law is cited in our motion,

3    that because Highland and HERA are separate entities,

4    there wouldn't have been an offset between those

5    judgments anyway.

6                    So the two things he says that he

7    would have done was seek to invalidate the escrow;

8    which, again, he was aware of that escrow agreement

9    before trial.  He sought to amend his pleadings before

10   trial but did not address that escrow agreement at

11   all.

12                   He has shown that he believes that

13   his -- before Mr. Dondero made that statement, he

14   didn't -- he thought his HERA units had been rendered

15   valueless and that's how he was litigating the case.

16   But he didn't try to "invalidate" the escrow

17   agreement.  He also doesn't explain or provide any

18   allegation of what that means, to invalidate the

19   escrow settlement.

20                   He doesn't provide any legal theory or

21   allegation of evidence to support a legal theory that

22   would show that had he sought to invalidate the escrow

23   agreement that the court would have allowed that

24   amendment and it would have changed the outcome.

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-15   Filed 02/05/26   Page 738 of 1104   PageID 16872
Exhibit 15   Page 265 of 98

64

1          The next element I want to talk about

2     was that a promise was made.  And, again, he's

3     identified two promises: one by David Klos, one by Jim

4     Dondero.  There's -- the one by Mr. Klos, again, was

5     done several months after trial.  The one by

6     Mr. Dondero is obviously during trial.  But both of

7     those statements, when you look at them, are not

8     unequivocal statements of -- there was no set of

9     circumstances where Mr. Daugherty will not be paid

10    this money on a final, nonappealable judgment.  And --

11    which is what --

12              THE COURT:  Why is that not exactly

13    what Mr. Dondero said?

14              MR. KATZ:  Well, Your Honor,

15    Mr. Dondero was being asked a question about the

16    language in the escrow agreement, that specific

17    provision.  And he was being asked based on

18    circumstances right now.  And perhaps if I give you an

19    analogy.  If I hire an employee and I'm paying the

20    employee $50,000 a year and they're an at-will

21    employee, and somebody asks me, "Well, how much does

22    that employee make?" I'm not likely going to say,

23    "Well, annually $50,000 a year, but I can terminate

24    them at any time."  Or "$50,000 a year, but less

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Exhibit 15   Page 262 of 98   Page 739 of 1104   PageID 16873

65

1  withholding," or other caveats.

2              And the question that was asked to

3  Mr. Dondero is the -- right now the assets that are --

4  and I apologize, I don't -- I can grab the quotation.

5  I don't have it right in front of me.  But the key

6  part was that it was predicated on right now, what

7  happens right now if there's a final judgment.

8              So -- and, again, this is Mr. Dondero

9  who's an individual defendant who is not being

10 questioned as a representative of Highland.  And what

11 they want to do is take that statement and say this is

12 an unequivocal statement that was binding Highland.

13 And it just doesn't rise to that level under the legal

14 standard.

15             And, you know -- but, moreover --

16 again, because what -- Mr. Dondero was reading the

17 escrow agreement on the stand as a layman, but that's

18 really more significantly the point, is that if the

19 alleged promises are subject to termination by a

20 contract -- I know this is in our pleading, the

21 *TrueBlue HRS Holding* case -- promissory estoppel does

22 not apply where a fully integrated and enforceable

23 contract governs the promise at issue.

24             And that's the issue, is the contract

66

1    is the contract; it means what it means.  And the --

2    unless there -- I don't believe, Your Honor, that they

3    even alleged that there is some promise, unequivocal

4    promise, that Mr. Dondero or Mr. Klos made that was

5    not subsumed by the escrow agreement.  And that's

6    really the basis of their claim here.

7                    They also have to show that the claim

8    is necessary to avoid injustice.  And obviously, they

9    have brought a fraudulent transfer claim and an unjust

10   enrichment claim arising out of the same course of

11   conduct, that they claim these representations are

12   related to those claims.  And I think the case law is

13   fairly clear on this, that this is exactly the type of

14   situation where a promissory estoppel claim is not

15   necessary to avoid injustice.

16                   THE COURT:  But is the conclusion to

17   be taken from your argument that nothing can ever be

18   pled in the alternative to a promissory estoppel

19   claim?

20                   MR. KATZ:  No, not at all.  But I

21   believe that you would have to have a set of

22   circumstances where there wasn't a fully integrated

23   enforceable contract, and that the underlying promises

24   weren't about the interpretation of that contract.

67

1              And then, finally, Your Honor, I'm

2    going to use the word "conclusory" again, that they --

3    well, actually not even conclusory, Your Honor.  They

4    didn't even plead that Highland intended to induce

5    reliance or that Highland should have reasonably

6    expected to induce reliance by Mr. Daugherty.

7              And I don't think that's necessarily

8    an accident.  I think that's because the statements

9    that they're relying on were not statements that were

10   made on behalf of Highland.  They're individual

11   statements.  And I think that it would be fairly

12   tortured to say otherwise.

13             So, Your Honor, again, for each of

14   those reasons, we don't think that they have pled any

15   reasonably conceivable set of circumstances that could

16   support the promissory estoppel claim.

17                  THE COURT:  Thank you.

18                  MR. KATZ:  Thank you, Your Honor.

19                  MR. UEBLER:  Good afternoon again,

20   Your Honor.

21                  THE COURT:  Good afternoon.

22                  MR. UEBLER:  I'll start with the

23   promise that was made.  And before I do, I think I

24   heard Mr. Katz talking about the standard to prevail

68

 1   on a claim.  And I understand we're a little bit late

 2   in the game of this lawsuit.  But this is a 12(b)(6)

 3   motion and the standard is reasonably conceivable.

 4                 So I just want to reset where we are

 5   on this motion and talk about the promise that was

 6   made, briefly.  So what was the promise?  The promise

 7   was Jim Dondero testifying at trial, under oath, that

 8   Mr. Daugherty's assets would be held in escrow and

 9   released to him through HERA if he won in Texas.  I

10   mean, it was as simple as that.

11                 You may have been left with the

12   impression from Mr. Katz's presentation that the line

13   of questioning was about the terms of the escrow

14   agreement.  I can save all of us and just refer to the

15   pages of the testimony, or I'd be glad to read the

16   preceding three or four questions to set that up.  But

17   it was not interpreting the escrow agreement.  And

18   Mr. Katz didn't have the testimony on hand, but I do.

19   And the question was:

20                 "Question:   Okay, so -- so if

21   Mr. Daugherty somehow prevails in his lawsuit against

22   Patrick Boyce and Lane Britian and HERA, what happens

23   to Mr. Daugherty's interest that's being escrowed

24   right now with a third-party escrow agent?

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 134   Filed 06/27/23   Page 743 of 1104   PageID 16877
Exhibit 15   Page 69 of 98

69

1               "Answer:   They go to him.

2               "Question:   I'm sorry?

3               "Answer:   They go to him via to HERA

4    and then to him."

5               Is that promise consistent with the

6    escrow agreement?  Yes.  Is that promise separate and

7    apart from the escrow agreement?  Yes.  Mr. Dondero

8    wasn't there interpreting a contract.  He was there

9    making a promise to Daugherty and to the jury.

10              And just as we allege in paragraph 131

11   of our complaint, it was the reasonable expectation of

12   Highland, when that promise was made, that it was

13   going to be relied on.

14              THE COURT:  Tell me more how the

15   statement was separate and apart from the contract.

16              MR. UEBLER:  The statement is separate

17   and apart from the contract because I think --

18   Mr. Katz would be the first one to tell you that

19   Mr. Daugherty was not a party to the escrow agreement.

20   Mr. Daugherty, on the face of it, has no rights under

21   that escrow agreement.

22              So this idea that Highland proposes

23   that because there's a contract out there that also

24   addresses the subject matter of the promise, the

70

1    promisee is, therefore, precluded from relying on that

2    promise, it just -- it doesn't hold water.  They

3    don't -- they didn't cite any cases.

4                    We said it's not the law of Delaware

5    and never should be.  Highland shouldn't be allowed to

6    contract with Abrams & Bayliss and then use that

7    contract to say that a promise made to Daugherty that

8    Daugherty seeks to enforce, that is -- you know,

9    follows the terms of that contract but doesn't

10   expressly give any rights to Daugherty, that's just --

11   that's not an argument that the Court should accept,

12   in our view.  So that's why I say it's separate from

13   the contract.

14                    And that also gets into the

15   alternative claim argument, too.  Are we entitled to

16   bring promissory estoppel and a fraudulent transfer

17   claim and an unjust enrichment claim?  I think the

18   *Chrysler* case in the Supreme Court settled that

19   question a long time ago.  And I think Rule 8 of this

20   court does, too.

21                    So, of course, there's overlap in what

22   was promised and what's in the escrow.  Although, I

23   will point out, the escrow -- Mr. Katz said something

24   like -- he referred to a host of conditional

71

1   circumstances in the escrow agreement.  And I think

2   his point was paragraph 5 and paragraph 10 that they

3   had relied on when Abrams & Bayliss resigned.  Well,

4   you won't find any of that in the promise that was

5   made by Jim Dondero under oath to Pat Daugherty and

6   the jury.  So whatever conditional circumstances may

7   be in that contract, they're not in that promise.

8              And the notion that Jim Dondero was

9   testifying in his individual capacity, I think we

10  debunked that in Exhibit A to our answering brief --

11  which was Highland's own witness list -- that provided

12  an entire paragraph of what Mr. Dondero would be

13  testifying about, including testimony in support of

14  Highland's and Cornerstone's claims against Daugherty

15  and the damages suffered and the third-party

16  defendants' defenses to claims asserted against them.

17             So Jim Dondero is Highland.  He is

18  HERA.  He's HERA ERA management.  He controls them

19  all.  Mr. Katz pointed out that the closing argument

20  by HERA's lawyer in Texas was just HERA's lawyer.

21  Well, Jim Dondero controls HERA, just as he controls

22  Highland.  So I view that as a distinction without a

23  difference.

24             But what that closing argument did was

72

1  reaffirm the promise -- I thought I had it here.  So

2  what was said on closing argument by HERA's counsel,

3  just after Jim Dondero made the promise, was "... if

4  Pat Daugherty happens to prevail in his lawsuit

5  against Lane, Patrick and HERA you heard Jim Dondero

6  testify he gets his interest, which is currently

7  escrowed in the third-party escrow account, all of

8  it."

9           Then we had the other promise, which

10 was that September -- September of 2014, the Klos

11 affidavit.  It restated the promise.  This gets to the

12 reasonableness of the reliance of Daugherty's

13 promise -- the promise to Daugherty.  He kept hearing

14 this.

15           And the idea that Daugherty should

16 have somehow foreseen in either the six weeks between

17 when Highland sprung the escrow agreement on him

18 before trial or when Dondero testified or when Klos

19 submitted his affidavit -- by the way, as the senior

20 finance of Highland Capital -- that Daugherty should

21 have foreseen two years from now when he went to pay

22 the judgment that Highland was going to break that

23 promise.

24           So the idea that Daugherty should have

73

1   done something between December 2013 and December of

2   2016, I think entirely misses the point of our claim.

3   The reliance that we allege -- and it's paragraph 133

4   of our complaint -- is "In further reliance on the

5   promises of Highland Capital and its agents, on

6   December 14, 2016, nine days after Highland Capital

7   secretly obtained the Escrow funds, Daugherty wired

8   approximately $3.2 million in cash to Highland Capital

9   in satisfaction of its award of attorneys' fees in the

10   Texas Action."

11              That was the reliance.  What could

12   have been done, other than a cash payment, Daugherty

13   could have just engaged in self-help.  He could have

14   paid the difference between the 2.6 and the 2.8 of the

15   judgments.  He could have not paid anything at all.

16   He at least should have had the chance to go to court

17   like the petitioner did in the *Bonham Bank* case that

18   we cite from Texas to explain to a judge why, under

19   these circumstances, even though there are three

20   different litigants involved, these claims should be

21   offset.  But he didn't even get that chance because he

22   relied on Highland's promises and he wired the full

23   amount.  They took away that chance from him.

24              We don't have to prove today whether

74

1    he would have won on that setoff claim in Texas or

2    anywhere else.  We just have to prove that it's

3    reasonably conceivable that he was deprived of that

4    chance because he reasonably relied, to his detriment,

5    on a promise that was made under oath and repeated.

6                    In their opening brief, the defendants

7    stated that "Injustice can (and should) be avoided

8    through collection efforts in the Texas Action, which

9    Daugherty has not even attempted to pursue, making

10   this claim premature."

11                   I just wanted to point out, this was

12   in Exhibit B to Highland's own opening brief.  They

13   attached Mr. Daugherty's interrogatory responses.  And

14   if you look at Interrogatory 36 on page 25,

15   Mr. Daugherty stated that "... apart from filing this

16   action to collect his Texas judgment, he filed for a

17   writ of execution in Texas on July 7, 2017, which was

18   unsuccessful because Highland Capital claimed HERA had

19   no assets.  The return of service was dated

20   September 26, 2017."

21                   I think that's totally irrelevant to

22   the questions before the Court, but I wanted to point

23   out that Mr. Daugherty did, in fact, attempt some

24   collection efforts in Texas and those were

CHANCERY COURT REPORTERS

75

 1    unsuccessful.

 2                    I'd also like to point out that in

 3    addition to being able to plead alternative claims,

 4    this is one of those cases where injustice can only be

 5    avoided through the enforcement of this promise,

 6    notwithstanding the other claims out there.  The

 7    injustice to be avoided is allowing Highland Capital

 8    to walk away with both judgments from the Texas

 9    action.  They got Daugherty's 3.2 million, and they

10    got his HERA assets.  And that's the injustice to be

11    avoided.

12                    When you and Mr. Katz were discussing

13    this element, he referred to a fully integrated

14    contract.  Again, he would be the first to tell you,

15    I'm sure, that Daugherty has no rights under that

16    fully integrated contract.  So the fact that there is

17    a similar contract out there is not relevant to the

18    analysis.

19                    That's all I have, Your Honor.

20                    THE COURT:  Thank you.

21                    MR. UEBLER:  Thank you.

22                    MR. KATZ:  Your Honor, can I just

23    address a couple points?

24                    THE COURT:  Yes.

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 15    Filed 12/28/23    Page 750 of 1104    PageID 16884
Exhibit 15    Page 29 of 98

76

1            MR. KATZ:  For clarity purposes,

2    Counsel -- this is the second time they've read the

3    statement from HERA's counsel during the closing

4    argument.  That was not part of the statements that

5    were alleged to be part of the detrimental reliance in

6    either the complaint or in the response to the motion

7    to dismiss.

8            And I think that's significant, again,

9    because Counsel is certainly correct that what they

10   say is that Daugherty would not have paid the judgment

11   against him by Highland.  But their explanation of

12   what that means is that he would have sought offset or

13   sought to invalidate the escrow agreement, both of

14   which could only have been done, been sought, during

15   trial.  I suspect that's why they are not relying on

16   the statement that was made at closing argument where

17   it would have been too late for them to make those

18   allegations.

19           Highland had a judgment, a fully

20   perfected final judgment, collectible judgment that

21   Mr. Daugherty paid.  And from the motion to dismiss

22   perspective, claiming that he would have filed either

23   or both of two things that were barred by *res judicata*

24   does not provide the basis to avoid -- where there's a

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 31    Filed 04/28/25    Page 751 of 1104    PageID 16885

77

1    reasonably conceivable set of circumstances that those

2    allegations could support to avoid a motion to

3    dismiss.

4            And, again, we're really just talking

5    about Jim Dondero's statement because, as Counsel

6    recognized, the Klos statement was made, I believe,

7    roughly five months after the -- four or five months

8    after the final judgment was entered.

9            And then, finally, lastly, I just want

10   to touch on the escrow agreement.  Of course we

11   recognize Mr. Daugherty is not a party to that

12   agreement.  But Mr. Daugherty's case is that he is

13   asserting rights under that escrow agreement.  He is

14   certainly saying that there was a transfer under that

15   agreement and that that agreement required the assets,

16   the money being held pursuant to that escrow

17   agreement, to go to HERA, which then Mr. Daugherty as

18   the shareholder of HERA would have had rights to.

19           And, you know, we disagree with some

20   of the underlying factual basis.  We don't agree that

21   there was a transfer.  But I think counsel for

22   Mr. Daugherty would certainly not say that there's not

23   a fully enforceable promise in that escrow agreement

24   that they are seeking relief under.

78

1              And that's -- and just as importantly,

2    Mr. Dondero's statement was exclusively an

3    interpretation of that promise.  And that's why -- and

4    I think that's exactly what the *TrueBlue* case is

5    referring to.  And there's a fully integrated contract

6    that has the promise that legally and factually

7    determines what the rights under that contract are.

8              And Mr. Dondero's interpretation of

9    that contract -- even if it's the exact same as the

10   contract or even if it's different than the

11   contract -- doesn't change that the claim is pursuant

12   to the contract and not for promissory estoppel.

13             THE COURT:  What is your understanding

14   of Mr. Daugherty's ability to sue to enforce the

15   escrow agreement in a way that benefits him?

16             MR. KATZ:  Well, he is a shareholder

17   of HERA.  And as a shareholder of HERA -- I mean, I'd

18   have to think through all the *res judicata*, collateral

19   estoppel, statute of limitations issues that all have

20   come out about all the issues that have been

21   litigated.

22             THE COURT:  I just mean from the terms

23   of the contract.

24             MR. KATZ:  I don't believe that

CHANCERY COURT REPORTERS

79

1    Mr. Daugherty is a third-party beneficiary of the

2    contract, if that's Your Honor's question.  He's

3    certainly not a direct party to the contract, but he

4    is a shareholder of HERA.  And their allegations are

5    that Highland was contractually obligated to send

6    money to HERA under that agreement.

7                    I think there are potentially

8    technical legal issues under that.  That's, of course,

9    not the claim that Mr. Daugherty has brought.  And --

10   but if Mr. Daugherty had any rights, it would be

11   through HERA.

12                   THE COURT:  So is it your

13   understanding that the point of the doctrine that

14   you're relying on, that there can't be both a contract

15   and a claim for promissory estoppel, is that those

16   rights substantially overlap?

17                   MR. KATZ:  I would suspect that's

18   probably the policy reason behind those decisions.

19                   THE COURT:  So if Mr. Daugherty

20   doesn't have contractual rights under the escrow

21   agreement, why does that knock out his promissory

22   estoppel claim?

23                   MR. KATZ:  Because it's the same --

24   because whatever rights he has under the contract,

80

1   whether he has rights or not, are no different than

2   any rights he would have vis-a-vis Mr. Dondero's

3   interpretation of what that contract said, what that

4   contractual language says.

5                    THE COURT:  Go ahead.

6                    MR. KATZ:  I think that the policy is

7   is not to create quasi-contractual claims when there

8   is a contract, regardless of who's the party to the

9   contract.

10                    And, actually, I think it's even --

11   there's no wiggle room around this situation because

12   it's not -- Mr. Dondero was -- I mean, I think the

13   quote was, "They go to Mr. Daugherty through HERA" is

14   the quote.  He wasn't saying something -- there's not

15   been an allegation, for example, that Mr. Dondero's

16   statement or Mr. Klos' statement created a separate

17   contract between Mr. Dondero or Mr. Daugherty.

18                    I mean -- and that's not what -- I

19   mean, there hasn't been an allegation that that's what

20   they were saying -- that Mr. Dondero was saying that

21   or Mr. Klos was saying that.  The allegation is they

22   were saying that's what the contract, the escrow

23   agreement, means.  And that's why you can't have a

24   separate claim, because the contract means what it is

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-4   Filed 09/22/23   Page 755 of 1104   PageID 16889
Exhibit 15   Page 292 of 98

81

1  and the contract determines the rights.

2                    THE COURT:  I understand.

3                    MR. KATZ:  Thank you, Your Honor.

4                    THE COURT:  Thank you.

5                    MR. UEBLER:  May I, briefly?

6                    THE COURT:  Briefly.

7                    MR. UEBLER:  Just to be clear, Your

8  Honor, we very much rely on the Klos statement as a

9  separate promise on behalf of Highland in the

10 affidavit.  We think it also supports the

11 reasonableness of the reliance on Mr. Dondero's

12 promise on behalf of Highland.  But we view the Klos

13 affidavit as part of the promise generally.

14                    With respect to the closing argument

15 by HERA, we didn't use it sooner because we just --

16 actually, I have to give credit where credit is due --

17 my colleague, Mr. Christensen just found it.  We

18 didn't try the Texas case, so we did find it in the

19 record.

20                    And fortunately for us, Highland

21 agrees on pages 13 and 14 of their own motion to

22 dismiss that the Court can "[consider] additional

23 materials from related litigation that were not

24 attached to the complaint if the plaintiff relied on

82

1   those materials in casting his complaint, as Daugherty

2   has done with regard to the Texas Action."

3                    The last paragraph on page 14 goes on

4   to say, "To the extent the Court finds that the Texas

5   Action materials are not already subject to

6   consideration based on Daugherty's extensive reliance

7   on them, Defendants respectfully request that the

8   Court take judicial notice of the documents under

9   Delaware Rule of Evidence 202(d)(2)."

10                   So we submit that the Court certainly

11  can consider the trial transcript from the Texas

12  action as further support for the reasonableness of

13  Mr. Daugherty's reliance.

14                   And my final point with respect to the

15  escrow agreement and the notion -- I think that what

16  Mr. Katz said is that Daugherty, in his view, has no

17  direct rights under that agreement.  The only real

18  direct relevance of the escrow agreement with respect

19  to the promissory estoppel claim is that it's even

20  more evidence of the reasonableness of Mr. Daugherty's

21  reliance on the promise because it's consistent with

22  that promise.

23                   Thank you, Your Honor.

24                   THE COURT:  Thank you.

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 184   Exhibit 15   Filed 09/29/23   Page 294 of 98   Page 757 of 1104   PageID 16891

83

1            Anything to -- Mr. Katz, I'll give you

2    the last word.

3            MR. KATZ:  No, Your Honor.

4            Just to address Counsel's last point

5    about just finding the statement.  You know, again, I

6    think that the issue is what did Mr. Daugherty

7    actually rely on.  Their claim is that when he wired

8    $3.2 million -- not what statements Counsel has found

9    in the record recently that could be retroactively

10   applied that way.

11           And Counsel's -- again, the complaint

12   that is in front of Your Honor that has the

13   allegations rely on the two statements and is very

14   clear that -- it is explained in their briefing --

15   that the remedies -- that the detrimental reliance was

16   forbearance from taking action in the Texas lawsuit.

17           So anything that occurred anytime

18   after they could raise issues in a Texas lawsuit could

19   not have been a basis for detrimental reliance.

20           THE COURT:  Thank you.

21           I'm going to take a recess.  It will

22   be at least 20 minutes.  So stretch your legs, do

23   whatever.  It'll probably be longer than that.  But --

24   thanks for your patience, but it's faster this way in

84

1    the short term.

2                     So we are in recess.

3         (Recess taken from 3:35 p.m. until 4:18 p.m.)

4                     THE COURT:  Thank you for your

5    patience.

6                     I'm going to start with the motion for

7    a status quo order.  It is denied.  We have some time

8    constraints this afternoon, so I will cut to the

9    chase.  Daugherty has not established a threat of

10   imminent irreparable harm as he must.  It is clear

11   that Daugherty is pursuing this relief now based on

12   what happened in the *Redeemer* case.  This complaint

13   was filed in July 2017, and he did not seek the relief

14   that he's now seeking until after the papers on the

15   status quo order dispute were filed in the *Redeemer*

16   case.  And Daugherty cites Highland's submissions in

17   that case in his brief.

18                    I disagree with Daugherty's reading of

19   the *Redeemer* papers as indicating that Highland is in

20   "severe financial distress" and is "unable to satisfy"

21   the arbitration judgment at issue there.  And the

22   facts are very different as between the two cases.

23   Before going to arbitration, there were issues

24   involving control over assets that led to Highland

85

1   making representations to the Court in the *Redeemer*

2   case.  And in the more recent request for a status quo

3   order related to confirming an arbitration judgment,

4   there was no separate claim that this court needed to

5   adjudicate, like Daugherty's fraudulent transfer claim

6   here.

7                    And, finally, the *Redeemer* parties

8   ultimately stipulated to a status quo order.  So I

9   don't think that anything that this court did in

10  entering the agreed-upon status quo order is helpful

11  in deciding whether to issue one in this case.

12                   Daugherty says that Highland has a

13  pattern of avoiding judgments, but has given me no

14  reason to think that Highland is going to do something

15  between now and a post-trial opinion that would make

16  it incapable of satisfying a judgment, nor is there

17  anything in the *Redeemer* case that leads me to believe

18  that.

19                   Quite frankly, if Highland is as good

20  at avoiding judgments as Daugherty claims, Highland

21  would have already moved the assets.  Daugherty, in

22  his reply, touches on that point and raises concerns

23  about whether the assets have already been

24  transferred.  He used a metaphor about the straw

86

1  breaking the camel's back.  I'm going to use a

2  different ungulate.  He's provided no reason to

3  believe the horse is not already out of the barn or

4  that the horse is going to imminently flee the barn.

5            So I fully appreciate that Daugherty

6  says that this is what happened to him in Texas, and

7  I've indicated before that I agree with Vice

8  Chancellor Glasscock's sentiment that what happened

9  here fails more than the smell test.  But that doesn't

10  mean that there is a sufficient imminent threat that

11  it's going to happen here with Highland.

12            I also distinguish this case from Vice

13  Chancellor Glasscock's entry of a status quo order in

14  the *Trussway* matter, which admittedly was, in part,

15  based on Highland's "prior history."  In that ruling,

16  Vice Chancellor Glasscock noted the unique appraisal

17  remedy that was at issue there, and distinguished that

18  property right -- which is meant to substitute for a

19  stockholder's ability to insist on unanimity in a

20  merger -- from recovery in a tort or contract case.

21  Daugherty is seeking the more common sort of recovery

22  here, so I do not find *Trussway* instructive.

23            So, in sum, because Daugherty's motion

24  for a status quo order is based on a recent

87

development that does not support a conclusion that

Daugherty faces imminent irreparable harm, the motion

for a status quo order is denied.

             Mr. Christensen, do you have any

questions about that?

             MR. CHRISTENSEN:  No, I do not.

             THE COURT:  Okay.  Anything from DLA?

             MR. KATZ:  No, Your Honor.

             THE COURT:  Thank you.

             Moving on to the motion to dismiss.

Highland's motion to dismiss Count IX of the amended

complaint is denied.  Count IX is a claim for a

promissory estoppel.  And to state a claim for

promissory estoppel, a plaintiff must plead four

elements.

             The first is that a promise was made.

The second is that it was the reasonable expectation

of the promisor to induce action or forbearance on the

part of the promisee.  The third is the promisee

reasonably relied on the promise and took action to

his detriment.  The fourth is that the promise is

binding because injustice can be avoided only by

enforcement of the promise.  That's all from the

*Chrysler* case out of the Supreme Court in 2003.

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 131   Filed 08/28/23   Page 762 of 1104   PageID 16896
Exhibit 15   Page 392 of 98

88

1                     On Highland's motion to dismiss, I

2        applied a reasonable conceivability standard of

3        Rule 12(b)(6).  Under that standard, I must accept all

4        well-pleaded factual allegations as true, accept even

5        vague allegations in the complaint as well-pleaded if

6        they provide the defendant notice, draw all reasonable

7        inferences in favor of the plaintiff, and deny the

8        motion unless the plaintiff could not recover under

9        any reasonably conceivable set of circumstances

10       susceptible of proof.  That familiar standard is from

11       *Century Mortgage Company v. Morgan Stanley.*

12                     Applying this standard, plaintiff has

13       adequately pled the four elements.  First, Highland

14       made promises through representations it and its

15       agents made in the Texas action.  Highland, through

16       testimony, explained that Daugherty would receive the

17       escrowed assets upon a judgment being finalized.

18                     Daugherty cites testimony from James

19       Dondero, Highland's cofounder and president.  On

20       direct examination, Dondero was asked what would

21       happen to Daugherty's interest that was being held in

22       escrow, and Dondero stated that it would go to

23       Daugherty via HERA if he won.  This testimony is cited

24       in paragraphs 43 and 129 of the complaint.

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 134    Filed 12/29/23    Page 763 of 1104    PageID 16897
Exhibit 15    Page 90 of 98

89

1               Highland tries to distance itself from

2      Dondero, but it cannot do so at this stage.  Highland

3      says Dondero was testifying in a personal capacity.

4      But the witness list Highland filed in the Texas

5      action shows that is not the case.  That is Exhibit A

6      to Daugherty's answering brief.  Highland had no

7      response to this in its reply brief, beyond

8      reiterating its original argument that Dondero was not

9      speaking on Highland's behalf.

10              Based on the allegations of the

11     complaint, including Dondero's role, it is reasonably

12     conceivable he was speaking on behalf of Highland.

13              Other support for the alleged promise

14     comes from an affidavit attached as Exhibit I to the

15     complaint from David Klos.  Klos submitted the

16     affidavit and stated he had "... personal knowledge of

17     the facts stated in this affidavit as the Senior

18     Manager of Finance for Highland Capital ..." and

19     because he oversaw accounting relating to HERA.  Klos

20     reiterated in his affidavit what the escrow agreement

21     says, and Dondero testified to, which is that after a

22     final nonappealable judgment, A&B, as the escrow

23     agent, would transfer the deposit assets to HERA.

24              Highland also tries to distance itself

90

1  from Klos.  And it cannot do so, as the document

2  presented to the Texas court states Klos was providing

3  the affidavit in his capacity as Highland's Senior

4  Manager of Finance.  At this stage, that is

5  sufficient.

6              Together, these allegations are

7  sufficient to establish that Highland made a promise

8  that the assets would be held in escrow and released

9  to Daugherty, via HERA, if Daugherty won in Texas.

10              Second, the reasonable expectation of

11  Highland as the promisor was to induce action or

12  forbearance on the part of Daugherty as promisee.

13              In briefing, Highland says the

14  statements were not directed to Daugherty, "... but

15  rather [to] the jury, the judge, legal counsel, the

16  public, and so forth."  That's a quote from page 20 of

17  Highland's reply.  It simply makes no sense to say

18  that the statements were directed to everyone else

19  involved in the legal proceeding -- indeed, in the

20  world by virtue of including "the public" -- but not

21  Daugherty, who had the greatest interest in that

22  proceeding.  It is reasonably conceivable the

23  reasonable expectation of someone discussing the

24  escrow agreement, as Highland did, would have been to

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 134   Filed 09/26/23   Page 765 of 1104   PageID 16899
Exhibit 15   Page 292 of 98

91

1   induce action or forbearance by their adversary in the
2   litigation.
3                  Third, it is reasonably conceivable
4   that Daugherty reasonably relied on the promise and
5   took action to his detriment.
6                  Daugherty could have pursued other
7   strategies if the escrow was not in place.  Daugherty
8   paid a judgment in the same case to Highland, which he
9   alleges was in the amount of $3.2 million.  If
10  Daugherty knew what would happen with the escrow, he
11  could have fought tooth and nail for an offset of the
12  judgment amounts.
13                 Highland focuses on the availability
14  of a triangular offset in this situation, asserting
15  that even if HERA owed Daugherty money, Daugherty was
16  legally unable to offset the judgment he owed Highland
17  by what he was owed from HERA.  I think that misses
18  the point, which is that Daugherty forewent even
19  trying to obtain the offset, and bringing the issue to
20  the attention of the Texas court.
21                 He could have argued for other
22  provisions in the final judgment, but he didn't.  He
23  paid his judgment and expected HERA and Highland would
24  do the same as set forth in the escrow agreement.

92

1              Other members of this court have

2    adopted a "no-chumps policy," meaning that good guys

3    should not feel like chumps for following the rules.

4    Daugherty played the game straight, and alleges

5    Highland and HERA didn't.  It is at least reasonably

6    conceivable that Daugherty pursued the strategy he did

7    because of the promises Highland made during the

8    course of the litigation.

9              And that reliance was reasonable.

10   Highland says Daugherty should have expected the worst

11   because the language of the escrow agreement allowed

12   the escrow agent to resign at any time, and so it was

13   never a sure thing that the assets would be available

14   to Daugherty.

15              In its reply, Highland says there was

16   never any promise "... that the Escrow Agreement would

17   never be terminated or that the Deposit Assets would

18   never be transferred back to Highland ...."  That

19   reflects a dim view of the world, the way adversaries

20   should evaluate the representations and promises made

21   during litigation, and how the people making those

22   promises should conduct themselves.  Daugherty has

23   adequately pled it was reasonable for him to rely on

24   the statements he's identified.

CHANCERY COURT REPORTERS

93

1            Fourth and finally, it is reasonably

2      conceivable that the promise is binding because

3      injustice can be avoided only by enforcement of the

4      promise.

5            Daugherty has made the point that

6      Highland walked away from the Texas litigation with

7      the benefit of both judgments.  It received the assets

8      supposedly held in escrow to satisfy the judgment for

9      Daugherty, and it received payment from Daugherty to

10     satisfy the judgment against him.

11           Black's Law Dictionary defines

12     "injustice" as "an unjust state of affairs;

13     unfairness."  As myself and Vice Chancellor Glasscock

14     have indicated, Daugherty's allegations raise serious

15     concerns over the fairness of how things played out in

16     Texas.  It may be that the only way to avoid injustice

17     is to enforce the promises.

18           It is not fatal to Daugherty that he

19     has pled alternative theories of relief.  Our Rule 8

20     allows it, and our Supreme Court has blessed doing so

21     for promissory estoppel in the *Chrysler v. Chaplake*

22     *Holdings* case.  At the pleadings stage, those

23     alternative theories of relief can go forward.

24           Highland also claims promissory

94

1   estoppel is not needed to prevent injustice because

2   the alleged promises are incorporated within the

3   escrow agreement, an enforceable contract.  But

4   Daugherty is not a party or a third-party beneficiary,

5   and so cannot sue under the contract's terms.  For

6   those reasons, the motion to dismiss is denied.

7                    Mr. Katz, any questions?

8                    MR. KATZ:  No, Your Honor.

9                    THE COURT:  Anything from you,

10   Mr. Uebler?

11                    MR. UEBLER:  No, Your Honor.

12                    THE COURT:  I'd like to, then, talk

13   about how we're going to get the summary judgment

14   briefing done in time for trial and in time for me to

15   have a minute to think about it.

16                    MR. KATZ:  Your Honor, we conferred --

17   my colleague conferred with Mr. Uebler this morning.

18   I think we've worked out a schedule.

19                    THE COURT:  How long does that

20   schedule leave me to think about it?

21                    MR. UEBLER:  Let me take a stab at

22   this, Your Honor, and see if it makes any sense to

23   you.  So it's my understanding that the defendants are

24   going to cross-move, or Highland -- it's a claim

95

1    against Highland.  Highland will cross-move for

2    summary judgment, and we will receive an answering

3    brief/opening brief by June 14th.  We'll reply by

4    June 28th.  And then looks like July 17th will be the

5    final brief.

6                    And I'm sure I speak for all the

7    parties when I say we have no intention of imposing a

8    burden on the Court to resolve that motion prior to

9    trial.  I think -- at least my view, and Mr. Katz and

10   Mr. Reed can chime in -- we don't necessarily need to

11   resolve the summary judgment/indemnification claim

12   before trial because there's really not that much, if

13   any, issue of fact to try regarding indemnification.

14                   I would propose that we resolve on the

15   papers, when the Court's able to do so, the issue of

16   entitlement.  And then, to the extent there's an issue

17   of allocation or reasonableness, we can get together

18   and propose something similar to Vice Chancellor

19   Laster's *Fitracks* opinion.  That was an advancement

20   case, but I would envision something similar here.

21                   So we're working in parallel and not

22   burdening anybody prior to trial on those issues.

23                   THE COURT:  Anything to add?

24                   MR. KATZ:  No, Your Honor.

96

                    THE COURT:  All right.  That works for

me, then, especially with the logical conclusion that

this can just kind of float in parallel to the real

merits issues to be handled at trial.

                    Anything else that we need to discuss

today while we're all together?

                    MR. KATZ:  Not from our side.

                    THE COURT:  We pretty much handled

every aspect of the case today.  Thank you, all, for

your presentations, they were helpful.  And we'll be

in touch.

                    We're adjourned.

                    (Court adjourned at 4:33 p.m.)

                              – – –

97

1                        CERTIFICATE

2

3                   I, KAREN L. SIEDLECKI, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, Registered Merit Reporter, and Certified

6    Realtime Reporter, do hereby certify that the

7    foregoing pages numbered 3 through 96 contain a true

8    and correct transcription of the proceedings as

9    stenographically reported by me at the hearing in the

10   above cause before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated, except for

12   the rulings at pages 3 through 19 and 84 through 94

13   which were revised by the Vice Chancellor.

14                   IN WITNESS WHEREOF I have hereunto set

15   my hand at Wilmington, this 22nd day of May, 2019.

16

17

18

19                   /s/Karen L. Siedlecki

20        ----------------------------
                Karen L. Siedlecki
21             Official Court Reporter
              Registered Merit Reporter
22           Certified Realtime Reporter

23

24

CHANCERY COURT REPORTERS

# EXHIBIT 16

EFiled:  Jul 08 2019 04:21PM EDT
Transaction ID 63518449
Case No. 2017-0488-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                  )
                                    )
     Plaintiff,                   )
                                    )
v.                                  )          C.A. No. 2017-0488-MTZ
                                    )
HIGHLAND CAPITAL MANAGEMENT,        )
L.P., HIGHLAND EMPLOYEE             )
RETENTION ASSETS LLC,              )
HIGHLAND ERA MANAGEMENT LLC,       )
and JAMES DONDERO,                  )
                                    )
     Defendants,                  )
                                    )
    and                          )
                                    )
HIGHLAND EMPLOYEE                   )
RETENTION ASSETS LLC,              )
                                    )
     Nominal Defendant.           )

## ORDER DENYING APPLICATION TO CERTIFY INTERLOCUTORY APPEAL

WHEREAS:

A.    Plaintiff Patrick Daugherty was a partner and senior executive of Defendant Highland Capital and certain of its affiliates from 1998 until his resignation in 2011.

B.    Highland sued Daugherty in Texas, and Daugherty countered with claims against Highland and Highland Employee Retention Assets LLC ("HERA") (the "Texas Action").

C.    During the course of the Texas Action, Defendants represented to the Texas court that Highland had placed Daugherty's HERA interests, worth approximately $3.1 million, in escrow with Abrams & Bayliss LLP as escrow agent.

D.    Highland received a judgment against Daugherty, and Daugherty received a judgment against HERA.  Daugherty paid the judgment against him. HERA did not pay the judgment against it.  The day after the Texas judgment became final and non-appealable, Abrams & Bayliss resigned as escrow agent and transferred the escrow assets it held back to Highland.  HERA claimed to have no assets to satisfy a judgment.

E.    Daugherty responded by filing his complaint in this action on July 6, 2017.  Vice Chancellor Glasscock, who previously presided over this case, dismissed some of Daugherty's claims.  Daugherty then filed his first amended complaint.  The case was reassigned to me in October 2018.  After Daugherty filed his second amended complaint, I denied a motion to dismiss.  The surviving claims are for fraudulent transfer, unjust enrichment, and indemnification.

F.    On February 2, 2018, Daugherty served a subpoena on Abrams & Bayliss.[1]  Defendants moved to quash the subpoena "in its entirety given the privileged and sensitive nature of the information requested and Daugherty's

_____

[1] D.I. 52.

failure to demonstrate relevance to this lawsuit."[2]    Vice Chancellor Glasscock

heard the motion to quash.    He started the argument by stating "general

principles":

> First, information regarding the actions of Abrams & Bayliss in
> connection with its operation of the escrow as agents of Highlands,
> HERA, those documents, that information is relevant, and it doesn't
> appear to me to be generally privileged. Second, to the extent the
> subpoena requests attorney client privilege material, I'm going to need
> a privilege log to decide issues of privilege, waiver, and common
> interest doctrine. Third, it is appropriate to seek discovery from the
> escrow agent as well as from the defendants.  Fourth, the subpoena in
> question is overbroad as it seeks information far beyond Abrams &
> Bayliss' documents as escrow agents, and I'm not going to require a
> third party to answer overbroad discovery requests that surely
> implicate attorney-client privilege.  Fifth, I am therefore disposed to
> quash the subpoena with leave to file a more narrow subpoena. And
> once that subpoena is issued, there needs to be a meaningful meet and
> confer as to what is producible and what is not so that the disputes that
> come to me are tailored to the discoverability of the documents and
> any privilege that may apply.[3]

    G.    Daugherty again subpoenaed Abrams & Bayliss, which produced 285

documents.    Daugherty and Abrams & Bayliss met and conferred.    Defendants

asserted more than 300 documents were privileged.

    H.    Daugherty challenged Defendants' privilege assertions by moving to

compel (the "Motion").    Daugherty challenged whether documents relating to

Abrams & Bayliss's work as escrow agent were properly withheld, and argued the

---

[2] D.I. 61 ¶ 2.

[3] D.I. 97 at 3-4.

crime-fraud exception vitiated any proper assertion of privilege.  I heard argument

on April 12.[4]  The hearing was not productive as Defendants could not articulate

the scope of their claimed privilege.  I gave Highland yet another chance to defend

its privilege and reconsider its privilege log, and specifically requested Abrams &

Bayliss's engagement letter and billing records.  I also requested to review the

withheld documents *in camera*.[5]

   I.     After receiving and reviewing the documents on the Defendants'

privilege log *in camera*, I granted the Motion (the "Motion to Compel Ruling").

The privilege log was organized chronologically, and the withheld documents fell

into four categories.   The first comprised documents regarding the initiation,

negotiation, and establishment of Abrams & Bayliss as Highland's escrow agent.

The second comprised Abrams & Bayliss's legal work during the pendency of the

Texas action to determine whether and how Daugherty might access the escrowed

assets.  The third category comprised Abrams & Bayliss's work responding to a

subpoena in Texas.  And the fourth comprised documents regarding Abrams &

Bayliss's resignation as Highland's escrow agent.

   J.     For reasons set forth at length in the Motion to Compel Ruling, I

concluded that "unfortunately my *in camera* review confirmed Daugherty's fear

---

[4] D.I. 181.

[5] D.I. 181 at 37-38.

that Highland is improperly withholding documents in categories 1 and 4 illustrating A&B's service and resignation as escrow agent, which are nonprivileged materials."[6]  I decided any privilege related to the topics in categories 1 and 4 was waived, but stopped short of a broader waiver.[7] Additionally, I concluded that even assuming categories 1 and 4 were privileged, the crime fraud exception applied to categories 1, 2 and 4.[8]

K.    On May 24, 2019, Defendants moved for reargument.[9]  On June 3, Defendants moved to stay the implementation of the Ruling pending interlocutory appeal.  On June 17, I denied Defendants' motion for reargument and declined to stay the decision pending interlocutory appeal (the "Reargument Ruling" and together with the "Motion to Compel Ruling," the "Rulings").[10]  I ordered the parties to agree upon a framework under Delaware Rule of Evidence 510(f) to govern discovery under the Rulings, which was entered on June 27.

---

[6] D.I. 218 at 4.

[7] *Id*. at 10 ("**Because Highland stuck by its position and continued to assert such a large percentage of improper privilege assertions while claiming it was producing documents concerning A&B's role as escrow agent, any privilege related to that topic is waived, and a full waiver of Highland's privilege could be an appropriate consequence. … I conclude Highland's unjustified withholding of other documents related to the escrow was not so egregious as to waive any privilege over these two sets of documents.").

[8] *Id*. at 10-15.

[9] D.I. 211.

[10] D.I. 253 (unredacted, filed under seal); D.I. 254 (redacted).

5

L.    On June 17, Defendants applied for certification of an interlocutory appeal of the Rulings (the "Application").[11]   Defendants identified three issues for certification:

> 1.   Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection without sufficient prima facie evidence that a party committed or attempted a fraud?
>
> 2.   Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection with respect to communications years before an alleged fraudulent transfer and without specific findings that each communication at issue was made in furtherance of the alleged fraud?
>
> 3.   Can the Court impose a waiver of privilege as punishment from a party's good faith, but ultimately incorrect, assertion of privilege?[12]

M.    Plaintiff filed his opposition to the Application on June 27.

N.    Under Supreme Court Rule 42(b), there are to be no interlocutory appeals "unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment."[13]

O.    "If the 'substantial issue' requirement is met, this Court will then analyze whether 'there are substantial benefits that will outweigh the certain costs

---

[11] D.I. 231.

[12] D.I. 231 at 5.

[13] Supr. Ct. R. 42(b)(i).

6

that accompany an interlocutory appeal.'"[14]  Under Supreme Court Rule 42(b)(iii)

the Court weighs the following factors along with "its own assessment of the most

efficient and just schedule to resolve the case":

> (A) The interlocutory order involves a question of law resolved for the first time in this State; (B) The decisions of the trial courts are conflicting upon the question of law; (C) The question of law relates to the constitutionality, construction, or application of a statute of this State, which has not been, but should be, settled by this Court in advance of an appeal from a final order; (D) The interlocutory order has sustained the controverted jurisdiction of the trial court; (E) The interlocutory order has reversed or set aside a prior decision of the trial court, a jury, or an administrative agency from which an appeal was taken to the trial court which had decided a significant issue and a review of the interlocutory order may terminate the litigation, substantially reduce further litigation, or otherwise serve considerations of justice; (F) The interlocutory order has vacated or opened a judgment of the trial court; (G) Review of the interlocutory order may terminate the litigation; or (H) Review of the interlocutory order may serve considerations of justice.

P.    "If the balance is uncertain, the trial court should refuse to certify the

interlocutory appeal."[15]

**IT IS ORDERED**, this 8th day of July, 2019, that the Application is

DENIED based on the following:

1.    The Rulings did not decide "a substantial issue of material importance

that merits appellate review before a final judgment."[16]  "The 'substantial issue'

---

[14] *Sider v. Hertz Glob. Hldgs., Inc.*, 2019 WL 2501481, at *4 (Del. Ch. June 17, 2019) (quoting Supr. Ct. R. 42(b)(ii)).

[15] Supr. Ct. R. 42(b)(iii).

requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters."[17]  "Generally speaking, the substantive element of the appealability of an interlocutory order must relate to the merits of the case, not to matters of discovery."[18]  That "proscription against interlocutory review of discovery rulings 'does not change merely because the discovery/disclosure order implicates the attorney-client privilege.'"[19]  The Rulings decided the application and waiver of the attorney-client and work product privileges, not a main issue on the merits.  The Rulings did not decide a substantial issue of material importance that warrants appellate review before a final judgment.

2.    Highland argues that it is not seeking "appellate review simply so that an appellate court can re-review each communication at issue and evaluate the privilege determinations made. . . . What [it] seeks is different.  It challenges the

---

[16] Supr. Ct. R. 42(b)(i).

[17] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008).

[18] *In re Examworks Grp., Inc.*, 2018 WL 1672991, at *2 (Del. Ch. Apr. 05, 2018) (ORDER) (quoting *Castaldo v. Pittsburgh-Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973)); *accord Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1993 WL 478084, at *1 (Del. Nov. 16, 1993) (ORDER); *see also Deloitte LLP v. Klig*, 2010 WL 3736141, at *1 (Del. Sept. 27, 2010) (ORDER) (refusing interlocutory appeal of order finding waiver of privilege).

[19] *Certain Underwriters at Lloyd's, London v. Monsanto Co.*, 1991 WL 134471, at *1 (Del. June 7, 1991) (ORDER) (citations omitted) (quoting *In re Rinehardt*, 575 A.2d 1079, 1081 (Del. 1990)).

8

Order's _legal conclusions_ that will reverberate throughout this action."[20]  This is a distinction without a difference.  Whether a party properly asserted a privilege, or whether an exception to the privilege applies, is a legal conclusion.  The question is whether it is the type of legal conclusion that warrants interlocutory review.  It is not.

3.    Turning to the factors underpinning whether there are substantial benefits that will outweigh the costs of interlocutory appeal, Highland identifies only Supreme Court Rule 42(b)(iii)(B) and (H) as favoring its Application.  I therefore "limit[] my review principally to those" issues.[21]  In short, the high costs of piecemeal litigation and interlocutory appeals outweigh the value of this Application.  This is particularly true here where trial will start on September 10 and there are other ongoing discovery disputes requiring the parties' attention.[22]

4.    The Rulings do not conflict with decisions of other trial courts.[23] Defendants have not identified any Delaware decision at odds with the Rulings on the crime-fraud exception.  Defendants cite authorities, such as _Buttonwood Tree_

---

[20] D.I. 231 at 6 (emphasis in original).

[21] _Chemours Co. v. DowDuPont Inc._, 2019 WL 2404817, at *3 (Del. Ch. June 7, 2019).

[22] On July 5, I attempted to quantify and remedy Defendants' other discovery shortcomings by appointing a third-party neutral to collect documents.  D.I. 255.  It is possible that trial will have to be postponed.  But this possibility, borne from Defendants' failure to collect their own documents, should not support the relief Defendants seek here.

[23] Supr. Ct. R. 42(b)(iii)(B).

*Value Partners, L.P. v. R.L. Polk & Co.*,[24] and *Princeton Ins. Co. v. Vergano*,[25]
discussed in the Rulings, and argue the Court erred in ruling Daugherty had made a
*prima facie* showing of fraud.  Defendants do not dispute that Abrams & Bayliss
assisted Highland in the transaction that Daugherty claims was fraudulent, but
argue he "has not established through a prima facie showing [] that the transaction
*was* fraudulent."[26]

5.    Distilled, Defendants' argument is that Daugherty has not shown
sufficient evidence of fraud in Highland's "desire to avoid paying money to
Daugherty."[27]    In arguing the Court applied a standard that was too low,
Defendants advocate for a standard that is too high.   As explained in the
Reargument Ruling, "the party opposing the privilege is not required to introduce
evidence sufficient to support a verdict of crime or fraud or even to show that it is
more likely than not that the crime or fraud occurred."[28]  Discovery to date, and *in
camera* review, indicate that Defendants used Abrams & Bayliss as their escrow
agent, made numerous representations to the Texas court and Daugherty that assets
to satisfy any judgment were held in escrow, held the assets in escrow differently

---

[24] 2018 WL 346036 (Del. Ch. Jan. 10, 2018).

[25] 883 A.2d 44 (Del. Ch. 2005).

[26] D.I. 231 at 9 (emphasis in original).

[27] *Id.* at 9 n.2.

[28] D.I. 254 at 11 (quoting *Kickflip, Inc. v. Facebook, Inc.*, 2016 WL 5929003, at *5 (D.
Del. Sept. 14, 2016)).

than represented, and then at the end of it all directed Abrams & Bayliss to transfer assets from that same escrow to Highland to avoid satisfying the judgment to Daugherty.[29]   Daugherty met his burden of showing a *prima facie* case of fraud sufficient to warrant the crime-fraud exception.   Defendants cite no Delaware decisions that conflict with this analysis.   As a result, they have not shown interlocutory review is warranted to resolve conflicting decisions.

6.    Defendants also argue that the Court applied the crime-fraud exception too broadly and "did not make the factual finding needed to support its conclusion that each communication [] 'was made in furtherance of a fraud' and thus fell within the exception."[30]   In fact, *in camera* review showed that the documents in category 2 reflected "efforts that culminated in the allegedly fraudulent acts."[31]   The Court made the factual finding Defendants seek.   Again, Defendants cannot identify Delaware decisions that conflict with this analysis, and so have not shown interlocutory review is warranted.

7.    Finally, Defendants argue the Rulings conflict with precedent concerning the sanction of a punitive waiver.   Defendants have failed to present a conflict among trial court decisions that merits interlocutory review.   Waiver was

---

[29] I described specific documents in the Reargument Ruling, but sealed that portion of the transcript pending resolution of Defendants' Application and will not repeat that description here.   *See* D.I. 253 at 13-15.

[30] D.I. 231 at 10.

[31] D.I. 218 at 13.

11

based on Defendants' persistence in claiming privilege over the work of their escrow agent, after Vice Chancellor Glasscock informed them that work was not privileged, and after they were given multiple opportunities to follow those instructions.[32]  The waiver component of the Rulings "applied settled principles of law" on the application and waiver of privilege.[33]  "An improperly asserted claim of privilege is no claim at all."[34]  Further, for reasons explained in the Reargument Ruling, Defendants misconstrued the Motion to Compel Ruling: I concluded categories 1 and 4 were not privileged, but went on to make the point that even if they were, that privilege would have been waived.  Defendants have not identified any documents or testimony that they assert are privileged but that they must produce as a result of the waiver.

8.     The second factor Defendants address is that interlocutory review may serve considerations of justice.[35]  Defendants seek interlocutory relief on the secondary holding that categories 1 and 4 would be waived if they were privileged, and on the crime-fraud exception, in pursuit of a different set of guideposts for the remainder of the case.  The Supreme Court has declined to intervene to move discovery guideposts, even where the attorney-client privilege (and any harm

---

[32] Ex. 254 at 19-22.

[33] *Klig v. Deloitte LLP*, 2010 WL 3489735, at *9 (Del. Ch. Sept. 7, 2010) (describing decisions applying principle).

[34] *Id*. at *4.

[35] Supr. Ct. R. 42(b)(iii)(H).

flowing from disclosure) is at issue.[36]  This factor does not support interlocutory

appeal.

9.      Neither side argues any of the remaining factors set out in Supreme

Court Rule 42(b)(iii).  None of those factors apply here.

10.    In line with our State's general preference against interlocutory

appeals, I decline to certify the Rulings for interlocutory review.

_/s/ Morgan T. Zurn_____
Vice Chancellor Morgan T. Zurn

---

[36] *Supra* ¶ 1.

# EXHIBIT 17

Case 19-34054-sgj11    Doc 3596-17    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-1 Filed 11/06/23 Page 22 of 5 Page 787 of 1104    PageID 16921
Case 18-30264-sgj11 Doc 75 Filed 03/20/18    Entered 03/20/18 17:26:53    Page 1 of 4





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 20, 2018**

_____
**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-7** |
| | § | |
|     **Alleged Debtor.** | § | |

_____

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.P.,** | § | **CASE NO. 18-30265-SGJ-7** |
| | § | |
| | § | |
|     **Alleged Debtor.** | § | |

**ORDER DENYING ALLEGED DEBTORS' JOINT MOTION TO DISMISS THE
INVOLUNTARY PETITIONS FILED BY JOSHUA N. TERRY FOR LACK OF
SUBJECT MATTER JURISDICTION OR, ALTERNATIVELY, TO COMPEL
ARBITRATION[1] [DE ## 72 & 73]**

_____

[1] DE ## 72 & 73 in Case No. 18-30264; DE ## 69 & 70 in Case No. 18-30265.

1

Case 19-34054-sgj11    Doc 3596-17    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document Exhibit 17 Filed Page 226 of 5   Page 788 of 1104   PageID 16922
Case 18-30264-sgj11 Doc 75 Filed 03/20/18    Entered 03/20/18 17:26:53    Page 2 of 4

Late at night on March 19, 2018—on the day before a long-scheduled Trial of an

Involuntary Bankruptcy Petition filed against the above-referenced Alleged Debtors—and

despite the provisions of an Agreed Scheduling Order dated February 26, 2018 (which clearly

contemplated that motions to dismiss, supplements, and other pleadings would have been filed

significantly prior to March 19, 2018)—the Alleged Debtors filed a Joint Motion to Dismiss the

Involuntary Petitions filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or,

Alternatively, Motion to Compel Arbitration (the "Motions to Dismiss/Compel"),[2] and a

supplement thereto on March 20, 2018.[3]  The Motions to Dismiss/Compel argue a lack of subject

matter jurisdiction, with regard to this court's ability to adjudicate the Involuntary Bankruptcy

Petitions, because allegedly Petitioning Creditor Joshua Terry (the "Petitioning Creditor") lacked

standing to file the Involuntary Bankruptcy Petitions because of an arbitration clause in an

Amended and Restated Agreement of Limited Partnership of ACIS Capital Management, L.P.

(the "Partnership Agreement") dated January 21, 2011, which required parties to the Partnership

Agreement to arbitrate disputes.  The arbitration clause at issue is found at Section 6.12 of the

Partnership Agreement.  The Motions to Dismiss/Compel alternatively argue that this court

should enforce/recognize the arbitration clause and order the parties to arbitrate whether the

above-referenced Alleged Debtors should be in bankruptcy.  The Motions to Dismiss/Compel are

**DENIED** for the following reasons:

---

[2] DE # 74 in Case No. 18-30264; DE # 71 in Case No. 18-30265.

[3] The court will presume that the Alleged Debtors thought that a subject matter jurisdiction argument—and
the fact that courts can consider their subject matter jurisdiction at all times during litigation—warranted their
blatant violation of the Agreed Scheduling Order.  The court will expect a good explanation in court as to why this
subject matter jurisdiction argument was made 47 days after the case was filed, and after a previous answer and
motion to dismiss were filed by the Alleged Debtor, and, of course, in violation of a court order.

APPX. 16315

Case 19-34054-sgj11   Doc 3596-17   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1-36   Filed 04/04/23   Page 426 of 5   Page 789 of 1104   PageID 16923
Case 18-30264-sgj11  Doc 75  Filed 03/20/18   Entered 03/20/18 17:26:53   Page 3 of 4

(1) The parties involved here have already arbitrated prepetition.  In fact, it is undisputed that the Petitioning Creditor obtained an arbitration award that was confirmed with a judgment in state court.

(2) Section 6.12 of the Partnership Agreement is not applicable because filing an involuntary bankruptcy case is a ***collection remedy*** available to creditors with unsecured claims that are not the subject of a bona fide dispute and whose claims aggregate at least $15,775 in amount.  It is not a ***claim*** or ***controversy*** in and of itself, and is certainly not a claim or controversy "arising of, relating to or in connection with the [Partnership] Agreement."

(3) Even if Section 6.12 of the Partnership Agreement is applicable, the filing of an involuntary bankruptcy case, such as in the case at bar, presents a "core" bankruptcy proceeding and a bankruptcy court has discretion to decline to stay its proceedings in deference to arbitration where the underlying nature derives exclusively from the Bankruptcy Code (*i.e.,* is "core") and arbitration conflicts with the purposes of the Code. Arbitration in the case at bar would irreconcilably conflict with the purposes and goals of the Bankruptcy Code (including, but not limited to, the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and debtors from piecemeal litigation, and the expeditious and equitable distribution of assets of a debtor's estate). *See In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1069-70 (5th Cir. 1997) (a bankruptcy court can deny enforcement of arbitration provisions when it finds either: (1) that enforcement of the provision would irreconcilably conflict with the Code; or (2) in exercising its discretion in a core case where the only rights at issue were created by the Code rather than inherited from pre-petition property of the debtors); *In re Gandy*, 299 F.3d 489, 499-500 (5th Cir. 2002) (same).

Case 19-34054-sgj11   Doc 3596-17   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-36   Filed 12/29/23   Page 790 of 1104   PageID 16924
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 4 of 4

**WHEREFORE** the Motions to Dismiss/Compel are **DENIED.**

**###END OF ORDER###**

# EXHIBIT 18

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 09/08/23   Page 792 of 1104   PageID 16926
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 1 of 229





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 31, 2019**

**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | **(Jointly Administered Under Case** |
| DEBTORS. | § | **No. 18-30264-SGJ-11)** |
| | § | |
| | § | **Chapter 11** |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMING THE THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC, AS MODIFIED

On December 11, 12 and 13, 2018, the Court held a hearing (the "Combined Hearing")

to consider (a) final approval of the *Disclosure Statement Pursuant to Section 1125 of the*

*United States Bankruptcy Code with Respect to the Third Amended Joint Plan for Acis Capital*

*Management, L.P. and Acis Capital Management GP, LLC* (the "Disclosure Statement") [Docket

No. 661] and (b) confirmation of the *Third Amended Joint Plan for Acis Capital Management,*

*L.P. and Acis Capital Management GP, LLC* (the "Third Amended Plan") [Docket No. 660], a

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 184    Filed 03/06/23    Page 793 of 1104    PageID 16927
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 2 of 229

copy of which is attached hereto as **Exhibit "1,"** as modified by (i) the *First Modification to the*
*Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management*
*GP, LLC* (the "First Modification") [Docket No. 693], a copy of which is attached hereto as
**Exhibit "2,"** and (ii) the *Second Modification to the Third Amended Joint Plan for Acis Capital*
*Management, L.P. and Acis Capital Management GP, LLC* (the "Second Modification") [Docket
No. 702], a copy of which is attached hereto as **Exhibit "3,"** as supplemented by the
*Supplement to Second Modification to the Third Amended Joint Plan for Acis Capital*
*Management, LP and Acis Capital Management GP, LLC* [Docket No. 769], a copy of which is
attached hereto as **Exhibit "4,"** filed by Robin Phelan (the "Chapter 11 Trustee"), as Chapter 11
Trustee for Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC
("Acis GP," and together with Acis LP, the "Debtors"). The Third Amended Plan, as modified by
the First Modification and Second Modification (as supplemented), is hereafter referred to as the
"Plan;" *provided that*, as provided in the last sentence of paragraph 13 of this Order, the
schedule of assumed executory contracts attached hereto as Exhibit 5 to this Order replaces, is
substituted for, and supersedes Exhibit B to the Third Amended Plan. Capitalized terms used in
this Order, unless otherwise specifically defined herein, shall be given the same meaning as in
the Plan and/or the Disclosure Statement.

The Combined Hearing was commenced at the time and date scheduled. Based on the
testimony, evidence admitted, judicial notice of the records of the Chapter 11 Cases, and the
arguments of counsel, the Court makes this *Findings of Fact, Conclusions of Law, and Order*
*Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan*
*for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*
("Order").

ACCORDINGLY, IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED
AND ORDERED THAT:

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 08/23/23   Page 794 of 1104   PageID 16928
Case 18-30264-sgj11  Doc 829  Filed 01/31/19   Entered 01/31/19 17:34:06   Page 3 of 229

A.      _Findings and Conclusions_.  All findings of fact or conclusions of law made by the

Court on the record at the Combined Hearing are hereby incorporated in their entirety into this

Order.  All findings of fact contained in the Court's _Findings of Fact and Conclusions of Law in_

_Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petitions_

entered on April 13, 2018 [Docket No. 118] are hereby incorporated in their entirety into this

Order.  The findings and conclusions set forth herein and in the record of the Combined Hearing

constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052

as made applicable herein by Bankruptcy Rule 9014.  To the extent any of the following findings

of fact constitute conclusions of law, they are adopted as such.  To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such.

B.      _Jurisdiction; Venue; Core Proceeding_.  The Court has jurisdiction over these

bankruptcy cases pursuant to 28 U.S.C. sections 157(b) and 1334.  Venue is proper before this

Court pursuant to 28 U.S.C. sections 1408 and 1409.  Final approval of the Disclosure

Statement and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. section

157(b)(2)(A), (L) and (O) over which the Court has exclusive jurisdiction and full constitutional

jurisdiction and authority to enter final orders with respect thereto.

C.      _Eligibility for Relief_.  The Debtors were and are eligible for relief under section

109 of the Bankruptcy Code.[1]

D.      _Commencement and Joint Administration of the Debtors' Cases_.  On January 30,

2018, Joshua N. Terry ("Terry") filed involuntary petitions under chapter 7 of the Bankruptcy

Code against both of the Debtors in the United States Bankruptcy Court for the Northern District

of Texas, Dallas Division (the "Court").  Acis LP's bankruptcy case was assigned Case No. 18-

30264, and Acis GP's bankruptcy case was assigned Case No. 18-30265.  The involuntary

petitions were contested and the Court held a multi-day trial spanning March 21, 22, 23, 27 and

---

[1] Unless otherwise indicated, section references are to the Bankruptcy Code.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-4  Filed 05/08/23    Page 795 of 1104    PageID 16929
Exhibit 18    Page 25 of 230
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 4 of 229

29, 2018.  On April 13, 2018, the Court entered an *Order for Relief in an Involuntary Case* in

both cases [Docket No. 119 in Case No. 18-30264 and Docket No. 114 in Case No. 18-30265].

Diane G. Reed (the "Chapter 7 Trustee") was appointed Chapter 7 Trustee in both cases.  On

motion of the Chapter 7 Trustee, the Court entered an *Order Directing Joint Administration*

[Docket No. 137],[2] which provides for the joint administration of the Debtors' respective

bankruptcy cases under Case No. 18-30264.

      E.     *Conversion of the Debtors' Cases and Appointment of the Chapter 11 Trustee*.

On motion of the Chapter 7 Trustee, the Court entered an *Order Granting Trustee's Expedited*

*Motion to Convert Cases to Chapter 11* [Docket No. 205] on May 11, 2018, converting the

Debtors' bankruptcy cases to cases under chapter 11 of the Bankruptcy Code.  On motion of

Terry, the Court entered an *Order Granting Emergency Motion for an Order Appointing A*

*Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital*

*Management GP, LLC Pursuant to Bankruptcy Code Section 1104(A)* [Docket No. 206] on May

11, 2018, directing the United States Trustee (the "U.S. Trustee") to appoint a Chapter 11

Trustee in the Chapter 11 Cases.  The U.S. Trustee appointed Robin Phelan as Chapter 11

Trustee in the Chapter 11 Cases.  Mr. Phelan's appointment as Chapter 11 Trustee in Acis LP's

case was approved pursuant to an *Order Approving Appointment of Chapter 11 Trustee* [Docket

No. 221] entered by the Court on May 17, 2018 and his appointment as Chapter 11 Trustee in

Acis GP's case was approved pursuant to an *Order Approving Appointment of Chapter 11*

*Trustee* [Docket No. 184 in Case No. 18-30265] entered by the Court on June 12, 2018.

      F.     *No Official Committee of Unsecured Creditors*.  The U.S. Trustee has not

appointed an official committee of unsecured creditors in the Chapter 11 Cases.

      G.     *Claims Bar Date*.   October 15, 2018 was originally fixed as the deadline for all

holders of alleged Claims (except for governmental units) to file proofs of Claim.  However, on

---

[2] Unless otherwise indicated, all references to the "Docket" refer to the Docket in Case No. 18-30264.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18    Filed 20/03/23    Page 796 of 1104    PageID 16930
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 5 of 229

motion of the Chapter 11 Trustee, the Court entered the Bar Date Order on July 9, 2018 [Docket
No. 387].  Pursuant to the Bar Date Order, August 1, 2018 was established as the deadline for
all holders of alleged Claims (except for governmental units) to file proofs of Claim and October
10, 2018 was established as the deadline for governmental units to file proofs of Claim.

H.     _Adequacy of Disclosure Statement_.  The Disclosure Statement contains
"adequate information," as that term is defined in section 1125 of the Bankruptcy Code and
satisfies all requirements of section 1125 of the Bankruptcy Code.

I.     _Solicitation Order Compliance_.  On October 3, 2018, the Chapter 11 Trustee filed
his _Chapter 11 Trustee's Amended Motion for Entry of Order (A) Conditionally Approving
Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure
Statement and Confirmation of Second Amended Joint Plan, and Setting Related Deadlines; (C)
Approving Forms for Voting and Notice; and (D) Granting Related Relief_ (the "Conditional
Approval Motion") [Docket No. 622].  The Chapter 11 Trustee filed a _Supplement to Amended
Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling
Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Second
Amended Joint Plan, and Setting Related Deadlines; (C) Approving Forms for Voting and
Notice; and (D) Granting Related Relief_ (the "Supplement to Conditional Approval Motion")
[Docket No. 646] on October 19, 2018.  The Court conducted a hearing on the Conditional
Approval Motion, as supplemented, on October 24, 2018.  On October 25, 2018, the Court
entered an _Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined
Hearing on Final Approval of Disclosure Statement and Confirmation of Second Amended Joint
Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV)
Approving Related Matters_ (the "Solicitation Order") [Docket No. 659] granting the Conditional
Approval Motion.  The Conditional Approval Motion was filed in connection with a second
amended plan of reorganization and disclosure statement with respect thereto.  However, for
convenience and ease of review, the modifications to the second amended plan and disclosure

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 04/06/23   Page 797 of 1104   PageID 16931
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 6 of 229

statement with respect thereto, including modifications discussed at the October 24, 2018

hearing, were incorporated into the Third Amended Plan and Disclosure Statement filed on

October 25, 2018.  Consequently, the Solicitation Order approved solicitation of votes on the

Third Amended Plan and distribution of the Disclosure Statement in connection with solicitation

of votes on the Third Amended Plan.  Pursuant to the Solicitation Order, the Court, among other

things: (a) conditionally approved the Disclosure Statement for use in soliciting votes on the

Third Amended Plan; (b) established procedures and deadlines for the solicitation and

submission of votes to accept or reject the Third Amended Plan (the "Solicitation Procedures");

(c) fixed deadlines for objections to final approval of the Disclosure Statement and/or

confirmation of the Third Amended Plan and related briefing deadlines; (d) fixed a deadline for

serving notice of the Combined Hearing; and (e) set the Combined Hearing to commence on

December 11, 2018, at 9:30 a.m., Central Time.  The Solicitation Order approved the following

documents (collectively the "Solicitation Materials") to be served on Creditors entitled to vote on

the Third Amended Plan:

> (i)    the Third Amended Plan;
>
> (ii)   the Disclosure Statement;
>
> (iii)  the Ballots for voting on the Third Amended Plan;
>
> (iv)   the Solicitation Order;
>
> (v)    a Notice (the "Combined Hearing Notice") [Docket No. 667] reflecting the deadlines and other information relating to the Combined Hearing; and,
>
> (vi)   a letter (the "Transmittal Letter") from counsel for the Chapter 11 Trustee.

The Solicitation Order directed the Chapter 11 Trustee to serve the Solicitation Materials on

holders of Claims in Classes 2 and 3 and Subclasses 4A and 4B under the Third Amended

Plan.  The Solicitation Order also authorized the tabulation of Ballots on a consolidated basis.

The Solicitation Order further directed the Chapter 11 Trustee to serve on various parties

defined in the Supplement to Conditional Approval Motion as the "Noteholders," "Highlands" and

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Exhibit 18 Filed 09/08/23 Page 29 of 230 Page 798 of 1104   PageID 16932
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 7 of 229

"Notice Parties" certain notices and copies of the following documents (the "Notice-Only Materials"):  the Disclosure Statement, the Third Amended Plan, the Solicitation Order and the Combined Hearing Notice.  The Chapter 11 Trustee has complied with the Solicitation Order, including the Solicitation Procedures contained therein, in all respects.

J.       *Transmittal and Mailing of Solicitation Materials; Notice*.  Due, adequate, and sufficient notice of the Third Amended Plan, Disclosure Statement and Combined Hearing, together with all deadlines for voting on the Third Amended Plan and for objecting to final approval of the Disclosure Statement and/or confirmation of the Third Amended Plan, has been given to known holders of Claims and Interests and, to the extent required, to all other known parties-in-interest, in compliance with the applicable Bankruptcy Rules and the Solicitation Order, as evidenced by the: (i) Combined Hearing Notice (and Certificate of Service included therewith) filed at Docket No. 667; (ii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Noteholders* (and Certificate of Service included therewith) filed at Docket No. 664; (iii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Highland Entities* (and Certificate of Service included therewith) filed at Docket No. 665; (iv) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Notice Parties* (and Certificate of Service included therewith) filed at Docket No. 666; and (v) *Certificate of Service* filed at Docket No. 676.  The packages containing the Solicitation Materials, the packages containing the Notice-Only Materials, and all other materials relating in any way to the solicitation process were transmitted and served in substantial compliance with the Solicitation Order and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth in the Solicitation Order, and all other applicable rules, laws and regulations.

K.       *Adequacy of Solicitation*.  The Chapter 11 Trustee distributed packages containing the Solicitation Materials to the holders of Claims entitled to vote on the Third

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18 Exhibit 18 Filed 09/08/23 Page 29 of 230  Page 799 of 1104    PageID 16933
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 8 of 229

Amended Plan and sufficient time was prescribed for such holders of Claims to vote on the

Third Amended Plan in substantial compliance with the Solicitation Order and the applicable

provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth

in the Solicitation Order, and all other applicable rules, laws and regulations.  Transmittal and

service were adequate and sufficient, and no further notice is or shall be required.  In addition,

holders of Claims not entitled to vote on the Amended Plan, and certain other parties-in-interest,

were provided with certain non-voting materials approved by the Court in compliance with the

Solicitation Order.  All procedures used to distribute the Solicitation Materials to holders of

Claims entitled to vote on the Third Amended Plan were fair and conducted in good faith and in

accordance with the Bankruptcy Code, Bankruptcy Rules, the Solicitation Procedures contained

in the Solicitation Order, and all other applicable rules, laws and regulations.

        L.     *Good Faith Solicitation – Section 1125(e)*.  Based on the Record, the Chapter 11

Trustee and Estate Professionals have acted in good faith within the meaning of sections

1125(e) and 1129(a)(3), and in compliance with the applicable provisions of the Bankruptcy

Code, the Bankruptcy Rules, and the Solicitation Order, in connection with all of their respective

activities relating to the solicitation of acceptances of the Third Amended Plan and their

participation in the activities described in section 1125, and are entitled to the protections

afforded by section 1125(e).

        M.     *Voting Tabulation*.  In accordance with the Solicitation Order, on December 3,

2018 the *Tabulation of Ballots in Connection with Confirmation of the Third Amended Joint Plan*

*for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Ballot

Tabulation") [Docket No. 746] was filed and served on all parties that filed a timely objection to

confirmation of the Plan.  All procedures used to tabulate the Ballots (which were tabulated on a

consolidated basis) were fair and conducted in accordance with the Solicitation Order, the

Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 44-18 Filed 10/20/23   Page 800 of 1104   PageID 16934
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 9 of 229

N.  *Classes Deemed to Have Accepted or Rejected the Third Amended Plan*. As set forth in the Third Amended Plan and Disclosure Statement: (i) Class 1 is unimpaired and is conclusively deemed to have accepted the Third Amended Plan pursuant to section 1126(f), and (ii) Class 5, consisting of Interests in the Debtors, is Impaired, but because the Third Amended Plan provides that holders of Class 5 Interests shall not receive or retain any property on account of their Interests, Class 5 is conclusively deemed to have rejected the Third Amended Plan pursuant to section 1126(g).

O.  *Impaired Classes of Creditors Voting to Accept or Reject the Third Amended Plan*. Based upon the Ballot Tabulation, the Court finds that the following Impaired Classes have voted on the Third Amended Plan as follows:

(i)  Class 2 (the Terry Partially Secured Claim) voted to accept the Third Amended Plan as follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $8,060,827.84 100% | 1 100% | $0.00 0.00% | 0 0.00% |

Two Ballots were submitted by Terry in Class 2. One of the Ballots was based on a proof of Claim recorded in the Claims Register for Case No. 18-30264 as Claim No. 26-1 and filed by Terry for the benefit of his IRAs ("Claim No. 26"). Highland filed an objection [Docket No. 522] on August 17, 2018 seeking an order disallowing Claim No. 26 and striking any vote (on a prior plan of reorganization) by Terry on account of Claim No. 26. Although the Ballot Tabulation reflects the Ballot submitted by Terry on account of Claim No. 26, the Court disregards that Ballot and does not take it into account in its determination regarding acceptance of the Third Amended Plan. The other Ballot submitted by Terry accepted the Third Amended Plan.

(ii)  Class 3 (General Unsecured Claims) voted to accept the Third Amended Plan as follows:

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 04/21/23   Page 801 of 1104   PageID 16935
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 10 of 229

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $667,550.00<br>100% | 2<br>100% | $0.00<br>0.00% | 0<br>0.00% |

Three Ballots were submitted in Class 3.  One of the Ballots was submitted by Jennifer G. Terry.

Such Ballot is based on a proof of Claim recorded in the Claims Register for Case No. 18-30264

as Claim No. 25-1 and filed by Jennifer G. Terry for the benefit of her IRAs and 401k ("Claim

No. 25").  Highland filed an objection [Docket No. 521] on August 17, 2018 seeking an order

disallowing Claim No. 25 and striking any vote (on a prior plan of reorganization) by Jennifer G.

Terry on account of Claim No. 25.  Although the Ballot Tabulation reflects the Ballot submitted

by Jennifer G. Terry on account of Claim No. 25, the Court disregards that Ballot and does not

take it into account in its determination regarding acceptance of the Plan.  The other two Ballots

submitted in Class 3 accepted the Third Amended Plan.

(iii)   Class 4 (Insider Claims) voted to reject the Third Amended Plan as

follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $0.00<br>0.00% | 0<br>0.00% | $4,172,140.38<br>100% | 1<br>100% |

Based on the foregoing, and as evidenced by the Ballot Tabulation, at least one

Impaired Class of Claims (excluding the acceptance by any Insiders of the Debtors) has voted

to accept the Third Amended Plan in accordance with the requirements of sections 1124 and

1126 of the Bankruptcy Code.

P.   *Modifications to the Third Amended Plan*.  The modifications to the Third

Amended Plan set forth in the First Modification, the Second Modification (as supplemented),

and as set forth in this Order constitute non-material or technical changes and do not materially

or adversely affect or change the treatment of any Claims against or Interests in the Debtors

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 14-18 Filed 12/22/23    Page 802 of 1104    PageID 16936
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 11 of 229

under the Third Amended Plan (the "<u>Non-Material Modifications</u>").  The filing of the First

Modification on November 8, 2018 constitutes due and sufficient notice thereof under the

circumstances of these Chapter 11 Cases.  The filing of the Second Modification on November

16, 2018 (as supplemented on December 10, 2018) constitutes due and sufficient notice thereof

under the circumstances of these Chapter 11 Cases.  The Non-Material Modifications neither

require additional disclosure under section 1125 of the Bankruptcy Code nor re-solicitation of

votes on the Plan under section 1126 of the Bankruptcy Code and Bankruptcy Rules 3018 and

3019.  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all

holders of Claims against the Debtors who voted to accept the Third Amended Plan are hereby

deemed to have accepted the Third Amended Plan as modified consistent with the Non-Material

Modifications.  No Holder of a Claim against the Debtors who has voted to accept the Third

Amended Plan shall be permitted to change its acceptance to a rejection as a consequence of

the Non-Material Modifications.  The Non-Material Modifications incorporated in the Plan comply

with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

Q.      *Bankruptcy Rule 3016*.  The Plan is dated and identifies the Chapter 11 Trustee

as the Person submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the

Disclosure Statement satisfied Bankruptcy Rule 3016(b).  The Plan provides for the Temporary

Plan Injunction (as defined herein), which constitutes an injunction against conduct not

otherwise enjoined under the Bankruptcy Code.  The Plan and Disclosure Statement both

describe in specific and conspicuous language all acts to be enjoined and identify the entities

subject to the Temporary Plan Injunction.  Therefore, the Plan and Disclosure Statement satisfy

the requirements of Bankruptcy Rule 3016(c).

R.      *Bankruptcy Rule 3017*.  The Chapter 11 Trustee has given notice of the

Combined Hearing as required by the applicable provisions of Bankruptcy Rule 3017 and the

Solicitation Order.  The materials transmitted and notice given by the Chapter 11 Trustee to

holders of Claims entitled to vote on the Third Amended Plan and the materials transmitted by

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 61-18    Filed 12/22/23    Page 803 of 1104    PageID 16937
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 12 of 229

the Chapter 11 Trustee to holders of Interests and other parties-in-interest satisfy the applicable

provisions of Bankruptcy Rules 3017(d)-(f) and the Solicitation Order. Therefore, the

requirements of Bankruptcy Rule 3017 have been satisfied.

      S.     *Bankruptcy Rule 3018*. The solicitation of votes to accept or reject the Third

Amended Plan satisfies Bankruptcy Rule 3018. The Third Amended Plan was transmitted to all

holders of Claims entitled to vote, sufficient time was prescribed for such parties to accept or

reject the Third Amended Plan, and the Solicitation Materials used and Solicitation Procedures

followed comply with sections 1125 and 1126, thereby satisfying the requirements of

Bankruptcy Rule 3018. Further, the Chapter 11 Trustee filed the Ballot Tabulation in

accordance with the provisions of the Solicitation Order.

      T.     *Burden of Proof*. The Chapter 11 Trustee, as proponent of the Plan, has the

burden of proving the elements of sections 1122, 1123 and 1129 of the Bankruptcy Code by a

preponderance of the evidence. The Court finds that the Chapter 11 Trustee has met each

element of such burden with respect to the Plan.

      U.     *Judicial Notice*. The Court takes judicial notice of the entire record of

proceedings in the Chapter 11 Cases and related adversary proceedings, including, without

limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence

and arguments made, proffered or adduced at the hearings held before the Court during the

Chapter 11 Cases and related adversary proceedings, including, without limitation, the

Combined Hearing. Any resolutions of objections to final approval of the Disclosure Statement

or confirmation of the Plan explained on the record at the Combined Hearing are hereby

incorporated by reference.

      V.     *The Record*. The record established at the Combined Hearing (the "Record") to

support final approval of the Disclosure Statement and confirmation of the Plan includes:

          (i)     All documents identified by the Chapter 11 Trustee at the Combined
                Hearing and all exhibits admitted into evidence at the Combined Hearing,
                including but not limited to admitted exhibits which are listed on the *Joint*

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 12/28/23   Page 804 of 1104   PageID 16938
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 13 of 229

*Witness and Exhibit List* [Docket No. 767] filed jointly by the Chapter 11
Trustee, Highland and HCLOF with the Court on December 7, 2018;

(ii)     The Ballot Tabulation;

(iii)     The testimony of witnesses; and

(iv)     The statements and arguments of counsel.

W.     *Objections to Final Approval of Disclosure Statement and Confirmation of Plan*.

The Solicitation Order established November 26, 2018 as the deadline for filing objections to

final approval of the Disclosure Statement and/or confirmation of the Plan.  The following

objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the

"Objections") were timely filed in accordance with the Solicitation Order:

(i)     *Objection by Stinson Leonard Street LLP to Debtors' Second Modification to the Third Amended Joint Plan* [Docket No. 720];

(ii)     *Joint Objection of Highland Capital Management, L.P. and Highland CLO Funding, Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket no. 722]; and

(iii)     *Objection of Neutra Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 723].

X.     *Transfer and Vesting of Assets*.  Pursuant to Article VI of the Plan, all Assets

shall be transferred to and vested in the Reorganized Debtor as of the Effective Date.  The

transfer of the Assets to the Reorganized Debtor pursuant to the Plan is consistent with, and

authorized by, section 1123(a)(5)(B) of the Bankruptcy Code and will be fully effectuated

through this Order as of the Effective Date without the necessity of any other or further

assignment or transfer.

Y.     *Claim Objections and Resolutions*.  Pursuant to the Plan, the Reorganized

Debtor has the sole power and exclusive standing and authority to object to any Claim.  Without

limiting the generality of the foregoing, the Reorganized Debtor shall have the power:  (i) to

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 05/26/23   Page 805 of 1104   PageID 16939
Exhibit 18   Page 15 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 14 of 229

object to any Claim on any legal or equitable basis; (ii) to seek subordination of any Claim on

any legal or equitable basis; (iii) to assert any right of setoff or recoupment, including without

limitation, any such right pursuant to section 553 of the Bankruptcy Code; (iv) to assert any and

all Estate Defenses to any Claim, whether legal or equitable, including any affirmative defenses

or any right of setoff; (v) to assert all Estate Claims as a counterclaim against any Claim,

whether arising out of the same or different transactions, both for an affirmative recovery and as

an offset against any such Claim; and (vi) to object to any Claims on the basis of section 502(d).

Vesting such exclusive power and standing in the Reorganized Debtor is reasonable and

appropriate, and is authorized by, and in compliance with, section 1123(b)(3) of the Bankruptcy

Code.

       Z.     *Compliance with the Requirements of Section 1129 of the Bankruptcy Code*. The

Plan complies with the applicable provisions of the Bankruptcy Code, as follows:

       (i)     *Section 1129(a)(1) – Compliance of the Plan with the Applicable*

*Provisions of the Bankruptcy Code*.  The Plan complies with all applicable provisions of the

Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections

1122 and 1123.

       (a)     *Sections 1122 and 1123(a)(1) – Proper Classification*.  The

classification of Claims and Interests in the Plan is proper under the Bankruptcy Code.

Pursuant to sections 1122(a) and 1123(a)(1), the Plan provides for the separate classification of

Claims and Interests into six (6) Classes (Class 1, Class 2, Class 3, Subclass 4A, Subclass 4B

and Class 5), based on differences in the legal nature and priority of such Claims and Interests

(other than Claims for Administrative Expenses, Priority Tax Claims and U.S. Trustee's quarterly

fees, which are not required to be designated as separate Classes pursuant to section

1123(a)(1)).  Based upon the Record, valid business, factual and legal reasons exist for the

separate classification of the various Classes of Claims and Interests created under the Plan,

the classifications were not created for any improper purpose and the creation of such Classes

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 41-18    Filed 05/26/23    Page 806 of 1104    PageID 16940
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 15 of 229

does not unfairly discriminate between or among holders of Claims or Interests.  In accordance with section 1122(a), each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code have been satisfied.

(b)    *Section 1123(a)(2) – Specification of Unimpaired Classes*.  The Plan specifies that Claims in Class 1 are unimpaired under the Plan.  Therefore, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

(c)    *Section 1123(a)(3) – Specification of Treatment of Impaired Classes*.  Other than Class 1, all Classes of Claims and Interests (Class 2, Class 3, Subclass 4A, Subclass 4B and Class 5) are Impaired under the Plan.  The Plan specifies the treatment of each Impaired Class of Claims and Interests under the Plan.  The treatment of Impaired Classes of Claims and Interests is specified in Article IV of the Plan.  Therefore, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

(d)    *Section 1123(a)(4) – No Discrimination*.  The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.  Therefore, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

(e)    *Section 1123(a)(5) – Adequate Means for Plan Implementation*.  The Plan provides for adequate and proper means for the Plan's implementation.  This includes means for implementation set forth in Article VI of the Plan.  Therefore, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

(f)    *Section 1123(a)(6) – Prohibition on Issuance of Non-Voting Securities*.  The Debtors are not corporations.  Therefore, section 1123(a)(6) of the Bankruptcy Code is inapplicable.

(g)    *Section 1123(a)(7) – Selection of Officers, Directors and Trustees*.  Under the Plan, Terry shall receive 100% of the equity interests in the Reorganized Debtor.  The

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 41-18 Filed 11/29/23    Page 807 of 1104    PageID 16941
Exhibit 18 Page 17 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 16 of 229

Plan does not provide for the selection or appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized Debtor's management as he wishes. Therefore, to the extent section 1123(a)(7) of the Bankruptcy Code is applicable to the Plan, its requirements have been satisfied.

(h)       _Section 1123(a)(8) – Payment of Individual Debtor's Earnings_. The Debtors are not individuals.  Therefore, section 1123(a)(8) of the Bankruptcy Code is inapplicable.

(i)       _Section 1123(b) – Discretionary Contents of the Plan_.  The Plan contains various provisions that are properly construed as discretionary and not required for confirmation of the Plan under the Bankruptcy Code.  As set forth below, all such discretionary provisions comply with section 1123(b) of the Bankruptcy Code, are not inconsistent with the applicable provisions of the Bankruptcy Code and are hereby approved.  Therefore, section 1123(b) of the Bankruptcy Code has been satisfied.

(1)       _Section 1123(b)(1) – Impairment / Unimpairment of Claims and Interests_.  The Plan impairs or leaves unimpaired each Class of Claims and Interests. Therefore, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

(2)       _Section 1123(b)(2) – Assumption / Rejection of Executory Contracts and Unexpired Leases_.  Article XI of the Plan provides that all of the Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Court, (b) is identified in **Exhibit 5** to this Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date.  Therefore, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 14-18    Filed 10/16/23    Page 808 of 1104    PageID 16942
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 17 of 229

(3)       *Section 1123(b)(3) – Settlement / Retention of Claims and Causes of Action*.  The Chapter 11 Trustee has delineated the Estate Claims and Estate Defenses to be retained in the Plan.  The terms "Estate Claims" and "Estate Defenses" are defined in sections 1.55 and 1.56 of the Plan, respectively, and together include all claims, causes of action, defenses, affirmative defenses, counterclaims, or offsets held by the Debtors' Estate.  The identification and retention of the Estate Claims and Estate Defenses in the Plan is reasonable and appropriate and reflects a proper exercise of the good faith business judgment of the Chapter 11 Trustee.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor and the Reorganized Debtor shall be entitled to file, prosecute and/or settle each of the Estate Claims so reserved in accordance with the terms of the Plan.  The provisions of the Plan regarding reservation of Estate Claims and Estate Defenses are appropriate and in the best interests of the Debtors, the Estate, and holders of Claims and Interests.

(4)       *Section 1123(b)(5) – Modification of Creditors' Rights*.  With the exception of holders of Class 1 Claims, which are unimpaired, the Plan modifies the rights of all holders of Claims against the Debtors.  Accordingly, the Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

(ii)      *Section 1129(a)(2) – Compliance of the Chapter 11 Trustee with the Applicable Provisions of the Bankruptcy Code*.  The Chapter 11 Trustee, as proponent of the Plan, has complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1127 and

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 14-18 Filed 09/29/23 Page 809 of 1104 PageID 16943
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 18 of 229

1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019. Votes to accept or reject the Third Amended Plan were solicited after the Court conditionally approved the adequacy of the Disclosure Statement. The Chapter 11 Trustee and his present and former representatives, advisors, attorneys, professionals and agents have solicited and tabulated the votes on the Third Amended Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly and in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code. The Chapter 11 Trustee and his present and former representatives, advisors, attorneys, professionals and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with respect to the offering, issuance and distribution of recoveries under the Plan and, therefore, are not (and on account of such distributions, will not be) liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Third Amended Plan or distributions made pursuant to the Plan, so long as distributions are made consistent with and pursuant to the Plan.

(iii) *Section 1129(a)(3) – Proposal of the Plan in Good Faith.* The Chapter 11 Trustee has proposed the Plan (and all other agreements, documents and instruments necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Court has examined and considered the totality of the circumstances surrounding the formulation of the Plan, including both the Record at the Combined Hearing and the record of the Chapter 11 Cases. The Chapter 11 Trustee's good faith is evident from the facts and Record of the Combined Hearing. The Chapter 11 Trustee proposed the Plan for legitimate and honest purposes.

---

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 41-18 Filed 20/23 230age 810 of 1104   PageID 16944
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 19 of 229

   (iv)  *Section 1129(a)(4) – Court Approval of Certain Payments as Reasonable*.

All payments made or to be made by the Reorganized Debtor for services or for costs and

expenses in or in connection with the Chapter 11 Cases or in connection with the Plan and

incident to the Chapter 11 Cases, have either been approved by, or are subject to final approval

of, the Court as reasonable.  Notwithstanding anything to the contrary in the Plan, the provisions

of section 3.01(e) of the Plan governing the filing of final fee applications by Estate

Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to

the Chapter 11 Trustee.  Compensation sought by the Chapter 11 Trustee through a final fee

application shall be subject to final approval of the Court as reasonable in accordance with

section 330(a)(3) of the Bankruptcy Code.  Therefore, the requirements of section 1129(a)(4) of

the Bankruptcy Code are satisfied.

   (v)  *Section 1129(a)(5) – Disclosure of Identity of Proposed Management,*

*Compensation of Insiders and Consistency of Management Proposals with the Interests of*

*Creditors and Public Policy*.  Under the Plan, Terry, who does not constitute an Insider, shall

receive 100% of the equity interests in the Reorganized Debtor.  The Plan does not provide for

appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and

Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized

Debtor's management as he wishes.  Terry's identity and affiliations have been fully disclosed

and, to the extent that Terry serves as an officer of the Reorganized Debtor after confirmation of

the Plan, Terry's appointment to any such role is consistent with the interests of Creditors,

holders of Interests and public policy.  Therefore, the requirements of section 1129(a)(5) of the

Bankruptcy Code are satisfied.

   (vi)  *Section 1129(a)(6) – No Rate Changes*.  The Plan does not contain any

rate changes subject to the jurisdiction of any governmental regulatory commissions and will not

require governmental regulatory approval.  Therefore, section 1129(a)(6) is not applicable to the

Chapter 11 Cases.

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED     PAGE 19 of 46

APPX. 16933

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 61-18    Filed 05/29/25    Page 811 of 1104    PageID 16945
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 20 of 229

(vii)    *Section 1129(a)(7) – Best Interest of Creditors Test*.  The Plan satisfies section 1129(a)(7).  The Liquidation Analysis attached as Exhibit 4 to the Disclosure Statement and the other exhibits and evidence proffered or adduced at the Combined Hearing related thereto: (a) are persuasive and credible; (b) have not been controverted by other evidence; (c) are based upon sound methodology; and (d) conclusively establish that each holder of an Impaired Claim or Interest either (1) has accepted the Plan, or (2) will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

(viii)    *Section 1128(a)(8) – Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of Plan by Each Impaired Class*.  Class 1 is unimpaired under the Plan and is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Classes 2 and 3 are Impaired under the Plan and have voted to accept the Plan.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Class 5 is Impaired under the Plan.  Holders of Class 5 Interests will not receive or retain any property on account of their Interests under the Plan and are therefore conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Notwithstanding the fact that the Plan was not accepted by all Classes of Impaired Claims and Interests, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

(ix)    *Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code*.  The treatment of Allowed Claims for Administrative Expenses and Priority Tax Claims under Article III of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.  Accordingly, the requirements of section 1129(a)(9) are satisfied.

(x)    *Section 1129(a)(10) – Acceptance by at Least One Impaired Class*.  As set forth in the Ballot Tabulation and in this Order, Classes 2 and 3 voted to accept the Plan.  As

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 61-18    Filed 22/23 230   Page 812 of 1104    PageID 16946
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 21 of 229

such, at least one Class of Claims that is Impaired under the Plan has accepted the Plan

without including the acceptance of the Plan by any Insider.  Therefore, the requirements of

section 1129(a)(10) of the Bankruptcy Code have been satisfied.

(xi)     _Section 1129(a)(11) – Feasibility of the Plan_.  The evidence submitted at

the Combined Hearing regarding feasibility, together with all evidence proffered or advanced at

or prior to the Combined Hearing, (a) is persuasive and credible, (b) has not been controverted

by other evidence, and (c) establishes that confirmation of the Plan is not likely to be followed by

the liquidation or the need for further financial reorganization of the Reorganized Debtor.

Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been

satisfied.

(xii)    _Section 1129(a)(12) – Payment of Bankruptcy Fees_.  The Plan provides

that all fees due and payable under 28 U.S.C. section 1930 as of the Confirmation Date will be

paid in full on the Effective Date or as soon thereafter as is practicable, thus satisfying the

requirements of section 1129(a)(12) of the Bankruptcy Code.

(xiii)   _Section 1129(a)(13), (14), (15) and (16) – Non-Applicability_.  The Debtors

do not provide any retiree benefits within the meaning of section 1114, do not owe any domestic

support obligations, are not individuals, and are not non-profit corporations.  Thus, sections

1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16) do not apply to the Chapter 11 Cases.

(xiv)    _Section 1129(b) – Confirmation of the Plan Over Non-Acceptance of_

_Impaired Classes_.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Holders of

Class 5 Interests are deemed to have rejected the Plan.  Nevertheless, the Plan may be

confirmed pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that the

requirements of section 1129(a)(8) have not been met because the Chapter 11 Trustee has

demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the other

requirements of section 1129(a) of the Bankruptcy Code and (b) does not "discriminate unfairly"

and is "fair and equitable" as to each Impaired Class which has not voted to accept (or is

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 14-18    Filed 12/23/23    Page 813 of 1104    PageID 16947
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 22 of 229

deemed to reject) the Plan.  The Plan therefore satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

(xv)    *Section 1129(c) – Only One Plan*.  Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

(xvi)    *Section 1129(d) – Principal Purpose of the Plan is Not the Avoidance of Taxes*.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of application of Section 5 of the Securities Act of 1933 and there has been no filing by a Governmental Unit asserting any such attempted avoidance.  Therefore, the requirements of section 1129(d) of the Bankruptcy Code are satisfied.

(xvii)    *Section 1129(e) – Small Business Case*.  Neither of the Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code and, accordingly, section 1129(e) is inapplicable to the Chapter 11 Cases.

AA.    *Executory Contracts and Unexpired Leases*.  The Chapter 11 Trustee has satisfied the provisions of section 365 of the Bankruptcy Code with respect to the assumption and rejection of the Executory Contracts and Unexpired Leases pursuant the Plan.  The Chapter 11 Trustee has exercised reasonable business judgment prior to the Combined Hearing in determining whether to assume or reject each of the Executory Contracts and Unexpired Leases as set forth in Article XI of the Plan, **Exhibit "5"** to this Order, or otherwise. Each assumption or rejection of an Executory Contract or Unexpired Lease pursuant to this Order and in accordance with Article XI of the Plan, or otherwise by order of this Court, shall be valid, legal, and binding upon the applicable Debtor, Reorganized Debtor, Estate, and all non-Debtor persons or entities party to such Executory Contract or Unexpired Lease.  Executory Contracts and Unexpired Leases not previously assumed by order of this Court and which the Chapter 11 Trustee has determined to assume are identified in **Exhibit "5"** to this Order.

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 15-18 Filed 04/24/23 Page 814 of 1104 PageID 16948
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 23 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.

BB.      *Compromise and Settlement*.  The Court finds and concludes that, pursuant to

section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of

the Distributions and other benefits provided under the Plan, the provisions of the Plan

constitute a good faith compromise and settlement of all Impaired Claims and Interests.  Such

settlement and compromise, which was made at arms'-length in exchange for good and

valuable consideration, is in the best interests of the holders of Impaired Claims and Interests, is

within the range of possible litigation outcomes, and is fair, equitable, and reasonable.  Each

element of the compromise and settlement reflected in the Plan is integrated and inexorably

linked.

CC.      *Plan Injunction*.  The Plan Injunction is necessary and appropriate to facilitate the

transactions and distributions to Creditors pursuant to the Plan.  The Plan Injunction constitutes

an essential and integral part of the Plan without which the holders of Claims against the

Debtors could potentially interfere with implementation and performance of the Plan.  The Plan

Injunction protects the best interests of the holders of Allowed Claims and facilitates the efficient

performance of the Plan.  Consequently, the Plan Injunction is appropriate pursuant to sections

105(a) and 1123(a)(5) of the Bankruptcy Code.

DD.      *Temporary Plan Injunction*.  The Temporary Plan Injunction (as defined herein) is

a temporary injunction which provides for the continuation, after the Effective Date, of injunctive

relief the Court previously granted in its *Preliminary Injunction Order* (the "Preliminary

Injunction") [Docket No. 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the

Trustee's Adversary.  The Preliminary Injunction was originally set to expire by its own terms

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 41-18 Filed 25/20 230 Page 815 of 1104   PageID 16949
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 24 of 229

upon confirmation of the Plan, but is extended by this Order through the Effective Date of the Plan.  Based on the record of prior proceedings in the Chapter 11 Cases, including in the Trustee's Adversary, and the Record at the Combined Hearing, no grounds have been shown to give the Court reason to reconsider any findings supporting its prior Preliminary Injunction.  Furthermore, as set forth below, the Record at the Combined Hearing demonstrates that the four elements required for issuance of injunctive relief are present, the Temporary Plan Injunction is necessary and appropriate in all respects, and it complies with the applicable requirements of the Bankruptcy Rules.

(i)      *Substantial Likelihood of Success on the Merits*.  In the Highland Adversary, the Chapter 11 Trustee has asserted a counterclaim seeking to avoid the prepetition transfer of Acis LP's rights under the ALF PMA (the "ALF PMA Transfer") as a fraudulent transfer under the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act.  Such fraudulent transfer actions seek an equitable remedy and involve claims to specific assets of Highland HCF.  But for the ALF PMA Transfer, HCLOF could not have attempted to direct and effectuate an optional redemption of the Acis CLOs (which it has twice attempted to do postpetition in the Chapter 11 Cases).  The rights transferred in the ALF PMA Transfer appear to have been fraudulently transferred for no apparent value.  The Court found in the Preliminary Injunction, and the Court finds again for purposes of this Order, that the Chapter 11 Trustee has demonstrated a substantial likelihood of success on the merits of his claim to avoid the ALF PMA Transfer as a fraudulent transfer.

(ii)     *Irreparable Harm*.  Revenue to be generated by the Reorganized Debtor under the PMAs is a primary source of funding Distributions to Creditors under the Plan.  Absent the Temporary Plan Injunction, HCLOF will be free to direct an optional redemption before this Court can adjudicate the fraudulent transfer actions with respect to the ALF PMA Transfer.  Such an optional redemption – or similar call or liquidation of the Acis CLOs – would not only render such fraudulent transfer actions moot, but would effectively terminate and destroy all

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 44-18    Filed 26/28 230    Page 816 of 1104    PageID 16950
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 25 of 229

value in the PMAs.  This would, in turn, effectively destroy the Reorganized Debtor's ability to

perform under the Plan to the detriment of the Reorganized Debtor, Creditors and other parties-

in-interest.  Consequently, the Reorganized Debtor faces immediate and irreparable harm if the

Temporary Plan Injunction is not issued.

       (iii)   *Balance of Harms*.  The balance of harms weighs in favor of issuing the

Temporary Plan Injunction because any alleged harm to HCLOF, Highland or their affiliates is

substantially outweighed by the imminent and irreparable harm that would be suffered by the

Reorganized Debtor, Creditors and other parties-in-interest if the Temporary Plan Injunction is

not issued and an optional redemption, call or other liquidation of the Acis CLOs follows.  At a

minimum, the Temporary Plan Injunction is appropriate to maintain the status quo pending

adjudication of the fraudulent transfer actions with respect to the ALF PMA Transfer.  Highland,

HCLOF and their affiliates will not suffer any material, recognizable harm if temporarily enjoined

from pursuing an optional redemption, call or other liquidation of the Acis CLOs before the Court

adjudicates the fraudulent transfer actions concerning the ALF PMA Transfer and thereby

determines whether HCLOF has any legitimate right to direct an optional redemption, call or

other liquidation of the Acis CLOs in the first instance.

       (iv)   *Public Policy*.  Public policy favors maximization of a debtor's assets and

successful reorganization.  Because an optional redemption, call or other liquidation of the Acis

CLOs would destroy the value of the PMAs and the Reorganized Debtor's ability to perform

under the Plan, issuance of the Temporary Plan Injunction is consistent with public policy.

Furthermore, public policy favors disposition of cases on their merits.  Absent the Temporary

Plan Injunction, HCLOF could be expected to immediately direct an optional redemption, call or

other liquidation of the Acis CLOs following confirmation of the Plan, thus rendering the

fraudulent transfer actions concerning the ALF PMA Transfer moot.  Issuance of the Temporary

Plan Injunction will avoid the potential for such fraudulent transfer actions being mooted prior to

adjudication of such actions on their merits and is consistent with public policy.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 41-18    Filed 02/27/24    Page 817 of 1104    PageID 16951
Exhibit 18    Page 27 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 26 of 229

(v)      _Section 105(a)_.  Section 105(a) empowers this Court to "issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions" of the

Bankruptcy Code.  11 U.S.C. § 105(a).  The Temporary Plan Injunction is essential to the

Reorganized Debtor's ability to perform the Plan and to maintain the status quo during

prosecution of the fraudulent transfer actions concerning the ALF PMA Transfer.  The

Temporary Plan Injunction is therefore both necessary and appropriate to carry out the

provisions of the Bankruptcy Code in the Chapter 11 Cases.

(vi)      _Compliance with Technical Requirements_.  Bankruptcy Rule 3020(c)

requires that the Temporary Plan Injunction (a) describe the acts enjoined in reasonable detail;

(b) be specific in its terms with regard to the injunction; and (c) identify the entities subject

thereto.  The Temporary Plan Injunction satisfies each of these requirements.  The description

of acts enjoined is specific and particular and the language of the Temporary Plan Injunction is

therefore reasonably detailed.  The Temporary Plan Injunction is also specific in its terms, as its

language clearly describes the condition triggering the injunction and the specific events which

will serve to terminate it.  The Temporary Plan Injunction also specifically identifies the entities

subject to its terms.  Federal Rule of Civil Procedure 65(d)(1), made applicable by Bankruptcy

Rule 7065, also requires that the Temporary Plan Injunction be specific in its terms and describe

the enjoined acts in reasonable detail.  Federal Rule of Civil Procedure 65(d)(1) further requires

that the reasons for issuance of the Temporary Plan Injunction are stated.  The reasons for this

Court's issuance of the Temporary Plan Injunction are stated herein.  Therefore, the Temporary

Plan Injunction satisfies all requirements of the applicable Bankruptcy Rules.

EE.      _Substantive Consolidation of the Debtors_.  The Court finds and concludes that

the substantive consolidation of the Debtors for the purpose of implementing the Plan, including

for purposes of distributions under the Plan, is in the best interests of the Debtors, the Estate,

and holders of Claims and Interests.  Substantive consolidation recognizes the Debtors'

common business purpose and the fact that Acis GP's liability is derived from the liabilities of

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 28/28/23   Page 818 of 1104    PageID 16952
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 27 of 229

Acis LP based on Acis GP's status as general partner of Acis LP.  The Court further finds that

substantive consolidation of the Debtors constitutes an integral part of the Plan.

FF.    *Retention of Jurisdiction*.  This Court finds and concludes that this Court's

retention of jurisdiction as set forth herein and in the Plan comports with 28 U.S.C. sections 157

and 1334.  Consequently, the Court may properly retain jurisdiction over the matters set forth in

Article XV of the Plan.

GG.    *Implementation of Other Necessary Documents and Agreements*.  All documents

and agreements necessary to implement the Plan are essential elements of the Plan and entry

into and consummation of the transactions contemplated by each of such documents and

agreements is in the best interests of the Debtors, the Estate, and holders of Claims and

Interests.  The Chapter 11 Trustee has exercised reasonable business judgment in determining

which agreements to enter into and has provided sufficient and adequate notice of such

documents and agreements.  The terms and conditions of such documents and agreements

have been negotiated in good faith, at arm's length, are fair and reasonable, and are reaffirmed

and approved.

HH.    *Conditions Precedent to the Effective Date*.  Each of the conditions precedent to

the Effective Date, as set forth in Article XIII of the Plan, has been satisfied or waived in

accordance with the provisions of the Plan, or is reasonably likely to be satisfied or waived.

II.    *Satisfaction of Confirmation Requirements*.  Based upon the foregoing, all other

filed pleadings, exhibits and documents filed in connection with confirmation of the Plan and all

evidence and arguments made, proffered, or adduced at the Combined Hearing, the Plan

satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

## ORDER

Based on the foregoing, it is hereby ORDERED:

1.    Findings of Fact and Conclusions of Law.  The above-referenced findings of fact

and conclusions of law are incorporated by reference as though fully set forth herein.  To the

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 61-18 Filed 09/26/23 Page 819 of 1104 PageID 16953
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 28 of 229

extent any of the prior findings of fact or conclusions of law constitutes an order of this Court, they are adopted as such.

2. <u>Objections to Final Approval of Disclosure Statement and Confirmation of Plan</u>. To the extent that any of the Objections have not been resolved, withdrawn, waived or settled prior to entry of this Order or otherwise resolved as stated on the Record of the Combined Hearing or as set forth in this Order, they are hereby overruled on their merits.

3. <u>Final Approval of Disclosure Statement</u>. The Disclosure Statement is hereby approved on a final basis as containing adequate information as required by section 1125 of the Bankruptcy Code.

4. <u>Confirmation of Plan</u>. All requirements for confirmation of the Plan have been satisfied. The Third Amended Plan, as modified by the First Modification and Second Modification (as supplemented) and as modified herein, is hereby CONFIRMED in accordance with section 1129 of the Bankruptcy Code, and all terms and conditions set forth in the Plan are hereby APPROVED. The terms of the Plan are incorporated by reference into, and as an integral part of, this Order.

5. <u>Solicitation and Notice</u>. Notice of the Combined Hearing complied with the terms of the Solicitation Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and was in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. The solicitation of votes on the Third Amended Plan and the Solicitation Materials complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

6. <u>Plan Classification Controlling</u>. The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of distributions to be made thereunder. The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 14-18 Filed 30/23 Page 820 of 1104 PageID 16954
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 29 of 229

accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding upon the Debtors and the Reorganized Debtor except for voting purposes.

7.      <u>Resolution of Stinson Objection</u>.  Stinson Leonard Street LLP ("<u>Stinson</u>") has asserted a Claim against the Debtors for $158,552.98.  On July 31, 2018, Stinson initially asserted its Claim as an unsecured Claim by filing proof of Claim number 12 in the Acis LP case and proof of claim number 2 in the Acis GP case.  Those Claims represent a single Claim for satisfaction of a total alleged debt of $158,552.89.  All proofs of Claim filed by Stinson will be referred to collectively as the "<u>Stinson Claim</u>."  The Stinson Claim is treated as part of Class 3 under the Plan.  On November 9, 2018, Stinson amended the Stinson Claim to assert a secured Claim based on a possessory lien on legal files belonging to the Debtors.  The Chapter 11 Trustee currently intends to object to the Stinson Claim, including Stinson's claim to secured status.  Stinson filed an Objection to the Plan on November 26, 2018 [Docket No. 720] which was subsequently withdrawn based on this proposed paragraph being included in any Order confirming the Plan.  This paragraph resolves Stinson's Objection as follows:  Notwithstanding any contrary provision of the Plan or this Order, the Stinson Claim, to the extent it is Allowed by a Final Order of the Bankruptcy Court as a Secured Claim, shall be considered a separate class under the Plan and paid by the Reorganized Debtor within thirty (30) days after entry of such Final Order.  To the extent it is an Allowed Secured Claim, the Stinson Claim will be removed from Class 3.  To the extent it is an Allowed General Unsecured Claim, the Stinson Claim will remain a Class 3 Claim.  This recognizes that the Stinson Claim may be allowed as partly secured (*i.e.* only secured to the extent of the value of its collateral) and be paid accordingly. The Chapter 11 Trustee reserves all rights to object to Stinson's proofs of Claim, and Stinson reserves all rights to defend its proofs of Claim.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 41-18   Filed 02/21/24   Page 821 of 1104   PageID 16955
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 30 of 229

8.      Plan Implementation.  Upon the Effective Date of the Plan, the Chapter 11 Trustee and the Reorganized Debtor are hereby authorized and directed to take all actions necessary or appropriate to implement, effectuate or consummate the Plan, the terms of this Order and the transactions respectively contemplated therein, and to otherwise fully perform and execute their duties under the Plan or this Order.  Without limiting the generality of the foregoing, pursuant to section 1142(b) of the Bankruptcy Code, each and every Person (including, without limitation, the Chapter 11 Trustee, HCLOF, Highland, any and all affiliates of HCLOF and Highland, the Issuers and Co-Issuers, and the Indenture Trustee), to the extent necessary, is hereby directed to execute or deliver, or to join in the execution or delivery of, any instrument required to effect the transfers of property dealt with under the Plan and this Order, and to perform all other acts necessary for the consummation of the Plan.  Further pursuant to section 1142(b) of the Bankruptcy Code, to the extent that any Person fails to execute or deliver any instrument required to effect the transfers of property pursuant to the Plan and this Order, the Chapter 11 Trustee is hereby authorized to execute and deliver on behalf of any such Person (including, without limitation, HCLOF, Highland, and any and all affiliates of HCLOF and Highland) any instrument required to effect the transfers of property pursuant to the Plan and this Order.  In the event of an appeal of this Order, the Chapter 11 Trustee and the Reorganized Debtor are hereby authorized and directed to take all steps necessary to make the Plan effective and, from and after the Effective Date, execute their duties, responsibilities and obligations under the Plan, this Order and the Plan Documents unless and until this Order is stayed by order of a court of appropriate jurisdiction.

9.      Restructuring Transactions.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan; provided, however, that no such restructuring transactions may violate the terms of any assumed Executory Contract or Unexpired Lease.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 32/20 23 Page 822 of 1104    PageID 16956
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 31 of 229

10.    <u>Approval of Plan Documents</u>.  The form and substance of the Plan Documents

are all hereby APPROVED.  The Chapter 11 Trustee is authorized and directed, without the

need for further corporate or other organizational action by or on behalf of the Debtors or further

order or authorization of this Court, to take such actions and do all things as may be necessary

or required to implement and effectuate the Plan Documents and to make the Plan effective.

11.    <u>Transfer and Vesting of Assets; Assumption of Obligations</u>.  On the Effective

Date, without the execution of any other or further document or any further order by the Court,

all Assets shall be deemed as fully, completely and irrevocably transferred to, and vested in, the

Reorganized Debtor in accordance with the Plan.  All transfers of Assets to the Reorganized

Debtor shall be free and clear of all Liens, Claims, rights, Interests and charges, except as

otherwise expressly provided in the Plan or any agreement, instrument, or other document

incorporated therein, or this Order.  Upon the Effective Date, the Reorganized Debtor shall be

deemed to have assumed the obligations to make all Distributions pursuant to the Plan and this

Order.

12.    <u>Estate Claims and Estate Defenses</u>.  Upon the Effective Date, without the

necessity of the execution of any further documents or further order of the Court, all Estate

Claims and Estate Defenses, including without limitation all Estate Claims and Estate Defenses

identified in Exhibit A to the Plan, shall be deemed as fully, completely and irrevocably

transferred to, and vested in, the Reorganized Debtor.  From and after the Effective Date, the

Reorganized Debtor shall have the exclusive standing and authority to assert, prosecute,

collect, compromise and settle all Estate Claims and Estate Defenses pursuant to the terms of

the Plan.

13.    <u>Treatment of Executory Contracts and Unexpired Leases</u>.  The Executory

Contract and Unexpired Lease provisions of Article XI of the Plan, as modified herein**,** are

hereby approved in their entirety.  The assumption of Executory Contracts and Unexpired

Leases as set forth in the Plan, this Order, and **Exhibit "5"** to this Order are hereby approved.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 03/23/23   Page 823 of 1104   PageID 16957
Exhibit 18 Page 33 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 32 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.  All other Executory

Contracts and Unexpired Leases that have not been previously assumed or rejected shall be

deemed as rejected as of the Effective Date in accordance with the terms of the Plan.  All

Rejection Claims must be filed within the time specified in section 11.03 of the Plan, failing

which any such Rejection Claim shall be forever barred and precluded from receiving any

Distribution pursuant to the Plan.  Notwithstanding anything to the contrary herein or in the Plan,

Exhibit 5 to this Order hereby replaces, is substituted for, and supersedes Exhibit B to the Third

Amended Plan and any explicit or inferred references herein or in the Plan to Exhibit B to the

Third Amended Plan shall refer to Exhibit 5 to this Order.

14.    <u>Executory Contracts with Issuers and Co-Issuers</u>.  Pursuant to the Plan and as

provided in this Order, the Debtors are authorized to assume executory contracts that include as

a party ACIS CLO 2014-3 Ltd., ACIS CLO 2014-4 Ltd., ACIS CLO 2014-5 Ltd., ACIS CLO 2015-

6 Ltd., ACIS CLO 2014-3 LLC, ACIS CLO 2014-4 LLC, ACIS CLO 2014-5 LLC, and/or ACIS

CLO 2015-6 LLC solely if and to the extent that one or more of the Debtors is a signatory to

each such executory contract.

15.    <u>Approval of Brigade as Sub-Advisor and Shared Services Provider</u>.  Pursuant to

an *Order Granting Emergency Motion to Approve Replacement Sub-Advisory and Shared*

*Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services*

*LLC* [Docket No. 464] entered on August 1, 2018, the Court authorized the Chapter 11 Trustee

to engage Brigade Capital Management, LP ("<u>Brigade</u>") and Cortland Capital Markets Services

LLC to perform the services previously provided by Highland under the Sub-Advisory

Agreement and Shared Services Agreement, on an interim basis.  The Chapter 11 Trustee

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 51-18    Filed 34/23    Page 824 of 1104    PageID 16958
Exhibit 18    Page 34 of 230
Case 18-30264-sgj11    Doc 829    Filed 01/31/19    Entered 01/31/19 17:34:06    Page 33 of 229

selected Brigade as the party to provide both sub-advisory and shared services to the

Reorganized Debtor.  Based on the record of prior proceedings in the Chapter 11 Cases and

the Record at the Combined Hearing, the Chapter 11 Trustee has demonstrated that Brigade is

fully qualified to perform such services, and that the Chapter 11 Trustee's selection of Brigade is

an exercise of his sound business judgment.  Furthermore, adequate assurance of future

performance by Brigade has been shown.  Therefore, the selection of Brigade as the provider to

the Reorganized Debtor of the sub-advisory and shared services previously provided by

Highland under the Sub-Advisory Agreement and Shared Services Agreement is hereby

approved in all respects.

      16.    <u>Substantive Consolidation</u>.  The substantive consolidation of the Debtors for

purposes of implementation of and distributions under the Plan is hereby approved as of the

Effective Date such that on the Effective Date:  (a) all assets and liabilities of the Debtors will be

deemed merged; (b) all guaranties by one Debtor of the obligations of the other Debtor will be

deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed

by the other Debtor and any joint or several liability of the Debtors will be deemed to be one

obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the

case of either of the Debtors will be deemed filed against the consolidated Debtors and will be

deemed one Claim against and a single obligation of the consolidated Debtors.

      17.    <u>Compromise and Settlement</u>.  Pursuant to section 363 of the Bankruptcy Code

and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and

other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith

compromise and settlement of all Claims, Interests and controversies subject to, or dealt with,

under the Plan, including, without limitation, all Claims against the Debtors or Estate arising

prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or

unasserted, fixed or contingent, arising out of, relating to or in connection with the business or

affairs of, or transactions with, the Debtors or the Estate.  The entry of this Order constitutes the

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 05/26/23   Page 825 of 1104   PageID 16959
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 34 of 229

Court's approval of each of the foregoing compromises or settlements embodied in the Plan, and all other compromises and settlements provided for in the Plan, as well as a finding by the Court that such compromises and settlements are in the best interest of the Debtors, the Estate, holders of Claims and Interests, and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests therein are in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets. Except as otherwise provided in the Plan or this Order, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's assets, the Estate, or the Assets, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

18.     <u>Discharge</u>.  Except for the obligations expressly set forth in the Plan or this Order, on the Effective Date, the Debtors, the Reorganized Debtor and their successors in interest and assigns shall be deemed and they each are discharged and released to the fullest extent permitted by applicable law, including pursuant to section 1141(d)(1) of the Bankruptcy Code, from any and all Claims, Interests, demands, debts and liabilities that arose before the Effective Date.  Without limiting the generality of the foregoing, the discharge shall apply to and cover both known and unknown Claims although the Court makes no determination in this Order as to which Creditors may constitute holders of unknown Claims.  In addition, all such discharged Claims, both known and unknown, shall be subject to the Plan Injunction.

19.     <u>Injunctions</u>.  The following injunction provisions set forth in Article XIV of the Plan are hereby approved and authorized in their entirety:

(a)     **Permanent General Plan Injunction:**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 06/20/23   Page 826 of 1104   PageID 16960
Exhibit 18   Page 36 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 35 of 229

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING: (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THE PLAN APPLICABLE TO SUCH CLAIM OR INTEREST.**

The above injunction is an integral term of this Order and shall be fully binding upon, and

enforceable against, all Persons through and as a part of this Order. Furthermore,

notwithstanding anything to the contrary in the Plan or this Order, the above injunction is

permanent and shall not expire upon the occurrence of any event that causes the Temporary

Plan Injunction to expire.

(b)     **Temporary Injunction Against the Liquidation of the Acis CLOs and**

**Related Actions (the "Temporary Plan Injunction"):**

**EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 114-18   Filed 12/29/23   Page 827 of 1104   PageID 16961
Exhibit 18 Page 37 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 36 of 229

THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF:  (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS.  FOR PURPOSES OF THIS PARAGRAPH, THE TERM "ENJOINED PARTIES" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS.  FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.

The above Temporary Plan Injunction is an integral term of this Order and the Temporary Plan Injunction shall be fully binding upon, and enforceable against, the Enjoined Parties through and as a part of this Order.  For the avoidance of doubt, the occurrence of any event specified in the Temporary Plan Injunction that results in expiration of the Temporary Plan Injunction shall not cause any of the other injunctive relief set forth in the first paragraph of section 14.03 of the Plan and paragraph 18(a) of this Order to expire, such other injunctive relief being permanent.

20.    Notwithstanding anything to the contrary in the Plan or this Order, nothing in the Plan or in this Order shall discharge, release, enjoin or otherwise bar (a) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of Claim, (b) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (c) any valid right of setoff or recoupment of a Governmental Unit, and (d) any police or regulatory action by a Governmental Unit.  In addition, nothing in the Plan or this Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 14-18  Filed 03/28/23    Page 828 of 1104    PageID 16962
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 37 of 229

Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date.  For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

21.    Extension of the Preliminary Injunction.  Notwithstanding anything to the contrary in the terms of the Preliminary Injunction entered in the Trustee's Adversary, the Preliminary Injunction shall not expire upon confirmation of the Plan.  The Preliminary Injunction is hereby extended to and through the Effective Date of the Plan and shall remain in full force and effect until the Effective Date of the Plan.

22.    Exculpation.  The exculpation provisions set forth in section 16.06 of the Plan are hereby approved in all respects.

23.    Priority and Secured Tax Claims.  The treatment of Priority Tax Claims and Secured Tax Claims is specified in the Plan.  Nothing in the Plan or this Order shall modify or affect the Lien rights of a Taxing Authority under applicable non-bankruptcy law.  In the event of a default on the payment of a Priority Tax Claim or Secured Tax Claim under the Plan, the Taxing Authority to which the payment is owed may pursue all administrative and judicial remedies under applicable law to collect the unpaid Priority Tax Claim or Secured Tax Claim.

24.    Injunctions and Automatic Stay.  Except as otherwise provided in the Plan or this Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

25.    Setoffs.  Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 41-18   Filed 09/20/23   Page 829 of 1104   PageID 16963
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 38 of 229

against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of

such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and

Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed

Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such

holder have not been otherwise compromised or settled on or prior to the Effective Date

(whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect

such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a

waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate

may possess against such Claimant.  In no event shall any Claimant or Interest holder be

entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors

without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion

with the Court requesting the authority to perform such setoff notwithstanding any indication in

any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of

setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

26.     Recoupment.  Except as otherwise expressly provided for in the Plan, in no event

shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any

Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor

unless (a) such holder actually provides notice thereof in writing to the Debtors or the

Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount

to be recouped by the holder of the Claim or Interest and a specific description of the basis for

the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written

response to such Claim or Interest holder, stating unequivocally that the Debtors or the

Reorganized Debtor consents to the requested recoupment.  The Debtors and the Reorganized

Debtor shall have the right, but not the obligation, to seek an order of the Court allowing any or

all of the proposed recoupment.  In the absence of a written response from the Debtors or the

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 41-18 Filed 20/20/23 Page 830 of 1104    PageID 16964
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 39 of 229

Reorganized Debtor consenting to a recoupment or an order of the Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

27.    <u>Preservation of Causes of Action</u>.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Such reservation of the Estate Claims and Estate Defenses is hereby approved.  **No person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against any Person, <u>except</u> as otherwise provided in the Plan.**  Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, such causes of action are hereby expressly reserved (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication and, therefore, no preclusion doctrine, <u>including without limitation</u>, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan.

28.    Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor notwithstanding the occurrence of the Effective Date or the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  All such reserved Estate Claims and Estate Defenses shall be vested with the Reorganized Debtor and the Reorganized Debtor shall have the exclusive right, authority and standing to assert, file,

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 18 Filed 24/26 230 Page 831 of 1104   PageID 16965
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 40 of 229

prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment each of the Estate Claims and Estate Defenses so reserved in accordance with the terms of the Plan without the consent or approval of any third party or further notice to or action, order or approval of the Court.

29.     <u>Subordinated Claims</u>.  The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

30.     <u>Release of Liens</u>.  Except as otherwise provided in the Plan, this Order, or in any contract, instrument, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date all Liens against any Assets transferred to and vested in the Reorganized Debtor are hereby deemed to be released, terminated and nullified without the necessity of further order of this Court.

31.     <u>Provisions Governing Distributions</u>.  The distribution provisions of Articles VII and VIII of the Plan shall be, and hereby are, approved in their entirety; provided, however, that notwithstanding anything to the contrary set forth in Section 7.02 of the Plan, the Reorganized Debtor may, but shall not be required to, reserve for Distributions to holders of Allowed Subclass 4B Claims.  The Reorganized Debtor shall make all Distributions required under the Plan.

32.     <u>Procedures for Resolving Contested and Contingent Claims</u>.  The Claims resolution procedures contained in Article X of the Plan are hereby approved.

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 61-18 Filed 42/22 230 Page 832 of 1104 PageID 16966
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 41 of 229

33.     <u>Section 1145 Exemption</u>.  The solicitation of acceptances and rejections of the Plan was exempt from the registration requirements of the Securities Act of 1933 and applicable state securities laws, and no other nonbankruptcy law applies to the solicitation.

34.     <u>Exemption from Certain Transfer Taxes and Recording Fees</u>.  Section 1146(a) shall apply to the transfers of Assets pursuant to the Plan and, therefore, such transfers may not be taxed under any law imposing a stamp tax or similar tax.

35.     <u>Governmental Approvals Not Required</u>.  This Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement and any documents, instruments or agreements, and any amendments or modifications thereto.

36.     <u>Allowance and Payment of Certain Administrative Expense Claims</u>

(a)     <u>Administrative Expense Claims (Generally)</u>.  The holder of a Claim for an Administrative Expense, other than (i) such a Claim by an Estate Professional, (ii) an Ordinary Course Claim, (iii) a Claim for U.S. Trustee fees under 28 U.S.C. § 1930, or (iv) an Allowed Administrative Expense, must file with the Court and serve upon the Reorganized Debtor and its counsel, as set forth in the Plan, a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date (the "<u>Administrative Bar Date</u>").  Such notice of Claim for an Administrative Expense shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  ***<u>The failure to timely and properly file and serve a notice of Claim for an Administrative Expense on or before the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred and discharged without further order of the Court and the holder thereof shall be barred from receiving any Distribution from the Reorganized Debtor on account</u>***

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 02/28/23   Page 833 of 1104   PageID 16967
Exhibit 18 Page 43 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 42 of 229

**_of such Claim for an Administrative Expense._**  A Claim for an Administrative Expense with respect to which a notice of Claim for an Administrative Expense has been timely and properly filed and served shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after the date of filing and service of the applicable notice of Claim for an Administrative Expense, or such later date as may be approved by the Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Claim for an Administrative Expense shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(b)     <u>Estate Professional Compensation</u>.  All final requests for compensation or reimbursement by any Estate Professional shall be filed no later than sixty (60) days after the Effective Date in accordance with the Plan.  A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed shall become an Allowed Administrative Expense only to the extent allowed by Final Order and, if so Allowed, shall be paid in accordance with the terms of the Plan.  Notwithstanding anything to the contrary in the Plan, the provisions of the Plan governing the filing of final fee applications by Estate Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to the Chapter 11 Trustee.  Compensation or reimbursement sought by the Chapter 11 Trustee through a final fee application shall be subject to final approval of the Court as reasonable in accordance with section 330(a)(3) of the Bankruptcy Code.

(c)     <u>U.S. Trustee Fees</u>.  Any U.S. Trustee fees incurred pursuant to 28 U.S.C. § 1930 which are past due as of the Confirmation Date shall be paid in full by the Chapter 11 Trustee on or before the earlier of (i) December 21, 2018, or (ii) that day which is ten (10) days after the Confirmation Date.  After the Confirmation Date, the Reorganized Debtor shall continue to pay U.S. Trustee fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 14-18 Filed 24/28 Page 834 of 1104    PageID 16968
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 43 of 229

37.     <u>Effectuating Documents and Further Transactions</u>.  The Chapter 11 Trustee and

the Reorganized Debtor, and their respective representatives, agents and attorneys, may take

all actions to execute, deliver, file, or record such contracts, instruments, releases, and other

agreements or documents and take such actions as may be necessary or appropriate to

effectuate and implement the provisions of the Plan without the need for any approvals,

authorizations, actions, or consents except for those expressly required pursuant hereto.  This

Order shall constitute all approvals and consents required, if any, by the laws, rules and

regulations of all states and any other governmental authority with respect to the implementation

or consummation of the Plan and any documents, instruments, agreements, any amendments

or modifications thereto and any other acts and transactions referred to in or contemplated by

the Plan, the Plan Documents, the Disclosure Statement, and any documents, instruments, and

agreements and any amendments or modifications thereto.

38.     <u>Filing and Recording</u>.  This Order is and shall be binding upon and shall govern

the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state and local officials, and

all other persons and entities who may be required, by operation of law, the duties of their office,

or contract, to accept, file, register or otherwise record or release any document or instruments.

Each and every federal, state and local government agency is hereby directed to accept any

and all documents and instruments necessary, useful or appropriate to effectuate, implement

and consummate the transactions contemplated by the Plan and this Order.

39.     <u>Inconsistency between Documents</u>.  In the event of an inconsistency between

the terms of the Plan and the terms of the Disclosure Statement, the Plan shall control.  In the

event of any inconsistency between the terms of the Plan or the terms of the Disclosure

Statement and the terms of this Order, this Order shall control.

Case 19-34054-sgj11  Doc 3596-18  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 46-18  Filed 05/26/23  Page 835 of 1104  PageID 16969
Case 18-30264-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 44 of 229

40.  <u>References to Plan Provisions</u>.  The failure specifically to include or to refer to any particular article, section, or provision of the Plan or any related document in this Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan and any related documents be confirmed in their entirety.

41.  <u>Applicable Nonbankruptcy Law.</u>  Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of the Plan and this Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

42.  <u>Notice of Entry of the Confirmation Order</u>.  No later than the third Business Day after the entry of this Order, the Chapter 11 Trustee shall serve a copy of this Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest.

43.  <u>Notice of the Effective Date</u>.  No later than the third Business Day after the occurrence of the Effective Date, the Reorganized Debtor shall file a notice of occurrence of the Effective Date with the Clerk of the Court and shall serve a copy on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest.  Such notice shall include notice of (a) the Administrative Bar Date, (b) the deadline for filing Rejection Claims set forth in section 11.03 of the Plan, and (c) the deadline for filing final requests for compensation and reimbursement by Estate Professionals.  The filing of such notice shall conclusively establish that all conditions precedent have been satisfied or waived and shall constitute adequate and sufficient notice to all parties entitled thereto of the occurrence of the Effective Date.

44.  <u>Retention of Jurisdiction</u>.  The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising in, arising under, and related to, the Chapter 11 Cases, including the matters set forth in Article XV of the Plan and section 1142 of the Bankruptcy Code.  Without limitation as to the generality of the

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 14-18    Filed 06/28/23    Page 836 of 1104    PageID 16970
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 45 of 229

preceding sentence, the Court retains exclusive jurisdiction (a) to interpret and enforce this Order and the Plan; (b) to enforce the provisions of this Order and the Plan; (c) to resolve any disputes arising under or related to this Order or the Plan; and (d) over all transactions contemplated in this Order and the Plan.  All Persons are hereby forever prohibited and enjoined from taking any action (including, without limitation, legal action) that would adversely affect or interfere with the ability of any Person to complete any of the transfers of property contemplated by this Order and the Plan other than in this Court or in connection with any appeals from this Court.

45.    _Headings_.  Paragraph headings contained in this Order are for convenience of reference only and shall not affect the meaning or interpretation of this Order.

46.    _Final Order_.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

47.    _Appeal or Motion for Reconsideration; Reversal._  In the event this Order is appealed or a motion for reconsideration is filed, the Chapter 11 Trustee and the Reorganized Debtor, and their respective representatives, agents and attorneys, are all hereby authorized to proceed with the consummation and performance of the Plan unless and until this Order is stayed, reversed or modified by a court of competent jurisdiction.  If any or all of the provisions of this Order are hereafter reversed, modified, or vacated by subsequent order of this Court or any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Chapter 11 Trustee's or Reorganized Debtor's receipt of written notice of any such order.  Notwithstanding any such reversal, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan (including the Plan Documents) and any amendments or modifications thereto.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 09/29/23   Page 837 of 1104   PageID 16971
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 46 of 229

### END OF ORDER ###

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 4 Filed 06/26/23 Page 838 of 1104 PageID 16972
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 47 of 229

SUBMITTED BY:

/s/ Jeff P. Prostok
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthew G. Maben
State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

-and-

Rakhee V. Patel
State Bar No. 00797213
Phillip Lamberson
State Bar No. 00794134
Joe Wielebinski
State Bar No. 21432400
Annmarie Chiarello
State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Confirmation Order (3rd Amended Plan) 1.31.18.docx

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-18 Filed 09/26/23   Page 839 of 1104   PageID 16973
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 48 of 229

# EXHIBIT "1"

**[Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 660]**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18 Filed 05/25/23   Page 840 of 1104   PageID 16974
Exhibit 18 Page 50 of 230

Case 18-30264-sgj11  Doc 820  Filed 01/25/19   Entered 01/25/19 17:34:06   Page 49 of 229
Case 18-30264-sgj11  Doc 680  Filed 10/25/18   Entered 10/25/18 18:23:08   Page 1 of 62

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case |
| | § | No. 18-30264-SGJ-11) |
| DEBTORS. | § | |
| | § | Chapter 11 |

**THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND
<u>ACIS CAPITAL MANAGEMENT GP, LLC</u>**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

DATED:      October 25, 2018
            Dallas, Texas

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 09/29/23   Page 841 of 1104   PageID 16975
Case 18-30264-sgj11 Doc 828 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 50 of 229

# ARTICLE I.
## DEFINITIONS

A.  <u>Defined Terms</u>. In addition to such other terms as are defined in other sections of the Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined).

1.01.  "<u>Acis CLOs</u>" refers collectively to CLO-3, CLO-4, CLO-5, and CLO-6.

1.02.  "<u>Acis GP</u>" means Acis Capital Management, GP, LLC, one of the Debtors in the above-referenced Chapter 11 Cases.

1.03.  "<u>Acis LP</u>" means Acis Capital Management, LP, one of the Debtors in the above-referenced Chapter 11 Cases.

1.04.  "<u>Administrative Bar Date</u>" means the deadline to file Claims for Allowance as an Administrative Expense set forth in section 3.01(c) of the Plan.

1.05.  "<u>Administrative Expense</u>" means any cost or expense of administration of the Chapter 11 Cases allowed under subsections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estate of the Debtors, any actual and necessary expenses of operating the business of the Debtors, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930, chapter 123 of title 28 of the United States Code.

1.06.  "<u>Affiliate</u>" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

1.07.  "<u>ALF PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and Acis Loan Funding, Ltd. dated December 22, 2016.

1.08.  "<u>Allowed</u>," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; *provided, however*, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court. "<u>Allowed</u>," when used with respect to an Administrative Expense, shall mean an Administrative Expense approved by application to the Bankruptcy Court.

1.09.  "<u>Assets</u>" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.  Without limiting the foregoing, this shall include all

APP.163363

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 02/22/23   Page 842 of 1104   PageID 16976
Exhibit 18 Page 52 of 230
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:42:08   Page 51 of 229
Case 18-30264-sgj11 Doc 680 Filed 10/25/18   Entered 10/25/18 18:43:06   Page 51 of 229

1.10.   "<u>Available Cash</u>" means any Cash over and above the amount needed for the Reorganized Debtor to maintain business operations and pursue the Estate Claims, as determined in the sole discretion of the Reorganized Debtor.

1.11.   "<u>Avoidance Action</u>" means a cause of action assertable by the Debtors pursuant to Chapter 5 of the Bankruptcy Code, including without limitation, actions brought or which may be brought under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code. Such causes of action may be asserted to recover, among other things, the transfers listed in the Debtors' respective Schedules, including in response to Question 3 of the statements of financial affairs.

1.12.   "<u>Ballot</u>" means the form of ballot provided to holders of Claims or Interests entitled to vote pursuant to Bankruptcy Rule 3017(d), by which each such holder may accept or reject the Plan.

1.13.   "<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as amended and codified at Title 11 of the United States Code.

1.14.   "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over all or any part of the Chapter 11 Cases.

1.15.   "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, including applicable local rules of the Bankruptcy Court.

1.16.   "<u>Brigade</u>" means Brigade Capital Management, LP.

1.17.   "<u>Business Day</u>" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.18.   "<u>Cash</u>" means legal tender of the United States of America, cash equivalents and other readily marketable securities or instruments, including, but not limited to, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks or commercial paper.

1.19.   "<u>Chapter 11 Cases</u>" refers collectively to the Acis LP bankruptcy case, Case No. 18-30264-sgj11, and the Acis GP bankruptcy case, Case No. 18-30265-sgj11, which are being jointly administered under Case No. 18-30264-sgj11.

1.20.   "<u>Chapter 11 Trustee</u>" refers to Robin Phelan, the chapter 11 trustee for the Debtors.

1.21.   "<u>Claim</u>" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 03/23/23   Page 843 of 1104   PageID 16977
Case 18-30264-sgj11   Doc 680   Filed 10/25/18   Entered 10/25/18 18:42:06   Page 52 of 229

1.22.   "<u>Claimant</u>" means the holder of a Claim.

1.23.   "<u>Class</u>" means a class of Claims or Interests as described in the Plan.

1.24.   "<u>CLO</u>" means collateralized loan obligations.

1.25.   "<u>CLO-1</u>" means Acis CLO 2013-1 LTD.

1.26.   "<u>CLO-1 Indenture</u>" means that certain Indenture, dated as of March 18, 2013, issued by CLO-1, as issuer, Acis CLO 2013-1 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.27.   "<u>CLO-1 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013.

1.28.   "<u>CLO-3</u>" means Acis CLO 2014-3 LTD.

1.29.   "<u>CLO-3 Indenture</u>" means that certain Indenture, dated as of February 25, 2014, issued by CLO-3, as issuer, Acis CLO 2014-3 LLC, as co-Issuer and US Bank, as Indenture Trustee

1.30.   "<u>CLO-3 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014.

1.31.   "<u>CLO-4</u>" means Acis CLO 2014-4 LTD.

1.32.   "<u>CLO-4 Indenture</u>" means that certain Indenture, dated as of June 5, 2014, issued by CLO-4, as issuer, Acis CLO 2014-4 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.33.   "<u>CLO-4 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014.

1.34.   "<u>CLO-5</u>" means Acis CLO 2014-5 LTD.

1.35.   "<u>CLO-5 Indenture</u>" means that certain Indenture, dated as of November 18, 2014, issued by CLO-5, as issuer, Acis CLO 2014-5 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.36.   "<u>CLO-5 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014.

1.37.   "<u>CLO-6</u>" means Acis CLO 2015-6 LTD.

1.38.   "<u>CLO-6 Indenture</u>" means that certain Indenture, dated as of April 16, 2015, issued by CLO-6, as issuer, Acis CLO 2015-6 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.39.   "<u>CLO-6 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015.

1.40.   "<u>CLO Holdco</u>" means CLO Holdco, Ltd.

1.41.   "<u>Collateral</u>" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim.

4

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 09/20/23   Page 844 of 1104   PageID 16978
Exhibit 18   Page 54 of 230
Case 18-30664-sgj11   Doc 820   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 58 of 229

1.42.   "Confirmation Date" means the date of entry of the Confirmation Order.

1.43.   "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as such hearing may be continued from time to time.

1.44.   "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.45.   "Contested," when used with respect to a Claim, means a Claim against the Debtors that is listed in the Debtors' Schedules as disputed, contingent, or unliquidated; that is listed in the Debtors' Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; that is not listed in the Debtors' Schedules, but as to which a proof of Claim has been filed with the Bankruptcy Court; or as to which an objection has been or may be timely filed and has not been denied by Final Order. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

1.46.   "Creditor" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.47.   "Cure Claim" means the payment or other performance required to cure any existing default under an Executory Contract or Unexpired Lease.

1.48.   "Debtors" means, collectively, Acis GP and Acis LP, the debtors in the above-captioned Chapter 11 Cases.

1.49.   "Disallowed," when used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an objection or motion to disallow has been sustained by a Final Order.

1.50.   "Disclosure Statement" means the Disclosure Statement filed with respect to the Plan, as it may be amended, modified, or supplemented from time to time.

1.51.   "Distribution" means any payment or other disbursement of property pursuant to the Plan.

1.52.   "Effective Date" means the first Business Day which is fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) Business Days after the Confirmation Date, and upon which all conditions to the effectiveness of the Plan set forth in Article XIII below are satisfied.

1.53.   "Estate" shall collectively refer to the bankruptcy estates of the Debtors in the Chapter 11 Cases.

1.54.   "Estate Accounts Receivable" shall include all accounts receivable of the Estate, including from all sums payable to the Debtors on account of goods or services provided by the Debtors.

APPX. 16370

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 05/26/23   Page 845 of 1104   PageID 16979
Exhibit 18   Page 55 of 230
Case 18-30064-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 54 of 229
Case 18-90064-sgj11   Doc 680   Filed 10/25/18   Entered 10/25/18 18:43:08   Page 56 of 629

1.55.   "Estate Claims" shall include all claims and causes of action held by the Debtors' Estate, including, without limitation, the Estate Claims listed on the attached **Exhibit A** and all Avoidance Actions.

1.56.   ""Estate Defenses" means all defenses, affirmative defenses, counterclaims, or offsets by the Debtors' Estate against any Person, including but not limited to any Creditor.

1.57.   "Estate Insurance" means any insurance policy or interest in an insurance policy in which the Estate has an interest or rights.

1.58.   "Estate Professionals" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

1.59.   "Executory Contract" means any executory contract which is subject to section 365 of the Bankruptcy Code and which is not an Unexpired Lease.

1.60.   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body, as to which the time to appeal or seek rehearing or petition for certiorari shall have expired or which order or judgment shall no longer be subject to appeal, rehearing, or certiorari proceeding and with respect to which no appeal, motion for rehearing, or certiorari proceeding or stay shall then be pending.

1.61.   "General Unsecured Claim" means any Claim against the Debtors that is not an Administrative Expense, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Secured Claim, or Insider Claim, but includes any Rejection Claims pursuant to section 502(g) of the Bankruptcy Code.

1.62.   "Governmental Unit" means a "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code.

1.63.   "HCLOF" means Highland CLO Funding, Ltd.

1.64.   "Highland" means Highland Capital Management, L.P.

1.65.   "Highland Adversary" means Adversary Proceeding No. 18-03078-sgj.

1.66.   "Highland Claim" means all Claims asserted by Highland or any Affiliates of Highland against the Debtors, including any Claim resulting from the termination of the Sub-Advisory Agreement and Shared Services Agreement.

1.67.   "Highland CLOM" means Highland CLO Management, Ltd.

1.68.   "Highland HCF" means Highland HCF Advisors, Ltd.

1.69.   "Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.70.   "Indentures" refers collectively to the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture, and the CLO-6 Indenture.

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 14-18 Filed 06/26/23 Page 846 of 1104 PageID 16980
Exhibit 18 Page 56 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/11/19 Entered 01/11/19 17:42:08 Page 55 of 229
Case 18-30264-sgj11 Doc 680 Filed 10/25/18 Entered 10/25/18 14:36:08 Page 55 of 629

1.71. "<u>Indenture Trustee</u>" refers to US Bank solely in its capacity as Indenture Trustee under the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture and the CLO-6 Indenture, as applicable

1.72. "<u>Initial Distribution Date</u>," when used with respect to any Contested Claim or Rejection Claim, shall mean the later of (i) the first Business Day at least thirty (30) days after the date on which any such Contested Claim or Rejection Claim becomes an Allowed Claim, or (ii) if the payment terms of Article IV of this Plan applicable to each such Claim specify a different date, then the date as calculated pursuant to the terms of Article IV of this Plan applicable to each such Claim. The Initial Distribution Date shall be separately determined with respect to each Contested Claim or Rejection Claim based upon the date each such Claim becomes an Allowed Claim.

1.73. "<u>Insider</u>" means a Person described in section 101(31) of the Bankruptcy Code.

1.74. "<u>Insider Claim</u>" means any Claim asserted by Insiders of the Debtors, including but not limited to any Claim asserted by Highland or any Affiliate thereof, unless otherwise indicated in the Plan.

1.75. "<u>Interests</u>" means any equity or stock ownership interest in the Debtors.

1.76. "<u>Issuers and Co-Issuers</u>" means CLO-1, CLO-3, CLO-4, CLO-5, CLO-6, Acis CLO 2013-1, Acis CLO-2014-3, LLC, Acis CLO 2014-4, LLC, Acis CLO 2014-5, LLC, and Acis 2015-6, LLC.

1.77. "<u>Lien</u>" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtors contemplated by section 101(37) of the Bankruptcy Code.

1.78. "<u>Management Fees</u>" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.79. "<u>Neutra</u>" means Neutra, Ltd.

1.80. "<u>Objection</u>" means (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.

1.81. "<u>Objection Deadline</u>" shall mean the later of (a) ninety (90) days following the Effective Date, unless otherwise extended by order of the Bankruptcy Court, or (b) as to any Rejection Claim filed after the Effective Date, ninety (90) days after the date on which the proof of Claim reflecting the Rejection Claim is filed.

1.82. "<u>Optional Redemption</u>" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.83. "<u>Person</u>" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-8   Filed 07/28/23   Page 847 of 1104   PageID 16981
Case 18-90064-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 56 of 229

1.84.   "Petition Date" means January 30, 2018.

1.85.   "Plan" means this Third Amended Joint Chapter 11 plan, either in its present form or as it may be altered, amended, or modified from time to time.

1.86.   "Plan Documents" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court.

1.87.   "Plan Rate" means a rate of interest of five percent (5%) per annum.

1.88.   "PMAs" refers collectively to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA.

1.89.   "Priority Claim" means a Claim (other than a Claim for an Administrative Expense) to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.90.   "Priority Non-Tax Claim" means a Priority Claim other than a Priority Tax Claim.

1.91.   "Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in subsection 507(a)(8) of the Bankruptcy Code.

1.92.   "Professional" means those persons retained pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code.

1.93.   "Pro Rata Distribution" means an optional Distribution made in accordance with section 4.03(c), 4.04(e), or 4.04(i) of the Plan.  Each Creditor entitled to receive a portion of a Pro Rata Distribution shall receive such Creditor's Pro Rata Share of such Distribution.

1.94.   "Pro Rata Share" means, as to the holder of a specific Claim, the ratio that the amount of such holder's Claim bears to the aggregate amount of all Claims included in the particular Class or category in which such holder's Claim is included.

1.95.   "Refinancing Proceeds" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.96.   "Rejection Claim" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract or Unexpired Lease.

1.97.   "Reorganized Debtor" refers collectively to the Debtors, as reorganized, acting from and after the Effective Date if the Plan is confirmed based on the terms and provisions herein.

1.98.   "Reserve" or "Reserves" means any reserves set aside by the Reorganized Debtor pursuant to this Plan, including reserves set aside to fund any Distributions, make payments pursuant to the Plan, or pursue the Estate Claims.

1.99.   "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules or statements have been or may be subsequently amended.

1.100.  "Secured Claim" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, and which is duly Allowed, but only to the

APPX. 16324

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18 Filed 08/28/23   Page 848 of 1104   PageID 16982
Exhibit 18   Page 58 of 230
Case 18-30664-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 57 of 229
Case 18-30664-sgj11 Doc 680 Filed 10/25/18   Entered 10/25/18 17:34:06   Page 57 of 229

extent of the value of the holder's interest in the Collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the Class of which the Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed.

1.101.  "Secured Tax Claim" means any ad valorem tax Claim that arises or is deemed to have arisen on or before the Petition Date, irrespective of the date on which such Claim is assessed or due.

1.102.  "Shared Services Agreement" means that certain Fourth Amended and Restated Shared Services Agreement by and between Acis LP and Highland dated March 17, 2017.

1.103.  "Sub-Advisory Agreement" means that certain Third Amended and Restated Sub-Advisory Agreement by and between Acis LP and Highland dated March 17, 2017

1.104.  "Subordinated Notes" means the subordinated notes in the Acis CLOs held by HCLOF, and expressly does not include any subordinated notes in the Acis CLOs held by any other party.

1.105.  "Substantial Consummation" means the day on which a Creditor first receives a Distribution of any kind under the terms and provisions of the Plan.

1.106.  "Taxing Authority" shall include the State of Texas or any subdivision thereof, including without limitation any political subdivision of the State of Texas assessing ad valorem taxes against any of the Assets.

1.107.  "Terry" means Joshua N. Terry.

1.108.  "Terry Partially Secured Claim" means any Claim asserted against the Debtors by Terry, including as asserted in Proof of Claim No. 1 in both Chapter 11 Cases and Proof of Claim No. 26 against Acis LP.

1.109.  "Unclaimed Property" means any cash, Distribution, or any other property of the Debtors unclaimed for a period of one (1) year after the applicable Initial Distribution Date.

1.110.  "Unexpired Lease" means any unexpired lease or agreement which is subject to section 365 of the Bankruptcy Code and which is not an Executory Contract.

1.111.  "US Bank" means U.S. Bank National Association.

1.112.  "Other Acis-Managed Funds" refers collectively to CLO-1, Acis CLO 2013-2, Ltd., Hewitt's Island CLO 1-R, Ltd, and BayVK R2 Lux S.A., SICAV-FIS.

B.      Interpretation. Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 44-18   Filed 09/29/23   Page 849 of 1104   PageID 16983
Exhibit 18   Page 59 of 230
Case 18-30264-sgj11   Doc 829   Filed 10/31/18   Entered 10/31/18 17:34:06   Page 50 of 229
Case 18-30264-sgj11   Doc 860   Filed 10/25/18   Entered 10/25/18 18:34:08   Page 50 of 229

same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof. The rules of construction set forth in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to construction of the Plan. For the purposes of construction of the Plan, "or" is disjunctive.

C.    Other Terms. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1) of the Bankruptcy Code. Otherwise, a term used herein that is not specifically defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

D.    Exhibits and Plan Documents. All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. Any Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing. Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Forshey & Prostok, LLP, 777 Main Street, Suite 1290, Fort Worth, Texas 76102, Attention: Linda Breedlove; Fax number (817) 877-4151; email: lbreedlove@forsheyprostok.com.

**ARTICLE II.**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

2.01.    The following is a designation of the Classes of Claims and Interests under the Plan. Administrative Expenses, Priority Claims of the kinds specified in sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code and Priority Tax Claims have not been classified, are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code, and their treatment is set forth in Article III of the Plan.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class.  A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

> Class 1 – Secured Tax Claims
> Class 2 – Terry Partially Secured Claim
> Class 3 – General Unsecured Claims
> Class 4 – Insider Claims
> Class 5 – Interests

2.02.    Impaired Classes of Claims and Interests.  Class 1 is unimpaired.  Classes 2 through 5 are Impaired.

2.03.    Impairment or Classification Controversies. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

**ARTICLE III.**
**TREATMENT OF UNCLASSIFIED CLAIMS**

3.01.    Administrative Expenses

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 54-18   Filed 09/30/23   Page 850 of 1104   PageID 16984
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:32:06   Page 59 of 229

(a)      The Reorganized Debtor shall pay, in accordance with the ordinary business terms applicable to each such expense or cost, the reasonable and ordinary expenses incurred in operating the Debtors' businesses or administering the Estate before the Effective Date ("Ordinary Course Claims").  The remaining provisions of this section 3.01 shall not apply to the Ordinary Course Claims, except that if there is a dispute relating to any such Ordinary Course Claim, the Reorganized Debtor may move the Bankruptcy Court to apply the provisions of Article III below relating to Contested Claims and require the holder of the Contested Ordinary Course Claim to assert such Claim through the Chapter 11 Cases.

(b)      Each holder of an Allowed Administrative Expense (other than Ordinary Course Claims and Administrative Expense Claims by Estate Professionals), shall receive (i) the amount of such holder's Allowed Administrative Expense in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

(c)      Unless the Bankruptcy Court orders to the contrary or the Reorganized Debtor agrees to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim by an Estate Professional, an Ordinary Course Claim, or an Administrative Expense which is already Allowed, shall file with the Bankruptcy Court and serve upon the Reorganized Debtor and its counsel a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date.  This deadline is the "Administrative Bar Date."  Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  **Failure to timely and properly file and serve such notice by the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred and discharged and the holder thereof shall be barred from receiving any Distribution from the Reorganized Debtor on account of such Claim for an Administrative Expense**.

(d)      A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.01(c) above, shall become an Allowed Administrative Expense if no Objection is filed within thirty (30) days of the filing and service of such notice.  If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(e)      The procedures contained in subsections 3.01(a), (c) and (d) above shall not apply to Administrative Expense Claims asserted by Estate Professionals, who shall each file and submit an appropriate final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date.  A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense only to the extent Allowed by order of the Bankruptcy Court and, if so Allowed, shall be paid in accordance with subsection 3.01(b) above.  Professional fees and expenses to any Estate Professional incurred on or after the Effective Date may be paid by the Reorganized Debtor without necessity of application to or order by the Bankruptcy Court.

(f)      If the Reorganized Debtor asserts any Estate Claims as counterclaims or defenses to a Claim for Administrative Expense, the Administrative Expense Claim shall be determined through an adversary proceeding before the Bankruptcy Court.  The Bankruptcy

11

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 11-18   Filed 08/21/23   Page 851 of 1104   PageID 16985
Case 18-30264-sgj11   Doc 850   Filed 10/25/18   Entered 10/25/18 17:33:06   Page 60 of 229

Court shall have exclusive jurisdiction to adjudicate and Allow all Claims for any Administrative Expense.

3.02.    Priority Non-Tax Claims.  Each holder of an Allowed Priority Non-Tax Claim shall receive (i) the amount of such holder's Allowed Priority Non-Tax Payment in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim and a determination has been made that such Allowed Priority Non-Tax Claim is not subject to equitable subordination under section 510(c) of the Bankruptcy Code, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

3.03.    Priority Tax Claims. Each holder of an Allowed Priority Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Priority Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Priority Tax Claim may be paid without penalty, no later than sixty (60) days after each such Claim becomes an Allowed Claim, or (b) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Reorganized Debtor.

3.04.    U.S. Trustee's Fees. The Reorganized Debtor shall pay the U.S. Trustee's quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) which are due as of the Confirmation Date in full on the Effective Date or as soon thereafter as is practicable.  After the Confirmation Date, the Reorganized Debtor shall continue to pay quarterly fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.  The Reorganized Debtor shall file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports for each quarter, or portion thereof, that the Chapter 11 Cases remain open.

**ARTICLE IV.
TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

4.01.    Class 1 – Secured Tax Claims. Each holder of an Allowed Secured Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Secured Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Secured Tax Claim may be paid without penalty, on the Initial Distribution Date, or (b) such other treatment as may be agreed to in writing by the holder of the Secured Tax Claim and the Reorganized Debtor.  The Liens securing such Secured Tax Claims shall remain unimpaired and unaffected until each such Class 1 Claim is paid in full.  All Distributions on account of Allowed Class 1 Claims shall be made by the Reorganized Debtor.  Class 1 is unimpaired. Holders of Class 1 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

4.02.    Class 2 – Terry Partially Secured Claim.  In exchange for a one million dollar ($1,000,000.00) reduction in the amount of the Terry Partially Secured Claim, Terry shall receive one hundred percent (100%) of the equity interests in the Reorganized Debtor as of the Effective Date.  The remaining balance of any Allowed Terry Partially Secured Claim shall be treated and paid as a Class 3 General Unsecured Claim.  Class 2 is Impaired.  The Holder of the Class 2 Terry Partially Secured Claim is entitled to vote on the Plan.

4.03.    Class 3 – General Unsecured Claims.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 54-18    Filed 02/22/23    Page 852 of 1104    PageID 16986
Case 18-30264-sgj11    Doc 820    Filed 10/25/18    Entered 10/25/18 17:32:06    Page 61 of 229

(a)    Each holder of an Allowed General Unsecured Claim shall receive a promissory note issued by the Reorganized Debtor (each an "Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's General Unsecured Claim becomes an Allowed Class 3 Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(b)    To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(c)    If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(d)    Class 3 is Impaired.  Holders of Class 3 Claims are entitled to vote on the Plan.

4.04.    Class 4 – Insider Claims.  Holders of Class 4 Insider Claims shall be treated as follows:

(a)    Class 4 Claims shall be divided into two (2) subclasses.  Subclass 4A shall consist of all Allowed Class 4 claims which are not subject to equitable subordination.  Subclass 4B shall consist of all Class 4 claims which are determined by the Bankruptcy Court to be subject to equitable subordination.  If only a part of a Class 4 Claim is subject to equitable subordination, then the portion of such claim subject to equitable subordination shall be included in Subclass 4B and the remainder not subject to equitable subordination shall be included in Subclass 4A.  Subclass 4A and Subclass 4B will vote separately on the Plan, although Subclass 4B is currently an empty class.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 08/23/23   Page 853 of 1104   PageID 16987
Case 18-30264-sgj11   Doc 820   Filed 10/31/18   Entered 10/25/18 17:34:06   Page 64 of 229

(b)     All Class 4 Claims (regardless of which subclass) shall be and remain subject to all Estate Defenses and all Estate Claims, including any rights of offset, recoupment, and/or to an affirmative recovery against the Holder of any Class 4 Claim.

(c)     Each holder of an Allowed Subclass 4A Claim shall receive an Unsecured Cash Flow Note on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(d)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(e)     If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(f)     Unless otherwise provided by Order of the Bankruptcy Court, holders of Allowed Subclass 4B claims shall not be entitled to any Distribution from the Reorganized Debtor until all Allowed Claims included in Classes 1 through 3 and Subclass 4A, including all Unsecured Cash Flow Notes, have been paid in full.

(g)     Holders of Allowed Subclass 4B Claims shall receive a subordinated promissory note issued by the Reorganized Debtor ("Subordinated Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Subordinated Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on the earlier to occur of (i) the date that is two

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 12/04/23   Page 854 of 1104   PageID 16988
Exhibit 18   Page 64 of 230
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 63 of 229

(2) years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five (5) years after the Effective Date.

      (h)    To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of a Subordinated Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 90th day after the payment in full of the Unsecured Cash Flow Notes.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Subordinated Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that a Subordinated Unsecured Cash Flow Note is first issued after payments have been made on one or more other Subordinated Unsecured Cash Flow Notes, the first Distribution made on account of such Subordinated Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Subordinated Unsecured Cash Flow Note had such Subordinated Unsecured Cash Flow Note been issued at the time the first payment on any Subordinated Unsecured Cash Flow Note was made, such that the first Distribution shall bring all payments current on account of such Subordinated Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of a Subordinated Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Subordinated Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Subordinated Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Subordinated Unsecured Cash Flow Note.

      (i)    Subject to section 4.04(f) above, if the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Subclass 4B Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Subclass 4B Claims.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Subordinated Unsecured Cash Flow Note.

      (j)    The Reorganized Debtor may establish appropriate Reserves as to any Contested Claim included in Class 4.

      (k)    Class 4 is Impaired.  Holders of Class 4 Claims are entitled to vote on the Plan.

4.05.   Class 5 – Interests.  All Interests in the Debtors shall be extinguished and shall cease to exist as of the Effective Date. The holders of such Interests shall not receive or retain any property on account of such Interests under the Plan.  Class 5 is Impaired.  Holders of Class 5 Interests are conclusively presumed to have rejected the Plan and, accordingly, are not entitled to vote on the Plan.

**ARTICLE V.**
**ACCEPTANCE OR REJECTION OF THE PLAN**

5.01.   Classes Entitled to Vote.  Creditors in Classes 2 through 4 are entitled to vote and shall vote separately to accept or reject the Plan.  Any unimpaired Class shall not be entitled to vote to accept or reject the Plan.  Any unimpaired Class is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 55-18   Filed 05/26/23   Page 855 of 1104   PageID 16989
Case 18-30264-sgj11   Doc 829   Filed 10/31/18   Entered 01/25/19 17:34:06   Page 64 of 229

5.02.   <u>Class Acceptance Requirement</u>. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

5.03.   <u>Cramdown</u>. This section shall constitute the request by the Plan proponent, pursuant to section 1129(b) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met.

### ARTICLE VI.
### MEANS FOR IMPLEMENTATION OF THE PLAN

6.01.   <u>Vesting of Assets</u>. As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets, including the PMAs, all Cash, Estate Accounts Receivable, Estate Insurance, Estate Claims and Estate Defenses, shall be transferred from the Estate to, and vested in, the Reorganized Debtor, free and clear of all rights, title, interests, claims, liens, encumbrances and charges, except as expressly set forth in the Plan.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

6.02.   <u>Continued Existence of the Debtors</u>.  The Debtors shall continue to exist after the Effective Date, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents.  On or after the Effective Date, each Reorganized Debtor may, within its sole and exclusive discretion, take such action as permitted by applicable law and its constituent documents as it determines is reasonable and appropriate.

6.03.   <u>Retention and Assertion of Causes of Action and Defenses</u>.

(a)      Except as expressly set forth in this Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Estate Claims, Estate Defenses and Avoidance Actions) belonging to the Debtors (collectively, the "<u>Retained Causes of Action</u>") shall, upon the occurrence of the Effective Date, be reserved, retained and preserved for, and transferred to, received by and vested, in the Reorganized Debtor for the benefit of the Debtors and the Debtors' estates.  Without limitation, the Retained Causes of Action include the claims and causes of action described on **Exhibit A** attached hereto.

(b)      Except as expressly set forth in this Plan, the rights of the Reorganized Debtor to commence, prosecute or settle the Retained Causes of Action shall be retained, reserved, and preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against them. The Debtors and their Estate expressly reserve all rights to prosecute any and all of the Retained Causes of Action (including all**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 06/26/23   Page 856 of 1104   PageID 16990
Case 18-30264-sgj11 Doc 829 Filed 10/31/18   Entered 10/31/18 17:34:06   Page 65 of 229

Estate Claims, Estate Defenses and Avoidance Actions) against any Person, <u>except</u> as otherwise provided in this Plan. Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order, the Debtors expressly reserve all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, <u>including</u> without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan. The Debtors and the Reorganized Debtor may also assert Estate Defenses as a defense to the allowance of any Claim not otherwise Allowed.

6.04.    <u>Assumption of Obligations to Make Distributions</u>.  The Reorganized Debtor shall be deemed to have assumed the obligations to make all Distributions pursuant to this Plan.

6.05.    <u>Actions by the Debtors and the Reorganized Debtor to Implement Plan</u>.  The entry of the Confirmation Order shall constitute all necessary authorization for the Debtors and the Reorganized Debtor to take or cause to be taken all actions necessary or appropriate to consummate, implement or perform all provisions of this Plan on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (a) all transfers of Assets, including to the Reorganized Debtor, that are to occur pursuant to the Plan; (b) the cancellation of Interests and issuance of 100% of the equity interests in the Reorganized Debtor to Terry; (c) the performance of the terms of the Plan and the making of all Distributions required under the Plan; and (d) subject to the terms of the Plan, entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

6.06.    <u>Termination of Highland as Shared Services Provider and Sub-Advisor</u>.  The Bankruptcy Court authorized the Chapter 11 Trustee to terminate the Shared Services Agreement and Sub-Advisory Agreement and engage Brigade to perform the services previously provided by Highland.  The Shared Services Agreement and Sub-Advisory Agreement were terminated by the Chapter 11 Trustee on or about August 1, 2018, and the services previously performed by Highland were transitioned to Brigade on an interim basis.  Brigade has agreed to continue to provide shared services and sub-advisory services to the Reorganized Debtor with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs) subject to a minimum two (2) year term unless otherwise agreed as between the Reorganized Debtor and Brigade.  Consequently, any agreement between the Reorganized Debtor and Brigade shall provide that Brigade cannot be removed without cause for a period of two (2) years except as may be otherwise agreed as between the Reorganized Debtor and Brigade.

6.07.    <u>Continued Portfolio Management by the Reorganized Debtor</u>.  The PMAs and any other Executory Contracts and Unexpired Leases identified on Exhibit B to the Plan or in the Confirmation Order shall be assumed and the Reorganized Debtor shall, from an after the Effective Date, serve as the portfolio manager with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs).  Consistent with Section 15 of the PMAs, the Reorganized Debtor may only be removed as portfolio manager under the assumed PMAs for cause as set forth in the PMAs.

6.08.    <u>Reset of the Acis CLOs</u>.  HCLOF has maintained that it desires to reset the Acis CLOs. The Reorganized Debtor, with the assistance of Brigade as its shared services provider and sub-advisor, is prepared to promptly seek to perform such reset transactions as set forth herein.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 41-18    Filed 09/07/23    Page 857 of 1104    PageID 16991
Exhibit 18    Page 857 of 230
Case 18-30264-sgj11    Doc 820    Filed 10/26/18    Entered 10/26/18 17:34:06    Page 66 of 229
Case 18-30264-sgj11    Doc 860    Filed 10/26/18    Entered 10/26/18 17:34:06    Page 66 of 229

HCLOF shall have the right to submit one or more notice(s) of Optional Redemption solely for the purpose of effectuating a reset of one or more of the Acis CLOs under this section 6.08 of the Plan utilizing Refinancing Proceeds (a "Reset Optional Redemption") for each of the Acis CLOs.  If HCLOF requests a Reset Optional Redemption of an Acis CLO, the Reorganized Debtor, with the assistance of Brigade, shall thereafter seek to reset the Acis CLOs, either consecutively or simultaneously, in its good faith business judgment and consistent with then-prevailing market terms; *provided, however,* (i) the Management Fees to be charged by the Reorganized Debtor to any reset Acis CLOs shall remain the same going forward and shall not be increased, and no transaction fee shall be charged by the Reorganized Debtor (other than, for avoidance of doubt, transaction expense reimbursements consistent with market standards), and (ii) HCLOF shall be granted a right of first refusal for any funding of debt or equity required to effectuate a reset of each of the Acis CLOs.  The terms of the Indentures shall control any Reset Optional Redemption.  If HCLOF elects to not reset one or more of the Acis CLOs, then the Acis CLOs will continue to be managed in accordance with market standards.

6.09.   Post-Effective Date Service List.  Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "Service List"): (a) any Person directly affected by the relief sought in the pleading, (b) the U.S. Trustee, (c) parties which have filed a Notice of Appearance in the Chapter 11 Cases, and (d) the Reorganized Debtor.

6.10.   Section 505 Powers.  All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date.

6.11.   Section 510(c) Powers.  All rights and powers to seek or exercise any right or remedy of equitable subordination are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date as an Estate Defense.

6.12.   Section 506(c) Powers.  The Estate hereby reserves all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtor.

6.13.   Plan Injunction.  The Reorganized Debtor shall each have full power, standing and authority to enforce the Plan Injunction against any Person, either through an action before the Bankruptcy Court or any other tribunal having appropriate jurisdiction.

6.14.   Cancellation of Interests.  Except as otherwise specifically provided herein, upon the Effective Date of the Plan: (a) all Interests in the Debtors shall be cancelled; and (b) all obligations or debts of, or Claims against, the Debtors on account of, or based upon, the Interests shall be deemed as cancelled, released and discharged, including all obligations or duties by the Debtors relating to the Interests in any of their respective formation documents, including Acis LP's limited partnership agreement and bylaws, Acis GP's articles of formation and company agreement, or any similar formation or governing documents.

**ARTICLE VII.**
**PROVISIONS GOVERNING DISTRIBUTION**

7.01.   Distributions from Reorganized Debtor.  The Reorganized Debtor shall be responsible for making Distributions to holders of Allowed Claims only to the extent this Plan requires Distributions to be made by the Reorganized Debtor.  The priority of Distributions from the

APPX. 16334

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 54-18    Filed 02/28/23    Page 858 of 1104    PageID 16992
Case 18-30264-sgj11    Doc 820    Filed 10/25/18    Entered 10/25/18 17:34:06    Page 67 of 229

Reorganized Debtor shall be in accordance with the terms of this Plan and the Confirmation Order as follows:

(a)    First, to satisfy Allowed Class 1 Secured Tax Claims;

(b)    Second, to satisfy Allowed Administrative Expenses and Allowed Priority Claims in accordance with Article III above, including all U.S. Trustee quarterly fees due and owing as of the Effective Date;

(c)    Third, to make Distributions to holders of any Allowed Class 3 General Unsecured Claims and Allowed Subclass 4A Claims; and

(e)    Fourth, to make Distributions to holders of any Allowed Subclass 4B Claims

7.02.    Reserves.  The Reorganized Debtor may estimate, create and set aside Reserves as may be necessary or appropriate, including without limitation, Reserves on account of Contested Claims.  The Reorganized Debtor may, but shall not be required to, move the Bankruptcy Court to approve: (a) the amount of, and terms on which, such Reserves shall be held, maintained and disbursed, or (b) the amount and timing of any proposed interim Distribution to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The Reorganized Debtor may elect to seek approval by the Bankruptcy Court for the creation and amount of any Reserves or regarding the amount or timing of any Distribution on account of any Allowed Claims.  Except as otherwise expressly provided herein, the Reorganized Debtor, in the exercise of its good faith business judgment, may transfer funds out of any of the Reserves as necessary or appropriate.  However, the Reorganized Debtor shall not be required to create separate accounts for such Reserves which may be created and memorialized by entries or other accounting methodologies, which may be revised from time-to-time, to enable the Reorganized Debtor to determine the amount of Cash available for Distributions under the Plan.  Subject to any specific deadlines set forth herein, the Reorganized Debtor, shall determine, from time-to-time, in the exercise of the Reorganized Debtor's good faith business judgment: (x) the amount of Cash available for Distribution, (y) the timing of any Distributions, and (z) the amount and creation of any Reserves for Contested Claims.  The Reorganized Debtor shall not be entitled to reserve for, and this section 7.02 does not apply to, Distributions to holders of Allowed Subclass 4B Claims.

7.03.    Prosecution and Settlement of Estate Claims.  Upon the Effective Date, the Reorganized Debtor (a) shall automatically be substituted in place of the Chapter 11 Trustee as the party representing the Estate in respect of any pending lawsuit, motion or other pleading pending before the Bankruptcy Court or any other tribunal, and (b) is authorized to file a notice on the docket of each adversary proceeding or the Chapter 11 Cases regarding such substitution.  The Reorganized Debtor shall have exclusive standing and authority to prosecute, settle or compromise Estate Claims for the benefit of the Estate in the manner set forth in this Plan.

7.04.    Plan Injunction.  The Reorganized Debtor shall be entitled to the full protection and benefit of the Plan Injunction and shall have standing to bring any action or proceeding necessary to enforce the Plan Injunction against any Person.

7.05.    Relief from the Bankruptcy Court.  The Reorganized Debtor shall be authorized to seek relief from the Bankruptcy Court or any other tribunal having jurisdiction as to any matter relating or pertaining to the consummation, administration or performance of this Plan, including without

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84-18   Filed 02/09/23   Page 859 of 1104   PageID 16993
Case 18-30264-sgj11   Doc 820   Filed 10/31/18   Entered 10/31/18 17:34:06   Page 68 of 229

limitation seeking any relief from the Bankruptcy Court which the Reorganized Debtor deems necessary or appropriate to the performance of its duties or the administration of this Plan.

## ARTICLE VIII.
### SOURCE OF DISTRIBUTIONS

8.01.   Source of Distributions.  All Distributions under this Plan shall be made by the Reorganized Debtor in the manner provided in this Plan and the Confirmation Order.

8.02.   Timing and Amount of Distributions.  No Distribution shall be made on account of any Claim until such Claim is Allowed, except as otherwise set forth in this Plan or otherwise ordered by the Bankruptcy Court.  No Distribution shall be made on account of any Contested Claim until such Claim is Allowed.  Except as expressly set forth in the Plan or in the Confirmation Order, the Reorganized Debtor shall, in the exercise of its good faith business judgment, determine the timing and amount of all Distributions which are required to be made under the Plan, consistent with the goal of making such Distributions as expeditiously as reasonably possible.  The Reorganized Debtor may, but shall not be required to, seek approval of, or any other appropriate relief from, the Bankruptcy Court with respect to any of such Distributions.  Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or otherwise distributed in accordance with the orders of the Bankruptcy Court.

8.03.   Means of Cash Payment.  Cash payments pursuant to this Plan shall be made by check drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor and payee.

8.04.   Record Date for Distributions.  As of the close of business on the Effective Date (the "Distribution Record Date"), the register for Claims will be closed, and there shall be no further changes in the holders of record of any Claims.  Although there is no prohibition against the transfer of any Claim by any Creditor, the Reorganized Debtor shall have no obligation to recognize any transfer of a Claim occurring after the Distribution Record Date, and the Reorganized Debtor shall instead be authorized and entitled to recognize and deal for all purposes under this Plan, including for the purpose of making all Distributions, with only those holders of Claims so reflected as of the Distribution Record Date.  However, the Reorganized Debtor may, in the exercise of its good faith business judgment, agree to recognize transfers of Claims after the Distribution Record Date, but shall have no obligation to do so.

8.05.   Delivery of Distributions.  All Distributions, deliveries and payments to the holders of any Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed in the Chapter 11 Cases by such Claimants or, if the Distribution is to be made based on a Claim reflected as Allowed in the Schedules, at the address reflected in the Schedules.  Any such Distribution, delivery or payment shall be deemed as made for all purposes relating to this Plan when deposited in the United States Mail, postage prepaid, addressed as required in the preceding sentence.  If any Distribution is returned as undeliverable, no further Distribution shall be made on account of such Allowed Claim unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed Distributions shall be made to the holder of such Allowed Claim.  However, all notices to the Reorganized Debtor reflecting new or updated addresses for undeliverable Distributions shall be made on or before one hundred twenty (120) days after the date of the attempted Distribution or such longer period as the Reorganized Debtor may fix in the exercise of its sole discretion.  After such date, all Unclaimed Property shall revert to the Reorganized Debtor and the Claim of any holder with respect to such property shall be discharged and forever barred.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 51-18   Filed 10/20/23   Page 860 of 1104   PageID 16994
Case 18-30264-sgj11   Doc 820   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 69 of 229
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 18:32:08   Page 69 of 229

8.06.   <u>W-9 Forms</u>.  Each holder of an Allowed Claim must provide a W-9 form or other such necessary information to comply with any withholding requirements of any Governmental Unit (collectively the "<u>W-9 Form</u>") to the Reorganized Debtor prior to receiving any Distribution from the Reorganized Debtor.  In the event a holder of an Allowed Claim does not provide a W-9 Form to the Reorganized Debtor within thirty (30) days of the Effective Date, the Reorganized Debtor shall, at an appropriate time, issue a written request to each holder of an Allowed Claim that has not previously provided a W-9 Form to the Reorganized Debtor.  The request shall be in writing and shall be delivered to the last address known to the Debtors or Reorganized Debtor, as appropriate.  The request shall conspicuously advise and disclose that failure to provide a W-9 Form to the Reorganized Debtor within thirty (30) days shall result in a waiver of any right or rights to a Distribution from the Reorganized Debtor.  In the event any holder of an Allowed Claim fails to provide the Reorganized Debtor with a W-9 Form within thirty (30) days after the date of written request described herein, then the holder of such Allowed Claim shall be deemed to have waived the right to receive any Distribution whatsoever from the Reorganized Debtor.

8.07.   <u>Time Bar to Cash Payments</u>.  Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the issuer of the check by the holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before one hundred twenty (120) days after the date of issuance of such check or such longer period as the Reorganized Debtor may fix.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.08.   <u>Cure Period</u>.  Except as otherwise set forth herein, the failure by the Reorganized Debtor to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to this Plan, shall not constitute an event of default unless and until the Reorganized Debtor has been given thirty (30) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure such alleged default.  Until the expiration of such thirty (30) day cure period, the Reorganized Debtor shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes.  Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.

8.09.   <u>Pre-Payment of Claims</u>. Unless the Plan expressly prohibits or conditions the pre-payment of an Allowed Claim, the Reorganized Debtor may pre-pay any Allowed Claim in whole or in part at any time and may do so without penalty.

8.10.   <u>Distributions after Substantial Consummation</u>.  All Distributions of any kind made to any Creditor after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

APPX. 163336

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 54-18   Filed 09/29/23   Page 861 of 1104   PageID 16995
Exhibit 18   Page 79 of 230
Case 18-30264-sgj11   Doc 820   Filed 01/31/18   Entered 01/31/18 17:34:06   Page 79 of 229
Case 18-30264-sgj11   Doc 860   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 72 of 229

## ARTICLE IX.
## RETENTION OF ESTATE CLAIMS AND ESTATE DEFENSES.

9.01.   Retention of Estate Claims.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Claims shall be transferred to, and vested in, the Reorganized Debtor, both for purposes of seeking an affirmative recovery against any Person and for the purposes of offset, recoupment or defense against any Claim asserted against the Estate or Reorganized Debtor.  All Estate Claims shall be deemed to have been transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

Without limiting the effectiveness or generality of the foregoing reservation, out of an abundance of caution, the Debtors and the Estate hereby specifically reserves, retains, and preserves the Estate Claims reflected in the attached **Exhibit A**.  Reference is here made to **Exhibit A** which constitutes an integral part of this Plan.  The provisions of this Article of the Plan, as well as the descriptions and disclosures relating to the Estate Claims in the Disclosure Statement, are provided in the interest of providing maximum disclosure of the Estate Claims of which Debtors are presently aware and shall not act as a limitation on the potential Estate Claims that may exist.  It is the specific intention of this Plan that all Avoidance Actions and all associated remedies, and any other Estate Claims, whether arising before or after the Petition Date, and whether arising under the Bankruptcy Code or applicable state or federal non-bankruptcy laws, shall all be reserved, retained and preserved under this Plan to be transferred to, and vested in, the Reorganized Debtor.  All Estate Claims are reserved, retained and preserved both as causes of action for an affirmative recovery and as counterclaims and for the purposes of offset or recoupment against any Claims asserted against the Estate.

9.02.   Retention of Estate Defenses.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Defenses shall be transferred to, and vested in, the Reorganized Debtor.  For this purpose, all Estate Defenses are hereby reserved, retained and preserved by the Debtors and the Estate, including without limitation all such Estate Defenses available to the Estate pursuant to section 558 of the Bankruptcy Code, and shall be deemed as transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

9.03.   Assertion of Estate Claims and Estate Defenses.  The Reorganized Debtor shall have, and be vested with, the exclusive right, authority and standing to assert all Estate Claims and Estate Defenses for the benefit of the Reorganized Debtor.

## ARTICLE X.
## PROCEDURES FOR RESOLVING AND TREATING
## CONTESTED AND CONTINGENT CLAIMS

10.01.  Claims Listed in Schedules as Disputed.  Any General Unsecured Claim which is listed in the Schedules as unliquidated, contingent or disputed, and for which no proof of Claim has been timely filed, shall be considered as Disallowed as of the Effective Date without the necessity of any further action by the Reorganized Debtor or further order of the Bankruptcy Court other than the entry of the Confirmation Order.

10.02.  Responsibility for Objecting to Claims and Settlement of Claims.  The Reorganized Debtor shall have the exclusive standing and authority to either object to any Claim or settle and compromise any Objection to any Claim, including as follows:

22

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 64-18 Filed 02/22/23 Page 862 of 1104 PageID 16996
Case 18-30264-sgj11 Doc 860 Filed 10/31/18 Entered 10/31/18 17:34:06 Page 23 of 29

(a)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim.  Any Contested Claim may be litigated to Final Order by the Reorganized Debtor; and

(b)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court.  Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Effective Date.

10.03.  <u>Objection Deadline</u>.  All Objections to Claims shall be served and filed by the Objection Deadline; <u>provided, however</u>, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim.  The Reorganized Debtor may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim.  Any such motion may be granted without notice or a hearing.  In the event that the Reorganized Debtor files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion.  Any proof of Claim other than one based upon a Rejection Claim and which is filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtor.  Nothing contained herein shall limit the right of the Reorganized Debtor to object to Claims, if any, filed or amended after the Objection Deadline.

10.04.  <u>Response to Claim Objection</u>.  If the Reorganized Debtor files an Objection to any Claim, then the holder of such Claim shall file a written response to such Objection within twenty-four (24) days after the filing and service of the Objection upon the holder of the Contested Claim.  Each such Objection shall contain appropriate negative notice advising the Creditor whose Claim is subject to the Objection of the requirement and time period to file a response to such Objection and that, if no response is timely filed to the Objection, the Bankruptcy Court may enter an order that such Claim is Disallowed without further notice or hearing.  The negative notice language in the Objection shall satisfy the notice requirement in section 3007(a) of the Bankruptcy Rules, and the Reorganized Debtor shall not be required to send a separate notice of the Objection to the Creditor whose Claim is subject to the Objection.

10.05.  <u>Distributions on Account of Contested Claims</u>.  If a Claim is Contested, then the dates for any Distributions as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter Distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan.  No Distribution shall be made on account of a Contested Claim until Allowed.  Until such time as a contingent Claim becomes fixed and absolute by a Final Order Allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan.  Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

10.06.  <u>No Waiver of Right to Object</u>.  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan, or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtor's right to object to any Claim.

10.07.  <u>Offsets and Defenses</u>.  The Reorganized Debtor shall be vested with and retain all Estate Claims and Estate Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant holding a Claim.  Assertion of counterclaims by the

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6 Exhibit 18   Filed 02/23/23   Page 873 of 230   Page 863 of 1104   PageID 16997
Case 18-30264-sgj11   Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 72 of 229
Case 18-30264-sgj11   Doc 860 Filed 10/25/18   Entered 10/25/18 18:34:08   Page 24 of 229

Reorganized Debtor against any Claim asserted against the Estate or Reorganized Debtor shall constitute "core" proceedings.

10.08.  <u>Claims Paid or Reduced Prior to Effective Date</u>.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court.  To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Debtors or the Reorganized Debtor from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

### ARTICLE XI.
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.01.  <u>Assumption and Rejection of Executory Contracts</u>.  All Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected by the Debtors upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is identified in **Exhibit B** to this Plan and/or the Confirmation Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date. The Plan shall constitute a motion to reject all Executory Contracts and Unexpired Leases except as stated in this paragraph.  However, the Debtors may file a separate motion for the assumption or rejection of any Executory Contract or Unexpired Lease at any time through the Confirmation Date.

11.02.  <u>Cure Payments</u>.  All payments that may be required by section 365(b)(1) of the Bankruptcy Code to satisfy any Cure Claim shall be made by the Reorganized Debtor as soon as reasonably practical after the Effective Date or upon such terms as may be otherwise agreed between the Reorganized Debtor and the holder of such Cure Claim; *provided, however*, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, or any other matter pertaining to assumption or assignment of an Executory Contract, the Reorganized Debtor shall make such cure payments and cure such other defaults, all as may be required by section 365(b)(1) of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

11.03.  <u>Bar to Rejection Claims</u>.  Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract or Unexpired Lease shall be forever barred and shall not be enforceable against the Reorganized Debtor or the Reorganized Debtor's assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtor and its counsel by the earlier of thirty (30) days after the Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract or Unexpired Lease.

11.04.  <u>Rejection Claims</u>.  Any Rejection Claim not barred by section 11.03 of the Plan shall be classified as a Class 3 General Unsecured Claim subject to the provisions of sections 502(b)(6) and 502(g) of the Bankruptcy Code; *provided, however*, that any Rejection Claim by a lessor based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.  All Rejection Claims shall be deemed as Contested Claims until Allowed. Nothing contained herein shall be deemed an admission by the Debtors or the Reorganized

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 04/24/23   Page 74 of 230   Page 864 of 1104   PageID 16998
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 73 of 229

Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Reorganized Debtor of any objections or defenses to any such Rejection Claim if asserted.

11.05.  Reservation of Rights.  Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtor have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XII.
## SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

12.01.  Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the substantive consolidation of the Debtors for the sole purposes of implementing the Plan, including for purposes of voting and Distributions to be made under the Plan.  Pursuant to such order:  (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of the other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by the other Debtor and any joint or several liability of the Debtors will be deemed to be one obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the Chapter 11 Case of either Debtor will be deemed filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors.

## ARTICLE XIII.
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN

13.01.  Conditions to Confirmation and Effectiveness of Plan.  The Plan shall not become effective until the following conditions shall have been satisfied and which may occur concurrently with the Effective Date:  (a) the Confirmation Order shall have been entered, in form and substance acceptable to the Chapter 11 Trustee; (b) the necessary Plan Documents have been executed and delivered, and (c) all other conditions specified by the Chapter 11 Trustee have been satisfied.  Any or all of the above conditions other than (a) may be waived at any time by the Chapter 11 Trustee.

13.02.  Notice of the Effective Date.  On or as soon as reasonably practical after the occurrence of the Effective Date, the Reorganized Debtor shall cause a notice of the Effective Date to be filed with the Bankruptcy Court and served on all Creditors and parties-in-interest.

13.03.  Revocation of Plan.  The Chapter 11 Trustee may revoke and withdraw the Plan at any time before the Effective Date.  If the Chapter 11 Trustee revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then this Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, as the case may be, or any other Person, or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5-18   Filed 05/26/23   Page 865 of 1104   PageID 16999
Exhibit 18   Page 75 of 230
Case 18-30264-sgj11   Doc 820   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 74 of 229

## ARTICLE XIV.
## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

14.01.  Compromise and Settlement

(a)      Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under this Plan, including, without limitation, all Claims against the Debtors or Estate arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors or the Estate.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements embodied in this Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtors, the Estate, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets.  Except as otherwise provided herein, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's Assets, or the Estate, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(b)      It is not the intent of this Plan that confirmation of the Plan shall in any manner alter or amend any settlement and compromise (including those contained in agreed orders) between the Debtors and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement").  To the extent of any conflict between the terms of the Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control and such Prior Settlement shall be enforceable according to its terms.

14.02.  Discharge.  The Debtors and their successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(1) of the Bankruptcy Code from any and all Claims provided for in the Plan.

14.03.  **PLAN INJUNCTION.**

**THIS SECTION IS REFERRED TO HEREIN AS THE "PLAN INJUNCTION." EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING:    (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 44-18   Filed 02/16/23   Page 866 of 1104   PageID 17000
Case 18-30264-sgj11   Doc 820   Filed 10/31/18   Entered 10/31/18 17:32:06   Page 75 of 229

ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THIS PLAN APPLICABLE TO SUCH CLAIM OR INTEREST.  THE PLAN INJUNCTION SHALL ALSO BE INCORPORATED INTO THE CONFIRMATION ORDER.

IN ADDITION TO THE FOREGOING, EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF:  (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS.  FOR PURPOSES OF THIS PARAGRAPH, THE TERM "<u>ENJOINED PARTIES</u>" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF

27

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-14   Filed 09/29/23   Page 867 of 1104   PageID 17001
Case 18-30264-sgj11   Doc 820   Filed 10/31/19   Entered 10/31/19 17:34:06   Page 28 of 229

**HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS. FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

Notwithstanding anything to the contrary in the Plan: (a) third-party professionals employed by the Reorganized Debtor shall not be released or exculpated from any losses, claims, damages, liabilities, or expenses arising from their duties and services provided to the Reorganized Debtor; and (b) any third-party professionals employed by the Reorganized Debtor shall only be entitled to be indemnified by the Reorganized Debtor to the extent provided by applicable law.

Notwithstanding anything to the contrary in the Plan or Confirmation Order, nothing in the Plan or in the Confirmation Order shall discharge, release, enjoin or otherwise bar (i) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of claim, (ii) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (iii) any valid right of setoff or recoupment of a Governmental Unit, and (iv) any police or regulatory action by a Governmental Unit. In addition, nothing in the Plan or Confirmation Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date. For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

14.04. Setoffs. Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate may possess against such Claimant. In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

14.05. Recoupment. Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor unless (a) such holder actually provides notice thereof in writing to the Debtors or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-18   Filed 07/31/23   Page 2 of 230 Page 868 of 1104   PageID 17002
Case 18-30264-sgj11   Doc 860   Filed 01/25/19   Entered 01/25/19 17:34:06   Page 29 of 229

recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtors or the Reorganized Debtor consents to the requested recoupment.  The Debtors and the Reorganized Debtor shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment.  In the absence of a written response from the Debtors or the Reorganized Debtor consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

14.06.  Turnover.  On the Effective Date, any rights of the Estate to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtor.

14.07.  Automatic Stay.  The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtors, the Estate and all Assets.  As of the Effective Date, the automatic stay shall be replaced by the Plan Injunction.

**ARTICLE XV.**
**JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN**

15.01.  Retention of Jurisdiction.  Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, to the full extent allowed or permitted by applicable law, including without limitation for the purposes of invoking sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)      To hear and determine any and all objections to, or applications or motions concerning, the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

(b)      To hear and determine any and all applications for payment of fees and expenses pursuant to this Plan to any Estate Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed under this Plan, and any and all objections thereto;

(c)      To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and Unexpired Leases and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract or Unexpired Lease;

(d)      To hear and determine any and all adversary proceedings, applications, or contested matters, including relating to the allowance of any Claim;

(e)      To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset or recoupment; and (iv) determinations of Objections to Contested Claims;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 41-18   Filed 09/29/23   Page 869 of 1104   PageID 17003
Case 18-30264-sgj11   Doc 850   Filed 01/21/19   Entered 01/21/19 17:34:06   Page 30 of 229

(f)     To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g)     To administer Distributions to holders of Allowed Claims as provided herein;

(h)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i)     To enable the Reorganized Debtor to prosecute any and all proceedings which may be brought to set aside transfers, Liens or encumbrances and to recover any transfers, Assets, properties or damages to which the Reorganized Debtor may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between the Reorganized Debtor and any other party, including but not limited to, any causes of action or Objections to Claims, preferences or fraudulent transfers and obligations or equitable subordination;

(j)     To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(k)     To enforce the discharge and Plan Injunction against any Person;

(l)     To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of this Plan and the transactions required or contemplated pursuant thereto;

(m)    To hear and determine any motion or application which the Reorganized Debtor is required or allowed to commence before the Bankruptcy Court pursuant to this Plan;

(n)     To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(o)     To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(p)     To enter a final decree closing the Chapter 11 Cases; and

(q)     To determine any other matter or dispute relating to the Estate, the Estate Claims, the Estate Defenses, the Assets, or the Distributions by the Reorganized Debtor.

15.02.  <u>Abstention and Other Courts</u>.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

15.03.  <u>Non-Material Modifications</u>.  The Reorganized Debtor may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable.  The Reorganized Debtor may undertake such nonmaterial modification pursuant

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 51-18   Filed 02/20/23   Page 870 of 1104   PageID 17004
Case 18-30264-sgj11   Doc 829   Filed 01/25/19   Entered 01/25/19 17:34:06   Page 79 of 229

to this section insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

15.04.  <u>Material Modifications</u>.  Modifications of this Plan may be proposed in writing by the Chapter 11 Trustee at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Chapter 11 Trustee shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be modified at any time after confirmation and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.  A holder of a Claim or Interest that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

**ARTICLE XVI.**
**<u>MISCELLANEOUS PROVISIONS</u>**

16.01.  <u>Severability</u>.  Should the Bankruptcy Court determine any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtor may modify the Plan so that any such provision shall not be applicable to the holder of any Claim or Interest.  Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

16.02.  <u>Oral Agreements; Modification of Plan; Oral Representations or Inducements</u>.  The terms of the Plan, Disclosure Statement and Confirmation Order may only be amended in writing and may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation.  None of the Debtors, any representative of the Estate, including Robin Phelan in his capacity as Chapter 11 Trustee, nor their attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

16.03.  <u>Waiver</u>.  The Reorganized Debtor shall not be deemed to have waived any right, power or privilege pursuant to the Plan unless the waiver is in writing and signed by the Reorganized Debtor.  There shall be no waiver by implication, course of conduct or dealing, or through any delay or inaction by the Reorganized Debtor, of any right pursuant to the Plan, including the provisions of this anti-waiver section.  The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

16.04.  <u>Notice</u>.  Any notice or communication required or permitted by the Plan shall be given, made or sent as follows:

(a)     If to a Creditor, notice may be given as follows: (i) if the Creditor has not filed a proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

(b)     If to the Reorganized Debtor, notice shall be sent to the following addresses:

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 64-18   Filed 10/31/23   Page 871 of 1104   PageID 17005
Case 18-30264-sgj11   Doc 850   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 82 of 229

|  |  |
|---|---|
| Jeff P. Prostok | Josh Terry |
| Suzanne K. Rosen | c/o Brian P. Shaw |
| Forshey Prostok LLP | Rogge Dunn Group, PC |
| 777 Main Street, Suite 1290 | 1201 Elm Street, Suite 5200 |
| Fort Worth, Texas 76102 | Dallas, Texas 75270 |

(c)     Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtor of its new address in accordance with the terms of this section.

(d)     Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

16.05.  Compliance with All Applicable Laws.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Reorganized Debtor shall comply with such law, rule, regulation, or order; provided, however, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate Reserve has been set aside on the books of the Reorganized Debtor.

16.06.  Duties to Creditors; Exculpation.  Neither the Chapter 11 Trustee nor any agent, representative, accountant, financial advisor, attorney, shareholder, officer, affiliate, member or employee of the Chapter 11 Trustee or the Debtors, including but not limited to Estate Professionals (collectively, the "Exculpated Parties"), shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Debtors' bankruptcy Estate, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following: (a) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date.  All such Exculpated Parties shall be fully exculpated and released from any and all claims and causes of action by any Person, known or unknown, in connection with, or arising out of, or relating to, any of the following:  (x) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (y) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (z) any act or omission relating to the administration of the Plan after the Effective Date, except for claims and causes of action arising out of such Exculpated Party's gross negligence or willful misconduct.

16.07.  Binding Effect.  The Plan shall be binding upon, and shall inure to the benefit of, the Reorganized Debtor, the holders of the Claims or Liens, and their respective successors-in-interest and assigns.

16.08.  Governing Law, Interpretation.  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 08/22/23   Page 872 of 1104   PageID 17006
Case 18-30264-sgj11   Doc 860   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 83 of 229

Documents without regard to conflicts of law.  The Plan shall control any inconsistent term or provision of any other Plan Documents.

16.09.  <u>Payment of Statutory Fees</u>.   All accrued U.S. Trustee Fees as of the Confirmation Date shall be paid by the Reorganized Debtor on or as soon as practicable after the Effective Date, and thereafter shall be paid by the Reorganized Debtor as such statutory fees become due and payable.

16.10.  <u>Filing of Additional Documents</u>.  On or before Substantial Consummation of the Plan, the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

16.11.  <u>Computation of Time</u>.  Bankruptcy Rule 9006 shall apply to the calculation of all time periods pursuant to this Plan.  If the final day for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act or event shall be extended to the next Business Day.  Any payment or Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

16.12.  <u>Elections by the Reorganized Debtor</u>.  Any right of election or choice granted to the Reorganized Debtor under this Plan may be exercised, at the Reorganized Debtor's election, separately as to each Claim, Creditor or Person.

16.13.  <u>Release of Liens</u>.  Except as otherwise expressly provided in this Plan or the Confirmation Order, all Liens against any of the Assets transferred to and vested in the Reorganized Debtor shall be deemed to be released, terminated and nullified without the necessity of any order by the Bankruptcy Court other than the Confirmation Order.

16.14.  <u>Rates</u>.  The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

16.15.  <u>Compliance with Tax Requirements</u>.  In connection with the Plan, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

16.16.  <u>Notice of Occurrence of the Effective Date</u>. Promptly after occurrence of the Effective Date, the Reorganized Debtor, as directed by the Bankruptcy Court, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of the occurrence of the Effective Date.

16.17.  <u>Notice of Entry of Confirmation Order</u>.  Promptly after entry of the Confirmation Order, the Chapter 11 Trustee, as directed by the Bankruptcy Court in the Confirmation Order, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of entry of the Confirmation Order.

APPX. 16349

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 08/28/23   Page 873 of 1104   PageID 17007
Case 18-30264-sgj11 Doc 829 Filed 10/31/18   Entered 10/31/19 17:34:06   Page 82 of 229
Case 18-30264-sgj11 Doc 860 Filed 10/25/18   Entered 10/25/18 18:32:06   Page 84 of 232

Dated:  October 25, 2018.

Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ Robin Phelan_____
     Robin Phelan
     Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By:/s/ Robin Phelan_____
     Robin Phelan
     Chapter 11 Trustee

APPROVED:

/s/ Jeff P. Prostok_____
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ Rahkee V. Patel_____
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Third Amended Joint Plan 10.25.18.docx

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Exhibit 18   Filed 09/01/23   Page 874 of 1104   PageID 17008
Case 18-30264-sgj11   Doc 839   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 83 of 229
Case 18-30264-sgj11   Doc 880   Filed 10/25/18   Entered 10/25/18 18:23:08   Page 85 of 432

# EXHIBIT A

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

**[ESTATE CLAIMS]**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 05/26/23   Page 875 of 1104   PageID 17009
Case 18-30264-sgj11 Doc 830 Filed 10/24/18   Entered 10/24/18 17:34:06   Page 86 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.     <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.     <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.     <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 06/26/23   Page 876 of 1104   PageID 17010
Case 18-30264-sgj11   Doc 830   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 85 of 229

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 09/20/23   Page 877 of 1104   PageID 17011
Case 18-30264-sgj11   Doc 829   Filed 01/25/19   Entered 01/25/19 17:34:06   Page 86 of 229

control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-14   Filed 08/28/23   Page 878 of 1104   PageID 17012
Case 18-30264-sgj11   Doc 830   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 87 of 229

HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 09/20/23   Page 879 of 1104   PageID 17013
Exhibit 18 Page 290 of 230
Case 18-30264-sgj11 Doc 830 Filed 10/25/18   Entered 10/25/18 17:34:08   Page 86 of 229

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.      <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland CLOM;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 14-18 Filed 20/20/23 Page 880 of 1104 PageID 17014
Case 18-30264-sgj11 Doc 830 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 89 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of
Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or
Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control
of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

7.     <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO
Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized
Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in
the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims
set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee
or Estate in, or which could be asserted based on the facts or transactions alleged in, the
Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee
or Estate in, or which could be asserted based on the facts or transactions alleged in, the
Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets,
including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363
of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets
owned by the Debtors or Estate, as well as the turnover of any books, documents, records and
papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets
including, without limitation, any intellectual property rights or Assets owned by the Debtors or
Estate;

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18    Filed 09/29/23    Page 881 of 1104    PageID 17015
Case 18-30264-sgj11 Doc 830 Filed 10/26/18    Entered 10/26/18 17:34:06    Page 90 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18 Filed 09/22/23   Page 882 of 1104   PageID 17016
Case 18-30264-sgj11 Doc 830 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 93 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)      All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.      <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)      All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 03/28/23   Page 883 of 1104   PageID 17017
Case 18-30264-sgj11 Doc 830 Filed 10/26/18   Entered 10/26/18 17:34:06   Page 92 of 229

(i) All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j) All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l) All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10. <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a) All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b) All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c) All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d) All Avoidance Actions against any Highland Affiliate;

(e) All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f) All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g) All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h) All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets

---

Exhibit "A" to Second Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC Page 9

APPX. 163409

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18 Filed 04/24/23   Page 884 of 1104   PageID 17018
Exhibit 18 Page 29 of 230
Case 18-30264-sgj11   Doc 830   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 95 of 229

owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 05/26/23   Page 885 of 1104   PageID 17019
Case 18-30264-sgj11   Doc 830   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 94 of 229

unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.     <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.     <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.     <u>Retention of Claims Against Specific Persons or Categories of Persons</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

(a)     William Scott;

(b)     Heather Bestwick;

(c)     Any other Person who may be so named at a later date by the Reorganized Debtor.

---

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 06/26/23   Page 886 of 1104   PageID 17020
Case 18-30264-sgj11   Doc 830   Filed 10/31/18   Entered 10/31/18 17:34:06   Page 95 of 229

16.     <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17.     <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18.     <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19.     <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20.     <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

21.     <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.  Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 5414-18 Filed 09/20/23 Page 887 of 1104 PageID 17021
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 96 of 229

Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Schedule 1b to Exhibit A

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|-------------------------------|
| Payments within 90 Days of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| Payments to Insiders within One Year of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 14-18 Filed 08/28/23 Page 888 of 1104 PageID 17022
Exhibit 18 Page 28 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 97 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 49 of 62

Schedule 1 to Exhibit "A" to
Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 64-18    Filed 09/29/23    Page 889 of 1104    PageID 17023
Exhibit 18    Page 29 of 230
Case 18-30264-sgj11  Doc 839  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 98 of 229
Case 18-30264-sgj11  Doc 680  Filed 10/25/18    Entered 10/25/18 18:23:06    Page 30 of 42

# EXHIBIT B

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

### [EXECUTORY CONTRACTS ASSUMED UNDER THE PLAN]

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-18 Filed 12/09/22 Page 890 of 1104 PageID 17024
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 99 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 51 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1, Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 LLC<br>850 Library Ave, Suite 204<br>Newark, DE 19711 | Indenture | March 18, 2013 | $0 |

1

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18   Filed 12/20/23   Page 891 of 1104   PageID 17025
Exhibit 18   Page 52 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 100 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 52 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Supplemental Indenture | February 26, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1, Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |

2

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 10/22/22   Page 892 of 1104   PageID 17026
Exhibit 18   Page 209 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 101 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 53 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Document<br>(requested from HCM) | -- | $0 |

3

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84-18   Filed 02/09/23   Page 893 of 1104   PageID 17027
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 102 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-3 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 LLC<br>850 Library Ave, Suite 204<br>Newark, DE 19711 | Indenture | February 25, 2014 | $0 |

4

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-18 Filed 09/26/23 Page 894 of 1104 PageID 17028
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 103 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-3 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Memorandum and Articles of Association of Acis CLO 2014-3 Ltd. | December 24, 2013 | $0 |
| Acis CLO 2014-4 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | June 5, 2014 | $0 |

5

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-18 Filed 05/26/23 Page 895 of 1104 PageID 17029
Exhibit 18 Page 295 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 104 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 56 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Island KY1-1102 | Memorandum and Articles of Association<br>of Acis CLO 2014-4 Ltd. | April 1, 2014 | $0 |
| Acis CLO 2014-5 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |

6

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 57 of 62

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-18 Filed 10/26/23 Page 896 of 1104 PageID 17030
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 105 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | November 18, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Memorandum and Articles of Association of Acis CLO 2014-5 Ltd. | August 21, 2014 | $0 |
| Acis CLO 2015-6 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |

7

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 10/20/26   Page 897 of 1104   PageID 17031
Exhibit 18   Page 296 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 106 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 58 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | April 16, 2015 | $0 |
| Acis CLO 2015-6 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | April 16, 2015 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2015-6 | Indenture | April 16, 2015 | $0 |

8

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 09/26/23    Page 898 of 1104    PageID 17032
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 107 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd.<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, KY1-1102, Cayman Islands | Memorandum and Articles of Association of Acis CLO 2015-6 Ltd. | February 11, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC<br>P.O. Box. 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |
| Acis CLO Value Master Fund II, LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |

9

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 684-18   Filed 12/09/26   Page 899 of 1104   PageID 17033
Exhibit 18   Page 200 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 108 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 60 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| BayVK R2 Lux S.A., SICAV FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Power of Attorney<br>86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement<br>(Requested from HCM) | November 20, 2007 | $0 |

10

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 12/29/26 Page 900 of 1104    PageID 17034
Exhibit 18    Page 2900 of 270
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 109 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 20, 2007 | $0 |
| Deutsche Bank Trust Company Americas 1761 East St. Andrew Place Santa Ana, CA 92705 Attn: CDO Business Unit – Hewet's Island CLO 1-R | Indenture | November 20, 2007 | $0 |
| State Street (Guernsey Limited) First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| Acis Loan Funding, Ltd. First Floor, Dorey Court St. Peter Port, Guernsey GY1 6HJ Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |

11

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 12/29/26   Page 901 of 1104   PageID 17035
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 110 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 62 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Capital Management, LP<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Agreement of Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Limited Liability Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1. Acis CLO 2013-1, Ltd.
2. Acis CLO 2013-2, Ltd.
3. Acis CLO 2014-3, Ltd.
4. Acis CLO 2014-4, Ltd.
5. Acis CLO 2014-5, Ltd.
6. Acis CLO 2015-6, Ltd.
7. Acis CLO Value Fund II, L.P.
8. Acis CLO Value Fund II (Cayman), L.P.
9. Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS
11. Hewitt's Island CLO 1-R, Ltd.
12. Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit B.

12

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 12/19/22    Page 902 of 1104    PageID 17036
Exhibit 18    Page 112 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 111 of 229

# EXHIBIT "2"

**[First Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 693]**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 12/12/23   Page 903 of 1104   PageID 17037
Exhibit 18   Page 226 of 270
Case 18-30264-sgj11   Doc 829   Filed 01/30/18   Entered 01/30/18 17:34:00   Page 112 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

## FIRST MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
## ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this First Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP

and Acis Capital Management GP, LLC* [Docket No. 660] (the "Plan").

1.      Reference is here made to the Plan for all purposes.   This First Modification

modifies the Plan.

2.      **Modification to Section 1.09.**  Section 1.09 of the Plan is hereby modified to read

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 12/29/26   Page 904 of 1104   PageID 17038
Exhibit 18   Page 2 of 230
Case 19-34054-sgj11   Doc 839   Filed 11/31/18   Entered 11/31/18 17:34:00   Page 2 of 3

as follows:

> 1.09   "Assets" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.

3.      The change to section 1.09 above merely corrects a typographical error in the definition of the term "Assets."  Specifically, the revised definition removes the incomplete phrase "Without limiting the foregoing, this shall include all" from the end of the definition of Assets.

4.      **Modification to Exhibit "A".**  The copy of the Exhibit "A" reflecting Estate Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached hereto as **Exhibit "1."**

5.      A copy of the document reflecting the modifications to Exhibit A to the Plan in redline format is attached hereto as **Exhibit "2."**

6.      This First Modification is a non-material change.  It merely corrects a typographical error and revises the Estate Claims being reserved, retained and preserved under the Plan.  Further, even if this First Modification were deemed material, it does not adversely affect any creditor because no ballots have yet been received in relation to the Plan and this First Modification is being sent to all creditors and parties in interest eighteen (18) days in advance of the deadline for parties to submit ballots and any objections to the Plan.  Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this modification prior to voting on the Plan.

Dated:  November 8, 2018.          Respectfully submitted,

                                   ACIS CAPITAL MANAGEMENT, L.P.

                                   By:   /s/ *Robin Phelan*
                                         Robin Phelan
                                         Chapter 11 Trustee

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18  Filed 12/29/23    Page 905 of 1104    PageID 17039
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 14 of 29
Exhibit 18 Page 29 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 14 of 29

ACIS CAPITAL MANAGMENET GP, LLC

By: /s/ *Robin Phelan*
       Robin Phelan
       Chapter 11 Trustee

APPROVED:                       APPROVED:

/s/ *Jeff P. Prostok*               /s/ *Rakhee V. Patel*
Jeff P. Prostok –  State Bar No. 16352500   Rakhee V. Patel – State Bar No. 00797213
J. Robert Forshey – State Bar No. 07264200  Phillip Lamberson – State Bar No. 00794134
Suzanne K. Rosen –  State Bar No. 00798518  Joe Wielebinski – State Bar No. 21432400
Matthew G. Maben – State Bar No. 24037008  Annmarie Chiarello –State Bar No. 24097496
**FORSHEY & PROSTOK LLP**          **WINSTEAD PC**
777 Main St., Suite 1290             500 Winstead Building
Ft. Worth, TX 76102                2728 N. Harwood Street
Telephone: (817) 877-8855         Dallas, Texas 75201
Facsimile: (817) 877-4151          Telephone: (214) 745-5400
jprostok@forsheyprostok.com       Facsimile:  (214) 745-5390
bforshey@forsheyprostok.com       rpatel@winstead.com
srosen@forsheyprostok.com         plamberson@winstead.com
mmaben@forsheyprostok.com        jwielebinski@winstead.com
                                   achiarello@winstead.com

**COUNSEL FOR ROBIN PHELAN,**  **SPECIAL COUNSEL FOR ROBIN**
**CHAPTER 11 TRUSTEE**            **PHELAN, CHAPTER 11 TRUSTEE**

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 8, 2018.

                     /s/ *Jeff P. Prostok*
                     Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\First Modification to Third Amended Plan 11.8.18.docx

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18 Filed 12/26/23   Page 906 of 1104   PageID 17040
Case 18-30264-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 17:34:06 Page 115 of 229

# Exhibit "1"
## [Revised Exhibit "A" to the Third Amended Joint Plan]

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 12/29/23   Page 907 of 1104   PageID 17041
Case 18-30264-sgj11 Doc 8299 Filed 01/31/18 Entered 01/31/18 17:34:00 Page 16 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.  Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.  Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.  Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)  All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)  All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)  All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 12/19/26 of 23 Page 908 of 1104   PageID 17042
Case 18-30264-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 17:34:00 Page 17 of 22

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 12/19/22 Page 909 of 1104    PageID 17043
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:09    Page 18 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-4 Filed 12/22/23   Page 910 of 1104   PageID 17044
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:00   Page 19 of 29

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("Highland HCF") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-8 Filed 12/22/23   Page 911 of 1104   PageID 17045
Exhibit 18 Page 126 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:00   Page 120 of 429

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.      Highland CLO Management, Ltd. Claims.  All Estate Claims against Highland CLO Management, Ltd. ("Highland CLOM") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-18   Filed 12/22/23   Page 912 of 1104   PageID 17046
Case 18-30264-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 10 of 28

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.    CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against CLO Holdco;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18 Filed 12/22/23 Page 913 of 1104 PageID 17047
Exhibit 18 Page 22 of 37
Case 18-30654-sgj11 Doc 829 Filed 01/30/19 Entered 01/30/19 17:30:20 Page 22 of 29

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Neutra;

(e)     All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document fb8418 Filed 12/22/26 Page 914 of 1104 PageID 17048
Case 18-30264-sgj11 Doc 889 Filed 01/30/18 Entered 01/30/18 17:34:00 Page 23 of 28

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)　　All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)　　All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)　　All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)　　All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.　　<u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)　　All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)　　All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)　　All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)　　All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)　　All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)　　All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)　　All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 12/22/23   Page 915 of 1104   PageID 17049
Case 18-30264-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 24 of 28

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    Highland Affiliate Claims.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Highland Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18 Filed 12/22/23 Page 916 of 1104 PageID 17050
Case 18-30264-sgj11 Doc 893 Filed 01/30/19 Entered 01/30/19 13:43:00 Page 25 of 289

(h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18   Filed 12/22/26   Page 917 of 1104   PageID 17051
Exhibit 18   Page 22 of 230
Case 18-30064-sgj11 Doc 893 Filed 01/30/18   Entered 01/30/18 17:34:00   Page 25 of 289

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    _Preference Claims_.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    _Claims Against Officers, Managers and Members_.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    _Claims Against Former Attorneys and Law Firms_.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal and/or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

---

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-18   Filed 12/22/23   Page 918 of 1104   PageID 17052
Case 18-30264-sgj11   Doc 829   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 12 of 28

(a)     Cole Schotz, P.C.

(b)     Michael D. Warner

(c)     Jacob Frumkin

(d)     Warren A. Usatine

(e)     McKool Smith

(f)     Gary Cruciani

(g)     Michael Fritz

(h)     Carson Young

(i)     Lackey Hershman, LLP

(j)     Stinson Leonard Street LLP

(k)     Paul Lackey, Esq.

(l)     Michael Aigen, Esq.

(m)     Abrams & Bayliss, LLP

(n)     Kevin G. Abrams

(o)     A. Thompson Bayliss

(p)     Jones Day

(q)     Hilda C. Galvan

(r)     Michael Weinberg

(s)     Reid Collins & Tsai, LLP

(t)     Lisa Tsai

(u)     Stanton, LLP

(v)     James M. Stanton

(w)     Hunton Andrews Kurth

(x)     Marc Katz

(y)     Greg Waller

(z)     any other law firm or attorney who may be so named at a later date by the
Reorganized Debtor.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18   Filed 12/29/23   Page 919 of 1104   PageID 17053
Case 18-30264-sgj11 Doc 869 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 13 of 29

16.   <u>Retention of Claims Against Specific Persons or Categories of Persons</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

     (a)    William Scott;

     (b)    Heather Bestwick;

     (c)    Any other Person who may be so named at a later date by the Reorganized Debtor.

17.   <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.   <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.   <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.   <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.   <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18 Filed 12/29/23    Page 920 of 1104    PageID 17054
Case 18-30264-sgj11 Doc 889 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 13 of 28

22.    <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-18 Filed 12/29/23 Page 921 of 1104 PageID 17055
Exhibit 18 to Exhibit A Page 19 of 45
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 130 of 229
Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 19 of 45

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| | | **Payments within 90 Days of Petition Date** | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| | | **Payments to Insiders within One Year of Petition Date** | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-18 Filed 12/29/23 Page 922 of 1104 PageID 17056
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 131 of 229

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Schedule 1 to Exhibit "A" to

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|--------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18 Filed 12/23/23    Page 923 of 1104    PageID 17057
Case 18-30264-sgj11 Doc 893 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 132 of 289

# Exhibit "2"
## [Redline – Plan Exhibit "A"]

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 12/13/23   Page 924 of 1104   PageID 17058
Exhibit 18   Page 23 of 232
Case 18-30664-sgj11   Doc 829-3 Filed 01/30/19   Entered 01/30/19 13:43:50   Page 22 of 29

### EXHIBIT "A"
### to
### Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

1.      Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.      Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.      Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

        (a)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                    Page 1

APPX. 10450

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18 Filed 12/23/24   Page 925 of 1104   PageID 17059
Case 18-30264-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 34 of 48

Chapter 11 Trustee or Estate;

> (d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

> (e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

> (f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

> (g)     All Claims for breach of the PMAs or the Indentures;

> (h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

> (i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

> (j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

> (k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

> (l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

> (m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

> (n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

> (o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

> (p)     All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 12/26/23 Page 926 of 1104    PageID 17060
Case 18-30264-sgj11 Doc 8293 Filed 01/30/19    Entered 01/30/19 17:34:00    Page 135 of 289

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Exhibit "A" to Second Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                              Page 3

APP. 10452

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 12/29/23   Page 927 of 1104   PageID 17061
Case 18-30264-sgj11 Doc 8293 Filed 01/30/19   Entered 01/30/19 17:34:36   Page 136 of 289

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Exhibit "A" to ~~Second~~<u>Third</u> Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                                    Page 4

APPX. 102454

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 03/23/23   Page 928 of 1104   PageID 17062
Case 18-30264-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 37 of 49

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                             Page 5

APPX. 17455

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18 Filed 12/29/26 of 23 Page 929 of 1104   PageID 17063
Case 18-30264-sgj11 Doc 829-3 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 137 of 489

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.     <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                           Page 6

APPX. 07456

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18 Filed 12/24/26 of 290 Page 930 of 1104   PageID 17064
Case 18-30064-sgj11 Doc 8293 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 130 of 289

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.     <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Neutra;

(e)     All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Neutra for the unauthorized use of Estate Assets

Exhibit "A" to ~~Second~~<u>Third</u> Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                          Page 7

APPX. 102456

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18  Filed 12/14/23   Page 931 of 1104   PageID 17065
Exhibit 18 Page 1 of 270
Case 18-30264-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 149 of 489

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)      All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.      <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)      All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                    Page 8

APPX. 10755

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18   Page 24 of 230   Page 932 of 1104   PageID 17066
Case 18-30264-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:34:00   Page 10 of 28

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Highland Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                              Page 9

APPX. 17459

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-18   Filed 12/14/23   Page 933 of 1104   PageID 17067
Case 18-30264-sgj11   Doc 863   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 42 of 48
Exhibit "A" Page 24 of 30

(h)    All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.    <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.    <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Exhibit "A" to ~~Second~~<u>Third</u> Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                    Page 10

APPX. 02459

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-4 Filed 12/14/23   Page 934 of 1104   PageID 17068
Exhibit 18 Page 244 of 270
Case 18-30264-sgj11   Doc 869-3 Filed 01/30/18   Entered 01/30/18 17:34:00   Page 43 of 49

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                    Page 11

APPX. 02460

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 12/15/23    Page 935 of 1104    PageID 17069
Case 18-30064-sgj11 Doc 8293 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 44 of 289

(a) Cole Schotz, P.C.

(b) Michael D. Warner

(c) Jacob Frumkin

(d) Warren A. Usatine

(e) McKool Smith

(f) Gary Cruciani

(g) Michael Fritz

(h) Carson Young

(i) Lackey Hershman, LLP

(j) Stinson Leonard Street LLP

(k) Paul Lackey, Esq.

(l) Michael Aigen, Esq.

(m) Abrams & Bayliss, LLP

(n) Kevin G. Abrams

(o) A. Thompson Bayliss

(p) Jones Day

(q) Hilda C. Galvan

(r) Michael Weinberg

(s) Reid Collins & Tsai, LLP

(t) Lisa Tsai

(u) Stanton, LLP

(v) James M. Stanton

(w) Hunton Andrews Kurth

(x) Marc Katz

(y) Greg Waller

(z) any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC        Page 12

APPX. 07462

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18 Filed 12/26/23   Page 936 of 1104   PageID 17070
Case 18-30264-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 15 of 29
Exhibit "A" Page 14 of 28

15. 16.  Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

       (a)    William Scott;

       (b)    Heather Bestwick;

       (c)    Any other Person who may be so named at a later date by the Reorganized Debtor.

16. 17.  Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17. 18.  Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18. 19.  Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19. 20.  Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20. 21.  Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity

Exhibit "A" to Second Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC       Page 13

APP. 10462

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18   Filed 12/04/23   Page 937 of 1104   PageID 17071
Case 18-30264-sgj11   Doc 893   Filed 01/06/19   Entered 01/06/19 17:34:06   Page 16 of 29

interest owners of the Debtors, Highland, or any Affiliates thereof.

     21. 22.  **Recharacterization**. All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Exhibit "A" to Second Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC         Page 14

APPX. 17464

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18   Filed 12/28/23   Page 938 of 1104   PageID 17072
Exhibit 18   Page 248 of 270
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 147 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18   Entered 11/08/18 13:03:00   Page 36 of 45
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-18 Filed 12/29/23 Page 939 of 1104 PageID 17073
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 148 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 37 of 45

Schedule 1 to Exhibit "A" to

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|--------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

# Exhibit "3"

## [Service Lists]

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 12/29/23   Page 941 of 1104   PageID 17075
Exhibit 18 Page 251 of 270

Case 18-30264-sgj11   Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 59 of 29

## Notice Service List
## Acis Capital Mgmt./Phelan
## #5980

**BNP Paribas Securities Services**
**Luxembourg Branch**
**60 Avenue John F. Kennedy**
**1855 Luxembourg**

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

**Acis Funding GP, Ltd.**
**Acis Funding L.P.**
**c/o Maples Corporate Services Limited**
**P0 Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1 -1104**

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

**Acis CLO Value Fund II (Cayman), L.P.**
**Acis CLO Value Fund II GP, LLC**
**Acis CLO Value Master Fund II, L.P.**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1-1104**

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX  76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C.  20530

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

**State Street (Guernsey) Limited**
**First Floor Dorey Court**
**Admiral Park, St. Peter Port, Guernsey**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

**BayVK R2 Lux S.A., SICAV-FIS**
**15 Rue de Flaxweiler**
**L-6776 Grevenmacher**
**Luxembourg**

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA  1901-7346

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 12/15/23 Page 2 of 270 of Page 942 of 1104    PageID 17076

Case 18-30264-sgj11 Doc 893 Filed 01/30/19    Entered 01/30/19 17:34:00    Page 50 of 239

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

**Universal-Investment-Luxembourg S.A.**
**15 Rue de Flaxweiler**
**L-6776 Grevenmacher**
**Luxembourg**

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Andrew Zollinger
DLA Piper LLP
1717 Main St., Suite 4600
Dallas, TX 75201-4629

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Thomas Califano/Shmuel Klahr
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Fort St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-I and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, KY1-1102, Cayman Islands**

Deutsche Bank Trust Company Americas
Attn:  CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey GYI 6HJ**
**Channel Islands**

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

# Noteholders List

# [Confidential]

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-18   Filed 12/05/23   Page 945 of 1104   PageID 17079
Exhibit 18   Page 255 of 270
Case 18-30264-sgj11   Doc 893   Filed 01/30/18   Entered 01/30/18 13:36:00   Page 54 of 89

**Creditors Service List**
**Acis Capital Mgmt./Phelan**
**#5980**

## Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

## Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
P0 Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18   Filed 12/26/23   Page 946 of 1104   PageID 17080
Exhibit 18   Page 256 of 280

Case 18-30264-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:34:00   Page 55 of 259

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Directors - Acis CLO 2013-1 Ltd.**
**75 Fort St., Clifton House**
**PO Box 1350**
**George Town, Grand Cayman**
**Cayman Island, KY1-1108**

**Directors - Acis CLO 2014-3 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-4 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-5 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2015-6 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Acis CLO 2013-1, Ltd.**
**c/o Appleby Trust, Attn: Directors**
**Clifton House 75 Fort St., P0 Box 13**
**Grand Cayman, Cayman Islands KY1-1108**

**Acis CLO 2013-2 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-3 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-4 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2015-6 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-8 Filed 12/29/23    Page 947 of 1104    PageID 17081
Case 18-30264-sgj11 Doc 893 Filed 01/30/18 Entered 01/30/18 13:36:06 Page 156 of 289

## Class 4

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 02/25/26    Page 948 of 1104    PageID 17082
Exhibit 18    Page 258 of 290
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 157 of 229

# EXHIBIT "3"

**[Second Modification to the Third Amended Joint Plan for
Acis Capital Management, L.P. and Acis Capital Management
GP, LLC – Dkt. No. 702]**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18   Filed 12/29/23   Page 949 of 1104   PageID 17083
Case 18-30264-sgj11 Doc 829-02 Filed 01/31/19 Entered 01/31/19 17:34:05 Page 158 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
|  | § |  |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
|  | § |  |
| Debtors. | § |  |

### SECOND MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
### ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and Acis Capital Management GP, LLC (the "Debtors"), files this Second Modification (the "First Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 660], as modified by the *First Modification to the Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 693] (together, the "Plan").

1.       Reference is here made to the Plan for all purposes.  This Second Modification

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 12/26/23   Page 950 of 1104   PageID 17084
Case 18-30264-sgj11 Doc 829 Filed 11/16/18 Entered 11/16/18 17:34:35 Page 159 of 229

modifies the Plan.

    2.      **<u>Modification to Exhibit "A"</u>.**  The copy of the Exhibit "A" reflecting Estate Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached hereto as **Exhibit "1."**

    3.      A copy of the document reflecting the modifications to Exhibit A to the Plan in redline format is attached hereto as **Exhibit "2."**

    4.      This Second Modification is a non-material change.  It merely revises the Estate Claims being reserved, retained and preserved under the Plan.  Further, even if this First Modification were deemed material, it is being sent to all creditors and parties in interest ten (10) days in advance of the deadline for parties to submit ballots and any objections to the Plan. Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this modification prior to voting on the Plan or to change their previous acceptance or rejection upon consideration of the modification.

Dated:  November 16, 2018.     Respectfully submitted,

                       ACIS CAPITAL MANAGEMENT, L.P.

                       By: /s/ *Robin Phelan*
                           Robin Phelan
                           Chapter 11 Trustee

                       ACIS CAPITAL MANAGMENET GP, LLC

                       By: /s/ *Robin Phelan*
                           Robin Phelan
                           Chapter 11 Trustee

APPX. 017476

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 06/26/23   Page 951 of 1104   PageID 17085
Case 18-30264-sgj11 Doc 829-2 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 160 of 229

APPROVED:

*/s/ Jeff P. Prostok*
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

*/s/ Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL   COUNSEL   FOR   ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 16, 2018.

*/s/ Jeff P. Prostok*
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Second Modification to Third Amended Plan 11.16.18.docx

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-4 Filed 12/26/23 Page 952 of 1104    PageID 17086
Case 18-30264-sgj11 Doc 829 Filed 01/31/69 Entered 01/31/69 17:34:06 Page 161 of 229

# Exhibit "1"

## [Revised Exhibit "A" to the Third Amended Joint Plan]

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18 Filed 12/26/23   Page 953 of 1104   PageID 17087
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 162 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.      _Defined Terms_.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.      _Estate Claims Reserved, Retained and Preserved_.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "_Estate Claims_," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.      _Highland Claims_.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "_Highland Adversary_") and Adversary Proceeding No. 18-03212-sgj (the "_Trustee's Adversary_").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

        (a)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 10/26/23   Page 954 of 1104   PageID 17088
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 163 of 229

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18 Filed 10/05/23   Page 955 of 1104   PageID 17089
Case 18-30264-sgj11 Doc 829-2 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 164 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

---

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-4 Filed 10/26/23   Page 956 of 1104   PageID 17090
Exhibit 18 Page 266 of 270
Case 18-30264-sgj11 Doc 829-02 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 165 of 229

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("Highland HCF") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-18 Filed 12/20/23 Page 957 of 1104   PageID 17091
Exhibit B Page 166 of 273
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 166 of 429

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 12/06/23   Page 958 of 1104   PageID 17092
Case 18-30264-sgj11 Doc 829 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 6 of 20

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.     CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 10/30/23   Page 959 of 1104   PageID 17093
Exhibit 18   Page 269 of 270
Case 18-30264-sgj11 Doc 829-7 Filed 01/16/19   Entered 01/16/19 17:34:06   Page 168 of 209

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

---

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-48 Filed 12/27/23 Page 960 of 1104   PageID 17094
Exhibit 48 Page 229 of 230
Case 18-30264-sgj11 Doc 879-1 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 69 of 70

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 6-18 Filed 07/26/23 Page 961 of 1104 PageID 17095
Exhibit 18 Page 126 of 230
Case 18-30264-sgj11 Doc 879 Filed 01/16/19 Entered 01/16/19 17:34:05 Page 79 of 209

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-4 Filed 12/29/23 age 962 of 1104    PageID 17096
Case 18-30264-sgj11 Doc 879-2 Filed 01/16/19    Entered 01/16/19 17:34:05    Page 71 of 209

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

       (h)    All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

       (i)    All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

       (j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

       (k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

       (l)    All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

       (m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    11.    <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

    12.    <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 12/27/23   Page 963 of 1104   PageID 17097
Case 18-30654-sgj11 Doc 820 Filed 01/16/18   Entered 01/16/18 17:34:05   Page 78 of 209

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.     <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.     <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.     <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 07/24/23   Page 964 of 1104   PageID 17098
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 78 of 209

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

(a)    Cole Schotz, P.C.

(b)    Michael D. Warner

(c)    Jacob Frumkin

(d)    Warren A. Usatine

(e)    McKool Smith

(f)    Gary Cruciani

(g)    Michael P. Fritz

(h)    Carson D. Young

(i)    Nicholas Matthews

(j)    Lackey Hershman, LLP

(k)    Stinson Leonard Street LLP

(l)    Jamie R. Welton

(m)    Paul B. Lackey

(n)    Michael Aigen

(o)    Roger L. Mandel

(p)    Abrams & Bayliss, LLP

(q)    Kevin G. Abrams

(r)    A. Thompson Bayliss

(s)    Jones Day

(t)    Hilda C. Galvan

(u)    Michael Weinberg

(v)    Reid Collins & Tsai, LLP

(w)    Lisa Tsai

(x)    Stanton, LLP

(y)    James M. Stanton

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 8-18 Filed 12/27/23 Page 965 of 1104 PageID 17099
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 74 of 209

(z)     Hunton Andrews Kurth

(aa)    Marc Katz

(bb)    Greg Waller

(cc)    any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>. In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act. Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Scott Ellington

(d)    Isaac Leventon

(e)    Jean Paul Sevilla

(f)    Hunter Covitz

(g)    The Dugaboy Investment Trust

(h)    Nancy Dondero, Trustee of the Dugaboy Trust

(i)    Grant Scott

(j)    Any other Person who may be so named at a later date by the Reorganized Debtor.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 12/26/23   Page 966 of 1104   PageID 17100
Case 18-30264-sgj11 Doc 802 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 15 of 29

17.     <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.     <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.     <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.     <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.     <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.     <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-8 Filed 09/29/23   Page 967 of 1104   PageID 17101
Case 18-30264-sgj11 Doc 820 Filed 01/16/19   Entered 01/16/19 17:34:06   Page 76 of 209

# Exhibit "2"

## [Redline – Plan Exhibit "A"]

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18 Filed 12/28/23   Page 968 of 1104   PageID 17102
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 177 of 209
Case 18-30264-sgj11 Doc 792 Filed 01/16/18   Entered 01/16/18 17:34:05   Page 70 of 49

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.     Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.     Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.     Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-18    Filed 12/29/23    Page 969 of 1104    PageID 17103
Case 18-30264-sgj11  Doc 829-2  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 78 of 209
Case 18-30264-sgj11  Doc 792  Filed 11/16/18    Entered 11/16/18 17:34:05    Page 78 of 40

Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)    All Claims for breach of the PMAs or the Indentures;

(h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)    All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)    All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18 Filed 12/28/23    Page 970 of 1104    PageID 17104
Exhibit 18 Page 29 of 270

Case 18-30264-sgj11 Doc 828 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 179 of 289
Case 18-30264-sgj11 Doc 702 Filed 11/16/18    Entered 11/16/18 17:34:05    Page 72 of 46

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    HCLOF Claims.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 09/26/23   Page 971 of 1104   PageID 17105
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 180 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18   Entered 11/16/18 17:34:55   Page 29 of 40

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 09/29/23   Page 972 of 1104   PageID 17106
Case 18-30264-sgj11   Doc 829-1 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 181 of 229
Case 18-30264-sgj11   Doc 792 Filed 11/16/18   Entered 11/16/18 17:34:35   Page 24 of 40

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18 Filed 12/28/23    Page 973 of 1104    PageID 17107
Case 18-30264-sgj11  Doc 802  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 182 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18  Entered 11/16/18 17:34:05  Page 25 of 40

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 12/29/23   Page 974 of 1104   PageID 17108

Case 18-30264-sgj11 Doc 829-2 Filed 01/16/19   Entered 01/16/19 17:34:06   Page 183 of 229
Case 18-30264-sgj11 Doc 792 Filed 11/16/18   Entered 11/16/18 17:34:35   Page 28 of 40

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims.</u>  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18 Filed 28/52 3 Page 975 of 1104   PageID 17109

Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 184 of 289
Case 18-30264-sgj11 Doc 701 Filed 11/16/18   Entered 11/16/18 17:33:05   Page 27 of 40

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 48-18   Exhibit 18   Page 196 of 230 Page 976 of 1104   PageID 17110

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 185 of 209
Case 18-30264-sgj11 Doc 701 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 25 of 209

(h)     All Claims for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     ~~Highland Affiliate~~ Claims  Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against ~~any~~such Affiliates ~~of Highland~~ shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any ~~Highland~~ Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-8 Filed 09/29/23 Page 977 of 1104 PageID 17111

Case 18-30264-sgj11 Doc 820 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 186 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18 Entered 11/16/18 17:34:55 Page 89 of 209

(g)     All Claims for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against any ~~Highland~~ Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any ~~Highland~~ Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any ~~Highland~~ Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, ~~or any~~the Affiliates ~~thereof~~, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any ~~Highland~~ Affiliate as to any Person, including as against ~~any other~~Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates ~~of Highland~~, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any ~~Highland~~ Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due

---

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18  Filed 12/28/22  Page 978 of 1104    PageID 17112
Case 18-30264-sgj11 Doc 820 Filed 01/16/19 Entered 01/16/19 17:34:06 Page 187 of 289
Case 18-30264-sgj11 Doc 792 Filed 01/16/19 Entered 01/16/19 17:33:25 Page 57 of 40

care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    _Preference Claims_.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    _Claims Against Officers, Managers and Members_.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    _Claims Against Former Attorneys and Law Firms_.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-18  Filed 12/29/23  Page 979 of 1104    PageID 17113
Case 18-30264-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 188 of 229
Case 18-30264-sgj11 Doc 792 Filed 11/16/18  Entered 11/16/18 17:34:95  Page 91 of 40

for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

(a)     Cole Schotz, P.C.

(b)     Michael D. Warner

(c)     Jacob Frumkin

(d)     Warren A. Usatine

(e)     McKool Smith

(f)     Gary Cruciani

(g)     Michael P. Fritz

(h)     Carson D. Young

(i)     Nicholas Matthews

(i)(j)     Lackey Hershman, LLP

(j)(k)     Stinson Leonard Street LLP

(l)     Jamie R. Welton

(k)(m)  Paul B. Lackey, Esq.

(l)(n)   Michael Aigen, Esq.

(o)     Roger L. Mandel

(m)(p)  Abrams & Bayliss, LLP

(n)(q)  Kevin G. Abrams

(o)(r)   A. Thompson Bayliss

(p)(s)   Jones Day

(q)(t)   Hilda C. Galvan

(r)(u)   Michael Weinberg

(s)(v)   Reid Collins & Tsai, LLP

(t)(w)   Lisa Tsai

(u)(x)   Stanton, LLP

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-18 Filed 12/12/23   Page 980 of 1104   PageID 17114
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 189 of 229
Case 18-30264-sgj11 Doc 792 Filed 11/16/18   Entered 11/16/18 17:34:55   Page 92 of 209

(v)(y)   James M. Stanton

(w)(z)   Hunton Andrews Kurth

(x)(aa)   Marc Katz

(y)(bb)   Greg Waller

(z)(cc)   any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

~~16.    Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:~~

16.   Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)   William Scott;

(b)   Heather Bestwick;

(c)   Scott Ellington

(d)   Isaac Leventon

(e)   Jean Paul Sevilla

(f)   Hunter Covitz

(g)   The Dugaboy Investment Trust

(h)   Nancy Dondero, Trustee of the Dugaboy Trust

(i)   Grant Scott

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 58-18 Filed 12/29/23 Page 981 of 1104    PageID 17115
Exhibit 18    Page 291 of 270

Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 190 of 209
Case 18-30264-sgj11 Doc 792 Filed 11/16/18    Entered 11/16/18 17:34:55    Page 99 of 209

(j)        Any other Person who may be so named at a later date by the Reorganized Debtor.

(c)

> **Formatted:** Indent: Left:  1",  No bullets or numbering

17.    Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    Recharacterization.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.  Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84-18   Filed 12/29/26   Page 982 of 1104   PageID 17116
Case 18-30264-sgj11   Doc 792   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 91 of 209

# Exhibit "3"
## [Service Lists]

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-18 Filed 12/29/23    Page 983 of 1104    PageID 17117
Exhibit 18    Page 29 of 30
Case 18-30264-sgj11 Doc 828 Filed 01/16/18    Entered 01/16/18 17:34:05    Page 98 of 489

**Notice Service List**
**Acis Capital Mgmt./Phelan**
**#5980**

**BNP Paribas Securities Services**
**Luxembourg Branch**
**60 Avenue John F. Kennedy**
**1855 Luxembourg**

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

**Acis Funding GP, Ltd.**
**Acis Funding L.P.**
**c/o Maples Corporate Services Limited**
**P0 Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1 -1104**

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

**Acis CLO Value Fund II (Cayman), L.P.**
**Acis CLO Value Fund II GP, LLC**
**Acis CLO Value Master Fund II, L.P.**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1-1104**

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX  76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C.  20530

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

**State Street (Guernsey) Limited**
**First Floor Dorey Court**
**Admiral Park, St. Peter Port, Guernsey**
**Channel Islands GYI 6HJ**

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey**

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA  1901-7346

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-18 Filed 12/29/26 of 270 Page 984 of 1104    PageID 17118
Case 18-30066-sgj11 Doc 828-2 Filed 01/16/18    Entered 01/16/18 17:34:05    Page 98 of 229

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Port St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**

**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Deutsche Bank Trust Company Americas
Attn:  CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102,**

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-18 Filed 12/29/23 Page 985 of 1104   PageID 17119
Case 18-30264-sgj11 Doc 828-2 Filed 01/31/18    Entered 01/31/18 17:34:06    Page 94 of 289

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

## Creditors Service List
### Acis Capital Mgmt./Phelan
### #5980

### Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

### Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
P0 Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18 Filed 12/29/23   Page 987 of 1104   PageID 17121
Exhibit 18   Page 297 of 370

Case 18-30264-sgj11   Doc 828-2   Filed 01/16/98   Entered 01/16/98 17:34:05   Page 96 of 429

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Directors - Acis CLO 2013-1 Ltd.**
**75 Fort St., Clifton House**
**PO Box 1350**
**George Town, Grand Cayman**
**Cayman Island, KY1-1108**

**Directors - Acis CLO 2014-3 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-4 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-5 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2015-6 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Acis CLO 2013-1, Ltd.**
**c/o Appleby Trust, Attn: Directors**
**Clifton House 75 Fort St., P0 Box 13**
**Grand Cayman, Cayman Islands KY1-1108**

**Acis CLO 2013-2 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-3 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-4 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2015-6 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-4   Exhibit 18   Filed 12/29/23   Page 988 of 1104   PageID 17122

Case 19-30964-sgj11   Doc 878-2   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 97 of 409

**Class 4**

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 09/29/23   Page 989 of 1104   PageID 17123
Exhibit Page 292 of 370
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 198 of 229

# EXHIBIT "4"

**[Supplement to Second Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 769]**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-18   Filed 12/20/23   Page 990 of 1104   PageID 17124
Case 18-30264-sgj11   Doc 826   Filed 01/31/19   Entered 01/31/19 18:54:10   Page 199 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

## SUPPLEMENT TO SECOND MODIFICATION TO THE THIRD AMENDED JOINT
## PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND
## ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this Supplement to the Second

Modification (the "Second Modification") to the *Third Amended Joint Chapter 11 Plan for Acis*

*Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 660], as modified

by the *First Modification to the Third Amended Joint Chapter 11 Plan for Acis Capital*

*Management, LP and Acis Capital Management GP, LLC* [Docket No. 693] (together, the "Plan").

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-18   Filed 01/24/23   Page 991 of 1104   PageID 17125
Case 18-30264-sgj11   Doc 828   Filed 12/10/18   Entered 12/10/18 17:34:06   Page 200 of 229

1.      On November 16, 2018, the Trustee filed the Second Modification.  The Second Modification modified the Plan to replace the Exhibit "A," reflecting Estate Claims, with a revised version of Exhibit A.  The Schedule "1" to Exhibit A, which reflects the Estate's Preference Claims, was not changed from the version attached to the Plan but was inadvertently omitted from the Second Modification.  For completeness and to avoid any confusion regarding the Preference Claims being reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, the Second Modification is hereby supplemented with the Schedule "1" to Exhibit "A" to the Plan.

2.      A copy of the Schedule "1" is attached hereto as **Exhibit 1**.

3.      A copy of the complete Exhibit "A" to the Plan, including Schedule "1," is attached hereto as **Exhibit "2."**

4.      A redline is not necessary because the attached Schedule "1" is unchanged from the version attached to the Plan and included in the Trustee's solicitation materials.

Dated:  December 10, 2018.          Respectfully submitted,

                                    ACIS CAPITAL MANAGEMENT, L.P.

                                    By:  /s/ *Robin Phelan*
                                         Robin Phelan
                                         Chapter 11 Trustee

                                    ACIS CAPITAL MANAGMENET GP, LLC

                                    By:  /s/ *Robin Phelan*
                                         Robin Phelan
                                         Chapter 11 Trustee

APPX. 017518

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 12/20/23   Page 992 of 1104   PageID 17126
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:54:06   Page 201 of 229
Exhibit 18   Page 220 of 230
Case 18-30264-sgj11 Doc 865 Filed 12/11/18   Entered 12/11/18 14:06:10   Page 3 of 3

APPROVED:

/s/ Jeff P. Prostok
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ Rahkee V. Patel
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL   COUNSEL   FOR   ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system on December 10, 2018.

/s/ Jeff P. Prostok
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Supplement to Second Modification to Third Amended Plan 12.10.18.docx

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-4    Filed 12/29/23    Page 993 of 1104    PageID 17127
Case 18-30264-sgj11    Doc 829    Filed 01/31/19    Entered 01/31/19 17:34:06    Page 202 of 229

# EXHIBIT "1"

## Schedule "1" to Exhibit "A" to Third Amended Plan

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-18 Filed 09/26/23 Page 994 of 1104 PageID 17128
Exhibit 18 Page 204 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 203 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 5 of 23

**Schedule 1 to Exhibit "A" to**

**Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| | | **Payments within 90 Days of Petition Date** | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| | | **Payments to Insiders within One Year of Petition Date** | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-41 Filed 09/20/23 Page 995 of 1104 PageID 17129
Exhibit 18 Page 205 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 204 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 6 of 23

Schedule 1 to Exhibit A to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 09/26/23   Page 996 of 1104   PageID 17130
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 18:46:10 Page 205 of 229

# EXHIBIT "2"

[Exhibit "A" to Third Amended Plan
as Supplemented]

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18 Filed 12/20/23    Page 997 of 1104    PageID 17131
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:00    Page 206 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.     <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.     <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.     <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

        (a)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

---

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18   Filed 2/08/26   Page 998 of 1104   PageID 17132
Exhibit 18 Page 208 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/018   Entered 01/31/019 17:34:06   Page 207 of 229

Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)    All Claims for breach of the PMAs or the Indentures;

(h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)    All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)    All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-8 Filed 10/20/23   Page 999 of 1104   PageID 17133
Case 18-30264-sgj11 Doc 789 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 208 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1-18   Filed 22/03 of 230   Page 1000 of 1104   PageID 17134
Case 18-30264-sgj11 Doc 820 Filed 01/91/19   Entered 01/91/19 17:34:06   Page 209 of 229

(l)      All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.      <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland HCF;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-14   Filed 09/21/23   Page 1001 of 1104   PageID 17135
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:00   Page 10 of 29

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 51-18 Filed 02/29/24   Page 1002 of 1104   PageID 17136
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 11 of 22

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 9-18 Filed 12/23/23   Page 1003 of 1104   PageID 17137
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:54:06   Page 12 of 29

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 31-18 Filed 09/29/23 Page 1004 of 1104 PageID 17138
Case 18-30064-sgj11 Doc 789 Filed 12/31/18 Entered 12/31/18 17:54:06 Page 18 of 29

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-18 Filed 02/23/23   Page 1005 of 1104   PageID 17139
Exhibit 18 Page 29 of 230
Case 18-30064-sgj11 Doc 820-7 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 14 of 229

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "<u>Affiliates</u>" and each, an "<u>Affiliate</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 14-18   Filed 02/21/23   Page 216 of 230   Page 1006 of 1104   PageID 17140
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 215 of 229

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.    Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.    Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-18 Filed 02/21/23   Page 1007 of 1104   PageID 17141
Case 18-30264-sgj11 Doc 829 Filed 01/31/18   Entered 01/31/18 17:54:06   Page 16 of 29

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.     <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.     <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.     <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

---

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-11 Filed 29/23 of 230 Page 1008 of 1104   PageID 17142
Case 18-30264-sgj11 Doc 789 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 13 of 29

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

    (a)     Cole Schotz, P.C.

    (b)     Michael D. Warner

    (c)     Jacob Frumkin

    (d)     Warren A. Usatine

    (e)     McKool Smith

    (f)     Gary Cruciani

    (g)     Michael P. Fritz

    (h)     Carson D. Young

    (i)     Nicholas Matthews

    (j)     Lackey Hershman, LLP

    (k)     Stinson Leonard Street LLP

    (l)     Jamie R. Welton

    (m)     Paul B. Lackey

    (n)     Michael Aigen

    (o)     Roger L. Mandel

    (p)     Abrams & Bayliss, LLP

    (q)     Kevin G. Abrams

    (r)     A. Thompson Bayliss

    (s)     Jones Day

    (t)     Hilda C. Galvan

    (u)     Michael Weinberg

    (v)     Reid Collins & Tsai, LLP

    (w)     Lisa Tsai

    (x)     Stanton, LLP

    (y)     James M. Stanton

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-18   Page 291 of 230   Page 1009 of 1104   PageID 17143
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 216 of 229
Exhibit 18   Page 291 of 230

(z)     Hunton Andrews Kurth

(aa)    Marc Katz

(bb)    Greg Waller

(cc)    any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)     William Scott;

(b)     Heather Bestwick;

(c)     Scott Ellington

(d)     Isaac Leventon

(e)     Jean Paul Sevilla

(f)     Hunter Covitz

(g)     The Dugaboy Investment Trust

(h)     Nancy Dondero, Trustee of the Dugaboy Trust

(i)     Grant Scott

(j)     Any other Person who may be so named at a later date by the Reorganized Debtor.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 51-18    Filed 02/22/23    Page 1010 of 1104    PageID 17144
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 19 of 29

17.    <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 18-30264-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 34-18 Filed 02/23/23 Page 1011 of 1104 PageID 17145
Exhibit 1 to Exhibit A
Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 22 of 23
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 220 of 229

**Schedule 1 to Exhibit "A" to**

**Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|--------------------------------|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 34-18 Filed 12/22/23 Page 1012 of 1104 PageID 17146
Exhibit 1 to Exhibit "A" to
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 221 of 229
Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 23 of 23
Schedule 1 to Exhibit "A" to

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|-------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 31-18 Filed 09/22/23    Page 1013 of 1104    PageID 17147
Exhibit 18    Page 222 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 222 of 229

# EXHIBIT "5"

**[Executory Contracts and Unexpired Leases to be Assumed by the Trustee]**

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 34-18 Filed 12/22/23 Page 1014 of 1104 PageID 17148
Exhibit 18 Page 223 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 223 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A. 601 Travis Street, 16th Floor Houston, Texas 77002 Attn: Global Corporate Trust – Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |

1

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-18    Filed 12/22/23    Page 1015 of 1104    PageID 17149
Exhibit 18    Page 225 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 224 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |

2

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18    Exhibit 18    Page 226 of 230    Page 1016 of 1104    PageID 17150
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 225 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC<br>P.O. Box. 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |

3

APPX. 102542

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-18    Filed 03/22/23    Page 1017 of 1104    PageID 17151
Exhibit 18    Page 227 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 226 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO Value Master Fund II, LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II (Cayman), L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd. 300 Crescent Court Suite 700 Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| BayVK R2 Lux S.A., SICAV FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services Luxembourg Branch 60 Avenue John F. Kennedy 1855 Luxembourg | Power of Attorney 86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd. c/o Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |

4

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-18    Filed 02/28/23    Page 1018 of 1104    PageID 17152
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 227 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Governing Documents (Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement (Requested from HCM) | November 20, 2007 | $0 |
| State Street (Guernsey Limited) First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |

5

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-18    Filed 12/22/23    Page 1019 of 1104    PageID 17153
Exhibit 18    Page 229 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 228 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Loan Funding, Ltd.<br>First Floor, Dorey Court<br>St. Peter Port, Guernsey GY1 6HJ<br>Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |
| Acis Capital Management, LP<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Agreement of<br>Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Limited Liability<br>Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1.  Acis CLO 2013-1, Ltd.
2.  Acis CLO 2013-2, Ltd.
3.  Acis CLO 2014-3, Ltd.
4.  Acis CLO 2014-4, Ltd.
5.  Acis CLO 2014-5, Ltd.
6.  Acis CLO 2015-6, Ltd.
7.  Acis CLO Value Fund II, L.P.
8.  Acis CLO Value Fund II (Cayman), L.P.
9.  Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS

6

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-18   Filed 12/23/23    Page 1020 of 1104   PageID 17154
Exhibit 18    Page 230 of 230

Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 229 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

11.  Hewitt's Island CLO 1-R, Ltd.

12.  Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit 5.

7

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| NEUTRA, LTD., et al., | § § § | Civil Action No. 3:18-CV-1056-D (Consolidated with Civil Action Nos. 3:18-CV-1057-D, 3:18-CV-1073-D, and 3:18-CV-1084-D) |
| Appellants, | § § | |
| VS. | § § | (Bank. Ct. Nos. 18-30264-SGJ-7; 18-30265-SGJ-7) |
| JOSHUA N. TERRY, et al., | § § | |
| Appellees. | § | |
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| HIGHLAND CLO FUNDING, LTD., et al., | § § § | Civil Action No. 3:18-CV-1822-D (Bank. Ct. Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11) |
| Appellants, | § § | |
| VS. | § § | |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, et al., | § § § | |
| Appellees. | § | |

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 59   Filed 12/22/23   Page 1023 of 1104   PageID 17157

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 2 of 84   PageID 97995

IN RE ACIS CAPITAL                       §
MANAGEMENT, L.P., et al.,                §
                                         §
                     Debtors.            §
                                         §      Civil Action No. 3:19-CV-0291-D
                                         §      (Bank. Ct. Nos. 18-30264-SGJ-11 and
HIGHLAND CAPITAL                         §      18-30265-SGJ-11)
MANAGEMENT, L.P., et al.,                §
                                         §
                     Appellants,         §
                                         §
VS.                                      §
                                         §
ROBIN PHELAN, CHAPTER 11                 §
TRUSTEE, et al.,                         §
                                         §
                     Appellees.          §

_____

APPEALS FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

FITZWATER, Senior Judge:

In multiple appeals taken from two involuntary bankruptcy cases, the principal

questions presented are whether the bankruptcy court erred by issuing orders for relief and

denying the debtors' motion to dismiss or compel arbitration; whether the bankruptcy court

erred by approving a seven-figure break-up fee in favor of a potential transaction partner; and

whether the bankruptcy court erred by confirming a reorganization plan ("the Plan") that

enjoins a non-debtor, non-creditor entity from exercising certain contractual rights.  The

court must also decide questions of the bankruptcy court's subject matter jurisdiction and of

one appellant's standing to appeal.  For the reasons that follow, the court DISMISSES the

appeal from the orders for relief, AFFIRMS the break-up fee order, and AFFIRMS the order

- 2 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 31    Filed 12/09/23    Page 1024 of 1104    PageID 17158
Exhibit 19    Page 4 of 85

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 3 of 84    PageID 97996

approving the Plan. The court need not address the bankruptcy court's denial of the motion to dismiss.

## I

The following factual summary is based on the bankruptcy court's findings of fact in support of the orders for relief and the Plan confirmation order. *See In re Acis Capital Mgmt., L.P.* (*Acis II*), 2019 WL 417149, at *2-7 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.) (confirmation order); *In re Acis Capital Mgmt., L.P.* (*Acis I*), 584 B.R. 115, 119-42 (Bankr. N.D. Tex. 2018) (Jernigan, J.) (orders for relief).[1]

## A

Appellant Highland Capital Management, L.P. ("Highland") is a Dallas-based registered investment advisor that manages nearly $15 billion of assets through an organizational structure comprised of roughly 2,000 different entities. Its investment vehicles include mutual funds, private equity funds, and (relevant here) collateralized loan obligation funds ("CLOs"). Highland conducted its CLO business through an entity called Acis Capital Management, L.P. ("Acis LP") and Acis LP's general partner, Acis Capital Management GP, L.L.C. ("Acis GP") (collectively, "Acis," unless otherwise indicated), both debtors in these appeals.

In 2005 Highland hired appellee Joshua Terry ("Terry") as a portfolio analyst. Terry

---

[1]"The court reviews the bankruptcy court's . . . fact findings only for clear error." *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000) (Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).

APPX. 102650

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 9 Filed 12/05/23 Page 1025 of 1104   PageID 17159
Exhibit 19   Page 526 of 85

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 4 of 84   PageID 97997

rose through the ranks at Highland until he became the portfolio manager for Highland's
CLO business, and, in turn, received a 25% limited partnership interest in Acis LP. Terry
successfully managed billions of dollars of assets on Highland's behalf until June 2016, when
Highland terminated him. The reason for Terry's termination is disputed.[2] As a result of the
termination, Terry's partnership interest in Acis LP was deemed forfeited without
compensation.

In September 2016 Highland sued Terry in the 162nd Judicial District Court of Dallas
County, seeking to recover, *inter alia*, on theories of breach of fiduciary duty, disparagement,
and breach of contract. Terry asserted counterclaims against Highland, Acis, and others, and
demanded arbitration. The state court stayed the proceeding and ordered arbitration, and in
October 2017 the arbitration panel rendered an award in Terry's favor for $7,949,749.15,
plus post-judgment interest, against Acis ("the Award"). Terry sought and obtained
confirmation of the Award in the 44th Judicial District Court of Dallas County.

After the Award was confirmed, Terry began conducting post-judgment discovery,
which revealed some transactions that appeared suspicious to Terry. Terry thought that
Highland was denuding Acis of assets in an effort to make Acis judgment-proof. At a
January 24, 2018 hearing, Terry requested a temporary restraining order ("TRO") to restrain

---

[2]According to the bankruptcy court, "[t]he arbitration panel that issued the Arbitration
Award found that Mr. Terry was terminated for essentially doing the right thing for
investors." *Acis II*, 2019 WL 417149, at \*14; *see also* P. 1st Supp. to Pet. to Confirm
Arbitration Award Exh. 1, No. DC-17-15244 (44th Dist. Ct., Dall. Cty., Tex. filed Nov. 13,
2017).

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Filed 12/29/23   Page 1026 of 1104   PageID 17160
Exhibit 19   Page 26 of 85

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 5 of 84   PageID 97998

Acis LP from transferring any more assets pending a January 31 temporary injunction hearing. Acis LP agreed to the request, and the court issued a TRO. Five days later, Terry filed supplemental pleadings alleging that Acis LP was engaging in more wrongdoing, and requested appointment of a receiver. Instead of proceeding with the January 31 state-court hearing, however, Terry took a different tack. At 11:57 p.m. the night before the hearing, Terry filed involuntary bankruptcy petitions against both Acis LP and Acis GP.[3]

B

To comprehend some of the key issues in these appeals, it is helpful to recount some of the fundamentals of CLOs and how Highland structured its CLO business.

At the most basic level, a CLO is a "basket of loans." *Acis I*, 584 B.R. at 123. A special-purpose CLO entity ("CLO-SPE") purchases variable-rate commercial loans at the direction of the CLO manager, and collects them into a pool of loans. The obligors of the loans are usually large, well-known companies. Investors, such as pension funds, life insurance companies, and others, buy into the CLO by purchasing fixed-rate, secured notes on which the CLO-SPE itself is the obligor. These notes are typically sold in tranches representing different levels of risk. The CLO-SPE pays its obligations on the secured notes using the income it receives from its pool of loans, starting with the top tranche of notes and then proceeding through the lower tranches. These payments are made according to the terms of certain indenture agreements between the CLO-SPE and the indenture trustee (here,

---

[3]The bankruptcy court administratively consolidated the two cases, appointed a single trustee, and ultimately confirmed one Plan applicable to both alleged debtors.

- 5 -

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 36-1 Filed 12/29/26 Page 1027 of 1104 PageID 17161
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 6 of 84 PageID 97999

U.S. Bank, N.A.) to whom the CLO-SPE pledges collateral to secure the notes.

The last investor to be paid is the "equity" holder, who does not own actual equity but instead holds a subordinated, unsecured note. The equity investor earns money when the variable interest rates paid to the CLO-SPE on the commercial loans exceed the fixed interest rates that the CLO-SPE must pay to the secured note holders. Although the equity investor assumes the most risk, it also possesses certain rights that allow it to control the CLO—most significantly, the right to call for an optional redemption of the CLO.[4] When an optional redemption is effected, the CLO's pool of loans is liquidated and the resulting cash is used to pay back the outstanding secured notes, beginning with the top tranche and proceeding downward.[5]

In the present cases, Acis LP acts as the portfolio manager—*not* as the equity holder—of four CLO-SPEs, and is contractually entitled to receive portfolio management fees from them. Appellant Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey[6] entity formerly known as Acis Loan Funding, Ltd.,[7] is the primary equity investor in the CLOs.

---

[4]It is disputed whether the equity holder in this case had the right to compel Acis LP to effect an optional redemption of the relevant CLOs against Acis LP's will. The court need not resolve this dispute and therefore suggests no view on this question.

[5]The holders of the top tranche of secured notes also have special rights—namely, the right to terminate the CLO manager for cause on 45 days' notice. The note holders in these cases have so far not exercised that right.

[6]Guernsey is a small island nation located in the English Channel.

[7]For clarity, the court will refer to this entity as HCLOF, even when describing events that occurred before the entity changed its name.

- 6 -

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 59 Filed 10/29/22 Page 1028 of 1104 PageID 17162
Exhibit 19 Page 926 of 85

Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 7 of 84 PageID 98000

HCLOF does not own Acis; to the contrary, Acis LP once owned an indirect 15% stake in HCLOF for regulatory compliance reasons. Acis itself has never had any employees. Instead, it subcontracts all front office advising and back office support services to another entity. Highland was originally Acis LP's subcontractor, but, under the Plan, an entity called Brigade Capital Management, L.P. ("Brigade") fills that role (for a much lower cost).

Historically, all of these entities—Acis LP, Highland, HCLOF, and the CLO-SPEs—operated within an ecosystem of contracts that allowed Acis to manage the CLOs effectively. First, Acis LP had various fee-generating portfolio management agreements ("PMAs") with the CLO-SPEs . These contracts remain in place under the Plan. Second, Acis LP and Highland had a sub-advisory agreement, which obligated Highland to provide advisory and management services in exchange for substantial fees. Third, Acis LP and Highland had a shared services agreement, through which Highland provided back office services to Acis for a significant fee. And, fourth, Acis LP had a separate PMA with HCLOF ("the Equity PMA"). While the parties dispute the exact effect of the Equity PMA—i.e., to whom it gave power over whom—it is undisputed that Acis LP earned no fees from this contract.

## C

Circumstances changed after the state-court litigation between Highland and Terry began. As noted above, Highland and Acis LP engaged in numerous transactions that caused Terry to believe "that Highland was dismantling and denuding Acis LP of all of its assets and value." *Acis I*, 584 B.R. at 144. In October 2017, four days after Terry obtained the Award,

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19    Filed 12/29/20    Page 1029 of 1104    PageID 17163
Exhibit 19    Page 926 of 85

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 8 of 84    PageID 98001

Acis LP sold its stake in HCLOF back to HCLOF in exchange for about $990,000 in cash. As a result, Acis LP could no longer lawfully manage any new CLOs under the applicable regulatory scheme. Three days later, HCLOF entered into a new PMA—a replacement for the Equity PMA—with a recently-formed Cayman Islands entity called Highland HCF Advisor, Ltd. At around the same time, Acis LP terminated the original Equity PMA. In early November 2017, Acis LP transferred one of its most significant assets—a $9.5 million note receivable that Highland owed to it—to another Cayman Islands entity, Highland CLO Management, Ltd. ("Highland Management"). Acis LP transferred the note pursuant to a contract that provided that Highland Management would step into Acis LP's shoes as the portfolio manager for the CLOs. Highland Management also promised to reimburse Acis LP for up to $2 million of future legal fees and up to $1 million of future administrative expenses. One day after the Award was confirmed, Acis LP transferred away "the vehicle that can most easily be described as the Acis LP 'risk retention structure' (necessitated by [the] federal Dodd Frank law)" to Highland CLO Holdings Ltd., yet another Cayman Islands entity. *Acis I*, 584 B.R. at 129. That same day, Acis LP conveyed to the same Cayman Islands entity its contractual right to receive management fees from a particular CLO-SPE. This contractual right was worth $5 million, but all Acis LP received in return was forgiveness of a $2.8 million receivable that it owed to Highland.

On the day after Terry obtained his final judgment in the 44th Judicial District Court of Dallas County, Acis LP underwent a sudden change in ownership. Previously, Acis LP's limited partners were Mark Okada ("Okada"), Highland's chief investment officer, and the

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19-84    Filed 10/29/23    Page 9 of 85    Page 1030 of 1104    PageID 17164
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 9 of 84    PageID 98002

Dugaboy Investment Trust, a family trust of Highland's CEO, James Dondero.  But on December 18, 2017 Okada and the Dugaboy Investment Trust both conveyed their interests in Acis LP to appellant Neutra, Ltd. ("Neutra"), a Cayman Islands exempted company.  The Dugaboy Investment Trust also conveyed its 100% ownership interest in Acis GP to Neutra.  Thus Neutra became Acis' sole equity owner.

Highland asserts that these transactions were part of a market-driven restructuring, or "reset," of Highland's CLOs.  According to Highland's witnesses, Acis LP had become "'toxic' in the market place" due to the litigation with Terry, and had to be excised from Highland's CLO business.  *Acis I*, 584 B.R. at 128; *accord Acis II*, 2019 WL 417149, at *11.  HCLOF also has an anonymous, third-party institutional investor ("the Passive Investor") who purportedly demanded that Acis LP be removed as Highland's CLO manager.  But the Passive Investor's representative testified at a hearing that the Passive Investor had made no such demand, and the bankruptcy court found that Highland's testimony about Acis' supposed toxicity was not credible.  According to the bankruptcy court, Highland's explanations for the transfers described above were "a seemingly manufactured narrative to justify prior actions."  *Acis II*, 2019 WL 417149, at *16 (capitalization omitted).  The bankruptcy court rejected this narrative, finding that "[t]he evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor."  *Id.* at *12.

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19    Filed 09/23/23    Page 1031 of 1104    PageID 17165
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 10 of 84    PageID 98003

D

Terry filed the involuntary petitions against Acis LP and Acis GP in order to stop the apparent transfer of assets away from Acis LP.  *See Acis I*, 584 B.R. at 144.  Fast-paced litigation followed.

On March 19, 2018—two days before the scheduled trial on the involuntary petitions—Acis filed a motion to dismiss for lack of subject matter jurisdiction, or, in the alternative, to compel arbitration ("the Arbitration Motion").  The bankruptcy court's decision to deny this motion is at issue in all three of the instant appeals.  The Arbitration Motion was based on the Acis LP limited partnership agreement ("the Acis LPA"), which governed the relationship between Terry and Acis.  The Acis LPA provides a dispute resolution procedure for "any controversy or claim . . . arising out of, relating to or in connection with the [Acis LPA] or otherwise involving the Partnership, its Partners and/or any GP Party."  Third Appeal R. 4504 (brackets in original).  Under this dispute resolution procedure, the parties must first attempt to mediate any dispute; only after mediating may they resort to binding arbitration.  Any party who fails to mediate a claim, or who files a judicial lawsuit, ostensibly waives that claim.  Acis argued in the Arbitration Motion that the Acis LPA's dispute resolution provisions applied to the involuntary petitions, and that because Terry failed to comply with those provisions, the bankruptcy court lacked subject matter jurisdiction over the controversy.  The bankruptcy court denied the Arbitration Motion on the eve of trial.

In the early morning hours of the day the trial was scheduled to begin (at 2:33 a.m.),

- 10 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-84   Filed 09/29/23   Page 12 of 85   Page 1032 of 1104    PageID 17166
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 11 of 84    PageID 98004

several Highland-related entities—including Neutra and HCLOF—filed a motion to intervene.  They sought intervention as of right under Fed. R. Bankr. P. 7024, or, alternatively, permissive intervention under Rule 2018.[8]  The putative intervenors did not, however, intend to participate in the trial; they sought only to preserve their right to appeal any adverse ruling.  The bankruptcy court denied the motion.

The trial of the involuntary petitions began as scheduled on March 21, 2018, and spanned five days.  On the first day of trial, the putative intervenors informed the bankruptcy court of their objection to the involuntary petitions, and they appeared via counsel during each day of the trial.  Following the trial, the bankruptcy court ruled in favor of Terry as the petitioning creditor, concluding that  Acis had fewer than 12 eligible creditors; Acis was not generally paying its debts as they came due; Terry filed the involuntary petitions in good faith; and abstention under 11 U.S.C. § 305 was not warranted.  The bankruptcy court issued orders for relief on April 13, 2018.

E

Highland and its related entities continued to participate in the bankruptcy court proceedings after the orders for relief were issued.  The bankruptcy court, after finding that a "trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP . . . [and] to resolve the inherent conflicts of interest between [Acis] and Highland," appointed Robin Phelan ("the Trustee") as trustee.  *See Acis I*, 584 B.R. at 149-

---

[8]Unless otherwise indicated, all citations in this opinion to a "Rule" are to the Federal Rules of Bankruptcy Procedure.

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-1    Filed 02/23/23    Page 1033 of 1104    PageID 17167
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 12 of 84    PageID 98005

50.  On April 30, 2018 HCLOF—acting in its capacity as the equity note holder—sent five notices to Acis LP directing it to effect an optional redemption of the Acis CLOs on June 14, 2018.  The Trustee analyzed the notices and concluded that they were defective.

Highland and HCLOF responded by filing an adversary proceeding against the Trustee, seeking to compel the Trustee to effect a redemption.[9]  The bankruptcy court *sua sponte* issued a TRO forbidding all relevant parties (including HCLOF) from taking any action in furtherance of an optional redemption of the CLOs.  HCLOF then informed the bankruptcy court at a June 14, 2018 hearing that it had withdrawn the optional redemption notices.  Because of HCLOF's representation, the Trustee did not seek to extend the TRO.  The next day, HCLOF sent a *second* set of notices to Acis LP, again demanding that Acis LP effect an optional redemption of the CLOs.  The Trustee then filed his own adversary proceeding ("the Trustee Adversary") against Highland, HCLOF, and others, seeking a *second* TRO.[10]  The bankruptcy court granted the TRO, and, after an evidentiary hearing, converted the TRO into a preliminary injunction.

While these adversary proceedings were taking place, the Trustee was preparing a chapter 11 reorganization plan for Acis.[11]  The Trustee initially proposed three plans: Plan A, Plan B, and Plan C.  Under Plan A, the Trustee—using the doctrine of equitable

---

[9]Adversary Proceeding No. 18-03078-SGJ.

[10]Adversary Proceeding No. 18-03212-SGJ.

[11]When the bankruptcy court issued the orders for relief, the cases were under chapter 7 of the Bankruptcy Code.  The bankruptcy court later converted the cases to chapter 11 cases.

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 34 Filed 09/23/23 Page 1034 of 1104 PageID 17168
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 13 of 84 PageID 98006

subrogation—would have transferred HCLOF's subordinated equity notes to a third party—Oaktree Capital Management LP ("Oaktree")—in exchange for a $100 million payment to HCLOF, and would have paid off Acis' other creditors with additional funds provided by Oaktree. Plans B and C would have amended the indenture agreements to prohibit any redemption right from being exercised until all allowed claims were paid in full. The purpose of Plans B and C was to prevent HCLOF from calling for an optional redemption of the CLOs, which would have rendered Acis LP's fee-paying PMAs worthless. The bankruptcy court ultimately held that all three of these proposed plans were unconfirmable.

Before proposing Plans A, B, and C, the Trustee asked the bankruptcy court to approve the payment of a $2.5 million break-up fee ("the Break-Up Fee") to Oaktree if Plan A was not confirmed within a certain time period. This Break-Up Fee was a small percentage of the total value of the Plan A transaction—which was roughly $108 million—but represented a large percentage of the $8.6 million that Acis LP would retain after HCLOF was compensated for its subordinated notes. The Trustee's motion also sought to substitute Oaktree for Highland as Acis LP's investment advisor and service provider. The Trustee also requested that Oaktree be reimbursed for any reasonable expenses it might incur in connection with the proposed transaction ("the Expense Reimbursement"). The bankruptcy court granted the motion with minor modifications.[12]

---

[12]Brigade—not Oaktree—now provides advisory and back office services to Acis.

- 13 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19-84t 19led Page 29/53of 85age 1035 of 1104    PageID 17169
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 14 of 84    PageID 98007

After the bankruptcy court rejected Plans A, B, and C, the Trustee proposed—and the bankruptcy court confirmed—Plan D.  Under the confirmed Plan, Terry received full equity ownership of Acis in exchange for a $1 million reduction in the value of his claim.  Acis LP continues to serve as the portfolio manager for the Acis CLOs and continues to earn management fees.  The cash flow resulting from Terry's operation of Acis will be used to pay the claims of Acis' creditors, including Terry.  To prevent Highland and HCLOF from disrupting this cash flow, the bankruptcy court entered an injunction ("the Temporary Injunction")[13] prohibiting various parties and non-parties—including HCLOF—from taking any steps to effect an optional redemption or liquidation of the Acis CLOs.  The Temporary Injunction is actually an extension of the preliminary injunction that the bankruptcy court issued in the Trustee Adversary.  It is set to expire upon the earlier of the following: (1) the entry of a final order in the Trustee Adversary; (2) the satisfaction of all allowed claims against Acis; (3) the bankruptcy court's entry of an order finding that a material default has occurred under the Plan; or (4) any subsequent order of the bankruptcy court providing otherwise as to one or more of the CLOs.

F

Three appeals (the first consisting of four consolidated appeals)[14] taken from the

---

[13]Because the briefing refers to the plan injunction as a "temporary" injunction rather than a "preliminary" injunction, which is the federal nomenclature, the court will do so as well.

[14]The First Appeal consists of four consolidated appeals.  No. 3:18-CV-1056-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding

- 14 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19    Filed 09/63f 85age 1036 of 1104    PageID 17170

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 15 of 84    PageID 98008

bankruptcy court's rulings are now before this court. For clarity, the court will refer to the appeals as the First, Second, and Third Appeals.

In the First Appeal (No. 3:18-CV-1056-D), appellant Neutra[15] contends that the bankruptcy court erred by denying the Arbitration Motion,[16] failing to dismiss the involuntary petitions on the ground that they were filed in bad faith, and declining to abstain under 11 U.S.C. § 305.

———————————————

against Acis GP. No. 3:18-CV-1073-D is an appeal of the order for relief as to Acis LP. No. 3:18-CV-1084-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding against Acis LP.

No. 3:18-CV-1057-D is *supposed* to be an appeal of the order for relief as to Acis GP, but, due to a filing error, the notice of appeal actually challenges the order denying intervention as to Acis GP—the same order at issue in 3:18-CV-1056-D. Neutra attempted to remedy this mistake by filing a second amended notice of appeal in the bankruptcy court, but that notice was erroneously transmitted to the docket of 3:18-CV-1084-D instead of 3:18-CV-1057-D. Because these are ministerial errors that do not affect the court's jurisdiction, the court will correct them at the conclusion of this opinion. *See, e.g., In re Smith*, 133 B.R. 800, 804 (N.D. Tex. 1991) (Fitzwater, J.) ("In contrast to the failure properly to designate an appellant, which is a jurisdictional defect, the failure to specify the correct judgment is irrelevant where it is clear which judgment the appellant is appealing." (citations omitted)).

[15]HCLOF and an entity called CLO Holdco Ltd. are also named as appellants in the First Appeal. Neutra is the only appellant, however, who has submitted briefing.

[16]Neutra did not file a separate notice of appeal with respect to the order denying the Arbitration Motion. Instead, it contends that this order is an interlocutory order that merged into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Terry does not contest this assertion. Neutra also maintains that mandatory arbitration agreements implicate subject matter jurisdiction, which any party can raise at any time.

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19    Filed 09/29/23    Page 1037 of 1104    PageID 17171
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 16 of 84    PageID 98009

In the Second Appeal (No. 3:18-CV-1822-D), appellant Highland[17] contends that the bankruptcy court erred by denying the Arbitration Motion and approving the Break-Up Fee and Expense Reimbursement.[18]

In the Third Appeal (No. 3:19-CV-0291-D), appellants Highland and Neutra contend that the bankruptcy court erred by denying the Arbitration Motion; confirming the Plan while the appeal of the orders for relief was still pending; confirming the Plan even though the statutory requirements of 11 U.S.C. § 1129 were not met; and entering the Temporary Injunction. HCLOF submitted a separate brief in the Third Appeal, arguing that the Temporary Injunction is beyond the constitutional authority of the bankruptcy court, is overbroad, and is not supportable under the four-part preliminary-injunction test.

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal.

The appeals and Acis' motion are before the court for decision.

## II

"The court reviews the bankruptcy court's conclusions of law *de novo*, but reviews its fact findings only for clear error." *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000)

---

[17]HCLOF is also named as an appellant in the Second Appeal, but it did not submit or join in any briefing.

[18]The notice of appeal in the Second Appeal also challenges the bankruptcy court's decisions to deny a preliminary injunction requested by HCLOF and to grant the Trustee's request for a preliminary injunction in the Trustee Adversary. These appeals were separately docketed and subsequently dismissed.

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-4 Filed 10/29/23 Page 1038 of 1104 PageID 17172
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 17 of 84 PageID 98010

(Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997) (Fitzwater, J.) (quoting *In re Placid Oil Co.*, 158 B.R. 404, 412 (N.D. Tex. 1993) (Fitzwater, J.)). "If the trier of fact's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it." *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412). "[T]his court does not find facts. Neither is it free to view the evidence differently as a matter of choice." *Id.* (alteration in original) (quoting *Placid Oil Co.*, 158 B.R. at 412). "The bankruptcy judge's unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected." *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412) (internal quotation marks omitted).

In reviewing matters committed to the bankruptcy court's discretion—such as whether to approve a break-up fee and expense reimbursement—the court applies an abuse of discretion standard. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010). "To constitute an abuse of discretion, the [bankruptcy] court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous." *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19    Filed 10/29/21 of 85    Page 1039 of 1104    PageID 17173

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 18 of 84    PageID 98011

III

In the First Appeal, appellee Terry contends that appellant Neutra lacks standing to appeal the orders for relief.[19]

A

1

"Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) (citing *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 210 n.18 (5th Cir. 1994)). But there are still limits on who may appeal a bankruptcy court order. *See In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018). Before 1978, those limits were provided by the Bankruptcy Act, which granted appellate standing only to "person[s] aggrieved" by a bankruptcy court order. *Coho Energy*, 395 F.3d at 202 (quoting 11 U.S.C. § 67(c) (1976)). Congress repealed the relevant statutory provision when it passed the Bankruptcy Reform Act of 1978, but courts—including the Fifth Circuit—nonetheless still apply the person aggrieved test to bankruptcy appeals. *See id.* Because "[b]ankruptcy cases often involve numerous parties with conflicting and overlapping interests," and "[a]llowing each and every party to appeal each and every order

---

[19]The other appellants in the First Appeal have not briefed the issue of standing. They have therefore failed to meet their burden to assert that they have standing. *See Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994) ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal.").

- 18 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 15  ExhibitFiled 19  07/23Page 20  Page of 85 1040 of 1104    PageID 17174

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 19 of 84    PageID 98012

would clog up the system and bog down the courts," it is necessary for courts to limit who may appeal any given order. *Technicool Sys.*, 896 F.3d at 385.

The person aggrieved test "is 'more exacting' than the test for Article III standing." *Id.* (quoting *In re Delta Produce, L.P.*, 845 F.3d 609, 619 (5th Cir. 2016)). "Rather than showing the customary 'fairly traceable' causal connection, a bankruptcy appellant must instead show that he was 'directly and adversely affected pecuniarily by the order of the bankruptcy court.'" *Id.* (footnotes omitted) (first quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), then quoting *Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806 F.3d 363, 366 (5th Cir. 2015)).[20]

2

Equally important to deciding whether Neutra has standing is the "shareholder standing rule," which is "a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation" absent special circumstances. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The doctrine derives from the third-party standing rule: "the plaintiff generally must assert his

_____

[20]Some courts have imposed an additional prerequisite: that the appellant have attended and objected at the underlying bankruptcy proceedings. *See, e.g., In re Palmaz Sci., Inc.*, 262 F.Supp.3d 428, 435 (W.D. Tex. 2017); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 693-94 (Bankr. W.D. Tex. 2011) (quoting *In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010)). But other courts have held that appearance and objection are not indispensable to appellate standing. *See In re Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1192-93 (9th Cir. 2018); *In re Urban Broad. Corp.*, 401 F.3d 236, 244 (4th Cir. 2005). The Fifth Circuit has not yet decided the question. *See Palmaz*, 262 F.Supp.3d at 434. This court need not decide the issue because it disposes of the question of Neutra's standing on other grounds.

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84-19 Page 21 of 85   Page 1041 of 1104   PageID 17175
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 20 of 84   PageID 98013

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002). This court has recognized that "[u]nder federal common law [and] Texas law . . . only a corporation and not its shareholders, not even sole shareholders, can complain of an injury sustained by, or a wrong done to, the corporation." *Rigco, Inc. v. Rauscher Pierce Refsnes, Inc.*, 110 F.R.D. 180, 183 (N.D. Tex. 1986) (Fitzwater, J.). Although the rule is phrased in terms of corporations and shareholders, it applies with equal force to limited partnerships like Acis LP. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122-23 (2d Cir. 2013) (applying federal common law); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 220-22 (5th Cir. 1994) (applying Texas law); *see also In re A.S. Acquisition Corp.*, 56 Fed. Appx. 415, 416 (9th Cir. 2003) (memorandum) (holding that limited partner lacked standing to appeal bankruptcy court order that affected partnership property). It also applies to limited liability companies like Acis GP. *See Heyer v. Schwartz & Assocs. PLLC*, 319 F.Supp.3d 299, 304-05 (D.D.C. 2018) (applying federal common law); *Schoen v. Underwood*, 2012 WL 13029591, at *4 (W.D. Tex. May 15, 2012) (applying Texas law).

The Supreme Court has "treated standing as consisting of two related components: the constitutional requirements of Article III and nonconstitutional prudential considerations." *Franchise Tax Bd.*, 493 U.S. at 335. The shareholder standing rule falls within the latter category, and thus can operate to bar a lawsuit even if Article III standing is satisfied. *See id.* at 336. Recently, the Supreme Court called into question the continuing vitality of

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 19-34   Filed 09/22/23   Page 21 of 85   Page 1042 of 1104   PageID 17176
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 21 of 84   PageID 98014

prudential standing, observing that it is in tension with the principle that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)) (internal quotation marks omitted); *see also Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, 758 F.3d 592, 603 n.34 (5th Cir. 2014) ("[T]he continued vitality of prudential 'standing' is now uncertain in the wake of the Supreme Court's recent decision in *Lexmark*[.]"). But the Fifth Circuit has since reaffirmed the third-party standing doctrine in particular. *See Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 506 (5th Cir. 2015). The doctrine therefore remains binding in this circuit.

The court is aware of no binding precedent requiring it to apply the shareholder standing rule in the context of a bankruptcy appeal, but other courts have done so. *See, e.g., In re Heyl*, 770 F.3d 729, 730 (8th Cir. 2014) (per curiam); *In re AFY*, 734 F.3d 810, 822-23 (8th Cir. 2013); *A.S. Acquisition Corp.*, 56 Fed. Appx. at 416; *In re Troutman Enters.*, 286 F.3d at 365; *In re Dein Host, Inc.*, 835 F.2d 402, 404-06 (1st Cir. 1987); *Rose v. Logan*, 2014 WL 1236008, at *5-7 (D. Md. Mar. 25, 2014). This court concludes that it should do so as well, for at least two reasons.

First, the person aggrieved test already includes a version of the third-party standing rule. It requires that the appellant be "*directly* and adversely affected pecuniarily by the order of the bankruptcy court." *Technicool Sys.*, 896 F.3d at 385 (emphasis added) (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366). "An 'indirect financial stake' in another's claims

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-1 Filed 02/23/23 Page 22 of 85 age 1043 of 1104    PageID 17177

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 22 of 84    PageID 98015

is insufficient for standing." *In re The Watch Ltd.*, 257 Fed. Appx. 748, 749 (5th Cir. 2007) (per curiam) (quoting *Rohm*, 32 F.3d at 208).

Second, the person aggrieved doctrine is itself a creature of prudential standing—it is distinct from, and narrower than, constitutional standing, and it is justified by practical considerations. *See Coho Energy*, 395 F.3d at 202 ("To prevent unreasonable delay, courts have created an *additional* prudential standing requirement in bankruptcy cases: The appellant must be a 'person aggrieved' by the bankruptcy court's order." (quoting *In re P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))); *see also Technicool Sys.*, 896 F.3d at 384-86 (distinguishing constitutional standing from bankruptcy standing, and offering prudential justifications for the latter). The policy underlying the person aggrieved doctrine would be well-served by including within it a third-party standing or shareholder standing rule. Without such a limitation, any one of a debtor's numerous shareholders could separately appeal bankruptcy court orders affecting the value of the debtor—thus resulting in "umpteen appeals raising umpteen issues." *Technicool Sys.*, 896 F.3d at 384. Neutra does not argue that the shareholder standing rule is inapplicable to bankruptcy appeals generally. Instead, Neutra maintains that it is asserting a direct, rather than a derivative, interest in the orders for relief. The court therefore holds that the shareholder standing rule applies in the context of bankruptcy appeals.

Although no party cites it, the court is aware of one Fifth Circuit decision that allowed a debtor's majority shareholder to appeal an order of the bankruptcy court. In *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), *superseded by statute on other*

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 19-84   Filed 02/23/23   Page 1044 of 1104   PageID 17178
Exhibit 19   Page 24 of 85

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 23 of 84   PageID 98016

*grounds as recognized by In re Woerner*, 783 F.3d 266, 274 (5th Cir. 2015) (en banc),[21] the

Fifth Circuit authorized a debtor's majority shareholder to appeal an order awarding

attorney's fees to the trustee's attorneys (one of whom was himself the trustee).  But as the

*First Colonial* panel was careful to point out, the case involved unique circumstances.  *See

id.* at 1297 ("Although the attorneys and the trustee are correct in stating that in the usual

case the bankrupt and its shareholders do not have an interest in the disposition of the assets

of the estate . . . this is hardly the usual case.").  The appeal involved an issue on which the

interests of the trustee and the debtor diverged, because "[w]here the trustee serves as his

own attorney there is no disinterested trustee to ensure that the attorney is paid only for

professional services necessary to the administration of the estate." *Id.*  Thus the panel made

an exception: it allowed the shareholder to appeal, thereby "refusing to permit [the trustee]

to use his position as trustee to prevent [the shareholder] from contesting the size of his

attorneys' fee." *Id.*  There are no such circumstances present here: the Trustee lacks a

similarly-direct "personal financial stake" in the orders for relief, and he is not using his

special position to insulate a favorable order from review.  *Cf. AFY*, 734 F.3d at 823

(distinguishing *First Colonial* because trustee lacked personal financial stake in outcome of

appealed orders).  *First Colonial* therefore does not prevent this court from applying the

shareholder standing rule to a bankruptcy appeal.

---

[21]Although *First Colonial* was decided before the passage of the Bankruptcy Reform
Act of 1978, the "person aggrieved" test applied by the courts post-1978 was taken directly
from pre-1978 jurisprudence. *See Coho Energy*, 395 F.3d at 202.  *First Colonial*'s analysis
is therefore still relevant.

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19    Filed 02/23 Page 25 of 85 Page 1045 of 1104    PageID 17179

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 24 of 84    PageID 98017

B

Neutra asserts four different interests in the orders for relief.  None of these interests suffices to give Neutra standing to appeal.

Neutra contends that it "is watching its interest in Acis being decimated by administrative expenses."  Neutra First Appeal Br. 19.  In other words, Neutra's ownership interest in Acis is losing value as a result of the inherent expenses of bankruptcy.  Under the shareholder standing rule, however, this interest is quintessentially derivative of Acis' own interests, and therefore cannot confer standing.  *See, e.g., Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. Unit B Apr. 1981) ("Plaintiffs' individual injury arises only from the loss in value of their stock as a result of injury to the corporation.  Under these circumstances, plaintiffs have no independent cause of action.").  The First Circuit rejected a nearly-identical argument in *Dein Host*, 835 F.2d 402.  It held that an appellant lacked standing where his only interest in the bankruptcy court order was "that his beneficial interest in [another entity]—his stock—[was] in jeopardy and subject to shrinkage."  *Id.* at 405.  In so concluding, the court relied on the principle that "[t]he fact that the injury may indirectly harm a stockholder by diminishing the value of his corporate shares does not bestow upon him a right to sue on his own behalf."  *Id.* at 405-06 (quoting *Papilsky v. Berndt*, 466 F.2d 251, 255 (2d Cir. 1972)).  Thus even if Acis loses value as a result of its plunge into bankruptcy, Neutra cannot appeal on this basis.

Neutra also posits that it "has lost its right to protect its interest [in Acis] via control of [Acis]."  Neutra First Appeal Br. 19.  This interest is insufficient to confer standing

- 24 -

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 19-1 Filed 02/13 Page 26 of 85 Page 1046 of 1104 PageID 17180

Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 25 of 84 PageID 98018

because losing control over an entity is not, in itself, a *pecuniary* injury. *See Technicool Sys.*, 896 F.3d at 385 (requiring that appellant be "directly and adversely affected *pecuniarily* by the order of the bankruptcy court" (emphasis added)); *see also Rose*, 2014 WL 1236008, at *5-7 (holding that shareholder standing rule applies with full force to entity's *sole* equity owner). Control rights may enhance the value of Neutra's ownership interest, or may allow Neutra to protect the value of that interest via advantageous business decisions. But, as the court has already discussed, any diminishment in the value of Neutra's interest in Acis does not confer standing on Neutra.

Neutra also asserted, at the time it filed its briefing in the First Appeal, that it would soon "be forced to partner with Oaktree against its wishes, and may be completely divested from its equity interests without its consent." Neutra First Appeal Br. 19-20. But this outcome was by no means an inevitable result of the *orders for relief*. The person aggrieved test does not take into account every injury caused by the bankruptcy case as a whole, but instead asks whether "the *order* of the bankruptcy court . . . directly and adversely affect[s] the appellant pecuniarily." *Fortune Nat. Res. Corp.*, 806 F.3d at 367. And "bankruptcy standing requires 'a higher causal nexus between act and injury'" than does traditional Article III standing. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366). Thus although the orders for relief created the possibility that Neutra might suffer harm in the future, Neutra was not aggrieved by them for standing purposes because "[the] speculative prospect of harm is far from a direct, adverse, pecuniary hit." *Id.* at 386; *see also id.* at 384-86 (concluding that equity owner was not aggrieved by order allowing

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19-34    Exhibit 19    Page 27 of 85    Page 1047 of 1104    PageID 17181
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 26 of 84    PageID 98019

trustee to employ special counsel, even though special counsel's purpose was to pierce the corporate veil to reach equity owner's other companies and assets).

Of course, the future harms identified by Neutra in the First Appeal did actually come to pass: the bankruptcy court appointed first Oaktree, and then Brigade, as the new service provider for Acis, and later divested Neutra of its equity interest in Acis. But this court cannot take these events into account in its analysis of the First Appeal. A district court hearing a bankruptcy appeal may only consider information if it is "part of the record before the bankruptcy court" or if it "meets the narrow purpose of judicial notice." *In re SI Restructuring Inc.*, 480 Fed. Appx. 327, 329 (5th Cir. 2012) (per curiam). The subsequent events that are asserted to have injured Neutra are not part of the record in the First Appeal. No party has asked this court to take judicial notice of any subsequent bankruptcy court orders in the First Appeal, and the court has no duty to do so *sua sponte*.[22] Moreover, Neutra would lack standing even if the court *did* take these events into account. That a once-speculative harm actually came to pass does not mean that the harm was initially *likely* to happen—so Neutra would still fail to show the "higher causal nexus between act and injury" that the person aggrieved test demands. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366); *cf. Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928) (finding no liability for negligence where, *ex ante*, "there was nothing in the

---

[22]The Fifth Circuit has indicated that when no party asks the district court to take judicial notice of a fact, and the district court does not do so *sua sponte*, the Fifth Circuit is unlikely to do so for the first time on appeal. *See United States v. Herrera-Ochoa*, 245 F.3d 495, 502 & n.6 (5th Cir. 2001) (citing cases).

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-34   Filed 12/29/23   Page 28 of 85   Page 1048 of 1104   PageID 17182

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 27 of 84   PageID 98020

situation to suggest to the most cautious mind" that defendant's actions would result in harm to plaintiff, even though harm actually occurred).

The court therefore dismisses the First Appeal, i.e., all the appeals of the orders for relief.

## C

The court's conclusion that Neutra lacks standing[23] is buttressed by the fact that the bankruptcy court properly denied Neutra's motion to intervene.[24]

## 1

Neither Neutra nor Terry has substantially briefed the question whether the bankruptcy court erred by denying Neutra's motion to intervene. Neutra contends that the ruling on its motion to intervene has no bearing on whether it can appeal as a person

---

[23]This conclusion does not mean that *no one* has standing to appeal. The Trustee likely could have appealed the orders for relief on Acis' behalf had he believed the orders were not in the best interests of the estates. *See In re C.W. Mining Co.*, 636 F.3d 1257, 1261-66 (10th Cir. 2011); *see also* 11 U.S.C. § 323(a) ("The trustee in a case under this title is the representative of the estate.").

[24]The parties agree that this court has jurisdiction over the orders denying intervention because they are interlocutory orders that merged into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Neutra only asserts that it has standing to appeal the orders for relief; it does not contend that it has standing to appeal independently the orders denying intervention. *Cf. Rohm*, 32 F.3d at 208 ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal."). Thus even though the court concludes—in the context of this standing analysis—that the orders denying intervention were correctly decided, it does not affirm them. Instead, it dismisses the entire First Appeal for lack of standing.

- 27 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-1    Filed 12/29/23    Page 29 of 85    Page 1049 of 1104    PageID 17183

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 28 of 84    PageID 98021

aggrieved; Terry, meanwhile, maintains that the bankruptcy court's decision was correct, but also contends that any error was harmless because Neutra had no intention of participating in the trial on the involuntary petitions. The court is not persuaded, however, that the question is irrelevant.

Some courts have suggested that the bankruptcy court's proper denial of a motion to intervene is dispositive of the movant's right to appeal. *See, e.g., In re Living Hope Sw. Med. Servs., LLC*, 598 Fed. Appx. 467, 467 (8th Cir. 2015) (per curiam) (concluding that appellant lacked standing because bankruptcy court correctly denied his motion to intervene); *In re Thompson*, 965 F.2d 1136, 1140-46 & n.9 (1st Cir. 1992) (equating person aggrieved test with the test for intervention under Rule 7024, and concluding that because bankruptcy court properly denied motion to intervene in adversary proceeding, appellant lacked standing to appeal judgment); *In re S. State St. Bldg. Corp.*, 140 F.2d 363, 367 (7th Cir. 1943) ("If one who has a right to intervene, but does not, has no standing to appeal, a fortiori, one who has no right to intervene, and does not, has no standing to appeal."); *see also In re Blair*, 2016 WL 8608454, at *5 (D. Colo. Aug. 24, 2016) ("One might expect that [the person aggrieved] doctrine would not apply to a party that sought and was denied intervention. Or, at a minimum, it seems incongruous to permit a party to file an unsuccessful motion to intervene and nonetheless be permitted to appeal under the persons aggrieved doctrine and immediately attack the Bankruptcy Court's substantive rulings, rather than first challenging the denial of intervention."). Other courts disagree. *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (holding that "[Rule 2018,] governing permissive

- 28 -

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 19-84 Filed 10/23/23 Page 30 of 85 PageID 17184
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 29 of 84 PageID 98022

intervention, does not limit the rights of a 'person aggrieved' to be heard" on appeal).

It is also possible that, had Neutra been allowed to intervene, it would have had standing to appeal by virtue of its intervention alone. *See First Colonial*, 544 F.2d at 1296-98 (finding that appellant was a person aggrieved, and then adding, as alternative ground for its holding, that "[appellant] has standing to appeal from all of the fee awards because the bankruptcy judge granted its motion to intervene [under what is now Rule 7024] without qualifying its right to participate in the proceeding"); *see also Int'l Trade Admin.*, 936 F.2d at 747 (stating that permissive intervention under Rule 2018 "provides a formal mechanism that expands the right to be heard to a wider class than those who qualify under the 'person aggrieved' standard"). *But see Troutman Enters.*, 286 F.3d at 363-64 (holding that parties who were permitted to intervene in bankruptcy proceeding nonetheless lacked appellate standing because they were not persons aggrieved).

Because the bankruptcy court's decision to deny intervention could affect Neutra's standing to bring the present appeal, the court will consider the merits of Neutra's appeal of that decision.

2

"A ruling denying intervention of right is reviewed *de novo*." *St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969, 973 (5th Cir. 2019) (quoting *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)). Although generally "the timeliness of an intervention motion is reviewed for abuse of discretion," if the bankruptcy court did not explain its ruling on timeliness, review is *de novo*. *See id.* (citing *Sommers v. Bank of Am.*,

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19 Filed 12/23/25 Page 32 of 85 Page 1051 of 1104    PageID 17185

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 30 of 84    PageID 98023

*N.A.*, 835 F.3d 509, 513 (5th Cir. 2016)).  The court reviews the denial of a motion for permissive intervention for "clear abuse of discretion," and will disturb the bankruptcy court's ruling "only under extraordinary circumstances."  *Id.* (quoting *Edwards*, 78 F.3d at 995).

Neutra sought intervention as of right under Rule 1018, which provides that Rule 7024 applies in proceedings to contest an involuntary petition.  Rule 7024, in turn, states that "[Fed. R. Civ. P. 24] applies in adversary proceedings."

> A party is entitled to an intervention of right under Rule 24(a)(2) if (1) the motion to intervene is timely, (2) the interest asserted by the potential intervenor is related to the action, (3) that interest may be impaired or impeded by the action, and (4) that interest is not adequately represented by the existing parties.

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2012 WL 2133667, at *1 (N.D. Tex. June 12, 2012) (Fitzwater, C.J.) (citing *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247 (5th Cir. 2009); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994)), *rev'd on other grounds*, 747 F.3d 275 (5th Cir. 2014), *aff'd*, ___ U.S. ___, 135 S. Ct. 2507 (2015).  "Failure to satisfy any one requirement precludes intervention of right."  *Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 578 (5th Cir. 2007).

Neutra also sought permissive intervention under Rule 2018.  That rule provides that "after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter."  Rule 2018(a).

- 30 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 19-34   Exhibit 19   Page 32 of 85   Page 1052 of 1104   PageID 17186

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 31 of 84   PageID 98024

>       In deciding whether to permit intervention under Rule
> 2018(a), courts look to various factors, including (1) whether the
> moving party has an economic or similar interest in the matter;
> (2) whether the interest of the moving party [is] adequately
> represented by the existing parties; [(3)] whether the
> intervention will cause undue delay to the proceedings; and (4)
> whether the denial of the movant's request will adversely affect
> their interest.

*Pasternak & Fidis, P.C. v. Wilson*, 2014 WL 4826109, at *6 (D. Md. Sept. 23, 2014)

(collecting cases). Thus "[t]he standards under Rule 2018 and [Rule] 24 overlap." *In re

Adilace Holdings, Inc.*, 548 B.R. 458, 462 (Bankr. W.D. Tex. 2016). "The decision whether

to allow intervention is wholly discretionary under Rule 2018 . . . even where each required

element is met." *Id.* at 463 (citing *Staley v. Harris County*, 160 Fed. Appx. 410, 414 (5th Cir.

2005) (per curiam); *In re Durango Ga. Paper Co.*, 336 B.R. 594, 596 (Bankr. S.D. Ga.

2005)).

### 3

Neutra was not entitled to intervention of right in the trial of the involuntary petitions

because it did not have a sufficiently direct interest in the proceedings. The only interest that

Neutra asserted was its property interest in Acis. But in the intervention context, "[t]he term

'interest' is narrowly read to mean a *direct* and substantial interest in the proceedings . . . that

the substantive law recognizes as belonging to or being owned by *the party seeking

intervention*." *Rigco*, 110 F.R.D. at 183 (emphasis added). Accordingly, the shareholder

standing rule applies to Rule 24(a) motions to intervene. *See id.* at 183-84. Neutra's

property interest in the alleged debtors therefore could not support Neutra's claimed right to

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84    Filed 3/23/3 of 85    Page 1053 of 1104    PageID 17187
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 32 of 84    PageID 98025

intervene in the trial on the involuntary petitions. *See supra* § III(B). Because one of the four Rule 24(a) factors was not met, the bankruptcy court did not err by denying Neutra's motion to intervene as of right. *See Haspel*, 493 F.3d at 578.

For similar reasons, the bankruptcy court did not abuse its discretion by denying Neutra permissive intervention under Rule 2018. This is because Neutra lacked a sufficiently direct interest in the proceedings. And even if Neutra had such an interest, this court still would not disturb the bankruptcy court's ruling. This court reviews the bankruptcy court's denial of a Rule 2018 motion under a deferential standard—the bankruptcy court has discretion to deny such a motion even if all four factors are met. *See Adilace Holdings*, 548 B.R. at 463; *see also St. Bernard*, 914 F.3d at 973 (providing that orders as to permissive intervention are reviewed for clear abuse of discretion). Neutra offers no argument on appeal that the bankruptcy court committed a clear abuse of its discretion by denying its motion. *Cf. Brinkmann v. Dall. Cty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (holding that arguments not briefed on appeal are deemed abandoned). In the absence of such an argument, the court will not disturb the bankruptcy court's ruling.

IV

Neutra argues in the First Appeal that, regardless whether it has standing to appeal the orders for relief, it can challenge the bankruptcy court's denial of the Arbitration Motion because mandatory arbitration agreements implicate the court's subject matter jurisdiction. The appellants in the Second Appeal and Third Appeal make the same argument, and contend that every subsequent order entered by the bankruptcy court is void for lack of

- 32 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19-84    Filed 02/23/24    Page 1054 of 1104    PageID 17188
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 33 of 84    PageID 98026

subject matter jurisdiction.

The Fifth Circuit recently reiterated that it has not yet decided the question whether a dismissal based on an arbitration provision is a dismissal for lack of subject matter jurisdiction. *See McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch*, 923 F.3d 427, 430 n.5 (5th Cir. 2019); *see also McGee v. W. Express, Inc.*, 2016 WL 1622632, at *2 (N.D. Tex. Apr. 5, 2016) (Horan, J.) (explaining that the Fifth Circuit has not yet decided the issue), *rec. adopted*, 2016 WL 1627662, at *1 (N.D. Tex. Apr. 22, 2016) (Kinkeade, J.).  Neutra relies, however, on another Fifth Circuit opinion, *Gilbert v. Donahoe*, 751 F.3d 303 (5th Cir. 2014), in which the panel stated: "We have held that a district court lacks subject matter jurisdiction over a case and should dismiss it pursuant to Federal Rule of Civil Procedure 12(b)(1) when the parties' dispute is subject to binding arbitration." *Id.* at 306.  The *Gilbert* panel cited two supporting cases in a footnote: *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012), and *Omni Pinnacle, LLC v. ECC Operating Services, Inc.*, 255 Fed. Appx. 24 (5th Cir. 2007) (per curiam).  In both of these supporting cases the Fifth Circuit affirmed a district court's dismissal of a case under Rule 12(b)(1) pursuant to an arbitration agreement.  The *Gilbert* opinion also acknowledged precedent indicating that the issue was previously unsettled.  *See Gilbert*, 751 F.3d at 306 n.1 (citing *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472 n.3 (5th Cir. 2010) ("Our court has not previously definitively decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause.")).  Thus *Gilbert*—if read in a vacuum—appears to settle the issue in a precedential decision.

- 33 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84 19 Filed Page 353 of 85 Page 1055 of 1104   PageID 17189

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 34 of 84   PageID 98027

But in *Ruiz v. Donahoe*, 784 F.3d 247 (5th Cir. 2015) (on petition for rehearing), Judge Owen—who authored *Gilbert* just one year before—wrote for the panel that "[a]lthough in *Gilbert* we spoke in terms of subject-matter jurisdiction, we used the term imprecisely." *Id.* at 249. The *Ruiz* panel observed that whereas subject matter jurisdiction can be raised at any time and cannot be waived by the parties, a party *can* waive its right to compel arbitration. *See id.* And "[i]f a dispute is subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration." *Id.* Thus "agreements to arbitrate implicate forum selection and claims-processing rules *not subject matter jurisdiction*." *Id.* at 250 (emphasis added).

This court is persuaded by the reasoning of *Ruiz* and follows *Ruiz*'s explanation that the *Gilbert* panel was imprecise when it spoke in terms of subject matter jurisdiction. It is well-established in the Fifth Circuit that a party can waive its right to compel arbitration. *See, e.g., Petroleum Pipe Ams. Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009); *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991); *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985). It is equally well-established that a party *cannot* waive challenges to the court's subject matter jurisdiction; the issue can be raised at any time by any party or by the court *sua sponte*. *See, e.g., Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). Moreover, in the Fifth Circuit a court may order a stay pending arbitration instead of dismissing a case outright. *See, e.g., Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 662 (5th Cir. 1995); *see also* 9 U.S.C. § 3 (authorizing courts to grant stays pending arbitration). But when a court lacks subject matter jurisdiction over a

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-41   Filed 06/16/23   Page 36 of 85   Page 1056 of 1104   PageID 17190
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 35 of 84   PageID 98028

controversy, it cannot enter a stay order—or *any* order besides an order dismissing the case. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 434 (2007) ("[O]nce a court determines that jurisdiction is lacking, it can proceed no further and must dismiss the case on that account."). Thus if the *Gilbert* panel actually held that a dismissal based on an arbitration clause is jurisdictional, then it impliedly overruled many years of precedent set by many prior panels. Under the Fifth Circuit's rule of orderliness, however, the *Gilbert* panel lacked the power to do so. *See, e.g., Odle v. Flores*, 683 Fed. Appx. 288, 289 (5th Cir. 2017) (per curiam) ("[U]nder the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer language has no effect." (alteration in original) (quoting *Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000))). Fifth Circuit precedent instead supports the conclusion that a dismissal based on an arbitration agreement does *not* implicate the court's subject matter jurisdiction.

Indeed, it would be strange if parties by contract could divest a federal court of subject matter jurisdiction or confer such jurisdiction. "Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) (citing U.S. Const. art. III, § 1). "[N]o action of the parties can confer subject-matter jurisdiction upon a federal court" if such jurisdiction is otherwise lacking. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). And federal courts have long resisted attempts by private parties to manipulate their jurisdiction—including attempts to deprive courts of removal jurisdiction where that jurisdiction properly exists. *See, e.g., Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 576 (5th Cir. 2004) (en banc) ("The

- 35 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19-84    Filed 12/23/23    Page 37 of 85    Page 1057 of 1104    PageID 17191
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 36 of 84    PageID 98029

doctrine of improper joinder implements our duty to not allow manipulation of our jurisdiction.").  It follows that "if a court has jurisdiction of an action, the parties cannot deprive the court thereof by contract."  17A C.J.S. *Contracts* § 309 (2019).  Parties may not, in the course of ordering their private affairs, enlarge *or shrink* Article III or the federal statutes governing subject matter jurisdiction.[25]

Nor does the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, mandate that a dismissal based on an arbitration agreement is a dismissal for lack of subject matter jurisdiction.  The Supreme Court has urged caution in interpreting statutory provisions to be jurisdictional.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("'Jurisdiction,' this Court has observed, 'is a word of many, too many, meanings.'  This Court, no less than other courts, has sometimes been profligate in its use of the term." (citation omitted) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998))).  This is because calling an issue "jurisdictional" has profound consequences.  If an issue implicates the court's subject matter jurisdiction, then it cannot be waived or forfeited, and the court has a duty to raise the issue on its own; the trial judge (instead of a jury) can resolve factual disputes underlying the issue; and if subject matter jurisdiction is lacking, the court must dismiss the entire complaint.  *See id.* at 514-15.  The Supreme Court has therefore established clear interpretive rules on the subject:

---

[25]For similar reasons, the waiver clause in the Acis LPA does not divest this court or the bankruptcy court of subject matter jurisdiction.

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19    Filed 09/23 Page 38 of 85    Page 1058 of 1104    PageID 17192

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 37 of 84    PageID 98030

> [i]f the Legislature clearly states that a threshold limitation on a
> statute's scope shall count as jurisdictional, then courts and
> litigants will be duly instructed and will not be left to wrestle
> with the issue. But when Congress does not rank a statutory
> limitation on coverage as jurisdictional, courts should treat the
> restriction as nonjurisdictional in character.

*Id.* at 515-16 (footnote and citation omitted).

Nothing in the FAA indicates that Congress intended arbitration agreements to divest federal courts of subject matter jurisdiction. To the contrary, the FAA authorizes courts to issue orders that would be beyond the power of a court that lacks jurisdiction. *See Sinochem Int'l*, 549 U.S. at 434. For instance, courts must, in certain circumstances, issue orders staying their proceedings pending arbitration, *see* 9 U.S.C. § 3; orders compelling recalcitrant parties to submit to arbitration, *see id.* § 4; orders appointing an arbitrator, *see id.* § 5; and orders compelling witnesses to appear before an arbitrator, *see id.* § 7. Thus the text of the FAA—far from containing a clear statement that arbitration agreements are jurisdictional—suggests instead that the opposite is true. The court therefore concludes that Congress did not intend for dismissals based on arbitration agreements to be dismissals for lack of subject matter jurisdiction.[26]

---

[26]Neutra contends in the First Appeal that the Acis LPA's arbitration clause deprived Terry of *standing*, and that a creditor who lacks *standing* cannot confer subject matter jurisdiction on the bankruptcy court by filing an involuntary petition. But "[s]tanding is a species of subject matter jurisdiction." *In re Rhinesmith*, 450 B.R. 630, 631 (Bankr. W.D. Tex. 2011) (citing *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009)). To conclude that arbitration agreements do not implicate a court's subject matter jurisdiction is also to conclude that they do not implicate standing. Thus Neutra's circuitous logic does not allow it to escape the court's conclusion on this issue.

- 37 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 19-19   Page 393 of 85   Page 1059 of 1104   PageID 17193
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 38 of 84   PageID 98031

Because the bankruptcy court's order denying the Arbitration Motion does not implicate subject matter jurisdiction, it can only be challenged by a party with standing. Neutra lacks standing to do so in the First Appeal. *See supra* § III.  In the Second and Third Appeals, the appellants who challenge the order do not contend that they have standing to do so; instead, they rely on what they maintain is the jurisdictional nature of the order.  They have therefore failed to carry their burden to establish standing. *See Rohm*, 32 F.3d at 208. Thus the court will not consider the merits of appellants' challenges to the bankruptcy court's order denying the Arbitration Motion.

V

Highland argues in the Second Appeal that the Break-Up Fee does not satisfy the requirements of 11 U.S.C. § 503, which governs administrative expenses; the Break-Up Fee is unreasonably large; and the Expense Reimbursement was not a reasonable exercise of the Trustee's business judgment under 11 U.S.C. § 363(b).[27]

A

The court first considers whether the bankruptcy court abused its discretion by finding that the Break-Up Fee satisfies § 503(b)(1)(A).[28]

---

[27]As a creditor of the estates, Highland has standing to appeal the order approving the Break-Up Fee and Expense Reimbursement because that order disposes of estate assets. *See, e.g., In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997).  Neither Oaktree nor the Trustee contends otherwise.

[28]The parties do not dispute that § 503 applies to the bankruptcy court's decision to approve a break-up fee.  *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (suggesting, in *dicta*, that § 503 is "the proper channel for requesting payment" of a break-up

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 3-34  Filed 19 Page 940 of 85  Page 1060 of 1104    PageID 17194
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 39 of 84    PageID 98032

In bankruptcy, administrative expenses—such as the "actual and necessary costs and expenses of preserving the estate"—are given priority over other non-secured claims in the distribution of the estate. *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001). "In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefi[t]ed the estate." *Id.* (citing *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)). Such claims "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate." *Id.* "Crucial to satisfying the § 503 test is that the estate receive a 'discernible benefit' as a result of the expenditure." *In re ASARCO LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010) (quoting *Jack/Wade Drilling*, 258 F.3d at 387), *aff'd*, 650 F.3d 593 (5th Cir. 2011); *see also In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) ("The court's administrative expense inquiry centers upon whether the estate has received an *actual benefit, as opposed to the loss a creditor might experience*[.]" (quoting *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994))). The claimant bears the burden of proving by a preponderance of the evidence that its claim qualifies as an administrative expense. *See TransAmerican*, 978 F.2d at 1416. Once the claimant has established a prima facie case, the burden of production shifts to the objector—but the burden of persuasion remains at all times upon the claimant. *See id.*

---

fee).

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 9-84   Exhibit 19 Page 94 of 85   Page 1061 of 1104   PageID 17195
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 40 of 84   PageID 98033

The bankruptcy court did not abuse its discretion by concluding that the Break-Up Fee was an actual and necessary expense that conferred a discernible benefit upon the debtors' estates. Courts have recognized that a break-up fee can confer a benefit on the estate even though the contemplated transaction with the claimant was not consummated. *See, e.g., In re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018) (recognizing that break-up fee can benefit estate if, *inter alia*, the "assurance of a break-up fee promote[s] more competitive bidding," or the fee "induce[s] a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely"); *In re Lamb*, 2002 WL 31508913, at *1 (Bankr. D. Md. Oct. 11, 2002) (recognizing that break-up fees are appropriate where they incentivize a "stalking horse" bidder).

Here, the primary benefit identified by the bankruptcy court was that the Break-Up Fee facilitated the plan confirmation process. Without the Break-Up Fee, the Trustee would have had no ready, willing, and able partner for the proposed Plan A transaction, because Oaktree would not have made an offer or undertaken the expense and effort of preparing for the contemplated transaction. In this respect, the present case is similar to a traditional "stalking horse" situation, where a break-up fee induces a bidder to research a potential transaction and make an initial bid. *See, e.g., Energy Future Holdings*, 904 F.3d at 313-14. Without Plan A, the bankruptcy court faced the possible "doomsday" scenario, Second Appeal R. 78, of Acis' fee-generating PMAs being rendered worthless by HCLOF's exercise of its optional redemption right. The bankruptcy court did not abuse its discretion by recognizing these benefits.

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 19-84 Filed 10/24/23 Page 42 of 85 Page 1062 of 1104 PageID 17196
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 41 of 84 PageID 98034

The record also reflects that the Break-Up Fee conferred other benefits on the estates, although the bankruptcy court did not expressly acknowledge them. Oaktree's initial bid was meant to start a public sale process. *Cf. Energy Future Holdings*, 904 F.3d at 313-14 (citing *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999)) (acknowledging that break-up fees can benefit estate by initiating a public bidding process, even where claimant was eventually outbid). And the Break-Up Fee was part of a transaction by which Oaktree agreed to step into Highland's shoes as Acis LP's sub-advisory and shared services provider, for a significantly lower price than what Highland was charging.

Of course, the Break-Up Fee is unique in one significant respect: it was expressly conditioned on the bankruptcy court's approval of Plan A. Plan A was based on the doctrine of equitable subrogation, "the legal fiction through which a person or entity, the subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible." *Gen. Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949-50 (5th Cir. 1999). Under the Trustee's theory, HCLOF was to be treated as a creditor of the estates on the basis of its adversary claim against the Trustee seeking specific performance of its optional redemption right. The Trustee proposed to monetize HCLOF's claim, and to satisfy that claim by paying HCLOF the sum of $100 million (provided by Oaktree). The Trustee would then, as subrogee, substitute himself as the holder of HCLOF's rights in the subordinated CLO notes. Finally, the Trustee would use his position as subrogee to transfer HCLOF's interest in the subordinated notes to Oaktree. The bankruptcy court acknowledged that "[t]he legal theories [underpinning Plan A] are not

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84   Filed 10/24/23   Page 1063 of 1104   PageID 17197
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 42 of 84   PageID 98035

at all clear cut and are likely to be hotly contested by [HCLOF] and Highland." Second Appeal R. at 78. Despite this uncertainty, the bankruptcy court approved the Break-Up Fee.[29]

Break-up fees are by nature contingent upon uncertain future events. If a transaction were sure to happen, there would be no need for a break-up fee. Highland essentially contends that there was *too much* uncertainty here—that the bankruptcy court abused its discretion by approving the Break-Up Fee "in the face of [a] huge execution risk and the substantial legal authority that the Trustee's proposed transaction with Oaktree could not be approved." Highland Second Appeal Br. 31. But Highland overstates the degree to which the Trustee's theory was foreclosed by existing law. The bankruptcy court was aware of authority suggesting that, in some circumstances, an entity's claim for specific performance may be treated as a monetary claim against the bankruptcy estate under 11 U.S.C. § 101(5). *See In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993). And under New York law, which ostensibly governs the PMAs between Acis and the CLO-SPEs, the doctrine of equitable subrogation is interpreted

> broad[ly] enough to include every instance in which one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter, so long as the payment was made either under compulsion or for the protection of some interest of the party

---

[29]The bankruptcy court later decided that Plan A was unconfirmable because the Trustee could not be subrogated to the rights of an entity that did not hold a claim against the estates. The bankruptcy court concluded that HCLOF did not hold such a claim because the Equity PMA was not then in effect, and HCLOF could not sue to enforce the PMAs between Acis and the CLO-SPEs because HCLOF was not a party to, or a third-party beneficiary of, those PMAs. This decision is not part of the record in the Second Appeal.

- 42 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 19-4   Filed 12/14/23   Page 44 of 85   Page 1064 of 1104   PageID 17198
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 43 of 84   PageID 98036

making the payment, and in discharge of an existing liability.

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 112 (N.Y. App.

Div. 2009) (quoting *Gerseta Corp. v. Equitable Tr. Co. of N.Y.*, 150 N.E. 501, 504 (N.Y.

1926)).  The bankruptcy court was thus within its discretion to conclude that the Trustee's

theory was at least colorable.

More important, whether the benefits of the Break-Up Fee outweighed the risks is not

for this court to decide.  Unless the bankruptcy court committed a clear error of fact or

incorrectly applied the law, this court cannot disturb its decision.  *See Grigson*, 210 F.3d at

528.  There is no indication that the bankruptcy court committed such an error here.  The

bankruptcy court recognized the potential benefits *and* the potential risks of approving the

Break-Up Fee, and it properly applied the correct legal test—the § 503(b)(1)(A) standard—in

coming to its conclusion that the Break-Up Fee benefited the estate.

The principal authority on which Highland relies, *Energy Future Holdings*, is not to

the contrary.  In that case, the Third Circuit affirmed the bankruptcy court's reconsideration

of its own decision to authorize a break-up fee.  *See Energy Future Holdings*, 904 F.3d at

301.  The bankruptcy court originally approved the break-up fee on the premise that the fee

would not be paid if a certain regulatory body did not permit the proposed transaction to go

forward.  *See id.* at 304.  When the bankruptcy court learned that this premise was incorrect,

it reconsidered the order and came to a different conclusion.  *See id.* at 307.  The Third

Circuit, in affirming the bankruptcy court, *deferred to the bankruptcy court's discretion* to

weigh the potential risks and benefits of allowing the fee:

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19-84    Filed 09/23 of 85    Page 1065 of 1104    PageID 17199
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 44 of 84    PageID 98037

> In sum, the Termination Fee provision had the potential of providing a large benefit to the estates, but it also had the possibility to be disastrous. Once it had a complete understanding, the Bankruptcy Court properly weighed the various considerations and determined that the potential benefit was outweighed by the harm that would result under predictable circumstances. In other words, the risk was so great that the Fee was not necessary to preserve the value of Debtors' estates. Having made such a determination, the Bankruptcy Court did not abuse its discretion in denying the Fee in part.

*Id.* at 315 (footnote omitted). Likewise, the bankruptcy court in the present appeal was within its discretion to conclude that the benefits of the Break-Up Fee outweighed the risks, despite the uncertainty of the Trustee's legal theory.

B

The court considers next whether the Break-Up Fee was so large as to be unreasonable.

Highland cites no binding authority for the proposition that a break-up fee that meets the requirements of § 503(b)(1)(A) must be rejected if it is "unreasonable," nor does Highland explain what test a break-up fee must pass in order to be "reasonable." *See* Highland Second Appeal Br. 32-33. Assuming *arguendo* that it would be error to approve an "unreasonable" break-up fee, the court concludes that the bankruptcy court did not err in this respect. The bankruptcy court found that the Break-Up Fee constituted roughly 2.3% of the total price that Oaktree would pay under the terms of the proposed transaction. This amount is in line with break-up fees authorized by other courts. *See, e.g., In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely large transactions,

- 44 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 41   Filed 09/23/85   Page 1066 of 1104   PageID 17200
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 45 of 84   PageID 98038

break-up fees ranging from one to two percent of the purchase price have been authorized by some courts."); *see also Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 625 (S.D.N.Y. 1987) (approving 2% break-up fee); *In re Sea Island Co.*, 2010 WL 4393269, at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving 3% break-up fee).

Highland contends that the relevant benchmark is not the total transaction price, but is instead the amount of money that Acis LP would retain after the transaction was complete. Applying Highland's logic, the Break-Up Fee is actually *26%* of the transaction's value. But Highland's logic does not stand up in light of the legal theory proposed by the Trustee in support of the transaction. Under Plan A, Oaktree was not purchasing HCLOF's subordinated notes outright. Rather, it was funding the proposed plan so that Acis could satisfy all of its creditors' claims—including HCLOF's liquidated claim for specific performance—in exchange for the Trustee's promise to use the doctrine of equitable subrogation to transfer the subordinated notes to Oaktree. There is no principled reason to compare the Break-Up Fee to the amount of money retained by Acis *after* paying off HCLOF's claim, but *before* paying off any other creditor's claim. Highland's unreasonableness argument lacks merit.

## C

Finally, the court considers whether the bankruptcy court abused its discretion by concluding that the Expense Reimbursement was a proper exercise of the Trustee's business judgment.

Expense reimbursements are governed by 11 U.S.C. § 363(b), which incorporates a

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-4    Filed 09/24/23    Page 1067 of 1104    PageID 17201

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 46 of 84    PageID 98039

business judgment standard.  *See ASARCO*, 650 F.3d at 601-03.  Section 363(b) permits a trustee, after notice and a hearing, to use, sell, or lease estate property other than in the ordinary course of business.  *See id.* at 601.  "In such circumstances, 'for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.'"  *Id.* (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)).  "The business judgment standard in section 363 is flexible and encourages discretion."  *Id.*; *see also GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) (Lynn, J.) ("Great judicial deference is given to the Trustee's exercise of business judgment.").

The bankruptcy court acknowledged that "Oaktree has spent significant time and expense related to the [Plan A] Transaction," and that "[i]t is reasonable to anticipate that Oaktree will continue to incur additional significant time and expense."  Second Appeal R. 78.  The bankruptcy court found that the Expense Reimbursement, along with the Break-Up Fee, was an "essential inducement[]" for Oaktree's continuing commitment to the Plan A transaction.  *Id.*  Oaktree's commitment to the proposed transaction was beneficial to the estates for the reasons explained *supra* at § V(A).  Thus the bankruptcy court concluded that "the Trustee has established, in his business judgment, that the Expense Reimbursement is necessary here."  *Id.* at 77.  The bankruptcy court did not abuse its discretion.

Highland's arguments to the contrary are unavailing.  Highland contends that the Trustee lacked any reasonable business justification for allowing the Expense

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-34  Filed 19 Page 2 of 85 Page 1068 of 1104    PageID 17202

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 47 of 84    PageID 98040

Reimbursement because he knew in advance that Plan A was unconfirmable, as evidenced by his proposing Plans B and C at the same time. The court disagrees. If the Trustee knew that Plan A could not be confirmed, then he would have had *no reason* to propose it in the first place—let alone any reason to go through the effort and expense of negotiating with Oaktree. Highland also argues that Oaktree "assume[d] the risk" of losing any money it spent in relation to the Plan A transaction, because Oaktree was experienced enough to know that Plan A could not be approved. Highland Second Appeal Reply 16. But the question is not whether Oaktree assumed any particular risk; the question is whether the Trustee had an "articulated business justification for" the Expense Reimbursement. *ASARCO*, 650 F.3d at 601 (quoting *Cont'l Air Lines*, 780 F.2d at 1226). The bankruptcy court did not abuse its discretion by concluding that he did.

The court therefore affirms the bankruptcy court's order approving the Break-Up Fee and Expense Reimbursement.

## VI

In the Third Appeal, Highland and Neutra contend that the filing of the First Appeal divested the bankruptcy court of subject matter jurisdiction to confirm the Plan.

## A

"It is a fundamental tenet of federal civil procedure that—subject to certain, defined exceptions—the filing of a notice of appeal from the final judgment of a trial court divests the trial court of jurisdiction and confers jurisdiction upon the appellate court." *In re Transtexas Gas Corp.*, 303 F.3d 571, 578-79 (5th Cir. 2002) (citing *Griggs v. Provident*

- 47 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-34    Filed 12/29/23    Page 1069 of 1104    PageID 17203
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 48 of 84    PageID 98041

*Consumer Co.*, 459 U.S. 56, 58 (1982)). "This rule applies with equal force to bankruptcy cases." *Id.* at 579. Thus while an appeal is pending, the bankruptcy court cannot exercise control over "those aspects of the case involved in the appeal." *In re Scopac*, 624 F.3d 274, 280 (5th Cir. 2010) (quoting *Griggs*, 459 U.S. at 58), *modified on denial of reh'g*, 649 F.3d 320 (5th Cir. 2011).

But "the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are not the subject of that appeal." *Transtexas*, 303 F.3d at 580 n.2. The Fifth Circuit "has specifically rejected 'the broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order on appeal.'" *Scopac*, 624 F.3d at 280 (quoting *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 727 (5th Cir. 1991)). Instead, the Fifth Circuit has adopted a "functional test: 'once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process.'" *Id.* (quoting *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007)).

Where courts have held that a bankruptcy court was divested of jurisdiction to enter a subsequent order, it is usually because the subsequent order would have modified, or would have been inconsistent with, an order pending on appeal. *See, e.g., Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court was divested of jurisdiction to supplement plan confirmation order that was then pending on appeal); *Whispering Pines*, 369 B.R. at 760

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 19-14   Filed 10/25/23   Page 1070 of 1104   PageID 17204
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 49 of 84   PageID 98042

(concluding that bankruptcy court could not issue stay relief order that essentially modified confirmed plan while plan confirmation order was pending on appeal); *In re BNP Petroleum Corp.*, 2012 WL 7620694, at *3 (S.D. Tex. Feb. 27, 2012) (observing that bankruptcy court can consider motion to set aside sale agreement, and can deny that motion, but cannot *grant* it while the order approving the sale agreement is pending on appeal); *In re Southold Dev. Corp.*, 129 B.R. 18, 19, 21 (E.D.N.Y. 1991) (invalidating order that modified reorganization plan, where plan confirmation order was already pending on appeal); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 1648725, at *1, *3-6 (Bankr. D.N.J. Apr. 24, 2014) (refusing to consider motion to clarify plan confirmation order that was pending on appeal, because a court "cannot take action that will alter or modify its prior order while that order is pending on appeal"); *In re New Century TRS Holdings, Inc.*, 2012 WL 2064500, at *1-3 (Bankr. D. Del. June 7, 2012) (dismissing motion for sanctions where motion essentially repackaged issues and arguments then pending in appeal of motion for reconsideration); *In re Wallace's Bookstores, Inc.*, 330 B.R. 193, 195 (Bankr. E.D. Ky. 2005) (denying adversary plaintiff's motion to dismiss claims whose resolution was then pending on appeal); *see also Wireless Agents, LLC v. Sony Ericsson Mobile Comms. AB*, 2006 WL 1189687, at *3 (N.D. Tex. May 3, 2006) (Fitzwater, J.) ("Because Wireless has appealed the court's denial of a preliminary injunction, the Federal Circuit has exclusive jurisdiction over the preliminary injunction motion, and this court cannot modify its preliminary findings of fact and conclusions of law during the pendency of the appeal."). Attempting to modify an order pending on appeal, or issuing a subsequent order that is inconsistent with the order being

- 49 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84-19   Filed 05/23/8age 1071 of 1104   PageID 17205
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 50 of 84   PageID 98043

appealed, circumvents the appellate process. *Cf. Scopac*, 624 F.3d at 280 (holding that a bankruptcy court cannot "interfere with or effectively circumvent the appeal process").

B

Neutra identifies three issues on appeal in the First Appeal that supposedly divested the bankruptcy court of jurisdiction to confirm the Plan: (1) whether the bankruptcy court erred by denying the Arbitration Motion; (2) whether the bankruptcy erred by not abstaining under 11 U.S.C. § 305; and (3) whether Terry filed the involuntary petitions in good faith.

The appeal of the bankruptcy court's denial of the Arbitration Motion did not divest the bankruptcy court of jurisdiction to issue further orders.  In *Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011), the Fifth Circuit held that the appeal of an order denying a motion to compel arbitration does not divest a district court of jurisdiction to decide the merits of a case, even though a motion to compel arbitration—if granted—would effectively end the case. *See id.* at 907-10.  The *Weingarten* panel interpreted the divestiture doctrine "narrowly."  *See id.* at 908-09.  It reasoned that, because the denial of a motion to compel arbitration does not, as a matter of law, determine the merits of the case, the merits question is not an "aspect[] of the case involved in the appeal," and the district court may decide it.  *See id.* at 909 (alteration in original) (quoting *Griggs*, 459 U.S. at 58).  The Fifth Circuit rejected the Seventh Circuit's reasoning that the appeal of a motion to compel arbitration—much like the appeal of a motion to dismiss based on double jeopardy, sovereign immunity, or qualified immunity—results in an automatic stay of the proceedings below because "the appeal is to determine whether the matter should be litigated in the district court

- 50 -

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 84 Filed 09/25/23 Page 1072 of 1104 PageID 17206
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 51 of 84 PageID 98044

at all." *Id.* at 908 (citing *Bradford-Scott Data Corp. v. Physician Comput. Network*, 128 F.3d 504, 505-06 (7th Cir. 1997)). Under *Weingarten*, because the bankruptcy court's ruling on the Arbitration Motion is separate from the merits of Plan confirmation, the appeal of that prior ruling did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The reasoning of *Weingarten* applies with full force to the § 305 abstention issue. Highland and Neutra have not shown that there is any overlap, as a matter of law, between the bankruptcy court's decision to confirm the Plan and its decision not to abstain from ruling on the involuntary petitions. Thus even though the bankruptcy court's abstention decision "determine[d] whether the matter should be litigated in the [bankruptcy] court at all," *id.* at 908, the appeal of that decision did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The issue of Terry's good faith in filing the involuntary petitions presents a closer question. For the bankruptcy court to confirm a plan, it must find, *inter alia*, that the plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Eleventh Circuit has held that where an involuntary petition is filed in bad faith, any subsequently-proposed reorganization plan is *necessarily* proposed in bad faith and cannot be confirmed. *See In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *but see In re Landing Assocs., Ltd.*, 157 B.R. 791, 812 (Bankr. W.D. Tex. 1993) ("Bank United relies on the legal standard established in several bad-faith filing cases for this proposition. However, a different legal standard is employed when evaluating good faith for plan confirmation purposes under [11 U.S.C.] § 1129(a)(3)." (citations omitted)). Under the

- 51 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 19    Filed Page 253 of 85    Page 1073 of 1104    PageID 17207

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 52 of 84    PageID 98045

Eleventh Circuit's rule, the bankruptcy court's ruling that Terry filed the involuntary petitions in good faith has some bearing on its decision to confirm the Plan.

But even assuming that the Eleventh Circuit's rule applies, the court is not convinced that, under these circumstances, the First Appeal divested the bankruptcy court of jurisdiction to confirm the Plan. In issuing the confirmation order, the bankruptcy court did not directly exercise jurisdiction over the question of Terry's good faith in filing the involuntary petitions—it did not revisit, comment upon, or supplement its earlier decision. *See In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016) ("[A] confirmation order does not 'tamper' with prior rulings in the case; rather, to state the obvious, it confirms a plan of reorganization."); *cf. Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court lacked jurisdiction to supplement plan confirmation order that was then pending on appeal); *Southold Dev. Corp.*, 129 B.R. at 18, 21 (vacating order that modified reorganization plan that was pending on appeal); *710 Long Ridge, II, LLC*, 2014 WL 1648725, at *1, *3-6 (refusing to consider motion to clarify plan confirmation order that was pending on appeal). Nor did the bankruptcy court issue any order that was inconsistent with, or that implicitly modified, its previous ruling. *Cf. Whispering Pines*, 369 B.R. at 760 (concluding that bankruptcy court could not issue stay relief order that was inconsistent with confirmed plan while plan confirmation order was pending on appeal). Instead, the bankruptcy court proceeded in accordance with that ruling. It was entitled to do so—just as it was entitled to carry out the confirmed Plan in the absence of a stay order, even while the Plan confirmation order was pending on appeal. *See In re Prudential Lines, Inc.*, 170 B.R. 222, 243-44

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-1 Filed 05/23/23 Page 53 of 85   PageID 17208
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 53 of 84   PageID 98046

(S.D.N.Y. 1994). If the bankruptcy court had instead *denied* plan confirmation on the ground that Terry filed the involuntary petitions in *bad faith*, the divestiture analysis might be different. *Cf. BNP Petroleum*, 2012 WL 7620694, at *3 (observing that bankruptcy court can deny motion to set aside sale agreement, but cannot grant it while the order approving the sale agreement is pending on appeal). As it is, however, the bankruptcy court's Plan confirmation order did not in any way interfere with, or circumvent, this court's consideration of the First Appeal.

Moreover, to conclude that Neutra's appeal of the orders for relief divested the bankruptcy court of jurisdiction to confirm the Plan would be to hold that whenever an order for relief is entered, any disappointed litigant—even a litigant who *lacks standing to appeal*—can bring the bankruptcy case grinding to a halt. But the divestiture doctrine is not intended to "cede control of the conduct of a chapter 11 case to disappointed litigants. This cannot be, and is not, the law." *Sabine*, 548 B.R. at 680. And such a decision would be contrary to Fifth Circuit precedent indicating that "a narrow interpretation [of divestiture doctrine] is normally appropriate." *See Weingarten*, 661 F.3d at 908. The court thus concludes that the First Appeal did not divest the bankruptcy court of jurisdiction to confirm the Plan.

## VII

The court now turns to the contention of HCLOF (joined by Highland and Neutra) in the Third Appeal that the bankruptcy court erred by confirming the Plan because the Temporary Injunction—a crucial part of the Plan—is unlawful.

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-19 Page 523 of 85 Page 1075 of 1104   PageID 17209
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 54 of 84   PageID 98047

A

The bankruptcy court had authority to enter the Temporary Injunction under 11 U.S.C.

§§ 105(a) and 1123(b)(6), and had jurisdiction to do so under 28 U.S.C. § 157(b)(2)(L).

Section 157(b)(2)(L) grants the bankruptcy court jurisdiction to enter final orders concerning

the confirmation of plans.[30]  Section 1123(b)(6) gives bankruptcy courts residual authority

to include in a plan "any other appropriate provision not inconsistent with the applicable

provisions of this title."  11 U.S.C. § 1126(b)(6).  The bankruptcy court can exercise its

residual authority via § 105(a), which provides that "[t]he court may issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).

Section 105(a) permits a bankruptcy court "to fashion such orders as are necessary to

further the substantive provisions of the Bankruptcy Code."  *In re Sadkin*, 36 F.3d 473, 478

(5th Cir. 1994) (per curiam) (quoting *In re Oxford Mgmt. Inc.*, 4 F.3d 1329, 1333 (5th Cir.

1993)).  But the bankruptcy court's § 105(a) powers are not unlimited: the statute "does not

authorize the bankruptcy courts to create substantive rights that are otherwise unavailable

---

[30]To the extent that a temporary plan injunction restrains a third-party *lawsuit*, the bankruptcy court must have statutory "related to" jurisdiction over that lawsuit per 28 U.S.C. § 157(a).  *See In re Seatco, Inc.*, 257 B.R. 469, 475-76 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.).  For the reasons discussed *infra* at note 34, the bankruptcy court has statutory "related to" jurisdiction over all lawsuits potentially restrained by the Temporary Injunction.  For the reasons discussed *infra* at § VII(B), the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), does not affect the bankruptcy court's statutory jurisdiction to issue a temporary plan injunction.

- 54 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19    Filed 05/23 Page 1076 of 1104    PageID 17210

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 55 of 84    PageID 98048

under applicable law, or constitute a roving commission to do equity." *Id.* (quoting *Oxford Mgmt.*, 4 F.3d at 1333). The Trustee[31] contends that the bankruptcy court's § 105(a) powers are broad enough to allow it to temporarily enjoin a non-debtor, non-creditor entity—HCLOF—from attempting to assert certain contractual rights, at least where such an injunction is necessary to the debtors' successful reorganization.[32]

Fifth Circuit precedent indicates that § 105(a) *does*, under some circumstances, permit a bankruptcy court to enjoin a non-debtor, non-creditor entity from taking particular actions. *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), involved a challenge to a § 105(a) injunction that prohibited certain nonparties from filing lawsuits against certain other nonparties. *See id.* at 750-51. The Fifth Circuit—citing 11 U.S.C. § 524, which forbids the discharge of the debts of nondebtors—invalidated the injunction insofar as it constituted a *permanent* release of the nonparties' claims. *See id.* at 760-61. But the court noted that "[t]he impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions." *Id.* at 761. The court provided a non-exhaustive list of "unusual circumstances" that might justify such an injunction: "1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to

---

[31]On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal, arguing that once the Plan took effect, Acis became the Trustee's successor-in-interest. The court addresses this motion *infra* at § XI.

[32]The court expresses no opinion on the question whether the Equity PMA or any other contract presently entitles HCLOF to demand an optional redemption of the CLOs.

- 55 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-84   Filed 10/25/23   Page 1077 of 1104   PageID 17211
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 56 of 84   PageID 98049

accomplish reorganization." *Id.* Bankruptcy judges in this district have approved temporary injunctions under *Zale* multiple times. *See In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 117 (Bankr. N.D. Tex. 2002) (Hale, J.); *In re Seatco, Inc.*, 257 B.R. 469, 476-78 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 749-53 (Bankr. N.D. Tex. 2015) (Houser, J.) (applying *Zale* unusual-circumstances test and declining to issue injunction). As discussed below, the second unusual circumstance described in *Zale* is present here.[33]

The court recognizes that the bankruptcy court did not rely on this rationale. Instead, it based the Temporary Injunction on its ostensible authority over the Trustee Adversary. The bankruptcy court described the Trustee Adversary as "a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan." *Acis II*, 2019 WL 417149, at *8. It conducted its four-prong preliminary-injunction analysis in the context of, and based on the likelihood of success of, the Trustee Adversary. *See id.* at *10-12. This court, of course, can affirm the bankruptcy court on alternative grounds. *See, e.g., Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1011 (N.D. Tex. 1987)

---

[33]The *Zale* panel ultimately vacated the temporary injunction because it was not issued after an adversary proceeding, as required at the time by Rule 7001(7). *See Zale*, 62 F.3d at 764-65. But Rule 7001(7) was amended in 1999 so that it does not apply where, as here, "a . . . chapter 11 . . . plan provides for the [injunctive] relief." Rule 7001(7); *see* Rule 7001 advisory committee's note (1999 amendments). And HCLOF, unlike the objectors in *Zale*, had a full and fair opportunity to present its objections to the bankruptcy court. *Cf. Zale*, 62 F.3d at 763-64.

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 19Filed 06/23/3 Page 58 of 85 Page 1078 of 1104    PageID 17212

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 57 of 84    PageID 98050

(Fitzwater, J.) ("[T]his court may affirm a correct judgment for reasons not given by the court below or advanced to it."). But here, the bankruptcy court's rationale is significant because "[i]f the bankruptcy court does not determine that unusual circumstances exist, the court may not enter an injunction of the third-party actions." *Zale*, 62 F.3d at 761.

The bankruptcy court's factual findings are nonetheless sufficient to satisfy the "unusual circumstances" requirement. The bankruptcy court expressly found that the Temporary Injunction is a "critical component of the Plan," *Acis II*, 2019 WL 417149, at *10, and that "[t]he Temporary Plan Injunction is essential to [Acis'] ability to perform the Plan," *In re Acis Capital Mgmt., L.P.*, 2019 WL 406137, at *14 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.). HCLOF has twice demanded that Acis effect an optional redemption of the CLOs, and its directors testified that it will do so again if given the chance. *See Acis II*, 2019 WL 417149, at *10. The bankruptcy court found that an optional redemption would be an economically "[ir]rational" transaction that would serve as the last step in Highland's "intentional scheme to keep assets away from Mr. Terry as a creditor." *Id.* at *12. It further found that if HCLOF succeeds in forcing an optional redemption, Acis "[will] have no going concern value," and "Terry will be precluded from reorganizing the business and paying creditors" in accordance with the Plan. *Id.* at *10. Thus the Temporary Injunction enjoins third-party conduct that would adversely impact the ability of Acis to reorganize. These are unusual circumstances that justify the bankruptcy court's Temporary Injunction. *Cf. Zale*, 62 F.3d at 762 ("We hold that [the bankruptcy court's] language satisfies the 'unusual circumstances' requirement because it clearly identifies the settlement as providing

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84   Filed 10/29/23   Page 1079 of 1104   PageID 17213

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 58 of 84   PageID 98051

'substantial consideration' to the estate and constituting part of a 'key provision' of the plan.").[34]

## B

HCLOF argues that the Trustee cannot invoke § 105(a) to support an injunction that is prohibited under *Stern v. Marshall*, 564 U.S. 462 (2011).  In *Stern* the Supreme Court concluded that certain claims and controversies must, as a constitutional matter, be resolved by an Article III court, even if they are statutorily committed to the jurisdiction of the bankruptcy court.  *See id.* at 482.  HCLOF contends that the Trustee Adversary, which "is

---

[34]The Fifth Circuit's recent decision in *SEC v. Stanford International Bank, Ltd.*, 927 F.3d 830, ___, 2019 WL 2496901, at *5-7 (5th Cir. June 17, 2019), is not to the contrary. The *Stanford* panel interpreted *Zale*'s discussion of certain limits on a bankruptcy court's statutory "related to" jurisdiction to be a broad "maxim of law" that applies to all receiverships, regardless of the statutory basis of jurisdiction.  *See id.* at ___, 2019 WL 2496901, at *6.  *Zale* and *Stanford* thus stand for the proposition that a court overseeing a receivership lacks jurisdiction to enjoin third-party lawsuits whose resolution would have no effect on the *res* of the estate.  *See id.* at ___, 2019 WL 2496901, at *7 (stating that courts lack jurisdiction "to permanently bar and extinguish independent, non-derivative third-party claims that do not affect the *res* of the receivership estate"); *Zale*, 62 F.3d at 752 ("Those cases in which courts have upheld 'related to' jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate." (footnotes omitted)); *see also In re FoodServiceWarehouse.com, LLC*, 601 B.R. 396, ___, 2019 WL 1877006, at *10 (E.D. La. Apr. 26, 2019) ("If the outcome of a proceeding could conceivably have *any effect* on the estate being administered in bankruptcy, then 'related to' jurisdiction will generally exist." (citing *Zale*, 62 F.3d at 755)).  The Temporary Injunction, however, enjoins certain acts that *would* affect the *res* of the bankruptcy estate.  The bankruptcy court found that after an optional redemption, Acis "would have no going-concern value" because it would no longer receive any management fees with which to pay creditors.  *Acis II*, 2019 WL 417149, at *10. Thus the equitable principles endorsed by *Stanford* do not prevent the bankruptcy court from issuing the Temporary Injunction pursuant to § 157(b)(2)(L)'s conferral of subject matter jurisdiction.

- 58 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-84   Filed 02/23/26   Page 603 of 85   Page 1080 of 1104   PageID 17214
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 59 of 84   PageID 98052

essentially a multi-faceted fraudulent transfer action," *Acis II*, 2019 WL 417149, at *8, involves such a claim. Thus, according to HCLOF, the bankruptcy court lacks authority to grant final relief in the Trustee Adversary, and where a court lacks the power to grant a litigant *final* relief, it cannot grant *preliminary* relief. *See* HCLOF Third Appeal Br. 22 (citing *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561-62 (5th Cir. 1987)). HCLOF maintains that, because *Stern* prohibits the bankruptcy court from issuing the Temporary Injunction in the context of the Trustee Adversary, the bankruptcy court cannot issue the Temporary Injunction as part of the confirmed Plan.

Assuming *arguendo* that a fraudulent transfer claim brought by a bankruptcy trustee against a non-creditor is a *Stern* claim—i.e., "a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter," *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 30-31 (2014)—the court disagrees with HCLOF's contention. Whatever the precise contours of *Stern*, it only concerns the power of a bankruptcy court to enter a "final judgment" on certain causes of action. *See Stern*, 564 U.S. at 503 ("The Bankruptcy Court below lacked the constitutional authority to enter a *final judgment* on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." (emphasis added)). When the bankruptcy court exercises powers that are *independent of* its authority to enter a final judgment on a claim—e.g., when it makes use of its authority under § 105(a) to issue a temporary plan injunction—*Stern* simply does not apply. *See, e.g., In re Yellowstone Mountain Club, LLC*, 646 Fed. Appx. 558, 558-59 (9th Cir. 2016) (per curiam) (holding that

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19    Filed 06/23 of 85 Page 1081 of 1104    PageID 17215

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 60 of 84    PageID 98053

*Stern* did not apply because "the bankruptcy court issued a preliminary injunction [pursuant to § 105(a)], not a final judgment"); *In re Quigley Co.*, 676 F.3d 45, 52 (2d Cir. 2012) ("[A]t issue here [is] the stay of litigation during the pendency of [debtor's] bankruptcy, rather than the entry of final judgment on a common law claim.").

This conclusion is consistent with the Article III concerns underlying *Stern*. According to *Stern*, Article III creates an independent judiciary by guaranteeing federal judges life tenure and an irreducible salary. *See Stern*, 564 U.S. at 483-84. But "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Id.* at 484. Thus, as a general rule, "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty,'" and place that matter within the authority of an Article I bankruptcy court. *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)).

The Temporary Injunction does not "withdraw from judicial cognizance any matter" of any kind whatsoever. *Id.* (quoting *Murray's Lessee*, 59 U.S. (18 How.) at 284). Instead, it *temporarily* enjoins a number of parties and non-parties from taking any action—including, presumably, pursuing a lawsuit—in furtherance of an optional redemption or liquidation of the Acis CLOs. To the extent that the Temporary Injunction affects any legal claims, it does not prevent an Article III court from entering a final judgment on those claims after the Temporary Injunction is lifted. In other words, it has no *res judicata* effect on those claims.

- 60 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19-34 Filed 12/23 Page 1082 of 1104    PageID 17216
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 61 of 84    PageID 98054

*Cf.* 43A C.J.S. *Injunctions* § 378 (2019) ("A temporary or preliminary injunction does not adjudicate the ultimate rights in controversy and it is not conclusive on the court on a subsequent hearing."). In this respect, the Temporary Injunction is similar to other mine-run, temporary bankruptcy injunctions—including the automatic stay, a hallmark of bankruptcy law that bars creditors from commencing or continuing any judicial action to recover a debt from the debtor after a bankruptcy petition is filed. *See* 11 U.S.C. § 362(a); *see also In re Quigley*, 676 F.3d at 52 ("Enjoining litigation to protect bankruptcy estates during the pendency of bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts."). Thus even if *Stern* prevents the bankruptcy court from entering a final judgment in the Trustee Adversary, it has no bearing on whether the bankruptcy court can issue the Temporary Injunction as part of the confirmed Plan.[35]

## C

When a bankruptcy court issues a temporary injunction under § 105(a) as part of a confirmed plan, the bankruptcy court must still consider the four-prong preliminary injunction test. *See, e.g., Seatco*, 257 B.R. at 477 (applying traditional preliminary-injunction factors in approving a temporary plan injunction under *Zale*). The factors are (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury

---

[35]The present appeal does not involve, and the court does not address, the propriety of a plan provision that finally adjudicates a *Stern* claim. Nor does the court decide whether a bankruptcy court can grant preliminary relief on a *Stern* claim outside the context of a plan confirmation order.

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84-19   Filed 10/26/23   Page 1083 of 1104   PageID 17217

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 62 of 84   PageID 98055

if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *See, e.g., Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

The first factor, when applied to a temporary plan injunction, turns on whether the reorganization plan is likely to succeed. *See Seatco*, 257 B.R. at 477. In support of the Temporary Injunction, the bankruptcy court evaluated the likelihood of success of the Trustee Adversary, not the likelihood of success of the Plan. *See Acis II*, 2019 WL 417149, at *11-12. But the bankruptcy court separately determined that the Plan is feasible, *see id.* at *14, and its factual findings in that context support the conclusion that the Plan is substantially likely to succeed. The bankruptcy court found that Terry has an excellent track record as a portfolio manager; that Terry will be able to generate new business for Acis; and that Brigade is qualified to serve as the sub-advisor to Acis. *See id.* Thus in the absence of an optional redemption, it is substantially likely that the reorganized Acis will be able to satisfy its creditors' claims and emerge from bankruptcy.

The bankruptcy court did not clearly err in finding that, without the Temporary Injunction, Acis faces a substantial threat of irreparable injury: specifically, "evisceration of the Acis CLOs, by parties with unclean hands." *Id.* at *10. The bankruptcy court found that an optional redemption would leave Acis with nothing to manage, and thus no going-concern value and no means of satisfying its creditors' claims. *See id.* Highland and Neutra argue that Acis has an adequate remedy at law because all it stands to lose is money—i.e., the

- 62 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84-19   Filed 06/23/23   Page 1084 of 1104   PageID 17218
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 63 of 84   PageID 98056

management fees generated by the PMAs—and it can recover that money via a final judgment in the Trustee Adversary. But there is more at stake here than money. Without the Temporary Injunction, Acis will have no opportunity to *reorganize* instead of *liquidate*—and, "[a]s the Code contemplates, the Debtor should be given the opportunity to successfully reorganize." *Seatco*, 257 B.R. at 477. To deny Acis the chance to reorganize would be to subject it to a substantial threat of irreparable injury.

The bankruptcy court likewise did not clearly err in finding that the risk of harm to Acis in the absence of an injunction outweighs any potential harm to HCLOF. Indeed, the bankruptcy court found that there *is* no potential harm to HCLOF because "a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan." *Acis II*, 2019 WL 417149, at *12. The Plan allows for just such a reset.[36] Thus HCLOF's complaint that it is losing money on the CLOs as they are currently structured lacks force.

Finally, the bankruptcy court did not clearly err in finding that the public interest favors an injunction. The public has an interest in allowing businesses to reorganize instead of liquidate. And, more important, there is a strong public interest *against* "allowing potential wrongdoers to complete the last step in what appears likely to have been a scheme

---

[36]HCLOF contends that a reset is impossible under the terms of an offering memorandum that it issued in November 2017—i.e., within a month after Terry's arbitration award was issued—but the bankruptcy court did not find this contention to be credible, and this court will not disturb the bankruptcy court's credibility findings in the absence of clear error.

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 84 Filed 10/23/23 Page 1085 of 1104 PageID 17219
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 64 of 84 PageID 98057

to strip [Acis] of its assets, steal its business, and leave it unable to pay creditors." *Id.* The

bankruptcy court therefore did not err by concluding that the four-part preliminary injunction

test supports the Temporary Injunction.

## VIII

Highland and Neutra argue that the Trustee proposed the Plan in bad faith, contrary

to 11 U.S.C. § 1129(a)(3).

## A

The first contention that Highland and Neutra advance is that Terry filed the

involuntary petitions in bad faith per 11 U.S.C. § 303(i)(2), and, as a result, any

subsequently-proposed plan was necessarily proposed in bad faith. Highland and Neutra

base their argument on *Natural Land Corp.*, 825 F.2d 296, in which the Eleventh Circuit held

that "the taint of a petition filed in bad faith must naturally extend to any subsequent

reorganization proposal." *Id.* at 298. It is not clear that this rule applies in the Fifth Circuit,

and at least one bankruptcy court has declined to apply it. *See Landing Assocs.*, 157 B.R. at

812. But assuming *arguendo* that *Natural Land Corp.* does apply, Highland and Neutra have

nonetheless failed to establish that Terry filed the involuntary petitions in bad faith.

## 1

The first question the court must resolve is what standard of review to apply. In their

briefing in the First Appeal, Neutra and Terry agreed that the question whether Terry filed

the involuntary petitions in good faith is a factual determination governed by the clear error

standard. At oral argument, however, Neutra challenged whether this is the correct standard

- 64 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 13-84  Filed 09/23/85  Page 1086 of 1104    PageID 17220

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 65 of 84    PageID 98058

of review.  But case law supports applying the clear error standard to the question of the

petitioner's good faith.  *See, e.g., In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 245 (B.A.P.

9th Cir. 2007) ("The bankruptcy court's finding of the absence of bad faith is reviewed under

the clearly erroneous standard."); *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 269

(E.D. Tex. 2016) ("The Court reviews the Bankruptcy Court's determination of bad faith for

clear error as a finding of fact."); *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R.

768, 785 (E.D. Pa. 2014) ("'Proving an involuntary petition was filed in bad faith requires

an inquiry into the creditor's knowledge,' a factual question that is reviewed for clear error."

(quoting *In re Bock Transp., Inc.*, 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005))), *aff'd sub nom.*

*In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).  Moreover, Fifth

Circuit case law provides that, post-filing, "[a] bankruptcy court's determination that a debtor

has acted in bad faith is a finding of fact reviewed for clear error."  *In re Jacobsen*, 609 F.3d

647, 652 (5th Cir. 2010).  The parties do not cite any cases suggesting that *de novo* review

would apply; nor would it make sense to conduct a *de novo* review of what is, in large part,

a question of the petitioner's intentions.  The court will therefore apply the clear error

standard.[37]

---

[37]There is some case law suggesting that, where a bankruptcy court dismisses an involuntary petition on the ground that the petitioner filed it in bad faith, the *dismissal* is reviewed for abuse of discretion.  *See, e.g., Forever Green*, 804 F.3d at 335.  But even then, the bankruptcy court's finding that the petitioner acted in bad faith is reviewed for clear error.  *See In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007); *see also Jacobsen*, 609 F.3d at 652 (observing that "[a] bankruptcy court's determination that a debtor has acted in bad faith is a finding of fact reviewed for clear error," even while "[t]he decision to convert a Chapter 13 case to Chapter 7" on that ground "is reviewed for abuse of discretion").

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19    Filed 06/23 Page 1087 of 1104    PageID 17221
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 66 of 84    PageID 98059

2

The court next considers what legal test governs a determination of bad faith.  This

is not a clear-cut or easy question: courts have developed a "dizzying array of standards" that

can be applied to the issue.  *Forever Green*, 804 F.3d at 335.  Some of these tests include:

> (1) the "improper use" test, which finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum[;]

> (2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition. Cases under this line of reasoning have emphasized that the petition was motivated by ill will, malice or for the purpose of harassing the debtor[;]

> (3) the "objective test," which essentially asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;

> (4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing; and

> (5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).[38]

---

[38]The "combined test" is often guided by principles from Rule 9011, which mirrors Fed. R. Civ. P. 11.  *See In re Landmark Distribs., Inc.*, 189 B.R. 290, 310 n.24 (Bankr. D.N.J. 1995).  The Second and Eleventh Circuits have likewise observed that "a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011."  *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 106 (2d Cir. 2000) (citing *Gen. Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997)).

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 3-84    Filed 05/23/... Page 67 of 85    Page 1088 of 1104    PageID 17222

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 67 of 84    PageID 98060

*In re Landmark Distribs., Inc.*, 189 B.R. 290, 309-10 (Bankr. D.N.J. 1995) (citations and footnotes omitted).  Courts have also applied a "totality of circumstances" test, which essentially combines the improper use, improper purpose, and objective tests.  *See, e.g., Forever Green*, 804 F.3d at 336 (citing *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 255 n.2 (6th Cir. 2006)).  This test has been used by at least one bankruptcy court in this circuit.  *See In re TRED Holdings, L.P.*, 2010 WL 3516171, at *7 (Bankr. E.D. Tex. Sept. 3, 2010).

The Fifth Circuit has not expressly endorsed any particular standard, but it has considered both objective and subjective factors in deciding whether an involuntary petition was filed in bad faith.  *See In re Sims*, 994 F.2d 210, 222 (5th Cir. 1993) (considering whether "the filing of the petitions was 'motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor[s],'" and whether petitioners "conducted a reasonable inquiry into the facts and the law prior to filing the petitions, as required by Bankruptcy Rule 9011" (alteration in original) (quoting *In re W. Side Cmty. Hosp., Inc.*, 112 B.R. 243, 258 (Bankr. N.D. Ill. 1990))).  Any test that considers *only* subjective or objective factors thus cannot be correct.  The court will therefore apply a totality of circumstances or combined test in analyzing Terry's good faith.

3

Applying the above principles, the court concludes that the bankruptcy court did not clearly err by holding that Terry filed the involuntary petitions in good faith.

On the question of Terry's alleged bad faith, the bankruptcy court found:

- 67 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 19 Exhibit 19 Page 69 of 85 Page 1089 of 1104    PageID 17223

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 68 of 84    PageID 98061

> the evidence suggested that Mr. Terry and his counsel filed the
> Involuntary Petitions out of a legitimate concern that Highland
> was dismantling and denuding Acis LP of all of its assets and
> value and that a bankruptcy filing was the most effective and
> efficient way to preserve value for the Acis LP creditors.

*Acis I*, 584 B.R. at 144. This finding is not clearly erroneous. The record before the

bankruptcy court showed that Acis and Highland had engaged in numerous transactions that

stripped Acis of much of its value, and that Terry only filed the involuntary petitions after

learning about these transactions during post-judgment discovery. *See supra* § I(C). Terry

testified that he believed bankruptcy was the best way to stop Acis from making further

fraudulent transfers, so that the entire community of Acis' creditors could receive an

equitable distribution of assets. The bankruptcy court was entitled to credit this testimony.

Terry also took the objectively reasonable step of consulting with bankruptcy counsel, albeit

briefly, before making the filing. He reasonably believed that Acis had fewer than 12

creditors based on a net-worth affidavit he received during post-judgment discovery in the

44th Judicial District Court of Dallas County. As for whether Acis was paying its debts as

they came due, Terry was aware of a number of accruing debts that Acis owed—including

his own judgment against Acis. He also reasonably concluded that if Acis were stripped of

its assets, then *no* creditor would be paid. The bankruptcy court did not clearly err by finding

that Terry filed the petitions based on a legitimate, good-faith belief that Acis was

fraudulently transferring assets to the detriment of all creditors.

Terry's motive, as characterized by the bankruptcy court, is a proper bankruptcy

purpose. The Third Circuit, in a case relied upon by Neutra, describes "protect[ing] against

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-1 Filed Exhibit 19 Page 9703 of 85 Page 1090 of 1104   PageID 17224
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 69 of 84   PageID 98062

the preferential treatment of other creditors or the dissipation of the debtor's assets" as legitimate purposes of an involuntary petition. *Forever Green*, 804 F.3d at 335. An additional "purpose of an involuntary procedure is to provide a method for creditors to protect their rights against debtors who are not meeting their debts" by "forc[ing] [them] to submit to the jurisdiction of the bankruptcy court." *In re All Media Props., Inc.*, 5 B.R. 126, 137 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. Unit A May 1981) (adopting opinion of bankruptcy court). The bankruptcy court's characterization of Terry's "concern that Highland was dismantling and denuding Acis LP of all of its assets and value," to the detriment of all of Acis' creditors, fits comfortably into the bankruptcy purposes described above. *See Acis I*, 584 B.R. at 144.

Neutra argues that the timing of Terry's petitions reveals that he was not actually concerned about fraudulent asset transfers. Neutra points out that Terry filed the involuntary petitions mere hours before a scheduled temporary injunction hearing in Texas state court, and following a single meeting with bankruptcy counsel. According to Neutra, Terry's real motive was to collect his judgment in a more favorable forum. But Neutra's argument constitutes, at best, a plausible alternative view of the evidence. On appellate review, this court may not substitute its own interpretation of the evidence for that of the bankruptcy court in the absence of clear error. *See Johnson Sw.*, 205 B.R. at 827. Because the bankruptcy court did not commit clear error, its pertinent factual findings must be affirmed. *See id.*

Neutra cites a number of cases for the proposition that when an involuntary petition

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-4    Filed 09/27/23    Page 1091 of 1104    PageID 17225
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 70 of 84    PageID 98063

is filed as a collection remedy in what is essentially a two-party dispute, the petition is necessarily filed in bad faith. But Neutra's cases are distinguishable.

In *In re Smith*, 243 B.R. 169 (Bankr. N.D. Ga. 1999), the court found bad faith using a combined subjective and objective test where: (1) the petitioning creditor based its petition on the claim that the alleged debtor was fraudulently transferring assets, but had no evidence of any such transfers; (2) the case involved essentially a two-party dispute, and the petitioning creditor had sufficient remedies under state law; (3) the evidence showed that the petitioning creditor was motivated by a desire to shut down the debtor's business operations and to have the debtor criminally prosecuted; (4) the petitioning creditor failed to conduct critical research before filing its petition; and (5) the petitioning creditor failed to disclose the existence of additional creditors. *See id.* at 195-201. Here, by contrast, there *is* evidence that Highland was denuding Acis of assets; the bankruptcy court found that this is not a two-party dispute and that Terry's remedies under state law were insufficient; Terry conducted sufficient research before filing; and the bankruptcy court did not find that Terry was motivated by ill will or malice toward the debtor.

In *In re Frailey*, 144 B.R. 972 (Bankr. W.D. Pa. 1992), the court stated that "[a] bankruptcy court should refuse to enter an order for relief where petitioning creditors can go into state court to satisfy a debt." *Id.* at 977-78. But the cases cited by the *Frailey* court indicate that it did not make this statement in the context of a bad-faith filing analysis. *See id.* (citing *In re Cent. Hobron Assocs.*, 41 B.R. 444, 451 (D. Haw. 1984) (applying balancing test to exclude unpaid debt from "not generally paying" determination); *In re Kass*, 114 B.R.

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-1 Filed 02/27/23 Page 1092 of 1104   PageID 17226
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 71 of 84   PageID 98064

308, 309 (Bankr. S.D. Fla. 1990) (conducting abstention analysis under 11 U.S.C. § 305)).

Indeed, the court in *Frailey* declined (on other grounds) to award the alleged debtor damages

under § 303(i). *See id.* at 978.  The case is therefore inapposite.[39]

*In re Tichy Elec. Co.*, 332 B.R. 364 (Bankr. N.D. Iowa 2005), states: "[t]he power of

an involuntary petition must be exercised for the good of the entire creditor body and for

legitimate bankruptcy purposes.  It is not intended to be used in an exclusively self-serving

manner as a collection device."  *Id.* at 376.  But in the present case, the bankruptcy court

found that Terry acted out of concern for the entire body of Acis' creditors.  And the

petitioning creditors in *Tichy* did not actually intend to liquidate or reorganize the debtor.

Rather, "[t]hey understood that after filing, some negotiations would occur, payments would

be made, and the case dismissed."  *Id.*  In other words, the petitioning creditor intended to

use the threat of bankruptcy as leverage to negotiate a settlement with the debtor.  That does

not appear to be the case here.  Finally, unlike the present appeals, there is no indication in

*Tichy* that the alleged debtor was fraudulently transferring assets in order to frustrate

collection efforts.  *See generally id.*

---

[39]Similarly, *In re Tarletz*, 27 B.R. 787 (Bankr. D. Colo. 1983), states that "it is obvious
that the use of the bankruptcy court as a routine collection device would quickly paralyze this
Court."  *Id.* at 794.  But this was in the context of 11 U.S.C. § 305 abstention, *not* a bad-faith
filing analysis.  *See id.* at 793.  And *In re Spade*, 258 B.R. 221 (Bankr. D. Colo. 2001), holds
that where a petitioning creditor seeks only to gain a litigation advantage over the debtor, and
does not seek the orderly distribution of the debtor's assets to all creditors, § 305 abstention
is appropriate.  *See id.* at 233.  Not only does *Spade* not involve a § 303(i) bad-faith analysis,
it is also factually inapposite: the bankruptcy court here found that Terry *was* motivated by
concern for all of Acis' creditors.

- 71 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 84-19    Filed 02/27/23    Page 1093 of 1104    PageID 17227
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 72 of 84    PageID 98065

In sum, because the bankruptcy court did not commit clear error in determining that Terry filed the involuntary petitions in good faith, its relevant findings on this issue must be affirmed.  Neutra and Highland's argument that the proposed Plan was tainted by Terry's bad-faith filing therefore fails to establish that the bankruptcy court committed reversible error.

B

Highland and Neutra maintain that the Plan fails to satisfy § 1129(a)(3) because it effects an unlawful result: allowing a portfolio manager to veto the wishes of the portfolio's owner.  They cite *In re Noll*, 172 B.R. 122 (Bankr. M.D. Fla. 1994), for the premise that a reorganization plan cannot be proposed in order to obtain a result that would be unobtainable in state court.  Highland and Neutra's reliance on *Noll* is misplaced.  *Noll* is, by its own terms, of limited instructive value—it states that "one cannot define [bad faith] but will readily recognize it when one sees it."  *Id.* at 124.  The case is factually distinguishable because it involves a proposed plan that, in essence, would have constituted self-dealing by the plan proponent (who was not a disinterested trustee).  *See id.*  And it is difficult to square Highland and Neutra's characterization of the holding of *Noll*—that a reorganization plan cannot be used to obtain results that are unobtainable in state court—with Neutra's argument in the bad-faith filing context that filing involuntary petitions is *only* appropriate when the petitioner lacks adequate remedies in state court.

Highland and Neutra argue that the Plan is unlawful because it contains an overbroad release.  They complain about language "vesting assets in the reorganized debtor 'free and

- 72 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-84   Filed 12/27/23   Page 1094 of 1104   PageID 17228
Exhibit 19 Page 74 of 85

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 73 of 84   PageID 98066

clear of all right, title, interests, claims, liens, encumbrances and charges'; purporting to compromise all claims against the estates; preserving estates' right of setoff and recoupment; and enjoining the 'continuation' of lawsuits against the debtors." Highland & Neutra Third Appeal Br. 30. But this language merely effects the express terms of 11 U.S.C. §§ 524(a) and 1141(c). *See* 11 U.S.C. § 524(a) ("A discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor[.]"); 11 U.S.C. § 1141(c) ("[A]fter confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."); *see also In re Coho Res., Inc.*, 345 F.3d 338, 343 (5th Cir. 2003) ("11 U.S.C. § 524(a) operates as an injunction against actions against a debtor subsequent to a discharge of a debt. The bankruptcy discharge and § 524 injunction serve to give the debtor a financial fresh start." (internal quotation marks, emphasis, and footnote omitted)). The challenged language does not render the Plan unlawful.[40] Highland and Neutra have failed to demonstrate reversible error much less any error.

IX

The court now considers the argument of Highland and Neutra that the Plan fails to meet the requirements of 11 U.S.C. § 1129(a)(5).

---

[40]Highland and Neutra also cite several cases for the proposition that a plan is proposed in bad faith when it seeks merely to delay or frustrate the efforts of a secured creditor. But Highland and Neutra are not secured creditors.

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 84-19 Page 23 of 85  age 1095 of 1104   PageID 17229

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 74 of 84   PageID 98067

A

Section 1129(a)(5) provides that a plan may only be confirmed if:

> (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

> (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

*Id.* Neutra and Highland contend that the Plan is deficient because Terry is actually a non-statutory insider, and because Terry's ownership of Acis is not in the best interests of creditors, Acis' investors, or public policy.[41]

B

The court affirms the bankruptcy court's conclusion that Terry is not an insider.

---

[41]Neutra and Highland also contend that § 1129(a)(5)(A)(i) requires disclosure of the corporate structure of the reorganized debtor, and that the confirmed Plan is deficient because it merely states that Terry will have control over the structure of Acis instead of defining that structure in advance. In support of this argument, Neutra and Highland cite *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 765-66 (Bankr. N.D. Ill. 2013). But the plan in *GAC Storage* did not fail because it left the management structure of the reorganized debtor undefined; rather, it failed because it did not disclose that the reorganized debtor's sole owner "intend[ed] to bring on either himself or another entity which he would control as the manager of [the debtor] and that the manager would have a 1% ownership interest in [the debtor]." *Id.* at 766. Thus *GAC Storage* is not controlling.

- 74 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-1   Exhibit 19   Page 97 of 85   Page 1096 of 1104   PageID 17230

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 75 of 84   PageID 98068

11 U.S.C. § 101(31) provides a list of persons who are considered to be "insiders" of the debtor based on their relationship with the debtor.  A person not included in the statutory list can nonetheless qualify as a "non-statutory insider" under certain circumstances.  In deciding whether a person is a non-statutory insider, the court considers two factors: "(1) the closeness of the relationship between the [putative insider] and the debtor; and (2) whether the transactions between the [putative insider] and the debtor were conducted at arm's length." *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992); *accord In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002).  Highland and Neutra contend that a person can be a non-statutory insider based on his relationship with a statutory insider of the debtor, regardless of his relationship with the debtor itself.  *See A. Tarricone*, 286 B.R. at 263-64. They then assert that the Trustee, as a person in control of the debtor, is a statutory insider. *See In re GSC, Inc.*, 453 B.R. 132, 158 n.31 (Bankr. S.D.N.Y. 2011).  The court will assume *arguendo* that these legal assertions are correct.  Highland, Neutra, and the Trustee agree that the bankruptcy court's determination of insider status is a question of fact that is reviewed for clear error.  *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, ___ U.S. ___, 138 S. Ct. 960, 966 (2018).

Highland and Neutra posit that the relationship between the Trustee and Terry is unusually close.  The controlling question under the first factor is whether the relationship is close enough for the alleged insider to gain advantage due to affinity.  *See In re Rexford Props., LLC*, 557 B.R. 788, 797 (Bankr. C.D. Cal. 2016).  Among the indicators of closeness cited by Highland and Neutra are: that the lawyers who represented Terry in the filing of the

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-19 Filed 09/23/8 5age 1097 of 1104    PageID 17231
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 76 of 84    PageID 98069

involuntary petitions now represent the Trustee; that the Trustee relied on Terry's financial advice for a period of time after the Trustee's appointment; that Terry's expert witness in the arbitration was engaged by the Trustee to testify at the confirmation hearings; that Terry's counsel in related litigation in Guernsey testified as an expert at the confirmation hearings; and that Terry introduced Oaktree to the Trustee's predecessor. As for whether the Plan was negotiated at arm's length, Highland and Neutra point out that the Trustee did not solicit competing bids for Acis' equity, and that there was essentially no negotiation between the Trustee and Terry regarding that price.

But after reviewing the record, the court is not "left with the definite and firm conviction that a mistake has been committed." *Johnson Sw.*, 205 B.R. at 827 (quoting *Placid Oil*, 158 B.R. at 412). The Trustee testified that, before the bankruptcy cases, he had no relationship with Terry—and after he was appointed, his relationship with Terry was typical of that between a trustee and the debtor's largest creditor. He relied on Terry's financial advice for a brief time out of necessity, not affinity. Terry appears to have been represented by independent counsel in his dealings with the Trustee. The lack of an auction can be explained by the Trustee's assertion—credited by the bankruptcy court—that no other creditor was a logical choice to be Acis' equity owner. And the record indicates that there was at least some negotiation between Terry and the Trustee regarding the amount of the reduction of Terry's claim against the estates. Indeed, according to the Trustee's testimony, Terry thought the price for Neutra's equity was *too high*, but the Trustee held firm and Terry gave in. These facts plausibly support the findings that Terry and the Trustee were not so

- 76 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-1  Filed 09/23/ Page 1098 of 1104    PageID 17232

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 77 of 84    PageID 98070

close as to give Terry an advantage based on affinity, and that the Plan was negotiated at arm's length. The bankruptcy court thus did not commit clear error by finding that Terry was not an insider.[42]

C

Highland and Neutra's remaining § 1129(a)(5) arguments—that Terry's appointment as Acis' new equity owner is contrary to the interests of creditors, investors, and the public—are unavailing.

Highland and Neutra first contend that "[c]onfirmation of a Chapter 11 plan of reorganization that was designed to allow an *insider* to obtain ownership of the reorganized debtor for an improper purpose is against public policy." Highland & Neutra Third Appeal Br. 43 (emphasis added) (citing *In re S. Beach Sec., Inc.*, 606 F.3d 366, 371 (7th Cir. 2010)). But Terry is not an insider, and—as discussed *supra* at § VIII(A)(3)—he pursued Acis' involuntary bankruptcy in good faith and for a proper bankruptcy purpose.

Highland and Neutra also assert that "a bankruptcy court must, by considering the broader public policy interests, prevent the appointment of a proposed leader who has a conflict of interest or other financial or personal affiliation that would make his or her control inappropriate." Highland & Neutra Third Appeal Br. 44. They note that Terry is embroiled in a battle with HCLOF over control of the subordinated notes, and with Highland itself over

---

[42]As an additional ground for finding that Terry is an insider, Highland and Neutra assert that Terry had access to voluminous insider information during the pendency of these cases. But they cite no evidence in the record on appeal in support of this assertion.

- 77 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 1-84    Filed 12/29/23    Page 79 of 85    Page 1099 of 1104    PageID 17233

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 78 of 84    PageID 98071

myriad issues in state court. But this assertion is not entirely accurate: it is *Acis*, not Terry, who is battling with HCLOF over the subordinated notes. And even if Terry has disagreements with Highland in state court, this fact is not necessarily dispositive of whether the Plan is in the public interest. According to case law cited by Highland and Neutra, there are numerous factors to consider in deciding whether a proposed plan is in the public interest, and the weight given to each factor varies depending on the circumstances of the case. *See In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014). Relevant factors include whether the appointment "perpetuate[s] incompetence, lack of direction, [or] inexperience," and whether "the individual [is] capable and competent to serve in the proposed capacity assigned to him." *Id.* The bankruptcy court found that Terry is "well qualified to reorganize" Acis and that his new role "will be similar to the role he very successfully performed for" Acis. *Acis II*, 2019 WL 417149, at *14. Giving appropriate weight to all of the public policy factors in the context of this case—particularly in light of the bankruptcy court's finding that Highland has "unclean hands," *id.* at *10—the court concludes that the bankruptcy court did not clearly err by finding that confirmation of the Plan was consistent with public policy.

## X

Finally, the court considers the contention of Highland and Neutra that the Plan does not satisfy the cram-down requirements of 11 U.S.C. § 1129(b).

It is familiar jurisprudence that the acceptance of all impaired classes of claims or interests required by § 1129(a)(8) is not necessary for plan confirmation when § 1129(b) is

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-19 Filed 12/23/23 Page 3 of 85  Page 1100 of 1104   PageID 17234

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 79 of 84   PageID 98072

satisfied.  Section 1129(b) permits confirmation when all other requirements of § 1129(a) are

met and "the plan does not discriminate unfairly, and is fair and equitable, with respect to

each class of claims or interests that is impaired under, and has not accepted, the plan."

§ 1129(b)(1).  The court reviews the bankruptcy court's finding that the cram-down

requirements are met for clear error.  *See In re Block Shim Dev. Co.-Irving*, 118 B.R. 450,

452 (N.D. Tex. 1990) (Fitzwater, J.).

Highland and Neutra challenge the bankruptcy court's finding that the Plan meets

these requirements, contending the Plan is neither fair nor equitable to them, in violation of

§ 1129(b)(1).[43]  More specifically, Highland and Neutra assert that the Plan violates the

absolute priority rule and its corollaries.

Under the absolute priority rule, "fairness and equity require[] that 'the creditors . . .

be paid before the stockholders [can] retain [equity interests] for any purpose whatever.'"

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 444 (1999)

(last alteration in original) (quoting *N. Pac. R.R. Co. v. Boyd*, 228 U.S. 482, 508 (1913)).

The reason for the rule is "the danger inherent in any reorganization plan proposed by a

debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners."

*Id.*  The rule is embodied in § 1129(b)(2)(B)(ii).  *See LaSalle*, 526 U.S. at 449.  The debtor's

old equity owners *can* retain their interest in the debtor if they contribute new value to the

bankruptcy estate, and this new value "makes the senior creditors (and the estate as a whole)

_____

[43]Highland and Neutra also argue that the requirements of § 1129(a)(3) are not met.
For the reasons discussed *supra* at § VIII, the court rejects this argument.

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 84 Filed 08/23 Page 3 of 85 Page 1101 of 1104 PageID 17235
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 80 of 84 PageID 98073

better off." *In re Castleton Plaza, LP*, 707 F.3d 821, 821 (7th Cir. 2013). The way to assess whether the value contributed by the old equity owners makes the senior creditors better off is to allow for a market valuation of the debtor's equity. *See LaSalle*, 526 U.S. at 454-58.

Highland and Neutra contend that the Plan violates the absolute priority rule because there was no market test to assess the value of Acis' equity—instead, the Trustee unilaterally selected the $1 million number without soliciting competing bids. But the absolute priority rule, by its own terms, only applies when the debtor's old equity owners will retain their equity interest after bankruptcy. *See LaSalle*, 526 U.S. at 444. Where, as here, a non-insider creditor becomes the debtor's new owner, there is no "danger . . . that the plan will simply turn out to be too good a deal for the debtor's [old] owners." *Id.* Whatever the significance of the Trustee's failure to solicit competing bids, it does not violate the absolute priority rule in this instance.

Highland and Neutra also argue that the Plan violates a corollary of the absolute priority rule: "that a senior class cannot receive more than full compensation for its claims." *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)). They assert that "to obtain confirmation of a reorganization plan that completely extinguishes equity interests, the plan's proponent must prove that there is no value left once the creditors have had their turn." Highland & Neutra Third Appeal Br. 47 (quoting *In re Dave's Detailing, Inc.*, 2015 WL 4601726, at *16 (Bankr. S.D. Ind. July 30, 2015)). This, in turn, requires a showing that no creditor is paid more than in full. *See In re MCorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D.

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-1   Filed 03/23/2 Page 1102 of 1104   PageID 17236

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 81 of 84   PageID 98074

Tex. 1992), *abrogated on other grounds by In re Briscoe Ents., Ltd., II*, 994 F.2d 1160, 1164 n.11 (5th Cir. 1993). Highland and Neutra maintain that the Plan violates this rule in two ways.

First, they contend that the bankruptcy court wrongly inflated the value of the secured portion of Terry's partially-secured claim from approximately $634,000 to $1 million. This argument rests on an erroneous understanding of the Plan. The Plan reduces the *total* value of Terry's partially-secured claim—i.e., the sum of both the secured and unsecured portions of his claim—by $1 million, and then treats the remaining *total* balance of Terry's claim as a general unsecured claim. The Plan does not inflate the value of his secured claim.

Second, Highland and Neutra argue that, without a market test of Acis' value, the bankruptcy court could not have determined whether Terry was overcompensated when he received Acis' equity in exchange for a $1 million reduction in his claim. But there *was* a market valuation in the present case. In *LaSalle* the Supreme Court suggested (but did not decide) that the termination of exclusivity—i.e., allowing any interested person to submit a competing reorganization plan—can constitute a sufficient market test of a debtor's value. *See LaSalle*, 526 U.S. at 458. Since then, courts have concluded in a number of cases that opening the bankruptcy process to competing plan proposals is a valid market test. *See H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 WL 2261483, at *7 (D. Md. June 3, 2011) ("Indeed, if the Bankruptcy Court simply allowed Roebuck to file a competing plan, and the creditors found that plan to be inferior, they could still vote for Alter's original plan, and [*LaSalle*] would have been satisfied."); *Dave's Detailing*, 2015 WL 4601726, at *18

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 19-84   Filed 10/23/23   Page 1103 of 1104   PageID 17237

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 82 of 84   PageID 98075

("The termination of exclusivity provides an open market for competition in the form of competing plans."); *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 866 (Bankr. D. Mass. 2000) ("[T]he competing plan approach provides for a more informed process for creditors and to interested bidders than an auction of equity interests in the context of a Debtor's plan."); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 716-17 (Bankr. N.D. Ga. 1996) ("Competing plans certainly would foster alternate bids for control of the reorganized debtor, and would thereby dispel any concerns regarding the necessity and value of the shareholder's offer."); *In re SM 104 Ltd.*, 160 B.R. 202, 227 (Bankr. S.D. Fla. 1993) ("[A]t least in all but the largest bankruptcy cases, the disclosure and confirmation procedures provided by Chapter 11 offer an acceptable alternative for marketing the ownership interests of the reorganized debtor.").[44]

No party in the present case held the exclusive right to propose a reorganization plan. Highland and Neutra could have proposed a competing plan if they believed that the Trustee's plan undervalued Acis' equity. They did not do so. Thus the bankruptcy court did not err by approving a Plan that valued Acis' equity at $1 million.

---

[44]Highland and Neutra's argument to the contrary, based on the Seventh Circuit's opinion in *Castleton*, 707 F.3d 821, is unpersuasive. The court in *Castleton* concluded that the termination of exclusivity was insufficient to constitute a market test in the context of the absolute priority rule. *See id.* at 823-24. The court applied that rule because the person receiving the debtor's equity under the plan was an insider. *See id.* In contrast, Terry is not an insider, and the absolute priority rule does not apply in the present case. *See Dave's Detailing*, 2015 WL 4601726, at *18 ("The holding in *Castleton Plaza* applies to shareholders or insiders—not to non-insider third parties—obtaining equity in a reorganized debtor.").

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-4   Filed 12/29/23   Page 84 of 85   Page 1104 of 1104   PageID 17238
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 83 of 84   PageID 98076

XI

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal. It maintains that, once the Plan took effect, Acis became the Trustee's successor-in-interest. But as Acis recognizes, "the Federal Rules of Bankruptcy Procedure applicable to this case, those numbered 8001-8028, do not provide a specific rule governing substitution of parties in bankruptcy appeals to the district court." Acis Mot. Substitute 3. Acis also fails to cite, and the court has not found, any case in which a district court allowed such party substitution while an appeal was pending. Accordingly, the court in its discretion denies Acis' motion. *Cf. Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th Cir. 1985) (holding that substitution of parties under an analogous rule, Fed. R. Civ. P. 25(c), is within court's discretion). If Acis wishes to take the place of the Trustee in any further appeal to the Fifth Circuit, it may make a request under the procedure prescribed by Fed. R. App. P. 43.

\* \* \*

In the First Appeal, the clerk is directed to strike ECF Doc. No. 2 from the docket of No. 3:18-CV-1084-D and to refile that document in No. 3:18-CV-1057-D with a filing date of April 27, 2018.

The court DISMISSES the appeals of the orders denying intervention in Nos. 3:18-CV-1056-D and 3:18-CV-1084-D, and DISMISSES the appeals of the orders for relief in Nos. 3:18-CV-1057-D and 3:18-CV-1073-D.

The court AFFIRMS the Break-Up Fee and Expense Reimbursement order at issue